AGREEMENT made of this 1st day of June, 1985, by and between SUNBOW PRODUCTIONS, INC. ("Company"), whose business address is 380 Lexington Avenue, Suite 1105, New York, New York 10168, and KINDER & BRYANT LTD. ("Contractor") whose business address is 41 West 73rd Street, New York, New York 10023, f/s/o Anne Bryant and Ford Kinder (jointly referred to as "Writer").

In consideration of the mutual covenants herein contained, the parties hereto have agreed and do agree as follows:

1. Company hereby engages Contractor and Contractor hereby accepts such engagement, to furnish the services of Writer to Company for the purpose of writing, preparing and delivering to Company original musical material (hereinafter referred to as the "Music") for songs to be used in a fully-animated children's television show consisting of either five one-half hours, fifteen segments, or a television motion picture, presently entitled "JEM" (the "Show")(it being understood that the mention of the Show is for purposes of identification only and shall in no way restrict Company's rights in the Music, and the use thereof, as set forth in this Agreement). The number of songs for which music is to be written and delivered by Writer hereunder shall be determined by Company. The Music shall be delivered to Company in accordance with a schedule to be mutually determined by the Company and Contractor.

2. (a) For all rights herein granted to Company in the Music, and for performance by Contractor of all obligations hereunder (including but not limited to composing and arranging the Music, supervision of the orchestra recording of the Music for the Show, and Company's right to use the Music on and in connection with phonorecordings sold or distributed in conjunction with merchandise based on the Show ["Premium Cassettes"]), Company shall pay Contractor a fee of Two Thousand Two Hundred ($2,200) Dollars for each song for which Writer writes and delivers the Music, payable on delivery thereof.

(b) Payment by a parent or affiliate of Company shall be deemed to constitute payment by Company hereunder. Nothing herein contained shall be deemed to impose any obligation on Company to use or authorize the use of the Music, and Company shall have fully discharged its obligations to Contractor hereunder by payment to Contractor of the amount specified in subparagraph (a) of this Paragraph 2.

3. Contractor shall deliver one (1) copy of the Music to Company as Company shall designate.

4. It is understood and agreed that Writer may write the Music at such times and places as Writer may choose, subject only to Contractor's obligation to make timely delivery of the Music in accordance with the terms of this Agreement.



PLAINTIFF'S EXHIBIT 48d

SUN 0870

5. (a) Contractor warrants, acknowledges and agrees that the Music to be written by Writer and delivered by Contractor is to be written by Writer under and pursuant to an employment agreement between Contractor and Writer pursuant to which Contractor is entitled to the exclusive services of Writer, and to all the results of Writer's services; that the Music was specifically ordered and commissioned by Company for use as part of an audiovisual work; and that the Music is a work made for hire within the meaning of Section 101 of the United States Copyright Act. Upon writing of the Music, all right, title and interest therein shall automatically vest in Company and Company shall be the sole and unlimited owner thereof and of all rights therein throughout the world forever, and Company shall be entitled to copyright therein, including statutory copyright and all renewals thereof, as copyright author and proprietor. Company may freely assign and grant rights and licenses with respect to the Music and any copyrigt therein (including any renewals thereof), and in this connection Contractor agrees to execute and deliver and/or cause Writer to execute and deliver to Company any and all instruments required by Company in connection with the use and enjoyment of the Music and of Company's rights therein and thereto. Contractor hereby appoints Company as Contractor's and Writer's attorney-in-fact with the right but not the obligation to execute any such instruments in Contractor's or Writer's name on Company's behalf. On execution hereof, Contractor shall sign and shall cause Writer to sign the Certificate of Authorship attached hereto for the Music.

(b) Without in any way limiting the generality of the foregoing, it is agreed that Company shall have the exclusive right and may license others to use, adapt, arrange, change, add to, or subtract from the Music and to combine the same with other literary material and/or lyrics and to publish, record, produce, reproduce, transmit, perform, broadcast, telecast, and/or otherwise communicate the same or any version or versions thereof by any means (including, but not limited to, in synchronization with motion pictures, television and/or any other form of recordation or reproduction of sight and/or sound), whether now known or hereafter devised, publicly for profit or otherwise, it being understood that Contractor and Writer hereby waive any so-called "moral rights" which may now be or may hereafter be recognized. It is understood and agreed that neither Contractor nor Writer shall have any right, title or interest in any other literary material and/or lyrics which may be combined with the Music.

(c) During any period or periods of time during which Writer is affiliated with any small performing rights society (herein called the "Society"), Company shall and does hereby, under and pursuant to this Paragraph, license back to Writer the so-called "writer's share" (i.e., fifty (50%) percent) (but, if the Music or any form thereof are the composition of

- 2 -

0040H

Writer and other composers and/or lyricists, then the grant hereunder shall be deemed a grant of the "writer's share" to Writer and all other such lyricists and/or composers jointly except that for instrumental uses, only Writer and any other composer(s) shall share in the "writer's share") in the non-dramatic (i.e., "small") performing rights in the Music so as to enable Writer to license such non-dramatic performing rights to Society, and to collect the "writer's share" of royalties derived therefrom, it being understood, in this connection, that Company (or any assignee or licensee of all or any of Company's rights under this Agreement) shall not exercise such non-dramatic performing rights during such period or periods without obtaining a license therefor from Society, except that Company and/or any such assignee or licensee, may exercise such non-dramatic performing rights in the Music by reason of, under and pursuant to this Agreement,

    (i)  during any period or periods during which such non-dramatic performing rights are not controlled by and/or available for license to Company or any such assignee or licensee at standard rates from Society, or in the case of public performances of the Music in geographical areas outside of Society's jurisdiction, from any other organization or society which is affiliated with Society or which has a collection agreement with Society and which controls the non-dramatic performing rights in any geographical area in which the Music is to be performed; and/or

    (ii)  in connection with theatrical exhibitions in the United States, its territories and possessions; and/or

    (iii)  in connection with any performance of the Music within the United States, its territories and possessions, which is not a public performance;

it being understood that Company (and/or any such assignee or licensee) shall have no obligation to pay any royalties or other sums to Writer, Contractor, Society, or any successor to the rights of any of them with respect to non-dramatic performances of the Music made pursuant to subclauses (i) through (iii) hereof. If Company makes or authorizes any non-dramatic performances of the Music under and pursuant to this Agreement, and if Writer or Contractor shall assert any claim that any such performance violates any rights of Writer or Contractor, then (A) under no circumstances shall Writer or Contractor have the right to take any action or initiate any proceeding with respect to such claim which would have the effect of enjoining and/or preventing and/or otherwise interfering with any said non-dramatic performances, it being agreed that any such action or proceeding shall be limited to an action at law for damages; and (B) if Writer or Contractor

shall assert such a claim pertaining to a non-dramatic performance of the Music made by any assignee or licensee of Company, then any action taken or proceeding brought by Writer or Contractor shall be limited to an action at law for damages against such assigee or licensee exclusively. The foregoing references to Society shall not be construed as giving Society any independent right to take any action or initiate any proceeding against Company or any of its assignees or licensees with respect to any such claim.

    (d) Without limiting the generality of any rights granted under this Agreement, and notwithstanding any license hereunder to Writer pursuant to subparagraph (c) above, Writer and Contractor expressly acknowledge that Company, its successors, assigns and/or licensees shall have the right to collect the "publisher's share" of performance royalties becoming due and payable hereunder from any small performing rights society by reason of performances of the Music, it being expressly agreed that Writer and Contractor shall not be entitled to any share of such monies which are distributed to Company, its successors, assigns, and/or licensees by any small performing rights society. Writer shall be entitled to collect the "writer's share" of any such royalties with respect to the Music jointly with any other lyricists and/or composers of such Music. The terms "publisher's share" and "writer's share" as used in this Agreement have the same meaning here as is commonly understood in the music publishing and motion picture and television industries. Company may represent to any domestic or foreign performing rights society or similar organization requiring an acknowledgement of the type made by Writer herein that Contractor and Writer have acknowledged Company's right to collect and retain the publisher's share of royalties; further, if any such society or organization requires written authorization from Writer or Contractor in order to make payments of the publisher's share of royalties to Company, Writer and Contractor shall promptly execute and deliver such authorization. If any such society or organization makes payment to Writer or Contractor of all royalties (<u>i.e.</u>, both "writer's" and "publisher's" share) with respect to any performance to Writer, Contractor shall promptly remit one-half (1/2) of such royalty to Company.

    6. Further, in the exercise of its rights hereunder and without in any way limiting the generality of the foregoing, Company shall have, as owner and copyright proprietor of the Music, the complete control of the publication of the Music and of all rights incident thereto, including, but not limited to, the right to license the manufacture of phonograph records and other recordings of the Music and the right to license motion picture synchronization rights (all of which rights are herein sometimes collectively called "music publishing rights"). Without limiting the generality of the foregoing, it is agreed that Company may assign or license any or all such music publishing rights and/or any or all other rights granted to Company under this Agreement to

0040H

- 4 -

SUN 0873

any music publishing company or production company which is a parent or subsidiary of Company or otherwise affiliated with Company or to any other third party.

(a) With respect to Company's exercise of music publishing rights in the Music (as defined above)(but excluding use in connection with Premium Cassettes as defined in Paragraph 2(a) for which Contractor shall not receive any further compensation), uses of the Music combined with lyrics (but, if the Music with lyrics or any form thereof is the composition of Writer and other composers and/or lyricists, then the royalties hereunder shall be shared equally by all such lyricists and/or composers):

(i) sums equal to fifty (50%) percent of the net proceeds (as defined below) received by Company from third parties for licenses for the manufacture or commercial phonograph records and/or licenses of theatrical motion picture synchronization rights (as defined below);

(ii) for regular piano copies, if any, sold and paid for at wholesale in the United States and/or Canada, sums equal to eight cents (.08) per copy for the first one hundred thousand (100,000) copies sold, and ten cents (.10) per copy for copies sold in excess of 100,000;

(iii) sums equal to fifty (50%) percent of net proceeds received by Company from third parties for regular piano copies, if any, sold and paid for at wholesale outside of the United States and/or Canada;

(iv) with respect to orchestrations, including band arrangements, if any, sold and paid for at wholesale anywhere in the world, sums equal to ten (10%) percent of the wholesale price therefor, after trade discounts;

(v) with respect to any songbook, folio or similar publication, if any, sold and paid for at wholesale anywhere in the world, sums equal to the amount resulting from dividing ten (10%) percent of the wholesale price, after trade discounts, therefor by the total number of copyrighted musical compositions contained in such publication;

(vi) with respect to other uses of the Music hereunder, sums equal to the amount resulting from dividing fifty (50%) percent of the net proceeds received by Company from third parties therefor by the total number of copyrighted musical compositions and/or literary materials contained or included in such uses.

0040H

SUN 0874

No royalties shall be payable hereunder for professional material not sold or resold; further, no royalties shall be payable to Writer with respect to uses of the Music except as hereinabove expressly set forth. The term "theatrical motion picture rights" as used herein refers to synchronization rights granted with respect to motion pictures intended primarily and initially for theatrical release by direct projection before paid-admission audiences; in no event shall such term refer to motion pictures or other methods of recordation, whether now known or hereafter devised, which are produced primarily and initially for television broadcasting by any means whatsoever. The term "net proceeds" as used hereinabove, shall mean all monies (including advances) actually received by Company (or any assignee of Company's rights or licensee hereunder) which are directly attributable to licenses issued authorizing the manufacture of commercial phonograph records and/or licenses relating to theatrical motion picture synchronization rights, and/or for the exercise of publication rights referred to in subclause (iii) above, as the case may be, after the deduction of all costs, expenses, fees and commissions which are directly attributable to the exploitation of the Music and combined music by way of commercial phonograph records or by way of theatrical motion picture synchronization, or by way of publication, as the case may be, computed in accordance with good and standard practices. In the event that Company licenses the Music in a form containing music or other literary materials written or composed by any third party or parties, then Contractor's royalties thereon, shall be reduced proportionately to an amount equal to the royalties payable hereunder divided by the number of composers and lyricists (including Writer) who have furnished materials and services for such use and who are entitled to receive royalties from Company, provided that in no event shall Writer receive less than one-half of the royalty Writer would otherwise be entitled to receive hereunder. Company shall render royalty statements to Contractor, accompanied by any remuneration due Contractor, such statements to be rendered at least twice during each calendar year during which royalties are payable.

   (b) If, for any reason, exportation of money to the United States from any foreign country, territory or place should be prohibited, prevented or rendered commercially impracticable, the amount received by Company (if Company's share thereof is actually paid to Company in such foreign country, territory or place) shall not be considered gross receipts hereunder unless and until the same shall have actually been received in the United States in United States currency, less any discounts, losses, costs or expenses suffered by or imposed upon Company with respect to transmittal of such money to the United States and the conversion thereof to United States currency; provided, however, that if Contractor so requests in writing, that portion of such blocked or frozen funds which would represent Contractor's share of net proceeds of such gross receipts, but for being frozen or blocked, shall be deposited in Contractor's name in any bank or

0040H

- 6 -

SUN 0875

depository designated by Contractor in such country wherein such funds are blocked or frozen subject to the laws of such country with respect to such deposits and withdrawals by Contractor therefrom. Contractor shall have the right at Contractor's sole expense to inspect Company's books and records relative to gross receipts derived from use of the Music hereunder and to make extracts thereof provided such inspection shall be made at Company's offices during reasonable business hours and upon reasonable notice and not more frequently than once per year. All royalties, statements and other accounts rendered by Company shall be binding upon Contractor and not subject to any objection by Contractor unless specific objection in writing, stating the basis thereof, is given to Company by Contractor by one (1) year from the date rendered.

(c) If Company assigns or licenses any uses of the music publishing rights to any third party (including any aforementioned subsidiary or affiliated company) and if Company authorizes such third party to account directly to Contractor with respect to royalties payable to Contractor by reason of any such uses of such music publishing rights, then Contractor agrees that, during the term of any such assignment or license, Writer shall look only to such assignee or licensee for payment of such royalties (and shall be entitled only to inspect such assignee's or licensee's books and records relative to uses of the Music at reasonable business hours and at such assignee's or licensee's offices), provided that Company shall not be relieved of its obligations with respect thereto unless the assignee is a parent, subsidiary or affiliate of Company, or a recognized distributor of motion pictures or television programs, or a "major" motion picture company (as that term is understood in the motion picture industry), or a "major" television network (as that term is understood in the television industry), or a "major" record company or music publishing company (as those terms are understood in the music industry).

(d) Contractor acknowledges that Company has not made and is not hereby making any representation or warranty with respect to the amount of royalties, if any, which may be derived from uses of music publishing rights, it being further understood that nothing herein shall be deemed to impose any obligation on Company to use or authorize the use of the Music and/or any music publishing rights derived therefrom.

7. Company agrees that:

(a) if the description of the Music in Paragraph 1 of this Agreement refers to a particular television program in connection with which such Music may be used, and if such Music or a substantial portion thereof are used in connection with such program or are otherwise used hereunder, then Company shall give Writer (or cause Writer to be given) credit as Writer of such

0040H

- 7 -

Music or as a writer of the television series on all release prints of such programs. Company further agrees to use best efforts to have Writer given credit in connection with other uses of the Music;

   (b) if any of the Music as described in Paragraph 1 of this Agreement is used as Music for the theme song for a television pilot program and/or television series, then Company shall give Writer (or cause Writer to be given) credit on all release prints of any such program in which such theme song is used as the theme song, as Writer of the Music of such theme song.

The form, style, size, placement and nature of any credit provided for herein shall be determined by Company (or its assignee or licensee) in its sole discretion except that Company agrees that the identification of Writer shall be in the form "Kinder and Bryant." Any unintentional and/or inadvertent failure to give credit as above provided, whether because of lack of broadcast time or otherwise, shall not be a breach of this Agreement.

  8. Company shall have the right and may grant to others the right to use, disseminate, reproduce, print and publish Writer's name, likeness, voice and biographical material concerning Writer as news or informative matter and in connection with advertising and for purposes of trade in connection with any motion picture or television program in which the Music is used, and/or in connection with any other uses of the Music. The rights granted herein shall not include the right to use or to grant to others the right to use Writer's name, voice, likeness and biographical material in any direct endorsement of any product or service without Writer's prior written consent.

  9. Contractor hereby warrants that Contractor is free and able to enter into and fully perform this Agreement, to furnish the services of Writer, and to grant all rights herein granted. Further, Contractor warrants that the Music in the form in which it is delivered shall be wholly original with Writer and shall not be copied from any other work and shall not, nor shall the use thereof, infringe or violate the copyright or any common law right or any personal, proprietary, or other right of any kind whatsoever of any person, firm, corporation or association. If any of the Music delivered hereunder is described as based upon traditional or public domain compositions, Contractor warrants that such compositions are in the public domain throughout the world and that Writer's treatment of such compositions is original and shall not be copied from any work other than such public domain compositions, nor shall the use thereof infringe or violate the copyright or any common law right or any personal, proprietary or other right of any kind whatsoever of any person, firm, corporation or association. Notwithstanding the foregoing, if any of the Music delivered hereunder is described as based upon materials furnished by Company or as based upon traditional or

public domain compositions furnished by Company, Contractor makes no warranty as to the originality or ownership of such materials or compositions furnished by Company.

10. Contractor shall indemnify and hold Company, its successors, assigns and licensees, any network and/or stations over which the Music shall be broadcast, the sponsors, if any, of any program on which they are broadcast, and their advertising agencies, if any, and any other parties who shall utilize the Music or any part thereof in any way with Company's permission, and the directors, officers, agents and employees of any of the foregoing, free and harmless from any and all claims, damages, liabilities, costs and expenses, including reasonable counsel fees, arising out of any breach by Contractor of any warranty or agreement made by Contractor herein, in an amount not to exceed the monies paid to Contractor by Company hereunder.

11. It is understood and agreed that all or part of this Agreement and all the results and proceeds thereof may be assigned by Company to any third party without Contractor's consent and in this event, Company's successors and/or assigns shall be entitled to any and all rights, privileges, and equities to which Company is entitled under and by virtue of this Agreement. In the event of such an assignment, Company shall not be relieved of its obligations hereunder unless the assignee is a parent, subsidiary or affiliate of Company or a recognized distributor of motion pictures or television programs, or a "major" motion picture company (as that term is understood in the motion picture industry), or a "major" television network (as that term is understood in the television industry), or a "major" record company or music publishing company (as those terms are understood in the music industry).

Nothing in this Agreement shall in any way derogate from, diminish or impair any rights granted to the Company or to any parent, subsidiary or affiliate of Company under any other agreement entered into between Writer and Company or any parent, subsidiary or affiliate thereof.

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their successors, assigns and licensees.

12. Company agrees to furnish Contractor with cue sheets of the Music within sixty (60) days of the initial broadcast of the Show.

13. (a) This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to contracts entered into and fully to be performed therein.

One Revision:

- 9 -

004 OH

(b)  A waiver by either party of any of the terms and conditions of this Agreement in any one instance shall not be construed to be a waiver of such term or condition for the future, or of any subsequent breach thereof.  All remedies, rights, undertakings, obligations and agreements contained in this Agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either party.

(c)  This Agreement contains the entire understanding of the parties hereto relating to the subject matter herein contained and this Agreement cannot be changed, rescinded or terminated orally.

(d)  If any provisions of this Agreement as applied to any party or to any circumstances shall be adjudged by a court to be void or unenforceable, the same shall in no way affect any other provision of this Agreement, the application of such provision in any other circumstances or the validity or enforceabililty of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

SUNBOW PRODUCTIONS, INC. ("Company")

By: _____
       Its

KINDER & BRYANT LTD. ("Contractor")

By: _____
       Its

0040H

- 10 -

SUN 0879

Schedule A

Anne Bryant and Ford Kinder ("Writers") hereby certify that they wrote certain original music as employees of KINDER & BRYANT LTD. ("Contractor") in the regular course of their employment. Contractor hereby certifies that Contractor was specially commissioned by SUNBOW PRODUCTIONS, INC. ("Company") to furnish the services of Writers to write and deliver said music to Company for use as part of a fully-animated children's television program tentatively entitled "JEM" pursuant to an agreement dated as of _____, 1986. Accordingly, Writers and Contractor acknowledge and agree that the said music is a work made for hire within the meaning of Section 101 of the United States Copyright Act and that Company is the author and owner thereof and is entitled to copyright therein (and all renewals thereof), and all rights of any kind or nature therein, with the right to make such changes therein and uses thereof as Company may from time to time determine as such author and owner.

KINDER & BRYANT LTD.
("Contractor")

Dated:                           By: _____

Dated:                           _____
                                 Anne Bryant

Dated:                           _____
                                 Ford Kinder

0040H

- 11 -

INDUCEMENT LETTER

Dated as of             , 1986

Sunbow Productions, Inc.
380 Lexington Avenue
Suite 1105
New York, New York  10168

Re:  Sunbow Productions, Inc. with
     Kinder & Bryant Ltd./"JEM"

Gentlemen:

Reference is made to that certain agreement dated as of _____, 1986 (herein called the "Agreement") between KINDER & BRYANT LTD. (herein called "Contractor") and you, which, among other things, makes available the services of the undersigned by Contractor to you for the purposes set forth in said Agreement.

As an inducement to you to enter into the Agreement and as a material part of the consideration moving to you for so doing, each of the undersigned hereby represents, warrants and agrees as follows:

1. That the undersigned has heretofore entered into an agreement (herein callled the "Employment Agreement") with Contractor covering the rendition of the undersigned's services for Contractor and that Contractor has the right and authority to enter into the Agreement and to furnish the rights and services of the undersigned upon the terms and conditions therein specified.

2. That the undersigned is familiar with each and all of the terms, covenants and conditions of the Agreement and hereby consents to the execution thereof; that the undersigned shall perform and comply with all of the terms, covenants and conditions of the Agreement on the part of the undersigned to be performed and complied with, even if the Employment Agreement should hereafter be terminated or suspended; that the representations and warranties of Contractor contained in the Agreement are true; that the undersigned shall render all of the services provided for under the Agreement and hereby confirms that there have been granted to Contractor all of the rights granted by Contractor to you under the Agreement; that all notices served upon Contractor in accordance with the Agreement shall be deemed notices to the undersigned of the contents thereof.

0040H

- 12 -

SUN 0881

3. That the undersigned is under no obligation or disability by law or otherwise which would prevent or restrict the undersigned from performing and complying with all of the terms, covenants and conditions of the Agreement on the part of the undersigned to be performed or complied with.

4. That, except in the event that the undersigned is deemed substituted for Contractor as a direct party to the Agreement, pursuant to Paragraph 6 hereof, the undersigned will look solely to Contractor and not to you for all compensation and other remuneration for any and all services and rights which the undersigned may render and/or grant under the Agreement.

5. That you shall be entitled to equitable relief against the undersigned by injunction or otherwise to restrain, enjoin and/or prevent the violation or breach by the undersigned of any obligation of the undersigned to be performed as provided in the Agreement and/or the violation or breach by the undersigned of any obligations or agreements under this present instrument.

6. That if Contractor should be dissolved or should otherwise cease to exist or for any reason whatsoever should fail, be unable, neglect or refuse to perform and observe each and all of the conditions of the Agreement requiring performance or compliance on its part, the undersigned shall at your election be deemed substituted as a direct party to the Agreement in the place and stead of Contractor and, further, that in the event of a breach or threatened breach of the Agreement by Contractor or by the undersigned you shall be entitled to legal and equitable relief by way of injunction or otherwise against Contractor or against the undersigned or both of us in your discretion, in any event without the necessity of first resorting to or exhausting any rights or remedies which you may have against Contractor; all of the foregoing to be to the same extent and with the same force and effect as if the undersigned were a direct party to the Agreement in the first instance and as if in the Agreement the undersigned had personally agreed to render the services therein provided to be rendered by the undersigned and to perform and observe each and all of the terms and conditions of the Agreement requiring performance or compliance on the part of the Contractor or the undersigned or both of us.

Very truly yours,

_____    _____
FORD KINDER                        ANNE BRYANT