UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANNE BRYANT,

          Plaintiff,

   -against-

AB DROITS AUDIOVISUELS, AB PRODUCTIONS, APOLLO'S
CHARIOT MUSIC, BANANA ALERT MUSIC, BEST
ENTERTAINMENT LTD, BLOKKER BV, BRIDGE RIGHTS B.V.,
CARTOON NETWORK, CENCIENTA VIDEO, CHAD
ENTERTAINMENT LLC., COLUMBIA TRISTAR HOME VIDEO
INC., DREAMWORKS LLC a/k/a DREAMWORKS PICTURES,
FILM FACTORY, FLEX MEDIA ENTERTAINMENT, HASBRO
INC., HASBRO INTERNATIONAL, INC., INITIAL S.A.,
LOONLAND UK LTD., MADMAN ENTERTAINMENT INC.,
MAVERICK ENTERTAINMENT LIMITED, MEDIA SALES
GROUP AND LICENSING B.V., MEGA ENTERTAINMENT,
METRODOME GROUP PLC, PARAMOUNT PICTURES CORP.,
PEXLAND INTERNATIONAL (PICTURES) LTD, PROXIMA
FLIMS, RHINO ENTERTAINMENT CO., RHINO HOME VIDEO
CORE, ROUGE CITRON PRODUCTIONS S.A.R.L., SILVER
MEDIA GROUPS S.A., SONY/ATV SONGS LLC [BMI],
SONY/ATV TUNES LLC [ASCAP],  SONY BMG MUSIC
ENTERTAINMENT INC., SONY LEGACY, SONY PICTURES
HOME ENTERTAINMENT INC., SONY WONDER, SUNBOW
ENTERTAINMENT LLC., SUNBOW PRODUCTIONS INC.,
STARWILD MUSIC INC., TALENT PARTNERS INC., TRANS
ENTERTEL TELECOMMUNICATIONS LTD, TV LOONLAND
AG, TV LOONLAND HOME ENTERTAINMENT LTD,
UNICORN TV DISTRIBUTORS LTD., UNION FILMS GROUP,
VIDART LIMITADA, VOLCANO RECORDS, WARNER MUSIC
GROUP, WARNER STRATEGIC MARKETING, WILDSTAR
MUSIC, INC., JOHN AND JANE DOES 1-20, ABC
CORPORATIONS 1-20,

          Defendants.

07-CV-6395 (SHS)(MHD)

---

**DECLARATION OF GLORIA C. PHARES IN SUPPORT OF THE MOTION
OF DEFENDANTS SUNBOW PRODUCTIONS, INC., SONY BMG MUSIC
ENTERTAINMENT, LOONLAND UK LTD., TV LOONLAND HOME ENTERTAINMENT
LTD, METRODOME GROUP P.L.C., SONY/ATV SONGS, INC., SONY/ATV TUNES, INC.,
AND RHINO ENTERTAINMENT CO., TO DISMISS UNDER FED. R. CIV. P. 12(b)(6) ON
GROUNDS OF RES JUDICATA AND COLLATERAL ESTOPPEL**

I, GLORIA C. PHARES, make the following declaration under penalty of

perjury.

        1.     I am a member of Patterson Belknap Webb & Tyler LLP, attorneys for

defendants Sunbow Productions, Inc. ("Sunbow"), Sony BMG Music Entertainment ("Sony

BMG"), Loonland UK Ltd., TV Loonland Home Entertainment Ltd., and Metrodome Group

P.L.C., Sony/ATV Songs, Inc., Sony/ATV Tunes, Inc., and Rhino Entertainment Co. (together,

"Sunbow Defendants"). I am admitted to practice in the State of New York (1988) and the

District of Columbia (1976).

        2.     I was the principal lawyer acting on behalf of defendant Sunbow during

nearly all of the five years in which *Bryant v. Sunbow Productions, Inc. et al.,* Index No. 2821/02

was pending in Rockland County, New York Supreme Court before the honorable Andrew J.

O'Rourke ("State Action"). I am thoroughly familiar with the facts relating to the State Action.

I submit this declaration in support of the Sunbow Defendants' motion to dismiss this action

under Fed. R. Civ. P. 12(b)(6) on the grounds of res judicata and collateral estoppel.

        3.     In recounting the history of the five years of the State Action, I am

omitting events that are not relevant to the Court's consideration of the Sunbow Defendants' res

judicata and collateral estoppel arguments. I have not, for example, described events that

account for three gaps in the course of the litigation: the removal of the case to and remand from

federal court in January and February 2004; a round of briefing in March and April 2004 relating

to the statute of frauds; and Sunbow's perfection of an appeal in 2005-06. To help the Court

identify all relevant documents filed in the case and which of those are also exhibits to this

declaration, I have attached two charts: Exhibit 1-A, which lists all the documents with their

exhibit numbers, and another, Exhibit 1-B, which re-orders Exhibit 1-A by exhibit number.

4.    The following exhibits contain the trial and other hearing transcripts in the State Action.  (These and all subsequent exhibits are attached to this declaration; all copies are accurate copies of the original documents.)

Exhibit 2 is January 2, 2003 (hearing with the court and consolidation of Bryant's 2000 and 2002 cases);

Exhibit 3 is July 6, 2004;

Exhibit 4 is July 7, 2004;

Exhibit 5 is July 8, 2004;

Exhibit 6 is July 9, 2004;

Exhibit 7 is July 21, 2004;

Exhibit 8 is September 13, 2004 (hearing with parties and Court about newly discovered documents);

Exhibit 9 is October  29, 2004 (framed issue hearing on the authenticity of Bryant's signatures, which the State Court confirmed was part of the trial (Exhibit 11 at 20:20-25));

Exhibit 10 is December 1, 2004 (phone conference among parties and Court before the resumption of trial);

Exhibit 11 is December 4, 2006;

Exhibit 12 is December 5, 2006;

Exhibit 13 is December 6, 2006;

Exhibit 14 is December 11, 2006.

v.

## GENERAL BUSINESS RELATIONS OF THE PARTIES

### Parties, Affiliates, and Indemnitors

5.    In the 1980s, Hasbro Inc. ("Hasbro") retained Sunbow, a television production company, to create several animated television series based on various Hasbro toys. For each animated television series (or television movie), Hasbro and Sunbow signed a separate Production License Agreement.  Exhibit 15 includes examples of these agreements.  In addition, Sunbow and Hasbro (and certain affiliates of each of them) executed Standard Terms and Conditions that govern their business relations.  The Standard Terms and Conditions, as amended, is Exhibit 16, and it provides, among other things, that the copyrights in the television productions could be held in Sunbow's name, but that Sunbow would hold the copyrights "in trust" for Hasbro's benefit.  *Id.* at § G (1).  Hasbro was deemed the owner of all musical compositions commissioned for all the productions, and it authorized Sunbow's music publishing companies, Starwild Music, Inc. (affiliated with Broadcast Music, Inc. ("BMI")) and Wildstar Music, Inc. (affiliated with the American Society of Composers, Authors, and Publishers ("ASCAP")), to act as music publishers for that music.  *Id.* at § G(3).

6.    Among Sunbow's obligations under the Standard Terms and Conditions is the requirement that it acquire copyright ownership in the TV Shows and that it not permit any third party (other than Hasbro or a Hasbro affiliate) to share in the ownership of the copyrights or to own or control any publishing interest in the musical compositions created in connection with the TV Shows.  Exh. 16 at § G(3).

7.    In the early 1980s, Anne Bryant formed a company with a fellow songwriter, Clifford (Ford) Kinder, which was eventually called Kinder & Bryant Ltd. ("Kinder & Bryant").  In the 1980s, Sunbow commissioned Kinder & Bryant to write music for several television series, including all those that were the subject of the State Action and this action:  *G.I.*

3

v.

*Joe* (TV Shows and Movie), *Transformers* (TV Shows and Movie), *Visionaries*, *Jem*, *My Little Pony* (TV Shows and Movie), *My Little Pony & Friends*, *Robotix*, and *Inhumanoids* (collectively, the "TV Shows"). Exh. 17 at 29:8-30:5.

        8.     In the 1980s, Kinder & Bryant also wrote advertising jingles for Griffin Bacal, Inc. ("Griffin Bacal"), an advertising company, for Hasbro toys. *See* Exh. 5 at 388:9-15. That jingle work was done pursuant to letter agreements between Kinder & Bryant and Griffin Bacal, on behalf of Hasbro. Exh. 6 at 608:15-609:19. The principals of Sunbow, Jules "Joe" Bacal and Thomas Griffin, were also principals of Griffin Bacal. In 1989, Plaintiff and Kinder had a dispute and Bryant left Kinder & Bryant. Exh. 17 at 80:21-25, 81:20-21, 82:15-84:11.

        9.     For each TV Show, Kinder & Bryant signed an agreement with Sunbow. These were essentially form agreements except for the financial terms. An example of the form agreements is the agreement for the Jem TV Show, which is Exhibit 18. Under each agreement, Kinder & Bryant agreed to write and deliver "Music" (defined to mean the music that Kinder & Bryant were delivering under the agreement) for the relevant "Show" (defined as the particular audiovisual work named in the agreement) as work for hire, meaning that ownership of the copyright in the Music written for the Show arose in Sunbow in the first instance. Exh. 18 at 1, § 1; 17 U.S.C. § 201(B). Kinder & Bryant were members of performing rights societies, and the agreement formally granted to them the right to what is known in the music business (and in the contract) as the writer's share (as distinct from the publisher's share) of performing rights of the Music. *Id.* at 2, § 5. That section also clarifies that Sunbow controls exclusively the right to change the Music or to use it with other material such as lyrics or other literary material and in movies or television shows and that "neither [Kinder & Bryant] nor [Anne Bryant or Ford

4

v.

Kinder] shall have any right, title or interest in any other literary material and/or lyrics which may be combined with the Music." *Id.* at 2, § 5(b).

        10.     The next section (Section 6) of the Jem agreement grants to Kinder & Bryant royalty income from certain narrowly defined licenses of publishing rights in the Music, including mechanical licenses and synchronization licenses to third parties (Exh. 18 at 5, § 6(a)(i)), *i.e.*, no royalty income is due if Sunbow exercises those rights itself. The synchronization licenses are also limited to theatrical motion pictures—the contract specifically excludes any work that is produced primarily and initially for television. *Id.* at 6, § 6(a). Royalties are also due if certain print rights are exercised (*id. at 5,* § 6(a)(ii-v)) and royalties are due from "other uses of the Music," which is defined to mean income from Sunbow's licensing of the Music to third parties (*id.* at 5, § 6(a)(vi) and at 6 ("In the event that [Sunbow] licenses the Music. . . .")), whether alone or in conjunction with other creative work.

        11.     Sunbow paid Kinder & Bryant the consideration set out in each agreement for the delivery of music and for their services as performers. In addition, BMI has paid Plaintiff royalties arising from the public performance of the TV Shows. Beginning in 1996, Sony/ATV Songs, Inc. (affiliated with BMI) and Sony/ATV Tunes, Inc. (affiliated with ASCAP) (together "Sony/ATV") were licensed by Sunbow to administer the publishing rights in the music that Kinder & Bryant composed for the TV Shows. Under that agreement, Sunbow makes extensive warranties and representations, including that it has entered into written agreements with each songwriter and that it is the sole owner of the rights and copyrights in each of the compositions that Sunbow owns, controls, or administers (or will in the future). *Id.* at § 9.01(a) & (b) and § 2. For breach (or alleged breach) of any of those warranties, Sunbow indemnifies the Sony/ATV entities. *Id.* at § 9.04(a). Sony/ATV provides royalty statements to Sunbow; Sunbow in turn

v.

representations and warranties or failure to observe or perform any of their covenants or obligations. *Id.* at 11, § 9.1(j).

14.    In 1999 and 2000, Sunbow Entertainment LLC entered into agreements with Rhino Entertainment Co. d/b/a Rhino Home Video to distribute TV Shows in the United States in the home video market.  Exhibit 22 includes those licenses.  Under those agreements, Sunbow Entertainment LLC warranted that the works will be in copyright throughout the term of the agreements and that "all mechanical, synchronization, master, use," and other third-party clearances in the TV Shows have been obtained and that Rhino will have no additional financial responsibilities with respect to such clearances. *Id.* at 11-12 (Exhibit "A" ¶ (i)(1) & (2)).  It also agreed to indemnify and hold Rhino harmless from any losses incurred in connection with or arising from any breach of its warranties, representations, or covenants. *Id.* at 12 (Exhibit "A" § (i)(4)).

15.    In mid- 2005, Sony BMG succeeded to the recorded music business of SMEI, which includes licensing in the United States the distribution of the TV Shows in the home video market and licensing the music in the TV Shows.  It also succeeded to SMEI's indemnification obligation to pay for Sunbow's defense in the State Action.  Sony BMG (or its predecessors) has continued to license the distribution of the TV Shows in the United States and Canada in the home video market by means of the Rhino licenses.  In 2006, Sony BMG distributed a 20th Anniversary version of the 1986 *Transformers* movie pursuant to the December 21, 2000 license from Sunbow and TV Loonland.

16.    Sunbow is the wholly-owned subsidiary of TV Loonland AG, to which it licenses the right to distribute the TV Shows in the home-video market outside the United States and Canada.  Until December 20, 2007, TV Loonland A.G. licensed Metrodome Group P.L.C.,

7

v.

provides them to Plaintiff (or her lawyer) with a check for the amount of the royalties due to Plaintiff. Exhibits 19 and 83 include the royalty statements. Plaintiff's royalty statements for the periods covering January 1, 2004 and afterwards report royalties for ringtones. Exh. 13 at 68:14-15; Exh. 83. The music administration agreement between Sunbow and Sony/ATV is Exhibit 20.

12.     In 1998, Sunbow was sold to the Sony Wonder division of Sony Music Entertainment, Inc. ("SMEI"). On December 21, 2000, SMEI sold the shares of Sunbow to TV Loonland AG, but retained Sunbow Entertainment LLC. (Sunbow Entertainment LLC was later renamed Chad Entertainment, and then its assets were eventually transferred to SMEI.) As part of the sale of Sunbow to TV Loonland SMEI agreed to indemnify Sunbow for any claim made against Sunbow within a specified time period. Because the State Action was filed within that time period, SMEI was responsible to Sunbow under that indemnity, and it paid for and controlled that defense.

13.     Also on December 21, 2000, Sunbow and TV Loonland AG, Sunbow's parent company, licensed back to SMEI the exclusive, royalty free, perpetual right to distribute the TV Shows in the home video market in the U.S. and Canada and the worldwide audio rights (as defined in the agreement) in the TV Shows. That license, which is Exhibit 21, includes extensive warranties, representations, and covenants, including the warranty that Sunbow has all right, power and authority "to grant the rights herein granted, and . . . to fully perform its obligations hereunder without the consent of any other third party." *Id.* at 10, § 9.1(a)(ii and iii). Sunbow and TV Loonland also indemnify and hold SMEI harmless against all loss, damage, liability, costs and expenses, arising out of or in connection with their breach of their

6

v.

61.7% of whose shares it owns, to distribute the TV Shows in the U.K. home video market; TV

Loonland A.G. licenses its wholly-owned subsidiary, TVL Home Entertainment Ltd, to make

further sublicenses to distribute the TV Shows in certain home video markets in the rest of the

world outside the U.S., Canada, and the U.K. (Examples of these foreign licenses are referred to

in the complaint in the federal action and are posted on the website of Plaintiff's lawyer,

http://litigation.monaghanlawyers.com/bryant.html.) Loonland UK Ltd, another wholly-owned

subsidiary of TV Loonland A.G. has  no role in the distribution of the TV Shows or any other

Sunbow property. All of these licenses include standard warranties and indemnities relating to

ownership of rights in the licensed TV Shows.


## STATE ACTION

### Verified Complaint and Amended Complaint

17.    Plaintiff Ann Bryant filed the State Action against Sunbow on May 21,

2002.   The claims in her original Verified Complaint were conversion, prima facie tort, and

accounting. Exhibit 23 is the Verified Complaint.

18.    In response to Sunbow's October 31, 2002 motion to dismiss based on

statute of limitations grounds and failure to state a cause of action or, alternatively, for a more

definite statement, Plaintiff requested and was granted leave to file an Amended Complaint,

which she did. The factual allegations of Plaintiff's Amended Complaint were essentially

identical to the initial Complaint. The principal changes were the deletion of all the claims—

conversion, accounting and prima facie tort—and the substitution of claims for unjust

enrichment and constructive trust. Exhibit 24 is a copy of the Amended Complaint, which was

entered as of December 2, 2003.

8

v.

19.    The factual allegations of both pleadings focused on Plaintiff's claims that Sunbow had somehow participated in a scheme to alter registrations with BMI, her performing rights society, of songs Plaintiff had written so that she received a lesser share of royalties from BMI than she believed she was entitled to. *Compare* Exh. 24 ¶¶ 1-10 *with* Exh. 23 ¶¶ 1-10. She made no specific allegations about Sunbow's participation in this alleged scheme.

20.    Plaintiff also alleged that Sunbow had used musical compositions she had written for the TV Shows in "movies, videos, television productions, and cd's . . . without compensation to plaintiff or authorization from plaintiff for its use." Exh. 24 at 7, ¶ 3. By this conduct, she asserted that Sunbow was unjustly enriched, that she should be paid "any and all monies received or to be received by defendant Sunbow from the exploitation of the foregoing compositions and that judgment be had in plaintiff's favor for all such monies together with interest and attorney's fees and costs of suit." *Id.* at 7, ¶ 5. Plaintiff also sought the imposition of a constructive trust for "any and all monies received by [Sunbow] or any of it, now or in the future until this matter is finally resolved, from the sale and distribution of any product, cd's, videos, movies, tapes, or any product whatsoever which utilized music from the compositions set forth above and regardless of the source of any such monies received by [Sunbow]." *Id.* at 9, ¶ 7.

21.    Plaintiff's Amended Complaint did not allege breach of any contract, written or oral. Nor did it identify any other basis for her claim of entitlement to "any and all monies" that Sunbow received from exploitation of the TV Shows in new formats or from the use of the music in the TV Shows.

<u>Sunbow's January 2003 Motion to Dismiss</u>

22.    On January 2, 2003, shortly after Plaintiff filed her Amended Complaint, the state judge held a conference and consolidated the State Action with an earlier case that

9

v.

Plaintiff had brought in 2000 against BMI, Kinder, Bacal, and others, making essentially the same allegations. Exh. 2 at 11:21-25. On the same day as the conference with the Court, Sunbow renewed its motion to dismiss on the grounds that (1) any purported change of registrations with BMI were barred by the statute of limitations and (2) Plaintiff had not alleged either a fiduciary or confidential relationship with Sunbow, which is a necessary element of a constructive trust. The state court denied that motion in a decision and order filed on March 18, 2003, which is Exhibit 25, adopting Plaintiff's argument that she ought to be given the opportunity through further discovery to find facts sufficient to support her claims. Exh. 25 at 5-7.

### Bryant's March 31, 2003 Deposition

23.     Sunbow deposed Plaintiff on March 31, 2003. Exhibit 17 is the transcript of that deposition. Plaintiff testified that she did not own the copyrights in the music for the TV Shows, and she did not know who did. Exh. 17 at 34:6-35:2; 39:10-15; 49:13-16. When she wrote these compositions, she did so on a work-for-hire basis. *Id.* at 43:24-44:2; 49:5-12; 109:16-110:2. She added that for the 2100 compositions—commercials, TV Shows, and movies—that she wrote over a seven-year period working with Sunbow or Griffin Bacal "it was always work for hire." *Id.* at 109:6-110:2. When asked if she had written contracts to produce the compositions at issue in the State Action, she said that "Ford Kinder told me that there was a contract. I don't remember ever signing a contract with them, but he was my partner and he said there was a contract at some point in our association with those people." *Id.* at 44:3-9. Plaintiff said that she had never read the contract with Sunbow (*id.* at 46:4-8); when asked about whether the contract addressed copyright ownership of the compositions, she stated: "I can see the work for hire in my mind, yes" (*id.* at 49:5-12).

10

v.

24.     Plaintiff referred frequently during her deposition to the use of music that she had written for the TV Shows having been distributed in the home video market by Rhino or Kid Rhino for several years. Exh. 17 at 172:17-173:7, 178:4-181:10; see also Exh. 26b at 8-9, ¶ 11; exhibits 2(a), 2(b) and 2(c) thereto. After Ms. Bryant testified that she believed that Rhino Home Video had generated money from the production and distribution of videos of the TV Shows, she was asked why Rhino Home Video was not named as a defendant in the lawsuit. Exh. 17 at 182:3-9. Her lawyer immediately interjected that "Well, that goes into legal judgments" and confirmed that he would direct Ms. Bryant not to answer the question. *Id.* at 182:10-23.

<u>Note of Issue and Subsequent Discovery – June 30, 2003</u>

25.     Exhibit 27 is the Note of Issue that Plaintiff filed on June 30, 2003. That same day Plaintiff served Sunbow with a late document request seeking, among other things, documents relating to Bryant's "purported relinquishment of royalties of any type," and "every agreement which defendant [Sunbow] . . . entered into with plaintiff Anne Bryant." Sunbow explained in its November 10, 2003 response that it could not locate any of its signed work-for-hire agreements with Bryant. Sunbow speculated that its original documents relating to the commissioning of creative materials had been destroyed in a flood of a Sunbow storage space in the early 1990s. But Sunbow did produce an unsigned copy of the June 1, 1985 agreement between Sunbow and Kinder & Bryant for the Jem TV Show. Exhibit 28 is the unsigned Jem agreement. It also produced another document indicating that the agreement had been signed, namely, a letter from Kinder & Bryant's lawyer, William Dobishinski, proposing an amendment to the Jem agreement. Exhibit 29 is the amendment that Kinder & Bryant's lawyer proposed. Sunbow continued to search for responsive documents. Exh. 8 at 5:9-13:4. *See* ¶ 50 below.

v.

Sunbow's 2003 Motion for Summary Judgment—Plaintiff Contradicts
Her Deposition Statements and Claims to be a Copyright Owner.

26.    On September 30, 2003, both Sunbow and Bacal moved for summary

judgment based on the statute of limitations and the merits of the unjust enrichment and

constructive trust claims. Sunbow's opening brief is Exhibit 30. Plaintiff opposed and cross-

moved for partial summary judgment (her brief is Exhibit 31), arguing that Sunbow was

equitably estopped from making a statute of limitation arguments because of its fiduciary

relationship with Plaintiff, (*id.* at 24-30) and because she had never signed any agreements with

Sunbow, she was the copyright owner of all the compositions she had written for Sunbow and

entitled to all royalties attributable to those compositions (*id.* at 22-24).

27.    In her November 25, 2003 affidavit supporting her opposition and motion

for partial summary judgment, which is Exhibit 32, Plaintiff stated "I never executed a written

contract with [Griffin Bacal], Sunbow, Wildstar or Starwild concerning the music I composed"

(*id.* at 6,¶ 9). Based on that testimony Plaintiff argued that

> "there is no dispute that plaintiff never signed any contract transferring or
> assigning her rights to her compositions to any of the defendants.
> Accordingly, plaintiff retains all rights to her compositions, and plaintiff is
> therefore entitled to all performance and mechanical royalties, as well as
> sync license fees, attributable to these works," Exh. 31 at 23-24; and
>
> "Ms. Bryant's claim . . . is therefore firmly rooted in the United States
> Copyright Law. As the author of her compositions, Ms. Bryant is the
> owner of the copyrights for those works. 17 U.S.C. § 201(a). Ms.
> Bryant's ownership of the copyright gives her the exclusive right to, in
> relevant parts, 'reproduce the copyrighted work in copies or phonorecords'
> and 'to prepare derivative works based upon the copyrighted work.' *See* 17
> U.S.C. 106(a), (b); *id.* at 35.

28.    Ignoring her deposition testimony that she and Kinder had always worked

with Sunbow pursuant to written work-for-hire agreements (see ¶ 23 above), Plaintiff claimed to

own the copyrights in the music she had composed for Sunbow and stated that she had a

12

v.

"working arrangement and agreement" with "Joe Bacal (on behalf of [Griffin Bacal] and Sunbow)." Exh. 31 at 7, 31; Exh. 32 at ¶¶ 6, 10-22, 27.

29.     In its reply, which is Exhibit 33, Sunbow noted that Plaintiff's contractual relationship with Sunbow was incompatible with her claim of a fiduciary relationship (*id.* at 7-12 & nn.6-8) and explained how Plaintiff's new re-registration claims also failed on the merits (*id.* at 14-18). Sunbow also opposed Plaintiff's untimely motion for summary judgment noting that her new argument was directly contradicted by her own deposition testimony relating both to her work-for-hire relationship with Sunbow (by which Sunbow was the owner of the copyrights in her music) and the existence of written agreements. *Id.* at 18-23. To support its argument, Sunbow provided the unsigned Jem agreement and a letter to Sunbow from Kinder & Bryant's lawyer, proposing an amendment to the Jem agreement, suggesting that the Jem agreement had been signed. *Id.*; Exh. 34 at ¶¶ 11-13 & Exhibits E, F, G to that affirmation; and Exh. 35 at ¶ 10 & Exhibits A, D, E to that affidavit; see ¶ 25 above.

<u>Sunbow's Motion for Partial Dismissal for Lack of Jurisdiction—Dec. 9, 2003</u>

30.     On December 9, 2003, even before the state court ruled on Sunbow's motion for summary judgment, Sunbow moved for partial dismissal for lack of subject matter jurisdiction. It argued that to the extent the state court accepted Plaintiff's new claims that she had never signed any work-for-hire agreements with Sunbow, that she was the copyright owner of the music she had composed, and that she had not transferred to Sunbow the right to make derivative works, Plaintiff was making out a case of copyright infringement for which the state court did not have jurisdiction. Sunbow's memorandum of law is Exhibit 36.

31.     In opposition, which is Exhibit 37, Plaintiff denied that this was a copyright infringement case and argued that her constructive trust claim "centers around the fact that she is either the composer or otherwise entitled to writers royalties, pursuant to the parties'

13

v.

working arrangement/agreement and course of dealing . . . ." Exh. 37 at 2. Plaintiff persisted in claiming that she was "the owner of the musical compositions at issue in this case (*id.* at 3) and rejected as "inadmissible" any reliance on the unsigned Jem agreement, "which they claim somehow governed the parties' entire working relationship" (*id.* at 4 & n.2).

32.    Sunbow's reply, which is Exhibit 38, observed that having raised her claim of copyright ownership and claims "firmly rooted in the United States Copyright Law," Plaintiff was backtracking in order to preserve the state court's jurisdiction. Sunbow agreed that Plaintiff's entitlement to any royalties was based in contract but asserted that the contracts were exemplified by the Jem agreement and that proceeding on that basis was consistent with state court jurisdiction, while Plaintiff's position was not. *Id.* at 3-6.

### Decisions and Orders on Sunbow's 2003 Motions

33.    On December 15, 2003, while Sunbow's motion for partial dismissal was pending, the state court decided Sunbow's (and Bacal's) motions for summary judgment. That decision is Exhibit 39. After a 13-page recitation of the parties' arguments, the state court concluded that there was a triable issue of fact about whether there was a fiduciary relationship with Bacal, but it found that

> plaintiff has woefully failed to demonstrate that it is appropriate to pierce the corporate veil and find that Bacal's identity was one with his production company Sunbow, which of course otherwise had no confidential relationship to plaintiff, so as to render Sunbow potentially liable for alleged wrongdoings which otherwise would be time-barred. Accordingly, the Court finds that any and all claims against Sunbow for alleged wrongdoings which pre-date six years before the commencement of the action against Sunbow in 2002 are time-barred and are hereby dismissed.

*Id.* at 15-16. The state court continued to say that after a careful review of the record and the parties' arguments, it found that "a triable issue of fact is presented with respect to whether

14

v.

plaintiff has any copyright rights in the musical compositions used for the TV shows and whether she is entitled to any royalties with respect thereto." *Id.* at 18.

34.    On December 24, 2003, the state court issued a decision on Sunbow's motion to dismiss, which is Exhibit 40. It denied Sunbow's motion, "as this Court finds that plaintiff is not seeking relief under or construction of the Copyright Act, but rather relief pursuant to a working arrangement, the specific terms of which will be determined at a trial, and that she is claiming that pursuant to said agreement defendants wrongfully have deprived her of the fair share of royalties related to her compositions, the rights to which she never voluntarily relinquished." *Id.* at 4.

<u>Sunbow's Motion for Reconsideration and Clarification – Dec. 31, 2003</u>

35.    In opposition to Sunbow's December 31, 2003 motion for reconsideration and clarification of the state court's December 15 and 24, 2003 orders, which is Exhibit 41, Plaintiff persisted in arguing (Plaintiff's brief is Exhibit 42) that "Sunbow also continues its inappropriate attempt to divert the Court's attention to an unsigned, inadmissible draft of a contract pertaining to the Jem TV show." Exh. 42 at 4. Plaintiff continued, "Sunbow has the sheer audacity to allege that it has 'offered proof that the Jem agreement was typical of the agreements for all the TV music at issue in this case.'" *Id.* at 5. "Plaintiff has, and will continue to, vigorously dispute Sunbow's woefully inadequate proffer of patently inadmissible evidence in this context." *Id.* "By repeatedly brushing aside plaintiff's testimony regarding the parties' working agreement and her entitlement to royalties thereunder, defendants have relegated themselves to a tenuous position where they have been attempting to rely upon an unsigned, inadmissible draft of a contract pertaining to one of the many compositions [sic] at issue in this case, which they claim governed the parties' entire working relationship." *Id.* at 10.

v.

36.     The January 23, 2004 decision of the state court, which is Exhibit 43, rejected Sunbow's motion and stated that "as previously stated by this Court in its December 24th Decision and Order, the scope and terms of the parties' work relationship and their agreements shall properly be the subject of inquiry and examination at trial." *Id.* at 3.

### Sunbow's Motion to Dismiss for Statute of Frauds – April 5, 2004

37.     After remand from federal court (see ¶ 3 above), in a March 2, 2004 conference with the state court, Plaintiff's counsel confirmed that Plaintiff was proceeding on her claims that she had an oral "working arrangement" with Sunbow. Sunbow continued to contend that Plaintiff had worked for hire according to a written work-for-hire agreement that granted her good and sufficient payments for her services. Accepting for purposes of the motion Plaintiff's contention that she had an oral working arrangement with Sunbow, Sunbow (and Bacal) moved on April 5, 2004 to dismiss on the ground that an oral agreement to pay royalties for the term of copyright violated the statute of frauds. On May 28, 2004, the state court denied the motion on the ground that Sunbow had failed to assert it in its Answer to the Amended Complaint, even though Sunbow's Answer was filed after Plaintiff's deposition when she was still claiming that she had always worked pursuant to written agreements. The state court's decision and order is Exhibit 44.

38.     Although the merits of Sunbow's statute of frauds argument is not relevant to Sunbow's argument before this Court, Plaintiff made certain statements in the six affidavits she filed in opposition to Sunbow's motion that are relevant. Specifically, she swore that the "JEM agreement remained unsigned because I did not sign it." Exh. 26a at 5, ¶ 8 (Plaintiff's affidavit in opposition to the motions generally). She also claimed that "Defendants harp on four sample Sunbow agreements and the unsigned JEM agreement which shed light on absolutely nothing. * * * Typicality is not the issue here, the question is whether or not I signed

16

v.

any such agreements and I deny doing so." Exh. 26b at 9, ¶ 13 (Plaintiff's Apr. 2004 affidavit in opposition to the affidavit of Sunbow's expert Helene Blue).

<u>Beginning of the State Trial – July 2004</u>

39.    Trial began on July 6, 2004. Plaintiff's opening statement began as follows:

> This is an action for unjust enrichment and constructive trust. There are basically two types of damages involved in the case: One is the performance royalties which is where BMI comes in. * * * But the other type of damages that we are talking about, which is way more significant, is the monies that are attributable to the music composed by Miss Bryant which is in various intellectual properties. Videos, DVDs, CDs, which is a huge market, even now, growing market.

Exh. 3 at 23:5-8, 23:24-25:5. Plaintiff's counsel did not describe any basis for liability.

40.    Plaintiff's counsel said: "There is no writing in this case where [Plaintiff] relinquished her writers interest." Exh. 3 at 24:11-13. "By all the criteria that has been set forth in the case law you will find that Miss Bryant did not write these works as works-for-hire." *Id.* at 28:23-24:2.

41.    Plaintiff testified on direct examination for the balance of July 6, July 7, and July 8. Plaintiff testified that she had never signed an agreement with Sunbow. Exh. 3 at 102:24-103:10; Exh. 6 at 534:5-10, 534:23-536:4. She also testified that in her 30-year working career, she had always worked for hire, including when she worked for Sunbow. Exh. 6 at 526:11-527:12, 528:14-17. Asked to describe the working arrangement under which Kinder & Bryant worked for Sunbow, Plaintiff repeatedly explained it was the same agreement that had been used when she (and Kinder) had been employed by Michelin & Co., an advertising agency, from 1977 to 1981. Exh. 3 at 76:12-20, 80:17-22; 100:2-17; 101:2-8; Exh. 4 at 182:14-21. Plaintiff also testified that when she worked at Michelin & Co, there were always written agreements because Spence Michelin was a "stickler about everything." Exh. 6 at 556:24-7.

17

v.

42.     Plaintiff also said that she and Ford Kinder had a conversation with Joe Bacal about doing a jingle for the Transformers toy for Griffin Bacal, Inc. Asked what the terms of the arrangement was, she said Bacal told them it would be the "same deal as Michelin & Company." Exh. 5 at 398:4-18, 401:4-10, 403:19-404:2. On cross examination, Plaintiff identified two written agreements between Kinder & Bryant and Griffin Bacal, signed by Ford Kinder as President of Kinder & Bryant, in which they agreed to write jingles as works for hire and received performing rights royalties, certain flat payments if the music was used in a wider advertising market; but it granted no royalties from the exercise of publishing rights. Exh. 5 at 563:10-566:14; Exhs. 45 & 46.

43.     One theme of Plaintiff's testimony was that entries in her BMI catalog ascribed percentages to her that did not accurately reflect her role in the composition of the music, and in some cases apportioned shares to people that she contended had nothing to do with composing the music. She contended that these entries had been changed without her knowledge. See, e.g., Exh. 4 at 195:19-196:3, 197:15-198:17, 247:25-250:18; Exh. 5 at 339:12-345:12, 364:14-21, 365:12-21, 465:24-406:25, 419:6-420:11, 441:4-443:21; Exh. 47, 48, and 49.

44.     During her cross-examination, Plaintiff testified that she was not contending that any part of the writers' share of the public performance royalties that should have been paid to Kinder & Bryant was ever paid to Sunbow. Exh. 6 at 511:11-515:11.

45.     Another theme of Plaintiff's testimony was that the Sunbow TV Shows for which she had composed music were being distributed under license in the U.S. by Rhino and by Loonland around the world and that she was not receiving money for them. Exh. 4 at 213:3-20, 217:6-10, 218:7-12, 219:9-14, 233:23-234:4, 247:18-21; Exh. 5 at 461:14-16, 461:25-462:3, 466:21-467:3. In addition, she testified that the music in the TV Shows that she had composed

18

v.

was being used in new contexts such as in premium cassettes, new television programs (Armada and Energon), video games (Transformers), ringtones, and cartoons, for which she was not paid. Exh. 5 at 457:20-24, 463:21-465:6, 473:25-474:5, 474:20-474:14. Exhibits 50-54 are photocopies of the packaging of products for which Plaintiff contended that she should be receiving royalties under her oral agreement.

46.     Plaintiff was copied on a March 3, 1986 letter from William Dobishinski, acting for "his clients" Kinder & Bryant, to Robert Harris, Sunbow's outside counsel, in which Mr. Dobishinski sought additional payments for use of the TV Shows on videocassettes, but Plaintiff denied having ever seen the letter. She also said that she had never seen Mr. Harris's May 30, 1986 letter, responding to Mr. Dobishinski's letter, which described the request as "unacceptable." Exh. 7 at 83:4-18, 85:10-88:4, 102:6-105:10; Exh. 56-57. But Plaintiff remembered discussing the unsigned Jem agreement with Kinder at the time they were writing music for Jem. She said that they tried to "improve the contract" to take account of future or new uses, but "[u]ltimately [it] never got signed . . . ." Exh. 7 at 68:15-70:8; Exh. 28. Plaintiff also denied having ever seen a letter from Mr. Dobishinski to Sunbow proposing amendment to the Jem agreement, which was attached in clean and redlined versions. *Id.* at 109:13-112:9 and Exhibit 29.

47.     Plaintiff also agreed that in an April 29, 2004 affidavit in opposition to the affidavits of Thomas Griffin and Jules Bacal in support of her opposition to Sunbow's motion to dismiss, which is Exhibit 55, she had stated that the "Copyright Act and the very agreement that Sunbow is throwing before the Court at this late date reveal that a relinquishment of the copyright requires a written agreement and no such written agreement has been produced by the Defendants." Exh. 6 at 531:19-532:11. But Plaintiff agreed that she did not own the copyrights

v.

in the music she wrote for the TV Shows and could not control the use of the copyrights in those compositions. *Id.* at 516:4-517:3, 532:2-535:21. Plaintiff could not explain how to reconcile those two statements. *Id.* at 546:8-548:22.

<u>The Signed Jem and My Little Pony and Friends Agreements are Discovered.</u>

48.      On August 18, 2004, after a months-long search (*see* ¶ 25 above and ¶ 50 below), Sunbow discovered two agreements between Sunbow and Kinder & Bryant for the Jem and My Little Pony and Friends TV Shows signed by Ford Kinder on behalf of Kinder & Bryant. Each of the agreements includes accompanying schedules and exhibits signed by both Plaintiff and Ford Kinder. The signed Jem agreement is Exhibit 18. The signed My Little Pony agreement is Exhibit 58. Also found was a March 15, 1986 amendment to the Jem agreement, signed by Ford Kinder for Kinder & Bryant, which is Exhibit 59.

49.      The next day, August 19, 2004, Sunbow notified the state court and Plaintiff of its discovery, providing copies of the documents to both. During a conference call the next day, the state judge said that the trial would not resume on September 13, 2004, as scheduled, but he ordered the parties to appear that day. Before that conference, Plaintiff submitted affidavits from Plaintiff and Ford Kinder in which Kinder authenticated his signatures on the Jem and My Little Pony and Friends agreements and the amendment to the Jem agreement, and Plaintiff claimed that her signatures on the inducement letter and schedules attached to the two agreements were forged.

50.      At the September 13, 2004 conference, Sunbow produced for the court's and Plaintiff's inspection the original binders of documents and explained that they had been discovered by a stroke of luck in a Queens warehouse rented by SMEI, Sunbow's prior owner. See ¶ 25 above. Sunbow argued that the discovery of the documents should put an end to the case since the sole premise for proceeding to trial was to try Plaintiff's claim that she had always

20

v.

worked with Sunbow pursuant to an oral working arrangement. Since that claim was clearly without support, the case should be dismissed. Exh. 8 at 24:4-13. Plaintiff contended that the court should hold a framed issue hearing on the authenticity of the documents (*id.* at 14:17-18) and the state judge acceded to Plaintiff's position (*id.* at 28:23-24).

51.     In a September 22, 2004 order, which is Exhibit 60, the state court preliminarily ruled under CPLR R 4536 that it was "inclined to find that the disputed signatures are proved to its satisfaction [to be Plaintiff's]." Exh. 60 at 2. The Court "nevertheless" decided that it would hold a framed issue hearing.

### Framed Issue Hearing

52.     At the framed issue hearing, an expert forensic document examiner testified that he had compared Plaintiff's signatures on the two signed written agreements between Kinder & Bryant and Sunbow for the Jem and My Little Pony and Friends TV Shows with contemporaneous exemplars of Plaintiff's handwriting, and his "definitive" opinion was "[t]hat the three questioned signatures [on the two documents] and the known signatures were all the product of the same person." Exh. 9 at 54:18-59:12, 61:12-64:21, 72:18-23.

53.     Robert Harris, an entertainment lawyer who had represented Sunbow from approximately 1982-1998, was the other witness. Exh. 9 at 3:8-22. He testified that it was Sunbow's practice to commission the work of contributors to Sunbow's production by means of work-for-hire agreements in order to obtain ownership of the various contributions to the entire film or movie. *Id.* at 3:23-4:2, 4:3-10. Mr. Harris was unaware of Sunbow's ever working with writers, lyricists or composers according to oral agreements. Exh. 9 at 4:15-18, 26:21-27:4.

54.     Mr. Harris testified that the signed agreements for *Jem* and *My Little Pony and Friends* are the same form agreements that Sunbow used to commission music from composers (Exh. 9 at 14:12-15:3, 16:2-18; Exh. 15 & 58), and he had participated in the

21

v.

negotiations of the Jem agreement (*Id.* at 16:5-7). Mr. Harris testified that Exhibit 61, the agreement between Sunbow and the lyricist for the *Jem* TV Shows, and Exhibit 62, a binder containing 14 agreements between Sunbow and either lyricists or composers from 1983-1986, were all "basically the same work for hire agreements." Exh. 9 at 18:21-19:11, 20:19-24, 23:15-24:24.

55.     Mr. Harris testified that he had corresponded with Kinder & Bryant's lawyer, William Dobishinski (Exh. 9 at 13:13-14:3) and identified, Exhibit 56 as a letter that he had received from Mr. Dobishinski regarding the Jem and My Little Pony agreements, in which Mr. Dobishinski proposed additional changes that his clients wanted, including payments for videocassette use (*id.* at 50:7-18). He also identified the handwriting on the letter as his own, including the handwritten "6-1-85" that was written in response to Mr. Dobishinski's request for the date of the agreement. *Id.* at 50:19-51:11.

56.     Plaintiff offered no rebuttal witness at the hearing, nor did she testify. The day before the framed issue hearing, Plaintiff submitted to the state court an October 27, 2004 affidavit, which is Exhibit 63, in which she claimed that the hearing was not necessary because she had not "relied *solely* upon an oral agreement as evidence of my working relationship with Bacal . . . . *Our arrangement included both oral and written agreements* . . . . While it is true that I once said in an affidavit that there were no written agreements, my point there was there were none which would have signed away my writer's royalties . . . ." Exh. 63 at 3, ¶ 4 (emphasis added). She stated that her position on the agreements is that she is entitled to the monies from the exercise of the rights described on page 5 of the Jem agreement (*i.e.* ¶ 6(a)(i-vi)). *Id.* at 5-7, ¶¶ 8 and 9.

v.

57.     Following the framed issues hearing the state court asked for briefing addressed to whether Plaintiff's signatures were forged and the position of each party about "what remains, if anything, in this trial." Exh. 9 at 80: 7-21.

58.     Sunbow's post-hearing brief, which is Exhibit 64, argued that Plaintiff's disputed signatures were genuine, and she always composed for Sunbow pursuant to written agreements, not oral agreements as she had claimed previously. Sunbow urged the state court to dismiss Plaintiff's case entirely because the only reason the case had gone to trial was her now-disproved oral agreement theory. *Id.* at 13-14. Sunbow also argued that in making its decision, the state court should discount Plaintiff's testimony (affidavit and at trial) because she had proved untrustworthy in her prior representations to the state court, and Sunbow's position was supported by the recollection of Sunbow's counsel and the documentary evidence. *Id.* at 14-18.

59.     Sunbow also argued that nothing remained for trial on Sunbow's summary judgment motion related to the alleged mis-registration of Plaintiff's compositions with BMI, because Plaintiff had conceded at trial that none of the payments that Plaintiff contended should have been paid to her had been paid to Sunbow. In the absence of proof of Sunbow's receipt of monies due to Plaintiff, Plaintiff could not sustain her unjust enrichment claim. Exh. 64 at 18-20; *see* ¶ 44 above. Her constructive trust claim was similarly unsupported, because the state court had held in November 2003 that Plaintiff had not shown that she had anything but a contractual relationship with Sunbow, and nothing in the interim had changed that finding. Exh. 64 at 20-21; *see* ¶ 33 above.

60.     Plaintiff's brief, which is Exhibit 65, argued that the state court should draw a negative inference from Sunbow's failure to call various Sunbow officers as witnesses at the framed issue hearing (Exh. 65 at 2-4), that the meaning of the contracts could be learned only

23

· v.

from the parties who were involved with them and not from the interpretation of lawyers of the written words (*id.* at 5-6), and that if the state court were to find that the Jem agreement governed the parties' relationship, Plaintiff should be permitted to amend the complaint to include a breach of contract claim (*id.* at 7-8). Supporting this brief was Plaintiff's February 5, 2005 affidavit, which is Exhibit 66. In a discussion of the signed documents that had been the subject of the framed issue hearing, Plaintiff stated "I do not contest the signatures on the JEM agreement . . . " (*id.* at 6, ¶ 5.a.i.).

61.    Sunbow's reply brief, which is Exhibit 67, observed that Plaintiff had said nothing about the authenticity of her signatures on the Jem and My Little Pony agreement or the implication of that finding on "what remains, if anything, in this trial," as the state judge had directed. Exh. 67 at 1; *see* ¶ 57 above. Sunbow reprised its argument that nothing remained of the premise on which the parties had proceeded to trial (Exh. 67 at 3), and argued that Plaintiff's suggestion that the amended complaint be further amended was another attempt to reinvent her case, pointing out that to do so after five days of trial was too late and prejudicial to Sunbow (*id.* at 4-7).

62.    The trial was then put on hold for nearly two years. In its March 10, 2005 Order, the state court noted that while the case was on appeal (relating to Sunbow's jurisdictional claims), it would suspend action, including a decision on the framed issue hearing).

### Plaintiff's December 2005 Motion to Amend the Complaint

63.    On December 6, 2005, however, Plaintiff moved for an order resuming the trial, bifurcating claims based on performance royalties from those based on publishing royalties so that trial of the former could continue, permitting depositions of additional witnesses; and amending the pleadings to conform to the proof at trial to state claims for breach of the written contracts with Sunbow that Sunbow found and produced in August 2004. This motion was

v.

supported by an affirmation of Plaintiff's counsel, Patrick J. Monaghan, Jr., which is Exhibit 68.
Plaintiff also filed a memorandum in support of her motion, which is Exhibit 69.

64.    Mr. Monaghan reviewed the status of the case (Exh. 68 at 3-5) and
described why he believed that it was "manifestly unfair to the plaintiff to allow Sunbow to make
a stealth, unauthorized motion [to dismiss]. . . " and "a reading of the very agreements dropped
on the Court and Plaintiff in mid-trial does not at all support defendant's positions and in fact
confirms plaintiff's rights to both performance royalties and publishing royalties" (*id.* at 6).  In
addition, he noted that Plaintiff's February 5, 2005 affidavit showed that she was not contesting
the signature on the Jem agreement.  *Id.*  He then argued that the Jem agreement gave rise to
breach of contract relating to both performance and publishing royalties (Exh. 68 at 6-7, 8-9) in
addition to unjust enrichment and constructive trust, and that the state court could permit the
pleading to be amended to conform to the proofs, whatever their source (*id.* at 12).  Stating that
he disagreed with the characterization that the case was being tried on an oral agreement theory,
he urged the state court to deem the pleadings amended to include claims based on the terms of
the Jem agreement.  *Id.*

65.    Plaintiff supported this motion with a December 6, 2005 affidavit, which
is Exhibit 70.  "I also ask [the] Court to allow my claims to be deemed amended to include
claims based on certain of the writings produced in 2004 during trial and consider my Amended
Complaint . . . amended to conform to the evidence already in this case and proofs to state claims
for breach of <u>written</u> <u>contracts</u> (including a certain Jem agreement dated June 1986) dealing with
my performance royalties and publishing rights."  Exh. 70 at 5-6, ¶ 3 (emphasis in original).  In a
footnote dropped from the parenthetical, Plaintiff stated: "Although this is the Jem Feature Song
Agreement, not the Jem Theme Song Agreement, I have accepted it as stating the terms of my

v.

Sunbow agreements with Jules M. "Joe" Bacal and Sunbow related to Sunbow productions." *Id.*
at 5-6 n.3.

66.    Sunbow (and BMI separately) opposed Plaintiff's motion to amend the
complaint and to conduct further discovery; Sunbow's brief is Exhibit 71. Sunbow argued that
New York's liberal rules regarding amendments of complaints have limits, and that amendment
of the Amended Complaint after several days of trial was too late (Exh. 71 at 8-9); Plaintiff had
not offered a reasonable explanation why she was asking to amend the complaint to add a claim
that she knew (or should have known) about for 20 years (*id.* at 9-11); and she also failed to
show, as is required, that her amended complaint would have any merit (*id.* at 11-13). Finally,
Sunbow argued that it had been severely prejudiced by the extensive, unnecessary judicial
proceedings provoked by Plaintiff's prior changing positions and by the additional expense it
would endure if it were required to start over on a new theory. *Id.* at 14-16.

67.    Sunbow's opposing brief had noted that Plaintiff's supporting affidavit
omitted an exhibit, a declaration of her expert David Berman addressing a composer's
entitlement to royalties and possible measurements of damages, and on January 10, 2006,
Plaintiff provided the missing exhibit. That declaration is Exhibit 72. In response, Sunbow filed
a supplemental memorandum, which is Exhibit 73. It contended that Mr. Berman, a person with
little experience in the film and television business, had made no attempt to interpret the Jem
agreement; had based his views on practices in the recording, not the television or film, business;
and had reached conclusions that conflicted with the express terms of the Jem agreement.

68.    On January 30, 2006, the state court issued a decision and order, which is
Exhibit 74. The state court denied Plaintiff's request to vacate the stay of the trial, to amend the
complaint to include breach of contract, or to bifurcate the trial. But it granted Plaintiff the right

v.

to take video depositions of Ford Kinder and David Berman and urged her to cooperate with

BMI in resolving her claim against it. Exh. 6. The video deposition of Ford Kinder was taken in

August 2006.

### The State Court's Decision on the Framed Issue Hearing

69.     After the Appellate Division, 2d Department, disposed of Sunbow's

appeal, the state judge issued its June 15, 2006 decision and order on the issues raised by the

framed issue hearing, which is Exhibit 75. "The Court is satisfied that there were written and

valid signed contracts between Plaintiff and Defendant Sunbow. The Plaintiff now claims

[referring to the April 26, 2006 conference call] that there were also oral agreements besides

these written contracts and those form the basis of her complaint. This is a matter for Plaintiff to

prove on future trial of this matter." Exh. 75 at 2. Turning to the question that the state court

had raised at the conclusion of the hearing, i.e., "what remains, if anything of this trial . . .," the

state court rejected Sunbow's contention that the case should be dismissed (*id.* at 2) and stated

that "[t]his case must go on for a while longer. Both side[s] should decide which are their

essential witnesses and be prepared to present them before the end of this year in person or by

videos (EBT's). From the Court's point of view experts in this particular area of authorship and

attendant needs for compensation would be a benefit to both sides" (*id.* at 3.)

70.     On July 6, 2006, Sunbow moved to reargue this decision on the ground

that the state court had overlooked the merger clause in each of the agreements that governed

Plaintiff's relation with Sunbow. That clause states

> This Agreement contains the entire understanding of the parties hereto
> relating to the subject matter herein contained and this Agreement cannot
> be changed, rescinded, or terminated orally.

Exh. 18 at 10 ¶ 13(c). Sunbow argued that by the terms of the contracts that the Court found

existed between the parties, there could not be, as Plaintiff was claiming, oral agreements in

27

v.

addition to the written contracts. In addition, Sunbow contended that the law is settled that in the face of an integration or merger clause like the one in the contracts between Plaintiff and Sunbow, a party cannot introduce oral statements to vary the terms of the agreements. The motion and my supporting affirmation are Exhibit 76.

71.    In opposition, Plaintiff submitted the July 21, 2006 affirmation of Patrick J. Monaghan, Jr., which is Exhibit 77. He explained that Plaintiff was not talking about oral modifications of Plaintiff's written agreements with Sunbow. Instead she was talking about compositions for which "there is no Sunbow written agreement before the Court," such as the Jem themes, the Transformers themes, Inhumanoids, or Visionaries music. *Id.* at 2, ¶¶ 4 and 5. "The task for the Court then will be at trial to determine the understandings and agreements as to other compositions." *Id.* at 3, ¶ 5. "To state the obvious—where there is no written contract before the Court with respect to certain compositions there obviously can be an oral agreement not precluded by an unrelated written agreement." *Id.* at 3, ¶ 6. "The [Griffin Bacal] agreements are still contested and contain all of the irregularities that were cited by Plaintiff in her affidavit of February 4, 2005." *Id.* at 5, ¶ 10.

72.    Plaintiff then advanced another theory upon which an "integration clause would, if applicable, only bar inconsistent or contrary oral understandings." Exh. 77 at 6 (heading above ¶ 12). Plaintiff then described cases that had found an oral modification compatible with an integration clause if the oral modification has been partially or completely performed. *Id.* at 6-8, ¶¶ 13-15.

73.    My affirmation, which is Exhibit 78, was submitted for Sunbow in reply. First, Sunbow noted that Plaintiff was not disputing Sunbow's principal contention that the merger clause in each of Kinder & Bryant's agreements with Sunbow bars any testimony about

v.

oral agreements or amendments relating to the subject matter of the agreement. Thus, there was no basis for going to trial to discuss any oral agreements relating to any contracts between Sunbow and Kinder & Bryant. *Id.* at 3-4, ¶ 5. Plaintiff's claim that she did not know which contracts Sunbow was referring to was not credible in light of the evidence that Sunbow had presented at the framed issue hearing and the state court's June 15, 2006 ruling that "there were valid and signed contracts between Plaintiff and Defendant Sunbow." *Id.* at 4-5, ¶¶ 6-7.

74.    Sunbow also clarified that whatever argument Plaintiff advances about the interpretation of the terms of the agreements between Sunbow and Kinder & Bryant is not relevant, because the state court's January 30, 2006 decision had denied her motion to amend the pleadings, because it was untimely, inadequately supported, and prejudicial to Sunbow. Exh. 78 at 5, ¶ 8.

75.    Sunbow also argued that Plaintiff's reliance on case law permitting modification despite an integration clause was not applicable because Plaintiff had not explained what the purported modification of her contracts was, what consideration the parties had exchanged for the purported modification, or how she had performed the purported modification, either partially or fully. Exh. 78 at 5-6, ¶ 9.

76.    Sunbow also disputed any suggestion that anything remained in the case regarding "other compositions" that Plaintiff wrote for Griffin Bacal, which was not and never had been a defendant in the case. Exh. 78 at 6-8, ¶¶ 11-14. Sunbow contended that the Court should dismiss the case altogether because the only oral agreements that Plaintiff was able to identify related to Griffin Bacal, which was not a party to the lawsuit, or to evidence of TV Shows that the state court had excluded because Plaintiff had not named them in the Amended

v.

Complaint. *Id.* at 8, ¶ 15; *see also* Exh. 3 at 81:22-82:8; Exh. 5 at 410:10-413:7, 468:24-469:9,

470:16-471:2.

  77.  On August 9, 2006, the state court ruled as follows: "Defendant's motion

to reargue is granted. However, the order of this Court dated June 15, 2006 remains in full force

and effect." The decision is Exhibit 79. Sunbow understood this to mean that the state court

agreed with Sunbow's arguments, but was still going to permit Plaintiff to put on her case. That

understanding was confirmed in an August 10, 2006 letter, confirming the substance of an earlier

telephone call with the parties. That letter is Exhibit 80. Repeating the substance of the July 15,

2006 decision and order on the framed issues hearing (see ¶ 74), the state judge wrote that

"Defendant has presented evidence that said written contracts were the only way Defendant,

Sunbow, operated with the artists it employed. If Plaintiff intends to now say there were oral

contracts, it is up to her to prove this especially in the face of the integration or merger clauses."

*Id.* at 1. He went on to say that "This matter is still on Plaintiff's case and that that case must go

forward. Ms. Bryant's testimony must be finished. Plaintiff has stated that it was also to call an

expert." *Id.* The state court's determination to complete Plaintiff's case was also confirmed in

its November 2, 2006 decision and order denying Sunbow's motion to dismiss under CPLR 4401

on the basis of Plaintiff's admissions, which I have not described in detail. The state court's

November 2, 2006 decision is Exhibit 81. The relevant part of the state court's decision is as

follows:

> After a telephone conversation between the parties on July 7, 2006, the
> Court was asked to clarify its [June 15, 2006] decision, which it did by
> letter dated August 10, 2006. That letter (a copy of which is attached) set
> forth the Court's views about what remained to be decided. [Sunbow's]
> motion to dismiss, if at all made, should be offered after the Plaintiff's
> case is concluded. It is obvious that the [2d Department] intended for the
> Plaintiff to have her day in Court. The motion and cross-motion of the

v.

parties have been made before and denied by this Court. All relief requested is also denied herein as to both parties.

Exh. 81 at 2 (referring to Exh. 80).

<u>Resumption of the State trial – December 2006</u>

78. In a December 1, 2006 conference call with the parties, the state judge addressed the subject of the scope of the trial. He agreed with Sunbow's position that the only thing before the court would be Plaintiff's relations with the Defendants Sunbow and BMI. Exh. 10 at 7:19-8:4. When Mr. Monaghan said that based on "the fact that the Court has ruled, you have ruled that the written agreement applies, [Plaintiff] is bringing her claims under [the Jem agreement], but she must lay a foundation that that agreement applies to the other compositions . . . ," I objected, and Justice O'Rourke reminded Mr. Monaghan that he had denied Plaintiff's motion to amend the complaint. *Id.* at 21:14-22:10. Justice O'Rourke added that "I want to really, as I said in the Order, I want to give Ms. Bryant her chance to make her case. Then I want to give Sunbow their chance to get out of this case, if they can." Exh. at 20:17-20. He then directed that when trial resumed, I should continue my cross-examination of Plaintiff, and then Mr. Monaghan would have redirect. *Id.* at 24:20-25:7.

79. On that same day, December 1, 2006, Plaintiff submitted her lengthy witness list, which is Exhibit 82. She noticed the following witnesses to testify on specific subjects: (a) Anne Bryant as a witness on "the Jem agreement and her understanding of the applicable oral and written agreements with respect to other compositions…and payments received or due for performance and publishing royalties"; (b) Joseph M. "Jules" Bacal as a witness and to be impeached by his deposition on topics including "Sunbow and [Griffin Bacal] oral and written contractual relationships with Plaintiff"; (c) Clifford Kinder by deposition on topics including "reservation of rights of writers, nonpayment of publishing royalties, breaches

v.

of agreement"; (d) Carole Weitzman by deposition on topics including "the contracts between and among the parties, the performance of those obligations with the contracts"; and (e) David Berman as an expert witness on topics including "his opinion on the rights granted to Plaintiff under the Jem agreement and as to other compositions at issue."

### December 4, 2006

80.     On December 4, 2006, the trial resumed with the state judge giving each party's counsel an opportunity to explain "where they are and what they think we're doing here." Exhibit 11 at 3:4-5. Plaintiff's counsel said that Plaintiff "composed the compositions that are at issue" and "there's no question that there was an agreement by which she turned over copyrights to Sunbow to exploit them for their mutual behalf, and the question you're going to have to answer and deal with based on the evidence is what rights did she retain when she turned over the copyrights." *Id.* at 3:24-4:6. Plaintiff's counsel stated that "the Jem Agreement, dated June 1, 1985, does contain Ms. Bryant's signature, is not challenged, and we submit does govern the relationship between the parties, *all the relationships, all the compositions.*" *Id.* at 4:20-24 (emphasis added).

81.     As directed by the state court, the trial continued with Sunbow cross-examining the Plaintiff. Sunbow offered two admissions, which were accepted: (a) Plaintiff's admission from earlier in the trial that Sunbow had never received any of the performance royalties that she was claiming had been diverted from her (Exh. 11 at 36:18-37:13; Exh. 6 at 512:18-21); and (b) Plaintiff's admission that she had accepted that the Jem agreement stated the terms of all her agreements with Sunbow (Exh. 11 at 38:4-14; *see also* Exh. 70 at 5-6 n.3).

82.     Plaintiff acknowledged that the merger clause in the Jem agreement (Exh. 18 at 10 ¶ 13(c)) meant that the agreement could not be changed with an oral agreement. Exh. 11 at 44:25-45:18. Shown copies of the amendment of the Jem agreement proposed by her

v.

lawyer, William Dobishinski, and the signed amendment (Exhs. 29 & 59), Plaintiff also acknowledged that "when Kinder and Bryant wanted to amend the Jem agreement, it knew how to do it." Exh. 11 53:9-22. Plaintiff also confirmed that the Jem agreement was the form of agreement that governed all her relations with Sunbow. *Id.* at 56:11-19. Asked whether she was contending that she also had an oral agreement with Sunbow in addition to her written agreements, she said, "No," and explained that in all the jobs she got from Sunbow, Kinder & Bryant was first offered the job and terms were agreed and then later those terms were confirmed in a written agreement and that was the only thing that governed. *Id.* at 56:20-57:11.

83.    On the basis of those admissions, Sunbow moved under CPLR 4401 in open court for dismissal of the case. Exh. 11 at 57:12-19. Plaintiff's counsel attempted to keep the case alive by claiming (contrary to Plaintiff's prior admissions) that the Jem agreement applied only to the Jem music, and that the state court could not apply it to "other compositions" without a foundation for doing so. *Id.* at 58:12-59:12. "You have found, but you did not identify in your opinion, Judge, which agreements you found to be valid and binding." *Id.* at 59:13-15. The state court rejected this argument pointing out that it had already found that agreements in the form of the Jem agreement applied to all the productions on which Kinder & Bryant worked for Sunbow. If the agreements were all like the Jem agreement, then each had the same merger clause, and therefore none of them could have been amended with an oral agreement. *Id.* at 60:16-61:12. At that point, Plaintiff's counsel switched gears completely and announced that "We're going to prove, and proof that's probably half-way or three-quarters of the way there, that the Jem royalty provisions in Exhibit 18 apply to each of the other compositions, including Transformers." *Id.* at 61:13-17.

33

v.

84.     At this point and in several subsequent colloquies with the state court, Sunbow objected to the expansion of the trial to include the interpretation of the Jem (and other Sunbow) agreements; the scope of the trial had been limited to Plaintiff's contention that she had oral agreements with Sunbow, in addition to the written agreements, that were compatible with the merger provisions in the written agreements. Exh. 11 at 61:19-62:9; 65:17-66:25. The state court had properly denied Plaintiff's motion to amend the Amended Complaint because it was ill-founded and prejudiced Sunbow. *Id.* at 62:14-17; *see* ¶¶ 68 above. The agreements were in evidence only to rebut Plaintiff's claim that she had never signed a written agreement (Exh. 11 at 62:16-25, and permitting Plaintiff to go forward on the merits of those agreements without notice to Sunbow and after denying her December 2005 motion to amend the Amended Complaint was prejudicial to Sunbow. *Id.* at 65:17-66:24, 81:8-16; Exh. 12 at 22:7-18.

85.     Plaintiff argued that the Jem agreement should be treated as though it was in evidence for all purposes and that it provided Plaintiff with rights to royalties and an accounting to review Sunbow's records. Exh. 11 at 62:10-13, 62:14-21. The agreement "isn't a one-way street. It doesn't just work for Sunbow. . . . [T]hose clauses give my client rights." *Id.* at 63:14-17. "I want this Court to apply the written agreement, the Jem agreement . . . . That's what I want." *Id.* at 64:14-17.

86.     The state judge struggled to determine whether anything remained of Plaintiff's case. Exh. 11 at 69:2-9. He tried to find common ground on the proposition that the oral agreements were no longer in the case, but Plaintiff's counsel disagreed even though his client had conceded the point. *Id.* at 63:19-64:13. The state judge asked Sunbow why Plaintiff was not entitled to an "accounting," and I agreed that there was a contractual provision entitling her to challenge royalty her payments and conduct an accounting, but she had never presented

34

v.

the detailed challenge that was a condition precedent to that right. *Id.* at 66:1-21. The state

judge invited counsel to chambers to discuss further what was left in the case. *Id.* at 67:25-68:2.

Later he confirmed a decision made in chambers that "the theory of there being an oral contract

still in this case is now over" (*id.* at 69:22-70:2), and he said that "it seems to me that the

[Kinder] EBT that [Plaintiff was] going to use tomorrow may not be relevant anymore" (*id.* at

69:11-14).

      87.    Because there was still time available on that day (Dec. 4, 2006) to

examine Plaintiff, the state judge directed the parties to finish. Because the state court seemed

interested in what rights Plaintiff retained and whether Sunbow had abided by them (despite the

fact that a breach of contract claim had not been formally pled), Sunbow examined Plaintiff

about Paragraph 6(b) in the Jem agreement which states that

> [Kinder & Bryant] shall have the right at the at [its] sole expense to
> inspect [Sunbow's] books and records relative to gross receipts derived
> from use of the Music hereunder and to make extracts thereof . . . . All
> royalties, statements and other accounts rendered by [Sunbow] shall be
> binding upon [Kinder & Bryant] and not subject to any objection by
> [Kinder & Bryant] unless specific objection in writing, stating the basis
> thereof, is given to [Sunbow] by [Kinder & Bryant] by one (1) year from
> the date rendered.

      88.    Plaintiff testified that she had received a royalty payment from Sunbow in

2004 accompanied by royalty statements from Sony/ATV (Exh. 11 at 71:3-10) and had seen

royalties statements that had been provided to her lawyer on December 1, 2006; she also

understood that she was required to object to royalty statements within one year, but she said that

she did not know whether she had done so (*id.* at 71:11-72:8). When pressed about whether she

had made a specific objection in writing to Sunbow about royalties statements, Plaintiff said "I

don't know why this lawsuit, suing for my royalties, is not a writing to Sunbow." *Id.* at 80:19-

v.

25. Asked if she had ever arranged for an accounting using an auditor, Plaintiff interrupted to say that she was suing for an accounting. *Id.* at 81:4-7.

89.    As the testimony unfolded that day and when Plaintiff's expert testified the next day, it became clear that Plaintiff and her counsel (through objections) were taking the position that (a) royalty statements prepared by Sony/ATV, Sunbow's music administrator, that Sunbow forwarded to Plaintiff with its payment were not Sunbow's royalty statements; (b) any royalty statements prepared by Sony/ATV that Sunbow provided to Plaintiff's counsel for transmittal to her had not been "received by Plaintiff"; and (c) what Plaintiff was characterizing as Sunbow's royalty statements were the memos or transmittal letters from Mr. Joseph Souza at Sunbow accompanying Sunbow's check that simply recited the royalty periods that the payment covered. Exh. 11 at 70:23-71:8, 73:8-21, 76:1-78:9, 78:20-80:9, 86:7-87:10, 89:7-95:25, 96:8-99:23; Exh. 12 at 12:24-14:1, 16:6-8, 16:17-17:9; Exh. 13 at 40:12-44:17, 61:11-62:25; Exh. 14 at 7:2-6 ("We've never gotten a statement . . . . those are statements by Sony/ATV to Loonland. So those aren't really accountings."); Exhs. 83, 84, 85, 19; 86 at 2, ¶ 3 and its exhibit B. *See also* Exh. 87 at 10-11 & nn. 3-5.

90.    A confusion that arose on that first day of trial was the use of the word "accounting" to refer to whether Plaintiff had a cause of action for an accounting, *i.e.*, to determine monies allegedly wrongly received by Sunbow, *and* to refer to Kinder & Bryant's contractual right under Paragraph 6(b) of the Jem agreement to challenge any royalty payments that Plaintiff had received. *See e.g.*, Exh. 11 at 101:1-102:9, 103:7-104:13.

91.    At the end of the trial day on December 4, 2006, in response to Sunbow's question about what remained other than the argument that the court had requested on Sunbow's motion to dismiss, the state judge stated:

v.

"I'll give you an example. Mr. Monaghan may want to put on some expert dealing with the right to have an accounting. I don't know. * * * I don't know what's going to happen, except that, from my standpoint, the written agreements are all as the Jem contract set forth, and the – there are no oral agreements. The oral agreements got folded into them. And that the only question that I saw left was whether there was a cause of action that either directly or indirectly caused this Court to move now to say, okay, there has to be an accounting. And I'll listen to those arguments tomorrow." Exh. 11 at 144:21-145:8.

December 5, 2006

92.    The state court heard argument during the entire meeting with the parties on December 5, 2007. In response to the state court's inquiry about which witnesses on Plaintiff's witness list were still relevant to the case ( Exh. 12 at 4:3-5), Plaintiff's counsel identified his expert, David Berman, who would testify, "among other things, . . . how accountings are supposed to be rendered pursuant to custom and industry in the music publishing business, in the music business. What are these accountings supposed to look like, what are artists and songwriters supposed to receive . . . " (*id.* at 8:22, 11:8-13). "[H]e's also going to tell us what products come within the meaning of the definitions in the document . . . what does the industry currently regard as a phonograph record, which would entitle the Plaintiff to mechanical royalties." *Id.* at 11:23-12:3 "So when Your Honor's dealing with the issue of liability, you're going to have to decide . . . I've got the contract; what's included in that contract? Then we get to the accounting issue." *Id.* at 12:12-16.

93.    After further argument about whether an accounting was ever pled, the state judge finally observed that "to the extent that the Court decides that Mr. Berman may testify, he would be limited, as far as I'm concerned, only to whatever additional information he can give to the Court concerning the practices within the industry concerning audits. . . ." Exh. 12 at 25:12-16. Plaintiff's counsel objected that "That would be cutting off the major issue in the case because . . . you have plenty of old contracts in the industry. How is—the intent of

v.

the parties is always an issue in a contract case. You cannot apply a construction . . . strict construction of the agreement without knowing how the business operates" (*id.* at 25:21-26:4), to which the state judge responded: "I said I'm willing to listen to some of that about how the business operates, if I let him in" (*id.* at 26:5-7).

94.    Plaintiff's counsel explained that his next witness, Carole Weitzman, is "one of the two Sunbow people who can tell you what went on . . . about whether or not . . . they followed the procedures under the contract and also . . . the link between Sunbow and [Griffin Bacal]." Exh. 12 at 33:18-21, 35:3-9. The state judge rejected the notion that Ms. Weitzman could add anything and noted that "[Griffin Bacal] is not in the lawsuit." *Id.* at 35:21-23. When Plaintiff's counsel persisted that she was relevant to his effort to impute to Sunbow "understandings" about "the Transformers or other music, other jingle music," the state judge answered "We're not talking about understandings anymore in this case. * * * "This agreement, I've said, controls it. That's it. In all honesty, I don't see what Carole Weitzman does for your case at all." *Id.* at 36:14-37:4.

95.    Plaintiff's counsel pressed Plaintiff's contention that Sunbow "was supposed to give a complete accounting with respect to the terms of the agreement, with whatever definitions this Court finds applies to mechanical royalties and the Other Uses Clause. That Other Uses Clause, other uses of the music, Judge, what does that mean? What does that mean? Who's going to tell the Court?" Exh. 12 at 41:21-42:2. Finally, the state judge permitted testimony on this point: "All right. Mr. Berman, if he comes in, I'll let him put in some testimony on what terms mean. Carole Weitzman is not coming in." *Id.* at 18-21.

96.    The state judge announced that he was going to consider Sunbow's motion for a directed verdict, which had been filed that morning, because it had been made originally the

v.

day before in open court, "and if the remaining end of this case is an accounting, then that's still before this court. I have found that it was in the Amended Complaint and that, therefore, it has been before this court one way or another." Exh. 12 at 46:12-19.

97.    When the state judge directed the parties to reconvene on Friday, December 8, after Plaintiff had had an opportunity to file whatever she wished to file in response to Sunbow's motion (Exh. 12 at 47:4-17, Plaintiff's counsel announced that David Berman, Plaintiff's expert, was already en route to New York from California because Plaintiff's counsel had originally thought he was scheduled for the next day, December 6 (*id.* at 48:24-49:3). To accommodate Plaintiff, the state judge decided to resume trial the next day to hear the testimony of David Berman. I'm limiting it to anything to do with accounting and whatever his position is on what terms in the contract might mean . . . ." *Id.* at 53:12-15.

### December 6, 2006

98.    At the beginning of the day on December 6, 2007, I inquired what cause of action we were proceeding on. The state judge responded "I'm going to take the testimony." Exh. 13 at 4:2-5.    The court overruled my objection, noting my exception. *Id.* at 10:13.  I therefore examined Plaintiff's expert, David Berman about his opinion of the meaning of the contract, whether it had been breached, and Plaintiff's obligations under the contractual procedure by which she could challenge royalty statements she received from Sunbow.

99.    Mr. Berman testified about his extensive experience in private practice and in the recording industry as a senior executive in several recording companies. Exh. 13 at 6:25-14:17. The state court accepted him as an expert over the objections of both Sunbow and BMI, who argued that Mr. Berman had insufficient experience in the business of commissioning music for television or the movies and because of his lack of experience with the registration of music cues with performing rights societies. *Id.* at 14:18-22:8; 46:18-23.

v.

100.    Mr. Berman described music publishing and music administration
(Exh. 13 at 23:24-25:21); the information including music cues that a music administrator files
with performing rights societies, and what is a mechanical license. *Id.* at 24:18-26:17; 27:7-22;
36:22-37:2). He described the Harry Fox Agency's role in obtaining mechanical licenses (*id.* at
28:4-13), synchronization licensing, and the other principal forms of licensing that produces
income for songwriters (*id.* at 28:14-29:13).

101.    Mr. Berman described the materials that he had reviewed, including the
Jem agreement; an affidavit of Sunbow's expert, Helene Blue, a music publisher; and a recording
contract of the Plaintiff; and Sunbow licensing agreements. Exh. 13 at 29:14-30:11.

102.    Mr. Berman testified that the Jem agreement provides for the payment of
writers' royalties from all types of licensing income that he had described, except that it does not
provide synchronization license income from the inclusion of the music in a television broadcast
of the show; nor is the writer entitled to mechanical royalties from promotional cassettes.
Exh. 13 at 30:17-31:19.

103.    Plaintiff had arranged to have certain pages of the Jem agreement
reproduced on large poster boards so that they could be seen by the witness, the state judge, and
others in the courtroom. Referring to those blow-ups, Mr. Berman explained that Paragraph 5 of
the Jem agreement deals with performing rights and makes clear that the writer is entitled to
them. Exh. 13 at 31:24-32:6. Paragraph 6 of the Jem agreement covered all other sources of
licensing income. *Id.* at 32:6-7. Reviewing the text of that paragraph, Mr. Berman noted the
exception for premium cassettes and then he identified the subparagraphs 6(a)(i)-(vi).
Subparagraph 6(a)(i) dealt with mechanical and synchronization licenses (which he described).
*Id.* at 33:7-20. He defined "the industry's customary interpretation of phonograph records" as

40

v.

"any audio and/or audiovisual device intended for home use" (*id.* at 33:21-25), and he testified

that a home video of Jem episodes would have required "a payment of some form, be it

mechanical or synchronization, for the right to include music in that device . . . under

[subparagraph] 6(a)(i) or 6(a)(vi), the provision dealing with Other Uses of the Music" (*id.* at

35:13-20, 35:21-22).

        104.    In response to Mr. Berman's opinion that the reference to "phonograph

record" in Section 6(a)(i) of the Jem agreement was broad enough to reach a DVD, the state

judge and Mr. Berman engaged in the following colloquy:

> THE COURT: So, your opinion is: If some day they invent a hologram
> that sits in the middle of your living room and sings for you, that there is,
> even though it isn't spelled out anywhere in here, it is assumed, because
> the word "phonograph" was in there, that it applies?
>
> MR. BERMAN: And because 6(a)(vi) includes any other use of music.
> Any future use of music, anything not covered by "a", by "i", double "ii",
> triple "iii", etcetera.
>
> THE COURT: Isn't that a pretty broad view of two words that say other
> license, or whatever it says?
>
> MR. BERMAN: It's totally standard. It's totally --
>
> THE COURT: All right. Go ahead, Counselor.

Exh. 13 at 36:20-38:6.

        105.    On Sunbow's cross-examination, Mr. Berman testified that he was not

aware that in connection with the negotiation of the Jem agreement, Plaintiff's lawyer had asked

for payments for videocassettes and that they were denied. Exh. 13 at 55:5-20.

        106.    Mr. Berman agreed that he had described the use of music in TV

broadcasts as one of the exceptions for which synchronization royalties were not due under

Paragraph 6(a)(i) because that provision allows income only for licenses of "theatrical motion

pictures." Exh. 13 at 49:3-9. Directed to the continuation of Paragraph 6(a) that appears on page

v.

6 of the Jem agreement, which he read aloud, Mr. Berman agreed that under that definition, royalties for synchronization licenses were not due for any kind of audiovisual work made for television. *Id.* at 50:9-52:2.

107.    Mr. Berman agreed that synchronization and mechanical license under the Jem agreement applied only to licensing income from third parties, and he agreed that it was "quite possibly true" that neither of these provisions applied to exploitations by Sunbow itself. Exh. 13 at 76:6-22.

108.    Mr. Berman also testified that subparagraph 6(a)(vi) covered "any other use not specified." Exh. 13 at 37:13-38:4. Mr. Berman was directed to Paragraph 1 of the agreement, which defines "Music" as the music that Kinder & Bryant agreed to write and deliver, and "Show" as the five one-half hours, fifteen segments, or a television motion picture entitled "Jem." Exh. 13 at 55:23-56:24. He agreed that the entire Paragraph 6(a) of the Jem agreement referred only to uses of "Music," and that subparagraph 6(a)(vi) referred to "Music," not to other uses of the "Show." *Id.* at 56:25-7, 58:4-7. Mr. Berman advanced the argument that the term "Show" did not exclude other uses of Music with the "Show" (*id.* at 57:7-8), but he conceded that if "Show" were used with that meaning in subparagraph 6(a)(vi), it "would certainly create . . . a gross ambiguity as to whether or not the writer was entitled to income derived from elements of the Show other than the Music, which I'm not maintaining" (*id.* at 58:8-17). Asked whether the reason that the contract defined the terms "Music" and "Show" separately was to avoid that confusion, Mr. Berman said he didn't know. *Id.* at 58:18-59:1).

109.    Mr. Berman described royalty statements and accounting generally. *Id.* at 38:9-40:11. Mr. Berman reviewed a royalty statement prepared by Sony/ATV, the administrator for the Sunbow music, including music written by Kinder & Bryant for Sunbow. Despite

42

v.

Plaintiff's contention that these statements were inadequate to tell her the source of the monies she was receiving, Mr. Berman described them as "pretty clear." Exh. 13 at 65:20-24, 68:9; Exh. 19. He identified the following information on the statement: the name of the composition, the names of the other people entitled to money from use of the composition, record or catalog numbers, the number of units, the time period, the percent due to Plaintiff, the amount received, her share of the whole, and the amount due to her. *Id.* at 66:12-68:7. He also identified income from ringtones on the royalty statements, which Plaintiff had contended she had never received. *Id.* at 68:14-17.

110.   The state judge probed Mr. Berman about a composer's obligation to inquire if she thought that she was not receiving royalties:

> THE COURT: All right. And under that contract, she had rights to receive a statement, I take it, every six months?
>
> MR. BERMAN: That is my opinion, yes.
>
> THE COURT: All right. Now, that right, I take it, she didn't have to ask for a statement; they were just supposed to be given to her?
>
> MR. BERMAN: That's my understanding.
>
> THE COURT: Now, if there came a time when for years no statement came in, and Transformers is all over, . . . wouldn't you think that a reasonable writer would investigate about why there wasn't any money coming in, when obviously it was doing so well?
>
> MR. BERMAN: I can't say a writer wouldn't. I can think of a couple of issues where a writer might not.
>
> * * * * * *
>
> THE COURT: Okay. But there is a requirement that within a year you have to do something?
>
> MR. BERMAN: There's a requirement that you have to object to a statement within a year, but if you never get the statement, I don't know how the year commences.

43

v.

THE COURT: So, you feel it's a reasonable action on the part of a writer—and I'm asking you this as an expert—with a product, if I can call it that, that is obviously immensely popular, not to wonder through years why no checks are coming?

MR. BERMAN: Well, my problem -- my problem with that is that there were checks coming. They certainly weren't of the amount that I think they should have been.

THE COURT: All right. Final question. Ms. Bryant is entitled to an accounting, is she not, for the money that she purports to be owed under this agreement?

MR. BERMAN: Yes, that's my understanding.

THE COURT: All right. Now, what must she do under this agreement to get that accounting?

MR BERMAN: Well, under this agreement, she shouldn't have to do anything to get that accounting.

THE COURT: Well, she at least has to say I'm unhappy.

MR BERMAN: Well, the burden of the accounting is on the publisher, on Sunbow. The agreements provide that they're obligated, as is the norm in any such arrangement, that the publisher is obligated to render these periodic accounting statements.

THE COURT: All right. That's all the questions I have.

Exh. 13 at 82:2-84:15.

111.    At the conclusion of the expert's testimony, the state court summed up as follows:

Well, so, it comes down to this: I intend to decide whether or not at this point there is a viable claim for an accounting. Now, I have already decided on the record that there is no problem with the contracts. We've been through that. There are written contracts; there are no oral contracts. They have all been assumed into the final written version. So, as far as I'm concerned, that's not in the case anymore. The only question is: What right, if any, does Ms. Bryant have for an accounting, for an audit, or whatever?

Exh. 13 at 95:14-24.

v.

112.    In response to a comment from me, the state judge said: "I said several times that if [Mr. Berman] was allowed to be called, I was interested in his view on, you know, the terms and also on the question of the accounting, and I think we've gone into that. Exh. 13 at 96:11-15. And in further discussion about whether the trial court could rule on Sunbow's motion for a directed verdict before Plaintiff had rested, the trial judge said:

> Let me give you an analogy, . . . let me put you into a standard negligence case. And there gets to be a time when the Plaintiff is on the stand and it turns out that he didn't fall off this roof, he actually fell down the stairs in his own home and he carried himself up and all this. It comes out that way. The Plaintiff hasn't called his doctor yet, etcetera, and the defense gets up, and they move for a directed verdict or a dismissal. The Judge, in that case, could handle it without the Defense -- excuse me -- the Plaintiff ever resting. It's up to me. * * * So, I'm pointing out to you that, as far as I'm concerned, [Sunbow] made a motion, dismissal, directed verdict, whatever you want to call it. I'm going to see what's left in this case over the next couple of days, and I'll also read any last minute tidbits you want to send to me . . . .

Exh. 13 at 98:7-99:6.

### December 11, 2006

113.    On the final day of trial, the state court said that it appeared that Plaintiff had offered evidence on whether she was entitled to an accounting, and he wondered what more she needed before resting her case. Exh. 14 at 4:22-5:1. Plaintiff's counsel stated that "although I think we've made out a prima facie case on the equitable issue of an accounting and constructive trust, the issue of do they hold these monies that they've received in trust, the rest of the proofs would be . . . Bacal and Weitzman." *Id.* at 7:13-18. The state court reminded counsel that it had already ruled on Sunbow's motions in limine *Id.* at 17:6-15.

114.    When Plaintiff's counsel conceded that the trial court had fully explored Plaintiff's theory that she was entitled to a "true and accurate accounting," and the trial court then asked "So, then, are you ready to rest the Plaintiff's case on liability?" Plaintiff's counsel

v.

said "no" Plaintiff still wanted to make out a case for an equitable accounting by establishing a

fiduciary relationship with Bacal. Exh. 14 at 13:7-22. The Court then pointed out: "I said just

the opposite, that Bacal and ... Griffin Bacal are not in this case." *Id.* at 13:24-14:5. When it

became clear that the state judge was not going to revisit issues relating to Bacal's fiduciary

relationship and Plaintiff's entitlement to performance royalties, Plaintiff's counsel turned to his

claim of entitlement to monies under the Jem agreement: "We're talking about those

mechanicals that we haven't seen anything from, all the money that's due for al those DVD's (*id.*

at 14:20-16:11), at which point, the following exchange occurred:

> THE COURT: Well, you tried to get those DVDs and audiovisuals put
> into the contract and it was rejected.
>
> MR. MONAGHAN: Oh, no. I know -- oh, no, Your Honor. If I may? If
> you're talking about a letter from Dobishinski, that's the last thing
> probably you've seen because the papers came in.
>
> THE COURT: Right.
>
> MR. MONAGHAN: He wasn't our lawyer. That's what you need to hear
> from Weitzman's testimony. Sunbow hired Dobishinski. He was their
> administrator. Sunbow is talking about dealing with itself.
>
> THE COURT: But, regardless, that letter, does it not, shows that there
> were no audiovisual rights ever given to Ms. Bryant?
>
> MR. MONAGHAN: No, doesn't show anything of the sort. It doesn't
> show anything of the sort.
>
> THE COURT: Well, okay. One thing I don't want to do is -- we've had an
> awful lot of argument in this case -- I don't want to reargue the things that
> we've already done. I do want to get your appreciation of where we're at.

Exh. 14 at 16:12-17:8. The state judge said that he had hoped to decide the case that day but had

decided that he would prepare a written decision. "This ends this phase of the case. You'll get

an answer." *Id.* at 17:10-14, 23:22-23.

v.

Mid- and Post-Trial Briefing

115.    Sunbow confirmed its December 4, 2006 oral motion to dismiss Plaintiff's claims for unjust enrichment and constructive trust in a written motion it filed the next day to dismiss under CPLR 4401 on the basis of admissions and under CPLR 3211 to dismiss the accounting claim. The motion is attached as Exhibit 88. Although Sunbow was unsure what Plaintiff meant by claiming an "accounting"—whether she was advancing a contractual audit right or a state law accounting remedy—Sunbow objected to Plaintiff's proffering evidence with regard to contractual right because Plaintiff had come to trial on an oral agreement theory, not on breach of a written agreement; she also could not make out a case for an equitable accounting because she had not demonstrated a fiduciary duty. *Id.* at 1-4.

116.    Sunbow also opposed Plaintiff's suggestion that she be allowed to "conform the pleadings" because doing so would prejudice Sunbow if it were forced to defend against not just new claims but new evidence and arguments sprung upon it without notice or warning at trial. Exh. 88 at 4-7. Sunbow also objected to Plaintiff's proposed admission of the Jem agreement in evidence for all purposes, including to construe it on the merits. *Id.* at 7. Sunbow had offered the agreement solely to rebut Plaintiff's claim that she had operated pursuant to oral agreements, and the state court had denied Plaintiff's December 2005 motion to amend the complaint for breach of the written agreements. *Id.* But if the state court was inclined to admit the agreements into evidence for all purposes, Sunbow argued that a condition precedent to Plaintiff's breach of contract claim was a *contractual* right to challenge her payments and audit her account, a right that she had never exercised. *Id.* at 7-10.

117.    Plaintiff opposed Sunbow's motion (and moved for judgment) on December 8, 2006, which is Exhibit 87, claiming without citation that the state court had "accepted a written agreement, *i.e.*, the June 1, 1985 JEM Agreement as the agreement that

47

v.

governed all relations between Sunbow and Plaintiff." *Id.* at 1. Plaintiff noted that "[t]here has now been extensive testimony by Plaintiff and the Plaintiff's expert, David Berman, as to that agreement and Sunbow's breach of the terms of the subject agreement." *Id.* Plaintiff sought "to enforce rights granted to her under the Jem Agreement between Sunbow and Plaintiff [and] [t]herefore, this Court must consider all of the evidence before it based on the facts as they are . . . ." *Id.*

118.    Plaintiff requested that an "accounting be held to determine the extent of Sunbow's harm caused to Plaintiff." Exh. 87 at 1. Plaintiff claimed that David Berman had testified that "Plaintiff is entitled to specific royalties that are provided by the terms of the Agreement." *Id.* Plaintiff argued that if she "establishes a right to money damages" on the basis of the "transactions, occurrences, or series of transactions or occurrences set out in his complaint," the form of her pleadings should not limit her recovery. *Id.* at 3-4.

119.    Plaintiff also argued at length that she was owed an "equitable accounting" regardless of what was pled in the Amended Complaint. Exh. 87 at 3-6. According to Plaintiff, the Jem agreement "did not exist within the realm of this litigation" until "Sunbow spr[a]ng this agreement upon Plaintiff (mid-trial)." *Id.* at 6. She argued that "This is a Court of Law and Equity and as such, this Court is entrusted with the right to allow pleadings to be conformed to the evidence." *Id.* at 7. For that reason, the court must "hold Sunbow accountable for the material breaches of the Jem Agreement." *Id.* Plaintiff stated that she sought "an accounting under the agreement to allow Plaintiff to determine the extent of Sunbow's willful violation of the terms of the Jem Agreement resulting in the loss of unknown and untold dollars that unjustly enriched Sunbow." *Id.* at 12.

48

v.

120.    In a supporting affidavit, which is Exhibit 89, another of Plaintiff's counsel, Michael Korik, argued that "Plaintiff is entitled to an accounting on either a contractual or equitable basis." *Id.* at 5 (argument heading). Reproducing sections of David Berman's testimony, which counsel characterized as "overwhelming evidence," counsel claimed that "Sunbow did not do exactly what its own Jem Agreement required:  account to and pay Plaintiff." *Id.* at 9-10, both ¶¶ 15.

121.    On December 8, 2007, Sunbow filed its reply memorandum of law, which is Exhibit 90, and reply affirmation, which is Exhibit 91.  Sunbow opposed Plaintiff's claim that she be granted an accounting pointing out that the clearest evidence that she had abandoned such a claim was a comparison of her Verified Complaint (which included a claim for an accounting) with her Amended Complaint (which deleted the claim).  Exh. 90 at 4; *see* Exh. 23 & 24. Moreover, the state court had denied Sunbow's first motion to dismiss (including dismissal of Plaintiff's accounting claim) as moot once Plaintiff amended her Verified Complaint and deleted the claims on which Sunbow had moved.  Exh. 90 at 4; Exh. 92.  Sunbow repeated its opening argument about the prejudice of permitting Plaintiff to conform the pleadings to include an action for breach of the Jem agreement (Exh. 90 at 6-7, 14-17).  Finally, *Sunbow pointed out that Plaintiff still had the right to exercise her contractual right to audit and challenge her payments Id.* at 7-8.

122.    Sunbow objected to the court's consideration of David Berman's testimony on the grounds that he had been noticed as a witness on the "oral agreement" theory that was no longer in the case, but then had testified about "the construction of the contract, " which is an issue for the court, not an expert.  Exh. 90 at 10-11.  Moreover, Berman's testimony contradicted facts in the record, including the plain language of the agreement and the 1986

v.

exchange of correspondence between Plaintiff's and Sunbow's counsel in which Plaintiff had sought royalties for videocassette tapes, and Sunbow's counsel replied that this request was "unacceptable." *Id.* at 11-13; Exhs. 56-57.

### Plaintiff's Motion to Continue the Trial

123.    On January 23, 2007, while the state court was considering the pending motion to dismiss, Plaintiff filed a motion for an order "allowing this trial to proceed," which is Exhibit 93, asking the Court to "allow Plaintiff to complete her case" by admitting the testimony of Kinder, Bacal, and Weitzman. Plaintiff's counsel attached the complete deposition transcripts of all three witnesses to his affirmation in support of this motion. On her witness list, Plaintiff had noticed Kinder and Weitzman to appear by deposition and Bacal to testify and to be impeached with his deposition testimony. Exh. 82 at 2, 3, 6. Plaintiff argued that this testimony was relevant to establishing a "special confidential relationship" or "fiduciary" relationship between Sunbow and Plaintiff (Exh. 93 at ¶¶10-12) and to her claim against BMI and Sunbow regarding registrations of compositions with BMI (*id.* at ¶12). By attaching the deposition transcripts, Plaintiff presented substantially all the testimony that she would have submitted before resting her case on these issues had the trial court not concluded it was irrelevant to the surviving claims.

124.    In reply to defendant BMI's letter objecting to this motion, the state judge held a telephone conference among the parties on February 2, 2007, in which he informed the parties that he was not going to consider Plaintiff's motion or the attached testimony. Plaintiff objected to this ruling in a letter to the state judge that same day, which is Exhibit 94. Then in a February 8, 2007 letter to the parties, which is Exhibit 95, the state court announced that it had "revised its prior decision to disregard Plaintiff's motion and will consider same" and its decision

50

v.

on that motion would be "incorporated into the presently pending decision." *Id.* at 2. The court then set a briefing schedule for oppositions and replies to the motion.

125.    In its opposition, which is Exhibit 96, Sunbow argued that the testimony submitted with Plaintiff's motion (a) did not support any confidential or fiduciary relationship, (b) did not demonstrate any unjust enrichment, and (c) did not evidence any improper "re-registration" of her credits with BMI. *Id.* at 6-9. Moreover, Sunbow argued, Plaintiff had been unable to refute the substance of the correspondence between Plaintiff's and Sunbow's lawyers in 1986—that Plaintiff had asked Sunbow for royalties from home video distribution, knowing that they were not covered by the Jem agreement, and Sunbow had denied that request. *Id.* at 4, n.1.

126.    Plaintiff replied on March 3, 2007, which is Exhibit 97, stating that "[i]t is the facts that determine the relief—not the legal theories." *Id.* at 4, ¶ 5. Plaintiff stated that "[t]here has never been any admission that Plaintiff is suing *on only an oral agreement* and none of her three Complaints so state…. She asked for an accounting in her Amended Complaint as the Court noted on the record. The JEM Contract was admitted for all purposes and this Court held that it applies to the relationships. It was not admitted solely for impeachment purposes-evidence comes in from all sources" *Id.* at 5-7, ¶11 (emphasis in original). The reply also addressed BMI's opposition.

### Final Decision

127.    On March 12, 2007, the state court issued a Decision and Order, which is Exhibit 98, holding that "[t]his case is dismissed with costs and disbursements." *Id.* at 8. The decision begins by noting that the case "concerns the attempts of Plaintiff to reconcile her belief that she has not been sufficiently recompensed for her obvious talent, artistry and musical abilities." *Id.* at 2. The state court recounted the history of the case, noting that although in the

v.

"beginning of these cases Plaintiff claimed there were no written contracts between Plaintiff and Defendant Sunbow...the Court found that there were signed contracts." *Id.* at 3. Once the court "decided the signatures were genuine," it allowed Plaintiff to "introduce such evidence, as she had, that there were oral agreements as well as the written ones between the parties." *Id.* On the first day of the resumption of trial "Plaintiff admitted that there were no oral agreements," and "Sunbow moved to dismiss the case based on the admissions of Plaintiff although Plaintiff had not formally rested." *Id.*

128.    The state court then noted that, in opposition to Sunbow's motion, Plaintiff "move[d] for an order conforming the pleadings to the proof and for an action for an accounting based on contract law, which was not included in the aforementioned amended complaint." Exh. 98 at 3-4.

129.    The state court then recounted the various positions taken by the parties in the post-trial briefing. In addition to the trial testimony, the court noted that Sunbow had attached to its opposition the 1986 correspondence between the lawyers for Plaintiff and Sunbow, noting that the "purpose of this correspondence is that Sunbow would not give Plaintiff additional money for audio recordings, videocassette or masters produced by Plaintiff embodied in commercial distribution." *Id.* at 5-6; Ex. 56 & 57.

130.    As for its holdings, the state court first noted that although the Amended Complaint had been "based upon unjust enrichment and constructive trust based on unjust enrichment...[s]ince that time Plaintiff has failed to prove any confidential or fiduciary relationship between either Sunbow or BMI." Exh. 98 at 6.

131.    Next the state court noted that the case had "occupied so much time and motions because Plaintiff had advanced several different theories relative to the Defendant's

v.

alleged liabilities." Exh. 98 at 6-7. The state court then reviewed the remainder of the trial and post-trial briefing, including Plaintiff's motion to conform the pleadings to the proof and her breach of contract claim, and held that "Plaintiff is not entitled to any equitable accounting having failed to prove a prima facie case against either Defendant." *Id.* at 8. "However," the state court noted that "Plaintiff is entitled to whatever rights still exist under her agreements with defendants" (*id.*), alluding to Plaintiff's contractual right to challenge her royalty reports under Section 6(b) of the Jem agreement (Exh. 18), as Sunbow had itself explained in the its motion to dismiss.

### Final Judgment

132. On May 8, 2007, Sunbow entered the Final Judgment on the March 12, 2007 Decision and Order and Bill of Costs. The Final Judgment, which is Exhibit 99, states that the "issues have been duly tried, and defendants [having] moved the Court for an order pursuant to [CPLR §§ 4401 and 3211]" and "the Court after due deliberation duly made [having] filed a decision in writing," accordingly, the "complaint [was] dismissed in its entirety with prejudice." *Id.* at 2.

133. On May 23, 2007, Plaintiff moved to vacate the judgment, which is Exhibit 100, claiming that Sunbow had improperly filed the judgment (*id.* at 2-3), that the judgment was "erroneous" insofar as it stated that "the issues have been duly tried" because Plaintiff claimed she was "unable to complete her full case and put forth all evidence necessary to support her claim" (*id.* at 4-5), and erroneous in stating that the dismissal was "with prejudice." (*id.* at 5-6).

134. In its opposition, which is Exhibit 101, Sunbow observed that Plaintiff offered no evidence to support her objections to the filing of the Final Judgment, that the filing was consistent with CPLR § 5016(c), case law, and treatises (*id.* at 2-3); and that the language of

v.

the Decision and Order made clear that state court was dismissing the action on the merits (*id.* at 3-5). Plaintiff's June 1, 2007 reply, which is Exhibit 102, simply restated the arguments in her motion.

135.    The state court's June 12, 2007 Decision and Order, which is Exhibit 103, denied Plaintiff's motion "in all respects." *Id.* at 3.

## WHAT INFORMATION PLAINTIFF KNEW (OR SHOULD HAVE KNOWN) BEFORE THE FILING OF THE STATE ACTION OR BEFORE TRIAL BEGAN.

136.    Plaintiff testified at her March 31, 2003 deposition that "over the last three, four years" she had been aware that compositions that she wrote were being used in cartoon shows and movies, animated features, videos, and DVDs. Exh. 17 at 122:17-123:4, 123:23-25. She described particularly having purchased a copy of a *Transformers* movie through amazon.com and then receiving regular marketing emails over several years from amazon.com whenever one of the TV Shows was issued in a new format. *Id.* at 123: 5-22.

137.    Plaintiff repeated that information during trial (July 2004), testifying that she learned about these new uses—in premium cassettes, new television cartoons (Armada and Energon), video games (Transformers), ringtones, and foreign broadcasts—three to four years earlier by searching internet sites and purchasing video tapes and discs from amazon.com Exh. 4 at 213:3-20, 218:7-12, 233:23-234:4, 235:24-236:14, 237:19-238:23, 294:24-295:4;Exh. 50-54; Exh. 5 at 459:12-20, 475:15-16; see ¶ 45 above. In addition, she knew from documents that Sunbow produced that TV Shows had been distributed "in home video throughout the 90s abroad." Exh. 5 at 460:13-17, 461:25-462:3.

138.    Plaintiff also testified that the home video products that she had purchased in the 2-4 years before trial began in 2004, were marketed under the name and logos of

v.

distributors, such as Rhino Home Video, and included references to Sunbow, Wildstar Music and

Hasbro, all of which she is now suing in this case. Exh. 4 at 223:17-224:9, 293:11-295:4; Exhs.

50-54, 104 and 105.

        139.    On November 10, 2003, more than six months before the 2004 trial and

before Sunbow's motion for summary judgment, Sunbow produced to Plaintiff

> the correspondence between Kinder & Bryant's lawyer and Sunbow's
> lawyer negotiating the terms of the Jem and My Little Pony agreements,
> including an attempt to obtain additional royalties from distribution of
> videocassettes (Exh. 56 & 57);
>
> an unsigned copy of the Jem agreement (Exh. 28);
>
> a copy of a letter from Kinder & Bryant's proposing an amendment to the
> Jem agreement (Exh. 29); and
>
> a May 1, 1994 license between Sunbow and Backlund & Co, for
> distribution of *My Little Pony* in Hungary from Sept. 15, 1994 through
> Sept. 14. (Exh. 106)

The signed Jem agreement is identical to the unsigned copy Sunbow produced to Plaintiff in

November 2003. *Compare* Exh. 18 *with* Exh. 28. The signed amendment to the Jem agreement

is identical to the amendment that Kinder & Bryant's lawyer had proposed to Sunbow and that

Sunbow had produced to Plaintiff in November 2003. *Compare* Exh. 29 *with* Exh. 59.

        140.    Sunbow produced to Plaintiff's counsel copies of the following

agreements on the dates indicated:

> Hasbro-Sunbow Production License Agreements for various TV Shows
> (Exhibit 15)—on June 22, 2004 and July 2, 2004;
>
> The October 1988 Standard Terms and Conditions, as amended effective
> January 1, 1991, and further amended, April 24, 1992, among Hasbro Inc.,
> Milton Bradley International, Inc., Sunbow Productions, Inc., Starwild
> Music, Inc. and Wildstar Music Inc., which is incorporated into each
> Production License Agreement (Exhibit 15)—on June 22, 2004;
>
> Two April 8, 1988 work-for-hire agreements between Griffin Bacal, as
> agent for Hasbro, and Kinder & Bryant for compositions entitled

v.

*Visionaries* and for compositions entitled *Transformers* (Exh. 108 & Exh. 109)—on June 22, 2004;

Another, more legible copy of the April 8, 1988 work-for-hire agreement between Griffin Bacal, as agent for Hasbro, and Kinder & Bryant for the composition entitled *Transformers* and a copy of a Mar. 21, 1984 work-for-hire agreement between Griffin Bacal, as agent for Hasbro, and Kinder & Bryant for the composition entitled *Transformers* (Exh. 110 & 111)—on Aug. 20, 2004;

Royalty Statements prepared by Sony/ATV for TV Loonland AG for the periods July 1997 through Dec. 31, 2003 (Exh. 19)—on June 22, 2004;

Royalty Statements prepared by Sony/ATV for TV Loonland AG for the periods January 1, 2004 through June 30, 2006 (Exh. 19)—on December 1, 2006 and a duplicate copy produced with production numbers on December 3, 2006;

many license agreements or deal memos between TV Loonland AG or TV Loonland Home Entertainment Ltd. and foreign entities for the distribution of various TV Shows in countries outside the U.S. and Canada (now available on Plaintiff's counsel's website cited in the Complaint: http://litigation.monaghanlawyers.com —on July 2, 2004;

the Nov. 12, 1987 Publishing Administration Agreement between Hasbro and Milton Bradley Inc. ("Publisher") and the Law Offices of William M. Dobishinski ("Administrator") for the administration of music contained in the TV Shows (Exh. 112)—on July 2, 2004;

the March 11 1996 music administration agreement between Sunbow Entertainment L.L.C. d/b/a various publishers including Wildstar Music, Inc. and Starwild Music, Inc. on one hand and Sony/ATV Songs, LLC, and Sony/ATV Tunes, LLC on the other hand for the administration of the music that the publishers owned, controlled, or administered or would acquire such interest in the future (Exh. 113)—on July 2, 2004;

the December 2000 license from TV Loonland AG and Sunbow to SMEI (Exhibit 21)—on July 2, 2004; and

141.    Plaintiff produced to Sunbow on March 29, 2004

several license agreements from the 1980s between Sunbow and International Video Entertainment Inc. and between Sunbow and Milton Bradley International Inc. and Children's Video Library for the distribution, both foreign and domestic of various TV Shows. (Exh. 114).

v.

142.    Plaintiff obtained the SMEI/Rhino licenses described in ¶ 14 on or around January 29, 2004 pursuant to a July 10, 2003 subpoena she issued approximately one year before the state trial.  Exhibit 115 includes a June 7, 2004 transmittal letter by which Plaintiff produced the Rhino agreements (Exh. 26b) to Sunbow, including correspondence between Plaintiff's counsel and Warner Strategic Marketing relating to the July 2003 and the production of the Rhino agreements.  But Plaintiff knew about the Rhino agreements even earlier than July 2003, because she testified about them at her March 31, 2003 deposition.  *See* ¶ 24.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on January 4, 2008.

    /s/Gloria C. Phares
        Gloria C. Phares

57

v.