# EXHIBIT 2

S5576-017

| SERIAL NO. | 15 | |
|---|---|---|
| SERVED | | |
| RECEIVED | | |
| FILED | | |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

- - - - - - - - - - - - - - - - - - - - x

ANNE BRYANT,

                Plaintiff,

                                      # 5192/00

    - against -

                                <u>CONFERENCE ORDER</u>

BROADCAST MUSIC, INC., et al.,

                Defendants.

- - - - - - - - - - - - - - - - - - - - x

ANNE BRYANT,

                Plaintiff,

                                      # 2821/02

    - against -

SUNBOW PRODUCTIONS, INC.,

                Defendant.

- - - - - - - - - - - - - - - - - - - - x

                          Rockland County Courthouse
                          One South Main Street
                          New City, New York  10956
                          January 2, 2003
                          9:30 a.m.

B e f o r e:

                HONORABLE ANDREW P. O'ROURKE,

                        Supreme Court Justice.

Appearances:

                MONAGHAN, MONAGHAN, et al., ESQS.
                Attorneys for Plaintiff
                25 East Salem Street
                Hackensack, New Jersey  07601
                BY:  PATRICK J. MONAGHAN, ESQ.

(Appearances continue)

1

2              DUANE MORRIS, ESQS.
               Attorneys for Defendant McCall
3              380 Lexington Avenue, 32nd Fl.
               New York, New York  10168
4              BY:  DAVID S. TANNENBAUM, ESQ.
                    of counsel.

5

6              PATTERSON, BELKNAP, et al., ESQS.
               Attorneys for Defendant Sunbow
7              1133 Avenue of the Americas
               New York, New York  10036
8              BY:  STEVEN ZALESIN, ESQ.
                    of counsel.

9

10                           Daniela Fahey
                             Senior Court Reporter
11                    o0o

12             COURT CLERK:  Counsels' appearance.

13             MR. MONAGHAN:  Good morning, your Honor.

14   Patrick Monaghan for plaintiff in both matters.

15             MR. TANNENBAUM:  Good morning, your Honor.

16   David Tannenbaum and Adrienne Valencia for the

17   defendant Joel McCall on the first matter on the

18   calendar.

19             MR. ZALESIN:  Steven Zalesin for defendant

20   Sunbow Productions in the second matter.

21             THE COURT:  Second matter, Sunbold?

22             MR. ZALESIN:  B-o-w, Sunbow.

23             THE COURT:  They were listed in the first

24   matter but weren't served.  Is that correct?

25             MR. MONAGHAN:  They were served, but we

```
 1                          Proceedings
 2              did not take a default in a timely fashion under
 3              the one-year provision in the CPLR.
 4                   MR. ZALESIN:  We believe we are not
 5              served.
 6                   THE COURT:  One way or another you were
 7              named.
 8                   MR. ZALESIN:  Named but without notice;
 9              without service or without actual notice.  We
10              had no idea that this case existed until several
11              months after we were served with the complaint
12              in our case in mid 2002.  It was only
13              essentially by happenstance that we learned
14              there was a second action pending in this Court
15              before your Honor in which -- which is, I
16              gather, on the trial-ready calendar.
17                   THE COURT:  Yes, but it seems to be based
18              on the same factors and has the same parties
19              involved, so it's hard for me to understand why
20              we shouldn't consolidated it.  Admittedly this
21              is late.
22                   MR. TANNENBAUM:  If I may, your Honor, I
23              understood you wrote the letter for the
24              defendant Bryant, and we didn't know about the
25              action for Sunbow until their papers arrived a
```

1                        Proceedings

2           few weeks before.  We didn't know there were two

3           cases.  Otherwise we would have most likely made

4           an application to consolidate the two cases

5           because its makes sense.  It's the same case.

6                    THE COURT:  Let me ask you this.  You're

7           all here this morning.  Any chance of getting

8           this resolved?

9                    MR. TANNENBAUM:  We tried this a couple of

10          months ago when we were before this calendar.

11          We don't think there is a basis for the case.

12                   THE COURT:  I got a cattle prod for a

13          Christmas present.

14                   MR. TANNENBAUM:  That would be good.  When

15          you brought the plaintiff in, we didn't get a

16          counter offer.  If you want to use it on the

17          plaintiff, I'm all for it.

18                   THE COURT:  How about us having a short

19          chat?  I'm going to consolidate this.

20                   MR. ZALESIN:  If I can be heard briefly on

21          that subject.

22                   THE COURT:  Yes.

23                   MR. ZALESIN:  We certainly understand that

24          the allegation in the two cases are similar, and

25          as we understand it, defendant Sunbow is a

|  | |
|---|---|
| 1 | Proceedings |
| 2 | corporation that was controlled by Mr. |
| 3 | Tannenbaum's client.  Mr. McCall was a principal |
| 4 | at some point in time.  He isn't at this point |
| 5 | in time but was at some time in the past, so |
| 6 | there's certainly some substantial overlap |
| 7 | between the two cases.  We acknowledge that. |
| 8 | The problem that we have, your Honor, is |
| 9 | that we are in vastly different procedural |
| 10 | postures as between the two cases.  We are |
| 11 | literally just getting started.  We're going to |
| 12 | serve a motion to dismiss the complaint that is |
| 13 | due today on statute of limitation grounds and |
| 14 | some pleading issues, but we have had no |
| 15 | discovery really, not even time for adequate |
| 16 | factual investigation, and, Judge, it's a little |
| 17 | bit like being asked to take a final exam before |
| 18 | you've taken the class.  We understand we would |
| 19 | expect the Court would grant us some time for |
| 20 | discovery, but in cases like these, where |
| 21 | there's been full discovery in the other case, |
| 22 | and the first case is ready for trial, and the |
| 23 | second case issue isn't even joined -- we |
| 24 | haven't even answered the complaint yet.  It |
| 25 | would be either highly prejudicial to us to |

```
 1                        Proceedings
 2       consolidate, or I guess the only alternative is
 3       to allow for a substantial delay of the first
 4       case in order for us to get up to speed and take
 5       discovery and make whatever motions.
 6              THE COURT:  Let me ask you this.  Have you
 7       seen the discovery that's already been had?
 8              MR. ZALESIN:  No.  We know nothing about
 9       this case.
10              MR. TANNENBAUM:  I know you have
11       deposition transcripts, and there were only two
12       depositions taken, and I know you have those
13       because I spoke to somebody from your office.
14              THE COURT:  Let me say it seems to me that
15       if I gave you a discovery schedule today, that
16       you should certainly be able to be through with
17       discovery in 90 days.
18              MR. ZALESIN:  I don't know whether that's
19       reasonable or not, your Honor.
20              THE COURT:  I've been accused of being
21       unreasonable before.
22              MR. ZALESIN:  I would expect that the
23       plaintiff can supply us with whatever discovery
24       we require within a reasonable period of time.
25       That's within their control.  My concern,
```

```
 1                        Proceedings
 2            however, is that there are other parties that
 3            have important factual knowledge.
 4                 The case, as I understand it, that Mr.
 5            Monaghan originally brought and is named as BMI,
 6            Broadcast Music, Inc., it's a performing rights
 7            society which basically controls the copyright
 8            warranties for copyright musical works.  We
 9            absolutely need discovery from BMI in order to
10            litigate this case because the allegation is
11            that my client, in some conspiracy along with
12            Mr. Tannenbaum's client, and others who aren't
13            before you, arranged to have the plaintiff's
14            copyrighted musical compositions reregistered
15            with BMI so monies that would be paid to the
16            plaintiff would be paid to others.
17                 THE COURT:  I'm sort of aware of this
18            because of the first case.
19                 MR. ZALESIN:  Bear with me because again
20            we haven't participated in any of the Court
21            hearings or conferences, and I don't know how
22            much your Honor is familiar with or not, but we
23            absolutely need discovery from BMI in order to
24            litigate this case.  We don't know in any of
25            this is true.  We haven't seen a shred of
```

```
 1                         Proceedings
 2            evidence that any of this is true or certainly
 3            that my client Sunbow had anything to do with
 4            it, if it did happen, but we absolutely need
 5            discovery from third parties.
 6                 THE COURT:  Your request for discovery
 7            seems to lie its worth here in intention in
 8            making a motion for summary judgment.
 9                 MR. ZALESIN:  Your Honor, it would seem to
10            me, based on the amount of information available
11            to us at the moment, that this should be a
12            summary judgment case.  I don't know what's
13            happened in this case, but we have seen no
14            evidence, not a shred of documentary evidence,
15            that anything that's alleged in the complaint
16            ever occurred, and it would seem to me that in a
17            case that's trial ready, there ought to be some
18            evidence.  Otherwise it ought to be dismissed on
19            summary judgment.
20                 I don't know what the record looks like in
21            the first case.  We certainly would intend to
22            develop a factual record, and if it supports it,
23            make a summary judgment motion, and we would, of
24            course, request the opportunity to proceed on a
25            normal procedural track, not in any way impeded
```

1                    Proceedings

2          or prejudiced by the fact that there's another

3          case, which I understand is years ahead of us on

4          the calendar, and your Honor would like to move

5          forward to trial, but we are, like any other

6          litigant, entitled to our full rights as a

7          defendant and would like to pursue them.

8               THE COURT:  Okay.  This is what we're

9          going to do.  Number one is the plaintiff will

10         withdraw the note of issue subject to

11         stipulation putting it back on, and I will tell

12         you now that if you don't sign the stipulation,

13         I'll just deliver it back on, so let's do it the

14         easy way.

15              Secondly, in the second action I'll give

16         you the normal time I have give for discovery,

17         which is 40 days for discovery of documents,

18         which would take you to about February 12th.

19         Examination before trial a month after that.

20         I'll make it March 19th.  EBTs that are

21         scheduled will be held on March 19th, and --

22         where is the plaintiff's office?

23              MR. MONAGHAN:  We have one in midtown.  We

24         can take it at their offices if they like.

25              THE COURT:  You'll either agree to

1                           Proceedings

2          someplace or take it across the street at

3          Rockland & Orange.

4                   MR. MONAGHAN:  That's not a problem, your

5          Honor.

6                   THE COURT:  I will order it for Rockland &

7          Orange -- you can take it at another place -- 10

8          a.m., and to continue from day to day until

9          completed.  That starts on March 19th of this

10         year.

11                  And then I'll give you a return date back

12         here.

13                  COURT CLERK:  April 11, 9:30 a.m.

14                  MR. MONAGHAN:  Your Honor, if I may, is

15         that party discovery?  Because we have these

16         third parties we have to subpoena and work out

17         schedules with them.

18                  THE COURT:  I don't know how many people

19         you're planning on calling, but I'm going to

20         assume that you can get this done before you

21         come back here in April.  You've got to get

22         moving on this case.  Everybody has to get

23         moving, and actually when you come right down to

24         it, you have six months under the rules to

25         finish all discovery, and I'm not going to rush

1               Proceedings

2          you, but on the other hand I've consolidated the

3          action.  I think it is in judicial economy not

4          to try the same facts twice.

5               Okay.  So that's it.  Meantime I'm going

6          to order the plaintiff to make available, if due

7          the defendant Sunbow, all of the outstanding

8          discovery that has been had in this case up

9          until now.  You may certainly charge for copies,

10         as required or as allowed, but that should be

11         done within the next 10 days I would say.

12              MR. MONAGHAN:  That's fine, your Honor.

13              THE COURT:  And you can decide for Sunbow

14         what additional discovery you need, any of the

15         parties that are involved in this case, since

16         it's now consolidated.

17              Anything else I can do for you all this

18         morning?  I've done enough, you think?

19              MR. ZALESIN:  No.  This is reasonable,

20         your Honor.  Thank you.

21              COURT CLERK:  Is this consolidated for

22         purposes of joint discovery or consolidated

23         under one index number, 5092?

24              THE COURT:  I think it should be

25         consolidated for all purposes, the first one.

12

1          Proceedings

2          COURT CLERK:  Do you want to prepare some

3      form of stipulation, long form caption,

4      indicating the matter is being consolidated

5      under Index 5192/2000, and the Judge will so

6      order it when you submit it.

7          THE COURT:  You might want to get a copy

8      of the record we just made so you'll know what's

9      going on.  As a matter of fact, I'll direct it,

10     and the parties to share the cost.

11         MR. MONAGHAN:  Very well.  Thank you,

12     Judge.

13                      o0o

14         I do hereby certify that the foregoing is

15     a true and accurate transcript of the within

16     proceedings.

17

18     _____

       Daniela Fahey

19

20

21

22

23

24

25

# EXHIBIT 3

```
 1    SUPREME COURT :  STATE OF NEW YORK
      COUNTY OF ROCKLAND      :    CIVIL TERM
 2    ----------------------------------------x
      ANNE BRYANT,
 3                                       Index No.
                         Plaintiff,      5192/2000
 4
              -against-
 5
      BROADCAST MUSIC, INC, (a/k/a "BMI"),
 6    CLIFFORD A. "FORD" KINDER, KINDER & CO.,
      LTD., VADIVOX, LTD., JULES M. "JOE"
 7    BACAL, GRIFFIN BACAL, INC., STARWILD
      MUSIC BMI, WILDSTAR MUSIC ASCAP, SUNBOW
 8    PRODUCTIONS, INC. and JOHN AND JANE DOES
       - 10,
 9
                         Defendants.
10    ----------------------------------------x
      ANNE BRYANT,
11                                       Index No.
                         Plaintiff,      2821/2002
12
              -against-
13
      SUNBOW PRODUCTIONS,INC.,
14
15                       Defendant.
      ----------------------------------------x
16    NON-JURY TRIAL
                            Rockland Supreme Court
17                          One South Main Street
                            Suite 200
18                          New City, New York  10956
                            July 6, 2004
19
20    B E F O R E:
21
                            HON. ANDREW P. O'ROURKE
22                      JUSTICE OF THE SUPREME COURT
23
24
25
```

Page 2

1    APPEARANCES:
2    FOR THE PLAINTIFF:
3        MONAGHAN, MONAGHAN, LAMB & MARCHISIO, ESQS.
         150 West 55th Street
4        New York, New York 10019
         BY: PATRICK J. MONAGHAN, JR., ESQ.
5            -and-
         JEFFREY C. PRIMIANO, ESQ.
6
7    FOR THE DEFENDANT, BACAL:
8
         DUANE MORRIS, LLP.
9        380 Lexington Avenue
         New York, New York 10168
10       BY: DAVID S. TANNENBAUM, ESQ.
             -and-
11           ADRIENNE L. VALENCIA, ESQ.
12
13   FOR THE DEFENDANT, SUNBOW:
14       PATTERSON, BELKNAP, WEBB & TYLER, LLP.
         1133 Avenue of the Americas
15       New York, New York 10036-6710
         BY: GLORIA C. PHARES, ESQ.
16           -and-
         LAUREN HAMMER BRESLOW, ESQ.
17
18
19   FOR THE DEFENDANT, BMI, INC.:
20       JUDITH M. SAFFER, ESQ.
         BMI, INC.
21       320 West 57th Street
         New York, New York 10019-3790
22       Assistant General Counsel
23
24
25

Page 3

1    APPEARANCES: (Continued)
2
3
4    ALSO PRESENT:    ANNE BRYANT, PLAINTIFF
                      JULES M. "JOE" BACAL, DEFENDANT
5                     NEIL RIGBY
6
7
8
9    ROBERT FRITZ
     SENIOR COURT CLERK
10
11
12
13            ELIZABETH A. KENT
              SENIOR COURT REPORTER
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1              - APPLICATIONS -
2            (Convened: 11:10 a.m.)
3        (Trial convenes on the record, in open court
4    - counsel and parties present)
5        THE COURT: Okay, at the end of this session
6    I would like all the attorneys to -- you've got to
7    keep together. I want to know who you represent.
8    Pass it along, let everybody sign it. It looks
9    like the whole bar association is here.
10       As I said to you, I'm going to take opening
11   statements.
12       MS. SAFFER: Your Honor, if it please the
13   Court, when you asked for appearances, I did not
14   stand because I'm not going to be participating.
15   But, on reflection, I thought you should be aware
16   of the fact my name is Judith Saffer, I'm the
17   attorney for Broadcast Music, Inc., the first
18   listed Defendant.
19       You stayed the case against Broadcast Music
20   and ordered the Plaintiff to begin in arbitration
21   four years ago. An arbitration proceeding has not
22   been commenced, and I am here because I'm
23   obviously concerned about the outcome of the case
24   and, also, because a witness from BMI Broadcast
25   Music, Inc. has been subpoenaed and will be here

Page 5

1              - APPLICATIONS -
2    to testify.
3        THE COURT: What happened to the
4    arbitration?
5        MS. SAFFER: It was not commenced.
6        MR. MONAGHAN: The arbitration has been on
7    hold pending litigation, your Honor. BMI is the
8    Performing Rights Society, as your Honor knows.
9        THE COURT: Yeah.
10       MR. MONAGHAN: And Miss Bryant is a member
11   of that. You do not have, in arbitration, the
12   same kinds of discovery and the rights that you
13   would have in litigation to get documents and
14   whatever. Our thought was to pursue the --
15       Your Honor, this is Miss Bryant, the
16   Plaintiff in this case --
17       MS. BRYANT: How do you do?
18       MR. MONAGHAN: -- and see how the litigation
19   turns out before we pursue it. We couldn't go on
20   both fronts at the same time. It was simply too
21   much.
22       MS. SAFFER: Your Honor, although the
23   proceeding has been stayed we have produced all
24   the records that have been requested by any of the
25   parties in this, and I am finding myself, frankly,

Page 6

- APPLICATIONS -

1
2  in a slightly difficult position in that the
3  rulings on -- in this matter, of course, will
4  affect BMI greatly, and yet I'm not really a
5  participant because it was stayed and because they
6  didn't commence an arbitration.  So --
7      THE COURT:  Do you want to be a participant?
8      MS. SAFFER:  I would like to be allowed the
9  opportunity, if need be, to ask a question or
10  whatever.  But --
11      THE COURT:  I think you have to be either in
12  or out.
13      MS. SAFFER:  In or out?
14      Well, then, frankly, I'm going to stay out
15  for the following reasons:  Since I did not
16  participate up until this point, I didn't take
17  discovery, we were the subject of discovery, my
18  client did give depositions.  But we, on the other
19  hand, did not have a role.  And I think it might
20  be prejudicial to us to jump in at the very last
21  second.  So we will remain on the sidelines and
22  trust in the wisdom of your proceedings.
23      THE COURT:  All right.  Okay, I heard before
24  that there was some initial motions of some sort
25  that the people wanted to make?  Or statements?

Page 7

- APPLICATIONS -

1
2      MR. TANNENBAUM:  Yeah, that's correct, your
3  Honor.  There are certain motions in limine that
4  we want to make, and I believe --
5      MS. PHARES:  As does counsel for Sunbow
6  Productions.
7      MR. TANNENBAUM:  -- and I believe Mr.
8  Monaghan has some issues -- I'm David Tannenbaum.
9  I represent Joe Bacal.  That is Mr. Bacal over
10  here.
11      If your Honor wants, I'll go first.
12      THE COURT:  We usually say ladies first, but
13  I'll let you go first.
14      Go ahead.
15      MR. TANNENBAUM:  Thanks.
16      Your Honor, today the Plaintiff has done a
17  masterful job in making the Court believe that
18  this is a complex case.  It's not a complex case.
19  It is a very simple case.  They have only one
20  cause of action left in the case.  Your Honor
21  dismissed everything else.  There is a cause of
22  action for unjust enrichment.
23      What their claim is, is that somehow Mr.
24  Bacal received certain payments that he shouldn't
25  have received and those payments should have gone

Page 8

- APPLICATIONS -

1
2  to Miss Bryant.  That's their case.  It's a very
3  simple case.  If your Honor will have Miss Bryant
4  identify finally the songs, the musical
5  compositions, that she claims were re-registered
6  at a certain date and how Mr. Bacal benefitted
7  from their re-registration and that somehow she
8  suffered a detriment by that, I'll go through
9  those songs one by one --
10      THE COURT:  I thought this was in limine?
11      MR. TANNENBAUM:  They've listed 26 witnesses
12  in this case, your Honor, and there appears to be
13  an effort on their part to also put in evidence
14  that money that went to other people or other
15  theories of damages, such as she had to sell her
16  house, she stopped doing business because of this.
17  It is going to take months and months to try the
18  case they want to try.
19      Very simply, what we want to do is limit the
20  case to the case that is in the pleadings, the
21  only cause of action in evidence.  If she's got
22  evidence that -- of money that went back because
23  of an alleged re-registration.  That is the case.
24      Also, to be fair, in the amended pleading
25  there are some unconnected claims about DVD sales

Page 9

- APPLICATIONS -

1
2  and CD sales.  We'll deal with that separately.
3  But we would like to limit the case to the issues
4  that are pled.  Your Honor carved out four days
5  for this trial.  I don't see how we will do 26
6  witnesses just on the Plaintiff's case in four
7  days.
8      What I would like to hand up is to simply
9  have the Court exclude certain irrelevant
10  testimony about money that allegedly went other
11  places or other kinds of types of damages that she
12  suffered and just try the case that is pled.  And
13  I'm confident that as soon as she identifies the
14  songs, within an hour I'll be able to show your
15  Honor the claims are nonsense.  We'll be able to
16  go home and this will end.  I cannot continue to
17  have this man suffer these attorney's fees, huge
18  fees on a case that I will be able to show you
19  when she identifies the songs is complete
20  nonsense.
21      THE COURT:  Sort of like Name That Tune.
22      MR. TANNENBAUM:  No, your Honor, it is
23  really not.  We have all the evidence, we just
24  want to be able to show it to you quickly.
25      THE COURT:  I don't know that's an official

Page 10

- APPLICATIONS -

1   - APPLICATIONS -
2   in limine motion. If you have one I would be glad
3   to look at it.
4       Would the Plaintiff like to address that?
5       MR. MONAGHAN: Sure.
6       That was not an accurate characterization of
7   where we are at in this case. And I'm sure your
8   Honor knows full well having dealt with a slew of
9   motions which articulated not only the points that
10  Mr. Tannenbaum just made, but even others which he
11  made on behalf of Mr. Bacal.
12      The case is not just the eleven odd thousand
13  dollars that Mr. Bacal has said that he received
14  by way of performance royalties through BMI. The
15  record is going to show, the evidence will show
16  that he reaped huge amounts of money from the
17  exploitation of Miss Bryant's music. This was
18  done through licensing agreements which were all
19  over the world, which are still being done. Even
20  new deals are being made as we speak through
21  Sunbow Productions.
22      Now, granted, he is no longer involved, but
23  during the period that he was millions of dollars
24  over the week -- I guess it's the last two
25  weeks -- we've gotten documents showing that Mr.

Page 11

1   - APPLICATIONS -
2   Bacal's company, Sunbow, just in a limited period
3   of time, '93 through '98 -- this is the first time
4   we're getting this stuff. Why we are getting it
5   now when we've asked for it for years, over the
6   weekend -- we were inundated with documents --
7   showed that they received over $23 million over
8   this period of time.
9       So not to spend time on the opening
10  statement now, but Mr. Bacal is being sued because
11  he not only received monies to which he wasn't
12  entitled, okay, he was instrumental through his
13  companies in altering registrations.
14      THE COURT: I take it counsel is saying that
15  unjust enrichment is the last count left, which is
16  my understanding; do you agree to that?
17      MR. MONAGHAN: No, I don't. I think
18  constructive trust is also left in the case.
19      MR. TANNENBAUM: Based on the unjust
20  enrichment?
21      MR. MONAGHAN: Right.
22      Those two things are in the case.
23      THE COURT: The second thing is he says your
24  proof has to be limited to direct dealings by his
25  client that would have caused this unjust

Page 12

1   - APPLICATIONS -
2   enrichment. I would assume you agree with that
3   too?
4       MR. MONAGHAN: No, I don't agree with that,
5   your Honor. If we are able to show through the
6   proofs that Mr. Bacal received monies either
7   directly or indirectly through his companies,
8   through the various companies, Sunbow, Wildstar,
9   Starwild, if he received a financial benefit and
10  we can show and I believe we will show that a
11  portion of those license fees represents Miss
12  Bryant's music.
13      THE COURT: All right, I think we are way
14  off here. I'll reserve on your motion.
15      Let's go ahead and -- is there anything
16  else?
17      MS. PHARES: Your Honor, may I please be
18  heard?
19      THE COURT: Yes.
20      MS. PHARES: I'm going to confine myself
21  just to the procedural part of this case that we
22  are now discussing and, in particular, I agree
23  with Mr. Tannenbaum that we are all prepared to go
24  forward with the case that was pled. Part of what
25  Mr. Monaghan has just referred to with all these

Page 13

1   - APPLICATIONS -
2   licensing claims are the parts of this case that
3   have never been pled that he first raised in
4   response to our motion for summary judgment last
5   November. Among the motions that we are making
6   this morning and I have available is the one open
7   legal issue which I want to discuss as well as
8   motions in limine with respect to copyright claims
9   that are likely to be raised with respect to
10  wrongfully subpoenaed documents and with respect
11  to documents that are hearsay or otherwise
12  objectionable and on evidentiary grounds.
13      Mr. Monaghan is complaining about late
14  produced documents. These are documents on a
15  claim that has never been pled in this case.
16  They -- most of the documents that were produced
17  to him recently are not documents that were
18  requested. Indeed, in a state of total irony, he
19  has finished his recent letter to the Court saying
20  that he is complaining that there has never been
21  discovery. And, indeed, that is the position that
22  we have been taking for sometime. In fact, I sent
23  you a letter on June 10th asking for your
24  intervention, because on the contractual claim,
25  which is not in the complaint, Mr. Monaghan is

Page 14

- APPLICATIONS -

1  attempting -- and which most of his 26 witnesses
2  relate to, there has been no complaint, no answer,
3  and no discovery. And, whereas, we are all
4  prepared to try the case that has been pled we
5  think that there will be reversible error if the
6  Court goes forward with that part of the case
7  without accommodating the Defendants in this case
8  who are proper complaint.
9      Indeed, frankly, I will also ask to reserve
10  any proper opening on this case until the
11  beginning of the Defendant's case because,
12  candidly, I do not know which case Mr. Monaghan is
13  intending to put on.
14      THE COURT: Let me see if we can come to
15  that conclusion. Mr. Monaghan, tell me, are you
16  not bound by the four corners of the pleadings?
17      MR. MONAGHAN: And your rulings, your Honor.
18  You've addressed these very issues a number of
19  times. They've made this claim that there was
20  never any pleading or claim in any of the
21  pleadings for these royalties from the sales of
22  DVDs and CDs. Your Honor's ruling has already
23  addressed that, addressed the fact that the
24  pleadings did cover that. We are notice pleading

Page 15

- APPLICATIONS -

1  jurisdiction. They have had fair notice of the
2  claims. They know exactly what the case is all
3  about as a result of four or five perhaps even
4  more summary judgment motions. They've buried us
5  with paper. And even as recently as this weekend,
6  July 4th, we are getting a couple of hundred pages
7  of documents in PDF formats, license agreements,
8  that we've asked for.
9      If you notice, Miss Phares used most in her
10  statement a moment ago. Most she said were not
11  requested. Well some were and we're still getting
12  production. But we are prepared to try the case
13  as it stands right now with the pleadings and your
14  Honor's ruling.
15      THE COURT: Go ahead.
16      MS. PHARES: Your Honor, the note of issue
17  in this case was filed last June and discovery
18  closed last June. The first time Mr. Monaghan
19  raised this contractual oral working agreement was
20  in November. There has never been discovery on
21  the contractual issues in this case, and the fact
22  that he happened to have asked for certain
23  documents relating to license agreements were
24  irrelevant to the original case, and he's now

Page 16

- APPLICATIONS -

1  trying to rely upon that.
2      I would also like to add that, whereas, I
3  said most were not called for, the rest of them
4  were simply formal production -- formal production
5  of documents that were attached to our motion for
6  summary judgment. In his letter to your Honor he
7  claimed that we had produced 13 documents on
8  July 4th. In fact it was one document of 13
9  pages, which was yet another one of the for
10  work-for-hire agreements which Sunbow continually
11  used. So there has been a lot of stir and drum of
12  the misbehavior of the Defendants.
13      But the fact of the matter is we have never
14  had a proper complaint and proper discovery on the
15  part of the case that Mr. Monaghan is intending to
16  produce his 26 witnesses.
17      MR. TANNENBAUM: All of this is the reason
18  why it makes sense to try the issue of
19  re-registrations right up front, your Honor. It's
20  the core of her complaint. And we will show you
21  very quickly it is nonsense. All this other stuff
22  about indirectly you've gotten paid, over here
23  indirectly, and somehow owns or controls this
24  company when he wasn't even the controlling -- he

Page 17

- APPLICATIONS -

1  didn't have controlling voter shares in the
2  company. It will all fall like a house of cards
3  one by one and your Honor will no longer continue
4  to believe something happened to this woman. Make
5  her say which compositions, what went wrong.
6  We'll take you through them and we'll see in ten
7  minutes. Otherwise, we will be here for months on
8  indirect and documents. We're getting killed
9  here. That's the case she pled. Let's try that
10  case.
11      I agree, the words CDs and DVDs are in the
12  complaint. What they didn't point out are
13  payments for CDs that have nothing to do with
14  payments that come from BMI. They are not public
15  performance royalties. What they've done is mixed
16  in all these theories, royalties here, royalties
17  there, to make your Honor believe that somehow
18  things are being hidden, making a claim some
19  monies are coming.
20      Make her try the case on public performance
21  royalties. You'll see it right away, and that's
22  what is in the pleadings. That's what her
23  pleading says. That's what we should try. We
24  have no reason about the other stuff. We should

Page 18

- APPLICATIONS -

1    try the --
2    MS. PHARES: Your Honor, one further thing I
3    wanted to ask or say is that the other real
4    problem that we have in the absence of a complaint
5    is that in the -- in the pleadings that have gone
6    on since November Mr. Monaghan has moved his case
7    backwards and forwards from copyright to contract
8    depending on which court he has been in. We are
9    entitled to know really what the form of his
10   complaint is.
11        The contents of one of our motions in limine
12   is the fact what he is trying to do is to
13   stipulate the jurisdiction of this Court. He
14   cannot do that. He is trying to say that there is
15   an oral working relationship between the parties
16   and at the same time say that the Plaintiff has
17   given exclusive rights of her works to Sunbow.
18   That is an impossibility under the Copyright Act.
19   Either there is a contractual relationship, a
20   written contractual relationship which the
21   Copyright Act would recognize and over which this
22   Court would have jurisdiction, or there is not a
23   written agreement. And if there is not a written
24   agreement then she's the copyright owner and what

Page 19

- APPLICATIONS -

1    she is really claiming is a copyright claim which
2    is pre-empted. But we are really not in a
3    position to make our defense because we don't
4    really know what today or tomorrow or in the days
5    to come Mr. Monaghan is going to make his case
6    into.
7        THE COURT: Well, why don't we start out do
8    the openings, see if we can shed some light on it.
9        MR. TANNENBAUM: Can I make one more point,
10   your Honor?
11        Your Honor ordered them to go forthwith with
12   arbitration with BMI on February 27th 2001.
13   Happens to be my birthday. Had they done that,
14   had they done that what your Honor ordered them to
15   do, instead of trying to use this case and somehow
16   get discovery for the other case, which is what he
17   just said, had they done that they would have seen
18   from the BMI people at the arbitration how
19   nonsensical these claims of re-registration are.
20   They're going to put Miss Bryant on to testify
21   what the internal BMI document said. Had they
22   done it, Judge, I wouldn't be on -- July 4th
23   wouldn't have been wasted.
24        THE COURT: Mr. Monaghan, do you agree, this

Page 20

- APPLICATIONS -

1    is a matter of re-registration?
2        MR. MONAGHAN: No, your Honor, it is much
3    more than that. If I can make my opening?
4        THE COURT: All right, let's go to the
5    opening.
6        MS. PHARES: Your Honor, may I submit the
7    memoranda that were due this morning?
8        THE COURT: Yes, certainly.
9        MS. PHARES: Thank you.
10        MR. MONAGHAN: We have not seen any of this
11   material.
12        MS. PHARES: It is being served as Mr. Fritz
13   asked us to do in court today.
14        MS. SAFFER: Your Honor, if I may, before
15   Mr. Monaghan begins, it is becoming clear to me as
16   I'm just listening to these discussions that the
17   actions of BMI are going to be critical to the
18   outcome of this case. And that, therefore, with
19   your forgiveness or mercy or whatever, I would
20   like to indicate that I believe it would be
21   appropriate that I participate.
22        If BMI's actions are going to be ruled upon
23   and decisions are going to be made it seems to me
24   they should be represented by counsel and I'm

Page 21

- APPLICATIONS -

1    prepared to do that.
2        THE COURT: Well, since the arbitration was
3    never gone forward with, I don't think the
4    Plaintiff can have any disagreement with that.
5        MR. MONAGHAN: I have a huge disagreement
6    with it, your Honor, for this reason:
7        This action does not seek any relief against
8    BMI. It seeks no relief. If they wanted to
9    participate in the action they didn't have to move
10   to stay it and seek arbitration.
11        THE COURT: Why didn't you arbitrate it
12   then?
13        MR. MONAGHAN: Because we were involved in
14   this litigation.
15        MR. TANNENBAUM: Three years?
16        MR. MONAGHAN: The issue with -- the issue
17   with BMI is a very different issue. BMI is
18   theoretically a union or a Performing Rights
19   Society. We are not prepared at this point to lay
20   any great fault at the feet of BMI. We want to
21   see what comes out of this litigation. BMI, we
22   think, didn't follow its own procedures. We think
23   that they re-registered things without the proper
24   documentation. But, at this point, the real

- APPLICATIONS -

1
2  culprits, I think, are before this Court. We are
3  not seeking any relief against BMI.
4      I'm very surprised that Miss Saffer, with
5  whom I've dealt over the years, is here saying,
6  oh, all of a sudden we want to participate.
7  Procedurally, it is irregular. If they wanted to
8  be in the case, they've known about it, they've
9  monitored the case for four years.
10      THE COURT: I find, Mr. Monaghan, the fact
11  that you had the ability to arbitrate this for all
12  this time and never did it I'm going to allow BMI
13  to participate in this action. We'll see what
14  happens.
15      MR. MONAGHAN: That's fine.
16      THE COURT: Let's get along here. If you
17  can find a chair, sit down.
18      MS. SAFFER: Thank you very much.
19      THE COURT: All right, let's go to the
20  opening.
21      MR. MONAGHAN: Sure, Judge.
22      Your Honor, what is your pleasure in terms
23  of time on this?
24      THE COURT: Well, generally in non-juries,
25  30 minutes.

OPENING - PLAINTIFF/MONAGHAN

1
2      MR. MONAGHAN: Good morning, Judge. I'm Pat
3  Monaghan and my associate Jeff Primiano is here on
4  behalf of the Plaintiff, Anne Bryant.
5      This is an action for unjust enrichment and
6  constructive trust. There are basically two types
7  of damages involved in the case: One is the
8  performance royalties which is where BMI comes in.
9  BMI is a Performing Rights Society. Miss Bryant,
10  the Plaintiff, is a member of BMI and has been for
11  many years. The one thing about BMI is that
12  according to its own rules and procedures it must
13  pay the writer directly and the publisher. So
14  that it's quite different with respect to other
15  monies that may be realized from the compositions
16  at issue. This is the one instance, public
17  performances, live performances, broadcast
18  performances, where the writer and publisher get
19  their money directly. BMI monitors the
20  performances and pays the writers according to the
21  percentages attributable to each of the
22  participants. So that is one type of damages that
23  we are talking about.
24      But the other type of damages that we are
25  talking about, which is way more significant, is

OPENING - PLAINTIFF/MONAGHAN

1
2  the monies that are attributable to the music
3  composed by Miss Bryant which is in various
4  intellectual properties. Videos, DVDs, CDs, which
5  is a huge market, even now, growing market. You
6  can go to Amazon.com and you will see
7  Transformers, the JEM Show, all of these products
8  are being sold, and they have Miss Bryant's music
9  on it. But Miss Bryant doesn't get a farthing,
10  not a penny, for the use of her music.
11      So, let me put the issue right out there.
12  There is no writing in this case where she
13  relinquished her writer's interest. And the
14  record will show that the writers, and Miss Bryant
15  in particular, zealously guard their writer's
16  share of royalties. They don't give that up
17  willy-nilly. It is usually a rare case where a
18  writer will actually forego and give up the
19  writer's share of royalties. It is even
20  considered gauche or not industry practice for the
21  publisher who exploits these musical compositions
22  to seek to get the writer's royalties.
23      So this case is actually going to be shown
24  to be consistent with the way the industry
25  practice works.

OPENING - PLAINTIFF/MONAGHAN

1
2      We have an expert who is going to come in
3  here who is the former president of Capitol
4  Records. Harvard educated. We won't hold that
5  against him. But he will testify as to industry
6  practice about writers and publishers.
7      Now, as of 2001 we've had limited
8  information, piecemeal discovery. Those
9  performance royalties, the BMI monies which we say
10  Miss Bryant was shorted on are over $238,000.
11  Now, how do we do that? How do we calculate that?
12  It actually took Miss Bryant -- she charted this
13  to go back over all the royalty statements. Not
14  only her own royalty statements, but those that
15  Mr. Bacal -- from what we could glean from Mr.
16  Bacal -- Starwild and Wildstar, the two publishing
17  entities, and put that information together. She
18  charted it, and she can show well they got money.
19  When the writer gets money the publisher should
20  get money.
21      There is a 200 percent interest in every
22  composition with BMI. 100 percent for the writer,
23  100 percent for the publisher. You will see the
24  BMI catalog which, by the way, BMI was less than
25  what shall I say forthcoming for Miss Bryant to

Page 26

OPENING - PLAINTIFF/MONAGHAN

1   OPENING - PLAINTIFF/MONAGHAN
2   obtain that catalog which she asked for years.
3   It took my involvement. So after two years of
4   begging to get a copy of her catalog, only when
5   the lawyers got involved she finally got a
6   catalog, which showed how they were allocating the
7   percentages. That's performance royalties,
8   238,000.
9       Now, the other monies we're talking about in
10  the case are monies for the exploitation of the
11  music with other intellectual properties. We are
12  not saying that every dime that Sunbow got or Mr.
13  Bacal got is to be split with Miss Bryant. That
14  would be piggish, and we're not pigs. We are here
15  to get what we think is a fair shake. But some
16  portion, some percentage of that intellectual
17  property is represented by her music. In other
18  words, the Transformers theme, which is even now a
19  ring tone on telephones, that is a very
20  recognizable theme. Your kids may know it, my
21  kids know it, and it is readily identifiable.
22  Some portion of that intellectual property in the
23  Transformers -- and we have the CDs -- is
24  represented by her music for which she is not
25  paid. These ring tones, these other uses of her

Page 27

1   OPENING - PLAINTIFF/MONAGHAN
2   music, they all are compensable.
3       We've come up with a formula, a damages
4   formula, because we've had to sort of cobble
5   together information. For example, we only have
6   sales figures, unit sales figures for '99 through
7   2003, okay, so we can only say, well, what we call
8   mechanical royalties, mechanical -- the term
9   "mechanical" is a term that derives from the old
10  Copyright Act, but it basically means any
11  iteration of the music in some form. Used to be
12  in records. Actually it used to mean player piano
13  rolls is where it actually comes from.
14      But we are going to urge upon you that
15  mechanicals, and we think we have the authority
16  for that, includes any CDs, DVDs, anything that
17  has their music in it. There is a royalty for the
18  use of such music in that -- in those iterations.
19  There is a statutory royalty rate.
20      Now, the Defendants are going to jump up and
21  down and say, oh, my, Monaghan is trying a
22  copyright case again. They tried to take us down
23  to Foley Square with Judge Owen arguing we have a
24  copyright case here. Judge, this is a red
25  herring, and I'll tell you why it is a red

Page 28

1   OPENING - PLAINTIFF/MONAGHAN
2   herring. Because where the copyright resides has
3   no direct bearing on whether she is entitled to
4   her writer royalties. Writers often turn the
5   copyright over to the publisher or the exploiter,
6   and they say, here, you can go with the copyright
7   but you still have to pay me my writer royalties.
8   Unless she signed off, and there are agreements
9   that can do that, unless she signed off and said
10  I'm giving up my writer's royalties I'm just
11  working for hire. And that is going to be a term
12  you hear, "work-for-hire," which is in the classic
13  sense, the United States Supreme Court has already
14  identified what "work-for-hire" is and what the
15  criteria is. It is nothing new. It is the old
16  classic agency.
17      If you are an employee -- let's say, you are
18  an employee of Capitol Records and you write a
19  song while you are working for Capitol Records,
20  and you get a 1099 or a W-2 income -- not 1099.
21  W-2. And you've written that for hire because
22  you -- okay, your employer might own all the
23  rights. That's not the case here. By all the
24  criteria that has been set forth in the case law
25  you will find that Miss Bryant did not write these

Page 29

1   OPENING - PLAINTIFF/MONAGHAN
2   works as works-for-hire. Okay. They were written
3   while she was an outside independent contractor
4   working at various -- in this case most of the
5   compositions were written between 1983 and 1989
6   when she was at a company called Kinder-Bryant,
7   her music jingles.
8       So the two types of damages we are talking
9   about here are the performance royalties, over
10  $238,000.
11      And, by the way, the fact that Mr. Bacal
12  only got 11,000 directly, according to that,
13  doesn't mean that his company by using the music,
14  by taking the music from the musical piggy-bank,
15  by going in and saying, oh, here is Anne Bryant's
16  music, let's put together a T.V. production and
17  we'll just use that music, by doing it that way,
18  Judge, they are able to file what are known as
19  Q-Sheets with BMI.
20      BMI uses two types of documents to
21  accomplish the registration on its records: One
22  is called a clearance form which is the usual --
23  if the writer writes a song and there is a BMI
24  writer they fill out a document called a clearance
25  form. Identifies the song, BMI assigns it a

1    OPENING - PLAINTIFF/MONAGHAN
2  number, goes in the catalog, and the writer
3  indicates participation in the song.
4      The other way that BMI accomplishes
5  registrations is through the vehicle of a cue
6  sheet. Cue sheets are only used in productions,
7  T.V. productions, for example. There are some of
8  those at issue here. The JEM shows, T.V.
9  productions for Sunbow, Defendant, Sunbow. And,
10  first of all, they have to be accurate in terms --
11  but the producer then files a Q-Sheet with BMI and
12  says here are the participants in the music and
13  these are their contributions, okay?
14      What happened here is that most of the
15  songs, including the Transformers and My Little
16  Pony, but not My Little Pony and Friends, GI Joe,
17  these were not written for T.V. productions
18  originally. They were written as jingles for toys
19  for the usual toy commercial. HASBRO was the
20  ultimate advertising client. HASBRO had these
21  toys. They were all familiar with GI Joe and
22  Transformers, and the others, My Little Pony, and
23  commissioned the agency Griffin-Bacal to do the
24  advertising for it. Griffin-Bacal then goes out
25  and retains a jingle company, in this case Anne

1    OPENING - PLAINTIFF/MONAGHAN
2  Bryant.
3      Now, one of the themes that the Defendants
4  has tried to argue, well, Miss Bryant was either a
5  fledgling or not very well known or whatever,
6  somewhere along those lines. But Griffin-Bacal
7  was pretty new itself. It only started in or
8  about the time that Miss Bryant was involved with
9  Kinder-Bryant. And so did Sunbow. Okay. Now,
10  maybe they didn't cross their Ts and dot their Is
11  in terms of they way they wanted to do things, but
12  the idea that Miss Bryant was some sort of a
13  second class citizen in the ad agency or the music
14  business versus this big ad agency is just not
15  going to be -- you know, it is not going to be
16  shown by the evidence in this case. It is quite
17  the contrary.
18      So those are the types of royalties we have.
19  Miss Bryant is a talented
20  composer/musician/lyricist. She has one Clio
21  Awards, won Ad Agency Awards. She was -- I'm not
22  going to go through this now, but she is going to
23  testify to her background, her training, from the
24  time she was a young child. She received musical
25  training. Even Mr. Bacal testified she was a very

1    OPENING - PLAINTIFF/MONAGHAN
2  talented composer.
3      The Court may recall from its prior
4  decisions that Mr. Bacal was unable to even
5  explain why he's given any share of the
6  Transformers on BMI's records. That's in the
7  record. That's in your decisions already. He was
8  less than forthcoming. His son -- we will show
9  you the videos. His son, Jay Bacal, is shown as a
10  producer.
11      You are going to hear from Carole Weitzman.
12  She is an employee of Sunbow. She is on there.
13  They are all in these videos, and nobody can
14  explain how this happened. Mr. Bacal's testimony,
15  which we will read into the record if he doesn't
16  repeat it, is I don't know how that happened, I
17  don't know why I got percentages of songs I had
18  nothing to do with. But he did. And it's on
19  BMI's records.
20      So we have from the limited information
21  we've been able to cobble together substantial
22  damages claims in the millions. So that in the
23  absence of any writing where Miss Bryant signed
24  off those writer's royalties remain hers. She is
25  supposed to have received them. And Sunbow is in

1    OPENING - PLAINTIFF/MONAGHAN
2  the nature of -- we urge Mr. Bacal and Sunbow,
3  because of the unequal bargaining position she
4  can't exploit these compositions, they do. They
5  go out and they take these compositions, they make
6  the license deals, which are you are going to see
7  are huge. They are supposed to pay her. They are
8  supposed to split. All the treatises say that,
9  the experts say that and Miss Bryant says that
10  that was her understanding. You go out, you take
11  my music, you exploit it, you put it in whatever
12  you want to put it in, I don't care, I'm not
13  controlling it, but when you do, 50 cents of every
14  dollar you get is supposed to be paid to me.
15      So again the copyright is going to be the
16  issue of the copyright. Whether we should have
17  been at Foley Square or not is a red herring. We
18  are here on a case that involves the
19  understandings between the parties. The Court has
20  characterized it as a working arrangement. And
21  that was the arrangement and the understanding.
22      And Transformers is one of the major songs
23  here. And the record will show Mr. Bacal
24  approached Kinder-Bryant about that composition.
25  And the rest is history as far as that song is

Page 34

OPENING - PLAINTIFF/MONAGHAN

1    concerned.  It was a huge hit.  Still is.
2    Now, Miss Bryant has over the years
3    represented and done work for many well-known ad
4    agencies, not just Griffin-Bacal.  Griffin-Bacal
5    is actually a small agency.  Worked for Leo
6    Barnett, Great Advertising.  She's been involved
7    with commercials and jingles for Kellogg's,
8    Dannon, Budweiser.
9        And I also want to tell the Court about the
10    relationship of the Defendant to the companies,
11    okay.  Mr. Bacal, who is a major shareholder in
12    Griffin-Bacal, Inc., he also testified he was an
13    owner of Sunbow Productions, the T.V. production
14    company which was an adjunct.  Sunbow was the
15    owner of two publishing entities: Wildstar and
16    Starwild.  Now, when you see the catalog, Judge,
17    you are going to see those names in there,
18    Starwild and Wildstar.  One is an ASCAP publisher,
19    which is Wildstar, and Starwild is the BMI
20    publisher.  And you will see they are getting
21    shares of these performance royalties.  So the
22    songs at issue in the case -- and I would have to
23    set up the equipment to -- we're not going to
24    burden the Court with listening to a whole video

Page 35

OPENING - PLAINTIFF/MONAGHAN

1    or watching, but we've tried to mark -- so we're
2    going to show the Court the music that is on these
3    videos and DVDs and other mechanicals is in fact
4    Miss Bryant's music.  And I don't even think if
5    there is a serious dispute about that, maybe there
6    are, but I have not really heard one thus far,
7    that she was the composer as she's indicated.
8    With some exceptions.
9        Now, one major exception is GI Joe.  And I
10    want to point out that in the case of GI Joe,
11    which is also hugely successful, she did not
12    write -- we don't claim that she wrote that music,
13    but in another case that she had in settlement
14    with her former partner Ford Kinder, who is also
15    listed as a witness here, Mr. Kinder turned over
16    his performance rights to GI Joe as part of the --
17    that settlement to Miss Bryant.  So she is
18    entitled by virtue of that settlement to
19    Mr. Kinder's performance interest rights and
20    royalties on GI Joe which was listed in her
21    catalog.  It was in her BMI catalog pursuant to
22    their understanding.
23        Songs in the case are the Transformers.  My
24    Little Pony.  GI Joe.  My Little Pony and Friends.

Page 36

OPENING - PLAINTIFF/MONAGHAN

1    The JEM opening and closing themes.  JEM is also
2    known as Truly Outrageous.  The JEM songs, of
3    which there are 154.  Visionaries.  There is
4    another song.  And we've just learned over the
5    weekend that the Defendants have exploited two
6    other compositions we didn't even know about until
7    this most recent production.  The Great Space
8    Coaster, which was Sunbow's first T.V. production
9    Miss Bryant wrote music for.  So that is pretty
10    much it.  And I won't burden the Court with
11    anything further because I think Miss Bryant will
12    cover it.
13        We have a case for unjust enrichment.
14    They've reaped huge amounts of money.  They have
15    not paid the Plaintiff her share.  Mr. Bacal made
16    a whole lot more than $11,000.  He made it through
17    the various licensing deals for which he
18    benefitted.  He was able to use Miss Bryant's
19    music by just going in it and using it making
20    deals with other people.  You'll see, your Honor,
21    that there are individuals shown that Miss Bryant
22    had no knowledge of, had nothing to do with, and
23    suddenly shown as receiving percentages for songs
24    that she wrote.  How did that happen?  Mr. Bacal

Page 37

OPENING - PLAINTIFF/MONAGHAN

1    testified that he had to make deals.  Miss
2    Weitzman testified that Mr. Bacal made the deals.
3    Mr. Bacal and Mr. Griffin.  But also Mr. Bacal.
4    You are going to hear testimony, I think, from the
5    Defendant that he wasn't the deal maker.  That is
6    in the affidavits.  That's not the case.  We'll
7    show the Court that Mr. Bacal was involved in
8    the business deals.  In fact, the Transformers was
9    a case in point where he was the one who actually
10    made that deal.
11        So with that, your Honor, I conclude the
12    opening statement.
13        THE COURT:  All right.  We're going to go, I
14    assume, in the order of the caption.  For defense
15    statements I'd like to keep it down to ten or 15
16    minutes.
17        MS. SAFFER:  Well, your Honor, I thought
18    that I will take the full 10, 15 minutes that has
19    been allotted to me.
20        As you heard in the beginning, BMI is the
21    first named Defendant, but we were not an active
22    participant because we believed that our dispute,
23    if you will, or issues related to BMI, would be
24    resolved in arbitration.  Since that was never

Page 38

OPENING - DEFENDANT BMI/SAFFER

1  commenced and since they seem apparently to be
2  critical to the outcome of this case it seemed
3  appropriate that I join in.
4
5      I find it also interesting that everybody
6  has worked very hard on all sides in preparation
7  in order to try to clarify matters for your Honor,
8  except perhaps me, because I was just sitting by
9  the -- on the outside watching what was going on.
10 However, I probably better than all the other
11 attorneys and probably more so than anybody in
12 this court understand the underlying, if you will,
13 difficulties since I have been an attorney in the
14 copyright field for 35 years and have been the
15 Assistant General Counsel at BMI for 18 years.
16     So let me just say that Mr. Monaghan who
17 took a crash course in how performing rights
18 organizations operate got some of it right and
19 some of it wrong.  The role of BMI is to represent
20 writers and publishers of music.  We operate
21 differently, if you will, than any other aspect of
22 the music industry in that our rules and
23 regulations call for the fact that we will pay
24 writers, the human beings, the people that
25 actually wrote the music, one half of the

Page 39

OPENING - DEFENDANT BMI/SAFFER

1  royalties we collect, and we will pay the other
2  half of the royalties to the publishers, which in
3  the normal course of events are the copyright
4  owners.  We will do that even if there is what is
5  known in the copyright field as a "work made for
6  hire".
7
8      Under the Copyright Law in a work made for
9  hire, the quote/unquote author is the entity that
10 commissioned the work.  We say, we don't care, we
11 want to pay 50 percent to the human being that was
12 actually the creative person, and everybody who
13 joins writers and publishers alike know that's
14 what the rules are in the game.
15     Now, in this particular instance, Anne
16 Bryant received the writer's share no matter from
17 BMI, no matter what the deal may have been when
18 she wrote the works.  And the question as far as
19 BMI is concerned is did there come a time when
20 things that were originally attributed to her for
21 her creative content which, by the way, nobody is
22 disputing, she is a very talented, very
23 able-bodied composer, to which everybody in the
24 Court will I'm sure can see, but the question is
25 did we take things that we had written -- that

Page 40

OPENING - DEFENDANT BMI/SAFFER

1  Anne Bryant wrote it originally, and change it in
2  our records.
3
4      Now, thinking that we were not a party to
5  the case, I never thought that today or in the
6  next couple of days I would have to prove that.
7  But, in fact, one of the other parties, the
8  attorney representing Mr. Bacal, subpoenaed the
9  senior vice-president at BMI who will come to
10 testify actually as his witness to trace what
11 happened on each and every one of these
12 compositions and whether or not somebody else was
13 credited with her writer's share, whether it be as
14 a song or a cue, which is the word used for music
15 written as background to television shows or for
16 commercial jingles.  And I think the records will
17 show that, in fact, BMI never changed their
18 records, whatsoever, and that she was always
19 credited from beginning to end with the music that
20 the parties claimed originally she had written.
21     I think the point was made by the attorney
22 representing Mr. Bacal that this whole proceeding
23 will be simplified if you first get a chance to go
24 through that and determine what happened on those
25 particular songs.  Then, flowing out of that maybe

Page 41

OPENING - DEFENDANT BMI/SAFFER

1  somewhere along the line there were some other
2  ancillary arrangements, which -- I don't know,
3  which would have allowed Miss Bryant or should
4  have allowed Miss Bryant to receive additional
5  funding.
6
7      But, traditionally, in the music industry, a
8  writer is, if you will, guaranteed royalties for
9  the performance.  They are not guaranteed the
10 writer royalties for anything else unless they
11 have contractually negotiated that.  And there
12 will be witnesses on behalf of SONY, I believe,
13 and others music industry experts which will talk
14 about the -- what the practices are in that field,
15 and whether or not Miss Bryant should have gotten
16 additional royalties for other things under other
17 circumstances.
18     So at least in terms of the beginning of
19 this case and at least in terms of the role of
20 BMI, we are prepared through a witness called by
21 Bacal to show in fact that Anne Bryant has been
22 credited from the beginning, from the early 1980s
23 to date, with the things that she wrote.
24     Thank you.
25     THE COURT:  Okay.  All right, let's see, who

11 (Pages 38 to 41)

1    OPENING - DEFENDANT BMI/SAFFER
2  is next? Kinder and company.
3    MR. MONAGHAN: He settled, Judge.
4    THE COURT: He settled. That's right.
5  Okay.
6    MR. TANNENBAUM: Mr. Bacal.
7    THE COURT: What about Vadivox?
8    MR. MONAGHAN: That was part of the Kinder
9  settlement.
10    THE COURT: Okay. Let's get then to Mr.
11  Bacal.
12    MR. TANNENBAUM: Again, David Tannenbaum,
13  and I'll try to be very brief, your Honor.
14    THE COURT: All right.
15    MR. TANNENBAUM: There is one thing that I
16  think really needs to be said to clear things up
17  because they really have done a great job of
18  mixing a lot of concepts and potential rights
19  together to make it look like something happened
20  here.
21    Let's deal with what BMI does, and Miss
22  Saffer can explain it a lot better than I can, I
23  am glad she is now involved in the case. BMI,
24  what they do is they track public performances of
25  musical compositions. Has to be very clear here,

1    OPENING - DEFENDANT BACAL/TANNENBAUM
2  Judge, BMI has nothing to do with tallying any
3  kind of sums that are made for selling
4  videocassettes, which is for home use or CDs which
5  is for home use. It is only public performance
6  royalties. Somebody goes on American Idol and
7  sings an Elton John song. Elton John is entitled
8  to some kind of money. There has to be a way of
9  tracking it. He can't keep flipping T.V. stations
10  all the time. Is he BMI. There is a couple of
11  different performance societies. I was hoping I
12  would pick one that was BMI. I just threw that
13  out.
14    What they do is they have people who track
15  performances, whether it is in movie, on a T.V.
16  show or somewhere else, as a public performance so
17  that the writers and the publishers can get paid
18  for somebody using their work. There are two
19  separate shares and, again, that has nothing to do
20  with DVDs, CDs, which I will get to a little bit
21  later unless I forget. There is a writer's share
22  and publisher's share. The writer's share goes to
23  the person who composed the composition. If it is
24  one person, that person gets 100 percent. If it
25  is more than one person, it gets whacked up,

1    OPENING - DEFENDANT BACAL/TANNENBAUM
2  divvied up to be fair.
3    We will show you in each case in this
4  instance in the 1980s, your Honor, when these
5  songs were written by Miss Bryant, either alone or
6  with Mr. Bacal contributing some lyrics or
7  somebody else, they were registered in a certain
8  way and she was making a lot of money on these
9  writer's shares and performances because these
10  T.V. shows were first run and on the air in
11  television. You had Transformers. Mostly
12  children's cartoons. My Little Pony. JEM. It's
13  in between my age and my kid's age, so I didn't
14  watch those shows, but they were popular in the
15  80s. They are not shown anymore here and that's
16  why her royalties are going down. Nobody changed
17  anything.
18    And we will show you, as we have several
19  times, I don't know why it has not been effective,
20  we've tried it several times, we have the 1099
21  statements from BMI showing exactly what Joe Bacal
22  got paid from 1994 to date for his writer's share
23  of public performance royalties. Again, I'm not
24  talking about CDs, not talking about
25  direct/indirect, that company, his company -- not

1    OPENING - DEFENDANT BACAL/TANNENBAUM
2  trying to be Jackie Mason here, but I almost did.
3  Just his writer's share of performance royalties.
4  We have the 1099s. Those 1099s show that for that
5  entire period of time he received approximately
6  $11,000. I didn't want to have to break that down
7  because I didn't want to spend time on this case,
8  but we'll now show you that about $9,000 of that
9  money has absolutely nothing to do with any song
10  that Miss Bryant worked on. They'll probably
11  agree to that because she didn't work on those
12  songs. So we are talking about a very small,
13  little amount of money. And now we are going to
14  show you with respect to that there were no
15  changes and he was entitled to those shares
16  because when they were registered in the 1980s.
17  They were registered a portion for Miss Bryant and
18  a portion for Mr. Bacal. Sometimes a portion for
19  Mr. Kinder. Depended on who worked on it.
20    And, by the way, Mr. Bacal had nothing to do
21  with those registrations. He and his partner Tom
22  Griffin started an advertising agency and a
23  television production agency. They had no
24  experience, whatsoever, with DDM performance
25  royalties so they hired an administrator, a

Page 46

OPENING - DEFENDANT BACAL/TANNENBAUM

1  gentleman by the name of Mr. Dobishinsky. Mr.
2  Dobishinsky is the one who, working with Anne
3  Bryant's partner Ford Kinder, would actually do
4  the filings. He is the one, we believe, did the
5  filings. Bryant had nothing to do with that. So
6  the original shares -- which, by the way, are not
7  in the case, your Honor, they are trying to get
8  them in the case, they are trying to say now
9  because we tried to show them nothing changed in
10 the 1990s, now they are trying to claim way back
11 in the 1980s when they were originally registered
12 they were registered incorrectly.
13     Two problems with that. It's not in the
14 complaint, not in the theory of their case. Not
15 in the complaint. And if the statute of
16 limitations doesn't bar that, I don't know what
17 does.
18     We'll also show by 1990 she knew exactly
19 what was in her catalog. That is the writer's
20 share of BMI Productions. The producer gets
21 100 percent of that share -- excuse me, publisher.
22 I'm new to the copyright field too. The
23 publisher's share. 100 percent publisher's share.
24 100 percent writer's share. There is no claim

Page 47

OPENING - DEFENDANT BACAL/TANNENBAUM

1  ever here until today as I can tell that Miss
2  Bryant is entitled to any of the publisher's
3  share. That belonged to the publishing company.
4  She wasn't just supposed to get 100 percent of all
5  the money all over the place for giving a song for
6  a T.V. Series. There is a reason they hire
7  somebody to write a song for T.V. Wildstar and
8  Starwild received those shares.
9     I've been puzzled by submissions in the
10 affidavit that somehow Joe Bacal made $238,000,
11 when I've got the 1099s. I've got his tax
12 returns. I've got the internal documents from BMI
13 that show he got $11,000. I think what I'm
14 hearing now is she is making a claim for the
15 Starwide and Wildstar publishing shares to get up
16 to this 238,000-dollar number. That has nothing
17 to do with anything that's in this case.
18     Now, we have this one paragraph that appears
19 in the complaint not connected to anything else,
20 it's in the amended pleading, by the way, that
21 says somehow Joe Bacal is getting money for
22 videotapes and CDs and other things. And in their
23 motion papers they pointed out something that we
24 didn't know because, as a matter of fact, he had

Page 48

OPENING - DEFENDANT BACAL/TANNENBAUM

1  sold his shares, as all the other shareholders in
2  his company, in Sunbow in 1998 to SONY; that
3  apparently sometime in 1999 SONY entered into a
4  deal with I think called -- Rhino is the name of
5  the company, to sell these things on
6  videocassettes I think somehow this is making
7  money for Joe Bacal or somebody else. The CDs and
8  the videocassette claims have absolutely nothing
9  to do with Mr. Bacal. He was gone from the
10 company in 1998. We'll show you the documents
11 that show he is gone from the company in 1998.
12 Nothing in there that says he is entitled to any
13 percentages or anything after 1998. We'll show
14 you his tax returns that showed he didn't get any
15 money for this stuff before 1998 -- after 1998.
16     Now, also, I think I'm hearing a claim that
17 while the company was doing business they were
18 making money by selling videotapes and CDs. Of
19 course they were. It is part of their business.
20 It is money that Sunbow owned -- excuse me, Sunbow
21 earned. I'll let Miss Phares deal with the Sunbow
22 issues. But the claim that somehow Mr. Bacal is
23 Sunbow, we will show you in ten minutes it is
24 ridiculous. He never even owned a majority of the

Page 49

OPENING - DEFENDANT BACAL/TANNENBAUM

1  voting share of these two companies. That was
2  owned by Mr. Griffin. We'll bring Mr. Griffin in.
3  We'll show you the documents. There is a wild
4  claim out there somehow he is the alterego. It is
5  not true. We'll show it to your Honor.
6     Again, if we can just try the case on the
7  re-registration claim you will see very quickly
8  there is nothing there.
9     Thank you, your Honor.
10    MS. PHARES: Your Honor, Sunbow is a T.V.
11 production company. And it is important to
12 remember that because there will be attempts to
13 introduce many witnesses from the record business,
14 which is a different kind of a business. T.V.
15 production companies are producing what in
16 copyright world is known as audiovisual work, a
17 T.V. production or movie. And to make sure they
18 get all of the rights they secure from independent
19 contractors, like Miss Bryant, work made for hire
20 agreements. And those kinds of agreements, unlike
21 the one that Mr. Monaghan was talking about
22 earlier that the Supreme Court was addressing,
23 those kinds of agreements have to be in writing.
24 The Copyright Act says there are two kinds of ways

Page 50

OPENING - DEFENDANT SUNBOW/PHARES

1  of saying a work made for hire, and if you are
2  dealing with an independent contractor it must be
3  in writing.
4
5      And there are benefits from having a work
6  made for hire. It means that there can be no
7  termination of the rights in years to come; that
8  the property that's being created will no longer
9  have people coming in later and saying, you know,
10  you have to make new deals with me.
11      So Sunbow, which was a -- maybe a new but
12  certainly a well put-together organization, used
13  work made for hire agreements with all the
14  creative people with whom it operated. And that
15  was the case in this case. And, as I think your
16  Honor knows, it has been Sunbow's contention that
17  indeed Kinder & Bryant signed work made for hire
18  agreements.
19      Now, the way that work made for hire
20  agreements works is that as part of that agreement
21  the performance rights to which we know that BMI
22  is going to pay to Miss Bryant in any case are
23  licensed back to her. Those are the performance
24  rights that are licensed back for her. She is
25  also by contract given certain other rights. She

Page 51

OPENING - DEFENDANT SUNBOW/PHARES

1  has the right to mechanical royalties if a record
2  is made. She is entitled to certain limited
3  synchronization rights. But the contract doesn't
4  provide for royalties from a home video
5  production, that is a reproduction of the original
6  entire work, not just the music in a home video
7  format.
8
9      If there had been a disagreement about the
10  home -- the work made for hire agreement that Miss
11  Bryant and her -- rather her company signed, that
12  would be an issue that would properly be before
13  this Court. When this case started there was --
14  there are only claims pled with respect to the
15  performance rights. As far as I can tell, and I
16  don't think Miss Bryant disagrees, there is no
17  suggestion that she has no objection to the
18  publisher having received the publisher's share of
19  the performance rights. That was customary in the
20  business and there is also no issue in this case
21  that Sunbow received any part of the writer's
22  share.
23      So Sunbow, in fact, had a very minor role in
24  this case until last November. And then last
25  November, after we had moved for summary judgment

Page 52

OPENING - DEFENDANT SUNBOW/PHARES

1  to show that there in fact were no claims on the
2  performance rights, in opposition to that Miss
3  Bryant for the first time claimed that she was a
4  copyright owner. She introduced this issue that
5  her jingles in fact or, rather, that the music in
6  the Sunbow productions were derivative works, and
7  other copyright issues. We removed that -- after
8  we had determined or it was clear that the Court
9  thought that it was entitled to go forward on
10  those issues, we removed that case to Federal
11  Court.
12
13      Now, in Federal Court there was no question
14  that Judge Owen thought those were copyright
15  issues. But at the end of the argument Mr.
16  Monaghan stood up and he said: "I am telling the
17  Court there is no -- despite what we said in our
18  brief, our brief was a little over the top on the
19  issue, and I will be candid with you -- we are not
20  demanding any relief under the Copyright Act."With
21  that, Judge Owen returned the case to State Court.
22      Now, in the most recent affidavits Miss
23  Bryant is again claiming that she is a copyright
24  owner. But, more importantly, she is also now
25  denying that she ever signed an agreement. Now,

Page 53

OPENING - DEFENDANT SUNBOW/PHARES

1  what's really interesting about this is that the
2  first time that she claimed to be a copyright
3  owner is in November, after Sunbow had made
4  production of the unsigned JEM Agreement. And
5  Plaintiffs became aware that -- and became aware
6  in our pleadings that the other agreements had
7  been lost in a flood. So now we are in a position
8  where Miss Bryant is claiming that she does not
9  have an agreement. And she says she doesn't have
10  an agreement and that she is a copyright owner and
11  that she is making claims to monies as a copyright
12  owner.
13      Now, if that is the case, this Court does
14  not have jurisdiction. If she agrees that she
15  signed an agreement, even if it is lost, and we
16  think that she did sign an agreement, then we are
17  properly in this Court. But, if not, her claims
18  arise under the Copyright Act. The derivative
19  work claims, the ownership claims, all require
20  construction of the Copyright Act, and the cases
21  are clear that you may not use another label. If
22  you call it unjust enrichment, if it is still a
23  copyright claim, then it is pre-empted and there
24  is no jurisdiction in this Court.

Page 54

OPENING - DEFENDANT SUNBOW/PHARES
1
2     And I hear Mr. Monaghan saying in his
3  opening statement we'll at least wait to see if
4  his client confirms him that there is no written
5  agreement in this case. If that is the case, then
6  on the issues that were pled in November, long
7  after the close of discovery and after they
8  discovered we did not have copies, signed copies
9  of the agreements, then those cases -- those
10  issues are completely pre-empted.
11     Your Honor, Mr. Tannenbaum and I have tried
12  to prepare, if it would help you, a chart which
13  maps out the claims made that were pled originally
14  in this case, and also the claims that were not
15  pled, which I would be happy to offer up to you.
16     I think we still all remain prepared and
17  believe that the Court has jurisdiction on the
18  performance rights issues. But if the evidence
19  develops as it sounds like it is going to be then
20  I respectfully submit that your Honor does not
21  have jurisdiction over these claims with respect
22  to what effectively are Miss Bryant's claims to be
23  an equal co-owner with Sunbow in these -- in this
24  music.
25     THE COURT: Has Plaintiff received a copy of

Page 55

OPENING - DEFENDANT SUNBOW/PHARES
1
2  that?
3     MS. PHARES: I'm offering it as we speak.
4     MR. MONAGHAN: Thank you very much.
5     THE COURT: All right. Thank you.
6  Who else have we got?
7     MR. TANNENBAUM: That's it, your Honor.
8     MR. MONAGHAN: That is it for openings, your
9  Honor.
10     THE COURT: We'll break for lunch now. And
11  I've got a quarter after twelve -- let's go ahead.
12  You've got 15 minutes. We'll use it up until
13  12:30.
14     Go ahead.
15     MR. MONAGHAN: Thank you, Judge. I call the
16  Plaintiff, Anne Bryant.
17     COURT OFFICER: Place your left hand on the
18  Bible, raise your right hand, face the Judge.
19     THE COURT: Do you solemnly swear the
20  testimony you shall give before this Court shall
21  be the truth, the whole truth and nothing but the
22  truth, so help you God.
23     THE WITNESS: I do.
24     THE COURT: Please be seated.
25  Thank you. You may inquire.

Page 56

CAROL ANNE BRYANT - DIRECT/MONAGHAN
1
2     COURT OFFICER: Give your name and address
3  to the court reporter and spell your name.
4     THE WITNESS: Carol Anne Bryant. C-A-R-O-L.
5  A-N-N-E. B-R-Y-A-N-T.
6     I live at 21 Collaberg Road, in Stony Point,
7  New York  10980 -- 10980.
8  C A R O L     A N N E     B R Y A N T,
9           the Plaintiff, having been first
10           duly sworn by the Court, was
11           examined and testified as follows:
12     MR. MONAGHAN: Thank you, Judge.
13  DIRECT EXAMINATION
14  BY MR. MONAGHAN:
15     Q.  Miss Bryant, I saw you brought a pad up
16  there, and I'm sure that counsel would like to know
17  what that is and why you brought it up to the stand.
18     A.  It's a pacifier. I feel nervous. When I
19  feel nervous I like to scribble.
20     Q.  Is that a doodle pad?
21     A.  Doodle pad. I was just playing around with
22  it.
23     MR. MONAGHAN: We have no objection to them
24  looking at it during the course of the case. Miss
25  Bryant indicates she likes to doodle.

Page 57

CAROL ANNE BRYANT - DIRECT/MONAGHAN
1
2     A.  Helps me think, remember things.
3     MR. MONAGHAN: They can look at it, if they
4  wish.
5     THE COURT: Let's go on.
6     Q.  Miss Bryant, you are the Plaintiff in this
7  action, are you not?
8     A.  Yes.
9     Q.  Your complaints in this case concern certain
10  musical compositions, do they not?
11     A.  Yes.
12     Q.  Can you briefly identify them? And we'll
13  come back to them, but just for a starting point.
14     A.  The Transformers. These are themes which
15  also is called Robots in Disguise. My Little Pony and
16  Friends. My Little Pony. GI Joe. The Real American
17  Hero. JEM, also called Truly Outrageous. There are
18  several others.
19     Q.  Visionaries?
20     A.  Visionaries.
21     Q.  How about Robotics?
22     A.  Robotics. Humanoids. Big Foot. I just
23  learned about that. And The Great Space Coaster. I
24  think that's all of them.
25     Q.  And some of these compositions were -- well,

15 (Pages 54 to 57)

Page 58

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1  let me ask you another way.
2      Can you tell the Court now which of these
3  compositions were composed as music for T.V.
4  productions and which were composed for some other
5  reason?
6      A.  Well, the first one was The Great Space
7  Coaster in 1978.  It was for Sunbow's first show,
8  actually.  And then JEM, of course, was a television
9  show first and later became a jingle attached to the
10  show with products that spun out of the show.
11      My Little Pony and Friends.
12      Q.  How is that different, if it is, from My
13  Little Pony?
14      A.  Well, My Little Pony was the first theme.
15  And within the My Little Pony and Friends theme that I
16  did, we harken back, we do a little tip of the hat
17  melodically to My Little Pony, about six bars in the
18  middle of the theme.
19      Q.  Are there any other of those compositions
20  that were for T.V. productions?
21      A.  Yes.
22      I forgot something.  My Little Pony and
23  Friends had another theme called Funny Friends.  And it
24  always said England on my statements.  I think it was

Page 59

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1  an alternate theme for that country.
2      Q.  Okay.  Now, let's go down the songs just to
3  make sure we are clear with the Judge.
4      Transformers:  T.V. production or --
5      A.  It was a jingle first.
6      Q.  Jingle for a toy?
7      A.  Yes.
8      Q.  My Little Pony.  Just, My Little Pony.
9      A.  A jingle for a line of toys.
10      Q.  What about GI Joe?
11      A.  It was a jingle first.
12      Q.  Okay.  And what was your participation in GI
13  Joe?
14      A.  Well that was written by Ford Kinder in
15  about 1979 when we were both employees at Michelin
16  Company.  So, subsequent to that, it was a successful
17  jingle and then I think it became the T.V. show.  And
18  at our own company, before we went into business,
19  Kinder & Bryant, we worked to create a movie theme for
20  that called GI Joe The Movie.
21      Q.  So it was first a jingle?
22      A.  Yeah.
23      Q.  Toy jingle?
24      A.  So he wrote it.  And we developed it for

Page 60

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1  other uses somewhat at Kinder & Bryant, and I did the
2  arrangements.  These were big orchestra days.  I was a
3  well-known arranger.
4      Q.  Why is that song an issue in this case if he
5  wrote it?
6      A.  Well, when Ford and I finally figured out
7  how to separate Kinder & Bryant a few years ago and we
8  came to a settlement and I had received no money from
9  my company he said, well, everything that's in your BMI
10  catalog, which Sunbow's administrator had put some of
11  those things in my catalog without my permission, he
12  said, keep them, they are yours.  You no longer have to
13  split them back with me.  We used to split everything
14  Ford and I.
15      Q.  Okay.
16      A.  So then I lost out on that.  It was a
17  worthless item of settlement.
18      Q.  But you are here bringing an action for the
19  performance royalties relative to GI Joe; is that
20  right?
21      A.  Yes.
22      Q.  Okay.  And that's as a result of your
23  settlement with Mr. Kinder?
24      A.  Yes.

Page 61

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1      Q.  And you let -- because the GI Joe was in
2  your BMI catalog at the time you settled with Kinder?
3      A.  Yes.
4      MR. TANNENBAUM:  Objection, your Honor.  I
5  want to move things along, but he is leading the
6  witness.
7      THE COURT:  Yes, try not to.
8      MR. MONAGHAN:  All right, Judge.
9      Q.  Have you ever been known by any other name?
10      A.  Well, I was born Carole Anne MacDougal in
11  1950.
12      Q.  Okay.  How did your name change come about?
13      A.  My mother surrendered me for adoption when I
14  was a year old.  I was adopted by Roger and Dorothy
15  Bryant on Christmas Eve, 1951.  I became Carole Anne
16  Bryant, but they call me Anne Bryant.
17      Q.  How old are you now?
18      A.  I'm 53.
19      Q.  Where do you live?
20      A.  I live in Stony Point.
21      Q.  Okay.  And how long have you been here?
22      A.  I bought that house in 1987.  It was a
23  weekend house initially, but I moved there full-time in
24  1991.

Page 62

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1
2    Q.    Okay. Where is it in Rockland?
3    A.    It's in North Rockland. One of those river
4    towns, you know.
5    Q.    What is the name of it?
6    A.    Stony Point. I'm sorry.
7    Q.    Okay.
8          MS. PHARES: Objection, relevance.
9          MR. MONAGHAN: This is biographical
10   information.
11         THE COURT: It is not relevant, but I guess
12   it's background or something. I'll allow it.
13   Q.    Okay. Are you married, ma'am?
14   A.    I'm divorced.
15   Q.    Okay. And what is your occupation?
16   A.    I'm a composer and a producer. And I create
17   music, I arrange it. There are so many parts to that
18   now. I used to write music for an orchestra, now I do
19   it on synthesizers and electronics. And I'm a
20   recording engineer too.
21   Q.    Do you sing? Play instruments?
22   A.    I sing. I do voice-overs. I play
23   keyboards.
24   Q.    What is your current employment?
25   A.    My current employment is Square Business

Page 63

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1
2    Music with -- Ltd. Which has been my company since
3    1977. It has always had my personal services, but I
4    have a d/b/a for that called Music & Art. Name of a
5    high school I went to.
6    Q.    Where are the offices of Square Business?
7    A.    In Garnerville, New York, which is about a
8    mile from my house. It's in the Civil War Union
9    Factory.
10   Q.    Who works there besides yourself?
11   A.    Just me.
12         Although, lots of artists work there. Kind
13   of a Soho on the Hudson.
14   Q.    What do you actually do there?
15   A.    I have two recording studios. My favorite
16   studios I've ever had. And, you know, factories are a
17   great place for a recording studio because you can work
18   with power and, you know, space. It is an artist
19   complex.
20   Q.    What is the business that is done there?
21   A.    I write music for commercials and
22   documentaries and like that.
23   Q.    Can you give the Court the names of some
24   clients of Square Business?
25   A.    All right. Some recent clients last couple

Page 64

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1
2    of years you mean?
3    Q.    Sure.
4    A.    Since I was there?
5          I work a lot for Arm & Hammer. I do their
6    baking soda and their tooth -- toothpaste. And cat
7    litters and whatnot. And I work for Nair and Arid. I
8    do a lot of, you know, name brand jingles. I did the
9    Ultramax series with Jason Giombi. What a cute guy.
10   Q.    Giombi?
11   A.    He's a football player. I'm only kidding.
12   He's a baseball player.
13   Q.    Talking about the New York Yankee?
14   A.    Yeah, New York Yankee.
15   Q.    Are you associated with any other entities
16   currently at this time?
17   A.    Yes. I'm music company for the Joey Company
18   & Advertising Agency, president of that company. And
19   founder is Josephine Cummings. She's on the Queen Mary
20   II right now.
21         MS. PHARES: Objection, your Honor, if Miss
22   Bryant is going to read from her pad.
23         THE WITNESS: I'm not reading. There is
24   nothing here.
25         MS. PHARES: Okay.

Page 65

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1
2          THE WITNESS: As a matter of fact --
3          THE COURT: The pad will be available for
4    anyone who wants to look at it.
5          THE WITNESS: Here, you can have this. It's
6    doodles.
7          MR. MONAGHAN: If you don't mind, please
8    look up so it doesn't appear as though you are
9    reading.
10         THE WITNESS: Oh, okay.
11         MR. MONAGHAN: That will be better.
12         THE WITNESS: I feel like Bob Dole with his
13   pen, holding onto something.
14   BY MR. MONAGHAN:
15   Q.    What do you do for the Joey Company?
16   A.    Music director and consultant for Joey's Ad
17   Agency. And we worked together for about 30 years, so
18   our whole careers -- I write an awful lot of music for
19   them too.
20   Q.    What are some of the clients of the Joey
21   Company?
22   A.    Well, Arm & Hammer is their biggest client.
23         THE COURT: There is a problem with
24   relevancy with this counsel.
25         MR. MONAGHAN: Well, because the Defendants

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1    made an issue and I assume they will in their
2    papers that the issue is about the kind of fees
3    that Miss Bryant could come in. Your Honor may
4    recall that one of the points that was made by
5    Miss Bryant in her affidavits was we took a lower
6    creative fee up front to make sure that we kept
7    our writer royalties. So that --
8        MR. TANNENBAUM: Twenty years ago.
9        MR. MONAGHAN: -- her background -- we can
10   make it more current, but I mean her background in
11   the music business --
12       THE COURT: Apparently there's been an
13   agreement that this lady is a very active
14   musician, et cetera.
15       MS. PHARES: She is, your Honor. There was
16   a point made that she was new in the television
17   production business in the early 80s. I don't
18   think that's what this testimony is directed
19   towards.
20       THE COURT: I just want to keep it moving.
21       MR. MONAGHAN: I'm doing my best, Judge.
22       THE COURT: Personally, I want you to know,
23   Miss Bryant, I'm very interested in this, but we
24   have a record and we don't want to get it any
25

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1    longer than this.
2        THE WITNESS: It is getting really long.
3    Q.   Okay, with that admonition about being
4    brief, let me just ask you to run through your
5    educational background as quickly as you can.
6    A.   From the beginning up?
7    Q.   Well, skip kindergarten.
8    A.   Skip kindergarten, all right.
9        I went to grade school in Brooklyn and
10   Manhattan. I went to the High School of Music & Art.
11   That took me through high school. Went to the Eastman
12   School of Music. First, I went to Berkeley -- I forgot
13   I went to Berkeley -- for an intensive year in Boston.
14   Music. And then I came back to New York. I studied
15   recording engineering for a year. And my mother was
16   very sick and she died. I started school in Eastman
17   School of Music, in Rochester. So I came home. Then I
18   continued at Eastman for five intense summers, although
19   I never pulled that degree together for about 15 years,
20   but I got a Bachelor of Music there.
21   Q.   Where is that? Berkeley?
22   A.   No, no, Eastman School of Music --
23   Q.   I'm sorry.
24   A.   -- composition. All classical training

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1    there.
2        And then I got a Master of Fine Arts at SUNY
3    Purchase Conservatory, Classical Conservatory, in
4    classical composition. And then after that I studied
5    intensive Spanish for a couple of years so that I could
6    write in Spanish -- read and write in Spanish. Then I
7    got a Ph.D. in music in contemporary media. And then
8    my last new study is this new recording thing we're
9    doing called Pro-Tools, the standard of production in
10   the industry. And I work with it, but I want to be an
11   expert, so I've taken two out of three levels for
12   expert training. That's --
13   Q.   This is what? Electronic music?
14   A.   Yeah, very wonderful.
15   Q.   Okay, very quickly --
16   A.   Recording production.
17   Q.   -- could you describe your formative years
18   growing up, especially as it relates to musical
19   training and experience.
20       MS. PHARES: Objection.
21       THE COURT: Sustained.
22       THE WITNESS: What does sustained mean? It
23   is okay?
24       MR. MONAGHAN: No, sustained means you can't
25

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1    answer it.
2        THE WITNESS: Okay. What's the other one?
3        MR. MONAGHAN: It's overruled.
4        THE WITNESS: Overruled.
5        Okay, sustained.
6        THE COURT: It's really stop and go soon.
7        THE WITNESS: All right.
8    BY MR. MONAGHAN:
9    Q.   In the context of the music business with
10   which you've been associated, I'll try and touch upon
11   some of the other companies very quickly, but what is a
12   union shop? What does that mean?
13   A.   It means a company that's signatore to union
14   codes and practices, like the Screen Actor's Guild.
15   After which is the American Federation of Television
16   and Radio Artists, and the Union --
17       MS. PHARES: Objection, your Honor.
18   A.   -- American Federation --
19       THE COURT: Every time there is an objection
20   just hold for a minute.
21       THE WITNESS: Yeah.
22       MS. PHARES: Objection, relevance. There
23   are no issues in this case regarding any kinds of
24   performance unions.
25

Page 70

1    CAROL ANNE BRYANT - DIRECT/MONAGHAN
2        THE COURT: All right. Counsel, do you
3    claim there are?
4        MR. MONAGHAN: No. It actually -- not in
5    this case. But it does relate to the practices
6    and her customary business policies.
7        THE COURT: That's sustained the objection.
8        All right, we're going to break for lunch.
9    For those of you that are out-of-towners I
10   understand that this is the mecca for cuisine for
11   Rockland County. Mr. Potato, whatever it is, is
12   right across the street. Generally, we'll go from
13   12:30 to two. We'll work from two to 4:30 to
14   five, depending -- 4:30, 4:45, depending who is on
15   the stand and how close we are to being finished.
16       Have a nice lunch.
17       MR. MONAGHAN: Thank you, Judge.
18       (Luncheon Recess: 12:30 p.m.)
19   A F T E R N O O N      S E S S I O N
20       (Reconvened: 2:00 p.m.)
21       (Resumed on the record, in open court -
22   counsel and parties present as previously noted)
23       THE COURT: All right, Miss Bryant, please
24   take the stand.
25       MS. PHARES: Your Honor, if I may be heard

Page 71

1        - APPLICATION -
2    before we begin.
3        The one issue on which I do think that
4    Defendants are entitled to a ruling is the issue
5    of the jurisdiction, because it seems based on Mr.
6    Monaghan's opening in which he is now saying quite
7    emphatically that there is no written agreement in
8    this case, then just because of the way the
9    Copyright Act works, the way the Copyright Act
10   says that a copyright arises in an author when the
11   author has written something, and the only way in
12   which it can be transferred is in writing. And,
13   in fact, it says that a transfer of copyright
14   ownership other than by operation of law is not
15   valid unless an instrument of conveyance or a note
16   of memorandum of the transfer is in writing and
17   signed by the owner. And, similarly, the work
18   made for hire provision that is applicable to it
19   independent to an independent contractor makes
20   very clear that it shall be considered or made for
21   hire only if it is one of the works, and if it is
22   in writing and signed by -- if the parties
23   expressly agree in a written instrument signed by
24   them that the work shall be considered a
25   work-for-hire.

Page 72

1        - APPLICATION -
2        Now, it seems quite clear here that
3    because -- because the Plaintiff's position is
4    that she has now never entered into an agreement
5    that is written she is holding herself out as a
6    copyright owner. When she is claiming rights
7    to -- what is it, 50 percent of -- 50 percent on
8    the dollar, Mr. Monaghan said of everything that
9    Sunbow earned she is claiming to be a copyright
10   owner in the work. And, your Honor it is
11   really -- I think it is pretty clear does not have
12   jurisdiction of this issue. That this is an issue
13   that is subject to dismissal because it's
14   pre-empted by the Copyright Act and we, you
15   know -- without a ruling we aren't in a position
16   to know where we are to go next.
17       THE COURT: Well, I'm taking it that on the
18   part of the Plaintiff that there is no relief
19   requested under Copyright Law; is that not right?
20       MR. MONAGHAN: That's correct.
21       MS. PHARES: But if in fact, your Honor,
22   their claim sounds in copyright they can call it
23   unjust enrichment. And there are cases, in fact
24   the Second Circuit just affirmed 12 weeks ago in
25   which the parties came in claiming unjust

Page 73

1        - APPLICATION -
2    enrichment, but the Court looks at it and says if
3    in fact what your facts and the law present is
4    effectively a copyright claim, then it is
5    pre-empted and cannot be heard as an unjust
6    enrichment claim.
7        THE COURT: I have a problem here because
8    the Federal Court unfortunately has thrown this
9    case out.
10       MS. PHARES: Well, it did so on a
11   representation by Mr. Monaghan that he was not
12   pressing his copyright claims. But now that he is
13   back here he is.
14       THE COURT: Well, this Court is not going to
15   grant any relief under the Copyright Law, I
16   guarantee you.
17       MR. MONAGHAN: They are completely
18   mischaracterizing what this case is all about. It
19   isn't a copyright case. You've already ruled
20   that. The Federal Court ruled that.
21       MS. PHARES: They did not rule that, Mr.
22   Monaghan.
23       MR. MONAGHAN: Well, if it didn't we
24   wouldn't be here. Excuse me, I didn't interrupt
25   you. I would appreciate the same courtesy.

Page 74

1      - APPLICATION -
2         MS. PHARES: I beg your pardon.
3         MR. MONAGHAN: Your Honor, we've done battle
4    on this subject with extensive briefs throughout
5    before both your Honor and before the Federal
6    Court. We have law of the case that -- we are not
7    here seeking copyright relief. We are not seeking
8    to prevent anybody from copying it. We are not
9    seeking --
10        THE COURT: Well, I think the problem goes
11   like this that as this case goes along or at the
12   end of your Plaintiff's case you are looking for
13   damages which this Court finds are grounded in a
14   copyright cause of action, a quasi copyright cause
15   of action, you are not going to get it.
16        MR. MONAGHAN: Well --
17        THE COURT: You have unjust enrichment which
18   I'm going to listen to, and let's see how it
19   develops.
20        The request of the Defendant is reserved
21   because I'll tell you the truth this case has been
22   going around and around and around since 2001, and
23   we've had motions and on top of motions here, and
24   I've tried to continually get the perspective of
25   the case down so it's manageable. And the -- and

Page 75

1         CAROL ANNE BRYANT - DIRECT/MONAGHAN
2    I really don't want a case that is all over the
3    field. As far as I'm concerned, now that you have
4    Miss Bryant on the stand, let's hear what she has
5    to say. Let's get her cross-examined. And then
6    maybe or maybe not it might be a time to look back
7    again at where we are going here.
8         MS. PHARES: Thank you, your Honor.
9         THE COURT: All right. Miss Bryant, you may
10   take the stand. You are still under oath.
11   C A R O L    A N N E    B R Y A N T,
12              the Plaintiff, previously duly sworn
13              by the Court, resumed the stand
14              and testified further as follows:
15        THE WITNESS: I have a pen and reading
16   glasses. Okay? Pen and reading glasses.
17        MR. MONAGHAN: Okay.
18        THE COURT: Let's go.
19   DIRECT EXAMINATION
20   BY MR. MONAGHAN: (Continued)
21        Q.   Miss Bryant, when we left off we were -- we
22   had gone over your background, although not as
23   extensively as we hoped we would. But, nonetheless, we
24   were at a point where I was about to ask you about your
25   experience in the music business in terms of the jingle

Page 76

1         CAROL ANNE BRYANT - DIRECT/MONAGHAN
2    business and what companies you were associated with
3    that were involved in the jingle business. So that's
4    the subject matter.
5         What was the name of the first entity within
6    which you were involved that was in the jingle
7    business?
8         A.   Comtrek in Chicago. Commercial Musi-Cast
9    that I worked for.
10        Q.   When was that?
11        A.   1972, I think, or three to 1977.
12        Q.   Okay, the next one?
13        A.   Michelin & Company.
14        Q.   Okay. And where is that located?
15        A.   In New York City.
16        Q.   What was the nature of the business?
17        A.   Commercial music production.
18        Q.   What were you to that company?
19        A.   I was music director, vice-president and
20   writer.
21        Q.   And what Performing Rights Society were you
22   a member of when you were at that company?
23        A.   BMI. I've always been at BMI since I was
24   21.
25        Q.   Let me show you, please, Exhibit --

Page 77

1         CAROL ANNE BRYANT - DIRECT/MONAGHAN
2         THE COURT: Have these been premarked?
3         MR. MONAGHAN: No, but we have copies for
4    them and Defendants have these. This is the
5    BMI --
6         THE COURT: Is this in contention, whether
7    Miss Bryant is a member of BMI?
8         MS. SAFFER: No, your Honor. There is
9    not -- there is no issue she is a member of BMI.
10        THE COURT: Is that why you are offering
11   this, counsel?
12        MR. MONAGHAN: Well, this is her BMI
13   agreement.
14        THE COURT: All right.
15        MR. MONAGHAN: I mean --
16        THE COURT: Let's have it marked as
17   Plaintiff's 1.
18        (Plaintiff's Exhibit No. 1, Bryant's BMI
19   agreement, marked for identification)
20        MR. MONAGHAN: If there is no objection,
21   we'll ask it be moved into evidence.
22        MS. SAFFER: No objection.
23        MS. PHARES: No objection.
24        MR. TANNENBAUM: No objection.
25        (Plaintiff's Exhibit No. 1, marked and

Page 78

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1  received in evidence)
2
3  Q.  Miss Bryant, the court officer has shown you
4  Exhibit 1 in evidence.
5  A.  Yes.
6  Q.  That's your BMI agreement, is it?
7  A.  Yes.
8  Q.  And when was that agreement signed?
9  A.  I remember it was September 3rd, my
10  birthday, 1971.
11  Q.  Okay. And you've been a member of BMI since
12  then?
13  A.  Yes.
14  MS. SAFFER: Asked and answered.
15  Q.  What is your understanding of what BMI is?
16  A.  BMI is a -- I think they are a non-profit
17  organization, but they have writer members they call
18  affiliated and publisher affiliated who are
19  member/publisher affiliated, and they track and collect
20  performances for the writers and publishers, and they
21  pay royalties based on an exotic formula that I don't
22  really understand. But appropriate royalties based on
23  these performances that the writers have cleared in
24  their catalogs and the publishers have cleared in
25  theirs.

Page 79

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1
2  Q.  What is a publisher? What is your
3  understanding of a publisher?
4  A.  A publisher is an administrator who accounts
5  to its writers for 50 percent of what they
6  administrate. They do the administrative chores. They
7  receive -- except when it comes to BMI, each -- the
8  writer and the publisher get their own check directly.
9  The publisher receives money, negotiates licenses and
10  accounts to their writers.
11  MS. PHARES: Your Honor, I'm going to object
12  to this because this witness really is not
13  competent to testify to what a music publisher is.
14  She is talking -- she is guessing about this. And
15  there are other witnesses who can testify to this
16  more appropriately.
17  THE COURT: Well, as long as she keeps it
18  very general. In other words, I would like to
19  know whether Miss Bryant is a writer according to
20  BMI.
21  THE WITNESS: Yes. I'm an author.
22  THE COURT: Publisher according to BMI.
23  THE WITNESS: I own a publishing company as
24  well.
25  THE COURT: No, BMI.

Page 80

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1
2  THE WITNESS: Yes, BMI Publishing Company.
3  But I don't have any titles in it, I don't think.
4  MS. PHARES: I just think that Miss Bryant
5  is not really competent to testify about --
6  THE COURT: I think some kind of broad
7  brush. I'll allow it.
8  THE WITNESS: That is to my understanding.
9  MR. MONAGHAN: I asked for her
10  understanding.
11  THE COURT: Her understanding may not be
12  what is going on.
13  MR. MONAGHAN: They are free to put anyone
14  they want on the stand.
15  THE COURT: Okay, now we've gotten her
16  understanding, let's go on.
17  Q.  All right, now getting back to Michelin.
18  Were you ever associated with a company
19  called Michelin & Company?
20  A.  Yes.
21  Q.  What period of time?
22  A.  1977 to 1981.
23  Q.  And during this period of time what, if any,
24  contacts did you have with either Griffin Bacal or Mr.
25  Bacal or Sunbow? That's the '77 to '81 Michelin

Page 81

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1
2  Company period.
3  A.  Okay, I met Joe Bacal for the second time
4  when he came to Michelin & Company to meet with Spence
5  Michelin to have a meeting to discuss the music -- our
6  music house working for his new company, Griffin Bacal.
7  And I believe Sunbow was talked about that too.
8  Q.  Where did that meeting take place?
9  A.  At Michelin Company offices, 41 West 56th
10  Street.
11  Q.  Now, which of the compositions at issue in
12  this case have anything to do with Michelin & Company?
13  A.  Great Space Coaster was their first Sunbow
14  production, and I wrote the music for that.
15  MR. TANNENBAUM: I object, your Honor. That
16  is not in the complaint. Not in the complaint.
17  MR. MONAGHAN: The Great -- this is one of
18  the points that was made earlier, your Honor,
19  about documents that had just been produced over
20  the weekend, over the last five days showing that
21  The Great Space Coaster --
22  THE COURT: Counsel, what you said was that
23  you would limit your proof in this case to
24  whatever was in the complaint. Plus, as you said,
25  anything that was in any of the decisions of the

Page 82

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1    Court.
2
3        Is this in any of the decisions of the Court
4    or the complaint?
5        MR. MONAGHAN: The Great Space Coaster is
6    not mentioned.
7        THE COURT: Then it is not in. Let's go
8    ahead.
9        MR. MONAGHAN: Okay. And this was --
10   incidentally, this is just background
11   information --
12       THE COURT: All right.
13       MR. MONAGHAN: -- at this point.
14   BY MR. MONAGHAN:
15       Q.   All right. And what other compositions
16   which are at issue in this case?
17       A.   GI Joe, the jingle theme. Ford Kinder wrote
18   that. And, My Little Pony -- the original My Little
19   Pony melody.
20       Q.   And what was your involvement with My Little
21   Pony?
22       A.   Well, with both of those, I may have done
23   the arrangements. I usually did most of the
24   arrangements. I was a well-known arranger, so I did
25   the arrangements in Michelin & Company. It was

Page 83

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1    orchestra days. Co-produced it with Spence and/or
2    Ford. I don't remember what I did for sure.
3        MR. TANNENBAUM: I object on the ground of
4    relevance. She just testified she didn't write GI
5    Joe.
6        THE COURT: Well, she didn't write this.
7    She said she co-produced it.
8        THE WITNESS: And arranged it.
9        THE COURT: And arranged it.
10       Tell me about arranging; how does this come
11   into this lawsuit?
12       MR. MONAGHAN: Well, GI Joe, as the witness
13   has already testified, she received the rights to
14   GI Joe by virtue of a settlement in this
15   courthouse. The witness already testified, laid a
16   foundation, that she received the performance
17   royalties from GI Joe which are supposed to be in
18   her catalog. That is part of her case. It is in
19   the pleadings. The Defendants know about this.
20   And these are not legitimate objections. They can
21   cover what they want on cross. They keep
22   interrupting the direct. I am not going to be
23   able to go through it.
24       THE COURT: Go ahead.
25

Page 84

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1        MR. TANNENBAUM: She may claim she has some
2    kind of agreement with Mr. Kinder. But, as far as
3    I know, they never notified BMI, whatsoever, that
4    payments for GI Joe are supposed to go to Kinder
5    are supposed to go to her.
6        MS. SAFFER: We have never received any
7    notification of an assignment from Mr. Kinder to
8    Miss Bryant.
9        THE COURT: Okay, this is what the Plaintiff
10   is saying right now. I tend to agree with
11   Plaintiff's counsel that these things should be
12   covered on cross.
13       Go ahead.
14       MR. MONAGHAN: Thank you, Judge.
15   BY MR. MONAGHAN:
16       Q.   And the music for My Little Pony, who wrote
17   that?
18       A.   Ford Kinder.
19       Q.   Okay.
20       MR. TANNENBAUM: Just note my objection,
21   your Honor.
22       THE COURT: All right.
23       MR. MONAGHAN: Incidentally, Judge, I just
24   want to put on the record, I don't know if I did,

Page 85

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1    I think I did an objection to the participation at
2    this late stage of BMI. I don't think it is
3    proper. I think it is procedurally --
4        THE COURT: I think I ruled you had three or
5    four years to take them to arbitration. You
6    didn't do it. They are a named Defendant. They
7    obviously belong in this courtroom.
8        MR. MONAGHAN: I just want to object.
9        THE COURT: Objection is noted.
10       MR. MONAGHAN: Okay. Thank you, Judge.
11       THE COURT: Go ahead.
12       Q.   Miss Bryant, just so the Court and the rest
13   of us who don't know much about this business
14   understand, what is your understanding based on your
15   experience of an evolution of a jingle? How does that
16   come about? What is the normal process of a jingle
17   being created for an ad campaign?
18       MS. PHARES: Objection, relevance.
19       THE COURT: I'll allow this.
20       Go ahead.
21       A.   Well, we're given a call about writing a
22   jingle from an ad agency. And the script comes over or
23   we go over to meet with the agency and discuss the kind
24   of music that they are looking for, what the audience

Page 86

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1  is. Generalities really about what they want the music
2  to be. And sometimes they give us a lyric or sometimes
3  they give us a line and we write the lyric. It happens
4  a lot of different ways. Then usually it is a budget
5  given. It is made clear up front that this is a
6  competition. It is often made clear it is a
7  competition. Sometimes it is not. And that several
8  music houses are also going to take a try at writing
9  this until they find the one they like. You know, we
10  have to do a demo. Usually there is a demo fee of
11  about a thousand dollars. And then we go away and do
12  our demos and submit them, and they pick what they like
13  from our music house or another one, possibly.
14     Sometimes as many as ten or 15 songs. A
15  little crazy there for a while. A hundred, 200 songs
16  people were choosing from, and that is ridiculous. And
17  then the next stage is yea, we won, hopefully. Then it
18  is time to orchestrate, arrange and book the recording
19  session and give a budget. I always do budgets off the
20  top of my head, because I have a sense, an ability to
21  do that.
22     Then we would record the final. I would do
23  the arrangement. Conduct a date. Book the singers, of
24  course, and musicians to do that. And do the final mix

Page 87

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1  and mastering and submit the final to the agency. And
2  then we also prepared all the union contracts and
3  payroll and waited to be reimbursed. Also given a fee.
4  That's about right.
5     Q.  And this is the general practice?
6     A.  Yeah.
7     Q.  And compare that to the practice that was
8  utilized in this case with respect to anything you did
9  for Griffin-Bacal?
10     A.  I think --
11     MS. PHARES: Objection.
12     MR. TANNENBAUM: I object to the form of the
13  question.
14     MS. PHARES: Griffin-Bacal is not a
15  Defendant in this case.
16     MR. MONAGHAN: Doesn't have to be. These
17  are the -- these are the jingles that are at issue
18  in the case.
19     MR. TANNENBAUM: There's no cause of action
20  for the jingles, your Honor. The jingles -- we
21  are talking about re-registrations. This is what
22  we constantly have to face here.
23     THE WITNESS: Same piece of music.
24     THE COURT: Let's have a little discussion

Page 88

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1  about this. If it's registered in nineteen -- if
2  the jingles were registered in 1980, is there a
3  requirement that it be re-registered?
4     MR. MONAGHAN: Is there? No.
5     THE COURT: Okay, so then --
6     MS. SAFFER: Your Honor, the cause of action
7  has to do with the use of music in what we refer
8  to as cues, background music in television shows,
9  et cetera. We have a different system of
10  registering music for jingles for commercials than
11  we do for the background music in T.V. shows. It
12  may be a similar piece of music, it may be totally
13  different. It is a different possess.
14     THE COURT: Well, maybe I can short-circuit
15  this somewhat, I doubt it, but we now had a short
16  discussion, testimony by the witness about how
17  things normally worked in jingles. Now go on to
18  whatever your next point is, counselor.
19     Did something different happen?
20     MR. MONAGHAN: Well, that's what I asked
21  her.
22     THE COURT: Go to the point where in this
23  complaint or decision of mine are we dealing with
24  jingles?

Page 89

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1     MR. MONAGHAN: Okay, I did. But I'll do it
2  again, if you don't mind, your Honor.
3  BY MR. MONAGHAN:
4     Q.  Which of the compositions at issue in this
5  case are commercial jingles?
6     A.  The Transformers was originally a jingle.
7  GI Joe and My Little Pony were originally jingles. And
8  Humanoids, Visionaries -- I'm not sure about
9  Visionaries. Robotics was originally a jingle. Only
10  about three or four of them that were original themes
11  that started this --
12     THE COURT: Hold on one second.
13     MS. PHARES: Your Honor, the complaint in
14  this case has to do with registrations of cues in
15  the 1990s, of the cues that were used in T.V.
16  productions produced by Sunbow. Jingles are not
17  part of the complaint in this case.
18     MR. MONAGHAN: Not true. Just flatly not
19  true.
20     THE WITNESS: Not true.
21     MR. TANNENBAUM: Where is the word "jingle"
22  in the complaint? Can you show us the word
23  "jingle" in the complaint?
24     THE COURT: Or in some decision where I

Page 90

1    CAROL ANNE BRYANT - DIRECT/MONAGHAN
2    extended your complaint.
3        MR. MONAGHAN: Your Honor, could we also
4    perhaps get some guidance from the Court on how
5    many different lawyers are going to jump up and
6    down at what point and interrupt the exam? I
7    mean, perhaps they are going to decide you'll take
8    this objection and then I'll take that objection
9    instead of --
10       THE COURT: Well, I wish it were that
11   simple. I'm not going to curtail the right of a
12   lawyer to defend their client. If the two of them
13   jump up at the same time, the fastest one up is
14   the first one. Except for the tall guy.
15       MR. TANNENBAUM: Gloria is smarter than I am
16   so she may have more objections.
17       THE COURT: I want to get through this as
18   reasonably as possible. And I thought we had come
19   to an agreement that anything not in the complaint
20   or not as you would say extended somehow by a
21   decision is not for this Court. And they are
22   complaining now that you are going into jingles
23   and they say that is not in the complaint.
24       MR. MONAGHAN: Well, they are wrong.
25       THE COURT: Show me.

Page 91

1    CAROL ANNE BRYANT - DIRECT/MONAGHAN
2        MR. MONAGHAN: The jingles -- in the middle
3    of my direct I have to run through the pleadings?
4        THE COURT: Objections have to be handled
5    when they are made.
6        MR. MONAGHAN: All right, Judge.
7        THE COURT: There is no jury here.
8        MR. MONAGHAN: No, I understand that.
9        THE COURT: I'm not worried.
10       MR. MONAGHAN: I'm not either. But I
11   think -- just think it is unfair to force me to go
12   through the pleadings right now and pick this out
13   in the middle of my direct of this witness. But
14   I'll do that. But I need a minute.
15       THE COURT: I appreciate that.
16       MR. MONAGHAN: You also answered
17   interrogatories. And we've also used the word
18   "compositions" throughout the pleadings. And the
19   compositions include the songs and the music we
20   are talking about. Paragraph 9 of the complaint,
21   the verified complaint, which initially had BMI
22   talks about Bryant and Kinder to being in the
23   jingle business dealing with ad agencies such as
24   BMI.
25       MS. PHARES: The verified complaint is not

Page 92

1    CAROL ANNE BRYANT - DIRECT/MONAGHAN
2    the complaint at issue.
3        MR. MONAGHAN: Excuse me, I'm answering
4    questions from the Court. When I'm done --
5        THE COURT: Go ahead, counsel.
6        MR. MONAGHAN: Throughout the entire course
7    of the litigation, in depositions and answers to
8    interrogatories, that has been the way these songs
9    have been characterized. They were -- and the
10   witness just testified, they were done as jingles
11   for toys with the exception of the three
12   compositions she talked about. She's testified on
13   direct and so far without rebuttal, except from
14   lawyers jumping up and down, that these were done
15   as jingles for toys, for HASBRO Toys,
16   Transformers, GI Joe. And the other toys she
17   talked about, including Paragraph 14, which talks
18   about the music for the client HASBRO which
19   marketed toy products, including Transformers, My
20   Little Pony, JEM and GI Joe.
21       And that's exactly what they want the Court
22   to believe. They want the Court to believe that
23   these were -- this music was done for T.V.
24   productions, therefore, they could use a cue
25   sheet. That's the essence of the case. And it

Page 93

1    CAROL ANNE BRYANT - DIRECT/MONAGHAN
2    has been in the rulings. I believe you discussed
3    that, your Honor, in prior rulings. We say you
4    can't use a cue sheet if the music was not done
5    for a T.V. production.
6        MS. SAFFER: I stood up last, but I'm
7    littlest.
8        THE COURT: All right, counsel, I have seen
9    in your complaint that you mentioned GI Joe is
10   mentioned, several of the items that have been
11   classified as jingles are mentioned in there by
12   name, and -- but if Miss Saffer --
13       MS. SAFFER: Yes.
14       THE COURT: -- has something to add to this,
15   I'm willing to listen.
16       MS. SAFFER: I'm not going to contest
17   whether or not a particular melody was written for
18   a jingle or a theme or a song. The practice in
19   the industry is depending upon the use of the
20   music no matter what it was originally thought of
21   in the composer's mind. It is registered
22   differently because it receives different kinds of
23   payments. If something is registered as a jingle
24   it is paid when it appears in a commercial on T.V.
25   If it is registered as a cue, that means that it

Page 94

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1 is part of the background music, the theme or
2 background scoring on a television show. And if,
3 for example, it is a song, it's registered as a
4 song and paid that way. If you think, for
5 example, of something in today's world, Friends,
6 the theme of Friends became a popular song. It is
7 registered at BMI as a theme from the T.V. show
8 and it's registered as a song. So that if it's
9 sung by somebody on the radio or in another show
10 somebody sings it, the composer and the publisher
11 can be paid for the use of that song.
12         Frankly, there are different amounts of
13 money that we pay for different kind of uses. A
14 song we view as being more, if I can use the word,
15 "important", I was going to say maybe that's not
16 the right word, is more valuable, it brings in
17 more revenue and, therefore, we pay it more money.
18         So the issue here is Miss Bryant can write a
19 particular melody that can be -- that same melody
20 can be registered at BMI three times, three
21 different ways, if it's going to be used three
22 different ways.
23         THE COURT: All right, hold on a second.
24 You need a lawyer to ask you questions. This is

Page 95

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1 the last I'm going to take on this issue.
2         MS. PHARES: Your Honor, also, Griffin-Bacal
3 was a company that was in the jingle business, and
4 Miss Bryant worked for Griffin-Bacal through her
5 own company. But Griffin-Bacal is not a Defendant
6 in this case. The only Defendant -- and I don't
7 believe it was ever served, the only Defendant in
8 this case that involves any of the use of Miss
9 Bryant's work is Sunbow. And for Sunbow she was
10 writing music for television series. Jingles are
11 not relevant to what is pled in this complaint and
12 certainly not in the amended complaint against
13 Sunbow.
14         THE COURT: Well, any of the items that are
15 in there that have been designated by name that
16 are jingles, they are in this lawsuit.
17         MR. TANNENBAUM: Except they were registered
18 as jingles in the 1980s.
19         MS. PHARES: In the 1980s.
20         MR. MONAGHAN: We'll change them is the
21 issue.
22         MS. PHARES: There is no change.
23         THE COURT: Hold on. Hold on. If you want
24 to sum up let's just go straight out -- ladies and

Page 96

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1 gentlemen, you know, I realize that you all have
2 to educate me as we are going along, as opposed to
3 a jury, but at least I have the background of
4 having read these. I can't say I know as much
5 about it as you do, I don't, but I do want to let
6 the Plaintiff put in his case, and I don't like an
7 excessive amount of interfering with Plaintiff or
8 anybody putting in their case. So let's try to
9 keep the objections down. At least for the
10 present I'm going to allow now the witness on the
11 stand to -- who has given us the background of how
12 she makes jingles operate, tell us if counsel
13 wants to ask her what any of the named Defendants
14 in here did to her jingles, if anything.
15         MR. MONAGHAN: We'll get to that, your
16 Honor, if I may.
17         MR. TANNENBAUM: Just so we don't interrupt
18 the flow, can we have a continuing objection?
19         THE COURT: You may have a continuing
20 objection throughout the entire trial.
21         MR. TANNENBAUM: Thank you.
22         MS. PHARES: And, your Honor, if to the
23 extent now Miss Bryant is going to say that those
24 songs in the Sunbow works were derivative works,

Page 97

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1 we are again right back squarely right in the
2 middle of a copyright case.
3         THE COURT: No, we're not squarely in the
4 middle of it. We are going forward. This trial
5 will end. All wars end, even the Trojan War.
6 This war will end soon.
7         Go ahead.
8         MR. MONAGHAN: Thank you.
9         THE WITNESS: I wish I got to talk.
10         THE COURT: Go ahead. Question.
11 BY MR. MONAGHAN:
12    Q.    Okay. Where were you between the years 1983
13 and 1989 in terms of your employment, Miss Bryant?
14    A.    1983 and -- you left out a couple of years,
15 but, okay.
16    Q.    I'm mindful of the Judge's admonition to get
17 to the meat.
18    A.    1981 to 1983 Kinder & Bryant music. 1983 to
19 about 1990 --
20    Q.    When you were at Anne Bryant Music, were any
21 of the compositions at issue in this case composed?
22    A.    No.
23    Q.    And, okay, Kinder-Bryant 1983 to 1989, which
24 of the compositions in this case, if any, were composed

CAROL ANNE BRYANT - DIRECT/MONAGHAN

during that period of your involvement?

A. All of them were either composed or developed further. My Little Pony was Michelin Company and was developed further at Kinder & Bryant. GI Joe the same. Except for Great Space Coaster.

Q. Okay. Now, who is Mr. Kinder?

A. Ford Kinder is a composer. Right now he is a medical doctor practicing in Florida.

Q. He is one of the witnesses we've listed?

A. (Nodding in the affirmative).

Q. You have to answer verbally, by the way?

A. Yes.

And he's a composer, an arranger, a singer, a wonderful singer, a businessman. Grew up in the music business in Atlanta.

Q. Okay.

A. He was my partner 50/50.

Q. Who were some of the clients you had at Kinder-Bryant?

A. We worked for a lot of agencies. In the beginning we worked at Saatchi & Saatchi. We did Dunkin' Hines music. And Dannon music. And High Point Coffee. A lot of the major brands. We worked for Ogilvy & Mader. I forget what we did for them. And we



CAROL ANNE BRYANT - DIRECT/MONAGHAN

worked for Leo Barnett in Chicago. Some of my clients doing Kellogg's and some of their major brands. Also Needer, Harper & Speers in Chicago. Jay Walter Toms.

Q. We may have touched upon this, when did you first meet Mr. Bacal?

A. I first met Joe Bacal in 1976 when I was doing arrangements for Jinny Reddington, who is a wonderful songwriter. At that time he was still at Bowls. He was a creative director for HASBRO then.

Q. What were the circumstances? Why did you have occasion to meet with him?

A. He came to the recording session. That's when I met with him. And, after that, I met him again several years later. Maybe 1978. Actually, a couple of years later, at Michelin & Company, when he came to discuss Michelin & Company working for his new ad agency.

Q. Do you remember any conversations you had with him that long ago? I know it is difficult.

A. Not really. I remember Spence Michelin called me upstairs to his office and said I want you to talk to Joe Bacal. And he vaguely remembered me. And I remember meeting him. And we talked a little bit about music and arrangements and what-not.



CAROL ANNE BRYANT - DIRECT/MONAGHAN

Q. Tell the Court, please, about the Transformers, that particular song. What is your involvement with that music?

A. Well, I composed it in 1983. Late August, as it turned out, in '83.

Q. And how did that come about?

A. Kinder-Bryant was two months old and Ford very much wanted to work for Joe and HASBRO. Called him a lot. It was summertime, nobody was around, you know. And at the end of August Joe called saying I got a job for you. New toy, great new toy called Transformers. He called Ford, but we had an office that was a huge room, and Ford was at one end and I was at the other end. He was going, Joe Bacal was on the phone, he really wanted to work for Joe, he loved Joe so much. And so he hung up and said, you know, Joe called and explained the job to me, the Transformers and Joe said same deal as Michelin Company. We were a new music house.

MR. TANNENBAUM: Objection, your Honor. She's testifying to conversations between Mr. Bacal and Mr. Kinder.

THE WITNESS: Ford Kinder told me that.

THE COURT: That's why it is hearsay.



CAROL ANNE BRYANT - DIRECT/MONAGHAN

Q. What was your understanding of the arrangement at Michelin & Co.?

A. I knew the arrangement we worked under it --

MR. TANNENBAUM: Objection.

MR. MONAGHAN: This is a witness who knows it personally.

THE COURT: I said it was all right.

MR. MONAGHAN: I'm sorry, Judge, I was used to getting hammered on it.

THE COURT: I think you've done all right so far. Go ahead.

A. We wrote the music for them and we were given 100 percent of the writer's share of the royalties with Griffin-Bacal, as I am with all my advertising clients. 100 percent of the writer's share.

Q. What does that mean? Tell the Judge what that means, the writer's share; what is that?

A. There is publishing and writing equal amount, 50/50 or 100 and 100. 100 percent of the publishing, 100 percent of the writing. And the writers keep the writer's share -- or, in the jingle business they do. And the publishers keep the publisher's share. Sometimes when a writer gets lucky

Page 102

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1  CAROL ANNE BRYANT - DIRECT/MONAGHAN
2  they get a little bit of the publishing too.
3      Q.  And what does the publisher do?
4      A.  The publisher basically causes a piece of
5  music to be performed.  I mean, that's the simplest
6  definition of what -- and they work the song, I guess.
7  That's a publisher.  And they also do -- they are
8  responsible for accountings and administration.
9      Q.  What involvement does the publisher have,
10  for example, with licensing of the music?
11      A.  They issue licenses.
12      Q.  Okay.  What about monitoring the payments
13  for the licenses?
14      A.  They receive the payments for the licenses.
15  But not in the case of BMI.  They receive their check,
16  BMI, and the writer receives a separate check.
17      Q.  Okay.  And what about determining what uses
18  would be made of the music?  Who makes that decision as
19  between the writer and the publisher?
20      A.  The publisher makes that decision if the
21  publisher is a copyright owner, or the publisher maybe
22  is an agent for a copyright owner.  The writer doesn't
23  have any say in that.
24      Q.  And under what circumstances would you as a
25  writer have given up your writer's royalties through

Page 103

1  CAROL ANNE BRYANT - DIRECT/MONAGHAN
2  songs that you composed?
3      A.  I never give up my writer's royalties.
4      Q.  Can you cite a single instance in your
5  career where you ever gave up your writer's royalties?
6      A.  No.
7      Q.  Okay.  Have you seen any document in this
8  case in all the four years of this litigation where you
9  signed off on your writer's royalties?
10      A.  No.
11      MS. SAFFER:  Your Honor, I wish to object,
12  unless it is made clear that what the witness is
13  testifying to is her understanding, if you will,
14  of what has transpired, as opposed to a definitive
15  statement that this is in fact what has
16  transpired.
17      In other words, with all due respect to Miss
18  Bryant, she is not an employee of a performing
19  arts organization.  She doesn't have an expertise
20  in that area.  There will be witnesses who do.
21  There will be other witnesses maybe also brought
22  by the Plaintiff.  And I just want the record to
23  indicate that what she is testifying to is her
24  understanding, but is not a fact.
25      THE COURT:  What you are saying is there are

Page 104

1  CAROL ANNE BRYANT - DIRECT/MONAGHAN
2  ways that a person could lose or have their rights
3  expire other than a written document?
4      MS. SAFFER:  Among other things, your Honor,
5  yes.
6      THE COURT:  All right, I think that was in a
7  couple of the motions.
8      MS. SAFFER:  Yes.
9      THE COURT:  All right, let's go ahead.
10      Q.  Okay, you have to answer questions.
11      Let's get back to the Transformers.  Let's
12  get a timeframe now, please, again.
13      A.  1983, September.
14      Q.  1983?
15      A.  I found it the other day.  September 1st,
16  1983 was the day we recorded that, National Edison
17  Studios in New York.
18      Q.  Recorded Transformers?
19      A.  The Transformers jingle theme.
20      Q.  Are you talking about a demo?  Are you
21  talking about the final version?  What are you talking
22  about?
23      A.  We did a piano demo first.  We always did
24  that with Joe Bacal.  And actually he came over to our
25  office and listened to the different songs in person

Page 105

1  CAROL ANNE BRYANT - DIRECT/MONAGHAN
2  which he did sometimes, you know, he came over to us.
3      Q.  Let's just stick with the Transformers.
4      A.  On that day he did.  That was Transformers.
5  I remember he did.  And he picked -- I think we did a
6  demo on more than one.  But he clearly picked the one I
7  did.  It was an unusual jingle.
8      Q.  Have you got with you on the stand something
9  that would play the music of the Transformers?
10      A.  Yes.  I'll take this out.  I've got it on my
11  phone.  You can get this all around the world.
12      MR. MONAGHAN:  We're going to play this
13  again, Judge, but this is just to show you a
14  general idea what the music is like.
15      THE COURT:  This also goes to the question
16  that somehow or another the Transformers ended up
17  on cell-phone.
18      MR. MONAGHAN:  Correct.
19      THE WITNESS:  Yeah, it's everywhere.
20      (Music played)
21      THE WITNESS:  The whole song, the bridge and
22  everything.
23      Anyway, it keeps going.  Sounds kind of
24  silly.
25  BY MR. MONAGHAN:

Page 106

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1  CAROL ANNE BRYANT - DIRECT/MONAGHAN
2  Q.   How did you get that music in your phone?
3  A.   I downloaded it onto my phone and I got
4  some -- maybe because I bought the Transformers movie,
5  they were marketing the daylights out of me, and I got
6  a notification that now you can get free Transformers
7  ring tones from Nokia.  Or you can get it from
8  Mini-Ring Tones.  I Googled them and found you can get
9  lots of ring tones from the Transformers theme.
10  THE COURT:  You have an objection?
11  MS. PHARES:  Objection, your Honor.
12  Relevance.
13  And, furthermore, there is no foundation for
14  Miss Bryant's testimony about ring tones.  For all
15  we know, these ring tones are all unauthorized.
16  Frankly, I don't think any of us knows.
17  THE COURT:  No special reason except she is
18  playing it on her phone.
19  MS. PHARES:  I understand that, but we are
20  now also moving far away from the area of
21  performance royalties because her ring tone does
22  not involve public performance royalties.
23  THE WITNESS:  Yes, it does.  I get royalties
24  for it.
25  THE COURT:  Just a minute.

Page 107

1  CAROL ANNE BRYANT - DIRECT/MONAGHAN
2  That's really cross-examination.
3  THE WITNESS:  I get royalties for it.
4  THE COURT:  Go ahead.
5  Q.   Who composed the music the Court just heard?
6  A.   I did.
7  Q.   And is this the music you were talking about
8  a moment ago?
9  A.   Yes.
10  Q.   Is this the music you composed pursuant to
11  the overture from Joe Bacal's agency?
12  A.   Yes.
13  MR. TANNENBAUM:  Objection to the form.  Not
14  Joe Bacal's agency.  It was a corporation.
15  THE COURT:  Sustained.
16  MR. TANNENBAUM:  Thank you.
17  Q.   And were there lyrics to the Transformers?
18  A.   Yes.
19  Q.   Okay.  And let me back up a little bit.
20  For what purpose was the Transformers music
21  composed?  What commercial purpose?
22  A.   It was to create a theme for this toy,
23  interesting toy, that was coming out.
24  Q.   And at that point in time what T.V.
25  productions were contemplated with respect to the

Page 108

1  CAROL ANNE BRYANT - DIRECT/MONAGHAN
2  Transformers at that time that you composed the music?
3  MR. TANNENBAUM:  Objection to the form.
4  MS. PHARES:  Objection.
5  MR. TANNENBAUM:  Played by whom?
6  THE COURT:  Sustained.
7  Find a different word.
8  Q.   What was your understanding at the time of
9  the composition of that music by you as to its use, its
10  intended use at that time?
11  A.   Well, nothing specific.  But, you know, we
12  always had the hope that these things would turn into
13  T.V. shows, but we didn't know that at that point.
14  Q.   It was a toy jingle?
15  A.   Yeah, it was a toy jingle first.  It had to
16  be a toy jingle, yeah.
17  Q.   What did Sunbow have to do with this?
18  A.   Nothing, at that point.
19  Q.   Did the name Sunbow even come up at that
20  point?
21  A.   Not in the discussions on the Transformers.
22  We knew about Sunbow.  We worked for them, you know, in
23  other ways.
24  Q.   The Great Space Coaster?
25  A.   Yeah.

Page 109

1  CAROL ANNE BRYANT - DIRECT/MONAGHAN
2  Q.   All right.  Now, I'm going to show the
3  witness --
4  MR. MONAGHAN:  I'm going to ask the reporter
5  to mark this as Exhibit 2.
6  THE COURT:  State what it is, for the
7  record.
8  MR. MONAGHAN:  Yes, your Honor.  It is Miss
9  Bryant's BMI catalog dated April -- I'm sorry,
10  March 16th 2000.  It is Bate Stamp Numbered 574
11  through 658.
12  The Defendants have copies of this --
13  THE COURT:  Just off the record a moment.
14  (Discussion off the Record)
15  (Resumed on the record, in open court)
16  THE COURT:  Let's go.
17  MR. MONAGHAN:  All right, thanks.
18  (Plaintiff's Exhibit No. 2, Ms. Bryant's BMI
19  Catalog dated March 16, 2000, Bate Stamp Numbered
20  574 through 658, marked for identification)
21  THE COURT:  It's been marked for
22  identification.
23  Any objection to it?
24  MS. PHARES:  I have not seen it.
25  MR. TANNENBAUM:  We have not seen it.

Page 110

1    CAROL ANNE BRYANT - DIRECT/MONAGHAN
2    THE COURT: Show it to counsel.
3    THE WITNESS: It says Exhibit 2.
4    MR. TANNENBAUM: We have not gone through
5    every page, your Honor, but with the right to
6    reserve an objection if something pops up, we do
7    believe that was the catalog that was provided to
8    BMI.
9    THE COURT: And that this catalog would at
10   least theoretically contain all of the musical
11   jingle, songs, cues?
12   MS. SAFFER: I'm not prepared to say that,
13   your Honor. It is a possibility that it does not
14   contain the jingles. I don't know, because of the
15   date.
16   THE COURT: All right, thank you.
17   It's admitted into evidence.
18   MR. MONAGHAN: Thank you, Judge.
19   (Plaintiff's Exhibit No. 2, marked and
20   received in evidence)
21   MR. MONAGHAN: If I may, Judge, we do have
22   equipment, it is not set up, and I don't want to
23   take the time to do that, but probably tomorrow
24   morning where we'll go through the DVDs and the
25   CDs and all the music.

Page 111

1    CAROL ANNE BRYANT - DIRECT/MONAGHAN
2    THE COURT: All right, let me get this
3    straight, it's a good thing we don't have a jury
4    here, we have now established that the Plaintiff
5    composed, originated some music that was later
6    called Transformers; is that right?
7    MR. MONAGHAN: At the time it was called
8    Transformers.
9    THE COURT: At the time.
10   MR. MONAGHAN: At the time, because the
11   toy --
12   THE COURT: Is that Transformers listed in
13   the catalog?
14   MR. MONAGHAN: Yes, in a variety of ways.
15   THE COURT: Okay. Then somebody is going --
16   I mean, believe me, I know about NAPSTER and those
17   things. Even I know about it. How does it then
18   get to be on the telephone?
19   MS. SAFFER: Well --
20   MR. MONAGHAN: Very good question.
21   MS. SAFFER: Okay, your Honor, there are
22   many different ways it gets to be on the
23   telephone. Some of them authorized, some of them
24   not. Just like the NAPSTER situation where
25   NAPSTER was not authorized. But there are

Page 112

1    CAROL ANNE BRYANT - DIRECT/MONAGHAN
2    services where you can legally download. Ring
3    Tones is a relatively new use of music. There are
4    companies that are coming to BMI and other
5    performing rights organizations and getting
6    licenses. To that extent, we then pay royalties.
7    Granted, not great amounts of money, pennies, but
8    we pay royalties to the people who are listed as
9    the writers and publishers of the music in our
10   records.
11   I have no way of knowing, sitting here,
12   whether what Miss Bryant downloaded was from one
13   of those authorized people who got permission or
14   not.
15   THE COURT: I understand. I understand.
16   Okay, let's go forward.
17   MR. MONAGHAN: Thank you, Judge.
18   THE WITNESS: I do that legitimately. I'm a
19   composer.
20   BY MR. MONAGHAN:
21   Q.   Miss Bryant, to finish the thought about the
22   ring tones on your phone, just tell the Judge how you
23   got that into your telephone.
24   A.   I downloaded it from Get It Now on the web
25   from a legitimate site that I checked out on Google

Page 113

1    CAROL ANNE BRYANT - DIRECT/MONAGHAN
2    called Mini-Ring Tones that pays royalties and has
3    legitimate licenses. I don't pirate anything.
4    THE COURT: All right, lets continue.
5    A.   So, you know --
6    THE COURT: I think the search for
7    Transformers is something we'll keep going here
8    rather than get into anything else.
9    MR. MONAGHAN: That's what we are on, your
10   Honor, we are on Transformers.
11   Q.   Miss Bryant, just --
12   A.   Looking for it.
13   Q.   -- if I can direct your attention to Page 4.
14   A.   Page 4. Oh, Transformers. Oh, right, cues.
15   MR. TANNENBAUM: Just so I understand, when
16   you say Page 4 you mean the number on the top,
17   right?
18   MR. MONAGHAN: I do.
19   Is that one we furnished you?
20   MR. TANNENBAUM: No.
21   Q.   Just a couple of foundational questions.
22   This is your BMI catalog?
23   A.   Yes, it is. It is old.
24   Q.   How did you get it?
25   A.   I tried for two years to get this. Then I

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1  called you. And you went to work on my behalf.
2  Q.  When you say you tried for two years, what
3  efforts did you make?
4  A.  I wrote letters, made phone calls to BMI
5  asking them to investigate missing titles for -- from
6  my catalog and investigate things that seemed to be
7  registered strangely. And I got sent around to several
8  people. And then I wrote several letters with cover
9  copies. I did it, right, you know, to try to determine
10  what was going on.
11  Q.  When did you start that process?
12  A.  Spring of 1998.
13  Q.  And how did you start it? Was it with a
14  call?
15  A.  Started with a phone call.
16  Q.  Who did you call?
17  A.  I called the Writer Relations Department,
18  and then I was told to speak to Greg Bob's office.
19  Q.  Writer's Relations Department at BMI?
20  A.  Yeah. And I don't know what his title was.
21  So I called this number that they gave me, Greg Bob's
22  office, and I spoke to his assistant Lisa Turner. And
23  Lisa Turner -- when I called, I told her the problem.
24  I said, I don't see GI Joe and I don't see My Little

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1  Pony. She said, let me just go into the computer.
2  Q.  Stop there.
3  A.  Yes.
4  Q.  When you say you don't see it, what are you
5  talking about?
6  A.  Oh, I found this all on the web quite by
7  accident. I wasn't looking for it.
8  Q.  What did you find on the web?
9  A.  I typed my name in on the new BMI site to
10  see if I was in the site. My catalog was there.
11  Q.  Was there any reason that prompted you to do
12  that?
13  A.  Yes. Joey Cummings from the Joey Company
14  asked me to try to find out publisher information for
15  Jim Croce on one of his songs called Feelings. And I
16  did. I thought it was very exciting. Here his whole
17  catalog came up, everything is underlined in blue. I
18  said, wait a minute, I'm in BMI, maybe I'm in there. I
19  typed my name, my catalog came up. It was all
20  wonderful. Until I got to G. I said good, where is GI
21  Joe? I went to down to J. JEM was there. I went to
22  My Little Pony. That was missing. I got down to the
23  Transformers and I clicked on the blue and the
24  underscoring, you know, I wasn't as much a geek then,

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1  and the Transformers came up with lots of different
2  people being credited with writing it and me having
3  participation in some and not others. I said, what is
4  going on here?
5  Q.  Why didn't you have a catalog before this
6  time, a BMI catalog of your songs?
7  A.  Well, I didn't know there was anything
8  wrong. I remember, years ago, I called for a catalog,
9  and I said can I get a copy of my catalog? That is
10  when Ford and I split up. I want to have a copy of my
11  catalog. It was at the house in two days. Somebody
12  ran it for me. I have it somewhere. And everything
13  was fine.
14  Q.  So, okay, let's back up a little bit, short
15  cut this a little bit.
16  What information would you -- prior to this
17  exercise in trying to get the catalog, what information
18  would you get from BMI by way of writing statements,
19  that type of thing?
20  A.  Well, it used to be that you could see your
21  feature songs, next to it it would say your percentage.
22  A hundred percent.
23  Q.  What would say that? What piece of paper?
24  A.  The statements.

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1  Q.  I'll show you some of those later.
2  A.  Okay. A number of performances credited to
3  you and then an amount.
4  Q.  These are the public performances that
5  generate the money?
6  A.  These were on feature songs and jingles had
7  payments, I think it was once a year, in January.
8  Maybe it was twice a year. That kind of fell under
9  that category. And you would see your percentage there
10  too. The Transformers, actually, Robots In Disguise,
11  100 percent. And that was the way it was listed. The
12  way it was born.
13  Q.  And so in 1998 you said you commenced the
14  process of trying to get a copy of your catalog as it
15  existed at that time?
16  A.  Yeah.
17  Q.  And --
18  A.  To find out what was going on, you know.
19  Q.  Okay. And you contacted -- what did you
20  say? Artist Rights Section?
21  A.  The Writer Relations.
22  Q.  Writer Relations, okay.
23  And do you remember the names of anybody
24  else you spoke with?

Page 118

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1   CAROL ANNE BRYANT - DIRECT/MONAGHAN
2   A.   I spoke to Lisa Turner. And she typed my
3   name. She said, well, let me just take a look. She
4   typed my name in the computer and she said, oh, my God,
5   there's a writer's change here. We never see that.
6   And, you don't know about this? And I said, no, I
7   don't know anything about it.
8        MS. SAFFER: Excuse me, your Honor.
9   Objection.
10       MR. TANNENBAUM: Objection with respect to
11  my client. That is hearsay.
12       MS. SAFFER: And with respect to my client
13  that is hearsay too.
14       MS. PHARES: With respect to all Defendants.
15       MR. MONAGHAN: BMI has asked to participate
16  in the case.
17       MS. SAFFER: Yes, but she's testifying as to
18  what somebody else was saying.
19       MR. MONAGHAN: Somebody at BMI.
20       THE WITNESS: I put in a letter, you know,
21  to Charlie Feldman --
22       THE COURT: I'll let it in for limited
23  purposes. This isn't a jury trial. I know the
24  difference.
25       Go ahead.

Page 119

1   CAROL ANNE BRYANT - DIRECT/MONAGHAN
2        Q.   And what other efforts besides telephone
3   calls did you make?
4        A.   Well, she said you should call -- you need
5   to get in touch with Charles Feldman. Charlie Feldman
6   who I think is in the legal department. Used to be.
7        Q.   Did you have any contact with him?
8        A.   I called his office, and his assistant
9   Maggie told me that you need to write a letter to
10  Mr. Feldman and include some copies showing, you know,
11  past registrations of these particular themes that you
12  are concerned about. Ask him what to do. That's how
13  this all began. I was trying to find out what
14  happened.
15       Q.   Why didn't you get your catalog for two
16  years?
17       A.   I don't know. Everybody gave me the dodge
18  at BMI. I loved BMI. They were always very helpful.
19  If you had a question they would always answer it. All
20  of a sudden, nobody wanted to know anybody.
21       Q.   How many letters did you write?
22       A.   I wrote to Mr. Feldman two or three times.
23  Then I spoke to him and he blew me off. And then I was
24  about to give up on the whole thing. It went over a
25  period of a year. And I went to a party and I met

Page 120

1   CAROL ANNE BRYANT - DIRECT/MONAGHAN
2   somebody who worked at BMI and I said, you know, I have
3   this problem, it is not like BMI sees it this way. They
4   said call Mr. Marcilio.
5        THE COURT: Do you have an objection?
6        MS. SAFFER: Yes, I'm objecting. I really
7   don't understand the relevance. It may be
8   relevant whether or not there was something that
9   was done to change the records or whatever. But
10  every conversation she had with everybody in
11  various implications about BMI changing from being
12  nice to not nice, I really don't think it has
13  anything to do with the issues in the case.
14       THE COURT: Well, maybe we could get away
15  from the plot theory and get to what happened
16  next.
17       MR. MONAGHAN: Okay, Judge. Thanks.
18       A.   So Kathy King told me to contact John
19  Marcilio, who I -- I sent him an E-mail, who also
20  worked there. She said he'll -- he can really help you
21  with this and help you get the answers.
22       Q.   How did you eventually get the catalog?
23       A.   When you got it for me. That was two years.
24       Q.   Is this the catalog?
25       A.   Yes.

Page 121

1   CAROL ANNE BRYANT - DIRECT/MONAGHAN
2        Q.   Did BMI -- strike that.
3        What reason did BMI give you for not
4   providing that catalog for that period of time?
5        A.   I don't think they ever gave me a reason.
6        Q.   You are the writer, this is your catalog,
7   and it took you two years to get it?
8        A.   Yeah.
9        MS. SAFFER: Objection, your Honor.
10       THE COURT: Sustained. I think we got the
11  picture here.
12       Q.   All right. Let's go, if we can -- I think
13  we started at Page 4 of the catalog?
14       A.   Uh-huh.
15       Q.   Exhibit -- what is it? 2?
16       THE COURT: You have to say yes or no.
17       A.   Yes.
18       THE WITNESS: I thought he was talking to
19  you.
20       Q.   Referring to the Transformers. We're going
21  the stick with the Transformers for a little while.
22       A.   Yes.
23       Q.   Okay. Does the Transformers composition
24  appear on Page 4?
25       A.   Well, Autobots Go Into Battle.

1    CAROL ANNE BRYANT - DIRECT/MONAGHAN
2        MR. MONAGHAN: Judge, we have another copy
3    of this if you want to follow along.
4        MR. TANNENBAUM: We would really like you
5    to, your Honor.
6        MR. MONAGHAN: You would really like.
7    Swell.
8        MR. TANNENBAUM: Okay, I have no objection
9    to this.
10        THE COURT: My grandchildren listen to this.
11    I'm very familiar with it.
12        Go ahead.
13        MR. MONAGHAN: This is Page 4, your Honor.
14        THE COURT: Yes.
15    Q.    Autobots Go Into Battle.
16        Incidentally, what is your understanding of
17    the information that's supposed to be provided by the
18    catalog?
19    A.    There's a writer and publisher print
20    information.
21    Q.    Okay.
22    A.    You could see we have writer I.D.s and our
23    affiliations. ASCAP. And our shares.
24    Q.    Okay. So we see, for example, that with
25    Autobots Go Into Battle this is a total percentage

1    CAROL ANNE BRYANT - DIRECT/MONAGHAN
2    shown there of 200 percent, correct?
3    A.    Yes.
4    Q.    And the first column where it says,
5    "participant", that is the writer --
6    A.    Yes.
7    Q.    -- or the publisher, as the case may be?
8    A.    The writers seem to be always listed first.
9    Q.    Okay, but that column will identify the
10    writer or the publisher with respect to the
11    composition?
12    A.    That's right.
13        MR. TANNENBAUM: We'll stipulate that "P"
14    means publishing and "W" means writer, your Honor.
15        THE COURT: All right.
16    Q.    And then there is some information under the
17    column, account number; what is that?
18    A.    That is my account. 44388.
19    Q.    And then there is P/W, and counsel was
20    generous in stipulating to publishers and writers.
21        And then next is a column headed A-F-F-I-L.
22    I assume that is affiliation?
23    A.    Yes.
24    Q.    That means whether you are a BMI writer or
25    ASCAP?

1    CAROL ANNE BRYANT - DIRECT/MONAGHAN
2    A.    Right.
3    Q.    ASCAP is another Performing Rights Society?
4    A.    Yes.
5    Q.    Under what circumstances would a writer such
6    as yourself select one or the other of these Performing
7    Rights Societies, ASCAP versus BMI?
8    A.    Well, I like BMI better.
9    Q.    Well, what is the criteria for deciding?
10        MS. PHARES: The objection was relevance.
11        THE COURT: Well, I'm going to allow it
12    because we're trying to track down the
13    Transformers mystery right now.
14        Go ahead.
15    Q.    Can you answer that?
16    A.    Why do I like them better?
17    Q.    Why did you like BMI better?
18    A.    I met Mr. Catron.
19        THE COURT: Okay, not going any further.
20    This is irrelevant.
21        MR. MONAGHAN: It wasn't exactly --
22    A.    They were very helpful.
23        MR. MONAGHAN: It wasn't where I was going
24    actually at all.
25        THE COURT: Let's go.

1    CAROL ANNE BRYANT - DIRECT/MONAGHAN
2    Q.    All right, number four.
3    A.    I'm sorry?
4    Q.    What is that song, Autobots Going Into
5    Battle?
6    A.    It is the Transformers melody. It is a cue.
7    Q.    The melody we just heard, is it the same
8    melody?
9    A.    Yeah.
10    Q.    When you say it is a cue, what does that
11    mean in the parlance of the trade?
12    A.    It means it is background, it is
13    orchestration, it is behind the scene, of music. It is
14    a cue, a film cue.
15    Q.    Does that mean there would not be lyrics?
16    A.    No lyric.
17    Q.    If it is a cue there is no lyrics?
18    A.    No lyric.
19    Q.    You have to answer verbally. I see you
20    shaking your head. I want you to acknowledge.
21        Okay. Now, with respect to Autobots Go Into
22    Battle, is there anything wrong with that registration
23    in your understanding as to your participation and the
24    participation of others in that composition?
25        Is there anything wrong with the way it is

Page 126

1  CAROL ANNE BRYANT - DIRECT/MONAGHAN
2  registered?
3      A.  Well, Ford Kinder shouldn't be there.  I
4  wrote this song, and it is 100 percent mine, and the
5  writer's royalty.
6      Q.  Now --
7          MR. TANNENBAUM:  Objection, your Honor.
8  This is where we are.  It's an unjust enrichment
9  claim against Joe Bacal.  You have her catalog.
10  50 percent Anne Bryant, 50 percent Ford Kinder.
11  Nada for Joe Bacal.  This is entirely irrelevant.
12  Bacal is not getting anything on this composition.
13  This was my case.  She's putting in my case.  It
14  is not there.  He doesn't get anything.  If
15  somehow by some mysterious way somebody schemed to
16  change and give money to Ford Kinder that Kinder
17  is not supposed to get, she sued Kinder, that is
18  Kinder's case.  This is where we are.  There are
19  20 straight examples of this and we are going to
20  sit here and do this.
21          THE COURT:  Well, unless somebody finds a
22  different way we're going to sit and do this.
23          MR. TANNENBAUM:  I object to relevance.
24          THE COURT:  As to some of the Defendants in
25  this lawsuit I'm going to allow it in.

Page 127

1  CAROL ANNE BRYANT - DIRECT/MONAGHAN
2          MR. MONAGHAN:  Thank you, your Honor.
3      Q.  Do you know, Miss Bryant, how it was that
4  Ford Kinder was credited with 50 percent of the
5  writer's royalties on the music cue that you said you
6  composed?
7      A.  It appears to be through a cue sheet because
8  it is not a registration number.
9          MR. TANNENBAUM:  Objection.
10          THE WITNESS:  They have registration numbers
11  on this, Mr. Tannenbaum.
12          MR. TANNENBAUM:  Appears to be through a cue
13  sheet.
14          MR. MONAGHAN:  This is cross.  If you want
15  to cross-examine her, I'm sure you will get an
16  opportunity.
17          THE COURT:  I'm going to allow the witness.
18  On the other hand, my recollection is that the
19  Kinder part of this had been settled, isn't it?
20          MS. PHARES:  Correct.  Correct.
21          Your Honor, I want to make clear, I'm just
22  not popping up every time Mr. Bacal -- I mean, Mr.
23  Bacal's counsel does.  But I don't want that
24  silence to be read as any suggestion that Sunbow
25  believes that this line of questioning is -- has

Page 128

1  CAROL ANNE BRYANT - DIRECT/MONAGHAN
2  anything to do with Sunbow.
3          THE COURT:  I assume that everybody at that
4  back table is against everything that they are
5  hearing from the Plaintiff.
6          MS. SAFFER:  Except when she says BMI was
7  very cooperative.
8          MR. MONAGHAN:  And nice.
9          THE COURT:  Let's go ahead.
10          MR. MONAGHAN:  All right, Judge.
11          THE COURT:  We're going to take a break at
12  3:15.
13          MR. MONAGHAN:  Thank you, Judge.
14  DIRECT EXAMINATION BY
15  MR. MONAGHAN:  (Continued)
16      A.  Can I finish?  You asked me a question.
17      Q.  Yes, go ahead.
18      A.  The other way -- I mean, the other thing
19  that I see on here is that somebody registered this
20  apparently by cue sheet and it was the administrator
21  for Sunbow.  They were -- they have Starwild and
22  Wildstar Music.
23          Another thing I see on here is why is
24  Wildstar Music listed with two BMI writers?  Wildstar
25  is an ASCAP company.  This is something that doesn't

Page 129

1  CAROL ANNE BRYANT - DIRECT/MONAGHAN
2  make sense here about the way it was registered.  But I
3  don't register these.  The publisher's administrator
4  registers them.
5      Q.  Do you know -- can you attribute any
6  significance to the date, October 26th '94?
7          What does that have to do with anything you
8  did with this song?
9      A.  I really don't understand.  It's a melody
10  that was registered ten years before.  Why it had to be
11  re-registered, but --
12          MR. TANNENBAUM:  Objection.  There is no
13  evidence it was re-registered.
14          THE COURT:  Was it registered?
15          THE WITNESS:  It was registered again.
16          MR. TANNENBAUM:  It wasn't registered again.
17  There is nothing on this page.  That's not true.
18          MR. MONAGHAN:  This is argument.
19          THE COURT:  No, no, we're now working hard
20  on Transformers.
21          MR. MONAGHAN:  We are.
22          THE COURT:  The witness has testified that
23  she originated this sometime before this --
24          Did it ever appear before in this catalog?
25          THE WITNESS:  Absolutely.

33 (Pages 126 to 129)

Page 130

1   CAROL ANNE BRYANT - DIRECT/MONAGHAN
2       MR. MONAGHAN: Again, this catalog was only
3   produced in 2000.
4       THE COURT: No, but was there a prior
5   catalog in which it was in?
6       MR. MONAGHAN: Well, the witness is
7   indicating yes.
8       THE WITNESS: Yes.
9       THE COURT: How is it listed there?
10      You said you used to get them fairly
11  regularly when you asked for them.
12      THE WITNESS: No, I only got them once
13  before.
14      MR. MONAGHAN: No, those are the statements
15  she got.
16      THE WITNESS: It is registered many
17  different ways in different percentages. It is
18  the same song.
19      MS. SAFFER: Your Honor, I object to the
20  term "registered". The piece of paper says
21  "entered". I would appreciate it if she would use
22  the word that is listed on the actual piece of
23  paper. Her counsel can ask her if she knows what
24  "entered" means. But let's say it like it is on
25  the document.

Page 131

1   CAROL ANNE BRYANT - DIRECT/MONAGHAN
2       MR. MONAGHAN: Your Honor, I don't know -- I
3   tried a fair number of cases, I've never tried one
4   where people jump up and down in the middle of
5   your exam like this. They are free to. But I
6   will say this, this is an exhibit in evidence. My
7   understanding of the evidence rules are the
8   witness can read from any exhibit that is in
9   evidence.
10      My question to her is if she understands why
11  it is this way. That's all I'm asking.
12      THE COURT: Apparently she doesn't.
13      MR. MONAGHAN: That's right, she doesn't.
14      THE COURT: All right, let's go on to
15  something. Let's hold anything that we possibly
16  can for cross, all right?
17      Go ahead.
18   Q.  Okay. Are you finished discussing Autobots
19  Go Into Battle?
20   A.  Yes. But I know that entered is a date and
21  song number is not shown here. There is a BMI work
22  number. I'm giving this to you. And there's no
23  clearance number, which means I believe comparing it to
24  everything else that it wasn't done through a clearance
25  form.

Page 132

1   CAROL ANNE BRYANT - DIRECT/MONAGHAN
2    Q.  Okay. How do you know of this term -- let
3   me back up a little bit.
4       In your understanding, because I'm sure Miss
5   Saffer will correct me if I'm wrong, I just have a
6   feeling, how are songs registered with BMI? How do
7   they get any of this information that eventually finds
8   its way into these catalogs?
9    A.  They are registered by someone authorized to
10  put in a registration form or cue sheet. I put in
11  registrations for my work and I've been authorized in
12  certain circumstances, but not solely as the writer.
13   Q.  What does a registration form look like?
14  What is the name of the form?
15   A.  BMI clearance form.
16   Q.  Have you seen them in the case?
17   A.  I think we had some around. I, you know --
18   Q.  Just so we are on that subject matter --
19   A.  -- I can identify it by sight.
20   Q.  -- let me show you now a document.
21      MR. MONAGHAN: I'm going to ask the reporter
22  to mark this as Exhibit 3.
23      (Plaintiff's Exhibit No. 3, a clearance
24  form, marked for identification)
25      THE COURT: Clearance form marked as

Page 133

1   CAROL ANNE BRYANT - DIRECT/MONAGHAN
2   Plaintiff's Exhibit 3.
3       Any objection to it going into evidence?
4       MR. TANNENBAUM: None, whatsoever.
5       THE COURT: Objections?
6       MS. PHARES: No objections, your Honor,
7   except to note that the date on it is October,
8   '85.
9       THE COURT: In evidence.
10      (Plaintiff's Exhibit No. 3, marked and
11  received in evidence)
12      MR. MONAGHAN: May I approach the witness
13  because I don't have my own copy now?
14      THE COURT: Yes.
15   Q.  Miss Bryant, what is this form?
16   A.  It is the original Transformers T.V. --
17  Transformers registration for the T.V. show,
18  apparently.
19   Q.  Okay. And what is the title of the work
20  being indicated?
21   A.  Transformers T.V. show.
22   Q.  No, no, the title.
23   A.  Oh, Transformers Main Theme.
24   Q.  Is that the theme that you said you
25  composed?

Page 134

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1
2   A.   Yes.
3   Q.   Is that the one we just heard through your
4   phone?
5   A.   Yes.
6   Q.   That's the main part of the song?
7   A.   Yes.
8   Q.   Okay.  You used the word, "bridge"; what
9   does that mean "bridge"?
10  A.   The middle part.
11  Q.   Does the word, "refrain", have any
12  application here?
13  A.   "Refrain" is used all over the place.
14  Q.   Okay.
15  A.   It is used in many ways.
16  Q.   And does this show Ford Kinder and yourself
17  as co-writers?
18  A.   Yes.
19  Q.   And what was Mr. Kinder's contribution to
20  the Transformers Main Theme?
21  A.   Well, he didn't write it.  He didn't write
22  anything.  But he did come up with a line that Joe
23  liked, I think, Robots In Disguise, and that was one
24  line of lyric we were 50/50 partners.
25  Q.   Did you ever see this -- did you see this at

Page 135

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1
2   the time this was generated?
3   A.   No.
4   Q.   Who was the party submitting this presumably
5   to BMI?
6   A.   Lisa Goyette.
7   Q.   Who was she?
8   A.   She worked for Sunbow.
9   Q.   And is this the type of form that is
10  submitted and under what circumstances?
11  A.   That's submitted by the publisher, someone
12  who had the authorization to submit it.
13       THE COURT:  But you are not saying there was
14  anything wrong with that form.  You and
15  Mr. Kinder, you said, were 50/50 splits.
16       THE WITNESS:  We were and -- initially.
17       THE COURT:  All right.
18       THE WITNESS:  Then it changed when Mr.
19  Dobishinsky started filing things.
20       THE COURT:  All right, on that note we will
21  take a short break.
22       (Recess: 3:15 p.m.)
23       (Resumed: 3:30 p.m.)
24       (Resumed on the record, in open court -
25  counsel and parties present as previously noted)

Page 136

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1
2   C A R O L    A N N E    B R Y A N T,
3        the Plaintiff, previously duly sworn
4        by the Court, resumed the stand
5        and testified further as follows:
6        MR. MONAGHAN:  If I could ask the court
7   reporter to read the last question, it was your
8   Honor's question to the witness, back.
9        COURT REPORTER:  "The Court:  But you are
10  not saying there was anything wrong with that
11  form.  You and Mr. Kinder, you said, were 50/50
12  splits.
13       "The Witness:  We were and -- initially.
14       "The Court:  All right.
15       "The Witness:  Then it changed when Mr.
16  Dobishinsky started filing things."
17  DIRECT EXAMINATION
18  BY MR. MONAGHAN:  (Continued)
19       Q.   You were referring to Plaintiff's Exhibit
20  No. 3 in evidence.  The Judge was asking you about the
21  form.
22       A.   Yes.
23       Q.   And then there was a discussion about the
24  50/50 split with Mr. Kinder.
25       A.   Yes.

Page 137

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1
2        Q.   What does that 50/50 split arrangement with
3   Mr. Kinder have to do with this form?
4        A.   Ford Kinder and I split our income, but we
5   didn't split our credits that way.
6        Q.   Okay, explain to the Court, so we are clear,
7   what you mean by that when you say you split the
8   income -- you are talking about Kinder-Bryant?
9        A.   Yes.
10       Q.   What about writer credits as reflected in
11  Exhibit 3?
12       A.   Well, that should have never been listed
13  that way.  It was initially filed by Sunbow, Kinder &
14  Bryant.  And that makes sense that they did it.  I
15  don't think they did anything on purpose, but that was
16  the way it was filed.  But, of course, it was picked up
17  on lots of cue sheets over time.  Like even this title,
18  I don't know who has custody of all of that.  And these
19  are instrumental cues.
20       Q.   Wait, wait.
21       A.   Music.
22       Q.   Miss Bryant, we'll go over that.  I'm trying
23  to stick with that form.
24       A.   Oh, that form.
25       Q.   When did you authorize, if you authorized,

Page 138

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1  CAROL ANNE BRYANT - DIRECT/MONAGHAN
2  someone to put in Kinder for 50 percent on the
3  Transformers Main Theme?
4      A.   I didn't. I didn't put in that form.
5      Q.   When did you first see this form?
6      A.   The last couple of years ago.
7          MS. PHARES: Your Honor, my understanding
8  was that this had been offered as an example of a
9  form. But I now hear Mr. Monaghan asking about or
10 questioning the registration. This is a form in
11 1985 which is well before your Honor's ruling on
12 the statute of limitations. So for Sunbow, in any
13 event, I am objecting that this is irrelevant to
14 the issues before you.
15         THE COURT: Also the witness testified that
16 she thinks Sunbow put it in. I'm not giving it
17 any weight.
18         MR. TANNENBAUM: I have the same objection.
19 This is a case on re-registration. This is not
20 the original registration.
21         MR. MONAGHAN: Well, for the record, your
22 Honor, this is in evidence and it bears the name
23 Sunbow Productions as the party submitting.
24         THE COURT: All right.
25         MR. MONAGHAN: So I don't think it is just

Page 139

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1  CAROL ANNE BRYANT - DIRECT/MONAGHAN
2  her opinion. It is in evidence.
3      Q.   And you identified this person Lisa?
4      A.   Yes. She worked at Sunbow.
5      Q.   How do you know that?
6      A.   I met her at some point in time.
7      Q.   Did Lisa show you this form at some point
8  before it was submitted?
9      A.   No. They did the submissions.
10     Q.   Now, let's get back to the catalog. Go back
11 to the Transformers. Hopefully, maybe we can get
12 through the catalog on Transformers today.
13         THE COURT: All right.
14     Q.   If I can turn to the next song, there is
15 another song -- I say song, another entry, Autobot Go
16 Into Battle.
17         That is the one we just looked at?
18     A.   That is the same thing.
19     Q.   Okay. Any idea why it is in there twice?
20 Because the work number is different, is it not?
21     A.   I don't understand that, no.
22     Q.   You don't understand why it is in there
23 twice?
24     A.   No.
25     Q.   It's talking about the same composition?

Page 140

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1  CAROL ANNE BRYANT - DIRECT/MONAGHAN
2      A.   Same composition.
3      Q.   The next one is a little different. Prepare
4  For Battle.
5          THE COURT: Okay, thanks.
6      Q.   This is -- I guess we've got the middle of
7  it and now --
8          THE COURT: Okay.
9      Q.   What is your understanding about the
10 accuracy of the information reflected under Autobots
11 Prepare For Battle in terms of participation, writer
12 participation?
13         MR. TANNENBAUM: Prepare For Battle.
14         MR. MONAGHAN: Prepare For Battle.
15     A.   Well, I wrote the music. It is a hundred
16 percent music cue.
17     Q.   Are there any lyrics?
18     A.   No, there are no lyrics in that background
19 score.
20     Q.   So what percentage should that reflect?
21     A.   100 percent.
22     Q.   In your name?
23     A.   Yes.
24     Q.   Do you have any idea how this registered
25 this way?

Page 141

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1  CAROL ANNE BRYANT - DIRECT/MONAGHAN
2          Do you see?
3      A.   If you ask me to guess that I would say that
4  came off that original incorrect registration and then
5  traveled through Marvel and all the other different
6  companies that make these animations. That is my
7  guess.
8          MR. TANNENBAUM: I object. The witness has
9  no knowledge, your Honor.
10         THE COURT: Sustained.
11         MR. TANNENBAUM: I also object on relevance
12 on this, your Honor. If I can have a standing
13 objection to that, I won't stand again.
14         THE COURT: I gave you that once. You still
15 have it.
16         Go ahead.
17     Q.   Okay, let's go to Page 6.
18     A.   Yes.
19     Q.   Referencing the third work which also bears
20 a date entry 10/26/94. Again, do you have any idea of
21 the significance of that date?
22     A.   No, I just see it on this form.
23     Q.   Okay. Now, the title of the composition
24 here is Battle A; what does that have to do with the
25 Transformers, if anything?

Page 142

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1
2  A.  It's a cue.
3  Q.  And a cue again is music only?
4  A.  Yes. It's a cue.
5  Q.  Okay. And the participation shown, writer
6  participations?
7  A.  Dannon, Ford, Wildstar, Starwild.
8  Q.  What should it be, in your estimation?
9  A.  It should be Anne and Starwild.
10  Q.  What percentage writer royalties?
11  A.  100 percent.
12  Q.  Do you know how this came about that you
13  only got 50 percent?
14  A.  I think it is key to that very first form
15  you showed.
16  MS. PHARES:  Objection, your Honor. Is the
17  witness referring to Plaintiff's Exhibit 3 which
18  relates to something called Transformers Main
19  Theme --
20  THE WITNESS:  Yes.
21  MS. PHARES:  -- and not to Battle A, which
22  is the entry we're now referring to?
23  THE COURT:  I think we are talking about
24  Battle A, are we not?
25  MR. TANNENBAUM:  Yes.

Page 143

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1
2  MR. MONAGHAN:  The witness's testimony --
3  THE COURT:  Oh, I see.
4  MR. MONAGHAN:  The witness's testimony is
5  that's how it got -- that's the same music.
6  Q.  Correct?
7  A.  Right.
8  BY THE COURT:
9  THE COURT:  How do we know that?
10  MS. PHARES:  Yes. Objection to foundation.
11  THE COURT:  How do you know it is the same
12  music?
13  MR. MONAGHAN:  Miss Bryant?
14  THE WITNESS:  It wouldn't be in my catalog.
15  These cues wouldn't be continuing in my catalog
16  for the Transformers if it wasn't the same melody.
17  THE COURT:  Is there some way you can tell
18  by looking at that by the numbers?
19  THE WITNESS:  I can tell by looking at it,
20  hearing it, I do that.
21  THE COURT:  Could it be that you wrote
22  something called Battle A?
23  THE WITNESS:  I never wrote a song called
24  Battle A. That is a cue.
25  THE COURT:  So it is your position that's

Page 144

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1
2  Transformers?
3  THE WITNESS:  Oh, yeah.
4  THE COURT:  All right.
5  BY MR. MONAGHAN:
6  Q.  Have you ever heard any music which is
7  identified as Battle A? Is there -- I'm asking a
8  question out of the blue here myself. It says, Battle
9  A. And the Judge asked a perfectly reasonable
10  question.
11  How do you know that's Transformers? Do you
12  have any degree of familiarity with the Transformers
13  products?
14  A.  Well, yeah. I never saw them on T.V. There
15  was a T.V. show. I don't watch T.V. But because of
16  all that has been going on for the last four years I've
17  seen some of the videocassettes. And it's full of the
18  Transformers Theme. They play it throughout the entire
19  show.
20  Q.  How about Battle A?
21  A.  They never announced the name of a video of
22  a background cue on -- in the middle of a show. Those
23  are many of the cues that go for the Transformers show.
24  I believe I saw them all over the cue sheets that Miss
25  Saffer provided for us. Battle AA was on the

Page 145

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1
2  Transformers show.
3  MR. MONAGHAN:  I'll ask counsel, is there
4  any dispute that this is referring to the
5  Transformers?
6  MR. TANNENBAUM:  No.
7  MR. MONAGHAN:  No dispute.
8  MR. TANNENBAUM:  Not as to the -- it's -- it
9  appears in the Transformers catalog. Whether it
10  is the same song as another listed Transformers
11  song, there is much debate about that.
12  THE WITNESS:  There is.
13  MS. PHARES:  Sunbow joins that objection.
14  But, in addition, the objection that I was lodging
15  originally is that I see no reference to Battle A
16  as it appears on Page 6 of Plaintiff's Exhibit 2,
17  and Plaintiff's Exhibit 3 which refers to
18  something referred to as the Transformers Main
19  Theme.
20  MR. MONAGHAN:  Well, this is
21  cross-examination material. The witness has
22  testified -- excuse me one second. The witness
23  has testified this is -- it wouldn't be in her
24  catalog if it weren't Transformers.
25  THE COURT:  I believe it is for

Page 146

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1  cross-examination. Let's go.
2  cross-examination. Let's go.
3     Q.   Okay. Then there is another entry for
4  Battle A; is that the same?
5     A.   On 8?
6     Q.   Page 6.
7           There are three Battle As on?
8     A.   Yeah, the same.
9     Q.   In fact, there are a slew of Battle As?
10    A.   Yes.
11    Q.   They all seem to bear, you agree -- and it
12 is in evidence -- they bear different work numbers?
13    A.   Yes.
14    Q.   Okay. Do you have any explanation for that?
15    A.   No, I really don't understand how that
16 catalog --
17    Q.   All appear on that October 26th '94 date?
18    A.   Yes.
19    Q.   Except -- I beg your pardon -- I beg your
20 pardon. There is an entry on Page 7, the second entry
21 has a date of 11/10/94.
22    A.   Sightly different.
23    Q.   Any significance to that date in your mind?
24    A.   Just a couple of weeks later. None for me,
25 personally.

Page 147

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1     Q.   Okay. And what would your testimony be with
2  respect to the compositions reflected on Page 7? In
3  what respect do they relate to the Transformers Theme
4  that you composed?
5     A.   All Transformers cues.
6     Q.   Okay.
7     A.   And they are instrumental and they are music
8  only.
9     Q.   And do you have any explanation for the
10 Court why Mr. Kinder is shown as a 50 percent writer?
11    A.   No.
12    Q.   What did you have to do with that occurring
13 in terms of the registration?
14    A.   I didn't file that registration.
15    Q.   Okay. Now, if we can go to Page 8.
16    A.   You know, these are all on the Transformers
17 cue sheets that Mrs. Saffer gave us, Battle A, Battle
18 B, Battle D. It says Transformers Television Show.
19 Battle A, you know, it is all the theme credited on
20 that cue sheet.
21    MR. MONAGHAN: Let me show you since we are
22 on that subject matter.
23           (Pause in the Proceedings)
24    MR. MONAGHAN: We'll try and locate that,

Page 148

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1  but right now I'll show you another on the
2  Transformers.
3           Are we up to 4?
4           (Plaintiff's Exhibit No. 4, a clearance
5  form, marked for identification)
6     MR. MONAGHAN: We're going to offer this in
7  evidence; is there any objection?
8     MS. PHARES: I object on the statute of
9  limitations grounds. 1988.
10    MR. TANNENBAUM: Same objection.
11    MR. MONAGHAN: That is not an evidentiary
12 objection.
13    MS. PHARES: It is an exclusion.
14    MR. MONAGHAN: It is dealing with the
15 Transformers Theme. And it was produced.
16    THE COURT: I'm going to allow it for
17 whatever purpose I'll use it for. This is again a
18 clearance form.
19    MR. MONAGHAN: Yes, it is, your Honor.
20           (Plaintiff's Exhibit No. 4, marked and
21 received in evidence)
22    Q.   Okay, Miss Bryant, you see the document that
23 the reporter has marked as Exhibit 4?
24    A.   Yes.

Page 149

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1     Q.   When did you first see this document?
2     A.   Whenever you subpoenaed it from BMI. A
3  couple of years ago, maybe.
4     Q.   And do you know what it refers to?
5           It's a BMI clearance form, is it not?
6     A.   Transformers Movie Theme.
7     Q.   Okay. Had you seen this in or about the
8  time that it is dated, which appears to be 1988?
9     A.   No, I never saw it until you subpoenaed it
10 from BMI.
11    Q.   And it is in evidence, so you are entitled
12 to read from it.
13           Could you read, please, what the name of the
14 title is that is being registered through this
15 clearance form?
16    A.   Transformers Rock & Roll Theme.
17    Q.   Are you familiar with the Transformers Rock
18 & Roll Theme?
19    A.   Yes.
20    Q.   And what music of yours is utilized in that
21 theme?
22    A.   It's the payoff of the song. New lyrics.
23 Music was written to build up to the Transformers
24 Theme, which is the famous piece. A verse. Kind of

CAROL ANNE BRYANT - DIRECT/MONAGHAN
1
2    think of it as a verse and then boom here's the hook.
3        Q.    What we just heard on the phone earlier?
4        A.    Yes.  It paid off with that melody.
5        Q.    Now, there is a mention of an outfit called
6    Holy Moly Music on Pico Boulevard.  We spent a lot of
7    time on Pico Boulevard recently in Santa Monica,
8    California.
9            Are you familiar with that company?
10       A.    No, I don't know that at all.
11       Q.    Did you submit this form?
12       A.    No.
13       Q.    And you have not seen it before this
14   litigation?
15       A.    No, I have not.
16       Q.    Can you tell the Court, please, what the
17   breakdown of writers -- and identify the writers shown
18   on the form, the names and the percentages attributed
19   to those writers?
20       A.    I'll try.
21            Douglas Aldrich, 25 percent.
22       Q.    A-L-D-R-I-C-H?
23       A.    Yes.
24       Q.    Do you know Douglas Aldrich?
25       A.    No.

CAROL ANNE BRYANT - DIRECT/MONAGHAN
1
2        Q.    The next name?
3        A.    Norman Murray Swan.
4        Q.    Do you know him?
5        A.    No, I don't.
6            25 percent.
7        Q.    Right.
8        A.    Joe Bacal, 10 percent.
9            Anne Bryant, 20 percent.
10            Clifford Kinder -- Ford Kinder, 20 percent.
11       Q.    Do you see the box checked Motion Picture or
12   T.V. Film up on top?
13       A.    Yes.  It does -- it says also in somebody's
14   hand "From Film Transformers".
15       Q.    Is it your understanding this was submitted
16   to BMI?
17       A.    Yes, it was.
18       Q.    Okay.  And how is it that Douglas -- can you
19   explain to the Court why a person named Douglas Aldrich
20   is given 25 percent of music that you say you composed?
21       A.    You know, they did write music that led up
22   to the theme.  The theme was the famous piece the
23   Transformers kids grew up on.  But they wrote a verse,
24   like a Noel Coward song has a verse that pays off in
25   the famous song, you know.  There was verse music that

CAROL ANNE BRYANT - DIRECT/MONAGHAN
1
2    led up to it.  I believe there might have been a
3    performance even.  So you can argue for what their
4    percentage should be.  Should it be a half?  Should it
5    be a quarter?  I don't know.  But I think that was
6    their justification for getting this half.
7        Q.    Did you authorize these percentages?
8        A.    No.  No, I didn't.
9        Q.    Did anybody discuss this with you?
10       A.    No.
11       Q.    Do you know of any relationship between Mr.
12   Bacal and any of these other persons?
13       A.    All I know is that Joe produced the movie.
14       Q.    Joe Bacal was the producer of the movie?
15   The Transformers movie?
16       A.    He's shown on the credits as the producer.
17       Q.    Do you know what Holy Moly has to do with
18   Mr. Bacal, if anything?  Or Sunbow?
19       A.    No, I don't know anything about Holy Moly.
20       Q.    And I saw the name, "Lion"; do you see the
21   name "Lion"?
22       A.    Lion is a rock group.
23       Q.    Are you familiar with that group?
24       A.    No.  I heard them sing on the Transformers.
25   They are good.  And Scotty Brothers is a record label.

CAROL ANNE BRYANT - DIRECT/MONAGHAN
1
2    We never got any royalties, by the way, for records.
3        Q.    When did you authorize your theme music to
4    be used as part of the Transformers Rock & Roll Theme?
5        A.    I didn't.
6        Q.    Okay.
7        A.    There's something you missed.  Starwild only
8    got 50 percent of the publishing.  These people
9    actually got 50 percent of the publishing.
10       Q.    "These people" being whom?
11       A.    Aldrich and Swan.
12       Q.    And do you know how that came about?
13       A.    They must have negotiated for it.  I don't
14   know how.
15       Q.    All right.
16       A.    I could never get publishing with them.
17       Q.    You could never get publishing from Griffin
18   Bacal; is that what you are saying?
19       A.    Right.  And Sunbow.  They kept the
20   publishing.
21       Q.    All right.  Now, going back to the catalog,
22   we covered Battle A.  Now we are on Page 8.  And I
23   think actually there is a carryover.  Yes.  Page 7.
24            If I can direct your attention to the bottom
25   of Page 7 which refers to Battle B.

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1
2      A.    Uh-huh.
3      Q.    Again, October 26th, 1994, date shown,
4    writers shown as yourself and Mr. Kinder, 50/50.
5          The testimony would be the same about that
6    entry as previously?
7      A.    Yes.
8      Q.    You wrote 100 percent of the music?
9      A.    Yes.
10     Q.    It is instrumental?
11     A.    Yes.
12     Q.    Battle D, the next one.
13     A.    Can I just say same?
14     Q.    You can. I believe that is acceptable.
15     A.    Same.
16     Q.    Same on Battle D.
17          And there are two entries for Battle D?
18     A.    Yes.
19     Q.    And then Battle E?
20     A.    That's the same.
21     Q.    All Transformers?
22     A.    All Transformers.
23          Now we are on to Beat This.
24     Q.    That is not a Transformers?
25     A.    No. A JEM song.

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1
2      Q.    Now, if I can direct your attention to Page
3    13?
4      A.    Thirteen.
5      Q.    Do you see that first full entry title
6    C-H-A-E-D?
7      A.    It is misspelled. It should be Chase.
8      Q.    What song is that referring to?
9      A.    Transformers.
10     Q.    Same deal?
11     A.    Yes.
12     Q.    Chase B?
13     A.    D and B, same thing. C.
14     Q.    Again, you have no idea how this came about;
15    is that right?
16     A.    No. I told you --
17          MR. TANNENBAUM: Objection to the form.
18     A.    -- I think it came off the original
19    registration.
20          THE COURT: Sustained. Objection is to
21    form, counselor.
22          MR. MONAGHAN: Okay.
23          THE COURT: Go ahead.
24     Q.    Chase C, Chase D would be the same?
25     A.    Yes.

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1
2          MR. TANNENBAUM: I object. I'm not sure I
3    know what the question is, I'm sorry.
4          MR. MONAGHAN: Her testimony would be it is
5    incorrect showing Mr. Kinder 50 percent, which she
6    said ad nauseam.
7          MR. TANNENBAUM: Incorrect --
8          MR. MONAGHAN: My question is: Is it
9    incorrect in showing Mr. Kinder at 50 percent when
10    it was originally registered, and she said yes.
11     Q.    Is that correct?
12     A.    That's right.
13          MS. PHARES: And relevance as well, your
14    Honor.
15          MR. TANNENBAUM: We have a standing
16    objection?
17          THE COURT: Yes.
18     Q.    Well, on Page 14 we are dealing with entries
19    in 1994, according to the date on BMI records.
20          MR. TANNENBAUM: No, no, no. Then I
21    strenuously object to anything -- establish
22    anything that happened before the change. You put
23    in a piece of paper that showed 50/50, then you
24    show 1994 that shows 50/50. I don't know if you
25    know when something changed.

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1
2          MR. MONAGHAN: This may be a new way of
3    trying a case.
4          MR. TANNENBAUM: I'm objecting to you --
5          THE COURT: Let's continue.
6      Q.    There is an entry on Page 14, Miss Bryant,
7    Chase D? And a work number, BMI work number ending in
8    76; do you see that?
9      A.    Yes.
10     Q.    What is your testimony about the splits, the
11    writer splits?
12     A.    The split is incorrect. It is an
13    instrumental cue. Should be 100 percent for music.
14     Q.    Okay. And do you have any knowledge of the
15    date, significance of the date October 26th, 1994?
16     A.    No, I don't.
17     Q.    Do you have any knowledge of the
18    significance of the work number?
19     A.    No, I don't.
20     Q.    Okay. Are you -- up until 2000, did you
21    gain any degree -- let me ask it a different way so
22    they don't jump on me for that.
23          What degree of familiarity did you have with
24    respect to BMI's nomenclature; in other words, the
25    names and the designations they used, words like

Page 158

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1    "clearance forms", "entered", "work numbers", that kind
2    of nomenclature?
3
4        A.   I knew about all that except I had a
5    different understanding of cue sheets than what they
6    had been saying here.  My understanding --
7            Do you want to know what it is?
8        Q.   You might as well.
9        A.   Okay, my understanding of cue sheets, they
10   were used to time and to log music composed for
11   television.  None of this music was composed for
12   television, it was composed for another purpose years
13   ago, and then it kept getting lifted from different --
14   became a jingle, it became a Sunbow theme, and then it
15   became a later T.V. Series.  They used the same piece
16   of music that was written many years ago.  So I didn't
17   understand why that would ever be on a cue sheet to
18   change the percentage of the registration.  I can
19   understand that you might want to list the song that is
20   on the cue sheet so that it gets paid, but not list it
21   the different percentages to pay the writers than had
22   been there previously.
23           MS. SAFFER:  Your Honor, there has not been
24       a single bit of testimony to the effect that any
25       of the percentages were ever changed.  In fact,

Page 159

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1
2    the Plaintiff's own exhibits, which are very old,
3    and we object to on those grounds.  But,
4    nevertheless, they have the identical percentages
5    and shares that are listed on the document that
6    the Plaintiff is now testifying to.  There is not
7    a wit of evidence that one share changed between
8    the time they were originally registered and it
9    appears on that list.
10           MR. MONAGHAN:  If I can address this, okay,
11       I don't know if Miss Saffer was listening as
12       closely as perhaps you might have, because the
13       witness's testimony was that she didn't see this
14       form.  It was submitted by somebody else.  The
15       witness's testimony was that she wasn't able to
16       get her catalog in a timely fashion.  And the
17       witness is saying that these entries,
18       notwithstanding that form that might have been
19       submitted by Sunbow Productions, is incorrect.
20       That's her testimony.
21           It is fair game for cross-examination.  I'm
22       not trying to deprive them, but these repeated
23       interruptions, they are bolloxing up my direct,
24       Judge, I can't get through it.
25           THE COURT:  I agree.

Page 160

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1
2        All right, let's continue.
3    BY MR. MONAGHAN:
4        Q.   Okay, still working on the Transformers.
5            Directing your attention, Miss Bryant, to
6    Page 16.  If you know -- and only every question I ask
7    you, Anne, is asking for your personal knowledge.
8            If you know, that second entry there
9    continuing, are you able to identify the music at
10   issue?
11       A.   It is a Transformers music cue.
12   Instrumental.
13           MS. PHARES:  Your Honor, one question I do
14       have here is -- and I should have asked this when
15       it was offered -- do we know whose handwriting is
16       on this --
17           (Counsel conferring off the record)
18           MR. TANNENBAUM:  We are working off a
19       different copy.  Go ahead.
20           MR. MONAGHAN:  Okay.
21       Q.   Next -- okay, now, we don't have one that
22   mentions Transformers.  Page 20.
23           See the third entry there, Miss Bryant?
24       A.   Fast Action Transformer Theme.  Fast Action.
25       Q.   Again, bears a different BMI work number

Page 161

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1
2    than previously identified compositions?
3        A.   Yes.
4        Q.   Does it bear the date October 26th '94?
5        A.   Yes.
6        Q.   What would your testimony be about the
7    writer's splits?
8        A.   They are -- they are the same as the other
9    cues.  They are instrumentals and they are 100 percent
10   music, and they are incorrect.
11       Q.   Okay.
12           MR. MONAGHAN:  Your Honor, I have another
13       document that will lead me to the place faster.
14       If I could just have a second?
15       Q.   I'd like to direct your attention to Page
16   55 --
17       A.   Fifty-five?
18       Q.   Yes, ma'am.
19           The third entry on Page 55.  Three Battle A.
20           What composition are we talking about?
21       A.   This is all Transformers.
22       Q.   What would your testimony be about the
23   writer split?
24       A.   The same as the other named battles.  It's
25   an instrumental cue.  100 percent.

Page 162

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1
2    Q.    Now, if I can -- okay, let's go to Page 69.
3    A.    I found one that is right. I found one that
4    is right on Page 69.
5    Q.    Which one would that be?
6    A.    Two in a row. Transformer Bryant cues
7    music.
8        THE COURT: Did you say 69?
9        THE WITNESS: Yes, 69.
10        MR. MONAGHAN: Yes, I did, Judge.
11    Q.    The third entry there, that's correct?
12    A.    And the fourth too.
13    Q.    Can you explain why entries that apparently
14    according to the exhibit one made in '97 is correct as
15    well as one made in '94 where these others are
16    incorrect? Do you have any explanation for that?
17    A.    You know, I really don't.
18        MS. SAFFER: Excuse me, I'm sorry, but I
19    object because in asking the question an
20    assumption is being made. There has been no
21    explanation as to what the word "entered" means.
22        THE COURT: Well, you'll get your chance --
23        MS. SAFFER: Okay.
24        THE COURT: -- on cross-examination.
25        Go ahead.

Page 163

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1
2    Q.    Now, how about the bottom entry there,
3    Transformers Theme B?
4    A.    Oh, back to that, it's like the other
5    Chase -- it should be 100 percent for the music
6    instrumental cue.
7    Q.    Okay. Page 70, if I can direct your
8    attention, the testimony about the top entry there
9    which I believe is titled on the previous page, it
10    looks like the title is just Transformers entered
11    12/10/97.
12        What is your testimony about the writer
13    splits reflected there?
14    A.    It's 50/50.
15    Q.    What should it be?
16    A.    It should be 100 percent in my name.
17    Q.    Again, why is that?
18    A.    Because I wrote it.
19    Q.    No lyrics involved here?
20    A.    There's no lyrics involved in this.
21    Q.    Next entry Transformers Bumper?
22    A.    A bumper is a musical sting. It closes out
23    a scene. Bum da dum, and then you go to a commercial.
24    And it is used quite a bit.
25        That is a commercial, it should be

Page 164

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1
2    100 percent in my name.
3    Q.    And then the next one, Transformers
4    Instrumental Theme Two. It says, "a/k/a Transformers
5    closing theme instrumental or with lyrics?"
6    A.    Well, it is an instrumental.
7    Q.    That's what it says.
8    A.    It is a closing theme for the television
9    show and it was actually cleared. There is a clearance
10    number here.
11    Q.    Okay. Now, we have not seen -- I don't
12    think we've seen a clearance number.
13        What is your understanding of the
14    significance of the fact that BMI is showing a
15    clearance number in and a song number here, if you
16    know?
17        MR. MONAGHAN: This witness's understanding.
18        MS. SAFFER: Thank you.
19    A.    I don't understand what the song number is
20    all about, but the clearance number -- we just saw
21    clearance sheets that, you know, that you fill out and
22    are sent back to you by BMI. So that would be the
23    clearance number.
24    Q.    What did Joe Bacal, that shows as
25    24.9 percent interest, have to do with the composition

Page 165

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1
2    of the Transformers closing theme?
3    A.    I don't know. He didn't write the music.
4    He didn't write the music.
5    Q.    Okay.
6    A.    How does anybody write 24.9 percent for a
7    piece of music anyway? That's weird.
8    Q.    Did you -- what authorization was given to
9    credit Mr. Bacal with 24.9 percent?
10    A.    I never gave any authorization.
11    Q.    Okay.
12    A.    I'm not in a position to do that.
13    Q.    Just please stick with my question.
14        And what is the -- now, we see the word
15    "register" 4/28/97.
16        What is the significance in your mind of
17    that date?
18    A.    Seems to be a difference between register
19    and enter.
20    Q.    Right.
21    A.    Getting it? Okay.
22    Q.    Do you know what the date significance is?
23    A.    I don't know. No, I don't.
24    Q.    Was anything happening of which you are
25    aware at that point in time? Dealing with your music

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1           CAROL ANNE BRYANT - DIRECT/MONAGHAN
2  the Transformers.
3     A.   I don't know. I don't watch television.
4     Q.   Okay. Now, let's go to the next entry which
5  is Transformers Main Theme.
6        Is that the same theme you've been talking
7  about?
8     A.   Yes, that's the original theme.
9     Q.   Do you know how it was Kinder was credited
10  with 50 percent of that?
11     A.   I don't know how that happened.
12     Q.   Okay.
13     A.   But it's on that -- that clearance form that
14  you showed us.
15     Q.   Next page.
16     A.   This is the television theme.
17     Q.   This is the television theme?
18        How do you know that?
19     A.   Because I don't have new jingles in here.
20  The jingle theme had a nick-name Robots In Disguise
21  which was a major line from the Transformers Robots In
22  Disguise. So Mr. Dobishinsky listed Robots In Disguise
23  for the jingles and the Transformers theme for the
24  song, for the television song. Maybe so that they
25  could tell them apart. I don't know.

1           CAROL ANNE BRYANT - DIRECT/MONAGHAN
2     Q.   You mentioned him twice now. You mentioned
3  him right at the break when the Judge asked you the
4  question.
5     A.   Right.
6     Q.   Bill Dob -- D-O-B-I-S?
7     A.   -- H-I-N-S-K-I.
8     Q.   Who is he?
9     A.   He's a lawyer who is an administrator who
10  worked in administration for publishing for maybe a
11  number of people, but I know he worked for Bacal and
12  son, both. They are a publishing arm. Wildstar and
13  Starwild.
14     Q.   What was his function as the administrator,
15  as you understood it?
16     A.   Well, he filed and cleared compositions with
17  BMI and ASCAP for the Griffin-Bacal and Sunbow writers
18  and for, you know, the publisher. He worked with the
19  publisher.
20     Q.   Sunbow?
21     A.   Yeah.
22     Q.   Or Wildstar or Starwild?
23     A.   Right.
24     Q.   Did you ever hire him as your lawyer?
25     A.   No. No, he was a lawyer, but we never hired

1           CAROL ANNE BRYANT - DIRECT/MONAGHAN
2  him as a lawyer.
3        MR. TANNENBAUM: The witness said "we". I
4  just want to know who --
5        THE COURT: Or anyone else she knows.
6        THE WITNESS: I thought he meant Kinder &
7  Bryant. I believed he was saying you.
8     Q.   So he never acted as your attorney?
9     A.   No. He once --
10     Q.   That's just a yes or no.
11     A.   Okay. No.
12     Q.   I know it's tempting, okay.
13        THE COURT: Let's go on.
14        MR. MONAGHAN: Thank you, Judge.
15     Q.   I believe we are on Page 71.
16     A.   Oh, there it is.
17     Q.   Transformers Rock & Roll Theme. That's the
18  same name we saw before in the clearance form, wasn't
19  it? The one we could hardly make out?
20     A.   Yes.
21     Q.   And who are these people? You mentioned
22  Douglas Aldrich. You don't know who he is, although
23  you have an idea. Then you know who Mr. Bacal is.
24     A.   Of course.
25     Q.   Okay. Is this -- is this an instrumental or

1           CAROL ANNE BRYANT - DIRECT/MONAGHAN
2  does this have lyrics?
3     A.   Oh, it has lyrics.
4     Q.   Okay. Do you know what participation Mr.
5  Bacal had in the lyrics for Transformers Rock & Roll?
6     A.   He wrote the lyrics for the original
7  Transformers.
8     Q.   The Transformers that had lyrics?
9     A.   Yeah, the jingle.
10     Q.   And the phrase, Robots In Disguise, is that
11  Mr. Bacal's?
12     A.   Ford says he wrote it. Said he changed it.
13  I don't know -- I don't remember.
14     Q.   All right, again, I think you talked about
15  this, I don't want to beat a dead horse here, but these
16  people are the individuals, some of them anyway, who
17  are listed on that clearance form we showed you
18  earlier. I forget the exhibit number. Plaintiff's
19  Exhibit 4.
20        Do you know Enson Music Corporation? Does
21  that name have any meaning to you?
22     A.   No, I don't know them.
23     Q.   And there's a name on the bottom that
24  apparently doesn't participate in any U.S. sharing but
25  it's BMG Dunbar Enson.

Page 170

CAROL ANNE BRYANT - DIRECT/MONAGHAN
1
2      What does that mean to you?
3      A.    It's a Canadian company, isn't it?
4      Q.    I'm asking you if you know.
5      A.    I think it's Canadian or PROCA. Yeah.
6      Q.    And then the next entry is Theme B,
7  Transformers Theme B; what is your testimony about the
8  splits on that?
9      A.    It's an instrumental cue.
10     Q.    And what should the splits be?
11     A.    100 percent should be for me and it should
12 be Starwild.
13     Q.    And, again, your testimony is -- and correct
14 me if I'm wrong -- you had an agreement with Kinder
15 that you would split the income that came into
16 Kinder-Bryant, but you didn't have an agreement that
17 you would split these writer shares; is that correct?
18     A.    No, it would get all screwed up if we did it
19 that way. And it did anyway.
20     Q.    Transformers Theme Close.
21     A.    Yes.
22     Q.    How does Joe Bacal get credited with
23 24.9 percent?
24     A.    I don't know.
25     Q.    Did you authorize that?

Page 171

CAROL ANNE BRYANT - DIRECT/MONAGHAN
1
2      A.    No.
3      Q.    Did he ever discuss it with you?
4      A.    No.
5      Q.    Did anyone ever discuss it with you?
6      A.    No.
7      Q.    Instrumental?
8      A.    Usually the closing theme is -- I believe
9  it's the instrumental closing theme. I saw it on the
10 cue sheet.
11     Q.    How about this is a different date now,
12 August 25th, '94. Does that date have any significance
13 to you?
14     A.    It's six years.
15     Q.    Do you know what happened then that might
16 give rise to an entry in the records of BMI?
17     A.    No. I don't know what would have created
18 that all of a sudden.
19     Q.    Okay. Then we have Transformers Theme Close
20 entered 6/4/98, Joe Bacal 24.9 percent.
21         Same questions.
22     A.    I didn't know who did that and why.
23     Q.    And what should the split be?
24     A.    It should be 100 percent.
25         MR. MONAGHAN: We're winding down, Judge, on

Page 172

CAROL ANNE BRYANT - DIRECT/MONAGHAN
1
2  the Transformers.
3      Q.    Okay, Page 72, Transformers Theme Open.
4          Now, am I correct this is an example of
5  where Mr. Bacal is entitled to some participation as a
6  writer; is that right?
7          Didn't he write lyrics for this?
8          MS. PHARES: Objection, leading.
9          THE COURT: Sustained.
10         MR. TANNENBAUM: I liked the question.
11     A.    What should I do?
12         MR. MONAGHAN: I'll withdraw it. Let me ask
13 it straight.
14     Q.    What was Mr. Bacal's involvement in this
15 composition as it is listed here; if you know?
16     A.    This is the same composition as Transformers
17 jingle Robots In Disguise. And the way we worked with
18 his companies was that we got 100 percent of the
19 writer's royalties. So it is the same song.
20     Q.    But how -- you got 100 percent?
21     A.    No matter what they wrote.
22     Q.    No matter what even Mr. Bacal wrote?
23     A.    That's true.
24     Q.    Why do you say that? You are here under
25 oath. Why are you saying under oath that you got --

Page 173

CAROL ANNE BRYANT - DIRECT/MONAGHAN
1
2  what is your basis for saying you got 100 percent of
3  the writer's royalties even if Mr. Bacal participated
4  in some way?
5      A.    Well, that was the deal that we made and
6  that's the deal I have with every advertising agency I
7  work with. They all give us 100 percent of the
8  writer's royalties. It is standard practice in the
9  jingle business. The writers keep the royalties
10 100 percent.
11         MR. TANNENBAUM: Objection on the grounds of
12 relevance. This is not a jingle. This is a song
13 that is used in a television series.
14         THE COURT: Overruled.
15         MR. TANNENBAUM: I also object on the
16 grounds of statute of frauds if there is some kind
17 of oral agreement.
18         THE COURT: Overruled.
19         Go ahead.
20         MS. PHARES: Same objection, your Honor.
21         THE COURT: Go ahead.
22         MS. PHARES: And also we are not referring
23 to jingles in this case nor to -- nor to
24 advertising agencies.
25         THE COURT: Well, we are referring to

Page 174

1    CAROL ANNE BRYANT - DIRECT/MONAGHAN
2    Transformers. Let's go.
3    BY MR. MONAGHAN:
4    Q.    The next entry, Miss Bryant, do you know --
5    let me back up to the previous entry.
6         Do you know how the percentages -- is there
7    any basis in your mind for those particular percentages
8    8.3, 8.3 --
9    A.    8.3, 8.3, 83.4.
10   Q.    That should add up to 100 percent.
11        Do you know how that was arrived at?
12   A.    I can't imagine.
13   Q.    Okay.
14   A.    It is the same song.  And who writes
15   8.3 percent of his song?  What is that?  A comma?
16   Q.    How about the next one?
17   A.    Same thing.  8.3, 8.3, 83.4.
18        THE COURT:  Well, this may help us as we go
19   along this road.
20        Is there anything, Miss Bryant, that you
21   know about this form, these forms, that can help
22   you decipher about how the split was made?  In any
23   of them?  Any of them?
24        THE WITNESS:  I can't imagine how the split
25   was made.

Page 175

1    CAROL ANNE BRYANT - DIRECT/MONAGHAN
2    THE COURT:  All right, so let's stop going
3    one to another here, all right?
4    MR. MONAGHAN:  I think we might be done.
5    THE COURT:  Well, I should have said that
6    sooner then.
7    THE WITNESS:  That was the important one,
8    because that's --
9    THE COURT:  Okay, but I mean this is going
10   to go on for the other ones that are listed here.
11   MR. MONAGHAN:  No, they are not nearly as
12   Transform --
13   THE COURT:  No, I mean but to this
14   witness --
15   MR. MONAGHAN:  Yes.
16   THE COURT:  -- she doesn't know how this was
17   done --
18   MR. MONAGHAN:  Right.
19   THE COURT:  -- as to any of them that are in
20   this catalog.
21   MR. MONAGHAN:  That is true.  But she does
22   have to lay a foundation making a claim and
23   100 percent of it is hers and that's the way she's
24   doing it, she is taking each composition because
25   this is the basis for how --

Page 176

1    CAROL ANNE BRYANT - DIRECT/MONAGHAN
2    THE COURT:  Okay, go ahead.
3    MR. MONAGHAN:  Okay.  Your Honor, I've
4    reached the end of my line on Transformers.  I've
5    reached the end of the line on my energy.  I
6    wonder if you would indulge us by breaking a
7    little bit earlier today.
8    THE COURT:  I would like to talk to the
9    attorneys for a minute.
10   MS. PHARES:  At this point, your Honor, I
11   would like to make a motion to strike all of this
12   testimony to the extent that it refers to initial
13   registrations, not re-registrations, as was pled
14   in Paragraph 10 of the complaint.  And also in
15   your Honor's decisions both in December and in
16   January of last year and this year that all
17   registrations prior to 1994 were time-barred.
18   THE COURT:  Yes, well -- let's talk to the
19   attorneys, I'll reserve on that.
20   MR. TANNENBAUM:  I just want to join in the
21   objection, your Honor.
22   THE COURT:  All right.
23   MR. MONAGHAN:  I think we're done.
24   THE COURT:  You can step down.
25   THE WITNESS:  Okay, thank you.

Page 177

1    CAROL ANNE BRYANT - DIRECT/MONAGHAN
2         (Witness Excused)
3         (Counsel retired to Judge's Chambers of an
4    off the record discussion)
5         (Court Adjourned:  4:20 p.m.)
6              oOo
7
8    C E R T I F I C A T I O N
9
10   I, Elizabeth A. Kent, Senior Court Reporter for
11   the State of New York, do hereby certify the foregoing
12   to be true and accurate, as taken by me on the 6th Day
13   of July, 2004, before the Hon. Andrew P. O'Rourke,
14   J.S.C.
15
16   _____
17   Elizabeth A. Kent
18
19
20
21
22
23
24
25