# EXHIBIT 4

SUPREME COURT : STATE OF NEW YORK
COUNTY OF ROCKLAND : CIVIL TERM

----------------------------------------x

ANNE BRYANT,

Plaintiff,

Index No. 5192/2000

-against-

BROADCAST MUSIC, INC, (a/k/a "BMI"), CLIFFORD A. "FORD" KINDER, KINDER & CO., LTD., VADIVOX, LTD., JULES M. "JOE" BACAL, GRIFFIN BACAL, INC., STARWILD MUSIC BMI, WILDSTAR MUSIC ASCAP, SUNBOW PRODUCTIONS, INC. and JOHN AND JANE DOES 1 - 10,

Defendants.

----------------------------------------x

ANNE BRYANT,

Plaintiff,

Index No. 2821/2002

-against-

SUNBOW PRODUCTIONS,INC.,

Defendant.

----------------------------------------x

NON-JURY TRIAL - CONTINUED

Rockland Supreme Court
One South Main Street
Suite 200
New City, New York 10956
July 7, 2004

B E F O R E:

HON. ANDREW P. O'ROURKE
JUSTICE OF THE SUPREME COURT

APPEARANCES:

FOR THE PLAINTIFF:
MONAGHAN, MONAGHAN, LAMB & MARCHISIO, ESQS.
150 West 55th Street
New York, New York 10019
BY: PATRICK J. MONAGHAN, JR., ESQ.
-and-
JEFFREY C. PRIMIANO, ESQ.

FOR THE DEFENDANT, BACAL:
DUANE MORRIS, LLP.
380 Lexington Avenue
New York, New York 10168
BY: DAVID S. TANNENBAUM, ESQ.
-and-
ADRIENNE L. VALENCIA, ESQ.

FOR THE DEFENDANT, SUNBOW:
PATTERSON, BELKNAP, WEBB & TYLER, LLP.
1133 Avenue of the Americas
New York, New York 10036-6710
BY: GLORIA C. PHARES, ESQ.
-and-
LAUREN HAMMER BRESLOW, ESQ.

FOR THE DEFENDANT, BMI, INC.:
JUDITH M. SAFFER, ESQ.
BMI, INC.
320 West 57th Street
New York, New York 10019-3790
Assistant General Counsel

APPEARANCES: (Continued)

ALSO PRESENT: ANNE BRYANT, PLAINTIFF
JULES M. "JOE" BACAL, DEFENDANT

ROBERT FRITZ
SENIOR COURT CLERK

ELIZABETH A. KENT
SENIOR COURT REPORTER

- APPLICATIONS -

(Convened: 11:00 a.m.)

(Reconvened in open court, on the record, counsel and parties present)

C A R O L A N N E B R Y A N T,

the Plaintiff, previously duly sworn by the Court, resumed the stand and testified further as follows:

THE COURT: Good morning, all.

All right, let's go.

MS. PHARES: Good morning, your Honor.

Before we get started I would just like to renew Sunbow's motion to exclude on your Honor's statute of limitations grounds Defendant's Exhibits 3 and 4, which are dated in the mid-80s, and which are based on original -- original registrations, not the re-registrations that are alleged in the contract.

THE COURT: Fine. Denied.

Let's go ahead.

MS. PHARES: And, your Honor, if we may put on the record just your ruling yesterday in Chambers that there would be no further amendment of the pleadings? I just wanted to confirm that for the record.

- APPLICATIONS -

THE COURT: I thought I put it on the record yesterday that this case is bound by the four corners of the pleadings, plus whatever determination I made about it in any -- the Court made about them in any decision that was rendered.

MS. PHARES: Thank you, your Honor.

THE COURT: Okay, let's go.

MR. MONAGHAN: Good morning, Miss Bryant.

THE WITNESS: Good morning, Patrick -- Mr. Monaghan.

DIRECT EXAMINATION

BY MR. MONAGHAN: (Continued)

Q. You recall your testimony yesterday in discussing what your arrangement was with Mr. Bacal re: Writer royalties and who got what?

A. Yes. Said same deal was Michelin & Company was what he said it was.

Q. Just to repeat, what was your discussion with Mr. Bacal and your understanding with him as far as any royalties for any work that he might have done?

A. Well, we got hundred -- we got 100 percent of the writer's royalties, no matter who wrote the lyrics.

MR. MONAGHAN: Your Honor, pursuant to

CAROL ANNE BRYANT - DIRECT/MONAGHAN

C.P.L.R. 3117 Subsection 2 which entitles us to read in and use any party's deposition and we're going to read in testimony from Mr. Bacal's deposition.

MR. TANNENBAUM: I object, your Honor. He is cross-examining -- he is examining the witness. If he wants to read something in he can do it separately. This doesn't take place --

THE COURT: Yes, I think that is correct. You are certainly entitled to read a deposition of a party to a lawsuit, however, I don't see why take up your direct testimony here.

MR. MONAGHAN: Your Honor, I believe in the context of the questions that we're talking about this is particularly relevant. And I looked at the C.P.L.R. this morning, just to make sure, it says you can use it for any purpose at any time.

THE COURT: I agree with that. I agree with that. But, I mean, why take up your direct testimony here?

MR. MONAGHAN: It is really to nail down -- the proffer is very simple. To indicate that Mr. Bacal has testified exactly what the witness said.

THE COURT: This is a conversation she had

CAROL ANNE BRYANT - DIRECT/MONAGHAN

with him.

MR. MONAGHAN: This is --

THE COURT: No, no, she testified about a conversation she had with him. Get it that way in this.

MR. MONAGHAN: I'll hook it up.

MR. TANNENBAUM: Thank you, your Honor.

THE COURT: Go on. Go ahead.

MR. MONAGHAN: Now, I'm going to show you Exhibit 5, which I'm going to ask the reporter to mark. Okay, I thought I premarked this one. This is one I missed. Copy for counsel.

THE COURT: For the record, what is 5?

MR. MONAGHAN: 5, your Honor, is BMI U.S. Feature Royalty Statement indicating commercial jingles, dated for the period 7/1/86 through 6/30/87, addressed to Anne Bryant at a California address.

THE COURT: We're going to have a question, I'm sure, about the date on this thing.

Why is this important?

MR. MONAGHAN: Yeah. Well, your Honor, that's part of the case. Very simply, the way the registrations go in originally is the way they are

CAROL ANNE BRYANT - DIRECT/MONAGHAN

supposed to remain throughout the course of the relationship, unless somebody changes them.

MS. SAFFER: Excuse me --

MR. MONAGHAN: And that's part of the case.

Your Honor, I have to object to Miss Saffer jumping up and down in the middle of it.

THE COURT: You are going to move this into evidence?

MR. MONAGHAN: I am.

THE COURT: Okay, well, they had a chance to look at it. Now they are going to comment on it.

MR. MONAGHAN: Can I finish getting the witness to identify it?

THE COURT: Absolutely.

MR. MONAGHAN: Thank you, Judge.

(Plaintiff's Exhibit No. 5, a BMI U.S. Feature Royalty Statement dated for the period 7/1/86 through 6/30/87, marked for identification)

Q. Miss Bryant, can you identify Exhibit 5?

A. It's a jingle royalty statement distributed on January 18th 1988. It's addressed to me at the address of Bill Dobishinsky, Tamad, in California. He received our checks.

Q. And you've seen this statement before?

CAROL ANNE BRYANT - DIRECT/MONAGHAN

A. Yes.

Q. And at some point in time you did get a copy of this statement?

A. Yes, we did.

MR. MONAGHAN: We offer this in evidence as Exhibit 5.

THE COURT: All right, I'll hear from counsel.

MS. PHARES: Go ahead.

MS. SAFFER: Your Honor, I object on the grounds that this statement has been characterized by the plaintiff's witness in a way that is not accurate. I don't object to the document itself. I object to his characterization of what it's for, what it's about, et cetera.

THE COURT: All right.

MR. TANNENBAUM: We object to it on two grounds, your Honor: One, again, as you pointed out, the date is 1988. Statute of limitations, two, stopped that. And also on relevance grounds in that this deals with commercial jingles. It does not deal with either music that is used for the television series or songs that are independently registered. It's irrelevant to the

Page 187

CAROL ANNE BRYANT - DIRECT/MONAGHAN

issues that are in the case.

THE COURT: All right.

MR. TANNENBAUM: There is no claim in the complaint about anything that was wrong in 1988.

MS. PHARES: And I join in that objection, your Honor, for Sunbow.

THE COURT: All right, for whatever weight I want to put on it I'll allow it into evidence.

However, I would say why are we using documents so far back? Are there any newer ones?

MR. MONAGHAN: Yes.

THE COURT: Let's go.

MR. MONAGHAN: I'm doing my best.

THE COURT: All right.

MR. MONAGHAN: But it's like, you know, once upon a time and then in the middle and then the end. I'm trying to do it chronologically.

THE COURT: Okay.

(Plaintiff's Exhibit No. 5, marked and received in evidence)

Q. You have in --

MR. MONAGHAN: Your Honor, I have a copy for your Honor too, if I may?

THE COURT: Okay. Sure.

Page 188

CAROL ANNE BRYANT - DIRECT/MONAGHAN

Q. Miss Bryant --

A. Yes.

Q. -- you have before you Exhibit 5, do you?

A. Yes.

Q. Okay. Now, to begin, what is your understanding of what this document is? Your understanding.

A. It's a royalty statement.

Q. And does it bear BMI -- it's a little cropped there at the top.

A. BMI royalty statement. I've gotten this many times.

Q. You see the words, "commercial jingles"?

A. Yes.

Q. Did you put those words there?

A. No. That's the way they come. I have the original.

Q. Okay. All right. And is that your name over on the left-hand side?

A. Yes, it is.

Q. Okay, and whose address is that?

A. The address of Bill Dobishinsky, who is Sunbow's administrator. Tamad was his company.

Q. And how is it that your statement is being

Page 189

CAROL ANNE BRYANT - DIRECT/MONAGHAN

sent to this California address, to Mr. Dobishinsky?

A. Well, he was the administrator for Sunbow and he received our checks and he knew how the administration worked. Once he received them, he separated the amounts and gave Ford and I each an equal check.

MR. MONAGHAN: Your Honor, at this point I had intended to read in just a line or two from Miss Weitzman's deposition on this very point of who Mr. Dobishinsky was.

THE COURT: Well, she's testified to who Mr. Dobishinsky was.

MR. MONAGHAN: Unless the Defendants are willing to consent that Mr. Dobishinsky was Sunbow's administrator.

MR. TANNENBAUM: No, I'm not willing to consent, unless you consent that he was also her lawyer.

MR. MONAGHAN: No, I won't. That is exactly what this testimony is intended to address.

THE COURT: Please. That is cross-examination. I want this case to get going. Come on.

BY MR. MONAGHAN:

Page 190

CAROL ANNE BRYANT - DIRECT/MONAGHAN

Q. Now, if I could direct your attention to the reference to Robot In Disguise.

A. Yes.

Q. Do you see that reference?

A. Yes.

Q. What composition is that? What does it have to do with this lawsuit?

A. That's the Transformers. It's a jingle name that Bill registered Transformers on.

Q. And what percentage is shown as your percentage of Robot In Disguise, also known as the Transformers?

A. 100 percent.

Q. What other information is shown on here?

Although it may be obvious to some people that have more experience than I or perhaps the Court, what other information is supposed to be shown on this statement or is shown on the statement?

A. The number of performances.

Q. These are public performances?

A. Yes. 107,625. 100 percent is my share. My percentage, it says. Performances credited to me 176,125. And it's local T.V. performances. And then there is a dollar amount.

4 (Pages 187 to 190)

Page 191

CAROL ANNE BRYANT - DIRECT/MONAGHAN

Q. And do you know --
A. $40,000.
Q. Do you know how that dollar amount is arrived at when you are credited with these performances?
A. They have a formula, BMI, that takes the number of performances and where they are generated from if it is a local network, whatever. And it has a formula that multiplies out to be the dollar amount. I don't really know how they do it, but that is the basis of it.
Q. Just so we are on the subject, what royalties besides public performance royalties as reflected in this and perhaps others similar to this did you receive other than publi -- what royalties other than public performance royalties have you ever received with respect to the Transformers?
A. I've got some mechanical royalties for European VHS videos in the late eighties around this time and through 1992 or '93.
Q. These were through BMI?
A. No, they came through Sunbow. Sunbow sent them and --
Q. Do you know whether they were performance royalties?
A. No, they were mechanical royalties. It is mechanical royalties.
Q. How about -- are you familiar with -- well, let's ask you: What is a mechanical royalty, as you understand it?
A. As I understand it, mechanical royalty is for music that's on a fixed item that was like a final or a tape or a disc that's been brought by a mechanical means. I think it started out in the old piano roll days. You had to use a mechanical device to create this as opposed to something being broadcast over the air or live.
Q. Are you familiar with the term "synchronization fees" or "sync fees"?
A. I know it has to do with music synchronization with film.
Q. Music that is somehow also synchronized with a visual image?
A. Yes.
MS. PHARES: Objection. Leading.
THE COURT: Sustained.
Q. Well, what did you mean when you said, "with film"? What was your understanding?

Page 192

CAROL ANNE BRYANT - DIRECT/MONAGHAN

Page 193

CAROL ANNE BRYANT - DIRECT/MONAGHAN

A. The music went with -- with like a song, like a music video. It's --
Q. Okay. Now --
MS. PHARES: Your Honor, I'm going to ask to have that stricken. I mean, after Mr. Monaghan has testified for his client we can't now have her repeat it back to him.
THE COURT: That's been standard in every courtroom I've been in. When anyone objects to leading they just said -- they just rephrase the question. I'm not going to strike that.
But, please don't lead.
Go ahead.
MR. MONAGHAN: I won't.
THE COURT: All right, let's go.
Q. All right. Now, if I can continue to address Exhibit 5, Miss Bryant, there are references to some other compositions that are at issue in this case. We've heard the names. Can you please identify which on Exhibit 5 are at issue in the case?
A. Yes, there's several. I see in Humanoids, My Little Pony, Robotics, and Truly Outrageous. We used to call it the nick-name for JEM. That was the jingle name that Bill used to register it for jingles.
Q. In each case you are credited with 100 percent?
A. Yes. Oh, there's also Real American Hero.
Q. What is Real American Hero?
A. That is GI Joe.
Q. And do you know how it is that you are credited with a one third share of Real American Hero?
A. I don't understand that, because on other -- on the other jingle statements it is 100 percent.
Q. Okay, now --
MR. TANNENBAUM: Objection --
MS. PHARES: Objection.
MR. TANNENBAUM: -- to the reference of other jingle statements. They are apparently not in evidence.
THE COURT: I'll allow it.
MR. MONAGHAN: Now, I'll ask the reporter to mark Exhibit 6.
THE WITNESS: Do you want this back?
MR. MONAGHAN: Just hold it. Put it right here in the evidence pile. Thanks. Okay.
(Plaintiff's Exhibit No. 6, a clearance report dated 4/24/97, marked for identification)
Q. Now, are you able to identify Exhibit 6,

Page 194

CAROL ANNE BRYANT - DIRECT/MONAGHAN

5 (Pages 191 to 194)

CAROL ANNE BRYANT - DIRECT/MONAGHAN

Miss Bryant? Take your time.

A. Yes. This is the Transformers Vocal Theme 2.

Q. Well, no, what is the document itself, if you know?

A. Okay, Broadcast Music received a clearance report. I believe this is an electronic clearance. I think that's what they call it.

Q. Do you know how you happened to obtain a copy of this, if you did?

A. You subpoenaed BMI and they sent it to you.

MR. MONAGHAN: We're offering Exhibit 6.

MR. TANNENBAUM: No objection.

MS. PHARES: No objection.

THE COURT: I'm waiting to hear from BMI.

MS. SAFFER: I signalled no objection. I'm sorry, your Honor.

THE COURT: So 6 is in evidence.

MR. MONAGHAN: Yes, your Honor. If I may hand a copy up to the Court.

THE COURT: Okay, describe it for the record.

MR. MONAGHAN: BMI -- I'm sorry, Broadcast Music, Inc. clearance report dated 4/24/97. Looks

CAROL ANNE BRYANT - DIRECT/MONAGHAN

like there is a time entry of twenty hundred hours, 54 minutes, 57 seconds. Page 21. They reference the submitter as SONY/A.T.V. songs. Looks like trace special account.

THE COURT: That's enough. I'll take a copy of it.

(Plaintiff's Exhibit No. 6, marked and received in evidence)

Q. Firstly, if I can ask you this, Miss Bryant, do you know who SONY/A.T.V. songs is with respect to?

A. Me.

Q. You?

A. They are my publisher, I believe.

Q. How were they selected as a publisher with respect to this song, Transformers Vocal Theme; and who selected them?

A. Well, my understanding is that --

MR. TANNENBAUM: Objection, your Honor.

A. -- Wildstar was sold to SONY --

THE COURT: What is your objection?

MR. TANNENBAUM: She doesn't have any personal knowledge. She said, "my understanding". What is that based on?

MR. MONAGHAN: It is always her

CAROL ANNE BRYANT - DIRECT/MONAGHAN

understanding.

THE COURT: Well, this is in evidence now.

MR. TANNENBAUM: Well, the document is --

MS. PHARES: The document is --

MR. TANNENBAUM: He asked a question about an entry on the document. I'll withdraw my objection.

THE COURT: Let's go forward.

Q. Who is SONY A.T.V. songs in the picture here?

A. They are registering as a submitter and they are -- A.T.V. songs is a big publisher, music publisher.

Q. What song is being registered?

A. Transformers Vocal Theme which now says 2 a/k/a Transformers Opening Theme.

Q. Okay. Now, what is their -- what are the percentages shown -- let me back up.

Do you have an understanding of the purpose of this form?

A. It's a registration form.

Q. Okay. And do you have an understanding of how it was that this registration form, dated April 24th 1997, was according to the document a

CAROL ANNE BRYANT - DIRECT/MONAGHAN

received clearance report?

A. Well, I didn't register it. They registered it and I don't know why they registered it, but they did.

Q. Okay.

A. The publisher registered it.

Q. Was this done with your authorization?

A. No, I didn't even know about it.

Q. Okay. Now, what are the percentages shown with respect to this song Transformers Opening Theme?

A. The writers are Joe Bacal. The share is 8.30. Anne Bryant, my share, is 8.30. And Ford Kinder, his share, is 83.40. That totals a hundred.

Q. Do you know how those percentages were arrived at when this form was submitted?

A. I can't imagine.

Q. Okay. And --

A. This is different on page two. Did you see page two?

Q. Yeah.

MS. PHARES: Objection, your Honor.

THE COURT: Sustained.

Q. You have to respond to a question.

A. I'm sorry.

Page 199

CAROL ANNE BRYANT - DIRECT/MONAGHAN

Q. Let me go back to Exhibit 5 for a second.
Do you remember the discussions yesterday about whether jingles were at issue in this case or not?
Do you remember those discussions?
A. I remember the people objected to that.
Q. Do you know who put the words "commercial jingles" on this form?
A. It comes that way from BMI.
Q. Do you have any idea why the Defendants contend that we are not talking about jingles?
A. I don't understand that, no.
MR. TANNENBAUM: Objection, your Honor.
MS. PHARES: Objection, your Honor.
THE COURT: Sustained. Sustained. Struck from the record.
Q. Okay, I'd like you to tell the Court, please, about how the Transformers, the sessions get into actually the mechanics of composing the music, where it was done.
You don't have to answer the question yet, just give me the idea what the subject matter is.
A. For this song or any song?
Q. Just talking about Transformers now.

Page 200

CAROL ANNE BRYANT - DIRECT/MONAGHAN

A. A little history?
Q. We want you to tell the Court what was involved in doing that music, where it was done, who did it, who decided how it would be done. Those are going to be the general subject matters.
A. Okay, it was 1983, late August, and I got a script from a bike messenger with this Transformers job that was forwarded -- spoke to Joe the day before, Joe Bacal the day before. And I open it up from the bike messenger. Look at it. I heard it. I went to the piano and I played it. And then I noticed that I wasn't supposed to sing the middle part. So I liked it that way. So I kept it. So the song would have a bridge. It was supposed to be spoken by an announcer, but I said I'm going to present it this way.
A few days later Joe Bacal came over to our office and forwarded a written version. And we also had a friend of ours, Shepherd Stern, write a version. And it was my version which was very different from anybody else's. It was in a minor key. It was a strange thing to do for a children's jingle, but it worked, you know, and Joe liked it. And we presented all three to him. And then we -- I think we did demos on it. We usually did piano demos on it. But we

Page 201

CAROL ANNE BRYANT - DIRECT/MONAGHAN

presented that live to him. Said, maybe not. Then they selected the one that I wrote --
Q. Let me stop you there for a second. I don't want to break your train of thought.
Where was the work done?
A. It was done at my office, 41 West 73rd Street.
Q. And in the actual composition phase, which you just talked about, was anyone there from Mr. Bacal's agency overseeing or directing how that work would be done?
A. Oh, no, I never let anybody do that.
Q. Who made the decisions as to the actual composition of the music?
A. Joe chose it.
Q. And when you say, Joe chose it, I'm talking about who made the decisions as to the creative aspects of the music?
A. Oh, I did.
Q. Okay.
A. We wrote it, wrote our versions and presented them to him.
Q. And how many musicians were involved?
A. At that point it was just myself and Ford

Page 202

CAROL ANNE BRYANT - DIRECT/MONAGHAN

and Shep. Each played our songs. And then when he called to say that we were going to do the song -- he only recorded one version, my version.
Q. Where was that recorded?
A. National Edison Studios on 46th Street.
Q. Who made the arrangements for that?
A. Well, we booked the singers and the musicians.
Q. What was involved with Mr. Bacal or anyone from his agency in that respect?
A. They don't do that. I do that. And I also decide on the -- the orchestra. How many people there are in it. Of course, I have to weigh that against a budget that they have to work with. But the idea was to achieve what they wanted to achieve with the song, musically.
Q. When you say, a budget, you were given a specific budget here?
A. I don't think I was given a specific budget, but it was like, well, we can't afford real strings, can't we do synthesizer? And those kind of considerations. But bring off the idea the same way and watch the costs.
Q. All right, and ultimately you came to the

7 (Pages 199 to 202)

CAROL ANNE BRYANT - DIRECT/MONAGHAN

point of a final version?

A. The recording session, yes.

Q. The recording session?

A. Yes.

Q. That was at the National --

A. No, I -- first I did an arrangement. It's an orchestration. And I called, booked musicians and singers, then I recorded the music tracks. I -- the singers came in, we recorded them, we did that on their own. Seldom came to a session.

Q. Who hires the musicians?

A. Well, technically, we're hiring the musicians at that point. We are the signatore to the musicians union and the producers and the leaders.

Q. When you say, leader, what is the meaning of that term?

A. That is a real term, leader. Doesn't necessarily mean conductor. Leader is a person who is responsible to file the session and make sure things are done properly and paid properly and that everybody is credited properly. That was usually me. Sometimes it was Ford. We took turns.

Q. File with who for what?

A. The A.F.M., American Federation of Musicians

CAROL ANNE BRYANT - DIRECT/MONAGHAN

Local 802.

Q. And what participation did you or Mr. Kinder have in either singing or playing instruments?

A. I was the arranger/conductor, and I sang. And Ford -- I don't know what he played, but he definitely produced. I can't remember what he played. Ford is a good percussionist. He often did that. And he was a contractor.

Q. Okay. Over what period of time was the Transformers Theme that you are talking about composed? How long did it take?

A. How long did it take me to write it?

Q. Yeah.

A. The song?

Q. Yeah.

A. About 30 seconds. It was fast.

Q. Over what period of time -- what period of time was involved in actually bringing it to fruition to the point where it was submitted?

A. Well, it was written in late August. Maybe the very next day Joe came over and reviewed the song, listened to them, and chose what he liked. And then I recorded on September 1st -- I thought we recorded on September 1st, but I see the wrong date in my mind. It

CAROL ANNE BRYANT - DIRECT/MONAGHAN

was September 9th.

Q. Of what year?

A. '83. So it was about a week or ten days later we recorded it and it went out fast because of their concerns about timing on it.

Q. How were their musicians paid?

A. Well, they were paid according to union scales and jingle code.

MS. PHARES: Objection. Relevance.

THE COURT: I'll allow that.

Go ahead.

Q. And who paid them?

A. We usually paid them, and we were reimbursed for the session. And then it was upgraded by the agency with their payrolling people.

Q. Who controlled the recording sessions?

A. I did.

Q. In what format was this music?

A. This tape, 24 track master tape that was then mixed down to two track and four track master mixes.

Q. And how were you -- when I say you, Kinder -- is it Kinder and Bryant we are talking about?

A. Yes.

CAROL ANNE BRYANT - DIRECT/MONAGHAN

Q. How was Kinder & Bryant paid? When I say how, was there a check in gross, was there a check with deductions for --

A. No, no, we got a 3500 creative fee, and a 1500-dollar arranging fee, then we got reimbursements for payrolling.

Q. And how about any tax forms? Did you -- do you recall whether you got a W-2 or a 1099, or do you remember at all?

A. Are you talking about the production company Kinder & Bryant?

Q. I'm talking about when you got money from --

A. You, meaning Kinder & Bryant?

Q. Kinder & Bryant, yes. You. Kinder & Bryant.

A. It was a corporation. We got a gross check and -- I don't know if we got any forms. There were no deductions. It was a corporation.

Q. Okay.

A. But Kinder & Bryant, the people got paid by our own -- into our own corporation for our services, gross.

Q. Right. Okay. And how about the other compositions that you've talked about, the other -- the

Page 207

CAROL ANNE BRYANT - DIRECT/MONAGHAN

songs, the music at issue in the case, how did it work in terms of payment, arranging, controlling how the music was prepared? All the questions I just asked you.

A. It worked that way almost the same exact same way except that I remember we did piano demos. Let's say Ford and I each always wrote a version of each job for, let's say, Humanoids. He wrote a version, I wrote a version. In that one they chose his version. And what would happen is that I would give Ford a lead sheet, that is musical notation of mine, and I would sing a rough through a little tape recorder on the piano and send it over to him and he would record a version of mine, a nice piano demo, great singer with his voice, and one on his -- one on his song too. Then we would send the tapes over to Joe and he would pick the one he liked better.

Q. Now, about those same sort of questions that I asked you earlier about, who hired the musicians?

A. We did.

Q. Who paid the musicians?

A. If it was a final I have to make distinction. If there was a final they pay -- payrolling agency just took the whole thing. I think

Page 208

CAROL ANNE BRYANT - DIRECT/MONAGHAN

that was the way it worked. But if there was a demo that they were going to review and decide, if they were going to go final we usually played a demo session and got reimbursed. That is my memory.

Q. Who decided on the number of musicians that would be involved?

A. I always did. I did all the arrangements.

Q. Who was the leader on the other compositions, if you remember?

A. It was either Ford or myself. One of us. We both as many of the sessions together as we could be.

Q. Now, are you familiar, are you, with the advertising business and commercial jingles in general?

A. I've been doing it for 30 -- more than 30 years.

Q. And for how long is a typical commercial and jingle? What is the life of a commercial jingle?

A. Commercial that goes on the air, it goes on the air for 13 weeks. We hope it goes on longer.

Q. But when you do the jingle what is your expectation of how long this jingle -- this jingle you may have written the music for?

A. That's gone final?

Page 209

CAROL ANNE BRYANT - DIRECT/MONAGHAN

Q. That's gone final.

A. Yeah, 13 weeks, that's all I can expect.

Q. Okay. Do you have any idea where that 13-week period comes from?

A. Well, it is four times 13 is 52. So it's a quarter of the year. And that's the way musicians are paid, and --

Q. When you did these -- and when you did the -- when you composed the music at issue here was your expectation any different than what you just said about the life of the jingles? Thirteen weeks?

A. I think I had a different expectation of the JEM Show only because it was -- wait a minute. It was written as a theme first, you know, so that that T.V. show took off and we didn't know, and it might be on all year. You know, we were hoping that it would catch fire and it did. So that was the different one. We weren't sure, we didn't know what was going to happen with the Transformers toy but, of course, it was a block buster. Then they went into television.

Q. When you -- when you composed the music that you talked about for Mr. Bacal, what was your expectation and understanding about the royalties that would be generated by those compositions?

Page 210

CAROL ANNE BRYANT - DIRECT/MONAGHAN

A. We got 100 percent of the writer's royalties.

MR. TANNENBAUM: Just object to the form of the question, writing for Mr. Bacal.

THE COURT: I didn't hear the objection.

MR. TANNENBAUM: Oh, I said when you wrote it for Mr. Bacal. I don't see any testimony that she was working for Mr. Bacal as an individual. She was working for a company.

THE COURT: I'll allow it.

Go ahead.

Q. Now, yesterday a couple of times we played Transformers on your telephone.

A. Yes.

Q. Do you remember that?

A. Yes.

Q. Okay. And if I'm not mistaken you said you did receive some performance royalties, right?

A. Yes, I did.

Q. Correct?

Are you able to tell the Court what percentage?

A. 8.3 percent.

Q. That same 8.3 we've just seen --

CAROL ANNE BRYANT - DIRECT/MONAGHAN

A. Yes.
Q. -- in these exhibits?
A. Yes.
Q. Okay.

MR. MONAGHAN: Actually, your Honor, I believe we are to the point where we are actually going to do a little technical stuff and we got there faster than I thought.

THE COURT: We'll take a short break.

MR. TANNENBAUM: Judge, we'll stipulate she wrote the music.

THE COURT: Is that all?

MR. MONAGHAN: We'll take the stipulation but, I don't know, I've got to look at how it comes through.

Which music?

MR. TANNENBAUM: Tell me which music you want us to stipulate to that he wrote the music to. I'll turn to my client.

MR. MONAGHAN: It isn't just a question of the music she wrote. It's a question of the music to which she has rights, firstly.

THE COURT: Well, let's start out with the music that she wrote then we can worry about the

CAROL ANNE BRYANT - DIRECT/MONAGHAN

ones she had rights to. We've got a whole bunch here. Let's go quickly through those.

In Humanoids everybody agree she wrote it.

MR. BACAL: I'm not sure who wrote Humanoids.

THE COURT: Let's take a break.

THE WITNESS: I said Ford wrote it.

MR. BACAL: I can't stipulate to that.

THE COURT: Well, we're not getting any stipulation.

MR. TANNENBAUM: No, I think --

THE COURT: We're going to allow the court reporter to take a break. Every hour the court reporter takes a break.

(Recess: 11:30 a.m.)

(Reconvened: 11:40 a.m.)

C A R O L A N N E B R Y A N T,
the Plaintiff, previously duly sworn
by the Court, resumed the stand
and testified further as follows:

THE COURT: Let's continue.

MR. MONAGHAN: I'm going to ask the reporter to mark the next exhibit as 7.

(Plaintiff's Exhibit No. 7, DVD, marked for

CAROL ANNE BRYANT - DIRECT/MONAGHAN

identification)

Q. Can you identify, Miss Bryant, Exhibit 7, please?
A. This is a DVD. The Original Transformers Heroes The Rebirth. Special three-episode collector's edition. Rhino Nation DVD/video. Shall I read the back?
Q. Well, let's just start with how is this in the courtroom? Where does it come from?
A. This is one of the many releases of the Transformers Original T.V. Series.
Q. Who purchased this?
A. Oh, I did.
Q. That's what I'm trying to --
A. Oh, I'm sorry.
Q. Okay, you purchased it.
When did you purchase it?
A. I don't remember. In the last couple of years from Amazon.com.

MR. MONAGHAN: We offer this into evidence the CD and the case.

MS. PHARES: This is being offered for what?

MR. MONAGHAN: This is being offered because it says Transformers and has Transformers music on

CAROL ANNE BRYANT - DIRECT/MONAGHAN

it which the Plaintiff will talk about.

MS. PHARES: Well -- we don't have an objection.

MR. TANNENBAUM: No objection, your Honor.

MS. SAFFER: No objection.

THE COURT: All right, no objection. I thought there was some colloquy.

MR. MONAGHAN: That is their --

MR. TANNENBAUM: BMI royalty has nothing to do with tapes. My argument, this has nothing to do with Mr. Bacal, but that's my position.

MS. PHARES: We certainly have -- I mean, that's why I'm asking what it is being offered for. I don't understand what the offer is for.

THE COURT: Well, but --

MS. PHARES: It doesn't say -- I mean, as far as I understand this it has nothing to do with performance royalties or re-registration which is all that is included in either the complaint or your Honor's rulings.

MR. MONAGHAN: Not entirely accurate on that last point, but --

THE COURT: Go ahead.

MR. MONAGHAN: Thank you, Judge.

CAROL ANNE BRYANT - DIRECT/MONAGHAN

MR. TANNENBAUM: I will say the amended complaint there was some mention of DVDs not connected to anything, but the word is in there.

THE COURT: All right, so we have it in evidence.

(Plaintiff's Exhibit No. 7, marked and received in evidence)

THE COURT: Go ahead.

MS. PHARES: Your Honor --

MR. MONAGHAN: You know, you can all --

MS. PHARES: If you are playing this for the purpose of stipulating that her music is on as part of the T.V. Shows, we can stipulate to that.

THE COURT: Well, this is -- I take it we can all agree the music that Miss Bryant wrote.

MS. PHARES: That it is -- and that it is part of the audiovisual work that she originally wrote it for.

MR. TANNENBAUM: It's the television program from the 1980s that is now being released on videocassette and DVD.

MR. MONAGHAN: You are not testifying.

THE COURT: Hold on. Hold on. Well, it is in evidence already. You were just commenting on

CAROL ANNE BRYANT - DIRECT/MONAGHAN

it. Let's have some questions. Please sit down.

MR. MONAGHAN: I just have to raise the volume a little so you can hear it.

THE COURT: I can hear it.

THE WITNESS: That's the jingle.

(Plaintiff's Exhibit No. 7 in evidence being played)

MS. PHARES: Your Honor, I don't know what the question is.

THE COURT: Okay, we've got that down.

MR. MONAGHAN: Okay.

THE COURT: Miss Bryant's music is on this video. Let's go ahead. Turn it off.

BY MR. MONAGHAN:

Q. Your music is on that video?

A. Not only my music but my arrangement. And that's a jingle.

Q. Okay, what monies do you receive --

A. That's the jingle session.

MR. TANNENBAUM: Objection.

MS. PHARES: Objection.

MR. MONAGHAN: Can I finish my question?

MR. TANNENBAUM: She wasn't answering the question.

CAROL ANNE BRYANT - DIRECT/MONAGHAN

MR. MONAGHAN: I didn't --

THE COURT: All right, that part is struck from the record.

Go ahead.

Q. What monies do you, Miss Bryant, receive from this property? The sale and distribution.

A. Of this property --

Q. That property.

A. -- the DVD? None.

Q. Okay, we have --

MR. MONAGHAN: Perhaps the Defendants -- I'll identify them, but I guess we should do that. We can take these and --

THE COURT: We're marking these?

MR. MONAGHAN: Yes, your Honor.

Just so the record is clear, your Honor, the exhibit includes not only the jacket but obviously the CD that is inside.

THE COURT: Yes.

MS. PHARES: DVD.

MR. MONAGHAN: DVD, thank you.

(Plaintiff's Exhibit No. 8, a DVD, Transformers Villain The Ultimate Doom, marked for identification)

CAROL ANNE BRYANT - DIRECT/MONAGHAN

(Plaintiff's Exhibit No. 9, movie, marked for identification)

(Plaintiff's Exhibit No. 10, Season 2, Part 1, marked for identification)

Q. Miss Bryant, I'm now going to show you Exhibit 8.

Can you identify this?

A. That's Transformers Villain The Ultimate Doom. It's a DVD from Rhino Nation. Special three-episode collector's edition. That's a real problem.

MS. PHARES: Your Honor, does the -- does Plaintiff's counsel have photocopies at least of the face material of these DVDs? Because we have no physical record of these unless, of course, you are providing the DVDs to us as well. But, you know, I have nothing -- we have nothing to refer to for our evidence of these exhibits.

MR. MONAGHAN: We would be happy to do that. We don't have them with us today. We'll make cover copies of the face and reverse.

MS. PHARES: And reverse?

MR. MONAGHAN: I believe that's what I said.

MR. TANNENBAUM: Is there language on the

Page 219

CAROL ANNE BRYANT - DIRECT/MONAGHAN

inside jacket as well?

MR. MONAGHAN: That will be a little more difficult.

THE COURT: Well, I think what I really want to know is no doubt in my mind that Miss Bryant with her talent is responsible for that music and made the arrangement and whatever.

Who of the Defendants here do you claim is the offending party preventing Miss Bryant from getting her money?

MR. MONAGHAN: Right there. Sunbow. These are Sunbow Productions. Sunbow licensed this. Sunbow --

THE COURT: Okay. Okay.

MS. PHARES: Objection to the representation that's been made by counsel. It may be a Sunbow Production, I will concede that.

THE COURT: I didn't say you were responsible for anything.

MR. MONAGHAN: I didn't mean you personally.

THE COURT: That's their position.

Let's go ahead and mark the exhibits, please.

MR. MONAGHAN: Thank you, Judge. And we

Page 220

CAROL ANNE BRYANT - DIRECT/MONAGHAN

did.

THE COURT: They are all marked now?

Q. Now, before we finish with Exhibit 7 --

THE COURT: Let me see 7 in evidence.

A. Patrick, this is a serious problem for me. I'm a leader on that. That's a jingle.

MS. PHARES: Objection, your Honor. No question pending.

MR. MONAGHAN: That is not a serious problem. I'll take it up with you at the break. You've already got a stipulation in the record.

THE WITNESS: It is for me. That is actually a pre-recorded jingle.

THE COURT: Don't have any discussion with your counsel unless you want to break and talk to your client.

Do you want a minute?

MR. MONAGHAN: May I, Judge?

THE WITNESS: Yeah.

THE COURT: Step outside.

(Pause in the Proceedings)

(Resumed on the record, in open court - counsel and parties present as previously noted)

THE COURT: Okay, we have 8 through 10 which

Page 221

CAROL ANNE BRYANT - DIRECT/MONAGHAN

have now been shown to counsel for the Defendants. I'm ready to listen to objections.

MR. TANNENBAUM: I have no objections, your Honor. I just want the record to reflect that Miss Bryant just went to meet privately with her counsel. No objection.

THE COURT: Nothing wrong with that, that I know of. That comes up often.

MR. TANNENBAUM: I didn't say there was anything wrong.

THE COURT: I don't know any rule in any case that says a client can't meet with the lawyer.

MR. TANNENBAUM: I wasn't objecting, I was just noting it.

MS. PHARES: Your Honor, I'm just going to object once again to the fact that this complaint has never alleged any recovery under any contractual theory for any monies related to DVDs. And I would like to reserve that as a continuing objection to testimony relating to all these audiovisual works that are on DVDs.

THE COURT: Well, I think we're going to get there. I'm aware of your objection about the

Page 222

CAROL ANNE BRYANT - DIRECT/MONAGHAN

performance royalties, et cetera. We're going to get there.

MS. SAFFER: Excuse me, your Honor, I would also just like to reiterate that plaintiff's counsel had made clear that this does not relate to performance royalties and, therefore, BMI is not involved in this aspect of the case. It is related to the possible sale.

THE COURT: All right, let's try and keep this down so we can get around to cross and then some consideration of where we are somewhere down the road, but not here in the direct.

Now, is there any objection to 8 through 10 going into evidence?

There being none --

MR. TANNENBAUM: None.

MS. PHARES: None.

THE COURT: -- 8 through 10 are accepted into evidence.

(Plaintiff's Exhibit Nos. 8 through 10, marked and received in evidence)

MR. MONAGHAN: Judge, can I go back to 7 in a moment?

THE COURT: As soon as they are marked.

CAROL ANNE BRYANT - DIRECT/MONAGHAN

MR. MONAGHAN: Oh, I'm sorry.

MS. PHARES: Your Honor, I just want to clarify. I have no objection, for example, to the authenticity of these documents, but I still want to make clear my objection as to the germaneness and the relevance of these exhibits.

THE COURT: All right.

DIRECT EXAMINATION
BY MR. MONAGHAN: (Continued)

Q. All right, Exhibit 7, Miss Bryant --

A. Yes.

Q. -- which is in evidence, which means you can read from any written material on it.

Now, I would ask you to read the -- can you?

A. Okay, yes.

Q. Would you please read the information that appears on the bottom after the word "Rhino"?

MR. TANNENBAUM: Just don't know which one that is, the title?

MS. PHARES: We don't have this.

THE COURT: 7 is DVD Transformers.

MR. MONAGHAN: Heroes The Rebirth.

MR. TANNENBAUM: Thank you. If you could just let us know.

CAROL ANNE BRYANT - DIRECT/MONAGHAN

MR. MONAGHAN: I will do that.

MR. TANNENBAUM: Thank you.

A. Program content copyright 19 -- sorry -- 86 Sunbow Productions, Inc., Wildstar, Inc., Hasbro, Inc. All rights reserved. Package artwork design summary copyright 2001 Rhino Home Video and AOL Time-Warner Entertainment Company. Addresses. All rights reserved. And then warnings.

Q. Okay.

A. Do you want that?

Q. Now, did you --

A. Any authorized --

Q. You did read the copyright 2001?

A. Yes, I did.

Q. Okay. Now, what did you have to do with the music that the Court just heard a snippet of in this DVD?

A. I wrote the music, I wrote the arrangement and I recorded and conducted the date and produced it. And I did it for a jingle and it was the campaign that we did on -- that I did on that series of arrangements was called Good Guys Bad Guys. GGBG. I also have those stubs from those recording sessions.

Q. You did this as a jingle?

CAROL ANNE BRYANT - DIRECT/MONAGHAN

A. Yes, the Transformers jingle on the A.F.M. jingle code --

Q. Okay, now --

A. -- and its Screen Actor's Guild jingle code.

Q. This was also, by the way, just for the record marked at the deposition of Miss Weitzman from Sunbow in May 19th, '03.

MR. TANNENBAUM: Which exhibit number, the Weitzman?

MR. MONAGHAN: It was Exhibit J at the Weitzman deposition.

Q. Now, I'm going to show you now, Miss Bryant, Exhibit 8.

MR. MONAGHAN: Do we have a stipulation on Exhibit 8 that is Miss Bryant's music the name of it is Transformers The Villains The Ultimate Doom?

MR. BACAL: Yeah, I mean, if it contains, you know, the music that she wrote then it contains the music that she wrote. I have not heard that particular one. If you let me see the package I may be able to stipulate to that.

MR. MONAGHAN: Is that acceptable, your Honor?

THE COURT: It's your stipulation.

CAROL ANNE BRYANT - DIRECT/MONAGHAN

Do I take it that at the end of this it is all going to come out that these were all copyrighted by Sunbow? Or were there other people?

MR. BACAL: Yes, I'm sure Anne wrote the main theme through that, yeah.

MS. PHARES: I just want to make clear that this is a soundtrack of the audiovisual work that is contained on the DVD.

THE COURT: Okay, but each and every case of this that is shown here ultimately it's going to show that Sunbow copyrighted it, right?

MR. MONAGHAN: Well, the copyright can relate to the text. In other words, the copy could -- when they put --

MS. PHARES: Not in 1986 it can't.

MR. MONAGHAN: I'm talking about the 2001. 2001 Rhino copyright notice.

MR. TANNENBAUM: Can we have a side bar? I think it might be --

THE COURT: Let's go off the record. No sense having a side bar.

MR. TANNENBAUM: I don't want the witness to hear the question I have, okay?

CAROL ANNE BRYANT - DIRECT/MONAGHAN

THE COURT: Off the record.

(Discussion off the Record)

(Resumed on the record, in open court)

THE COURT: Back on the record.

What I'm trying to find out folks in my fashion is if the offer now is a series of T.V. Shows that were recorded back -- performed, recorded, whatever the right word is, back in the early eighties or mid-eighties or late eighties and that the -- that those contained music that was written by the Plaintiff but later were copyrighted by Sunbow. Is that where we are at?

MS. PHARES: They were registered for copyright by Sunbow at the time they were created, your Honor. The time they were distributed.

THE COURT: Yeah, but that's the sequence of events.

MS. PHARES: I assume so.

THE WITNESS: Never really heard that until that particular DVD. I didn't know that they were using the jingle that we did for Griffin-Bacal Advertising for Transformers directly on a DVD. That is a union problem.

THE COURT: Well, I'm not taking union

CAROL ANNE BRYANT - DIRECT/MONAGHAN

problems today.

Let's -- okay, so now we all understand where we are going. Your position is these were copyrighted as they were done -- as they were -- as the television shows were done back in the eighties, all right?

MR. MONAGHAN: I don't accept that.

THE COURT: What is your position?

MR. MONAGHAN: Well, my position is as far as I can tell we've looked at the copyright records, the fact that it bears a copyright notice in 1986, first of all it is only -- it's only an indication that someone is claiming that they have a copyright, A, and; B, there is another copyright notice 2001.

So the proffer on this, your Honor, if I may, and on the others is this material is being sold currently. The witness testified the last exhibit she got it from Amazon.com. You will see an exhibit later on on what products are available with Miss Bryant's music. So the Defendants are being less than generous when they suggest that they want to stipulate. Our point is that these products are being sold currently and in fact with

CAROL ANNE BRYANT - DIRECT/MONAGHAN

increasing frequency now with my client's music without compensation.

THE COURT: Which brings us back to the old saw that is: This is a copyright case?

MS. PHARES: Yes, which I was just about to mention, your Honor. I mean, if we are going to sit here and make interpretations of the Copyright Act, that could not be more squarely within the jurisdiction, the exclusive jurisdiction of the federal court.

MR. MONAGHAN: We're not claiming copyright. We're claiming that our client's music is being sold now. We don't care who has the copyright. Sunbow the publisher, Miss Phares's client, was given -- whether they copyrighted them or not and the record will show that they didn't copyright all this stuff, as far as I can tell I think they only copyrighted JEM songs, the music. In order to copyright, Miss Phares is an expert in the field and lectures in the field, you actually have to have a deposit.

MS. PHARES: No, you do not.

MR. MONAGHAN: All right, she knows more than I do.

CAROL ANNE BRYANT - DIRECT/MONAGHAN

THE COURT: Please. Please.

MS. PHARES: As a matter of law, a copyright arises at the moment the music is created. Registration is not required, not after January 1st 1978 in the United States of America.

THE COURT: I'll tell you what, you all are doing a great job of trying to help me, I'm sure, but it doesn't work that way. You see, you all know what you are doing. I'm the one that has to decide this case. So let's keep it as simple as we can. That's what I try and do.

Okay, so let's get back to where we're at. Ask the witness a couple more questions.

MR. MONAGHAN: Thank you, your Honor.

THE COURT: And all of those exhibits for whatever they are worth are in evidence.

MR. MONAGHAN: Okay. I would seek a stipulation, but I think Mr. Bacal was not prepared to agree that my client's music --

MR. BACAL: I am prepared to agree that if the song that Anne wrote for the Transformers, the original melody that she wrote for the Transformers is in this DVD, then that's -- she wrote that.

CAROL ANNE BRYANT - DIRECT/MONAGHAN

MR. MONAGHAN: That's no stipulation.

THE COURT: Okay, let's go ahead.

MR. BACAL: Why?

MR. MONAGHAN: Because it has an "if". I have to show the music is in there.

Now, we've covered Exhibit --

THE COURT: 10.

MR. MONAGHAN: Yes. But we've covered Exhibit 7 that was actually played.

THE COURT: All right. I'll tell you what I'm going to do, I'm going to let counsel listen to this and decide -- to me, it's a no-brainer. If it is in there it belongs to -- not belongs, but she is the one that wrote it. If you want to listen to it, that's fine with me, but I'm going to break for lunch. I'll see you back here at 1:30.

MR. MONAGHAN: All right, Judge. Thanks.

THE COURT: Don't leave until you listen to whatever you are going to listen to here because I'm not going to listen to it all, with all due respect. We're off the record until 1:30.

(Luncheon Recess: 12:05 p.m.)

oOo

CAROL ANNE BRYANT - DIRECT/MONAGHAN

A F T E R N O O N S E S S I O N

(Reconvened: 1:30 p.m.)

(Trial resumes on the record, in open court - counsel and parties present as previously noted)

THE COURT: All right, let's go.

MR. MONAGHAN: Thank you, Judge.

C A R O L A N N E B R Y A N T,

the Plaintiff, previously duly sworn by the Court, resumed the stand and testified further as follows:

DIRECT EXAMINATION

BY MR. MONAGHAN: (Continued)

Q. All right, Miss Bryant, we spent some time on the Transformers and I would like to finish this up as quickly as possible.

A. Yes.

MR. MONAGHAN: During the break I would like to report to the Court -- Miss Phares will report to the Court.

MS. PHARES: We figured is because Mr. Bacal is really the only one of us who knows what the original programs were and it's going to take about four hours to go through them that he'll watch them this morning and then we'll report back

CAROL ANNE BRYANT - DIRECT/MONAGHAN

in the morning just to let your Honor know that these are what they were.

THE COURT: Thank you, Mr. Bacal.

MR. MONAGHAN: I don't know if I can go along with that. It's our evidence. I really -- I'm not --

THE COURT: They look trustworthy.

MR. MONAGHAN: Okay.

MR. TANNENBAUM: If you want to mark them in some way --

THE COURT: They are marked.

MR. TANNENBAUM: He's talking about not changing the disc.

THE COURT: Don't make any copies. All right, let's go.

Q. All right, Exhibit 8 I've shown you already I believe, Miss Bryant, just to make sure I've picked up on this.

A. The Ultimate Doom. Yes, Weitzman and --

MR. MONAGHAN: Okay, this will be subject to the same conditions and stipulation.

Q. So I show you now Exhibit 9 in evidence and can you identify that, please, for the record?

A. Special collector's edition of Transformers

CAROL ANNE BRYANT - DIRECT/MONAGHAN

The Movie. A Sunbow and Marvel production Transformers The Movie, starring Eric Idol, Judd Nelson, Leonard Nimoy and Orson Welles as Unifron.

Q. Does the jacket indicate -- well --

A. Shall I keep reading?

Q. After Orson Welles please read the information on the front jacket.

A. Music score by Vince DaCola. Story Flint Dilly. Written by Ron Friedman. Executive producers Margaret Leish and Lee Gunther. Supervising producer Jay Bacal. Produced by Joe Bacal, Tom Griffin. Co-produced by Nelson Shin.

MR. MONAGHAN: Can we have a stipulation that Mr. Bacal was the producer of the movie which is depicted in --

MR. TANNENBAUM: Can I just see that?

MR. MONAGHAN: Well, that the Bacals are correctly shown.

MS. PHARES: I just want to see it.

MR. TANNENBAUM: We think it's right.

MR. MONAGHAN: Stipulation?

MR. TANNENBAUM: That the Bacals --

MR. MONAGHAN: Are correctly characterized.

MR. TANNENBAUM: Yes.

Page 235

CAROL ANNE BRYANT - DIRECT/MONAGHAN

MR. MONAGHAN: So stipulated, your Honor.

Q. Okay. Have you had occasion to review the music which the Defendants --

A. I've reviewed that.

Q. Is there a theme in there?

A. Yes, in the opening.

Q. I show you --

A. I want to make sure I'm clear about that that there's additional music, verse music, I think I said this yesterday, that leads up to the Transformers's Theme that becomes the big whole piece anticipatory music, Transformers music moves back down and then Transformers Theme.

Q. You are not claiming you wrote all the music.

A. Yes, that's right, I want to make sure.

Q. And to what extent is your theme --

A. Well, it's the highlight of the piece of music. You know, we often do that, write a piece of music that leads up to another piece of music that is well known. The same thing as the GI Joe Theme. We did that too.

Q. I show you Exhibit 10 now in evidence. Let me just finish.

Page 236

CAROL ANNE BRYANT - DIRECT/MONAGHAN

Did you purchase these items, Miss Bryant?

A. I bought them from Amazon.com.

Q. When did you do that?

A. Three, four years ago I bought the Transformers's movie.

Q. And, to the best of your knowledge, are these products still available?

A. Oh, yeah, and many more. This seems to be a four disc -- one, two, three, four disc -- six -- no. Six disc. One, two, three, four, five-disc set of episodes called Transformers's Season 2, Part One.

Q. Is this also purchased by you?

A. Yes.

Q. Okay. And to what extent, if you know, is your music on this set or in this set?

A. It's the theme. It's used for the television show.

Q. Do you remember what you paid for these items?

A. They were pretty hefty. I think that was about $50. Some of them are 59.98. Some of them are 19.98.

Q. Same question as before: Did you realize any monies out of these?

Page 237

CAROL ANNE BRYANT - DIRECT/MONAGHAN

A. No. I spent.

MR. MONAGHAN: I think this is the last of the Transformers. Can you mark this -- this is -- by description, your Honor, this is Transformers Volumes 10 to 12. I think this is in VHS format referencing Kid Rhino trademark on it, and Sunbow Entertainment, a division of SONY Wonder bearing dates packaging 2000 Rhino Entertainment Company d/b/a Rhino owned video program 1986 Sunbow Productions.

I'll offer that in evidence?

THE COURT: Has it been marked?

MR. MONAGHAN: Oh, it has not been marked yet?

MS. PHARES: Once again, I would just ask for all of these videos if we can be provided with photocopy --

MR. MONAGHAN: Yes, yes.

(Plaintiff's Exhibit No. 11, VHS, Transformers Volumes 10 to 12, marked for identification)

THE WITNESS: I think you did.

MR. MONAGHAN: I think you might have. Is this the Weitzman -- all right, we'll be glad to

Page 238

CAROL ANNE BRYANT - DIRECT/MONAGHAN

do that.

MR. TANNENBAUM: My only objection is as to relevance. I think Sunbow, but I have no objection.

THE COURT: All right.

(Plaintiff's Exhibit No. 11, marked and received in evidence)

Q. Did you purchase these items as well?

A. Yes.

Q. Do you remember what you paid for them?

A. No, I don't really remember. I think maybe I have a receipt somewhere.

Q. Okay. And to what extent is your music?

A. That's the theme. That's the theme for the television show.

Q. Television shows?

A. Yeah, I think there are several shows on each, aren't there?

Q. Volume 10 Megatrons Master Plan Volume 12, Size Matters Volume 11?

A. Maybe not. Maybe they are single shows. There are so many of them.

MR. MONAGHAN: Same stipulation about looking at this or hearing this?

Page 239

CAROL ANNE BRYANT - DIRECT/MONAGHAN

MR. TANNENBAUM: Sure.

MR. MONAGHAN: I'm going to turn to a different composition, your Honor. I'm sure you are happy to hear that.

THE COURT: All right.

MR. MONAGHAN: And if I could have Exhibit 3.

Q. Miss Bryant, we're going to talk about the JEM songs. And if you would first explain to the Court, please, how you became involved at all in connection with the JEM songs.

A. We were asked to find -- to compete on writing a theme for Joe for JEM, which was originally called M. It was a project. And we got a treatment, I remember, dramatic treatment by the television show that was about this rock singer JEM, originally M. Her nemesis was Pizzaz. Good Girl Bad Girl in the music business and a show about the music business. So we were to try to find JEM and try to find Pizzaz, find the singers who were to be the main characters, vocal characters. And first we found Ellen Burnfeld who is right back there, who is Pizzaz. And then -- I don't know who JEM is, but that's Pizzaz when he heard her doing a certain song. Then our pianist Peter Phillips.

Page 240

CAROL ANNE BRYANT - DIRECT/MONAGHAN

Young singer, fabulous, I heard her tape, Joe, you have to hear this. He said that's JEM. Then we wrote the JEM songs. Picked Joe's lyric and they picked the one I wrote. And then we did a demo and we sang it as M Truly Outrageous. And then something legal happened, they didn't want to use M and they changed it to JEM. So we sang it about a month later.

Q. When was that?

A. 1985. I have the orchestra score so I know the date.

Q. Was this done for -- for Sunbow?

A. Well, it was a Sunbow television show. Joe was creative director. He gave out the jobs. And we understood, I think, at that point that they were going to do a television show first and then shortly after that they were going to issue toys. A JEM doll and her toys. It was a T.V. show first, unlike Transformers.

Q. Unlike the other compositions you've talked about.

A. Yeah.

Q. Okay. Now, ultimately the composition was finished and presented to whom?

A. To Joe Bacal. And Joe called me up on a Saturday. I got a message. Joe Bacal called, said

Page 241

CAROL ANNE BRYANT - DIRECT/MONAGHAN

Annie, they picked your tune.

Q. And?

A. That was nice.

Q. And at some point the T.V. show aired?

A. Yes, the T.V. show it went like lightening. All of a sudden we were in production. It seemed to go on the air very quickly and then we had ten shares due. And each show had three original feature songs. This is a show about the music business. Two for the JEM character the good girl and one for the bad girl Pizzazz character, and they were competing in the music business. There were a lot of values that came through the show. A great show. Everybody loved the show and still does. And it centered on the music business. So when a feature song would come on for one of the main characters it would be a little M T.V. I.D. on it saying JEM and the holograms we can make a difference, whatever the name of the song would be. So very much featured songs.

Q. What do you mean when you use the phrase featured song?

A. They were the sole focus of attention. They were paid as featured songs in our character just like Over The Rainbow is a feature song. I mean, it is a

Page 242

CAROL ANNE BRYANT - DIRECT/MONAGHAN

feature song. It's a song.

Q. Contrast that with?

A. Jingle?

Q. Yes.

A. Something that has announcer copy in it and interruptions and, you know, a lot of selling points. This was a song exclusively about being a song about the content of the song and they are liveable. I mean, they stand on their own as songs. They were not oinky-doinky kid songs. They were real songs. They were pop songs, rock and roll songs, but they were really beautifully produced all around and sung, performed by everybody.

Q. Have those songs been identified in this case thus far, to your knowledge?

A. I don't think the songs have. You know, there were 154 of them we did.

Q. Are they in your catalog --

A. Yeah.

Q. -- Exhibit 3?

A. Yes.

Q. Okay. Now, how many songs were there?

A. We wrote 154 songs and I did 154 arrangements. We actually wrote 308 songs because Ford

17 (Pages 239 to 242)

CAROL ANNE BRYANT - DIRECT/MONAGHAN

and I wrote a version on each so -- so that Joe could have a choice. And Ford did the piano demos. We sent them over to Joe. He chose what he wanted. I got the go ahead. And these are next week songs do this version. Three of this 1A of that one. And I would know which one to do the full arrangement on. Then we spent two and a half days in the studio producing the JEM show.

Q. What was your understanding or arrangement with respect to your composing these songs?

A. Financially?

Q. Financially.

A. Well, we had an arranging production fee. Ford always called it a token fee. $2200 to do the arrangement and the production.

MS. PHARES: Objection. Hearsay.

MR. TANNENBAUM: For what Ford called it, certainly hearsay.

THE COURT: I thought the witness was testifying to an arrangement she had with Ford. Maybe I'm wrong.

MS. PHARES: No, I don't think so, your Honor. I think she was referring to what Mr. Kinder said about the arrangement.

CAROL ANNE BRYANT - DIRECT/MONAGHAN

MR. MONAGHAN: I'll rephrase the question.

THE COURT: All right, let's go back.

Q. What was the agreement or understanding?

A. All right, we've got $2200 to do an arrangement.

THE COURT: The agreement and understanding with whom.

Q. Yes, with whom, Miss Bryant?

A. Well, we billed Sunbow.

Q. Okay.

A. You know --

Q. Did you say you billed Sunbow?

A. That's who paid the bill was Sunbow. I mean, we worked it out in the beginning. We understood from Joe what, you know, this is an expensive show to produce all around for everybody. The money would only be $2200 for arrangement and production for each song. But that was okay.

Q. Why was it okay?

A. Because it was really a great show. It was so much fun to do that show. It was fabulous. It was a nightmare. It was a fabulous nightmare. It was great. Hard.

Q. What?

CAROL ANNE BRYANT - DIRECT/MONAGHAN

A. So much work and -- but it was really enjoyable.

Q. Who represented Sunbow?

A. Joe. Joe is our creative director.

MR. TANNENBAUM: Objection.

THE COURT: What's the objection?

MR. TANNENBAUM: Represented Sunbow in what?

THE WITNESS: He's our creative director, I just told you.

MR. TANNENBAUM: Creative director.

THE COURT: If that's an objection, I don't think so. Please let's have objections and not interrupt the Plaintiff's case. This is more for cross-examination. Thank you. Sit down.

Go ahead.

Q. All right, what you just testified to, I asked you what your arrangement and understanding was. You talked about the creative fees?

A. Yeah.

Q. Okay what, if anything, was the understanding about any future royalty interests?

A. We got a royalties as writers. Ford said he -- the publishing, he said he would never give us the publishing.

CAROL ANNE BRYANT - DIRECT/MONAGHAN

MS. PHARES: Objection, hearsay.

THE WITNESS: This is a discussion I had with him.

THE COURT: Hold up. Let's back it up now. You can tell us if you had a conversation with somebody. Some third-party not in court you can't say what they said to you.

THE WITNESS: Okay. Can I say I had a discussion with my partner, an ongoing discussion about publishing?

THE COURT: Yeah.

THE WITNESS: And we disagreed on publishing. I always felt that the client should get the publishing. It was fine with me. And he always said we should keep the publishing.

Q. We're not talking publishing right now.

A. Oh, okay.

Q. We're talking writer's royalties.

A. Okay. What ultimately shook down was we got the writer's royalties. That was the only money we made was to make writer's royalties for writing songs.

Q. From what sources were these writer royalties to come?

A. This was a T.V. show that was broadcast and

Page 247

CAROL ANNE BRYANT - DIRECT/MONAGHAN

so we were paid writer's royalties that came through BMI.

Q. Okay. And any other source of potential writer's royalties?

A. Oh, there was a lot of potential there.

Q. From what other sources could these writer's royalties --

A. We didn't know what would happen. We never know what is going to happen when something goes on the air in the beginning. But we can certainly imagine that a show with that many songs, a T.V. show, and it is about music, could be a CD and the video market, was happening then. They didn't have DVDs yet.

Q. And what agreements have you ever signed where you relinquished any writer royalties?

A. I never relinquished any writer's royalties.

Q. Have you ever gotten a farthing -- wrong word -- a dime out of any of these videos and CDs that we've been talking about?

A. None of those.

MS. PHARES: Objection.

MR. MONAGHAN: DVDs. DVDs. I'm sorry.

MS. PHARES: It's --

THE COURT: What is the objection?

Page 248

CAROL ANNE BRYANT - DIRECT/MONAGHAN

MS. PHARES: The objection was the characterization of the exhibit, your Honor.

THE COURT: All right.

MR. MONAGHAN: Okay. Let me show you now if I can exhibit -- what would be the next one?

THE WITNESS: Can I ask a question? No? Okay.

MR. MONAGHAN: If you can mark this as Exhibit 12, two-page exhibit.

(Plaintiff's Exhibit No. 12, JEM Opening Theme, marked for identification)

Q. I show you now Exhibit 12 and ask you if you can identify this document.

MR. MONAGHAN: Actually, can I -- can I substitute -- this one has some markings that we've cleaned up so I've actually handed my working copy. I wonder if I could substitute?

MR. TANNENBAUM: Do you want these back?

MR. MONAGHAN: No, I have enough here. I have a clean one.

THE COURT: Yes, you may substitute.

MR. MONAGHAN: Okay, we'll substitute this copy, a clean copy without notes.

Q. Can you identify, Miss Bryant, Exhibit 12,

Page 249

CAROL ANNE BRYANT - DIRECT/MONAGHAN

please.

A. Yeah, it's broadcast music received clearance report on 4/24/97 at 20 54 58. That's the time. Submitter SONY A.T.V.

Q. What song is it?

A. It's the JEM Opening Theme. It is also known as the JEM Vocal Theme.

Q. Whose music is this?

A. Joe Bacal 50 percent. Anne Bryant 50 percent.

Q. Whose music is this?

A. Oh, I'm sorry. The music.

Q. Yes. Please listen to the questions Anne.

A. Music is Anne Bryant.

Q. Okay.

MR. MONAGHAN: We offer this exhibit in evidence, your Honor.

THE COURT: Any objection?

MR. TANNENBAUM: I'm sorry, no objection.

MS. PHARES: No objection, your Honor.

THE COURT: 12 is received in evidence. Describe it, please, for the record.

MR. MONAGHAN: Yes, your Honor, it is a Broadcast Music, Inc. clearance report dated

Page 250

CAROL ANNE BRYANT - DIRECT/MONAGHAN

April 24th, 1997, referring to the JEM Vocal Theme and a/k/a JEM Opening Theme.

THE COURT: That's enough. And if I can --

MR. MONAGHAN: If I can hand a copy up to your Honor.

(Plaintiff's Exhibit No. 12, marked and received in evidence)

Q. Miss Bryant, do you have a copy of the exhibit in front of you?

A. Yes.

Q. Can you please tell the Court how it is that Mr. Bacal is shown as receiving a 50 percent interest in this composition in light of your testimony that the writer's royalties were to be obtained by you regardless of Mr. Bacal's contribution?

A. I don't know how it happened. It says a new registration, that's all I can see.

Q. Did you know this about the time in April of 1997 that there was a reg --

A. No.

Q. When did you actually find out that this registration had occurred?

A. When I got my catalog.

Q. When was that?

19 (Pages 247 to 250)

CAROL ANNE BRYANT - DIRECT/MONAGHAN

A. When did we get it? In 2000? And then you subpoenaed the clearance that went along with some of these entrances and -- enterings.

Q. Now, Exhibit 3 I'm not sure, because the Judge wants me to run through every JEM song entry already referenced. The JEM songs you talked about you composed they are all referred to in Exhibit 3 the catalog?

A. It says Exhibit 2 here.

MS. PHARES: 2.

Q. I'm sorry, Exhibit 2.

A. Yeah, they are.

Q. Okay.

A. I should say Barry Harmon wrote the lyrics. It is all the same JEM songs. I don't know if I said that.

Q. So you are not saying that you had anything to do with the lyrics, you are talking about the theme music, the instrument --

A. The instrumental. I wrote the music. Because the songs -- I wrote the music and Ford wrote the music and Barry wrote all the lyrics.

MR. MONAGHAN: Okay, I've got three -- two videos here, VHS videos, I'll ask the reporter to

CAROL ANNE BRYANT - DIRECT/MONAGHAN

mark. One is referencing JEM on the cover. Passport to Rock. Previously marked at the Bacal deposition as Bacal 6. Referencing on the reverse packaging 1999 Rhino Entertainment, d/b/a Rhino Home Video Program 1986 Sunbow Productions, Inc., Wildstar Music, Inc., HASBRO, Inc.

That will be Exhibit 13.

(Plaintiff's Exhibit No. 13, video referencing JEM on the cover, Passport to Rock, marked for identification)

MS. PHARES: Once again, I'm going to ask for a copy of this because when Mr. Bacal was deposed Sunbow was not in this case. So I will need to have, you know, the same photocopies. We've never had a copy of this at any deposition.

MR. MONAGHAN: Okay, that's fine.

MR. TANNENBAUM: No objection, your Honor.

MR. MONAGHAN: And Plaintiff's 14 will be similar. VHS video JEM Volume 2 Fashion Fiasco, which was Bacal 5. And referencing on the reverse Rhino Home Video, 1999 packaging Rhino Entertainment. And can we stipulate that Rhino Entertainment was a licensee, domestic licensee of Sunbow?

CAROL ANNE BRYANT - DIRECT/MONAGHAN

(Plaintiff's Exhibit No. 14, VHS video JEM Volume 2 Fashion Fiasco, marked for identification)

MS. PHARES: No, I don't think we can.

MR. MONAGHAN: Okay.

MR. TANNENBAUM: And I wouldn't know.

MR. MONAGHAN: Okay. That's offered as the next Exhibit 14, Plaintiff's 14. I'm sorry, it has to be marked first.

THE COURT: 14 marked for identification.

MR. MONAGHAN: I offer it. Plaintiff's 14.

MR. TANNENBAUM: I have no objection.

MS. PHARES: Once again, I will need a copy of this because this was done at Mr. Bacal's deposition which when Sunbow was not yet a part of this case.

THE COURT: All right. In evidence.

(Plaintiff's Exhibit Nos. 13 and 14, marked and received in evidence)

THE COURT: Let's do 15. What's that?

MR. MONAGHAN: Your Honor, this is a new one. New to me anyway. This appears to be a CD set.

MS. PHARES: DVD set.

CAROL ANNE BRYANT - DIRECT/MONAGHAN

MR. MONAGHAN: I'm not going to get that right. DVD set referencing Truly Outrageous on the back and JEM And The Holograms on the front. And indicating the complete first and second seasons referencing Rhino Home Video on the reverse with a program content copyright notice 1985, six, seven Sunbow Productions, Inc.

That would be the next exhibit.

(Plaintiff's Exhibit No. 15, DVD set referencing Truly Outrageous, marked for identification)

MR. MONAGHAN: Offering 15.

MR. TANNENBAUM: Again, I have no objection, with the understanding I don't have to say it every time that Mr. Monaghan is saying they are being produced with respect to Sunbow.

THE COURT: All right.

MS. PHARES: Again, I will ask for copies of this and I will also repeat the fact that all of these DVDs are not part of this case in so far as they appear in -- either in the complaint or in the Judge's rulings.

THE COURT: All right, they're admitted into evidence, Plaintiff's Exhibit 15.

Page 255

CAROL ANNE BRYANT - DIRECT/MONAGHAN

MR. MONAGHAN: I just wanted to say that I don't agree with the statement by Mr. Tannenbaum that they are only being offered against one Defendant. That's not so.

THE COURT: I didn't take a position either way.

MR. MONAGHAN: No, you didn't, but he did.

THE COURT: They say what they want to say.

MR. MONAGHAN: Silence is sometimes acquiescence.

(Plaintiff's Exhibit No. 15, marked and received in evidence)

Q. I show you these three videos in the interest of expediency. I ask you if you can tell the Court, please, to what extent to your knowledge your music is involved in any or all of these.

A. Yes, I've seen all of these. I remember the scripts and I wrote the music for the scripts and produced all of the music. And in the VHSs the JEM Theme was used. Not only front and back but in the underscore they used the lead-ups, the tracks that I did that were the backing tracks for the vocals very often were used as part of the underscore. So they got a lot of use out of the music tracks, which was good.

Page 256

CAROL ANNE BRYANT - DIRECT/MONAGHAN

I thought it dramatically worked. And also the underscore composer Mr. Walsh played the JEM Theme throughout -- throughout the shows. It's part of the music library. So I know these. I saw some of the DVD which is really wonderful, and so it has 74 of our songs on it in the 26 episodes. And what's different about each show is that it has the JEM Theme, the well-known theme. And it has a lesser known theme at the back end of the show called the JEM Girls, which is also a theme I wrote. And it's very wonderfully done. And there is also a feature in here called The Jukebox where you can just play only the songs.

Q. Say that again, please?

A. The Jukebox I think it's called. What is it called? Where you can play only the songs.

Q. So you can ignore the visual?

A. Oh, it's called Play Songs Feature. Here it is, where you can just play the songs, like any record.

Q. Okay, what monies do you realize from the sale or distribution of any of these JEM products?

A. None.

MR. MONAGHAN: I'm going to ask the reporter to mark this as 16.

(Plaintiff's Exhibit No. 16, Amazon.com

Page 257

CAROL ANNE BRYANT - DIRECT/MONAGHAN

order form, marked for identification)

Q. Just for the record --

MR. MONAGHAN: For the record I'll describe this. This is an Amazon.com order form that bears the name Anne Bryant. Her address in Stony Point, New York. It is referencing an order of February 15, 2001. And it was previously marked at Mr. Bacal's deposition as Exhibit 3 for identification. This is Plaintiff's 16 here at the trial.

Q. I'll ask the witness to identify the exhibit.

A. Yes, I remember this.

Q. Okay. Is that an order you placed with Amazon?

A. Yes.

Q. And which of the products that we've seen so far?

A. GI Joe Volumes 1 to 3. The three-pack. That's it over there. Volume 1 of JEM Passport To Rock, Volume 2 of JEM Fashion Fiasco.

MS. PHARES: Your Honor, I'm not sure this is in evidence. I'm also not sure this is a business document of this witness. If she wants

Page 258

CAROL ANNE BRYANT - DIRECT/MONAGHAN

to testify about what she spent on these, that's fine, for Sunbow.

MR. MONAGHAN: It doesn't have to be, your Honor. The witness has identified this is the order she placed. We're offering it in evidence. If they wish to object --

THE COURT: Well, is it your claim that this is part of your damages because Miss Bryant bought copies?

MR. MONAGHAN: Well, it's part of the damages because they are marketing it without paying her. That's the --

THE COURT: For whatever limited purpose, I will accept it.

(Plaintiff's Exhibit No. 16, marked and received in evidence)

Q. I'd like to show you now --

MR. MONAGHAN: Mark this as Exhibit 17.

(Plaintiff's Exhibit No. 17, four-page document dated September 7, 1989, marked for identification)

MR. MONAGHAN: I'm sorry, this would consist of four pages, Exhibit 17 so far, for identification. The first page is dated

21 (Pages 255 to 258)

CAROL ANNE BRYANT - DIRECT/MONAGHAN

September 7, 1989 addressed to Anne Bryant. Second page is dated January 11, 1990, addressed to Anne Bryant. Third page is November 30, 1990 addressed to Anne Bryant. The fourth page is December 20, 1991 addressed to Anne Bryant. I am sorry, I don't have copies of this.

I would like to show it to the witness and ask her if she can identify Exhibit 17.

MR. TANNENBAUM: May we see a copy first?

THE COURT: Let's get it identified first.

A. Yes, I remember this.

Q. Okay, please tell the Court what this four-page document consists of?

A. This was sent to me by Tamad, Mr. Dobishinsky's organization, September 7th 1989. The date up top is my writing. The little note is Bill Dobishinsky's writing.

Q. You are talking about the first page?

A. Yes. Sent to me at my place at 41 West 73rd Street, New York.

Q. Actually, these four pages are not the same document?

A. No.

Q. They are all different?

CAROL ANNE BRYANT - DIRECT/MONAGHAN

A. No, they are sent to different places.

MS. PHARES: Objection, leading.

THE COURT: Sustained.

MR. MONAGHAN: I'm just trying to speed this along.

A. Okay. They are all -- one is SACEM, Friends Distribution Mechanical Royalties with a note congrats new royalty source we opened up. That's September 7, 1989.

January 11, 1990 is the next one which was sent to me at my home in Stony Point. Sacem friends distribution for mechanical royalties through December 31st, 1988.

Q. Okay, just --

A. And it involves -- the first one involves JEM.

Q. Wait one second, Miss Bryant.

A. And Transformers.

Q. It has to get into evidence before you can read from it.

A. Oh, it's not in evidence?

Q. You are identifying it right now.

A. Oh, okay. I'm sorry, I didn't know it. Just identify it. Okay.

CAROL ANNE BRYANT - DIRECT/MONAGHAN

Q. You have to watch more Law and Order.

A. I know. I don't watch television.

The third one is November 30th 1990. Do I say that?

Q. Did you receive this document?

A. Yes.

Q. Did you receive each of the other two pages?

A. Yes.

Q. Did you receive the fourth page?

A. Yes.

Q. Did you receive them roughly sometime contemporaneously with the date that is shown?

A. Yes.

MR. MONAGHAN: Okay, we offer that exhibit, your Honor.

THE COURT: Show it to opposing counsel.

MR. TANNENBAUM: I have no objection.

MS. PHARES: Well, just for background, were these sent to the witness --

MR. MONAGHAN: Wait, this is voir dire?

MS. PHARES: Yes, this is voir dire.

THE COURT: Go ahead.

MS. PHARES: Were these sent to Miss Bryant from Mr. Dobishinsky acting as administrator of

CAROL ANNE BRYANT - DIRECT/MONAGHAN

your royalties?

MR. MONAGHAN: This is incorrect type of voir dire, your Honor.

THE WITNESS: Yes.

MR. MONAGHAN: Voir dire would be only to authenticate the document not to do cross.

THE COURT: I will allow it. The witness said yes.

MS. PHARES: We have no objection, your Honor.

MR. MONAGHAN: Excuse me --

MS. SAFFER: She's from BMI. There is no more room at counsel tables. She is sitting back here instead of sitting up there.

MR. MONAGHAN: I've never tried a case like this.

MS. SAFFER: You know, everybody else has their client, your Honor. I apologize, but there's no room.

THE COURT: Please, let's just go forward.

MS. SAFFER: Okay.

THE COURT: What is your position on it?

MS. SAFFER: I'm sorry, I got confused. I have no objection.

Page 263

CAROL ANNE BRYANT - DIRECT/MONAGHAN

THE COURT: All right. So no one has any objection, so it is admitted into evidence.

(Plaintiff's Exhibit No. 17, marked and received in evidence)

THE COURT: Now, it is in evidence. Please explain to me what it is.

MR. MONAGHAN: Well, if I can let Elizabeth mark it.

THE COURT: All right.

(Plaintiff's Exhibit No. 17, marked and received in evidence)

MR. MONAGHAN: What it is, your Honor, to the best of my knowledge, and I may stand corrected, this is one of the rare occasions, maybe the only, where there is a reference to mechanical royalties. So the witness received from Sunbow's appointed administrator and through this Sacem France there was a distribution of mechanical royalties during the periods indicated. And there's a fee for the administrator is deducted. There is a reference to the songs JEM Transforms --

MS. PHARES: Is Mr. Monaghan testifying? Objection.

Page 264

CAROL ANNE BRYANT - DIRECT/MONAGHAN

MR. MONAGHAN: It is in evidence.

THE COURT: I asked that it be described. I think it is some kind of royalty explanation.

MR. MONAGHAN: Correct, mechanical royalties. Up to now we've been talking about, as far as documents, performance royalties.

THE COURT: All right, counsel.

MS. PHARES: And also there's an objection to Mr. Monaghan's characterization of Mr. Dobishinsky as the Sunbow appointed administrator. There is no evidence in the record to support that.

MR. MONAGHAN: I'm fully prepared they wouldn't let me read the testimony from Sunbow.

THE COURT: You're getting around to it, counsel. If you start arguing about small things, I know they are not small to anybody here, but in the greater scheme of things we have to keep going. Let's go.

Q. Do each of these refer -- each of these do in fact refer to mechanical royalties, correct?

A. Yes.

Q. So there's a reference to $286.19 in the '89 letter?

Page 265

CAROL ANNE BRYANT - DIRECT/MONAGHAN

A. Yes.

Q. Your understanding of that was a mechanical royalty referencing JEM and Transformers?

A. Yes. We got only a part, small part of that, you see.

Q. And why is that?

A. I don't know.

Q. Where did the other royalties go?

A. So it looks like they must have split that between me and Ford. This just went to me personally. And then Bill took a hefty piece of that. 25 percent.

THE COURT: All right, the mechanical royalties are royalties for tapes? Video?

MR. MONAGHAN: That's what we say.

MS. PHARES: Objection, your Honor. Absolutely an objection.

THE COURT: Just tell me you don't agree.

MS. PHARES: Yes, I do not agree.

THE COURT: All right, fine. Thank you. Let's go forward.

MR. MONAGHAN: Okay, Judge, will the Court permit us to take the evidence back and make copies for counsel?

THE COURT: Well, the Defendants look

Page 266

CAROL ANNE BRYANT - DIRECT/MONAGHAN

trustworthy, I'll make an exception.

MR. MONAGHAN: Thank you, Judge.

This will be the next exhibit which will be 18.

(Plaintiff's Exhibit No. 18, December 11th 1990 letter, marked for identification)

Q. I show you now Exhibit 18 for identification and ask you if you can identify this document.

A. But not read from it, just identify it.

Q. So far --

A. December 11th 1990 note, letter.

Q. To?

A. Bill Dobishinsky.

Q. To whom?

A. To dear client. He sent this to me. There's no address on it, however. And cover copies sent to Mina Ramatour, Carole Weitzman and Steve Stanley.

Q. Who are the people?

A. They are people who work for Sunbow -- worked for Sunbow.

Q. Did you receive this letter --

A. Yeah.

Q. -- on the date indicated?

23 (Pages 263 to 266)

CAROL ANNE BRYANT - DIRECT/MONAGHAN

A. Yes. With one of the statements.

MR. MONAGHAN: We offer this as Plaintiff's 18.

MR. TANNENBAUM: I have no objection.

MS. SAFFER: No objection.

THE COURT: All right, accepted into -- what is it? 18 is accepted in evidence.

(Plaintiff's Exhibit No. 18, marked and received in evidence)

Q. And reading from Exhibit 18 in evidence:

Dear client: The enclosed check is your share of French broadcast mechanical royalties that SDRM has paid to Starwild/Wildstar but which SDRM may ask to be returned if SDRM changes its policy regarding who is entitled to this type of royalties period by endorsing this check you acknowledge that you will return these royalties to Starwild/Wildstar if SDRM requests the return of such royalties from Starwild/Wildstar respectfully bill/with some initials and then the name William M. Dobishinsky.

Do you see that information in Exhibit 18?

A. Yes.

Q. Were you ever called upon to return any of the royalties which are referred to in Exhibit 18?

CAROL ANNE BRYANT - DIRECT/MONAGHAN

A. No, no. We continued to get them.

Q. And who again is Dobishinsky?

A. He was Sunbow's administrator.

Q. I would ask the reporter mark Exhibit 19.

(Plaintiff's Exhibit No. 19, document dated January 14th, 1993, marked for identification)

Q. And I show it to you now it's for identification at this point and ask you if you can identify the document.

A. 1993, Tamad Communication. I remember their mark. That's their mark.

Q. To whom?

A. To me. January 14th, 1993, care of my other company Gloryvision in Stony Point.

Q. Did you receive this letter?

A. Yes.

Q. Did you receive anything else with it?

A. I got a check.

Q. How much was the check?

A. $1,222.05.

Q. And there are some handwritten notations?

MS. PHARES: Do you have copies of this document?

MR. MONAGHAN: No. None of the rest of the

CAROL ANNE BRYANT - DIRECT/MONAGHAN

exhibits yet have we been able to copy. But we'll certainly give you copies.

Q. There are some handwritten notations on the sheet?

A. Yes.

Q. Whose are those?

A. Those are mine.

Q. And when did you make those?

Did you make them at the time of this litigation or did you make them at some other time?

A. I made them in 1993 so I could keep my tax records straight.

MR. MONAGHAN: We offer Exhibit 19 in evidence.

MR. TANNENBAUM: I have no objection.

MR. MONAGHAN: I don't hear --

THE COURT: No objection.

MS. PHARES: No.

MS. SAFFER: No.

THE COURT: In evidence, 19.

(Plaintiff's Exhibit No. 19, marked and received in evidence)

Q. And, Miss Bryant, Exhibit 19 in evidence now is referring to, is it not, mechanical royalties?

CAROL ANNE BRYANT - DIRECT/MONAGHAN

A. Yes, from Germany and France. Sacem, SACEM France and GEMA Germany distribution for mechanical royalties through December 31st, 1992. And this is also a gross check to me. I made a note to myself, entire amount is A, B gross direct from Tamad. Nothing held, nothing due to anyone. Because Ford and I always split everything. Sometimes bills in the end started splitting them for us. But that was the gross, the whole thing was for me.

Q. SACEM France is what?

A. I think it is like BMI.

Q. Performing Rights Society?

A. Yes.

Q. GEMA, Germany, same deal?

A. I just think so. I just don't know.

MR. MONAGHAN: I ask the reporter to mark Exhibit 20.

(Plaintiff's Exhibit No. 20, song writer agreement, marked for identification)

Q. I'll show you now Exhibit 20 for identification and ask you if you can just in a quick summary fashion describe what this document is.

A. It's a song writer agreement between me and Wonderland Music. It is Walt Disney Company. First

Page 271

CAROL ANNE BRYANT - DIRECT/MONAGHAN

writing songs for record --

Q. And can you go to the signature page. Whose signature is on there?

A. I signed it.

Do you want the date?

Q. Yes, please.

A. I signed it on the 14th of August, 1990. And it was notarized.

Q. Okay.

MR. MONAGHAN: We offer Exhibit 20, which is a song writer's agreement, March 28th, 1990 by and between Wonderland Music and Anne Bryant writer.

MS. PHARES: Objection, your Honor, on relevance. This is a song writer's agreement. It is not an agreement with respect to T.V. production. And your Honor noted in the last decision of this Court that this has extremely marginal relevance because of the fact that it is a signed recording agreement.

THE COURT: Well, tell me about the relevance. This agreement is not with any of the named Defendants here.

MR. MONAGHAN: That's correct.

THE COURT: So what's the relevancy?

Page 272

CAROL ANNE BRYANT - DIRECT/MONAGHAN

MR. MONAGHAN: The relevance is that it establishes -- this was attached to the motion papers previously.

THE COURT: Yeah.

MR. MONAGHAN: This was witness's business custom and practice in terms of writer royalties, that even though under this agreement there is this reference to work-for-hire and copyright, she nonetheless kept her writer royalties.

THE COURT: Okay, but along the line here we come up with an agreement that, my recollection is, that it wasn't signed.

MR. MONAGHAN: No, this one -- yeah, you are right, that is the JEM -- the JEM unsigned.

THE COURT: If you are saying this is the normal procedure and practice of this witness to sign it, why shouldn't I assume that that one was signed?

MR. MONAGHAN: Well, because if the normal practice is for her to reserve her writer royalties she would have reserved them notwithstanding any written agreement that they claimed was signed. So I agree that there's a question of what weight your Honor wants to accord

Page 273

CAROL ANNE BRYANT - DIRECT/MONAGHAN

the agreement, but it isn't coming in as a surprise. They've seen it. So I ask it be admitted for whatever purpose your Honor might give it.

MS. PHARES: Your Honor, this entire proceeding relates to T.V. production.

MR. MONAGHAN: It does not.

MS. PHARES: It is a different business. It is not the commission of work for a record company which is a different business. And it's not a relevant agreement for the purposes of the issues before this Court. And I think --

THE COURT: I will tell you what --

MS. PHARES: I think your Honor recognized that.

THE COURT: -- I'm going to take a break and I'll take this with me. I'll take a look at it.

MR. MONAGHAN: Sure.

COURT OFFICER: You can step down.

(Recess: 2:30 p.m.)

(Resumed: 2:45 p.m.)

(Resumed on the record, in open court - counsel and parties present as previously noted)

C A R O L A N N E B R Y A N T,

Page 274

CAROL ANNE BRYANT - DIRECT/MONAGHAN

the Plaintiff, previously duly sworn by the Court, resumed the stand and testified further as follows:

MS. PHARES: Your Honor, to the extent that this document is admitted solely for the purpose of showing that Miss Bryant reserved her right to public performance royalties in a written document, we would withdraw our objection.

MR. TANNENBAUM: Yes, your Honor.

THE COURT: Actually, I'll tell you the truth, I was going to admit it on that basis, but I will tell you that I find -- I think I saw this in one of the motion papers. But, you understand, the motion papers disappear out of here once I write a decision. They are down in the County Clerk's Office, so I don't have those to go back to.

But this is a reservation of public performance royalties throughout the world by Miss Bryant. But what gets me, interests me is that Paragraph 2 gives to the publisher every right existing or that shall exist to the end of the world including the copyrights and extensions of copyrights and all compositions and arrangements,

25 (Pages 271 to 274)

Page 275

CAROL ANNE BRYANT - DIRECT/MONAGHAN

so that the only thing left is the -- that verbiage, writer's performance royalties.

Is that what we are talking about?

MR. MONAGHAN: No, I don't believe it is. I believe it reserves all writer royalties.

THE WITNESS: Mechanicals.

MR. MONAGHAN: Mechanicals. All types.

THE COURT: Well, E says, Writer shall receive his or her performance royalty -- public performance royalties throughout the world directly from his or her own affiliated performing rights society. Writer shall not have any claim whatsoever against the publisher for any royalties received by the publisher from any performing rights society which makes payments directly or indirectly other than through publisher to writers, authors and --

If, however, to the extent publisher shall collect both the writer's and publisher's share of performance income directly and such income shall not be collected by the writer's public performance society, publisher shall pay to the writer as the so-called writer's share thereof, fifty percent of all net sums which are received

Page 276

CAROL ANNE BRYANT - DIRECT/MONAGHAN

by the publisher in the United States from exploitation of such rights in the compositions throughout the world.

MR. MONAGHAN: Right, but that language is -- if the -- if for some reason or another the publisher's share gets sent to the writer, the writer's agreeing.

THE COURT: The thing I see here is reservation simply of public performance royalties. You are telling me it also includes mechanicals?

MR. MONAGHAN: That is our understanding.

THE COURT: Well, there you go. Show me. I could be wrong. I went through it fast.

THE WITNESS: I can show him.

MR. MONAGHAN: It is admitted. The witness --

THE COURT: Yeah.

MS. PHARES: Your Honor, if we're going to be complete about this, I would like to draw your attention to Exhibit A of the document.

THE COURT: That's what I was reading from.

THE WITNESS: That was all the different kinds of royalties I get.

Page 277

CAROL ANNE BRYANT - DIRECT/MONAGHAN

THE COURT: Where? What?

THE WITNESS: Song writer royalties you were reading from.

THE COURT: I read from it. That's E?

THE WITNESS: Exhibit A.

MS. PHARES: And we are saying that we will consent to the -- we will withdraw objection to it except to the extent that it's being admitted to show that Miss Bryant reserved her public performance royalties in a written contract.

THE COURT: Well, it is admitted in evidence.

MR. MONAGHAN: Just to answer your question, your Honor --

THE COURT: Yeah.

MR. MONAGHAN: -- Exhibit A --

THE COURT: Yes.

MR. MONAGHAN: -- of this --

THE COURT: Right.

MR. MONAGHAN: -- says as follows: Song writer royalties --

THE COURT: Right.

MR. MONAGHAN: -- 50 percent of -- Subsection A of Exhibit A, 50 percent of any and

Page 278

CAROL ANNE BRYANT - DIRECT/MONAGHAN

all -- of any and all net sums actually received by publisher in the U.S. from the sale of sheet music and the compositions printed, published and sold in the U.S. and Canada, et cetera, et cetera.

B, 50 percent of any and all net sums actually received by publisher in the U.S. from the sale of any folio, song book or similar publication, et cetera, et cetera.

C, 50 percent of any and all net sums actually received by publisher from the exploitation in the U.S. and Canada by licensees of publisher of mechanical rights, electrical transcription and reproducing rights, motion picture and television synchronization rights and all other rights in the compositions.

THE COURT: All right, missed it. It is in evidence in any case.

MS. PHARES: I'm still going to make the original objection then, your Honor, with respect to the fact this is a song writer's agreement. It is not -- it is not an agreement commissioning music for a television program.

THE COURT: And the only thing I'm taking it for is the fact in this agreement Miss Bryant

26 (Pages 275 to 278)

Page 279

CAROL ANNE BRYANT - DIRECT/MONAGHAN

reserved her rights, whatever they were, in the agreement.

Let's go ahead.

MR. MONAGHAN: Thanks, Judge.

(Plaintiff's Exhibit No. 20, marked and received in evidence)

MR. MONAGHAN: This would be better through a different witness, your Honor.

(Plaintiff's Exhibit No. 21, an arrangement, premarked for identification)

MR. MONAGHAN: Just for the record -- I think we may have given this to you already, but it is musical notation.

Q. Is that a correct characterization?

A. It's an arrangement.

MR. MONAGHAN: It is Exhibit 21 referencing the JE in JEM is not there, the M is there, M Theme Outrageous T.V. And Miss Bryant's name appears up top.

THE WITNESS: And the date.

MR. MONAGHAN: And the date is March 7th 1985.

THE WITNESS: That's --

MR. MONAGHAN: I'll show it to the witness.

Page 280

CAROL ANNE BRYANT - DIRECT/MONAGHAN

Q. I'll ask her if she can identify it.

A. That is my arrangement. JEM Theme formally called M Theme.

Q. What is the reference to Outrageous?

A. Well, the line in the song was Truly Outrageous.

Q. Right. Which is the same as the reference on the reverse of -- same as referred to on the back of Exhibit 15?

A. Truly Outrageous.

Q. Okay, in whose hand is this?

A. This is my hand.

MR. MONAGHAN: Okay, we offer that exhibit in evidence, your Honor. Exhibit 21.

THE COURT: All right.

MR. TANNENBAUM: No objection.

MS. PHARES: No objection.

THE COURT: All right, admitted into evidence.

(Plaintiff's Exhibit No. 21, marked and received in evidence)

MR. TANNENBAUM: I'm sorry, can you tell me the date on top of the document?

MR. MONAGHAN: I think I said March 7th,

Page 281

CAROL ANNE BRYANT - DIRECT/MONAGHAN

1985.

MR. TANNENBAUM: Thank you.

MR. MONAGHAN: Okay? I'm going to ask the reporter to mark 22.

(Plaintiff's Exhibit No. 22, printout from the Amazon.com, marked for identification)

Q. I show --

MR. MONAGHAN: Which, for the record, appears to be a printout from the Amazon.com website, multiple pages. First page refers to Transformers Villains. Bears a printout date of 09/02/2002.

THE COURT: Do we have any problem with the fact that this was available in 2002 and may well be available today?

MR. TANNENBAUM: I'm sorry, your Honor, I'm not sure I understand your question.

MR. MONAGHAN: The Judge's question is do we have a problem with the point that these products are available even today.

MS. PHARES: Well, I think the question was do we have a problem with whether or not they were available in 2002 and may be available even today.

THE COURT: Yeah.

Page 282

CAROL ANNE BRYANT - DIRECT/MONAGHAN

MR. MONAGHAN: Okay, that's fine.

MR. TANNENBAUM: I'm sorry, I got lost for a second. I apologize.

THE COURT: Let's do it the way you do it. Show it to them and see.

MR. MONAGHAN: Well, we have a later printout actually for today.

MR. TANNENBAUM: Oh, I see. No objection. I'm sorry.

MS. PHARES: You want to know if they've been sold in the last three or four years.

MR. TANNENBAUM: If they are still on the website for sale. No objection.

MR. MONAGHAN: All right, why don't we --

MS. PHARES: We have no objection to that -- to that fact.

MR. MONAGHAN: Okay, I have a more complete Amazon.com printout dated July 4th. We were working over the weekend, if you may recall, getting documents and whatever.

THE COURT: Okay, now this is now 23.

MR. MONAGHAN: This will be 23.

(Plaintiff's Exhibit No. 23, printout dated July 4th, marked for identification)

27 (Pages 279 to 282)

CAROL ANNE BRYANT - DIRECT/MONAGHAN

THE COURT: All right, 22 is in and 23 is the same thing but July 4th. Any objection?

MR. TANNENBAUM: No objection.

MS. PHARES: No, your Honor.

THE COURT: That is in evidence.

MR. MONAGHAN: I have to expand the description, however, Judge on 24. It is more than just Transformers.

(Plaintiff's Exhibit Nos. 22 and 23, marked and received in evidence)

MR. MONAGHAN: We'll describe Exhibit 23, your Honor. I caused Exhibit 23 to be prepared and run. Someone under my direction, i.e. my daughter Eileen. Went onto a website, printed out all of the various products, Transformers, GI Joe, JEM. I believe it's complete, but I was going to call her as a witness to do that. JEM, JEM, Strawberry Shortcake. But I would actually like to have the witness go through it to make sure I've got them all.

THE COURT: Has it been marked?

MR. MONAGHAN: It's been marked 23 in evidence.

THE COURT: Well, let the witness go through

CAROL ANNE BRYANT - DIRECT/MONAGHAN

it. Okay, maybe I'm wrong.

MR. MONAGHAN: It's not in. Not yet.

THE COURT: 22 went in. I hope you paid your daughter. If she's here we're going to ask her.

MS. PHARES: Your Honor, some of the GI Joe shows were produced by organizations other than Sunbow. And I have no way of knowing from these documents whether the particular DVDs that are being sold are Sunbow Productions or not. So I'm not trying to hold things up, but I want you to be aware of the fact that the fact that a particular Transformers DVD is for sale may be interesting, but may have no bearing on any income being made by Sunbow Productions.

THE COURT: The only way I would take it is that it shows the music that the Plaintiff wrote at some time or another is still being made available through these outlets. I'm not at this point saying that it's Sunbow's obligation. That has not been proved one way or another.

MS. PHARES: Well, see, the problem is with the deep productions they did their own music to GI Joe.

CAROL ANNE BRYANT - DIRECT/MONAGHAN

THE COURT: So the music isn't the same.

MS. PHARES: It's not the same music. The fact that a Transformers work is being sold does not evidence the fact that her music is necessarily being used. And that's the problem is that these Amazon.com printouts don't indicate who the producer is or which version we are talking about. So I really am not in a position to stipulate to this. And, frankly, I think it's -- it would be misleading to put this in evidence.

THE COURT: Okay, what do you say to this?

MR. MONAGHAN: What I say to this, we're going to establish, and I think we have, that the only party who could have licensed these products is Sunbow. Every one of these other videos, I believe, and DVDs mentions Sunbow. We have -- we have not brought them in evidence yet because we need a proper person, but there are Sunbow licenses, Kid Rhino. They are entitled to try and bring it out on cross whatever they want to bring out but those products are now available on the market.

MR. TANNENBAUM: You are missing the point. There are some GI products not produced by Sunbow

CAROL ANNE BRYANT - DIRECT/MONAGHAN

and some -- let me finish -- didn't have Miss Bryant's music in it. To the extent they appear in their catalog it has nothing to do with this case.

MR. MONAGHAN: Fair enough. But we have not gotten to GI Joe set actually.

MS. PHARES: Well --

THE COURT: I'll tell you what, I'm going to allow them in for the limited purpose of showing that these titles, some of which may be have the music of the Plaintiff in them are still available for purchase.

MS. PHARES: But these all may not show that.

THE COURT: Your point is taken.

MS. PHARES: Okay.

MR. MONAGHAN: This will be 24.

(Plaintiff's Exhibit No. 24, five-page document dated May 23, 2001, marked for identification)

Q. I show you now 24 for identification which consists of -- it looks like five pages with the date on the bottom of May 23rd, '01, and referencing BMI catalog on the top left, and Transformers Vocal Theme

CAROL ANNE BRYANT - DIRECT/MONAGHAN

on the first page.

I ask you if you can identify this document.

A. Okay, Transformers Vocal Theme 2 --

MS. PHARES: Your Honor, we have to see the exhibits. This is -- this is extremely difficult.

MR. MONAGHAN: No, that isn't how it works. My understanding -- my understanding --

THE COURT: Hold on. Hold on. The first thing with any document it gets marked for identification. It gets shown to the witness. If the witness identifies it as something then if there's a motion to put it into evidence at which point it has to be shown to opposing counsel, not before that.

Let's go forward.

MR. MONAGHAN: Thank you, Judge.

A. Okay, Transformers Vocal Theme.

Q. Don't read. Don't read yet.

Can you identify this document? What is it? What do you know about it?

A. I don't know how to answer. BMI Catalog Page 1. The working title of Transformers Vocal Theme 2.

Q. How is this document here in court? Do you

CAROL ANNE BRYANT - DIRECT/MONAGHAN

know how it got here? Did you get it?

A. Somehow I got it. It looks like I printed it out.

Q. Okay. What does this have to do with you and the songs at issue in the case?

A. Well, it says there's a registration here and it has Joe's name, Anne's name and Ford's name in the 8.3 percent -- 8.3 --

Q. What compositions are being talked about?

A. The Transformers Opening Theme.

Q. All four pages?

Just so you understand, maybe it will help a little bit when we are trying to establish a foundation for getting it in, we're talking about authenticity. If you know what it is, you received it, you sent it, you obtained it, that is the first subject matter.

A. Oh, this is from Ford's catalog. He gave me this.

Q. Okay. You got this from Ford Kinder's catalog?

A. Yes. This is his handwriting.

Q. Is that all four pages -- five pages?

A. It looks like six to me.

Q. Six.

CAROL ANNE BRYANT - DIRECT/MONAGHAN

A. All Transformers. All five pages. So I guess from the Ford catalog.

Q. You recognize the handwriting?

A. Yeah.

MR. MONAGHAN: We offer that as Exhibit 24.

THE COURT: Is this duplicative of 2? Plaintiff's 2?

MR. MONAGHAN: Some of the information in 2 is in this, but this bears a more current -- more current date. I think we've also provided this to the Defendants already under Bate Stamp 699 to 703 in our document production.

MR. TANNENBAUM: We have no objection, your Honor.

MS. PHARES: Is this one exhibit?

MR. MONAGHAN: Yes.

MS. SAFFER: No objection, your Honor.

THE COURT: All right. Okay, so 24 is in evidence and now you can tell us what it is.

(Plaintiff's Exhibit No. 24, marked and received in evidence)

MR. MONAGHAN: Your Honor, this is a document, as I said, dated May 23rd '01. And it has the breakdown and referencing the Transformers

CAROL ANNE BRYANT - DIRECT/MONAGHAN

opening theme. It does have the same percentages your Honor has already heard about that 8.3 to Bacal. 8.3 to Miss Bryant.

MS. PHARES: Your Honor, is there a question pending?

MR. MONAGHAN: The Judge just asked me to tell him what it is. Maybe you didn't hear that.

MS. PHARES: It didn't sound like you were telling him what it was.

MR. MONAGHAN: I was. I was reading from the first page. It is in evidence.

The second page refers to -- by the way, your Honor, it also references a BMI work number and a date of registration of April 28th, 1997.

So, as a proffer, we are bringing these things forward from the original registration dates.

MR. TANNENBAUM: I object to whatever that was.

THE COURT: I have not agreed to anything. It was a statement made by counsel.

MS. SAFFER: Yes, and we're objecting to his characterization or his analysis of what that document says.

CAROL ANNE BRYANT - DIRECT/MONAGHAN

THE COURT: I don't accept his evidence.

MS. SAFFER: Thank you.

THE COURT: Go ahead.

MR. MONAGHAN: The second page is dated the same date, April 28th 1997. Same percentages sharing talking about a different -- no, it is talking about the same thing, Transformers Opening Theme third page. Has a different date 8/25, 1994. And it's referring to the Transformers Theme Opening. And a fourth, last page, refers to Transformers BG cues.

Q. Now, BG cues, Miss Bryant.

A. Background.

Q. Tell the Judge, please.

A. Background cues. Background music.

Q. Okay. Now, Page 1 mentions vocals, so presumably there is some lyrics in that?

A. Yes, yes.

Q. But also your theme?

A. Yes.

Q. Page 2 also refers to vocal theme?

A. They are all my music.

Q. Understood.

But Page 3 which shows Mr. Bacal getting

CAROL ANNE BRYANT - DIRECT/MONAGHAN

8.3 percent or credited with at least at that point in time, which is 1998, this is the Transformers Theme Opening; is that instrumental or with lyrics?

A. It would be sung.

Q. And, likewise, the next page, is that right, Transformers Theme Open?

A. That would be sung as well.

Q. How about the last one, background cues?

A. Background cues are under actually --

Q. Lyrics?

A. No.

Q. That's just --

A. Under dialogue too often.

Q. Okay.

MS. SAFFER: Your Honor, just as sort of general observation, please, it is very difficult, we don't have copies of these documents and he's reading and referring to them and we don't have the opportunity to -- we've never seen them or to respond appropriately.

THE COURT: Well, apparently there was some last minute discovery here on both sides. I don't know what happened, but we are here, we are trying this case. Counsel said he would get copies for

CAROL ANNE BRYANT - DIRECT/MONAGHAN

the future and I'm sure he will do that.

MR. MONAGHAN: Thank you, Judge.

MS. SAFFER: Could we see it at least?

MR. MONAGHAN: Yes. This was produced, it has Bate Numbers. We produced it previously. But I'm happy to give you a copy.

(Pause in the Proceedings)

THE COURT: All right, let's go ahead.

Q. Now, if I can show you now, Miss Bryant --

MR. MONAGHAN: I'm going to ask the reporter to mark these as the next two in sequence. And, for the record, the next one will be series of three boxed videos set, I think they call them box set; is that accurate? Referencing GI Joe Volume One World Without End, Volume 2 Revenge Is Not Always Sweet, Volume 3 Crime Doesn't Pay.

And, just for the record this was previously exhibited to Defendants at the Weitzman deposition on May 19th '03, marked as Exhibit F at that deposition. So this would be the next Plaintiff's exhibit.

And 26, for the record, Judge, is a DVD GI Joe The Movie in the case referencing on the cover Sunbow and Marvel Production GI Joe starring Don

CAROL ANNE BRYANT - DIRECT/MONAGHAN

Johnson, Burgess Meredith, Sergeant Slaughter, Buzz Dickson. Written by Ron Friedman. Executive producers Margaret Rose Gunther. Supervising producer Joe Bacal. Produced by Joe Bacal, Tom Griffin. Co-producer, director John Bervich. Music by Ford Kinder, Spence Michelin. Lyrics by Barry Harmon. Additional music by Robert Walsh, John Douglas. Bearing a date on the reverse with Rhino Home Videos name 2000 packaging and 1987 copyright notice by Sunbow Productions, Inc./HASBRO Inc. That is Exhibit 26.

And if I may return to the description of 25 I neglected to mention that on the box it references Kid Rhino. Sunbow Entertainment. Rhino Home Video. Packaging 1999 Rhino Entertainment. And it mentions Sunbow Productions Wildstar Music/HASBRO.

(Plaintiff's Exhibit No. 25, series of three boxed videos set, marked for identification)

(Plaintiff's Exhibit No. 26, DVD GI Joe The Movie, marked for identification)

BY MR. MONAGHAN:

Q. Miss Bryant, did you have occasion to purchase these items?

Page 295

CAROL ANNE BRYANT - DIRECT/MONAGHAN

A. Yes, I got them from Amazon.
Q. Through Amazon.com?
A. Yes.
Q. Have we seen the receipt for this already?
A. Yes, I think we did.
Q. And whose music is on GI Joe?
A. This is -- Ford Kinder wrote this song.
Q. And what rights do you have, if any, to claim anything with respect to GI Joe?
A. That was part of my catalog that Dobishinsky put it in my catalog in 1985. Dobishinsky. '85, six without my permission, but it was there, and so it was an artifact in my catalog for a long time. When the check would come in I would just give it to Ford. It wasn't mine. And when Ford and I settled Kinder and Bryant he said, you know, how about you keep GI Joe and that settles our company. And that was my item of settlement was in my catalog and I was entitled to claim it so --
Q. We're talking only about performance royalties here; is that right?
A. Yeah, I think so. I mean --
Q. With respect to GI Joe?
A. Yes.

Page 296

CAROL ANNE BRYANT - DIRECT/MONAGHAN

Q. We're not talking about royalties other than performance royalties?
A. No. Although -- he's okay about me claiming it.
Q. Yes.
MS. PHARES: I didn't hear that.
MR. TANNENBAUM: I didn't hear that.
THE WITNESS: He's okay about me claiming it. But I would -- I don't know.
THE COURT: Is it part of this lawsuit or not?
THE WITNESS: It is.
MR. MONAGHAN: Okay.
THE WITNESS: It is in my catalog.
THE COURT: All right.
THE WITNESS: It got moved around from my catalog.
MR. MONAGHAN: Actually I know what you are -- I know I messed up on something, and I'm sure my colleagues will pick me up on it very quickly.
Q. Let me ask you that same question again.
As we stand here and sit here today what rights do you have to pursue claims for royalties on GI

Page 297

CAROL ANNE BRYANT - DIRECT/MONAGHAN

Joe?
A. I've been authorized to pursue these claims.
Q. You got the performance rights from Mr. Kinder in 1993 when you settled with him?
A. Yes.
MR. TANNENBAUM: Objection. Leading.
MR. MONAGHAN: She already said --
THE COURT: I'll allow it.
Q. Okay, have you obtained any other rights or authority with respect to any other royalties on GI Joe?
A. Yes.
Q. And how did you get that and when did that occur?
A. I spoke to Ford a couple of months ago and I felt that I had the right to claim these and I would be happy to claim them, but I don't want the money, I want him to have it. So he authorized me to claim anything for him that was appropriate --
MS. PHARES: Objection.
A. -- from our company.
MS. PHARES: Your Honor, this witness doesn't have standing to assert Mr. Kinder's rights.

Page 298

CAROL ANNE BRYANT - DIRECT/MONAGHAN

THE COURT: I assume we're going to have some kind of a written document?
MR. MONAGHAN: There is a written document.
MR. TANNENBAUM: I hardly know the way to begin on this one.
MR. MONAGHAN: I'll show it to him.
MR. TANNENBAUM: The witness didn't write the music. She admits she didn't write the music. She admits it was mistakingly in her catalog. And Mr. Dobishinsky was mistakingly paying her.
THE WITNESS: It wasn't mistaken. I didn't say that.
THE COURT: Sounds like you are cross-examining counsel. If the witness says that Mr. Kinder tendered over to her his rights to collect whatever he was supposed to collect. Then that's satisfactory to me. It's subject to connection, obviously. The witness herself can't just say so and so told me I can come here and get money for him. But it is subject to connection. I'm going to allow it.
MR. TANNENBAUM: We object, your Honor.
THE COURT: Okay, your objection is noted.
MR. MONAGHAN: I'll dig that agreement out.

31 (Pages 295 to 298)

CAROL ANNE BRYANT - DIRECT/MONAGHAN

I can't find it right now.

THE COURT: Have you moved 25 and 26?

THE WITNESS: 25.

MR. MONAGHAN: I'm moving 25 and 26, your Honor.

THE COURT: Okay, subject to the objections that are already on the record. Yes.

MR. TANNENBAUM: Yes. I don't want to slow the including potential jeopardy -- claim of jeopardy.

THE COURT: They were in a partnership or some type of corporation. They broke up. As part of the deal she got the rights to this. I don't think that's against any law. And I don't know yet that she is authorized to, because I have not seen anything. So, for that limited purpose, it is subject to connection, I'm going to allow 25 and 26 into evidence.

(Plaintiff's Exhibit Nos. 25 and 26, marked and received in evidence)

MR. MONAGHAN: Your Honor, whenever you take the afternoon break I'll dig out the other document that we are talking about.

THE COURT: All right.

CAROL ANNE BRYANT - DIRECT/MONAGHAN

MR. MONAGHAN: If you would like me to continue now, I will, or we can break.

THE COURT: No, I would like you to continue for another ten minutes.

MR. MONAGHAN: Okay. In the meantime, I'm going to ask the reporter to mark another exhibit.

THE COURT: Tell you what, I'll see you back here at half past three, that is ten minutes from now.

MR. MONAGHAN: Thank you, your Honor.

(Recess: 3:20 p.m.)

(Reconvened: 3:35 p.m.)

CAROL ANNE BRYANT, the Plaintiff, previously duly sworn by the Court, resumed the stand and testified further as follows:

MR. MONAGHAN: I'm going to ask the reporter to mark this as exhibit --

THE COURT: 27.

MR. MONAGHAN: -- 27.

For the record, your Honor, this is a stipulation of settlement without prejudice in this case, Anne Bryant v. Broadcast Music, Inc. Index 1592/00. It consists of five or six pages.

CAROL ANNE BRYANT - DIRECT/MONAGHAN

I believe the Defendant had copies of this document.

Q. I'm showing the witness Exhibit 27 --

(Plaintiff's Exhibit No. 27, stipulation of settlement, marked for identification)

Q. -- stipulation of settlement.

And I ask you, Miss Bryant, if your signature appears on this document on the signature page.

MR. MONAGHAN: By the way, it also has a FAX cover sheet to Miss Valencia, Mr. Bacal's lawyer.

Q. Is that your signature?

A. Yes.

Q. On Page 7?

A. Yes.

Q. Do you recognize Mr. Kinder's signature?

A. Yes.

Q. Is this the stipulation of settlement with Mr. Kinder in this action?

A. Yes. Yes, it is.

Q. Is this the document you were referring to that conferred rights upon you with respect to performance royalties which would otherwise possibly have been Mr. Kinder's but because of your settlement

CAROL ANNE BRYANT - DIRECT/MONAGHAN

you obtained -- withdrawn?

A. It was two years ago.

Q. Withdrawn.

A. There were two. I'm not sure which one did, but I -- both of them did, I thought.

MR. MONAGHAN: I'm going to offer Exhibit 27 in evidence.

MR. TANNENBAUM: We object, your Honor. First of all, I believe the witness testified that these rights that she is claiming she got -- she got two months ago. This document was signed in July and August of 2001.

Second of all, they are talking about getting performance royalties. As I believe the Court knows by now, BMI performance royalties are not paid for whatever you got there for GI Joe videos and DVDs.

Third of all, if you read what it says with respect to GI Joe it says any representation of this theme listed to Anne Bryant prior to 1993 shall remain so listed. Any representation of this theme listed to Ford Kinder prior to 1993 will remain so listed. In the event that a formal right of change or re-registration has been

CAROL ANNE BRYANT - DIRECT/MONAGHAN

effected on BMI's records the Kinder Defendants will cooperate with the Plaintiff and execute such further documents as are necessary to rectify and correct the credits and listings with respect to GI Joe themes, background cues, as currently listed to Anne Bryant will remain so registered. Nothing about assigning any rights, whatsoever, to sue anybody for certain claims that she believes that Mr. Kinder has.

MR. MONAGHAN: I don't think he's understanding what the stipulation does. What this stip -- the proffer on this -- by the way, he just read from a document a portion -- what it does, this is the proffer, your Honor, is the GI Joe was in Miss Bryant's BMI catalog. That is a matter of record. It was in Exhibit 2. When they settled at this point in time the settlement was that whatever was in her catalog, even if Kinder was entitled to those royalties, would stay in her catalog. That's what she testified about this. There is another document which is en route to the courthouse which relates to the other royalties.

So she's identified her signature, she's identified Kinder's signature.

CAROL ANNE BRYANT - DIRECT/MONAGHAN

THE COURT: Any other objections?

MR. TANNENBAUM: Yes, I have one other. It is very important too. This settlement happened in this case after the complaint was served, therefore, it cannot possibly be a claim that is in the complaint in this case. It is not a pled claim in this case. It can't be. Physically met, physically impossible.

THE COURT: Counsel?

MS. PHARES: I was only going to emphasize Sunbow was not even in the case when this settlement was entered. But that, on the face of it, this relates solely to public performance royalties. There is at least so far no assignment by Mr. Kinder of any rights that he may have with respect to any other kinds of publishing rights. And we are not admitting that publishing rights would include any recoveries from DVDs.

THE COURT: All right, I'm going to admit this subject to some further elucidation that I find satisfactory. And also the same goes for 25 and 26. Considering this as some turn over of Mr. Kinder's rights to the Plaintiff to GI Joe, I'm allowing 25 and 26 in.

CAROL ANNE BRYANT - DIRECT/MONAGHAN

27 is in subject to further elucidation about what it really means or apparently there is another document out there somewhere.

Let's keep going.

MR. MONAGHAN: Thank you, Judge.

(Plaintiff's Exhibit No. 27, marked and received in evidence)

DIRECT EXAMINATION

BY MR. MONAGHAN: (Continued)

Q. So, just so we are clear, you are not claiming that you composed GI Joe?

A. No --

Q. Okay.

A. -- I'm not claiming that.

Q. What you are claiming is what you testified to earlier is that you got certain rights via Exhibit 27, and the document that is going to be forthcoming; is that right?

A. Yes. And when Ford and I made that agreement in 1994 the spirit of the agreement which I reminded him of was that GI Joe is yours for Kinder and Bryant to settle Kinder and Bryant and that was the spirit of it. I think it may be excessive. So Ford and I split everything. We always did. So when we

CAROL ANNE BRYANT - DIRECT/MONAGHAN

figured out, you know, we would share with each other whatever is more appropriate.

Q. Okay, and we're talking about --

A. I'm talking about the GI Joe song. I wrote those arrangements.

Q. You did the arrangements in the movie?

A. Yeah. They are not the same. This is an old show. This is Kinder and Bryant.

Q. I have to ask a further question then when you say that what you just testified to about having no involvement, direct involvement in the composition of the music.

A. I really don't know if I did. GI Joe over time -- and I don't know if any of it was -- it was all done elsewhere after Ford wrote the song. I don't remember that.

Q. Now does GI Joe have any other names?

A. The Real American Hero. The commercial name for it.

Q. Okay. Now, you've mentioned something different about Exhibit 26.

GI Joe The Movie, you had some involvement with that?

A. Absolutely. I have the orchestra score

Page 307

CAROL ANNE BRYANT - DIRECT/MONAGHAN

right here. It is a biggie movie theme. It was the centerpiece, like the Transformers Movie Theme, was the GI Joe -- famous GI Joe song with lead up writing which Ford did and I -- some of it was instrumental and I did. We did that together. But he wrote that wonderful COBRA scream. And Barry Harmon I just learned recently he did the additional lyric for that. I didn't even see it on there, but it was all leading up to the star, which was Ford's original song.

MR. MONAGHAN: Okay, let's mark that musical notation -- we'll give it back to you. It's an original, okay. I think we can mark that 28.

(Plaintiff's Exhibit No. 28, musical notation, marked for identification)

THE COURT: Okay, that has been marked for identification.

Has it been moved into evidence?

MR. MONAGHAN: Yes, so moved, your Honor.

THE COURT: All right, any objection to 28?

MR. TANNENBAUM: No.

MS. PHARES: No, your Honor.

THE COURT: All right, 28 is in evidence. Hand it back to the court reporter, please.

(Plaintiff's Exhibit No. 28, marked and

Page 308

CAROL ANNE BRYANT - DIRECT/MONAGHAN

received in evidence)

Q. Now, do we have Exhibit 2, the catalog?

Does GI Joe or Real American Hero appear in the catalog, Exhibit 2?

A. I think GI Joe does. It does on mine. It didn't for a while.

THE COURT: Try Page 23.

A. Yeah, GI Joe cues are here, background cues. But, you know, The Real American Hero was a jingle name and we never could get the BMI database catalog.

Did I say too much? Here is GI Joe background cues.

MR. MONAGHAN: I'm going to mark one I missed earlier which is going to be the next exhibit number.

THE COURT: 29.

MR. MONAGHAN: 29.

(Plaintiff's Exhibit No. 29, a BMI statement, marked for identification)

Q. I show you now, if I may, Exhibit 29, which I might note was also marked at the McLaughlin deposition, BMI employee, number seven at that deposition on June 30th '03, attended by all counsel, I believe.

Page 309

CAROL ANNE BRYANT - DIRECT/MONAGHAN

Plaintiff's Exhibit No. 29, can you identify this document?

A. Real American Hero, yes, okay, BMI statement that was sent to Bill Dobishinsky for me.

MR. MONAGHAN: Okay, we offer that Exhibit 29.

THE COURT: Objection?

MS. PHARES: Yes, your Honor. This is a sheet relating to commercial jingles for a period in 1985 to 1986. It does not refer to re-registrations within the scope of the complaint or the rulings of this Court.

THE COURT: All right. Mr. Tannenbaum?

MR. TANNENBAUM: Same objection.

THE COURT: What's your answer to that?

MR. MONAGHAN: Oh, this is GI Joe, the registration that we're talking about that was the subject of the settlement. It was in Miss Bryant's catalog as witnessed by the fact that BMI is sending her a statement distribution date commercial jingles. We've heard them say they are not jingles. And it shows that Real American Hero a/k/a GI Joe she is credited with 100 percent of the royalties.

Page 310

CAROL ANNE BRYANT - DIRECT/MONAGHAN

MR. TANNENBAUM: Doesn't say a/k/a GI Joe on the document.

MR. MONAGHAN: No, I understand, but the witness has testified it is the same song.

THE COURT: Well, I'll tell you what --

THE WITNESS: Same song.

THE COURT: -- she testified to it. I don't see the relevance of it. So at this time at least I'm going to leave it out.

MR. MONAGHAN: Your Honor, Exhibit 5 has already been in evidence which is a similar document. I don't want to beat a dead horse, but if I could just pose one more question on this, that may answer your Honor's question. Exhibit 5 is in evidence. It's the same document, same type of document. It refers to the same song Real American Hero, but here we have a 33 and a third interest shown. This is exactly the same document for a different period of time, a year later, and now it's 100 percent. So we have two -- one in evidence already, without a problem --

THE COURT: Tell me what the point of that is, though.

MR. MONAGHAN: That she's supposed to get at

34 (Pages 307 to 310)

Page 311

CAROL ANNE BRYANT - DIRECT/MONAGHAN

least 100 percent of the GI Joe royalties consistent with her agreement -- the performance royalties with her agreement and settlement with -- it was in her catalog. They had agreed that it would be in her catalog because she was a --

THE COURT: So far I tentatively let you get in the stipulation of settlement and the video and the movie subject to some other connection, which I have not seen yet. And I don't know that -- I mean, there is plenty of testimony in this case that she didn't write GI Joe.

MR. MONAGHAN: Right.

THE COURT: And that this is a right purportedly given to her in a settlement of an action.

MR. MONAGHAN: Yes.

THE COURT: So what does that prove?

MR. MONAGHAN: What did she get in the settlement? What did she get? Did she get a third as indicated in 5? Or did she get 100 as indicated in the proposed exhibit? So somebody is changing percentages with BMI. And that somebody -- and, again, both of these are sent to

Page 312

CAROL ANNE BRYANT - DIRECT/MONAGHAN

Miss Bryant care of Sunbow's administrator Dobishinsky. So Miss Bryant isn't the person responsible for accomplishing the registrations with BMI. This is done through the publisher, in this case Sunbow or its publishing subsidiaries. So what it shows is that changes are being made by Sunbow.

THE COURT: What's the date of that?

MR. MONAGHAN: This is dated 1986. This is for year '85 to '86. Shows 100 percent to her. '86, '87 it shows 33 percent.

MS. PHARES: Your Honor, both of these documents that he's looking at are in the mid-80s, long before the statute of limitations period for this case. Both of them relate to jingles.

MR. TANNENBAUM: Television commercials.

MS. PHARES: And both of them way precede the settlement agreement that he was referring to earlier.

THE COURT: Well, I mean, the testimony is that Miss Bryant knew that it was in her catalog sort of erroneously and whenever the checks came she testified she used to give them to her partner.

Page 313

CAROL ANNE BRYANT - DIRECT/MONAGHAN

MR. MONAGHAN: Yes.

THE COURT: I don't know that we need any testimony on that. I mean, later on, you can try it again if you can find somebody that -- who ever this masked marvel is that changed -- that changes these things on us. At least for the present I'm not going to let it in.

MR. MONAGHAN: Okay.

THE WITNESS: Can I speak to Patrick for a minute? I have a question. I'm not allowed to ask a question?

THE COURT: No.

THE WITNESS: No? So --

THE COURT: I don't write music. You don't ask questions. How about that?

THE WITNESS: All right.

THE COURT: You are getting the much better end of that deal.

Let's go ahead.

Q. Okay, Miss Bryant, I'm --

MR. MONAGHAN: I'm going to ask the reporter to mark this as Exhibit 30.

THE COURT: 30, right.

(Plaintiff's Exhibit No. 30, multi-page

Page 314

CAROL ANNE BRYANT - DIRECT/MONAGHAN

document royalty tally sheet, marked for identification)

Q. I show you now a document, multipage document with the heading Anne Bryant number 784, concise royalty tally sheet, and then featured THBG Foreign 1, multiple pages.

Can you identify this document?

A. Yes. This is Excel chart. E-X-C-E-L chart of royalties. I made from documents that were produced by BMI. Payment documents for myself for Kinder and Joe Bacal and Starwild Music.

Q. Tell the Judge exactly what the process was that you went through to create this document?

A. Took four months. All these documents showed up. A stack that high, everything upside down.

Q. What are these documents?

A. They were payment documents that showed on every given pay out of statement for BMI what Anne got. And then there was one for Joe Bacal. There was one for Ford Kinder. There was one for Starwild Music. But they were in all kinds of order. It took quite a while to put them in year order and sift through them. And then take Anne's statement, Ford's statement, Joe's statement and Starwild's statement, lay them and look

35 (Pages 311 to 314)

CAROL ANNE BRYANT - DIRECT/MONAGHAN

at them for each period and see what happened. And very often what we saw --

Q. Wait, don't characterize them yet.

A. Okay.

Q. Now, these documents that you were looking at that you used to prepare this document, where are those?

A. They are over there in a little white plastic case.

Q. Okay. So you are saying that the source documents that enabled you to put this together are over here in this white case; is that right?

A. Yes. It says Excel on it.

Q. And I'm showing you now the case that you've talked about, am I not?

A. Yes, yes. Year by year.

Q. And how did you get the documents that you used to prepare this concise tally sheet?

MS. SAFFER: Your Honor, I am going to object to this. There were allegations made that BMI did not produce every statement for the past 20 years, which in fact is probably true because there were certain documents very old that were missing. We are in a position from our computer

CAROL ANNE BRYANT - DIRECT/MONAGHAN

records to give an exact accounting of the amounts that were paid to each one of these individuals, which I'm sure would be more accurate if the Court needs it, requires it, for whatever reason. I would be happy to do that.

THE COURT: Well, I don't see that's an objection. This document has not even gone anywhere yet except it's being explained how it is being put together, so just hold on that.

MS. SAFFER: Okay.

THE COURT: Go ahead. So where did all these documents come from in the white case?

THE WITNESS: They were produced by BMI for each one of us. About two years ago, I think it was. We asked for, you know, printouts from Ford's and mine and Joe's so we could figure out what is going on with Sunbow, what was happening with Sunbow -- I mean Starwild, and why things didn't seem to match up. So we got these payment documents.

Q. Now, let me see if I can -- keeping in mind that 100 percent publisher, 100 percent writer, so it should somehow equate when you've got the writers and the publisher.

CAROL ANNE BRYANT - DIRECT/MONAGHAN

Okay, so this information relates to which parties and individuals?

A. Anne Bryant, Joe Bacal and Ford Kinder and Starwild Music.

Q. Okay, Starwild Music being the publisher?

A. Yes. They are missing 15 statements you were asking about.

Q. Okay. And what compositions are at issue or are discussed in these documents?

A. Well, I broke it down further to GI Joe, Transformers, My Little Pony, JEM and Visionaries. Those are the ones I saw in there.

Q. And this was attached to your motion papers back when the summary judgment motion was made at the end of '03, was it not?

A. I believe so. I don't really remember when I did this.

Q. Okay.

MR. MONAGHAN: And I'll represent to the Court that it was and it was furnished to the Defendants at that time. And I believe I even furnished them with a disc, at least one of them.

MR. TANNENBAUM: No, we never got any underlying data for this.

CAROL ANNE BRYANT - DIRECT/MONAGHAN

MS. PHARES: Any underlying data.

MS. SAFFER: Also, to the extent that it is relevant, it may not be. BMI at that point was not part of this action. And you remember you had stayed us and we didn't get all of the documents. We got some things.

THE COURT: All right.

Q. Okay. Now, what were the types -- can you show the Judge -- there's too much here to go through one by one unless the Defendants want us to do that or the Court wishes. But can you illustrate the methodology you referred to by referring to some of the original source documents?

A. Yes, I would take -- you want me to take one of these out?

Q. Yes, that's exactly what I would like you to do.

A. 1988. That looks skinny.

Q. Before you even do that yet, Anne, what was the ultimate goal?

A. The ultimate goal was trying to reconcile the payments, you know, to -- if the publisher had $100 dollars in this instance, do the three of us writers get $100 somehow even between us or not? Just

Page 319

CAROL ANNE BRYANT - DIRECT/MONAGHAN

determine who was getting what and how much and if we were all being paid fairly. You know, I was doing everything I could to go -- to be very careful about what I was saying here.

Q. Okay.

A. So it gave me a window into where the money was going and where it wasn't going.

Q. Okay.

A. Oh, you want me to do this? Yeah. Okay. So what I would do -- here is --

Q. Wait, let me interrupt you. I'm sorry for interrupting, the questions are coming on the fly.

What period of time is encompassed in this exercise?

MS. PHARES: Your Honor, could Mr. Monaghan step back so he can speak loudly enough for all of us to hear?

MR. MONAGHAN: Okay, I apologize.

Q. What period of time is encompassed in this exercise?

A. I started in 1988 and I finished in 2000. That's as many documents as I had produced.

Q. And what -- how would you describe what these documents were? Are they BMI documents?

Page 320

CAROL ANNE BRYANT - DIRECT/MONAGHAN

A. They are BMI printouts. BMI on-line royalty statements, T.V. BG royalty details. And they gave me these summaries for each one of us.

Q. And what would it show, for example, with respect to Starwild over that period of time as the publisher?

A. Well, it would show what Starwild got for the same titles.

Q. And why would that be relevant to what you think you should have gotten?

A. Well, for example, if Starwild got $100 and Joe got $10 and Anne got $10 and Ford got $10, then who got $70? What I was sometimes able to see there was something that wasn't there. I could always see what was there and who got what, but then sometimes when there was a gaping hole like the difference between $30,000 and $1,000 I wondered who got the other 29. I mean, I wondered that a lot.

MS. SAFFER: Your Honor, to the extent that Miss Bryant has not included all of the relevant parties, I object to the production of the document. In other words, there was more than one publisher. And that might, you know, one publisher's share and another publisher's share

Page 321

CAROL ANNE BRYANT - DIRECT/MONAGHAN

added together may equal what was paid to the writers.

Also, there was a period of time that Mr. Kinder, one of the writers, didn't belong to BMI. He belonged to ASCAP. So he wasn't getting any money from ASCAP. Making this document --

THE COURT: In one of the decisions here didn't I cut this off at some time or another?

MR. TANNENBAUM: That's the other thing, we are going back to 19 --

THE COURT: What was the date?

MS. PHARES: 1994.

MR. TANNENBAUM: 1994. Six years.

THE COURT: 1994, okay. So why doesn't BMI give us -- hold on.

MS. SAFFER: Yes. Just responding.

THE COURT: -- your own work sheet for what each of these parties got including the publisher?

MS. SAFFER: From 1994 --

THE COURT: To date.

MS. SAFFER: -- to date.

I would be happy to do that. I will have that in court tomorrow morning.

THE WITNESS: That's wonderful. Then I have

Page 322

CAROL ANNE BRYANT - DIRECT/MONAGHAN

it that way too.

THE COURT: So we can compare the two.

MR. MONAGHAN: That's fine.

MS. SAFFER: Excuse me, I may have spoken too quickly. I have to speak to the business people. It may take some time to separate out the compositions that are in this lawsuit from payments made for other things. In other words, if I was just giving a total amount paid to each party, I can do that instantaneously.

THE COURT: Tomorrow afternoon will do.

MS. SAFFER: I will do my best. I will confer with the business people.

THE COURT: Next day I'm sure you can do that.

THE WITNESS: Are you going to mix in the jingles?

MR. MONAGHAN: We may be talking apples and another kind of apples.

THE WITNESS: That's what I'm worried about.

MR. MONAGHAN: We're a little worried about that.

THE COURT: All right.

MR. MONAGHAN: If I may address Miss Saffer

37 (Pages 319 to 322)

CAROL ANNE BRYANT - DIRECT/MONAGHAN

about what it is she's going to get us.

THE COURT: Yes.

MR. MONAGHAN: Would this address commercial jingles?

MS. SAFFER: Again, depending upon what it is I'm asked to get it may require, frankly, the writing of a new program. It may take a couple of days because, in other words, when we now send out statements things are combined. So we have to sit down and isolate the songs that are at issue here as well as the relevant time period, and also separate out payments that may relate to jingles, because they are not part of this lawsuit per your Honor's ruling. So just -- I'm not saying that it cannot be done, I'm just saying it may be a little bit of a project, therefore, I ask some indulgence in order to create it.

THE COURT: Don't worry. But you understand now that -- Miss Bryant, explain once more this tally that you've made; what is included in that?

THE WITNESS: It says right in the right-hand corner feature theme and background and foreign. Those are the statements you furnished to me. I was begging for the jingle statements

CAROL ANNE BRYANT - DIRECT/MONAGHAN

but no one had the database anymore, so --

MS. SAFFER: Correct.

THE WITNESS: If you don't have the database then you still don't have it.

MS. SAFFER: Again, in more recent years, your Honor, the jingle database has been combined. It wasn't early on, so --

THE COURT: Hold on. So what I'm going to ask you to do is come up with an equivalent of what Miss Bryant has brought to court today.

MS. SAFFER: I will. I just want to make sure -- I'm going to write it down that everybody is in agreement that this is what I'm doing so it won't be a problem later on.

I will get the earnings for each one of the parties who are involved in this lawsuit, right?

THE COURT: Yes.

MS. SAFFER: For the songs that are involved in this lawsuit from 1994 through whenever you would like.

THE WITNESS: Give her one of these.

MR. MONAGHAN: We can give that too, yes.

THE COURT: She has one of these.

MS. SAFFER: No, I never got it.

CAROL ANNE BRYANT - DIRECT/MONAGHAN

MR. MONAGHAN: Jeff, give her one.

THE COURT: Well, actually that will be more complete than this because this only went up to 2000.

MR. TANNENBAUM: Also save a lot of time because we won't have to go through the underlying data.

THE WITNESS: This is '98 to 2000. This is without jingles. You can do it that way. After 2000 is when you combined it.

MR. TANNENBAUM: I don't --

THE WITNESS: It is like the British Empire, it is playing somewhere, something is always playing somewhere, it is amazing.

MS. PHARES: Your Honor, not only are the jingles not being played after 1994, because Miss Bryant already explained to us they only exist for a quarter and they were created in the 80s, but jingles are also not part of either the complaint or your Honor's rulings. So I really think it will just contaminate this data --

THE COURT: I don't think we've asked --

THE WITNESS: It goes back one year.

THE COURT: We didn't ask for the jingles.

CAROL ANNE BRYANT - DIRECT/MONAGHAN

MR. MONAGHAN: We are asking for the jingles. But what Miss Saffer said is they didn't keep that information separately.

THE COURT: She can't provide that.

MR. MONAGHAN: It is going to be included.

MS. SAFFER: I can provide it for recent years. I can't provide it for earlier years. Off the top of my head, I can consult with my client, I do not know when the two databases were combined.

MR. MONAGHAN: Now, your Honor, you heard a suggestion that differences may be explained by another publisher. I would like to stipulate -- I would like them to stipulate that for every dollar the publisher gets, whether they are multiple publishers adding up to a dollar, there should be a similar dollar paid to the writers.

MS. SAFFER: No, your Honor, I can't stipulate to that, and I don't think the other parties, the relevant parties -- because it may be that a share of a particular song is licensed by another society.

What I am prepared to do is give you -- and I will have a witness that attests to the fact --

Page 327

CAROL ANNE BRYANT - DIRECT/MONAGHAN

an accurate reflection of the amounts earned and paid to all the parties who are involved in the songs that are at issue in this litigation from 1994 to date. And I will not agree in the abstract that the publisher share and the writer's share automatically is the same, because on some of these works there may be a portion that was licensed by somebody else.

THE COURT: Okay, even if there is disagreement about it, it would be helpful to the Court if nobody else. All right.

MR. MONAGHAN: Okay.

THE COURT: Go ahead.

MR. MONAGHAN: Thank you, sir. Am I allowed to pursue this further?

THE COURT: Sure.

THE WITNESS: This was some job.

DIRECT EXAMINATION

BY MR. MONAGHAN: (Continued)

Q. Okay. Now, what did you say it took you? Four months?

A. It took me four months. I'm running a business too.

Q. Now, ultimately --

Page 328

CAROL ANNE BRYANT - DIRECT/MONAGHAN

THE COURT: Is there another --

MS. PHARES: Your Honor, this isn't being admitted then; is that correct?

THE COURT: It's never been offered.

MS. PHARES: Oh, I see.

MR. MONAGHAN: Not yet.

THE COURT: Not yet.

MS. PHARES: Not clear to me what was going on.

MR. MONAGHAN: And we are offering it essentially as a compilation of a chart. We are offering it as a chart of information put together by the witness based on the original source documentation.

THE WITNESS: It's very accurate.

THE COURT: But it is only good for two years, right?

MR. MONAGHAN: No. The witness did, if I'm not mistaken --

THE WITNESS: 2000 was the end of the statements I got.

MS. PHARES: From 1988 until 2000.

THE WITNESS: Still a history.

MS. PHARES: It's also not relevant to this

Page 329

CAROL ANNE BRYANT - DIRECT/MONAGHAN

case.

THE COURT: Well, that part of it from 1994 to 2000 is relevant.

MS. PHARES: Well --

THE COURT: That's what she says.

MS. PHARES: I understand, your Honor. I have no problem with the admission of a compilation exhibit but, you know, we don't really know what is in this box, and it has not even been identified so that we have it, you know, sort of bound together and so forth.

MR. MONAGHAN: Happy to do that.

MS. PHARES: If Mr. -- we don't have to do this this evening, Mr. Monaghan.

THE COURT: Folks, I'm going to allow this in because it is some proof going to the Plaintiff's question of whether or not she sustained any damages. She claimed, I'm not saying that it is true, that the publisher was supposed to get as much as the writers or writer no matter what. Now, I'm not saying you have to agree to that. So for that limited purpose I'm going to allow this in. If you want to produce other evidence, please feel free to do so.

Page 330

CAROL ANNE BRYANT - DIRECT/MONAGHAN

MR. TANNENBAUM: I just want to state my objection, your Honor, please.

THE COURT: Okay.

MR. TANNENBAUM: Again, it is an unjust enrichment claim against Joe Bacal. For some reason she didn't get paid certain monies that she's entitled to from some other entity for some other reason. That is not this case. Also, to the extent this document reflects any payments from 1988 to August of 1994, it is irrelevant.

THE COURT: I think I told you that I would only take information abstracted from this dealing with 1994 to date. Although this one runs out in the year 2000, so this is six years.

MS. PHARES: And, your Honor, similarly, I object to the extent that this is relating to an unjust enrichment claim in which I think it is conceded Sunbow received no part of the writer's share.

And, furthermore, I want to make clear that -- hang on, I just lost my train here.

THE COURT: Join the club.

MR. MONAGHAN: My train doesn't leave the station sometimes.

39 (Pages 327 to 330)

Page 331

CAROL ANNE BRYANT - DIRECT/MONAGHAN

THE COURT: All right.

MS. PHARES: All right, I will leave it at that. It relates only to the performance royalties -- oh, I know what my point was. And I was going to say and to the extent also that Miss Bryant is putting all this evidence in to support her claim of damages, I would like to still point out that so far as I can tell, Miss Bryant has not yet put in any evidence with respect to her theory of recovery of her entitlement of her liability.

THE COURT: What I was going to say before is Miss Bryant said that she attempted to juxtapose these various payments. And she said, well, what do you do if somebody -- if the publisher got 30,000 and the writer got one, somebody has to explain that.

So I'm going to let it in for whatever it is worth. So it's -- whatever this number is. It's 30, it is now in evidence.

MR. TANNENBAUM: Just one last question about the chart, your Honor. Does the chart have anywhere on here the administrative fee that Mr. Dobishinsky was getting?

THE COURT: Again --

Page 332

CAROL ANNE BRYANT - DIRECT/MONAGHAN

MR. TANNENBAUM: Just so we know what it is.

THE COURT: Again, can you tell me what the difference is between that -- hold on -- and cross-examination?

MR. TANNENBAUM: I want to understand the document so I can make a basis for the objection.

THE COURT: That's why you cross-examine. It doesn't go to voir dire, I assume.

Let's go.

MR. MONAGHAN: Can I ask the reporter -- I know you were good enough to mark the back. I think it will get lost.

(Plaintiff's Exhibit No. 30, marked and received in evidence)

(Plaintiff's Exhibit No. 31, marked for identification)

MR. MONAGHAN: Just for the record it is my belief that we did produce copies of --

THE WITNESS: I remember we gave it to Roseann Kitson --

MR. MONAGHAN: -- of each of these documents.

THE WITNESS: -- at my deposition.

THE COURT: All right, this is only for

Page 333

CAROL ANNE BRYANT - DIRECT/MONAGHAN

identification.

MR. MONAGHAN: Okay.

MS. PHARES: Just one final question. Can you tell us when this was created?

THE WITNESS: I could if I looked at my computer, I bet. You know how you go in it says original date created?

MR. MONAGHAN: What is your best recollection sitting here today when you did this?

MS. PHARES: It was produced to us when we were here to meet with your Honor on March 2nd.

MR. MONAGHAN: Right.

MS. PHARES: If you can tell me if it was on or about that time.

THE WITNESS: If somebody can tell me when my deposition was at your office, it was March --

THE COURT: I'll tell you what, I think everybody is worn out and I think I'm going to bring this session today to a close. We'll start again at 10:30 tomorrow morning.

How much longer do you have, counsel?

MR. MONAGHAN: I wouldn't guess that I have more than maybe an hour, at the most.

THE COURT: All right, so be prepared for

Page 334

CAROL ANNE BRYANT - DIRECT/MONAGHAN

some snappy cross-examinations, because many of the cross-examinations have been -- questions have been raised as objections. So I would tend to think that the cross-examination should be a little shorter. All right.

MR. MONAGHAN: Thanks, Judge.

THE COURT: I'll see you tomorrow morning at 10:30 unless there is something you must put on the record.

MR. TANNENBAUM: Just quickly for scheduling purposes if we get to another witness tomorrow can we know who it is?

MR. MONAGHAN: Mr. Bacal.

MR. TANNENBAUM: Thank you.

THE COURT: You'll have certainly time to cross-examine. Thank you all for helping out in this thing, you know, it's -- it has to be done. We're here to do it and I appreciate it.

MR. MONAGHAN: Thank you for your patience.

THE WITNESS: Thank you.

(Court Adjourned: 4:15 p.m.)

oOo

C E R T I F I C A T I O N

I, Elizabeth A. Kent, Senior Court Reporter for the State of New York, do hereby certify the foregoing to be true and accurate as taken by me on 7th Day of July, 2007, before the Hon. Andrew P. O'Rourke, J.S.C.

________________________________

Elizabeth A. Kent

- CERTIFIED TRANSCRIPT -