# EXHIBIT 6

```
1    SUPREME COURT :  STATE OF NEW YORK
     COUNTY OF ROCKLAND    :    CIVIL TERM
2    ----------------------------------------x
     ANNE BRYANT,
3                                          Index No.
                    Plaintiff,            5192/2000
4
            -against-
5
     BROADCAST MUSIC, INC, (a/k/a "BMI"),
6    CLIFFORD A. "FORD" KINDER, KINDER & CO.,
     LTD., VADIVOX, LTD., JULES M. "JOE"
7    BACAL, GRIFFIN BACAL, INC., STARWILD
     MUSIC BMI, WILDSTAR MUSIC ASCAP, SUNBOW
8    PRODUCTIONS, INC. and JOHN AND JANE DOES
     1 - 10,
9
                    Defendants.
10   ----------------------------------------x
     ANNE BRYANT,
11                                         Index No.
                    Plaintiff,            2821/2002
12
            -against-
13
     SUNBOW PRODUCTIONS,INC.,
14
15                  Defendant.
     ----------------------------------------x
16   NON-JURY TRIAL - CONTINUED
     ANNE BRYANT - DIRECT-EXAMINATION
17              - CROSS-EXAMINATION
18                        Rockland Supreme Court
                          One South Main Street
19                        Suite 200
                          New City, New York  10956
20                        July 9, 2004
21   B E F O R E:
22
                       HON. ANDREW P. O'ROURKE
23             JUSTICE OF THE SUPREME COURT
24
25
```

Page 480

```
1  APPEARANCES:
2      FOR THE PLAINTIFF:
3          MONAGHAN, MONAGHAN, LAMB & MARCHISIO, ESQS.
           150 West 55th Street
4          New York, New York  10019
           BY: PATRICK J. MONAGHAN, JR., ESQ.
5              -and-
               JEFFREY C. PRIMIANO, ESQ.
6
7
8      FOR THE DEFENDANT, SUNBOW:
9          PATTERSON, BELKNAP, WEBB & TYLER, LLP.
           1133 Avenue of the Americas
10         New York, New York  10036-6710
           BY: GLORIA C. PHARES, ESQ.
11             -and-
               LAUREN HAMMER BRESLOW, ESQ.
12
13     FOR BMI:
14         JUDITH M. SAFFER, ESQ.
           Assistant General Counsel - BMI
15         320 West 57th Street
           New York, New York  10019-3790
16
17
18     ALSO PRESENT:  NEIL RIGBY
19
20
21  ROBERT FRITZ
    SENIOR COURT CLERK
22
           ELIZABETH A. KENT
23         SENIOR COURT REPORTER
24
25
```

Page 481

```
1                 - PROCEEDINGS -
2            (Convened:  10:00 a.m.)
3            (Convened:  10:45 a.m.)
4        (Non-jury trial resumed on the record, in
5    open court - counsel and parties present as
6    previously noted)
7        THE COURT:  Good morning, ladies and
8    gentlemen.  I understand that one party is leaving
9    us?
10       MR. MONAGHAN:  Yes, your Honor.  That would
11   be Defendant, Jules M. "Joe" Bacal.
12   C A R O L    A N N E    B R Y A N T,
13           the Plaintiff, previously duly sworn
14           by the Court, resumed the stand
15           and testified further as follows:
16       THE COURT:  Anything you want to put on the
17   record?
18       MR. MONAGHAN:  Well, Judge, just report that
19   there has been a settlement with that Defendant.
20   This will be followed with formal stipulation of
21   dismissal.
22       MR. TANNENBAUM:  Right.  We'll draft
23   settlement papers, we'll execute them, and then
24   right after that, your Honor, we'll submit a
25   stipulation for dismissal.
```

Page 482

```
1                 - PROCEEDINGS -
2        MR. MONAGHAN:  And the terms of the
3    settlement will be confidential as per the
4    Defendant's request.
5        THE COURT:  All right.  Well, Mr. Bacal, I
6    hate to have you leave.  You and Miss Bryant seem
7    to have had a good relationship in the past.
8        MR. BACAL:  We did.
9        THE COURT:  I hope you and Anne -- and she
10   calls you Joe -- I hope you get back to that on a
11   level soon.  Thank you very much.  Thank you,
12   counselors.  And you are excused.
13       MR. MONAGHAN:  I'm sorry, one other item we
14   were going to unless -- there were documents that
15   were produced recently, and for the limited
16   purpose, unless counsel for Sunbow will stipulate
17   to them, we were going to put Mr. Bacal on simply
18   to identify them and that would be it.
19       MR. BACAL:  I would be happy to do that.
20       MR. TANNENBAUM:  I think we can do that
21   here.
22       MR. MONAGHAN:  Yeah, actually, you know,
23   David, I think it's only --
24       THE COURT:  Just have counsel stipulate to
25   it.
```

Page 483

```
1                 - PROCEEDINGS -
2        MR. MONAGHAN:  Yeah, okay.
3        MS. PHARES:  Just say what you want and then
4    we'll do it instead -- you want to stipulate to
5    what?
6        MR. MONAGHAN:  I would like you to stipulate
7    to the authenticity of the closing binder --
8    closing binder purchase agreement dated as of
9    April 8, 1998, as amended by and among C.J.
10   Kettler, Thomas L. Griffin, Jules M. Bacal, Arthur
11   Heller, Paul Kurnit and SONY Music Entertainment,
12   Inc.
13       MR. TANNENBAUM:  Bate Stamp.
14       MR. MONAGHAN:  Bate Stamp JB0533 through
15   JB1002.
16       MS. PHARES:  And Sunbow will stipulate to
17   its authenticity, your Honor.
18       THE COURT:  And BMI?
19       MS. SAFFER:  No objection.  I stipulate even
20   though I don't know what it is.
21       THE COURT:  Just for the purposes of the
22   record, let's mark it as 46.
23       (Plaintiff's Exhibit No. 46, marked and
24   received in evidence)
25       THE COURT:  Is there anything else we need
```

Page 484

1  - PROCEEDINGS -
2  from counsel?
3      MR. TANNENBAUM: I hope not. I think we are
4  done.
5      THE COURT: Mr. Bacal, this has been a tough
6  case. I know you took umbrage, you were concerned
7  about some of the language in some of the
8  decisions. I write what I think. That means
9  nothing against you personally, I want you to
10  know, and I wish you the very best for the rest of
11  your obviously your good professional career and
12  the rest of your life. Health and happiness go
13  forward.
14      MR. BACAL: Thank you, sir.
15      MR. TANNENBAUM: Thank you, your Honor, it
16  has been a pleasure.
17      (Pause in the Proceedings)
18      THE COURT: All right, I want you to know we
19  have a lot more room at the counsel table now.
20      MS. SAFFER: I've gotten so used to sitting
21  here, I'll just stay.
22      THE COURT: Okay, let's go forward. I did
23  give you a couple more minutes this morning.
24      MR. MONAGHAN: You did. Thank you, your
25  Honor, I appreciate that indulgence.

Page 485

1  - PROCEEDINGS -
2      THE COURT: Okay, go ahead.
3      MR. MONAGHAN: Before I finish up with Miss
4  Bryant there is one other matter which is the
5  availability of Mr. Rigby. I know counsel will
6  have cross and I'm wondering -- and I don't know
7  how extensive the cross will be. We had discussed
8  his availability. Today is the last day he will
9  be available.
10      MS. PHARES: For this term. Today is the
11  last day, but the trial is going to continue.
12      MR. MONAGHAN: Okay, so you will make him
13  available at some further date?
14      MS. PHARES: Yes.
15      MR. MONAGHAN: Okay, that's fine.
16  DIRECT EXAMINATION
17  BY MR. MONAGHAN: (Continued)
18      Q.   I'll show you now previously marked Exhibit
19  No. 20, songwriter's agreement, that is the one that the
20  Court had taken in during the lunch break previously, and
21  it is an agreement, it is in evidence entered as of the
22  20th day of March 1990 by and between Wonderland Music
23  Co., Inc. and Anne Bryant, writer. Wonderland being
24  described as the publisher. But I didn't really get any
25  information about this agreement from you at the time, and

Page 486

1  CAROL ANNE BRYANT - DIRECT/MONAGHAN
2  what I want you to tell the Court is what is this and
3  what -- how did it come about? What were the
4  circumstances?
5      A.   I wrote -- I wrote two songs for the Walt
6  Disney Company. Wonderland is one of the publishers for a
7  children's record called Minnie and Me.
8      Q.   Is that Minnie Mouse?
9      A.   Yeah, Minnie Mouse. It was for girls seven
10  to nine, I think. And it sold quite a few copies. And I
11  wrote two songs. I want to be the conductor and I can
12  hardly wait until morning. And this is their song writer
13  agreement that they sent. And it gives me all writer
14  royalties.
15      Q.   Okay. Who prepared the agreement?
16      A.   Well, it was negotiated by Noel Silverman.
17      Q.   Who is Noel Silverman?
18      A.   He was my attorney at the time on --
19      Q.   In 1990?
20      A.   -- yes.
21      Q.   Okay. And do you know who it was who
22  drafted the language that eventually became Exhibit A
23  describing song writer royalties? Which side?
24      A.   No, I really don't actually. I don't know
25  if it was the Disney people or Noel worked that out.

Page 487

1  CAROL ANNE BRYANT - DIRECT/MONAGHAN
2      Q.   Okay. Now, referencing Exhibit A, song
3  writer royalties, could you please read briefly into the
4  record -- let's put some context on it.
5      A.   I'll put some glasses on.
6      THE COURT: I thought we had this read in,
7  in Annex A attached?
8      MR. MONAGHAN: Oh, I read it in? You are
9  right.
10      THE COURT: I just want you to know I pay
11  attention.
12      THE WITNESS: Yes, you sure do.
13      MR. MONAGHAN: I guess I didn't pay close
14  enough --
15      THE COURT: All right.
16      MR. MONAGHAN: All right, I have no further
17  questions on this part of the case.
18      THE COURT: All right, you can stay right
19  there.
20      THE WITNESS: Oh, okay.
21      THE COURT: All right, we're going to first
22  hear from Miss Saffer.
23      MS. SAFFER: Good morning, your Honor.
24  CROSS-EXAMINATION
25  BY MS. SAFFER:

1              CAROL ANNE BRYANT - CROSS/SAFFER
2      Q.    Good morning, Miss Bryant.
3      A.    Good morning, Miss Saffer.
4      Q.    I want to start out before I ask any
5    questions explaining to you that I ask these questions
6    because we are a Defendant in this lawsuit, and my
7    objective here is to clarify things as much as possible,
8    vis-a-vis BMI's involvement in this lawsuit. I,
9    therefore, I don't have very many questions for you, and
10   they deal really specifically toward claims that were made
11   against BMI.
12            Now, we heard a lot of testimony from you
13   that you had some difficulty getting a copy of your
14   catalog listing from BMI in the late 90s; however, you had
15   also testified that you did receive one in 1990, correct?
16     A.    Well, that was an approximate date.
17     Q.    About?
18     A.    Yeah.
19     Q.    About?
20     A.    Yeah.
21     Q.    Yes.
22            And that what you were trying to do in 1998
23   was to verify whether there had been changes --
24     A.    Yes.
25     Q.    -- since you had seen it previously?

1              CAROL ANNE BRYANT - CROSS/SAFFER
2      A.    Yes.
3      Q.    -- correct?
4            Fine.
5            There came a time in October of 2000 when
6    you met with a BMI executive named Allison Smith, isn't
7    that right?
8      A.    Yes. Yes, I did. And you were present.
9      Q.    Yes, I was.
10           And isn't it true that your lawyer was also
11   present?
12     A.    Yes. Patrick Monaghan was present.
13     Q.    We met in Miss Bryant's office for an
14   afternoon?
15     A.    Smith's office. Didn't give me an office
16   there yet.
17     Q.    I apologize. But you are welcome to use one
18   whenever you wish.
19     A.    Thank you very much.
20     Q.    I misspoke, I'm sorry.
21           We met in Miss Smith's office, correct?
22     A.    Okay.
23     Q.    And at that time we went through various
24   records and we looked at the catalog listing, correct?
25     A.    Yes.

1              CAROL ANNE BRYANT - CROSS/SAFFER
2      Q.    Yes.
3            Now, isn't it true that at the time Miss
4    Bryant said to you -- I'm doing that again, I'm sorry --
5    Miss Smith said to you that BMI had not changed your
6    records?
7      A.    Yes, she said that.
8      Q.    Isn't it true --
9      A.    She said -- no, she said they had not
10   changed my records except there was a date where there was
11   a general change.
12     Q.    Correct, exactly. There was a date when
13   there was a general change.
14           On the Exhibit 2 that we looked at, there is
15   a column on the far right-hand side that has the heading
16   "entered", isn't that right?
17     A.    I'm not sure what Exhibit 2 is.
18     Q.    The catalog listing.
19     A.    My catalog?
20     Q.    Yes.
21     A.    Yes.
22     Q.    Yes. And isn't it true that Miss Smith
23   explained to you that BMI had made a number of changes to
24   their computer system and these dates reflected the
25   updating of the computer system?

1              CAROL ANNE BRYANT - CROSS/SAFFER
2            MR. MONAGHAN: Your Honor, I'm going to
3    start objecting here because this would be
4    hearsay. This is being offered for the truth of
5    the statements made by Miss Smith.
6            THE COURT: Well --
7            MR. MONAGHAN: And it's also after the suit,
8    I think.
9            THE COURT: Well, it's cross-examination. I
10   give a lot of leeway, and it really is a question
11   of what does this witness know about. I'll let
12   her answer.
13           MS. SAFFER: Yes, Judge.
14     A.    It is true that she explained that to me. I
15   don't know if it is true. It is true that she explained
16   it to me. No offense, of course --
17     Q.    None taken.
18     A.    -- that is intended.
19     Q.    None taken.
20           I want to move on to another item, if I can.
21           During the course of that meeting, isn't it
22   true that we explained -- Miss Smith primarily explained
23   to you how registrations were made and how BMI's databases
24   were kept?
25     A.    Generally she did, yes, generally.

Page 492

CAROL ANNE BRYANT - CROSS/SAFFER

2  Q.   Generally.
3       Didn't she explain to you that there were
4  separate records kept for commercial jingles, for
5  background music cues and for feature songs, like popular
6  songs, if you will?
7  A.   Like the JEM song?
8  Q.   Correct.
9  A.   Those are feature songs.
10 Q.   Correct.
11 A.   She did explain it, but I didn't understand
12 why the database or jingles we couldn't get that. She
13 said it was a separate database. Jingles and these others
14 were separate databases. But my catalog never had them in
15 it. That's what she explained to me. She said, well, it
16 is a separate database, okay.
17 Q.   Didn't at that time she also explain to you
18 that the jingle database back in the late 70s and 80s had
19 been kept on one individual's personal computer and it
20 wasn't until the 90s that the records were combined?
21 A.   No, she didn't -- she did not explain that
22 to me then.
23      MR. MONAGHAN: Your Honor, I would just like
24      a standing objection on this discussion which is
25      probably in the nature of some sort of a

Page 493

CAROL ANNE BRYANT - CROSS/SAFFER

2  settlement issue with Plaintiff and BMI, and --
3       THE COURT: Your position is that it was a
4       settlement conference?
5       MR. MONAGHAN: It was in the nature of an
6       attempt to find out what was going on between BMI.
7       THE COURT: I'll allow it. Go ahead.
8       MR. MONAGHAN: But I don't want to jump up
9       and down so I would just like a standing
10      objection.
11      THE COURT: Okay.
12 Q.   You are aware, aren't you, that jingles are
13 registered in a different fashion with BMI than cues for
14 T.V. Shows and songs?
15 A.   I'm aware that presently, in recent years,
16 that they are registered differently. But, for me, with
17 all these songs that are involved in this case, I didn't
18 register them. They were registered by an administrator,
19 so I don't know -- I didn't know what his process was even
20 until a couple of years ago when I tried to register
21 something myself, and I was rejected.
22 Q.   We have in evidence -- and, forgive me, I
23 don't know the exhibit number -- but a clearance form.
24      MS. SAFFER: And maybe one of the other
25      lawyers can help me?

Page 494

CAROL ANNE BRYANT - CROSS/SAFFER

2       THE COURT: There was a couple of them.
3  Plaintiff's 4, 3 --
4       MS. SAFFER: The one yesterday that was
5  signed by Ford Kinder that you identified his
6  signature.
7       THE WITNESS: Yes.
8       MS. SAFFER: Yes. Okay. Can somebody just
9  show it to me, please, for a moment?
10      MS. PHARES: 40.
11      THE COURT: 40.
12      MS. SAFFER: I'm just using this one for
13 illustrative purposes. I remember this one from
14 yesterday.
15      MR. MONAGHAN: 39.
16      MS. SAFFER: 39 is fine. I can use 39.
17 They are similar.
18 BY MS. SAFFER:
19 Q.   I'd like to show this to you again, please,
20 which you identified yesterday.
21      Whose signature is at the bottom?
22 A.   Ford Kinder's.
23 Q.   Okay. And can I have -- it's the only copy.
24 Can we look at it together for a moment? Okay.
25      And it is listed as the authorized

Page 495

CAROL ANNE BRYANT - CROSS/SAFFER

2  signature, correct?
3  A.   Yes.
4  Q.   So it was Mr. Kinder, your partner, who was
5  registering, correct?
6  A.   Yes. But this isn't a jingle.
7  Q.   This particular one -- and I'll go back to
8  another one, if I have -- if there was one that was
9  presented, I honestly don't know -- indicates that it
10 should get sent to Starwild care of the Law Offices of
11 William Dobishinsky?
12 A.   Right.
13 Q.   But it was Mr. Kinder who did the
14 registration, correct?
15 A.   He signed it.
16 Q.   He signed it, right. Okay.
17 A.   But it has a different number than a jingle
18 which was registered by someone else.
19      MS. SAFFER: Do we have a copy in evidence
20 of any jingle statements?
21      THE WITNESS: Yeah, we do.
22      MS. SAFFER: Excuse me -- jingle statement.
23 I mean, registration, excuse me. Jingle
24 registration.
25      MR. MONAGHAN: Well, because I'm not

Page 496

1    CAROL ANNE BRYANT - CROSS/SAFFER
2    familiar with the parlance --
3        MS. SAFFER: The equivalent of Exhibit 39,
4    but that is for a jingle. The witness has
5    testified that somebody else registered the
6    jingles, not Mr. Ford, so I'm asking if we have
7    something that would demonstrate that.
8        THE WITNESS: You know, the Robots in
9    Disguise, GI Joe, Real American Hero.
10       MS. SAFFER: Not a statement. A clearance
11   form.
12       THE COURT: 3 and 4.
13       MS. PHARES: Look at 3.
14       THE WITNESS: Can I get my glasses? I
15   forgot my glasses.
16       MR. MONAGHAN: Here are a couple of them,
17   Judy.
18       MS. SAFFER: I have a document that I would
19   like now to introduce into evidence, because
20   apparently up until now there has not been a
21   clearance form for a jingle. I'd like to show
22   this -- is that okay with you?
23       MS. PHARES: I'm giving you a sticker.
24       MS. SAFFER: You are giving me a sticker.
25       THE COURT: All right, this is Defendant's

Page 497

1    CAROL ANNE BRYANT - CROSS/SAFFER
2    Exhibit A.
3        MS. SAFFER: Yes. Thank you very much.
4        THE COURT: Hand it to the reporter.
5        (Defendant's Exhibit A, a clearance jingle,
6    marked for identification)
7    Q.   Once again, since this is the only copy,
8    we'll share it, if it is okay with you?
9        MR. MONAGHAN: May I step up and look at it
10   too? I have not seen it.
11       THE COURT: It has not been offered in yet.
12       MS. SAFFER: I would ask her to identify it
13   first.
14   A.   Yes, this is a clearance form that I sent in
15   for my company for a jingle I did for Arm & Hammer Super
16   Cat. And it was returned to me as --
17       MS. PHARES: Objection, your Honor. We're
18   just identifying the document.
19       THE COURT: Yes.
20       MS. PHARES: And for our convenience, we've
21   just given you the only copy we have. Would you
22   give us the production number that is at the
23   bottom of it on the --
24       THE WITNESS: 000738. Do you want me to
25   identify it that way?

Page 498

1    CAROL ANNE BRYANT - CROSS/SAFFER
2        THE COURT: What is it?
3        THE WITNESS: The BMI clearance form.
4        MS. PHARES: And the number.
5        THE WITNESS: 000738.
6        MR. MONAGHAN: We have copies, actually.
7        MS. SAFFER: Okay.
8        THE COURT: Okay, now it has been
9    identified.
10       MS. SAFFER: Yes.
11       THE COURT: Miss Bryant, you are the one
12   that sent this into BMI?
13       THE WITNESS: Yes. And they sent it back to
14   me.
15       THE COURT: All right, we have not gotten to
16   that yet.
17       THE WITNESS: They rejected it.
18       THE COURT: Do you want to move it into
19   evidence now?
20       MS. SAFFER: Yes.
21       THE COURT: Show it to the other attorney.
22       MR. MONAGHAN: No objection.
23       THE COURT: Miss Phares?
24       MS. PHARES: No objection.
25       THE COURT: All right, admitted into

Page 499

1    CAROL ANNE BRYANT - CROSS/SAFFER
2    evidence.
3        (Defendant's Exhibit A, marked and received
4    in evidence)
5    Q.   Using this as just illustrative to show that
6    clearance forms for jingles have different forms than
7    clearance forms for cue sheets, isn't that correct?
8        You looked at both now in the past five
9    minutes. Not for the content of it, but the fact that
10   they are registered separately, they provide different
11   information, and that from time to time you have submitted
12   clearance forms. I'm not going into the body of this
13   particular one and whether there was any problem with it
14   or anything. Just the general proposition.
15       MR. MONAGHAN: Well, I'm not sure if it's a
16   comparison. I don't know what the other side of
17   the comparison is.
18       MS. SAFFER: The exhibit --
19       MR. MONAGHAN: This is a clearance form.
20   She's identified it.
21       THE WITNESS: That is correct.
22       MS. SAFFER: The fact it is different from
23   Exhibit 39 which is a clearance form for T.V.
24   cues, I'm asking her to admit they are different
25   forms and different procedures --

Page 500

CAROL ANNE BRYANT - CROSS/SAFFER
1
2      THE COURT:  Right.
3      MS. SAFFER:  -- for T.V. and for jingles.
4   Q.  Isn't that correct?
5   A.  Yes, well, that one, the theme you accepted.
6  But the jingles you rejected.  So I, you know --
7      THE COURT:  We're not talking about that.
8      THE WITNESS:  Oh, okay.
9      THE COURT:  It is a different form.
10     THE WITNESS:  It looks like the same form to
11  me.  I mean, it is a clearance form for a piece of
12  music.
13     THE COURT:  Okay, but there's an A form and
14  a B form.
15     THE WITNESS:  No, not that I've ever seen.
16  There are more forms attached to a jingle
17  registration.
18     MS. SAFFER:  Well, the witness supplied
19  information that was going to be my next question.
20  BY MS. SAFFER:
21  Q.  There are different procedures for
22  registering jingles than there are for T.V. cues, correct?
23  A.  I learned that recently, yes.
24  Q.  You've been in the business and received
25  millions of dollars from BMI since the 70s and you didn't

Page 501

CAROL ANNE BRYANT - CROSS/SAFFER
1
2  know there were different procedures?
3      MR. MONAGHAN:  Argumentative, your Honor.
4  Objection.
5      THE COURT:  It's a question.  I'll allow it.
6      THE WITNESS:  Can I answer it?
7      THE COURT:  Yes.
8  A.  I didn't register my own jingles.  I tried
9  to do it there, but I didn't have an administrator.  So I
10  tried to do it and I found out I was never allowed to do
11  it.  Miss MacLaughlin sent me a data sheet.
12  Q.  Have you ever received a data sheet in the
13  registering the T.V. cues?
14  A.  I can't register T.V. cues.
15  Q.  Miss Bryant, what I'm asking is not whether
16  you do it or somebody does it on your behalf.  What I'm
17  asking you is you are aware that there are different
18  procedures for the handling of jingles, T.V. cues and
19  popular songs?
20  A.  I've learned that, yes.
21  Q.  Okay, therefore, you are aware that BMI
22  keeps different records for different kinds of uses of
23  music, correct?
24      MR. MONAGHAN:  Object.  How would she know
25  that?

Page 502

CAROL ANNE BRYANT - CROSS/SAFFER
1
2      THE COURT:  If she knows it.  If you know
3  it.
4  A.  I've been told that they have different
5  databases.  They told me that.
6  Q.  Okay.  We've had discussions during the
7  course of the trial about your former partner Ford Kinder,
8  correct?
9  A.  Yes, yes.
10  Q.  And, in fact, discussion has come up during
11  the course of the trial now that at one time back in the
12  late 70s early 80s Ford Kinder belonged to a different
13  Performing Rights Society, correct?
14  A.  Yes.  Right.  Yes, he did.
15  Q.  Mr. Kinder belonged to ASCAP, isn't that
16  true?
17  A.  Yes, he did.
18  Q.  Yes, he did.
19      Now, you were aware that Mr. Kinder received
20  money from ASCAP just like you received money from BMI,
21  correct?
22  A.  Yes.
23  Q.  Okay.
24  A.  For a period of time.
25  Q.  While he was a member.

Page 503

CAROL ANNE BRYANT - CROSS/SAFFER
1
2  A.  While he was a member, yes.
3  Q.  Right.
4      Were you aware that the jingles that you
5  registered as the sole composer at BMI were registered by
6  Mr. Kinder at ASCAP as the sole composer?
7  A.  No.  This is news.
8  Q.  Well, you combined your money, didn't you?
9  A.  If either one of us got a check we shared
10  the gross, yeah.
11  Q.  And you were getting ASCAP money as well as
12  BMI money, correct?
13  A.  He shared his money with me.  I made more
14  money.  I shared my money with him.
15  Q.  And you made more money.  Okay.
16      Do you know the reason why Mr. Kinder left
17  ASCAP and came over to BMI?
18      MR. MONAGHAN:  I have to object.
19  Q.  If you know.
20      MR. MONAGHAN:  Withdrawn.
21  A.  No, I don't know.
22  Q.  He never discussed it with you?
23      This was the primary source of your income
24  and his income and he never discussed with you the reasons
25  why he would belong to one and you would belong to

Page 504

CAROL ANNE BRYANT - CROSS/SAFFER

1
2 another?
3        I mean, you never had any discussions over
4 any of this?
5     A.   Ford joined ASCAP before I ever met him.  I
6 joined BMI before I met him.  I joined BMI.
7     Q.   Did there come a time in the 1980s when you
8 were partners and you were sharing all of your income and
9 he decided, for some reason, to come over to BMI?  And I'm
10 asking you whether you ever discussed with him the reasons
11 why he may decide to do that?
12     A.   Well, you are going to like this.  I thought
13 BMI was better and he was stuck in an ASCAP contract.
14 They revolve every two years, you know.  You can't get out
15 of them.  They just roll over unless you are at the right
16 moment, notify them you want to switch societies.
17     Q.   Were you aware of the fact that when he came
18 over to ASCAP — I mean, came over from ASCAP to BMI and
19 music was put down as cues rather than jingles, the two of
20 you who were anyway splitting your money registered these
21 things as 50/50 authorship?
22        MR. MONAGHAN:  Can we have that question
23     read back?
24        MS. SAFFER:  It is a little awkward, I
25     agree.  Let me rephrase it.

Page 505

CAROL ANNE BRYANT - CROSS/SAFFER

1
2        THE WITNESS:  That's nice, thank you.
3     Q.   Were you aware that when Mr. Kinder came
4 over from ASCAP and music was used as cues in television
5 programs, music that the two of you worked on, he
6 registered the music as 50 percent Bryant and 50 percent
7 Kinder?
8     A.   When he joined BMI?
9     Q.   Yes.
10     A.   I — no, I wasn't aware, and I don't know
11 how — I don't know how he could have done that.  I'm
12 sorry.
13     Q.   I'm showing you Exhibit 39, which was
14 submitted by Ford Kinder, which indicates Anne Bryant
15 50 percent and Ford Kinder 50 percent, correct?
16        And you were not aware of any of this?
17     A.   5/4/88.  Wait a minute.  These changed for
18 us at the end, you know, we broke up a couple of months
19 after this.  So, you know, putting it 50/50 in our names,
20 at that point we were about to go out of business
21 together.  It took us a year to break up.  That's all I
22 can say.  You know, I don't specifically remember it, but
23 that would be my explanation for it.
24     Q.   Do you remember as part of the discussions
25 that we had with Miss Bryant —

Page 506

CAROL ANNE BRYANT - CROSS/SAFFER

1
2     A.   Smith.
3        MS. PHARES:  Miss Smith.
4        MR. MONAGHAN:  We'll stipulate that —
5        MS. SAFFER:  Miss Bryant means Miss Smith.
6 I do apologize.  Please forgive me.
7        THE COURT:  That's all right.
8     Q.   — that part of the discussions we had
9 involved whether or not a piece of music was registered as
10 an instrumental or an instrumental/vocal; do you remember
11 our talking about that subject?
12     A.   Do you want to know what I remember about
13 it?
14     Q.   Do you remember our talking about the
15 subject, just in general?
16     A.   Vaguely saying that instrumentals were
17 different than jingles and feature songs.  But if you want
18 to ask me what I remember of it, that's a different —
19     Q.   Do you recall Miss Smith explaining to you
20 that because BMI credits writers based upon logs that are
21 submitted BMI has no way of knowing whether the particular
22 performance was an instrumental or an instrumental with
23 vocals?  We just get a report.  We don't listen to it.
24        Do you remember her explaining that to you?
25     A.   I remember her explaining that you get a

Page 507

CAROL ANNE BRYANT - CROSS/SAFFER

1
2 report and you don't listen to it, but I don't remember
3 you illustrating instrumental or instrumental with vocal
4 and setting that out.  I do remember you saying you got a
5 report and you didn't listen to it.  And that there was a
6 lot of music, you couldn't listen to it all.  You were
7 working with a report.  I remember that.
8     Q.   Do you remember her explaining that when a
9 composition is registered and there are on the
10 registration a composer and an author written that we will
11 pay each 50/50 unless we are given instructions that the
12 split should be different?
13     A.   Yes, I remember that.
14     Q.   Do you know the industry practice on who
15 prepares cue sheets?  Do you know the industry, the
16 general industry practice on who prepares cue sheets that
17 are submitted to BMI?
18     A.   My experience is the producer certifies
19 them.  I don't really know who exactly who submits them.
20     Q.   And you are aware, are you not, that BMI
21 accepts these cue sheets from the producers and does not
22 in fact investigate and try to determine if everything on
23 that sheet is accurate, that we accept these cue sheets
24 from the producers and use them as part of our records?
25        MR. MONAGHAN:  Your Honor, I object.  It

Page 508

CAROL ANNE BRYANT - CROSS/SAFFER

1   sounds like testimony to me. I don't know how she
2   would be aware.
3   
4       THE COURT: Let her say she's not aware of
5   it. Let's go ahead.
6   A.   Am I aware? Was that the question?
7   Q.   Yes. Do you know about that?
8   A.   I know about your practice.
9   Q.   Yes?
10  A.   Yeah.
11  Q.   Okay. Did you or Mr. Kinder ever notify
12  BMI, to the best of your knowledge, before this lawsuit
13  began, that you were supposed to be paid the royalties
14  attributable to Mr. Kinder's writer share?
15  A.   No. No, no.
16  Q.   Okay. Did you ever provide BMI with a copy
17  of an assignment from Mr. Kinder before this litigation
18  began?
19  A.   No.
20  Q.   Okay. I believe you testified, but I'd like
21  to clarify it, that you know that BMI pays royalties for
22  the public performance of music, correct?
23  A.   Yes.
24  Q.   You don't believe that BMI pays for sheet
25  music, correct?

Page 509

CAROL ANNE BRYANT - CROSS/SAFFER

1   
2   A.   I don't believe they do.
3   Q.   Right.
4   A.   No.
5   Q.   And we don't pay royalties for the sale of
6   records or videos?
7   A.   Not to my knowledge.
8   Q.   Okay. We had a lot of testimony in the past
9   couple of days that certain music might have different
10  names depending upon how it's used. For example, I wrote
11  down in my notes Real American Hero was how you named the
12  jingle, and when it was on television show it was called
13  the GI Joe Theme. Am I right? Or did I write that down
14  wrong?
15  A.   You are right, except I didn't give it those
16  alternate names for registration. The administrator did,
17  okay? But I --
18  Q.   To the best of your knowledge, is there any
19  way BMI who admittedly doesn't listen to the music could
20  possibly know that Real American Hero is the same music as
21  the GI Joe Theme?
22  A.   Well, if you don't listen to the music, I
23  don't know how you could know that.
24  Q.   Good enough.
25      MS. SAFFER: Your Honor, that's the end of

Page 510

CAROL ANNE BRYANT - CROSS/SAFFER

1   
2   my cross. And I don't know if this is the proper
3   place or procedure, but I would like based upon
4   the testimony to move to have BMI dismissed.
5   Paragraph 16 and 17 of the complaint alleges that
6   BMI knowingly permitted Kinder and Bacal to
7   reregister her titles. There's been no testimony
8   to that effect.
9       It further alleges that Plaintiff was to be
10  paid all of Kinder's royalties, and the witness
11  has admitted she never told us to do that.
12      The complaint says that these actions on
13  behalf of BMI allegedly showed a pattern of fraud
14  and a breach of our fiduciary duty because we
15  allegedly caused re-registrations. And there has
16  been absolutely no testimony that there was ever
17  any re-registration.
18      The complaint further deals with the sale of
19  DVDs and videos, et cetera, and the Plaintiff has
20  just admitted that BMI doesn't have anything to do
21  with the sale of DVDs or videos.
22      THE COURT: All right, my suggestion is that
23  you discuss that with Plaintiff's counsel, and
24  that if the two of you don't agree to that
25  position now and what should happen in the future,

Page 511

CAROL ANNE BRYANT - CROSS/SAFFER

1   
2   that I would take that only at the end of the
3   Plaintiff's case.
4       MS. SAFFER: Okay. Thank you very much,
5   your Honor.
6       THE COURT: Miss Phares.
7       THE WITNESS: I don't understand
8   something -- okay.
9   CROSS-EXAMINATION
10  BY MS. PHARES:
11  Q.   Miss Bryant, you have many times earlier
12  testified about the public -- that the performance
13  royalties should be thought of as having two parts; is
14  that right?
15  A.   Yes.
16  Q.   And that's 100 percent for the writers; is
17  that correct? And 100 percent for the publishers; is that
18  correct?
19  A.   Yes.
20  Q.   And, is it fair to say, that in the industry
21  these two parts when they are referred to just in the
22  lingo of the business are referred to as the writer's
23  share and the publisher's share, correct?
24  A.   Yes.
25  Q.   Now, up until now, am I correct, that what

Page 512

CAROL ANNE BRYANT - CROSS/PHARES

1  
2  we've been talking about and what you've been talking
3  about with respect to Mr. Bacal and Mr. Kinder is the
4  issue of how the writer's share of the public performance
5  royalties had been divided; is that correct?
6      A.  Could you read that back?
7      COURT REPORTER: "Question: Now, up until
8  now, am I correct, that what we've been talking
9  about and what you've been talking about with
10  respect to Mr. Bacal and Mr. Kinder is the issue
11  of how the writer's share of the public
12  performance royalties had been divided; is that
13  correct?"
14     A.  We have talked about that issue, but we've
15  talked about other issues about the writer's shares --
16     Q.  Well --
17     A.  -- as well.
18     Q.  -- when you were working for Sunbow, that
19  is, when Kinder & Bryant were working for Sunbow, is it
20  your understanding that the publisher's share went to
21  Sunbow?
22     A.  Publisher's share went to Sunbow's
23  publishing companies.
24     Q.  By that you mean Starwild or Wildstar?
25     A.  Yes.

Page 513

CAROL ANNE BRYANT - CROSS/PHARES

1  
2      Q.  And you don't have a dispute with the
3  propriety of that money being paid to the publishers,
4  isn't that correct?
5      A.  Yeah, that's correct.  We gave them the
6  publishing.
7      Q.  All right.  Now, if you turn to the writer's
8  share -- turn to the writer's share of this.  You are not
9  saying, are you, that BMI paid any part of the writer's
10  share to Sunbow, are you, or to its publishing companies?
11     A.  No.
12     Q.  Okay, so you are okay with this.  And
13  nothing was paid to Sunbow?
14     A.  Nothing that I know of.
15     MR. MONAGHAN:  I just want to make sure we
16  are talking about public performance royalties.
17     MS. PHARES:  Public performance royalties is
18  all that is at issue here.
19     MR. MONAGHAN:  Well --
20     MS. PHARES:  At the moment.
21     Q.  So with respect to public performance
22  royalties, it's true that you don't have any complaint
23  against Sunbow for its conduct.  We didn't receive your
24  monies.  And the monies we did receive, you've testified,
25  we were entitled to receive, isn't that correct?

Page 514

CAROL ANNE BRYANT - CROSS/PHARES

1  
2      A.  You were entitled to receive the publishing
3  royalties.  We don't question that.  We are not asking for
4  the publishing.  Never did.
5      Q.  Right.
6      A.  As far as the writer's royalties, I just
7  said that Sunbow didn't directly receive the writer's
8  royalties that I know of.  However, I am capable of
9  listening to an underscore and hearing my melody being
10  played constantly throughout a show.  So I do dispute that
11  part being given to other people.
12     Q.  I'm just talking for the moment about the
13  BMI monies that gets collected for public performances.
14  And all the money that BMI collects gets put into two
15  pots.  Right?  One pot went to the publishers.  And you
16  are saying you have no problem with that.  And the other
17  pot was divided among you, Kinder, lyricists, other people
18  who wrote songs, and music, right?
19     A.  That's where I have the problem with the
20  "other people".
21     Q.  Right.  With the other people.
22     And you don't have a problem with Sunbow,
23  isn't that right, with respect to that?
24     A.  I'm not sure that I don't have a problem
25  with Sunbow with respect to that.

Page 515

CAROL ANNE BRYANT - CROSS/PHARES

1  
2      Q.  All right, what I want to know is did -- are
3  you testifying that Sunbow received any of those monies?
4      A.  I don't know that they did.
5      Q.  It's just a yes or no.
6      Do you know or not?  Or are you testifying
7  that they did or not -- rather, is it your claim that
8  Sunbow received part of the writer's share of the
9  royalties?
10     A.  No, it's not my testimony that they received
11  it.
12     Q.  And you don't have a tort claim in your
13  complaint against Sunbow?
14     A.  You have to tell me what tort claim is.
15     MS. PHARES:  Well, I'm going to ask your
16  counsel if he will concede that there is no tort
17  claim.
18     MR. MONAGHAN:  There's a claim for unjust
19  enrichment and constructive trust.
20     THE WITNESS:  Is that a tort claim, Patrick?
21     MS. PHARES:  Is that an answer?
22     MR. MONAGHAN:  There is no fight what is in
23  the pleadings and the Judge has already indicated.
24     THE COURT:  It is not a tort.
25     MS. PHARES:  Okay.

1           CAROL ANNE BRYANT - CROSS/PHARES
2       THE WITNESS:  Is not a tort claim?
3       Q.    Now I have another question.
4           You are not claiming to be a joint owner
5   with Sunbow of the copyright in the whole T.V. Series, are
6   you?
7       A.    I never claimed copyright.
8       Q.    Just a yes or a no.
9       A.    No.
10      Q.    And you are not claiming that you own the
11  copyright in any of the songs that you wrote for Sunbow
12  for the HASBRO series, are you?
13      A.    No.
14      Q.    You've never registered a copyright in any
15  of the songs in the copyright office, have you?
16      A.    No.
17      Q.    And in the notices on the T.V. Series or on
18  the videocassettes of the T.V. Series, you are not
19  included in the copyright notice as a copyright owner, are
20  you?
21      A.    No, I'm not.
22      Q.    And you've never objected about your name
23  not being included in the copyright notice, right?
24      A.    No, I have not.
25      Q.    And that's because you are not a copyright

1           CAROL ANNE BRYANT - CROSS/PHARES
2   owner?
3       A.    Yes.  And because no one ever asked me
4   anyway.  But I didn't mind.
5       Q.    So when you occasionally refer to the music
6   in the T.V. Series as "my music", either here or in
7   affidavits that you've submitted, you don't mean that you
8   own the copyright in the music, isn't that right?  You
9   just mean that you wrote it?
10      A.    Yes.
11      Q.    Well, actually, that's not fair.  I've asked
12  you two questions.
13          You don't mean --
14      A.    Yes, there were two questions, right.
15      Q.    You don't mean that you wrote the copyright?
16      A.    That's true, I don't --
17      Q.    You do mean that you wrote the music?
18      A.    I do mean that I wrote the music.
19      Q.    And isn't the reason that you don't own the
20  copyrights and the compositions that you wrote for the --
21  at least for the Sunbow T.V. Series is that when Kinder &
22  Bryant wrote the music for Sunbow you worked-for-hire,
23  isn't that right?
24      A.    We were hired to write.
25      Q.    Didn't you work on a work-for-hire basis?

1           CAROL ANNE BRYANT - CROSS/PHARES
2       MR. MONAGHAN:  We have to have a definition
3   by counsel of what that means to this witness in
4   this question.
5       THE COURT:  Well, let's ask the witness if
6   she knows what the term of art apparently within
7   the music business of to work-for-hire means.
8       Do you know what it means?
9       THE WITNESS:  I know what it means in the
10  way that everyone I know who works in the --
11      THE COURT:  Tell us.
12      THE WITNESS:  -- in the jingle business.
13  Primarily, the jingle business we are
14  talking about.
15      MS. PHARES:  No, actually, primarily we're
16  talking about the T.V. production business.
17      THE WITNESS:  Well, my initial relationship
18  with Griffin-Bacal then took me into Sunbow.
19  We've always said of our writer rights, of our
20  copyright, no dispute, we do not want the
21  copyright.  Everyone I've ever worked for wants
22  the copyright.  We don't dispute that they need
23  that.  The publishing we try to get, but we very
24  seldom do, so we give them the publishing.  We
25  reserve our writer rights.  All of our writer

1           CAROL ANNE BRYANT - CROSS/PHARES
2   royalties come to us.  And that's the way it works
3   in the jingle business, and that was my frame of
4   reference with Griffin-Bacal carried over into
5   Sunbow.
6       THE COURT:  But tell us -- tell us what it
7   means to you to say you worked-for-hire in the
8   music business.
9       THE WITNESS:  I give away my copyright.
10      Q.    Right.  And you give away your copyright?
11      A.    Reserving my writer's rights.
12      Q.    That's what I want to talk about.  I want to
13  talk about what you reserved.  We agree that you reserved
14  public performance royalties.  Now, you talk about your
15  publishing and sometimes your writer's rights.  I want to
16  be a little more specific about that, if you don't mind.
17          We've said that the writer share is
18  certainly this 100 percent part of the public performance
19  royalties, correct?
20      A.    Yes.
21      Q.    Okay.  Now, are there other royalties that
22  you think you are entitled to?
23      A.    Yes.
24      Q.    And what were they?
25      A.    The writer's share of the music publishing

Page 520

CAROL ANNE BRYANT - CROSS/PHARES

1
2  income.
3      Q.    All right, music publishing.
4          For the sake of clarity, anyway, I want to
5  talk about this as music publishing.  It might even be
6  easier if we -- if we called this -- since this other one
7  has this confusing term of the writer's share and the
8  publisher's share, we sometimes here also reference to
9  publishing, publishers, and I think there's been a little
10  bit of a collapse about the rights we're talking about.
11          So just for the purposes of this, we'll call
12  this music publishing or even other rights, just to make
13  it different.
14          Now, what is included in other rights, in
15  your mind?
16      A.    I've seen other rights attributed to things
17  like moral rights, things that I -- you know --
18      Q.    Well --
19      A.    -- I wouldn't call publishing.
20      Q.    Go back to your testimony.
21          You said that you reserved -- you reserved
22  the writer's share and other publishing rights was what
23  you just said.  And -- I mean, did you understand --
24      A.    Is that what I said?
25      Q.    -- other publishing rights to mean --

Page 521

CAROL ANNE BRYANT - CROSS/PHARES

1
2      A.    Other music publishing didn't I call it?
3      Q.    Or other music publishing.  That is all
4  right with me too.
5          What did you mean by it?
6      A.    Music publishing.
7      Q.    Uh-huh.
8      A.    Do you want me to tell you all -- it's in my
9  Wonderland agreement.  You want me to tell you what it
10  means?
11      Q.    I want you to tell me what you understood --
12  when you were telling the Court, what you understood what
13  you reserved when you made a work-for-hire agreement.
14      A.    The writer's royalties.
15      Q.    The writer's royalties, meaning the writer's
16  share of the public performance royalties?  This?
17      A.    That too.
18      Q.    That.
19          And then what else did you reserve?
20      A.    All -- half of the other music publishing
21  income goes to the publisher and half of it goes to the
22  writer and that would include synch fees and licensing
23  fees for the music.
24      Q.    Licensing for what?
25      A.    Licensing the songs.  It would include

Page 522

CAROL ANNE BRYANT - CROSS/PHARES

1
2  mechanical royalties.  It would include sheet music sales
3  and folios.  I mean, those --
4      Q.    Well, we call synch music and royalties is
5  called print?
6      A.    It is called sheet music.  Old fashioned
7  term.
8      Q.    But sheet music and folios, you might have
9  orchestrations, right?
10      A.    Right.  Right.
11      Q.    All right.  I am just calling them print
12  because they are all on paper.  But sheet folio
13  orchestrations, and you said mechanical --
14      A.    You should start off on the left.  It's a
15  long word.
16      Q.    Yes, I should.  But what I should have is a
17  better sense of space.
18          And the mechanical rights, what do you
19  understand that to be?
20      A.    That's for -- as opposed to something that
21  is broadcast over the air.
22      Q.    Which is a public performance?
23      A.    Public performance.
24          A mechanical is something that is brought
25  mechanically.  It's vinyl.

Page 523

CAROL ANNE BRYANT - CROSS/PHARES

1
2      Q.    Like making a phonograph record?
3      A.    Or a disc.
4      Q.    Or a disc?
5      A.    Or a tape.
6      Q.    Like an audiotape of your song, you mean,
7  right?
8      A.    Yes.  That would be a mechanical.
9      Q.    So your understanding is that you received
10  rights when you were working for hire that included both
11  the public performance royalties for those rights, that
12  is, the writer's share, and you said you were entitled to
13  have these other rights?
14          MR. MONAGHAN:  Object to the form of the
15      question.  That wasn't the testimony.  She didn't
16      say received, which would connote that it was
17      given back to her.  Her testimony was that she
18      reserved them.
19          THE COURT:  All right, as to form I'll
20      sustain the objection.
21      Q.    But it's your understanding, is it not, that
22  when you work-for-hire, you never own the copyright; is
23  that correct?
24          MR. MONAGHAN:  I'm going to object to the
25      line now.  We didn't say this was a copyright

Page 524

CAROL ANNE BRYANT - CROSS/PHARES

1 CAROL ANNE BRYANT - CROSS/PHARES
2 case.
3 THE COURT: It's cross-examination. The
4 witness can answer it. As a matter of fact, I
5 think she already did answer it.
6 THE WITNESS: Not really. She's causing me
7 to think that there have been times when I've been
8 paid to write something that I've been able --
9 that I've been given the copyright. And a strange
10 situation is the National Council of Churches.
11 Q. I'm only talking about in this case.
12 A. I own the copyright and I get 200 percent
13 and they can't own the copyright, but they pay me to do
14 this and I own it still. So that has happened. I can't
15 say never.
16 Q. I'm not asking --
17 A. Commonly --
18 Q. I said when you work-for-hire, and you said
19 that you have -- in fact, you have testified that for 30
20 years you've worked-for-hire. It's not your understanding
21 that you own the copyright in the materials, isn't that
22 correct?
23 A. Yes. I think that -- I've been hired for
24 work, you know, and I understand that when I do I give
25 up -- I am -- I give up the copyright and willingly.

Page 525

1 CAROL ANNE BRYANT - CROSS/PHARES
2 THE COURT: Okay, we're going to take a
3 ten-minute break and then we'll go through to
4 12:30.
5 THE WITNESS: Okay.
6 (Recess: 11:40 a.m.)
7 (Reconvened: 11:55 a.m.)
8 C A R O L     A N N E     B R Y A N T,
9 the Plaintiff, previously duly sworn
10 by the Court, resumed the stand
11 and testified further as follows:
12 MR. MONAGHAN: Your Honor, a question has
13 been asked by someone at the defense table. Would
14 your Honor object if jackets were removed?
15 THE COURT: It is warm out there?
16 MR. RIGBY: I was asking the question out of
17 curiosity.
18 THE COURT: Well, the answer is no. If I
19 have to wear this robe.
20 MR. MONAGHAN: Fair enough.
21 THE COURT: Though, of course, that wasn't
22 always the rule.
23 MS. PHARES: Perhaps we could negotiate
24 comfort for everyone, your Honor.
25 THE COURT: That wasn't always the rule.

Page 526

1 CAROL ANNE BRYANT - CROSS/PHARES
2 People used to smoke. And I've tried cases in
3 court where there were spittoons. But, of course,
4 we had stone tablets then and only ten laws.
5 Let's go.
6 CROSS-EXAMINATION
7 BY MS. PHARES: (Continued)
8 Q. Your Honor, I just want to read in a passage
9 from Miss Bryant's deposition which was taken on March 31,
10 2003 in which she was asked:
11 "Miss Bryant, are you familiar with the term
12 `work-for-hire'?
13 "Answer: Yes.
14 "Question: And what do you understand that
15 term to mean?
16 "Answer: It always applied in my career I'm
17 not the copywriter on it. The work I've done has
18 been made work-for-hire on behalf of the publisher
19 client whoever they assigned it to. I give up the
20 copyright in exchange for a fee"--
21 MR. PRIMIANO: Excuse me, can we have page
22 and line numbers? I'm sorry.
23 MS. PHARES: Page 42 beginning at Line 18.
24 Shall I begin again?
25 THE COURT: No, I've got it up.

Page 527

1 CAROL ANNE BRYANT - CROSS/PHARES
2 MS. PHARES: I'm going to start with that
3 answer.
4 "It always applied in my career I'm not the
5 copyrighter on it. The work I've done has been
6 made for hire on behalf of the publisher client
7 whoever they assigned it to. I give up the
8 copyright in exchange for a fee while also
9 retaining my performance rights royalties and any
10 other outside royalties. That's the way
11 work-for-hire works in the jingle business. It
12 has worked for me for 30 years."
13 And I take it you are saying that -- is it
14 your understanding, rather, that work-for-hire works the
15 same way when you are writing for Sunbow --
16 MR. MONAGHAN: I would ask that Miss Phares
17 read the rest of that testimony so we have a
18 contiguous -- there is another question and
19 answer.
20 THE COURT: Well, if Miss Phares wants to do
21 that, she may.
22 MS. PHARES: That actually wasn't what I was
23 intending to do, but Mr. Monaghan can certainly do
24 it when he is doing his rebuttal.
25 Q. Now, that was in March of last year that you

CAROL ANNE BRYANT - CROSS/PHARES

1
2  testified to; is that correct?
3      A.   Is that when it was? Was my deposition -- I
4  think --
5      Q.   That is when it was, okay?
6      A.   -- Mr. Monaghan -- yes, that's --
7      Q.   So March --
8      A.   Yes.
9      Q.   -- 2003.
10         And I'm going to just put work made for
11 hire. And just have a definition up here. You know
12 lawyers love definitions.
13     A.   Yeah, I noticed that.
14     Q.   And is it your understanding that when you
15 worked for Sunbow that your work-for-hire understanding
16 was the same as it was when you testified in March?
17     A.   Yes.
18     Q.   Okay. But, isn't it true that as recently
19 as this last April you claimed that you had been the
20 copyright owner of the music you wrote for Sunbow's T.V.
21 Series?
22     A.   Copyright owner -- I claimed that? I never
23 claimed to own the copyright. I never asked for the
24 copyright.
25     Q.   Do you remember doing an affidavit in

CAROL ANNE BRYANT - CROSS/PHARES

1
2  opposition to the motions for summary judgment and
3  dismissal submitted by the Defendants Jules M. Bacal and
4  Sunbow Productions, Inc. in April of this year?
5      A.   A couple of months ago, yes, I remember
6  that.
7      Q.   And in that affidavit didn't you say that
8  "upon creation the writer owns all of the rights in the
9  composition. What's actually true in this case is that
10 Ford Kinder and I entrusted the copyright to Bacal and his
11 companies Griffin-Bacal and Sunbow Starwild on behalf of
12 their client HASBRO?"
13     A.   Yes.
14     Q.   Well, in this statement aren't you claiming
15 that Kinder and Bryant didn't work-for-hire?
16         Weren't you saying that you and Kinder owned
17 the copyrights and entrusted them to Bacal --
18         MR. MONAGHAN: Object.
19     Q.   -- and to Sunbow?
20         MR. MONAGHAN: She's making this a copyright
21 case.
22         THE COURT: No. This is cross-examination.
23         Go forward.
24     A.   Can I go forward? I mean, can I answer you?
25     Q.   I'm just asking you, weren't you claiming

CAROL ANNE BRYANT - CROSS/PHARES

1
2  that you and Ford Kinder owned the copyrights but
3  entrusted them to Bacal?
4      A.   We began from the moment we wrote the piece
5  of music -- we began as the creators from the moment we
6  created a piece of music by owning everything which would
7  be then entrusted to Sunbow on behalf of their client. I
8  don't know how they worked that out. But I know that we
9  gave it up. It is not our copyright.
10     Q.   But that you owned it in the beginning you
11 are saying you entrusted it to them?
12     A.   For a hot minute. I'm not saying I retained
13 it. I gave it back -- I gave it away to them.
14     Q.   You owned the copyright and entrusted it to
15 Sunbow, is that right? Sunbow?
16     A.   That's what you just read me that you told
17 me I said. I have a problem with the word "entrusted."
18     Q.   This morning I get to ask the questions.
19     A.   Oh. Yeah, I bet you always get to ask the
20 questions.
21     Q.   And didn't you recently point out that the
22 Copyright Act requires a writing to transfer the copyright
23 also in April of this year?
24         MR. MONAGHAN: There's an objection. She's
25 not a lawyer.

CAROL ANNE BRYANT - CROSS/PHARES

1
2      A.   As a matter of fact, you wrote to me --
3  wrote after -- it said the Plaintiff is not a lawyer, she
4  doesn't know what she is talking about. So you yourself
5  wrote that.
6          THE COURT: Well, Miss Bryant, just to sort
7  of -- hold on. Just to cut through this, are you
8  claiming you ever had a copyright in the music
9  that's before this Court?
10         THE WITNESS: I automatically when I create
11 something have a copyright unless I give it to
12 someone else.
13         THE COURT: Okay. Was there any -- was
14 there ever a case here where you say you didn't
15 give that copyright to Sunbow?
16         THE WITNESS: No. No problem. They need
17 it.
18 BY MS. PHARES:
19     Q.   I would like to read to you your statement
20 from Page 12 of another one of your affidavits from April.
21 This is the affidavit in response to the affidavits of
22 Thomas Griffin and Jules M. Bacal.
23     A.   This is the same group, same time period?
24     Q.   The same time period.
25     A.   Okay.

CAROL ANNE BRYANT - CROSS/PHARES

1
2   Q.   In April this one particularly, this
3   affidavit was also signed on this was the day before
4   April 29th.
5        You said: "The Copyright Act and the very
6   agreement that Sunbow is throwing before the Court at this
7   late date reveal that a relinquishment of the copyright
8   requires a written agreement and no such written agreement
9   has been produced by the Defendants."
10       Correct?
11  A.   Yes.
12  Q.   And then you went on to say: "Rather than
13  march down to the U.S. Federal Court in Foley Square, I
14  will simply state that the issue of the copyright was that
15  I gave G.B.I. and/or Sunbow the musical properties that I
16  created but reserved and never transferred my writer's
17  royalties."
18  A.   That's correct.
19  Q.   But you didn't do that in writing; is that
20  correct?
21  A.   I never executed anything where I gave away
22  my writer's rights.
23  Q.   So --
24  A.   My writer's royalties share rights.
25  Q.   I'm just reading -- I'm going to go back

CAROL ANNE BRYANT - CROSS/PHARES

1
2   over what you just said you wrote was: "The Copyright Act
3   and the very agreements that Sunbow was throwing before
4   the Court at this late date reveal that a relinquishment
5   of the copyright requires a written agreement."
6        Is that right?
7   A.   That's what I said.
8   Q.   That's what you said.
9        You've also just said that you didn't sign
10  anything, isn't that correct?
11       MR. MONAGHAN:  No, she didn't.  I object to
12  the form.
13  A.   I didn't say that.
14       THE COURT:  Overruled.
15  A.   I said I never signed anything that gave
16  away my writer's rights.  That's how I make a living.
17  Q.   Did you sign anything that gave away the
18  copyrights?
19  A.   I don't remember.  But I didn't give away my
20  writer's rights.  I've never done that in my career.
21  Q.   I'm asking you, you don't remember whether
22  or not you signed anything that gave away your writer's
23  rights?
24  A.   In my career I've signed something.
25  Q.   I'm only talking --

CAROL ANNE BRYANT - CROSS/PHARES

1
2   A.   My royal -- my copyright.
3   Q.   I'm only talking about your relationship
4   with Sunbow.
5        Did you sign any agreement with Sunbow in
6   which you gave away the copyright?
7   A.   I don't remember signing Sunbow agreements.
8   Q.   So you could have done it, you just don't
9   remember; is that right?
10  A.   I don't remember signing.  That's my answer.
11  Q.   I'm asking you another question.
12  A.   Okay.
13  Q.   Could you have done it, but you just don't
14  remember?  We're talking about events that took place
15  almost 20 years ago.
16  A.   I would remember.  I would not have signed
17  away my writer's rights.  I know that.  And I wouldn't
18  have forgotten that.  I just never did it in my career.
19  Q.   Miss Bryant, I'm not talking about any of
20  the rights that are on these first two pages, all right.
21  I'm not talking about did you sign away either your public
22  performance royalties or did you give away your music
23  publishing.  These other rights.  I'm asking a different
24  question.
25       I'm asking you:  Did you sign a writing in

CAROL ANNE BRYANT - CROSS/PHARES

1
2   which you conceded that the copyright in your works was
3   not yours, that it belonged to Sunbow?
4   A.   I never -- I -- I never signed that.  I -- I
5   never gave away my writer's rights.  That's all I can say.
6   I would remember signing contracts about that.
7   Q.   I didn't ask you about your writer's rights.
8   I'm asking you a different question.
9        I'm asking you about the copyright in the
10  entire work, the songs you wrote.  Did you sign a writing
11  that transferred those rights to Sunbow?
12       MR. MONAGHAN:  Asked and answered.  She said
13  I don't remember.
14       THE COURT:  No, I'm going to allow it.
15  A.   We worked with these people for so many
16  years.  I don't think we signed agreements on everything.
17  I told you it started with the same deal as Michelin &
18  Company.  We gave up our copyright.  That was the way we
19  worked in everything we did with them.  I don't remember
20  signing Sunbow agreements really.  We were working with
21  the same two people along with the same two companies.
22  Q.   I understand.  You described yesterday how
23  you think the negotiation took place.  What I'm asking you
24  is a different question.
25       I'm asking you:  Did you sign any agreement

Page 536

CAROL ANNE BRYANT - CROSS/PHARES

1
2  in which you surrendered your copyright or agreed that the
3  copyright was belong -- was owned by Sunbow?
4      A.  I don't remember signing that.
5      Q.  But you could have signed such a thing, you
6  just don't remember?
7      A.  I remember an agreement you showed us that
8  we tried to negotiate for a long period of time, but I
9  don't remember any other agreements on those other songs.
10  I don't personally remember.  I can't speak for Ford.
11      Q.  All right.  And do you remember -- do you
12  remember also testifying in November of last year in an
13  affidavit that you were -- that as the owner of the
14  musical compositions used in videos and DVDs you were
15  entitled to the mechanical royalties and/or other synch
16  licences attributable to the other licenses?  And we're
17  talking about --
18      A.  Can I read that?
19      Q.  Certainly.  This is from Page 20, Paragraph
20  81 of your affidavit in opposition to the motions for
21  summary judgment submitted by the Defendants, Jules M.
22  Bacal and Sunbow Productions, Inc., and in support of
23  Plaintiff's cross-motion for partial summary judgment at
24  Page 20, Paragraph 81.
25          (Pause in the Proceedings)

Page 537

CAROL ANNE BRYANT - CROSS/PHARES

1
2      Q.  That's your testimony, isn't it?
3      A.  I need a minute.
4      Q.  I beg your pardon?
5      A.  I need a minute.
6          (Pause in the Proceedings)
7      A.  Well, this is my affidavit.  It's the owner.
8      Q.  You signed that affidavit under oath; is
9  that correct?
10      A.  Yes.
11      Q.  So that is your testimony?
12      A.  That's what I wrote.
13      Q.  In November, 2003?
14      A.  Yes.
15      Q.  And --
16          MS. PHARES:  If I may have one minute, your
17  Honor.
18          THE COURT:  Yes.
19          (Pause in the Proceedings)
20          MS. PHARES:  Your Honor, I would like to
21  read from a footnote in Judge Owen's decision in
22  the Federal Court on the remand in which he quotes
23  Mr. Monaghan's representation at the oral
24  argument.  And the footnote says -- hang on.  It's
25  dropped from the statement and text which said:

Page 538

CAROL ANNE BRYANT - CROSS/PHARES

1
2      "In November Plaintiffs asserted in a brief
3  in opposition that quote Ms. Bryant's claim to the
4  mechanical royalties and synch license fees
5  generated by her compositions is firmly rooted in
6  United States Copyright Law" close quote.
7          And then the footnote is:
8      "Plaintiffs have since retracted this
9  assertion in the hearing before me.  Counsel for
10  Plaintiffs explained quote `I am telling the Court
11  there is no -- despite what we said in our brief,
12  our brief was a little over the top on the issue,
13  and I'll be candid with you, we're not demanding
14  any relief under the Copyright Act,'" close quote.
15          And that was citing from the transcript at
16  Pages 29 to 30.
17  BY MS. PHARES:
18      Q.  So in January you were saying you weren't
19  the owner of the copyright, correct?
20      A.  I never said I owned the copyright.
21      Q.  Well, I just read you from your deposition
22  in November at the time of that motion in which you said
23  you were an owner.
24          MR. MONAGHAN:  No, she said she was an owner
25  of the musical compositions.  That's a

Page 539

CAROL ANNE BRYANT - CROSS/PHARES

1
2  mischaracterization.
3      A.  Yeah, that was bad.  I shouldn't have said
4  that owner of the writer's share of the musical
5  composition.  I don't --
6      Q.  I will rely on what your affidavit said.
7          But my problem is, Miss Bryant, is which of
8  the statements all sworn that you have given are we
9  supposed to believe?  Did you work-for-hire meaning that
10  Sunbow owned copyright --
11          MR. MONAGHAN:  I object to the form.
12      Q.  Or I'll ask you --
13          MR. MONAGHAN:  Excuse me, your Honor, if I
14  may.  There is no testimony -- and Miss Phares
15  isn't testifying, she's asking questions.  Where
16  she says work-for-hire means Sunbow owns the
17  copyright.  That's not -- that's not a proper way
18  to frame that question.  She's not a lawyer.
19  She's a lay person.  She testified that her
20  understanding of work-for-hire was.
21          THE COURT:  Well --
22          MS. PHARES:  I'll reframe the question.
23          THE COURT:  Well, during this witness's
24  direct testimony she stated that she didn't have
25  any copyright rights in the things that she wrote.

Page 540

CAROL ANNE BRYANT - CROSS/PHARES

1
2  At least, that's what my notes say.
3        MR. MONAGHAN:  That's correct.
4        THE WITNESS:  That's right.
5        THE COURT:  So I don't know what the
6  discussion is here.
7     Q.   And you said you had worked-for-hire all
8  your life, all your career?
9     A.   Been hired for work.  That's the first thing
10  that means to me.
11     Q.   No, I had read you from your --
12     A.   Okay, you want me to reread something I
13  said, but I'm telling you what that means to me when I say
14  it that -- and I thought I had explained that here, but --
15        THE COURT:  Well, I take it, Miss Bryant,
16  that when you say you worked-for-hire that this
17  was a deal under which you would not get
18  copyrights.
19        THE WITNESS:  That's what it means.
20        THE COURT:  All right.
21        THE WITNESS:  That's what we get the fee
22  for.
23     Q.   All right, but -- but isn't it true that
24  your testimony has been inconsistent on this subject in
25  the last year?

Page 541

CAROL ANNE BRYANT - CROSS/PHARES

1
2        MR. MONAGHAN:  Object to that.  Let the
3  Court decide whether it is or it isn't.
4        THE COURT:  I'll allow it.
5        MS. PHARES:  She can answer this question.
6     A.   I don't know.  I would have to look at it
7  all again.  I mean --
8     Q.   Well, we've put up the statements as you've
9  said them.  You can see the -- the board, can't you?
10     A.   Yes.  The first thing that you read to me I
11  explained that you gave -- we gave the copyright, we gave
12  the publishing away.  Always retained writer's royalties.
13  I don't know what date that was.
14     Q.   And then in November you said you were the
15  owner of the copyright; is that correct?
16        MR. PRIMIANO:  Your Honor, I have to object.
17  The deposition -- I mean, the affidavit that Miss
18  Phares read in, Miss Bryant testified as the owner
19  of the musical compositions used in these videos.
20        THE COURT:  She entrusted the copy.
21        MS. PHARES:  No, that's another one, your
22  Honor.
23        THE COURT:  When you say you entrusted the
24  copyright, it takes on at least an aura that you
25  owned it and you allowed somebody else to use it.

Page 542

CAROL ANNE BRYANT - CROSS/PHARES

1
2  That's what I think is the problem.
3        THE WITNESS:  That choice of words.
4        THE COURT:  Perhaps.  But I don't see that
5  is a problem here.  Miss Bryant, as far as I can
6  see, testified under direct and whatever she may
7  have perhaps inartfully said in an affidavit is
8  not saying now that she is the owner of any
9  copyright.
10        MS. PHARES:  Well, that's correct, your
11  Honor.
12     Q.   But is it not also true, Miss Bryant, that
13  in October of 2003 Sunbow produced to you an unsigned copy
14  of the JEM Agreement?
15     A.   I don't know when it was.  But I did see
16  that agreement.
17        MS. PHARES:  Well, I'll represent for the
18  record -- and I don't think Mr. Monaghan is going
19  to object -- that it was produced after Defendants
20  filed their motion for summary judgment on
21  September 30th and before the Plaintiff filed
22  opposition on November 30th.
23        MR. MONAGHAN:  I don't think that's, you
24  know, incorrect.
25     Q.   And are we also agreed that neither you nor

Page 543

CAROL ANNE BRYANT - CROSS/PHARES

1
2  Mr. Kinder has any rights to exercise the copyrights in
3  the music that you wrote for Sunbow?
4     A.   Only the ones we reserved.  We always
5  reserved, which we were the writers, we got the royalties
6  for writing music.
7     Q.   Do you contend that you could authorize
8  somebody to make a public performance of your work?
9     A.   How could I do that?  I don't -- I don't
10  think I can do that.
11     Q.   I just want to know whether you think you
12  can.
13     A.   Are you talking about a work I did for
14  someone else?  That I gave them a copyright?  They have
15  the right to copy.  They have the right to do that.  I
16  don't.
17     Q.   You don't have any rights.  And you don't
18  have a right to authorize the making of a phonograph
19  record from say the recording of Truly Outrageous?
20        MR. MONAGHAN:  Objection to the first part
21  of that question, you don't have any rights.
22        THE COURT:  Overruled.
23     A.   To authorize?  Is that what you are asking
24  me?
25     Q.   That's right.

Page 544

CAROL ANNE BRYANT - CROSS/PHARES

1
2    A.    Do I have the authority?
3    Q.    If someone calls you up and says:  Miss
4   Bryant, I want to make a phonograph record of the musical
5   composition you wrote entitled Truly Outrageous, do you
6   have the authority to authorize that?
7    A.    I tell them to call the publisher.
8    Q.    And that's because the publisher has the
9   authority and you don't?
10   A.    As far as I know I don't have the authority.
11  They, the publisher, does those kind of negotiations and
12  they have the copyright somehow entrusted to them.
13   Q.    And it's also your understanding that Mr.
14  Kinder couldn't make that authorization either?
15   A.    No, he couldn't make that authorization.
16   Q.    So how exactly did Kinder & Bryant convey
17  their copyright rights to Sunbow?
18   A.    Well, they always had the copyright rights.
19  We've been working with them for years.
20   Q.    I know that.  But, remember you -- I read to
21  you your testimony in which you said that can only be done
22  in a writing?
23        MR. MONAGHAN:  No, actually -- I object.  It
24  is a mischaracterization.  If the whole portion
25  were read it said that she said in her affidavit

Page 545

CAROL ANNE BRYANT - CROSS/PHARES

1
2   that you said it could only be done in a writing.
3   She's referring to what you said in your papers
4   what the copyright said -- copyright statute said.
5        MS. PHARES:  Do you want to show me?
6        MR. MONAGHAN:  I think it's on the record
7   already.
8        THE COURT:  I think that --
9        MR. MONAGHAN:  It says Paragraph -- can I
10  finish?
11       THE COURT:  Yes.
12       MR. MONAGHAN:  Paragraph 17 says that
13  "critically," comma, "the Copyright Act and the
14  very agreements that Sunbow is throwing before the
15  Court at this late date reveal that a
16  relinquishment of the copyright requires a written
17  agreement and no such written agreement has been
18  produced by the Defendants."
19       And what that is referring to is this
20  unsigned JEM Agreement that has the classic
21  work-for-hire and you turn everything over, which
22  there's no proof it was ever signed, there is no
23  proof anybody ever saw her sign it.
24       THE COURT:  But the witness is testifying
25  that she always -- they always turned over the

Page 546

CAROL ANNE BRYANT - CROSS/PHARES

1
2   copyrights --
3        MR. MONAGHAN:  Right.
4        THE COURT:  -- to the publisher.
5        MR. MONAGHAN:  That's correct.  Not in
6   dispute.
7        THE COURT:  All right.  Let's go on.
8        MS. PHARES:  I'm asking how it was turned
9   over.
10  BY MS. PHARES:
11   Q.    How did you turn it over, Miss Bryant?
12   A.    You know, I heard what you just said, and
13  Sunbow went ahead and they had copyrighted these, so
14  obviously your opinion doesn't hold.
15   Q.    You are talking to your counsel right now;
16  is that correct?
17   A.    No, I'm talking to you.
18   Q.    Would you please read back the last
19  question.
20       BY COURT REPORTER:  How did you turn it
21  over, Miss Bryant?"
22   Q.    And when you said, "I heard what you just
23  said", were you referring to Mr. Monaghan?
24   A.    What Patrick Monaghan just read of your
25  writing that I believe -- I believe you said that they had

Page 547

CAROL ANNE BRYANT - CROSS/PHARES

1
2   to be conveyed in writing.  And you earlier said to me,
3   well, how did they get them?  You know, I mean how?  If
4   you didn't have a writing.
5    Q.    I'm asking --
6    A.    Well, obviously, there was an understanding
7   that it was fine and they went ahead and copyrighted it
8   without a writing.  So what's the problem?
9    Q.    I'm asking you now how, in your
10  understanding, you were the person -- you are saying that
11  this was given to them.  How did you do it?  Did you tell
12  them something?  Did you write something?
13   A.    Some of the things I did with Griffin-Bacal
14  and Sunbow were part of the long period of writing -- I
15  would say, a couple thousands -- thousand pieces of music.
16  Two, three, 400 pieces a year, and that many arrangements
17  as well.  And we worked constantly.  And there was an
18  understanding.  They always got the copyright.  And I saw
19  that's a copyright.  So I don't know that there were
20  agreements that went along with all of those, but that was
21  fine, that was our working arrangement.  And we got -- and
22  it was also fine that we got royalties, and it was fine
23  that they kept the publishing.  We had the same publisher
24  for Griffin & Bacal and for Sunbow, Starwild/Wildstar.
25  And the companies worked together, and developed

Page 548

CAROL ANNE BRYANT - CROSS/PHARES

1  properties together, and they copyrighted it. So
2  obviously you can copyright it without a written
3  agreement.
4
5      Q.   So you are claiming that you gave away your
6  copyright, you don't remember how; is that correct?
7      A.   We gave away our copyright. That was our
8  working agreement with them.
9      Q.   Okay. And when you gave away your
10  copyright, how is it that you -- how is it that you are
11  claiming that you have rights to the performance
12  royalties?
13     A.   Same deal as Michelin & Company.
14     Q.   That's not what I'm asking you.
15     A.   You asked me how is it. And, I mean, it
16  worked that way and it worked that way the entire time we
17  worked with Griffin-Bacal and Sunbow.
18     Q.   So you are saying you don't have any rights
19  as a copyright owner. You just have whatever rights you
20  made with Griffin -- with Sunbow?
21     A.   I'm saying I reserved my writer's rights
22  royalties.
23     Q.   Did you have that conversation with
24  somebody? Your writer's rights? Now you are saying when
25  you reserved your writer's rights. We are talking about

Page 549

CAROL ANNE BRYANT - CROSS/PHARES

1  here -- and I write here writer's share of the performance
2  royalties. Is that correct?
3      A.   Among other rights.
4      Q.   And what other rights did you talk about?
5      A.   The writer's share of other publishing
6  income.
7      Q.   Okay. When you had your -- the deal that
8  was involved with Michelin, with Spence Michelin and with
9  G.B.I. and another advertising agency, did you have print
10  rights with those people?
11         MR. MONAGHAN: Can we have a definition?
12     I'm not sure what that is.
13     Q.   Did you have the kinds of publishing rights
14  that we are talking about, among the other rights? Did
15  you reserve -- was that part of your deal with Spence
16  Michelin?
17     A.   The deal was we had the writer's rights and
18  other music publishing income. The writer gets half and
19  the publisher gets half. And the public performance --
20  the checks are sent separately to the two parties. But in
21  other music publishing income the publisher receives and
22  accounts to the writer.
23     Q.   Has any -- have any of your jingles ever
24  been published?

Page 550

CAROL ANNE BRYANT - CROSS/PHARES

1
2      A.   Yes.
3      Q.   They've been published on print?
4      A.   I don't know.
5      Q.   I'm asking you: Have there ever been a
6  print publication of any of your jingles?
7      A.   I don't know. I -- not that I know of. I
8  really don't know.
9      Q.   And has anybody ever recorded a phonograph
10  record of any of your jingles?
11     A.   Jingles? I'm not sure.
12     Q.   Does that mean you don't know?
13     A.   I had some other -- I had some other uses of
14  my jingles, but I can't remember if any of them ever wound
15  up on record.
16     Q.   Did anybody ever put a jingle of yours in
17  the -- when they were making a movie, did they ever put
18  any of your jingles in the sound track of a movie?
19     A.   Not me. Ford had that happen.
20     Q.   It was something he had written?
21     A.   Yeah.
22     Q.   But nothing for you?
23     A.   You want to know if it was ever in another
24  context?
25     Q.   No. I just want to know whether or not

Page 551

CAROL ANNE BRYANT - CROSS/PHARES

1  anybody ever exercised any of these --
2      A.   In a record or --
3      Q.   -- or made any use of any of these other --
4  these other rights.
5      A.   -- jingles.
6         I just remember something to do with Johnny
7  Carson I used to get checks from. I'm not sure what that
8  was. Checks -- Johnny Carson used to send me checks.
9      Q.   You are telling me what your deal was with
10  Spencer Michelin, the one you agreed to do when you moved
11  over and started doing advertising for G.B.I. --
12         MR. MONAGHAN: Objected to the form of the
13     question several times. But I think, your Honor,
14     understanding we're talking about the deal between
15     Michelin and G.B.I., not her deal with Spence
16     Michelin. The question is saying --
17         MS. PHARES: All right, I'll rephrase it.
18         MR. MONAGHAN: -- you are dealing with
19     Spence Michelin rather than --
20         MS. PHARES: I'll reformulate.
21         THE COURT: Okay, you can reformulate it
22     over lunch. We're going to break for lunch until
23     2:00 o'clock.
24         I would like to have a conversation when we

Page 552

CAROL ANNE BRYANT - CROSS/PHARES

1  come back, all right?
2  MR. MONAGHAN: Okay, Judge.
3  THE COURT: See you then. Have a nice
4  lunch.
5  THE WITNESS: Thank you.
6  (Luncheon Recess: 12:30 p.m.)
7  A F T E R N O O N    S E S S I O N
8  (Reconvened: 2:30 p.m.)
9  (Trial resumes on the record, in open court
10  - counsel present)
11 C A R O L    A N N E    B R Y A N T,
12  the Plaintiff, previously duly sworn
13  by the Court, resumed the stand
14  and testified further as follows:
15  THE COURT: I want the record to reflect
16  that with the permission of all the parties in
17  this lawsuit that I had a discussion with the
18  Plaintiff, her attorney was present in Chambers.
19  And we are now back in session.
20  Let's go forward.
21  CROSS-EXAMINATION
22  BY MS. PHARES: (Continued)
23  Q.    Miss Bryant, when you worked at Michelin &
24  Co. you were an employee; is that correct?
25

Page 553

CAROL ANNE BRYANT - CROSS/PHARES

1
2  A.    Yes.
3  Q.    And your job responsibility was to write
4  music?
5  A.    Write music, arrange music, orchestrate it,
6  conduct it, produce it. And supervise other people's
7  writing.
8  Q.    But it wasn't your job to negotiate
9  agreements, was it?
10  A.    Not to negotiate.
11  Q.    And about what were the years that you were
12  at Spence -- Michelin & Co.?
13  A.    Michelin? '77 through sometime in '81.
14  Q.    And then when did Kinder & Bryant begin?
15  A.    Oh, in 1983. June 10th 1983.
16  Q.    And when you first formed Kinder & Bryant
17  were you doing -- continuing to do advertising work?
18  A.    Yes. I had a company in between Michelin &
19  Company that did advertising, writing music.
20  Q.    And were you -- did you -- did Kinder &
21  Bryant then do work for Michelin & Co.?
22  A.    No. Ford Kinder and I were both employees
23  of Michelin & Company.
24  Q.    But after you went off and formed your own
25  company?

Page 554

CAROL ANNE BRYANT - CROSS/PHARES

1
2  A.    Ford had two more years on his contract,
3  about two more years at Michelin & Company. And I started
4  my own company, Energon Music, and obviously the jingle
5  business.
6  Q.    But when you and Ford Kinder first started
7  your company did you continue -- did you do work for
8  Michelin & Company?
9  A.    No. Michelin & Company was a competitor of
10  ours.
11  Q.    Okay, thank you.
12  And then at that time you did work for
13  Griffin-Bacal; is that correct?
14  A.    Not initially.
15  Q.    Not initially?
16  A.    We did music -- we kind of continued Anne
17  Bryant Music. I had a rolling start. And my clients
18  rolled into -- kind of rolled into Kinder-Bryant. Anne
19  Bryant Music became Kinder & Bryant when Ford was cleared
20  of his contract.
21  Q.    I see. And then -- and then, after that,
22  you began doing work for Sunbow Productions, Inc. That
23  is, you and Kinder & Bryant began doing work.
24  A.    Let me just think about that. We worked for
25  Griffin-Bacal. In September of '83 that was the first

Page 555

CAROL ANNE BRYANT - CROSS/PHARES

1
2  time I worked with Griffin-Bacal.
3  Q.    Griffin-Bacal?
4  A.    And I don't remember when Sunbow -- both of
5  us had written -- I had written a theme for Sunbow two
6  years before when I was at Michelin & Company. But -- I'm
7  trying to think --
8  Q.    I'm just trying to think of kind of when --
9  A.    Sunbow happened.
10  Q.    -- when Kinder & Bryant started working for
11  Sunbow?
12  A.    I'm not exactly sure of how long it took --
13  Transformers moved really quickly from a jingle and it was
14  very successful and we did a lot of jingle work on it.
15  Then it became a T.V. show.
16  Q.    We don't have to go onto where --
17  A.    That's when I started working for Sunbow.
18  Kinder & Bryant.
19  Q.    You did a Transformers jingle for G.B.I.?
20  A.    Uh-huh.
21  Q.    And you were part of Kinder & Bryant when
22  you did that?
23  A.    I was Bryant.
24  Q.    Yes. No, I know that. But I meant you had
25  a company at the time you did it?

Page 556

CAROL ANNE BRYANT - CROSS/PHARES

1
2   A.   Yes.
3   Q.   And then shortly after that you began
4   working for Sunbow doing the T.V. production for the
5   Transformers series?
6   A.   We didn't do that much.  We did an alternate
7   recording of the theme for the T.V. Series.  I think the
8   T.V. Series was '84 or '85.  I don't remember.  But it was
9   pretty quick that they got into it.  And I remember we did
10  some instrumental version of it or two.  But on the jingle
11  we did lots of edits and then future arrangements and
12  what-not.
13  Q.   So it may have been, if you recall, starting
14  Kinder and Ford together back in '83, it might have been
15  as soon as a year, within a year you started doing
16  production work for Sunbow?
17  A.   Yeah, right.  Same piece of music.
18  Q.   And when you -- '83.
19       Now, I want to go back a little bit.  So
20  when you were at Michelin & Co., you weren't actually
21  negotiating the agreements, right?  Isn't that what you
22  testified --
23  A.   Yes, I did testify to that.
24  Q.   And did you ever see any of the written
25  agreements at Michelin & Co.?

Page 557

CAROL ANNE BRYANT - CROSS/PHARES

1
2   A.   Yes.
3   Q.   They had written agreements?
4   A.   Yes.
5   Q.   You say that very emphatically?
6   A.   Well, no, Spence Michelin was a stickler
7   about everything.
8   Q.   And so when you said that you had sort of
9   the same agreement with G.B.I., is that -- that same
10  agreement didn't also include written contracts?
11  A.   See, it must have been contract -- I don't
12  know.  Those were Joe's words.  Okay, guys, same deal as
13  Michelin & Company, okay?  Okay.  Sit down, play the song
14  and we started.  And -- you know --
15  Q.   Well, when you say that there must have been
16  contracts, that's because that was the way you did
17  business at Michelin & Co., right?
18  A.   I would think there would have been
19  contract -- I don't remember.  I know that we knew what we
20  were doing, when I knew that we had been operating -- when
21  we worked for Joe Bacal and Sunbow and Michelin & Company
22  we were just rolling the deal over and we did the same
23  thing.
24  Q.   But when you were at Michelin & Company you
25  were doing -- I certainly know you were doing the

Page 558

CAROL ANNE BRYANT - CROSS/PHARES

1
2   production work for writing jingles, but you weren't
3   handling the business relationship that Michelin & Co. had
4   with its clients, were you?
5   A.   Not exactly true.  Spence relied on me to
6   sound out the do-ability of things with numbers and that's
7   why I happened to know when the fee was low, you know, can
8   we deliver on this?  We had musicians to pay.  We had
9   timing.  We had the number of hours that went into the
10  things.  I was the one who planned all the sessions.  He
11  wanted to know if these things were do-able.  And I was
12  his music director.
13  Q.   He was consulting you certainly about the
14  budget, how he was going to do this, right?
15  A.   He told me about it.
16  Q.   But that's because he was putting it into a
17  final agreement, right?
18  A.   Yeah, make sure everything was right.  The
19  basic parts of that agreement I think were the same for
20  everybody that I saw.
21  Q.   Do you remember just a couple of days ago,
22  on the 7th, that you testified at great length about the
23  process you were just reviewing a moment ago about how --
24  the transfer from the jingle for Transformers, and you
25  testified that Kinder & Bryant were paid a 3,500-dollar

Page 559

CAROL ANNE BRYANT - CROSS/PHARES

1
2   creative fee, right?
3   A.   Yes.
4   Q.   And when you wrote jingles were you always
5   paid the same 3,500-dollar creative fee?
6   A.   You mean for Griffin-Bacal?
7   Q.   For Griffin-Bacal, yes?
8   A.   To my knowledge, it was always $3,500.  It
9   never changed.  That I remember.
10  Q.   And you have also testified that Kinder &
11  Bryant never had written agreements with Michelin & Co.,
12  G.B.I. or Sunbow, right?
13       MR. MONAGHAN:  Object to the form of the
14  question.  She said they didn't do work for
15  Michelin & Co.
16       THE COURT:  All right.
17       MS. PHARES:  I beg your pardon.  I'll amend
18  that.
19  Q.   And you've testified, have you not, that
20  Kinder & Bryant never had written agreements with G.B.I.
21  or Sunbow, right?
22  A.   No, I just don't really remember them.
23  Q.   Do you think that there were or you don't
24  remember them?
25  A.   Well, I don't really remember them.  I

Page 560

CAROL ANNE BRYANT - CROSS/PHARES

1    remember the terms.
2    Q.    All right. But didn't you also testify
3    generally Kinder & Bryant had written contracts with all
4    the major advertising -- advertising companies that it
5    dealt with?
6    A.    I don't remember that.
7         MS. PHARES: Page 74, starting Line 14.
8         MR. PRIMIANO: March 31st?
9    A.    Give it to me so I understand what you are
10   saying.
11        Q.    Miss Bryant, I'm going to read from your
12   deposition of March 31st, 2003, starting with Line 13 --
13   14, rather.
14             "As a general matter while you were
15        associated with Kinder & Bryant, did Kinder and
16        Bryant use a written contract in their business
17        dealings with its clients, particularly those that
18        you had just named?"
19             Now I'm going to skip the interruption of
20   Mr. Monaghan. And your answer was:
21             "As a general rule there was always some
22        kind of piece of paper I think that existed.
23        There may have been exceptions, but some kind of
24        royalty assignment or payment agreement or

Page 561

CAROL ANNE BRYANT - CROSS/PHARES

1    reimbursement that set forth the terms. They were
2    often presented -- they often presented it to us.
3    That more often was the case."
4         Do you remember that?
5    A.    Yes.
6    Q.    Okay. And isn't it true also that Kinder &
7    Bryant also had a written agreements with G.B.I.?
8    A.    I think we had some. I don't remember,
9    though.
10        MS. PHARES: I'm going to offer you what has
11   been identified as Defendant's Exhibit B and C,
12   which are two agreements both dated April 8th 1988
13   between Griffin-Bacal and Kinder & Bryant. One
14   for Transformers, one for Visionaries. Production
15   numbers Sunbow 503 or SUN 503 through 510 for
16   Transformers. And SUN 511 through 518 for
17   Visionaries.
18        MR. MONAGHAN: I don't have the Visionaries
19   there.
20        (Defendant's Exhibits B, agreement dated
21   April 8, 1988 for Transformers, marked for
22   identification)
23        (Defendant's Exhibit C, agreement dated
24   April 8, 1988 for Visionaries, marked for

Page 562

CAROL ANNE BRYANT - CROSS/PHARES

1    identification)
2    Q.    And I'm handing these to you for
3    identification. I'm referring to B and C here.
4    A.    Shall I say that that's not a C?
5    Q.    That's all right. I've identified them for
6    the record.
7         I would like to know, have you ever seen
8    these before?
9         MR. MONAGHAN: This is in the material that
10        was just produced to us within the last two weeks,
11        correct?
12        MS. PHARES: I don't have the exact date,
13        but I would say it was sometime after the
14        beginning of June.
15        MR. MONAGHAN: Right, June -- according to
16        June 22nd we received a letter with those page
17        numbers. It wasn't previously produced in the
18        litigation.
19   A.    I'm looking at Visionaries. There's my
20   song. I see Ford Kinder's, FK.
21   Q.    Hang on, I'll tell you --
22   A.    What's the question?
23   Q.    My question for you is: Have you ever seen
24   them before?

Page 563

CAROL ANNE BRYANT - CROSS/PHARES

1    A.    I don't -- I never saw these two before, but
2    they -- they seem to say some of the figures that we
3    worked with.
4    Q.    Hang on.
5         MS. PHARES: Your Honor, if you would please
6         just ask the witness if she would answer the
7         question I've asked.
8    A.    I have not seen these before.
9    Q.    Okay, thank you.
10        Now, if you would turn to the signature page
11   of the Transformers contract, that's C to the page that
12   has the Sunbow 506 at the bottom.
13        And would you tell me is that Ford Kinder's
14   signature?
15   A.    That looks like Ford Kinder's signature.
16   Q.    And while you are still looking at that same
17   page, you see up a little farther there are initials.
18        Are those Ford Kinder's initials?
19   A.    They look like Ford Kinder's.
20   Q.    That's exactly what I wanted to know.
21        Now, change -- move on to the music that is
22   written on Sunbow 508.
23   A.    Which one are we looking at? Transformers
24   or Visionaries?

Page 564

CAROL ANNE BRYANT - CROSS/PHARES

1
2      Q.    We are still with the same contract.
3   Transformers.
4      A.    Transformers. Page 508?
5      Q.    Uh-huh. I confess that I can't say that I
6   recognize your notation or Mr. Kinder's notation, so can
7   you identify that?
8      A.    That's my notation.
9      Q.    That's yours.
10          And now turning to the other exhibit,
11  Exhibit B --
12      A.    You know this is a different Transformers
13  song, right?
14      Q.    Just for the moment -- I'm not really
15  interested in the piece of music for the moment. I just
16  want to talk about the agreements, all right?
17      A.    Okay. And the other piece --
18      Q.    And Exhibit B, same thing, let's go to
19  Sunbow 513.
20          And would you tell me is that Mr. Kinder's
21  signature?
22      A.    It looks like Ford Kinder's signature, yeah.
23      Q.    And his initials farther up on that page?
24      A.    It looks like his initials.
25      Q.    And on the next Page 514 there are at the

Page 565

CAROL ANNE BRYANT - CROSS/PHARES

1
2   end of those two additional paragraphs 6A and B, are those
3   his initials or -- his initials? Yes?
4      A.    Yes. It looks like they would be, yeah.
5      Q.    And then moving to 516; is that musical
6   notation yours?
7      A.    Yes.
8      Q.    Okay. Now, both of these agreements are
9   signed by Mr. Kinder on behalf of Kinder and Ford; is that
10  correct?
11      A.    Kinder & Bryant you mean?
12      Q.    That's what I was going to say.
13      A.    Kinder & Bryant.
14      Q.    Kinder & Bryant, I beg your pardon.
15      A.    Let me see --
16      Q.    Is that correct?
17      A.    Very truly yours, Kinder & Bryant. Do I
18  read this or --
19      Q.    And you don't have to look at Mr. Monaghan
20  for this answer. My question only is --
21      A.    Well, how do you expect me to answer what it
22  is about if you have not given me a chance to read it?
23      Q.    No, I didn't ask you that.
24          Mr. Kinder signing on behalf of Kinder &
25  Ford -- I mean, Kinder & Bryant.

Page 566

CAROL ANNE BRYANT - CROSS/PHARES

1
2          MR. MONAGHAN: I object to the form of the
3   question.
4          THE COURT: Overruled.
5      A.    Very truly yours, Kinder & Bryant, Ltd. name
6   of contractor.
7      Q.    And it's after the word "by"; is that
8   correct?
9      A.    By Ford Kinder.
10      Q.    And underneath it he's written what?
11      A.    President.
12      Q.    So this contract was signed by Ford Kinder
13  on behalf of Kinder & Bryant; is that right?
14      A.    Yes.
15          MR. MONAGHAN: Objection to the form of the
16  question.
17          THE COURT: I'll allow it.
18      Q.    Now --
19          MR. MONAGHAN: It says what it says. We're
20  not debating that. Just as far as it being on
21  behalf of is an entirely separate issue. The
22  document does say that. That's as far as it goes.
23          THE COURT: Well, the objection is
24  overruled. That's it. Let's go.
25      Q.    Now, except for the date and the names on

Page 567

CAROL ANNE BRYANT - CROSS/PHARES

1
2   the works and the parties these are formal agreements; is
3   that right? With the spaces you just fill in?
4      A.    They appear to be form agreements.
5      Q.    And would you look at Paragraph 2 of either
6   of the agreements, although I would recommend Visionaries,
7   because the photocopies are marginally better.
8      A.    Yeah, it is. Yeah.
9      Q.    And in that paragraph Kinder & Bryant is
10  assigning all of its copyrights in the material it
11  delivers to Sunbow -- I mean, to G.B.I., and agrees that
12  the material delivered is work-for-hire within the meaning
13  of the 1976 Copyright Act of the U.S., isn't that so?
14      A.    That's what it says.
15      Q.    Okay. And it appears, wouldn't you say, to
16  the extent that you've ever said that Kinder & Bryant
17  didn't have agreements with G.B.I., this suggests that
18  that's wrong, isn't that correct?
19      A.    This is a jingle agreement.
20      Q.    I said with G.B.I.
21      A.    Yeah. Yeah.
22      Q.    Am I correct?
23      A.    I'm sorry, would you read that back, please?
24      Q.    I said to the extent that you have ever said
25  that Kinder & Bryant did not have written agreements with

Page 568

CAROL ANNE BRYANT - CROSS/PHARES

1           CAROL ANNE BRYANT - CROSS/PHARES
2  G.B.I., that you incorrect?  These are agreements of
3  between G.B.I. and Kinder & Bryant, aren't they?
4         MR. MONAGHAN:  I object. I object.  If I
5     could get my statement on the record, your Honor?
6     What we have here is a document which has
7     just been produced in litigation, so we have not
8     even crossed that point as yet.  Just produced in
9     the last two weeks.  We also have one that is (A)
10    a copy and it is only signed apparently by one
11    side.  It has an excepted provision there with no
12    corresponding signature on behalf of the other
13    party.  And, so far, Miss Phares is treating it
14    already in evidence.
15     MS. PHARES:  Hang on. Are you objecting to
16    it going into evidence.
17     MR. MONAGHAN:  Yes, I am.
18     MS. PHARES:  Your Honor, this is being
19    offered at least in part for the fact that these
20    are agreements where the intent of Kinder on
21    behalf of the president is showing their intent to
22    enter into this contract on behalf of Kinder &
23    Bryant.
24     THE COURT:  Miss Bryant, was Mr. Kinder the
25    president?

Page 569

1           CAROL ANNE BRYANT - CROSS/PHARES
2     THE WITNESS:  He was the president and I was
3    the chairman.
4     THE COURT:  Okay.  All right, they are
5    accepted in evidence.
6     (Defendant's Exhibits B and C marked and
7    received in evidence)
8     MR. MONAGHAN:  Can we possibly have an
9    explanation why it was not produced previously in
10    the case?  I have not been able to take any
11    discovery on this document.  I have not been able
12    to ask Mr. Kinder any questions about how he did
13    that.
14     THE COURT:  When we began this trial,
15    counselor, I said to you the battle is going to be
16    fought on the grounds that you all have ordained
17    it to be fought on.  Whatever discovery is added
18    at the last minute, apparently they cobbled
19    together at the last minute and gave it to you. I
20    was not going to put this trial aside for further
21    discovery.  That's it.  If you don't like it put
22    your exception on the record.
23     All right, let's go.
24  BY MS. PHARES:
25    Q.   Miss Bryant?

Page 570

1           CAROL ANNE BRYANT - CROSS/PHARES
2    A.   Yes.
3    Q.   Are you with me?
4    A.   I'm with you.
5    Q.   Okay.  I just want to establish to the
6  extent that you have testified in the past that Kinder &
7  Bryant did not have agreements with G.B.I.; is that not
8  incorrect?
9    A.   I'm not sure what I -- if I ever said
10  anything like that.  I think -- I don't remember.  I -- I
11  didn't sign this so, you know -- I know that we had a way
12  that we worked with Griffin-Bacal and a way that we worked
13  with Sunbow and everything seemed to go according to Hoyle
14  during the whole time.
15    Q.   Is there a reason you don't remember it is
16  because these agreements were usually done by Mr. Kinder?
17    A.   He may have -- yeah.  These two were.
18    Q.   These two were.
19     And did Mr. Kinder tend to do the kind of
20  the paperwork associated with the company or was he
21  responsible for it?
22    A.   Well, the staff did the paperwork largely,
23  you know.  We put those systems in place.  There was a lot
24  of paperwork.
25    Q.   I'm sure.

Page 571

1           CAROL ANNE BRYANT - CROSS/PHARES
2    A.   Yeah.
3    Q.   But did Mr. Kinder do the agreements with
4  your other advertising agencies?
5    A.   You know, I said there was some kind of
6  piece of paper.  It could be a purchase order.
7    Q.   Do you know whether or not Kinder & Bryant
8  was an S Corporation or a C Corporation?
9    A.   Oh, gosh, I used to know that and I've
10  forgotten. I'm not sure.
11    Q.   Who did the tax returns for Kinder & Bryant?
12    A.   Robin, Spielman, Slaten and Hoffen.
13  [phonetic]
14    Q.   Who handled the relationships for that
15  company?
16    A.   We always went together.
17    Q.   You and Mr. Kinder?
18    A.   Yes.
19    Q.   And do you know what a 1099 is?  Do you?
20    A.   Yes.
21    Q.   What is that?
22    A.   It's -- it's miscellaneous income.
23    Q.   And who gets a 1099?
24    A.   An independent contractor, usually.
25    Q.   And did you ever get those?

Page 572

CAROL ANNE BRYANT - CROSS/PHARES

1
2     A.    From who?
3     Q.    From the entities that you worked for Kinder
4  & Bryant?
5     A.    They paid us as a corporation.
6     Q.    And did the corporation receive 1099s?
7     A.    I don't think so. I don't remember seeing
8  any accounting meetings. We got 1099s from BMI, Ford and
9  I.
10    Q.    I understand that, but that is not my
11 question?
12    A.    I'm sorry, I was just trying to think about
13 1099s.
14    Q.    Let's go back a moment to Defendant's
15 Exhibits B and C, all right?
16    A.    Okay.
17    Q.    I want to direct your attention to Paragraph
18 2A, and I still think the Visionaries contract is the best
19 to read.
20    A.    It is. They are both terrible.
21    Q.    Under that agreement it says you all were
22 paid a basic fee of $250, right?
23    A.    Yes.
24    Q.    And then if they selected what you were
25 going to -- what you had written, they paid you more so as

Page 573

CAROL ANNE BRYANT - CROSS/PHARES

1
2  to make up the 1500-dollar fee; is that right?
3     A.    That was the arranging fee.
4     Q.    Well --
5     A.    Producing, radio, television, and other
6  advertising purposes. That's what it says.
7     Q.    Right. It says --
8     A.    Pay an additional sum of $1500 --
9     Q.    Less --
10    A.    Well, these are the numbers, but it was
11 always billed as 1500, 3500 and 250, so --
12    Q.    So the -- this agreement, though, reflects
13 the payments that you got even if you don't necessarily
14 remember exactly what they were for; is that correct?
15    A.    I remember what they were for. 3500 was a
16 creative fee.
17    Q.    Hang on.
18    A.    1500 was the arranging fee.
19    Q.    Miss Bryant -- Miss Bryant, can we just get
20 started here again.
21          In Paragraph 2B does it say that if you
22 determine -- and this is written as though it were a
23 letter for Mr. Kinder from Kinder & Bryant to
24 Griffin-Bacal?
25    A.    Uh-huh.

Page 574

CAROL ANNE BRYANT - CROSS/PHARES

1
2     Q.    -- that if you determine to use material in
3  radio, television and/or other advertising purposes you'll
4  give us written notice after -- and then after giving the
5  written notice of that determination you will also pay
6  $1500 less the payment that was made in Paragraph 3A,
7  which is -- and I misspoke earlier when I said 2A --
8     A.    Piano demo.
9     Q.    So you got a total here of 1500 if they
10 actually took your work; is that correct?
11    A.    No. We got 250 for each piano demo, then we
12 got $1500 for each arrangement, and we got $3500 for a
13 creative fee.
14    Q.    When the checks came in, did you handle the
15 bookkeeping of those, not mark them up against the
16 contract?
17    A.    No, the office -- administrative lady, Pam
18 Burgoin did.
19    Q.    So you never saw those checks as they came
20 in?
21    A.    No. She certified that they would come in.
22    Q.    So you could be mistaken about whether or
23 not these were additional fees of 1250 as opposed to 250,
24 1500 and 3500, right? Because you weren't doing that?
25    A.    No. I wasn't mistaken about that. I knew

Page 575

CAROL ANNE BRYANT - CROSS/PHARES

1
2  what checks were coming in. It's just that I didn't take
3  them to the bank.
4     Q.    How did you know what was coming?
5     A.    Well, I knew what we had done and I knew
6  that we used to budget our money, because we had to outlay
7  payrolling and say, oh, God, we're nearly broke. Well, we
8  have all these piano demos money coming in this week and
9  we knew what was coming in because we had to payroll for
10 people.
11    Q.    Do you think G.B.I. paid you more than they
12 were required to under their agreement with you?
13    A.    I don't know.
14    Q.    Well, let's finish this off. In 3C --
15    A.    I know there was some changes at the very
16 end for the fees.
17    Q.    Miss Bryant, at the moment I have another
18 question.
19          In 3C it says that if you determine -- that
20 is, "if G.B.I. determines in its discretion to use the
21 materials in more than one of the three major markets,
22 that is New York, Chicago and Los Angeles, you will after
23 such use pay us as a one time payment such additional sum
24 as will increase the royalty payments hereunder to 3500
25 inclusive of all the payments made to us pursuant to some

Page 576

CAROL ANNE BRYANT - CROSS/PHARES
1  CAROL ANNE BRYANT - CROSS/PHARES
2  Paragraphs 3A and 3B;" is that what it says?
3      A.   Yes.
4      Q.   You think, though, they were paying you more
5  than they had to pay you; is that correct?
6      A.   No, I'm saying that, you know, there could
7  be 12 piano demos.  So that 250 was paid to do a piano
8  demo, and we always did at least two of them.  And so
9  that's what the 250 was for.  So we would do these piano
10 demos which are a lot of work.
11     Q.   But you don't really know that because you
12 were not logging in monies as it came in.
13     A.   I knew every year -- I don't have a file
14 system in my mind of every single one of them.  Some we
15 wrote three versions.  Some -- most we wrote two.  Every
16 now and then we wrote four.  So this is pretty general
17 that 250 would have been times four if there were four
18 piano demos.
19     Q.   Now, I want to also direct your attention to
20 Paragraph 3D.  And doesn't that say that except --
21     A.   Which one is D?
22     Q.   It follows C.
23     A.   Is that C the top one?  Oh, there's D.
24     Q.   See it?
25          And does it not say that "except as

Page 577

1  CAROL ANNE BRYANT - CROSS/PHARES
2  otherwise expressly provided for herein neither we nor the
3  artist shall be entitled to any payment and/or other
4  consideration;" does it not?
5      A.   It says that.
6      Q.   And it doesn't provide for any other uses
7  except for the ones that are laid out in this agreement,
8  isn't that right?
9      A.   It says, advertising.
10     Q.   It says for advertising and then it says --
11     A.   The purposes of advertising.
12     Q.   It says the particular payments that they
13 will lay out are the basic payment following receipt of
14 the materials.  A payment if they give you notice that
15 they are going to use the material in a radio
16 advertisement, and then an additional payment if it is
17 used in a national radio advertisement.  There's nothing
18 else spelled out in this agreement, is there?
19     A.   That's basically it.  But the notice was,
20 hey, we need dubs of that this afternoon.  I mean, it's
21 move like lightening.  We did hundreds of pieces of music
22 a year.
23     Q.   I'm not talking about the work that you did.
24 I'm just asking you:  This is the agreement that you did
25 when you worked-for-hire and these are the payments that

Page 578

1  CAROL ANNE BRYANT - CROSS/PHARES
2  they agreed to make to you for that, isn't that correct?
3      A.   Yeah.  Yes, but --
4      Q.   Thank you.
5      A.   -- basically --
6      Q.   And isn't it also true that when you moved
7  on and worked for Kinder & Bryant that you had -- I mean,
8  that Kinder & Bryant worked for Sunbow, that you also had
9  written agreements with Sunbow?
10     A.   I don't remember any except for the one that
11 you gave us.  That was a big problem for us.
12     Q.   Have you not testified that there were
13 written agreements with Sunbow?
14     A.   I don't think I have.
15     Q.   Didn't you testify that Ford Kinder, your
16 business partner, told you the Sunbow agreements were
17 written?
18     A.   I don't remember that.  Refresh my memory.
19          MS. PHARES:  March 2003 deposition, 44, Line
20 3.
21     Q.   All right, I'm reading you again, Miss
22 Bryant, from your deposition from March, 2003.  This of
23 course was before we had produced the unsigned agreement.
24          "Did you have a written agreement to produce
25     the compositions at issue in this case?

Page 579

1  CAROL ANNE BRYANT - CROSS/PHARES
2          "Answer:  Ford Kinder told me that there was
3  a contract.  I don't remember ever signing a
4  contract with them, but he was my partner and he
5  said there was a contract at some point in our
6  association with those people."
7          And then later or -- so, according to your
8  testimony in March, Mr. Kinder had told you there was a
9  written contract with Sunbow, had he not?
10     A.   Was he talking about Sunbow?
11     Q.   He was.
12          MR. MONAGHAN:  Talking about B and C, G.B.I.
13     A.   Aren't we talking about G.B.I.?
14          MS. PHARES:  Excuse me, I asked questions
15     relating to Sunbow and the witness answered them.
16     A.   But you just read something.  Did I say that
17 in reference to Sunbow or to G.B.I. or what?
18     Q.   Yes, that's exactly right.
19     A.   We didn't do that much for Sunbow.  We did a
20 huge T.V. show, but we didn't do lots of shows for Sunbow.
21     Q.   Well, you did about seven or eight of them,
22 didn't you?  Maybe that's why you don't remember them
23 because there weren't very many.
24     A.   There was a JEM show, television show.  And
25 there was a theme from My Little Pony and Friends.  I

26 (Pages 576 to 579)

Page 580

CAROL ANNE BRYANT - CROSS/PHARES
1
2  believe the GI Joe movie theme was for Sunbow. I believe
3  it was.
4      Q.   You don't know?
5      A.   It started at Griffin-Bacal. See, I know
6  that Transformers started at Griffin-Bacal. It's not like
7  we did lots of television shows. We had themes that moved
8  from advertising into television themes. That's not like
9  doing a television show. JEM was a musical television
10 show.
11     Q.   Miss Bryant, I'm not --
12     A.   So I'm not sure what you are referring to.
13     Q.   Okay. I said if Ford Kinder told you that
14 there were written agreements you wouldn't have any reason
15 to disbelieve him, would you?
16     A.   No. I just have a problem with what you
17 just asked -- read into there. I have a right to ask you
18 what you are talking about.
19          Are you talking about a Griffin-Bacal
20 statement that I made there or a Sunbow statement? You
21 produced the Sunbow agreement.
22     Q.   You said that it was your practice in 30
23 years of work to have these kinds of agreements. And you
24 were asked:
25          "Were they -- were they written agreements?"

Page 581

CAROL ANNE BRYANT - CROSS/PHARES
1
2          And you said -- and you said what I just
3  read is:
4          "Ford Kinder told me there was a contract.
5      I don't remember ever signing a contract with
6      them. But he was my partner and he said there was
7      a contract at some point in our association with
8      those people."
9      A.   I'm sorry, I just --
10     Q.   Now --
11     A.   -- I don't know whether you are talking --
12          THE COURT: There is no question pending.
13     Q.   There is no question pending.
14          THE COURT: Don't answer anything that is
15 not pending.
16          THE WITNESS: I can't answer it?
17          THE COURT: There is no question pending.
18          THE WITNESS: Well, she keeps talking about
19 what I said. What did I say?
20          THE COURT: Miss Bryant -- Miss Bryant,
21 let's have a question and then an answer.
22          THE WITNESS: Okay. Sorry.
23          THE COURT: It's all right.
24          THE WITNESS: I'm getting confused.
25     Q.   I'll tell you what, in order to sort of make

Page 582

CAROL ANNE BRYANT - CROSS/PHARES
1
2  this clearer I'm going to read back the question before
3  the passage I just read to you, all right?
4          This is, by the way, during the deposition
5  with Miss Kitson.
6          Do you remember Roseanne Kitson?
7      A.   Yes, I remember her.
8      Q.   She said, okay, "when you wrote the
9  compositions" --
10          MR. MONAGHAN: What page?
11     Q.   Page 43.
12          "When you wrote the compositions at issue in
13 this case were you working on a work-for-hire
14 basis?
15          "Yes, yes."
16          This is your answer:
17          "Yes, a commercial business music house."
18          Then --
19          "Question: Did you have a written contract
20 to produce the compositions at issue in this case?
21          "Answer: Yes. Ford Kinder told me that
22 there was a contract. I don't remember ever
23 signing a contract with him, but he was my partner
24 and he said there was a contract at some point in
25 our association with those people."

Page 583

CAROL ANNE BRYANT - CROSS/PHARES
1
2          MR. MONAGHAN: You read the word, yes, which
3  is not in the answer.
4          MS. PHARES: I beg your pardon. It just
5  begins with what Ford Kinder told me, but other
6  than that I've now read it three times. I'm sure
7  one time I got it right.
8      Q.   And in March -- in that same deposition
9  where you were asked whether your working arrangement at
10 Kinder & Bryant covered the copyright ownership of the
11 compositions you created, didn't you also state under
12 oath -- and I'm now at 49 --
13          "I believe so. I believe it termed it -- I
14 can see work-for-hire in my mind, yes."
15          MR. MONAGHAN: Can you read the question
16 that preceded it and the answer?
17     Q.   All right.
18          "Did those working agreements here at Kinder
19 & Bryant or Michelin & Co. cover the copyright
20 ownership of the question of the compositions you
21 created?
22          "Answer: I believe so. I believe it termed
23 it -- I can see work-for-hire in my mind, yes."
24          Okay, now, when you referred to it terming
25 something work-for-hire, weren't you referring to a

27 (Pages 580 to 583)

Page 584

CAROL ANNE BRYANT - CROSS/PHARES

1    written contract?
2    A.    I remember Michelin & Company too.
3    Q.    And when you recalled you were seeing
4    work-for-hire in your mind, weren't you talking about
5    seeing a written contract?
6    A.    Well, I have them now with the people I work
7    for.
8    Q.    Is the answer yes?
9    A.    Yes. I've seen that a lot.
10    Q.    You testified earlier this morning that you
11    didn't register your jingles, and I think you were talking
12    about registering them with -- with BMI?
13    A.    Yes.
14    Q.    Do you know who did?
15    A.    The administrator.
16    Q.    Okay, and --
17    A.    Publisher's administrator.
18    Q.    Who in your office had any -- or who, if
19    anybody, in your office had any relationships with the
20    music administrator?
21    A.    Bill Dobishinsky.
22    Q.    At the beginning?
23    A.    Well, he was -- he was the administrator.
24    He came to town once in a blue moon. He was from

Page 585

CAROL ANNE BRYANT - CROSS/PHARES

1    California. And he would come over and see us.
2    Q.    And did you both meet with him?
3    A.    Yes.
4    Q.    And how come he came to see you if he wasn't
5    your administrator -- or he was the administrator you said
6    earlier for the music publisher, isn't that correct?
7    A.    Yes.
8    Q.    But he would come to see you personally?
9    A.    Well, we -- we had the most registrations
10    and he would come and make sure everything was right and
11    clear.
12    Q.    Well, he had --
13    A.    He had to file all those things, you know,
14    so he would double-check it with us.
15    Q.    You had -- I thought a moment ago you said
16    you had only very few songs that you did for Sunbow and
17    Co. -- Sunbow productions?
18    A.    Well, for Starwild we had a lot. We had
19    jingles and songs. The jingles were in Starwild too.
20    Q.    I see. So, in other words, he was coming to
21    see you with respect to your business both for G.B.I. and
22    your business for Sunbow?
23    A.    Our registrations for Starwild and Wildstar.
24    Q.    And Wildstar was the ASCAP publisher and

Page 586

CAROL ANNE BRYANT - CROSS/PHARES

1    Starwild was -- I mean, Wildstar was the ASCAP publisher
2    and Starwild was the BMI publisher, correct?
3    A.    That's right.
4    Q.    And who arranged, by the way, for the
5    incorporation of Kinder & Bryant; do you remember?
6    A.    Who arranged for the incorporation of it?
7    Q.    Uh-huh.
8    A.    You know, it used to be Kinder, Bryant and
9    Aquino for a short time. I don't remember who
10    incorporated that. But I know when Sarah Aquino moved
11    west and it became Kinder & Bryant, that Pam did that. I
12    don't know if you did Kinder Bryant and Aquino, Pam
13    Burguoin. The name changed.
14    Q.    But you don't remember who did the
15    incorporation work at the beginning?
16    A.    I would just be guessing.
17    Q.    Do you think you did it?
18    A.    No.
19    Q.    Do you think Ford Kinder probably handled
20    the work?
21    A.    No.
22    Q.    I don't mean did it himself. I mean, did he
23    arrange for a lawyer to set up your corporation?
24    A.    I told you I would be guessing, but I can

Page 587

CAROL ANNE BRYANT - CROSS/PHARES

1    remember that we went to Dave Sonnenberg's office, and
2    maybe that was why.
3    Q.    And who is Don Sonnenberg?
4    A.    Dave Sonnenberg is a music attorney.
5    Q.    Do you think he set up your corporation?
6    A.    Kinder, Bryant & Aquino, yes.
7    Q.    I beg your pardon?
8    A.    I think he did. I think he set up Kinder,
9    Bryant & Aquino. I wish I had the same idea. It was a
10    name change.
11    Q.    Were there other employees at Kinder &
12    Bryant?
13    A.    Yes.
14    Q.    How many?
15    A.    It varied.
16    Q.    Give me --
17    A.    Temporary employees, somebody -- we had
18    temporary office workers who came in two days a week. We
19    got busier and busier. And then we had two full-time
20    office people or three. Three -- no, three employees
21    steady.
22    Q.    Okay.
23    A.    Yeah.
24    Q.    And who handled the payroll?

Page 588

CAROL ANNE BRYANT - CROSS/PHARES

1
2  A.   We signed the checks.
3  Q.   I asked you who handled payroll.
4  A.   Pam Burgoin.
5  Q.   And she was your office manager?
6  A.   Yes.
7  Q.   And so she would provide you with the checks
8  and you would sign them?
9  A.   With the paper clip to the bill. And he
10 would go over them and sign them and we would both have to
11 sign the checks.
12 Q.   Keep everybody honest, right?
13 A.   Well, it was an artifact of Kinder, Bryant.
14 And Sarah Aquino was our partner. We all decided, two out
15 of three of us had to sign a check and we just left it
16 that way.
17 Q.   All right. Now, earlier you testified that
18 you gave up the copyright when you were doing work in your
19 music arrangements between Kinder & Bryant with Sunbow;
20 that you gave up the copyright in exchange for a fee and
21 performance royalties and, remember, for the fee, the
22 performance royalties -- back to this, and other
23 royalties?
24       MR. MONAGHAN: Object to the form of the
25       question. That isn't her testimony.

Page 589

CAROL ANNE BRYANT - CROSS/PHARES

1
2  Q.   All right, make this quick, sort of -- I
3  guess quick. Page 43.
4       And did you testify in March 31, 2003 you
5  gave up the copyright in exchange for a fee while also
6  retaining my performance rights royalties and other
7  outside royalties?
8  A.   Yes.
9  Q.   And did each deal have the same creative
10 fee?
11       Now, I'm talking about your agreements,
12 Kinder & Bryant's agreements with Sunbow, and I'm just
13 talking about the creative fee.
14 A.   With Sunbow?
15 Q.   Right.
16 A.   No, it was different with Sunbow.
17 Q.   Well, how was it with Sunbow?
18 A.   I just need to review this in my mind. I
19 think the only television show we did was JEM of the full
20 television show they had that had a theme, and it had
21 original songs, so they were different arrangements.
22 Q.   Miss Bryant, you don't have to talk about
23 what was in each program. We will maybe come to that
24 later on. But for right now I'm just asking you --
25 A.   About the theme.

Page 590

CAROL ANNE BRYANT - CROSS/PHARES

1
2  Q.   -- were the creative fees the same for each
3  of the programs -- each of the series for which you wrote
4  music? GI Joe -- you said you didn't write GI Joe. But
5  JEM, My Little Pony, the series that are in issue in this
6  case, all right, did you have a different creative fee for
7  each one of them?
8       MR. MONAGHAN: I'm sorry, I thought
9       originally the question had Sunbow in it.
10 Q.   In the agreements with Sunbow for each of
11 the T.V. series at issue in this case, did you have a
12 different creative fee for each of them?
13 A.   I don't remember the agreements. They were
14 different jobs.
15 Q.   Well --
16 A.   So I can't imagine that they were exactly
17 the same. And -- I don't remember the agreements at all.
18 You see, JEM has a different situation than this.
19 Q.   Well, this is for jingles?
20 A.   This is in advertising.
21 Q.   This is for jingles. We're not talking
22 about this anymore. I'm talking about a T.V. Series.
23       So you are saying that you can't remember
24 whether or not you had the same creative fee whether you
25 wrote all the music in JEM or you wrote some background

Page 591

CAROL ANNE BRYANT - CROSS/PHARES

1
2  music cues and an opening theme for another one?
3       MR. MONAGHAN: What is the other one?
4  That's the problem.
5  Q.   Well, how about Transformers?
6       MR. MONAGHAN: Well, excuse me. How about
7  it? It's a jingle.
8       MS. PHARES: Miss Bryant said --
9       THE COURT: I take it that's an objection to
10 form?
11      MR. MONAGHAN: It is. I'm sorry, your
12 Honor. I apologize.
13      THE COURT: All right. Sustained as to
14 that.
15      THE WITNESS: Maybe we should go one by one.
16 Q.   Do you recall what the creative fee was for
17 Kinder & Bryant when they wrote the music for Transformers
18 for Sunbow?
19 A.   We didn't write the music for Transformers
20 for Sunbow. We wrote it for Griffin-Bacal.
21 Q.   Did you write any music cues for the
22 Transformers series?
23 A.   I did it -- a new arrangement for the
24 opening theme.
25 Q.   All right, new arrangement is music, is it

Page 592

CAROL ANNE BRYANT - CROSS/PHARES

1   CAROL ANNE BRYANT - CROSS/PHARES
2   not?
3       A.   Thank you. I've always thought so, yes.
4       Q.   So would I.
5       A.   It's not music that gives you royalties.
6   It's the melody that gives you the royalties. An arranger
7   doesn't get royalties.
8       Q.   Well, if an arranger does a new and original
9   work based on something, doesn't an arranger get
10  royalties?
11      A.   No.
12      Q.   Isn't that a derivative work? Why
13  wouldn't --
14      A.   No, that's an arrangement of an existing
15  song. If I do an arrangement of Somewhere Over The
16  Rainbow Harold Arlen's estate gets the music royalties,
17  not me. I get a fee. So it would be an arranging fee.
18      Q.   If you did that would you sign a
19  work-for-hire agreement?
20          MR. MONAGHAN: Object. Speculative. Not at
21  issue.
22      A.   For an arrangement?
23          THE COURT: Overruled.
24          Go ahead.
25      A.   Are you asking me if I would sign a

Page 593

1   CAROL ANNE BRYANT - CROSS/PHARES
2   work-for-hire agreement for an arrangement?
3       Q.   Uh-huh.
4       A.   I've been doing arrangements for a long
5   time. Nobody asked me to sign an agreement. I do my
6   arrangement, I send my bill, payroll the session, and they
7   reimburse me.
8       Q.   They send you an invoice?
9       A.   They send me an invoice?
10      Q.   Uh-huh. Do they send you a statement for
11  this is what we've agreed and you are going to pay --
12  we're going to pay you -- I see what you are saying.
13          They don't send you any paperwork for that?
14      A.   It's usually a stub for an invoice number,
15  yes.
16      Q.   Oh, there is an invoice number.
17          Have you ever read the back of the invoice?
18      A.   Which invoice are we talking about?
19      Q.   The one you just mentioned.
20      A.   Ogilvy & Maver.
21      Q.   Which one?
22      A.   Which one did I just mention?
23      Q.   Let's go on.
24          THE COURT: I'll tell you what, I'm going to
25          recompose my mind for ten minutes. We're going to

Page 594

1   CAROL ANNE BRYANT - CROSS/PHARES
2   take a break. So let's everybody do the same
3   thing.
4           MS. PHARES: Fair enough.
5           THE COURT: Come back and we'll ask more
6   questions, all right?
7           THE WITNESS: Okay.
8               (Recess: 3:25 p.m.)
9               (Resumed: 3:45 p.m.)
10  C A R O L      A N N E        B R Y A N T,
11              the Plaintiff, having been previously
12              duly sworn by the Court, resumed the
13              witness stand and testified further as
14              follows:
15          THE COURT: Miss Bryant, I think I might
16  tell you something about yes or no answers when
17  somebody says answer yes or no. The first is yes,
18  the second is no, the third is I can't answer it
19  that way. And that may speed things up.
20          All right, let's go.
21  CROSS-EXAMINATION
22  BY MS. PHARES: (Continued)
23      Q.   One thing I would like to do before I
24  forget, I would like to give you a document which Miss
25  Saffer gave to you this morning, which is Defendant's

Page 595

1   CAROL ANNE BRYANT - CROSS/PHARES
2   Exhibit A.
3           MS. PHARES: And, I'm sorry, your Honor, I
4   don't have another copy for you.
5           THE COURT: It's all right.
6           MS. PHARES: Because this is the one we had
7   to get from the Defendant -- I mean, the
8   Plaintiff.
9       Q.   This is a clearance form that was signed by
10  you; is that correct?
11      A.   That's me, yes.
12          MR. MONAGHAN: We have that, if the Court
13  wants it.
14      Q.   By Anne Bryant.
15          THE COURT: Mr. Monaghan, are you saying you
16  have an extra copy?
17          MR. MONAGHAN: Yes, I think so.
18          THE COURT: If you have, I'll take it.
19          MS. PHARES: This is the same one. I think
20  the problem is I don't have the one I needed.
21          THE COURT: Thank you.
22      Q.   All right. Now, having gone through all
23  that exercise I'm going to instead ask you if you would
24  look at Plaintiffs' Exhibit No. 39.
25          And that is also a clearance form, is it

Page 596

CAROL ANNE BRYANT - CROSS/PHARES

1
2 not?
3     A.   Yes, it is.
4     Q.   And the date on it is what?
5     A.   5/4/88.
6     Q.   So that's when you were working with Kinder
7 & Bryant; is that correct?
8     A.   That's true.
9     Q.   And that is signed by Mr. Kinder?
10     A.   Yes.
11     Q.   And Mr. Kinder was authorizing BMI to send
12 your royalties to Mr. Dobishinsky, the music
13 administrator?
14     A.   Yes.
15     Q.   Was it Mr. Kinder who typically signed these
16 forms making that authorization?
17     A.   This is not typical. I can't answer it that
18 way.
19     Q.   Okay. What is not typical about it?
20     A.   It is the first time I ever saw Ford sign an
21 agreement with a clearance form for BMI.
22     Q.   Is it possible that Mr. Kinder was signing
23 the forms, but you just weren't aware of it?
24     A.   Oh, we have the other forms. They were
25 submitted by the administrator. Or by SONY. They were

Page 597

CAROL ANNE BRYANT - CROSS/PHARES

1
2 submitted by the publisher.
3     Q.   And who typically signed the forms and
4 authorized the publisher to send your royalties to BMI --
5 I mean, to Mr. Dobishinsky?
6     A.   The publisher submitted the clearances.
7     Q.   I understand that, but BMI doesn't send your
8 royalties to anybody but you. That is, to you -- the two
9 of you, unless you authorize it.
10          Now, is Mr. -- did Mr. Ford -- Mr. Kinder
11 typically sign these agreements on behalf of Kinder &
12 Ford?
13     A.   He didn't have any authority to sign any
14 agreement about my royalties. He couldn't authorize about
15 my royalties.
16     Q.   You would have signed separate agreements
17 with authorizing these for -- for your royalties?
18     A.   Yes.
19     Q.   And you authorized Mr. Dobishinsky then to
20 receive your royalties?
21     A.   Yes. In trust.
22     Q.   Okay, thank you.
23          Now, let's go back to what we were saying
24 just before the break, and what I want to do in light of
25 your last testimony is I'm going to make a list here of

Page 598

CAROL ANNE BRYANT - CROSS/PHARES

1
2 the compositions or rather the shows that are listed in
3 the complaint with -- against Sunbow, okay?
4     A.   Uh-huh.
5     Q.   This is in Paragraph 11 of the amended
6 complaint. And the shows that are here are GI Joe,
7 Transformers, Visionaries --
8          MR. MONAGHAN: Does it say shows?
9          MS. PHARES: Utilized in various Sunbow
10 Productions, all right?
11     Q.   JEM and My Little Pony.
12          Now --
13     A.   What about Inhumanoids?
14     Q.   That's not in our complaint?
15     A.   Okay.
16     Q.   Now, can you tell me for GI Joe did you
17 first write GI Joe the theme or tune or whatever you
18 identify as the basic music for G.B.I. or for Sunbow?
19     A.   I didn't write it.
20     Q.   Who wrote it?
21     A.   Ford Kinder.
22     Q.   But Kinder & Bryant wrote it, didn't they?
23     A.   GI Joe main theme?
24     Q.   Yes.
25     A.   No. Ford Kinder wrote it when he was at

Page 599

CAROL ANNE BRYANT - CROSS/PHARES

1
2 Michelin & Company.
3     Q.   I see, okay.
4          So he wrote the main theme for the -- for
5 the Sunbow Production?
6     A.   No, that was the main theme first Ford,
7 Griffin, Bacal, Hasbro.
8     Q.   So it was a jingle?
9     A.   Yes.
10     Q.   So this one was written by Kinder at
11 Michelin?
12     A.   Jingle.
13     Q.   Jingle, thank you.
14          How about Transformers?
15     A.   Well, you left one out. The GI Joe movie
16 theme.
17     Q.   Just for the moment we're going to do --
18     A.   Do this?
19     Q.   Yes.
20     A.   Transformers. I wrote that. I wrote the
21 music. That's my music.
22     Q.   And who wrote -- are there lyrics?
23     A.   Yes.
24     Q.   And who wrote those?
25     A.   Joe Bacal.

Page 600

CAROL ANNE BRYANT - CROSS/PHARES

1
2  Q.  Okay.
3  A.  And Ford wrote a line. An important line.
4  Robots in Disguise.
5  Q.  Okay, you wrote the music, he wrote the
6  lyrics.
7      And this was?
8  A.  A jingle.
9  Q.  A jingle.
10     Okay. And then Visionaries?
11  A.  Visionaries -- it's right here. I wrote
12  that.
13  Q.  Now, actually were you -- were you and Mr.
14  Kinder both at your company Kinder & Bryant when you wrote
15  that?
16  A.  Visionaries?
17  Q.  No, I'm sorry. Let's go back to
18  Transformers. I left out one piece of information.
19  A.  Okay.
20  Q.  When you wrote -- you mentioned you wrote
21  the music and Mr. Bacal and Mr. Kinder wrote the lyrics;
22  were you and Mr. Kinder already part of Kinder & Bryant?
23  A.  Kinder & Bryant was open for business.
24  Q.  Okay. So we're going to put K & B here.
25  Okay.

Page 601

CAROL ANNE BRYANT - CROSS/PHARES

1
2      And Visionaries -- we'll go on.
3  A.  I wrote it.
4  Q.  You wrote the music?
5  A.  I wrote the music, yes.
6  Q.  And were there any lyrics?
7  A.  There were theme lyrics, but I was never
8  quite sure -- I mean, I didn't worry about it. We wrote
9  to their lyrics. I don't know who the lyricist was for
10  sure.
11  Q.  When you say, "we wrote", who are you
12  talking about?
13  A.  Well, Ford and I wrote two versions of
14  everything, so that was my version.
15  Q.  Okay. And you don't remember who did the
16  lyrics?
17  A.  I don't know that I ever knew who did the
18  lyrics for sure.
19  Q.  I see. What you are meaning -- you are
20  saying they provided you with lyrics and you wrote music
21  to it?
22  A.  Right.
23  Q.  Now, was that a jingle?
24  A.  You know, I used to know that and I actually
25  have something that would confirm that.

Page 602

CAROL ANNE BRYANT - CROSS/PHARES

1
2  Q.  The answer is yes, no, or I don't know.
3  A.  Okay. I believe so.
4  Q.  So you are saying it was a jingle, but you
5  are not sure?
6  A.  I'm saying it's a jingle. At some point I
7  think it was a jingle first.
8  Q.  Okay.
9  A.  Yeah.
10  Q.  That was written by -- when you were part of
11  Kinder & Bryant?
12  A.  Yes.
13  Q.  So you did that work for G.B.I., right?
14  A.  Yes.
15  Q.  Okay. And then JEM?
16  A.  JEM, the JEM theme. JEM's complicated. The
17  JEM theme. I wrote that music. That is my music.
18  Q.  Did Mr. Kinder do any work on JEM?
19  A.  Well, he wrote a version but they chose my
20  version.
21  Q.  In the overall work, there is live music in
22  JEM, isn't that correct?
23  A.  I was talking about first the theme, then I
24  was going to give you the songs. But if you want me to do
25  it --

Page 603

CAROL ANNE BRYANT - CROSS/PHARES

1
2  Q.  No, let's start overall, did you or Mr.
3  Kinder write music or lyrics for JEM?
4  A.  Music.
5  Q.  Music. Not lyrics?
6  A.  Mr. Harman wrote the lyrics.
7  Q.  All right. So for JEM -- I'm just going to
8  put K & B because there was so much music. And we'll put
9  Harman because Barry Harman wrote the lyrics?
10  A.  M-A-N.
11  Q.  Sorry.
12     And that was for a T.V. production; is that
13  correct?
14  A.  Yes, but Barry didn't write the lyrics for
15  the theme, and I really do think it is a separate case. I
16  can't make the same statements for the theme that I can
17  for the songs.
18  Q.  I understand. I'm not suggesting that
19  Mr. Harman wrote lyrics for everything, but if he wrote
20  lyrics it was he that wrote them?
21  A.  No. If there were lyrics Joe Bacal wrote
22  the lyrics for the theme, I believe.
23  Q.  Okay.
24  A.  And Barry Harman wrote all of the lyrics for
25  the songs, I believe.

Page 604

CAROL ANNE BRYANT - CROSS/PHARES

1
2    Q.   Okay.  And you wrote -- Kinder & Bryant did
3  their work for JEM for whom?  Sunbow?
4        A.   For Sunbow.
5    Q.   Because it was a T.V. production first?
6        A.   A television show.
7    Q.   T.V. Series.
8        Okay, and My Little Pony?
9        A.   Again, the original My Little Pony song
10 which is -- like GI Joe -- Ford Kinder at Michelin
11 Company.  And it was a jingle.
12    Q.   So My Little Pony was initially done by
13 Kinder at Michelin and it was a jingle?
14       A.   Yeah.
15    Q.   And then did you write more music for it
16 when it was a T.V. production?
17       A.   My Little Pony original song became the
18 theme song of the My Little Pony T.V. show.  And I didn't
19 have anything to do with that.  And I don't know what Ford
20 did.  I left.
21    Q.   Because you had left Kinder & Bryant by
22 then?
23       A.   Yes.  But then there were other My Little
24 Pony-Sunbow works.
25    Q.   And did you work on those?

Page 605

CAROL ANNE BRYANT - CROSS/PHARES

1
2        A.   Yes.
3    Q.   While you were at Kinder & Bryant?
4        A.   Yes.
5    Q.   So you are saying that there was another one
6  in here?  Someplace?  Or before -- I shouldn't do that
7  because this is not chronological.  I beg your pardon,
8  that is confusing.
9        A.   My Little Pony and Friends, another T.V.
10 show, I wrote that with Ford.  His six bars in the
11 middle -- we discussed that yesterday, harp back to this
12 melody.
13    Q.   I see.
14       A.   And that was in '86, '87, something like
15 that.
16    Q.   That was an independent production for
17 Sunbow?
18       A.   It was a T.V. theme.
19    Q.   It was a T.V. theme.
20       And you are saying that your theme harkened
21 back to the --
22       A.   The song was very different.  It just had a
23 musical instrumental bridge, short six bars, where it
24 quoted the original melody of the theme.
25    Q.   I see.

Page 606

CAROL ANNE BRYANT - CROSS/PHARES

1
2        Is it possible that the -- that when you
3  were saying here that the theme for JEM was written first
4  for the jingle but the songs were written for the T.V.
5  program?
6        A.   No.
7    Q.   Well, the songs were written for the T.V.
8  program for JEM, weren't they?
9        A.   Yes.
10    Q.   And the songs were written for Sunbow when
11 they were making that T.V. program?
12       A.   Yes.
13    Q.   Okay.  And the theme was -- you are saying
14 the theme was never a jingle first?
15       A.   The theme was a theme first and a jingle
16 second.
17    Q.   I see.
18       A.   With the exception --
19    Q.   The other way around?
20       A.   Yeah.
21    Q.   Okay.  All right.  And so this jingle was
22 done for Michelin & Co., and the Transformers jingle was
23 first done for G.B.I., right?
24       A.   Uh-huh.  Yes.
25    Q.   And the Visionaries work which you think was

Page 607

CAROL ANNE BRYANT - CROSS/PHARES

1
2  a jingle was also done for G.B.I.?
3        A.   No, it was a jingle.  It was a jingle.
4    Q.   And it was done for G.B.I.?
5        A.   Yes.
6    Q.   And for JEM you had -- you did that for
7  Sunbow?
8        A.   Yes.
9    Q.   And My Little Pony was a jingle that you did
10 for G.B.I.; is that correct?
11       A.   It was a jingle that Ford Kinder wrote when
12 he worked for Michelin for G.B.I.
13    Q.   You wrote it while he was at Michelin, and
14 presumably they had an arrangement with G.B.I.  Okay.
15       So all of the works that were done for
16 G.B.I. would have had a G.B.I. contract, isn't that
17 correct?
18       A.   I can't confirm that.
19    Q.   But that was the way you testified that you
20 had done business, isn't that correct?
21       A.   I don't think I testified to that.  I said
22 we had a working agreement and it was the way we worked on
23 all these jobs for --
24    Q.   Do you still have Defendant's Exhibit B and
25 C there?

Page 608

CAROL ANNE BRYANT - CROSS/PHARES

1
2      A.    Are those the contracts?
3      Q.    Yeah.
4      A.    Yeah, got them.
5      Q.    Yeah. So those were the kinds of agreements
6   that you did with G.B.I. when you wrote jingles, isn't
7   that correct?
8      A.    Something like this.
9      Q.    Okay. So you had something like this for
10  all the jingles that you did, that Kinder & Bryant did for
11  G.B.I.?
12     A.    I'm only looking at these two.
13     Q.    Right.
14     A.    So I don't know if they were there for all
15  of them.
16     Q.    But they were something like that.
17     A.    Well, you read me something where I said
18  there's always something, there's always some kind of
19  piece of paper that's involved in these.
20     Q.    Okay. I want to go back to something that
21  we kind of got sidetracked from earlier. And do you
22  remember when we talked about creative fees?
23     A.    Yes.
24     Q.    I'm still trying to figure out how you guys
25  kept track of your creative fees.

Page 609

CAROL ANNE BRYANT - CROSS/PHARES

1
2         In other words, I'm assuming that, you know,
3   you said you did all this work for JEM and you had to
4   write several songs, and then they chose some; how many
5   songs were there for each JEM episode?
6      A.    Three.
7      Q.    And there were 65 episodes, isn't that
8   right?
9      A.    Yes.
10     Q.    It's a lot of songs.
11     A.    But it's not 195 because we didn't do three
12  for everyone.
13     Q.    I just asked you --
14     A.    It is a lot of songs.
15     Q.    It is a lot of songs?
16     A.    Yeah.
17     Q.    So when you worked on another -- on another
18  series for Sunbow, presumably your fee wasn't as great on
19  those; is that correct?
20     A.    As great as on what? On the other show?
21     Q.    That you did for Sunbow.
22     A.    We didn't do any other shows.
23     Q.    You didn't do any other agreements?
24        What about the My Little Pony? You are
25  talking about My Little Pony and Friends?

Page 610

CAROL ANNE BRYANT - CROSS/PHARES

1
2      A.    We wrote a theme for My Little Pony and
3   Friends.
4      Q.    That's all you wrote?
5      A.    Yes.
6      Q.    So there wasn't very much music?
7      A.    My understanding was it was an opening and
8   closing theme. I -- you know --
9      Q.    Did you write the cues?
10     A.    Sometimes when I do an arrangement often
11  they take -- always gave them what we call the track only,
12  not the voices. And often that winds up being used as a
13  bed for music within the shows. And that's one thing.
14  And the other way it's used is often the film score
15  arranger orchestrator quotes the melody of the theme
16  throughout the -- his score and -- but it's our melody.
17     Q.    So you are saying that you really didn't
18  have to write very much music for each one of these. You
19  would write the theme and then it would be used just sort
20  of underneath the photography?
21     A.    Well, they got a lot of use out of it. It
22  is a good thing, you know.
23     Q.    But it wasn't different music. It was the
24  same theme that was being used underneath?
25     A.    Quite a bit, yeah. That's the job. I've

Page 611

CAROL ANNE BRYANT - CROSS/PHARES

1
2   done that work and it very much gives it cohesiveness to
3   the show, and you ride the theme throughout the score as
4   much as you can. I think probably even more so for
5   children.
6      Q.    Did you ever sign contracts with Kinder &
7   Bryant?
8      A.    I remember signing a lot of administration
9   contracts for Kinder & Bryant as a leader and a contractor
10  and a signatory. I did a lot of that work.
11     Q.    Are you talking about like music guild
12  agreements, those kinds of things?
13     A.    The American Federation of Musicians Screen
14  Actor's Guild and AFTRA, I signed those agreements. A lot
15  of them carried over from my other company, my signatory
16  status. I think I signed most of those or many anyway.
17     Q.    What about the ones that you signed for
18  Kinder & Bryant, which ones were those?
19     A.    Everything we worked on.
20     Q.    You signed all the agreements you worked on?
21     A.    Just about. Ford must have signed some at
22  some point, but I was already a signatore.
23     Q.    You have testified --
24     A.    We were able to jump right into business
25  because of that, you know.

34 (Pages 608 to 611)

Page 612

CAROL ANNE BRYANT - CROSS/PHARES

1
2    Q.    You testified, however, that you didn't
3    think that Ford Kinder would have signed an agreement
4    without discussing a deal with you first, have you not?
5    A.    Yes.  If it was something that we generally
6    worked with I wouldn't expect that necessarily.  But if it
7    was something new and different he would definitely tell
8    me what it was.
9    Q.    Didn't you state under oath in your
10   affidavit in April, and you were talking about the
11   unsigned JEM Agreement, the work-for-hire agreement
12   between Kinder & Bryant and Sunbow, that I do not believe
13   that my former partner Ford Kinder would have signed any
14   agreement without discussing it in detail with me.  That
15   was our practice in all important matters.
16   A.    I said that.
17   Q.    And writing three times 65 songs is a pretty
18   important matter, isn't it?
19   A.    Sure is.
20   Q.    It's a lot of income, isn't it?
21   A.    A lot of arranging fees.
22   Q.    Well, you wrote original songs for JEM, not
23   just arrangements, isn't that right?
24   A.    We were paid a fee for production.  That's
25   arrangements --

Page 613

CAROL ANNE BRYANT - CROSS/PHARES

1
2    Q.    I'm just asking you --
3    A.    Oh, yes, we did.
4    Q.    You were paid for writing the songs, for
5    those three songs for every episode of JEM?
6    A.    I'm sorry, we were not.
7    Q.    You were not?  You were not paid?
8    A.    We were not paid.  We were paid arranging
9    fees.  Our compensation was royalties.
10   Q.    Only royalties?
11   A.    Well, I don't do arrangements for free.
12   $2200 paid our production fee.
13   Q.    When you wrote songs for the JEM
14   productions, you are saying that you only wrote
15   arrangements?  I thought you said those were original
16   songs?
17   A.    They were original songs.  Six we wrote for
18   three shows, three episodes -- I mean, I'm sorry, three
19   songs per episode.  Two versions of each.  Two piano demos
20   for each song.  Joe Bacal -- we sent them to Joe, and he
21   picked his choice on each of the three songs per episode.
22   Q.    Right.
23   A.    Then I was told which ones to go ahead with.
24   My version.  Ford's version.  As long as one of our
25   versions.  And it always was I would do the arrangement on

Page 614

CAROL ANNE BRYANT - CROSS/PHARES

1
2    the chosen version, so three a week.  So it was three
3    arrangements.
4    Q.    So --
5    A.    And so we did six piano demos and I did
6    three final arrangements.  $2200 for each set of piano
7    demos and arrangement.
8    Q.    $2200 for each song; is that right?  Or
9    isn't that right?
10   A.    Yeah, for the ultimate choice of the final
11   song fully produced.
12   Q.    And so for each of those three you got
13   $2200; is that right?
14   A.    To do an arrangement.  Not to write a song.
15   Q.    And for each of those songs -- so we are
16   talking about 185 -- 185 songs, right?  If you want to --
17   A.    It --
18   Q.    If at some point in the past, Miss Bryant,
19   my multiplication was off I stand corrected.  But at least
20   when I multiply 65 times three I get 195.
21   A.    Theoretically, that would be --
22   Q.    Is your arithmetic coming out the same as
23   mine?
24   A.    Well, I just happen to know that we have a
25   tally of 154 songs that we wrote.  I wish it was 195.  But

Page 615

CAROL ANNE BRYANT - CROSS/PHARES

1
2    it was 154.
3    Q.    You are saying it was only 150?
4    A.    I said 154.
5    Q.    Right.
6         Where do you have the tally for that 154?
7    A.    Right in my JEM catalog.
8    Q.    For the songs?
9    A.    Right in my BMI catalog.  I misspoke.  I'm
10   sorry.
11   Q.    But now I want to come back, though, to what
12   I -- where I was when we took that little flyer -- is when
13   you testified in April that Mr. Kinder wouldn't have
14   signed any agreement without discussing it in detail
15   because it was your practice in all important matters for
16   him to discuss it.  Doesn't that mean that before Kinder
17   signed agreements on behalf of Kinder & Bryant he
18   discussed them with you?
19   A.    This is a special agreement.
20   Q.    Did you hear what I asked you?  I'm not
21   talking about a particular agreement.
22   A.    Yes.  Answered all important matters.
23   Q.    He discussed them with you before he signed?
24   A.    Well, he wouldn't have signed that agreement
25   without me.  He couldn't.

CAROL ANNE BRYANT - CROSS/PHARES
Q. Because he couldn't because you were partners you mean?
A. Because we were both independent song writers. He can't sign over my ability to -- he doesn't have the authority to sign over my rights as a writer. He can bind the company to, I would think, a production agreement, but --
Q. He?
A. -- individual writer's rights he has no authority to give them away. I would have to do that.
Q. He could sign for the company on behalf of Kinder & Bryant, couldn't he?
A. But royalties are an individual composer.
Q. That's just a yes or a no, or I don't know.
A. Could you repeat that?
Q. Yes.
Mr. Kinder could sign a production agreement on behalf of Kinder & Bryant, couldn't he?
A. A production agreement?
Q. Right.
A. I believe so.
Q. Just like he could sign an agreement with G.B.I., like Exhibits B and C in front of you.
He signed those on behalf of Kinder &

CAROL ANNE BRYANT - CROSS/PHARES
Bryant, didn't he?
A. It appears so.
Q. Yes.
And in that agreement he was agreeing on behalf of Kinder & Bryant that you were -- you, the organization, were working-for-hire, didn't he?
A. Yes. According to this, yes.
Q. And he could have signed a production agreement with Sunbow agreeing that you were working for hire, couldn't he?
A. Let me think about that.
I really don't know how to answer that. Are you talking about JEM?
Q. I'm just asking you, as a general corporate matter of your company, Mr. Kinder as the president could sign a production agreement for the company, couldn't he?
A. I don't believe he could.
Q. Why not? Wasn't he the president of the company?
A. Yes.
Q. Didn't he sign the Kinder-Bryant agreement?
A. Well, if he's going to write all the songs and do all the work maybe he could, but I don't think he could do that with Sunbow because it was all feature

CAROL ANNE BRYANT - CROSS/PHARES
songs.
Q. Now, hang on, just so that neither you nor the Court nor I am confused. I'm not talking about -- not saying anything about how you are going to be paid, how you are going to be paid your writer's share of the performance royalties. I'm not talking about how you were going to get paid those monies.
I'm talking about couldn't he enter into a production agreement with Sunbow and agree that Kinder & Bryant would work-for-hire?
A. What would this production agreement encompass?
Q. It would say just something like we'll use the G.B.I. agreement, just as an example. It would say something like, you know, we're engaging you to write songs for our T.V. production. It would say you are going to do that as a work-for-hire. Everything you deliver to us will be work-for-hire and we can do X, Y and Z with them. And then it would lay out the amounts of creative fees that you were going to be paid. And then it might even say and, by the way, you will get all the writer's share of the public performance royalties. And then it might even also say something like and there are certain other music publishing rights that you get. And it would

CAROL ANNE BRYANT - CROSS/PHARES
be all laid out in that agreement. And then at the bottom couldn't Mr. Kinder have signed for the company as the president, just like he did for G.B.I. on this one? It is not really very different except it is a little bit -- except it would give you more rights.
A. Well, I don't want to answer that in the abstract. I don't think he really could. We're talking about feature songs for which we were paid nothing as a creative fee. And, I'm sorry, I just can't answer it in the abstract. If you want to ask me about a specific agreement I'll try to answer it, but --
Q. You and Mr. Kinder worked for Kinder & Bryant, didn't you?
A. We both had our own corporations.
Q. That's okay.
A. We worked --
Q. A corporation can be part of another corporation?
A. Right. Right. Just so you know.
Q. And the two of you worked for Kinder & Bryant, didn't you, and the music you created Kinder & Bryant delivered to its customers, right?
A. Kinder & Bryant produced, yes.
Q. Right.

Page 620

CAROL ANNE BRYANT - CROSS/PHARES

1     CAROL ANNE BRYANT - CROSS/PHARES
2     A.   And there's a company called Kinder & Bryant
3   or there was.
4     Q.   Right.
5     A.   And there are two people who are called
6   Kinder & Bryant who are individuals who have individual
7   rights.
8     Q.   I'm talking about --
9     A.   K & B.
10    Q.   I'm talking about K & B.  Exactly.
11    A.   Okay.
12    Q.   And it could be, by the way -- and the kind
13  of the agreement I'm talking about, that K & B would agree
14  that each of Kinder & Bryant would receive certain rights,
15  for example, the writer's share of their performance
16  royalties.
17          Now, couldn't Mr. Kinder have signed an
18  agreement on behalf of K & B?  He's the president of the
19  company.  Who else could have signed such an agreement?
20    A.   The chairman.  Me.
21    Q.   But he could have signed one too, couldn't
22  he?
23    A.   I don't think the chairman could have
24  either.  I think it was Ford's individual rights and my
25  individual rights.  It would have to be something else

Page 621

1     CAROL ANNE BRYANT - CROSS/PHARES
2   that would allow one of us or the other to enter into an
3   agreement that gave the other person's rights away.
4     Q.   Well, I'm assuming --
5          THE COURT:  Hold on a second.
6     A.   I'm having trouble with the abstract.
7          THE COURT:  I think you are asking this
8   witness for a legal conclusion.  Now, as far as
9   I'm concerned a legal conclusion is that a
10  president can bind a corporation.
11          Let's go on.
12          MS. PHARES:  Okay.
13          THE WITNESS:  A corporation, but not an
14  individual.  If that's the question she's trying
15  to get to.
16          THE COURT:  Let's go on.
17    Q.   Just as we sit here today, do you remember
18  whether or not Mr. Kinder ever told you about signing an
19  agreement, say an agreement for JEM with Sunbow?
20    A.   JEM was a big problem.  And, as I said, we
21  discussed JEM.  It was a real problem for us.
22    Q.   You remember discussing it?
23    A.   Yes.
24    Q.   What was the problem you were discussing?
25  Were you discussing the agreement?

Page 622

1     CAROL ANNE BRYANT - CROSS/PHARES
2     A.   We discussed the fact that we didn't like
3   the terms, I remember, and there really was no creative
4   fee.  There was a production fee.  And I know Ford was
5   concerned about a show that was centered on songs, on
6   original songs, and I was too, and he wanted the
7   publishing.  I remember that.  But that a show like that
8   could wind up on CDs or in VHS.  In the 80s that was
9   happening.
10    Q.   Well, do you remember discussing -- do you
11  remember his discussing with you the terms of any other
12  agreement with Sunbow?
13          MR. MONAGHAN:  Your Honor, it's time for a
14  parole evidence objection.  If there is a
15  contract, fine.  Produce it.  If not, we're
16  talking about what Miss Phares is actually trying
17  to get in as terms of an agreement that we don't
18  have before the Court.  It is a parole evidence
19  issue.
20          THE COURT:  Well, it is cross-examination.
21  I'm going to allow her -- counsel to go on for
22  eight more minutes, then we are going to quit.
23          THE WITNESS:  I have a problem with
24  answering about an abstract contract that doesn't
25  exist.  I said I would be happy to look at

Page 623

1     CAROL ANNE BRYANT - CROSS/PHARES
2   something that --
3          THE COURT:  Just please try to answer the
4   questions.
5          Go ahead.
6   BY MS. PHARES:
7     Q.   Do you remember Mr. Kinder talking with you
8   about the terms of any other agreement?
9          MR. MONAGHAN:  Object.  Hearsay.
10          THE COURT:  Overruled.
11    A.   About any other agreement ever?
12    Q.   With Sunbow.
13    A.   I don't remember other agreements with
14  Sunbow.
15    Q.   Do you think you only had one agreement with
16  Sunbow?
17    A.   I know we had one that was discussed, and
18  that was the unsigned JEM Agreement.  That was the only
19  show we did for Sunbow.
20    Q.   And even if you don't remember signing an
21  agreement with Sunbow, isn't it possible that Mr. Kinder
22  signed an agreement?
23          MR. MONAGHAN:  Anything is possible.
24  Objection.
25          THE COURT:  Sustained as to form.

37 (Pages 620 to 623)

Page 624

CAROL ANNE BRYANT - CROSS/PHARES

1
2    Q.    Just because you don't remember signing an
3    agreement with Sunbow doesn't mean that it was never
4    signed, does it?
5    A.    I would say that if I don't remember signing
6    it, I can't say that it was never signed by someone.  But
7    it wasn't signed by me, that I can remember.
8    Q.    And just because you didn't sign an
9    agreement doesn't mean that Mr. Kinder didn't sign it,
10   isn't that right?
11   A.    Not necessarily.  Depends on what he was
12   signing.
13   Q.    But Mr. Kinder could have signed an
14   agreement after discussing it with you without your
15   knowing whether he'd signed it, isn't that right?
16   A.    That's pretty wild.  I think if he discussed
17   it with me I would have remembered it.
18   Q.    You could have remembered an agreement, but
19   if he signed it you wouldn't know whether he had signed
20   it, right?  You wouldn't have seen him sign it if he did
21   it by himself, would you?
22   A.    This is very creepy.  I'm sorry.  I have to
23   think this through.
24        He discusses something with me and I leave
25   the room and I don't know whether he ever executed it or

Page 625

CAROL ANNE BRYANT - CROSS/PHARES

1
2    not; is that what you are saying?
3    Q.    How about this:  Supposing you are together
4    in that big room you were in and he describes the deal
5    that you are going to have.  If he then later, after
6    you've gone home for the evening, signed the agreement,
7    you wouldn't know whether he'd signed the agreement,
8    right?
9         MR. MONAGHAN:  We'll stipulate if she didn't
10        know he signed the agreement she didn't know he
11        signed the agreement.
12   A.    Yes.
13   Q.    He could have signed the agreement for you,
14   right?
15   A.    Yes, I guess, if I didn't know.
16        MS. PHARES:  Your Honor, I'm at a breaking
17        point even though I have not completed my last
18        three minutes.
19        THE COURT:  All right, there's a couple of
20        housekeeping things I want to talk to you about.
21        One is I understand from the court officer that
22        some of you want to leave some of these documents
23        here?  If you do, I want you to understand that we
24        are not responsible if anything happens to any of
25        them.  This courtroom, as you well know from being

Page 626

- MOTION -

1
2    here, is pretty active every day.  But if it will
3    be of assistance to you, you may leave them here.
4         Do we have room in that --
5         COURT OFFICER:  There is room in that
6    closet.
7         THE COURT:  There is room in that closet and
8    it is locked.  I think you'll lock it?
9         COURT OFFICER:  Yes.
10        THE COURT:  All right, you may do that.
11   That is up to you.
12        The other thing is I see this as a 40 to
13   45-day trial, and you completed four days of it.
14   I want you to think long and hard about what you
15   are doing with your future.  I'm here every day.
16   If I don't try this case, I try another one.  So,
17   from my standpoint, I'm at your service.  But I've
18   talked to both sides probably at more length than
19   you wanted about settling this case.  Think about
20   that carefully.
21        What you are going to have to do is the
22   Plaintiff will call the court clerk as of Monday
23   and get some dates from him and some more dates
24   that I'll be open hopefully for a week or
25   something and we're going to try this hopefully a

Page 627

- MOTION -

1
2    week at a time until it gets done.
3         MS. PHARES:  Your Honor, before we finish
4    for the day I would like to make a motion to
5    dismiss the claims against Sunbow with respect to
6    all of the T.V. productions named in the
7    complaint, except JEM, because the work was
8    originally done for G.B.I. which is not a
9    Defendant in the case.
10        MR. MONAGHAN:  In the middle of cross?  I
11   have not finished our case.
12        THE COURT:  Well, I'm not going to have any
13   discussion about that now.  I will take it up next
14   time we get together.  Although, I would tell you
15   that probably I will let the Plaintiff put in the
16   remainder of her case before we do any dismissing
17   of anything.
18        All right, have a good weekend.
19        MR. MONAGHAN:  Thank you.
20        (Court Adjourned:  4:10 p.m.)
21        oOo

Page 628

```
 1              C E R T I F I C A T I O N
 2
 3        I, Elizabeth A. Kent, Senior Court Reporter for
 4   the State of New York, do hereby certify the foregoing to
 5   be true and accurate, as taken by me on July 9, 2004,
 6   before the Hon. Andrew P. O'Rourke, J.S.C.
 7
 8   _____
 9     Elizabeth A. Kent
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 632

```
 1                 E X H I B I T S
 2
 3   DEFENDANTS'        DESCRIPTION        IDENT. EVID.
 4
 5     A      Jingle.                 497   499
 6     B      Transformers agreement, 4-8-88.  561    569
 7     C      Visionaries agreement, 4-8-88.  561    569
 8
 9                        oOo
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 629

```
 1   BMI agreement,8-24-71.        77    77
 2   Bryant BMI catalog.          109   110
 3   Public clearance form.        132   133
 4   Clearance form, 8-17-88.      148   148
 5   BMI statement.               185   187
 6   Transformers clearance form.  194
 7   Video.                        212   215
 8   DVD Transformers Villains.    217   222
 9   Movie.               218   222
10   Season 2, Part 1.             218   222
11   VHS Transformers Vo. 10-12.   237   238
12   Sony BMI clearance form.      248   250
13   Video Passport Vol. 1.        252   253
14   VHS Jem.              253   253
15   DVD Jem.              254   255
16   Amazon.com bill.      256   258
17   4 page document, 9-7-89.      258   263
18   Letter 12-11-90.     266   267
19   Document 1-14-93.    268   269
20   Songwriter agreement.        270   279
     0630
21   Music 2 pages.               279   280
22   Amazon.com printout.         281   283
23   Printout.            282   283
24   5 page document 5-23-01.     286   289
25   GI Joe Series.               294   299
26   GI Joe DVD.          294   299
27   Stipulation of Settlement.   301   305
28   GI Joe original score.       307   307
29   BMI statement.       308
30   Tally sheet.         313   332
31   Box.                 332
32   Settlement.          339
33   3 page document 5-13-98.     346   349
34   BMI statements (copies).     361   371
35   Original music.      393   395
36   VHS Visionaries.             413   434
37   Bryant employment history.   422   423
38   Armada.              424
39   Clearance form.      436   437
40                        436   442
     0631
41                        436   444
42   CD download.         436   449
43   Cue sheets.          446   449
44                        472
45   Energon.             473
46   Binder.              483
```