# EXHIBIT 7

```
 1    SUPREME COURT OF THE STATE OF NEW YORK

 2    ROCKLAND COUNTY

 3    -------------------------------------------X

 4

 5     ANNE BRYANT,

 6

 7   Plaintiff      Index No.

 8                                          5192/2000

 9          -against-

10

11    BROADCAST MUSIC, INC., (a/k/a "BMI"),

12    CLIFFORD A. "FORD" KINDER, KINDER & CO.,

13    LTD., VADIVOX, LTD., JULES M. "JOE"

14    BACAL, GRIFFIN BACAL, INC., STARWILD

15    MUSIC BMI, WILDSTAR MUSIC ASCAP,

16    SUNBOW PRODUCTIONS, INC. and JOHN AND

17    JANE DOES - 10,

18

19                          Defendants

20    -------------------------------------------X

21

22     ANNE BRYANT,

23

24                          Plaintiff,

25                                    Index No.
```

Page 2

```
 1    -against-              2821/2002
 2  SUNBOW PRODUCTIONS, INC.,
 3                Defendant
    --------------------------------------X
 4  NON-JURY TRIAL
 5
    Rockland County Courthouse
 6        One South Main Street
          New City, New York  10956
 7        July 21, 2004
 8
    B E F O R E :
 9
          HON. ANDREW P. O'ROURKE,
10             Supreme Court Justice
11
12  ROBERT FRITZ              DONNA RACANELLI
    SENIOR COURT CLERK        COURT REPORTER
13
14
15
    A P P E A R A N C E S :
16
17    MONAGHAN, MONAGHAN, LAMB & MARCHISIO, ESQS.
      Attorneys for the Plaintiff
18    150 West 55th Street
      New York, New York  10019
19  BY: PATRICK J. MONAGHAN, JR., ESQ.
20
      PATTERSON, BELKNAP, WEBB & TYLER, LLP
21    Attorney for the Defendant SUNBOW
      1133 Avenue of the Americas
22    New York, New York  10036-6710
    BY: GLORIA C. PHARES, ESQ.
23        -and-
      LAUREN HAMMER BRESLOW, ESQ.
24
25  ALSO PRESENT:  JUDITH M. SAFFER, ESQ.
      Assistant General Counsel - BMI
```

Page 3

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10        THE COURT:  Well good morning, all.
11
12        MR. MONAGHAN:  Good morning, Your Honor.
13
14  MS. PHARES:  Good morning, Your Honor.
15
16        MS. SAFFER:  Good morning, Your Honor.
17
18        THE COURT:  Are we prepared to go
19
20  forward?
21
22        MR. MONAGHAN:  We are, Your Honor.
23
24        THE COURT:  And I believe that the
25
```

Page 4

```
 1  plaintiff still is on the stand?
 2
 3        MR. MONAGHAN:  She is, Your Honor.
 4
 5        THE COURT:  You have to come back.
 6
 7        COURT OFFICER:  Re-swear, Judge?
 8
 9        THE COURT:  No, the witness is still
10
11  under oath.
12
13        MS. PHARES:  Your Honor, there is just a
14
15  couple of housekeeping questions I would like
16
17  to start with.  Mr. Monaghan had offered, and
18
19  you had directed him to produce copies, you
20
21  know, of the videotapes for us, front and
22
23  back, so we know what was put into evidence
24
25  and if the issue is he needs to take the
```

Page 5

```
 1
 2  originals home with him.  If it is okay with
 3
 4  Your Honor, it is certainly okay with the
 5
 6  defendants because we really do need to know
 7
 8  what it is, is in evidence.  And we do not
 9
10  have copies of them yet.
11
12        MR. MONAGHAN:  I think Miss Phares is
13
14  talking about the actual videos, taking
15
16  pictures of them.  They were here, didn't do
17
18  that yet.  They are here.  Take them with us
19
20  this afternoon.
21
22        THE COURT:  Off the record.
23
24        (Discussion off the record.)
25
```

Page 6

1    A N N E    B R Y A N T, having previously

2

3        been duly sworn, resumed the witness stand,

4

5        was examined and testified as follows:

6

7    CROSS-EXAMINATION

8

9    BY MS. PHARES:

10

11   Q    Miss Bryant, when Kinder and Bryant, when your

12

13   company was retained to write music, the entity

14

15   that delivered music was Kinder and Bryant,

16

17   isn't that true?

18

19   A    Yeah.  Yes.

20        —

21   Q    And when your client paid you, the entity

22

23   that was paid was Kinder and Bryant, isn't that also

24

25   correct?

Page 7

1

2    A    Fees were paid to Kinder and Bryant.

3

4    Q    And then -- and then you and Mr. Kinder

5

6    presumably would divide that according to

7

8    whatever your internal plan was, was that

9

10   correct?

11

12   A    It pays the overhead.

13

14   Q    I only need to know --

15

16   A    We didn't necessarily divide it.  It paid the

17

18   on-going business.

19

20        THE COURT:  All right, now you and

21

22   Mr. Kinder dissolved your relationship in

23

24   1989, is that right?

25

Page 8

1        THE WITNESS:  Yes.

2

3    Q    And that's what you sometimes refer to as your

4

5    corporate divorce?

6

7    A    That is what they call it.

8

9    Q    And the two of you had an agreement regarding

10

11   that divorce, didn't you?

12

13   A    Yes.

14

15   Q    And then two years later you sued Mr. Kinder to

16

17   enforce that dissolution agreement, didn't you?

18

19   A    Yes.

20

21        MS. PHARES:  I am offering for

22

23   identification as Defendant's Exhibit D a

24

25   document which is the complaint in an

Page 9

1

2        action entitled Anne Bryant and Ware

3

4        Business Music Productions Limited against

5

6        Ford Kinder, Kinder and Co. Limited FA

7

8    Productions, Vadivox Inc., and Kinder

9

10       Bryant, Kinder Limited, Lance Margan,

11

12       Maria Goodman, also known as Maria Arbery

13

14       Kinder, also known as Margie Kinder, Jeff

15

16       Kinder and Janet in quotes, Britten

17

18       Kinder and with this document has 22 pages

19

20       and attached to it is an exhibit of six

21

22       pages, which itself has exhibits.

23

24       (Complaint was marked as Defendant's

25

Page 10

1  Exhibit D for identification.)
2
3      COURT OFFICER:  D for ID.
4
5  Q    Miss Bryant, do you recognize this complaint?
6
7      MR. MONAGHAN:  Just note for the
8
9  record, Your Honor, the complaint has a
10
11 number of handwritten notations on it.  We
12
13 don't know who made those notations.  Our
14
15 office did prepare this complaint, but we
16
17 disclaim any knowledge of any of those
18
19 handwritten notations.
20
21     MS. PHARES:  And for the record, Your
22
23 Honor, this was photocopied from the files
24
25 of the court.

Page 11

1
2      THE COURT:  Okay.
3
4      THE WITNESS:  Okay.
5
6  Q    And if you turn to Page 22 of the complaint, is
7
8  that your signature?
9
10 A    It was then, yes.
11
12 Q    Have you changed your signature?
13
14 A    Yes.
15
16 Q    And if you would turn to the attachment, is
17
18 that the dissolution agreement between you and
19
20 Mr. Kinder and Kinder and Bryant?
21
22 A    Yes.  This looks like it.  Check the end.
23
24 Q    Look at Page 6 of that agreement, is that also
25

Page 12

1  your signature?
2
3  A    Yes.
4
5  Q    And is that Mr. Kinder's signature?
6
7  A    Yes, it looks like his signature and it's an
8
9  agreement.  I remember the agreement.
10
11     MS. PHARES:  Your Honor, I offer the
12
13 document, it is Defendant's Exhibit D.
14
15     THE COURT:  Counselor.
16
17     MR. MONAGHAN:  No objection, except
18
19 that I would ask that the handwritten
20
21 information be not part of the admission
22
23 into evidence.
24
25     THE COURT:  Looks like somebody was

Page 13

1
2  making up pleadings for court or something.
3
4      MS. PHARES:  It does, Your Honor.
5
6      THE COURT:  However, I will avoid
7
8  paying any attention to those.
9
10     MR. MONAGHAN:  Looks like the usual
11
12 marked pleadings by the defendant.
13
14     MS. PHARES:  Work with this document.
15
16     (Defendant's Exhibit D received in
17
18 evidence.)
19
20 Q    Miss Bryant, I would like you to turn, if you
21
22 would, to the dissolution agreement and
23
24 particularly to Paragraph 1.
25

Page 14

1    A    That's the back agreement, the '89 agreement.
2
3    Yeah.  That is the dissolution agreement.
4
5    Separation agreement.  Yeah, that is what we
6
7    called it, Page 1.
8
9    Q    Page 1.  And Paragraph 1.  Isn't it true that
10
11   in this document you sold your shares in the
12
13   company to Mr. Kinder, isn't that right?
14
15        MR. MONAGHAN:  Object to the form.
16
17        It speaks for itself.
18
19        THE COURT:  I will allow the witness
20
21        to answer.
22
23   A    Yes.  Subject to all these things.
24
25   Q    And I am now looking at Paragraph 2, and in

Page 15

1
2    consideration of that Mr. Kinder paid you
3
4    $1,000.00 personally, isn't that right?
5
6    A    I think so.  I don't remember.  That is what it
7
8    says.
9
10   Q    And if you look down at Paragraph 3A,
11
12   Miss Bryant, A, in consideration of your services to the
13
14   corporation, which is defined in the very first
15
16   paragraph as Kinder and Bryant, the corporation
17
18   paid you $117,187.00 to your company Ware
19
20   Business Music Productions, isn't that right?
21
22   A    That is right.  Correct.
23
24   Q    So after you and Mr. Kinder signed the
25

Page 16

1    agreement, you didn't have any further interest
2
3    in Kinder and Bryant, did you?
4
5    A    Yes, I did.  If you look down at B I had many
6
7    pieces of music that were about to become final
8
9    and sold, and I continued to have an interest
10
11   in the creative fee part of Kinder and Bryant
12
13   for a while.
14
15   Q    But that was pursuant to this agreement, isn't
16
17   that correct?  Don't look at Mr. Monaghan for
18
19   this.
20
21   A    I am sorry.  I don't understand.  Pursuant to
22
23   this agreement --
24
25   Q    That is fine.  If you don't understand tell me

Page 17

1
2    that.  I would be happy to clarify it for you.
3
4    A    There was a continuing --
5
6    Q    What you did -- am I correct in this agreement
7
8    the two of you ended your relationship, so you
9
10   were no longer part of Kinder and Bryant, is
11
12   that correct?
13
14        MR. MONAGHAN:  Your Honor, I think
15
16        she has to have an opportunity to review
17
18        the agreement.  Number of years ago.
19
20        THE COURT:  Miss Bryant, do you want
21
22        a moment or two to read this or look this
23
24        over?
25

Page 18

1  THE WITNESS:  I am afraid having to
2
3  say yes or no.
4
5  THE COURT:  What I am going to do,
6
7  I'll take the counsel into chambers and
8
9  we will discuss the witnesses now, and I
10
11  am going to give you ten minutes to review
12
13  that.
14
15  THE WITNESS:  Okay.  That is good.
16
17  (Court and counsel went into chambers
18
19  and subsequently returned and the proceedings
20
21  continued as follows.)
22
23  CONTINUED CROSS-EXAMINATION
24
25  BY MS. PHARES:

Page 19

1
2  Q    Miss Bryant, is it true that after you and
3
4  Mr. Kinder signed this separation agreement, you no
5
6  longer had any rights in the corporation,
7
8  Kinder and Bryant?
9
10  A    Well I read this and I think it is true.  I am
11
12  also going to read about -- I am not sure.
13
14  Q    I just want to know that part for the moment.
15
16  A    I think I didn't have any rights in the
17
18  corporation but still had obligations to me is
19
20  the way I read it.
21
22  Q    And after you left in fact it changed the name
23
24  of the corporation, didn't it?
25

Page 20

1  A    Yes.
2
3  Q    So from that time forward the only rights that
4
5  you had you were provided for in your
6
7  separation agreement, isn't that correct?
8
9  Don't look at
10
11  Mr. Monaghan.
12
13  A    Well, he should move.
14
15  Q    Well you only have to look at me or Justice
16
17  O'Rourke.
18
19  MR. MONAGHAN:  Can I have that
20
21  question read back.
22
23  THE COURT:  You may read it.
24
25  THE WITNESS:  Read it.

Page 21

1
2  (Whereupon, the last question was
3
4  read back by the reporter.)
5
6  MR. MONAGHAN:  Object to the form
7
8  of the question.
9
10  THE COURT:  Overruled.  Go ahead.
11
12  THE WITNESS:  Overruled means I should
13
14  answer it?
15
16  THE COURT:  Yes, please.
17
18  MR. MONAGHAN:  Can we just get a
19
20  definition of the rights relative to this
21
22  deal.  Is that the -- what the question
23
24  relates to?
25

Page 22

1    THE WITNESS:  Or rights.

3    THE COURT:  If the witness can't

5    answer the question, she is very bright

7    woman.  She will say I can't answer the

9    question.

11    A    All right, I can't answer the question.  Thank

13    you.

15    Q    At the -- is it true that after you had signed

17    this the only rights that you had vis-a-vis Mr.

19    Kinder and his company were whatever the two of

21    you had provided for in this separation

23    agreement?

25        MR. MONAGHAN:  Object.  Calls for a

Page 23

2    legal conclusion what her rights are.

4    THE COURT:  Overruled.  You can answer

6    the question.

8    THE WITNESS:  I feel like I need to

10    be a lawyer to answer the question.

12    THE COURT:  This was a break up between

14    you and Kinder?

16    THE WITNESS:  It was a break up.  There

18    were pieces of music.

20    THE COURT:  Hold on.  So in this

22    agreement you covered any rights that still

24    existed between you and Kinder, is that right?

Page 24

1    THE WITNESS:  That seems right.

3    THE COURT:  Is that right?

5    THE WITNESS:  Yes, it does seem right

7    of B, you know --

9    THE COURT:  And what was left over, I

11    think it were some, maybe not the right

13    word, royalties, or something that you should

15    get from some things that were still in the

17    mix?

19    THE WITNESS:  Right.  More than

21    royalties.  There were also payment.

23    THE COURT:  Let's go forward.

25    Q    And whatever payments you thought you were

Page 25

2    entitled to --

4    A    Yes.

6    Q    -- were laid out in the separation agreement,

8    isn't that correct?

10    A    Yes.

12    Q    So by the way did you ever find that written

14    agreement that you made with Mr. Kinder a

16    couple of months ago?

18    A    I didn't make an agreement with Ford Kinder a

20    couple of months ago.

22    Q    Do you remember testifying on July 7th, and

24    Mr. Monaghan or the court -- Mr. Monaghan asked you have

Page 26

1  you obtained any other rights or authority with

2

3  respect to any other royalties on G.I. Joe and

4

5  you answered yes, and then he asked, and how

6

7  did you get that and how did that occur.

8

9       And you answered I spoke to Ford a couple of

10

11 months ago and I felt I had the right to claim

12

13 these and I would be happy to claim them but I

14

15 don't want the money, I want him to have it.

16

17 So he authorized me to claim anything for him

18

19 that was appropriate.  Do you remember that?

20

21  A   Yes.

22

23  Q   Have you obtained that agreement?

24

25  A   I don't have -- I didn't sign an agreement with

Page 27

1

2  Ford about that.  I discussed it with Ford.

3

4   Q   And then -- and then a few pages later, the

5

6  court said, I assume we are going to have some

7

8  kind of a written document.  Mr. Monaghan said

9

10 there is a written document?

11

12  A   Yes.

13

14  Q   Have you found the written document?

15

16  A   He gave you the document.

17

18  Q   No, we have received no written document.  Have

19

20 you found it?  Did you find it and give it to

21

22 your lawyer?

23

24      THE COURT:  I thought Mr. Monaghan

25

Page 28

1       said after that, that there was no claim

2

3  as to anything of this.  That we are talking

4

5  about now.

6

7  MR. MONAGHAN:  Exactly.

8

9  THE COURT:  Twenty days afterwards,

10

11 this agreement.

12

13 MR. MONAGHAN:  That is correct.

14

15 MR. PHARES:  So no claim to G.I. Joe?

16

17 MR. MONAGHAN:  No claim to G.I. Joe,

18

19 other than what is set forth in the

20

21 settlement agreement that are part of the

22

23 record.  Nothing based on any recent

24

25 agreement.

Page 29

1

2   Q   Okay.  I just wanted to make sure that is

3

4  clear.

5

6   A   I thought you dealt with that two weeks ago.

7

8   Q   There is no question pending.

9

10  A   Okay.

11

12  Q   Isn't it true, Miss Bryant, that if there is

13

14 money coming or due to Kinder and Bryant that

15

16 that is no longer your claim?  If it is not in

17

18 the separation agreement?

19

20  A   Separation agreement ended Kinder and Bryant.

21

22  Q   Right.  So if there were monies due to Kinder

23

24 and Bryant arising out of music written by

25

Page 30

1  Kinder and Bryant --
2
3      MR. MONAGHAN:  Object to the form of
4
5      the question.  Kinder and Bryant doesn't
6
7      write music.
8
9  Q    You no longer have any interest with Kinder and
10
11  Bryant, is that correct?
12
13     THE COURT:  Overruled.
14
15  A    I no longer have an interest in Kinder and
16
17  Bryant.  It doesn't exist.
18
19  Q    And if there were rights, and if there were
20
21  money due for the music that was delivered by
22
23  Kinder and Bryant, you no longer have a claim
24
25  to those monies, isn't that correct, unless you

Page 31

1
2  provided for it in your agreement?
3
4  A    Were monies due.  As creative fees.
5
6  Q    Look, Miss Bryant, this isn't too complicated.
7
8  A    It is complicated.
9
10  Q    You just told us that this was the deal that
11
12  you made and this is what you provided for for
13
14  all the monies that you felt you were due at
15
16  the time of your separation agreement.
17
18      Now I am just trying to say, isn't it not true
19
20  that if there were monies due to Kinder and
21
22  Bryant and you did not provide for them here,
23
24  you are not entitled to them, isn't that
25

Page 32

1  correct?
2
3      MR. MONAGHAN:  I have to object to
4
5      the form of the question.  It does call
6
7      for a legal conclusion, and the differences
8
9      between monies due from Kinder and Bryant
10
11      and monies due from third parties.  That
12
13      is entirely different proposition.
14
15      THE COURT:  The question only went to
16
17      Kinder and Bryant or whatever the name was.
18
19      So I will allow the question.  But I
20
21      think at this point it should be repeated.
22
23      MS. PHARES:  Could you repeat it?
24
25      (Whereupon, the last question was read

Page 33

1
2  back by the reporter.)
3
4      MR. MONAGHAN:  Judge, a double negative
5
6      in the question.  Is it not true --
7
8      straight forward question.
9
10      THE COURT:  Counsel, I think you have
11
12      to leave it up to your client.  Can't answer
13
14      the question.  Believe me I am not telling
15
16      you to say he can't answer it because we
17
18      are going to move a lot faster as we get
19
20      these questions going.  Maybe there is a
21
22      problem with that question.  So Counsel,
23
24      let's try that one again.
25

Page 34

1   Q    You made a separation agreement with Kinder and

2

3   Bryant, didn't you?

4

5   A    Yes.

6

7   Q    And you provided in your separation agreement

8

9   for everything that you felt you were entitled

10

11   to after the separation, isn't that correct?

12

13   A    Everything we could.  Yes, addressed.

14

15   Q    And therefore, anything that you are now

16

17   entitled to must be in the agreement or you are

18

19   not entitled to it, isn't that correct?

20

21       MR. MONAGHAN:  Object to the form.

22

23       THE COURT:  Overruled.  You may

24

25       answer.

Page 35

1

2   A    I don't think it is correct.

3

4   Q    Why not?

5

6   A    Because certain things have happened in the

7

8   world, in the market place weren't even

9

10   invented then and I would hope, I read it would

11

12   address future possibilities, but it deals with

13

14   me, Bryant as a shareholder and as part of the

15

16   company that had created fees and as an

17

18   individual that got royalties, and I think that

19

20   it would cover all of that, but I am just not

21

22   sure, and feel like you said don't look at my

23

24   lawyer.  I feel like I need advice from my

25

Page 36

1   lawyer to really answer that question right for

2

3   you.

4

5   Q    What was invented that you couldn't have

6

7   thought about?

8

9   A    Well, the internet wasn't doing very well back

10

11   then.  DVD's, cellular ring tones.  A lot of

12

13   technology hadn't happened.

14

15   Q    Video cassettes were certainly widely used even

16

17   in the mid-80's weren't they?

18

19   A    They were an up and coming market.

20

21   Q    More than up and coming in the mid-80's?

22

23   A    They were starting to swing.

24

25   Q    You testified to that?

Page 37

1

2   A    They were viable and CD's had been invented and

3

4   sounding better, but ring tones weren't.

5

6   Internet use wasn't.

7

8   Q    The issue in this case here involves video

9

10   cassettes, right?

11

12   A    Yes.

13

14   Q    So tell me why it is you think you were

15

16   entitled to something that was not in your

17

18   agreement?

19

20   A    I am not saying that I am not.

21

22   Q    I thought that is what you were saying.  I

23

24   asked you a question and I said isn't it true

25

Page 38

1  that if everything you felt you were entitled
2
3  to, you provided for in your agreement.  Are
4
5  you telling me that you now agree with that?
6
7    A   I am telling you that I think this covers all
8
9  of that.  I think this covers the
10
11  possibilities, even the things transferred into
12
13  new mediums because we did address TAMED as a
14
15  representative for publishing and we had
16
17  addressed me in several different ways.  I had
18
19  several different hats.
20
21    Q   So you would agree that this agreement
22
23  represents everything?  That this is rather the
24
25  agreement that governed your relationships

Page 39

1
2  after the termination of Kinder and Bryant,
3
4  isn't that correct?
5
6        MR. MONAGHAN:  With whom?
7
8    Q   With Kinder and Bryant and Mr. Kinder?
9
10    A   It governed my relationships after Kinder and
11
12  Bryant was Kinder and Company.
13
14    Q   That is correct.  This was your relationship
15
16  with the successor, is that correct?
17
18    A   Yes.
19
20    Q   So what you are entitled to you agree to is
21
22  this is what you would expect from Kinder and
23
24  Bryant, isn't that correct?
25

Page 40

1    A   Yes.
2
3    Q   And this is, you no longer had an interest in
4
5  the corporate entity Kinder and Bryant or its
6
7  successor, Kinder and Co., that is --
8
9    A   That is right.
10
11    Q   Now look at Paragraph 3B, the one that you were
12
13  referring to earlier.
14
15        In that paragraph isn't it true that you
16
17  arranged to get one-third of what was called
18
19  contingent compensation that Kinder and Bryant
20
21  or Kinder and Co. received after the date of
22
23  the agreement relating to work created, but the
24
25  two of you had done before that.  Isn't that

Page 41

1
2  right?
3
4    A   Before the cutoff date.
5
6    Q   That is correct.
7
8    A   Right.
9
10    Q   And those contingent fees covered creative
11
12  fees, arranging fees, editing fees, studio
13
14  billing, studio re-billing and the
15
16  reimbursement of all production costs in terms
17
18  of demo costs already billed, is that right?
19
20    A   That is correct.
21
22    Q   And then you also provided in Paragraph 4A that
23
24  you would get performance royalties, is that
25

11 (Pages 38 to 41)

Page 42

1  correct?
2
3    A    Yes, I am sorry, I was looking at the wrong
4
5  one.
6
7    Q    Miss Bryant, when we talk about public
8
9  performance royalties, we are talking about
10
11  these that we had on our chart, isn't that
12
13  correct?
14
15    A    Yes.
16
17    Q    And in 4B, you provided that you would continue
18
19  to be credited for your work on the contract
20
21  with the American Federation of Music for your
22
23  services as a musician so that you would be
24
25  paid, isn't that so?

Page 43

1
2    A    Yes, but I need to clarify that because I
3
4  wasn't saying that Kinder and Company would
5
6  credit me as a ranger on this work.  It was
7
8  only work that I had already done that hadn't
9
10  gone on the air yet, or was in the presentation
11
12  phase.
13
14    Q    Just for our clarification, for those of us who
15
16  are not in your business, the American
17
18  Federation of Music doesn't have anything to do
19
20  with your work as a composer, isn't that right?
21
22    A    The American Federation of Musicians and our
23
24  local is 802 in New York, is a union of
25

Page 44

1  musicians that includes side men, that is
2
3  musicians, instrumentalists, writers.  Out of
4
5  arrangements or in orchestrations.  That is me.
6
7  Also responsible parties, leaders they were
8
9  called and we are a union.
10
11    Q    This had more to do with your performance of
12
13  music, is that correct, than composing of?
14
15    A    Had to do with my arranging services, my
16
17  musician services, which is union services.
18
19    Q    As a musician?
20
21    A    Yeah.
22
23    Q    By the way, in that same paragraph 4B it says
24
25  that the public performance royalties that BMI

Page 45

1
2  paid will be paid to television and advertising
3
4  music administration, TAMED?
5
6    A    Yeah.
7
8    Q    Is that correct?
9
10    A    Yes.
11
12    Q    And that's Mr. Dobinshinski's company, isn't
13
14  it?
15
16    A    Yes.
17
18    Q    It says it will be paid, quote, in accordance
19
20  with the existing arrangement among Bryant,
21
22  Kinder and TAMED, isn't that so?
23
24    A    That is right.
25

Page 46

1    Q    That existing arrangement didn't include

2

3    Sunbow, isn't that correct?

4

5    A    Yes, it did include Sunbow. It included

6

7    Starwild.

8

9    Q    And what was the arrangement?

10

11    A    The arrangement was although Dobinshinski was

12

13    the administrator for Starwild and Wildstar and

14

15    that he was responsible to administrate for

16

17    them and also contacted the writers and made

18

19    sure that you know the monies were all sent to

20

21    him in trust for whoever.

22

23    Q    Why didn't you include Sunbow in this

24

25    agreement? Why didn't you refer to it? This

Page 47

1

2    describes an existing arrangement among Bryant

3

4    Kinder and TAMED, doesn't it?

5

6    A    He was the administrator paying the writers and

7

8    he was the administrator, worked for the

9

10    publisher. He worked for the publisher and he

11

12    got his information, he did the filing,

13

14    registrations for the publisher.

15

16    Q    You are just describing what a music

17

18    administrator does. This says an existing

19

20    arrangement. Did you have a separate

21

22    arrangement with

23

24    Mr. Dobinshinski?

25

Page 48

1    A    They provided him as the administrator and then

2

3    he said how would you like to work.

4

5    Q    Didn't you and Mr. Bryant have a separate

6

7    arrangement with Mr. Dobinshinski?

8

9    A    He received our monies, yes, and then he

10

11    distributed them to us.

12

13    Q    That is the only existing arrangement you had

14

15    with him?

16

17    A    Yes.

18

19    Q    You are sure?

20

21    A    That is all I know about.

22

23    Q    Is it possible you had a relationship with

24

25    Mr. Dobinshinski that you don't know about?

Page 49

1

2    A    How could I have an arrangement? What you say,

3

4    a relationship with --

5

6    Q    Did you have any kind of business relationship

7

8    apart from his being Starwild's music

9

10    administrator? That you know of?

11

12    A    Well I think the fact that he received my check

13

14    and then he separated out, you know. He gave

15

16    us a statement that said what everything was

17

18    for and he deducted his commission and then he

19

20    sent us the balance.

21

22    Q    And you had authorized him to receive your

23

24    check, hadn't you?

25

Page 50

1    A    Yes. Yes, that made for good clear paperwork

2

3    for everybody. You know, money trail, and he

4

5    sent me my original statement, except a few

6

7    times he didn't.

8

9    Q    You had no other arrangement with

10

11   Mr. Dobinshinski other than this role as music

12

13   administrator for Starwild and Wildstar?

14

15   A    That is right.

16

17   Q    You are sure of that?

18

19   A    I am sure I didn't.

20

21   Q    Let's go on to Paragraph 4C.

22

23        You provided in this corporate separation that

24

25   you would also continue to be credited, and am

Page 51

1

2    now, I will amend my question to take into

3

4    account what you said earlier, that you would

5

6    continue to be credited let's say on music that

7

8    you had written earlier and on all contracts

9

10   filed with the Screen Actors Guild, the

11

12   American Federation of Radio and Television

13

14   Artists for your services as a singer, isn't

15

16   that correct?

17

18   A    That is right.

19

20   Q    So that you would be paid, isn't that correct?

21

22   A    Yes.

23

24   Q    Now, neither SAG or ASCAP has nothing to do

25

Page 52

1    with your work as a composer?

2

3    A    No, it doesn't.

4

5    Q    There was no agreement in this 1989 dissolution

6

7    agreement that Kinder and you would change the

8

9    division of royalties between you as they were

10

11   registered with BMI, was there?

12

13   A    In this agreement no. No. We would continue

14

15   to do things as we always had when we were

16

17   actively in business.

18

19   Q    Would you turn back to the caption, the very

20

21   beginning of this document, Miss Bryant. Could

22

23   you tell me who Maria Goodman, also known as

24

25   Maria Arbory Kinder, also known as Mijor Kinder

Page 53

1

2    is?

3

4    A    That is Ford Kinder's mother. She is Ford

5

6    Kinder's mother.

7

8    Q    And Jeff Kinder, who is that?

9

10   A    Ford's brother.

11

12   Q    And Janet Brittany Kinder?

13

14   A    Ford's wife.

15

16   Q    Did they all have an interest in Kinder and

17

18   Bryant?

19

20   A    I don't know how to answer that for Jan.

21

22   Janet. Because we had a buy sell agreement at

23

24   some point where if one of us died the other

25

Page 54

1  got an amount of money that bought it. Took
2
3  the other person's shares, something. I think
4
5  she was named in that, you know, because she
6
7  was his wife.
8
9     Q    She might have been his beneficiary you mean?
10
11    A    I don't remember how it worked.
12
13    Q    Did his brother and his mother have an interest
14
15  in Kinder and Bryant?
16
17    A    Not in Kinder and Bryant, but we did not
18
19  have -- I think we had a corporation? Did we have a
20
21  corporation called Kinder, Bryant Kinder dealt
22
23  with our working with his younger brother Jeff.
24
25  He is a composer in Atlanta. It wasn't Kinder

Page 55

1
2  and Bryant, it was
3
4  another --
5
6     Q    It was another corporation?
7
8     A    Yeah.
9
10    Q    I am just talking about the Kinder and Bryant
11
12  that was the subject of your separation
13
14  agreement?
15
16    A    No.
17
18    Q    They didn't have anything to do with that?
19
20    A    No.
21
22    Q    But they were named as defendants in this
23
24  lawsuit?
25

Page 56

1     A    Yes.
2
3     Q    Okay. And did Mr. Monaghan also represent you
4
5  in that suit?
6
7     A    Yes, he did.
8
9     Q    And you were claiming in that suit that
10
11  Mr. Kinder hadn't paid you the payments that were due
12
13  under the separation agreement, is that
14
15  correct?
16
17    A    Yes, I wasn't receiving proper contingent
18
19  compensation.
20
21    Q    And then you eventually settled the 1991
22
23  lawsuit in 1994, isn't that correct?
24
25    A    Yes.

Page 57

1
2       MS. PHARES: Your Honor, I am offering
3
4  for identification Your Honor's decision on
5
6  March -- well I beg your pardon, April 3rd,
7
8  2001, in the case of Anne Bryant against
9
10  Broadcast Music Inc, et al, for
11
12  identification, as Defendant's E.
13
14       (Decision 4/2/01 was marked as
15
16  Defendant's Exhibit E for identification.)
17
18       THE COURT: All right.
19
20       MS. PHARES: Filed as of April 3rd,
21
22  2001, and decision date April 2nd. Your
23
24  Honor, the copy of --
25

Page 58

1    COURT OFFICER: E for ID.
2
3    MS. PHARES: The copy of the settlement
4
5    in 1994, it was not available to the
6
7    defendants but Your Honor described it in
8
9    this decision denying Ford Kinder's motion
10
11   to dismiss when he was sued in this case,
12
13   and since that agreement has not been made
14
15   available to Sunbow, I would like to read
16
17   from your decision and I am starting at
18
19   the bottom of Page 2.
20
21       It says the 1991 action was settled
22
23   on the record on September 21st happening
24
25   on -- I actually shouldn't be reading from

Page 59

1
2    this until I offer it into evidence, and I
3
4    offer this exhibit into evidence. Identified
5
6    as E, as the Defendant's Exhibit E.
7
8        MR. MONAGHAN: I don't understand why
9
10   the decision offered as an exhibit in
11
12   evidence.
13
14       THE COURT: Just to clear that up. As
15
16   far as I am concerned any pleading within an
17
18   action is part of the file, but I will
19
20   accept it as evidence. E is in evidence.
21
22       (Defendant's Exhibit E received in
23
24   evidence.)
25

Page 60

1    MS. PHARES: And Your Honor, I'm
2
3    reading from the bottom of Page 2, and it
4
5    begins with -- I want you to follow along
6
7    Miss Bryant. I want to make sure you are
8
9    still in complete agreement with this.
10
11       The 1991 action was settled on the
12
13   record on September 21st, 1994 before
14
15   Justice Howard Miller. The parties had
16
17   agreed internally to discontinue that action
18
19   with prejudice and to exchange general
20
21   releases and the court dropped a note saying
22
23   that the copy of the general releases had
24
25   not been included in the motion papers and

Page 61

1
2    it is not clear if they were ever executed.
3
4    Then goes on to say, defendants had
5
6    agreed to pay plaintiff the sum of $70,000
7
8    subject to plaintiff providing defendants
9
10   with a certain accounting from which any
11
12   sums due would be subtracted. Specifically
13
14   the parties had each agreed as follows:
15
16       All BMI money in plaintiff Anne
17
18   Bryant's name shall remain in Anne Bryant's
19
20   name with no obligation to account for
21
22   Defendant Kinder. All BMI and all ASCAP
23
24   monies in Ford Kinder's name remain in Ford
25

Page 62

1  Kinder's name, with no obligation to account
2
3  to Anne Bryant.
4
5     Further the settlement stipulation
6
7  provided that, quote, all continuing
8
9  obligations of either party under the
10
11 November 8th, 1989 agreement are hereby
12
13 terminated except as to the provision of
14
15 Paragraph 8.
16
17    And then court dropped a footnote
18
19 saying Paragraph 8 of the agreement relates
20
21 to plaintiff's agreement to reimburse the
22
23 corporation for any tax deficiencies for the
24
25 period prior to April 1, 1989 assessed by

Page 63

1
2  taxing authorities, and then on the record
3
4  plaintiff has specifically stated that she
5
6  understood the terms of the settlement.
7
8  That the terms as they were stated were
9
10 consistent with her understanding of the
11
12 settlement.  That the terms were
13
14 satisfactory and understood that she would
15
16 be releasing all the defendants in that
17
18 case.
19
20    Q    Now, is that -- was that true then and is it
21
22 still true today?
23
24    A    It is true.  Yes.
25

Page 64

1     Q    So is it fair to say that by the terms of the
2
3  settlement that you had in 1994 that when Mr.
4
5  Kinder paid you the flat sum of $70,000 to
6
7  terminate any continuing obligations that he
8
9  had, you no longer had any interest under your
10
11 separation agreement, isn't that correct?
12
13    A    Yes, that is correct.
14
15    Q    Now, you sued Mr. Kinder again in 2000 as a
16
17 defendant when you first filed this lawsuit,
18
19 isn't that right?
20
21    A    That is right.
22
23    Q    And that's when you claim that he had been
24
25 involved in the alleged re-registration of your

Page 65

1
2  songs with BMI, isn't that so?
3
4    A    Yes.
5
6      MS. PHARES:  I am offering for
7
8  identification, Defendant's Exhibit F, a
9
10 stipulation of settlement without prejudice
11
12 in the case of Anne Bryant against Broadcast
13
14 Music bearing production numbers 3544 through
15
16 3549.
17
18 (Stipulation of settlement was marked
19
20 as Defendant's Exhibit F for identification.)
21
22 COURT OFFICER:  F for ID.
23
24 THE COURT:  Yes.
25

Page 66

1   Q   Do you recognize this document, Miss Bryant?
2
3   A   Yes.
4
5   Q   And it is signed by Ford Kinder, isn't that
6
7   correct?
8
9   A   Yes.
10
11  Q   Can we presume that you also signed it?
12
13  A   Yes, I signed it.
14
15  Q   I mean the copy I have doesn't have your
16
17  signature. I just wanted to confirm that.
18
19      MS. PHARES: Your Honor, I offer
20
21      this as Defendant's Exhibit F in evidence.
22
23      MR. MONAGHAN: No objection.
24
25      THE COURT: All right, F goes in as

Page 67

1
2   evidence.
3
4       COURT OFFICER: F in evidence.
5
6       (Defendant's Exhibit F received in
7
8   evidence.)
9
10  Q   In this agreement, Miss Bryant, isn't it true
11
12  that Mr. Kinder agreed to give you half of his
13
14  share or rather he first of all gave you
15
16  information regarding his BMI catalog?
17
18      MR. MONAGHAN: Just ask the witness
19
20      have a few minutes to look it over.
21
22  A   Yeah, I don't remember it that well. Yeah,
23
24  that is in Number 2, he authorizes --
25

Page 68

1   Q   Well Paragraph 1 says that they were requested
2
3   and provided you with copies of current
4
5   catalogs, isn't that true?
6
7   A   That is true.
8
9   Q   And he also, as you say in Paragraph 2,
10
11  authorized BMI to furnish you with copies of
12
13  his catalog, isn't that also true?
14
15  A   Yes.
16
17  Q   And he agreed to cooperate with any formal
18
19  writers change file with BMI, isn't that true?
20
21  A   Yes.
22
23  Q   Did you ever file a formalized change with BMI?
24
25  A   We couldn't do it yet.

Page 69

1
2   Q   So the answer is no?
3
4   A   No. To be done.
5
6   Q   And this entire agreement related to your right
7
8   to recover performance royalties, isn't that
9
10  correct?
11
12  A   Yes.
13
14  Q   Now, do you still have E in front of you or at
15
16  least available to you?
17
18  A   The decision and order?
19
20  Q   If you look at the sticker on the lower left.
21
22  A   The blue sticker?
23
24  Q   That should identify for you. Isn't it true,
25

Page 70

1  and I am referring to the dissolution agreement
2
3  that is attached to it.
4
5      A    The 1989 agreement?
6
7      Q    That is right.
8
9          Isn't it true that in this dissolution
10
11 agreement with Kinder and Bryant you didn't
12
13 make any arrangement to receive music
14
15 publishing royalties, isn't that true?  Now I
16
17 am not talking about the public performance
18
19 royalties.   You were certainly provided for
20
21 those.  Isn't it true that you made no
22
23 provision to receive music publishing
24
25 royalties?

Page 71

1
2          MR. MONAGHAN:  Can we have the
3
4          definition of music publishing?
5
6      Q    Well right here on this chart we have the ones
7
8  that Miss Bryant described when she was
9
10 testifying.  It included mechanical.  She said
11
12 sing royalties and print, isn't that right?
13
14     A    Yes.
15
16         THE COURT:  You have to say yes or no.
17
18         THE WITNESS:  I said yes.
19
20         THE COURT:  Didn't hear you.
21
22         THE WITNESS:  I am sorry.
23
24     Q    Isn't it true that in your dissolution
25

Page 72

1  agreement in 1989 you made no provision for the
2
3  recovery of music publishing royalties?
4
5      A    That is true.
6
7      Q    And isn't it also true that in your 1989
8
9  dissolution agreement you made no provision for
10
11 the recovery of any royalties from video
12
13 cassettes?
14
15     A    That is true.  They weren't even in the mix at
16
17 that point.  They weren't in the mix on the
18
19 jingles.  These were just jingles.  That they
20
21 were selling up.
22
23     Q    Hang on.  You are saying your 1989 dissolution
24
25 agreement had anything only to do with jingles

Page 73

1
2  you wrote for GEI and not for any other music?
3
4      A    From the list I see everyone was a GEI jingle.
5
6  These were not shows.  These were just jingles.
7
8      Q    Where are you referring to?
9
10     A    My complaint list in the back.  These were the
11
12 remaining -- I think what may be confusing to
13
14 you, see something like My Little Pony and you
15
16 think we are talking about the song that became
17
18 the entertainment vehicle.  This is a whole
19
20 other Pony campaign.  These are different
21
22 transformers campaign.  Not dealing with what
23
24 talking about.
25

Page 74

1    Q    You are referring to the exhibit to your

3    dissolution agreement, isn't that correct?

5    A    Yes.  These were outstanding pieces.

7    Q    And where is it that it is designated that

9    these compositions are only jingles and not

11   songs?

13   A    Well it does refer to the American Federation

15   of Musicians and the Screen Actors Guild

17   acknowledging that I gave those services on

19   contract which described them very clearly as

21   jingles. I could pull them if you needed them

23   I could get them.

25   Q    You made a listing some of your listings refers

Page 75

2    quite clearly to payments that you are

4    expecting from SAG.  You also told us that that

6    had nothing to do with this.  I am talking

8    simply about your public performance royalties

10   that were due on the music that is listed on

12   the attachment.

14   A    No, you said to me what says this is about a

16   jingle, and I said to you when we refer to the

18   Screen Actors Guild and musicians union for

20   these pieces, they are jingle agreements that

22   are filed with those people and that is what we

24   were referring to and that is all we had to

Page 76

1    settle up with Kinder and Bryant.

3    Q    Because Kinder and Bryant wasn't producing any

5    music for Sunbow?

7    A    In 1989, no.

9    Q    Had it been producing music for Sunbow?  It had

11   produced music all the way through the eighties

13   for Sunbow, hadn't it?

15   A    Yes.

17   Q    So if you didn't provide for your music for

19   Sunbow in this agreement, you weren't entitled

21   to anything after that?

23   A    That was dealing with fees.

25   Q    Miss Bryant, I asked you a question.  I said if

Page 77

2    there was nothing in this agreement relating to

4    the music you wrote for Sunbow, then you aren't

6    entitled for any further payments for music

8    that you wrote for Sunbow, isn't that true?

10   A    No.

12   Q    Why is that?

14   A    Because I am an individual composer.

16   Q    I am asking you about the arrangements you made

18   with Kinder and Bryant.  You were just now

20   saying to me that this has only to do with

22   jingles that you wrote, is that correct?

24   A    That is all we had to settle up.  That is

Page 78

1  right. At that point remaining fees and

2

3  services that were from existing pieces of

4

5  music that hadn't gone on the air yet.

6

7    Q    And in 1989 you had written all the music that

8

9  you could have written or that you ever wrote

10

11  for Sunbow by then, isn't that correct?

12

13    A    Yes.

14

15    Q    You are telling me that there is nothing in the

16

17  1989 separation agreement relating to music you

18

19  wrote for Sunbow?

20

21    A    There is nothing in there.

22

23    Q    And you made no provision for payments for

24

25  anything else other than what is in this

Page 79

1

2  agreement, is that correct?

3

4    A    That is right.

5

6    Q    So isn't it true that if there is money due on

7

8  compositions written for Sunbow that you are

9

10  not entitled to any payment?

11

12    A    No, it is not true. This is Kinder and Bryant.

13

14  Kinder and Bryant doesn't write songs. People

15

16  write songs.

17

18    Q    You didn't provide for it in your agreement

19

20  with Kinder and Bryant, isn't that true?

21

22    A    It wasn't an outstanding issue. I don't know

23

24  how many ways I can say it. This is about fees

25

Page 80

1  and property.

2

3    Q    Because you had been paid everything that you

4

5  expected to get, isn't that also true?

6

7    A    No, it isn't. I got fees, production fees,

8

9  through my company, were paid to my company.

10

11    Q    You saying that you provided for all the ones

12

13  that were outstanding. No telling me that the

14

15  only ones outstanding related to jingles, is

16

17  that correct?

18

19    A    At that point in 1989 that's correct.

20

21    Q    Couldn't been anything after that, you weren't

22

23  working together after that, isn't that true?

24

25    A    We weren't working together and I will say that

Page 81

1

2  no fees were due for production for music for

3

4  Sunbow. No fees.

5

6    Q    That is because they were already paid, is that

7

8  correct?

9

10    A    That is right.

11

12    Q    You had received everything that you ever

13

14  expected to get from Sunbow at that point,

15

16  isn't that correct?

17

18    A    I wouldn't say that is correct.

19

20    Q    A part from your public performance royalties?

21

22    A    When you spoke of you --

23

24    Q    I am talking about Kinder and Bryant.

25

Page 82

1    A    Or Anne Bryant.
2
3    Q    Talking about Kinder and Bryant and as
4
5    Miss Saffer has testified or has said, and you understand
6
7    that your public performance royalties were
8
9    going to be paid separately by BMI, correct?
10
11   A    They paid the right of publishers separately.
12
13   Q    So you got those separately from BMI?
14
15   A    Yes.
16
17   Q    And you provided for that in your agreement?
18
19   A    Yes.
20
21   Q    But you didn't provide for anything else, and
22
23   certainly not you are now testifying to us
24
25   nothing else relating to Sunbow, is that

Page 83

1
2    correct?
3
4        MR. MONAGHAN:  I don't understand
5
6        the question.
7
8    Q    You are saying that at the time of your
9
10   separation agreement you had no expectation of
11
12   fees relating to Sunbow, is that correct?
13
14   A    The only -- yes.  The only fees I got from
15
16   Sunbow were already paid and they were
17
18   arranging fees and production --
19
20   Q    I don't need to know what they are. I need to
21
22   know, yes or no, were they paid?
23
24   A    To Kinder and Bryant.
25

Page 84

1    Q    To Kinder and Bryant.
2
3    A    Not to me.  And my other on-going royalties.
4
5    Q    And you provided for those in your separation
6
7    agreement?
8
9    A    Object to the form of the question.
10
11       THE COURT:  Overruled.  You may put
12
13       the objection on the record.
14
15       MR. MONAGHAN:  To the extent that the
16
17       question implies that is necessary to be
18
19       in this agreement between Kinder and Bryant.
20
21       THE COURT:  I don't see that
22
23       implication.  I will allow the question to
24
25       stand.  Let it stand.

Page 85

1
2        (Whereupon the last question was read
3
4        back by the reporter.)
5
6    Q    Did you --
7
8    A    My knowledge I provided for any unfinished
9
10   business that I knew of in that agreement.
11
12   Q    Okay.  And there was nothing in that agreement
13
14   relating to music publishing royalties, isn't
15
16   that correct?
17
18   A    There is a whole section about, that agreement
19
20   talks --
21
22   Q    Music publishing royalties?
23
24   A    Like sheet music.
25

Page 86

1    Q    We don't want to confuse music publishing

3    royalties with public performance royalties

5    because they are different.

7    A    Right.

9    Q    There are provisions in the agreement for

11    public performance royalties, but there is

13    nothing in the agreement with respect to music

15    publishing --

17    A    Nothing in the agreement about that.

19    Q    And from that time forward you had no further

21    interest in Kinder and Bryant or Kinder and

23    Co., isn't that correct?

25    A    That is right, the companies.

Page 87

2    Q    Right.  And isn't it true also that in your

4    1994 settlement agreement that's the agreement

6    settling the 1991 suit with Mr. Kinder, you

8    didn't make any arrangements to insure that you

10    would get your share of payments from music

12    publishing rights, did you?

14    A    No.

16    Q    No.  You took the $70,000 and you said we are

18    done.  Isn't that correct?

20    A    We are done with Kinder and Bryant and fees and

22    what-not.

24    Q    And you didn't make any provision to receive

Page 88

1    anything else pursuant to the flowing from the

3    music that you had written together as Kinder

5    and Bryant, is that correct?

7    A    That is right.  There was no issue at the time

9    that we knew of.

11    Q    Isn't it really because you didn't make any

13    arrangement in your working oral arrangement

15    for music publishing rights?  Isn't that why

17    you didn't include it in your agreement?

19    A    It was never an issue and we never gave them

21    up, so.

23    Q    You never discussed it, is that right?

25    MR. MONAGHAN:  With whom?

Page 89

2    THE WITNESS:  With whom?

4    Q    Who is testifying?  When you say you never

6    discussed it --

8    THE COURT:  It's an objection as to

10    form, Counselor.

12    MS. PHARES:  Okay.

14    MR. MONAGHAN:  Sorry, Judge.  Try --

16    THE COURT:  And I sustained it as to

18    that.

20    Q    You and Mr. Kinder hadn't discussed music

22    publishing rights, isn't that correct?

24    A    We talked about it with the television show.

Page 90

1    Q    With what television show?

2

3    A    Gem, G-e-m.  And it seems that we wrote some

4

5    songs for My Little Pony and Friends just a

6

7    couple, but we wrote the themes and Gem was the

8

9    most unique of all the things we did out of

10

11   those people for Sunbow.

12

13   Q    So the two of you discussed it?

14

15   A    Yes.

16

17   Q    You discussed music publishing rights?

18

19   A    For Gem.

20

21   Q    So is there some reason why that issue doesn't

22

23   appear in your 1989 separation agreement?

24

25   A    Well Gem died, you know.

Page 91

1

2    Q    And the two of you forgotten that you had

3

4    written it?

5

6    A    No, we didn't forget that we wrote it.

7

8    Q    You were continuing to receive your public

9

10   performance royalties from that, weren't you?

11

12   A    Yeah, and that was the only game in town as far

13

14   as I know for that show.

15

16   Q    You certainly knew about music publishing

17

18   rights, didn't you?  You have been in this

19

20   business a long time?

21

22   A    Yes, I have.  Know about them.  I didn't get

23

24   all exercise about them but if no uses that I

25

Page 92

1    have to be concerned with.  When something

2

3    comes up I will be notified.

4

5    Q    So wait a minute.  You made a 1989 separation

6

7    agreement.  You settled it and in all those

8

9    years you didn't think to even include this in

10

11   any of these agreements?

12

13       MR. MONAGHAN:  Your Honor, we have

14

15       been over this ground a number of times.

16

17       Asked and answered.  Many times.

18

19       THE COURT:  That is a fair objection.

20

21       Go on to another question.

22

23   Q    All right.  I am still referring to the -- I am

24

25   now going to refer to the 2001 settlement

Page 93

1

2    agreement that is Defendant's Exhibit E.

3

4    A    I thought it was F.

5

6    Q    It is F.  Hang on.  No, I beg your pardon.

7

8    You're absolutely right.  Defendant's Exhibit

9

10   F.  Do you see any mention in the 2001

11

12   settlement agreement with

13

14   Mr. Kinder of music publishing rights?

15

16   A    To really answer you, well, I have to read it

17

18   again, but I can tell you that this was about

19

20   our BMI situation and the way the listings

21

22   moved around, so it was focused on that, on

23

24   trying to straighten that out.

25

Page 94

1  Q   Because that is what this case was about when

2

3  you started, isn't that right?

4

5  A   It was one of the thing it was about.

6

7  Q   Well was it about anything else that you should

8

9  have included in your settlement?

10

11  A   With Ford?

12

13  Q   Did you provide that you were going to get any

14

15  music publishing rights in your settlement with

16

17  Mr. Kinder?

18

19  A   No.

20

21  Q   No.

22

23  A   This was about a different issue.

24

25      MR. MONAGHAN:  The horse is dead,

Page 95

1

2  Your Honor.

3

4      MS. PHARES:  Your Honor, this is

5

6  another settlement.  I am entitled to

7

8  develop the facts that no time in the last

9

10  15 years has the plaintiff ever made an

11

12  issue of music publishing rights.

13

14  THE WITNESS:  Well we didn't know till

15

16  ten days ago that your client was marketing

17

18  this 15 years around the world out of our

19

20  sight.

21

22  THE COURT:  All right, now go to lunch.

23

24  THE WITNESS:  It would have gotten

25

Page 96

1  raised.

2

3  THE COURT:  Now go to lunch.  See you

4

5  back here at two o'clock.

6

7  (Whereupon, court stood in luncheon

8

9  recess.  After the recess the proceedings

10

11  continued as follows.)

12

13  MR. PHARES:  Your Honor, before we

14

15  begin I want to confirm on the record the

16

17  agreement that we made in chambers that if

18

19  Mr. Monaghan is going to call his out of

20

21  town witnesses that he will either do so

22

23  in court or he will proceed with a video

24

25  conference deposition that we can all

Page 97

1

2  attend without the need for a commission,

3

4  is that correct?

5

6  THE COURT:  There is no need for a

7

8  commission and if you can work it out

9

10  through a video conference that is fine.

11

12  MR. MONAGHAN:  Thank you, Judge.

13

14  THE COURT:  Otherwise, have to be in

15

16  court.

17

18  MR. MONAGHAN:  Understood.

19

20  CONTINUED CROSS-EXAMINATION

21

22  BY MS. PHARES:

23

24  Q   Miss Bryant, at the break I just put up here on

25

Page 98

1  the board what I think is a summary of, may not

2

3  be a well spelled summary, but it is a summary

4

5  of what we discussed this morning, and I want

6

7  to be sure that you don't think there is any

8

9  mistake in it.

10

11      That in the 1989 separation agreement you were

12

13  bought out of your corporate interest. There

14

15  was provision for public performance, but not

16

17  for music publishing, is that correct?

18

19   A   That is correct.

20

21   Q   The 1994 settlement agreement you were paid

22

23  $70,000. There were no further corporate

24

25  obligations. You provided for your performance

Page 99

1

2  royalties but no music publishing, is that

3

4  correct?

5

6   A   That is correct.

7

8   Q   And then in the 2000 settlement agreement with

9

10  Mr. Kinder you provided for your performance

11

12  royalties and there was no provision for music

13

14  publishing, is that correct?

15

16   A   Ford Kinder was not my publisher and Kinder and

17

18  Bryant was not my publisher. That is why.

19

20   Q   And isn't it true that the first time that you

21

22  claimed any kind of music publishing in this

23

24  lawsuit or any prior lawsuit was in November of

25

Page 100

1  2003 in opposition to defendant's motion for

2

3  summary judgment after Sunbow's production of

4

5  documents showed that you didn't have the

6

7  signed agreements?

8

9   A   I don't think that is true, and the reason I

10

11  don't think it is true is that I don't know

12

13  when you say music publishing that seems to

14

15  embrace the payments for disks and VHS's and

16

17  all the other uses other than public

18

19  performance royalties.

20

21   Q   Well you testified earlier that there is --

22

23  what music publishing was, isn't that correct?

24

25   A   Right. We made that distinction.

Page 101

1

2   Q   And you said that mechanical included making a

3

4  phono record, didn't you?

5

6   A   Yes. A DVD. So I think that that has been

7

8  said for a quite a long time.

9

10   Q   But wasn't in your separation agreement in

11

12  1989, was it?

13

14   A   No, because Ford Kinder was not my publisher.

15

16  He was not a party in my music publishing

17

18  business.

19

20   Q   But you and Ford Kinder together were, you

21

22  shared in the income of your work, did you not?

23

24   A   Yes.

25

Page 102

1  Q    And so that the agreements that were made by
2
3  Ford Kinder, I mean by Kinder and Bryant, is
4
5  what was formed the basis for what you got,
6
7  isn't it?
8
9  A    Make this clear. Kinder and Bryant was not a
10
11 publisher of our work. Sunbow's and Griffin
12
13 Bacal's company, Starwild was our publisher.
14
15 Starwild was common to Kinder and Bryant. I
16
17 mean -- Starwild was common to Griffin Bacal
18
19 and Sunbow. Starwild published music for both
20
21 companies owned by the same two men.
22
23 Q    And those publishers, if they made a deal, if
24
25 they made a deal for say mechanical royalties,

Page 103

1
2  then did you make arrangements to get that?
3
4  What made you entitled to that?
5
6  A    Well, they were the publisher and they sent it
7
8  to us.
9
10 Q    They sent it to you? Why did they send it to
11
12 you?
13
14 A    Because we wrote the music. They were the
15
16 publisher and they sent the writer's share to
17
18 us.
19
20 Q    Let me just ask you something. Are you saying
21
22 that you are entitled to mechanical royalties
23
24 because you wrote the music?
25

Page 104

1  A    Yes.
2
3  Q    And did you not testify earlier that you had
4
5  worked for hire and that you never owned the
6
7  company rights?
8
9  A    I said I never owned the company rights.
10
11 Q    So we are agreed that you got no right to music
12
13 publishing because you are a copyright owner,
14
15 isn't that correct?
16
17 A    I didn't get them for that reason. I got them
18
19 because I reserved them.
20
21 Q    You got them because you had a contractual
22
23 agreement, isn't that right?
24
25 A    Is that what that would be?

Page 105

1
2  Q    Because you had an agreement?
3
4  A    I had an agreement, yeah.
5
6  Q    You had an agreement with the entity that owned
7
8  the copyright?
9
10 A    That we gave the copyright to.
11
12 Q    Right. Whoever you gave the copyright to you?
13
14 Do you know who you gave it to?
15
16 A    Starwild Music through Griffin Bacal into their
17
18 Starwild Music or Starwild Music and Sunbow
19
20 into Wildstar or Starwild Music.
21
22 Q    So they got the copyright?
23
24 A    Yes.
25

Page 106

1  Q    That means they got the right to exercise the
2
3  copyright, is that right?
4
5  A    Except that we kept the writer's share.
6
7  Q    Except that they provided that you would get
8
9  the writer's share, is that correct?
10
11 A    Well they paid us the writer's share for a
12
13 while.
14
15 Q    They paid it to you?  And if you were going to
16
17 get the music publishing you had to have an
18
19 agreement for the music publishing, isn't that
20       ˉ
21 correct?
22
23 A    We didn't ask for the publishing.  We wanted
24
25 writer's share.

Page 107

1
2  Q    Hang on.  I am not talking here - I want to be
3
4  very clear.  I am not talking about public
5
6  performance royalties.
7
8  A    We got those.
9
10 Q    You're saying you didn't ask for the
11
12 publisher's share, all agreed about that?
13
14 A    Right.
15
16 Q    We were just agreeing that you were given the
17
18 right to receive the writer's share of the
19
20 public performance royalties, correct?
21
22 A    Right.  I don't like given, you know, we gave
23
24 to them.
25

Page 108

1  Q    Did you make an agreement with either GBI,
2
3  although they are not in the case, and I am
4
5  really not worried about them or Sunbow to
6
7  receive your music publishing rights?  Another
8
9  right owned by the copyright's owner?
10
11 A    We retained our writer's share of the music
12
13 publishing.
14
15 Q    You negotiated this?  You negotiated your
16
17 share?  What do you mean by your share?
18
19 A    The writer's share of the royalties from the
20
21 music publishing.
22
23 Q    I don't understand that.
24
25      MR. MONAGHAN:  Can she be permitted

Page 109

1
2  to finish an answer, Your Honor?
3
4  THE COURT:  All right.
5
6  Q    I understand the term writer's share with
7
8  respect to public performance royalties.
9
10 A    Am I using the wrong word?
11
12 Q    I just want to make sure.
13
14 A    We got the writer's royalties.  They got the
15
16 publisher's royalties.  They or their client
17
18 got the copyright, so that they needed it for
19
20 this product and what-not.  But we got the
21
22 writer's share.  That is how one got paid.
23
24 That is how we made money.
25

Page 110

1   Q   And you got the writer's share of the public
2
3   performance royalties; is that correct?
4
5   A   We got that and we got the writer's share of
6
7   the royalties.
8
9   Q   Of what royalties?
10
11   A   Of all royalties.
12
13   Q   You are saying you negotiated the other rights,
14
15   the state rights, the mechanical royalties and
16
17   the print rights, is that correct?
18
19   A   We always got them.  That was always understood
20
21   that --
22
23   Q   Who did you understand get that with?
24
25   A   That started way back with Michlin Company.  I

Page 111

1
2   told you that.
3
4   Q   Yes, you did.  But then if you recall we then
5
6   looked at your agreement with GBI and if you
7
8   recall, there was no provision for music
9
10   publishing royalties.  If you want I would like
11
12   to show you.
13
14   A   Please do.
15
16   Q   I would show you B and C again.
17
18   A   Yes.
19
20   Q   Do you see any provision for music publishing
21
22   in those agreements?
23
24   A   I also see two agreements.  I never saw before
25

Page 112

1   you gave them to me.  I didn't sign these
2
3   agreements or any agreements that gave away my
4
5   writer's share.
6
7   Q   These were agreements on behalf of your
8
9   company, Kinder and Bryant, isn't that right,
10
11   Miss Bryant?
12
13   A   That is what you say.
14
15   Q   That is what you testified to.
16
17   A   I said looks like a Griffin Bacal production
18
19   agreement.
20
21   Q   And do you recall in this agreement that you
22
23   went through and you showed us the provisions
24
25   that you had to get monies for, single use of

Page 113

1
2   your jingles and then additionally monies for
3
4   your national use and then the Paragraph D
5
6   which says that except otherwise as expressly
7
8   provided for herein, neither we or artists
9
10   shall be entitled to any payment and/or other
11
12   consideration.
13
14   Do you remember that?
15
16   A   I remember.  You asked me what I remember.  I
17
18   do remember saying I recognize some of these
19
20   amounts, but this is not how we were paid.
21
22   Q   So --
23
24   A   So I don't know.  I don't know about these
25

Page 114

1  contracts. I didn't sign them and I never saw
2
3  them signed and I never seen them before you
4
5  produced them. I couldn't even read them when
6
7  you sent them over Friday night, July 2nd.
8
9     Q    Do you know who you made the agreement with,
10
11  for these music publishing rights with Sunbow?
12
13     A    Well, Starwild Sunbow?
14
15     Q    We all agreed that Starwild is one of the
16
17  publishing subsidiaries of Sunbow.
18
19     A    And it was the one that published the --
20
21     Q    That is not the question that is pending. I am
22
23  asking you with whom did you make the agreement
24
25  that you were going to get music publishing

Page 115

1
2  rights?
3
4     A    It was always understood.
5
6     Q    You didn't have an agreement you mean?
7
8     A    I don't remember. I remember same deal as
9
10  Michlin Company, that is the way we worked, and
11
12  they sent me mechanicals for several years,
13
14  Sunbow did.
15
16     Q    That was as a result of your oral agreement?
17
18  You can't just shrug. We need an answer.
19
20     A    The deal that I remember was same deal as
21
22  Michlin Company and we always kept the writer's
23
24  share of all the writer's share of the
25

Page 116

1  publishing.
2
3     Q    And did you ever get music publishing royalties
4
5  from a jingle?
6
7     A    Yes, we did. Wait a minute. What are you
8
9  asking, music publishing from a jingle?
10
11     Q    You can look here on your chart.
12
13     A    Yes, I believe so. And I can tell you why.
14
15  Listen to one of the jingles --
16
17     Q    You said you heard it in a show?
18
19        MR. MONAGHAN: Object, Your Honor.
20
21        She is interrupting the witness and the
22
23        answer each time.
24
25        THE COURT: Well I think both of them

Page 117

1
2        are speaking really too rapidly for the
3
4        court reporter. Let's look at the important
5
6        things here.
7
8     Q    Did anyone ever make a phonograph record of one
9
10  of your jingles all by itself?
11
12     A    I find that it a very confusing question the
13
14  other day.
15
16        As far as the mechanical payments for something
17
18  that was originally a jingle I believe I -- I
19
20  believe I did that because I learned in court
21
22  that they were using a jingle as an actual
23
24  production, a complete piece, and they just
25

Page 118

1  lifted it to be used on these DVD's and I did

2

3  get mechanicals for that.

4

5      Q    You did?

6

7      A    Or transformers.  We showed one of our exhibits

8

9  here.

10

11     Q    You got mechanicals for that, and you are sure?

12

13     A    Yeah.  I think so.  That is what we gave them.

14

15     Q    And have you ever -- was there ever any time

16

17  when that one of your jingles was synchronized

18

19  with a motion picture?

20

21     A    You mean the jingles as opposed to music I

22

23  wrote for a jingle?  You have to define that.

24

25     Q    You wrote jingles for GBI, right?

Page 119

1

2      A    The writing of the music --

3

4      Q    And they were made as part of an advertisement

5

6  for a product?

7

8      A    Right.

9

10     Q    That is what I am calling a jingle, and I am

11

12  calling the Sunbow songs the songs that were

13

14  heard on the soundtrack of the TV shows.  Did

15

16  anybody ever synchronize one of your jingles

17

18  with a motion picture?

19

20     A    As long as I can -- I don't like your

21

22  definition.  You are not in the music business.

23

24  As long as I can make it clear the difference

25

Page 120

1  between me writing a song, which somebody then

2

3  takes and do a different version of it and what-

4

5  not, and recording separate for television.

6

7          There is a difference between that and from

8

9  taking a jingle, a fully produced piece of

10

11  music and then dubbing it into another form.

12

13  That has happened.  We heard it right here.

14

15     Q    I am asking you --

16

17     A    I got mechanicals --

18

19     Q    I am asking you about the former.  Has anybody

20

21  ever synchronized your jingle in a motion

22

23  picture?

24

25     A    The transformers is on so many -- jingles is on

Page 121

1

2  motion pictures.  It is on records.  It is on

3

4  DVD's and VHS's and ring tones, and that was a

5

6  jingle and it got used in all those different

7

8  ways.

9

10     Q    And used apart from the shows by itself?

11

12     A    Yes.

13

14     Q    Yes.

15

16     A    Yes.

17

18     Q    It is on a DVD apart from the shows?

19

20     A    It's on DVD's apart from the show.  You played

21

22  my phone.  On my phone apart from the shows.

23

24     Q    I am not talking about a ring tone right now.

25

Page 122

1    A    I am trying to be clear about if you are asking

2

3    about the music or actual production of jingle.

4

5    Jingles.

6

7    Q    I am going to ask you again. I am only talking

8

9    about synchronization with a motion picture.

10

11    THE COURT: Let's make this the

12

13    last time --

14

15    MS. PHARES: Your Honor, I need to

16

17    get an answer and I get a lot other

18

19    answers.

20

21    THE COURT: Try and answer.

22

23    Miss Bryant, try and answer them as directly

24

25    as possible. If it is yes or no possibility,

Page 123

1

2    say yes, no or I can't answer that way.

3

4    Go ahead.

5

6    Q    I am trying to find out, Miss Bryant, whether

7

8    you were ever received music publishing from

9

10    your jingles and I would like to know has there

11

12    ever been a time when someone has synchronized

13

14    your jingles with a motion picture?

15

16    THE COURT: Let's take them -- those

17

18    questions one at a time. Did you ever get

19

20    paid synchronization for jingles?

21

22    THE WITNESS: I can answer that in two

23

24    ways.

25

Page 124

1    THE COURT: Try one way.

2

3    THE WITNESS: The first way, an actual

4

5    jingle, a completely produced work, with

6

7    singing and everything done, in the studio

8

9    which was a jingle on television I had that

10

11    actually used and we saw it right here on a

12

13    DVD with a show.

14

15    Now I also had the music that I written

16

17    that was, that it represented used in lots

18

19    of different ways, um, other than the

20    -

21    jingle.

22

23    Q    Have you ever had one of your so-called

24

25    jingles used in a show other than a show relating to

Page 125

1

2    Hasbro toy?

3

4    A    We are talking specifically with Griffin Bacal?

5

6    Q    Talking about Sunbow?

7

8    A    I didn't write jingles for Sunbow.

9

10    Q    You wrote jingles for GBI. They are not in

11

12    this case, right? You just testified that your

13

14    jingles had been used on shows?

15

16    A    Yes. The actual jingles.

17

18    Q    And I said to you, have they ever been used in

19

20    any show other than a show involving the Hasbro

21

22    toys?

23

24    A    A show, no. Wait a minute. Not that I know

25

Page 126

1  of.
2
3      THE COURT:  Miss Bryant, let me get
4
5      this straight.  Are you saying that if they
6
7      use your music on a Hasbro toy show that you
8
9      are entitled to be paid for that?
10
11     THE WITNESS:  Yes, and I was paid for
12
13     that.  When it was broadcast, and I was also
14
15     given mechanicals for about five years.
16
17  Q   And reruns, should you get paid for that?
18
19  A   That would be public performance and --
20
21     THE COURT:  How about a DVD of that
22
23     music, should you get paid for that?
24
25     THE WITNESS:  Well I think I do.  It

Page 127

1
2      is DVD, audio or audio and video is a
3
4      record and supposed to get mechanicals for
5
6      that.
7
8      MS. PHARES:  Objection, legal
9
10     conclusion.
11
12     THE COURT:  Well isn't there something
13
14     on the front of DVD's that says something.
15
16     I can see it.  FBI warns me all the time
17
18     that says this is for private use only and
19
20     can't make a public use out of it.  Isn't
21
22     that what it says?
23
24     MR. MONAGHAN:  There is actually --
25

Page 128

1      MS. SAFFER:  Yes, most videos certainly
2
3      have that admonition on them because the
4
5      owner of the copyright has reserved the
6
7      owner of the copyright the right to exploit
8
9      it in other fashions.  So what you get when
10
11     you buy it is the right to use it personally.
12
13     THE COURT:  So then a DVD showing your
14
15     music is not a public performance, is it?
16
17     THE WITNESS:  No.  It is closely to
18
19     that other publishing right.
20
21     THE COURT:  Go ahead.
22
23  CONTINUED CROSS-EXAMINATION
24
25  BY MS. PHARES:

Page 129

1
2   Q   But is it also true, is it not, before we go
3
4   on, that at no time in the last 15 years, 14
5
6   years, 13 years, that you have ever claimed or
7
8   tried to reserve for yourself the right to any
9
10  music publishing rights, isn't that true?
11
12  A   No, it is not true.
13
14  Q   In your settlement with Mr. Kinder, isn't it
15
16  true that you have never reserved to yourself
17
18  the right to payments from any music publishing
19
20  rights, isn't it true?
21
22  A   It is true.  He was not my publisher.
23
24  Q   Yes, but you were provided for performance
25

Page 130

1  royalties and he is not your publisher for that

3  either, is he?

5      A    That had to do with the fact that my checks

7  were sent to Bill Dobinshinski and that he

9  provided us statements and we decided that was

11  a good thing to keep in place.

13      Q    But you provided for your public performance

15  royalties, right, even though he wasn't your

17  publisher?

19      A    He wasn't our publisher, but he was the

21  administrator for Sunbow's publishing

23  companies, but he did receive my money and

25  Ford's money.

Page 131

2      Q    Didn't Mr. Dobinshinski also handle music

4  publishing for you as well?

6      AA    He was an administrator.

8      Q    He was administrator?

10      A    I got mechanicals that were sent from Bill

12  Dobinshinski. I believe they came from Bill.

14      Q    I am going to show you what your counsel marked

16  into evidence as Plaintiff's 17 and 18. Those

18  were statements from Mr. Dobinshinski, weren't

20  they?

22      A    Yes.

24      Q    Weren't they from music publishing?

Page 132

1      A    Yes.

3      Q    So whey didn't they include music publishing in

5  your agreement like you included the

7  performance royalties?

9      A    You notice he sent this directly to me.

11      Q    Right. Because you were one of the people that

13  he was providing royalties to. What does that

15  have to do with anything?

17      A    Well this wasn't Kinder and Bryant. This

19  wasn't sent to Kinder and Bryant. This was

21  handled, the situation was well handled.

23      Q    The music administrator sent you your music

25  publishing royalties?

Page 133

2      A    Right.

4      Q    The music administrator dealt with BMI and BMI,

6  sent you public performance royalties?

8      A    Uh-huh.

10      Q    So you provided for public performance

12  royalties in these agreements, but didn't

14  provide for music publishing, did you?

16      A    I don't know where Bill Dobinshinski, how these

18  were sent to Bill Dobinshinski, but I know that

20  my statements were sent to Bill Dobinshinski

22  and we decided that that was a good idea and

24  Ford's were sent that way so he could make sure

Page 134

1  that we both earned, knew what each other was

2

3  earning and we would split it, and we decided

4

5  to keep that in place.

6

7    Q    And that would provide to music publishing as

8

9  well as performance record?

10

11   A    That was split at the source. I mean Ford got

12

13  a check too.

14

15   Q    Miss Bryant, I am not disputing whether you

16

17  were paid or not. I am just pointing out to

18

19  you that

20

21  Mr. Dobinshinski was music administrator and handled for

22

23  both of you public performance royalties and

24

25  music publishing. Now you provided in your

Page 135

1

2  agreement for one of them, not the other, is

3

4  that correct?

5

6    A    That is right. This was sent from Starwild and

7

8  Wildstar.

9

10   Q    There is no question pending.

11

12     MS. PHARES:  Your Honor, offering

13

14     for identification Defendant's Exhibit G,

15

16     which is an agreement made as of the first

17

18     day of June, 1985 between Sunbow Productions

19

20     Company and Kinder and Bryant identified

21

22     as the contractor.

23

24     (Agreement 6/1/85 was marked as

25

Page 136

1     Defendant's Exhibit G for identification.)

2

3     MS. PHARES:  And it bears production

4

5     numbers Sun 382 to 394.

6

7     COURT OFFICER:  G for ID.

8

9     THE WITNESS:  Thank you.

10

11   Q    You looked at this Gem agreement before,

12

13  haven't you, Miss Bryant?

14

15   A    Well this is the unsigned Gem agreement.

16

17   Q    It does not have a signature, that is correct.

18

19   A    Yeah, this is what -- this is what you sent to

20

21  us in your last motion.

22

23   Q    Well you mean this is what we sent to you

24

25  before our motion or just after our motion for

Page 137

1

2  summary judgment in September, isn't that

3

4  right?

5

6    A    Did you send it that far back?

7

8    Q    We made a motion for summary judgment in

9

10  September and we produced this agreement in

11

12  October before your opposition.

13

14   A    Oh, I see. I don't have all of those dates

15

16  straight yet.

17

18   Q    But you had seen this agreement before that,

19

20  hadn't you?

21

22   A    I saw this agreement, yeah, in there.

23

24   Q    And you are pointing to the flip chart, aren't

25

Page 138

1  you?
2
3  A    Yeah.  Whenever you sent it to us, I am sure I
4
5  was shown it.
6
7  Q    But my question is, you had seen this agreement
8
9  before last fall, isn't that true?
10
11  A    Well we originally were sent this agreement.
12
13  Q    What do you mean by we?
14
15  A    At Kinder and Bryant we were sent over an
16
17  agreement to work on Gem.
18
19  Q    You were sent an agreement?
20
21  A    Uh-huh.
22
23  Q    Why were you sent an agreement if you always
24
25  worked according to the old working arrangement

Page 139

1
2  you had with Spencer Michlin?
3
4  A    We never did a show with Spencer Michlin and
5
6  Spencer Michlin Company.  This was a different
7
8  situation.  Totally different than anything
9
10  else we did.
11
12  Q    Do you received an agreement from GEM?
13
14  A    Yes.
15
16  Q    You received other agreements, didn't you, for
17
18  other Sunbow shows?
19
20  A    I don't remember that.
21
22  Q    You don't remember any other agreement?
23
24  A    I don't.
25

Page 140

1  Q    You didn't receive one from My Little Pony?
2
3  A    I didn't write My Little Pony.
4
5  Q    Did anybody at Kinder and Bryant write My
6
7  Little Pony?
8
9  A    No, not at Kinder and Bryant.  Ford Kinder
10
11  wrote it but at Michlin and Company.
12
13  Q    Are you positive of that?
14
15  A    I was there.
16
17  Q    You said that Kinder and Bryant, the two of you
18
19  formed it in 1983, right?
20
21  A    Yes.
22
23  Q    And My Little Pony was written, the show, when
24
25  was the show done?

Page 141

1
2  A    I don't know.
3
4  QQ    You don't know.  Was it after  1983?
5
6  A    No, I think it was before, but I don't know.
7
8  It is not my song.
9
10  Q    So okay, so this is the one where you are
11
12  claiming that Mr. Kinder wrote it when he was
13
14  at Michlin, but you said it was a jingle?
15
16  A    Originally My Little Pony was a jingle for a
17
18  series of little girl toys, have to do with
19
20  horses.
21
22  Q    Never done for Sunbow?
23
24  A    It was done for Griffin Bacal, the new company,
25

Page 142

1   and it was published by Wildstar Music and

2

3   Starwild Music.

4

5       Q    You said you received this agreement while you

6

7   were at Kinder and Bryant, is that right?

8

9       A    Yes.

10

11      Q    And what did you do with the agreement?

12

13      A    We screamed.  We didn't like it.

14

15      Q    What didn't you like about it?

16

17      A    Well, it didn't take into account any other

18

19   things, your other papers wrote up in our back

20

21   and forth writing.

22

23      Q    Asking you what you complained about between

24

25   yourselves when it was sent to you?

Page 143

1

2       A    We were concerned about the fact that we were

3

4   doing a music show that was based on songs.

5

6   Not jingles.  Real songs.  That was all about

7

8   the music business, and that it was going to

9

10  wind up on a tape or a CD or a video.  It was a

11

12  music show and it was all about the music.  So

13

14  we were concerned that didn't seem to cover it.

15

16      Q    Before we go on let's just talk about that

17

18  for a second.  These were children animated programs,

19

20  right?

21

22      A    Yes.

23

24      Q    So it is true that in Gem -- Gem, she is a rock

25

Page 144

1   star, right?

2

3       A    Yeah.

4

5       Q    Little more music in each one of these than the

6

7   usual little children programs, is that

8

9   correct?

10

11      A    Way more.

12

13      Q    Well two songs instead of one?

14

15      A    No.

16

17      Q    How many?

18

19      A    There was a full opening and closing theme and

20

21  there were three feature songs per episode in

22

23  24 minutes of programming.

24

25      Q    How long were the songs?

Page 145

1

2       A    The songs varied from about a minute and a half

3

4   and we got them up to two at some point and

5

6   then they reduced them because it cost too much

7

8   to animate them and then we brought them back

9

10  to a minute and a half.

11

12      Q    You think the children were tuning in too

13

14  because of the songs?

15

16      A    Absolutely.

17

18      Q    Uh-huh.  Now put that aside for a minute, and

19

20  so what was the problem with the agreement from

21

22  your point of view?

23

24      A    It didn't seem to cover us well enough in terms

25

Page 146

1  of the futures that could come from this show.

2

3  Q    Okay. So you have the agreement in front of

4

5  you, right?

6

7  A    Right.

8

9  Q    And it's true, isn't it, that in Section 5C,

10

11  which starts on Page 2 and continues on Page 4,

12

13  this agreement grants Kinder and Bryant

14

15  performance royalties, doesn't it?

16

17  A    I haven't seen this in a long time. On Page 2?

18

19  Q    At the bottom of Page 2 in Section 5C.

20

21  A    Let me see.

22

23  Q    And it says that that will be a grant of the

24

25  writer's share, doesn't it?

Page 147

1

2  A    Yeah. And it was -- it is also about Barry

3

4  Harmon's, he is the lyricist, about his share.

5

6  Q    Because it says that if there are other

7

8  composers or lyricists that you are going to

9

10  share that 50 percent with other people, right?

11

12  A    Yes.

13

14  Q    So that this writer's share gets divided among

15

16  however many composers there are or lyricists?

17

18  A    Correct.

19

20  Q    That is in the agreement, correct?

21

22  A    Yes.

23

24  Q    You didn't have a problem with that, I assume?

25

Page 148

1  A    Well we had some discussion about it.

2

3  Q    What was the discussion?

4

5  A    Well the discussion was with Barry. How we

6

7  really wanted to divide this.

8

9  Q    Did you have any discussion with Sunbow? You

10

11  weren't disputing the fact that Sunbow was

12

13  going to be taking the publisher's share,

14

15  correct?

16

17  A    No. We had the discussion about the writer's

18

19  share, actually with Sunbow.

20

21  Q    What was that discussion about?

22

23  A    Well Joe Bacal wanted us to meet Barry Harmon

24

25  to decide the two different ways that we could

Page 149

1

2  divide the royalties, and he said that you

3

4  could do it 50/50. You know music and lyrics

5

6  or you could do it in thirds which sounds like

7

8  more for Kinder and Bryant, but actually we did

9

10  it in thirds, saying music and lyrics by all

11

12  three of us, that Barry would be compensated on

13

14  instrumental uses which could be better for

15

16  him.

17

18      So Joe Bacal set up a meeting for us with

19

20  Barry, who I met once in my life to have lunch

21

22  and discuss it and we decided, Barry said no, I

23

24  am old-fashioned. 50/50, that is what I want.

25

1    There was discussion about even the writer's

2

3    share part.

4

5        MS. PHARES:  It occurs to me that I

6

7    have overlooked the one formality, which

8

9    is I would like to offer this in evidence

10

11    as Defendant's Exhibit G.

12

13        MR. MONAGHAN:  There is an objection.

14

15    It is an unsigned agreement.  Been over

16

17    this before.  There is no evidence that

18

19    this agreement was ever signed.  It could

20

21    have been modified.

22

23        THE COURT:  Hold on here.  Your client

24

25    said she received it.

1

2        MR. MONAGHAN:  If the testimony is

3

4    reviewed, she will say she received --

5

6    remembers an agreement.  She remembers

7

8    receiving an agreement.

9

10        THE COURT:  This is coming in.  The

11

12    amount of weight going to be put on it, I

13

14    don't know.

15

16        MR. MONAGHAN:  I understand.

17

18    (Defendant's Exhibit G received in

19

20    evidence.)

21

22    COURT OFFICER:  G in evidence.

23

24        THE COURT:  Now you may go on.

25

1    Q    And if you turn to Page 5, Miss Bryant, and you

2

3    look at Section, it is 6.  6 actually started

4

5    on Page 4.  But 6A lower little i.

6

7    A    Uh-huh.

8

9    Q    This agreement also grants a 50 percent of the

10

11    net proceeds.

12

13    A    Wait a minute.  Which one?

14

15    Q    On Page 5.  Here hang on.

16

17    A    Right.  The premium.

18

19    Q    Right here.  A1.

20

21    A    A1, okay.

22

23    Q    That this provides that there will be paid, and

24

25    mind you we are talking about the contractor.

1

2    That is Kinder and Bryant will be paid a sum

3

4    equal to 50 percent of the net proceeds

5

6    received by the company, that is Sunbow, from

7

8    third parties for licenses for the manufacture

9

10    of commercial phonograph records, isn't that

11

12    correct?

13

14    A    Yes, I read that.  That is what it says.

15

16    Q    And it says it will be for the use of -- now go

17

18    back up into that Section A right before it.

19

20    This is for the use of capital M, Music.  Do

21

22    you see that?  With respect to companies

23

24    exercise of music publishing rights in the

25

Page 154

1 Capital M Music as defined above, isn't that

2

3 correct?

4

5    A    Uh-huh.

6

7    Q    I will show, Miss Bryant, where that is

8

9 defined.  Go back to Page 1 in Paragraph 1.

10

11    A    Okay.

12

13    Q    And it's defined as the original musical

14

15 material that you write, prepare and deliver to

16

17 the company, isn't that right?

18

19    A    Yes.

20

21    Q    So let's go back to Page 5 again.  This is a

22

23 royalty of 50 percent for the use of the

24

25 musical alone?  Right?  When it is made into

Page 155

1

2 commercial phonograph records, correct?

3

4    A    Yes.  I am saying yes to what I am reading but

5

6 I am not saying yes that we agreed to this.

7

8    Q    I understand.  Now, by the way, I missed one

9

10 thing on Page 1.  Let's go back to that.  You

11

12 see also there is definition of the show also

13

14 in that same paragraph?

15

16    A    Fully animated children's television show.

17

18 Consisting of five, one-half hour 15 segments.

19

20    Q    Or a television motion picture?

21

22    A    Yeah.

23

24    Q    Presently entitled Gem, that's the show,

25

Page 156

1 right?

2

3    A    Uh-huh.

4

5    Q    And isn't it also true that that same Paragraph

6

7 6A little i, grants to Kinder and Bryant 50

8

9 percent of the net proceeds of the use of the

10

11 music in a theatrical motion picture

12

13 synchronization?

14

15    A    That's what it says.  That Paragraph 1, the

16

17 show wasn't called Gem then.

18

19    Q    Well at the time, at the beginning of this

20

21 document that you received it, says it was

22

23 presently entitled Gem, is that correct?

24

25    A    That is what it says, but it was called M.

Page 157

1

2    Q    Maybe that was earlier.

3

4    A    It wasn't called M for a while.  Gem for a

5

6 while.  We had to re-sign it.  I will look it

7

8 up for

9

10 you.

11

12    Q    Now, in this case, where they are giving you a

13

14 right -- or they are giving you a royalty for

15

16 use of the music alone, it makes sense, doesn't

17

18 it that the publisher shares the royalties with

19

20 the writers, doesn't it?

21

22    A    That is the way it always is.  Unless I get to

23

24 keep publishing, which I didn't, you know.

25

Page 158

1   Q   I am talking about public performance

2

3   royalties.  Okay.

4

5       I want to be clear when you keep referring to

6

7   publishing.  Publishing in the music business

8

9   usually refers to the publisher's share of the

10

11  public performance royalties?  Not talking

12

13  about that any more.  Remember we are now -- we

14

15  left Section 5C.  We are in Section 6, which

16

17  has to do with music publishing.

18

19      MR. MONAGHAN:  Object and move to

20      _

21      strike the portion of counsel's statement

22

23      about what publishing refers to.

24

25      Miss Phares is not a witness.  Qualified

Page 159

1

2   as an expert.

3

4       THE COURT:  I think a fair comment.

5

6       Go ahead.

7

8   Q   And do you understand what synchronization

9

10  rights are?  Or what do you understand what

11

12  synchronization rights are?

13

14  A   My understanding was when music was put

15

16  together with picture, that is called

17

18  synchronization.

19

20  Q   And this is, if it is licensed by the publisher

21

22  to a third party, they were going to make a new

23

24  picture and put your music in it, you would be

25

Page 160

1   entitled to 50 percent of it, if it is a

2

3   theatrical motion picture, isn't that correct?

4

5   A   That is correct.

6

7   Q   Now, just for completeness, why don't you turn

8

9   to Page 6, the top of the page, and I am

10

11  starting in the fourth line, where it says the

12

13  term theatrical motion picture rights, refers

14

15  to synchronization rights granted with respect

16

17  to motion pictures intended primarily and

18

19  initially for theatrical release by direct

20

21  projection before paid admission audiences,

22

23  semi-colon, in no event shall such term refer

24

25  to motion pictures or other methods of

Page 161

1

2   recreation whether now known or hereafter

3

4   devised, which are provided primarily and

5

6   initially for television, broadcasting by any

7

8   means whatsoever; is that correct?

9

10  A   That is what it says.  Incredible.

11

12  Q   Now --

13

14  A   Disgusting.

15

16      MR. PHARES:  Your Honor, there is

17

18      no question pending and I would appreciate

19

20      if those comments would be stricken from

21

22      the record.

23

24      THE COURT:  Let's not have any

25

Page 162

1    extraneous comments.  They are stricken
2
3    from the record.
4
5    Q    I am just going to put this -- according to
6
7    this agreement, this mechanical in the Gem
8
9    agreement was 50 percent and the synch was 50
10
11    percent.  Theatrical motion picture, phonograph
12
13    records.
14
15    Now, you testified on July 7th that you and
16
17    Mr. Kinder were very excited about what was happening in
18
19    the market.  You hoped there would be CD's.
20
21    You mentioned that the video market was
22
23    happening and do you recall did you try and
24
25    provide for payments from a video cassette?  In

Page 163

1
2    your conversations in the middle eighties
3
4    relating to the Gem agreement?
5
6    A    By your own correspondence in the last motion
7
8    you put in, there was quite a bit of back and
9
10    forth writing about that very subject, and the
11
12    last statement was made that Tom and Joe would
13
14    when that happened provide for payment for --
15
16    if a CD ever happened.  We didn't know.  This
17
18    was all possibility.  And you sent that to us
19
20    from your own attorney for Sunbow.  The
21
22    attorney for Sunbow.
23
24    Q    And that attorney was referring to a mechanical
25

Page 164

1    royalty, wasn't he?
2
3    A    You know we probably have it.  I can't remember
4
5    exactly what it said.  It was Mr. Harris or
6
7    Hayes.
8
9    Q    Miss Bryant, you always have a perfect memory
10
11    for anything that helps you.
12
13    MR. MONAGHAN:  Object to that, Your
14
15    Honor.
16
17    THE COURT:  Sustained.  It is
18
19    argument.
20
21    Q    First of all, if Mr. Monaghan wants to
22
23    introduce the letter he may.
24
25    A    Okay.

Page 165

1
2    Q    I am asking you just right now, did you try and
3
4    negotiate anything at the time with respect to
5
6    video cassettes?
7
8    A    We tried to improve this contract to take into
9
10    account that it was a music business show that
11
12    could have another life beyond broadcast, and
13
14    that includes anything that was possible.
15
16    Ultimately never got signed, but the show
17
18    ended.
19
20    Q    What did you try and include in the contract?
21
22    A    Well I told you what we were concerned about,
23
24    this music business show was something the
25

Page 166

1  complete television show that could be

2

3  broadcast and then it could be maybe released

4

5  in other ways. Including songs alone. The

6

7  songs were wonderful in this show. It really

8

9  stands alone, and a lot of people collected

10

11  them.

12

13    Q    Who did you have these conversations with?

14

15    A    Well Ford and Bill and I talked and Ford and I

16

17  talked. It was kind of just like round robin.

18

19  We were doing the show while these discussions

20                      -

21  were going on.

22

23    Q    By Bill, you mean Mr. Dobinshinski?

24

25    A    Yeah.

Page 167

1

2    Q    Why were you talking to Mr. Dobinshinski about

3

4  it?

5

6    A    He said he wanted to be -- he knew we had a lot

7

8  of problems with it. He said I can be a friend

9

10  of all nations here and talk to Carol Weissman

11

12  and she will talk to Joe and Tom and maybe I

13

14  can help you resolve some of these issues. We

15

16  did talk to Bill Dobinshinski very often

17

18  because he was our contact. He was their

19

20  administrator.

21

22    Q    He was your lawyer, wasn't he?

23

24    A    No.

25

Page 168

1    Q    He wasn't your lawyer? He didn't represent

2

3  Kinder and Bryant in negotiations of this

4

5  agreement?

6

7    A    Is there a technical definition of a lawyer?

8

9    Q    Yes, there certainly is.

10

11    A    Somebody that represents you, is that what that

12

13  means?

14

15    Q    Represents you at law.

16

17    A    He didn't bill us. Does that mean anything?

18

19    Q    That means nothing.

20

21    A    Well he said, let me be a friend of all nations

22

23  here. You call that being our lawyer. That is

24

25  fine. That is what it is. But we never

Page 169

1

2  retained Bill as our attorney.

3

4    Q    But he represented you, didn't he, as your

5

6  lawyer?

7

8    A    He represented us and he is a lawyer.

9

10    Q    He is a lawyer. You have to be a lawyer to be

11

12  a music administrator, right?

13

14    A    I don't know. I never thought about it.

15

16    Q    You never met a music administrator who wasn't

17

18  a lawyer?

19

20    A    I haven't met them -- many of them.

21

22        MS. PHARES: Your Honor, I am offering

23

24        for identification, Defendant's Exhibit H,

25

Page 170

1    a letter on the letterhead of law offices
2
3    of William M. Dobinshinski, dated March 3rd,
4
5    1986 sent to Robert C. Harris, Esq. of
6
7    Lyndon and Duetsch.  The re line 1 Gem,
8
9    parens, Kinder and Bryant and 2, My Little
10
11   Pony, parens, Kinder and Bryant, comma, Rick
12
13   Brinkman, close parens.  Bears production
14
15   Numbers Sun 380 to 381.
16
17       COURT OFFICER:  H for ID.
18
19       (Whereupon, a letter 3/3/86 was marked
20
21   as Defendant's Exhibit H for identification.)
22
23       THE WITNESS:  Harris.
24
25   Q    You seen this letter before, haven't you?

Page 171

1
2    A    I saw it when you sent it in your last motion.
3
4    Q    Miss Bryant, would you look at the second page
5
6    at the bottom.  You were copied on this letter,
7
8    weren't you?
9
10   A    Eighteen years ago.
11
12   Q    This whole case is too old, Miss Bryant.  You
13
14   were copied on this letter, weren't you?
15
16   A    It says I was, yes.
17
18   Q    And you were copied on it because
19
20   Mr. Dobinshinski was representing you, isn't that
21
22   correct?
23
24   A    Yes.
25

Page 172

1    MS. PHARES:  Your Honor, I offer
2
3    Defendant's Exhibit H in evidence.
4
5    MR. MONAGHAN:  No, it is hearsay.
6
7    MS. PHARES:  I will say that except
8
9    for the handwritten material on it.
10
11   MR. MONAGHAN:  There is no foundation
12
13   for this document.  The witness said, was
14
15   my name appears on it.  No foundation, no
16
17   witnesses on the stand saying I sent this.
18
19   No witnesses saying I received this.   No
20
21   witnesses saying I offered this letter.
22
23   MS. PHARES:  There is a witness
24
25   saying her lawyer sent it.

Page 173

1
2    MR. MONAGHAN:  No, she didn't say that.
3
4    She just said he represented her, to the
5
6    extent he represented her.
7
8    THE COURT:  Pretty obvious, ladies
9
10   and gentlemen, Mr. Dobinshinski was
11
12   representing Kinder and Bryant, at least
13
14   he refers to them as his clients.  They're
15
16   talking about agreement which I assume
17
18   that's the G.
19
20   MS. PHARES:  G, yes.
21
22   THE COURT:  Famous unsigned contract,
23
24   and this is apparently negotiating some
25

Page 174

1  other changes. I am going to let it in.
2
3  MR. MONAGHAN: Being offered for the
4
5  truth of its contents or being offered --
6
7  THE COURT: I'm going to judge the
8
9  amount of weight I'm going to put on it,
10
11  but at least it shows that this agreement
12
13  was in play at some point. As a matter of
14
15  fact, the fact you were talking about
16
17  amending the agreement doesn't mean it was
18
19  ever signed. Just means that people are,
20
21  you know, having a discussion about what
22
23  should be in it and what finally if it does
24
25  get signed, it gets signed. I don't know

Page 175

1
2  what you are all excited about it. I am
3
4  taking it. That is it.
5
6  MR. MONAGHAN: I understand that, Your
7
8  Honor. Not objecting to it any further,
9
10  but I will point out that Exhibit G is
11
12  dated June '85. This exhibit is dated
13
14  March 3rd, 1986. There is no connection
15
16  that can be made on the surface at least.
17
18  MS. PHARES: If you turn to Page 2
19
20  you will see in the last thing it says
21
22  please advise us regarding the desired
23
24  dates be inserted in the agreement and the
25

Page 176

1  date given for Gem is June '85.
2
3  MR. MONAGHAN: Talking about a
4
5  handwritten comment.
6
7  MS. PHARES: Yes.
8
9  MR. MONAGHAN: Just saying we are not
10
11  going to deal with handwritten comments.
12
13  MS. PHARES: We will eventually.
14
15  THE COURT: Looks as though
16
17  Mr. Dobinshinski is the guy who signs it,
18
19  Bill, and looks as though he made a lot of
20
21  the marks on it. I can't tell that.
22
23  MR. MONAGHAN: That may be the case
24
25  and we don't know where he is. I don't

Page 177

1
2  think anybody does.
3
4  THE COURT: Missing -- non-signed
5
6  document on a missing witness.
7
8  MR. MONAGHAN: Correct.
9
10  MR. PHARES: Your Honor, I will at
11
12  least represent for the record, just so there
13
14  is no question, this handwriting, other than
15
16  I assume the signature is Mr. Harris'
17
18  handwriting. And he has testified to that
19
20  by affidavit earlier in this case.
21
22  THE COURT: But you won already.
23
24  MS. PHARES: I know that. I didn't
25

Page 178

1    want any confusion.  I am not proffering it

2

3    as Mr. --

4

5    THE COURT:  Just that Bill looked as

6

7    though it was the same handwriting as

8

9    Gem 6185.  However, on that happy note, we

10

11    will take a short break.

12

13    (Defendant's Exhibit H received in

14

15    evidence.)

16

17    (Whereupon, court stood in brief

18

19    recess.  After the recess the proceedings

20

21    continued as follows.)

22

23    MS. PHARES:  Before we go ahead with

24

25    Defendant's Exhibit H, I just want to finish

Page 179

1

2    up something with Defendant's Exhibit G.

3

4    CONTINUED CROSS-EXAMINATION

5

6    BY MS. PHARES:

7

8    Q    Do you still have that?

9

10    A    Yes.

11

12    Q    I want to direct your attention to -- just want

13

14    to sort of make sure we understand the

15

16    structure of this whole thing.  In Paragraph 2A

17

18    the agreement provides for payment for a fee of

19

20    $2200 for each song, is that correct?

21

22    A    Yes.  For each produced song.

23

24    Q    Right.  And then if you would turn to the

25

Page 180

1    next page and look at Paragraph 5A -- and I just remind

2

3    you again, by the way, the contractor in this

4

5    contract

6

7    is Kinder and Bryant -- and it says, does it not, that

8

9    the contractor warrants, acknowledges and

10

11    agrees that

12

13    the music to be written by the writer and delivered by

14

15    the contractor -- I beg your pardon -- is to be

16

17    written by writer under and pursuant to an

18

19    employment agreement between the contractor and

20

21    writer, pursuant to which all the results of

22

23    writer's services that the music was

24

25    specifically ordered and commissioned by a

Page 181

1

2    company,

3

4    that is Sunbow, for use as part of an audio visual work,

5

6    semi-colon, and that the music is a work made

7

8    for hire within the meaning of Section 101 of

9

10    the United States Copyright Act.  Still with

11

12    me?

13

14    A    I am with you.

15

16    Q    Upon writing of the music all right, title and

17

18    interest therein shall automatically vest in

19

20    the company that is Sunbow, and Sunbow or

21

22    company shall be the sole and unlimited owner

23

24    thereof, and of all rights therein throughout

25

Page 182

1 the world forever and company shall be entitled

2

3 to copyright therein.

4

5     Now it goes on to describe the rights in

6

7 copyright, but if it is okay with you I will

8

9 finish there.

10

11   A   Okay.

12

13   Q   Okay.  So in 5A we have work made for hire.

14

15 Remember we used that abbreviation in an

16

17 earlier chart, all right.

18

19     Copyright is in Sunbow.  Then we come down to

20

21 5C, that is the one we looked at before, and it

22

23 says during any period or periods of time

24

25 during which writer is affiliated with any

Page 183

1

2 small performing rights society, which herein

3

4 is called the society and that is BMI, is that

5

6 correct, in your case?

7

8   A   Yes, that is my small society.

9

10   Q   Company shall and does hereby under and

11

12 pursuant to this paragraph license back to the

13

14 writer the so-called writer's share, is that

15

16 correct?

17

18   A   That is what it says.

19

20   Q   Okay.  So that's in 5C.  Okay.

21

22     And then moving on to 6, which we were looking

23

24 at before, and you will see at the bottom of

25

Page 184

1 Page 4 where 6 begins, that in the exercise of

2

3 its rights here under and without in any way

4

5 limiting the generality of the foregoing, the

6

7 company that is Sunbow again has at the owner

8

9 and copyright proprietor the complete control

10

11 of the publication of the music, including but

12

13 not limited to the right to license and

14

15 manufacture phono records and other recordings

16

17 of the music and the right to license motion

18

19 picture synchronization, all of which rights

20

21 are herein sometimes collectively called music

22

23 publishing rights, correct?

24

25   A   That is what it says.

Page 185

1

2   Q   And then in 6A it provides for the monies that

3

4 will be paid to the contractor, correct?

5

6   A   Oh, all those little numbers under A, are A.

7

8   Q   Yes, exactly.  So, and we had already said that

9

10 in 1 there was 50 percent of net for phonograph

11

12 records, right, for use of music?

13

14   A   In phonograph records.

15

16   Q   And 50 percent of net for use of music in

17

18 theatrical motion pictures, right?

19

20     Now you testified earlier that your

21

22 understanding that the composers and lyricists

23

24 and --

25

Page 186

1  oh, by the way, you will notice that at the end of A
2
3  that at least this agreement provided that you and
4
5  Mr. Harmon really wouldn't have to have a negotiation,
6
7  does it, because it says that where the use of
8
9  the music is combined with lyrics, then the
10
11  royalty shall be
12
13  shared equally by the lyricist and the composers, doesn't
14
15  it?
16
17    A   I have to hear what you said. We don't have to
18
19  have a negotiation.
20
21    Q   I will show you where I am referring to.
22
23    A   I am not sure what you said. Ask me the
24
25  question.

Page 187

1
2    Q   You referred earlier to the possibility of your
3
4  negotiating something other than a one-third
5
6  split, do you remember that?
7
8    A   Than the 50/50 split we were talking about the
9
10  one-third and --
11
12    Q   I am saying in this agreement it is certainly
13
14  contemplated that there would be a 50/50 split
15
16  between the lyricist and the composers, is that
17
18  correct?
19
20    A   Yes, it did.
21
22    Q   And going back now to what I was saying, is
23
24  that you had suggested earlier, that there is
25

Page 188

1  always a 50/50 split of music publishing
2
3  royalties, isn't that correct?
4
5    A   It starts with that.
6
7    Q   If you look at Paragraph --
8
9    A   I can be changed. It can be other.
10
11    Q   You mean you can negotiate?
12
13    A   You can say, you know, I want three-quarters
14
15  and you only get one-quarter. People find that
16
17  agreeable, they can do that.
18
19    Q   So it can be negotiated?
20
21    A   Right.
22
23    Q   And in Paragraph, for example, 4, which is a
24
25  print rights with respect to orchestration in

Page 189

1
2  this case if they are sold, if orchestrations
3
4  are sold at wholesale anywhere in the world,
5
6  you were to receive sums equal to ten percent
7
8  of the wholesale price after the trade
9
10  discount, is that correct?
11
12    A   That is what it says.
13
14    Q   That is what it says. And in, and then in
15
16  Paragraph 2, for example for piano copies,
17
18  which we think we agree we will call sheet
19
20  music, in that case it is done actually by
21
22  cents per copy? In this case eight cents for
23
24  copy for the first 100,000 copies, isn't that
25

Page 190

1 correct?
2
3   A   Yes.
4
5   Q   And then it stepped up to ten cents per copy
6
7 after 100,000, correct?
8
9   A   That is what it says.
10
11   Q   Now let's turn again to Mr. Dobinshinski's
12
13 letter or let me just say one thing.  Is it
14
15 fair to say that the structure of this in your
16
17 view is that this is an agreement whereby there
18
19 is -- whereby there are provisions made for
20
21 payments of creative fees or public performance
22
23 royalties and for music publishing in exchange
24
25 for the delivery of music and the work for hire

Page 191

1
2 agreement?
3
4   A   It is a fair --
5
6   Q   Description of this agreement?
7
8   A   It seems like basic terms in that agreement are
9
10 those -- on your board.
11
12   Q   Now in Defendant's Exhibit H, which is
13
14 Mr. Dobinshinski --
15
16   A   Except that is arrangement fee.  It is not an
17
18 advance, I should make that clear.
19
20   Q   Do you have the agreement?
21
22   A   Yeah, right there.
23
24   Q   Paragraph 2A says that for all the rights
25

Page 192

1 granted for the company and the Music, capital
2
3 M, and
4
5 for the performance by the contractor of all the
6
7 obligations hereunder, which include but are
8
9 not limited to composing and arranging the
10
11 music supervision of the orchestras recording
12
13 of the music for the show and company's right
14
15 to use the music on and in connection with
16
17 phono recording sold or distributed in
18
19 conjunction with merchandise based on the show
20
21 which are called premium cassettes, the company
22
23 that is Sunbow shall pay the contractor, that
24
25 is Kinder and Bryant a fee of $2,200.00 for

Page 193

1
2 each song for which the writer writes and
3
4 delivers the music payable on delivery thereof,
5
6 is that correct?
7
8   A   That is what it says.  That is not how we were
9
10 paid.
11
12   QQ   Okay.
13
14   A   We didn't sign this anyway.
15
16   Q   I am turning to Exhibit H and I hope you will
17
18 come with me.
19
20   A   I am with you.
21
22   Q   Now in this letter, Mr. Dobinshinski is, he
23
24 refers, does he not, he refers at the outset to
25

Page 194

1  the above mentioned agreements with my client?
2
3    A    Yes.
4
5    Q    Now he refers in fact to the above captioned
6
7  includes an agreement for My Little Pony,
8
9  doesn't it?
10
11   A    My Little Pony, yes.
12
13   Q    And you have testified earlier that you didn't
14
15  have anything to do with My Little Pony, didn't
16
17  you?
18
19   A    I have testified all along that there is My
20
21  Little Pony, the original song and the My
22
23  Little Pony and friends which actually has a
24
25  quote from the original song within the song I

Page 195

1
2  wrote. So that's my involvement with My Little
3
4  Pony. I don't know what Rick was doing on My
5
6  Little Pony.
7
8    Q    Who is Rick Brinkman?
9
10   A    He is a composer.
11
12   Q    So does this help you recall that there was in
13
14  fact an agreement from My Little Pony between
15
16  Sunbow and Kinder and Bryant?
17
18   A    Kinder and --
19
20   Q    Do you need me to repeat?
21
22   A    What did you ask me?
23
24   Q    I asked whether this refreshed your
25

Page 196

1  recollection whether or not you also had an
2
3  agreement between Kinder and Bryant and Sunbow
4
5  with respect to My Little Pony?
6
7    A    Never had a Little Pony agreement that I know
8
9  of. We didn't work on it.
10
11   Q    I am just asking you, do you think
12
13  Mr. Dobinshinski was writing to Sunbow and to his lawyer
14
15  about an agreement that didn't exist or you
16
17  just don't recall it?
18
19       MR. MONAGHAN: Object to the form,
20
21       speculation.
22
23       THE COURT: Overruled.
24
25   A    I am -- I don't know. I never saw this before,

Page 197

1
2  but I know we were back and forth about a lot
3
4  of different things. What's confusing a little
5
6  bit to me and I think an important distinction,
7
8  there is a difference between My Little Pony
9
10  and My Little Pony and Friends.
11
12   Q    Miss Bryant, I am not talking about anything
13
14  other than My Little Pony, and I just asked you
15
16  a simply question --
17
18   A    My Little Pony was a dead TV show. My Little
19
20  Pony and Friends had --
21
22       MS. PHARES: Your Honor, at least
23
24       not the question she is answering.
25

Page 198

1    THE COURT:  I think maybe the witness
2
3        is testifying that she doesn't know
4
5        anything at all about an agreement for
6
7        My Little Pony, is that what you are saying?
8
9    THE WITNESS:  I don't.
10
11    Q    And you said you don't recall the letter
12
13    either, is that correct, even though you are
14
15    copied on it?
16
17    A    Not really.  I mean I recall it from seeing it
18
19    from you.
20
21    Q    Is it possible that is because this was being
22
23    handled by Mr. Kinder?  Just like Mr. Kinder
24
25    signed the agreements with GBI?

Page 199

1
2    MR. MONAGHAN:  Object to the form
3
4        of the question, misstates.
5
6    A    I don't know if Ford signed those agreements,
7
8    but you know -- and I don't know what that
9
10    means.  I just don't remember this agreement.
11
12    So I, um, this letter whatever it is, but I see
13
14    them copied on it and I read it recently and I
15
16    know what is in it.  But that doesn't mean I
17
18    remember from 18 years ago.
19
20    Q    I didn't ask you that.  I asked you -- I said I
21
22    understand is it possible the reason you don't
23
24    remember it is because Mr. Kinder was handling
25

Page 200

1    the relationship with Mr. Dobinshinski with
2
3    respect to the agreements?
4
5    A    I guess it is possible that he was doing that.
6
7    Q    And you remember that you testified earlier
8
9    that Mr. Kinder discussed agreements with you
10
11    but that -- and you knew there were written
12
13    agreements but you didn't see them, isn't that
14
15    right?
16
17    A    Yeah.  I think I remember that there was an
18
19    agreement on Gem sent over, but no, I didn't
20
21    really look at the agreement.  I did the union
22
23    agreements.
24
25    Q    You did the union agreements and Mr. Kinder did

Page 201

1
2    the other agreements, is that it?
3
4    A    Well, we both did both, but more or less I was
5
6    in charge of the production of the music more
7
8    than he was.
9
10    Q    I am just going to remind you again, and
11
12    reading from your deposition from March 2003,
13
14    which you were asked, did you have a written
15
16    contract to produce the compositions at issue
17
18    in this case, answer, Ford Kinder told me that
19
20    there was a contract.  I don't remember signing
21
22    a contract with him.  He was my
23
24    partner and he said there was a contract at some point
25

Page 202

1  in our association with those people.  Do you remember
2
3  that?
4
5     A   Yes.
6
7     Q   Isn't it likely that Mr. Kinder was handling
8
9  the contract negotiations?
10
11    A   We didn't negotiate a whole lot.  We tried to
12
13  negotiate this show, Gem.  Because that was a
14
15  different situation than anything else we had
16
17  with them.
18
19       MS. PHARES:  Excuse me.  Read the
20
21       question back?
22
23       (Whereupon, the last question was
24
25       read back by the reporter.)

Page 203

1
2     A   I don't think there were any to speak of.  So
3
4  when you ask me --
5
6     Q   To speak of.  I am asking you was Mr. Kinder
7
8  handling the arrangement with respect to the
9
10  contracts with Sunbow?
11
12    A   They were standard fare.  It wasn't like we
13
14  negotiated and sat down like what you do with
15
16  your clients.  We had a working relationship
17
18  with these people and we worked around the
19
20  clock.  We didn't call them, you know, and
21
22  negotiate every point with them.  We just
23
24  worked with a certain understanding all the way
25

Page 204

1  through the whole time we met them.
2
3     Q   You mean any agreements were standard fare,
4
5  that what you meant, standard form agreements?
6
7     A   I don't know.  I didn't see standard form
8
9  agreements.
10
11    Q   You just saw the Gem agreement?
12
13    A   I remember the Gem agreement was a problem
14
15  because there was an agreement that showed up
16
17  that was not good for us.
18
19    Q   Miss Bryant, turn to Page 2 of this --
20
21    A   H?
22
23    Q   Of H, I beg your pardon, of Page 2 of
24
25  Defendant's Exhibit H, Mr. Dobinshinski's

Page 205

1
2  letter from Paragraph A3 and you will see that
3
4  he's referring to Paragraph 6A and he is asking
5
6  for additional payments of 50 percent of the
7
8  creative fee for each compensation embodied on
9
10  audio recordings distributed as premiums or on
11
12  video cassettes, is that right?
13
14    A   That is what he says.
15
16    Q   And 6A of the Gem agreement is the provision
17
18  having to do with music publishing, correct?
19
20    A   I don't know.
21
22    Q   Well look at Page 5.  That's the one with all
23
24  those numbers.  That's the provision on music
25

Page 206

1  publishing, isn't it?
2
3     A    Right.  We're talking about the premium
4
5  cassettes?
6
7     Q    Right.  Which were exempted from this
8
9  agreement.  And he was also trying to negotiate
10
11  for a video cassette in this Paragraph 6A,
12
13  isn't that correct?
14
15    A    Yes.  Looks that way.
16
17    Q    Did Mr. Dobinshinski report to you that some
18
19  Sunbow rejected the request for those payments?
20
21    A    I don't remember Bill reporting to us.  I just
22
23  remember that somewhere along the line it was
24
25  acknowledged that we were creating products and

Page 207

1
2  we should get a fee for that.
3
4     Q    I didn't ask you that.  I asked you did
5
6  Mr. Dobinshinski inform you that Sunbow had rejected that
7
8  request?
9
10    A    I don't remember that.
11
12       MR. PHARES:  Your Honor, I am
13
14    offering for identification Defendant's
15
16    Exhibit I a letter from -- dated May 30th,
17
18    1986 from Robert C. Harris on letterhead
19
20    of Linden and Deutsch to William M.
21
22    Dobinshinski.  And the re line shows Gem,
23
24    My Little Pony.
25

Page 208

1       (Whereupon, letter dated 5/30/86
2
3    was marked as Defendant's Exhibit I for
4
5    identification.)
6
7    COURT OFFICER:  I for ID.
8
9     Q    You ever seen this letter before this lawsuit?
10
11    A    I never saw this letter before.  I don't
12
13  remember this letter before then.
14
15    Q    So you don't remember Mr. Dobinshinski either
16
17  showing you this letter or reporting that
18
19  Sunbow was unwilling to change the original
20
21  compensation agreement?
22
23       MR. MONAGHAN:  Object to the form
24
25    of the question simply because the last

Page 209

1
2    paragraph in this letter is still
3
4    suggesting that perhaps the agreement has
5
6    not yet been executed.  Seems to be
7
8    negotiating.
9
10    MS. PHARES:  I am not talking about
11
12    that.  This letter is negotiation.  I am
13
14    just asking her whether or not the lawyer
15
16    reported to her something.  That is a yes
17
18    or no or I can't remember.
19
20    THE COURT:  Yes.  The witness should
21
22    answer that question.
23
24    A    No, I said no, didn't I?
25

Page 210

1  Q    He didn't report it or you don't remember?

3  A    I don't remember. I am sorry. I feel I need

5  to look at it to make sure I say the right

7  thing.

9       THE COURT: If you need to look at

11      something you tell us. Give you a chance

13      to do that.

15      THE WITNESS: Sorry. Kind of involved

17      in that.

19  Q    And you don't recall that you ever received a

21  copy of this? Is that also what you testified?

23  A    I don't remember ever seeing this before.

25  Q    Okay. Now you had testified on the 7th I

Page 211

2  believe it was, that the creative fees that you

4  were paid for each of the television series or

6  you were paid creative fees for each of the

8  television series, isn't that correct?

10  A    Production fees for Gem for the songs creative

12  fee for the theme and then the other Sunbow

14  themes of My Little Pony and Friends and G.I.

16  Joe we were paid. They are different and not

18  all the same.

20  Q    And you testified that the fee that you were

22  paid for, the Kinder and Bryant was paid, was

24  $2200 per song for Gem, correct?

Page 212

1  A    Arrangements in demo, yes.

3  Q    And that in fact is the fee that is in this

5  draft Gem agreement, isn't that correct?

7  A    I thought it was 2250, but that seems close

9  enough.

11  Q    And then you wrote -- I think maybe we did this

13  before, you wrote three programs for -- three

15  songs for each program in the Gem series, is

17  that correct?

19  A    Right. Six songs.

21  Q    I only mean the numbers that were accepted.

23  A    The finally produced songs.

25  Q    The produced songs, that is all we are talking

Page 213

2  about. I just want to make sure we are talking

4  about, for the moment talk about the produced

6  songs. Not the ones that you submitted for

8  their choosing.

10  A    I realize you are not in the music business.

12  We wrote six, but we produced three. Final

14  produced.

16  Q    Now I am going to short circuit a little bit.

18  My definition, 65 programs times three, would

20  have come to 195, correct?

22  A    Yes.

24  Q    But you are contending that you in fact wrote

Page 214

1  154, isn't that correct?
2
3  A  Yes.
4
5  Q  And that's because that's how you identified
6
7  them in your BMI catalog, correct?
8
9  A  That is one of the ways I know that.
10
11  Q  So it's true, isn't it, that Kinder and Bryant
12
13  made maximum $429,000, minimum $338,800 for the
14
15  creation of the music that was produced for the
16
17  Gem shows, correct?
18
19  A  They made one of those two amounts or somewhere
20
21  in between for the arrangement of the songs for
22
23  the Gem show.
24
25  Q  And then --

Page 215

1
2  A  The company.
3
4  Q  And after that, the way things left that Sunbow
5
6  was stopped and its publishing company was the
7
8  owner of the copyright, and in exchange you
9
10  also got the writer's share of the public
11
12  performance royalties and the music publishing,
13
14  correct?
15
16  A  Yes, the writer's share of the music
17
18  publishing.
19
20  Q  Or whatever was negotiated as the writer's
21
22  share, correct?
23
24  A  The writer's share of the music publishing was
25

Page 216

1  ours.
2
3  Q  You testified a moment earlier, didn't you,
4
5  that those numbers could be negotiated?
6
7  A  It could be, but they would never give us any
8
9  of the publishing.
10
11  Q  They never gave you any of the publishing?
12
13  Didn't you tell us earlier that you had
14
15  received mechanical royalties?
16
17  A  No.  Publisher gets 50 percent.  The writers
18
19  get --
20
21  Q  You're talking about the public performance
22
23  royalties?
24
25  A  Well, in that case too.  Mechanical royalty is

Page 217

1
2  paid to a publisher.  They split it with a
3
4  writer 50 percent.
5
6  Q  You said you never got any part of the share
7
8  that went to the publisher?
9
10  A  In public performance royalties everybody gets
11
12  their own check.
13
14  Q  Let's do this.  Here you are saying that the
15
16  custom in the industry is to do 100 percent,
17
18  one-half of it goes to the publisher, and one-
19
20  half goes to the writers, correct?
21
22  A  Yes.
23
24  Q  Didn't you just say to me a little while ago
25

Page 218

1  that these arrangements for the synchronization
2
3  rights, the mechanical royalties for print
4
5  rights, those rights can be negotiated?
6
7  A  Yes. How much of the publishing you keep. How
8
9  much you give away.
10
11  Q  Or okay. How much is divided between the
12
13  publisher and the composer of the music,
14
15  correct?
16
17  A  And the lyricists. The writers, yeah. There
18
19  be a term that is the -- a proper term and I am
20
21  not using that, but that is what I mean.
22
23  Q  You are testifying, if I understand this
24
25  correctly, or you are claiming that -- okay,

Page 219

1
2  hang on. Before we go there I just want to
3
4  continue. Finish off one thing with respect to
5
6  the negotiations of the agreements.
7
8      MS. PHARES: Your Honor, I am
9
10     offering for identification Defendant's
11
12     Exhibit J, which is a letter dated
13
14     February 9th, 1987 from William M.
15
16     Dobinshinski to Carol Weissman, Sunbow
17
18     Productions with a re line of Kinder
19
20     Bryant Gem. Bearing production number
21
22     Sunbow 397 to 401. And to finish -- I
23
24     beg your pardon. There are enclosures.
25

Page 220

1      It says one revised agreement dated
2
3      March 15th, 1986 of agreement dated
4
5      June 1, 1985 between Sunbow Productions Inc.
6
7      and Kinder and Bryant Limited and a red
8
9      line copy of the revised amendment.
10
11     (A letter 2/9/87 was marked as
12
13     Defendant's Exhibit J for identification.)
14
15     THE WITNESS: Is that a question?
16
17     MS. PHARES: No. No question.
18
19  Q  Are you ready?
20
21  A  Yes, I thought you were going to ask me is that
22
23  what it says.
24
25  Q  Have you ever seen this document before this

Page 221

1
2  lawsuit?
3
4  A  No. No.
5
6  Q  Did you ever discuss with Mr. Dobinshinski
7
8  amending the June 1, 1985 Sunbow Kinder Bryant
9
10  agreement relating to Gem?
11
12  A  Well we were trying to find a way we could sign
13
14  an agreement with them. Which we never did.
15
16  Q  I'm not asking you that.
17
18  A  There were discussions, yes.
19
20  Q  I didn't ask you about whether or not you had
21
22  signed it or not. I asked you whether or not
23
24  you had ever discussed it with Mr. Dobinshinski
25

Page 222

1  amendment, an amendment to the June 1st, 1985
2
3  agreement between Sunbow Productions and Kinder
4
5  and Bryant relating to Gem?
6
7      A   As I understand it, amendments is a change to
8
9  or is in addition to.
10
11     Q   An amendment is a change to existing agreement.
12
13     A   Well, we didn't have an agreement, so I would
14
15  say no.
16
17     Q   You don't remember Mr. Dobinshinski discussing
18
19  that with you?
20
21     A   I don't remember him discussing an amendment.
22
23  He was trying to help us. Everybody working
24
25  together to try to find an agreement that we

Page 223

1
2  could sign.
3
4      Q   You don't remember him discussing an amendment
5
6  to the signed Gem agreement?
7
8      A   No, no.
9
10     Q   Do you remember ever discussing with
11
12  Mr. Dobinshinski negotiating, trying to get the rights to
13
14  premium cassettes?
15
16     A   Trying to get the rights to premium cassettes?
17
18     Q   Trying to get payments for production of phono
19
20  recordings used in conjunction with
21
22  merchandise?
23
24     A   Yes, I remember that. I remember that premium
25

Page 224

1  cassettes were a product that were actually
2
3  being released with the Gem doll product, and
4
5  we felt that should not be lumped into an
6
7  arranging fee for the show.
8
9      Q   But you otherwise have no recollection of a
10
11  discussion of amendment to the agreement?
12
13     A   I think I answered you. I don't know how many
14
15  different ways I can say the same thing.
16
17         THE COURT:  Well try it this way.
18
19         Do you have any recollection of ever seeing
20
21         this letter?
22
23         THE WITNESS:  No.
24
25         THE COURT:  That is J.

Page 225

1
2         THE WITNESS:  No.
3
4         THE COURT:  And do you have any
5
6         recollection of being aware that there was
7
8         negotiations going on between Dobinshinski
9
10        and the Linden firm regarding the Gem
11
12        agreement?
13
14        THE WITNESS:  I don't know about the
15
16        Linden firm.
17
18        THE COURT:  How about answering what
19
20        I said. Did you know that there was
21
22        discussions going on about the Gem agreement?
23
24        THE WITNESS;  Yes.
25

Page 226

1    THE COURT: I think that is about it,

2

3    Counselor.

4

5    Q    Okay. Let's go back to where we were. Now am

6

7    I understanding you correctly that you're

8

9    saying that you were entitled to 50 percent of

10

11    the monies made by Sunbow from any kind of home

12

13    video cassettes?

14

15    A    No, you don't understand me correctly.

16

17    Q    What is it that you think you are entitled to?

18

19    A    We are talking about the songs and the

20

21    publishing as you call it, music publishing, in

22

23    addition separate from the public performance

24

25    rights this music publishing right, which gets

Page 227

1

2    paid directly to the publisher, a hundred

3

4    percent. Writers are entitled to half of that.

5

6    Writers who keep their writer's share.

7

8    Q    So let me restate.

9

10    A    That is not Sunbow anyway. It is Starwild,

11

12    which is part of Sunbow, but I am not saying I

13

14    am a partner with Sunbow on all of their --

15

16    Q    How much do you think you are entitled to?

17

18    A    The acceptable amount when a song is paid for

19

20    or royalty, and I get half of that.

21

22    Q    Now, Miss Bryant -- oh, you get half of what?

23

24    A    Well if a royalty was a nickel the publisher

25

Page 228

1    would get two and a half cents and the writer

2

3    would get two and a half cents and that would

4

5    be divided among all of the writers.

6

7    Q    This is what I want to know. You started with

8

9    the notion that you had an oral agreement. I

10

11    thought until now you had said that you were

12

13    entitled to 50 percent of the income?

14

15    A    From a whole DVD.

16

17    Q    That is what you have testified to. That is

18

19    what your lawyer has represented to in papers.

20

21    Now did you have a different agreement with

22

23    somebody at Sunbow that we don't know about?

24

25    A    This is song writing royalties.

Page 229

1

2    Q    Right.

3

4    A    I get royalties for writing songs just like

5

6    with Walt Disney presented a couple of

7

8    Wonderland agreements. I got four cents and

9

10    they got four cents and I happened to write the

11

12    music and lyrics on that, but if I got

13

14    lyricists I would have got two cents and the

15

16    lyricists would have gotten two cents. Now all

17

18    -- the whole album, I am not their partner in

19

20    the entire album. It is just my song.

21

22    Q    And in fact when you delivered -- when you,

23

24    Kinder and Bryant delivered the music, this was

25

Page 230

1  the deal, right? As part of that audio visual
2
3  work they paid you between 380,000 and
4
5  $429,000, and they said you are going to get
6
7  the public performance royalty and they said
8
9  you would get some music publishing royalty.
10
11 Now what is it exactly that you think you are
12
13 entitled to for these home videos?
14
15    A    Songwriters royalty.
16
17    Q    But there is no songwriter's royalty in a home
18
19 video of an audio visual work. You created
20
21 these songs for that work, didn't you?
22
23    A    We didn't make any money, you know.
24
25    Q    I didn't ask you that. I said you created the

Page 231

1
2  songs for particular audio visual work, namely
3
4  that animated TV series, is that correct?
5
6    A    That is right.
7
8    Q    And that animated TV series is what has been
9
10 reproduced on DVD or on a video cassette?
11
12    A    Exactly.
13
14    Q    The only thing being exploited is the entire
15
16 work, isn't that correct?
17
18    A    No.
19
20    Q    Nobody made a license for your music when they
21
22 make a home video cassette, do they?
23
24    A    If you want to look at the Gem, the Gem DVD,
25

Page 232

1  you will see. What I talked about last time.
2
3  Two weeks ago.
4
5    Q    Answer my question please. Could you please
6
7  read it back?
8
9         (Whereupon, the last question was
10
11        read back by the reporter.)
12
13    A    I don't know. You know it is -- there is an
14
15 unsigned agreement here. I don't know. As far
16
17 as I know I --
18
19    Q    I am with you. If somebody makes a phonograph
20
21 record and puts your song on the phonograph
22
23 record, there is a fee paid. It is music that
24
25 you wrote at the beginning and you made a deal

Page 233

1
2  that if there was a phonograph record that you
3
4  would get a half of that license. And if there
5
6  was a synch made somebody makes a new movie and
7
8  in the background they want to put a song or
9
10 something from Gem, you would get 50 percent of
11
12 the synchronization rights, correct?
13
14    A    Correct.
15
16    Q    But when they -- when someone reproduces the
17
18 entire TV series, the one you originally made
19
20 the music for, there is no license for the
21
22 music, isn't that
23
24 right?
25

Page 234

1    A    I don't know if it is right.  There is an
2
3   independent play song featured or all of the
4
5   songs are playable on that DVD just like you
6
7   are buying any other CD.  I don't want to
8
9   define what a record is.  I will let the
10
11  experts do that.
12
13   Q    Your counsel tried to negotiate a payment for a
14
15  video cassette, for payment for a video
16
17  cassette, and the answer was no, is that
18
19  correct?
20
21   A    My counsel?
22
23   Q    Your counsel, Mr. Dobinshinski?
24
25   A    He was the publisher's, administrator's,

Page 235

1
2   publishers administrator.
3
4    Q    He was your lawyer, too, wasn't he?  Isn't that
5
6   what you testified?  Are we going to go back
7
8   and do that again?
9
10   A    Maybe we should.
11
12       THE COURT:  No, you are not.  Let's
13
14       keep going.
15
16   A    He is not my lawyer.
17
18   Q    I mean --
19
20       THE COURT:  By the way, we have an
21
22       outstanding technical area here.  I don't
23
24       believe that I and J are in evidence.
25

Page 236

1       MS. PHARES:  I am not offering I yet.
2
3       THE COURT:  So I and J are not in
4
5       evidence.
6
7       MS. PHARES:  And J I am not yet offering.
8
9       Except, Your Honor, in that case -- I beg
10
11      your pardon.  I am offering that because
12
13      it is being written by Mr. Dobinshinski on
14
15      behalf of his client, and that is an
16
17      admission of his client.
18
19      THE COURT:  Well just to keep this --
20
21      I mean certainly I think the letter since
22
23      it says in there that obviously hasn't
24
25      been executed or the amendment hasn't been

Page 237

1
2   executed.
3
4       MS. PHARES:  The amendment has not,
5
6   but he refers to the agreement dated
7
8   June 1, 1985.  The enclosure says advised,
9
10  revised amendment --
11
12      THE COURT:  I will let it in.  J is
13
14  in, but I is not.
15
16      MS. PHARES:  That is correct.
17
18      THE COURT:  Sorry to break your train.
19
20      MR. MONAGHAN:  I know you know what my
21
22  objection was, and I know what your ruling
23
24  would be, but I don't want the silence to be
25

Page 238

1  acquiesced.  We don't have Mr. Dobinshinski
2
3  saying he wrote the letter.  We don't have
4
5  anybody saying we received the letter.
6
7  (Discussion off the record.)
8
9  (Defendant's Exhibit J received in
10
11 evidence.)
12
13 THE COURT:  Let's go back on the
14
15 record.  Finish up these last few minutes.
16
17 Q   Do you recall, Miss Bryant, your lawyer saying
18
19 on the first day of trial that you are entitled
20
21 to 50 cents for every dollar that Sunbow earns
22
23 on home videos?
24
25 MR. MONAGHAN:  If he said that he was

Page 239

1
2  incorrect.  And I don't remember if I said
3
4  that.
5
6  A   Did he say Sunbow or Starwild?
7
8  Q   He said Sunbow.
9
10 THE COURT:  I think we got an answer.
11
12 The lawyer said it was incorrect if he said
13
14 it.
15
16 MR. MONAGHAN:  Talking about the
17
18 music.
19
20 Q   Since you think you are entitled to something
21
22 else, what is it that you allegedly agreed with
23
24 somebody that you were entitled to?
25

Page 240

1  A   All of the writers share of royalties in every
2
3  use.
4
5  Q   Okay.  But there had to be a particular share.
6
7  Somebody one day has to sit down and decide how
8
9  much that is, right?  How much?  What is it you
10
11 think you negotiated with somebody that you
12
13 were supposed to get from the exploitation of
14
15 home videos?
16
17 A   The mechanical for the use of my songs.
18
19 Q   So you are saying it was 50 percent, is that
20
21 what you are saying?
22
23 A   Fifty percent of the mechanical.
24
25 Q   What -- there is a mechanical license?

Page 241

1
2  A   There is a statutory rate for mechanicals as
3
4  set by the government, I guess.  Nine cents
5
6  now.  Next year will be nine cents.  Now it is
7
8  eight and a half cents divided by the publisher
9
10 and writer at four and a quarter cents each.
11
12 Q   Now what you are just describing is a
13
14 compulsory license for a phonograph record.  We
15
16 are not talking about a phonograph record.  We
17
18 are talking about a home video.  Now I assume
19
20 that, you know, so we are not talking about
21
22 that.  So there must have been another number
23
24 that you negotiated, and it's -- we need to
25

Page 242

1  know what it is.
2
3  A  I can't keep responding to you because you
4
5  apparently are an expert in this and I am not.
6
7  And other people who are experts and you are
8
9  asking me to give you things I feel I am
10
11  committing myself to some kind legal
12
13  definition. I told you my answer and you keep
14
15  asking it again and again.
16
17  Q  You are saying it was nine percent.
18
19  A  Not nine percent.
20
21  Q  Nine cents?
22
23  A  It is going to be nine cents.
24
25  Q  So you are saying you negotiated a nine cent

Page 243

1
2  statutory rate for the use of your songs in a
3
4  home video?
5
6  A  I said I get a standard mechanical and I have
7
8  never kept Starwild, Sunbow, Wildstar from
9
10  having their half.
11
12  Q  Wait a minute we just said nine cents and
13
14  another half?
15
16  A  It is eight and a half cents now for publishing
17
18  and writer.
19
20  Q  Eight and a half cents for what? Based on
21
22  what?
23
24  A  Per song.
25

Page 244

1  Q  Per song?
2
3  A  Yes. It is a mechanical right of royalty.
4
5  Q  But it is a rate for records, isn't it?
6
7  A  It is rates for recordings.
8
9  Q  Who did you negotiate this thing with?
10
11  A  What thing?
12
13  Q  This royalty right that you were supposed to
14
15  get?
16
17  A  It is a statutory mechanical right. I get it
18
19  from Walt Disney, I get it from anybody.
20
21  Q  For what? When you are making a record, isn't
22
23  that correct? You are referring to the
24
25  recording agreement that you put into evidence,

Page 245

1
2  is that what you mean?
3
4  A  Exactly.
5
6  Q  And that was for a recording agreement for a
7
8  record, isn't it?
9
10  A  That was an audio only record.
11
12  Q  That was just audio only record?
13
14  A  An audio plus visual and video or audio.
15
16  Q  I just asked you what was that contract for?
17
18  A  A record.
19
20  Q  For a record. Now with whom did you negotiate
21
22  this video cassette rate?
23
24  A  It is a standard rate.
25

Page 246

1    Q   And you discussed this with someone in 1985,
2
3   six or seven --
4
5    A   It was lower way back then.
6
7    Q   It was less than that, that is true for
8
9   records, it was.  Now what about a home video
10
11  work, that includes audio visual work like an
12
13  animated TV series?  What was the rate you
14
15  negotiated for that?
16
17   A   My understanding is that a record is a audio
18
19  only or audio and visual work that is a record.
20
21  So this would be a record and I never asked for
22
23  the publishing money in that.  They get the
24
25  publisher's share, I get the writer's share.

Page 247

1
2   That is the way we do everything else.
3
4    Q   You have been in the music business for how
5
6   many years?
7
8    A   Thirty some years.
9
10   Q   Thirty some years.  And in your experience
11
12  someone has paid a statutory compulsory
13
14  mechanical rate for video cassettes?
15
16   A   Thirty years ago they didn't exist.
17
18   Q   Twenty years ago?
19
20   A   Yes.  Sunbow paid me.
21
22   Q   So if your former employer Spencer Michlin
23
24  comes here he is going to say he was paying
25

Page 248

1   people the statutory rate for compulsory
2
3   license when commissioning work for an audio
4
5   visual animated children's show?
6
7    A   He didn't do that.  I can't say what Spencer
8
9   would say if he came here.
10
11     THE COURT:  I think it is time to quit
12
13  for the day.  Miss Saffer, I am concerned
14
15  about a document you are producing.
16
17     MS. SAFFER:  Showing the earnings.
18
19     THE COURT:  Been produced.
20
21     MS. SAFFER:  It was prepared, didn't
22
23  get produced because we moved on.  I will
24
25  certainly give it and make it available.

Page 249

1
2   BMI had had a witness that had been
3
4   subpoenaed by Bacal and Bacal is no longer
5
6   in the lawsuit, so the witness is Allison.
7
8   Allison, talking about Allison is no longer
9
10  a witness.  She is the one who prepared the
11
12  document.  So I am a little confused
13
14  procedurally.
15
16     MS. PHARES:  In fact Miss Smith
17
18  appeared on the defendant Bacal list.  She
19
20  was certainly also going to be testifying
21
22  with respect to defendant Sunbow.  I made a
23
24  motion at the end of the testimony, the
25

Page 250

1  cross on the 9th, and I am prepared to
2
3  redo it again that we believe that there is
4
5  no claim remaining in this case with respect
6
7  to performance royalties because Miss Bryant
8
9  has testified that Sunbow did not receive
10
11  any part of the writers share of the public
12
13  performance royalties.  Therefore they could
14
15  not have been unjustly enriched.  I will
16
17  make a motion that that portion of this case
18
19  be dismissed on that basis.  We no longer
20
21  need Miss --
22
23      THE COURT:  Two things.  One is that
24
25  when you last made that I didn't grant it.

Page 251

1
2  I reserved on it.  Secondly, my
3
4  understanding is that the plaintiff and BMI
5
6  are discussing a withdrawal from the case
7
8  and let that go forward.  I am not going to
9
10  rule on that.  And lastly, only reason I
11
12  brought this up was that it was in my notes
13
14  as unanswered whatever happened to it, and I
15
16  am just wondering if it can help the parties
17
18  or the court in this march.
19
20      MR. MONAGHAN:  We want to see it.
21
22      MS. SAFFER:  Certainly anybody can see
23
24  it.  Absolutely nothing to hide.  I am happy
25

Page 252

1  to produce it.  It won't help clarify this
2
3  at all because it just deals with what the
4
5  people would have paid the writers.
6
7      THE COURT:  Do this.  Please make a
8
9  copy of this available to all the attorneys
10
11  in this lawsuit.
12
13      MS. SAFFER:  Certainly.
14
15      THE COURT:  And a copy to the court.
16
17      MS. SAFFER:  Certainly.
18
19      THE COURT:  Somewhere, we ever get the
20
21  damages in this case, might prove of some
22
23  help to us.  Which case we might ask you to
24
25  come back.  Who knows.

Page 253

1
2      MS. SAFFER:  Nothing personal.
3
4      THE COURT:  Have a good day all.  Off
5
6  the record.
7
8              *       *       *
9
10
11
12
13      I hereby certify that this is a true
14  and correct transcript of the within
15  proceedings.
16
17
18
19              DONNA RACANELLI
20
21
22  Dated:
23