# EXHIBIT 8

SUPREME COURT : ROCKLAND COUNTY
STATE OF NEW YORK

- - - - - - - - - - - - - - - - -X

ANNE BRYANT,

                   Plaintiff,

                                 Index No.:
        -against-              5192/00

BROADCAST MUSIC, INC., (a/k/a "BMI"),
CLIFFORD A. "FORD" KINDER, KINDER &
CO., LTD., VADIVOX, LTD., JULES M.
"JOE" BACAL, GRIFFIN BACAL, INC.,
STARWILD MUSIC BMI, WILDSTAR MUSIC
ASCAP, SUNBOW PRODUCTIONS, INC., and
JOHN AND JANE DOES 1-10,

                   Defendants.

- - - - - - - - - - - - - - - - -X

                 CONFERENCE

                 September 13, 2004
                 One South Main Street
                 New City, New York

BEFORE:  HON. ANDREW P. O'ROURKE,
         Justice of the Supreme Court

APPEARANCES:

        For the Plaintiff:

                MONAGHAN, MONAGHAN, LAMBS & MARCHISCO, ESQS.
                23 West Grand Avenue
                Montvale, New Jersey 07645
                BY:  PATRICK J. MONAGHAN, ESQ.

        For the Defendant Sunbow:

                PATTERSON, BELKNAP, WEBB & TYLER LLP
                1133 Avenue of the Americas
                New York, New York 10036-6710
                BY:  GLORIA C. PHARES, ESQ.
                      and
                BY:  LAUREN HAMMER BRESLOW, ESQ.

Ellen P. Maguire, RMR,
Senior Court Reporter

Proceedings                3

1

2      THE COURT:  I just this have one housekeeping

3  question.  Is BMI in this case?

4      MS. PHARES:  It is still in this case.

5      MR. MONAGHAN:  It is.

6      MS. PHARES:  I have spoken to Ms. Saffer.  She

7  said that she had actually thought that BMI would have

8  settled by now.  She had sent a marked-up copy of a

9  settlement agreement to Mr. Monaghan and has not heard

10  from him.  She does want the Court to know that,

11  however, that their case has not been settled as yet,

12  and she is out of town.  Although she thought she would

13  have, as I said, her case would have been settled by

14  now.  She's in Utah.

15      MR. MONAGHAN:  We are -- there was a settlement

16  in principle.  It is the details of working out how to

17  correct some of the BMI registrations.  It is the

18  details of that, that have been taking sometime to try

19  and work out.

20      THE COURT:  But there is no problem with either

21  of the sides that are here and going on without BMI.

22      MS. PHARES:  There is no problem.

23      THE COURT:  Okay.  Let the record reflect that I

24  had an opportunity to discuss this matter with counsel

25  in chambers, and that it is the understanding of this

Proceedings                                          4

1
2      Court that some documents have been discovered that
3      were heretofore unavailable, and, at this time, Ms.
4      Phares, perhaps, you'll tell us what is going on.
5              MS. PHARES: All right. Your Honor, what I, as I
6      indicated in chambers, I am beginning with the premise,
7      which was that of the trial on the basis for denying
8      the defendant Sunbow summary judgment was the
9      plaintiff's contention that she had an oral working
10     arrangement with Sunbow, and it is our contention that
11     these documents, which we contend are genuine, that the
12     premise falls with the assigned work-for-hire
13     agreements, and that, frankly, Ms. Bryant's denial of
14     her various signatures is really irrelevant, because
15     Mr. Kinder, who signed for the company, has
16     acknowledged his signatures on them.
17             We note now also that Ms. Bryant has in her
18     affidavit, has changed from her old theme of "I never
19     signed agreements" to now "I would never have signed
20     away my writer's share."  But for purposes of today,
21     the issue is whether or not these documents are
22     genuine, and I gather that part of the concern that
23     they may not be relays to the fact that as their
24     appearance has been described as mysterious, and I
25     would like to dispel that mystery.

1                          Proceedings                    5
2          But as a background for this, and so you
3    understand how this works, Sunbow was sold to Sony,
4    actually to a division of Sony, Sony Wonder in 1998.
5    Then Sony againg itself sold Sunbow at the end of the
6    year in 2000 to a German company called TV Loonland,
7    and this is important for how I finally figured out
8    where these documents might be.
9          Just as a background, although this case was
10   originally brought in 2000, it was not until after the
11   note of issue that Mr. Monaghan sought these
12   work-for-hire agreements.  That was on June 30th of
13   last year.  And it had been our contention that this
14   discovery was late, but then on an application to your
15   Honor in October, Sunbow was ordered to respond to that
16   request.  So we checked the index of the documents that
17   were in Sunbow's warehouse, and we searched all those
18   files in New York.  And Mr. Rigby who you will remember
19   was here during our first week of trial, who was with
20   TV Loonland, searched files in Germany.
21         In fact, he was the one who found the unsigned
22   Jem agreement in the file that I was describing in
23   chambers, which was a file that related to a request to
24   make a record of greatest hits of cartoon themes, and
25   Ms. Weitzman of Sunbow had been apparently unable to

1          Proceedings                    6

2    find the document, the original agreement, and

3    consulted Mr. Harris, Robert Harris, who was then with

4    Levy, Rosensweig and Hyman, asking him if he had a

5    copy.  So it was in a file relating to that request

6    that we found the unsigned Jem agreement, the

7    correspondence from Mr. Dobishinski to Mr. Harris, and

8    the comparable agreement with Barry Harmon who was the

9    lyricist for Jem.  And there was also a letter from Mr.

10   Harris to Ms. Weitzman explaining what he had in his

11   file, then that he was conveying it all to her.  And

12   that's where that was.

13        All right.  On November 10, we produced those

14   documents.  Now, until that time, and we went over this

15   at trial with Ms. Bryant, she had testified in March of

16   that year, that there had been agreements, that she had

17   signed them, that she didn't remember, she didn't

18   remember signing them, but she knew there were

19   agreements.  She discussed them with her partner and

20   she also had said there were agreements with GBI.

21        Now, however, in response to the motion for

22   summary judgment for the first time, we were told that

23   they had never had signed agreements, that they always

24   worked on an oral working arrangement.

25        All right.  From the end of November through

| | | |
|---|---|---|
| 1 | Proceedings | 7 |

2   February of this year, we went through the period of

3   the motion for summary judgment, and the

4   reconsideration and the removal.  When the case was

5   remanded in February, and in anticipation also of our

6   meeting with you at the beginning of March, I got a

7   hold of David Rosensweig to try and find out with him

8   where he had sent his documents, when his firm

9   disbanded at the end of 1999.  He said he sent them to

10  Sony, which made sense, because at that time Sony owned

11  Sunbow.  So I called lawyers at Sony.  Some of whom I

12  know because they have been with our firm before, and

13  we have a relationship with them.  And I asked them,

14  did they know where these were?  And they said that,

15  no, that Sunbow had always had a separate

16  administration; in other words, it kept its own

17  documents.  It had its own people, and, therefore, they

18  wouldn't have had them in their files.

19      If you recall, in March, you invited us to make a

20  motion to dismiss on statute of frauds, which we did.

21  And then that was resolved in April, and so in June and

22  in May, before the -- I started thinking about where

23  these documents could possibly be and who might have

24  copies of them.  I checked with the AFM, the American

25  Federation of Music in LA, with Local 802 in New York,

1                           Proceedings                        8

2       Talent Payment Partners, which was later called

3       Entertainment Partners, who made the residual payments

4       under those union contracts.  I thought maybe they

5       might have them.

6              We reviewed the summary of the diligence that was

7       done by the outside corporate lawyers, Rosen and

8       Collins, who had handled the sale of Sunbow to Sony,

9       but it turned out that they had primarily been looking

10      at current ongoing licenses.  I mean, this was years

11      after these programs had originally been broadcast.

12      There never had been claims, there was never any -- it

13      was at that point it was kind of unreasonable to go

14      back and look at the underlying agreements that had to

15      do with the creation of the programs.

16             Lauren, Ms. Breslow, my associate, went to the

17      offices of the outside counsel who handled the sale of

18      Sunbow from Sony, then to TV L, and we found nothing

19      that was relevant.  We even, because we figured that

20      there were probably very few copies of these, that

21      would have been probably one for each of Ms. Bryant and

22      Mr. Kinder and one for Sunbow, and that seems to be

23      corroborated by the correspondence we have seen, which

24      it usually says there are three or four executed

25      copies.  We even went to the company that we found out

Proceedings                                    9

had acquired the assets of Mr. Kinder's, Kinder and

Co., after he went off to medical school, and they did

not have any documents.

So we went to trial in July, and we were

obviously preoccupied with preparing for that.  Right

beforehand, although I was trying to find these

documents, and after the trial in July, I sort of

thought about it.  I am not going to rely on any more

of these warehouse entities for documents.  I insisted

all of the boxes on the Sunbow warehouses be searched

here and in Germany, everything.  We went through all

those documents, and we still weren't finding them.

Germany said they frankly had mostly '90's documents,

which was, which was consistent with what they had

found beforehand.  But we were not finding these older

documents, and I, then, again, got to thinking about

where these documents might have been, and I went back

to Sony.  And I asked the lawyers that were there, were

there any other place they could be.  They gave me the

same explanation they had given me before, but at the

same time they also sort of said that there is a

decentralized kind of filing of documents at Sony.  So

the record company is distinct from the division that

does their TV work, and I asked them would they please

at least send around an E-mail to all the people who
might have anything to do with this, to see if anybody
had any documents relating to Sunbow.

Well, I was waiting for that response.  On the
second of August -- I sent that on the 23rd -- I sent
him an E-mail that could be distributed on the second
of August.  Before I heard back from them, I even
suggested to TV Loonland it try to use its relationship
with Hasbro to obtain documents.  So this is kind of
tricky because Hasbro is TV L's licensor, and which is
an adversary relationship, and they were unlikely to
want to go routing around in their documents.

But, finally, two days later on August 4, Sony
let us know they had found 16 boxes.  So after a lot of
toing and frowing, we had to get the right lot numbers
and the right this and that.  They finally permitted
Ms. Breslow to go to the warehouse to search the 16
boxes.  She did not find any work-for-hire agreements
there, but Brian, the warehouse man, says to Ms.
Breslow, what about those boxes in the back that are
Sunbow boxes, and at the time they went back.  They
looked at them.  They were up high, on very high
shelves.  They had not been used for a very long time.
Boxes that are used go in and out of the warehouse all

Proceedings                          11

the time were on lower shelves.

So, you know, she came back, and Reported this to

me.  I reported this to Sony, and as it turned out

there were not 200 boxes.  There were over 600 boxes.

So we had to go through figuring out, just the

procedure of getting these all to be brought down and

looked at.  I said, all right.  Look, why don't we just

bring them all down, and at least we can flip the tops

to see whether or not they have things like costumes or

promotional materials, things that are clearly not

relevant.

Finally, on the 18th of August, Ms. Breslow and

Suzanna Healan, our legal assistant, went together.

We were in a warehouse in Queens, in a, frankly,

dangerous neighborhood.  It was a filthy, unbelievably

dirty job because these boxes had clearly not been

removed for years.  They were taped shut, old tapes.

In the course of doing this, they came upon binders of

documents, and I want the Court to see these, because

this is the Jem contracts file.  This is exactly the

way they looked.  They weren't in any obvious order.

They were just sort of put in on top of the

arrangement.  Later they found another one for My

Little Pony, and, finally, we found another for GI Joe,

1

2   and this is the GI Joe one.

3        So searching in these became very easy because

4   they are filed.  These are writer's contracts and the

5   composer's contracts, and there is an entry for Kinder

6   and Bryant, and that's how we found those documents.

7   They also figured there were about 65 documents that

8   were too hard to figure out what was in them from just

9   standing in the warehouse, so those 65 boxes were

10   brought back to our office.  They reviewed them for

11   more information, but we did not find any more binders.

12   That was on the 18th.  We produced the documents to

13   plaintiff and the Court on the 19th, and if you recall,

14   we had our conference on the 20th.

15        I will say that I am still not, frankly, myself

16   satisfied that we have found all the possible

17   documents.  In addition, to not finding other binders,

18   we still haven't found the Levy Rosensweig documents,

19   which would have presumably the correspondence and

20   negotiations related to not only Kinder and Bryant,

21   but, obviously, other creative people who participated

22   in these television programs.  But there is nothing in

23   the least bit.  We were not withholding these

24   documents.  I tried to find them since the, since the

25   very beginning of when this finally became an issue in

1

2    this case, which it was not until last November.  And

3    as I say, we have the original documents here, and we

4    have color copies of the others.

5         Now, the next thing that I would like to do is we

6    have prepared notebooks, which I'd like to provide to

7    you and to Mr. Monaghan, and just so you can look at the

8    documents that have been acknowledged, just to see,

9    just put them together in a way that will make sense of

10   them.  Whether you want to examine them today or not,

11   obviously, is your decision.  But at least so you know

12   how that has been organized so it makes it easier to do

13   it rather than having to go through the affidavits,

14   and, well, and they don't have all the acknowledged

15   signatures in any event.

16        THE COURT:  Just so that I understand these

17   folders that you are giving out contain copies of those

18   contracts that you found that bear, what did you say?

19   Are the signatures Kinder and Bryant or one of the

20   other on them?

21        MS. PHARES:  Right.  If you look at them, inside

22   the front folder we have put the affidavits of Mr.

23   Kinder and Ms. Bryant.  In the back, there is a back

24   sleeve at the very back of the book, are color

25   photocopies of the original documents.

1                        Proceedings                    14

2              The color copies are of the Jem and the My

3    Little --

4              Well, actually, I was just told there is actually

5    color photocopying.  In any event, the originals are

6    here in the books, but that the color photocopies were

7    just some of the additional materials that had been

8    provided to us, but we will certainly make those

9    available for reference.

10             But I'll tell you what, if you would like right

11   now, could you just look at the Jem, the Jem agreement.

12   Here is the red book.  I think it is the red one

13   anyway, right, and there should be a, should be a tab

14   for Kinder and Bryant.

15             THE COURT:  Would it be in the writer's contract?

16             MS. PHARES:  No.  If I may, your Honor.

17             It might actually say their names, or it would

18   say.

19             MS. BRESLOW:  I believe it is the last tab.

20             MS. PHARES:  It is in the very back.  It is not

21   sticking out, of course, just to make life easier.

22             Now, the document that's at the front, your

23   Honor, the very first document is the two-page

24   document.  That's an amendment.  And, in fact, it is

25   the amendment that was the subject of that

Proceedings                    15

correspondence of Mr. Dobishinski that we were

examining at trial.  This is the signed amendment,

signed by Mr. Kinder.  Behind it is the agreement

itself.  The agreement has sort of three parts.  There

is the main agreement, signed by Mr. Kinder and Carole

Weitzman from Sunbow.  Then there is a Schedule A,

which is a representation by the two writers that they

worked for hire for Kinder and Bryant, and then there

is something called an inducement letter.  An

inducement letter is customary in these kinds of

agreements, because since it is known that the writers

themselves are going to be doing the work, they

essentially reiterate the representations and

warranties that are in the main agreement, and the

representation that the work is for hire.

        THE COURT:  Okay.  Your position is that when

work is for hire, that unless it is specifically spelt

out in the agreement, that the writer gets only that

amount of money that is promised in the agreement for

doing that particular operation.

        MS. PHARES:  That's correct, your Honor.

        THE COURT:  That, therefore, that ends when the

song is produced or whatever it is that they do.

        MS. PHARES:  Not necessarily.  Sometimes an

1                           Proceedings                    16

2      agreement will provide for ongoing royalties.

3              THE COURT: Unless it provides in the agreement a

4      work-for-hire agreement, unless somebody is in there

5      and it ends at the point that the job is done.

6              MS. PHARES: That's correct.

7              That was that agreement that they found, and then

8      there is a similar one in the My Little Pony and

9      Friends.

10             Now, I recognize that My Little Pony and Friends

11     is not one of the compositions or rather the TV series,

12     if that is an issue here, but I think it is extremely

13     probative to our contention that it was the practice to

14     do this, and, certainly, to the contention of the

15     plaintiff that she, that she worked, according to an

16     oral working arrangement, that, in fact, there were

17     agreements that did this. We did not find an agreement

18     for GI Joe, which is consistent with the plaintiff's

19     claim that they did not do the music for it.

20             THE COURT: GI Joe. My recollection was Ms.

21     Bryant's position was that she had gotten the rights

22     from somebody else. Is that not correct?

23             MS. PHARES: My understanding is she said she did

24     not do the music for GI Joe. I think she said Mr.

25     Kinder had some role in its creation, but she did not.

Proceedings                          17

1

2      THE COURT:  At certain points, he gave her

3   rights to.

4      MS. PHARES:  She has said that, yes.

5      THE PLAINTIFF:  I did the music for GI Joe theme

6   product we are talking about here.  I think I did that

7   with Ford.  Ford and I did that, and Barry Harmon

8   contributed new lyrics to it.  That's different than

9   the original GI Joe song.

10     MS. PHARES:  Also, not an issue in this case.

11     THE PLAINTIFF:  GI Joe theme, why is that?

12     MS. PHARES:  Because it wasn't alleged in the

13  complaint.

14     THE COURT:  So, now, that is the way that this

15  document, these documents came.  That's the way this

16  document came to light.  Ms. Breslow, at risk of life

17  and limb, went through these boxes at some obscure

18  place in Queens.  That sounds like where Imus has his

19  radio program.

20     Mr. Monaghan, is there any comment you want to

21  make about -- you talked before in chambers whether or

22  not you wanted to take the deposition of the person who

23  found it.  What's your position on that?

24     MR. MONAGHAN:  I don't think I need to take Ms.

25  Breslow's deposition.  I'll accept the representations

Proceedings                                          18

1

2       thus far.  But I would want to know, I would want to

3       see all of the documents, not just those that were

4       selected for presentation to the Court.

5           THE COURT:  These are here I assume.

6           MR. MONAGHAN:  I understand there were a bunch of

7       boxes.  I mean, something like hundreds of boxes, not

8       that I am anxious to do this.  Believe me.

9           MS. PHARES:  These documents were not called for.

10      What are at issue are the documents that you asked for

11      on the -- and at the moment, also, dealing with

12      liability.

13          MR. MONAGHAN:  Can I just finish.

14          I would think, your Honor, that we would be

15      entitled to know -- the judgment call about what was

16      relevant has been made unilaterally here.  Judgment

17      call about what documents, out of these hundreds of

18      boxes, was a judgment call made by Ms. Phares, perhaps,

19      Ms. Breslow and perhaps others.  I am entitled to see

20      there may be other documents that have a direct bearing

21      that may be applicable.  Who knows, we don't know.

22          So I think we should have an opportunity, if the

23      Court is going to, you know, consider these documents,

24      which, obviously, I think you probably are, we have to

25      see everything.  We have to be able to.

| | Proceedings | 19 |

1

2     THE COURT:  Hold on.

3         My understanding of it was that, Mr. Monaghan,

4     you and your client took a position that these

5     documents were never signed, and that there was an oral

6     agreement that covered all of this.  Now, we have,

7     apparently, copies, and I just looked at them, of,

8     signed in ink and the ink is different.  You know, it

9     looks pretty much as though that the people signed it.

10    I am not a person that will make that lightly.  I have

11    to look at a lot of signatures before I decide.  Even

12    then I might want to hear some evidence from somebody

13    on it.

14        But I don't know that you are entitled to any

15    other discovery.

16        MR. MONAGHAN:  Well, your Honor, if I may, there

17    is nothing inconsistent even with what you have been

18    presented with, what we have said all along, and Ms.

19    Bryant just said this in her affidavit, what she has

20    said.  She's never said, "I didn't sign certain

21    documents."  She is saying in her affidavit she's not

22    changing anything she said.  What she said is I keep my

23    writer's royalties.  That's what she says.

24        Now, the ultimate issue of whether one or more of

25    these documents relinquishes those writer royalties is

1                          Proceedings                    20

2      entirely a separate issue.  You can make the call on

3      that provided it is a genuine document, provided it is

4      done at the time it is supposed to be done.

5           For example, for example, the Jem themes were

6      composed earlier than these documents would indicate.

7      They were composed months before it.  You cannot have a

8      proper work for hire ex post facto.  The author must

9      compose it as work for hire at the time.  You don't go

10     back and reconstruct it later on.

11          Secondly, the Jem agreement is one agreement we

12     have to deal with.  It doesn't provide an answer to all

13     the questions about all the other compositions.

14          THE COURT:  It is your position there were oral

15     agreements on some and written agreements on others.

16          MR. MONAGHAN:  Our position is the oral

17     understanding, which is the understanding they had at

18     Michelin (phonetic) and Company, which is what my

19     client testified to, consistently, and you will see

20     Michelin's name for some reason comes in.  Is that

21     writers keep their royalties.  And that's the oral

22     argument.  That's the oral arrangements.  Writers keep

23     their royalties and that's the industry standard as

24     well.

25          What Ms. Phares wants you to do is to render a

1                          Proceedings                    21
2      decision that would be conradictory to industry
3      standards because they have presented you with
4      work-for-hire agreements in some case and not in
5      others.  That work for hire is not mutually exclusive
6      with writers keeping their royalties.
7             THE COURT:  In the work-for-hire agreement, there
8      is a provision.
9             MR. MONAGHAN:  Or it is ignored.  It is not, it
10     is not covered, because, for example, there are uses
11     being made of music today in 2004, that were never
12     contemplated by any agreements previously.  And there
13     are cases holding, for example, ring tones, who would
14     have thought in 1985, that someone's music would
15     somehow find its way into a phone and would not
16     compensation be required under those circumstances.  It
17     is not as simple as it would seem.  It is not as simple
18     as counsel has made it appear.
19            THE COURT:  I would say this case has not been
20     simple.
21            MR. MONAGHAN:  It hasn't been simple.
22            THE COURT:  Don't worry about it.  I think it is
23     a very complex case.
24            MR. MONAGHAN:  But I am not asking for anything
25     remarkable here.  We have been given 2000 pages even

1            Proceedings                     22
2    before this, that your Honor --
3            THE COURT:  Discovery is over here.  I'll tell
4    you the --
5            MR. MONAGHAN:  They just discovered them.
6            THE COURT:  Well, that's true.  But these were
7    documents that were asked for, as I understand it.
8            MR. MONAGHAN:  But how do we know that, that they
9    are giving us documents responsive to the request when
10   they make a unilateral production of documents.
11           THE COURT:  There was the document you requested.
12           MS. PHARES:  That was asked for.
13           THE COURT:  There also was a document that at one
14   point we had marked in as the unsigned agreement as I
15   recall.  It is an exhibit in this case.
16           MR. MONAGHAN:  An unsigned agreement that in
17   1994, appeared someone who was involved still thought
18   was unsigned.
19           THE COURT:  Well, I remember that testimony.
20           MR. MONAGHAN:  You have got two other agreements
21   that were used, too, by Ms. Phares, Defendant's B and C
22   that are -- the Court has a sworn declaration -- are
23   forged.  You have Ms. Bryant saying a number of these
24   documents are forged.  You have slip-ins.  You can
25   have, you know if you have a form in the computer and

1                           Proceedings                    23
2      page 1 is a fill-in.  Let's talk about this agreement
3      with Michelin and Company, Page 2, 3 and 4 and 5 would
4      be virtually identical regardless of what agreement.
5      It is not a difficult task to slip them in.
6            I am, by the way, I am not accusing lawyers of
7      doing anything here, other than droping stuff on us on
8      the 11th hour, but someone else could have done this.
9      Someone could be playing --
10           That's what we want to find out about.
11           THE COURT:  Yes.
12           MS. PHARES:  GBI agreements that Mr. Monaghan is
13     referring to, first of all, GBI agreements are not in
14     this case.  We had brought them in when we were trying
15     to defeat this argument.  There had never been
16     agreements because we know that, that was not the way
17     it was handled, and Mr. Kinder has, in fact,
18     acknowledged his signature on the 1984 GBI agreement,
19     which was one that we found in the -- but it wasn't an
20     original copy.  It was not an original one.  But he has
21     acknowledged it was his signature.  But that is really
22     beside the point because GBI is not in this case, and
23     we have now two of the Sunbow agreements that are
24     original agreements.  Mr. Kinder has acknowledged they
25     are his agreements.  He has acknowledged his signatures

Proceedings                                24

1

2    on the schedules, on the inducement letters, of all of

3    them.

4         And the issue in this case that brought us to

5    trial was the plaintiff's testimony that she had worked

6    with an oral working arrangement.  She denied there

7    were these agreements.  That was the basis on which

8    your Honor denied Sunbow's motion for summary judgment.

9    We wouldn't have gone to trial, but for that.  She

10   raised an issue of fact and claimed there was an oral

11   working arrangement.  That has been shown now to be

12   false, if the Court accepts the documents as genuine as

13   we believe it should.

14         THE COURT:  Let me hear Mr. Monaghan on whether

15   we should have a framed issue hearing in this matter,

16   and if so, on what.

17         MR. MONAGHAN:  I think we have to have a framed

18   issue hearing on the validity of these documents.  Are

19   they genuine?  Are they genuine documents?  And we are

20   going to need -- you have Mr. Kinder's.  The question

21   is, is that signature -- I did just hear them say they

22   don't have the original, which agreement are we talking

23   about?  The one you just said.

24         MS. PHARES:  GBI, one, that's not in case.

25         MR. MONAGHAN:  GBI is in this case.  This is not

1                              Proceedings                        25

2      correct.

3              THE COURT:  Why is it?

4          MR. MONAGHAN:  Because the Transformers is not a

5      Sunbow production.  Anything to do with Transformers is

6      not Sunbow.

7              THE PLAINTIFF:  Originated.

8              THE COURT:  So.

9          MR. MONAGHAN:  If, unless there is an agreement

10     that is validly signed that gives up Ms. Bryant's

11     rights with respect to the music that she composed for

12     Transformers and --

13             THE COURT:  You just said that Sunbow didn't own

14     Transformers or it isn't theirs.

15         MR. MONAGHAN:  It was done for -- originally

16     done.  What happened -- okay.  As your Honor may

17     recall, the music composed by Ms. Bryant was composed

18     either for Sunbow or for GBI.

19             You have the same parties involved.  Joe Bacal

20     and Griffin.

21         MS. PHARES:  GBI is not a defendant in this case

22     and never has been a defendant in this case.

23         MR. MONAGHAN:  Sunbow then, as we have alleged,

24     used that music composed by Ms. Bryant in Transformers.

25     We had the video here.  Those were Sunbow Productions.

1
2   Right on the labels it said Sunbow.  Her music in

3   Sunbow Productions.  Music originally commissioned by

4   GBI for which she does not get compensated by the same

5   publishers.

6        THE PLAINTIFF:  Commonly owned.

7        MR. MONAGHAN:  So it is in the case, and it has

8   been in the case.

9        So, I mean, as far as the framed issue, if the

10  documents are to be given any effect, we have to find

11  out if they are legit.

12       THE COURT:  They are here.  You can look at them.

13  I am not going to let you have physical possession of

14  them other than destroy them in the process.

15       MR. MONAGHAN:  Your Honor.

16       THE COURT:   I don't mean, don't take that

17  incorrectly.  I mean, carbon date them or something so

18  we don't have them any more.  This isn't the Shroud of

19  Turin, I understand.  We have to have some kind of

20  control over these documents.

21       MR. MONAGHAN:  All I want is the, well, initially

22  I want the -- are the documents that were discovered in

23  the warehouse indexed anywhere?

24       MS. PHARES:  No.

25       MR. MONAGHAN:  Was a judgment made about which of

Proceedings                                    27

1  the documents -- are those binders we are looking at

2  exactly as they were?

3  MS. PHARES:  Exactly.

4  MR. MONAGHAN:  And there are originally signed

5  documents in those binders.

6  MS. PHARES:  There are.

7  MR. MONAGHAN:  Is what you are saying?  Have I

8  got a binder here that has every single document that's

9  in those --

10  MS. PHARES:  No.  What you have, and by the way,

11  we should really make clear the binder that I have

12  given you, the one with the affidavits in the front of

13  them, that I think is to your left, what that is, just

14  let me quickly tell you how we set that up so you know.

15  What you have got is at the front of it is a summary of

16  what the parties have stated about what they have

17  signed on the first page.  Then there is a -- you will

18  see a tab that says "flag key".  And so after the

19  summary of the documents, there is a flag key that

20  indicates what there are.

21  The purple tabs are all the signatures that Ms.

22  Bryant has acknowledged as her own, and then we have

23  put behind it the agreements.  The Jem agreements,

24  copies of the Jem agreements, a copy of the Jem

Proceedings                                    28

modification, a copy of My Little Pony and Friends, and
there are tabs on each of them. The blue ones are Mr.
Kinder's, and there is an okay written on them, which
corresponds to our key, and the okay means that he has
conceded his signature. There is a "U" because he says
he's unsure. The orange tabs are Ms. Bryant's
signatures, and we put in an "F" where she claims they
are a forgery or an alleged forgery. And then these go
back through the agreements through the GBI
Transformers agreement in '84, two in '88.

There was a screen actors agreement because Ms.
Breslow and Ms. Healan pulled out anything they found
with their signatures. And there is one for Mr.
Kinder, there is another for Ms. Bryant, and then with
them are some W4 statements.

And just to make it clear, in the original
binders, what's in them, which is not really relevant
to this case, but it shows the nature of the agreements
that were signed here are just writers' agreements.
There are agreements with animators, I believe with
composers, lyricists and so forth.

THE COURT: I believe that a framed issue hearing
is necessary. The documents that have been produced,
the binders, the whole binders will be made available

|   |                                                                      |
|---|----------------------------------------------------------------------|
| 1 | Proceedings                                    29 |
| 2 | to Mr. Monaghan or any expert that he has to look at -- |
| 3 | MS. PHARES:  I would prefer to make them |
| 4 | available to the expert directly, if you would, your |
| 5 | Honor. |
| 6 | THE COURT:  Certainly, counsel can be present |
| 7 | with the expert. |
| 8 | MS. PHARES:  Yes, absolutely. |
| 9 | MR. MONAGHAN:  Does that mean you don't trust me. |
| 10 | THE COURT:  I will tell you that I will look at, |
| 11 | in the meantime, a comparison of signatures, and I will |
| 12 | give you a decision on whether or not I find them |
| 13 | comparable.  So you'll have that before you do the |
| 14 | framed issue.  I am not going to take that right now |
| 15 | just on the basis of looking at these documents. |
| 16 | To me, the issue still stands whether there is a |
| 17 | case.  If I find these documents are accurate and even |
| 18 | after a framed issue hearing, I am not going to take |
| 19 | that up today, because I am going to let you develop |
| 20 | the arguments.  But my recollection is that all |
| 21 | throughout this case the assumption has been from Ms. |
| 22 | Bryant's testimony that she never gave away her rights, |
| 23 | and that she never signed any agreements. |
| 24 | THE PLAINTIFF:  That gave away my rights. |
| 25 | THE COURT:  That gave away. |

Proceedings                                    30

1

2      THE PLAINTIFF: Right. That's right.

3      THE COURT: Whether or not that changes anything,

4  I can tell you I am not ready to make that decision

5  today. You may say when, and I will tell you that as

6  far as I know, I have five, four more years on the

7  bench. So this case, like the Trojan war, will end

8  somewhere down the road.

9      MS. PHARES: Your Honor, one more thing is that

10  we served a trial subpoena on Ms. Bryant for signatures

11  from 1984. All the signatures that she has in her

12  possession on business documents, 1984, '85 and '86,

13  because according to the handwriting expert that we

14  have consulted, the best practice would require our

15  seeing the signatures from that period, and we would

16  rather not rely on the signatures that she has

17  selected. We would like to see all of the ones that

18  she has.

19      MR. MONAGHAN: Let me just address that. This

20  subpoena was faxed to me at 5:36 Friday night. The

21  subpoena that was served, was not served on Ms. Bryant

22  personally.

23      MS. PHARES: It was served substitute service on

24  Marlene Phelan when who was at her home and described

25  herself as a coworker.

1

2          MR. MONAGHAN:  That's not good service.  We are

3    not going to give them a hard time about that.  But we

4    are going to need some time to -- we have no problem

5    with -- she is going to try and gather what she can.

6    She's been working on it already, and I would say maybe

7    within a week.

8          THE PLAINTIFF:  I found a mortgage in '85.  I

9    paid it off.

10          MS. PHARES:  That's 1989.

11          THE PLAINTIFF:  '85.

12          MS. PHARES:  You have an '85 one.

13          MR. MONAGHAN:  Ladies, so we'll try and comply as

14    best as we can with the subpoena.  I am still troubled

15    by your Honor circumscribing what I can look at.  This

16    isn't --

17          THE COURT:  Look at anything in these books.

18    Counsel, if I gave you six hundred boxes to look

19    through, I wouldn't see you back here until next year

20    sometime, and I am not going to do that.  This case has

21    got to continue to go forward.

22          MR. MONAGHAN:  Will you at least leave the issue

23    open in case there is an inquiry prompted by something

24    I see in the binders.

25          MS. PHARES:  Your Honor, we can represent, and

1

2      Ms. Breslow has just said to me, we pulled everything

3      we found with her name and signature on it and Mr.

4      Kinder's. Everything.

5          THE COURT: You know, the problem is that this

6      case is in the middle of a trial now. If you had

7      wanted all of the Sunbow records or something that you

8      could have asked for it very early on. I don't know

9      that you did.

10         MR. MONAGHAN: I did.

11         MS. PHARES: He could have.

12         THE COURT: Did you ask for the ones relative to

13     these particular items?

14         MR. MONAGHAN: Your Honor, we asked for any

15     document in which Ms. Bryant purportedly signed away

16     her rights. Okay. Number one.

17         MS. PHARES: These are not in Sunbow's custody,

18     and we have provided every single document that we had.

19         THE COURT: Just a minute.

20         MR. MONAGHAN: I don't want to get in trouble

21     here.

22         THE COURT: We are not going to have any more

23     discovery. You can have these three binders looked at

24     by yourself and an expert at the offices of the

25     Patterson firm.

1

2      MR. MONAGHAN:  Can we take a quick scan now while

3  we are here.

4      THE COURT:  He certainly can do that.

5      MR. MONAGHAN:  Judge, how could I get in trouble

6  when I receive documents in the middle of a trial.  Why

7  get mad at me?

8      THE COURT:  I am not mad at anybody.  With due

9  deference to the rights of all parties here, I am

10  trying to keep this in a manageable order.

11      MR. MONAGHAN:  It has been a tough case.

12      THE COURT:  I don't want to do a Judge Ito on

13  this.  I want to keep control of it.  That's all.

14      MR. MONAGHAN:  Judge, I am going before Judge

15  Ito's partner in crime, if you will, next week.  Next

16  Tuesday in LA.

17      THE COURT:  What I am going to do is, I am going

18  to let the court reporter leave.  But, first, I want to

19  tell you again, I'll reiterate, I am going to give you

20  an order, a decision on my view of the handwriting

21  here.  I am also going to set up a framed issue hearing

22  in which both sides may introduce, if they feel that it

23  is proper, experts on handwriting.  And after that I am

24  going to see what I think is left in this case.  All

25  right.

1                          Proceedings                    34

2            Is there any question now about what we are going

3    to do next?

4            MS. PHARES:  None, your Honor.

5            THE COURT:  And explain it to me, if would you.

6            All right.  So I am going to give you a half hour

7    to look over these until 1:00.  The court officer will

8    stay here, but the court stenographer is not to stay,

9    but you will get a copy of this record.  The Patterson

10   firm will pay for it, and you'll pay the Patterson firm.

11           MR. MONAGHAN:  Thanks, Judge

12                      o     o     o

13                 (Proceedings adjourned.)

14

15                       CERTIFICATION

16

17           Certified to be a true and accurate

18           record of the within proceedings.

19

20           _____

21           Ellen P. Maguire, RMR
             Senior Court Reporter

22

# EXHIBIT 9

```
 1    SUPREME COURT OF THE STATE OF NEW YORK
                   COUNTY OF ROCKLAND
 2    - - - - - - - - - - - - - - - - - - - - - x
      ANNE BRYANT,
 3
                        Plaintiff,
 4                                          # 5192/00
           -against-
 5
      SUNBOW PRODUCTIONS, INC.,
 6
                        Defendants.
 7    - - - - - - - - - - - - - - - - - - - - - x
      FRAMED ISSUE HEARING
 8                         Rockland County Courthouse
                           Main Street
 9                         New City, New York 10956
                           October 29, 2004
10
11    B e f o r e:
                     HONORABLE ANDREW P. O'ROURKE,
12                   Supreme Court Justice
13    Appearances:
14    For the Plaintiff(s):
15              MONAGHAN, MONAGHAN & MARCHISIO, ESQS.
                150 West 55th Street
16              New York, New York 10019
                BY: PATRICK J. MONAGHAN, ESQ.
17
      For the Defendant(s):
18
                PATTERSON, BELKAMP, WEBB & TYLER, ESQS.
19              1133 Avenue of the Americas
                New York, New York 10036-6710
20              BY: GLORIA C. PHARES, ESQ.
                         and
21              LAUREN HAMMER BRESLOW, ESQ.
                of Counsel.
22
23                       Robin DiMichele, RPR
                         Senior Court Reporter
24
25
```

Page 2

- R. Harris/Direct -

1
2  THE COURT: Okay. All right. This is
3  a continuation of the Bryant v Sunbow
4  Productions matter, and we are having a
5  framed issue hearing today on the question
6  of the validity and authenticity of various
7  signatures that were attached purportedly to
8  contracts and documents that have been
9  offered by the defendant Sunbow, and are we
10 ready to proceed?
11       MS. PHARES: Sunbow, yes, your Honor.
12       MR. MONAGHAN: We are.
13       THE COURT: Call your first witness.
14       MS. PHARES: Sunbow then calls Mr.
15 Robert Harris.
16            ROBERT HARRIS,
17       having affirmed was examined
18       and testified as follows:
19       COURT OFFICER: Please be seated.
20 State your name, spell your first and last
21 name and give your business address for the
22 record.
23       THE WITNESS: Robert Harris,
24 R-o-b-e-r-t, H-a-r-r-i-s. Business address
25 is 561 Seventh Avenue, 11th floor, New York,

Page 3

- R. Harris/Direct -

1
2  New York, 10018.
3       THE COURT: Go ahead, counselor.
4  DIRECT EXAMINATION BY MS. PHARES:
5       Q   Mr. Harris, what's your profession?
6       A   I'm an attorney.
7       Q   In what area do you practice?
8       A   Entertainment law and intellectual
9  property.
10      Q   Have you handled agreements related to
11 TV productions?
12      A   I have.
13      Q   For how long?
14      A   Well, since I've begun practice about
15 26 years.
16      Q   Did you ever represent Sunbow
17 Productions, Inc.?
18      A   I did.
19      Q   During what period of time did you
20 represent Sunbow?
21      A   From approximately, I'd say, 1982 until
22 1998, give or take.
23      Q   And was it Sunbow's practice to enter
24 into work made for hire agreements with
25 contributors to its productions?

Page 4

- R. Harris/Direct -

1
2       A   Yes, it was.
3       Q   Why, if you know, did Sunbow have
4  creative contributors sign work for hire
5  agreements?
6       A   Well, television and film productions
7  are collaborative efforts, and in order to obtain
8  ownership of the various contributions and hence
9  the entire production, it was necessary either to
10 acquire them by work for hire or assignment, and
11 the industry practice is a practice I believe
12 familiar with, is we would use work for hire
13 agreements and inquest ownership and copyright
14 ownership in the production company.
15      Q   To your knowledge did Sunbow ever work
16 with writers, lyricists or composers according to
17 oral agreements?
18      A   Not to my knowledge.
19      Q   Did you prepare work for hire
20 agreements for productions involving "Hasbro" Toys
21 like the "Transformers", "Jem", "My Little Pony",
22 "My Little Pony and Friends", "G.I. Joe",
23 "Visionaries", "Charmkins" and "Glow Friends"?
24      A   Yes I did.
25       MS. PHARES: I'm offering for

Page 5

- R. Harris/Direct -

1
2  identification Defendant's Exhibit K, which
3  is the binder relating to the "Jem"
4  contracts, this is the, a copy of the binder
5  that we looked at on September 13th, and
6  Defendant's Exhibit L which is a copy of the
7  binder for "My Little Pony and Friends".
8  (Items further described herein were marked
9  as Defendant's Exhibits K and L for
10 identification, as of this date.)
11      Q   Mr. Harris, we're handing you notebooks
12 of contracts relating to the productions for "Jem"
13 and "My Little Pony and Friends". Have you had an
14 opportunity to look through these before?
15      A   Yes I have.
16      Q   And do these notebooks contain
17 agreements and correspondence that you prepared for
18 Sunbow?
19      A   Yes they do.
20      Q   Even if you did not handle the negot--
21 or the negotiations for every contract, do you
22 recognize these as examples of work made for hire
23 agreements that Sunbow used for writers, composers
24 and other creative people who worked on the Sunbow
25 TV series?

Page 6

- R. Harris/Direct -

1
2 MR. MONAGHAN: I'll object to this
3 unless this witness is able to say he did all
4 the work for Sunbow, they never hired any
5 other lawyers. He's an outside attorney. I
6 don't know how he can testify as to Sunbow's
7 practices beyond what he knows personally.
8 THE COURT: I assume that's the
9 question. Whether he knows.
10 MR. MONAGHAN: I understand, your
11 Honor, there's no evidence by any Sunbow
12 witness yet as to whether or not Mr. Harris
13 did all of the work for Sunbow or some of the
14 work or most of the work.
15 THE COURT: Overruled. I'll let him
16 answer that question if he can.
17 Q   Do you remember it?
18 A   I'm not sure of the question.
19 THE COURT: We'll have it read back.
20       (Question Read.)
21 A   Yes, I do recognize them as work for
22 hire agreements that were used.
23 Q   When these agreements were executed did
24 you see the creators sign their agreements?
25 A   No I did not.

Page 7

- R. Harris/Direct -

1
2 MR. MONAGHAN: Can we have it specific
3 as to which agreements we're talking about?
4 THE COURT: He said he didn't see them
5 sign.
6 MR. MONAGHAN: I know, but prior to
7 that, we have a series of questions about
8 these agreements contained in binders. I
9 don't know which agreements we're talking
10 about, how many agreements are in each
11 binder, whether we're talking about "Jem" or
12 some other jingle. We just don't know at
13 this point.
14 MS. PHARES: We're talking about, these
15 were binders provided to you on
16 September 13th.
17 MR. MONAGHAN: I understand that.
18 MS. PHARES: We're talking about the
19 contracts in the binders.
20 MR. MONAGHAN: Can he please address
21 those contracts?
22 Q   Mr. Harris, would you look in the
23 binder for "Jem", for example, if you would, and if
24 you would tell me, or leafing through them, they
25 are arranged by contributor to the movie, and the

Page 8

- R. Harris/Direct -

1
2 very last ones are the ones for Kinder and Bryant.
3 If you want to just name the people who are
4 involved and whether or not they appear to be the
5 standard work made for hire writer's license or
6 composer license so that Mr. Monaghan understands
7 where we are, that would be helpful.
8 A   They appear to me to be the standard
9 agreements that we use, yes, work for hire
10 agreements.
11 MR. MONAGHAN: Well, we have Sunbow
12 numbers on these documents. Perhaps they can
13 be identified by the Sunbow numbers then we
14 know what we're talking about.
15 MR. PHARES: You want him to go through
16 each document?
17 MR. MONAGHAN: No, no, just the
18 contract.
19 MS. PHARES: That's what we're talking
20 about. These are all contracts.
21 THE COURT: Let's keep this thing in
22 some kind of perspective here. My
23 understanding of K and L is that this
24 contains all of the contracts that are in the
25 possession of Sunbow that deal with the "Jem"

Page 9

- R. Harris/Direct -

1
2 contracts; is that correct?
3 MS. PHARES: That's correct.
4 THE COURT: And the same goes for L
5 which is "My Little Pony", "My Little Pony
6 and Friends", all of the contracts in the
7 possession of Sunbow that deal with that
8 particular piece of --
9 Q   It has to do with all of the music that
10 is encompassed in the entire TV series. For
11 example, if we look at the contract behind the name
12 Barry Harmon, the lyricist for "Jem", is that a
13 form work for hire agreement that you recognize,
14 Mr. Harris?
15 A   Yes it is.
16 Q   Do you recognize any of the writing on
17 the contract?
18 A   Well, believe it or not I think the
19 date of the contract is my handwriting.
20 Q   And do you recognize the signature on
21 the contract?
22 A   The signature of Thomas Griffin on
23 behalf of Sunbow Productions, Inc. On Page 11.
24 Q   And for example, the following writers
25 agreements with Jina Bacarr, is that a form

Page 10

- R. Harris/Direct -

1
2     writer's agreement?
3         A     Yes, it is a form writer's agreement.
4         Q     And well, we're going to do this in any
5     case. Are the composer agreements in this notebook
6     essentially the same form agreements?
7         A     Yes, essentially they are.
8         Q     Is there some way in which they might
9     differ?
10        A     It's possible on some negotiations
11    there may have been some slight changes in wording
12    here or there, but the overall thrust and structure
13    of the agreements, the best of my recollection and
14    the ones I was involved with, remained virtually
15    and essentially the same.
16        Q     As far as you know did Sunbow ever
17    contract with creative people without your
18    involvement?
19        A     Well, you say without my involvement,
20    without my firms involvement since we were counsel
21    to Sunbow I do not believe so. I'm not aware of
22    that.
23        Q     And if you would just look through the
24    notebook for "My Little Pony and Friends", would
25    you just confirm your testimony with respect to the

Page 11

- R. Harris/Direct -

1
2     fact that these are the same form work made for
3     hire agreements that your firm handled?
4         A     Yes, they are.
5         MS. PHARES:  Your Honor, I offer
6     Defendant's K and L in evidence.
7         THE COURT:  Mr. Monaghan?
8         MR. MONAGHAN:  Well, I'm sure you're
9     going to take them for what they're worth
10    anyway, so with the caveat that he hasn't
11    identified each particular document within
12    those binders, which I don't think the
13    witness can, and only as to the agreements
14    he's talked about specifically, I have no
15    objection as to those particular documents
16    being so identified.
17        THE COURT:  I'm going to accept both K
18    and L into evidence.
19        MR. MONAGHAN:  I just want to point
20    out, your Honor, my client did not do "My
21    Little Pony and Friends" show for Sunbow.
22    They wrote no music. It's not at issue and
23    the witness has just identified a binder that
24    has nothing to do with the case right now.
25    This isn't about "My Little Pony and Friends"

Page 12

- R. Harris/Direct -

1
2     TV production for Sunbow. We don't claim
3     anything with respect to the music for that
4     show. There's a "My Little Pony" theme, the
5     toy jingle, that's a different animal.
6         MS. BRYANT:  "My Little Pony and
7     Friends" theme.
8         MS. PHARES:  The issue is whether or
9     not --
10        THE COURT:  We all can't talk at once.
11    So your point is that you say that this is
12    not relevant.
13        MR. MONAGHAN:  Not the TV production
14    agreement with Sunbow that's just been marked
15    as Exhibit L. Exhibit K that's for the song,
16    your Honor.
17        THE COURT:  So that's your position. I
18    got it. Go ahead.
19        Q     Mr. Harris, when these agreements were
20    executed did you see the signatories sign the
21    agreements with your own eyes?
22        A     No I did not.
23        Q     What was the procedure for obtaining
24    signatures from the writers, the composers and
25    lyricist who signed work for hire agreements?

Page 13

- R. Harris/Direct -

1
2         A     Generally I would send out the
3     contracts for execution when I was involved, unless
4     I were told, may have been a case where the writers
5     was at Sunbow and they would arrange to get the
6     signatures directly otherwise I would generally
7     send them out by mail.
8         Q     And then they were returned to you?
9         A     Yes.
10        Q     And then what did you do with them?
11        A     Then I would send them to Sunbow for
12    countersignature.
13        Q     During the time that you represented
14    Sunbow did you ever prepare agreements between
15    Sunbow and Kinder and Bryant?
16        A     Yes I did.
17        Q     Was Kinder and Bryant represented by
18    counsel?
19        A     At one point, yes. I can't say that
20    they were represented by counsel the whole time. I
21    don't have that knowledge, but I do know I had
22    correspondence with an attorney who was purporting
23    to represent them.
24        Q     And who was that?
25        A     William Dobishinski,

Page 14

- R. Harris/Direct -

1   D-o-b-i-s-h-i-n-s-k-i I believe.
2   
3   Q   That's correct.
4       MS. PHARES: Your Honor, I'm offering
5   for identification an agreement dated June,
6   1985 between Sunbow and Kinder and Bryant for
7   the production "Jem" bearing production
8   number Sun 870 through 882.
9   (A document further described herein was
10  marked as Defendant's Exhibit M for
11  identification, as of this date.)
12  Q   Do you recognize this agreement?
13  A   Yes I do.
14  Q   Were you involved with the negotiations
15  of this agreement?
16  A   Yes I was.
17  Q   And if you'll turn to Page 8, I'm
18  looking at the production number, Page 10 of the
19  agreement for Sun 879.
20  A   Yes.
21  Q   Who is the signatory for Sunbow?
22  A   Carole Weitzman.
23  Q   Do you recognize Miss Weitzman's
24  signature?
25  A   Yes I do.

Page 15

- R. Harris/Direct -

1   
2   Q   Is that her signature?
3   A   I believe so, yes.
4       MS. PHARES: Your Honor, I offer
5   Defendant's Exhibit M in evidence.
6       MR. MONAGHAN: No objection.
7       THE COURT: All right. Received in
8   evidence.
9   (A document previously marked as
10  Defendant's Exhibit M for identification was
11  received in evidence, as of this date.)
12      MS. PHARES: Your Honor, and I'm
13  offering for identification Defendant's
14  Exhibit N, an agreement dated
15  December 1st, 1985 between Sunbow
16  Productions and Kinder and Bryant bearing
17  production numbers Sun 883 through 895.
18  (Documents further described herein were
19  marked as Defendant's Exhibit N for
20  identification, as of this date.)
21  Q   Mr. Harris, do you recognize the
22  document that's been identified as Defendant's
23  Exhibit N?
24  A   Yes I do.
25  Q   What is it?

Page 16

- R. Harris/Direct -

1   
2   A   It's an agreement between Sunbow and
3   Kinder and Bryant with respect to preparation of
4   music for the show "My Little Pony and Friends".
5   Q   Do you recall whether or not you were
6   involved in the negotiations of the agreement?
7   A   I believe that I was, yes.
8   Q   And on Page 10 of the agreement, do you
9   recognize the signatory for Sunbow?
10  A   Yes.
11  Q   And who is it?
12  A   Carole Weitzman.
13      MS. PHARES: Your Honor --
14  Q   And, Mr. Harris, are both of these
15  agreements the same, the form agreements that were
16  used by Sunbow to commission work for hire work
17  from composers?
18  A   Yes.
19      MS. PHARES: I'm now offering for
20  identification --
21      Before I do that, I'd like to move the
22  admission of Defendant's Exhibit N in
23  evidence.
24      MR. MONAGHAN: We have the same issue I
25  mentioned earlier which is this is not, these

Page 17

- R. Harris/Direct -

1   
2   are not songs that are at issue in this case.
3       THE COURT: All right. I'll allow it
4   in evidence.
5   (A document previously marked as
6   Defendant's Exhibit N for identification was
7   received in evidence, as of this date.)
8       MS. PHARES: And now I'm offering for
9   identification Defendant's Exhibit O, a
10  two page agreement between Sunbow
11  Productions and Kinder and Bryant dated
12  March 15th, 1986 with production numbers Sun
13  860 to 869.
14  (A document further described herein were
15  marked as Defendant's Exhibit O for
16  identification, as of this date.)
17  Q   Mr. Harris, do you recognize this
18  agreement?
19  A   Yes I do.
20  Q   What is it?
21  A   This appears to be an amendment to the
22  same agreement.
23  Q   And on the second page, the signatory
24  for Sunbow is who?
25  A   Carole Weitzman.

Page 18

- R. Harris/Direct -

1
2      MS. PHARES: Your Honor, I offer
3  Defendant's Exhibit O in evidence.
4      MR. MONAGHAN: We don't have any
5  objection.
6      THE COURT: All right. Received in
7  evidence.
8  (A document previously marked as
9  Defendant's Exhibit O for identification was
10 received in evidence, as of this date.)
11     MS. PHARES: Your Honor, I'm offering
12 for identification another agreement dated
13 September 2nd, 1985 as Defendant's Exhibit P,
14 it's an agreement between Gary Harmon and
15 Sunbow Productions relating to the television
16 show "Jem" bearing production numbers Sun 854
17 through 867.
18 (Documents further described herein were
19 marked as Defendant's Exhibit P for
20 identification, as of this date.)
21 Q     Have you had an opportunity to look at
22 it?
23 A     Yes.
24 Q     Do you recognize this agreement?
25 A     Yes I do.

Page 19

- R. Harris/Direct -

1
2  Q     And what is it?
3  A     It's an agreement between Sunbow and
4  BHB Productions for the services of Barry Harmon as
5  a writer to write lyrics for songs to be used in
6  television show called "Jem".
7  Q     And who is the signatory for Sunbow?
8  A     Appears to me to be the signatory of
9  Thomas L. Griffin.
10 Q     Are you familiar with his signature?
11 A     Yes, I've seen it many times.
12     MS. PHARES: Your Honor, I'd like to
13 offer Defendant's Exhibit P in evidence.
14     MR. MONAGHAN: I'd like a profer on P
15 since it's not between my client or Mr.
16 Kinder and Sunbow.
17     THE COURT: All right. I guess the
18 question is why is it relevant?
19     MS. PHARES: Because it has to do with
20 the fact it is also, which I'm about to ask,
21 one of the same form agreements that were
22 used between writers, between composers or
23 lyricists with Sunbow, that these are form
24 agreements.
25     MR. MONAGHAN: This is sort of like

Page 20

- R. Harris/Direct -

1
2  habit evidence which I don't think is
3  appropriate in this kind of a case. We have
4  written documents, some of which have been
5  and some--
6      THE COURT: I guess the other question
7  is, do you agree that it was a standard
8  practice of Sunbow to have such agreements
9  made?
10     MR. MONAGHAN: No, we don't agree with
11 that at all. It was a new company. I don't
12 think it had standard practices.
13     THE COURT: All right. Then I'll allow
14 it in for whatever purpose or weight I want
15 to put on it.
16 (A document previously marked as
17 Defendant's Exhibit P for identification was
18 received in evidence, as of this date.)
19     MS. PHARES: And now, your Honor, I'm
20 offering for identification Defendant's
21 Exhibit Q for identification, and this is a
22 document which contains 14 agreements between
23 Sunbow and either lyricists or composers from
24 1983 to 1986.
25     THE COURT: Are any of these parties to

Page 21

- R. Harris/Direct -

1
2  this lawsuit?
3      MS. PHARES: Mr. Harmon -- no, parties
4  to the lawsuit no, they are not. These are
5  being offered to show the practice of using
6  the same form agreement with all lyricists
7  and composers.
8      THE COURT: What's the difference
9  between those and Mr. Harmon's agreements?
10     MS. PHARES: The basic contract, they
11 are not different. That's exactly the point.
12     THE COURT: Isn't it cumulative then?
13     MS. PHARES: It is not, we need the
14 evidence though. Your Honor, if Mr. Monaghan
15 is prepared to agree, which I thought I heard
16 him just say that it was not the practice of
17 Sunbow to do this, then I think it's not
18 cumulative because I'm expecting that, and he
19 has already raised the objection, that we do
20 not have the signed agreements for the other
21 Sunbow productions that are named in the
22 complaint, and I am trying to lay a basis for
23 the proper inference for the fact finder to
24 draw that these were used in all cases, and
25 that you can conclude that Kinder and Bryant

- R. Harris/Direct -

1  signed them in all cases.
2  MR. MONAGHAN: Your Honor, I haven't
3  seen this before this moment, right here in
4  Court, Number 1. Number 2, I come back to
5  the issue of where's Carole Weitzman? Where
6  is somebody from Sunbow to talk about its
7  practices, A, and B, you may recall my little
8  heading in one of the papers we submitted,
9  Matsui's contract doesn't have to be the same
10  as Jeter's contract or anybody else's
11  contract. All these contracts presumably,
12  counsel just said, although we disagree, that
13  Dobishinski was Miss Bryant's-- we just said
14  negotiations. Presuming there are
15  negotiations.
16  THE COURT: That's for cross
17  examination.
18  MR. MONAGHAN: To cut it short, I'm
19  being asked to deal with an exhibit here
20  we've never seen before with a bunch of
21  contracts with a bunch of other people.
22  THE COURT: But it's not going to, it's
23  only in for the purpose, I take it, of
24  bolstering the position of Sunbow that this

- R. Harris/Direct -

1  was their common practice which was to get
2  these kind of contracts signed. For that
3  limited purpose I'm going to allow it in
4  evidence.
5  MR. MONAGHAN: Okay.
6  THE COURT: If there are any other
7  exhibits along this line they will be
8  cumulative.
9  MS. PHARES: That's the end. I
10  understand.
11  (A document further described herein was
12  marked as Defendant's Exhibit Q in evidence,
13  as of this date.)
14  Q   And, Mr. Harris, have you had an
15  opportunity to look through Defendant's Exhibit Q?
16  A   Yes I did.
17  MR. MONAGHAN: I'd like to ask why we
18  couldn't have had this before today to look
19  at it, maybe have some meaningful cross
20  examination on it, then I get it in the
21  middle of the trial.
22  THE COURT: I don't know what you can
23  cross examine on. You're not asking to say
24  well, these contracts are forged or

- R. Harris/Direct -

1  something, these are just examples. If we
2  had a contract case about delivery of a
3  widget, these are examples of the widgets.
4  MR. MONAGHAN: I'm willing to stipulate
5  that Sunbow says it was its standard
6  practice.
7  THE COURT: That's a step in the right
8  direction.
9  MR. MONAGHAN: It says it was its
10  standard practice. I don't know if you even
11  found it were standard practice why it's
12  helpful on this case with theses parties and
13  these agreements and whatever they were.
14  THE COURT: It is an unfolding mystery
15  and we're going forward. Go ahead.
16  Q   Mr. Harris, you have had an opportunity
17  to look through these contracts?
18  A   Yes.
19  Q   Are these all essentially the same form
20  agreements that were used by Sunbow with composers
21  and lyricists?
22  A   They're basically the same work for
23  hire agreements.
24  Q   And I'm going to hand you again what's

- R. Harris/Direct -

1  already in evidence as Exhibit M which is the
2  Kinder and Bryant "Jem" agreement. Just so we all
3  know what we're talking about. The first ten pages
4  of this agreement are the basic agreement; is that
5  correct?
6  A   Yes.
7  Q   All right. And then could you just
8  describe for the Court what is, what the Schedule A
9  is on Page 11?
10  MR. MONAGHAN: Which Exhibit are you?
11  MS. PHARES: M.
12  A   This is a sort of an addendum form of
13  which the individual writers of the corporation
14  acknowledge that they wrote this material for the
15  corporation which was the contracting party with
16  Sunbow and that it was done on a work made for hire
17  basis.
18  Q   So that they are acknowledging that
19  their work for Kinder and Bryant was work for hire;
20  is that correct?
21  A   Correct, yes.
22  Q   And what's the next, the thing that
23  says, "inducement letter" at the top. What is
24  that?

Page 26

- R. Harris/Direct -

A    An inducement letter is just for the
individual writers so that it's clear that they
know they are contracting through their
corporation, that they will look solely to their
corporation for payment, and that they make the
same warranties and representations that had been
made by their company, standing behind their
company, so to speak.

Q    And are these additional amendments and
schedules, these are part of the form Sunbow
agreement?

A    Yes, I believe that I prepared these.

Q    All right.  And except for the things
like the initial creative fees or the number of
songs for which music or lyrics were to be
composed, these agreements that we have in evidence
Defendant's Exhibits M, N and Q are essentially the
same?

A    Yes.

Q    To your knowledge did Sunbow work with
Kinder and Bryant without signing work made for
hire agreements?

MS. PHARES:  Objection.  Asked and
answered.

Page 27

- R. Harris/Cross -

THE COURT:  I think it might have been.
I'll allow it.  Go ahead.

A    Not to my knowledge.

Q    And to your knowledge did any creative
person or entity working on the "Hasbro" TV
productions not sign a --

MR. MONAGHAN:  Objection.  He cannot
answer that question.

THE COURT:  I think it's asked and
answered.

MS. PHARES:  Asked and answered.  I'll
go with that.  I pass the witness.

MR. MONAGHAN:  Thank you.

CROSS EXAMINATION BY MR. MONAGHAN:

Q    Mr. Harris, you've testified, I
believe, that you did work for Sunbow Productions,
correct?

A    Yes.

Q    That was a TV production company,
correct?

A    Yes it was.

Q    Are you familiar with Griffin Bacal?

A    Yes I am.

Q    And to your knowledge what was the

Page 28

- R. Harris/Cross -

relationship of Griffin Bacal to Sunbow, if you
know?

A    They were affiliated companies.

Q    In fact they were commonly owned,
weren't they, by Messrs. Bacal and Griffin?

MS. PHARES:  Objection, your Honor,
this is outside the scope of the direct.

THE COURT:  I'll allow it.

A    I believe that's correct.

Q    Okay.  Now, when -- you put in an
affidavit in this case a while back, did you not?

A    Yes I did.

Q    And am I correct, and I unfortunately
didn't anticipate you being here today so I didn't
bring the whole file although we bought a bunch of
stuff, my recollection is that in that affidavit
you said you really didn't recall these agreements;
isn't that right?

A    I don't recall saying that I didn't
recall the agreements.  I thought I said I didn't
recall the specifics of each agreement.

Q    Okay.  And I think I heard you say a
while ago that you negotiate with a gentleman named
Dobishinski?

Page 29

- R. Harris/Cross -

A    Yes I did.

Q    Were you aware that Dobishinski was
Sunbow's administrator?

A    To my knowledge he became the
administrator subsequently.

Q    And what is that knowledge based upon?

A    My memory.

Q    Okay.  Now, you are familiar with the
concept of work for hire under the Copyright Act;
are you not?

A    Yes I am.

Q    And isn't it a fact that in order for
the commissioning party to actually register the
copyright they must obtain a written agreement to
do that?

A    Yes, if it's a commissioned work for
hire as opposed to a different type of work for
hire.

Q    What are we talking about, Section 101
of the Copyright Act?

A    Yes.

Q    And so that when a songwriter is hired
to write a song, in order for the song to be
exploited by someone else, the commissioning party,

Page 30

1              - R. Harris/Cross -
2    they in effect have to sign a work for hire
3    agreement, don't they?
4         A    Yes, or they can get an assignment or a
5    license.
6         Q    Okay.  So that it is normal practice in
7    the entertainment industry for those commissioning
8    them to obtain these work for hire agreements so
9    that they can exploit the song on the mutual behalf
10   of both the songwriter and the commissioning party;
11   isn't that correct?
12        A    Yes.
13        Q    Okay.  Now, the fact that there is a
14   work for hire agreement does not mean necessarily
15   that no rights are retained by the composer; isn't
16   that so?
17        A    It depends on the agreement.
18        Q    Right.  And isn't it standard industry
19   practice for a writer to retain certain publishing
20   interests notwithstanding it's a work for hire
21   agreement?
22        MS. PHARES:  Objection, your Honor, we
23        are now going right down the path that I
24        predicted we would go.  We are not here to
25        discuss what rights get exchanged, what is in

Page 31

1              - R. Harris/Cross -
2        this agreement, only are they the same
3        agreements and are they genuine.
4        THE COURT:  Well, I think that first
5        it's far beyond direct, though I allowed you
6        some leeway, and while I'm clear that Mr.
7        Harris is an expert in his field he hasn't
8        really been qualified that he knows
9        everything about what happens in this
10       industry.
11       MR. MONAGHAN:  I'm actually referring
12       to Exhibit M.
13       THE COURT:  Let's talk about Exhibit M
14       then.
15       MR. MONAGHAN:  That's fine, Judge.
16       Q    Mr. Harris, you talked about Exhibit M.
17   You were intimately familiar with this agreement,
18   correct?
19       A    I can't see it from here.
20       Q    I'm sorry, that's the "Jem" agreement.
21       A    Okay.  Thank you.
22       Q    Okay.
23       A    Yes, sir.
24       Q    And this agreement that you were
25   involved with provides that the composers will

Page 32

1              - R. Harris/Cross -
2    retain, for example, publishing, I'm sorry, let's
3    start with performance royalties, correct?
4        THE COURT:  Could you direct both the
5        witness and myself whatever paragraph you're
6        dealing with?
7        MS. PHARES:  Your Honor, we will
8        stipulate that in this agreement in Paragraph
9        Five the commissioning party Sunbow grants
10       to, grants to Kinder and Bryant the rights to
11       receive their performance royalties.
12       MR. MONAGHAN:  Okay.  I don't need the
13       stipulation right now because I'm asking the
14       witness who was involved with it.  That's
15       what this agreement provides.
16       MS. PHARES:  That's what you asked.
17       I'm going to stipulate to it.  So we can move
18       on.
19       THE COURT:  Go ahead.  It's in record
20       now.
21       MR. MONAGHAN:  That's stipulated.
22       THE COURT:  That is stipulated.
23       Q    And this also provides for certain
24   other continuing interests in the writer, does it
25   not?

Page 33

1              - R. Harris/Cross -
2        A    Yes, some financial participation, yes.
3        Q    And that is also standard; is it not?
4        A    Yes, it is.
5        Q    Okay.  Now, these "Jem" compositions
6    which are the subject of this agreement, Exhibit M
7    in evidence, are those all the "Jem" songs?
8        MS. PHARES:  Your Honor, we are way
9        past the scope of the direct.
10       A    Which "Jem" songs are you referring to?
11       THE COURT:  I'm going to allow it for a
12       little while.  Go ahead.
13       Q    Which "Jem" songs were referred to in
14   Exhibit M?
15       A    Well, these are songs that were to be
16   written.  I don't think they were written at the
17   time.
18       Q    Okay.  Do you know when the
19   compositions were actually written?
20       A    No, I don't have personal knowledge.
21       Q    Okay.  Do you know whether there were
22   "Jem" songs that were not written for the TV
23   production?
24       MS. PHARES:  Mr. Monaghan, could you
25       please stand at the lectern so I can see the

Page 34

1           - R. Harris/Cross -
2     witness.
3       A   I don't know.
4       Q   Were you familiar with a toy called the
5   "Jem" toy, the "Jem" doll?
6       A   Yes.
7       Q   Do you know whether or not there were--
8   are you familiar with the "Jem" theme?
9       A   I was at one time.  I don't recall.
10  Sorry.
11      Q   Do you know whether the "Jem" theme was
12  the subject of this agreement?
13          MS. PHARES:  Objection.
14          THE COURT:  What's the objection?
15          MS. PHARES:  It's beyond the scope of
16  the, both the hearing and the direct.
17          THE COURT:  Well, this document was put
18  in during your direct.
19          MS. PHARES:  That's true but it was not
20  put in, there was no subject that was written
21  pursuant to it.
22          THE COURT:  Let me see if I understand
23  the question here.  What you're saying is
24  before this there was an agreement to create
25  the "Jem" jingle or song; is that correct?

Page 35

1           - R. Harris/Cross -
2           MR. MONAGHAN:  This one is the reverse
3   of what we said with respect to the others.
4   This was first a TV show and then later taken
5   and made as a jingle for the toy, so it's the
6   reverse of, for example, what we're talking--
7           THE COURT:  Well, in any case this is
8   an agreement that covers every song that the
9   company asked the writers to create for them,
10  doesn't it?
11          MR. MONAGHAN:  Only the subject songs,
12  the "Jem" songs.
13          THE COURT:  Yes.
14          MR. MONAGHAN:  Nothing else.
15  Now, may I continue?
16          THE COURT:  Yes.
17      Q   Now, were you the counsel for Griffin
18  Bacal, Inc.
19      A   Yes.
20      Q   And did you deal with all of the
21  agreements with composers with respect to jingles
22  that were commissioned by Griffin Bacal, Inc.?
23      A   I can't specifically recall and say
24  every agreement.  I have no basis to say that.
25      Q   Okay.  And when was this Exhibit M, the

Page 36

1           - R. Harris/Cross -
2   "Jem" agreement, I think you have it in front of
3   you, right, Mr. Harris --
4       A   Yes I do.
5       Q   --when was this actually completed and
6   signed, if you recall?
7       A   I don't have a clear recollection.
8       Q   I recall, perhaps you can correct me,
9   seeing a letter from you dated 1987 referring to
10  the unsigned "Jem" agreement, an issue which was
11  previously raised in this case between Sunbow--
12          MS. PHARES:  Your Honor --
13          MR. MONAGHAN:  Can I finish?
14          MS. PHARES:  If he's going to refer to
15  a document and ask the witness about it he
16  should show the witness the document.
17          MR. MONAGHAN:  We're talking about this
18  exhibit here.  (Indicating.)
19          MS. PHARES:  30, no.  The letter you
20  just referred to.
21          MR. MONAGHAN:  I don't have it with me.
22  Maybe you have it.
23          MS. PHARES:  No, I don't.
24          MR. MONAGHAN:  Okay.
25      Q   Do you recall referring in

Page 37

1           - R. Harris/Cross -
2   correspondence as late as 1987 to an unsigned "Jem"
3   agreement?
4       A   I don't.  I recall -- I don't remember
5   the year.  I remember having some correspondence
6   with Dobishinski and referring to the previous
7   agreement.  I don't remember saying unsigned.
8   You'd have to show me the documents.
9       Q   Okay.  If I had known you were going to
10  be a witness I promise I would have brought that.
11  Now, can you account for the
12  handwritten 5, apparently a 5 on the first line of
13  Exhibit M?
14      A   It looks like my handwriting, by the
15  way.  I can't precisely recollect but I assume that
16  that was the date at which we deemed there to be an
17  agreement.  I don't recall the actual date of
18  physical signature.
19      Q   Did I just hear you say that was the
20  date we deemed it to be an agreement?
21      A   My recollection, I'm not sure whether
22  that was an agreed date or was the actual date.  It
23  says, "made of this 1st day."
24      Q   Well, would you agree with me -- by the
25  way, was this done in your office, the typewritten

Page 38

- R. Harris/Cross -

1  agreement?
2     A   Yes, I believe so.
3     Q   Would you agree with me that underneath
4  that handwritten 5 there's a typewritten 6?
5     A   It looks like it to me from here.
6     Q   Okay.  Do you know that the "Jem" songs
7  were recorded on March 7th of 1985?
8     A   I don't know the date the songs were
9  recorded.
10    Q   Do you know they were recorded in 1985?
11    MS. PHARES:  Objection, your Honor.
12    THE COURT:  Sustained.
13    Q   Now, and you believe that's your --
14    A   I think it is.  It's hard to tell from
15  one digit.
16    Q   And what circumstances caused you to
17  put that date in?  What was it that triggered
18  concerning that date?
19    A   I don't recall.
20    Q   Do you recall there being a series of
21  negotiations following June of 1985 for a year or
22  so more during which the parties were still
23  dickering over some of the terms?
24    A   I do recall some negotiations with the
25

Page 39

- R. Harris/Cross -

1  attorney, yes.  Without seeing the correspondence I
2  don't remember the exact time frame.
3     MS. PHARES:  Objection, your Honor.  I
4  don't understand the basis of what the
5  purpose of this testimony is.
6     THE COURT:  Well, are we going to come
7  down to eventually, this document is
8  purportedly signed by people, and are you
9  saying that, you lost me too, that there was
10  another document somewhere or that this was
11  signed later and referred back?
12    MR. MONAGHAN:  It looks like that,
13  that's what it looks like.
14    THE COURT:  Even if that were true
15  wouldn't it be binding?
16    MR. MONAGHAN:  It could be but if it
17  has, for example, implications on the work
18  for hire doctrine, and for example, the
19  copyrights -- let me ask the witness.
20    Q   Do you know when these songs were
21  copyrighted?
22    A   No I do not.
23    Q   And if this agreement was not actually
24  executed or deemed effective until after the
25

Page 40

- R. Harris/Cross -

1  registration of the copyright those copyright
2  registrations would be flawed I take it, wouldn't
3  they, because they were registrations without a
4  written agreement?
5     A   Well, if you're asking me for a legal
6  opinion on the validity of the registration I can't
7  answer that.  I'd have to check that out.  I'm not
8  sure those registrations would be invalid.
9     Q   You're not sure?
10    A   No.  I wouldn't give you that legal
11  conclusion.
12    Q   Now, coming back to who Dobishinski
13  was, do you know that Carole Weitzman has testified
14  that Sunbow hired Mr. Dobishinski?
15    A   I don't know any of Carole Weitzman's
16  testimony.
17    Q   And do you know whether or not the
18  other agreement "My Little Pony and Friends" the
19  other binder, do you know whether that has anything
20  to do with this case in terms of the music that is
21  at issue here?
22    A   I'm not sure I understand your
23  question.
24    Q   That's the question.  Do you know
25

Page 41

- R. Harris/Cross -

1  whether that particular binder and the agreements
2  you've talked about, Exhibit L, has anything to do
3  with any of the songs at issue in this case?
4     A   I'd have to see L.  Which is L? L deals
5  with writings for "My Little Pony", yes.
6     Q   And do you know whether Kinder and
7  Bryant actually wrote the music for the TV show,
8  the TV production?
9     A   I can't answer whether anybody actually
10  wrote anything.  I did the contracts.  I was not
11  involved in production.
12    Q   And when you say you were familiar with
13  the policies of Sunbow, you're basing that on the
14  work you did as outside counsel for Sunbow?
15    A   That's correct.
16    Q   And primarily your dealings with Carole
17  Weitzman?
18    A   Yes, on these projects, yes, and Tom
19  Griffin both.
20    Q   Do you know why Carole Weitzman isn't
21  here testifying today?
22    A   No I do not.
23    Q   Have you had any discussions with
24  Carole Weitzman in the last let's say six,
25

Page 42

1              - R. Harris/Cross -
2    eight months?
3        A    Not within the last six, eight years
4    perhaps.
5        Q    And you said it was your practice to
6    send the agreements out and then hopefully have
7    them returned countersigned by the appropriate
8    parties?
9        A    Generally, yes.
10       Q    Okay.  And if the agreement were not
11   countersigned would you agree with me that it would
12   not be effective?
13       A    Well, you're asking me for a legal
14   conclusion.
15       Q    Well, let's say we're going to see some
16   "Transformer" agreements in here that are not
17   countersigned by anybody and they're copies.  Would
18   you regard that as an effective agreement?
19       MS. PHARES:  Objection.  Mr. Harris is
20   being offered as a fact witness.
21       MR. MONAGHAN:  You've offered him.
22       THE COURT:  Sustained.
23       MR. MONAGHAN:  Give me 30 seconds, your
24   Honor.
25       THE COURT:  Yes.

Page 43

1              - R. Harris/Cross -
2        (Pause.)
3        Q    Do you know the name Spence Michlin?
4        A    I've heard the name, yes.
5        Q    Who is that?
6        MS. PHARES:  Objection.  Relevance.
7        THE COURT:  What's the purpose?
8        MR. MONAGHAN:  It's in the agreements
9    that they have been offering on
10   "Transformers".  There's a reference.  We
11   brought this out in our papers that one of
12   the agreements, two of the agreements, those
13   Exhibits B and C, Defendant's B and C that we
14   saw at the last hearing, we've said they're
15   forgeries, Mr. Kinder said they're forgeries
16   and one of the --
17       THE COURT:  The only forgeries that
18   this Court is interested in is whether there
19   was a Kinder or Bryant forgery.  That's what
20   we're talking about.
21       MS. PHARES:  On a Sunbow agreement.  On
22   a Sunbow agreement is what we're talking
23   about.
24       Q    I'm referring to Defendant's B and
25   Defendant's C that were offered--

Page 44

1              - R. Harris/Cross -
2        MS. PHARES:  Those are GBI agreements.
3        MS. BRYANT:  You brought them in.
4        MR. MONAGHAN:  The witness just
5    testified he did work for GBI.  I want to
6    know if he did these agreements which are
7    contested.
8        MS. PHARES:  He was asked a question
9    outside of the direct.  He answered the
10   question.  That doesn't allow a bootstrap for
11   us to start discussing GBI agreements.
12       MR. MONAGHAN:  These are agreements at
13   issue in the case.
14       MS. PHARES:  No they are not.
15       MR. MONAGHAN:  Why did you use them in
16   examining my client?
17       MS. PHARES:  For impeachment.
18       MR. MONAGHAN:  That's what I'm using
19   them for now.
20       THE COURT:  Well, I don't know that
21   you're up to impeachment.
22       Mr. Harris, what do you know about GBI
23   agreements?
24       THE WITNESS:  I worked on a number of
25   them, not every one of them.  It's a big

Page 45

1              - R. Harris/Cross -
2    company.  It's an advertising agency.
3        THE COURT:  So you're going to ask Mr.
4    Harris now whether there's a forgery on one
5    of these --
6        MR. MONAGHAN:  No, I mentioned, your
7    Honor, if I may, that two of those have the
8    name Spence Michlin in there as though Spence
9    Michlin was somehow connected with Kinder and
10   Bryant when he wasn't.  We're trying to get
11   to the bottom of -- here's a person who
12   worked on these agreements.  Would he know
13   Mr. Michlin is slipped in a Kinder Bryant
14   agreement?
15       Q    Do you have any knowledge about that,
16   Mr. Harris?
17       MS. PHARES:  Your Honor, the focus of
18   the hearing today is to determine the
19   authenticity of the agreements between Kinder
20   and Bryant and Sunbow and whether or not
21   there was some reason why Spence Michlin was
22   mentioned in agreement between Kinder and
23   Bryant and GBI is not --
24       THE COURT:  Well, I'll tell you what.
25   Because I am actually curious I'm going to

Page 46

- R. Harris/Cross -

1
2    let the witness answer this one question. Do
3    you know the answer to that question?
4        THE WITNESS: I don't know what
5    "slipped in" means. I don't think I slipped
6    anything. If I were involved in the
7    document, I don't know that I was, but I
8    can't explain the connection between Michlin
9    and Kinder and Bryant. I have no knowledge.
10       THE COURT: Okay. That's the end of it.
11       MR. MONAGHAN: I'm sorry. I was looking.
12       THE COURT: He says he doesn't know why
13   there would be any reference and certainly it
14   wasn't slipped in, that's a little
15   editorializing, into an agreement. He doesn't
16   know why it would be there.
17       Q    You had no information that Spence
18   Michlin had anything at all to do with Kinder
19   Bryant?
20       A    I have no personnel knowledge of that.
21       Q    Did you know that Michlin did work for
22   Bacal and for Sunbow?
23       MS. PHARES: Objection.
24       THE COURT: Sustained.
25       MR. MONAGHAN: If I can ask the witness

Page 47

- R. Harris/Cross -

1
2    if he recognizes the writing on that
3    agreement we're talking about which is the,
4    which is --
5        MS. PHARES: You have not given him
6    anything.
7        MR. MONAGHAN: You gave me this. This is
8    your binder. (Indicating.)
9        MS. PHARES: Why don't you tell him what
10   you're looking at so he can answer.
11       MR. MONAGHAN: Thanks. I'm talking
12   about the GBI "Transformer" agreement which
13   counsel labeled 1984 and I'd like to ask the
14   witness, if I may, what he knows about this
15   agreement, your Honor.
16       THE COURT: All right. Ask him.
17       MS. PHARES: Which exhibit are we
18   looking at?
19       MR. MONAGHAN: We're looking at the
20   binder you gave me.
21       MS. PHARES: What binder? You're
22   looking at some other binder of your own.
23       THE COURT: Is it Q? All right. Q is
24   in evidence.
25       MS. PHARES: No, no. I beg your pardon,

Page 48

- R. Harris/Cross -

1
2    your Honor. What Mr. Monaghan is looking at
3    is the notebook that we three looked at at
4    the hearing on September 13th which has never
5    been put in evidence.
6        MR. MONAGHAN: Okay. Let's mark it for
7    identification. I'll take it out of the
8    binder.
9        THE COURT: I think you're going pretty
10   far afield but I'll let you mark it.
11   (A notebook further described herein was
12   marked as Plaintiff's Exhibit 47 for
13   identification, as of this date.)
14       Q    Would you take a look at 47, Mr.
15   Harris?
16       A    (Witness Complies.)
17       THE COURT: How are you denominating
18   47?
19       MR. MONAGHAN: What it is?
20       THE COURT: Yes.
21       MR. MONAGHAN: It is, purports to be the
22   1984 "Transformers" agreement with GBI. Just
23   for the Court this is one of the documents
24   that Mr. Kinder said was forged.
25       MS. PHARES: No. I beg your pardon. This

Page 49

- R. Harris/Cross -

1
2    is one in which he admits.
3        MS. BRYANT: And I do too.
4        MS. PHARES: Also so does Ms. Bryant
5    admit she signed this.
6        MR. MONAGHAN: Okay. I stand corrected.
7    I still have to ask him a question.
8        THE COURT: All right.
9        Q    Are you familiar with this?
10       A    I don't recall it.
11       Q    Okay.
12       A    It doesn't come to my mind. I'm not
13   saying I didn't participate on this form. It
14   doesn't look that familiar to me.
15       Q    Can you identify the handwriting on the
16   side which appears to be the same as the next page?
17       A    I cannot. I do not believe it's mine.
18       MS. PHARES: Your Honor, there's no
19   question about the genuineness of this
20   document.
21       THE COURT: Let's go onto something
22   else. Let's stick to the direct at this
23   point. We have to move along.
24       MR. MONAGHAN: I don't have any further
25   questions.

Page 50

- R. Harris/Redirect -

1
2   THE COURT: Any redirect?
3       MS. PHARES: Yes, your Honor, just one.
4   REDIRECT EXAMINATION BY MS. PHARES:
5       Q   Mr. Harris, I'm handing you what has
6   already been admitted in evidence as Defendant's
7   Exhibit H. Are you familiar, have you ever seen
8   this letter before?
9       A   Yes I have.
10      Q   And just to remind the Court, would you
11  explain what this letter is?
12      A   It was a letter from an attorney Bill
13  Dobishinski who says to me that he's referring to
14  the agreements for "Jem" and "My Little Pony" which
15  he discussed with his clients, and although they
16  appreciate certain changes that were in those
17  agreements they would like to raise some additional
18  points that they would like changed.
19      Q   And is there any handwriting on this
20  agreement?
21      A   Yes there is.
22      Q   Whose is it?
23      A   I believe it's mine.
24      Q   All right. And in the last paragraph on
25  the second page with roman numeral D, would you

Page 51

- R. Harris/Redirect -

1
2   please read the typed question that Mr. Dobishinski
3   consist you?
4       A   "Please advise us regarding the desired
5   dates to be inserted in the agreements."
6       Q   And is the handwriting under that your
7   agreement, your handwriting?
8       A   Yes it is.
9       Q   And what's the date that you've written
10  there for "Jem"?
11      A   6-1-85.
12      MS. PHARES: That's all, your Honor.
13      MR. MONAGHAN: May I see that?
14      MS. PHARES: Just to finish up.
15  CONT'D REDIRECT EXAMINATION BY MS. PHARES:
16      Q   On the Defendant's Exhibit M, is that
17  the date that is the date of the agreement?
18      A   Yes.
19      MS. PHARES: Thank you.
20      (Document shown to counsel.)
21      MR. MONAGHAN: Are you going to offer
22  this?
23      MS. PHARES: It's in evidence. I just
24  took it out of the box.
25      MR. MONAGHAN: Okay. I don't know if

Page 52

- R. Harris/Recross -

1
2   this is in. It says Id.
3       MS. PHARES: I think it's in evidence.
4   It's in the box.
5       MR. MONAGHAN: I'll stipulate --
6       THE COURT: It's in evidence now.
7       MR. MONAGHAN: Fine. If it wasn't
8   before. I'm just going by the sticker. I'd be
9   happy to have it in evidence.
10      THE COURT: Good. All right. Are you
11  through?
12      MS. PHARES: I'm through.
13      THE COURT: Go ahead, Mr. Monaghan.
14      MR. MONAGHAN: Thank you, Judge.
15  RECROSS EXAMINATION BY MR. MONAGHAN:
16      Q   So this letter refreshes your
17  recollection that this was the precipitating factor
18  which caused you to insert the date 1985 in Exhibit
19  M, the agreement?
20      A   I think so, yes.
21      Q   You think so?
22      A   I think so.
23      Q   And so that certainly before March of
24  1986 at least there apparently was not a final
25  agreement reached between the parties; is that

Page 53

- R. Harris/Recross -

1
2   right?
3       A   That's included. I'm not saying there
4   wasn't an agreement.
5       Q   Well, if you didn't insert the date--
6   did you have signatures on the agreement before
7   March of '86?
8       A   I don't recall.
9       Q   But it would seem that the agreement
10  was not finalized in all respects including the
11  date as late as March of 1987?
12      MS. PHARES: Objection. The witness has
13  answered.
14      THE COURT: I'll allow it. It seems to
15  me, Mr. Monaghan, that you get yourself into
16  this problem. If you're saying that there was
17  a problem with the copyrighting of these,
18  these particular documents or songs, then
19  you're in the wrong courthouse.
20      MR. MONAGHAN: We never contested the
21  copyrighting.
22      THE COURT: Why were you asking these
23  questions?
24      MR. MONAGHAN: Because the -- it does
25  not deal with all the songs.

Page 54

-G. Lesnevich/Direct -

1   THE COURT: All right.
2   MR. MONAGHAN: No further questions.
3   THE COURT: Okay. Thank you. You may
4   step down.
5   (Witness Excused.)
6   MS. PHARES: Your Honor, I call Mr. Gus
7   Lesnevich.
8   GUS LESNEVICH,
9   having been duly sworn was examined
10  and testified as follows:
11  COURT OFFICER: State your name, spell
12  your name and give your business address.
13  THE WITNESS: Gus Robert Lesnevich,
14  L-e-s-n-e-v-i-c-h, 270 West Lancaster Avenue,
15  Malvern, Pennsylvania.
16  DIRECT EXAMINATION BY MS. PHARES:
17  Q   Mr. Lesnevich, what is your title and
18  how are you employed?
19  A   I'm a forensic document examiner, more
20  commonly referred to as a handwriting expert and
21  I'm self employed.
22  Q   Do you know Anne Bryant, the plaintiff
23  in this case?
24  A   No.

Page 55

-G. Lesnevich/Direct -

1   Q   Until I asked you to testify in this
2   case had you ever heard of Sunbow Productions,
3   Inc.?
4   A   No.
5   Q   How long have you been employed in the
6   field of forensic document examination?
7   A   As a full time profession approximately
8   36 years.
9   Q   And for whom have you been employed?
10  A   Originally began working in the field
11  of questioned documents when I was assigned to the
12  United States Army Criminal Investigation
13  Laboratory where I worked as an examiner in the lab
14  of the United States and also as Chief of a
15  Questioned Document Unit at the Army Crime Lab in
16  Vietnam. After leaving military service I briefly
17  entered private practice in Atlanta, Georgia. While
18  in private practice I was recruited by the United
19  States Secret Service. Subsequently joined their
20  staff as one of their senior experts and was with
21  them for about eight years. I then left the secret
22  service and reentered private practice.
23  Q   And since entering private practice do
24  you still work for government agencies?

Page 56

-G. Lesnevich/Direct -

1   A   Yes I do.
2   Q   And which agencies do you work for?
3   A   Most of my practice is civil. 35,
4   40 percent of my work involves government agencies.
5   I work for various U.S. Attorney's Offices,
6   particularly New York City and Newark, New Jersey.
7   I work for the Attorney General's Office in the
8   State of Pennsylvania, various District Attorney's
9   Offices.
10  Q   Would you please state some of the more
11  notable civil cases in which you have testified?
12  A   The ones that people would know are
13  probably cases related to the government, not civil
14  cases, most people don't recognize civil cases.
15  I've been retrained to work on cases, I did the
16  Iran contra-affair involving Oliver North
17  Poindexter Secort; I did the Vince Foster suicide;
18  I did the work involving Leona Helmsley; Bes
19  Myerson; Don King. I've done work on Bin Laden on
20  some of the bombings, especially the embassy
21  bombings in Africa and a number of other cases.
22  Q   Were you retained to do any work with
23  respect to the "Harry Potter" series?
24  A   Yes I was retained to examine the

Page 57

-G. Lesnevich/Direct -

1   records and documents in that case.
2   MR. MONAGHAN: We stipulate, but I'm
3   sure they want to go through as well. In fact
4   that's how they got him, from me.
5   THE COURT: Go ahead, counselor.
6   Q   What kind of studies and training have
7   you had for your work?
8   A   There are no universities or colleges
9   that offer degrees in handwriting identification or
10  forensic documentation. The only way a person can
11  learn the profession is by serving an old-fashion
12  apprenticeship training program under the direct
13  supervision of senior experts. In my case I
14  completed a two-year course of instruction at the
15  United States Army Criminal Investigation
16  Laboratory which at that time was located at Fort
17  Gordon, Georgia. Training consisted of sitting
18  side-by-side with experts, looking over their
19  shoulder, being exposed to the various cases,
20  working cases with other experts, doing research in
21  the field of questioned documents, reading the
22  various literature on documents and questioned
23  documents and being tested throughout the training
24  program as to the various phases that I was going

Page 58

-G. Lesnevich/Direct -

1
2  through. Upon completion of the training program I
3  was then certified by the Department of Defense,
4  United States Army, as an examiner in questioned
5  documents and then began work in that field.
6      Q    How much time do you devote to this
7  work?
8      A    All of my working time. It's how I make
9  my living.
10     Q    And I take it you have testified in a
11 Court of law as an expert in the field of forensic
12 document examination?
13     A    Yes. I've done testifying in Courts,
14 arbitration hearings and various procedures now for
15 about 34 years.
16     Q    Have you ever worked in cases for a
17 foreign agency or government?
18     A    Yes I have.
19     Q    Can you identify some of them?
20     A    Yes. I've done work with the overseas
21 governments of South Korea, South Vietnam,
22 Australia, New Zealand. I've also done work with
23 the overseas embassies of Great Britain and France.
24     Q    Now that you have become a more senior
25 person do you also teach in the field of forensic

Page 59

-G. Lesnevich/Direct -

1
2  document examination?
3      A    I've trained individuals in their
4  training program going through training in the
5  field of questioned documents. I don't do a lot of
6  teaching anymore.
7          MS. PHARES: Your Honor, I offer Mr.
8  Lesnevich as an expert in the examination of
9  forensic documentation.
10         MS. MONAGHAN: We accept that.
11         THE COURT:  All right. Accepted as an
12 expert.
13     Q    Would you explain to the Court how a
14 person can be identified through handwriting
15 examination?
16     A    Yes. When a person first learns to
17 write back in elementary school there's usually
18 across the top of the blackboard the printed
19 alphabet, A, B, C,D, and that alphabet above the
20 blackboard has a solid line, a dotted line and a
21 solid line. Every capital letter is exactly the
22 same height, so if you had a capital A it would be
23 like a teepee and then a cross-bar right where the
24 dotted line would be. If you had a capital B you'd
25 have the staff and two half circles meeting where

Page 60

-G. Lesnevich/Direct -

1
2  the dotted line would be. Your lower case letters
3  a, e and o would be half the height of capital
4  letters. There would be uniformity in writing. A
5  teacher will come to a student, the student will
6  have what they call a copybook in front of them or
7  sheet of paper which has solid lines, dotted lines
8  and solid lines. The teacher will place into the
9  hand of the student and tell the student or
10 instruct the student how to properly hold the
11 writing instrument. Usually when the teacher moves
12 to the next student that student takes the
13 instrument and moves it to how they feel
14 comfortable writing with it. What happens is the
15 student begins to process by seeing images and
16 reproducing images in the copybook. When they do
17 that they develop hand eye coordination. They also
18 develop form perception and how they can take those
19 forms and then reproduce them. Most importantly
20 what they do is they develop the various nerves and
21 muscles that go through the fingers, wrists, elbow,
22 shoulder, and in some cases even your back there's
23 muscles that move when you write. Over a period of
24 time, over many years when an individual begins to
25 write without looking at the blackboard, when they

Page 61

-G. Lesnevich/Direct -

1
2  can pick up a writing instrument and hold it
3  comfortably to them, and automatically they begin
4  to write, and as that writing is written naturally
5  and spontaneously with quickness, at the same time
6  that writing differs from that perfected uniformity
7  you started with then it becomes highly unique to
8  one individual. When you have complete agreements
9  in speed and quickness of writing and uniformity of
10 how the letters are formed then you can make an
11 identification of the person writing something.
12     Q    Okay. I'm going to hand you what is
13 already in evidence as Defendant's Exhibits M and
14 N. In Defendant's Exhibit M, would you please turn
15 to the Page 11, which is the page with Sunbow
16 Production Number 880, and I invite your attention
17 to the signatures on the line with the typed name
18 Anne Bryant.
19     A    Yes.
20     Q    Have you examined that signature?
21     A    Yes I have.
22     Q    When you made your examination did you
23 examine an original document or a photocopy?
24     A    An original document.
25     Q    And did you obtain that from me?

-G. Lesnevich/Direct -
1
2    A    Yes.
3    Q    All right. And then in the Defendant's
4    Exhibit N, would you look at the page with Sunbow
5    Production 893 which is also Page 11, and turning
6    your attention to the signature on the line with
7    the typed name Anne Bryant.
8    A    Yes.
9    Q    Have you examined that signature?
10   A    Yes I have.
11   Q    And my same question, when you made
12   that original examination did you do it from an
13   original copy that I provided to you?
14   A    The original document.
15   Q    Thank you. And then in that same
16   Exhibit N would you turn to the page with Sunbow
17   895, Page 13.
18   A    Yes.
19   Q    And again, did you examine the original
20   document with respect to the signature of Anne
21   Bryant?
22   A    Yes I did.
23   Q    Mr. Lesnevich, did Mr. Monaghan send to
24   you directly for examination original documents
25   bearing the plaintiff's signature?

1                -G. Lesnevich/Direct -
2    A    Anne Bryant, yes.
3    Q    Yes. And did you examine those
4    documents as well?
5    A    Yes I did.
6    Q    And did you return those originals to
7    Mr. Monaghan after as he requested?
8    A    Yes I did.
9         MS. PHARES: Your Honor, I am offering
10   for identification, first of all, documents
11   as R, a form 5500EZ with production numbers
12   621 and 622, and I'm also offering for
13   identification as Defendant's Exhibit S an
14   agreement dated November 8, 1989 between Anne
15   Bryant, Ford Kinder and Ford Kinder with
16   production numbers 606 to 609, and also
17   identifying as Defendant's Exhibit T three
18   pages of cancelled checks from Square Music
19   Business Productions, Limited, bearing
20   production numbers 597, 600, 601, 603 and
21   604.
22        THE COURT: Is there any objection to
23   those going into evidence?
24        MR. MONAGHAN: None.
25        THE COURT: Okay. They can be marked

1                -G. Lesnevich/Direct -
2    directly in then.
3         (Documents further described herein were
4         marked as Defendant's Exhibits R, S and T in
5         evidence, as of this date.)
6    Q    Mr. Lesnevich, have you compared these,
7    the signatures on these exhibits, that is
8    Defendant's R, S and T with the questioned
9    signature that you identified earlier?
10   A    Yes I did.
11   Q    From your examination and the
12   comparison of the questioned signatures on the
13   Sunbow agreements with the known signatures on
14   plaintiff's documents, have you formed an opinion
15   as to whether they were executed by the same
16   person?
17   A    Yes I have.
18   Q    And what is that opinion?
19   A    That the three questioned signatures
20   and the known signatures were all the product of
21   the same person.
22   Q    And --
23        MR. MONAGHAN: Can we have which
24        signatures are questioned because we don't --
25        the "Jem" signatures are not questioned.

1                -G. Lesnevich/Direct -
2    A    The signature, there's one signature on
3    Defendant's Exhibit M.
4         MR. MONAGHAN: M is not --
5         MS. PHARES: Your Honor, actually the
6         letter we received from Mr. Monaghan was a
7         bit equivocal about she thought there was a
8         possibility it was genuine and we asked Mr.
9         Lesnevich to examine it.
10        THE COURT: All right.
11        MS. BRYANT: We agreed to "Jem".
12        THE COURT: Let's continue questioning.
13   Go ahead.
14   Q    In the course of making your
15   determination, do you have any kind of diagrams
16   that demonstrate how you reached your conclusion?
17   A    Yes. After the examinations were
18   completed I prepared a graphic illustration called
19   a comparison chart that points out some of the
20   unique similarities in the abbreviated signatures,
21   the three that were given to me as questioned as
22   well as a group of nine known signatures.
23        MS. PHARES: I offer for identification
24        Defendant's Exhibit U, which is a document
25        entitled comparison chart Anne Bryant.

Page 66

-G. Lesnevich/Direct -

1
2  (An item further described herein was marked
3  as Defendant's Exhibit U for identification,
4  as of this date.)
5  Q  Mr. Lesnevich, is the copy of the chart
6  that you are currently looking at the same as the
7  one that was marked for identification?
8  A  Yes, all the charts are the same.
9  Q  Thank you. Now, if you would, and the
10 person who really needs to understand this is
11 Justice O'Rourke. If you would explain how, or I'll
12 give you a moment so you can line this up.
13     Let me just make one thing clear just
14 for the record. When, if you look at the first long
15 printed page, across the top it has Q1A. Is that
16 Q1A the agreement on the Defendant's Exhibit M, the
17 "Jem" agreement from page, the pages Sunbow 88EZ?
18 A  It was Page 11.
19 Q  That's right. Page 11 of the agreement?
20 A  Right.
21 Q  Yes. And the questioned Document 1B, is
22 that from Page 11 of the "My Little Pony and
23 Friends".
24 A  That's correct.
25 Q  And "My Little and Pony Friends" which

Page 67

-G. Lesnevich/Direct -

1
2  is Defendant's Exhibit N, and is the questioned
3  Document 1C also from Defendant's Exhibit M, "My
4  Little Pony and Friends" Page 13?
5  A  That's correct. At the top of the
6  chart again there are enlargements of the three
7  signatures in question. Below that are nine samples
8  of the known signatures that we're working with.
9  It's obvious from looking at the signatures that
10 there's no way you would know that spells out the
11 word Anne Bryant. It's a unique signature or
12 marking of an individual.
13     THE COURT: Would have been a great
14 doctor I assume.
15     THE WITNESS: Yes, your Honor.
16     THE COURT: Go ahead.
17 A  One of the things I looked at in
18 examining the documents first was looking at the
19 known signatures down below to determine that
20 there's a great deal of variation in this
21 individual's signing of the name. There are times
22 when a person makes the first A, the ending stroke
23 more circular, in the lower right-hand corner shows
24 an unusual formation, on the check shows an unusual
25 formation of the A. So there's a variation.

Page 68

-G. Lesnevich/Direct -

1
2     The other is when examining the three
3  questioned signatures at the top, what I first
4  looked at to see was A, is it unique. The second
5  is, is it someone's spontaneous and natural
6  writing. That can be seen in the upper left-hand
7  corner on Q1A where the writer goes from the middle
8  letter to the last letter you can see the pen comes
9  up very little before it gets heavy in the final
10 movements, and in the center signature in question,
11 which is N11 you'll see the movement coming off the
12 middle initial or letter, and again the pen drags
13 up and continues up and continues on with the last
14 letter.
15 Q  Just one thing. When you said, "N11"
16 you're referring to Defendant's Exhibit N?
17 A  That's correct. On the upper right the
18 third questioned signature you can again see the
19 actual connection between the second and third
20 writing movement or letters, and that shows natural
21 and speed and quickness. There was no hesitation in
22 the writings, no indication of someone trying to
23 draw. It certainly is not a tracing. On Page Number
24 2 I placed some arrows just to point out some of
25 the similarities in the writing movements. At the

Page 69

-G. Lesnevich/Direct -

1
2  top in the questioned signature Q1A, Arrow 1 points
3  to a little eyelet in the back of the movement in
4  the first letter A. That can also be seen in the
5  extreme right-hand side at the top, that little
6  eyelet movement.
7  Q  You're referring to questioned
8  document 1C?
9  A  Correct. If you look down below into
10 the known writing, if you look at the check in the
11 center of the chart, Check Number 822, you can see
12 an example of that little eyelet that's being put
13 in there. Also if you look at Arrow 2 in Q1B the
14 questioned signature it shows the writer starts to
15 make a formation like a triangle and if you look
16 down below to the top line of the known on the
17 right-hand side which says K schedule P, 1987, you
18 have that same writing movement as illustrated by
19 Arrow 2. Arrow 3 in all three of the questioned
20 signatures shows the writer's movement coming
21 across to the right and then ending that writing
22 movement. So if you look down below you have that
23 same type of writing movement coming across ending
24 the first letter. In the middle letter in the
25 questioned signature at the top, Arrow 4 shows an

Page 70

1          -G. Lesnevich/Direct -
2    angular movement, a wrist movement of writing
3    that's the same in all three of the questioned
4    signatures, and if you look down below to Arrow 4
5    and a number of the known signatures you can see
6    that same curvature being used which shows a wrist
7    movement that's again similar to what you see in
8    the questioned signatures. If you turn to Page
9    Three in the comparison chart, Arrow 5 in the
10   questioned signatures shows the pen going or light
11   pen movement between the second and third letters
12   being written and if you look down below the Arrow
13   5, especially down in the lower right-hand corner
14   you can see the little tick at the top. If you look
15   at the check in the center again, Check 822 you can
16   see that light movement where the pen drags on the
17   paper, and again it's a similar writing movement.
18   If you look at the ending stroke of the three
19   questioned signatures starting on the left, Arrow 7
20   shows a large movement, large upward movement on
21   the left side of the staff and if you look down
22   below to the lower left you can see that same large
23   opening or if you look to the top line of the known
24   signatures in the center that same opening you see.
25        Q    And you're referring to the K

Page 71

1          -G. Lesnevich/Direct -
2    agreement, 1989; is that correct?
3        A    Correct. If you look to the upper right
4    in Q1C, Arrow 8 it shows a smaller opening at the
5    end and if you look just below that you'll see by
6    Arrow 8 again a similar opening and similar
7    spacing.
8        Q    Now, referring to K schedule P, 1987?
9        A    Correct. And finally if you look at the
10   questioned signature in the center, Q1B, Arrow 9 it
11   shows a little bit more of a triangle effect at the
12   ending stroke and if you look in to the lower
13   right-hand corner, Check Number 840 you can see an
14   example of the writer using a triangle, and what
15   you have is that the three questioned signatures
16   were naturally and spontaneously written. Each one
17   has a normal variation to it but the same
18   variations can be found within the known
19   signatures. If you're dealing with simulations or
20   forgeries you would expect all three of the
21   questioned signatures to look almost the same. If a
22   person was using one model to work with or if a
23   person practiced all three it would be almost the
24   same. You would not have this natural variation you
25   see. Plus the signatures are written quickly and

Page 72

1          -G. Lesnevich/Cross -
2    rapidly, and there's no evidence of any hesitation
3    or tracing.
4        MS. PHARES: Thank you. Your Honor, I
5    offer Defendant's Exhibit U in evidence.
6        MR. MONAGHAN: No objection.
7        (An item previously marked as
8    Defendant's Exhibit U for identification was
9    received in evidence, as of this date.)
10       MS. PHARES: Your witness.
11   CROSS EXAMINATION BY MR. MONAGHAN:
12       Q    Mr. Lesnevich, we've never met but we
13   have spoken before; have we not?
14       A    We may have, yes.
15       Q    On a different case, the Cohen case,
16   Merryl Lynch?
17       A    I'm sure we have.
18       Q    Okay. When you give an opinion, that
19   opinion is your best opinion based on the available
20   evidence, correct?
21       A    Well, I would not render a definitive
22   conclusion such as this case if I didn't feel I had
23   enough known writings.
24       Q    I understand it.
25       A    But which, it is based on my

Page 73

1          -G. Lesnevich/Cross -
2    examination of the evidence I'm given.
3        Q    But it is possible there could be a
4    forgery that was so professional that it could even
5    pass your professional expertise; isn't that right?
6        A    Oh, I think it's possible the sun is
7    not going to rise tomorrow must I'm sure it will. I
8    have never seen such a thing so I wouldn't know it.
9        Q    You do admit it's a possibility?
10       A    Anything is a possibility in life.
11       Q    And to -- let me talk to you about the
12   exhibit that just went in. Where did it go? Did
13   you see any dissimilarities in the -- by the way,
14   we're not talking about the signatures now Q1A,
15   that's not at issue in the case.
16       A    All right.
17       Q    But if I can direct your attention to
18   Q1B where you had gone through very carefully the
19   similarities that you saw and point-by-point, by
20   your numbered points, did you see any
21   dissimilarities in any of the letters in Q1B when
22   you compared this to the genuine signatures?
23       A    No. You see a variation in writing but
24   that variation was found within the known's. For
25   instance, if a person were to sign their name three

Page 74

- G. Lesnevich/Cross -

1    times in a row at one setting, just one, two,
2    three, you'll find a normal and natural variation
3    between each one.
4        Q    Okay. Well, and I'm not going to go
5    much further with this, but by my layman's eye,
6    would I be fairly close to the mark by suggesting
7    that the A in Q1B is the only A that seems to go
8    from left to right, each of the other left sides of
9    the letter A is basically going in a straight line,
10   but certainly not slightly to the left?
11       A    Are you referring to an overhand
12   movement on the initial stroke coming up?
13       Q    It's easier for me to show you. Okay.
14   Q1B--
15           MS. PHARES: If you could try and say
16           out loud what it is you're doing for the
17           record and for us.
18       A    I'll mark it and hold it up if that
19   works.
20       Q    Okay. We all have a copy of it. So,
21   you're aware, of course, that Ms. Bryant has said
22   this is not her signature, that is Q1B, questioned
23   signature 1B?
24       A    I assumed that's an issue.

Page 75

- G. Lesnevich/Cross -

1        Q    Okay. Would I be correct in saying that
2    all the exemplars, all the A's in the exemplars,
3    and you have six of them on this page --
4        A    Nine actually.
5        Q    Okay. Fine. Right. Right -- -the A's,
6    all, all of those A's start on the left side in
7    either a straight line or going slightly towards
8    12 o'clock?
9        A    Are you referring to this moving like
10   this? (Indicating)
11       Q    Exactly what I'm referring to. Isn't
12   that at least one distinguishing characteristic of
13   the letter A in these signatures?
14       A    No, because if you look at the center
15   top known signature you have a more exaggeration of
16   it and if you look into the lower left on Check 756
17   you almost have the exact movement as you have in
18   the questioned.
19       Q    You're telling the Court that, 756
20   there's sort of a line blurring it?
21       A    But it's there.
22       Q    Maybe we can look at the check.
23           MR. MONAGHAN: We have the checks?
24           MS. PHARES: You have the checks.

Page 76

- G. Lesnevich/Cross -

1           MR. MONAGHAN: I know. I'm going to pull
2    it out.
3           THE COURT:  Well, I'm going to have to
4    break. I have a meeting.
5           MR. MONAGHAN: We only have a minute and
6    we'll be done.
7        Q    Just so we're clear. You're saying that
8    Check 756, the A in Check 756 is the same as far as
9    you can tell with normal variations as the A in
10   Q1B?
11       A    Yes, also taking into consideration the
12   center on line one of the knowns which is the K
13   agreement 1989 which shows even more of the
14   exaggeration of an overhand movement.
15       Q    Yes, but it doesn't go to the left the
16   way the one in Q1B does, does it?
17       A    I don't see much of a difference. They
18   both start a little lower on the left and you can
19   see that for instance on Check 756 and the writing
20   movement appears to me to be very similar to the
21   Check 756 to Q1B.
22       Q    Well, here's 756 the actual check.
23           (Check handed to witness.)
24       Q    You're telling the Court that A is the

Page 77

- G. Lesnevich/Redirect -

1    same as the A in Q1B?
2        A    What I'm saying is the writing
3    movement, the initial stroke of the A as it comes
4    up has that same ark to as you see in --
5        Q    Ark, that's the word I want.  You're
6    saying that Q1B has an ark in it, does it not, in
7    the A?
8        A    Yes.  The writing movement has a little
9    bit of an ark.
10       Q    And you're telling the Court that the
11   same ark is present on Check 756?
12       A    Yes.
13       Q    Okay.
14           MR. MONAGHAN:  I don't have any further
15   questions.
16           THE COURT:  Any redirect?
17           MS. PHARES: I just have one.
18   REDIRECT EXAMINATION BY MS. PHARES:
19       Q    Mr. Lesnevich, has anything been
20   brought out on cross examination that would alter
21   in any way your original conclusion?
22       A    No.
23           MS. PHARES: Thank you.
24           Your Honor, I have just three documents

Page 78

-G. Lesnevich/Redirect -
1
2   to offer in evidence, they are all affidavits
3   and then that's it.
4       THE COURT: All right.
5       MS. PHARES: They are, I am offering as
6   Defendant's Exhibit--
7       (Witness Excused.)
8       MS. PHARES: Your Honor, I'm offering in
9   evidence the affidavit of Ford Kinder which
10  is dated September 23, 2004.
11      THE COURT: Any objection to that?
12      MR. MONAGHAN: No, your Honor.
13      MS. PHARES: And I am offering in
14  evidence the letter of Mr. Monaghan to the
15  Court dated September 20th. This is the
16  letter in which he says that Ms. Bryant still
17  has some questions about the signature on the
18  "Jem" agreement and does not recall the
19  agreement but she doesn't rule out the
20  possibility that it is in fact her signature.
21      MR. MONAGHAN: We don't need a lawyer's
22  letter in evidence. I'll put her on the
23  stand and she can say the same thing.
24      MS. PHARES: We can do it much more
25  quickly. This is an admission.

Page 80

-G. Lesnevich/Redirect -
1
2   Her signature has been identified a couple of
3   times.
4       THE COURT: All right.
5       MR. MONAGHAN: Thanks, Judge.
6       THE COURT: Now, let me just wind this
7   up. I am reserving decision today. I am going
8   to give each side a chance to submit a,
9   hopefully short analysis of what we've done
10  today, looking towards two things. One, you
11  will, first of all, has the defendant proved
12  to the satisfaction of, should that evidence
13  prove to the satisfaction of the Court that
14  the signatures involved here, questioned here
15  actually belong to Ms. Bryant; the next
16  question is, what is the purported -- if
17  those signatures are Ms. Bryant's, and third,
18  what is the stand of each party at this point
19  about what remains, if anything, in this
20  trial, and if you can get that to me within
21  30 days.
22      All right. Thank you very much. Very
23  instructive.
24  (Whereupon the proceedings were concluded.)
25

Page 79

-G. Lesnevich/Redirect -
1
2       MR. MONAGHAN: Why don't we just do
3   this. We'll stipulate on what we said in
4   exhibit, in my letter of September 20th. We
5   don't need it in evidence.
6       MS. PHARES: Well, then do you want me
7   to read it into the record?
8       THE COURT: Just put it in evidence.
9       MS. PHARES: And we are offering also
10  the affidavit of Carole Weitzman identifying
11  her signature on the "Jem" and "My Little
12  Pony" agreements.
13      MR. MONAGHAN: Absolutely not. She was
14  mentioned in your Honor's order. I don't
15  know why she's not here. Can't cross examine
16  her, she's testified at a deposition.
17  Affidavits don't usually get in evidence.
18      THE COURT: Sustained.
19      MS. PHARES: Your Honor, Mr. -- so far
20  as I know Mr. Monaghan has the same subpoena
21  power I do.
22      THE COURT: All right.
23      MS. PHARES: I do not control this
24  witness. She is a third party, but we have
25  evidence already in the record as to her.

Page 81

-G. Lesnevich/Redirect -
1
2
3
4       C-E-R-T-I-F-I-C-A-T-I-O-N
5
6
7
8       Certified to be a true and accurate
9   record of the within proceedings as taken and
10  transcribed by me.
11
12
13
14
15
16
                Robin E. DiMichele, RPR
17              Senior Court Reporter
18
19
20
21
22
23
24
25