# EXHIBIT 10

```
 1                DRAFT/NOT CERTIFIED
 2            Telephone Conference
 3
 4                              December 1, 2006
                               10:30 AM
 5                             40 Gleneida Avenue
                               Putnam County Office
 6                              Building
                               Carmel, New York
 7
 8   BEFORE:  HON. ANDREW P. O'ROURKE
                Presiding Supreme Court Justice
 9
10   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF ROCKLAND
11   _____X
12   ANNE BRYANT
                              Plaintiff
13
     - versus -                       Index No.
14                                    5192/00
     BROADCAST MUSIC, INC., (a/k/a "BMI"),
15   FORD KINDER, KINDER & CO., LTD., VADIVOX, INC.,
     JULES M. "JOE" BACAL; GRIFFIN BACAL, INC.,
16   STARWILD MUSIC BMI, WILDSTAR MUSIC ASCAP,
     SUNBOW PRODUCTIONS, INC.,
17                              Defendants
     _____X
18
     ANNE BRYANT
19                              Plaintiff
                                    Index No.
20   - versus -                       2821/02
21
     SUNBOW PRODUCTIONS, INC.,
22                              Defendant
23
     _____
24              Laurie Hardisty, RMR
              Official Court Reporter
25      44 Gleneida Avenue, Carmel, NY 10512
               (845) 225-3641 Ext. 294
```

Page 2

1
2  APPEARANCES:  PATRICK J. MONAGHAN, JR., ESQ.,
       Monaghan, Monaghan, Lamb &
       Marchisio, Esqs.
3      Attorneys for Plaintiff
4
5      GLORIA C. PHARES, ESQ.,
       Patterson, Belknap, Webb & Tyler, Esqs.
6      Attorneys for Defendant Sunbow
7
8      JUDITH SAFFER, ESQ.,
       Co-counsel BMI Legal Department
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1  IN CHAMBERS:
2
3      THE COURT:  The conference is going to begin.
4  We're going on the record.  We have a Court
5  Sentographer.
6      Please place your appearances on the record.
7      MR. MONAGHAN:  Yes, Good Morning, Your Honor.
8  Pat Monaghan for the Plaintiff.
9      THE COURT:  All right.  Who else do we have?
10     MS. SAFFER:  Judith Saffer.  Judith Saffer
11 for BMI.
12     MS. TATE:  It's Ms. Tate.  I have Ms. Phares'
13 number to be reached at.  Apparently she was at a
14 different number.  It's 212-336-2786.
15     THE COURT:  Okay.
16
17     (Off the record discussion.)
18
19 (Gloria Phares connected to tele-conference.)
20
21     THE COURT:  As I told everyone else, Ms.
22 Phares, this telephone conversation is being recorded.
23 I have a Court Stenographer here.
24     There are some things that I want to get
25 across to you before we get together on Monday.

Page 4

1      First, I want you to know that the
2  arrangements in Putnam County are not quite as
3  imposing as Rockland and much more humble, and there's
4  been a request by somebody's office that we have
5  certain electronic equipment.  I doubt very much that
6  this courthouse has it.  We're building a new
7  courthouse next door, but it won't be ready until next
8  year, and this case, I hope to God, is not still going
9  on then.
10     MS. PHARES:  I think it was our office that
11 inquired, and we -- we understand what's available,
12 and if we do need something, we'll provide it.
13     THE COURT:  Well, as far as I know, we have a
14 wall.
15     MS. PHARES:  That's fine.
16     THE COURT:  Okay.  That should do it.
17     Now, I want you to know that in several Court
18 Orders, and I believe in the letter I sent you all,
19 too, that -- that I asked not only for the witnesses,
20 but I asked for a short statement about what they
21 intended to tell us and also the time that would be
22 required.  And I don't think I've gotten that from
23 anybody.
24     MS. SAFFER:  Yes, you did, Your Honor.
25 Please forgive me.  You got it from me, and you also

Page 5

1  got from me a letter saying we'd like to know it from
2  everybody else.
3      MS. PHARES:  Your Honor, actually, I thought
4  we had sent a revised one with that information, but
5  we'll do that right after the call.
6      THE COURT:  Okay.  Well, you might have.
7      MS. PHARES:  Then if you need the information
8  for purposes of planning right now, we can provide it.
9      THE COURT:  No, if you haven't sent it to
10 me, please do it by the end of the day so that I can
11 get some kind of feel for what we're going to do next
12 week.
13     MR. MONAGHAN:  Okay.
14     MS. SAFFER:  Your Honor, if I may?
15     The reason that I wrote to you and pointed it
16 out was that in ... Sorry.  Forgive me, forgive me; I
17 don't have the date.  But you indicated that the trial
18 would occur next week and that you had set aside one
19 week for the trial.  BMI has one witness, the
20 Plaintiff has listed 25 or 26 witnesses, and Sunbow
21 has listed, I believe, seven witnesses, and, at this
22 juncture, I'd like some help determining how we're
23 getting that all done in one week.
24     MR. MONAGHAN:  We're revising our list,
25 lopping off about 16 witnesses.

Page 6

1    THE COURT: Well, good, because, you know, I
2  think I've stated this several times, but let me try
3  it again. This is the juncture that we're at. I
4  believe at this point that Sunbow -- excuse me -- has
5  proven to the Court's satisfaction that there were
6  written contracts that were the only way they entered
7  into agreements with artists.
8    Now, Ms. Bryant's position is that there were
9  also -- excuse me -- unwritten agreements, and I
10  believe that it's up to her to prove that, and we
11  should be going along that route.
12    MR. MONAGHAN: We understand that route
13  perfectly, Judge.
14    THE COURT: Okay.
15    MR. MONAGHAN: The issue with the oral
16  agreement is for the composition for which there is no
17  written agreement in order to --
18    THE COURT: No, but hold on, hold on. When
19  you say there's no written agreement, the -- shouldn't
20  I take the position, or the court take the position,
21  that because there is no written agreement presently
22  before us, why shouldn't I say, well, this is just
23  like the rest of them; there was a written agreement
24  somewhere along the line and followed the same general
25  pattern?

Page 7

1    MR. MONAGHAN: You should.
2    MS. PHARES: Your Honor?
3    MR. MONAGHAN: We welcome that.
4    MS. PHARES: Your Honor, I think --
5    MR. MONAGHAN: We still need -- I believe,
6  Your Honor -- if I may -- you still need some
7  foundation that the same written agreement that covers
8  Composition X, in this case the Jem Agreement, applies
9  to the other compositions at issue. You still need a
10  foundation, I believe, on the record for that.
11    MS. PHARES: Your Honor, I think the
12  confusion that is going on here, Ms. Bryant wrote
13  materials for GBI, and she wrote materials for Sunbow,
14  and in some cases the music is similarly related, and
15  Mr. Monaghan is trying to open this case to looking at
16  the agreement with GBI as thinking that they have
17  something to do with the agreements with Sunbow
18  because the compositions are related.
19    Our position is that the only thing before
20  this court is Ms. Bryant's relations with the
21  Defendants Sunbow and BMI.
22    THE COURT: Well, I tend to agree with you.
23  As a matter of fact, I -- Ms. Phares, you wrote in one
24  of the letters, I think going back to mid-November,
25  that it's your position that you want the Plaintiff

Page 8

1  excluded, except with -- with evidence -- except that
2  evidence that shows an agreement between Sunbow and
3  and Bryant, and, to me, nobody else is in this case,
4  with the exception of Bryant and Sunbow. The --
5    MR. MONAGHAN: We don't have a problem with
6  that because the relationship is with Sunbow as to all
7  the compositions.
8    THE COURT: Okay. I just want you to know
9  where I believe we're going.
10    Now, if that's where we are going, then we
11  shouldn't need an awful lot of witnesses.
12    MR. MONAGHAN: As I say, Judge, we knocked
13  off about 17 witnesses because we think they're
14  damages witnesses.
15    THE COURT: All right. So, I would take
16  witnesses -- I would take witnesses that know anything
17  about a so-called unwritten agreement or lost
18  agreement. I would take at least one witness that is
19  an expert in the -- this general area.
20    I notice, Mr. Monaghan, that you had two
21  witnesses that were experts, and, so, I hope that you
22  can get that down to one.
23    Hello?
24    MR. MONAGHAN: Yes, Judge. I don't know what
25  that noise --

Page 9

1    THE COURT: It's probably the FBI. Don't
2  worry about it.
3    But, so, let's try and keep the number down.
4    Now, when I said the whole week would be
5  devoted to this case, it certainly was my hope that we
6  could finish this up to get to the point where the
7  Plaintiff is going to rest, and, at that point, as I
8  pointed out in some decision or another, that's the
9  point where I will accept a motion from the Defendant
10  Sunbow to dismiss, and I'll look and see where we're
11  at.
12    MR. MONAGHAN: Okay.
13    THE COURT: All right?
14    Now, the next thing is: Why do we still have
15  BMI in this case? Didn't that end of it get settled
16  and the -- the catalog, composition catalog, get
17  secured away?
18    MR. MONAGHAN: No, it didn't, Your Honor.
19  Well, there's two parts to the BMI story. One part is
20  the settlement with Bacal and Kinder, which
21  accomplished changes in the registration. That is
22  still an ongoing process. That hasn't occurred yet
23  completely.
24    MS. SAFFER: Excuse me. I'd like to be able
25  to comment on just that portion.

Page 10

1    The changes for Kinder were done when we got
2    a letter from Mr. Kinder at his deposition this
3    summer.  They were immediately made.  Mr. Bacal's
4    settlement with Anne Bryant indicated and it was
5    provided to us by Pat, that Bacal would give whatever
6    was needed in order to accomplish that.  We have asked
7    Pat repeatedly, get a letter from Mr. Bacal telling us
8    to change our records and we'll do it.  Nothing has
9    come.
10    MR. MONAGHAN:  Well, Bacal is no longer
11    represented by the firm.  Mr. Tannenbaum (sic), we've
12    been notified that they would not accept a subpoena
13    for him.  And I see that Gloria has served a subpoena
14    or is about to.
15    As far as getting a letter from him, as I
16    pointed out when this was first broached, that could
17    be a very difficult proposition, and it's our position
18    that the settlement tells him what to do, Number 1.
19    Number 2, we don't believe that, even as to
20    the Kinder settlement, that BMI has yet completed the
21    proper corrections to the registration.  But that's
22    only half the BMI case.  The other part of the case,
23    Judge, is the other several hundred thousand dollars
24    that Ms. Bryant lost from the royalties that were
25    lost.  We have a claim in our Complaint against BMI

Page 11

1    for breach of duty, breach of fiduciary duty.  When
2    you hear the evidence, especially Kinder's testimony,
3    and you look at the BMI contract, you will conclude
4    that they have an obligation to make sure and protect
5    their writers.
6    THE COURT:  Hold on.  Isn't it a fact that if
7    payments were made by BMI to Kinder or anybody else,
8    because they had the wrong information, that it's up
9    to Ms. Bryant to get it back from whoever got the
10    payments?
11    MR. MONAGHAN:  No, that's -- well, it's --
12    it's possible she can pursue that, but the -- BMI also
13    had an independent obligation itself to its own
14    writers.  There's no -- when someone -- we have the
15    contract, actually, right -- right here.  I
16    anticipated this being the question.  And the contract
17    has provisions in it.
18    One, why would someone be a member of either
19    of those performing rights societies if it doesn't
20    confer any -- any protection since the registration.
21    MS. SAFFER:  Your Honor, that's --
22    THE COURT:  But --
23    MR. MONAGHAN:  That's an issue I think you're
24    going to have to hear testimony on.  And I think as
25    far as BMI, I ask you to reserve until you hear the

Page 12

1    evidence.
2    THE COURT:  Okay.
3    MS. SAFFER:  Your Honor, if I may?
4    THE COURT:  Yes; go ahead.
5    MS. SAFFER:  And we vehemently dispute Pat's
6    interpretation of the BMI contract.  But even if,
7    assuming arguendo, he was correct, Mr. Bacal and Mr.
8    Kinder were also BMI writers.  Why should we have, if
9    you will, tout that Anne's claim was any more valid
10    than their claims were?
11    We have done everything.  We are not poaching
12    any royalties.  We have paid out all the royalties.
13    Even if we make a change to Mr. Bacal's interest, if
14    you will, without getting the letter, we are talking
15    literally hundreds of dollars, not hundreds of
16    thousands of dollars; hundreds of dollars.  That's it.
17    MR. MONAGHAN:  Well, I don't understand,
18    then, why the contract, the BMI contract Anne signed
19    with BMI in '71, says that you have the right to
20    withhold monies if there's a problem with the
21    registration.  These are registrations that were
22    originally in her name, in some cases for a hundred
23    percent, that were reduced without her consent,
24    without her approval, without even notice to her.
25    THE COURT:  All right.  I don't want to get

Page 13

1    too far into --
2    MR. MONAGHAN:  That's the idea of the case,
3    Judge, and I'd ask you to hear the evidence.
4    THE COURT:  All right.  I'll hear some
5    evidence on it, but let's get back to this fact that
6    BMI needs this letter.
7    MR. MONAGHAN:  I welcome any suggestions on
8    how I can squeeze it out of Bacal.
9    MS. SAFFER:  Well, you entered into a
10    settlement agreement with him in which he said that he
11    would give it to you, so it seems to me that that's
12    only between you and Mr. Bacal, and if Mr. Bacal is
13    now represented by a different lawyer, you should give
14    us a different lawyer.  It's your arrangement with him
15    that's the issue --
16    THE COURT:  Pat?  Hold on --
17    MS. SAFFER:  -- on payment.
18    THE COURT:  -- hold on.
19    How about a Court Order based on the fact
20    that Kinder is -- still a party to this
21    case?  At least he's in your caption.
22    MR. MONAGHAN:  No.
23    MS. PHARES:  He's already settled, Your
24    Honor.
25    MR. MONAGHAN:  Bacal and Kinder are out, but

Page 14

1 a Court Order inspecting the settlement vis-a-vis
2 Bacal is a very good idea.
3      MS. SAFFER: Your Honor, I'm prepared
4 unilaterally to say that we will, when I get off this
5 phone call, make the changes for Bacal, and to the
6 extent that Mr. Bacal, in the past year, received a
7 hundred dollars that Anne claims that she's entitled
8 to, I would be happy to write my personal check, if
9 this will get rid of this problem.
10      MR. MONAGHAN: That's not necessary. It's in
11 the holiday season. We're not looking for your
12 personal check.
13      THE COURT: You know, I'd put in ten bucks
14 myself to get rid of the whole case.
15      MS. SAFFER: That will not be a problem, Your
16 Honor. We will make the changes to Mr. Bacal's
17 catalog to the extent that Anne claims that she should
18 be credited with what we're now giving to Mr. Bacal,
19 and, in the future, that will entitle her to each
20 distribution to make an additional ten bucks.
21      THE COURT: Now, listen, we've got three very
22 bright lawyers here. Come up with some language, put
23 it into a Court Order, I'll sign it, and that ought to
24 be good enough for BMI --
25      MR. MONAGHAN: Okay.

Page 15

1      THE COURT: -- to make whatever changes are
2 necessary.
3      I've got a copy of the settlement. They were
4 in the lawsuit; so, put your fertile minds to work
5 here.
6      MS. SAFFER: Your Honor, if it is --
7      THE COURT: Think about that.
8      MS. SAFFER: If it is -- BMI's records have
9 to be adjusted, I will volunteer to draft that
10 document for you this afternoon.
11      THE COURT: Okay.
12      MS. SAFFER: And I will bring it to you
13 Monday when we recommence the trial.
14      THE COURT: Okay.
15      MR. MONAGHAN: There's one housekeeping
16 thing, if I may? My wife is having some surgery on
17 Tuesday morning. I was thinking that perhaps we could
18 do part of the -- it's important surgery. I was
19 thinking perhaps we could have -- and I know you set
20 aside this week, and perhaps we could have the Kinder
21 deposition, video deposition, which was pursuant to
22 your Order, played in the morning, and my associate
23 Michael would cover that part of it. But I'll be
24 there for the afternoon at least.
25      THE COURT: Well, if you are lead counsel in

Page 16

1 this, and if you want the morning off to be with your
2 wife, if she's being operated on, if you ask, I will
3 certainly give it to you.
4      MR. MONAGHAN: Then I ask for it.
5      THE COURT: Okay; then you've got it.
6      MR. MONAGHAN: Thank you, Judge.
7      THE COURT: I would be very glad -- you know,
8 your associate there Michael was an intern in my
9 office.
10      MR. MONAGHAN: Yes, I know that, Judge.
11      THE COURT: We don't hold that against him, I
12 want you to know.
13      MR. MONAGHAN: No, I understand that.
14      THE COURT: He did a very good job.
15      MR. MONAGHAN: And I understand he never
16 worked on this case.
17      THE COURT: No, he never had anything to do
18 with this case.
19      All right. Now, let me get to another area.
20 I got a letter from Mr. Monaghan pointing out that
21 they had received a check from Sunbow which should
22 lead to depositions, I think it was, of Mr. Knapp or
23 something like that. I also have just received, and I
24 haven't even read it, just sort of skimmed through it,
25 a very detailed explanation, I assume, of where that

Page 17

1 check came from.
2      MS. PHARES: Your Honor, if I can just
3 describe to you briefly what's happened?
4      THE COURT: Yes.
5      MS. PHARES: Under the agreements with Kinder
6 and Bryant, they are entitled to certain publishing
7 rights which Sunbow has conceded all along, just not
8 the ones she is claiming, and those are managed by
9 Sony ATV and then sent through to Sunbow and then
10 divided up among all the people that are -- who appear
11 on those sheets and then redistributed, and we have
12 paid these before. Mr. Monaghan has produced copies
13 of similar kinds of royalty statements as Plaintiff's
14 Exhibits 17, 18, and 19, and these are simply the
15 royalties that have been due -- admittedly late, but
16 that lateness has been cured -- that have been due in
17 the past for the royalties periods that are indicated
18 on those statements. And I can't imagine why -- why
19 Plaintiff, given the burden of what she has to prove
20 with respect to an oral agreement, thinks that she's
21 entitled to another witness relating to these royalty
22 statements, let alone a deposition.
23      THE COURT: Hold on one second.
24      MS. PHARES: And the notion, as I say, that
25 there's another witness or -- let alone a deposition

Page 18

1  of that witness, is a complete detour from the -- the
2  matter that's before the court, which are these oral
3  agreements that she contends, you know, in addition to
4  the -- the written agreements with Sunbow.
5      MR. MONAGHAN: That's really -- I don't want
6  to fence with Gloria right now, Judge. You've heard
7  too much of this back and forth; but here it is on the
8  eve of trial, we get a check. It's not clear to us
9  exactly why we get this check, although an explanation
10  has been proffered, but without -- and we're obliged
11  to accept that explanation without testing somebody?
12  But I say, a deposition is not unusual for -- and --
13  and I think Mr. Rigby may be there, am I correct,
14  Gloria?
15      MS. PHARES: He will be there.
16      MR. MONAGHAN: Okay. Neil Rigby.
17      MS. PHARES: He also --
18      MR. MONAGHAN: Let me just finish with this
19  point.
20      That if we can perhaps get up there an hour
21  earlier or something and take Mr. Rigby's deposition
22  before trial ... I'm not suggesting disrupting the
23  trial. I want to find out the background of the
24  checks that just pop up, just by happenstance, on the
25  eve of each trial.

Page 19

1      MS. PHARES: Your Honor?
2      THE COURT: Yes?
3      MS. PHARES: This is really a frolick and a
4  detour. These are -- when Mr. Monaghan sent you the
5  material that he did the other day, he neglected, by
6  the way, to -- to add the following page, which says
7  that if she has a problem with any of these
8  statements, she's supposed to make a detailed claim
9  about them within a year.
10      We certainly have never heard any claims from
11  Ms. Bryant in the past relating to these, and there is
12  no basis for rethinking that she has any -- any
13  additional claims. Most of these have to do with --
14  not all, but many of them have to do with foreign
15  royalties. Some of them are domestic ones. There are
16  ring tones. So, the only thing that Mr. Monaghan
17  perhaps has a complaint about is that they weren't
18  paid as timely as he would like, but, frankly, that's
19  not the topic of this trial and it has never been.
20      And, furthermore, the -- you know, to have
21  the notion that we're now going to need deposing
22  witnesses is pretty amazing given that -- that Pat has
23  had about six or seven experts on his -- on his list,
24  including Mr. Berman -- Berman whom he did not offer
25  for a deposition and he is, I gather, still proposing

Page 20

1  to offer. And I just think this is -- this is
2  unnecessary.
3      MR. MONAGHAN: But, you know, I didn't issue
4  the check on eve of trial triggering this curiosity.
5      MS. PHARES: Well, curiosity isn't really
6  enough to burden Sunbow with --
7      MR. MONAGHAN: But curious as to why we just
8  got it.
9      THE COURT: Well, I want you to know that I
10  do not belong to the school of, you know, counter-
11  spies and curious happenings. What happens happens.
12      I'm not going to -- you're not going to take
13  any more depositions until we get this week under our
14  belt, at least.
15      MR. MONAGHAN: Okay.
16      THE COURT: And I don't think then, because I
17  want to -- to really, as I said in the Order, I want
18  to give Ms. Bryant her chance to make her case. Then
19  I want to give Sunbow their chance to get out of this
20  case, if they can.
21      MR. MONAGHAN: Well, Your Honor, you have
22  given Sunbow multiple opportunities to get out.
23  They've filed more motions than Carter has little
24  liver pills. But let me just say this: The
25  characterization that the Plaintiff, who did not have

Page 21

1  any written agreements in her possession for over four
2  years, the characterization that she's now, although
3  there is a written agreement that she has accepted --
4  that's the Jem Agreement. She's accepted that
5  agreement. She doesn't deny it's her signature. She
6  doesn't accept some of the other agreements that have
7  been proffered, but she does accept that one as
8  genuine. The characterization that -- that now we're
9  trying to base on an oral agreement -- remember, before
10  the Appellate Division came down with its ruling, the
11  Court did not permit us to amend to include a claim on
12  the written agreement; however, with the Appellate
13  Division's ruling and with -- ruling and with the fact
14  that the Court has ruled, you have ruled that the
15  written agreement applies, she is bringing her claims
16  under that written agreement, but she must lay a
17  foundation that that agreement applies to the other
18  compositions, which Sunbow's already admitted.
19      MS. PHARES: Hang on, hang on. Wait a
20  minute. This is an argument that Mr. Monaghan tried
21  to make several times over the course of the last six
22  months. This is not what happened. The issue before
23  the Appellate Division had nothing to do with the
24  amendment of the Complaint, and Mr. Monaghan moved to
25  amend the Complaint when we were in the middle of

Page 22

1  trial.  Sunbow's defense to that was that that was too
2  late, it was improperly supported, and that we were
3  prejudiced.  And that was the grounds for excluding
4  it, and they are still the grounds for excluding it.
5      I'm not finished, Pat; and I respected you
6  before.
7      THE COURT:  Hold on.  I denied that, the
8  amendment.
9      MS. SAFFER:  Denied the motion.
10     THE COURT:  Yes.
11     MS. PHARES:  And they are not in the case.
12 And as part of her motion, Ms. Bryant submitted an
13 affidavit sworn to the court that -- that she accepted
14 that the agreements governed all of her relations with
15 Sunbow, and she submitted that to Justice O'Rourke
16 asking him to rely on it when she wanted to amend.
17 And we are now going to go back and now have her
18 saying, oh, no, it's -- they don't, they don't all
19 apply.  And, in fact, Justice O'Rourke, when he ruled
20 on the framed-issue hearing, found that that same form
21 agreement governed all of her relations with Sunbow.
22     So, I hear Pat now saying, one, that if there
23 isn't an agreement, he's entitled to go into that;
24 and, two, he thinks he's entitled to construe these
25 agreements.  These agreements are not in front of the

Page 23

1  Court.
2      MR. MONAGHAN:  I am of -- that's an
3  interesting proposition, Your Honor.  Your Honor's
4  already found the written agreement applies, but --
5  but what I'm hearing from my opponent is it applies
6  only as a one-way street; it doesn't apply as to any
7  rights that Ms. Bryant might have under the very
8  written agreement Sunbow begged you to construe.
9      MS. PHARES:  And you agreed to it.
10     MR. MONAGHAN:  Because I didn't have a signed
11 copy.  How could I embrace a copy where I have no
12 signed agreement?
13     THE COURT:  Ladies and Gentlemen --
14     MR. MONAGHAN:  Discovery is closed.  What
15 kind of a lawyer --
16     THE COURT:  Ladies and Gentleman, please.
17     MR. MONAGHAN:  -- submits an unsigned
18 contract without knowing if his client ever signed it?
19     THE COURT:  I tell you what:  If you two
20 don't stop talking over each other and allow me to
21 talk, I'm going to hang up on you.
22     MR. MONAGHAN:  Sorry.  I apologize.
23     THE COURT:  All right.  Let's get down -- one
24 of the things I think I heard somewhere along the line
25 is that in this royalty check, there was some money

Page 24

1  for ring tones; is that correct?
2      MR. MONAGHAN:  I believe so.
3      THE COURT:  Well, wasn't that how this case
4  started, with Anne Bryant on the -- the stand playing
5  her cell phone for me, which had the transformer music
6  on it?
7      MR. MONAGHAN:  Yes, Your Honor, you're right.
8  That was when -- used when -- was the ring tone
9  licensed for the company; that that -- actually, you
10 know, the telephone company, they had to buy a license
11 from somebody.
12     MS. SAFFER:  Well, for whatever it's worth,
13 Your Honor, BMI pays for the performance of ring
14 tones, and Anne has received royalties from BMI for
15 the performance of her music on ring tones.
16     THE COURT:  Okay.  I'm coming down to the
17 last couple issues here.
18     I think it was Ms. Phares said, you know,
19 what's going to happen.
20     When we last left the -- Ms. Bryant was on
21 the stand under Cross-examination.  Now, I believe
22 that that Cross-examination should go forward, and,
23 Ms. Phares, you can ask any question you want about
24 unwritten agreements whatever.  But I'm not going to
25 stop now and go back to direct questioning.  And

Page 25

1  then -- excuse me -- Mr. Monaghan, you've got
2  Redirect.
3      MR. MONAGHAN:  Yes.
4      THE COURT:  I'm going to give you a fairly
5  wide area on that, but not as wide, probably, as you
6  want.  And then we've got Recross, and that should
7  finish Ms. Bryant's testimony.  And my hope is that we
8  can finish that on Monday.
9      MR. MONAGHAN:  Your Honor, I was going to
10 suggest ten minutes -- I mean, it's two years ago that
11 we stopped the trial.  I was going to suggest sort of
12 a ten-minute-for-each-side opening, supplemental
13 opening, if you will, to say where we are now and in
14 light of the -- the developments in the case.
15     THE COURT:  Well, I'll go along with that.
16     MR. MONAGHAN:  That will be helpful to you.
17     THE COURT:  I'll go along with that, but I
18 tell you, since you write to me I think once a week,
19 both of you -- I can't tell you how many trees we've
20 killed with this case -- that I've been sort of
21 following it; but, yes, fine, that will be ten-
22 minutes a piece, and then we're going to get Anne back
23 on the stand.
24     MR. MONAGHAN:  Okay.
25     THE COURT:  You're going to continue with

Page 26

1  Cross, and then you go into Redirect, etcetera. And
2  let's try and finish her up on Monday.
3      MR. MONAGHAN: Okay.
4      THE COURT: All right? Then, on Tuesday ...
5      MR. MONAGHAN: Kinder; and I have the morning
6  issue with my wife.
7      THE COURT: Yeah; okay. So, we'll get
8  together at 2:00 o'clock on Tuesday.
9      MS. PHARES: Now, hang on. So, we are not
10  going to -- you're saying that your associate is not
11  going to do the --
12      MR. MONAGHAN: Whatever the Judge's pleasure.
13  I am the lead attorney, and the Judge has --
14      THE COURT: Well, I'll tell you my problem.
15  As bright as Michael is, that, let's supposing we get
16  into arguments about questions during the -- during
17  the showing of this EBT and I have to make rulings?
18      MR. MONAGHAN: Yes.
19      THE COURT: I would think that you, as lead
20  attorney, want to be there.
21      MR. MONAGHAN: I do.
22      MS. PHARES: Well, I have a question:
23  Aren't you submitting -- you're not submitting the
24  whole examination?
25      MR. MONAGHAN: I don't know how -- actually,

Page 27

1  the technology doesn't allow for it, doesn't allow for
2  anything other than playing the whole darn thing.
3  We -- actually, you know, I think the Judge should
4  hear the whole thing.
5      MS. PHARES: Well, I mean --
6      MR. MONAGHAN: We took a lot of money to go
7  to Florida. We took a lot of money on the Reporter.
8  I think he's a critical third-party witness and sheds
9  a lot of light on the relationship also with BMI as
10  well. So, I think he's a very important witness.
11      MS. PHARES: Well, wait a minute. But we
12  only have a narrow issue. The deposition is all over
13  the place, and what you're proposing now is that we
14  take all the time from -- that we spent on that
15  deposition in court again, instead of you selecting
16  the selections that you want.
17      THE COURT: How long is the deposition?
18      MR. MONAGHAN: Well, it was a videotaped
19  deposition.
20      MS. PHARES: It was about three or four
21  hours, Your Honor, five.
22      MR. MONAGHAN: That's correct; but you
23  still -- Your Honor, this is -- this is a trial
24  witness now. This is not a deposition. This is a
25  trial witness, and we think it's important you see his

Page 28

1  demeanor and judge the credibility of the witness,
2  just as you would with a live witness. And that's
3  what the Order said. The Order said it's essentially
4  a trial witness. That's why we spent all the money to
5  go down there and made the motion. So, I think it's
6  important that you witness his demeanor and see the
7  testimony.
8      MS. SAFFER: Well, once again, I go back to a
9  very practical consideration. I was under the -- at
10  least an understanding that we were going to try to
11  wrap this thing up in a week. If we take a full day
12  on Mr. Kinder, how are you going to get all the other
13  witnesses to be heard that everybody wishes to have?
14      To be perfectly frank, I've got one witness,
15  and my witness, I said to the Judge, I expect I could
16  complete in about two hours. So, it's not really
17  going to effect my participation so much as I want.
18      You know, I sort of do consider myself
19  slightly impartial. I would like to think that the
20  Judge gets an opportunity to get a total picture from
21  everybody's point of view, and, therefore, I wonder
22  why we need to spend a full day with Mr. Kinder and
23  down in Florida and not -- where he went to elementary
24  school --
25      THE COURT: Okay; all right. Okay. Let's

Page 29

1  back up here.
2      Mr. Monaghan, what you want to do is see if
3  you can get a, you know -- you can run this through
4  and -- a machine and find out, you know, how many feet
5  are involved, and maybe you can bring it up to the
6  point where you want that testimony, you don't want
7  the other stuff.
8      MR. MONAGHAN: Okay.
9      THE COURT: I'm going to ask you to do that.
10      MR. MONAGHAN: Will do.
11      THE COURT: Because one way or another,
12  you've only got three hours on Tuesday afternoon to do
13  this whole witness; so, try and get it done by the end
14  of three hours. All right?
15      MR. MONAGHAN: All right.
16      MS. PHARES: And if you're going to designate
17  testimony, as I assume you are, would you just let us
18  know the lines and so forth in the transcript so that
19  we can prepare with any cross designation that we
20  need?
21      THE COURT: I think that's fair.
22      MR. MONAGHAN: All right.
23      THE COURT: Okay. So, all right, that I
24  think takes care of all of the housekeeping issues
25  that we have, and if there's something any of the

Page 30

1   parties want to put on the record, do it now.
2       MS. SAFFER: I would like to ask, since Mr.
3   Monaghan has indicated that he's removed 16 witnesses,
4   if he could tell us who he still intends to call so
5   that we can prepare only for what's relevant.
6       MR. MONAGHAN: We both indicated, Gloria and
7   I, that we're going to submit revised witness lists.
8       THE COURT: All right.
9       MS. PHARES: As early in the day as possible,
10  okay, because we are all preparing, and this has a
11  huge impact on everyone's preparation.
12      MR. MONAGHAN: Of course.
13      Also, Judge, yesterday I raised the
14  possibility of trying to simplify this with some
15  stipulations, some stipulated facts. I don't know why
16  this idea just occurred to me, but ... By simplifying
17  that -- both Gloria and Judy have said that they were
18  amendable to it, but crafting it over night, I tried
19  to do that, but I just couldn't put it together.
20      THE COURT: Well, look I'd certainly be in
21  favor of it. I would say continue working on it.
22  Maybe the three sides could come up with the points
23  that they're willing to concede, and when you get here
24  on Monday morning, you could sit down and we could put
25  it on the record.

Page 31

1       MR. MONAGHAN: That would be great.
2       MS. SAFFER: Well, Your Honor, I think I made
3   a substantial contribution. I conceded that we'll
4   change our claim for Mr. Bacal. Does that count for
5   anything?
6       THE COURT: I'm sure you did.
7       All right. I wish you all a nice weekend.
8   It sounds like it's going to be a busy one.
9       MR. MONAGHAN: Yes.
10      THE COURT: But --
11      MR. MONAGHAN: Well, Judge Judge?
12      THE COURT: Yes?
13      MR. MONAGHAN: You're starting at what time,
14  then, on Monday?
15      THE COURT: All right. 10:00 o'clock. I
16  have a regular calendar every morning, as you may
17  remember from Rockland County, and while I can get my
18  Principal Law Clerk to take a lot of them, some of
19  them I have to handle myself. And, so, 10:00 o'clock
20  we'll start and go through until lunch every day,
21  which is an hour-and-a-quarter, or something like
22  that, and around 12:30 or 12:00, and we'll wrap up --
23  we have to be out of this building by 5:00 o'clock at
24  night, I want you to know, but you can leave things
25  here over night, you know, and at lunch time.

Page 32

1       MR. MONAGHAN: All right. Thank you, Judge.
2       THE COURT: All right. Have a good weekend
3   all.
4       MS. PHARES: It's -- Your Honor?
5       THE COURT: And don't send me any more mail
6   until Monday.
7       MR. MONAGHAN: Monday is fair game?
8       THE COURT: No. Goodbye.
9
10      (Whereupon the proceeding concluded.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT 11

```
 1                    (DAILY COPY)
 2                 Continuing Bench Trial
                        (Day 3)
 3
 4                                      December 4, 2006
                                        10:10 AM
 5                                         40 Gleneida Avenue
                                        Putnam County Office
 6                                         Building
                                        Carmel, New York
 7
 8
      BEFORE:   HON. ANDREW P. O'ROURKE
 9              Presiding Supreme Court Justice
10
      SUPREME COURT OF THE STATE OF NEW YORK
11    COUNTY OF ROCKLAND
                                                  X
12
      ANNE BRYANT
13                            Plaintiff
14    - versus -                          Index No.
                                          5192/00
15    BROADCAST MUSIC, INC., (a/k/a "BMI"),
      FORD KINDER, KINDER & CO., LTD., VADIVOX, INC.,
16    JULES M. "JOE" BACAL; GRIFFIN BACAL, INC.,
      STARWILD MUSIC BMI, WILDSTAR MUSIC ASCAP,
17    SUNBOW PRODUCTIONS, INC.,
                            Defendants
18    _____X
19    ANNE BRYANT
                             Plaintiff
20                                   Index No.
      - versus -                     2821/02
21
22    SUNBOW PRODUCTIONS, INC.,
                            Defendant
23
      _____
24               Laurie Hardisty, RMR
                 Official Court Reporter
25         44 Gleneida Avenue, Carmel, NY 10512
                 (845) 225-3641 Ext. 294
```

Page 2

1  APPEARANCES:  PATRICK J. MONAGHAN, JR., ESQ.,
          and MICHAEL KORIK, ESQ., Co-counsel
2      Monaghan, Monaghan, Lamb &
          Marchisio, Esqs.
3      Attorneys for Plaintiff
4
5      GLORIA C. PHARES, ESQ.,
          and JOHN C. KNAPP, ESQ., Co-counsel
6      Patterson, Belknap, Webb & Tyler, Esqs.
          Attorneys for Defendant Sunbow
7
8
          JUDITH SAFFER, ESQ.,
9          and JOHN COLETTA, ESQ.,
          Co-counsel BMI Legal Department
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1          THE COURT:  All right, Ladies and Gentlemen.
2  In talking to the attorneys the other day, I had said
3  that I would give a few minutes to enable each side --
4  all sides to refresh themself and the Court where they
5  are and what they think we're doing here.
6          So, go ahead, Mr. Monaghan.
7          MR. MONAGHAN:  Thank you, Your Honor.
8  Your Honor, this will involve some projection on the
9  board, but I promise I won't take longer than ten
10  minutes.
11          THE COURT:  All right.
12          MR. MONAGHAN:  After six years of litigation,
13  four appeals, one removal to federal court, and a
14  trial which was interrupted in 2004, the question of
15  the day is where are we now, where are we going, and
16  where are we with the evidence that's come in so far?
17          And, Your Honor, I clerked a case when I was
18  going to law school and there was a partner there
19  named Kiernan, and the word about Tom Kiernan was his
20  ability to simplify matters was his greatest talent.
21  He was the senior litigating partner.
22          This case has had a lot of complex issues
23  thrown at you, but it really boils down to a fairly
24  simple proposition.  There's no question that Anne
25  Bryant composed the compositions that are at issue.

Page 4

1          There's no question that there was an agreement by
2  which she turned over the copyrights to Sunbow to
3  exploit them for their mutual behalf, and the question
4  that you're going to have to answer and deal with
5  based on the evidence is what rights did she retain
6  when she turned over the copyrights.
7          The Defendant Sunbow has attempted to
8  distract the Court, I believe, by suggesting that
9  merely because it's a work-for-hire that we're dealing
10  with that the Plaintiff somehow signed away all her
11  rights.  They then begged you, in 2004, to look at a
12  Jem agreement, which, at that point in time, was
13  unsigned, and they said repeatedly throughout their
14  pleadings, the Jem agreement is the Bible; the Jem
15  agreement is the agreement that governed all the
16  relationships.
17          There then was the issue of whether or not
18  some of the agreements which were tendered with the
19  Jem agreement in the middle of trial were legitimate.
20  The agreement, the Jem agreement, dated June 1, 1985,
21  does contain Ms. Bryant's signature, is not
22  challenged, and we submit does govern the relationship
23  between the parties, all the relationships, all the
24  compositions.
25          So, what's the beef?  Why are we here?

Page 5

1          Let's start with BMI.
2          MS. PHARES:  Your Honor, where you can see,
3  I'm afraid we can't.
4          THE COURT:  If you need to move around ...
5  The accommodations are not spacious here.  We're
6  hoping for the new courthouse, though I hope this case
7  is over by the time the new courthouse gets here.  So,
8  just moved around at your -- where you can see best.
9          MS. PHARES:  If you don't mind, I'm just
10  going to go stand over here.
11          THE COURT:  You can take the witness chair if
12  you want.
13          MS. PHARES:  All right.
14          THE COURT:  It won't hurt.  Most lawyers
15  doesn't like to be witnesses.
16          Go ahead.
17          MR. MONAGHAN:  In the course of the
18  litigation, in various pleadings before you, Judge, on
19  the many, many motions we've had to deal with, Sunbow
20  has made some damaging admissions.  They're damaging
21  because they acknowledge, and we're going to bring
22  some of them up on the screen, and they're
23  evidentiary.  These are not just pleadings or motions.
24  When they made informal judicial proceedings they
25  become formally judicially binding.

Page 6

1    And what are those admissions?
2        Now, what we're looking at is the face page
3    of the appendix, and this is merely for convenience of
4    reference. I have the volumes here.
5        What has Sunbow already told the Court? It's
6    told the Court that Ms. Bryant is entitled to her
7    performance royalties. No problem. Ms. Phares
8    stipulated to that the last time we were on.
9        THE COURT: Go ahead.
10        MR. MONAGHAN: It's told the Court she's also
11    entitled to certain additional publishing royalties.
12        Where is the fight?
13        They don't agree with the type of rights to
14    which -- to which we claim entitled. We got a check,
15    which I brought to Your Honor's attention. We got a
16    check just a few days ago, as we did before the 2004
17    trial, for publishing royalties, music royalties.
18        Now, Michael can you bring up, please, the
19    first appendix reference?
20        Fortunately I did leave one of the folders in
21    the cart, despite this morass of stuff.
22        In Sunbow's papers, which were submitted to
23    Your Honor, this was -- this is a portion of the
24    affidavit from Carole Weitzman submitted on -- in
25    connection with their motion for summary judgment.

Page 7

1    And ...
2
3        (Off the record discussion between
4        Mr. Monaghan and Mr. Korik.)
5
6        MR. MONAGHAN: I submit, Your Honor,
7    throughout the pleadings before the Court down below,
8    there are at least a half a dozen places where Sunbow
9    acknowledges, yes, she's entitled to her performance
10    royalties, but she's also entitled to publishing
11    royalties.
12        Well, what does that do to the proposition,
13    Your Honor, that she should be out of court? What
14    does that admission do to the notion that we just
15    found this agreement, which is dispositive, and you
16    have nothing left? It destroys it. We're here
17    because we haven't gotten a proper accounting of the
18    royalties to which Ms. Bryant is entitled. The two
19    checks that just -- the check that just came, came
20    with a small bare-bones accounting, under the Jem
21    agreement, the Jem agreement requires that there be an
22    accounting for these royalties.
23        So, what's the fight with Sunbow? The fight
24    is we haven't gotten accountings for years for the
25    royalties, and the major fight, the major fight is

Page 8

1    that she's entitled, Ms. Bryant, to mechanical
2    royalties.
3        And what would the Court define mechanical
4    royalties as? We say, and all of the experts say, and
5    Sunbow's own contract say, an audio visual work, which
6    would be the classic definition, includes records with
7    sound and visual or sound only. That's defined in
8    their agreements.
9        In evidence already before Your Honor are a
10    number of the compositions, the transformers showing
11    you VHSs, DVDs, and various other iterations for which
12    Ms. Bryant receives nothing. They use her music, she
13    receives nothing. This accounting that she just
14    received, which will go into evidence, did not mention
15    any of these other uses. Right now, as I'm standing
16    before you, her music is being used all over the
17    world. It's being used on the Cartoon Network, and
18    this is already in evidence. I'm only repeating
19    what's been testified to. There is a movie coming out
20    next year, Steven Spielberg, Live Action Transformers
21    Movie. The music in that movie is Ms. Bryant's music.
22    If you go to the trailers now, you will hear
23    transformers more than meets the eye. The classic
24    song. That is her song. She neither gets credit for
25    it, nor any money for it.

Page 9

1        Now, we have the agreement. We have the Jem
2    agreement that they begged you to apply. At least 6
3    or 7 times in their papers before you they said the
4    Jem agreement is dispositive, the Jem agreement
5    controls. We agree. And they also told you something
6    else. They said it doesn't just apply to Jem, it
7    applies to all of the compositions and all of the
8    series, all of the Sunbow series. Okay? So, it
9    applies to all of the compositions at issue in the
10    case, including transformers.
11        Now, Ms. Phares has been want to say that's
12    not in the case. It's not in the case. They're not a
13    Defendant Griffen Bacal is not a Defendant. We don't
14    care because it's a Sunbow production. The names on
15    all of those transformers products, it's not Griffen
16    Bacal, it's Sunbow. You will hear evidence, you will
17    hear additional testimony from other witnesses, that
18    if Sunbow and GBI were the same, Ms. Weitzman
19    testified, and we will put it in evidence, that the
20    music was just handed over, handed over to Sunbow for
21    use. The transformers music was the subject of that
22    inquiry at her deposition.
23        So, we're here. We're fighting about the
24    royalties to which she's entitled. She has a
25    contract. The contract does apply to all the

1 relationships. The contract is in the case. It
2 was -- they besieged you to put it in the case. So be
3 it. It's binding upon them. And the admissions in
4 the papers are binding.
5     We'll give you a formal request to take
6 judicial notice of the admissions that were made by
7 Sunbow.
8     Now, what's our beef with -- with BMI? Okay.
9 The BMI contract is Exhibit 1 in evidence. That
10 contract provides -- it's an old contract. I think
11 Ms. Bryant was just 21, perhaps.
12     MS. BRYANT: My 21st birthday.
13     MR. MONAGHAN: 21 at the time it was signed.
14 A long time ago, a while ago.
15     MS. BRYANT: A while ago.
16     MR. MONAGHAN: And it provides that when the
17 writer signs up with BMI, a performing rights society,
18 that BMI is -- seeks and obtains acknowledgments and
19 guarantees that the composition is original, not
20 somebody elses work.
21     Ms. Bryant, if you read the contract, you
22 will come away from that contract with a view that the
23 obligation to protect the writer, the member of the
24 society, is inherent in that -- in that contract.
25 You're going to hear testimony from Dr. Kinder, said

1 the same thing.
2     Now, BMIs position here as well, it's not our
3 fault that other people come in with cue sheets and
4 change registrations. They're only two parties
5 responsible for that process. One is Sunbow, which
6 sends in the sheets, and the other is BMI, who --
7 which has the obligation to protect its writers. In
8 this case it didn't. In fact, the registrations are
9 still not straightened out, even after two
10 settlements, hard fought, hard negotiated settlements.
11 She still only gets something like 8.3% of
12 transformers, even though by all accounts, all
13 admissions she's entitled to a hundred percent of the
14 writer's royalty on transformers. We're still not
15 where we should be on correcting the riff.
16     So, is it just, well, BMI is a not-for-profit
17 performing rights society and they shouldn't be held
18 accountable? No, Your Honor. They're responsible for
19 $238,000.00 worth of damages we've already put in the
20 record as Exhibit 30. Exhibit 30 was a tally that Ms.
21 Bryant had calculated based on looking at what the
22 publisher got because. There's a two hundred percent
23 split on those royalties. The Publisher gets a
24 hundred percent of the performance royalties; writers
25 split up the other hundred percent. She was able to

1 calculate only through the Year 2000 and -- I think it
2 was 2000, 2001, $238,000.00 worth of damage. We've
3 had no discovery for three years. Those damages are
4 continuing and on-going. Our discovery stopped when
5 the Note of Issue was filed.
6     So, our beef with BMI is a serious one. They
7 were supposed to protect their writers. They didn't
8 protect. They had a fiduciary duty to protect their
9 writers. They didn't do so. They accepted those cue
10 sheets without challenge and switched and changed
11 those registrations, to Ms. Bryant's detriment. So,
12 BMI is not just an innocent bystander in this case.
13     That's the case. It's a contract case, an
14 unjust enrichment case against Sunbow. They received
15 huge royalties using Ms. Bryant's music. They
16 continue to receive huge royalties with respect to her
17 music, and the evidence is already in for the most
18 part on that major subject matter.
19     THE COURT: Well, let me ask you a question
20 and we talked about this the other day on the
21 telephone. If Ms. Bryant only got 8% of transformers,
22 who got the other 92%?
23     MR. MONAGHAN: Joe Bacal got a piece of it
24 and -- and, oh, Dr. Kinder.
25     THE COURT: Well, now, you settled that with

1 them.
2     MR. MONAGHAN: We did.
3     THE COURT: So, wouldn't your claim be
4 against them if they -- for unjust enrichment if they
5 got the money and your client didn't?
6     MR. MONAGHAN: Our claim is that, as far as
7 BMI, and they made changes, the source of which we
8 still don't know how those changes came about, they --
9 maybe Kinder got the money, but they took the actions
10 that resulted in Kinder getting the money. Yes, we
11 have settled with Kinder, but that doesn't make it go
12 away. That doesn't erase the fact that changes were
13 made.
14     THE COURT: By the way, under your view of
15 the case, it's Kinder that was unjustly enriched;
16 isn't that so?
17     MR. MONAGHAN: Kinder may have been unjustly
18 enriched, but Sunbow was equally unjustly enriched.
19 Why? Because they made deals with the various
20 parties, various producers along the way and gave
21 away, gave away pieces of her attribution on those
22 particular compositions. And BMI is responsible not
23 because it got any money, we're not suggesting that
24 BMI got any money out of it. What we're suggesting is
25 they had an obligation to their writers under the

Page 14

1  writers agreement. This is why you become a member of
2  that society in the first place. So, they shouldn't
3  have allowed those changes without checking with her.
4          Your Honor, they're being very, very zealous
5  right now. We haven't been able to get those changes
6  we worked out years ago with the settlements now
7  because they're being very zealous in protecting. If
8  they had been half as zealous along the way, we
9  wouldn't be here.
10         THE COURT: Okay. I don't want to get into
11  the argument on this.
12         All right. Thank you very much. And maybe
13  we could move that out of the way so Ms. Bryant could
14  see what's going on.
15         Oh, you're going to go over there now. All
16  right.
17         MS. PHARES: Preference of order, Your Honor?
18         THE COURT: I think you're next up.
19         MS. PHARES: Okay. I'll do this from here.
20         THE COURT: Someone else can have the jury
21  chair if they'd like.
22         MS. PHARES: I don't think we need this any-
23  more.
24         MR. KORIK: Okay.
25         MS. PHARES: So that I can see the Court.

Page 15

1          Good Morning, Your Honor. It is nice to see
2  you again.
3          Before I begin, I just would like to -- I
4  have to say that there is a certain Alice-In-Wonder-
5  land quality about listening to the Plaintiff's
6  recounting of the beginning of this case. But the
7  Plaintiff, if you look at the Complaint in this case,
8  there is no contract claim, and despite the fact that,
9  from the very beginning of this case, as -- as Mr.
10  Monaghan points out, we have said that this was a
11  contract case. And it was only that there was such --
12  such strenuous objection to the possibility of that
13  that this case went the way it did. But that was the
14  choice that was made by the Plaintiff. And it was
15  only when the -- she was confronted with finally the
16  signed agreements, and then we had to go through,
17  it-wasn't-my-signature phase, that we got to where we
18  are. But we are proceeding and Sunbow is proceeding
19  right now this week according to the findings that are
20  laid out in your Court August 10, 2006, letter, in
21  which you reaffirmed in the November 2nd decision on
22  Sunbow's CPLR 4401 motion based on admissions. And
23  according to that letter, and I'm going to now quote,
24  and this is what we discussed on Friday, the Court has
25  already found that there were written and valid signed

Page 16

1  contracts between Plaintiff and Defendant Sunbow.
2  Defendant has presented evidence that said written
3  contracts were the only way Defendant Sunbow operated
4  with the artists it employed. If Plaintiff intends to
5  now say there were oral contracts, it is up to her to
6  prove this, especially in the face of the integration
7  or merger clauses. That's the end of the quote.
8          Now, Mr. Monaghan and -- and his client made
9  a motion to amend their Complaint at the end of 2005
10  in the middle of our trial and Your Honor denied that
11  motion. So, what Mr. Monaghan is now trying to do is
12  to just ignore that decision and say, well, no we're
13  here to construe the agreements.
14         We aren't really here to construe the
15  agreements. We're here on her claim that she has an
16  oral agreement, in addition to the agreements that
17  Your Honor has found bound their relationship.
18         Each of the Sunbow agreements contains a
19  merger clause stating that the agreement is the entire
20  agreement of the parties relating to its subject
21  matter and that it cannot be changed, rescinded, or
22  terminated orally. Under New York Law that clause is
23  the evidence of the parties' intent that the agreement
24  be considered a completely integrated agreement. It
25  also discharges all prior agreements that are

Page 17

1  inconsistent with it or fall within the scope of the
2  agreement.
3          The Sunbow agreement includes a section
4  relating to the royalties to which Kinder and Bryant
5  are entitled from rising from public performance, just
6  as Mr. Monaghan agreed, and which -- which Sunbow has
7  said since the beginning of this case. It also has a
8  section indicating to what publishing royalties
9  Plaintiff is entitled to. But that's not the subject
10  of the lawsuit today, even though that's the way Mr.
11  Monaghan would like to reform it.
12         The Plaintiff has the burden of proving an
13  oral agreement that she claims entitles her to
14  royalties from a much broader range of publishing than
15  it permitted under the Sunbow agreements. Sunbow does
16  not believe that Plaintiff can carry her burden of
17  proving the oral agreement that she claims, but even
18  if it can, if she can show an agreement, it conflicts
19  and it relates to the subject matter of the written
20  Sunbow agreements, therefore is barred as a matter of
21  law under the parole evidence rule.
22         And in connection with that, Your Honor, and
23  in light of the focus of this trial, as set out in
24  your August 10 letter, Sunbow is submitting this
25  morning four motions in limine. And I don't know to

Page 18

1   whom we should be giving these to.  Do you have a
2   courtroom clerk to whom you want us to give them or
3   should we hand them up to you?
4         THE COURT:  I'll take them.
5         MS. PHARES:  Okay.
6         THE COURT:  They really should be filed with
7   the County Clerk'S Office and then they come upstairs
8   here, but since you have them all ready, let me have
9   them so I can take a look at them over the time I
10  have.
11        MS. PHARES:  We can also give a set and have
12  them filed, if that's what you prefer.
13        THE COURT:  Yes.
14        MS. PHARES:  Okay.  How would that be?
15
16  (Handing to Judge.)
17
18        MS. PHARES:  The first is that the Court --
19  and we also discussed this on Friday, is that the
20  Court exclude testimony about agreements with parties
21  other than Sunbow.  I believe that Your Honor endorsed
22  that idea when we discussed it on Friday.
23        The other three motions in limine relate to
24  witnesses that the Plaintiff has noticed.
25  Specifically we move to exclude the testimony of Neil

Page 19

1   Rigby, who is TV Loonlands Head of Business Affairs,
2   and Carole Weitzman and David Berman.  None of the
3   three witnesses has any testimony that is relevant to
4   the oral agreement that Ms. Bryant claims was made in
5   the early to mid 1980s and which was the principal
6   focus of the trial this week, and none of the issues
7   for which their testimony is noticed is relevant to
8   her alleged oral agreement.
9         In addition, Ms. Weitzman's testimony is
10  inadmissible under CPLR 3116A because it's being
11  offered by an unsigned deposition transcript, and
12  Plaintiff has not shown that it was sent to her and
13  that she was given a 60 day opportunity to review it.
14  It's also inadmissible under CPLR 3117A because the
15  testimony isn't being used for impeachment.  She isn't
16  a party and wasn't a party when the deposition was
17  taken, nor was she employed by Sunbow at the time of
18  her deposition, and the Plaintiff has not shown that
19  Ms. Weitzman is unavailable under any of the standards
20  set out in CPLR 3117A3.
21        As for Mr. Berman, Plaintiff's expert, Sunbow
22  moves to exclude his testimony, not only because it
23  doesn't relate to the principal issue, that is -- that
24  is whether or not there was an oral agreement on which
25  he clearly has no evidence, but because he does not

Page 20

1   have extensive area -- experience, rather, in the area
2   of music publishing that is relevant to this case.
3   I'm not saying that Mr. Berman hasn't had a career in
4   the sound-recording industry.  He has.  But he does
5   not have the experience in the commissioning of music
6   for television and movie production, and that is
7   another area of music law than the one he has
8   practiced in.
9         Finally, both Mr. Berman and Mr. Rigby have
10  been noticed for issues that relates to an
11  interpretation of the meaning of certain provisions of
12  the Sunbow agreements.  And, again, as I've said
13  earlier, these are attempts by the Plaintiff to evade
14  the Court's ruling when it denied the Plaintiff's
15  motion to amend her Complaint and to sue on those
16  agreements.  If she had wanted to sue on those
17  agreements, she should have done that at the outset of
18  this case, and instead she denied that there were ever
19  agreements.  She has come to this point by her own
20  choosing.
21        The interpretation of the Sunbow agreements
22  is not before the Court this week and Sunbow asks Your
23  Honor to exclude any attempt to introduce testimony
24  purporting to interpret the agreements.
25        We'll also, just as a matter of record, renew

Page 21

1   the motions in limine that we made at the outset of
2   the trial in 2004.  And then one thing I was -- kind
3   of a matter of housekeeping that I would just like to
4   confirm is that the exhibits from the framed issue
5   hearing and the transcript of that hearing are
6   considered part of our trial.
7         THE COURT:  Yes.
8         MS. PHARES:  Thank you.  We had, I know,
9   proceeded that way.  We marked our exhibits that way,
10  but I just wanted to make sure that would be the case.
11        And, also, I would like to ask Your Honor,
12  there are three witnesses who are -- that are on both
13  -- that are on Sunbow's and Plaintiff's witness list,
14  and I just ask that when any witness is called, that
15  they be examined one time for all parties so that we
16  don't have to have people coming back.
17        THE COURT:  Well, that sounds reasonable.
18  Now, has Mr. Monaghan had a chance to review
19  these motions in limine?
20        MR. MONAGHAN:  Just handed to me.
21        THE COURT:  All right.
22        MR. MONAGHAN:  Your Honor?
23        MS. PHARES:  Well, Your Honor, I should
24  say --
25        MR. MONAGHAN:  Let me just put an

Page 22

1 objection --
2      MS. PHARES: Excuse me.
3      THE COURT: Hold on. Let me just -- let her
4 finish.
5      MS. PHARES: We couldn't actually prepare all
6 these motions because we didn't receive Mr. Monaghan's
7 witness list until ten minutes past five on Friday
8 evening when he was -- when -- after you had said that
9 you were closing up at 4:30. So, we could hardly
10 really address these issues until after we had
11 received that list.
12      And then one final thing that I would just
13 like to make sure is all right with the Court, we
14 have, in the ensuing two years, managed to lose our
15 copies of the Plaintiff's exhibits, and on Friday we
16 were going to -- we were going to -- last Friday,
17 rather, our paralegal came to copy them, and it turns
18 out that they were not here in the courthouse because
19 Mr. Monaghan had taken them with him. So, we would
20 like the Court's permission to borrow them for the
21 evening so that we may copy them, and we will bring
22 them back tomorrow.
23      MR. MONAGHAN: No problem.
24      THE COURT: All right.
25      MS. PHARES: Thank you, Your Honor.

Page 23

1      THE COURT: All right. Thank you.
2      MR. MONAGHAN: Your Honor?
3      THE COURT: Before Ms. Saffer -- go ahead,
4 Mr. Monaghan.
5      MR. MONAGHAN: Your Honor, I think what you
6 just heard was -- was not so much an opening but
7 preliminary to an argument and, in fact, most of an
8 argument that had no place in an opening, Number 1.
9      Number 2, since it was raised, let me deal
10 with this idea of oral contract, written contract, and
11 merger clauses; okay? A contract that has a merger
12 clause, the merger clause relates only to the subject
13 matter of that contract, no other contract. A merger
14 clause dealing with Composition X does not bar any
15 testimony about Composition Y. There is only one
16 written agreement that is valid in this case. It is
17 the Jem agreement.
18      Now, Ms. Phares says, Monaghan, you should
19 have sued on that agreement. We didn't have that
20 agreement until Your Honor allowed them into 2004 to
21 drop it in the middle of the trial, a year after we
22 had demanded it. So, fair -- fairness and justice
23 require that the Plaintiff -- and you've already found
24 valid written contracts that Sunbow besieged you to
25 apply to the relationship. They are stuck with the

Page 24

1 contract.
2      THE COURT: But aren't we getting in now --
3 what I really wanted to hear from you is, I'm going to
4 give you a chance to answer the motions in limine.
5      Will you be able to do that by this
6 afternoon?
7      MR. MONAGHAN: No.
8      THE COURT: Right after lunch or tomorrow,
9 whenever you appear?
10      MR. MONAGHAN: I will be able to deal with
11 them by tomorrow.
12      THE COURT: All right.
13      MR. MONAGHAN: As for preliminarily say --
14      THE COURT: No, I don't want to hear any
15 preliminarily. I want to give you a chance to read
16 them.
17      MR. MONAGHAN: Okay.
18      THE COURT: Okay. Ms. Saffer, we saved the
19 best for last. Now you're on.
20      MS. SAFFER: Thank you. That's the nicest
21 introduction I think I've ever received. Thank you.
22      You know, when we concluded the testimony
23 back in 2004, I asked for BMI to be dismissed at that
24 point, and Your Honor indicated that although you
25 didn't think there was any claim against BMI, you

Page 25

1 would wait until the entire testimony had been
2 finished before you ruled.
3      BMI believed we were out of the case shortly
4 after the end of the testimony because we thought we
5 had reached an agreement, a settlement agreement, Your
6 Honor was aware of that, that called for us receiving
7 certain documents from Mr. Kinder and Mr. Bacal so
8 that we could make switches to our records. We didn't
9 get those agreements. In fact, we received a copy of
10 an E-mail that Anne had sent to Dr. Kinder saying BMI
11 wants your agreement; you don't have to give BMI
12 anything.
13      Notwithstanding that, this summer at his --
14 at his deposition, he did, in fact, give us that.
15      When we spoke on Friday, you indicated, once
16 again, that you weren't sure why we were still in the
17 case, to which I agreed, and you said, would it be
18 possible for BMI to make the changes to Bacal's
19 records so it would all be over. I looked at the
20 settlement agreement that Ms. Bryant had reached with
21 Mr. Bacal. I said, fine, and you said prepare an
22 Order, and I did. And this Order instructs BMI to
23 change its records, and when you sign it, we'll be
24 happy to do so.
25

Page 26

1    (Handing to the Judge and co-counsel.)
2
3    THE COURT: All right. Has anyone seen this
4  Order yet?
5    MR. MONAGHAN: No.
6    MS. SAFFER: No. Again this happened on
7  Friday.
8    THE COURT: All right.
9    MS. SAFFER: The Order says we will make the
10  changes Ms. Bryant requested. So, I find it hard to
11  see how she could object, since we are giving her, in
12  fact, what she asked for.
13    I want to back up a little bit because I
14  really feel it's necessary to address the points that
15  were made in the opening by Mr. Monaghan.
16    If you look at the original Complaint filed
17  in this case, it alleged that BMI is guilty of having
18  participated in a fraud and not filling our fiduciary
19  duties, because Mr. Kinder had made changes to the
20  records, fraudulently and BMI had acquiesced to those
21  changes. We indicated that we had never changed any
22  of our records as a result of instructions from Mr.
23  Ford.
24    Subsequently, Ms. Bryant, Mr. Ford, reached a
25  settlement agreement. Mr. Ford's testimony, as you

Page 27

1  will hear in deposition, said he never changed any of
2  his registrations.
3    There is no evidence whatsoever that BMI ever
4  changed a single record pertaining to Ms. Bryant.
5  There was original testimony that there was confusion
6  over the dates. It became clear that the date
7  indicated on the registration, 1993 was a date in
8  which we changed our computer records, and, so,
9  everything got in 1993 date, if it had been registered
10  earlier, but the substance didn't get changed. And
11  the difficulty is apparently that Ms. Bryant is
12  disturbed that she's not being credited correctly or
13  fully for music that she wrote.
14    It's not my place to opine on that. That may
15  be true, that may not be true, I don't know, and, I
16  say, I, on behalf of BMI, BMI doesn't know. There is
17  no way BMI can know those things.
18    Ms. Bryant's attorney points to a paragraph
19  in the affiliation agreement and says in Paragraph 11
20  that that obligates BMI to look out for her interest.
21  And the response that I had is that if you look at the
22  language, it, first of all, gives BMI a right not an
23  obligation. Second of all, it would mean that BMI
24  would have to favor Ms. Bryant over Mr. Kinder, Mr.
25  Bacal, hundreds of thousands of other writers.

Page 28

1    BMI is not the Judge. You're the Judge. You
2  determine what her interests may be. We follow the
3  instructions given by a Court. We're not a Judge,
4  we're not a jury. We are -- our practice is, as Ms.
5  Bryant is aware, and as she testified, and as a BMI
6  witness will testify if we have to go forward, to
7  receive these registrations, these cue sheets, from
8  the people who make the programs. Whatever they tell
9  us is what we put down. If they change the music, if
10  they substitute music, if they hire somebody to make
11  an arrangement and decide that the shares should be
12  different, that's what we follow. We don't make any
13  independent evaluation. We don't determine one
14  person's rights vis-a-vis another person's rights.
15    And, furthermore, when we get a registration,
16  we have no way of knowing what that represents. We
17  have hundreds of thousands of musical compositions.
18  Titles are not protected by copyright. If Paul Lennon
19  wrote -- excuse me -- Paul Lennon -- John -- excuse
20  me -- John Lennon wrote Yesterday. If I turn around
21  and I write a song, and I call it Yesterday, and I
22  register it with BMI, they'll take it. They won't
23  credit me with his song if his song is reported
24  because it will say John Lennon's Yesterday. It won't
25  say Judy Saffer's yesterday. But, otherwise, they

Page 29

1  don't know; BMI can't know.
2    The burden and the expectation that is being
3  put upon BMI is totally unrealistic. No court has
4  ever found that BMI has an independent fiduciary duty
5  to each writer and each publisher. We have a
6  contractual obligation to do our best to pay them the
7  royalties that come to us.
8    As Mr. Monaghan said and admitted just this
9  morning, he's not alleging that we kept any money. If
10  we paid money to Ford Kinder that should have gone to
11  Anne by her evaluation, she should get that money from
12  Ford Kinder.
13    She, in fact, testified during the course of
14  her trial that a lot of registrations were made by Mr.
15  Dobishinski, who was her attorney and her
16  representative and she and Ford were partners and they
17  shared. We write checks based upon what's written on
18  the registration. If she and Mr. Kinder choose to
19  share, divide it up, whatever they want to do, it's
20  their business.
21    The rights that were granted to BMI, in her
22  contract to BMI, and every writers contract to BMI,
23  authorizes BMI to license their music for public
24  performance to people who use music. We're not
25  involved in mechanicals. We're not involved in any

Page 30

1  other portion of the rights, only the performance on
2  media like radio, television, whatever it may be or
3  even ring tones, as Your Honor pointed out. And, in
4  fact, Ms. Bryant has received money from BMI for ring
5  tones.
6      BMI shouldn't be in this case. BMI -- there
7  has been no -- not a scintilla of proof at all that
8  BMI has participated in any wrongdoing. We make up
9  nothing. We change nothing. If new registrations
10  came in from a new production company, that, in fact,
11  didn't properly credit Ms. Bryant, her lawyer has
12  every opportunity to go and sue the production
13  company, as, in fact, he has sued Sunbow. It's not
14  BMI's role. Our role is simply to license her work on
15  her behalf, which we do to the best of our ability.
16      I sincerely hope once again you will consider
17  dismissing BMI from this litigation.
18      THE COURT: All right. Just a moment.
19      You've heard Mr. Monaghan say that Ms. Bryant
20  only gets 8% of the royalties that she claims she is
21  entitled to for transformers.
22      Now, would you know where the rest of those
23  royalties went?
24      MS. SAFFER: If -- wherever it is that said
25  that she got eight-and-a-half percent, or whatever,

Page 31

1  lists the other writers that were credited with the
2  remaining percentages. We didn't set up that
3  percentage. The production company did, the people
4  who use the music.
5      Your Honor, it may very well be that all of
6  the music out there, with -- on the transformer show
7  has, at its very basis, work written by Anne Bryant.
8  I don't know. I'm not a musicologist. But the
9  copyright law says that the copyright owner has the
10  right to make changes, adaptations, arrangements, and
11  how they then credit people, if they decide her
12  contribution is worth 8% or 50%, I don't know. I take
13  what they give me because they own the copyright and
14  they have the right to make that evaluation.
15      THE COURT: So, if Sunbow owns the copyright,
16  Sunbow gets to decide who gets what percentage?
17      MS. SAFFER: Correct, correct.
18      THE COURT: All right.
19      All right. I thank you all. Rather than put
20  Ms. Bryant on the stand right now and then take a
21  break in a few minutes from now, we're going to take a
22  ten minute break. I'll see you back here at a little
23  after 11:00 o'clock.
24      MR. MONAGHAN: One quick question, Judge.
25      THE COURT: Yes?

Page 32

1      MR. MONAGHAN: I thought you said, ad
2  nauseam, no more motions, and here I am --
3      THE COURT: Well, in limines, I can see
4  motions in limine before you start a trial.
5      MR. MONAGHAN: Yes, I understand, Judge, but
6  we've known about the trial for months and months.
7  Couldn't they have served these motions --
8      THE COURT: Well, I understand. I'm not
9  making excuses for anybody, but I'm going to take the
10  motions and read them, as I have everything else.
11      You notice my glasses have been getting
12  bigger since this trial started, and I'm not blaming
13  anybody for it.
14      One thing I want to tell you, a slight change
15  in plans. At the present time we're not having court
16  tomorrow morning until 2:00 in the afternoon, at which
17  time you have until 5:00 to finish up that deposition,
18  whatever you want us to see.
19      Wednesday we have a full day.
20      Thursday, unfortunately, I have a hospital
21  appointment at 8:00 o'clock in the morning and I will
22  not be out of that until the next day. So, I arranged
23  us to have next Monday as a fill-in for Thursday. So,
24  there won't be any court on Thursday, but there will
25  be court next Monday. We may even go over until

Page 33

1  Tuesday if I can get that cleared off.
2      MR. MONAGHAN: Okay, Judge.
3      THE COURT: Okay. Have a break. See you in
4  a few minutes.
5
6      (Whereupon a recess was taken at
7      approximately 10:55 A.M.)
8      (Court reconvened at approximately 11:15 A.M.)
9
10      THE COURT: Let us have Ms. Bryant back on
11  the stand.
12      MS. SAFFER: Excuse me. Before we get into
13  substance, we're a little confused on calendar and the
14  like.
15      THE COURT: Okay.
16      MS. SAFFER: Because we thought this would
17  end this week, I have scheduled some stuff for Tuesday
18  and Thursday of next week. Monday is okay for me.
19      THE COURT: All right.
20      MS. SAFFER: Just trying to -- you will be --
21  we will be resuming on Friday?
22      THE COURT: Right.
23      MS. SAFFER: Friday, and then ...
24      THE COURT: Monday.
25      MS. SAFFER: Monday; okay. We're just

Page 34

1 clarifying. Thank you very much.
2        THE COURT: Sure.
3        Yes, please.
4
5        (Whereupon the Plaintiff, Anne Bryant,
6        resumes the witness stand.)
7
8        THE WITNESS: How are you?
9        THE COURT: Good. It's been a while; but
10 you're still under oath. It stays with you forever.
11        THE WITNESS: All right.
12        THE COURT: All right. We're back on
13 Cross-examination. Go ahead.
14        MS. PHARES: We are back on Cross-
15 examination, but our case has sort of changed a little
16 bit, so ...
17        THE COURT: All right.
18        MS. PHARES: So, I would like to begin, Your
19 Honor, partly to orient us, and -- and also I hope to
20 save some time is to offer two admissions, documents
21 as admissions. The first is Defendant's Exhibit Y
22 that we're offering for identification, is Page 32
23 from our trial date of July 9, 2004, and the -- the
24 testimony, it relates to -- relating to Ms. Bryant's
25 testimony that she does not contend that Sunbow has

Page 35

1 received any of the performance royalties from BMI
2 that were due to her. And I'll offer it for
3 identification.
4        THE COURT: All right. Has it already been
5 marked?
6        MS. PHARES: We've put a sticker on it, but
7 it has not been.
8        THE COURT: And it is "X", did you say?
9        MS. PHARES: It's Y.
10        THE COURT: Y.
11
12        (PLAINTIFF'S EXHIBIT Y - TWO PAGES OF
13        TRIAL TRANSCRIPT FROM JULY 9, 2004 -
14        MARKED FOR IDENTIFICATION.)
15
16        MS. PHARES: And I think we have a copy for
17 Your Honor as well.
18        THE COURT: Okay.
19        MS. PHARES: The front page is just for
20 identification, and this is -- do you have an
21 objection to it, Pat.
22        MR. MONAGHAN: I haven't seen it yet.
23        MS. PHARES: I'm sorry.
24        MR. MONAGHAN: I don't think it's something
25 that is normally an exhibit. It's part of the record,

Page 36

1 there's no doubt, but why would you just offer a
2 portion of testimony? It's not something --
3        THE COURT: Well, supposedly it's an
4 admission.
5        MR. MONAGHAN: It is as it is. I mean, we
6 can't complain about the testimony.
7        I guess I have no objection.
8        THE COURT: All right.
9        Ms. Saffer?
10        MS. SAFFER: No objection, Your Honor.
11        THE COURT: All right it's accepted into
12 evidence.
13
14        (PLAINTIFF'S EXHIBIT Y - TWO PAGES OF
15        TRIAL TRANSCRIPT FROM JULY 9, 2004 -
16        RECEIVED IN EVIDENCE.)
17
18        MS. PHARES: And then, Your Honor, I'm also
19 offering as --
20        THE COURT: Maybe so that the record is
21 clear, read what you claim is the admission.
22        MS. PHARES: And the admission is: And you
23 don't have a dispute -- hang on; let's see.
24        "All right. Now, if you turn to the writer's
25 share, turn to the writer's share of this" -- and this

Page 37

1 was -- I was pointing to our easel, if you remember --
2 "you're not saying, are you, that BMI paid any part of
3 the writer's share to Sunbow, are you, or to its
4 publishing companies?
5        "No.
6        "Okay. So, you're okay with this and nothing
7 was paid to Sunbow.
8        "Nothing that I know of."
9        And then Mr. Monaghan confirms, "I just want
10 to make sure we're talking about public performance
11 royalties." And I agree with him, "public performance
12 royalties is all that's at issue here."
13        THE COURT: All right. Thank you.
14        MS. PHARES: All right. And then, Your
15 Honor, I'd like to offer as an admission Ms. Bryant's
16 affidavit dated December 6, 2005. This is the -- this
17 is the affidavit that she submitted in support of her
18 motion to amend her Complaint. And we have marked
19 this as Defendant's Exhibit Z.
20
21        (PLAINTIFF'S EXHIBIT Z - AFFIDAVIT
22        OF ANNE BRYANT DATED 12/6/05 - MARKED
23        FOR IDENTIFICATION.)
24
25        THE WITNESS: We can't have any more. End of

Page 38

1    the alphabet.
2        MS. PHARES: Oh, we can double up. We're
3    really clever.
4        MR. MONAGHAN: What's the date on the
5    affidavit again?
6        MS. PHARES: December 6, 2005.
7        Specifically, if you're asking for the
8    particular language that we're referring to, it is on
9    Page 5 to 6, and it is specifically the Footnote 3.
10       "Although this is the Jem feature song
11   agreement, not the Jem theme song agreement, I have
12   accepted it as stating the terms of my Sunbow
13   agreements with Jules and Joe Bacal and Sunbow
14   agreements related to Sunbow Productions."
15       THE COURT: All right.
16       Mr. Monaghan?
17       MR. MONAGHAN: No objection.
18       THE COURT: All right. It's in evidence.
19
20       (PLAINTIFF'S EXHIBIT Z - AFFIDAVIT OF ANNE
21       BRYANT DATED 12/6/05 - RECEIVED IN EVIDENCE.)
22
23       MR. MONAGHAN: Do we have exhibits
24   in-between, all the way through?
25       MS. PHARES: Uh-huh.

Page 39

1        MR. MONAGHAN: I don't have that on my
2    Official Court Reporter's list of exhibits. It only
3    went through Defendant's ... I have up to J.
4
5        (Off the record discussion.)
6
7        MS. PHARES: That's A to J was our trial.
8    The framed issue hearing picks up from then on, but
9    we've agreed that that's all part of our trial record.
10       MR. MONAGHAN: I understand. That's fine.
11       MS. PHARES: I'll just give this to you if
12   you need to refer to it.
13       MR. MONAGHAN: Sorry for the interruption.
14       THE COURT: Go ahead.
15   CROSS-EXAMINATION BY MS. PHARES:
16   Q.  Ms. Bryant, would you please turn to Page 2 of that
17       Defendant's Exhibit Z?
18   A.  Yes.
19   Q.  And in that, if you look at the Paragraph D, you were
20       asking the Court to amend the pleadings to state
21       claims agreed to written contracts with Sunbow; isn't
22       that right?
23   A.  Yes.
24   Q.  And when you submitted this affidavit, you were asking
25       the Court to rely on the statement you made in the

Page 40

1        affidavit, weren't you?
2    A.  Which affidavit?
3    Q.  The one in front of you.
4    A.  Oh. Oh, this affidavit?
5    Q.  Yes.
6    A.  Yeah.
7    Q.  So, would you please turn to Page 5? And in Paragraph
8        3, didn't you ask the Court to amend the -- the
9        Amended Complaint to state claims for breach of
10       written agreements, including a certain Jem agreement
11       dated June 1986, dealing with my performance and
12       royalty rights?
13   A.  Yes.
14   Q.  That referred to agreements in the plural, didn't it?
15   A.  No, it says written contracts, including a certain Jem
16       agreement, singular. Right?
17   Q.  Well, a contract was in the plural, wasn't it?
18   A.  Well, if this Jem agreement is being used for all of
19       the compositions, then it would be a single contract
20       being used for all of the contracts.
21   Q.  Look at the Footnote 3.
22   A.  Okay. I understand that.
23   Q.  That's -- that refers to Sunbow agreements, related to
24       Sunbow Productions, does it not, in Footnote 3 at the
25       bottom of Page 6?

Page 41

1    A.  Yes, yes.
2    Q.  Okay. And that's the Jem agreement that you referred
3        to, the one that you refer to as the one that you and
4        Ford Kinder signed; isn't that right?
5    A.  Yes, we both signed it.
6    Q.  And in the statement after the words Jem agreement,
7        you refer to a Footnote 3; right?
8    A.  Yes.
9    Q.  Okay. And that's again where you refer to a plural
10       agreements?
11   A.  Yes.
12   Q.  And earlier in the -- and earlier in this trial, you
13       agreed that during your March 31, 2003, deposition,
14       you said that Ford Kinder had told you that there were
15       written agreements for the compositions at issue in
16       this case; right?
17   A.  He told me that there were agreements on a lot of
18       these -- on most of these things is what he said. I
19       think that's what I testified to.
20   Q.  Okay. Now, I want to give you what's already in
21       evidence as Defendant's Exhibit M (handing.) This is a
22       Jem agreement that you signed, isn't it?
23   A.  Yes.
24   Q.  All right. And just for the record, the date of this
25       agreement, which is written in hand on Line 1, is June

Page 42

1    5, 1985, isn't it?
2         MR. MONAGHAN: June 1st.
3    Q.   June 1, 1985. Isn't it?
4    A.   Yeah, we inserted this date here.
5    Q.   The year date is 1985, isn't it?
6    A.   Right. This is back-dated.
7    Q.   I'm just -- I'm just asking a question, all right?
8    A.   Okay.
9    Q.   And that's -- that's the only one I need you to
10   answer, Ms. Bryant.
11   A.   All right.
12   Q.   In your -- in your December 2005 affidavit, that's the
13   Defendant's Exhibit Z, we were just looking at --
14   A.   Yeah.
15   Q.   -- on Page 5, your date is 1986. That's a typo, isn't
16   it?
17   A.   Well, I don't know if it's a typo, Mrs. Phares,
18   because I can't recall whether this says 1985 or 1986.
19   And I know by all the correspondence and by the fact
20   that we negotiated this agreement for a couple of
21   years that we didn't sign it until 1987 or so, and
22   they -- they asked us to insert a back date, and I
23   don't know which back-date it was.
24   Q.   I'm just asking you: What is the date on the top of
25   the agreement that you signed?

Page 43

1    A.   Okay. It's either June 1, 1985, or it's June 1 1986.
2    Q.   And because you can see a 6 there?
3    A.   Is that a five or a six?
4    Q.   You mean you don't know?
5    A.   Yeah. What I do know is it wasn't signed until 1987,
6    so...
7    Q.   I'm not asking you when it was signed. I asked you
8    what is the date at the top of the agreement.
9    A.   Okay. I'm not sure.
10   Q.   Okay.
11   A.   You told me I could say that; right?
12   Q.   Fine.
13        THE COURT: Yeah.
14   A.   I'm not sure if that's a five or a six. I know it was
15   signed way later.
16   Q.   And you always discussed the Sunbow agreements with
17   Ford Kinder, didn't you?
18   A.   This one we certainly did.
19   Q.   Did you discuss all the agreements with Ford Kinder?
20   A.   We work -- when we worked for Griffen Bacal, we had
21   pretty much the way we worked together --
22   Q.   I'm just talking about Sunbow.
23   A.   Then I would say, yes, all Sunbow agreements were --
24   were discussed with -- by me and Ford and that -- that
25   all of the Sunbow interest in the Griffen Bacal's --

Page 44

1    they were involved in some Griffen Bacal agreements,
2    too. So, we didn't discuss all of them.
3         MS. PHARES: Your Honor, I'm going to make an
4    objection and please ask that the witness be
5    instructed just to answer the question that I have
6    asked.
7         THE COURT: Well, that will move things
8    along.
9         THE WITNESS: I understand, but, I mean,
10   it's --
11        MS. PHARES: It will.
12        THE WITNESS: Sometimes you just can't say
13   yes or no.
14        THE COURT: Well, I agree with you. And
15   we've been through this. If you're asked a yes or no
16   question, the answers are yes, no, or, I can't answer
17   it that way.
18        THE WITNESS: I can't answer it that way.
19   That's a new one. I like that. Thank you.
20   Q.   Okay. And after you discussed the Sunbow agreements
21   with Mr. Ford -- I mean with Mr. Kinder, you signed
22   them, didn't you?
23   A.   We mutually agreed to sign them. We signed them,
24   yeah.
25   Q.   Would you please turn to Page 10 --

Page 45

1    A.   Oh, this one.
2    Q.   -- of Exhibit M?
3    A.   I don't remember signing any other agreements, though.
4    I remember this one.
5    Q.   Have you got Page 10 in front of you?
6    A.   Yes.
7    Q.   Do you see a paragraph that begins with a lower case C
8    in parentheses?
9    A.   Yes.
10   Q.   Doesn't that paragraph say this agreement contains the
11   entire understanding of the parties hereto, relating
12   to the subject matter herein contained, and this
13   agreement cannot be changed, rescinded, or terminated
14   orally?
15   A.   Yes, I see that.
16   Q.   That provision means that the agreement cannot be
17   changed with an oral agreement, doesn't it?
18   A.   Yes.
19   Q.   Kinder and Bryant signed this agreement, didn't they?
20   A.   Yes.
21   Q.   Okay. But you're still claiming that you have an oral
22   agreement with Sunbow; is that correct?
23   A.   I'm saying that an oral agreement preceded this
24   agreement, not that it followed this agreement. It
25   preceded this agreement, as it did with everything we

Page 46

1  did for Tom and Joe and --
2  Q.  An oral agreement with Sunbow. You're saying that you
3  have -- I just want to -- I just want to make sure.
4      You're contending that you have an oral
5  agreement with Sunbow that preceded this written
6  agreement; is that correct?
7  A.  Yes, that's the way we get our jobs. They lay it out
8  for us orally, and then if it goes final, it becomes a
9  written contract.
10 Q.  Okay. And would you please turn to Page -- to Page 6
11 of the agreement?
12 A.  Yes, Ma'am.
13 Q.  Okay. This is the continuation of Section 6A, which
14 begins on Page 4 and 5, that sets out when Sunbow
15 agrees to pay publishing royalties to Kinder and
16 Bryant; isn't that right?
17 A.  This -- this is about where they won't pay royalties,
18 isn't it?
19 Q.  The whole section relates to publishing royalties; is
20 that correct?
21 A.  Yes, that's good; right.
22 Q.  Okay. And isn't it true that the first two-and-a-half
23 lines on Page 6 state:  No royalty shall be payable
24 hereunder for professional material not sold or
25 resold. Further, no royalty shall be payable to

Page 47

1  writer with respect to uses of the -- Capital M --
2  Music, except as hereinabove expressly set forth.
3      Is that correct?
4  A.  Yes.
5  Q.  Okay. So, how does an oral agreement with Sunbow for
6  royalties that exceed this agreement co-exist with a
7  statement in the agreement you signed?
8      MR. MONAGHAN: Object to the form of that
9  question. Presupposes a whole issue that hasn't even
10 been addressed, and there's no foundation for this.
11     THE COURT: Well, the witness has testified,
12 as I take it, that there was an oral agreement that
13 probably, as I understand it, was part of the
14 negotiations that are going back and forth, and
15 eventually that became M.
16     THE WITNESS: That's right.
17     THE COURT: So, I don't know that there's
18 anything wrong --
19     THE WITNESS: Everything we did --
20     THE COURT: -- with the question.
21     MR. MONAGHAN: My problem with the question
22 is that there's part of it that's saying, how is it
23 that you're asking for royalties that exceed. We
24 haven't even -- we haven't even gone there yet.
25 There's been no foundation for any of that. That

Page 48

1  question had inherent in it, how is it you're asking
2  for royalties which --
3      THE COURT: Okay. I'll tell you what, as to
4  form, I'll sustain the objection.
5      Ask the question again.
6  Q.  All right. How does an oral agreement with Sunbow
7  co-exist with that statement in the agreement you
8  signed?
9  A.  The oral agreement was a rough layout of the terms,
10 the basic terms that -- that laid out our
11 compensation, how we would be paid and how -- what
12 Sunbow needed to acquire. That's what the basic terms
13 of all working for in my industry begin with a phone
14 call; here's the terms, and if it even lives long
15 enough to go a written agreement, then it's hashed out
16 with more detail.
17     So, nobody said anything about using the
18 music hereinabove over the phone call. They said, you
19 get the royalties, we need the copyright. If we
20 choose your song, if it goes to final -- there are a
21 lot of ifs. This is a competition with ten different
22 people writing on it. It's not a work for hire until
23 I say it's a work for hire. It's all orally done.
24 That's -- the whole industry works that way, and they
25 don't make up ten contracts for people -- nine of whom

Page 49

1  are going to lose.
2      So, I don't think that my -- my oral contract
3  said, this is how much money we'll get. You'll get
4  your royalties. My writer's royalties were always
5  reserved. Those basic things were laid out in the
6  oral agreement before we said, okay, we'll take a
7  crack at it.
8      And that's all it is. It's a simple sketch-
9  out of the basic terms.
10 Q.  All right; fine. Now, I'm going to hand you two
11 documents that are already an exhibit, Defendant's
12 Exhibit J and O (handing.)
13     MR. MONAGHAN: Can you identify those for the
14 record, please?
15     MS. PHARES: Yes. The first is a letter from
16 Mr. Dobishinski to Carole Weitzman relating to the
17 amendment of the Jem agreement.
18 A.  O, and what?
19 Q.  I beg your pardon?
20 A.  Which do you want?
21 Q.  That's J?
22 A.  You want J?
23 Q.  And O.
24 A.  Okay.
25 Q.  So, first, looking at Exhibit J, when Kinder and

Page 50

1 Bryant wanted an amendment to the Jem agreement, Mr.
2 Dobishinski wrote to Sunbow and proposed it, didn't
3 he?
4 A.   I don't know whether he wrote to them or not.
5        Is that here?
6 Q.   Are you looking at Exhibit J?
7 A.   I was looking at O.  Okay.  Giving me two things at
8 once.
9 Q.   Right.  And I asked you, let's look first at Exhibit
10 J.  And I'm saying:  So, when Kinder and Bryant wanted
11 to amend the Jem agreement, Mr. Dobishinski wrote to
12 Sunbow and proposed it, didn't he?
13 A.   I don't see that he wrote to Sunbow.  He wrote to us.
14 Did he write to Sunbow?
15        Yeah; Carole.  Here it is on the back.  Let
16 me see.
17        He copied somebody.  He copied everybody.
18 Q.   So, Ms. Bryant, let's do this this way.
19 A.   Yeah.
20 Q.   The front of it -- let's do it page by -- the front of
21 this is -- this is a letter from Mr. Dobishinski to
22 Carole Weitzman; correct?
23 A.   Yes.  Oh, there, I see it.
24 Q.   And he copied you on it; is that correct?
25 A.   And he copied us on it.

Page 51

1 Q.   And the first page of it is Revised Amendment, dated
2 March 15, 1986, of Agreement dated June 1, 1985,
3 between Sunbow Productions, Inc., and Kinder and
4 Bryant Limited.
5 A.   Right.
6 Q.   And, two, red line copy of the arrived Revised
7 Amendment; is that correct?
8 A.   Yes.
9 Q.   And then when you turn to Page 2, do you see a red
10 line copy of the amendment?
11 A.   I assume it's red, yeah.
12 Q.   Well, it has underline --
13 A.   Underlined is true, but --
14 Q.   -- not red.
15 A.   -- that's because it's a photocopy.
16 Q.   And then if you turn to the page that has a -- the
17 production number at the bottom SUN 0400, that is the
18 clean copy of that amendment; isn't it?
19 A.   It looks like it.  I'm assuming that it is.  You read
20 it; right?
21        MR. MONAGHAN:  You know, Your Honor, if I
22 may?
23 A.   Can I --
24        MR. MONAGHAN:  I'm trying to see if this is
25 in evidence, this exhibit.

Page 52

1        MS. PHARES:  It is in evidence.
2        MR. MONAGHAN:  I don't know how it would have
3 gotten in evidence.  It's not signed.
4        THE COURT:  Well, I refer to the Court
5 Reporter.
6
7        (Off the record discussion.)
8
9        MR. MONAGHAN:  I'm going to ask that they be
10 stricken.  There's just no basis for these getting in.
11 Ms. Weitzman wasn't here.  They're unsigned.  Maybe I
12 missed the ball at the last hearing, but they
13 shouldn't be in evidence.
14        MS. PHARES:  Your Honor, this document has a
15 word, name Bill written in hand after the name Mr.
16 Dobishinski on the From line, and he is sending two
17 proposed amendments.  They would not be signed because
18 they haven't been accepted yet.
19        THE COURT:  Well, it's still in evidence.
20        MS. PHARES:  Right.
21        THE COURT:  You can't knock things out of
22 evidence now.  You get a chance to argue when it comes
23 in, not when it's in.
24        Let's go ahead.
25        MS. PHARES:  All right.

Page 53

1 Q.   Now, Ms. Bryant, if you look at Exhibit O.  Ms.
2 Bryant?
3 A.   Yeah.
4 Q.   Is this not the amendment to the Jem agreement signed
5 by Mr. Kinder and Carole Weitzman?
6 A.   Let me just make sure of that.  This is part of what
7 was two years ago.
8        Yes, this appears to be that.
9 Q.   All right.  So, when Kinder and Bryant wanted to amend
10 the Jem agreement, it knew that it had to be in
11 writing, didn't it?
12 A.   Yes.
13 Q.   And when Kinder and Bryant wanted to amend the Jem
14 agreement, it knew how to do it; didn't it?
15 A.   I don't know what that question means.  I don't
16 understand the question.  You mean in writing?
17 Q.   Yes.
18 A.   Yeah.
19 Q.   It knew the procedure.  It wrote, it proposed
20 something, and then it was finally put into writing;
21 is that correct?
22 A.   Yes.
23 Q.   Okay.  Now, you've testified earlier in this trial
24 about an oral understanding that Kinder and Bryant
25 claims that it had with Joe Bacal in 1984, when Kinder

Page 54

1  and Bryant first started working with GBI; is that
2  right?
3  A.  Right.
4  Q.  And you've testified that the oral agreement was based
5  on some earlier agreements between Michelin Co. and
6  GBI; is that correct?
7  A.  That's correct.
8  Q.  So, am I correct that you're saying that when you and
9  Ford Kinder started Kinder and Bryant in 1983, you had
10  the same agreement with GBI that Michelin Co. had had
11  with GBI?
12  A.  It was very -- a hand shake, rough, you know, same
13  basic principles that we always worked under, yeah.
14  Q.  Is it a yes or a no?
15  A.  Well, I don't know to say that the exact ink on -- on
16  the Michelin Company and ours was the same. I mean,
17  time went by. Rates went up, prices went up, you
18  know.
19  Q.  In 1983; or, actually, you testified you did this in
20  '84.
21  A.  Yes.
22  Q.  And it was the same agreement, essentially?
23  A.  On principle it was the same agreement. We kept our
24  royalties. We got a creative fee. They got the
25  copyright because they needed the copyright. It was

Page 55

1  just the same structure, and it's the way I work with
2  everybody.
3  Q.  All right. Now, is it correct that you're contending
4  that Kinder and Bryant also had an oral agreement with
5  Sunbow, in addition to the written agreement that
6  Kinder and Bryant signed with Sunbow for each of the
7  TV series?
8  A.  Well, we only did one original TV series. The others
9  were just taken from the Sunbow library and used for
10  their other TV series. We only did one, Mrs. Phares.
11  Q.  You have named several productions that were done for
12  Sunbow as part of your Complaint; correct? Those are
13  the agreements that I'm talking about.
14  A.  Could you help me out by telling me what you're
15  talking about? Are you talking about the Jem show?
16  That was contracted with Jem.
17  Q.  I'm talking about all of the productions that you told
18  Justice O'Rourke that you were suing on on the first
19  day of trial.
20  A.  The transformers, we did not do the television show.
21  They simply took their Sunbow library of music and
22  used it in the transformers TV show and on all their
23  products. They were the common publisher between
24  Griffen Bacal and Sunbow Productions. I mean,
25  anything that was listed --

Page 56

1  Q.  Are you saying you did not do -- you didn't have an
2  agreement with Sunbow with -- relating to
3  transformers?
4  A.  I don't know. I don't remember that.
5  Q.  You don't know that you didn't have one?
6  A.  I know I had certain pieces of paper that -- that --
7  that were related to that.
8  Q.  I am talking about agreements with Sunbow.
9  A.  I don't know. I don't -- I don't have them, and I
10  wish you did.
11  Q.  But you have agreed that the Jem agreement is the form
12  of agreement that governed all your relationships with
13  Sunbow. That was what you stated in your affidavit,
14  that is what the Court found in his decision on June
15  15th at the end of the framed -- ruling on the framed
16  issue hearing. That's -- that's your testimony; is
17  that correct?
18  A.  Yes. And all of the -- the agreements with Sunbow's
19  Productions all track with this agreement.
20  Q.  So, I am asking you: Are you contending whether --
21  that you also have a written -- an oral agreement in
22  addition to your written agreements with Sunbow?
23  A.  No. I'm saying that all -- all the jobs I got from
24  GBI, Sunbow, anybody involved in -- in that double
25  company, all of them came to me as all my jobs today

Page 57

1  come to me, on spec, with the terms being given
2  orally. That's how the industry runs. Later on,
3  those terms are fleshed out in a written contract if
4  lightening strikes and something goes on the air.
5  Q.  So, you're saying that if there was later a written
6  contract on one of those speculative offers, that then
7  the only thing that governs is the written agreement;
8  is that what you're saying?
9  A.  Yes, there's nothing about the oral agreement that was
10  more than the written agreement. It was the basis of
11  the written agreement. That's what I'm saying.
12       MS. PHARES: Well, Your Honor, on the basis
13  of that, it seems to me that I am going to make a
14  motion for a directed verdict right now, because the
15  Court has already found that the Sunbow agreements
16  governed all of her relationships. They have a merger
17  clause in them. She apparently is conceding that any
18  prior oral agreement was merged into them; and we're
19  done.
20       THE COURT: Mr. Monaghan?
21       MR. MONAGHAN: That's easy. The Jem
22  agreement that was just inquired about relates to a
23  particular subject matter. The particular subject
24  matter were the feature songs for the shows. Does not
25  cover, does not describe the subject matter as

Page 58

1  anything other than that. Doesn't describe
2  transformers, doesn't identify the Jem themes, which
3  are the more valuable property. So that the merger
4  clause, which I don't know why counsel keeps stressing
5  it, can only relate to that particular composition.
6  That merger clause in the Jem agreement can only
7  relate to the -- the feature songs and -- and what it
8  says is, we cannot have an oral agreement that
9  contravenes this written agreement about the subject
10  matter, the feature songs. So, we're still here, and
11  we're still going to continue our trial because --
12          THE COURT: Hold on.
13      Is it -- now, your client has testified that
14  there could be oral agreements beforehand and
15  generally were, and then they would be incorporated
16  into a written final agreement.
17          MR. MONAGHAN: Correct.
18          THE WITNESS: Uh-huh.
19          THE COURT: Is that your position?
20          MR. MONAGHAN: That's her testimony,
21  regardless of my position.
22          THE COURT: Okay. So, then, and this Court
23  has found sufficient evidence to say that this
24  happened in all the cases.
25      Now, I understood that we were going to have

Page 59

1  some evidence that there were other oral agreements as
2  to -- as to some of the songs that -- or musical
3  pieces that were done by the Plaintiff that you're
4  going to introduce in this case. Are you?
5          MR. MONAGHAN: We're going to introduce,
6  because we do not have a written agreement, we do not
7  have written agreements as to, Judge, these other
8  compositions. So that, in order for the Court to
9  apply the Jem agreement concept of royalties,
10  reservation of royalties, there must be a foundation
11  that that was the agreement that applied to the other
12  compositions.
13      You have found, but you did not identify in
14  your opinion, Judge, which agreements you found to be
15  valid and binding. The transformers agreement that
16  was submitted is not valid and binding. It is still
17  challenged.
18          THE COURT: Your client stated she doesn't
19  even know if there was a written agreement on
20  transformers.
21          THE WITNESS: It was with Griffen Bacal
22  initially, but that wasn't it because that's not our
23  agreement.
24          THE COURT: All right.
25          MR. MONAGHAN: That's true, Judge, and that's

Page 60

1  exactly what was going on before the Jem agreement was
2  produced in 2004. We didn't know whether it was
3  signed or not.
4      I mean, I don't understand a position that
5  says, please, Judge, apply this written agreement, the
6  Jem agreement, to all of the relationships between the
7  parties, and then says on the other hand, no, don't
8  apply it to all of the other relationships.
9          MS. PHARES: Your Honor --
10          THE COURT: No, I have said I am applying it
11  to all relationships.
12          MR. MONAGHAN: We would ask you to do so.
13  And the merger clause, again, does not bar any
14  testimony as to the other agreements. It's a merger
15  clause as to --
16          THE COURT: Listen, if -- if there was a
17  contract like M on Jems for every piece of work done
18  by the Plaintiff, then everyone of them had a merger
19  clause in it --
20          MR. MONAGHAN: Right.
21          THE COURT: -- and, so, in order to change
22  that, you would have needed a writing.
23          MR. MONAGHAN: Agreed.
24          THE COURT: Okay. Now --
25          MR. MONAGHAN: No dispute.

Page 61

1          THE COURT: Now, counsel says, well, that's
2  the end of their case because there is no proof at all
3  about written agreements or -- excuse me -- oral
4  agreements that superseded or in any way changed the
5  written agreements.
6          MR. MONAGHAN: I'm actually very puzzled,
7  Your Honor. A merger clause does not bar any other
8  composition.
9          THE COURT: Yeah, but we're going on the
10  assumption that everyone had a contract that had a
11  merger clause, what are you going to prove about oral
12  contracts, then?
13          MR. MONAGHAN: We're going to prove, and
14  proof that's probably half-way or three-quarters of
15  the way there, that the Jem royalty provisions in
16  Exhibit M apply to each of the other compositions,
17  including transformers.
18      You actually found that, I think, already.
19          MS. PHARES: Your Honor, you have already
20  found that these agreements apply. What Mr. Monaghan
21  wants you -- is trying now to do is just what I had
22  predicted. He is trying to evade the fact that you
23  have already denied an amendment to the Complaint for
24  us to start this case over again, on a breach of
25  contract on the written agreements. And that is not

Page 62

1  in this case, and, apparently, neither is an oral
2  agreement that we all thought was going to be proved.
3  And, as we understand it, and which is what we had
4  thought before, is that there are written agreements.
5  They all have merger clauses. Ms. Bryant is now
6  saying that any oral agreement she made was turned
7  into a written agreement which had a merger clause.
8      We do not understand how this case can
9  continue.
10     MR. MONAGHAN: Well, very simply, even as to
11  the Jem written agreement we have, it provides for
12  royalties and accountings. So, if we just isolate
13  that agreement, we have --
14     MS. PHARES: The agreement --
15     MR. MONAGHAN: Excuse me one second.
16     MS. PHARES: We -- you were denied a motion
17  to amend to sue on that agreement.
18     MR. MONAGHAN: The agreement is in the case,
19  Your Honor. We haven't gone six years, had it
20  produced in the middle of trial, motions galore,
21  and have it introduced in evidence by counsel.
22     MS. PHARES: To prove that there was no oral
23  agreement. That was the purpose.
24     MR. MONAGHAN: It's in for all purposes --
25     MS. PHARES: No, it is not.

Page 63

1      MR. MONAGHAN: -- all evidence. Well, that's
2  for the Judge to rule.
3      You cannot -- we can't come this far, we
4  can't come this far, have this agreement dropped on us
5  in 2004, after we demanded it in 2003. This is all
6  part of the record. And then counsel say, okay, too
7  bad, tough break; although we dredge it from the briny
8  deep in 2004, it's not in the case.
9      They wanted you to put it in the case. It's
10  in the case. They're stuck with it. There are
11  admissions that I'm going to read in as part of my
12  affirmative case as to what they said in their papers
13  before Your Honor.
14     This agreement isn't a one-way street. It
15  doesn't just work for Sunbow. Those clauses that we
16  now agree, all agree, Your Honor and counsel, those
17  clauses give my client rights.
18     MS. PHARES: Your Honor --
19     THE COURT: Okay. Hold on, hold on.
20     MR. MONAGHAN: They give her --
21     THE COURT: Do we now agree that we are not
22  arguing over oral contracts of any sort; that that's
23  out of the case?
24     MR. MONAGHAN: I don't -- if I may, Your
25  Honor? I don't understand how we -- it's not an

Page 64

1  either or proposition.
2      THE COURT: Sure it is. Your client said
3  that there was a time, with each of these things, when
4  it was orally discussed, and then eventually it would
5  be incorporated, all of the things that were orally
6  discussed, into a written contract.
7      MR. MONAGHAN: Right.
8      THE WITNESS: Can I say something?
9      MR. MONAGHAN: No.
10     THE COURT: Just a minute.
11     All right. So, now, what is it about oral
12  contracts that you want this Court to know, other than
13  what your client has testified to?
14     MR. MONAGHAN: I want this Court to apply the
15  written agreement, the Jem agreement, to all the
16  relationships, just as you found and they
17  acknowledged. That's what I want. We went up on
18  appeal on Statute of Frauds when we didn't have a
19  written agreement, and all I did was, once that
20  written agreement came into the case, evidence comes
21  in from any source, Plaintiff, Defendant. It came
22  into the case, and there's no appellate court in the
23  land that would not say that that agreement is not in
24  the case. It's in the case for all purposes. It's
25  for the Court to construe. It's for us to take

Page 65

1  advantage of whatever clauses benefit the Plaintiff
2  and the royalty clauses -- that's why she's getting a
3  check; that's why she got a check before the trial.
4      MS. PHARES: There was no appeal on the
5  Statute of Frauds position, by the way.
6      MR. MONAGHAN: In any event, those issues are
7  gone. We're not here to contravene the Jem agreement,
8  the written Jem agreement. We're not here to say
9  there's a separate oral agreement. We're here to say
10  that applies to that, to the Jem, and orally she will
11  testify that the -- and did, just now, those -- those
12  terms, the reservation of writers royalties, they
13  apply across the board. That's what they said.
14  That's what they said.
15     MS. PHARES: Your Honor?
16     THE COURT: Yes?
17     MS. PHARES: When we started this case --
18  let's just... When we started this case, we said
19  there was an agreement, and Mr. -- and the Plaintiff
20  denied it. And I did, indeed, beseech you -- I think
21  that was the word I used, and I lost, and I lost --
22  and Plaintiff -- and Plaintiff prevailed, and we went
23  ahead to prove the oral agreement that she claimed.
24  And then we found the written agreements. But we were
25  already well into trial by the time those written

Page 66

1  agreements were found, and then the Plaintiff denied
2  the -- the signatures. And then we had to prove the
3  signatures. And then a year later, after we had been
4  in this case for three years, she asked to amend her
5  Complaint, and you denied it, as was appropriate
6  because it was too late. It was not well-founded, and
7  it was certainly prejudicial to Sunbow. And, now, you
8  have, I thought, given great indulgence -- you had
9  then found, you then indeed found, as a result of the
10  framed issue hearing, and having heard all the
11  testimony about the fact that everyone signed the
12  exact same agreement, that she indeed signed her
13  agreement, that the Jem agreement and that form
14  governed all of her relationships. Then she asked,
15  no, I have another oral agreement. And the Court had
16  indulged her. And we have come today, and now we hear
17  that, in fact, no, she has conceded that those oral
18  agreements were indeed merged into the -- into the
19  written agreement. But those written agreements were
20  not sued on, they are not part of the pleadings, and
21  we are not here to construe those agreements, which is
22  what Mr. Monaghan is asking. We were here today only
23  to find out whether there was an oral agreement that
24  could somehow co-exist with the written agreements.
25  It cannot, and therefore --

Page 67

1        THE COURT: Well, Counsel, isn't she still
2  entitled to an accounting?
3        MS. PHARES: She is -- she may be. She can
4  bring her case on those -- on the agreements if she
5  thinks so. But the fact of the matter is is that she
6  is paid royalties on the publishing rights that are
7  laid out in them. What Mr. Monaghan and his client
8  want to start now is a new case trying to interpret
9  these agreements to include something more.
10        But the other thing is is that if she has a
11  complaint about her accounting, the agreement says you
12  are to bring a complaint within one year of receiving
13  your royalty statement.
14        Now, we paid royalties, it's true, in -- the
15  last time was 2004, but we received no complaint about
16  that royalty statement.
17        THE COURT: So, she's just been paid another
18  one in 2006.
19        MS. PHARES: So, if she wants to bring a
20  complaint about them, she is entitled to do that, but
21  that's not what this case is. This case started about
22  her claim that she had an oral agreement, and we have
23  now shown that she did not have an oral agreement, and
24  that's the end of this case.
25        THE COURT: All right. I want to talk to the

Page 68

1  principal attorneys in chambers. You can decide for
2  yourself who the principal attorneys are.
3        THE WITNESS: Your Honor, can I just ask you
4  a question in general, general, not about the case?
5        THE COURT: Talk to your attorney first;
6  okay?
7        THE WITNESS: It's just that if I bought a
8  house --
9        THE COURT: Yeah.
10        THE WITNESS: -- wouldn't I talk to my
11  attorney, say I want this and that and that? And then
12  he'd say, Okay, I'll do the contract. I mean, that's
13  what I'm saying.
14        THE COURT: Okay.
15        THE WITNESS: I think everything begins with
16  an oral contract.
17
18  (Whereupon a recess was taken at approximately 11:55
19  AM.)
20
21  (Luncheon recess taken at approximately 12:40 PM.)
22
23  (Court reconvened at approximately 2:35 PM.)
24
25        THE COURT: All right. We're back on the

Page 69

1  record.
2        All right, Ladies and Gentlemen, I took as
3  much time as I could during lunch and the -- and I
4  could not answer some of the questions that were in my
5  mind. So, I'm going to take some more time this
6  afternoon and tomorrow morning. At 2:00 o'clock
7  tomorrow afternoon, I'll address everybody's concerns,
8  including I'm go through these Orders. I would like
9  to have BMIs Order looked at by everybody and your
10  analysis of that. We certainly might get rid of that.
11  I will look at the suppression request, though it
12  seems to me that the EBT that you were going to use
13  tomorrow may not be relevant anymore; but I'll talk to
14  you about that tomorrow.
15        In any case, that's for 2:00 o'clock
16  tomorrow. And, at this time, we still have Ms. Bryant
17  on the stand.
18        And, Mrs. Phares, are you finished or do you
19  have --
20        MS. PHARES: Well, I'll just ask a few more
21  questions.
22        But, Your Honor, I would like to confirm on
23  the record what I think was said before we all
24  adjourned, and in which I think you indicated in
25  chambers, was that the theory of there being an oral

Page 70

1    contract still in this case is now over.
2    THE COURT: That's correct.
3    CROSS-EXAMINATION BY MS. PHARES: (Cont'd)
4  Q.  Ms. Bryant, is Exhibit M still there by your side.
5  A.  Yes, that's it. It's funny. The show used to be
6    called M.
7  Q.  Would you please turn to Page 7 of the agreement?
8
9    (The witness complies)
10
11  Q.  And there's a carry-over paragraph at the top of the
12    page.
13  A.  Yeah.
14  Q.  And the last sentence of it, if you would look at it,
15    says: All royalties, statements, and other accounts
16    rendered by company shall be binding upon contractor
17    and not subject to any objection by contractor, unless
18    specific objection in writing, stating the basis
19    thereof, is given to company by contractor by one year
20    from the date rendered.
21    Is that correct?
22  A.  Yes.
23  Q.  Now, do you understand that this relates to your
24    obligations under the agreement with respect to any
25    royalty payments that are made to you?

Page 71

1  A.  But none were made. Yeah, I understand that. So, how
2    could I object?
3  Q.  Do you recall before -- before -- in 2004 that you had
4    received royalty payments from Sunbow?
5  A.  Not from Sunbow.
6  Q.  Well, there were royalty payments received from Sunbow
7    accompanied by Sony ATV royalty statements?
8  A.  Yeah, I think it was Sony.
9  Q.  Okay. So, you remember receiving those?
10  A.  Yes.
11  Q.  Did you -- do you understand from this language that
12    if you have an objection to those statements, that you
13    are required to make an objection in writing within
14    one year?
15  A.  Yes; but we were about to go to court, so I just gave
16    it to my attorney to put in his trust account. I
17    didn't at all accept it as a valid accounting.
18  Q.  Did you make -- did you make an objection to those
19    accounting statements to Sunbow?
20  A.  We didn't understand them, so we asked you what they
21    were. And you said that's what she's owed. That's
22    all I remember about it.
23  Q.  I'm just asking you this: Did you make an objection
24    to Sunbow in writing?
25  A.  I really don't know. I don't know whether we did or

Page 72

1    not.
2  Q.  You have no recollection?
3  A.  I don't know if -- we did so many things in writing,
4    but I don't know if we did that.
5  Q.  You have no record of having made an objection in
6    writing?
7  A.  I have to defer to my attorney. I don't know if we
8    ever made that particular objection.
9  Q.  Do you understand that if you did not make an
10    objection, that after one year you were barred from
11    making an objection?
12  A.  That's what this says.
13  Q.  Do you have any recollection of whether or not you
14    retained an auditor to have the records audited?
15  A.  No, I didn't.
16  Q.  Do you recall whether or not you have ever, in the
17    past, made a written complaint to Sunbow with respect
18    to any of the royalty statements that you've received?
19  A.  No. I made a phone call once about it, and I was told
20    that I had no -- I called Sony after I got my BMI
21    catalog and I said, You're my publisher. And they
22    said, well, we control all your compositions. I said,
23    Well, I've never gotten any statements from you. And
24    then I guess that was at the very beginning when I got
25    my catalog and I saw that Sony was my publisher. I

Page 73

1    didn't know Sony was my publisher.
2  Q.  At the beginning of this agreement, you understand
3    that the -- that Kinder and Bryant is the contractor;
4    is that correct?
5  A.  Yes.
6  Q.  And Sunbow is the company; is that correct?
7  A.  Yes.
8  Q.  So, did you make any claim to Sunbow?
9  A.  No, I didn't know to make a claim. They didn't give
10    me any statements.
11  Q.  You don't recall receiving statements --
12  A.  No.
13  Q.  -- from Sony before -- before the trial last year, in
14    2004?
15  A.  Right -- the day -- a day or so before the trial, just
16    like this one, we got a statement.
17  Q.  You did receive the statements in 2004?
18  A.  I got one statement and a check.
19  Q.  You got -- were there several pages of statements that
20    were submitted?
21  A.  I don't really remember. I remember there were some
22    wacky percentages on there that I didn't understand,
23    and I didn't understand how it was arrived at, the
24    particular figure was arrived at. But something came
25    in with a check, and it came in just about two days

Page 74

1   before the trial, which is the same thing that
2   happened for this trial.
3          MS. PHARES:  Your Honor, if I may have a
4   minute?
5          THE COURT:  Yes.
6
7          (Off the record discussion among
8          Ms. Phares and co-counsel.)
9
10  A.   And we questioned you.
11         MR. MONAGHAN:  Excuse me, Your Honor.  We're
12  missing those exhibits, and I think perhaps I know --
13  I suggest that we might have left it in your chambers.
14
15         (Off the record discussion.)
16
17         MS. PHARES:  Pat, do you have Plaintiff's
18  Exhibit 17, 18, and 19?
19         MR. MONAGHAN:  I did.  The court set of
20  exhibits?
21         MS. PHARES:  Yeah, the court set of exhibits
22  is what I'm looking for.
23         MR. MONAGHAN:  They're here.
24         MS. PHARES:  We're just trying to find
25  the ...  That's 17, 18, and 20.

Page 75

1
2          (Mr. Korik hands exhibits to Ms. Phares.)
3
4          MS. PHARES:  Thank you.
5   Q.   Ms. Bryant, I'm handing you documents that you
6        produced to us which are accounting statements from
7        1989 (handing).
8   A.   Yeah, I remember this.
9   Q.   And 1990 and 1993.
10  A.   Right.
11  Q.   1991.
12  A.   Right.
13  Q.   Do you recognize these?
14  A.   Yes.
15  Q.   These were sent to you by your lawyer Mr. Dobishinski?
16  A.   Mr. Dobishinski was not my lawyer.  He was Sunbow's
17       administrator.
18  Q.   In any event, did you ever make a written claim about
19       any of these royalty statements?
20  A.   Well, I took them to be on honest statements.  I had
21       no dispute with them.  How would I know?
22  Q.   I just asked you a simple question.  Did you make any
23       claim in writing to Sunbow in connection with these
24       statements?
25  A.   No.

Page 76

1          MS. PHARES:  Okay.  I'd like to offer in
2   evidence as Defendant's double AA, as double AA, a set
3   of documents bearing Sunbow Production Numbers 526 to
4   564, which we don't have a sticker for.
5          MR. MONAGHAN:  Just give us a description.
6          MS. PHARES:  Which is a set of royalty
7   statements from -- for the period -- well, for several
8   periods; but January to June 1998; from January to
9   June 1999; from July to December, 1998; from July to
10  December 1999; from January to June 2000; from July to
11  December 2000; from January to June 2001; from July to
12  December 2001; from January to June 2002; from July to
13  December 2002; from January to June 2003, and from
14  July to December 2003.
15  Q.   Do you recognize those statements, Ms. Bryant
16       (handing)?
17  A.   No.
18  Q.   Well, these are the statements that were delivered to
19       you with the check that you remember.
20  A.   When, just the other day, yesterday?
21  Q.   No, in 2004.
22  A.   I didn't get anything like this.  I got a check.  I
23       remember a check.  I don't remember anything like
24       this.  I never got this.
25  Q.   You have no recollection of that?

Page 77

1   A.   No.  This is explanation for what that check for
2        $4,000.00 was.
3           What did you say, it was six years of
4        royalties?
5   Q.   I just read -- whatever I read is what they were.
6   A.   Yeah, six years of royalties.
7   Q.   That's correct.
8   A.   Because this would have gotten a letter.  I didn't get
9        something like that.  I got a little piece of paper
10       and a check.  Just like the other day, I got a little
11       piece of paper and a check.  It doesn't explain what
12       anything was for.
13  Q.   And then after the check, you did also receive -- or
14       maybe your lawyer hasn't given it to you -- but you
15       received statements accompanying the check last week
16       as well, did you not?
17  A.   No.  Last week I got Bryant, Anne/Kinder, Ford.  It
18       didn't say what it was for.  It didn't say what the
19       songs were.  It didn't say the percentages on what
20       basis.  You're telling me with the millions of copies
21       of CDs and DVDs you sold that I got $4,000.00 and I'm
22       supposed to accept this?  I didn't get this.  I did
23       get this.
24  Q.   Well, I don't know -- what is it that you say that you
25       did get and you didn't get?

Page 78

1  A.  I got this from Bill Dobishinski.
2  Q.  What's the exhibit number on it?
3  A.  Exhibit ... I can't even -- I don't know what it
4      says. It looks like -- what does that say?
5  Q.  It's Plaintiff's Exhibit 17.
6  A.  Yeah, okay.
7  Q.  And it's Plaintiff's Exhibit 18, and it's Plaintiff's
8      Exhibit 19.
9  A.  Yeah. That's from my own records. This has to do
10     with thousands upon thousands of sales of mechanical
11     royalties that I never -- I never got this, and you're
12     saying it's a four-year statement.
13 Q.  All I'm asking you --
14 A.  Why did you wait for four years to send it to me? How
15     dare you.
16         THE COURT: Let's not have an argument,
17     please.
18 Q.  There's no question pending.
19 A.  I know.
20 Q.  So, you don't recall receiving the statements in 2004?
21         MR. MONAGHAN: That's not her testimony. Her
22     testimony is she didn't get it.
23 A.  I didn't get it. I got a check and a piece of paper,
24     something said music royalties, I think, or publishing
25     royalties. And the other day I got this piece of

Page 79

1      paper that said different periods, and it said
2      publishing music royalties it said. And then the next
3      day something came along that said, In Account with
4      Anne Bryant; not like this. That just said Anne
5      Bryant this much money, and so and so that much money,
6      and it was -- it was not this.
7  Q.  All right. And just let me ask you, just for your
8      information, we've provided the royalty statements to
9      your lawyer on Friday morning. Just, you perhaps --
10     have you seen those statements?
11 A.  I saw that -- I saw that. It came in the other day.
12 Q.  You've seen those statements?
13 A.  Yeah.
14 Q.  Thank you. That's all I wanted to know.
15         But, in any event, have you ever made a claim
16     on a royalty statement that you have received from
17     Sony -- from Sunbow? I beg your pardon.
18 A.  No, I haven't from Sunbow.
19         MR. MONAGHAN: Let me put an objection on the
20     record, just to make my record. The notion that the
21     royalty statement would be binding as to information
22     that isn't covered in the royalty statement is
23     completely incorrect. If there is a royalty statement
24     that sets forth information from which a reasonable
25     person or the artist in question could glean

Page 80

1      information that would trigger a duty of inquiry,
2      fine; that would be one thing. But the case here and
3      the case that's set forth in our pleadings is for an
4      accounting for information we don't have about various
5      uses of the music.
6          So, we can proceed down this road all we
7      wish, but it's still only going to deal with those
8      particular statements that are proven to have been
9      received by the Plaintiff.
10 Q.  And my only question is, is whether or not you had
11     made a claim that you thought that there was something
12     faulty about the royalties?
13 A.  Yes, that's why we're here.
14 Q.  And you made a claim in writing to Sunbow; is that
15     what you're stating?
16 A.  They're all kinds of writings to Sunbow having to do
17     with my royalties.
18 Q.  No, no, I'm not talking about all kinds of royalties.
19     I want you to tell me specifically what writing you
20     presented to -- and you understand that it said,
21     according to this, you are to state a specific
22     objection in writing to Sunbow. Did you ever make --
23 A.  I'm sorry. I'm not an attorney, but I don't know why
24     this lawsuit, suing for my royalties, is not a writing
25     to Sunbow. There's been a lot of writing to Sunbow

Page 81

1      about my mechanical royalties and my sync fees. Those
2      are writings to Sunbow. Consider yourself notified
3      for six years now.
4  Q.  Ms. Bryant, have you ever asked -- have you ever
5      arranged for an accounting using an auditor to audit
6      the records of your publishing --
7  A.  I'm suing for an accounting.
8          MS. PHARES: Your Honor, I don't think
9      there's any -- this is all the record that I can make
10     today based on the fact that --
11         THE COURT: All right.
12         MS. PHARES: -- we were not on notice that we
13     were proceeding on anything relating to accountings
14     under this. There's certainly no notice in the
15     Complaint, and there was certainly no notice as of
16     last Friday.
17         THE COURT: All right.
18         Mr. Monaghan?
19         MR. MONAGHAN: Thank you, Judge. Redirect.
20     We're still missing Volume 1 of the appendix,
21     Your Honor, and we're missing the other binder, but
22     I'll proceed with what I have.
23         THE COURT: Well --
24         MR. MONAGHAN: It's what I showed you in
25     chambers, but I don't know what happened to it

Page 82

1  thereafter.
2       MR. KORIK: Your Honor, it was --
3       MR. MONAGHAN: It's the other volume of the
4  appendix, and I showed you the Complaint.
5       THE COURT: Well, I'll tell you what, I will
6  go look because I could have put it somewhere. I
7  doubt it, but we'll take a short recess, ten minute
8  recess.
9       MR. MONAGHAN: Thank you, Your Honor.
10
11      (Recess taken at approximately 2:55 PM.)
12
13      (Court reconvened at approximately 3:10 PM.)
14
15      THE COURT: Okay. Let's see. Ms. Saffer,
16  are you --
17      MS. SAFFER: I'm so sorry.
18      THE COURT: Do you have any questions to ask
19  anybody?
20      MS. SAFFER: No, I will, maybe after Pat does
21  his Redirect have some questions but not at this
22  juncture. Thank you.
23      THE COURT: Okay; all right.
24      MS. SAFFER: I apologize, Your Honor.
25      THE COURT: That's all right.

Page 83

1       MR. MONAGHAN: May I proceed, Judge?
2       THE COURT: Yes, please.
3       MR. MONAGHAN: Do you have Exhibit M, the Jem
4  agreement?
5       THE WITNESS: I have it here.
6       MR. MONAGHAN: Oh, you have it. Okay.
7  REDIRECT EXAMINATION BY MR. MONAGHAN:
8  Q.  Mrs. Bryant, Ms. Phares had asked you questions about
9      the Jem agreement, and we've all agreed that Exhibit
10     M, the Jem agreement, applies to all the relationships
11     in the case?
12 A.  Yes.
13 Q.  Okay. And the Court has found there's valid written
14     agreements, and you understand that?
15 A.  Yes.
16 Q.  Okay. And you understand that, for a period of time,
17     you were telling the Court there was no written
18     agreement; do you recall that?
19 A.  I don't remember whether there was one, but I didn't
20     have one. I didn't have a copy. I didn't know if we
21     signed it.
22 Q.  Now, Ms. Phares also directed your attention to the
23     last page, Page 10, and she asked you, I believe, to
24     read that into the record, which is, and I'll repeat
25     it, that's Subparagraph 13C, quote:  This agreement

Page 84

1       contains the entire understanding of the parties
2  hereto relating to the subject matter herein
3  contained, and this agreement cannot be changed,
4  rescinded, or terminated orally.
5       Do you remember that?
6  A.  Yes, I remember that.
7  Q.  Okay. And that's the clause that we've been calling
8      the merger clause, the integration clause.
9  A.  Uh-huh.
10 Q.  What was the subject matter to which that clause in
11     this agreement referred?
12     MS. PHARES: Objection. Calls for a legal
13     conclusion.
14     MR. MONAGHAN: No, it doesn't. Her
15     understanding.
16     THE COURT: I'll allow it. Go ahead.
17 A.  Well, this agreement was not changed or terminated
18     orally, so, I don't know ...
19 Q.  To what does this particular Jem agreement apply?
20     MS. PHARES: Objection, Your Honor. I
21     thought the oral agreement theory was now behind us.
22 A.  To all --
23     THE COURT: Just a moment, just a moment.
24     You have to let an attorney state an objection.
25     Go ahead.

Page 85

1       MS. PHARES: My understanding is that the
2  merger clause which was relevant to Plaintiff's -- to
3  Plaintiff's oral agreement theory is now behind us
4  since we have conceded that all of the oral agreements
5  about which she engaged were merged into the later
6  written agreements.
7       THE COURT: Well, I'll tell you, Counselor, I
8  don't quite know where Mr. Monaghan is going, and,
9  therefore, I tend to let attorneys ask a couple of
10 questions. I'm going to allow him to go ahead.
11 Q.  What songs were the subject matter of this particular
12     Jem agreement?
13 A.  Oh, the Jem songs, the Jem feature songs.
14 Q.  Okay. And is that -- was that specifically the Jem --
15     MS. PHARES: Objection, Your Honor.
16     THE COURT: Yes.
17     MS. PHARES: We're once again construing an
18     agreement which it describes on Page 1 what it covers,
19     and this is a legal conclusion from this -- from
20     this --
21     THE COURT: Well --
22     MS. PHARES: -- witness.
23     THE COURT: Well, it's in evidence, and I'll
24     allow the question. Let's go ahead.
25     MR. MONAGHAN: She's answered the question.

Page 86

1  Q.  Your answer is this -- this agreement --
2      MS. PHARES: Excuse me. Objection. She said
3  that she answered it. We don't need to have you
4  repeat it.
5      MR. MONAGHAN: Okay. Thank you, Ms. Phares.
6  I appreciate the correction.
7  Q.  All right. Now, Ms. Phares also showed you what she
8  characterized as an accounting. That was dubbed
9  Exhibit double A. Do you recall this?
10 A.  Yes.
11 Q.  This is not in evidence. But do you recall her
12 showing you this account?
13 A.  Yes.
14 Q.  And you recall your testimony that you didn't receive
15 this?
16 A.  I don't remember receiving that. I remember a check.
17 Q.  Okay. But take a look at what Ms. Phares has referred
18 to as an accounting.
19     MS. PHARES: Objection, Your Honor. These
20 were referred to as royalty statements, and I'm -- you
21 know, I can't look back at the record. We don't have
22 it today. They are royalty statements.
23     MR. MONAGHAN: Okay. Royalty statements.
24 I'll take that.
25     MS. PHARES: Mr. Monaghan knows that these

Page 87

1  are royalty statements.
2      THE COURT: All right. They're royalty
3  statements. Go ahead.
4      MR. MONAGHAN: Well, is counsel stipulating,
5  then, that these are not the accountings that are
6  referred to in Paragraph 6 of the Jem agreement?
7      MS. PHARES: No.
8      MR. MONAGHAN: Okay. I didn't think so.
9  That's why I'm asking.
10 A.  I don't remember getting this or these monies.
11 Q.  Okay. Is there anything in that document that relates
12 to this Jem agreement?
13 A.  Right off I see some Jem songs.
14 Q.  Is there anything that tells you that you're getting
15 these royalty statements accompanied by remuneration
16 rendered twice during each calendar year during which
17 royalties are payable? In other words, how do you
18 connect that document to that provision in the
19 agreement?
20 A.  Well, I don't know if I can find it fast enough.
21 Q.  I'm not asking you to do that. I'm asking you to --
22 A.  No, but she read off -- she read off semi-annual
23 dates. That's the only thing I know. I haven't had a
24 chance to look at this particular accounting yet.
25 Q.  Do these royalty statements tell you the number of

Page 88

1  units that have been sold?
2  A.  It says "your share". And I don't know what my share
3  is. My share of what?
4  Q.  Do these royalty statements tell you the amount of
5  sheet music which has been sold?
6  A.  No, it just says --
7  Q.  Do these royalty statements tell you the number of
8  piano copies sold?
9  A.  No, no.
10 Q.  Do these royalty statements tell you anything about
11 orchestrations for which 10% is required under the
12 agreement?
13 A.  No.
14 Q.  Do these royalty statements tell you anything about
15 song books, folios, or similar publications?
16 A.  No.
17 Q.  Do they tell you about any other uses of the music for
18 which you're supposed to get 50% according to that
19 agreement?
20 A.  Well, in a quick look I don't see anything coming
21 anywhere near 50%. I just see a period received, and
22 then it says a hundred, and then it says, Amount
23 received and Your share.
24     MR. MONAGHAN: Okay.
25 A.  And I don't know where -- my share seems to be

Page 89

1  repeatedly 229 -- point 973, not 50%.
2  Q.  Okay. And against what information could you possibly
3  have used what you have in your hands now to determine
4  whether or not you were getting an accurate
5  accounting?
6  A.  Nothing. I wouldn't be able to tell that.
7  Q.  Now, counsel also made reference to the check that you
8  got last week. And I'm going to ask the Reporter to
9  mark this Plaintiff's 49 for identification, Your
10 Honor.
11 A.  Do I get to take this home?
12     MR. MONAGHAN: We'll get you a copy.
13     THE WITNESS: I didn't get these checks.
14     MR. MONAGHAN: I asked the Reporter to mark
15 the exhibit.
16     THE COURT: Okay.
17     MR. MONAGHAN: I have a copy for Your Honor.
18     THE COURT: Yeah, sure.
19     MR. MONAGHAN: This is what I got, and I
20 received it -- I received it eventually by Mr. Knapp's
21 letter dated December 1, 2006, in the form that we've
22 given you.
23
24     (PLAINTIFF'S EXHIBIT NO. 48 - LETTER
25      AND ACCOUNTING STATEMENTS - MARKED

Page 90

1      FOR IDENTIFICATION.)
2
3          MS. PHARES:  These were the ones that -- Your
4   Honor, I just want to make -- this is the one that was
5   sent on Friday; right?
6          MR. MONAGHAN:  Yeah.
7          MS. PHARES:  Right, yes, of course I agree
8   that they were sent to you.
9          MR. MONAGHAN:  All right.  Then we're going
10  to offer Exhibit 49 in evidence.
11         THE WITNESS:  It's three percent for the
12  transformers.
13         MR. MONAGHAN:  Wait, Anne.
14         MS. PHARES:  But, Your Honor, just for the
15  record, we also produced another set of these
16  yesterday to Mr. Monaghan with base numbers so that we
17  can refer to them, and we did it for that purpose.
18  So, you might want to use that copy.
19         THE COURT:  All right.  This is 48 or 49?
20         MR. MONAGHAN:  This is 49.  So, will that be
21  in evidence, Your Honor?
22         THE COURT:  Objection?
23         MS. PHARES:  Just one moment, Your Honor.  I
24  just want to make sure that this is indeed all of what
25  we produced.  And it's not, it's not.

Page 91

1          We produced -- yeah, we produced 27 -- I
2   think pages of royalty statements.  We can hand you a
3   copy with the base numbers on them.
4          MR. MONAGHAN:  And I endeavored to put
5   together everything that you sent to us.
6          Well, how about we make this -- I don't have
7   the time to compare, neither do you, Your Honor, but
8   we'll make this 48A and deem it part of the exhibit.
9          THE COURT:  Well, okay.  I really want to
10  have the exhibit --
11         MR. MONAGHAN:  Mark it part of 48, then.
12         THE COURT:  All right.  It's all 48.
13         MS. PHARES:  Your Honor, no.  We have an
14  objection here.  First of all, this is a letter from
15  my associate John Knapp, and he's enclosing the
16  documents.  This was on Friday morning.  And there
17  were 27 pages of them.  Then attached to it are copies
18  of --
19         MR. MONAGHAN:  We don't accept that.
20         MS. PHARES:  -- a letter from Mr. De Sousa of
21  TV Loonland to Mr. Monaghan transmitting the check.
22  That was not sent by Mr. Monaghan -- by Mr. Knapp.
23  So, this is a little confusing, this exhibit is.
24         MR. MONAGHAN:  I'm trying to have in one
25  place, one exhibit, all the stuff we got lately

Page 92

1   relating to that check.
2          MS. PHARES:  Well, you didn't manage to
3   achieve that, I'm afraid.
4          MR. MONAGHAN:  Well, I didn't also receive 27
5   pages of royalty statements.  So, if -- I'll mark it
6   as a separate exhibit.  I don't care -- or counsel can
7   do it on her own, Recross.
8          THE COURT:  Look, I have, I think, a copy,
9   and there are 30 pages.
10         MS. PHARES:  Yes, that's --
11         THE COURT:  30 pages.
12         MS. PHARES:  That's the copy that we sent to
13  Mr. Monaghan, and you were copied on it, Your Honor.
14         THE COURT:  Right.  And it's --
15         MS. PHARES:  And Mr. Monaghan's copy does not
16  have that many pages.
17         THE COURT:  Okay.  And, Mr. Monaghan, because
18  we're getting near the holiday season, I'm going to
19  give you this one, and then I'll get that one.  Do you
20  have it now?
21         MR. MONAGHAN:  I think I have.
22         THE COURT:  30 pages in it?
23         MR. MONAGHAN:  Is there, other than the cover
24  letter -- I have 11 -- can I just look at it for a
25  second, Judge?

Page 93

1          THE COURT:  Yeah, yeah (handing).
2          MR. MONAGHAN:  Well, this doesn't have the
3   Sunbow Production numbers on it, but ...
4          MS. PHARES:  That's right.
5          MR. MONAGHAN:  For the purposes of my
6   question --
7          MS. PHARES:  We're going to do this -- I'm
8   not going to stipulate to the exhibit going in if it's
9   not the right exhibit.
10         MR. MONAGHAN:  Okay.
11         THE COURT:  Hold on.  Then I have ten pages
12  that are from your office.
13         MR. MONAGHAN:  Yes, Your Honor.
14         THE COURT:  Okay.  Is that part of that
15  exhibit, too?
16         MR. MONAGHAN:  Yes.
17         MS. PHARES:  But not ten pages.
18         THE COURT:  Not ten pages.
19         MS. PHARES:  I mean, he has bits of both
20  communications.
21         THE COURT:  Well, let's do this:  Let's take
22  the 30 pages, all right, and that's 48.  All right?
23         MR. MONAGHAN:  Then I'm going to offer 49,
24  which was the cover letter, which is not part of the
25  30 pages.

Page 94

1  THE COURT: Is that this letter from you?
2  MR. MONAGHAN: Yes.
3  THE COURT: Why do we need that?
4  MR. MONAGHAN: Well, this doesn't have a
5  check as far as I can tell.
6  THE COURT: Well, the one with the check is
7  really the one from Mr. De Sousa.
8  MS. PHARES: Right.
9  MR. MONAGHAN: Right.
10  THE COURT: So -- and that is, I think, three
11  or four pages, plus a copy of the envelope.
12  MR. MONAGHAN: I'm happy to substitute 30
13  pages that Ms. Bryant gave the Court -- Ms. Bryant --
14  Ms. Phares gave the Court underneath the cover letter
15  from Mr. Knapp, in lieu of the seven or eight pages I
16  received the first go 'round. I'm happy to substitute
17  what they say, and I'll take the letters off the top,
18  put that in there --
19  MS. PHARES: And make that one exhibit, but
20  don't put Mr. De Sousa's letter in it because it
21  appears as though Mr. Knapp sent that to you and he
22  did not.
23  MR. MONAGHAN: I agree. How about with that
24  stipulation? I agree.
25  MS. PHARES: So, we have two documents.

Page 95

1  MR. MONAGHAN: Mr. Knapp did not send me Mr.
2  De Sousa's letter. Mr. De Sousa sent the letter
3  directly to our office with the check on behalf of
4  Sunbow; came to our office directly, as addressed.
5  So, with that stipulation --
6  MS. PHARES: And would you tell me the base
7  stamps you've got? Just the first and the last.
8  MR. MONAGHAN: Up here I only have 1142.
9  MS. PHARES: To ...?
10  MR. MONAGHAN: To 1169.
11  MS. PHARES: Okay.
12  MR. MONAGHAN: Shall we put that in there?
13  MS. PHARES: Inclusive, yes.
14  MR. MONAGHAN: Inclusive, all inclusive. You
15  want the whole record?
16  THE COURT: Okay. That's what 37 pages?
17  Don't count them.
18  MR. MONAGHAN: Okay. I'm not good at it.
19  Okay. And that's in evidence, 48.
20
21  (Off the record discussion.)
22
23  (PLAINTIFF'S EXHIBIT NO. 48 - LETTER
24  AND ACCOUNTING STATEMENTS - RECEIVED
25  IN EVIDENCE.)

Page 96

1
2  MS. PHARES: Your Honor, just so -- there's
3  some confusion. Did you just say that the 47 was
4  withdrawn?
5  THE COURT: Yes.
6  MS. PHARES: Okay.
7  BY MR. MONAGHAN:
8  Q.  All right, Ms. Bryant. I'm showing you now
9  Plaintiff's 48 in evidence. Are you familiar with
10  this exhibit now?
11  A.  I'm familiar with this part of it, with the letter
12  that came from Mr. De Sousa, the check.
13  MS. PHARES: Your Honor, if Mr. Monaghan
14  stands back here, then Ms. Bryant will probably speak
15  loud enough so that we can all hear her.
16  THE WITNESS: That's true.
17  MR. MONAGHAN: I'll stand here.
18  THE COURT: Okay. Go ahead.
19  Q.  Tell the Court and counsel which of these pages in
20  this exhibit in evidence you are familiar with and
21  you've seen?
22  A.  First and foremost I got a check from Mr. De Sousa,
23  and I got a short statement with it with the check,
24  and that's all that came that day. It came by
25  international FedEx.

Page 97

1  Q.  Okay. Now, what does that short statement tell you,
2  what information is provided in the short statement?
3  A.  It just gave me several quarters, June 30, 2004, and
4  then U.S. dollars, 327; December 31, 2004, $266.00;
5  June 30, 2005, $205.00; and then a bump up December
6  31, 2005, $5897 and change. And then one more
7  quarter. So, it's looks like one, two, three, four,
8  five quarters totaling $7,417.00. That's what that
9  was, by global FedEx. And here's a copy of the FedEx.
10  Q.  And the single page, that total there, the 7417.43
11  agrees with the amount on the check?
12  A.  Yes.
13  Q.  Yeah. And what does the check say?
14  A.  The check?
15  Q.  Does the check have any notation on it --
16  A.  Yeah.
17  Q.  -- as to why it's being given to you?
18  A.  The check says music royalties.
19  Q.  Okay. Now, just at this point, just limiting to that
20  short statement and the check, is there any way that
21  you can relate that check and that payment to any of
22  these payments that are to be made to you under the
23  Jem agreement?
24  A.  I can only assume that they're accurate.
25  Q.  Don't assume.

Page 98

1  A.  I don't know, I don't know. They seem to be music
2      publishing royalty -- music publishing income. That's
3      all it says. But I don't know if they're accurate.
4  Q.  Does it say anything about phonograph records sold,
5      piano copies --
6  A.  No, it's not specific.
7  Q.  -- sheet music, the amount of units that have been
8      sold, where licenses have been granted to third
9      parties?
10 A.  No, it's not specific.
11 Q.  Is any of that information at all provided there?
12 A.  No.
13 Q.  Now, would you please look at the statements, the
14     so-called royalty statements.
15         By the way, who is the issuer of this royalty
16     statement?
17 A.  Sony ATV Music Publishing, LLC.
18 Q.  Do you have any agreement with Sony ATV Music
19     Publishing, LLC.
20 A.  I never made an agreement with them.
21 Q.  Okay. Do you know why Sony ATV, LLC, is sending you
22     this statement?
23 A.  I know from the production -- document production in
24     this case and from my finally getting my --
25 Q.  No.

Page 99

1  A.  I just know that they seem to have taken over the
2      catalog in some way for Star Wild and Wild Star,
3      Sunbow's companies.
4  Q.  Did you ever see any document, were you ever told by
5      Sunbow, did you ever receive a letter or anything that
6      told you we are now assigning the publishing from
7      Sunbow or Wild Star or Star Wild over to Sony ATV?
8  A.  No, I was never notified.
9  Q.  How can you tell whether or not you are getting a
10     royalty statement rendered by the company that is the
11     company mentioned in the Jem agreement versus some
12     third party, Sony ATV? How would one know?
13 A.  By letterhead.
14 Q.  Other than that.
15 A.  Other than that, no.
16 Q.  How do you know that Sunbow is endorsing the royalty
17     information that's set forth in this -- in this
18     document?
19 A.  I don't know what Sunbow has done.
20 Q.  Other than the fact that it came with a letter from
21     Mr. De Sousa?
22 A.  Yes, it has a Sunbow Loonland insignia on it and it's
23     letterhead mark.
24 Q.  By the way, the word "Writer" is in initial cap in
25     this agreement, is it not?

Page 100

1  A.  Yes.
2  Q.  Okay. You have "the company". Who's the company?
3      What's the company in the agreement?
4  A.  Sunbow.
5  Q.  And you have the contractor?
6  A.  Kinder and Bryant.
7  Q.  And who is the Writer?
8  A.  Anne Bryant. Ford Kinder, too.
9  Q.  And do you know why the writer is initial capped? In
10     other words, is the Writer a defined term in the
11     agreement?
12 A.  Well, they determined the Writer up top as I remember.
13 Q.  Okay. In the preamble of the agreement --
14 A.  Yes.
15 Q.  -- paragraph?
16         MS. PHARES: Your Honor, the agreement speaks
17     for itself.
18         MR. MONAGHAN: It does.
19         MS. PHARES: It's ...
20 Q.  So, ...
21 A.  They call this collectively the Writer, us as
22     individual writers.
23         MR. MONAGHAN: Okay.
24         MS. PHARES: It refers to you jointly as the
25     Writer.

Page 101

1          THE COURT: Please, go ahead.
2          MR. MONAGHAN: Your Honor, I'm going to
3      address now the question of whether or not there has
4      been an accounting issue in the case, and I'm going to
5      point to your decision dated May 28, 2004, right
6      before the last trial, and an Order of May 26, 2004.
7      And in that you said, quote: Following extensive
8      prior motion practice, Plaintiff's first Amended
9      Complaint specifically pleads two causes of action
10     against Defendant Bacal for unjust enrichment and
11     constructive trust and a single cause of action
12     against Defendant Sunbow, for which -- for unjust
13     enrichment, for which Plaintiff seeks compensatory
14     damages and an accounting -- and an accounting.
15         And I will point out that the Amended
16     Complaint set forth claim for an accounting.
17         MS. PHARES: Page?
18         MR. MONAGHAN: And also said --
19         MS. PHARES: Your Honor?
20         MR. MONAGHAN: Okay.
21         MS. PHARES: -- if Mr. Monaghan's quoting from
22     the one of his many Complaints, I'd like to know which
23     one and what paragraph.
24         MR. MONAGHAN: Okay. Page 6, which deals
25     with the first amended cause of action allowed by the

Page 102

1  Court against Defendant Sunbow for unjust enrichment,
2  and, among other things, Paragraph 5 demands that the
3  Court direct Sunbow to render a true and complete
4  accounting as to any and all monies received -- or to
5  be received by Defendant Sunbow from the production
6  and exploitation of the foregoing compositions and
7  that judgment be had in Plaintiff's favor for all such
8  monies, together with interest and attorney's fees
9  caused in the suit.
10      MS. PHARES:  But this isn't an accounting on
11  monies received by Defendant Sunbow.
12      MR. MONAGHAN:  Oh, it is.  It is.  That's the
13  damages phase.  And requests --
14      THE COURT:  I thought -- hold on.  I thought
15  that in one of the admissions that was read by Ms.
16  Phares, that the Plaintiff agreed that there was no
17  money that had gone to Sunbow that should have gone to
18  her.
19      MR. MONAGHAN:  For performance royalties.
20  Performance royalties.  We are not talking about
21  performance royalties.  This agreement licenses back
22  to Ms. Bryant.
23      When the copyright was transferred -- and I
24  don't think I'll get a fight on this one.  When the
25  copyright was transferred, all rights go over to

Page 103

1  Sunbow, all rights.  But the coming back to the
2  Plaintiff or the rights set forth in the agreement,
3  which includes the writer's share of performance
4  royalties.  There's a separate clause in there.
5      MS. PHARES:  Your Honor?
6      THE COURT:  Hold on.
7      MR. MONAGHAN:  In addition to that -- in
8  addition to that, Paragraph 6 is the paragraph dealing
9  with the writer's rights, the writer's reservation of
10  publishing interest.  And that's what this accounting
11  is purporting to try and deal with, this so-called
12  accounting.
13      THE WITNESS:  Yeah.
14      MR. MONAGHAN:  But without -- without telling
15  the recipient what it is you're accounting for, how
16  many units, and going down the list, this is
17  meaningless information for the Plaintiff.  So, to
18  suggest she should have tried to complain about it
19  previously, other than this lawsuit, which has been in
20  place for years and years, is disingenuous.
21      MS. PHARES:  Well, Your Honor, I mean, first
22  of all, there are several statements here.  First of
23  all, the Paragraph of the Complaint that Mr. Monaghan
24  is referring to is 5 of the demand or, rather, 5 under
25  his first amended cause of action.  It specifically

Page 104

1  says that they are requesting an accounting as to any
2  and all monies received or to be received by Defendant
3  Sunbow.
4      Now, this statement is -- these are
5  statements produced by a music administrator for the
6  copyright owners.  It is sent to -- to Sunbow and
7  produced to Ms. Bryant.  These are not monies received
8  by Sunbow.  And, furthermore, and it was -- and --
9  yes -- and this is an accounting under a claim for
10  unjust enrichment, and there is no question that
11  Sunbow has not received any monies.  And, furthermore,
12  -- well, that's a fact.  We have not received any of
13  these monies.  If there is a claim, and, frankly, this
14  is part of what I was going to say to you tomorrow,
15  but if there's likely to be an accounting, there are
16  likely to be other necessary parties, including a
17  music administrator, and there are going to have to be
18  -- and the -- and the parties for whom the
19  administrator is acting, who will have to be part of
20  this.  And for -- and on top of it, as a factual
21  matter, whereas neither Mr. Monaghan or Ms. Bryant is
22  very expert on -- on royalty statements, and I can
23  certainly say that neither am I, but I can certainly
24  see that right across the top is our headings and
25  they're separate because these come from different

Page 105

1  countries because the publisher is collecting also
2  from foreign collecting agencies, it says record
3  number and then it has a unit number.  And it has the
4  number of units that are involved.  It has the period
5  involved.  It has the percent received.  And then it
6  has the specific amount and the shares and the amount
7  due to this person.
8      Now, I suspect that there hasn't been
9  sufficient time to study this in the last 48 hours,
10  since everyone was getting ready for trial, but this
11  is exactly like the statements that were produced in
12  2004, and we have not heard any complaint specifically
13  about them.  But, furthermore, if there had been a
14  complaint, then the action is to go to Sunbow and say
15  we have a problem with this.  And you put it in
16  writing, and then you proceed to follow up on the
17  collection of facts that would lead to a question of
18  whether or not there's a dispute on the royalty
19  statements.  That's what the accounting would be.
20      This is -- this is just an effort to try and
21  suggest that -- that something has not happened when
22  we have no information about that.  We don't even have
23  the right parties to determine that.  We are not --
24  the parties in this room cannot decide whether or not
25  these royalty statements are accurate.  And this --

Page 106

1  this is a proceeding that has to take place pursuant
2  to a condition proceeding, which is a demand, if Ms.
3  Bryant believes that there's something the matter, and
4  she writes down and she says, I think that I'm
5  entitled to X, Y, and Z, and I don't see it here, or I
6  don't believe that it is here. And then someone has
7  an opportunity to show that. That hasn't happened.
8      THE COURT: All right. That's certainly your
9  position.
10      All right. Do you have any other questions
11  of this witness?
12      MR. MONAGHAN: Yes, I do, Your Honor.
13      THE COURT: All right.
14      MR. MONAGHAN: I'm assuming I'm proceeding on
15  a Redirect which is following the Direct that occurred
16  when we were up in New City or --
17      THE COURT: Plus I'm allowing you to go into
18  other things that were brought up on Cross, that --
19      MR. MONAGHAN: Were not covered.
20      THE COURT: The oral agreements and things
21  like that; even though I believe that's out of the
22  case now.
23      Go ahead.
24      MR. MONAGHAN: The oral agreements.
25  BY MR. MONAGHAN:

Page 107

1  Q.  Ms. Bryant, now this -- for the first part of my
2      questioning I'm going to be dealing with BMI. And you
3      were questioned by Ms. Saffer about how jingles are
4      registered, songs are registered.
5  A.  Yeah.
6  Q.  And do you remember what you told Court, and, if you
7      can, refresh our recollection, your understanding as
8      to how your compositions were registered with BMI.
9  A.  In the main, my compositions are registered by a
10     publisher or the administrator for the publisher.
11  Q.  Okay. And who is that?
12  A.  The publisher was Sunbow, d/b/a Star Wild or Wild
13     Star, one of d/b/a companies, publishing companies,
14     and they had an administrator that they hired, Bill
15     Dobishinski.
16  Q.  Okay. They hired Bill Dobishinski?
17  A.  Yes.
18  Q.  He wasn't hired by you?
19  A.  No.
20  Q.  Okay. Now, that -- that Star Wild and Wild Star is,
21     in fact, the music publishing company that's referred
22     to in the Sunbow agreement, isn't it?
23  A.  Right.
24  Q.  Okay. And, so, you aren't complaining about the fact
25     that Sunbow was allowing Wild Star or Star Wild to

Page 108

1      deal with the publishing on your behalf?
2  A.  No.
3  Q.  Okay. You understood that they were doing it for the
4      mutual benefit of yourself and the publisher?
5  A.  Yes, I do.
6  Q.  Okay. And that was completely consistent with the
7      agreement?
8  A.  Yes.
9  Q.  Okay. But whose responsibility was it to file
10     accurate information with BMI as to the contributions,
11     musical contributions to these compositions?
12  A.  The publisher or the publisher's administrator, which
13     would be Sunbow or Sunbow's publishing companies and
14     their administrator, Bill Dobishinski.
15  Q.  Right. And were those -- do you know what types of
16     forms? Do they have a name that were used?
17  A.  Yes. Clearance forms.
18  Q.  When are clearance forms used?
19  A.  They're the forms where you list the name, address,
20     Social Security number, and affiliation, BMI or ASCAP,
21     of the writers and their percentage of the songs, and
22     they're filed by the producer, the publisher. In the
23     beginning they were filed by Sunbow, Alyss Gouyet
24     (sic) at Sunbow, and then, when they hired Bill
25     Dobishinski, he put in -- in the clearance forms.

Page 109

1  Q.  So, for example, Exhibit 3 in evidence, is that such a
2      clearance form (handing).
3  A.  Yes, this is the original filing for the transformers.
4  Q.  And what's your percentage interest shown on that
5      clearance form?
6  A.  50%.
7  Q.  Okay. And what's the composition?
8  A.  The transformers main theme. This is actually the TV
9      show filing, yeah.
10  Q.  Okay. And what percentage are you currently getting
11      from any use of the transformers, performance use?
12  A.  In the main, I'm getting 8.3%. I've seen a few 50%
13      credits, and I don't know who decides which -- which
14      way to pay me.
15  Q.  Okay. But this form, that wasn't seen by you before
16      it was filed, was it?
17  A.  No.
18      MR. MONAGHAN: Okay.
19  A.  Sunbow submitted it with their names on it.
20  Q.  Okay. And, likewise, Plaintiff's Exhibit 4 in
21      evidence, is that another clearance form that was used
22      (handing)?
23  A.  Oh, I remember this one. Yes, this is the
24      transformers movie theme, which is also called the
25      transformers rock and role theme.

28 (Pages 106 to 109)

Page 110

1    Q.    And what percentage are you shown on that form as
2          owning in that?
3    A.    20%.
4    Q.    And do you know how that form came to be filed?
5    A.    No. It's -- it's filed for Scotty Brother Records,
6          CBS, Scotty Brothers label, Holly Moley Music.
7    Q.    What do you have to do with any of those parties?
8    A.    Nothing.
9    Q.    Who filed that form?
10   A.    It says -- I don't know who filed the form. Mark
11         Perez.
12               Can you read that? That's the authorized
13         signature.
14   Q.    Okay. But it's your understanding that Sunbow or its
15         publishing arm would have been responsible for the
16         filing of the exhibit?
17   A.    Yeah, or would have authorized it. I couldn't file
18         it.
19   Q.    Okay. And is there another form that is used to
20         register compositions with BMI?
21   A.    They have a cue sheet system.
22   Q.    What's a cue sheet system? We've heard about it, but
23         let's get it on the record.
24   A.    A cue sheet is a record of all the music that's used
25         in a television program, and it could have like 30

Page 111

1          seconds of violent music, and then a wedding march,
2          and then it could have the transformers theme, and
3          each composer would be listed in their affiliation and
4          the length of that piece of music. So, that's how
5          they submit for original music written for TV. ...
6
7               MS. SAFFER: Your Honor, I wish to raise an
8          objection. Clearly, the witness can testify as to her
9          understanding, but the witness hasn't been shown to be
10         an expert, nor is she an employee of BMI, nor is she
11         somebody, by her own admissions, who normally files
12         these documents, and I'd like the record to indicate
13         at least that it's her understanding of how this is
14         done, not that it is the way that it's done.
15              MR. MONAGHAN: That's all she testified to.
16              THE COURT: All right.
17              MR. MONAGHAN: That's her understanding.
18         That was the question. Okay.
19   Q.    And what do you have to do with filing clearance
20         forms?
21   A.    Well, only --
22   Q.    I'm sorry. Wrong question. Cue sheets, cue sheets.
23   A.    Well, I don't file cue sheets. The administrator
24         files them.
25              MR. MONAGHAN: Okay.

Page 112

1    A.    The publisher files them.
2    Q.    And have you come to learn in this case and has the
3          evidence shown that Sunbow or its employee, Bill
4          Dobishinski, caused forms to be filed with BMI?
5    A.    Yes.
6               MR. MONAGHAN: Okay.
7    A.    BMI gave them to us.
8    Q.    Okay. Now, can you very quickly, just to refresh the
9          Court, as quickly as possible, Exhibit 5, can you tell
10         the Court what that was, Exhibit 5 in evidence
11         (handing)?
12   A.    This is a BMI U.S. Feature Royalties Statement. At
13         top it says: BMI commercial jingles.
14   Q.    What song?
15   A.    It's a bunch of different songs.
16              MS. PHARES: Your Honor, I'm going to object.
17         Jingles relate to GBI. They're not in this case.
18         It's not relevant.
19              MR. MONAGHAN: We've gone around -- we've
20         show the Court, and it's already in evidence --
21              MS. PHARES: Yes, but we've come a long way
22         since the last two years when it went into evidence.
23              MR. MONAGHAN: But we haven't gotten by that
24         point because it's still the case that your client,
25         Sunbow, produced -- and this is in evidence --

Page 113

1          produced these transformers videos and Sunbow's name
2          is on it. It's in evidence. There's Sunbow --
3               MS. PHARES: Well, of course they're Sunbow.
4          Sunbow produced this thing in the 1980s. Their name
5          will always be on it.
6               MR. MONAGHAN: And the evidence will show,
7          when we get to the rest of the case, when we get
8          to -- when we get by the Plaintiff -- and I've never
9          heard of a case getting dismissed right on the
10         Plaintiff's case, right on the Plaintiff, when she's
11         the witness -- but the evidence will show through Ms.
12         Weitzman, and the Plaintiff has testified, the music
13         was just handed over. The music composed as jingles
14         was handed over to Sunbow. Sunbow used it; Sunbow has
15         to pay the royalties.
16              THE COURT: Well, hold on.
17              Didn't Sunbow have the right to do anything
18         they wanted with it?
19              MR. MONAGHAN: Sure.
20              THE COURT: So, you keep saying they handed
21         it over.
22              MR. MONAGHAN: We're not complaining about
23         it; but Ms. Phares doesn't want the transformers issue
24         to be in the case because she says that was done for
25         GBI. And what we're saying is Sunbow, GBI, Bacal, we

Page 114

1  don't care.
2      MS. PHARES: I beg your pardon. There is a
3  transformers movie that was done for Sunbow. What I
4  am saying is that we are not talking about cue sheets,
5  whatever, that have to do with jingles. We're just --
6  that's not here. That's not in this case.
7      MR. MONAGHAN: What we're talking about is
8  the registrations with BMI.
9      I think what's important for the Court to
10 know, and we've been discussing this a little bit
11 today ...
12 Q.  What effect does an incorrect registration at BMI have
13     with respect to any use of the music? In other words,
14     is it just -- does it only have an impact on
15     performance royalties or does it effect any other
16     uses?
17 A.  It effects these statements right here.
18     MS. PHARES: Objection. Foundation.
19     THE COURT: Hold on.
20     MS. PHARES: Objection. Foundation.
21     THE COURT: Sustained, sustained.
22 A.  It effects -- it effects all of my payments
23     everywhere.
24     MR. MONAGHAN: The objection was sustained.
25     THE WITNESS: Oh, I forgot about that.

Page 115

1      MR. MONAGHAN: Okay. It's sustained.
2  Q.  How -- well, we've got to address this issue. The
3      question is:  When an a cue sheet is filed -- well,
4      I'll withdraw that question.
5      Have you come to learn that your music has
6      been used in these various products that we've already
7      introduced into evidence, these various DVDs, VHSs?
8  A.  Yes, all of them used my -- you're talking about
9      transformers there?
10 Q.  Right.
11 A.  All of them used my transformers theme, and many of
12     them actually used a master recording from my jingle
13     recording of that and listed it on to the DVDs and
14     VHSs for the theme for that. The same publisher
15     published for GBI and Sunbow. They just shuffled it
16     over. That's okay.
17 Q.  And do you know how it is that Sunbow was able to use
18     your music, license your music to third parties,
19     pursuant to what authority?
20 A.  Well, it was a carry-over from -- that I can see. All
21     I can figure is because they were the publisher all
22     along for GBI, they could do --
23     MS. PHARES: Objection. The question is do
24     you know. I think the answer to that is yes or no.
25     THE COURT: I agree. Sustained.

Page 116

1      MR. MONAGHAN: Okay.
2      THE COURT: But --
3  A.  Yes or no.
4      THE COURT: Well, didn't Sunbow have the
5  power to transfer your music to anyone they wanted?
6      THE WITNESS: As long as they gave me my
7  royalties.
8      THE COURT: But were your royalties then
9  coming from Sunbow or somebody else?
10     THE WITNESS: They didn't have my copyright
11 until I agreed with them that I would get my royalties
12 if I gave them the copyright. So, just because they
13 have the copyright that doesn't excuse them paying me
14 royalties in -- in music publishing and making sure my
15 listings were proper for my performance royalties.
16     THE COURT: Hold on. You say that Sunbow was
17 responsible for your listings?
18     THE WITNESS: Well, Sunbow registered these
19 with BMI.
20     THE COURT: All right. Go ahead.
21     MR. MONAGHAN: Yeah. That's the case. You
22 just heard of essence of it right there.
23     THE COURT: Okay.
24 Q.  You've seen Exhibit 1. That's your BMI agreement of
25     August '71; correct?

Page 117

1  A.  Yeah, yes.
2  Q.  Okay. Now ...
3      MS. PHARES: Of what period? '71?
4      MR. MONAGHAN: Yeah.
5      MS. PHARES: That -- that's -- even in your
6  wildest dreams, that's earlier than any Statute of
7  Limitations that could apply to this case.
8      THE WITNESS: It rolls over every two years.
9      MR. MONAGHAN: No, no; wait.
10     MS. PHARES: What are we talking about?
11     MR. MONAGHAN: Perhaps there's a slight
12 misunderstanding.
13     MS. PHARES: Are we talking about a cue
14 sheet? I don't know what we're talking about,
15 frankly.
16     MR. MONAGHAN: All right. We're talking
17 about the BMI agreement, the BMI agreement.
18     MS. PHARES: I beg your pardon.
19     MR. MONAGHAN: It's okay. And my
20 recollection, the contract was six years from the
21 breach, so the contract could be '71, but the breach
22 could be 2005.
23 Q.  Okay. This is your BMI agreement; right?
24 A.  Yes.
25 Q.  Okay. What was your understanding of the substance of

Page 118

1  this agreement? What did you understand BMI was going
2  to do for you and what were you -- what were you
3  giving BMI the rights to do?
4      MS. SAFFER: Excuse me, excuse me, Your
5  Honor.
6      MR. MONAGHAN: I'm asking for her
7  understanding.
8      MS. SAFFER: Wait.
9      THE COURT: Go ahead.
10     MS. SAFFER: Mr. Monaghan presented his case
11 back a couple years ago, to which I then Cross-
12 examined Anne. Since that time, Mr. Monaghan has come
13 up with a novel new theory that was not in his
14 original Complaint and that, frankly, was not part of
15 his Direct Testimony with Anne. There has been
16 nothing on Cross to bring up this new subject matter,
17 and I'm going to object that it's untimely for him to
18 come up with a new theory to produce on Redirect that
19 hasn't been part of the case until he came up with
20 this theory this summer in dealing with Mr. Kinder.
21     So, I will object to testimony relating to a
22 subject that was not part of the original Direct case.
23     THE COURT: All right. I'm going to allow
24 that line of questioning within reason, and since we
25 don't have a jury, I'll take it for whatever

Page 119

1  evidentiary worth I want to put on it.
2      MR. MONAGHAN: Thank you, Your Honor.
3  Q.  And, Ms. Bryant, same question: What was the effect
4  of the BMI -- what did you understand BMI was going to
5  do for you; why did you join BMI in the first place?
6  A.  I joined BMI -- I had met Mr. Stan Katron there, and I
7  was trying to figure out whether I should affiliate
8  with ASCAP or BMI. He was a wonderful man. He was
9  the head of writer relations, and I felt very good
10 about the fact that they would protect my catalogs, I
11 would claim them my entire catalog, they would look out
12 for it, they would claim for me. They were wonderful.
13 And I always had a great feeling about BMI.
14     My contract says that I -- I vouch for
15 everything that I list with them as original, which,
16 you know, means that everybody does that, and that
17 they have the right to exclude anything from licensing
18 in the BMI catalog of works that infringes by, it says
19 here very clearly, by --
20 Q.  What paragraph? Tell the Court what you mean.
21 A.  Paragraph 11 -- by -- has a title or music or lyrics
22 similar to that of a previously existing composition
23 and may lead to a claim of unfair competition. That
24 says to me right there that they have oversight, and
25 I've always considered them the gatekeeper of those

Page 120

1  listings, which impact these Sony listings and these
2  percentages all across the board.
3  Q.  You have to tell the Court how that happens. Connect
4  the dots.
5      MS. SAFFER: Excuse me.
6      THE COURT: Yes. Go ahead.
7      MS. SAFFER: I'd like to object in that I
8  don't believe that Ms. Bryant's understanding of what
9  she thought the contract may mean is relevant. What's
10 relevant is the contract itself, and the terms, I
11 believe they speak for themselves, and I'll address it
12 further on Cross.
13     THE COURT: All right; okay.
14 Q.  Connect the dots, please; that is, connect your
15 registration as a BMI writer.
16     That's a performing rights society; correct?
17 A.  Performing rights, royalties.
18 Q.  And these are public performance broadcast royalties?
19 A.  Right.
20 Q.  And they're split into two hundred percent interest;
21 correct?
22 A.  Yes, a hundred percent for the publisher and a hundred
23 percent for the writer.
24     MS. SAFFER: Again, excuse me, Your Honor.
25 I'm sorry. I'm sorry to keep interrupting, but Ms.

Page 121

1  Bryant and Mr. Monaghan are attempting to explain how
2  BMI works. BMI will put on a witness, one that
3  actually Pat has asked for himself, who can explain
4  how BMI operates, and that it's -- it's wasting time
5  to have people who are familiar with it but not experts
6  in explaining that.
7      THE COURT: The witness, I assume, is talking
8  what about she believes to be the system.
9      MR. MONAGHAN: That's correct.
10     THE COURT: Go ahead.
11 Q.  How did it work?
12     MS. SAFFER: No. How did you believe it
13 worked, if you don't mind. I'm sorry.
14 A.  After 35 years, I've all along believed --
15     THE COURT: All right, all right now.
16     MR. MONAGHAN: You don't have to debate with
17 Ms. Saffer.
18 A.  35 years --
19 Q.  What was your understanding of how this process, this
20 two hundred percent process, worked?
21 A.  That the publisher got a hundred percent -- the two
22 hundred percent system, the publishers got a hundred
23 percent of the listing and the writer or writers got
24 the writer's share, which was another hundred percent
25 system, which could be divided into several writers or

Page 122

1   multiple publishers as listed in either a clearance
2   form or on a cue sheet.
3   Q.  Okay. Now, there came a time, did there not, when you
4       found that there were some problems? You testified to
5       this already, so I don't think it's ... There came a
6       time when you discovered some problems with your
7       catalog; is that right?
8   A.  Yes.
9   Q.  When was that?
10  A.  Initially in 19 -- the end of 1997 was when I -- when
11      I -- I saw some problems on the website, the brand new
12      website.
13  Q.  Okay. And Exhibit 2 in evidence, that is your
14      catalog, isn't it, your BMI catalog?
15  A.  Yes.
16  Q.  And this is produced as of what date, however?
17          MS. SAFFER: Excuse me, Your Honor. You
18      know, this is, I guess, what we learned in -- in
19      grammar school, as the two bites at the same apple.
20          Ms. Bryant, we went through all of
21      this. What Mr. Monaghan is doing is pulling out the
22      same exhibits and eliciting the same testimony. In
23      case he didn't get it the way he wanted originally,
24      he's going to see if he can't fix it the second time
25      around.

Page 123

1           We've gone through all of this ground the
2       first couple of days of trial. Now, you have limited
3       the amount of time that you're going to be spending on
4       this case right now, and I don't think it's
5       appropriate for them to redo what has already been
6       done and then maybe not give us time to reach new
7       material.
8           THE COURT: Let me just ask, Mr. Monaghan,
9       where are we going with this?
10          MR. MONAGHAN: We don't have much more on
11      this, but let me just say --
12          THE COURT: We did actually go through this.
13          MR. MONAGHAN: We've had a two-year hiatus in
14      the case. The context for any questions I might ask
15      has to be set forth on the record now or it won't make
16      any sense.
17          THE COURT: Well, let's really speed this
18      along.
19          MR. MONAGHAN: And I appreciated Your Honor
20      saying you're going to give us wide latitude on this.
21          MS. SAFFER: Yeah.
22          THE COURT: I always regret things that I
23      say.
24          Go ahead.
25          MR. MONAGHAN: All right.

Page 124

1   Q.  So, what's the state of the catalog listings now as we
2       sit here today?
3   A.  Didn't you ask me another question?
4           MS. SAFFER: Objection.
5   A.  I got this question in 2000. I didn't finish
6       answering my question.
7   Q.  What's the date on the print-out?
8   A.  3/16/2000.
9   Q.  How did you get that catalog?
10  A.  I didn't get any help from -- from BMI after two years
11      of writing and trying to get some answers on my
12      catalog, so I went to you, Patrick Monaghan, and said,
13      something's up, and you got -- we began this action.
14      And that's when I -- two years later is when I got a
15      copy of my catalog.
16  Q.  And there's even a letter to Mr. Charlie Feldman. Do
17      you know who he is?
18  A.  Oh, yeah.
19          MR. MONAGHAN: And that's in evidence.
20          THE COURT: Okay. I really don't see what
21      difference it makes, Counselor, when this was
22      received. I mean, historical information --
23          THE WITNESS: Well, it took me two years to
24      get my own catalog.
25          THE COURT: Just a moment, just a moment.

Page 125

1           THE WITNESS: I'm sorry.
2           MR. MONAGHAN: Moving on.
3           THE WITNESS: I'm sorry, Your Honor.
4           MR. MONAGHAN: Exhibit 29.
5           Ms. Reporter, you don't have Exhibit 29 in
6       evidence; is that correct?
7           THE COURT: I don't have it in evidence.
8       It's not in evidence.
9           MS. PHARES: No, it was -- it was excluded.
10          THE COURT: Right.
11          MR. MONAGHAN: Right.
12          THE COURT: It was on the GI Joe royalty.
13          MR. MONAGHAN: Right.
14          MS. PHARES: And it has to do with jingles.
15          MR. MONAGHAN: I'm going to -- I don't know
16      why it's not in evidence. I'm going to ask the
17      witness to identify it. It should be in evidence.
18      It's a statement addressed to Anne Bryant. If she
19      received it, there's a sufficient foundation for
20      getting it.
21          MS. PHARES: Your Honor, this was excluded on
22      July 7, 2004. Are we going to just repeat the whole
23      case over again?
24          MR. MONAGHAN: I don't think so.
25          THE COURT: Well, I don't remember why it was

Page 126

1     excluded.
2         Is it to Ms. Bryant?
3         MS. PHARES: Maybe we can find out for you.
4         THE COURT: It's to Ms. Bryant.
5         MR. MONAGHAN: It's to Ms. Bryant.
6         MS. SAFFER: I believe -- I believe --
7         THE COURT: Just a moment.
8         Go ahead. Why do you think it was excluded?
9         MS. SAFFER: I believe it was excluded
10    because it dealt with jingles and that wasn't the
11    basis for this lawsuit. It was not relevant.
12         THE COURT: All right. There you go.
13         MR. MONAGHAN: Well, jingles are the basis of
14    the lawsuit. This is -- the jingles are mentioned
15    right in the -- in the statement, and it's -- you can
16    take it for whatever weight it has, but it was sent to
17    you.
18         THE COURT: No, this is like before, you
19    know, when it's in evidence, it's in evidence. I'm
20    not going to go back. And if you want to dig up the
21    record from two years ago, I'll look at the record,
22    but I'm not going to allow it in.
23         Let's go ahead.
24         MR. MONAGHAN: Okay.
25 Q.  So, just to summarize the claims against BMI, so that

Page 127

1    the Court has a clear idea why it is you're suing BMI,
2    tell the Judge why you're here today suing BMI? What
3    did they do wrong?
4 A.  Well, they failed to safeguard my catalog, and it
5    appears that these cue sheets are back door to
6    changing people's listings from 100% or 50% down to
7    8%. And it was after two years of tooth-pulling
8    efforts that we finally got -- I had to hire an
9    attorney -- that I finally got my catalog so I could
10    actually see all that was going on in my catalog, so
11    that I could even begin to understand the extent of
12    why my income had gone away and why there were changes
13    that were in front of my face on the website that
14    didn't make any sense to me. But for two years, they
15    refused to help me, and then when I sued them, they
16    joined with the other Defendants against me, and it's
17    been nothing but controversy ever since and -- instead
18    of straightening out the catalog. And then two years
19    ago they said they wanted to straighten out the
20    catalog, and here we are.
21         THE COURT: All right. I think we are far
22    beyond any question that was posed. Let's go ahead.
23         MR. MONAGHAN: Okay.
24 Q.  Exhibit 45, it may have suffered the same fate as 29,
25    I don't remember, but --

Page 128

1         THE COURT: 45 was --
2         MS. PHARES: Was also excluded.
3         THE COURT: Energies TV program, the bunny,
4    yes, energizer TV program.
5         THE WITNESS: No, it's not the bunny, Your
6    Honor. It's a different --
7         THE COURT: Are you correcting me?
8         THE WITNESS: I'm just letting you know.
9         THE COURT: People say energizer, I always
10    imagine it's the bunny.
11         THE WITNESS: Oh, no, that's a television
12    show called Energi.
13         MR. MONAGHAN: Do you have 29?
14         MR. PHARES: I have 29.
15         MR. MONAGHAN: What about 45?
16         MS. PHARES: No, I don't have 45.
17         MR. MONAGHAN: My records did not indicate
18    whether you had --
19         MS. PHARES: Well, our records indicate that
20    it was excluded.
21         Was this a download by any chance?
22         THE WITNESS: No.
23         MR. MONAGHAN: No.
24         THE COURT: Well, if it was excluded, unless
25    you can dig up the point where it was excluded and I

Page 129

1    can take a look at it again, it's still out.
2         MR. MONAGHAN: Okay. Well, I'm just going to
3    make the offer of Exhibit 45, just let her identify it
4    for the record here. If it's excluded on the same
5    basis, fine.
6         THE COURT: All right.
7 Q.  I show you now, just for the record, if you can
8    identify Exhibit 45, Ms. Bryant?
9 A.  Okay. From the Internet Movie Data Base, this is a
10    read-out on the television show currently airing
11    called Transformers Energi. It's one of three
12    television shows using my television theme for the
13    last five years without any accounting to me.
14         MS. PHARES: Your Honor, I think the reason
15    that this was excluded is because Sunbow didn't make
16    this program. It doesn't distribute it. It has
17    nothing to do with it. It may very well be that the
18    copyright owner, the ultimate copyright owner,
19    licensed the work to another production company; has
20    nothing to do with Sunbow. And I believe that's what
21    we told you the last time, and it was excluded.
22         THE COURT: Well, how does a person like Ms.
23    Bryant, then --
24         MS. PHARES: And, in fact, that is indeed
25    what I said to you the last time.

Page 130

1    THE COURT: How does she get redress for lost
2  money under those circumstances?
3    MS. PHARES: Well, there are -- there are
4  only certain occasions in which she is entitled to
5  money. She is not always entitled to money. That's
6  her assumption, but that is not the case. It's sort
7  of the example, if I may say so, Your Honor, of what
8  Ms. Saffer described to you in chambers, of the man
9  who created the resistor. He was -- transistor, I
10  mean. He was paid certain monies, but he did not get
11  money from every exercise of the transistor patent.
12  And that's the same situation that applies here.
13    THE COURT: Now, as I understand it, a
14  work-for-hire person may or may not get any rights; is
15  that true?
16    THE WITNESS: If they're -- yes, if they
17  don't provide that their contracts give back the
18  royalties, which I always do.
19    THE COURT: Okay. Go ahead.
20    MR. MONAGHAN: Your Honor, that sets on a
21  good subject matter to cover.
22  Q.  And the work-for-hire concept as it applied to these
23  relationships, who is the hirer and who is the hiree?
24    MS. SAFFER: Excuse me. These relations? We
25  have talked about lots of --

Page 131

1    MR. MONAGHAN: Sunbow.
2    MS. SAFFER: Sunbow; okay.
3  Q.  The Jem agreement, what is it, Exhibit M?
4  A.  Uh-huh.
5  Q.  Did you understand who was being hired in the Sunbow
6  agreement? You have three --
7  A.  Because that last question was a little funny. I
8  understand that -- you're kind of starting from the
9  middle of the copyright story.
10    I write a piece of music as an individual.
11  At the point where someone wants to buy it, I have to
12  sign a piece of paper that says this will be deemed a
13  work for hire and I'll turn over the copyright to you.
14  I could have had the song for ten years before I did
15  that.
16    Okay. Then, at that point that I sign it
17  over, it presumes that I have --
18    MS. PHARES: Objection, Your Honor. This
19  is --
20  A.  -- I have gotten all of these rights.
21    MS. PHARES: This is calling for a legal
22  conclusion. And I might add that the answer is so
23  wrong that we just shouldn't go here. This is just
24  not an accurate description of the law.
25    THE WITNESS: This is my way of working for

Page 132

1  35 years.
2    MS. PHARES: But the Court asked something
3  about --
4    THE COURT: You know what the problem is,
5  folks? It's 4:10 and people are getting testy.
6    Now, let's all relax. Take a deep breath.
7  And, Ms. Bryant, if you could quickly sum up what you
8  were saying.
9    THE WITNESS: It's not a work-for-hire until
10  I sign a contract that's satisfactory to me that makes
11  it a work-for-hire. And, at that point, Your Honor, I
12  give them the copyright, and contemporaneously they
13  license back my royalties. That's the way it was done
14  my entire career.
15    THE COURT: Okay. So, M is a work-for-hire
16  agreement --
17    THE WITNESS: Yes.
18    THE COURT: -- where you got back only those
19  rights that are absolutely set forth in that
20  agreement?
21    THE WITNESS: Yes.
22    THE COURT: Nothing beyond that?
23    THE WITNESS: And that's all of them, that I
24  can tell. I don't know of any other rights I would
25  ask for.

Page 133

1    THE COURT: All right. Let's go ahead.
2    MR. MONAGHAN: Your Honor, is this a good
3  time -- if you give me five minutes, I probably don't
4  have more than five minutes more.
5    THE COURT: All right. Go ahead. We're
6  going to quit at 4:30, so, take your time.
7    MR. MONAGHAN: No, I was going to say, if
8  you'd give us a five-minute break to look over
9  everything, make sure I covered everything.
10    THE COURT: All right. I'll give you five
11  minutes. Go ahead.
12
13    (Whereupon a recess was taken at
14    4:10 PM.)
15
16    (Trial resumes at approximately 4:20 PM.)
17
18    THE COURT: Ms. Bryant, come back on the
19  stand.
20
21    (Whereupon the Plaintiff resumes the
22    witness stand.)
23
24    MR. MONAGHAN: One last question.
25    THE COURT: That's what they all say.

Page 134

1      MR. MONAGHAN: I know they all say that.
2      THE COURT: All right.
3      REDIRECT EXAMINATION BY MR. MONAGHAN: (Cont'd)
4  Q.  Ms. Bryant, can you look at Exhibit M, the Jem
5      agreement?
6  A.  Jem agreement, yes.
7  Q.  Okay?
8  A.  Okay.
9  Q.  And let me direct your attention to Page 7. Yeah.
10     You're looking at the same page that I've got
11     the blow up of?
12  A.  Yes.
13  Q.  Okay. Would you read that last sentence, please?
14  A.  The whole page?
15  Q.  The one -- no, the last sentence.
16  A.  All royalty statements ...?
17  Q.  All royalty statements ...
18  A.  Okay. "All royalties statements and other accounts
19     rendered by Company shall be binding upon contractor
20     and not subject to any objection by contractor, unless
21     specific objection in writing stating the basis
22     thereof is given to Company by contractor by one year
23     from date rendered."
24     Didn't I just do that?
25  Q.  Who's the contractor?

Page 135

1  A.  Kinder and Bryant.
2  Q.  Who's the writer?
3  A.  Anne Bryant.
4      MS. PHARES: And Ford Kinder.
5      THE WITNESS: And/or Ford Kinder.
6      MS. PHARES: Your Honor, objection.
7      MR. MONAGHAN: That's all I have, Your Honor,
8      on Redirect.
9      THE COURT: All right.
10     MS. PHARES: Objection, Your Honor. The
11     document speaks to itself, and unless there be any
12     question, it quite clearly says that this is for the
13     services of Anne Bryant and Ford Kinder, jointly
14     referred to as Writer.
15     THE WITNESS: All right; yes, that's true.
16     I'm sorry.
17     THE COURT: All right.
18     Ms. Saffer, do you have a few questions?
19     MS. SAFFER: I do, Your Honor.
20     RECROSS-EXAMINATION BY MS. SAFFER:
21  Q.  During the course of Redirect there were a number of
22     questions directed to the fact that there are multiple
23     registrations for a number of works that were written
24     by you and Mr. Kinder; correct?
25  A.  Yes.

Page 136

1  Q.  And I believe you testified that on some of these
2      registrations, you're credited with fifty percent,
3      some with a hundred, and some with as little as, I
4      think you said, eight-and-a-half percent; is that
5      correct?
6  A.  Eight -- 8.3, yes.
7  Q.  8.3; okay. You also testified, I believe, that you
8      don't normally submit registrations or cue sheets, but
9      that they are submitted, you said, in this instance by
10     Sunbow or Sunbow's representative, Bill Dobishinski?
11  A.  In a work-for-hire situation it's their responsibility
12     as publisher. I submit my own at times.
13  Q.  Okay. During the first part of the trial, isn't it
14     true that there were documents produced that indicated
15     that Bill Dobishinski was also representing you and
16     Mr. Kinder?
17  A.  He was the -- he was administrator for Sunbow, and he
18     also administrated for all of Sunbow's writers.
19  Q.  Well, then, if he administered for Sunbow's writers,
20     he administered for you and Mr. Kinder; correct?
21  A.  Well, he accounted to us, yes. He was the
22     administrator for Sunbow.
23  Q.  No, I didn't say for Sunbow and neither did you.
24     There was correspondence that was produced which
25     showed that he represented the two of you.

Page 137

1  A.  As an administrator, yes.
2  Q.  Wasn't there also correspondence -- I mean testimony
3      that you gave in the beginning of the trial that said
4      that you and Mr. Kinder had an arrangement, that the
5      royalties were collected and you split them 50/50?
6  A.  That's right.
7  Q.  Okay. So that, in essence, it didn't matter to you
8      how they were registered, as long as you got what you
9      considered your fair share?
10  A.  That's not fair to say, that I didn't care how they
11     were registered. I wanted them registered properly.
12  Q.  Well, what was properly?
13  A.  Well, properly, with the person who had the authority
14     to register them, with the responsibility of
15     registering them, registering the proper percentages.
16  Q.  You indicated in your testimony that the proper person
17     to register it was the individual representing, in
18     this case Sunbow, or the production company. You
19     testified to that a number of times.
20  A.  Okay.
21  Q.  You also testified that the man who registered a great
22     many of these represented you.
23  A.  Yes, but there were also registrations for -- for
24     example, that were given to me in this past afternoon
25     that were registered by other people who were not the

Page 138

1     -- Sunbow and were not the administrator for Sunbow
2     productions.
3   Q.   Did you have authority, when you were not the
4     copyright owner, to say what the copyright owner would
5     do with these works that no longer belonged to you by
6     your own admission?
7   A.   Wait a minute. Star Wild was my publisher. Somebody
8     else, out of left field, is registering my song. I
9     don't understand that.
10  Q.   How do you know it's somebody out of left field?
11  A.   Because none of these people have the names that
12    they're supposed to have to be registering my songs
13    for Star Wild and Sunbow. Holy Moley Music? Who's
14    that?
15  Q.   How do you know what Sunbow did with the music which
16    was owned by Sunbow?
17  A.   That's a very good question. I'm glad you brought
18    that up. How could I possibly know what they're
19    doing?
20  Q.   What right did you have, what right --
21  A.   I have that right. I have the music publishing rights
22    and I have the performance rights, and they just can't
23    go licensing it around and avoiding me getting my
24    payments for publishing -- music publishing money and
25    performance rights money. They just can't put on

Page 139

1     Armada and Energi and all of these TV shows and avoid
2     me. I have a contract.
3          MS. PHARES:  Objection, Your Honor.
4     Foundation.
5          THE COURT:  No, I think that --
6          MS. PHARES:  Ms. Bryant is not -- not only
7     does she not know how it's being licensed, she doesn't
8     even know whether or not she's entitled to money when
9     it is licensed.
10         THE COURT:  I take her statement just as an
11    expression of her own frustration as she sees it.
12         THE WITNESS:  I'm supposed to get the
13    performance rights royalties, Mrs. Phares. Why are my
14    things being broadcast and I'm not getting them?
15         THE COURT:  All right. Now, there's no
16    question pending. Please don't answer anything.
17         MS. SAFFER:  Well, Your Honor, you'll have to
18    forgive me on this. Mr. Monaghan has only blown up
19    the pages of this contract that he thought was
20    relevant, which, okay; fair enough. I didn't know we
21    were going to be addressing this. So, do you have a
22    copy of the contract? It's Exhibit M.
23         THE COURT:  It's right here.
24         MS. SAFFER:  Okay.
25  Q.   Page 2, Paragraph 5B.

Page 140

1          THE COURT:  Go ahead.
2   Q.   Can you read that to the Court, please?
3   A.   B.  "Without in any way limiting the generality of the
4     foregoing, it is agreed that the Company shall have
5     the exclusive right and may license others to use,
6     adapt, arrange, change, add to, or subtract from the
7     music and to combine the same with other reproduced,
8     transmit, perform, broadcast, telecast, and/or
9     otherwise communicate the same or any version or
10    versions thereof by any means, including, but not
11    limited to, in synchronization with motion pictures,
12    television, and/or other form of recordation or
13    reproduction of sight and/or sound, whether now known
14    or hereafter devised, publicly, for profit, or
15    otherwise, it being understood the Contractor and
16    Writer hereby waive any so-called moral rights" --
17    ha -- "which may now be or may hereafter be
18    recognized. It is understood and agreed that neither
19    Contractor, nor Writer shall have any right, title, or
20    interest in any other literary material and/or lyrics
21    which may be combined with the music."
22         My God, how do you guys write this stuff?
23  Q.   I will ask you, although you're not a writer --
24  A.   I am a writer.
25  Q.   I mean -- excuse me, excuse me. That was a slip. I

Page 141

1     apologize -- that you're not a lawyer, does it not say
2     that they have the right to do with this as they see
3     fit?
4   A.   Yeah, but they have to give me the royalties.
5   Q.   No, they only have to give you the royalties as
6     spelled out there. This allows them to take this
7     music that they now own, license it, use it, give it
8     to anybody else, combine it with other music, adapt
9     it, arrange it, etcetera. That's what this contract
10    that you signed gives them the right to do.
11  A.   An arrangement is not a composition, Ms. Saffer. You
12    know that. Arrangers -- I'm an arranger. Arrangers
13    don't get royalties. Composers get royalties. I get
14    my royalties as a composer. This is a composition.
15  Q.   Doesn't this contract give them the right to make new
16    versions of the music, to take it, to change it in any
17    way they see fit as the owner of the music?
18  A.   Yes; but they haven't done that. They're using the
19    same song. That's not a change. An arrangement is
20    not a change. An arrangement's an arrangement. And
21    if that's the excuse, that doesn't hold.
22  Q.   Well, clearly you're entitled to believe what you wish
23    to believe.
24  A.   You pay royalties on arrangements?
25         THE COURT:  All right. Please, let's not

Page 142

1  have any argument here.
2       Do you have one more question?  That's going
3  to be it.
4       MS. SAFFER:  Yes, I have one more question.
5  It may have to have a couple of parts.
6       THE COURT:  All right.
7       MS. SAFFER:  Forgive me.
8  Q.  Mr. Monaghan also referred you to the BMI contract
9      that you signed as a writer; correct?
10 A.  Yes.
11 Q.  Do you have it in front of you there?
12 A.  Yes.
13 Q.  Okay.  Paragraph 4 talks about the rights that were
14     granted to BMI by you.
15      MS. SAFFER:  Do you have it there, sir?
16      THE COURT:  No.
17
18      (Handing to Judge.)
19
20 Q.  All right.  Paragraph 4.  Doesn't that paragraph
21     indicate that what you have granted to BMI is the
22     right to license the public performance of your
23     rights -- you haven't granted to BMI anything else but
24     the right to license the public performance of the
25     music; correct?

Page 143

1  A.  Yes, that's -- that looks right.
2  Q.  Therefore, you haven't asked BMI to be your agent,
3      your representative, whatever word you want to use,
4      for any other rights you may have, just the right to
5      license the public performance?
6  A.  (No verbal response.)
7  Q.  If that's the case, how can you expect BMI to be
8      responsible to you if any other right you may have is
9      violated?  On what basis would BMI be obligated to do
10     that on your behalf?
11 A.  You're asking me a good question.  I like this
12     question.
13      If I have a song in my catalog, that I'm a
14     BMI writer all these years, and it's a BMI catalog of
15     works, right, and it takes -- it's used in situations
16     where it must be licensed by you, but the people who
17     are being paid are all ASCAP writers, now how does
18     that happen, as in the case of Enerjon and Armada and
19     these other TV shows, that a BMI title, the
20     transformer's being paid to ASCAP writers, and BMI is
21     not saying, hey, wait a minute; that's a BMI title?
22      Explain to me.  Why don't you claim that for
23     me?  How do you feel about ASCAP writers collecting on
24     BMI songs?
25      I don't understand.  I think that's part of

Page 144

1  your responsibility as -- as the person licensing.
2       THE COURT:  All right.  We're going to stop
3  for tonight.  Tomorrow at 2:00 o'clock we will resume.
4       The only thing left with Ms. Bryant is a
5  Recross, should there be one, and whatever --
6       MS. SAFFER:  I haven't finished this, just
7  this line of questioning.
8       THE COURT:  Well, that's it for today.
9       MS. PHARES:  Your Honor, my understanding was
10 that you were going to hear arguments.
11      THE COURT:  Yes, yes, I'm going to hear
12 arguments.  I'm going to rule on any motions that I
13 have to tomorrow, and we'll see where we go.
14      MS. PHARES:  And, Your Honor, if I may just
15 pursue that?  If -- well, maybe we'll wait until
16 tomorrow.
17      I was going to say:  At the moment, all of
18 the witnesses on our list, certainly, and on Mr.
19 Monaghan's list were directed towards this oral
20 agreement theory.  And I don't know what's left.
21      THE COURT:  Well, I'll give you an example.
22 Mr. Monaghan may want to put on some expert dealing
23 with the right to have an accounting.  I don't know.
24 I'm not going to put myself in his shoes; but I don't
25 know what's going to happen, except that, from my

Page 145

1  standpoint, the written agreements are all as the Jem
2  contract set forth, and the -- there are no oral
3  agreements.  The oral agreements got folded into them.
4  And that the only question that I saw left was whether
5  there was a cause of action that either directly or
6  indirectly caused this Court to move now to say, okay,
7  there has to be an accounting.  And I'll listen to
8  those arguments tomorrow.
9       MS. PHARES:  Thank you, Your Honor.
10      THE COURT:  All right.
11      THE WITNESS:  Can I take these statements
12 home?
13      THE COURT:  No.  You have to talk to your
14 lawyer about it.  He'll give you a copy of them.
15      THE WITNESS:  We didn't get this.
16      MS. PHARES:  Well, Your Honor, I don't know
17 where these original Plaintiff's exhibits are in the
18 room, but --
19      MR. MONAGHAN:  In that pile.
20      THE COURT:  Ms. Saffer, here's your copy.
21      MS. SAFFER:  That's of the contract?
22      THE COURT:  Yeah, that's of the contract.
23      MS. SAFFER:  You need it or want it or would
24 you rather not?
25      THE COURT:  All right; I'll take it.

Page 146

1    I N D E X   T O   E X H I B I T S
2
3    (PLAINTIFF'S EXHIBIT Y - TWO PAGES OF
4        TRIAL TRANSCRIPT FROM JULY 9, 2004 -
5        MARKED FOR IDENTIFICATION.)............... 35:5
6
7    (PLAINTIFF'S EXHIBIT Y - TWO PAGES OF
8        TRIAL TRANSCRIPT FROM JULY 9, 2004 -
9        RECEIVED IN EVIDENCE.).................... 36:7
10
11   (PLAINTIFF'S EXHIBIT Z - AFFIDAVIT
12       OF ANNE BRYANT DATED 12/6/05 - MARKED
13       FOR IDENTIFICATION.).................... 37:14
14
15   (PLAINTIFF'S EXHIBIT Z - AFFIDAVIT OF ANNE
16       BRYANT DATED 12/6/05 - RECEIVED IN EVIDENCE.)
17   ............................................ 38:13
18
19   (PLAINTIFF'S EXHIBIT NO. 48 - LETTER
20       AND ACCOUNTING STATEMENTS - MARKED
21       FOR IDENTIFICATION.).................... 89:18
22
23
24
25

Page 147

1    C E R T I F I C A T I O N
2
3
4        I, LAURIE HARDISTY, a Stenographic Reporter for
5    the State of New York, do hereby certify that I
6    recorded Stenographically the proceedings herein, at
7    the time and place noted in the heading hereof, and
8    that the foregoing is an accurate transcript of same,
9    to the best of my knowledge and belief.
10
11
12
13       _____
14               LAURIE HARDISTY
15
16
17
18
19
20
21
22
23
24
25