# EXHIBIT 12

Page 1

```
 1              DRAFT/NOT CERTIFIED
 2              Continuing Bench Trial
                    (Day 4)
 3
                                    December 5, 2006
 4                                  2:15 PM
                                    40 Gleneida Avenue
 5                                  Putnam County Office
                                     Building
 6                                  Carmel, New York
 7
    BEFORE:  HON. ANDREW P. O'ROURKE
 8              Presiding Supreme Court Justice
 9
    SUPREME COURT OF THE STATE OF NEW YORK
10  COUNTY OF ROCKLAND
                                              X
11
    ANNE BRYANT
12                           Plaintiff
13  - versus -                          Index No.
                                        5192/00
14  BROADCAST MUSIC, INC., (a/k/a "BMI"),
    FORD KINDER, KINDER & CO., LTD., VADIVOX, INC.,
15  JULES M. "JOE" BACAL; GRIFFIN BACAL, INC.,
    STARWILD MUSIC BMI, WILDSTAR MUSIC ASCAP,
16  SUNBOW PRODUCTIONS, INC.,
                             Defendants
17                                            X
18  ANNE BRYANT
                             Plaintiff
19                               Index No.
    - versus -                      2821/02
20
21  SUNBOW PRODUCTIONS, INC.,
                             Defendant
22
23  
                   Laurie Hardisty, RMR
24              Official Court Reporter
        44 Gleneida Avenue, Carmel, NY 10512
25              (845) 225-3641 Ext. 294
```

Page 2

```
 1  APPEARANCES:  PATRICK J. MONAGHAN, JR., ESQ.,
               and MICHAEL KORIK, ESQ., Co-counsel
 2             Monaghan, Monaghan, Lamb &
               Marchisio, Esqs.
 3             Attorneys for Plaintiff
 4
 5      GLORIA C. PHARES, ESQ.,
         and JOHN C. KNAPP, ESQ., Co-counsel
 6       Patterson, Belknap, Webb & Tyler, Esqs.
         Attorneys for Defendant Sunbow
 7
 8
         JUDITH SAFFER, ESQ.,
 9       and JOHN COLETTA, ESQ.,
         Co-counsel BMI Legal
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

1   THE COURT: Ladies and Gentlemen, we have a
2   series of things to discuss this afternoon.
3       I have received a deluge of paper today, and
4   I will tell you that I haven't had a chance to review
5   it all, except that it appears to be more or less what
6   was said in court yesterday and -- the majority of it.
7       We have a couple of things to discuss before
8   I get around to that.
9       Number 1 is: Yesterday, BMI offered a Court
10  Order.
11      MS. SAFFER: Sorry. It's hard to hear.
12      THE COURT: Yesterday we had a Court Order
13  offered by BMI. I wanted to give everybody a chance
14  to look at it.
15      I will now hear any remarks that people want
16  to make relative to that Order. And we'll go first to
17  Mr. Monaghan.
18      MR. MONAGHAN: Thank you, Judge.
19      We have not had a chance. We've been dealing
20  with these in limine motions, frankly. During a
21  break, I'll take a quick look at it. We just have not
22  had the opportunity.
23      THE COURT: All right. I can understand
24  that.
25      I have received both motions in limine and an

Page 4

1   omnibus motion against that. I've had a chance to
2   read those motions, but let me ask the Plaintiff about
3   -- let me ask the Plaintiff about the witness list and
4   whether these people are still relative to the case
5   that's before us.
6       MR. MONAGHAN: Yes, that's in the papers that
7   we filed today.
8       THE COURT: All right.
9       MR. MONAGHAN: And not only do I think that
10  the witnesses I identified are relevant, I think these
11  motions are completely and utterly frivolous, and I
12  say so in the papers. And I thought Your Honor issued
13  a firm mandate time and time again, no more motions.
14  These motions are nothing more than an effort to keep
15  us busy while they crank out paper. When you look at
16  your papers, I think you'll be convinced of how
17  frivolous these are.
18      I'll prepared to address them now if you'd
19  like.
20      THE COURT: Well, I read the papers, perhaps
21  too quickly, because I had -- was faced with a lot of
22  them very quickly when I came in; but as I understand
23  it, your argument is -- first of all, I understand
24  that you're saying that I said no motions. But I did
25  say yesterday motions in limine, when could you make

Page 5

1   them? You know, we've been sort of going quickly
2   through this and the witness lists were truly only
3   available a few days ago. So, I excuse that. And
4   that -- what you're saying, I take it, is that it's up
5   to the trial Judge to decide whether or not these
6   witnesses are -- are necessary to the case and not up
7   to Defense Counsel to do it.
8       MR. MONAGHAN: That's correct, Your Honor.
9       THE COURT: And to that extent, since I've
10  already ruled in this case that there is -- there are
11  written contracts to cover the parameters between the
12  Plaintiff and the Defendant -- the Defendants, and
13  since there are no longer -- there's no longer any
14  claim of oral contracts, then what do we need these
15  witnesses for? Maybe you'd address that.
16      MR. MONAGHAN: Yes, Your Honor.
17      Well, let me take each of the in limines.
18      Now, I would assume, though, that no more
19  motions should apply to apparently a motion that was
20  just served, this omnibus motion. You did advise all
21  of us that at the end of the Plaintiff's case, there
22  would be an opportunity to make one more motion. You
23  gave them that opportunity back in 2004.
24      THE COURT: Okay. But what they're saying is
25  the case is over, why shouldn't we make it now.

Page 6

1    But let's not get into that. Let's go
2 through the motions in limine, if you would. Tell me
3 who you're going to handle first.
4    MR. MONAGHAN: Well, let me just very briefly
5 for one minute outline where I think we are as a
6 result of the rulings yesterday.
7    Okay. I'll be perfectly honest with the
8 Court. The tough -- the tough burdens in this case,
9 in my humble opinion, had been passed. Those tough
10 burdens were the issues that went up to the Second
11 Department. We came to Court, as we all know,
12 originally, with allegations of a written --
13 allegations of an understanding, a working
14 arrangement. That's -- that's the way you described
15 it. You did not have a written agreement. So,
16 obviously, the Statute of Frauds was a major issue in
17 the case, given the fact that we're dealing with
18 relationships that go back to 1985, given the fact
19 that there were no agreements, memories dim, and so
20 forth.
21    Well, thanks to the Defendants bearing gifts,
22 in a way -- you might look at it that way -- they've
23 provided you with a written agreement. They provided
24 you with a written agreement that is now the touch-
25 stone for the entire case. It's going to determine

Page 7

1 what the rights and obligations and liabilities are of
2 the parties. So, we passed -- we passed the tough
3 part of the case, as far as the Plaintiff's concerned.
4    THE COURT: Hold on. I don't mean to cut you
5 off, but I recall somewhere along the line there was
6 an affidavit from Ms. Phares saying that the argument
7 was that they were holding, that there were written
8 agreements, but if there weren't, then the Statute of
9 Frauds would apply. So, I don't think they were
10 saying the Statute of Frauds. They were saying that
11 if there were no written agreements, then the Statute
12 of Frauds would apply.
13    MR. MONAGHAN: They argued the Statute of
14 Frauds, Your Honor, and you ruled that they hadn't put
15 it in their Answer.
16    THE COURT: Right.
17    MR. MONAGHAN: And your decision was upheld.
18    MS. PHARES: Objection, Your Honor. Our
19 motion was denied on the ground that it was too late.
20 That was the only ground.
21    THE COURT: All right. Let's not get into
22 argument now. Go ahead, Mr. ...
23    MS. PHARES: I was just correcting the
24 record.
25    MR. MONAGHAN: Okay. So, that's the

Page 8

1 landscape right now as we stand here on December 5,
2 2006. We're dealing with what you ruled already
3 yesterday and in your previous written opinion. We're
4 dealing with this written Jem Agreement, which applies
5 to all the compositions at issue, all the compositions
6 at issue that are set forth in the case.
7    Now, we gave them the witness list, but we
8 gave them a witness list which was largely a
9 replication of what we gave them in 2004; okay?
10 It's -- we've named essentially the same witnesses;
11 Berman, Weitzman, and the rest of the witnesses are
12 essentially the same people.
13    We get hit on -- just recently with a motion
14 in limine which could have been made, given the
15 current trial date set back in whenever it was when --
16 when we had the conference. This motion could have
17 been made way back then. It's an attempt to just keep
18 us busy.
19    And now I'm going to tell you why these
20 witnesses are still important, which I did in my
21 papers, which you haven't had a chance to review.
22    Okay. Now, David Berman, as I said in the
23 papers, you don't have to be -- Dr. DeBacci (sic) is
24 not the only expert who can testify about heart
25 surgery. You don't have to be the best heart surgeon.

Page 9

1 You just have to have reasonable expertise in the
2 area. Not all experts are possessed of the same
3 expertise.
4    Berman's CV, which I gave to the Defendant's
5 two years ago, indicates that he's a graduate of
6 Harvard Law School, University of Michigan. He was an
7 associate and partner in one of the leading music
8 firms in the country, music industry firms, Mitchell
9 Silverberg in LA, and his resume, which they've had,
10 indicates that he's dealt with music publishers,
11 producers, artists. He also was the President of
12 Capital Records.
13    There's no evidence in the case that suggests
14 we only have to proffer a person who's only expert in
15 the limited music publishing field of jingles.
16 There's no reason why -- why this court has to so
17 limit it. And to come in on the 11th hour with a
18 motion that says, well, Berman does not have expertise
19 in the same exact, precise area, music publishing,
20 although he does, according to his resume, he has
21 dealt with that as a lawyer dealing with contracts and
22 as a person in the industry, is frivolous. It's a
23 frivolous motion. It's a motion that could have been
24 made before, and perhaps it was even addressed back in
25 2004, but it went by the boards, and if they wanted to

1 try it again, they shouldn't have tried it now in
2 December.
3      That's Berman.
4      THE COURT: Well, hold on now before you go
5 beyond Berman.
6      What is Berman going to tell us now in this
7 case when, as far as I'm concerned, we're limited to
8 the -- to the -- is there an accounting owed and new
9 and properly before this court?
10      MR. MONAGHAN: Well, yesterday Your Honor
11 said, well, perhaps the Plaintiff wants to put on an
12 expert to discuss accountings. Now, we have a
13 contract that has specific publishing clauses in it.
14      THE COURT: Right.
15      MR. MONAGHAN: We've gone over that. And we
16 had a suggestion yesterday that these two attempts in
17 20 years, two attempts to render some kind of a
18 cockamamie accounting were sufficient and the
19 Plaintiff somehow had an obligation to gripe about it
20 and go through hoops and even sue; Ms. Phares said,
21 gotta sue. Well, guess what? We did sue. And that
22 check in 2004, Judge, is four years after the lawsuit
23 began and a couple years after Silver Star -- not
24 Silver Star -- a couple years after Sunbow was sued
25 for an accounting; okay?

1      So, what is Berman going -- Berman is going
2 to tell us what kind of account with this language,
3 which the Court has already been told, Judge, is
4 standard, their expert Helene Blue, told this court,
5 in her affidavits, that these contracts follow
6 industry standard; okay? They told you that.
7      We agree. He's going to tell you, Mr.
8 Berman, among other things, what these -- how
9 accountings are supposed to be rendered pursuant to
10 custom and industry in the music publishing business,
11 in the music industry. What are these accountings
12 supposed to look like, what are artists and song-
13 writers supposed to receive, and how are they supposed
14 to match it up against --
15      THE COURT: Well, is he going to go -- is he
16 going to tell us that they're not supposed to file a
17 complaint within a year?
18      MR. MONAGHAN: No.
19      THE COURT: That that isn't a precedent,
20 something that has to be done? I mean, what's he
21 going to tell us about accounting?
22      MR. MONAGHAN: He's going to tell us, first
23 of all, before we even get to the accounting, he's
24 going to tell us what products come within the meaning
25 of the definitions in the document, what is the --

1 what does the industry currently regard as a
2 phonograph record, which would entitle the Plaintiff
3 to mechanical royalties.
4      We've got a 20-year-old contract here. We've
5 got a contract that didn't talk about these -- these
6 DVDs and these VHSs and all of these products. And
7 I'm making a proffer to you he's going to tell you
8 that, throughout the industry, mechanical royalties,
9 as set forth in this agreement, doesn't use the term,
10 include these products, include DVDs, include VHSs,
11 include all these uses.
12      So, when Your Honor's dealing with the issue
13 of liability, you're going to have to decide, you're
14 going to have to decide, well, I've got the contract;
15 what's included in that contract? Then we get to the
16 accounting issue.
17      THE COURT: Well, before you get to -- before
18 you get there, no matter what is included in that
19 contract, there are -- there are ways for the artist,
20 writers, I think you used the expression, to register
21 displeasure about what's going on.
22      MR. MONAGHAN: When they've not received
23 anything?
24      You know, the simple expedient of not sending
25 an accounting for 18 years or 20 years cannot possibly

1 be interpreted by Your Honor as meaning, you can't
2 bitch about what you don't get; you can't gripe about
3 a statement you never received.
4      This witness, this Plaintiff, who was on the
5 witness stand, told you she never got anything until
6 this last week. She never got any kind of a --
7      MS. PHARES: Your Honor, I really have to
8 stop for a moment because Mr. Monaghan does not know,
9 because he hasn't received our affidavit, that I have
10 included in it the June 22, 2004, letter to him
11 producing the statements that Ms. Bryant testified she
12 had never received.
13      MR. MONAGHAN: That doesn't -- that's not
14 evidence, Your Honor. If they want to bring somebody
15 in to dispute what the Plaintiff said on the stand,
16 they're free to do that, they're free to do that. But
17 we don't take an affidavit now that has never been
18 shown to us -- and, Your Honor, to give --
19      MS. PHARES: It has been shown to you.
20      MR. MONAGHAN: Excuse me, excuse me -- and
21 say, well, okay that's enough to end the issue. It
22 doesn't end the issue.
23      The issue is: Did the Plaintiff get the
24 accountings that were supposed to be sent to her under
25 this agreement, and what does the industry regard as a

Page 14

1  sufficient accounting?
2      THE COURT: Well, now what would a reasonable
3  writer do if 18 years went by and she never got an
4  anything from anybody? Wouldn't a reasonable writer
5  say, you know, there's something going on here; I
6  better find out what's going on?
7      MR. MONAGHAN: That's a different question.
8  The question before the Court is not that. The
9  question is: Was there anything to report? Was there
10 anything to report? And this writer --
11     THE COURT: No, I think you're wrong. It
12 goes to the issue of what she's supposed to do as a
13 petitioner precedent, which is complain, and it gives
14 her a year to get a statement. If she doesn't get a
15 statement the rest of her life, does she have a chance
16 to come back? Is there no Statute of Limitations, no
17 laches, nothing here?
18     MR. MONAGHAN: Well, you know, it's just like
19 a tax return. If you never file a tax return, then
20 they -- they can only go after you for not filing, and ·
21 then you've got to file it. And if there's something
22 wrong with it, the IRS will come after you.
23     In this case, you can't hold the Plaintiff to
24 a contractual provision that says if you --
25     MS. PHARES: Excuse me. Your Honor, I don't

Page 15

1  know what Mr. Monaghan's foundation is for this --
2  this analogy with the tax return.
3      MR. MONAGHAN: This is an argument.
4      MS. PHARES: Well, it's argument.
5      THE COURT: Yeah. Let's try -- I'm having
6  enough trouble between them.
7      I want to know which side hired these people
8  that are outside.
9      MS. PHARES: Not we.
10     THE COURT: Okay. Go ahead.
11     MR. MONAGHAN: Watch how quiet it gets when
12 Gloria's up.
13     THE COURT: Okay. Let's go.
14     MR. MONAGHAN: Okay. You can't be held
15 accountable under a contract that tells you --
16 purportedly tells you what you're supposed to do if
17 you get an accounting. You can't be held to one year
18 from nothing. You can't -- now, you might have a
19 different issue with that. That's a different issue;
20 was it pled and is it proven or something. Now, but
21 just remember the posture of the case, Your Honor, if
22 I may? This is a case where the Plaintiff didn't get
23 her catalog that told her of any deficiencies until
24 the Year 2000. She didn't get that catalog, until I
25 got involved; okay? So, you can't go yelling about

Page 16

1  anything. If you're getting your checks, and the
2  checks don't tell you who else is sharing in your
3  music, you can't -- you can't be held to gripe about
4  it because there's just no way to do that; okay?
5      So, Berman is going to cover that.
6      MS. PHARES: Your Honor, the people back here
7  believe that you did not hear something that I just
8  said, and I just want to make sure.
9      MR. MONAGHAN: But did you hear what the
10 Judge said about letting me finish my argument?
11     MS. PHARES: Well, but it's relevant to what
12 you keep saying and the conversation that you're
13 having.
14     THE COURT: Just a moment, just a moment.
15 You know, if both of you talk, this whole record just
16 becomes a babble on the record.
17     Ms. Phares, go ahead.
18     MS. PHARES: What I just want to make sure is
19 that you understand that this is the document by which
20 we submitted --
21     THE COURT: Yes.
22     MS. PHARES: -- those statements which she
23 continually says they never received, but which we
24 sent in 2004. In fact, I have a letter from Mr.
25 Monaghan complaining about our production of

Page 17

1  documents.
2      MR. MONAGHAN: You mean the --
3      MS. PHARES: Including these.
4      MR. MONAGHAN: Is that the one in 2004?
5      MS. PHARES: 2004.
6      MR. MONAGHAN: What happened to the other 20,
7  18 years?
8      MS. PHARES: There are now royalty statements
9  in the record from 1988 through --
10     MR. MONAGHAN: I can't deal with this.
11     THE COURT: Neither can I.
12     MS. PHARES: -- through last year.
13     THE COURT: Ms. Phares, let us -- let Mr.
14 Monaghan finish. I think he's having a hard enough
15 time with me, without you being involved in it at this
16 point.
17     MS. PHARES: All right.
18     THE COURT: Go ahead.
19     MR. MONAGHAN: If they want to rely on
20 provision in here that says, after you get a
21 statement, you're supposed to gripe about it, fine.
22 You're going to have to decide whether that statement
23 is sufficient. My expert is going to tell you that
24 it's not and it's not consistent with industry
25 standards and you're not supposed to have to jump

Page 18

1  through hoops.
2       Your Honor, would you not expect that if
3  you're rendering an accounting pursuant to Paragraph
4  6, wouldn't the artist have a right to have something
5  that says, with respect to Paragraph A, you get zero
6  because we didn't sell -- we didn't make any licenses
7  regarding commercial phonograph records; for piano
8  copies, you get zero because we didn't do that, or you
9  get ten cents because we only did this, or whatever it
10  is.
11       They have an obligation to give -- they have
12  possession of the information.  They have exclusive
13  possession.  They license it, they give it away, they
14  do the numbers.
15       They got paid by Rhino.  We showed Your Honor
16  that they got paid two-and-a-half million dollars up
17  to the period we were able to get the records.
18  Remember, they -- they made a mistake in going into
19  federal court which enabled us to get those records
20  because you closed discovery in 2003.  We were able to
21  get that information.  It was in one of your opinions.
22       So, we need -- we need the Court -- that's
23  where we are.  The Court has to direct an accounting,
24  a proper accounting.  If they don't owe us anything, I
25  will say good-bye and be done with it, but I don't

Page 19

1  think that's going to be the case, and especially so
2  when you're going to be ruling on what products are
3  they required to account for.
4       Now, that's Berman.
5       THE COURT:  All right.  I'm going to ask you
6  now to allow Ms. Phares to explain their position on
7  Berman.
8       MS. PHARES:  Your Honor, I know that there
9  are all these oppositions to the motions in limine,
10  but I think the first thing that has to be addressed
11  is the fundamental question of whether or not we can
12  proceed at all.  And we -- the Plaintiff, in our view,
13  cannot make a claim for an accounting.  She has not
14  made a claim for an accounting.  First, she has an
15  adequate contractual remedy at law, and I'll discuss
16  that later, but -- I mean in more detail.  I'm
17  referring, of course, to the section --
18       THE COURT:  So, listen.  So, as to Berman,
19  you're submitting on the papers you already have
20  and --
21       MS. PHARES:  Oh, if you want me to do those
22  first, I can do them, but what I'm really trying to
23  say is that those issues are irrelevant because if
24  he's supposed to be testing -- testifying, rather, on
25  this -- on this -- on this accounting theory, what I'm

Page 20

1  really trying to say is the Court does not -- he has
2  not pled it, he cannot plead it as a matter of law.
3  He has a legal remedy and a legal remedy bars the
4  accounting.
5       THE COURT:  Okay.
6       MS. PHARES:  More than that --
7       THE COURT:  Just a moment.  I'm going back
8  now to the Amended Complaint.
9       MS. PHARES:  The ...
10       THE COURT:  Amended Complaint.
11       MS. PHARES:  Complaint.
12       THE COURT:  Which has that Sunbow, Paragraph
13  4, wrongly profited and retained the fruits of its
14  wrongful conduct, etcetera.
15       Paragraph 5.  Plaintiff therefore demands
16  that the Court direct Sunbow to render a true and
17  complete accounting of all monies received.
18       Now, I understand that you have set before
19  this Court a part of a deposition, I think it was in
20  which Ms. Bryant said that -- that Sunbow didn't owe
21  her any money.
22       MS. PHARES:  Right.
23       THE COURT:  But you can't say that -- that an
24  accounting wasn't asked for in this case.  Hold on.
25  And BMI, also in the same Complaint, it was alleged

Page 21

1  that -- I think it was the first cause of action -- or
2  maybe it was the second cause of action against BMI --
3  that an accounting was asked of them.  So, it's not
4  that an accounting isn't before us.
5       MS. PHARES:  Your Honor, there are -- there
6  are two different issues here.  First of all, she's
7  asking for an equitable accounting.
8       I agree with you that she has a legal audit
9  and notice right under her contract.
10       THE COURT:  Right.
11       MS. PHARES:  First of all, an accounting
12  requires an equitable fiduciary relationship between
13  the parties.  The law is perfectly clear about that.
14  And, more over, you ruled three years ago that there
15  is no fiduciary relationship between Sunbow and
16  Plaintiff.  So, as a matter of law, she is not
17  entitled to that.  She does have a contractual audit
18  and notice procedure that is available to her.  It's a
19  legal remedy, but there is a condition precedent
20  which she's supposed to take advantage of those
21  provisions of the contract under which she has --
22  she's operating, and then after that audit, and her
23  notice to Sunbow, if there is still a dispute that is
24  not resolved, she is entitled to go to court, but she
25  hasn't availed herself of any of those things.

Page 22

1      Second of all -- and then -- and just on
2  those legal issues alone we do not have jurisdiction
3  to proceed, which is why I've been talking about the
4  relevancy of Berman at all to an accounting, because
5  it is not really before us because the threshold
6  question is whether or not you even have jurisdiction
7  to hear that. And the notion that was suggested
8  yesterday that there can be an amendment of the
9  pleadings to conform is -- is sort of taking -- we're
10  right at the edge of due process. No one has talked
11  about an accounting in this case since the day Mr.
12  Monaghan lifted his pen from the Complaint. He has
13  never mentioned it in any pleadings in this case, and
14  now, yesterday, when -- when his last theory of the
15  case started to dissolve, he suddenly turns to you and
16  says, but, I have -- there's -- the word "accounting"
17  appears in the Complaint. But that's not enough for
18  us to go forward.
19      THE COURT: Well, if it doesn't apply to
20  Sunbow, let me ask Ms. Saffer, doesn't it apply to
21  BMI?
22      MS. SAFFER: No, Your Honor, it doesn't, for
23  the same reason. She has a contractual right, and, in
24  fact, when this proceeding first began, in terms of
25  discovery, we gave her copies of all of the records

Page 23

1  that we had. And it is by reviewing those records
2  that, in fact, Ms. Bryant has now taken the position
3  that we owe her all this additional money by saying,
4  well, if you pay that money to the publisher, then you
5  must owe all this additional money to us. She's
6  already had, in effect, in an informal sense, the
7  equivalent by having been given all the records we
8  have.
9      And I agree, though I didn't make the motion,
10  I agree with Ms. Phares that, in fact, the industry
11  practice is to hire an accountant, have them come in,
12  review the books and records, find fault with
13  something if need be, and then begin a proceeding
14  based upon --
15      THE COURT: Well --
16      MS. SAFFER: -- that proceeding.
17      THE COURT: -- do you deny that this second
18  Complaint, second Complaint, says BMI owes an
19  accounting to the Plaintiff?
20      MS. SAFFER: I don't deny that the words are
21  there. I agree with the arguments made by Ms. Phares
22  as to why it is inappropriate at this point and at
23  this juncture to try to turn this proceeding into an
24  accounting proceeding.
25      THE COURT: Okay. Now, Mr. Berman, and the

Page 24

1  Court hasn't ruled about his expertise, but I assume
2  that he is competent to get on the stand and talk.
3      MS. PHARES: Well, what I hear, I mean, if
4  we're going to address that, what Mr. Monaghan said
5  was that he was going to help the Court construe the
6  contract. That's not -- we don't need an expert for
7  that. The Court has -- that's within the competency
8  of the Court, and --
9      THE COURT: I'm getting worried about that
10  myself as this case goes on.
11      MS. PHARES: But, in any event, as I cannot
12  be more -- I actually think that if we go forward, you
13  are -- there is law, there's law in the Second
14  Department that to proceed with simply going directly
15  to a legal -- a legal action when the parties have not
16  taken advantage of their contractual agreements for
17  how they are dispose of this is reversible error.
18      THE COURT: Well, I'll tell you one thing
19  that concerns me, being reversed doesn't concern me.
20  At this end of it you do what you think is right at
21  the moment and then upstairs they get a chance to look
22  at it.
23      Let's supposing that the Plaintiff has a
24  right to an accounting. And it seems to me that --
25  that has been shown, even though it may not be that

Page 25

1  she has punched in all of the prerequisite steps
2  beforehand. Now, were I to dismiss this case,
3  wouldn't I be extinguishing any right she has that
4  goes back to the dates when this case began?
5      MS. PHARES: No. She has whatever rights she
6  has under her contract. She has never exercised it.
7  She has statements that she has just received, and she
8  is entitled to -- to have an audit and to then
9  determine and have -- go in with her auditor and have
10  him examine the books and --
11      THE COURT: All right. I will tell you that
12  to the extent that the Court decides that Mr. Berman
13  can testify, he would be limited, as far as I'm
14  concerned, only to whatever additional information he
15  can give to the Court concerning the practices within
16  the industry concerning audits or -- yeah -- and so --
17      MR. MONAGHAN: Your Honor?
18      THE COURT: -- if I decide to let him in,
19  that's where he's coming in.
20      MR. MONAGHAN: Your Honor, that's not --
21  excuse me one second. That would be cutting off the
22  major issue in the case because -- if I can just
23  finish this thought? The question is: What does the
24  industry regard -- you have plenty of old contracts in
25  the industry. How is -- the intent of the parties is

Page 26

1 always an issue in a contract case. You cannot apply
2 a construction -- a force where literal construction
3 of the agreement, strict construction of the agreement
4 without knowing how the business operates.
5     THE COURT: Well, I said, I'm willing to
6 listen to some of that about how the business
7 operates, if I let him in.
8     MR. MONAGHAN: I understand.
9     THE COURT: But I'm not going to take his
10 advice about what the contract means.
11     MR. MONAGHAN: No.
12     THE COURT: That's up to this court to figure
13 out.
14     MR. MONAGHAN: Exactly. I'm not disputing
15 that. I wouldn't try that. But what who is going to
16 say what the industry regards as a mechanical in
17 today's world? If you cut me off and you don't allow
18 me to ask Berman, in the industry, provided you find
19 he has sufficient knowledge and expertise, if you
20 don't ask -- if you don't allow me to ask him what the
21 industry now regards as something that's accountable
22 as a mechanical, for example, under the publishing
23 royalty scheme, then I am foreclosed from a major part
24 of my case because they still want to keep out
25 (indicating).

Page 27

1     THE COURT: I know; I've seen them.
2     MR. MONAGHAN: Okay. So, that would be
3 unfair, and I don't want to go up to the Second
4 Department on that either.
5     THE COURT: All right.
6     MS. PHARES: Your Honor, the way this works
7 is -- what -- what Mr. Monaghan is really saying is,
8 no, I want to go ahead and we're going to do an
9 accounting in this courtroom.
10     That is not what Plaintiff agreed to in her
11 agreement. And there are plenty of expert people who
12 do auditing in the music area. They are as familiar,
13 or I suspect, more so than Mr. Berman about the kinds
14 of rights that are available. They make that
15 analysis. That's part of the way they do the audit,
16 because that's how they have to decide what they're
17 going to look at. And then what gets formulated is
18 that they then present that to the -- to the
19 publisher, there are conversations, and, frankly, most
20 of these never end up in a court because they are then
21 resolved at that stage. And that is exactly what goes
22 on with very expert people on both sides talking about
23 them. But what Mr. Monaghan wants to do is to
24 completely leap over his condition precedent and just
25 go for it right now here. And now he needs to have

Page 28

1 Mr. Berman because he wants to have Mr. Berman act as
2 the auditor in this case before the court. That is
3 not what the parties agreed to.
4     THE COURT: Do you agree that -- or what's
5 your definition of mechanicals?
6     MS. PHARES: Mechanicals are -- first of all,
7 it's a term that doesn't appear in the Copyright Act,
8 I will just tell you, and it's left over from the old
9 Act when -- at a time when there was a right to put
10 something on a mechanical device. And as in -- in the
11 new Act -- and, by the way, the agreements between the
12 parties reflect that. All they say is that there is a
13 right to make phono records. That is a term that's
14 defined in the Act, and it does not -- and it includes
15 -- it includes phono -- it does not include an audio/
16 visual work. The audio/visual work is like a music
17 video, an animated movie, a TV program.
18     THE COURT: You mean that when this agreement
19 was signed, they were looking forward to either a
20 thirty-three-and-a-third or a 45 record?
21     MS. PHARES: No, no, no. You're thinking
22 phonograph record, like the one that we had when we
23 were children, young, but -- but, no, that's not the
24 one that I'm talking about. Phono record is defined
25 in the Copyright Act, and it is defined quite broadly,

Page 29

1 and it was looking forward to the digital age as well.
2 But the fact is that it does not include the sound
3 track of an audio/visual work like a TV show or a
4 movie. And I don't -- and I don't think -- you know,
5 these are all terms that everybody's throwing around
6 in this case without really knowing what was going on.
7 Mr. Berman has even given a declaration in this case
8 in which he uses the definition of this that it is a
9 song in a recording company contract. And it is so
10 broad, it is incredibly broad, but it happens not to
11 be a definition that's in the Sunbow.
12     THE COURT: Well, look, if I've got somebody
13 up here that is an expert, I hold him as an expert to
14 talk about how the industry looks at this from an
15 accounting standpoint, wouldn't it be relevant to what
16 that person says this contract would allow them to
17 audit? I mean, what are we going to audit? Are we
18 going to audit these --
19     MS. PHARES: The contract already says -- the
20 contract already does allow it.
21     THE COURT: -- five things here, whatever?
22     MS. PHARES: Well, where is --
23     THE COURT: Yeah, it's right on that page
24 right there.
25     MS. PHARES: B, where is the continuation of

Page 30

1  B? Here.
2      THE COURT: No, I think it was A.
3      MS. PHARES: "Contractor shall have the
4  right, at Contractors sole expense to inspect
5  company's books and records relative to gross receipts
6  derived from the use of the music hereunder and to
7  make extracts thereof provided such inspections shall
8  be made at Company's offices", blah, blah, blah. "All
9  royalty statements and other accounts rendered by
10  company shall be binding." I mean, this is the
11  procedure.
12      THE COURT: But, Counselor, go to Page 1.
13  I've been looking at these so long I know them, not by
14  heart, but close.
15      MS. PHARES: This is actually Page 5, but,
16  okay.
17      THE COURT: Whatever it is. But it's the one
18  right there.
19      Now, that says that the following things are
20  covered under the contract.
21      MS. PHARES: Right.
22      THE COURT: And I take it that we all agree
23  that if it's not on that list, then the writer doesn't
24  get any part of it. We all agree on that?
25      MS. PHARES: We are agreed, and it even

Page 31

1  indeed says that that's all there is.
2      Do we have Page 6?
3      MR. MONAGHAN: Except the Other Uses Clause.
4      MS. PHARES: It says: No royalties shall be
5  payable to Writer with respect to uses of the music,
6  except as hereinabove expressly set forth."
7      THE COURT: Yes.
8      MS. PHARES: That's it.
9      THE COURT: Well, that's this paragraph.
10      MS. PHARES: Right. But we are not here to
11  do that. That's not what we're here for. And this
12  court does not have jurisdiction until the parties --
13  I mean, Your Honor, I think maybe it would make sense
14  maybe for us to even take some time to give you an
15  opportunity to look at the cases because I had to read
16  them last night in the middle of the night, and they
17  could not be more clear that it is error to go forward
18  in a legal action without permitting -- without
19  requiring the parties to fulfill this condition
20  precedent. There just isn't any leeway. And there's
21  a Second Department case, Degrossman versus Lawrence
22  Handprints where they went through the whole
23  proceeding. Second Department just reversed it
24  because there was an error not to have gone through
25  the condition precedent of the contract. This is a

Page 32

1  waste of time.
2      THE COURT: Actually, I think in my halting
3  fashion that's what I was saying.
4      Aren't there conditions precedent here that
5  she has to have punched in and done first, you know,
6  like complaining?
7      MS. PHARES: Indeed; that's exactly correct.
8  And that's what I am trying to say.
9      MS. SAFFER: If I may, Your Honor, for a
10  moment?
11      You know, in some respects we're both
12  Defendants and we share positions, but BMI is, in
13  other respects, very different from Sunbow, and, in
14  fact, we represent both Sunbow and the Plaintiff in
15  this case. And I think it's appropriate for me to
16  remind you, since we are going back and looking at the
17  original Complaint, that when the original Complaint
18  was filed, BMI said, not about the audit, but in terms
19  of all of the Complaints or the agrievances, if you
20  will, being raised by Plaintiff that she hadn't
21  fulfilled another condition precedent which was to
22  have an arbitration. And you agreed. You required
23  that she begin an arbitration. She didn't. I made
24  the mistake of showing up in your courtroom to hear
25  the first day of the trial, and you said to me:

Page 33

1  You're here; defend BMI. And so here I've been ever
2  since. But the fact of the matter is the condition
3  precedent of BMI was an arbitration, and it's six
4  years later and that was never begun.
5      THE COURT: So, you want me to direct this
6  into an arbitration?
7      MS. SAFFER: Well, no I'd like you to dismiss
8  it totally; but if you don't agree with that position,
9  yes. In other words, there -- there are different --
10  I don't have this contract. I'm not bound by this
11  contract. I'm bound by my contract with the
12  Plaintiff. And that contract says you will go to
13  arbitration, and in that regard you ruled for me.
14      THE COURT: All right.
15      MS. SAFFER: And I'm still sitting here.
16      THE COURT: Okay. I've got whatever I'm
17  going to do on Berman.
18      Let's go on to the next one.
19      Mr. Monaghan?
20      MR. MONAGHAN: Thank you, Judge.
21      Carole Weitzman.
22      THE COURT: Now, I've lost track of this.
23      Wasn't she here once or was it an affidavit
24  or something?
25      MR. MONAGHAN: Affidavit. You saw her

Page 34

1  affidavit. Sunbow proffered her affidavit in the
2  case.
3       THE COURT: Okay. Go ahead.
4       MR. MONAGHAN: Sunbow tendered her as a
5  within in 2003 on behalf of Sunbow. Her deposition
6  was taken before a notary public. We have a copy of
7  the notary public's signature. That's the way it
8  works under the rules.
9       But here's really even the more telling
10  evidence that this is a frivolous motion. The
11  deposition was sent to counsel's office in the Year
12  2003 by former associate John Donovan and ordered.
13       I have a letter from the GAF Reporting
14  Company right here that we obtained when they raised
15  the question again the other night, just to keep us
16  busy, that says that: In further checking, I found
17  that Kathleen Jennings of Patterson, Belknap,
18  purchased a copy of the transcript on September 29,
19  2003.
20       And let me add to that. Weitzman has been
21  mentioned numerous times in the case. You've
22  mentioned her in your opinions. She's submitted
23  affidavits on Sunbow's behalf in their previous
24  multiple efforts to get rid of this case. And to
25  question the deposition testimony now, on the eve of

Page 35

1  trial, after four appeals and all of this, is just
2  totally frivolous and disingenuous. She should be
3  allowed to testify. She's one of the two Sunbow
4  people who can tell you what went on.
5       THE COURT: About what?
6       MR. MONAGHAN: About the -- about whether or
7  not the -- they followed the procedures under the
8  contract and also the link between -- well, Your
9  Honor, if I may? The link between why Sunbow and GBI
10  are, for our purposes here, and your purposes, are the
11  same person. Okay?
12       Now, you've heard Ms. Phares. She's got --
13  that's one of her back-up arguments, GBI is not in the
14  cases; even though we know these are Sunbow
15  Productions. I'm not going to show you the video
16  again.
17       Okay. So, we need to hear from Ms. Weitzman
18  here. Remember, we challenged them to produce her.
19  We thought she was going to produce her at the framed
20  issue hearing. They didn't produce her, so ...
21       THE COURT: Well, I'll tell you the truth, I
22  don't see what Ms. Weitzman is going to do for anybody
23  in this case. I mean, the GBI is not in this lawsuit.
24  The GBI, as I understand it, became Sunbow or was sold
25  to Sunbow, Sunbow bought it, or whatever happened.

Page 36

1       MR. MONAGHAN: No, Judge, no, it's not, no.
2  The company was commonly owned by the same principals.
3       THE COURT: All right.
4       MR. MONAGHAN: GBI was the ad agency, Sunbow
5  was the TV production agency. The transformers music
6  was written pursuant to an agreement between Ms.
7  Bryant and Bacal. Bacal is the common denominator.
8  You've already ruled that Ms. Bryant may make out a
9  case of a fiduciary relationship with Bacal. That's
10  in your rulings already. Bacal equals Sunbow. Sunbow
11  equals GBI. These are all the same.
12       THE COURT: GBI is not in this case?
13       MR. MONAGHAN: No; we don't need it in the
14  case. But for purposes of imputing to Sunbow --
15  imputing to Sunbow any understandings vis-a-vis
16  these -- the transformers or other music, other jingle
17  music, they are in the case.
18       THE COURT: We're not talking about
19  understandings anymore in this case.
20       MR. MONAGHAN: No, this agreement. You've
21  already ruled this agreement applies.
22       THE COURT: So, what does understandings have
23  to do with it?
24       MR. MONAGHAN: No; we're talking about --
25  okay; fine. Understandings, agreement, the Jem

Page 37

1  agreement.
2       THE COURT: This agreement, I've said,
3  controls it. That's it. In all honesty, I don't see
4  what Carole Weitzman does for your case at all.
5       MR. MONAGHAN: Your Honor, I don't understand
6  why Your Honor would foreclose me at this point in the
7  case from putting on the rest of my Plaintiff's case
8  and rule as -- as you may rule at the end of my case.
9  But I've been repeatedly harassed with these motions,
10  and I would just like to get through my case. If
11  every case that came before a court had interruptions
12  on your first witness -- I'm still on my first
13  witness -- and because somebody doesn't think --
14  excuse me -- Ms. Phares doesn't think -- it's not
15  fair. Let me finish my case. You can -- you know,
16  I'm fine, I'm a big boy; I can deal with it. I think
17  we made out our case already, but let us finish our
18  case at end of the week. We've got thousands of
19  hours, tons of trees, lots of your time, Appellate
20  Division time, federal court time. I want to complete
21  my case.
22       THE COURT: All right.
23       Ms. Phares?
24       MS. PHARES: Your Honor, we did complete the
25  case that was supposed to be presented this week

Page 38

1  yesterday on -- on this Plaintiff's testimony. Now,
2  that may not have been what Mr. Monaghan wanted, but
3  that in fact did complete the case that we were told
4  we were going to try this week. And now Mr. Monaghan,
5  yesterday in chambers, comes up with yet another
6  theory. So, if he wants to know why he never gets
7  past his first witness, it's because we never get past
8  the first witness on all of his many theories of this
9  case. But this is now becoming a due process issue
10 for the Defendants in this case because we -- I
11 frankly am sitting here saying to myself, I am -- are
12 we going to go forward with an accounting when we have
13 had no notice? Well, one there's no jurisdiction.
14 We're not prepared. There is no reason for us to be
15 going forward. She has not met -- she doesn't meet
16 the legal requirements for making an accounting. She
17 has a legal -- she has a legal claim which she has not
18 fulfilled the conditional precedents on, and -- and
19 we're sitting here talking about addressing an
20 accounting we're not prepared to address.
21        MR. MONAGHAN: You know, Your Honor, I don't
22 believe, if I may, that that defense was ever pled. I
23 do not believe that the defense that you failed to
24 follow a contractual remedy has ever been raised
25 before in the six years of the case.

Page 39

1        Now, I'd like to look at their Answers and
2  see if it has, because this is just like the Statute
3  of Frauds.
4        MS. PHARES: But you were denying there was
5  an agreement at the beginning of this case.
6        MR. MONAGHAN: No, we didn't. We didn't have
7  an agreement. We didn't have it in our physical
8  possession. We wouldn't have spent all this time
9  fighting over it when we demanded this in 2003 if they
10 had given it to us in 2003.
11       MS. SAFFER: With all due respect, Your
12 Honor, I pled it, and I asked for an arbitration, and
13 you ruled in my favor. And, notwithstanding that,
14 it's six years later and it has not been commenced,
15 notwithstanding your ruling.
16       THE COURT: All right. Let's go on.
17       MR. MONAGHAN: One last thing on BMI. I
18 didn't address BMI. Five seconds.
19       Ms. Saffer is a very nice lady -- I don't
20 mind litigating with her at all -- has just told you
21 that they gave us all the statements. I have put in
22 evidence already Exhibit 30, which was Ms. Bryant's
23 accounting, and she had a whole column of black
24 blacked out where she said she didn't have the
25 statements for years, she doesn't have. So, the way

Page 40

1  she calculated that $238,000.00, Judge, was because of
2  the two hundred percent split. If she can't see what
3  the other half of the publishing team, i.e., Star
4  Wild, is she can't figure out what she's owed.
5        So, I come back to the same point. BMI
6  didn't give her the information. What's the starting
7  point for this Plaintiff? What is Ms. Phares really
8  asking us to do?
9        MS. SAFFER: Wait a minute, wait a minute.
10       MR. MONAGHAN: Just one minute.
11       MS. SAFFER: You just said BMI and then you
12 switched to Ms. Phares. I think I have a right to
13 respond to the allegations against BMI.
14       It's been said repeatedly in affidavits and
15 in court, Your Honor. This goes back and requests
16 documents from the 1980s. We produced every single
17 piece of paper we could locate. Are there missing
18 statements here and there? Absolutely. Mr. Monaghan
19 is correct. We don't have them. We can't give what
20 we don't have. We gave numbers, but we don't have a
21 hundred percent back-up. We have 90%, 95%. We
22 produced what we can produce.
23       MR. MONAGHAN: Maybe Sunbow did. Sunbow
24 got -- Sunbow and Star Wild, its publishing arm, may
25 well have had the information. I still come back, you

Page 41

1  can't complain about information you don't get. You
2  can't complain when you've never been given a
3  statement. It's just impossible.
4        No, but what I started with is: What is Ms.
5  Phares really asking this Court to do with this?
6  Well, this new theory, talk about new theory. Here's
7  a new theory. She said, oh, you should have gone --
8  now we have this contract, now we have this remedy,
9  and you had that remedy, and now we go back and we
10 demand, give us all the information on all the sales.
11 But, wait a minute, you're not entitled to any
12 information, Mr. Monaghan, or Ms. Bryant, or whoever
13 is representing her, if I'm still alive at that time,
14 okay? You're not entitled to that because we don't
15 agree with you that DVDs are -- are within the
16 mechanical definition in that agreement. We don't
17 agree with you. We're not going to give you any
18 information about that. Go chase stones.
19       And that's why we still need -- we need a
20 ruling from you, and the ruling should be, in my
21 humble judgment, that they're supposed to render a
22 complete accounting with respect to the terms of the
23 agreement, with whatever definitions this Court finds
24 applies as to mechanical royalties and the Other Uses
25 Clause. That Other Uses Clause, other uses of the

Page 42

1  music, Judge, what does that mean? What does that
2  mean? Who's going to tell the Court?
3      THE COURT: You think somebody's going to
4  come in here and say, well, other uses, when this was
5  put together, means anything that could be thought up
6  in the future?
7      MR. MONAGHAN: I do. I mean, I think that's
8  exactly what that catch-all means. They had a
9  sufficient foresight to say, well, we don't know how
10  we're doing it now, but we've got now, something's
11  going to happen later on in technology, digital down-
12  loads, DVDs and VHSs. That's precisely what I think.
13      And, by the way, that's the same 50% that's
14  in -- that Ms. -- all the experts say is the proper
15  proportion for publisher/writer split on publishing
16  royalties. You have the treatises. You've already
17  ruled on them.
18      THE COURT: All right. Mr. Berman, if he
19  comes in, I'll let him put in some testimony on what
20  terms mean.
21      Carole Weitzman is not coming in.
22      Next.
23      MR. MONAGHAN: Can you enter an Order on
24  that, Judge, please?
25      THE COURT: This record is an Order. Submit

Page 43

1  it and I'll sign it.
2      MR. MONAGHAN: Okay.
3      THE COURT: Go ahead.
4      MR. MONAGHAN: I'll address the ...
5      THE COURT: Neil Rigby.
6      MR. MONAGHAN: Neil Rigby has been called
7  because Mr. Rigby is the head of legal and business
8  affairs, as you know, and, also, Mr. Rigby has
9  submitted affidavits already to the court that he's a
10  person with knowledge of how Sunbow has operated under
11  this agreement. He's been dealing with it since the
12  Year 2000; okay?
13      It's not for Ms. Phares to define the scope
14  of this case. It's for you to define the scope of
15  this case. You are certainly equal to the task of
16  deciding how relevant Mr. Rigby's testimony might be
17  on these issues about accountings and whether or not
18  -- now suppose, for example, just suppose, that that
19  Other Uses Clause, which they said is a standard
20  clause, is in 50 other agreements, and they're paying
21  for DVDs, they're paying for VHS, the exact same
22  language? He's the guy who can talk about that.
23      MS. PHARES: I would just like to point out
24  that we wrote our motions in limine on the weekend
25  right after we received Mr. Monaghan's witness list

Page 44

1  and when we were going to trial on a different subject
2  than which he is trying now to ask Your Honor to go
3  forward on. So, we haven't really made our motions in
4  limine with respect to now this new theory. And, I
5  mean, Mr. -- for one thing, these are all -- these are
6  provisions that occur under a U.S. contract. Mr.
7  Rigby is not a U.S. lawyer, and he's now going to be
8  asked to, what, to comment on these provisions, to
9  interpret the law for -- for -- this is -- this is
10  irrelevant, I mean, and I'm going -- I have a standing
11  objection to all of these witnesses because I think
12  that there is no theory under which this Court should
13  continue this trial.
14      MR. MONAGHAN: This is simple, Judge. It's
15  not -- we're not calling Mr. Rigby to testify to
16  something he didn't know about at the time. But
17  aren't there two issues? What was the contract and
18  whether there was a breach. Mr. Rigby can talk about
19  whether or not there's been compliance with this
20  agreement and whether there's been a breach of this
21  agreement.
22      MS. PHARES: Excuse me, Your Honor. Are we
23  alleging breach of contract? Is that now what we're
24  up to?
25      MR. MONAGHAN: Sure we're alleging breach of

Page 45

1  contract. We're alleging that you failed to account
2  properly under that —
3      MS. PHARES: But where in the Complaint is
4  that?
5      MR. MONAGHAN: We read it in the record
6  already many times.
7      THE COURT: All right. Anyone have anything
8  else to say about Mr. Rigby?
9      MR. MONAGHAN: I don't have anything to add
10  about Mr. Rigby. It's my papers, though. I
11  incorporate my papers.
12      THE COURT: All right. As far as I'm
13  concerned, Mr. Rigby doesn't come in.
14      All right. Let's get back to the motions
15  that I have received this morning. And, Mr. Monaghan,
16  have you had sufficient time to read over these and
17  make appropriate answers to them? This is a motion to
18  dismiss.
19      MR. MONAGHAN: I haven't even seen it. Your
20  Honor knows what was going on this morning. I mean, I
21  haven't even seen this motion.
22      THE COURT: Isn't this the motion that you
23  sent a copy to Mr. Monaghan?
24      MS. PHARES: Yes, we did. We faxed it to
25  him, --

1    MR. MONAGHAN: But I haven't seen it.
2    MS. PHARES: -- we E-mailed it to him, we've
3  given it to him in court when --
4    MR. KORIK: Your Honor, it takes
5  approximately two hours, to get here. So, with -- the
6  time stamp on my Blackberry is well after that.
7    MR. MONAGHAN: I came back at 12:00 o'clock.
8    MS. PHARES: These were sent at about 11:15
9  this morning.
10    MR. MONAGHAN: You should not hear this,
11  Judge. This is a no-more-motion issue this time.
12    THE COURT: I'm going to listen to it because
13  it was here and it was made in open court and I
14  believe this is a restatement of what was made in open
15  court, and the -- if the remaining end of this case is
16  an accounting, then that's still before this court. I
17  have found that it was in the Amended Complaint and
18  that, therefore, it has been before this court one way
19  or another. If you didn't do any discovery on it, ask
20  any questions on it, don't ask me why that wasn't
21  done.
22    MS. PHARES: Your Honor, I'm going to make an
23  objection to our going forward on this for all the
24  reasons that I have stated before. There is the fact
25  that it appears in the Complaint does not mean,

1  especially in the light of Your Honor's learning of --
2  of written agreements that you were aware of at the
3  beginning of this case, does not change the fact that
4  these are conditions precedent. This would be just
5  like the claim that has to be made in an Article 78.
6  If it's not made, it's jurisdictional, it doesn't go
7  forward. And for you to go forward is a -- yeah --
8  and, in fact, also, there is not a cause of action for
9  an accounting in the Complaint. The word "accounting"
10  appears. There are only two causes of action. Both
11  of them equitable. Neither of them applicable to
12  Sunbow because of our -- our -- of the fact that we do
13  not have a fiduciary relationship.
14    THE COURT: All right. I tell you what I'm
15  going to do. I'm going to put this case over to
16  Friday morning at 9:30. It will give Mr. Monaghan
17  time to put in anything he wants.
18    I will try in the meantime to read everything
19  that is before me at this point, and also, at that
20  time, decide if and when and to what extent we're
21  going forward.
22    Ms. Saffer, the accounting that you were
23  talking about, --
24    MS. SAFFER: Yes.
25    THE COURT: -- this is an accounting between

1  the Plaintiff and BMI we're talking about?
2    MS. SAFFER: Yes.
3    THE COURT: And Sunbow is not involved in
4  that?
5    MS. SAFFER: Correct. What I -- the position
6  that I am taking is for the same reasons alleged in
7  Sunbow's Complaint, but with a different set of
8  circumstances, based upon the fact that there is also
9  a condition precedent which is the arbitration clause,
10  for the fact that you ruled on that, and that the
11  Plaintiff disregarded your ruling, that there is no
12  basis to go forward as if that had already occurred
13  when, in fact, six years later no arbitration has
14  begun.
15    THE COURT: All right. Before we end today's
16  session, I want you to look at that Order, because if
17  I could accomplish one thing each day that we get
18  together, I would think it an appalling victory. So,
19  I want you to look at this, and if there's any
20  comments you have to make, I'll be back in 15 minutes
21  and we'll go forward on that.
22    MR. MONAGHAN: That's fine. We'll do that,
23  Judge.
24    One issue, though. Our expert is already on
25  route. We had him scheduled for --

1    THE COURT: Friday?
2    MR. MONAGHAN: I believe we had him scheduled
3  for tomorrow. We thought today was going to be
4  Kinder. Of course these things never go as planned
5  and that's tricky business.
6    THE COURT: Well, you'll have him here
7  Friday. We'll see what happens.
8    MR. MONAGHAN: Thank you.
9    MS. SAFFER: Your Honor, I just also mention,
10  we don't have to do anything right now, but I didn't
11  complete -- I had about ten more minutes with Ms.
12  Bryant if we're going forward. At some point that has
13  to be completed.
14    THE COURT: Well, let's do this: First of
15  all, let's take a 10 -- 15-minute break .
16    MS. SAFFER: Yes.
17    THE COURT: I want you to read the Order that
18  has been -- that you have suggested to the Court. I
19  want to know how everybody feels about it. Maybe
20  we'll take a vote, who knows? We're getting to that
21  point. And let's talk to each other, and I'll see you
22  in a few minutes.
23    MR. MONAGHAN: Okay, Judge. Thank you.
24
25    (Recess taken at approximately 3:10 PM.)

Page 50

1    (Court reconvened at approximately 3:25 PM.)
2
3        MS. SAFFER:  Your Honor, I gave the Order to
4    Mr. Monaghan that I had proposed.  He made what I
5    thought are some relatively minor changes, which I
6    have no problem.  I signed off that I consent to the
7    changes.
8        MR. MONAGHAN:  I'm going to sign a consent
9    myself, Your Honor.
10       THE COURT:  All right.
11       MR. MONAGHAN:  And I will ask Ms. Phares to
12   review it to the extent that --
13       MS. PHARES:  I have no objection.
14       MR. MONAGHAN:  Okay.
15       THE COURT:  Okay.  I have a copy here.
16   Maybe --
17       MR. MONAGHAN:  Can we just give you this one?
18       THE COURT:  Yeah, you could give me this one
19   or conform this one.
20       MS. SAFFER:  Yes, just so we all have a copy
21   of the --
22       THE COURT:  I'm sure you want one also.
23
24       (Judge hands to Ms. Saffer.)
25

Page 51

1        MS. SAFFER:  Just let me copy it onto here,
2    and then we'll send this up to him.
3        MR. MONAGHAN:  Now, if I may, Your Honor?
4        THE COURT:  Yes.
5        MR. MONAGHAN:  The issue on the expert
6    witness.
7        THE COURT:  Yes.
8        MR. MONAGHAN:  These guys do not come
9    cheaply.
10       THE COURT:  Right.
11       MR. MONAGHAN:  He's going to want
12   approximately another six or seven thousand dollars a
13   day, a day.  We should not have to bear that cost.
14   These motions that have delayed the proceedings, we
15   scheduled these -- I don't know; I think he's on a
16   plane already.  They should be born by the party
17   causing it, and that's Sunbow.
18       THE COURT:  Well, I don't know that I agree
19   with you here.  But let me ask you, can you prevent
20   him from coming?
21       MR. MONAGHAN:  I'm trying.
22       MS. PHARES:  But right now?
23       MR. MONAGHAN:  Yes, we've already -- we've
24   already placed the call.
25       MR. KORIK:  He might already be in the air.

Page 52

1        THE COURT:  Where is he coming from?
2        MR. MONAGHAN:  California.
3        THE COURT:  All right.  I will tell you that
4    I don't think there is any way that I would charge
5    this to the Defense Counsel.  As a matter of fact, I'm
6    the one that said Friday at this point, and you're not
7    getting six thousand dollars from me, I'll tell you
8    that much.
9        But what time are you planning on having him
10   testify tomorrow?
11       MR. MONAGHAN:  Well, originally was -- today
12   was supposed to be Kinder's dep for the last three
13   hours, and you were going to indulge me, very kindly,
14   and I appreciate that.  And then we had him, you know,
15   starting out tomorrow morning.
16       THE COURT:  And how long do you think he
17   would be tomorrow?
18       MR. MONAGHAN:  I don't think he'd been that
19   long, you know.
20       THE COURT:  Well, within the rubrics of what
21   I said I'm willing to take from him.  Are we talking
22   about a couple hours?
23       MR. MONAGHAN:  I think we'd be talking about
24   three hours, probably.
25       THE COURT:  Three hours on Direct?

Page 53

1        MR. MONAGHAN:  Well, with, you know, what I
2    expect, the way things are going, and objections and
3    fussing and feuding and all, I think that's -- I'm
4    just trying to be as liberal on that as possible; not
5    tie you in or me.
6        THE COURT:  All right.  Then I'll tell you
7    what I'm going to do is, then we'll meet tomorrow and
8    we'll take his testimony.  Whatever I want to do with
9    it I'm going to do with it.
10       MR. MONAGHAN:  Okay.
11       THE COURT:  Excuse me.  9:30 tomorrow morning
12   for that one witness.  I want it kept down.  I'm
13   limiting it to anything to do with accounting and
14   whatever his position is on what terms in the contract
15   might mean, subject to whatever objections are made
16   and whatever rulings I make.
17       MR. MONAGHAN:  Okay.  Thank you, Judge.
18       MS. PHARES:  Your Honor, just for some house-
19   keeping.
20       First of all, I would like -- we want to have
21   an opportunity to reply to Mr. Monaghan's response on
22   our motion, and if you could just -- if we could set a
23   time, when his Answer is due so that we can prepare a
24   reply, or if you just want us to do a reply in court
25   on Friday, we can do that.  But I think it's -- it's

14 (Pages 50 to 53)

Page 54

1  important for us to have seen his papers in advance
2  because things do change from day-to-day in this case
3  and we -- we're entitled to an opportunity to know
4  what the response is.
5      THE COURT: Mr. Monaghan, when do you think
6  you'd be able to get those papers, considering that
7  I'm not going to do anything on this 'till Friday
8  morning and tomorrow is Wednesday? Could you have
9  them to counsel on Thursday morning?
10     MR. MONAGHAN: We'll do our best.
11     THE COURT: All right.
12     MR. MONAGHAN: And then we would expect
13  that --
14     THE COURT: Any reply papers by Thursday
15  afternoon or Thursday morning.
16     MS. PHARES: Well, wait a minute. What's
17  morning? I don't want to get them at 11:59.
18     THE COURT: Well, I mean like 10:00 o'clock.
19  How about that? All right?
20     MR. MONAGHAN: Yes, Judge.
21     MS. PHARES: And, Your Honor --
22     THE COURT: That will be the best we can do.
23     MS. PHARES: -- I just want to point out one
24  thing that occurred to me, that if you were concerned
25  about the fact that Ms. Bryant might be somehow

Page 55

1  disadvantaged by you're not going forward here, and
2  that is that, I think it's important to think about
3  the fact that, under this provision, her contractual
4  provision, she has a much greater and broader audit
5  right with access to much greater information than she
6  is entitled to under the equitable accounting that
7  would be allowed under the equitable principles. In
8  this case she can -- she has a much greater
9  opportunity to investigate all the sources of income
10  and make the comparisons that she would want to make
11  and other than just asking for the information that
12  she -- that she gets from Sunbow under an equitable
13  remedy. And I know that you're concerned about what
14  happens to her if you are to dismiss this, but it -- I
15  think that's something that we should be thinking
16  about.
17     THE COURT: All right. I'll give it some
18  thought.
19     MS. SAFFER: Also, just under housekeeping.
20  There was only to be one BMI witness, Alison Smith,
21  who was here yesterday, and I just want to -- I don't
22  know where this is going or whatever, but to sort of
23  put everybody on notice, that she made herself
24  available for this week because we had the trial set
25  for this week, and next week she's got obligations in

Page 56

1  Los Angeles. So, if she is needed, everybody should
2  know that I can have her here on Friday, if we go in
3  that direction, but the following week she's not going
4  to be able to be here.
5      THE COURT: All right. Well, listen, we
6  haven't been able to march forward necessarily.
7      MS. SAFFER: Yes.
8      THE COURT: Though I am very thankful to you
9  all for signing, all of you that signed this Order or
10  agreed to it. And maybe, Ms. Bryant, that will help
11  you work out whatever problems you have with BMI.
12     I am sending this down to the County Clerk's
13  office now, and you all have copies of it, so I'm not
14  going to worry about that anymore.
15     And I will see you tomorrow morning at 9:30
16  and we'll have the one expert witness.
17     MS. BRYANT: Can I say that I don't have any
18  current information for the last six years to be able
19  to work out anything with BMI?
20     THE COURT: Well, I think you ought to talk
21  to them about it and get it from them.
22     All right. Have a good day.
23     MR. MONAGHAN: Thank you, Judge.
24
25     (Whereupon court adjourned for the day.)

Page 57

# EXHIBIT 13

```
 1                (EXPEDITED COPY)
 2              Continuing Bench Trial
                      (Day 5)
 3
                                    December 6, 2006
 4                                  9:30 AM
                                       40 Gleneida Avenue
 5                                  Putnam County Office
                                     Building
 6                                  Carmel, New York
 7
      BEFORE:   HON. ANDREW P. O'ROURKE
 8             Presiding Supreme Court Justice
 9
      SUPREME COURT OF THE STATE OF NEW YORK
10    COUNTY OF ROCKLAND
                                              X
11
      ANNE BRYANT
12                           Plaintiff
13    - versus -                        Index No.
                                         5192/00
14    BROADCAST MUSIC, INC., (a/k/a "BMI"),
      FORD KINDER, KINDER & CO., LTD., VADIVOX, INC.,
15    JULES M. "JOE" BACAL; GRIFFIN BACAL, INC.,
      STARWILD MUSIC BMI, WILDSTAR MUSIC ASCAP,
16    SUNBOW PRODUCTIONS, INC.,
                           Defendants
17    _____X
18    ANNE BRYANT
                           Plaintiff
19                                      Index No.
      - versus -                         2821/02
20
21    SUNBOW PRODUCTIONS, INC.,
                           Defendant
22
23    _____
                   Laurie Hardisty, RMR
24               Official Court Reporter
           44 Gleneida Avenue, Carmel, NY 10512
25               (845) 225-3641 Ext. 294
```

Page 2

```
1   APPEARANCES:  PATRICK J. MONAGHAN, JR., ESQ.,
         and MICHAEL KORIK, ESQ., Co-counsel
2        Monaghan, Monaghan, Lamb &
         Marchisio, Esqs.
3        Attorneys for Plaintiff
4
5        GLORIA C. PHARES, ESQ.,
          and JOHN C. KNAPP, ESQ., Co-counsel
6        Patterson, Belknap, Webb & Tyler, Esqs.
         Attorneys for Defendant Sunbow
7
8
         JUDITH SAFFER, ESQ.,
9        and JOHN COLETTA, ESQ.,
         Co-counsel BMI Legal Department
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1        THE COURT:  We're prepared to go forward,
2   Counselor?
3        MR. MONAGHAN:  Yes, I am, Your Honor.
4        THE COURT:  All right.  Call your witness.
5        MR. MONAGHAN:  All right.  The Plaintiff
6   calls David Berman.
7
8        (Whereupon the witness, David M. Berman,
9        took the witness stand.)
10
11       THE COURT:  Left hand on the Bible.  Raise
12  your right hand.
13       Do you solemnly swear that the evidence
14  you're about to give in the matter herein before this
15  court will be the truth, the whole truth, and nothing
16  but the truth, so help you God?
17       THE WITNESS:  Yes.
18
19  DAVID M. BERMAN, having been duly sworn, was examined
20  and testified as follows:
21
22       THE COURT:  Please be seated.  State your
23  name and your business address and spell your last
24  name.
25       THE WITNESS:  David Berman,
```

Page 4

```
1   B-E-R-M-A-N, 5142 Calvin Avenue, Tarzana, California.
2        MS. PHARES:  Your Honor, just for the record,
3   could we please have an explanation of what cause of
4   action we are proceeding on this morning?
5        THE COURT:  I'm going to take the testimony.
6   As I said yesterday, I limited this witness to certain
7   things that I would take testimony from him on, and I
8   think that's what we're going on it.
9        Let's go ahead.
10       MS. PHARES:  And, for the record, I object to
11  our proceeding with this witness until there has been
12  a decision on our motion to dismiss.
13       THE COURT:  Overruled.  Exception granted.
14       Go ahead.
15       MR. MONAGHAN:  Thank you, Your Honor.
16  DIRECT EXAMINATION BY MR. MONAGHAN:
17  Q.   Mr. Berman, you have given your full name and address
18       to the Court Reporter?
19  A.   Yes.
20  Q.   Okay.  And what is your occupation, sir?
21  A.   Essentially I'm retired, but I do do a fair amount of
22       expert witnessing in music-related matters.
23  Q.   Okay.  And are you also an attorney?
24  A.   I'm currently an inactive member of the California
25       Bar.
```

Page 5

```
1        MR. MONAGHAN:  All right.  I'm going to have
2   the Reporter mark this document as ...
3        MS. PHARES:  Could you ask Mr. Monaghan to do
4   his examination from the podium so we can see the
5   witness?
6        THE COURT:  I'm sure he will, I'm sure he
7   will as he can.  But I think maybe his questions are
8   on that computer there.
9        MR. MONAGHAN:  That's correct, Your Honor.
10  And I'm over here, and I think everybody can see from
11  here.  That's why I moved to the left side of the
12  table.
13       THE COURT:  Okay.  But do try to speak up.
14  We don't have that noise we had yesterday, but make it
15  back.
16       Go ahead.
17
18       (PLAINTIFF'S EXHIBIT NO. 49 - CURRICULUM
19       VITAE OF DAVID M. BERMAN - FOR IDENTIFICATION.)
20
21       MR. MONAGHAN:  I'm going to show the witness
22  a document which will be marked Plaintiff's 49 for ID
23  at this time.
24  Q.   Mr. Berman, can you identify this document?
25  A.   Yes, I can.
```

Page 6

1  Q.  What is it, sir?
2  A.  It's my CV.
3  Q.  I'm sorry. I didn't catch your answer.
4  A.  It's my CV.
5  Q.  Your CV, your resume?
6  A.  Yes.
7      THE COURT: Any objection to that going into
8  evidence?
9      MS. PHARES: I don't have any objection to
10  this going into evidence, but I don't want that to be
11  considered a waiver of our position of whether or not
12  he's qualified.
13      THE COURT: Counselor, I'm not waiving
14  anything for you.
15      MR. PHARES: I'm just making the record, Your
16  Honor.
17      THE COURT: Now, it's been accepted into
18  evidence.
19
20      (PLAINTIFF'S EXHIBIT NO. 49 - CURRICULUM
21      VITAE OF DAVID M. BERMAN - RECEIVED IN
22      EVIDENCE.)
23
24      THE COURT: Go ahead.
25  Q.  Now, sir, is this a current resume?

Page 7

1  A.  Actually, the only addition to the current one I use
2  is there's a paragraph at the end which just indicates
3  my activities as an expert witness in music-related
4  matters.
5  Q.  Okay. And can you tell the Court, in your own words, a
6  brief resume of your educational background?
7  A.  I went to University of Michigan, graduated with a
8  Bachelor's of Business Administration in 1966, and
9  then I received a J.D. from Harvard Law School in
10  1969.
11  Q.  Okay. What did you do after you graduated Harvard Law
12  School?
13  A.  I joined the law firm of Mitchell, Silberberg, and
14  Knupp, K-N-U-P-P.
15  Q.  Okay. And when did you do that?
16  A.  In 1969.
17  Q.  Did you start as an associate?
18  A.  I started as an associate in the Entertainment
19  Department, specifically the Music Division of the
20  Entertainment Department, specializing in music-
21  related matters.
22  Q.  And we'll get to some of what you did there.
23      What did you do after you were at Mitchell,
24  Silberberg, and Knupp, after you left Mitchell,
25  Silberberg?

Page 8

1  A.  I left Mitchell. I went to Warner Brothers Records in
2  April of 1976 as the Vice President and later Senior
3  Vice President of Business Affairs.
4  Q.  Okay. Coming back to your -- so, now we've got your
5  career from '69 around '87?
6  A.  That's correct, beginning of '87, yes.
7  Q.  Okay. When you were at Mitchell, Silberberg, what
8  involvement did you have with the music industry in
9  general and specifically with music publishing?
10  A.  At Mitchell we represented -- we represented a wide
11  variety of songwriters, music publishers, Hoyt Axton,
12  -- he wrote Joy to the World -- Buffy Saint Marie, The
13  Doors, The Beach Boys. We represented a number of
14  publishing companies, relative -- fairly large ones,
15  such as Almo-Irving, the publishing affiliate of A&M
16  Records, Island Music, the publishing affiliate of
17  Island Records.
18      We also represented a number of smaller
19  publishing companies. Hoyt Axton's company, Buffy
20  Saint Marie's company, Perry -- Richard Perry, a well-
21  known producer, his company. They all -- they all
22  acquired copyrights in various ways, either as writers
23  or, in the case of producers, often acquiring
24  copyrights of artists they would produce. And we
25  would, in fact, administer those smaller publishing

Page 9

1  companies. So, we actually administered the
2  publishing for Hoyt and Buffy Saint Marie, and Richard
3  Perry, and many others like that.
4  Q.  This is while you were at Mitchell Silberberg?
5  A.  This was all while I was at Mitchell Silberberg.
6      In addition, at Mitchell, we were involved
7  with the licensing of copyrights for soundtrack albums
8  and for theatrical motion pictures.
9  Q.  Okay. Now, you went to Warner Brothers, according to
10  your Exhibit 49, your resume, in 1976; is that right?
11  A.  That's correct.
12  Q.  And you were Vice President, Senior Vice President of
13  Business Affairs?
14  A.  That's correct.
15  Q.  Tell the Court, please, what that involved, generally.
16  A.  Well, on the music publishing side, it involved again,
17  obviously, acquiring mechanical licenses for all of
18  the recordings that we made. We also had somewhat of
19  a joint venture arrangement with Warner Music, the
20  publishing arm the Warner Music group, whereby if we
21  signed an artist to a recording contract, I would
22  contact, at the time, a gentleman by the name of Chuck
23  Kay, who was running Warner Music, and he would
24  attempt to get the publishing on that artist. It was
25  a bit of synergy. And if he was able to do so, and we

3 (Pages 6 to 9)

Page 10

1   would cooperate, then we would share in the publishing
2   income derived from that artist. So, we were also in
3   the publishing business in that sense.
4   Q.   So, you've had --
5   A.   Excuse me. Plus, we also did a large number of
6   soundtrack albums and was involved in licensing music
7   rights for the -- the theatrical motion pictures and
8   the soundtrack albums therefrom.
9   Q.   And did there come a time when you left Warner
10  Brothers?
11  A.   Yes. In February of '87, I went to Capital --
12  actually, I started as the President of Capital
13  Industries, Inc., which was a North American holding
14  company authority of EMI, and in that capacity, I was
15  responsible for international, Canada, human resources
16  legal, finance, etcetera, as well as, I had
17  responsibilities for Screen Gems Music, which was the
18  publishing affiliate of, at the time it was Thorne
19  EMI.
20  Q.   And when you were at Warner Brothers, what were some
21  of the artists that you dealt with in publishing
22  agreements that you dealt with?
23  A.   I don't remember -- well, in terms of artists involved
24  with, Prince, Rod Stewart, George Benson, Fleetwood
25  Mac --

Page 11

1   Q.   How about Madonna?
2   A.   Madonna.
3   Q.   And how about some of the publishing companies, can
4   you recall the names of any of the publishing
5   companies that you were involved with at that time?
6   That's at Warner Brothers.
7   A.   Well, the direct involvement with the publishing there
8   was with arrangement we had with Warner Brothers
9   Music.
10  Q.   How about, does the name Chrysalis Records, Island
11  Records, Tommy Boy Records mean anything -- those
12  names mean anything to you?
13  A.   Well, yes, they do, but they were all record deals,
14  not necessarily publishing agreements.
15  Q.   Okay. Now, you mentioned EMI. What is that company,
16  please?
17  A.   Well ... I'm sorry?
18  Q.   I think you mentioned that you, when you were at
19  Capital, that was the North American subsidiary of
20  EMI.
21       MS. PHARES: We can't hear, we can't see, and
22  I know that Mr. Monaghan has apparently given up using
23  his screen.
24       MR. MONAGHAN: No, no, I haven't. It's a
25  combination.

Page 12

1        MS. PHARES: Well, it's not turned on.
2        THE COURT: All right. Mr. Monaghan, I'm
3   going to ask you to keep your voice up. Perhaps you
4   could go a little this way, just to make sure that
5   you're heard.
6        MR. MONAGHAN: I'll hide behind the screen,
7   Judge. They'd probably like me to do that.
8   Q.   All right. And for how long were you at Capital
9   Industries, sir?
10  A.   For approximately six months I was the President of
11  Capital Industries, Inc., till -- from roughly
12  February through October. I then went and became the
13  President of Capital Records, the label itself.
14  Q.   And you mentioned Screen Gems. What was Screen Gems?
15  A.   Screen Gems was the publishing arm of EMI, a pretty
16  substantial publishing company. And Screen Gems
17  reported to me when I was President of Capital
18  Industries.
19  Q.   Over the course of the period of time that you were
20  first an associate of Mitchell Silberberg and then
21  through the period of time you were at Capital,
22  approximately how many music publishing agreements
23  would you have had dealings with?
24  A.   Oh, my good -- starting at Mitchell?
25  Q.   Right.

Page 13

1   A.   Hundreds.
2   Q.   Okay. And in what capacities? For example, were you
3   involved with drafting them, reviewing them, giving
4   opinions about them, any of those?
5   A.   All of the above.
6   Q.   And have you been hired --
7        THE COURT: He said "all of the above".
8        Go ahead.
9   Q.   Okay. And were you retained by the Plaintiff in this
10  matter?
11  A.   Yes.
12  Q.   And are you being paid for your services?
13  A.   Yes, I am.
14  Q.   And have you testified before as an expert witness in
15  various matters?
16  A.   Yes, I have.
17  Q.   And approximately how many matters have you testified?
18  A.   Oh, testimony, either via affidavit, expert report,
19  deposition, or trial testimony, in probably 20 cases.
20  Q.   And, overall, how long is your experience in the music
21  business?
22  A.   Well, since 1969.
23  Q.   And have you also, after your Capital Industries
24  tenure, did you have occasion to take on another
25  position?

**Page 14**

1  A.  I left Capital, and for about a year, from roughly
2     1990 to early '91, I went back to Mitchell,
3     Silberberg. And then in '91, May, I think, of '91, I
4     became -- I went to Geffen Records, where I was -- we
5     didn't have titles per se. I think my contract
6     referred to me as a Senior Executive in charge of
7     business affairs and administration. And I
8     subsequently took on the title of General Counsel.
9  Q.  Okay. And then did there come a time when you left
10    Geffen Records?
11 A.  I left in February of '98 to become the President of
12    the Buena Vista Music Group, which is the recorded
13    music and music publishing arm of the Walt Disney
14    Company.
15       MR. MONAGHAN: We offer Mr. Berman, Your
16    Honor, as a Plaintiff's expert on the subject matters
17    that were discussed by the Court yesterday.
18       MS. PHARES: Voir dire, Your Honor?
19       THE COURT: Yes, certainly.
20 VOIR DIRE BY MS. PHARES:
21 Q.  How are you, Mr. Berman. I'm Gloria Phares. I'm
22    counsel for the Defendant, Sunbow Productions, Inc.
23 A.  Good Morning.
24 Q.  You mentioned that when you were at Mitchell,
25    Silberberg, you said "we represented", and I take it

**Page 15**

1     you mean the firm represented, a wide variety of
2     interests and so forth; is that correct?
3  A.  The firm did. I believe that every writer, producer,
4     or publishing company that I mentioned I also worked
5     on.
6  Q.  And when you say you worked on it, were you directly
7     drafting agreements with publishing agreements?
8  A.  Yes.
9  Q.  And could you say roughly what -- what number of them
10    you did while you were there?
11 A.  I did practically all of the agreements for Almo/
12    Irving, which is a very large publishing affiliate of
13    A&M Records. It could have been hundreds in the seven
14    plus years I was there.
15 Q.  Did they involve -- did any of these agreements
16    involve the commissioning of music for movies?
17 A.  At times it did. We -- I was involved with the movie
18    Shaft. Isaac Hayes wrote the theme for Shaft. There
19    were others. I can't recall specifically right now.
20 Q.  Was the commissioning of music for TV and movie a
21    large portion of your publishing work?
22 A.  Not a large portion, no.
23 Q.  What proportion would you say it was?
24 A.  Of the publishing work?
25 Q.  Yes.

**Page 16**

1  A.  10%.
2  Q.  And have you ever participated directly in the
3     auditing of a -- company songwriters, audits of their
4     royalty statements?
5  A.  I have not performed an audit, but I've certainly
6     reviewed and been involved with audits.
7  Q.  And how have you been involved?
8  A.  As the attorney for the writer or the publisher, both
9     sides.
10 Q.  How many times?
11 A.  Oh, 10, 15.
12 Q.  Are you familiar with music publishing royalty
13    statements?
14 A.  Yes, I am.
15 Q.  And have you had extensive experience reviewing them?
16 A.  I certainly had a lot of experience reviewing them.
17 Q.  Have you ever reviewed them in connection with an
18    audit?
19 A.  Yes.
20 Q.  And when you were at Warner Music, did you have direct
21    day-to-day responsibility for its publishing work?
22 A.  No, I was not at Warner Music. I was at Warner
23    Brothers Records.
24 Q.  Correct.
25 A.  And I dealt with their music publishing affiliate,

**Page 17**

1     Warner Music.
2  Q.  But you did not have day-to-day work with their music
3     publishing when you were at Warner Music?
4  A.  I believe I used "responsibility".
5  Q.  At Warner Records.
6  A.  At Warner Records I did not have responsibility for
7     Warner Music.
8  Q.  Right. So, you were not doing day-to-day music
9     publishing work when you were at Warner Records?
10 A.  I did -- I did get involved occasionally on publishing
11    issues. I didn't have day-to-day publishing
12    involvement.
13 Q.  Did you get involved with the commissioning of music
14    for motion pictures while were you at Warner Records?
15 A.  Yes.
16 Q.  In what capacity?
17 A.  In the case of Purple Rain, Prince's movie, which he
18    was a Warner Brothers artist, and we of course had the
19    soundtrack album and we were involved in the entire
20    creation of that film and the licensing of all the
21    rights; other soundtracks as well.
22 Q.  But that wasn't commissioned music, was it?
23 A.  All of the music in Purple Rain was written for the
24    film.
25 Q.  And when you were at Capital Industries, you said you

Page 18

1    had responsibilities for Screen Gems and they reported
2    to you.  Did you have day-to-day responsibility for
3    the music publishing in that capacity?
4  A.    Well, the head of ...  It was one of the areas of my
5    responsibility.  I didn't do the day-to-day publishing
6    work, but the entire operation of Screen Gems Music
7    reported to me.
8  Q.    But you didn't have day-to-day responsibility for the
9    work or you weren't participating in their day-to-day
10   operations?
11 A.    I was certainly involved in any dealings that they
12   would make, in any signings that they would enter
13   into.  I had responsibility for the operation of the
14   publishing company.
15 Q.    Well, I understand, I do understand your being
16   responsible.  What I'm looking for is whether or not
17   you have the day-to-day experience with the
18   commissioning of music, with the licensing of it on a
19   day-to-day basis, as opposed to being ultimately
20   responsible for it?
21 A.    I didn't personally license the music, nor did even
22   the head of Screen Gems.  That went down substantial
23   layers.
24 Q.    How much are you being paid?
25 A.    $500.00 an hour.

Page 19

1  Q.    And of your 20 cases, could you say generally how they
2    break down of whether or not you represent song-
3    writers or publishers?
4  A.    My goodness.
5  Q.    Or record companies, I suppose.
6  A.    Right.  It runs the gamut.  Songwriters, artists,
7    record companies, Solomon Smith Barney I represented
8    in one case on a music matter.  I'd say more of them
9    were in the record area than the publishing area, but
10   some of them certainly did deal with music.
11 Q.    How many?
12 A.    Maybe five.
13 Q.    And when you were at Geffen, were you directly
14   involved with day-to-day publishing matters?
15 A.    At Geffen, for the initial few years, there was also
16   an affiliated company, Geffen Music, a publishing
17   company, and I had responsibilities for Geffen Music.
18   We ultimately sold that to Universal but I continued
19   to be involved in publishing issues.  We did a large
20   number of soundtrack albums, and -- and it became
21   prevalent by that time, when a label would acquire a
22   soundtrack album, that essentially what we were doing
23   was paying the music budget for entire film.  And in
24   that sense, any music that was being commissioned
25   specifically for the film, the film company generally

Page 20

1    insisted on ownership of at least half the copyright.
2    Since we were paying for that, I got intimately
3    involved in the negotiation and the contractual
4    negotiation of those licenses.
5  Q.    With the songwriters?
6  A.    With representatives of the songwriters, yes.
7  Q.    And when you were at Buena Vista Music?
8        I mean, I understand that record companies
9    have publishing labels, so -- and I understand the
10   notion of your being ultimately responsible, but what
11   I'm looking for is how much experience you have on a
12   day-to-day level with the commissioning of music for
13   TV or motion pictures.
14 A.    Well, you said at Buena Vista?
15 Q.    Uh-huh.
16 A.    At Buena Vista, again, I had responsibility for the
17   Walt Disney Publishing Company, a very large
18   publishing operation.  In addition, we did do a number
19   every soundtrack albums on the record side with
20   Paramount, under the same terms that I just described,
21   where essentially we paid for the entire music budget.
22   Paramount insisted on anything that was written for
23   the movie that they own the copyright.  So, I became
24   involved in negotiating those.
25        Finally, at the Disney Company, on the

Page 21

1    animated side, the Walt Disney Company demands
2    complete and total ownership of a hundred percent of
3    the copyright on any composition that is written for
4    and included in their animated features.  And while I
5    was there, we did Tarzan, and, you know ...  I can't
6    remember all the features we did.  So, yeah, I was
7    involved in those issues.
8  Q.    Now, you mentioned throughout your answers references
9    to movies.
10       Have you ever done any music publishing work
11   in connection with the commissioning of work for
12   television?
13 A.    Yes, but much less.
14 Q.    When did you do it?
15 A.    I know I did some at Mitchell Silberberg.
16 Q.    You mean in the early in the 70s?
17 A.    Yeah, I left in 78, yes.
18 Q.    '78 or '76?  Maybe I misread this.
19 A.    I left Mitchell, Silberberg in '76; you're right.
20 Q.    And any other occasion which you have done the
21   commissioning of music for television in the last 30
22   years?
23 A.    Yes, yes, but I can't recall specifically right now.
24 Q.    Is that because there's so little of it?
25 A.    There wasn't that much television work.

Page 22

1    MS. PHARES: Your Honor, I am going to oppose
2  the admission of the -- or acceptance of Mr. Berman as
3  an expert for the subjects with which he's being asked
4  to testify --
5    THE COURT: All right.
6    MS. PHARES: -- based on his qualifications.
7    THE COURT: I'm allowing his testimony, and
8  I'll put such weight on it as I feel is warranted.
9    Thank you, Counsel.
10    MR. MONAGHAN: Thank you, Your Honor.
11    So, the Court is an accepting Mr. Berman as
12  an expert for the subject matters discussed?
13    THE COURT: Yes, yes.
14    MR. MONAGHAN: All right.
15  DIRECT EXAMINATION BY MR. BERMAN:
16  Q.    Now, Mr. Berman, what is music publishing? What does
17  that mean?
18    MS. PHARES: Your Honor, could we please ask
19  Mr. Monaghan to use the podium? He's not -- he's
20  really working off his --
21    MR. MONAGHAN: Your Honor, that's a very tiny
22  podium and I have a lot of papers --
23    MS. PHARES: We can't see.
24    MR. MONAGHAN: -- and I don't think I'm
25  impeding anybody's view, or if I have to speak up, I

Page 23

1  certainly will.
2    MS. PHARES: I can't see.
3    THE COURT: Well, if you'd move more that way
4  so that you can see whatever you need to get hold of
5  you there, in front of you, maybe that will solve the
6  problem.
7    Go ahead.
8    MR. MONAGHAN: Can everybody back there see?
9    THE COURT: Well, now you're looking at them.
10    MS. PHARES: At the moment.
11    THE COURT: Try looking this way and make
12  sure they understand.
13    MR. MONAGHAN: All right.
14  Q.    Same question: What's music publishing to the
15  uninitiated?
16  A.    Music publishing involves the exploitation of
17  copyrights into musical compositions.
18  Q.    And for whose benefit is that done, that exploitation
19  you just mentioned?
20  A.    Well, for the benefit of the publisher, the owner of
21  the copyright, and the writer of the composition, or
22  writers.
23  Q.    And are you -- what is the extent of your familiarity
24  with the general customs and practices in the music
25  publishing business?

Page 24

1    Are you saying you're an expert in that area
2  as well, specifically?
3  A.    Yes, I am.
4  Q.    Okay. Now, what does administration, which is a term
5  you've used, what does that mean, administration of
6  publishing?
7  A.    The administrator of the publishing is the entity,
8  whether or not they own the copyright, that is the
9  entity that issues the licenses, be they mechanical
10  synchronization, enters into foreign publishing
11  agreements, etcetera, collects the income, and pays
12  out to the respective participants, be they
13  co-publishers or writers.
14  Q.    Okay. So, the job of the administrator is to exploit
15  the copyright and then collect the monies and pay and
16  also account for those monies; is that not right?
17  A.    That's correct.
18  Q.    Okay. And what are some of the tasks involved in
19  doing that? From -- take the Court from start to
20  finish. Let's take it from the time that -- assume a
21  writer -- and you're allowed to make assumptions here
22  as an expert witness -- assume that a writer has
23  conveyed the copyright to a publishing company.
24  A.    Okay.
25  Q.    Take the Court through that whole process, please.

Page 25

1  A.    All right. The writer conveys the copyright to the
2  publishing company in question. The publishing
3  company then has the obligation to register the
4  copyright with the copyright office, also to register
5  the composition with the appropriate performing rights
6  society.
7  Q.    Who would they be?
8  A.    The prominent ones are ASCAP or BMI. There's also
9  SESAT (sic), a lesser -- a smaller company.
10  Q.    If I can interrupt this. It's not a good idea for me
11  to interrupt you either.
12    And for whose benefit is that registration
13  with the performing rights society provide? For who
14  is that done?
15  A.    That is done for both the publisher and the writer,
16  performing rights, law performing rights, the income
17  derived from that is collected by the performing
18  rights society, essentially BMI or ASCAP. They
19  collect them, and they pay directly to the publisher
20  the publisher's share of performing royalties and
21  directly to the writer or writers the writer's share.
22  Q.    And what information is filed by the publisher with
23  the performing rights society? Are you familiar with
24  how that's done?
25  A.    Yes.

Page 26

1  Q.  Please tell the Court.
2          MS. PHARES: Objection. Relevance?
3          THE COURT: I'll allow it.
4          Go ahead.
5  A.  In the case of a basic composition, they will send a
6     copy of the composition with the appropriate
7     information of the writer -- the writers, etcetera.
8        In the case of music for television, written
9     for television, there's a cue sheet which is sent to
10    the performing rights society, and the cue sheet is a
11    notation of the music to be included in the
12    appropriate TV show. And the performing rights
13    society uses the cue sheet in a very complicated
14    manner that I can't explain to eventually calculate
15    how much performance income is going to be paid to the
16    publisher and writer for the music contained in the
17    appropriate television show.
18  Q.  Okay. Now, we were talking about what's involved in
19    administering publishing. You've said filing the
20    copyright, registering with the performing rights
21    society.
22        What is about licensing?
23  A.  The administrator will also issue or cause to be
24    issued various licenses, mechanical licenses, for the
25    reproduction of a record, CD, etcetera;

Page 27

1    synchronization licenses, the licensing of the
2    composition for inclusion in a motion picture,
3    theatrical motion picture, or television or
4    commercial; print licenses, for the licensing of
5    sheet music, music folios, band arrangements,
6    etcetera.
7  Q.  Now, you said mechanical licensing. Can you be a
8    little more -- can you elaborate a little bit on what
9    a mechanical license involves and what products or use
10    of the music come within your understanding as an
11    expert, with all that background that you've testified
12    to, regarding mechanical licenses?
13  A.  In order to manufacture and distribute a phonograph
14    record, which embodies a musical composition, the
15    record company in question has to obtain what is
16    called a mechanical license, which gives them the
17    right to include that composition in that record. And
18    record includes not only CCS, DVD -- not only CDs,
19    vinyl, cassettes, etcetera, but also DVD, audiovisual
20    devices, etcetera.
21  Q.  Audiovisual devices?
22  A.  Yes.
23  Q.  So, would I be correct that if one were to bring out a
24    DVD which had a video component, but also an audio
25    component, that would require some sort of mechanical

Page 28

1    license from the -- either the administrator, the
2    publisher, or the composer?
3  A.  Yes.
4  Q.  And, typically, who keeps track? Is there some
5    organization that is generally used with respect to
6    the mechanical licensing?
7  A.  There was an agency called the Harry Fox Agency, which
8    many publishers and small publishing companies use to
9    issue mechanical licenses, to collect mechanical
10    royalties, and then to distribute them accordingly.
11  Q.  Now, you also used the term sync license, I believe,
12    or synchronization license.
13  A. ,  Correct.
14  Q.  Under what circumstances would a synchronization
15    license come into play with respect to the
16    administration of publishing?
17  A.  A synchronization license is required to synchronize a
18    musical composition in timed relationship with moving
19    images. So, to include a composition in a theatrical
20    motion picture or a television show, the film company
21    or television production company, as the case may be,
22    is required to obtain a synchronization license, which
23    is issued by the publisher.
24  Q.  Okay. Are there any other ways that income is
25    generated in connection, in your experience in the

Page 29

1    business, from the use of a piece of music?
2  A.  Well, there are -- the four predominant methods of
3    generating income from a musical composition are
4    performing rights; there's also a concept, grand
5    performing rights, which is for production of a live
6    theatrical presentation, a Broadway play would be
7    grand performing rights. So, you have performing
8    rights, mechanical royalties, synchronization
9    licenses, and print licenses, and those are the four
10    predominant areas of earning money off of a copyright.
11  Q.  And BMI deals with small performing rights, as opposed
12    to grand performing rights; is that right?
13  A.  That's correct.
14  Q.  Okay. In connection with your retention by the -- in
15    this matter, what documents or materials were you
16    given?
17  A.  Let me think. I reviewed an Amended Complaint in this
18    matter. I reviewed what I think is being referred to
19    as the Jem Agreement.
20  Q.  Is that -- is that the document I'm showing you now,
21    Exhibit M in evidence (handing)?
22  A.  Yes, yes.
23  Q.  And did you review that agreement in detail?
24  A.  Yes, I did.
25  Q.  And you've had this agreement for a couple of years

1     now; correct?

2  A.   I think it's been almost three years, I think.

3  Q.   Anything else you reviewed?

4  A.   I reviewed an expert report or affidavit -- I think

5     affidavit of a Helene Blue.

6  Q.   How about any other agreements?

7  A.   Yes. I reviewed some other songwriter's agreements of

8     Ms. Bryant, as well as I reviewed a number of foreign

9     licensing agreements.

10  Q.   Licensing agreements by Sunbow?

11  A.   Yes.

12  Q.   Okay. Now, you reviewed these agreements in the

13     context and with the background of the experience

14     you've had in the music publishing and music business

15     generally; correct?

16  A.   That's correct.

17  Q.   Okay. Did you see anything different in the Jem

18     Agreement, in general, in terms of consents and income

19     sources than you've seen throughout your career in

20     music publishing agreements?

21  A.   Not really, no.

22  Q.   Did the Jem Agreement deal with those types of income

23     that you've described are generated by the use of a

24     musical composition?

25  A.   Yes, it did.

1  Q.   Okay. So, it dealt with all four areas of the

2     generation of income, did it not?

3  A.   Yes, it did.

4  Q.   Okay. And did it have a -- did it not have a

5     provision for payment of writers' royalties?

6  A.   Yes, it did.

7  Q.   And did you see anything in the agreement where there

8     was a waiver in the agreement of any rights to either

9     performance royalties or publishing royalties by the

10     writer?

11  A.   There's no waiver. There are two exclusions. I

12     wouldn't call them a waiver.

13         The agreement does specify that the writer is

14     not entitled to synchronization license income from

15     the inclusion of the music in the television broad-

16     cast of the show. And, also, there -- it does not --

17     the writer is not entitled to mechanical royalties on

18     what I believe is referred to as promotional

19     cassettes. But, other than that, the writers'

20     royalties provided for in the agreement are the

21     standard and typical writers' royalties.

22  Q.   Now, do you have the agreement in front of you?

23  A.   No.

24  Q.   Can you tell the Court, please, which paragraphs of

25     the agreement deal with which type of royalties?

1  A.   Paragraph 5 deals with performing rights and makes it

2     clear that the writer is entitled to his or her share

3     of performance income, also makes clear that the

4     writer is not entitled to the publisher's share of

5     performance income.

6         Paragraph 6 covers all of the other sources

7     of income.

8  Q.   Okay. Now, if I can direct your attention to

9     Paragraph 6, which begins on the bottom of Page 4;

10     okay?

11         Do you agree with me, and this is in

12     evidence, so we can actually read it into the record,

13     but we won't burden the Court with that. It's seen

14     this for a while now.

15         This deals with music publishing rights, does

16     it not, on the bottom of Page 4?

17  A.   Yes, yes.

18  Q.   Then it goes on to provide, does it not, that if the

19     Company -- and in this case the Company is Sunbow;

20     correct?

21  A.   Yes.

22  Q.   If the Company that exercises music publishing rights

23     in the music, but excluding the premium cassettes --

24     that's the exclusion you just talked about?

25  A.   Correct.

1  Q.   Okay -- for which the Contractor shall not receive any

2     further compensation, uses of the music, combined with

3     lyrics -- and then it goes on to say -- and then it

4     goes on to define what the writer is supposed to get.

5     Is that not correct?

6  A.   That's correct.

7  Q.   Okay. And what does Subparagraph 6(ai) deal with?

8  A.   6(ai) deals essentially with mechanical royalties and

9     synchronization licenses for theatrical motion

10     pictures.

11  Q.   Now, are synchronization licenses for other than

12     motion pictures?

13  A.   Yes.

14  Q.   Okay. And you might have touched upon this, but would

15     you please elaborate now and tell us where a

16     synchronization license might be obtained for a -- the

17     use of the music other than in a theatrical motion

18     picture?

19  A.   A television show or a television commercial, certain

20     Karaoke videos, things like that.

21  Q.   Okay. Now, and in your expert opinion, what is a --

22     what is the industry's customary interpretation of the

23     term phonograph records?

24  A.   Essentially, any audio and/or audiovisual device

25     intended for home use.

Page 34

1  Q.   Okay.  And was this a -- this audiovisual device
2        intended for home use that you talked about, when did
3        such devices actually start to come into use in the
4        United States?
5  A.   I believe audio/video cassettes -- excuse me -- boy,
6        I'm showing my age.  I'm going to say late '70s.
7  Q.   Okay.  This is Jem -- this is Exhibit 13 in evidence,
8        Jem.  Is that the type of audio cassette -- audio/
9        video cassette we're talking about?
10 A.   Yes.
11 Q.   You play that in a video recorder?
12 A.   Old-fashioned VCR.
13 Q.   Okay.  The technology -- we're dealing with a contract
14       here, what is it, 1986 contract.  And is it your
15       testimony, under oath, that --
16            MS. PHARES:  Objection, Your Honor.  The
17       contract is an '85 contract.  We keep going over and
18       over this.
19            MR. MONAGHAN:  Okay.  That's fine.  I change
20       that.
21            THE COURT:  All right.  1985.
22            MR. MONAGHAN:  Thank you.  It actually helps
23       the question.
24 Q.   So, we're dealing with a 1985 contract that talks
25       about license of commercial phonograph records.  Now,

Page 35

1        this is a typical clause in 1985; isn't it?
2  A.   Yes.
3  Q.   Okay.  Now, if this -- if this similar subject matter
4        were in a typical contract today, what would you have
5        expected the language dealing with that subject matter
6        to say?
7             MS. PHARES:  Objection.  Relevance.
8             THE COURT:  Sustained.
9  Q.   Okay.  Now, so you've covered mechanical royalties.
10       So, Subparagraph 6(ai) would deal with mechanical
11       royalties?
12 A.   Yes.
13 Q.   Okay.  And this Exhibit 13, would you please tell the
14       Court whether or not you would have expected that the
15       use of the music in this, which is a Sunbow
16       Production, would have required an accounting and
17       payment of mechanical royalties?
18 A.   It would have required a payment of some form, be it
19       mechanical or synchronization, for the right to
20       include music in that device.
21 Q.   Coming within Paragraph 6(ai)?
22 A.   6(ai) or 6(avi), a combination thereof.
23 Q.   You're talking about the paragraph -- that
24       subparagraph that says with respect to Other Uses of
25       The Music?

Page 36

1  A.   That's correct.
2  Q.   Okay.  So, it's either going to be in "I" or in 6a --
3        6(avi)?
4  A.   "vi", that's correct.
5  Q.   Okay.  And, likewise, what about licenses for DVD?
6  A.   Same answer.
7             MS. PHARES:  Objection, Your Honor.
8             THE COURT:  What's the objection?
9             MS. PHARES:  We're talking about the period of
10       these contracts as 1985.  DVD weren't in existence in
11       1985.
12            MR. MONAGHAN:  That's precisely the point
13       he's here to testify about.
14            THE COURT:  Well, we're talking, as I said --
15            MS. PHARES:  We're talking about the terms of
16       the contract.
17            THE COURT:  -- yesterday, that I would take
18       testimony of his opinion as to the terms that are in
19       this agreement.
20            In this agreement, it's your opinion that
21       they were looking forward to DVD?
22            THE WITNESS:  It is my opinion that the -- by
23       1985, the standard definition of phonograph record, as
24       commonly used, included all audio or audiovisual
25       devices for home use now known or hereafter devised.

Page 37

1             So, yes, it did include DVD, in my opinion,
2        in '85, even though there were no DVD in '85.
3             THE COURT:  All right.  Go ahead.
4             MR. MONAGHAN:  Okay.
5  Q.   Now, are you familiar with --
6             THE WITNESS:  Excuse me.  That is not a
7        complete answer, Your Honor.
8             THE COURT:  All right.  Go ahead.  What's the
9        complete answer?
10            THE WITNESS:  The DVD, whether known in '85
11       or not, when it did come into existence, required the
12       licensing of the music.
13            Paragraph 6(avi) contemplates payment to the
14       writer for any other use not specified.  Since the DVD
15       required music to be licensed and income to be paid to
16       the publisher for that --
17            THE COURT:  So, your opinion is:  If some day
18       they invent a hologram that sits in the middle of your
19       living room and sings for you, that there is, even
20       though it isn't spelled out anywhere in here, it is
21       assumed, because the word "phonograph" was in there,
22       that it applies?
23            THE WITNESS:  And because 6(avi) includes any
24       other use of music.  Any future use of music, anything
25       not covered by "a", by "i", double "ii", triple "iii",

Page 38

1  etcetera.
2  THE COURT: Isn't that a pretty broad view of
3  two words that say other license, or whatever it says?
4  THE WITNESS: It's totally standard. It's
5  totally --
6  THE COURT: All right. Go ahead, Counselor.
7  I don't want to interrupt you.
8  Go ahead.
9  Q.  In terms of accounting and royalty statements, sir,
10  are there any customary practices of which you're
11  aware of in the music publishing business, music
12  business in general?
13  A.  Well, generally, a royalty statement by a publisher
14  to --
15  MS. PHARES: Wait a minute. Excuse me.
16  Is there any focus of this question? Any
17  general practice regarding royalty statements? I
18  don't even understand the question.
19  MR. MONAGHAN: Yeah. The question is: Are
20  there practices in terms of when we're dealing
21  with income that's supposed to be received by the
22  writer, is there any general practice about how the
23  writer gets information about what the writers --
24  THE COURT: Well, wait a minute.
25  Aren't we all in agreement that whatever is

Page 39

1  in this agreement is what binds the writer, and this
2  witness is being called upon to give his opinion about
3  what this means?
4  MR. MONAGHAN: No, no, not at this -- at this
5  point in the question, I'm laying a foundation for his
6  knowledge and experience with how this thing works.
7  How does the system work?
8  MS. PHARES: Your Honor --
9  MR. MONAGHAN: How does the system of
10  reporting and accounting for royalties that are due,
11  how does that work?
12  THE COURT: All right. I will allow some
13  questioning. Go ahead.
14  MS. PHARES: I will just say for the record
15  that I adopt Your Honor's objection. I think we
16  are -- our concern with royalties has to do with what
17  was agreed to between the parties, not what the
18  general practice is.
19  THE COURT: Well, I have a general idea --
20  excuse me -- we're just getting some very quick
21  background. So, let's get to the quick background.
22  Go ahead.
23  A.  Generally, a royalty statement will be issued either
24  quarterly or semi-annually, as the general rule, and
25  will include an accounting or income from all of the

Page 40

1  various licenses that had been issued during that
2  accounting period, a listing of mechanical licenses
3  and the income therefrom, synchronization licenses and
4  the income therefrom, print licenses and the income
5  therefrom. Essentially, that's it.
6  Q.  Okay. And is there some frequency that these reports
7  are rendered?
8  MS. PHARES: Asked and answered.
9  THE COURT: No, I'll allow it.
10  Go ahead.
11  A.  Generally semi-annually and sometimes quarterly.
12  Q.  Okay. Now, have you seen any reporting or royalty
13  statements in connection with this case?
14  A.  Yes.
15  Q.  Okay. And how many such statements have you seen?
16  A.  Well, a statement rendered to the Plaintiff?
17  Q.  Right.
18  A.  I saw one, I believe, one or two.
19  Q.  And did they describe the types of licenses that were
20  involved?
21  A.  No.
22  Q.  Did they say anything about mechanical licenses?
23  A.  No.
24  Q.  Synchronization licenses?
25  A.  No.

Page 41

1  Q.  Now, what is the --
2  MS. PHARES: Clarification? Could -- could
3  we understand a little bit better the one or two?
4  What does that refer to? What is it that the witness
5  saw?
6  MR. MONAGHAN: Oh.
7  Q.  Were you shown, Mr. Berman, a document dealing with
8  some December 1, 2006, communication? And I'm showing
9  you now a document purporting to be a Sony ATV royalty
10  statement with the name TV Loonland on it.
11  Did you see this (handing)?
12  MS. PHARES: Your Honor, I mean, is the
13  document in evidence?
14  MR. MONAGHAN: Well, I think it's your
15  Exhibit 48.
16  MS. PHARES: Well, if it has a number on it,
17  it's your exhibit.
18  THE COURT: All right. Hold on. There was
19  one of them that didn't go into evidence. 48 is in
20  evidence --
21  MR. MONAGHAN: Yeah.
22  THE COURT: -- according to my record.
23  But ask the witness, did you see it.
24  Q.  Did you see this? Yeah.
25  A.  I did see this, but this is not what I was referring

Page 42

1  to.
2  Q.  Okay. And now I'm showing you AA for identification.
3  A.  I also saw this, but this is not what I'm referring
4      to.
5  Q.  Okay. And perhaps you can help me out. I don't
6      remember what you're referring to either.
7  A.  It was a -- purported to be a statement from Sunbow
8      that had various time periods --
9  Q.  Oh, I see. I recall.
10 A.  -- with merely a gross amount of money and no
11     indication, no back-up or information of the source of
12     any of the income.
13 Q.  You're talking about this page from Exhibit 48 in
14     evidence (handing)?
15 A.  That's exactly what I'm talking about.
16     MR. MONAGHAN: Okay.
17     MS. PHARES: Well, Your Honor, are you
18 marking this so that we know what we're talking about?
19     MR. MONAGHAN: That's it.
20     MS. PHARES: Yes, I see it. So --
21     THE COURT: I think counsel just said it was
22 part of 48 in evidence.
23     MR. MONAGHAN: Right.
24     THE COURT: Let's not remark things.
25     MR. MONAGHAN: Counselor did say that. Now

Page 43

1  Counsel --
2      MS. PHARES: But is it there?
3      MR. MONAGHAN: I don't see it there.
4      THE COURT: All right. Then you may mark it.
5      MR. MONAGHAN: Let's just mark it separately.
6
7  (PLAINTIFF'S EXHIBIT NO. 50 - SONY ATV
8      ROYALTY STATEMENT, 12/1/06, SINGLE PAGE
9      - MARKED FOR IDENTIFICATION.)
10
11     THE COURT: Is there any objection to it
12 going into evidence?
13     MS. PHARES: No objection, Your Honor.
14
15 (PLAINTIFF'S EXHIBIT NO. 50 - SONY ATV
16     ROYALTY STATEMENT, 12/1/06, SINGLE PAGE
17     - RECEIVED IN EVIDENCE.)
18
19     MR. MONAGHAN: Your Honor, would this be a
20 time to take a morning break. I don't have too much
21 more.
22     THE COURT: Let me tell you, we're on a very
23 strict schedule today. That I now have 20 minutes
24 after 10:00. I want you all back in your seats at
25 10:30.

Page 44

1      MR. MONAGHAN: Yes, sir.
2      THE COURT: All right.
3
4      (Recess taken at 10:20 AM.)
5
6      (Court reconvened at approximately 10:30 AM.)
7
8  CROSS-EXAMINATION BY MS. SAFFER:
9  Q.  Good Morning, Mr. Berman. My name is Judith Saffer.
10     I'm the Assistant General Counsel at BMI.
11 A.  Good Morning.
12 Q.  As you're aware, BMI is one of the Defendants in this
13     lawsuit.
14     You testified a few minutes ago about various
15     matters which impact BMI, and I'd like to ask you
16     about them.
17     Isn't it correct that during your Direct
18     Testimony, you indicated that registrations to BMI,
19     which are sent in by publishers, are submitted with a
20     copy of the sheet music?
21 A.  I believe I did.
22 Q.  Would you be surprised to learn that, in fact, that is
23     not the practice?
24 A.  No, because in thinking about it, I know that was
25     incorrect.

Page 45

1  Q.  You also testified that cue sheets are normally filed
2      with BMI by the publishers, didn't you?
3  A.  Or the production -- the television production entity.
4  Q.  In your experience, would you say that it was more
5      usual for publishers or production companies to file
6      cue sheets?
7  A.  Probably production companies.
8  Q.  In your role as counsel to record companies and
9      publishing companies, were you involved in the
10     preparation of cue sheets?
11 A.  In the preparation, no.
12 Q.  Did your staff prepare cue sheets?
13 A.  In various capacities, yes.
14 Q.  Did you ever review any of these cue sheets?
15 A.  I have, I have seen cue sheets, so I am generally
16     familiar with them.
17 Q.  Would you please explain what you mean by "generally
18     familiar with them"?
19 A.  I have seen cue sheets. They're notations of music.
20 Q.  Would you surprised to learn that cue sheets do not
21     contain notations of music?
22 A.  Yes.
23 Q.  Would you be surprised to learn that cue sheets
24     normally list a composition and provide time
25     indications and not the notations of music?

Page 46

1  A.    I know they contain time. I know they contain the
2       timing of the use of the music.
3  Q.    In the course of your Direct Testimony a few minutes
4       ago, you said, and I quote, I can't explain how rights
5       are calculated by PROs from the submission of cue
6       sheets. Performing rights organizations.
7  A.    Societies.
8  Q.    I'm sorry.
9  A.    What I should have said is, and what I mean is, that
10       the entire method by which ASCAP or BMI collects and
11       disseminates performance income is extremely complex
12       and it is more complex than I could explain.
13            MS. SAFFER: Your Honor?
14  A.    There are formulas for varying uses of the composition
15       that create a public performance right, some of which
16       are specific for the use and some of which are some
17       formula that I don't know.
18            MS. SAFFER: Your Honor, based upon this
19       testimony, I would move to strike the expert witness
20       insofar as his qualification on any accounting or
21       dispute concerning royalty payments made by BMI since
22       he has admitted he doesn't understand the process.
23            THE COURT: Denied.
24            Go ahead.
25            MS. SAFFER: Okay.

Page 47

1  Q.    I'd like to draw your attention to Defendant's Exhibit
2       M, which has been shown to you by your counsel, the
3       contract.
4            MS. PHARES: The Jem Agreement.
5  Q.    The Jem Agreement, the contract, some pages of which
6       are contained on this -- some of which are contained
7       on the blowups.
8            MS. SAFFER: Is it up here from before?
9            MR. MONAGHAN: There is my copy.
10            MS. PHARES: It's there someplace.
11  Q.    I'd like to refer you back to Paragraph 5, which Mr.
12       Monaghan pointed out to you earlier.
13            Doesn't that paragraph specifically say that
14       the Company, which is Sunbow, has the exclusive right
15       to change, add, or subtract from the music?
16  A.    I believe it does.
17  Q.    Doesn't that paragraph also contain the language that
18       the Company has the exclusive right to combine
19       Plaintiff's music with lyrics?
20  A.    I believe it does.
21  Q.    Wouldn't that language mean to you that the Company,
22       Sunbow, has the right to add music, which might be
23       creating a new work or a derivative work?
24  A.    Adding music -- adding music might create a derivative
25       work. Adding just a different arrangement, in my

Page 48

1       opinion, would not be a derivative work.
2  Q.    What about the addition of lyrics?
3  A.    Yes.
4  Q.    Yes, that would be creating a new work or a derivative
5       work?
6  A.    Take your pick.
7  Q.    Would you not agree that creation of a new work or a
8       derivative work, whichever word you want to use, would
9       require the submission of a new cue sheet in order to
10       indicate the participation of the additional writers?
11  A.    Yes.
12  Q.    I'd like to refer you to Paragraph 5 again. Later on
13       in that paragraph doesn't that say that Sunbow has the
14       right to extend the writer's share of royalties to all
15       others who have participated in the making of this new
16       work or derivative work?
17  A.    I'm not exactly sure of the language specifically
18       referred to.
19  Q.    5C.
20  A.    Yes; but I believe it's in the context of adding
21       lyrics. I could be wrong.
22  Q.    The words are "writer and all other such lyricists."
23  A.    Right. The adding of lyrics, yes, I agree.
24            MS. SAFFER: Okay. I have no further
25       questions.

Page 49

1            THE COURT: All right. Ms. Phares.
2  CROSS-EXAMINATION BY MS. PHARES:
3  Q.    Mr. Berman, you said that there were, in fact, two
4       exclusions indicated in this contract; is that
5       correct?
6  A.    Yes.
7  Q.    And you describe one of them as a for-TV-broadcast of
8       the show; is that correct?
9  A.    Yes.
10  Q.    And I want to ask you where this exclusion is; if you
11       would identify it?
12  A.    I know that you could probably point it to me easier
13       than I can find it.
14  Q.    All right. How about this try: Look at Page 6,
15       beginning on the fourth line.
16  A.    Correct.
17  Q.    Well, would you read that sentence for me? Beginning
18       with "the term".
19  A.    "The term theatrical motion picture rights, as used
20       herein, refers to synchronization rights granted with
21       respect to motion pictures intended primarily and
22       initially for theatrical release by direct projection
23       before a paid audience."
24  Q.    Paid admission audiences; correct?
25  A.    Paid admission audiences.

Page 50

1   Q.   Semi-colon. Keep reading.
2   A.   Want me to continue?
3   Q.   Yes, please.
4   A.   "In no event shall such term refer to motion pictures
5        or other methods of recordation, whether now known or
6        hereafter devised, which are produced primarily and
7        initially for television broadcasting by any means
8        whatsoever."
9   Q.   So, in fair, it's not just the TV broadcast of the
10       show that's excluded here, it's any kind of movie that
11       is made primarily for TV; is that correct?
12            MR. MONAGHAN: What's the -- I'm sorry. I
13       have to object to the form. What's the "it" in that
14       question? "It's not just" ... I don't ...
15  Q.   All right. This is a -- this is a definition that --
16       that goes with provision 6a; is that correct?
17  A.   Are you saying that this refers only to 6a and not
18       to --
19  Q.   Well, this says that there is a sync right, does it
20       not, for licenses of theatrical motion picture
21       synchronization as defined below. Correct?
22  A.   Yes.
23  Q.   And "below" is a reference to this definition, is it
24       not?
25  A.   Of sync, yes.

Page 51

1   Q.   All right. So, we're talking now about licenses to
2        third parties to synchronize music written under this
3        agreement; is that correct?
4   A.   Yes.
5   Q.   In theatrical motion pictures. And that's defined to
6        mean only a theatrical motion picture that is
7        exhibited to a paid admission audience; correct?
8   A.   So far.
9   Q.   And, therefore, it does not apply to any audiovisual
10       work made for TV?
11  A.   No. Well, that -- that -- so far you might be
12       correct.
13  Q.   Well, how wouldn't I be correct?
14  A.   Because the -- maybe more relevant portion is 6(avi)
15       which covers any other use. And in order to release a
16       home audiovideo device of the TV show, a license is
17       required, and that comes under "avi", Other Use.
18  Q.   I'm talking about the definition of theatrical motion
19       picture in 6a-1; correct?
20  A.   Okay.
21  Q.   We're just focusing on that. And a theatrical motion
22       picture is defined to exclude, does it not, any motion
23       picture which is produced primarily and initially for
24       television broadcasting?
25  A.   Yes.

Page 52

1   Q.   It does not include any such movie; correct?
2   A.   Yes, yes.
3   Q.   That's all I want to know.
4   A.   Okay.
5   Q.   Now, you also testified that your definition of -- of
6        a phono record includes DVDs and videocassettes and so
7        forth; correct?
8   A.   That's the industry generally-accepted definition.
9   Q.   Are you familiar with the definition of a phono-record
10       in the Copyright Act?
11  A.   I've seen it. I don't recall it right now.
12  Q.   Well, would you -- I'm reading to you from the
13       Copyright Act; that the phonograph -- a -- phonograph
14       records are material objects in which sounds, other
15       than those accompanying a motion picture or other
16       audiovisual work, are fixed by any method now known or
17       later developed and from which the sounds can be
18       perceived, reproduced, or otherwise communicated
19       either directly or with the aid of a machine or
20       device.
21            Does that sound familiar to you?
22  A.   Yes.
23  Q.   And under that definition, is it not clear -- is it
24       also true that -- that it would not include the sound
25       which is associated with an audiovisual work like a TV

Page 53

1        show?
2   A.   The -- the reference to phonograph records in 6(ai) is
3        in the context of mechanical licenses.
4   Q.   Well, it doesn't say mechanical licenses, does it?
5   A.   Well, that is -- to anybody knowledgeable about music
6        publishing, that is what is being referred to there.
7   Q.   Well, I have -- I have I just want -- I understand
8        that you think that that's being referred to, but is
9        it not also possible that this was very carefully
10       drafted to refer to the new definition in the
11       Copyright Act that was effective in 1978?
12  A.   It obviously wasn't very carefully drafted to say that
13       because it doesn't say that.
14  Q.   Because ...?
15  A.   It could have said phono-records as defined in the
16       Copyright Act of 1978; so, it wasn't clear drafted to
17       say that.
18  Q.   It just doesn't -- it just refers to phonograph
19       records, you mean, without the -- without the
20       reference to the Act?
21  A.   My recollection is that the Act refers to phono-
22       records, not phonograph records.
23  Q.   And is it not also true that the Act includes the
24       reference to phono-records in order to distinguish
25       them from copies which includes audiovisual works?

Page 54

1  A.    I'm not following that. I'm sorry.
2  Q.    There is here two kinds of forms of copies in the
3        Copyright Act, right, phono-records and copies?
4  A.    Okay.
5  Q.    And copies includes audiovisual works, including their
6        sounds, and phono-records does not include audiovisual
7        -- the sounds of audiovisual works?
8  A.    Phono-records, yes.
9  Q.    So, doesn't it seem more likely to you that
10       phono-record is used here because it's referring not
11       to the audiovisual works?
12 A.    No, because this doesn't refer to phono-records. It
13       refers to phonograph records. So, it's not tracking
14       the language in the Copyright Act.
15 Q.    I see. And what were we calling those things in which
16       music was fixed in 1978?
17 A.    A variety of things; among others, phonograph records.
18 Q.    And ...?
19 A.    And what?
20 Q.    And what else?
21 A.    Records. Sometimes records used alone.
22 Q.    Anything else in that time?
23 A.    Master recordings.
24 Q.    But for the synchronization of -- I mean for the --
25       for making copies of music alone, what were we calling

Page 55

1        those things in 1978, and '85 for that matter?
2  A.    I don't know.
3  Q.    You don't know. All right.
4  A.    I don't know what you were calling them.
5  Q.    And are you aware that in connection with the
6        negotiation of this Jem contract, that there was a
7        negotiation involving videocassettes, and that video-
8        cassettes were denied by Sunbow?
9              MR. MONAGHAN: Objection. He would not have
10       any knowledge, nor can he be asked about what the
11       negotiations were.
12             MS. PHARES: I asked him --
13             THE COURT: Well, this is Cross-examination.
14       He's being asked if he knows anything about it. He
15       can answer it either way.
16 A.    No, I have no information on that.
17 Q.    So, you're not aware that -- that Ms. Bryant's lawyer
18       asked for payments for videocassettes and that they
19       were denied?
20 A.    I'm not aware of that.
21 Q.    And I have another question for you. If you would --
22       since we don't have the front page of this agreement --
23       if you would turn to the front page of this contract,
24       and in Paragraph 1, you'll see that there is a
25       reference to the -- the writing, preparing, and

Page 56

1        delivering to the Company original musical material,
2        which is here and after referred to as the -- capital
3        M -- Music, for songs to be used in a fully animated
4        children's television show.
5              Do you see that?
6  A.    Yes, I do.
7  Q.    And do you also see, further along in that sentence,
8        that the fully-animated children's television show
9        consisting of either 5 one-half hours, 15 segments, or
10       a television motion picture presently entitled "Jem",
11       and that is referred to as The Show; correct?
12 A.    Correct.
13 Q.    And, in your mind, how would you distinguish "Music"
14       and "The Show" as they appear in this contract?
15 A.    Music are the musical compositions created pursuant to
16       this contract for the show, and the show is the visual
17       portion of the dialogue, the --
18 Q.    So, you think that when it describes the five
19       one-and-a-half hours, 15 segments, or the television
20       motion picture, that that -- that ensemble is the
21       show, but that doesn't you include the music?
22 A.    No, I said it includes the music.
23 Q.    It includes the music?
24 A.    Yes.
25 Q.    Okay. So, then, if you turn to Section 6, where the

Page 57

1        publishing rights are described, and specifically to
2        Section 6a-1, that's a reference to Other Uses of the
3        Music -- Capital M -- isn't that correct?
4  A.    Yes.
5  Q.    It's not a reference to other uses of the show; isn't
6        that correct?
7  A.    To other uses of the Music. It doesn't exclude others
8        uses of music with the show, but it is of the Music,
9        that's correct.
10 Q.    But it uses specifically the defined term Music, with
11       a Capital M, does it not?
12 A.    Certainly it does, because the writer of the music
13       would have no economic interest in the exploitation of
14       the show absent the music. The rights granted here-
15       under to the writer only pertain to income derived
16       from the music.
17 Q.    The composer really wouldn't have any economic
18       interest in the show as a whole; isn't that correct?
19 A.    No. In the show, absent the music, would be correct.
20 Q.    But you just said that the show -- didn't you just
21       testify that the show included the music, that that
22       was a unitary whole; isn't that correct?
23 A.    For certain purposes. But if you are reproducing the
24       show, with the music, pursuant to a license to a third
25       party, you are granting them rights to the music and

Page 58

1 the other elements that make up the show. You're
2 granting a broad bundle of rights, part of which is
3 the rights to the music.
4 Q.    Isn't it true, Mr. Berman, that this entire section,
5      6a, refers only to -- in every single section, it
6      refers to, Capital M, Music?
7 A.    I believe it -- yes, it only refers to the music.
8 Q.    And under your definition, we would have -- we have a
9      confusion, don't we? We have -- we could use show, by
10     your example. It wouldn't make any difference,
11     because we would always be picking out the music
12     portion of it?
13 A.    No, we couldn't -- well, show would certainly create,
14     use of that term, a gross ambiguity as to whether or
15     not the writer was entitled to income derived from
16     elements of the show other than the music, which I'm
17     not maintaining.
18 Q.    So, in fact, didn't the contract define them
19     separately so we wouldn't have that confusion, isn't
20     that correct? If we were using the music --
21 A.    I don't --
22 Q.    If we were using the music alone, we use the word
23     "music"?
24 A.    I'm not sure that was intended.
25 Q.    But you don't know; isn't that correct?

Page 59

1 A.    I -- I can't specifically say I know.
2 Q.    Now, you also said that royalty statements sometimes
3      refer to mechanical licenses; isn't that correct?
4 A.    Mechanical income, yes, from the licenses.
5 Q.    And, well, are you making distinction between
6      mechanical licenses and mechanical income?
7 A.    For what purpose? For the purpose of --
8 Q.    I don't know. You just corrected me. I was wondering
9      if you were making a distinction.
10 A.    I was referring to what generally is provided for in a
11     royalty statement to a writer, and it would indicate,
12     in general, mechanical royalty income that was derived
13     from any licenses issued during the relevant period.
14 Q.    And that would refer to -- and that's because you'd
15     see a reference to mechanicals; is that correct?
16 A.    Yes, with generally the catalog number of the record
17     in question for which the license was issued.
18 Q.    Now, you're familiar with these kinds of royalty
19     statements in the record business; isn't that correct?
20 A.    No, I'm talking about a publishing statement.
21 Q.    A publishing statement. And do publishing statements
22     include income from foreign countries?
23 A.    Yes.
24 Q.    Do foreign countries charge mechanical licenses for
25     things that are different than what are charged for

Page 60

1      mechanicals in the United States?
2 A.    I am sorry?
3 Q.    Are mechanical licenses made in foreign countries for
4      uses that are -- that differ from the uses made in the
5      United States?
6 A.    There is a custom -- it's a ... Possibly.
7 Q.    What do you mean by "possibly"?
8 A.    The custom and practice currently for royalties on
9      home audiovisual devices, particularly for television
10     pictures, is that the initial license for the
11     television show is a synchronization license, and it
12     has now become standard that, in addition to the
13     synchronization license, there is a buy-out, not a
14     waiver, but a buy-out of the rights to include the
15     composition in home audiovisual devices. The buy-out
16     can be a lump sum, the buy-out can be a royalty, but
17     it's generally taken care of at the time the music is
18     licensed for the show.
19        I believe it may be true in certain foreign
20     countries where the norm for the licensing of the
21     music in a home audiovisual device is a straight
22     mechanical royalty.
23 Q.    You say you "believe". Do you know?
24 A.    I think that to be the case.
25        MS. PHARES: Do we have double A in evidence

Page 61

1 yet?
2        MR. MONAGHAN: That's not in evidence.
3        MS. PHARES: Do we know where it is?
4        MR. MONAGHAN: Sure. Right here. (Handing).
5
6      (Off the record discussion between Ms. Phares
7       and co-counsel. )
8
9        MS. PHARES: Exhibit 48 -- I am completely
10     confused with -- oh, these are duplicates. Okay.
11 Q.    Now, did you say you were or were not shown
12     Plaintiff's 48 and Defendant's Exhibit A, which has
13     been offered, apparently, only for identification --
14     but, actually, I would be happy to offer it in
15     evidence, if Your Honor would clear that up now. This
16     was offered --
17        MR. MONAGHAN: I know she'd be happy, but we
18     have a serious objection. There's no foundation for
19     this exhibit at all. The only witness who has
20     testified about it is the Plaintiff, who said she
21     never got it. The only way you can get it in is with
22     a person to say it was either sent or received.
23        MS. PHARES: So, there is, actually, Your
24     Honor, attached, as Exhibit B to the affidavit that
25     was admitted yesterday, a letter from me to Mr.

Page 62

1    Monaghan in 2004, transmitting this document.
2        I don't have it with me, but I can bring it
3    on Friday, a document in which Mr. Monaghan is
4    complaining about having received it.
5        THE COURT: Okay.
6        MS. PHARES: So, if that's --
7        THE COURT: Hold on. The question yesterday
8    of the witness was had she ever seen it, and the
9    answer was no.
10       Now, Mr. Monaghan and you may send anything
11   back and forth to each other, but it doesn't make it
12   evidence.
13       MS. PHARES: Well, the issue -- I understand
14   that. The issue related, however, to whether or not
15   they had been provided to -- to Ms. Bryant. She said
16   she couldn't recall.
17       MR. MONAGHAN: No, she said "no".
18       THE COURT: So, what you're saying -- hold
19   on. What you're saying is, by sending a copy of it to
20   her lawyer, she's, in fact -- in fact provided with
21   it?
22       MS. PHARES: I think that's a fair
23   assumption.
24       THE COURT: Well, I'll consider that. But
25   not now.

Page 63

1        Go ahead.
2        MS. PHARES: It was produced in discovery in
3    this case.
4        MR. MONAGHAN: But that's not -- that's not
5    the issue. The issue --
6        MS. PHARES: It was also sent to --
7        MR. MONAGHAN: The issue was a royalty
8    accounting rendered pursuant who whatever the contract
9    requires?
10       MS. PHARES: Well, she also said she
11   certainly remembered receiving the receipt -- the
12   checks that went with it.
13       MR. MONAGHAN: I make my arguments to the
14   Court.
15       THE COURT: All right. Please, let's go
16   forward with this.
17  Q.   All right. In any event, have you been shown what is
18       in evidence as Defendant's Exhibit double A?
19       MR. MONAGHAN: It's not in evidence.
20  Q.   I mean -- I beg your pardon. It has been identified
21       as Defendant's Exhibit double A (handing).
22  A.   I think I saw this.
23  Q.   And you're testifying that you don't have any
24       indication of what the uses are when you read this; is
25       that correct?

Page 64

1   A.   No, I didn't say that.
2   Q.   Oh, I thought you had said earlier that there were no
3       indications on what you had seen for -- of the uses of
4       the -- of the material. Is that incorrect?
5        THE COURT: I think that's 50 he was talking
6       about.
7        MR. MONAGHAN: That's correct, Your Honor.
8       Objection.
9   Q.   I see. But on these royalty statements, Mr. Berman,
10      are the uses indicated on the royalty statements?
11  A.   Yes.
12  Q.   And what else is indicated on the royalty statements?
13      And tell me what you're looking at, just so we're
14      clear for the record.
15  A.   Well, I'm looking at Exhibit AA.
16  Q.   Okay. Just use the top page, maybe, as an example or
17      choose a page and give us the production number so
18      we're clear?
19       THE COURT: Well, you're asking him to read
20      something that's not in evidence, Counselor.
21  Q.   Are you familiar with these kinds of royalty
22      statements?
23  A.   Not this one specifically.
24  Q.   I said: Are you familiar with these kinds of royalty
25      statements?

Page 65

1        MR. MONAGHAN: Well, what does that mean?
2       Object to the form. There's no -- "kind" means
3       there's some standard, some form typical --
4        THE COURT: No, I think that's an answerable
5       question.
6        Have you seen statements like that before?
7        THE WITNESS: Not exactly like this.
8       Somewhat like this.
9        THE COURT: Well, somewhat like this.
10       And in those statements, did they identify
11      the source, purported source, of the money that was
12      being paid to the artist?
13       THE WITNESS: To some extent, yes.
14       THE COURT: Okay.
15       MS. PHARES: Your Honor, I offer this exhibit
16      in evidence.
17       MR. MONAGHAN: Object, Your Honor, on the
18      grounds that have already been discussed.
19       THE COURT: Yes; sustained.
20  Q.   So, all right. Would you turn to the other exhibit,
21      Number 48?
22       Have you ever seen a royalty statements like
23      that?
24  A.   Somewhat, yes.
25  Q.   And do those statements indicate the origin of the

Page 66

1    monies that are being paid?
2  A.  I'm just looking at the first page now.
3  Q.  Would you give me the production number?
4  A.  I'm sorry?
5       MR. MONAGHAN:  The dates numbered on the
6    bottom.
7  A.  1142.
8  Q.  Well, rather than look at that summary page, why don't
9    you look at one of the regular pages that is a royalty
10   statement.  Let's say 1143.
11  A.  What's the question?
12  Q.  Can you describe for me, based on your familiarity
13   with royalty statements, for example, taking the first
14   entry, what is indicated by this statement?
15  A.  Yes, to a certain extent I can.
16  Q.  Would you do so, please?
17  A.  It's a mechanical royalty statement.  The initial
18   section is for GI Joe.  It gives units, it gives the
19   time period, it gives the amount received.  I can't
20   tell -- I mean, it does have -- and it has record or
21   catalog numbers.  I can't tell by looking at it,
22   because I don't know what the catalog numbers refer
23   to, whether this is for a CD, a DVD, a video device,
24   or not; I don't know.  But it's a mechanical royalty
25   statement and it lists the catalog number of the item

Page 67

1    in question.
2  Q.  And does it indicate who the -- who the other -- or
3    the people who are to be paid for the particular ...
4  A.  I believe it does.
5  Q.  You believe so or does it?
6  A.  Well, it says Douglas/Bryant/Walsh.
7       MR. PHARES:  Right.
8  A.  I'm making an assumption -- I don't have first-hand
9    knowledge -- I'm making the assumption that those are
10   the writers of these cues for which a mechanical
11   royalty is being paid.
12  Q.  And then the next row over is under "units".  What do
13   you understand that to mean?
14  A.  The number of units sold or for which a royalty was
15   paid.
16  Q.  And then for the next period, the -- the row, cap
17   period?
18  A.  The time period in which those units were sold.
19  Q.  And .  The next column, what do you understand that to
20   mean?
21  A.  The amount received by --
22  Q.  I mean, the column that has above it, Percent,
23   P-E-R-C.
24  A.  I read that column to indicate percent received.
25  Q.  Okay.  And then the next column?

Page 68

1  A.  Amount received.
2  Q.  And the next column?
3  A.  Your share.
4  Q.  And then the next column?
5  A.  Amount due.
6  Q.  And then the next column?
7  A.  It's a total.
8  Q.  Okay.  That was the easy part.
9  A.  No, it's pretty clear.
10  Q.  And the rest of these statements indicate the other
11   kinds of royalty income?
12  A.  Well, I haven't studied these.  If you want me to take
13   the time I will.
14  Q.  Is there -- do you see any income for ring tones?
15  A.  There may well -- yes, I do, yes.
16  Q.  And do you see any ring tones for which Ms. Bryant is
17   the recipient of income?
18       MR. MONAGHAN:  Object to the form of the
19   question.  If I can explain this objection, Your
20   Honor?
21       THE COURT:  No.  Overruled.  You've got an
22   expert witness on the stand.  He can answer the
23   question.  If he can't, he's going to tell us.
24       MR. MONAGHAN:  This is an entirely different
25   subject matter.  This royalty statement is not a

Page 69

1    royalty statement addressed to Ann Bryant.  When they
2    say your share, it's addressed to TV Loonland.
3       THE COURT:  Counselor?
4       MR. MONAGHAN:  The attempt here has been
5    made --
6       THE COURT:  Counselor?
7       MR. MONAGHAN:  Okay.  Withdrawn.
8       THE COURT:  Go ahead.
9  A.  I'm sorry.  Where --
10       THE COURT:  Start -- let's go to a new
11   question.
12  Q.  Can you identify an entry here that shows the payment
13   of ring tones to Ms. Bryant?
14  A.  Oh, I can't identify anything that shows a payment to
15   Ms. Bryant on any of this.  This doesn't indicate any
16   payment to Ms. Bryant.  It appears to me to indicate
17   money that would be due Ms. Bryant.
18  Q.  And why is it that you wouldn't be able to do that?
19  A.  It is a statement from Sony ATV Music Publishing, LLC,
20   to TV Loonland purporting, in my estimation, to set
21   forth the various royalties that TV Loonland would be
22   obligated to pay various writers.
23  Q.  Okay.  And now turn back to Page 1, the one that we
24   spurned earlier.  And --
25  A.  My goodness.

Page 70

1  Q.  Which is Sunbow 1142 is the production number. Do you
2      see an entry on that page referring to Ms. Bryant?
3  A.  Referring to Ms. Bryant? Yes.
4  Q.  And from that you are able to determine payments?
5  A.  Not to Ms. Bryant.
6  Q.  All right. What can you determine from them?
7  A.  Well, I can't determine. I intuit, and I think
8      logically so, that there was a payment of a total of
9      approximately $60,000.00 paid by Sony ATV Music to TV
10     Loonland.
11 Q.  That's what you -- right. And for what purpose.
12 A.  For the exploitation of various musical compositions
13     in various foreign territories.
14 Q.  Attributable to the people who are listed -- and these
15     monies are attributable to these publishing companies
16     and these composers or lyricists; is that correct?
17 A.  That would be my understanding.
18 Q.  And one of them is Ms. Bryant; is that correct?
19 A.  That would be -- that would be my understanding.
20 Q.  Thank you. Now, one of the -- all right.
21         Well, before we leave that one, why don't you
22     turn to the next -- to the next page, 1143, and do you
23     see at the top, which we were looking at -- at the top
24     of that page, where it says "in account with"?
25 A.  Yes.

Page 71

1  Q.  And what does it say?
2  A.  Anne Bryant. Bryant, comma, Anne.
3  Q.  I beg your pardon?
4  A.  Bryant, comma, Anne.
5  Q.  And do you understand, then, this to be a page
6      referring to Ms. Bryant?
7  A.  It refers to Ms. Bryant, yes.
8  Q.  And this is a breakdown of royalties with respect to
9      her?
10 A.  I believe it is.
11 Q.  Okay. And what about the next page?
12 A.  I believe the same.
13 Q.  And the next?
14 A.  The same.
15 Q.  And the next?
16 A.  The same.
17 Q.  Okay. And then what's the next page, Mr. Berman?
18 A.  Again a summary page.
19 Q.  It's another summary page, isn't it?
20 A.  Correct.
21 Q.  And then what about the next page? Does it not also
22     have a ledger referring to, In account with Bryant,
23     Anne?
24 A.  Yes, it does.
25 Q.  So, is there really -- is it really so difficult for

Page 72

1      you to figure out what it is that she has been paid
2      by -- based on looking at these statements?
3  A.  It's not difficult, it's impossible.
4  Q.  And why is that?
5  A.  Because all this does is refer to payments that are
6      due, and presumably paid, but I don't even know that
7      for a fact, payments that are due from Sony ATV Music
8      to TV Loonland.
9  Q.  Correct. But these particular payments on these
10     particular royalties are referring to those assigned
11     to Anne Bryant, are they not?
12 A.  I would make the logical assumption that this
13     indicates specific amounts of money that TV Toonland
14     (sic) would owe Ms. Bryant. I have no knowledge
15     whatsoever of whether or not those payments were ever
16     made.
17 Q.  You certainly -- you certainly -- well ...
18 A.  I don't even know, have any knowledge, as to whether
19     Sony ATV paid these amounts to TV Loonland. I'm
20     making that assumption.
21 Q.  You're not aware -- you're saying that Sunbow has sent
22     a check to Ms. Bryant for the summary of the amounts
23     that are shown on these pages?
24 A.  That's correct.
25 Q.  But you wouldn't be surprised to learn that they have,

Page 73

1      would you?
2  A.  I wouldn't be surprised, no.
3  Q.  And in your earlier testimony you mentioned a number
4      of major stars for whom you have negotiated
5      agreements.
6          Isn't it true that these kinds of publishing
7      agreements are, in fact, the subject of negotiation;
8      isn't that correct?
9  A.  As a general statement, that's true.
10 Q.  And it's also true that the -- the form of the deal is
11     very likely going to relate to how much clout each
12     side has; isn't that correct?
13 A.  That's a generally true statement.
14 Q.  And it's probably likely, also, that a major artist or
15     a major composer may end up with a more favorable deal
16     than a -- than a more junior, less well-known artist
17     or composer or lyricist; correct?
18 A.  I would agree.
19 Q.  So, it's -- that it's quite possible, also, that
20     somebody who ends up with a deal that includes
21     extensive publishing rights may differ from a person
22     who has very little clout and can't demand that from a
23     publisher?
24 A.  I don't think you phrased it very well. I do believe
25     I know what you're getting at.

Page 74

1  Q.   Well, why don't you patronize me and tell me what you
2       think.
3  A.   I do not want to be patronizing here.
4        There are artists, writers, who have more
5       clout, as you say, more bargaining power than others
6       and would get more favorable terms.
7  Q.   And isn't it also true, Mr. Berman, that very often,
8       especially in the field of commissioned music for
9       movies and TV, that major, major, writers do not get
10      any publishing?
11 A.   Publishing in the sense, then, because the term is
12      used ambiguously, even by people within the industry,
13      publishing in the sense of ownership of copyright,
14      yes. Publishing in the sense of right to what I refer
15      to as, quote, songwriters royalties, definitely, no.
16 Q.   And your definition of songwriter royalties are those
17      that are described in this agreement?
18 A.   In general, yes.
19 Q.   And you think it was common in the mid '80s for a
20      songwriter to have a provision that allowed for other
21      uses of music?
22 A.   I'm not -- I'm not following.
23 Q.   Isn't it true that for a songwriter to have obtained a
24      provision like Section 6a in an agreement, for
25      commissioned music for a TV show or movies, was highly

Page 75

1       unusual?
2  A.   No, I would say that is part of the standard song-
3       writers royalties provision; 50% of all other income.
4       The normal split between -- of income between the
5       publisher and the writer, because for me the writer
6       has no interest in the copyright, is -- and excluding
7       print -- is roughly 50/50.
8  Q.   Well, print is a big part of these -- of these rights
9       here. I mean, print doesn't go on a 50/50 basis.
10 A.   Print does not go on a 50/50 basis and print is
11      generally the least lucrative of any of the rights or
12      income producing properties of a composition.
13 Q.   Do you happen to know whether or not any of Ms.
14      Bryant's compositions for Sunbow have been licensed
15      for a theatrical motion picture.
16 A.   I believe I was informed -- I don't know it from
17      first-hand knowledge. I believe I've been advised
18      that that is the case.
19 Q.   By somebody other than someone in this case?
20 A.   By Mr. Monaghan.
21 Q.   Okay. Not by anybody in this case.
22        Do you know whether or not any of Ms.
23      Bryant's music has ever been -- whether a phono-record
24      has ever been made of any of her songs?
25 A.   I don't know.

Page 76

1  Q.   Do you know whether or not --
2  A.   Excuse me. By phono-record, you -- in the context of
3       that question, you're excluding audiovisual devices?
4  Q.   Correct.
5  A.   I don't know.
6  Q.   And a synchronization right, let's make it clear, a
7       synchronization right in this agreement only refers to
8       a license made to a third party; isn't that correct?
9  A.   I would have to really study it to see that. I think
10      that's probably the case.
11 Q.   Well, when it says received by the Company from third
12      parties for licensing, doesn't that mean to you that
13      it would have to be from a third party?
14 A.   Well, that includes the mechanical license also.
15 Q.   Correct.
16 A.   I think it pretty much all refers to third parties; I
17      agree.
18 Q.   It all refers to third parties.
19        None of these refer to exploitations by
20      Sunbow itself; correct?
21 A.   I have never addressed that issue. I think that's
22      quite possibly true.
23 Q.   Mr. Berman, let's go back to the Page 1 where we
24      indicate that the definition of music for this -- for
25      this contract refers to -- well, let me go back.

Page 77

1       Let's see. That -- I don't want to take this out of
2       context -- but that this is -- music, for purposes of
3       this definition, is original musical material for
4       songs to be used in a fully-animated children's
5       television show that are being delivered pursuant to
6       this agreement.
7        Is that correct?
8  A.   That's my understanding.
9  Q.   So, am I correct that -- or would you agree, then,
10      that the Sunbow contracts for this contract applies
11      only to the compositions written for Sunbow and not
12      for compositions written for other entities?
13       MR. MONAGHAN: That's -- objection; because
14      the contract speaks for itself and this witness is not
15      privy to the rulings about the other compositions.
16       MS. PHARES: If so we wouldn't have this
17      witness.
18       THE COURT: Hold on. He's an expert witness.
19      If he can answer it. Now, you know, there are things
20      that you can't answer because you don't know all the
21      parts, in which case you say, I can't answer it that
22      way, or ...
23       THE WITNESS:
24 A.   I really don't know. I ... I ... It's beyond my
25      purview.

Page 78

1    THE COURT: Okay. Let's move along with this
2  witness.
3  Q.    Wait a minute. You're saying to me that you would
4  understand that -- that the music written under this
5  agreement could be governed by some agreement other
6  than this agreement?
7  A.    Well, certainly there could be other agreements which
8  would modify or amend it, so, that is possibly true.
9  It's also possibly true that this agreement is being
10  used, however so, to interpret other agreements, not
11  this agreement. I don't have knowledge of that; I
12  don't know.
13  Q.    I just want to tell you that there is a merger clause
14  in this contract and it makes no reference to any
15  other agreements.
16  A.    That doesn't mean there can't be a subsequent
17  amendment to it.
18  Q.    Well, there is actually a subsequent amendment, that's
19  true, but Mr. Monaghan hasn't deemed it important to
20  show that to you.
21    MR. MONAGHAN: Not fair, Judge. Object to
22  the form.
23    THE COURT: Well, I'm not paying any
24  attention to remarks of counsel. Let's keep going
25  here. I want to move along with this witness.

Page 79

1    Let's go on.
2    MS. PHARES: I have no further questions,
3  Your Honor.
4    THE COURT: All right.
5    Mr. Monaghan, have you got Redirect?
6  REDIRECT EXAMINATION BY MR. MONAGHAN:
7  Q.    Is there any doubt in your mind, Mr. Berman, but that
8  any licenses issued by Sunbow to third parties, such
9  as Kid Rhino Productions, would have come within the
10  purview of the agreement that you've been testifying
11  about?
12  A.    None.
13  Q.    Is there any doubt but that there should have been
14  reporting about any such licenses?
15  A.    None.
16  Q.    Have you seen any reporting about licenses to, for
17  example, Kid Rhino or any of these other entities?
18  A.    No.
19    MR. MONAGHAN: Thank you, Sir.
20    THE COURT: Ms. Saffer?
21    MS. SAFFER: No further questions.
22    THE COURT: All right.
23    THE COURT: Ms. Phares?
24    MS. PHARES: Just one moment, Your Honor.
25

Page 80

1    (Off the record discussion between
2    Ms. Phares and co-counsel.)
3
4    THE COURT: You're limited, of course, by the
5  Redirect.
6    MS. PHARES: I have nothing more, Your Honor.
7    MR. MONAGHAN: Thank you, Judge.
8    THE COURT: Mr. Berman, you're not finished
9  yet. I have a couple questions for you.
10    THE WITNESS: Yes, Your Honor.
11    THE COURT: First of all, you know, you have
12  pointed out that the system for dividing up the rights
13  or -- or, even better, put the money is a very
14  complicated one. You said that, so, just --
15    THE WITNESS: Oh, excuse me. I'm glad you
16  asked that, because I was narrowly referring to the
17  methodology used by BMI and ASCAP --
18    THE COURT: Yeah.
19    THE WITNESS: -- which I doubt that many
20  people, including those working for BMI and ASCAP,
21  could explain to you the methodology of how
22  performance income is divided up.
23    THE COURT: Okay. Now imagine, now, you,
24  with a very reasonable background in this field, are
25  having trouble with this. Now imagine a layman, such

Page 81

1  as myself, trying to figure this out. And that leads
2  me up to the following question:   Would it be any
3  surprise to you that the Plaintiff in this case, Anne
4  Bryant, would only get eight percent or
5  eight-and-a-half percent for transformers?
6    THE WITNESS: Yes, it's surprising to me.
7    THE COURT: So, you think that through all
8  the iterations that have gone on with this, that she
9  still should be getting a much larger share of the
10  transformer bucks that are coming in?
11    THE WITNESS: Yes, I do.
12    THE COURT: All right.
13    Yes?
14    MS. SAFFER: If I may, I'd like to ask him a
15  specific question relating to yours.
16    THE COURT: Well, hold on, hold on. If my
17  few questions give rise to something else that you
18  want to ask, you obviously will be permitted to ask
19  that.
20    MS. SAFFER: Thank you, Your Honor.
21    THE COURT: All right.
22    Is there any doubt in your mind that Ms.
23  Bryant was a -- was involved as -- I'm trying to
24  figure the right word, but an artist-for-hire; this
25  was a contract, right?

Page 82

1   THE WITNESS: That's correct.
2       THE COURT: All right. And under that
3   contract, she had rights to receive a statement, I
4   take it, every six months?
5       THE WITNESS: That is my opinion, yes.
6       THE COURT: All right. Now, that right, I
7   take it, she didn't have to ask for a statement; they
8   were just supposed to be given to her?
9       THE WITNESS: That's my understanding.
10      THE COURT: Now, if there came a time when
11  for years no statement came in, and transformers is
12  all over, it made it into Tom Clancy's books, as a
13  matter of fact, his kids in London, one of them are
14  listening to the transformers tape, wouldn't you think
15  that a reasonable writer would investigate about why
16  there wasn't any money coming in, when obviously it
17  was doing so well?
18      THE WITNESS: I can't say a writer wouldn't.
19  I can think of a couple of issues where a writer might
20  not.
21      If Ms. Bryant was regularly receiving
22  performance income from BMI, she might have thought,
23  improperly, that that was all the activity that was
24  going on. I don't know how sophisticated Ms. Bryant
25  in terms of royalty accountings.

Page 83

1       Secondly -- I suppose it not for me to say,
2   Your Honor, but there is a No Waiver Clause in this
3   agreement. So that to the extent that she did -- she
4   should have objected at some point, there is a
5   provision in the agreement that says that -- that no
6   waiver doesn't waive any subsequent actions.
7       THE COURT: Okay. But there is a requirement
8   that within a year you have to do something?
9       THE WITNESS: There's a requirement that you
10  have to object to a statement within a year, but if
11  you never get the statement, I don't know how the year
12  commences.
13      THE COURT: So, you feel it's a reasonable
14  action on the part of a writer -- and I'm asking you
15  this as an expert -- with a product, if I can call it
16  that, that is obviously immensely popular, not to
17  wonder through years why no checks are coming?
18      THE WITNESS: Well, my problem -- my problem
19  with that is that there were checks coming. They
20  certainly weren't of the amount that I think they
21  should have been.
22      THE COURT: All right. Final question.
23      Ms. Bryant is entitled to an accounting, is
24  she not, for the money that she purports to be owed
25  under this agreement?

Page 84

1       THE WITNESS: Yes, that's my understanding.
2       THE COURT: All right. Now, what must she do
3   under this agreement to get that accounting?
4       THE WITNESS: Well, under this agreement, she
5   shouldn't have to do anything to get that accounting.
6       THE COURT: Well, she at least has to say I'm
7   unhappy.
8       THE WITNESS: Well, the burden of the
9   accounting is on the publisher, on Sunbow. The
10  agreements provide that they're obligated, as is the
11  norm in any such arrangement, that the publisher is
12  obligated to render these periodic accounting
13  statements.
14      THE COURT: All right. That's all the
15  questions I have.
16      If that raises other questions in the mind of
17  any of the attorneys here present, they may now ask
18  them.
19  RE-RECROSS EXAMINATION BY MS. SAFFER:
20  Q.  I think that there is one point that's universally
21      accepted by everybody in this courtroom, that this
22      product is valuable and that Ms. Bryant participated
23      in the creation of the music. The argument's over how
24      much, to what extent, etcetera.
25          Now, would you agree that there are multiple,

Page 85

1   multiple versions, many versions of this music that
2   has appeared in TV commercials, jingles, whatever, on
3   all of these things that have been waived around by
4   Mr. Monaghan?
5   A.  I don't know that for a fact, but I wouldn't be
6       surprised if that were the case.
7   Q.  Okay. And you have testified that when an inversion's
8       created because lyrics are added, I think those were
9       your words, that that would call for the submission to
10      BMI of a new cue sheet?
11  A.  An additional lyrics, yes, I would agree with that.
12  Q.  Okay. Would you agree that if there's new material
13      added by the copyright owner, which you have conceded
14      is Sunbow, that that is going to reduce Ms. Bryant's
15      participation as new writers with new material are
16      added?
17  A.  It depends upon whether it is new material or merely a
18      new arrangement.
19  Q.  I didn't say new arrangement. I said new material.
20  A.  If you are distinguishing it from a new arrangement, I
21      would agree with you.
22  Q.  Okay. Would you be surprised to learn that BMI has
23      cue sheets in which Ms. Bryant is indicated as the
24      only writer of the composition?
25  A.  No.

Page 86

1  Q.   Would you be surprised to learn that BMI has received
2       cue sheets in which she is the listed as a co-writer?
3  A.   I have no first-hand knowledge, but I wouldn't be
4       surprised.
5  Q.   Would you be surprised to learn that there has been
6       one cue sheet received by BMI which reduced Ms.
7       Bryant's share to, I think it was, eight-and-a-half
8       percent?
9  A.   I just have no knowledge of this.
10 Q.   Do you have any knowledge of BMI ever creating cue
11      sheets themselves?
12 A.   No, I don't.
13 Q.   And you have testified that it is BMI's practice to
14      accept cue sheets that are submitted by publishers and
15      producers, have you not?
16 A.   It was my understanding that if BMI or ASCAP received
17      new cue sheets which reduced the share -- well, I'm
18      talking about arrangements. New material, which I
19      agree Sunbow had the right to add, I would have
20      thought it would be Sunbow -- excuse me -- BMI's
21      practice to go to the original writer to confirm that
22      this was the case.
23 Q.   Why would you have thought so?
24 A.   Because the new material being submitted negatively
25      impacts upon BMI's obligation to pay the original

Page 87

1       writer.
2  Q.   Have you ever, in your many, many, many years of being
3       in the music business, submitted a cue sheet and had
4       BMI come to you and say, wait a minute, this is a new
5       cue sheet for a show and, therefore, we're rejecting
6       your cue sheet?
7  A.   No.
8  Q.   Has that ever happened to you?
9  A.   Not to me, no.
10      MS. SAFFER: Okay. Thank you.
11      No further questions.
12      THE COURT: Ms. Phares?
13 RE-RECROSS EXAMINATION BY MR. BERMAN:
14 Q.   Mr. Berman, I want to talk about this -- this
15      provision of --
16      MR. MONAGHAN: Your Honor said any questions
17      generated by the questions --
18      MS. PHARES: Yes, I do know.
19      MR. MONAGHAN: -- that Your Honor asked.
20      THE COURT: Right.
21      MS. PHARES: That he asked, and that's
22      exactly what I'm asking about.
23 Q.   I'm asking about this audit and notice right of the --
24      of the composer. Specifically where it says that the
25      Contractor -- which under this agreement was Kinder

Page 88

1       and Bryant -- shall have the right, at the
2       Contractor's sole expense, to inspect the Company's
3       books and records relative to gross receipts derived
4       from the use of the Music hereunder and to make
5       extracts thereof, provided such inspection shall be at
6       the Company's offices during reasonable business hours
7       and upon reasonable notice, and not more frequently
8       than once a year. All royalties, statements, and
9       other accounting rendered by Company shall be binding
10      upon the Contractor -- that's, again, Kinder and
11      Bryant -- and not subject to any objection by -- by
12      the Contractor, unless specific objection in writing
13      stating the basis thereof is given to Company by
14      Contractor by one year from the date rendered.
15      Correct?
16 A.   Yes.
17 Q.   So, if -- so, that one year doesn't begin to run until
18      those statements are received; isn't that correct?
19 A.   That would be my interpretation.
20 Q.   So, if they happen to be late, that really -- that one
21      year still runs from the date that they're received;
22      isn't that correct?
23 A.   I would interpret that to be the case.
24 Q.   I mean, if Sunbow happens to send a statement late, it
25      means that that one year is still going to run from

Page 89

1       whenever it's received by the -- by the artist, the
2       composer; correct?
3  A.   Yes. I don't know if that negates a breach, but in
4       general I agree with that.
5  Q.   All right. And then -- and then what is the
6       obligation exactly of the -- of the composer at that
7       point?
8       MR. MONAGHAN: The contract speaks for
9       itself, Judge.
10      THE COURT: No, I'll allow it.
11 A.   The obligation is nothing. The right of the
12      contractor is to object within a year of receiving the
13      statement.
14 Q.   And, in order to help them do that, they can even
15      demand the right to inspect the books of the company;
16      is that correct?
17 A.   That have -- that is a fairly typical audit provision,
18      yes, they have the right to audit the books.
19 Q.   And they could do that if they had a problem
20      interpreting or they questioned something on the
21      statement, isn't that correct?
22 A.   Yes, they could.
23 Q.   And that is -- and if they don't do that, however,
24      then that claim is barred; is that correct?
25 A.   Well, you know, that's ... What's interesting about

Page 90

1 that, in my opinion, poorly drafted clause, is the
2 right to audit, which it normally would be, is not
3 specifically limited to the one year from the date
4 rendered. It does say, shall be binding, not subject
5 to objection. But it doesn't -- within one year of
6 rendering --
7 Q. Wait a minute, wait a minute.
8 A. -- but it doesn't --
9       MR. MONAGHAN: Can he finish his answer,
10 Judge.
11 Q. What is it that -- I know, but it had a lot of -- what
12 is it that you say is binding or not binding?
13 A. The account rendered, the royalty statements and other
14 accounts rendered --
15       MS. PHARES: Okay.
16 A. -- if not objected to within a year from being
17 rendered.
18 Q. Let's take as an example where you were last employed
19 at Buena Vista Music.
20       Did those agreements, say, with the people
21 who wrote music for the -- the animated Disney shows,
22 did they include an accounting provision like this?
23 A. Not, that strenuous, not that onerous, no.
24 Q. And those -- those composers also had publishing
25 rights from that music?

Page 91

1 A. Again, ambiguous term. My answer to that would be
2 absolutely no, because I distinguish between song-
3 writers royalties and publishing royalties, and in
4 Disney's animated feature films, Disney insists on
5 owning clearly 100% of the copyright.
6 Q. Of the copyright. But --
7 A. And, therefore, 100% of the, quote, publishing or the
8 publisher's share of income.
9 Q. Of the publisher's share. But there were -- but those
10 agreements included publishing royalties to the
11 composers of the music?
12 A. Well, you can refer to it in that way. I think that's
13 a poor way of referring to it. It did include song-
14 writers' royalties to the writers.
15       MR. MONAGHAN: This is way beyond the
16 questions, Judge.
17       MS. PHARES: I'm just -- I was trying to use
18 an example, but I want to make sure we're talking
19 about the same thing.
20 Q. I see. But those agreements included what you're
21 calling songwriter royalties?
22 A. Absolutely.
23 Q. And they would have included -- what would have been
24 less onerous?
25       THE COURT: Well, let's stick to this

Page 92

1 contract alone.
2       MS. PHARES: All right, Your Honor.
3       THE COURT: I'm having enough trouble with
4 that.
5       MS. PHARES: That's fine.
6 Q. And, then, in your view, this -- if then there had
7 been an audit by the -- by the composer, and they had,
8 in fact, made their objection within one year, then
9 what would happen in the ordinary course of an
10 auditing of that procedure?
11 A. The audit would have been presented. There would have
12 been some kind of dialogue or negotiation. A
13 settlement would have been reached or a lawsuit would
14 have been filed.
15 Q. And it's at that point that if there were no
16 settlement, that a lawsuit would be filed?
17 A. That would be a typical case of what would happen.
18 Q. And that's what would be required under the agreement,
19 too; isn't that correct?
20 A. What, a lawsuit?
21 Q. No, that you would have to pursue this -- this process
22 before you get to the point of deciding that you're
23 going to sue.
24 A. If the statements were rendered, I think that's
25 probably true, if they were rendered, yes.

Page 93

1       MS. PHARES: Thank you, Your Honor.
2       THE COURT: All right.
3       MS. PHARES: Thank you, Mr. Berman.
4       THE COURT: All right, Mr. Berman, you may
5 step down.
6       THE WITNESS: Thank you.
7
8       (Whereupon the witness, David M. Berman,
9       was excused at approximately 11:45 AM.)
10
11       THE COURT: All right. I have said that
12 we'll meet on Friday.
13       Let me ask Mr. Monaghan, have you had time to
14 put in whatever response you want?
15       MR. MONAGHAN: Not at all. Haven't even
16 looked at it yet, Your Honor. We were with Mr.
17 Berman. We're going to do that today, this afternoon.
18       THE COURT: Well, I, tomorrow, am out all
19 day, as I told you. And, so, my question is: Do you
20 want to put our next meeting off until Monday?
21       MR. MONAGHAN: Yes, that's fine.
22       THE COURT: Ms. Phares?
23       MS. PHARES: Well, Your Honor, is -- is the
24 Plaintiff resting?
25       MR. MONAGHAN: No, of course not.

Page 94

1    MS. PHARES: Well, what's ...
2    THE COURT: Well, what I'm putting off is the
3    oral argument on your motion.
4    MR. MONAGHAN: Right.
5    MS. PHARES: Yes, I understand that, but
6    that's -- the only thing that -- that I'm asking: Is
7    the Plaintiff resting?
8    MR. MONAGHAN: No, of course not.
9    THE COURT: He said "no".
10   MR. MONAGHAN: We have admissions we're going
11   to get into the record, formal judicial admissions.
12   We have witnesses we've subpoenaed.
13   We're not resting.
14   MS. PHARES: Your Honor, I mean, I can -- if
15   this is the end of that, I can convert that motion to
16   a directed verdict and we can argue that on Friday,
17   but I don't want --
18   THE COURT: I thought that from what you said
19   the other day orally that that was your motion for a
20   directed verdict?
21   MS. PHARES: I was -- that motion was a
22   motion for -- I made a directed verdict at the end of
23   Ms. -- at the end of Ms. Bryant's testimony --
24   THE COURT: Right.
25   MS. PHARES: -- when she had conceded the

Page 95

1    merger of her oral agreements. That's what we were on
2    trial for. Then Mr. Monaghan was raising new issues
3    that he thought he was entitled to proceed on. That
4    motion, and the motion we filed yesterday, was
5    explaining that there is no claim for an equitable
6    accounting in this case and cannot be as a matter of
7    law because there is no fiduciary relationship between
8    Ms. Bryant and Sunbow Productions.
9    And, in addition to that, we were also
10   arguing that as a condition precedent to any -- to any
11   contractual accounting, she is required to go through
12   the -- the audit notice provisions that are in her
13   contract. That's the subject of that motion.
14   THE COURT: Yeah. Well, so, it comes down to
15   this: I intend to decide whether or not at this point
16   there is a viable claim for an accounting.
17   Now, I have already decided on the record
18   that there is no problem with the contracts. We've
19   been through that. There are written contracts; there
20   are no oral contracts. They have all been assumed
21   into the final written version. So, as far as I'm
22   concerned, that's not in the case anymore. The only
23   question is: What right, if any, does Ms. Bryant have
24   for an accounting, for an audit, or whatever? And I
25   am prepared to rule on it on Friday or Monday.

Page 96

1    However, to give Mr. Monaghan a reasonable chance to
2    read your papers --
3    MS. PHARES: I understand, Your Honor, but --
4    THE COURT: -- I put it over until Monday.
5    MS. PHARES: But here's my confusion. If she
6    has no right to an accounting, then I don't understand
7    why we're hearing evidence on an accounting, which, I
8    mean, we only did this with Mr. Berman today because
9    of the representation that he was already en route to
10   the -- to the court.
11   THE COURT: No, I said -- I said several
12   times that if he was allowed to be called, I was
13   interested in his view on, you know, the terms and
14   also on the question of the accounting, and I think
15   we've gone into that.
16   MS. PHARES: But I guess I'm trying to also
17   deal with just the practicality of the time that's
18   available to us, is that if Mr. Monaghan is talking
19   about having many, many more witnesses that he's
20   noticed, but he noticed them on an issue that I think
21   Your Honor has said is behind us, so I'm trying to
22   figure out what's left.
23   THE COURT: Well, I told you what's left.
24   From my standpoint what's left is whether or not Ms.
25   Bryant is entitled, on this action, to go ahead with

Page 97

1    an accounting of any sort, and I'm willing to decide
2    that on Friday, if that's what the parties all want;
3    or, to give Mr. Monaghan time to answer a motion that
4    I think he justifiably claims he hasn't even read yet
5    because he's been involved in preparing an expert
6    witness, etcetera, so I think fairness would require
7    me to say that, regardless of any objection, that I
8    will see you all on Monday morning at 10:00 o'clock.
9    And, at that time, I'll listen to any oral argument
10   you have and probably decide this from the bench
11   because I will have done whatever I wanted to do over
12   the weekend.
13   MS. SAFFER: Your Honor, I have, I guess one
14   would call it scheduling or housekeeping.
15   THE COURT: I thought you told me you were
16   available on Monday.
17   MS. SAFFER: I am available on Monday.
18   THE COURT: Good.
19   MS. SAFFER: And I will be here on Monday, I
20   promise. I mean, you know, as they say, God willing.
21   THE COURT: All right.
22   MS. SAFFER: But if we are to go forward, I
23   do have some problems later on during the week, as I
24   do with my witness.
25   THE COURT: I'll address those on Monday.

Page 98

1  MS. SAFFER: Okay, okay.
2  MS. PHARES: But, Your Honor, I understand
3  and I appreciate your wanting to make time for us to
4  make a directed verdict, but I can't make a directed
5  verdict unless I know whether or not Mr. Monaghan is
6  resting.
7  THE COURT: Let me give you an analogy, even
8  though it will -- Libby said all analogies limp.
9  Well, this one may do worse than that. But let me put
10  you into a standard negligence case. And there gets
11  to be a time when the Plaintiff is on the stand and it
12  turns out that he didn't fall off this roof, he
13  actually fell down the stairs in his own home and he
14  carried himself up and all this. It comes out that
15  way. The Plaintiff hasn't called his doctor yet,
16  etcetera, and the defense gets up, and they move for a
17  directed verdict or a dismissal. The Judge, in that
18  case, could handle it without the Defense -- excuse
19  me -- the Plaintiff ever resting.
20  It's up to me. This case has been a little
21  disjointed, but mostly, I would say, that that falls
22  on the complexity of the matter, the density of the
23  Court in appreciating it all, and also a great many
24  speeches that have been put into this record, and I
25  think everybody's responsible for that.

Page 99

1  So, I'm pointing out to you that, as far as
2  I'm concerned, you made a motion, dismissal, directed
3  verdict, whatever you want to call it. I'm going to
4  see what's left in this case over the next couple of
5  days, and I'll also read any last minute tidbits you
6  want to send to me, but don't send them after Friday,
7  please, because I have to read this over the next
8  couple of days, and I don't want to be here on Monday
9  morning reading things. All right? So, anything you
10  send to me after Friday afternoon will not be read.
11  MS. PHARES: But we're arguing the motion
12  that I made earlier on Monday morning, are we not?
13  THE COURT: On your motion, which you made at
14  that time for a directed verdict, and which I pointed
15  out that the Plaintiff doesn't have to rest as far as
16  I'm concerned.
17  MS. PHARES: You know what? I think maybe
18  there's confusion. I did make a motion for a directed
19  verdict at the time of Ms. Bryant's testimony. Then,
20  if you'll recall, Your Honor, yesterday we had papers
21  on the motion to dismiss these new claims that Mr.
22  Monaghan then advanced on Monday afternoon, and I
23  thought that's what we were going to argue on Monday
24  morning.
25  But are you saying that we're going to argue

Page 100

1  both of those motions?
2  THE COURT: As far as I'm concerned, on
3  Monday morning, I am prepared to tell you where this
4  case stands and what, if anything, is left in this
5  case and -- but, first, obviously, I'm going to allow
6  each of you to make a record, a short record of your
7  points. I'm sure Mr. Monaghan is going to say, how
8  can you do this when you haven't heard the entire
9  Plaintiff's case? A very good argument. I pointed
10  out how that can happen in other types of cases, and
11  it could happen here.
12  Now, if I haven't thoroughly confused you,
13  which was not my intention, at least in my own mind I
14  know what's going on and I will see you -- don't
15  laugh; I'm not kidding. And I will see you on Monday
16  morning at 10:00 o'clock.
17  MS. PHARES: It's not Friday. Monday
18  morning?
19  THE COURT: Yes.
20  MS. PHARES: Okay.
21  THE COURT: I've decided that Mr. Monaghan
22  deserves a chance to put in any papers he wants.
23  And, remember, Friday don't send me any
24  papers after Friday.
25  MS. PHARES: So, but now yesterday -- so,

Page 101

1  this is a revision of the briefing schedule we
2  discussed yesterday?
3  THE COURT: Yes.
4  MS. PHARES: Okay. So, Mr. Monaghan is going
5  to -- we're going to, what, simultaneously brief? We
6  don't get to see what Mr. Monaghan's saying at all in
7  response to ours?
8  THE COURT: Well, you have made a very
9  extensive oral argument on the record about this, and
10  the -- which I have had a copy of; so, I know what you
11  said. Mr. Monaghan and you made a written motion.
12  Mr. Monaghan deserves to be able to answer that.
13  MS. PHARES: And we were going to reply to it
14  by the following --
15  THE COURT: And you can reply to it by -- as
16  long as it isn't after Friday afternoon.
17  MS. PHARES: Well, unfortunately, Mr.
18  Monaghan only serves at 5:05 on Fridays, so that will
19  be difficult for us to respond to.
20  MR. MONAGHAN: How about we'll serve the
21  papers by 12:00 or -- 1:00 o'clock on Friday?
22  THE COURT: Personally, I don't know what
23  more there is to say in this case.
24  MS. PHARES: Well, the problem is that we say
25  it and then it changes, and then we have to have an

Page 102

1  opportunity to respond.
2      THE COURT: Well, Ms. Phares, I have done my
3  best to whittle the issues in this case down, and we
4  are where we're at, and I'm going to see what is left,
5  and I will see you on Monday morning at 10:00 o'clock.
6  No brief from anybody will be accepted after 5:00
7  o'clock on Friday -- let me make it 4:30 because I'm
8  going to leave at 5:00 o'clock.
9      This has been a very hard-fought case, which
10  may or may not be over.  Some very, very good points
11  have been made; and, in all honesty, Mr. Berman, I'm
12  glad we had you as a witness.
13      MR. BERMAN: Thank you.
14      THE COURT: Doesn't mean I understand it any
15  better, but I've tried.
16      MR. MONAGHAN: One very brief, very quick --
17      THE COURT: Go ahead.
18      MR. MONAGHAN: On our Plaintiff's case we
19  still have admissions to get in the record.  I don't
20  want to burden the Court with it now, but -- but on
21  Monday --
22      THE COURT: If there are admissions, I tell
23  you, submit them.
24      MR. MONAGHAN: I will.
25      THE COURT: If they're admissions, they're

Page 103

1  admissions.
2      MS. PHARES: If you have them, why don't we
3  just do them now?  We're here.
4      THE COURT: All right.
5      MR. MONAGHAN: Okay.
6      THE COURT: My recollection is that there
7  weren't that many.
8      All right.  We'll take a ten-minute break.
9  Then we'll have the admissions.
10      MR. MONAGHAN: Thank you, Judge.
11
12      (Whereupon a recess was taken at approximately
13      11:55 AM.)
14
15      (Court reconvened at approximately 12:10 PM.)
16
17      THE COURT: All right, Mr. Monaghan.
18      MR. MONAGHAN: I will make this very short.
19      We are asking the Court to take formal
20  judicial notice of the following admission made by
21  Sunbow in its Memorandum of Law in support of its
22  motion to dismiss, dated May 7, 2004.  That's one of
23  the many Sunbow motions you've dealt with.
24      In that motion, Sunbow made the following
25  statement, on Page 19.  On appeal this was referenced

Page 104

1  A802.  Sunbow said, and I'm reading from Paragraph 4:
2  "Under the standard Sunbow work-for-hire agreements,
3  Plaintiff still has publishing rights.  Plaintiff
4  appears to be confused about the publishing royalties
5  available to her under the Sunbow agreements.  She
6  cites Sunbow as stating she has no rights to
7  mechanical or synchronization royalties."
8      Plaintiff's brief at 31-33, Bryant affidavit,
9  Blue paragraphs 15, 17, and 19.  "Sunbow does not say
10  this.  While this misunderstanding does not impact the
11  Court's analysis of the sufficiency of Plaintiff's
12  evidence for purposes of summary judgment, we think it
13  would be helpful to point out that Sunbow is not
14  interpreting Plaintiff's rights under the Sunbow
15  contracts as narrowly as she claims they are.  Under
16  the Sunbow agreements, and the Kohn, K-O-H-N, Form
17  3.8, Phares Exhibit G to J", parens, "Sunbow is
18  obliged to pay Plaintiff a royalty of 50% of the net
19  profits from licenses to third parties of mechanical
20  or synchronization rights, assuming they are not
21  barred by the Statute of Limitations", parens, "see
22  Section 2C, Intro., CEG, Phares Exhibit H-k, Paragraph
23  6a-1."
24      And here's the rub.  "But Sunbow does not
25  agree that the licenses made for the distribution of

Page 105

1  the TV shows and videocassettes and DVDs is an
2  exercise of either one of those rights", closed paren.
3      So, that's why we're here, that's the
4  admission, and that -- you've heard the expert
5  witness.
6      MS. PHARES: Your Honor, that sounds to me
7  like argument.
8      MR. MONAGHAN: No, it was asked as an
9  admission.
10      THE COURT: The Court will take it any way it
11  wants.
12      MS. PHARES: Well, I mean --
13      THE COURT: Let's not have any more argument
14  today on it.
15      MS. PHARES: Okay.
16      THE COURT: Anything else?
17      MR. MONAGHAN: No, Your Honor.
18      THE COURT: Any other admissions?
19      MR. MONAGHAN: No, Your Honor.
20      THE COURT: Okay.  I'll see you all at 10:00
21  o'clock on Monday morning.  And I've already told you
22  what to do with any other papers you want to submit.
23      MR. MONAGHAN: Thank you, Judge.
24      THE COURT: Have a good day, good afternoon,
25  and a good weekend.

Page 106

1        I N D E X   T O   E X H I B I T S

2

3    (PLAINTIFF'S EXHIBIT NO. 49 - CURRICULUM

4        VITAE OF DAVID M. BERMAN - FOR IDENTIFICATION.)

5        ............................................. 5:18

6

7    (PLAINTIFF'S EXHIBIT NO. 49 - CURRICULUM

8        VITAE OF DAVID M. BERMAN - RECEIVED IN

9        EVIDENCE.).............................. 6:20

10

11   (PLAINTIFF'S EXHIBIT NO. 50 - SONY ATV

12       ROYALTY STATEMENT, 12/1/06, SINGLE PAGE

13       - MARKED FOR IDENTIFICATION.)............ 43:7

14

15   (PLAINTIFF'S EXHIBIT NO. 50 - SONY ATV

16       ROYALTY STATEMENT, 12/1/06, SINGLE PAGE

17       - RECEIVED IN EVIDENCE.)................ 43:15

18

19   (PLAINTIFF'S EXHIBIT NO. 50 - SONY ATV

20       ROYALTY STATEMENT, 12/1/06, SINGLE PAGE

21       - RECEIVED IN EVIDENCE.)................ 43:15

22

23

24

25

# EXHIBIT 14

```
 1          Continued Bench Trial
                (Day 6)
 2
 3                              December 11, 2006
                               10:50 A.M.
 4                             40 Gleneida Avenue
                               Putnam County Office
 5                              Building
                               Carmel, New York
 6
 7

    BEFORE:  HON. ANDREW P. O'ROURKE
 8           Presiding Supreme Court Justice
 9

    SUPREME COURT OF THE STATE OF NEW YORK
10  COUNTY OF ROCKLAND
    ─────────────────────────────────────X
11
    ANNE BRYANT
12                        Plaintiff
13  - versus -                        Index No.
                                      5192/00
14  BROADCAST MUSIC, INC., (a/k/a "BMI"),
    FORD KINDER, KINDER & CO., LTD., VADIVOX, INC.,
15  JULES M. "JOE" BACAL; GRIFFIN BACAL, INC.,
    STARWILD MUSIC BMI, WILDSTAR MUSIC ASCAP,
16  SUNBOW PRODUCTIONS, INC.,
                            Defendants
17  ─────────────────────────────────────X
18  ANNE BRYANT
                          Plaintiff
19                                  Index No.
    - versus -                       2821/02
20
21  SUNBOW PRODUCTIONS, INC.,
                            Defendant
22
23  ───────────────────────────────────────
              Laurie Hardisty, RMR
24            Official Court Reporter
         44 Gleneida Avenue, Carmel, NY 10512
25            (845) 225-3641 Ext. 294
```

Page 2

1  APPEARANCES:  PATRICK J. MONAGHAN, JR., ESQ.,
               and MICHAEL KORIK, ESQ., Co-counsel
2  Monaghan, Monaghan, Lamb &
               Marchisio, Esqs.
3  Attorneys for Plaintiff
4
5  GLORIA C. PHARES, ESQ.,
               and JOHN C. KNAPP, ESQ., Co-counsel
6  Patterson, Belknap, Webb & Tyler, Esqs.
               Attorneys for Defendant Sunbow
7
8
               JUDITH SAFFER, ESQ.,
9  and JOHN COLETTA, ESQ.,
               Co-counsel BMI Legal Department
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1          THE COURT:  All right.  We're on the record.
2          I want you to know that I received many of
3  your papers so late on Friday that there wasn't anyone
4  here by the time they got — we got them, and when we
5  came in this morning, I think there were over a
6  hundred pieces of paper that had been spewed out of
7  the machine, and the machine had run out of paper.
8  So, some of these documents have not been read by me,
9  and — I just haven't had time to read them.  And then
10 we got some additional copies this morning.  Mr.
11 Korik's affidavit — affirmation I got, and I think
12 that's a copy of what was sent, but I haven't had time
13 to look at it.
14         One of the things that has come up is that,
15 you know, I was talking about a directed verdict or —
16 or that there had been a motion for a directed verdict
17 or a dismissal, one or the other, and I went into that
18 fairly carefully.  It's CPLR 4401, and it provides for
19 a motion for judgment during trial, and it reads:
20 "Any party may move for a Judgment with respect to a
21 cause of action or issue upon the grounds that the
22 moving party is entitled to the Judgment as a matter
23 of law after the close of evidence presented by the
24 opposing party with respect to such cause of action or
25 at any time on the basis of admissions.  Grounds for

Page 4

1  the motion shall be specified.  The motion shall not
2  waive the right to trial by jury."
3          But that doesn't apply here.
4          It goes on further, says:  "The party may
5  make a motion only after the other side's case is in."
6          So that it does not seem, at the outset of a
7  trial, that it is possible, unless it's based on
8  admissions -- there have been admissions that have
9  been offered by both sides here.  I don't think the
10 admissions in and of themself are enough to say that I
11 accepted them all to allow me to make a judgment on a
12 directed verdict.
13         So, we're left, as I see it, in the following
14 posture:  I went back and looked at the Amended
15 Complaint.  Let me back that up for a moment.
16         In the first Complaint, there was a cause of
17 action for an accounting.  In the second amended -- in
18 the Amended Complaint, there was no cause of action
19 for an accounting, but in each of the cases, the
20 addendum clause asked for -- one element was for an
21 accounting.  So, from the position of the Court, the
22 question -- one of the questions I have is:  Since
23 the first and second causes of action in the Amended
24 Complaint appear to have been taken care of or proof
25 entered into by the Plaintiff, what else is there that

Page 5

1  the Plaintiff would want before it rested its case?
2          Mr. Monaghan?
3          MR. MONAGHAN:  Well, Your Honor, as we
4  pointed out in our papers that were faxed on Friday
5  before 1:00 o'clock and then -- copies were -- in
6  order to make out the confidential relationship with
7  Mr. Bacal, which is the, if you will, the equitable
8  accounting theory, we put Ms. Bryant on, but we
9  had proofs through Mr. Kinder, through Mr. Bacal, and
10 through Ms. Weitzman that would address those specific
11 issues, which your last decision before trial in '04,
12 your May 26, '04, decision said that that's still part
13 of the case vis-a-vis Bacal.
14         Now, if we make that relationship out
15 vis-a-vis Bacal, by principles of respondeat superior,
16 we make it out against Sunbow.
17         In the case of Bacal, Your Honor, we're not
18 dealing with large mega corporations; we're dealing
19 with a one-on-one relationship, which you've already
20 addressed in a number of opinions.
21         The Plaintiff gave her music over to a
22 person, Joe Bacal.  She gave the copyrights over to
23 him.  He wore a couple of different hats, but you've
24 already said we can make that out.  To make out that
25 fiduciary relation, which would be the element,

Page 6

1  perhaps, of a constructive trust equitable case, we
2  needed the rest of those proofs to come in; not that I
3  don't think we've made out a prima facia case.
4       So, that would be part of that case.
5       Now, the case has morphed into, through no
6  fault of ours -- into also being a contract case for
7  the accounting provided for in the Jem Agreement.
8       Now, you found that agreement to be valid and
9  binding on all parties. It's not a one-way street.
10 Sunbow has switched theories. They accuse us of doing
11 that; but the fact is, we started out, we didn't have
12 the written agreement. I certainly couldn't adopt an
13 unsigned agreement. And then in 2004, they produced
14 the written agreement.
15      First, we deal with the Statute of Frauds.
16 Sunbow says there's no agreement, there's no written
17 agreement. Now they say there's a written agreement
18 and you have to follow the terms of the written
19 agreement. And, of course, this is an account-stated
20 issue which has been only obliquely and recently
21 addressed.
22      So, what we're saying is, in the papers: You
23 can't have an account stated unless you account. The
24 same thing when you get a bank statement every month.
25 The bank doesn't send you a statement, you can't be

Page 7

1  bound by a statement you don't get.
2       We've never gotten a statement, and the two
3  that have been looked at in court, one of which got
4  into evidence, one of which didn't, those are not
5  statements to Ms. Bryant; those are statements by Sony
6  ATV to Loonland. So, those aren't really accountings.
7       So, now they've gone -- they keep going down
8  the ladder to the point now where they say, okay,
9  you've got a contract, and the contract terms dictate
10 you have to demand an accounting now. So, they want
11 us to waste six years of the case.
12      So, anyway, to answer your question about
13 what's left on the Plaintiff's case, although I think
14 we've made out a prima facie case on the equitable
15 issue of an accounting and constructive trust, the
16 issue of do they hold these monies that they've
17 received in trust, the rest of the proofs would be
18 through Messrs. Bacal and Weitzman. Weitzman
19 testified, we've cited it, that the music was just
20 handed over and used by Mr. Bacal and his companies.
21      So, that's what would be left on that part of
22 the case.
23      THE COURT: But you're still looking for an
24 accounting, and that would be the only part of your
25 case you would still have witnesses on?

Page 8

1       MR. MONAGHAN: At this point in the case. As
2  we said when we made that motion to bifurcate the
3  case, we can't -- until we get a full and complete
4  accounting, we can't ask -- we can't ask you to award
5  us damages because we don't know what the number would
6  be.
7       THE COURT: No, no, but we're talking about
8  the principle that you're entitled to an accounting.
9       MR. MONAGHAN: Right.
10      THE COURT: In this courtroom we've had
11 testimony that you can get an accounting from BMI.
12      MR. MONAGHAN: No, we're not talking about
13 BMI.
14      THE COURT: No, I know; but there was no
15 doubt that BMI stood ready, and I guess stands ready
16 today, to render an accounting for all of the money or
17 -- or is it all? Is it time-limited?
18      MS. SAFFER: We provided all the statements
19 that we had up until the date of the trial. Ms.
20 Bryant has received her statements since the date of
21 the trial. She has not received, since the date of
22 the trial, Kinder and Bacal's statements, which we
23 would happily give to her.
24      Beyond that, there's a claim that we haven't
25 given her full accounting. We've given her, as I've

Page 9

1  said repeatedly, and as our witness has said in
2  affidavits, everything we have.
3       There are some statements that are missing.
4  Goes back to the early 1980s. We don't have them.
5  Can't produce what we don't have. But we had given
6  cartons full of documents. We have produced to the
7  extent we physically are capable. We have hidden
8  nothing.
9       THE COURT: All right.
10      MR. MONAGHAN: Two different issues here,
11 Your Honor. One is the BMI performance royalty issue,
12 obviously, and then the accounting by Sunbow for all
13 the licensing, all the mechanical licensing that Mr.
14 Berman told you includes all those DVDs and all those
15 others, so ...
16      THE COURT: Okay.
17      MR. MONAGHAN: So, with BMI we've already got
18 an exhibit in evidence that we've shown you that we
19 don't have all the statements. And my colleague, Ms.
20 Saffer, says they don't have all -- but, you know,
21 there is somebody who does have all the statements;
22 and that's Sunbow. Sunbow got -- Sunbow's publishing
23 company received all those statements that even Ms.
24 Saffer can't produce right now. There could be no --
25 no doubt about that. The publishing company, they get

Page 10

1  a hundred percent and the writers split a hundred
2  percent. So, they knew what happened throughout the
3  years.
4        We haven't seen any of those. So --
5        THE COURT: All right. I don't want to cut
6  you off, but I want to get to Ms. Phares.
7  You've listened to what I've --
8        MS. PHARES: Yes, Your Honor.
9        THE COURT: -- read to you from 4401.
10  Is it your position that the Plaintiff in
11  this case has, in fact, put in their entire case?
12        MS. PHARES: It is, Your Honor. And let me
13  start with the beginning of -- in order -- first of
14  all, and I'm reading from Your Honor's decision of
15  December 15, 2003. "The Court further finds that
16  Plaintiff has woefully failed to demonstrate that it
17  is appropriate to pierce the corporate veil and find
18  that Bacal's identity was one with his production
19  company, Sunbow, which of course otherwise had no
20  confidential relationship with Plaintiff."
21        And there has been no additional evidence
22  since then to alter that conclusion.
23        Second of all, Mr. Monaghan says that this
24  case has morphed into a breach of contract, and he has
25  relied in his papers on the Kaminsky case, which says,

Page 11

1  basically, that if a Plaintiff establishes a right to
2  money damages on the basis of transactions or
3  occurrences, the claim wasn't be dismissed merely
4  because it was framed to dismiss a cause of action for
5  an equitable type of relief.
6        And we don't disagree with that, but what we
7  are saying is that the Kaminsky case says the question
8  is -- what is the basis of the allegations of the
9  pleadings is whether, on the basis of the allegations
10  of the pleadings, it establishes a right to any relief
11  at the hands of the Court.
12        And that's where we say this case, we do not
13  have anything like that in our Complaint. The facts
14  in the facts section of this Complaint refer to the
15  re-registrations involving BMI. And when you get to
16  the causes of action that seem to be directed to -- to
17  the Defendant Sunbow, all that we have is the
18  statement that: Plaintiff has profited from his
19  exploitation of music written and owned by Plaintiff.
20  Plaintiff is entitled to an accounting.
21        We don't have any mention of a contract. We
22  don't have any mention of an oral contract. We don't
23  have any mention of a written contract. We don't have
24  any mention of what it is that is the basis for her
25  belief that she's entitled to this. There's no

Page 12

1  suggestion of why she thinks she is entitled to it or
2  how much she thinks she's entitled to. There is just
3  nothing in this contract -- in this Complaint making
4  out anything like that.
5        The rest of the Complaint we think has been
6  disposed of, and we think that the -- the Plaintiff is
7  at end of her case, that we are there.
8        THE COURT: All right.
9        MR. MONAGHAN: One point may I make very
10  quickly, Your Honor?
11        THE COURT: Yes.
12        MR. MONAGHAN: On the way in, Michael and I
13  were talking about the CPLR. The CPLR is rules and
14  statutes. Not many lawyers know that some of the
15  sections are rules, some of the sections are statutes.
16  CPLR 3017 is a statute. There's a legislative mandate
17  to this court that says, 3017a, generally, this is
18  demand for relief: "Except as otherwise provided in
19  Subdivision C of this section, every complaint,
20  counterclaim, cross-claim, interpleaded complaint,
21  third-party complaint, shall contain a demand for the
22  relief to which the pleader deems himself entitled.
23  Relief in the alternative or several different types
24  may be demanded. Except as provided in Section 3215,
25  the Court may grant any type of relief within its

Page 13

1  jurisdiction appropriate to the proof, whether or not
2  demanded, imposing such terms as may be just."
3        That's the statute. That's why you have the
4  power, the authority, and in this case, certainly, the
5  right. It's the facts which are pled which count.
6  That's what the Kaminsky case says.
7        Was Sunbow surprised that Ms. Bryant was
8  looking for two things, a true and accurate accounting
9  and, B, whatever money was owed to her -- was owed to
10  her?
11        That's the case, and it's been in the case
12  for six years.
13        THE COURT: And don't you think that has
14  been -- the theory of that has been fully gone into by
15  this court?
16        MR. MONAGHAN: Yes.
17        THE COURT: All right. So, then, are you
18  ready to rest the Plaintiff's case on liability?
19        MR. MONAGHAN: No, I'm not because I want --
20  I still want to make that case out for the equitable
21  accounting, establishing of a fiduciary relation with
22  Bacal.
23        THE COURT: Well, I have never said that --
24  as a matter of fact, I said just the opposite, that
25  Bacal and -- what was his company, the other one?

Page 14

1    MR. MONAGHAN: Griffen Bacal.
2    THE COURT: Pardon?
3    MR. MONAGHAN: Griffen Bacal.
4    THE COURT: -- Griffen Bacal are not in this
5    case.
6    MR. MONAGHAN: No, they're not in, but the
7    personal relationship with Sunbow, through Bacal, is
8    in the case. And you have -- you have said that, and
9    you said that right before we went to trial in May of
10   '04.
11   In Your Honor's decision, and we cited it to
12   you, it says very clearly that if we can make out that
13   case, we're entitled to prove that.
14   MS. PHARES: But that's --
15   MR. MONAGHAN: And I don't want to leave any
16   stone unturned after six years, Judge. There's no
17   point in leaving a record incomplete.
18   THE COURT: Well, what kind of proof are you
19   talking about?
20   MR. MONAGHAN: I'm talking about the proof of
21   the relationship with Mr. Bacal, the fact that Mr.
22   Bacal, Your Honor, and Mr. Kinder were the ones who
23   collaborated to change the registrations. This isn't
24   Sunbow as Sunbow.
25   THE COURT: Wait, wait. We're past that. We

Page 15

1    finally have gotten an Order signed last time you were
2    here to re-register the -- any compositions that were
3    not in your client's name. And that basically went to
4    Jay (sic) Bacal's writer's share of the performance
5    rights and everything that he had. And that wasn't
6    really part of this case. That was only to help Ms.
7    Bryant get these squared away. And, apparently, she
8    also told Bacal not to sign over, not to do it.
9    Isn't that so?
10   MR. MONAGHAN: No.
11   MS. SAFFER: It was Mr. Kinder.
12   THE COURT: Mr. Kinder. Excuse me.
13   MS. SAFFER: Yes, it was Mr. Kinder.
14   THE COURT: But we got this thing signed, and
15   I don't see that Bacal or his company are part of this
16   case anymore.
17   MR. MONAGHAN: Your Honor, that's -- we're
18   stitching up the wound now, but the wound was there
19   for six years or even further back. This doesn't do a
20   thing in terms of rectifying and remedying the damages
21   that were caused by the actions to begin with. Yes,
22   Your Honor, you're speaking prospectively. We gave --
23   we gave Judy the settlement documents a long time ago,
24   and we're only now -- you signed an Order a week ago.
25   We're only now putting it into -- by the way, we say

Page 16

1    it could have been done a couple years ago. But this
2    doesn't do a thing to all of the past damage.
3    So, we still have claims against BMI in our
4    view, for what happened previously, for not protecting
5    its writer. You can look at the contract. Ms. Saffer
6    said you're entitled to interpret it. We agree. But
7    as far as Sunbow's concerned, Your Honor's focusing, I
8    think, heavily on performance royalties. We're
9    talking about those mechanicals that we haven't seen
10   anything from, all the money that's due for all those
11   DVDs. So --
12   THE COURT: Well, you tried to get those DVDs
13   and audiovisuals put into the contract and it was
14   rejected.
15   MR. MONAGHAN: Oh, no. I know -- oh, no,
16   Your Honor. If I may? If you're talking about a
17   letter from Dobishinski, that's the last thing
18   probably you've seen because the papers came in.
19   THE COURT: Right.
20   MR. MONAGHAN: He wasn't our lawyer. That's
21   what you need to hear from Weitzman's testimony.
22   Sunbow hired Dobishinski. He was their administrator.
23   Sunbow is talking about dealing with itself.
24   THE COURT: But, regardless, that letter,
25   does it not, shows that there were no audiovisual

Page 17

1    rights ever given to Ms. Bryant?
2    MR. MONAGHAN: No, doesn't show anything of
3    the sort. It doesn't show anything of the sort.
4    THE COURT: Well, okay. One thing I don't
5    want to do is -- we've had an awful lot of argument in
6    this case -- I don't want to reargue the things that
7    we've already done. I do want to get your
8    appreciation of where we're at.
9    MR. MONAGHAN: Okay.
10   THE COURT: I don't believe -- as I looked at
11   it over the weekend, I thought, well, maybe I can sew
12   this thing up today.
13   I can't possibly do that. I'm going to have
14   to do a written decision. One way or another this
15   case, if I allow it to go forward, probably that will
16   be appealed. I know if I direct a verdict, it's going
17   to be appealed. And that for all the work that has
18   been done here, I am going to have to take the time to
19   give you a decision, and that is what we're going to
20   do. And in that decision, if this case is going to go
21   forward, I'll give you the dates when we're going to
22   get back together on it.
23   MR. MONAGHAN: Your Honor, if I may? And
24   that's fine; I mean, I understand. I'm just
25   suggesting that, we win, there's going to be an appeal

Page 18

1 by the Defendants; conversely, there's going to be an
2 appeal. But shouldn't we have at least a full
3 testimonial record? What is the harm? If we've spent
4 all this time before the Court, what is the harm of
5 letting us complete our case?
6      THE COURT: Well, if you recall, we had a
7 motion in limine about some of your witnesses and I
8 ruled against you on that. So, that's part of the
9 record.
10     MR. MONAGHAN: On Weitzman and ...
11     MS. PHARES: Rigby.
12     MR. MONAGHAN: Pardon?
13     MS. PHARES: Rigby.
14     MR. MONAGHAN: Oh; and Rigby. Yeah, you did,
15 you did; but you have also rendered other rulings in
16 the past which seem to have left some room on some of
17 these issues, so ... -- including your May 26, '04,
18 decision right before we began the trial. So, it's
19 been -- look, it's been a difficult case for you; it's
20 a difficult case for us. But all I'm saying is, I
21 think it's prudent and more efficient in terms of the
22 system if we just complete our case, render the
23 rulings that Your Honor's going to render. There's
24 not a great deal more to that part of the case, and
25 you can even take the testimony without putting the

Page 19

1 witness on the stand. We have the portions of the
2 testimony that you -- you're going to get a motion for
3 reconsideration, probably, no matter what. Why not
4 have all of the testimony that we -- it's already part
5 of the record. We have Weitzman. We have Bacal.
6      MS. PHARES: It's been excluded.
7      MR. MONAGHAN: We also have Kinder down in
8 Florida. All of those are transcribed already. Why
9 not have a full record when you make your decision?
10     THE COURT: All right.
11     Ms. Phares, why not?
12     MS. PHARES: Your Honor, because the
13 witnesses that he's referring to referred to the case
14 that we came to try last Monday on December 4th and
15 which has been completed on the basis of the
16 Defendant's testimony, and Your Honor has already
17 ruled that that oral agreement theory is not in this
18 case. The Plaintiff has completed her case. Any case
19 that she has ever presented to this Court is finished.
20 And I understand your wanting to perhaps take time to
21 write a decision, and we also -- if -- if it is of any
22 assistance to you, instead of dealing with unbound fax
23 pages, I'm quite happy to give you a bound set of the
24 papers; but it's our position that this case is over,
25 that the Plaintiff has finished her case.

Page 20

1      THE COURT: All right. Well, what would be
2 the problem, Ms. Phares, of allowing the Plaintiff to
3 submit to the Court those sections that she believes
4 are relevant to whatever else she has to say in this
5 matter and -- and then we won't have a problem with
6 the Plaintiff saying that they were prevented from
7 putting in their case?
8      MS. PHARES: Well, one of the problems we
9 have is that we already made a motion to exclude
10 Weitzman. You granted that motion. And there were
11 other reasons in our motion in limine for excluding
12 her. I mean, she is not -- she's referred to in the
13 Plaintiff's papers as Sunbow's missing witness. She's
14 not our witness. We represented her at her
15 deposition, but we have not called her, and Mr.
16 Monaghan is very anxious to call a witness who is
17 within a hundred miles of the courthouse through a
18 deposition. It's not appropriate under the rules.
19 And he's very quick to rely on the rules when they
20 support him, but we have given Your Honor plenty of
21 reason why it's inappropriate.
22     He's relying on a witness who is unfamiliar
23 with what she's talking about. If you see the entire
24 deposition, it's clear that she is guessing, and she
25 more or less says as much. And there is, you know --

Page 21

1 Mr. Kinder was testifying entirely on this -- this
2 so-called oral agreement.
3      This is just a ruse in order to keep this
4 case going in the hopes that Your Honor will perhaps
5 change his mind, decide that maybe there is something
6 more. The fact is that the -- the causes of action
7 have not been supported and there is nothing in this
8 Complaint, nothing, that, I mean, suggests a basis of
9 entitlement of right; nothing.
10     THE COURT: All right. But what I was asking
11 you was not what the rules allow, the hundred mile
12 rule, etcetera. What I was asking you: Wouldn't it
13 be better, from your standpoint, not to have an issue
14 about whether or not the Plaintiff got to finish their
15 case?
16     MS. PHARES: But, Your Honor, they have
17 finished their case, and, frankly --
18     THE COURT: Okay; that's your position. I
19 accept that.
20     MS. PHARES: -- and at this point -- and at
21 this point what we are asking is, you're sort of
22 keeping -- we're being held hostage while the
23 Plaintiff continues to raise seriatim one theory after
24 another, none of which are in her Complaint.
25     THE COURT: All right. The --

Page 22

```
1          MS. SAFFER:  Your Honor?
2          THE COURT:  Yes?
3          MS. SAFFER:  Excuse me.  Yes.
4          Because of the time constraints, we filed a
5   motion to dismiss, and Mr. Monaghan responded to it at
6   the end of the day on Friday, and we appeared here
7   this morning.  We did not have an opportunity to put
8   in a reply.
9          Mr. Monaghan's response to our papers, his
10  own affidavit, in which he states things as if they
11  were proven without supporting it just because he says
12  so, that --
13         THE COURT:  You want to put in another reply?
14         MS. SAFFER:  I'd like to put in a reply, a --
15  very short, but I'd like to be able to address that,
16  and if you're taking additional time to consider the
17  papers, I'd appreciate --
18         THE COURT:  Well, let me tell you:  It is
19  with deep regret that I am having -- that I am doing
20  this.  I had hoped to be able to bring this to a
21  conclusion for everybody today, but that is not in the
22  cards.
23         I will let you put in a reply.  However --
24         MS. SAFFER:  It can be very short.
25         THE COURT:  -- don't let that begin another
```

Page 23

```
1   firestorm of motions and papers.  I have whatever I
2   have now.  I'm going to work off that, and you'll get
3   my answer within the statutory 60 days.
4          MR. MONAGHAN:  What about the issue of the
5   other testimony coming in by the transcripts?
6          THE COURT:  Well, I think that counsel raises
7   an objection, and I can't do anything without --
8   with -- over that objection.  These were witnesses
9   that were available within a hundred miles.
10         MR. MONAGHAN:  I don't know anything about
11  this.  I mean, for Ms. Phares to say the witness is
12  within a hundred miles, I don't know that; I don't
13  know how she knows that.  This is a witness they say
14  is not available.
15         THE COURT:  Besides, she says that your case
16  is already in and you don't need it.  Let me --
17         MR. MONAGHAN:  She says.
18         THE COURT:  Let me look at the situation, and
19  I will give you my answer as soon as I can.
20         Thank you all very much.
21         MR. MONAGHAN:  Thank you, Judge.
22         THE COURT:  That ends this phase of the case.
23  You'll get an answer.
24
25         (Whereupon the proceeding concluded.)
```