# EXHIBIT 16

A. MENDED
1992

HASBRO, INC., MILTON BRADLEY INTERNATIONAL, INC., SUNBOW PRODUCTIONS, INC.,
STARWILD MUSIC, INC., and WILDSTAR MUSIC, INC.

STANDARD TERMS AND CONDITIONS

PREAMBLE

These Standard Terms and Conditions are incorporated in the Production License
Agreement ("PLA") attached hereto, and these Standard Terms and Conditions and
the PLA (collectively referenced herein as the "Agreement") together govern
the production, completion, delivery and distribution of the "Programs" (as
defined in Paragraph 2 of the PLA).

HASBRO, INC., a corporation duly organized and existing under the laws of
the State of Rhode Island and Providence Plantations with a principal place of
business at 1027 Newport Avenue, Pawtucket, Rhode Island 02862-1059
("Hasbro"), owns and/or controls the "Property" as defined in Paragraph 1 of
the PLA, including all trademarks, copyrights and other proprietary interests
associated therewith, in the United States of America, its territories and
possessions.

MILTON BRADLEY INTERNATIONAL, INC., a corporation duly organized and
existing under the laws of the Commonwealth of Massachusetts, and a
wholly-owned subsidiary of Hasbro, with a principal place of business at 1027
Newport Avenue, Pawtucket, Rhode Island 02862-1059 ("MBI"), owns and/or
controls the Property throughout the universe excluding the United States of
America, its territories and possessions. Unless otherwise designated herein,
all references to "Hasbro" shall be deemed to include MBI.

SUNBOW PRODUCTIONS, INC., a corporation duly organized and existing under
the laws of the State of Delaware with a principal place of business at 130
Fifth Avenue, New York, New York 10011 ("Sunbow"), desires to produce,
complete, deliver and distribute certain animated television cartoon programs
based upon the Property as particularly described in Paragraph 2 of the PLA
("Programs").

SUN 417

STARWILD MUSIC, INC., an affiliated corporation of Sunbow, organized and existing under the laws of the State of Delaware with a principal place of business at 130 Fifth Avenue, New York, New York 10011 ("Starwild") and an active member of Broadcast Music, Inc. ("BMI"), desires to be the publisher of the musical compositions to be initially created by member artists of BMI for synchronization with the Programs.

WILDSTAR MUSIC, INC., an affiliated corporation of Sunbow, organized and existing under the laws of the State of Delaware with a principal place of business at 130 Fifth Avenue, New York, New York 10011 ("Wildstar") and an active member of the American Society of Composers, Authors and Publishers ("ASCAP"), desires to be the publisher of the musical compositions to be initially created by member artists of ASCAP for synchronization with the Programs.

### TERMS AND CONDITIONS

A.   Quality of Programs.  The quality of the Programs to be produced, completed and delivered hereunder shall be at least equal to standards for the production of animation or live-action programming of the three United States national television networks (i.e., ABC, CBS, NBC) intended for children's audiences.

B.   Funding.

(1)   Hasbro shall, subject to the terms of the Agreement, and provided Sunbow is not in material breach of the Agreement, advance or cause to be advanced on account of the cost of producing, completing, delivering and distributing the Programs, the monies set forth in the PLA. Sunbow agrees that the production funds described under the caption "Production" in the Exhibits to the PLA shall be used solely for the cost of producing, completing and delivering the said Programs.

(2)   Hasbro may, at any time in its absolute discretion, establish a special production account in its designated bank, in which all production funds shall be deposited. No other monies shall be deposited in said account

-2-

SUN 418

and withdrawals therefrom shall be made only by check, draft or other order signed by a designee of Sunbow satisfactory to Hasbro and countersigned by a designee of Hasbro.

(3)   Subject to Subparagraph (2) above and Paragraph 4 of the PLA, production funds shall be advanced from time to time in installments in such amounts as shall reasonably be required by Sunbow to meet production commitments. Sunbow shall advise Hasbro in writing of the amount required by Sunbow for production commitments, giving such detail as Hasbro may require.

(4)   If the cost of producing, completing and delivering the Programs exceeds the "Program Cost" set forth in Paragraph 4(a) of the PLA, Sunbow shall be responsible for such excess cost, and all of Sunbow's compensation pursuant to Paragraph 8 of the PLA shall be applied to pay for such excess costs. In the event Sunbow's said compensation is insufficient to recoup such excess costs and if Hasbro has advanced Sunbow or otherwise paid monies to cover any such excess costs, Hasbro shall be entitled to recoup such monies from the Distribution Proceeds (as defined in Paragraph H(3)(c) below) before any such Distribution Proceeds are shared pursuant to Paragraph I(5).

C.   Production.

(1)   Sunbow shall have the authority and responsibility to do all things reasonably necessary to produce, complete and deliver the Programs, including, without limitation, the following:   employing, engaging and providing all creative, performing, technical and other personnel; filming and/or taping, and editing all materials; securing all requisite music, literary and other proprietary rights and interests; providing and/or securing necessary animation; securing studio facilities, including all sets; securing all necessary laboratories;   and securing all necessary contractors. Notwithstanding the foregoing, the following items shall, if requested by Hasbro in writing, be subject to the prior written approval of Hasbro: story outlines and teleplays; teleplay writers and the terms of the writers' agreements; final budget; production and shooting schedules; all musical materials, composers, lyricists, and music publishers; the place or places at which the Programs shall be produced; the laboratory to perform the production printing and the terms of the agreement with such laboratory; directors, principal artists and/or talent, editors, and the terms of their respective employment agreements.

Paragraph C

(2)   Sunbow may subcontract certain portions of the production work for the Programs to one or more contractors, provided that Hasbro provides its advance written approval of each particular contractor, which approval Hasbro agrees not to withhold unreasonably.   Hasbro hereby approves TMS, Marvel Productions, Ltd. and/or an affiliate of the Marvel Entertainment Group as a contractor to provide teleplays, voiceovers, and/or animation for any Programs produced before September 1, 1988.

(3)   Sunbow agrees that at the request of Hasbro, it shall retain and consult with a child psychologist or psychiatrist to review the story outlines of any Program or Programs and/or any public service messages.

(4)   Sunbow hereby warrants and represents that, upon completion of production, editing, and delivery, the Programs shall be free and clear of any and all claims, liens and encumbrances whatsoever, other than residual and supplemental market fees payable under applicable collective bargaining agreements, and any performing rights royalties payable to Performing Rights Societies such as ASCAP and BMI.

(5)   Sunbow shall maintain with respect to the Programs, for the benefit of Sunbow and Hasbro as their interests may appear, such negative and cast insurance and liability and property damage insurance and other insurance as Hasbro may deem reasonably necessary.   Sunbow shall carry Worker's Compensation Insurance for the benefit of Sunbow's employees and shall indemnify and hold Hasbro harmless against any and all claims, actions, liability, judgments, costs and expenses (including attorneys' fees and disbursements) which may be asserted by or on behalf of any such employee by reason of injury or death arising out of or in the course of his employment; or by or on behalf of any party by reason of accident, injury, death or property damage resulting from any negligence or fault on the part of Sunbow or its agents, representatives or employees.

(6)   Sunbow shall keep and maintain, at its principal office in New York City, books and records with respect to the production of the Programs and, at Hasbro's request, shall furnish Hasbro with all documents reflecting receipts by Sunbow and expenses and charges incurred by Sunbow in connection with the production of the Programs.   Not later than ninety (90) days following the completion of the last Program, Sunbow will render to Hasbro a final production cost statement with respect to all of the Programs

Paragraphs C-D

contemplated by the PLA. Hasbro or its authorized agent or agents, at Hasbro's expense, shall have the right upon reasonable notice, during normal business days and hours, to examine the books, records, and other documents of Sunbow as they relate to the production of the Programs and to make copies and take excerpts therefrom. Sunbow shall cooperate with Hasbro's auditors to the fullest extent, and shall furnish such auditors with all books, records and other documents and materials relating to the Programs as Hasbro's auditors may reasonably request.

(7)  The payment to Sunbow set forth in Paragraph 4(a) of the PLA shall be increased by the costs of reformatting approved in writing by Hasbro and by the costs incurred during the Initial Telecast Term (as defined in Paragraph 5 of the PLA), in the Territory (as defined in Paragraph 10 of the PLA), in excess of those set forth in the exhibits to the PLA of (i) sales expenses, (ii) distribution fees and commissions and distribution expenses, and (iii) all residual fees by reason of free television telecasts and all fees required to be paid under applicable collective bargaining agreements, so long as, in each such case, the reasons giving rise to any such excess have been approved by Hasbro in advance and in writing.

D.  Distribution.

(1)  All rights to distribute the Programs, including, without limitation, the right to sell or otherwise dispose of time acquired in so-called "barter" transactions, in any and all media, whether now known or hereafter created (and including, without limitation, free television, as defined herein, pay cable television, direct broadcast satellite, SMATV and any form of pay or subscription television, theatrical distribution, and home videocassette and home videodisc ["videogram"] distribution) shall reside exclusively in Sunbow in perpetuity, subject always to the terms and conditions of the Agreement and provided Sunbow is not in material breach thereof.  Sunbow agrees to utilize the services of Claster Television Productions ("Claster") to distribute the Programs as Sunbow's Agent, on terms agreeable to Hasbro and Sunbow, in the United States of America over so-called "free television", that is, by means of television signals received over the air for home use through ordinary television receivers and without charge therefor, so long as Hasbro requests Sunbow to so utilize Claster's services, during both the Initial Telecast Term and the Subsequent Term.

SUN 421

Paragraphs D-E

(2)   Sunbow shall have the right to enter into agreements with
stations, networks, sponsors, subdistributors, cable and cable television
services, videogram distributors, exhibitors and others to license rights in
the Programs as provided in the Agreement; provided, however, that any
agreement(s) with a free home over-the-air national television network or with
a major free cable television network or service or major pay cable television
network or service, major over-the-air pay television network or service, or
any pay-per-view telecast network or service, or any sponsors of the Programs
selected by Sunbow, or any videogram distributor, subdistributor or retailer,
shall be subject to Hasbro's prior written approval; and, provided further,
however, that Sunbow shall consult with Hasbro at every stage of negotiation
toward any agreement for videogram distribution or exhibition of the Programs;
and, further provided that in the event Hasbro determines, in its absolute
discretion, that it or one of its subsidiary or affiliated companies should
license rights in the Programs outside of the United States, its territories
and possessions, the Programs shall be licensed by the designated company and
the resulting license and other fees resulting therefrom shall be paid to
Hasbro or its subsidiary or affiliated company and appropriate adjustments
shall be made so that "Distribution Proceeds" as defined in Paragraph H(3)(c)
shall not be reduced by any such licensing arrangements.  In any event, any
licensing of rights in the Programs outside of the United States, its
territories and possessions, shall always be subject to Hasbro's prior written
approval.

E.   Clearance.  Sunbow, through Claster, as its agent (or through other
agent(s) designated by Sunbow in the event Claster is not so designated by
Hasbro), shall have the responsibility during the Initial Telecast Term to
clear the commercial spots that become available to Hasbro or cause such spots
to be cleared in not less than seventy percent (70%) of the television markets
in the United States as measured by the Nielsen Television Index.  Sunbow will
not be in breach of this Section unless less than seventy percent (70%) of
such markets are the subject of clearances during the Initial Telecast Term
for a period of more than thirty (30) consecutive days or more than an
aggregate of thirty (30) business days in any calendar year.

SUN 422

Paragraphs F-G

F.  Third Party Participation.   Sunbow, subject to Hasbro's prior
written approval, may grant shares of Domestic and/or International General
Revenues, Music Performance Royalties, Total Revenues, and/or Distribution
Proceeds from the distribution of the Programs to persons and other entities
furnishing services and/or materials in connection with the Programs.  (Any
such person or entity is referred to as a "Third Party Participant.")  Sunbow
warrants and represents that any and all agreements and transactions which it
enters into with any Third Party Participants will be at arms length and
consistent with good business practices in the entertainment industry to
maximize Hasbro's share of Distribution Proceeds pursuant to Paragraph I(6).
Sunbow shall provide Hasbro with full and complete copies of any and all
agreements which are entered into with a Third Party Participant within ten
(10) days after the full execution of the same.  Sunbow shall be solely
responsible and liable for any and all payments due to any such Third Party
Participant unless otherwise specifically agreed in writing by Hasbro.

G.  Ownership.

(1)  Subject to the terms and conditions of the Agreement, as
between Sunbow and Hasbro, the Programs, including, but not limited to, the
copyrights and renewals thereof and all rights in and to the Programs and the
underlying literary, dramatic and musical material upon which the Programs are
based, and the Properties and material used in the Programs, shall be owned by
Hasbro perpetually throughout the universe.  While the copyrights in the
Programs may be held in Sunbow's name, Sunbow shall hold all such copyrights
in trust for the benefit of Hasbro, and shall maintain their registration and
recordation at the United States copyright office in Washington D.C. and at
various foreign copyright offices, with the understanding that, upon Hasbro's
written request, such copyrights shall be assigned to Hasbro or Hasbro's
designee, subject to the distribution rights granted to Sunbow herein.  In
recognition of said trust, Sunbow shall sign and file with the United States
copyright office in Washington, D.C., and shall deliver to Hasbro for filing
at whatever foreign copyright offices as may be requested by Hasbro, the
"NOTICE OF COPYRIGHT OWNERSHIP" in the form attached hereto as Exhibit A.  In
the event that Sunbow fails to make such assignment, then Sunbow hereby

Paragraph G

appoints Hasbro to be Sunbow's irrevocable attorney-in-fact with all requisite
powers to execute such assignment of copyrights from Sunbow to Hasbro or its
designee and to deliver any such assignment to Hasbro for recordation in the
copyright office in Washington D.C. and any foreign copyright office as may be
determined by Hasbro.  Insofar as the copyrights are held in trust for Hasbro
by Sunbow, all prints of each of the Programs shall contain the following
notice of copyright placed there by Sunbow:

> " © 19__ (year of first publication) Sunbow Productions, Inc.  All
> Rights Reserved."

(2)    Sunbow recognizes the great value of the good will associated
with Hasbro's Property trademarks and acknowledges that the Property name has
a secondary meaning in the mind of the public.  All uses of the Property
trademarks will inure to Hasbro's benefit, and Sunbow acknowledges that Hasbro
is the exclusive owner of all Property trademarks and any and all trademarks
created by Sunbow's use of the Property hereunder.  If requested in writing by
Hasbro, Sunbow shall place trademark designations at the end of the credits of
each Program in order to protect Hasbro's trademarks in the Property
underlying such Program, in substantially the following form:

> "[PROPERTY TRADEMARK], its logo, and all associated characters are
> trademarks owned by and used under license from HASBRO, INC.
> © 19__ (year of first publication) HASBRO, INC.  All Rights
> Reserved."

(3)    Sunbow, Starwild, and Wildstar acknowledge that Hasbro is sole
owner in perpetuity throughout the Universe of all musical compositions
initially produced and/or created for use, publication and/or performance in
connection with the Programs ("Compositions"), including, but not limited to,
all right, title and interest in and to the copyrights, the right to copyright
and any renewal rights, therein and thereto.  Notwithstanding the foregoing,
the Compositions may be registered for copyright in the name of STARWILD
MUSIC, INC. in the event that the songwriter of the Composition is affiliated
with EMI, and in the name of WILDSTAR MUSIC, INC. in the event that the

SUN  424

Paragraph G

songwriter of the Composition is affiliated with ASCAP. Starwild and Wildstar may act as publishers of the Compositions, but in no event shall Sunbow, Starwild or Wildstar permit any third party (other than Hasbro, or a Hasbro affiliate or other designee upon Hasbro's prior written approval) to share in the ownership of the copyrights or publishing interest in the Compositions, unless otherwise specifically agreed in writing by Hasbro. Hasbro may, in its sole discretion, designate a third party to act as publisher, editor, and/or copyright owner of any Compositions outside of the United States of America and its territories and possessions, but the "Net International Music Performance Royalties" (as defined in Paragraph H(2)(b) below) from any use, publication and/or performance of Compositions shall remain included in "International General Revenues" (as defined in Paragraph H(2)(a) below). Sunbow, Starwild and Wildstar shall execute any further documents including, without limitation, assignments of copyrights, and do all acts necessary to effectuate fully the terms and provisions of this Agreement. Moreover, Sunbow fully guarantees the performance of Starwild and Wildstar under the terms and conditions of the Agreement, and agrees to indemnify and hold harmless Hasbro and its affiliates from and against any claims, actions, loss, damage, liability, judgments, costs and expenses (including reasonable attorneys' fees and disbursements) sustained and/or incurred by Hasbro and/or its affiliates by reason of any failure of Starwild and/or Wildstar to abide by the terms hereof.

(4)  Statements.  Sunbow agrees to use its best efforts, in its employment or other agreements with all persons or entities participating in the production of, performing services in respect of, and appearing in, the Programs, to obtain all rights in and to the results and proceeds of such person's services in any and all media, either now known or hereafter devised, perpetually throughout the universe and to pay any such person's residuals at minimum scale under applicable collective bargaining agreements. Sunbow further agrees, subsequent to completion of production, to assign in writing all such employment agreements and all rights thereunder to Hasbro, upon the request of Hasbro, free and clear of all claims, liens and/or encumbrances, subject to applicable collective bargaining agreements. In the event that, subject to applicable collective bargaining agreements, Sunbow cannot obtain all rights in perpetuity throughout the universe from any such person or

SUN 425

Paragraphs G-H

entity, free of all claims, liens or encumbrances, or any such person or entity demands residuals in excess of minimum scale under applicable collective bargaining agreements, Sunbow will so advise Hasbro and will not enter into an agreement with such person or entity unless Hasbro provides written approval of the limited grant of rights or over-scale payments.

H. **Accounting Definitions**.

(1) **Domestic Transactions**.

(a) "Domestic General Revenues" means all royalties, advances, guarantee payments, proceeds from favorable dispute settlements, and all other proceeds and consideration from all sources (other than those set forth in Paragraphs H(1)(b)-(c)) derived from the license, lease, rental, exploitation, distribution or other disposition of the Programs, or the Compositions separate from the Programs, in the United States of America and its territories and possessions, including, but not limited to, videogram distribution, pay cable distribution (i.e., the telecast of the Programs on non-broadcast services such as HBO, SIN, CBN, Showtime, ESPN, etc.), and including any distribution of the Compositions, separately from the Programs, on tapes, records, cassettes, compact discs, or other media in the United States of America, its territories and possessions. Domestic General Revenues shall exclude: the "Barter Media Value" (as defined in Paragraph I(7) below) of commercial time utilized and paid for by Hasbro or its affiliates; the monies to be paid to Hasbro pursuant to Paragraph 5 of the PLA, i.e., any monies paid by television stations for carrying the Programs in the Initial Telecast Term and any Subsequent Term (which monies shall be paid to Hasbro); and Hasbro's payment for the Programs pursuant to Paragraph 4(a) of the PLA.

(b) "Net Domestic Cable Royalties" means the gross amount of royalties distributed by the Copyright Royalty Tribunal pursuant to the 1976 Copyright Revision Act (17 USC Sec. 101, et seq.; P.L. 94-553) in consideration for the simultaneous retransmission of the Program by cable television systems, less a twenty percent (20%) commission retained by Claster Television, Inc. as the U.S. distributor of the Program.

(c) "Net Domestic Music Performance Royalties" means (i) the gross amount of the publisher's share of music performance royalties, mechanical royalties, advances, and other consideration paid by any music

SUN 426

Paragraph H(1)

publishing company or "Music Publishing Society" (as defined below) in connection with the use, publication, and/or performance within the United States of America and its territories and possessions, of those musical compositions initially produced and/or created for use, publication and/or performance in connection with the Programs ("Compositions"), (ii) less any administration fees, expenses, and/or commissions which have been specifically authorized by Hasbro to be paid to a Third Party Participant. Net Domestic Music Performance Royalties shall exclude any royalties or consideration paid by a Music Publishing Society in connection with the use, publication and/or performance of any such Compositions as commercial jingles, and/or which are used, published, and/or performed solely for promotional or ad-related purposes. "Music Publishing Society," as used herein, is to be construed in accordance with its customary meaning in the industry and may include, without limitation, so-called "Performing Rights Societies" such as ASCAP and BMI, as well as so-called "Mechanical Societies" such as SDRM in France.

(d) "Domestic Total Revenues" means the sum total of Net Domestic Cable Royalties, Net Domestic Music Performance Royalties, and Domestic General Revenues.

(e) "Sunbow Domestic Variable Expenses" means all reasonable costs and fees paid by Sunbow in connection with its distribution of the Programs, or the Compositions separate from the Programs, in the United States of America and its territories and possessions, including (i) the cost of manufacturing, shipping, and storing negatives, prints, videotapes, videocassettes, and videodiscs of the Programs created for television exhibition and home video licensing, sale, and distribution, (ii) reasonable advertising and promotion expenses paid by Sunbow in connection with the licensing, sale, and distribution of the Programs, (iii) reasonable travel expenses paid by Sunbow in connection with the licensing, sale, and distribution of the Programs, to the extent such expenses are incurred in accordance with the most current "Hasbro Corporate Travel Policy" (a copy of which Sunbow acknowledges receipt), (iv) supplemental market fees, union payments and residual and reuse fees other than those union payments and residual and reuse fees paid in connection with the syndication of the Programs over free television in the United States for the "Initial Telecast Term" and/or the "Subsequent Term", as such terms are defined in the PLA, and

SUN 427

Paragraph H(1)-(2)

(v) reasonable expenses incurred in redressing breaches of, or enforcing contracts with home video distributors/subdistributors, or television stations, distributors and/or subdistributors, or bringing suits and/or actions regarding any infringements of the Property and/or Program, to the extent such expenses are not recouped from any favorable settlement or judgment.

Notwithstanding anything to the contrary in this subparagraph (e), Sunbow Domestic Variable Expenses shall not include any costs, expenses, and/or fees which pertain to free television syndication of the Programs in the United States and its territories and possessions in either the Initial Telecast Term or any Subsequent Term. Such costs, expenses and/or fees for the Initial Telecast Term shall be solely covered by Paragraph 4 of the PLA, and any such costs, expenses and/or fees for any Subsequent Term shall be covered by an amendment to the PLA, notwithstanding the fact that they may be referenced in any manner whatsoever in this subparagraph. Any cost for television distribution, as contrasted with costs for production, of the Programs in the United States which exceeds that amount authorized pursuant to Paragraph 4(a) of the PLA (or any amendment thereto for any Subsequent Term) shall be borne solely by Sunbow and shall not be subject to recoupment hereunder unless specifically authorized by Hasbro by means of a written amendment to the PLA.

(f) "Domestic Net Proceeds" means Domestic Total Revenues less Sunbow Domestic Variable Expenses.

(2) <u>International Transactions</u>.

(a) "International General Revenues" means all royalties, advances, guarantee payments, proceeds from favorable dispute settlements, and all other proceeds and consideration from all sources (other than those set forth in Paragraph H(2)(b) below) derived from the license, lease, rental, exploitation, distribution or other disposition of the Programs, or the Compositions separate therefrom, outside of the United States of America and its territories and possessions, including, but not limited to, videogram distribution, television distribution, pay cable distribution, and including any distribution of the Compositions separately from the Programs, on tapes, records, cassettes, compact discs, or other media outside of the United States of America and its territories and possessions. In the event of a worldwide

SUN 428

Paragraph H(2)

deal involving the Program and/or the Compositions, all revenues therefrom shall be treated as International General Revenues. International General Revenues shall also include any foreign revenues which are blocked or otherwise prevented from being remitted to the United States as a result of any foreign law and which are, upon Hasbro's instruction, paid to Hasbro's designee in such foreign country or deposited to the account of Hasbro's designee in a bank designated by Hasbro in such country. The value of any such blocked funds shall be determined in accordance with the interbank exchange rate on the last day of the relevant accounting period, ending either June 30 or December 31, at Citibank, 399 Park Avenue, New York, New York 10043.

(b)  "Net International Music Performance Royalties" means (i) the gross amount of the publisher's share of music performance royalties, mechanical royalties, advances, and other consideration paid by any music publishing company or Music Publishing Society, including Performing Rights Societies such as SACEM in France, or Mechanical Societies such as SDRM in France or MCPS in England, in connection with the use, publication, and/or performance outside of the United States of America and its territories and possessions, of the Compositions, (ii) less any administration fees, expenses, and/or commissions which have been specifically authorized by Hasbro to be paid to a Third Party Participant. Net International Music Performance Royalties shall exclude any royalties or consideration paid by a Music Publishing Society in connection with the use, publication, and/or performance of any such Compositions as commercial jingles, and/or which are used, published, and/or performed solely for promotional or ad-related purposes, and shall exclude the writer's and/or composer's share of music performance royalties and/or mechanical royalties.

(c)  "International Total Revenues" means the sum of International General Revenues and Net International Music Performance Royalties.

(d)  "Sunbow International Variable Expenses" ("SIVE") means all reasonable costs and fees paid by Sunbow in connection with the distribution of the Programs, or the Compositions separate therefrom, outside of the United States of America, its territories and possessions. Such Sunbow International Variable Expenses include, but are not limited to: (i) the cost of manufacturing, shipping, and storing negatives, prints, videotapes,

Paragraph H(2)

videocassettes, and videodiscs of the Programs created for television exhibition and home video licensing, sale, and distribution, (ii) reasonable advertising and promotion expenses paid by Sunbow in connection with the licensing, sale, and distribution of the Programs, (iii) reasonable travel expenses paid by Sunbow in connection with the licensing, sale, and distribution of the Programs, to the extent such expenses are incurred in accordance with the most current "Hasbro Corporate Travel Policy" (a copy of which Sunbow hereby acknowledges receipt), (iv) supplemental market fees, union payments and residual fees, (v) reasonable expenses incurred in redressing breaches of, or enforcing contracts with home video distributors/subdistributors, or television stations, distributors, and/or subdistributors, or bringing suits and/or actions against any infringements of the Property and/or Program, to the extent such expenses are not recouped from any favorable settlement or judgment, (vi) costs of translating the dialogue of the Programs into foreign languages and inserting subtitles or dubbing the foreign language soundtrack, including music synchronization license fees for the dubbed music, (vii) taxes, excluding income taxes, paid by or on behalf of Sunbow to governmental authorities as a result of the licensing, distribution, exploitation and/or sale of the Programs, for which Sunbow does not receive a credit against its income taxes, (viii) expenses incurred in adapting the program content (as opposed to the soundtrack only) for distribution outside of the United States, its territories and possessions, and (ix) commissions paid to third party representatives, who have been approved in writing by Hasbro, as a commission for rendering services in the negotiation and consummation of the foreign licensing, sale and/or distribution of the Programs. All such expenses must be approved by Hasbro in accordance with the Annual Sunbow Budget review, as discussed in Paragraph J, below.

(e)    "Sunbow International Fixed Expense" means that portion of all overhead and operating costs and expenses of the international division of Sunbow (the sum total of which has been specifically authorized by Hasbro) which is allocated to the Programs. The Sunbow International Fixed Expense ("SIFE") shall be determined for the Programs by dividing (i) the sum of the SIVE and the International Total Revenue for the Programs (for the relevant accounting period) by (ii) the sum of the aggregate SIVE for all programs produced by Sunbow for Hasbro, pursuant to this and other agreements ("Other

SUN 430

Programs"), and the aggregate International Total Revenue for all Other Programs during the same accounting period, and multiplying the resulting percentage by the sum total of all overhead and operating costs and expenses of Sunbow's international division for the same period.

"All overhead costs and expenses" as used herein shall include the costs of salaries, indirect salaries, payroll taxes, group insurance, outside consultants, conventions, telephone, telex, utilities, office rent, data processing, postage, freight and delivery, office supplies, and general insurance. Such expenses must be pre-approved by Hasbro in accordance with the Annual Sunbow Budget review, as discussed in Paragraph J, below.

(f)    "Hasbro International Fixed Expense" means that portion of particular overhead and operating costs and expenses incurred by Hasbro and its affiliates (including Milton Bradley International, Inc.) which is allocated to the Programs. The Hasbro International Fixed Expense shall be determined for the Program by dividing (i) the sum of the SIVE and the International Total Revenues (for the relevant accounting period) by (ii) the sum of the aggregate SIVE, for this and "Other Programs" (as defined above), and the aggregate International Total Revenues for this and Other Programs during the same period, and multiplying the resulting percentage by the sum total of those particular overhead and operating costs and expenses of Hasbro for the same period. Hasbro's particular overhead and operating costs and expenses that are to be included in the foregoing definition shall be subject to the mutual agreement of Hasbro and Sunbow during the Annual Sunbow Budget review. Such overhead costs and expenses shall include, for example, those incurred by Hasbro in relation to the administration of particular legal, business, and financial aspects of Sunbow's international operations, including salaries, fringe benefits, travel expenses, management information systems support, telephone, telex, and postage expenses.

(g)    "International Net Proceeds" means (i) International Total Revenues less (ii) the sum of Sunbow International Variable Expenses, Sunbow International Fixed Expense, and Hasbro International Fixed Expense.

(3)    Revenue Distribution.

(a)    "Costs of Production" means all direct costs of producing and completing the Program as budgeted and authorized pursuant to

Paragraphs H-I

the PLA, including, without limitation, animation costs, sales taxes, script/teleplay costs, talent costs (including all performing, creative, technical and other personnel), studio costs, so-called "below-the-line" costs, costs of music, costs and fees of contractors, costs of sets, Sunbow's Production Fee Percentage (as defined in Paragraph 8 of the PLA), legal fees paid by Sunbow in regard to contract negotiation(s) related to the Programs, insurance fees in relation to the Programs, talent holding costs, costs of travel in connection with the production of the Program and all other costs paid by Sunbow in connection with the production of the Program, but excluding "supplemental market" payments to or on behalf of performing artists and excluding distribution costs.

(b)  "Hasbro Reimbursement" means three percent (3%) of the Costs of Production, which amount shall be considered a preferential distribution to Hasbro of the total of Domestic Net Proceeds and International Net Proceeds.

(c)  "Distribution Proceeds" means the total of Domestic Net Proceeds and International Net Proceeds, less the Hasbro Reimbursement.

I.  Accounting and Transfer of Monies.

(1)  Costs of Production.  The Costs of Production of the Program shall be advanced by Hasbro to Sunbow in accordance with the terms set forth in the PLA.  If not otherwise specified in the PLA, Sunbow will issue invoices to Hasbro for payment of the various items included in the Costs of Production as such expenses are incurred.  Within thirty (30) days of its receipt of any such proper invoice, Hasbro will send Sunbow monies for full payment of such invoice.  In the event Hasbro advances and/or pays Sunbow for any Cost of Production which is not paid by Sunbow to the relevant third party creditor within one hundred eighty (180) days of Sunbow's receipt of such Hasbro payment, Sunbow shall immediately refund such payment in full to Hasbro upon the expiration of said one hundred eighty (180) day period, with interest calculated thereon at the prime rate; provided, however, that any payments owed to Marvel Productions, Ltd. shall not be subject to this provision.

(2)  Domestic Revenues.

(a)  Net Domestic Cable Royalties.  Claster Television, Inc. ("Claster") shall make application for and shall collect all Domestic Cable

-16-

Paragraph I(2)

Royalties payable as a result of Claster's syndication of the Program. Claster shall be entitled to retain, as a commission for its collection services, twenty percent (20%) of one hundred percent (100%) of the gross amount of royalties distributed by the Copyright Royalty Tribunal. The balance of said royalties ("Net Domestic Cable Royalties") shall, for purposes of the Agreement, be deemed received by Hasbro.

(b)  Net Domestic Music Performance Royalties.

(i)  Starwild and Wildstar, as publishers of the Program Compositions, shall collect from BMI and ASCAP, respectively, all monies payable to the music publisher(s) as a result of any and all uses, publications and/or performances of the Compositions in the United States and its territories and possessions.  Starwild and Wildstar shall thereafter pay any and all administration fees, expenses and/or commissions to any relevant Third Party Participant pursuant to the terms of the agreement with such Third Party Participant (hereinafter "Third Party Agreement").  The balance shall be paid by Starwild and Wildstar to Sunbow before the end of the calendar quarter in which it is received by Starwild and/or Wildstar.

(ii)  Sunbow shall retain twenty percent (20%) of all Net Domestic Music Performance Royalties received as an advance against Sunbow's share of the Distribution Proceeds.  (Any advance against Sunbow's share of Distribution Proceeds is hereinafter referenced as "Sunbow Share Advance.")

(iii)  In the event that a Third Party Participant is entitled to a share of Distribution Proceeds, Sunbow shall also retain a percentage of Net Domestic Music Performance Royalties, equal to the percentage of Distribution Proceeds to which such Third Party Participant is entitled pursuant to the relevant Third Party Agreement (hereinafter referenced as "Third Party Percentage").  All Third Party Participant percentage shares so withheld by Sunbow shall constitute an advance against such Third Party Participant's share of Distribution Proceeds that will be subsequently calculated for Sunbow's payment to such Third Party Participant pursuant to Paragraph F hereof (hereinafter referenced as "Third Party Share Advance").

(iv)  The balance of Net Domestic Music Performance Royalties, remaining after deduction of the percentage amounts referenced in

Paragraph I(2)–(3)

Subparagraphs (ii)–(iii), shall be paid to Hasbro by Sunbow within forty-five (45) days of the end of each calendar quarter, and shall be accompanied by a statement enumerating all receipts and deductions permitted therefrom.

(c)    Domestic General Revenues.

(i)    Sunbow shall collect all Domestic General Revenues and shall deduct therefrom all Sunbow Domestic Variable Expenses attributed to the Program. Sunbow shall retain twenty percent (20%) of the balance of all Domestic General Revenues received as a Sunbow Share Advance.

(ii)    In the event that a Third Party Participant is entitled to a share of Distribution Proceeds, Sunbow shall also retain, after the deduction of Sunbow Domestic Variable Expenses, the Third Party Percentage as a Third Party Share Advance.

(iii)    The balance of Domestic General Revenues, remaining after deduction of the percentage amounts referenced in Subparagraphs (i)–(ii), shall be paid to Hasbro by Sunbow within forty-five (45) days of the end of each calendar quarter, and shall be accompanied by a statement enumerating all receipts and deductions permitted therefrom.

(iv)    In the event Hasbro collects any Domestic General Revenues from any third party, it shall pay Sunbow twenty percent (20%) of such monies as a Sunbow Share Advance, along with any applicable Third Party Percentage of such monies as a Third Party Share Advance, within thirty (30) days of its receipt thereof.

(v)    Unless otherwise specified in the PLA, and subject to Paragraph I(7) below in regard to the Subsequent Term, Hasbro shall receive one hundred percent (100%) of all monies paid by television stations in consideration for carrying the Program ("Station Revenue"). In the event Sunbow collects any such Station Revenue, it shall pay Hasbro same within thirty (30) days of its receipt thereof.

(3)    International Revenues.

(a)    MBI shall collect all International General Revenues and Net International Music Performance Royalties, unless otherwise directed by Hasbro in its absolute discretion.

(b)    In the event Sunbow collects any International General Revenues and/or Net International Music Performance Royalties, it shall pay MBI one hundred percent (100%) of such monies within thirty (30) days of its receipt thereof.

SUN 434

Paragraph I(4)-(6)

(4)   International Expenses.

(a).   Sunbow shall invoice Hasbro for all Sunbow International Variable Expenses and Sunbow International Fixed Expenses on a monthly basis. Hasbro shall pay Sunbow all amounts due pursuant to such invoices within forty-five (45) days of its receipt of such invoices. In the event Hasbro pays Sunbow for any invoiced amount which is not subsequently paid by Sunbow to the relevant third party creditor within one hundred eighty (180) days of Sunbow's receipt thereof, Sunbow shall immediately refund such payment in full to Hasbro upon the expiration of said one hundred eighty (180) day period.

*[handwritten margin note: delete by 1st Amend]*

(b)   At such time as the Distribution Proceeds are calculated pursuant to Paragraph I(6), the Sunbow International Variable Expenses, Sunbow International Fixed Expenses, and Hasbro International Fixed Expenses shall be deducted from International Total Revenues, and Domestic Total Revenues if needed, in determining International Net Proceeds pursuant to the definition set forth in Paragraph H(2)(g).

(5).   Hasbro Reimbursement. The Hasbro Reimbursement shall be paid to Hasbro at the time Distribution Proceeds are calculated.

(6)   Distribution Proceeds.

(a)   Within sixty (60) days following each semi-annual period ending June 30 and December 31, "Distribution Proceeds" for the preceding semi-annual period shall be calculated in accordance with the definitions set forth in Paragraph H, and the parties shall receive the following percentages of the Distribution Proceeds:

(i)   Sunbow shall receive twenty percent (20%) of the Distribution Proceeds ("Sunbow Share");

(ii)   Hasbro shall receive eighty percent (80%) of the Distribution Proceeds, unless a Third Party Participant is entitled to receive a percentage thereof pursuant to Paragraph F. In such event, Hasbro shall receive eighty percent (80%) of the Distribution Proceeds less the Third Party Percentage. (Hasbro's percentage share, in either event, is referenced as "Hasbro Share.")

(iii)   In the event of a Third Party Participant, Sunbow shall receive any Third Party Percentage of Distribution Proceeds ("Third Party Share") and shall pay such amount to the Third Party Participant in accordance with the applicable Third Party Agreement.

-19-

Paragraph I(6)-(7)

(b)   In the event that the sum of the Sunbow Share and Third Party Share exceeds the sum of the Sunbow Share Advance and Third Party Share Advance previously retained by Sunbow, then Hasbro shall pay Sunbow, within sixty (60) days after the close of the semi-annual period ending June 30 and December 31, that amount by which the sum of the Sunbow Share and Third Party Share exceeds the sum of the Sunbow Share Advance and Third Party Share Advance, and Hasbro shall retain the balance as the Hasbro Share.

(c)   In the event that the sum of the Sunbow Share and Third Party Share is less than the sum of the Sunbow Share Advance and Third Party Share Advance, then Sunbow shall pay Hasbro, within sixty (60) days after the close of the semi-annual period ending June 30 and December 31, that amount by which the sum of the Sunbow Share and Third Party Share falls short of the sum of the Sunbow Share Advance and Third Party Share Advance previously retained by Sunbow.

(d)   The parties shall provide one another with all information pertinent to the calculation of Distribution Proceeds and the division of shares therefrom, and Hasbro shall provide a statement to Sunbow, detailing the aforesaid calculations, within forty-five (45) days after the close of each semi-annual period ending June 30 and December 31.

(7)   <u>Sunbow Compensation and Barter Spots in Subsequent Term</u>. During the "Subsequent Term" (as defined in Paragraph 6 of the PLA) only:

(a)   Hasbro will pay Sunbow ten percent (10%) of sixty-five percent (65%) of the "Barter Media Value" (as such term is defined below) of all commercial time granted to Hasbro by a television station in consideration for the right to telecast the Program (all such commercial time herein referenced as "Barter Spots"), which Barter Spots are utilized directly by Hasbro or any affiliated company on television stations.

(b)   Hasbro will pay Sunbow ten percent (10%) of sixty-five percent (65%) of Station Revenue (as defined in Paragraph I(2)(c)(v)). The balance of Station Revenue shall be received by Hasbro, and no such Station Revenue shall be included in Domestic General Revenues.

(c)   In the event that Barter Spots are sold to a third party, all monies received from such sale shall be included in Domestic General Revenues.

Paragraph I(7)

(d)   In the event that Hasbro both pays a television station (such payment referenced herein as "Station Compensation") and grants a television station the right to telecast the Program in consideration for Barter Spots, then Hasbro will pay Sunbow ten percent (10%) of sixty-five percent (65%) of the Barter Media Value of such Barter Spots, less ten percent (10%) of sixty-five percent (65%) of the amount of Station Compensation.

(e)   Any approved Third Party Participant shall also be entitled to such percentage amount, if any, of the said sixty-five percent (65%) of the Barter Media Value and/or Station Revenue as may be specified in the PLA and in accordance with the relevant Third Party Agreement.

(f)   In determining the "Barter Media Value" of all Barter Spots utilized directly by Hasbro or any affiliated company on television stations as a result of Program syndication in the Subsequent Term, the Number of Household Impressions, as reported by the Nielsen Syndication Service (NSS), of the Program episode containing each Barter Spot will be multiplied by the number of children 2-11 Viewers Per Household level reported in the Nielsen Cassandra Report for the Program to determine the Number of Children Impressions. The February Cassandra Report will be used for all Barter Spots in the First Calendar Quarter of a year, the May Report for all Second Quarter Barter Spots, the July Report for all Third Quarter Barter Spots, and the November Report for all Fourth Quarter Barter Spots. The Number of Children Impressions (in thousands) will then be multiplied by the estimated "Fair Market Value" cost per thousand children 2-11 years of age of spot or local television when bought for the same quarter in one hundred twenty (120) markets. The result will be the cost per thirty (:30) second Barter Spot, i.e., the "Barter Media Value" of each Barter Spot. The "Barter Media Value" of Barter Spots of lengths other than thirty (:30) seconds will be estimated proportionately to the thirty (:30) second "Value." The estimation of Fair Market Value cost per thousand will be made in reasonable consideration of such factors as the season and broadcast time period, and such estimates shall be subject to the mutual agreement of Hasbro and Sunbow.

-21-

(8)    Statement Form.  All statements required to be rendered by one party to another shall be specific in itemizing revenues, expenses, and other relevant information as required pursuant to the terms of the Agreement.  In the event that the Programs contain more than one Property, all revenues, expenses and other monies regarding the Programs shall be allocated to each individual Property on a proportionate basis in accordance with the number of minutes of each such Property within the Programs.

(9)    Records.  Sunbow agrees to keep accurate books of account and records covering all transactions relating to the Agreement and the Programs, and Hasbro and its duly authorized representatives will have the right at all reasonable hours of the day to an examination of said books of account and records and of all other documents and materials in possession or under the control of Sunbow, and Hasbro, upon reasonable notice to Sunbow, will have free and full access thereto for said purposes and for the purpose of making extracts therefrom.  All books of account and records will be kept available for at least two (2) years after the termination of the Agreement.  In the event that Hasbro's duly authorized representatives discover a discrepancy of five percent (5%) or more pursuant to any such examination, Sunbow will pay Hasbro the reasonable cost incurred by Hasbro for conducting such examination.  Payments found to be due as a result of Hasbro's examination of Sunbow's books of account will be paid within thirty (30) days of the date of the audit report with interest at the prevailing Fleet National Bank of Providence, Rhode Island prime interest rate accruing from the date the payment should have been made to Hasbro.

(10)   Late Payments.  Any payments required to be made by one party ("payor") to the other ("payee") pursuant to the terms of the Agreement shall be made within the time period herein specified.  The payor shall be required to pay the payee monthly interest on any late payment(s) at the prevailing Fleet National Bank of Providence, Rhode Island prime interest rate accruing from the date such payment(s) was due under the terms of the Agreement.

SUN 438

Paragraphs J~K

J.    Annual Sunbow Budget.

(1)   Budget Review and Expense Authorization.  On or before January 31 of each calendar year during the term of the Agreement, the designees of Hasbro and Sunbow shall meet to discuss, review and and agree upon the maximum amount of money which Sunbow shall be entitled to recoup as Sunbow International Variable Expenses and Sunbow International Fixed Expenses during that calendar year (hereinafter "Budgeted Amounts"), as well as to determine the amount of Hasbro's overhead and operating costs that will be included in the Hasbro International Fixed Expenses (Paragraph H.(2)(f)) for that calendar year. The amount of such expenses allowed as a result of such review shall be subject to a quarterly review by Hasbro, at which time Hasbro and Sunbow may agree to amend the Budgeted Amounts.

(2)   Cost Overruns.  In the event that any expenses incurred by or on behalf of Sunbow exceed the Budgeted Amounts, the excess amount of such expense shall be Sunbow's full responsibility and liability, and shall not be recoupable hereunder.  Similarly, any costs and expenses incurred by Hasbro in excess of the Budgeted Amounts of Hasbro International Fixed Expenses shall be Hasbro's full responsibility and liability, and shall not be recoupable hereunder.

K.    Investment Tax Credit.  It is agreed that Hasbro will acquire an equity interest in the Programs under the Agreement through its contribution of the total investment to be made in their production and distribution. Hasbro's investment will be "at risk" under the Agreement in that recoupment of the funds contributed by Hasbro is uncertain and dependent upon the commercial success of the Programs. It is therefore agreed that Hasbro will be authorized to claim an investment tax credit to the extent allowed Hasbro under the Internal Revenue Code for all such investments made by Hasbro. Sunbow agrees not to make any claim inconsistent with the provisions of this paragraph on its federal tax returns.  Sunbow further agrees to furnish to Hasbro, promptly after production of the Programs are completed, but not later than sixty (60) days after such completion, a report explaining Sunbow's use of the funds paid by Hasbro under the Agreement and setting forth the amount of any expenditures made in foreign countries.

Paragraphs L–M

L.   <u>Representations and Warranties</u>. Except as provided in the PLA:

(1)   Hasbro represents that it owns and/or controls the Property and all copyright and trademark rights therein and the rights granted herein, that the Property and additional characters which may hereafter be created by Hasbro and to be used in the Programs will not violate or infringe the rights whatsoever of any person, firm, corporation, or other entity and will not constitute a libel or slander of any person, firm or corporation or other entity.

(2)   Sunbow represents and warrants that any materials created by Sunbow, and, to Sunbow's best knowledge any materials created by any Third Party Participant and used in the Programs, will not violate or infringe the rights whatsoever of any person, firm, corporation or other entity and will not constitute a libel or slander of any person, firm, corporation or other entity. Sunbow furthermore represents and warrants that all residual, re-use, supplemental market, and other applicable union fees will be paid by or on behalf of Sunbow in respect of the Programs.

M.   <u>Indemnity and Insurance</u>.

(1)   Each party agrees to indemnify and hold harmless the other party and its respective agents, affiliated and subsidiary companies, officers, directors, shareholders and employees, from and against any and all claims, liabilities, actions, judgments, damages, costs and expenses, including reasonable attorneys' fees and disbursements, by reason of any breach by such party of any of its representations, warranties, and agreements made pursuant to the Agreement.

(2)   Sunbow agrees to secure and maintain for coverage of all of the Programs, a standard Producer's Errors and Omissions insurance policy ("E&O Policy"), with coverage of at least $1,000,000/$3,000,000, for at least a five-year period beginning with the first telecast of the Programs or until such insurance coverage becomes unavailable or is no longer necessary in the view of both Hasbro and Sunbow. Sunbow agrees to cause Hasbro and Claster to be named as additional named insureds in the E&O Policy and will deliver or cause to be delivered to Hasbro and Claster, before the expiration of sixty (60) days after the execution of the Agreement, a certificate of insurance

Paragraphs M-N

showing Hasbro and Claster as named insureds. The terms of the Errors and Omissions Insurance policy shall be subject to the approval of Hasbro. Such policy shall be an "occurrence" policy and Hasbro shall be given at least thirty (30) days prior written notice of any amendment or modification thereto, or cancellation thereof.

(3)    Notwithstanding anything to the contrary which may be contained in Subparagraph (1) above, if any claim shall be made against Sunbow in respect to the Programs or any rights pertaining thereto, Sunbow shall forthwith advise Hasbro and the insurance carriers in respect of each such claim and abide by Hasbro's instructions with respect thereto. In connection therewith, Sunbow shall not, without the written consent of Hasbro, do or fail to do any act or thing which could adversely affect the rights of Hasbro in any respect whatsoever. Any recovery under any applicable insurance policy shall be paid to Hasbro and to the extent that the loss to which such recovery relates has resulted in an increase in the cost of production of the Programs, such recovery shall be credited to the cost of production thereof.

(4)    All rights and remedies granted to Hasbro hereunder are cumulative, and the exercise of one shall not limit or affect Hasbro's right, concurrently or subsequently, to exercise any other right or remedies and shall be in addition to such other rights or remedies as Hasbro may have at law, in equity, under the Agreement or otherwise.

N.    Litigation.   Hasbro may commence and/or prosecute any claims or suits in its own name to the extent necessary to protect any of Hasbro's rights to the Property and/or the Programs. Any such claim or suit may be commenced or prosecuted in the name of Hasbro, or in the name of Sunbow, or with both Hasbro and Sunbow joined as parties thereto. Sunbow shall notify Hasbro in writing of any infringements by others of the Property and/or the Programs immediately upon Sunbow's gaining knowledge of the same. Hasbro shall have the sole right to determine whether or not any action shall be taken on account of such infringements. Sunbow shall not institute any suit or take any action on account of any such infringements except with the prior written consent of Hasbro. Hasbro shall have the absolute right of control of all aspects of any such suit and/or action, and no such suit and/or action

shall be settled without Hasbro's prior written consent. Upon request of Hasbro, Sunbow will execute all papers, testify on all matters and otherwise cooperate in every way necessary and desirable for the prosecution of any such action or proceeding.

O.  **Miscellaneous.**

(1)  Sunbow and Hasbro each will, from time to time, upon the request of the other, execute, acknowledge and deliver such instruments as may be necessary and proper to evidence, maintain, effectuate or defend any and all rights of Sunbow or Hasbro, as the case may be, under any provision of the Agreement. Should Sunbow or Hasbro, as the case may be, fail to execute, acknowledge or deliver any such supplemental document upon Hasbro's or Sunbow's written request, Hasbro or Sunbow, as the case may be, shall have and is hereby granted, the right for and on behalf of Sunbow and Hasbro, as the case may be, as Sunbow's or Hasbro's attorney-in-fact, to execute, acknowledge and deliver any such document.

(2)  Nothing herein contained shall constitute a partnership between, or joint venture by the parties hereto, or constitute either party the agent of the other.

(3)  No waiver of any breach of any provision hereof shall be deemed a waiver of any preceding or succeeding breach. The Agreement expresses the entire understanding of the parties hereto with respect to the subject matter hereof, and no modification of the Agreement shall be valid or binding unless in writing and signed by the party to be charged therewith.

(4)  No party shall have the right to assign any of its rights under the Agreement or delegate any of its obligations thereunder without the prior written consent of the other, unless (i) the assignment or delegation is to a corporation controlling, controlled by or under the common control with the assignor, or the assignment or delegation is in connection with the sale or disposition of all or substantially all of the assignor's assets, or in connection with a merger or consolidation; (ii) the assignor agrees to remain liable for the full performance of its obligations under the Agreement notwithstanding the assignment; (iii) the assignor gives prompt written notice of the assignment to the other party; and (iv) any such assignment shall be

26

subject to the terms and provisions of the Agreement. Notwithstanding the foregoing, Hasbro shall have the right to assign its share of the proceeds under the Agreement and Sunbow shall have a similar right after all of the Programs have been delivered. Notwithstanding the foregoing, Sunbow's right to assign the Agreement, or any portion thereof, (other than its particular share of proceeds), or to delegate any of its obligations shall be subject to the prior written approval of Hasbro, which approval Hasbro may withhold in its absolute discretion.

(5)   All matters pertaining to the Agreement (including its validity, performance and breach) shall be governed by the laws of the State of New York applicable to contracts made and to be wholly performed in the State of New York.

(6)   Any "first negotiation right" of Sunbow set forth in the PLA shall be effected in the following manner:

Upon the determination by Hasbro to produce and/or distribute or cause the production and/or distribution of additional television programs or any other type of television program, motion pictures (whether theatrical or non-theatrical or otherwise), videograms (including video cassettes, discs, and tapes), programs for pay cable television or pay television, phonograph recordings, or any other project or production in any media, whether now or hereafter known (all of which are collectively referred to as "New Programming") based in whole or in part upon the Property, Hasbro shall so notify Sunbow and shall designate a date (which shall be not less than ten (10) days after the giving of such notice) and the time and place (during normal business hours at either Hasbro's office in Pawtucket, Rhode Island, or at a designated place in the Borough of Manhattan, the City of New York), at which time and place Hasbro and Sunbow shall meet to negotiate the terms and conditions under which Sunbow shall produce and distribute the New Programming. Such negotiations shall continue on a daily basis and shall be carried on in good faith. In the event, however, that after negotiating for a period of five (5) consecutive business days, the parties are unable to reach agreement, Hasbro shall be

-27-

Paragraph 0(6)-(7)

free to negotiate with and accept an offer from a third party to produce and distribute New Programming without any obligation whatsoever to Sunbow.

(7)  Any notice required hereunder shall be in writing and shall be given personally or sent by registered or certified mail, return receipt requested, or by cable or telex or telecopy (if the receiving party has compatible receiving equipment) to the parties at their respective addresses as set forth hereinbelow, or to such other address as any party may subsequently designate by like notice hereunder, and any such notice given personally shall be deemed given or served for all purposes when given personally, or if sent by registered or certified mail on the first business day following the posting thereof, or if by cable or telex or telecopy on the first business day following the sending thereof.  In addition to the foregoing, all statements and accountings required under the Agreement shall be sent to Hasbro at its address set forth below, Attention: Office of the Controller, or such other address as may be designated by Hasbro in writing.

SUNBOW PRODUCTIONS, INC.
130 Fifth Avenue
New York, New York 10011

Attention: Tom Griffin, Chairman

With copies to:

David Z. Rosensweig, Esq.
Leary, Rosensweig & Hyman
11 East 44th Street
New York, New York 10017

HASBRO, INC.
1027 Newport Avenue
Pawtucket, Rhode Island 02862-1059

Attention: Alfred C. Carosi, Jr.
Vice President

With copies to:

Barry J. Alperin, Senior Vice President
Hasbro, Inc.
32 West 23rd Street
New York, New York  10010

and to:

Stephen C. Stanley, Esq.
Hasbro, Inc.
1027 Newport Avenue
Pawtucket, Rhode Island  02862-1059

- 29 -

SUN  444

(8)    Whenever the Agreement refers to a breach or default of the Agreement by Sunbow or Hasbro, Sunbow or Hasbro, as the case may be, shall not be deemed to be in breach or default hereof until it fails to cure any alleged breach or default within ten (10) business days following notice thereof.

(9)    Whenever Hasbro is required to give its consent or approval hereunder, such consent or approval must be in writing.

(10)    In the event of the discontinuation of Sunbow's business or the adjudication of Sunbow as bankrupt, or the filing of a petition (voluntary or involuntary) by or against Sunbow for (or consent by Sunbow to) any relief under any bankruptcy or other debtor's relief act, or the appointment of a receiver, liquidator, trustee or custodian for all or a substantial part of Sunbow's assets, which petition is not vacated within sixty (60) days after filing or appointment then, and in any of those events, Hasbro shall have the right to terminate the Agreement without any liability whatsoever in which event the Programs and all elements thereof shall be promptly delivered to Hasbro at such place as Hasbro shall designate in writing.

(11)    Sunbow agrees promptly to disclose to Hasbro, and to all others to whom it is obligated to make disclosures under Section 507 of the Federal Communications Act, any information of which it shall acquire knowledge, or which has been disclosed to it, as to any money, service or other valuable consideration that any person has paid or accepted (or agreed to pay or accept) for the inclusion of any program matter in the Programs.

(12)    Hasbro shall have the right to terminate the Agreement without liability upon thirty (30) days' written notice to Sunbow in the event a binding order or decision adverse to Hasbro or any national television network or any television station, in or with respect to the certain complaint filed with the FCC by Boston Consumer Advocates known as "Action for Children's Television" (in late fall of 1983) or any similar complaint now or hereafter made. In such event, Hasbro shall pay to Sunbow all sums due and accrued to the date of termination and all Programs, whether then fully produced or in the process of production, shall be turned over to Hasbro, which shall be the sole owner thereof and of all proceeds therefrom and of all rights therein and thereto.

SUN 445

Paragraph O

(13) Any sale or other disposition of any or all Programs, or any rights therein, by Hasbro shall be made subject to the terms and conditions of the Agreement, including, but not limited to, Sunbow's right to receive revenues from distribution of the Programs as herein described, unless otherwise agreed in writing by Sunbow.

The foregoing STANDARD TERMS AND CONDITIONS are agreed to be incorporated in all Production License Agreements and to govern, along with such Production License Agreements, the production, completion, delivery and distribution of all Programs subject to said Production License Agreements.

HASBRO, INC.

By: _____

Its: _____

SUNBOW PRODUCTIONS, INC.

By: _____

Its: _____

MILTON BRADLEY INTERNATIONAL, INC.

By: _____

Its: _____

STARWILD MUSIC, INC.

By: _____

Its: _____

WILDSTAR MUSIC, INC.

By: _____

Its: _____

—30—

SUN 446

Paragraph O

(13) Any sale or other disposition of any or all Programs, or any rights therein, by Hasbro shall be made subject to the terms and conditions of the Agreement, including, but not limited to, Sunbow's right to receive revenues from distribution of the Programs as herein described, unless otherwise agreed in writing by Sunbow.

The foregoing STANDARD TERMS AND CONDITIONS are agreed to be incorporated in all Production License Agreements and to govern, along with such Production License Agreements, the production, completion, delivery and distribution of all Programs subject to said Production License Agreements.

HASBRO, INC.

By: _____

Its: _____

SUNBOW PRODUCTIONS, INC.

By: _____

Its: _____

MILTON BRADLEY INTERNATIONAL, INC.

By: _____

Its: _____

STARWILD MUSIC, INC.

By: _____

Its: _____

WILDSTAR MUSIC, INC.

By: _____

Its: _____

—30—

SUN 447

## Exhibit A

## NOTICE OF COPYRIGHT OWNERSHIP

I, THOMAS L. GRIFFIN, Chairman of the Board of Sunbow Productions, Inc. ("Sunbow"), hereby acknowledge and confirm on behalf of Sunbow that while the copyrights on the Programs in the television series [PROGRAM NAME] are in the name of Sunbow Productions, Inc., such copyrights are in fact held by Sunbow Productions, Inc. in trust for the benefit of HASBRO, INC., and that pursuant to an agreement between Sunbow and HASBRO dated _____, HASBRO, INC. has the unconditional right to an assignment of such copyrights to it upon HASBRO's request at any time.

IN WITNESS WHEREOF, the undersigned has executed this Notice this _____ day of _____, 1988.

SUNBOW PRODUCTIONS, INC.

By: _____

THOMAS L. GRIFFIN
Chairman of the Board

State of New York, County of New York

On the _____ day of _____, 1988, before me personally came Thomas L. Griffin to me known, who, being by me duly sworn, did depose and say that he is the Chairman of the Board of Sunbow Productions, Inc., the corporation described in and which executed the foregoing instrument, and that he signed his name thereto with full authority on behalf of Sunbow Productions, Inc.

Sworn to before me
this 4TH day of October, 1988.

_____
Notary Public
EDWARD HAGGERTY
NOTARY PUBLIC, State of New York

-31-

SUN 448

## Exhibit A

## NOTICE OF COPYRIGHT OWNERSHIP

I, THOMAS L. GRIFFIN, Chairman of the Board of Sunbow Productions, Inc. ("Sunbow"), hereby acknowledge and confirm on behalf of Sunbow that while the copyrights on the Programs in the television series [PROGRAM NAME] are in the name of Sunbow Productions, Inc., such copyrights are in fact held by Sunbow Productions, Inc. in trust for the benefit of HASBRO, INC., and that pursuant to an agreement between Sunbow and HASBRO dated _____, HASBRO, INC. has the unconditional right to an assignment of such copyrights to it upon HASBRO's request at any time.

IN WITNESS WHEREOF, the undersigned has executed this Notice this _____ day of _____, 1988.

SUNBOW PRODUCTIONS, INC.

By:_____
    THOMAS L. GRIFFIN
    Chairman of the Board

State of New York, County of New York
On the _____ day of _____, 1988, before me personally came Thomas L. Griffin to me known, who, being by me duly sworn, did depose and say that he is the Chairman of the Board of Sunbow Productions, Inc., the corporation described in and which executed the foregoing instrument, and that he signed his name thereto with full authority on behalf of Sunbow Productions, Inc.

Sworn to before me
this _____ day of _____, 1988.

_____
        Notary Public

SUN  449

**HASBRO, INC., HASBRO INTERNATIONAL, INC.,**
**SUNBOW PRODUCTIONS, INC., STARWILD MUSIC, INC.**
**and WILDSTAR MUSIC, INC.**

### FIRST AMENDMENT TO STANDARD TERMS AND CONDITIONS

1.   This Amendment modifies the Standard Terms and Conditions ("STC") which are incorporated into all of the Production License Agreements ("PLAs") listed on Exhibit A, effective as of January 1, 1991.

2.   Each of the terms set forth in this Amendment will have the meaning ascribed to it in the Standard Terms and Conditions Agreement, and the terms of this Amendment will control in the event of any inconsistency between the Standard Terms and Conditions and this Amendment.

3.   Effective as of January 1, 1991, Hasbro will no longer be responsible to advance or pay for any "Sunbow International Variable Expenses" [as defined in STC Subparagraph H(2)(d)] or any "Sunbow International Fixed Expense" [as defined in STC Subparagraph H(2)(e)]. Accordingly, Paragraph I(4) is hereby deleted.

4.   Hasbro will recoup any monies which it has advanced to Sunbow, since the effective date of this Amendment but prior to the execution of this Amendment, by having withdrawn a sum equal to the amount of all such previously advanced monies from National Westminster Bank Account Number 2-170-00178-4 prior to the signature of this Amendment. Hasbro will thereafter transfer ownership of the said account to Sunbow. Hasbro represents and warrants that the aforesaid account contains the full amount of all monies paid to Sunbow in 1991 in respect of all PLAs, less only those amounts previously withdrawn and advanced to Sunbow, and excluding those amounts paid directly to Sunbow by check draft or otherwise and not deposited by Sunbow to said bank account.

5.   Sunbow will determine, in the exercise of its best business judgment, the business terms applicable to the distribution of the Programs throughout the

world excluding the United States. As such, STC Paragraph D(2) shall apply only to agreements covering the United States of America and its territories and possessions, and lines 13 through 23 of said Paragraph D(2) (commencing '...and, further provided that in the event...' and ending with the words '...always be subject to Hasbro's prior written approval') are hereby deleted. Notwithstanding the foregoing, Sunbow will always provide Hasbro with a blind copy of each cover letter and proposed agreement forwarded to any pending licensee, as well as provide Hasbro with a copy of each executed agreement within ten (10) business days after the full execution thereof, and additionally will copy Hasbro on any bill of lading or shipping statement indicating when Program materials have been provided to a licensee. Sunbow shall furthermore meaningfully consult with Hasbro as to its ongoing distribution of the Programs.

6. The terms and conditions of any television, home videogram or theatrical distribution agreement for the Programs will be in accordance with the material terms and conditions contained in the form agreements attached hereto as Exhibits B, C, and D, respectively. Any modification of the material terms and conditions set forth therein with respect to any licensee or proposed licensee shall be subject to Hasbro's prior written approval.

7. Paragraphs H(2)(c), (d), (e), (f) and (g) are deleted in their entirety and the following inserted in their place:

'(d) 'Sunbow International Distribution Fee' means sixty percent (60%) of 'International Net Proceeds,' subject to Paragraph 13 below. (e) 'International Distribution Expenses' means only the following reasonable costs and fees paid out-of-pocket by Sunbow in connection with the distribution of the Programs outside of the United States of America, its territories and possessions:

> (i) the cost of manufacturing, shipping and storing negatives, prints, videotapes, videocassettes, and videodiscs of the Programs created for television exhibition and home video and any other media licensing, sale, and distribution;

2

(ii) reasonable trade publication, print production and brochure production expenses paid by Sunbow to advertise only the licensing, sale and distribution of the Programs;

(iii) supplemental market fees, union payments and residual fees;

(iv) reasonable expenses incurred in the engagement of outside legal counsel for the purpose of negotiating and executing agreements with third parties for distribution and exploitation of the Programs, redressing breaches of, or enforcing contracts with home video distributors, television distributors or television stations, or bringing suits and/or actions against any infringements of the Programs, to the extent such expenses are not recouped from any favorable settlement or judgment;

(v) costs of translating the dialogue of the Programs into foreign languages and inserting subtitles or dubbing the foreign language soundtrack, including music synchronization license fees for the dubbed music;

(vi) withholding taxes, excluding income taxes, paid by or on behalf of Sunbow to governmental authorities as a result of the licensing, distribution, exploitation and/or sale of the Programs, but only to the extent that Sunbow does not receive a credit against its income taxes;

(vii) expenses incurred in adapting (including editing) the Program content (as opposed to the soundtrack only) for distribution outside the United States, its territories and possessions;

(viii) commissions paid to third party representatives at arms length, who have been approved in writing by Hasbro, as a commission for rendering services in the negotiation and consummation of the foreign licensing, sale and/or distribution of the Programs; and

(ix) travel and entertainment expenses incurred pursuant to Hasbro's specific written request.

3

SUN 452

(f) 'International Net Proceeds' means International Total Revenues less (i) the Sunbow International Distribution Fee, and then less (ii) International Distribution Expenses.

8. Sunbow's out-of-pocket costs for attending international sales conventions ('Trade Show Expenses') will be included within "International Distribution Expenses" only for the 1991 and 1992 calendar years, as follows:

(a) in 1991, $50,000. for expenses incurred for attendance at NATPE in New Orleans;

(b) in 1991, 66% of Sunbow's Trade Show Expenses other than NATPE, but not to exceed $60,000.00 in the aggregate;

(c) in 1992, 50% of Sunbow's Trade Show Expenses, not to exceed in the aggregate $45,000.00;

(d) subsequent to 1992, no Trade Show Expenses will be allowed as an "International Distribution Expense".

9. Paragraph H(1)(d) of the STC is deleted and the following inserted in its place:  "(d) 'Domestic Total Revenues' means the sum total of Net Domestic Cable Royalties, Net Domestic Music Performance Royalties, and Domestic General Revenues, as well as 'Net International Music Performance Royalties' and 'Net International Cable Royalties'."

10. Paragraph H(3)(b) is deleted and the following inserted in its place:  "'Hasbro Reimbursement' means three percent (3%) of the Costs of Production, which amount shall be considered a preferential distribution to Hasbro of the Domestic Net Proceeds."  Paragraph H(3)(c) is also deleted and the following inserted in its place:  "'Distribution Proceeds' means the total of Domestic Net Proceeds less the Hasbro Reimbursement."

11. "International Net Proceeds" means International General Revenues less first the Sunbow International Distribution Fee, and then less the International Distribution Expenses.

4

SUN 453

12. At the time of the calculation of Distribution Proceeds pursuant to Paragraph I(6) which is now applicable only to "Domestic Net Proceeds," Sunbow shall calculate the International Net Proceeds and allocate and pay said International Net Proceeds, subject to Paragraph 13 below, as follows:

(a) Sunbow shall receive seventy-five percent (75%) of the International Net Proceeds;

(b) Hasbro shall receive twenty-five percent (25%) of the International Net Proceeds;

(c) Notwithstanding the foregoing, in the event that a Third Party Participant is entitled to receive a percentage of the International Net Proceeds pursuant to Paragraph F, then for purposes of this Paragraph alone, International Net Proceeds shall be calculated to be the sum remaining after the deduction of the Third Party Percentage.

13. Notwithstanding the provisions of Paragraph 12 above, in the event that "International General Revenues" [as defined in STC Subparagraph H(2)(a)] received by Sunbow from its international distribution of all Programs pursuant to this and all other PLAs effective between the undersigned parties in any calendar year subsequent to 1993 exceed $750,000.00, then the following will apply, and be calculated separately for each calendar year subsequent to 1993:

(a) Sunbow's "International Distribution Fee" will be reduced to 40% of those revenues in excess of $750,000.00;

(b) Sunbow's "International Distribution Expenses" to be deducted from International General Revenues in excess of $750,000.00 shall be that percentage of total International Distribution Expenses (in the applicable year) as shall be determined by dividing the International General Revenues in excess of $750,000.00 by the total International General Revenues (in the applicable year), but in no event shall any International Distribution Expense be deducted more than once; and

(c) International Net Proceeds for such calendar year will be shared on an equal basis (50/50) as applied to all International General Revenues derived by Sunbow pursuant to this and all other PLAs effective

5

SUN 454

between the undersigned parties to the extent said International General
Revenues exceed $750,000.

14. Paragraph I(6)(a)(iii) of the STC is modified to read as
follows:

'(iii) In the event of a Third Party Participant, Sunbow shall
receive any Third Party Percentage of Distribution Proceeds along with
any Third Party Percentage of International Net Proceeds, the sum of
which shall constitute the 'Third Party Share.'  Sunbow shall pay the
Third Party Share to the Third Party Participant in accordance with the
applicable Third Party Agreement.'

15. Paragraph H(2)(c) of the STC is deleted and the following
inserted in its place:  "(c)  'Net International Cable Royalties' means
(i) the gross amount of royalties distributed by AGICOA or similar
organizations in consideration for the retransmission of the Program by
cable television systems or other cable operators outside of the United
States, less any commissions paid to or retained by a third party agent,
which third party agent is appointed in Hasbro's sole discretion."

16. The second sentence of Paragraph H(2)(a) is revised as follows:
"In the event of a worldwide deal involving the Program and/or the
Compositions, all revenues therefrom shall be allocated in good faith
between Domestic General Revenues and International General Revenues as
shall be mutually agreed upon in writing by Hasbro and Sunbow.

17. STC Paragraph I(3) is deleted and the following inserted in its
place:  "(3)  International Revenues.  Sunbow shall collect all
International General Revenues.  Hasbro shall collect all Net
International Music Performance Royalties and Net International Cable
Royalties."  STC Paragraph I(2)(b)(ii) is deleted.

18. STC Paragraph J is deleted.

6

SUN 455

19. The notice address pursuant to Paragraph O(7) for Hasbro, Inc. shall now be made to the attention of Lawrence H. Bernstein, President, Hasbro Toy Division.

The foregoing Amendment to the Standard Terms and Conditions is agreed to be incorporated in all Production License Agreements and to govern, along with such Production License Agreements, the ongoing distribution of all Programs subject to said Production License Agreements. Except as modified herein, the Standard Terms and Conditions Agreement as incorporated into the Production License Agreements shall remain in full force and effect.

HASBRO, INC.

By: _____
Its: _____Vice Chairman_____

HASBRO INTERNATIONAL, INC.
(previously named
MILTON BRADLEY INTERNATIONAL, INC.)

By: _____
Its: _Executive Vice-President_

SUNBOW PRODUCTIONS, INC.

By: _____
Its: _____

STARWILD MUSIC, INC.

By: _____
Its: _____

WILDSTAR MUSIC, INC.

By: _____
Its: _____

7

SUN 456