# EXHIBIT 17

## In The Matter Of:

*Anne Bryant   v.*
*Broadcast Music, Inc., et al.*

---

*Anne Bryant*
*Vol. 1, March 31, 2003*

---

*Greenhouse Reporting, Inc.*
*Computerized Litigation Support*
*363 Seventh Avenue*
*20th Floor*
*New York, NY  10001*
*(212) 279-5108    FAX: (212) 279-5431*

*Original File AB033103.V1, 243 Pages*
*Min-U-Script® File ID: 3083516026*

## Word Index included with this Min-U-Script®

Page 1

[1]
[2] SUPREME COURT OF THE STATE OF NEW YORK
[3] IAS PART; ROCKLAND COUNTY
[4] ANNE BRYANT,
         Plaintiff,
[5]    -against-    Index No. 5192/00
[6] BROADCAST MUSIC, INC., (a/k/a "BMI"), CLIFFORD
     A. "FORD" KINDER, KINDER & CO., LTD., VADIVOX,
[7] LTD., JULES M. "JOE" BACAL, GRIFFIN BACAL INC.,
     STARWILD MUSIC BMI, WILDSTAR MUSIC ASCAP, SUNBOW
[8] PRODUCTIONS, INC., and JOHN AND JANE DOES 1-10,
[9]         Defendants.
[10]
[11] ANNE BRYANT,
[12]        Plaintiff,
[13]    -against-    Index No. 2821/02
[14] SUNBOW PRODUCTIONS, INC.,
[15]        Defendant.
[16]
[17]        March 31, 2003
           10:12 a.m.
[18]
[19] DEPOSITION OF: ANNE BRYANT
[20]
[21]
[22]
[23]    GREENHOUSE REPORTING, INC.
        363 Seventh Avenue - 20th Floor
[24]    New York, New York 10001
        (212) 279-5108
[25]

Page 2

[1]
[2]
[3]
[4]
[5]
[6]    Deposition of ANNE BRYANT, taken by
[7] the Defendant Sunbow Productions, pursuant to
[8] Agreement, at the offices of Monaghan, Monaghan,
[9] Lamb & Marchisio, 28 W. Grand Avenue, Montvale,
[10] New Jersey, before Celeste A. Galbo, a Certified
[11] Shorthand Reporter and Notary Public within and
[12] for the State of New York.
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 3

[1]
[2]        APPEARANCES:
[3]
[4]
[5] MONAGHAN, MONAGHAN, LAMB & MARCHISIO
[6]    Attorneys for the Plaintiff
[7]    28 W. Grand Avenue
[8]    Montvale, New Jersey 07645
[9] BY: PATRICK J. MONAGHAN, Jr., ESQ.
[10]
[11] PATTERSON, BELKNAP, WEBB & TYLER, LLP
[12]    Attorneys for the Defendant Sunbow
[13]    1133 Avenue of the Americas
[14]    New York, New York 10036
[15] BY: ROSEANN KITSON, ESQ.
[16]
[17] DUANE MORRIS
[18]    Attorneys for Defendant
[19]    Jules M. "Joe" Bacal
[20]    380 Lexington Avenue
[21]    New York, New York 10168
[22] BY: ANDRIENNE L. VALENCIA, ESQ.
[23]
[24]
[25]

Page 4

[1]
[2]        STIPULATIONS
[3]    IT IS HEREBY STIPULATED AND AGREED
[4] by and between counsel for the respective
[5] parties hereto that all rights provided by
[6] the CPLR including the right to object to
[7] any question except as to the form or to
[8] move to strike any testimony at this
[9] examination before trial shall not be a
[10] bar or waiver to make such motion at, and
[11] is reserved for the trial of this action.
[12]    IT IS FURTHER STIPULATED AND AGREED
[13] by and between counsel for the respective
[14] parties hereto that this examination may
[15] be sworn to by the witness being examined
[16] before a Notary Public other than the
[17] Notary Public before whom this examination
[18] was begun, but the failure to do so or to
[19] return the original of the examination to
[20] counsel, shall not be deemed a waiver of
[21] the rights provided by Rule 3116 and Rule
[22] 3117 of the CPLR and shall be controlled
[23] thereby.
[24]
[25]

Page 5

[1]
[2]
[3]       ANNE BRYANT, stating an address of P.O. Box 418,
[4] Stony Point, New York 10980, having been duly
[5] sworn by the Notary Public, was examined and
[6] testified as follows:
[7]               EXAMINATION BY
[8]               MS. KITSON:
[9]     Q: Miss Bryant, my name is Roseann
[10] Kitson. I'm with the firm of Patterson Belknap
[11] Webb & Tyler, and we represent defendant Sunbow
[12] Productions in the matter. Before we get into
[13] the substance of your deposition, I just wanted
[14] to go over a couple of preliminaries.
[15]     First is that the court reporter has
[16] to record both of us, so please wait until the
[17] end of my question before giving a response.
[18] Also, the court reporter needs an audible answer
[19] to record for the record, so please answer
[20] audibly. Nods or shakes of the head or sounds
[21] are not going to be sufficient.
[22]     A: Yes.
[23]     Q: Do you understand?
[24]     A: I understand.
[25]     Q: If you don't understand or you don't

Page 6

[1]                      *A. Bryant*
[2] hear a question that I ask you, let me know and
[3] I can either repeat it or I will clarify it,
[4] otherwise I'm going to assume that you
[5] understand the question as it was asked.
[6]     A: Okay.
[7]     Q: Okay. And if you need a break at
[8] any point that a question is not pending, just
[9] ask and it will be arranged.
[10]     A: Fine.
[11]     Q: Please state your full name and
[12] address for the record.
[13]     A: Anne Bryant, P.O. Box 418, Stony
[14] Point, New York, 10980.
[15]     Q: Ms. Bryant, have you ever been
[16] deposed before?
[17]     A: Yes.
[18]     Q: On how many occasions?
[19]     A: Half a dozen maybe.
[20]     MR. MONAGHAN: Did you say half a
[21] dozen maybe?
[22]     THE WITNESS: Yeah, I think so.
[23]     MR. MONAGHAN: Well, don't guess.
[24] That's another instruction. Don't guess.
[25] The question was how many, if you recall.

Page 7

[1]                      *A. Bryant*
[2]     A: You want me to —
[3]     MR. MONAGHAN: We can't talk.
[4]     THE WITNESS: We can't talk, okay.
[5]     MR. MONAGHAN: Listen carefully to
[6] her questions and if you remember,
[7] answer.
[8]     A: I think six. I think six times.
[9]     Q: And do you remember when those
[10] occasions occurred?
[11]     A: Yes, in 1981.
[12]     Q: That was the first?
[13]     A: Yes, the first three.
[14]     Q: The first three were in 1981.
[15] Okay. Were they all related to the same matter?
[16]     A: Yes. I was sued and I countersued
[17] and then the three depositions as I remember.
[18]     Q: Okay. And then after 1981?
[19]     A: Yes, in 1991 or 1992 regarding Ford
[20] Kinder, I think there were two depositions
[21] there.
[22]     Q: You gave two depositions in that?
[23]     A: Yes, two situations. And then
[24] Adrienne deposed me for Joe Bacal, I believe.
[25]     MS. VALENCIA: That was in October

Page 8

[1]                      *A. Bryant*
[2] of 2001.
[3]     THE WITNESS: That would be six.
[4]     Q: Have you ever given testimony in
[5] court —
[6]     A: I'm not sure.
[7]     MR. MONAGHAN: Don't speculate.
[8]     Q: If you're not sure, that answer is
[9] fine.
[10]     A: Yeah, I'm not sure if that was
[11] testimony.
[12]     Q: Ms. Bryant, in preparation for
[13] today's deposition, did you meet with anyone?
[14]     A: I talked to Patrick this morning for
[15] a few minutes.
[16]     Q: Okay. You spoke with Mr. Monaghan
[17] this morning?
[18]     A: Yes.
[19]     Q: For how long?
[20]     A: Ten minutes.
[21]     Q: Was anyone else present?
[22]     A: It was right here.
[23]     MR. MONAGHAN: The answer is no, no
[24] one else was present. It's
[25] attorney/client, so that's as far as you

Page 9

A. Bryant

[1]
[2] can go with that.
[3]   Q: Were you shown any documents in
[4] preparation for the deposition today?
[5]   A: The document about producing
[6] documents.
[7]   Q: Okay. Was that the document request
[8] that Sunbow served?
[9]   MR. MONAGHAN: Yes.
[10]   A: Yes.
[11]   Q: Okay, and have you spoken about your
[12] deposition with anyone else?
[13]   A: No.
[14]   Q: What is the highest level of
[15] education that you've completed?
[16]   A: I have an MFA, a master of fine
[17] arts, and halfway through my doctorate in fine
[18] arts and classical music composition.
[19]   Q: And from where did you receive that?
[20]   A: SUNY Purchase, Classical
[21] Conservatory.
[22]   Q: Do you hold any other degrees?
[23]   A: A BA from Eastman School of Music.
[24] And what did I get from Berkley School of Jazz?
[25] It's a diploma there. I didn't finish my

Page 10

A. Bryant

[1]
[2] bachelor's there. I went on to Eastman and
[3] that's it. Really a lot of certificates and
[4] things. Who cares?
[5]   Q: And you said that you were halfway
[6] through your doctorate?
[7]   A: Yes. The MFA that I got, it was
[8] wonderful degree, contains the research
[9] component of a doctorate. I don't want a Ph.D.,
[10] I want a DMA. A Ph.D. is a philosophical
[11] doctorate. I don't want to write about writing
[12] music, I'd rather write music, which is a DMA.
[13] I've done the research component, I just need to
[14] do the other lab work and composition work.
[15]   MR. MONAGHAN: Anne, just answer
[16] their questions.
[17]   Q: And where are you studying for your
[18] DMA?
[19]   A: I'm not right now. I'll do that
[20] when I'm 60.
[21]   Q: Through whom have you done your
[22] course work? Through what institution have you
[23] done the course work that you've done so far?
[24]   A: SUNY Purchase, State University of
[25] New York.

Page 11

A. Bryant

[1]
[2]   Q: Are you currently employed?
[3]   A: I have a business, an ongoing
[4] business.
[5]   Q: What is that business called?
[6]   A: The trade name is Music & Art which
[7] is —
[8]   MR. MONAGHAN: Let her get to the
[9] next question. Don't volunteer.
[10]   Q: And is that a corporation?
[11]   A: It's a d/b/a for a corporation. The
[12] corporation, the whole thing is Square Business
[13] Music Productions Ltd., d/b/a Music & Art. And
[14] that was filed with the New York State that way.
[15]   Q: Did you say Square Business Music
[16] Productions?
[17]   A: Ltd.
[18]   Q: Thank you.
[19]   MR. MONAGHAN: I need a minute with
[20] my client.
[21]   MS. KITSON: Sure.
[22]   MR. MONAGHAN: Thanks.
[23]   (Conference between witness and
[24] counsel.)
[25]   Q: Prior to Music & Art or Square

Page 12

A. Bryant

[1]
[2] Business Music Productions Limited d/b/a Music &
[3] Art, were you employed?
[4]   A: I've had Music & Art for 25 years,
[5] 26 years. I've always been employed by Music &
[6] Art. I mean Square Business rather, which is
[7] now called Music & Art but it's just Square
[8] Business.
[9]   Q: Have you had other employers over
[10] the course of the last 25 years?
[11]   A: No.
[12]   Q: Have you had other businesses over
[13] the course of the last 25 years?
[14]   A: Yes.
[15]   Q: Do you now work exclusively for
[16] Square Business Music Productions Ltd. d/b/a
[17] Music & Art?
[18]   A: Yes.
[19]   Q: Prior to the period where you worked
[20] exclusively for Square Business Music
[21] Productions, who did you work with or what
[22] business did you own?
[23]   A: I had additional businesses.
[24]   Q: Yes.
[25]   A: Kinder & Bryant, Ltd. with a

Page 13

A. Bryant

[1]
[2] partner, and Gloryvision, Ltd. with a partner.
[3] MR. MONAGHAN: I hope we're not
[4] going go back 25 years.
[5] MS. KITSON: I'm just getting
[6] background.
[7] MR. MONAGHAN: Okay. Well, you
[8] know, that much background may not be
[9] needed.
[10] Q: Have you ever worked with an
[11] organizations called Michlin Company?
[12] A: Yes, I'm sorry, I did.
[13] Q: And —
[14] MR. MONAGHAN: Worked with or for?
[15] MS. KITSON: Well, let's go with
[16] with.
[17] Q: Have you ever worked with Michlin
[18] Company?
[19] A: Yes.
[20] Q: Have you ever worked for Michlin
[21] Company?
[22] A: Yes.
[23] Q: You were employed by Michlin &
[24] Company then?
[25] A: I was, yes.

Page 14

A. Bryant

[1]
[2] Q: Was that prior to Kinder & Bryant?
[3] A: Yes.
[4] Q: Was that prior to Gloryvision?
[5] A: Yes.
[6] Q: And prior to Michlin Company?
[7] A: I freelanced.
[8] Q: And can you give me approximate
[9] dates that you worked with Michlin Company?
[10] A: Yes, 1977 through to 1981, somewhere in
[11] there. '80, '81, I'm not sure which. I'm not
[12] really sure.
[13] Q: And after you left Michlin & Company
[14] you went to Gloryvision?
[15] A: No, I continued to work for Square
[16] Business. I had Square Business the whole time.
[17] Q: Okay.
[18] A: And then I produced through Square
[19] Business and I was a solo business owner and
[20] arranger, composer, arranger.
[21] Q: And during what years were you
[22] associated with Gloryvision limited?
[23] A: That's ongoing, '92 and ongoing.
[24] Q: To the present?
[25] A: Yes.

Page 15

A. Bryant

[1]
[2] Q: And what years were you associated
[3] with Kinder & Bryant?
[4] A: 1983 to 19 — the very end of '89,
[5] yes, 1989.
[6] Q: And what years have you been
[7] associated with Square Business Music
[8] Productions?
[9] A: 1977 through to the present.
[10] Q: To the present. May I ask between
[11] the years 1981 and 1983 how were you employed?
[12] A: I worked for Square Business Music
[13] doing the very same things I did and have always
[14] done, writing music for commercials, and I did
[15] it exclusively through Square Business.
[16] Q: Is that true of the period between
[17] 1989 through 1992 as well?
[18] A: Yes, Square Business always has my
[19] services.
[20] Q: And during those two periods from
[21] 1981 to 1983 and 1989 to 1992, other than Square
[22] Business, were you associated with any other
[23] business?
[24] A: No. No.
[25] Q: Okay. Were you employed by any

Page 16

A. Bryant

[1]
[2] other business during those two periods?
[3] A: You clean a client?
[4] Q: As in were you an employee for —
[5] A: Like Michlin? You mean like the
[6] Michlin situation?
[7] Q: Yes.
[8] MR. MONAGHAN: Employee.
[9] THE WITNESS: No.
[10] A: No, no.
[11] Q: And Ms. Bryant, what do you do for a
[12] living?
[13] A: I'm a composer, an arranger, a
[14] musician, a singer, a lyricist, an announcer,
[15] and a music producer. Music for commercials,
[16] documentary scores, film scores, television
[17] shows, themes for television, and I've just
[18] added translation in the Spanish market to my
[19] business as well.
[20] Q: And was that translation of musical
[21] lyrics or song lyrics?
[22] A: They had me doing text. They had me
[23] doing that because I know advertising, so I'm
[24] not just translating, I'm also looking at the
[25] advertising. And I'm about to go into the

Anne Bryant   v.
Broadcast Music, Inc., et al.

Anne Bryant
Vol. 1, March 31, 2003

Page 17

*A. Bryant*

[1]
[2] Spanish song writing end because I can write
[3] lyrics in Spanish now. So that's what I do.
[4]    Q: Thank you. And —
[5]    THE WITNESS: It's long. I'm
[6] sorry.
[7]    Q: Approximately how many songs have
[8] you written?
[9]    MR. MONAGHAN: Songs as opposed to
[10] jingles?
[11]    A: Including compositions, you mean
[12] really?
[13]    Q: I can break them down into different
[14] categories if that would be easier for you to
[15] answer.
[16]    MR. MONAGHAN: Over what period?
[17]    Q: Since you began your employment with
[18] Michlin & Company.
[19]    A: Oh, my God.
[20]    MR. MONAGHAN: You're asking for the
[21] number of songs she's written since 1977?
[22]    MS. KITSON: Approximately.
[23]    A: 5,000, something like that.
[24]    Q: And within that number of songs does
[25] that include advertising jingles, TV themes —

Page 18

*A. Bryant*

[1]
[2]    A: Yes.
[3]    Q: — and —
[4]    A: I don't know how to separate them,
[5] albums.
[6]    Q: I don't know what you would call —
[7]    A: Album PCs, scores for background,
[8] dramatic scores. I'd say easily 5,000 pieces of
[9] music.
[10]    Q: Is it possible that you can break
[11] them down by giving an approximate number of
[12] advertising jingles that you've written?
[13]    A: Maybe I could. I can't think
[14] without paper.
[15]    MR. MONAGHAN: Well, how is this
[16] particularly relevant to this case?
[17]    MS. KITSON: I —
[18]    MR. MONAGHAN: This is way more
[19] background than is really critical to the
[20] issues in this case.
[21]    MS. KITSON: Well, Ms. Bryant's —
[22]    MR. MONAGHAN: You're going to take
[23] us through a number of particular types of
[24] compositions and pieces over the last 30
[25] something years? It's too much.

Page 19

*A. Bryant*

[1]
[2]    MS. KITSON: I'm just trying to
[3] explore the background. Ms. Bryant talks
[4] into her pleadings about her background as
[5] a song writer and as a composer.
[6]    MR. MONAGHAN: Right.
[7]    MS. KITSON: And I'm just trying to
[8] explore exactly what that background
[9] consists of.
[10]    MR. MONAGHAN: Can't we agree to
[11] limit it to like the last ten years?
[12] Wouldn't that be probably the longest
[13] period that a court would allow in terms
[14] of delving into background?
[15]    MS. KITSON: Well, I can agree that
[16] we can limit it since, let's say, 1990.
[17]    MR. MONAGHAN: That would be fine.
[18]    MS. KITSON: Okay.
[19]    MR. MONAGHAN: This is — you know,
[20] we want this time to be well spent by all
[21] of us.
[22]    MS. KITSON: Well, actually I would
[23] actually request that maybe we just
[24] discuss the period of time since
[25] Ms. Bryant was associated with Kinder &

Page 20

*A. Bryant*

[1]
[2] Bryant since that is very — that's a part
[3] of this lawsuit.
[4]    MR. MONAGHAN: That's '83. 20 years
[5] we have to go back?
[6]    MS. KITSON: I'm just asking for the
[7] number of jingles, theme songs, if she can
[8] break them down by an approximate. I'm
[9] not going to ask her for her titles. I'm
[10] not going to go into detail about this.
[11]    MR. MONAGHAN: Okay, we'll take it
[12] as it comes, but I would ask that you
[13] limit it.
[14]    THE WITNESS: I don't know what my
[15] job is now.
[16]    MR. MONAGHAN: Your job is to say
[17] approximately how many jingles. Is that
[18] what the question was?
[19]    MS. KITSON: Advertising jingles.
[20]    MR. MONAGHAN: Advertising jingles
[21] at least for this question without waiving
[22] my right to object to further inquiry into
[23] similar areas, jingles in the last 20
[24] years.
[25]    Have I got the question

Anne Bryant
Vol. 1, March 31, 2003

Page 21

*A. Bryant*

[1]
[2] approximately right?
[3]   Q: Approximately how many advertising
[4] jingles have you written since you began your
[5] association with Kinder & Bryant?
[6]   A: I would put it at about 2100.
[7]   Q: And approximately how many TV themes
[8] have you written?
[9]   A: Please could I have a piece of
[10] paper? I can't think.
[11]   MR. MONAGHAN: No, because you're
[12] testifying from your memory now.
[13]   A: Okay.
[14]   THE WITNESS: Okay.
[15]   MR. MONAGHAN: It shouldn't
[16] involve —
[17]   THE WITNESS: I could list them. If
[18] I tick them off one at a time that would
[19] help me, I think.
[20]   A: TV themes, right?
[21]   Q: Yes.
[22]   MR. MONAGHAN: She said
[23] approximately, Anne. It is a test of your
[24] recollection.
[25]   A: I don't know, a dozen at most.

Page 22

*A. Bryant*

[1]
[2]   Q: And approximately how many songs,
[3] which in my question would not include
[4] advertising jingles or TV themes?
[5]   A: 180 songs for the Jem Show. I think
[6] about 180. I think that's the number, 180.
[7]   MR. MONAGHAN: Okay.
[8]   THE WITNESS: No, there's more
[9] songs.
[10]   MR. MONAGHAN: More songs.
[11]   THE WITNESS: She asked for songs.
[12]   MR. MONAGHAN: Right, you said 180.
[13]   THE WITNESS: For that show.
[14]   MR. MONAGHAN: For that show, okay.
[15]   THE WITNESS: But she asked —
[16] Gloryvision about 50 for the Mirror Kids;
[17] two dozen for the songs for dogs and songs
[18] for cats. Don't laugh, it was a big hit.
[19] Half dozen or so for Walt Disney. I'm
[20] leaving something out but I don't know
[21] what it is. I'm sorry.
[22]   Q: That's okay. I asked for an
[23] approximate, so that's fine.
[24]     So the number that I had was
[25] approximately 260; 180, then 50, then 24 then

Page 23

*A. Bryant*

[1]
[2] approximately six. These are approximate
[3] numbers?
[4]   A: Yeah, right.
[5]   Q: Okay. And, Miss Bryant, how would
[6] you define the difference between a jingle, a TV
[7] theme or a song?
[8]   MR. MONAGHAN: Well, let me think
[9] about this for a minute. How is that
[10] relevant?
[11]   MS. KITSON: There are different
[12] types of songs that are at issue in the
[13] suit.
[14]   MR. MONAGHAN: Well, how do you
[15] define it in your question?
[16]   MS. KITSON: I'm asking for the
[17] witness' definition of the difference.
[18]   _ THE WITNESS: I can answer it.
[19]   MR. MONAGHAN: Well, the question is
[20] how would you define a song versus a
[21] jingle, is that what you said?
[22]   MS. KITSON: Versus a TV theme.
[23]   MR. MONAGHAN: What is the
[24] difference between those three types of
[25] compositions?

Page 24

*A. Bryant*

[1]
[2]     All right. Go ahead, if you can
[3] answer.
[4]   A: The length.
[5]   Q: Which would be most lengthy, as a
[6] general matter?
[7]   A: What was the third one, a song?
[8]   Q: Yes.
[9]   A: The lengthiest one would be the
[10] song, generally around three minutes.
[11]   Q: Are there any other differences?
[12]   A: Well, contents is going to be
[13] different on everything, you know, raison
[14] d'etre.
[15]   Q: Are there any other differences?
[16]   A: They're all in sonata form, so
[17] they're very similar. I think the length
[18] characterizes it. In terms of music, that's
[19] basically the difference.
[20]   Q: Okay.
[21]   A: In terms of lyric, it could be a
[22] different intent with the lyric.
[23]   Q: That's fine, okay. Are you
[24] affiliated with any performing rights
[25] organization?

Page 25

[1]                    *A. Bryant*
[2]    A: Yes, BMI.
[3]    Q: To your knowledge is there a
[4] difference between how a composition is
[5] registered with BMI based on whether it's a
[6] song, a jingle, a theme or a musical cue —
[7]    A: Clearance forms. I really don't
[8] know what would be different other than saying
[9] what it is on the clearance form.
[10]    MR. MONAGHAN: Her question is not
[11] necessarily how it's done, but it's to
[12] your knowledge what the differences are in
[13] registering these.
[14]    A: Wait a minute, there is a
[15] difference. I've tried to register a jingle
[16] lately and been given word that — jingles I
[17] wrote and had to submit the proof of air time
[18] and the commercial ID numbers on pay stubs from
[19] Talent Partners which is a payroll agency for
[20] the jingle business. And I've submitted proof
[21] and filled out the forms and only to be told —
[22] have it returned to me and told that a writer
[23] can't do that, only a publisher can do it. That
[24] was different from what I had known in the
[25] past. And they gave me a long form that said —

Page 26

[1]                    *A. Bryant*
[2] a very specific form, not a long form — to know
[3] certain information, was this an original piece
[4] or was this piece a pre-existing piece of
[5] music. That's for jingle. So I know that.
[6] That's recent information in the last couple of
[7] years this happened.
[8]    And then as far as documentary film
[9] scores, mostly I do for ABC, they're very
[10] specific about the clearance form. I can file
[11] it, but there has to be a cue sheet list with
[12] timings of every single music cue, titles
[13] designating the composer. It has to be signed
[14] by the executive producer or the producer and
[15] then agreed to by ABC, and then you can submit
[16] it. So it's a pretty long, but they're all a
[17] little different, you know.
[18]    Q: Okay.
[19]    A: But they also use clearance forms,
[20] yeah.
[21]    Q: And clearance forms are used for
[22] what types of musical compositions, to your
[23] knowledge?
[24]    A: Those two, right there.
[25]    Q: Jingles and documentary film scores?

Page 27

[1]                    *A. Bryant*
[2]    A: Yes, background film scoring.
[3]    Q: Okay.
[4]    A: And that's the music behind the
[5] television show, the dramatic score. So those
[6] are the only two I know about.
[7]    MR. MONAGHAN: We're talking BMI
[8] only?
[9]    MS. KITSON: Yes, just BMI.
[10]    Q: Miss Bryant, how do you keep records
[11] of what you have written? The musical
[12] compositions that you've written I'm referring
[13] to.
[14]    A: Lots of ways.
[15]    Q: Okay.
[16]    A: Getting harder and harder because
[17] there's so many pieces of digital information
[18] these days —
[19]    MR. MONAGHAN: Wait, wait. Can we
[20] have a time frame? It may have changed
[21] how you did that.
[22]    THE WITNESS: Over time.
[23]    MR. MONAGHAN: Are you talking about
[24] now or 10 years ago?
[25]    Q: We can talk about now to again

Page 28

[1]                    *A. Bryant*
[2] with. Currently how do you keep records of
[3] musical compositions that you've written?
[4]    A: Well, I do sheet music. It's in my
[5] computer, do it on the computer now.
[6]    MR. MONAGHAN: Wait. Then I'm not
[7] clear on whether you're answering this
[8] question. Are you talking about the work
[9] product itself or a record of the work
[10] product, sort of a listing of the work
[11] product?
[12]    Listen to these questions
[13] carefully.
[14]    MS. KITSON: What I'm talking about
[15] is the work product itself.
[16]    Q: Knowing what exactly you have
[17] written in terms of the musical composition, the
[18] notes, the key —
[19]    A: I think I may be going down the
[20] right road here.
[21]    MR. MONAGHAN: You were.
[22]    A: I have files, excellent files. I
[23] mean, really good files with everything in it,
[24] the lyric, the music, the storyboard, everything
[25] that was supplied to me, everything I wrote,

Anne Bryant
Vol. 1, March 31, 2003

Anne Bryant    v.
Broadcast Music, Inc., et al.

---

Page 29

A. Bryant

[1]
[2] everything that all the e-mail communications
[3] back and forth, any changes. Ultimately I have
[4] the music there which is very good. Then I also
[5] have my arrangement. I have all the notes that
[6] I wrote. I have a document with — now that
[7] we're doing everything on synthesizer, for
[8] goodness sake, I have a million sounds and
[9] catalog which sounds and what I did for each
[10] sound. And I have this mixing legend which
[11] tracks what each piece is on, which tape it
[12] belongs on. That all goes into the music file.
[13] Then I have a business file and they all have
[14] the same invoice number. Then I have all of the
[15] information that union contracts, billing, any
[16] pertinent document that would go along with the
[17] money side of things, my responsibility to other
[18] people. And then I have a great box that I
[19] found that I have all the CDs from the computer
[20] from the recording studios, the DAT, dubs, every
[21] possible thing is in there, and so that I don't
[22] lose anything which is really hard to do if you
[23] don't do this. I have records year to year of
[24] everything I've done and I have my invoices too.
[25]     (Discussion off the record.)

Page 30

A. Bryant

[1]
[2]     MS. KITSON: Back on the record.
[3]     Q: Miss Bryant, prior to the system
[4] that you just described which was how you kept
[5] records of compositions, was there a different
[6] system that you used to keep records of your
[7] compositions?
[8]     A: There was a big envelope in the old
[9] days where all the arrangements and the parts —
[10] depends on how far we go back because I write
[11] for orchestra, but orchestras have disappeared.
[12] So it used to be a big envelope put all the
[13] orchestration, arrangement, all the parts for
[14] the musicians in an envelope and filed it every
[15] year. And then —
[16]     MR. MONAGHAN: But that question was
[17] was there a system, and it's a yes or no.
[18]     THE WITNESS: Oh.
[19]     MR. MONAGHAN: Yeah, and then the
[20] next —
[21]     THE WITNESS: No, that was the
[22] system.
[23]     MR. MONAGHAN: She'll do a very good
[24] job. Roseann knows what she's doing.
[25] She'll ask the questions.

Page 31

A. Bryant

[1]
[2]     THE WITNESS: Okay.
[3]     MR. MONAGHAN: It's yes or no. If
[4] it's a yes or no, answer it yes or no.
[5]     A: Yes, there was a different system.
[6]     Q: Can you describe that system?
[7]     A: It was a big envelope that we put
[8] the music in, and then there was a file that we
[9] had put all similar to what I have now. It was
[10] a file with a union contracts and billing and
[11] receivable and reimbursement in that file. That
[12] was a business file.
[13]     Q: And can you tell me approximately
[14] when you began using your current system?
[15]     A: With the Music & art, which is
[16] organized in the last couple of years. We're
[17] now in the Internet time and digital records and
[18] what not, so I'd say two years. It's a
[19] different thing.
[20]     Q: So prior to two years ago, you used
[21] the system where you had the big envelope with
[22] the orchestration; is that correct?
[23]     A: For Kinder & Bryant we did.
[24]     Q: Okay.
[25]     A: For Kinder & Bryant.

Page 32

A. Bryant

[1]
[2]     Q: Was there another system that you
[3] used in the intervening time between your
[4] association with Kinder & Bryant and the system
[5] that you've used in the last two years?
[6]     A: Yes, Gloryvision. Gloryvision was
[7] different.
[8]     Q: And what system did you use to
[9] record your musical compositions?
[10]     A: Well, I did do them on synthesizer
[11] and I had a recording studio, yes, but it
[12] created product. It didn't work for hire. It
[13] created product.
[14]     MR. MONAGHAN: I'm sorry, I'm not
[15] clear. The term that Ms. Kitson is using
[16] for system, a system of recordkeeping.
[17]     THE WITNESS: I didn't have to keep
[18] records for Gloryvision in the same way.
[19] I didn't have a client.
[20]     MR. MONAGHAN: Well, did you have a
[21] system of keeping records is the
[22] question.
[23]     THE WITNESS: I put the papers in
[24] the closet.
[25]     MR. MONAGHAN: Did you have a

Case 1:07-cv-06395-SHS    Document 32-13    Filed 01/04/2008    Page 11 of 63

Anne Bryant  v.                                                    Anne Bryant
Broadcast Music, Inc., et al.                          Vol. 1, March 31, 2003

---

**Page 33**

*A. Bryant*

[1]
[2] system?
[3]     THE WITNESS: No, you didn't really
[4] need a system.
[5]     MR. MONAGHAN: Please listen very
[6] carefully to every part of the question.
[7]     Q: Miss Bryant, do you own the
[8] copyright on the songs that you right?
[9]     MR. MONAGHAN: Presently or at what
[10] point in time?
[11]     Q: At any point in time during your
[12] career have you owned the copyright on the songs
[13] that you write?
[14]     A: Yes.
[15]     Q: And we discussed earlier that you
[16] estimated you had written approximately 260
[17] songs. Do you own the copyright on all of them?
[18]     A: No.
[19]     Q: And for the advertising jingles that
[20] you've written, you stated that you had written
[21] approximately 2100 advertising jingles. Do you
[22] own the copyright on the advertising jingles
[23] that you've written?
[24]     A: No. A few I do, not very many.
[25]     Q: Okay. And you indicated that you

---

**Page 34**

*A. Bryant*

[1]
[2] had written approximately 12 TV themes. Do you
[3] own the copyright on the TV themes that you've
[4] written?
[5]     A: No.
[6]     Q: Ms. Bryant, what are the
[7] compositions that you've written that are at
[8] issue in this suit?
[9]     A: It's Transformers, also known as
[10] Robots in Disguise; G.I. Joe, also known as The
[11] Real American Hero; Jem, the Jem theme also
[12] known as Truly Outrageous; My Little Pony and
[13] Friends; My Little Pony; Visionaries.
[14] Inhumanoids is involved in this. That's it.
[15]     Q: Miss Bryant, you've named The
[16] Transformers, also known as Robots in Disguise,
[17] G.I. Joe, also known as The Real American Hero,
[18] Jem Theme, also known as Truly Outrageous, My
[19] Little Pony and Friends, My Little Pony,
[20] Visionaries and possibly Inhumanoids.
[21]     A: There's another one, Robotics.
[22]     Q: Are there any others?
[23]     A: There are others, but I don't know
[24] that we've found issue with them. There are
[25] other themes, but these are the ones we're

---

**Page 35**

*A. Bryant*

[1]
[2] concerned about.
[3]     Q: Are there any other musical
[4] compositions that you've written that are at
[5] issue in this case?
[6]     A: I don't think so. I haven't seen
[7] yet —
[8]     MR. MONAGHAN: I can't help you.
[9] I'm not allowed.
[10]     Q: And I'd like to go back through each
[11] of them and just get a little bit more
[12] information about them. For The Transformers,
[13] also known as Robots in Disguise, did you write
[14] that?
[15]     A: Yes.
[16]     Q: What did you write?
[17]     A: Music.
[18]     Q: Were you solely responsible for
[19] writing music?
[20]     A: Yes, and the arrangements.
[21]     Q: Are there lyrics to that
[22] composition?
[23]     A: Yes.
[24]     Q: Did you write the lyrics?
[25]     A: No.

---

**Page 36**

*A. Bryant*

[1]
[2]     Q: For G.I. Joe, also known as The Real
[3] American Hero, did you write that?
[4]     A: No.
[5]     Q: Did you write the music?
[6]     A: No, just arrangements.
[7]     Q: For the Jem theme, did you write the
[8] Jem theme?
[9]     A: Yes.
[10]     Q: What were you responsible for
[11] writing?
[12]     A: Music and arrangements.
[13]     Q: For My Little Pony and Friends?
[14]     A: Music.
[15]     Q: Did you write arrangements for that?
[16]     A: Yes.
[17]     Q: Were there lyrics to that
[18] composition?
[19]     A: Yes, Barry Harmon wrote the lyrics.
[20]     Q: For My Little Pony, did you write
[21] that?
[22]     A: No.
[23]     Q: You didn't write the music?
[24]     A: No, I didn't.
[25]     Q: Did you do an arrangement? Did you

---

Anne Bryant
Vol. 1, March 31, 2003

Anne Bryant    v.
Broadcast Music, Inc., et al.

---

Page 37

**A. Bryant**

[1]
[2] write the arrangements?
[3] A: I did some over the years.
[4] Q: Are there lyrics to that
[5] composition?
[6] A: There was a jingle, you know, but it
[7] got incorporated into the TV thing, couple lines
[8] of melody, so the lyrics were like about toys,
[9] you know.
[10] Q: For Visionaries, did you write
[11] Visionaries?
[12] A: I think I did.
[13] Q: Did you write the music for
[14] Visionaries?
[15] A: Yeah. Well, that's what I would
[16] have done for them. I don't know how it works
[17] for other people.
[18] Q: Did you do arrangements for
[19] Visionaries?
[20] A: Yes.
[21] Q: Were there lyrics to the Visionaries
[22] composition?
[23] A: Yes.
[24] Q: Did you write the lyrics?
[25] A: No.

---

Page 38

**A. Bryant**

[1]
[2] Q: For Inhumanoids, did you write
[3] Inhumanoids?
[4] A: I think I co-wrote that. There's a
[5] point at which I can't tell who wrote what,
[6] those two I'm not sure. It's so collaborative,
[7] I don't remember.
[8] Q: Did you write music for Inhumanoids?
[9] A: Yes, I did and I did arrangements.
[10] Q: Did Inhumanoids have lyrics?
[11] A: Yes.
[12] Q: Did you write the lyrics?
[13] A: No.
[14] Q: And for Robotics, did you write the
[15] composition Robotics?
[16] A: I think so. I do remember the
[17] session from 1983, Media Sound.
[18] MR. MONAGHAN: Just yes or no did
[19] you write it.
[20] THE WITNESS: I think I did.
[21] MR. MONAGHAN: Okay.
[22] A: I think I did.
[23] Q: Did you write the music?
[24] A: Yes, that's what I do for them.
[25] Q: Did you do arrangements?

---

Page 39

**A. Bryant**

[1]
[2] A: Yes.
[3] Q: For Robotics?
[4] A: For Robotics.
[5] Q: And were there lyrics to the
[6] Robotics theme or to the Robotics composition?
[7] A: Yes.
[8] Q: Did you write the lyrics?
[9] A: No.
[10] Q: For the compositions that we just
[11] went through, Ms. Bryant, are you the copyright
[12] owner of any of these compositions?
[13] A: No.
[14] Q: Do you know who is?
[15] A: No.
[16] Q: And I can either go through them
[17] individually again or ask as a group whether
[18] these compositions were written originally as an
[19] advertising jingle or whether they were
[20] specifically written for a TV series.
[21] Why don't I go through them
[22] individually.
[23] A: Yeah, I think they're all a little
[24] different.
[25] Q: Referring to Transformers, was

---

Page 40

**A. Bryant**

[1]
[2] this — was that composition originally written
[3] as an advertising jingle or for the TV series?
[4] A: Yes, it was written as a jingle.
[5] Q: And G.I. Joe also known as The Real
[6] American Hero, was that originally written as a
[7] jingle or —
[8] A: A jingle as well, yes.
[9] Q: The Jem theme, was that originally
[10] written as a jingle?
[11] A: It was written originally as a
[12] television theme.
[13] Q: My Little Pony and Friends?
[14] A: Television theme.
[15] Q: My Little Pony?
[16] A: Jingle, at first a jingle.
[17] Q: Visionaries, was that originally
[18] written as —
[19] A: A television theme. I believe it
[20] was a television theme.
[21] MR. MONAGHAN: Don't guess. Be sure
[22] of your answers.
[23] Q: If you don't know, that's fine too.
[24] MR. MONAGHAN: Yes.
[25] A: See, I don't watch television, so I

---

Page 41

**A. Bryant**

[1]
[2] don't really know which came out first on that
[3] one or on the next one either.
[4]    **Q:** The next one being Inhumanoids?
[5]    **A:** Yes.
[6]    **Q:** Was Robotics originally written as a
[7] jingle or television theme?
[8]    **A:** I don't know.
[9]    **Q:** You indicated that to your knowledge
[10] the Transformers composition, G.I. Joe and the
[11] My Little Pony composition were all originally
[12] written as jingles. Let me ask individually,
[13] was the Transformers composition included in the
[14] episodes of the TV series as it was originally
[15] composed as a jingle?
[16]    **A:** Same melody, yes.
[17]    **Q:** Were there changes?
[18]    **A:** I might have done a new
[19] arrangement. I think that that was a change.
[20] Same piece of music.
[21]    **Q:** For the G.I. Joe composition, was
[22] the jingle included in the episode of the TV
[23] series as it was originally composed?
[24]    **A:** I believe so.
[25]    **Q:** Were there any changes?

Page 42

**A. Bryant**

[1]
[2]    **A:** I'd just be guessing.
[3]    **Q:** And for the My Little Pony
[4] composition, was this jingle included in
[5] episodes of the TV series as it was originally
[6] composed?
[7]    **A:** I don't remember. Originally it had
[8] its own television show. I don't remember how
[9] that was done, but you can ask me another
[10] question that's going to be the answer.
[11]    **Q:** Were there changes?
[12]    **A:** I really don't remember. I know it
[13] was sold on video as a television show, then My
[14] Little Pony got mechanically sort of in the
[15] '80s. It was a TV show at one point but I
[16] didn't watch it. I write this stuff but I don't
[17] watch it.
[18]    **Q:** Miss Bryant, are you familiar with
[19] the term work for hire?
[20]    **A:** Yes.
[21]    **Q:** And what do you understand that term
[22] to mean?
[23]    **A:** As its always applied in my career,
[24] I'm not the copywriter on it. The work I've
[25] done has been made for hire on behalf of the

Page 43

**A. Bryant**

[1]
[2] publisher, client, whoever they assigned it to.
[3] I give up the copyright in exchange for a fee
[4] while also retaining my performance rights,
[5] royalties and any other outside royalties. That
[6] is the way work for hire works in the jingle
[7] business, it has worked for me for 30 years.
[8]    **Q:** Okay. So you get your fee and
[9] performance rights, royalties and other
[10] royalties?
[11]    **A:** Yes.
[12]    **Q:** What other types of royalties?
[13]    **A:** Mechanical royalties. If we write a
[14] piece for a jingle, then it becomes a television
[15] show, then it becomes a video, then it becomes
[16] VHS and television special, you know, go into
[17] these different areas that generate royalties
[18] for the writers.
[19]    **Q:** Any other types of royalties,
[20] performance rights royalties and mechanical
[21] royalties?
[22]    **A:** I've never experienced any.
[23]    **Q:** Okay. When you wrote the
[24] compositions at issue in this case were you
[25] working on a work for hire basis?

Page 44

**A. Bryant**

[1]
[2]    **A:** Yes, yes, commercial music house.
[3]    **Q:** Did you have a written contract to
[4] produce the compositions at issue in this case?
[5]    **A:** Ford Kinder told me that there was a
[6] contract. I don't remember ever signing a
[7] contract with them, but he was my partner and he
[8] said there was a contract at some point in our
[9] association with those people.
[10]    **Q:** And did you write all of these
[11] compositions during your — the periods of your
[12] association with Ford Kinder?
[13]    **A:** Yes, all of them were written
[14] during my associations with Ford Kinder except
[15] for My Little Pony and the G.I. Joe music, G.I.
[16] Joe jingle. They were composed prior to Kinder
[17] & Bryant.
[18]    **Q:** Did you ever have a copy of a
[19] contract that you've had to produce these
[20] jingles?
[21]    **A:** Those specifically?
[22]    **Q:** Yes, I'm sorry, these compositions.
[23]    **A:** No, I don't have the contracts.
[24]    **Q:** And were you paid a creative fee
[25] according to your agreement to produce these

Page 45

A. Bryant

[1]
[2] compositions?
[3]   A: Yes.
[4]   Q: Did your agreement to produce these
[5] compositions specify that you would receive a
[6] writer's share of the royalties for public
[7] performances of the music?
[8]   MR. MONAGHAN: Did she testify that
[9] there were agreements?
[10]   MS. KITSON: She said she
[11] believed — she was told by Ford Kinder —
[12]   MR. MONAGHAN: Okay.
[13]   MS. KITSON: — that there was --
[14]   MR. MONAGHAN: But she said she
[15] didn't have copies. So now you're asking
[16] her what the elements of the agreement
[17] that she doesn't have copies —
[18]   MS. KITSON: I'm asking her about
[19] the elements of the contract that was
[20] formed by Kinder.
[21]   MR. MONAGHAN: You still need some
[22] foundation, I think; does she know what
[23] the terms of this agreement were.
[24]   Q: In regard to the contract —
[25]   MR. MONAGHAN: It's not the best

Page 46

A. Bryant

[1]
[2] evidence --
[3]   Q: You said that Ford Kinder told you
[4] that there was. Did you ever read that
[5] contract?
[6]   A: I didn't know —
[7]   MR. MONAGHAN: Yes or no.
[8]   A: No.
[9]   Q: Okay. Were you ever made aware in
[10] any other way of what the terms of that contract
[11] included?
[12]   A: I knew our working agreement with
[13] clients and I knew that it passed from our
[14] working agreement at Michlin Company with the
[15] same rules, and Joe Bacal said —
[16]   MR. MONAGHAN: Wait, wait. You got
[17] to answer just the question as asked.
[18]   THE WITNESS: All right.
[19]   MR. MONAGHAN: Because, you know,
[20] these are events of many years ago and you
[21] have to be certain of what you're saying.
[22]   Q: What form did this working agreement
[23] take? Was it written?
[24]   A: I've been told that it was written.
[25] The Michlin Company was written —

Page 47

A. Bryant

[1]
[2]   MR. MONAGHAN: You've been told it
[3] was written?
[4]   THE WITNESS: Yes.
[5]   MR. MONAGHAN: Okay. Well, that's
[6] all you can say because then unless you
[7] know what the terms of it were, you're
[8] just guessing.
[9]   THE WITNESS: Can I have a minute?
[10]   MR. MONAGHAN: To talk to me?
[11]   THE WITNESS: Yes.
[12]   MR. MONAGHAN: It's up to Roseann.
[13]   MS. KITSON: Sure. Yes.
[14]   THE WITNESS: Thanks, Roseann.
[15]   MS. KITSON: We'll go off the
[16] record.
[17]   (Discussion off the record.)
[18]   Q: Were you familiar with the terms of
[19] the working agreement that Michlin Company
[20] operated under?
[21]   A: Yes.
[22]   Q: What were those terms?
[23]   A: For a specified fee, for creative
[24] fee, arranging fee, productions fees, music
[25] would be created for the client, and the writers

Page 48

A. Bryant

[1]
[2] of the music would also be allowed to be part of
[3] the group, vocal group for singing. And all
[4] performance rights — I can't say this is the
[5] entire time of Michlin Company because that kind
[6] of changed toward the end. This happened — it
[7] grew into this, the performance rights,
[8] royalties and other items would go to the
[9] writers.
[10]   Q: And you say that that was the
[11] working agreement that existed at the end of
[12] your association with Michlin & Company, if I
[13] understand what you just said?
[14]   A: The last couple of years which
[15] involve from Bacal, that's when they sort of
[16] came along into an already existing business.
[17] They had other clients besides them, you know,
[18] prior to them.
[19]   Q: And when you were associated with
[20] Kinder & Bryant, did you operate a working
[21] agreement?
[22]   A: Yes, Joe Bacal said first day "same
[23] deal as Michlin & Company."
[24]   Q: When you worked with Kinder &
[25] Bryant, was Joe Bacal your sole client?

Anne Bryant    v.
Broadcast Music, Inc., et al.

Anne Bryant
Vol. 1, March 31, 2003

---

Page 49

*A. Bryant*

[1]
[2]    A: Not initially but he became my sole
[3]    client. He and his companies became the sole
[4]    client.
[5]    Q: Did these working agreements here at
[6]    Kinder & Bryant or Michlin Company cover the
[7]    copyright ownership of the compositions you
[8]    created?
[9]    MR. MONAGHAN: I think she answered
[10]   that, but it's okay, Anne.
[11]   A: I believe so. I believe it termed
[12]   it — I can see work for hire in my mind, yes.
[13]   Q: So under these working agreements
[14]   you were not the copyright owner of the
[15]   composition?
[16]   A: No.
[17]   Q: Okay. Miss Bryant, what is your
[18]   understanding of the rights of a composition's
[19]   copyright owner in terms of what they can do
[20]   with the composition?
[21]   MR. MONAGHAN: I'm — she's not a
[22]   lawyer.
[23]   MS. KITSON: I'm not asking for her
[24]   legal opinion.
[25]   MR. MONAGHAN: No, and her opinion

---

Page 50

*A. Bryant*

[1]
[2]    as to what a copyright owner owns is
[3]    really not particularly relevant or
[4]    illuminating as to the issues in this
[5]    case. She just testified what the
[6]    arrangement was regarding the copyrights
[7]    and what the writers retained.
[8]    MS. KITSON: She's previously
[9]    testified, though, that she does own
[10]   copyrights on songs that she's written.
[11]   MR. MONAGHAN: Right.
[12]   MS. KITSON: So I'm asking —
[13]   MR. MONAGHAN: Not at issue in the
[14]   case, though.
[15]   MS. KITSON: But what copyright
[16]   owners did with the compositions at issue
[17]   in the case is part of what the case is
[18]   about.
[19]   MR. MONAGHAN: Well, then I think
[20]   you have to stick with these
[21]   compositions.
[22]   MS. KITSON: Okay.
[23]   Q: Miss Bryant, what is your
[24]   understanding of what the rights of the
[25]   copyright owner of the compositions at issue in

---

Page 51

*A. Bryant*

[1]
[2]    the case can do with the compositions?
[3]    A: My understanding about any copyright
[4]    has always been it's the right —
[5]    MR. MONAGHAN: We're not talking
[6]    any.
[7]    THE WITNESS: That was prior to this
[8]    case was the right to copy. That's how I
[9]    learned how to spell copyright.
[10]   Q: And what do you understand the right
[11]   to copy to encompass?
[12]   A: To use the piece of music that the
[13]   copyright is held for in various different ways,
[14]   various ways.
[15]   Q: Referring specifically to the
[16]   compositions at issue in this case, is it your
[17]   understanding that the copyright owner of those
[18]   compositions could create derivative works from
[19]   those compositions?
[20]   MR. MONAGHAN: Define for the
[21]   record.
[22]   MS. KITSON: Derivative works?
[23]   MR. MONAGHAN: Yes.
[24]   MS. KITSON: Works that are based
[25]   upon but different than the original

---

Page 52

*A. Bryant*

[1]
[2]    compositions.
[3]    MR. MONAGHAN: Well, it's a term of
[4]    art, as you know, and I'm not sure that's
[5]    exactly the definition of it as used as a
[6]    term of art. So, I think we need some
[7]    clarification.
[8]    Are you talking about derivative
[9]    works as defined in the Copyright Act or
[10]   as defined by the case law under the
[11]   Copyright Act?
[12]   MS. KITSON: I'm talking about —
[13]   well, yes.
[14]   MR. MONAGHAN: Loosely termed
[15]   derivative rights could be anything
[16]   that —
[17]   MS. KITSON: What I'm talking about
[18]   is music that is based upon the original
[19]   composition.
[20]   MR. MONAGHAN: Okay.
[21]   MS. KITSON: But is not exactly the
[22]   same as the original composition.
[23]   MR. MONAGHAN: Okay.
[24]   A: I'm sorry, I got confused.
[25]   Q: Okay. With that definition in mind

---

Page 53

*A. Bryant*

[1]
[2] of what I am referring to as a derivative work,
[3] is it your understanding that the copyright
[4] owner of the compositions at issue in this case
[5] could create derivative works from those
[6] compositions?
[7]    A: It's not my understanding. I
[8] believe that they can use it however they want
[9] as long as they account for the performance
[10] royalties, mechanical royalties or other
[11] considerations for performers and composers. I
[12] think that's right.
[13]    Q: Is it your understanding that the
[14] copyright owner of the compositions at issue in
[15] this case could alter the way that a composition
[16] is credited?
[17]    MR. MONAGHAN: Where?
[18]    MS. KITSON: With a performing
[19] rights organization, with BMI. With any
[20] performing arts organization.
[21]    MR. MONAGHAN: Unilaterally?
[22]    A: Could you read that back to me?
[23]    MS. KITSON: Can you read that
[24] back? Read my question back.
[25]    (The record was read.)

Page 54

*A. Bryant*

[1]
[2]    A: Is it my understanding that they can
[3] do that?
[4]    Q: Yes.
[5]    A: It's my understanding that they
[6] can't do that unless formal procedures are
[7] followed that are in place at BMI and ASCAP.
[8]    Q: And what do you understand those
[9] procedures to be?
[10]    A: Well, it's a matter of protecting
[11] writers. BMI — and I can't speak for ASCAP, I
[12] know they have a similar situation — but BMI
[13] has a formal writer change agreement in which
[14] someone comes in and says I wrote the
[15] Transformer music and they go "hold it, let's
[16] contact Anne Bryant." And then I'm told that
[17] somebody said they wrote my music. And then I
[18] have to defend that or knock that down and they
[19] stop the royalty payments and hold everything.
[20]    This is in their rule book. It's
[21] online. It's a protection for everybody.
[22] Everyone involved is notified and until they
[23] have an agreement as to who really wrote this
[24] and all things have been satisfied, no changes
[25] are made. But if in fact it turns out that

Page 55

*A. Bryant*

[1]
[2] somebody else wrote part of this and it's
[3] proven, then they make all the changes and we
[4] all sign off on it. That's a formal writer
[5] change. That's the only way they can change
[6] writer's credits. It says it all over the
[7] place. And without that, who would sleep if the
[8] people could come in and say I wrote Just The
[9] Way You Are, Billy Joel didn't write it. They
[10] need that, you know. So that's how it's
[11] changed.
[12]    Q: And do you own a rule book that
[13] contains this BMI policy within it?
[14]    A: I did. I think I sent it to you,
[15] yes.
[16]    MR. MONAGHAN: Well, own — yes, we
[17] had a copy of the rule book. I don't know
[18] what iteration it is.
[19]    A: But also it's online. The rule book
[20] is online now.
[21]    Q: And is the online version the same
[22] as exists within the rule book that you have a
[23] copy of?
[24]    A: On this issue it speaks in the same
[25] way, there are no changes of writers without a

Page 56

*A. Bryant*

[1]
[2] formal writer change agreement.
[3]    REQ MS. KITSON: I would request a copy
[4] of the — I'm not sure whether or not we
[5] need the entire rule book, but the formal
[6] writer change agreement policy that
[7] Ms. Bryant is explaining.
[8]    MR. MONAGHAN: Okay. Can I trouble
[9] you to do what we usually do in these
[10] circumstances which provides that after
[11] the deposition you'll drop me a note and
[12] say this is what I —
[13]    MS. KITSON: No problem.
[14]    MR. MONAGHAN: Because I'll never
[15] remember this.
[16]    Q: Miss Bryant, do you receive
[17] royalties on the compositions that you've
[18] written?
[19]    A: Yes.
[20]    Q: In calendar year 1992 — excuse me,
[21] 2002, for example, the year just past,
[22] approximately how many compositions did you
[23] receive royalties on in that year?
[24]    A: Eight, 10 — no, I can't say that.
[25] That's just little Jem show songs, I produced

Anne Bryant   v.
Broadcast Music, Inc., et al.

Anne Bryant
Vol. 1, March 31, 2003

---

Page 57

[1]                          *A. Bryant*
[2] hundreds of them. It's very little money, lots
[3] of songs.
[4]    MR. MONAGHAN: Just answer the
[5] question.
[6]    THE WITNESS: Pat, I don't know. I
[7] have to look.
[8]    MR. MONAGHAN: If you don't
[9] remember, then you don't remember.
[10]   Q: If you don't know, you don't know.
[11]   MR. MONAGHAN: You're not going to
[12] get marked.
[13]   THE WITNESS: I'm sorry, I'm not —
[14]   MR. MONAGHAN: How many do you
[15] recall or know compositions produced
[16] royalties in 2002?
[17]   A: I don't know, I can get you that
[18] information if you really needed it. I could
[19] look for it. I have all my statements since
[20] 1975.
[21]   MR. MONAGHAN: Don't volunteer. Let
[22] her ask the questions.
[23]   THE WITNESS: Well, she has
[24] everything. Sorry. They have the
[25] statements. I mean, goodness. They have

---

Page 58

[1]                          *A. Bryant*
[2] whatever I have.
[3]    MS. KITSON: Well, to the extent
[4] that the statements — I assume the
[5] statements have been produced. Have the
[6] statements been produced to Mr. Bacal's
[7] attorney?
[8]    MR. MONAGHAN: For 2002?
[9]    REQ MS. KITSON: The statements for the
[10] period since Miss Bryant says she has them
[11] since 1975. We would only be interested
[12] in the period relevant to the suit, so I
[13] guess that would be approximately 1993 to
[14] the present.
[15]   THE WITNESS: Did I do something? I
[16] thought everybody had this.
[17]   MR. MONAGHAN: We'll make — this is
[18] Sunbow.
[19]   THE WITNESS: So what's the
[20] difference?
[21]   MR. MONAGHAN: This is Sunbow's
[22] attorney asking for these statements, not
[23] BMI's or Bacal's.
[24]   THE WITNESS: Aren't you Joe Bacal's
[25] attorneys?

---

Page 59

[1]                          *A. Bryant*
[2]    MR. MONAGHAN: They're not
[3] together.
[4]    THE WITNESS: You don't speak to
[5] each other?
[6]    MS. KITSON: We just share the same
[7] side of the caption.
[8]    MS. VALENCIA: But we should all
[9] have the same discovery since we are
[10] related.
[11]   THE WITNESS: You can't give it to
[12] her?
[13]   MS. VALENCIA: I don't believe that
[14] we have it.
[15]   MR. MONAGHAN: The request is for
[16] the statements. We'll take it under
[17] advisement. Send me a letter and we'll
[18] respond.
[19]   MS. KITSON: It's from '93 to the
[20] present, not from 1975 to the present.
[21]   MR. MONAGHAN: Well, '93 to the
[22] present is a large enough project.
[23]   THE WITNESS: I'm going to have a
[24] big job when I get home.
[25]   Q: Miss Bryant, from how many entities

---

Page 60

[1]                          *A. Bryant*
[2] do you receive royalties from the compositions
[3] that you've written?
[4]    A: You mean like BMI?
[5]    Q: Exactly.
[6]    A: From BMI.
[7]    Q: And are there any other entities
[8] that pay you royalties for the composition?
[9]    MR. MONAGHAN: SAG or other
[10] performing rights societies.
[11]   A: The Screen Actor's Guild is a
[12] performing union, it's no a royalty.
[13]   Q: I'm only asking for royalty
[14] payments.
[15]   A: I'm in BMI. You can only be in
[16] one. Formerly I got mechanical royalties
[17] through Sunbow, but I haven't gotten them for
[18] many years.
[19]   MR. MONAGHAN: You don't want to
[20] pick up on that question, so I don't have
[21] to ask her.
[22]   Q: What mechanical royalties did you
[23] receive from Sunbow?
[24]   A: VHS sales on Transformers, I think
[25] that was in France, and My Little Pony which I

---

Page 61

**A. Bryant**

[1]
[2] know was in France.
[3] Q: And when did you receive those
[4] approximately?
[5] A: In the late '80s.
[6] Q: And do you receive those any longer?
[7] A: I haven't gotten them since the late
[8] '80s.
[9] Q: How often do you receive royalty
[10] payments?
[11] A: Twice a year now. They combine the
[12] statements of all categories.
[13] Q: And I think we went over this, but
[14] do you receive reports regarding the royalty
[15] payments when you receive the payments?
[16] MR. MONAGHAN: Statements?
[17] A: Statements, yeah.
[18] Q: Statements, okay.
[19] A: Yes.
[20] Q: And are those the statements that
[21] you referred to earlier that we asked to have
[22] produced?
[23] A: Yes.
[24] Q: Other than BMI have you ever had a
[25] problem collecting royalties from any other

Page 62

**A. Bryant**

[1]
[2] royalty collecting entity?
[3] A: I've always been with BMI.
[4] MR. MONAGHAN: Since she was 18?
[5] THE WITNESS: 21, unfortunately.
[6] Remember that?
[7] Q: And are you familiar with the term
[8] mechanical royalties?
[9] A: Yes.
[10] Q: And what do you understand
[11] mechanical royalties to be?
[12] A: It's a compensation for composers,
[13] authors for music and songs used in connection
[14] with a mechanical item. Like it's not broadcast
[15] aired, it's attached to a DVD, a VHS, a video
[16] game.
[17] MR. MONAGHAN: A record?
[18] A: A record. A mechanical object. A
[19] film. Those are mechanicals. Performance
[20] rights are things that are out in the air.
[21] Q: Okay.
[22] A: It gets broadcast or a live
[23] performance.
[24] Q: Have you ever entered into a
[25] contract that governed your collection of

Page 63

**A. Bryant**

[1]
[2] mechanical royalties for a composition that
[3] you've created —
[4] A: Yes, a very specific contract with
[5] Walt Disney.
[6] MR. MONAGHAN: Relating to any of
[7] these compositions?
[8] THE WITNESS: None of these, no.
[9] Strange company.
[10] Q: And did you ever enter into a
[11] contract for mechanical royalties with Sunbow
[12] Productions?
[13] A: No.
[14] Q: Did you ever enter into a contract
[15] regarding mechanical royalties with Griffin
[16] Bacal Incorporated?
[17] MR. MONAGHAN: Are you talking about
[18] a written contract?
[19] MS. KITSON: Yes.
[20] A: Not that I know of.
[21] Q: Have you ever heard of the Harry Fox
[22] Agency?
[23] A: I've heard of him, yes.
[24] Q: Are you affiliated with the Harry
[25] Fox Agency?

Page 64

**A. Bryant**

[1]
[2] A: No.
[3] Q: Are you familiar with the term
[4] synchronization license or sync license?
[5] A: I've heard it.
[6] Q: Do you have any understanding of
[7] what a sync license is?
[8] A: I don't really know how that works.
[9] Q: To the best of your knowledge have
[10] you ever entered into a contract that granted a
[11] sync license?
[12] A: I don't know. I don't know enough
[13] about it.
[14] Q: Do you now or have you in the past
[15] collaborated with others in composing
[16] compositions?
[17] A: I don't corroborate writing
[18] compositions.
[19] MR. MONAGHAN: So that was no?
[20] THE WITNESS: No.
[21] Q: Have you worked with lyricists?
[22] A: Yes.
[23] Q: And have those lyricists created
[24] lyrics for music that you have written?
[25] A: Yes.

Page 65

A. Bryant

[1]
[2] Q: Could you tell me the names of the
[3] lyricists that you have worked for during the
[4] period relevant to this suit?
[5] A: Worked for?
[6] Q: I'm sorry, worked with.
[7] A: Oh, okay. Barry Harmon.
[8] Q: Any others?
[9] A: You know, in the jingle business
[10] advertising copy is provided. I don't know if
[11] you call that lyrics, but you can call it
[12] lyrics.
[13] MR. MONAGHAN: No, just as you're
[14] testifying about. Any other lyricists as
[15] you've described it in your testimony thus
[16] far that you worked with?
[17] THE WITNESS: Ad agencies often give
[18] me —
[19] MR. MONAGHAN: You don't know.
[20] You're saying you're not sure? If you're
[21] saying something like this, it sounds like
[22] you don't know the answer, you're not sure
[23] of something and we don't want you to give
[24] an answer that you're not sure about.
[25] A: Well, I wouldn't call them lyrics,

Page 66

A. Bryant

[1]
[2] okay. I'm not sure is probably a good way to
[3] go.
[4] Q: Other than Barry Harmon you are
[5] unsure of any other lyricist that you've work
[6] with during the period relevant to this suit?
[7] A: In Gloryvision I had a partner who I
[8] wrote lyrics with, too.
[9] Q: And who was that person?
[10] A: Ellen Bernfeld.
[11] (Discussion off the record.)
[12] Q: Miss Bryant, when you worked with
[13] lyricists, how is each person's share for the
[14] credit of the compositions determined?
[15] A: It's highly individual to each song
[16] and the situation with it. It can be 50/50 but
[17] it can be other than that.
[18] Q: Do you currently write songs or
[19] jingles for an advertising agency?
[20] A: Yes.
[21] Q: Do you currently write songs or
[22] jingles for a TV production company?
[23] MR. MONAGHAN: How would that be —
[24] maybe it's changed, so I'm not sure that
[25] question asking what the current situation

Page 67

A. Bryant

[1]
[2] is is helpful.
[3] A: Background scores for documentaries
[4] for television, but I write jingles and scores
[5] for jingles for ad agencies, but as far as
[6] production companies, it's been, you know,
[7] documentary film scores, not TV show themes.
[8] But the score.
[9] Q: Do you currently have a written
[10] contract that governs your business dealings
[11] with the advertising agency you write for?
[12] MR. MONAGHAN: Object. I'm going to
[13] object to that question as being
[14] irrelevant.
[15] Q: You can answer.
[16] MR. MONAGHAN: You can answer unless
[17] I say don't.
[18] THE WITNESS: I don't know why I
[19] should answer anything you object to.
[20] MR. MONAGHAN: Well, I object as it
[21] being relevant, but I'm not telling you
[22] not to answer unless I think I should. So
[23] it's just a yes or no. Do you currently
[24] have a contract —
[25] A: I have contracts on everything that

Page 68

A. Bryant

[1]
[2] I write in terms of registration with BMI, the
[3] rights that the clients has as far as —
[4] MR. MONAGHAN: So that's a yes, it's
[5] a production contract?
[6] THE WITNESS: I guess it's a
[7] production contract.
[8] MR. MONAGHAN: Well, that's what she
[9] asked. That's what Roseann asked.
[10] Q: So the answer is yes?
[11] A: Yes.
[12] MR. MONAGHAN: And we won't produce
[13] it because we don't think it's relevant.
[14] DIR Q. Who negotiated the contract on your
[15] behalf?
[16] MR. MONAGHAN: Object to the
[17] question and instruct her not to answer.
[18] Q: Do you have an agent?
[19] A: No.
[20] Q: Have you ever had an agent?
[21] A: No.
[22] Q: Do you utilize an attorney to
[23] negotiate business agreements for you?
[24] A: When necessary. Standard practice I
[25] don't, you know.

Page 69

### A. Bryant

[1]
[2] Q: Who is your attorney? Who
[3] negotiates business arrangements for you?
[4] A: Patrick Monaghan, Jr.
[5] MR. MONAGHAN: No, negotiating, I
[6] don't negotiate. I don't negotiate.
[7] THE WITNESS: Advise?
[8] MR. MONAGHAN: Well, there's a big
[9] difference. I've had no dealings with —
[10] Q: Assists you in entering into the
[11] written agreements that you say you have in
[12] terms of producing your work.
[13] A: I don't think I have anybody to do
[14] that for me.
[15] Q: Okay.
[16] A: I've been in the business so long,
[17] this is standard publishing.
[18] MR. MONAGHAN: Stop.
[19] Q: Going back to your prior employment
[20] history, focusing on the period from — focusing
[21] on your employment with Michlin & Company,
[22] Kinder & Bryant and what is subsequent to that,
[23] when you worked with Michlin Company did you
[24] work for more than one client?
[25] A: Lots of clients, yes. Mainstream

Page 70

### A. Bryant

[1]
[2] advertising.
[3] Q: And at that time was your work for
[4] those clients governed by the — let me get the
[5] right term, the working agreement that we
[6] discussed previously?
[7] A: You mean Michlin & Company's working
[8] agreement?
[9] Q: Yes.
[10] A: Yes, but they paid much higher fees
[11] than the one we discussed previously.
[12] Q: Okay. But your work with all of
[13] your different clients would be governed by the
[14] terms of that working agreement, the terms of
[15] which we discussed earlier?
[16] MR. MONAGHAN: Well, the client is
[17] the agent's agency. I just want a
[18] clarification. When she's asking client,
[19] you're talking about the ad agency,
[20] correct?
[21] MS. KITSON: It was my
[22] understanding —
[23] MR. MONAGHAN: — or Michlin Co.—
[24] MS. KITSON: — during Miss Bryant's
[25] associations with Michlin & Company she

Page 71

### A. Bryant

[1]
[2] worked for Michlin & Company.
[3] MR. MONAGHAN: Right.
[4] MS. KITSON: The clients I'm
[5] referring to are —
[6] MR. MONAGHAN: Michlin's clients.
[7] MS. KITSON: — are the clients of
[8] Michlin Company.
[9] A: So what's the question?
[10] Q: The question is while you were
[11] associated with Michlin Company, was your work
[12] for Michlin Company's clients governed by the
[13] terms of the working agreement that we discussed
[14] previously?
[15] A: That Michlin & Company had with its
[16] clients, yes, it was.
[17] Q: During your association with Kinder
[18] & Bryant, was your work with Kinder & Bryant's
[19] clients governed by the working agreement that
[20] we discussed previously?
[21] A: Yes, those are the terms that you
[22] work under the jingle business, in the jingle
[23] business, so we carried them over.
[24] Q: Was that the same with regard to all
[25] of the clients that you worked with when you

Page 72

### A. Bryant

[1]
[2] were associated with Kinder & Bryant?
[3] A: Yes, but sometimes there was
[4] different, the payment terms, fees.
[5] Q: Other than Joe Bacal or JBI, could
[6] you tell me what other clients Kinder & Bryant
[7] worked with?
[8] A: Okay, Leo Burnett.
[9] Q: Could you spell the last name?
[10] A: B-U-R-N-E-T-T, Leo Burnett
[11] Advertising Agency, Chicago, Kellogg's, and —
[12] MR. MONAGHAN: Kellogg's cereal?
[13] THE WITNESS: Kellogg cereal, yeah.
[14] I see a dog. I don't know, a dog food. I
[15] don't remember. Also in Chicago a J.
[16] Walter Thompson, another dog food, and
[17] Kraft, and then also in Chicago, Needham
[18] Harper and Steers which got bought — I
[19] think eventually bought Griffin Bacal,
[20] Needham we called them. What's the name
[21] of that beer? I think it was Budweiser.
[22] It was a beer. I don't know, Budweiser.
[23] Q: Well, it's the king of beers.
[24] A: Yeah, it's a pretty nice campaign.
[25] And several other campaigns. I can't remember

Anne Bryant   v.
Broadcast Music, Inc., et al.

Anne Bryant
Vol. 1, March 31, 2003

Page 73

*A. Bryant*

[1]
[2] them all, but a number of those. And then that
[3] was in Chicago, the Chicago agencies. The New
[4] York agency I remember Grey Advertising. We
[5] used to call it Gay Advertising because
[6] everybody was gay there.
[7]   MR. MONAGHAN: Don't volunteer.
[8]   THE WITNESS: Oh, my God.
[9]   Q: We won't be sharing this with Grey.
[10]   THE WITNESS: I didn't care. I'm
[11] sorry.
[12]   Q: Any others besides Grey?
[13]   A: Yes, J. Walter Thompson.
[14]   MR. MONAGHAN: This is a New York
[15] now?
[16]   THE WITNESS: This is New York.
[17]   MR. MONAGHAN: BBD&O?
[18]   A: Yeah, we did a job for BBD&O, that
[19] was the last one, too. Ogilvy and Mather, Geer
[20] du Bois.
[21]   Q: Any others that you recall?
[22]   MR. MONAGHAN: Anne, that's fine.
[23]   A: There were a couple of those of the
[24] agencies that we haunted as much as possible,
[25] but these we worked for quite a bit.

Page 74

*A. Bryant*

[1]
[2]   Q: Okay.
[3]   THE WITNESS: Is that bad? I'm
[4] sorry.
[5]   MR. MONAGHAN: No, it's not bad.
[6] That's fine.
[7]   Q: While you were associated with
[8] Kinder & Bryant, did Kinder & Bryant have a
[9] written contract that governed its business
[10] dealings with these clients?
[11]   MR. MONAGHAN: Case by case or
[12] generic?
[13]   Q: For each of them, did — or let me
[14] withdraw that question and ask; as a general
[15] matter while you were associated with Kinder &
[16] Bryant, did Kinder & Bryant use a written
[17] contract in their business dealings with its
[18] clients, particularly those that you just named?
[19]   A: I have to answer this in a general
[20] way. Can I do that?
[21]   MR. MONAGHAN: No, yes or no or I
[22] don't remember. Written, she asked if
[23] there was a written contract.
[24]   A: But she's asking me about lots of
[25] different people.

Page 75

*A. Bryant*

[1]
[2]   Q: As a general matter.
[3]   MR. MONAGHAN: As a general rule.
[4]   A: As a general rule, there was always
[5] some kind of piece of paper I think that
[6] existed. There may have been exceptions but
[7] some kind of royalty assignment or payment
[8] agreement or reimbursement that set forth the
[9] terms. They often presented it to us, that more
[10] often was the case.
[11]   MR. MONAGHAN: Okay.
[12]   A: They sent it to us.
[13]   Q: And who negotiated those agreements
[14] on behalf of Kinder & Bryant?
[15]   A: I don't think we got any advice on
[16] them. It was fairly standard in the industry.
[17]   MR. MONAGHAN: This is going back
[18] into the '80s?
[19]   MS. KITSON: During her association
[20] with Kinder & Bryant.
[21]   MR. MONAGHAN: I really don't think
[22] it's relevant. I don't think we should go
[23] down this line much further.
[24]   MS. KITSON: Okay.
[25]   MR. MONAGHAN: It's too old.

Page 76

*A. Bryant*

[1]
[2]   MS. KITSON: We can stop right
[3] there.
[4]   Q: Miss Bryant, who is Ford Kinder?
[5]   MR. MONAGHAN: Now, just —
[6]   A: He was my partner in Kinder &
[7] Bryant.
[8]   Q: When did you first start working
[9] with Ford Kinder?
[10]   A: 1977.
[11]   Q: Were you partners at that time?
[12]   A: No, he was hired to be my assistant
[13] at Michlin & Company.
[14]   Q: How long did you work with Ford
[15] Kinder?
[16]   A: About 13 years I think we were
[17] together.
[18]   Q: When did you form your partnership
[19] with Ford Kinder?
[20]   A: In 1981 I had Anne Bryant Music —
[21]   MR. MONAGHAN: No, it's when.
[22]   A: June of 1983 he became part of my
[23] company and we created a larger company. I had
[24] an ongoing company of my own at that point that
[25] he came into.

Page 77

*A. Bryant*

[1]
[2]   Q: And was that larger company Kinder &
[3] Bryant?
[4]   A: The larger company became the two of
[5] us.
[6]   Q: And it was called Kinder & Bryant?
[7]   A: Ltd.
[8]   Q: Ltd.
[9]   THE WITNESS: Didn't you do that?
[10]   MR. MONAGHAN: She's referred to you
[11] called it a partnership, it actually is a
[12] corporation.
[13]   MS. KITSON: Oh, okay.
[14]   Q: Did the two of you have rules or
[15] policies that you followed regarding registering
[16] compositions with performing rights
[17] organizations that were written by both of you
[18] together during your association with Kinder &
[19] Bryant?
[20]   MR. MONAGHAN: Did you have rules
[21] and policies?
[22]   A: Well, it's a two-part question that
[23] you're asking me, two conditions within that.
[24] One is we didn't write together.
[25]   Q: Okay.

Page 78

*A. Bryant*

[1]
[2]   A: Two is that rules and policies, we
[3] didn't register things. The publisher and their
[4] employees did.
[5]   Q: Did the two of you split the
[6] responsibilities of running your business apart
[7] from the work of actual song writing or
[8] composing?
[9]   MR. MONAGHAN: Meaning like 50/50?
[10]   MS. KITSON: Did they or did one do
[11] it all and the other did not?
[12]   MR. MONAGHAN: No, I understand.
[13]   A: We both wrote, we both did business.
[14]   Q: How did the two of you split the
[15] responsibilities on the business end of Kinder &
[16] Bryant?
[17]   MR. MONAGHAN: I don't think it's
[18] relevant. Some of the other questions
[19] were tangentially possibly relevant, but I
[20] don't think this is relevant.
[21] Registration issues might be but not this,
[22] this is too old.
[23]   Q: Was contact with publishers part of
[24] the business end of Kinder & Bryant?
[25]   A: It's a lot more streamline than

Page 79

*A. Bryant*

[1]
[2] that. We didn't go visit the publisher. The
[3] client was the publisher.
[4]   MR. MONAGHAN: The client was the
[5] publisher?
[6]   A: So —
[7]   MR. MONAGHAN: So the question was
[8] did you visit, is that it?
[9]   Q: Was contact with the publisher —
[10]   MR. MONAGHAN: Contact.
[11]   Q: — part of what would be referred to
[12] as the business end?
[13]   A: It was within the whole scope of
[14] writing music for these people and the way that
[15] the industry worked. Work for hire, going
[16] rights and stuff.
[17]   Q: Generally speaking did you or Ford
[18] Kinder have more client contact on behalf of
[19] your company?
[20]   A: In the aggregate —
[21]   MR. MONAGHAN: Yeah, at what point?
[22] Which client?
[23]   Q: Generally speaking.
[24]   MR. MONAGHAN: Generally.
[25]   Q: In terms of dealing with the

Page 80

*A. Bryant*

[1]
[2] client.
[3]   MR. MONAGHAN: Is it possible to
[4] answer that generally speaking?
[5]   A: I had all the contact with the
[6] Chicago clients because I used to write for them
[7] out there. He had none and they called on me
[8] and they wanted me to do the writing.
[9]   MR. MONAGHAN: Okay, but that was —
[10] the question was generally?
[11]   A: So sometimes it was more, one or the
[12] other. He had a connection over here. I had a
[13] connection over there. And we pulled it all
[14] together for both of us. So I think it came out
[15] pretty even.
[16]   Q: Was the amount of client contact
[17] that either of you had dependant upon which
[18] client would be in question?
[19]   A: I would say that would be true,
[20] yeah, yeah, sometimes.
[21]   Q: How long were you in business with
[22] Ford Kinder? And I'm referring to Kinder &
[23] Bryant Ltd.
[24]   A: June 10th, 1983 to November 8th,
[25] 1989.

Anne Bryant v.                                                    Anne Bryant
Broadcast Music, Inc., et al.                           Vol. 1, March 31, 2003

---

Page 81

[1]                    *A. Bryant*
[2]    THE WITNESS: How is that?
[3]    MR. MONAGHAN: It's great if it's
[4] correct like everything else.
[5]    THE WITNESS: Did you know
[6] corporations have a birthday?
[7]    MR. MONAGHAN: Yes.
[8]    THE WITNESS: I love that.
[9]    MR. MONAGHAN: What did you say 11,
[10] what was that answer?
[11]    MS. KITSON: 11/8/89.
[12]    Q: And is that when the partnership
[13] broke up, November 8th, 1989?
[14]    A: You mean when it severed?
[15]    MR. MONAGHAN: What's the
[16] significance of the date, what happened?
[17]    Q: What is the significance of November
[18] 8 —
[19]    A: We signed a separation agreement.
[20]    Q: And what was the reason for the
[21] break up of the partnership?
[22]    MR. MONAGHAN: Well, is there a
[23] reason stated in the separation agreement
[24] or, you know, her opinion or his opinion?
[25] There's a bunch of variables there.

---

Page 82

[1]                    *A. Bryant*
[2]    Q: Okay, we'll start with are there
[3] reasons for the break up of the partnership
[4] stated in the separation agreement?
[5]    A: No, it was very kind of clinical.
[6]    MR. MONAGHAN: Usually those kinds
[7] of things have whereas the parties have
[8] irreconcilable differences or something
[9] like that. But I don't remember.
[10]    MS. KITSON: An explanation of
[11] what's happening.
[12]    MR. MONAGHAN: But I don't
[13] remember.
[14]    MS. KITSON: Okay. Okay.
[15]    Q: After your partnership broke up you
[16] sued Ford Kinder, correct?
[17]    A: Yes.
[18]    Q: And what were your allegations in
[19] that suit?
[20]    MR. MONAGHAN: Well, subject to what
[21] the pleadings say. Her allegations are
[22] contained in the pleadings in the suit.
[23]    Q: To the best of your recollection,
[24] what were your allegations against Ford Kinder
[25] in that suit?

---

Page 83

[1]                    *A. Bryant*
[2]    MR. MONAGHAN: Okay, I don't think
[3] it's relevant, but I'll let her answer
[4] this question, but I don't want to go down
[5] everything in that case.
[6]    THE WITNESS: What was the
[7] question?
[8]    MR. MONAGHAN: Generally speaking
[9] what was the case about?
[10]    MS. KITSON: Could you read the
[11] question?
[12]    MR. MONAGHAN: The Kinder.
[13]    THE WITNESS: The Kinder suit.
[14]    (The record was read.)
[15]    A: He didn't pay the contract, the
[16] settlement contract and he undermined it. And
[17] in many ways — and essentially I left my
[18] company for no money.____
[19]    Q: By the settlement contract, are you
[20] referring to the separation agreement that was
[21] signed on November 8th, 1989?
[22]    A: Yes.
[23]    Q: Okay.
[24]    MR. MONAGHAN: Breach of contract?
[25]    THE WITNESS: Breach of contract.

---

Page 84

[1]                    *A. Bryant*
[2]    Q: Did Kinder interpose any
[3] counterclaims against you in that suit, if you
[4] recall?
[5]    A: Yes, he did temporarily, slander.
[6]    MR. MONAGHAN: That's right.
[7]    THE WITNESS: Remember that?
[8]    MR. MONAGHAN: That's right. Which
[9] was dismissed.
[10]    Q: And how was the suit resolved?
[11]    A: We settled it in 1994.
[12]    Q: And what are the terms of those
[13] settlements, if you recall?
[14]    MR. MONAGHAN: You have that, I
[15] think.
[16]    MS. KITSON: The settlement
[17] agreement?
[18]    MR. MONAGHAN: Yes. I think you do.
[19]    MS. KITSON: Okay.
[20]    MR. MONAGHAN: I know Adrienne
[21] does.
[22]    MS. VALENCIA: We do. If you don't
[23] have it, we can send it.
[24]    MR. MONAGHAN: Without holding her
[25] to it, if she can generally state what she

---

Page 85

A. Bryant

[1]
[2] recalls.
[3]    MS. VALENCIA: No, actually for
[4] clarification, we have a copy of the
[5] settlement agreement between Anne and Ford
[6] Kinder of the BMI lawsuit, not the 1994
[7] lawsuit.
[8]    MR. MONAGHAN: Really? I thought I
[9] sent you the other one, but, okay.
[10]    Q: So the question would stand. To the
[11] best of your recollection what were the terms of
[12] the settlement that you reached with Ford Kinder
[13] in 1994?
[14]    A: He paid me some cash and then he
[15] waived any right to any claim on anything that
[16] was in any composition for payment that was in
[17] my BMI catalog, I never had to account to him
[18] again. I had been paying him half for
[19] everything for our whole partnership and beyond,
[20] so then it became mine 100 percent. And then
[21] there was some other things that we did but I
[22] don't remember what they were.
[23]    Q: Okay. Ford Kinder and Kinder &
[24] Company were two of the original companies named
[25] in this suit; is that correct?

Page 86

A. Bryant

[1]
[2]    A: Yes.
[3]    Q: What is Kinder & Company, to the
[4] best of your knowledge?
[5]    A: It was a continuation of Kinder &
[6] Bryant without Bryant.
[7]    MR. MONAGHAN: And I have to check
[8] the agreement, too, if there's a
[9] confidentiality clause in there. I don't
[10] remember now. So if there is, until I
[11] look at it, I don't think I can let her
[12] answer any more questions about the
[13] settlement. I just don't remember.
[14]    MS. KITSON: The settlement, the
[15] 1994 settlement?
[16]    MR. MONAGHAN: Yes.
[17]    MS. KITSON: Okay, I'm done asking
[18] questions about that.
[19]    MR. MONAGHAN: So, if inadvertently
[20] there is, we would object belatedly, I
[21] suppose.
[22]    MS. KITSON: Okay, I have no more
[23] questions about the 1994 settlement.
[24]    MR. MONAGHAN: All right.
[25]    Q: Miss Bryant what is Vadivox Ltd.?

Page 87

A. Bryant

[1]
[2]    A: It's Latin for Ford's chords. It
[3] was Ford's personal services company.
[4]    Q: And by personal services company,
[5] what do you understand he did through Vadivox
[6] Ltd.?
[7]    A: He sang.
[8]    Q: In August 2001 you executed a
[9] settlement with Ford Kinder in regard to this
[10] litigation and he's no longer a defendant; is
[11] that correct?
[12]    A: I don't know how that — if he's no
[13] longer a defendant. I know it was without
[14] prejudice to recall him. So I don't know what
[15] that — I don't know what the legal situation is
[16] in that.
[17]    Q: So in August 2001 you did execute a
[18] settlement with Ford Kinder in regard to this
[19] litigation?
[20]    MR. MONAGHAN: There is a
[21] settlement. I don't remember the date of
[22] that one either.
[23]    THE WITNESS: It's a settlement, is
[24] that what you call it?
[25]    MR. MONAGHAN: Yes, but it has

Page 88

A. Bryant

[1]
[2] conditions.
[3]    A: Okay.
[4]    Q: Did that same settlement cover
[5] Kinder & Company?
[6]    A: You know, I don't know.
[7]    Q: Okay. Do you know if it covered
[8] Vadivox Ltd. —
[9]    MR. MONAGHAN: I think it covered
[10] all the defendants named in the suit and
[11] they were named.
[12]    MS. KITSON: Earlier we had
[13] discussed that counsel for Mr. Bacal has
[14] received a copy of that settlement.
[15]    MR. MONAGHAN: I've seen it in the
[16] papers. .
[17]    REQ MS. KITSON: I would just ask that
[18] that be produced to me.
[19]    MR. MONAGHAN: It's in Mr. Bacal's
[20] motion papers.
[21]    Q: Miss Bryant, have you had any
[22] contact with Ford Kinder since the execution of
[23] the settlement in August 2001?
[24]    A: He called me shortly after that to
[25] tell me his father died.

Anne Bryant   v.                                                                    Anne Bryant
Broadcast Music, Inc., et al.                                            Vol. 1, March 31, 2003

Page 89

[1]                    *A. Bryant*

[2]    Q: Any other contact?

[3]    A: I don't think so.

[4]    MR. MONAGHAN: That's interesting.

[5] How you were able to figure it was August

[6] '01 if you didn't have a copy of it?

[7]    MS. KITSON: It's amazing.

[8]    Q: Are you aware of any communications

[9] with Kinder regarding his serving as a witness

[10] in a trial of this matter?

[11]   MR. MONAGHAN: With anybody? By

[12] us?

[13]   MS. KITSON: If she is aware of any

[14] communications. I'm asking for her

[15] awareness, not the content of any

[16] communications, just whether or not you're

[17] aware of any communications with Kinder

[18] regarding his serving as a witness in the

[19] trial of this matter.

[20]   A: No.

[21]   Q: At some point during your career did

[22] you become familiar with an entity called Sunbow

[23] Productions, Inc.?

[24]   A: Yes.

[25]   Q: When was that?

Page 90

[1]                    *A. Bryant*

[2]    A: I believe it was 1978 when I wrote

[3] the theme for The Great Space Coaster.

[4]    Q: Did you work for Sunbow Productions?

[5]    A: Well, they were a client, you know.

[6]    Q: And Sunbow Productions was a client

[7] for Michlin Company?

[8]    A: Initially, yes.

[9]    Q: Initially?

[10]   A: Yeah.

[11]   Q: When you became associated with

[12] Kinder & Bryant Ltd., was Sunbow Productions,

[13] Inc. — did Sunbow Productions, Inc. continue to

[14] be a client of yours?

[15]   A: Yes, The Jem Show and other shows,

[16] yes.

[17]   Q: Who did you work with at Sunbow

[18] Productions?

[19]   A: Well, Joe Bacal over — was the

[20] over — creative director of Sunbow and Griffin

[21] Bacal, and they were kind of related, you know,

[22] together, those two companies. And Joe Bacal

[23] knew a certain rotating business staff that we

[24] sent contracts to. Carole Weitzman was in

[25] charge of — executive producer on the shows and

Page 91

[1]                    *A. Bryant*

[2] mostly Joe and Carole. Joe's secretary would

[3] get information.

[4]    MR. MONAGHAN: I lost track of the

[5] question, I'm sorry.

[6]    THE WITNESS: Who did we work with.

[7]    MS. KITSON: At Sunbow.

[8]    Q: Well, you've answered my next

[9] question whether you know Carole Weitzman. Did

[10] you work with Carole Weitzman?

[11]   MR. MONAGHAN: Work with?

[12]   A: Well, Carole wasn't a writer.

[13]   Q: Okay. What was the nature of your

[14] contact with Carole Weitzman?

[15]   A: I would see her at the Christmas

[16] party, and every now and then see her in a

[17] meeting or something, you know.

[18]   Q: Did you ever have any business

[19] related discussions with Carole Weitzman?

[20]   A: I don't remember if I did during

[21] Kinder & Bryant, but a few years ago I did.

[22]   Q: Does the conversation that you just

[23] referenced, did that have something to do with

[24] Sunbow Productions?

[25]   A: Yes.

Page 92

[1]                    *A. Bryant*

[2]    Q: And what did you speak about in the

[3] conversation that you've referenced?

[4]    A: I had set up a new recording studio

[5] and I had set it up in Rockland County, and it

[6] was ideal for me doing music for scoring, for

[7] background scoring for television. So I called

[8] her to see if there's — if I could get some

[9] work from Sunbow.

[10]   Q: And approximately when did this

[11] conversation happen?

[12]   A: It happened sometime I think the

[13] fall of 1997. It happened before this BMI

[14] problem came up.

[15]   MR. MONAGHAN: You want to think

[16] about breaking or you want to go a little

[17] bit? You have a line you want to finish?

[18]   MS. KITSON: I have a very short

[19] line.

[20]   MR. MONAGHAN: Sure.

[21]   Q: Okay. When was the last time that

[22] you worked with Sunbow Productions?

[23]   A: I stopped working with or for Sunbow

[24] or Griffin Bacal, they stopped hiring me the

[25] minute I separated from Ford Kinder. I don't

Anne Bryant                                                               Anne Bryant   v.
Vol. 1, March 31, 2003                                      Broadcast Music, Inc., et al.

---

Page 93

[1]                        *A. Bryant*
[2] know why.
[3]    Q: Was that as of November 8th, 1989?
[4]    A: They called me one time, that's
[5] right, they called me one time.
[6]    Q: Post-November 8th, 1989?
[7]    A: Yeah.
[8]    Q: Okay. And did you speak with
[9] somebody from Sunbow at that point?
[10]    A: Joe called me and told me that he
[11] wanted me to work for him, as much or as little
[12] I wanted and that I was his best composer and he
[13] wanted me to work with him. And then I split up
[14] with Ford Kinder, the settlement agreement was
[15] signed and they I didn't hear from Joe. And
[16] then I called him and I was encouraged to bring
[17] a studio into the city and I did. I remember
[18] that. It was my birthday, September 3rd, 1991.
[19]    Q: I'm sorry, is —
[20]    A: The time that I was moved in and
[21] they gave me a series of jobs, they loved them
[22] and then they never called me again.
[23]    Q: So you did a series of jobs —
[24]    A: Well, you can do a series of jobs in
[25] two days.

---

Page 94

[1]                        *A. Bryant*
[2]    Q: Okay —
[3]    A: You just don't sleep.
[4]    Q: And that was in approximately
[5] September of 1991?
[6]    A: Yeah.
[7]    Q: Do you recall what those jobs
[8] related to?
[9]    A: Puppy Surprise. It was a jingle, a
[10] superman kind of thing. I don't remember what
[11] the toy was. These are toy jingles. And
[12] Playskool. I remember Playskool, a series for
[13] Playskool.
[14]    Q: Other than your contact with Joe
[15] Bacal in approximately September of '91 and your
[16] contact with Carole Weitzman in approximately
[17] the fall of 1997, have you had any contact with
[18] anybody associated with Sunbow Productions since
[19] November 8th, 1989?
[20]    A: Yes. Depends upon what you mean by
[21] associated, though. I know people who work for
[22] them, composers who do work for their companies,
[23] engineers who do work for their company.
[24]    MR. MONAGHAN: Are these business
[25] contacts?

---

Page 95

[1]                        *A. Bryant*
[2]    THE WITNESS: Yes.
[3]    Q: And who said to me — said things
[4] about the company to me.
[5]    Q: And the people that you're referring
[6] to, are these employees of Sunbow Productions?
[7]    A: Well, you know, recording engineers
[8] are independent contractors.
[9]    Q: So they would work with Sunbow
[10] Productions?
[11]    A: They'd work on their job. They'd
[12] work for a music house that would be working for
[13] Sunbow, music house that would be working for
[14] Griffin Bacal, because I was kind of an
[15] ex-person there, people in the industry knew me
[16] and they would say I'm working for Kinder &
[17] Company.
[18]    Q: And did you have involvement in the
[19] business that they were working on for Sunbow
[20] Productions?
[21]    A: You mean the engineers?
[22]    Q: Yes, the people —
[23]    A: No, I hired an engineer who I hired
[24] from Kinder & Bryant as my engineer now. He
[25] wants work from me over there, and I continue to

---

Page 96

[1]                        *A. Bryant*
[2] use him because he's very good, Christopher
[3] Howard.
[4]    Q: Okay. And so the contact that
[5] you're referring to is outside of the business
[6] contacts, so you're not working with the people
[7] who are working for Sunbow?
[8]    MR. MONAGHAN: These casual contacts
[9] with business, people you knew in the
[10] business?
[11]    MS. KITSON: That's what I'm trying
[12] to get to.
[13]    MR. MONAGHAN: The contact isn't
[14] business related itself.
[15]    THE WITNESS: I hire an engineer who
[16] also worked for Kinder & Company and a
[17] remark would happen that —
[18]    MR. MONAGHAN: She's looking for —
[19]    MS. KITSON: These are casual
[20] remarks.
[21]    MR. MONAGHAN: She's looking for
[22] business issues, you know.
[23]    THE WITNESS: Well, you know.
[24]    MR. MONAGHAN: Sunbow business.
[25]    THE WITNESS: Sunbow business,

---

Anne Bryant   v.
Broadcast Music, Inc., et al.

Anne Bryant
Vol. 1, March 31, 2003

Page 97

**A. Bryant**

[1]
[2] Howard would say that Griffin Bacal and
[3] Sunbow don't pay creative fees anymore,
[4] they just let the writers have all the
[5] royalties. We used to get small creative
[6] fees, but we got creative fees. Chris has
[7] told me that, and I've heard that from
[8] other people in the business, singers,
[9] they don't pay double, they just pay
[10] single scale. A lot of things. I'm in
[11] the music business. Everyone talks.
[12]    Q: So you've heard through the
[13] grapevine about Sunbow?
[14]    A: Yeah, reliable grapevine.
[15]    Q: I just have one more short series of
[16] questions within this section and then it would
[17] be a good place to break.
[18]    MR. MONAGHAN: Sure.
[19]    Q: Miss Bacal, what is Wildstar?
[20]    A: That's the ASCAP publishing arm as I
[21] understand it of Sunbow, Starwild being the BMI
[22] publishing.
[23]    MR. MONAGHAN: If you want to change
[24] that to Miss Bryant. I think you said
[25] Miss Bacal.

Page 98

**A. Bryant**

[1]
[2]    Q: I'm sorry, Miss Bryant.
[3]    A: I thought it was cute.
[4]    Q: Starwild is the BMI publishing arm
[5] of Sunbow?
[6]    A: Yes.
[7]    MR. MONAGHAN: The last time I think
[8] you said BMI.
[9]    THE WITNESS: I think it functions
[10] for both. I've seen it on some jingle
[11] listings as the publisher.
[12]    Q: What does the publisher do regarding
[13] commercial jingles and other music that's
[14] registered with performing arts organizations?
[15]    A: Publisher causes the music to be
[16] performed somehow. A publisher also accounts to
[17] the writers and makes sure that their royalties
[18] are collected and counted up properly and
[19] distributed. The publisher has kind of a sales
[20] functions and promotion function and also a,
[21] what do you call it when somebody calls it an
[22] administrative — an administrative function.
[23]    MR. MONAGHAN: But I think the
[24] question was as far as registering.
[25]    THE WITNESS: Did you say about

Page 99

**A. Bryant**

[1]
[2] registering?
[3]    Q: In regard to music that is
[4] registered with performing rights organizations,
[5] I was asking what the function of the publisher
[6] was.
[7]    MR. MONAGHAN: It's already
[8] registered?
[9]    MS. KITSON: Yeah.
[10]    MR. MONAGHAN: Okay, I thought you
[11] were asking what function do they perform
[12] in registering.
[13]    MS. KITSON: No, just sort of an as
[14] general matter.
[15]    MR. MONAGHAN: I'm sorry.
[16]    THE WITNESS: They also can give
[17] licenses to other people, other parties to
[18] use the music because they have the right
[19] to copy.
[20]    Q: Okay. How do they collect royalty
[21] payments from performing rights organizations,
[22] do you know?
[23]    MR. MONAGHAN: The publisher?
[24]    MS. KITSON: The publisher.
[25]    A: They get a check mailed to them.

Page 100

**A. Bryant**

[1]
[2]    Q: And is it then the publisher's
[3] responsibility to pay the writers of the
[4] compositions the royalties that are owing to
[5] them?
[6]    A: It depends on who administers the
[7] work. The publisher may get their own check and
[8] the writer — they may have hired an
[9] administrator which Griffin called Sunbow,
[10] Wildstar did, they had administrative, they may
[11] have had more than one, I don't know, who put in
[12] the paperwork for them to file for these
[13] royalties and they may have already been
[14] distributed directly to the writer and the
[15] publisher at that point dividing at the source.
[16]    Q: Okay.
[17]    A: Or some of them came through an
[18] administrator to us for a while. And they
[19] farmed it out to employees.
[20]    Q: To employees to —
[21]    A: What do you call those people;
[22] administrators —
[23]    Q: Oh, okay. I got it —
[24]    A: — that they hired.
[25]    Q: To your knowledge have either

Page 101

A. Bryant

[1]
[2] Wildstar or Starwild been listed as publishers
[3] of the compositions you listed that are at issue
[4] in this suit?
[5]    A: Yes.
[6]    Q: And I'll just quickly go through
[7] them and then we can break for lunch. To your
[8] knowledge are either Starwild or Wildstar the
[9] publisher of the Transformers?
[10]    A: Yes.
[11]    Q: Do you know which one?
[12]    A: Which Transform —
[13]    Q: No, is Starwild the publisher or is
[14] Wildstar the publisher of Transformers?
[15]    A: Well, I'm a BMI writer and Starwild
[16] is a BMI publisher. An ASCAP publisher cannot
[17] publish a BMI writer. So my publisher for the
[18] Transformer is Starwild.
[19]    Q: In regard to G.I. Joe, is
[20] Starwild — are Starwild or Wildstar the
[21] publishers of that composition?
[22]    A: Starwild is the publisher. It's in
[23] my catalog.
[24]    Q: Okay. Oh, okay. In regard to the
[25] Jem Theme is Starwild the publisher?

Page 102

A. Bryant

[1]
[2]    A: Yes.
[3]    Q: In regard to My Little —
[4]    A: Wait. Yes, the Jem theme, yes. I'm
[5] sorry.
[6]    Q: Jem Theme a/k/a Truly Outrageous?
[7]    A: Right.
[8]    Q: Okay. Starwild is the publisher of
[9] that composition?
[10]    A: Um-hum.
[11]    Q: For My Little Pony and Friends, is
[12] Starwild the publisher of that composition?
[13]    A: In regards to my portion of it, yes,
[14] they are.
[15]    Q: Is there another portion which —
[16]    A: I might have had a lyricist on it.
[17] I don't remember. If I did, it would have been
[18] Barry. And if was Barry, it would have been
[19] ASCAP, so that would have been Wildstar. I
[20] think it was split with Barry. I think so.
[21]    Q: So it's possible that on the My
[22] Little Pony and Friends composition Wildstar is
[23] also listed as publisher?
[24]    A: Could be.
[25]    Q: Okay.

Page 103

A. Bryant

[1]
[2]    MR. MONAGHAN: Only as to Barry.
[3]    Q: As to Barry?
[4]    A: Yeah, yeah. I think it might have
[5] been.
[6]    MR. MONAGHAN: Each song has 200
[7] percent, 100 publishers —
[8]    MS. KITSON: Right.
[9]    A: On the Jem songs it's Barry and me,
[10] yeah.
[11]    Q: So does that include the Jem
[12] theme —
[13]    A: No.
[14]    Q: — Truly Outrageous? Okay. In
[15] regard to the My Little Pony
[16] composition, is Starwild the publisher of that
[17] composition?
[18]    A: It's in my catalog, I think so.
[19]    Q: In regard to the Visionaries Theme
[20] is Starwild the publisher?
[21]    A: Yes.
[22]    Q: In regard to Inhumanoids is Starwild
[23] the publisher?
[24]    A: Yes. You really assume these things
[25] went on to Sony, but I don't know how that

Page 104

A. Bryant

[1]
[2] works.
[3]    Q: And in regard to Robotics, is
[4] Starwild the publisher?
[5]    A: Yes, I guess it would be.
[6]    Q: And when you say that some of these
[7] things went on to Sony, do you know that it is
[8] possible that the publisher has changed?
[9]    A: My understanding is that they sold
[10] the cat — I don't know this for sure, but
[11] that's all I've been hearing is that they sold
[12] the catalog to Sony or some numbers, some pieces
[13] out of the catalog, compositions to Sony. And I
[14] saw a registration to Sony on something that
[15] crossed me. We have that somewhere.
[16]    Q: So by selling the catalog, the
[17] publisher might change?
[18]    A: I don't know if they sold the whole
[19] catalog.
[20]    Q: When a composition is sold to —
[21] sold out of a catalog as you're describing, does
[22] the publisher change?
[23]    A: I think they must.
[24]    MR. MONAGHAN: The records of the
[25] performing rights society, the BMI?

Page 105

*A. Bryant*

[1]
[2] A: The writers aren't changing.
[3] Q: No, I'm referring specifically to
[4] the publishers.
[5] A: Yeah.
[6] MS. KITSON: I think this is a good
[7] places to break.
[8] (Luncheon recess taken at 12:44
[9] p.m.)
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 106

*A. Bryant*

[1]
[2] AFTERNOON SESSION
[3] 1:46 p.m.
[4] ANNE BRYANT, having been previously duly sworn
[5] by a Notary Public, was examined and testified
[6] further as follows:
[7] EXAMINATION Continued
[8] MS. KITSON:
[9] Q: Miss Bryant, who is Joe Bacal?
[10] A: Who is Joe Bacal?
[11] Q: Yes.
[12] A: He's a wonder. He's an advertising
[13] copywriter. He created with Tom Griffin,
[14] founded Griffin Bacal, developed a Hasbro Toy
[15] account, I think, into the biggest toy company
[16] in the world. He's super human, doesn't sleep;
[17] works, works, works very hard. And he's an
[18] amazing, creative talent, advertising, in
[19] advertising and then expanded into television
[20] production and developed Sunbow with Tom
[21] Griffin. I think they had another partner, I
[22] don't remember who that was.
[23] Q: Have you worked with Joe Bacal?
[24] A: I worked for — he was my client.
[25] Q: Okay.

Page 107

*A. Bryant*

[1]
[2] A: — Joe Bacal. First met him in 1976
[3] when I was arranger for a song writer that he
[4] was using at the time, Ginny Readington
[5] (phonetic). I remember that. Then at Michlin
[6] Company he came to us, I worked for him, music,
[7] did arrangements too. And then Kinder Bryant as
[8] well.
[9] Q: When did you first start working for
[10] Joe Bacal?
[11] A: As my client?
[12] Q: As your client.
[13] A: He was Ginny Readington's client,
[14] and then he was Spencer Michlin's client. I was
[15] an employee there. I was music director. Then
[16] I would say it would be at Kinder & Bryant we
[17] started working for Joe.
[18] Q: Do you know approximately which
[19] year?
[20] A: Yeah, the fall of '83, a few months
[21] after we started together.
[22] Q: And while you were working at
[23] Michlin & Company, approximately what time
[24] period did you work for Joe Bacal?
[25] A: I think it was 1979, 1980, toward

Page 108

*A. Bryant*

[1]
[2] the second half of my working at Michlin he came
[3] to us.
[4] Q: Did you start working for Joe Bacal
[5] before or after you started working with Ford
[6] Kinder.
[7] A: Well, I met Joe Bacal and worked for
[8] him as an arranger in 1976, before I worked for
[9] Kinder.
[10] Q: And in what capacity did you work
[11] for Joe Bacal?
[12] A: Initially as an arranger and then as
[13] a composer and arranger.
[14] Q: And for how long did you work for
[15] him?
[16] A: I was a freelancer in '76, that's
[17] not much — job to job situation. I did a
[18] fairly significant amount of work at Michlin
[19] Company for two years and then didn't work for
[20] him for a couple of years and then starting in
[21] the fall, late fall maybe of 1983 through the
[22] end of my association with Ford Kinder worked
[23] for him increasingly to the point where there
[24] was no time to work for anyone else.
[25] Q: So when you say you worked for him

Page 109

A. Bryant

[1]
[2] through the end of your association with Ford
[3] Kinder, are you saying that you worked with him
[4] from 1983 to approximately 1989?
[5]   A: Yeah. Yes.
[6]   Q: Do you recall what projects you
[7] worked on with Joe Bacal?
[8]   A: Besides everything that we've
[9] already named, commercials and TV shows and
[10] movies that were generated from that, hundreds
[11] of other products. My 2100 estimate for that
[12] seven-year period comes out of about 300 pieces
[13] of music a year. It was that much. So lots of
[14] Hasbro Toys and — yeah, Hasbro toys, huge
[15] account.
[16]   Q: For every composition at issue in
[17] this case, were those compositions composed
[18] during your association with Joe Bacal?
[19]   A: Yes.
[20]   Q: Were they composed for your work
[21] that you were doing for Joe Bacal?
[22]   A: That was the work I was doing for
[23] Joe Bacal, yeah.
[24]   Q: Okay. And while you worked for Joe
[25] Bacal, was this work work for hire?

Page 110

A. Bryant

[1]
[2]   A: Yes, it was always work for hire.
[3]   Q: Did you work on advertising
[4] campaigns for Joe Bacal?
[5]   A: I wrote music for advertising.
[6]   Q: And did you work on animated series
[7] for Joe Bacal, animated TV series?
[8]   A: Yes, I wrote themes for animated TV
[9] series and I also wrote for The Jem Show which
[10] was a musical television show. I think there
[11] were about 180 songs in that general area. I
[12] did all the music production, the arrangements
[13] and production.
[14]   Q: For an animated series, when you
[15] worked with Joe Bacal, would you create one set
[16] of themes, musical cues, that would be used
[17] in — throughout the entire series or were you
[18] called upon to continue to create new music for
[19] the series?
[20]   A: Well, in the case of The Jem Show
[21] there were three new songs every episode. The
[22] theme is a very valuable item because you use it
[23] to underscore, constantly underscore the show,
[24] you know. It gives an identity, cohesiveness to
[25] the show. So you don't replace a theme easily.

Page 111

A. Bryant

[1]
[2]   Q: And would you do this —
[3]   A: It's an equity.
[4]   Q: I'm sorry?
[5]   A: It's an equity.
[6]   Q: Would you do this continual
[7] rescoring on an ongoing basis or would you
[8] create several different versions of the themes
[9] at one time which would then be used
[10] periodically in the series?
[11]   A: You mean like a library?
[12]   Q: Something like that.
[13]   A: No, I wrote the theme.
[14]   Q: Were you responsible for continuing
[15] to do variations on the theme for the
[16] underscoring?
[17]   A: No, no. No.
[18]   Q: You didn't compose those?
[19]   A: Well, it was my music, but I didn't
[20] do the orchestrations.
[21]   Q: Okay. And by orchestrations, what
[22] do you mean?
[23]   A: Well, I could play the Jem melody on
[24] the trumpet. It's very simple. I could play it
[25] on a tuba or clarinet or I could have a guitar

Page 112

A. Bryant

[1]
[2] playing. That's an arranger, orchestrator's
[3] choice composing it. I could have an oboe play
[4] it because somebody's uncle died. That's
[5] dramatic shows, but it's the same melody, so
[6] that's an orchestration task. I've orchestrated
[7] movies, that's kind of a color choice or
[8] dramatic choice but the melody is the melody.
[9]   Q: And would background scoring in the
[10] series that you worked on consistently use the
[11] same melody or would the same melody be
[12] rearranged in different ways?
[13]   A: It's the same melody even if it's
[14] rearranged, yeah, right.
[15]   Q: Okay.
[16]   A: The arrangement you can make it go
[17] faster or slower, that's an arranger's choice
[18] but it's the same melody. Right, so...
[19]   Q: Would the animated series use
[20] variations on the melody as your theme as
[21] underscoring to the series?
[22]   A: I think in some they did. They used
[23] legitimate techniques of reharmonization,
[24] diminution, makes it tinier, elongation
[25] stretches it out, retrograde places it

Anne Bryant  v.
Broadcast Music, Inc., et al.

Anne Bryant
Vol. 1, March 31, 2003

---

Page 113

**A. Bryant**

[1]
[2] backwards, retrograde canon placed it forward.
[3] Every classical composer uses it. Most people
[4] who do this work are classically trained, that's
[5] how you develop a theme and do it over and over
[6] again.
[7]     Q: And would you be responsible for
[8] composing these variations on your original
[9] theme song?
[10]     A: No, that's the job of the underscore
[11] writers to take the theme and use it in as many
[12] ways as possible.
[13]     Q: Then you were not an underscore
[14] writer on any of the —
[15]     A: Not on these shows. I did many
[16] different versions of all of these, not the
[17] songs from The Jem Show, but the themes I did
[18] many versions because of a TV commercials too.
[19] There were different lengths and stylistically
[20] we would change them, you know, but it was the
[21] same melody.
[22]     Q: How was the music that you created
[23] for Bacal's projects registered with performing
[24] rights organizations?
[25]     A: They were registered in my name.

---

Page 114

**A. Bryant**

[1] You mean how did it get effected?
[2]
[3]     Q: Let me break it down. Who would be
[4] responsible for completing the registration?
[5]     A: That's the publisher's
[6] responsibility. Whether they did it directly or
[7] they used an administrator for their company, I
[8] don't know. I don't which. They always did one
[9] or the other or both.
[10]     Q: Did you have any responsibility in
[11] terms of registering your compositions with BMI?
[12]     A: No.
[13]     Q: Did Ford Kinder have any
[14] responsibility for registering compositions with
[15] BMI?
[16]     A: Not to my knowledge. You're not
[17] supposed to.
[18]     Q: Did Joe Bacal have any
[19] responsibility for registering compositions with
[20] BMI?
[21]     A: Whoever he assigned it to, whether
[22] he did it himself or his employees.
[23]     Q: Are you aware of what means were
[24] used to register the compositions at issue in
[25] this case with performing rights organizations?

---

Page 115

**A. Bryant**

[1]
[2]     A: We have a few of them that we called
[3] for from BMI, a subpoena, that is. Clearance
[4] forms, BMI clearance forms is one way. We saw
[5] some Sony clearance forms, electronic
[6] registrations and then, of course, we have gobs
[7] of cue sheets which were used to register this
[8] music in question that were very specific. And
[9] at the top it says "executive producer contact
[10] Carole Weitzman, Sunbow." So I guess Sunbow
[11] submitted that.
[12]     Q: And you said that you have these
[13] documents, these clearance forms and cue sheets
[14] that you just referred to?
[15]     A: Yes, we've subpoenaed, yeah, some
[16] clearance forms on specific titles, Transformers
[17] and —
[18]     MR. MONAGHAN: We have something.
[19]     MS. KITSON: Have they been
[20] produced?
[21]     MR. MONAGHAN: I think so..
[22]     REQ MS. KITSON: Okay, let me just put
[23] on the record that to the extent that they
[24] have not yet been produced, we would like
[25] them, the clearance forms and cue sheets.

---

Page 116

**A. Bryant**

[1]
[2]     MR. MONAGHAN: You don't have any?
[3]     MS. KITSON: I have certain forms
[4] that are attached —
[5]     MR. MONAGHAN: To motion papers.
[6]     MS. KITSON: — to the motion
[7] papers, but if they consist of more than
[8] that, then we have nothing else besides
[9] those.
[10]     MR. MONAGHAN: Okay.
[11]     Q: Would the person who was responsible
[12] for registering compositions with BMI change
[13] with regard to whether the music was registered
[14] by a clearance form or a cue sheet?
[15]     MR. MONAGHAN: Give me that question
[16] again, please.
[17]     Q: Was the person who was responsible
[18] for registering the compositions at issue in
[19] this case with BMI, would that person change
[20] with regard to whether the music was registered
[21] by a clearance form or a cue sheet?
[22]     MR. MONAGHAN: I'm not sure — the
[23] responsibility for doing it?
[24]     MS. KITSON: Yes, the different
[25] people.

---

Anne Bryant
Vol. 1, March 31, 2003

Anne Bryant   v.
Broadcast Music, Inc., et al.

---

Page 117

**A. Bryant**

[1]
[2]   MR. MONAGHAN: Okay.
[3]   Q: Were there different people who
[4] registered clearance forms versus cue sheets?
[5]   A: I really don't know. I just know
[6] the writer didn't.
[7]   Q: Okay. Did you have the opportunity
[8] to review any kind of forms used for the
[9] registration of your works that would be
[10] submitted in regard to the compositions at issue
[11] in this case?
[12]   MR. MONAGHAN: Before filing?
[13]   Q: Before filing.
[14]   A: No.
[15]   Q: You did not have the opportunity?
[16]   A: No.
[17]   Q: Did anyone have the opportunity to
[18] review them that you know of?
[19]   MR. MONAGHAN: On her behalf?
[20]   Q: Okay, let me ask more specific. Did
[21] Ford Kinder — to the best of your knowledge did
[22] Ford Kinder review any kind of forms used for
[23] the registration of musical works in connection
[24] with the compositions at issue in this case?
[25]   A: Well, I would have said no until we

---

Page 118

**A. Bryant**

[1]
[2] got the subpoena and I found one that he
[3] actually submitted himself which surprised me.
[4] I was surprised to see that. But I didn't know
[5] that Ford had any, you know, opportunity to
[6] review anything. We wrote the music we wrote,
[7] and when it went on the air they registered it.
[8] I don't know exactly who at Sunbow but they
[9] registered it.
[10]   Q: Were you ever given copies of forms
[11] that were used to register —
[12]   A: Clearance forms. No.
[13]   Q: — the compositions at issue in this
[14] case?
[15]   A: Not until we subpoenaed this.
[16]   Q: Did you keep copies of your original
[17] compositions, referring specifically to the ones
[18] at issue in this case, either in recorded or in
[19] notation form from when you first composed them?
[20]   A: I have a lot of them, yes.
[21]   Q: Do you mean that you have a lot of
[22] copies or that you have copies of a lot of the
[23] compositions at issue in this case?
[24]   A: I have a copies of a lot of them. I
[25] know I have copies of Transformer's work. I

---

Page 119

**A. Bryant**

[1]
[2] know I have The Jem Show Theme, a lot of the
[3] songs. I have many arrangements I did but I
[4] donated a lot of them.
[5]   Q: Let me just go through. You said
[6] you have the Transformer — you have copies of
[7] Transformers?
[8]   A: I believe so. I know I have
[9] recorded copies.
[10]   Q: Okay, either in recording or
[11] notation form.
[12]     Do you have copies of the G.I. Joe
[13] theme?
[14]   A: Yes.
[15]   Q: And you mentioned that you have a
[16] copy of the Jem theme or you have copies of the
[17] Jem themes?
[18]   A: Yes.
[19]   Q: Do you have a copy of My Little Pony
[20] and Friends?
[21]   A: Yes, not a good copy but I have it.
[22]   Q: What about My Little Pony?
[23]   A: Well, interestingly enough that's
[24] contained within My Little Pony and Friends, so
[25] I guess I do.

---

Page 120

**A. Bryant**

[1]
[2]   Q: Do you have a copy of Visionaries?
[3]   A: I have a recorded copy.
[4]   Q: Do you have a copy of Inhumanoids?
[5]   A: Yes.
[6]   Q: Do you have a copy of Robotics?
[7]   A: Somewhere, yes, in the tape archives
[8] I do.
[9]   Q: Do any of the compositions at issue
[10] in this case have alternate titles?
[11]   A: Yes.
[12]   Q: Which ones?
[13]   A: Transformers is registered as a
[14] jingle, but the title Robots in Disguise.
[15]   Q: Do any others besides Transformers?
[16]   A: Jem, Jem's jingle name is Truly
[17] Outrageous and G.I. Joe's jingle name is really
[18] American Hero.
[19]     Let me see, does anybody else have
[20] it? I think that's it. Other things that we're
[21] not questioning here have —
[22]   Q: I'm referring specifically to the
[23] compositions that you identified as being at
[24] issue in this case.
[25]   A: Right.

---

Page 121

*A. Bryant*

[1]
[2]   Q: Do any of the compositions at issue
[3] in this case have alternate version or
[4] arrangements that to your knowledge are
[5] separately registered with BMI —
[6]   A: I'm not sure how to answer this.
[7] It's come to my attention that, yes, there are
[8] alternate registrations and names and listings,
[9] lots of them have happened and that's part of
[10] the reason for this case, that happened without
[11] my knowledge, didn't come up on the information
[12] until just a few years ago when we started all
[13] this.
[14]   Q: Which ones are those?
[15]   A: Transformers, G.I. Joe.
[16]   Q: Would it help you if I went through
[17] the list?
[18]   A: Jem had some alternates too. You
[19] see the Jem theme, you wrote it, then you list
[20] it, then subsequently it's the Jem opening, Jem
[21] OP theme, JCL theme, Jem theme main, Jem main
[22] theme. They're all different words but it's all
[23] the same piece of music. That's the kind of
[24] thing that went on all over the place. There's
[25] lots of them on those three titles.

Page 122

*A. Bryant*

[1]
[2]   Q: And in the examples that you just
[3] gave, all of those are separately registered, to
[4] the best of your knowledge?
[5]   A: Yes.
[6]   Q: To the best of your knowledge have
[7] all of the compositions at issue in this case
[8] been used in Sunbow Productions?
[9]   A: I'm not sure what happened to
[10] Visionaries and Robotics at this point as far as
[11] Sunbow goes. It seems to me that they were
[12] maybe commercials, but I'm not sure.
[13]   MR. MONAGHAN: What about the
[14] other — does that mean the others were?
[15]   THE WITNESS: Yes, the others were,
[16] yes.
[17]   Q: And what types of Sunbow Productions
[18] were they used in?
[19]   A: Cartoon shows and movies, animated
[20] features.
[21]   Q: To the best of your knowledge were
[22] they used in videos?
[23]   A: Yes, videos. It became videos,
[24] DVDs. People have told me but I haven't heard
[25] it that they're in video games too, but I

Page 123

*A. Bryant*

[1]
[2] haven't heard it for myself, so...
[3]   Q: Were they used in audio tapes?
[4]   A: CDs, yeah. Thank you.
[5]   Q: And what is the basis for your
[6] knowledge of these uses?
[7]   A: You mean the mechanical items?
[8]   Q: Yes.
[9]   A: I got an e-mail from Amazon.com, I
[10] wanted a copy of the Transformers movie. You
[11] can imagine my archives are kind of hard for me
[12] to stay on top of. Someone said you can
[13] probably buy that through Amazon.com or the
[14] movie because it was a VHS. So I typed in
[15] Amazon.com and I bought a copy. And generally
[16] Amazon.com started marketing me and sending me
[17] e-mails saying I'd be happy to know that the
[18] first 10 episodes are on VHS. And then another
[19] one would say Transformers is now on DVD. And
[20] then another one that would say that people who
[21] bought The Transformers also loved the G.I. Joe
[22] movie and the G.I. Joe episode.
[23]     So they were just telling me all
[24] these items that were for sale over the last
[25] three, four years, I guess it's been. And then

Page 124

*A. Bryant*

[1]
[2] Jem is, you know, out. And Inhumanoids is out.
[3] So, I was contacted. I made one little inquiry
[4] and this whole trove of marketing information
[5] came my way.
[6]   Q: And is that true for all of the
[7] compositions at issue in this case with the
[8] exception of the two you're unsure of,
[9] Visionaries and Robotics?
[10]   A: Yes. I found them all to be
[11] available, yes, and I was notified that they
[12] were available.
[13]   Q: By what means do you believe that
[14] the compositions at issue in this case were
[15] reregistered?
[16]   MR. MONAGHAN: What vehicle was used
[17] to do that?
[18]   MS. KITSON: How was that
[19] accomplished, yes.
[20]   A: It appears that they were done
[21] through either electronic registrations or cue
[22] sheets.
[23]   Q: And who do you believe is
[24] responsible for reregistering the compositions?
[25]   A: I really don't know. When I look at

Page 125

A. Bryant

[1]
[2] the cue sheets the only contact name on the top
[3] is Carole Weitzman. She worked for Joe's
[4] company Sunbow.
[5]    Q: What do you believe was Sunbow's
[6] role in the alleged reregistration of the
[7] compositions at issue in this case?
[8]    MR. MONAGHAN: She just said that,
[9] Carole for Sunbow.
[10]    Q: You said that Carole's name was on
[11] the —
[12]    A: That's the role where she submitted
[13] it. I mean, it's been submitted to a
[14] department. Whatever, she was a vice president
[15] I think at Sunbow or president even. So, you
[16] know, she have must have had people who do that
[17] for her even though it's her responsibility or
[18] not.
[19]    Q: And is that the case for each of the
[20] compositions at issue in this case?
[21]    A: Or —
[22]    MS. KITSON: Withdrawn, withdrawn.
[23]    Q: Do you believe that the process of
[24] reregistration that you just described was the
[25] same for each of the compositions that you claim

Page 126

A. Bryant

[1]
[2] was reregistered in this case?
[3]    A: Not the Transformer Rock & Roll
[4] theme. The Transformers' Rock & Roll theme
[5] which they used for the movie had a clearance
[6] form that was filled out by Holy Moley Music.
[7] That's the name on it, and on behalf of several
[8] people who claimed to be the writers of it,
[9] including me, they gave me a little piece of
[10] it.
[11]    Q: Other than Transformers Rock & Roll
[12] Theme, do you believe that the reregistration
[13] was accomplished in the way that you described
[14] earlier, electronically or by cue sheets
[15] submitted by Sunbow with Carole Weitzman's name
[16] on it?
[17]    A: I saw that on G.I. Joe, I saw that.
[18] I believe I saw that on Jem. I saw that on
[19] Transformers. I don't remember what happened
[20] with My Little Pony and Friends, but I think
[21] that was the — from looking at Starwild catalog
[22] paper when we looked it over, it seemed that
[23] they used the cue sheet as their primary method
[24] of registering music that already existed. It
[25] was born in another place and then they upgraded

Page 127

A. Bryant

[1]
[2] it, changed it.
[3]    Q: Going through them each
[4] individually, could you tell me when you believe
[5] each of the compositions was reregistered? And
[6] let's start with Transformers.
[7]    MR. MONAGHAN: Well, that's a matter
[8] of record with BMI when changes were
[9] made. You're going to test her memory on
[10] something that's a matter of records like
[11] that?
[12]    Q: Well, then I can ask do you have any
[13] documents that show when each of these
[14] compositions were reregistered with BMI?
[15]    A: It's in catalogs. It's in
[16] everybody's catalog, I think. Yes, we did, we
[17] have the catalogs showing that there were
[18] registrations.
[19]    Q: Which catalogs are those?
[20]    A: My catalog, showing — take The
[21] Transformers — look at the Transformers which I
[22] wrote in 1983 or '84, whatever it was. And then
[23] you see also registered in 1993 it was some big
[24] reregistration in 1993 where hundreds of pieces
[25] were given new registrations, or dozens of

Page 128

A. Bryant

[1]
[2] pieces.
[3]    MR. MONAGHAN: This copy has notes
[4] on it.
[5]    MS. KITSON: I have a copy of Miss
[6] Bryant's catalog without notes.
[7]    MR. MONAGHAN: Okay. I might here
[8] as well.
[9]    MR. MONAGHAN: Those aren't my
[10] notes.
[11]    THE WITNESS: Those are my notes.
[12]    MS. KITSON: They're just notes.
[13] They're not my notes either.
[14]    A: If you were to look at this catalog,
[15] you would see Transformers is registered on lots
[16] of different dates. That's just Transformers.
[17] It's a good choice. You'd see that on all of
[18] these. And for some reason June of 1993 lots of
[19] these were reregistered or given alternate —
[20]    Q: Can we take one, for example, just
[21] so that you can explain to me where on the
[22] record, the individual record of a composition
[23] you believe —
[24]    A: Right here.
[25]    Q: What page is that?

Anne Bryant   v.
Broadcast Music, Inc., et al.

Anne Bryant
Vol. 1, March 31, 2003

Page 129

**A. Bryant**

[1]
[2]   A: This is page No. 69.
[3]   Q: Okay. And which entry are you
[4] referring to?
[5]   A: It's Transformers.
[6]   MR. MONAGHAN: The third grouping,
[7] "Transformer Bryant cues."
[8]   Q: And on this individual form here for
[9] "Transform Bryant cues," which data entry do
[10] you indicate shows the date of change?
[11]   A: I don't show a date of change. What
[12] I'm saying is, this was already registered in
[13] 1983 or '84. It's being constantly
[14] reregistered, in '94, '97, again on the bottom
[15] in October of '94 and then the percentage
[16] fluctuates. Ford Kinder becomes a co-writer.
[17] It shows Sony as a publisher. It shows Wildstar
[18] as a publisher. The year dates fluctuate. Here
[19] is the original registration in 1985.
[20]   Q: And that's at the bottom of page 70?
[21]   A: Yes.
[22]   Q: Okay. Can we just — let's just so
[23] that I understand what you're looking at on each
[24] of these individual records and what these
[25] entries mean to you.

Page 130

**A. Bryant**

[1]
[2]    If we can look, for example, at the
[3] original Transformer Bryant cues on page 69,
[4] when you say that it was reregistered, are you
[5] looking at the field that is indicated by the
[6] word "entered"?
[7]   A: Yes.
[8]   Q: Okay. And the date that follows on
[9] this particular record in that field is
[10] 01/21/1997?
[11]   A: Right.
[12]   Q: Okay. And the BMI work number that
[13] just precedes that field, does that work number
[14] indicate — that work number indicates only this
[15] particular musical work; is that correct?
[16]   A: Well, they're given all different
[17] work numbers.
[18]   Q: To the best of your knowledge is
[19] each individual musical work that's registered
[20] with BMI given an individual BMI work number?
[21]   A: That's my understanding.
[22]   Q: So, for example, it's your
[23] understanding that No. 003894632 in BMI's record
[24] would always indicate the musical composition
[25] entitled Transformer Bryant cues?

Page 131

**A. Bryant**

[1]
[2]   A: Right.
[3]   Q: And then on this catalog listing,
[4] each separate title with their separate BMI work
[5] numbers represents a separate musical
[6] composition?
[7]   A: Um-hum.
[8]   Q: Okay?
[9]   A: That's what it's supposed to do.
[10] It's the same piece of music, though. Go
[11] figure.
[12]   Q: Okay. In clarifying what you just
[13] said, are you saying that, for example, on this
[14] page 69 on the Broadcast Music, Incorporated
[15] participant catalog listing for Bryant, Anne,
[16] are you saying that title "Transformer Bryant
[17] cues", the title "Transformer Bryant cues" and
[18] the title "Transformer Theme B" are all the same
[19] piece of music?
[20]   A: Yes.
[21]   Q: Do you have an understanding of why
[22] they would be separately registered?
[23]   A: I have no understanding of why they
[24] have to separately register the same piece of
[25] music. I'm an arranger. I've made a living

Page 132

**A. Bryant**

[1]
[2] that way. I don't get paid to do royalties for
[3] arrangements.
[4]   Q: Okay.
[5]   A: So I don't understand why a
[6] different arrangement would call for a different
[7] registration.
[8]   Q: And what is the basis for your
[9] knowledge that these are the same piece of work?
[10]   A: I wrote it.
[11]   Q: Okay. Let me go back to this
[12] document. What is this document that we've just
[13] been looking at? Can you identify this for me?
[14]   A: What do you call that, my composer's
[15] catalog. "Broadcast Music catalog listing
[16] Bryant, Anne BMI account No. 44388," that's my
[17] writer catalog.
[18]   Q: Does this represent every
[19] composition in your catalog with BMI through the
[20] date that it was printed which on the first page
[21] seems to be March 16th, of 2000?
[22]   A: Every one that was performed, yeah.
[23]   Q: Okay. Does this catalog encompass
[24] every catalog that you feel is at issue in this
[25] case? And when I say that, I mean including the

---

Page 133

A. Bryant

[1]
[2] alternate titles and separately registered
[3] alternate arrangements that we discussed
[4] previously?
[5]    A: I think there's something missing.
[6] I think G.I. Joe is missing from this catalog.
[7] I think that was one of the things that were
[8] missing.
[9]    No, just a couple little cues in
[10] G.I. Joe. G.I. Joe is in here as a couple of
[11] cues and —
[12]    MR. MONAGHAN: What page is that?
[13]    THE WITNESS: That's on page 23.
[14] But, you know, what this doesn't
[15] represent, and I've given the alternate
[16] titles, there is no jingle work in here
[17] and that's a very — that's a substantial
[18] income. And it's also off in the first
[19] registration of these pieces of music.
[20] You know, Robots in Disguise is a — The
[21] Transformers and none of that is in here,
[22] they gave it a jingle name.
[23]    Q: Are jingles registered with BMI?
[24]    A: Yes, and we tried very hard to get a
[25] catalog for everybody, and they only sent me a

---

Page 135

A. Bryant

[1]
[2]    (Recess taken.)
[3]    Q: Miss Bryant, what I wanted to do was
[4] to go through the participant catalog listing of
[5] your songs and I would like for you, if we can,
[6] to page through it and for you to identify all
[7] of the compositions that you feel are at issue
[8] so that we have a full listing.
[9]    A: You mean —
[10]    Q: Starting at page 1 —
[11]    MR. MONAGHAN: Are you talking about
[12] which of these registrations is being
[13] complained of?
[14]    MS. KITSON: Right. We've pointed
[15] to several and they all have different
[16] titles, and as long as this contains a
[17] comprehensive list with the exception of
[18] G.I. Joe.
[19]    MR. MONAGHAN: But, again, it's only
[20] as of 2000, so we don't even know what it
[21] looks like now.
[22]    MS. KITSON: Right. Okay.
[23]    A: Then another thing I know what's
[24] there but I don't know what's not there. There
[25] are things that are like not there. This only

---

Page 134

A. Bryant

[1]
[2] copy of my own catalog.
[3]    Q: And is there a separate catalog that
[4] BMI keeps?
[5]    A: A BMI jingle database that they told
[6] us, by account. This is feature songs and TV
[7] background scoring. There seems to also be a
[8] foreign database.
[9]    Q: Okay.
[10]    A: And I think there's even a foreign
[11] jingle database but we haven't been successful
[12] in getting those catalogs from them.
[13]    MR. MONAGHAN: Just for
[14] identification, your understanding this
[15] catalog contains what?
[16]    THE WITNESS: Feature, television
[17] and background registrations concerning
[18] the titles in question.
[19]    MR. MONAGHAN: But no jingles?
[20]    A: But no jingles. And I don't really
[21] know, there may be something even more going on
[22] with foreign, domestic and — I'm sorry,
[23] domestic and foreign jingles.
[24]    MR. MONAGHAN: Off the record.
[25]    (Discussion off the record.)

---

Page 136

A. Bryant

[1]
[2] pertains to what is there in my window and that
[3] way.
[4]    MR. MONAGHAN: And it's the not the
[5] commercial jingles.
[6]    THE WITNESS: It's limited, not any
[7] foreign.
[8]    MR. MONAGHAN: And we had to jump
[9] through hoops to get this.
[10]    MS. KITSON: This is the catalog
[11] that you refer to in the complaint?
[12]    MR. MONAGHAN: This is the catalog
[13] that we had to practically sue them to
[14] get.
[15]    MS. KITSON: Okay.
[16]    THE WITNESS: I'm missing page 2.
[17]    MS. KITSON: You know, I'm missing
[18] page 2 as well.
[19]    THE WITNESS: Abracadabra.
[20]    MR. MONAGHAN: Likewise.
[21]    MS. VALENCIA: Is it possible it's
[22] somewhere else?
[23]    MS. KITSON: I don't have page 2
[24] either.
[25]    THE WITNESS: And it's such an

---

Anne Bryant  v.
Broadcast Music, Inc., et al.

Anne Bryant
Vol. 1, March 31, 2003

Page 137

[1]                        *A. Bryant*
[2] important thing.
[3]    MR. MONAGHAN: Is it?
[4]    THE WITNESS: I don't know.
[5]    (Discussion off the record.)
[6]    MS. KITSON: We all are in a similar
[7] situation, all of us are missing page 2 on
[8] our copies. So, you know, reserving that
[9] there may be something on page 2 which,
[10] you know, may subsequently appear and be
[11] included, let's move through what we have.
[12]    MR. MONAGHAN: Sure. But to be
[13] honest with you, I don't know if all the
[14] rest of the pages are there either. So
[15] that same reservation should apply to any
[16] other missing page.
[17]    MS. KITSON: Yes.
[18]    MR. MONAGHAN: Are you going to mark
[19] this, Roseann?
[20]    MS. KITSON: I can. I don't have
[21] copies for everyone.
[22]    MR. MONAGHAN: Well, I'll give you a
[23] copy you can use to mark.
[24]    MS. KITSON: Okay, why don't we do
[25] that.

Page 138

[1]                        *A. Bryant*
[2]    MR. MONAGHAN: I think it's
[3] complete, but I don't know.
[4]    MS. KITSON: Then I'm going to ask
[5] the court reporter to mark this document
[6] as Bryant Exhibit 1.
[7]    (Bryant Exhibit 1, catalog listing,
[8] was marked for identification.)
[9]    Q: And for the record, Miss Bryant, can
[10] you identify what Bryant Exhibit 1 is?
[11]    A: Catalog listing.
[12]    MR. MONAGHAN: BMI catalog?
[13]    A: BMI participant catalog listing,
[14] Anne Bryant, Bryant Anne, they have BMI account
[15] No. 44388. That's my writer number. And then
[16] it says "short CAT," meaning short catalog.
[17] Catalog count 342. The date is March 16th,
[18] 2000, the date of this run.
[19]    Q: Now, if we can go through page by
[20] page, and if you would just identify for me all
[21] of the compositions that you've identified as at
[22] issue in this case.
[23]    A: Okay, you want me to say like
[24] abracadabra no or —
[25]    Q: Why don't you just identify the ones

Page 139

[1]                        *A. Bryant*
[2] that you believe are.
[3]    A: So I would just thumb through until
[4] I hit one, right?
[5]    Q: Yes, I think that would be fastest?
[6]    A: Page 4.
[7]    Q: What is its title?
[8]    A: Autobots Go Into Battle.
[9]    Q: And what is the BMI work number?
[10]    A: 003245430.
[11] Can somebody else read this because
[12] I can't see, honestly. I just don't have very
[13] good vision anymore.
[14]    Q: No problem, I'll read them into the
[15] record if you can identify what the compositions
[16] are. Okay?
[17]    A: Then there is also Autobotics Go
[18] Into Battle and then it's a different BMI work
[19] number.
[20]    Q: That's why I read the number
[21] initially.
[22]    A: In both of these the registration
[23] date entered is October 26th, 1994.
[24]    Q: Okay. The second Autobots Go Into
[25] Battle is BMI work No. 003245559?

Page 140

[1]                        *A. Bryant*
[2]    A: Yes.
[3]    Q: Okay. Any others on this page?
[4]    A: Autobots Prepare For Battle.
[5]    Q: And is that one BMI No. 003245458?
[6]    A: That is, and it's also registered on
[7] 10/26/94.
[8]    Q: Okay.
[9]    A: If we go to page 6, Battle A.
[10]    Q: And is that one BMI work
[11] No. 003245421?
[12]    A: Yes.
[13]    Q: Any others on this page?
[14]    A: The following Battle A. There seems
[15] to be to Battle As which has a different work
[16] number. There's three Battle As.
[17]    Q: The second one has BMI work
[18] No. 003245457?
[19]    A: There's lots of Battle As, I'm
[20] afraid. These are all registered on 10/26/1994.
[21]    Q: The third one is BMI work
[22] No. 003245840?
[23]    A: Yes. Oh, the date changes on what
[24] is this, the fourth Battle A.
[25]    Q: On page 7?

Page 141

[1]                    A. Bryant
[2]    A: Yes.
[3]    Q: BMI work No. 003257826?
[4]    A: Yes, and registration date is
[5] 11/10/94.
[6]    Q: Okay. Any others on this page?
[7]    A: Battle A alternate ending.
[8]    Q: BMI work No. 003245552?
[9]    A: Yes.
[10]    Q: Okay.
[11]    A: Then you go to Battle B finally.
[12] We're back to 10/26/94.
[13]    Q: And that one is BMI work
[14] No. 003245423?
[15]    A: Um-hum.
[16]    Q: Okay. Any others on this page?
[17]    A: Battle D.
[18]    Q: We skipped Battle C?
[19]    A: I don't know, I missed it.
[20]    Q: And that would be BMI 003245392?
[21]    A: Yes. 10/26/94.
[22]    Q: On the next page, page 8?
[23]    A: Battle D.
[24]    Q: Battle D, work No. 003245427?
[25]    A: Yes. Yet another Battle D coming

Page 142

[1]                    A. Bryant
[2] up.
[3]    Q: And that's BMI work No. 003245839?
[4]    A: Yes. Then battle E.
[5]    Q: BMI work No. 003245422?
[6]    A: Yes, 10/26/94 is the entrance date,
[7] registering date.
[8]     I want to show you something on page
[9] 9. Some things say register, like look at
[10] Believe, Don't Believe, on page 9. It says
[11] "register in the same position always." The
[12] other places had 4/24/97. And the next line it
[13] says on Believe In Yourself, it says "entered
[14] 4/25/96." So for some reason some of these say
[15] entered and some of them say registered, and I
[16] don't know what the difference is but I never
[17] did know what the difference was and why one
[18] would say register and also the ones that say
[19] register have a lot more information, song
[20] number, clearance number, you know, all of that
[21] in it. You might want to notice that. Okay.
[22]     (Discussion off the record.)
[23]    A: Page 13, Chase D.
[24]    MR. MONAGHAN: It's misspelled.
[25]    Q: It's BMI work No. 003245683?

Page 143

[1]                    A. Bryant
[2]    A: Yes.
[3]    MR. MONAGHAN: Yes, so stipulated.
[4]    A: 10/26/94 is the entered date.
[5]    Q: Okay.
[6]    A: Chase B.
[7]    Q: And is that BMI work No. 003239322?
[8]    A: Entered date is 10/19/94. See,
[9] Chase C.
[10]    Q: And that's BMI work No. 003245401?
[11]    A: Yes, entered date 10/26.
[12]    Q: 10/26/94?
[13]    A: '94.
[14]    Q: Any others on this page?
[15]    A: Chase D.
[16]    Q: Okay. Is that BMI work
[17] No. 003245409?
[18]    A: Yes, it is. 10/26 is the enter
[19] date. And then there is a Chase D.
[20]    Q: This is on page 14?
[21]    A: Yes.
[22]    Q: And it's BMI work No. 003245576?
[23]    A: Yes, entered date 10/26/94. Then
[24] Chase D.
[25]    Q: And is that BMI work No. 003257827?

Page 144

[1]                    A. Bryant
[2]    A: Yes, and the enter he date is
[3] 11/10/94.
[4]    Q: Okay. Are there any others on this
[5] page?
[6]    A: I don't see any.
[7]    Q: Okay, turn to the next.
[8]    A: Page 16.
[9]    Q: Okay.
[10]    A: I'm just not sure.
[11]    Q: Which one?
[12]    A: Day 1B Continuing, I think that Day
[13] 1B is part of the Transformer series because I
[14] remember it, so I question it.
[15]    Q: And that's BMI work No. 003245549?
[16]    A: Yes, 10/26/94 entered.
[17] Best Action Transformer Theme on
[18] page 20.
[19]    Q: Is that BMI No. 003245583?
[20]    A: Yes, it is 10/26/94.
[21] All right, page 23 two references to
[22] the G.I. Joe music. I get 100 percent credit
[23] for it, so I'm not complaining, but in both
[24] cases these registrations were put in years
[25] later, 6/19/1993. There's two works there.

Case 1:07-cv-06395-SHS    Document 32-13    Filed 01/04/2008    Page 39 of 63

Anne Bryant   v.                                                Anne Bryant
Broadcast Music, Inc., et al.                              Vol. 1, March 31, 2003

Page 145

A. Bryant

[1]
[2]    Q: And the two BMI work numbers that
[3] you're referring to are 002404286?
[4]    A: Yes.
[5]    Q: And 002411781?
[6]    A: Um-hum.
[7]    Q: Okay.
[8]    MR. MONAGHAN: Do you want her to
[9] explain why she would comment on them
[10] anyway even though she's not questioning
[11] the registration?
[12]    Q: If you would like to explain why
[13] you're commenting.
[14]    A: I don't understand that massive
[15] reregistration owns six — was it 6/19/93 why it
[16] was necessary to give —
[17]    MR. MONAGHAN: In other words,
[18] nothing happened?
[19]    THE WITNESS: Nothing happened. I
[20] mean, it's the same piece of music. I
[21] didn't do anything on 6/19/93 but I look
[22] in my catalog, it looks like I wrote lots
[23] of pieces of music on that date that was
[24] submitted, and they actually are old
[25] pieces that were registered years before.

Page 146

A. Bryant

[1]
[2]    Q: Okay.
[3]    A: It's like apportioning out, we'll
[4] give you this, we'll give you that, we'll give
[5] you that. I don't think it's right.
[6]    The first one says Jem Bryant cue.
[7]    Q: That's on page 38 and BMI work
[8] No. 002135836?
[9]    A: Yes.
[10]    Q: And that lists you as having 100
[11] percent of the writer's shares?
[12]    A: That's correct. I only marked it
[13] because the next one, the instrumental is
[14] music. And in this one I split that 50/50 with
[15] Ford — I mean with Joe, I'm sorry, with Joe
[16] Bacal, same piece of music.
[17]    Q: And that, the work you're referring
[18] to is BMI work No. 002135739?
[19]    A: That's right.
[20]    MR. MONAGHAN: Wait, the way you
[21] said that on the record it's going to come
[22] out I split that with. What is your
[23] criticism of it.
[24]    THE WITNESS: Well, it shows me
[25] splitting this with Joe Bacal. It had

Page 147

A. Bryant

[1]
[2] nothing to do with anything that I know
[3] about why he would be suddenly getting 50
[4] percent of the instrumental theme.
[5]    Q: So —
[6]    THE WITNESS: He didn't write the
[7] music.
[8]    Q: For BMI work No. 002135739 you never
[9] made an agreement to split the writer's share
[10] with Joe Bacal?
[11]    A: No.
[12]    MR. MONAGHAN: Remember the
[13] question, the question is what's wrong
[14] with these as you're going along. You're
[15] not just reading it into the record,
[16] you're telling her, am I correct?
[17]    MS. KITSON: I would like to know —
[18] to have them identified.
[19]    Q: Are there any others on this page?
[20]    A: Yes, the Jem Vocal Theme.
[21]    Q: And is this BMI work No. 0702135810?
[22]    A: Yes, and all of these three Jems are
[23] registered on 4/24/96. In this one it shows that
[24] Joe is a 50 percent writer and that was 100
[25] percent in my catalog, and now it shows him as a

Page 148

A. Bryant

[1]
[2] 50 percent writer, Joe Bacal.
[3]    Q: Okay.
[4]    A: And the same on the next page, page
[5] 39.
[6]    Q: Page 39?
[7]    A: Yes.
[8]    Q: And which work are you referring to
[9] by title?
[10]    A: Jem Vocal Theme.
[11]    Q: And is that BMI work 003985754?
[12]    A: Yes, it is. And then a different
[13] date, 4/28/1997, and it's shown as registered
[14] date. There's also a song number with this one,
[15] GO 46204 and there's a clearance number,
[16] 7046204. I don't know but it seems to me this
[17] was done by a clearance form. This was written
[18] in 1986, so I don't understand why it has this
[19] clearance form.
[20]    Q: Okay. Any others on this page?
[21]    A: No.
[22] All of these pieces have in common
[23] that they were pieces that were originally
[24] listed in my catalog at 100 percent and were
[25] altered without notifying me, all of these have

Page 149

*A. Bryant*

[1]
[2] that in common. And they're the same piece of
[3] music, you know, in each particular case.
[4] That's why I'm objecting.
[5]    On page 48.
[6] Q: Okay?
[7] A: My Little Pony is misspelled.
[8] Q: Are you referring to BMI work
[9] No. 002609175?
[10] A: That's right. Entered on 6/19/93.
[11] Q: Any others on this page?
[12] A: Yes, the next one, My Little Pony
[13] and Friends theme.
[14] Q: And that is BMI work No. 002609225?
[15] A: Yes, 6/19/93.
[16] Next page.
[17] Q: Page 49. Which one?
[18] A: My Little Pony and Friends.
[19] Q: And is that work No. 002609226?
[20] A: Yes, entered 6/19/93.
[21] Q: Any others on that page?
[22] A: One more, the next one My Little
[23] Pony and Friends theme.
[24] Q: And that's BMI work No. 002609227?
[25] A: Yes, entered on 6/19/93.

Page 150

*A. Bryant*

[1]
[2] Q: Any others on this page?
[3] A: No, I didn't see any who are on
[4] there.
[5]    On page 55, pre-Battle A.
[6] Q: And that's BMI work No. 003245596?
[7] A: Yes, entered 10/26/94.
[8] Q: Okay. And the next one?
[9] THE WITNESS: Did you find
[10] anything?
[11] MR. MONAGHAN: Yeah.
[12] A: 69.
[13] Q: This is the page we started on?
[14] A: Yes. Did we read that one in yet?
[15] Q: Well, which one are you referring
[16] to?
[17] A: Transformer Bryant cues.
[18] Q: And that's BMI work 003894632?
[19] A: Entered 1/21/97.
[20] Q: Any others on this page?
[21] A: Transformer Bryant cues.
[22] Q: The next one down?
[23] A: Yes.
[24] Q: And that's BMI work 003167942?
[25] A: Entered 7/28/94.

Page 151

*A. Bryant*

[1]
[2] Q: Any others on this page?
[3] A: Transformers B, Theme B.
[4] Q: And that's BMI work No. 003245684?
[5] A: Yes. Entered 10/26/94.
[6] Page 70.
[7] Q: Okay.
[8] A: The Transformers.
[9] Q: And are you referring to BMI work
[10] No. 004210722?
[11] A: Yes, entered 12/10/97. And this
[12] shows Sony as the publisher.
[13] Q: Sony as 50 percent publisher?
[14] A: There's an ASCAP publisher. I'm not
[15] in ASCAP. If you look at the affiliations, Anne
[16] is a BMI writer, that's me. Ford Kinder who is
[17] not even supposed to be registered here is a BMI
[18] writer, and here the BMI publisher is Starwild,
[19] but then Sony ATV Tunes has 50 percent and
[20] they're an ASCAP publisher. How is that
[21] happening? I don't understand that. Who is in
[22] charge of this thing?
[23]    Okay.
[24] Q: Okay, any others on this page?
[25] A: Yes, Transformers Bumper.

Page 152

*A. Bryant*

[1]
[2] Q: Is that BMI work No. 003245454?
[3] A: Yes, entered 10/26/94. Transformers
[4] Instrumental Theme 2.
[5] Q: And that's BMI work No. 003985749?
[6] A: Yes. It's also known as The
[7] Transformers Closing Theme it says that here and
[8] it's shown as registered on 4/28/97. It's got a
[9] song number GO 46203 and a clearance number,
[10] 7046203. I don't know really know what that
[11] means, but it's important.
[12] Q: Okay. Any others on this page?
[13] A: Yes, The Transformers Main Theme.
[14] Q: And that's BMI work No. 001540534?
[15] A: Yes.
[16] Q: Okay.
[17] A: And that was registered September
[18] 27th, 1985.
[19] Q: Okay.
[20] A: Song No. 5758906 and clearance
[21] No. 705758906.
[22] Q: What is that?
[23] A: There's a comment there in the field
[24] that says "title was written when Kinder was
[25] ASCAP."

Page 153

*A. Bryant*

[1]
[2]  **Q:** Was that a comment that you included
[3] on this registration?
[4]  **A:** No, they put it on this. They put
[5] it in the notation next to my — in my catalog
[6] next to the title. BMI did it.
[7]  **Q:** What's the next one?
[8]  **A:** Transformers Rock & Roll Theme.
[9]  **Q:** And that's BMI work No. 001540 535?
[10]  **A:** Yes.
[11]  **Q:** Okay.
[12]  **A:** Registered 7/29/88. We have a copy
[13] of this registration. Many people are listed as
[14] the writer of this song.
[15]  **Q:** Okay.
[16]  **A:** Self-publishers and the comment
[17] field says "from film The Transformers" from the
[18] movie.
[19]  **Q:** Any others on this page?
[20]  **A:** Theme B, Transformers Theme B.
[21]  **Q:** And is that BMI work No. 003245575?
[22]  **A:** Yes, entered 10/26/94.
[23]  **Q:** Any others on this page?
[24]  **A:** Transformers Theme Close.
[25]  **Q:** Is that BMI work No. 003192089?

Page 154

*A. Bryant*

[1]
[2]  **A:** Yes.
[3]  **Q:** Okay.
[4]  **A:** 8/25/94 is the date on that.
[5]  **Q:** Any others on this page?
[6]  **A:** There's another Transformers Theme
[7] Close with a different number.
[8]  **Q:** And is that BMI work No. 004392390?
[9]  **A:** Yes, entered 6/4/98.
[10]  **Q:** What is the next one?
[11]  **A:** Transformers Theme Open, that's on
[12] page 72.
[13]  **Q:** Okay. And that's BMI work
[14] No. 003192088?
[15]  **A:** Yes, entered on 8/25/94.
[16]  **Q:** Okay.
[17]  **A:** And Ford Kinder is shown to be the
[18] 83.4 percent author. Joe Bacal and I each
[19] received 8.3 percent and Ford didn't even write
[20] it. And the same situation as the next one.
[21]  **Q:** Any others on this page?
[22]  **A:** Yes, Transformers Theme Open has the
[23] same dispute.
[24]  **Q:** Okay. And that's BMI work
[25] No. 004392367?

Page 155

*A. Bryant*

[1]
[2]  **A:** Yes, 6/4/98.
[3]  **Q:** Are there any others on this page?
[4]  **A:** Did you read in the second one,
[5] Roseann?
[6]  **A:** Transformers Theme Opening
[7] 004392367?
[8]  **A:** Yes.
[9]  **Q:** Yes.
[10]  **A:** Entered on 6/4/98. And then
[11] Transformers Vocal Theme 2.
[12]  **Q:** BMI No. 003985746?
[13]  **A:** Yes. And it's registered 4/28/97
[14] and looks like it says registered, so it's got a
[15] song No. GO 46202 and a clearance No. 7046202
[16] and it's got a notation in the comments field
[17] "a/k/a Transformers Opening Theme."
[18]  **Q:** Okay. Any others on this page?
[19]  **A:** I'm a little concerned about Truly
[20] Outrageous, actually. Truly Outrageous on the
[21] bottom of this page is the jingle name for The
[22] Jem Show Theme. But we also did a song during
[23] the series called it's Truly Outrageous, so I'm
[24] not sure which this is. It's got a registration
[25] date 7/1/87. I'm not sure if this is the song,

Page 156

*A. Bryant*

[1]
[2] it might be the song because no jingles seem to
[3] really be in my catalog.
[4]  **Q:** So you're not sure, but the BMI work
[5] number that you're referring to here is
[6] 001549492?
[7]  **A:** Yes.
[8]  **Q:** Okay. And the next one?
[9]  **A:** Yes, page 75 Visionaries Closing
[10] Title.
[11]  **Q:** Okay. And is that BMI work
[12] No. 003985715?
[13]  **A:** Yes, registered 4/28/97. This is
[14] the registration.
[15]  **Q:** Okay.
[16]  **A:** Song No. 23046196, clearance
[17] No. 7046196. And in this one Jay Bacal and Joe
[18] Bacal are shown to be my co-writers giving each
[19] of them 25 percent of the song and I have 50
[20] percent. That's what shown here.
[21]  **MR. MONAGHAN:** Wait, wait. What's
[22] wrong with that?
[23]  **THE WITNESS:** Well, this is going to
[24] be really clear in a minute they —
[25]  **MS. KITSON:** I'm simply asking for

Page 157

**A. Bryant**

[1]
[2] an identification here.
[3]    MR. MONAGHAN: Then we're going to
[4] go back over and say what's wrong with
[5] it.
[6]    MS. KITSON: I mean, we can. I
[7] would like, though, for the witness to
[8] just sort of make this, you know, an
[9] exercise she does on her own.
[10]    MR. MONAGHAN: Okay.
[11]    MS. KITSON: On the Visionary
[12] Closing Title, Miss Bryant, what do you
[13] identify to be the problem with the
[14] registration on that composition?
[15]    A: Jay and Joe Bacal are listed as
[16] co-writers and that's a new registration. If
[17] you look down two more items you'll see ten
[18] years before the original registration was to
[19] Ford and myself and now Ford has been removed
[20] and replaced by Joe and his son Jay Bacal.
[21]    Q: So a second composition on this page
[22] that you're identifying is Visionaries'Theme,
[23] BMI work No. 001589577?
[24]    A: That's the original registration of
[25] that theme.

Page 158

**A. Bryant**

[1]
[2]    Q: Is there any other composition on
[3] this page?
[4]    A: Yes, the Visionaries Opening Title
[5] which shows Jay and Joe Bacal as co-writers, and
[6] that's registered on 4/28/1997 and it has a song
[7] number GO 46197 and clearance No. 7046197. And
[8] you want to read the work number?
[9]    Q: The work number is 003985717?
[10]    A: Yes. That's so clear that they
[11] knocked him off and put themselves on. It's not
[12] a smart thing.
[13]    Q: And what's the next?
[14]    MR. MONAGHAN: Did you cover the
[15] last one?
[16]    THE WITNESS: Yeah, we did.
[17]    MS. KITSON: We did it out of
[18] order.
[19]    A: I just have to say that this is what
[20] I can see. This is not what I can't see.
[21]    Q: Right.
[22]    A: We went hunting for the things we
[23] couldn't get by looking at my catalog.
[24]    Q: Okay.
[25]    A: All right.

Page 159

**A. Bryant**

[1]
[2]    Q: Miss Bryant, do you have any
[3] documents in your possession that demonstrate
[4] that the compositions at issue were originally
[5] registered as you claim that they were?
[6]    MR. MONAGHAN: Other than what she
[7] just testified to, she just identified
[8] several in the catalog?
[9]    MS. KITSON: I thought we identified
[10] several that were changes. I assume that
[11] if they were changes that they were
[12] original registrations that were
[13] different. And what I'm asking for is any
[14] documentation of the original
[15] registrations.
[16]    A: Robots in Disguise, 100 percent, My
[17] Little Pony, 100 percent.
[18]    MR. MONAGHAN: Identify the
[19] document.
[20]    Q: What are you reading from?
[21]    A: BMI —
[22]    Q: BMI Commercial Jingles U.S. Feature
[23] Royalties Statement?
[24]    A: Yes.
[25]    Q: Okay.

Page 160

**A. Bryant**

[1]
[2]    A: What else is on there? Truly
[3] Outrageous 100 percent, Robotics 100 percent.
[4] Real American Hero on these there were two other
[5] people.
[6]    Q: And it's 33.33 percent?
[7]    A: Yes, on those performances. There's
[8] more of them.
[9]    Q: What is this document that you're
[10] reading from? Is this a royalty statement —
[11]    A: This comes with my check.
[12]    Q: Okay. It comes with your check.
[13] And when did you receive that statement?
[14]    A: Well, I can't be sure. But the
[15] distribution date was 1/18/88.
[16]    Q: So would you have received it in
[17] approximately 1988?
[18]    A: I would have received it a week or
[19] two later.
[20]    Q: Okay.
[21]    A: Usually this much money they sent by
[22] courier, not — Wells Fargo, but I mean like
[23] some kind of secure mailing.
[24]    Q: Right.
[25]    A: My Little Pony 100 percent. My

Anne Bryant  v.
Broadcast Music, Inc., et al.

Anne Bryant
Vol. 1, March 31, 2003

Page 161

**A. Bryant**

[1]
[2] Little Pony 100 percent. Real American Hero,
[3] this is Lou Foresteri did two-thirds of these.
[4]     MR. MONAGHAN: Two-thirds of what?
[5]     A: These performances were credited to
[6] him.
[7]     Q: And are you reading from the same
[8] document that we identified before?
[9]     A: No, I have another one.
[10]     Q: Okay. And what is this?
[11]     A: 1989 commercial jingles.
[12]     MR. MONAGHAN: Features royalties
[13] statement.
[14]     A: Truly Outrageous, 100 percent. The
[15] date is 1/89.
[16]     Q: Okay.
[17]     A: We could just keep —
[18]     MS. KITSON: I have not received a
[19] copy of that but we discussed it earlier,
[20] so it will be forthcoming.
[21]     THE WITNESS: This is what we set
[22] aside to copy for you. We have these,
[23] they're blue. They're very pretty.
[24]     MS. KITSON: I'll just take a
[25] xerox.

Page 162

**A. Bryant**

[1]
[2]     A: Robots in Disguise, 100 percent.
[3] Truly Outrageous, 100 percent. My Little Pony,
[4] 100 percent. So this is this one, 1/30/90.
[5]     Q: Okay.
[6]     A: Same kind of statement. It keeps
[7] going on like that, so —.
[8]     Q: So the collection of commercial
[9] jingle statements that will be produced to me
[10] you indicate demonstrate the original
[11] registrations of these compositions?
[12]     A: Yes. Yes, I think if you just look
[13] at 88 and 89 if anything predates that, I'll
[14] pull it.
[15]     Q: And what documents do you have in
[16] your possession that demonstrate that the
[17] compositions at issue were altered and
[18] reregistered in the way and at the time you
[19] claim they were?
[20]     MR. MONAGHAN: She already went
[21] through the catalog.
[22]     A: Only what I can see on those
[23] catalogs.
[24]     Q: The catalog?
[25]     A: Yes.

Page 163

**A. Bryant**

[1]
[2]     Q: Is this the only catalog that you
[3] claim demonstrates those alterations and
[4] reregistrations?
[5]     A: Well, you probably have Joe Bacal's
[6] catalog or Ford Kinder's catalog. This kind of
[7] information crosses into theirs, too.
[8]     Q: Did you receive copies of Joe
[9] Bacal's catalog produced in this form?
[10]     A: I think we did. I don't know. I
[11] know we did get a copy of Ford Kinder's, didn't
[12] we?
[13]     MR. MONAGHAN: I'm fuzzy. I don't
[14] know. I don't know off the top of my
[15] head. I don't know.
[16]     THE WITNESS: But I thought they got
[17] a copy of it.
[18]     MR. MONAGHAN: I think they got a
[19] copy of it.
[20]     Q: What I have in terms of Ford
[21] Kinder's BMI catalog are two different
[22] printouts.
[23]     A: Yeah, those are — those are cue
[24] sheet registrations, I think, aren't they?
[25]     Q: Did you receive a catalog for Ford

Page 164

**A. Bryant**

[1]
[2] Kinder that was —
[3]     A: It was only a couple of pages.
[4]     Q: But it was the type of catalog — it
[5] was a participant catalog listing?
[6]     A: Yes.
[7]     Q: Okay.
[8]     REQ MS. KITSON: I would ask that that
[9] be produced to me.
[10]     MR. MONAGHAN: Yes.
[11]     THE WITNESS: You want me to do
[12] that? I have it.
[13]     MR. MONAGHAN: Okay.
[14]     REQ MS. KITSON: And if you have the
[15] same thing for Joe Bacal, I ask that that
[16] be produced to me also.
[17]     THE WITNESS: I don't think we have
[18] that. I don't think we have Joe's catalog
[19] like that.
[20]     MR. MONAGHAN: I don't know. I
[21] don't remember right now. But you're
[22] going to drop me a note anyway?
[23]     MS. KITSON: Yes, I'll put it all in
[24] the same.
[25]     Q: Did you receive copies of any

Case 1:07-cv-06395-SHS    Document 32-13    Filed 01/04/2008    Page 44 of 63

Anne Bryant                                                    Anne Bryant  v.
Vol. 1, March 31, 2003                          Broadcast Music, Inc., et al.

Page 165

[1]                          *A. Bryant*
[2] other — any of the catalogs of any of the other
[3] parties?
[4]    A: There was a Starwild catalog.
[5]    MR. MONAGHAN: Here's Wildstar.
[6]    A: I didn't know he had a Wildstar. We
[7] had the Starwild. Oh, I saw this, yeah. This
[8] is totally confusing. I don't know what it even
[9] means. It's a big thing.
[10]    MS. KITSON: I received a Wildstar
[11] catalog from ASCAP from you?
[12]    MR. MONAGHAN: Right, right.
[13]    MS. KITSON: Are you speaking about
[14] something other than that.
[15]    MR. MONAGHAN: Starwild, that's
[16] BMI's.
[17] REQ MS. KITSON: I ask that that also be
[18] produced.
[19]    MR. MONAGHAN: We gave you one but
[20] not the other?
[21]    MS. KITSON: All I have is the
[22] Wildstar catalog and Miss Bryant's
[23] catalog.
[24]    MR. MONAGHAN: And you don't have
[25] Bacal's, Kinder or Starwild?

Page 166

[1]                          *A. Bryant*
[2]    MS. KITSON: Other than the cue
[3] sheet registrations that I received from
[4] Kinder, no.
[5]    (Discussion off the record.)
[6]    Q: Just going back to your participant
[7] catalog listings, Miss Bryant, for each of the
[8] compositions that you identified before have you
[9] either received recordings of those compositions
[10] or received musical notation sheet music showing
[11] what those compositions consist of musically?
[12]    A: Well, I'm the one that generates
[13] that. I create the music. Nobody sends me
[14] sheet music, I send them sheet music.
[15]    MR. MONAGHAN: Do you mean for any
[16] later iteration or derivative, so-called
[17] derivative work does she have the musical
[18] notation?
[19]    MS. KITSON: Does she have the
[20] musical notation for — we read a number
[21] of BMI work numbers for each of them.
[22]    Q: Do you have either a recording of
[23] that composition or a musical notation that
[24] shows the actual composition of that work
[25] number?

Page 167

[1]                          *A. Bryant*
[2]    A: I don't, but that's not the form.
[3] People don't send me anything. I send the music
[4] to them. But if you were to listen to any one
[5] of the Transformer episodes, you know, that's
[6] easy enough to transcribe.
[7]    Q: Is it possible that any of those
[8] different compositions listed under different
[9] BMI numbers are different from your original
[10] compositions?
[11]    MR. MONAGHAN: Well, anything is
[12] possible.
[13]    MS. KITSON: I'd like the witness to
[14] answer.
[15]    MR. MONAGHAN: But wait, the problem
[16] is we're looking at a BMI record and we're
[17] proceeding from the BMI record and you're
[18] asking if one thing may be different from
[19] another. How would she know?
[20]    MS. KITSON: Well, what the witness
[21] has asserted is that they're all the same
[22] music but that she has not received from
[23] BMI or she does not have in her possession
[24] any recording or any notation of the
[25] musical composition of each or the musical

Page 168

[1]                          *A. Bryant*
[2] composing of each of these compositions.
[3] So what I'm asking is, is it possible that
[4] the compositions that she identified are
[5] each actually different from the original
[6] compositions that she composed.
[7]    A: I think I have an answer for you.
[8]    MR. MONAGHAN: Well, don't
[9] speculate.
[10]    A: No, I have an answer for you. Go
[11] through and see that there are things called The
[12] Transformers Day 1, Theme, Alternative Theme,
[13] Old Theme, New Theme, they're all the same
[14] thing. And that goes with The Transformers
[15] Theme. Now, there may be music from that show
[16] called Car Chase. Let's call it Car Chase.
[17] It's not called The Transformers, it's called
[18] Car Chase. So anything that is titled The
[19] Transformer, tied into the Transformer title, is
[20] the Transformer music. Why would they call Car
[21] Chase The Transformers and call Loveseat The
[22] Transformers and call Wedding Day The
[23] Transformers? Those are different cues.
[24]    So that's what I see in the
[25] catalogs, I've seen in the underscore catalog.

Case 1:07-cv-06395-SHS    Document 32-13    Filed 01/04/2008    Page 45 of 63

Anne Bryant   v.                                                    Anne Bryant
Broadcast Music, Inc., et al.                              Vol. 1, March 31, 2003

Page 169

[1]                    *A. Bryant*

[2] The things that are derived are the theme,
[3] restate the theme or have the theme name, all
[4] right. Whereas it was a wedding cue or church
[5] cue or car cue, it would have something
[6] connected to that.
[7]    Q: Okay. When you say derived from the
[8] theme —
[9]    A: It uses the theme.
[10]    Q: Okay. Would it also use different
[11] music?
[12]    MR. MONAGHAN: What's it?
[13]    MS. KITSON: In Ms. Bryant's example
[14] of a car chase which would be derived from
[15] the Transformer's theme, would Car Chase
[16] also have separate originally composed
[17] music in which melodies from the theme
[18] were interposed?
[19]    A: Well, I didn't say what you just
[20] said.
[21]    Q: Okay.
[22]    A: I said if it's Car Chase, it's going
[23] to be Car Chase. If it uses the Transformer
[24] theme, it's going to be a Transformer something,
[25] and that's seems to be the distinction. If it's

Page 170

[1]                    *A. Bryant*

[2] Car Chase or Wedding Bells or Nervous Breakdown,
[3] it's going to be called that.
[4]    Q: And in that case would Car Chase
[5] Wedding Bells or Nervous Breakdown be a separate
[6] pieces of music that do not rely on the theme?
[7]    A: No, I don't think that's true at
[8] all. Everything relies on the melodical theme.
[9] That's how you hold music together for
[10] television. But as far as restating the melody
[11] or in retrograde it doesn't necessarily do
[12] that. It takes the first five notes of the
[13] theme and creates all of the music from that.
[14] That's how you develop the piece of music to
[15] give it integrity, musical integrity. They
[16] don't just randomly write new pieces every time
[17] it's a car chase.
[18]    Q: Right.
[19]    A: It comes from the theme. However
[20] anything that's entitled Transformer anything,
[21] it uses the theme in its normal kind of playing
[22] order, its notes, you know.
[23]    Q: Then what my question would be is in
[24] these alternate compositions that use the, let's
[25] say the example you gave was the first five

Page 171

[1]                    *A. Bryant*

[2] notes of the Transformers Theme, after those
[3] first five notes are interspersed, when those
[4] first five notes appear in the new composition,
[5] can there be original music which does not rely
[6] on the theme music?
[7]    MR. MONAGHAN: I think she answered
[8] that.
[9]    A: Yes, I think what's very difficult
[10] about answering, this is — it's musicology and
[11] classical composition technique which I know and
[12] it's hard to explain. It's kind of fun.
[13]    It's kind of like you're trying to
[14] find here the difference between an arrangement
[15] and a composition. And if I go bop, bop, bop,
[16] bop, bum, bum, bum, and it's the same
[17] melody, and if I have a big brass section do it
[18] or drums playing notes in between each one of
[19] them, it's still the same melody. If it's
[20] acappella or a symphonic orchestra or rock and
[21] roll, anything, it's the same notes. And I
[22] think you have to go to intent. It is the
[23] intention to reinforce that theme always.
[24]    Q: So to your understanding that kind
[25] of work would not be a separate musical work

Page 172

[1]                    *A. Bryant*

[2] from the theme?
[3]    A: Well, it's not. It's the theme.
[4]    Q: Do you believe that your
[5] compositions continue to be reregistered today?
[6]    MR. MONAGHAN: How would she know?
[7]    A: I don't know.
[8]    MR. MONAGHAN: Her belief is
[9] speculative. I mean, she's going by what
[10] she got from BMI thus far, and the other
[11] documents that have been produced.
[12]    A: I don't know if they're being
[13] registered. These compositions, I have new
[14] compositions registered all the time but not by
[15] these people. I haven't written for them in
[16] years.
[17]    Q: Miss Bryant, in your affidavit in
[18] opposition to Sunbow's motion to dismiss the
[19] amended complaint, in paragraph 2 you state "my
[20] claims here are straightforward. At relevant
[21] times going back to 1986 but continuing to the
[22] present Sunbow, a TV production company, which
[23] was owned by defendant Jules Bacal until 1998,
[24] produced and distributed through Rhino Home
[25] Video, movie, TV productions and video using

Page 173

A. Bryant

[1]
[2] music composed by me including the jingles and
[3] various iterations of Jem, Visionaries, My
[4] Little Pony and Transformers and also G.I. Joe,
[5] the rights to which composition were granted to
[6] me by virtue of a settlement with defendant Ford
[7] Kinder."
[8]     Based on that I ask the question do
[9] you believe that your compositions continue to
[10] be reregistered today?
[11]     MR. MONAGHAN: I don't think it's —
[12] I object to the form of the question.
[13] It's a misleading question. You mean some
[14] kind of reregistration with BMI happening
[15] today on March 31st, 2003?
[16]     Q: Do you believe that your
[17] compositions continue to be reregistered in the
[18] present?
[19]     MR. MONAGHAN: Still, I object to
[20] the form of the question.
[21]     A: I really don't know. And you just
[22] read me something to me about —
[23]     MR. MONAGHAN: She read your
[24] affidavit.
[25]     THE WITNESS: They're use, but that

Page 174

A. Bryant

[1]
[2] was about their use in video products
[3] wasn't it?
[4]     Q: Yes.
[5]     MR. MONAGHAN: My objection is —
[6]     A: What does that have to do with
[7] registration?
[8]     Q: Well, I'm asking you that. Your
[9] affidavit here is referring to use of the
[10] products but not reregistration. Then that
[11] would be — I would understand that to be the
[12] answer to my question. But my question was
[13] derived from your statement here. And my
[14] question was just clarifying that, do you
[15] believe that your compositions continue to be
[16] reregistered today?
[17]     MR. MONAGHAN: But it doesn't say
[18] that. The complaint doesn't say that.
[19] The premise is incorrect.
[20]     Q: Do you believe that Sunbow continues
[21] to produce and distribute TV productions and
[22] videos using music composed by you?
[23]     A: Yes.
[24]     Q: From 1986 to the present?
[25]     A: Yes, that we got through.

Page 175

A. Bryant

[1]
[2]     MR. MONAGHAN: It doesn't
[3] necessarily mean you have to have a
[4] reregistration today.
[5]     A: I don't know if they registered
[6] anything for mechanical.
[7]     MR. MONAGHAN: We don't know what's
[8] going on.
[9]     Q: Miss Bryant, you claim that Sunbow
[10] has been unjustly enriched by its alleged
[11] unauthorized uses of your songs.
[12]     In what ways do you believe that
[13] Sunbow has been unjustly enriched by the alleged
[14] unauthorized use of your songs?
[15]     A: Well, I've never been paid any
[16] mechanical royalties for those songs which are
[17] used in various mechanical products, VHS, DVD,
[18] CDs. I've heard in video games about — I
[19] haven't heard them myself. I heard that they
[20] are in video games. So they were able to
[21] transfer my license, something, without paying
[22] royalties, and so I don't think — I think that
[23] would be like quite a bit of money if they paid
[24] their royalties. And they haven't had to pay
[25] them, so they've gotten away without paying

Page 176

A. Bryant

[1]
[2] them, so they made more money than they would
[3] have.
[4]     Another thing is the singers and
[5] original musicians that played on that were paid
[6] to play for television production or sometimes
[7] jingles. Those original recordings which were
[8] governed by the Screen Actor's Guild are now
[9] moving into another medium which is video
[10] products, audio products. I believe they're
[11] supposed to all be repaid when it lists into
[12] another medium just as when we go with a radio
[13] commercial it goes to another kind of
[14] classification, industrial, they get another
[15] payment. So nobody has been paid in that way.
[16] So unjustly enriched, they just jumped over the
[17] need to within the license pay people who
[18] perform these services.
[19]     Q: Are there any other ways that you
[20] can think of that they're unjustly enriched?
[21]     A: I believe that based on what Carole
[22] Weitzman told me and what other people in the
[23] industry has said, that Sunbow avoided having to
[24] pay fees to underscore composers because they,
[25] as she told me, they get to keep the royalties.

Case 1:07-cv-06395-SHS   Document 32-13   Filed 01/04/2008   Page 47 of 63

Anne Bryant   v.                                                    Anne Bryant
Broadcast Music, Inc., et al.                              Vol. 1, March 31, 2003

Page 177

A. Bryant

[1]
[2] We don't pay them anymore. They get to keep the
[3] royalties and that's quite a lot of money and
[4] they're fine with that. That's when we were
[5] talking about me doing some work for them or
[6] somebody, underscore work. And I thought that
[7] was fine at the time because I thought that she
[8] meant that I would write a theme and then do the
[9] underscore and that would be fine. I didn't
[10] know she meant that the composers got to keep my
[11] royalties. So that wasn't okay. So, that's I
[12] think one of the ways they gave money and they
[13] did so at my expense.
[14]     Q: Any others ways?
[15]     A: I think that will do it.
[16]     Q: At the beginning of your answer you
[17] referred to Sunbow transferring something by
[18] license. What is it that you believe was
[19] transferred by license by Sunbow? And if you'd
[20] like, the court reporter can read your answer
[21] over again to refresh your recollection.
[22]     A: Okay, I would like that, but I also
[23] want to look at that box.
[24]     MR. MONAGHAN: We accept what the
[25] testimony was unless you feel it was a

Page 178

A. Bryant

[1]
[2] mistake, but I did hear you say Sunbow
[3] licensed two others.
[4]     Q: And my question is, what is it that
[5] you were referring to when you say something was
[6] transferred by license by Sunbow?
[7]     A: Well, if you look at the jacket,
[8] now, I don't know, I wasn't there, Rhino Home
[9] Video —
[10]     MR. MONAGHAN: Identify what you're
[11] looking at.
[12]     A: We're looking at —
[13]     MR. MONAGHAN: The jacket on the
[14] video?
[15]     A: Jacket on the video from The Jem
[16] Show, volume 1, Passport to Rock.
[17]     MR. MONAGHAN: Which was a previous
[18] exhibit at the Bacal deposition.
[19]     A: It's got a 6 on it.
[20]     MS. VALENCIA: Volume one was Bacal
[21] Exhibit 6.
[22]     A: Yes, so if you look at this on the
[23] back it says "Sunbow." It's got the Sunbow logo
[24] on it in the right-hand corner —
[25]     MR. MONAGHAN: Beneath that.

Page 179

A. Bryant

[1]
[2]     MS. KITSON: Why don't we just — I
[3] would prefer the witness just gives her
[4] own answer, please.
[5]     A: On the left corner it says "Kid
[6] Rhino Home Video." So and then it explains
[7] Rhino Home Video, its address, 10635 Santa
[8] Monica Boulevard, Los Angeles. The packaging is
[9] copyright Rhino and the program is copyright
[10] 1986 Sunbow, Inc., Productions, Inc. and
[11] Wildstar Music and Hasbro Inc.
[12]     So this is the show that I wrote
[13] music for. I know this show. I wrote all the
[14] music for it, the songs for it and it's got the
[15] Sunbow production logo on it. So they assigned
[16] this to Kid Rhino as a distributor.
[17]     See, they even designed the jacket
[18] and what's wrong with the picture? Well, they
[19] obviously licensed it, I think, to Kid Rhino and
[20] it's Wildstar music. How could it be Wildstar
[21] music without Starwild Music when I'm a BMI
[22] writer? I don't understand that. Some things
[23] about this don't yet add up. But I know that
[24] they produced this and then somebody else is
[25] getting to distribute it. That's a license, is

Page 180

A. Bryant

[1]
[2] it not?
[3]     Q: You know that Sunbow produced it?
[4]     A: Yes.
[5]     Q: And that someone else is
[6] distributing it?
[7]     A: Right.
[8]     Q: Okay.
[9]     A: Kid Rhino, so —
[10]     Q: And when you say that they licensed
[11] it, are you referring to the Jem program that
[12] was licensed?
[13]     A: This show, this video from this show
[14] and which has two different episodes on it, "The
[15] World Hunger Shindig" and "Adventure in China."
[16] And then this one has other episodes on it. I
[17] wrote these songs. I wrote the themes and the
[18] songs. This is about eight pieces of music on
[19] each, eight songs.
[20]     Q: And when you say Sunbow produced
[21] these, are you referring to Sunbow producing the
[22] animated series Jem or — is that a yes?
[23]     A: Yes. Yes. And they had rights to
[24] it.
[25]     Q: Okay. Are you referring to Sunbow

Page 181

**A. Bryant**

[1]
[2] producing this video of these few episodes of
[3] Jem?
[4]   A: I don't know who physically made the
[5] video.
[6]   Q: Okay.
[7]   A: If I wanted to distribute the Jem
[8] video products, I would have to have a license
[9] from all of these people. So I assume they had
[10] to give a license to Rhino.
[11]   Q: And do you have any evidence that
[12] Sunbow has generated monies from the production
[13] and distribution of these videos and the other
[14] media in question?
[15]   MR. MONAGHAN: We hope to get that
[16] when you give us the documents.
[17]   MS. KITSON: Okay, I'd like the
[18] witness to answer the question.
[19]   A: No, I don't.
[20]   Q: Okay.
[21]   A: I know that the sales rack at
[22] Amazon.com and that's only one outlet, it's
[23] reasonably good, lots of copies have been sold.
[24] I think both on the Transformers and G.I. Joe.
[25] The Jem fans are hysterical, so I'm sure it's

Page 182

**A. Bryant**

[1]
[2] selling well.
[3]   Q: Do you believe that Kid Rhino or
[4] Rhino Home Video has generated money from the
[5] production and distribution of the individual
[6] questions and other media in question?
[7]   A: Yes, lots of copies have sold.
[8]   Q: Why were they not named as a
[9] defendant in the lawsuit?
[10]   MR. MONAGHAN: Well, that goes into
[11] legal judgments.
[12]   (Recess taken.).
[13]   DIR MS. KITSON: I want to go back to
[14] where we were about the question about Kid
[15] Rhino and Rhino Home Video. And I was
[16] going to ask are you objecting to Miss
[17] Bryant answering the question about why
[18] they haven't been named as a defendant in
[19] the suit?
[20]   MR. MONAGHAN: Yes.
[21]   MS. KITSON: Are you going to direct
[22] her not to answer?
[23]   MR. MONAGHAN: Yes.
[24]   MS. KITSON: Okay.
[25]   MR. MONAGHAN: Thanks for the

Page 183

**A. Bryant**

[1]
[2] invitation.
[3]   MS. KITSON: Just cutting through.
[4]   Q: Miss Bryant, do you have any
[5] evidence that all of the compositions at issue
[6] in this case have been used on video and other
[7] media that's been produced and distributed by
[8] Sunbow?
[9]   A: All of them?
[10]   Q: All of them.
[11]   A: I don't have evidence that all of
[12] them have been used on these materials. I told
[13] you before I was not sure about Visionaries, and
[14] I'm not sure what's going on with My Little Pony
[15] and Friends. But the others are video products
[16] for sale.
[17]   Q: And those video products for sale
[18] are produced and distributed by Sunbow?
[19]   MS. KITSON: We can go on the
[20] record.
[21]   MR. MONAGHAN: Which do you know are
[22] being produced by Sunbow?
[23]   A: I don't know about the Visionaries
[24] and I don't know what's going on with My Little
[25] Pony and Friends, but other than that, that

Page 184

**A. Bryant**

[1]
[2] would give me G.I. Joe, Jem, The Transformers,
[3] Inhumanoids is now a DVD. So that I know
[4] about. Because we have the products. They are
[5] for sale.
[6]   Q: Okay. Miss Bryant, is it your
[7] belief that you have been totally uncompensated
[8] by Sunbow for the use of your songs or that you
[9] have been inadequately compensated by Sunbow due
[10] to the alleged reregistrations?
[11]   MR. MONAGHAN: Object to the form.
[12]   A: It's like two different questions.
[13]   Q: Is it, Miss Bryant, is it your
[14] belief that you've been totally uncompensated by
[15] Sunbow for the use of your songs?
[16]   MR. MONAGHAN: I don't understand
[17] that, totally uncompensated, not
[18] compensated at all?
[19]   MS. KITSON: Completely
[20] uncompensated as opposed to partially
[21] uncompensated, that partial compensation
[22] based upon the change of registrations.
[23]   A: Okay. Are we talking mechanicals?
[24] Are we talking about performance?
[25]   Q: Let's break that down. Have you

Anne Bryant   v.                                                                    Anne Bryant
Broadcast Music, Inc., et al.                                           Vol. 1, March 31, 2003

---

Page 185

[1]                    *A. Bryant*
[2] received any mechanical royalties from Sunbow
[3] for the use of your songs on the videos and
[4] other media that you say that they've produced
[5] and distributed?
[6]    A: I have in my file some mechanical
[7] royalties that I received for My Little Pony. I
[8] think from Saycom (phonetic) which is a French
[9] royalty collection back in 1987 or '88. And I
[10] think there was small mechanical royalties for
[11] Transformers. I don't remember where, maybe
[12] Germany or maybe France. So three years running
[13] they paid mechanical royalties. I think it was
[14] '87, '88, '89 or '88, '89, '90, but nothing
[15] since.
[16]    Q: Okay.
[17]    A: And now it's going into full tilt.
[18] It's been several years they've really been
[19] selling these and there's been no compensation
[20] and no payment to singers.
[21]    Q: For the sale of videos, would — is
[22] it your understanding that you would also be
[23] owed writers royalties apart from mechanical
[24] royalties?
[25]    A: Mechanical royalties are the writers

Page 186

[1]                    *A. Bryant*
[2] royalties.
[3]    Q: All right. How did you arrive at
[4] the damage figure that you assert in your
[5] complaint against Sunbow —
[6]    A: I looked at a loss — I did it a
[7] number of different ways and it came up with the
[8] same amount. I looked at a loss of $50,000 a
[9] year for ten years of performance royalties,
[10] that added up to $500,000. I looked at the fact
[11] that I made about $500,000 a year for — before
[12] this fiasco. And so that's one year. I mean,
[13] everything seemed to come up $500,000. I looked
[14] at the fact that I've got mechanical royalties
[15] from Walt Disney, small kids records two feature
[16] songs on, it made $80,000 with the two little
[17] songs. Little kids record that they asked me to
[18] do. Just two pieces, mechanical royalties. And
[19] I looked at the percentages of what I got versus
[20] what other people got that I was getting 100
[21] percent of, and they all seemed to add up to
[22] about $500,000. And also I'm missing a lot of
[23] information we asked for.
[24]    Is that right? That's about how
[25] we —

Page 187

[1]                    *A. Bryant*
[2]    Q: And is the $500,000 figure an
[3] aggregate damage amount that has been caused by
[4] all defendants or is that figure specific to the
[5] damage that you allege has been caused by
[6] Sunbow?
[7]    A: Well, it's certainly by Sunbow.
[8] Absolutely it's by Sunbow. They were
[9] responsible for filing these things and
[10] protecting these things and being the
[11] administrator of these pieces of music. And I
[12] don't think $500,000 is coming close to what it
[13] is. I think it's a low figure. But I think we
[14] said in the original complaint that we started
[15] at 500,000 because we had a lot of unknown
[16] information and lot of difficulty getting
[17] information.
[18]    Q: Okay. Have you determined the
[19] damages that you believe are owing to you from
[20] the other defendants in this case?
[21]    A: What other defendants?
[22]    MR. MONAGHAN: Bacal and GBI?
[23]    MS. KITSON: Yes.
[24]    MR. MONAGHAN: BMI?
[25]    A: BMI is not in this case.

Page 188

[1]                    *A. Bryant*
[2]    MS. KITSON: Are they a non-party?
[3]    MR. MONAGHAN: Well, I don't know,
[4] they're still in the caption.
[5]    MS. VALENCIA: They're supposed to
[6] be going forth with arbitration but that
[7] hasn't happened.
[8]    MS. KITSON: Are they a party or do
[9] they consider them a non-party?
[10]    MR. MONAGHAN: No, there's an order
[11] staying the proceedings against them
[12] compelling administration.
[13]    A: So who else is in the case?
[14]    Q: Bacal and GBI.
[15]    A: Now, that means that Bacal and GBI,
[16] what's the difference between Bacal and GBI and
[17] Sunbow?
[18]    MR. MONAGHAN: Don't speculate.
[19]    A: They're all together for me. I
[20] don't really see any difference.
[21]    Q: Okay. You've stated that you
[22] believe that Joe Bacal has received at least
[23] 29,036.90 from December 28th, 1998 to October
[24] 10th, 2001 based on BMI records. What BMI
[25] records do you base this estimate on?

---

Anne Bryant
Vol. 1, March 31, 2003

Anne Bryant   v.
Broadcast Music, Inc., et al.

---

Page 189

*A. Bryant*

[1]
[2]   A: On statements.
[3]   Q: I'm sorry, could you repeat that?
[4]   A: On payment statements that I laid
[5] side to side with my own and that creates a —
[6] you can see, for example, that Jem Theme,
[7] instrumental theme hypothetically is $100 is
[8] paid and Joe gets $25 of it. Well, he didn't
[9] write that, so that's $25 in his IOU column.
[10] That kind of thing.
[11]       We had the statements, my
[12] statements, his statements and changes in the
[13] registration, put it all together, people got
[14] what they weren't supposed to get via these
[15] changed registrations.
[16]   Q: Okay. And were those statements
[17] produced to you by Mr. Bacal's counsel? You
[18] referenced Bacal statements. Were those
[19] statements produced to you by Mr. Bacal's
[20] counsel?
[21]   A: By —
[22]   MR. MONAGHAN: By BMI, I think.
[23]   A: Yeah, by BMI.
[24]   REQ MS. KITSON: I request that they be
[25] produced to me.

---

Page 190

*A. Bryant*

[1]
[2]   THE WITNESS: Why didn't BMI send
[3] them to them? I don't understand.
[4] There's 3,000 pages. I almost went blind
[5] putting them together.
[6]   MS. KITSON: I assume this all
[7] occurred before we — before the case had
[8] been reinstated against Sunbow.
[9]   MS. VALENCIA: And for the record, I
[10] don't believe that we have received copies
[11] of those statements either.
[12]   MR. MONAGHAN: Copies of which?
[13]   MS. VALENCIA: Payment statements.
[14]   MR. MONAGHAN: Payment statements,
[15] how could we get them? What do you mean,
[16] we got them by subpoena and you didn't get
[17] copies?
[18]   MS. VALENCIA: Right.
[19]   MR. MONAGHAN: Every letter that
[20] Judith Saffer sends out with anything is
[21] copied to you. It was enclosed with the
[22] letter of December 20th.
[23]   REQ MS. VALENCIA: Just to the extent
[24] Mr. Monaghan had referenced that the
[25] enclosure letters from Miss Saffer who is

---

Page 191

*A. Bryant*

[1]
[2] BMI's general counsel usually copy
[3] Mr. Bacal's counsel, my firm, Duane Morris
[4] — what I requested was to the extent
[5] that the cover letter which enclosed the
[6] payment statements Miss Bryant had
[7] referred to a few moments as about
[8] Mr. Bacal's I guess royalties or payments
[9] made to Bacal, and if it didn't cc our
[10] firm, that the documents enclosed with
[11] that letter be produced to us.
[12]   MR. MONAGHAN: Well, that's putting
[13] me to — now, for example, there's another
[14] letter dated December 19th that copies
[15] Duane.
[16]   MS. VALENCIA: If you're going to be
[17] producing it to Sunbow, I would think you
[18] have to find the enclosure letter if it
[19] came with an enclosure letter and it
[20] either copies us or it doesn't.
[21]   MR. MONAGHAN: All right.
[22]   Q: And, Miss Bryant, do you have any
[23] evidence that Mr. Bacal was ever actually paid
[24] that money? And that's what I'm referring to by
[25] that money is the $29,036.90 figure?

---

Page 192

*A. Bryant*

[1]
[2]   A: The only evidence would be his
[3] payment statements. I can only assume if they
[4] say here is what was paid to Joe Bacal that he
[5] actually got a check on the other. I wasn't
[6] there.
[7]   MS. KITSON: What I would like to do
[8] now is I would like to mark — I would
[9] like to have the court reporter mark as
[10] Bryant Exhibit 2 a copy of the Amended
[11] Complaint that was served on Sunbow
[12] Productions incorporated.
[13]   (Bryant Exhibit 2, Amended
[14] Complaint, was marked for identification.)
[15]   Q: Miss Bryant, have you ever seen this
[16] document before?
[17]   A: Yes, I've seen this.
[18]   Q: I'm going to go through the
[19] complaint and ask you to clarify certain
[20] statements within it.
[21]   A: Okay.
[22]   Q: First I'd like to refer you to
[23] paragraph 2 of the complaint, and I'm referring
[24] to the sentence at the bottom in bold which
[25] reads, "For purposes of receiving performing

---

Anne Bryant   v.
Broadcast Music, Inc., et al.

Anne Bryant
Vol. 1, March 31, 2003

Page 193

[1]                          *A. Bryant*
[2] rights royalties payments from performing rights
[3] societies such as ASCAP and BMI, Sunbow utilizes
[4] and utilized at relevant times entities known as
[5] Starwild and Wildstar."
[6]     **MR. MONAGHAN:** Just to interrupt for
[7] a second, they are also named as
[8] defendants, I believe.
[9]     **MS. VALENCIA:** In the original
[10] lawsuit?
[11]    **MR. MONAGHAN:** In the original
[12] suit.
[13]    **MS. KITSON:** And did they appear?
[14]    **MR. MONAGHAN:** I don't think so.
[15]    **THE WITNESS:** Are they human
[16] beings?
[17]    **MS. KITSON:** Even corporations can
[18] appear.
[19]    **Q:** In regard to the sentence that I
[20] just read, Miss Bryant, what is the basis for
[21] your knowledge that Sunbow has utilized Starwild
[22] and Wildstar for purposes of receiving
[23] performing rights royalty payments from
[24] performing rights societies?
[25]    **A:** Because the songs, feature songs,

Page 194

[1]                          *A. Bryant*
[2] jingles and scores that I have written that are
[3] in my catalog and have been for some time in my
[4] catalog, many years have list the publisher,
[5] next to it Starwild Music. On my — it used to
[6] be more information on BMI forms, Starwild
[7] Music, a statement who is the publisher. Look
[8] in my catalog, it says Starwild Music or it says
[9] Wildstar a song that Barry Harmon and I that
[10] lists both Starwild and Wildstar because Barry
[11] was ASCAP.
[12]    **Q:** And has Sunbow utilized Starwild and
[13] Wildstar to collect publisher's royalties from
[14] performing rights organizations or both
[15] publisher's and writer's rights?
[16]    **A:** They're a publisher. They can't
[17] call it writer's royalties.
[18]    **Q:** So they've only collected
[19] publisher's royalties?
[20]    **A:** Yes.
[21]    **Q:** And is it your allegation that in
[22] collecting publisher's royalties through
[23] Starwild and Wildstar that Sunbow has collected
[24] any monies that are due and owing to you?
[25]    **A:** No, not that they have collected it.

Page 195

[1]                          *A. Bryant*
[2]    **MR. MONAGHAN:** Testify to what you
[3] know.
[4]    **A:** That they've diverted it to other
[5] people than myself. They have control of the
[6] paperwork and the ability to register, and they
[7] registered these things over and over again and
[8] diluted my equity in the songs that I've written
[9] from the original registration. So I don't
[10] think that Starwild and Wildstar directed back
[11] to themselves. A publisher can only collect for
[12] publishing.
[13]    **Q:** Right.
[14]    **A:** The writers collect for writing.
[15] But Sunbow is in a position to submit these
[16] registrations and reregistrations and cue sheets
[17] and direct the flow of the money to other
[18] people.
[19]    **Q:** In the collection of publisher's
[20] royalties through Wildstar and Starwild you are
[21] not alleging that those monies are due and owing
[22] to you, the publisher's royalties?
[23]    **A:** No, I never had any claim on the
[24] publishing royalties.
[25]    'Q: Okay. And do Starwild and Wildstar

Page 196

[1]                          *A. Bryant*
[2] collect writer's royalties from BMI?
[3]    **A:** Writer's royalties are distributed
[4] to the writers.
[5]    **Q:** Okay. I'd like to go to paragraph 9
[6] of the Complaint on page 4. And I'm referring
[7] specifically to the last sentence in the
[8] paragraph which reads "The foregoing arrangement
[9] was established by Kinder, Griffin Bacal and
[10] William Dobishinski through Tamad Incorporated
[11] which administered and received the royalties
[12] and then made distributions to the interested
[13] parties."
[14]    Do you see what I'm referring to?
[15]    **A:** Yeah, but I have to read this in
[16] context.
[17]    **MR. MONAGHAN:** Thank you.
[18]    **A:** It's a little confusing, I think.
[19] But I can explain it if you want me to.
[20]    **Q:** Okay. Let me first ask you, Miss
[21] Bryant, who is William Dobishinski?
[22]    **A:** He's an administrator, I think an
[23] attorney — yes, he's an attorney who was an
[24] administrator that Sunbow hired to administrate
[25] very large amount of royalties, a lot of

Anne Bryant
Vol. 1, March 31, 2003

Anne Bryant    v.
Broadcast Music, Inc., et al.

Page 197

*A. Bryant*

[1]
[2] clearance forms, a lot of pieces of music,
[3] several writers. And Starwild and Wildstar were
[4] the publisher, so he worked for them.
[5]   Q: And what is Tamad Incorporated?
[6]   A: Tamad. It's television advertising
[7] music something distribution, administration and
[8] distribution, that's I think what it stood for.
[9]   MR. MONAGHAN: She is asked what
[10] is —
[11]   Q: What is the business that they were
[12] in?
[13]   MR. MONAGHAN: What's the
[14] connection?
[15]   A: They were engaged in the business of
[16] administrating royalties, making sure things
[17] were cleared and registered and moved through,
[18] and claimed for the writers and the publishers.
[19]   Q: So to the best of your knowledge
[20] Dobishinski and Tamad were working for Sunbow?
[21]   A: Yes.
[22]   Q: Do you know who hired them?
[23]   A: I only know what Joe Bacal said
[24] which was he said we hired an administrator to
[25] work for a company, so I don't know who we is.

Page 198

*A. Bryant*

[1]
[2] We is Sunbow.
[3]   MR. MONAGHAN: That's his
[4] testimony.
[5]   A: Excuse the English, we is.
[6]   Q: And to the best of your knowledge
[7] what specific responsibilities did Dobishinski
[8] and Tamad have in the administration of
[9] royalties?
[10]   A: You got the name of the people who
[11] were the writers of commercials and they cleared
[12] and registered pieces of music with BMI and
[13] ASCAP appropriately, inappropriately as directed
[14] by their employer.
[15]   Q: As directed by Sunbow?
[16]   A: Sure. They didn't know. They
[17] didn't know who wrote what. They're just on the
[18] receiving end of information.
[19]   Q: Okay.
[20]   A: Somebody had to tell them there was
[21] a song called The Transformers.
[22]   Q: And then would they fill in the
[23] forms and would they send the forms to BMI?
[24]   A: Yes.
[25]   Q: Okay.

Page 199

*A. Bryant*

[1]
[2]   A: And you can even see on some of
[3] these things that we were going to give to you
[4] that my name on some of these statements it says
[5] "Anne Bryant — Bill Dobishinski or Tamad Music
[6] in trust for Anne Bryant." It like went to the
[7] lawyer and then he divided everything and then
[8] issued the checks.
[9]   Q: Okay.
[10]   A: Some of them it says that.
[11]   Q: Did you have any contact with
[12] William Dobishinski during the process of his
[13] administering the royalties?
[14]   A: Yeah, I only met Bill twice. He
[15] lived in California.
[16]   Q: Would you speak with him regarding
[17] the registration of your compositions?
[18]   A: No, there wasn't really much problem
[19] with anything that he was doing that I knew of.
[20]   Q: To the best of your knowledge did
[21] Ford Kinder have contact with him?
[22]   A: Well, I don't know how much Ford
[23] talked to him.
[24]   Q: Would Joe Bacal have contact with
[25] him?

Page 200

*A. Bryant*

[1]
[2]   A: I wouldn't know. Sunbow would have
[3] had contact with him.
[4]   Q: Do you know who from Sunbow would
[5] have had contact with him?
[6]   A: It's only a guess.
[7]   Q: Did you have an opportunity to check
[8] or review the work that he did on your behalf —
[9]   A: No.
[10]   Q: — in the administration of
[11] royalties?
[12]   A: No, but I did get statements from
[13] BMI, and if they were missing pieces I would
[14] pick up the phone and say hey, what about, how
[15] come that is not registered.
[16]   Q: And would you pick up the phone and
[17] call Mr. Dobishinski or would you call BMI or
[18] someone else?
[19]   A: I would call Bill Dobishinski, yeah.
[20]   Q: And did you have —
[21]   A: I'd call his office and say we're
[22] concerned about this item or that doesn't
[23] appear. And he might say oh, you'll see that in
[24] the next six-month statement, that didn't go on
[25] the air long enough yet or we haven't claimed

Anne Bryant  v.                                                    Anne Bryant
Broadcast Music, Inc., et al.                              Vol. 1, March 31, 2003

---

Page 201

[1]                    *A. Bryant*
[2] that yet. So there's usually little things,
[3] explanations for that, that kind of thing.
[4]     Q: And did you have occasion to do that
[5] during your association with Sunbow?
[6]     A: Yes, but at that point it became a
[7] problem where Bill Dobishinski's office got hit
[8] with the earthquake. Remember that earthquake
[9] in 1993? But for about a year preceding that
[10] earthquake he started moving all the time and I
[11] couldn't get him on the phone. And what was
[12] happening was I wasn't getting copies of my
[13] actual statement. I was just kind of getting a
[14] wrap up sheet, here's what we got, we're giving
[15] this to Ford, we're giving this to you, and it
[16] was very incomplete and I didn't like that. I
[17] don't like you not sending me an actually copy
[18] of the BMI statement, you know. And so that's
[19] when I tried to find him.
[20]     Then he got hit with the earthquake
[21] and you could never find the guy. Fax machine,
[22] everything was changed. You call him on the
[23] mobile phone that never worked. Very weird.
[24] This company that seemed to be so organized
[25] suddenly fell apart.

Page 202

[1]                    *A. Bryant*
[2]     Q: Approximately how many occasions did
[3] you take the opportunity to call him to discuss
[4] any problems with your royalties?
[5]     A: I didn't really have very many
[6] problems with my royalties at all. It was just
[7] around 1992 he had a turnover in his staff and I
[8] didn't like the way — the documentation they
[9] were sending me back. And then the State of
[10] California because of this arrangement sent me a
[11] tax bill for $50,000, not a nice day, and
[12] threatened to put a lien on my home because of
[13] this arrangement with Dobishinski that
[14] Sacramento was picking up as California income
[15] that I wasn't declaring. But I lived in New
[16] York.
[17]     So I finally was able to track
[18] Dobishinski down and get a letter to the IRS
[19] people in California and that was a little bit
[20] of contact. But I didn't have much contact with
[21] Bill. We straightened that out, of course.
[22]     Q: Would you say that you contacted him
[23] in this regard ten or fewer times?
[24]     A: Oh, certainly fewer than 10.
[25]     Q: Five or fewer times?

Page 203

[1]                    *A. Bryant*
[2]     A: I'd say at least five times, you
[3] know, in regards to everything. I didn't see
[4] him much or talk to him.
[5]     Q: What specific responsibilities did
[6] Dobishinski and Tamad have in regard to
[7] receiving the royalty payments and making
[8] distribution?
[9]     A: Well, Ford Kinder and I were 50/50
[10] partners, so these checks went to Bill — i
[11] don't know how it's called like in trust or
[12] something like that.
[13]     MR. MONAGHAN: Escrow?
[14]     THE WITNESS: My statements were
[15] produced like that.
[16]     MR. MONAGHAN: Care of?
[17]     A: And he would deposit it in his
[18] attorney's account, I guess, some kind of
[19] attorney's account. Is that what you would call
[20] it? And he would look at the titles and make
[21] sure that Ford got half and I got half and he'd
[22] send — but he'd get, you know, a percentage
[23] from us, too. He was like the Garden State
[24] Parkway, he got you coming and going, charged
[25] the publisher and then charged a little to the

Page 204

[1]                    *A. Bryant*
[2] writer too, but it was convenient. I mean, we
[3] didn't have anything to say about it. He was
[4] the publisher's administrator, you know.
[5]     Q: Were you ever given an accounting of
[6] royalties by Dobishinski or Tamad?
[7]     A: I had my statements.
[8]     Q: Were royalty payments ever paid to
[9] Kinder Bryant as an entity?
[10]     A: No, not to my knowledge. They don't
[11] pay corporations.
[12]     Q: Okay. Then I'd like to move on to
[13] paragraph 10. And paragraph 10 states "through
[14] its employees, agents and principals, including
[15] but not limited to Jules "Joe" Bacal, Sunbow was
[16] involved in and received financial benefits from
[17] musical compositions and musical cues which were
[18] formerly registered in plaintiff's BMI account
[19] which subsequent to 1993 were altered and
[20] reregistered in a manner to benefit Kinder,
[21] Griffin Bacal and Bacal and Sunbow both before
[22] and after said settlement."
[23]     Do you see that?
[24]     A: Um-hum. I see that, yes.
[25]     Q: What do you mean when you say Sunbow

---

Page 205

*A. Bryant*

[1] was involved in and received financial benefits
[2] from musical compositions and musical cues that
[3] were formerly registered in plaintiff's BMI
[4] account?
[5]     A: Well, there was a mass
[6] reregistration and reorganization via —
[7] reorganization of titles via new registration in
[8] 1993. Hundreds of titles were registered, I
[9] call them reregistered, on 6/19/93. It's in
[10] Starwild's catalog which you've asked for a copy
[11] of that. Lots went on that day. And a lot of
[12] changes from the original registrations.
[13]     We showed you all the 100 percent.
[14] Now that went on to other people. It went in
[15] different percentages. And some of the shows
[16] people were underscore composers who were
[17] working for royalties as opposed to fees.
[18] Unfortunately both Joe Bacal and Ford Kinder had
[19] some of the percentages moved into their name.
[20] I don't know by who but Sunbow had control of
[21] the paperwork. So that's what I mean. Things
[22] that benefited them directly or benefited Sunbow
[23] by saving them money or making them money.
[24]     Q: And who do you allege that Sunbow

Page 206

*A. Bryant*

[1] acted through in order to accomplish these
[2] things?
[3]     A: Sunbow is it. Sunbow has the
[4] paperwork. Bill Dobishinski was an
[5] administrator. Somebody had to give him the
[6] paperwork.
[7]     Q: Do you know who that person is?
[8]     A: Have no idea.
[9]     Q: Okay.
[10]     A: Who does that? I would think that
[11] after all this time Joe Bacal would have said
[12] who did that. Was it a secretary? Was it a
[13] partner? I don't know who did it.
[14]     Q: In paragraph 10 where you state you
[15] refer to musical compositions and musical cues
[16] formerly registered in plaintiff's's BMI
[17] account, do you refer to — are you referring to
[18] the list of compositions at issue in this case
[19] that we discussed before?
[20]     A: Yes.
[21]     Q: And I can read them out loud if you
[22] want me to.
[23]     A: If you want to.
[24]     Q: Let me just say and by that I mean

Page 207

*A. Bryant*

[1] Transformers, G.I. Joe, The Jem Theme, My Little
[2] Pony and Friends, My Little Ponies, Visionaries,
[3] Inhumanoids and Robotics, possibly Inhumanoids?
[4]     A: Possibly Inhumanoids. That's more
[5] about the mechanicals.
[6]     Q: Right.
[7]     A: And Visionaries — no, Visionaries
[8] is about performance rights, that's right.
[9] Okay, who do you want me to answer that about,
[10] Sunbow?
[11]     Q: I'm just asking you if in this
[12] paragraph where you say "from musical
[13] compositions and musical cues which were
[14] formerly registered in plaintiff's BMI account,
[15] that is the universe of compositions that you're
[16] referring to there?
[17]     A: Right, as each apply to the
[18] different defendants or all of them apply to —
[19] I think all of them apply to Sunbow.
[20]     Q: And you allege in paragraph 10 that
[21] subsequent to 1993 the compositions you named
[22] were altered and reregistered in a manner to
[23] benefit Kinder, GBI, Bacal and Sunbow both
[24] before and after your settlement of the 1991

Page 208

*A. Bryant*

[1] suit.
[2]     MS. KITSON: You know, we've gone
[3] through most of this before. I'm going to
[4] withdraw that question since we've gone
[5] through most of the information
[6] previously.
[7]     Q: Do you have in your possession any
[8] documents that show that it was Sunbow that
[9] affected the allege reregistration of your
[10] compositions?
[11]     A: I'm not privied to that. They have
[12] the paperwork.
[13]     Q: Sunbow has the paperwork, is that
[14] what you mean?
[15]     A: Yes, they control it and who they
[16] designate to turn it in, register it, clear it,
[17] I really don't know the individual who is
[18] charged with that.
[19]     Q: On what document or evidence do you
[20] rely when you say that Sunbow affected the
[21] reregistrations?
[22]     A: Okay, Sunbow controls Starwild,
[23] Starwild is a publishing arm of Sunbow. A
[24] little while ago I read to you Robots in

Anne Bryant  v.
Broadcast Music, Inc., et al.

Anne Bryant
Vol. 1, March 31, 2003

Page 209

**A. Bryant**

[1]
[2] Disguise 100 percent, My Little Pony 100
[3] percent. I have those documents showing the way
[4] things were listed, you know. And we also have
[5] the altered registrations.
[6]    Now, Sunbow has the paperwork.
[7] Sunbow is Starwild. Starwild is their
[8] publishing arm and Sunbow puts in that
[9] information. So in between the way it was and
[10] the way it became, it had to go through Sunbow.
[11]    **Q:** But you don't have any documents
[12] that show that it in fact did go through Sunbow?
[13]    **A:** Well, we do have some. I think we
[14] have the cue sheets that show Carole Weitzman as
[15] the responsible producer. I think we have some
[16] of those registrations. We pulled on that show
[17] Sunbow registering people who work — Lyse
[18] Goyette I remember on one of them. It came from
[19] them. Writers aren't allowed to do this.
[20]    **Q:** And these are the cue sheets we
[21] previously requested.
[22]    **A:** Um-hum.
[23]    **Q:** Okay.
[24]    **MR. MONAGHAN:** Sony is on the
[25] electronic clearance?

Page 210

**A. Bryant**

[1]
[2]    **THE WITNESS:** Sony is on the
[3] electronic clearance and I don't know when
[4] Sunbow sold Wildstar or Starwild to Sony.
[5] I don't know when that happened. It
[6] happened at some point, some of the
[7] catalogs were sold, I think.
[8]    **Q:** You have electronic clearance forms?
[9]    **A:** Yes.
[10]    **Q:** Have they been produced?
[11]    **A:** Yeah, we have those.
[12]    **MR. MONAGHAN:** We have those, some.
[13]    **REQ MS. KITSON:** We ask that they be
[14] produced to the extent that they haven't
[15] previously been produced.
[16]    **A:** We only asked for a few.
[17]    **MR. MONAGHAN:** I think they're
[18] attached to the motion papers.
[19]    **MS. KITSON:** Is that the entire —
[20]    **MR. MONAGHAN:** In Anne's response,
[21] Anne's affidavit in opposition to the
[22] motion to dismiss.
[23]    **Q:** And moving on to paragraph 11 of the
[24] complaint —
[25]    **MR. MONAGHAN:** We've we covered this,

Page 211

**A. Bryant**

[1]
[2] didn't we?
[3]    **MS. KITSON:** You know, we probably
[4] believe did. So we'll skip that.
[5]    **Q:** Miss Bryant, in paragraph 11 you
[6] indicate at the end of the paragraph that "set
[7] forth hereafter are compositions utilized in
[8] various Sunbow Productions and videos which have
[9] used plaintiff's music without approval or
[10] compensation." And you list G.I. Joe,
[11] Transformers, Visionaries, Jem and My Little
[12] Pony.
[13]    Why is My Little Pony and Friends
[14] excluded from that list?
[15]    **A:** I think it's sort of meant to be
[16] like the umbrella My Little Pony. I think that
[17] was a mistake or...
[18]    **Q:** And why is Robotics missing from
[19] that list?
[20]    **A:** That's about mechanicals, isn't it?
[21] Isn't that about mechanicals? I don't know.
[22] What's going on with Robotics with mechanicals?
[23] And Inhumanoids I got an e-mail about. I just
[24] found out that Inhumanoids you could buy a DVD
[25] on that. So that would be subsequent from when

Page 212

**A. Bryant**

[1]
[2] this was written. That happened in the last
[3] couple of months.
[4]    **Q:** Moving on to paragraph 12 of the
[5] complaint. Paragraph 12 reads "Bryant attempted
[6] diligently to determine the background facts
[7] concerning this reregistration, but BMI failed
[8] and refused to provide relevant information
[9] until in or about May of 2000. And plaintiff
[10] then sought to review and analyze the
[11] information."
[12]    By what means did you attempt to
[13] determine the background facts of the
[14] reregistration?
[15]    **A:** I called and I was given the name —
[16] I called the office, Greg Bob, and I spoke to
[17] his assistant. Her name was Lisa Turner. And I
[18] told her the problem, that I looked at my
[19] catalog online for the first time, somebody told
[20] me it was online. I thought how exciting. And
[21] G.I. Joe was missing. And she was his
[22] assistant. And when I told her that she said
[23] well, let me just go in the computer. He was
[24] out to lunch and she went in the computer and
[25] she went "oh, my God, this was a writer change

Anne Bryant
Vol. 1, March 31, 2003

Anne Bryant    v.
Broadcast Music, Inc., et al.

---

Page 213

A. Bryant

[1]
[2] and nobody notified you of that?" We never had
[3] writer changes at BMI which I was told is the
[4] case. She said "you have to have been notified,
[5] this illegal." She said too much.
[6]     Then she told me to write to Charlie
[7] Feldman and she gave me different people to
[8] write to in his department. And he was the vice
[9] president, I think, in the legal department.
[10] And I wrote to him with copies of statements. I
[11] talked to his secretary. Charlie's statement —
[12] Charlie's secretary was Maggie I remember. And
[13] then I wrote to him and with a copies of
[14] everything and he didn't even answer me. And I
[15] wrote to him again six weeks later and I copied
[16] what I had already written to him. He still
[17] didn't answer me. And then I got him on the
[18] phone one day and he blew me off.
[19]     He told me that Sunbow — Starwild
[20] was — you know, they didn't even have any
[21] titles in their catalog. It was a defunct
[22] company and they have been out of business for
[23] years is what he told me. It didn't make any
[24] sense to me.
[25]     And then I met somebody who advised

---

Page 214

A. Bryant

[1]
[2] me at a party who advised me to try to write to
[3] John Marcillo over there. And I sent John
[4] Marcillo copies of everything that I had from
[5] the beginning and didn't hear from him. And I
[6] kept it going on and finally I came to Patrick
[7] this was two years, two years they didn't even
[8] send me a copy of my own catalog.
[9]     Q: Are all the people you just
[10] mentioned Greg Bob, Lisa Turner, Tony Feldman,
[11] Maggie and Marcillo, are they all employees at
[12] BMI to the best of your knowledge?
[13]     A: Yes, they were.
[14]     Q: And when did you begin these
[15] efforts?
[16]     A: I discovered my catalog was in
[17] strange shape at the end of 1997 quite by
[18] accident.
[19]     Q: And that's when you began to contact
[20] BMI in regard to the —
[21]     A: Well, there seemed to be two titles
[22] missing from my catalog online, G.I. Joe and My
[23] Little Pony. So those are big titles. So I
[24] inquired, you know.
[25]     Q: Moving on to paragraph 14 of the

---

Page 215

A. Bryant

[1]
[2] complaint, paragraph 14 reads "Bryant has no way
[3] of knowing the extent to which the royalties and
[4] payments otherwise due her have been wrongly
[5] paid to other persons including defendant
[6] Sunbow."
[7]     Miss Bryant, to the best of your
[8] knowledge other than Sunbow, who else do you
[9] allege has received royalties and payments due
[10] to you?
[11]     MR. MONAGHAN: Well, what kind of
[12] royalties, performance?
[13]     MS. KITSON: Let's go with
[14] performance royalties first.
[15]     MR. MONAGHAN: Well, she's covered
[16] that in her testimony when she went over
[17] the listings and said —
[18]     Q: Are those the individuals to whom
[19] credit was given?
[20]     A: Ford Kinder and Joe Bacal, but
[21] others — other unknowns. I only can see what's
[22] there. I can't see what's not there. But I see
[23] a gaping hole between my royalty and the
[24] publisher's royalty. It tells me a lot of
[25] writer's were paid or writers were paid a lot.

---

Page 216

A. Bryant

[1]
[2]     Q: Okay. What about mechanical
[3] royalties?
[4]     A: I have no way of knowing how much
[5] they are.
[6]     Q: Or to who else they may have been
[7] paid?
[8]     A: Right.
[9]     Q: Okay. Turning to paragraph 15,
[10] paragraph 15 says "Absent a full and accurate
[11] accounting from defendant Sunbow of the monies
[12] generated through the use of various
[13] compositions, plaintiff Bryant has no way of
[14] knowing the extent to which she has been
[15] damaged. Plaintiff estimates, however, that
[16] said damage is in excess of $500,000."
[17]     MR. MONAGHAN: She covered that.
[18]     MS. KITSON: Okay.
[19]     Q: The question I have is, by the
[20] phrase "the monies generated through the use of
[21] various compositions," in that phrase what uses
[22] are you alleging that Sunbow has generated these
[23] monies through?
[24]     A: Okay, let me just read this one more
[25] time. I know what you're saying, I just want to

---

Anne Bryant    v.
Broadcast Music, Inc., et al.

Anne Bryant
Vol. 1, March 31, 2003

---

Page 217

[1]                     **A. Bryant**
[2] be very clear about it.
[3]    **Q:** Okay.
[4]    **MR. MONAGHAN:** Objection to the form
[5] of the question. It's repetitive. We're
[6] going over the same ground now.
[7]    **THE WITNESS:** Should I answer or not
[8] answer?
[9]    **Q:** You can answer.
[10]    **THE WITNESS:** Or don't answer?
[11]    **Q:** You can answer.
[12]    **MR. MONAGHAN:** Go ahead, answer one
[13] more time.
[14]    **A:** Performance royalties, royalties,
[15] which is broadcast music, music that's aired,
[16] and mechanical royalties of use of music that I
[17] wrote that's attached to mechanical items, CDs,
[18] DVD, VHSs, video games, cassette tapes, VHSs,
[19] mechanical. So it's broadcast royalties,
[20] performance rights royalties, mechanical
[21] royalties.
[22]    **Q:** Okay. And so then the mechanical
[23] royalties that you believe you are owed would
[24] come through what you believe are Sunbow's
[25] production and distribution of the various types

---

Page 218

[1]                     **A. Bryant**
[2] of media that you just listed?
[3]    **A:** Yes.
[4]    **Q:** Okay. And the sale of those media?
[5]    **A:** Yeah, we're talking about mechanical
[6] items.
[7]    **Q:** And for performance royalties, do
[8] you believe that — so your allegation that
[9] Sunbow has broadcast these shows using your
[10] compositions and you have not been compensated
[11] for that?
[12]    **A:** I think it's very important that I
[13] explain this because I think you're missing the
[14] point.
[15]    **MR. MONAGHAN:** That's okay.
[16]    **A:** I have to put this on the record
[17] somewhere, Pat. This is not coming out of
[18] Sunbow's pocket, these royalties. They're
[19] coming out of the broadcaster's pocket. And
[20] they're diverting them to other writers. It's
[21] not like Sunbow has to pay me a royalty on
[22] broadcast royalties. It's coming out of CBS,
[23] NBC and ABC and all the broadcaster fund.
[24] That's where royalties are paid.
[25]    **MR. MONAGHAN:** But you've already

---

Page 219

[1]                     **A. Bryant**
[2] testified how you believe Sunbow profits
[3] through the use of your compositions.
[4]    **THE WITNESS:** There's a distinction
[5] between the mechanical in which the
[6] producer does pay a royalty and the
[7] broadcast where all that happens is that
[8] royalties are claimed out of a fund that's
[9] collected for the use of music that's
[10] broadcast.
[11]    **Q:** And are those public performance
[12] royalties?
[13]    **A:** I don't know what they're called.
[14] Every television network and cable station at
[15] the end of the day has a certain number of
[16] minutes of music that have been logged for which
[17] in prime time and not prime time and overnight
[18] and different categories, and they have to
[19] contribute money for the use of music that they
[20] air. And it's all weighted by the number of
[21] subscribers or people and they put that into the
[22] broadcaster's funds.
[23]    Our job as writers, administrators,
[24] publishers is to claim the part that says well,
[25] those two minutes were mine, so the money is

---

Page 220

[1]                     **A. Bryant**
[2] already collected and so I get money for those
[3] two minutes and my publisher gets money for
[4] those two minutes. The publisher doesn't pay
[5] me. The publisher dips into the same pot with
[6] me. The difference between me and the publisher
[7] is the publisher has the ability to put in
[8] somebody else's name to claim my part. That's
[9] the difference. It's not that Sunbow has to pay
[10] me. They can change their information about
[11] which writer collects.
[12]    **MR. MONAGHAN:** We also have a ruling
[13] by the court that there may be an identity
[14] of interest between Bacal individually and
[15] Sunbow. The court has said in its most
[16] recent opinion that fails to see why to
[17] achieve justice cannot permit plaintiff in
[18] essence to pierce the corporate veil, find
[19] such an identity between Bacal and Sunbow,
[20] that Bacal's relationship with plaintiff
[21] is the same as Sunbow's relationship to
[22] plaintiff, and thereby permit plaintiff to
[23] recover any financial benefit that has
[24] been wrongfully conferred about Sunbow."
[25]    So the questions that seek to

---

Anne Bryant                                                                    **Anne Bryant**   v.
Vol. 1, March 31, 2003                                         **Broadcast Music, Inc., et al.**

---

Page 221

*A. Bryant*

[1]
[2] segregate the parties are somewhat — I
[3] understand why you're asking them, and I'm
[4] not saying you don't have the right to ask
[5] them, but in the context of the case in
[6] the posture it's in now, for her purposes
[7] Bacal may be Sunbow and Sunbow may be
[8] Bacal. And certainly Bacal was collecting
[9] performance rights royalties to which he
[10] was not entitled and so alleged in the
[11] complaint and so identified by the
[12] plaintiff in the course of her testimony.
[13]     MS. KITSON: May I look at a copy of
[14] the decision? I did not understand that to
[15] be a ruling by the court that there is an
[16] identity of interest, but rather that the
[17] court stated that if plaintiff was able to
[18] establish that Bacal's relationship with
[19] Sunbow had been such that he exercised
[20] complete domination and control thereof,
[21] that then upon that proof that there may
[22] be a piercing of the corporate veil. I
[23] did not understand there to be a ruling,
[24] but at this point there was an identity of
[25] interest.

Page 222

*A. Bryant*

[1]
[2]     MR. MONAGHAN: Well, we can fence
[3] about that. Certainly we've alleged it.
[4] We put the testimony before the court and
[5] the court has certainly raised that as a
[6] legitimate issue to be pursued by the
[7] plaintiff. I don't think there can be a
[8] serious dispute about that.
[9]     MS. KITSON: No.
[10]     MR. MONAGHAN: Okay. And that's why
[11] I'm saying these questions are — that
[12] seek to differentiate, if you will,
[13] Sunbow's role from the role of other
[14] defendants may not be totally, how shall I
[15] say — they may be somewhat misleading.
[16] The record may be, not that you're
[17] attempting to mislead, but the record may
[18] not be clear because the allegation is
[19] that Bacal was in control of Sunbow and
[20] Bacal was in control of Starwild and
[21] Wildstar and there was a community or
[22] identity of interest.
[23]     MS. KITSON: As that has not been
[24] established as of yet through the proof,
[25] that still has to be presented to the

Page 223

*A. Bryant*

[1]
[2] court for a ruling, I still think it's in
[3] my client's interest for me to pursue the
[4] line of questioning that does —
[5]     MR. MONAGHAN: Sure —
[6]     MS. KITSON: — highlight
[7] differentiation.
[8]     MR. MONAGHAN: But you are going
[9] over the complaint with my client and we
[10] all know the lawyers draw the complaint.
[11]     MS. KITSON: Well, yes, but I'm
[12] trying to understand the allegations in
[13] the complaint which are — you know, it's
[14] filed on your client's behalf and that's
[15] all I'm trying to do —
[16]     MR. MONAGHAN: That's fine.
[17]     MS. KITSON: — is just clarify.
[18]     MR. MONAGHAN: That's fine.
[19]     Q: Under the first calls of action
[20] which is on page 6, paragraphs 2 and 3 read
[21] "Sunbow has been involved in the production,
[22] distribution and sale of television" — do you
[23] know what, hold on one second.
[24]     I have only one question about this
[25] part and it's only in paragraph 2. So let me

Page 224

*A. Bryant*

[1]
[2] withdraw the previous question and just refer
[3] Miss Bryant to the end of paragraph 2 and ask
[4] simply who is Monroe Michaels?
[5]     A: Monroe Michaels is an alias for a
[6] man named Andy Heyward who is a major animation
[7] television show producer. And he has a show —
[8] a company called — production company called
[9] DIC. DIC and he produces animated television
[10] shows. And he produced episodes of the G.I. Joe
[11] Show, quite a lot of them. And the period that
[12] his company produced the G.I. Joe Show all of
[13] the music for G.I. Joe was then listed to Monroe
[14] Michaels as the composer. And Monroe Michaels
[15] is Andy Heyward.
[16]     So, he is a producer who obviously
[17] either wrote entirely new music for all of those
[18] shows and threw out a very famous theme piece or
[19] he claimed to have written it for that period of
[20] time.
[21]     Q: And on page 8 under the second cause
[22] of action —
[23]     A: One other thing, we asked Sunbow to
[24] please give us copies of the theme that Monroe
[25] Michaels wrote. We asked for them many times.

---

Case 1:07-cv-06395-SHS    Document 32-13    Filed 01/04/2008    Page 59 of 63

Anne Bryant    v.                                                    Anne Bryant
Broadcast Music, Inc., et al.                              Vol. 1, March 31, 2003

Page 225

*A. Bryant*

[1]
[2]    MS. KITSON: Right. That was in
[3] your document request.
[4]    Q: Paragraph 2 states that "defendant
[5] Sunbow has received and will continue to receive
[6] credit and monies for the exploitation of
[7] musical compositions authored by plaintiff
[8] including The Transformers, My Little Pony, G.I.
[9] Joe and Jem, and is thereby unjustly enriched to
[10] the detriment of plaintiff. Such credits and
[11] monies are paid by third parties including but
[12] not limited to BMI and possibly ASCAP, another
[13] performing rights society or other third parties
[14] unknown to plaintiff."
[15]    MR. MONAGHAN: We can't say anymore
[16] about this subject and that's it.
[17]    A: I think I say it really well. I'm
[18] trying to remember how I said it a half hour
[19] ago.
[20]    MR. MONAGHAN: If you're talking
[21] about the performing rights —
[22]    Q: I'm talking about whether you refer
[23] to credit or credits, what is it that you're
[24] referring to there, the idea of credit or
[25] credits?

Page 226

*A. Bryant*

[1]
[2]    A: If a lot of money is being paid to
[3] Anne Bryant to Transformers and we can take that
[4] money and divert it to Jim, Joe, and Ed, Anne
[5] has made enough already, we can save ourselves
[6] having to pay Jim, Joe, and Ed a salary for
[7] writing these underscore episodes. That's in a
[8] way that a credit would be directed by them in
[9] such a way as to cause them to save money.
[10]    Q: Do you mean writer's credit?
[11]    A: Yes.
[12]    Q: Okay.
[13]    A: If they divert it to other people —
[14]    Q: Okay, that was my entire question.
[15] Have you identified any other third parties that
[16] you allege have paid Sunbow for the exploitation
[17] of your music —
[18]    A: This company, Kid Rhino I would
[19] assume — can you assume? I don't know.
[20] Somebody got a license to do this, licensing
[21] fee. And Sony got the catalog, right, so it's
[22] Sony. And I know that there were releases of
[23] the music from the Transformers movie, DVD
[24] releases and CD releases. So... I don't know
[25] who the record company was, though, for the

Page 227

*A. Bryant*

[1]
[2] music.
[3]    MS. KITSON: That's all for the
[4] complaint, and I have just a few other
[5] questions actually much of which we've
[6] gone over during the course of today, so
[7] I'm just going to quickly skim through
[8] what I have.
[9]    Q: Did BMI or any other party or any
[10] third party produce to you a catalog — strike
[11] that.
[12]    MR. MONAGHAN: You have a request
[13] into us for whatever catalogs we got.
[14]    MS. KITSON: We do have Miss
[15] Bryant's catalog, so that does not need to
[16] be reproduced.
[17]    MR. MONAGHAN: We showed you
[18] Wildstar. Wildstar we may have.
[19]    MS. VALENCIA: It's right there.
[20]    THE WITNESS: And then the
[21] subpoenas, the statements.
[22]    MS. KITSON: And we requested the
[23] cue sheets that had been produced to you
[24] listing Carole Weitzman as the contact
[25] person.

Page 228

*A. Bryant*

[1]
[2]    MR. MONAGHAN: Clearance forms.
[3]    MS. KITSON: Right.
[4]    Q: In defendant Bacal's answers and
[5] objections to plaintiff's first set of
[6] interrogatories, plaintiff's 36 interrogatory
[7] refers to cue sheets being attached. Defendant
[8] Bacal's answer states that the reference cue
[9] sheets were not attached to the copies of the
[10] interrogatories served on his attorney.
[11]    Have those cue sheets been produced
[12] or are they the cue sheets that we've previously
[13] made — do they refer to the same cue sheets
[14] that we've made a request for?
[15]    MR. MONAGHAN: No.
[16]    MS. KITSON: To the extent that they
[17] may be different, we request the
[18] production.
[19]    MR. MONAGHAN: But I think you've
[20] seen some on the motions.
[21]    MS. KITSON: I have not seen any cue
[22] sheets.
[23]    THE WITNESS: They're not
[24] different. I don't know if they're the
[25] same ones.

Page 229

*A. Bryant*

[1]
[2]    Q: If paragraph 5, Miss Bryant, of your
[3] affidavit opposing defendant Sunbow's motion to
[4] dismiss the amended complaint, you said you have
[5] reviewed the BMI printouts of changes and can
[6] advise the court that in 1998 at or about the
[7] time of the transfer of Sunbow by Bacal to Sony
[8] Entertainment that there were many changes made
[9] at BMI.
[10]    What is the BMI printout of changes
[11] to which you refer?
[12]    A: The thing that we just went through,
[13] my catalog.
[14]    Q: Your catalog?
[15]    A: It shows it right there. Every
[16] catalog shows it.
[17]    Q: Okay. And, Miss Bryant, during the
[18] course of this litigation, did you have occasion
[19] to meet with any attorney from BMI?
[20]    A: Yes, I met with Judith Saffer.
[21]    Q: And when was that, this meeting?
[22]    A: In October of 2000.
[23]    MR. MONAGHAN: You actually remember
[24] the date.
[25]    Q: Who was present at the meeting?

Page 230

*A. Bryant*

[1]
[2]    A: Judith Saffer and Allison Smith.
[3]    Q: Anyone else?
[4]    A: Patrick and myself.
[5]    Q: At that meeting did you discuss the
[6] alteration and reregistration of your
[7] compositions in your BMI catalog?
[8]    A: Yes.
[9]    Q: What was the explanation given by
[10] the representatives of BMI regarding the alleged
[11] reregistrations?
[12]    MR. MONAGHAN: Well, which
[13] representative?
[14]    Q: Did Judith Saffer offer an
[15] explanation regarding the reregistrations?
[16]    A: No, she was an apologist, I think,
[17] in the situation saying well, we have no way of
[18] knowing if it's not a completely different song,
[19] how can we tell is what she said. Where Allison
[20] Smith had some different answers.
[21]    Q: What was Ms. Smith's answers?
[22]    A: She made light of the background
[23] cues, "it's just a couple of little cues,"
[24] which, by the way, are the biggest royalties
[25] that there are. And said, you know, that I

Page 231

*A. Bryant*

[1]
[2] never really had these things registered in my
[3] name. And that 6/19/1993 was where hundreds of
[4] registrations went in and things changed around
[5] tremendously and I lost a lot of percentage of
[6] my writer share. She said that was just a
[7] system change for BMI, that every writer's
[8] catalog at BMI would show some kind of a change
[9] on that date. And that's when I first said to
[10] her, I said "did Billy Joel lose Just The Way
[11] You Are? What kind of system is this that causes
[12] people to lose so much of the value of their
[13] catalog?" So she also revealed that the jingle
[14] had — database was a separate database and we
[15] were never able to get it. And she told us that
[16] cue sheets were a legitimate way to register
[17] works, you didn't have to have a registration
[18] form. But she said, as she did in her —
[19] possession, as it does in the rule book, that
[20] it's the way that you can register a piece of
[21] music written for television, written
[22] specifically for television, not a pre-existing
[23] piece. So all of these were pre-existing pieces
[24] of music and they were using cue sheets to
[25] register them again, and so they were brand new

Page 232

*A. Bryant*

[1]
[2] compositions.
[3]    MR. MONAGHAN: Okay. The question
[4] was just what she said.
[5]    THE WITNESS: That's what she
[6] revealed.
[7]    Q: Her explanation —
[8]    MR. MONAGHAN: But I'm going to put
[9] an objection on the record that it's all
[10] hearsay by Allison Smith. It has no
[11] relevance.
[12]    A: Allison Smith is a bullshit artist.
[13]    Q: What did the representatives from
[14] BMI tell you with regard to the right of
[15] copyright owners of television shows to make
[16] variations in the music used in the shows?
[17]    A: They didn't say anything about that.
[18]    MR. MONAGHAN: Well, objection. I
[19] object to the question anyway.
[20]    Q: Did the representatives from BMI
[21] tell you anything in regard to the right of
[22] copyright owners of television shows to change
[23] writer's credit?
[24]    MR. MONAGHAN: Object to the
[25] question. It calls for some sort of an

Anne Bryant  v.                                                        Anne Bryant
Broadcast Music, Inc., et al.                              Vol. 1, March 31, 2003

---

Page 233

[1]                    *A. Bryant*
[2] analysis of legal conclusions made by
[3] others which has no bearing on the case
[4] and may be totally incorrect. I don't
[5] remember any discussion of that anyway.
[6]     A: No, there was no discussion like
[7] that. They better not do that to me.
[8]     Q: Did the representatives from BMI
[9] tell you anything with regard to the
[10] registration of writers credit for the G.I. Joe
[11] theme?
[12]     A: They said there was no writer
[13] change.
[14]     Q: Did they tell you that you had never
[15] been listed as a writer on that composition?
[16]     A: Yes, they said just a few little
[17] cues which amounted to a couple hundred thousand
[18] dollars.
[19]     MR. MONAGHAN: We're not claiming
[20] that Miss Bryant wrote G.I. Joe. You're
[21] aware of that?
[22]     MS. KITSON: Yes. .
[23] DIR Q. Did the representative from BMI tell
[24] you anything with regard to explaining why you
[25] may have experienced a diminishment of royalty

---

Page 234

[1]                    *A. Bryant*
[2] income in the 1990s?
[3]     MR. MONAGHAN: Okay, that's it for
[4] this line. I can't take anymore of these
[5] questions. I'm going to direct her not to
[6] answer any more questions about that
[7] meeting which occurred years ago, and it
[8] was in the context of sort of a settlement
[9] meeting in the first place, to settle
[10] issues with BMI. So I don't see how it's
[11] particularly relevant.
[12]     MS. KITSON: Well, the meeting was
[13] neither privileged nor — the meeting was
[14] not privileged, and Allison Smith comments
[15] extensively on the meeting in her
[16] affidavit which was submitted within the
[17] context both of Ford Kinder's dismissal
[18] motion and Joe Bacal's summary judgment
[19] motion. And since Sunbow was not a party
[20] to the case at that point, I'm interested
[21] in probing what Miss Bryant recalls about
[22] the meeting and what she recalls being
[23] said.
[24]     MR. MONAGHAN: I understand you're
[25] interested in it, but I don't she how it

---

Page 235

[1]                    *A. Bryant*
[2] sheds any light in the issue in this case,
[3] what self-serving statements are made by
[4] BMI which is a defendant in the case
[5] anymore than what any other defendant
[6] would say in support of its position. It
[7] doesn't help. It doesn't enlighten
[8] anybody. It doesn't go to the central
[9] issues in the case about the
[10] reregistrations in terms of Miss Bryant's
[11] interest being reduced wrongfully.
[12]     MS. KITSON: I don't believe that
[13] the question as I posed it asks Miss
[14] Bryant to explain to me what BMI's
[15] position was. But just rather to —
[16]     MR. MONAGHAN: Well, it does,
[17] because it asks what they said.
[18]     MS. KITSON: I asked did they tell
[19] you anything in regard to explaining why
[20] you may have experienced a diminishment of
[21] royalty in the 1990s. The question as
[22] posed does not require her to explain
[23] BMI's position.
[24]     MR. MONAGHAN: It's still hearsay
[25] and wouldn't be admissible at trial. You

---

Page 236

[1]                    *A. Bryant*
[2] couldn't ask this witness on the stand did
[3] they say this.
[4]     MS. KITSON: But I can ask her here
[5] if they said something.
[6]     MR. MONAGHAN: But it's pointless
[7] and a waste of time and it's 25 after 5.
[8] And I don't see how — why we have to sit
[9] here and ask about hearsay statements made
[10] by other defendants and it's happened a
[11] couple years ago. It just doesn't — it's
[12] not helpful. So I'm going to direct her
[13] not to answer. If you want to try for a
[14] ruling, please go ahead.
[15]     MS. KITSON: And are you claiming
[16] privilege in directing her not to answer?
[17]     MR. MONAGHAN: I'm claiming that it
[18] was a discussion, a settlement discussion
[19] at the time of issues between BMI and the
[20] plaintiff. And, yes, courts usually don't
[21] like to let people get into settlement
[22] discussions.
[23]     MS. KITSON: Okay. It would not be
[24] the first public airing of the discussion
[25] at that meeting, but I'll move on.

---

Page 237

*A. Bryant*

[1]
[2]    Q: Miss Bryant, how many Transformers
[3] movies have been made?
[4]    A: One Transformers movie to my
[5] knowledge. It was remastered, though, for DV
[6] form, DV presentation.
[7]    MS. KITSON: I have one more
[8] question.
[9]    MR. MONAGHAN: Sure.
[10]    Q: Miss Bryant, in Mr. Bacal's motion
[11] for summary judgment, Exhibit B is the original
[12] complaint in the Bryant versus BMI action. As
[13] Exhibit A to the complaint? And I can show you
[14] if you'd like to see it.
[15]    A: I didn't know I had to memorialize
[16] all of them.
[17]    MR. MONAGHAN: Isn't that this
[18] case?
[19]    MS. KITSON: Well, yes, it's — this
[20] was filed before we were consolidated.
[21]    MR. MONAGHAN: Oh, okay.
[22]    Q: What is Exhibit A?
[23]    MR. MONAGHAN: You remember this.
[24]    A: Yeah, that's the very minimal
[25] information we were able to — only after two

Page 238

*A. Bryant*

[1]
[2] years we could get my catalog. We got my
[3] catalog in two years three months after I
[4] requested it from BMI. And from that, from
[5] combing through it and comparing it to the way
[6] these pieces of music had been registered 100
[7] percent, we could see that changes had been
[8] made. And those are the changes we could see
[9] and we submitted that with the original
[10] complaint, didn't we, to show the changes.
[11]    Q: Who generated the information as it
[12] exists in Exhibit A or let me withdraw that
[13] question?
[14]    A: What do you mean by generate?
[15]    Q: Who physically —
[16]    A: Compiled them?
[17]    Q: Compiled —
[18]    A: I did. I did.
[19]    Q: And from what sources, to the best
[20] of your recollection, did you get the
[21] information that you compiled?
[22]    A: From all that I had which was my own
[23] catalog that we went through earlier of my own
[24] BMI catalog and compared to my original BMI
[25] statements that I compared, cross checked all

Page 239

*A. Bryant*

[1]
[2] those years.
[3]    Q: Just to recap, you made this chart,
[4] Exhibit A?
[5]    A: Yes.
[6]    MS. KITSON: Those are all the
[7] questions that I have. I don't know if
[8] you'd like to go into anything.
[9]    MR. MONAGHAN: Cross?
[10]    MS. KITSON: If you'd like to.
[11]    MR. MONAGHAN: I never cross my own
[12] witnesses.
[13]    MS. KITSON: Okay.
[14]    MR. MONAGHAN: Unless there's
[15] something outrageously wrong that needs
[16] clarification.
[17]    MS. KITSON: Then I would just like
[18] to reserve on the record Sunbow's right to
[19] reopen the deposition with regard to any
[20] issues that may be raised in the documents
[21] that we've requested during the
[22] deposition, as well as any documents which
[23] — conversations which counsel have
[24] indicated may or may not be produced from
[25] third parties subsequent to this date.

Page 240

*A. Bryant*

[1]
[2]    MR. MONAGHAN: Okay. I understand
[3] what you said, and my silence should not
[4] be deemed acquiescence, but I'm not being
[5] silent. So I will say that we'll take
[6] that under advisement and when the time
[7] comes, we believe that you probably do
[8] have much of the documentation that we've
[9] referred to, but maybe not. But we'll
[10] cross that bridge when we come to it.
[11]    MS. KITSON: Okay.
[12]    Q: Thank you very much, Miss Bryant.
[13]    A: Thank you.
[14]    (Time noted: 5:26 p.m.)
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 241

[1]                     *A. Bryant*
[2]
[3] I, the witness herein, having read the foregoing
[4] testimony, do hereby certify it to be a true and
[5] correct transcript, subject to the corrections,
[6] if any, shown on the attached page.
[7]
[8]
[9]
[10]

                    **ANNE BRYANT**

[11]
[12]
[13] Subscribed and sworn to
[14] before me this day
[15] of 2002.
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 242

[1]                 A. Bryant
[2]                 CERTIFICATE
[3]
     STATE OF NEW YORK )
[4]                                 :ss
     COUNTY OF NEW YORK )
[5]
[6]
[7]        I, Celeste A. Galbo, a Shorthand
[8] Reporter and Notary Public within and for the
[9] State of New York, do hereby certify:
[10]        That ANNE BRYANT, the witness whose
[11] deposition is hereinbefore set forth, was duly
[12] sworn by me and that such deposition is a true
[13] record of the testimony given by such witness.
[14]        I further certify that I am not
[15] related to any of the parties to this action by
[16] blood or marriage and that I am in no way
[17] interested in the outcome of this matter.
[18]        In witness whereof, I have hereunto
[19] set my hand this  14th day of  April 2003.
[20]
[21]
[22]
          Celeste A. Galbo
[23]
[24]
[25]

Page 243

[1]                 A. Bryant
[2]            INDEX
[3] WITNESS        EXAMINATION BY      PAGE/LINE
[4] ANNE BRYANT    Ms. Kitson          4  7
[5]
[6]            EXHIBITS
[7] PLAINTIFF'S                      PAGE/LINE
[8] Bryant Exhibit 1, catalog listing...... 137  7
[9] Bryant Exhibit 2, Amended Complaint..... 191  13
[10]
[11]    INFORMATION AND/OR DOCUMENTS REQUESTED
        PAGE      LINE
[12]     55        2
        57        8
[13]     87        16
        114       22
[14]     163       8
        163       14
[15]     164       17
        188       24
[16]     189       23
        209       13
[17]
        DIRECTIONS NOT TO ANSWER
[18]
        PAGE      LINE
[19]
        67        13
[20]     67        15
[21]     181       13
[22]     232       25
[23]     233       4
[24]
[25]