# EXHIBIT 20

AGREEMENT made as of March 11, 1996 between SUNBOW ENTERTAINMENT d/b/a WILDSTAR MUSIC, INC. (ASCAP), STARWILD MUSIC INC. (BMI), APOLLO'S CHARIOT MUSIC (ASCAP) AND BANANA ALERT MUSIC, INC. (BMI), 100 Fifth Avenue, New York, New York, 10011, Attention: Andrew Karpen ("you"), on the one hand, and SONY/ATV TUNES LLC (ASCAP) and SONY/ATV SONGS LLC (BMI), 550 Madison Avenue, New York, New York 10022 (collectively, "Sony"), on the other hand.

1.    **SUBJECT COMPOSITIONS**

    1.01.  As used in this agreement "Compositions" shall mean the following:

        (a)    All Old Compositions.

        (b)    All Acquired Compositions.

You will not, by your acts or omissions, diminish your rights to the Compositions in the Territory.

2.    **COMPOSITIONS.**

    2.01.  Old Compositions.  You warrant and represent that all musical compositions owned, controlled or administered by you or any Affiliate, in whole or in part are listed in Schedule A annexed hereto ("Old Compositions").  Any failure to list any Old Composition on Schedule A as aforesaid shall not affect Sony's rights in and to such Old Composition. You shall Deliver to Sony the Old Compositions for exploitation hereunder simultaneously with your execution of this agreement.

    2.02.  Acquired Compositions.  All musical compositions in which you or any Affiliate acquire any ownership, control, administration interest, or other economic benefit, during the Term ("Acquired Compositions"), shall be Delivered to Sony for exploitation hereunder within 10 days following acquisition in each instance.

3.    **TERM**

    3.01.  The term of this agreement (the "Term") will begin on the date first listed above  (the "Commencement Date") and will continue until June 30, 1999.

    3.02.  Upon the termination of the Term, Sony will sign any and all assignments or other documents relating to the Compositions and the termination of the Term as you shall reasonably request, and Sony hereby appoints you as its attorney-in-fact for the sole purpose

ID: 20275                          -1-              BTR          [SMP 95-46.3(1)]
(6/10/96)(20276RL)

SUN 0728

of executing such documents in the event Sony fails to so execute within twenty (20) business days after your written request.

## 4.    GRANT OF RIGHTS

4.01.    Execution of Documents.  You will execute and deliver to Sony such instruments of transfer and other documents regarding the rights of Sony in the Compositions subject to this agreement as Sony may reasonably request to carry out the purposes of this agreement (including, without limitation, the Exhibits annexed hereto), and Sony may sign such documents in your name or the name of any Songwriter (subject to any restrictions contained in your agreement with any such Songwriter) and make appropriate disposition of them.  Sony shall give you twenty (20) business days' notice before signing any document in your name.  Sony may dispense with that waiting period when necessary, in Sony's reasonable judgment, to protect or enforce its rights, but Sony shall notify you in each instance when it has done so.  Sony shall not be required to notify you before signing short form assignments of rights granted in this agreement for recordation in the Copyright Office.

4.02.    Administration.  Sony and its Licensees will have the sole and exclusive right during the Term and throughout the Territory, to:

(a)    License and cause others to license the exploitation of the Compositions, including, without limitation, the right to print, publish and sell printed editions of the Compositions, the right to license broadcast and other public performances, sound synchronization in audiovisual works, and the right to license the manufacture, distribution and sale of Records embodying any one or more Compositions.

(b)    Administer and grant rights in the Compositions and the copyrights therein.

(c)    Intentionally omitted.

(d)    Collect all monies payable during the Term, with respect to the Compositions, in addition to all monies due prior to the Term, and all performance royalties payable to you with respect to the Compositions by the American Society of Composers, Authors and Publishers (ASCAP), Broadcast Music, Inc. (BMI), SESAC or any other applicable performing rights society (hereinafter collectively the "Societies"), but excluding any songwriter share of public performance income.  If a Society in any territory does not license any particular public performance use of a Composition, it is understood Sony may license that use directly and all income received by Sony in connection with such licenses shall be deemed Gross Income subject to accounting hereunder.  In addition, Sony shall have the right to continue to collect after the Term, for a period of one (1) year (the "Collection Period"), all monies earned during the Term.

ID: 20275                                         -2-                    BTR            [SMP 95-46.3(1)]
(6/10/96)(20276RL)

*BTR*

SUN 0729

**4.02.1    Licensing Restrictions.**  Notwithstanding anything to the contrary contained in paragraph 4.02 above, Sony's exercise of Sony's rights hereunder shall be subject to the following conditions:

(a)    Sony shall not make or authorize any changes (other than de minimis changes) to the words, music and/or title of any Composition (except authorizing foreign translations thereof) or any parody of such Composition without your prior written consent; provided, however, that any changes to the words and/or music of any Composition in a third Party musical arrangement resulting from any change in breach of a mechanical license granted by Sony voluntarily in the ordinary course of business or involuntarily as a result of the compulsory mechanical license provisions of the U.S. Copyright Act shall not be deemed to be a violation by Sony of this provision.  Notwithstanding the foregoing, Sony shall not, without your prior written consent (which may be withheld by you for any reason), (i) authorize a foreign language translation hereunder which would reduce the royalty payable to you, and (ii) no third Party translator shall acquire a copyright interest in the Composition by virtue of writing the lyrics for a foreign translation, unless a payment of royalties or transfer of copyright is required by applicable law in the country of translation.

(b)    Sony shall not license any Composition in connection with (i) any commercial advertisement, (ii) any political advertisement or (iii) in motion pictures without your prior written consent.

(c)    Sony shall not grant any so-called "grand rights" or dramatization rights in or to any Composition without your prior written consent.

(d)    Sony shall not print, publish or sell printed editions of any of the Compositions without your prior written consent.

(e)    Sony shall not grant any mechanical licenses without your prior written consent.

**4.02.2.    Requested Licenses.**  You may direct Sony, by giving notice at any time during the Term, to issue one or more of the following licenses to you or such persons as you direct, subject to the terms of this subparagraph 4.02.2:

(a)    a license for the use of a Composition in a home video version of the audiovisual project in which such Composition was embodied, provided that each such license shall be at a rate and on terms no less than the reasonable and customary rates and terms for the use concerned in the music publishing industry;

(b)    a U.S. mechanical license for the use of a Composition in a Record, provided that the rate for such license is at a rate not less than seventy-five percent (75%) of

ID: 20275                          -3-              BTR            [SMP 95-46.3(1)]
(6/10/96)(20276RL)

the minimum U.S. statutory rate for top-line albums in effect at the time of the initial U.S. release of the master embodying such Composition; and

(c) all licenses to use the music reasonably requested by you in connection with the use of any Composition in any and all media now known or hereinafter developed, provided that each such license shall be at a rate and on terms no less than the reasonable and customary rates and terms for the use concerned in the music publishing industry. If Sony fails to issue any license requested by you in accordance with this subparagraph 4.02.2, you shall be entitled to grant such license on the same terms to the same Person; provided, however, that all income generated by such license (whether in the form of a fee, advance, royalty, or guaranteed payment) shall immediately be turned over to Sony for accounting as "Gross Income" hereunder. For purposes of clarification, "income generated by such license" shall not include the overall fee, advance or guarantee payment payable to you solely for the use of a program, film or character associated with the concerned Compositions; provided that in no event shall such fee, advance or guaranteed payment be an advance against any income generated by the licenses contemplated by this subparagraph.

4.03.  Power of Attorney. You hereby irrevocably authorize, empower, and appoint Sony your true and lawful attorney, during the Term and the Collection Period, to secure and renew the copyright in the Compositions for the initial and any renewal periods for your benefit and Sony's rights hereunder, to initiate and compromise any claim or action with respect to the Compositions including any claim or action against infringers of Sony's or your rights in the Compositions, and to execute in your name, and the name of any Songwriter, any and all documents and/or instruments necessary or desirable to accomplish the foregoing and/or to effectuate Sony's rights hereunder. You may participate in any such claim or action through counsel of your selection at your own expense, but Sony shall have the right at all times, in Sony's reasonable discretion, to retain or resume control of the conduct of such claim or action. Notwithstanding the foregoing, Sony shall give you ten (10) days' notice and consult with you before signing any such document in your name. Sony may dispense with that waiting period when necessary, in Sony's reasonable judgment, to protect or enforce Sony's rights, but Sony shall notify you in each instance when Sony has done so, and shall provide you with copies of such documents promptly after your request therefor. Sony shall not be required to notify you before signing short form assignments of rights granted in this agreement for recordation in the Copyright Office. The powers granted herein are coupled with an interest and irrevocable. Without limiting the generality of the foregoing, Sony and its Licensees each shall have the right but not the obligation to cause the copyrights in the Compositions to be registered or re-registered in your name and the names of any additional parties as may be appropriate.

4.04.  Names and Likenesses. (a) Subject to subparagraphs 4.04(b) and (c) below, Sony and any Licensee of Sony each shall have the right and may grant to others the right to reproduce, print, publish, or disseminate in any medium your name, the names, portraits, pictures and likenesses of the Songwriters (including, without limitation, all professional,

ID: 20275                          -4-              BTR         [SMP 95-46:3(1)]
(6/10/96)(20276RL)

*BTR*

SUN 0731

group, and other assumed or fictitious names used by them), and biographical material concerning them, to the extent you have such rights, as news or information, for the purposes of trade, or for advertising purposes solely in connection with the exploitation of musical compositions, institutional advertising and marketing for Sony.

(b)     Sony will furnish to you for your approval at its offices any pictures of one or more Songwriters, or biographical material about such Songwriters, which it proposes to use for packaging, advertising, publicity or other use in the United States during the Term. Sony will not use any such material which you disapprove in writing, provided you furnish substitute material, satisfactory to Sony in its sole discretion, in time for Sony's use within its production and release schedules. This subparagraph will not apply to any material previously approved by you or previously used with your approval by Sony. No inadvertent failure to comply with this subparagraph will constitute a breach of this agreement, and you will not be entitled to injunctive relief to restrain the continuing use of any material used in contravention of this subparagraph provided Sony uses its best efforts to prospectively cure such failure.

(c)     The rights granted by you pursuant to this paragraph 4.04 in respect of the names, portraits, and likenesses of the Songwriters shall be subject only to those limitations on your rights thereto which are set forth in written agreement(s) between you and the Songwriter concerned and of which you have notified Sony with specificity within a reasonable time prior to Sony's intended use.

4.05.  Without limitation of anything contained in this Article 4, for the country of Brazil, you grant to Sony the exclusive right in respect to mechanical and electrical reproduction of the Compositions on Phonograph Records and the exclusive collection of the sub-publishing rights (including performance and mechanical rights) in accordance with local representation by SONY SONGS EDICOES MUSICAIS LTDA., at Praia do Flamengo, 200, Rio de Janeiro, Brazil 22210  (or any successor organizations), to whom all necessary powers are granted for the collection and administration of the Compositions for which Sony agrees to undertake all necessary proceedings to execute the requirements of this agreement.

4.06.  Option to Purchase. If at any time during the Term you receive a bona fide offer from a third party at any time to purchase all or any portion of your interest in the Compositions, or any one of them, and you desire to sell such interest, you shall accord to Sony First Refusal Rights with respect to such proposed purchase.

5.     INTENTIONALLY OMITTED.

ID: 20275                    -5-                 BTR          [SMP 95-46.3(1)]
(6/10/96)(20276RL)

BTR

SUN 0732

**6.** **ADMINISTRATION FEES; ROYALTIES**

Sony shall be entitled to retain for its own account the following administration fees:

6.01.  United States Income.  ten percent (10%) of Gross Income derived from any exploitation of the Compositions in the United States; except that Sony shall be entitled to retain twenty percent (20%) of Gross Income derived from Cover Recordings in the United States.

6.02.  Non-United States Income.  fifteen percent (15%) of Gross Income derived from any exploitation of the Compositions outside the United States; except that Sony shall be entitled to retain thirty percent (30%) of Gross Income derived from Cover Recordings outside the United States.

6.03.  Any direct or indirect payments to you with respect to the Compositions (other than songwriter share of non-dramatic public performance income) shall be immediately reported and turned over to Sony for accounting under this Article 6.

6.04.  Sony shall pay you a royalty of one hundred percent (100%) of Net Income.

**7.** **ROYALTIES ACCOUNTINGS**

7.01.  Sony will compute your royalties as of each June 30th and December 31st for the prior six (6) months.  (Sony reserves the right to alter such accounting periods without notice, but in no event shall Sony account less frequently than every six (6) months.)  On the next September 30th or March 31st (or if Sony alters the accounting periods, on the date ninety (90) days following the period concerned) Sony will send you a statement covering those royalties and will pay you any net royalties which are due.  Sony will not be required to send you a royalty payment for any period in which the royalties payable to you will be $50.00 or less; such royalties shall be held and paid along with the next statement requiring payment in excess of $50.00.  If Sony makes any overpayment to you, you will reimburse Sony for it; to the extent not immediately reimbursed, Sony may also deduct it from any payments due or becoming due to you.  In respect of print sales of Compositions made by print operations owned by Sony or any of Sony's affiliates, Sony shall have the right to maintain royalty reserves against unanticipated returns and credits only with respect to print uses of the Compositions not in excess of 15% of Net Income, payable to you in respect of print uses.  Each such royalty reserve shall be liquidated not later than the end of the fourth semi-annual accounting period following the accounting period during which the applicable reserve is initially established.

7.02.  Sony will compute royalties in the same national currency in which Sony's Licensee pays Sony for that exploitation, and Sony will credit those royalties at the same rate

ID: 20275                          -6-              BTR          [SMP 95-46.3(1)]
(6/10/96)(20276RL)

*BTR*

SUN 0733

of exchange at which the Licensee pays Sony. For purposes of accounting to you, Sony will treat any exploitation outside the United States as an exploitation occurring during the same six (6) month period in which Sony receives its Licensee's accounting and payment for that exploitation. If any Sony Licensee deducts any taxes from its payments to Sony, Sony may deduct a proportionate amount of those taxes from your royalties. If after a final audit of its tax returns by the Internal Revenue Service Sony is allowed a credit against its U.S. income taxes for all or a portion of any taxes withheld by a Sony Licensee from its royalty remittances to Sony which were deducted from your royalties, the amount of such tax credit attributable to your royalties will be credited to your account. The amount of the tax credit to be credited to your account will be determined by Sony; such determination will be conclusive and you will not be entitled to examine Sony's tax returns or any portion of them. If any law, any government ruling, or any other restriction affects the amounts which a Sony Licensee can remit to Sony, Sony may deduct from your royalties an amount proportionate to the reduction in the Licensee's remittances to Sony. If Sony cannot collect payment for any foreign exploitation in the United States in U.S. Dollars it will not be required to account to you concerning that exploitation, except as provided in the next sentence. Sony will, at your request and at your expense, deduct from the monies so blocked and deposit in a foreign depository the equivalent in local currency of the royalties which would be payable to you on the foreign sales concerned, to the extent such monies are available for that purpose, and only to the extent to which your royalty account is then in a fully recouped position. All such deposits will constitute royalty payments to you for accounting purposes.

7.03. Sony will maintain Books and Records which report exploitation of Compositions for which royalties are payable to you. You may, at your own expense, examine those books and records, as provided in this paragraph only. You may make those examinations only for the purpose of verifying the accuracy of the statements sent to you under paragraph 7.01. You may make such an examination for a particular statement only once, and only within three (3) years after the date when Sony sends you that statement under paragraph 7.01. Sony will be deemed conclusively to have sent you each statement on the date prescribed in paragraph 7.01 unless you notify Sony otherwise, with respect to any statement, within thirty (30) days after that date. You may make those examinations only during Sony's usual business hours, and at the place where it keeps the books and records to be examined. If you wish to make an examination you will be required to notify Sony at least 30 days before the date when you plan to begin it. Sony may postpone the commencement of your examination only twice and by notice given to you not later than seven (7) days before the commencement date specified in your notice; if it does so, the running of the time within which the examination may be made will be suspended during the postponement. If your examination has not been completed within one month from the time you begin it, Sony may require you to terminate it on seven (7) days' notice to you at any time, provided any delay is not caused directly by Sony; Sony will not be required to permit you to continue the examination after the end of that seven-day period. You will not be entitled to examine any records that do not specifically report exploitation of Compositions as to which royalties are payable to you. You may appoint a certified public accountant to

ID: 20275                    -7-                BTR            [SMP 95-46.3(1)]
(6/10/96)(20276RL)

make such an examination for you, but not if he or his firm has begun an examination of Sony's books and records for any Person except you, unless the examination has been concluded and any applicable audit issues have been resolved.

7.03.1.    Notwithstanding the last sentence of paragraph 7.03, if Sony notifies you that the representative designated by you to conduct an examination of Sony's books and records under paragraph 7.03 is engaged in an examination on behalf of another Person ("Other Examination"), you may nevertheless have your examination conducted by your designee, and the running of the time within which such examination may be made shall be suspended until your designee has completed the Other Examination, subject to the following conditions:

(a)    You shall notify Sony of your election to that effect within 30 days after the date of Sony's said notice to you;

(b)    Your designee shall proceed in a reasonably continuous and expeditious manner to complete the Other Examination and render the final report thereon to the client and Sony; and

(c)    Your examination shall not be commenced by your designee before the delivery to Sony of the final report on the Other Examination, shall be commenced within seventy-five (75) days thereafter, and shall be conducted in a reasonably continuous manner.

(The preceding provisions of this paragraph 7.03.1 will not apply if Sony elects to waive the provisions of the last sentence of paragraph 7.03 which require that your representative shall not be engaged in any Other Examination.)

7.04.    If you have any objections to a royalty statement, you shall give Sony specific notice of that objection and your reasons therefor within three (3) years after the date when Sony is deemed to have sent you that statement under paragraph 7.01 (giving effect to the fifth sentence of paragraph 7.03). Each royalty statement shall become conclusively binding on you at the end of that three (3)-year period, and you shall no longer have any right to make any other objections to the statement. You shall not have the right to sue Sony in connection with any royalty accounting unless you commence the suit within that three (3)-year period. If you commence suit on any controversy or claim concerning royalty accountings rendered to you under this agreement, you will have no right to seek termination of this agreement or avoid the performance of your obligations hereunder by reason of any such claim. The preceding two sentences shall not apply to any item in a royalty accounting if you establish that the item was intentionally misstated by Sony.

8. **SONGWRITER AGREEMENTS**

8.01. The term "you" as used in this Article, and Article 9, means and includes you and every Affiliate.

8.02. (a)    You will fulfill all of your obligations to Songwriters under your agreements with Songwriters ("Songwriter Agreement") including, without limitation, all payment obligations thereunder. You shall notify Sony promptly of every material default and alleged default by you in doing so. If you do not cure any such default within thirty (30) days of notice from Sony, Sony shall have the right at its election to cure the default on your behalf. If Sony does so by making payment therefor, then you shall repay Sony immediately for such payment, or Sony shall have the right to deduct such amount from royalties payable to you hereunder.

(b)    In the event of your dissolution or the liquidation of your assets, or the filing of a petition in reorganization, by, for or against you, or the appointment of a receiver or a trustee for all or a portion of your property, or if you make an assignment for the benefit of creditors or commit any act for, or in, bankruptcy or become insolvent, then at any time after the occurrence of any such event, in addition to any other remedies under this agreement or otherwise, Sony shall have the right to cause your rights in respect of the applicable Compositions under any or all of the Songwriter Agreements to be assigned to Sony.

8.03. You shall protect, implement and enforce all of your rights under the Songwriter Agreements unless Sony agrees otherwise in writing. Sony shall have the right to do any act or thing, in your name and on your behalf, which you could do yourself under any Songwriter Agreements or for the purpose of protecting, implementing or enforcing your rights thereunder, if you do not do so within (10) days of Sony's notice.

8.04. Except as otherwise expressly provided in this agreement, each assignment to Sony of a Songwriter Agreement or your rights thereunder in respect of the applicable Compositions pursuant to Sony's rights under this agreement shall be effective upon the giving of notice by Sony that it elects to cause such assignment. Notwithstanding the preceding sentence, you will execute and deliver such further instruments and documents and will take such other steps as Sony shall reasonably request for the purpose of implementing any such assignment; if you fail to do so promptly upon Sony's request in any instance, Sony shall have the right to do so in your name and on your behalf.

8.05. If a Songwriter Agreement or your rights thereunder in the applicable Compositions shall be assigned to Sony pursuant to this agreement. Sony will credit to your royalty account an amount equal to the royalties you would have been paid hereunder (but for such assignment) on Compositions delivered prior to such assignment (after deduction of Songwriter or other third party share.)

ID: 20275                        -9-            BTR            [SMP 95-46.3(1)]
(6/10/96)(20276RL)

9.    **ADDITIONAL WARRANTIES, REPRESENTATIONS, RESTRICTIONS, COVENANTS, WAIVERS, INDEMNITIES**

9.01.    You warrant and represent:

(a)    You have or will enter into written agreements with each Songwriter and or Songwriter Furnishing Entity. The period during which you are entitled, pursuant to each such agreement, to own and administer the Songwriting services of each such Songwriter and the rights to musical compositions subject thereto shall be no less than the Term and the Collection Period hereunder, as the same may be extended.

(b)    The Compositions and all rights and copyrights therein are your sole property, free from any claims whatsoever by any Person. Prior to the execution of this agreement, you have received no notice of any such claim nor are you aware of any such claim.

(c)    All rights in the Compositions herein granted to Sony shall be available to Sony throughout the territory without restriction, except as may be specifically indicated herein.

(d)    You have the right and power to enter into and fully perform this agreement.

(e)    Sony shall not be required to make any payments of any nature for, or in connection with, the acquisition, exercise or exploitation of rights by Sony pursuant to this agreement except as specifically provided in this agreement. Without limiting the generality of the foregoing, you shall be solely responsible for any payments due to Songwriters with respect to Sony's exploitation of the Compositions and the other rights granted to Sony hereunder.

(f)    There are no advances made by ASCAP, BMI or any other third parties which are recoupable from income derived from any use of the Compositions. You are entitled to be paid and to collect on all such income (including both the publisher and songwriter share) from the date hereof. On or before your execution of this agreement you will deliver to Sony a letter in the form attached hereto as Exhibits B-1, B-2, B-3 or B-4 from ASCAP and BMI, and such other documents from other third parties as Sony may reasonably request in connection with this subparagraph.

(g)    No Materials, as hereinafter defined, or any use thereof, will violate any law or infringe upon or violate the rights of any Person. "Materials," as used in this Article, means: (1) all Compositions, (2) each name used by Songwriters, individually or as a group, in connection with the Compositions, and (3) all other musical, dramatic,

ID: 20275                    -10-                BTR            [SMP 95-46.3(1)]
(6/10/96)(20276RL)

SUN 0737

artistic and literary materials, ideas, and other intellectual properties, furnished or selected by you or Songwriter(s) and contained in or used in connection with the Compositions or the exploitation thereof.

(h)     WILDSTAR MUSIC, INC. and APOLLO'S CHARIOT MUSIC are members in good standing of ASCAP pursuant to valid current membership agreements. STARWILD MUSIC INC. and BANANA ALERT MUSIC, INC. are members in good standing of BMI pursuant to valid current membership agreements.

(i)     Neither you, nor any third party, on your behalf, will collect or permit the collection of any income arising in the Territory in connection with the Compositions at any time during the Term or the Collection Period. To the extent you are in breach of your warranty and representation (or your agreement) herein, Sony shall, in addition to its other rights, have the right to deduct from any royalties due you, an amount equal to any monies which Sony is unable to collect by reason of such monies having been collected by you or on your behalf.

9.02.  During the Term of this agreement, neither you nor any Songwriter or Songwriter Furnishing Entity will enter into any agreement which would interfere with the full and prompt performance of your obligations hereunder.

9.03.  You warrant and represent that, to the best of your knowledge, the relevant text of any licenses concerning any Compositions made by you, any Affiliate, any Songwriter, or any Songwriter Furnishing Entity prior to the Term hereof is annexed hereto as Exhibit D. You shall provide Sony with the text of any additional licenses immediately following your knowledge thereof.

9.04.  The exclusive rights granted hereunder are unique and extraordinary, and the loss thereof cannot be adequately compensated in damages, and Sony shall be entitled to injunctive relief to enforce the provisions of this agreement. (The preceding sentence shall not be construed to preclude you, from opposing any application for such relief based upon contest of the other facts alleged by Sony in support of the application.)

(a)     You will at all times indemnify and hold harmless Sony and any Licensee of Sony from and against any and all claims, damages, liabilities, costs and expenses, including reasonable legal expenses and reasonable counsel fees, arising out of any breach or alleged breach of any warranty or representation made by you in this agreement, or any other act or omission by you or any Songwriter, provided the claim concerned has been settled with your consent or has resulted in a judgment against Sony or its Licensees. If any claim involving such subject matter has not been resolved, or has been resolved by a judgment or other disposition which is not adverse to Sony or its Licensees, you will reimburse Sony for eighty percent (80%) of the expenses actually incurred by Sony and its Licensees in connection with that claim. Pending the resolution of any such claim Sony will

ID: 20275               -11-              BTR            [SMP 95-46.3(1)]
(6/10/96)(20276RL)

not withhold monies which would otherwise be payable to you under this agreement in an amount exceeding your potential liability to Sony under this paragraph.

(b)    If Sony pays more than $5,000 in settlement of any such claim, you will not be obligated to reimburse Sony for the excess unless you have consented to the settlement, except as provided in the next sentence. If you do not consent to any settlement proposed by Sony for an amount exceeding $5,000 you will nevertheless be required to reimburse Sony for the full amount paid unless you make bonding arrangements, satisfactory to Sony in its reasonable discretion, to assure Sony of reimbursement for all damages, liabilities, costs and expenses (including legal expenses and counsel fees) which Sony or its Licensees may incur as a result of that claim.

10.    **DEFINITIONS**

As used in this agreement the following terms shall have the meanings set forth below:

10.01.    INTENTIONALLY OMITTED.

10.02.    "Affiliate" – any Person which you own or in which you have an interest, in whole or in part, any Person the operation of which is controlled directly or indirectly by you and any Person which is owned or controlled by the same Person which owns or controls you. Upon formation of an Affiliate subsequent to the date hereof, you shall promptly give notice to Sony thereof and deliver to Sony a counterpart to this agreement executed by such Affiliate. Such execution shall not relieve you of any of your warranties, representations or agreements hereunder.

10.03.    "Books and Records" - that portion of Sony's books and records which specifically report monies received by Sony from the commercial exploitation of the Compositions for which a royalty is payable to you hereunder; provided that the term "Books and Records" shall not be deemed to include any manufacturing records (e.g., inventory and/or production records) or any other of Sony's records.

10.04.    Intentionally Omitted.

10.05.    "Cover Recording" - any recording of a Composition on Records, which recording has not been secured by you.

10.06.    "Delivery" or "Delivered" – when used with respect to Compositions, means the actual receipt by Sony's Business Affairs and Administration Department at its offices in New York, New York of a DAT tape, cue sheets, and a lyric sheet of the Composition, and authorizations in the form of the Exhibits annexed hereto; in addition,

ID: 20275                    -12-            BTR        [SMP 95-46.3(1)]
(6/10/96)(20276RL)

BTR

SUN 0739

"Delivery" means the actual receipt by Sony of all data and records in your possession or control regarding the copyrights therein and the interests of any co-writers, co-owners and/or other parties in all Compositions, including without limitation, certificates of registration of claims to copyright, notices of use, correspondence, demo records, and mechanical licenses with respect thereto.

    10.07.    INTENTIONALLY OMITTED.

    10.08.    "Gross Income" - all monies earned as compensation for the use of any Composition(s) and any proceeds from litigation regarding such Composition(s).  With respect to monies earned outside the United States, calculation of Gross Income" shall be made "at source"; that is, such calculation shall include, for the purposes of this paragraph, any share of such monies retained by Sony's wholly-owned Licensees.  For purposes of clarification, "Gross Income" shall exclude any advances or fees paid to you by third parties, unless such advances or fees are paid in connection with the use of Compositions.

    10.09.    "Licensees" - music publishing licensees, including without limitation, music publishing subsidiaries, wholly or partly owned, divisions and affiliates of Sony Music Entertainment Inc., and Subpublishers.

    10.10.    "Net Income" - Gross Income, less any amounts Sony is permitted to deduct from such Gross Income pursuant to the terms of this agreement, including, without limitation, the administration fees permitted under Article 6 hereof, the amounts, if any, paid to partial owners of Compositions or other publishers, the actual costs, if any, incurred in connection with the registration of copyrights, actual third-party costs of translating and arranging the Compositions (subject to subparagraph 4.02.1(a)), actual, third-party costs of collecting income with respect to the Compositions, actual third-party fees paid to or charged by a trustee or collecting agent for the licensing of the Compositions (provided such costs are customary and reasonable in the music publishing industry), all actual, third-party expenses (including reasonable legal fees and expenses) incurred by Sony in connection with any claim or suit brought by or against Sony concerning the Compositions (other than those claims or suits subject to full reimbursement under paragraph 9.04) and demo costs (provided such demos are made with your prior approval).  Expenses of salaries of employees, rent and overhead will not be deducted.

    10.11.    "Person" and "Party" - any individual, corporation, partnership, association or other organized group of persons or legal successors or representatives of the foregoing.

    10.12.    INTENTIONALLY OMITTED.

    10.13.    "Records" and "Phonograph Records" - all forms of reproductions, now or hereafter known, manufactured or distributed primarily for home use, school use,

ID: 20275                         -13-              BTR            [SMP 95-46.3(1)]
(6/10/96)(20276RL)

jukebox use, or use in means of transportation, embodying (a) sound alone or (b) sound coupled with visual images, e.g. "sight and sound" devices.

10.14.    "Songwriter(s)" - all writers and composers of the Compositions. "Songwriter Furnishing Entity" - such corporate entity furnishing the songwriting services of, and granting all ownership and administration interest in musical compositions written by, a Songwriter.

10.15.    "Subpublisher" - A Person authorized by Sony, directly or indirectly, to administer and act as a publisher of one or more Compositions on a general basis and grant rights in them to users or other Subpublishers, in a particular territory.  Persons who administer particular rights only and do not assume general responsibility for exploiting the composition(s) concerned, such as performance and mechanical right licensing organizations, are not Subpublishers.

10.16.    "Territory" - the universe.

## 11.    NOTICES

11.01.    Except as otherwise specifically provided herein, all notices under this agreement shall be in writing and shall be given by courier or other personal delivery or by registered or certified mail at the appropriate address below or at a substitute address designated by notice by the party concerned.

TO YOU:                              The address shown above.

TO SONY:                             550 Madison Avenue
                                     New York, New York  10022-3211

Each notice to Sony shall be addressed for the attention of Sony's Vice President, Business Affairs & Administration, and a copy of each notice to Sony shall be sent simultaneously to the Sony Music Entertainment Inc. Law Department for the attention of Sony's Senior Vice President and General Counsel.  Sony shall undertake to send a copy of each notice sent to you to Loeb & Loeb, 345 Park Avenue, New York, New York 10154, Attention: Marc Chamlin, Esq., but Sony's failure to send any such copy shall not constitute a breach of this agreement or impair the effectiveness of the notice concerned.  Notices shall be deemed given when mailed or, if personally delivered, when so delivered, except that a notice of change of address shall be effective only from the date of its receipt.

ID: 20275                    -14-            BTR            [SMP 95-46.3(1)]
(6/10/96)(20276RL)

SUN  0741

## 12.    EVENTS OF DEFAULT; REMEDIES

**12.01.**        In the event of your dissolution or the liquidation of your assets, or the filing of a petition in bankruptcy or insolvency or for an arrangement or reorganization, by, for or against you, or in the event of the appointment of a receiver or a trustee for all or a portion of your property, or in the event that you shall make an assignment for the benefit of creditors or commit any act for, or in, bankruptcy or become insolvent, or in the event of any default or alleged default by you under a Songwriter Agreement which default is not cured in accord with subparagraph 8.02(a), then at any time after the occurrence of any such event, in addition to any other remedies under this agreement or otherwise, Sony shall have the right to cause your rights under any or all of the Songwriter Agreements in respect of the applicable Compositions to be assigned to Sony.

**12.02.**        If because of a(n): act of God; inevitable accident, fire; lockout, strike or other labor dispute; riot or civil commotion; act of public enemy; enactment, rule, order or act of any government or governmental instrumentality (whether federal, state, local or foreign); failure of technical facilities; failure or delay of transportation facilities; or other cause of similar or different nature not reasonably within Sony's control; Sony is materially hampered in the exploitation or administration of musical compositions, then, without limiting Sony's rights, Sony shall have the option by giving you notice to suspend the Term for the duration of any such contingency. If any suspension imposed under this paragraph by reason of an event affecting no Record manufacturer or distributor except Sony continues for more than six (6) months, you may request that Sony, by notice, terminate the suspension by notice given to you within sixty (60) days after Sony's receipt of your notice. If Sony does not do so, the Term shall terminate at the end of that sixty (60) day period (or at such earlier time as Sony may designate by notice to you), and all parties shall be deemed to have fulfilled all of their obligations under this agreement except those obligations which survive the end of the Term (such as warranties, re-recording restrictions, and the obligation to pay royalties).

**12.03.**        If you do not fulfill any of your material obligations hereunder, Sony will have the following options:

(a)        to suspend Sony's obligations to make payments under this agreement until you have cured the default;

(b)        to terminate the Term of this agreement at any time before the expiration of the period of sixty (60) days after the date on which you have fully cured the default; and

Sony may exercise each of those options by sending you the appropriate notice. If Sony terminates the Term under subparagraph 12.03(b) all parties will be deemed to have fulfilled all of their obligations under this agreement except those

ID: 20275                            -15-                    BTR            [SMP 95-46.3(1)]
(6/10/96)(20276RL)

obligations which survive the end of the Term (such as accountings, indemnification obligations, and your obligations under clause 12.03(c)). No exercise of an option under this paragraph will limit Sony's rights to recover damages by reason of your default, its rights to exercise any other option under this agreement, or any of its other rights.

12.04.    Without limiting any of Sony's rights or remedies contained in this Article 12, in the event of a breach of any of the representations or warranties set forth in subparagraph 9.01(a) hereof, Sony shall, in addition to its other rights, have the right to deduct from any royalties due you, an amount equal to any monies which Sony is unable to collect by reason of such monies having been collected by you or on your behalf as a result of such breach.

13.    **MISCELLANEOUS**

13.01.    This agreement contains the entire understanding of the Parties hereto relating to the subject matter. No change or termination of this agreement shall be binding unless it is made by an instrument signed by an authorized officer of Sony. No change of this agreement shall be binding upon you unless it is made by an instrument signed by you. A waiver by either Party of any term or condition of this agreement in any instance shall not be deemed a waiver of such provision or any other provision hereof, as to any future instance or occurrence. All remedies, rights, undertakings, obligations, and agreements contained in this agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either Party. The captions of the Articles in this agreement are included for convenience only and shall not affect the interpretation of any provision.

13.02.    Neither party shall be entitled to recover damages or impose on the other party any other remedy by reason of any breach by the other party of its material obligations, unless the latter party has failed to remedy the breach within thirty (30) days following receipt of notice thereof (or, if the breach concerned cannot be remedied within thirty (30) days, if the latter party commences to remedy the breach within that time and proceeds to complete the remedy with reasonable promptness). (The preceding sentence shall not apply to any termination by Sony under subparagraph 12.03.)

13.03.    (a)    As to all matters treated herein to be determined by mutual agreement, or as to which any approval or consent is required, such agreement, approval or consent will not be unreasonably withheld, and you shall not be entitled to withhold your consent to any exploitation of any Composition for financial reasons (e.g., in order to obtain payment of a designated amount in respect of such license) unless the fee or royalty suggested by Sony which is payable in connection with such exploitation is not reasonable and customary in the music publishing industry.

ID: 20275                    -16-            BTR            [SMP 95-46.3(1)]
(6/10/96)(20276RL)

SUN 0743

(b)    Your agreement, approval or consent, or that of any Songwriter, whenever required, shall be deemed to have been given unless you notify Sony otherwise within seven (7) days following the date of Sony's request therefor.

13.04.    Sony may assign Sony's rights under this agreement in whole or in part to any subsidiary, affiliated or controlling corporation, to any Person owning or acquiring a substantial portion of the stock or assets of Sony, or to any partnership or other venture in which Sony participates, and such rights may be similarly assigned by any assignee. No such assignment shall relieve Sony of any of Sony's obligations hereunder. Sony may also assign Sony's rights to any of Sony's Licensees if advisable in Sony's sole discretion to implement the license granted, provided that no such assignment shall relieve Sony of any of its obligations hereunder. Any purported assignment by you in violation of this paragraph shall be void.

13.05.    THIS AGREEMENT HAS BEEN ENTERED INTO IN THE STATE OF NEW YORK, AND THE VALIDITY, INTERPRETATION AND LEGAL EFFECT OF THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS ENTERED INTO AND PERFORMED ENTIRELY WITHIN THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO ANY CONFLICT OF LAW PRINCIPLES UNDER NEW YORK LAW). THE NEW YORK COURTS (STATE AND FEDERAL), SHALL HAVE SOLE JURISDICTION OF ANY CONTROVERSIES REGARDING THIS AGREEMENT; ANY ACTION OR OTHER PROCEEDING WHICH INVOLVES SUCH A CONTROVERSY SHALL BE BROUGHT IN THOSE COURTS IN NEW YORK COUNTY AND NOT ELSEWHERE. THE PARTIES WAIVE ANY AND ALL OBJECTIONS TO VENUE IN THOSE COURTS AND HEREBY SUBMIT TO THE JURISDICTION OF THOSE COURTS. ANY PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY, AMONG OTHER METHODS, BE SERVED UPON YOU BY DELIVERING IT OR MAILING IT, BY REGISTERED OR CERTIFIED MAIL, DIRECTED TO THE ADDRESS FIRST ABOVE WRITTEN OR SUCH OTHER ADDRESS AS YOU MAY DESIGNATE PURSUANT TO ARTICLE 11. ANY SUCH PROCESS MAY, AMONG OTHER METHODS, BE SERVED UPON ANY OTHER PERSON WHO APPROVES, RATIFIES, OR ASSENTS TO THIS AGREEMENT TO INDUCE SONY TO ENTER INTO IT, BY DELIVERING THE PROCESS OR MAILING IT BY REGISTERED OR CERTIFIED MAIL, DIRECTED TO THE ADDRESS FIRST ABOVE WRITTEN OR SUCH OTHER ADDRESS AS THE OTHER PERSON CONCERNED MAY DESIGNATE IN THE MANNER DESCRIBED IN ARTICLE 11. ANY SUCH DELIVERY OR MAIL SERVICE SHALL BE DEEMED TO HAVE THE SAME FORCE AND EFFECT AS PERSONAL SERVICE WITHIN THE STATE OF NEW YORK.

13.06.    In entering into this agreement, and in providing services pursuant hereto, you and the Songwriters have and shall have the status of independent contractors and

ID: 20275                    -17-            BTR            [SMP 95-46.3(1)]
(6/10/96)(20276RL)

SUN 0744

nothing herein contained shall contemplate or constitute you or the Songwriters as Sony's agents or employees.

13.07.    You may assign your rights under this agreement to another corporation, all of whose capital stock is owned solely by you, subject to the following conditions:

(a)    The assignee shall be subject to Sony's approval in Sony's sole reasonable discretion;

(b)   The assignment shall not be effective until you have delivered to Sony an instrument satisfactory to Sony in Sony's sole reasonable discretion effecting the assignment and the assignee's assumption of your obligations, and Sony has executed that instrument to evidence Sony's approval of it;

(c)   No such assignment shall relieve you of your obligations under this agreement; and

(d)    If such an assignment takes place, any further transfer of the rights assigned shall be subject to the same conditions.

Any purported assignment by you in violation of this subparagraph 13.07 shall be void.

13.08.    This agreement shall not become effective until executed by all proposed Parties hereto.

13.09.    Any and all riders annexed hereto together with this basic document shall be taken together to constitute the agreement between you and Sony.

ID: 20275                    -18-            BTR    · · ·    - [SMP 95-46.3(1)]
(6/10/96)(20276RL)

*BTR*

SUN 0745

13.10.    Your obligations under this agreement are joint and several, and all references to you herein shall apply to both of you collectively and to each of you individually unless otherwise specified.

SUNBOW ENTERTAINMENT d/b/a
WILDSTAR MUSIC, INC. (ASCAP)

By _____

SUNBOW ENTERTAINMENT d/b/a
STARWILD MUSIC INC. (BMI)

By _____

SUNBOW ENTERTAINMENT d/b/a
APOLLO'S CHARIOT MUSIC (ASCAP)

By _____

SUNBOW ENTERTAINMENT d/b/a
BANANA ALERT MUSIC, INC. (BMI)

By _____

SONY/ATV TUNES LLC

By _____

SONY/ATV SONGS LLC

By _____

ID: 20275                    -19-            BTR            [SMP 95-46.3(1)]
(6/10/96)(20276RL)

SUN 0746

Our taxpayer identification number (employer identification number) is
Under the penalties of perjury, I certify that this information is true, correct, and complete.

SUNBOW ENTERTAINMENT d/b/a
WILDSTAR MUSIC, INC. (ASCAP)

Our taxpayer identification number (employer identification number) is
Under the penalties of perjury, I certify that this information is true, correct, and complete.

SUNBOW ENTERTAINMENT d/b/a
STARWILD MUSIC INC. (BMI)

Our taxpayer identification number (employer identification number) is
Under the penalties of perjury, I certify that this information is true, correct, and complete.

SUNBOW ENTERTAINMENT d/b/a
APOLLO'S CHARIOT MUSIC (ASCAP)

Our taxpayer identification number (employer identification number) is
Under the penalties of perjury, I certify that this information is true, correct, and complete.

SUNBOW ENTERTAINMENT d/b/a
BANANA ALERT MUSIC, INC. (BMI)

ID: 20275                    -20-              BTR            [SMP 95-46.3(1)]
(6/10/96)(20276RL)

SUN 0747

## SCHEDULE A

to an agreement between SUNBOW ENTERTAINMENT d/b/a WILDSTAR MUSIC, INC. (ASCAP), STARWILD MUSIC INC. (BMI), APOLLO'S CHARIOT MUSIC (ASCAP) AND BANANA ALERT MUSIC, INC. (BMI), 100 Fifth Avenue, New York, New York, 10011, Attention: Andrew Karpen ("you"), on the one hand, and SONY/ATV TUNES LLC (ASCAP) and SONY/ATV SONGS LLC (BMI), 550 Madison Avenue, New York, New York 10022 (collectively, "Sony") on the other hand, dated as of November 3, 1995 [SMP 95-46]

(Reference Paragraph 2.01)

### SUNBOW COMPOSITIONS

| Title | Writer(s) | Publisher Splits | U.S. Copyright Registration No./Date |
|---|---|---|---|
| | | | |

ID: 20275
(6/10/96)(20276RL)                    -21-                    BTR               [SMP 95-46.3(1)]

## EXHIBIT C-1

to an agreement between SUNBOW ENTERTAINMENT d/b/a WILDSTAR MUSIC, INC. (ASCAP), STARWILD MUSIC INC. (BMI), APOLLO'S CHARIOT MUSIC (ASCAP) AND BANANA ALERT MUSIC, INC. (BMI), 100 Fifth Avenue, New York, New York, 10011, Attention: Andrew Karpen ("you"), on the one hand, and SONY/ATV TUNES LLC (ASCAP) and SONY/ATV SONGS LLC (BMI), 550 Madison Avenue, New York, New York 10022 (collectively, "Sony") on the other hand. dated as of November 3, 1995  [SMP 95-46]

---

(Reference - Paragraph 4.01)

Dated:  as of January 1, 1996

American Society of Composers,
   Authors and Publishers
ASCAP Building
One Lincoln Plaza
New York, NY  10023

Gentlemen:

This is to advise you that we intend to assign any publishing royalties which are now or may become due us from you to Sony Tunes Inc. up to the amount of $500,000.

We understand that Sony Tunes Inc. may not make a further assignment for these royalties except to another ASCAP member or to another bank, and any further purported assignment not so limited will not be honored by you.  A copy of the proposed administration agreement is attached as Exhibit A to this Notice of Assignment and a brief summary of the terms of the administration agreement is attached as Exhibit C-1.

We have read the Society's Regulation issued pursuant to Article XX, Section 4 of the Society's Articles of Association, and this will certify that the administration agreement conforms in all particulars with the terms of that Regulation, a copy of which is annexed hereto.

In consideration of your agreeing to this assignment, we agree that we may not resign from membership nor will we take any action which would diminish the number of works in our catalogue or reduce our present interest in such works, by assignment or otherwise until our obligations pursuant to the administration agreement are fully met.

If the administration agreement is still in effect, we further agree, on behalf of Sony Tunes Inc. or any other person or persons who may acquire, by will or under any law,

ID: 20275                          -30-              BTR    ---      [SMP 95-46.3(1)]
(6/10/96)(20276RL)

SUN 0749

our right, title and interest in any musical works in our catalogue, to execute any new assignment, for the period commencing 1996, vesting in you the right to license, upon non-exclusive basis, the non-dramatic public performance of such works which may be approved for the members generally in accordance with Article III, Section 6 of ASCAP's Article of Association.

If you agree to this assignment, please so indicate at the foot hereof in the place provided.

Accepted and Agreed:

AMERICAN SOCIETY OF            Sincerely,
COMPOSERS, AUTHORS
AND PUBLISHERS                 SUNBOW ENTERTAINMENT d/b/a
                               WILDSTAR MUSIC, INC. (ASCAP)


By_____     By_____

Subject to the terms of the
Regulation issued pursuant to
Article XX, Section 4 of the
Society's Articles of Association

ID: 20275                 -31-          BTR          [SMP 95-46.3(1)]
(6/10/96)(20276RL)

SUN 0750

Pursuant to Article XX, Section 4, assignment of royalties will be permitted with the prior written approval of the Society, in order to provide for the repayment of an advance or loan to a member, on the following conditions:

1.  The assignment is for a specified amount of money, not to exceed the amount of the loan or advance given to the member.

2.  The assignee is a member of ASCAP or a bank who may not further assign except to another member or bank.

3.  A copy of the proposed assignment or loan agreement shall be furnished to the Society prior to the execution of the document, together with a statement, on a form supplied by the Society, (a) summarizing the terms of assignment and (b) waiving the member's right to resign from membership until the full amount of the loan or advance covered by the assignment has been repaid.

4.  The Society reserves the right, in its discretion, to withhold approval of any assignment for reasons such as, but not limited to, the following: the member is indebted to the Society; the member has any other outstanding assignments; or a tax or judgment lien against the member has been served on ASCAP.

5.  If the advance or loan provides for recoupment or repayment from other sources, it shall provide that the assignee shall furnish ASCAP, upon receipt of a written request from the assignor or the Society, with a certified statement showing all amounts recouped or repaid and the current balance owed.

ID: 20275                     -32-              BTR            [SMP 95-46.3(1)]
(6/10/96)(20276RL)

SUN 0751

**EXHIBIT C-2**

**SUMMARY OF ASSIGNMENT**

1.    Amount of Assignment - $500,000

2.    Amount of loan or advance given to member $500,000

3.    Assignee is:  Sony Tunes Inc.
       (Check appropriate Blank)

       _____ Bank

       _____X_____ Member

4.    Advance or loan

                                    ___X___ does

                                    _____ does not

       provide for recoupment from other sources
       (Check appropriate blank)

SUNBOW ENTERTAINMENT d/b/a
WILDSTAR MUSIC, INC. (ASCAP)

By_____

ID: 20275                    -33-              BTR          [SMP 95-46.3(1)]
(6/10/96)(20276RL)

SUN 0752

**EXHIBIT C-3**

to an agreement between SUNBOW ENTERTAINMENT d/b/a WILDSTAR MUSIC, INC. (ASCAP), STARWILD MUSIC INC. (BMI), APOLLO'S CHARIOT MUSIC (ASCAP) AND BANANA ALERT MUSIC, INC. (BMI), 100 Fifth Avenue, New York, New York, 10011, Attention: Andrew Karpen ("you"), on the one hand, and SONY/ATV TUNES LLC (ASCAP) and SONY/ATV SONGS LLC (BMI), 550 Madison Avenue, New York, New York 10022 (collectively, "Sony") on the other hand. dated as of November 3, 1995 [SMP 95-46]

---

(Reference – Paragraph 4.01)

Dated:  as of January 1, 1996

American Society of Composers,
  Authors and Publishers
ASCAP Building
One Lincoln Plaza
New York, NY  10023

Gentlemen:

This is to advise you that we intend to assign any royalties which are now or may become due us from you to Sony Tunes Inc. up to the amount of $500,000.

We understand that Sony Tunes Inc. may not make a further assignment for these royalties except to another ASCAP member or to another bank, and any further purported assignment not so limited will not be honored by you.  A copy of the proposed administration agreement is attached as Exhibit A to this Notice of Assignment and a brief summary of the terms of the administration agreement is attached as Exhibit C-1.

We have read the Society's Regulation issued pursuant to Article XX, Section 4 of the Society's Articles of Association, and this will certify that the administration agreement conforms in all particulars with the terms of that Regulation, a copy of which is annexed hereto.

In consideration of your agreeing to this assignment, we agree that we may not resign from membership nor will we take any action which would diminish the number of works in our catalogue or reduce our present interest in such works, by assignment or otherwise until our obligations pursuant to the administration agreement are fully met.

If the administration agreement is still in effect, we further agree, on behalf of Sony Tunes Inc. or any other person or persons who may acquire, by will or under any law,

ID:  20275                        -34-              BTR            [SMP 95-46.3(1)]
(6/10/96)(20276RL)

*BTR*

SUN 0753

our right, title and interest in any musical works in our catalogue, to execute any new assignment, for the period commencing 1996, vesting in you the right to license, upon non-exclusive basis, the non-dramatic public performance of such works which may be approved for the members generally in accordance with Article III, Section 6 of ASCAP's Article of Association.

If you agree to this assignment, please so indicate at the foot hereof in the place provided.

Accepted and Agreed:

AMERICAN SOCIETY OF
COMPOSERS, AUTHORS
AND PUBLISHERS

Sincerely,

SUNBOW ENTERTAINMENT d/b/a
APOLLO'S CHARIOT MUSIC (ASCAP)

By_____

By_____

Subject to the terms of the
Regulation issued pursuant to
Article XX, Section 4 of the
Society's Articles of Association

ID: 20275                 -35-            BTR          [SMP 95-46.3(1)]
(6/10/96)(20276RL)

SUN 0754

Pursuant to Article XX, Section 4, assignment of royalties will be permitted with the prior written approval of the Society, in order to provide for the repayment of an advance or loan to a member, on the following conditions:

1. The assignment is for a specified amount of money, not to exceed the amount of the loan or advance given to the member.

2. The assignee is a member of ASCAP or a bank who may not further assign except to another member or bank.

3. A copy of the proposed assignment or loan agreement shall be furnished to the Society prior to the execution of the document, together with a statement, on a form supplied by the Society, (a) summarizing the terms of assignment and (b) waiving the member's right to resign from membership until the full amount of the loan or advance covered by the assignment has been repaid.

4. The Society reserves the right, in its discretion, to withhold approval of any assignment for reasons such as, but not limited to, the following:  the member is indebted to the Society; the member has any other outstanding assignments; or a tax or judgment lien against the member has been served on ASCAP.

5. If the advance or loan provides for recoupment or repayment from other sources, it shall provide that the assignee shall furnish ASCAP, upon receipt of a written request from the assignor or the Society, with a certified statement showing all amounts recouped or repaid and the current balance owed.

## EXHIBIT C-4

### SUMMARY OF ASSIGNMENT

1.    Amount of Assignment - $500,000

2.    Amount of loan or advance given to member $500,000

3.    Assignee is:  Sony Tunes Inc.
       (Check appropriate Blank)

       _____ Bank

       _____X_____ Member

4.    Advance or loan

                                                    __X·__ does

                                                    _____ does not

       provide for recoupment from other sources
              (Check appropriate blank)

SUNBOW ENTERTAINMENT d/b/a
APOLLO'S CHARIOT MUSIC (ASCAP)

By_____

ID: 20275                    -37-              BTR              [SMP 95-46.3(1)]
(6/10/96)(20276RL)

                                                            *BTR*

                                                            SUN  0756

## EXHIBIT D

to an agreement between SUNBOW ENTERTAINMENT d/b/a WILDSTAR MUSIC, INC.
(ASCAP), STARWILD MUSIC INC. (BMI), APOLLO'S CHARIOT MUSIC (ASCAP)
AND BANANA ALERT MUSIC, INC. (BMI), 100 Fifth Avenue, New York, New York,
10011, Attention: Andrew Karpen ("you"), on the one hand, and SONY/ATV TUNES LLC
(ASCAP) and SONY/ATV SONGS LLC (BMI), 550 Madison Avenue, New York, New
York 10022 (collectively, "Sony") on the other hand, dated as of November 3, 1995  [SMP
95-46]

(Reference - Paragraph 9.03)

[text of controlled composition clauses, if any]

ID:  20275                      -38-                BTR              [SMP 95-46.3(1)]
(6/10/96)(20276RL)

*BTR*

SUN  0757

## EXHIBIT E-1

to an agreement between SUNBOW ENTERTAINMENT d/b/a WILDSTAR MUSIC, INC. (ASCAP), STARWILD MUSIC INC. (BMI), APOLLO'S CHARIOT MUSIC (ASCAP) AND BANANA ALERT MUSIC, INC. (BMI), 100 Fifth Avenue, New York, New York, 10011, Attention: Andrew Karpen ("you"), on the one hand, and SONY/ATV TUNES LLC (ASCAP) and SONY/ATV SONGS LLC (BMI), 550 Madison Avenue, New York, New York 10022 (collectively, "Sony") on the other hand. dated as of November 3, 1995  [SMP 95-46]

---

(Reference – Subparagraph 9.01(f))

Date:   As of January 1, 1996

To:     SONY/ATV TUNES LLC (ASCAP)

Re:     SUNBOW ENTERTAINMENT d/b/a WILDSTAR MUSIC, INC. (ASCAP)

        Please be advised that as of the date set forth above, we have made no advances which are recoupable from public performance royalties payable to the above-referenced publisher member(s).

                            Very truly yours,
                            ASCAP


                            By_____
                            An Authorized Signatory


ID: 20275                   -39-            BTR            [SMP 95-46.3(1)]
(6/10/96)(20276RL)

                                                            BTR

                                                    SUN 0758

## EXHIBIT E-2

to an agreement between SUNBOW ENTERTAINMENT d/b/a WILDSTAR MUSIC, INC. (ASCAP), STARWILD MUSIC INC. (BMI), APOLLO'S CHARIOT MUSIC (ASCAP) AND BANANA ALERT MUSIC, INC. (BMI), 100 Fifth Avenue, New York, New York, 10011, Attention: Andrew Karpen ("you"), on the one hand, and SONY/ATV TUNES LLC (ASCAP) and SONY/ATV SONGS LLC (BMI), 550 Madison Avenue, New York, New York 10022 (collectively, "Sony") on the other hand. dated as of November 3, 1995  [SMP 95-46]

(Reference – Subparagraph 9.01(f))

Date:  As of January 1, 1996

To:  SONY/ATV TUNES LLC (ASCAP)

Re:  SUNBOW ENTERTAINMENT d/b/a APOLLO'S CHARIOT MUSIC (ASCAP)

Please be advised that as of the date set forth above, we have made no advances which are recoupable from public performance royalties payable to the above-referenced publisher member(s).

Very truly yours,
ASCAP


By_____
An Authorized Signatory


ID: 20275                         -40-                  BTR              [SMP 95-46.3(1)]
(6/10/96)(20276RL)

BTR

## EXHIBIT E-3

to an agreement between SUNBOW ENTERTAINMENT d/b/a WILDSTAR MUSIC, INC. (ASCAP), STARWILD MUSIC INC. (BMI), APOLLO'S CHARIOT MUSIC (ASCAP) AND BANANA ALERT MUSIC, INC. (BMI), 100 Fifth Avenue, New York, New York, 10011, Attention: Andrew Karpen ("you"), on the one hand, and SONY/ATV TUNES LLC (ASCAP) and SONY/ATV SONGS LLC (BMI), 550 Madison Avenue, New York, New York 10022 (collectively, "Sony") on the other hand, dated as of November 3, 1995 [SMP 95-46]

(Reference Subparagraph 9.01(f))

Date:   As of January 1, 1996

To:     SONY/ATV SONGS LLC (BMI)

Re:     SUNBOW ENTERTAINMENT d/b/a  STARWILD MUSIC INC. (BMI)

Please be advised that as of the date set forth above, we have made no advances which are recoupable from public performance royalties payable to the above-referenced publisher member(s).

Very truly yours,

BMI

By._____
    An Authorized Signatory

ID:  20275                    -41-            BTR          [SMP 95-46.3(1)]
(6/10/96)(20276RL)

BTR

SUN  0760

## **EXHIBIT E-3**

to an agreement between SUNBOW ENTERTAINMENT d/b/a WILDSTAR MUSIC, INC. (ASCAP), STARWILD MUSIC INC. (BMI), APOLLO'S CHARIOT MUSIC (ASCAP) AND BANANA ALERT MUSIC, INC. (BMI), 100 Fifth Avenue, New York, New York, 10011, Attention: Andrew Karpen ("you"), on the one hand, and SONY/ATV TUNES LLC (ASCAP) and SONY/ATV SONGS LLC (BMI), 550 Madison Avenue, New York, New York 10022 (collectively, "Sony") on the other hand. dated as of November 3, 1995 [SMP 95-46]

---

(Reference Subparagraph 9,01(f))

Date:   As of January 1, 1996

To:     SONY/ATV SONGS LLC (BMI)

Re:     SUNBOW ENTERTAINMENT d/b/a BANANA ALERT MUSIC, INC. (BMI)

  Please be advised that as of the date set forth above, we have made no advances which are recoupable from public performance royalties payable to the above-referenced publisher member(s).

                          Very truly yours,

                          BMI


                          By_____
                            An Authorized Signatory


ID:  20275                    -42-              BTR          [SMP 95-46.3(1)]
(6/10/96)(20276RL)

                                                            BTR

# EXHIBIT 21

## LICENSE AGREEMENT

This LICENSE AGREEMENT is entered into as of December 21, 2000 among TV-Loonland AG ("TVL"), a stock corporation established under the laws of the Federal Republic of Germany and Sunbow Productions, Inc., a Delaware corporation (collectively the "Licensor") and Sony Music Entertainment Inc., a Delaware corporation ("Licensee").

### BACKGROUND

WHEREAS, TVL, Licensee, Sunbow Entertainment, LLC ("Entertainment") and Sunbow Productions, Inc. have entered into a Purchase Agreement, dated September 29, 2000, as amended by an Amendment to Purchase Agreement, dated as of December 21, 2000 (as amended, the "Purchase Agreement");

WHEREAS, TVL has acquired certain rights from Licensee and Entertainment in the "Sony Wonder Assets", the "Sunbow Assets" and the "Hasbro Contracts" (as those terms are defined in the Purchase Agreement) and rights under the Specific Product Contracts (as defined below); and

WHEREAS, the parties to the Purchase Agreement have agreed that Licensor shall license the Audio Rights and Home Video Rights (as such terms are defined below) to Licensee as set forth herein.

NOW, THEREFORE, the parties hereto hereby agree as follows:

1. Definitions. In addition to the terms defined elsewhere in this License Agreement, the following terms when used in this License Agreement shall have the meanings indicated below:

"Acquired Contracts" shall mean the Sony Wonder Contracts, Sunbow Contracts, Hasbro Contracts and Specific Product Contracts.

"Affiliate" shall have the same meaning hereunder as under the Purchase Agreement.

"Artwork" shall mean the photographs, liner notes, and other pictorial, graphic and textual material used in the packaging of the Records in which the Masters are to be released hereunder, and such other materials that are to be used in the packaging of other "Licensed Materials" (as defined below), to be delivered to Licensee under this License Agreement.

"Audio Rights" shall mean all of Licensor's rights in respect of Programs pursuant to the Acquired Contracts: to manufacture audio Records in any form and by any method now or hereafter known derived from the Licensed Materials; to sell, transfer or otherwise deal in the same under any trademarks, trade names and labels, or, to the extent permitted by the Acquired Contracts, to refrain from such manufacture, sale, transfer and dealing; to reproduce, adapt, transmit, distribute, communicate and otherwise use the audio Masters, and the Licensed Materials relating thereto (collectively, the "Audio Materials") in any medium and in any manner, including but not limited to use in audiovisual works; and to publicly perform or to permit the public performance of the Audio Materials by means of radio

31092443.09

SUN 0695

broadcast, transmission over cables or other physical media, satellite, cellular or other "wireless" transmission, transmission over the Internet, television broadcast, digital transmission or any other method now or hereafter known. Audio Rights also shall be deemed to include the Name and Likeness Rights related to the Audio Materials.

"Audiovisual Record" shall mean any Record in the form of a physical carrier which embodies or reproduces visual images whether or not the interaction of a consumer is possible or necessary for the visual images to be utilized or viewed.

"Composition" shall mean a single musical composition, irrespective of length, including all spoken words and bridging passages and including a medley. Recordings of more than one (1) arrangement or version of the same Composition, reproduced on the same Record, shall be considered, collectively, a recording of one (1) Composition for all purposes under this License Agreement.

"Contracts" shall have the same meaning hereunder as under the Purchase Agreement.

"Home Video Rights" shall mean all of Licensor's rights in respect of Programs pursuant to the Acquired Contracts: to manufacture Audiovisual Records in any form and by any method now or hereafter known derived from the Licensed Materials; to sell, transfer or otherwise deal in the same under any trademarks, trade names and labels, or, to the extent permitted by the Acquired Contracts, to refrain from such manufacture, sale, transfer and dealing; and to reproduce, adapt, distribute and otherwise use the audiovisual Masters and the Licensed Materials relating thereto ("Audiovisual Materials") in any medium and in any manner, provided however that Home Video Rights do not include the right to digitally transmit or publicly perform the audiovisual Materials, whether by means of transmission over cables or other physical media, satellite, cellular or other "wireless" transmission, transmission over the Internet, television broadcast or otherwise, including without limitation "Pay Per View" rights or video on demand or video on near-demand. Home Video Rights also shall be deemed to include the Name and Likeness Rights to the Audiovisual Materials.

"Licensed Materials" shall mean all Masters, Artwork and Promo Videos that are the subject of the Acquired Contracts.

"Masters" shall mean all Recordings used for the manufacture and sale of Recordings. For the avoidance of doubt, "Masters" shall not be construed to interfere with Licensor's right to exploit the audio track portion of the Programs as it is coupled with the visual track portion of such Programs.

"Name and Likeness Rights" shall mean the rights, to the extent Licensor owns or can exploit such rights pursuant to the Acquired Contracts, to reproduce, print, publish, or disseminate in any medium Licensor's name and the name, portrait, picture, voice, signature and likeness of all Persons performing services in connection with the recording of the Masters (including, without limitation, all professional, group, and other assumed or fictitious names or sobriquets used by them), and biographical material concerning them, as news or information, for the purposes of trade, advertising, publicity and promotion, on and in connection with the marketing and exploitation of Records hereunder, or on Internet websites, and for purposes of

2

31092443.09

SUN 0696

advertising, promotion and trade and in connection with the marketing and exploitation of Records hereunder, and in institutional advertising (advertising designed to create goodwill and prestige and not for the purpose of selling a specific product or service) without payment of any compensation to Licensor, or any other Person.

"Other Contracts" shall mean all agreements set forth on Schedule 1 to the Agreement regarding Development Deals between TVL, Licensee and Sunbow Entertainment, LLC dated November _____, 2000.

"Programs" shall mean those programs for which all the production expenses required to be paid pursuant to the Acquired Contracts have been paid by the applicable Sony Party (as such term is defined in the Purchase Agreement) prior to the date hereof. The parties hereto acknowledge and agree that the following programs shall not constitute Programs hereunder: "Timothy Tweedle", "Donner" and "Santa Mouse & the Ratdeer" and the other properties indicated on Exhibit C to the Purchase Agreement.

"Person" shall mean any natural person, corporation, unincorporated organization, partnership, association, limited liability company, joint stock company, joint venture, trust or government, or any agency or political subdivision of any government, or any other entity.

"Promo Videos" shall mean all audio visual Recordings which contain the performance of an audio Master coupled with visual images.

"Recording" shall mean the recording of sound, whether or not coupled with a visual image, by any method and on any substance or material, on any other form or format, whether now or hereafter known, which is used or useful in the recording, production and/or manufacture of Records or for any other commercial exploitation.

"Recording Costs" shall mean all amounts paid or incurred in connection with the production of Recordings or Records hereunder.

"Record(s)" shall mean all forms of reproductions, transmissions or communications of Recordings now or hereafter known, manufactured, distributed, transmitted or communicated primarily for home use, school use, juke box use or use in means of transportation, including, without limitation, Records embodying or reproducing sound alone and Audiovisual Records.

"Single" shall mean a vinyl audio-only Record not more than seven (7) inches in diameter, or the equivalent in non-vinyl configuration.

"Sony Wonder Contracts", "Sunbow Contracts" and "Hasbro Contracts" each shall have the same meaning hereunder as under the Purchase Agreement.

"Specific Product Contracts" shall mean all Contracts with respect to any of the programs entitled "Gen-O" and "Da Mob," to which Sunbow Entertainment LLC or Sony Wonder, a division of Licensee, is a party relating to, among other things, Audio Rights and/or Home Video Rights for such programs and the Other Contracts.

3

31092443.09

SUN 0697

"Sublicensees" shall mean a licensee of rights from Licensee, including, without limitation, wholly or partly owned subsidiaries, affiliates and other divisions and components of Licensee.

"Term" shall mean the period commencing as of the date hereof and continuing in perpetuity.

"Territory" shall mean (i) the universe with respect to Audio Rights and (ii) the United States, Canada and their respective territories and possessions with respect to Home Video Rights.

"Unrecouped Balances" shall mean the amounts which at the time concerned are recoupable pursuant to the Acquired Contracts from amounts that previously have been paid or otherwise would be payable pursuant to the Acquired Contracts. The amount of such Unrecouped Balances as of the last complete accounting period and the party to whom they relate are set forth on Schedule A hereto.

2.　Licdnse of Rights.

(a)　For good and valuable consideration, receipt of which hereby is acknowledged, Licensor hereby irrevocably grants to Licensee for the Term throughout the applicable Territory, on an exclusive, royalty-free, unlimited basis, the Audio Rights and the Home Video Rights.

(b)　The rights specified above in this paragraph 2 are not conditioned upon Licensee's specific compliance with any other provision of this License Agreement. Without limiting the generality of the foregoing, said rights granted to Licensee hereunder include the right, at its own expense in its discretion, to apply for and obtain registration of copyright for the Licensed Materials in Licensor's name and on Licensor's behalf, and Licensor hereby nominates, constitutes and appoints Licensee as Licensor's attorney-in-fact, which power is coupled with an interest and shall be irrevocable, for the sole purpose of obtaining registration of the copyright (if available) in the Licensed Materials in Licensor's name, and to take any and all actions in Licensor's name and on Licensor's behalf if and to the extent reasonably necessary or advisable to protect and enforce Licensor's or Licensee's rights therein with respect to the Audio Rights and Home Video Rights, and to execute, acknowledge and deliver such other and further instruments and documents in furtherance thereof, and Licensor will otherwise cooperate with Licensee, as Licensee shall reasonably request for any of such purposes. The decision whether or not Licensee shall bring any action or proceeding or take any other steps to protect or enforce such rights, and, if brought or taken, all decisions as to the conduct and disposition thereof, shall be solely within Licensee's discretion and at Licensee's expense.

(c)　Licensee shall have the right to sublicense any of the rights granted herein to Sublicensees at any time in the sole exercise of its discretion.

3.　Royalties.

(a)　The Audio Rights and the Home Video Rights are licensed hereunder on a royalty-free basis and shall be without any payment to Licensor or any other

4

SUN　0698

Person, other than as set forth in paragraphs 3, 4 and 7 below, and as otherwise provided elsewhere in this Agreement.

(b)    Licensee shall accrue to Licensor's royalty account, in accordance with the provisions of paragraph 4 below, such royalties as Licensor is obligated to accrue or pay to the respective third parties to the applicable Acquired Contracts to the extent arising out of Licensee's exploitation of the Audio Rights and Home Video Rights hereunder.

(c)    (i)    The Unrecouped Balances shall be recoupable from royalties ("Licensee Royalties") that accrue to Licensor hereunder (as well as from royalties ("Licensor Royalties") arising from Licensor's activities) on an Acquired Contract by Acquired Contract basis (i.e., "uncrossed") on a "first come first served" basis as between Licensor Royalties and Licensee Royalties, to the extent permitted pursuant to the applicable Acquired Contract.  No royalties shall be due and payable to Licensor hereunder with respect to any Acquired Contract until such time as the applicable Unrecouped Balances under such Acquired Contract have been recouped hereunder and/or by such Licensor activities.

(ii)    In any calendar month during which any Unrecouped Balance becomes "recouped" (i.e., there no longer is any remaining amount which is recoupable under the applicable Acquired Contract), Licensee Royalties and Licensor Royalties shall be applied towards recoupment of the amount of such Unrecouped Balance as of the commencement of such calendar month in the same proportion as the Licensee Royalties and Licensor Royalties for the entire calendar month.

(d)    Licensor shall provide Licensee with such information as Licensee reasonably requests regarding each Unrecouped Balance, which information shall be provided by Licensor to Licensee such period prior to the date each accounting is due hereunder as Licensee reasonably requests.  Licensor shall maintain books and records regarding the amounts included in the calculation of such Unrecouped Balances and Licensee shall have the right to examine such books and records once during each year, on reasonable notice during normal business hours.

4.    <u>Royalty Payments and Accountings</u>.

(a)    Except as may otherwise be required pursuant to an Acquired Contract, Licensee shall compute Licensor's royalties as of each June 30th and December 31st for the prior six (6) months, and shall send to Licensor a statement covering such royalties on the next September 30th and March 31st, respectively, and Licensee shall make such accountings and shall pay to Licensor any royalties which are due, after deducting amounts which are recoupable hereunder, a minimum of ten (10) days prior to the date that Licensor is required to account or pay pursuant to the applicable Acquired Contract.

(b)    The following provisions of this subparagraph (b) shall apply except as may otherwise be required pursuant to the Acquired Contracts.  Licensee shall have the right to maintain reasonable royalty reserves against anticipated returns and credits.  Each such royalty reserve shall be liquidated not later than the end of the eighth quarterly accounting period following the accounting period during which the applicable reserve is initially established or such earlier period, if any, required pursuant to any of the Acquired Contracts.  A royalty reserve

SUN 0699

shall not be established for any product during any particular accounting period in excess of thirty-five percent (35%) (or such lesser amount, if any, required by any of the Acquired Contracts) of the aggregate number of units of that product shipped to Licensee's customers. (The preceding sentence shall not apply to any product sold subject to return privileges more liberal than Licensee's normal return policies.) A royalty reserve shall not be established for any Single during any particular accounting period in excess of forty percent (40%) (or such lesser amount, if any, required by any of the Acquired Contracts) of the number of units of that Single shipped to Licensee's customers, unless Licensee reasonably anticipates returns and credits which justify the establishment of a larger reserve in Licensee sole discretion. No interest shall be payable with respect to reserves, except to the extent it is required pursuant to any Acquired Contract. If Licensee makes any overpayment to Licensor, Licensor shall reimburse Licensee for that overpayment; Licensee may also deduct any overpayment from any monies due or becoming due to Licensor. If Licensee pays any royalties on Records which are returned later or on other transactions which are reversed, those royalties shall be considered overpayments. If Licensee is required to make any payments to the AFM Special Payments Fund or Music Performance Trust Fund based on sales of Records made under this License Agreement, or any similar payment, Licensee may recoup those amounts, also, from payments due or becoming due to Licensor to the extent permitted under the Acquired Contracts.

(c)    If any payment owed by Licensee to Licensor is not made when due, to the extent required under any Acquired Contract, Licensee also will pay Licensor interest on, and any other penalty, fee or other amount with respect to, the unpaid balance to the extent Licensor is obligated to pay the same under such Acquired Contract in accordance with such Acquired Contract.

(d)    Licensee shall maintain accurate and complete records and books of account with respect to the royalties accruing hereunder. Licensor's representatives will have the right to audit those books and records at any time during Licensee's normal business hours upon reasonable prior notice one (1) time during each year during the Term and for two (2) years thereafter, and to make copies of them and extract information from said books and records. Licensee will cooperate with Licensor's representatives to insure their full access to Licensee's books and records. Licensor will cooperate with Licensee to minimize any interference with Licensee's business during any such audit. Licensor will keep and hold all materials and information received from Licensee strictly confidential. If Licensor's audit established that Licensee has over-accounted for or overpaid any Royalties, Licensor shall promptly notify Licensee and, if any overpayment has occurred, shall, within thirty (30) days of such determination, reimburse Licensee for such over-payment.

(e)    The parties shall use good faith efforts to mutually resolve any claim by Licensor that Licensee has under accounted and/or underpaid any Royalties hereunder, without waiver or limitation of their other rights or remedies with regard thereto. If Licensee has under-accounted and/or underpaid any Royalties (deficiency) of five percent (5%) or more of the Royalties reported during the audit period then the total reasonable out-of-pocket expenses of such audit, including fees of outside auditors, shall be reimbursed to Licensor by Licensee. Licensee shall promptly pay the amount of such deficiency, plus interest, as provided herein.

(f)    Only to the extent permitted by the applicable Acquired Contract, Licensor hereby authorizes and directs Licensee to withhold from any monies due to Licensor

6

31092443.09

SUN  0700

from Licensee with respect to such Acquired Contract, any portion thereof required to be withheld by the United States Internal Revenue Service and/or any other governmental authority, and to pay same to the United States Internal Revenue Service and/or such other authority.

(g)      Licensee shall comply with the other accounting provisions of the Acquired Contracts.

5. · Acquired Contracts.

(a)      Licensor acknowledges that Licensee shall retain a copy of all Acquired Contracts for the purposes of exercising its rights and complying with its obligations hereunder. Licensor agrees to promptly provide Licensee with copies of any amendments to any Acquired Contracts and to provide Licensee with prompt written notice of any information (e.g., the exercise or non-exercise of an option, the receipt or issuance of a claim letter, etc.) which Licensor reasonably believes may have a material effect on Licensee's rights or obligations hereunder with respect to any of the Acquired Contracts.  Licensor agrees that it shall not transfer any rights under any Acquired Contract that (or amend any Acquired Contract in a manner that) deprives Licensee of any rights it otherwise would have under this License Agreement in any material respect or increases any of Licensee's financial obligations (or materially increases any of Licensee's non-financial obligations) under this License Agreement.

(b)      It is acknowledged and agreed that both the rights granted to Licensee and Licensor's obligations hereunder are subject to the Acquired Contracts and when the performance by the parties to the Acquired Contracts of their obligations pursuant to the Acquired Contracts is a condition precedent to the rights or obligations of Licensor or Licensee hereunder, then the rights and obligations of Licensor and Licensee shall also be subject to the performance by the parties to the Acquired Contracts of their obligations under the Acquired Contracts and Licensor shall not be in breach of this Agreement for any reason relating to any failure by Licensee to perform any of such obligations not due to any act or omission by Licensor. Licensee agrees that it shall not take any action, or omit to take any action, that would violate any explicit provision of the Acquired Contracts, and Licensee will exercise reasonable judgment, in good faith, otherwise to observe and perform its obligations, and to exercise its rights, in a customary manner, so as not to knowingly and intentionally cause any violation of the Acquired Contracts.

6. Delivery.   Licensor shall deliver to Licensee the Licensed Materials as follows:

(a)      Licensee shall be entitled to retain a duplicate copy of all Licensed Materials which otherwise are provided to Licensor pursuant to the provisions of the Purchase Agreement.

(b)      Licensor shall deliver to Licensee, promptly after its production, the Licensed Materials relating to each Master produced by or under authority of Licensor after the commencement of the Term (e.g., Licensor shall deliver all Masters that it obtains after commencement of the Term).

7

31092443.09

SUN 0701

(c)    At any time, and from time to time, Licensee may request Licensor to, and Licensor shall, at Licensee's expense, cause the production of the Licensed Materials with respect to any other Masters, to the extent Licensor may exercise the rights to do so pursuant to the Acquired Contracts and Licensor shall, at Licensee's expense, deliver said Licensed Materials to Licensee promptly after their production (e.g., if Licensor has not otherwise elected to exercise its rights to obtain any Master(s) pursuant to any Acquired Contract(s), Licensor nonetheless shall, at Licensee's request, exercise such rights and obtain such Master(s) on Licensee's behalf).

(d)    Licensee shall bear the duplication and shipping expenses reasonably incurred by Licensor in delivering the Licensed Materials pursuant to subparagraphs 6(b) and (c) and Licensee shall bear any third party costs reasonably incurred by Licensor in connection with the Production Costs (as defined below) in connection with the Masters referred to in subparagraph 6(c) above.

7.    Third Party Costs.

Licensee shall to pay all royalties due to music publishers in connection with the sale of Records hereunder ("Mechanical Royalties"), except to the extent Licensor does not have an obligation to pay such Mechanical Royalties pursuant to the Acquired Contracts.

8.    Recording Costs/Delivery Matters.

(a)    As between Licensor and Licensee and subject to subparagraph 6(d) above, Licensor shall be solely responsible for and shall pay all costs in connection with the making of Licensed Materials hereunder (the "Provided Licensed Materials") and Licensee shall be free from any liability or obligation to make any payments therefor, including, without limitation: (i) Recording Costs; (ii) all costs relating to Artwork; (iii) all amounts required to be paid pursuant to any applicable law or collective bargaining agreement; and (iv) advances and other compensation (including, without, limitation, royalties) to be paid to any Person rendering services in connection with the Licensed Materials (collectively, the "Production Costs"). In connection with Licensee's exploitation of the Audio Rights or Home Video Rights, Licensee shall bear any Production Costs it incurs ("Licensee's Production Costs") with respect to any Licensed Materials which it commissions (e.g. costs to record additional tracks to be included on a soundtrack album, etc.) or Production Costs it incurs (e.g. editing or re-mastering costs regarding Masters delivered by Licensor) (collectively, "Licensee Production Activities"). All Licensee's Production Costs shall be recoupable hereunder (to the extent recoupment of such amounts is permitted by the terms of the Acquired Contracts) from any royalties otherwise payable from Licensee to Licensor. Promptly after request from Licensee, Licensor shall supply Licensee with all of the information then existing in Licensor's possession or to which it has access pursuant to the Acquired Contracts reasonably necessary for Licensee to release and exploit Records derived from the Masters. Without limiting the foregoing, except to the extent Licensor may not do so pursuant to the Acquired Contracts and except with respect to obligations arising in connection with the sale of Records hereunder, Licensor shall supply documentation reasonably satisfactory to Licensee that all unions concerned and the owners of the recording studios to be used have agreed not to look to Licensee for payment of any scale compensation or other obligations arising in connection with the making or use of the Masters. If any claim is asserted against Licensee for payment of any obligation required to be discharged

8

SUN 0702

by Licensor in this paragraph, Licensor may elect at its own expense to challenge such claim; otherwise, Licensee will have the right to make the payment and Licensor will reimburse Licensee for it.

(b)    Licensor will Deliver to Licensee, at Licensee's sole expense, promptly following the creation thereof by Licensor or on Licensor's behalf, all Licensed Materials (including, without limitation, Artwork), together with all necessary licenses, permissions and authorizations. Each Recording will be clearly marked to identify the recording artist, and to show the title(s) of the composition(s) and recording date(s).

(c)    Licensee shall be solely responsible for obtaining and paying for all rights, licenses, consents, permissions and clearances in connection with its exploitation of the Audio Rights and the Home Video Rights in connection with the Provided Licensed Materials hereunder.  Licensee also shall be solely responsible for obtaining and paying for all rights, licenses, consents, permissions and clearances in connection with its exploitation of the Audio Rights and the Home Video Rights in connection with the Licensee Production Activities.

(d)    Licensor will cooperate with Licensee, as Licensee reasonably requests and at Licensee's sole expense, in making available photographs and preparing other materials for use in promoting and publicizing the Masters distributed under this License Agreement.

(e)    If Licensor owns an interest in the copyright in the Masters included in any Record, then copies of such Record manufactured after the date hereof shall at Licensor's request employ Licensor's distinctive logo or trademark (hereinafter collectively referred to as the "Mark"), provided that, notwithstanding anything to the contrary in this subparagraph 8(e), Licensee shall have no obligation under this subparagraph 8(e) with respect to any copies of any Records manufactured prior to such date (which copies may bear the "Sunbow" distinctive logo and/or trademark).  The Mark shall appear on all such packaging and labels (the size and prominence of Licensor's Mark, the size and prominence of Licensee's mark and juxtaposition of the Mark with Licensee's mark, shall be mutually determined by Licensor and Licensee).  Licensor hereby irrevocably grants to Licensee the exclusive right to use and to authorize others to use the Mark throughout the applicable Territory during the Term, for advertising and purposes of trade, and otherwise, solely in connection with Licensee's exploitation of the Audio Rights and Home Video Rights in accordance with the terms and conditions hereof.  All such uses of the Mark shall be without any payment to Licensor or any other party.  With respect to all Records released under this License Agreement, Licensee shall have the right, at its election, to indicate that such Records are manufactured and/or distributed by Licensee.  Licensor warrants, represents and agrees that (i) Licensor owns all rights in and to the Mark, (ii) the use hereunder of the Mark will not infringe upon the rights of any party and (iii) Licensor has the right to make the grant to Licensee set forth in this paragraph.  If Licensee, in its sole judgment, believes that any liability or expense may be incurred by reason of the use of the Mark, Licensor and Licensee shall discuss in good faith either the use of a substitute mark and/or Licensor's indemnification of Licensee for a continuous use of the Mark.

(f)    "Deliver" or "Delivery" or "Delivered", when used with respect to the Masters referred to in subparagraphs 6(b) and (c) above means the actual receipt by the representative of Licensee designated in each instance of Recordings together with all necessary

9

SUN 0703

licenses, approvals, consents and permissions, and all materials for use in the packaging and marketing of the Records.   In lieu of the physical delivery to Licensee's designated representative of all of the original and duplicate Recordings concerned, Licensor may provide written notice to Licensee's designated representative in a form reasonably acceptable to Licensee which, to Licensee's reasonable satisfaction, enables Licensee at Licensee's reasonable discretion to control and/or to take possession of the original and duplicate Recordings concerned at the recording studios or other facilities at which such Recordings are maintained. The quality of the Recordings and other Licensed Materials delivered by Licensor to License hereunder shall be equal to the highest quality Recordings and other Licensed Materials in Licensor's possession or control.

9.   Warranties, Representations, and Covenants; Restrictions; Indemnities.

9.1    Licensor represents, warrants and covenants that:

     (a)    Licensor has all the requisite corporate right, power and authority to (i) enter into this Agreement, which upon execution will constitute the legal, valid and binding obligations of Licensor, (ii) to grant the rights herein granted, and (iii) to fully perform its obligations hereunder without the consent of any other third party.

     (b)    All rights granted to Licensee are free and clear of all liens, encumbrances or other claims imposed by reason of any action or inaction by TVL.

     (c)    TVL is organized, validly existing and in good standing under the laws of the Federal Republic of Germany.

     (d)    During the Term, Licensor has observed or performed, and will continue to observe and perform, all of its financial obligations, and all of its non-financial obligations in all material respects, under the Acquired Contracts including, but not limited to, all payment obligations thereunder.

     (e)    TVL has not, sold, assigned, or otherwise disposed of any right, title or interest in the Licensed Materials that would materially adversely affect the rights granted to Licensee hereunder, and Licensor will not do so during the Term.

     (f)    Licensor will not grant any Audio Rights or Home Video Rights to the Programs to any other Person during the Term and in the applicable Territory.

     (g)    During the Term, Licensor shall not exercise any Audio Rights or Home Video Rights in the applicable Territory hereunder, nor shall Licensor sell any Audiovisual Records derived from the Licensed Material outside of the applicable Territory to anyone who customarily exports Records to the applicable Territory hereunder.  For the avoidance of doubt, the prohibition contained in this subparagraph 9(g) shall not be construed to interfere with Licensor's right to exploit the audio track portion of the Programs as it is coupled with the visual track portion of such Programs.

     (h)    During the Term, Licensor will not enter into any agreement which would materially interfere with the full and prompt performance of Licensor's obligations

10

SUN 0704

hereunder, and Licensor will fully and promptly perform Licensor's obligations set forth hereunder to all Persons rendering services in connection with the Licensed Materials.

      (i)    To the extent of Licensor's rights pursuant to the Acquired Contracts:

      (i)    Licensor hereby agrees that all Compositions included in the Licensed Materials shall be available for licensing hereunder by Licensee for reproduction and distribution in each country of the Territory outside of the United States and Canada through the author's society or other licensing and collecting body generally responsible for such activities in the country concerned. Licensor shall cause, at Licensee's sole expense, the issuance of effective licenses, under copyright and otherwise, to reproduce each Composition on Records and distribute those Records outside the United States and Canada, on terms not less favorable to Licensee or its Sublicensees than the terms prevailing on a general basis in the country concerned with respect to the use of Compositions on comparable Records. In respect of the United States and Canada, Licensor will use reasonable efforts, at Licensee's sole cost and expense, to obtain or to assist Licensee in obtaining appropriate licenses covering those Compositions for Licensee's benefit; and

      (ii)    Licensor also grants to Licensee an irrevocable license under copyright to reproduce each Composition in Promo Videos, to reproduce, distribute and perform those Promo Videos in any manner (including, without limitation, publicly and for profit), to manufacture and distribute Audiovisual Records and other copies of those Promo Videos, and to exploit them otherwise, to reproduce lyrics (including translations thereof), of each Composition, in whole or in part, on and in Records and in any other manner and to manufacture and distribute those Records and exploit them otherwise, each by any method and in any form known now or in the future, through the applicable Territory and during the Term, and to authorize others to do so. Except as otherwise required under any Acquired Contract, Licensee and its Sublicensees shall not be required to make any payment to Licensor in connection with those uses but must bear all third-party costs pursuant to paragraph 7 above, and that license shall apply whether or not Licensee receives any payment in connection with any use of any Promo Video or other Record. If any exhibition of a Video is also authorized under another license (such as a public performance license granted by ASCAP or BMI), that exhibition shall be deemed authorized by that license instead of this License Agreement.

      (j)    Licensor will fully indemnify and hold harmless Licensee and its Affiliates, officers, directors, employees and agents (collectively, the "Licensee Indemnified Parties"), from and against, and will reimburse the Licensee Indemnified Parties for, any and all loss, damage, liability, claims, cost and expense, including reasonable attorneys' and accountants' fees and expenses (and including those incurred in connection with the enforcement of this indemnity) (collectively, "Losses"), incurred by the Licensee Indemnified Parties by reason of or arising out of or in connection with Licensor's breach of any of its representations and warranties herein or failure to observe or perform any of it covenants or obligations hereunder.

11

31092443.09

SUN 0705

(k)    If Licensor shall become aware of any unauthorized recording, manufacture, distribution or sale by any third party contrary to the restrictions set forth in this License Agreement, Licensor shall notify Licensee thereof and shall cooperate with Licensee, at Licensee's sole cost and expense, in the event that Licensee commences any action or proceeding against such third party.

9.2    Licensee represents, warrants and covenants that:

(a)    Licensee has all requisite corporate right, power and authority to enter into this License Agreement which upon execution will constitute the legal, valid and binding obligations of Licensee and fully to perform its obligations hereunder.

(b)    Licensee is a corporation duly organized, validly existing and in good standing under the laws of Delaware.

(c)    Licensee will fully indemnify and hold harmless Licensor and its Affiliates, officers, directors, employees and agents (collectively, the "Licensor Indemnified Parties"), from and against, and will reimburse the Licensor Indemnified Parties for, any and all Losses incurred by the Licensor Indemnified Parties by reason of or arising out of or in connection with Licensee's breach of any of its representations and warranties herein or failure to observe or perform any of its covenants or obligations hereunder or arising out of the matters described in subparagraphs 2(b) or 8(a) above.

9.3    Injunctive Relief.  Licensee and Licensor each shall be entitled to seek injunctive relief to enforce the provisions of this License Agreement.

10.    Notices.  Any notice, request, demand or other communication required or permitted under this Agreement shall be in writing and shall be delivered personally or sent by certified mail, return receipt requested, postage prepaid, or sent by prepaid overnight courier to the parties at the addresses set forth below their names below (or at such other addresses as shall be specified by the parties by like notice). ·

If to Licensee:

c/o Sony Music Entertainment Inc.
550 Madison Avenue
New York, New York 10022
Attention: General Counsel

With a copy to:

Rosenman & Colin LLP
575 Madison Avenue
New York, New York 10022-2585
Attention: H. Paul Burak, Esq.

If to Licensor:

TV-Loonland AG
Munchner Str. 16

12

31092443.09

SUN 0706



85774 Unterfohring
Munich, Germany
Attention:    Peter Volkle
              Carl L. Woebcken

Such notices, demands, claims and other communications shall be deemed given when actually received or (a) in the case of delivery by overnight service with guaranteed next day delivery, the next day or the day designated for delivery or (b) in the case of certified U.S. mail, five days after deposit in the U.S. mail.

11.    Entire Agreement. This Agreement contains every obligation and understanding between the parties relating to the subject matter hereof and merges all prior discussions, negotiations and agreements, if any, between them, and none of the parties shall be bound by any representations, warranties, covenants, or other understandings with respect to the subject matter hereof, other than as expressly provided or referred to herein.

12.    Assignment. This Agreement may not be assigned by any party without the written consent of the other party, except that this Agreement may be assigned by any party to an Affiliate or, in the case of Licensor, to a party actively involved in the distribution of television programming that acquires all or a substantial portion of TVL's assets, and in the case of Licensee, to a party actively involved in audio and/or home video distribution that acquires all or a substantial portion of Licensee's assets, provided that the assigning party shall remain jointly and severally liable with such Affiliate for its obligations hereunder. Subject to the preceding sentence, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

13.    Waiver and Amendment. Any representation, warranty, covenant, term or condition of this Agreement which may legally be waived, may be waived, or the time of performance thereof extended, at any time by the party hereto entitled to the benefit thereof, and any term, condition or covenant hereof may be amended by the parties hereto at any time. Any such waiver, extension or amendment shall be evidenced by an instrument in writing executed on behalf of the appropriate party by a person who has been authorized by such party to execute waivers, extensions or amendments on its behalf. No waiver by any party hereto, whether express or implied, of its rights under any provision of this Agreement shall constitute a waiver of such party's rights under such provisions at any other time or a waiver of such party's rights under any other provision of this Agreement. No failure by any party hereto to take any action against any breach of this Agreement or default by another party shall constitute a waiver of the former party's right to enforce any provision of this Agreement or to take action against such breach or default or any subsequent breach or default by such other party.

14.    No Third Party Beneficiary. Nothing expressed or implied in this Agreement is intended, or shall be construed, to confer upon or give any Person other than the parties hereto, and the other indemnified parties hereunder, and their respective successors and permitted assigns any rights or remedies under or by reason of this Agreement.

15.    Severability. In the event that any one or more of the provisions contained in this Agreement shall be declared invalid, void or unenforceable, the remainder of the provisions of this Agreement shall remain in full force and effect, and such invalid, void or unenforceable provision shall be interpreted as closely as possible to the manner in which it was written.

13

31092443.09

SUN 0707

16.    <u>Expenses</u>. Each party agrees to pay, without right of reimbursement from the other party, the costs incurred by it incident to the preparation of this Agreement, and the fees and disbursements of counsel, accountants and consultants employed by such party in connection therewith.

17.    <u>Headings</u>.   Article titles and headings to sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.   The schedules and exhibits referred to herein shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth verbatim herein.   The specification of any dollar amount in the representations or warranties contained in this Agreement or the inclusion of any specific item in any schedules hereto is not intended to imply that such amounts, or higher or lower amounts, or the items so included or other items, are or are not material, and neither party shall use the fact of the setting of such amounts or the inclusion of any such item in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in a schedule is or is not material for purposes of this Agreement.

18.    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

19.    <u>Governing Law; Jurisdiction</u>. This Agreement has been entered into and shall be construed and enforced in accordance with the laws of the State of New York without reference to the choice of law principles thereof.   Each party hereto agrees that any action, proceeding or claim it commences against any other party pursuant to this Agreement shall be brought in either the courts of the State of New York, sitting in New York County, or the courts of the United States for the Southern District of New York.   Each party hereby irrevocably submits to the jurisdiction of the courts of the State of New York, sitting in New York County, and the courts of the United States for the Southern District of New York.   Each party irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court, any claim that any such suit, action or proceeding brought in such a court has been brought in an inconvenient forum and the right to object, with respect to any such suit, action or proceeding brought in any such court, that such court does not have jurisdiction over such party. In any such suit, action or proceeding, each party waives, to the fullest extent it may effectively do so, personal service of any summons, complaint or other process and agrees that the service thereof may be made by certified or registered mail, addressed to such party at its address set forth in paragraph 10 above.  Each party agrees that a final non-appealable judgment in any such suit, action or proceeding brought in such a court shall be conclusive and binding.

20.    <u>Further Assurances</u>. From time to time, Licensor shall execute and deliver or cause to be executed and delivered to Licensee, such other instruments of conveyance and transfer as Licensee may reasonably request or as may be otherwise necessary to more effectively convey and transfer to, and invest in Licensee, and to put Licensee in possession of the rights granted hereunder.

21.    <u>WAIVER OF JURY TRIAL</u>. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY LEGAL

14

31092443.09

SUN 0708

PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

IN WITNESS WHEREOF, the parties hereto have each executed and delivered this License Agreement as of the day and year first above written.

TV-LOONLAND AG

By: _____    _____

Title: _CEO_    _____

SONY MUSIC ENTERTAINMENT INC.

By: _____

Title: _____

SUNBOW PRODUCTIONS, INC.

By: _____

Title: _____

15

31092443.09

PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

IN WITNESS WHEREOF, the parties hereto have each executed and delivered this License Agreement as of the day and year first above written.

TV-LOONLAND AG

By:_____

Title:_____

SONY MUSIC ENTERTAINMENT INC.

By:_____

Title:_____

SUNBOW PRODUCTIONS, INC.

By:_____

Title:_____

15

31092443.09

SUN 0710

SONY WONDER
PROGRAMMING RIGHTS
NOVEMBER 24, 2000

| Title | Unearned Balance |
|---|---|
| Andy Kaufman | $20,276 |
| Baby It's You | 123,019 |
| Beginner's Bible | 1,449,212 |
| Cinderella: Frozen In Time | 72,359 |
| Enchanted Tales I | 18,271 |
| Enchanted Tales II | 1,845,707 |
| Enchanted Tales III | 2,548,171 |
| Enchanted Tales - Fisher Price | 281,837 |
| Forgotten Toys | 196,095 |
| Jack & the Beanstalk | 46,976 |
| King Arthur | 550,875 |
| Lapitch, The Little Shoemaker | 117,094 |
| The Last Polar Bears | 137,600 |
| Mega Man | 173,690 |
| Odyssey Productions | 171,505 |
| Old Bear Stories | 125,591 |
| Salter Street Films ("Works") | 63,960 |
| Street Fighter II | 532,985 |
| Totalmente en Forma | 67,010 |
| Tubby the Tuba | 51,407 |
| White Christmas | 175,229 |
| Xuxa | 310,009 |
| **Total Unearned Balances** | ######### |

| Title | Amortizable Costs |
|---|---|
| Angel Wings | $618,113 |
| Hoyt-n-Andy | 2,443,719 |
| Lion of Oz | 1,713,977 |
| The Little Witch | 456,733 |
| Mama, Do You Love Me? | 455,731 |
| Mega Babies | 2,927,553 |
| Rainbow Fish Series | 2,442,567 |
| Santa Mouse & the Ratdeer | 378,891 |
| Santa's Special Delivery | 255,600 |
| Timothy Tweedle | 478,384 |
| Wondrous Myths & Legends | 2,276,490 |
| **Total Amortizable Costs** | ######### |

SUN 0711