# EXHIBIT 22

$C$  $K \# 50072$

EXCLUSIVE LICENSE AGREEMENT
Standard Terms and Provisions



This shall confirm the agreement reached this 18th day of April, 2000 by and between Rhino Entertainment Company d/b/a Rhino Home Video (hereinafter referred to as "Rhino") located at 10635 Santa Monica Blvd., Los Angeles, California 90025-4900, and Sunbow Entertainment LLC (hereinafter referred to as "Licensor") located at 100 Fifth Avenue, New York, NY 10011, with reference to the following facts:

WHEREAS Licensor owns or controls the rights to that certain program(s) listed on Exhibit "A" (attached hereto and incorporated herein) (hereinafter referred to as the "WORK(S)").

WHEREAS Rhino desires to have the exclusive right, license and privilege to manufacture, reproduce, distribute, promote, sell and otherwise exploit the WORK(S) as videograms, and is willing to pay royalties to Licensor therefor.

NOW THEREFORE, in consideration of the foregoing and the mutual promises contained herein, the parties agree as follows:

1.    GRANT OF RIGHTS
      Licensor hereby grants to Rhino the sole and exclusive right, license and privilege to manufacture, reproduce, distribute, promote, sell and otherwise exploit each of the WORK(S), in their entirety, as videograms, in a territory set forth in Exhibit "A" (hereinafter referred to as the "Territory") for a term as set forth in Exhibit "A" (hereinafter referred to as the "term"). The foregoing grant of rights to Rhino includes, but is not limited to, the following:

      (a)    The right to use the title or titles by which each of the WORK(S) is or may be known or identified, or such other title as Rhino may desire;

      (b)    The right to use the names, likenesses and biographies of all featured artists and characters whose performances are embodied in the WORK(S), and all producers, authors and other persons contributing to the creation of the WORK(S), for purposes of advertising and exploiting the WORK(S), and for purposes of trade;

      (c)    The right to use such names and trademarks of Rhino (its affiliates and sublicensees), as Rhino may elect, on the packaging and labels of the videograms, and in all advertising and publicity relating thereto, in such manner as Rhino may desire;

      (d)    The right to use, perform and broadcast excerpts of the WORK(S) up to thirty (30) seconds in length, to use any literary, dramatic or musical material contained in the WORK(S), alone or in conjunction with other material, and to prepare and use brief synopses and/or revised or abridged versions of the WORK(S), or any literary, dramatic or musical material contained therein, for purposes of advertising and publicizing the WORK(S), and for purposes of trade. The foregoing shall include the right to use, perform and broadcast excerpts of the WORK(S) on the Rhino website(s). If Rhino wishes to use excerpts of the WORK(S) that are more than thirty (30) seconds in length, Rhino shall seek the approval of Licensor, such approval shall not be unreasonably withheld.

      (e)    The right to distribute videograms to the institutional market, including but not limited to medical, educational and religious institutions, retirement homes, libraries, civic groups, clubs, summer camps and institutions with shut-ins, for their non-commercial, non-theatrical exhibition;

(f)    The right to edit and change the WORK(S) for length and for purposes of conforming to censorship or other legal requirements. In no event shall any such edit or change delete or otherwise alter the credits or copyright notice for the WORK(S); and

(g)    The right to sublicense the WORK(S), in whole or in part, or subcontract others to exercise any rights granted to Rhino hereunder.

2.    DELIVERY OF MATERIALS
(a)    Licensor shall deliver to Rhino each of the items set forth in Section (g) of Exhibit "A" hereunder;

(b)    Rhino shall notify Licensor within fifteen (15) business days after delivery of any such item of any defect therein. Licensor shall use best efforts to correct such defect or replace such item, as may be necessary, within fifteen (15) additional business days thereafter.

(c)    No such notice of defects delivered by Rhino shall be deemed a waiver by Rhino of Licensor's obligation to deliver any materials or items set forth hereunder within the time set forth below.

(d)    Each of the items set forth in Section (g) of Exhibit "A" shall remain the property of Licensor and shall be returned to Licensor upon termination of this Agreement (or at such other time as may be expressly provided below or on Exhibit "A" with respect to any item).

(e)    All costs and expenses incurred in connection with the creation, manufacture and delivery of said items shall be paid by Licensor, except as set forth hereunder,

3.    ROYALTIES
(a)    Basic Royalty Rate: As compensation for the rights granted to Rhino hereunder, and subject to the remaining provisions of this Section 3 and Section 4 herein, Rhino shall pay to Licensor a Basic Royalty Rate, as set forth in Exhibit "A."

(b)    Returns, Exchanges, Promotions & Free Goods: No royalties shall be payable to Licensor in respect of videograms (i) returned, exchanged, distributed free of charge for promotional purposes and/or distributed as "free" or "no charge," (ii) distributed to television or radio stations or publications to promote or stimulate the sale of videograms, or (iii) videograms sold directly to Licensor by Rhino at a discount.

(c)    Advance: Rhino shall pay to Licensor a non-returnable advance(s), as set forth in Exhibit "A," which shall be recoupable from any and all royalties earned by Licensor pursuant to this Agreement.

4.    PAYMENT AND ACCOUNTING
(a)    Royalties earned and payable as aforesaid shall be accounted for and paid within sixty (60) days after the end of each calendar quarter. Rhino shall have the right to establish reserves of up to twenty-five percent (25%) of net sales hereunder. Reserves established as aforesaid shall be liquidated equally over a twenty-four (24) month period after initially established.

(b)    Rhino makes no express or implied representation or guarantee as to the amount of royalties to be derived from the sale of videograms, or the exercise of any right granted to Rhino hereunder.

5.    WARRANTIES OF LICENSOR
Licensor hereby represents and warrants to Rhino throughout the term and any extension hereof, that:

2

000009

(a)    Licensor has the absolute right to enter into this Agreement, and to grant to Rhino all of the rights, licenses and privileges granted hereunder. If Licensor is the owner of the WORK(S), Licensor will, upon request by Rhino and prior to the execution of this Agreement, provide to Rhino a copy of the certificate(s) of copyright registration for the WORK(S), or documents evidencing Licensor's ownership of the property. If Licensor is not the owner of the WORK(S), Licensor will, upon request by Rhino and prior to the execution of this Agreement, provide to Rhino a copy of any and all appropriate documents or agreements by and between Licensor and the owner of the WORK(S) evidencing Licensor's right to enter into this Agreement and to grant to Rhino all of the rights, licenses and privileges granted hereunder;

(b)    Neither the WORK(S) or any part thereof, or the exercise of any of the rights granted to Rhino hereunder, will violate or infringe the trademark, tradename, contract, copyright, literary, artistic, dramatic, property or civil rights, right of privacy or any other rights whatsoever of any person or entity;

(c)    Neither Licensor nor Rhino will, at any time during the term or any extension hereof, sell, assign, encumber or grant to any other person or entity, or exercise for its own account, any of the rights, licenses or privileges granted to the other party hereunder, or any other rights, licenses or privileges that will directly compete with the rights, licenses or privileges granted to the other party hereunder;

(d)    There is no claim or litigation, pending or threatened, which may materially or adversely affect the rights, licenses and privileges granted to Rhino hereunder, or the use thereof by Rhino;

(e)    Neither the WORK(S) or any part thereof is in the public domain, and the copyrights of the WORK(S) and all literary, dramatic and musical material upon which it is based or which is contained in the WORK(S) will be valid and subsisting throughout the Territory during the term hereof. Licensor shall secure, register, renew and extend all such copyrights as may be necessary. Without limiting the foregoing obligation, Licensor hereby authorizes and empowers Rhino to register its licensing interest in the WORK(S) for copyright purposes and to secure renewals and extensions thereof in the Copyright Office of the United States of America and/or in any other country or political entity where it deems it appropriate to do so;

(f)    Neither the WORK(S) nor any part thereof has been previously sold or distributed as videograms in the Territory other than pursuant to this Agreement, or as disclosed to Rhino on Exhibit "A" hereunder;

(g)    Licensor has not heretofore authorized, nor will it at any time during the term or any extension hereof authorize, any other person or entity to import videograms of the WORK(S) into the Territory;

(h)    All rights granted to Rhino hereunder are and will be free and clear of any liens, restrictions, claims and encumbrances of any kind, and all royalties, license fees and/or other fees required to be paid in connection with said rights, or the use, distribution, performance or exploitation of the WORK(S) hereunder (and the music and all other matter contained therein) will be paid by Licensor, including but not limited to all payments on account of or arising from:

(i)    Any claims or rights of owners of copyrights or other property rights in the WORK(S), or in any music or other material contained therein;

(ii)    Any claims or rights of any performing rights society or any body or group representing authors, composers, musicians, artists, publishers or other persons having legal or contractual rights of any kind to participate in the receipts of the WORK(S); and

3

000310

(iii)    Any other claims or rights with respect to the use, distribution and exploitation of the WORK(S) as contemplated hereunder, including but not limited to any guild and/or union residuals, reuse payments or other similar payments, which shall be Licensor's sole obligation;

(i)    Licensor shall at its sole cost and expense take all reasonable steps to protect all copyrights and other rights pertaining to the WORK(S) from infringement by unauthorized parties and, in particular, shall initiate such action and proceedings as may be reasonably required to prevent any unauthorized use by third parties of the WORK(S) or any part thereof. If Licensor fails to initiate any such action, Rhino may, in its sole discretion, and at Licensor's sole cost and expense, initiate such action in its own name and/or Licensor's name and may join Licensor as a party thereto.

6.    INDEMNITY
Reference is made to the indemnity provision set forth in Section (i) of Exhibit "A."

7.    INSURANCE
Licensor will maintain, at its own expense, at all times during the term hereunder and for three (3) years thereafter, and with a reasonable insurance carrier acceptable to Rhino, at least a One Million Dollar ($1,000,000.00) combined single limit liability insurance policy with respect to the WORK(S).

8.    DISTRIBUTION AND EXPLOITATION
(a)    Rhino shall have the complete, exclusive and unqualified right to promote, distribute and exploit videograms of the WORK(S) throughout the Territory and each part thereof, during the term and any extension hereof, in accordance with such methods, policies, terms and conditions as Rhino in its reasonable business judgment may determine proper or expedient. The failure of Rhino in its sound business judgment to exercise any of the rights granted hereunder in any portion of the Territory shall not be deemed to be an abandonment or relinquishment of such rights.

(b)    Notwithstanding the foregoing, Rhino will not promote the WORK(S) through any medium that is inappropriate for children's videos (e.g., Playboy, adult websites, etc.).

9.    BOOKS AND RECORDS
(a)    All accountings rendered by Rhino shall be deemed conclusive unless objections in writing, specifying all objections with particularity, are received by Rhino within two (2) years from the date such accounting is rendered. Rhino shall not be obligated to keep any books or records pertaining to this Agreement for any period exceeding two (2) years from the date the accounting derived therefrom is rendered unless specific objections to any such accounting have been received pursuant to this paragraph. Licensor shall maintain no action, claim, or proceeding against Rhino with respect to any accounting or statement rendered by Rhino hereunder unless such action, claim or proceeding is commenced within two (2) years after such accounting or statement is rendered.

(b)    A certified public accountant, on Licensor's behalf, may, at Licensor's sole cost, examine Rhino's books or records with respect to the WORK(S) hereunder, but only during Rhino's normal business hours and after reasonable written notice, and no more than once within each twelve (12) month period or once with respect to any statement rendered hereunder. Licensor shall have no right to examine any books or records relating to Rhino's general business operations, or any matter other than the WORK(S) hereunder.

10.    BREACH: REMEDIES

4

000011

Except as otherwise provided herein, in the event that at any time during the term or any extension hereof either party hereto breaches any of its warranties or representation hereunder, or in the event either party fails to perform any obligation required of it under this Agreement, and such breach or failure continues for a period of thirty (30) days after written notice thereof is given by the non-breaching party, said party shall be in default hereunder and the non-breaching party may pursue any and all remedies available under this Agreement, by law or at equity, except that if the nature of the breach is such that it cannot be reasonably cured within said thirty (30) day period, and within said thirty (30) day period the breaching party takes substantial measures towards curing the breach and within a reasonable time thereafter diligently pursues such cure to completion, such party shall not be deemed to be in default hereunder.

11.    RESOLUTION OF CONTROVERSIES

(a)    In the event of any litigation between the parties hereto to enforce any of the provisions hereunder, the unsuccessful party to such litigation covenants and agrees to pay to the successful party therein all costs and expenses, including but not limited to reasonable attorneys' fees incurred therein by such successful party, which costs, expenses and attorneys' fees shall be included in and as a part of any judgment rendered in such litigation.

(b)    In the event of a breach of this Agreement by Rhino, Licensor shall be limited to its right, if any, to recover money damages, and shall not be entitled to injunctive or other equitable relief.

12.    FORCE MAJEURE

If, because of any act of God, accident, strike, fire, riot, war or any other cause not within Rhino's control, Rhino is prevented from performing any of its obligations hereunder, then Rhino may suspend the term hereof for the duration of the force majeure, but not for longer than six (6) months. If such force majeure continues beyond said period, Rhino shall, within an additional thirty (30) days, subcontract or sublicense a third party to manufacture and sell videograms of the WORK(S). If Rhino fails to thus subcontract or sublicense its obligations, Licensor may terminate this Agreement. If Licensor does not so terminate this Agreement, the term hereof shall be extended by a period of time equal to the period of the duration of the force majeure.

13.    RELATIONSHIP OF PARTIES

(a)    The relationship between Licensor and Rhino is that of creditor and debtor with respect to the payment of any monies due Licensor hereunder. Nothing contained herein shall be construed to create a trust or specific fund as to royalties or any other monies, or to prevent or preclude Rhino from commingling any monies due Licensor with any other monies.

(b)    This Agreement shall not be construed as creating a joint venture or partnership between Licensor and Rhino. Neither party shall have any authority to bind the other or the other's representatives in any way except as expressly provided to the contrary herein. The provisions of this clause are not intended to destroy or diminish in any way the rights, licenses and privileges granted to Rhino with respect to the WORK(S).

14.    ASSIGNABILITY

Rhino may assign this Agreement to any parent, subsidiary or affiliate entity, or to any financially responsible entity which acquires substantially all of Rhino's stock or assets through merger, consolidation or other reorganization, subject to Licensor's consent, not to be unreasonably withheld. Any such assignee (or sub-assignee) shall prospectively assume all contractual obligations of the assigned party hereunder. This agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective successors, permitted assigns, heirs, executors, administrators and legal and personal representatives.

15.    NOTICES

5

000012

(a)    Except as expressly provided to the contrary herein, all notices and demands of any kind which the parties hereto may require or desire to serve upon each other shall be in writing and shall be served by sending such notice certified or registered mail, postage prepaid, with return receipt requested, to the address of each party as listed below:

If to RHINO:            Vice President
                        Business & Legal Affairs
                        Rhino Entertainment Company
                        10635 Santa Monica Blvd.
                        Los Angeles, CA 90025-4900

If to LICENSOR:         Kerry Romeo
                        Director of Sales and Acquisitions
                        Sunbow Entertainment
                        100 Fifth Avenue
                        New York, NY 10011

(b)    In case of service by mail, service shall be deemed complete on the date of actual delivery as shown by the registration or certification receipt or at the expiration of the third day after the date of the mailing, whatever first occurs. The addresses to which notices and demands shall be delivered or sent may be changed from time to time by notice served as hereinabove provided by any party upon any other party.

16.    VIDEOGRAMS
"Videograms" are herein defined as all forms of audiovisual devices, including but not limited to videocassette, and such video devices now known or hereafter devised that enable the WORK(S) to be received visually when used in combination with or as part of a piece of electronic, mechanical or other apparatus, through a playback system or device.

17.    GENERAL PROVISIONS
(a)    Entire Agreement: This Agreement contains the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements between the parties with respect thereto. No claim of waiver, modification, consent or acquiescence with respect to any provision of this Agreement shall be made against either party hereto except on the basis of a written instrument executed by or on behalf of the party to be charged.

(b)    Construction: Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be valid under applicable law, but if any provision of this Agreement shall be invalid or prohibited thereunder, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

(c)    Successors and Assigns: Except as otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of the successors and assigns of each of the parties hereto.

(d)    Paragraph Headings: The headings of the several paragraphs of this Agreement are inserted solely for convenience of reference, and are not a part of and are not intended to govern, limit or aid in the construction of any term or provision hereof.

(e)    Person and Tense: Whenever necessary herein, all terms used in the singular shall apply to the plural and vice versa, and all terms used in the neuter shall apply to the masculine and feminine genders and vice versa.

6

G03013

(f)    Governing Law: This Agreement is to be governed by and construed in accordance with the laws of the State of New York, applicable to agreements executed and wholly to be performed therein.

(g)    Execution in Counterparts:    This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but such counterparts together constitute only one and the same instrument.

(h)    Cumulative Remedies: All rights and remedies granted to any party hereunder shall be cumulative and shall not interfere with or prevent the exercise of any other right or remedy which may be available to such party.

(i)    Reservation of Rights: All rights in and to the WORK(S) not specifically granted to Rhino hereunder are hereby reserved by Licensor.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first set forth above

RHINO                                          LICENSOR

RHINO ENTERTAINMENT COMPANY              SUNBOW ENTERTAINMENT
d/b/a RHINO HOME VIDEO

By:_____              By:_____
Date:        7/21/00                     Date:

                                         Fed ID #:
                                              SAM MILLSTONE
                                         VP FINANCE AND OPERATIONS
                                           CHIEF FINANCIAL OFFICER

7

G00014

EXHIBIT "A"

Exhibit "A" to that certain Exclusive License Agreement entered into by and between Rhino Entertainment Company d/b/a Rhino Home Video ("Rhino") and Sunbow Entertainment ("Licensor") dated this 18th day of April, 2000.

(a) Work(s):

(1) The following animated, color programs (the "Programs"):

   (i)  Inhumanoids
      (a) Inhumanoids – The Movie (consists of first three (3) episodes; total running time of 90 minutes)
      (b) Thirteen (13) episodes of 18 minutes each
          30 *[handwritten]*

   (ii) Robotix
      (a) Robotix – The Movie (total running time of 90 minutes)
      (b) Nine (9) episodes of 15 minutes each

   (iii) Visionairies
      (a) Visionairies – The Movie (consists of first three (3) episodes; total running time of 90 minutes)
      (b) Thirteen (13) episodes of 30 minutes each

(2) Rhino shall have the right to release the Programs individually as WORK(S) or to create new WORK(S), other than that described above, by combining multiple Programs so as to tell a complete story ("New Compilation(s)"). Rhino shall also have access to pre-edited compilations ("Pre-edited Compilation(s)") for use in the creation of the WORK(S), at no additional charge, where available. Rhino shall retain the right to edit the Pre-edited Compilation(s) for creation of the WORK(S) at Rhino's own cost. In the event Rhino creates New Compilations for creation of the WORK(S), Rhino shall pay for all costs pertaining to the New Compilation(s), with those costs to be absorbed by Rhino. Rhino shall also pay all costs pertaining to the creation of any DVD packages, with those costs to be absorbed by Rhino.

(3) Notwithstanding the foregoing, Rhino shall not, at any time, alter the Programs as delivered in any way for use in these New Compilation(s).

(4) Rhino shall have the right to include a promotional trailer or video for other Rhino products on the WORK(S) and have the right to compile multiple Programs onto a single cassette for custom packages or special releases subject to Hasbro's reasonable approval. In the event said approval is not received within 10 business days of submission, Rhino shall assume that approval has been given.

(5) Rhino shall be responsible for all editing costs related to (a)(3) through (a)(4), said amount not to be recoupable against royalties. In the event the New Compilation(s) are licensed by Licensor for release on video in other terrritories, Licensor will reimburse Rhino fifty percent (50%) of Rhino's editing costs.

8

000015

(b) Media:

Home Video, in all formats now known or hereafter devised, including but not limited to video cassette, all video disc configurations (including DVD) and 8mm formats. Specifically excluded are all interactive, broadcast, cable, syndication, satellite, on-line or other transmission rights, except as specifically noted herein.

(c) Territory:

The United States, its territories and possessions.

(d) Term:

Five (5) years from the release of each WORK(S). There shall also be a six (6) month sell off period for each WORK(S) at the end of the initial Term for such WORK(S) provided Rhino shall not have the right to manufacture additional units of the WORK(S) past the end of the initial Term.

(e) Recoupable Advance:

A total of thirty five thousand dollars ($35,000.00), payable as follows: (i) fifty percent (50%) upon execution of this Agreement and substantiation of Licensor's right to enter into this Agreement; (ii) fifty percent (50%) upon delivery and acceptance of master video and art elements requested for those Programs that Rhino has targeted for release in the immediate future ("Initial Programs"). Rhino shall provide Licensor a list of the Initial Programs upon execution of the Agreement. The Advance will be allocated as follows: Inhumanoids - $15,000.00; Robotix - $10,000.00; Visionairies - $10,000.00. Notwithstanding the foregoing, the Advance is to be cross collateralized against all royalties payable to Licensor for the WORK(S) hereunder.

(f) Royalties:

The royalty payable to Licensor hereunder shall be as follows: (i) 25% of Rhino's wholesale, for all videos with a SRLP of $19.95 and above; (ii) 20% of wholesale, for all videos with a SRLP of between $14.95 and $19.94; and (iii) 15% of wholesale, for all videos with a SRLP of between $10.00 and $14.94; (iv) 12% of wholesale, for all videos with a SRLP of between $7.95 and $9.99; and (v) 10% of wholesale, for all videos with a SRLP under $7.95.

Rhino shall retain the right to establish prices as indicated by market conditions and change prices at any time, but in no case shall Rhino offer the WORK(S) for less than $7.95 without prior written approval from Licensor.

The royalty percentage shall be based on Rhino's landed wholesale price ("LWP"), which is defined as Rhino's wholesale selling price ("wholesale") of each WORK(S), less a deduction of six percent (6%) as a fee paid to WEA for handling fulfillment and collections.

The LWP shall fluctuate in accordance with Rhino's suggested retail list price ("SRLP") and is inclusive of any third party royalties, including but not limited to payments to producers, union, sychronization, and mechanical license fees.

There will be no other deductions taken with the exception of prebook discounts, offered as an incentive to obtain initial product placement and re-stocking WORK(S). Licensor shall retain the reasonable right

9

000016

of approval of any other discount programs that would lessen the anticipated revenues paid to Licensor.

Notwithstanding the foregoing, when product is sold through mail order, direct response or video clubs (e.g. Columbia House); sublicensed for release on all home video formats, now known or hereinafter developed, including but not limited to video cassette, all video disc configurations (including DVD) and 8mm formats; exploited as part of a promotional program, as a premium, or in connection with the sale of any product, commodity, or service, Rhino and Licensor shall equally split all advances and royalties paid or credited to Rhino, less all third party payments by Rhino, including but not limited to duplication and packaging costs, and any and all costs incurred in the marketing or manufacturing of the WORK(S). The term "royalties" shall not include any monies paid or credited to Rhino as reimbursement for finished goods.

(g) Delivery:

(1) Master(s): First generation, first quality, master video elements on an NTSC Digi Beta or D-2 master format, with all commercial blacks edited out, to be delivered upon execution of contract;

(i) The costs of editing out the commercial blacks and promotional spots will be paid by Licensor.

(ii) Rhino may be charged reasonable material fees for the creation of the Master(s) as all elements that may be needed may not exist in either Digi Beta or D-2 configurations. Rhino shall retain the right to have such editing done at the lab facility of Rhino's choice and cost.

(iii) If the original source Master(s) provided by Licensor for any particular Program is defective, Licensor will provide an additional Master(s), at no cost to Rhino, and will reimburse Rhino for any additional transfer costs incurred.

(iv) If Licensor is unable to provide an acceptable replacement for the defective Master(s) referenced in subparagraph (iii) above, Rhino shall have the right to delete the Program in question from this Agreement and reduce the Advance accordingly.

(2) Packaging and Collateral Materials: Elements needed for the creation of packaging and collateral materials, including but not limited to photographs and slides featuring performers as they appear in the WORK(S);

(i) Licensor warrants that they have, control and will provide such elements to Rhino and/or that -Rhino shall have reasonable access to same based on availability.

(ii) Prior to the execution of this Agreement, Licensor shall apprise Rhino of what elements are available as well as to the format in which they exist.

10

C00017

(iii) Both parties acknowledge that ownership of these elements are retained by Licensor and that these elements may only be used in the sale and promotion of the Licensed Titles, as set forth hereunder.

(3) Advertising Materials: Copies of advertisements and other advertising materials prepared by or for LICENSOR in connection with the WORK(S) (including publicity stills, photographs and other transparencies of the artwork relating to the WORK(S)) suitable for use in creating advertising and merchandising devices for the videograms; upon execution of contract.

(4) Credits: The statement of credits applicable to the WORK(S) (for use in according credit on videograms and the packaging thereof), which statement of credits shall in all respects be compiled by Rhino; upon execution of contract.

(5) Theatrical Rating (where applicable): The theatrical rating given the WORK(S) by the Motion Picture Association of America ("MPAA"), or other motion picture rating association; when available.

(6) Press Kit: A press kit or press book for the WORK(S); when available.

(7) Copyright: Detailed information as to the appropriate copyright notice, symbols and wording to be affixed to videograms and the packaging thereof; upon execution of contract.

(h) Special Package(s):

(1) Subject to Licensor's approval not to be unreasonably withheld, Rhino shall retain the right to create special packages that include the WORK(S) along with other promotional or licensed goods such as posters, t-shirts, or pins, as value added on-pack items ("special package(s)"), and sell the special package(s) at a retail price higher that the video alone.

(2) In the event that any of the WORK(S) are coupled with products not directly licensed to Rhino by Licensor ("additional merchandise"), the royalty paid by Rhino to Licensor for such special package(s) containing such additional merchandise shall be based on either the suggested wholesale price of the video portion of the release or a pro-ration to be negotiated by the parties in good faith prior to the release of the special package(s).

(3) Rhino shall have the right to offer said additional merchandise for the sale and apart from the WORK(S) by any means, including but not limited to inclusion of so-called "tip in cards" or by including spots on the actual WORK(S). Licensor hereby acknowledges that it shall receive no revenues from the sales of additional merchandise separate and apart from the WORK(S).

(i) Warranties & Indemnification: (1) Licensor warrants that neither the WORK(S) nor any part thereof is in the public domain, and the copyrights in and to the WORK(S) and all literary, dramatic and musical material upon which the

11

660018

WORK(S) is based or which is contained in the WORK(S) will be valid and subsisting in the Territory throughout the Term hereunder. Licensor shall secure, register, renew and extend all such copyrights as may be necessary. Without limiting the foregoing obligation, Licensor hereby authorizes and empowers Rhino to register its licensing interest in the WORK(S) for copyright purposes and to secure renewals and extensions thereof in the Copyright Office of the United States of America and/or in any other country or political entity where it deems it appropriate to do so.

(2) Licensor further warrants that all mechanical, synchronization, master, use, name and likeness, union, performance and any other third party clearances with respect to the WORK(S) have been obtained; that such clearances are now, and through the Term of this agreement shall be in effect; and that Rhino shall have no aditional financial responsibilities with respect to any such clearances.

(3) Prior to the execution of this Agreement, Licensor shall provide Rhino with substantiation of their right to enter into this Agreement, including but not limited to a copy of the certificate(s) of copyright registration (or other documentation evidencing chain of title), and any documentation pertaining to the rights and clearances indicated in the preceding paragraph. Should Licensor be unable to provide said copy of the certificate(s) of copyright registration (or other documentation evidencing chain of title), Rhino shall have the right to conduct a copyright search relating to the WORK(S), the cost of which shall be treated as an additional recoupable expense hereunder.

(4) Licensor agrees to defend, indemnify and hold Rhino, and each of its directors, officers, agents, employees, sublicensees and distributors harmless from any liability, damages, judgment, settlement, cost or expense, including reasonable attorneys' fees, incurred in connection with or arising out of any breach or failure of any of Licensor's covenants, representations and warranties under this Agreement. In the alternative, Rhino, in Rhino's sole discretion, shall have the right to defend any such action, at Licensor's sole cost and expense. In the event of any such decision to defend by Rhino, the indemnity provision by Licensor of Rhino contained within this paragraph shall still apply.

(5) As to any matter to which the foregoing indemnity relates, Rhino may, in addition to all other rights it may have, withhold from payments due Licensor a sum which is reasonably necessary to satisfy any judgment or settlement approved by Licensor in connection with such matter, plus a reasonable amount to cover the expenses of contesting or defending such claim, and Rhino may further apply the amount withheld to the satisfaction of such judgment or settlement approved by Licensor and to reimbursement of such expenses.

(6) Rhino agrees to defend, indemnify and hold Licensor, and each of its directors, officers, agents, employees, sublicensees and distributors harmless from any liability, damages, judgment, settlement, cost or expense, including reasonable attorneys' fees, incurred in connection with or arising out of any breach or failure of any of Rhino's covenants, representations and warranties under this Agreement.    In the

GC0019

alternative, Licensor, in Licensor's sole discretion, shall have the right to defend any such action, at Rhino's sole cost and expense. In the event of any such decision to defend by Licensor, the indemnity provision by Rhino of Licensor contained within this paragraph shall still apply.

(j) Promotional Uses:

(1) Rhino shall have the right to creat promotional items in supports of the WORK(S). These items will not be made available for sale and will only be offered as promotional items within the trade.

(2)Licensor will make best efforts to aid Rhino in coordinating promotions and sales with other licensees. Licensor shall provide Rhino with a list of other principal licensors of products for the Programs, or have Hasbro provide same, which will include contact names, address and phone/fax information.

(3) Licensor will provide access, at no charge to Rhino, to any and all fan and/or consumer mailing lists developed that pertain to the Programs, for use during the Term for sale of the WORK(S) only.

(4) Licensor agrees to provide access to those character costumes that may be available, for promotional purposes, including but not limited to press and other public relations support, trade shows and store openings, amoung other uses.

(5) Rhino shall have the right to utilize not more than thirty (30) seconds from each of the Programs for broadcast promotional use only.

(6) Rhino shall have the non-exclusive right to stream no more than thirty (30) seconds from each of the Programs via any Rhino and/or Time-Warner owned, controlled or affiliated sites, for the sole purpose of promoting the WORK(S).

(k) Additional Comments:

(1) It is understood that certain Programs were previously released on home video by a number of companies, including but not limited to Family Home Entertainment, LIVE Entertainment, Golden Books Video, Video Treasures, Image Entertainment and Vestron Video. Licensor warrants that all rights and sell off periods have lapsed, and that specific information as to previous licensors and when those licenses lapsed will be provided to Rhino prior to execution of this Agreement.

(2) For the purposes of this Agreement, it is understood that Hasbro retains underlying rights in and to these programs and will retain the reasonable right of approval for certain elements, as outlined herein.

(3) All rights not granted to Rhino are reserved to Licensor for use without restriction, and Rhino acknowledges that the name of the Programs, the characters, character designs and likenesses are owned and/or controlled by Licensor, and that Rhino will not challenge, copy or imitate such names or rights during or after the Term ends.

000020

(4) In the event a discrepancy exists between the Standard Terms and Provisions and this Exhibit "A", Exhibit "A" shall prevail.

RHINO

RHINO ENTERTAINMENT COMPANY
1'b/a RHINO HOME VIDEO

By: _____

Date: _____

LICENSOR

SUNBOW ENTERTAINMENT

By: _____

Date: _____
        SAM MILLSTONE
Fe-VP, FINANCE AND OPERATIONS
        CHIEF FINANCIAL OFFICER

14

000021

r # 30075

**ORIGINAL**

EXCLUSIVE LICENSE AGREEMENT
Standard Terms and Provisions

This shall confirm the agreement reached this 18th day of April, 2000 by and between Rhino Entertainment Company d/b/a Rhino Home Video (hereinafter referred to as "Rhino") located at 10635 Santa Monica Blvd., Los Angeles, California 90025-4900, and Sunbow Entertainment LLC (hereinafter referred to as 'Licensor") located at 100 Fifth Avenue, New York, NY 10011, with reference to the following facts:

WHEREAS Licensor owns or controls the rights to that certain program(s) listed on Exhibit "A" (attached hereto and incorporated herein) (hereinafter referred to as the "WORK(S)").

WHEREAS Rhino desires to have the exclusive right, license and privilege to manufacture, reproduce, distribute, promote, sell and otherwise exploit the WORK(S) as videograms, and is willing to pay royalties to Licensor therefor.

NOW THEREFORE, in consideration of the foregoing and the mutual promises contained herein, the parties agree as follows:

1.    GRANT OF RIGHTS

Licensor hereby grants to Rhino the sole and exclusive right, license and privilege to manufacture, reproduce, distribute, promote, sell and otherwise exploit each of the WORK(S), in their entirety, as videograms, in a territory set forth in Exhibit "A" (hereinafter referred to as the "Territory") for a term as set forth in Exhibit "A" (hereinafter referred to as the "term"). The foregoing grant of rights to Rhino includes, but is not limited to, the following:

(a)    The right to use the title or titles by which each of the WORK(S) is or may be known or identified, or such other title as Rhino may desire;

(b)    The right to use the names, likenesses and biographies of all featured artists and characters whose performances are embodied in the WORK(S), and all producers, authors and other persons contributing to the creation of the WORK(S), for purposes of advertising and exploiting the WORK(S), and for purposes of trade;

(c)    The right to use such names and trademarks of Rhino (its affiliates and sublicensees), as Rhino may elect, on the packaging and labels of the videograms, and in all advertising and publicity relating thereto, in such manner as Rhino may desire;

(d)    The right to use, perform and broadcast excerpts of the WORK(S) up to thirty (30) seconds in length, to use any literary, dramatic or musical material contained in the WORK(S), alone or in conjunction with other material, and to prepare and use brief synopses and/or revised or abridged versions of the WORK(S), or any literary, dramatic or musical material contained therein, for purposes of advertising and publicizing the WORK(S), and for purposes of trade. The foregoing shall include the right to use, perform and broadcast excerpts of the WORK(S) on the Rhino website(s). If Rhino wishes to use excerpts of the WORK(S) that are more than thirty (30) seconds in length, Rhino shall seek the approval of Licensor, such approval shall not be unreasonably withheld.

(e)    The right to distribute videograms to the institutional market, including but not limited to medical, educational and religious institutions, retirement homes, libraries, civic groups, clubs, summer camps and institutions with shut-ins, for their non-commercial, non-theatrical exhibition;

RCK\mdm
F:\USER\CKAMINS\MS_WORD\PROJECTS\Video\My Little Pony\Agreement2.doc

000022

(f)     The right to edit and change the WORK(S) for length and for purposes of conforming to censorship or other legal requirements. In no event shall any such edit or change delete or otherwise alter the credits or copyright notice for the WORK(S); and

(g)     The right to sublicense the WORK(S), in whole or in part, or subcontract others to exercise any rights granted to Rhino hereunder.

2.     DELIVERY OF MATERIALS
(a)  -   Licensor shall deliver to Rhino each of the items set forth in Section (g) of Exhibit "A" hereunder;

(b)     Rhino shall notify Licensor within fifteen (15) business days after delivery of any such item of any defect therein. Licensor shall use best efforts to correct such defect or replace such item, as may be necessary, within fifteen (15) additional business days thereafter.

(c)     No such notice of defects delivered by Rhino shall be deemed a waiver by Rhino of Licensor's obligation to deliver any materials or items set forth hereunder within the time set forth below.

(d)     Each of the items set forth in Section (g) of Exhibit "A" shall remain the property of Licensor and shall be returned to Licensor upon termination of this Agreement (or at such other time as may be expressly provided below or on Exhibit "A" with respect to any item).

(e)     All costs and expenses incurred in connection with the creation, manufacture and delivery of said items shall be paid by Licensor, except as set forth hereunder.

3.     ROYALTIES
(a)     Basic Royalty Rate: As compensation for the rights granted to Rhino hereunder, and subject to the remaining provisions of this Section 3 and Section 4 herein, Rhino shall pay to Licensor a Basic Royalty Rate, as set forth in Exhibit "A."

(b)     Returns, Exchanges, Promotions & Free Goods: No royalties shall be payable to Licensor in respect of videograms (i) returned, exchanged, distributed free of charge for promotional purposes and/or distributed as "free" or "no charge," (ii) distributed to television or radio stations or publications to promote or stimulate the sale of videograms, or (iii) videograms sold directly to Licensor by Rhino at a discount.

(c)     Advance: Rhino shall pay to Licensor a non-returnable advance(s), as set forth in Exhibit "A," which shall be recoupable from any and all royalties earned by Licensor pursuant to this Agreement.

4.     PAYMENT AND ACCOUNTING
(a)     Royalties earned and payable as aforesaid shall be accounted for and paid within sixty (60) days after the end of each calendar quarter. Rhino shall have the right to establish reserves of up to twenty-five percent (25%) of net sales hereunder. Reserves established as aforesaid shall be liquidated equally over a twenty-four (24) month period after initially established.

(b)     Rhino makes no express or implied representation or guarantee as to the amount of royalties to be derived from the sale of videograms, or the exercise of any right granted to Rhino hereunder.

5.     WARRANTIES OF LICENSOR
Licensor hereby represents and warrants to Rhino throughout the term and any extension hereof, that:

2

000023

(a)       Licensor has the absolute right to enter into this Agreement, and to grant to Rhino all of the rights, licenses and privileges granted hereunder. If Licensor is the owner of the WORK(S), Licensor will, upon request by Rhino and prior to the execution of this Agreement, provide to Rhino a copy of the certificate(s) of copyright registration for the WORK(S), or documents evidencing Licensor's ownership of the property. If Licensor is not the owner of the WORK(S), Licensor will, upon request by Rhino and prior to the execution of this Agreement, provide to Rhino a copy of any and all appropriate documents or agreements by and between Licensor and the owner of the WORK(S) evidencing Licensor's right to enter into this Agreement and to grant to Rhino all of the rights, licenses and privileges granted hereunder;

(b)       Neither the WORK(S) or any part thereof, or the exercise of any of the rights granted to Rhino hereunder, will violate or infringe the trademark, tradename, contract, copyright, literary, artistic, dramatic, property or civil rights, right of privacy or any other rights whatsoever of any person or entity;

(c)       Neither Licensor nor Rhino will, at any time during the term or any extension hereof, sell, assign, encumber or grant to any other person or entity, or exercise for its own account, any of the rights, licenses or privileges granted to the other party hereunder, or any other rights, licenses or privileges that will directly compete with the rights, licenses or privileges granted to the other party hereunder;

(d)       There is no claim or litigation, pending or threatened, which may materially or adversely affect the rights, licenses and privileges granted to Rhino hereunder, or the use thereof by Rhino;

(e)       Neither the WORK(S) or any part thereof is in the public domain, and the copyrights of the WORK(S) and all literary, dramatic and musical material upon which it is based or which is contained in the WORK(S) will be valid and subsisting throughout the Territory during the term hereof. Licensor shall secure, register, renew and extend all such copyrights as may be necessary. Without limiting the foregoing obligation, Licensor hereby authorizes and empowers Rhino to register its licensing interest in the WORK(S) for copyright purposes and to secure renewals and extensions thereof in the Copyright Office of the United States of America and/or in any other country or political entity where it deems it appropriate to do so;

(f)        Neither the WORK(S) nor any part thereof has been previously sold or distributed as videograms in the Territory other than pursuant to this Agreement, or as disclosed to Rhino on Exhibit "A" hereunder;

(g)       Licensor has not heretofore authorized, nor will it at any time during the term or any extension hereof authorize, any other person or entity to import videograms of the WORK(S) into the Territory;

(h)       All rights granted to Rhino hereunder are and will be free and clear of any liens, restrictions, claims and encumbrances of any kind, and all royalties, license fees and/or other fees required to be paid in connection with said rights, or the use, distribution, performance or exploitation of the WORK(S) hereunder (and the music and all other matter contained therein) will be paid by Licensor, including but not limited to all payments on account of or arising from:

(i)        Any claims or rights of owners of copyrights or other property rights in the WORK(S), or in any music or other material contained therein;

(ii)       Any claims or rights of any performing rights society or any body or group representing authors, composers, musicians, artists, publishers or other persons having legal or contractual rights of any kind to participate in the receipts of the WORK(S); and

3

CC3324

(iii)    Any other claims or rights with respect to the use, distribution and exploitation of the WORK(S) as contemplated hereunder, including but not limited to any guild and/or union residuals, reuse payments or other similar payments, which shall be Licensor's sole obligation;

(i)    Licensor shall at its sole cost and expense take all reasonable steps to protect all copyrights and other rights pertaining to the WORK(S) from infringement by unauthorized parties and, in particular, shall initiate such action and proceedings as may be reasonably required to prevent any unauthorized use by third parties of the WORK(S) or any part thereof. If Licensor fails to initiate any such action, Rhino may, in its sole discretion, and at Licensor's sole cost and expense, initiate such action in its own name and/or Licensor's name and may join Licensor as a party thereto.

6.    INDEMNITY
Reference is made to the indemnity provision set forth in Section (i) of Exhibit "A."

7.    INSURANCE
Licensor will maintain, at its own expense, at all times during the term hereunder and for three (3) years thereafter, and with a reasonable insurance carrier acceptable to Rhino, at least a One Million Dollar ($1,000,000.00) combined single limit liability insurance policy with respect to the WORK(S).

8.    DISTRIBUTION AND EXPLOITATION
(a)    Rhino shall have the complete, exclusive and unqualified right to promote, distribute and exploit videograms of the WORK(S) throughout the Territory and each part thereof, during the term and any extension hereof, in accordance with such methods, policies, terms and conditions as Rhino in its reasonable business judgment may determine proper or expedient. The failure of Rhino in its sound business judgment to exercise any of the rights granted hereunder in any portion of the Territory shall not be deemed to be an abandonment or relinquishment of such rights.

(b)    Notwithstanding the foregoing, Rhino will not promote the WORK(S) through any medium that is inappropriate for children's videos (e.g., Playboy, adult websites, etc.).

9.    BOOKS AND RECORDS
(a)    All accountings rendered by Rhino shall be deemed conclusive unless objections in writing, specifying all objections with particularity, are received by Rhino within two (2) years from the date such accounting is rendered. Rhino shall not be obligated to keep any books or records pertaining to this Agreement for any period exceeding two (2) years from the date the accounting derived therefrom is rendered unless specific objections to any such accounting have been received pursuant to this paragraph. Licensor shall maintain no action, claim, or proceeding against Rhino with respect to any accounting or statement rendered by Rhino hereunder unless such action, claim or proceeding is commenced within two (2) years after such accounting or statement is rendered.

(b)    A certified public accountant, on Licensor's behalf, may, at Licensor's sole cost, examine Rhino's books or records with respect to the WORK(S) hereunder, but only during Rhino's normal business hours and after reasonable written notice, and no more than once within each twelve (12) month period or once with respect to any statement rendered hereunder. Licensor shall have no right to examine any books or records relating to Rhino's general business operations, or any matter other than the WORK(S) hereunder.

10.    BREACH; REMEDIES

4

000025

Except as otherwise provided herein, in the event that at any time during the term or any extension hereof either party hereto breaches any of its warranties or representation hereunder, or in the event either party fails to perform any obligation required of it under this Agreement, and such breach or failure continues for a period of thirty (30) days after written notice thereof is given by the non-breaching party, said party shall be in default hereunder and the non-breaching party may pursue any and all remedies available under this Agreement, by law or at equity, except that if the nature of the breach is such that it cannot be reasonably cured within said thirty (30) day period, and within said thirty (30) day period the breaching party takes substantial measures towards curing the breach and within a reasonable time thereafter diligently pursues such cure to completion, such party shall not be deemed to be in default hereunder.

11. RESOLUTION OF CONTROVERSIES

(a)     In the event of any litigation between the parties hereto to enforce any of the provisions hereunder, the unsuccessful party to such litigation covenants and agrees to pay to the successful party therein all costs and expenses, including but not limited to reasonable attorneys' fees incurred therein by such successful party, which costs, expenses and attorneys' fees shall be included in and as a part of any judgment rendered in such litigation.

(b)     In the event of a breach of this Agreement by Rhino, Licensor shall be limited to its right, if any, to recover money damages, and shall not be entitled to injunctive or other equitable relief.

12. FORCE MAJEURE

If, because of any act of God, accident, strike, fire, riot, war or any other cause not within Rhino's control, Rhino is prevented from performing any of its obligations hereunder, then Rhino may suspend the term hereof for the duration of the force majeure, but not for longer than six (6) months. If such force majeure continues beyond said period, Rhino shall, within an additional thirty (30) days, subcontract or sublicense a third party to manufacture and sell videograms of the WORK(S). If Rhino fails to thus subcontract or sublicense its obligations, Licensor may terminate this Agreement. If Licensor does not so terminate this Agreement, the term hereof shall be extended by a period of time equal to the period of the duration of the force majeure.

13. RELATIONSHIP OF PARTIES

(a)     The relationship between Licensor and Rhino is that of creditor and debtor with respect to the payment of any monies due Licensor hereunder. Nothing contained herein shall be construed to create a trust or specific fund as to royalties or any other monies, or to prevent or preclude Rhino from commingling any monies due Licensor with any other monies.

(b)     This Agreement shall not be construed as creating a joint venture or partnership between Licensor and Rhino. Neither party shall have any authority to bind the other or the other's representatives in any way except as expressly provided to the contrary herein. The provisions of this clause are not intended to destroy or diminish in any way the rights, licenses and privileges granted to Rhino with respect to the WORK(S).

14. ASSIGNABILITY

Rhino may assign this Agreement to any parent, subsidiary or affiliate entity, or to any financially responsible entity which acquires substantially all of Rhino's stock or assets through merger, consolidation or other reorganization, subject to Licensor's consent, not to be unreasonably withheld. Any such assignee (or sub-assignee) shall prospectively assume all contractual obligations of the assigned party hereunder. This agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective successors, permitted assigns, heirs, executors, administrators and legal and personal representatives.

15. NOTICES

5

000026

(a)     Except as expressly provided to the contrary herein, all notices and demands of any kind which the parties hereto may require or desire to serve upon each other shall be in writing and shall be served by sending such notice certified or registered mail, postage prepaid, with return receipt requested, to the address of each party as listed below:

| If to RHINO: | Vice President |
|---|---|
| | Business & Legal Affairs |
| | Rhino Entertainment Company |
| | 10635 Santa Monica Blvd. |
| | Los Angeles, CA 90025-4900 |
| | |
| If to LICENSOR: | Kerry Romeo |
| | Director of Sales and Acquisitions |
| | Sunbow Entertainment |
| | 100 Fifth Avenue |
| | New York, NY 10011 |

(b)     In case of service by mail, service shall be deemed complete on the date of actual delivery as shown by the registration or certification receipt or at the expiration of the third day after the date of the mailing, whatever first occurs. The addresses to which notices and demands shall be delivered or sent may be changed from time to time by notice served as hereinabove provided by any party upon any other party.

16.    VIDEOGRAMS
"Videograms" are herein defined as all forms of audiovisual devices, including but not limited to videocassette, and such video devices now known or hereafter devised that enable the WORK(S) to be received visually when used in combination with or as part of a piece of electronic, mechanical or other apparatus, through a playback system or device.

17.    GENERAL PROVISIONS
(a)     Entire Agreement: This Agreement contains the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements between the parties with respect thereto. No claim of waiver, modification, consent or acquiescence with respect to any provision of this Agreement shall be made against either party hereto except on the basis of a written instrument executed by or on behalf of the party to be charged.

(b)     Construction: Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be valid under applicable law, but if any provision of this Agreement shall be invalid or prohibited thereunder, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

(c)  .   Successors and Assigns: Except as otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of the successors and assigns of each of the parties hereto.

(d)     Paragraph Headings: The headings of the several paragraphs of this Agreement are inserted solely for convenience of reference, and are not a part of and are not intended to govern, limit or aid in the construction of any term or provision hereof.

(e)     Person and Tense: Whenever necessary herein, all terms used in the singular shall apply to the plural and vice versa, and all terms used in the neuter shall apply to the masculine and feminine genders and vice versa.

6

003027

(f)    Governing Law:  This Agreement is to be governed by and construed in accordance with the laws of the State of New York, applicable to agreements executed and wholly to be performed therein.

(g)    Execution in Counterparts:  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but such counterparts together constitute only one and the same instrument.

(h)    Cumulative Remedies:  All rights and remedies granted to any party hereunder shall be cumulative and shall not interfere with or prevent the exercise of any other right or remedy which may be available to such party.

(i)    Reservation of Rights:  All rights in and to the WORK(S) not specifically granted to Rhino hereunder are hereby reserved by Licensor.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first set forth above

RHINO                                          LICENSOR

RHINO ENTERTAINMENT COMPANY                    SUNBOW ENTERTAINMENT
d/b/a RHINO HOME VIDEO

By:_____                     By:_____
Date:_____ 7/21/00                          Date:_____ 7/17/00
                                               Fed ID #:        SAM MILLSTONE
                                                        VP FINANCE AND OPERATIONS
                                                        CHIEF FINANCIAL OFFICER

F:\USER\CKAMINS\MS_WORD\PROJECTS\Video\My Little Pony\Agreement2.doc

000028

EXHIBIT "A"

Exhibit "A" to that certain Exclusive License Agreement entered into by and between Rhino Entertainment Company d/b/a Rhino Home Video ("Rhino") and Sunbow Entertainment ("Licensor") dated this 18th day of April, 2000.

(a) Work(s): -

(1) The following animated, color programs related to the children's television series "My Little Pony" (the "Programs"):

(i) 90-minute "My Little Pony" theatrical movie;

(ii) "My Little Pony" original series consisting of sixty-five (65) 15-minute episodes:

(iii) "My Little Pony Tales" consisting of twenty-six (26) 15-minute episodes.

(2) Rhino shall have the right to release the Programs individually as WORK(S) or to create new WORK(S), other than that described above, by combining multiple Programs so as to tell a complete story ("New Compilation(s)"). Rhino shall also have access to pre-edited compilations ("Pre-edited Compilation(s)") for use in the creation of the WORK(S), at no additional charge, where available. Rhino shall retain the right to edit the Pre-edited Compilation(s) for creation of the WORK(S) at Rhino's own cost. In the event Rhino creates New Compilations for creation of the WORK(S), Rhino shall pay for all costs pertaining to the New Compilation(s), with those costs to be absorbed by Rhino. Rhino shall also pay all costs pertaining to the creation of any DVD packages, with those costs to be absorbed by Rhino.

(3) Notwithstanding the foregoing, Rhino shall not, at any time, alter the Programs as delivered in any way for use in these New Compilation(s).

(4) Rhino shall have the right to include a promotional trailer or video for other Rhino products on the WORK(S) and have the right to compile multiple Programs onto a single cassette for custom packages or special releases subject to Hasbro's reasonable approval. In the event said approval is not received within 10 business days of submission, Rhino shall assume that approval has been given.

(5) Rhino shall be responsible for all editing costs related to (a)(3) through (a)(4), said amount not to be recoupable against royalties. In the event the New Compilation(s) are licensed by·Licensor for release on video in other territories, Licensor will reimburse Rhino fifty percent (50%) of Rhino's editing costs.

(b) Media:

Home Video, in all formats now known or hereafter devised, including but not limited to video cassette, all video disc configurations (including DVD) and 8mm formats. Specifically excluded are all

8

003029

interactive, broadcast, cable, syndication, satellite, on-line or other transmission rights, except as specifically noted herein.

(c) Territory:    The United States, its territories and possessions.

(d) Term:    Five (5) years from the release of each WORK(S). There shall also be a six (6) month sell off period for each WORK(S) at the end of the initial Term for such WORK(S) provided Rhino shall not have the right to manufacture additional units of the WORK(S) past the end of the initial Term.

(e) Recoupable Advance:    A total of fifty thousand dollars ($50,000.00), payable as follows: (i) fifty percent (50%) upon execution of this Agreement and substantiation of Licensor's right to enter into this Agreement; (ii) fifty percent (50%) upon delivery and acceptance of master video and art elements requested for those Programs that Rhino has targeted 'for release in the immediate future ("Initial Programs"). Rhino shall provide Licensor a list of the Initial Programs upon execution of the Agreement. The Advance is to be cross collateralized against all royalties payable to Licensor for the WORK(S) hereunder.

(f) Royalties:    The royalty payable to Licensor hereunder shall be as follows: (i) 25% of Rhino's wholesale, for all videos with a SRLP of $19.95 and above; (ii) 20% of wholesale, for all videos with a SRLP of between $14.95 and $19.94; and (iii) 15% of wholesale, for all videos with a SRLP of between $10.00 and $14.94; (iv) 12% of wholesale, for all videos with a SRLP of between $7.95 and $9.99; and (v) 10% of wholesale, for all videos with a SRLP under $7.95.

Rhino shall retain the right to establish prices as indicated by market conditions and change prices at any time, but in no case shall Rhino offer the WORK(S) for less than $7.95 without prior written approval from Licensor.

The royalty percentage shall be based on Rhino's landed wholesale price ("LWP"), which is defined as Rhino's wholesale selling price ("wholesale") of each WORK(S), less a deduction of six percent (6%) as a fee paid to WEA for handling fulfillment and collections.

The LWP shall fluctuate in accordance with Rhino's suggested retail list price ("SRLP") and is inclusive of any third party royalties, including but not limited to payments to producers, union, sychronization, and mechanical license fees.

There will be no other deductions taken with the exception of prebook discounts, offered as an incentive to obtain initial product placement and re-stocking WORK(S). Licensor shall retain the reasonable right of approval of any other discount programs that would lessen the anticipated revenues paid to Licensor.

Notwithstanding the foregoing, when product is sold through mail order, direct response or video clubs (e.g. Columbia House); sublicensed for release on all home video formats, now known or hereinafter developed, including but not limited to video cassette, all

9

000030

video disc configurations (including DVD) and 8mm formats; exploited as part of a promotional program, as a premium, or in connection with the sale of any product, commodity, or service, Rhino and Licensor shall equally split all advances and royalties paid or credited to Rhino, less all third party payments by Rhino, including but not limited to duplication and packaging costs, and any and all costs incurred in the marketing or manufacturing of the WORK(S). The term "royalties" shall not include any monies paid or credited to Rhino as reimbursement for finished goods.

(g) Delivery:

(1) Master(s): First generation, first quality, master video elements on an NTSC Digi Beta or D-2 master format, with all commercial blacks edited out, to be delivered upon execution of contract;

> (i) The costs of editing out the commercial blacks and promotional spots will be paid by Licensor.

> (ii) Rhino may be charged reasonable material fees for the creation of the Master(s) as all elements that may be needed may not exist in either Digi Beta or D-2 configurations. Rhino shall retain the right to have such editing done at the lab facility of Rhino's choice and cost.

> (iii) If the original source Master(s) provided by Licensor for any particular Program is defective, Licensor will provide an additional Master(s), at no cost to Rhino, and will reimburse Rhino for any additional transfer costs incurred.

> (iv) If Licensor is unable to provide an acceptable replacement for the defective Master(s) referenced in subparagraph (iii) above, Rhino shall have the right to delete the Program in question from this Agreement and reduce the Advance accordingly.

(2) Packaging and Collateral Materials: Elements needed for the creation of packaging and collateral materials, including but not limited to photographs and slides featuring performers as they appear in the WORK(S);

> (i) Licensor warrants that they have, control and will provide such elements to Rhino and/or that Rhino shall have reasonable access to same based on availability.

> (ii) Prior to the execution of this Agreement, Licensor shall apprise Rhino of what elements are available as well as to the format in which they exist.

> (iii) Both parties acknowledge that ownership of these elements are retained by Licensor and that these elements may only be used in the sale and promotion of the Licensed Titles, as set forth hereunder.

(3) Advertising Materials: Copies of advertisements and other advertising materials prepared by or for LICENSOR in connection with

10

000331

the WORK(S) (including publicity stills, photographs and other transparencies of the artwork relating to the WORK(S)) suitable for use in creating advertising and merchandising devices for the videograms; upon execution of contract.

(4) Credits: The statement of credits applicable to the WORK(S) (for use in according credit on videograms and the packaging thereof), which statement of credits shall in all respects be compiled by Rhino; upon execution of contract.

(5) Theatrical Rating (where applicable): The theatrical rating given the WORK(S) by the Motion Picture Association of America ("MPAA"), or other motion picture rating association; when available.

(6) Press Kit: A press kit or press book for the WORK(S); when available.

(7) Copyright: Detailed information as to the appropriate copyright notice, symbols and wording to be affixed to videograms and the packaging thereof; upon execution of contract.

(h) Special Package(s): (1) Subject to Licensor's approval not to be unreasonably withheld, Rhino shall retain the right to create special packages that include the WORK(S) along with other promotional or licensed goods such as posters, t-shirts, or pins, as value added on-pack items ("special package(s)"), and sell the special package(s) at a retail price higher that the video alone.

(2) In the event that any of the WORK(S) are coupled with products not directly licensed to Rhino by Licensor ("additional merchandise"), the royalty paid by Rhino to Licensor for such special package(s) containing such additional merchandise shall be based on either the suggested wholesale price of the video portion of the release or a pro-ration to be negotiated by the parties in good faith prior to the release of the special package(s).

(3) Rhino shall have the right to offer said additional merchandise for the sale and apart from the WORK(S) by any means, including but not limited to inclusion of so-called "tip in cards" or by including spots on the actual WORK(S). Licensor hereby acknowledges that it shall receive no revenues from the sales of additional merchandise separate and apart from the WORK(S).

(i) Warranties & Indemnification: (1) Licensor warrants that neither the WORK(S) nor any part thereof is in the public domain, and the copyrights in and to the WORK(S) and all literary, dramatic and musical material upon which the WORK(S) is based or which is contained in the WORK(S) will be valid and subsisting in the Territory throughout the Term hereunder. Licensor shall secure, register, renew and extend all such copyrights as may be necessary. Without limiting the foregoing obligation, Licensor hereby authorizes and empowers Rhino to register its licensing interest in the WORK(S) for copyright purposes and to secure renewals and extensions thereof in the Copyright Office of the

11

000032

United States of America and/or in any other country or political entity where it deems it appropriate to do so.

(2) Licensor further warrants that all mechanical, synchronization, master, use, name and likeness, union, performance and any other third party clearances with respect to the WORK(S) have been obtained; that such clearances are now, and through the Term of this agreement shall be in effect; and that Rhino shall have no aditional financial responsibilities with respect to any such clearances.

(3) Prior to the execution of this Agreement, Licensor shall provide Rhino with substantiation of their right to enter into this Agreement, including but not limited to a copy of the certificate(s) of copyright registration (or other documentation evidencing chain of title), and any documentation pertaining to the rights and clearances indicated in the preceding paragraph. Should Licensor be unable to provide said copy of the certificate(s) of copyright registration (or other documentation evidencing chain of title), Rhino shall have the right to conduct a copyright search relating to the WORK(S), the cost of which shall be treated as an additional recoupable expense hereunder.

(4) Licensor agrees to defend, indemnify and hold Rhino, and each of its directors, officers, agents, employees, sublicensees and distributors harmless from any liability, damages, judgment, settlement, cost or expense, including reasonable attorneys' fees, incurred in connection with or arising out of any breach or failure of any of Licensor's covenants, representations and warranties under this Agreement. In the alternative, Rhino, in Rhino's sole discretion, shall have the right to defend any such action, at Licensor's sole cost and expense. In the event of any such decision to defend by Rhino, the indemnity provision by Licensor of Rhino contained within this paragraph shall still apply.

(5) As to any matter to which the foregoing indemnity relates, Rhino may, in addition to all other rights it may have, withhold from payments due Licensor a sum which is reasonably necessary to satisfy any judgment or settlement approved by Licensor in connection with such matter, plus a reasonable amount to cover the expenses of contesting or defending such claim, and Rhino may further apply the amount withheld to the satisfaction of such judgment or settlement approved by Licensor and to reimbursement of such expenses.

(6) Rhino agrees to defend, indemnify and hold Licensor, and each of its directors, officers, agents, employees, sublicensees and distributors harmless from any liability, damages, judgment, settlement, cost or expense, including reasonable attorneys' fees, incurred in connection with or arising out of any breach or failure of any of Rhino's covenants, representations and warranties under this Agreement. In the alternative, Licensor, in Licensor's sole discretion, shall have the right to defend any such action, at Rhino's sole cost and expense. In the event of any such decision to defend by Licensor, the indemnity provision by Rhino of Licensor contained within this paragraph shall still apply.

12

CC0033

(j) Promotional Uses:

(1) Rhino shall have the right to creat promotional items in supports of the WORK(S). These items will not be made available for sale and will only be offered as promotional items within the trade.

(2)Licensor will make best efforts to aid Rhino in coordinating promotions and sales with other licensees. Licensor shall provide Rhino with a list of other principal licensors of products for the Programs, or have Hasbro provide same, which will include contact names, address and phone/fax information.

(3) Licensor will provide access, at no charge to Rhino, to any and all fan and/or consumer mailing lists developed that pertain to the Programs, for use during the Term for sale of the WORK(S) only.

(4) Licensor agrees to provide access to those character costumes that may be available, for promotional purposes, including but not limited to press and other public relations support, trade shows and store openings, amoung other uses.

(5) Rhino shall have the right to utilize not more than thirty (30) seconds from each of the Programs for broadcast promotional use only.

(6) Rhino shall have the non-exclusive right to stream no more than thirty (30) seconds from each of the Programs via any Rhino and/or Time-Warner owned, controlled or affiliated sites, for the sole purpose of promoting the WORK(S).

(k) Additional Comments:

(1) It is understood that certain Programs were previously released on home video by a number of companies, including but not limited to Family Home Entertainment, LIVE Entertainment, Golden Books Video, Video Treasures, Image Entertainment and Vestron Video. Licensor warrants that all rights and sell off periods have lapsed, and that specific information as to previous licensors and when those licenses lapsed will be provided to Rhino prior to execution of this Agreement.

(2) It is understood that no episodes from "My Little Pony Tales" were ever release on home video.

(3) For the purposes of this Agreement, it is understood that Hasbro retains underlying rights in and to these programs and will retain the reasonable right of approval for certain elements, as outlined herein.

(4) All rights not granted to Rhino are reserved to Licensor for use without restriction, and Rhino acknowledges that the name of the Programs, the characters, character designs and likenesses are owned and/or controlled by Licensor, and that Rhino will not challenge, copy or imitate such names or rights during or after the Term ends.

13

CC0034

(5) In the event a discrepancy exists between the Standard Terms and Provisions and this Exhibit "A", Exhibit "A" shall prevail.

RHINO

RHINO ENTERTAINMENT COMPANY
d/b/a RHINO-HOME VIDEO

By: _____

Date: _____ 7/21/00 _____

LICENSOR

SUNBOW ENTERTAINMENT

By: _____

Date: _____ 7/17/00 _____   SAM MILLSTONE
                       VP FINANCE AND OPERATIONS
Fed ID #: _____   CHIEF FINANCIAL OFFICER

14

CC0035

# FIRST AMENDMENT

#30126

as of January 22, 2002

Reference is made to that certain Exclusive License Agreement ("Agreement") dated March 12, 1999, by and between Rhino Entertainment Company, d/b/a Rhino Home Video, ("Rhino") at 10635 Santa Monica Boulevard, Los Angeles, California 90025 and Chad Entertainment, LLC (formerly known as Sunbow Entertainment, LLC), ("Licensor") at 550 Madison Avenue, New York New York 10022, concerning the exploitation on home video formats of the individual episodes comprising the "G.I. Joe Original" programs produced from 1983 to 1989 as well as other titles. All terms defined in the Agreement shall have the same meaning in this First Amendment.

WHEREAS, the parties hereto desire to amend the Agreement as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and in the Agreement, the parties hereto agree as follows:

1.      Licensor hereby waives its share of advances and royalties paid or credited to Rhino, as set forth in Paragraph F of Exhibit "A" of the Agreement, solely with respect to the premium offer of one (1) videocassette embodying Rhino's previously released "G.I. Joe" Vol. 4, 7, 8 or 9 bundled with a Hasbro G.I. Joe toy for sales initiating in the year 2002.

2.      Promptly following execution hereof, Rhino agrees to pay to Licensee $17,500.00, which is the second half advance payment in regard to the Exclusive License Agreement between Rhino and Licensor dated April 18, 2000, provided that it is understood and agreed that Rhino has not been delivered masters and art elements for "Robotix" and "Visionaries", and that licensor shall deliver same within 45 days after execution of this First Amendment. If such payment is not received by Licensor within such period, then this First Amendment shall be null and void and have no further force and effect.

3.      This First Amendment may be executed via facsimile and such facsimile shall be deemed an original hereof. The parties, however, shall deliver two (2) fully executed hard copy originals to each other promptly following execution hereof.
///
///
///
///
///
///
///
///
///
///

CC0041

4.      Except as amended hereby, the Agreement is hereby ratified and shall remain in

full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment as of the date first above written.

RHINO ENTERTAINMENT COMPANY,
d/b/a RHINO HOME VIDEO

By: _____
Amy Schorr

Its: Senior Vice/President, General Manager,
Rhino Home Video

CHAD ENTERTAINMENT, LLC

By: _____ M. Yulle_____

Its: _____

000043

3004<sub></sub>



**HOME VIDEO**

**revised** March 12, 1999

Kerry Romeo
Director of Sales and Acquisitions
Sunbow Entertainment
100 Fifth Ave.
New York, NY 10011

Dear Kerry,

Per your discussion with Craig Kamins, following is a revised copy of the deal memo for the JEM, Transformers and G.I. Joe programs:

**A. WORK(S)/PROGRAM(S):** Exclusive English language home video rights to the following three (3) children's television series:

1. "JEM"
    65 half hour programs, produced in 1987
2. "Transformers"
    "Transformers Takara"
        115 half hour programs, produced in Japan in the 1980's
    "Transformers Original"
        46 half hours programs, produced between 1984 and 1988.
    "Transformers Generation 2"
        52 half hours that were re-edited with computer generated graphics added in 1994
    "Transformers- The Movie"
        1 ninety (90) minute feature film.
3. "G.I. Joe"
    "G.I. Joe Original"
        95 animated half hour programs produced from 1983 to 1989
    "G.I. Joe- The Movie"
        1 ninety (90) minute feature length movie

All programs are animated and in color.

It is understood that the programs may exist in configurations other than that outlined herein, specifically, there may be 60, 90 and 150 minute programs created by compiling multiple episodes so as to tell a complete story, and that Rhino shall have access to the pre-edited episode compilations, at no additional charge, where available. Rhino will also retain the right to edit the materials at their own cost.

**B. RIGHTS:** The exclusive right to produce, manufacture, market and sell in the territory all home video formats, now known or hereinafter developed, including but not limited to video cassette, all video disc configurations, and 8mm formats.

Specifically excluded are all interactive, broadcast, cable, syndication, satellite, on-line or other transmission rights.

**C. TERRITORY:** The United States, its territories and possessions.

**D. TERM:** Five (5) years from the earlier of the release of the first program(s) by Rhino or 120 days after Delivery, as defined in Section E below. It is contemplated that the release of the first program(s) by Rhino shall occur in September 1999. There shall also be a six (6) month sell off period at the end of the Term.

**E. RECOUPABLE ADVANCE:** A total of one hundred twenty five thousand dollars ($125,000.00), payable one half upon execution of this deal memo and substantiation of Licensor's rights to enter into an Agreement, and one half upon delivery and acceptance by Rhino of master video and art elements for at least 10 JEM programs, 30 Transformers programs and 30 GI Joe programs ("Delivery"), receipt of which is hereby acknowledged.

We have allocated the advance to each series as follows:
1. JEM...$25,000.00
2. Transformers...$50,000.00
3. G.I. Joe...$50,000.00

**F. ROYALTY:**
The royalty percentage will be based on Rhino's landed wholesale price, will fluctuate in accordance with Rhino's suggested retail list price and is inclusive of any and all third party royalties, including but not limited to royalties and producers, union, synchronization, and mechanical license fees.

| SUGGESTED RETAIL | ROYALTY |
|---|---|
| $19.95 and above suggested retail | 25% of wholesale |
| $14.95 to $19.94 | 20% of wholesale |
| $10.00 to $14.94 | 15% of wholesale |
| $7.95 to $9.99 suggested retail | 12% of wholesale |
| under $7.95 suggested retail | 10% of wholesale |

We anticipate offering product at prices ranging from $7.95 to $19.95 but Rhino shall reserve the right to establish prices as indicated by market conditions. There will be nothing that will impact or limit our rights to change them at any time but in no case will Rhino offer the programs at a price less than $7.95 without prior written approval from Licensor.

The landed price is determined by taking the wholesale price of each program, less a deduction of 6% as a fee paid to WEA for handling fulfillment and collections. There will be no other deductions taken with the exception of prebook discounts, offered as an incentive to obtain initial product placement, and re-stocking programs. These discounts usually are in the range of 3% of the wholesale price.

Licensor shall retain the reasonable right of approval of any other discount programs that would lessen the anticipated revenues paid to Licensor.

When product is sold through television direct response, video clubs (eg: Columbia House), when sublicensed for release on disc and/or 8mm, exploited as part of a promotional program or distributed as a premium or in connection with the sale of any

000037

product, commodity or service, Rhino and Licensor shall equally split all advances and/or royalties paid or credited to Rhino, less any direct out of pocket costs paid or credited against Rhino for the release of the product. The term 'royalties' shall not include any monies paid or credited to Rhino as reimbursement for finished goods, at Rhino's actual cost.

## G. ADDITIONAL COMMENTS:

1. Licensor warrants that all mechanical, synchronization, master, name and likeness, performer, performance, union and any and all third party clearances have been or will be obtained prior to the release of the product and that now and through the Term of this Agreement, such clearances shall be in effect and that Rhino shall only have royalty obligations to Licensor.

2.a. Licensor agrees to defend, indemnify and hold Rhino, and each of its directors, officers, agents, employees, sublicensees and distributors harmless from any liability, damages, judgement, settlement, cost or expense, including reasonable third party attorney's fees, incurred in connection with or arising out of any breach or failure of any of Licensor's covenants, representations and warranties hereunder.

2.b. Rhino agrees to defend, indemnify and hold Licensor, and each of its directors, officers, agents, employees, sublicensees and distributors harmless from any liability, damages, judgement, settlement, cost or expense, including reasonable third party attorney's fees, incurred in connection with or arising out of any breach or failure of any of Rhino's covenants, representations and warranties hereunder.

3. Licensor warrants that all programming licensed to Rhino is now and through the term of the Agreement, protected by copyright in the territory.

4. Licensor shall deliver to master video elements on an NTSC Digi Beta or D-2 master format, with all commercial blacks edited out. Reasonable material fees may be paid for by Rhino as all elements that may be needed may not exist in either digi beta or D-2 configurations. Rhino will retain the right to have such editing done at the lab facility of their choice and cost.

5. Licensor warrants that they have and control elements needed for the creation of packaging and collateral materials, including but not limited to photographs and slides picturing those characters featured in the programs and that Rhino shall have reasonable access to same. Rhino acknowledges that ownership of these elements are retained by Licensor and that these elements may only be used in the sale and promotion of the licensed programs.

6.a. Rhino shall have the right to release the programs as delivered and/or to compile the programs into configurations that Rhino, at it's sole discretion, may determine to be more saleable. In the event Rhino does compile program(s), Rhino shall be pay for the all costs pertaining to the compilation, with those costs to be absorbed by Rhino. In no event shall Rhino create compilations that contain programs from more than one series and/or compile the programs with programs controlled by third parties.

6.b. It is understood that Rhino may not, at any time, alter the programs as delivered in any way, for use in these compilations.

6.c. With reasonable approval from Hasbro, Rhino shall have the right to include a promotional trailer or video for other Rhino product and have the right to compile multiple programs onto a single cassette for custom packages or special releases. In the

000038

event said approval is not received from Hasbro within 15 business days of submission, it will be assume approval has been granted.

6.d. Rhino shall be responsible for all editing costs related to paragraphs 6.a. through 6.c., said amount not to be recoupable. In the event that Licensor makes use of such edited programs outside of the Territory, hereunder, Licensor shall reimburse Rhino (from the revenue generated from such usages) up to 50% of its editing costs.

7.a.Rhino may chose, with the reasonable approval of Hasbro, to create special packages that include other goods not licensed from Licensor, and embodying characters appearing in the programs, including but not limited to toys, posters, t-shirts, or hats, as value added on-pack items, and sell the special packages at a retail price higher than the video or audio alone (with a corresponding increase to the wholesale price).

7.b. Rhino shall be obligated to purchase or manufacture these third party goods at their own expense.

7.c. In the event that the video programs are coupled with those products not directly licensed to Rhino by Licensor, the royalty paid by Rhino to Licensor shall be based on the previously established landed wholesale price of the video portion of the release.

7.d. Should Rhino offer these third party licensed goods for sale seperately by any means, including but not limited to inclusion of insert cards or by including spots on the actual programs, shall not be obligated to pay Licensor any fees or royalties generated from those sales.

7.e. It is understood that merchandising rights for non-video product are controlled by an entity other than the Licensor of this programming and that Rhino shall be obligated to purchase these goods from that entity or its licensees.

7.f. Licensor will provide Rhino with a list of other principal licensors of products for the licensed series, or have Hasbro provide same, which will include contact names, address and phoone/fax information, as available.

8. Licensor will make reasonable efforts to aid Rhino in their efforts to coordinate promotions and sales with other Licensees.

9. Licensor will provide access, at no charge to Rhino, to any and all fan and/or consumer mailing lists developed that pertain to the licensed series, for use during the term for sale of the licensed programs only.

10.a. It is understood that there were extensive previous video releases, from a number of companies, including but not limited to Family Home Entertainment, LIVE Entertainment, Golden Books Video, Video Treasures, Image Entertainment and Vestron Video. Licensor warrants that all rights and sell off periods have lapsed, as follows:

    "JEM"...1994
    "Transformers"...1994
    "G.I. Joe Original"...1994
    "G.I. Joe – The Movie" ...1997

10.b. Prior to the execution of a formal Agreement, Licensor shall provide Rhino with a complete list of programming released, pricing and previous unit sales

11. All rights not granted to Rhino are reserved to Licensor for use without restriction, and Rhino acknowledges that, as between Licensor and Rhino, the name of the show, the characters, character designs and likenesses are owned and/or contolled by Licensor, including without limitation all copyright and trademark rights, and that all good will arising during the term in respect to the benefit of and is assigned to Licensor, and that Rhino will not challenge, copy or imitate such names or rights during or after the term of the Agreement ends.

12.a. Licensor agrees to provide access to those character costumes that may be available, for promotional purposes, including but not limited to press and other public relations support, trade shows and store openings, among other uses.

13. For the purposes of this agreement, it is understood that Hasbro retains underlying rights in and to these programs and will retain the right of approval for certain elements, as outlined herein.

14. At the end of the formal Agreement, Rhino shall have a period of 6 months to sell off existing inventory but manufacturing and production of product shall not continue past the date of expiration of the Term.

If the foregoing is acceptable, please indicate your acceptance by signing in the space provided below. Inasmuch as our marketing and business affairs departments have not yet had the opportunity to review and comment on this revised deal memo, I must reserve their rights to make comments and modifications thereto.

Warm regards,

Amy Schorr
Sr. Vice President

AGREED AND ACCEPTED

By: _____
Date: ___3·19·99___
Fed ID #: _____

10635 Santa Monica Blvd. Los Angeles, Ca. 90025- 4900
phone: 310 474 4778    fax: 310 441 6573

0C0040

# EXHIBIT 23

55576-0017

| SERIAL NO. | 1 |
|---|---|

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

| SERVED | |
|---|---|

ANNE BRYANT

| RECEIVED | |
|---|---|

INDEX FILED
| INDEX NO. | |
|---|---|

Plaintiff

Summons Filed:

-against-

_____ , 2002

SUNBOW PRODUCTIONS, INC.

Plaintiff designates
Rockland County as
the place of trial

Defendant

The basis of venue is
plaintiff's residence

---

## SUMMONS

To the above named Defendant: Sunbow Productions, Inc.

**YOU ARE HEREBY SUMMONED** to reply to the Complaint in this
action and to serve a copy of your answering papers, or, if the
Complaint is not served with this Summons, to serve a notice of
appearance, on the Plaintiff's Attorney(s) within 20 days after the
service of this Summons, exclusive of the day of service (or within
30 days after the service is complete if this Summons is not
personally delivered to you within the State of New York); and in
case of your failure to appear or answer, judgment will be taken
against you by default for the relief demanded.

DATED:       April 3, 2002

Defendant's address: 100 Fifth Avenue, New York, NY 10011

By: _____

Robert M. Baratta, Esq.
MONAGHAN, MONAGHAN, LAMB & MARCHISIO
Attorneys for Plaintiff
150 West 55th Street, Suite 1G
New York, New York 10019
(212) 541-6980
       -and-
25 East Salem Street
Hackensack, New Jersey 07601
(201) 488-1201

MONAGHAN, MONAGHAN
LAMB & MARCHISIO
ATTORNEYS
25 EAST SALEM STREET
HACKENSACK, NJ 07601

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

ANNE BRYANT

                                  INDEX NO.

           Plaintiff

    -against-                      **VERIFIED COMPLAINT**

Sunbow Proctions, Inc.

           Defendant

1.  Plaintiff Anne Bryant is a citizen and resident of the State of New York, residing at 21 Collaberg Road, Stony Point, New York.  She is an accomplished composer, arranger, lyricist, music producer and songwriter and has won industry awards for her compositions including Clio awards.

2.  Defendant Sunbow Productions, Inc. ("Sunbow") is a television production company that, during relevant times, had its offices at 100 Fifth Avenue, New York, NY 10011.  Defendant corporation was once owned by Griffin-Bacall, Inc., an advertising agency.  Griffin-Bacall, Inc. was owned and operated by Jules "Joe" Bacall.  Upon information and belief, GBI was sold to Sony Music in 1998.

MONAGHAN, MONAGHAN
LAMB & MARCHISIO
ATTORNEYS
35 EAST SALEM STREET
HACKENSACK, NJ 07601

## BACKGROUND

3.   In or about November, 1991, plaintiff brought an action in the Supreme Court, State of New York, County of Rockland (Index No. 8721/91) against Kinder & Co., Ltd., among others (hereafter Bryant-Kinder suit). The litigation arose out of the prior business relationship between Bryant and Clifford "Ford" Kinder ("Kinder") and an entity known as Kinder-Bryant, Ltd. in which Bryant and Kinder were officers and directors of the corporation which was engaged in the jingle business dealing with advertising agencies such as Griffin Bacal.

4.   As a result of differences which arose between Bryant and Kinder, it was determined that Kinder and Bryant would effect a corporate divorce and a property settlement, and did so by virtue of an agreement dated November 8, 1989 (known and designated as the "Separation Agreement").

5.   Among other things, the Kinder-Bryant litigation alleged that Kinder had breached the Agreement, owed Bryant an accounting, had breached fiduciary duties, had converted certain royalties and other monies due and owing to Bryant; and further alleged that Kinder had engaged in fraud and a conspiracy to convert monies due plaintiff.

MONAGHAN, MONAGHAN
LAMB & MARCHISIO
ATTORNEYS
20 EAST SALEM STREET
HACKENSACK, NJ 07601

2

## SETTLEMENT OF BRYANT-KINDER LITIGATION

6.   Following extensive discovery, document production and negotiations, the Bryant-Kinder suit was settled on or about September 21, 1994.  The essentials of the settlement were set forth in the record before the Hon. Howard Miller, J.S.C.

7.   Prior to the settlement and in connection therewith, specific representations were made to plaintiff by Kinder concerning the then existing registrations with Broadway Music, Inc. ("BMI").

8.  BMI is a performing rights society that, along with the American Society of Composers and Publishers ("ASCAP") is an organization comprised of publisher members and writer members which, as transferee of its members such as the plaintiff Anne Bryant, licenses the non-dramatic performing rights in the musical works of its members.  BMI monitors, pools and collects royalty payments due to writers and publishers and then, in exchange for good and valuable consideration to it, distributes payments to its member writers and publishers in accordance with a formula and schedule relative to the respective parties' contribution to the compositions.

9.   During the course of their relationship, Kinder and

MONAGHAN, MONAGHAN
LANG & MARCHISIO
ATTORNEYS
25 EAST SALEM STREET
HACKENSACK, NJ 07401

3

Bryant were the principal suppliers of music and lyrics for Griffin Bacal, an advertising agency, which selected music for its client Hasbro which marketed a number of popular toy products including, but not limited to, the Transformers, My Little Pony, Jem and G.I Joe. All musical titles which were produced by Bryant-Kinder were listed in plaintiff's name. As between Bryant and Kinder, the parties divided their profits from any such royalties received from BMI on a fifty/fifty basis. Griffin Bacal, as publisher, also received a portion of publishing royalties through BMI. All of the foregoing was done for the mutual benefit of plaintiff, Kinder and Griffin/Bacal. Plaintiff's compositions actually out-earned Kinder's compositions through BMI by at least a two to one ratio. The foregoing arrangement was established by Kinder, Griffin/Bacal and William Dobishinski through Tamad, Inc. which administered and received the royalties and then made distributions to the interested parties.

10. As will be shown hereafter, Sunbow Productions caused musical compositions and musical cues, which were formerly registered in plaintiff's BMI account, to be altered and re-registered in a manner to benefit Kinder, Griffin-Bacal and Bacal, both before and after said settlement.

MONAGHAN, MONAGHAN
LAMB & MARCHISIO
ATTORNEYS
ES EASY SALEM STREET
HACKENSACK, NJ 07601

4

## REGISTRATION OF MUSICAL COMPOSITIONS WITH BMI

11.    Defendant Sunbow knowingly and without plaintiff's
knowledge caused the re-registration of plaintiff's titles and
compositions registered to her, without plaintiff's consent or
approval.

12.    Set forth in Exhibit A hereafter are the some of the
songs, title and musical cues and themes which were registered
with BMI in her name and her account and the dates of re-
registration and the change in credits.

13. G.I. Joe: As aforesaid, from the time of the settlement
with Kinder, Bryant was to receive the entire writer's share
relative to the music for various G.I. Joe "themes" (a Hasbro
product).    This included G.I. Joe/G.I. Joe Main Theme/G.I. Joe
Theme/G.I. Joe Avg/American Hero/G.I. Joe PM/G.I. Joe/Bryant PM,
and numerous G.I. Joe episode themes.

14. My Little Pony: As aforesaid, from the time of the
settlement with Kinder, Bryant was to receive the entire
writer's share relative to the music for the My Little Pony
themes.    My Little Pony themes were fraudulently re-registered
in 1993, according to the information recently received from
BMI.    With respect to the "My Little Pony and Friends" theme,
such was wrongfully re-registered in June of 1993 to accomplish

MONAGHAN, MONAGHAN
LAMB & MARCHISIO
ATTORNEYS
25 EAST SALEM STREET
HACKENSACK, NJ 07601

5

a sharing in the music royalties of twenty-five percent to Bryant, twenty-five percent to Kinder.   Sunbow fraudulently effected the re-registration.

15.  <u>The Transformers</u>:   The musical theme for the Hasbro Products "Transformers" was composed by Bryant (50%) with lyrics by Bacal (50%) (the "writers share" of 100%) and upon information and belief, registered accordingly in 1983 or 1984 at BMI.  Kinder had no participation in the musical composition. The Transformers theme has been re-registered on numerous occasions, upon information and belief beginning on 8/25/94, to benefit Kinder by granting him writer's shares of from 50% to 83.40%, (see Exhibit A). This is false and fraudulent, as Kinder had no interest in the musical theme.

16.  Registrations in 1988 of the Transformers "From film" reduce Bryant's writer share from 50% to 20%, crediting Kinder 20% and Bacal 10%.

17.  Re-registrations in 1994 and 1998 of instrumental versions of the Transformers musical theme have been wrongfully divided to benefit Joe Bacal, the lyricist, (See Exhibit A.). The foregoing compositions were solely musical cues written based upon music composed by Bryant with no involvement from Bacal.

18. Plaintiff Bryant and Kinder, while in business together
(Kinder and Bryant, Ltd., 1983-1989) had a policy by which all
income to either of them that was generated from music written
by either of them would be divided equally between them.
Plaintiff Bryant at all times accounted to Kinder, and paid him
one half of her royalties in good faith. It was only after
receiving a copy of Bryant's catalog from BMI in or about May
2000 that Bryant learned that Kinder had always listed himself
as the other 50% writer of the Transformers.  Unbeknownst to
her, while she was actively in partnership with Kinder, it
appears that for a significant period of time Kinder was
collecting through his own BMI catalog 50% of The Transformers
writer's share, while also demanding one half of Bryant's share.
Kinder had been collecting, until 1994 re-registrations began,
a total of 75% of the writer's share of the music.  This is
false and fraudulent, as Kinder had no participation in the
music.

19. <u>Jem</u>:  Bryant composed the music and Bacal the lyrics
for the theme Jem (another Hasbro product) as set forth in
Exhibit A.  As indicated in Exhibit A, the "Jem instrumental
theme" title registered to Bryant was re-registered in or about
April of 1996 reducing, what had previously been a one hundred

MONAGHAN, MONAGHAN
LAMB & MARCHISIO
ATTORNEYS
28 EAST SALEM STREET
HACKENSACK, NJ 07601

7

percent interest in Bryant's favor on the Jem music and derivatives thereof, to fifty percent, thereby granting fifty percent of that interest to defendant Bacal. Bryant was the sole composer of the music and Bacal had no contribution thereto.

20.    Plaintiff only recently discovered in May of 2000 that the G.I. Joe and My Little Pony compositions were re-registered in 1993 in BMI's catalogue without any explanation or basis. According to information only recently revealed by BMI after tooth-pulling efforts by plaintiff and her counsel, the lucrative opening and closing G.I. Joe themes (the Main Themes) are missing entirely from Bryant's catalogue.

21.    Bryant attempted diligently to determine the background facts concerning this re-registration, but BMI failed and refused to provide relevant information until in or about May of 2000.

22.    Furthermore, since BMI pays its members approximately one to one and a half years after the airing of the music in question, plaintiff had no way of knowing that the significant revenue generating G.I. Joe Theme had been removed from her catalogue when the Bryant-Kinder litigation was settled in September of 1994.

MONAGHAN, MONAGHAN
LANG & MARCHISIO
ATTORNEYS
25 EAST SALEM STREET
HACKENSACK, NJ 07601

8

## FRAUDULENT RE-REGISTRATION OF BRYANT'S COMPOSITIONS

23.   As will be set forth hereafter, at various times beginning at a point unknown to plaintiff, defendant Sunbow without the approval or knowledge of Bryant, transferred and altered registrations at BMI with respect to the foregoing compositions thereby depriving plaintiff of royalties to which she is entitled.

31.   Bryant has no way of knowing the extent to which the royalties and payments otherwise due her have been wrongly paid to other persons, including defendants Kinder, Bacal and others.

32.   The foregoing reflects a pattern of fraud and self-dealing on the part of defendant Sunbow.

34.   Absent a full and accurate accounting from defendant Sunbow of the monies generated by the various compositions and received and paid to the Kinder, Bacal, GBI or John and Jane Does, plaintiff Bryant has no way of knowing the extent to which she has been damaged.   Plaintiff estimates, however, that said damage is in excess of five hundred thousand dollars.

MONAGHAN, MONAGHAN
LAMB & MARCHISIO
ATTORNEYS
25 EAST SALEM STREET
HACKENSACK, NJ 07601

9

## AS AND FOR A FIRST CAUSE OF ACTION AGAINST SUNBOW

### (CONVERSION)

1.   Plaintiff repeats and re-alleges each and every allegation
     hereinbefore alleged as though fully set forth at length
     hereat.

2.   Upon information and belief, defendant Sunbow Productions,
     has converted monies and royalties otherwise due plaintiff.

3.   Absent the accounting hereinafter demanded, plaintiff has
     no way of knowing the full extent to which he has been
     damaged.

4.   As a result of the foregoing, plaintiff has been damaged in
     an   amount   not   less   than   $500,000.00   and   demands
     compensatory and punitive damages and attorneys' fees.


## AS AND FOR A SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS

### (ACCOUNTING)

1.   Plaintiff repeats and re-alleges each and every allegation
     hereinbefore alleged as though fully set forth at length
     hereat.

2.   As a result of the wrongful conduct hereinbefore alleged
     including, but not limited to, the fraudulent re-
     registrations of plaintiff's titles, plaintiff has been

MONAGHAN, MONAGHAN
LAMB & MARCHISIO
ATTORNEYS
15 EAST SALEM STREET
HACKENSACK NJ 07601

10

deprived of monies and royalties otherwise due her for her
musical compositions.

3.   Without a full and true accounting by Sunbow as to the
monies and royalties paid with respect to the compositions
identified by plaintiff herein (and as set forth in Exhibit
A), plaintiff is without knowledge of the amounts due her
and cannot obtain such knowledge or ascertain said amounts.

4.   Plaintiff is without adequate remedy at law and demands a
full and true accounting from all defendants as to all
dealings with, and transactions concerning, plaintiff's
titles and monies collected and disbursed with respect
thereto.

5.   Plaintiff is entitled to a full and accurate accounting by
all defendants, and upon such accounting, a judgment for
all amounts of royalties and payments due plaintiff as
against all defendants.


### AS AND FOR A THIRD CAUSE OF ACTION AGAINST DEFENDANTS SUNBOW

#### (PRIMA FACIE TORT)

1.   Plaintiff repeats and realleges each and every allegation
hereinbefore alleged as though fully set forth at length
hereto.

MONAGHAN, MONAGHAN
LAMB & MARCHISIO
ATTORNEYS
25 EAST SALEM STREET
HACKENSACK, NJ 07601

11

08/27/02  16:12 FAX 212 833   )7  _____SONY MUSIC                    ☒017

2. As set forth herein, the defendant Sunbow, by its wrongful conduct and fraudulent re-registrations, is greatly hindering and damaging plaintiff in the conduct of her business.

3. The wrongful acts and representations of the defendant, as hereinbefore set forth, have seriously impaired the vested property rights of the plaintiff, and the continuation of such wrongful acts is calculated to cause grave and irreparable harm to the plaintiff.

4. The said acts of the defendant are fraudulent in purpose and design, are malicious and made with intent to deceive, and constitute deceptions to plaintiff, to the public at large, to the advertising community and jingle industry, and others with whom plaintiff does business, or relies upon in connection with her business.

5. The aforesaid acts by the defendant were made with the intent to maliciously injure the plaintiff.

6. By reason of the foregoing, plaintiff has been damaged in an amount, which can only be determined by an accounting , and demands compensatory and punitive damages and attorneys' fees.

7. As a result of the foregoing, plaintiff is entitled to

MONAGHAN, MONAGHAN
LAMB & MARCHISIO
ATTORNEYS
29 EAST SALEM STREET
HACKENSACK, NJ 07601

12

compensatory damages, and such other relief as to the Court

seems proper.

WHEREFORE, plaintiff demands judgment as set forth in the

respective causes of action herein together with such other

further and different relief as to the Court seems just and

proper including, but not limited to, punitive damages,

attorneys' fees, and the costs and disbursements incident to

this action.

> MONAGHAN, MONAGHAN, LAMB & MARCHISIO
> Attorneys for Plaintiff
>
> By:  _Robert Baratta_
>      ROBERT M. BARATTA
>
> 150 West 55th Street, Suite 1G
> New York, NY   10019
> Tel. (212) 541-6980
> Fax. (212) 541-6994
>
>           and
>
> 25 East Salem Street
> Hackensack, NJ   07601
> Tel. (201) 488-1201
> Fax. (201) 487-8030

March 25, 2002

MONAGHAN, MONAGHAN
LAMB & MARCHISIO
ATTORNEYS
25 EAST SALEM STREET
HACKENSACK, NJ 07601

13266

13

## CERTIFICATION NYCRR 130.1.1-A

I hereby affirm under penalties of perjury that I am an attorney admitted to the Courts of the State of New York and that I certify that all papers submitted in support of the within are non-frivolous, upon diligent inquiry under the circumstances, as defined in subsection C of section 130.1.1

14

## VERIFICATION

I, Robert M. Baratta, Esq., am an attorney duly admitted to practice law before the courts of the State of New York, and say that:

1.    I am the attorney of record, or of counsel with the attorney of record, for plaintiff herein.

2.    I have read the annexed Complaint, know the contents thereof and the same are true to my knowledge, except those matters therein which are stated to be alleged upon information and belief, and as to those matters I believe them to be true. My belief, as to those matters therein not stated upon knowledge, is based upon information supplied by plaintiff and the books and records and information supplied by plaintiff and maintained in the office files of the undersigned for the prosecution of the within action.

3.    The reason I make this affirmation instead of plaintiff is that plaintiff does not reside in the county where deponent has his office.

I AFFIRM that the foregoing statements are true under penalties of perjury.

DATED:       March 21, 2002
             Hackensack, N.J.

                                              ROBERT M. BARATTA

MONAGHAN, MONAGHAN
LAHO & MARCHISIO
ATTORNEYS
73 EAST SALEM STREET
HACKENSACK NJ 07601

15