# EXHIBIT 26 B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

55576-017
SERIAL NO. 172
SERVED
RECEIVED
FILED

```
ANNE BRYANT,                        :
                  Plaintiff,        :
                                    :
   -v-                              :
                                    :
BROADCAST MUSIC, INC.               :
(a/k/a/"BMI"), FORD KINDER,         :
KINDER & CO., LTD.,                 :   Index No. 5192/00
VADIVOX, INC., JULES M. "JOE"       :
BACAL; GRIFFIN BACAL, INC.,         :   Hon. Andrew P. O'Rourke
STARWILD MUSIC BMI, WILDSTAR        :
MUSIC ASCAP, SUNBOW                 :
PRODUCTIONS, INC.,                  :
                                    :
                  Defendants.       :
ANNE BRYANT,                        :
                  Plaintiff,        :
                                    :
                                    :   Index No. 2821/02
   -v-                              :
                                    :   Hon. Andrew P. O'Rourke
                                    :
SUNBOW PRODUCTIONS, INC.,           :
                                    :
                  Defendant.        :
```

## AFFIDAVIT OF PLAINTIFF ANNE BRYANT IN RESPONSE TO AFFIDAVIT OF HELENE BLUE

STATE OF NEW YORK    )
                     ) ss:
COUNTY OF ROCKLAND   )

ANNE BRYANT, being duly sworn, deposes and says:

1.    Defendant Sunbow Productions, Inc. ("Sunbow"), obviously in tandem with its co-defendant Jules M. ("Joe") Bacal, has submitted an Affidavit by Helene Blue, a party not previously identified in the case.  Whatever her general music expertise and

qualifications, Ms. Blue has no factual information to offer and her experience in the commercial jingle business does not appear in her Affidavit. Ms. Blue's Affidavit is wrong in multiple respects:

a.  **Wrong Assumption 1- [TOY JINGLES VS. TV SHOWS]**  Ms. Blue assumes that all of the music I wrote was originally written in connection with Sunbow T.V. Productions- a fundamental misstatement by the defendants. The only music which was written relative to Sunbow productions was the JEM show music and My Little Pony and Friends. On the other hand, Transformers, GI Joe, Robotics, Inhumanoids, Visionaries, and My Little Pony were written as jingles for toy commercials and this is not disputed.

b.  **Wrong Assumption 2- [CUE SHEETS MISUSE]** Cue sheets might be appropriate vehicles for notifying the performing rights societies such as ASCAP and BMI where music was specifically composed for T.V. shows, but only if the allocable composers/ lyricists' percentages were correct. Cue sheets are <u>not</u> appropriate for use as a registration document with BMI where the music was previously composed as a jingle and then later used as a theme for T.V. shows or other media. This point has been discussed many times especially related to the Affidavit of Allison Smith of BMI, who acknowledged it.

c.  **Wrong Assumption 3- [WORK-FOR-HIRE AGREEMENT IN THIS CASE]** Another premise and erroneous assumption of Ms. Blue's Affidavit, is that there must be a signed work-for-hire agreement in existence somewhere even though defendants can't find it. I never signed one and Bacal himself knew of none. However, she concedes in Paragraph 9, "Whenever there is an agreement for the use of a musical composition, the terms of a license must be negotiated." She acknowledges that this negotiation can have a number of variables including a flat-fee or the contractual right to receive payments over time. She further acknowledges that other factors in these negotiations are the relative leverage of the parties

-2-

and the level of business which may be anticipated.

d. **Wrong Assumption Number 4- [I HAD NO NEGOTIATING
LEVERAGE]** Ms. Blue says in Paragraph 25 on Page 12 of
her Affidavit "...It would be completely unremarkable
that Kinder and Bryant Limited accepted a lower fee
when they had the expectation making $6,600.00 for each
of 65 episodes or $429,000.00 **especially if they were
new in the television business and didn't have a lot of
negotiating clout."** In the first place, as a result of
our work at Michlin & Co., both Ford Kinder and I did
have "negotiating clout" to use Ms. Blue's term. We
had already written the music for The Great Space
Coaster, G.I. Joe, and My Little Pony: very successful
Sunbow TV shows. Also the Transformers was the theme
for a very successful TV show. See my attached CV for
my other credentials and Kinder Bryant accounts. Also,
prior to working with Bacal at GBI and Sunbow, I had
already worked with Benton & Bowles; Oglivy & Mather;
Doyle Dane & Bernbach; and J. Walter Thompson, NY. I
was a top jingle writer as was Ford Kinder and we had a
long history of working as such for big budget consumer
brands. In fact when we began working day and night
for Joe Bacal's company, we turned down work from other
clients in favor of the trusted relationship engendered
by Bacal at his companies. I should add that both Ford
and I were both singers, who performed on many of the
recordings.

e. **Wrong Assumption Number 5- [SUNBOW AND GBI OPERATED IN
THE SAME MANNER]** Ms. Blue addresses her Affidavit to
Sunbow's alleged practices, but ignores the fact that
the music written for the toy commercials GI Joe,
Transformers, Robotix, Visionaries, and My Little Pony
was related to work for GBI- the ad agency. Again,
only JEM and My Little Pony and Friends were written in
connection with Sunbow projects.

2. I will address the mean-spirited Affidavit by Bacal
separately hereafter, but I think it is important that the Court
recognize what my credentials were at the time of my dealings
with Sunbow and Bacal in the early 1980's. Attached as Exhibit 1

-3-

is my CV indicating the background I had even before I dealt with Sunbow and Bacal and GBI.

3.    As my CV indicates, between 1972 and 1976, I wrote music for Revlon, Coca Cola, Hasbro, Kendor Educational, and jazz musicians Gerry Mulligan and Stan Getz.  I also composed and arranged for Kentucky Fried Chicken, Schlitz, United Airlines, Heinz Ketchup, McDonald's, Wrigley's, and Kellogg's.  I wrote music for film and T.V. including "All the Presidents Men," and Mary Tyler Moore Productions' "The Phyllis Show."

4.    Between 1977 and 1980, I wrote commercials for numerous popular brands.  The Court may remember the commercial for "Peak Freens," "a very serious cookie," which won a number of awards for us, as did our jingles for Maxwell House, Mormon's Public Service, and others.  These compositions were written and arranged during the period 1977 to 1980 at Michlin and Company. In 1981 and 1982, I formed Anne Bryant Music and worked on a number of major campaigns including Kraft, Listermint, NEHI Drinks, Hershey's and Diet Rite Cola, winning awards for several of them.

5.    In 1983, Ford Kinder and I formed Kinder Bryant and Co., and I have listed other ad campaigns in my attached CV which were

-4-

done during the period of time I was in association with Ford
Kinder. It is in this period 1983 to 1990 that much of the music
at issue here in this litigation was composed. Although I did
not compose the music for GI Joe, in my settlement with Ford
Kinder in this litigation, he relinquished certain rights in the
composition to me.

## IS "A-ROD'S" CONTRACT EXACTLY THE SAME AS JETER'S,
## MATSUI'S, AND POSADA'S?

6.    Suggesting that I must have signed a written work-for-hire
agreement because others may have done so at different times in
different negotiations on different projects is tantamount to
suggesting that Alex Rodriguez must sign the same contract that
other Yankee stars have signed. George Steinbrenner may have a
"standard contract" but he can't force anyone to sign it.
Obviously, and as acknowledged by Helene Blue, each contract is a
matter of individual negotiation. Although they've been
conveniently able to dredge up various and sundry other
agreements when they choose, including an unsigned JEM agreement,
defendants have not produced:

a.        a signed agreement by me relinquishing my
          writer's royalties to anyone else;

b.        any draft of any such proposed work-for-hire
          agreement;

c.        any proof that there ever was an original copy of
          such an agreement in the allegedly flooded

offices;

d.      anyone who will testify to my ever signing any
        such agreement;[1]

e.      documentary proof filed with the United States
        Copyright Office in Washington of execution by me
        of any work-for-hire agreement as required by
        Section 101 of the Copyright Act and as referred
        to in the sample Sunbow Agreements (See attachment
        to Phares Affidavit, Exhibit O, Page 11, Sunbow
        Bates No. 0392- The Unsigned JEM Agreement).[2]

### NEITHER SUNBOW NOR GBI HAD LONG
### ESTABLISHED CUSTOMS AND PRACTICES

7.      In her Affidavit, Ms. Blue expresses concern that because a
composer or songwriter may terminate an assignment or license of
rights thirty-five years after granting such rights such would be
"not an attractive prospect for the producer." She apparently
does not know that both GBI and Sunbow were fledgling companies
when I dealt with them in the 80's. Bacal's partner Griffin
indicates such in paragraph 1 of his Affidavit when he says, "I

---

[1] The Court will recall that Jules M. Bacal, who presumably would know, said he was
unaware of any such signed agreement. Bacal must have spoken to his partner and "best friend"
Tom Griffin about the issue. Bacal's response to Interrogatory No. 1 states that he is "not aware
of any written agreements [wherein plaintiff relinquished any rights]" (Bacal Answers to
Interrogatories, Answer 1).

[2] Plaintiff is aware that with respect to JEM and possibly Transformers compositions, that
Sunbow may have filed Copyright registrations claiming that the works were for-hire, but there
are no documents on file in the Copyright office executed by me indicating that to be true in fact,
nor are there any Copyright registrations, to my knowledge, with respect to any of the other
compositions at issue in the case.

co-founded Sunbow.....and GBI...in 1978 with Jules M. Bacal.."

8.    GBI and Sunbow could not have had any long-established
practices.  Again, it is important to recognize that the music
written for the commercials GI Joe, Transformers, Robotix,
Visionaries, and My Little Pony was related to work for Griffin
Bacal, the ad agency.  Only JEM and My Little Pony and Friends
were written relative to Sunbow. At no time did anyone ever
express concern to me regarding what would or would not occur
thirty-five years down the road.

9.    This is especially so with respect to commercials and the
animated television programs at issue in this case, which were
only originally intended to air on television for a limited
period of time likely less than a year.  A typical jingle has a
thirteen week life cycle in the ad industry and only if
successful will get longer play.  Generally, a Pilot episode plus
thirteen episodes of an Animated T.V. show are produced.   More
shows are produced if it is popular.   This point also has
relation to the new argument about what I am told is the Statute
of Frauds, but I will cover that later. To suggest that Sunbow
would have taken actions to protect interests it would have
thirty-five years down the road is utterly absurd, and does not
comport with the types of jingles, commercials, and television

-7-

series at issue in this case or for whom we did the work.

## ADMISSIONS BY MS. BLUE REGARDING THIRD-PARTY LICENSES

10.    Ms. Blue acknowledges in her Paragraph 12 that even in a typical work-for-hire arrangement situation, where the music was specifically produced for television or movies, a composer will retain the contractual right to mechanical and sync license fees and indicates "the payments are expressed either as a certain amount of money per copy or a percentage of the net receipts or wholesale price" (Blue Affidavit, Paragraph 20).  She repeats this theme in Paragraph 21 where she says that the "grant of such licenses to third-parties will generate this type of income." This flatly contradicts Sunbow and Bacal's argument.  Even Ms. Blue concedes that when the producer licenses the properties to others that in such cases the composer would be entitled to mechanical and sync fees.  In fact, the defendants, including Bacal, have reaped millions of dollars in license fees as I will show.

## SUNBOW LICENSES

11.    Although far from a complete production, due to subpoenas and tooth-wrenching efforts to get production from these defendants, we have obtained copies of several domestic and numerous foreign licenses issued by Sunbow for properties containing my music.  Attached as Exhibit 2 are the following:

-8-

a. License Agreement[3] dated April 18, 2000/ Rhino Entertainment-Sunbow Entertainment, Signed July 21, 2000[Re: Inhumanoids, Robotix, Visionaries] Advance: $35,000.00
Royalty Schedule: 25% Video, $19.95 and above
b. License Agreement dated April 18, 2000/ Rhino-Sunbow Entertainment, Signed July 21, 2000 [Re: My Little Pony and My Little Pony Tales] Advance: $50,000.00
Royalty Schedule: 25% Video, $19.95 and above
c. License Agreement dated March 12, 1999 "Revised"/ Rhino-Sunbow,
[Re: JEM, Transformers, and GI Joe] Advance: $125,000.00
Royalty Schedule: Same as above.
d. E-mail 1/23/04 Warner Music & Schedules of Units Sold [2,216,513]
e. Chart summarizing Multiple Foreign License Agreements, Bates Numbered 1 to 232, 367 to 369, Varying terms and advances

12.    We have also obtained information about the payments made by Warner-Music, a domestic licensee,  which amount to over $4 million for the period 1999-2003.

13.    Defendants harp on four sample Sunbow agreements and the unsigned JEM agreement which shed light on absolutely nothing. In fact in denying the last round of motions, the Court refused to accept these "agreements" as evidence [Opinion and Order 1/22/04 p. 3]. Typicality is not the issue here, the question is whether or not I signed any such agreements and I deny doing so. Despite several years of vigorous and expensive litigation and

---

[3] Most of the license agreements contain a requirement that the licensee pay all required mechanical performance and other royalties.

discovery, no evidence at all has been produced to show I signed
away my writer's royalty rights.

<u>**"STANDARD SONGWRITER AGREEMENTS ? "**</u>

14.   As Donald S. Passman author of "All You Need to Know About
the Music Business" (copyright 2000 Simon & Schuster)indicates:

> "for some reason, all songwriter contracts seem to be
> labeled 'standard songwriter agreements' however, I've
> never seen any two standard songwriter contracts that
> look like they are even distant cousins, much less
> twins.  So don't take any comfort in the words at the
> top of the page."  Here's really what to look for:
> [Passman Excerpts-submitted separately pages 257-259.]

15.   Passman's discussion assumes that the songwriter has
signed a contract transferring ownership of the copyright in the
musical composition to the publisher.  In exchange for this, the
publisher agrees to handle the business and pay royalties to the
writer" (Passman, Page 257).  The songwriter, according to
Passman, is supposed to get 50% of the publisher's collections
with the exception of performance royalties. Passman says that
these publisher's receipts include receipts from **<u>mechanical,
synchronization, and transcription income</u>.**  Passman even warns
the songwriter to make sure that he or she has a "catchall
phrase."  The reason performance monies are excluded is because
as Passman indicates, "unlike other forms of income the
performing rights societies pay the songwriters directly and the

publishers do not want to further share his performance monies with the writer." (Passman, Page 259).

16.    Ms. Blue notes in Paragraph 35 that even the Sunbow Agreement and the form 3.8 from Kohn to which she refers give 50% of net proceeds received from third-parties for mechanical and sync fees to the composer.

17.    To similar effect is a section in "Everything You Better Know About the Record Industry" by Kashif Michael Jones, 1st Edition, Brooklyn Boy Books, copyright 1996, which indicates:

> "When a song is released and sold in any format-
> CD, record, or cassette- there are two incomes
> that are derived from that sale as far as the
> songs are concerned. **They're called the
> songwriter's and the publisher's share and are of
> equal proportion.** This income is referred to as
> mechanical royalties and is paid by record
> companies to the publisher, who in turn pays the
> songwriter". Remember mechanical royalties are
> paid by the record company to the publisher, who
> in turn pays the songwriter. Also, remember the
> publisher's share and the writer's share are
> equal." (Kashif, Page 147-14)

18.    The Passman book has a chart showing the usual publisher-writer splits [Passman pp. 215-221]. At page 217 he discusses that the musical publishers' share [except for performance royalties which are sent directly by the performing rights society] is divided 50/50 with the writer. Sunbow and Bacal whenever they chose simply made deals which included my music.

-11-

and Sunbow and Bacal had complete control of the publishing through Wildstar and Starwild to do that.

19. Another leading treatise, "This Business of Music: The Definitive Guide to the Music Industry" by Krasilovsky and Shemmel, (a treatise cited by Sunbow) indicates as follows:

> "In the agreement between the songwriter and publisher, provision is made for the writer to share in mechanical license fees received by the publisher. **The customary share is 50% of the publisher's receipts in the United States. This means 50% of 100% of license fee payments from US record companies, Harry Fox Agency collection charge of 5.75% on mechanicals. For mechanical license earnings, outside of the United States, the writer is usually entitled to 50% of the net sums received domestically by the US publisher.** A similar division applies to a publisher's receipts from licensing, the synchronization, or reproduction of music on television, video, motion picture sound tracks, video games, <u>and even bell tones for cellular telephones</u>. Such licenses are referred to as synchronization licenses. Harry Fox no longer administers synchronization rights for publishers." [Page 167-168]

20. In sum, the weightier evidence of industry customs supports my claim that I kept my writer's royalties even though Sunbow, Bacal and GBI had control of the music. They could exploit the music as they chose but subject to my reserved writer's royalties-that was the deal.

## WONDERLAND AGREEMENT

21. I can point to an industry agreement I signed with a
Disney company, which was expressly a work-for-hire, but I,
nonetheless, retained my writer's interests in mechanical and
sync fees. Attached herewith as Exhibit 3 is my songwriter's
agreement dated March 28, 1990 with Wonderland Music Co. Inc.
related to my compositions, "I Can Hardly Wait Til Morning" and "
I Want to be The Conductor." Although there was a transfer to
the publisher Wonderland Music and the contract characterizes the
compositions to be written as "work-for-hire" compositions, I
retained the right to receive royalty income as set forth in
Exhibit A to the Wonderland Agreement, which included the
following:

> a. 50% of net sums for the sale of sheet music.
> b. 50% from the sale of songbooks, folios, or
>    similar publications.
> c. 50% of the sums received by the publisher for
>    the exploitation of **mechanical rights,**
>    **electrical transcription and reproducing rights,**
>    **motion picture and television synchronization**
>    **rights, and all other rights in the**
>    **compositions.**
> d. 50% of any and all net sums received by
>    publisher for sales licenses and other uses of
>    the compositions in countries outside of the US
>    and Canada.
> e. A complete reservation of public performance
>    royalties but excepting the publisher's right to
>    such performing rights royalties.

22. This is consistent with the discussion in Passman and the
other treatises. It is just nonsense for the defendants to

-13-

continue to urge the proposition that there are some sort of
standard agreements when not only do the authorities who write on
the subject dispute that, but I personally would never have
executed any agreement that relinquished my rights to these
royalties and I demonstrate that by an agreement that was
executed ten years prior to the institution of this litigation.[4]

### "WORK-FOR-HIRE" - DIFFERENT THINGS TO DIFFERENT PEOPLE

23.    Defendants point to some deposition testimony given by me
and selectively excerpted that testimony to suggest that in the
use of the phrase "work-for-hire," I acknowledged that I had
relinquished all rights.  This is likewise false and incomplete.
If defendants had been truthful, they would have mentioned that
in every instance where I discussed what I retained, I mention
writer's royalties including performance royalties and mechanical
royalties.  Here is my testimony on this subject taken from my
March 31, 2003 Deposition at pages 42-53:

> Q: Miss Bryant, are you familiar with the term work for
>    hire?
>
> A: Yes.
>
> Q: And what do you understand the term to mean?
>
> A: As it always applied in my career, I'm not the
>    copywriter on it.  The work I've done has been made
>    for hire on behalf of the publisher, client, whoever

---

[4]Furthermore, my attorneys advise me that from an evidence standpoint that unsigned
agreements have no evidentiary effect whatsoever.

they assigned it to.  I give up the copyright in exchange for a fee while also retaining my performance rights, royalties and any other outside royalties.  That is the way work for hire works in the jingle business, it has worked for me for over 30 years.

Q: Okay.  So you get your fee and performance rights, royalties and other royalties?

A: Yes.

Q: What other types of royalties?

A: Mechanical royalties.  If we write a piece for a jingle, then it becomes a television show, then it becomes a video, then it becomes VHS and television special, you know, go into these different areas that generate royalties to writers.

            ****

Q: Okay.  With that definition in mind of what I am referring to as a derivative work, is it your understanding that the copyright owner of the compositions at issue in this case could create derivative works from those compositions?

A: It's not my understanding.  **I believe that they can use it however they want as long as they can account for the performance royalties, mechanical royalties or other considerations for performers and composers. I think that's right.**

24.   I believe that the above refutes Ms Blue's Affidavit
and I will address the other defense affidavits separately.

_Anne Bryant_

ANNE BRYANT

DATED: 4/29/04

Sworn to before me this 29, Day of April 2004.

_Juliet Forsyth_

NOTARY PUBLIC

```
JULIET W FORSYTH
Notary Public
State of New Jersey
My Commission Expires Mar 17, 2007
```

18462

-16-

Exhibit 1

# Anne Bryant CV

## Freelance 1972-76
*(NYC)* Revlon, CocaCola, Hasbro (Benton & Bowles), Kendor Educational Music Publishers, Gerry Mulligan Albums & Festivals
*(Chicago)* Kentucky Fried Chicken, Schlitz Beer (London Philharmonic), United Airlines, Heinz Ketchup 'Anticipation,' New Freedom, Wrigley's, Kellogg's
*(Los Angeles/film & TV)* "All the President's Men," "Cornbread Earl & Me," Mary Tyler Moore Productions "Phyllis Show."

## Michlin & Company 1977-80
Pepsi, Mountain Dew, Stouffer's (clio), Peek Freens 'a very serious cookie,' (all awards), Burger King, Maxwell House (all awards), Pabst Beer, Schmidt's Beer, Schlitz Beer,
Asti Cinzano, Harvey's Bristol Cream, Mormon's Pubic Service (clios), Johnson's Baby Shampoo, Wurtzburger Beer, Hasbro Toys, Sunbow Productions, L'erin Lipsticks (Cannes Festival Lion), Evan Picone Hoisery, Midas Mufflers, The Limited Stores, Planned Parenthood, Milky Way, M&Ms, Meaty Bone Dog Treats, Crisco, Ford Trucks, Chevrolet, GM, A&W Root Beer, Sheraton Hotels, Minute Maid, Lay's Potato Chips, Doritos, Polaroid, Mainstay Dog Food, Fresca, Diet Coke, Emigrant Savings Bank, Crest, Citibank, Kellogg's

## Anne Bryant Music (1981-82)
SC Johnson Enhance Shampoo (clio), Maxwell House, Kraft, Listermint, Nehi Soft Drinks (clio), Hershey's, Diet Rite Cola (clio), Barq's Root Beer, CBS, American Express, Hallmark Cards, Sears, Zest Soap, Kellogg's Product 19, Sergio Valente Jeans,
Lee's Jeans, RC Cola Brands: *RC Cola, Caffiene-free RC, RC 100…*

## Kinder & Bryant (1983-90)
Life Magazine (clio), Dannon Yogurt, Kenn-L-Ration, HighPoint Coffee, Kellogg's Product 19, Budweiser LA Beer, Budweiser Bud Lite Beer,Schweppes ginger Ale, Duncan Hines, HBO, Top Job, Vellamints, Post Cereals, Diet Coke, American Greeting Cards, Hasbro, Sunbow Productions

## Gloryvision (1991-97) *(products, libraries, songs)*
The Adventures of the Mirror Kids,
Songs for Dogs (and the people who love them),
Songs for Cats (and the people who love them),

# Anne Bryant CV

Walt Disney Records, Minnie & Me,
Digital Rabbit: Contemporary/Classical Library—long works: *Adagio for Anna, After the Fire, DemiTasse, WindUp Toy, El Campo de Paz, Calle Cuarenta y Cinco, Haverstraw, Hudson River Barge, Halloween, RockStorm, One Dream Café*

## Music & Art (1997-)
Shoney's Restaurants, Martha Stewart Living (arrangements/theme development), Dallas Zoo, Century 21/Cendant Corp., Maxwell House, Pawsenclaws Stores, WorldWide Wholesale Flooring, Dorito's, Vertical Clubs, NBC Dateline, Coty Aspen Sensation, Party City, Open Adoption, CocaCola, Luv's Diapers, Arm & Hammer Brands: *Baking Soda, Carpet Deodorizer, Trash Can Deodorizer, SuperCat/SuperStop Cat Litter, Crystal Blend Cat Litter, Fabricare, EnamelCare,* UltraMax Deodorant, Nair, Lineance, Arrid, Brillo, First Response Tests.

Documentary Scores: *NYC Hospitals BioTerorism Council, U Michigan School of Public Health, National Council of Churches, Rockland Center for the Arts, ABC/Capital Cities...*

Exhibit 2

Exhibit A

ORIGINAL

EXCLUSIVE LICENSE AGREEMENT
Standard Terms and Provisions

This shall confirm the agreement reached this 18th day of April, 2000 by and between Rhino Entertainment Company d/b/a Rhino Home Video (hereinafter referred to as "Rhino") located at 10635 Santa Monica Blvd., Los Angeles, California 90025-4900, and Sunbow Entertainment LLC (hereinafter referred to as "Licensor") located at 100 Fifth Avenue, New York, NY 10011, with reference to the following facts:

WHEREAS Licensor owns or controls the rights to that certain program(s) listed on Exhibit "A" (attached hereto and incorporated herein) (hereinafter referred to as the "WORK(S)").

WHEREAS Rhino desires to have the exclusive right, license and privilege to manufacture, reproduce, distribute, promote, sell and otherwise exploit the WORK(S) as videograms, and is willing to pay royalties to Licensor therefor.

NOW THEREFORE, in consideration of the foregoing and the mutual promises contained herein, the parties agree as follows:

1.    GRANT OF RIGHTS

Licensor hereby grants to Rhino the sole and exclusive right, license and privilege to manufacture, reproduce, distribute, promote, sell and otherwise exploit each of the WORK(S), in their entirety, as videograms, in a territory set forth in Exhibit "A" (hereinafter referred to as the "Territory") for a term as set forth in Exhibit "A" (hereinafter referred to as the "term"). The foregoing grant of rights to Rhino includes, but is not limited to, the following:

(a)    The right to use the title or titles by which each of the WORK(S) is or may be known or identified, or such other title as Rhino may desire;

(b)    The right to use the names, likenesses and biographies of all featured artists and characters whose performances are embodied in the WORK(S), and all producers, authors and ᵢ other persons contributing to the creation of the WORK(S), for purposes of advertising and exploiting the WORK(S), and for purposes of trade;

(c)    The right to use such names and trademarks of Rhino (its affiliates and sublicensees), as Rhino may elect, on the packaging and labels of the videograms, and in all advertising and publicity relating thereto, in such manner as Rhino may desire;

(d)    The right to use, perform and broadcast excerpts of the WORK(S) up to thirty (30) seconds in length, to use any literary, dramatic or musical material contained in the WORK(S), alone or in conjunction with other material, and to prepare and use brief synopses and/or revised or abridged versions of the WORK(S), or any literary, dramatic or musical material contained therein, for purposes of advertising and publicizing the WORK(S), and for purposes of trade. The foregoing shall include the right to use, perform and broadcast excerpts of the WORK(S) on the Rhino website(s). If Rhino wishes to use excerpts of the WORK(S) that are more than thirty (30) seconds in length, Rhino shall seek the approval of Licensor, such approval shall not be unreasonably withheld.

(e)    The right to distribute videograms to the institutional market, including but not limited to medical, educational and religious institutions, retirement homes, libraries, civic groups, clubs, summer camps and institutions with shut-ins, for their non-commercial, non-theatrical exhibition;

(f)     The right to edit and change the WORK(S) for length and for purposes of conforming to censorship or other legal requirements. In no event shall any such edit or change delete or otherwise alter the credits or copyright notice for the WORK(S); and

(g)     The right to sublicense the WORK(S), in whole or in part, or subcontract others to exercise any rights granted to Rhino hereunder.

2.     DELIVERY OF MATERIALS
(a)     Licensor shall deliver to Rhino each of the items set forth in Section (g) of Exhibit "A" hereunder;

(b)     Rhino shall notify Licensor within fifteen (15) business days after delivery of any such item of any defect therein. Licensor shall use best efforts to correct such defect or replace such item, as may be necessary, within fifteen (15) additional business days thereafter.

(c)     No such notice of defects delivered by Rhino shall be deemed a waiver by Rhino of Licensor's obligation to deliver any materials or items set forth hereunder within the time set forth below.

(d)     Each of the items set forth in Section (g) of Exhibit "A" shall remain the property of Licensor and shall be returned to Licensor upon termination of this Agreement (or at such other time as may be expressly provided below or on Exhibit "A" with respect to any item).

(e)     All costs and expenses incurred in connection with the creation, manufacture and delivery of said items shall be paid by Licensor, except as set forth hereunder.

3.     ROYALTIES
(a)     Basic Royalty Rate: As compensation for the rights granted to Rhino hereunder, and subject to the remaining provisions of this Section 3 and Section 4 herein, Rhino shall pay to Licensor a Basic Royalty Rate, as set forth in Exhibit "A."

(b)     Returns, Exchanges, Promotions & Free Goods: No royalties shall be payable to Licensor in respect of videograms (i) returned, exchanged, distributed free of charge for promotional purposes and/or distributed as "free" or "no charge," (ii) distributed to television or radio stations or publications to promote or stimulate the sale of videograms, or (iii) videograms sold directly to Licensor by Rhino at a discount.

(c)     Advance: Rhino shall pay to Licensor a non-returnable advance(s), as set forth in Exhibit "A," which shall be recoupable from any and all royalties earned by Licensor pursuant to this Agreement.

4.     PAYMENT AND ACCOUNTING
(a)     Royalties earned and payable as aforesaid shall be accounted for and paid within sixty (60) days after the end of each calendar quarter. Rhino shall have the right to establish reserves of up to twenty-five percent (25%) of net sales hereunder. Reserves established as aforesaid shall be liquidated equally over a twenty-four (24) month period after initially established.

(b)     Rhino makes no express or implied representation or guarantee as to the amount of royalties to be derived from the sale of videograms, or the exercise of any right granted to Rhino hereunder.

5.     WARRANTIES OF LICENSOR
Licensor hereby represents and warrants to Rhino throughout the term and any extension hereof, that:

000009

(a)     Licensor has the absolute right to enter into this Agreement, and to grant to Rhino all of the rights, licenses and privileges granted hereunder. If Licensor is the owner of the WORK(S), Licensor will, upon request by Rhino and prior to the execution of this Agreement, provide to Rhino a copy of the certificate(s) of copyright registration for the WORK(S), or documents evidencing Licensor's ownership of the property. If Licensor is not the owner of the WORK(S), Licensor will, upon request by Rhino and prior to the execution of this Agreement, provide to Rhino a copy of any and all appropriate documents or agreements by and between Licensor and the owner of the WORK(S) evidencing Licensor's right to enter into this Agreement and to grant to Rhino all of the rights, licenses and privileges granted hereunder;

(b)     Neither the WORK(S) or any part thereof, or the exercise of any of the rights granted to Rhino hereunder, will violate or infringe the trademark, tradename, contract, copyright, literary, artistic, dramatic, property or civil rights, right of privacy or any other rights whatsoever of any person or entity;

(c)     Neither Licensor nor Rhino will, at any time during the term or any extension hereof, sell, assign, encumber or grant to any other person or entity, or exercise for its own account, any of the rights, licenses or privileges granted to the other party hereunder, or any other rights, licenses or privileges that will directly compete with the rights, licenses or privileges granted to the other party hereunder;

(d)     There is no claim or litigation, pending or threatened, which may materially or adversely affect the rights, licenses and privileges granted to Rhino hereunder, or the use thereof by Rhino;

(e)     Neither the WORK(S) or any part thereof is in the public domain, and the copyrights of the WORK(S) and all literary, dramatic and musical material upon which it is based or which is contained in the WORK(S) will be valid and subsisting throughout the Territory during the term hereof. Licensor shall secure, register, renew and extend all such copyrights as may be necessary. Without limiting the foregoing obligation, Licensor hereby authorizes and empowers Rhino to register its licensing interest in the WORK(S) for copyright purposes and to secure renewals and extensions thereof in the Copyright Office of the United States of America and/or in any other country or political entity where it deems it appropriate to do so;

(f)     Neither the WORK(S) nor any part thereof has been previously sold or distributed as videograms in the Territory other than pursuant to this Agreement, or as disclosed to Rhino on Exhibit "A" hereunder;

(g)     Licensor has not heretofore authorized, nor will it at any time during the term or any extension hereof authorize, any other person or entity to import videograms of the WORK(S) into the Territory;

(h)     All rights granted to Rhino hereunder are and will be free and clear of any liens, restrictions, claims and encumbrances of any kind, and all royalties, license fees and/or other fees required to be paid in connection with said rights, or the use, distribution, performance or exploitation of the WORK(S) hereunder (and the music and all other matter contained therein) will be paid by Licensor, including but not limited to all payments on account of or arising from:

(i)     Any claims or rights of owners of copyrights or other property rights in the WORK(S), or in any music or other material contained therein;

(ii)     Any claims or rights of any performing rights society or any body or group representing authors, composers, musicians, artists, publishers or other persons having legal or contractual rights of any kind to participate in the receipts of the WORK(S); and

3

000010

(iii)     Any other claims or rights with respect to the use, distribution and exploitation of the WORK(S) as contemplated hereunder, including but not limited to any guild and/or union residuals, reuse payments or other similar payments, which shall be Licensor's sole obligation;

(i)     Licensor shall at its sole cost and expense take all reasonable steps to protect all copyrights and other rights pertaining to the WORK(S) from infringement by unauthorized parties and, in particular, shall initiate such action and proceedings as may be reasonably required to prevent any unauthorized use by third parties of the WORK(S) or any part thereof. If Licensor fails to initiate any such action, Rhino may, in its sole discretion, and at Licensor's sole cost and expense, initiate such action in its own name and/or Licensor's name and may join Licensor as a party thereto.

6.     INDEMNITY
Reference is made to the indemnity provision set forth in Section (i) of Exhibit "A."

7.     INSURANCE
Licensor will maintain, at its own expense, at all times during the term hereunder and for three (3) years thereafter, and with a reasonable insurance carrier acceptable to Rhino, at least a One Million Dollar ($1,000,000.00) combined single limit liability insurance policy with respect to the WORK(S).

8.     DISTRIBUTION AND EXPLOITATION
(a)     Rhino shall have the complete, exclusive and unqualified right to promote, distribute and exploit videograms of the WORK(S) throughout the Territory and each part thereof, during the term and any extension hereof, in accordance with such methods, policies, terms and conditions as Rhino in its reasonable business judgment may determine proper or expedient. The failure of Rhino in its sound business judgment to exercise any of the rights granted hereunder in any portion of the Territory shall not be deemed to be an abandonment or relinquishment of such rights.

(b)     Notwithstanding the foregoing, Rhino will not promote the WORK(S) through any medium that is inappropriate for children's videos (e.g., Playboy, adult websites, etc.).

9.     BOOKS AND RECORDS
(a)     All accountings rendered by Rhino shall be deemed conclusive unless objections in writing, specifying all objections with particularity, are received by Rhino within two (2) years from the date such accounting is rendered. Rhino shall not be obligated to keep any books or records pertaining to this Agreement for any period exceeding two (2) years from the date the accounting derived therefrom is rendered unless specific objections to any such accounting have been received pursuant to this paragraph. Licensor shall maintain no action, claim, or proceeding against Rhino with respect to any accounting or statement rendered by Rhino hereunder unless such action, claim or proceeding is commenced within two (2) years after such accounting or statement is rendered.

(b)     A certified public accountant, on Licensor's behalf, may, at Licensor's sole cost, examine Rhino's books or records with respect to the WORK(S) hereunder, but only during Rhino's normal business hours and after reasonable written notice, and no more than once within each twelve (12) month period or once with respect to any statement rendered hereunder. Licensor shall have no right to examine any books or records relating to Rhino's general business operations, or any matter other than the WORK(S) hereunder.

10.     BREACH; REMEDIES

4

000011

Except as otherwise provided herein, in the event that at any time during the term or any extension hereof either party hereto breaches any of its warranties or representation hereunder, or in the event either party fails to perform any obligation required of it under this Agreement, and such breach or failure continues for a period of thirty (30) days after written notice thereof is given by the non-breaching party, said party shall be in default hereunder and the non-breaching party may pursue any and all remedies available under this Agreement, by law or at equity, except that if the nature of the breach is such that it cannot be reasonably cured within said thirty (30) day period, and within said thirty (30) day period the breaching party takes substantial measures towards curing the breach and within a reasonable time thereafter diligently pursues such cure to completion, such party shall not be deemed to be in default hereunder.

11. RESOLUTION OF CONTROVERSIES

(a)     In the event of any litigation between the parties hereto to enforce any of the provisions hereunder, the unsuccessful party to such litigation covenants and agrees to pay to the successful party therein all costs and expenses, including but not limited to reasonable attorneys' fees incurred therein by such successful party, which costs, expenses and attorneys' fees shall be included in and as a part of any judgment rendered in such litigation.

(b)     In the event of a breach of this Agreement by Rhino, Licensor shall be limited to its right, if any, to recover money damages, and shall not be entitled to injunctive or other equitable relief.

12. FORCE MAJEURE

If, because of any act of God, accident, strike, fire, riot, war or any other cause not within Rhino's control, Rhino is prevented from performing any of its obligations hereunder, then Rhino may suspend the term hereof for the duration of the force majeure, but not for longer than six (6) months. If such force majeure continues beyond said period, Rhino shall, within an additional thirty (30) days, subcontract or sublicense a third party to manufacture and sell videograms of the WORK(S). If Rhino fails to thus subcontract or sublicense its obligations, Licensor may terminate this Agreement. If Licensor does not so terminate this Agreement, the term hereof shall be extended by a period of time equal to the period of the duration of the force majeure.

13. RELATIONSHIP OF PARTIES

(a)     The relationship between Licensor and Rhino is that of creditor and debtor with respect to the payment of any monies due Licensor hereunder. Nothing contained herein shall be construed to create a trust or specific fund as to royalties or any other monies, or to prevent or preclude Rhino from commingling any monies due Licensor with any other monies.

(b)     This Agreement shall not be construed as creating a joint venture or partnership between Licensor and Rhino. Neither party shall have any authority to bind the other or the other's representatives in any way except as expressly provided to the contrary herein. The provisions of this clause are not intended to destroy or diminish in any way the rights, licenses and privileges granted to Rhino with respect to the WORK(S).

14. ASSIGNABILITY

Rhino may assign this Agreement to any parent, subsidiary or affiliate entity, or to any financially responsible entity which acquires substantially all of Rhino's stock or assets through merger, consolidation or other reorganization, subject to Licensor's consent, not to be unreasonably withheld. Any such assignee (or sub-assignee) shall prospectively assume all contractual obligations of the assigned party hereunder. This agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective successors, permitted assigns, heirs, executors, administrators and legal and personal representatives.

15. NOTICES

000012

(a)     Except as expressly provided to the contrary herein, all notices and demands of any kind which the parties hereto may require or desire to serve upon each other shall be in writing and shall be served by sending such notice certified or registered mail, postage prepaid, with return receipt requested, to the address of each party as listed below:

If to RHINO:          Vice President
                      Business & Legal Affairs
                      Rhino Entertainment Company
                      10635 Santa Monica Blvd.
                      Los Angeles, CA 90025-4900

If to LICENSOR:       Kerry Romeo
                      Director of Sales and Acquisitions
                      Sunbow Entertainment
                      100 Fifth Avenue
                      New York, NY 10011

(b)     In case of service by mail, service shall be deemed complete on the date of actual delivery as shown by the registration or certification receipt or at the expiration of the third day after the date of the mailing, whatever first occurs. The addresses to which notices and demands shall be delivered or sent may be changed from time to time by notice served as hereinabove provided by any party upon any other party.

16.    VIDEOGRAMS
       "Videograms" are herein defined as all forms of audiovisual devices, including but not limited to videocassette, and such video devices now known or hereafter devised that enable the WORK(S) to be received visually when used in combination with or as part of a piece of electronic, mechanical or other apparatus, through a playback system or device.

17.    GENERAL PROVISIONS
       (a)     Entire Agreement:  This Agreement contains the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements between the parties with respect thereto. No claim of waiver, modification, consent or acquiescence with respect to any provision of this Agreement shall be made against either party hereto except on the basis of a written instrument executed by or on behalf of the party to be charged.

       (b)     Construction:  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be valid under applicable law, but if any provision of this Agreement shall be invalid or prohibited thereunder, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

       (c)     Successors and Assigns:  Except as otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of the successors and assigns of each of the parties hereto.

       (d)     Paragraph Headings:  The headings of the several paragraphs of this Agreement are inserted solely for convenience of reference, and are not a part of and are not intended to govern, limit or aid in the construction of any term or provision hereof.

       (e)     Person and Tense:  Whenever necessary herein, all terms used in the singular shall apply to the plural and vice versa, and all terms used in the neuter shall apply to the masculine and feminine genders and vice versa.

6                                              000013

(f)     Governing Law: This Agreement is to be governed by and construed in accordance with the laws of the State of New York, applicable to agreements executed and wholly to be performed therein.

(g)     Execution in Counterparts: This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but such counterparts together constitute only one and the same instrument.

(h)     Cumulative Remedies: All rights and remedies granted to any party hereunder shall be cumulative and shall not interfere with or prevent the exercise of any other right or remedy which may be available to such party.

(i)     Reservation of Rights: All rights in and to the WORK(S) not specifically granted to Rhino hereunder are hereby reserved by Licensor.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first set forth above

RHINO                                              LICENSOR

RHINO ENTERTAINMENT COMPANY                        SUNBOW ENTERTAINMENT
d/b/a RHINO HOME VIDEO

By: _____                      By: _____
Date: _____ 7/24/00 _____                      Date: _____ 7/14/00 _____

                                                   Fed ID #: _____
                                                       SAM MILLSTONE
                                                   VP FINANCE AND OPERATIONS
                                                   CHIEF FINANCIAL OFFICER

7                                                              000014

Exhibit "A" to that certain Exclusive License Agreement entered into by and between Rhino Entertainment Company d/b/a Rhino Home Video ("Rhino") and Sunbow Entertainment ("Licensor") dated this 18th day of April, 2000.

(a) Work(s):

(1) The following animated, color programs (the "Programs"):

    (i) Inhumanoids
       (a) Inhumanoids – The Movie (consists of first three (3) episodes; total running time of 90 minutes)
       (b) Thirteen (13) episodes of 15 minutes each
           /30 A/

    (ii) Robotix
       (a) Robotix – The Movie (total running time of 90 minutes)
       (b) Nine (9) episodes of 15 minutes each

    (iii) Visionairies
       (a) Visionairies – The Movie (consists of first three (3) episodes; total running time of 90 minutes)
       (b) Thirteen (13) episodes of 30 minutes each

(2) Rhino shall have the right to release the Programs individually as WORK(S) or to create new WORK(S), other than that described above, by combining multiple Programs so as to tell a complete story ("New Compilation(s)"). Rhino shall also have access to pre-edited compilations ("Pre-edited Compilation(s)") for use in the creation of the WORK(S), at no additional charge, where available. Rhino shall retain the right to edit the Pre-edited Compilation(s) for creation of the WORK(S) at Rhino's own cost. In the event Rhino creates New Compilations for creation of the WORK(S), Rhino shall pay for all costs pertaining to the New Compilation(s), with those costs to be absorbed by Rhino. Rhino shall also pay all costs pertaining to the creation of any DVD packages, with those costs to be absorbed by Rhino.

(3) Notwithstanding the foregoing, Rhino shall not, at any time, alter the Programs as delivered in any way for use in these New Compilation(s).

(4) Rhino shall have the right to include a promotional trailer or video for other Rhino products on the WORK(S) and have the right to compile multiple Programs onto a single cassette for custom packages or special releases subject to Hasbro's reasonable approval. In the event said approval is not received within 10 business days of submission, Rhino shall assume that approval has been given.

(5) Rhino shall be responsible for all editing costs related to (a)(3) through (a)(4), said amount not to be recoupable against royalties. In the event the New Compilation(s) are licensed by Licensor for release on video in other territories, Licensor will reimburse Rhino fifty percent (50%) of Rhino's editing costs.

8

000015

| | |
|---|---|
| (b) Media: | Home Video, in all formats now known or hereafter devised, including but not limited to video cassette, all video disc configurations (including DVD) and 8mm formats. Specifically excluded are all interactive, broadcast, cable, syndication, satellite, on-line or other transmission rights, except as specifically noted herein. |
| (c) Territory: | The United States, its territories and possessions. |
| (d) Term: | Five (5) years from the release of each WORK(S). There shall also be a six (6) month sell off period for each WORK(S) at the end of the initial Term for such WORK(S) provided Rhino shall not have the right to manufacture additional units of the WORK(S) past the end of the initial Term. |
| (e) Recoupable Advance: | A total of thirty five thousand dollars ($35,000.00), payable as follows: (i) fifty percent (50%) upon execution of this Agreement and substantiation of Licensor's right to enter into this Agreement; (ii) fifty percent (50%) upon delivery and acceptance of master video and art elements requested for those Programs that Rhino has targeted for release in the immediate future ("Initial Programs"). Rhino shall provide Licensor a list of the Initial Programs upon execution of the Agreement. The Advance will be allocated as follows: Inhumanoids - $15,000.00; Robotix - $10,000.00; Visionairies - $10,000.00. Notwithstanding the foregoing, the Advance is to be cross collateralized against all royalties payable to Licensor for the WORK(S) hereunder. |
| (f) Royalties: | The royalty payable to Licensor hereunder shall be as follows: (i) 25% of Rhino's wholesale, for all videos with a SRLP of $19.95 and above; (ii) 20% of wholesale, for all videos with a SRLP of between $14.95 and $19.94; and (iii) 15% of wholesale, for all videos with a SRLP of between $10.00 and $14.94; (iv) 12% of wholesale, for all videos with a SRLP of between $7.95 and $9.99; and (v) 10% of wholesale, for all videos with a SRLP under $7.95. |

Rhino shall retain the right to establish prices as indicated by market conditions and change prices at any time, but in no case shall Rhino offer the WORK(S) for less than $7.95 without prior written approval from Licensor.

The royalty percentage shall be based on Rhino's landed wholesale price ("LWP"), which is defined as Rhino's wholesale selling price ("wholesale") of each WORK(S), less a deduction of six percent (6%) as a fee paid to WEA for handling fulfillment and collections.

The LWP shall fluctuate in accordance with Rhino's suggested retail list price ("SRLP") and is inclusive of any third party royalties, including but not limited to payments to producers, union, sychronization, and mechanical license fees.

There will be no other deductions taken with the exception of prebook discounts, offered as an incentive to obtain initial product placement and re-stocking WORK(S). Licensor shall retain the reasonable right

9

of approval of any other discount programs that would lessen the anticipated revenues paid to Licensor.

Notwithstanding the foregoing, when product is sold through mail order, direct response or video clubs (e.g. Columbia House); sublicensed for release on all home video formats, now known or hereinafter developed, including but not limited to video cassette, all video disc configurations (including DVD) and 8mm formats; exploited as part of a promotional program, as a premium, or in connection with the sale of any product, commodity, or service, Rhino and Licensor shall equally split all advances and royalties paid or credited to Rhino, less all third party payments by Rhino, including but not limited to duplication and packaging costs, and any and all costs incurred in the marketing or manufacturing of the WORK(S). The term "royalties" shall not include any monies paid or credited to Rhino as reimbursement for finished goods.

(g) Delivery:

(1) Master(s): First generation, first quality, master video elements on an NTSC Digi Beta or D-2 master format, with all commercial blacks edited out, to be delivered upon execution of contract;

(i) The costs of editing out the commercial blacks and promotional spots will be paid by Licensor.

(ii) Rhino may be charged reasonable material fees for the creation of the Master(s) as all elements that may be needed may not exist in either Digi Beta or D-2 configurations. Rhino shall retain the right to have such editing done at the lab facility of Rhino's choice and cost.

(iii) If the original source Master(s) provided by Licensor for any particular Program is defective, Licensor will provide an additional Master(s), at no cost to Rhino, and will reimburse Rhino for any additional transfer costs incurred.

(iv) If Licensor is unable to provide an acceptable replacement for the defective Master(s) referenced in subparagraph (iii) above, Rhino shall have the right to delete the Program in question from this Agreement and reduce the Advance accordingly.

(2) Packaging and Collateral Materials: Elements needed for the creation of packaging and collateral materials, including but not limited to photographs and slides featuring performers as they appear in the WORK(S);

(i) Licensor warrants that they have, control and will provide such elements to Rhino and/or that Rhino shall have reasonable access to same based on availability.

(ii) Prior to the execution of this Agreement, Licensor shall apprise Rhino of what elements are available as well as to the format in which they exist.

000017

(iii) Both parties acknowledge that ownership of these elements are retained by Licensor and that these elements may only be used in the sale and promotion of the Licensed Titles, as set forth hereunder.

(3) Advertising Materials: Copies of advertisements and other advertising materials prepared by or for LICENSOR in connection with the WORK(S) (including publicity stills, photographs and other transparencies of the artwork relating to the WORK(S)) suitable for use in creating advertising and merchandising devices for the videograms; upon execution of contract.

(4) Credits: The statement of credits applicable to the WORK(S) (for use in according credit on videograms and the packaging thereof), which statement of credits shall in all respects be compiled by Rhino; upon execution of contract.

(5) Theatrical Rating (where applicable): The theatrical rating given the WORK(S) by the Motion Picture Association of America ("MPAA"), or other motion picture rating association; when available.

(6) Press Kit: A press kit or press book for the WORK(S); when available.

(7) Copyright: Detailed information as to the appropriate copyright notice, symbols and wording to be affixed to videograms and the packaging thereof; upon execution of contract.

(h) Special Package(s):

(1) Subject to Licensor's approval not to be unreasonably withheld, Rhino shall retain the right to create special packages that include the WORK(S) along with other promotional or licensed goods such as posters, t-shirts, or pins, as value added on-pack items ("special package(s)"), and sell the special package(s) at a retail price higher that the video alone.

(2) In the event that any of the WORK(S) are coupled with products not directly licensed to Rhino by Licensor ("additional merchandise"), the royalty paid by Rhino to Licensor for such special package(s) containing such additional merchandise shall be based on either the suggested wholesale price of the video portion of the release or a pro-ration to be negotiated by the parties in good faith prior to the release of the special package(s).

(3) Rhino shall have the right to offer said additional merchandise for the sale and apart from the WORK(S) by any means, including but not limited to inclusion of so-called "tip in cards" or by including spots on the actual WORK(S). Licensor hereby acknowledges that it shall receive no revenues from the sales of additional merchandise separate and apart from the WORK(S).

(i) Warranties & Indemnification:

(1) Licensor warrants that neither the WORK(S) nor any part thereof is in the public domain, and the copyrights in and to the WORK(S) and all literary, dramatic and musical material upon which the

000018

WORK(S) is based or which is contained in the WORK(S) will be valid and subsisting in the Territory throughout the Term hereunder. Licensor shall secure, register, renew and extend all such copyrights as may be necessary. Without limiting the foregoing obligation, Licensor hereby authorizes and empowers Rhino to register its licensing interest in the WORK(S) for copyright purposes and to secure renewals and extensions thereof in the Copyright Office of the United States of America and/or in any other country or political entity where it deems it appropriate to do so.

(2) Licensor further warrants that all mechanical, synchronization, master, use, name and likeness, union, performance and any other third party clearances with respect to the WORK(S) have been obtained; that such clearances are now, and through the Term of this agreement shall be in effect; and that Rhino shall have no aditional financial responsibilities with respect to any such clearances.

(3) Prior to the execution of this Agreement, Licensor shall provide Rhino with substantiation of their right to enter into this Agreement, including but not limited to a copy of the certificate(s) of copyright registration (or other documentation evidencing chain of title), and any documentation pertaining to the rights and clearances indicated in the preceding paragraph. Should Licensor be unable to provide said copy of the certificate(s) of copyright registration (or other documentation evidencing chain of title), Rhino shall have the right to conduct a copyright search relating to the WORK(S), the cost of which shall be treated as an additional recoupable expense hereunder.

(4) Licensor agrees to defend, indemnify and hold Rhino, and each of its directors, officers, agents, employees, sublicensees and distributors harmless from any liability, damages, judgment, settlement, cost or expense, including reasonable attorneys' fees, incurred in connection with or arising out of any breach or failure of any of Licensor's covenants, representations and warranties under this Agreement. In the alternative, Rhino, in Rhino's sole discretion, shall have the right to defend any such action, at Licensor's sole cost and expense. In the event of any such decision to defend by Rhino, the indemnity provision by Licensor of Rhino contained within this paragraph shall still apply.

(5) As to any matter to which the foregoing indemnity relates, Rhino may, in addition to all other rights it may have, withhold from payments due Licensor a sum which is reasonably necessary to satisfy any judgment or settlement approved by Licensor in connection with such matter, plus a reasonable amount to cover the expenses of contesting or defending such claim, and Rhino may further apply the amount withheld to the satisfaction of such judgment or settlement approved by Licensor and to reimbursement of such expenses.

(6) Rhino agrees to defend, indemnify and hold Licensor, and each of its directors, officers, agents, employees, sublicensees and distributors harmless from any liability, damages, judgment, settlement, cost or expense, including reasonable attorneys' fees, incurred in connection with or arising out of any breach or failure of any of Rhino's covenants, representations and warranties under this Agreement. In the

12

000019

alternative, Licensor, in Licensor's sole discretion, shall have the right to defend any such action, at Rhino's sole cost and expense. In the event of any such decision to defend by Licensor, the indemnity provision by Rhino of Licensor contained within this paragraph shall still apply.

(j) Promotional Uses:

(1) Rhino shall have the right to creat promotional items in supports of the WORK(S). These items will not be made available for sale and will only be offered as promotional items within the trade.

(2)Licensor will make best efforts to aid Rhino in coordinating promotions and sales with other licensees. Licensor shall provide Rhino with a list of other principal licensors of products for the Programs, or have Hasbro provide same, which will include contact names, address and phone/fax information.

(3) Licensor will provide access, at no charge to Rhino, to any and all fan and/or consumer mailing lists developed that pertain to the Programs, for use during the Term for sale of the WORK(S) only.

(4) Licensor agrees to provide access to those character costumes that may be available, for promotional purposes, including but not limited to press and other public relations support, trade shows and store openings, amoung other uses.

(5) Rhino shall have the right to utilize not more than thirty (30) seconds from each of the Programs for broadcast promotional use only.

(6) Rhino shall have the non-exclusive right to stream no more than thirty (30) seconds from each of the Programs via any Rhino and/or Time-Warner owned, controlled or affiliated sites, for the sole purpose of promoting the WORK(S).

(k) Additional Comments:

(1) It is understood that certain Programs were previously released on home video by a number of companies, including but not limited to Family Home Entertainment, LIVE Entertainment, Golden Books Video, Video Treasures, Image Entertainment and Vestron Video. Licensor warrants that all rights and sell off periods have lapsed, and that specific information as to previous licensors and when those licenses lapsed will be provided to Rhino prior to execution of this Agreement.

(2) For the purposes of this Agreement, it is understood that Hasbro retains underlying rights in and to these programs and will retain the reasonable right of approval for certain elements, as outlined herein.

(3) All rights not granted to Rhino are reserved to Licensor for use without restriction, and Rhino acknowledges that the name of the Programs, the characters, character designs and likenesses are owned and/or controlled by Licensor, and that Rhino will not challenge, copy or imitate such names or rights during or after the Term ends.

000020

(4) In the event a discrepancy exists between the Standard Terms and Provisions and this Exhibit "A", Exhibit "A" shall prevail.

RHINO

RHINO ENTERTAINMENT COMPANY
d/b/a RHINO HOME VIDEO

By: _____

Date: _____ 7/21/02

LICENSOR

SUNBOW ENTERTAINMENT

By _____

Date: _____ 7/17/00

SAM MILLSTONE
VP FINANCE AND OPERATIONS
CHIEF FINANCIAL OFFICER

14

000021

Exhibit B

V# 30073

ORIGINAL

EXCLUSIVE LICENSE AGREEMENT
Standard Terms and Provisions

This shall confirm the agreement reached this 18th day of April, 2000 by and between Rhino Entertainment Company d/b/a Rhino Home Video (hereinafter referred to as "Rhino") located at 10635 Santa Monica Blvd., Los Angeles, California 90025-4900, and Sunbow Entertainment LLC (hereinafter referred to as 'Licensor") located at 100 Fifth Avenue, New York, NY 10011, with reference to the following facts:

WHEREAS Licensor owns or controls the rights to that certain program(s) listed on Exhibit "A" (attached hereto and incorporated herein) (hereinafter referred to as the "WORK(S)").

WHEREAS Rhino desires to have the exclusive right, license and privilege to manufacture, reproduce, distribute, promote, sell and otherwise exploit the WORK(S) as videograms, and is willing to pay royalties to Licensor therefor.

NOW THEREFORE, in consideration of the foregoing and the mutual promises contained herein, the parties agree as follows:

1.    GRANT OF RIGHTS

Licensor hereby grants to Rhino the sole and exclusive right, license and privilege to manufacture, reproduce, distribute, promote, sell and otherwise exploit each of the WORK(S), in their entirety, as videograms, in a territory set forth in Exhibit "A" (hereinafter referred to as the "Territory") for a term as set forth in Exhibit "A" (hereinafter referred to as the "term"). The foregoing grant of rights to Rhino includes, but is not limited to, the following:

(a)    The right to use the title or titles by which each of the WORK(S) is or may be known or identified, or such other title as Rhino may desire;

(b)    The right to use the names, likenesses and biographies of all featured artists and characters whose performances are embodied in the WORK(S), and all producers, authors and other persons contributing to the creation of the WORK(S), for purposes of advertising and exploiting the WORK(S), and for purposes of trade;

(c)    The right to use such names and trademarks of Rhino (its affiliates and sublicensees), as Rhino may elect, on the packaging and labels of the videograms, and in all advertising and publicity relating thereto, in such manner as Rhino may desire;

(d)    The right to use, perform and broadcast excerpts of the WORK(S) up to thirty (30) seconds in length, to use any literary, dramatic or musical material contained in the WORK(S), alone or in conjunction with other material, and to prepare and use brief synopses and/or revised or abridged versions of the WORK(S), or any literary, dramatic or musical material contained therein, for purposes of advertising and publicizing the WORK(S), and for purposes of trade. The foregoing shall include the right to use, perform and broadcast excerpts of the WORK(S) on the Rhino website(s). If Rhino wishes to use excerpts of the WORK(S) that are more than thirty (30) seconds in length, Rhino shall seek the approval of Licensor, such approval shall not be unreasonably withheld.

(e)    The right to distribute videograms to the institutional market, including but not limited to medical, educational and religious institutions, retirement homes, libraries, civic groups, clubs, summer camps and institutions with shut-ins, for their non-commercial, non-theatrical exhibition;

(f)     The right to edit and change the WORK(S) for length and for purposes of conforming to censorship or other legal requirements. In no event shall any such edit or change delete or otherwise alter the credits or copyright notice for the WORK(S); and

(g)     The right to sublicense the WORK(S), in whole or in part, or subcontract others to exercise any rights granted to Rhino hereunder.

2.     DELIVERY OF MATERIALS
(a)     Licensor shall deliver to Rhino each of the items set forth in Section (g) of Exhibit "A" hereunder;

(b)     Rhino shall notify Licensor within fifteen (15) business days after delivery of any such item of any defect therein. Licensor shall use best efforts to correct such defect or replace such item, as may be necessary, within fifteen (15) additional business days thereafter.

(c)     No such notice of defects delivered by Rhino shall be deemed a waiver by Rhino of Licensor's obligation to deliver any materials or items set forth hereunder within the time set forth below.

(d)     Each of the items set forth in Section (g) of Exhibit "A" shall remain the property of Licensor and shall be returned to Licensor upon termination of this Agreement (or at such other time as may be expressly provided below or on Exhibit "A" with respect to any item).

(e)     All costs and expenses incurred in connection with the creation, manufacture and delivery of said items shall be paid by Licensor, except as set forth hereunder.

3.     ROYALTIES
(a)     Basic Royalty Rate: As compensation for the rights granted to Rhino hereunder, and subject to the remaining provisions of this Section 3 and Section 4 herein, Rhino shall pay to Licensor a Basic Royalty Rate, as set forth in Exhibit "A."

(b)     Returns, Exchanges, Promotions & Free Goods: No royalties shall be payable to Licensor in respect of videograms (i) returned, exchanged, distributed free of charge for promotional purposes and/or distributed as "free" or "no charge," (ii) distributed to television or radio stations or publications to promote or stimulate the sale of videograms, or (iii) videograms sold directly to Licensor by Rhino at a discount.

(c)     Advance: Rhino shall pay to Licensor a non-returnable advance(s), as set forth in Exhibit "A," which shall be recoupable from any and all royalties earned by Licensor pursuant to this Agreement.

4.     PAYMENT AND ACCOUNTING
(a)     Royalties earned and payable as aforesaid shall be accounted for and paid within sixty (60) days after the end of each calendar quarter. Rhino shall have the right to establish reserves of up to twenty-five percent (25%) of net sales hereunder. Reserves established as aforesaid shall be liquidated equally over a twenty-four (24) month period after initially established.

(b)     Rhino makes no express or implied representation or guarantee as to the amount of royalties to be derived from the sale of videograms, or the exercise of any right granted to Rhino hereunder.

5.     WARRANTIES OF LICENSOR
Licensor hereby represents and warrants to Rhino throughout the term and any extension hereof, that:

2

000023

(a)     Licensor has the absolute right to enter into this Agreement, and to grant to Rhino all of the rights, licenses and privileges granted hereunder. If Licensor is the owner of the WORK(S), Licensor will, upon request by Rhino and prior to the execution of this Agreement, provide to Rhino a copy of the certificate(s) of copyright registration for the WORK(S), or documents evidencing Licensor's ownership of the property. If Licensor is not the owner of the WORK(S), Licensor will, upon request by Rhino and prior to the execution of this Agreement, provide to Rhino a copy of any and all appropriate documents or agreements by and between Licensor and the owner of the WORK(S) evidencing Licensor's right to enter into this Agreement and to grant to Rhino all of the rights, licenses and privileges granted hereunder;

(b)     Neither the WORK(S) or any part thereof, or the exercise of any of the rights granted to Rhino hereunder, will violate or infringe the trademark, tradename, contract, copyright, literary, artistic, dramatic, property or civil rights, right of privacy or any other rights whatsoever of any person or entity;

(c)     Neither Licensor nor Rhino will, at any time during the term or any extension hereof, sell, assign, encumber or grant to any other person or entity, or exercise for its own account, any of the rights, licenses or privileges granted to the other party hereunder, or any other rights, licenses or privileges that will directly compete with the rights, licenses or privileges granted to the other party hereunder;

(d)     There is no claim or litigation, pending or threatened, which may materially or adversely affect the rights, licenses and privileges granted to Rhino hereunder, or the use thereof by Rhino;

(e)     Neither the WORK(S) or any part thereof is in the public domain, and the copyrights of the WORK(S) and all literary, dramatic and musical material upon which it is based or which is contained in the WORK(S) will be valid and subsisting throughout the Territory during the term hereof. Licensor shall secure, register, renew and extend all such copyrights as may be necessary. Without limiting the foregoing obligation, Licensor hereby authorizes and empowers Rhino to register its licensing interest in the WORK(S) for copyright purposes and to secure renewals and extensions thereof in the Copyright Office of the United States of America and/or in any other country or political entity where it deems it appropriate to do so;

(f)     Neither the WORK(S) nor any part thereof has been previously sold or distributed as videograms in the Territory other than pursuant to this Agreement, or as disclosed to Rhino on Exhibit "A" hereunder;

(g)     Licensor has not heretofore authorized, nor will it at any time during the term or any extension hereof authorize, any other person or entity to import videograms of the WORK(S) into the Territory;

(h)     All rights granted to Rhino hereunder are and will be free and clear of any liens, restrictions, claims and encumbrances of any kind, and all royalties, license fees and/or other fees required to be paid in connection with said rights, or the use, distribution, performance or exploitation of the WORK(S) hereunder (and the music and all other matter contained therein) will be paid by Licensor, including but not limited to all payments on account of or arising from:

(i)     Any claims or rights of owners of copyrights or other property rights in the WORK(S), or in any music or other material contained therein;

(ii)     Any claims or rights of any performing rights society or any body or group representing authors, composers, musicians, artists, publishers or other persons having legal or contractual rights of any kind to participate in the receipts of the WORK(S); and

3

000024

        (iii)    Any other claims or rights with respect to the use, distribution and exploitation of the WORK(S) as contemplated hereunder, including but not limited to any guild and/or union residuals, reuse payments or other similar payments, which shall be Licensor's sole obligation;

        (i)    Licensor shall at its sole cost and expense take all reasonable steps to protect all copyrights and other rights pertaining to the WORK(S) from infringement by unauthorized parties and, in particular, shall initiate such action and proceedings as may be reasonably required to prevent any unauthorized use by third parties of the WORK(S) or any part thereof. If Licensor fails to initiate any such action, Rhino may, in its sole discretion, and at Licensor's sole cost and expense, initiate such action in its own name and/or Licensor's name and may join Licensor as a party thereto.

6.     INDEMNITY

      Reference is made to the indemnity provision set forth in Section (i) of Exhibit "A."

7.     INSURANCE

      Licensor will maintain, at its own expense, at all times during the term hereunder and for three (3) years thereafter, and with a reasonable insurance carrier acceptable to Rhino, at least a One Million Dollar ($1,000,000.00) combined single limit liability insurance policy with respect to the WORK(S).

8.     DISTRIBUTION AND EXPLOITATION

      (a)    Rhino shall have the complete, exclusive and unqualified right to promote, distribute and exploit videograms of the WORK(S) throughout the Territory and each part thereof, during the term and any extension hereof, in accordance with such methods, policies, terms and conditions as Rhino in its reasonable business judgment may determine proper or expedient. The failure of Rhino in its sound business judgment to exercise any of the rights granted hereunder in any portion of the Territory shall not be deemed to be an abandonment or relinquishment of such rights.

      (b)    Notwithstanding the foregoing, Rhino will not promote the WORK(S) through any medium that is inappropriate for children's videos (e.g., Playboy, adult websites, etc.).

9.     BOOKS AND RECORDS

      (a)    All accountings rendered by Rhino shall be deemed conclusive unless objections in writing, specifying all objections with particularity, are received by Rhino within two (2) years from the date such accounting is rendered. Rhino shall not be obligated to keep any books or records pertaining to this Agreement for any period exceeding two (2) years from the date the accounting derived therefrom is rendered unless specific objections to any such accounting have been received pursuant to this paragraph. Licensor shall maintain no action, claim, or proceeding against Rhino with respect to any accounting or statement rendered by Rhino hereunder unless such action, claim or proceeding is commenced within two (2) years after such accounting or statement is rendered.

      (b)    A certified public accountant, on Licensor's behalf, may, at Licensor's sole cost, examine Rhino's books or records with respect to the WORK(S) hereunder, but only during Rhino's normal business hours and after reasonable written notice, and no more than once within each twelve (12) month period or once with respect to any statement rendered hereunder. Licensor shall have no right to examine any books or records relating to Rhino's general business operations, or any matter other than the WORK(S) hereunder.

10.    BREACH; REMEDIES

4

000025

Except as otherwise provided herein, in the event that at any time during the term or any extension hereof either party hereto breaches any of its warranties or representation hereunder, or in the event either party fails to perform any obligation required of it under this Agreement, and such breach or failure continues for a period of thirty (30) days after written notice thereof is given by the non-breaching party, said party shall be in default hereunder and the non-breaching party may pursue any and all remedies available under this Agreement, by law or at equity, except that if the nature of the breach is such that it cannot be reasonably cured within said thirty (30) day period, and within said thirty (30) day period the breaching party takes substantial measures towards curing the breach and within a reasonable time thereafter diligently pursues such cure to completion, such party shall not be deemed to be in default hereunder.

11. RESOLUTION OF CONTROVERSIES

(a)     In the event of any litigation between the parties hereto to enforce any of the provisions hereunder, the unsuccessful party to such litigation covenants and agrees to pay to the successful party therein all costs and expenses, including but not limited to reasonable attorneys' fees incurred therein by such successful party, which costs, expenses and attorneys' fees shall be included in and as a part of any judgment rendered in such litigation.

(b)     In the event of a breach of this Agreement by Rhino, Licensor shall be limited to its right, if any, to recover money damages, and shall not be entitled to injunctive or other equitable relief.

12. FORCE MAJEURE

If, because of any act of God, accident, strike, fire, riot, war or any other cause not within Rhino's control, Rhino is prevented from performing any of its obligations hereunder, then Rhino may suspend the term hereof for the duration of the force majeure, but not for longer than six (6) months. If such force majeure continues beyond said period, Rhino shall, within an additional thirty (30) days, subcontract or sublicense a third party to manufacture and sell videograms of the WORK(S). If Rhino fails to thus subcontract or sublicense its obligations, Licensor may terminate this Agreement. If Licensor does not so terminate this Agreement, the term hereof shall be extended by a period of time equal to the period of the duration of the force majeure.

13. RELATIONSHIP OF PARTIES

(a)     The relationship between Licensor and Rhino is that of creditor and debtor with respect to the payment of any monies due Licensor hereunder. Nothing contained herein shall be construed to create a trust or specific fund as to royalties or any other monies, or to prevent or preclude Rhino from commingling any monies due Licensor with any other monies.

(b)     This Agreement shall not be construed as creating a joint venture or partnership between Licensor and Rhino. Neither party shall have any authority to bind the other or the other's representatives in any way except as expressly provided to the contrary herein. The provisions of this clause are not intended to destroy or diminish in any way the rights, licenses and privileges granted to Rhino with respect to the WORK(S).

14. ASSIGNABILITY

Rhino may assign this Agreement to any parent, subsidiary or affiliate entity, or to any financially responsible entity which acquires substantially all of Rhino's stock or assets through merger, consolidation or other reorganization, subject to Licensor's consent, not to be unreasonably withheld. Any such assignee (or sub-assignee) shall prospectively assume all contractual obligations of the assigned party hereunder. This agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective successors, permitted assigns, heirs, executors, administrators and legal and personal representatives.

15. NOTICES

5

000026

(a)    Except as expressly provided to the contrary herein, all notices and demands of any kind which the parties hereto may require or desire to serve upon each other shall be in writing and shall be served by sending such notice certified or registered mail, postage prepaid, with return receipt requested, to the address of each party as listed below:

If to RHINO:

Vice President
Business & Legal Affairs
Rhino Entertainment Company
10635 Santa Monica Blvd.
Los Angeles, CA 90025-4900

If to LICENSOR:

Kerry Romeo
Director of Sales and Acquisitions
Sunbow Entertainment
100 Fifth Avenue
New York, NY 10011

(b)    In case of service by mail, service shall be deemed complete on the date of actual delivery as shown by the registration or certification receipt or at the expiration of the third day after the date of the mailing, whatever first occurs. The addresses to which notices and demands shall be delivered or sent may be changed from time to time by notice served as hereinabove provided by any party upon any other party.

16.    VIDEOGRAMS
"Videograms" are herein defined as all forms of audiovisual devices, including but not limited to videocassette, and such video devices now known or hereafter devised that enable the WORK(S) to be received visually when used in combination with or as part of a piece of electronic, mechanical or other apparatus, through a playback system or device.

17.    GENERAL PROVISIONS
(a)    Entire Agreement: This Agreement contains the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements between the parties with respect thereto. No claim of waiver, modification, consent or acquiescence with respect to any provision of this Agreement shall be made against either party hereto except on the basis of a written instrument executed by or on behalf of the party to be charged.

(b)    Construction: Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be valid under applicable law, but if any provision of this Agreement shall be invalid or prohibited thereunder, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

(c)  .  Successors and Assigns: Except as otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of the successors and assigns of each of the parties hereto.

(d)    Paragraph Headings: The headings of the several paragraphs of this Agreement are inserted solely for convenience of reference, and are not a part of and are not intended to govern, limit or aid in the construction of any term or provision hereof.

(e)    Person and Tense: Whenever necessary herein, all terms used in the singular shall apply to the plural and vice versa, and all terms used in the neuter shall apply to the masculine and feminine genders and vice versa.

6

000027

(f)    Governing Law: This Agreement is to be governed by and construed in accordance with the laws of the State of New York, applicable to agreements executed and wholly to be performed therein.

(g)    Execution in Counterparts: This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but such counterparts together constitute only one and the same instrument.

(h)    Cumulative Remedies: All rights and remedies granted to any party hereunder shall be cumulative and shall not interfere with or prevent the exercise of any other right or remedy which may be available to such party.

(i)    Reservation of Rights: All rights in and to the WORK(S) not specifically granted to Rhino hereunder are hereby reserved by Licensor.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first set forth above

RHINO                                                          LICENSOR

RHINO ENTERTAINMENT COMPANY                SUNBOW ENTERTAINMENT
d/b/a RHINO HOME VIDEO

By: _____                    By: _____
Date: _____ 2/21/00                         Date: _____ 7/17/00
                                                 Fed ID #: _____ SAM MILLSTONE
                                                           VP FINANCE AND OPERATIONS
                                                           CHIEF FINANCIAL OFFICER

7

000028

## EXHIBIT "A"

Exhibit "A" to that certain Exclusive License Agreement entered into by and between Rhino Entertainment Company d/b/a Rhino Home Video ("Rhino") and Sunbow Entertainment ("Licensor") dated this 18th day of April, 2000.

(a) Work(s):

(1) The following animated, color programs related to the children's television series "My Little Pony" (the "Programs"):

(i) 90-minute "My Little Pony" theatrical movie;

(ii) "My Little Pony" original series consisting of sixty-five (65) 15-minute episodes:

(iii) "My Little Pony Tales" consisting of twenty-six (26) 15-minute episodes.

(2) Rhino shall have the right to release the Programs individually as WORK(S) or to create new WORK(S), other than that described above, by combining multiple Programs so as to tell a complete story ("New Compilation(s)"). Rhino shall also have access to pre-edited compilations ("Pre-edited Compilation(s)") for use in the creation of the WORK(S), at no additional charge, where available. Rhino shall retain the right to edit the Pre-edited Compilation(s) for creation of the WORK(S) at Rhino's own cost. In the event Rhino creates New Compilations for creation of the WORK(S), Rhino shall pay for all costs pertaining to the New Compilation(s), with those costs to be absorbed by Rhino. Rhino shall also pay all costs pertaining to the creation of any DVD packages, with those costs to be absorbed by Rhino.

(3) Notwithstanding the foregoing, Rhino shall not, at any time, alter the Programs as delivered in any way for use in these New Compilation(s).

(4) Rhino shall have the right to include a promotional trailer or video for other Rhino products on the WORK(S) and have the right to compile multiple Programs onto a single cassette for custom packages or special releases subject to Hasbro's reasonable approval. In the event said approval is not received within 10 business days of submission, Rhino shall assume that approval has been given.

(5) Rhino shall be responsible for all editing costs related to (a)(3) through (a)(4), said amount not to be recoupable against royalties. In the event the New Compilation(s) are licensed by Licensor for release on video in other territories, Licensor will reimburse Rhino fifty percent (50%) of Rhino's editing costs.

(b) Media:

Home Video, in all formats now known or hereafter devised, including but not limited to video cassette, all video disc configurations (including DVD) and 8mm formats. Specifically excluded are all

8

000029

interactive, broadcast, cable, syndication, satellite, on-line or other transmission rights, except as specifically noted herein.

(c) Territory:

The United States, its territories and possessions.

(d) Term:

Five (5) years from the release of each WORK(S). There shall also be a six (6) month sell off period for each WORK(S) at the end of the initial Term for such WORK(S) provided Rhino shall not have the right to manufacture additional units of the WORK(S) past the end of the initial Term.

(e) Recoupable Advance:

A total of fifty thousand dollars ($50,000.00), payable as follows: (i) fifty percent (50%) upon execution of this Agreement and substantiation of Licensor's right to enter into this Agreement; (ii) fifty percent (50%) upon delivery and acceptance of master video and art elements requested for those Programs that Rhino has targeted ·for release in the immediate future ("Initial Programs"). Rhino shall provide Licensor a list of the Initial Programs upon execution of the Agreement. The Advance is to be cross collateralized against all royalties payable to Licensor for the WORK(S) hereunder.

(f) Royalties:

The royalty payable to Licensor hereunder shall be as follows: (i) 25% of Rhino's wholesale, for all videos with a SRLP of $19.95 and above; (ii) 20% of wholesale, for all videos with a SRLP of between $14.95 and $19.94; and (iii) 15% of wholesale, for all videos with a SRLP of between $10.00 and $14.94; (iv) 12% of wholesale, for all videos with a SRLP of between $7.95 and $9.99; and·(v) 10% of wholesale, for all videos with a SRLP under $7.95.

Rhino shall retain the right to establish prices as indicated by market conditions and change prices at any time, but in no case shall Rhino offer the WORK(S) for less than $7.95 without prior written approval from Licensor.

The royalty percentage shall be based on Rhino's landed wholesale price ("LWP"), which is defined as Rhino's wholesale selling price ("wholesale") of each WORK(S), less a deduction of six percent (6%) as a fee paid to WEA for handling fulfillment and collections.

The LWP shall fluctuate in accordance with Rhino's suggested retail list price ("SRLP") and is inclusive of any third party royalties, including but not limited to payments to producers, union, sychronization, and mechanical license fees.

There will be no other deductions taken with the exception of prebook discounts, offered as an incentive to obtain initial product placement and re-stocking WORK(S). Licensor shall retain the reasonable right of approval of any other discount programs that would lessen the anticipated revenues paid to Licensor.

Notwithstanding the foregoing, when product is sold through mail order, direct response or video clubs (e.g. Columbia House); sublicensed for release on all home video formats, now known or hereinafter developed, including but not limited to video cassette, all

9

000030

video disc configurations (including DVD) and 8mm formats; exploited as part of a promotional program, as a premium, or in connection with the sale of any product, commodity, or service, Rhino and Licensor shall equally split all advances and royalties paid or credited to Rhino, less all third party payments by Rhino, including but not limited to duplication and packaging costs, and any and all costs incurred in the marketing or manufacturing of the WORK(S). The term "royalties" shall not include any monies paid or credited to Rhino as reimbursement for finished goods.

(g) Delivery:

(1) Master(s): First generation, first quality, master video elements on an NTSC Digi Beta or D-2 master format, with all commercial blacks edited out, to be delivered upon execution of contract;

(i) The costs of editing out the commercial blacks and promotional spots will be paid by Licensor.

(ii) Rhino may be charged reasonable material fees for the creation of the Master(s) as all elements that may be needed may not exist in either Digi Beta or D-2 configurations. Rhino shall retain the right to have such editing done at the lab facility of Rhino's choice and cost.

(iii) If the original source Master(s) provided by Licensor for any particular Program is defective, Licensor will provide an additional Master(s), at no cost to Rhino, and will reimburse Rhino for any additional transfer costs incurred.

(iv) If Licensor is unable to provide an acceptable replacement for the defective Master(s) referenced in subparagraph (iii) above, Rhino shall have the right to delete the Program in question from this Agreement and reduce the Advance accordingly.

(2) Packaging and Collateral Materials: Elements needed for the creation of packaging and collateral materials, including but not limited to photographs and slides featuring performers as they appear in the WORK(S);

(i) Licensor warrants that they have, control and will provide such elements to Rhino and/or that Rhino shall have reasonable access to same based on availability.

(ii) Prior to the execution of this Agreement, Licensor shall apprise Rhino of what elements are available as well as to the format in which they exist.

(iii) Both parties acknowledge that ownership of these elements are retained by Licensor and that these elements may only be used in the sale and promotion of the Licensed Titles, as set forth hereunder.

(3) Advertising Materials: Copies of advertisements and other advertising materials prepared by or for LICENSOR in connection with

10

000031

the WORK(S) (including publicity stills, photographs and other transparencies of the artwork relating to the WORK(S)) suitable for use in creating advertising and merchandising devices for the videograms; upon execution of contract.

(4) Credits: The statement of credits applicable to the WORK(S) (for use in according credit on videograms and the packaging thereof), which statement of credits shall in all respects be compiled by Rhino; upon execution of contract.

(5) Theatrical Rating (where applicable): The theatrical rating given the WORK(S) by the Motion Picture Association of America ("MPAA"), or other motion picture rating association; when available.

(6) Press Kit: A press kit or press book for the WORK(S); when available.

(7) Copyright: Detailed information as to the appropriate copyright notice, symbols and wording to be affixed to videograms and the packaging thereof; upon execution of contract.

(h) Special Package(s):

(1) Subject to Licensor's approval not to be unreasonably withheld, Rhino shall retain the right to create special packages that include the WORK(S) along with other promotional or licensed goods such as posters, t-shirts, or pins, as value added on-pack items ("special package(s)"), and sell the special package(s) at a retail price higher that the video alone.

(2) In the event that any of the WORK(S) are coupled with products not directly licensed to Rhino by Licensor ("additional merchandise"), the royalty paid by Rhino to Licensor for such special package(s) containing such additional merchandise shall be based on either the suggested wholesale price of the video portion of the release or a pro-ration to be negotiated by the parties in good faith prior to the release of the special package(s).

(3) Rhino shall have the right to offer said additional merchandise for the sale and apart from the WORK(S) by any means, including but not limited to inclusion of so-called "tip in cards" or by including spots on the actual WORK(S). Licensor hereby acknowledges that it shall receive no revenues from the sales of additional merchandise separate and apart from the WORK(S).

(i) Warranties & Indemnification:

(1) Licensor warrants that neither the WORK(S) nor any part thereof is in the public domain, and the copyrights in and to the WORK(S) and all literary, dramatic and musical material upon which the WORK(S) is based or which is contained in the WORK(S) will be valid and subsisting in the Territory throughout the Term hereunder. Licensor shall secure, register, renew and extend all such copyrights as may be necessary. Without limiting the foregoing obligation, Licensor hereby authorizes and empowers Rhino to register its licensing interest in the WORK(S) for copyright purposes and to secure renewals and extensions thereof in the Copyright Office of the

11

000032

United States of America and/or in any other country or political entity where it deems it appropriate to do so.

(2) Licensor further warrants that all mechanical, synchronization, master, use, name and likeness, union, performance and any other third party clearances with respect to the WORK(S) have been obtained; that such clearances are now, and through the Term of this agreement shall be in effect; and that Rhino shall have no aditional financial responsibilities with respect to any such clearances.

(3) Prior to the execution of this Agreement, Licensor shall provide Rhino with substantiation of their right to enter into this Agreement, including but not limited to a copy of the certificate(s) of copyright registration (or other documentation evidencing chain of title), and any documentation pertaining to the rights and clearances indicated in the preceding paragraph. Should Licensor be unable to provide said copy of the certificate(s) of copyright registration (or other documentation evidencing chain of title), Rhino shall have the right to conduct a copyright search relating to the WORK(S), the cost of which shall be treated as an additional recoupable expense hereunder.

(4) Licensor agrees to defend, indemnify and hold Rhino, and each of its directors, officers, agents, employees, sublicensees and distributors harmless from any liability, damages, judgment, settlement, cost or expense, including reasonable attorneys' fees, incurred in connection with or arising out of any breach or failure of any of Licensor's covenants, representations and warranties under this Agreement. In the alternative, Rhino, in Rhino's sole discretion, shall have the right to defend any such action, at Licensor's sole cost and expense. In the event of any such decision to defend by Rhino, the indemnity provision by Licensor of Rhino contained within this paragraph shall still apply.

(5) As to any matter to which the foregoing indemnity relates, Rhino may, in addition to all other rights it may have, withhold from payments due Licensor a sum which is reasonably necessary to satisfy any judgment or settlement approved by Licensor in connection with such matter, plus a reasonable amount to cover the expenses of contesting or defending such claim, and Rhino may further apply the amount withheld to the satisfaction of such judgment or settlement approved by Licensor and to reimbursement of such expenses.

(6) Rhino agrees to defend, indemnify and hold Licensor, and each of its directors, officers, agents, employees, sublicensees and distributors harmless from any liability, damages, judgment, settlement, cost or expense, including reasonable attorneys' fees, incurred in connection with or arising out of any breach or failure of any of Rhino's covenants, representations and warranties under this Agreement. In the alternative, Licensor, in Licensor's sole discretion, shall have the right to defend any such action, at Rhino's sole cost and expense. In the event of any such decision to defend by Licensor, the indemnity provision by Rhino of Licensor contained within this paragraph shall still apply.

12

000033

(j) Promotional Uses:

(1) Rhino shall have the right to creat promotional items in supports of the WORK(S). These items will not be made available for sale and will only be offered as promotional items within the trade.

(2)Licensor will make best efforts to aid Rhino in coordinating promotions and sales with other licensees. Licensor shall provide Rhino with a list of other principal licensors of products for the Programs, or have Hasbro provide same, which will include contact names, address and phone/fax information.

(3) Licensor will provide access, at no charge to Rhino, to any and all fan and/or consumer mailing lists developed that pertain to the Programs, for use during the Term for sale of the WORK(S) only.

(4) Licensor agrees to provide access to those character costumes that may be available, for promotional purposes, including but not limited to press and other public relations support, trade shows and store openings, amoung other uses.

(5) Rhino shall have the right to utilize not more than thirty (30) seconds from each of the Programs for broadcast promotional use only.

(6) Rhino shall have the non-exclusive right to stream no more than thirty (30) seconds from each of the Programs via any Rhino and/or Time-Warner owned, controlled or affiliated sites, for the sole purpose of promoting the WORK(S).

(k) Additional Comments:

(1) It is understood that certain Programs were previously released on home video by a number of companies, including but not limited to Family Home Entertainment, LIVE Entertainment, Golden Books Video, Video Treasures, Image Entertainment and Vestron Video. Licensor warrants that all rights and sell off periods have lapsed, and that specific information as to previous licensors and when those licenses lapsed will be provided to Rhino prior to execution of this Agreement.

(2) It is understood that no episodes from "My Little Pony Tales" were ever release on home video.

(3) For the purposes of this Agreement, it is understood that Hasbro retains underlying rights in and to these programs and will retain the reasonable right of approval for certain elements, as outlined herein.

(4) All rights not granted to Rhino are reserved to Licensor for use without restriction, and Rhino acknowledges that the name of the Programs, the characters, character designs and likenesses are owned and/or controlled by Licensor, and that Rhino will not challenge, copy or imitate such names or rights during or after the Term ends.

13

00003

(5) In the event a discrepancy exists between the Standard Terms and Provisions and this Exhibit "A", Exhibit "A" shall prevail.

RHINO

RHINO ENTERTAINMENT COMPANY
d/b/a RHINO HOME VIDEO

By: _____

Date: _____ 7/21/00

LICENSOR

SUNBOW ENTERTAINMENT

By: _____

Date: _____ 7/17/00 SAM MILLSTONE
VP FINANCE AND OPERATIONS
Fed ID #:_____ CHIEF FINANCIAL OFFICER

14

000035

**Exhibit C**



**HOME VIDEO**

**revised** March 12, 1999

Kerry Romeo
Director of Sales and Acquisitions
Sunbow Entertainment
100 Fifth Ave.
New York, NY 10011

Dear Kerry,

Per your discussion with Craig Kamins, following is a revised copy of the deal memo for the
JEM, Transformers and G.I. Joe programs:

**A. WORK(S)/PROGRAM(S):** Exclusive English language home video rights to the following
three (3) children's television series:

1. "JEM"
     65 half hour programs, produced in 1987
2. "Transformers"
     "Transformers Takara"
          115 half hour programs, produced in Japan in the 1980's
     "Transformers Original"
          46 half hours programs, produced between 1984 and 1988.
     "Transformers Generation 2"
          52 half hours that were re-edited with computer generated graphics added in
               1994
     "Transformers- The Movie"
          1 ninety (90) minute feature film.
3. "G.I. Joe"
     "G.I. Joe Original"
          95 animated half hour programs produced from 1983 to 1989
     "G.I. Joe- The Movie"
          1 ninety (90) minute feature length movie

All programs are animated and in color.

It is understood that the programs may exist in configurations other than that outlined
herein, specifically, there may be 60, 90 and 150 minute programs created by compiling
multiple episodes so as to tell a complete story, and that Rhino shall have access to the
pre-edited episode compilations, at no additional charge, where available. Rhino will also
retain the right to edit the materials at their own cost.

**B. RIGHTS:** The exclusive right to produce, manufacture, market and sell in the territory
all home video formats, now known or hereinafter developed, including but not limited to
video cassette, all video disc configurations, and 8mm formats.

000036

Specifically excluded are all interactive, broadcast, cable, syndication, satellite, on-line or other transmission rights.

**C. TERRITORY**: The United States, its territories and possessions.

**D. TERM**: Five (5) years from the earlier of the release of the first program(s) by Rhino or 120 days after Delivery, as defined in Section E below. It is contemplated that the release of the first program(s) by Rhino shall occur in September 1999. There shall also be a six (6) month sell off period at the end of the Term.

**E. RECOUPABLE ADVANCE**: A total of one hundred twenty five thousand dollars ($125,000.00), payable one half upon execution of this deal memo and substantiation of Licensor's rights to enter into an Agreement, and one half upon delivery and acceptance by Rhino of master video and art elements for at least 10 JEM programs, 30 Transformers programs and 30 GI Joe programs ("Delivery"), receipt of which is hereby acknowledged.

We have allocated the advance to each series as follows:
1. JEM...$25,000.00
2. Transformers...$50,000.00
3. G.I. Joe...$50,000.00

**F. ROYALTY**:
The royalty percentage will be based on Rhino's landed wholesale price, will fluctuate in accordance with Rhino's suggested retail list price and is inclusive of any and all third party royalties, including but not limited to royalties and producers, union, synchronization, and mechanical license fees.

| SUGGESTED RETAIL | ROYALTY |
|---|---|
| $19.95 and above suggested retail | 25% of wholesale |
| $14.95 to $19.94 | 20% of wholesale |
| $10.00 to $14.94 | 15% of wholesale |
| $7.95 to $9.99 suggested retail | 12% of wholesale |
| under $7.95 suggested retail | 10% of wholesale |

We anticipate offering product at prices ranging from $7.95 to $19.95 but Rhino shall reserve the right to establish prices as indicated by market conditions. There will be nothing that will impact or limit our rights to change them at any time but in no case will Rhino offer the programs at a price less than $7.95 without prior written approval from Licensor.

The landed price is determined by taking the wholesale price of each program, less a deduction of 6% as a fee paid to WEA for handling fulfillment and collections. There will be no other deductions taken with the exception of prebook discounts, offered as an incentive to obtan initial product placement, and re-stocking programs. These discounts usually are in the range of 3% of the wholesale price.

Licensor shall retain the reasonable right of approval of any other discount programs that would lessen the anticipated revenues paid to Licensor.

When product is sold through television direct response, video clubs (eg: Columbia House), when sublicensed for release on disc and/or 8mm, exploited as part of a promotional program or distributed as a premium or in connection with the sale of any

000037

product, commodity or service, Rhino and Licensor shall equally split all advances and/or royalties paid or credited to Rhino, less any direct out of pocket costs paid or credited against Rhino for the release of the product. The term 'royalties' shall not include any monies paid or credited to Rhino as reimbursement for finished goods, at Rhino's actual cost.

## G. ADDITIONAL COMMENTS:

1. Licensor warrants that all mechanical, synchronization, master, name and likeness, performer, performance, union and any and all third party clearances have been or will be obtained prior to the release of the product and that now and through the Term of this Agreement, such clearances shall be in effect and that Rhino shall only have royalty obligations to Licensor.

2.a. Licensor agrees to defend, indemnify and hold Rhino, and each of its directors, officers, agents, employees, sublicensees and distributors harmless from any liability, damages, judgement, settlement, cost or expense, including reasonable third party attorney's fees, incurred in connection with or arising out of any breach or failure of any of Licensor's covenants, representations and warranties hereunder.

2.b. Rhino agrees to defend, indemnify and hold Licensor, and each of its directors, officers, agents, employees, sublicensees and distributors harmless from any liability, damages, judgement, settlement, cost or expense, including reasonable third party attorney's fees, incurred in connection with or arising out of any breach or failure of any of Rhino's covenants, representations and warranties hereunder.

3. Licensor warrants that all programming licensed to Rhino is now and through the term of the Agreement, protected by copyright in the territory.

4. Licensor shall deliver to master video elements on an NTSC Digi Beta or D-2 master format, with all commercial blacks edited out. Reasonable material fees may be paid for by Rhino as all elements that may be needed may not exist in either digi beta or D-2 configurations. Rhino will retain the right to have such editing done at the lab facility of their choice and cost.

5. Licensor warrants that they have and control elements needed for the creation of packaging and collateral materials, including but not limited to photographs and slides picturing those characters featured in the programs and that Rhino shall have reasonable access to same. Rhino acknowledges that ownership of these elements are retained by Licensor and that these elements may only be used in the sale and promotion of the licensed programs.

6.a. Rhino shall have the right to release the programs as delivered and/or to compile the programs into configurations that Rhino, at it's sole discretion, may determine to be more saleable. In the event Rhino does compile program(s), Rhino shall be pay for the all costs pertaining to the compilation, with those costs to be absorbed by Rhino. In no event shall Rhino create compilations that contain programs from more than one series and/or compile the programs with programs controlled by third parties.

6.b. It is understood that Rhino may not, at any time, alter the programs as delivered in any way, for use in these compilations.

6.c. With reasonable approval from Hasbro, Rhino shall have the right to include a promotional trailer or video for other Rhino product and have the right to compile multiple programs onto a single cassette for custom packages or special releases. In the

000038

event said approval is not received from Hasbro within 15 business days of submission, it will be assume approval has been granted.

6.d. Rhino shall be responsible for all editing costs related to paragraphs 6.a. through 6.c., said amount not to be recoupable. In the event that Licensor makes use of such edited programs outside of the Territory, hereunder, Licensor shall reimburse Rhino (from the revenue generated from such usages) up to 50% of its editing costs.

7.a.Rhino may chose, with the reasonable approval of Hasbro, to create special packages that include other goods not licensed from Licensor, and embodying characters appearing in the programs, including but not limited to toys, posters, t-shirts, or hats, as value added on-pack items, and sell the special packages at a retail price higher than the video or audio alone (with a corresponding increase to the wholesale price).

7.b. Rhino shall be obligated to purchase or manufacture these third party goods at their own expense.

7.c. In the event that the video programs are coupled with those products not directly licensed to Rhino by Licensor, the royalty paid by Rhino to Licensor shall be based on the previously established landed wholesale price of the video portion of the release.

7.d. Should Rhino offer these third party licensed goods for sale seperately by any means, including but not limited to inclusion of insert cards or by including spots on the actual programs, shall not be obligated to pay Licensor any fees or royalties generated from those sales.

7.e. It is understood that merchandising rights for non-video product are controlled by an entity other than the Licensor of this programming and that Rhino shall be obligated to purchase these goods from that entity or its licensees.

7.f. Licensor will provide Rhino with a list of other principal licensors of products for the licensed series, or have Hasbro provide same, which will include contact names, address and phoone/fax information, as available.

8. Licensor will make reasonable efforts to aid Rhino in their efforts to coordinate promotions and sales with other Licensees.

9. Licensor will provide access, at no charge to Rhino, to any and all fan and/or consumer mailing lists developed that pertain to the licensed series, for use during the term for sale of the licensed programs only.

10.a. It is understood that there were extensive previous video releases, from a number of companies, including but not limited to Family Home Entertainment, LIVE Entertainment, Golden Books Video, Video Treasures, Image Entertainment and Vestron Video. Licensor warrants that all rights and sell off periods have lapsed, as follows:

"JEM"...1994
"Transformers"...1994
"G.I. Joe Original"...1994
"G.I. Joe – The Movie" ...1997

10.b. Prior to the execution of a formal Agreement, Licensor shall provide Rhino with a complete list of programming released, pricing and previous unit sales

000039

11. All rights not granted to Rhino are reserved to Licensor for use without restriction, and Rhino acknowledges that, as between Licensor and Rhino, the name of the show, the characters, character designs and likenesses are owned and/or contolled by Licensor, including without limitation all copyright and trademark rights, and that all good will arising during the term in respect to the benefit of and is assigned to Licensor, and that Rhino will not challenge, copy or imitate such names or rights during or after the term of the Agreement ends.

12.a. Licensor agrees to provide access to those character costumes that may be available, for promotional purposes, including but not limited to press and other public relations support, trade shows and store openings, among other uses.

13. For the purposes of this agreement, it is understood that Hasbro retains underlying rights in and to these programs and will retain the right of approval for certain elements, as outlined herein.

14. At the end of the formal Agreement, Rhino shall have a period of 6 months to sell off existing inventory but manufacturing and production of product shall not continue past the date of expiration of the Term.

If the foregoing is acceptable, please indicate your acceptance by signing in the space provided below. Inasmuch as our marketing and business affairs departments have not yet had the opportunity to review and comment on this revised deal memo, I must reserve their rights to make comments and modifications thereto.

Warm regards,

Amy Schorr
Sr. Vice President

AGREED AND ACCEPTED

By: _____

Date: _____ 3·19·99 _____

Fed ID #: _____

10635 Santa Monica Blvd. Los Angeles, Ca. 90025- 4900
phone: 310 474 4778   fax: 310 441 6573

000040

**RHINO**

#30126

# FIRST AMENDMENT

as of January 22, 2002

Reference is made to that certain Exclusive License Agreement ("Agreement") dated March 12, 1999, by and between Rhino Entertainment Company, d/b/a Rhino Home Video, ("Rhino") at 10635 Santa Monica Boulevard, Los Angeles, California 90025 and Chad Entertainment, LLC (formerly known as Sunbow Entertainment, LLC), ("Licensor") at 550 Madison Avenue, New York New York 10022, concerning the exploitation on home video formats of the individual episodes comprising the "G.I. Joe Original" programs produced from 1983 to 1989 as well as other titles. All terms defined in the Agreement shall have the same meaning in this First Amendment.

WHEREAS, the parties hereto desire to amend the Agreement as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and in the Agreement, the parties hereto agree as follows:

1.      Licensor hereby waives its share of advances and royalties paid or credited to Rhino, as set forth in Paragraph F of Exhibit "A" of the Agreement, solely with respect to the premium offer of one (1) videocassette embodying Rhino's previously released "G.I. Joe" Vol. 4, 7, 8 or 9 bundled with a Hasbro G.I. Joe toy for sales initiating in the year 2002.

2.      Promptly following execution hereof, Rhino agrees to pay to Licensee $17,500.00, which is the second half advance payment in regard to the Exclusive License Agreement between Rhino and Licensor dated April 18, 2000, provided that it is understood and agreed that Rhino has not been delivered masters and art elements for "Robotix" and "Visionaries", and that licensor shall deliver same within 45 days after execution of this First Amendment. If such payment is not received by Licensor within such period, then this First Amendment shall be null and void and have no further force and effect.

3.      This First Amendment may be executed via facsimile and such facsimile shall be deemed an original hereof. The parties, however, shall deliver two (2) fully executed hard copy originals to each other promptly following execution hereof.

///
///
///
///
///
///
///
///
///
///

*signature*

**000041**

4.      Except as amended hereby, the Agreement is hereby ratified and shall remain in

Ph: (810) 474-4778   Fax: (310) 441-6587

full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment as of the date first above written.

RHINO ENTERTAINMENT COMPANY,           CHAD ENTERTAINMENT, LLC
d/b/a RHINO HOME VIDEO

By:_____              By:_____
    Amy Schorr

Its: Senior Vice President, General Manager,    Its:_____
     Rhino Home Video

000042

**Exhibit D**

| | |
|---|---|
| **From:** | Shapiro, Arlene (WMG/WSM) |
| **Sent:** | Friday, January 23, 2004 11:20 AM |
| **To:** | Sanchez, Gladys; St. James, Roman (WMG/WSM); Verdugo, Adrianne |
| **Cc:** | O'Neill, Bob; Gates, Craig |
| **Subject:** | RE: Sunbow Productions Inc. - Urgent |

We don't pay sync on the Sunbow deal.

-----Original Message-----
**From:** Sanchez, Gladys
**Sent:** Friday, January 23, 2004 11:16 AM
**To:** Shapiro, Arlene (WMG/WSM); St. James, Roman (WMG/WSM); Verdugo, Adrianne
**Cc:** O'Neill, Bob; Gates, Craig
**Subject:** Sunbow Productions Inc. - Urgent
**Importance:** High

Hi, Arlene, Roman and Adrianne

We're being asked to provide the following information on all the videos subject to the Sunbow/Rhino Agreement:

**Jem, Transformers, GI Joe, My Little Pony, Visionaries, Inhumanoids**

Adrianne can you please provide: Actual Sales of CD records, CSTs, Video Cassettes and DVDs featuring the above-referenced characters.

Arlene or Roman, can you please provide: Mechanical, synchronization, performance and/or any other licensing fees paid by us in exchange for the use of the musical compositions found in the items listed above.

Bob, we're also being asked to provide the following:
Licensing Agreements (synchronization, songwriter and/or assignment of rights). I don't think we obtained these, as
Sunbow warranted mech., synch, master, name&likeness, performer, performance, union and all 3rd party clearances
had been, or were to be, obtained and that we only had royalty obligations to Licensor with respect to Jem, Transfomers, GI Joe; Rhino has no additional financial responsibilities with respect to any such clearances with respect to My Little Pony, Inhumanoids, Visionaries and Robotix. Shouldn't plantiff seek these from Sunbow?

Please let me know if you have any questions at all regarding the aforementioned. Thanks,
gs

000044

| VENDOR | PREFIX | SEL NO | TOTAL UNITS SHIPPED 12/2003 | TITLE |
|---|---|---|---|---|
| SUNBOW | R3 | 01995 | 6,771 | JEM. VOL. 1 |
| | R3 | 02011 | 14,797 | G.I. JOE VOLUME 1 |
| | R3 | 02015 | 9,902 | G.I. JOE VOLUME 2 |
| | R3 | 02016 | 5,489 | G.I. JOE VOLUME 3 |
| | R3 | 02019 | 31,564 | TRANSFORMERS VOLUME 1 |
| | R3 | 02020 | 25,834 | TRANSFORMERS VOLUME 2 |
| | R3 | 02021 | 21,194 | TRANSFORMERS VOLUME 3 |
| | R3 | 02086 | 55,780 | G.I. JOE - THE MOVIE |
| | R3 | 02089 | 190,298 | TRANSFORMERS - THE MOVIE |
| | R3 | 02169 | 6,406 | G.I. JOE 3 PACK |
| | R3 | 02179 | 12,982 | TRANSFORMERS 3 PACK |
| | R3 | 02413 | 97,540 | TRANSFORMERS THE MOVIE SLIP |
| | R3 | 02414 | 48,289 | G.I. JOE - THE MOVIE SLIP SLEEVE |
| | R3 | 02720 | 24,135 | TRANSFORMERS VOLUME 4 |
| | R3 | 02721 | 20,395 | TRANSFORMERS VOLUME 5 |
| | R3 | 02722 | 18,075 | TRANSFORMERS VOLUME 6 |
| | R3 | 02723 | 5,328 | G.I. JOE VOLUME 4 |
| | R3 | 02724 | 3,506 | G.I. JOE VOLUME 5 |
| | R3 | 02725 | 4,125 | G.I. JOE VOLUME 6 |
| | R3 | 02726 | 5,306 | JEM VOLUME 2 |
| | R3 | 02785 | 4,707 | G.I. JOE 3 PACK |
| | R3 | 02786 | 8,858 | TRANSFORMERS 3 PACK (2720/1/2) |
| | R3 | 09010 | (1) | TRANSFORMERS THE MOVIE |
| | R3 | 970007 | 86,056 | TRANSFORMERS: THE MOVIE SPEC |
| | R3 | 970042 | 8,549 | KIDMONGOUS: THE VIPER IS COM |
| | R3 | 970043 | 19,798 | TRANSFORMERS: MORE THAN MEE |
| | R2 | 970049 | 24,962 | TRANSFORMERS - VILLAINS |
| | R3 | 970049 | 10,238 | TRANSFORMERS - VILLAINS |
| | R2 | 970050 | 41,142 | TRANSFORMERS - HEROES |
| | R3 | 970050 | 23,946 | TRANSFORMERS - HEROES |
| | R3 | 970096 | 50,000 | G.I. JOE - HASBRO TAPE 1 |
| | R3 | 970097 | 90,000 | G.I. JOE - HASBRO TAPE 2 |
| | R3 | 970098 | 60,000 | G.I. JOE - HASBRO TAPE 3 |
| | R3 | 970099 | 60,000 | G.I. JOE - HASBRO TAPE 4 |
| | R2 | 970114 | 1,670 | TRANSFORMERS SEASON 2 PT 5 |
| | R2 | 970115 | 1,589 | TRANSFORMERS SEASON 2 PT 6 |
| | R2 | 970116 | 1,690 | TRANSFORMERS SEASON 2 PT 7 |
| | R2 | 970117 | 1,676 | TRANSFORMERS SEASON 2 PT 8 |
| | R2 | 970156 | 41,560 | G.I. JOE - THE ORIGINAL MINI SERIES |
| | R2 | 970163 | 32,841 | G.I. JOE - THE ORIGINAL MINI SERIES |
| | R3 | 970202 | 50,000 | GI JOE - HASBRO TAPE 5 |
| | R3 | 972727 | 32,341 | TRANSFORMERS VOL. 7 |
| | R3 | 972728 | 11,032 | TRANSFORMERS VOL. 8 |
| | R3 | 972729 | 13,927 | TRANSFORMERS VOL. 9 |

| VENDOR | PREFIX | SEL NO | TOTAL UNITS SHIPPED 12/2003 | TITLE |
|---|---|---|---|---|
| | R3 | 972730 | 3,278 | G.I. JOE VOL. 7 |
| | R3 | 972731 | 2,402 | G.I. JOE VOL. 9 |
| | R3 | 972733 | 8,863 | TRANSFORMERS VOL. 10 |
| | R3 | 972734 | 11,896 | TRANSFORMERS VOL. 11 |
| | R3 | 972735 | 7,722 | TRANSFORMERS VOL. 12 |
| | R3 | 972672 | 3,633 | G.I. JOE VOL. 8 |
| | R3 | 972817 | 3,749 | G.I. JOE 3 PACK |
| | R3 | 972818 | 9,163 | TRANSFORMERS 3 PACK |
| | R3 | 972819 | 5,842 | TRANSFORMERS 3 PACK |
| | R2 | 976034 | 18,477 | TRANSFORMERS SEASON 1 PART 1 |
| | R2 | 976035 | 12,796 | TRANSFORMERS SEASON 1 PART 2 |
| | R2 | 976036 | 10,791 | TRANSFORMERS SEASON 1 PART 3 |
| | R2 | 976039 | 141,548 | TRANSFORMERS SEASON 1 BOXED |
| | R3 | 976039 | 4,694 | TRANSFORMERS SEASON 1 BOXED |
| | R2 | 976041 | 4,269 | TRANSFORMERS SEASON 2 PART 1 |
| | R2 | 976042 | 3,119 | TRANSFORMERS SEASON 2 PART 2 |
| | R2 | 976043 | 2,628 | TRANSFORMERS SEASON 2 PART 3 |
| | R2 | 976044 | 2,457 | TRANSFORMERS SEASON 2 PART 4 |
| | R2 | 976045 | 59,708 | TRANSFORMERS SEASON 2 BOXED 2 |
| | R3 | 976045 | 917 | TRANSFORMERS SEASON 2 BOXED 2 |
| | R2 | 976046 | 89,877 | TRANSFORMERS SEASON 2 BOXED 1 |
| | R3 | 976046 | 1,632 | TRANSFORMERS SEASON 2 BOXED 1 |
| | R2 | 976047 | 3,234 | TRANSFORMERS SEASON 3 PART 1 |
| | R2 | 976048 | 2,906 | TRANSFORMERS SEASON 3 PART 2 |
| | R2 | 976049 | 3,003 | TRANSFORMERS SEASON 3 PART 3 |
| | R2 | 976054 | 62,755 | TRANSFORMERS SEASON 3 BOXED |
| | R2 | 976626 | 113,273 | G.I. JOE - THE MOVIE |
| | R2 | 976644 | 331,449 | TRANSFORMERS - THE MOVIE |
| SUNBOW2 | R3 | 99999 (02401) | 359 | MISCELLANEOUS FEATURE FILM |
| SUNBOW3 | R3 | 970016 | 601 | VIDEO MISCELLANEOUS |
| | R3 | 970017 | 565 | VIDEO MISCELLANEOUS |
| | R3 | 970018 | 307 | VIDEO MISCELLANEOUS |
| | R3 | 970019 | 254 | VIDEO MISCELLANEOUS |
| | R2 | 976014 | 2,737 | DVD MISCELLANEOUS |
| | R2 | 976015 | 1,312 | DVD MISCELLANEOUS |
| | | | 2,216,513 | |
| I found "02401" | | 2401 | 2,192 | MISCELLANEOUS FEATURE FILM |
| and R3-99999 | R3 | 99999 | 359 | MISCELLANEOUS FEATURE FILM |

C00046

| VENDOR | PREFIX | SEL NO | TOTAL UNITS SHIPPED 12/2003 | TITLE |
|--------|--------|--------|------------------------------|-------|
| • I was not sure what number I should use or if I should combine | | | | |

000047

| Date | MMLM No. | Bates No. | Description | Comments |
|---|---|---|---|---|
| 12/15/02-12/14/09 | 1 | 0001-0006 | License Agreement<br>Licensor: TV Loonland AG<br>Licensee: Union Films Group<br>Programs: Transformers | |
| 12/15/02-12/14/09 | 2 | 0007-0012 | License Agreement<br>Licensor: TV Loonland AG<br>Licensee: Union Films Group<br>Programs: Transformers | |
| 9/1/94 | 3 | 0013-0019 | Video Recording Distribution Agreement<br>Licensor: Sunbow Productions L.P<br>Distributor: Blitz of Croatia<br>Property: Conan and The Adventurer | |
| 4/1/89-3/31/94 | 4 | 0020-0022 | Video Recording Distribution Agreement<br>Licensor: Hasbro International, Inc.<br>Distributor: Initial S.A. (Paris, France)<br>Property: JEM | |
| 1/15/96 | 5 | 0023-0031 | Video Recording Distribution Agreement<br>Licensor: Sunbow Entertainment<br>Distributor: Carlton Home Entertainment Sweden AB<br>Property: My Little Pony/My Little Pony-The Movie | |
| 6/15/90 | 6 | 0032-0048 | Video Recording Distribution Agreement<br>Licensor: Hasbro International, Inc.<br>Producer: Sunbow Productions, Inc.<br>Distributor: Collage Entertainment AB<br>Property: My Little Pony | |
| 11/1/90 | 7 | 0049-0052 | Television License Agreement<br>Licensor: Hasbro International, Inc.<br>Representative: Sunbow Productions, Inc.<br>Licensee: AB Productions<br>Title of Series: G.I. Joe (DIC-produced) | |
| 9/1/90 | | 0053-0055 | Television License Agreement<br>Licensor: Hasbro International, Inc.<br>Producer: Sunbow Productions, Inc.<br>Licensee: AB Productions<br>Title of Series: G.I. Joe-The Movie<br>My Little Pony-The Movie<br>Transformers | |

| | | | |
|---|---|---|---|
| 9/1/88-8/31/95 | 8 | 0056-0058 | Video Recording Distribution Agreement<br>Licensor: Milton Bradley International, Inc.<br>Distributor: Egmont Audio Visual Group<br>Property: G. I. Joe |
| 9/1/88 | 9 | 0059-0082 | Video Recording Distribution Agreement<br>Licensor: Milton Bradley International (now known as Hasbro International, Inc.)<br>Producer: Sunbow Productions<br>Distributor: Egmont Audio Visual Group<br>Title: G.I. Joe |
| 5/21/97 | 10 | 0083-0091 | Video Recording Distribution Agreement<br>Licensor: Sunbow Productions Inc.<br>Distributor: Filmfactory<br>Property: Transformers<br>　　　　　Jem |
| 5/1/94 | | 0092-0100 | Video Recording Distribution Agreement<br>Licensor: Sunbow Productions Inc.<br>Distributor: Backlund & Co. Kft.<br>Property: My Little Pony |
| 2/1/93 | 11 | 0101-0109 | Video Recording Distribution Agreement<br>Licensor: Visicom Corporation<br>Distributor: Sunbow Productions Inc.<br>Property: My Little Pony Tales<br>　　　　　G.I. Joe |
| 8/27/90 | 12 | 0110-0121 | Television Representative Agreement<br>Licensor: Hasbro International, Inc.<br>Representative: Juan Jose Pellegrini<br>Producer: Sunbow Productions, Inc.<br>Title: G.I. Joe<br>　　　　Glofriends Save Christmas<br>　　　　Inhumanoids<br>　　　　My Little Pony 'N Friends<br>　　　　Transformers |
| 9/1/89 | 13 | 0122-0140 | Video Recording Distribution Agreement<br>Licensor: Hasbro International, Inc.<br>Producer: Sunbow Productions, Inc.<br>Distributor: Cenicienta Video<br>Titles: Bigfoot, Charmkins, G.I. Joe,<br>Glofriends, Glofriends Save Christmas,<br>Inhumanoids, Moondreamers, My Little Pony,<br>Potato Head Kids, Robotix, Transformers |

| | | | |
|---|---|---|---|
| 3/1/91 | 14 | 0142-0160 | Video Recording Distribution Agreement<br>Licensor: Sunbow Productions, Inc.<br>Distributor: Unicorn TV Distributors LTD.<br>Titles: G.I. Joe, Inhumanoids,<br>My Little Pony 'N Friends, Transformers,<br>Visionaries |
| 3/15/94 | 15 | 0161-0169 | Video Recording Distribution Agreement<br>Licensor: Sunbow Productions Inc.<br>Distributor: Mega Entertainment International Inc.<br>Property: JEM |
| 9/1/91 | 16 | 0170-0187 | Video Recording Distribution Agreement<br>Licensor: Sunbow Productions, Inc.<br>Distributor: Mega Entertainment International, Inc.<br>Titles: G.I. Joe, My Little Pony, Robotix, Transformers, Visionaries |
| 3/1/98 | 17 | 0188-0196 | Video Recording Distribution Agreement<br>Licensor: Sunbow Entertainment LLC<br>Distributor: Videofilm Express<br>Property: My Little Pony<br>My Little Pony Movie |
| 4/15/91 | 18 | 0197-0214 | Video Recording Distribution Agreement<br>Licensor: Hasbro International, Inc.<br>Producer: Sunbow Productions, Inc.<br>Distributor: Blokker B.V.<br>Title: G.I. Joe<br>My Little Pony |
| 10/1/93 | 19 | 0215-0223 | Video Recording Distribution Agreement<br>Licensor: Sunbow Productions, Inc.<br>Distributor: Blokker<br>Property: My Little Pony Tales, G.I. Joe, Transformers, My Little Pony, Visionaries, Inhumanoids, Jem, Big Foot, Robotix, Moondreamers, Glofriends, Glofriends Save Christmas, Potato Head Kids, Great Space Coaster |
| 6/1/92 | 20 | 0224-0232 | Video Recording Distribution Agreement<br>Licensor: Sunbow Productions Inc.<br>Distributor: Blokker B.V.<br>Property: My Little Pony-The Movie |
| 10/29/1999 | — | 0367-0379 | License Agt<br>Sunbow — Maverick UK |

2

Exhibit 3

## SONGWRITER'S AGREEMENT

AGREEMENT entered into as of the 28th day of March, 1990, by and between WONDERLAND MUSIC CO., INC., 500 South Buena Vista Street, Burbank, California 91521 ("Publisher") and ANNE BRYANT, P.O. Box 418, Stony Point, New York 10980 ("Writer").

1.    <u>Services</u>.  Publisher hereby engages Writer, and Writer accepts such engagement, to compose and deliver to Publisher two (2) original musical compositions, including music and lyrics, presently entitled "I Wanna Be The Conductor" and "I Can Hardly Wait 'Til Morning" (the "Compositions") initially intended for inclusion in the record album entitled "Minnie & Me" (the "Album"). Writer agrees to compose the Compositions under the supervision, direction and control of Publisher (or such other person or entity as Publisher may from time to time designate), in a diligent and conscientious manner, to the best of Writer's ability, and to comply with all instructions, directions, requests, rules and regulations (including those relating to artistic taste and judgment) made or issued by Publisher.  Writer agrees to deliver to Publisher an original lead sheet for the Compositions together with an audio cassette tape recording thereof.  Writer hereby acknowledges that the Compositions will be written and composed by Writer as a "work-for-hire" for Publisher and that for copyright purposes, Publisher shall be deemed the author thereof.  This Agreement shall also operate as an assignment, transfer and conveyance by Writer to Publisher, its successors and assigns, of all now known or hereafter existing rights of every kind throughout the universe in perpetuity in and to the Compositions.  Publisher hereby acknowledges that the Compositions have been delivered to and accepted by Publisher.

2.    <u>Rights</u>.  Subject to the provisions of paragraph (e) of Exhibit "A" attached hereto, Publisher shall own all now and hereafter existing rights of every kind and character throughout the universe in and to the Compositions and the results and proceeds of Writer's services, including, but not limited to, the title, words and music of the Compositions, all copyrights therein and thereto, all registrations with respect thereto, and the exclusive right to secure copyrights and any extensions of copyrights in the Compositions and in any arrangements and adaptations thereof, all throughout the world.  Without limiting the generality of the foregoing, Publisher shall own all rights, claims and demands that Writer now has or to which Writer might be entitled or that Writer hereafter could or might secure throughout the world with respect to the Compositions if this Agreement had not been made, and to have and to hold the same absolutely and forever unto Publisher, its successors and assigns, and the perpetual right throughout the world to use and authorize the use

of the Compositions for any and all purposes by any and all means and methods in any and all media, whether now or hereafter known.

3.   _Warranties_.  Writer hereby warrants and represents that the Compositions shall be an original work, that neither the Compositions nor any part thereof shall infringe upon the title, literary or musical property or copyright of any other work nor the statutory, common law or other rights (including rights of privacy or publicity) of any person or entity; that Writer is the sole writer and composer of the Compositions; that Writer has not sold, assigned, transferred, hypothecated or mortgaged any right, title or interest in or to the Compositions or any part thereof or any of the rights therein; that Writer has not made or entered into any contract with any other person or entity affecting the Compositions or any right, title or interest therein or in the copyright thereof; that no person or entity other than Writer has or has had claims or has claimed any right, title or interest in or to the Compositions or any part thereof, any use thereof or any copyright therein; that the Compositions has never been published; and that Writer has the full right, power and authority to enter into and perform this Agreement.

4.   _Compensation_.

(a)   In full consideration of this Agreement and of the rights and interests hereby conveyed and granted, Publisher agrees to pay to Writer the following sums:

(i)   The royalties set forth on Exhibit "A" attached hereto in respect of the Compositions; and

(ii)   The sum of Seven Hundred Fifty Dollars ($750.00) per Composition as an advance recoupable by Publisher against the royalties payable pursuant to Exhibit "A", payable upon the execution of this Agreement.

(b)   Except as provided in paragraph 4(a) above, Writer shall not be entitled to any additional monies by reason of Publisher's exploitation of the Compositions, the Album or any other authorized exploitation hereunder.

5.   _Accounting and Audit_.

(a)   Within sixty (60) days after June 30 and December 31 in each year, Publisher will prepare and furnish semi-annual statements to Writer hereunder, and each such statement shall be accompanied by payment of all sums shown to be due thereby, after deduction of all advances.  With respect to print royalties only, Publisher shall have the right to retain, as a reserve against returns, such portion of payable royalties as shall be necessary in its reasonable business judgment, which reserve shall not exceed twenty percent (20%) of such royalties on a publication-by-

(handwritten left margin: → except for Writer's general agreement with BMI)

publication basis and shall be fully liquidated within two (2) accounting per8iods following establishment.

(b)  Writer shall notify Publisher of any specific objection to such statements no later than two (2) years after the receipt thereof by Writer.  Writer shall be conclusively presumed to have received a statement in any instance in which Writer shall fail to give Publisher notice of non-receipt within six (6) months following the due date of such statement.  Any and all objections, questions, or disputes concerning any such statement shall be deemed waived by Writer unless such written objection is received by Publisher within such two (2) year period.  A certified public accountant in Writer's behalf may, at Writer's expense, at reasonable intervals (but not more frequently than once each year and upon thirty (30) days notice in each instance), examine Publisher's books insofar as same concern Writer, during Publisher's usual business hours, in such a manner so as not to interfere with Publisher's normal business activities, for the purpose of verifying the accuracy of any statements rendered to Writer hereunder.  Publisher's books relating to activities during any accounting period may only be examined as aforesaid during the two (2) year period following receipt by Writer of the statement for said accounting period.

(c)  If Publisher shall be unable to receive payment in United States Dollars in the United States in respect of any exploitation of the Compositions due to currency control laws or regulations, and if Publisher agrees to accept such payments in foreign currency, Publisher shall deposit in a foreign bank or other depository, at Writer's expense, in such foreign currency such portion thereof, if any, as shall equal the royalties which would have actually been payable to Writer hereunder in respect of such exploitation had such payments been made to Publisher in United States Dollars in the United States, and Publisher shall notify Writer thereof.  Deposit as aforesaid shall fulfill Publisher's royalty obligations hereunder as to such exploitation.

(d)  Legal action by Writer with respect to a specific accounting period or the accounting statement to which the same relates shall be forever barred if not commenced in a court of competent jurisdiction within three (3) years after such statement is received by Writer.

6.  <u>Name and Likeness</u>.  Writer hereby grants to Publisher, its affiliates, subsidiaries, successors, assigns and licensees, the perpetual nonexclusive right to use and publish, and to permit others to use and publish, Writer's name, likeness and biographical material, or any reproduction or simulation thereof in connection with the exploitation of the Compositions.

7.  <u>Changes</u>.  Writer hereby acknowledges that Publisher has the right hereunder, in its sole discretion, to substitute a new

title or titles for the Compositions, to make changes, arrangements, adaptations, translations, dramatizations and transpositions of the Compositions, in whole or in part, and in connection with any other musical, literary, dramatic or other material, and to add new lyrics to the music of the Compositions or new music to the lyrics of the Compositions; provided, however, that Publisher shall afford to Writer the first opportunity to make any changes in the Compositions so long as Writer is available as and when required by Publisher for no additional compensation and can make the respective changes in accordance with the schedule designated by Publisher. Writer hereby waives (a) any and all claims which Writer has or may have against Publisher, its associates, affiliates and subsidiaries and licensees by reason of the fact that the titles of the Compositions may be the same as or similar to that of any other musical composition heretofore acquired by Publisher, and (b) any so-called "moral rights" of authors which are now or may hereafter be recognized anywhere in the world by law, custom or usage.

8.    <u>Further Instruments</u>.  Writer agrees to execute and deliver to Publisher all documents which may be required to effectuate the intent of this Agreement, including, but not limited to, a certificate of authorship in the form attached hereto as Exhibit "B" and a short form copyright assignment in the form attached hereto as Exhibit "C" and, if Writer fails to do so within ten (10) days following Writer's receipt of notice requesting same, Writer does hereby irrevocably empower and appoint Publisher, or any of its officers, Writer's true and lawful attorney (with full power of substitution and delegation) in Writer's name, and in Writer's place and stead, or in Publisher's name, to take and do such action, and to make, sign, execute, acknowledge, deliver, and record any and all instruments or documents which Publisher, from time to time, may deem desirable or necessary to vest in Publisher, its successors, assigns and licensees, any of the rights granted by Writer hereunder, including, but not limited to, such instruments or documents as may be required to secure to Publisher copyright registration and protection for the Compositions for the full term of copyright and for any extensions thereof.

9.    <u>Assignment</u>.

(a)    Writer shall not transfer or assign to more than one (1) person any sums that may be or become due hereunder without the prior written consent of Publisher, which consent shall not be unreasonably withheld.  No purported assignment or transfer in violation of this restriction shall be valid to pass any interest to the assignee or transferee.

(b)    Publisher shall have the right to assign this Agreement and/or any of its rights hereunder to any parent, subsidiary or affiliated entity, any third party, any entity into which or with which Publisher may merge or consolidate, or any

purchaser of substantially all of Publisher's stock or assets. Publisher shall remain secondarily liable for the performance of its obligations hereunder in the event of any such assignment. Publisher shall also have the right to enter into subpublishing, collection, print or other agreements with respect to the Compositions with any person or entity for any one or more countries of the world.

## 10. Enforcement of Rights.

(a) Publisher may take such action as it deems necessary, either in Writer's name or in its own name, against any person or entity to protect the rights and interests acquired by Publisher hereunder. Publisher will promptly notify Writer of all claims, actions, demands and proceedings which may affect Publisher's or Writer's interest in the Compositions and Writer shall have the right to participate therein by counsel of Writer's choice, at Writer's sole cost and expense. Writer will, at Publisher's request, cooperate fully with Publisher in any controversy which may arise or litigation which may be brought concerning Publisher's rights and interests acquired hereunder.

(b) Publisher shall have the right, in its absolute discretion, to employ attorneys and to institute or defend any action or proceeding and to take any other proper steps to protect the right, title and interest of Publisher in and to the Compositions and every portion thereof, and in that connection, to settle, compromise or in any other manner dispose of any matter, claim, action or proceeding and to satisfy any judgment that may be rendered, in any manner as Publisher in its sole discretion may determine. Any legal action brought by Publisher against any alleged infringer of the Compositions shall be initiated and prosecuted by Publisher at Publisher's expense.

11. Indemnification. Writer hereby agrees to indemnify and hold Publisher, its successors, assigns, licensees, parent, subsidiary and affiliated companies, and their respective directors, officers, agents and employees, harmless from and against any and all damages, liabilities, costs, losses and expenses (including attorneys' fees and court costs) incurred by Publisher as the result of any breach of any representation, warranty or agreement made by Writer hereunder. If a claim is presented against Publisher with respect to either or both of the Compositions, Publisher shall have the right thereafter, until said claim, demand or action has been fully adjudicated or settled, to withhold such portions of royalties that may be or become due with respect to the Compositions earned pursuant to this Agreement as shall be reasonably sufficient to reimburse Publisher for any contemplated costs or damages, including court costs and attorneys' fees, and costs resulting therefrom. Such withholding shall continue until the final resolution or settlement of any such claim, demand or action; provided, however, that any royalties so

withheld shall be released if legal action shall not have been commenced in a court of competent jurisdiction with respect to the applicable claim or demand within twelve (12) months following such withholding.

12. <u>Miscellaneous</u>.

(a) This Agreement contains the entire understanding between the parties, and all of its terms, conditions and covenants shall be binding upon and shall inure to the benefit of the respective parties and their heirs, successors and permitted assigns. No modification or waiver hereunder shall be valid unless the same is in writing and is signed by the party sought to be bound.

(b) This Agreement shall be deemed to have been made in the State of California and its validity, construction and effect shall be governed by and construed under the laws and judicial decisions of the State of California applicable to agreements wholly performed therein. The state and federal courts situated in Los Angeles, California shall have exclusive jurisdiction over all claims and disputes with respect to this Agreement and Writer hereby irrevocably submits to the jurisdiction of such courts. To the extent, if any, that service of process by mail is permitted under applicable California law, process in any action or proceeding commenced in such courts may be served upon either party by, among other methods, delivering or mailing same to the respective party at the address set forth above or such other address as such party may designate pursuant to paragraph 13 below.

(c) The use of the singular in this Agreement shall apply to and mean the plural where appropriate.

13. <u>Notices</u>. All notices, statements and payments required or desired to be given hereunder shall be given by addressing same to the addresses of the respective parties hereinbelow set forth, or to such other address as either party may hereafter designate in writing, and shall be delivered by the United States mails, certified or registered, postage prepaid, or by telegraph or cable, charges prepaid (except for royalty statements which shall be sent by regular mail). The date of sending or mailing any telegram, notice, statement or payment shall be deemed the date of service thereof, except that notices of address change shall be deemed effective upon receipt.

14. <u>Default</u>. Publisher shall not be deemed to be in default hereunder unless Writer shall notify Publisher thereof and Publisher shall fail to remedy the same within thirty (30) days thereafter (or, if the alleged default is of such a nature that it cannot be completely remedied within such thirty-day period, Publisher shall fail to commence the remedying of such alleged

default within such thirty-day period and to proceed to complete the same within a reasonable time thereafter).

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date hereinabove set forth.

WONDERLAND MUSIC CO. INC.

By _____

_____
ANNE BRYANT

Soc. Sec. #:   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

Date of Birth: _9- 3 -50_

## SONGWRITER'S ROYALTIES

(a)  Fifty percent (50%) of any and all net sums actually received by Publisher in the United States from the sale of sheet music of the Compositions printed, published and sold in the United States and Canada by Publisher or its licensees, after deduction of returns.

(b)  Fifty percent (50%) of any and all net sums actually received by Publisher in the United States from the sale of any folio, songbook or similar publication, and any instrumental, choral, orchestral, band arrangement or pedagogical edition containing either or both of the Compositions, for all copies sold in the United States and Canada by Publisher or its licensees.

(c)  Fifty percent (50%) of any and all net sums actually received by Publisher from the exploitation in the United States and Canada by licensees of Publisher of mechanical rights, electrical transcription and reproducing rights, motion picture and television synchronization rights, and all other rights in the Compositions [except public performance rights which are covered in paragraph (e) below].  Notwithstanding the foregoing, Writer acknowleddges that (i) Publisher shall have the right to issue licenses at Publisher's customarily reduced "in-house" rates for any uses of the Compositions in synchronization with any theatrical, television or other motion picture produced by or for Publisher or its affiliated, subsidiary or parent entities, or in connection with any advertising, publicizing or exploitation thereof, and (ii) Publisher shall have the right to isse mechaincal licenses to Publisher's affiliated entities for the use of the Compositions in the United States at a rate equal to seventy-five percent (75%) of the then current statutory mechanical royalty rate.

(d)  Fifty percent (50%) of any and all net sums actually received by Publisher in the United States from sales, licenses and other uses of the Compositions in countries outside of the United States and Canada [other than public performance royalties described in paragraph (e) below] from collection agents, licensees, subpublishers or others.

(e)  Writer shall receive his/her public performance royalties throughout the world directly from his/her own affiliated performing rights society.  Writer shall not have any claim whatsoever against Publisher for any royalties received by Publisher from any performing rights society which makes payment directly (or indirectly other than through Publisher) to writers, authors and composers.  If, however, (and to the extent that) Publisher shall collect both the Writer's and Publisher's share of

performance income directly and such income shall not be collected by Writer's public performance society, Publisher shall pay to Writer, as the so-called "writer's share" thereof, fifty percent (50%) of all such net sums which are received by Publisher in the United States from the exploitation of such rights in the Compositions, throughout the world.

(f) Publisher shall not be required to pay any royalties on (i) professional or complimentary printed copies of the Compositions, (ii) copies of mechanical derivatives of the Compositions which are distributed gratuitously to performing artists, orchestra leaders or disc jockeys, or for advertising, promotional or exploitation purposes, (iii) uses of the Compositions in connection with the advertising or promotion of merchandise or storyteller records embodying either or both of the Compositions, or (iv) consigned copies of the Compositions unless paid for, and not until Publisher shall have received a statement for the accounting period during which such payment is received.

(g) Subject to the provisions of paragraph 7 of the Agreement, If Publisher employs a writer or writers to translate, ~~substantially~~ add to or ~~change~~ materially the lyrics of either of the Compositions, or to ~~substantially~~ revise or ~~change~~ materially the music of either of the Compositions, the above royalties shall be divided equally between Writer on the one hand and each such writer or writers on the other hand, unless timely written instructions to the contrary are received from Writer and the applicable writer(s), provided that with respect to foreign language translations, Publisher shall pay only the minimum amount required by the applicable foreign society.

(h) In no event shall Writer be entitled to share in any advance payments, guarantee payments or minimum royalty payments which Publisher may receive in connection with any subpublishing agreement, collection agreement, licensing agreement or other agreement covering the Compositions, unless such payment shall be solely related to the Compositions, in which event Publisher shall credit Writer's royalty account with fifty percent (50%) of all such sums received by Publisher.

(i) For purposes of this Agreement, "net sums" means all revenue, income and other sums actually received by or credited to Publisher in the United States which are directly attributable to the exploitation of the Compositions as described above, after deduction of all costs of collection and foreign taxes; provided, however, Publisher warrants that net sums collected by Publisher's affiliates shall not be subject to a collection fee of more than ten percent (10%). Publisher shall furnish to Writer such information as is provided to Publisher regarding any foreign taxes deducted in order to enable Writer to apply to obtain income tax credit for the tax so withheld, provided that Publisher does not warrant or represent the availability of such credit.

EXHIBIT "B"

## CERTIFICATE OF AUTHORSHIP

I, Anne Bryant, hereby certify that I composed all musical material submitted by me in connection with the musical compositions tentatively entitled "I Wanna Be The Conductor" and "I Can Hardly Wait 'Til Morning" as works "made-for-hire" for Wonderland Music Co., Inc. ("Publisher") in connection with the record album entitled "Minnie & Me" pursuant to an agreement dated as of March 28, 1990, in the performance of my duties thereunder that all of said musical material has been specifically ordered or commissioned by Publisher and that Publisher is the author thereof and is entitled to all copyrights and renewals of copyrights therein and thereto, with the right to make and cause to be made such changes therein and uses thereof as it may determine as such author, subject to the provisions of paragraph 7 of said agreement.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this _14_ day of _August_ , 1990.

_____
ANNE BRYANT

State of _New York_ )
                    )SS
County of _Rockland_ )

On this the _14_ day of _August_, 1990, before _Norman Fogel_ the undersigned Notary Public, personally appeared Anne Bryant,

( ) personally known to me
(✓) proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged that he/she/they executed it.

WITNESS my hand and official seal.

_____
Notary's Signature

NORMAN FOGEL
NOTARY PUBLIC, State of New York
No. 44-1261975
Qualified in Rockland County
Commission Expires December 31, 1991

WONDER/BRYA-SA  040290
Revised  060590
Revised  073090

-10-

EXHIBIT "C"

## ASSIGNMENT

For valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned, ANNE BRYANT ("Assignor") hereby assigns, transfers and conveys to WONDERLAND MUSIC CO., INC. ("Assignee"), its successors and assigns, all rights, title and interest in and to the musical compositions entitled "I Wanna Be The Conductor" and "I Can Hardly Wait 'Til Morning" (the "Compositions") written and composed by Assignor, and all versions thereof, including the copyrights therein, all proprietary rights therein now known or hereafter created throughout the universe, any and all claims, demands and causes of action, for infringement or otherwise of the Compositions, past, present and future, and all of the proceeds from the foregoing accrued and unpaid and hereafter accruing.

Assignor represents and warrants to Assignee that Assignor is the sole owner of the rights herein assigned to Assignee and that Assignor has not heretofore assigned, licensed, transferred or in any manner encumbered, diminished or impaired such rights. Assignor agrees to sign all other documents which may be required to effectuate the purpose and interest of this Assignment and Assignor hereby authorizes and appoints Assignee its attorney and representative in its name as its true and lawful attorney-in-fact to take such actions and make, sign, execute, acknowledge and deliver all such documents as may from time to time be necessary to convey to Assignee, its successors and assigns, all rights granted herein, if Assignor fails to do so following written notice from Assignee.

This Assignment is executed in connection with, and is subject to the terms and conditions of, that certain agreement dated as of March 28, 1990, between Assignor and Assignee.

IN WITNESS WHEREOF, the undersigned has executed this Assignment, this _14_ day of _August_ , 1990.

_____
**ANNE BRYANT**