# EXHIBIT 27

 B 537—Note of issue and certificate of read. ...iform Rules, 22 NYCRR 202.21(b), 9-95 JULIUS BLUMBERG, INC. PUBLISHER NYC 10013

# NOTE OF ISSUE

For use of Clerk

:ndar No. (if any) ....................................
:x No. ....5192/00......................................
Supreme ...................... Court, ...... Rockland ..................... County, N.Y.

O'Rourke
*Name of Judge assigned*

Anne Bryant

## NOTICE FOR TRIAL

☒ Trial by jury demanded
 ☒ Of all issues
 ☐ Of issues specified below
 ☐ Or attached hereto
☐ Trial without jury

Filed by attorney for ...... Plaintiff ................
Date summons served .... 9/8/00 ...............
Date service completed ... 9/8/00 ................
Date issue joined ............. 6/7/01 .................

*Plaintiff(s)*

*against*

Broadway Music, Inc., Clifford A.
"Ford" Kinder, Kinder & Co., Ltd.,
Vadivox, Ltd., Jules M. "Joe" Bacal,
Griffin Bacal, Inc., Starwild Music
BMI, Wildstar Music ASCAP, Sunbow
Productions Inc. and John and Jane
Does 1-10

## NATURE OF ACTION OR SPECIAL PROCEEDING

☒ Tort    ☐ Motor vehicle negligence
     ☐ Medical malpractice
     ☐ Other tort

☐ Contract
☐ Contested matrimonial.
☐ Uncontested matrimonial
☐ Tax certiorari
☐ Condemnation
☒ Other (not itemized above) specify Accounting and Declaratory
Judgment..................................................
☐ This action is brought as a class action

*Defendant(s)*

Amount demanded $.. Not less than $500,000.00 ....
Other relief ...... Accounting and Declaratory ..........
............. Judgment.....................................
Insurance carrier(s), if known: .....................................

:ecial preference claimed under................................

. the ground that................................................

:torney(s) for Plaintiff(s)   Monaghan, Monaghan, Lamb & Marchisio
ffice & P.O. Address:    150 West 55th Street
     New York, NY   10019

1one No.:     212-541-6980

ttorney(s) for Defendant(s) Duane Morris LLP (Attorneys for Jules Bacal) Patterson, Belknap, Webb & Tyler, LLp
ffice & P.O. Address:    380 Lexington Avenue            (Attorneys for Sunbow Productions, Inc.)
     New York, NY   10168            1133 Avenue of the Americas

hone No.:     212-692-1000            New York, N.Y.   10036-6710
           (212) 336-2000

OTE: Clerk will not accept this note of issue unless accompanied by a certificate of readiness.

CERTIFICATE OF READINESS FOR TRIAL

(Items 1-7 must be checked)

| | Completed | Waived | Not required |
|---|---|---|---|
| 1. All pleadings served.............................................................. | X | | |
| 2. Bill of particulars served....................................................... | | | X |
| 3. Physical examinations completed.......................................... | | | X |
| 4. Medical reports exchanged.................................................... | | | X |
| 5. Appraisal reports exchanged................................................. | | | X |
| 6. Compliance with the Rules in matrimonial actions (22 NYCRR 202.16) ...................... | | | X |
| 7. Discovery proceedings now known to be necessary completed** ..... | X | | |

8. There are no outstanding requests for discovery. **

9. There has been a reasonable opportunity to complete the foregoing proceedings.

10. There has been compliance with any order issued pursuant to the Precalendar Rules (22 NYCRR 202.12).

11. If a medical malpractice action, there has been compliance with any order issued pursuant to 22 NYCRR 202.56.

12. The case is ready for trial.

Dated:. June 30, 2003 ........................

Signature — type name below
Patrick J. Monaghan, Jr.
Monaghan, Monagahn, Lamb & Marchisio
150 West 55th Street
New York, NY 10019

Attorney(s) for.
Office & P.O. Address

State of New York, County of                        ss.:

being duly sworn, deposes and says; that deponent is not a party to the action, is over 18 years of age and resides at

That on the            day of            19
deponent served the within note of issue and certificate of readiness on

attorney(s) for
herein, at his office at

during his absence from said office
(a) by then and there leaving a true copy of the same with

his clerk; partner; person having charge of said office.
(b) and said office being closed, by depositing a true copy of same, enclosed in a sealed wrapper directed to said attorney(s), in the office letter drop or box.

Sworn to before me on                        19

State of New York, County of                        ss.:

being duly sworn, deposes and says; that deponent is not a party to the action, is over 18 years of age and resides at

That on the            day of            19
deponent served the within note of issue and certificate of readiness on

attorney(s) for
at

the address designated by said attorney(s) for that purpose by depositing a true copy of same enclosed in a postpaid properly addressed wrapper, in—a post office—official depository under the exclusive care and custody of the United States Postal Service within New York State.

Sworn to before me on                        19

Admission of Service

admitted. June 30 ......................., 19 2003

Due service of a note of issue and certificate of readiness, of which the within is a copy,

Monaghan, Monaghan, Lamb & Marchisio

Attorney(s) for Plaintiff

** Note of Issue is filed at direction of Judge O'Rourke. Discovery is Outstanding.

# EXHIBIT 28

AGREEMENT made of this 1st day of June, 1985, by and between SUNBOW PRODUCTIONS, INC. ("Company"), whose business address is 380 Lexington Avenue, Suite 1105, New York, New York 10168, and KINDER & BRYANT LTD. ("Contractor") whose business address is 41 West 73rd Street, New York, New York 10023, f/s/o Anne Bryant and Ford Kinder (jointly referred to as "Writer").

In consideration of the mutual covenants herein contained, the parties hereto have agreed and do agree as follows:

1.     Company hereby engages Contractor and Contractor hereby accepts such engagement, to furnish the services of Writer to Company for the purpose of writing, preparing and delivering to Company original musical material (hereinafter referred to as the "Music") for songs to be used in a fully-animated children's television show consisting of either five one-half hours, fifteen segments, or a television motion picture, presently entitled "JEM" (the "Show")(it being understood that the mention of the Show is for purposes of identification only and shall in no way restrict Company's rights in the Music, and the use thereof, as set forth in this Agreement).  The number of songs for which music is to be written and delivered by Writer hereunder shall be determined by Company.  The Music shall be delivered to Company in accordance with a schedule to be mutually determined by the Company and Contractor.

2.     (a)  For all rights herein granted to Company in the Music, and for performance by Contractor of all obligations hereunder (including but not limited to composing and arranging the Music, supervision of the orchestra recording of the Music for the Show, and Company's right to use the Music on and in connection with phonorecordings sold or distributed in conjunction with merchandise based on the Show ["Premium Cassettes"]), Company shall pay Contractor a fee of Two Thousand Two Hundred ($2,200) Dollars for each song for which Writer writes and delivers the Music, payable on delivery thereof.

(b)  Payment by a parent or affiliate of Company shall be deemed to constitute payment by Company hereunder. Nothing herein contained shall be deemed to impose any obligation on Company to use or authorize the use of the Music, and Company shall have fully discharged its obligations to Contractor hereunder by payment to Contractor of the amount specified in subparagraph (a) of this Paragraph 2.

3.     Contractor shall deliver one (1) copy of the Music to Company as Company shall designate.

4.     It is understood and agreed that Writer may write the Music at such times and places as Writer may choose, subject only to Contractor's obligation to make timely delivery of the Music in accordance with the terms of this Agreement.



DEFENDANT'S EXHIBIT
6|
PENGAD-Bayonne, N.J.

5.    (a) Contractor warrants, acknowledges and agrees that the Music to be written by Writer and delivered by Contractor is to be written by Writer under and pursuant to an employment agreement between Contractor and Writer pursuant to which Contractor is entitled to the exclusive services of Writer, and to all the results of Writer's services; that the Music was specifically ordered and commissioned by Company for use as part of an audiovisual work; and that the Music is a work made for hire within the meaning of Section 101 of the United States Copyright Act.   Upon writing of the Music, all right, title and interest therein shall automatically vest in Company and Company shall be the sole and unlimited owner thereof and of all rights therein throughout the world forever, and Company shall be entitled to copyright therein, including statutory copyright and all renewals thereof, as copyright author and proprietor.   Company may freely assign and grant rights and licenses with respect to the Music and any copyrigt therein (including any renewals thereof), and in this connection Contractor agrees to execute and deliver and/or cause Writer to execute and deliver to Company any and all instruments required by Company in connection with the use and enjoyment of the Music and of Company's rights therein and thereto.   Contractor hereby appoints Company as Contractor's and Writer's attorney-in-fact with the right but not the obligation to execute any such instruments in Contractor's or Writer's name on Company's behalf.   On execution hereof, Contractor shall sign and shall cause Writer to sign the Certificate of Authorship attached hereto for the Music.

(b)  Without in any way limiting the generality of the foregoing, it is agreed that Company shall have the exclusive right and may license others to use, adapt, arrange, change, add to, or subtract from the Music and to combine the same with other literary material and/or lyrics and to publish, record, produce, reproduce, transmit, perform, broadcast, telecast, and/or otherwise communicate the same or any version or versions thereof by any means (including, but not limited to, in synchronization with motion pictures, television and/or any other form of recordation or reproduction of sight and/or sound), whether now known or hereafter devised, publicly for profit or otherwise, it being understood that Contractor and Writer hereby waive any so-called "moral rights" which may now be or may hereafter be recognized.   It is understood and agreed that neither Contractor nor Writer shall have any right, title or interest in any other literary material and/or lyrics which may be combined with the Music.

(c)  During any period or periods of time during which Writer is affiliated with any small performing rights society (herein called the "Society"), Company shall and does hereby, under and pursuant to this Paragraph, license back to Writer the so-called "writer's share" (i.e., fifty (50%) percent) (but, if the Music or any form thereof are the composition of

- 2 -

0040H

SUN 0383

Writer and other composers and/or lyricists, then the grant hereunder shall be deemed a grant of the "writer's share" to Writer and all other such lyricists and/or composers jointly except that for instrumental uses, only Writer and any other composer(s) shall share in the "writer's share") in the non-dramatic (i.e., "small") performing rights in the Music so as to enable Writer to license such non-dramatic performing rights to Society, and to collect the "writer's share" of royalties derived therefrom, it being understood, in this connection, that Company (or any assignee or licensee of all or any of Company's rights under this Agreement) shall not exercise such non-dramatic performing rights during such period or periods without obtaining a license therefor from Society, except that Company and/or any such assignee or licensee, may exercise such non-dramatic performing rights in the Music by reason of, under and pursuant to this Agreement,

> (i) during any period or periods during which such non-dramatic performing rights are not controlled by and/or available for license to Company or any such assignee or licensee at standard rates from Society, or in the case of public performances of the Music in geographical areas outside of Society's jurisdiction, from any other organization or society which is affiliated with Society or which has a collection agreement with Society and which controls the non-dramatic performing rights in any geographical area in which the Music is to be performed; and/or

> (ii) in connection with theatrical exhibitions in the United States, its territories and possessions; and/or

> (iii) in connection with any performance of the Music within the United States, its territories and possessions, which is not a public performance;

it being understood that Company (and/or any such assignee or licensee) shall have no obligation to pay any royalties or other sums to Writer, Contractor, Society, or any successor to the rights of any of them with respect to non-dramatic performances of the Music made pursuant to subclauses (i) through (iii) hereof. If Company makes or authorizes any non-dramatic performances of the Music under and pursuant to this Agreement, and if Writer or Contractor shall assert any claim that any such performance violates any rights of Writer or Contractor, then (A) under no circumstances shall Writer or Contractor have the right to take any action or initiate any proceeding with respect to such claim which would have the effect of enjoining and/or preventing and/or otherwise interfering with any said non-dramatic performances, it being agreed that any such action or proceeding shall be limited to an action at law for damages; and (B) if Writer or Contractor

- 3 -

0040H

shall assert such a claim pertaining to a non-dramatic performance of the Music made by any assignee or licensee of Company, then any action taken or proceeding brought by Writer or Contractor shall be limited to an action at law for damages against such assignee or licensee exclusively. The foregoing references to Society shall not be construed as giving Society any independent right to take any action or initiate any proceeding against Company or any of its assignees or licensees with respect to any such claim.

(d) Without limiting the generality of any rights granted under this Agreement, and notwithstanding any license hereunder to Writer pursuant to subparagraph (c) above, Writer and Contractor expressly acknowledge that Company, its successors, assigns and/or licensees shall have the right to collect the "publisher's share" of performance royalties becoming due and payable hereunder from any small performing rights society by reason of performances of the Music, it being expressly agreed that Writer and Contractor shall not be entitled to any share of such monies which are distributed to Company, its successors, assigns, and/or licensees by any small performing rights society. Writer shall be entitled to collect the "writer's share" of any such royalties with respect to the Music jointly with any other lyricists and/or composers of such Music. The terms "publisher's share" and "writer's share" as used in this Agreement have the same meaning here as is commonly understood in the music publishing and motion picture and television industries. Company may represent to any domestic or foreign performing rights society or similar organization requiring an acknowledgement of the type made by Writer herein that Contractor and Writer have acknowledged Company's right to collect and retain the publisher's share of royalties; further, if any such society or organization requires written authorization from Writer or Contractor in order to make payments of the publisher's share of royalties to Company, Writer and Contractor shall promptly execute and deliver such authorization. If any such society or organization makes payment to Writer or Contractor of all royalties (i.e., both "writer's" and "publisher's" share) with respect to any performance to Writer, Contractor shall promptly remit one-half (1/2) of such royalty to Company.

6. Further, in the exercise of its rights hereunder and without in any way limiting the generality of the foregoing, Company shall have, as owner and copyright proprietor of the Music, the complete control of the publication of the Music and of all rights incident thereto, including, but not limited to, the right to license the manufacture of phonograph records and other recordings of the Music and the right to license motion picture synchronization rights (all of which rights are herein sometimes collectively called "music publishing rights"). Without limiting the generality of the foregoing, it is agreed that Company may assign or license any or all such music publishing rights and/or any or all other rights granted to Company under this Agreement to

- 4 -

SUN 0385

any music publishing company or production company which is a parent or subsidiary of Company or otherwise affiliated with Company or to any other third party.

(a)  With respect to Company's exercise of music publishing rights in the Music (as defined above)(but excluding use in connection with Premium Cassettes as defined in Paragraph 2(a) for which Contractor shall not receive any further compensation), uses of the Music combined with lyrics (but, if the Music with lyrics or any form thereof is the composition of Writer and other composers and/or lyricists, then the royalties hereunder shall be shared equally by all such lyricists and/or composers):

(i)  sums equal to fifty (50%) percent of the net proceeds (as defined below) received by Company from third parties for licenses for the manufacture or commercial phonograph records and/or licenses of theatrical motion picture synchronization rights (as defined below);

(ii)  for regular piano copies, if any, sold and paid for at wholesale in the United States and/or Canada, sums equal to eight cents (.08) per copy for the first one hundred thousand (100,000) copies sold, and ten cents (.10) per copy for copies sold in excess of 100,000;

(iii)  sums equal to fifty (50%) percent of net proceeds received by Company from third parties for regular piano copies, if any, sold and paid for at wholesale outside of the United States and/or Canada;

(iv)  with respect to orchestrations, including band arrangements, if any, sold and paid for at wholesale anywhere in the world, sums equal to ten (10%) percent of the wholesale price therefor, after trade discounts;

(v)  with respect to any songbook, folio or similar publication, if any, sold and paid for at wholesale anywhere in the world, sums equal to the amount resulting from dividing ten (10%) percent of the wholesale price, after trade discounts, therefor by the total number of copyrighted musical compositions contained in such publication;

(vi)  with respect to other uses of the Music hereunder, sums equal to the amount resulting from dividing fifty (50%) percent of the net proceeds received by Company from third parties therefor by the total number of copyrighted musical compositions and/or literary materials contained or included in such uses.

- 5 -

SUN 0386

No royalties shall be payable hereunder for professional material
not sold or resold; further, no royalties shall be payable to
Writer with respect to uses of the Music except as hereinabove
expressly set forth. The term "theatrical motion picture rights"
as used herein refers to synchronization rights granted with
respect to motion pictures intended primarily and initially for
theatrical release by direct projection before paid-admission
audiences; in no event shall such term refer to motion pictures or
other methods of recordation, whether now known or hereafter
devised, which are produced primarily and initially for television
broadcasting by any means whatsoever. The term "net proceeds" as
used hereinabove, shall mean all monies (including advances)
actually received by Company (or any assignee of Company's rights
or licensee hereunder) which are directly attributable to licenses
issued authorizing the manufacture of commercial phonograph
records and/or licenses relating to theatrical motion picture
synchronization rights, and/or for the exercise of publication
rights referred to in subclause (iii) above, as the case may be,
after the deduction of all costs, expenses, fees and commissions
which are directly attributable to the exploitation of the Music
and combined music by way of commercial phonograph records or by
way of theatrical motion picture synchronization, or by way of
publication, as the case may be, computed in accordance with good
and standard practices. In the event that Company licenses the
Music in a form containing music or other literary materials
written or composed by any third party or parties, then
Contractor's royalties thereon, shall be reduced proportionately
to an amount equal to the royalties payable hereunder divided by
the number of composers and lyricists (including Writer) who have
furnished materials and services for such use and who are entitled
to receive royalties from Company, provided that in no event shall
Writer receive less than one-half of the royalty Writer would
otherwise be entitled to receive hereunder. Company shall render
royalty statements to Contractor, accompanied by any remuneration
due Contractor, such statements to be rendered at least twice
during each calendar year during which royalties are payable.

      (b)  If, for any reason, exportation of money to the
United States from any foreign country, territory or place should
be prohibited, prevented or rendered commercially impracticable,
the amount received by Company (if Company's share thereof is
actually paid to Company in such foreign country, territory or
place) shall not be considered gross receipts hereunder unless and
until the same shall have actually been received in the United
States in United States currency, less any discounts, losses,
costs or expenses suffered by or imposed upon Company with respect
to transmittal of such money to the United States and the
conversion thereof to United States currency; provided, however,
that if Contractor so requests in writing, that portion of such
blocked or frozen funds which would represent Contractor's share
of net proceeds of such gross receipts, but for being frozen or
blocked, shall be deposited in Contractor's name in any bank or

- 6 -

SUN 0387

depository designated by Contractor in such country wherein such funds are blocked or frozen subject to the laws of such country with respect to such deposits and withdrawals by Contractor therefrom. Contractor shall have the right at Contractor's sole expense to inspect Company's books and records relative to gross receipts derived from use of the Music hereunder and to make extracts thereof provided such inspection shall be made at Company's offices during reasonable business hours and upon reasonable notice and not more frequently than once per year. All royalties, statements and other accounts rendered by Company shall be binding upon Contractor and not subject to any objection by Contractor unless specific objection in writing, stating the basis thereof, is given to Company by Contractor by one (1) year from the date rendered.

(c) If Company assigns or licenses any uses of the music publishing rights to any third party (including any aforementioned subsidiary or affiliated company) and if Company authorizes such third party to account directly to Contractor with respect to royalties payable to Contractor by reason of any such uses of such music publishing rights, then Contractor agrees that, during the term of any such assignment or license, Writer shall look only to such assignee or licensee for payment of such royalties (and shall be entitled only to inspect such assignee's or licensee's books and records relative to uses of the Music at reasonable business hours and at such assignee's or licensee's offices), provided that Company shall not be relieved of its obligations with respect thereto unless the assignee is a parent, subsidiary or affiliate of Company, or a recognized distributor of motion pictures or television programs, or a "major" motion picture company (as that term is understood in the motion picture industry), or a "major" television network (as that term is understood in the television industry), or a "major" record company or music publishing company (as those terms are understood in the music industry).

(d) Contractor acknowledges that Company has not made and is not hereby making any representation or warranty with respect to the amount of royalties, if any, which may be derived from uses of music publishing rights, it being further understood that nothing herein shall be deemed to impose any obligation on Company to use or authorize the use of the Music and/or any music publishing rights derived therefrom.

7. Company agrees that:

(a) if the description of the Music in Paragraph 1 of this Agreement refers to a particular television program in connection with which such Music may be used, and if such Music or a substantial portion thereof are used in connection with such program or are otherwise used hereunder, then Company shall give Writer (or cause Writer to be given) credit as Writer of such

- 7 -

004 0H

Music or as a writer of the television series on all release
prints of such programs.  Company further agrees to use best
efforts to have Writer given credit in connection with other uses
of the Music;

(b)  if any of the Music as described in Paragraph 1
of this Agreement is used as Music for the theme song for a
television pilot program and/or television series, then Company
shall give Writer (or cause Writer to be given) credit on all
release prints of any such program in which such theme song is
used as the theme song, as Writer of the Music of such theme song.

The form, style, size, placement and nature of any credit provided
for herein shall be determined by Company (or its assignee or
licensee) in its sole discretion except that Company agrees that
the identification of Writer shall be in the form "Kinder and
Bryant."  Any unintentional and/or inadvertent failure to give
credit as above provided, whether because of lack of broadcast
time or otherwise, shall not be a breach of this Agreement.

8.     Company shall have the right and may grant to others
the right to use, disseminate, reproduce, print and publish
Writer's name, likeness, voice and biographical material
concerning Writer as news or informative matter and in connection
with advertising and for purposes of trade in connection with any
motion picture or television program in which the Music is used,
and/or in connection with any other uses of the Music.  The rights
granted herein shall not include the right to use or to grant to
others the right to use Writer's name, voice, likeness and
biographical material in any direct endorsement of any product or
service without Writer's prior written consent.

9.     Contractor hereby warrants that Contractor is free
and able to enter into and fully perform this Agreement, to
furnish the services of Writer, and to grant all rights herein
granted.  Further, Contractor warrants that the Music in the form
in which it is delivered shall be wholly original with Writer and
shall not be copied from any other work and shall not, nor shall
the use thereof, infringe or violate the copyright or any common
law right or any personal, proprietary, or other right of any kind
whatsoever of any person, firm, corporation or association.  If
any of the Music delivered hereunder is described as based upon
traditional or public domain compositions, Contractor warrants
that such compositions are in the public domain throughout the
world and that Writer's treatment of such compositions is original
and shall not be copied from any work other than such public
domain compositions, nor shall the use thereof infringe or violate
the copyright or any common law right or any personal, proprietary
or other right of any kind whatsoever of any person, firm,
corporation or association.  Notwithstanding the foregoing, if any
of the Music delivered hereunder is described as based upon
materials furnished by Company or as based upon traditional or

- 8 -

0040H

SUN 0389

public domain compositions furnished by Company, Contractor makes no warranty as to the originality or ownership of such materials or compositions furnished by Company.

10.   Contractor shall indemnify and hold Company, its successors, assigns and licensees, any network and/or stations over which the Music shall be broadcast, the sponsors, if any, of any program on which they are broadcast, and their advertising agencies, if any, and any other parties who shall utilize the Music or any part thereof in any way with Company's permission, and the directors, officers, agents and employees of any of the foregoing, free and harmless from any and all claims, damages, liabilities, costs and expenses, including reasonable counsel fees, arising out of any breach by Contractor of any warranty or agreement made by Contractor herein.

11.   It is understood and agreed that all or part of this Agreement and all the results and proceeds thereof may be assigned by Company to any third party without Contractor's consent and in this event, Company's successors and/or assigns shall be entitled to any and all rights, privileges, and equities to which Company is entitled under and by virtue of this Agreement.   In the event of such an assignment, Company shall not be relieved of its obligations hereunder unless the assignee is a parent, subsidiary or affiliate of Company or a recognized distributor of motion pictures or television programs, or a "major" motion picture company (as that term is understood in the motion picture industry), or a "major" television network (as that term is understood in the television industry), or a "major" record company or music publishing company (as those terms are understood in the music industry).

Nothing in this Agreement shall in any way derogate from, diminish or impair any rights granted to the Company or to any parent, subsidiary or affiliate of Company under any other agreement entered into between Writer and Company or any parent, subsidiary or affiliate thereof.

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their successors, assigns and licensees.

12.   Company agrees to furnish Contractor with cue sheets of the Music within sixty (60) days of the initial broadcast of the Show.

13.   (a)   This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to contracts entered into and fully to be performed therein.

- 9 -

(b)   A waiver by either party of any of the terms and conditions of this Agreement in any one instance shall not be construed to be a waiver of such term or condition for the future, or of any subsequent breach thereof.  All remedies, rights, undertakings, obligations and agreements contained in this Agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either party.

(c)   This Agreement contains the entire understanding of the parties hereto relating to the subject matter herein contained and this Agreement cannot be changed, rescinded or terminated orally.

(d)   If any provisions of this Agreement as applied to any party or to any circumstances shall be adjudged by a court to be void or unenforceable, the same shall in no way affect any other provision of this Agreement, the application of such provision in any other circumstances or the validity or enforceabililty of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

SUNBOW PRODUCTIONS, INC.  ("Company")

By:_____
         Its

KINDER & BRYANT LTD.  ("Contractor")

By:_____
        Its

0040H

SUN 0391

## Schedule A

Anne Bryant and Ford Kinder ("Writers") hereby certify that they wrote certain original music as employees of KINDER & BRYANT LTD. ("Contractor") in the regular course of their employment. Contractor hereby certifies that Contractor was specially commissioned by SUNBOW PRODUCTIONS, INC. ("Company") to furnish the services of Writers to write and deliver said music to Company for use as part of a fully-animated children's television program tentatively entitled "JEM" pursuant to an agreement dated as of _____, 1986. Accordingly, Writers and Contractor acknowledge and agree that the said music is a work made for hire within the meaning of Section 101 of the United States Copyright Act and that Company is the author and owner thereof and is entitled to copyright therein (and all renewals thereof), and all rights of any kind or nature therein, with the right to make such changes therein and uses thereof as Company may from time to time determine as such author and owner.

KINDER & BRYANT LTD.
("Contractor")

Dated:                      By: _____

Dated:                      _____
                               Anne Bryant

Dated:                      _____
                               Ford Kinder

- 11 -

0040H

SUN 0392

Dated as of          , 1986

Sunbow Productions, Inc.
380 Lexington Avenue
Suite 1105
New York, New York   10168

    Re:   Sunbow Productions, Inc. with
         Kinder & Bryant Ltd./"JEM"

Gentlemen:

Reference is made to that certain agreement dated as of
_____, 1986 (herein called the "Agreement") between
KINDER & BRYANT LTD. (herein called "Contractor") and you, which,
among other things, makes available the services of the
undersigned by Contractor to you for the purposes set forth in
said Agreement.

As an inducement to you to enter into the Agreement and as a
material part of the consideration moving to you for so doing,
each of the undersigned hereby represents, warrants and agrees as
follows:

1.   That the undersigned has heretofore entered into an
agreement (herein callled the "Employment Agreement") with
Contractor covering the rendition of the undersigned's services
for Contractor and that Contractor has the right and authority to
enter into the Agreement and to furnish the rights and services
of the undersigned upon the terms and conditions therein
specified.

2.   That the undersigned is familiar with each and all
of the terms, covenants and conditions of the Agreement and
hereby consents to the execution thereof; that the undersigned
shall perform and comply with all of the terms, covenants and
conditions of the Agreement on the part of the undersigned to be
performed and complied with, even if the Employment Agreement
should hereafter be terminated or suspended; that the
representations and warranties of Contractor contained in the
Agreement are true; that the undersigned shall render all of the
services provided for under the Agreement and hereby confirms
that there have been granted to Contractor all of the rights
granted by Contractor to you under the Agreement; that all
notices served upon Contractor in accordance with the Agreement
shall be deemed notices to the undersigned of the contents
thereof.

0040H

SUN 0393

3.    That the undersigned is under no obligation or
disability by law or otherwise which would prevent or restrict
the undersigned from performing and complying with all of the
terms, covenants and conditions of the Agreement on the part of
the undersigned to be performed or complied with.

4.    That, except in the event that the undersigned is
deemed substituted for Contractor as a direct party to the
Agreement, pursuant to Paragraph 6 hereof, the undersigned will
look solely to Contractor and not to you for all compensation and
other remuneration for any and all services and rights which the
undersigned may render and/or grant under the Agreement.

5.    That you shall be entitled to equitable relief
against the undersigned by injunction or otherwise to restrain,
enjoin and/or prevent the violation or breach by the undersigned
of any obligation of the undersigned to be performed as provided
in the Agreement and/or the violation or breach by the
undersigned of any obligations or agreements under this present
instrument.

6.    That if Contractor should be dissolved or should
otherwise cease to exist or for any reason whatsoever should
fail, be unable, neglect or refuse to perform and observe each
and all of the conditions of the Agreement requiring performance
or compliance on its part, the undersigned shall at your election
be deemed substituted as a direct party to the Agreement in the
place and stead of Contractor and, further, that in the event of
a breach or threatened breach of the Agreement by Contractor or
by the undersigned you shall be entitled to legal and equitable
relief by way of injunction or otherwise against Contractor or
against the undersigned or both of us in your discretion, in any
event without the necessity of first resorting to or exhausting
any rights or remedies which you may have against Contractor; all
of the foregoing to be to the same extent and with the same force
and effect as if the undersigned were a direct party to the
Agreement in the first instance and as if in the Agreement the
undersigned had personally agreed to render the services therein
provided to be rendered by the undersigned and to perform and
observe each and all of the terms and conditions of the Agreement
requiring performance or compliance on the part of the Contractor
or the undersigned or both of us.

                              Very truly yours,


_____        _____
  FORD KINDER                         ANNE BRYANT


0040H                          —  13  —

# EXHIBIT 29

LAW OFFICES OF

WILLIAM M. DOBISHINSKI
SUITE 1500
6430 SUNSET BOULEVARD
HOLLYWOOD, CALIFORNIA 90028
(213) 469-0045

BY AIR COURIER

WILLIAM M. DOBISHINSKI*
SCOTT F. PEARCE
LADD S. LJUNGBERG, Law Clerk

*Also member of New York and
District of Columbia Bars
DIRECT LINE (213) 469-4003

DATE: February 9, 1987

TWX 910-321-3738
Cable Address "COBOLEX"

N.Y. OFFICE
SUITE 300
1560 BROADWAY
NEW YORK, NEW YORK 10036
(212) 221-7171

TO: Carole Weitzman
    Sunbow Productions
    130 Fifth Avenue
    New York, NY 10011

FROM: William M. Dobishinski   Bill (L.S.L.)

RE: Kinder/Bryant - "JEM"

ENCLOSURES: (1) revised amendement, dated March 15, 1986 of agreement dated
                June 1, 1985, between Sunbow Productions, Inc. and
                Kinder & Bryant Ltd.; and
            (2) red-lined copy of revised amendment.
    ( )  Please sign and return.

    (x)  Please read and advise me of your comments.

    ( )  In accordance with your request.

    ( )  For your information and/or files.

    ( )  Please telephone me.

    ( )  Please handle.

    (x)  Other: If the enclosed amendment is acceptable to Bob
               Harris and you, please so advise me and I can
               then request Kinder & Bryant to execute the
               amendment. By copy of this letter to Bob Harris,
               Anne Bryant and Ford Kinder, I am also requesting
               their approval and/or comments.

cc (w/enc.):                          cc (w/o enc.):

Bob Harris, Esq.
Anne Bryant
Ford Kinder



DEFENDANT'S
EXHIBIT
S
PENGAD-Bayonne, N.J.

SUN 0397

SUNBOW PRODUCTIONS, INC.
130 Fifth Avenue
New York, New York 10011

Red lined copy
2/9/87
Not reviewed by
William M Dobishinsk

March 15, 1986

Kinder & Bryant Ltd.
41 West 73rd Street
New York, New York 10023

Attention: Anne Bryant and Ford Kinder

    Re:  JEM

Dear Anne and Ford:-

        Reference is made to our June 1, 1985 Agreement concerning the above (including, without limitation, all defined terms therein).

        It is hereby agreed that effective as of the date of this letter:

    (1)  the term "Music" in said Agreement shall be deemed to refer to all original music heretofore or hereafter delivered by Contractor to Company for "JEM" (until written notice by either party that Music delivered after the notice date shall not be deemed "Music");

    (2)  Music delivered pursuant to the engagement of the original Agreement shall be subject only to the terms of the original Agreement; and

    (3)  Music delivered subsequent to the engagement of the original Agreement shall be subject to the terms of the original Agreement, except that Paragraph 2(a) of the said Agreement is hereby deleted and the following inserted in its stead:

            "For all rights herein granted to Company in the Music and for performance by Contractor of all obligations hereunder (including but not limited to composing and arranging the Music and supervision of the orchestra recording of the Music for the Show), Company shall pay Contractor a fee of One Thousand Three Hundred and Fifty ($1,350) Dollars for each song for which Writer writes and delivers the Music, payable on delivery thereof. For each such song actually used on phonorecordings sold or distributed in conjunction with merchandise based on the Show ("Premium Cassettes"), Company shall pay Contractor an additional fee of One Thousand ($1,000) Dollars as full consideration therefor."

In all other respects, the said Agreement is hereby ratified and confirmed.

SUN 0398

If the foregoing accurately sets forth your understanding, kindly sign in the space provided below, which signature shall create a valid and binding amendment to the said Agreement.

Very Truly yours,

SUNBOW PRODUCTIONS, INC.
("Company")

By _____

ACCEPTED AND AGREED TO:

KINDER & BRYANT, LTD.
("Contractor")

By _____

SUNBOW PRODUCTIONS, INC.
130 Fifth Avenue
New York, New York 10011

March 15, 1986

Kinder & Bryant Ltd.
41 West 73rd Street
New York, New York 10023

Attention: Anne Bryant and Ford Kinder

Re: JEM

Dear Anne and Ford:

Reference is made to our June 1, 1985 Agreement concerning the above (including, without limitation, all defined terms therein).

It is hereby agreed that effective as of the date of this letter:

(1) the term "Music" in said Agreement shall be deemed to refer to all original music heretofore or hereafter delivered by Contractor to Company for "JEM" (until written notice by either party that Music delivered after the notice date shall not be deemed "Music");

(2) Music delivered pursuant to the engagement of the original Agreement shall be subject only to the terms of the original Agreement; and

(3) Music delivered subsequent to the engagement of the original Agreement shall be subject to the terms of the original Agreement, except that Paragraph 2(a) of the said Agreement is hereby deleted and the following inserted in its stead:

"For all rights herein granted to Company in the Music and for performance by Contractor of all obligations hereunder (including but not limited to composing and arranging the Music and supervision of the orchestra recording of the Music for the Show), Company shall pay Contractor a fee of One Thousand Three Hundred and Fifty ($1,350) Dollars for each song for which Writer writes and delivers the Music, payable on delivery thereof. For each such song actually used on phonorecordings sold or distributed in conjunction with merchandise based on the Show ("Premium Cassettes"), Company shall pay Contractor an additional fee of One Thousand ($1,000) Dollars as full consideration therefor."

In all other respects, the said Agreement is hereby ratified and confirmed.

SUN 0400

If the foregoing accurately sets forth your understanding, kindly sign in the space provided below, which signature shall create a valid and binding amendment to the said Agreement.

Very Truly yours,

SUNBOW PRODUCTIONS, INC.
("Company")

By _____

ACCEPTED AND AGREED TO:

KINDER & BRYANT, LTD.
("Contractor")

By _____

# EXHIBIT 30

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

———————————————————————x

ANNE BRYANT,

             Plaintiff,

       - against -

BROADCAST MUSIC, INC., (a/k/a "BMI"),
CLIFFORD A. "FORD" KINDER, KINDER & CO.,
LTD., VADIVOX, LTD., JULES M. "JOE"
BACAL, GRIFFIN BACAL, INC., STARWILD
MUSIC BMI, WILSTAR MUSIC ASCAP,
SUNBOW PRODUCTIONS, INC., and JOHN
AND JANE DOES 1-10,

             Defendants.

———————————————————————x
———————————————————————x

ANNE BRYANT,

             Plaintiff,

       - against -

SUNBOW PRODUCTIONS, INC.,

             Defendant.

———————————————————————x

Index No. 5192/00

Hon. Andrew P. O'Rourke

Index No. 2821/02

Hon. Andrew P. O'Rourke



## BRIEF IN SUPPORT OF DEFENDANT
## SUNBOW PRODUCTIONS, INC.'S
## MOTION FOR SUMMARY JUDGMENT

PATTERSON, BELKNAP, WEBB & TYLER LLP
Attorneys for Defendant
 Sunbow Productions, Inc.
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000
Gloria C. Phares
Kathleen L. Jennings

## Table of Contents

PRELIMINARY STATEMENT ................................................................................................. 2

FACTUAL BACKGROUND .................................................................................................... 3

ARGUMENT ........................................................................................................................... 9

I.      THIRTY-NINE OF PLAINTIFF'S FORTY-EIGHT
        "RE-REGISTRATION" CLAIMS ARE TIME-BARRED .............................................. 10

II.     PLAINTIFF'S WRITER'S SHARE OF PUBLIC PERFORMANCE
        ROYALTIES FOR THE 48 COMPOSITIONS AT ISSUE HAS
        NOT BEEN REDUCED ............................................................................................... 12

        A.      COMPOSITIONS FOR WHICH NO CHANGE IN PERCENTAGE
                CAN BE SHOWN .......................................................................................... 12

        B.      COMPOSITIONS FOR WHICH PLAINTIFF RETAINS 100% OF
                THE WRITER'S SHARE .................................................................................. 13

        C.      ALLEGED RE-REGISTRATIONS THAT PLAINTIFF LACKS
                STANDING TO CHALLENGE .......................................................................... 13

III.    PLAINTIFF CANNOT PROVE
        ESSENTIAL ELEMENTS OF HER CLAIM ................................................................. 14

CONCLUSION ....................................................................................................................... 16

## Table of Authorities

### Cases

Page (s)

Alvord & Swift v. Stewart M. Muller Construction Co. Inc.,
46 N.Y.2d 276, 385 N.E.2d 1238 .................................................................................9

Congregation Yetev Lev D'Satmar v. 26 Adar N.B. Corp.,
596 N.Y.S.2d 435 (N.Y. App. Div. 1993) ....................................................................11

D'Aprile v. Blythe, 386 N.Y.S.2d 144 (N.Y. App. Div. 1976)...........................................15

Dombek v. Reiman, 748 N.Y.S.2d 630 (N.Y. App. Div. 2002).........................................10

Jones v. Surrey Co-Op. Apartments, Inc., 700 N.Y.S.2d 118
(1st Dep't 1999)..........................................................................................................14

Larry Spier, Inc. v. Bourne Co., 953 F.2d 774, 776 (2d Cir. 1992)....................................7

Mellencamp v. Riva Music Ltd., 698 F.Supp. 1154, 1157-58 (S.D.N.Y. 1988)...............15

Mente v. Wenzel, 577 N.Y.S.2d 167 (N.Y. App. Div. 1991).......................................12, 14

Niagara Mohawk Power Corp. v Freed, 733 N.Y.S.2d 828
(N.Y. App. Div. 2001) ...............................................................................................10

Paine Webber Real Estate Security v. D.G. Meyer & Co.,
835 F. Supp. 116 (S.D.N.Y. 1993) .............................................................................15

Sharp v. Kosmalski, 40 N.Y.2d 119, 386 N.E.2d 721 (1976) ...............................12, 14, 15

Szczotka v. Adler, 291 A.D.2d 444, 7347 N.Y.S.2d 121
(2d Dep't 2002) ..........................................................................................................9

Vogel v. Palmieri, 221 A.D.2d 522, 633 N.Y.S.2d 404
(2d Dep't 1995) ..........................................................................................................10

Zuckerman v. City of New York, 49 N.Y.2d 557, 404 N.E.2d 718,
427 N.Y.S.2d 595 (1980)..............................................................................................9

### Statutes

17 U.S.C. § 106.....................................................................................................................4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
————————————————————————x

ANNE BRYANT,

             Plaintiff,

      - against -

BROADCAST MUSIC, INC., (a/k/a "BMI"),
CLIFFORD A. "FORD" KINDER, KINDER & CO.,
LTD., VADIVOX, LTD., JULES M. "JOE"
BACAL, GRIFFIN BACAL, INC., STARWILD
MUSIC BMI, WILSTAR MUSIC ASCAP,
SUNBOW PRODUCTIONS, INC., and JOHN
AND JANE DOES 1-10,

             Defendants.

Index No. 5192/00

Hon. Andrew P. O'Rourke

————————————————————————x
————————————————————————x

ANNE BRYANT,

             Plaintiff,

      - against -

SUNBOW PRODUCTIONS, INC.,

             Defendant.

Index No. 2821/02

Hon. Andrew P. O'Rourke

————————————————————————x

## BRIEF IN SUPPORT OF DEFENDANT SUNBOW
## PRODUCTIONS, INC.'S MOTION FOR SUMMARY JUDGMENT

        Pursuant to Civil Procedure Law and Rules ("CPLR") § 3212, Defendant Sunbow

Productions, Inc. ("Sunbow") respectfully submits this memorandum of law in support of its

motion for summary judgment dismissing Plaintiff's Amended Complaint in its entirety with

prejudice.

## PRELIMINARY STATEMENT

Plaintiff has been complaining since 2000 that defendants Broadcast Music, Inc. ("BMI"), Jules "Joe" Bacal, Sunbow Productions, Inc. ("Sunbow"), and former defendant Ford Kinder have conspired somehow to re-register her musical compositions with BMI in a manner that has reduced the public performance royalties that she receives in connection with these compositions. What Plaintiff has noticeably failed to do at any point during the past three years, however, is identify any evidence to support her far-fetched claims of a conspiracy to deprive her of these royalties.

Plaintiff cannot demonstrate even the most basic facts regarding the alleged re-registrations of her musical compositions with BMI, such as who was responsible for these re-registrations. More importantly, however, even assuming that Plaintiff could prove that the re-registrations occurred, Plaintiff has no evidence whatsoever to support her contention that these re-registrations reduced the amount of royalties that she receives with respect to the compositions at issue.

In contrast, facts developed during discovery have confirmed that Plaintiff's claims against Sunbow for unjust enrichment and for imposition of a constructive trust fail as a matter of law. First, the vast majority of Plaintiff's claims are time-barred because the alleged re-registrations occurred outside the six-year statute of limitations applicable to her claims. Second, documents from BMI's files (almost all of which Plaintiff received from BMI nearly 3 years ago) show that the current BMI royalty percentage for her compositions is exactly the same as it was when these compositions were registered with BMI in the 1980s. In other words, Plaintiff's royalty percentages have remained unchanged with respect to these compositions. Finally, Plaintiff lacks standing to make some of her claims because she is complaining of injury to

2

parties other than herself. For all of these reasons, summary judgment is warranted on all of the claims in Plaintiff's Amended Complaint.

## FACTUAL BACKGROUND

### A. The Parties

Defendant Sunbow Productions, Inc. ("Sunbow") is a television production company that specializes in the production of television series for children. (Affidavit of Carole Weitzman ("Weitzman Aff.") ¶ 2.) Among the many series that Sunbow has produced are G.I. Joe, The Transformers, JEM, My Little Pony and The Visionaries. (Id.)

Sunbow was formed by Defendant Jules "Joe" Bacal and Tom Griffin in or around 1978. (See Weitzman Aff. ¶ 4.) Bacal and Griffin owned Sunbow until in or around 1998, when Sony Wonder acquired Sunbow. (Id. ¶ 4.) Sunbow was thereafter acquired by TV-Loonland AG in or around 2000. (Id.)

Griffin and Bacal also owned and operated an advertising agency named Griffin Bacal, Inc. ("GBI"). One of GBI's biggest clients was Hasbro, which, among other things, marketed and distributed Transformer, G.I. Joe, My Little Pony and Jem toys. (Deposition of Anne Bryant ("Pls. Dep.") at 106.)

Plaintiff Anne Bryant is, among other things, a composer and musician who has written musical compositions for television shows, commercials, documentaries and films. (Pls. Dep. at 16.) In 1983, Plaintiff and Clifford "Ford" Kinder (also a composer and a defendant in this case until he settled with Plaintiff) formed Kinder & Bryant. (Id. at 76.) Kinder & Bryant was hired by GBI to write musical compositions for commercials and was also hired by Sunbow to write musical compositions to be used in the television series. (Id. at 90, 91, 92, 108-110; Affirmation of Roseann Kitson Schuyler ("Kitson Affirm."), Ex. B ("Am. Compl.") ¶ 9; see Weitzman Aff. ¶ 5.)

3

## B. The Registration of Musical Compositions with BMI

Because the right of public performance is one of the rights of a copyright owner of a musical composition under § 106(4) of the U.S. Copyright Act of 1976, writers and publishers of musical compositions have the right to compensation when their compositions are performed publicly (called "public performance royalties"), including on broadcast and cable television. See 17 U.S.C. § 106 (4); Affidavit of Allison Smith ("Smith Aff.") ¶ 4. BMI is a music performing rights organization which represents affiliated songwriters, composers and music publishers. (Smith Aff. ¶ 4.) Among other things, BMI collects license fees for the public performance of musical compositions written or published by its affiliates and distributes these fees as royalties to those affiliates. (Id.)

In order for BMI to track, collect and distribute royalties to its affiliates, the affiliates must "register" their musical compositions with BMI. BMI thereafter determines how often each such composition is publicly performed, collects license fees for these performances and distributes the fees as royalties to the appropriate writers and publishers. (Smith Aff. ¶ 5.) While some types of songs are registered through the use of a "registration form" or "clearance form," themes and background music specifically written for film and television shows are most often registered by the producer of the television show through the submission to BMI of a "cue sheet" for each film or episode of a television series. Cue sheets generally list, among other things: (a) the television producer for the episode in question; (b) the air date for the episode; (c) the title given to each of the musical compositions used in the episode; (d) the writer(s) and publisher(s) of each individual composition used in the episode; and (e) their respective shares of the public performance royalties for each such composition. (Smith Aff. ¶ 7.)

BMI allocates the public performance royalties for each composition between the writer and publisher of the composition. BMI typically assumes that the writer is entitled to

4

100% of the writer's share of the royalties. (Smith Aff. ¶ 8.) BMI similarly assumes that the publishers are entitled to 100% of the publisher's share of the royalties. (Smith Aff. ¶ 8.) If there are multiple writers for a single composition, the cue sheet typically specifies how much of the 100% writer's share each writer should receive. (Smith Aff. ¶ 8.) When, as sometimes is the case, a cue sheet lists more than one writer but does not indicate what percentage of the writer's share of the royalty each writer is to receive, BMI's practice is automatically to assign an equal share of the writer's royalty to each writer listed on the cue sheet. (Smith Aff. ¶ 8.)

It is essential that cue sheets be filed with BMI at or around the time that a musical composition is first publicly performed. (Smith Aff. ¶ 9.) Late filing of cue sheets interferes with BMI's ability to track all of the public performances of a musical composition accurately and can result in BMI's not being able to credit writers and publishers for royalties with respect to each airing of a particular television episode in which their composition is used. (Smith Aff. ¶ 9.) As a result, television producers generally submit cue sheets for television episodes on or around the air date for the particular episode in order to make sure that they and the writer(s) receive all of the royalties to which they are entitled for the compositions used in that episode. (Smith Aff. ¶ 9.)

## C. Sunbow's Registration of Plaintiff's Musical Compositions with BMI

As it did with all musical compositions used in its television series, Sunbow registered the musical compositions written by Plaintiff that were used in its television series.[1] It did so through the submission of cue sheets to BMI for each of the television episodes in which

---

[1] Sunbow was not involved in the registration of the musical compositions that Plaintiff or Kinder wrote for commercials in connection with their work for GBI because Sunbow produced television shows only, not commercials. (See Weitzman Aff. ¶ 5.) It was GBI, not Sunbow, that handled all arrangements with respect to the percentage of royalties Plaintiff received and registration of compositions for commercials. (Id.)

5

Plaintiff's compositions were used. (See Weitzman Aff. ¶ 8; Smith Aff. at ¶ 9.) Sunbow generally received the information regarding what compositions were used in each episode of the Television Series from the outside post-production companies that worked on the series, whereas Griffin or Bacal negotiated the writers' royalty percentages that appeared on the cue sheets directly with the writers. (Weitzman Aff. ¶ 9.)

Sunbow hired individuals or entities called "music administrators" to file its cue sheets with BMI. In 1984 and 1985, the Mary Williams Music Clearance Corporation performed this function for some of Sunbow's television series. (See Weitzman Aff. ¶ 11; Ex. 1 to Ex. K. to Kitson Affirm.) Sunbow later hired William Dobishinsky to perform this function. In or around the mid-1990s, Sony ATV also performed this function for Sunbow. (Id. ¶ 11; Ex. 28 to Ex. K to Kitson Affirm.) These music administrators submitted cue sheets to BMI around the time that the television episodes were going to be broadcast on television. This helped to ensure that the writers and publishers of the compositions used in those episodes would promptly obtain their public performance royalties from BMI. (Id. ¶ 11.)

## D.  Plaintiff's Allegations in This Case

Plaintiff's allegations in this case focus initially on her protracted dispute with her former business partner, Kinder. Plaintiff alleges that she and Kinder dissolved Kinder & Bryant in November 1989 pursuant to a corporate divorce agreement. (See Kitson Affirm., Ex. B ¶ 4.) Thereafter, Plaintiff sued Kinder for, among other things, breach of that agreement, breach of fiduciary duty, conversion and fraud, all relating to royalties and other monies Plaintiff believed that Kinder had been withholding from her. (Id. ¶ 5.) Plaintiff and Kinder settled that suit in September 1994. (Id. ¶ 6.) Plaintiff alleges that "[p]rior to the settlement and in connection therewith," Kinder made representations regarding the then existing registrations of Plaintiff's compositions with BMI. (Id. ¶ 7.) With respect to Sunbow, Plaintiff's only allegations are that:

6

> Through its employees, agents and principals, including but not
> limited to Jules 'Joe' Bacal, Sunbow was involved in and received
> financial benefits from musical compositions and musical cues,
> which were formerly registered in plaintiff's BMI account, which
> subsequent to 1993 were altered and re-registered in a manner to
> benefit Kinder, Griffin-Bacal and Bacal, and Sunbow, both before
> and after said settlement.

(Kitson Affirm., Ex. B ¶ 10 (emphasis added).) Plaintiff further alleges that Sunbow "received

such benefits without plaintiff's knowledge and without plaintiff's consent or approval and was

thereby unjustly enriched by monies to which it was not entitled."[2] Id. Plaintiff has testified

generally that the compositions at issue in this case relate to the following television series: The

Transformers, G.I. Joe, Jem, My Little Pony & Friends, My Little Pony, Visionaries,

Inhumanoids, and Robotics. (Kitson Affirm. Ex. D, Pls. Dep. at 34.) However, Plaintiff has

alleged no specific facts with respect to the registration of any compositions relating to the

Inhumanoids or Robotics series.

## E.    BMI Communications with Plaintiff Regarding Her Royalty Complaints

Plaintiff filed the instant action against BMI, Bacal and the Kinder defendants in

August 2000. Both before and after the filing of that action, BMI attempted to communicate

with Plaintiff to discuss her concerns about certain compositions in the catalog of Plaintiff's

works registered with BMI ("Plaintiff's Catalog"). In March 2000, as part of that attempt at

dialogue, BMI even provided Plaintiff with a copy of Plaintiff's Catalog. (Smith Aff. ¶ 12-13.)

However, Plaintiff failed to respond to BMI until after she had filed suit. (Smith Aff. ¶ 13.)

---

[2] Plaintiff has also claimed that she is entitled to "mechanical royalties", (Kitson Affirm., Ex. D.
(Pls. Dep.) at 43, 175-76.), a term used in the recording industry to refer to the right under
§ 106(1) of the Copyright Act, 17 U.S.C. § 106(1), to reproduce a musical composition in a
recording. See Larry Spier, Inc. v. Bourne Co., 953 F.2d 774, 776 (2d Cir. 1992) (describing
example of mechanical royalties). However, the reproduction right and the right to receive
royalties from exploiting it is a right exercised by the copyright owner, and Plaintiff has
conceded that she is not the owner of the compositions at issue in this case. (Id. at 34, 39.)
Thus, Plaintiff is not entitled to mechanical royalties.

7

In October 2003, shortly after BMI was served with Plaintiff's complaint in this action, BMI arranged a meeting with Plaintiff and her counsel to discuss her complaints regarding her royalty distributions from BMI. (Smith Aff. ¶ 14.) During that four-hour meeting, BMI reviewed with Plaintiff and her attorney copies of many of the hundreds of cue sheets that had been submitted to BMI by or on behalf of Sunbow in the 1980s for the television episodes in which her compositions had been used. (Smith Aff. ¶ 15.) By comparing the writer's royalty shares listed for Plaintiff on these cue sheets with the writer's royalty shares listed in Plaintiff's then-current BMI catalog, BMI demonstrated to Plaintiff that there had been no change to her share of the writer's royalty for any of the compositions in her catalog. (Id. ¶ 17.) Copies of these cue sheets and Plaintiff's Catalog were forwarded to Plaintiff's attorney after the meeting. (Id. ¶ 16.)

BMI also explained to Plaintiff at this meeting that many of the "entry dates" listed for compositions in her catalog – which she claimed were evidence that her writer's share was reduced for those compositions as of those entry dates – reflected non-substantive changes to her catalog, such as changes to addresses or other contact information. (Smith Aff. ¶ 18.) For example, many of the entries in her catalog show an entry date of June 13, 1993. (Smith Aff. ¶ 18.) However, that is the date on which BMI switched from one computer system to another. (Smith Aff. ¶ 18.) One result of this change was that it caused the entry date for every composition registered in BMI's system to reflect a "change" on that date. (Smith Aff. ¶ 18.) However, Plaintiff's share of the writer's royalties for her compositions did not change on this date. (Smith Aff. ¶ 18.)

F. The Court's Prior Statute of Limitations Holding

In January 2002, Sunbow moved to dismiss Plaintiff's Amended Complaint in its entirety on the grounds that her claims were time-barred by the applicable statutes of limitations

8

and that she had failed to state claims for unjust enrichment and constructive trust.[3] (See Kitson Affirm. ¶ 5.) The Court denied that motion in order to permit Plaintiff to obtain discovery from Sunbow regarding her claims, but recognized that if the facts show the registrations to have occurred before 1996, the case must be dismissed against Sunbow. (Id. Ex. C at 5.)

## ARGUMENT

A motion for summary judgment should be granted "if, upon all the papers and proof submitted, the cause of action or defense shall be established sufficiently to warrant the court as a matter of law in directing judgment in favor of any party." CPLR § 3212(b). A defendant's motion for summary judgment must be granted where a plaintiff fails to demonstrate the existence of a triable issue of fact with respect to her claims. See Zuckerman v. City of New York, 49 N.Y.2d 557, 562, 404 N.E.2d 718, 720, 427 N.Y.S.2d 595, 597-98 (1980); Alvord & Swift v. Stewart M. Muller Constr. Co. Inc., 46 N.Y.2d 276, 279, 385 N.E.2d 1238, 1239, 413 N.Y.S.2d 309, 310 (1978).

Moreover, the New York Court of Appeals has "repeatedly held that one opposing a motion for summary judgment must produce evidentiary proof in admissible form sufficient to require a trial of material questions of fact on which he rests his claim or must demonstrate acceptable excuse for his failure to meet the requirement of tender in admissible form; mere conclusions, expressions of hope or unsubstantiated allegations or assertions are insufficient." Zuckerman, 49 N.Y.2d at 562; see Szczotka v. Adler, 291 A.D.2d 444, 444, 737 N.Y.S.2d 121,

---

[3] Plaintiff filed this action against Sunbow in April 2002. Sunbow moved to dismiss Plaintiff's complaint in its entirety for failure to state a claim and because most, if not all, of her claims were barred by the applicable statutes of limitations. (See Kitson Affirm. ¶ 3.) In response to Sunbow's motion, Plaintiff cross-moved to voluntarily withdraw all three of her original claims and for leave to instead plead causes of action for constructive trust and unjust enrichment. (Kitson Affirm. Ex J at 4.) In an order dated December 2, 2002, the Court granted Plaintiff's motion to amend her complaint. (Id. at 6.)

9

122 (2d Dep't 2002) ("speculation . . . is insufficient to raise a triable issue of fact" at summary judgment stage); Vogel v. Palmieri, 221 A.D.2d 522, 523, 633 N.Y.S.2d 404, 405 (2d Dep't 1995) (same).

Here, each of Plaintiff's re-registration claims fails as a matter of law for at least one – and sometimes more than one – reason. Each of Sunbow's grounds for summary judgment is discussed in the following sections of this brief. In addition, for the Court's convenience, Sunbow has attached two charts that demonstrate why summary judgment is warranted with respect to each of Plaintiff's re-registration claims.

Attached to this brief as Appendix A is a chart that (1) lists the name of each composition at issue in this case and (2) very briefly summarizes each ground on which summary judgment is warranted for that composition. Sunbow has also submitted as an exhibit to the Kitson Schuyler Affirmation a more detailed chart that sets forth: (1) all of the compositions in Plaintiff's BMI Catalog that she claims were re-registered to her detriment; (2) plaintiff's specific allegations of wrongdoing with respect to each composition; and (3) Sunbow's grounds for summary judgment with respect to each composition. (See Kitson Affirm ¶ 10 & Ex. K.) ("Sunbow's Composition Chart"). Attached to Sunbow's Composition Chart are documents organized by composition (*e.g.*, copies of cue sheets, royalty statements and BMI catalog entries for plaintiff's compositions) that support Sunbow's grounds for summary judgment with respect to each composition.

## I.   Thirty-Nine of Plaintiff's Forty-Eight "Re-Registration" Claims Are Time-Barred

As the Court has already acknowledged, Plaintiff's claims for unjust enrichment and imposition of a constructive trust are both subject to New York's six-year statute of limitations. Niagara Mohawk Power Corp. v Freed, 733 N.Y.S.2d 828, 829 (N.Y. App. Div. 2001); Dombek v. Reiman, 748 N.Y.S.2d 630 (N.Y. App. Div. 2002); CPLR § 213(1); see

10

Kitson Affirm. Ex. J at 5. The statute of limitations on these actions begins to run "upon the occurrence of the wrongful act giving rise to a duty of restitution." Congregation Yetev Lev D'Satmar v. 26 Adar N.B. Corp., 596 N.Y.S.2d 435, 437 (N.Y. App. Div. 1993); see Kitson Affirm. Ex. C at 5.

Here, Plaintiff alleges that Sunbow, Bacal and Kinder conspired to re-register 48 musical compositions that she wrote in a manner that decreased her share of the public performance royalties for those compositions. (See Kitson Affirm., Ex. B (Am. Compl. ¶ 10); Kitson Affirm., Ex. D (Bryant Dep.) at 124, 125-26.) The dates of those alleged re-registrations are therefore the dates that must fall within the statute of limitations period. Because Plaintiff filed this action against Sunbow in April 2002, the Court held earlier this year that:

> [s]hould it ultimately be determined that the wrongful re-
> registrations of plaintiff's work . . . occurred prior to 1996 [i.e.,
> more than six years before the complaint was filed], then the Court
> finds, as a matter of law, that plaintiff's claims properly would
> have to be dismissed as untimely.

(Kitson Affirm., Ex. C at 5.)

The Court denied Sunbow's motion to dismiss on statute of limitations grounds in order to permit discovery regarding Plaintiff's vague allegation that the alleged re-registrations about which she complains took place "subsequent to 1993." (See Kitson Affirm., Ex. C at 4.) However, Plaintiff has now conceded in her responses to Sunbow's Interrogatories that 39 of the 48 compositions about which she complains were re-registered before 1996. (See Kitson Affirm., Ex. G at 3-5; see also Appendix A (Entries 1-22, 24, 25, 27, 29-38, 42-45).) Accordingly, Plaintiff's claims with respect to these compositions fall outside the applicable six-year statute of limitations and should be dismissed as a matter of law.

11

## II. Plaintiff's Writer's Share of Public Performance Royalties for the 48 Compositions at Issue Has Not Been Reduced

As a matter of law, Plaintiff cannot succeed on her claims against Sunbow for unjust enrichment and for a constructive trust without proving, among other things, that Sunbow has received public performance royalties that rightfully belong to her. E.g., Mente v. Wenzel, 577 N.Y.S.2d 167, 168 (N.Y. App. Div. 1991) (unjust enrichment "arises when one party possesses money or obtains a benefit that in equity and good conscience they should not have obtained or possessed because it rightfully belongs to another"); Sharp v. Kosmalski, 40 N.Y.2d 119, 121, 386 N.E.2d 721, 723 (1976) (constructive trust may be imposed "when property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest," if plaintiff also proves a confidential or fiduciary relation, a promise, a transfer in reliance thereon and unjust enrichment).

### A. Compositions for Which No Change in Percentage Can Be Shown

Numerous documents demonstrate that Plaintiff's percentage of the writer's share of public performance royalties for 42 of the 48 challenged compositions remains exactly the same as it was when those compositions were first registered with BMI.

Sunbow submitted cue sheets to BMI for each episode of the television series at issue so that BMI could monitor, collect and distribute public performance royalties to the writers and publishers of the musical compositions used in those episodes. See pp. 5-6 above; Weitzman Aff. ¶ 8; Smith Aff. ¶ 4-7. As has been the practice in the television industry, Sunbow typically submitted such cue sheets to BMI on or around the dates on which the episodes were scheduled to be broadcast. (Weitzman Aff. ¶ 11; see Smith Aff. 9.) These cue sheets identify, among other things, the writers of particular compositions used in the episodes and the writers' shares of the public performance royalties for those compositions.

12

A simple comparison of the cue sheets submitted by Sunbow at or around the time when the BMI television productions at issue were first broadcast with Plaintiff's Catalog reveals that the cue sheets and Plaintiff's Catalog list the same writer's percentage for 35 of the 48 compositions at issue. See Appendix A (entries 1-22, 25, 26, 28-31, 39-45). Detailed facts with respect to each composition (*i.e.*, the writer's percentage Plaintiff claims she should have, the percentage listed on the 1980s cue sheet, etc.) are set forth on Sunbow's Composition Chart. (See Kitson Affirm. Ex. K (same entry numbers). In addition, attached to Sunbow's Composition Chart for each composition are documents that support the facts on Sunbow's Composition Chart and the argument that no change in percentage has occurred. (Id.)

In other words, Plaintiff's writer's percentages for these 35 compositions have not changed: they remain exactly the same as her percentages when those compositions were registered with BMI almost twenty years ago. Because Plaintiff has not been deprived of any public performance royalties with respect to these compositions, her claims for unjust enrichment and constructive trust against Sunbow must be dismissed.

B. Compositions for Which Plaintiff Retains 100% of the Writer's Share

With respect to four of the compositions at issue, Plaintiff's claim that her share of public performance royalties has been reduced is disproved by the simple fact that Plaintiff's Catalog states that she in fact receives 100% of the writer's share for these compositions. See Appendix A (entries 23, 24, 37, 38); Kitson Affirm., Ex. K (Sunbow Composition Chart) (same entry numbers).

C. Alleged Re-Registrations That Plaintiff Lacks Standing to Challenge

Plaintiff alleges that three compositions that she co-wrote with Kinder for the Visionaries television series were re-registered to give Bacal and Bacal's son Kinder's portion of the writer's royalties for these compositions. (See Kitson Affirm. Ex. K, Sunbow's Submission

13

Chart (Entry Nos. 46-48).) Clearly, however, Plaintiff lacks standing to bring claims based on alleged reductions of Kinder's royalties. Because Plaintiff herself has not been deprived of royalties with respect to these Visionaries compositions, her claims as to them must be dismissed as a matter of law.[4]

## III. Plaintiff Cannot Prove Essential Elements of Her Claims

Even assuming the above defenses did not defeat all of Plaintiff's claims (which they do), Plaintiff fails to meet other elements of her claims for unjust enrichment and constructive trust as well. For example, Plaintiff cannot show, as she must for both of her claims, that Sunbow has retained any public performance royalties or benefits from such royalties that should be returned to her. See, e.g., Mente, 577 N.Y.S.2d at 168 (unjust enrichment arises when defendants obtain "benefit that in equity and good conscience they should not have obtained or possessed"); Sharp v. Kosmalski, 40 N.Y.2d at 121, 386 N.E.2d at 723 (constructive trust warranted where defendant has acquired property under circumstances where cannot "in good conscience" retain it).

---

[4] There are six compositions for which Sunbow has not been able to locate documents demonstrating that Plaintiff's royalty percentage has remained the same. (See Kitson Affirm. Ex. K (entries 27, 32-36).) However, this in no way supports Plaintiff's contention that her royalty percentage declined with respect to these compositions. Indeed, Carole Weitzman, who was responsible for maintaining copies of cue sheets for music used in Sunbow's productions from the late 1980s through in or around 2001 has no knowledge of any forms having been submitted to BMI requesting a change in the percentage of Plaintiff's royalties. (Weitzman Aff. ¶ 13.) Similarly, BMI has not located in its records any cue sheets or registration forms which purport to change Plaintiff's writer's share for these compositions. (Smith Aff. ¶ 20.) Moreover, if BMI had received such a request, it would have investigated the request in accordance with its process regarding writer changes to registered compositions. (Id. at ¶ 19.) In any event, summary judgment is warranted with respect to these compositions because: (1) Plaintiff's claims with respect to these compositions are time-barred, see Kitson Affirm., Ex. K (entries 27, 32-36); and (2) plaintiff has failed to produce any evidence that her royalty percentages with respect to these four compositions (or any other compositions) have decreased, see Jones v. Surrey Co-Op. Apartments, Inc., 700 N.Y.S.2d 118, 122 (1st Dep't 1999) (summary judgment should be granted where plaintiff has failed to produce "even a shred of evidence" to support alleged wrongdoing).

14

Plaintiff admits that she does not believe that "Sunbow has collected any monies that are due and owing" to her. (Kitson Affirm., Ex. D (Pls. Dep.) at 194.) Rather, her claim is that Sunbow has "diverted [her public performance royalties] to other people." (Id. at 195; see id. at 218 (accusing Sunbow of "diverting [royalties] to other writers"). Because Plaintiff does not claim that Sunbow has retained any public performance royalties that rightfully belong to her, her claims for unjust enrichment and for a constructive trust fail as a matter of law.

Plaintiff's claim against Sunbow for a constructive trust also fails because she cannot demonstrate that she had a confidential or fiduciary relationship with Sunbow or that Sunbow made any promise to her on which she relied in connection with her public performance royalties. See Sharp v. Kosmalski, 40 N.Y.2d 119, 121, 386 N.E.2d 721, 723 (1976) (requiring plaintiff to prove a confidential or fiduciary relation, a promise, a transfer in reliance thereon and unjust enrichment for constructive trust claim). Rather, it is clear that Plaintiff had only a commercial relationship with Sunbow, which does not as a matter of law rise to the level of a confidential or fiduciary relationship for purposes of imposing a constructive trust. Kitson Affirm. Ex. D, Pls. Dep. 90, 92-94; see Paine Webber Real Estate Sec. v. D.G. Meyer & Co., 835 F.Supp. 116, 119 (S.D.N.Y. 1993); see also Mellencamp v. Riva Music Ltd., 698 F.Supp. 1154, 1157-58 (S.D.N.Y. 1988). Nor has Plaintiff identified any promise that Sunbow made to her regarding her public performance royalties. See D'Aprile v. Blythe, 386 N.Y.S.2d 144, 145 (N.Y. App. Div. 1976) (absent any agreement between the parties embodying an implied or express promise, a confidential relationship alone was not sufficient to support the imposition of a constructive trust).

These flaws in Plaintiff's proof undermine her claims and require dismissal of the Amended Complaint as a matter of law.

15

## CONCLUSION

For the reasons set forth above, Defendant Sunbow Productions, Inc. respectfully

requests this Court to grant its motion for summary judgment on all counts of Plaintiff's

Amended Complaint and to dismiss the Amended Complaint with prejudice.

Dated:     New York, New York
September 30, 2003

Respectfully submitted,

PATTERSON, BELKNAP, WEBB & TYLER LLP

By: _____
Gloria C. Phares
Kathleen L. Jennings

1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

Attorneys for Defendant Sunbow Productions, Inc.

16

# APPENDIX A

| NO. | COMPOSITION | GROUNDS FOR SUMMARY JUDGMENT |
|-----|-------------|------------------------------|
| 1 | Autobots Go Into Battle (BMI Work # 003245430) | 1. Claim barred by statute of limitations.<br>2. Plaintiff was never entitled to 100% of writer's royalty. Sunbow cue sheet from October 1985 reflects that Kinder and Bryant were each entitled to 50%. |
| 2 | Autobots Go Into Battle (BMI Work # 003245559) | Same as No. 1 above. |
| 3 | Autobots Prepare for Battle (BMI Work # 003245558) | 1. Claim barred by statute of limitations.<br>2. Plaintiff was never entitled to 100% of writer's royalty. Sunbow cue sheet from October 1985 reflects that Kinder and Bryant were each entitled to 50%. |
| 4 | Battle A (BMI Work # 003245421) | 1. Claim barred by statute of limitations.<br>2. Plaintiff was never entitled to 100% of writer's royalty from BMI. Sunbow cue sheet from September 1984 reflects that Kinder and Bryant were each entitled to 50%. |
| 5 | Battle A (BMI Work # 003245457) | Same as No. 4 above. |
| 6 | Battle A (BMI Work # 003245840) | Same as No. 4 above. |
| 7 | Battle A (BMI Work # 003257826) | Same as No. 4 above. |
| 8 | Battle A Alt End (BMI Work # 003245552) | 1. Claim barred by statute of limitations.<br>2. Plaintiff was never entitled to 100% of writer's royalty. Sunbow cue sheet from September 1984 reflects that Kinder and Bryant were each entitled to 50%. |
| 9 | Battle B (BMI Work # 003245423) | 1. Claim barred by statute of limitations.<br>2. Plaintiff was never entitled to 100% of writer's royalty. Sunbow cue sheet from November 1985 reflects that Kinder and Bryant were each entitled to 50%. |
| 10 | Battle D (BMI Work # 003245392) | 1. Claim barred by statute of limitations.<br>2. Plaintiff was never entitled to 100% of writer's royalty. Sunbow cue sheet from September 1984 reflects that Kinder and Bryant were each entitled to 50%. |
| 11 | Battle D (BMI Work # 003245427) | Same as No. 10 above. |

| NO. | COMPOSITION | GROUNDS FOR SUMMARY JUDGMENT |
|---|---|---|
| 12 | Battle D (BMI Work # 003245839) | Same as No. 10 above. |
| 13 | Battle E (BMI Work # 003245422) | 1. Claim barred by statute of limitations. 2. Plaintiff was never entitled to 100% of writer's royalty. Sunbow cue sheet from September 1984 reflects that Kinder and Bryant were each entitled to 50%. |
| 14 | Chae [sic] D (BMI Work # 003245683) | Same as No. 17 below. |
| 15 | Chase B (BMI Work # 003239322) | 1. Claim barred by statute of limitations. 2. Plaintiff was never entitled to 100% of writer's royalty. Sunbow cue sheet from November 1985 reflects that Kinder and Bryant were each entitled to 50%. |
| 16 | Chase C (BMI Work # 003245401) | 1. Claim barred by statute of limitations. 2. Plaintiff was never entitled to 100% of writer's royalty. Sunbow cue sheet from November 1984 reflects that Kinder and Bryant were each entitled to 50%. |
| 17 | Chase D (BMI Work # 003245409) | 1. Claim barred by statute of limitations. 2. Plaintiff was never entitled to 100% of writer's royalty. Sunbow cue sheet from October 1984 reflects that Kinder and Bryant were each entitled to 50%. |
| 18 | Chase D (BMI Work # 003245576) | Same as No. 17 above. |
| 19 | Chase D (BMI Work # 003257827) | Same as No. 17 above. |
| 20 | Day 1 B Continuing (BMI Work # 003245549) | 1. Claim barred by statute of limitations. 2. Plaintiff was never entitled to 100% of writer's royalty. Sunbow cue sheet from September 1984 reflects that Kinder and Bryant were each entitled to 50%. |
| 21 | Fast Action Transformer Theme (BMI Work # 003245583) | 1. Claim barred by statute of limitations. 2. Plaintiff was never entitled to 100% of writer's royalty. Sunbow cue sheet from November 1984 reflects that Kinder and Bryant were each entitled to 50%. |
| 22 | Pre-Battle A (BMI Work # 003245596) | 1. Claim barred by statute of limitations. 2. Plaintiff was never entitled to 100% of writer's royalty. Sunbow cue sheet from December 1984 reflects that Kinder and Bryant were each entitled to 50%. |

942512v1

| No. | Composition | Grounds for Summary Judgment |
|-----|-------------|------------------------------|
| 23 | Transform Bryant Cues (BMI Work # 003894632) | Even assuming re-registration in 1997, Plaintiff continues to receive 100% of the writer's royalties from BMI for these compositions. |
| 24 | Transformer Bryant Cues (BMI Work # 003167942) | 1. Claim barred by statute of limitations.<br>2. Plaintiff continues to receive 100% of the writer's royalties from BMI for these compositions. |
| 25 | Transformer Theme B (BMI Work # 003245684) | 1. Claim barred by statute of limitations.<br>2. Plaintiff was never entitled to 100% of writer's royalty. Sunbow cue sheet from November 1984 reflects that Kinder and Bryant were each entitled to 50%. |
| 26 | Transformers (BMI Work # 004210722) | Represents intent of television station to use composition in special program, not a re-registration. See Smith Aff. ¶ 25 and Ex. 1 thereto. |
| 27 | Transformers Bumper (BMI Work # 003245454) | 1. Claim barred by statute of limitations. |
| 28 | Transformers Instrumental Theme II a/k/a Transformers Closing Theme (BMI Work # 003985749) | Indicated change of music administrator for this television series, not re-registration. See Smith Aff. ¶ 22 and Ex. 2 thereto. |
| 29 | Transformers Main Theme (BMI Work # 001540534) | 1. Claim barred by statute of limitations.<br>2. Plaintiff was never entitled to 100% of writer's royalty. Sunbow cue sheet from November 1984 reflects that Kinder and Bryant were each entitled to 50%.<br>3. Plaintiff's claim, if any, was against Kinder, not Sunbow. |
| 30 | Transformers Rock & Roll Theme (BMI Work # 001540535) | 1. Claim barred by statute of limitations.<br>2. Plaintiff was never entitled to 100% of writer's royalty. Sunbow clearance sheet from August 1988 reflects that Bryant entitled to 20% of writer's royalty. |
| 31 | Transformers Theme B (BMI Work # 003245575) | Same as No. 25 above. |
| 32 | Transformers Theme Close (BMI Work # 003192089) | Claim barred by statute of limitations. |
| 33 | Transformers Theme Close (BMI Work # 004392390) | Same as No. 32 above. |
| 34 | Transformers Theme Open (BMI Work # 003192088) | Claim barred by statute of limitations. |

942512v1

| NO. | COMPOSITION | GROUNDS FOR SUMMARY JUDGMENT |
|---|---|---|
| 35 | Transformers Theme Open (BMI Work # 004392367) | Same as No. 34 above. |
| 36 | Transformers Vocal Theme II a/k/a Transformers Opening Theme | Claim barred by statute of limitations. |
| 37 | G I Joe Bryant Cues (BMI Work # 002404286) | 1. Claim barred by statute of limitations.<br>2. BMI catalog reflects that Plaintiff receives 100% of writer's royalties. |
| 38 | GI Joe Bryant Cues (BMI Work # 002411781) | Same as No. 37 above. |
| 39 | Jem Inst Theme (BMI Work # 002135739) | Plaintiff was never entitled to 100% of writer's royalty. Sunbow cue sheet from December 1987 reflects that Kinder and Bryant were each entitled to 50%. |
| 40 | Jem Vocal Theme (BMI Work # 0702135810) | Plaintiff was never entitled to 100% of writer's royalty from BMI. Sunbow cue sheet from December 1987 reflects that Kinder and Bryant were each entitled to 50%. |
| 41 | Jem Vocal Theme (BMI Work # 003985754) | Same as No. 40 above. |
| 42 | My Little Pony and Friends The [sic] (BMI Work # 002609175) | 1. Claim barred by statute of limitations.<br>2. Plaintiff was never entitled to 100% of writer's royalty. Sunbow cue sheet from November 1990 reflects that Bryant's share of writer's royalties was 25%. |
| 43 | My Little Pony and Friends The [sic] (BMI Work # 002609225) | Same as No. 42 above. |
| 44 | My Little Pony and Friends The (BMI Work # 002609226) | Same as No. 42 above. |
| 45 | My Little Pony and Friends The [sic] (BMI Work # 002609227) | Same as No. 42 above. |
| 46 | Visionaries Closing Title (BMI Work # 003985715) | Plaintiff lacks standing to bring this claim. |
| 47 | Visionaries Theme (BMI Work # 001589577) | Plaintiff lacks standing to bring this claim. |

942512v1

| NO. | COMPOSITION | GROUNDS FOR SUMMARY JUDGMENT |
|-----|-------------|------------------------------|
| 48  | Visionaries Opening Title (BMI Work # 003985717) | Plaintiff lacks standing to bring this claim. |

942512v1