# EXHIBIT 31

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

| | | |
|---|---|---|
| ANNE BRYANT, | : | |
| Plaintiff, | : | |
| | : | |
| -v- | : | |
| | : | |
| BROADCAST MUSIC, INC. | : | |
| (a/k/a/"BMI"), FORD KINDER, | : | |
| KINDER & CO., LTD., | : | Index No. 5192/00 |
| VADIVOX, INC., JULES M. "JOE" | : | |
| BACAL; GRIFFIN BACAL, INC., | : | Hon. Andrew P. O'Rourke |
| STARWILD MUSIC BMI, WILDSTAR | : | |
| MUSIC ASCAP, SUNBOW | : | |
| PRODUCTIONS, INC., | : | |
| | : | |
| Defendants. | : | |
| ANNE BRYANT, | : | |
| Plaintiff, | : | |
| | : | Index No. 2821/02 |
| -v- | : | |
| | : | Hon. Andrew P. O'Rourke |
| | : | |
| SUNBOW PRODUCTIONS, INC., | : | |
| | : | |
| Defendant. | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS FOR
SUMMARY JUDGMENT SUBMITTED BY DEFENDANTS JULES M. BACAL AND
SUNBOW PRODUCTIONS INC., AND IN SUPPORT OF PLAINTIFF'S CROSS-
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Monaghan, Monaghan, Lamb & Marchisio
Attorneys for Plaintiff
150 West 55th Street, Suite 1G
New York, New York 10019
Tel. (212) 541-6980
Fax. (212) 541-6994

Of Counsel:
Patrick J. Monaghan, Jr.

On the Brief:
Jeffrey C. Primiano

## PRELIMINARY STATEMENT

Plaintiff Anne Bryant respectfully submits this memorandum of law and her accompanying Affidavit dated November 25, 2003 (the "Bryant Aff.") in opposition to the motions for summary judgment submitted by defendants Jules M. "Joe" Bacal ("Bacal") and Sunbow Productions, Inc. ("Sunbow"), and in support of plaintiff's cross-motion for partial summary judgment declaring her entitlement to receive royalties attributable to the sale of videos, CD's, DVD's and other products by Sunbow and Bacal.[1]

These motions represent defendants' fourth and latest attempt to avoid a trial on the complex factual issues presented in this case. Although factual issues abound in this case, precluding defendants' motions, defendants nevertheless attempt to mask this fact by presenting an over-simplified portrait of a situation that is inherently complex and confusing. This difficulty has been exacerbated by defendants' repeated refusals to produce requested documents and to provide relevant information, which the Court has previously highlighted should be in the custody or control of

---

[1] At this juncture in the litigation, through no lack of effort by plaintiff and due to defendants' collective – and perhaps collaborative – efforts, plaintiff has received records of sales pertaining to only Sunbow's domestic licensee, Rhino Entertainment, for the three-year period of time from October 1, 1999 through September 30, 2002. Despite plaintiff's request, defendants have failed to provide plaintiff with Sunbow's license agreement with Rhino Entertainment, claiming they were unable to locate such an agreement. Defendants have also failed to provide any sales records whatsoever relative to foreign sales or any domestic sales other than the foregoing.

defendants.

In three different rulings, this Court has determined that a fiduciary relationship exists between Anne Bryant and Joe Bacal; that plaintiff can pierce the corporate between Sunbow and Bacal veil by demonstrating Bacal's dominion and control over Sunbow; and that it would be improper to award defendant Bacal summary judgment when he continuously claims ignorance as to matters that "seemingly would be within his exclusive knowledge." (See Decision and Order, 9/26/02, p. 10, attached as Exhibit "A" to the Affirmation of Patrick J. Monaghan dated November 26, 2003 (the "Monaghan Aff.").  The Court's characterization can also be applied with equal force to Bacal's company Sunbow.

### Performance Royalties Are Not The Only Issue

In their over-simplified construction of this case, defendants focus solely on the issue of performance royalties for 48 compositions that appear in plaintiff's BMI catalog. In so doing, defendants categorically fail to address compositions that have been entirely excluded from plaintiff's catalog, along with cue sheets and clearance form filings by Sunbow that had the effect of altering plaintiff's entitlement to performance royalties.  Defendants similarly fail to address the mechanical royalties, synchronization, and similar license fees to which plaintiff is entitled, and which defendants have wrongfully withheld from her or effectively transferred to themselves or others.  The details follow.

3

### STATEMENT OF FACTS

Although defendants Jules M. Bacal ("Bacal") and Sunbow Productions, Inc. ("Sunbow") make repeated references to 48 separate compositions at issue in this case, it is more accurate to characterize these 48 pieces as <u>seven</u> compositions written originally as commercial jingles for Griffin-Bacal, Inc. ("GBI") – one for Transformers, GI Joe, Jem, My Little Pony, Visionaries, Inhumanoids, and Robotics – and numerous subsequent derivative uses, arrangements, and other similar uses of those original compositions. (<u>See</u> Affidavit of Anne Bryant dated November 25, 2003 ("Bryant Aff."), ¶ 5).

This denial of "re-registrations" by defendants is disingenuous and misleads the Court. In some instances, defendants did file BMI Clearance Forms that diluted the percentage of royalties attributable to plaintiff for her compositions. (<u>See</u> Bryant Aff., Exh. E). By filing a "new", but improper, Clearance Form, defendants simply took plaintiff's composition, gave it a slightly different title – Transformers Rock and Roll Theme – and laid claim to the performance royalties. In other instances, defendants re-registered plaintiff's compositions so as to dilute or vitiate her royalty allocation through the filing of cue sheets, which are only to be used to register compositions when the music is composed <u>specifically</u> for a television production. (<u>See</u> Affidavit of Alison Smith dated September 30, 2003 ("Smith Aff."), ¶ 6). None of the music at issue was composed for

4

that purpose – the songs were jingles created for use in television commercials.

BMI's Alison Smith simply misstates the truth by claiming that these jingles at issue in this case were "specifically written for films as television shows." (See Smith Aff., ¶ 6). In fact, because plaintiff's jingles pre-dated the television shows and were originally registered with BMI though submission of registration or clearance forms, plaintiff would have been required to execute formal writer registration change forms to permit her ownership interest in these jingles to be diminished, which she certainly never signed. Therefore, any alterations in the registrations of plaintiff's compositions, which Sunbow accomplished by submitting incorrect cue sheets, amounted to wrongful writer registration changes by Sunbow. Defendants' therefore cannot justify the fact that they wrongfully registered plaintiff's compositions by submitting cue sheets to BMI, as opposed to registration or clearance forms.

All of the compositions at issue in this case, such as the Transformer backgrounds, themes and cues, are derivative uses of the original jingles, and plaintiff should have received performance royalties for any and all subsequent derivative uses and/or re-uses of that music. As defendants discuss in their moving papers, compositions may be registered in two ways with Broadcast Music, Inc. ("BMI"). Either a

5

registration form is submitted to BMI by the music publisher[2] or a "cue sheet" is submitted to BMI by a production company, which in this case was Sunbow. Plaintiff had no involvement whatsoever with the cue sheet process, since cue sheets were and are used in the course of producing television shows, movies, CD's, and videos, which was and is Sunbow's business.

Bacal was an owner and co-chairman of Sunbow, which controlled Starwild and Wildstar, in which he had a financial interest. Bacal thus had either actual or constructive knowledge of registrations and cue sheet filings, since as a direct result of these filings and registrations, his own share of royalties either increased, or he began to receive a share of royalties for compositions on which he previously received no royalties whatsoever. Neither Bacal, Sunbow, Starwild, or any other defendant ever notified plaintiff that Bacal — or other individuals to whom Bacal (through Sunbow) gave shares — would be receiving an increased percentage of the performance royalties originally allocated to plaintiff.

In this case, instead of paying the customary creative fees to the individuals who arranged subsequent re-uses of plaintiff's compositions, Sunbow wrongfully allocated either some or all of plaintiff's performance royalties to these arrangers, which were certainly not Sunbow's royalties to

---

[2] In this case, the relevant publisher was Starwild Music BMI ("Starwild"), which was a wholly-owned subsidiary of Sunbow used for BMI writers. Sunbow's other wholly-owned subsidiary, Wildstar Music ASCAP ("Wildstar"), published music for ASCAP writers.

6

give. (See Bryant Aff., ¶ 71). Rather, they were plaintiff's. Thus, in an effort to save on production costs, Sunbow misappropriated and transferred plaintiff's royalty income stream to arrangers of plaintiff's compositions.

### The Working Arrangement Between Plaintiff and Bacal (on Behalf of GBI and Sunbow)

The correct analysis is to compare the working arrangement and agreement between plaintiff and Joe Bacal (on behalf of GBI and Sunbow) - pursuant to which plaintiff was entitled to receive 100% of the writer's royalties attributable to her compositions - with the percentage royalty allocations set forth in the cue sheets Sunbow submitted to BMI. (See Bryant Aff., ¶ 6). Under the working arrangement agreed to by plaintiff and Bacal, on behalf of GBI and Sunbow, plaintiff accepted significantly reduced up-front creative fees in exchange for future entitlement to 100% of the performance and mechanical royalties attributable to these compositions, even when Bacal actually wrote the lyrics for the jingle. (See id. at ¶¶ 7, 22). In this regard, plaintiff's up-front creative fees were only one-third or one-fourth of the normal creative fees to which plaintiff would otherwise have been entitled. (See id. at ¶ 8).

The original payment statements issued to plaintiff prove that this was in fact the arrangement between plaintiff and Bacal (imputable to GBI and Sunbow by virtue of Bacal's ownership and control of those entities). (See id., Exh. D). These statements reveal the performance and mechanical

7

royalties that were paid to plaintiff when she was actively working on the defendants' behalf, despite the fact that Anne Bryant never executed a written contract with GBI, Sunbow, or Starwild concerning the music she composed. (See id.).

Defendants offer no evidence whatsoever to contradict this business arrangement. Indeed, Joe Bacal acknowledged that this was the parties' course of dealing and understanding in his deposition. (See Bacal dep., 11/15/01, p. 40, attached as Exhibit B to the Monaghan Aff.). Plaintiff, on the other hand, possesses original BMI royalty statements showing a 100% share of royalties allocated to her for Transformers, GI Joe, My Little Pony, Jem, Robotix and Inhumanoids. (See Bryant Aff., Exhs. D, I). Indeed, even Carole Weitzman, Sunbow's Senior Vice President of Production who handled the BMI filings for Sunbow, acknowledged that composers of music receive one hundred percent of the writer's royalty from either BMI or ASCAP. (See Weitzman Dep. Tr. at 45:10-15, attached as Exhibit C to the Monaghan Aff.).

If there had been a legitimate reason for changing the allocations for such later compositions and re-uses, a formal "writer change" should have been effected at BMI, which would have required plaintiff's permission. (See Bryant Aff., ¶ 15). However, because defendants improperly submitted cue sheets with new performance royalty allocations, they succeeded in circumventing the formal writer change procedures that have been in place at BMI for at least twenty-five years.

8

## Cue Sheets

Ultimately, defendants Sunbow, GBI, and/or Bacal, through subsequent cue sheet filings, diluted plaintiff's royalty interest in compositions with BMI, which issued new work numbers for these compositions, from which royalty payments were then diverted from plaintiff to others. (See Bryant Aff., ¶ 17). These cue sheets supplanted the original registrations and re-directed the flow of royalty payments away from plaintiff and toward the new registrants, such as defendant Bacal and others. (See ¶ 18). Through this process, defendants not only succeeded in circumventing BMI's formal writer change procedure, but they also avoided having to pay the customary creative fees to individuals who arranged subsequent re-uses of plaintiff's compositions, thereby saving tremendous amounts on production costs. (See Bryant Aff., ¶ 19).

A comparison of plaintiff's early BMI royalty statements with later statements or catalog entries for re-uses of the same songs clearly reveals that plaintiffs' share of royalties has been diminished.[3] See id. at ¶¶ 20-71). This is easily accomplished by examining plaintiff's early BMI statements,

---

[3] Sunbow, as the television production company and "publisher", was and is responsible for submitting cue sheets to BMI, to account for uses of pre-existing music. Despite extensive discovery, defendants have repeatedly refused to explain why these changes were made or who was responsible for them, and have provided no information or evidence that would resolve the issue, despite the fact that such evidence is clearly within their custody or control.

locating those registrations in plaintiff's catalog, then examining the numerous subsequent registrations with the same or slightly altered title, which represent the exact same piece of music.

### Evidence of changes to Plaintiff's Royalty Share for the Compositions at Issue

Contrary to defendant's claims, plaintiff has provided ample evidence of wrongful re-registrations and filings. Defendants, by comparing cue sheets submitted to BMI by Sunbow with plaintiff's BMI-generated catalog, have attempted to mislead the court into believing that no reduction in plaintiff's royalties occurred. That comparison, however, is wholly illusory.

BMI creates catalogs based on information submitted by production companies, which in this case was Sunbow. (See Smith Aff., pp. 5-6). Accordingly, the BMI catalog entries should reflect whatever information is submitted to BMI.

The information on the cue sheets that Sunbow submitted to BMI was wrong. (See Bryant Aff., ¶ 78). The royalty share allotted to plaintiff on cue sheets submitted by Sunbow was wrongfully reduced from the percentage granted to plaintiff in her original dealings with Bacal and GBI. (See id.). When such reductions were submitted to BMI (through cue sheets or clearance forms), they were entered with neither plaintiff's knowledge nor permission, in direct contravention to BMI procedure. (See id.).

10

### The Transformers

Anne Bryant composed the music for the Transformers commercial jingle in 1983, and Joe Bacal wrote the lyrics for the jingle. (See Bryant Aff., ¶ 20). While typically the writer share would be evenly split between the lyricist and the composer for such songs, Bacal had made special arrangements with Kinder & Bryant, Ltd. (See id. at ¶ 21). Bacal agreed to give Kinder & Bryant the entire writer share for songs composed by them, even when he wrote the lyrics. (See id. at ¶ 22). In return, GBI paid Kinder & Bryant a lower up-front creative fee. (See id.).

Thus, in 1984, the song was registered to Anne Bryant 50% (BMI) and Ford Kinder 50% (ASCAP), and no share was registered to Bacal. (See id. at ¶ 23). Bacal and Sunbow's knowledge and consent to this agreement is evidenced by the registration clearance form submitted by Sunbow Productions when it began to use the Transformers Main Theme ("the jingle") as a theme for its television series in 1985, which shows 100% of the writer share of royalties going to Kinder & Bryant, Ltd., and no percentage going to Joe Bacal. (See id., Exh. C).

In 1987, Bill Dobishinski, the lawyer hired by Sunbow to administer music publishing rights, changed the name of the theme from Transformers to Robots in Disguise and arranged for Anne Bryant to receive 100% of the writer share for the song. (See id. at ¶ 26). This was done for accounting purposes, and all proceeds were received by Dobishinski in trust. Bryant and

11

Kinder were each paid 50% of the proceeds net Dobishinski's fee. (See id. at ¶ 27).

In 1986, plaintiff received a special distribution royalty statement, which reflected that her share of royalties for the Transformers theme was reduced to 33%. (See id., Exh. D). When plaintiff inquired as to this split, she was told it was a Saturday morning 3-pack cartoon special, and each cartoon accounted for 1/3 of the royalties. (See id. at ¶ 31). In reality, the royalties were split among Bryant and two other writers. Plaintiff has inquired with BMI as to the identity of these two writers, yet to this date defendants have failed to provide this information. (See id. at ¶ 32).

In or about 1988, the Transformers Rock N Roll theme was registered with BMI for use in the motion picture movie "The Transformers." (See id. at ¶ 33). Sunbow hired a music director for the movie, who in turn hired the music group Lion to make a "rock" version of the Transformers Main Theme plaintiff Bryant had written. (See Bacal dep. p. 75). That registration gave 50% of royalties to Lion, and 20% each to Kinder & Bryant. The remaining 10% share was registered to Joe Bacal, despite the pre-existing deal which excluded Bacal from any share of writer royalties. Plaintiff was not consulted about the reduction in her share, did not give her permission for such a reduction, and was never notified by anyone at Sunbow or BMI about such reduction. (See Bryant Aff., ¶¶ 35-36, Exh. E). During his deposition, Joe Bacal was more than evasive when

12

asked who was involved in the re-registration of this title. (See Bacal dep. 75-79).

On April 24, 1997, Sony ATV (Sunbow's successor), submitted clearance forms to BMI for two Transformers themes – Transformers Instrumental Theme, aka Transformers Closing Theme, and the Transformers Vocal Theme II, aka Transformers Opening Theme. Again, because these themes were derivative uses of the original Transformers jingle written by plaintiff, she should still have been credited with the 100% writer share allocated to her in the 1987 change by Dobishinski.[4] (See Bryant Aff., ¶ 38).

However, the clearance forms submitted by Sony ATV show a 75.10% share to Anne Bryant and a 24.90% share to Joe Bacal for the Transformers Instrumental Theme. (See Bryant Aff., Exh. F). This is especially illogical, since Joe Bacal's only possible source of participation in the royalty proceeds would be the lyrics he wrote for the jingle, which, obviously, would not appear in an instrumental theme.

For the Transformers Vocal Theme II, Anne Bryant's share was reduced from 100% to a meager 8.30%. (See id. at ¶ 41). Bacal also received 8.30% and Ford Kinder, inexplicably, received an 83.90% share. (See id., Exh. G). Even Joe Bacal testified that there is no legitimate reason for such a change. (See Bacal dep., p. 100-101). Again, plaintiff was never

---

[4] All themes, background, and cues derived from the Transformers should follow the 100% allocation to Anne Bryant, even though the registration in 1987 was for Robots in Disguise, since Robots in Disguise and Transformers Main Theme are one and the same. (See Bryant Aff., ¶ 28).

13

consulted or notified about this change, and she certainly never gave permission for this change. (See Bryant Aff., ¶ 42).

Both Sunbow and Bacal refuse to divulge the information needed for plaintiff to determine exactly how such reductions were effected, and by whom. (See id. at ¶ 43). However, it is clear from the evidence that Sunbow, and Bacal, as a principal at Sunbow, were involved. The granting of summary judgment on defendant's behalf, while the truth continues to be obscured through defendants' steadfast refusal to cooperate, would be a great injustice to plaintiff.

There are further examples of unauthorized changes that remain unexplained, for which plaintiff has been unable to procure documentary evidence. However, Sunbow must have records of such changes, and since it has refused to come forth with such documentation, an adverse inference should be made against Sunbow and Bacal.

### GI Joe

This jingle was written by Ford Kinder (music) and Spencer Michelin (lyrics) in or around 1978 or 1979. (See id. at ¶ 46). Joe Bacal did not write lyrics for this jingle. (See id.). The title was registered to plaintiff 100% at BMI as Real American Hero in 1986, and plaintiff received royalties under that title for use of the main theme and other themes and background cues. (See id., Exh. D).

The title was registered again as GI Joe in 1987, and after that, plaintiff only received royalties for two

14

background cues, but not for use of the main theme. (See id.,
Exh. H, pp. 23). By 2000, when plaintiff finally obtained her
catalog from BMI, all other GI Joe titles, under both the GI
Joe and Real American Hero names, had disappeared entirely.
(See id., Exh. H., pp. 23, 55-56). Between 1987 and 2000, a
slew of writer changes occurred, again without plaintiff's
permission or knowledge. For example, in 1988, a BMI statement
indicted an inexplicable royalty reduction from 100% to 33%,
which plaintiff had been incorrectly told was a 3-show pack
special distribution. (See id., Exh. I).

Defendants have offered no explanation for these
"disappearing titles," and plaintiff is left to infer from the
documents available that defendants removed plaintiff entirely
from the registration of GI Joe titles that garnered large
royalty income streams, and left the two GI Joe background
registrations in her catalog so it would appear on royalty
statements as though she was receiving normal GI Joe income
(plaintiff's royalty statements show income by main title
only, not by each use of that title). (See id. at ¶ 51).

As part of the 1994 settlement of litigation between
plaintiff and Ford Kinder, plaintiff was to continue to
receive the full 100% writer share to GI Joe titles in her
catalog, with no obligation to account to Kinder. (See id. at
¶ 52). At the time, being unaware that she only had two minor
titles in her catalog, plaintiff agreed to this valueless
provision. On the other hand, Joe Bacal, who never

15

contributed any lyrics or music to the GI theme, received royalties for GI Joe. (See id. at ¶ 53, Exh. J).

### My Little Pony

This jingle was written by Ford Kinder (music) and Spencer Michelin (lyrics). (See Bryant Aff., ¶ 54). However, it was registered 100% to Anne Bryant at BMI for the same accounting purposes cited above. (See id., Exh. K). Again, retaining the 100% share of royalties was part of Bryant's 1994 litigation settlement with Kinder. (See id. at ¶ 54). Yet, a 2000 version of Bryant's catalog shows contains no My Little Pony titles attributed to her. (See id., Exh. H). Meanwhile, Kinder and two other musicians are credited for My Little Pony. (See Exhibit L). As a direct result of defendants' refusal to produce relevant documents, plaintiff to this day has been unable to determine how or why these titles were removed from her catalog. (See id. at ¶ 56).

### JEM (Truly Outrageous)

Plaintiff wrote the music for the JEM jingle, aka Truly Outrageous, upon which subsequent JEM themes were based, and Joe Bacal wrote the lyrics for the jingle. (See id. at ¶ 57). Plaintiff received 100% of the writer royalty for JEM themes, until about or around April 24, 1997. (See id., Exh. M). At that time Sony ATV changed the royalty split to give Joe Bacal 50%, which he received subsequent to that date. (See id., Exh. N). Even though Bacal wrote the lyrics, the business arrangement with Bryant was the same as with the Transformers

16

— Anne Bryant was and continues to be entitled to the full 100% writer share. (See id. at ¶ 60).

### Visionaries

The original registration clearance form for the Visionaries Theme splits the writer share evenly between Bryant & Kinder, even though Bacal wrote the lyrics. (See id., Exh. O). However, on a 1997 Sony ATV clearance form for Visionaries Opening Title (which is a re-use of the main theme), Kinder's share is divided equally between Joe Bacal (25%) and his son Jay Bacal (25%). (See id., Exh. P). While Bryant's share remains unchanged, she has an interest in recouping the misappropriated Kinder share, since she is entitled to his original 50% share as per her 1994 settlement of litigation against Kinder. The same royalty change was wrongfully effected by Sony for the Visionaries Closing Theme as well. (See id., Exh. Q).

### Robotix

According to BMI royalty statements covering July 1985-1987, Bryant received 100% writer share of the Robotix jingle/main theme. (See id., Exh. R). However, Sony ATV cleared Robotix Theme Opening (again, just a re-use of the main theme), with a 50% share to Bryant and 50% to Bacal. (See id., Exh. S).

### Inhumanoids

A 1988 BMI royalty statement shows that plaintiff received 100% of the writer share of the Inhumanoids

17

jingle/main theme.  (See id., Exh. T).  These royalties were
promised to plaintiff in the corporate divorce from Kinder,
and it was based on this 100% share that Bryant accepted the
agreement.  See id. at ¶ 68).

However, when plaintiff obtained her BMI catalog in 2000,
it became clear that no Inhumandoids titles were attributed to
her, and her bargain with Kinder became worthless as a result.
(See id., Exh. H, pp. 33-34).  Again, as a result of
defendants' persistent failure to provide responsive
information and documents, plaintiff has no idea how those
titles were removed from her catalog between 1988 and 2000.
(See id. at ¶ 69).

### Facts that Defendants Fail to Discuss in their Papers

Critically, the 48 compositions listed by defendants are
not the *only* compositions at issue.  (See id. at ¶ 70).
Defendants have entirely excluded a whole list of compositions
from plaintiff's catalog, as noted above, for which she
receives no royalties at all.  (See id.).  Moreover,
defendants do not even address royalties other than
performance royalties, such as the mechanical royalties and
synchronization license fees ("sync license fees") generated
when her music is used in CD's, movies, and videos, of which
plaintiff has been wrongfully deprived, other than by
gratuitously claiming that plaintiff should not be entitled to
such royalties for her compositions.

**Videocassettes and DVD's featuring Plaintiff's Compositions**

Some of plaintiff's compositions, which were used in such television programs as "G.I. Joe," "Transformers," "Jem," "Visionaries," and "My Little Pony," all produced by Sunbow, were ultimately released on videocassettes and DVDs for the home market. "G.I. Joe" and "Transformers" were particularly popular releases and are currently marketed by Rhino Entertainment Company. (See id. at ¶ 79). The Harry Fox Agency, the arm of the National Music Publishers Association that processes mechanical royalties and, until recently, synchronization licenses, reported that they do not have any license agreements in their database for any of plaintiff's compositions at issue in this case. (See id. at ¶ 80).

Pursuant to a Rhino Entertainment / Sunbow License Agreement (which Sunbow to this day unashamedly claims it has been unable to locate), Rhino Entertainment paid Sunbow $2,471,868.61 in mechanical royalties and/or synchronization license fees from video and DVD sales during the three-year period of time from October 1, 1999 through September 30, 2002. (See id., Exh. U). These video and DVD sales continue to this very day.

Plaintiff, as the owner of the compositions used in these videos and DVDs, is entitled to the mechanical royalties and sync license fees attributable to these works. Defendants, for valuable consideration they received, have wrongfully contracted away plaintiff's right to receive her portion of

19

mechanical royalties and sync license fees from Rhino Entertainment. Plaintiff therefore respectfully requests on her cross-motion for summary judgment that the Court place a constructive trust upon this $2,471,868.61 and any other monies paid by Rhino Entertainment to Sunbow, since plaintiff was clearly entitled to receive either a writer's percentage of this amount, due to the fact that she wrote the compositions that are prominently featured in these videos and DVDs.

## ARGUMENT

### I.   MATERIAL ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT FOR DEFENDANTS BUT NOT FOR PLAINTIFF

A motion for summary judgment may be granted only when, upon the proof submitted, the cause of action or defense is sufficiently established to warrant the court as a matter of law in directing judgment in favor of a party. See N.Y. C.P.L.R. 3212 (b). Since summary judgment deprives the litigant of his day in court, it is considered a drastic remedy that should not be granted where there is any doubt at all as to the existence of a triable issue of fact. See Rotuba Extruders, Inc. v. Ceppos, 46 N.Y. 2d 223, 231 (1978), Andre v. Pomeroy, 35 N.Y.2d 361, 365 (1974).

The Court's task on a motion for summary judgment is one of "issue finding, rather than issue determination. " Di Giacomo v. New York, 58 A.D.2d 347, 397 N.Y.S.2d 632, rev'd.

20

on other grounds, 46 N.Y.2d 894, 414 N.Y.S.2d 690 (1st Dept.
1977). Thus, to overcome a motion for summary judgment, the
non-movant must present prima facie evidence of its claims.
Middle States Leasing Corp. v. Manufactures Hanover Trust Co.,
404 N.Y.S.2d 846, 848 (1st Dept. 1978). The court shall not
determine the credibility of such evidence, but must determine
whether there are actually triable issues or fact, or whether
there arguably could be. See S.J. Capelin Assoc. v. Globe Mfg.
Corp. 34 N.Y.2d 338, 341 (1st Dept. 1974); see also Newton-
Waltham Bank & Trust Co. v. Bergen Motors, Inc., 327 N.Y.S.2d
77, 82 (1971), aff'd 347 N.Y.S.2d 568 (1972) (where court has
any doubts as to the existence of triable issues, summary
judgment must be denied). Further, summary judgment also must
be denied where varying inferences can be drawn from the
facts. See Federal Terra Cotta Co. v. Margolies, 211 N.Y.S 876
(1st Dept. 1925). The same holds true where the evidence of
each party is contradictory. See Jones v. John A. Johnson &
Sons, Inc., 129 N.Y.S.2d 479, 482 (N.Y. Sup. 1954), aff'd 131
N.Y.S.2d 362 (2nd Dept. 1954).

In order to defeat the defendants' Motions for Summary
Judgment here, plaintiff does not have to prove her case or
defense to the motions, but rather offer evidence tending to
show that her claims have merit. Gold v. Katz, 646 N.Y.S.2d
1(1st Dept. 1996); Brylgrove Ltd. v. Tompkins, 630 N.Y.S.2d
323 (1st Dept. 1995).

21

In this case, plaintiff has certainly offered sufficient evidence, as discussed above and attached to the Bryant Affidavit, to create genuine issues of material fact sufficient to defeat defendants' motions for summary judgment.

## Plaintiff is, However, Entitled to Partial Summary Judgment on at least her Claim for Mechanical Royalties.

Where the documents and agreements submitted to the Court are essentially undisputed, at least on the specific issue before the Court, the Court may render summary judgment. See Eden Temp. Services, Inc. v. House of Excellence, Inc., 270 A.D.2d. 66, 704 N.Y.S.2d 239 (1st Dept. 2000); and see Zolotar v. New York Life Ins. Co., 172 A.D.2d 27, 576 N.Y.S.2d 850 (1st Dept. 1991) (employer entitled to summary judgment where contract undisputed and contract term covered subject matter of parties dispute). Applying the above standard, plaintiff's cross-motion for summary judgment should be granted, which will establish a constructive trust upon the $2,471,868.81 paid by Rhino Entertainment to Sunbow and enable plaintiff to receive her appropriate share of mechanical royalties that have been wrongfully withheld from plaintiff by the defendants in this case.

## II. Plaintiff Possesses a Copyright Ownership Interest in Each of the Compositions at Issue in this Case.

Copyright in a song initially vests in the author of the work (i.e. composer). See 17 USC § 201(a). The owner of the copyright in a musical composition has the exclusive right to

22

reproduce the work in a sound recording, make a derivative
work based upon the copyrighted composition, to distribute
copies of the work to the public, including digital
transmission, to perform the work in public, and to display
the work publicly. See 17 U.S.C. § 106(1)-(6). The copyright
owner/author may transfer any or all of these rights, in whole
or in part. See 17 U.S.C. § 201(d)(1).

Any transfer of a right within the "bundle of rights"
granted a copyright owner must be embodied in a written
instrument signed by the copyright owner. See 17 U.S.C. §
204; see also Imperial Residential Design, Inc. v. Palms, 29
F.3d 581 (11th Cir. 1994) (grant of exclusive license is a
transfer of ownership and must be in writing). "Rights not
specifically granted by an artist in an agreement are reserved
to the artist and the owner of such property, absent the
clearest language, is not free to do with it whatever the
owner wishes." Caldwell v. ABKCO Music & Records, Inc., 269
A.D.2d 206, 206-07 (1st Dept. 2000) (citation omitted). When
ownership is in dispute, there is a presumption that copyright
is in the author. See Forward v. Thorogood, 985 F.2d 604 (1st
Cir. 1993).

In this case, there is no dispute that plaintiff never
signed any contract transferring or assigning her rights to
her compositions to any of the defendants. Accordingly,
plaintiff retains all rights to her compositions, and
plaintiff is therefore entitled to all performance and

23

mechanical royalties, as well as sync license fees, attributable to these works.

### III. Defendants should be Estopped from Asserting a Statute of Limitations Defense to Claim that Plaintiff's Re-Registration Claims Are Untimely.

Defendants Bacal and Sunbow claim that plaintiff's claims as to several of the Compositions are time-barred. Bacal argues that plaintiff's claims regarding fourteen compositions wrongfully re-registered prior to August 24, 1994 are time barred, and Sunbow contends a time bar applies to thirty-nine compositions that defendants wrongfully re-registered prior to April of 1996. However, defendants Bacal and Sunbow should be estopped from asserting a statute of limitations defense in this case.

### Requirements for equitable estoppel defense

To prevail on a claim for equitable estoppel, a plaintiff must show 1) an intentional concealment or misrepresentation, 2) which plaintiff relies upon, 3) which reliance caused plaintiff's failure to file a timely suit, and 4) that plaintiff brought her action within a reasonable time after the concealment stops. Where a fiduciary relationship exists, as the Court has already found existed here between Bryant and Bacal, a defendant's mere silence or failure to disclose facts establishes the first two elements by creating an inference of intentional concealment and of justifiable reliance. Similarly, Sunbow cannot rely on the statute of limitations

24

defense, because it too has a fiduciary relationship with Bryant, since Sunbow is an alter ego of Bacal.

Under New York's General Obligation Law § 17-103(4)(b), a court may prevent a defendant from asserting a statute of limitations defense, and allow a plaintiff to recover full damages despite a statutory bar, where the defendant's inequitable conduct (such as intentionally concealing a cause of action) justifies such action. See General Stencils, Inc. v. Chiappa, 272 N.Y.S.2d 337 (1966); Simcuski v. Saeli, 406 N.Y.S.2d 259 (1978). In General Stencils, the Court of Appeals noted that the equitable estoppel defense "is deeply rooted in our jurisprudence," "has been applied in many diverse classes of cases," and "has frequently been employed to bar inequitable reliance on statutes of limitations." See General Stencils, 272 N.Y.S.2d at 339 (quoting Glus v. Brooklyn East. Term, 359 U.S. 231, 232-33 (1959)).

Simcuski v. Saeli is the controlling New York case involving the equitable estoppel defense where a defendant intentionally concealed of a cause of action from plaintiff. In that medical malpractice case, the Court of Appeals ruled that a plaintiff must establish the following to estop the defendant from asserting a limitations defense:  1) an intentional concealment and false representation by defendant; 2) plaintiff's reasonable reliance on that misrepresentation or concealment; 3) plaintiffs' failure to file a timely action based on that reliance, and 4) plaintiff's due diligence in

25

bringing an action within a reasonable time after the facts
giving rise to the estoppel cease to be operational.  See
Simcuski, supra at 262-63.

Typically, mere silence, or non-disclosure of wrongdoing,
is not sufficient to establish intentional concealment. See
Zoe G. v. Frederick F.G., 208 A.D.2d 675, 675-76, 617 N.Y.S.2d
370 (2nd Dept. 1994).  However, where a fiduciary relationship
exists between defendant and plaintiff, such silence and/or
non-disclosure is sufficient to trigger equitable estoppel.
See Ross v. Community General Hospital of Sullivan County, 150
A.D.2d 838, 841, 541 N.Y.S.2d 246 (3rd Dept. 1989); see also
Simcuski, supra at 264-65 (noting that where a fiduciary
relation exists, non-disclosure or silence can "provide a
foundation for seeking to invoke the doctrine of equitable
estoppel").

In Ross, the Third Department held that a physician's
silence after discovering a mis-diagnosis created an inference
of intentional concealment in light of the doctor-patient
fiduciary relationship.  See Ross, supra; Jordan v. Ford Motor
Co., 73 A.D.2d 422, 424, 426 N.Y.S.2d 359 (4th Dept. 1980)
(holding that only a defendant who is in a fiduciary
relationship with plaintiff has a duty to disclose and thus
can be estopped from asserting the statute of limitations
defense for mere non-disclosure).

Plaintiff's Fiduciary Relationship with Joe Bacal

26

This court has already ruled that the plaintiff and defendant Joe Bacal shared a fiduciary relationship. <u>See</u> Decision and Order, September 26, 2002, p. 9 (wherein the Court found "that a relationship of trust and confidence had resulted" between Plaintiff and Bacal). Thus, Bacal had a duty to disclose any wrongful conduct which adversely affected Bryant's receipt of royalties. In light of that duty to disclose, Bacal's failure to notify Bryant of the inaccurate registration estops him from claiming that Bryant's claims are time barred. This is true even if Bacal's failure to notify Bryant of the changes was not willful. <u>See</u> <u>Renda</u> v. <u>Frazer</u>, 75 A.D.2d 490, 495, 429 N.Y.S.2d 944 (4th Dept. 1980) (holding that a misrepresentation still triggers the equitable estoppel defense even when made for altruistic reasons).

Thus, Bacal must have only been aware of the wrongful, inaccurate registrations and failed to inform Bryant, in order to satisfy the first element of the equitable estoppel defense. It is virtually impossible for Bacal not to have known that he was given a new or larger share of certain compositions, and that this would negatively affect Bryant's royalties, since he had relinquished his right to those royalties to plaintiff. Bacal's royalty statements and royalty checks put him on notice of changes in his writer's share.

Further, since the re-registrations of certain titles were most likely effected through cue sheets submitted by Sunbow Productions, it is unlikely that Joe Bacal, as a

27

principal of that company, was not aware of any changes. It is, at the very least, an issue of fact whether Bacal knew about the wrongful re-registrations, and if he did, then his failure to disclose such information to plaintiff satisfies the "intentional concealment" element.

The fiduciary relationship between plaintiff and Bacal creates an inference of justifiable reliance that satisfies the reliance element of the defense. See Ross, supra at 841. Further, since plaintiff had no knowledge of any wrongdoing before May 2000, she could not have known that she should investigate the wrongful acts. Plaintiff assumed Bacal's silence meant nothing was amiss, and thus was prevented from pursuing her cause of action.

Finally, Bryant initiated this lawsuit in a reasonable time after she realized, through her own intense and beleaguered investigation, that a cause of action even existed. She first began an inquiry into the decreased royalties in 1998, and began her suit in 2000. It took this long for plaintiff to even obtain records of the suspect activity from BMI. Plaintiff has more than met the Simcuksi court's standard for bringing an action within a reasonable time after the facts giving rise to the estoppel cease to be operational. See Simcuski, supra at 451-52 (bringing a cause of action within the statutory limitations period is more than reasonable). The statute of limitations would be 6 years in

28

this case, making plaintiff's two year investigation period more than reasonable.

## Fiduciary Relationship with defendant Sunbow

By Decision and Order dated February 23, 2003, the Court concluded that for plaintiff to pierce the corporate veil, and thus assign the same liability to Sunbow as to Bacal, plaintiff need only show that Bacal had "complete dominion and control" over Sunbow. (See Feb 23 Order and Decision, p. 7). Plaintiff is clearly able to satisfy her burden in this regard.

The fact of the matter is that Sunbow freely used musical compositions (i.e., jingles) that plaintiff created specifically for GBI. There is no evidence whatsoever that Sunbow negotiated licenses with GBI for such use, which would certainly been necessary had Bacal -- a co-owner and chairman of both companies -- actually treated GBI and Sunbow as two separate corporate entities.

In fact, all available evidence indicates that Bacal treated Sunbow and GBI as one and the same entity, which he clearly controlled, dominated, and operated for his personal gain. For example, Starwild and Wildstar, which were affiliates of Sunbow, routinely paid the publisher's royalties from the use of plaintiff's jingles through to Hasbro, which was a GBI client and never a Sunbow client. Bacal also voluntarily relinquished his *personal* share of writer's

29

royalties to plaintiff in exchange for plaintiff's agreement
to accept significantly reduced creative fees from GBI. This
reveals that Bacal viewed GBI as the personification of
himself, in that he was willing to sacrifice payments to
himself in order to save money for GBI, since all proceeds
would ultimately benefit Bacal personally in any event.

In reality, therefore, both GBI and Sunbow were mere
instrumentalities of defendant Bacal, who maintained a unity
of ownership and interest between himself and each of these
entities. Bacal controlled and dominated GBI and Sunbow in
such a way as to deprive plaintiff of royalty payments she was
otherwise entitled to receive. The fiction of Sunbow's
separate corporate form must therefore be disregarded, in
order to prevent great injustice and financial injury to
plaintiff. See Lederer v. King, 625 N.Y.S.2d 149 (1st Dept.
1995).

Accordingly, a fiduciary relationship existed between
plaintiff and Sunbow, which flows directly from the fiduciary
relationship that the Court has already found existed between
plaintiff and Bacal. Sunbow is therefore also equitably
estopped from asserting a statute of limitations defense in
this matter.

IV.   **Plaintiff has Submitted Sufficient Evidence to Create a
      Genuine Issue of Material Fact Sufficient to Defeat
      Defendants' Motions for Summary Judgment.**

   A.   **Plaintiff's Writer's Share of Public Performance
        Royalties has been Wrongfully Reduced.**

As discussed at length _supra_, all of the compositions at
issue in this case, such as the Transformer backgrounds,
themes and cues, are derivative uses of plaintiff's original
jingles, and plaintiff should have received performance
royalties for any and all subsequent re-uses of that music at
the royalty rate negotiated for the original compositions.

Pursuant to the working arrangement between plaintiff and
Joe Bacal (on behalf of GBI and Sunbow), plaintiff was
entitled to receive 100% of the writer's royalties
attributable to her compositions.  (_See_ Bryant Aff., ¶ 7).
However, unbeknownst to plaintiff, defendants wrongfully
diminished plaintiff's royalties in the cue sheets Sunbow
submitted to BMI.  (_See_ _id._ at ¶¶ 20-71).

Plaintiff had originally agreed to accept significantly
reduced up-front creative fees in exchange for future
entitlement to 100% of the performance and mechanical
royalties attributable to these compositions, even when Bacal
actually wrote the lyrics for the jingle.  (_See_ _id._ at ¶ 22).
In this regard, plaintiff's up-front creative fees were only
one-third or one-fourth of the normal creative fees to which

31

plaintiff would otherwise have been entitled. (<u>See</u> <u>id.</u> at ¶ 8).

The original payment statements issued to plaintiff prove that this was in fact the arrangement between plaintiff and Bacal (on behalf of GBI and Sunbow). (<u>See</u> <u>id.</u>, Exhs. D, I). These statements reveal the performance and mechanical royalties paid to plaintiff when she was actively working on the defendants' behalf, despite the fact that plaintiff never executed a written contract with GBI, Sunbow, Wildstar or Starwild concerning the music she composed.

Ultimately, defendants Sunbow, GBI, and/or Bacal re-registered plaintiff's compositions with BMI, which issued new work numbers for these compositions, from which royalty payments were then diverted from plaintiff to others. (<u>See</u> <u>id.</u> at ¶ 17). These re-registrations supplanted the original registrations and re-directed the flow of royalty payments away from plaintiff and toward the new registrants, such as defendant Bacal and others. (<u>See</u> <u>id.</u> at ¶ 18). Through this process, defendants not only succeeded in circumventing BMI's formal writer change procedure, but they also avoided having to pay the customary creative fees to individuals who arranged subsequent re-uses of plaintiff's compositions, thereby saving tremendous amounts on production costs. (<u>See</u> <u>id.</u> at ¶ 19).

In the final analysis, the information on the cue sheets that Sunbow submitted to BMI was wrong. (<u>See</u> <u>id.</u> at ¶ 78).

Sunbow wrongfully reduced plaintiff's royalty share from the percentage granted to plaintiff in her original dealings with Bacal and GBI. (See id.). When such reductions were submitted to BMI (through cue sheets or clearance forms), they were entered with neither plaintiff's knowledge nor permission, in direct contravention to BMI procedure. (See id.).

Furthermore, the 48 compositions listed by defendants are not the *only* compositions at issue. Defendants have entirely excluded a whole list of compositions from plaintiff's catalog, for which she receives no royalties at all. Moreover, defendants do not even address the mechanical royalties and synchronization license fees ("sync license fees") wrongfully withheld from plaintiff, other than by gratuitously claiming that plaintiff should not be entitled to such royalties for her compositions.

Plaintiff has therefore established a genuine issue of material fact sufficient to defeat defendants' motions for summary judgment with respect to plaintiff's diminished royalties.

### B. Plaintiff has Standing to Dispute Defendants' Re-Registration of the Three Compositions for the Visionaries Television Series.

Plaintiff is contractually entitled, in accordance with her 1994 settlement with Ford Kinder, to receive his royalties

33

on the three Visionaries compositions discussed by defendants.
(See Sunbow Br. at 14; Bacal Br. at 9). Therefore, the three
compositions in which Kinder's share was diminished, in
essence, diminishes the amounts due to Anne Bryant via that
settlement. As such, plaintiff has been deprived of royalties
with respect to these compositions, and she clearly has
standing to assert claims in this regard.

VI.     Plaintiff is entitled to summary judgment on her claim
        for a constructive trust on a percentage of the
        $2,471,868.61 in mechanical royalties and synch license
        fees that Rhino Entertainment paid to Sunbow attributable
        to the sale of videos, CD's, DVD's and other products
        over a three year period.

### Legal Basis for Claim

Mechanical royalties are royalties paid on sales of music
reproduced and sold on records, cassettes and compact discs.
See Woods v. Bourne Co., 60 F.3d 978, 986 (2nd Cir. 1995).
Mechanical royalties are distinguished from the performance
royalties paid by BMI and ASCAP, which are based upon public
performances of songs on radio, television and other sources.
See Jasper v. Bovina Music, 314 F.3d 42, 45 (2nd Cir. 2002).
In addition, sync license fees are paid in exchange for a
license to use a copyrighted musical composition in
"timed-relation" or synchronization with an audiovisual work.
See ABKCO Music, Inc. v. Stellar Records, Inc., 96 F.3d 60, 63
(2nd Cir. 1996) (citing 4 Melville B. Nimmer & David Nimmer,
Nimmer on Copyright § 24.02[f] (1995)). Synch licenses are

34

necessary when copyrighted music is included in movies and commercials. See id. (citing 4 Nimmer § 24.04[C][1]).

Ms. Bryant's claim to the mechanical royalties and synch license fees generated by her compositions is therefore firmly rooted in United States Copyright Law. As the author of her compositions, Ms. Bryant is the owner of the copyright for those works. See 17 U.S.C. § 201(a). Ms. Bryant's ownership of the copyright gives her the exclusive right to, in relevant parts, "reproduce the copyrighted work in copies or phonorecords" and "to prepare derivative works based upon the copyrighted work." See 17 U.S.C. § 106(a), (b).

**Defendants' Use of Plaintiff's Compositions in Video and DVD's**

As discussed supra, Pursuant to a Rhino Entertainment / Sunbow License Agreement (which Sunbow claims to be unable to locate), Rhino Entertainment paid Sunbow $2,471,868.61 in mechanical royalties and/or synchronization license fees from video and DVD sales during the three-year period of time from October 1, 1999 through September 30, 2002. These video and DVD sales continue to this very day.

Plaintiff, as the owner of the compositions used in these videos and DVDs, is entitled to the mechanical royalties and sync license fees attributable to these works. Plaintiff therefore respectfully requests that the Court place a constructive trust upon this $2,471,868.61 paid by Rhino Entertainment to Sunbow, since plaintiff was clearly entitled

35

to receive the writer's percentage attributable to this amount, due to the fact that she wrote the compositions that are prominently featured in these videos and DVDs.

### Damages

Plaintiff has established an entitlement to performance royalties, mechanical royalties, and sync license fees, which defendants wrongfully withheld from plaintiff.  For example, in <u>B.J. Thomas v. Gusto Records, Inc.</u>, the Sixth Circuit adopted plaintiff's expert's 33 percent incremental increase in the damage estimate because the record keeping practices of Gusto were "unseemly" and "forever prevent[ed] an exact determination of royalties earned by plaintiffs." <u>See</u> <u>Thomas v. Gusto</u>, 939 F.2d 395,397 (6th Cir. 1991).  Gusto maintained no records which documented the relation of any income to a particular master or artist, kept "grossly inadequate" inventory records, and claimed the accountant-client privilege with respect to other accounting records.  The Court also questioned whether accurate records did exist, but were being withheld from the court. <u>See</u> <u>id.</u> at 401.

The court further stated that "in an action for royalties, it is a well-established rule in New York that a plaintiff needs only demonstrate a stable foundation for reasonable estimate of royalties. <u>Id.</u> at 402.  The Court found that plaintiff's evidence established a stable foundation. <u>See</u> <u>id.</u> Plaintiff's expert considered many factors: sales of

36

comparable products, customs of the industry, sales figures from possessors of the master recordings, and the limited records provided by Gusto. See id.

In this case, defendants have repeatedly failed to provide responsive information and documents that would have enabled plaintiff to determine her withheld performance and mechanical royalties, as well as sync license fees, with any degree of accuracy. Indeed, the Court precisely highlighted the fact that defendant Bacal disclaimed knowledge of several facts that, as owner of defendant Sunbow, he certainly should have possessed knowledge.

As a result of their unified evasive and deceptive front, defendants have to date succeeded in preventing plaintiff from determining precisely who at Sunbow effected the wrongful registrations at issue in this case. The Court should therefore draw all appropriate adverse inferences against defendants, as a result of the evasive tactics they have demonstrated herein. Concomitantly, the Court should enter summary judgment in favor of plaintiff on her claim for a constructive trust to recoup her lost mechanical royalties and sync license fees.

37

## CONCLUSION

For the foregoing reasons, it is respectfully requested that defendants' motions be denied, and that plaintiff's Cross-Motion for partial summary judgment be granted.

Monaghan, Monaghan, Lamb & Marchisio
Attorneys for Plaintiff

Dated: November 26, 2003    By: _____
                               JEFFREY C. PRIMIANO

150 West 55th Street, Suite 1G
New York, New York 10019
Tel. (212) 541-6980
Fax. (212) 541-6994

28 W. Grand Avenue
Montvale, New Jersey 07645
Tel. (201) 802-9060
Fax. (201) 802-9066

17054

38

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

```
ANNE BRYANT,                       :
                   Plaintiff,      :
                                   :
    -v-                            :
                                   :
BROADCAST MUSIC, INC.              :
(a/k/a/"BMI"), FORD KINDER,        :
KINDER & CO., LTD.,                :        Index No. 5192/00
VADIVOX, INC., JULES M. "JOE"      :
BACAL; GRIFFIN BACAL, INC.,        :        Hon. Andrew P. O'Rourke
STARWILD MUSIC BMI, WILDSTAR       :
MUSIC ASCAP, SUNBOW                :
PRODUCTIONS, INC.,                 :
                                   :
                   Defendants.     :
ANNE BRYANT,                       :
                   Plaintiff,      :
                                   :        Index No. 2821/02
    -v-                            :
                                   :        Hon. Andrew P. O'Rourke
                                   :
SUNBOW PRODUCTIONS, INC.,          :
                                   :
                   Defendant.      :
```

## AFFIDAVIT OF SERVICE

STATE OF NEW JERSEY )
                    ss:
COUNTY OF BERGEN    )

JULIET FORSYTH, being of full age, deposes and says:

1.    I am a legal secretary employed at Monaghan, Monaghan, Lamb
& Marchisio, LLP, attorneys for plaintiffs in the above matter.

2.    On November 26, 2003, I served the following documents via
facsimile and federal express to Gloria C. Phares, Esq., and Kathleen
L. Jennings, Esq., Patterson, Belknap, Webb & Tyler LLP, 1133 Avenue
of the Americas, New York, NY 10036-6710, Attorneys for Defendant

Sunbow Productions, Inc., and to David S. Tannenbaum, Esq. and
Adrienne L. Valencia, Esq., Duane Morris LLP, 380 Lexington Avenue,
New York, NY 10168, Attorneys for Defendant Jules M. "Joe" Bacal:

1.  Notice of Cross-Motion for Summary Judgment

2.  Affidavit of Ann Bryant in Support;

3.  Plaintiffs' Memorandum of Law in Opposition to Defendants'
    Motions for Summary Judgment and in Support of Plaintiff's
    Cross-Motion for Partial Summary Judgment;

4.  Affirmation of Patrick J. Monaghan, Jr.;

5.  Affidavit of Service.

JULIET FORSYTH

Sworn to and subscribed before
me this 26th day of November, 2003

Jeffrey C. Primiano, Esq.
Attorney at Law of the
State of New Jersey

17044