# EXHIBIT 32

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

| | |
|---|---|
| ANNE BRYANT,<br>              Plaintiff,<br><br>   -v-<br><br>BROADCAST MUSIC, INC.<br>(a/k/a/"BMI"), FORD KINDER,<br>KINDER & CO., LTD.,<br>VADIVOX, INC., JULES M. "JOE"<br>BACAL; GRIFFIN BACAL, INC.,<br>STARWILD MUSIC BMI, WILDSTAR<br>MUSIC ASCAP, SUNBOW<br>PRODUCTIONS, INC.,<br><br>             Defendants. | Index No. 5192/00<br><br>Hon. Andrew P. O'Rourke |
| ANNE BRYANT,<br>              Plaintiff,<br><br>   -v-<br><br>SUNBOW PRODUCTIONS, INC.,<br><br>             Defendant. | Index No. 2821/02<br><br>Hon. Andrew P. O'Rourke |

**AFFIDAVIT OF PLAINTIFF ANNE BRYANT IN OPPOSITION TO MOTIONS
FOR SUMMARY JUDGMENT SUBMITTED BY DEFENDANTS JULES M. BACAL
AND SUNBOW PRODUCTIONS INC., AND IN SUPPORT OF PLAINTIFF'S
CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

STATE OF NEW YORK   )
                  ) ss:
COUNTY OF ROCKLAND  )

    ANNE BRYANT, being duly sworn, deposes and says:

    1.   I am the plaintiff herein, and I submit this Affidavit
in opposition to the motions for summary judgment by defendants
Jules M. ("Joe") Bacal and Sunbow Productions, Inc. ("Sunbow")
and in support of my cross-motion for partial summary judgment

against defendants. I believe that there are significant issues of fact precluding summary judgment for either defendant, but that the Court can and should grant me partial relief adjudicating that defendants Bacal and Sunbow are liable to me for their licensing of my compositions to third parties without providing me with any compensation whatsoever, and any monies received by them should be held in a constructive trust pending trial.

As the Court is aware, my efforts to obtain information about sales of the videos, DVD's, CD's, movies and other products have produced only limited information from the defendants. Nonetheless, even the limited information I have received relating to domestic licensing by Sunbow to Rhino Entertainment during the three-year period of time from October 1, 1999 through September 30, 2002, reveals that in excess of 1.5 million units were sold, producing approximately $2.5 million in licensing receipts to Sunbow.[1] I am entitled to be paid a fair and reasonable sum based upon those sales of units, and on the foreign licenses issued by Sunbow to third parties, in amounts that I will establish at trial.

---

[1] A chart that summarizes the royalties paid from Rhino Entertainment to Sunbow during this three-year period of time is attached hereto as Exhibit "U". The documents provided by Sunbow supporting the calculations set forth therein are too voluminous to attach, but can be provided if the Court wishes.

### History

2.  I previously submitted an Affidavit dated September 3, 2002 in opposition to defendant Bacal's prior motion for summary judgment, which set forth relevant background facts and which disputed various statements set forth in the Affidavit of defendant Bacal dated July 18, 2002.  A copy of my September 3, 2002 Affidavit is attached hereto as **Exhibit "A"**.  Earlier in this proceeding, I submitted an Affidavit dated February 16, 2001 in opposition to the Kinder Defendants' motion to dismiss my claims against them. A copy of my February 16, 2001 Affidavit is attached hereto as **Exhibit "B"**.  I incorporate the statements contained in my February 16, 2001 and September 3, 2002 Affidavits as if set forth at length herein.

### Performance Royalties and Other Royalty Rights

3.  Defendants' motions for summary judgment <u>only</u> pertain to the performance royalties (the EMI payments) that were wrongfully misappropriated by defendants or transferred to others by the defendants without my knowledge.  Defendants categorically fail to address the mechanical royalties and synchronization license fees that I have failed to receive as a result of defendants' wrongful conduct, and which I am currently seeking to recover in this litigation.

4.  By mechanical royalties, I am referring to the royalties paid on sales of music reproduced and sold on records, cassettes and compact discs.  Mechanical royalties must be

3

distinguished from the performance royalties that defendants discuss in their papers, which are paid by performing rights societies such as BMI and ASCAP, based upon public performances of music on radio, television and other sources. In addition, defendants fail to discuss my entitlement to synchronization or "sync" license fees based upon the fact that my musical compositions have been featured in audiovisual works, such as videos and DVD's produced by Sunbow.

5.    Although defendants Jules M. Bacal ("Bacal") and Sunbow Productions, Inc. ("Sunbow") make repeated references to 48 separate compositions at issue in this case, it is more accurate to characterize these 48 pieces as _seven_ original compositions – one for Transformers, GI Joe, Jem, My Little Pony, Visionaries, Inhumanoids, and Robotics – plus numerous derivative uses and/or re-uses of these seven original compositions, which were originally written for Griffin-Bacal, Inc. ("GBI"), while I was a partner at Kinder & Bryant, Ltd.

### The Correct Approach to Analyzing My Misappropriated Royalties in this Case

6.    I submit that the correct approach to determining my misappropriated royalties is to first consider the working arrangement and agreement that I had with Joe Bacal (on behalf of GBI and Sunbow), pursuant to which I was entitled to receive 100% of the writer's royalties attributable to my compositions, along with session fees and residual payments for any use of the tracks we provided, in accordance with

4

applicable union signatory agreements executed by the Screen
Actors Guild, the American Federation of Television and Radio
Artists, and the American Federation of Musicians.  By
comparing and contrasting my 100% writer's royalty entitlement
with the percentage royalty allocations set forth in the cue
sheets[2] Sunbow submitted to BMI, it becomes indelibly clear
that my royalty allocations have been severely diminished.  It
is important to note that the residual payments have ceased,
and defendants have failed to remit any new use payments for
their continued use of these tracks in broadcast and in their
home video market products.

     7.    Under my working arrangement and agreement with
Bacal (on behalf of Sunbow and GBI), I accepted significantly
reduced up-front creative fees in exchange for the future
entitlement to 100% of the royalties attributable to these
compositions, and Bacal in turn agreed to give Kinder &
Bryant, Ltd. the entire writer share for songs composed by us,
even when Bacal actually wrote the lyrics for these songs.

     8.    Pursuant to our agreement, my up-front creative fees
were only one-third or one-fourth of the normal industry-
standard creative fees to which I was entitled and which I
certainly would have demanded, had we not agreed to this

---

[2] "Cue sheets", as described in paragraph 6 of the Affidavit
of BMI's Allison Smith, are used to register music specifically
composed for a television production.  They are not used to
register music previously composed for another purpose.  My
compositions were commercial jingles, which were not written for
television or movies.  As such, defendants should not have
utilized cue sheets to register my compositions.

working relationship.

     9.    Several royalty statements issued to me prove that this was in fact the arrangement I had with Bacal (on behalf of GBI and Sunbow). These royalty statements[3] reveal the performance and mechanical royalties I received while I was actively working on the defendants' behalf, despite the fact that I never executed a written contract with GBI, Sunbow, Wildstar or Starwild concerning the music I composed.

     10.    Moreover, a comparison of my original BMI royalty statements with later statements or catalog entries for re-uses of the same songs clearly reveals that my share of royalty allocation has been diminished. This is easily accomplished by examining my original BMI statements, locating those registrations in my BMI catalog, then examining the numerous subsequent registrations with the same or slightly altered title, which represent the same basic piece of music.[4]

     11.    Defendants offer no evidence whatsoever to

---

[3] See Exhibits "D", "I", "M", and "T", attached hereto.

[4] For example, compare my 100% royalty allocation for Robots in Disguise as indicated in Exhibit "T" with my 8.3% royalty allocation as reflected in Exhibit "G". Also compare the royalty allocations set forth in Exhibits "D", "I", "M", and "T", with the royalty allocations reflected in my BMI catalog, which is attached hereto as Exhibit "H".

. Sunbow, as the television production company, was and is responsible for submitting cue sheets to BMI, to account for uses of pre-existing music. To this day, defendants have repeatedly refused to explain why these changes were made or who was responsible for them, and have provided no information or evidence that would resolve the issue, despite the fact that such evidence is clearly within their custody or control.

contradict the fact that, pursuant to my working arrangement and agreement with Bacal, I was to receive 100% of the royalties attributable to these compositions, in exchange for drastically reduced up-front creative fees.  Indeed, Joe Bacal acknowledged that this was our course of dealing and understanding in his deposition.  (See Bacal dep., 11/15/01, p. 40, attached as Exhibit "A" to the Affirmation of Patrick J. Monaghan dated November 26, 2003 (the "Monaghan Aff.")).

12.    In addition, Sunbow's Carole Weitzman testified that composers of music receive one hundred percent of the writer's share from either BMI or ASCAP.  (See Weitzman Dep. Tr. at 45:10-15, attached as Exhibit B to the Monaghan Aff.).

13.    As I explained in my prior Affidavit (see **Exhibit** "A" hereto, ¶¶ 24 - 27), the original compositions at issue in this case, for which my BMI royalty statements clearly show a 100% share of royalties being allocated to me, were written as jingles to be used in *commercials*.  As such, BMI's Alison Smith is simply incorrect in claiming that these jingles were "specifically written for films as television shows," such that they typically would have been registered by the television producer submitting cue sheets to BMI.  (See Smith Aff., ¶ 6).  In fact, because my jingles pre-dated the television shows and were originally registered with BMI though submission of registration or clearance forms, I would have been required to execute formal writer registration change forms to permit my ownership interest in these jingles

7

to be diminished, which I certainly never signed.  Therefore,
any alterations in the registrations of my compositions, which
Sunbow accomplished by submitting incorrect cue sheets,
amounted to wrongful writer registration changes by Sunbow.

14.   Therefore, the fact of the matter is that in an
effort to save on production costs, Sunbow transferred part of
my royalty income stream to subsequent arrangers of my
compositions, by submitting incorrect clearance forms and cue
sheets, of which Sunbow exercised exclusive control.  For
example, to this day, my Transformers theme is being used in
the Transformers Armada television program and my composition
is being wrongfully attributed to Hyato Matsuo.

15.   If there had been a legitimate reason for changing
the allocations for such re-uses, a formal "writer change"
should have been effected at BMI, which would have required my
permission.

16.   However, because defendants registered these re-uses
as new works, with new performance royalty allocations, they
succeeded in circumventing the formal writer change procedures
that have been in place at BMI for at least twenty-five years.

17.   Ultimately, defendants Sunbow, GBI, and/or Bacal re-
registered my compositions by submitting incorrect cue sheets
and clearance forms to BMI, which then issued new work numbers
for these compositions, from which royalty payments were
diverted from me to others.  (See footnote 3, above).

18.   These re-registrations supplanted the original

8

registrations and re-directed the flow of royalty payments
away from me and toward the new registrants, such as defendant
Bacal and others.  (See id.).

19.    Through this process of submitting incorrect cue
sheets and clearance forms, defendants not only succeeded in
circumventing BMI's formal writer change procedure, but they
also avoided having to pay the customary creative fees to
individuals who arranged subsequent re-uses of my
compositions, thereby saving tremendous amounts on production
costs.

### My Writer Share of Public Performance
### Royalties Has Clearly Been Reduced From What I Was To
### Receive Under My Working Arrangement and Agreement with
### Joe Bacal (on Behalf of GBI and Sunbow)

#### *The Transformers*

20.    I composed the music for the Transformers
commercial jingle in 1983, and Joe Bacal wrote the lyrics for
the jingle.

21.    Although the writer share would typically be split
evenly between the lyricist and the composer for such songs,
Bacal had made special arrangements with Kinder & Bryant, Ltd.

22.    As I have explained above, pursuant to our working
arrangement and agreement, Bacal agreed to give Kinder &
Bryant. Ltd. the entire writer share for songs composed by us,
even when he wrote the lyrics.  In return, GBI paid us a
significantly reduced up-front creative fee.

23.    Thus, in 1984, the Transformers jingle was

9

registered to me 50% (BMI) and Ford Kinder 50% (ASCAP), such that Joe Bacal would not receive any share of the royalties attributable to this composition.

24.   Bacal and Sunbow's knowledge and consent to this working arrangement and agreement is evidenced by the registration clearance form submitted by Sunbow Productions when it began to use the Transformers Main Theme ("the jingle") as a theme for its television series in 1985. (A copy of the Registration Clearance form is attached hereto as Exhibit "C").

25.   This form shows 100% of the writer share of royalties going to Kinder & Bryant, Ltd., and no percentage going to Joe Bacal.

26.   In 1987, Bill Dobishinski, the lawyer hired by Sunbow to administer music publishing rights, changed the name of the theme from Transformers to Robots in Disguise and arranged for me to receive 100% of the writer share for the song.

27.   This was done for accounting purposes, and all proceeds were received by Dobishinski in trust, and Ford Kinder and I were each paid 50% of the proceeds net of Dobishinski's fee.

28.   The Transformers Main Theme and Robots in Disguise are one and the same song.

29.   In 1989, Ford Kinder and I severed our business relationship. As part of our "corporate divorce," I was to

10

retain the full 100% of royalties to Transformer titles in my catalog.

30.  In 1986, I received a special distribution royalty statement, in which my share of royalties for the Transformers theme was reduced to 33%. (A copy of that royalty statement is attached as **Exhibit "D"**).

31.  When I inquired as to this split, I was told it was a Saturday morning 3-pack cartoon special, and each cartoon accounted for 1/3 of the royalties.  In reality, however, the royalties were split among me and two other writers.

32.  Despite my repeated inquiries with BMI to determine the identity of these two other writers, to this date I have been unable to acquire this information.

33.  In or about 1988, the <u>Transformers Rock N Roll Theme</u> was registered with BMI for use in the motion picture movie "The Transformers."

34.  Joe Bacal has testified that Sunbow hired a music director for the movie, who in turn hired the music group "Lion" to make a "rock" version of the <u>Transformers Main Theme</u> I had  written. (<u>See</u> Bacal dep. P. 75).

35.  That registration gave 50% of royalties to Lion, and 20% each to Ford Kinder and to me.  The remaining 10% share was registered to Joe Bacal, despite our pre-existing deal which excluded Bacal from any share of writer royalties.  (A copy of the Clearance Form reflecting this allocation is attached as **Exhibit "E"**).

11

36.   I never consented to such a reduction, nor was I
ever even notified by anyone at Sunbow or BMI about this
reduction.

37.   This may explain why Joe Bacal was more than evasive
when asked who was involved in the re-registration of this
title. (See Bacal dep. 75-79).

38.   On April 24, 1997, Sony ATV (Sunbow's successor),
submitted clearance forms to BMI for two Transformers themes —
Transformers Instrumental Theme, aka Transformers Closing
Theme, and the Transformers Vocal Theme II, aka Transformers
Opening Theme.  Again, because these themes were re-uses or
versions of the original Transformers jingle that I wrote, I
should still have been credited with the 100% writer share
allotted to me in the 1987 change by Dobishinski.

39.   However, the clearance forms submitted by Sony ATV
show a 75.10% allocation to me and a 24.90% share to Joe Bacal
for the Transformers Instrumental Theme.  (A copy of the
clearance form is attached as Exhibit "F").

40.   This is especially illogical, since Joe Bacal's only
possible source of participation in the royalty proceeds would
be the lyrics he wrote for the jingle, which, obviously, do
not appear in an instrumental theme.  In any event, Bacal had
previously given me any interest he might have had in this
composition.

41.   For the Transformers Vocal Theme II, my share was
reduced from 100% to 8.30%.  Bacal also received 8.30% for

12

this work, and Ford Kinder, inexplicably, received an 83.40% share.  (This allocation is reflected in **Exhibit** "G").

42.  Once again, I was never notified or consulted about this change, and I certainly never gave permission for this change to occur.  Even Joe Bacal testified that there is no legitimate reason for such a change.  (<u>See</u> Bacal dep. 100-101).

43.  Both Sunbow and Bacal refuse to divulge the information needed for me to determine exactly how these and other reductions were effected, and by whom, and utilize this as a means to argue that I can not prove who accomplished these reductions.  However, it is clear from the evidence that Sunbow, and Bacal as a principal at Sunbow, were involved.

44.  There are further examples of unauthorized changes that remain unexplained, for which documentary evidence continues to be wrongfully withheld from me.

45.  Sunbow must have records of such changes, but it has steadfastly refused to produce such documentation.


*GI Joe*

46.  This jingle was written by Ford Kinder (music) and Spencer Michelin (lyrics) in or around 1978 or 1979.  Joe Bacal did not write lyrics for this jingle.

47.  Through Bill Dobishinski, Sunbow's agent, the title was registered to me 100% at BMI as <u>Real American Hero</u> in 1986, and I received royalties under that title for use of the

13

main theme as well as other themes and background cues.  (This
is reflected in **Exhibit "D"**).

48.   The title was registered again as <u>GI Joe</u> in 1987,
but after that, I only received royalties for two background
cues, not for use of the main theme. (The lack of titles
registered to me is reflected on p. 23 of **Exhibit "H"**).

49.   By 2000, when I finally obtained my catalog from BMI
after the tooth-pulling efforts of my attorneys, all other GI
Joe titles, under both the <u>GI Joe</u> and <u>Real American Hero</u> name,
had disappeared entirely from my catalog. (This is reflected
in **Exhibit "H"**, pp. 23, 55-56).

50.   In between those years, a slew of writer changes
occurred, again without my permission or knowledge. For
example, in 1988, a BMI statement indicted an royalty
reduction from 100% to 33%. (The statement is attached as
**Exhibit "I"**).

51.   Defendant's have offered no explanation for these
"disappearing titles," and I can only extrapolate from the
documents available to me that defendants removed me entirely
from the registration of GI Joe titles that garnered large
royalty income streams, and left the two GI Joe background
registrations in my catalog so it would appear on my royalty
statements as though I was receiving normal GI Joe income (my
royalty statements show income by main title only, not by each
use of that title; nor do they indicate percentage of
authorship).

14

52.  Several years after the Kinder-Bryant 1989 corporate divorce, as part of my 1994 settlement of then-ongoing litigation proceedings with Kinder, I was to continue to receive the full 100% writer share to GI Joe titles in my catalog, with no obligation to account to Kinder.  At that time, I was unaware that I was no longer receiving royalties for the GI Joe main theme. Had I known this, I obviously would not have agreed to this worthless term of our separation.

53.  On the other hand, Joe Bacal, who never contributed any lyrics or music to the GI theme, received royalties for GI Joe. (This is reflected in Exhibit "J").

### My Little Pony

54.  This jingle was written by Ford Kinder (music) and Spencer Michelin (lyrics). However, it was registered 100% to me at BMI for the same accounting purposes cited above.  (This is reflected in Exhibit "K"). Again, retaining the 100% share of royalties was part of my 1994 litigation settlement from Ford Kinder.

55.  Nevertheless, a 2000 version of my catalog contains no My Little Pony titles. (This is reflected on pp. 48-49 of Exhibit "H").  Meanwhile, Kinder and two other writers are credited for My Little Pony.  (This is reflected in Exhibit "L").

56.  I have absolutely no idea why these titles were removed, and I have not been able to ascertain any reason for

15

this from BMI, Sunbow, or Bacal, despite my inquiries.

*JEM (Truly Outrageous)*

57.   I wrote the music for the JEM jingle, aka <u>Truly</u>
<u>Outrageous</u>, upon which subsequent JEM themes were based, and
Joe Bacal wrote the lyrics for this jingle.

58.   I received 100% of the writer royalty for JEM
themes, until April 24, 1997. (This is reflected in **Exhibit**
"M").

59.   At that time Sony ATV changed the royalty split to
give Joe Bacal 50%, which he received subsequent to that date.
(This is reflected in **Exhibit "N"**).

60.   Even though Bacal wrote the lyrics, our business
arrangement was exactly the same - I was and continue to be
entitled to the full 100% writer share.


*Visionaries*

61.   The original registration clearance form for the
<u>Visionaries Theme</u> splits the writer share evenly between Ford
Kinder and myself, notwithstanding the fact that Bacal wrote
the lyrics.  (This arrangement is reflected in **Exhibit "O"**).

62.   However, on a 1997 Sony ATV clearance form for
<u>Visionaries Opening Title</u>, (which is a re-use of the main
theme), Ford Kinder's share is divided equally between Joe
Bacal (25%) and his son Jay Bacal (25%).  (This is reflected
in **Exhibit "P"**).

63.   While my 50% share remains unchanged, I have an

16

interest in recouping the misappropriated Kinder share, since
I am entitled to his original 50% share as per the 1994
settlement of my litigation against Kinder.

64.    The same royalty change was wrongfully effected by
Sony ATV for the <u>Visionaries Closing Theme</u> as well. (This is
reflected in **Exhibit** "Q").

### Robotix

65.    According to BMI royalty statements covering July
1985-1987, I received the 100% writer share of the Robotix
jingle/main theme.   (This is reflected in **Exhibit** "R").

66.    However, Sony ATV cleared the <u>Robotix Theme Opening</u>
(again, just a re-use of the main theme), with a 50% share to
me and 50% to Bacal. (This is reflected in **Exhibit** "S").

### Inhumanoids

67.    A 1988 BMI royalty statement shows that I received
100% of the writer share of the Inhumanoids jingle/main theme.
(This is reflected in **Exhibit** "T").

68.    These royalties were promised to me in the corporate
divorce from Kinder, and I accepted the corporate divorce
agreement based on the fact that I would obtain this 100%
share.

69.    However, when I obtained my BMI catalog in 2000, it
became clear that no <u>Inhumanoids</u> titles were attributed to me,
and my bargain with Kinder was worthless as a result.   (This

17

is reflected in "**Exhibit H,**" pp. 33-34). Despite my inquiries, I have not been able to determine how those titles were removed from my catalog between 1988 and 2000.

70.   Accordingly, all of the compositions at issue in this case, such as the Transformer theme or jingle, are derivative uses and/or re-uses of my original themes, and I should have received performance royalties for any and all subsequent derivative uses and/or re-uses of that music.

71.   Ultimately, instead of paying the customary creative fees to the individuals who arranged derivative uses and/or re-uses of my compositions for Transformers, GI Joe, Jem, My Little Pony, Visionaries, Inhumanoids, and Robotics, Sunbow wrongfully allocated either some or all of my performance royalties to these arrangers, which were certainly not Sunbow's royalties to give.  These were my performance royalties.

### Facts that Defendants Fail to Discuss in their Papers

72.   Critically, the 48 compositions listed by defendants are not the *only* compositions at issue in this case. Defendants have entirely excluded a whole list of compositions from my catalog, for which I receive no royalties at all.

73.   Moreover, defendants do not even address the mechanical royalties and synchronization license fees ("sync license fees") wrongfully withheld from me, other than by gratuitously claiming that I should not be entitled to such

18

royalties for my compositions.

74.   Contrary to defendant's claims, I have provided ample evidence of wrongful re-registrations, as discussed in detail above.

75.   Defendants, by comparing cue sheets submitted to BMI by Sunbow with my BMI-generated catalog, have attempted to mislead the court into believing that no reduction in my royalties occurred.  Their comparison, however, is useless.

76.   BMI creates catalogs based on information submitted by publishers and production companies, which in this case was Sunbow.  (See Smith Aff., pp. 5-6).

77.   Accordingly, entries in the BMI catalog will reflect whatever is submitted to BMI by Sunbow.  Yet, even in this limited respect, BMI's Alison Smith has conceded that on several occasions BMI did not enter this information correctly. (See Smith Aff., pp. 5-6).

78.   The information on the cue sheets that Sunbow submitted to BMI was simply inaccurate.  The royalty share allotted to me on numerous cue sheets submitted by Sunbow did not accurately reflect the percentage granted to me in my original dealings with Bacal and GBI.  When these reductions were submitted to BMI (through cue sheets or clearance forms), they were entered with neither my knowledge nor permission, in direct contravention to BMI procedure.

19

**Videocassettes and DVD's featuring My Compositions**

79.   Some of my compositions, which were used in such
television programs as "G.I. Joe," "Transformers," "Jem,"
"Visionaries," and "My Little Pony," all produced by Sunbow,
were ultimately released on videocassettes and DVDs for the
home market.   "G.I. Joe" and "Transformers" were particularly
popular releases and are currently marketed by Rhino
Entertainment Company.   New releases of these shows continue
to be produced up to the present day.   Rhino also has plans to
release all sixty-five television episodes of "JEM" on DVD as
well.   Each of these episodes contains my JEM theme, its uses
in the instrumental underscore, as well as three feature songs
per episode, all of which I have written and which are
currently in my BMI catalog.

80.   Pursuant to a Rhino Entertainment / Sunbow License
Agreement (which Sunbow claims to be unable to locate), Rhino
Entertainment paid Sunbow $2,471,868.61 in mechanical
royalties and/or synchronization license fees from the sale of
over 1.5 million video and DVD units during the three-year
period of time from October 1, 1999 through September 30,
2002.   (A copy of a chart summarizing the Royalties Rhino
Entertainment paid to Sunbow during this period of time is
attached as **Exhibit "U"**.   These video and DVD sales continue
to this very day.   Defendants cannot dispute this.

81.   As the owner of the musical compositions used in
these videos and DVDs, I am entitled to the mechanical

20

royalties and/or sync license fees attributable to these
works.  I therefore respectfully request that the Court grant
my motion for partial summary judgment to establish a
constructive trust upon this $2,471,868.61 paid by Rhino
Entertainment to Sunbow and further monies to be received as a
result of the use of my compositions, since I am clearly
entitled to receive the writer's percentage attributable to
these amounts, due to the fact that I wrote the compositions
that are prominently featured in these videos and DVDs.

  82.  The Harry Fox Agency, the arm of the National Music
Publishers Association that processes mechanical royalties
and, until recently, synchronization licenses, reported that
they do not have any license agreements in their database for
any of my compositions at issue in this case.  Yet Sunbow is
nevertheless collecting royalties attributable to the sales of
videos and DVDs in which my compositions are being featured.

  83.  As the owner of these compositions, I have been
wrongfully denied the performance and mechanical royalties as
well as the synchronization license fees attributable to these
works.  I am entitled to a fair share of these royalties and
on the foreign licenses issued by Sunbow to third parties, in
an amount that I will establish at trial.

11/25/2003  13:20    84597    :96    GARNERVILLE H'    IG    PAGE  01

ANNE BRYANT

Sworn to before me this 25th
Day of November, 2003.

Notary Public
ROBIN E. ROSENBERG
Notary Public, State of New York
No. 31-4803932
Qualified in New York County
Commission Expires June 30, 20 06

# EXHIBIT 33

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

————————————————————————x

ANNE BRYANT,

        Plaintiff,                     Index No. 5192/00

        - against -                Hon. Andrew P. O'Rourke

BROADCAST MUSIC, INC., (a/k/a "BMI"),
CLIFFORD A. "FORD" KINDER, KINDER & CO.,
LTD., VADIVOX, LTD., JULES M. "JOE"
BACAL, GRIFFIN BACAL, INC., STARWILD
MUSIC BMI, WILSTAR MUSIC ASCAP,
SUNBOW PRODUCTIONS, INC., and JOHN
AND JANE DOES 1-10,

        Defendant.

————————————————————————x
————————————————————————x

ANNE BRYANT,

        Plaintiff,                     Index No. 2821/02

        - against -                Hon. Andrew P. O'Rourke

SUNBOW PRODUCTIONS, INC.,

        Defendant.

————————————————————————x

### REPLY BRIEF IN SUPPORT OF DEFENDANT SUNBOW PRODUCTIONS, INC.'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

                         PATTERSON, BELKNAP, WEBB & TYLER LLP
                         Attorneys for Defendant
                         Sunbow Productions, Inc.
                         1133 Avenue of the Americas
                         New York, New York 10036
                         (212) 336-2000
                         Gloria C. Phares
                         Kathleen L. Jennings

956814v1

S 5576 - 017
SERIAL NO. 76
SERVED
RECEIVED
FILED

## Table of Contents

Page

TABLE OF AUTHORITIES................................................................................... ii

PRELIMINARY STATEMENT ............................................................................ 1

ARGUMENT ......................................................................................................... 3

I.    ALL OF PLAINTIFF'S "RE-REGISTRATION" CLAIMS ARE TIME BARRED .......... 4

      A.    Plaintiff's Re-Registration Claims Fall Outside the Applicable Six-
            Year Statute of Limitations.................................................................... 4

      B.    Plaintiff Cannot Evade the Statute of Limitations by Asserting
            Equitable Estoppel................................................................................. 7

II.   PLAINTIFF'S NEW RE-REGISTRATION CLAIMS FAIL ON THE MERITS ............ 14

III.  PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT IS
      UNTIMELY AND FAILS AS A MATTER OF LAW.................................................. 18

      A.    Plantiff's Cross-Motion is Untimely ................................................... 18

      B.    Plaintiff Owns No Copyright in the Musical Compositions for the
            TV Shows and Is Not Entitled to Royalties for Distribution of Those
            TV Shows in Any Format. .................................................................... 19

CONCLUSION ...................................................................................................... 24

# TABLE OF AUTHORITIES

## CASES

**Page(s)**

<u>Alvord & Swift v. Stewart M. Muller Constr. Co. Inc.</u>,
    46 N.Y.S.2d 276, 281, 413 N.Y.S.2d 309, 312 (1978) ........................................ 3

<u>ABKCO Music, Inc. v. Stellar Records, Inc.</u>,
    96 F.3d 60 (2d Cir. 1996)........................................................................... 19

<u>Beagan v. Manhattanville Nursing Care Ctr.</u>,
    575 N.Y.S.2d 70, 76 A.D.2d 633 (1st Dep't 1991) .......................................... 9

<u>Bourne Co. v. MPL Committee, Inc.</u>,
    675 F. Supp. 859 (S.D.N.Y. 1987) .............................................................. 19

<u>Calvin Klein Trademark Trust v. Wachner</u>,
    123 F. Supp. 2d 731 (S.D.N.Y. 2000) ................................................... 10, 11

<u>Carter v. Goodman Group Music Publishers</u>,
    848 F. Supp. 438 (S.D.N.Y. 1994) ............................................................... 8

<u>Gilberg v. Barbieri</u>,
    53 N.Y.2d 285, 441 N.Y.S.2d 49 (1981) ....................................................... 9

<u>Jordan v. Ford Motor Co.</u>,
    426 N.Y.S.2d 359, 73 A.D.2d 422 (4th Dep't 1980) .................................. 8, 14

<u>Krakowska v. Niksa</u>,
    749 N.Y.S.2d 55, 298 A.D.2d 561 (2d Dep't 2002) ......................................... 5

<u>Mellencamp v. Riva Music</u>,
    698 F. Supp. 1154 (S.D.N.Y. 1988) ........................................................... 10

<u>People v. Evans</u>,
    94 N.Y.2d 499, 706 N.Y.S.2d 678 (2000) ..................................................... 9

<u>Simcuski v. Saeli</u>,
    44 N.Y.2d 442, 406 N.Y.S.2d 259 (1978) ........................................... 7, 8, 13

<u>State of New York Higher Education Services v. Zamore</u>,
    59 N.Y.2d 933, 466 N.Y.S.2d 297 (1983) ..................................................... 7

ii

## TABLE OF AUTHORITIES
### (continued)

Page

Surge Licensing, Inc. v. Copyright Promotions, Ltd.,
    685 N.Y.S.2d 175, 258 A.D.2d 257 (1st Dep't 1999)..................................... 11

Szczotka v. Adler,
    737 N.Y.S.2d 121, 122, 291 A.D.2d 444, 444 (2d Dep't 2002) ..................................... 3

Woods v. Bourne Co.,
    60 F.3d 978 (2d Cir. 1995)..................................................................................... 19

Zuckerman v. City of New York,
    49 N.Y.2d 557, 562, 427 N.Y.S.2d 595, 597-98 (1980) ................................................ 3


### STATUTES

17 U.S.C. § 101 .................................................................................................. 19

17 U.S.C. § 106(1) and (3) ................................................................................... 19

17 U.S.C. § 201(b) ................................................................................................ 22


### MISCELLANEOUS

57 N.Y. Juris. 2d, Evidence and Witnesses §§ 245, 247 (Aug. 2003) ............................. 10

## PRELIMINARY STATEMENT

At her deposition, Plaintiff identified 48 compositions and claimed that after 1993 but before 1998 some combination of the Defendants had caused all but two of her registrations at Broadcast Music Inc. ("BMI") to be changed so that she received a lower percentage of performance royalties than she had been entitled to when the works were first registered. Defendant Sunbow Productions, Inc. ("Sunbow") moved for summary judgment on the grounds that: (1) the statute of limitations for nearly all 48 compositions had expired; and (2) on the merits, Plaintiff's share of public performance royalties for these 48 compositions had not been diminished or she was not entitled to the royalties she was claiming. Sunbow demonstrated the latter point primarily by comparing original cue sheets submitted to BMI for the compositions at issue with Plaintiff's BMI's catalog, documents that had been in Plaintiff's possession since at least 2000 and which were obtained from Plaintiff through discovery in this case.

Plaintiff's opposition papers offer nothing to rebut Sunbow's arguments.

Instead, in a gambit that has now become familiar in this case, when faced with a defense argument that undermines her claims, Plaintiff ignores the claims that she had originally proffered and tries a whole new approach – an approach that in this case is also completely vulnerable to Sunbow's statute of limitation argument because it is based on alleged misconduct that took place in the 1980s. Under her new theory (for which she provides a new affidavit, including considerable inadmissible hearsay and contradicting or ignoring much of her deposition testimony), the musical compositions for which her share of BMI performance royalties was reduced are seven advertising jingles that Plaintiff wrote for Griffin Bacal Inc. ("GBI"), an advertising company, not Sunbow, a TV and movie production company. In the current transmogrification of her claim, the 48 compositions that she wrote for the TV series –

which had been the center of Plaintiff's case until now – are merely derivative works of the

seven advertising jingles and, when the musical compositions for the TV series were registered

with BMI, they changed the arrangement (including the percentage of performance royalties)

Plaintiff had had with Joe Bacal for GBI for her seven advertising jingles.

Plaintiff's transformed theory contradicts repeated testimony that she has given in

this case and appears to be a direct reaction to a contract between Sunbow and Kinder & Bryant

Ltd. for musical compositions for a TV show or motion picture entitled "Jem," which was

produced to Plaintiff on November 10, 2003, in response to Plaintiff's late-filed Second Request

for the Production of Documents and Things, to which the Court directed Defendants to respond

in an October 7, 2003 telephone conference.

Although many of the critical Sunbow documents were lost because of damage

from a water main break in 1991 affecting Sunbow's offices, the evidence – both from Plaintiff's

own testimony and contemporaneous documents – supports the conclusion that the Jem contract

is typical of those that Plaintiff and Kinder & Bryant Ltd. executed for all the TV compositions.

As Plaintiff must know, the terms of the contract contradict the new version of her story that she

is trying out on Defendants and the Court in response to Sunbow's motion for summary

judgment. Moreover, the contract (and Plaintiff's earlier deposition testimony) completely

undermine her untimely "cross-motion" for summary judgment because the contract makes plain

that Plaintiff has no copyright interest in any of the TV compositions and that her limited right to

royalties for exploitation of those compositions does not include any of the re-uses for which she

claims a constructive trust here.

Plaintiff's tactic seems to be that if she raises enough new issues with enough

unfounded facts, confuses jingles with music for TV series and makes no distinction between her

2

956814v1

work with GBI and her work for Sunbow, she will convince the Court that there are issues of fact

that prevent the grant of summary judgment. But a clear-eyed reading of Plaintiff's papers

shows that she has not presented an issue of fact on the claims relating to the 48 musical

compositions or on her spurious new theory relating to the seven jingles. All are time-barred or

subject to other legal bars. Her cross-motion for summary judgment is too late, but even if it had

been timely filed, Plaintiff's contract and her prior deposition testimony show that it is baseless:

the royalties on which she is attempting to impose a constructive trust arise from uses for which

Plaintiff was never entitled to receive royalties.

## ARGUMENT

It is beyond dispute that in order to survive a motion for summary judgment, a

plaintiff is "obliged to produce evidence, not just unsubstantiated allegations or assertions to

support the elements of her claims. Alvord & Swift v. Stewart M. Muller Constr. Co. Inc., 46

N.Y.2d 276, 281, 413 N.Y.S.2d 309, 312 (1978) (emphasis added); Zuckerman v. City of New

York, 49 N.Y.2d 557, 562, 427 N.Y.S.2d 595, 597-98 (1980) (non-moving party "must produce

evidentiary proof in admissible form" sufficient to raise a triable issue of material fact

concerning her claims); see Szczotka v. Adler, 737 N.Y.S.2d 121, 122, 291 A.D.2d 444, 444 (2d

Dep't 2002) ("speculation . . . is insufficient to raise a triable issue of fact" at summary judgment

stage). As discussed below, however, Plaintiff's opposition rests entirely on inadmissible

hearsay, unsubstantiated allegations or speculations regarding the key issues raised by her

claims.[1] Accordingly, Sunbow's motion for summary judgment should be granted in its entirety.

---

[1]    See, e.g., Pl. Opp. at 7 (claiming without any support that creative fees that she received
from GBI and Sunbow were "only one-third or one-fourth of the normal creative fees to which
plaintiff otherwise would be entitled"); Bryant Aff. ¶ 26 (claiming without any support that in
1987, Sunbow's lawyer increased her percentage of writer's share of public performance royalties
to 100% "for accounting purposes"); Pl. Opp. at 29 (claiming without any support to know that
Sunbow's publishing companies "routinely paid the publisher's royalties from the use of

3

## I.    All of Plaintiff's "Re-Registration" Claims Are Time Barred

In its opening brief, Sunbow explained that Plaintiff's claims with respect to 39 of the 48 alleged re-registrations are time-barred because she contends that the re-registrations occurred before 1996.  See Sunbow's Brief in Support of its Motion for Summary Judgment ("Sunbow Br.") at 10-11.  In her opposition, Plaintiff does not even attempt to dispute this showing.  Instead, Plaintiff contends that Sunbow should be equitably estopped from asserting this defense based on alleged misconduct by Bacal that somehow should be imputed to Sunbow.[2]
This argument fails as a matter of law and fact.  Indeed, based on the new theory of liability Plaintiff asserts in her opposition, all of Plaintiff's claims are time-barred and by an even greater margin than they were pursuant to Plaintiff's original re-registration theory .

### A.    Plaintiff's Re-Registration Claims Fall Outside the Applicable Six-Year Statute of Limitations

A summary of Plaintiff's abrupt shift on summary judgment regarding her re-registration theory of liability makes clear that her new claims involve re-registrations that supposedly occurred 15-19 years ago, rather than in the 1990s, as she previously alleged.

Prior to the filing of Sunbow's motion for summary judgment, Plaintiff had claimed that some combination of Kinder, Bacal and/or Sunbow re-registered many of her compositions with BMI in the 1990s in a manner that decreased her share of public performance royalties.  See Affirmation of Roseann Kitson Schuyler ("Kitson Affirm.") (submitted in support of Sunbow's Motion for Summary Judgment), Ex. B ¶ 10 (Amended Compl.) (alleging that re-

---

plaintiff's jingles through to Hasbro" and that Hasbro "was a GBI client and never a Sunbow client").

[2]     This is just one example of Plaintiff's repeated improper attempts in this case to blur the distinctions between Bacal and the two companies of which he was one principal:  Sunbow, the television production company, and GBI, the advertising agency.  See p.13, infra .

registrations took place "subsequent to 1993"). At her deposition, when asked to identify the compositions in her BMI Participant Catalog that were at issue in this case, Plaintiff identified the 48 compositions discussed in Sunbow's opening brief. See generally Kitson Affirm., Ex. D at 138-58; Appendix A to Sunbow Br. (listing compositions). Plaintiff confirmed also that her contention was that all but two of these 48 alleged re-registrations took place between 1993 and 1998, based on entries during those years in her BMI Participant Catalog.[3] See Kitson Affirm., Ex. D at 138-58; id., Ex. F (Sunbow's Interrogatory No. 1 to Plaintiff); id., Ex. G at 3-5 (Plaintiff's Response to Sunbow's Interrogatory No. 1).

With its opening brief, Sunbow provided copies of cue sheets submitted to BMI for TV shows that used music composed in whole or part by Plaintiff. See 9/30/03 Affidavit of Alison Smith ("Smith Aff.") (submitted in support of Sunbow's Motion for Summary Judgment) Exs. 1-48 to Ex. K to Kitson Affirm; ¶¶ 15-16. With respect to 35 of the 48 compositions at issue in this case, a simple comparison of the percentage of public performance royalties assigned to Plaintiff on these cue sheets with the percentage assigned to Plaintiff in her BMI Participant Catalog makes clear that her share of such royalties has not been reduced.

Faced with these undisputable facts, Plaintiff has simply abandoned her original theory of how and when her compositions were improperly re-registered in favor of a new approach. Despite her repeated prior allegations that the re-registrations occurred in the 1990s, Plaintiff suddenly contends in her opposition that the improper registrations occurred in the 1980s, when the original cue sheets for the TV shows at issue were submitted to BMI.[4] See

---

[3]    The other two re-registrations were alleged to have occurred in 1985 and 1987. Kitson Affirm., Ex. K, Nos. 29, 30.

[4]    The law is settled that an affidavit that contradicts earlier deposition testimony should be ignored. E.g., Krakowska v. Niksa, 749 N.Y.S.2d 55, 56, 298 A.D.2d 561, 562 (2d Dep't 2002) (disregarding on summary judgment affidavit that "contradict[ed] [plaintiff's] deposition

5

Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiff's Cross Motion for Partial Summary Judgment ("Pl. Opp.") at 10 (arguing royalty percentage on these cue sheets "was wrongfully reduced from the percentage granted to plaintiff in her original dealings with Bacal and GBI") (emphasis added); id. at 32-33 (same).

Plaintiff's claims are even more decisively time-barred under her new theory of liability than under her previous theory, however. Indeed, as can be seen from the air dates listed for the shows on the cue sheets, these allegedly inaccurate cue sheets were submitted to BMI during the period from 1984 through 1988 or, in other words, 15 -19 years before Plaintiff properly served Sunbow with the complaint in this case. See Kitson Affirm, Ex. K, entries 1 -22, 25, 29-31, 47; see also Affidavit of Carole Weitzman ("Weitzman Aff.") ¶ 11 (cue sheets were submitted to BMI when TV show was going to be aired).

Plaintiff does not dispute that, as explained in Sunbow's opening brief, the cue sheets and BMI Participant catalog supporting Sunbow's argument that no reduction of Plaintiff's share of performance royalties occurred in the 1990s have been in Plaintiff's possession since her 2000 meeting with BMI. See Brief in Support of Defendant Sunbow Productions, Inc.'s Motion for Summary Judgment ("Sunbow Br.") at 8;[5] Affidavit of Allison. Smith (submitted in support thereof) ("Smith Aff.") ¶ 16. Thus, she should have known since 2000 that her original claim of reduced performance royalties was unfounded. If she was going to assert this new theory, she should have done so at the beginning of her case and not waited

testimony and constitut[ed] an attempt to raise a feigned factual issue designed to avoid the consequences of dismissal").

[5]      The reference on page 8 of Sunbow's brief to this meeting taking place in 2003 is a typographical error. See Smith Aff. ¶ 16 (meeting took place in 2000); Kitson Affirm., Ex. D at 229:17-22 (same).

6

until Sunbow's motion for summary judgment. What this illustrates is that Plaintiff has never really investigated and formulated a theory of liability and recovery. She is instead pursuing a strategy that if she can prolong the case and make it sufficiently confusing, she will convince the Court that there is a triable issue of fact. Accordingly, Plaintiff's re-registration claims should be dismissed because the alleged re-registrations fall well outside the six-year statute of limitations applicable to these claims.

B.    Plaintiff Cannot Evade the Statute
of Limitations by Asserting Equitable Estoppel

Plaintiff's contention that equitable estoppel bars Sunbow from asserting its statute of limitations defense ignores the relevant law and is premised on repeated assertions of so-called "facts" that are unsupported by any evidence whatsoever other than her bald assertions. This desperate attempt to revive her obviously time-barred re-registration claims should be rejected.

Plaintiff correctly cites the general principle that "where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action," a defendant may be estopped from asserting a statute of limitations defense. Simcuski v. Saeli, 44 N.Y.2d 442, 449, 406 N.Y.S.2d 259, 262 (1978) (equitable estoppel applicable where plaintiff alleged that defendant doctor intentionally concealed alleged malpractice from plaintiff by falsely assuring her of effective treatment). To invoke equitable estoppel, a plaintiff must establish not only that she relied on the "alleged misrepresentations as the cause for her failure sooner to institute the action" but also that such reliance was justified. Id.; State of New York Higher Educ. Servs. v. Zamore, 59 N.Y.2d 933, 934, 466 N.Y.S.2d 297, 298 (1983) (same).

In addition, it is essential that the plaintiff establish that the "action was brought within a reasonable time after the facts giving rise to the estoppel have ceased to be operational."

7

Simcuski, 44 N.Y.2d at 450, 406 N.Y.S.2d at 263. Indeed, "[w]here the injured party is simply unaware that a cause of action is available to him, either due to lack of diligence on his own part or because of the difficulty of discovering the injury, the courts have not applied the doctrine of equitable estoppel." Jordan v. Ford Motor Co., 426 N.Y.S.2d 359, 361, 73 A.D.2d 422, 425 (4th Dep't 1980) (rejecting equitable estoppel defense where "[t]here was nothing to prevent plaintiff from investigating within the applicable statute of limitations period" the alleged wrongdoing).

Plaintiff can satisfy none of these essential elements of equitable estoppel. As an initial matter, she does not and cannot identify any misrepresentation whatsoever by Sunbow regarding her public performance royalties on which she relied in delaying this suit. See Carter v. Goodman Group Music Publishers, 848 F. Supp. 438 (S.D.N.Y. 1994) (applying New York law) (no triable issue on equitable estoppel where plaintiffs failed to allege that defendant music publishing companies made any misrepresentations about failure to pay royalties to plaintiff on which plaintiff relied). Instead, Plaintiff contends that Sunbow is equitably estopped from asserting the statute of limitations against her stale claims because: (1) Bacal "had a duty to disclose any wrongful conduct which adversely affected Bryant's receipt of royalties" because he and Bryant allegedly are fiduciaries, Pl. Opp. at 27; (2) Bacal "fail[ed] to notify Bryant of the inaccurate registration" of some unidentified compositions; id.; and (3) Sunbow "cannot rely on the statute of limitations defense, because it too has a fiduciary relationship with Bryant, since Sunbow is an alter ego of Bacal," id. at 24-25. This convoluted argument fails both as a matter of law and fact.

No Fiduciary Relationship: It is now clear that no fiduciary relationship exists between Plaintiff and Bacal. This Court made a preliminary finding in its September 2002 decision denying Bacal's motion for summary judgment that "in the circumstances presented . . .

8

a relationship of trust and confidence" existed between Plaintiff and Bacal. See Affirmation of

Patrick J. Monaghan in Opposition to Motions for Summary Judgment and in Support of

Plaintiff's Cross-Motion for Summary Judgment ("Monaghan Affirm."), Ex. A at 9. Since then,

however, new facts have emerged during discovery that clarify that Plaintiff and Bacal did not

enjoy a fiduciary relationship.[6] For example, Bryant's testimony when deposed by Sunbow in

this litigation makes clear that, although she and Bacal were creative collaborators on some

songs, her principal legal relationship with him was that his companies were clients of

companies she worked for or was a principal of.[7] It is well settled, however, that this type of

"conventional business relationship, without more, does not become a fiduciary relationship by

---

[6]     The Court's preliminary holding regarding the nature of the relationship between Plaintiff
and Bacal is not binding on Sunbow because Sunbow was not a party to Plaintiff's action against
Bacal when Bacal's summary judgment motion was decided (because Plaintiff failed to serve
Sunbow in that action). Indeed, Sunbow had no knowledge of any litigation between Bryant and
Bacal when Bacal's summary judgment motion was briefed and filed and had no opportunity to
be heard on the issue whether Bacal and Plaintiff had a fiduciary relationship. See Affirmation
of Gloria C. Phares ("Phares Affirm.") ¶ 2; Gilberg v. Barbieri, 53 N.Y.2d 285, 292, 441
N.Y.S.2d 49, 51 (1981) (due process requires that "party has had a full and fair opportunity to
contest a prior determination" of court before party is bound by that determination). Similarly,
the doctrine of "law of the case" does not prevent this Court from reconsidering its preliminary
fiduciary relationship ruling in view of the new evidence (discussed below) presented by
Sunbow that the relationship between Plaintiff and Bacal was one of mere business associates
engaged in contractual relations rather than fiduciaries. See People v. Evans, 94 N.Y.2d 499,
502-03, 706 N.Y.S.2d 678, 681 (2000) (explaining that doctrine of law of the case does not limit
court's discretion to "reopen what has been decided" where parties have not had "full and fair
opportunity to litigate the initial determination") (citation and quotation omitted); Beagan v.
Manhattanville Nursing Care Ctr. 575 N.Y.S.2d 70, 72, 76 A.D.2d 633, 636 (1st Dep't 1991)
(holding that "defendant was not barred from again moving for summary judgment, since the
second motion was based upon new information obtained through depositions").

[7]     Plaintiff began working with GBI in the early 1980s when she was working for The
Michelin Company. Kitson Affirm., Ex. D at 14. In that capacity, Plaintiff created advertising
jingles for various products, including toys manufactured and distributed by Hasbro. See id. at
106:12-16; 107:5-7. In the mid-1980s, Sunbow, a TV and movie production company that Joe
Bacal and Tom Griffin also operated, undertook to produce animated TV series and/or films
based on Hasbro toys, such as Transformers, GI Joe, Jem, My Little Pony and Friends, The
Visionaries, and The Inhumanoids (the "TV Shows"). See id. at 106:19-21; Affidavit of Carole
Weitzman (submitted in support of Sunbow's Motion for Summary Judgment) ¶ 2. In or around
1983 or 1984, Sunbow hired Plaintiff and Ford Kinder (through their company Kinder & Bryant
Ltd.) to write music for the TV Shows. Kitson Affirm., Ex. D at 107:15-21.

mere allegation." Calvin Klein Trademark Trust v. Wachner, 123 F. Supp. 2d 731, 734

(S.D.N.Y. 2000) (applying New York law) (no fiduciary relationship between trademark licensor

and licensee); Mellencamp v. Riva Music, 698 F. Supp. 1154, 1157, 1160 (S.D.N.Y. 1988)

(applying New York law) (holding that "professional relationship" between author and publisher

not fiduciary in nature).

Further, Plaintiff testified that when she wrote compositions for GBI during her

employment with Michelin and while she was a partner at Kinder & Bryant Ltd., there were

written agreements with GBI governing her share of royalties for those compositions. Kitson

Affirm., Ex. D at 46-47 (Plaintiff testified that agreement between Michelin and GBI was written

and that she was told by Kinder that the agreement between K&B and Sunbow was written).

Indeed, although Plaintiff claims never to have seen or signed any written agreement between

her and Sunbow, Sunbow recently located and produced to Plaintiff the contract concerning

Kinder & Bryant Ltd.'s work for the Jem television series.[8] See Affirmation of Neil R. Rigby

---

[8]    Because of a flood in Sunbow's storage area caused by a 1991 water main break, Sunbow
has not been able to locate all of the agreements between Kinder & Bryant Ltd. and Sunbow
relating to the TV Shows or a signed copy of the agreement for "Jem". Phares Affirm. ¶ 11 &
Ex. D; Rigby Aff. ¶¶ 8-11. However, where there is evidence that a document has been lost or
destroyed, as there is here, the contents of the document can be proved by other evidence,
including oral testimony, related documents, and contemporaneous documents. 57 N.Y. Juris.
2d, Evidence and Witnesses §§ 245, 247 (Aug. 2003).

    In this case, the strongest evidence of the existence of agreements between Kinder &
Bryant Ltd and Sunbow for the TV Shows and their basic terms is the testimony of Plaintiff
herself. She repeatedly testified that throughout her career, she worked on a work made for hire
basis in consideration of a flat fee and the performance rights to her compositions. Kitson
Affirm., Ex. D at 42:23-43:7, 43:23-44:2, 46:9-49:16. That describes precisely the basic terms of
the Jem agreement and presumably the other contracts for the TV shows. (The Jem agreement
also granted Kinder & Bryant Ltd. certain limited "music publishing rights." Rigby Aff., Ex. A
at ¶ 6.) Moreover, although Plaintiff did not remember signing an agreement, she explained that
Ford Kinder was her partner and that he had told her there was an agreement. Kitson Affirm.,
Ex. D at 44:3-9. That the terms of the agreements for all the TV Shows were the same as the
Jem agreement is also supported by the fact that the agreements that Sunbow used for other
composers and lyricists for contemporaneous Sunbow TV productions were all essentially the
same. Phares Affirm., ¶¶ 11-13 & Ex. E, F, G. Other documents found with the Jem contract,
including Plaintiff's lawyer, bolster the conclusion that the agreements for the TV Shows were

10

("Rigby Aff."), Ex. A; Phares Affirm., ¶ 7. Moreover, correspondence regarding the Jem

contract demonstrates that Plaintiff was represented by counsel with respect to the terms of her

association with Sunbow. See Rigby Aff., Ex. D, E, F. Where, as here, parties engage in arms-

length contractual negotiations regarding the scope of their business relationship, no fiduciary

relationship arises. See Surge Licensing, Inc. v. Copyright Promotions, Ltd., 685 N.Y.S.2d 175,

176, 258 A.D.2d 257, 258 (1st Dep't 1999) (holding that "parties' agreement premised . . . upon

a conventional business relationship and establishing at arms-length no more than routine

licensing and royalties rights and obligations, did not implicate or give rise to a fiduciary

relationship"); Calvin Klein, 123 F. Supp. 2d at 733-34 (explaining that "[u]nder New York law,

parties to a commercial contract do not ordinarily bear a fiduciary relationship to one another

unless they specifically so agree").

    No Concealment Because No Knowledge of Wrongful Conduct:  In any event,

even assuming that Plaintiff and Bacal had a fiduciary relationship, Plaintiff has not

demonstrated a triable issue of fact regarding whether Bacal or anyone else at Sunbow knew of

any wrongful conduct with respect to her royalty percentages and failed to communicate this

---

essentially the same.  The Jem contract was discovered with an exchange of letters between
Kinder & Bryant Ltd.'s lawyer, William Dobishinski, and Sunbow's lawyer, Robert Harris.
Rigby Aff. ¶ 10 & Ex. D, E.  Dobishinski's letter says that it relates to revisions in both the Jem
and the My Little Pony contracts, leading to the conclusion that both have the same language in
the same paragraphs.  (A comparison of this exchange of letters with the Jem agreement shows
that the accepted changes have already been incorporated in the Jem contract.  Compare Rigby
Aff., Ex. A with Rigby Aff., Ex. D and E.)  Finally, the February 9, 1987 letter from Kinder &
Bryant Ltd.'s lawyer to Sunbow confirms that the Jem contract was signed.  Rigby Aff., Ex. F.
That letter refers to an "amendment" to the "agreement dated June 1, 1985, between Sunbow
Productions, Inc. and Kinder & Bryant Ltd." and it encloses clean and red-lined versions of the
amendment.  Even if the amendment was never signed, an "amendment" is the ordinary device
for changing a signed agreement.  And the proposed amendment is drafted to include the usual
concluding language that "[i]n all other respects, the said Agreement is hereby ratified and
confirmed."  In other words, except to the extent of the amendment, the existing signed
agreement would be confirmed and ratified.  Thus, in this case, there is a luxury of evidence –
some with the highest indicia of reliability: it comes from Plaintiff or her lawyer – establishing
the contents of the signed agreements between Kinder & Bryant Ltd. and Sunbow for the TV
Shows.

11

information to Plaintiff. Plaintiff contends in a wholly conclusory fashion that Bacal "fail[ed] to notify Bryant of the inaccurate registration," without identifying the alleged inaccurate re-registration(s) to which she refers. Pl. Opp. at 27 (emphasis added). Similarly, Plaintiff's bald contention that there is an issue of fact as to whether Bacal knew about the wrongful re-registrations because "it is unlikely that Joe Bacal, as a principal of [Sunbow], was not aware of any changes," id. at 27-28 (emphasis added), is based purely on her own speculation and must be disregarded on summary judgment.

No Fiduciary Relationship with Sunbow: The impediments to Plaintiff's assertion of equitable estoppel do not stop there. Rather, to invoke equitable estoppel against Sunbow (rather than against Bacal), Plaintiff must pierce the corporate veil and demonstrate that, as the Court set forth in its decision denying Sunbow's motion for summary judgment, Bacal's relationship with Sunbow was such that he "exercised such complete dominion and control [over Sunbow] that it may be said that the corporation was in reality a shell or dummy corporation for Bacal's own purposes." Kitson Affirm, Ex. C at 7. This Plaintiff cannot do.

Although she contends in conclusory fashion that Sunbow's separate corporate form was a "fiction," Pl. Opp. at 30, Plaintiff offers no evidence whatsoever regarding Sunbow's corporate form.[9] In contrast, Carole Weitzman, the former Senior Vice-President of Production at Sunbow, testified at her deposition that, in addition to Bacal and Tom Griffin (the two

---

[9]     In support of Plaintiff's contention that Sunbow was Bacal's alter-ego, Plaintiff claims, without citation of any evidence whatsoever, that: (1) "Sunbow freely used musical compositions (i.e., jingles) that plaintiff created specifically for GBI, Bacal's advertising company, without obtaining licenses from GBI to use those compositions"; and (2) "Starwild and Wildstar, which were affiliates of Sunbow, routinely paid the publisher's royalties from the use of plaintiff's jingles through to Hasbro, which was a GBI client and never a Sunbow client." Pl. Opp. at 29. Moreover, Plaintiff fails to explain why, even if true, these facts would establish that Sunbow was "in reality a shell or dummy corporation for Bacal's own purposes." Kitson Affirm., Ex. C at 7. Plaintiff's contention that "Bacal viewed GBI as the personification of himself," Pl. Opp. at 30, even if supported, similarly has no bearing on whether Sunbow was a shell corporation and alter-ego of Bacal.

12

founders of Sunbow), several other senior level officers ran the company, including a President, Vice-President of Development, Vice-President of Sales, and Chief Financial Officer. Phares Affirm., Ex. H at 8:4-5, 9:12-13, 11:15-19, 19:4-12, 32:3-4. Ms. Weitzman also described the various other personnel and teams at Sunbow that operated under these corporate officers, such as a music administrator and music editor as well as a sales team and finance department. Id. at 14:6, 15:11-12, 31:2, 95:1. This evidence establishes beyond dispute that Sunbow was not a mere shell or dummy corporation.

Further dispelling any notion that Sunbow's existence was a mere fiction are the facts that: (1) Sunbow entered into written agreements with Kinder & Bryant Ltd. regarding Plaintiff's and Kinder's work on music for the TV Shows, as Plaintiff admitted during her deposition, Kitson Affirm., Ex. D at 44:3-9; see Rigby Aff., Ex. A; and (2) those contracts were negotiated by counsel for Kinder & Bryant Ltd. See Rigby Aff., Exs. D, E.

Plaintiff Cannot Demonstrate Diligence: Finally, even assuming that Plaintiff could surmount all of the above hurdles to her equitable estoppel theory, she still cannot invoke that theory to evade the statute of limitations because she cannot "establish that the action was brought within a reasonable time after the facts giving rise to the estoppel have ceased to be operational." Simcuski, 44 N.Y.2d at 449, 406 N.Y.S.2d at 263. Plaintiff contends that she "assumed Bacal's silence meant nothing was amiss [with her royalties], and thus was prevented from pursuing her cause of action." Pl. Opp. at 28. However, Plaintiff has never disputed that she regularly received royalty statements from BMI, see Kitson Affirm., Ex. D at 57 :18-20 (admitting that Plaintiff still has such statements for period from 1975 to present), which would have reflected any reduction in the royalties she was receiving for her commercial jingles and her work on the TV Shows. In addition, Plaintiff contends that as part of her "corporate divorce"

13

from Ford Kinder, which began in 1989 and ended with a settlement in 1994, they litigated and settled various claims regarding the amount of royalties she was receiving for works she had created for the Hasbro toys and the TV Shows. E.g., Bryant Aff. ¶¶ 29, 52. Thus, through her receipt of BMI royalty statements and this dispute with Kinder, Plaintiff had ample notice of royalty reductions and other problems with her royalties and an obligation to use due diligence in investigating such issues. Jordan, 426 N.Y.S.2d 359 at 361; 73 A.D.2d at 424 (equitable estoppel inapplicable where plaintiff failed to investigate claim). Her failure to do so prevents her reliance on equitable estoppel to evade the statute of limitations on her re-registration claims.

## II.    Plaintiff's New Re-Registration Claims Fail on the Merits

As discussed in Sunbow's opening brief, incontrovertible documentary evidence from Plaintiff's own files establishes that the vast majority of her original re-registration claims fail because her share of public performance royalties for the TV music at issue has remained exactly the same as when Sunbow first filed cue sheets with BMI for the TV Shows. See Sunbow Br. 12-13; Appendix to Sunbow Br. (entries 1-22, 25, 26, 28-31, 39-45); Kitson Affirm., Ex. K (same entries).

Sunbow also demonstrated that dismissal was warranted with respect to the rest of Plaintiff's re-registration claims because either (1) Plaintiff still retains 100% of the writer's share of the performance royalties for certain compositions, see Appendix to Sunbow Br. (entries 23, 24, 37, 38); Kitson Affirm., Ex. K (same), or (2) Plaintiff has no standing to challenge the alleged re-registration, see Appendix to Sunbow Br. (entries 46-48); Kitson Affirm., Ex. K (same), and Plaintiff had failed to produce any evidence that her royalty percentage had decreased with respect to any of the compositions at issue. See generally Sunbow Br. at 13-15.

14

Finally, Sunbow also explained that Plaintiff could not meet other essential elements of her claims for unjust enrichment and constructive trust. Id. at 14-15.

Plaintiff essentially ignores Sunbow's arguments and evidence demonstrating these fatal defects in her claims. Her only response to Sunbow's proof that the original cue sheets for the TV Shows gave Plaintiff the exact same share of performance royalties as reflected in the allegedly wrongful re-registrations with BMI is to argue – for the first time – that her shares as reported on those original cue sheets are "wrong." Pl. Opp. at 10. Plaintiff's convoluted new theory in support of this assertion rests on two main assertions. First, Plaintiff contends that "all of the compositions at issue in this case, such as the Transformer backgrounds, themes, and cues, are derivative uses of plaintiff's original jingles" and that therefore she "was entitled to receive 100% of the writer's royalties attributable to her compositions" because that was the "working arrangement" that she had with GBI for jingle work. Pl. Opp. at 31; Bryant S.J. Aff. ¶ 7. Second, and somewhat relatedly, Plaintiff implies that the working arrangement she had with GBI relating to her jingles also applied to her work on Sunbow's TV Shows. See Pl. Opp. at 7 (asserting that "working arrangement" was with Bacal "on behalf of GBI and Sunbow") (emphasis added). These contentions are completely unfounded.

No Evidence that Jingles Are Same as TV Music: Plaintiff fails to cite a shred of evidence to support her contention that the compositions listed on Sunbow's cue sheets for the TV Shows are "the exact same piece[s] of music" as the jingles for the toys on which those shows were based. Pl. Opp. at 10; see id. at 13 n.4 (contending without support that jingle for Transformers toy and theme for Transformers show "are one and the same"). Nor does Plaintiff cite any evidence to indicate whether or the extent to which her TV music represents "derivative uses" of the toy jingles. Indeed, although Plaintiff now claims categorically that the "jingles pre-

15

dated the television shows," Pl. Opp. at 5, she admitted at her deposition that some of the themes for the TV Shows were written <u>before</u> the commercial jingles for the toys corresponding to those shows, which obviously means that those themes could not have been based on Plaintiff's jingles work. Kitson Affirm., Ex. D at 40 (admitting themes for Jem, My Little Pony & Friends and Visionaries written before jingles for same and that she is not sure whether theme or jingle came first for Inhumanoids and Robotics). Plaintiff also warranted, as evidenced by the Jem contract, that the music she was creating for the TV Shows was "original," <u>i.e.</u>, the music could not have been derivative of the jingles. Rigby Aff., Ex. A ¶ 9 and Letter of Inducement ¶ 2 (at p. 12). Plaintiff further admitted in her deposition that she at least made a new arrangement of the Transformers theme for use in the Transformers show and that she does not know whether any changes were made to the jingles she alleges were used in the other TV Shows. Kitson Affirm., Ex. D at 41-42.

<u>No Evidence That GBI Arrangement Was the Same As Sunbow Arrangement</u>:
Similarly, Plaintiff fails to offer any competent evidence that her alleged agreement with GBI regarding jingles governed her work on Sunbow's TV Shows. Plaintiff contends that she had a working arrangement with "Bacal (on behalf of GBI <u>and Sunbow</u>)" pursuant to which she was entitled to receive "100% of the writer's royalties attributable to her <u>compositions</u>." Pl. Opp. at 7 (emphasis added). However, even assuming this was the arrangement that Plaintiff had with GBI,[10] she cites no evidence indicating that this arrangement also applied to her work for Sunbow. To the contrary, she miscites evidence in the record indicating otherwise. Plaintiff

---

[10] Although Plaintiff complains that Bacal received royalties for compositions to which he did not contribute, Plaintiff herself curiously claims that she was entitled to 100% of the public performance royalties for jingles that she neither composed or wrote the lyrics for. <u>E.g.</u>, Pl. Opp. at 14 (stating that 100% of writer's performance royalties for GI Joe jingle were registered to her, even though Kinder composed music and Spencer Michelin wrote lyrics); <u>id.</u> at 16 (same for My Little Pony jingle).

956814v1

asserts, for example, that "Joe Bacal acknowledged that this was the parties' course of dealing and understanding in his deposition." Id. at 8. However, in the testimony cited by Plaintiff, Bacal stated that this arrangement applied only to advertising work in the early days of GBI, not to work that Plaintiff performed for Sunbow. Monaghan Affirm., Ex. B at 40:16-20; see also Pl. Opp. at 11 (making clear that 100% public performance agreement related to advertising jingles written for GBI).[11]

Further, whatever the basis on which Plaintiff created jingles for GBI, by her own admission she did not handle the contract negotiations with Sunbow for the TV Shows. According to Plaintiff, those negotiations were conducted exclusively by her partner Ford Kinder, and Plaintiff never saw or read the contracts that emanated from those negotiations. Kitson Affirm., Ex. D at 44:3-9. And those contracts between Kinder & Bryant Ltd. and Sunbow specifically provide that Plaintiff and Ford Kinder would receive the "writer's share" of the public performance royalties with respect to music written for Sunbow jointly, unless any of the music was composed with other composers and/or lyricists, in which case they would all received the "writer's share" of the royalties jointly. Rigby Aff., Ex. A at ¶ 5(c).

Plaintiff's Comparison of Royalty Statements and Her Participant Catalog Is Meaningless: Finally, Plaintiff contends that a "comparison of [her] early BMI royalty statements with later statements or catalog entries for re-uses of the same songs clearly reveals that plaintiff's share of royalties has been diminished." Pl. Opp. at 9. However, the comparison Plaintiff suggests is completely meaningless. All of the royalty statements which Plaintiff claims

---

[11] Plaintiff again misstates the record when she claims that Carole Weitzman testified that "composers of music receive one hundred percent of the writer's royalty from either BMI or ASCAP." Pl. Opp. at 8. Ms. Weitzman actually testified that with respect to the contracts that she worked on for Sunbow, "they" received 100% of the writer's share of such royalties, referring to not only the composer(s) but also the lyricist(s) who worked on the music. Phares Affirm., Ex. H at 45.

956814v1

show her entitled to 100% of the performance royalties report royalties for <u>jingles</u> only, not for

music used in the TV Shows. <u>See</u> Bryant S.J. Aff., Exs. D, I, K, M, R, and T (each reflecting on

either top right or top center that statement relates to "commercial jingles"). In contrast, all of

the cue sheets and the BMI catalog entries Plaintiff cites relate only to music used in TV Shows

or movies or in commercials after the mid- to late- 1990s. [12]  Smith Aff. ¶ 10; <u>see</u> Bryant S.J.

Aff., Ex. H (BMI Participant Catalog).

   For all of these reasons, Sunbow is entitled to summary judgment on Plaintiff's

re-registration claims.

**III. Plaintiff's Cross-Motion for Summary<br>  Judgment is Untimely and Fails as a Matter of Law**

  A. <u>Plaintiff's Cross-Motion is Untimely</u>

   At a June 13, 2003 compliance conference, this Court set a schedule, later

amended, requiring all motions for summary judgment to be filed no later than September 30,

2003. Phares Affirm., Ex. J. If Plaintiff intended to move for summary judgment, she was

required to do so by that date. Her failure to do so – especially on grounds that were known to

her as of that date – should preclude her late filing (and the Court's consideration) of a cross-

motion at this time.

---

[12] Plaintiff's contention that certain titles "disappeared entirely" from her BMI participant catalog
is similarly misguided. <u>E.g.</u>, Pl. Opp. at 15 (claiming "whole list of compositions" that Plaintiff
fails to identify were removed from her BMI participant catalog). These so-called disappearing
compositions are <u>jingles</u> relating to the Hasbro toys, not the music used in the TV Shows. <u>E.g.</u>,
Bryant Aff. ¶¶ 54-55 (claiming My Little Pony jingle registered to her 100% but then
disappeared from her BMI Participant Catalog), and therefore never appeared in Plaintiff's BMI
Participant Catalog in the first place.

956814v1

B.    Plaintiff Owns No Copyright in the Musical Compositions for the TV Shows and Is Not Entitled to Royalties for Distribution of Those TV Shows in Any Format.

If the Court is inclined to consider Plaintiff's untimely motion, we urge that it be denied because its legal basis conflicts with Plaintiff's deposition testimony and the terms of the agreements that Kinder & Bryant Ltd., Plaintiff, and Kinder signed regarding the TV Shows.

Plaintiff seeks summary judgment that she is entitled to mechanical and synchronization royalties from the distribution of the TV Shows in video and DVD format by Rhino Entertainment under license from Sunbow. She also seeks to impose a constructive trust on the royalties earned from Rhino Entertainment. The basis of her claim is that as the composer of the music in the TV Shows, she owns the copyright in that music and is entitled to exercise all the rights of a copyright owner. Because Plaintiff claims that Sunbow exercised some of those rights when it licensed Rhino Entertainment to reproduce and distribute the TV Shows on videotape and DVDs, she contends that she is entitled to the income from the exercise of those rights.[13]  Pl. Opp. at 34-36.

---

[13]    Although Plaintiff refers to "mechanical royalties" and "sync" (i.e., synchronization) licenses, Pl. Opp. at 34, neither is really involved in this case. The Copyright Act does not refer to "mechanical royalties" or "synchronization" or "sync" rights. The right to reproduce and distribute works is among the rights of a copyright owner.  17 U.S.C. § 106(1) and (3).  In the music industry, however, using jargon left over from the 1909 Act, "mechanical royalties" refer to the royalties earned from reproducing and distributing a nondramatic musical composition in sound recordings on phonorecords.  Woods v. Bourne Co., 60 F. 3d 978, 986 & n.3 (2d Cir. 1995); Bourne Co. v. MPL Comm., Inc., 675 F. Supp. 859, 863 n.5 (S.D.N.Y. 1987), modified 678 F. Supp. 70 (S.D.N.Y. 1988). By statutory definition, a sound recording does not include the sounds accompanying a motion picture or other audiovisual work, such as the TV Shows. 17 U.S.C. § 101 ("audiovisual work," "phonorecords," and "sound recordings"). This case does not involve the reproduction and distribution of sound recordings on phonorecords, so mechanical royalties are not involved here. The music and motion picture businesses use the term "synchronization rights" to refer to the right to reproduce and distribute musical compositions in "timed-relation" or synchronization with an audiovisual work. ABKCO Music, Inc. v. Stellar Records, Inc., 96 F. 3d 60, 63 & n.4 (2d Cir. 1996)(relying on Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 224.02 [f] (1995)). Rhino Entertainment was not licensed to create new audiovisual rights in "timed-relation" with the music from the TV Shows. It was licensed simply to reproduce and distribute copies of the existing TV Shows on videos and DVDs. Thus, synchronization rights are similarly not involved in this case.

Plaintiff's argument that she was a copyright owner and that that status entitles her to share in royalties earned from the Rhino Entertainment licenses founders (1) on Plaintiff's repeated testimony that she always created music as "work for hire," and as a result never owned the copyrights in her work, and (2) on the agreements Kinder & Bryant Ltd., Plaintiff, and Kinder entered into for the music in the TV Shows, which corroborate that Plaintiff's work was for hire, that Sunbow owed the copyright in the works, and that the limited publishing rights from which Plaintiff is entitled to receive royalties do not include reproduction and distribution of the TV Shows regardless of the format in which they were distributed. (Sunbow has already demonstrated in Section II, supra, that Plaintiff's negotiated right to performance royalties was properly registered with BMI and was never reduced.)

Plaintiff's Testimony. Plaintiff testified without reservation and repeatedly that "[work for hire has] always applied in my career[.] . . . I give up my copyright in exchange for a fee while also retaining my performance rights, royalties and any other outside royalties. That is the way work for hire works in the jingle business, it has worked for me for 30 years." Kitson Affirm., Ex. D at 42:18–43:7. She also confirmed that she was working on a work for hire basis "when [she] wrote the compositions at issue in this case." Id. at 43:23–44:2. Indeed, she testified that for the 2100 compositions – commercials and TV Shows and movies – that she wrote over a seven-year period working with Joe Bacal at GBI or Sunbow, "it was always work for hire." Id. at 109:6–110:2; see also id. at 49:5-16.

Kinder & Bryant Ltd.'s Contracts with Sunbow. Plaintiff's papers steadfastly ignore the Jem contract – even deny that there ever were any written agreements related to the musical compositions for the TV Shows. Pl. Opp. at 23. But Plaintiff testified that "Ford Kinder told me that there was a contract [relating to the music for the TV Shows]. I don't remember

20

ever signing a contract with them, but he was my partner and he said there was a contract at some point in our association with those people." Kitson Affirm, Ex. D 44:3 -9. Despite not recalling that she ever had seen the contracts relating to the music for the TV Shows, Plaintiff's recollection that she worked for hire in exchange for a flat fee and performance rights and some other royalties and that she did not own the copyright in the material she created for the TV Shows is corroborated by Sunbow's written agreements with Kinder & Bryant Ltd., Plaintiff, and Kinder for Jem. Rigby Aff., Ex. A.

   In the Jem agreement, Kinder & Bryant Ltd. warrants and agrees that "the Music [for the Show, Jem] was specifically ordered and commissioned by Company for use as part of and audiovisual work; and that the Work is a work made for hire within the meaning of Section 101 of the United States Copyright Act." Rigby Aff., Ex. A ¶ 5(a). Kinder & Bryant Ltd. further warranted and agreed that as a consequence of that commission all right title and interest in the Music vested automatically in Sunbow and that Sunbow would be the sole owner of the rights, including copyright, throughout the world forever. Id. Plaintiff and Kinder also personally signed accompanying documents in which they personally acknowledged the work for hire status of the music in the TV Shows and Sunbow's status as copyright owner.[14]

---

[14] Concurrent with the Jem agreement, Plaintiff and Ford Kinder personally signed a Certification of Authorship (also referred to as the Employment Agreement), Exhibit A to the agreement, in which they certified that they wrote the Music in the regular course of their employment with Kinder & Bryant and that Kinder & Bryant was specifically commissioned by Sunbow to furnish the services of Plaintiff and Kinder to deliver the music for Jem pursuant to the main agreement. The two also acknowledged that the Music was a work for hire within the meaning of the U.S. Copyright Act and that Sunbow is the author and owner of the Music and is entitled to the copyright in it. Rigby Aff., Ex. A ¶ 5(a) and Schedule A (p. 11). The agreement and the Certification of Authorship/Employment Agreement were accompanied by an Inducement Letter, signed by Plaintiff and Kinder, in which they made the following pertinent warranties and representations: that (1) Kinder & Bryant Ltd. had the right and authority to enter into the Jem agreement and to furnish the services of Plaintiff and Kinder, and (2) Plaintiff and Kinder were familiar with all the terms, covenants and conditions of the agreement and consented to the execution of the agreement, agreed to perform according to the agreement, and

Even without the acknowledgement by Kinder & Bryant Ltd., Plaintiff, and Kinder that the work for hire arrangement made Sunbow the copyright owner of the music in the TV Shows, the Copyright Act provides that "[i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title." 17 U.S.C. § 201(b). The statute further provides that "unless the parties have expressly agreed otherwise in a written instrument signed by them, [the person for whom the work was prepared] owns all of the rights comprised in the copyright." Id.

Ownership of all the rights in a copyright includes the right to receive royalties from the exercise of those rights. In other words, without a written agreement, neither Kinder & Bryant Ltd. nor Plaintiff, who did not own the copyright in any of the music created pursuant to its arrangement with Sunbow, would have been entitled to participate in any of the benefits of the copyright, including the public performance rights, because those rights are owned by the copyright owner. It is only because the parties entered into these written contracts that Plaintiff has been entitled all these years to receive those performance royalties.

However, as Plaintiff correctly recollects (Kitson Affirm., Ex. D at 43:3-6, 49:5-16), the Jem contract licensed to Kinder & Bryant Ltd. the "so-called 'writer's share'" in the non-dramatic performing rights in the music for the TV Shows. Rigby Aff., Ex. A ¶ 5(c). In addition to the performance royalties, the Jem contract granted Kinder & Bryant Ltd. the right to receive royalties from certain limited narrowly defined types of exploitation of the music, defined as the "music publishing rights." Id., Ex. A ¶ 6. But those music publishing rights do

---

confirmed the truthfulness of the warranties and representations that Kinder & Bryant Ltd. had made in the agreement. Rigby Aff., Ex. A, Inducement Letter (pp. 12-13).

22

not include the royalties flowing from the license to Rhino Entertainment to reproduce and distribute the TV Shows.

The limited music publishing rights granted to Kinder & Bryant Ltd., Plaintiff and Kinder include the right to receive royalties from Sunbow's licenses to manufacture commercial phonograph records and Sunbow's license of theatrical motion picture synchronization rights. Rigby Aff., Ex. A ¶ 6(a)(i). However, the "theatrical picture synchronization rights" are defined to be motion pictures exhibited in theaters and to exclude "motion pictures or other methods of recordation, whether now known or hereafter devised, which are produced primarily and initially for television broadcasting by any means whatsoever." Id. ¶ 6 (at p. 6).

The TV Shows were not motion pictures exhibited in theaters, and they were produced primarily and initially for television broadcasting. Thus, contrary to Plaintiff's claim, she is not entitled to any royalties – nor the imposition of a constructive trust – from the reproduction and distribution of the TV Shows, including the distribution by Rhino Entertainment or by any other entity that distributes videos or DVDs of the TV Shows. Her cross-motion should be denied because as a matter of law, she was not entitled to royalties from the reproduction and distribution of the TV Shows.

956814v1

## CONCLUSION

For the reasons set forth above and in Sunbow's opening brief, Sunbow respectfully requests this Court (1) to grant its motion for summary judgment on all counts of Plaintiff's Amended Complaint and to dismiss the Amended Complaint with prejudice; and, (2) if the Court considers Plaintiff's cross-motion for summary judgment, to deny it as time-barred.

Dated:      New York, New York
            December 4, 2003

Respectfully submitted,

PATTERSON, BELKNAP, WEBB & TYLER LLP

By: _____
       Gloria C. Phares
       Kathleen L. Jennings

1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

Attorneys for Defendant Sunbow Productions, Inc.

24