# EXHIBIT 34

55576-017

| SERIAL NO. | 77 | |
|---|---|---|
| SERVED | | |
| RECEIVED | | |
| FILED | | |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

———————————————————————x

ANNE BRYANT,

               Plaintiff,                   Index No. 5192/00

       - against -               Hon. Andrew P. O'Rourke

BROADCAST MUSIC, INC., (a/k/a "BMI"),
CLIFFORD A. "FORD" KINDER, KINDER & CO.,
LTD., VADIVOX, LTD., JULES M. "JOE"
BACAL, GRIFFIN BACAL, INC., STARWILD
MUSIC BMI, WILSTAR MUSIC ASCAP,
SUNBOW PRODUCTIONS, INC., and JOHN
AND JANE DOES 1-10,

               Defendants.

———————————————————————x
———————————————————————x

ANNE BRYANT,

               Plaintiff,                   Index No. 2821/02

       - against -               Hon. Andrew P. O'Rourke

SUNBOW PRODUCTIONS, INC.,

               Defendant.

———————————————————————x

## AFFIRMATION OF GLORIA C. PHARES
## IN SUPPORT OF DEFENDANT SUNBOW PRODUCTIONS,
## INC.'S MOTION FOR SUMMARY JUDGMENT

            I, GLORIA C. PHARES, hereby affirm under penalty of perjury:

            1.    I am an attorney duly admitted to practice before the courts of the State of

New York (1988) and the District of Columbia (1976). I am member of the firm of Patterson,

Belknap, Webb & Tyler LLP, attorneys for Defendant Sunbow Productions, Inc. ("Sunbow"). I

am familiar with the facts and circumstances set forth in this affirmation, and pursuant to CPLR

§ 3212, I respectfully submit it in support of Defendant Sunbow's September 30, 2003 motion for summary judgment in this case.

### Sunbow's Late Appearance in This Case

2.      Although this case was first filed in 2000, Sunbow was not aware of the case until it was properly served in April 2002.  Thus, Sunbow was not a party to this action when the first summary judgment motion of the individual Defendant Jules M. "Joe" Bacal ("Bacal") was briefed and filed.  Therefore, when this Court concluded that Plaintiff had had a fiduciary relationship with Bacal, Sunbow had had no opportunity to present evidence and argument that would have been relevant to the issue.  Due process requires that a party have a full and fair opportunity to contest a prior determination before the party can be bound by that determination.  Gilberg v. Barbieri, 53 N.Y.2d 285, 292, 441 N.Y.S.2d 49, 51 (1981).

### Sunbow's Response to Plaintiff's Latest Request for Documents

3.      When Plaintiff filed her Note of Issue in this case dated June 30, 2003, she ignored this Court's order that outstanding discovery be specifically listed in the Note and stated simply that "discovery is outstanding."  Then after that date, Plaintiff filed a Second Request for the Production of Documents and Things.  Defendants, including Sunbow, objected to having to respond to this late-filed discovery, especially as it would require the search of voluminous files for documents that had never before been requested.  However, during a telephone conference with the Court's Law Secretary, Defendants were directed to respond to Plaintiff's late-filed discovery, and Sunbow was directed to supplement its response to Plaintiff's First Request for the Production of Documents and Things.  Because Sunbow learned that compliance with the late-filed discovery would require the search of documents that were in Europe, the due date for Sunbow's response was extended to November 10.

956370v1

4.    Plaintiff's Second Request for the Production of Documents and Things sought agreements relating to her "relinquishment of royalties;" agreements relating to musical compositions that are the subject of this case; agreements between Plaintiff and Sunbow or any of its subsidiaries; agreements between Plaintiff and Starwild Music, Inc. or Wildstar Music, Inc.; agreements between Sunbow and Griffin Bacal, Inc., an advertising company; and any agreement that would "reflect upon" the status of Plaintiff's musical compositions as "work made for hire."

5.    On October 27, 2003, Sunbow served its Supplement Response to Plaintiff's First Requests for the Production of Documents, a true copy of which is attached to this affirmation as Exhibit A.

6.    On November 10, 2003, Sunbow served its Objections and Responses to Plaintiff's Interrogatories to Defendant Sunbow, a true copy of which is attached to this affirmation as Exhibit B. On that date, Sunbow also filed its Objections and Responses to Plaintiff's Second Demand for the Production of Documents and Things, a true copy of which is attached to this affirmation as Exhibit C.

7.    Also on November 10, 2003, Sunbow produced the following documents: (a) an unsigned copy of a June 1, 1985 contract between Kinder & Bryant Ltd. and Sunbow relating to the production of music for the TV series entitled "Jem"; (b) a March 3, 1986 letter from William M. Dobishinski, Kinder & Bryant Ltd.'s lawyer and a May 30, 1986 letter from Robert C. Harris, Sunbow's lawyer, relating to revisions to that contract and the contract for the TV series "My little Pony"; and (c) a February 9, 1986 transmittal letter from Mr. Dobishinski, Kinder & Bryant's lawyer, to Sunbow, with two attached copies (one red-lined) of an amendment to the June 1, 1985 Jem agreement. True and correct copies of these documents are attached to

3

the Affidavit of Neil R. Rigby ("Rigby Aff.") submitted with this reply brief as Exhibits A, D, E and F, respectively.

        8.      Sunbow had been acquired from Sony Music Entertainment in 2000, by TV-Loonland AG ("Loonland"), a German company. Rigby Aff. ¶ 2. In order to respond to Plaintiff's document request, we communicated with Neil Rigby, Loonland's Head of Legal and Business Affairs, about the nature of the document request and the location of documents that might be responsive to the request. He informed us that part of the documents related to Sunbow had been transported to Loonland's headquarters in Munich. Some remained in a warehouse in New York.

        9.      As Mr. Rigby recounts in his affidavit, he traveled from London to Munich, and with other Loonland employees, searched about 200 boxes of Sunbow documents. For a complete description of that search, see Rigby Aff. ¶¶ 7-10. The documents that Sunbow produced on November 10, 2003 were found during the search of the documents in Germany.

        10.      In the meantime, this firm undertook a search of the Sunbow documents that were still located in the New York warehouse. Using an index of the boxes of documents, we searched all those related to Hasbro, to any of the TV shows for which Plaintiff composed music: Transformers, G.I. Joe, Jem, My Little Pony, My Little Pony and Friends, Visionaries, and Inhumanoids Robotics ("TV Shows"), and the finance department records (because we had been told that contracts with creative people were maintained in that department). I searched all those boxes. Nearly all the boxes included materials related to the actual production of the TV Shows.

        11.      For three TV productions not involved in this case, "Charmkins," an animated children's special, "Glo Friends Save Christmas," another children's special, and "The Great Space Coasters," a children's television series, I discovered three-ring notebooks

4

containing all the contracts with performers, musicians and creative people (such as writers,

directors, composers, and lyricists) and companies providing production services. As it

appeared, Sunbow's practice was to maintain a separate notebook of such contracts for each of its

TV productions. We hoped to find comparable notebooks for the TV Shows, however, we did

not find them in New York, and Mr. Rigby and his crew did not find them in Munich. We have

concluded that these documents were among those that were destroyed when the basement

storage areas of Sunbow's offices, located at 380 Lexington Avenue (at 41/42 Sts.) in New York

City (Weitzman Dep. Tr. at p. 9, Exhibit H; Rigby Aff., Ex. A at 1) were flooded in 1991 when

a New York water main broke. A true copy of the text of an October 18, 1991 New York Times

article related to that water main break is attached to this affirmation as Exhibit D; see Ex. C at

¶ 3 of the General Objections.

        12.    The three notebooks relating to "Charmkins," "Glo Friends Save

Christmas," and "The Great Space Coaster" include agreements with composers of music and

lyricists. For example, they include: (a) January 12, 1983 agreements with Barry Harmon (and

his loan-out company, BHB Productions, Inc.) relating to the creation of lyrics for "Charmkins, "

true copies of which are attached to this affirmation as Exhibit E; (b) July 1, 1985 agreements

with Tommy Goodman (and his loan-out company) relating to the composing and arranging of

musical compositions for "Glo Friends Save Christmas" and supervising their orchestral

recording, true copies of which are attached to this affirmation as Exhibit F; and (c) a June 1,

1985 agreement with Barry Harmon relating to the creation of lyrics for the songs that Goodman

wrote for "Glo Friends Save Christmas," a true copy of which is attached to this affirmation as

Exhibit G.

        13.    The contracts identified in Paragraph 12 all bear striking similarities to the

Jem agreement between Sunbow and Kinder & Bryant Ltd. (Indeed, the Barry Harmon contract

5

for "Glo Friends Save Christmas," in addition to having the same date as the Jem agreement, is identical to it. See Exhibit G.) In all cases, as with the Jem agreement, the work created by the composer or lyricist is created on a work for hire basis, and Sunbow is the owner of all copyright rights in the works e.g., music, lyrics or, in the case of Mr. Goodman, who also delivered recordings of his music, sound recordings. In all the agreements, as in the Jem agreement, the writer/lyricist/arranger receives a flat fee for each composition and a license to receive the royalties from the public performances of the work. In each contract, the composer/lyricist/arranger also is granted the right to receive royalties from certain limited "musical publishing rights," not including the use with any motion pictures produced primarily and initially for television broadcasting by any means whatsoever. The July 1, 1985 agreement with Tommy Goodman (Exhibit F), dated only one month after the Kinder & Bryant, Ltd. Jem agreement, is nearly identical to the Jem agreement, with few variations (compare Ex. F ¶¶ 5(c), 10, 11 (final paragraph) and 12, with Rigby Aff., Ex. A, ¶¶ 5(c), 10, 11, and 13), and the January 12, 1983 agreement with Barry Harmon (and his loan-out company) (Exhibit E) shows minor variations from the Kinder & Bryant Ltd. Jem agreement (compare Ex. E, ¶¶ 10, 11 (final paragraph), and 12 with Rigby Aff., Ex. A, ¶¶ 5(c), 10, 11, and 13).

### Miscellaneous Matters

14.     Plaintiff deposed Carole Weitzman, the former Senior Vice-President of Production for Sunbow, on May 19, 2003. She testified that Sunbow's offices were located at 380 Lexington Avenue, New York, New York. A true copy of the transcript of that deposition is attached to this affirmation as Exhibit H.

15.     An advertisement from amazon.com for the sound recording "Cartoon's Greatest Hits" includes a play list for the sound recording. None of Plaintiff's compositions is

6

included on the recording. A true copy of a page from the amazon.com web site is attached as Exhibit I.

16. A true copy of the letter to the Court confirming the Court's order that all motions for summary judgment must be filed by September 30, 2003, is attached as Exhibit J.

Dated:  New York, New York
     December 4, 2003

                   Gloria C. Phares

7

**Exhibit A**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
————————————————————————x

ANNE BRYANT,

               Plaintiff,                      Index No. 5192/00

          - against -                  Hon. Andrew P. O'Rourke

BROADCAST MUSIC, INC., (a/k/a "BMI"),
CLIFFORD A. "FORD" KINDER, KINDER & CO.,
LTD., VADIVOX, LTD., JULES M. "JOE"
BACAL, GRIFFIN BACAL, INC., STARWILD
MUSIC BMI, WILSTAR MUSIC ASCAP,
SUNBOW PRODUCTIONS, INC., and JOHN
AND JANE DOES 1-10,

               Defendants.

————————————————————————x
————————————————————————x

ANNE BRYANT,

               Plaintiff,                      Index No. 2821/02

          - against -                  Hon. Andrew P. O'Rourke

SUNBOW PRODUCTIONS, INC.,

               Defendant.

————————————————————————x

### DEFENDANT SUNBOW PRODUCTIONS, INC.'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S FIRST REQUESTS FOR THE PRODUCTION OF DOCUMENTS

        As directed by the Court in a telephone conference on October 7, 2003, Defendant

Sunbow Productions, Inc. ("Sunbow") supplements its responses to Plaintiff's first requests to

Sunbow for the production of documents and things, which took the form of a trial subpoena.

**Request No. 1**: Records reflecting the following:

(a)    sales figures showing the number of units sold for any one and all consumer audio visual products, including, but not limited to Compact Discs (CD), DVDs, Video tapes (VHS) and Video Game Products which contain or use in whole or in part songs and musical themes (instrumental, vocal):

The Transformers (a.k.a. Robots in Disguise) 1985 to date
The Jem Show(s) (a.k.a. Truly Outrageous) 1986 to date
GI Joe (a.k.a. The Real American Hero
My Little Pony, 1994 to date
My Little Pony and Friend, (Funny Friends) 1994 to date
Inhumanoids, 1994 to date
Visionaries, 1994 to date
Robotix, 1994 to date

(b)    Any agreements including licenses related to the aforementioned products relied on by Sunbow;

(c)    Any Agreements including licenses related to the foregoing products issued by Sunbow to third parties, including, but not limited to Kid Rhino Home Video and Sunbow Entertainment.

**Response**: As previously explained in communications with plaintiff's counsel and the Court, Sunbow has not been able to locate any responsive documents in its own possession, custody or control. Nevertheless, in an effort to cooperate with plaintiff to the fullest extent possible, Sunbow voluntarily obtained and produced responsive documents in the possession, custody and control of two non-parties to this litigation, as detailed below:

(a)    Sunbow voluntarily obtained from Sony Wonder ("Sony"), Sunbow's former parent corporation and a non-party to this litigation, all documents responsive to this request that were in Sony's possession, custody and control and has already produced those documents to plaintiff. Sunbow also voluntarily contacted TV Loonland AG ("Loonland"), which acquired all of the assets of Sunbow in or around 2000 and is also a non-party to this litigation, to determine whether it had any documents responsive to this request. Loonland informed Sunbow that it did not have any such documents in its possession, custody or control.

2

948112v1

(b)      Sunbow voluntarily obtained from Loonland and already has produced to plaintiff copies of all license agreements that Loonland was able to locate relating to the television programs listed in Request No. 1(a). Sunbow also voluntarily contacted Sony to determine whether it had any such documents in its possession, custody or control. Sony informed Sunbow that at one time it had in its possession, custody and control a license agreement between Sunbow and Rhino Entertainment Company, d/b/a/ Rhino Home Video, relating to the television programs listed in Request No. 1(a), but that despite undertaking a diligent search for that agreement, Sony has not been able to locate it.

(c)      Sunbow refers plaintiff to its response to Request No. 1(b) above.

**Request No. 2:** Records of payments of mechanical royalties to any and all composers of music used in the aforementioned audio/visual products.

**Response:** Sunbow states that after conducting a diligent search, it has been unable to locate any documents responsive to this request in its possession, custody or control. Sunbow also voluntarily asked Sony and Loonland whether they had any documents responsive to this request in their possession, custody and control, and they responded that they did not. Sunbow further states that based on its discovery efforts to date, it does not believe that any such documents exist.

**Request No. 3:** Copies of several episodes of the GI Joe TV show produced by Andy Heyward's company "DIC" which used "original" GI Joe music Hey ward composed (as registered to his pseudonym "Monroe Michaels" via cue sheets in 1993).

**Response:** Sunbow responds that it already has produced to plaintiff copies of all GI Joe television episodes produced by DIC in Sunbow's possession, custody and control. Sunbow does not understand plaintiff to have any continuing objection to its production in

3

948112v1

response to this request.

Dated:      New York, New York
              October 27, 2003

                        Respectfully submitted,

                        PATTERSON, BELKNAP, WEBB & TYLER LLP

                        By:                                
                                  Gloria C. Phares
                                  Kathleen L. Jennings

                        1133 Avenue of the Americas
                        New York, New York 10036
                        (212) 336-2000

                        Attorneys for Defendant Sunbow Productions, Inc.

4

948112v1

**Exhibit B**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
————————————————————x

ANNE BRYANT,

              Plaintiff,                             Index No. 5192/00

           - against -                      Hon. Andrew P. O'Rourke

BROADCAST MUSIC, INC., (a/k/a "BMI"),
CLIFFORD A. "FORD" KINDER, KINDER & CO.,
LTD., VADIVOX, LTD., JULES M. "JOE"
BACAL, GRIFFIN BACAL, INC., STARWILD
MUSIC BMI, WILDSTAR MUSIC ASCAP,
SUNBOW PRODUCTIONS, INC., and JOHN
AND JANE DOES 1-10,

              Defendants.

————————————————————x
————————————————————x

ANNE BRYANT,

              Plaintiff,                             Index No. 2821/02

           - against -                      Hon. Andrew P. O'Rourke

SUNBOW PRODUCTIONS, INC.,

              Defendant.

————————————————————x

## DEFENDANT SUNBOW PRODUCTIONS, INC'S OBJECTIONS AND
## RESPONSES TO PLAINTIFF'S INTERROGATORIES TO DEFENDANT SUNBOW

       Defendant Sunbow Productions, Inc. ("Sunbow"), by its attorneys, Patterson,

Belknap, Webb & Tyler LLP, responds to Plaintiff's Interrogatories to Defendant Sunbow as

follows:

### GENERAL OBJECTIONS

      1.     Sunbow objects to the interrogatories to the extent they seek to impose obligations in addition to or different from those embodied in the New York Civil Practice Law and Rules (the "CPLR") or this Court's individual rules or orders.

      2.     Sunbow objects to the interrogatories on the ground that they were served after the close of discovery and in violation of the Court's specific instruction at the June 13, 2003 compliance conference that plaintiff identify by specific request in her note of issue any discovery requests that were still outstanding as of the date on which the note of issue was being filed.

      3.     Sunbow objects to the interrogatories on the ground that, in an attempt to support time-barred and baseless, badly articulated claims, plaintiff is forcing Sunbow to the burden of having to search for information regarding events that took place over twenty years ago, when operational employees and agents of Sunbow (such as lawyers) who might have had responsive information are either no longer available or cannot remember with reliable clarity events that occurred such a long time ago. This burden is exacerbated by the fact that Sunbow has changed ownership twice since these events took place and its corporate parent, TV Loonland AG, is currently located in Europe.

      4.     Sunbow objects to the interrogatories to the extent that they seek the disclosure of information outside of Sunbow's possession, custody or control.

      5.     Sunbow objects to the interrogatories to the extent that they seek the disclosure of any information that is subject to the attorney-client privilege or that compromises work-product. Such information will not be disclosed, nor will a response to any interrogatory be deemed a waiver as to any attorney-client privilege or work product objections.

      6.     All responses to plaintiff's interrogatories are made on an express reservation of the specific objections made below and subject to each of the General Objections. No response

2

conclusion that the agreement was executed. Sunbow believes that the executed copy of the

agreement was destroyed along with numerous other boxes of documents when the basement of

Sunbow's New York offices was flooded in 1991 or 1992 due to a water main break. Sunbow

believes that plaintiff entered into agreements with Sunbow with respect to the compositions she

wrote for the other television series at issue in this case that were identical to the Jem agreement

referenced above and to contemporaneous Sunbow music agreements for other television series.

        Interrogatory No. 3:    Have you ever received any synchronization fees relative to
any of the composition above described?

        Response:    Sunbow objects to this interrogatory on the grounds that it is vague

and ambiguous and seeks information that is neither relevant to the claims or defenses in this

litigation nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and

without waiving the foregoing objections and the General Objections, Sunbow states that it has

discovered nothing supporting the contention that it has received such fees.

        Interrogatory No. 4:    If your answer to the foregoing interrogatory is in the
affirmative:

        (a)    State the amount that you received in total.

        (b)    State the amount of each individual payment.

        (c)    Identify the dates on which you received these royalties.

        (d)    State the purpose for receiving these royalties.

        Response:    Not applicable.

        Interrogatory No. 5:    Identify each agreement upon which you will rely at trial in
defense of the claims against you.

        Response:    Sunbow objects to this interrogatory on the grounds that it is

premature and seeks information that is protected by the work product privilege. Sunbow will

identify the documents on which it will rely at trial at a time and in a manner consistent with the

CPLR and the Court's instructions in this case.

Interrogatory No. 6:   Have you ever received any license fees relative to any of the compositions above set forth other than those fees set forth in the foreign licenses you produced?

Response:     Sunbow objects to this interrogatory on the grounds that it is vague

and ambiguous and seeks information that is neither relevant to the claims or defenses in this

litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Sunbow also

objects to this interrogatory on the ground that it mischaracterizes the "foreign licenses" Sunbow

has previously produced, which relate to fees for the distribution of episodes of the television

programs listed in Interrogatory No. 1 or movies related thereto, not to any of the relevant

compositions themselves.  Subject to and without waiving the foregoing objections and the General

Objections, Sunbow states that it has discovered nothing indicating that it has received fees in

connection with the licensing of the compositions used in those television programs.

Interrogatory No. 7:   If your answer to the foregoing is in the affirmative, identify each such fee.

Response:     Not applicable.

Interrogatory No. 8:   Describe your efforts to obtain documents relevant to your response to plaintiff's previous document demand and identify each person involved in the production efforts.

Response:     Sunbow objects to this interrogatory on the ground that seeks

disclosure beyond the scope authorized by the CPLR.  Subject to and without waiving the foregoing

objections and the General Objections, Sunbow states that the Court directed in a telephone

conference on October 7, 2003 that Sunbow serve a supplemental response to plaintiff's previous

document demands explaining its efforts to locate documents in response to those demands.

Sunbow's response, which was served on October 27, 2003, contains information responsive to this

request and satisfies its obligation to provide the information requested by this interrogatory.

950815v2

Interrogatory No. 9:    Identify each witness that you will call at trial and give a brief statement of the general subject matter upon which each such witness will testify.

Response:    Sunbow objects to this interrogatory on the grounds that it is premature and seeks information that is protected by the work product privilege.  Sunbow will identify the witnesses that it will call at trial and any required information regarding those witnesses at a time and in a manner consistent with the CPLR and the Court's instructions in this case.

Interrogatory No. 10:  Identify each document you will offer as a trial exhibit.

Response:    Sunbow objects to this interrogatory on the grounds that it is premature and seeks information that is protected by the work product privilege.  Sunbow will identify the documents it will offer as trial exhibits at a time and in a manner consistent with the CPLR and the Court's instructions in this case.

Dated:        New York, New York
              November 10, 2003

                              Respectfully submitted,

                              PATTERSON, BELKNAP, WEBB & TYLER LLP

                              By: _____
                                  Gloria C. Phares
                                  Kathleen L. Jennings

                              1133 Avenue of the Americas
                              New York, New York 10036
                              (212) 336-2000

                              Attorneys for Defendant Sunbow Productions, Inc.

6

Exhibit C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
————————————————————————X

ANNE BRYANT,

           Plaintiff,    .                    Index No. 5192/00

          - against -                  Hon. Andrew P. O'Rourke

BROADCAST MUSIC, INC., (a/k/a "BMI"),
CLIFFORD A. "FORD" KINDER, KINDER & CO.,
LTD., VADIVOX, LTD., JULES M. "JOE"
BACAL, GRIFFIN BACAL, INC., STARWILD
MUSIC BMI, WILDSTAR MUSIC ASCAP,
SUNBOW PRODUCTIONS, INC., and JOHN
AND JANE DOES 1-10,

           Defendants.

————————————————————————X
————————————————————————X

ANNE BRYANT,

           Plaintiff,                    Index No. 2821/02

          - against -                  Hon. Andrew P. O'Rourke

SUNBOW PRODUCTIONS, INC.,

           Defendant.

————————————————————————X

### DEFENDANT SUNBOW PRODUCTIONS, INC'S
### OBJECTIONS AND RESPONSES TO PLAINTIFF'S SECOND
### DEMAND FOR THE PRODUCTION OF DOCUMENTS AND THINGS

        Defendant Sunbow Productions, Inc. ("Sunbow"), by its attorneys, Patterson,

Belknap, Webb & Tyler LLP, responds to Plaintiff's Second Demand for the Production of

Documents and Things to Defendant Sunbow Productions, Inc. as follows:

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

————————————————————————x

ANNE BRYANT,

     Plaintiff,        Index No. 5192/00

     - against -       Hon. Andrew P. O'Rourke

BROADCAST MUSIC, INC., (a/k/a "BMI"),
CLIFFORD A. "FORD" KINDER, KINDER & CO.,
LTD., VADIVOX, LTD., JULES M. "JOE"
BACAL, GRIFFIN BACAL, INC., STARWILD
MUSIC BMI, WILDSTAR MUSIC ASCAP,
SUNBOW PRODUCTIONS, INC., and JOHN
AND JANE DOES 1-10,

     Defendants.

————————————————————————x
————————————————————————x

ANNE BRYANT,

     Plaintiff,        Index No. 2821/02

     - against -       Hon. Andrew P. O'Rourke

SUNBOW PRODUCTIONS, INC.,

     Defendant.

————————————————————————x

### DEFENDANT SUNBOW PRODUCTIONS, INC'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S SECOND DEMAND FOR THE PRODUCTION OF DOCUMENTS AND THINGS

    Defendant Sunbow Productions, Inc. ("Sunbow"), by its attorneys, Patterson,

Belknap, Webb & Tyler LLP, responds to Plaintiff's Second Demand for the Production of

Documents and Things to Defendant Sunbow Productions, Inc. as follows:

## GENERAL OBJECTIONS

1.      Sunbow objects to plaintiff's demands for documents and things to the extent they seek to impose obligations in addition to or different from those embodied in the New York Civil Practice Law and Rules (the "CPLR") or this Court's individual rules or orders.

2.      Sunbow objects to the demands for documents and things on the ground that they were served after the close of discovery and in violation of the Court's specific instruction at the June 13, 2003 compliance conference that plaintiff identify by specific request in her note of issue any discovery requests that were still outstanding as of the date on which the note of issue was being filed.

3.      Sunbow objects to the demands for documents and things on the ground that, in an attempt to support time-barred and baseless, badly articulated claims, plaintiff is forcing Sunbow to the burden of having to look for documents that were created, if they exist at all, nearly 20 years ago.  This burden is exacerbated by the fact that:  (a) Sunbow has changed ownership twice since those documents were created, which has resulted in the disruption of Sunbow's files; (b) many of Sunbow's files, including, as we now believe, many related to the television series at issue in this case, were ruined and destroyed because of a 1990 or 1991 water main break that flooded the basement storage area of Sunbow's New York offices; and (c) many of Sunbow's files currently are located in Europe under the custody and control of its current corporate parent, TV Loonland AG.

4.      Sunbow objects to the demands for documents and things to the extent that they seek the disclosure of information or materials outside of Sunbow's possession, custody or control.

5.      Sunbow objects to the demands for documents and things to the extent that they seek the disclosure of any information or material that is subject to the attorney-client privilege or that compromises work-product.  Such information or material will not be disclosed, nor will a

response to any demand for documents and things be deemed a waiver as to any attorney-client privilege or work product objections.

      6.    All responses to the demands for documents and things are made on an express reservation of the specific objections made below and subject to each of the General Objections. No response should be deemed, and specifically is stated not to be, a waiver of these objections, whether or not specifically referred to in any specific response.

      7.    Sunbow responds to the demands for documents and things on the basis of its present understanding and without prejudice to its right to obtain and present at trial or in pretrial proceedings such additional information or materials as may be acquired in this action. Sunbow also expressly reserves the right to amend or supplement any and all of its responses at any time.

### SPECIFIC OBJECTIONS AND RESPONSES

    <u>Request No. 1:</u>    Any and all agreements relating to Ann Bryant's purported relinquishment of royalties of any type, including but not limited to performance royalties, mechanical royalties and/or synchronization fees for any of the musical compositions or songs "G.I. Joe," "Transformers," "Jem," "My Little Pony" and/or "Visionaries."

    <u>Response:</u>    Sunbow objects to this request on the grounds that it is overly broad and seeks information that is neither relevant to the claims or defenses in this litigation nor reasonably calculated to lead to the discovery of admissible evidence. Sunbow further objects to this request for the reasons described in General Objection No. 3 above. Subject to and without waiving the foregoing objections and the General Objections, Sunbow is producing all agreements that it has located between it and plaintiff relating to the copyright ownership of the compositions she wrote for the television series listed in this request and any royalties payable to plaintiff in connection therewith.

Request No. 2:    Copies of every agreement relevant to the issues in the case upon which defendant, Sunbow Productions, Inc. will rely upon at trial.

Response:    Sunbow objects to this interrogatory on the grounds that it is premature and seeks information that is protected by the work product privilege. Sunbow will identify the documents on which it will rely at trial at a time and in a manner consistent with the CPLR and the Court's instructions in this case.

Request No. 3:    Every agreement which defendant Sunbow Productions, Inc. and/or any of its subsidiary companies and/or any companies owned by defendant Sunbow Productions, Inc. entered into with plaintiff Anne Bryant.

Response:    Sunbow objects to this request on the grounds that it is overly broad and seeks information that is neither relevant to the claims or defenses in this litigation nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections and the General Objections, Sunbow is producing all agreements that it has located between it and plaintiff.

Request No. 4:    Every agreement which Starwild Music, Inc. entered into with plaintiff Anne Bryant.

Response:    Sunbow objects to this request on the grounds that it is overly broad and seeks information that is neither relevant to the claims or defenses in this litigation nor reasonably calculated to lead to the discovery of admissible evidence and because it is a burdensome fishing expedition inasmuch as plaintiff has never contended that she entered into any agreements with Starwild Music, Inc. Subject to and without waiving the foregoing objections and the General Objections, Sunbow states that it has not located any documents that are responsive to this request.

Request No. 5:     Every agreement which defendant Sunbow Productions, Inc. and/or any of its subsidiary companies and/or any companies owned by defendant Sunbow Productions, Inc. entered into with Griffin Bacal, Inc.

Response:     Sunbow objects to this request on the grounds that it is overly broad and seeks information that is neither relevant to the claims or defenses in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving the foregoing objections and the General Objections, Sunbow states that it has not located any documents that are responsive to this request.

Request No. 6:     Any agreement which would reflect upon the status of Anne Bryant's compositions as "works made for hire," as defined by the United States Copyright Act, 17 U.S.C. § 101.

Response:     Sunbow objects to this request on the grounds that it is a fishing expedition in that it seeks documents that are not relevant to any of the claims that plaintiff has raised in her complaint or in her deposition, during which she conceded that her services for Sunbow were work made for hire.  Subject to and without waiving the foregoing objections and the General Objections, Sunbow is producing all documents that it has located that are responsive to this request.

Dated:     New York, New York
            November 10, 2003

                    Respectfully submitted,

                    PATTERSON, BELKNAP, WEBB & TYLER LLP

                    By: _____
                        Gloria C. Phares
                        Kathleen L. Jennings

                    1133 Avenue of the Americas
                    New York, New York 10036
                    (212) 336-2000

                    Attorneys for Defendant Sunbow Productions, Inc.

950754v1

Exhibit D

3 of 250 DOCUMENTS

Copyright 1991 The New York Times Company
The New York Times

October 18, 1991, Friday, Late Edition - Final

SECTION: Section B; Page 5; Column 1; Metropolitan Desk

LENGTH: 734 words

**HEADLINE: THE WATER MAIN BREAK;**
Around Grand Central, Nothing Ran but Water

BYLINE: By SETH FAISON Jr.

BODY:

One of New York City's busiest spots -- the crowded, hectic blocks around Grand Central Terminal -- was plunged into waterlogged chaos yesterday as the flood from the 42d Street **water main break** left it a nightmare of traffic jams and impassable streets.

For the office worker, it resembled a battle zone.

Forced on lengthy detours by disjointed police lines that were splayed through the area, pedestrians often found themselves caught between streams of water too broad to jump over. Drivers were led from one hopelessly blocked street to the next. Buses, where found, moved slowly. Businesses were forced to close. And to make it worse, there was rain.

Too Little **Water?**

Beyond the thorny obstacles for tens of thousands of commuters, there were other headaches after arrival at the office. An acute shortage of **water** was one of them.

At the center of yesterday's disaster was a pair of unplanned fountains, slits in the asphalt at the middle of 42d Street between Park and Lexington Avenues from which gushed small but hard streams of brown-tinted **water**. The street, buckled and misshapen by the overnight accident of excessive **water** pressure, was an unusual, mesmerizing sight for those who paused to stare.

"It's a disaster area," said Bill Tyler, an insurance executive who ventured to the glassed-in lobby of the Grand Hyatt Hotel for a panoramic view of the scene. "I can't remember ever seeing 42d Street like this."

Beneath the chaos on the street, underground electricity lines were threatened and the **water** supply was interrupted. To get to and repair the aging **water** main that burst before dawn yesterday, city workers had to shut off the entire water supply for a 20-block chunk of midtown, leading to closed stores that were without backup supply.

Wide Area Affected

Joe Conway, Director of the Bureau of Water Supply in the Department of Environmental Protection, said the area directly affected by the **water** cut-off stretched from 36th Street on the south side to 44th Street on the north, between Third and Park Avenues. Yet buildings beyond that area, he said, could be also affected by water discoloration or other problems.

"On a scale of 1 to 10, this is about a 7 or 8," said Mr. Conway. "With 10 being the worst, of course."

For restaurants and hotels, the problem of waterlessness was not merely an inconvenience.

The Hotel Bedford, at 118 East 40th Street, was without water beginning at 8:30 A.M., an hour when many guests were still rising. With many asking when they could have a shower or working toilet, the hotel manager, Hy Arbesseld, was frustrated at his inability to find a city official who could tell him when the water might return. He expected his guests to find other lodgings, he said, if the situation did not change.

Try a Bottled Drink

At Au Bon Pain, on Lexington Avenue at 41st Street, Fu Pong-pong, a server, was embarrassed to say no coffee was available and urged a customer to try a bottled drink instead. "There's no water. What can we do?"

Anger flared openly at times.

"I hate you!" yelled Sara Bernstein at a man whom she raced in vain for a rare taxi at the peak of an early afternoon downpour. Ms. Berstein felt she had grabbed the passenger door on her side of the cab a split second before the man, but he would not give way.

Yet the imperviousness for which New Yorkers are well known was also evident yesterday. Many pedestrians slogged through ankle-deep puddles as though it were an everyday event. A cyclist rode over a makeshift footbridge on 42d Street with ease.

Some were thankful for small mercies. "The good thing is that it's not summer," said Helen Manasian, an East 50's resident, who treated herself to a sponge bath after buying three gallons of bottled water.

A number of food and clothing stores in the area closed for the day, and others threatened to do so as well if the water did not return.

"My refrigerators are water cooled," said Matthew Azimi, the owner of Cafe Lex, a delicatessen-restaurant at 360 Lexington Avenue. With his water supply down to a slow trickle by early afternoon, Mr. Azimi expected to close after lunch.

Jan Van Eck, an amateur photographer who works in the area, braved the morning rain to take some shots of the water bursting from the middle of 42d Street.

"I've been doing a series on waterfalls in the city," he said. "This may fit in."

LOAD-DATE: October 18, 1991

Exhibit E

Dated as of January 12, 1983

BHB PRODUCTIONS, INC.
35 West 92nd Street
New York, New York  10025

Re:  Lending Agreement/CHARMKINS

Gentlemen:

    This will confirm the agreement between you and the
undersigned with respect to your loanout of the services
of Barry Harman to the undersigned as follows:

    1.   Reference is hereby made to that certain
Agreement (hereinafter referred to as the "Employment Agree-
ment"), of even date herewith, by and between the undersigned
and Barry Harman (hereinafter the "Employee") relating to the
services of Employee as designated therein in connection with
the fully animated children's special presently entitled
"CHARMKINS".  A copy of said Employment Agreement is attached
hereto, marked Exhibit "A" and is by this reference made a
part hereof.  Notwithstanding the fact that said Employment
Agreement is drafted in the form of an agreement between the
undersigned and Employee in Employee's individual capacity,
it is understood that we are engaging you to furnish to us
the services of Employee and to grant to us the rights
stated as granted to us by Employee under the Employment
Agreement in accordance with and subject to each and all of
the terms and conditions set forth therein, which terms and
conditions are by this reference incorporated herein as
though expressly set forth in full.  You hereby agree to
furnish said services and grant said rights and to cause
Employee to comply with all of the terms and conditions of
said Employment Agreement.  You, in your own behalf, hereby
represent, warrant and agree to all matters and things which
Employee has represented, warranted and agreed to under the
Employment Agreement, and in your own behalf hereby acknow-
ledge all matters and things which Employee has acknowledged
under the terms and provisions of the Employment Agreement.
The undersigned shall have all rights in and to Employee's
services and the results and proceeds thereof, and any and
all other rights and remedies provided for under the terms
and provisions of the Employment Agreement, all to the same
extent as if the undersigned had employed Employee directly
under said Employment Agreement.  Without in any way limiting
the generality of the foregoing, you warrant, represent and

agree that Employee's services and the results and pro-
ceeds thereof and all material written or composed by
Employee pursuant to the terms and provisions of the Employ-
ment Agreement are a work made for hire within the meaning
of Section 101 of the United States Copyright Act specially
ordered or commissioned by us for use as a part of an audio-
visual work and that all right, title and interest therein
shall upon the rendition of creation thereof vest in us,
and that we shall be the exclusive owner thereof and of
the copyright therein, as copyright author and proprietor.

2.    On condition that you and Employee keep and
perform every material term and condition on your respective
parts to be kept and performed by each of you under this
Agreement and under the Employment Agreement and neither you
nor Employee is in default or otherwise in breach under said
Agreements, the undersigned shall pay to you, and not to
Employee, as full and complete consideration for all ser-
vices to be rendered and all rights now or hereafter granted
by you and/or Employee under said Agreements, all compensa-
tion payable to Employee under the Employment Agreement.  Sub-
ject to the foregoing provision regarding to whom Employee's
share of the compensation arising under the Employment Agree-
ment shall be payable, such compensation shall be otherwise
payable as provided in said Employment Agreement.  You hereby
agree to make or cause to be made when due all payments of
compensation which may be required to be remitted to Employee,
as well as any and all payments of taxes and/or other contri-
butions which have arisen or may arise out of the services
to be rendered by Employee hereunder, and to indemnify and
hold the undersigned and the undersigned's licensees,
successors and assigns harmless with respect to the making
of any and all such payments.  Upon presentation to the
undersigned of satisfactory evidence of payment by you,
the undersigned shall reimburse you for all sums actually
paid by you to any applicable guild, union or other collec-
tive bargaining unit pension and health and welfare funds
arising out of the undersigned's use of Employee's services
pursuant hereto; provided, however, that in no event shall
such reimbursement exceed the extent to which the undersigned
would have been required to make the particular payment or
payments had the undersigned employed said Employee directly.

3.    You hereby represent, warrant and agree that
you are a duly organized and existing corporation and are pre-
sently in good standing under the laws of the State of your
incorporation; that you have or shall be deemed to have a
valid, binding and subsistent written employment agreement
with Employee pursuant to which Employee is obligated to

render Employee's services exclusively for you for at least the full term of the Employment Agreement and that you are exclusively entitled to all services of Employee which are or will be required to be performed by Employee hereunder, and that you are exclusively entitled to and control all rights in and to all results and proceeds of Employee's services which are granted or are to be granted hereunder; that you are free to enter into this Agreement to furnish to us the services of Employee upon the terms and conditions set forth herein, to make the representations and warranties contained herein, and to grant the rights granted herein; that you are not subject to any obligation or disability which will or might prevent or interfere with the full completion and performance by you of all of the obligations and conditions to be kept or performed by you hereunder; that you have not made and will not make any grant or assignment which will or might conflict with or impair the complete enjoyment of the rights and privileges granted to the undersigned hereunder.

You further warrant that you are or will become during the term of the Employment Agreement a signatory in good standing to any collective bargaining agreement between us and any union or guild having jurisdiction over the services of Employee.

4.    If you or your successors-in-interest should be dissolved or otherwise cease to exist or for any reason whatsoever fail, be unable, neglect or refuse to perform, observe or comply with any or all of the terms and conditions of this Agreement, Employee may, at our election, be deemed to be employed directly by us for the balance of the term of the Employment Agreement upon the terms and conditions set forth therein.  In the event of a breach or treatened breach of this Agreement or the Employment Agreement by you or by Employee, we shall be entitled to legal, equitable and other relief against you and/or against Employee in our discretion.  We shall have all rights and remedies against Employee which we would have if Employee were directly employed by us under the Employment Agreement. We shall not be required to first resort to or exhaust any rights or remedies which we may have against you before exercising our rights and remedies against Employee.

5.    You shall have the benefit of all agreements, representations and warranties made by the undersigned to Employee under the Employment Agreement; provided, however, that you shall not thereby receive any rights hereunder greater than or in excess of those which Employee would have received had the undersigned employed Employee directly.

6.    This Agreement shall be deemd to have been made in the State of New York and shall be construed and enforced in accordance with the internal law of the State of New York applicable to contracts negotiated, executed and wholly performed within said State.   You consent to the jurisdiction of the courts of the State of New York, and the United States courts located in New York, in connection with any lawsuit, action or proceeding arising out of or relating to this Agreement or the Employment Agreement.

7.    Service of all notices, demands or instruments relating to this Agreement, the Employment Agreement or either of them, or to the rendition of the services of Employee, which the undersigned is required or may desire to serve upon you shall be deemed effective by delivery to you or Employee in the manner provided in care of the address set forth under the notice provisions of the Employment Agreement.

Very truly yours,

SUNBOW PRODUCTIONS, INC.

By: _____

ACCEPTED AND AGREED TO:

BHB PRODUCTIONS, INC.

By: _____

INDUCEMENT LETTER

Dated as of January 12, 1983

Sunbow Productions, Inc.
122 East 42nd Street
Suite 1105
New York, New York  10168

Re:  Sunbow Productions, Inc. With
BHB Productions, Inc./CHARMKINS

Gentlemen:

Reference is made to that certain agreement dated as
of January 12, 1983 (herein called the "Agreement") between
BHB PRODUCTIONS, INC. (herein called "Contractor") and you,
which, among other things, makes available the services of
the undersigned by Contractor to you for the purposes set
forth in said Agreement.

As an inducement to you to enter into the Agreement and
as a material part of the consideration moving to you for
so doing, the undersigned hereby represents, warrants and
agrees as follows:

1.    That the undersigned has heretofore entered
into an agreement (herein called the "Employment Agreement")
with Contractor covering the rendition of the undersigned's
services for Contractor and that Contractor has the right
and authority to enter into the Agreement and to furnish the
rights and services of the undersigned upon the terms and
conditions therein specified.

2.    That the undersigned is familiar with each
and all of the terms, covenants and conditions of the
Agreement and hereby consents to the execution thereof; that
the undersigned shall perform and comply with all of the
terms, covenants and conditions of the Agreement on the part
of the undersigned to be performed and complied with, even
if the Employment Agreement should hereafter be terminated
or suspended; that the representations and warranties of
Contractor contained in the Agreement are true; that the
undersigned shall render all of the services provided for
under the Agreement and hereby confirms that there have
been granted to Contractor all of the rights granted by
Contractor to you under the Agreement; that all notices
served upon Contractor in accordance with the Agreement
shall be deemed notices to the undersigned of the contents
thereof.

3.    That the undersigned is under no obligation or disability by law or otherwise which would prevent or restrict the undersigned from performing and complying with all of the terms, covenants and conditions of the Agreement on the part of the undersigned to be performed or complied with.

4.    That, except in the event that the under-signed is deemed substituted for Contractor as a direct party to the Agreement, pursuant to Paragraph 6 hereof, the undersigned will look solely to Contractor and not to you for all compensation and other remuneration for any and all services and rights which the undersigned may render and/or grant under the Agreement.

5.    That you shall be entitled to equitable relief against the undersigned by injunction or otherwise to restrain, enjoin and/or prevent the violation or breach by the under-signed of any obligation of the undersigned to be performed as provided in the Agreement and/or the violation or breach by the undersigned of any obligations or agreements under this present instrument.

6.    That if Contractor should be dissolved or should otherwise cease to exist or for any reason whatsoever should failr, be unable, neglect or refuse to perform and observe each and all of the conditions of the Agreement re-quiring performance or compliance on its part, the undersigned shall at your election be deemed substituted as a direct party to the Agreement in the place and stead of Contractor and, further, that in the event of a breach or threatened breach of the Agreement by Contractor or by the undersigned you shall be entitled to legal and equitable relief by way of injunction or otherwise against Contractor or against the undersigned or both of us in your discretion in any event without the necessity of first resorting to or exhausting any rights or remedies which you may have against Contractor; all of the foregoing to be to the same extent and with the same force and effect as if the undersigned were a direct party to the Agree-ment in the first instance and as if in the Agreement the undersigned had personally agreed to render the services therein provided to be rendered by the undersigned and to perform and observe each and all of the terms and conditions of the Agreement requiring performance or compliance on the part of Contractor or the undersigned or both of us.

Very truly yours,

_Barry Harman_

Barry Harman

-2-

AGREEMENT made as of this 12th day of January, 1983, by and between SUNBOW PRODUCTIONS, INC. ("Company") and BARRY HARMAN ("Writer").

In consideration of the mutual convenants herein contained, the parties hereto have agreed and do agree as follows:

1.    Writer has written, prepared and delivered to Company certain original literary material (hereinafter referred to as the "lyrics"), more particularly described as follows (it being understood that the mention of any program or program series in said description is for purposes of identification only and shall in no way restrict Company's rights in the lyrics, and the use thereof, as set forth in this agreement):

Lyrics for the songs listed on Schedule "A" attached hereto for a fully-animated children's television special presently entitled "CHARMKINS".

2.    (a)  For all rights herein granted to Company, and for performance by Writer of all obligations hereunder, Company shall pay Writer a total fee of Two Thousand Five Hundred ($2,500.00) Dollars, payable within thirty (30) days after the delivery of the lyrics or the complete execution of this agreement, whichever is later.  Payment by a parent or affiliate of Company shall be deemed to constitute payment by Company hereunder.

(b)  Nothing herein contained shall be deemed to impose any obligation on Company to use or authorize the use of the lyrics, and Company shall have fully discharged its obligations to Writer hereunder by payment to Writer of the amount specified in subparagraph (a) of this paragraph 2.

3.    Writer shall deliver one (1) copy of the lyrics to Company as Company may designate.

4.    It is understood and agreed that Writer may write the lyrics at such times and places as Writer may choose, subject only to Writer's obligation to make timely delivery of the lyrics in accordance with the terms of this

agreement.

5.    (a)  Writer warrants, acknowledges and agrees
that the lyrics were specially ordered or commissioned by
Company for use as a part of an audiovisual work and that
same are a work made for hire within the meaning of Section
101 of the United States Copyright Act.  Upon writing of the
lyrics, as aforesaid, all right, title and interest therein
shall automatically vest in Company, and Company shall be
the sole and unlimited owner thereof and of all rights
therein throughout the world forever, and Company shall be
entitled to copyright therein, including statutory copyright
and all renewals thereof, as copyright author and
proprietor.  Company may freely assign and grant rights and
licenses with respect to the lyrics and any copyright
therein (including any renewals thereof), and in this
connection Writer agrees to, execute and deliver to Company
any and all instruments required by Company in connection
with the use and enjoyment of the lyrics and of Company's
rights therein and thereto and Writer hereby appoints
Company as Writer's attorney-in-fact with the right but not
the obligation to execute any such instruments in Writer's
name on Company's behalf.

(b)  Without in any way limiting the
generality of the foregoing, it is agreed that Company shall
have the exclusive right and may license others to use,
adapt, arrange, change, add to, or subtract from the lyrics
and to combine the same with other literary material and/or
music and to publish, record, produce, reproduce, transmit,
perform, broadcast, telecast, and/or otherwise communicate
the same or any version or versions thereof by any means
(including, but not limited to, in synchronization with
motion pictures, television and/or any other form of
recordation or reproduction of sight and/or sound), whether
now known or hereafter devised, publicly for profit or
otherwise, it being understood that Writer hereby waives any
so-called "moral rights" which may now be or may hereafter
be recognized.  It is understood and agreed that Writer
shall have no right, title or interest in any such other
literary material and/or music which may be combined with
the lyrics.  Without limiting the foregoing, Writer
acknowledges that Company has employed the composer(s)
listed on Schedule "A" attached hereto to write music for
the songs described in paragraph 1 hereof.

2

(c)  During any period or periods of time during which Writer is affiliated with any small performing rights society (herein called the "Society"), Company shall and does hereby, under and pursuant to this paragraph, license back to Writer a non-exclusive undivided one-half interest (but, if the lyrics or any form thereof are the composition of Writer and other lyricists and/or composers, then the grant hereunder shall be deemed a grant of an undivided one-half interest to Writer and all other such lyricists and/or composers jointly) in the non-dramatic (i.e., "small") performing rights in the lyrics (but only when the lyrics are combined with music) so as to enable Writer to license such non-dramatic performing rights to Society, and to collect the Writer's share of royalties derived therefrom, it being understood, in this connection, that Company (or any assignee or licensee of all or any of Company's rights under this agreement) shall not exercise such non-dramatic performing rights during such period or periods without obtaining a license therefor from Society, except that Company and/or any such assignee or licensee, may exercise such non-dramatic performing rights in the lyrics by reason of, under and pursuant to this agreement,

(i)  during any period or periods during which such non-dramatic performing rights are not controlled by and/or available for license to Company or any such assignee or licensee at standard rates from Society, or in the case of public perform-ances of the lyrics in geographical areas outside of Society's jurisdiction, from any other organization or society which is affiliated with Society or which has a collection agreement with Society and which controls the non-dramatic performing rights in any geographical area in which the lyrics are to be performed; and/or

(ii)  in connection with theatrical exhibitions in the United States, its territories and possessions; and/or

(iii)  in connection with any

3

performance of the lyrics within the United
States, its territories and possessions,
which is not a public performance;

it being understood that Company (and/or any such assignee
or licensee) shall have no obligation to pay any royalties
or other sums to Writer, Society, or any successor to the
rights of either with respect to non-dramatic performances
of the lyrics made pursuant to subclauses (i) through (iii)
hereof. If Company makes or authorizes any non-dramatic
performances of the lyrics under and pursuant to this
agreement, and if Writer shall assert any claim that any
such performance violates any rights of Writer, then (A)
under no circumstances shall Writer have the right to take
any action or initiate any proceeding with respect to such
claim which would have the effect of enjoining and/or
preventing and/or otherwise interfering with any said
non-dramatic performances, it being agreed that any such
action or proceeding shall be limited to an action at law
for damages; and (B) if Writer shall assert such a claim
pertaining to a non-dramatic performance of the lyrics made
by any assignee or licensee of Company, then any action
taken or proceeding brought by Writer shall be limited to an
action at law for damages against such assignee or licensee
exclusively. The foregoing references to Society shall not
be construed as giving Society any independent right to take
any action or initiate any proceeding with respect to any
such claim.

(d) Without limiting the generality of any
rights granted under this agreement, and notwithstanding any
license hereunder to Writer pursuant to subparagraph (c)
above, Writer expressly acknowledges that Company, its
successors, assigns and/or licensees shall have the right to
collect the publisher's share of performance royalties
becoming due and payable hereunder from any small performing
rights society by reason of performances of the lyrics
combined with music, it being expressly agreed that Writer
shall not be entitled to any share of such monies which are
distributed to Company, its successors, assigns, and/or
licensees by any small performing rights society. Writer
shall be entitled to collect the writer's share of any such
royalties with respect to the lyrics jointly with any other
lyricists and/or composers of such lyrics. The terms
"publisher's share" and "writer's share" as used in this

4

agreement have the same meaning here as is commonly
understood in the music publishing and motion picture and
television industries. Company may represent to any
domestic or foreign performing rights society or similar
organization requiring an acknowledgement of the type made
by Writer herein that Writer has acknowledged Company's
right to collect and retain the publisher's share of
royalties; further, if any such society or organization
requires written authorization from Writer in order to make
payments of the publisher's share of royalties to Company,
Writer shall promptly execute and deliver such authoriza-
tion. If any such society or organization makes payment to
Writer of all royalties (i.e., both writer's and publisher's
share) with respect to any performance to Writer, Writer
shall promptly remit one-half such royalty to Company.

      6.   Further, in the exercise of its rights
hereunder and without in any way limiting the generality of
the foregoing, Company shall have, as owner and copyright
proprietor of the lyrics, the complete control of the
publication of the lyrics and of all rights incident
thereto, including, but not limited to, the right to license
the manufacture of phonograph records and other recordings
of the lyrics and the right to license motion picture
synchronization rights (all of which rights are herein
sometimes collectively called "music publishing rights").
Without limiting the generality of the foregoing, it is
agreed that Company may assign or license any or all such
music publishing rights and/or any or all other rights
granted to Company under this agreement to any music
publishing company or production company which is a parent
or subsidiary of Company or otherwise affiliated with
Company or to any other third party.

      (a)  With respect to Company's exercise of
music publishing rights in the lyrics (as defined above),
Company agrees to pay Writer as royalties with respect to
uses of the lyrics combined with music:

          (i)  sums equal to fifty percent
(50%) of the net proceeds (as defined
below) received by Company from third
parties for licenses for the manufacture
of commercial phonograph records and/or
licenses of theatrical motion picture

5

synchronization rights (as defined below);

(ii)  for regular piano copies, if any, sold and paid for at wholesale in the United States and/or Canada, sums equal to six cents (6¢) per copy for the first one hundred thousand (100,000) copies sold, and eight cents (8¢) per copy for copies sold in excess of 100,000;

(iii)  sums equal to fifty percent (50%) of net proceeds received by Company from third parties for regular piano copies, if any, sold and paid for at wholesale outside of the United States and/or Canada;

(iv)  with respect to orchestrations, including band arrangements, if any, sold and paid for at wholesale anywhere in the world, sums equal to ten percent (10%) of the wholesale price therefor, after trade discounts;

(v)  with respect to any song book, folio or similar publication, if any, sold and paid for at wholesale anywhere in the world, sums equal to the amount resulting from dividing ten percent (10%) of the wholesale price, after trade discounts, therefor by the total number of copyrighted musical compositions contained in such publication;

(vi)  with respect to other uses of the lyrics hereunder, sums equal to the amount resulting from dividing fifty percent (50%) of the net proceeds received by Company from third parties therefor by the total number of copyrighted musical compositions and/or literary materials contained or included in such uses.

6

No royalties shall be payable hereunder for professional material not sold or resold; further, no royalties shall be payable to Writer with respect to uses of the lyrics except as hereinabove expressly set forth.  In the event that any other writer of lyrics for songs for the television series referred to in paragraph 1 hereof (other than the writer of lyrics for the theme song for said series) shall be entitled to receive higher royalties for the use of lyrics for the same television season than the amounts set forth above in this paragraph 6(a), then Writer shall be entitled to receive such higher royalties in lieu of the aforesaid amounts.  The term "theatrical motion picture rights" as used herein refers to synchronization rights granted with respect to motion pictures intended primarily and initially for theatrical release by direct projection before paid-admission audiences; in no event shall such term refer to motion pictures or other methods of recordation, whether now known or hereafter devised, which are produced primarily and initially for television broadcasting by any means whatsoever.  The term "net proceeds" as used hereinabove, shall mean all monies actually received by Company (or any assignee of Company's rights or licensee hereunder) which are directly attributable to licenses issued authorizing the manufacture of commercial phonograph records and/or licenses relating to theatrical motion picture synchronization rights, and/or for the exercise of publication rights refer-red to in subclause (iii) above, as the case may be, after the deduction of all costs, expenses, fees and commissions which are directly attributable to the exploitation of the lyrics and combined music by way of commercial phonograph records or by way of theatrical motion picture synchroniza-tion, or by way of publication, as the case may be, computed in accordance with good and standard practices.  In the event that Company licenses the lyrics or any songs in a form containing music or other literary materials written or composed by any third party or parties, then Writer's royalties hereunder, with respect to the lyrics or such songs in such form, shall be reduced proportionately to an amount equal to the royalties payable hereunder divided by the number of composers and lyricists (including Writer) who have furnished materials and services for such music and lyrics and who are entitled to receive royalties from Company, provided that in the event that both one or more composers and one or more lyricists have furnished materials

7

and services for such lyrics or such songs, then the total
royalties payable to all such lyricists (including Writer)
collectively in accordance with the aforesaid proportionate
reduction with respect to such lyrics or such songs shall be
equal to the total royalties payable to all such composers
collectively in accordance with said reduction with respect
to such lyrics or such songs. Company shall render royalty
statements to Writer, accompanied by any remuneration due
Writer, such statements to be rendered at least once during
each calendar year during which royalties are payable.

     (b) If, for any reason, exportation of money
to the United States from any foreign country, territory or
place should be prohibited, prevented or rendered commer-
cially impracticable, the amount received by Company (if
Company's share thereof is actually paid to Company in such
foreign country, territory or place) shall not be considered
gross receipts hereunder unless and until the same shall
have actually been received in the United States in United
States currency, less any discounts, losses, costs or
expenses suffered by or imposed upon Company with respect to
transmittal of such money to the United States and the
conversion thereof to United States currency, provided,
however, that if Writer so requests in writing, that portion
of such blocked or frozen funds which would represent
Writer's share of net proceeds of such gross receipts, but
for being frozen or blocked, shall be deposited in Writer's
name in any bank or depository designated by Writer in such
country wherein such funds are blocked or frozen subject to
the laws of such country with respect to such deposits and
withdrawals by Writer therefrom. Writer shall have the
right at Writer's sole expense to inspect Company's books
and records relative to gross receipts derived from use of
the lyrics hereunder and to make extracts thereof provided
such inspection shall be made at Company's offices during
reasonable business hours and upon reasonable notice and not
more frequently than once per year. All royalties,
statements and other accounts rendered by Company shall be
binding upon Writer and not subject to any objection by
Writer unless specific objection in writing, stating the
basis thereof, is given to Company by Writer by one (1) year
from the date rendered.

     (c) If Company assigns or licenses any uses
of the music publishing rights to any third party (including

8

any aforementioned subsidiary or affiliated company) and if
Company authorizes such third party to account directly to
Writer with respect to royalties payable to Writer by reason
of any such uses of such music publishing rights, then
Writer agrees that, during the term of any such assignment
or license, Writer shall look only to such assignee or
licensee for payment of such royalties (and shall be
entitled only to inspect such assignee's or licensee's books
and records relative to uses of the lyrics at reasonable
business hours and at such assignee's or licensee's
offices), provided that Company shall not be relieved of its
obligations with respect thereto unless the assignee is a
parent, subsidiary or affiliate of Company, or a recognized
distributor of motion pictures or television programs, or a
"major" motion picture company (as that term is understood
in the motion picture industry), or a "major" television
network (as that term is understood in the television
industry), or a "major" record company or music publishing
company (as those terms are understood in the music
industry).

(d)    Writer acknowledges that Company has not
made and is not hereby making any representation or warranty
with respect to the amount of royalties, if any, which may
be derived from uses of music publishing rights, it being
further understood that nothing herein shall be deemed to
impose any obligation on Company to use or authorize the use
of the lyrics and/or any music publishing rights derived
therefrom.

7.    Company agrees that:

(i)    if the description of the
lyrics in paragraph 1 of this agreement
refers to a particular television
program in connection with which such
lyrics may be used, and if such lyrics
or a substantial portion thereof are
used in connection with such program or
are otherwise used hereunder, then
Company shall give Writer (or cause
Writer to be given) credit as Writer of
such lyrics or as a writer of the
television series on all release prints
of such program;

9

                    (ii)  if any of the
lyrics are described in paragraph 1 of
this agreement as lyrics for the theme
song for a television pilot program
and/or television program series, and if
such theme song or a substantial portion
thereof is used as the theme song for
such pilot program and/or program series,
then Company shall give Writer (or cause
Writer to be given) credit on all release
prints of any such program in which such
theme song is used as the theme song, as
Writer of the lyrics of such theme song.

The form, style, size, placement and nature of any credit
provided for herein shall be determined by Company (or its
assignee or licensee) in its sole discretion.  Any
unintentional and/or inadvertent failure to give credit as
above provided, whether because of lack of broadcast time or
otherwise, shall not be a breach of this agreement.

       8.  Company shall have the right and may grant to
others the right to use, disseminate, reproduce, print and
publish Writer's name, likeness, voice and biographical
material concerning Writer as news or informative matter and
in connection with advertising and for purposes of trade in
connection with any motion picture or television program in
which the lyrics are used, and/or in connection with any
other uses of the lyrics.  The rights granted herein shall
not include the right to use or to grant to others the right
to use Writer's name, voice, likeness and biographical
material in any direct endorsement of any product or service
without Writer's prior written consent.

       9.  Writer hereby warrants that Writer is free
and able to enter into and fully perform this agreement and
to grant all rights herein granted.  Further, Writer
warrants that the lyrics in the form in which they are
delivered shall be wholly original with Writer and shall not
be copied from any other work and shall not, nor shall the
use thereof, infringe or violate the copyright or any common
law right or any personal, proprietary, or other right of
any kind whatsoever of any person, firm, corporation or
association.  If any of the lyrics delivered hereunder are

described as based upon traditional or public domain
compositions, Writer warrants that such compositions are in
the public domain throughout the world and that Writer's
treatment of such compositions is original and shall not be
copied from any work other than such public domain
compositions, nor shall the use thereof infringe or violate
the copyright or any common law right or any personal,
proprietary or other right of any kind whatsoever of any
person, firm, corporation or association. Notwithstanding
the foregoing, if any of the lyrics delivered hereunder are
described as based upon materials furnished by Company or as
based upon traditional or public domain compositions
furnished by Company, Writer makes no warranty as to the
originality or ownership of such materials or compositions
furnished by Company.

10. Writer shall indemnify and hold Company, its
successors, assigns and licensees, any network and/or
stations over which the lyrics shall be broadcast, the
sponsors, if any, of any program on which they are
broadcast, and their advertising agencies, if any, and any
other parties who shall utilize the lyrics or any part
thereof in any way with Company's permission, and the
directors, officers, agents and employees of any of the
foregoing, free and harmless from any and all claims,
damages, liabilities, costs and expenses, including
reasonable counsel fees, arising out of any use of the
lyrics or any part thereof or arising out of any breach by
Writer of any warranty or agreement made by Writer herein.
Company shall similarly indemnify and hold Writer harmless
with respect to any claims by any third party that the
separate music itself (as opposed to the lyrics or the music
combined with lyrics) infringes the copyright or other
rights of any third party.

11. It is understood and agreed that all or part
of this agreement and all the results and proceeds thereof
may be assigned by Company to any third party without
Writer's consent and in this event, Company's successors
and/or assigns shall be entitled to any and all rights,
privileges, and equities to which Company is entitled under
and by virtue of this agreement. In the event of such an
assignment, Company shall not be relieved of its obligations
hereunder unless the assignee is a parent, subsidiary or
affiliate of Company, or a recognized distributor of motion
pictures or television programs, or a "major" motion picture
company (as that term is understood in the motion picture
industry), or a "major" television network (as that term is
understood in the television industry), or a "major" record
company or music publishing company (as those terms are
understood in the music industry).

-11-

Nothing in this agreement shall in any way derogate from, diminish or impair any rights granted to Company or to any parent, subsidiary or affiliate of Company under any other agreement entered into between Writer and Company or any parent, subsidiary or affiliate thereof.

This agreement shall be binding upon and shall inure to the benefit of the parties hereto, their successors, assigns and licensees and, in the case of Writer, Writer's heirs, devisees, executor or administrator.

12.    (a)    This agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts entered into and fully to be performed therein.

(b)    A waiver by either party of any of the terms and conditions of this agreement in any one instance shall not be construed to be a waiver of such term or condition for the future, or of any subsequent breach thereof.    All remedies, rights, undertakings, obligations and agreements contained in this agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either party.

(c)    This agreement contains the entire understanding of the parties hereto relating to the subject matter herein contained and this agreement cannot be changed, rescinded or terminated orally.

(d)    If more than one person signs this agreement as "Writer", the rights and obligations of each such signatory shall be joint and several and all references throughout this agreement to "Writer" shall mean and refer to each signatory individually and to all such signatories jointly, so that a breach of any provision of this agreement shall be deemed a breach of each and all such signatories, it being understood that all such signatories assume each and every duty and obligation hereunder, both jointly and severally.    All payments specified herein shall be in full satisfaction of Company's obligations to all such signatories and, if this agreement does not provide for a division of such payments between such signatories, Company shall have no responsibility or liability with regard to the division of such payments between such signatories.

-12-

(e)   If any provision of this agreement as applied to any party or to any circumstance shall be adjudged by a court to be void or unenforceable, the same shall in no way affect any other provision of this agreement, the application of such provision in any other circumstances or the validity or enforceability of this agreement.

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the day and year first above written.

SUNBOW PRODUCTIONS, INC.
COMPANY

_Barry Harman_
Barry Harman (Writer)

By: _____

CERTIFICATE OF AUTHORSHIP

I hereby certify that I wrote, for SUNBOW PRODUCTIONS, INC. (herein referred to as the "Company"), certain original literary material for use in connection with the fully-animated children's television special tentatively entitled "CHARMKINS", pursuant to an agreement dated as of January 12, 1983.

I further certify that said material was specially ordered or commissioned by Company for use as a part of an audiovisual work and is a work made for hire within the meaning of Section 101 of the United States Copyright Act and that said Company is the author and owner thereof and is entitled to the copyright therein (if said material is copyrightable) and all renewals thereof, and all rights of any kind or nature therein, with the right to make such changes therein and uses thereof as said Company may from time to time determine as such author and owner.

Dated: _Jan 13, 1982_

_Barry Harman_
Barry Harman (Writer)

SCHEDULE "A"

TITLE OF COMPOSITION

The Charmkins' Theme

Pretty Lucky

Here in the Gloomy Swamps

Nothing is Impossible

In Disguise

Subterfugious Hocus Pocus

Imagine Me At My Worst

You Can Find a Rainbow Anywhere