# EXHIBIT 34

Exhibit F

AGREEMENT made as of this 1st day of July, 1985, by and between SUNBOW PRODUCTIONS, INC. ("Company") and TOMMY GOODMAN ("Writer").

In consideration of the mutual covenants herein contained, the parties hereto have agreed and do agree as follows:

    1.    Company hereby engages Writer to write, prepare and deliver to Company certain original musical material and arrangements thereof (hereinafter collectively referred to as the "music"), more particularly described as follows (it being understood that the mention of any program or program series in said description is for purposes of identification only and shall in no way restrict Company's rights in the music, and the use thereof, as set forth in this agreement):

        Music for the songs listed on Schedule "A" attached hereto for a fully-animated children's television program presently entitled "GLO FRIENDS SAVE CHRISTMAS" (the "Program").

    2.    (a)    For all rights herein granted to Company, and for performance by Writer of all obligations hereunder, Company shall pay Writer Seven Hundred ($700.00) Dollars for composing and Seven Hundred ($700.00) Dollars for arranging each song listed on Schedule "A" hereof (payable within thirty (30) days after Writer's delivery to Company of all of the music, and One Thousand Five Hundred ($1,500) Dollars is compensation for Writer's supervision of the orchestra recording of the music for the Program.  Payment by a parent or affiliate of Company shall be deemed to constitute payment by Company hereunder.

        (b)    Nothing herein contained shall be deemed to impose any obligation on Company to use or authorize the use of the music, and Company shall have fully discharged its obligations to Writer hereunder by payment to Writer of the amount specified in subparagraph (a) of this Paragraph 2.

    3.    Writer shall deliver one (1) copy of the music and arrangements to Company as Company may designate.

    4.    It is understood and agreed that Writer may write the music at such times and places as Writer may choose, subject only to Writer's obligation to make timely delivery of the music in accordance with the terms of this agreement.

5.   (a)   Writer warrants, acknowledges and agrees that the music was specially ordered or commissioned by Company for use as a part of an audiovisual work and that same are a work made for hire within the meaning of Section 101 of the United States Copyright Act.  Upon writing of the music as aforesaid, all right, title and interest therein shall automatically vest in Company, and Company shall be the sole and unlimited owner thereof and of all rights therein throughout the world forever, and Company shall be entitled to copyright therein, including statutory copyright and all renewals thereof, as copyright author and proprietor. Company may freely assign and grant rights and licenses with respect to the music and any copyright therein (including any renewals thereof), and in this connection Writer agrees to execute and deliver to Company any and all instruments required by Company in connection with the use and enjoyment of the music and of Company's rights therein and thereto and Writer hereby appoints Company as Writer's attorney-in-fact with the right but not the obligation to execute any such instruments in Writer's name on Company's behalf.

(b)   Without in any way limiting the generality of the foregoing, it is agreed that Company shall have the exclusive right and may license others to use, adapt, arrange, change, add to, or subtract from the music and to combine the same with other literary material and/or music and to publish, record, produce, reproduce, transmit, perform, broadcast, telecast, and/or otherwise communicate the same or any version or versions thereof by any means (including, but not limited to, in synchronization with motion pictures, television and/or any other form of recordation or reproduc-tion of sight and/or sound), whether now known or hereafter devised, publicly for profit or otherwise, it being understood that Writer hereby waives any so-called "moral rights" which may now be or may hereafter be recognized.  It is understood and agreed that Writer shall have no right, title or interest in any such other literary material and/or music which may be combined with the music.  Without limiting the foregoing, Writer acknowledges that Company has employed the lyricist(s) listed on Schedule "A" attached hereto to write lyrics for the songs described in Paragraph 1 hereof.

(c)   During any period or periods of time during which Writer is affiliated with any small performing rights society (herein called the "Society"), Company shall and does hereby, under and pursuant to this Paragraph, irrevocably license back to Writer a non-exclusive undivided one-half (1/2) interest (but, if the music or any form thereof are the composition of Writer and other lyricists and/or composers,

-2-

then the grant hereunder shall be deemed a grant of an undivided one-half (l/2) interest to Writer and all other such lyricists and/or composers jointly) in the non-dramatic (i.e., "small") performing rights in the music (but only when the music is combined with lyrics) so as to enable Writer to license such non-dramatic performing rights to Society, and to collect the Writer's share of royalties derived therefrom, it being understood, in this connection, that Company (or any assignee or licensee of all or any of Company's rights under this agreement) shall not exercise such non-dramatic performing rights during such period or periods without obtaining a license therefor from Society, except that Company and/or any such assignee or licensee, may exercise such non-dramatic performing rights in the music by reason of, under and pursuant to this agreement,

> (i)  during any period or periods during which such non-dramatic performing rights are not controlled by and/or available for license to Company or any such assignee or licensee at standard rates from Society, or in the case of public performances of the music in geographical areas outside of Society's jurisdiction, from any other organization or society which is affiliated with Society or which has a collection agreement with Society and which controls the non-dramatic performing rights in any geographical area in which the music is to be performed; and/or

> (ii)  in connection with theatrical exhibitions in the United States, its territories and possessions; and/or

> (iii)  in connection with any performance of the music within the United States, its terri-tories and possessions, which is not a public performance;

it being understood that Company (and/or any such assignee or licensee) shall have no obligation to pay any royalties or other sums to Writer, Society, or any successor to the rights of either with respect to non-dramatic performances of the music made pursuant to subclauses (i) through (iii) hereof.  If Company makes or authorizes any non-dramatic performances of the lyrics under and pursuant to this agree-ment, and if Writer shall assert any claim that any such performance violates any rights of Writer, then (A) under no circumstances shall Writer have the right to take any action or initiate any proceeding with respect to such

-3-

claim which would have the effect of enjoining and/or pre-
venting and/or otherwise interfering with any said non-
dramatic performances, it being agreed that any such action
or proceeding shall be limited to an action at law for
damages; and (B) if Writer shall assert such a claim per-
taining to a non-dramatic performance of the music made by
any assignee or licensee of Company, then any action taken
or proceeding brought by Writer shall be limited to an
action at law for damages against such assignee or licensee
exclusively.  The foregoing references to Society shall not
be construed as giving Society any independent right to take
any action or initiate any proceeding with respect to any
such claim.

       (d)  Without limiting the generality of any
rights granted under this agreement, and notwithstanding any
license hereunder to Writer pursuant to subparagraph (c)
above, Writer expressly acknowledges that Company, its
successors, assigns and/or licensees shall have the right to
collect the publisher's share of performance royalties
becoming due and payable hereunder from any small performing
rights society by reason of performances of the music
combined with lyrics, it being expressly agreed that Writer
shall not be entitled to any share of such monies which are
distributed to Company, its successors, assigns, and/or
licensees by any small performing rights society.  Writer
shall be entitled to collect the writer's share of any such
royalties with respect to the music jointly with any other
composers and/or lyricists of such music.  The terms "publisher's
share" and "writer's share" as used in this agreement have
the same meaning here as is commonly understood in the music
publishing and motion picture and television industries.
Company may represent to any domestic or foreign performing
rights society or similar organization requiring an acknowledgement
of the type made by Writer herein that Writer has acknowledged
Company's right to collect and retain the publisher's share
of royalties; further, if any such society or organization
requires written authorization from Writer in order to make
payments of the publisher's share of royalties to Company,
Writer shall promptly execute and deliver such authorization.
If any such society or organization makes payment to Writer
of all royalties (i.e., both writer's and publisher's share) with
respect to any performance, Writer shall promptly remit one-half
(1/2) of such royalty to Company.  If any such society or organiza-
tion makes payment to Writer of all royalties (i.e., both Writer's
and publisher's share) with respect to any performance, Company shall
promptly remit to Writer and such others as may be entitled thereto
the "writer's share" thereof.

      6.    Further, in the exercise of its rights here-
under and without in any way limiting the generality of the
foregoing, Company shall have, as owner and copyright pro-
prietor of the music, the complete control of the publication

-4-

of the music and of all rights incident thereto, including, but not limited to, the right to license the manufacture of phonograph records and other recordings of the music and the right to license motion picture synchronization rights (all of which rights are herein sometimes collectively called "music publishing rights").  Without limiting the generality of the foregoing, it is agreed that Company may assign or license any or all such music publishing rights and/or any or all other rights granted to Company under this agreement to any music publishing company or production company which is a parent or subsidiary of Company or otherwise affiliated with Company or to any other third party.

(a)  With respect to Company's exercise of music publishing rights in the music (as defined above), Company agrees to pay Writer as royalties with respect to uses of the music combined with lyrics (but, if the music with lyrics or any form thereof is the composition of Writer and other lyricists and/or composers, then the royalties hereunder shall be shared equally by all such lyricists and/or composers):

(i)  sums equal to fifty (50%) percent of the net proceeds (as defined below) received by Company from third parties for licenses for the manufacture of commercial phonograph records and/or licenses of theatrical motion picture synchronization rights (as defined below);

· (ii)  for regular piano copies, if any, sold and paid for at wholesale in the United States and/or Canada, sums equal to six cents (.06) per copy for the first one hundred thousand (100,000) copies sold, and eight cents (.08) per copy for copies sold in excess of 100,000;

(iii)  sums equal to fifty (50%) percent of net proceeds received by Company from third parties for regular piano copies, if any, sold and paid for at wholesale outside of the United States and/or Canada;

(iv)  with respect to orchestrations, including band arrangements, if any, sold and paid for at wholesale anywhere in the world, sums equal to ten (10%) percent of the wholesale price therefor, after trade discounts;

(v)  with respect to any song book, folio or similar publication, if any, sold and paid for at wholesale anywhere in the world, sums equal to the

-5-

amount resulting from dividing ten (10%) percent
of the wholesale price, after trade discounts,
therefor by the total number of copyrighted
musical compositions contained in such publica-
tion;

(vi)  with respect to other uses of the music
hereunder, sums equal to the amount resulting from
dividing fifty (50%) percent of the net proceeds
received by Company from third parties therefor by
the total number of copyrighted musical compositions
and/or literary materials contained or included in
such uses.

No royalties shall be payable hereunder for professional
material not sold or resold; further, no royalties shall be
payable to Writer with respect to uses of the music except
as hereinabove expressly set forth.  The term "theatrical
motion picture rights" as used herein refers to synchron-
ization rights granted with respect to motion pictures
intended primarily and initially for theatrical release by
direct projection before paid-admission audiences; in no
event shall such term refer to motion pictures or other
methods of recordation, whether now known or hereafter
devised, which are produced primarily and initially for
television broadcasting by any means whatsoever.  The term
"net proceeds" as used hereinabove, shall mean all monies
actually received by Company (or any assignee of Company's
rights or licensee hereunder) which are directly attributable
to licenses issued authorizing the manufacture of commercial
phonograph records and/or licenses relating to theatrical
motion picture synchronization rights, and/or for the exercise
of publication rights referred to in subclause (iii) above,
as the case may be, after the deduction of all costs, expenses,
fees and commissions which are directly attributable to the
exploitation of the lyrics and combined music by way of
commercial phonograph records or by way of theatrical motion
picture synchronization, or by way of publication, as the
case may be, computed in accordance with good and standard
practices.  In the event that Company licenses the music or any
songs in a form containing music or other literary materials
written or composed by any third party or parties, then
Writer's royalties hereunder, with respect to the music or such
songs in such form, shall be reduced proportionately to an
amount equal to the royalties payable hereunder divided by
the number of composers and lyricists (including Writer) who
have furnished materials and services for such music and
lyrics and who are entitled to receive royalties from Company,

-6-

provided that in the event that both one or more composers
and one or more lyricists have furnished materials and
services for such lyrics or such songs, then the total
royalties payable to all such parties (including Writer)
collectively in accordance with the aforesaid proportionate
reduction with respect to such lyrics or such songs shall be
equal to the total royalties payable to all such composers
collectively in accordance with said reduction with respect
to such lyrics or such songs. Company shall render royalty
statements to Writer, accompanied by any remuneration due
Writer, such statements to be rendered at least once during
each calendar year during which royalties are payable.

(b) If, for any reason, exportation of money
to the United States from any foreign country, territory or
place should be prohibited, prevented or rendered commercially
impracticable, the amount received by Company (if Company's
share thereof is actually paid to Company in such foreign
country, territory or place) shall not be considered gross
receipts hereunder unless and until the same shall have
actually been received in the United States in United States
currency, less any discounts, losses, costs or expenses
suffered by or imposed upon Company with respect to trans-
mittal of such money to the United States and the conversion
thereof to United States currency, provided, however, that
if Writer so requests in writing, that portion of such
blocked or frozen funds which would represent Writer's share
of net proceeds of such gross receipts, but for being frozen
or blocked, shall be deposited in Writer's name in any bank
or depository designated by Writer in such country wherein
such funds are blocked or frozen subject to the laws of such
country with respect to such deposits and withdrawals by
Writer therefrom. Writer shall have the right at Writer's
sole expense to inspect Company's books and records relative
to gross receipts derived from use of the music hereunder
and to make extracts thereof provided such inspection shall
be made at Company's offices during reasonable business
hours and upon reasonable notice and not more frequently
than once per year. All royalties, statements and other
accounts rendered by Company shall be binding upon Writer
and not subject to any objection by Writer unless specific
objection in writing, stating the basis thereof, is given to
Company by Writer by one (1) year from the date rendered.

(c) If Company assigns or licenses any uses
of the music publishing rights to any third party (including
any aforementioned subsidiary or affiliated company) and if
Company authorizes such third party to account directly to

-7-

Writer with respect to royalties payable to Writer by reason of any such uses of such music publishing rights, then Writer agrees that, during the term of any such assignment or license, Writer shall look only to such assignee or licensee for payment of such royalties (and shall be entitled only to inspect such assignee's or licensee's books and records relative to uses of the lyrics at reasonable business hours and at such assignee's or licensee's offices), provided that Company shall not be relieved of its obligations with respect thereto unless the assignee is a parent, subsidiary or affiliate of Company, or a recognized distributor of motion pictures or television programs, or a "major" motion picture company (as that term is understood in the motion picture industry), or a "major" television network (as that term is understood in the television industry), or a "major" record company or music publishing company (as those terms are understood in the music industry).

(d)  Writer acknowledges that Company has not made and is not hereby making any representation or warranty with respect to the amount of royalties, if any, which may be derived from uses of music publishing rights, it being further understood that nothing herein shall be deemed to impose any obligation on Company to use or authorize the use of the music and/or any music publishing rights derived therefrom.

7.  Company agrees that:

(i)  if the description of the music in Paragraph 1 of this agreement refers to a particular television program in connection with which such music may be used, and if such music or a substantial portion thereof are used in connection with such program or are otherwise used hereunder, then Company shall give Writer (or cause Writer to be given) "Music by Tommy Goodman" credit in the main titles of all release prints of such programs and whenever and wherever the lyricist(s) thereof receive credit;

(ii)  if any of the music is described in Paragraph 1 of this agreement as music for the theme song for a television pilot program and/or television series, and if such theme song or a substantial portion thereof is used as the theme song for such pilot program and/or program series, then Company shall give Writer (or cause Writer to be given) credit on all release prints of any such

-8-

program in which such theme song is used as the
theme song, as Writer of the music of such theme
song.

The form, style, size, placement and nature of any credit
provided for herein shall be determined by Company (or its
assignee or licensee) in its sole discretion. Any uninten-
tional and/or inadvertent failure to give credit as above
provided, whether because of lack of broadcast time or
otherwise, shall not be a breach of this agreement.

8.    Company shall have the right and may grant to
others the right to use, disseminate, reproduce, print and
publish Writer's name, likeness, voice and biographical
material concerning Writer as news or informative matter and
in connection with advertising and for purposes of trade in
connection with any motion picture or television program in
which the music is used, and/or in connection with any other
uses of the music. The rights granted herein shall not
include the right to use or to grant to others the right to
use Writer's name, voice, likeness and biographical material
in any direct endorsement of any product or service without
Writer's prior written consent.

9.    Writer hereby warrants that Writer is free
and able to enter into and fully perform this agreement and
to grant all rights herein granted. Further, Writer warrants
that the music in the form in which it is delivered shall be
wholly original with Writer and shall not be copied from any
other work and shall not, nor shall the use thereof, infringe
or violate the copyright or any common law right or any
personal, proprietary, or other right of any kind whatsoever
of any person, firm, corporation or association. If any of
the music delivered hereunder is described as based upon
traditional or public domain compositions, Writer warrants
that such compositions are in the public domain throughout
the world and that Writer's treatment of such compositions
is original and shall not be copied from any work other than
such public domain compositions, nor shall the use thereof
infringe or violate the copyright or any common law right or
any personal, proprietary or other right of any kind whatsoever
of any person, firm, corporation or association. Notwithstand-
ing the foregoing, if any of the music delivered hereunder is
described as based upon materials furnished by Company or as
based upon traditional or public domain compositions furnished
by Company, Writer makes no warranty as to the originality
or ownership of such materials or compositions furnished by
Company.

-9-

10.   Writer shall indemnify and hold Company, its successors, assigns and licensees, any network and/or stations over which the music shall be broadcast, the sponsors, if any, of any program on which they are broadcast, and their advertising agencies, if any, and any other parties who shall utilize the lyrics or any part thereof in any way with Company's permission, and the directors, officers, agents and employees of any of the foregoing, free and harmless from any and all claims, damages, liabilities, costs and expenses, including reasonable counsel fees, arising out of any use of the music or any part thereof or arising out of any breach by Writer of any warranty or agreement made by Writer herein.  Company shall similarly indemnify and hold Writer harmless with respect to any claims by any third party that the separate lyrics themselves (as opposed to the music or the music combined with lyrics) infringes the copyright or other rights of any third parties.

11.   It is understood and agreed that all or part of this agreement and all the results and proceeds thereof may be assigned by Company to any third party without Writer's consent and in this event, Company's successors and/or assigns shall be entitled to any and all rights, privileges, and equities to which Company is entitled under and by virtue of this agreement.  In the event of such an assignment, Company shall not be relieved of its obligations hereunder unless the assignee is a parent, subsidiary or affiliate of Company, or a recognized distributor of motion pictures or television programs, or a "major" motion picture company (as that term is understood in the motion picture industry), or a "major" television network (as that term is understood in the television industry), or a "major" record company or music publishing company (as those terms are understood in the music industry).

Nothing in this agreement shall in any way derogate from, diminish or impair any rights granted to Company or to any parent, subsidiary or affiliate of Company under any other agreement entered into between Writer and Company or any parent, subsidiary or affiliate thereof.

This agreement shall be binding upon and shall inure to the benefit of the parties hereto, their successors, assigns and licensees and, in the case of Writer, Writer's heirs, devisees, executor or administrator.

12.   (a)   This agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts entered into and fully to be performed therein.

-10-

(b)   A waiver by either party of any of the terms and conditions of this agreement in any one instance shall not be construed to be a waiver of such term or condition for the future, or of any subsequent breach thereof. All remedies, rights, undertakings, obligations and agreements contained in this agreement shall be cumulative and none of them shall be in limitation of any othe remedy, right, undertaking, obligation or agreement of either party.

(c)   This agreement contains the entire understanding of the parties hereto relating to the subject matter herein contained and this agreement cannot be changed, rescinded or terminated orally.

(d)   If more than one person signs this agreement as "Writer", the rights and obligations of each such signatory shall be joint and several and all references throughout this agreement to "Writer" shall mean and refer to each signatory individually and to all such signatories jointly, so that a breach of any provision of this agreement shall be deemed a breach of each and all such signatories, it being understood that all such signatories assume each and every duty and obligation hereunder, both jointly and severally.  All payments specified herein shall be in full satisfaction of Company's obligations to all such signatories and, if this agreement does not provide for a division of such payments between such signatories, Company shall have no responsibility or liability with regard to the division of such payments between such signatories.

(e)   If any provision of this agreement as applied to any party or to any circumstance shall be adjudged by a court to be void or unenforceable, the same shall in no way affect any other provision of this agreement, the application of such provision in any other circumstances or the validity or enforceability of this agreement.

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the day and year first above written.

SUNBOW PRODUCTIONS, INC.   (Company)

_____          By: _____
Tommy Goodman (Writer)               Its _____

-11-

<u>SCHEDULE "A"</u>

<u>GLO FRIENDS SAVE CHRISTMAS</u>

THE WHAT IF THERE'S NO CHRISTMAS BLUES

GLO FRIENDS OPENING THEME/CLOSING THEME

SAY GOODBYE TO CHRISTMAS

GLO EVERYBODY GLO

IT'S TIME TO BE BRAVE

YOU CAN'T ALWAYS COUNT ON SANTA CLAUS

<u>Lyricist - Barry Harman</u>

<u>CERTIFICATE OF AUTHORSHIP</u>

I hereby certify that I wrote, for SUNBOW PRODUCTIONS, INC. (herein referred to as the "Company"), certain original musical material for use in connection with the fully-animated children's television special tentatively entitled "GLO FRIENDS SAVE CHRISTMAS," pursuant to an agreement dated as of July 1, 1985.

I further certify that said material was specially ordered or commissioned by Company for use as a part of an audiovisual work and is a work-made-for-hire within the meaning of Section 101 of the United States Copyright Act and that said Company is the author and owner thereof and is entitled to the copyright therein (if said material is copyrightable) and all renewals thereof, and all rights of any kind or nature therein, with the right to make such changes therein and uses thereof as said Company may from time to time determine as such author and owner.

Dated:  As of July 1, 1985

_____
Tommy Goodman (Writer)

<u>INDUCEMENT LETTER</u>

Dated as of:  July 1, 1985

Sunbow Productions, Inc.
122 East 42and Street
Suite 1105
New York, New York  10168

Re:  Sunbow Productions, Inc. With TOMMY GOODMAN
     ENTERPRISES, INC./"GLO FRIENDS SAVE CHRISTMAS"

Gentlemen:

Reference is made to that certain agreement dated as of
July 1, 1985 (herein called the "Agreement") between TOMMY
GOODMAN ENTERPRISES, INC. (herein called "Contractor") and you,
which, among other things, makes available the services of the
undersigned by Contractor to you for the purposes set forth in
said Agreement.

As an inducement to you to enter into the Agreement and as a
material part of the consideration moving to you for so doing,
the undersigned hereby represents, warrants and agrees as follows:

1.    That the undersigned has heretofore entered into an
agreement (herein called the "Employment Agreement") with
Contractor covering the rendition of the undersigned's services
for Contractor and that Contractor has the right and authority to
enter into the Agreement and to furnish the rights and services
of the undersigned upon the terms and conditions therein
specified.

2.    That the undersigned is familiar with each and all
of the terms, covenants and conditions of the Agreement and
hereby consents to the execution thereof; that the undersigned
shall perform and comply with all of the terms, covenants and
conditions of the Agreement on the part of the undersigned to be
performed and complied with, even if the Employment Agreement
should hereafter be terminated or suspended; that the
representations and warranties of Contractor contained in the
Agreement are true; that the undersigned shall render all of the
services provided for under the Agreement and hereby confirms
that there have been granted to Contractor all of the rights
granted by Contractor to you under the Agreement; that all
notices served upon Contractor in accordance with the Agreement
shall be deemed notices to the undersigned of the contents
thereof.

3.   That the undersigned is under no obligation or disability by law or otherwise which would prevent or restrict the undersigned from performing and complying with all of the terms, covenants and conditions of the Agreement on the part of the undersigned to be performed or complied with.

4.   That, except in the event that the undersigned is deemed substituted for Contractor as a direct party to the Agreement, pursuant to Paragraph 6 hereof, the undersigned will look solely to Contractor and not to you for all compensation and other remuneration for any and all services and rights which the undersigned may render and/or grant under the Agreement.

5.   That you shall be entitled to equitable relief against the undersigned by injunction or otherwise to restrain, enjoin and/or prevent the violation or breach by the undersigned of any obligation of the undersigned to be performed as provided in the Agreement and/or the violation or breach by the undersigned of any obligations or agreements under this present instrument.

6.   That if Contractor should be dissolved or should otherwise cease to exist or for any reason whatsoever should failr, be unable, neglect or refuse to perform and observe each and all of the conditions of the Agreement requiring performance or compliance on its part, the undersigned shall at your election be deemed substituted as a direct party to the Agreement in the place and stead of Contractor and, further, that in the event of a breach or threatened breach of the Agreement by Contractor or by the undersigned you shall be entitled to legal and equitable relief by way of injunction or otherwise against Contractor or against the undersigned or both of us in your discretion in any event without the necessity of first resorting to or exhausting any rights or remedies which you may have against Contractor; all of the foregoing to be to the same extent and with the same force and effect as if the undersigned were a direct party to the Agreement in the first instance and as if in the Agreement the undersigned had personally agreed to render the services therein provided to be rendered by the undersigned and to perform and observe each and all of the terms and conditions of the Agreement requiring performance or compliance on the part of Contractor or the undersigned or both of us.

Very truly yours,

Tommy Goodman

-2-

Dated as of:  July 1, 1985

TOMMY GOODMAN ENTERPRISES, INC.
101 West 57th Street
Apartment 12H
New York, New York  10019

     Re:  <u>Lending Agreement/GLO FRIENDS SAVE CHRISTMAS</u>

Gentlemen:

    This will confirm the agreement between you and the
undersigned with respect to your loanout of the services of Tommy
Goodman to the undersigned as follows:

    1.    Reference is hereby made to that certain Agreement
(hereinafter referred to as the "Employment Agreement"), of even
date herewith, by and between the undersigned and Tommy Goodman
(hereinafter the "Employee") relating to the services of Employee
as designated therein in connection with the fully-animated child-
ren's special presently entitled "GLO FRIENDS SAVE CHRISTMAS."  A
copy of said Employment Agreement is attached hereto, marked
Exhibit "A" and is by this reference made a part hereof.
Notwithstanding the fact that said Employment Agreement is
drafted in the form of an agreement between the undersigned and
Employee in Employee's individual capacity, it is understood that
we are engaging you to furnish to us the services of Employee and
to grant to us the right stated as granted to us by Employee
under the Employment Agreement in accordance with and subject to
each and all of the terms and conditions set forth therein, which
terms and conditions are by this reference incorporated herein as
though expressly set forth in full.  You hereby agree to furnish
said services and grant said rights and to cause Employee to
comply with all of the terms and conditions of said Employment
Agreement.  You, in your own behalf, hereby represent, warrant
and agree to all matters and things which Employee has
represented, warranted and agreed to under the Employment
Agreement, and in your own behalf hereby acknowledge all matters
and things which Employee has acknowledged under the terms and
provisions of the Employment Agreement.  The undersigned shall
have all rights in and to Employee's services and the results and
proceeds thereof, and any and all other rights and remedies pro-
vided for under the terms and provisions of the Employment Agree-
ment, all to the same extent as if the undersigned had employed
Employee directly under said Employment Agreement.  Without in
any way limiting the generality of the foregoing, you warrant,
represent and agree that Employee's services and the results and
proceeds thereof and all material written or composed by

Employee pursuant to the terms and provisions of the Employ-
ment Agreement are a work made for hire within the meaning
of Section 101 of the United States Copyright Act specially
ordered or commissioned by us for use as a part of an audio-
visual work and that all right, title and interest therein
shall upon the rendition of creation thereof vest in us, and
that we shall be the exclusive owner thereof and of the
copyright therein, as copyright author and proprietor.

     2.   On condition that you and Employee keep and
perform every material term and condition on your respective
parts to be kept and performed by each of you under this
Agreement and under the Employment Agreement and neither you
nor Employee is in default or otherwise in breach under said
Agreements, the undersigned shall pay to you, and not to
Employee, as full and complete consideration for all ser-
vices to be rendered and all rights now or hereafter granted
by you and/or Employee under said Agreements, all compensa-
tion payable to Employee under the Employment Agreement.
Subject to the foregoing provision regarding to whom Employee's
share of the compensation arising under the Employment
Agreement shall be payable, such compensation shall be
otherwise payable as provided in said Employment Agreement.
You hereby agree to make or cause to be made when due all
payments of compensation which may be required to be remitted
to Employee, as well as any and all payments of taxes and/or
other contributions which have arisen or may arise out of
the services to be rendered by Employee hereunder, and to
indemnify and hold the undersigned and the undersigned's
licensees, successors and assigns harmless with respect to
the making of any and all such payments.  Upon presentation
to the undersigned of satisfactory evidence of payment by
you, the undersigned shall reimburse you for all sums actually
paid by you to any applicable guild, union or other collec-
tive bargaining unit pension and health and welfare funds
arising out of the undersigned's use of Employee's services
pursuant hereto; provided, however, that in no event shall
such reimbursement exceed the extent to which the undersigned
would have been required to make the particular payment or
payments had the undersigned employed said Employee directly.

     3.   You hereby represent, warrant and agree that
you are a duly organized and existing corporation and are
presently in good standing under the laws of the State of
your incorporation; that you have or shall be deemed to have
a valid, binding and subsistent written employment agreement
with Employee pursuant to which Employee is obligated to

- 2 -

render Employee's services exclusively for you for at least
the full term of the Employment Agreement and that you are
exclusively entitled to all services of Employee which are
or will be required to be performed by Employee hereunder,
and that you are exclusively entitled to and control all
rights in and to all results and proceeds of Employee's
services which are granted or are to be granted hereunder;
that you are free to enter into this Agreement to furnish to
us the services of Employee upon the terms and conditions
set forth herein, to make the representations and warranties
contained herein, and to grant the rights granted herein;
that you are not subject to any obligation or disability
which will or might prevent or interfere with the full com-
pletion and performance by you of all of the obligations and
conditions to be kept or performed by you hereunder; that
you have not made and will not make any grant or assignment
which will or might conflict with or impair the complete
enjoyment of the rights and privileges granted to the under-
signed hereunder.

        You further warrant that you are or will become
during the term of the Employment Agreement a signatory in
good standing to any collective bargaining agreement between
us and any union or guild having jurisdiction over the ser-
vices of Employee.

        4.    If you or your successors-in-interest should
be dissolved or otherwise cease to exist or for any reason
whatsoever fail, be unable, neglect or refuse to perform,
observe or comply with any or all of the terms and condi-
tions of this Agreement, Employee may, at our election, be
deemed to be employed directly by us for the balance of the
term of the Employment Agreement upon the terms and condi-
tions set forth therein.   In the event of a breach or threatened
breach of this Agreement or the Employment Agreement by you
or by Employee, we shall be entitled to legal, equitable and
other relief against you and/or against Employee in our
discretion.   We shall have all rights and remedies against
Employee which we would have if Employee were directly
employed by us under the Employment Agreement. We shall not
be required to first resort to or exhaust any rights or
remedies which we may have against you before exercising our
rights and remedies against Employee.

        5.    You shall have the benefit of all agreements,
representations and warranties made by the undersigned to
Employee under the Employment Agreement; provided, however,
that you shall not thereby receive any rights hereunder
greater than or in excess of those which Employee would have
received had the undersigned employed Employee directly.

- 3 -

6.    This Agreement shall be deemd to have been made in the State of New York and shall be construed and enforced in accordance with the internal law of the State of New York applicable to contracts negotiated, executed and wholly performed within said State.  You consent to the jurisdiction of the courts of the State of New York, and the United States courts located in New York, in connection with any lawsuit, action or proceeding arising out of or relating to this Agreement or the Employment Agreement.

7.    Service of all notices, demands or instruments relating to this Agreement, the Employment Agreement or either of them, or to the rendition of the services of Employee, which the undersigned is required or may desire to serve upon you shall be deemed effective by delivery to you or Employee in the manner provided in care of the address set forth under the notice provisions of the Employment Agreement.

Very truly yours,

SUNBOW PRODUCTIONS, INC.

By: _____

ACCEPTED AND AGREED TO:

TOMMY GOODMAN ENTERPRISES, INC.

By: _____

Employee I.D. #132950443

-4-

Exhibit G

AGREEMENT made of this  1st day of June  , 1985, by
and between SUNBOW PRODUCTIONS, INC. ("Company"), whose business
address is 380 Lexington Avenue, Suite 1105, New York, New York
10168, and BHB PRODUCTIONS, INC. ("Contractor") whose business
address is 35 West 92nd Street, New York, New York 10025, f/s/o
Barry Harman ("Writer").

In consideration of the mutual covenants herein contained,
the parties hereto have agreed and do agree as follows:

1.    Company hereby engages Contractor and Contractor
hereby accepts such engagement, to furnish the services of Writer
to Company for the purpose of writing, preparing and delivering
to Company original lyrics (hereinafter referred to as the
"Lyrics") for six (6) songs (including both television length
lyric as well as an expanded version thereof for each song) to be
used in a one-half hour fully-animated children's television show
presently entitled "GLO FRIENDS SAVE CHRISTMAS" (it being
understood that the mention of the show is for purposes of
identification only and shall in no way restrict Company's rights
in the Lyrics, and the use thereof, as set forth in this
Agreement).   The Lyrics shall be delivered to Company in
accordance with a schedule to be mutually determined by the
Company and Contractor, and the expanded versions thereof shall
be delivered as requested by Company.

2.    (a)   For all rights herein granted to Company in
the Lyrics for the six (6) songs, and for performance by
Contractor of all obligations hereunder, Company shall pay
Contractor a fee of Six Thousand Five Hundred ($6,500) Dollars.
In the event Company requests Contractor to furnish Writer's
services to write and deliver lyrics for additional songs (i.e.,
more than six [6]) and Contractor agrees to do so, Contractor
will be paid One Thousand ($1,000) Dollars for each such
additional song (including both television length lyric as well
as an expanded version thereof for each song) for which Writer
writes and delivers the Lyrics, in each case payable on delivery
of the Lyrics.

(b)   Payment by a parent or affiliate of Company
shall be deemed to constitute payment by Company hereunder.
Nothing herein contained shall be deemed to impose any obligation
on Company to use or authorize the use of the Lyrics, and Company
shall have fully discharged its obligations to Contractor
hereunder by payment to Contractor of the amount specified in
subparagraph (a) of this Paragraph 2.

3.    Contractor shall deliver one (1) copy of the Lyrics
to Company as Company shall designate.

4.    It is understood and agreed that Writer may write
the Lyrics at such times and places as Writer may choose, subject

only to Contractor's obligation to make timely delivery of the
Lyrics in accordance with the terms of this Agreement.

5.   (a)   Contractor warrants, acknowledges and agrees
that the Lyrics to be written by Writer and delivered by
Contractor are to be written by Writer under and pursuant to an
employment agreement between Contractor and Writer pursuant to
which Contractor is entitled to the exclusive services of Writer,
and to all the results of Writer's services; that the Lyrics were
specifically ordered and commissioned by Company for use as part
of an audiovisual work; and that the Lyrics are a work made for
hire within the meaning of Section 101 of the United States
Copyright Act.  Upon writing of the Lyrics, all right, title and
interest therein shall automatically vest in Company and Company
shall be the sole and unlimited owner thereof and of all rights
therein throughout the world forever, and Company shall be
entitled to copyright therein, including statutory copyright and
all renewals thereof, as copyright author and proprietor.
Company may freely assign and grant rights and licenses with
respect to the Lyrics and any copyrigt therein (including any
renewals thereof), and in this connection Contractor agrees to
execute and deliver and/or cause Writer to execute and deliver to
Company any and all instruments required by Company in connection
with the use and enjoyment of the Lyrics and of Company's rights
therein and thereto.  Contractor hereby appoints Company as
Contractor's and Writer's attorney-in-fact with the right but not
the obligation to execute any such instruments in Contractor's or
Writer's name on Company's behalf.  On execution hereof,
Contractor shall sign and shall cause Writer to sign the
Certificate of Authorship attached hereto for the Lyrics.

(b)   Without in any way limiting the generality of
the foregoing, it is agreed that Company shall have the exclusive
right and may license others to use, adapt, arrange, change, add
to, or subtract from the Lyrics and to combine the same with
other literary material and/or music and to publish, record,
produce, reproduce, transmit, perform, broadcast, telecast,
and/or otherwise communicate the same or any version or versions
thereof by any means (including, but not limited to, in
synchronization with motion pictures, television and/or any other
form of recordation or reproduction of sight and/or sound),
whether now known or hereafter devised, publicly for profit or
otherwise, it being understood that Contractor and Writer hereby
waive any so-called "moral rights" which may now be or may
hereafter be recognized.  It is understood and agreed that
neither Contractor nor Writer shall have any right, title or
interest in any other literary material and/or music which may be
combined with the Lyrics.

(c)   During any period or periods of time during
which Writer is affiliated with any small performing rights
society (herein called the "Society"), Company shall and does

- 2 -

hereby, under and pursuant to this Paragraph, license back to
Writer a non-exclusive undivided one-half (1/2) interest (but, if
the Lyrics or any form thereof are the composition of Writer and
other lyricists and/or composers, then the grant hereunder shall
be deemed a grant of an undivided one-half (1/2) interest to
Writer and all other such lyricists and/or composers jointly) in
the non-dramatic (i.e., "small") performing rights in the Lyrics
(but only when the Lyrics are combined with music) so as to
enable Writer to license such non-dramatic performing rights to
Society, and to collect the Writer's share of royalties derived
therefrom, it being understood, in this connection, that Company
(or any assignee or licensee of all or any of Company's rights
under this Agreement) shall not exercise such non-dramatic
performing rights during such period or periods without obtaining
a license therefor from Society, except that Company and/or any
such assignee or licensee, may exercise such non-dramatic
performing rights in the Lyrics by reason of, under and pursuant
to this Agreement,

> (i) during any period or periods during which
> such non-dramatic performing rights are not controlled
> by and/or available for license to Company or any such
> assignee or licensee at standard rates from Society, or
> in the case of public performances of the Lyrics in
> geographical areas outside of Society's jurisdiction,
> from any other organization or society which is
> affiliated with Society or which has a collection
> agreement with Society and which controls the
> non-dramatic performing rights in any geographical area
> in which the Lyrics are to be performed; and/or

> (ii) in connection with theatrical exhibitions
> in the United States, its territories and possessions;
> and/or

> (iii) in connection with any performance of the
> Lyrics within the United States, its territories and
> possessions, which is not a public performance;

it being understood that Company (and/or any such assignee or
licensee) shall have no obligation to pay any royalties or other
sums to Writer, Contractor, Society, or any successor to the
rights of any of them with respect to non-dramatic performances
of the Lyrics made pursuant to subclauses (i) through (iii)
hereof.  If Company makes or authorizes any non-dramatic
performances of the Lyrics under and pursuant to this Agreement,
and if Writer or Contractor shall assert any claim that any such
performance violates any rights of Writer or Contractor, then (A)
under no circumstances shall Writer or Contractor have the right
to take any action or initiate any proceeding with respect to
such claim which would have the effect of enjoining and/or
preventing and/or otherwise interfering with any said

- 3 -

non-dramatic performances, it being agreed that any such action
or proceeding shall be limited to an action at law for damages;
and (B) if Writer or Contractor shall assert such a claim
pertaining to a non-dramatic performance of the Lyrics made by
any assignee or licensee of Company, then any action taken or
proceeding brought by Writer or Contractor shall be limited to an
action at law for damages against such assigee or licensee
exclusively.  The foregoing references to Society shall not be
construed as giving Society any independent right to take any
action or initiate any proceeding with respect to any such claim.

        (d)  Without limiting the generality of any rights
granted under this Agreement, and notwithstanding any license
hereunder to Writer pursuant to subparagraph (c) above, Writer
and Contractor expressly acknowledge that Company, its
successors, assigns and/or licensees shall have the right to
collect the publisher's share of performance royalties becoming
due and payable hereunder from any small performing rights
society by reason of performances of the Lyrics combined with
music, it being expressly agreed that Writer and Contractor shall
not be entitled to any share of such monies which are distributed
to Company, its successors, assigns, and/or licensees by any
small performing rights society.  Writer shall be entitled to
collect the Writer's share of any such royalties with respect to
the Lyrics jointly with any other lyricists and/or composers of
such Lyrics.  The terms "publisher's share" and "Writer's share"
as used in this Agreement have the same meaning here as is
commonly understood in the music publishing and motion picture
and television industries.  Company may represent to any domestic
or foreign performing rights society or similar organization
requiring an acknowledgement of the type made by Writer herein
that Contractor and Writer have acknowledged Company's right to
collect and retain the publisher's share of royalties; further,
if any such society or organization requires written
authorization from Writer or Contractor in order to make payments
of the publisher's share of royalties to Company, Writer and
Contractor shall promptly execute and deliver such
authorization.  If any such society or organization makes payment
to Writer or Contractor of all royalties (i.e., both Writer's and
publisher's share) with respect to any performance to Writer,
Contractor shall promptly remit one-half (1/2) of such royalty to
Company.

        6.   Further, in the exercise of its rights hereunder
and without in any way limiting the generality of the foregoing,
Company shall have, as owner and copyright proprietor of the
Lyrics, the complete control of the publication of the Lyrics and
of all rights incident thereto, including, but not limited to,
the right to license the manufacture of phonograph records and
other recordings of the Lyrics and the right to license motion
picture synchronization rights (all of which rights are herein
sometimes collectively called "music publishing rights").

- 4 -

Without limiting the generality of the foregoing, it is agreed that Company may assign or license any or all such music publishing rights and/or any or all other rights granted to Company under this Agreement to any music publishing company or production company which is a parent or subsidiary of Company or otherwise affiliated with Company or to any other third party.

(a)  With respect to Company's exercise of music publishing rights in the Lyrics (as defined above), uses of the Lyrics combined with music (but, if the Lyrics with music or any form thereof is the composition of Writer and other composers and/or lyricists, then the royalties hereunder shall be shared equally by all such lyricists and/or composers):

(i)  sums equal to fifty (50%) percent of the net proceeds (as defined below) received by Company from third parties for licenses for the manufacture or commercial phonograph records and/or licenses of theatrical motion picture synchronization rights (as defined below);

(ii)  for regular piano copies, if any, sold and paid for at wholesale in the United States and/or Canada, sums equal to six cents (.06) per copy for the first one hundred thousand (100,000) copies sold, and eight cents (.08) per copy for copies sold in excess of 100,000;

(iii)  sums equal to fifty (50%) percent of net proceeds received by Company from third parties for regular piano copies, if any, sold and paid for at wholesale outside of the United States and/or Canada;

(iv)  with respect to orchestrations, including band arrangements, if any, sold and paid for at wholesale anywhere in the world, sums equal to ten (10%) percent of the wholesale price therefor, after trade discounts;

(v)  with respect to any songbook, folio or similar publication, if any, sold and paid for at wholesale anywhere in the world, sums equal to the amount resulting from dividing ten (10%) percent of the wholesale price, after trade discounts, therefor by the total number of copyrighted musical compositions contained in such publication;

(vi)  with respect to other uses of the Lyrics hereunder, sums equal to the amount resulting from dividing fifty (50%) percent of the net proceeds received by Company from third parties therefor by the

- 5 -

total number of copyrighted musical compositions and/or
literary materials contained or included in such uses.

No royalties shall be payable hereunder for professional material
not sold or resold; further, no royalties shall be payable to
Writer with respect to uses of the Lyrics except as hereinabove
expressly set forth.  The term "theatrical motion picture rights"
as used herein refers to synchronization rights granted with
respect to motion pictures intended primarily and initially for
theatrical release by direct projection before paid-admission
audiences; in no event shall such term refer to motion pictures
or other methods of recordation, whether now known or hereafter
devised, which are produced primarily and initially for
television broadcasting by any means whatsoever.  The term "net
proceeds" as used hereinabove, shall mean all monies actually
received by Company (or any assignee of Company's rights or
licensee hereunder) which are directly attributable to licenses
issued authorizing the manufacture of commercial phonograph
records and/or licenses relating to theatrical motion picture
synchronization rights, and/or for the exercise of publication
rights referred to in subclause (iii) above, as the case may be,
after the deduction of all costs, expenses, fees and commissions
which are directly attributable to the exploitation of the Lyrics
and combined music by way of commercial phonograph records or by
way of theatrical motion picture synchronization, or by way of
publication, as the case may be, computed in accordance with good
and standard practices.  In the event that Company licenses the
Lyrics or any songs in a form containing music or other literary
materials written or composed by any third party or parties, then
Contractor's royalties hereunder, with respect to the Lyrics or
such songs in such form, shall be reduced proportionately to an
amount equal to the royalties payable hereunder divided by the
number of composers and lyricists (including Writer) who have
furnished materials and services for such music and Lyrics and
who are entitled to receive royalties from Company, provided that
in the event that both one or more composers and one or more
lyricists have furnished materials and services for such songs,
then the total royalties payable to all such lyricists (including
Writer) collectively in accordance with the aforesaid
proportionate reduction with respect to such Lyrics or such songs
shall be equal to the total royalties payable to all such
composers collectively in accordance with said reduction with
respect to such Lyrics or such songs.  Company shall render
royalty statements to Contractor, accompanied by any remuneration
due Contractor, such statements to be rendered at least once
during each calendar year during which royalties are payable.

(b)  If, for any reason, exportation of money to
the United States from any foreign country, territory or place
should be prohibited, prevented or rendered commercially
impracticable, the amount received by Company (if Company's share

- 6 -

thereof is actually paid to Company in such foreign country,
territory or place) shall not be considered gross receipts
hereunder unless and until the same shall have actually been
received in the United States in United States currency, less any
discounts, losses, costs or expenses suffered by or imposed upon
Company with respect to transmittal of such money to the United
States and the conversion thereof to United States currency;
provided, however, that if Contractor so requests in writing,
that portion of such blocked or frozen funds which would
represent Contractor's share of net proceeds of such gross
receipts, but for being frozen or blocked, shall be deposited in
Contractor's name in any bank or depository designated by
Contractor in such country wherein such funds are blocked or
frozen subject to the laws of such country with respect to such
deposits and withdrawals by Contractor therefrom.  Contractor
shall have the right at Contractor's sole expense to inspect
Company's books and records relative to gross receipts derived
from use of the Lyrics hereunder and to make extracts thereof
provided such inspection shall be made at Company's offices
during reasonable business hours and upon reasonable notice and
not more frequently than once per year.  All royalties,
statements and other accounts rendered by Company shall be
binding upon Contractor and not subject to any objection by
Contractor unless specific objection in writing, stating the
basis thereof, is given to Company by Contractor by one (1) year
from the date rendered.

          (c)  If Company assigns or licenses any uses of the
music publishing rights to any third party (including any
aforementioned subsidiary or affiliated company) and if Company
authorizes such third party to account directly to Contractor
with respect to royalties payable to Contractor by reason of any
such uses of such music publishing rights, then Contractor agrees
that, during the term of any such assignment or license, Writer
shall look only to such assignee or licensee for payment of such
royalties (and shall be entitled only to inspect such assignee's
or licensee's books and records relative to uses of the Lyrics at
reasonable business hours and at such assignee's or licensee's
offices), provided that Company shall not be relieved of its
obligations with respect thereto unless the assignee is a parent,
subsidiary or affiliate of Company, or a recognized distributor
of motion pictures or television programs, or a "major" motion
picture company (as that term is understood in the motion picture
industry), or a "major" television network (as that term is
understood in the television industry), or a "major" record
company or music publishing company (as those terms are
understood in the music industry).

          (d)  Contractor acknowledges that Company has not
made and is not hereby making any representation or warranty with
respect to the amount of royalties, if any, which may be derived

from uses of music publishing rights, it being further understood
that nothing herein shall be deemed to impose any obligation on
Company to use or authorize the use of the Lyrics and/or any
music publishing rights derived therefrom.

       7.    Company agrees that:

       (a)  if the description of the Lyrics in Paragraph
1 of this Agreement refers to a particular television program in
connection with which such Lyrics may be used, and if such Lyrics
or a substantial portion thereof are used in connection with such
program or are otherwise used hereunder, then Company shall give
Writer (or cause Writer to be given) credit as Writer of such
Lyrics or as a writer of the television series on all release
prints of such programs;

       (b)  if any of the Lyrics as described in Paragraph
1 of this Agreement are used as Lyrics for the theme song for a
television pilot program and/or television series, then Company
shall give Writer (or cause Writer to be given) credit on all
release prints of any such program in whcih such theme song is
used as the theme song, as Writer of the Lyrics of such theme
song.  It being understood that whenever the composer receives
credit the lyricist receives credit in the same size and style as
the composer.

The form, style, size, placement and nature of any credit
provided for herein shall be determined by Company (or its
assignee or licensee) in its sole discretion.  Any unintentional
and/or inadvertent failure to give credit as above provided,
whether because of lack of broadcast time or otherwise, shall not
be a breach of this Agreement.

       8.   Company shall have the right and may grant to
others the right to use, disseminate, reproduce, print and
publish Writer's name, likeness, voice and biographical material
concerning Writer as news or informative matter and in connection
with advertising and for purposes of trade in connection with any
motion picture or television program in which the Lyrics are
used, and/or in connection with any other uses of the Lyrics.
The rights granted herein shall not include the right to use or
to grant to others the right to use Writer's name, voice,
likeness and biographical material in any direct endorsement of
any product or service without Writer's prior written consent.

       9.   Contractor hereby warrants that Contractor is free
and able to enter into and fully perform this Agreement, to
furnish the services of Writer, and to grant all rights herein
granted.  Further, Contractor warrants that the Lyrics in the
form in which they are delivered shall be wholly original with
Writer and shall not be copied from any other work and shall not,
nor shall the use thereof, infringe or violate the copyright or
any common law right or any personal, proprietary, or other right

- 8 -

of any kind whatsoever of any person, firm, corporation or
association. If any of the Lyrics delivered hereunder are
described as based upon traditional or public domain
compositions, Contractor warrants that such compositions are in
the public domain throughout the world and that Writer's
treatment of such compositions is original and shall not be
copied from any work other than such public domain compositions,
nor shall the use thereof infringe or violate the copyright or
any common law right or any personal, proprietary or other right
of any kind whatsoever of any person, firm, corporation or
association. Notwithstanding the foregoing, if any of the Lyrics
delivered hereunder are described as based upon materials
furnished by Company or as based upon traditional or public
domain compositions furnished by Company, Contractor makes no
warranty as to the originality or ownership of such materials or
compositions furnished by Company.

     10. Contractor shall indemnify and hold Company, its
successors, assigns and licensees, any network and/or stations
over which the Lyrics shall be broadcast, the sponsors, if any,
of any program on which they are broadcast, and their advertising
agencies, if any, and any other parties who shall utilize the
Lyrics or any part thereof in any way with Company's permission,
and the directors, officers, agents and employees of any of the
foregoing, free and harmless from any and all claims, damages,
liabilities, costs and expenses, including reasonable counsel
fees, arising out of any use of the Lyrics or any part thereof or
arising out of any breach by Contractor of any warranty or
agreement made by Contractor herein. Company shall similarly
indemnify and hold Contractor harmless with respect to any claims
by any third party that the separate music itself (as opposed to
the Lyrics or the music combined with Lyrics) infringes the
copyright or other rights of third parties.

     11. It is understood and agreed that all or part of
this Agreement and all the results and proceeds thereof may be
assigned by Company to any third party without Contractor's
consent and in this event, Company's successors and/or assigns
shall be entitled to any and all rights, privileges, and equities
to which Company is entitled under and by virtue of this
Agreement. In the event of such an assignment, Company shall not
be relieved of its obligations hereunder unless the assignee is a
parent, subsidiary or affiliate of Company or a recognized
distributor of motion pictures or television programs, or a
"major" motion picture company (as that term is understood in the
motion picture industry), or a "major" television network (as
that term is understood in the television industry), or a "major"
record company or music publishing company (as those terms are
understood in the music industry).

Nothing in this Agreement shall in any way derogate from, diminish or impair any rights granted to the Company or to any parent, subsidiary or affiliate of Company under any other agreement entered into between Writer and Company or any parent, subsidiary or affiliate thereof.

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their successors, assigns and licensees.

12.  (a)  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to contracts entered into and fully to be performed therein.

(b)  A waiver by either party of any of the terms and conditions of this Agreement in any one instance shall not be construed to be a waiver of such term or condition for the future, or of any subsequent breach thereof.  All remedies, rights, undertakings, obligations and agreements contained in this Agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either party.

(c)  This Agreement contains the entire understanding of the parties hereto relating to the subject matter herein contained and this Agreement cannot be changed, rescinded or terminated orally.

(d)  If any provisions of this Agreement as applied to any party or to any circumstances shall be adjudged by a court to be void or unenforceable, the same shall in no way affect any other provision of this Agreement, the application of such provision in any other circumstances or the validity or enforceabililty of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

SUNBOW PRODUCTIONS, INC. ("Company")

By: _____
        Its

BHB PRODUCTIONS, INC. ("Contractor")

By: _____
        Its

- 10 -

## Schedule A

Barry Harman ("Writer") hereby certifies that he wrote certain original lyrics as an employee of BHB PRODUCTIONS, INC. ("Contractor") in the regular course of his employment. Contractor hereby certifies that Contractor was specially commissioned by SUNBOW PRODUCTIONS, INC. ("Company") to furnish the services of Writer to write and deliver said lyrics to Company for use as part of a fully-animated children's television program tentatively entitled "GLO FRIENDS SAVE CHRISTMAS" pursuant to an agreement dated as of _June 1_, 1985. Accordingly, Writer and Contractor acknowledge and agree that the said lyrics are a work made for hire within the meaning of Section 101 of the United States Copyright Act and that Company is the author and owner thereof and is entitled to copyright therein (and all renewals thereof), and all rights of any kind or nature therein, with the right to make such changes therein and uses thereof as Company may from time to time determine as such author and owner.

BHB PRODUCTIONS, INC.
("Contractor")

Dated:

By: _Carole Weston_

Dated: _2/21/86_

_Barry Harman_
Barry Harman

- 11 -

INDUCEMENT LETTER

Dated as of *June 1* , 1985

Sunbow Productions, Inc.
380 Lexington Avenue
Suite 1105
New York, New York  10168

    Re:  Sunbow Productions, Inc. with BHB Productions,
        Inc./"GLO FRIENDS SAVE CHRISTMAS"

Gentlemen:

    Reference is made to that certain agreement dated as of
_____*June 1*_____ , 1985 (herein called the "Agreement") between
BHB PRODUCTIONS, INC. (herein called "Contractor") and you,
which, among other things, makes available the services of the
undersigned by Contractor to you for the purposes set forth in
said Agreement.

    As an inducement to you to enter into the Agreement and as a
material part of the consideration moving to you for so doing,
the undersigned hereby represents, warrants and agrees as follows:

    1.  That the undersigned has heretofore entered into an
agreement (herein callled the "Employment Agreement") with
Contractor covering the rendition of the undersigned's services
for Contractor and that Contractor has the right and authority to
enter into the Agreement and to furnish the rights and services
of the undersigned upon the terms and conditions therein
specified.

    2.  That the undersigned is familiar with each and all
of the terms, covenants and conditions of the Agreement and
hereby consents to the execution thereof; that the undersigned
shall perform and comply with all of the terms, covenants and
conditions of the Agreement on the part of the undersigned to be
performed and complied with, even if the Employment Agreement
should hereafter be terminated or suspended; that the
representations and warranties of Contractor contained in the
Agreement are true; that the undersigned shall render all of the
services provided for under the Agreement and hereby confirms
that there have been granted to Contractor all of the rights
granted by Contractor to you under the Agreement; that all
notices served upon Contractor in accordance with the Agreement
shall be deemed notices to the undersigned of the contents
thereof.

- 12 -

3.    That the undersigned is under no obligation or disability by law or otherwise which would prevent or restrict the undersigned from performing and complying with all of the terms, covenants and conditions of the Agreement on the part of the undersigned to be performed or complied with.

4.    That, except in the event that the undersigned is deemed substituted for Contractor as a direct party to the Agreement, pursuant to Paragraph 6 hereof, the undersigned will look solely to Contractor and not to you for all compensation and other remuneration for any and all services and rights which the undersigned may render and/or grant under the Agreement.

5.    That you shall be entitled to equitable relief against the undersigned by injunction or otherwise to restrain, enjoin and/or prevent the violation or breach by the undersigned of any obligation of the undersigned to be performed as provided in the Agreement and/or the violation or breach by the undersigned of any obligations or agreements under this present instrument.

6.    That if Contractor should be dissolved or should otherwise cease to exist or for any reason whatsoever should fail, be unable, neglect or refuse to perform and observe each and all of the conditions of the Agreement requiring performance or compliance on its part, the undersigned shall at your election be deemed substituted as a direct party to the Agreement in the place and stead of Contractor and, further, that in the event of a breach or threatened breach of the Agreement by Contractor or by the undersigned you shall be entitled to legal and equitable relief by way of injunction or otherwise against Contractor or against the undersigned or both of us in your discretion, in any event without the necessity of first resorting to or exhausting any rights or remedies which you may have against Contractor; all of the foregoing to be to the same extent and with the same force and effect as if the undersigned were a direct party to the Agreement in the first instance and as if in the Agreement the undersigned had personally agreed to render the services therein provided to be rendered by the undersigned and to perform and observe each and all of the terms and conditions of the Agreement requiring performance or compliance on the part of the Contractor or the undersigned or both of us.

Very truly yours,

BARRY HARMAN

- 13 -

Exhibit H

```
 1           SUPREME COURT OF THE STATE OF NEW YORK
                      COUNTY OF ROCKLAND
 2                   Index No. 5192/00

 3

 4    ANNE BRYANT,

 5                    Plaintiff,

 6          -vs-

 7    BROADCAST MUSIC, INC.,
      (a/k/a "BMI"), CLIFFORD A.
 8    "FORD" KINDER, BINDER & CO.,
      LTD., VADIVOX, LTD, JULES M.
 9    "JOE" BACAL,  GRIFFIN BACAL,
      INC., STARWILD MUSIC BMI,
10    WILDSTAR MUSIC ASCAP, SUNBOW
      PRODUCTIONS, INC., and JOHN
11    AND JANE DOES 1-10,

12                    Defendants.

13    Caption Continued...

14

15                    Deposition of CAROLE WEITZMAN,

16    taken by and before Denise Posillico, at the

17    offices of PATTERSON, BELKNAP, WEBB & TYLER,

18    LLP, 1133 Avenue of the Americas, New York, New

19    York, on Monday, May 19, 2003, commencing at

20    9:30 in the morning.

21

22

23               GAF LEGAL SERVICES, INC.
         COURT REPORTING * VIDEOGRAPHY * INTERPRETING
24               188 Eagle Rock Avenue
                 Roseland, NJ 07068
25                 (973) 618-0500
```

Page 2

```
 1   ANNE BRYANT,
 2        Plaintiff,
              Index No. 2821/02
 3        -vs-
 4   SUNBOW PRODUCTIONS, INC.,
 5        Defendant.
 6
 7
 8
 9
10   A P P E A R A N C E S:
11
12      MONAGHAN, MONAGHAN, LAMB
           & MARCHISIO
13      BY:  PATRICK J. MONAGHAN, JR., ESQ.
           28 West Grand Avenue
14         Montvale, New Jersey 07645
           Attorneys for Plaintiff
15
16      PATTERSON, BELKNAP, WEBB & TYLER, LLP
           BY:  ROSEANN KITSON, ESQ.
17         Attorneys for Defendant,
           Sunbow Productions, Inc.
18         1133 Avenue of the Americas
           New York, New York 10036-6710
19
20      DUANE MORRIS
           Attorneys for Defendant,
21         Jules M. Bacal
           380 Lexington Avenue
22         New York, New York 10168
           BY:  ADRIENNE L. VALENCIA, ESQ.
23
24
25
```

Page 3

```
 1              I N D E X
 2
     WITNESS                     PAGE
 3
 4   CAROLE WEITZMAN
 5   Direct Examination by Mr. Monaghan      6
 6   Cross Examination by Ms. Valencia      97
 7   Redirect Examination by Mr. Monaghan  101
 8
 9
10
11          E X H I B I T S
12
     WEITZMAN
13   A     Clearance Form           37
14   B     Group of documents       38
15   C     Document bearing production
                numbers 2398 through 2606   38
16
     D     Form submitted by Sony ATV
17         during the time it was
           administering Sunbow's
18         publishing               67
19   E     Document bearing production
                numbers 2205 through 2397   73
20
     F     G.I. Joe box set of the
21         three videos             84
22   G     G.I. Joe The Movie       86
23   H     The Transformers, The Movie   86
24   I     The Transformers, Villains
           The Ultimate Doom        86
25
```

Page 4

```
 1              E X H I B I T S
 2
     WEITZMAN
 3
     J     The Transformers, Heroes -
 4         The Rebirth              86
 5   K     Inhumanoids, The Evil That
           Lies Within, Episode one
 6         through five             86
 7
 8
 9
10
11       INFORMATION TO BE FURNISHED
12
     PAGE 25   Address of Sandrine Pechels De Saint
13               Sardos
14    97   Address of Sam Milstone
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1
 2          IT IS HEREBY STIPULATED AND
 3   AGREED by and between the attorneys for the
 4   respective parties herein, that the filing,
 5   sealing and certification of the within
 6   deposition be waived.
 7
 8          IT IS FURTHER STIPULATED AND
 9   AGREED that all objections, except as to the
10   form of the question, shall be reserved to
11   the time of the trial.
12
13          IT IS FURTHER STIPULATED AND
14   AGREED that the within deposition may be
15   sworn to and signed before any officer
16   authorized to administer an oath with the
17   same force and effect as if signed and
18   sworn to before the Court.
19
20
21
22
23
24
25
```

Page 6

1  C A R O L E   W E I T Z M A N,
2  called as a witness, having been
3  duly sworn, was examined and testified
4  as follows:
5
6  DIRECT EXAMINATION
7  BY MR. MONAGHAN:
8     Q.   Good morning.  My name is Patrick
9  Monaghan.  I'm with Monaghan, Monaghan, Lamb &
10 Marchisio.  We are attorneys for Anne Bryant in
11 this case.  I'm going to be asking you some
12 questions about matters pertaining to her
13 lawsuit against Sunbow Productions, Jules "Joe"
14 Bacal, originally against BMI.  And if you
15 don't understand my question, please let me
16 know, I'll try and clarify it.
17     If you answer one of my questions,
18 we're going to assume you understood the
19 question, is that fair?
20    A.   Yes.
21    Q.   I see you nodding and that's
22 another instruction we give, that the court
23 reporter is not allowed to interpret a nod or a
24 gesture, so you have to give your answers
25 verbally.

Page 7

1     A.   Okay.
2     Q.   What will happen is the reporter
3  will make a transcript up, which is a written
4  booklet with the questions and the answers, and
5  that testimony that you're giving, which is
6  under oath, may be utilized in a court
7  proceeding in accordance with the rules.
8     Have you ever been deposed before?
9     A.   No.
10    Q.   Are you currently employed?
11    A.   Yes.
12    Q.   By whom or what?
13    A.   Four Kids Productions.
14    Q.   Four Kids Productions?
15    A.   Yes, the number four.
16    Q.   It sounds like a family company to
17 me.  Would that be your company?
18    A.   No, it's a public corporation.
19    Q.   What do you do for that company?
20    A.   I supervise an animated series,
21 Teenage Mutant Ninja Turtles.
22    Q.   How long have you been employed by
23 Four Kids Productions?
24    A.   A year.
25    Q.   And before that?

Page 8

1     A.   Sunbow.
2     Q.   And what was your last job held at
3  Sunbow?
4     A.   The job?  I was senior
5  vice-president of production.
6     Q.   And is that the Sunbow company
7  that's involved in this lawsuit?
8     A.   Yes, it was bought by Sony, but
9  it's the same Sunbow.
10    Q.   And how is it that you're here
11 today, do you know?
12    A.   Well, I know there was a lawsuit
13 that was brought, something to do with music.
14    Q.   Are you being represented by
15 Ms. Kitson?
16    A.   Yes.
17    Q.   And what do you know about the
18 lawsuit?
19    A.   Not much at all.
20    Q.   Have you seen any court papers?
21    A.   I've just seen some cue sheet.
22    Q.   Do you have them here with you
23 today?
24    A.   No.
25    Q.   And what are cue sheets?

Page 9

1     A.   It's a record of the music that's
2  contained in the series.
3     Q.   All right, we'll come back to
4  this.  How long were you at Sunbow?
5     A.   About 21 years.
6     Q.   When was it sold to Sony, do you
7  know?
8     A.   No.
9     Q.   What type of company was Sunbow,
10 what did they do?
11    A.   TV production.
12    Q.   And who owned the company?
13    A.   Tom Griffin, Joe Bacal.
14    Q.   For how long a period do you know
15 they owned it?
16    A.   Ever since I started.
17    Q.   Is that 21 years ago?
18    A.   Yes.
19    Q.   And where was Sunbow located?
20    A.   When I started, it was at
21 Lexington and 42nd Street.
22    Q.   And when you left?
23    A.   We were at 100 Fifth Avenue.
24    Q.   Who did you report to when you
25 left?

Carole Weitzman

Page 10

1    A.   I'm sorry?
2    Q.   Who was your boss when you left,
3 who did you report to?
4    A.   There was really no boss. It was
5 George Becker, because the company was sold.
6    Q.   You were there after Sony
7 purchased the company?
8    A.   Oh, sure.
9    Q.   What was Mr. Becker's title?
10    A.   I don't know.
11    Q.   How did you know you were to
12 report to him?
13    A.   To George? Because the company
14 was sold to Loonland and there was no one left
15 from Sony.
16    Q.   What was Becker to Loonland?
17    A.   Nothing. I guess he made the
18 deal. I don't know what his job was. I know I
19 was finishing the production of the series.
20    Q.   What series is that?
21    A.   Cramp Twins.
22    Q.   Cramp, C-R-A-M-P?
23    A.   Yes.
24    Q.   Since I have twins, I would like
25 to know what that's all about.

Page 11

1    A.   It's fun, it's on on Saturday
2 morning.
3    Q.   Now, going back to the early
4 1990s, can you give me the hiarchy in terms of
5 management at Sunbow? Let's say from 1990 on.
6    A.   1990? Well, Tom Griffin, Joe
7 Bacal.
8    Q.   What were their titles with
9 Sunbow?
10    A.   I'm really not quite sure. I'm
11 not a hundred percent sure.
12    Q.   You just knew they owned the
13 company?
14    A.   Yes.
15    Q.   And you reported to them?
16    A.   Yeah, and C.J. Kettler.
17    Q.   What was his title?
18    A.   It's a woman. She became
19 president.
20    Q.   And you were there, and what was
21 your job at that point in time?
22    A.   Same thing, always supervising the
23 productions.
24    Q.   What does that entail?
25    A.   Oh, it's just watching over the

Page 12

1 shows, doing the budgets, managing the staff,
2 timetables, delivery schedules. It's the
3 management of it.
4    Q.   Are you familiar with BMI and
5 ASCAP?
6    A.   Yeah.
7    Q.   What are they?
8    A.   They are music associations.
9    Q.   Performing rights associations?
10    A.   I guess, yes.
11    Q.   Did you have any involvements with
12 those associations?
13    A.   Other than sending them cue
14 sheets, no.
15    Q.   What is a cue sheet?
16    A.   It's the record of -- it's, the
17 animation is done and then there is a library of
18 music that's composed of music cues. The cues
19 are strung together from beginning to end of the
20 show, and each cue has a name and a duration and
21 that's put on a cue sheet.
22    Q.   And under what circumstances are
23 cue sheets used?
24    A.   When a show is completed, the cue
25 sheets are done and then they are submitted to

Page 13

1 either ASCAP, BMI or both, and somehow money
2 comes out of it, which I'm not quite sure, to
3 publishers and composers and lyricists.
4    Q.   And did you take part in
5 submitting them to BMI and ASCAP?
6    A.   Well, I was always -- we didn't
7 have a lot of staff people at Sunbow, so I was
8 always the central person for copyright forms,
9 cue sheet, anything like that. Because when
10 people left after production, I was on staff.
11 So anything that kept coming in would come to my
12 attention. So I submitted them and got them
13 back and filed them.
14    Q.   Do you know what clearance sheets
15 are or clearance forms?
16    A.   No.
17    Q.   Did you ever use a cue sheet to
18 accomplish a change in the percentages or the
19 ownership or attribution, I should say, of a
20 writer's participation?
21    A.   No, never.
22    Q.   Where would you get the
23 information which would eventually be in your
24 cue sheets that you would submit?
25    A.   Well, typically in post

Carole Weitzman

Page 14

1   production, which is when the picture and the
2   sound are put together, there is a sound
3   editor, the music editor, and the music editor
4   lists the cues because they know the library, I
5   guess.
6       Q.    So the music editor would make the
7   decision as to the information that would
8   eventually --
9       A.    The cues.
10      Q.    To the cues?
11      A.    Yes.
12      Q.    Who would have information as to
13  the composers, the authors of the music?
14      A.    I didn't have anything to do with
15  that. I mean I don't know -- I guess there were
16  contracts or whatever it was that existed --
17      Q.    Right.
18      A.    -- that did that. I don't know
19  what they were, though.
20      Q.    What information was contained in
21  the cue sheets?
22      A.    Besides the cues? Who the
23  composers were.
24      Q.    Okay. Well, that's what I'm
25  trying to find out.

Page 15

1       A.    Oh, yeah, who the composers were
2   and who --
3       Q.    Who put the information in as to
4   the composers?
5       A.    I'm telling you, I didn't put that
6   information in there.
7       Q.    Somebody gave you that
8   information?
9       A.    I don't think they gave me that
10  information. It was on the cue sheet when I got
11  it. And we had a music administrator who filed
12  the cue sheet.
13      Q.    Who was the music administrator?
14      A.    Bill Dobishinski.
15      Q.    Well, in its earliest iteration,
16  who prepared the cue sheet?
17      A.    The post production facility.
18      Q.    So that was at your end, at
19  Sunbow's end?
20      A.    Usually in LA.
21      Q.    And then it went -- and who
22  did that, who was the person who did that?
23      A.    I have no idea. It was at Marvel
24  Productions. We hired Marvel to do the series.
25      Q.    Well, which cue sheets are you

Page 16

1   talking about here, when you say Marvel?
2       A.    Under Marvel? It was probably My
3   Little Pony, G.I. Joe, Transformers, Jem, Big
4   Foot, Robotix. I'm trying to think of the
5   others. Those were the earlier --
6       Q.    Real American Hero sound familiar?
7       A.    G.I. Joe is G.I. Joe Real American
8   Hero.
9       Q.    Same thing. What documents have
10  you read in connection with this lawsuit?
11      A.    Nothing, just the cue sheets.
12      Q.    Have you ever seen any testimony
13  by Mr. Bacal?
14      A.    No.
15      Q.    Have you talked to Mr. Bacal about
16  the case?
17      A.    No.
18      Q.    Aside from Ms. Kitson, have you
19  had any discussions with anyone else about the
20  case?
21      A.    No.
22      Q.    Do you know Alison Smith?
23      A.    No.
24      Q.    Who do you know at BMI, if anyone?
25      A.    Nobody.

Page 17

1       Q.    Do you know Anne Bryant?
2       A.    Sure.
3       Q.    For how long have you known her?
4       A.    She used to visit the office, so I
5   met her, God knows, in the '80s, I guess. Yeah,
6   when we did Jem.
7       Q.    How would you characterize your
8   relationship with Anne Bryant?
9       A.    My relationship? I was the
10  production assistant, so when she delivered
11  music and whatever -- I mean she's very friendly
12  and nice and she would give us music to go on
13  the show and that would be it.
14      Q.    I mean, did you get along, is what
15  I'm saying?
16      A.    Oh, sure, she was nice.
17      Q.    Now, how did Sunbow know whether
18  it could or could not use music employed in one
19  of its productions, whether it was permitted by
20  the composer?
21      A.    I have no idea.
22      Q.    Well, the cue sheets that you
23  submitted were submitted over your signature,
24  weren't they?
25      A.    I don't think I ever signed a cue

Carole Weitzman

Page 18

1  sheet. I'm sure my name was on it because it
2  was on every copyright form, it was on
3  everything.
4      Q.  In what areas was Sunbow involved
5  in production; TV, movies as well?
6      A.  There were two movies, the My
7  Little Pony movie and the Transformer movie.
8      Q.  What about CDs?
9      A.  CDs?
10     Q.  Yes.
11     A.  I didn't do any CDs.
12     Q.  You didn't do any CDs?
13     A.  (Witness nodding.)
14     Q.  Sunbow didn't?
15     A.  Not that I know of, no.
16     Q.  What about videos?
17     A.  Video distribution?
18     Q.  Yes.
19     A.  There was -- that was all done
20  through international sales, home video and
21  series distribution. I wasn't involved in that.
22     Q.  Give me the chain of command at
23  Sunbow in, let's take it, right from 1990. You
24  said Tom Griffin and Joe Bacal.
25     A.  Right.

Page 19

1      Q.  Were you second in command?
2      A.  No, C.J. Kettler was the
3  president.
4      Q.  Were there any other
5  vice-presidents?
6      A.  Yes, there was a development
7  vice-president and I was production
8  vice-president.
9      Q.  You were production
10  vice-president?
11     A.  Right. And then there is a sales
12  vice-president. So it was like a team under
13  her.
14     Q.  Could you give me the names of the
15  other people?
16     A.  I'm trying to think, in '90 there
17  were a lot of people coming and going. I think
18  Janet Scardino was there.
19     Q.  In what capacity?
20     A.  Sales.
21     Q.  Sales vice-president?
22     A.  Yeah, I think that was --
23     Q.  Do you know where she is now?
24     A.  No. Development was Nina Hahn.
25     Q.  Nina?

Page 20

1      A.  Nina.
2      Q.  H-A --
3      A.  H-N.
4      Q.  Do you know where she is now?
5      A.  No.
6      Q.  And is this --
7      A.  I'm production. I'm just trying
8  to think. Finance -- I don't remember.
9      Q.  And was this through the '90s?
10     A.  No, it changed. I mean all these
11  people were there in the early '90s, then some
12  sales people came, they left.
13     Q.  Okay. Give me the names of anyone
14  else that you can remember?
15     A.  Ken O'Shanski.
16     Q.  What was his job?
17     A.  Development. Andrew Carpon,
18  finances. Sales -- I don't remember.
19     Q.  Anyone else?
20     A.  I'm trying to give you the people
21  on my equivalent. No, because Ken took over,
22  Andrew was there, and then Janet and then -- no.
23     Q.  Do you know where Mr. O'Shanski --
24     A.  He's at Scholastic Productions.
25     Q.  And how about -- is it Carpon?

Page 21

1      A.  Yeah, I don't know where he is.
2      Q.  Where are the sales records of
3  Sunbow, if you know?
4      A.  The shows, how they sold? The
5  distribution part is at Loonland in New York,
6  you know, where the materials go.
7      Q.  Okay, let me back up. We're
8  trying to locate sales records with respect to
9  Sunbow Productions from the early '90s to date.
10  What can you tell me about where that
11  information might be at this time?
12     A.  Well, there were sales that took
13  place out of New York and the sales team was in
14  New York. When Loonland bought the company, the
15  sales team was their company elsewhere.
16     Q.  Okay, let's stop right there.
17  When Loonland bought -- when was that, 19 --
18     A.  It was right before I left. So I
19  guess it was -- I think 2001, maybe 2000,
20  something like that.
21     Q.  So the records of sales of videos
22  or sales of the two movies --
23     A.  I'm just saying the sales team was
24  in New York. Where they kept their records, I
25  really don't know. I know that they were there.

Carole Weitzman

Page 22

1    Q.    Well, where else could they have
2    been, the records?
3        A.    Oh, I don't know. I'm sure they
4    were there, but you're asking me that I know
5    that they were there, no, I don't know if they
6    were there.
7        Q.    You're sure they were there, but
8    you don't know if they were there?
9        A.    The people were there.
10       Q.    The people were there, you're
11   assuming they were there?
12       A.    Yes.
13       Q.    Okay. Do you have anything to
14   base that assumption upon? Did you have an
15   occasion to ask a question in that regard of
16   any of the people on the sales team?
17       A.    Not regarding the sales. Once I
18   delivered the shows, I delivered the shows.
19       Q.    Who had custody of the sales
20   records, if you know?
21       A.    I don't know. There was a sales
22   team. My presumption is they had their own
23   records.
24       Q.    Do you know how the records were
25   maintained? Were they on computer, were they

Page 23

1    on --
2        A.    No.
3        Q.    Who would know that?
4        A.    Who would know that?
5        Q.    Right, who would know that, you
6    were vice-president of the company.
7        A.    I was the vice-president of the
8    production part of the company, not the sales
9    part of the company.
10       Q.    Did you have meetings from time to
11   time?
12       A.    Sure.
13       Q.    Did you have sales meetings from
14   time to time?
15       A.    I attended them sometimes. So
16   there were people, were pads and pens, and files
17   and computers. I'm not being arbitrary, I'm
18   just saying to you I don't know where their
19   files were, nor would they know where mine were.
20   There were file cabinets all over the office, so
21   my presumption is they had files.
22       Q.    What did you do with your records
23   when the company was sold to Loonland?
24       A.    I left them.
25       Q.    In whose possessions?

Page 24

1        A.    At the office at 100 Fifth Avenue.
2        Q.    You walked out the door, locked
3    the door and left or did you leave them in
4    somebody's custody?
5        A.    I left them in the office because
6    there were still people at Loonland that were
7    there.
8        Q.    Who succeeded to your position, if
9    you know?
10       A.    They don't have production at
11   Loonland. They don't have domestic production.
12   I never worked for Loonland.
13       Q.    Who was there in the Sales
14   Department when the company was sold to
15   Loonland?
16       A.    There was a woman, Sandrine
17   Pechels.
18       Q.    How do you spell Sandrine?
19       A.    S-A-N-D-R-I-N-E  P-E-C-H-E-L-S,
20   it keeps going, De, D-E, Saint, S-A-I-N-T,
21   Sardos, S-A-R-D-O-S. She was the remaining
22   salesperson. I believe the rest of the
23   salespeople for Loonland were either in France,
24   England or Florida.
25       Q.    She was a Loonland person?

Page 25

1        A.    She got hired, yes.
2        Q.    In New York?
3        A.    Yes.
4        Q.    Do you know where she is now?
5        A.    She's not there any more, they let
6    her go.
7        Q.    How did you find that out?
8        A.    She's a friend of mine.
9        Q.    Where does she live?
10       A.    In New York.
11       Q.    Where in New York?
12       A.    In the 90s. I don't have her
13   information here, but she lives in the city.
14       Q.    If I leave a space in the record,
15   when you get a copy of the transcript can you
16   fill in her address for us?
17       A.    Sure.
18   REQUEST: _____
19       Q.    What was her job?
20       A.    She sold the shows, originally in
21   France, the French territories, but then she
22   ended up doing more domestic, trying to sell the
23   international shows to the networks here.
24           MR. MONAGHAN: Roseann, have you
25           been able to find out any information about

Carole Weitzman

Page 26

1    the sales records?
2        MS. KITSON: No.
3        Q.    Is there anyone else who might
4    have information about the sales records
5    besides -- can I call her Sandrine?
6        A.    Oh, yea. No, I mean she would
7    have what's in her head, I'm sure, just from
8    her latest sales, but -- I mean over the years
9    they cut staff, cut staff, so people just left
10   and went elsewhere.
11       Q.    Who is Jay Bacal, J-A-Y Bacal?
12       A.    Joseph.
13       Q.    What was he to Sunbow?
14       A.    He was like very heavily creative
15   in the series.
16       Q.    What series?
17       A.    Oh, God, all of them. From when I
18   started, he was in college, but he used to work
19   on the Great Space Coaster, G.I. Joe,
20   Transformers. He was the equivalent in
21   production, you know, in the creative
22   production, as I was in production management.
23   He watched over all of the shows.
24       Q.    He was a producer?
25       A.    Yes, like a supervising or

Page 27

1    executive producer.
2        Q.    What is Kid Rhino?
3        A.    I don't know.
4        Q.    You never heard of that company?
5        A.    (Witness nodding.)
6        Q.    You never heard of that company in
7    connection with any arrangements with Sunbow
8    Productions?
9        A.    No.
10       Q.    Were you involved in any licensing
11   deals while you were at Sunbow?
12       A.    No, only as far as, you know, if
13   we licensed the properties.
14       Q.    Well, that's what I'm talking
15   about.
16       A.    For sales. I mean not licensing
17   like where I work now, there is toys, there is
18   other ancillary rights. When I delivered the
19   shows, I know they were licensed for
20   distribution, that's the only license.
21       Q.    Okay. So you were not involved in
22   any transactions where Sunbow licensed rights to
23   any of these properties to third parties, is
24   that what you're saying?
25       A.    No, right.

Page 28

1        Q.    Who had responsibility for that?
2        A.    I would imagine C.J. or Tom or
3    Joe.
4        Q.    Did you ever serve as the producer
5    of any of the TV shows?
6        A.    I was never -- I was usually exec
7    in charge of production, not producer.
8        Q.    Are you familiar with the concept
9    of performance royalties?
10       A.    Um-hum.
11       Q.    What does that mean to you?
12       A.    I know that the publishing
13   companies get a hundred percent of the share of
14   their publishing rights and that the composers
15   and lyricists, whoever, get a hundred percent
16   of that through ASCAP, BMI or any international
17   society.
18       Q.    And your testimony is that other
19   than cue sheets, you're not familiar with any of
20   the other forms that are used with respect to
21   registering compositions with BMI or ASCAP?
22       A.    Right.
23       Q.    And who pays the royalties, those
24   performance royalties, that hundred percent to
25   the publisher and that hundred percent to the

Page 29

1    writer?
2        A.    I honestly don't know. I know you
3    get paid by ASCAP or BMI, but I don't know how
4    that revenue is generated.
5        Q.    You don't know how that revenue is
6    generated?
7        A.    No.
8        Q.    Do you know what mechanical
9    royalties are?
10       A.    I've heard of it, but I don't
11   know.
12       Q.    Do you know the name Starwild?
13       A.    Yes.
14       Q.    What is Starwild?
15       A.    It's one of Sunbow's publishing
16   companies.
17       Q.    What were the names of some
18   others?
19       A.    Wildstar.
20       Q.    Was one a BMI company and one an
21   ASCAP company?
22       A.    I was just going to say I don't
23   remember which one was which. I think Wildstar
24   was BMI. And then there was Banana Alert and
25   Apollo's Chariot, I think. Banana Alert was

Carole Weitzman

Page 30

1   BMI.
2       Q.    Under what circumstances would
3   Sunbow use one or the other of those two
4   companies?
5       A.    In the '90s we started using the
6   Apollo's Chariot and the Banana Alert. I have
7   no idea why.
8       Q.    Who made that decision?
9       A.    I don't really know. That's just
10  what became our companies.
11      Q.    What did you have to do with
12  Wildstar or Starwild?
13      A.    Nothing.
14      Q.    Who at Sunbow had involvement in
15  anything to do with Starwild or Wildstar?
16      A.    I'm not sure -- I don't know what
17  you mean.
18      Q.    Weren't they Sunbow's --
19      A.    It was on a cue sheet, that's all
20  I ever saw was of Starwild and Wildstar.
21      Q.    Well, weren't they companies,
22  Starwild and Wildstar?
23      A.    I would imagine they were.
24      Q.    And didn't monies come in from
25  time to time payable to Starwild or Wildstar

Page 31

1       A.    If monies came in, they went to
2   the Finance Department, they wouldn't have come
3   to me.
4       Q.    Okay, but maybe you could answer
5   my question anyway.
6       A.    Okay.
7       Q.    Didn't monies come in from time to
8   time payable to Wildstar or Starwild as the
9   publisher of certain compositions?
10      A.    Yes.
11      Q.    How do you know that?
12      A.    There would be checks that would
13  come in.
14      Q.    You would see the checks?
15      A.    Yes.
16      Q.    And what happened to the checks?
17      A.    They went to the Finance
18  Department.
19      Q.    And who had charge of that?
20      A.    Well, over the years it changed.
21      Q.    Give me some names.
22      A.    Years ago it was Bob Darcy, Bill
23  Biehl.
24      Q.    How do you spell Bill Biehl's
25  name?

Page 32

1       A.    Bill B-I-E-H-L, I think.
2       Q.    What were their titles?
3       A.    They were like chief financial
4   officers, I think.
5       Q.    Do you know where they are now?
6       A.    No. Then Raul Soto, he was a
7   controller at the time.
8       Q.    And when would either company have
9   received monies, under what circumstances?
10      A.    We also had that music
11  administrator, so he knew about all this too.
12      Q.    Bill Dobishinksi?
13      A.    Yes.
14      Q.    Do you know where he is?
15      A.    He kind of disappeared off the
16  face of the earth. I don't know what happened
17  to him.
18      Q.    Well, have you heard of a company
19  called TAMAD?
20      A.    Oh, yeah.
21      Q.    Do you know what that stands for?
22      A.    No.
23      Q.    And he was an administrator of the
24  publishing for Starwild and Wildstar?
25      A.    He would track the monies and

Page 33

1   hound people to get the monies in, and then he
2   would get a fee.
3       Q.    He took a fee from the monies he
4   tracked?
5       A.    Yes.
6       Q.    And who hired him?
7       A.    Sunbow hired him.
8       Q.    To administer Sunbow's publishing
9   rights?
10      A.    Yes.
11      Q.    And who provided the information
12  to Dobishinski as to what compositions he was
13  to administer?
14      A.    He got copies of the cue sheets.
15      Q.    So this was done through the cue
16  sheets, that was the source of Dobishinski's
17  information?
18      A.    Well, I don't know how he tracked
19  it through ASCAP and BMI. I know he did have
20  relationships with ASCAP and BMI.
21      Q.    But from Wildstar --
22      A.    From our side?
23      Q.    Yes, from your side.
24      A.    Yeah, through the cue sheets.
25      Q.    Any other sorts of information

Carole Weitzman

Page 34

1    given to him?
2        A.    No. I mean if he asked for a copy
3    of the show, we would give him a copy of the
4    show, but, you know, we had hundreds of half
5    hours of shows, so...
6        Q.    Now, if a cue sheet reflected that
7    Anne Bryant was the composer of music, where
8    would that information have come from?
9        A.    I guess Tom or Joe. Somebody
10   would have had to tell me.
11       Q.    Did Sunbow retain copies of the
12   cue sheets that were submitted to ASCAP or BMI?
13       A.    Yes.
14       Q.    And who had custody of those?
15       A.    They are at the office because
16   they are needed for international distribution,
17   they are used by a lot of different people.
18       Q.    Where are they now?
19       A.    I'm surely at Loonland's office.
20       Q.    In New York?
21       A.    Yes.
22       Q.    I know you left, but do you know
23   who would have them?
24       A.    It would be Rebecca Gallivan,
25   G-A-L-L-I-V-A-N.

Page 35

1        Q.    As far as you know, she's still
2    there?
3        A.    Yeah, she's there. I mean they
4    may be on disks now. I don't know how they have
5    them, but they have them.
6        Q.    Now, you indicated you're not
7    familiar with Alison Smith; is that correct?
8        A.    No.
9        Q.    Ms. Smith has put in an affidavit
10   in this case indicating that cue sheets are
11   used when music is prepared originally for the
12   TV production. Do you know anything about that
13   concept?
14       A.    I think what you're saying is what
15   I said at the beginning, when we prepare the
16   show, like the cues are listed.
17       Q.    Now, did you prepare cue sheets,
18   any cue sheets, when I say "you," Sunbow, any
19   cue sheets with respect to any of the music
20   composed by Anne Bryant for any of those
21   compositions or those properties that we talked
22   about earlier?
23       A.    Well, I mean I know Anne worked on
24   the early series, especially Jem, is the one I
25   really remember her working on. So I'm sure she

Page 36

1    would be on the cue sheets.
2        Q.    But the music that was composed by
3    Anne was not composed for any TV production or
4    any other iteration, they were composed as
5    jingles; isn't that right?
6        A.    No, the songs that she did for Jem
7    were composed for the series. She may have done
8    for commercials, which are called jingles, but
9    she didn't do jingles for the series.
10       Q.    For the Jem series?
11       A.    (Witness nodding.)
12       Q.    What about Transformers?
13       A.    I don't remember working with her
14   on those series.
15       Q.    You know she composed the music
16   though; isn't that right?
17       A.    I don't know that.
18       Q.    Do you know whether Anne had any
19   rights at all with respect to G.I. Joe?
20       A.    No.
21       Q.    You don't know?
22       A.    No.
23       Q.    Do you know Ford Kinder?
24       A.    They were partners, I believe, at
25   the time when I worked with them.

Page 37

1        Q.    Have you had any dealings with
2    Ford Kinder?
3        A.    No, not for years.
4        Q.    I'm going to show you now a
5    clearance form, which I'm going to ask the
6    reporter to mark as Weitzman Exhibit A.
7
8            (Weitzman Exhibit A, Clearance
9        Form, marked for identification.)
10
11       Q.    Have you ever seen that type of
12   document before?
13       A.    No.
14           MR. MONAGHAN: I'm going to show
15       you, I'm going to have them marked
16       collectively, the top document is a letter
17       from your attorney, Ms. Kitson, enclosing
18       documents, and there is also your list,
19       Roseann, and a number of license
20       agreements.
21           Since you may or may not know
22       anything about this, I would like to mark
23       them collectively as Weitzman Exhibit B,
24       with the caveat that it doesn't include the
25       videotapes, which I've mentioned

Carole Weitzman

Page 38

1     in the letter.
2
3          (Weitzman Exhibit B, Group of
4     documents, marked for identification.)
5
6     Q.    I'm going to ask you to take a few
7     minutes, please, look through those documents,
8     and then I'll ask you a question or two about
9     them.
10    A.    No, I haven't seen these.
11    Q.    You've never seen any of these
12    before?
13    A.    No.
14         MR. MONAGHAN:  Roseann, just a
15    question on the record, are you
16    representing Loonland?
17         MS. KITSON:  No, we represent
18    Sunbow Productions.
19         MR. MONAGHAN:  I guess we're going
20    to have to mark this batch as Exhibit C.
21    The top page is Bates stamped 2398 and the
22    bottom page is marked 2606.
23
24         (Weitzman Exhibit C, Document
25    bearing production number 2398 on the top

Page 39

1     page and production number 2606 on the last
2     page, marked for identification.)
3
4     Q.    I show you now, Ms. Weitzman,
5     Weitzman C for identification and ask you if you
6     could  identify these documents?
7     A.    Yeah, these are cue sheets.
8     Q.    Does each of these bear your name?
9     A.    Yes.  Well, I mean -- yes.
10    Q.    And what does that signify, that
11    your name is on there?
12    A.    That anything that came in the
13    office regarding this, you know, questions or
14    whatever, would just come to my attention.
15    Basically we just filed these and I didn't
16    really hear anything about it afterwards.
17    Q.    So the information that's in those
18    cue sheets was prepared by Sunbow?
19    A.    No, I think initially the
20    information about the cues came from, as I said,
21    the music  editor.  Then it probably got
22    compiled either -- I don't remember if it was
23    through me or Bill, because once Bill came on
24    board --
25    Q.    Bill Dobishinski?

Page 40

1     A.    Yeah, he had us reformat these cue
2     sheets because apparently the way we did them
3     wasn't very clear.
4     Q.    Are these pre-reformatting?
5     A.    These are the ones that I
6     remember.
7     Q.    So was that before or after
8     Dobishinski said to reformat them?
9     A.    I think this is during
10    Dobishinski.  Yeah, because this is '86.
11    Q.    Who was the music editor?
12    A.    I don't know, somebody that worked
13    at Marvel during the post-production.
14    Q.    Okay, I'm a little unclear now.
15    A.    Okay.
16    Q.    Let's take these compositions that
17    are in these cue sheets, could you
18    illustratively give me a few examples of some of
19    the Anne Bryant compositions?
20    A.    Okay, My Little Pony and Friends
21    theme.
22    Q.    You're looking at the first page?
23    A.    Yes.
24    Q.    Okay, My Little Pony and Friends
25    theme.

Page 41

1     A.    Right.
2     Q.    What does it indicate next to
3     Ms. Bryant's name?
4     A.    That she gets 25 percent -- where
5     are the publishing companies?  Oh, this is just
6     the composer's share?  Yeah.  Oh, here is the
7     publisher.  Okay, that Anne gets 25 percent of
8     the composer share.
9     Q.    Let's stop right there.  Who was
10    the source of that information?
11    A.    That's what I'm saying, I don't
12    know  who was the source of it.
13    Q.    That would not be something the
14    music editor --
15    A.    No, no, the music editor would
16    list  the themes, and then there would be
17    whatever  deals were worked out with Tommy
18    Goodman and  Barry Harmon and anything else.
19    Q.    Who is Barry Harmon?
20    A.    He was a lyricist.
21    Q.    And who would work these deals
22    out?
23    A.    They would be worked out with Tom
24    and Joe.
25    Q.    With Tom and Joe?

Carole Weitzman

Page 42

```
 1      A.   Um-hum.
 2      Q.   Tom Griffin and Joe Bacal?
 3      A.   Yes.
 4      Q.   So ultimately Tom Griffin and Joe
 5  Bacal were responsible for the percentage
 6  allocations?
 7      A.   (Witness nodding.)
 8      Q.   Is that a yes?
 9      A.   I don't know that it is, but I
10  know I didn't give the information, and I don't
11  know anybody else that would, except them.
12      Q.   You don't know anyone else that
13  would, except them?
14      A.   Right.
15      Q.   I mean, they would have nay or yea
16  say on that ultimately anyway, wouldn't they?
17      A.   Yes.
18      Q.   So let's take that My Little Pony,
19  25 percent, you assume that that was the
20  percentage that was assigned by Mr. Bacal or
21  Mr. Griffin?
22      A.   Yes.
23      Q.   Okay.  And then any deals on
24  percentages shown on Ms. Bryant's compositions
25  reflected in these cue sheets, your
```

Page 43

```
 1  understanding would be the same as to the
 2  others?
 3          MS. KITSON:  Objection as to the
 4      others.
 5      Q.   As to the other cue sheets, your
 6  answer would be the same?
 7      A.   Yes.
 8      Q.   Okay.  What is the Mary Williams
 9  Music Clearance Corporation, if you know?
10      A.   It was a company that we cleared
11  rights for music that we didn't own, if we
12  wanted to license music, like on The Great Space
13  Coaster, primarily.
14      Q.   Okay.  Well, what music did you
15  own?
16      A.   On The Great Space Coaster, there
17  was music that we owned, but then there was
18  music in the public that we wanted to license
19  and re-record, that's when we did it.  Anything
20  else, I believe, was composed for the shows by
21  us.
22      Q.   Okay, take me through this,
23  please, and take the record through it, so that
24  anyone reading this can understand.  Who owned
25  the music that was prepared for a Sunbow TV
```

Page 44

```
 1  production?
 2      A.   Well, I could tell you what I
 3  presume, but --
 4      Q.   Well, I mean if it's an informed
 5  understanding, then fine.  If it's just a sheer
 6  guess, then don't guess.
 7      A.   It's my presumption that Sunbow
 8  owned that music.
 9      Q.   Okay.  And what's the presumption
10  or assumption based upon?
11      A.   Generally, we had contracts with
12  composers.  Later on I did those contracts that
13  were simple buyout agreements with composers.
14      Q.   You were actually responsible for
15  those contracts?
16      A.   Not the early years, because I was
17  just a PA on the early shows.
18      Q.   Are you familiar with the concept
19  of work for hire?
20      A.   Yes, that's what we had.
21      Q.   Is that what you're talking about?
22      A.   Yes, that is what we called
23  buyout.
24      Q.   And so if a composer composed
25  music for one of your productions on a work for
```

Page 45

```
 1  hire basis, Sunbow owned that music?
 2      A.   Yes.
 3      Q.   Okay.  Now, what did that have to
 4  do with performance royalties, if anything?
 5      A.   I don't actually know.
 6      Q.   Do you know of situations where,
 7  notwithstanding the fact that it was a work for
 8  hire, the composer continued to receive their
 9  performance royalties?
10      A.   On the contracts that I did for
11  Sunbow, the publishing went a hundred percent to
12  Sunbow.  The composer, lyricist, whatever, they
13  received a hundred percent of that side of
14  either ASCAP or BMI.  That's the way the deals
15  were that I've done.
16      Q.   So they continued to receive the
17  royalties?
18      A.   Yes.  Yes.
19      Q.   So that's even in the case where
20  it's a work for hire?
21      A.   In the deals that I did, yes.
22      Q.   Well, were you the person involved
23  with the deals that you did with respect to Anne
24  Bryant's compositions?
25      A.   No.
```

Carole Weitzman

Page 46

```
 1        Q.    Who was responsible for those?
 2        A.    I believe Tom and Joe were the
 3   people involved with the deals.
 4        Q.    How was it determined that you
 5   would  be involved with a deal or Tom and Joe
 6   would be  involved with a deal?
 7        A.    As I grew -- I didn't just
 8   unilaterally make decisions, but as I grew with
 9   the company and became more senior and
10   supervised productions and co-productions, I
11   knew the  template for what the deal was in the
12   co-production scenario, you know, the '90s, I
13   guess it is. In the earlier years, I was just
14   watching over things, but not the business end
15   of it.
16        Q.    Are you aware of any circumstance,
17   and this isn't general, this is specific to Anne
18   Bryant or Ford Kinder, where Joe Bacal received
19   credit for -- in terms of BMI, writer credits to
20   which he was not entitled?
21        A.    No.
22        Q.    And when I say not entitled, where
23   he actually didn't write the music?
24        A.    Right. No, I know what you mean.
25        Q.    Are you familiar with The
```

Page 47

```
 1   Transformers themes?
 2        A.    Um-hum.
 3        Q.    That's a yes?
 4        A.    Yes.
 5        Q.    Do you know what Joe Bacal had to
 6   do with composing any of the music to that?
 7        A.    No.
 8        Q.    Do you know that he's shown as a
 9   24.9 percent participant in the writer's share?
10        A.    No. I mean, if it's on a cue
11   sheet and you show it to me, I might -- you
12   know, I know a lot of the themes for the show
13   were in  commercials first, so they were handed
14   over to me as a theme. Do you know what I mean?
15        Q.    Okay, let's explore that a little
16   bit. A lot of the music you say was done as
17   commercials first?
18        A.    Yes.
19        Q.    Are we talking about the Anne
20   Bryant  music?
21        A.    I don't know if it was Anne's
22   music. I know a lot of the series themes were
23   toy  properties and they were commercial themes
24   first.
25        Q.    And how were they treated when
```

Page 48

```
 1   something else was done with that commercial
 2   music in terms of these cue sheets?
 3             MS. KITSON: Objection, vague.
 4             MR. MONAGHAN: I'll rephrase it.
 5        Q.    You say it was handed over to you,
 6   that was the phrase you used, what did you mean?
 7        A.    The theme that was used in a
 8   commercial was frequently used in an extended
 9   version for the TV show.
10        Q.    Okay. And how did you handle
11   registration with BMI or ASCAP in those cases?
12        A.    It then became part of the cue
13   sheet for the show. I had nothing to do with
14   the cue sheets for the commercials, that's a
15   separate area.
16        Q.    Right. And who told you that you
17   could use cue sheets in those circumstances?
18        A.    Cue sheets?
19        Q.    Right. Who told you that a cue
20   sheet was the appropriate form?
21        A.    I didn't say it was -- I'm sorry,
22   not the cue sheet was handed over to me. If
23   there  was a theme that was used, and frequently
24   that  theme was rolled over into being used in a
25   show,  but expanded generally by the composer.
```

Page 49

```
 1        Q.    Right. Okay. How did Sunbow
 2   assure  itself that the composer's interest was
 3   being  accurately reflected in the cue sheets?
 4        A.    I have no idea.
 5        Q.    Well, wasn't that your job?
 6        A.    I had nothing to do with the
 7   accuracy of these cue sheets. The accuracy in
 8   later years had to do with me. I was the person
 9   that these  cue sheets went to and filed them
10   and worked with Bill Dobishinski to look after
11   the money. This  division had nothing to do
12   with me. It may have  had to be based on
13   contracts that existed, but I  wasn't the person
14   that said give yada yada this  percentage or
15   whoever.
16        Q.    Who did?
17        A.    Tom or Joe. Whoever did the
18   contract, which generally was Tom or Joe.
19             MR. MONAGHAN: Do you want to take
20        a two-minute break?
21             MS. KITSON: Sure.
22
23             (Recess taken.)
24
25   BY MR. MONAGHAN:
```

Carole Weitzman

Page 50

1      Q.    I'm going to show you, I alluded
2  to it earlier, Ms. Weitzman, the affidavit of
3  Alison Smith, who is a vice-president of
4  performing rights of Broadcast Music, Inc.,
5  BMI. And I'm going to direct your attention to
6  paragraph four of this affidavit, which is dated
7  March 16, 2001, and ask you to take a look at
8  that. And you're also free, if you need to, to
9  read any other part of that affidavit that you'd
10  like.
11          Could you read that into the
12  record when you're done reading it for yourself?
13      A.    Okay.
14      Q.    Now, could you read that paragraph
15  four into the record for us?
16      A.    "By way of background, there is
17  more than one way in which a musical work may be
18  registered with BMI. For songs, the common way
19  is for either the writer or the music publisher
20  to submit a registration form. With respect to
21  themes and background music specifically written
22  for television, registration forms are rarely
23  submitted. These works, which is the type of
24  music in question in this action, are most often
25  registered with BMI through the submission of

Page 51

1  cue sheets by the producer of each episode of
2  each show series or film."
3      Q.    Is that statement consistent with
4  your understanding of how this works, the
5  registration with BMI?
6      A.    Well, I've only done the cue sheet
7  parts, so I've never done any kind of
8  registration form that's here. With respect to
9  the cue sheets, yes.
10      Q.    That is consistent?
11      A.    Yes.
12      Q.    That's the form that's used when
13  music is written specifically for the TV
14  production?
15      A.    Well, it's a record of what's in
16  the show. Whether it was originally written
17  for the show, I don't know, but it's just a
18  list of what music is contained within the
19  show.
20      Q.    Well, you see that Ms. Alison
21  Smith says -- she uses the word "specifically"?
22      A.    Well, she may have a broader
23  knowledge than I have of that, but as far as I
24  know, the cue sheet was really just a record of
25  what's within the show. Just like you know who

Page 52

1  the writer is, you know who the composer is, you
2  know all of that stuff.
3      Q.    But --
4      A.    But if it was written specifically
5  for the show, that was never a consideration
6  that I had. It was just contained within the
7  show, is why I thought it was on a cue sheet.
8      Q.    Again, who supplied the
9  information in the cue sheet?
10      A.    The actual --
11      Q.    Who prepared the cue sheets?
12      A.    The physical cue sheets were
13  probably prepared through Marvel and Bill
14  Dobishinski and us. The information had to
15  have been given -- this part (indicating) from
16  Sunbow, and it wasn't me that gave that break
17  out.
18      Q.    You said it was Tom and Joe?
19      A.    Yes.
20      Q.    Okay. Now, could you tell me
21  which of these properties I'm showing you now,
22  there is a boxed set G.I. Joe, Jem, G.I. Joe The
23  Movie, Transformers CDs --
24          MS. KITSON: Those are DVDs.
25      A.    Those are DVDs, not CDs.

Page 53

1      Q.    Let's start with, are you familiar
2  with these products?
3      A.    The shows? I've seen these
4  materials, but that was all done through the
5  sales team. Any of the sales to create these
6  things was done through the sales team. I gave
7  the master show and then whatever was done with
8  that, was done with it.
9      Q.    Well, do you know whether the
10  music was written specifically for, for example,
11  the G.I. Joe videos I'm showing you now, the
12  boxed set?
13          MS. KITSON: Objection, the
14      witness doesn't know what music is on the
15      videos you're showing her.
16          MR. MONAGHAN: Well, maybe she
17      does.
18          Let me show it to her.
19      Q.    You were at Sunbow in 1999,
20  correct?
21      A.    Um-hum.
22      Q.    And G.I. Joe was a Sunbow
23  production?
24      A.    Yes.
25      Q.    And you said you weren't familiar

Carole Weitzman

Page 54

1   with Rhino Entertainment Company; is that right?
2       A.   No. I saw it on the boxed set
3   now, so I know, but as I said, I didn't do the
4   deal with them, that's a sales function.
5       Q.   I'm sorry, were you there after
6   Sony was involved at Sunbow?
7       A.   Yes, in the late '90s, right.
8       Q.   And that's after Tom and Joe sold
9   the company to Sony?
10      A.   Right.
11      Q.   You remained on?
12      A.   Um-hum.
13      Q.   At the risk of repetition, just
14  for --
15      A.   Yes, I did.
16      Q.   I won't ask it again.
17      A.   And just to clarify for you, when
18  I started at Sunbow in '80, I had been a
19  teacher for 10 years, so I was a PA, I worked
20  with Tom and Joe, they taught me, they gave me
21  more and more responsibility. Starting up in
22  the '90s, they started delegating a lot of their
23  work, because they had their own advertising
24  agency throughout the whole term, to C.J., who
25  was then the president. We moved out of their

Page 55

1   offices, we worked there, so things evolved
2   throughout. So when I say in the early years
3   what deals were set up, I just found out what
4   the deals were or what had to be put, and
5   that's kind of the evolution of my position.
6       Q.   Who did you report to when Sony
7   was the owner?
8       A.   Well, when Sony first acquired us,
9   there was Ted Green that was there, he was the
10  head of it, and then Becky Mancuso. So I pretty
11  much reported to Ted. And he left near the very
12  end of Sony and then Becky took over for a while
13  and then they just -- it fell apart. And from
14  what I understood, part of Sony's deal with
15  Loonland is they had to deliver the Cramp Twins
16  series. So that's when I started to work with
17  George Becker, because he needed me to help
18  fulfill the delivery of that series. So I
19  hadn't worked with George the whole time I was
20  there, but at the end he was kind of left with
21  the leftovers.
22      Q.   Is that at 100 Fifth?
23      A.   No, George was at Sony.
24      Q.   Where was that office?
25      A.   We stayed at 100 Fifth Avenue.

Page 56

1   Sony Wonder was up in the Sony building.
2       Q.   Okay. And what was Ted Green's
3   title?
4       A.   I don't know. He was somehow the
5   head of Sony Wonder. I don't know what his
6   title was.
7       Q.   And he was also at the Sony Wonder
8   building?
9       A.   Yes.
10      Q.   And Becky Mancuso, likewise?
11      A.   She was in LA Sony Wonder.
12      Q.   And during the time that Sony
13  owned the company, which is from 1997-ish?
14      A.   I don't know. They were my worst
15  years, nothing to do with Sony.
16      Q.   Through what, 2001?
17      A.   Yes, the end of 2001. Once we
18  delivered Cramp, I think that was their final...
19      Q.   Where were the records kept?
20          MS. KITSON: Objection as to the
21  records. Vague.
22      Q.   The business records?
23      A.   All of my stuff --
24      Q.   Sunbow's records?
25      A.   Sunbow Production, my part was

Page 57

1   down with me. There was still a sales team
2   that was still down there.
3       Q.   Were you ever present at a meeting
4   with Joe Bacal at any time where there was a
5   discussion of percentages of interests in a
6   song?
7       A.   No.
8       Q.   Do you have any knowledge as to
9   why Anne Bryant wouldn't be paid mechanical
10  royalties on videos or DVDs that have music
11  composed by her?
12      A.   I honestly don't know what her
13  deal was.
14      Q.   Well, aside from her deal, do you
15  know why --
16      A.   I don't know what a mechanical
17  royalty is. I know what — I don't know
18  specifically what that means, regarding --
19      Q.   Well, assume for the sake of my
20  question that a mechanical royalty is something
21  other than a performance royalty and it's a
22  royalty generated by some mechanical iteration
23  of a composition, a record, a DVD, a movie,
24  something like that. Do you know why she's not
25  getting any money, assume she's not getting any

Carole Weitzman

Page 58

1   money, do you know why she's not getting any
2   money on any of these compositions?
3       A.   No.
4       Q.   Do you know what Sunbow's position
5   is with respect to that issue?
6       A.   In the contracts I've done,
7   composers don't get anything other than the fee
8   that you give them up front and any ASCAP or
9   BMI that they are entitled to for their share.
10      Q.   And when you say then in the
11  contracts you've done, could you give me an
12  example of a contract you've done?
13      A.   Oh, you mean with the composers
14  that I've worked with?
15      Q.   Yes.
16      A.   Helene Muddiman, she just did
17  Cramp Twins for us.
18      Q.   Let me go back up a little bit.
19  You say in the contracts that you've done, the
20  composers don't get anything but their
21  performance royalty?
22      A.   They get the performance royalties
23  and an amount of money to do a certain library
24  of cues.
25      Q.   So whatever mechanical royalties,

Page 59

1   for the sake of my question, would go where?
2       A.   I've never mentioned mechanical
3   royalties in contracts.
4       Q.   Okay, whatever other royalties
5   there are?
6       A.   If there are other royalties, I
7   would imagine they would go to Sunbow, but I
8   don't know for sure.
9       Q.   Now, did that represent some sort
10  of a change in policy at Sunbow with respect to
11  payment of royalties?
12      A.   What I've done, versus what
13  existed? I really don't know what existed
14  before. I thought what I have done is kind of
15  the template for what the deals have been.
16      Q.   Okay. That's from the time you
17  were involved in doing those?
18      A.   Um-hum.
19      Q.   You say you don't know what --
20      A.   I don't know the deals.
21      Q.   Well, do you know whether it was a
22  change in any way, shape or form?
23      A.   No, I don't.
24      Q.   And a typical contract that you
25  talked about, again, please, what was the name

Page 60

1   of that party?
2       A.   Helene, H-E-L-E-N-E, Muddiman,
3   M-U-D-D-I-M-A-N.
4       Q.   And this was on the Cramp Twins?
5       A.   Yes.
6       Q.   Could you give me an example of
7   one a little older than that?
8       A.   Well, all of the deals that I've
9   been involved with -- I'm trying to think of the
10  series. Nathan Wang did it for Fat Dog Mendoza,
11  it's another series. Hey, it's cartoons, you
12  know.
13      Q.   And were these compositions
14  written as commercials or written for these
15  production?
16      A.   Written for the productions.
17      Q.   And when you said, "in the
18  contracts that you've done," were you talking
19  about contracts with respect to TV productions?
20      A.   Yes.
21      Q.   So you weren't talking about music
22  that was originally composed for commercials?
23      A.   No, I have not been involved in
24  the commercial area. That was Griffin Bacal,
25  which was a separate company and a separate

Page 61

1   commercial division.
2       Q.   Did you ever say to Anne in words
3   or substance that you thought the talent was
4   overpaid?
5       A.   No.
6       Q.   You never expressed that sentiment
7   to her?
8       A.   I can't imagine saying that,
9   although I felt it on many occasions.
10      Q.   Did you tell her, in or about
11  1998, that Sunbow no longer pays composers of
12  underscores because they get to keep their
13  royalties and they're satisfied with that?
14      A.   I don't even remember talking to
15  her in '98.
16      Q.   Well, don't hold me to the year,
17  but did you ever express that sentiment to her?
18      A.   By saying that the composers get
19  the money and they keep it?
20      Q.   That's enough.
21      A.   That's what we're doing, so it's
22  consistent with what we're doing. I just can't
23  imagine that was a conversation, but...
24      Q.   It's possible?
25      A.   I honestly don't remember talking

Carole Weitzman

Page 62

1   to her.
2       Q.   Who was the person responsible for
3   communicating the names and percentages of the
4   authorship of the composition to Sunbow's
5   administrator, Bill Dobishinski?
6       A.   I don't really know. I mean, I
7   didn't have that information, so if it was
8   communicated, it was either Tom, Joe or probably
9   through from the Finance Department.
10      Q.   When Sunbow was sold to Sony, did
11  Sunbow have to advise Sony of its interests in
12  various properties, what it owned in various TV
13  properties, stuff like we're talking about right
14  here?
15      A.   The only thing I had to give were
16  copies of the copyright forms, that's what I had
17  to provide during the deal. I don't know what
18  else they had to -- Sunbow had to provide to
19  Sony, I don't know.
20      Q.   Did you have charge of the
21  copyright forms or custody of them?
22      A.   Um-hum.
23      Q.   And why did you have custody of
24  those?
25      A.   Because I would register them. I

Page 63

1   would get the forms for every episode, so would
2   our attorney, make sure it was right, and then
3   for every subsequent half hour, I would register
4   it once the show aired.
5       Q.   Where would you register it?
6       A.   The Office of Copyright.
7       Q.   The Copyright Office in
8   Washington?
9       A.   Washington, yes.
10      Q.   Do you know what an arranger's
11  function is with respect to a musical
12  composition?
13      A.   No.
14      Q.   Do you know whether arrangers
15  receive fees?
16      A.   Don't know.
17      Q.   Did you notice in some of the
18  documents that you have G.I. Joe opening theme
19  and then you have some other theme, closing
20  theme, that type of thing?
21      A.   Yes.
22      Q.   You've seen that before?
23      A.   Um-hum.
24      Q.   Okay. Who makes the determination
25  as to the identity of that piece of music,

Page 64

1   calling it a closing theme or opening theme?
2       A.   Well, for every show there's -- in
3   visual, it's called a main title, it's the
4   beginning of the show that kind of tells the
5   back story in animation, and there was a theme
6   that goes over that, so it's the theme show.
7   And generally, it's repeated at the end of the
8   show over the end credits.
9       Q.   Okay. But in the registration
10  with BMI, and I could show you some and I'm
11  sure you've seen them, they've used
12  designations like that, opening theme, closing
13  theme, whatever. Who tells BMI what name to
14  give to the piece of music?
15      A.   Oh, we name the cues. We, meaning
16  the composer.
17      Q.   Sunbow?
18      A.   Well, no, the composer generally.
19  I mean there are cues that are done for anxious
20  time, there are cues that are race time.
21      Q.   Right.
22      A.   Each cue is given a name by the
23  composer, and then that is given as a library to
24  the editor that puts it together.
25      Q.   To the music editor?

Page 65

1       A.   Yes. And they use the cues, the
2   list of cues.
3       Q.   Now, do you know of any
4   circumstance where an originally composed theme
5   by, let's say, Anne Bryant could then become the
6   property of somebody else who may have
7   rearranged it or changed the music in some
8   respect, would that be a situation where someone
9   else would get credit for her music?
10          MS. KITSON: Objection to the
11  form.
12      Q.   Do you understand that question or
13  is that too long?
14      A.   No, it's not too long, I'm trying
15  to understand it. I don't know. The only time
16  we ever redid a series, we did G.I. Joe Extreme
17  and we did Transformers Generation X, I forgot
18  the name of it. So if you're saying she
19  composed themes for that, there was music in
20  those series. I don't know if they were
21  rearranged themes, I don't know what they were,
22  but I'm just saying those were the only shows.
23  Like out of this show, Jem died as a series, My
24  Little Pony died. A lot of these shows stopped
25  airing in '86 or '87. The only ones that we

Carole Weitzman

Page 66

1   did, kind of coming back was G.I. Joe and
2   Transformers.
3       Q.   They are coming back?
4       A.   They were, you know, in the
5   mid-'90s.
6       Q.   Well, do you know what is being
7   sold now on AMAZON.COM, for example?
8       A.   No.
9       Q.   Whose job was it at Sunbow to make
10  sure that Sunbow as publisher was getting its
11  correct performance royalties?
12      A.   At Sunbow, itself? Well, I know
13  Bill worked with the Finance Department, Bill
14  Dobishinski, I mean because he got his fee. He
15  was the one that tracked all of this. There was
16  nobody at Sunbow who knew the music business to
17  do this.
18      Q.   But how did Sunbow know whether or
19  not it was getting shorted, if it was getting
20  shorted?
21      A.   They hired him to do the
22  administration and look over it, the same way we
23  hired Sony afterwards to do that, before they
24  ever bought us, when Bill disappeared.
25      Q.   I'm sorry, let me get that again.

Page 67

1   You hired Sony to do the same thing that --
2       A.   Sony has an administration
3   division, ATV. We interviewed a lot of
4   different music administrators after Bill left
5   and then we hired Sony to do that,
6   coincidentally, it has nothing to do with the
7   Sony Wonder sale, and that was before they ever
8   bought us.
9           MR. MONAGHAN: Let me mark this
10          document, please.
11
12          (Weitzman Exhibit D, Form
13          submitted by Sony ATV during the time it
14          was administering Sunbow's publishing,
15          marked for identification.)
16
17      Q.   Are you familiar with Exhibit --
18  take a look. Let me give you a minute.
19      A.   No, I've never seen this.
20      Q.   Well, I think it says cue sheet
21  there, doesn't it?
22      A.   It's not a cue sheet, I don't
23  think. No.
24      Q.   Okay. But you do see that Sony
25  is --

Page 68

1       A.   The submitter, Sony ATV?
2       Q.   Sorry?
3       A.   Sony ATV, it says, as submitter.
4       Q.   Right. Would this be a form, if
5   it's not a cue sheet, submitted by Sony ATV
6   during the time it was administering Sunbow's
7   publishing?
8           MS. KITSON: Objection.
9       A.   I've never seen this, so I don't
10  know who submitted it or when. I mean, I see
11  it's dated 1997, but I've never seen it.
12      Q.   Was Sony doing the publishing
13  administration for Sunbow in that period of
14  time?
15      A.   I imagine it was. There is a
16  contract with them, but, yeah, I would imagine
17  it was.
18      Q.   And is that at or about the time
19  when they took over from Bill Dobishinski?
20      A.   It was in the '90s when we did it,
21  when we moved into the office of 100 Fifth
22  Avenue, I don't remember the year, but I have
23  not seen these. This sheet, this girl Elise
24  worked for me a long time ago. Oh, yeah, I see
25  it's 85, that's not a new one.

Page 69

1       Q.   There may be more than one
2   document together there.
3       A.   Maria Perez, I don't know who that
4   is. Wholly Molley music. Oh, the Scotty
5   Brothers, they were the people who worked on the
6   Transformers movie. But these other sheets, I
7   don't know what they are.
8       Q.   Okay. Did you give me the names
9   of the people in the Finance Department?
10      A.   Yeah, it was Bill Biehl, Bob
11  Darcy, Raul Soto, Andrew Carpon.
12      Q.   Who had custody of employment
13  records at Sunbow?
14      A.   I don't know for sure, but C.J.
15  was the president and Tom and Joe. I don't
16  know where the records were. Like a Human
17  Resource, is that what you're talking about?
18      Q.   Yes.
19      A.   We didn't have Human Resource, so
20  it was probably done through C.J. and the
21  finance guys.
22      Q.   Do you know whether those records
23  were turned over to Loonland?
24      A.   I don't know, but they would have
25  been turned over to Sony first, if they were

Carole Weitzman

Page 70

1  turned over to anybody. And then I don't know
2  what Sony did.
3      Q.    And where is C.J. Kettler?
4      A.    C.J. does free-lance work in the
5  industry, I don't know where she is now.
6      Q.    Do you know where she lives?
7      A.    Yeah, she lives in the city.
8      Q.    In the city?
9      A.    Yeah.
10     Q.    And for whom does she do
11  free-lance work?
12     A.    I think it's a company called
13  Solara. She used to work at Oxygen, that's where
14  I knew her last.
15     Q.    That's the cable?
16     A.    Yes.
17     Q.    And when did she leave the
18  company?
19     A.    When it was sold. She and Tom --
20  oh, no, actually she stayed on after Tom and Joe
21  and she sold it. She stayed on with Sony, and
22  I'm trying to think, around the time Ted left
23  she went to work at Oxygen.
24     Q.    How is it that Ms. Kitson is here
25  representing you today, who hired her?

Page 71

1      A.    Sony, I believe. Sunbow, Sony.
2      Q.    Well, do you know?
3          THE WITNESS: You told me, but I
4  forgot.
5      A.    I don't remember if it is Sony or
6  Sunbow. I think Sunbow.
7      Q.    Did you ever see the BMI
8  statements that were prepared from time to
9  time?
10     A.    No, I don't think so.
11     Q.    So if I showed you BMI statements
12  now, you would not have familiarity with those;
13  is that correct?
14     A.    I could look at it and see if it's
15  something that's familiar, I may not have known
16  what it was called, do you know what I mean?
17     Q.    Yeah, but you would not be able to
18  testify about the information in the form; is
19  that right?
20     A.    Right.
21     Q.    Now, you testified earlier about
22  the Mary Williams Clearance Corporation, and I
23  think your testimony was that if you didn't own
24  the music, or if Sunbow didn't own the music
25  you, would use this Mary Williams Clearance

Page 72

1  Corporation?
2      A.    If we wanted a sync license.
3      Q.    A sync license?
4      A.    Yeah, if we wanted to use another
5  composer's music, and it was basically done in
6  the Great Space Coaster, I don't remember it
7  done in any of the animated series, that we
8  would use Mary Williams to get the sync
9  license, and then we would be able to use it in
10  the show.
11     Q.    And the sync license is what, for
12  the record?
13     A.    It was called a sync license. The
14  right to use it.
15     Q.    In the production of some sort of
16  movie or film?
17     A.    Yeah, TV or -- right.
18     Q.    Is it the synchronization of the
19  movie with the film?
20     A.    I don't know what the name comes
21  from. To me it was just a license to use the
22  music. Not the recording of the person that
23  originally recorded it, but to re-record it for
24  your show.
25     Q.    Do you know the Harry Fox Agency?

Page 73

1      A.    They were one of the people that
2  Mary used to have to to get rights.
3      Q.    Okay. And I'm going to show you a
4  batch of documents, which are Bates stamped 2205
5  through 2397. And we'll let the reporter mark
6  collectively, which appear to be Mary Williams
7  Clearance Corporation cue sheets addressed to
8  Sunbow Productions, reflecting various
9  compositions, although actually it looks like
10  they are all Transformers.
11          I ask the reporter to mark that,
12  and then if you could take a look at it.
13          MS. VALENCIA: Patrick, where do
14      those Bates numbers come from?
15          MR. MONAGHAN: Ours.
16
17          (Weitzman Exhibit E, Document
18      bearing production numbers 2205 through
19      2397, marked for identification.)
20
21     A.    So these are cue sheets, they are
22  not BMI things.
23     Q.    No.
24     A.    This is not what you were talking
25  about. Oh, okay.

Carole Weitzman

Page 74

1    MS. KITSON: I would state for the
2   record that these sheets all indicate that
3   Sunbow Productions Incorporated is the
4   producer, but they are not addressed to
5   Sunbow Productions.
6    A.   We used Mary Williams, as I said,
7   for the G.I. Joe show, so she may have just -- I
8   don't remember her doing it, but she might have
9   just prepared --
10    Q.   Well, these are Transformers,
11   aren't they?
12    A.   Right, they are.
13    Q.   It's not G.I. Joe?
14    A.   Right.
15    MR. MONAGHAN: You gave us these,
16   Roseann.
17    MS. KITSON: No, we did not
18   produce those to you. You produced those
19   to us.
20    MR. MONAGHAN: Where did we get
21   them?
22    A.   She must have done this before
23   Bill got involved, I guess. These are for the
24   first series, '84, '85.
25    Q.   Do you have any information about

Page 75

1   these forms, Exhibit E?
2    A.   They appear to be cue sheets from
3   the first group of Transformer shows.
4    Q.   Would these have been in the
5   possession of Sunbow?
6    A.   I don't know. I don't remember
7   these, but I would imagine they would be, but I
8   don't know.
9    Q.   Do you know whether Mr. Bacal is
10   getting royalties, other than performance
11   royalties, on any of these DVDs that I'm showing
12   you, that are in front of me now?
13    A.   I have no idea.
14    Q.   You have no idea?
15    A.   No.
16    Q.   Do you know where Tom Griffin is
17   now?
18    A.   Yeah.
19    Q.   Where would he be?
20    A.   In Scarsdale.
21    Q.   Is he working?
22    A.   I don't think so.
23    Q.   Do you know who John Douglas is?
24    A.   He was a composer for the early
25   series.

Page 76

1    Q.   Of what?
2    A.   G.I. Joe, I think, and
3   Transformers. I never met him, I didn't know
4   him. I think they met him through Marvel.
5    Q.   Do you know what underscoring is?
6    A.   The background music.
7    Q.   Now, is that original music or is
8   it the rearrangement of existing music?
9    A.   Well, typically it's original
10   music, but it's frequently in animated series,
11   the theme is used throughout the show. It
12   brings the kids back into the da, da, da, and
13   then they do a run, and then whenever they come
14   back they do another cue, but they frequently
15   revisit cues of the theme throughout a series.
16    Q.   Did you know what John Douglas'
17   involvement was with Transformers?
18    A.   No. I mean I'm seeing it on these
19   sheets that he wrote a lot of the cues, but I...
20    Q.   Did you ever hear of Mr. Bacal
21   saying that Ford Kinder and Anne gave him a
22   percentage interest in Transformers?
23    A.   No.
24    Q.   Do you know what Barry Harmon's
25   involvement was with Transformers?

Page 77

1    A.   No. I know Barry is typically a
2   lyricist, he's not a composer, but I don't
3   remember that.
4    Q.   Are there lyrics through the
5   Transformers themes, any of them?
6    A.   Yeah, there were, I think.
7    Q.   Do you know who composed the
8   lyrics?
9    A.   No.
10    Q.   Do you know Spence Michelin?
11    A.   No.
12    Q.   Do you know Andy Hayward?
13    A.   Yes.
14    Q.   Who is Andy Hayward?
15    A.   He's the head of DIC.
16    Q.   How do you spell DIC?
17    A.   D-I-C, it's initials.
18    Q.   For what?
19    A.   I don't know.
20    Q.   What is DIC?
21    A.   It's an animation production
22   company.
23    Q.   Does he compose music?
24    A.   I don't know.
25    Q.   Do you know Monroe Michaels?

Carole Weitzman

Page 78

```
 1      A.   No.
 2      Q.   Did you ever hear of Andy Hayward
 3  using that as a pseudonym?
 4      A.   No.  That's a funny name.  No, I
 5  meant if you know Andy, that's not at all like
 6  him.
 7      Q.   Well, if I were to show you page
 8  289 of a BMI catalog, this was testimony given
 9  at Mr. Bacal's deposition, Monroe Michaels is
10  credited on the cue sheet as having some
11  interest in composing the music.
12          MS. KITSON:  Objection.  Is there
13      a question pending?
14      Q.   Do you know why that would be?
15      A.   DIC is a company that produced
16  G.I. Joe shows competitive with us.  The shows
17  were  taken away from Sunbow at a point and
18  given to  DIC to produce with Hasbro.  So I
19  don't really  know who worked on that series, it
20  didn't have  anything to do with us, Sunbow.
21      Q.   This was competitive to Sunbow?
22      A.   Yes.
23      Q.   And that was taken away by whom?
24      A.   Hasbro, I believe.  I guess they
25  had  a lesser bid for doing the series.  And
```

Page 79

```
 1  Hasbro  assigned -- I don't know how many
 2  episodes were  done, but it was quite a bit, I
 3  think.
 4      Q.   Do you know Larry Bernstein?
 5      A.   He's with Hasbro.  He was with
 6  Hasbro, I don't know what he does.
 7      Q.   Product manager, does that sound
 8  familiar?
 9      A.   I don't really know.
10      Q.   Paul Weinberg?
11      A.   No.
12      Q.   Steven James Taylor?
13      A.   No.
14      Q.   Do you have any records at all
15  pertaining to your employment at Sunbow?
16      A.   No.
17          MR. MONAGHAN:  Give me a few
18      minutes.
19
20          (Recess taken.)
21
22  BY MR. MONAGHAN:
23      Q.   Let me direct your attention back
24  to the summer of 1993.  I know it's a long time
25  ago, 10 years ago.
```

Page 80

```
 1      A.   It's hard to believe, isn't it?
 2  You  hear '93, it sounds as if it was yesterday.
 3      Q.   Was there some particular event
 4  that  occurred at Sunbow at that particular time
 5  which  required filing cue sheets, changing
 6  registrations at BMI?
 7      A.   Not that I know of.
 8      Q.   Ms. Weitzman, I would like to show
 9  you now page 49 of Ms. Bryant's BMI catalog
10  dated March 16, 2000.  And I would like to
11  direct your  attention to the two middle entries
12  dealing with  My Little Pony and Friends.
13      A.   Okay.
14      Q.   Now, you know that the publisher
15  generally takes care of the registrations with
16  BMI; is that right?
17      A.   I only know as far as giving the
18  cue sheets, I don't know what else has to
19  happen.
20      Q.   Well, do you see that next to --
21  do  you see you have both Starwild and Wildstar
22  Music shown on My Little Pony and Friends with a
23  P for  publishing?
24      A.   Oh, yes.
25      Q.   By the way, are you familiar with
```

Page 81

```
 1  this form that I'm showing you?
 2      A.   No, I've never seen this.
 3      Q.   Under what circumstances would
 4  Sunbow cause a form to be filed with either BMI
 5  or ASCAP, how would they make that decision?
 6      A.   I have no idea.
 7      Q.   Well, I'm going to show you now
 8  the Jem videos.  These have both been marked
 9  previously at Mr. Bacal's deposition.  And I
10  direct your attention to the back showing the
11  credits or production, I guess.  And I ask you
12  why is that these are shown as Sunbow
13  Productions, Inc./Wildstar rather than Sunbow
14  Productions, Inc./Starwild?
15      A.   I have no idea.  I don't know.
16      Q.   You know that Anne Bryant is a BMI
17  writer, correct?
18      A.   No, I don't remember that.  But it
19  is according to this, right?
20      Q.   You didn't remember that?
21      A.   No.
22      Q.   Okay.
23      A.   I know BMI, everybody always said,
24  yielded greater money, revenue, than ASCAP, but
25  I have no idea.
```

Carole Weitzman

Page 82

1       Q.   I hate to beat a dead horse, but
2   let me beat it.  If clearance forms were filed,
3   I think your testimony is it would have been
4   Joe or Tom that would have taken care of that;
5   is that right?
6       A.   I didn't say they would have taken
7   care of.
8       Q.   Under their direction?
9       A.   I said they know the deals that
10  they made with people.  I didn't make the
11  deals, I don't believe anybody else would have
12  made the deals.
13      Q.   Okay.
14      A.   Certainly in the early years.
15      Q.   And you personally have no
16  knowledge of who filed clearance forms with
17  BMI?
18      A.   I don't know what a clearance form
19  is, I only know the cue sheet.
20      Q.   Do you know of anyone else who
21  filed any forms with BMI?
22      A.   I don't know of anybody, no.
23      Q.   Or ASCAP?
24      A.   No.
25      Q.   Well, who would have done that?

Page 83

1       A.   That's what I'm saying, I don't
2   know who would have done that.
3           MS. KITSON:  Anybody else besides
4       what her previous testimony has been?
5       Q.   You're not changing any of your
6   previous testimony; is that right?
7       A.   No.
8           MR. MONAGHAN:  I think we'll mark
9       this as well, the G.I. Joe boxed set of
10      the three videos.
11      A.   Did you look at the end credits on
12  there, the visual end credits to see if Wildstar
13  and Starwild are both on there.
14      Q.   Where is the visual end credits?
15      A.   At the end of the video.
16      Q.   At the end of the video, itself?
17      A.   Yes.  So I'm saying it could just
18  be inadvertently left off the packaging, but not
19  off the tape.
20      Q.   I appreciate that information.
21  We'll take a look at it in that regard.  But
22  isn't it going to be one or the other, Starwild
23  or Wildstar?
24      A.   I don't know.  I don't remember
25  using one versus the other, I'd have to look at

Page 84

1   the credits on the shows.
2       Q.   You do know that the writer can't
3   be in both at the same time?
4       A.   Right, but sometimes the composer
5   was one and the lyricist was another, so we had
6   to list both.
7       Q.   Okay.  When I said it can't be
8   both at the same time, I'm talking about both
9   performing rights societies, ASCAP and BMI?
10      A.   Right.  No, I didn't know that, I
11  thought they could be and just use the one they
12  wanted.
13      Q.   But not on the same composition?
14      A.   Oh, right.  No, yeah, of course,
15  not on the same composition.
16
17          (Weitzman Exhibit F, G.I. Joe
18      boxed set of three videos, marked for
19      identification.)
20
21      Q.   I'm showing you now this boxed set
22  of G.I. Joe videos.  If you could take a look at
23  the production information on the back of the
24  video.  Is it not the same as --
25          MS. KITSON:  Of the individual

Page 85

1   tape or on the box itself?
2           MR. MONAGHAN:  The box itself.
3       A.   The box of the individual tape,
4   you're talking about.
5       Q.   Right.
6       A.   Not the big box.  Although on the
7   big box, it's the same thing.
8       Q.   It's the same, isn't it?
9       A.   Yes.
10      Q.   Does this show Sunbow Productions
11  Inc./Wildstar?
12      A.   Yes, and Hasbro.
13      Q.   And Hasbro.  Does this appear to
14  be a production during the period of time that
15  Sunbow was owned by Sony?
16      A.   The video set or -- because the
17  show is in '86.  Do you mean when this video
18  set was done?
19      Q.   Yes.
20      A.   I don't know.
21      Q.   Is this the Sunbow logo down at
22  the bottom there, on the box?
23      A.   Yes.  Oh, a division of Sony
24  Wonder, there you go.
25      Q.   Right.  And the same is true on

Carole Weitzman

Page 86

1   the Jems?
2       A.   Yes.
3       Q.   Now, based on your familiarity
4   with the business --
5           MR. MONAGHAN:  Actually, let's
6       just mark each one of these in series.
7
8       .       (Weitzman Exhibit G, G.I. Joe, The
9       Movie, marked for identification.)
10
11          (Weitzman Exhibit H, The
12      Transformers, The Movie, marked for
13      identification.)
14
15          (Weitzman Exhibit I, The
16      Transformers, Villains-The Ultimate Doom,
17      marked for identification.)
18
19          (Weitzman Exhibit J, The
20      Transformers, Heroes-The Rebirth, marked
21      for identification.)
22
23          (Weitzman Exhibit K, Inhumanoids
24      The Evil That Lies Within, Episode one
25      through five, marked for identification.)

Page 87

1
2       Q.   Are you looking at Exhibit G,
3   Ms. Weitzman?
4       A.   Yes, I am.
5       Q.   Could you tell me anything about
6   that?  That's the G.I. Joe The Movie?
7       A.   Um-hum.
8       Q.   That's a DVD?
9       A.   Yes.
10      Q.   Do you know who produced that DVD?
11      A.   The DVD, no.  I know we produced
12  the video, you know, the production.
13      Q.   We, meaning Sunbow?
14      A.   We, meaning Sunbow with Marvel,
15  yes.
16      Q.   Do you know who is shown as the
17  producer of this particular --
18      A.   Sunbow and Marvel.
19      Q.   Do you know when it was produced?
20      A.   Around '86.
21      Q.   This DVD?
22      A.   Oh, no, I'm talking about the
23  show.  I don't know about these tapes at all.
24      Q.   Could you tell us by looking at
25  the DVD when that DVD was produced?

Page 88

1           MS. KITSON:  Objection.
2           MR. MONAGHAN: I realize it speaks
3       for itself, but all objections except as to
4       form are reserved.
5           MS. KITSON:  She's already
6       testified she doesn't know about the DVD.
7       Her answer stands.  She knows about the
8       show, but not the DVD itself.  Any
9       questions about the DVD go beyond her
10      firsthand knowledge.
11          MR. MONAGHAN:  I'm now going on
12      her experience in the industry and being
13      familiar with these products.
14      A.   I'm just looking at the copyright,
15  it says 2000, that's the only way I would have
16  any idea when it was.
17      Q.   Who, according to that, holds the
18  copyright?
19      A.   It says Rhino Entertainment.
20  There is also a copyright for Sunbow.
21      Q.   What is it that they are claiming
22  a copyright of?
23          MS. KITSON:  Objection.
24      A.   I have no idea.
25      Q.   Could I have that one back?

Page 89

1       A.   (Handing.) You didn't finish
2   watching it last night?
3       Q.   Let me interrupt with one
4   question. Were you familiar with any licensing
5   deals being done with anyone out in California?
6       A.   No.
7       Q.   By the way, on Exhibit G, do you
8   notice Mr. Bacal's name appears as supervising
9   producer, also as a producer, along with
10  Mr. Griffin, did you see that on the front?
11      A.   No.  Okay.
12      Q.   That's the same Joe Bacal we've
13  been talking about, right?
14      A.   Yes.
15      Q.   Okay.  Did you ever deal with
16  anybody at Marvel?
17      A.   Sure.  Yes.
18      Q.   Who would that be?
19      A.   Margaret Loesch, L-O-E-S-C-H, Lee
20  Gunther, Jim Graziano, he was my counterpart
21  there.  And then the production team.  I don't
22  remember their names specifically.  We worked
23  with them for five, six years.
24      Q.   And where are they located, these
25  individuals?

Carole Weitzman

Page 90

1    A.    Well, I know Lee passed away,
2  Margaret I don't know, Jim Graziano is just
3  being a house dad right now.
4    Q.    Where was the company when you
5  dealt with them?
6    A.    Marvel? LA. It was before we
7  opened our own studio.
8    Q.    Before Sunbow opened its own
9  production studio?
10   A.    Yes.
11   Q.    Now, this, of course, is in DVD
12  format, which is relatively recent technology.
13  You don't have any knowledge of how this came to
14  be?
15   A.    No.
16   Q.    You were unaware that there was a
17  DVD out?
18   A.    No, I didn't know.
19   Q.    Could you look at the next
20  exhibit, please. H, I guess.
21   A.    It's Transformers The Movie.
22   Q.    What production information is on
23  the jacket of that?
24   A.    Exec producer is Margaret and Lee,
25  supervising producer is Joe Bacal, produced by

Page 91

1  Joe and Tom, Joe Bacal and Tom Griffin.
2    Q.    Do you know where Joe Bacal lives?
3    A.    In Westchester. North Salem, West
4  Salem. I don't know, I think that's
5  Westchester.
6    Q.    And do you know who he works for
7  now?
8    A.    He doesn't work for anybody.
9    Q.    Do you know what he does for a
10  living?
11   A.    He's kind of not working. He does
12  some script once in a while for Four Kids
13  Productions, my company, once in a while, but he
14  doesn't have a job job, it's for fun.
15   Q.    Do you know who Nelson Shin is?
16   A.    Yes, he's an animation producer.
17  He has a studio over in Korea.
18   Q.    Used from time to time by Sunbow?
19   A.    Oh, yeah, a lot. I like him, he
20  has a good animation studio.
21   Q.    The next one, please.
22   A.    It's J, right?
23   Q.    Yes.
24   A.    Transformers --
25   MS. KITSON: It's I.

Page 92

1    A.    Yes, I, sorry. Transformers,
2  Collector Edition. This is the series when we
3  redid it because you could tell by the framing
4  of it, it was a new version.
5    Q.    It's a new version?
6    A.    Yes. Same animation, new sound
7  effects, new computer graphics and things.
8    Q.    What about the music, or you
9  wouldn't know?
10   A.    I don't remember that.
11   Q.    Who produced this?
12   A.    Sunbow -- oh, you mean the DVD?
13   Q.    Yes.
14   A.    Rhino.
15   Q.    Incidentally, did you ever watch
16  any of these videos?
17   A.    Not lately. In the '80s they were
18  pretty cool. Oh, yeah, more than I wanted to.
19     J is again Transformers, it's a
20  Rhino DVD.
21   Q.    And these are, so far as I could
22  tell, they are all Wildstar, aren't they? For
23  example, I is Wildstar, I could tell.
24   A.    I'm just looking on the back.
25  Wildstar, yes.

Page 93

1    Q.    Now, if I'm reading this
2  correctly, on the back it seems to indicate
3  Rhino Home Video is an AOL Time Warner
4  Entertainment Company. Did you --
5    A.    I didn't know it, I just read it
6  myself.
7    Q.    Does that appear to be the case?
8    A.    Yes.
9    Q.    And what was the last one?
10   A.    K, Inhumanoids. I don't see
11  Wildstar on Inhumanoids.
12   Q.    Do you know of any connection that
13  any AOL Time Warner entity would have had with
14  anything that Sunbow was involved?
15   A.    No.
16   Q.    You don't know of any deals that
17  were made?
18   A.    No, but, again, any home video
19  deals were generally done through the sales
20  team, it was part of their domain.
21     MR. MONAGHAN: All right, give me
22  a minute, I think we're winding up.
23
24     (Recess taken.)
25

Carole Weitzman

Page 94

BY MR. MONAGHAN:
1
2       Q.    Did Sunbow produce TV or radio
3   commercials for Griffin Bacal?
4       A.    No.
5       Q.    Who produced the commercials for
6   Griffin Bacal related to these products?
7       A.    Griffin Bacal was an advertising
8   agency, and they had their own teams.  There
9   were guys assigned for G.I. Joe or Transformers
10  and things like that.
11      Q.    Do you know who they were?
12      A.    No.
13      Q.    So Sunbow was limited to TV
14  production and --
15      A.    Yes.
16      Q.    -- videos?
17      A.    We never produced the videos.
18      Q.    It was limited to TV productions?
19      A.    Yes.
20      Q.    And then later on, we've seen
21  these other things happening?
22      A.    Right.  We've always sold the
23  shows internationally.
24      Q.    Who had responsibility for the
25  international sales?

Page 95

1       A.    That was just the sales team.
2       Q.    Same sales team you identified
3   earlier?
4       A.    Yes.
5       Q.    What's your last information about
6   Mr. Dobishinski?
7       A.    Years ago, when we went --
8   whatever year we signed up with Sony as
9   administrators, maybe a year-and-a-half before
10  that, he just kind of disappeared.
11      Q.    Is he an attorney, do you know?
12      A.    Yeah, he's an attorney.  I think
13  his company -- like you brought up TAMAD, I
14  remember that was --
15      Q.    Mindy Miller, name familiar to
16  you?
17      A.    It sounds familiar, but she worked
18  in Griffin Bacal, not in Sunbow.
19      Q.    I don't know if you know this, but
20  do you know who would pay the residual payments
21  to the singers and musicians whose performances
22  on the TV shows later found their way into
23  these DVDs?
24      A.    No.
25      Q.    Do you have any familiarity with

Page 96

1   the Screen Actors Guild and the American
2   Federation of Musicians?
3       A.    Well, we used to use SAG actors
4   years ago as voice-over talent.
5       Q.    Do you know what a session fee is?
6       A.    No.  Only for voice-overs I do,
7   not in the music area.
8       Q.    Who was Sunbow's accounting firm?
9       A.    I don't know.  I mean, I knew a
10  lot of the accounting was done in-house.
11      Q.    Didn't they have an outside --
12      A.    They may have, I don't know.
13      Q.    Who was the bookkeeper, in-house?
14      A.    Well, there was Raul -- we shared
15  -- when we were in the Griffin Bacal
16  facilities, we shared the Accounting Department
17  with Griffin Bacal.
18      Q.    And who was in charge of the
19  Accounting Department?
20      A.    I'm sorry?
21      Q.    At that time, who was in charge of
22  the Accounting Department?
23      A.    Bill Biehl and Bob Darcy.  They
24  were there at two separate times.
25      Q.    And later on, when you had your

Page 97

1   own facility?
2       A.    We had Andrew Carpon and then Sam
3   Milstone near the very end.
4       Q.    Where is Mr. Milstone?
5       A.    I think in Baltimore.  He moved.
6   He was from there and he went back.
7       Q.    Would there be a record anywhere
8   on how to reach him?
9       A.    I could find out.
10      Q.    We'll leave a space in the record
11  and see if you could fill that in.
12  REQUEST: _____
13          MR. MONAGHAN:  Thanks very much,
14      Ms. Weitzman.  Depending on what
15      information comes out in the case, we may
16      have to have you back, but I can't say that
17      for sure right now.
18          MS. KITSON:  We'll take that under
19      advisement.
20
21
22  CROSS EXAMINATION
23  BY MS. VALENCIA:
24      Q.    Ms. Weitzman, my name is Adrienne
25  Valencia.  I'm with the law firm of Duane Morris

Carole Weitzman

Page 98

1    and we represent Jules "Joe" Bacal in this
2    litigation. He's named as an independent
3    defendant, and I just have a couple of questions
4    for you.
5            To your knowledge, did Mr. Bacal
6    remain involved with Sunbow after Sony purchased
7    the company?
8        A.    After Sony purchased it, no.
9        Q.    To your knowledge, after Sony
10   purchased Sunbow, was Mr. Bacal provided with
11   information concerning what royalties, if any,
12   Sunbow received?
13           MR. MONAGHAN: Object to the form.
14   How would she know? There is no
15   foundation.
16       A.    I wouldn't know.
17       Q.    To your knowledge, was information
18   concerning Sunbow's general business activities
19   provided to Mr. Bacal after Sony purchased
20   Sunbow?
21           MR. MONAGHAN: Objection to the
22   form. How would she know? No foundation
23   for that.
24       A.    Not that I know of.
25       Q.    To your knowledge, while Mr. Bacal

Page 99

1    was with Sunbow, this is prior to Sony's
2    acquisition, did he have any involvement with
3    the actual registrations of any compositions
4    with BMI?
5            MR. MONAGHAN: Object. She's
6        covered that in the direct.
7        A.    No. I mean he would -- I would
8    imagine he and Tom knew the information
9    regarding the deals of the composers and then
10   that was relayed.
11       Q.    But, to your knowledge, did he
12   have any involvement with the actual
13   registrations with BMI?
14       A.    Physical registrations, no.
15       Q.    And, to your knowledge, after
16   Mr. Bacal left Sunbow, did he have any
17   involvement with registrations of compositions
18   at BMI?
19           MR. MONAGHAN: Object. She said
20       she has no knowledge about the clearance
21       registration forms. The only testimony she
22       could give is about cue sheets. And she
23       made it very clear in her answers to my
24       questions that she doesn't know about that,
25       so I think it's misleading to give --

Page 100

1            MS. VALENCIA: The question is to
2    her knowledge. Ms. Kitson is not directing
3    her not to answer.
4            MR. MONAGHAN: That's true, but
5    I'm objecting to the form of the question,
6    there is no foundation for it.
7            MS. VALENCIA: It's noted for the
8    record.
9            MR. MONAGHAN: This witness has
10   absolutely no knowledge with what Mr.
11   Bacal did with respect to clearance forms.
12           MS. VALENCIA: I didn't ask about
13   clearance forms.
14           MR. MONAGHAN: Yes, you asked
15   about registrations, and they include
16   clearance forms.
17           MS. VALENCIA: If she has
18   knowledge, then we'll follow-up. If she
19   doesn't, that's the end of the question.
20           MR. MONAGHAN: The only knowledge
21   she has is about cue sheets.
22       Q.    Ms. Weitzman, do you recall the
23   question?
24       A.    Yeah. I have no knowledge of him
25   being involved in any aspect of registration.

Page 101

1            MS. VALENCIA: Thank you,
2    Ms. Weitzman. I have no further questions.
3            MR. MONAGHAN: I have one
4    follow-up.
5
6
7    REDIRECT EXAMINATION
8    BY MR. MONAGHAN:
9        Q.    Did any of your answers to
10   Ms. Valencia's questions change anything that
11   you had testified to on direct?
12       A.    No.
13       Q.    So your testimony about your lack
14   of knowledge of filing of clearance forms with
15   BMI remains as it was?
16       A.    Yes.
17       Q.    That is, you don't know anything
18   about how that was accomplished?
19       A.    No.
20       Q.    And you don't know whether Mr.
21   Bacal filed clearance forms or caused somebody
22   else to file those clearance forms with BMI; is
23   that right?
24       A.    Yes.
25       Q.    So it's just possible that he did

Carole Weitzman

Page 102

1  in fact file clearance forms with BMI, isn't
2  it?
3       MS. KITSON:  Objection.
4       MS. VALENCIA:  It's also possible
5  he didn't.
6       MR. MONAGHAN:  Yes.
7       A.    Right, I'm not comfortable saying
8  it's possible he did or he didn't, I don't know
9  anything of it.
10      Q.    In fact you don't even know
11 anything about those forms, do you?
12      A.    No.
13      MR. MONAGHAN:  Thank you.
14      MS. KITSON:  I have no questions.
15
16      (Whereupon, the deposition was
17 concluded at 11:50 a.m.)
18
19
20
21
22
23
24
25

Page 104

1              C E R T I F I C A T E
2
3  STATE OF NEW YORK      )
4                  ) Ss.:
5  COUNTY OF SUFFOLK      )
6
7       I, Denise Posillico, a Notary
8  Public within and for the State of New York, do
9  hereby certify:  That CAROLE WEITZMAN, the
10 witness whose deposition is hereinbefore set
11 forth, was duly sworn by me and that such
12 deposition is a true record of the testimon
13 given by such witness.
14      I further certify that I am not
15 related to any of the parties to this actio
16 by blood or marriage; and that I am in no
17 way interested in the outcome of this
18 matter.
19      IN WITNESS WHEREOF, I have
20 hereunto set my hand this 19th day of May, 2003.
21
22
23 ---------------------
24      DENISE POSILLICO
25

Page 103

1        A C K N O W L E D G E M E N T
2
3  STATE OF
4  COUNTY OF
5
6
7    I, CAROLE WEITZMAN, hereby certify
8  that I have read the transcript of my
9  testimony taken under oath in my deposition
10 of May 19, 2003, that the transcript is
11 a true, complete and correct record of my
12 testimony, and that the answers on the record
13 as given by me are true and correct.
14
15
16      _____
            CAROLE WEITZMAN
17
18
19 Signed and subscribed to me,
20 this_____day of_____,
21 2003.
22
23
   _____
24 Notary Public
25

Exhibit I

Free Music Download, MP3 Music, M'  ic Chat, Music Video, Music CD, ART  'direct Network          Page 1 of 4



                      Join | Help |

**Browse Artists by Alpha**

November 06, 2003    A  B  C  D  E  F  G  H  I  J  K  L  M  N  O  P  Q  R  S  T  U  V  W  X  Y  Z  #

Browse Artist By Genre     Browse Artist By Year

🔲 HOME
🔲 MUSIC NEWS         **SATURDAY MORNING: CARTOONS' GREATEST HITS**    ⬆ top
🔲 SHOPPING
🔲 DOWNLOADS             Saturday Morning: Cartoons'        
🔲 VIDEO                                      Greatest Hits
🔲 COMMUNITY                                  1995 Mca
                                             ★★    See Review
**Shopping**
                                             CD $12.95 $10.99
**Merch**                                    SATURDAY MORNING CARTOON'S
New Products                                 GREATEST HITS / VARIOUS
Exclusive Products
Clearance Center
Clothing
Accessories
For Your Walls
Household
Toys and Games
Books                        # Song Name
Rock Collectibles            1  Tra la la Song (One Banana, Two
Music Accessories               Banana) (The Banana Splits) (3:12)
                             2  Go, Speed Racer, Go! (From Speed
**Music**                       Racer) (3:06)
Hot 100                      3  Sugar, Sugar (From the Archie
New Releases                    Show) (3:52)
Pre-Orders                   4  Scooby-Doo, Where Are You?
Exclusive CDs                   (3:12)
New Artists                  5  Josie and the Pussycats (2:15)
Soundtracks                  6  Bugaloos (3:17)
Boxsets                      7  Underdog (3:54)
Compilations                 8  Gigantor (4:12)
                             9  Spiderman (2:05)
**Movies**                      Jonny Quest/Stop That Pigeon
New Releases                 10 (From Dastardly and Muttley in Their
Pre-Orders                      Flyin (3:10)
Action & Adventure              Open Up Your Heart and Let the
Art House &                  11 Sunshine In (From the Flinstones)
International                    (3:37)
Comedy                       12 Eep Opp Ork Ah-Ah (Means I Love
DVD                             You) (From the Jetsons) (3:21)
Documentary &                13 Fat Albert Theme (From Fat Albert &
Special Interest                the Cosby Kids) (3:44)
Drama                        14 I'm Popeye the Sailor Man (3:03)
Family & Kids                15 Friends/Sigmund and the
Music & The Arts                Seamonsters (4:21)
Mystery, Suspense            16 Goolie Get-Together (From the
& Horror                        Groovie Goolies) (3:48)
Romance                      17 Hong Kong Phooey (3:43)

**Sci-Fi & Fantasy**
**TV Shows**

**Genres**
Alternative Rock
Blues
Country
Dance
Electronica
Hip Hop
Jazz
New Age
Pop
R&B/Soul
Rock
Vocal
World

**Features**
Your Account
Shopping Cart
Checkout
Gift Certificates
Help

18  H.R. Pufnstuf (3:17)
19  Happy, Happy, Joy, Joy (From the Ren and Stimpy Show) (3:28)

**Album Review**                                        ⌂ top

At least since the mid-'60s, there has been a dubious but undeniable connection between kids' television and novelty pop songs. With the rise of the Archies in the latter part of the decade, Saturday morning TV became saturated throughout the early '70s with wacky adventures of young-ish hipsters who just happened to be able to break into super-groovy songs at any moment. Producer Ralph Small has capitalized on his self-confessed jones for Saturday morning TV with Saturday Morning Cartoon's Greatest Hits.

What makes this more than just another compilation co-optation is Small's recognition of the mind-melting nature of kids' TV, and the great liner notes. Artist prospective, show/song bios, and an essay from Small make this a truly fun collection. With minimal experimentation or revisionist arrangements, the tunes stick to their mind-numbing, ear-catching simplicity.

Of course it's guaranteed that you'll be singing along, but the faithful pairing of artists and songs makes it extra sweet. Groovy grrls **Liz Phair** ("The Tra La La Song"), **Mary Lou Lord** ("Sugar Sugar"), and **Juliana Hatfield** and Tanya Donnelly ("Josie and the Pussycats") spin a rainbow of sonic cotton candy. **Matthew Sweet** caves into his teen idol fantasies with a dreamy, safely psychedelic "Scooby-Doo Where Are You?." Sponge probes their Motor City roots via Japanamation with "Go Speed Racer Go," and several other acts seem to be channeling their childhood heroes: **Butthole Surfers**/"Underdog," Helmet/"Gigantor," Ramones/"Spiderman," and Sublime/"Hong Kong Phooey."

While the depth goes about as far as a Scooby Doo plot, this collection is great for parties -- or a Saturday morning hangover. ~ Theresa E. LaVeck, All Music Guide

**Album Credits**                                        ⌂ top



| | |
|---|---|
| **Stephen Marcussen** | Mastering |
| **Tony Marsico** | Bass |
| **Peter McCabe** | Engineer, Mixing |
| **Joe McGinty** | Keyboards |
| **Carl Nappa** | Assistant Engineer |
| **Mark Pirro** | Bass |
| **Joey Ramone** | Vocals |
| **Johnny Ramone** | Guitar |
| **Marky Ramone** | Drums |
| **Daniel Rey** | Guitar (Electric) |
| **Mark Reznicek** | Drums, Vocals (Background) |
| **Rick Rooney** | Assistant Engineer |
| **Ralph Sall** | Producer, Liner Notes, Executive Producer, Art Direction, Mixing, Concept |
| **John Stanier** | Drums |
| **Lisa Umbarger** | Vocals (Background), Bass |
| **Bryan Wakeland** | Drums, Percussion |
| **Dan Wilson** | Vocals (Background), Guitar |
| **Mike Zelenko** | Drums, Percussion |





| | |
|---|---|
| **Tanya Donelly** | Guitar (Rhythm), Vocals, Performer |
| **Sponge** | Performer |
| **Daniel Denholm** | Organ |
| **Phil Friedmann** | Vocals (Background), Bass |
| **Scott Hackwith** | Keyboards, Vocals, Guitar |
| **Brad Haehnel** | Assistant Engineer |
| **Luis Quine** | Assistant Engineer |
| **Michael Railton** | Keyboards |
| **Krish Sharma** | Assistant Engineer |
| **Wes Berggren** | Guitar |
| **Sublime** | Performer |
| **Dean Fisher** | Bass |
| **Semisonic** | Performer |
| **Andrew Davis** | Illustrations |
| **Joey Mazzola** | Guitar |
| **Jacob Slichter** | Drums, Keyboards, Vocals (Background), Percussion |
| **Guy Hoffman** | Drums, Vocals (Background) |
| **C.J. Ramone** | Bass |
| **Face to Face** | Performer |
| **Mary Lou Lord** | Vocals, Vocals (Background), Performer, ? |
| **Lisa Sutton** | Design |
| **Michael Lavine** | Photography |
| **Gabe Chiesa** | Assistant Engineer |
| **Dave Georgeff** | Vocals, Bass |
| **Rob Kurth** | Drums, Vocals (Background) |
| **Gary Panter** | Illustrations |
| **Matt Riddle** | Vocals (Background), Bass, Guitar |
| **Joe Sib** | Vocals |
| **Eddie Miller** | Assistant Engineer |
| **Andrew Catlin** | Photography |
| **Caram Costanzo** | Assistant Engineer |
| **Trever Keith** | Vocals, Guitar |
| **John Falls** | Photography |
| **Angie Hart** | Vocals |
| **Simon Austin** | Guitar |
| **Michael Halsband** | Photography |
| **Carlos Castro** | Assistant Engineer |
| **Andrew Garver** | Assistant Engineer |
| **Chad Yaro** | Vocals (Background), Guitar |
| **Josh Coffman** | Photography |
| **Tom Gardocki** | Horn, Vocals, Guitar |
| **Will Turpin** | Vocals (Background), Bass |
| **Glenn Barr** | Illustrations |
| **Jonathan Mooney** | Assistant Engineer |
| **Michael Muller** | Photography |
| **Mark Yeend** | Assistant Engineer |
| **Dean Roland** | Guitar (Rhythm) |
| **Eric Wilson** | Vocals (Background), Bass |
| **Jeff Bender** | Photography |
| **King Coffey** | Drums, Vocals (Background) |
| **Brad Nowell** | Vocals, Guitar |
| **Rob Echeverria** | Guitar |
| **Ross Childress** | Guitar |
| **Scott Churilla** | Drums, Vocals (Background) |
| **Heather Grody** | Vocals, Guitar (Acoustic) |
| **Adam Rhodes** | Assistant Engineer |
| **Jeanne Venton** | Project Coordinator |
| **Richard Lloyd** | Guitar |
| **Wax** | Performer |

| | |
|---|---|
| Tim Cross | Bass |
| Juliana Hatfield | Guitar (Rhythm), Vocals, Performer, Guitar |
| Chris Gorman | Drums, Percussion |
| Dig | Performer |
| Liz Phair | Vocals, Performer |
| Toadies | Performer |
| Tripping Daisy | Performer |
| Collective Soul | Performer |
| Frentel | Performer |
| Lisa Mednick | Organ (Hammond) |
| Murmurs | Performer |
| Ted Ansani | Vocals, Bass |
| Ian Bryan | Assistant Engineer |
| Jim Champagne | Assistant Engineer |
| Jeff DeMorris | Assistant Engineer |
| Tim Delaughter | Vocals |
| Dave Dysart | Assistant Engineer |
| Jim Ellison | Vocals, Guitar |
| Gordon Gano | Vocals, Guitar |
| Page Hamilton | Vocals, Guitar |
| Gibby Haynes | Vocals |
| Reverend Horton Heat | Performer |
| Darrel Herbert | Vocals (Background), Guitar |
| Richard Huredia | Assistant Engineer |
| Leslie Ann Jones | Assistant Engineer |
| Paul Leary | Vocals (Background), Bass, Guitar |
| Todd Lewis | Vocals, Vocals (Background), Guitar |
| Butthole Surfers | Performer |
| Helmet | Performer |
| Material Issue | Performer |
| The Ramones | Performer |
| Brian Ritchie | Vocals (Background), Xylophone, Bass |
| Matthew Sweet | Guitar (Rhythm), Vocals, Vocals (Background), Performer |
| Violent Femmes | Performer |

**Network Login | Help | Privacy Policy | Contact Us | About Us**
**Shopping Account | Terms of Use | To Advertise | Copyrght Policy**

© 1997 - 2003 ARTISTdirect Inc. All Rights Reserved
ARTISTdirect is a federally registered service mark of ARTISTdirect, Inc. The "A with the arrow logo" is a service mark of ARTISTdirect, Inc.

**Hear The Hottest New Songs**
Alkaline Trio ● Blood Brothers ● The Faint
Stagga Lee ● RX Bandits ● Delerium ● Jack Black
Click Here

**Exhibit J**

## Patterson, Belknap, Webb & Tyler LLP

1133 Avenue of the Americas
New York, NY 10036-6710
(212) 336-2000
Fax (212) 336-2222

Roseann Kitson Schuyler

Direct Phone
(212) 336-2341

Email Address
rkitson@pbwt.com

August 12, 2003

**By Fax**

Patrick J. Monaghan, Jr.
Monaghan, Monaghan, Lamb & Marchisio
28 W. Grand Avenue, 2nd floor
Montvale, NJ 07645

Re:    **Bryant v. BMI, et al. and Bryant v. Sunbow Productions, Inc.**

Dear Mr. Monaghan:

I have been asked by Justice Andrew P. O'Rourke to notify all parties in writing that the deadline for service of motions for summary judgment in the above consolidated matters has today been extended up to and including September 30, 2003.

Very truly yours,

Roseann Kitson Schuyler

cc:    Adrienne Valencia, Esq.
Marc Ostrow, Esq.
Chambers of Hon. Andrew P. O'Rourke