# EXHIBIT 35

04/12/2003  12:47     +442074341578            TV LOONLAND                      PAGE  02/06

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

```
55576-017
```

| SERIAL NO. | 7 8 |  |
|---|---|---|
| SERVED | | |
| RECEIVED | | |
| FILED | | |

----------------------------------------------x

ANNE BRYANT,

                    Plaintiff,                          Index No. 5192/00

          - against -
                                                        Hon. Andrew P. O'Rourke

BROADCAST MUSIC, INC., (a/k/a "BMI"),
CLIFFORD A. "FORD" KINDER, KINDER & CO.,
LTD., VADIVOX, LTD., JULES M. "JOE"
BACAL, GRIFFIN BACAL, INC., STARWILD
MUSIC BMI, WILDSTAR MUSIC ASCAP,
SUNBOW PRODUCTIONS, INC., and JOHN
AND JANE DOES 1-10,

                    Defendants.

----------------------------------------------x
----------------------------------------------x

ANNE BRYANT,

                    Plaintiff,                          Index No. 2821/02

          - against -                                   Hon. Andrew P. O'Rourke

SUNBOW PRODUCTIONS, INC.,                               **AFFIDAVIT OF**
                                                        **NEIL R RIGBY**
                    Defendant.

----------------------------------------------x

CITY OF LONDON          )
                        : ss.:
ENGLAND                 )

          I, Neil R Rigby, being duly sworn, depose and say:

          1.     I am the Head of Legal and Business Affairs for TV-Loonland AG

("Loonland"). I submit this affidavit in support of the motion of Defendant Sunbow Production, Inc.

("Sunbow") for summary judgment in the above-captioned case. The information in this affidavit is

based on my personal knowledge.

04/12/2003  12:47   +442074341578                    TV LOONLAND                          PAGE  03/06

2.    Loonland is an integrated media company headquartered in Germany that produces and distributes television series and animation for children, youth and families. In 2000, Loonland acquired Sunbow from Sony Music Entertainment.

3.    I began working for Loonland in December 2001 as its Head of Legal and Business Affairs. In this position, I am responsible for, among other things, responding to requests made during litigation for the production of documents relating to Loonland's various businesses.

### Loonland's Search for Contracts Relating to Anne Bryant

4.    In mid-October 2003, Sunbow's lawyers informed me that the Court in this case had recently directed Sunbow to respond to discovery requests by Plaintiff Anne Bryant seeking, among other things, every agreement that Sunbow or any of its subsidiaries had entered into with Bryant. Sunbow's lawyers asked me if Loonland would search Sunbow documents in Loonland's custody in Europe for the requested agreements.

5.    I informed Sunbow's lawyers that Loonland had recently moved approximately 250 boxes of Sunbow's documents from New York to Loonland's Munich offices and that Loonland would undertake as diligent a search of those boxes of documents as it was able to in the time provided.

6.    Sunbow's lawyers told me that Loonland should look for agreements between Anne Bryant, Ford Kinder and/or Kinder & Bryant Ltd. on the one hand, and Sunbow, Griffin Bacal, Inc., Starwild Music, Inc. and/or Wildstar Music, Inc., on the other hand. Sunbow's lawyers also informed me that the Sunbow television series for which Bryant claims she has written music include Transformers, G.I. Joe, Jem, My Little Pony, My Little Pony and Friends, Visionaries and Robotics (the "TV Shows"). In addition, Sunbow's lawyers told me that Bryant claims to have written commercial jingles for toys relating to some of these same properties, but none of the Sunbow files that Loonland searched contained information regarding commercial jingles.

2

04/12/2003  12:47    +442074341578           TV LOONLAND                    PAGE  04/06

7.    I personally traveled to Munich from my offices in London to supervise and participate in the search for these agreements. I and employees of Loonland's Munich offices reviewed approximately 200 boxes of Sunbow's documents. We selected for review boxes that were labeled as containing files relating to production and finance, which we understood from conversations with former Sunbow employees were most likely to contain the requested contracts.

8.    Except as described in Paragraph 9 below, we did not find any of the agreements requested by Sunbow's lawyers. Many of the boxes of documents contained production records for various Sunbow television shows. However, we found almost no documents from the 1980s and very few documents that related to any of the TV Shows at issue in this case. This was consistent with my understanding from conversations with Sunbow's former employees that many of Sunbow's documents from the 1980s were destroyed in a flood in the basement of Sunbow's offices in the early 1990s.

9.    The only agreement I was able to locate of the type requested by Sunbow's lawyers was an unsigned copy of an agreement between Kinder & Bryant, Ltd. and Sunbow relating to the Jem television series (the "Jem Contract"). A true and correct copy of the Jem Contract is attached hereto as Exhibit A. I found the Jem Contract in a file relating to an inquiry made by MCA Records, Inc. and Bulletproof Recording Company, Inc. (the "Record Companies") to Sunbow in July 1994 for permission to record the Jem theme song for use on a compilation album to be entitled "Cartoons' Greatest Hits." Attached hereto as Exhibit B is a true and correct copy of a letter from counsel for the Record Companies to Sunbow dated July 20, 1994 regarding this request.

10.    Also contained in this same file was a letter dated November 14, 1994 from Robert C. Harris, Esq., then outside counsel for Sunbow, to Carole Weitzman, then the Senior Vice-President of Sunbow, describing Mr. Harris' efforts to locate a copy of the Jem Contract. A true and correct copy of this letter is attached hereto as Exhibit C. Accompanying this letter from Mr. Harris in the Jem file were three additional letters concerning proposed changes to and an amendment of the Jem Contract: (a) a March 3, 1986 letter from William M. Dobishinski, Esq., then counsel for Plaintiff,

3

04/12/2003   12:47    +442074341578              TV LOONLAND                      PAGE  05/06

Ford Kinder and Kinder & Bryant Ltd., to Harris relating to revisions to the Jem Contract and the
contract for "My Little Pony," a true and correct copy of which is attached hereto as Exhibit D; (b) a
May 30, 1986 letter from Harris to Dobishinski responding to Dobishinski, a true and correct copy of
which is attached hereto as Exhibit E; and (c) a February 9, 1987 letter with attachments from
Dobishinski to Weitzman relating to an amendment of the Jem Contract, a true and correct copy of
which is attached hereto as Exhibit F.

11.    Based on my review of the documents in this file, it appears that as part of its
research relating to the Recording Companies' inquiry, Sunbow tried to determine whether any
royalties would be due to Plaintiff and Kinder if the Jem theme was used on the Cartoons' Greatest Hits
record but had to request the Jem Contract from its outside counsel for this purpose because its own
copy of the contract had been destroyed in the 1991 flood.

_____
NEIL R RIGBY

Sworn to before me this
__4ᵗʰ__ day of December, 2003

_____
Notary Public

**M J SCANNALL**
SCRIVENER NOTARY, LONDON

My Commission expires with Life

DE PINNA
35 PICCADILLY
LONDON
W1J 0LJ
SCRIVENER NOTARY

4

Exhibit A

AGREEMENT made of this 1st day of June, 1985, by and between SUNBOW PRODUCTIONS, INC. ("Company"), whose business address is 380 Lexington Avenue, Suite 1105, New York, New York 10168, and KINDER & BRYANT LTD. ("Contractor") whose business address is 41 West 73rd Street, New York, New York 10023, f/s/o Anne Bryant and Ford Kinder (jointly referred to as "Writer").

In consideration of the mutual covenants herein contained, the parties hereto have agreed and do agree as follows:

1.    Company hereby engages Contractor and Contractor hereby accepts such engagement, to furnish the services of Writer to Company for the purpose of writing, preparing and delivering to Company original musical material (hereinafter referred to as the "Music") for songs to be used in a fully-animated children's television show consisting of either five one-half hours, fifteen segments, or a television motion picture, presently entitled "JEM" (the "Show")(it being understood that the mention of the Show is for purposes of identification only and shall in no way restrict Company's rights in the Music, and the use thereof, as set forth in this Agreement).  The number of songs for which music is to be written and delivered by Writer hereunder shall be determined by Company.  The Music shall be delivered to Company in accordance with a schedule to be mutually determined by the Company and Contractor.

2.    (a)  For all rights herein granted to Company in the Music, and for performance by Contractor of all obligations hereunder (including but not limited to composing and arranging the Music, supervision of the orchestra recording of the Music for the Show, and Company's right to use the Music on and in connection with phonorecordings sold or distributed in conjunction with merchandise based on the Show ["Premium Cassettes"]), Company shall pay Contractor a fee of Two Thousand Two Hundred ($2,200) Dollars for each song for which Writer writes and delivers the Music, payable on delivery thereof.

(b)  Payment by a parent or affiliate of Company shall be deemed to constitute payment by Company hereunder. Nothing herein contained shall be deemed to impose any obligation on Company to use or authorize the use of the Music, and Company shall have fully discharged its obligations to Contractor hereunder by payment to Contractor of the amount specified in subparagraph (a) of this Paragraph 2.

3.    Contractor shall deliver one (1) copy of the Music to Company as Company shall designate.

4.    It is understood and agreed that Writer may write the Music at such times and places as Writer may choose, subject only to Contractor's obligation to make timely delivery of the Music in accordance with the terms of this Agreement.

5.   (a)  Contractor warrants, acknowledges and agrees that the Music to be written by Writer and delivered by Contractor is to be written by Writer under and pursuant to an employment agreement between Contractor and Writer pursuant to which Contractor is entitled to the exclusive services of Writer, and to all the results of Writer's services; that the Music was specifically ordered and commissioned by Company for use as part of an audiovisual work; and that the Music is a work made for hire within the meaning of Section 101 of the United States Copyright Act.  Upon writing of the Music, all right, title and interest therein shall automatically vest in Company and Company shall be the sole and unlimited owner thereof and of all rights therein throughout the world forever, and Company shall be entitled to copyright therein, including statutory copyright and all renewals thereof, as copyright author and proprietor.  Company may freely assign and grant rights and licenses with respect to the Music and any copyrigt therein (including any renewals thereof), and in this connection Contractor agrees to execute and deliver and/or cause Writer to execute and deliver to Company any and all instruments required by Company in connection with the use and enjoyment of the Music and of Company's rights therein and thereto.  Contractor hereby appoints Company as Contractor's and Writer's attorney-in-fact with the right but not the obligation to execute any such instruments in Contractor's or Writer's name on Company's behalf.  On execution hereof, Contractor shall sign and shall cause Writer to sign the Certificate of Authorship attached hereto for the Music.

(b)  Without in any way limiting the generality of the foregoing, it is agreed that Company shall have the exclusive right and may license others to use, adapt, arrange, change, add to, or subtract from the Music and to combine the same with other literary material and/or lyrics and to publish, record, produce, reproduce, transmit, perform, broadcast, telecast, and/or otherwise communicate the same or any version or versions thereof by any means (including, but not limited to, in synchronization with motion pictures, television and/or any other form of recordation or reproduction of sight and/or sound), whether now known or hereafter devised, publicly for profit or otherwise, it being understood that Contractor and Writer hereby waive any so-called "moral rights" which may now be or may hereafter be recognized.  It is understood and agreed that neither Contractor nor Writer shall have any right, title or interest in any other literary material and/or lyrics which may be combined with the Music.

(c)  During any period or periods of time during which Writer is affiliated with any small performing rights society (herein called the "Society"), Company shall and does hereby, under and pursuant to this Paragraph, license back to Writer the so-called "writer's share" (i.e., fifty (50%) percent) (but, if the Music or any form thereof are the composition of

- 2 -

STIN 0383

Writer and other composers and/or lyricists, then the grant hereunder shall be deemed a grant of the "writer's share" to Writer and all other such lyricists and/or composers jointly except that for instrumental uses, only Writer and any other composer(s) shall share in the "writer's share") in the non-dramatic (i.e., "small") performing rights in the Music so as to enable Writer to license such non-dramatic performing rights to Society, and to collect the "writer's share" of royalties derived therefrom, it being understood, in this connection, that Company (or any assignee or licensee of all or any of Company's rights under this Agreement) shall not exercise such non-dramatic performing rights during such period or periods without obtaining a license therefor from Society, except that Company and/or any such assignee or licensee, may exercise such non-dramatic performing rights in the Music by reason of, under and pursuant to this Agreement,

    (i)  during any period or periods during which such non-dramatic performing rights are not controlled by and/or available for license to Company or any such assignee or licensee at standard rates from Society, or in the case of public performances of the Music in geographical areas outside of Society's jurisdiction, from any other organization or society which is affiliated with Society or which has a collection agreement with Society and which controls the non-dramatic performing rights in any geographical area in which the Music is to be performed; and/or

    (ii)  in connection with theatrical exhibitions in the United States, its territories and possessions; and/or

    (iii)  in connection with any performance of the Music within the United States, its territories and possessions, which is not a public performance;

it being understood that Company (and/or any such assignee or licensee) shall have no obligation to pay any royalties or other sums to Writer, Contractor, Society, or any successor to the rights of any of them with respect to non-dramatic performances of the Music made pursuant to subclauses (i) through (iii) hereof. If Company makes or authorizes any non-dramatic performances of the Music under and pursuant to this Agreement, and if Writer or Contractor shall assert any claim that any such performance violates any rights of Writer or Contractor, then (A) under no circumstances shall Writer or Contractor have the right to take any action or initiate any proceeding with respect to such claim which would have the effect of enjoining and/or preventing and/or otherwise interfering with any said non-dramatic performances, it being agreed that any such action or proceeding shall be limited to an action at law for damages; and (B) if Writer or Contractor

- 3 -

SUN 0384

shall assert such a claim pertaining to a non-dramatic performance of the Music made by any assignee or licensee of Company, then any action taken or proceeding brought by Writer or Contractor shall be limited to an action at law for damages against such assigee or licensee exclusively. The foregoing references to Society shall not be construed as giving Society any independent right to take any action or initiate any proceeding against Company or any of its assignees or licensees with respect to any such claim.

(d)  Without limiting the generality of any rights granted under this Agreement, and notwithstanding any license hereunder to Writer pursuant to subparagraph (c) above, Writer and Contractor expressly acknowledge that Company, its successors, assigns and/or licensees shall have the right to collect the "publisher's share" of performance royalties becoming due and payable hereunder from any small performing rights society by reason of performances of the Music, it being expressly agreed that Writer and Contractor shall not be entitled to any share of such monies which are distributed to Company, its successors, assigns, and/or licensees by any small performing rights society. Writer shall be entitled to collect the "writer's share" of any such royalties with respect to the Music jointly with any other lyricists and/or composers of such Music. The terms "publisher's share" and "writer's share" as used in this Agreement have the same meaning here as is commonly understood in the music publishing and motion picture and television industries. Company may represent to any domestic or foreign performing rights society or similar organization requiring an acknowledgement of the type made by Writer herein that Contractor and Writer have acknowledged Company's right to collect and retain the publisher's share of royalties; further, if any such society or organization requires written authorization from Writer or Contractor in order to make payments of the publisher's share of royalties to Company, Writer and Contractor shall promptly execute and deliver such authorization. If any such society or organization makes payment to Writer or Contractor of all royalties (i.e., both "writer's" and "publisher's" share) with respect to any performance to Writer, Contractor shall promptly remit one-half (1/2) of such royalty to Company.

6.    Further, in the exercise of its rights hereunder and without in any way limiting the generality of the foregoing, Company shall have, as owner and copyright proprietor of the Music, the complete control of the publication of the Music and of all rights incident thereto, including, but not limited to, the right to license the manufacture of phonograph records and other recordings of the Music and the right to license motion picture synchronization rights (all of which rights are herein sometimes collectively called "music publishing rights"). Without limiting the generality of the foregoing, it is agreed that Company may assign or license any or all such music publishing rights and/or any or all other rights granted to Company under this Agreement to

— 4 —

0040H

any music publishing company or production company which is a parent or subsidiary of Company or otherwise affiliated with Company or to any other third party.

(a)  With respect to Company's exercise of music publishing rights in the Music (as defined above)(but excluding use in connection with Premium Cassettes as defined in Paragraph 2(a) for which Contractor shall not receive any further compensation), uses of the Music combined with lyrics (but, if the Music with lyrics or any form thereof is the composition of Writer and other composers and/or lyricists, then the royalties hereunder shall be shared equally by all such lyricists and/or composers):

(i)  sums equal to fifty (50%) percent of the net proceeds (as defined below) received by Company from third parties for licenses for the manufacture or commercial phonograph records and/or licenses of theatrical motion picture synchronization rights (as defined below);

(ii)  for regular piano copies, if any, sold and paid for at wholesale in the United States and/or Canada, sums equal to eight cents (.08) per copy for the first one hundred thousand (100,000) copies sold, and ten cents (.10) per copy for copies sold in excess of 100,000;

(iii)  sums equal to fifty (50%) percent of net proceeds received by Company from third parties for regular piano copies, if any, sold and paid for at wholesale outside of the United States and/or Canada;

(iv)  with respect to orchestrations, including band arrangements, if any, sold and paid for at wholesale anywhere in the world, sums equal to ten (10%) percent of the wholesale price therefor, after trade discounts;

(v)  with respect to any songbook, folio or similar publication, if any, sold and paid for at wholesale anywhere in the world, sums equal to the amount resulting from dividing ten (10%) percent of the wholesale price, after trade discounts, therefor by the total number of copyrighted musical compositions contained in such publication;

(vi)  with respect to other uses of the Music hereunder, sums equal to the amount resulting from dividing fifty (50%) percent of the net proceeds received by Company from third parties therefor by the total number of copyrighted musical compositions and/or literary materials contained or included in such uses.

- 5 -

No royalties shall be payable hereunder for professional material not sold or resold; further, no royalties shall be payable to Writer with respect to uses of the Music except as hereinabove expressly set forth. The term "theatrical motion picture rights" as used herein refers to synchronization rights granted with respect to motion pictures intended primarily and initially for theatrical release by direct projection before paid-admission audiences; in no event shall such term refer to motion pictures or other methods of recordation, whether now known or hereafter devised, which are produced primarily and initially for television broadcasting by any means whatsoever. The term "net proceeds" as used hereinabove, shall mean all monies (including advances) actually received by Company (or any assignee of Company's rights or licensee hereunder) which are directly attributable to licenses issued authorizing the manufacture of commercial phonograph records and/or licenses relating to theatrical motion picture synchronization rights, and/or for the exercise of publication rights referred to in subclause (iii) above, as the case may be, after the deduction of all costs, expenses, fees and commissions which are directly attributable to the exploitation of the Music and combined music by way of commercial phonograph records or by way of theatrical motion picture synchronization, or by way of publication, as the case may be, computed in accordance with good and standard practices. In the event that Company licenses the Music in a form containing music or other literary materials written or composed by any third party or parties, then Contractor's royalties thereon, shall be reduced proportionately to an amount equal to the royalties payable hereunder divided by the number of composers and lyricists (including Writer) who have furnished materials and services for such use and who are entitled to receive royalties from Company, provided that in no event shall Writer receive less than one-half of the royalty Writer would otherwise be entitled to receive hereunder. Company shall render royalty statements to Contractor, accompanied by any remuneration due Contractor, such statements to be rendered at least twice during each calendar year during which royalties are payable.

(b) If, for any reason, exportation of money to the United States from any foreign country, territory or place should be prohibited, prevented or rendered commercially impracticable, the amount received by Company (if Company's share thereof is actually paid to Company in such foreign country, territory or place) shall not be considered gross receipts hereunder unless and until the same shall have actually been received in the United States in United States currency, less any discounts, losses, costs or expenses suffered by or imposed upon Company with respect to transmittal of such money to the United States and the conversion thereof to United States currency; provided, however, that if Contractor so requests in writing, that portion of such blocked or frozen funds which would represent Contractor's share of net proceeds of such gross receipts, but for being frozen or blocked, shall be deposited in Contractor's name in any bank or

- 6 -

0040H

SUN 0307

depository designated by Contractor in such country wherein such
funds are blocked or frozen subject to the laws of such country
with respect to such deposits and withdrawals by Contractor
therefrom. Contractor shall have the right at Contractor"s sole
expense to inspect Company's books and records relative to gross
receipts derived from use of the Music hereunder and to make
extracts thereof provided such inspection shall be made at
Company's offices during reasonable business hours and upon
reasonable notice and not more frequently than once per year. All
royalties, statements and other accounts rendered by Company shall
be binding upon Contractor and not subject to any objection by
Contractor unless specific objection in writing, stating the basis
thereof, is given to Company by Contractor by one (1) year from
the date rendered.

(c)   If Company assigns or licenses any uses of the
music publishing rights to any third party (including any
aforementioned subsidiary or affiliated company) and if Company
authorizes such third party to account directly to Contractor with
respect to royalties payable to Contractor by reason of any such
uses of such music publishing rights, then Contractor agrees that,
during the term of any such assignment or license, Writer shall
look only to such assignee or licensee for payment of such
royalties (and shall be entitled only to inspect such assignee's
or licensee's books and records relative to uses of the Music at
reasonable business hours and at such assignee's or licensee's
offices), provided that Company shall not be relieved of its
obligations with respect thereto unless the assignee is a parent,
subsidiary or affiliate of Company, or a recognized distributor of
motion pictures or television programs, or a "major" motion
picture company (as that term is understood in the motion picture
industry), or a "major" television network (as that term is
understood in the television industry), or a "major" record
company or music publishing company (as those terms are understood
in the music industry).

(d)   Contractor acknowledges that Company has not
made and is not hereby making any representation or warranty with
respect to the amount of royalties, if any, which may be derived
from uses of music publishing rights, it being further understood
that nothing herein shall be deemed to impose any obligation on
Company to use or authorize the use of the Music and/or any music
publishing rights derived therefrom.

7.   Company agrees that:

(a)   if the description of the Music in Paragraph 1
of this Agreement refers to a particular television program in
connection with which such Music may be used, and if such Music or
a substantial portion thereof are used in connection with such
program or are otherwise used hereunder, then Company shall give
Writer (or cause Writer to be given) credit as Writer of such

- 7 -

0040H

Music or as a writer of the television series on all release prints of such programs. Company further agrees to use best efforts to have Writer given credit in connection with other uses of the Music;

        (b) if any of the Music as described in Paragraph 1 of this Agreement is used as Music for the theme song for a television pilot program and/or television series, then Company shall give Writer (or cause Writer to be given) credit on all release prints of any such program in which such theme song is used as the theme song, as Writer of the Music of such theme song.

The form, style, size, placement and nature of any credit provided for herein shall be determined by Company (or its assignee or licensee) in its sole discretion except that Company agrees that the identification of Writer shall be in the form "Kinder and Bryant." Any unintentional and/or inadvertent failure to give credit as above provided, whether because of lack of broadcast time or otherwise, shall not be a breach of this Agreement.

    8.    Company shall have the right and may grant to others the right to use, disseminate, reproduce, print and publish Writer's name, likeness, voice and biographical material concerning Writer as news or informative matter and in connection with advertising and for purposes of trade in connection with any motion picture or television program in which the Music is used, and/or in connection with any other uses of the Music. The rights granted herein shall not include the right to use or to grant to others the right to use Writer's name, voice, likeness and biographical material in any direct endorsement of any product or service without Writer's prior written consent.

    9.    Contractor hereby warrants that Contractor is free and able to enter into and fully perform this Agreement, to furnish the services of Writer, and to grant all rights herein granted. Further, Contractor warrants that the Music in the form in which it is delivered shall be wholly original with Writer and shall not be copied from any other work and shall not, nor shall the use thereof, infringe or violate the copyright or any common law right or any personal, proprietary, or other right of any kind whatsoever of any person, firm, corporation or association. If any of the Music delivered hereunder is described as based upon traditional or public domain compositions, Contractor warrants that such compositions are in the public domain throughout the world and that Writer's treatment of such compositions is original and shall not be copied from any work other than such public domain compositions, nor shall the use thereof infringe or violate the copyright or any common law right or any personal, proprietary or other right of any kind whatsoever of any person, firm, corporation or association. Notwithstanding the foregoing, if any of the Music delivered hereunder is described as based upon materials furnished by Company or as based upon traditional or

- 8 -

public domain compositions furnished by Company, Contractor makes no warranty as to the originality or ownership of such materials or compositions furnished by Company.

10.  Contractor shall indemnify and hold Company, its successors, assigns and licensees, any network and/or stations over which the Music shall be broadcast, the sponsors, if any, of any program on which they are broadcast, and their advertising agencies, if any, and any other parties who shall utilize the Music or any part thereof in any way with Company's permission, and the directors, officers, agents and employees of any of the foregoing, free and harmless from any and all claims, damages, liabilities, costs and expenses, including reasonable counsel fees, arising out of any breach by Contractor of any warranty or agreement made by Contractor herein.

11.  It is understood and agreed that all or part of this Agreement and all the results and proceeds thereof may be assigned by Company to any third party without Contractor's consent and in this event, Company's successors and/or assigns shall be entitled to any and all rights, privileges, and equities to which Company is entitled under and by virtue of this Agreement.  In the event of such an assignment, Company shall not be relieved of its obligations hereunder unless the assignee is a parent, subsidiary or affiliate of Company or a recognized distributor of motion pictures or television programs, or a "major" motion picture company (as that term is understood in the motion picture industry), or a "major" television network (as that term is understood in the television industry), or a "major" record company or music publishing company (as those terms are understood in the music industry).

Nothing in this Agreement shall in any way derogate from, diminish or impair any rights granted to the Company or to any parent, subsidiary or affiliate of Company under any other agreement entered into between Writer and Company or any parent, subsidiary or affiliate thereof.

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their successors, assigns and licensees.

12.  Company agrees to furnish Contractor with cue sheets of the Music within sixty (60) days of the initial broadcast of the Show.

13.  (a)  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to contracts entered into and fully to be performed therein.

- 9 -

0040H

(b)   A waiver by either party of any of the terms and conditions of this Agreement in any one instance shall not be construed to be a waiver of such term or condition for the future, or of any subsequent breach thereof.  All remedies, rights, undertakings, obligations and agreements contained in this Agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either party.

(c)   This Agreement contains the entire understanding of the parties hereto relating to the subject matter herein contained and this Agreement cannot be changed, rescinded or terminated orally.

(d)   If any provisions of this Agreement as applied to any party or to any circumstances shall be adjudged by a court to be void or unenforceable, the same shall in no way affect any other provision of this Agreement, the application of such provision in any other circumstances or the validity or enforceabililty of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

SUNBOW PRODUCTIONS, INC. ("Company")

By:_____
        Its

KINDER & BRYANT LTD. ("Contractor")

By:_____
        Its

— 10 —

0040H

SUN 0391

## Schedule A

Anne Bryant and Ford Kinder ("Writers") hereby certify that they wrote certain original music as employees of KINDER & BRYANT LTD. ("Contractor") in the regular course of their employment. Contractor hereby certifies that Contractor was specially commissioned by SUNBOW PRODUCTIONS, INC. ("Company") to furnish the services of Writers to write and deliver said music to Company for use as part of a fully-animated children's television program tentatively entitled "JEM" pursuant to an agreement dated as of _____, 1986. Accordingly, Writers and Contractor acknowledge and agree that the said music is a work made for hire within the meaning of Section 101 of the United States Copyright Act and that Company is the author and owner thereof and is entitled to copyright therein (and all renewals thereof), and all rights of any kind or nature therein, with the right to make such changes therein and uses thereof as Company may from time to time determine as such author and owner.

KINDER & BRYANT LTD.
("Contractor")

Dated:                 By: _____

Dated:                       _____
                                     Anne Bryant

Dated:                       _____
                                     Ford Kinder

- 11 -

SUN 0392

<u>INDUCEMENT LETTER</u>

Dated as of _____, 1986

Sunbow Productions, Inc.
380 Lexington Avenue
Suite 1105
New York, New York  10168

    Re:  Sunbow Productions, Inc. with
        <u>Kinder & Bryant Ltd./"JEM"</u>

Gentlemen:

    Reference is made to that certain agreement dated as of _____, 1986 (herein called the "Agreement") between KINDER & BRYANT LTD. (herein called "Contractor") and you, which, among other things, makes available the services of the undersigned by Contractor to you for the purposes set forth in said Agreement.

    As an inducement to you to enter into the Agreement and as a material part of the consideration moving to you for so doing, each of the undersigned hereby represents, warrants and agrees as follows:

    1.   That the undersigned has heretofore entered into an agreement (herein callled the "Employment Agreement") with Contractor covering the rendition of the undersigned's services for Contractor and that Contractor has the right and authority to enter into the Agreement and to furnish the rights and services of the undersigned upon the terms and conditions therein specified.

    2.   That the undersigned is familiar with each and all of the terms, covenants and conditions of the Agreement and hereby consents to the execution thereof; that the undersigned shall perform and comply with all of the terms, covenants and conditions of the Agreement on the part of the undersigned to be performed and complied with, even if the Employment Agreement should hereafter be terminated or suspended; that the representations and warranties of Contractor contained in the Agreement are true; that the undersigned shall render all of the services provided for under the Agreement and hereby confirms that there have been granted to Contractor all of the rights granted by Contractor to you under the Agreement; that all notices served upon Contractor in accordance with the Agreement shall be deemed notices to the undersigned of the contents thereof.

- 12 -

0040H

STIN 0202

3.    That the undersigned is under no obligation or disability by law or otherwise which would prevent or restrict the undersigned from performing and complying with all of the terms, covenants and conditions of the Agreement on the part of the undersigned to be performed or complied with.

4.    That, except in the event that the undersigned is deemed substituted for Contractor as a direct party to the Agreement, pursuant to Paragraph 6 hereof, the undersigned will look solely to Contractor and not to you for all compensation and other remuneration for any and all services and rights which the undersigned may render and/or grant under the Agreement.

5.    That you shall be entitled to equitable relief against the undersigned by injunction or otherwise to restrain, enjoin and/or prevent the violation or breach by the undersigned of any obligation of the undersigned to be performed as provided in the Agreement and/or the violation or breach by the undersigned of any obligations or agreements under this present instrument.

6.    That if Contractor should be dissolved or should otherwise cease to exist or for any reason whatsoever should fail, be unable, neglect or refuse to perform and observe each and all of the conditions of the Agreement requiring performance or compliance on its part, the undersigned shall at your election be deemed substituted as a direct party to the Agreement in the place and stead of Contractor and, further, that in the event of a breach or threatened breach of the Agreement by Contractor or by the undersigned you shall be entitled to legal and equitable relief by way of injunction or otherwise against Contractor or against the undersigned or both of us in your discretion, in any event without the necessity of first resorting to or exhausting any rights or remedies which you may have against Contractor; all of the foregoing to be to the same extent and with the same force and effect as if the undersigned were a direct party to the Agreement in the first instance and as if in the Agreement the undersigned had personally agreed to render the services therein provided to be rendered by the undersigned and to perform and observe each and all of the terms and conditions of the Agreement requiring performance or compliance on the part of the Contractor or the undersigned or both of us.

Very truly yours,

_____            _____
FORD KINDER                          ANNE BRYANT

– 13 –

0040H

SUN 0394

LAW OFFICES OF

WILLIAM M. DOBISHINSKI
SUITE 1500
6430 SUNSET BOULEVARD
HOLLYWOOD, CALIFORNIA 90028
(213) 469-0045

WILLIAM M. DOBISHINSKI*
SCOTT F. PEARCE
LADD S. LJUNGBERG, Law Clerk

* Also member of New York and
District of Columbia Bars
DIRECT LINE (213) 469-4003

TWX 910-321-3738
Cable Address "COBOLEX"

N.Y. OFFICE
SUITE 1820
135 WEST 50TH STREET
NEW YORK, NEW YORK 10020
(212) 333-3301

March 3, 1986

Robert C. Harris, Esq.
Linden & Deutsch
110 E. 59th Street
New York, NY 10022

Re: (1) "JEM" (Kinder & Bryant) and (2) " MY LITTLE PONY" (Kinder & Bryant, Rick Brenckman)

Dear Bob:

Pursuant to my February 13, 1986 letter, I have discussed the above-mentioned Agreements with my clients. Although they appreciate the revisions that have already been incorporated into these Agreements, my clients wish to pursue the additional points listed below that were denied in our previous negotiations.

(A) "JEM" (Kinder & Bryant), "MY LITTLE PONY" (Kinder & Bryant and Rick Brenckman)

(1) Paragraph 5 (c) — The Agreements should provide that with respect to all compositions for which my clients write the music and a third party writes the lyrics, performance royalties and all other royalties should be split as follows:

royalties from vocal uses of the composition should be shared 50/50, with royalties from instrumental uses being paid at 100% to the music writer (e.g. ASCAP/BMI registration should provide "Music by Ford Kinder & Anne Bryant (50%), lyrics by Barry Harman (50%)" / on cue sheets — vocal cues should provide "Ford Kinder & Anne Bryant (50%) / Barry Harman (50%)", instrumental cues should provide "Ford Kinder & Anne Bryant (100%)".

Alternatively, Kinder & Bryant (not Rick Brenckman) would agree that royalties from all uses (vocal or instrumental) be equally shared between all writers 1/3 — 1/3 — 1/3 (e.g. ASCAP/BMI registration should provide "Music by Ford Kinder (1/3), Anne Bryant (1/3), Barry Harman (1/3)", "Lyrics by Ford Kinder (1/3), Anne Bryant (1/3), Barry Harman (1/3)" / all cue sheets should then provide "Anne Bryant (1/3), Ford Kinder (1/3) and Barry Harman (1/3).

MAR 6 1986

SUN 0380

(2) <u>Paragraph 5 (c), fifth, last line</u> - correct typographical error to read "assignee";

(3) <u>Paragraph 6 (a)</u> - additional payment of 50% of creative fee for each composition embodied on audio recordings distributed as premiums or on videocassettes;

(4) <u>Paragraph 6 (a)</u> - royalties should be paid quarterly;

(5) <u>Paragraph 10</u> - delete "arising out of any use of the Music or any part thereof or";

(6) <u>Paragraph 10</u> - delete second sentence since it pertains to lyrics, which are not furnished by Kinder & Bryant or Rick Brenckman.

(B) "<u>JEM</u>" (Kinder & Bryant)

<u>Additional</u> - if masters produced by Kinder & Bryant are embodied in audio recordings for commercial distribution (i.e. sale or rental), Kinder & Bryant should receive additional producer compensation in the amount of 25% of all advances and royalties received by Griffin Bacal from such distribution.

(C) "MY LITTLE PONY" (Rick Brenckman)

(1) <u>Pages 10, 11, 13</u> - first name is "Rick", not "Rich";

(2) <u>Paragraph 7</u> - credit should read "Rick Brenckman/Easy Writer Music";

(D) Please advise us regarding the desired dates to be inserted in the Agreements.

In considering the financial points, please be advised that the performing rights society revenues are not as substantial a source of revenue from these projects as might be expected.

I look forward to your response to this letter.

Best regards.

                                    Sincerely,

                                    <i>Bill</i>

                                    William M. Dobishinski

cc: Anne Bryant
    Ford Kinder
    Rick Brenckman

SUN 0381

## LINDEN AND DEUTSCH

### ATTORNEYS AT LAW

DAVID BLASBAND
JOSEPH CALDERON
ALVIN DEUTSCH
SIDNEY FEINBERG
FREDERICK F. GREENMAN, JR.
EDWARD KLAGSBRUN
BELLA L. LINDEN
DAVID Z. ROSENSWEIG
NANCY F. WECHSLER
RICHARD A. WHITNEY
PAUL S. WOERNER

ROBERT C. HARRIS
BERNARD G. SCHNEIDER

110 EAST 59TH STREET
NEW YORK, N.Y. 10022

(212) 755-1100

CABLE: ANALOGUE, N.Y.

TELEX 424288

TELECOPIER (212) 593-3360

May 30, 1986

William M. Dobishinsky, Esq.
Suite 1500
6430 Sunset Boulevard
Hollywood, CA  90028

                    Re:  JEM; MY LITTLE PONY

Dear Bill:

        My apologies for not responding sooner to your March 3,
1986 letter.

        I have now had an opportunity to discuss your requested
changes with our client and can advise as follows (numbered in
accordance with your March 3, 1986 letter):

(A)
(1)  Your first alternative is acceptable and has been
incorporated.

(2) OK

(3) This is unacceptable.  The compensation set forth in the
agreement is the compensation that had been agreed to by the
parties.  Our client is unwilling to change the deal at this
time.

(4)  Our client is agreeable to paying semi-annually, and this
change has been made in the document.

(5)  Ok

(6)  Ok

(B)
(Additional)-Again, this was not part of the agreement negotiated
by the parties and our client is unwilling to change the

LINDEN AND DEUTSCH

William M. Dobishinsky, Esq.
May 30, 1986
Page Two


financial terms.  In the event that phonorecordings are made and
our client wishes to utilize the service of Kinder & Bryant as
producers, an agreement will be reached at that time.

(C)

(1)  Ok

(2)  Ok

(D) - We suggest the following dates be inserted in the
agreements: JEM - June 1, 1985; PONY - December 1, 1985.

      I am enclosing three copies of each of the three
agreements incorporating these changes as noted above.  I would
appreciate you having them signed and returned to me.

      Best regards.

                                    Sincerely yours,


                                    Robert C. Harris

RCH:alm
cc:  Ms. Carole Weitzman

# EXHIBIT 36

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
————————————————————————x

ANNE BRYANT,

                 Plaintiff,                               Index No. 5192/00

               - against -                              Hon. Andrew P. O'Rourke

BROADCAST MUSIC, INC., (a/k/a "BMI"),
CLIFFORD A. "FORD" KINDER, KINDER & CO.,
LTD., VADIVOX, LTD., JULES M. "JOE"
BACAL, GRIFFIN BACAL, INC., STARWILD
MUSIC BMI, WILSTAR MUSIC ASCAP,
SUNBOW PRODUCTIONS, INC., and JOHN
AND JANE DOES 1-10,

                 Defendants.

————————————————————————x
————————————————————————x

ANNE BRYANT,

                 Plaintiff,                               Index No. 2821/02

               - against -                              Hon. Andrew P. O'Rourke

SUNBOW PRODUCTIONS, INC.,

                 Defendant.

————————————————————————x

## BRIEF IN SUPPORT OF DEFENDANT SUNBOW PRODUCTIONS, INC.'S MOTION FOR PARTIAL DISMISSAL FOR LACK OF SUBJECT MATTER JURISDICTION

       Pursuant to Civil Procedure Law and Rules ("CPLR") § 3211(a)(2), Defendant

Sunbow Productions, Inc. ("Sunbow") respectfully submits this memorandum of law in support

of its motion to dismiss those portions of Plaintiff's case -- her new re-registration theory of

liability, the constructive trust claim in her complaint, and her cross-motion for summary

judgment based on that claim -- for lack of subject matter jurisdiction.

## PRELIMINARY STATEMENT

This Court does not have subject matter jurisdiction to consider either of Plaintiff's new arguments – either her new theory of BMI re-registration or her cross-motion – both raised for the first time in Plaintiff's opposition to Defendants' motions for summary judgment.  Both issues require the Court to consider copyright issues that are within the exclusive subject matter jurisdiction of the federal courts.  This Court cannot resolve copyright issues.  Walker v. Time Life Films, Inc., 1983 WL 37482 (Bronx Sup. Ct. July 18, 1983)(dismissing all claims that arise under the Copyright Act or are equivalent to copyright claims).

Although not raised in Sunbow's reply brief in support of its summary judgment motion, the Court's lack of subject matter jurisdiction may be raised at any time and cannot be waived.  CPLR § 3211(e); see Practice Commentary, N.Y. C.P.L.R. C3211:53 (McKinney 1992); Editorial Photocolor Archives, Inc. v. Granger Collection, 61 N.Y.2d 517, 474 N.Y.S.2d 964 (1984)(copyright case dismissed by Court of Appeals for lack of subject matter jurisdiction even after entry of preliminary injunction); Morrison v. Budget Rent A Car Systems, Inc., 230 A.D.2d 253, 257-60, 657 N.Y.S.2d 721, 724-26 (2d Dep't 1997)(subject matter jurisdiction may be raised at any time and cannot be waived); State v. Wolowitz, 96 A.D.2d 47, 54, 468 N.Y.S.2d 131, 137 (2d Dep't 1983)(same).

To the extent that any part of Plaintiff's case rests on copyright claims – whether her new BMI re-registration theory, the constructive trust claim in her complaint, or her cross-motion for summary judgment based on that claim – this Court does not have jurisdiction and should dismiss the relevant pleadings and motions in whole or part.  However, the Court continues to have jurisdiction over Plaintiff's original re-registration claim on which Defendants

2

moved for summary judgment, which should be disposed of as those motions are now fully briefed.

## ARGUMENT

**I.    Plaintiff's New Theory of Liability and
       Cross-Motion for Summary Judgment Raise Copyright Issues**

28 U.S.C. § 1338(a) states that federal district courts "shall" have exclusive, original jurisdiction "of any civil action arising under any Act of Congress relating to . . . copyrights." The Second Circuit's test for determining whether a claim arises under the Copyright Act, first set forth by Judge Friendly, says that jurisdiction is proper where "the complaint is for a remedy expressly granted by the Act . . . [citations omitted] or asserts a claim requiring construction of the Act, . . . or, at the very least and perhaps more doubtfully, presents a case where a distinctive policy of the Act requires that federal principles control the disposition of the claim." T.B. Harms Co. v. Eliscu, 339 F.2d 823, 828 (2d Cir. 1964)(1909 Act); Bassett v. Mashantucket Pequot Tribe, 204 F.3d 343, 355 & n.13 (2d Cir. 2000)(1976 Act, rejecting the test of Schoenberg v. Shapolsky Pub. Inc., 971 F.2d 926 (2d Cir. 1992), and re-affirming T.B. Harms).

Plaintiff's original re-registration claim and the claim on which Defendants moved for summary judgment – that Defendants had conspired to have her registrations with Broadcast Music Inc. re-registered so as to deprive her of the public performance royalties to which she was entitled – does not implicate the Copyright Act. Although it is not easy to identify Plaintiff's new and constantly changing contentions (and their scope), she now seems to say with respect to her cross-motion for summary judgment that she did not work for hire, but instead is the author of the musical compositions in the TV Shows ("Music"), see 17 U.S.C. §§ 101 ("work for hire"),

and that her claim "is therefore firmly rooted in the United States Copyright Law."[1]  Phares Affirm., Ex. A at 35.  (As part of her new re-registration argument, Plaintiff also claims (without support) that the Music is a "derivative work" of the jingles written for Griffin Bacal Inc., claiming that she is the copyright owner of those works too and that she did not convey to Sunbow Productions Inc. the right to make derivative works, namely, the Music, from the jingles. Id. at 23; see 17 U.S.C. §§ 101 ("derivative work") and 106(2).)

        While Sunbow contends that Plaintiff's prior deposition testimony and her agreements with Sunbow dispose of all those issues, Plaintiff seems to be denying (by ignoring) the sufficiency of those agreements to transfer Plaintiff's copyright interests to Sunbow.  To the extent that Plaintiff is seeking a declaration of copyright ownership or an interpretation of whether Plaintiff's agreements with Sunbow were sufficient to convey work for hire rights to the Music, her claims arise under the Copyright Act and are not within this Court's jurisdiction.  See discussion of De Sylva v. Ballentine, 351 U.S. 570 (1956) (deciding on the merits a claim to partial ownership of copyright renewal terms), in T.B. Harms, 339 F.2d at 827; Jasper v. Bovina Music Inc., 314 F.3d 42, 46-47 (2d Cir. 2002)(federal jurisdiction invoked because resolution of dispute required interpretation of the "writing" requirement under 17 U.S.C. § 204(a)).

## II.    Plaintiff's New Theory of Liability and Her Cross-Motion for Summary Judgment Are Preempted by the Copyright Act

        Alternatively, to the extent that Plaintiff is claiming that Sunbow exercised her right to make a derivative work or is exercising the right to reproduce and distribute the TV

---

[1]    Bryant herself does not state in any of her affidavits or in her deposition testimony that she is the copyright owner of any of the Music.  Indeed, she testified that she had always worked on a work for hire basis, Affirmation of Gloria C. Phares in Support of Motion of Sunbow Productions, Inc. for Partial Dismissal for Lack of Subject Matter Jurisdiction ("Phares Affirm."), Ex. B (Bryant Dep.) at 42:18-43:7, making the commissioning party the copyright owner, 17 U.S.C. § 201(b).  Those statements of copyright ownership are made in her brief only.  Phares Affirm., Ex. A (Plaintiff's Memorandum of Law in Opposition to Motions for Summary Judgment Submitted By Defendants Jules M. Bacal and Sunbow Productions Inc., and in Support of Plaintiff's Cross-Motion for Partial Summary Judgment) at 35.

4

Shows without her permission as a copyright owner, her claim is preempted under 17 U.S.C. § 301(a) because music is copyrightable subject matter, 17 U.S.C. § 104(2), and the rights to reproduce, distribute, and make derivative works of music are rights of a copyright owner, 17 U.S.C. § 106(1), (2), (3). See, e.g., Briarpatch Ltd., L.P. v. Geisler Roberdeau, Inc., No. 99 Civ. 9623, 2002 WL 31426207 (S.D.N.Y. Oct. 30, 2002)(claim of unjust enrichment is preempted); Sparaco v. Lawler, Matusky, Skelly Eng'rs, LLP, 60 F. Supp. 2d 247 (S.D.N.Y. 1999)(breach of contract claim preempted); Titan Sports, Inc. v. Turner Broadcasting Sys. Inc., 981 F. Supp. 65 (D. Conn. 1997)(tortious interference with contract claim preempted); Am. Movie Classics Co. v. Turner Entm't Co., 922 F. Supp. 926 (S.D.N.Y. 1996)(claims of breach of contract and tortious interference with contract preempted).

**CONCLUSION**

For the reasons set forth above, Defendant Sunbow Productions, Inc. respectfully requests this Court to dismiss for lack of subject matter jurisdiction Plaintiff's new theory of BMI re-registrations, the constructive trust claim in Plaintiff's complaint, and her cross-motion for summary judgment based on that claim.

Dated:      New York, New York
            December 9, 2003

                                    Respectfully submitted,

                                    PATTERSON, BELKNAP, WEBB & TYLER LLP

                                    By: _____
                                        Gloria C. Phares
                                        Kathleen L. Jennings

                                    1133 Avenue of the Americas
                                    New York, New York 10036
                                    (212) 336-2000

                                    Attorneys for Defendant Sunbow Productions, Inc.

5

**AFFIDAVIT OF SERVICE**

STATE OF NEW YORK       )

                           :ss.:

COUNTY OF NEW YORK    )

        KATHLEEN L. JENNINGS, being duly sworn, deposes and says:

        1.     I am over 18 years of age, not a party to this action, and am associated

with the law firm of Patterson, Belknap, Webb & Tyler LLP, located at 1133 Avenue of the

Americas, New York, New York 10036.

        2.     On December 9, 2003, I served a copy of the BRIEF IN SUPPORT OF

DEFENDANT SUNBOW PRODUCTIONS, INC.'S MOTION FOR PARTIAL DISMISSAL

FOR LACK OF SUBJECT MATTER JURISDICTION by overnight courier service (Federal

Express) upon the following, directed to him at the address below:

                Patrick J. Monaghan, Jr.
                Monaghan, Monaghan, Lamb & Marchisio
                28 West Grand Avenue
                2nd Floor
                Montvale, New Jersey 07645

                                          KATHLEEN L. JENNINGS

Sworn to before me this
9th day of December, 2003

_____
Notary Public

CHRISTINA I. BELANGER
NOTARY PUBLIC, State of New York
No. 01BE-4845827
Qualified in Suffolk County
Certificate Filed in New York County
Commission Expires Sept 30, 2005

# EXHIBIT 37

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

| | | |
|---|---|---|
| ANNE BRYANT, | : | |
| Plaintiff, | : | |
| | : | |
| -v- | : | |
| | : | |
| BROADCAST MUSIC, INC. | : | |
| (a/k/a/"BMI"), FORD KINDER, | : | |
| KINDER & CO., LTD., | : | Index No. 5192/00 |
| VADIVOX, INC., JULES M. "JOE" | : | |
| BACAL; GRIFFIN BACAL, INC., | : | Hon. Andrew P. O'Rourke |
| STARWILD MUSIC BMI, WILDSTAR | : | |
| MUSIC ASCAP, SUNBOW | : | |
| PRODUCTIONS, INC., | : | |
| | : | |
| Defendants. | : | |
| ANNE BRYANT, | : | |
| Plaintiff, | : | |
| | : | Index No. 2821/02 |
| -v- | : | |
| | : | Hon. Andrew P. O'Rourke |
| | : | |
| SUNBOW PRODUCTIONS, INC., | : | |
| | : | |
| Defendant. | : | |

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
SUNBOW PRODUCTIONS INC.'S MOTION FOR PARTIAL DISMISSAL FOR
LACK OF SUBJECT MATTER JURISDICTION

Monaghan, Monaghan, Lamb & Marchisio
Attorneys for Plaintiff
150 West 55th Street, Suite 1G
New York, New York 10019
Tel. (212) 541-6980
Fax. (212) 541-6994

Of Counsel:
Patrick J. Monaghan, Jr.

On the Brief:
Jeffrey C. Primiano

## PRELIMINARY STATEMENT

This Court clearly has subject matter jurisdiction over plaintiff's claim for imposition of a constructive trust on funds wrongfully received by defendants and withheld from plaintiff – the precise claim upon which plaintiff has cross-moved for partial summary judgment against defendants.

Defendant Sunbow Productions, Inc. ("Sunbow") would have this Court believe that it lacks subject matter jurisdiction to even "consider copyright issues" (Def. Br. at 2). However, this is not the law.

First, as postured, this is certainly not a copyright infringement case. Rather, plaintiff's claim for a constructive trust centers around the fact that she is either the composer or otherwise entitled to writers royalties, pursuant to the parties' working arrangement/agreement and course of business dealing, defendants were obligated to pay royalties to plaintiff if and when they utilized her compositions, which they clearly failed to do.[1]

Second, plaintiff's claim for a constructive trust cannot possibly be characterized as a claim seeking "a remedy provided by the Copyright Act," which would be necessary in order to confer federal jurisdiction over plaintiff's cause of

---

[1] With respect to BMI performance royalties, Sunbow claims that "most of the 48 compositions at issue never changed" (Sunbow Brief, page 2). But plaintiff had no catalog until 2000 to determine which compositions were wrongfully registered initially or which changes were accomplished by cue sheets without her knowledge or approval. See Affidavit of Anne Bryant dated November 25, 2003, ¶ 49.

2

action.   See Bassett v. Mashantucket Pequot Tribe, 204 F.3d
343, 355 (2d Cir. 2000).  Plaintiff is the owner of the
musical compositions at issue in this case, and plaintiff was
to retain all royalties attributable to her compositions
pursuant to the working arrangement / agreement and course of
dealing she had with defendant Jules M. Bacal ("Bacal") on
behalf of defendants Sunbow and Griffin Bacal, Inc. ("GBI").
Defendants Bacal and Sunbow exploited those compositions as
Publishers/Administrators subject to those rights and there is
no evidence shown that plaintiff relinquished those rights.

    Third, plaintiff has testified that, pursuant to her
agreement with Bacal on behalf of Sunbow and GBI, she was to
receive the "performance rights, royalties and any other
outside royalties," since "the performance rights, royalties
and other items would go to the writers."   See Affirmation of
Roseann Kitson Schuyler dated September 20, 2003 ("Schuyler
Aff."), Exh. D at 43:4-5; 48:6-9.  When asked "What other
types of royalties?", plaintiff responded: "Mechanical
royalties.  If we write a piece for a jingle, then it becomes
a television show, then it becomes a video, then it becomes a
VHS and television special, you know, go into these different
areas that generate royalties for the writers."   Id. at 43:13-
18.   This constituted plaintiff's *contractual relationship* and
course of dealing with defendants.

    Defendants conveniently ignore plaintiff's testimony in
this regard and choose instead to focus upon the fact that

3

plaintiff - who is not an attorney - described her
understanding of this working arrangement and agreement with
defendants as "work for hire." Defendants seize upon
plaintiff's statements in this regard to deny that plaintiff
was ever entitled to receive mechanical royalties and/or
license fees. (See Bacal Reply Br. at 9; Sunbow Br. at 20).
By brushing aside plaintiff's testimony regarding the parties'
working agreement and her entitlement to royalties thereunder,
defendants relegate themselves to a position where they are
now attempting to rely upon an unsigned, inadmissible draft of
a contract pertaining to one of the many compositions at issue
in this case, which they claim somehow governed the parties'
entire working relationship.[2]

    Plaintiff was entitled to receive performance and

---

[2] With respect to this unsigned draft document, 57 N.Y.
Juris. 2d, Evidence and Witnesses § 250 provides that once a
party has "established the prior existence of an original written
instrument," the party can then "introduce secondary evidence of
the contents upon an adequate showing of the loss or destruction
of the instrument...."

In light of the uniform testimony elicited from both
plaintiff and defendant Bacal denying the existence of any
written agreement, defendants cannot possibly satisfy this first
pre-requisite to the introduction of the unsigned draft contract.
In this particular context, plaintiff's supplemental
interrogatories specifically questioned Bacal as to whether he
was "aware of any agreements wherein plaintiff relinquished any
rights she may have possessed relative to any of the compositions
at issue in this litigation: G.I. Joe, Visionaries, My Little
Pony; Jem and Transformers." Bacal responded as follows: "Bacal
is not aware of any written agreements responsive to this
Interrogatory." (Emphasis added).

The draft contract proffered by defendants is clearly
inadmissible and therefore irrelevant to this case.

4

mechanical royalties, as well as license fees, pursuant to her working arrangement/agreement with defendants and there are no admissible documents contradicting such. Although defendants attempt to establish that plaintiff relinquished these rights and seek to proffer an unsigned, inadmissible draft of a contract in support of their contention without any foundational testimony or affidavits, plaintiff has testified she retained these very rights pursuant to the parties' agreement, and that she never signed any document relinquishing her rights to these royalties.

There is no dispute that Rhino Entertainment has paid Sunbow $2,471,868.61 in royalties and license fees attributable to video and DVD sales during the three year period of time from October 1, 1999 through September 30, 2002 and that plaintiff's music or derivatives thereof are contained in those productions. Rhino Entertainment continues to pay Sunbow royalties and license fees to this very day. Pursuant to her working agreement with Bacal on behalf of Sunbow and GBI, plaintiff is clearly entitled to a share of the royalties and license fees attributable to these works, which defendants have wrongfully withheld from her. Plaintiff therefore respectfully requests that the Court order that a constructive trust be placed upon these funds wrongfully withheld from plaintiff.[3]

---

[3]As to defendants' specious statute of limitation arguments, plaintiff relies upon her equitable estoppel argument and the fiduciary and special relationship between she and Bacal/Sunbow,

5

## ARGUMENT

I.   **This Court has Subject Matter Jurisdiction Over Plaintiff's Claim for a Constructive Trust, as this Claim Does Not Seek A Remedy Provided by the Copyright Act.**

Sunbow argues that "[t]o the extent that any part of Plaintiff's case rests on copyright claims ... this Court does not have jurisdiction and should dismiss the relevant pleadings and motions in whole or part." (See Sunbow Brief in support of its Motion to Dismiss at 2). However, Sunbow simply misconstrues the nature of plaintiff's claim for a constructive trust, which arises directly out of the parties' working arrangement and agreement, discussed supra, regardless of which party possesses copyright ownership of these compositions.

Nevertheless, as discussed at length in the preeminent copyright treatise:

> Not every action predicated on rights derived from the Copyright Act is necessarily an action for copyright infringement or ... an action otherwise "arising under" the Copyright Act. For example, many cases raising general copyright issues may arise in the context of a contractual dispute between the parties. ...
>
> Because contractual rights arise under state law, jurisdiction lies solely with the state courts in an action to enforce contracts relating to works subject to statutory copyright or rights under those contracts. Along these lines, it has been held that construction of an assignment of royalties under copyright implicates strictly a question of state law. By the same token, an action to invalidate such contractual rights, or

which exploited and promoted her compositions.

6

to enforce arbitration of those claims, belongs in state courts.  An "aroma of copyright" is insufficient to confer federal jurisdiction.

**_The fact that questions of copyright law may also have to be determined in such an action does not oust state jurisdiction._**

[3 <u>Nimmer on Copyright</u>, § 12.01 (2003) (citations omitted and emphasis added).

Sunbow itself concedes that Plaintiff's original re-registration claim, pursuant to which she seeks to recover royalties wrongfully withheld from her, "does not implicate the Copyright Act." <u>Id.</u> at 3.  Yet Sunbow evidently fails to realize that this conclusion applies with equal force to plaintiff's claim for a constructive trust upon monies due plaintiff pursuant to the parties' working agreement, which defendants wrongfully withheld from plaintiff.

Contrary to Sunbow's claim, plaintiff is not "seeking a declaration of copyright ownership or an interpretation of whether Plaintiff's agreements with Sunbow were sufficient to convey work for hire rights to the Music...." (<u>Id.</u> at 4).  In this case, such a declaration is simply not required, since plaintiff's working agreement with Bacal, on behalf of Sunbow and GBI (to which plaintiff has provided significant deposition testimony), governs plaintiff's entitlement to royalties and license fees.  Even if plaintiff were seeking a declaration of copyright ownership, this would not in and of itself confer federal court jurisdiction.

Indeed, where the cause of action focuses upon "state law principles of breach of contract and fraud, there is no

7

jurisdiction under [28 U.S.C.] § 1338." <u>Bear Creek</u>
<u>Productions, Inc. v. McCall</u>, 643 F. Supp. 489, 492 (S.D.N.Y.
1986). For example, in <u>Bear Creek Productions</u>, the Southern
District held that although "the real issue in this case is
who owns the copyright," the parties' "arguments aimed at
establishing copyright ownership all concern state law and do
nothing more than demonstrate why plaintiffs' claim belongs in
state court." <u>Id.</u> Because plaintiffs' complaint "center[ed]
about the contract entered into, alleged breaches of contract,
and alleged fraud with respect thereto, the Court found that
plaintiffs failed to show that their claims "arose under"
federal copyright laws. <u>Id.</u> at 494. The Court accordingly
dismissed these claims for lack of subject matter
jurisdiction. <u>See id.</u>

Federal jurisdiction is only "properly invoked" where a
party has no "colorable claim under contract or state law to
copyrighted works." <u>Shaw v. Kastner</u>, 152 Misc.2d 654, 656
(New York Co. 1991). In <u>Shaw</u>, the Court explained that
because "[n]o infringement of the copyright is alleged and no
construction of the Copyright Act is required for resolution
of the parties' dispute[,] State, not federal, principles
control the interpretation of the contracts involved." <u>Id.</u> at
657. The Court continued:

> Although there is a surplusage with an "aroma of
> copyright" in the complaint, i.e. the request
> that plaintiff be declared the sole owner of the
> copyright and the demand for damages for
> deprivation of the enjoyment of the copyright and
> for counsel fees, the dispute is over

8

interpretation of the contract.

[Id.]

As plaintiff made clear in her testimony, she is in fact entitled to the performance and mechanical royalties, as well as license fees, *pursuant to parties' working arrangement and agreement*. In the final analysis, plaintiff's constructive trust claim to monies wrongfully withheld by defendants arises directly from plaintiff's working agreement with defendants, pursuant to which she was contractually entitled to receive specified royalties and fees. This Court certainly has jurisdiction over this contractual matter. See Eden Music Corp. v. Times Square Music Publications Co., 127 A.D.2d 161, 163 (1st Dept. 1987) (in which the Supreme Court properly exercised its jurisdiction over a case concerning ownership of renewal rights to copyrighted songs, where plaintiff sought a declaratory judgment that defendants had no ownership in the disputed songs); Shaw v. Kastner, 151 Misc. 2d 654, 657 (New York Co. 1991) (reasoning that "[a]lthough there is surplusage with an 'aroma of copyright' in the complaint, i.e. the request that plaintiff be declared the sole owner of the copyright and the demand for damages for deprivation of the enjoyment of copyright and for counsel fees, the dispute is over interpretation of the contract").

II. **Plaintiff's Claim for a Constructive Trust is Clearly Not Preempted by the Copyright Act.**

Sunbow is simply incorrect in claiming that plaintiff's

9

claim is preempted pursuant to 17 U.S.C. § 301. Indeed, 17 U.S.C. § 301 (b)(3) provides:

> Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to—
>
> ...
> (3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified in section 106.

As explained supra, plaintiff is not seeking to hold defendants liable for violating her rights as a copyright owner. Rather, plaintiff's constructive trust claim, which alleges an entitlement to monies that defendants received and withheld from her, emanates directly from plaintiff's working arrangement and agreement with defendants, *regardless of which party has copyright ownership of the compositions at issue in this case.* See Computer Assoc. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 716 (2d Cir. 1992) (explaining that 17 U.S.C. § 301 "preempts only those state law rights that may be abridged by an act which, in and of itself, would infringe one of the exclusive rights provided by federal copyright law"); IZA Music Corp. v. W & K Music Corp., 995 F. Supp. 417 (S.D.N.Y. 1998) (in which the Southern District of New York dismissed plaintiffs claim for an accounting of royalties received by defendant and for a declaration that plaintiffs would be entitled to receive a certain percentage of royalty payments in the future, since "a joint author's right to an accounting is a creature of state law rather than of the Copyright Act"); Harrington v. Mure, 186 F. Supp. 655, 658 (S.D.N.Y 1960)

10

(instructing that although Congress "provided for exclusive
federal jurisdiction of 'copyright cases' - those in which
federal legislation defines the substance of the claim and the
relief to be secured[,] Congress  left a considerable residue
of power in the state courts to pass on 'copyright questions'
- among them, questions arising in contract and title
disputes).

Therefore, because this is clearly a contractual
situation in which plaintiff is alleging violations of her
"legal or equitable rights that are not equivalent to any of
the exclusive rights within the general scope of copyright,"
this Court has jurisdiction over plaintiff's constructive
trust claim.

11

## CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that defendant Sunbow's motion be denied, and that a constructive trust be placed upon the $2,471,868.61 in royalties and license fees that Rhino Entertainment paid to Sunbow from October 1, 1999 through September 30, 2002.

Monaghan, Monaghan, Lamb & Marchisio
Attorneys for Plaintiff

Dated: December 17, 2003       By: _____
                                        JEFFREY C. PRIMIANO

150 West 55th Street, Suite 1G
New York, New York 10019
Tel. (212) 541-6980
Fax. (212) 541-6994

28 W. Grand Avenue
Montvale, New Jersey 07645
Tel. (201) 802-9060
Fax. (201) 802-9066

17191

12

# EXHIBIT 38

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
——————————————————————x

ANNE BRYANT,

                Plaintiff,                        Index No. 5192/00

              - against -                Hon. Andrew P. O'Rourke

BROADCAST MUSIC, INC., (a/k/a "BMI"),
CLIFFORD A. "FORD" KINDER, KINDER & CO.,
LTD., VADIVOX, LTD., JULES M. "JOE"
BACAL, GRIFFIN BACAL, INC., STARWILD
MUSIC BMI, WILSTAR MUSIC ASCAP,
SUNBOW PRODUCTIONS, INC., and JOHN
AND JANE DOES 1-10,

                Defendants.

——————————————————————x
——————————————————————x

ANNE BRYANT,

                Plaintiff,                        Index No. 2821/02

              - against -                Hon. Andrew P. O'Rourke

SUNBOW PRODUCTIONS, INC.,

                Defendant.

——————————————————————x

### REPLY BRIEF IN SUPPORT OF DEFENDANT SUNBOW
### PRODUCTIONS, INC.'S MOTION FOR PARTIAL
### DISMISSAL FOR LACK OF SUBJECT MATTER JURISDICTION

        Defendant Sunbow Productions, Inc. ("Sunbow") respectfully submits this reply

brief in support of its motion for partial dismissal for lack of subject matter jurisdiction and urges

the Court to permit oral argument so that Sunbow can explain the significant copyright issues

Plaintiff appears to be asking this Court to decide.

## PRELIMINARY STATEMENT

In her joint opposition to Defendants' motions for summary judgment and in her cross-motion for summary judgment on her constructive trust claim, Plaintiff characterized her royalty claim relating to DVD and videotape distribution of TV shows that used her music as "firmly rooted in United States Copyright Law."[1]  Plaintiff had never before in this case characterized her royalty claim as being based on copyright law.  To the contrary, she admitted at her deposition that she created the compositions at issue as works for hire and that she did <u>not</u> own the copyrights to those works. <u>See</u> testimony cited at p.4 n.4, <u>infra</u>.  Indeed, it was that deposition testimony on which Sunbow relied in its opening brief in support of its motion for summary judgment to demonstrate that, as a matter of law, Plaintiff is not entitled to impose a constructive trust on royalties from the exercise of "mechanical" or "synchronization" rights.  Brief in Support of Sunbow's Motion for Summary Judgment at 7 n.2.

However, now that Sunbow has demonstrated that the Court lacks subject matter jurisdiction over Plaintiff's new copyright articulation of her constructive trust claim, Plaintiff desperately backtracks to attempt to preserve this Court's jurisdiction.  She now characterizes her claims that she owns the copyright in her compositions and her reliance on the Copyright Act as involving only "'an aroma of copyright.'"[2]  In a startling retreat from her summary judgment opposition, she also says that it does not matter "which party has copyright ownership of the compositions at issue in this case" and that her claim does not require a finding as to whether she created her compositions as works for hire for Sunbow. <u>Id.</u> at 10; <u>see id.</u> at 7.

---

[1]     Plaintiff's Memorandum of Law in Opposition to Motions for Summary Judgment Submitted By Defendants Jules M. Bacal and Sunbow Productions Inc., and in Support of Plaintiff's Cross-Motion for Partial Summary Judgment at 35.

[2]     Plaintiff's Memorandum of Law in Opposition to Defendant Sunbow Productions Inc.'s Motion for Partial Dismissal for Lack of Subject Matter Jurisdiction ("Pl. Opp.") at 7 (citing 3 Nimmer on Copyright, § 12.01 (2003)).

Once again re-inventing her theory of recovery, Plaintiff now claims that she is entitled to royalties in connection with the distribution of Sunbow's TV programs on DVD and videotape not because she is the copyright owner of her musical compositions but as the result of the terms of her "working arrangement and agreement" with Sunbow. Id. at 9. In a further attempt to preserve this Court's jurisdiction, Plaintiff also seems to have abandoned her (unsupported) theory that the musical compositions are derivative works of her jingles, apparently conceding that that issue falls squarely within the Copyright Act.

## ARGUMENT

Sunbow agrees with Plaintiff that the resolution of her constructive trust claim depends on the terms of agreements between Kinder & Bryant and Sunbow for the creation of musical compositions. But Sunbow has demonstrated that the basis for the "working arrangement" is not (and cannot be) Plaintiff's selective recounting of her deposition testimony, but rather is the written agreements that Kinder & Bryant entered into with Sunbow to create music for Sunbow's TV series. An example of those agreements is the agreement between those parties regarding the Jem television series (the "Jem Agreement") that Sunbow submitted in support of its motion for summary judgment.[3]

Consistent with Plaintiff's own deposition testimony that she worked for hire and did not own the copyrights in her music, the Jem Agreement provides that she created compositions for Sunbow on a work-for-hire basis and that automatically upon creation of the

_____

[3]    See Affidavit of Neil R Rigby, submitted in support of Sunbow's Motion for Summary Judgment ("Rigby Aff."), Ex. A.

music, Sunbow would be the owner of all copyrights in those compositions.[4]  The Jem

Agreement granted Plaintiff the right to receive her share of the composers' share of public

performance royalties, just as Plaintiff testified.  But, contrary to Plaintiff's assertions, the Jem

Agreement did <u>not</u> grant her the right to receive royalties in connection with the distribution on

DVD and videotape of TV shows that used her music.[5]  Moreover, for Plaintiff to claim detailed

knowledge of the terms of an agreement that she admits that she never read, Kitson Aff., Ex. D at

46:3-8, simply is not credible.

        Realizing that the Jem Agreement is fatal to her attempt to impose a constructive

trust on the royalties from the DVD and videotape distribution of the TV shows, Plaintiff argues

that the Jem Agreement is not admissible.  In doing so, she misstates and mischaracterizes the

record in this case.

        Plaintiff argues that the unsigned Jem Agreement cannot be admitted as evidence

of the terms of her agreements with Sunbow because Sunbow has not established the "'prior

existence of an original written instrument.'"[6]  But Sunbow <u>did</u> establish the existence of an

original written agreement with Plaintiff's own deposition testimony, which Plaintiff

conveniently ignores.  Plaintiff <u>admitted</u> that she and Ford Kinder entered into written

agreements with Sunbow regarding their rights to the compositions they wrote for the TV series:

---

[4]    Rigby Aff., Ex. A ¶ 5(a); <u>compare</u> Affirmation of Roseann Kitson Schuyler, submitted in support of Sunbow's Motion for Summary Judgment ("Kitson Affirm."), Ex. D (Bryant Dep.) at 109:6-110:2 (composition writing that she did for Sunbow and Griffin Bacal, Inc. "was always work for hire"); <u>id.</u> at 49:5-16 (under Kinder & Bryant agreements, Plaintiff was not the copyright owner of compositions she created).

[5]    <u>See</u> Reply Brief in Support of Sunbow's Motion for Summary Judgment ("Sunbow SJ Reply Br.") at 22-23.

[6]    Pl. Opp. at 4 n.2 (citing 57 N.Y. Juris. 2d Evidence and Witnesses § 250).

> Q. Did you have a <u>written contract</u> to produce the compositions at issue in this case?
>
> A [Bryant]: Ford Kinder told me that there was a contract. I don't remember ever signing a contract with them, but he was my partner and he said there was a contract at some point in our association with those people.

Kitson Affirm, Ex. D 44:3-9 (emphasis added). That Plaintiff does not recall signing the contract does not undercut her reliance on her business partner, who told her that there were written contracts.[7]

Plaintiff's testimony that there was a written agreement is corroborated by the February 1987 letter from Plaintiff's own lawyer to Sunbow. Writing to Sunbow nearly two years after the effective date of the Jem Agreement, he proposed an amendment to the "agreement dated June 1, 1985, between Sunbow Productions Inc. and Kinder & Bryant Ltd." Rigby Aff., Ex. F. If the contract had not already been signed, he would not have been proposing an amendment, the usual procedure for changing an agreement that is already signed.[8] Moreover, the proposed amendment concludes with the usual concluding language that "[i]n all other respects, the said Agreement is hereby ratified and confirmed," Rigby Aff., Ex. F, further supporting the conclusion that the Jem Agreement was signed and was in effect. That the terms

---

[7]     Plaintiff concedes that once a party has established the prior existence of an original written instrument, the party can then introduce secondary evidence of the contents upon an adequate showing of the loss or destruction of the instrument. Pl. Opp. at 4 n.2. Plaintiff does not contest that Sunbow has made an adequate showing of the loss of the original contracts relating to the TV shows in the flood in its office caused by the 1991 water main break. See Sunbow SJ Reply Brief at 10 n.8.

[8]     Sunbow also provided evidence that Plaintiff knew the difference between amending a signed contract and proposing revisions to an unsigned draft. Earlier correspondence from Plaintiff's lawyer shows that he used an entirely different format for proposing changes to the unsigned Jem Agreement when it was still being negotiated (i.e., proposing in a letter changes to specific paragraphs of the unsigned agreement) than when proposing an amendment to the already signed agreement (i.e. proposing a free-standing amendment to the signed agreement). Compare Rigby Aff., Ex. D, with id., Ex. F.

of the Jem Agreement govern Plaintiff's working relationship with Sunbow is also supported by the nearly identical terms of contemporary work-for-hire agreements between Sunbow and other composers and a lyricist for other Sunbow TV productions.  See Sunbow SJ Reply Brief at 10 n.8.

        If the Court accepts that the Jem Agreement is illustrative of the destroyed signed original agreements for the TV shows and is being asked only to examine the Jem Agreement to determine whether its terms entitle Plaintiff to recover royalties when the TV shows are distributed on DVDs or videotape, Sunbow agrees that those questions are within its jurisdiction. But if the Court is being asked to try the issue whether Plaintiff has any copyright rights in the musical compositions used in the TV shows or whether the musical compositions are derivative works of her jingles or what is sufficient to evidence a work-made-for-hire agreement, then those questions fall within the exclusive federal jurisdiction of the federal courts because Plaintiff is "assert[ing] a claim requiring construction of the [Copyright] Act." T.B. Harms Co. v. Eliscu, 339 F.2d 823, 828 (2d Cir. 1964).

## CONCLUSION

For the reasons set forth above and in the brief supporting its motion to dismiss, Defendant Sunbow Productions, Inc. respectfully requests this Court to dismiss for lack of subject matter jurisdiction: (1) Plaintiff's claim that the musical compositions in the TV shows are derivative works that entitle her to royalties; and (2) her claim to a constructive trust on monies earned by Sunbow from the DVD and videotape distribution of Sunbow's TV shows.

Dated:     New York, New York
            December 18, 2003

Respectfully submitted,

PATTERSON, BELKNAP, WEBB & TYLER LLP

By: _____
     Gloria C. Phares
     Kathleen L. Jennings

1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

Attorneys for Defendant Sunbow Productions, Inc.

7

# EXHIBIT 39

# DECISION AND ORDER

To commence the statutory
period of appeals as of right
(CPLR 5513[a]), you are advised
to serve a copy of this order,
with notice of entry, upon all
parties.

SUPREME COURT OF THE STATE OF NEW YORK
IAS PART, ROCKLAND COUNTY

Present:  HON. ANDREW P. O'ROURKE
          Supreme Court Justice

FILED BH

DEC 1 6 2003

ROCKLAND COUNTY
CLERK'S OFFICE

SERIAL NO. 88 A
SERVED
RECEIVED
FILED

55576-017

9—

-------------------------------------------X
ANNE BRYANT,

                              Plaintiff,

          -against-

                                        Index No. 5192/00
BROADCAST MUSIC INC., (a/k/a "BMI"),    Motion Date: 12/5/03
CLIFFORD A. "FORD" KINDER, KINDER &
CO., LTD., VADIVOX, LTD., JULES M.
"JOE" BACAL, GRIFFIN BACAL, INC.,
STARWILD MUSIC BMI, WILDSTAR MUSIC
ASCAP, SUNBOW PRODUCTIONS, INC. AND
JOHN AND JANE DOES 1 - 10,

                              Defendants.
-------------------------------------------X
ANNE BRYANT,
                                        Index No. 2821/02

                              Plaintiff,

          -against-

SUNBOW PRODUCTIONS, INC.,

                              Defendant.
-------------------------------------------X

        The following papers numbered 1 to 26 were read on this
motion by defendant Jules M. Bacal for an Order granting summary
judgment dismissing this action, and on this motion by defendant
Sunbow Productions for an Order granting summary judgment
dismissing this action, and on this cross-motion by plaintiff for

an Order granting her partial summary judgment.

**Papers Numbered**

Notice of Motion - Affidavits (Tannenbaum, Bacal) -
 Exhs. (B-H) ............................................. 1 - 4
Notice of Motion - Affidavits (Weitzman, Smith) -
 Exhs. (1-2) - Affirmation (Kitson) - Exhs. (A-K) ....... 6 - 11
Notice of Cross-Motion -Affidavit (Bryant) - Exhs. (A-U) -
 Affirmation (Monaghan) - Exhs. (A-G) ................... 13 - 17
Answering/Replying Affirmation (Tannenbaum) - Exhs. (A-B). 19 - 20
Answering/Replying Affidavit (Rigby) - Exhs. (A-F) -
 Affirmation (Phares) - Exhs. A-J) ..................... 22 - 25
Memoranda of Law ......................................... 5,12,18
                                                          21,26

     Upon the foregoing papers, it is Ordered and adjudged

that these motions are disposed of as follows:

     The relevant background facts of these actions previously

have been set forth in a number of prior Court Decisions and

Orders. Basically, plaintiff asserts a loss of royalty income over

recent years from a number of her created musical arrangements,

compositions and jingles, allegedly as the result of wrongful re-

registrations of her work by the named defendants, either

separately or conspiratorially.

     Defendant Broadcast Music, Inc. ("BMI") is a performing

rights society, comprised of publisher members and writer members,

which licenses to third parties rights to the musical works of its

members. BMI registers its members' works in catalogs, and

monitors and collects royalty payments due to its writers and

publishers and distributes same to them pursuant to a formula which

recognizes the respective parties' contribution to the particular compositions.

Defendant Sunbow Production Company ("Sunbow") is a television production company which, from 1980 until approximately 1998, had been owned by defendant Joe Bacal and Tom Griffen. Sunbow had registered the musical compositions used in its television productions with BMI so that the various writers and publishers of those compositions could be paid the royalties to which they are entitled. Payment of royalties is effected through the use of cue sheets which list the television producer for the particular episode, the air date for the episode, the title given to each musical compositions used in the episode, the writer(s) and publisher(s) of each individual composition used in the episode and their respective shares of the public performance royalties for each composition used. The cue sheets thereafter would be submitted to BMI by music administrators.

Griffen and defendant Bacal at this time also had been partners in an advertising agency, Griffen Bacal, Inc., which was responsible for writing musical compositions for commercials. At a certain time, plaintiff had been employed by Griffen Bacal, Inc.

Following extensive motion practice, the single cause of action pleaded against defendant Bacal in the Amended Complaint under Index No. 5192/00 and against Sunbow in the Amended Complaint

under Index No. 2821/02 is for unjust enrichment and imposition of a constructive trust and accounting.    Both defendants are now separately moving for summary judgment dismissing this sole remaining claim.    Their respective arguments are similar to the extent that they both argue that plaintiff's allegations with respect to the 48 specific works that plaintiff has identified as being here in issue are either time-barred pursuant to the applicable six-year statute of limitations, or must be dismissed based upon the documentary proof which establishes that, contrary to plaintiff's theory, there had not been any re-registration of the work since the time that BMI first accepted the registration thereof in the 1980's, or must be dismissed based upon the documentary proof which establishes that plaintiff is mistaken in her claims because the cue sheets establish that she in fact is receiving the full percentage shares for which she is entitled, and therefore neither defendant could not have been unjustly enriched, or must be dismissed based upon the documentary proof which establishes that for most of plaintiff's registered works Bacal is not listed as receiving a percentage and therefore could not have been unjustly enriched, or must be dismissed because plaintiff lacks standing to assert claims of injury to parties other than herself.

In an affidavit submitted by Sunbow in support of its

motion for summary judgment, Sunbow's former production assistant and later vice president of production, Carole Weitzman, avers that she was responsible for maintaining copies of the BMI submitted cue sheets and "to the best of [her] knowledge, [she has] never submitted a cue sheet of any other type of form to BMI that sought to change the amount of royalties that Plaintiff would receive for her compositions." Additionally, she has "no knowledge of anyone else at Sunbow or on Sunbow's behalf ever submitting a cue sheet or other form to BMI seeking to reduce the amount of royalties the Plaintiff would receive for any of her compositions."

Bacal also has submitted in support of his motion an affidavit from Alison Smith, presently Senior Vice President of BMI, who has worked at BMI since 1985. Ms. Smith oversees the process by which BMI pays out royalties to its affiliated songwriters, composers and music publishers, and she investigates questions of problems with respect to same. According to Ms. Smith, unless BMI is notified in writing otherwise as to a different distribution, BMI allocates royalties collected to its affiliates by giving 100 percent of the writers' share to the writers of the composition and 100 percent of the publisher's share to the publishers, so that the total performance royalties available for a particular composition equal 200 percent. If there are multiple writers for a single composition, usually the cue

sheet would specify how much goes to each; if the cue sheet does not indicate any specific distribution, BMI would equally divide the royalty.

A catalog is published by BMI which lists all compositions that are registered, including those by the use of cue sheets. At times, Ms. Smith admits that mistakes occur in the catalog to the extent that there may be multiple entries for the same composition used on the same day. Her examination of plaintiff's catalog reveals that mistakes have occurred in plaintiff's catalog whereby multiple listings inadvertently appear for a single composition.

Ms. Smith avers that she had met with plaintiff and her counsel in October, 2000, at which time they had reviewed "hundreds of cue sheets that had been submitted to BMI by or on behalf of Sunbow in the 1980's for television episodes in which her compositions had been used." Plaintiff thereafter had been sent copies of the cue sheets, along with a copy of her catalog. According to Ms. Smith, a comparison of the writer's royalty shares listed for plaintiff on these cue sheets with the writer's royalty shares listed for BMI's then-current BMI catalog "demonstrated to plaintiff that there had been no change to her share of the writer's royalty for the compositions in her catalog." While there were entry dates listed in June, 1993, for compositions in

BOOK    97 PAGE 4596

plaintiff's catalog which plaintiff asserts evidence that her writer's shares were reduced for those compositions on those dates, Ms. Smith explains BMI had changed computer systems on that date, which caused an entry "change" on that date, but that "the writer's royalties for her compositions did <u>not</u> change on this date."

Furthermore, Ms. Smith avers that BMI has a process for changing the writer's share on a composition which is already listed with BMI and that is to request documentation or confirmation from all of the affected persons before changing its records to reflect any new change as to writer's percentages. As to plaintiff's works which are here in issue, Ms. Smith states that BMI has not located any cue sheets or registration forms submitted to it after the original cue sheets or registration forms for those compositions which purport to make any writer's share changes.

Both moving defendants have submitted charts which list each of the compositions which plaintiff has identified as being in issue in these cases, along with a statement of plaintiff's allegation as to wrongful conduct involving the identified composition and a synopsis of why, according to defendants, summary judgment dismissing any claim with respect to that identified composition is warranted.

Plaintiff vigorously opposes both defendants' motions and has attempted to cross-move for partial summary judgment. The

Court, however, will not accept plaintiff's untimely motion for substantive consideration. It had been made clear to all parties that summary judgment motions, in this long protracted action, were to have been served by September 30, 2003. Plaintiff not only had failed to request prior permission from the Court for the making of her untimely motion for summary judgment, but she has offered herein no explanation or excuse for her two month delay in making her motion. Her papers shall therefore be considered only as opposition to defendants' motions.

Essentially, plaintiff maintains that defendants have attempted to portray the claims and issues presented in an overly simplified matter where instead complex factual issues abound. Moreover, plaintiff submits that defendants' entire presentations exclusively address the issue of plaintiff's entitlement to performance royalties and that they have failed to address plaintiff's further claims that she is entitled to mechanical royalties and synchronization, as well.[1] According to plaintiff, it is inaccurate to view this matter, as defendants have done, as involving 48 of plaintiff's compositions where instead it is more

---

[1]Mechanical royalties are royalties paid on sales of music reproduced and sold on records, cassettes and compact discs, as distinguished from performance royalties which are based upon public performances of songs on radio, television and the like. Synchronization licensing fees are paid in exchange for a license to use a copyrighted composition in "timed-relation" or synchronization with an audiovisual work.

accurate to view the matter as involving 7 compositions - one for Transformers, GI Joe, JEM, My Little Pony, Visionaries, Inhumanoids and Robotics, all with subsequent numerous derivative uses, re-uses and arrangements.

Moreover, it is entirely misleading, plaintiff contends, for defendants to simply compare the cue sheets submitted to BMI by Sunbow with BMI's catalog to establish, as they contend, that no reduction in plaintiff's royalties has occurred. Plaintiff notes that BMI creates its catalog based upon submissions from production companies, i.e., Sunbow, and here the cue sheets submitted by Sunbow were wrong and not reflective of the agreements she had with Bacal and Griffen Bacal Inc.

Plaintiff has submitted evidence which she claims demonstrates that defendants had filed BMI Clearance Forms that diluted the percentage of royalties attributed to plaintiff for her compositions and that by filing such defendants simply took plaintiff's composition, gave it a new name, and thereupon wrongfully took claim to the performance royalties. Other times, plaintiff maintains, the evidence establishes that defendants had re-registered plaintiff's compositions, diluting or vitiating her royalty allocation, through the use of cue sheets, which cue sheets plaintiff argues she had no involvement with and are properly only used to register music when the composition is composed

specifically for a television production, which is not her situation; all of plaintiff's music in issue having been composed as jingles for television commercials. A comparison of plaintiff's early royalty statements with later statements or BMI catalog entries for re-uses of plaintiff's compositions appears to support plaintiff's claim that her royalties have been diminished. By altering royalty allocations on cue sheets, plaintiff submits that defendant Sunbow had effected changes in the original registration of her works and saved on production costs by not having to pay what are called creative fees to those persons who subsequently used plaintiff's compositions in a re-arrangement. Plaintiff claims that she never had given approval to royalty changes for any of her compositions and that she had never been notified by defendants that others would be receiving a percentage of royalties originally allocated to plaintiff.

With respect to her additional claims seeking mechanical and synchronization fees, plaintiff contends that the evidence demonstrates that Sunbow has been paid $2,471,868.61 in mechanical royalties and/or synchronization licenses from Rhino Entertainment for video and DVD sales during the period of October, 1999 through September, 2002, that plaintiff is the owner of the compositions prominently used in these videos and DVDs, that she has never been paid any fees for the use of her compositions and that she

therefore is entitled to a constructive trust on the sum paid by Rhino to Sunbow.

Plaintiff further insists that, contrary to defendants' contentions, she is entitled to pursue her claims regarding re-registrations of three Visionaries works attributed to Ford Kinder because of her 1994 legal settlement with Kinder in which it had been contractually agreed that she would be entitled to his royalty shares with respect to such works. Accordingly, she argues here that the three compositions in which Kinder's royalty shares were improperly reduced consequently diminishes the amount of royalties to which plaintiff is entitled.

Finally, it is plaintiff's position that defendants should be equitably estopped from asserting a defense based upon the statute of limitations because, as previously found by this Court, there was a confidential relationship between plaintiff and Bacal, wherein Bacal had a duty to disclose to plaintiff wrongful conduct which diminished her royalty rights and that his failure to have done so, where it "is virtually impossible for Bacal not to have known that he was given a new or larger share of certain compositions, and that this would negatively affect Bryant's royalties," estops him from asserting that plaintiff's claims are time-barred, particularly since plaintiff commenced action within a reasonable time after first learning that she had a cause of

action.

        Similarly, since the re-registrations of plaintiff's works had been effected through cue sheets submitted by Sunbow, Bacal's production company, and Sunbow had carte blanche with respect to musical compositions that had been created specifically for Griffen Bacal Productions, also owned by Bacal, plaintiff claims that "Bacal had treated Sunbow and GBI as one and the same entity, which he clearly controlled, dominated, and operated for his personal gain" and the fiction of Sunbow's corporate entity should be disregarded, so that Sunbow to should be equitably estopped from asserting a statute of limitations defense.

        By way of their replies, defendants make several arguments. Firstly, defendants contend that plaintiff has altered her theory of liability from initially claiming that she had written compositions for Sunbow, a TV and movie production company, to instead arguing that the seven musical jingles that she had written were for Griffen Bacal Inc, an advertising company, and that her works here in issue are derivative works of those seven jingles, and that when the musical compositions for the TV series were registered with BMI there had been an unauthorized change in the percentage of performance royalties.

        They further contend that plaintiff has failed to come forward with any proof supporting her bald assertion that her

-12-

BOOK    97 PAGE 4602

jingles and compositions are the derivative source of the compositions for which she claims she is entitled to share in royalties.

Further, it appears that defendants have hit upon what they argue is a major flaw in plaintiff's theory, that being that plaintiff, contrary to her position, is not the copyright owner of her jingle works, since same were created for hire; therefore, they submit that she is not entitled to any apportion of royalty interests for the claimed derivative works.

Defendant Bacal also argues that plaintiff is mistaken in her claim that certain works have been excluded or removed from her catalog because the BMI catalog does not list commercial jingles written prior to the late 1990's and that "none of the jingles addressed by Bryant were ever in her BMI catalog."

Additionally, defendant Sunbow argues that it is not bound by this Court's earlier determination that there had existed a fiduciary relationship between Bacal and plaintiff because it had not had an opportunity to be heard at the time that issue was presented to the Court and, in any event, that evidence now establishes that theirs was actually in the nature of a conventional business relationship (plaintiff's relationship with him was that his companies were clients of companies for which she had worked or where she had been a principal, i.e. Kinder and

-13-

BOOK  97 PAGE 4603

Bryant) and contracts between plaintiff's company and Sunbow, which had been negotiated by counsel, had existed between them. Moreover, defendant Sunbow insists that plaintiff merely glosses over the fact that Sunbow was a corporate entity separate from Bacal and argues that plaintiff has made no showing that it is appropriate to pierce the corporate veil.

Initially, the Court finds that defendant Bacal has failed to establish entitlement to judgment as a matter of law dismissing plaintiff's claims which are alleged to be time-barred. It is well settled that a defendant may be precluded from pleading the statute of limitations as a defense where the plaintiff had been induced by fraud, misrepresentations or deception from filing suit. Simcuski v. Saeli, 44 N.Y.2d 442, 448-449 (1978); Herman v. Depinies, 273 A.D.2d 146 (1st Dept. 2000). While ordinarily the doctrine requires proof of an actual misrepresentation, if a fiduciary had concealed facts which he was required by virtue of his relationship to disclose, and the plaintiff had relied upon the non-disclosure and based thereon had delayed suit, a defendant may properly be estopped from asserting that the plaintiff's late filed claims are time-barred. See (1st Dept. 2003); Gleason v. Spota, 194 A.D.2d 764 (2nd Dept. 1993); Powers Mercantile Corp. v. Feinberg, 109 A.D.2d 117, 122 (1st Dept. 1985), affd. 67 N.Y.2d 981 (1986). The doctrine does not properly apply, however, where a plaintiff

-14-

possesses timely knowledge sufficient to place him under a duty to inquire and ascertain the relevant facts. See Contento v. Cortland Memorial Hosp., 237 A.D.2d 725 (3rd Dept. 1997), lv. to app. den. 90 N.Y.2d 802 (1997); Greene v. Abbott Laboratories, 148 A.D.2d 403 (1st Dept. 1989); Gleason v. Spota, supra; Melvor v. DiBenedetto, 121 A.D.2d 519 (2nd Dept. 1986).

Here, this Court previously had determined that a relationship of trust and confidence had existed between plaintiff and Bacal. Clearly, discovery has since transpired which may, as defendant Bacal argues, limit that earlier determination. Therefore, the Court finds that a triable issue of fact is presented as to whether a confidential fiduciary relationship had existed between plaintiff and Bacal with respect to any of the works here in issue, whether Bacal had failed to disclose to plaintiff that which he was obligated to disclose with respect to diminished royalties and whether plaintiff had been in possession of sufficient facts by virtue of her having received periodic statements and royalty payments which had imposed upon her the duty to inquire earlier. See Nick v. Greenfield, 299 A.D.2d 172 (1st Dept. 2002); Thompson v. Whitestone Savings and Loan Association, 131 A.D.2d 749, 751 (2nd Dept. 1987).

The Court further finds, however, that plaintiff has woefully failed to demonstrate that it is appropriate to pierce the

corporate veil and find that Bacal's identity was one with his production company Sunbow, which of course otherwise had no confidential relationship to plaintiff, so as to render Sunbow potentially liable for alleged wrongdoings which otherwise would be time-barred. Accordingly, the Court finds that any and all claims against Sunbow for alleged wrongdoings which pre-date six years before the commencement of the action against Sunbow in 2002 are time-barred and hereby dismissed.

The Court also rejects at this time defendants' contentions that plaintiff lacks standing to assert any diminishment of royalty rights of her former partner Kinder since she, by virtue of her prior settlement with Kinder, had stepped into his shoes and inherited his rights with respect to those musical compositions. Summary judgment as to those claims is therefore also denied.

As to the substantive merits of defendants' summary judgment motions, the Court, after careful review of the record at bar and the parties' respective arguments, finds that the issues presented are highly complex, even more so than originally thought, and that the evidence presented and pertaining to this unique industry is, on the whole, seemingly contradictory and confusing; consequently, the Court finds that there exists triable issues of fact which preclude outright dismissal of the non-time-barred

-16-

claims.

Initially in this regard, the Court notes, contrary to defendant Bacals' contention that plaintiff has failed to offer any proof that the additional works for which she seeks royalties had derived from her jingles or compositions, that as the movant for summary judgment, the burden had been on Bacal - not plaintiff- to remove all triable issues of fact.  Here, the Court finds that Bacal has not submitted any evidence establishing that the compositions in question were not derived from plaintiff's original jingles or compositions, and thus he is not entitled to summary judgment on this basis.

The Court finds that plaintiff has submitted sufficient evidence of allegedly improper re-registrations of her work, through a comparison of original BMI royalty statements with later statements of catalog entries for re-uses of the same composition showing a diminishment in her royalty share or in no credit at all being given to her for compositions for which she originally had been receiving 100 percent of the royalties, and that improper credit may be being given to Bacal and/or Kinder and/or others with respect to works for which she has demonstrated entitlement to 100 percent of performance royalties and that Bacal appears to be receiving shares of royalty credit for compositions authored by plaintiff on which he previously had received no royalties.

Defendants therefore have failed to establish entitlement to judgment as a matter of law with respect to plaintiff's claims pertaining to performance royalties.

The Court also finds that a triable issue of fact is presented with respect to whether plaintiff has any copyright rights in the musical compositions used for the TV shows and whether she is entitled to any royalties with respect thereto. While defendants have addressed this issue at length in their respective replying memoranda of law, same appears to not have been raised in their initial briefs and plaintiff has not been afforded the opportunity to respond to same. The function of a reply is to address arguments made in opposition to the movant's position and not to afford the movant to introduce new arguments in support of his motion. See Lumbermens Mutual Casualty Company v. Morse Shoe Company, 218 A.D.2d 624, 625 (1st Dept. 1995); Azzopardi v. American Blower Corp., 192 A.D.2d 453 (1st Dept. 1993).

With respect to plaintiff's claims that she is owed mechanical royalties and synchronization, the Court finds that, notwithstanding that Bacal had sold Sunbow in 1998 and plaintiff alleges that Sunbow has been profiting from mechanical royalties and synchronization license fees beginning in 1999, that there still exists an issue of fact as to whether Bacal nevertheless improperly is receiving monies from these other mediums using

BOOK    97 PAGE 4608

derivatives of plaintiff's work product, which properly belong to plaintiff.    Contrary to defendant's claim that this issue of mechanical royalties and synchronization license fees is newly contrived by plaintiff, plaintiff had asserted in her amended complaint that "defendants ..., including defendant Bacal, ..., have received payments from the sale and marketing of videos, movies, and CD's and other products which use plaintiff's compositions, without compensation due her, and defendants are thereby unjustly enriched to the detriment of plaintiff."

The parties are reminded that these actions are scheduled to be heard in the Mediation Part, at 10:00 a.m. on January 14, 2004, with a scheduled trial date of February 23, 2004.    These dates may not be changed without the Court's consent.    Any party's failure to appear may result in the imposition of costs and/or sanctions.

Dated: December 15, 2003
       New City, New York

ANDREW P. O'ROURKE
J.S.C.

BOOK    97 PAGE 4609    -19-

ENTERED

DEC 1 6 2003    A.M.
                P.M.

County Clerk Rockland

Duane Morris LLP
Atty. for Deft. Bacal
380 Lexington Avenue
New York, New York 10168

Patterson, Belknap, Webb & Tyler LLP
Attys. For Deft. Sunbow
1133 Avenue of the Americas
New York, New York 10036-6710

Monaghan, Monaghan, Lamb & Marchisio
Attys. for Pltf.
150 West 55th Street, Suite 1G
New York, New York 10019

# EXHIBIT 40

# DECISION AND ORDER

To commence the statutory time
period of appeals as of right
(CPLR 5513[a]), you are advised
to serve a copy of this order,
with notice of entry, upon all
parties.

```
FILED AND ENTERED
ON _____ 2003
      ROCKLAND
   COUNTY CLERK
```

**SUPREME COURT OF THE STATE OF NEW YORK**
**IAS PART, ROCKLAND COUNTY**

Present:  **HON. ANDREW P. O'ROURKE**
          **Supreme Court Justice**

FILED - RD

DEC 2 4 2003 9—

ROCKLAND COUNTY
CLERK'S OFFICE

-----------------------------------------------X
**ANNE BRYANT,**

                          Plaintiff,

        -against-

**BROADCAST MUSIC INC., (a/k/a "BMI"),**
**CLIFFORD A. "FORD" KINDER, KINDER &**
**CO., LTD., VADIVOX, LTD., JULES M.**
**"JOE" BACAL, GRIFFIN BACAL, INC.,**
**STARWILD MUSIC BMI, WILDSTAR MUSIC**
**ASCAP, SUNBOW PRODUCTIONS, INC. AND**
**JOHN AND JANE DOES 1 - 10,**

                          Defendants.
-----------------------------------------------X

**Index No. 5192/00**
**Motion Date:12/19/03**

        The following papers numbered 1 to 6 were read on this motion
by defendant Sunbow Productions, Inc. for an Order pursuant to CPLR
3211, subdivision (a), paragraph 2 dismissing certain causes of action
for lack of subject matter jurisdiction.

Notice of Motion  - Affirmation (Phares) - Exhs. (A - B) ....... 1 - 3
Memoranda of Law ............................................... 4,5,6

        Upon the foregoing papers, it is Ordered and adjudged that the

motion is disposed of as follows:

        At this late date, defendant Sunbow Productions, Inc. is

moving for an Order pursuant to CPLR 3211, subdivision (a), paragraph 2

dismissing plaintiff's claims for constructive trust and her newly

interposed theory of fraudulent re-registration of her work based upon

lack of subject r ner jurisdiction.    Said `efendant argues that plaintiff's earlier position always had been that she had created for hire the musical works which are the subject of these actions, whereby the commissioning party would be the copyright owner under copyright law,[1] but that she recently had claimed in her opposition to defendants' motions for summary judgment that she is the author of the subject works for copyright purposes. Since this Court does not have subject matter jurisdiction over copyright issues, which instead are within the exclusive subject matter jurisdiction of the federal courts, 28 U.S.C. §1338(a), defendant submits that dismissal of plaintiff's theories of liability that are within the ambit of the copyright laws is mandated.

Plaintiff opposes the motion, arguing that this is not a copyright infringement case, that no construction of the Copyright Act is required and that she is not seeking to hold defendants liable for violating her rights as a copyright owner, nor a remedy provided by the Copyright Act.    Rather, it is plaintiff's position that this is in the nature of a contractual matter; she is either the composer or otherwise entitled to all writer's royalties if and when her musical jingles/compositions were used, pursuant to the parties' working arrangement, agreement and course of dealings whereby all performance

---

[1]Defendant Sunbow states that plaintiff's original re-registration claim, whereby she claims that defendants had conspired to have her registrations with Broadcast Music, Inc. re-registered so as to deprive her of the public performance royalties to which she was entitled, does not implicate the Copyright Act.

-2-

rights and royalties were to go to the writers, and that defendants, in their capacities as publishers/administrators, had failed to acknowledge plaintiff's retained interest in her works and had failed to provide her with her share of the royalties and license fees attributable to her works, and that she therefore is entitled to a constructive trust over those sums collected which have used her works in any capacity.

According to plaintiff, it does not matter which party possesses copyright ownership of plaintiff's compositions because it is the parties' relationship and working arrangement which here is being sued upon and the mere fact that there are tangential copyright law issues does not negate state jurisdiction.

Initially, the Court notes that the issue of a court's lack of subject matter jurisdiction is not waivable and may be raised at any time. See Editorial Photocolor Archives, Inc. v. Granger Collection, 61 N.Y.2d 517 (1984); Morrison v. Budget Rent A Car Systems, Inc., 230 A.D.2d 253, 257-260 (2nd Dept. 1997).

Secondly, to the extent that defendant relies in part upon a contract, i.e. the Jem Agreement, to demonstrate that Sunbow was/is the owner of all copyrights in plaintiff's creations and that plaintiff had no right to receive royalties in connection with the distribution on DVD and videos that used her music, and plaintiff has argued that said Jem Agreement is not admissible in this action since said Agreement is not signed and defendant has not established the prior existence of an original written instrument, the Court notes that neither party has

-3-

produced in this mo' 'on the Jem Agreement or the 'eposition testimony or any of the other documents each relies upon to support his respective position.   While same recently had been before this Court at the time the latest summary judgment motions were sub judice, those motions have been decided and those papers have since been filed in the County Clerk's office.   This Court therefore cannot and will not address this aspect of the motion.

Defendant Sunbow's motion is denied, as this Court finds that plaintiff is not seeking relief under or construction of the Copyright Act, but rather relief pursuant to a working arrangement, the specific terms of which will be determined at a trial, and that she is claiming that pursuant to said agreement defendants wrongfully have deprived her of her fair share of royalties related to her compositions, the rights to which she never voluntarily had relinquished, and that she therefore is entitled to a constructive trust on those monies paid by third parties for her compositions and, also, for derivative works therefrom. This claim plainly is within the ambit of state court's jurisdiction. See Shaw v. Kastner, 151 Misc.2d 654 (N.Y. Co. Sup. Ct. 1991).

The parties are reminded that these actions are scheduled to be heard in the Mediation Part, at 10:00 a.m. on January 14, 2004, with a scheduled trial date of February 23, 2004.   These dates may not be changed without the Court's consent.  Any party's failure to appear may result in the imposition of costs and/or sanctions.

-4-

Dated: December 24, 2003
       New City, New York



ANDREW P. O'ROURKE
J.S.C

To:  Patterson, Belknap, Webb & Tyler LLP
     Attys. For Deft. Sunbow
     1133 Avenue of the Americas
     New York, New York 10036-6710

     Monaghan, Monaghan, Lamb & Marchisio
     Attys. for Pltf.
     150 West 55th Street, Suite 1G
     New York, New York 10019

-5-

BOOK  97 PAGE 5223