# EXHIBIT 55

Exhibit 2

**Click this link for a printable copy: <u>Jingle Scales.pdf</u>**



# AMERICAN FEDERATION OF MUSICIANS

# TV & RADIO COMMERCIAL ANNOUNCEMENTS AGREEMENT

Standard Commercial Summary

Please call (213) 251-4510 x206 regarding Regional & Local Commercial Announcements

(Effective October 17, 2001 - October 16, 2004)

No member of the Federation shall take engagements or become employed in the making of soundtracks for any type of recorded product (audio and/or visual) unless the employer/producer providing such engagement or employment shall have previously entered into a written agreement with the federation. (Become Signatory).

This is only a general summary of the scales and conditions of employment for Standard TV & Radio Commercial Announcements. (Called National Recording Rates in previous Agreements)

**Minimum Call Session:**

There shall be a minimum call session of one hour.

# Basic Scale – session fees:

| No. of Musicians | Base Scale Per Musician |
|---|---|
| 1 (Base Scale) | $212.00 |

| 2 or more (Base Scale) | $106.00 |
| --- | --- |

## Maximum number of commercials claimed:

A maximum of 3 commercial announcements may be recorded during any original one-hour minimum call session. One additional commercial announcement may be claimed for each additional 20-minutes or part thereof that has been paid as part of the original session. In computing the number of commercial announcements which may be claimed, the employer shall be limited to the number of commercial announcements which may be claimed for the Side Musician with the lowest reported hours worked for such session (including overtime, if any). For any session where the music is produced entirely by means of synthesizer(s), no more than eight commercial announcements maybe claimed even if the number or reported hours worked exceeds two hours and forty minutes.

### Overtime (continuous):

Shall be pro-rated in 20-minute increments. ($70.68-Ldr./Arr. & $35.34-S.M./Cpy.)

Leader or Single Musician:

Shall be paid double the base scale applicable to the Side Musician.

### Contractor:

If 10 or more Side Musicians and a Leader are employed (11 total), a Contractor is required. The Contractor may also be the Leader, but in no event shall the Contractor receive more than twice Side-Musician scale. The Contractor shall be paid double the base scale.

**Doubling:** Musician plays more than one instrument during continuous track. i.e. acoustic guitar for entire track, but musician also adds electric guitar track of not more than four measures.

1st Double – an additional 30% of base scale

2nd and each subsequent Double – an additional 15% of base scale

**Multiple Parts** (Musician plays different instruments for entire track. i.e. bass, drums, guitar, piano). Musician shall be listed separately for each instrument played and paid accordingly.

Note: When a Leader doubles, the additional fee shall be computed at the side Musicians base scale.

## Sideline Musicians

Base Scale:

| | |
|---|---|
| Minimum Pay for eight hours (Leader) | $313.93 |
| Overtime (Leader) per 15 minutes | $14.71 |
| Side Musician | $156.96 |
| Overtime (Side Musician) per 15 minutes | $7.36 |
| One person alone | $184.65 |
| Overtime (1 person alone) per 15 minutes | $8.66 |

Meal breaks must commence no more thank six hours after commencement of call. Musicians may not be called back for the next day's work if less than ten hours have elapsed from close of workday.

**Pension:** 10% of scale wages

**Health & Welfare:**
$13.00 + 2% of scale wages. (The flat contribution of $13.00 is for a maximum of two lines or $26.00 per session. So if a musician appears alone and plays three instruments, she/he would get $13.00 + $4.21 (2% of $212.00) for the top or Leader line ($17.24). The second line would be $13.00 + $2.12 (2% of $106.00) at Side Musician scale ($15.12). The third line would simply be 2% of Side Musician scale wages ($2.12)

## Music Preparation

**Arrangers'** skills are highly specialized, so wages for original sessions are left to the discretion of the individual performing services. An arranger shall appear on the contract at 2x's side-musician scale.

**Orchestrators:** For scoring a page of four bars across & not more than ten lines the cost will be $18.37 per page. The rate for each additional line or instrument in excess of ten lines will be $1.00. Scoring a piano part from a lead or melody sheet is $18.37 per four bar page. Scoring a full piano part from an orchestral score is $34.19 for a two to three line part. Scoring for voices including Coma Sopras per four-voice page is $8.15. Each additional voice is $0.76 per page.

**Copyists:** Single parts are $3.34 ($6.91 dupe) per page. Double stave and chorded parts are $5.77 ($14.19 dupe) per page. A page is four bars across & not more than ten lines down.

**Cartage:**

$30.00 – harp, keyboard, string bass and timpani $12.00 – tuba, all drums, all amplifiers, baritone sax, bass sax, cello, marimba, chimes, vibraphone, accordion, cordovox and contra-bass clarinet.

Any bill submitted in an amount in excess of $30.00 and $12.00, respectively, shall be paid provided that receipt is submitted for actual and reasonable expenses incurred

### Initial Use Cycle (first 13-week cycle):

Upon the first use of a commercial announcement claimed for an original session, a onetime payment for the first 13-week cycle shall be:

| | |
|---|---|
| **Base Scale:** | |
| Leader, Contractor, Arranger, Orchestrator | $60.00 |
| Single Musician | $60.00 |
| Side Musician, Sideline Musician, Copyist | $30.00 |

**Pension:** 10% of initial use scale.

**Health & Welfare:** 2% of initial use scale.

**Re Use, Dubbing, Conversion etc.** (each subsequent 13-week cycle per TV & Radio Commercial, 52-week Non-Broadcast or *100,000 units of CD ROM, or 26-week Internet use\**)

| | |
|---|---|
| Base Scale: | |
| Leader, Contractor, Arranger, Orchestrator | $159.00 |
| Single Musician | $159.00 |
| Side Musician, Sideline Musician, Copyist | $79.50 |

Pension: 10% of scale for each Dub/Reuse/Conversion Health & Welfare: 2% of scale for each Dub/Reuse/Conversion *Internet and CD-ROM rates have not been negotiated with the 4A's, although agency acceptance has been favorable.*

**Foreign Use (12 months):** This payment is for Foreign Initial Use (paid in addition to session fee). Each commercial may be used for 24 months by paying an additional 50% of scale.

Payment shall be made on a per commercial announcement basis.

| | Europe inc. UK | Outside Europe | Worldwide Use** |
|---|---|---|---|
| Leader | $132.50 | $132.50 | $212.00 |
| 2 or more Musicians | $66.25 | $66.25 | $106.00 |
| Single Musician | $132.50 | $132.50 | $212.00 |

| Cont., Arr., Orch. | $132.50 | $132.50 | $212.00 |
| Copyist | $66.25 | $66.25 | $106.00 |

**Rates for Worldwide Use are effective if paid at the start of each cycle. If the commercial starts in Europe, then goes Worldwide, each cycle must be paid separately.

Pension: 10% Health & Welfare: 2%

## Home Page



# The Scoop on Television Advertising Production Costs

by Kevin Carboni



OVATION

The Results Agency

# The Scoop on Television Advertising Production Costs

*"Yes. I am curious about the cost of television advertising production. So, what does that have to do with the price of ice cream?"* —A. Client

## WHO WANTS ICE CREAM?

*In its simplest form, knowing what kind of TV advertising you can afford to produce is no harder than it was deciding what to buy at the ice cream store for a special summer treat when you were a kid.*

It is hard to tell which one is worse. The guy who wants to advertise his product or service on TV and thinks he can do so for, "Oh, maybe, $1,200 max." Or the guy sitting at home watching *Friends* or *JAG* also wanting to advertise his product on TV, paralyzed with fear because he knows, just knows, the ads he sees on that programming must cost at least $7 million.

In its simplest form, knowing what kind of TV advertising you can afford to produce is no harder than it was deciding what to buy at the ice cream store for a special summer treat when you were a kid.

Then, like now, you had choices. Perhaps you really mowed a lot of grass that week and made a lot of money. Maybe that was the time for the Ice Creamer Dreamer Three Chocolate Layered Peanut Butter Banana Split Special. Or maybe the grass cutting biz was a little slow and funds were a little tighter. Nothing wrong with that; you simply enjoyed a delicious single scoop of all natural vanilla. Both treats satisfied. It was just a question of what you could afford. In much the same way, television commercial production is a question of what you can afford.

Pop quiz: How much does the average, or typical, commercial cost to produce? Think you know the answer? Well, you're probably wrong. The fact is, there is no such thing as an average cost. Studies have been done to determine average costs, but really, there is no such thing! Just as no two ads are the same, no two production costs are the same. That doesn't mean we can't give you some idea of what you can get for your money. That's what this paper is all about after all.

So, you're thinking about using television to advertise your product or service. Congratulations. Television is a very effective medium with a lot of possibilities. What do you say we head down to the ice cream parlor to see how much it's going to cost to do what you're thinking?

# SINGLE SCOOP

*So, you're thinking about using television to advertise your product or service. Congratulations. Television is a very effective medium with a lot of possibilities.*

Now, you might be saying something like, "What I want to do is just get my company name out there. Nothing fancy, just give me a basic ad. After all, there can't be much to one of those." Well, you may be in for a surprise. Even more than regular production, low-budget projects demand a highly disciplined approach...at least if you want to make it worth the time. Shooting a simple ad requires more time to research the least costly way to produce. The key is forethought... make decisions in advance and stick to them.

Yeah, yeah, but what's this about ice cream? Commercials in this arena can be likened to single-scoop ice cream cones. You know the type. A good-sized scoop of your favorite ice cream, heaped into, and onto, a crisp, waffle cone. It is not without its charm. It is simple, but if it is what your taste buds desire, it more than does the trick. Nothing fancy, but it's fulfilling.

**The Director, Light and Sound.** What exactly do you get with a single scoop? You can expect a director shooting your commercial on videotape. Accompanying the director will be a small crew such as a lighting person who helps light people and places as dramatically as possible and one audio person to make sure the lines the talents read come across cleanly. Yes, you probably have fantasies of going to Bali for your shoot, but the reality is you *might* get one nearby location.

**Union vs. Non-Union Talent.** Are you following so far? Excellent. But, here is where it gets a little tricky. Single-scoop treats that require talent must usually employ non-union or local talent. The best analogy on the difference between non-union on-air and voice-over talent versus their union counterparts might be as follows: a non-union talent is like a good, minor league baseball pitcher. Kid has a good fastball and a lot of potential, but hasn't been tried in the "bigs" yet. There are good non-union people out there. They cost less. While a union voice-over will read an ad for $500 per 13-week cycle (about $360 for the talent plus agent fees and taxes), a non-union talent will read the ad for a one time only cost of about $175.

While we are at it, what's all this about 13-week cycles? What this means is that you pay the fee and can run the spot for 13 weeks. After that, you will need to pay the same fee for another 13 weeks. "Yeah, but...what if I run my spot for 13 weeks, don't run it for two months, then want to run it again? I'll pay only the fees for the 13-week cycles, right?" Nope. You will pay the 13-week cycles AND you will need to pay a holding fee for the time the spot was "held" on the shelf. This is usually equal to what the talent got paid for in the first place. What can we gather from all this? I know what I gather. My kid is going to train to be talent whether she has some or not.

The same comparison on talent level is evident for on-air talent. Most single scoops do not use professional actors. Were you to somehow end up needing professional union talent, expect to shell out about $700 for a 13-week cycle. There is more room for negotiating with non-union talent. It is really up to the agent you deal with. But generally non-union talent is at least half the cost of hiring union talent.

**Graphics.** Now back to basics. You can expect graphics, albeit limited, in a single scoop...with basic video editing. Thanks to the wonders of computers you should be able to afford some fancy schmancy moves in your spot...like colored sprinkles on your ice cream. Maybe your logo comes full screen out of oblivion. Maybe there is a unique dissolve to the next scene. But, don't expect anything too cutting edge.

**Music.** Want music? Sure, but you need to be realistic. A few years ago, Revlon wanted to use Shania Twain's "Man, I Feel Like a Woman" in their commercial. So how much do you think they paid for the rights? They got it for a song—only $500,000 for 13-week usage. It did fit with their ad and it was effective, but OUCH...certainly not on a single-scoop budget.

Here's another case. The Ford Motor Company had a good idea to make their trucks seem a little more fun on their television commercials. They created a campaign centered around George Thorogood's version of "Move It On Over." Cost: $100,000 for 6 months. Again, not a single-scoop option.

"Yeah, but I still want music" you say? No problem. Most audio production studios will have what is called "needle-drop music." These selections are cuts from music libraries and often written for commercial use. You should be able to find music that will do the job. Start by giving the audio engineer some general direction: "I think we need something that sounds like New Age meets Reggae." The audio engineer will then have a number of cuts in that vein for you to choose from. Or, a good engineer may suggest a different route to explore.

Depending on where the ad will run and how many times it will be seen, needle-drop music will cost $175 to $250 per cut. You pay one time. As long as we are on the subject, here's a word of caution. Just because you have the music running on your ad and just because it fits perfectly with the mood and attitude you are trying to convey, there is nothing stopping Joe's Rag Shop from coming in the next day and using the same piece of music. It seldom happens, but it could.

**Production Costs.** In the end, the outside production costs on a single-scoop treat like this can range from $10,000 to about $25,000. Okay. Okay. I see you waving your hand in the back and I know what you are going to say. Sure, your local TV station may promise you FREE production if you just buy the time to run the spot on their station. It has been done and it will continue to be done. But, don't you think the advertising for your product or service deserves to be as unique as the product or service itself?

Wow, the single scooper really hits the spot, huh? Yes it's basic, but it's perfect for what you had in mind. Who uses single scoops? Well, it's mostly the kind of stuff you see on local television—auto dealers, banks, and bars. However, you may be surprised to learn that sometimes national ads go this route, too. Just because it is a brilliant idea, doesn't mean it has to cost you the deed to the farm. Southwest Airlines (which usually run after NFL Football) are funny, effective and highly inexpensive. Country Crock has a successful campaign that uses two sets of hands and their product and its been running for years. (Yes, it is film. Yes, they are union voice-over talent, but you get my point.)

## DOUBLE SCOOP

Now, you might be saying, "You know, I just don't think the single scoop is exactly what I had in mind. I have a little more money to spend and I am looking for something a little more intricate." In that case, how about a double scoop? Two heaping scoops of ice cream with sprinkles, marshmallows, a cherry and crushed nuts.

These double scoops make up a great deal of the spots you see on TV. Like anything else, there are some very good double-scoop ads and there are some that are not so good. Here the playing field changes a little and the possibilities are heightened.

**The Director.** It starts with a production house or production company. Included in this merry band is a director. This individual will be one who has done impressive work for other clients and will have the reel to prove it. This is the person who has the "eye"—the one that will help you achieve your vision on the screen. With the director come a lot of other helpers. At first this may seem extravagant, but they are needed. But who are these guys?

**The Production Assistant.** You'll get a production assistant who is the right-hand man (or woman) for the director. This person's duties include finding a set or studio location, gathering props, details about what is being shot, and a million other details you'd have never thought of even if you had been doing this awhile.

*Outside production costs on a single-scoop treat like this can range from $10,000 to about $25,000.*

*Double scoops make up a great deal of the spots you see on TV. Here the playing field changes a little and the possibilities are heightened.*

**Lighting.** You will get a more detailed lighting crew with bigger lighting setups. "But, I'm only shooting a kid with a sandwich," you say. All the more reason to have that kid lit perfectly. You want to make your product look as good as it can, don't you? The right lighting experts can make magic.

**Sound.** More than likely, you'll get a sound technician, too. This person is crucial to the process, especially if you have talent who will be speaking lines. You'd be surprised what a microphone will pick up. There will be hell to pay when you start editing only to discover the talent's sleeve was making a swoosh noise because the microphone was too close to her sleeve.

**The Stylist.** A stylist is very important if you are shooting people. And, depending on what you are shooting, you may need a food stylist. Yes! There really are such people as animal stylists, car stylists and hand stylists, so quit laughing. A production house will also take care of providing a caterer to feed your hard-working crew and talent.

**The Studio Set.** With a double scoop, you're using more elaborate studio sets. This means things like building a storefront in the studio, or a gorilla cage, or a park, or Frankenstein's lab, or anything else you can dream up that can be built within the confines of a studio.

**On Location.** You may choose to do your shoot on location at a real house, or with kids on the soccer field, or at the zoo. This is great. The production assistant will be a great asset in helping you select the best location. They know people. They are not afraid to peek in windows. They ask questions. They find suitable locations.

**Videotape vs. Film.** With a Double Scoop you have options as to what to shoot on. At the very least, opt for high-quality videotape. More than likely, though, you will be persuaded to get it on film. "Film? You mean the stuff they shot *Star Wars* on? I don't need ice cream, I need a stiff drink!" Hold on. There are two kinds of film: 16mm which is very common and more affordable, and 35mm which is the very best quality and, of course, more expensive.

Why film? The best example is to look back at some of those '80s sitcoms such as *Family Ties*, *Cosby*, *Different Strokes*, etc. They were flat, and there is no richness in the color. They were shot on tape. Not bad when the story is about Alex Keaton losing his favorite tie. And, tape has improved since the '80s. But videotape falls short if you are trying to convey the richness of fine leather, the closeness of a shave, or the luminous highlights of her hair coloring. You are, after all, telling a story and selling a product, and you want the best platform possible.

**The Talent.** Ah, talent. Swimming pools, move stars, hobnobbin' with the pretty people. Not quite. With a double scoop you really don't want to chance the success of your commercial with anything less than union professionals.

Lets start with the voice-over talent. As we talked about in the single-scoop option, this person will read your :30 TV script and charge you about $500 for a 13-week cycle in which time you can run the commercial as often as you want. After that, though, if you run it again, you will pay an additional $500. And, there could be additional charges if your commercial is running in multiple markets. The talent may require an additional $20 per market. They call it shares. That's funny, because they don't share anything.

As you probably guessed, on-air talent will cost more. You can figure about $700 for a 13-week cycle if you use union talent. You should be able to negotiate the rates for non-union talent for less than half the rate of union talent, depending on the agent you're working with. Sometimes you can leave it up to the production house to review and choose your talent. If you would like to do it yourself, you should start by calling the local talent agencies in your city or in the nearest big city. Agents will help you find what you are looking for, even if you aren't exactly sure.

*The cost on a double-scoop ad depends largely on the concept. The range of cost is so wide because there are just so many different variables to consider, but the cost of a double scoop generally starts at about $30,000.*

**Music.** It is not out of the question to use needle-drop music like you would in a single scoop. But, explore the possibility of having custom music created for your commercial. Composers (they hate to be called "jingle writers") are very good at getting out of you the tone or mood you want to convey lyrically and musically. Depending on how much you can allocate to the composer, you will probably get a mixture of real and synthesized instruments. Hardly anyone can tell the difference. If you have lyrics, you will get one vocalist. He or she will add tracks to provide harmony. Like everything else, it depends on what you have in mind, but you can expect a starting fee of about $14,000.

Who usually orders a double scoop? Most of the regional commercials you see and some national ones are double scoops: restaurant chains, regional automotive dealers, the bigger retail chains, financial institutes and vacation destinations.

**Production Costs.** The cost on a treat like this depends largely on the concept. The range of cost is so wide because there are just too many variables to consider that could alter the price. The cost of a double scoop generally starts at about $30,000. If you are asked to pay more than $110,000, you are really in another category and that is...

### ...THE HOT FUDGE SUNDAE SUPREME

This, to keep it in the ice cream vernacular, is the "works." Two scoops of ice cream, chocolate and caramel sauce, marshmallow crème, whipped cream, nuts, colored sprinkles and two cherries on top. Wow. This is the big time. Think of the ads you've seen that you really like from a production value. You know, those ads that look like mini movies. These are the hot fudge sundae supremes!

What can one except with a treat like this? Pretty much everything you got with the double scoop but more of it and maybe a better level of expertise from the people involved.

**The Director.** Here the directors will not only have experience behind them, they will be the ones with a strong reputation. They may have done feature films or music videos in addition to their commercial work. These are the people who have done ads for the top brands in the country and done them successfully. In other words, these are people from the "A" list.

**The Crew.** The hot-fudge-sundae-supreme director will have the same kind of crew that you had in a double scoop, but there will be more of them. You will see "teams" of lighting personnel. In addition to the production assistant, there may be a director assistant. There will be not just one sound technician, there could be several. You get the idea.

**The Shoot.** Sundae supremes are shot like a move, taking two or three days, and often longer. It could easily involve multiple locations. And, it won't be 16mm film here—it will be 35mm.

**The Talent.** Union models all the way whether on air or voiceover. And the same charges you encountered for these people in the double scoop apply here. If you choose a well-known talent that's in high demand, you may have to pay scale, plus 10%. An agent can help you with this arrangement.

Now might be the time to consider a celebrity spokesperson. Do celebrities really help sell product? That is probably a topic for a whole other paper. But, in some cases, it really seems like a fit. Cindy Crawford for Revlon, Jeff Irwin (the Crocodile Hunter) for Right Guard, George Clooney for Lexus. You will really need an agent to help you through the process of hiring a celebrity. They will do the negotiating through the celebrity's agent...for a nominal fee, of course.

**Music.** We talked about music in a double scoop. With the sundae supreme you will find yourself talking to top composers about creating custom music, specifically scored to what you want the message of your commercial to be. Here again you will get the top talent. They will want to use the best vocalists and the best session musicians playing real instruments. They will have worked with these people before and they will have done some good pieces.

At this level, you may find it beneficial to look into the rights to popular songs. A music publisher can assist you. The cost will vary depending on the song, where the spots will run and if you want the original recording or are planning to have someone re-record it.

**Graphics and Editing.** In editing your commercial you will have access to state-of-the-art effects and high-tech computer graphics. Technology allows you to do amazing, seemingly impossible things like that jet fighter that magically turns into the Mach II Razor. (For the record, that effect is called "morphing.") Or, the dog who moves his mouth and talks like a human. (For the record, this effect is called "dog moving his mouth to talk like a human.") Here is where computer enhancement stuff is used. You can have a guy going head-to-head with a big horn sheep, a dog making a sandwich, or talking pasta. Pretty neat stuff is possible here.

Who will you find indulging in a hot fudge sundae supreme? Usually it is the "big guys." National brands in most categories—soft drinks, fast food, athletic shoes, computers, beer, electronics, chain stores, etc. Think about it for a second. If you remember watching TV last night, you can probably guess which commercials fit into this level.

Before we discuss the tab on this treat, we need to make a point. Just because you or your client have the money, it does not mean you have to spend every last penny. Like anything else, there are good hot fudge sundae supremes and some that aren't so good. A good relationship with a director and/or production house is very useful here. They can, and will, make suggestions on improving your ad or doing it more efficiently. A lot will depend on the concept and how solid the idea is in the first place.

**Production Costs.** Your entry fee for a project on this level is…sit down…take a deep breath… around $120,000 and can go upwards to $300,000 plus. That is one expensive treat for most, but oh so satisfying if it's what is needed to sell your brand…and if it's successful!

## WHAT'LL YOU HAVE?

So, do any of these ice cream treats sound like they'll hit the spot? Remember, although you now have a pretty good idea about the kind of treat you may or may not be able to afford, this is just the tip of the ice cream. Who knows? Maybe you'll arrive at a combination of all three treats. Keep in mind, that just as no two TV commercials are exactly the same, no two budgets are similar. Congratulations on adding television to your advertising and branding mix. It can be sweet. And it can be very, very satisfying.

_A good relationship with a director and/or production house is very useful here. They can, and will, make suggestions on improving your ad or doing it more efficiently. A lot will depend on the concept and how solid the idea is in the first place._

NOTES
_1. A Client's Guide To Television Commercial Production_, American Association of Advertising Agencies, New York, 1994, p. 8

HOME | Special Payments | Info | Credits | Players | Support Services | Studios | Scales | Contact | Members
Motion Pictures · Low-Budget MP · Jingles · Phono · TV/Videotape · Music Prep

## TELEVISION & RADIO COMMERCIAL ANNOUNCEMENTS
Effective October 17, 2001 - October 16, 2004

**Basic Scales**    **Dub Fee**    **Conversion Fee**    **Internet Jingles**

| Basic Scale Wages & Overtime Rates | | |
|---|---|---|
| | Session (1hr) | Overtime (20 min.) |
| Basic Scale | **$106.00** | **$35.34** |
| 1st Double | **$31.80** | |
| Subsequent Doubles | **$15.90** | |

Doubling Computation: 30% of basic scale for first double. 15% of basic scale for each double thereafter.
Basic Scale for Sideline Musicians: for an 8-hour day, $156.96
Overtime (15 min.) $7.36

Leader, Contractor, Musician performing alone - double the Basic Scale.

When a leader or contractor also performs as a side musician, the scale payment for the leader or contractor includes the performance of a single instrumental part. The scale payment for any additional instrumental part(s) as provided in Section 16 of the agreement shall be side musician's scale for each part.

Initial Use

Side musician, Sideline musician, or Copyist (plus applicable doubling and multiple part fees)    **$30.00**

Leader, Contractor, Arranger, Orchestrator, or musician performing alone    **$60.00**

This use payment entitles the Employer to use all commercial announcements claimed from the same original session for the initial cycle from the date of first use of each spot.

Use/Reuse Payments

1. Reuse of a spot for 13 weeks in television or radio - 75% of the Session Fees.
2. Use or reuse of a spot for 8 weeks in radio only - 80% of 13 week cycle payment.
3. Use and reuse fees are paid under scale in effect at the time of the original session.

Premium Pay

All work done between midnight and 8:00am; on Sundays and on the following holidays is paid at double the applicable scale: New Years Day, Labor Day, Washington's Birthday, Thanksgiving Day, Memorial Day, Christmas, and Independence Day.

Cancellations
No cancellations or postponements without consent of the Federation.
Hold Period

40 Minutes beyond the length of the call.

Rest Period

5 minutes first hour, 10 minutes each subsequent hour.

First Air Date

Employer must submit first air date reports when spots air.

Dubbing & New Use

> Dubbing - transfer of a music track into a commercial used in the same broadcast medium - 75% of 1-hour Session Fee.
>
> New Use - transfer of music track into a commercial used in a different broadcast medium - 75% of 1-hour Session Fee.
>
> Dubbing and New Use fees are paid the scale amount in effect at the time of the Dubbing or New Use.

Adding Specific Factual Information

> To make copy and/or video changes over the recorded music of a commercial, provided such changes are limited to destination, points and times of departures, frequency of service, telephone numbers, rates, prices, availability, dates, dealer names and addresses. Such changes may be made without creating a new or additional commercials provided all versions are identical except for these informational changes.
>
> For every 13-week cycle of use of any commercial incorporating any such changes, including the first use cycle, the musicians shall receive 200% of the applicable reuse fee. This does not apply to commercials for which regional or local rates are being paid.

Mechanical Editing

> Shortening or lengthening a music track for a spot - Dubbing Fee.

Short Term TV Use

> 3 spots for the same advertiser for 10 weeks aggregate use during one 13-week cycle in one medium - 75% of Session Fee.

Non-Broadcast Use

> Non-broadcast use in an additional broadcast media except video cassettes - Dubbing Fee. For an additional payment of 150% of the conversion fee the Employer may obtain two consecutive 52-week periods of non-broadcast use.

Additional Broadcast Medium Use

> Use of a spot in an additional broadcast medium - Session Fee, or New Use Fee

Commercials Not Used for Two Years

> Session Fee under the scale in effect at the time the commercial is reactivated.
> Reuse under the scale in effect at time of reuse.

Adjusting Undisputed Overpayments

Where an overpayment has been made to a musician and there is no factual dispute as to overpayment, the overpayment may be credited against subsequent payments due to the same musician no sooner than 10 business days after the notice set forth in sub-paragraph (1) below has been sent, when the following conditions have been met.

1)    The Employer has given written notice to the musician with a copy to the local of which the .musician is a member identifying the reason for the overpayment, the amount and date thereof, and the commercial(s), advertiser and agency involved; and:

2)    The notice is given within ninety (90) days of the overpayment

Meal Period

With respect to any musician for whom a session call is more than six hours, or for whom the session extends beyond six hours as a result of overtime, a meal period of not less than one-half hour nor more than one hour shall be provided not later than six hours after the musician reports for work. Such meal period shall not be considered work time.

Cartage

If a public carrier (i.e. cartage company) is used, Employer will pay cartage bills as submitted. If a private transportation is used, the Employer will pay a musician cartage fees as follows:

**$30.00**    harp, keyboard, string bass and timpani ,marimba, chimes, vibraphone

**$12.00**    tuba, all drums, all amplifiers, baritone sax, bass sax, cello, accordion, cordovox and contra-bass clarinet.

Any bill submitted in an amount in excess of $30 and $12 respectfully shall be paid provided that the receipt is submitted for actual and reasonable expenses incurred.

Foreign Use

12 month's use
Europe **$66.25**
Outside Europe **$66.25**
World-wide use paid at start of cycle **$106.00**

Each commercial may be used for 24 months by paying an additional 50% of scale. Payment shall be made on a per commercial announcement basis.

Dubbing (Dub) Fee

75% of Session Fee for National commercial, 100% of Session Fee for Regional or Local Commercials.

A dub is where one takes an existing bed of music and creates an additional commercial within same medium. i.e. A producer wishes to create a fourth (additional) commercial (total amount of commercials allowed per 1 hour session is 3) so the producer pays a dub fee which is 75% of the Original Session Fee. (For this example we are discussing a National commercial.)

## Conversion Fee

75% of Session Fee for National spot, 100% of Session Fee for Regional or Local Commercials.

A conversion is where one takes an existing bed of music and creates a new commercial in a different medium. i.e. A producer wishes to take an existing bed of music from a television commercial* and place that music in a radio commercial, so the producer pays a conversion fee which is 75% of the Original Session Fee. (For this example we are discussing a National commercial.)

* A conversion can also be Radio to TV.

Internet Use: Made for Initial Use on Television or Radio

One Dub Fee for each 52-week period of use.

Internet Use: Made for Initial Use on the Internet

1. One session fee for any minimum call session (see rates under Basic Scale - Session Fees, pg. 1).

2. Initial Use payment for first 6-month period of use (see Initial Use Fee rates, pg. 3).

3. One dub fee (equivalent) for second 6-month period of use.

4. One dub fee (equivalent) for each subsequent 52-week period of use.



This is G o o g l e's cache of http://www.poiny.com/assumpt.html.
G o o g l e's cache is the snapshot that we took of the page as we crawled the web.
The page may have changed since that time. Click here for the current page without highlighting.
To link to or bookmark this page, use the following url: http://www.google.com/search?q=cache:Vaf-zBsWKp0J:www.poiny.com/assumpt.html+Commercial+Jingles+13+week+cycle&hl=en

*Google is not affiliated with the authors of this page nor responsible for its content.*

These search terms have been highlighted: **commercial jingles 13 week cycle**



Back to Poiny Home | Email Us

Assumptions | Radio | **Jingles** | Industrials | Media\Traffic Outsourcing | Tele

# *The Assumptions (Please Read)*

Here is a composite list of applicable rates for Commercials, **Jingles** and Industrials. The rates given here are from the source, the actual contract books. This means that they can be easily verifed and that other rates may be extrapolated (particularly from those nice charts at the back).

Please note that all of these rates must be multiplied by something!

We gave much thought as to whether we should state all rates as your total cost or whether we should stick to the numbers in the book. We choose the book-mostly because it is "the book."

We are all creatures of convention, alas, and the "convention" in the talent payment field is to refer to "gross to talent." This is what "the books" give you and the amounts agents negotiate. What you must remember is that your actual cost may be as much as 39% greater than "gross to talent" because of the "multiples" we discuss below.

Naturally you don't have to do any of this-that's what you pay us for. We are always happy to do estimates for you, and of course we make every effort to see that our invoices are correct. But we are not always around. That's why we feel that it is important for you to know how to do it yourself.

Every rate here must be multiplied by one or more of the following:

**Magic Multiple (MM)**

On top of the money you pay performers, you have also agreed to make a contribution to their Pension & Health Fund.

The performer is also to be treated as an "employee" under the Federal definition - which means that you must pay all of the employer payroll taxes.

These are FICA, FUTA, State Unemployment Insurance and Workers' Compensation Insurance. You also pay us a fee for our services, expressed as a percentage of the performer's gross wages.

Currently these rates are:
14.3%   Pension & Health
14.50% Payroll Tax Fee
10.00% Service Charge
38.8%   or 1.388 as a multiple

We call this the "Magic Multiple" and it must be applied to every rate. Please note that the 14.5% Payroll Tax Fee does not apply when paying a performer through his personal corporation. However, it is best to make estimates assuming that you are going to pay the taxes, since if the performer chooses to "dis-corporate," you would be obligated to.

**Over Scale Calculations**

Obviously, if a performer is paid double scale, everything must be multiplied by 2. What is less obvious is that a "scale" AFTRA radio (only) job booked through an agent means, according to custom, 1.1 times scale (scale plus 10%). This comes about because agents, under their agreement with AFTRA, may not take a commission if it would reduce a performer's payment to less than scale. Of course, taking a commission from scale would do that.



In Massachusetts, state law dictates that no agent may take a commission from scale whether AFTRA, SAG or you name it.

This might be a good time to remind you that an agent may ask for anything. You may also refuse.

I need my glasses to read this stuff...

So, if you were paying an announcer $220.00 base for a radio spot that you booked through an agent at "scale plus 10" and produced on 10/30/2000, you would use the following formula for finding your total cost:

| Base Fee | times | Scale Multiple | times | Magic Multiple | equals | Total |
|---|---|---|---|---|---|---|
| $235.40 | | 1.10 | | 1.388 | | $359.41 |

Now you know why we use computers!

**Residuals**

Remember, no one owns a **commercial**-you only rent it! Failure to pay a use fee can result in legal action.

Radio spots are paid use fees based on when and where they are run.

In television, in addition to use fees, you pay holding fees. What you are "holding" is the performer's exclusivity to your product, whether you want it or not. Holding fees are paid in fixed **13 week** cycles based (usually) on the session date. If you fail to pay a holding fee when due (the first day of the **cycle**), you relinquish your right to use the spot.

You can renegotiate with the talent, but this almost always costs more-and is

sometimes impossible because they have done a spot for a competing product, or have become stars and are not allowed by contract to do commercials-don't laugh, it's happened.

Thus it is wise to pay the holding fee if you think that the spot may be used again.

Assumptions | Client Info | Radio | **Jingles** | Industrials | Television | Email Us

**American Residuals and Talent**
2 Hedgehog Hill Road
Madison, NH 03849
603-367-9955
askpoiny@poiny.com

Exhibit 3

M.William Krasilovsky and Sydney Shemel
with contributions by John M.Gross

# This Business of

# MUSIC

The Definitive Guide to the Music Industry

new 9th edition

# 15

# Mechanical Rights

The copyright owner owns the exclusive right to reproduce and distribute to the public copyrighted musical compositions on phonorecords, which include compact discs, tapes, and any other material object in which sounds other than those accompanying motion pictures and other audiovisual works are fixed. This right is commonly called a *mechanical right* and the authority to exercise this right is called a *mechanical license*. These terms date from the days when records were reproduced mechanically, rather than electronically. Mechanical rights are an important and lucrative aspect of copyright, different from other rights protected under copyright, such as synchronization rights used in motion pictures, video, and television; print rights; and public performance rights.

Under the Copyright Act of 1909, Congress recognized for the first time the copyright owner's exclusive ownership of recording and mechanical reproduction rights in musical works. Congress's reason for doing so was twofold. Not only did it want to protect the composer's rights of mechanical reproduction, it also sought to prevent the creation of a monopoly in this area. At the time, millions of piano rolls (the ancestor of records) were being sold every year. The Aeolian Company, a leading manufacturer of piano rolls, had made exclusive contracts with most of the major music publishers to reproduce all the compositions that they owned or controlled. Section 1 (e) of the 1909 Copyright Act changed that. It provided that if the copyright owner used or permitted the use of a copyrighted composition for mechanical reproduction, then anyone else might also mechanically reproduce the composition on payment to the copyright proprietor of a royalty originally set at 2 cents "on each such part manufactured." This is usually referred to as a *compulsory license* and the license rate is referred to as the *statutory rate*. Although the compulsory license provision called for the payment of the statutory rate "on each such part manufactured," the music industry has interpreted this provision to mean that payment is required for each composition on a record, that is, for each song.

Under the Copyright Act of 1976, the concept of a compulsory mechanical license was continued and clarified. If phonorecords of a nondramatic compo-

sition have been distributed to the public with the authorization of the copyright owner, any other person may record and distribute phonorecords of the work by giving a specified notice and paying a statutory royalty. A record is considered distributed if possession has been "voluntarily and permanently parted with."

The National Music Publishers Association, the Songwriters Guild of America, and the Recording Industry Association of America jointly negotiate, for industywide purposes, 10-year maximum mechanical royalty rates with recourse for final determination, if necessary (that is, if the industry cannot reach an agreement), to a Copyright Arbitration Royalty Panel (CARP) (see Chapter 7, page 67). The mechanical royalty rate until December 31, 2003, is 8 cents per song per record distributed for songs up to 5 minutes in length or 1.55 cents per minute or fraction thereof for songs over 5 minutes. The approved escalations come in two-year units, so that for the period 2004–2005 the rate goes up 0.5 cent for songs up to 5 minutes, to 8.5 cents, and up 0.1 cent a minute, to 1.65 cents, for songs over 5 minutes. In 2006 those rates will be, respectively, 9.10 cents and 1.75 cents.

The compulsory license provisions of the Copyright Act expressly permit the making of an "arrangement of the work to the extent necessary to conform it to the style or manner of interpretation of the performance." Even a sound-alike recording, with an arrangement similar to that of a prior recording, is permitted. However, a compulsory licensee must avoid changing the basic melody or fundamental character of the work. The author of an arrangement cannot claim a derivative copyright in the arrangement without the consent of the copyright owner. Such consents are rarely given.

Compulsory mechanical licenses under the Copyright Act apply solely to audio recordings primarily intended for distribution to the public for private use. They are not available for purposes of background music services, broadcast transcriptions, television films or episodes, or any motion picture synchronization. A compulsory license applies only to the use of musical compositions in new recordings. There can be no compulsory license for compositions used in the duplication ("dubbing") of a prior sound recording, unless consent has been obtained from the owner of the prior recording, which itself was fixed lawfully. This acts as a significant restriction on the pirating of recordings.

## Parting with Possession; Returns

Under the Copyright Act a record is not considered distributed (and no statutory mechanical royalty is due) unless its possession has been "voluntarily and permanently parted with." In 1976, the House Committee on the Judiciary stated:

> The concept of "distribution" comprises any act by which the
> person exercising the compulsory license voluntarily relinquishes
> possession of a phonorecord (considered as a fungible unit),
> regardless of whether the distribution is to the public, passes title,

> constitutes a gift, or is sold, rented, leased, or loaned, unless it
> is actually returned and the transaction canceled. (H.R. Rep. No.
> 1476, 94th Cong., 2d Sess. 106)

In the legislative history preceding the Copyright Act, there is recognition of
a record industry practice of distributing records with return privileges.

> Phonorecords are distributed to wholesalers and retailers with
> the privilege of returning unsold copies for credit or exchange.
> As a result, the number of recordings that have been "permanently"
> distributed will not usually be known until some time—six or
> seven months on the average—after the initial distribution. In
> recognition of this problem, it has become a well-established
> industry practice, under negotiated licenses, for record companies
> to maintain reasonable reserves of the mechanical royalties due
> the copyright owners, against which royalties on the returns can
> be offset. The Committee recognizes that this practice may be
> consistent with the statutory requirements for monthly compulsory
> license accounting reports, but recognizes the possibility that,
> without proper safeguards, the maintenance of such reserves could
> be manipulated to avoid making payments of the full amounts
> owing to copyright owners.

committee recommended that the regulations to be published by the Register
Copyrights should

> Contain detailed provisions ensuring that the ultimate disposition of
> every phonorecord made under a compulsory license is accounted
> for, and that payment is made for every phonorecord "voluntarily
> and permanently" distributed. In particular the Register should
> prescribe a point in time when . . . . a phonorecord will be considered
> "permanently distributed," and should prescribe the situation in
> which a compulsory licensee is barred from maintaining reserves
> (e.g., situations in which the compulsory licensee has frequently
> failed to make payments in the past).

egister of Copyrights has promulgated regulations that, in effect, give a
lsory licensee 9 months at the most, from the month in which the
are relinquished from possession, to hold mechanical royalties in a
fund. However, the regulations deny the privilege of holding reserve to
al nonpayer of mechanical royalties. Such a licensee is one who, within
from when a phonorecord was parted from possession, has had final
nt rendered against it for failing to pay mechanical royalties on
cords, or within such period has been found in any proceeding
bankruptcy, insolvency, receivership, assignment for the benefit of
, or similar action to have failed to pay such royalties.

MECHANICAL RIGHTS | 155

The Register of Copyrights did not establish any specific criteria for what a reasonable reserve would be. In their absence, this is governed by customary music industry practice.

## Notice of Intention

Anyone who proposes to invoke the benefit of compulsory licensing provisions under the Copyright Act must serve a "notice of intention" in a form and manner prescribed by the Register of Copyrights. Pursuant to Section 115 of the Copyright Act, the notice must be sent to the copyright owner either before any records are distributed or within 30 days after distribution. If the records of the Copyright Office fail to identify the copyright owner and his or her address, then the notice requirements can be met by sending the notice to the Copyright Office along with a $12 fee.

Failure to timely serve a compulsory license notice "forecloses the possibility of a compulsory license." In other words, the making and distribution of phonorecords is copyright infringement and the copyright owner has various remedies available.

## Compulsory License Accountings

A compulsory licensee must make monthly royalty payments on or before the 20th of each month for records made and distributed during the preceding month. Accompanying each payment must be a detailed accounting statement made under oath. The copyright owner is also entitled to cumulative annual statements certified by a certified public accountant.

Under the Copyright Act there is an automatic termination of a compulsory license for failure to render monthly payments and the appropriate accountings when due if the default is not cured within 30 days after written notice by the copyright owner. If a default continues beyond this period, there is an automatic termination of the compulsory license. In addition, once a license has been terminated, parties can be sued for copyright infringement if they continue to make and distribute phonorecords for which royalties are unpaid.

## Copyright Owner Identification

There is no obligation under the Copyright Act of 1976 to pay compulsory license royalties to a copyright owner unless the owner is identified in the registration or other records of the Copyright Office. A copyright owner is entitled to receive compulsory license royalties for phonorecords made and distributed after this identification is made, but the owner cannot collect royalties for phonorecords made and distributed before the identification. This provides a strong incentive for early copyright registration by an owner.

## Negotiated Licenses

The procedure for monthly accountings and payments is a strong deterrent to resorting to compulsory licenses. In the music industry it is standard practice for a record manufacturer to account for and pay mechanical royalties quarterly, not monthly, and statements are not usually made under oath. In addition, it is unnecessary to serve a notice of intention to obtain a compulsory license if the publisher issues a negotiated license.

A compulsory license is inapplicable to the first recording of a copyrighted composition. The copyright owner has complete control over his or her decision to make the first recording as well as over the terms and conditions with respect to that recording of the composition. Thus, the copyright owner could, in theory, insist that higher mechanical royalties be paid, or that the record couple two compositions controlled by the copyright owner, or that the next recording by the same artist include a copyrighted composition from the catalog of the copyright proprietor, but this rarely, if ever, occurs. Finally, and most importantly, the possibility of obtaining a mechanical royalty rate of less than the statutory rate militates in favor of a negotiated license. By reason of the compulsory license provisions, the statutory rate has the effect of serving as a ceiling on negotiated mechanical license rates for records distributed in the United States. In practice, however, publishers usually grant initial licenses at the prevailing statutory rate and without additional restriction. It is rare that the maximum statutory rate is exceeded. Indeed, record companies, by the use of "controlled composition" clauses, usually provide for mechanical licenses to be issued at 75 percent of the basic per-song statutory rate, regardless of the song's duration.

## The Harry Fox Agency

The National Music Publishers Association (NMPA), which was founded in 1917, is a trade association of music publishers. It represents the interests of more than 750 of the leading U.S. music publishers in all pertinent national and international copyright issues, including legislation and U.S. intellectual trade policy. NMPA's far-ranging activities are supported in large part by commissions earned by its wholly owned subsidiary, the Harry Fox Agency (www.nmpa.org/hfa.html).

The Harry Fox Agency was established in 1917 to administer mechanical rights in the U.S. for publishers who wished to use its services on a commission basis. Effective June 30, 2002, it discontinued its synchronization licensing division, since by then most publishers were handling synchronization licensing directly, but in early 2003 announced that it would issue a joint mechanical and synchronization license for DVD audio allowing visual elements such as lyric reproduction. The agency represents more than 27,000 music publishers, many of whom are unaffiliated with NMPA, who in turn represent the interests of over 160,000 songwriters. In 2001, the agency's annual gross collections were $441.8

$29.95

million, a significant decrease from the previous year, reflecting the general contraction of the music industry.

The agency's services include the issuance of mechanical licenses and the supervision of collections from record companies. It employs auditing firms to regularly check the books of record companies and other licensees in order to ensure proper accountings of mechanical license fees. On behalf of publishers that it represents, the Harry Fox Agency has instituted litigation to pursue delinquent record firms and record pirates, as well as to settle disputes stemming from diffent interpretations of the Copyright Act. For its mechanical license services, the agency presently charges a commission of 5.75 percent on royalties distributed.

Under the basic mechanical license issued by the Harry Fox Agency on behalf of the publishers it represents, the record company must account and pay for all records manufactured and distributed. The license calls for quarterly accountings and payments and provides that failure to make accountings and payments constitutes grounds for the revocation of the license. It also states that service of a notice of intention to obtain a compulsory license is waived.

The license further states that the record company has requested a license under the compulsory license provision of the Copyright Act. It provides that the licensees have all the rights granted to and all the obligations imposed on users of copyrighted works under the compulsory license provision, with certain exceptions relating to quarterly instead of monthly or annual sworn accountings and a waiver of the notice requirements.

The courts have held that the Harry Fox license form is a modification of the compulsory license provisions of the Copyright Act and is not a separate, private contract. This preserves the statutory remedies afforded by the Copyright Act as well as federal jurisdiction. The Harry Fox license is generally nonassignable, and a separate license is required for each type of phonorecord configuration the licensee desires to manufacture or distribute, (i.e., CDs, cassettes, and singles).

In 1987, in the case of *T. B. Harms Co. v. Jem Records* (655 F. Supp. 1575), a federal district court in New Jersey ruled that according to the U.S. Copyright Act, the importation of phonorecords into the United States (regardless of whether such records were legally manufactured abroad and were subject to royalties at the place of manufacture) still requires a license from the owner of the U.S. copyright in the songs contained in the imported record. Although this case was never appealed to the Third Circuit Court of Appeals and is not technically binding in other judicial circuits, since that time the Harry Fox Agency has required that import licenses be obtained by record importers for the mechanical use of copyrighted music. Under this type of mechanical license, royalties are payable on all goods imported, whether or not they are ultimately sold.

## Other U.S. Mechanical Rights Organizations

A number of other agencies handle the licensing of mechanical rights in the United States, although their annual receipts are very small in comparison with

those of the Harry Fox Agency. The largest of these is probably the American Mechanical Rights Agency (AMRA; e-mail: amracalif@aol.com). Organized in 1961, AMRA licenses mechanical and synchronization rights for music publishers and writers, charging a fee of 5 percent of the gross collections, and represents a number of foreign mechanical rights societies.

## The Canadian Mechanical Rights Organizations

The Canadian Musical Reproduction Rights Agency Limited (CMRRA; www.cmrra.ca) performs the same functions in Canada as the Harry Fox Agency does in the United states. Another Canadian mechanical and synchronization licensing agent dealing with French-language recordings in Quebec is Société du Droit de Reproduction des Auteurs (SODRAC; www.sodrac.com).

## International Mechanical Rights Societies

The Harry Fox Agency has affiliations with various territorial mechanical rights societies and can make arrangements for them to act as agents to collect local mechanical license fees on behalf of U.S. publishers in more than 60 countries other than Canada. The collection fees charged by the local societies tend to average under 10 percent, to which is added the applicable percent Harry Fox Agency commission. Following is a list of the principal foreign mechanical rights organizations that make collections for the Harry Fox Agency.

- ► Argentina: SADAIC
- ► Australia and New Zealand: AMCOS
- ► Bolivia, Colombia, and Peru: FONOPERU
- ► Former Soviet Union countries: RAO
- ► France, the former French colonies, Belgium, and Luxembourg: Société pour l'Administration du Droit de Reproduction Mécanique (SDRM)
- ► Germany, Austria, Bulgaria, Rumania, Hungary, Czechoslovakia, Poland, South Korea, Taiwan, Yugoslavia, Turkey, and the Philippines: GEMA
- ► Great Britain, Scotland, and Northern Ireland: Mechanical Copyright Protection Society (MCPS)
- ► Israel: ACUM
- ► Italy: SIAE
- ► Japan: JASRAC
- ► Netherlands: STEMRA
- ► Portugal: SPA
- ► Scandinavia (Denmark, Estonia, Finland, Iceland, Lithuania, Norway, Sweden): Nordisk Copyright Bureau (NCB)
- ► Spain: SGAE
- ► Switzerland: SUISA
- ► Trinidad and Tobago: COTT

Some of the societies handle performing rights licensing and collections as well as mechanical rights licensing and collections. American publishers can make direct arrangements for the collection of mechanical right fees in some foreign territories; among these are MCPS, SDRM, GEMA, and NCB. JASRAC and SIAE do not permit such arrangements. Through direct dealings with mechanical rights societies, American publishers can eliminate the Harry Fox Agency charge, but they forgo the convenience of having different territories serviced through the one agency.

Each society operates under the customs and laws of its applicable home base. However, in the European Union, consolidated negotiations have resulted in a mechanical rate of 9.01 percent of published price to dealer (PPD) for the Continent and 8.5 thereof for the United Kingdom and Ireland.

## The Writer's Share of Mechanical Fees

In contracts between publishers and songwriters it is standard for the writer to receive 50 percent of the mechanical license fees collected by the contracting ("original") publisher. Where foreign subpublishers are entitled to retain 50 percent of the mechanical fees collected by them and they remit the balance to the original publisher, the writer in effect receives one-quarter of the amount collected at the source by the foreign subpublisher. In computing royalties due to the original publisher (and which the original publisher shares with the writer), it is common to disregard charges made by the local mechanical rights society that collected mechanical license fees from local record companies in the first instance, since the royalty to the original writer is customarily computed only on the balance remitted by the subpublisher to the original publisher (after the subpublisher has deducted its charges).

It should be noted that the writer share of public performance income is more favorable to the writer because it is computed at the source in each country and remitted through affiliated societies, whereas the writer share of mechanical income is filtered through the publisher and subpublisher.

## Record Clubs

Historically, record clubs did not obtain their own mechanical licenses when they reissued products under club imprint. The record clubs aimed to be an extension of the original record manufacturer, and in most instances they relied on industry custom in paying 75 percent of either the compulsory license rate or the negotiated or controlled-composition rate for a composition re-released through a club.

The Harry Fox Agency has taken the position that clubs should no longer rely on industry custom and usage but should have specific mechanical licenses for each record club release, which sets forth the manner of computation of royalties and the basis on which an audit can be conducted. The agency noted

that previous difficulties have become even greater now that many royalty statements are rendered electronically. The reason for this is the absence of an electronic database with separate licenses against which automatic tracking and verification could otherwise be done. The agency also noted that the court in the *Sleepless in Seattle* decision (see page 112) ruled that when old recordings are issued by a new licensee, new licensing rates must be negotiated for club release (on which a 75 percent rate is customary, as noted above). It is obviously in the best interest of publishers to try to update the mechanical royalty rates as the statutory (compulsory) rates increase.

## Title Use Restrictions

According to instructions from certain publishers, a Harry Fox Agency license may contain a restriction against the use of a licensed song as the title of a record album. Such uses may be the special concern of publishers affiliated with motion picture companies or with record companies that release soundtrack albums or original cast albums. Where the title song of a film is named after the film—for example, "Never on Sunday"—an album with the same title as the song may be confused by the public with the soundtrack album from the motion picture. The same would apply to a song from a show that has a title identical to that of the show, for example, "Oklahoma." The publishers that impose the restriction seek to avoid this confusion and regulate this type of usage.

## Record Rentals

The Record Rental Act of 1984 provides that no copies of sound recordings acquired on or after October 4, 1984, may be commercially rented, leased, or lent by the owner of the copies unless authorized by the copyright proprietors of the recordings and of the underlying musical works. This legislation represents a modification of the so-called *first-sale concept* of copyright law, according to which a purchaser of a phonorecord or an audiovisual recording, whether disc, tape, compact disc, or other configuration, had been permitted to rent, lease, or lend it without the consent of such copyright proprietors. An unauthorized commercial rental, lease, or lending constitutes a copyright infringement subject to civil but not criminal infringement penalties under existing copyright laws.

The Record Rental Act was passed in recognition that there was a potential threat of a substantial loss in sales for manufacturers, distributors, and retail record stores. Public libraries were exempted. In 1994, its provisions were made permanent. Accordingly, the commercial rental of recordings now requires the consent of both the music publisher and the record company.

# 16

## Songwriter Contracts and Royalty Statements

An article in *Billboard* once remarked that the music business was similar to the meat-packing business in that it used everything on the animal but the squeal. (Some music critics might even include the squeal.) Yet there are songwriters who sign agreements that make specific provisions for their participation in print music receipts and receipts from the sale of phonograph records and film synchronization licenses but fail to provide for their participation in many other commercial uses, such as advertising jingles and new technologies. Many writers have found a solution to this problem by providing that they must share equally in all receipts from unspecified sources. Other writers, especially writers for theater, put the burden on the music publisher to specify sources of income in which the publisher shall have any participation.

Unfortunately, many novice songwriters sign whatever is placed before them fearing that otherwise they may jeopardize the music publisher's willingness to enter into an agreement. Unlike the typical book publishing or theatrical contract, all rights under copyright are customarily assigned to the publisher of popular music. Thus, if writers are not protected by a well-constructed contract, which includes language covering approval of new lyrics and recapture of rights (discussed below), there is little likelihood that their rights will be safeguarded.

## Duration of Copyright Assignment

It is essential that both parties to a songwriter contract be fully aware that the relationship is likely to last a long time. How long a music publisher may continue to exploit and administer rights is determined both by the songwriter contract and by statute. As noted below, some contracts, such as the 1948 and 1969 Songwriters Guild contract forms, expressly limit the publisher's worldwide rights to 28 years, subject to certain notices applicable to foreign rights.

Where the duration of the contract is expressed as the duration of copyright, this would mean the 28-year initial term of copyright and a 28-year renewal

period; generally speaking, U.S. rights reverted to the author or the author's successors at the end of the initial term of copyright unless the author also expressly granted rights for the renewal term to the publisher. However, even if the U.S. renewal-term rights reverted, rights would remain with the publisher in foreign territories for the full duration of copyright protection there.

The Copyright Act of 1976 added a 19-year extension to the renewal term, subject to a right of termination of the additional 19 years in favor of the author or the specified statutory heirs. It also created a right of termination of grants or licenses of U.S. rights made by the author for compositions first fixed on or after January 1, 1978. The termination becomes effective within a period of 5 years from the end of the 35th year following the date of the grant or license, provided that timely notice is given by the terminating writer or designated successors. If the grant or license covers publication, the 5-year period begins at the end of 35 years from the date of publication or 40 years from the execution of the grant, whichever is earlier. This right of termination takes precedence over contrary contractual provisions. However, the parties are free to contract for a term of rights that is less than 35 years.

The subject of duration of copyright, including renewal term and termination, is more extensively covered in Chapter 11. The significant point here is that whatever the duration is—28 years, 35 years, or longer—the extensive length of the relationship between a songwriter and a publisher means that a carefully written publishing agreement is a necessity.

## Songwriters Guild Contracts

The Songwriters Guild of America (SGA), originally founded in 1931 as the Songwriters Protective Association, is an organization of songwriters with a present membership of over 3,500 writers. It is presently headquartered at 1500 Harbour Blvd., Weehawken, NJ 07087 and maintains branch offices in New York, Nashville, and Los Angeles. The organization recommends to its members that they use a standard songwriter contract form published by the SGA. The contract was originally issued in 1948, revised slightly in 1969, and amended substantially in 1978 in light of the Copyright Act of 1976.

Under the 1948 contract and the revised 1969 contract, the grant of worldwide rights to the publisher was for the original period of U.S. copyright, 28 years, or for 28 years from publication, whichever was shorter. However, writers would forfeit the right to recapture foreign copyrights, other than in Canada, if they did not give the original publisher at least 6 months' written notice of their intention to sell or assign to a third party their rights in U.S. renewal copyright or any of their rights in the United States or elsewhere for the period beyond the original grant.

The 1978 SGA contract form increased the 28-year period to a worldwide maximum of 40 years from the date of the agreement or 35 years from the first release of a commercial sound recording of a composition, whichever is ear-

lier; however, the parties can specify a lesser period. At the expiration of this period, worldwide rights revert to the writer even though the term of copyright extends until 70 years from the death of the last surviving collaborator on a song in most major countries. Because of the contractual limitation on duration, there is no need for designated statutory notices to effectuate the right of termination under the Copyright Act of 1976. Termination is automatic and applies to worldwide rights, whereas the statutory right of termination covers only U.S. rights.

Many music publishers argue that a recapture right on the part of the writer is wrong in principle because it fails to recognize the importance of the publisher's efforts and expenditures in establishing the popular acceptance of compositions. These music publishers attempt to obtain an assignment of copyright including full administration and publishing rights for the maximum possible period for any and all countries of the world. In negotiations between publishers and songwriters, a full understanding of the applicable statutory provisions concerning the duration of the agreement and the right of termination is essential.

While recognizing the merit of certain provisions in the SGA contract form, such as the right granted to the writer to participate in all possible revenue from a song, publishers contend that some clauses are outdated and tend to impede the proper administration of a publisher's functions. They assert, for instance, that a writer's consent should not be required for issuance of television or motion picture synchronization licenses.

## Copyright Divisibility

Except in rare instances, the music industry customarily treats all aspects of music copyright as a single bundle of rights exclusively owned and administered by the music publisher. As owner and administrator, the music publisher handles the separate rights of mechanical reproduction, preparation of derivative works, reproduction in printed editions, and publication.

Before passage of the Copyright Act of 1976, copyright was generally considered indivisible. There could be only an inseparable ownership of the rights under copyright, although such rights might be the subject of exclusive or nonexclusive licenses. The 1976 Copyright Act expressly recognizes, for the first time, that copyright is divisible. There can therefore be a separate transfer and ownership of any of the exclusive rights that collectively comprise a copyright.

Thus, it is possible under the statute for a writer to assign to a publisher the ownership of certain rights under copyright while reserving the ownership of one or more other such rights. Conceivably, a writer could assign the ownership of some rights to one publisher and ownership of other rights to another publisher. In practice, however, a single publisher generally owns and administers all rights, except in the case of "split copyrights."

## Royalty Statements

Obtaining a satisfactory contract is only part of a songwriter's job. A writer must also know how to read the publisher's royalty statements. In the past songwriters would sometimes boast of their ignorance in this respect by saying that they filed royalty checks in the bank and royalty statements in the wastepaper basket. In an era of computerized royalty statements with code letters or numerals instead of clearly understandable designations, songwriters may be even more tempted to ignore such matters. However, machine-prepared royalty statements can contain mistakes because somewhere in the data chain there is a human operator and each operator works from a source document. Reading the royalty statement not only informs writers as to the source of their livelihood but also keeps them alert to possible areas of exploitation that may not have been tracked.

An alert writer should have in mind specific questions when reading royalty statements:

- ▶ Is a certain song's advance being charged against the writer's other songs handled by the same publisher?
- ▶ Is the 50 percent division of mechanical royalties being properly allocated among collaborators, as in the case of a song with two lyricists and only one composer, where contractual provision is made that the sole composer is entitled to half of the writer royalties?
- ▶ Is payment being made immediately in respect of a foreign advance obtained by the publisher? Or is it being withheld pending the publisher's receipt of foreign royalty statements showing actual earnings against that advance—usually a long time later?
- ▶ Is the Harry Fox Agency commission being deducted in full by the publisher from mechanical receipts?
- ▶ Are the public performance license fees collected from a motion picture producer for U.S. theater performances being distributed at the same time as the synchronization license fees?

These and other questions can be raised only if the contract contains appropriate provisions.

## Recapture of Rights

Writers must try to ensure that a composition does not lie unnoticed on a publisher's shelf for an extended period of time. Under the 1978 SGA contract form, the writer is entitled to recapture rights from the publisher after 1 year from the date of the agreement, or such shorter period as may be specified, if the publisher has not licensed a recording or other use. However, if prior to the end of this period the publisher pays the writer a nonrecoupable bonus of $250 (or any larger amount that has been mutually agreed on), the period to obtain

the release of a commercial recording is extended for up to 6 months (or such lesser period as may be specified by the parties).

Some non-SGA publishing agreements make no provision for the recapture of rights by the writer for a publisher's failure to exploit a song. Other agreements may forestall recapture by one or more of the following acts on the part of the publisher: (1) printing sheet music copies, (2) obtaining a commercial recording of the composition, (3) licensing the music composition for inclusion in a television, motion picture, video, or dramatic production, or (4) paying a certain amount of money. The publisher may protect itself by a clause that requires the writer to give a 30-day (or longer) notice of intention to recapture, during which period the publisher may cure any default.

## Printed Editions

A customary provision in a songwriter's contract is for the payment to the writer of 8 to 12 cents per copy of sheet music sold in the United States and Canada, plus 50 percent of the sheet music royalties received by the publisher for sales in other countries. (The publisher usually contracts to be paid 10 to 12.5 percent of the retail selling price of sheet music sold outside the United States and Canada.) In common practice, most printing is done under license, and 50 percent of net receipts is the basis of print music royalties, just as it is with mechanicals.

For compositions included in printed song folios, the SGA contract provides for the writer to be paid a royalty of 10 percent of the wholesale selling price (less trade discounts, if any) prorated downward by the ratio between the number of compositions written by the writer and the number of other copyrighted compositions in the folio. If the publication contains more than 25 compositions, the 10 percent royalty rate is increased by an additional 0.5 percent for each additional composition. It is not uncommon for publishers to issue deluxe higher-priced folios containing as many as 45 to 50 songs, and usually writers gladly consent to such editions and waive extra royalties.

With respect to folios, many songwriter contracts provide for the payment of a one-time fixed sum to a writer, ranging anywhere from $1 up to about $25, irrespective of the number sold. If the lump-sum payment is reasonable no substantial harm results, since the sales of folios are often limited. There have been exceptional folios that sold in excess of 100,000 copies, such as those comprising the songs of Paul Simon, Andrew Lloyd Webber, Michael Jackson, or Lennon-McCartney. That having been said, it is generally advisable to avoid fixed-fee buyouts.

In the exploitation of music, the publisher is called on to distribute promotional or professional copies of printed editions. These copies may be given to the A&R personnel of record companies whose function it is to acquire material that has the potential to be recorded by artists under contract to their companies. Other copies may be delivered to orchestras or vocalists in order to encourage their performance of the composition. Additional copies may be sent

to managers, agents, and producers. The SGA contract and most songwriter agreements provide that the publisher is not obligated to pay royalties for promotional or professional copies.

## Sheet Music Sales

Over the past few decades sales of single copies of sheet music of most individual popular songs have slowed to a mere trickle in the United States, at least sales in bricks-and-mortar wholesalers and retailers, although some hit songs can still sell in large quantities. (The sale of folio and other collections is still big business—in 2000, a total of $316 million in the United States and $728 million worldwide.) Further, even the major retailers carry at most 10,000 selections, and even if a selection *is* in stock, it is likely to be available only for the piano and/or guitar instrumentation. On-line distribution, a relatively recent phenomenon, has changed all that, and numerous Web sites offer downloadable sheet music for sale. One of the largest, sheetmusicplus.com, claims to have over 366,000 titles. For more information on sheet music offerings on the Web, see Chapter 29.

## Mechanical Rights

As discussed in Chapter 15, the holder of the copyright to a musical composition has the sole right to reproduce that composition by mechanical means, including CDs, whether distributed as finished product or digitally. The songwriter grants that right to the music publisher, which then gives a mechanical license to a record company, under which a royalty based on the statutory rate is payable. As of January 1, 2002, the statutory rate was 8 cents per composition for each phonorecord made and distributed up to 5 minutes' duration or 1.55 cents per minute or fraction thereof, whichever is greater.

In some instances the mechanical royalty for a composition included in an album will be less than for a single because of the number of compositions on the album. This is often the case where the artist or producer is the writer and the recording agreement has a controlled-composition clause with a cap on the number of compositions. (Recall that a controlled composition is any composition written, owned, or controlled, in whole or in part, by the artist or producer.)

A great majority of the active publishers in the United States use the services of the Harry Fox Agency for mechanical licensing. In the agreement between a songwriter and a publisher, provision is made for the writer to share in mechanical license fees received by the publisher. The customary share is 50 percent of the publisher's receipts in the United States. This means 50 percent of 100 percent of license fee payments from U.S. record companies, after deducting the Harry Fox Agency collection charge of 5.75 percent on mechanicals. For mechanical license earnings outside the United States, the writer is usually entitled to 50 percent of the net sums received domestically by the U.S. publisher.



LL TONES =
NC LICENSE !

A similar division applies to a publisher's receipts from licensing the synchronization or reproduction of music on television, video, motion picture soundtracks, video games, and even bell tones for cellular telephones. Such licenses are referred to as *synchronization licenses.* Harry Fox no longer administers synchronization rights for publishers.

In promoting a new recording, a publisher may spend money in trade paper advertising and in the purchase and distribution of promotional records. These expenses are not normally chargeable either in whole or in part to the writer. Some publishers charge the writer's royalty account for one-half of these expenses by authorizing the record company to undertake the entire expense of the advertisements or promotional records and then deduct the portion of that expense that the publisher would usually bear from mechanical record royalties otherwise payable to the publisher. The publisher is obligated to pay the writer one-half of the receipts, but by allowing the record company to deduct the cost of advertising and promotion off the top—that is, from the mechanical royalties that it sends to the publisher—the publisher receives, and shares with the writer, reduced remittances. This practice is a violation of some songwriter agreements, including the SGA standard songwriter agreement. However, it is difficult to determine the extent of the practice without a detailed audit. The SGA recommends that all songwriter agreements include an audit provision with no time restriction.

## Accountings and Audits

The SGA agreement stipulates that the publisher will account to writers either quarterly or semiannually, depending on what period is customary for the publisher, within 45 days after the end of the applicable period. Other agreements usually provide for semiannual accountings. Quarterly accountings are obviously more desirable for a writer than semiannual accountings. Naturally, a publisher seeks fewer accountings, which lessens administrative costs and overhead.

Songwriters should be alert to provisions by which they waive any objections to royalty accountings unless such objections are lodged within a given period, such as one year. These provisions are generally enforceable. Of course, a publisher is entitled to some protection against complaints received long after events transpire.

Frequently, a basis for complaint regarding an accounting can be found only on an audit of the books of the publisher. Many reputable publishers will cooperate with a request for an audit even in the absence of a contractual provision permitting the songwriter to audit. Other publishers require such contractual provisions before they are willing to allow an audit. A contractual provision has the advantage of fixing rights and obligations without requiring a court order, although such orders are generally granted, even in the absence of contractual provisions.

Under the SGA contract, any writer may demand a detailed breakdown of royalties on 60 days' written notice, showing the receipts attributable to each record

label for each song as well as the details of other uses and the number of copies sold in each royalty category. The writer must pay the cost of the examination; but if the audit reveals that the writer is owed 5 percent or more of the amount shown on royalty statements the publisher must pay for the cost of the examination, up to 50 percent of the amount found to be due to the writer. When a record company and a publishing company are under common ownership and the publishing company does its own licensing of sound recordings, the writer may examine the books of the record company if royalty payments are questioned.

The SGA Collection Plan is a compulsory system of collection and auditing required of all members of SGA. It is designed to avoid the expense and delay involved for a songwriter in the auditing of publisher's books. The charge is 5.75 percent of the writer royalties collected from publishers, with a maximum charge of $2,170 a year. Under the system the writer directs publishers to send his or her checks and statements to the SGA office. Not all publisher accounts are audited, since the time and expense would be inordinate. SGA accountants make a random selection of publishers for the purpose of auditing the accounts for several years at the same time. Many responsible publishers welcome the opportunity to be audited in order to reassure their writers of their accounting integrity. Furthermore, by dealing with an accountant who represents many writers, the publisher avoids the loss of time required to make individual explanations to writers.

Many songwriters have requested that SGA charge only for collections and audits to particular publishers designated by the writers, rather than to all publishers audited by the SGA. This is not permitted on the grounds that the 5.75 percent fee, in respect of publishers who pay regularly and honestly, is required to subsidize the expense of auditing and collecting with regard to the less scrupulous publishers. However, if a publisher is owned in whole or in part to the extent of at least 25 percent by an SGA writer, the songwriter can exclude the royalties from that publisher in the collection plan and still use the collection service for other publishers.

## Default

Occasionally a songwriter complains that royalties are not paid when due and that statements are insufficient in detail. In the face of continued refusals to account, a claim can be made of a breach in the contract between the writer and the publisher. The writer can sue in the courts for an accounting, and under usual court procedure the writer will be able to examine the books and records of the publisher in support of the writer's action.

The writer may also take the position that the breach justifies termination of the contract and that on such a termination all rights in the copyright revert to the writer. It may be expected that the publisher will strongly oppose this position. A court has to decide whether the breach is material or immaterial—that is, whether or not it goes to the essence of the agreement and therefore

BELL TONES =
SYNC LICENSE

permits the aggrieved party to cancel it. A refusal to account for one period may well be deemed immaterial, whereas failure to account for several periods, during which repeated requests for accountings were made by the writer, may be judged material.

The prospect of court litigation discourages many songwriters from moving to obtain accountings or to nullify their agreements with publishers. There are at least two practical approaches for a writer to avoid having to pay for litigation. Under one approach, the writer may assign all publication rights to another publisher, and the writer and publisher may join in notifying the performing rights organization that the original publisher's rights have been canceled and that the publication rights have been vested in a new publisher. On such notice BMI may hold up payments of the publisher's share of performance royalties to the original publisher with a doubtful credit standing. ASCAP will hold back payments of the publisher's share of performance monies but will resume payments within 6 months if a suit is not filed or within 1 year if a filed suit is not adjudicated, provided the original publisher files an agreement to indemnify ASCAP against claims by the other publisher and, in addition, in disputes over renewal rights, files documentary support of its position. The performing rights organization's action may by itself be sufficient to make the original publisher willing to negotiate an agreeable settlement of the controversy.

Using the second approach, the writer, as a condition of the assignment to the new publisher, may require it to finance all litigation to establish the new publisher's rights to the material.

Obviously, it is to the writer's advantage to insert a clear and appropriate default clause in the songwriter's agreement. It should be provided that certain specified events constitute grounds for requesting arbitration or for the termination of the agreement. Among these events would be the failure to supply royalty statements and remittances, and the publisher's refusal to allow an inspection of its books and records.

The publisher may strongly oppose the default clause and claim, arguing that the writer is protected by law in case of a material breach. While this may be true, it entails the potential expense of litigation to establish the materiality of a breach and does not meet the objective of the writer to avoid litigation. The writer can counter with an offer to give adequate notice to the publisher of a default and a sufficient opportunity to cure it. Another counteroffer may be one calling for alternate dispute resolution by mediation or arbitration in the event of a dispute.

## Performance Fees

As discussed in Chapter 14, performance fees are collected by performing rights organizations—ASCAP, BMI, and SESAC in the United States—from radio and television stations and from other commercial users of music, such as nightclubs and hotels, for the right to publicly perform copyrighted music.

Under the Copyright Act of 1909, the performance would ordinarily have to be for profit. The Copyright Act of 1976 deletes this requirement, but it substitutes certain specific and limited exemptions set forth in Section 110, such as non-commercial performances during religious services in places of worship or in face-to-face classroom instruction. The performing rights organizations make distributions separately to the writers and publishers of musical compositions. They will not pay the writer's share to the publisher. As a consequence, song-writer agreements with publishers do not provide for the payment of perform-ance fees by the publisher to the writer. To clarify the matter, agreements often state that the publisher is not obligated to pay any public performance fees to the writer.

The SGA contract specifically denies the right of the writer or publisher to share in the revenues distributed to the other by the performing rights organi-zation with which both are affiliated.

## Assignments

Many songwriter agreements permit a publisher to assign its rights. Consequently, a songwriter who enters into an agreement relying on the personnel and integrity of a particular publisher may find that by virtue of an assignment the writer is dealing with a different entity. The SGA contract meets this problem by requiring the writer's consent to an assignment by the publisher, except if the song is included in a bona fide sale of the publisher's business or entire catalog, or in a merger, or as part of an assignment to a subsidiary or affiliate. However, in all cases a written assumption of obligations must be delivered to the author by the new assignee-publisher.

It is clear that over the long life of a copyright many situations may arise that can be handled more flexibly and expeditiously if a publisher can assign his or her rights. The principals of independent publishers die and estates may be forced to sell interests in a copyright, or they may retire and desire to dispose of their music publishing interests. There can be little cause for concern when the assignment is made to a large, established, reputable publisher, as is the ten-dency, since this type of purchaser is generally able to make higher offers.

## Lyrics versus Music

A song may be written for instruments alone, without lyrics, but more fre-quently it consists of both music and lyrics. While there are writers who write both music and lyrics, it is more common for an artist to be either a composer or a lyricist. The wedding of lyrics and music is an integral part of the business of a music publisher. A good publisher must know the commercial potential of various types of lyrics as well as qualified lyricists who can write them.

Through the grant of all rights under copyright, the publisher obtains the right to set words to the music and to modify and adapt the music. These powers

able to specify the items to be included in the statement so that disputes about the completeness of the accounting may be avoided. For mechanical income these items may consist of a list of the individual records released in the territory, the names of the artists and record companies on the records, the number of records sold, and the total fees received. Accountings for printed editions should itemize separately the different editions, the retail price, and the number of copies sold.

Most countries have reciprocal tax treaties with the United States under which copyright royalties are exempt from withholding taxes or subject to reduced withholding taxes. Japan is an example of the latter. Where there are foreign withholding taxes on remittances to the original publisher, the latter should be furnished with an appropriate certificate to enable the original publisher to obtain a U.S. tax credit for foreign taxes paid.

In order to verify and facilitate the collection of royalties due, U.S. publishers may wish to have royalties paid directly to their own performing rights society and mechanical rights collection agency. In these cases, the subpublisher may be required to instruct its local performing rights society to pay the original publisher's share to that publisher's own performing rights society. If the U.S. publisher has entered into an affiliation agreement with a local mechanical rights society, that society may be instructed to pay the appropriate share of mechanical rights collections directly to the U.S. publisher. Alternatively, the Harry Fox Agency may serve as the U.S. publisher's representative abroad and receive the U.S. publisher's share of mechanical rights collections on the U.S. publisher's behalf. The Cannes Accord, discussed above, is one attempt to reduce delays in remittances from abroad as well as administrative charges by the foreign societies.

There are also risks of loss caused by commingling the accounts of many publishers or by the failure to identify foreign version song titles. These risks may be worthwhile if the appointment of a subpublisher results in the receipt of greater overall royalties, some of which might otherwise fail to be accounted for. A prudent U.S. publisher will obtain the right to inspect and audit the account books of the subpublisher. If it is not practical for the U.S. publisher to exercise the right through its own employees or regular accountants because of the expense involved, the publisher may choose to have its audit rights exercised by a local accountant at a lower cost.

## Subpublication for Diverse Territories

A U.S. publisher may contract with a subpublisher for several countries under one agreement. However, within the 15 member states of the European Union, where free trade is mandated by EU directive, the traditional country breakdowns seem increasingly irrelevant. To the extent that the original U.S. publisher considers it desirable to enter separate subpublishing agreements for various territories, the following are the traditional groupings (italicized names represent countries that may also be licensed alone):


SELL TONES = SYNC LICENSE

- European Union, excluding the United Kingdom and Ireland
- *Germany*, Austria, and Switzerland
- Scandinavia, including Sweden, Norway, Denmark, Finland, and Iceland
- *Spain* and Portugal
- *United Kingdom and Northern Ireland*
- *France* and territories under the jurisdiction of SACEM
- *Japan*
- Far East, excluding Japan but including China, Singapore, Malaysia, Taiwan, and Thailand
- *Belgium, the Netherlands*, and Luxembourg, often collectively referred to as Benelux. (Belgium is sometimes included with France, and Luxembourg is split between Germany and France on a language basis.)
- *Italy*, Vatican City, and San Marino
- *Australia* and New Zealand
- *South Africa*
- *Mexico*, Central America, Venezuela, Colombia, Ecuador, and Peru
- *Argentina*, Uruguay, Chile, Paraguay, and Bolivia
- *Brazil*
- *Greece*
- Russia, Poland, the Czech Republic, Slovak Republic, Romania, Hungary, and former nations of the Soviet Union.

As indicated above, the original U.S. publisher receives royalties equivalent to negotiated percentages of various types of income collected by the subpublisher. Where the subpublisher's territory includes more than one country and the subpublisher uses the services of one or more secondary subpublishers in other countries, the latter will deduct a fee before remitting collections to the former, which can reduce the royalties paid to the original publisher. For example, if the secondary subpublisher's fee is 50 percent, the primary subpublisher will be paid only 50 percent of the funds earned "at the source." If the primary subpublication contract requires 50 percent of collections to be remitted to the U.S. publisher, the U.S. publisher would then be entitled to be paid only 25 percent of the earnings "at the source." As a result, nearly all subpublishing calculations are required to be made "at the source," thus requiring the primary subpublisher to absorb the cost of collection commissions deducted by the secondary subpublishers. Moreover, as the original U.S. publisher must usually pay 50 percent of its own receipts to the writer, the writer is also vitally interested in not allowing the diminution of monies as they pass from one country to another.

It should be noted that 50 percent of performing rights society monies are invariably collected and paid at the source to the account of the writer's originating society so that only the publisher's share of performing rights monies are involved in the subpublishing collection and payments. The writer does not get paid again out of the publisher's share of performing rights income remitted to the original publisher.

## The European Union

At present there are 15 member states in the European Union: Austria, Belgium, Denmark, England, Finland, France, Germany, Greece, Ireland, Italy, Luxembourg, the Netherlands, Portugal, Spain, and Sweden. Relations among members are governed by the Treaty of Rome, which provides for the abolition of tariff barriers and the free and unrestricted movement of goods across state borders. Territorial sales restrictions in license agreements among the EU countries are generally invalid. Similar restrictions apply to the four nations in the European Free Trade Association: Iceland, Liechtenstein, Norway, and Switzerland.

Questions arise as to the enforceability of exclusive subpublishing agreements with publishers in different EU states. For example, there may be one agreement with a subpublisher in England covering exclusive rights there and another with a subpublisher in France providing for exclusive rights in that country. Must each of these subpublishers respect and recognize the exclusive rights of the other? In practice, if a subpublishing agreement is for a limited term, the prospect of nonrenewal by the original U.S. publisher may tend to keep each subpublisher within the bounds of its own territory. But third parties, such as companies that buy phonograph records lawfully licensed for manufacture in France are free, under the Treaty of Rome, to export the records into England and other EU countries. The same also applies to printed editions manufactured in one EU state and bought for export to another.

The Treaty of Rome has been said not to affect the exclusive rights of copyright proprietors with respect to such matters as rented sheet music or the licensing of the public performance of copyrighted works. To what extent the Treaty of Rome restricts exclusivity and territorial restraints in subpublishing agreements is not entirely clear, and consequently the advice of local counsel should be obtained. Infringements of the treaty may involve not only the negation of business deals but also, in certain cases, prosecution and fines by the European Commission, which is one of the five governing institutions within the European Union.

## Default Clauses

It is difficult and often impossible to anticipate the legal effect, especially in a distant territory, of a default by a subpublisher in the performance of an obligation without a clear statement in the agreement of the effect intended by the parties. For example, if an accounting statement or a royalty payment is delayed, can this be grounds for canceling the agreement?

It is therefore advisable to include in the subpublication agreement a clause that defines the rights and obligations of the parties in case of default. From the U.S. publisher's point of view, it can be provided that there will be a material default if the subpublisher fails to (1) make periodic accountings, (2) pay royalties when due, or (3) release local cover records if that has been promised. Such a failure may give the U.S. publisher grounds to terminate the agreement and



BELL TONES =
SYNC LICENSE

cause a reversion of all rights in the composition. The subpublisher can in turn guard against cancellation by a clause under which the subpublisher must receive written notice of any default and an opportunity for a certain period, perhaps 30 days, to cure the default.

The default clause may further state that the U.S. publisher can cancel the subpublication agreement in the event an insolvency or bankruptcy proceeding is begun by or against the subpublisher and is not dismissed within a given period, such as 30 to 60 days.

## Jurisdiction over Disputes

Despite careful draftsmanship, subpublication contracts may still result in disputes regarding their interpretation. Because of this, and because of the expense involved in litigating a matter in a foreign country, U.S. publishers strive to provide in subpublication agreements that the exclusive forum for the determination of controversies will be U.S. courts or a U.S. arbitration tribunal in a specified location (customarily where the original publisher's main office is located) and that the subpublisher consents to that jurisdiction. Even when such a clause exists in a subpublication agreement, there may be problems enforcing an award in a foreign jurisdiction if the due process standards of that jurisdiction are not complied with.

## Catalog Agreements

It has been previously stated that if all the compositions of a U.S. publisher are the subject of a publication agreement, the agreement may be considered as a catalog subpublication contract under which all compositions are subpublished by the subpublisher for the term of the agreement. A catalog subpublication agreement has the advantage of relieving the U.S. publisher of the burden of negotiating separately for representation in the territory of each composition in the catalog. However, it also means that the U.S. publisher cannot shop for the largest cash advance among the various foreign subpublishers that may be interested in a musical work.

On the other hand, a U.S. publisher can require an overall cash advance for its catalog as the price for committing its entire catalog to a single subpublisher. It is possible that the overall advance will exceed the separate advances that might be negotiated for individual compositions. In negotiating a catalog deal, a U.S. publisher may be able to obtain other concessions, such as increased royalty rates and a shorter term for the subpublisher's interest in copyrights, which would not be granted if single compositions were involved.

## Local Firms

Larger U.S.-based publishers may eventually try to establish their own firms in a local territory. However, if the catalog is not suitable for and potentially strong



in the territory, the investment required—for office space, personnel, and over-head—may be financially unsound.

Some foreign performing rights societies tend to discourage foreign-controlled publishing firms. As a condition of membership, a society may insist that a new firm control a stipulated amount of locally originated material. Generally, lower-rung memberships in societies may be permitted, which gives the right to be represented by the society and to receive publisher distributions. Becoming a full member with additional voting and other rights can be more difficult. For example, PRS, the British performing rights society, requires an associate member to earn a minimum of about £17,000 a year in at least 2 of 3 recent years before qualifying for full membership.

At times the problem of attaining full membership can be solved by the purchase of local publishing firms that have already qualified for such memberships. On the other hand, a U.S. publisher may be satisfied with a lower-rung membership provided that, as is commonly observed by societies, the lesser members receive distributions on an equal basis with full members. The practices of each society should be investigated prior to the establishment of a local firm by a U.S. publisher.

## Joint Firms

Recognizing the perils and problems represented by a firm that is wholly owned locally, many U.S. publishers have in the past embarked on joint publishing ventures with an established local publisher. Together the parties create a jointly owned firm. In this way the U.S. publisher acquires local management and know-how at minimum expense. Advantageous arrangements can be made whereby the local partner manages the joint company and supplies the necessary office and other facilities for a fee, which is commonly a percentage of gross revenues of the joint company. The fee may be roughly 10 to 15 percent and is generally exclusive of direct expenses billed to the joint company for costs of demonstration records, advertising in trade publications, salaries of personnel who work solely for the joint company, and special legal and accounting services. In some instances the local partner will absorb all expenses in return for a negotiated fee.

Where a new joint firm is organized, the local partner arranges for its formation through territorial counsel. The local partner may advance the organizational expenses as a charge against future net income of the joint company. Because it is prudent for the U.S. publisher to be fully aware of the impact of territorial laws and practices, it should give serious consideration to being represented by its own local counsel who is completely familiar with the music business in the area, including the practices of the performing rights society.

If the local performing rights society will not qualify a new firm for membership unless it controls locally originated material, arrangements must be made with the territorial partner to supply this material so that membership can be obtained. Otherwise the joint firm will continue to be dependent on firms with membership for relations with the society.





BELL TONES = SYNC LICENSE

A problem in the operation of joint firms is that they may be administered by the local partner as if they were catalog deals. In other words, only the material from the U.S. publisher goes into the joint firm, and nothing is done by the local partner to develop the firm's status as a local publisher that vigorously seeks to acquire and exploit territorial copyrights. This makes good business sense for the local partner, since it has merely a 50 percent interest in the joint firm. In effect, the local partner tends to treat a joint firm as a catalog deal in which the U.S. partner's 50 percent interest is equivalent to an increased royalty; in return for the increased royalty the territorial partner is assured of a flow of desirable product for a number of years.

Overcoming the inertia of the territorial partner is not easy. One approach may be to employ a professional manager who works solely for the joint firm. This can result in a large financial burden for the firm, which the U.S. partner and the territorial partner may be unwilling to risk. The local partner is ordinarily the one who chooses the professional manager and may therefore be able to influence the manager to permit choice copyrights to remain with the local partner's publishing firm. Or the territorial partner may consciously choose an ineffective professional manager so that the joint firm is not built up as a strong competitor in local publishing.

Joint firms do, however, have a number of advantages over catalog arrangements. For example, if the joint firm is a member of the local performing rights and mechanical rights societies, the accountings for copyrights controlled by the firm will be completely segregated, and losses due to improper accountings by the local partner will be avoided. Where the subpublisher's honesty and dependability are above reproach, this advantage may be of little importance. The U.S. publisher may anticipate a greater overall return from a joint company than would otherwise be derived from a catalog deal, but if the publisher fails to assess all the factors adequately, there may ultimately be a negative effect on the company's earnings.

It can be argued that a U.S. publisher with a joint firm is better able to acquire from other U.S. publishers foreign territorial rights in U.S. copyrights. A joint firm, which is doing business in the territory as a separate entity from the U.S. firm, may be able to actively engage in pursuing territorial rights in attractive U.S. copyrights. It may have the authority to execute subpublication agreements with and make cash advances to U.S. publishers on behalf of the joint firm.

Finally, it must be recognized that while a catalog deal is designed to exploit a catalog and result in a profit to the U.S. publisher, the joint firm not only accomplishes the same purpose but can also act as a necessary first step in setting up a wholly locally owned publishing enterprise.

## The Termination of Joint Ownership

Inherent in the formation of a joint company is the agreement on the part of the U.S. partner to make a catalog deal with the company for a period of years. The number of years is subject to negotiations: 3 to 5 years is common.

It is usual to provide for the manner in which the joint firm will continue after the period of years expires. The U.S. partner will wish to have an option to buy out the local partner so that it has a wholly owned firm in the territory. This option may be exercised in many ways. An agreement may be struck that the purchase price for the half-interest of the local partner will be computed as a certain number of times local partner's average net income or the previous year's net income. Assuming it is reasonable to value a publishing company's net income in a range of 6 times such income, the parties might then fix the purchase price for a half-interest at 3 times the net income. For instance, if the company's net income is $10,000, the purchase price for the half-interest may be stipulated as $30,000 plus half the costs of organizing the company, which are usually low and may come to only a few hundred dollars.

A second method of obtaining an option to buy out a local partner is to provide for negotiations on the price and, if the parties are unable to agree, to have the price settled by designated arbitrators. A third method is to have a local partner divide the copyrights into two lists of equal quality and give the U.S. partner the right to elect to take either list plus the stock interest of the territorial partner. Again, the U.S. partner may agree to reimburse half of the costs of organizing the company to the local partner.

The parties may also agree on a buy or sell clause whereby either party has the option of making an initial bid to buy the other's interest, but with the understanding that the other party may instead buy out the bidder for the same price. Here once more, the local partner may be the final buyer and thus frustrate the purpose of the U.S. partner.

To avoid the necessity for a complicated procedure for either party to acquire the other's interest, the U.S. publisher may trade a long-term catalog deal—say, 10 years with the joint company—in return for an assignment to it gratis of the local partner's interest at the end of that period. An alternative approach, with practically the same economic results to the local partner, might be for the U.S. partner to retain 100 percent ownership at all times but have the firm managed by the local publisher on a basis that would give the same net return to the local publisher that it would receive if it were a partner; this scenario may not be practical where the joint firm must have some local ownership in order to qualify for membership in local societies.



BELL TONES = SYNC LICENSE

# 22

## The Writer as Publisher

Thousands of music publishers participate in the U.S. music industry. Some, such as Warner/Chappell and the EMI group of publishers, have extensive administrative and promotional offices. Some rarely have cash reserves equal to the next month's rent. Many are private firms owned and operated by the writer with the assistance of the writer's own attorney and accountant, and these firms usually handle shares of songs written by the writer that have not been placed with conventional publishers or with such interests recaptured due to statutory provisions.

No license is required to become a music publisher. The Constitution of the United States provides for freedom of the press, which is not limited to newspaper, magazine, and book publications. Anyone can publish printed products. However, in the music industry a publisher is more likely to be interested in other, more profitable aspects of music publishing, such as collecting broadcast and other performance fees through ASCAP, BMI, SESAC, and foreign performing rights societies and granting mechanical rights licenses for phonograph records.

Both ASCAP and BMI operate under consent decrees that tend to encourage people to qualify as publishers. ASCAP is required to advertise in music trade journals that anyone can become a publisher member with proof of being actively engaged in the music publishing business, and with musical compositions that have been used or distributed for at least one year. The BMI consent decree requires the acceptance of any publisher engaged in the music publishing business whose musical publications have been commercially published or recorded and publicly promoted or distributed for at least one year. In fact, ASCAP and BMI move promptly to grant publisher membership to persons active as publishers without insisting on any set prerequisite time period of operations. Writer membership in ASCAP or BMI is available to any composer or lyricist who has had at least one work published or recorded.

Publisher membership in ASCAP involves a $50 annual fee. BMI publisher status does not call for a fee—only a one-time $150 application charge. SESAC,

a for-profit corporation, does not charge an application or annual fee; however, affiliation is not available to all applicants, as SESAC grants membership only to those applicants they approve.

## Writer-Publisher Joint Firms

For many years, successful writers such as Stevie Wonder, Henry Mancini, Richard Rodgers and Oscar Hammerstein, the Gershwins, and Irving Berlin have founded publishing firms for their compositions in conjunction with and administered by established publishers. This type of writer-founded firm frequently involves common stock participation by the writer and the administering publisher in proportions commensurate with the bargaining power of the writer.

The supervising publisher usually requests an administration fee—a fixed percentage fee ranging from 7.5 to 25 percent of gross receipts—in lieu of charges for rent, local telephone services, management salaries, and other general overhead. In some instances, again dependent on the bargaining power of the composer or lyricist, the administration fee will be waived. In effect, the firm jointly owned by a writer and a publisher is a device for increasing the earnings of the writer as well as providing more control over his or her copyrights.

## Self-Publishing

Increasingly, successful writers are acting as their own publishers, with limited administrative assistance performed or supervised by their accountants and attorneys.

Less successful writers may decide to act as their own publisher because no other publishing company is interested in their compositions. These writers have to make demonstration records and attempt to place their compositions with record companies and artists. Some composers are by nature very active in promoting the recording of their compositions and their performance on the air, and they can easily claim that they are performing as a publisher. Until such time as they find an alert publisher that will match or exceed their efforts, they see no reason to share publishing income with another entity. They keep 100 percent of the publishing income by forming one of the thousands of music companies in existence and by qualifying the firm for membership in ASCAP or affiliation with BMI, depending on their own writer status. However, they also have to assume all the advertising, promotion, accounting, and other expenses, which may sometimes prove to be high.

Songwriters who are their own publisher rarely print their songs; if they want printed copies, they can deal with independent sheet music printer-distributors. They may arrange for the Harry Fox Agency to license and collect mechanical license fees for recordings of their compositions. The Harry Fox Agency will act on their behalf in the same manner as it does for larger publishers.

*REVISED AND UPDATED FOR THE 21ST CENTURY*

# ALL YOU NEED
# TO KNOW ABOUT THE
# MUSIC
# BUSINESS

"Should be required reading for anyone planning or enduring a career in the biz." —*Rolling Stone*

# 18

# *Songwriter Deals*

Now let's look at the terms of the agreement between the songwriter and the publisher. Remember, as we discussed, the songwriter signs a contract transferring ownership of the copyright in the musical composition to the publisher. In exchange for this, the publisher agrees to handle the business and pay royalties to the writer.

## SONGWRITER ROYALTIES

The reason we discussed publishers' receipts first was because a songwriter gets a piece of the publisher's collections (with the exception of performance monies and possibly DART monies, as we discussed on page 250). This is almost invariably 50% (except for print music). Just to remind you, the monies kept by the publisher are called the *publisher's share*, while the monies that the writer gets are called the *writer's share*.

## STANDARD CONTRACTS

For some reason, all songwriter contracts seem to be labeled "Standard Songwriter Agreement." However, I've never seen any two Standard Songwriter Contracts that looked like they were even distant cousins, much less twins. So don't take any comfort in the words at the top of the page. Here's really what to look for:

*"Catch All."* Some contracts say the songwriter gets 50% of the publisher's receipts from "mechanical, synchronization, and transcription income," or words to similar effect. The problem is that the language is sometimes a *limited list* of monies from which the songwriter is paid.

This means the publisher could be collecting monies that it doesn't share with the writer, and this is definitely something to avoid (if you're a songwriter).

This problem isn't cured by adding everything you can think of to the list. For example, even the most complete list of income sources anyone could put together in the 1950s would have omitted income from videocassettes, since they didn't exist. The same would be true of arcade games that play music, computer software that reproduces copyrighted songs, Internet transmissions, and so forth, which not only didn't exist but weren't even contemplated. What you really need, at the end of the list of items, is a **catch-all**. This is a phrase that says the writer gets 50% of "all other monies not referred to in this agreement." Often, you'll find the contract states just the opposite: the writer is only entitled to a share of monies *specifically* set forth in the contract. So cross this out, and add your "catch-all." (Tell them I said you have to have it.)

*Share of Advances.* Most contracts also say you don't share in any advances the publisher may get. Most of the time, this is fine—if the publisher gets an advance for its entire catalog of songs (of which you're only a part), you really have no right to share in that advance until your song has earnings that are used toward recoupment (see page 100 for what recoupment is). There's no way to know whose songs will earn back the advance, and so there's no reasonable way to allocate the advance to a particular song until royalties are earned.

The exception is an advance paid specifically for your composition. One example is when a publisher issues a license at less than the statutory rate and gets an advance (or guaranteed payment for a certain number of units), for one particular song. (We touched on this on page 221.) Since this advance or guarantee is recoupable only from your song's earnings (and doesn't have to be repaid if there are no earnings), you should get your share when the advance/guarantee is paid to the publisher. So add language saying you *do* share in advances and guarantees which are specifically for your composition.

*No Playing Footsie.* If the publishing company is affiliated with your record company, you want to make sure they don't issue "sweetheart" licenses (i.e., licenses at less than customary rates) to their own 'record company. In other words, you don't want them playing footsie with their sister companies at your expense. For example, they might license your songs to their company at half of the statutory rate. Sure, their publishing company makes less (it only gets its share of a smaller

amount), but the record company more than makes up the loss, and you don't. This would also apply if they own a film company or any other potential user. So add a provision saying that licenses to their affiliated companies must be on an arm's length, customary basis.

*"At Source."* It's also important (and cheap insurance) to make sure your *publisher's deals* with its subpublishers are all "at source" (see page 247). You have no right to have your *writer's share* computed "at source," because that would eliminate or radically reduce the publisher's participation. But you should make sure the *publisher's* deals are "at source," so that the publisher's income (in which you share) is the largest possible amount. This is especially true when the publisher owns a number of publishing companies around the world.

## PERFORMANCE MONIES

As we discussed on page 234, unlike all other forms of income, the performing rights societies pay songwriters directly (that is, they don't pay the publisher, who in turn accounts to the writer). In fact, the societies are so protective of a writer being paid directly that they won't honor an assignment of performance royalties by the writer. In other words, if the writer tries to sell his or her performance monies, the society will simply refuse to pay the buyer and continue paying the writer. (There is an exception for assignments of performance monies to a publisher who has paid the writer an advance, and for assignments to a bank securing a loan, but these assignments are limited to the amount of the advance or loan.)

Because the writer is paid directly, all songwriter contracts say the writer doesn't share in any performance monies received by the publisher. And since the performing rights societies are collecting DART monies, these are covered under the same provision (see page 250). Without this language, the writer would get all of the writer's share (from the society), and a part of the publisher's share as well. It's a good idea, however, to provide that, if a society no longer pays writers directly, the publisher must share its receipts. This could happen someday (see page 237).

## PRINTED MUSIC ROYALTIES

As we discussed on page 239, printed music consists primarily of single-song sheet music and multi-song folio books.

## THE NEW RECORD INDUSTRY BIBLE

# EVERYTHING
## YOU'D
# BETTER
## KNOW ABOUT THE
# RECORD
# INDUSTRY

for
### Artists, Songwriters, Producers, Musicians
### AND Music Entrepreneurs

# KASHIF

with contributions by GARY A. GREENBERG

## POWERFUL & EASY LESSONS
## FOR SUCCESS IN THE MUSIC BIZ

147

# WHAT IS
# MUSIC PUBLISHING?

When a song is released and sold in any format — CD, record, or cassette — there are two incomes that are derived from that sale as far as the songs are concerned. They are called the songwriter's and the publisher's share and are of equal proportion. This income is referred to as *mechanical royalties* and is paid by record companies to the publisher, who in turn pays the songwriter. We'll talk more about mechanical royalties below.

Income is also generated when a song plays on the radio, television and from other public performances. That income is referred to as *performance royalties* and is collected by performance societies that in turn pay the publisher and writer an equal split. You will learn more about performance societies in a later paragraph. There are other incomes that can be derived from your songs that include sync licenses and printed sheet music sales. I will address those in this chapter as well. It is important to note that sometimes artists and producers are also songwriters and publishers. Let's look at what a publishing deal is and how it works.

## MECHANICAL ROYALTIES

Mechanical royalties are royalties paid to publishers by a record company for the right to use songs contained on albums and singles released by that label. Writer royalties are also referred to as mechanical royalties. Mechanical royalties are based on whatever licensing rate is negotiated with the record company by either a publisher or the producer, if the producer is also the writer.

Although these licensing fees are compensation for the uses of songs contained on a project that is released by a record company, they are not paid upfront. These fees are calculated according to the number of units that are sold. These fees are paid on a fixed schedule that starts after the release date of the project that contains the songs.

## A PUBLISHING DEAL

Beginner writers barely make it by from week to week financially unless they have a paying job. Believe me, I've seen enough starving songwriters in my time. I know because I was one once. A songwriter's work goes unrewarded financially until one of his songs is recorded and that song generates record sales, or contact is made with a publisher who believes in his writing abilities and is willing to invest in him so that he can become a full time songwriter. If the songwriter has a song released and has not yet signed with a publishing company, he is considered to be his own publisher.

If a songwriter signs a deal with a publishing company, the publisher pays the writer advances and thus becomes entitled to part or all of the publisher's share of mechanical royalties resulting from record sales. In some instances the publisher also becomes entitled to the publisher's share of performance royalties that are generated from airplay and public performances of that songwriter's songs.

The publisher will pay a songwriter an advance because he believes the writer will eventually write a song or songs that will become hits that will generate money for both the publisher and the writer. The publisher also believes the amount of money generated by the writer's songs will be enough for the publisher to pay the writer, the