# EXHIBIT 56

LAW OFFICES OF

## WILLIAM M. DOBISHINSKI

SUITE 1500
6430 SUNSET BOULEVARD
HOLLYWOOD, CALIFORNIA 90028
(213) 469-0045

WILLIAM M. DOBISHINSKI*
SCOTT F. PEARCE
LADD S. LJUNGBERG, Law Clerk

* Also member of New York and
District of Columbia Bars
DIRECT LINE (213) 469-4003

TWX 910-321-3738
Cable Address "COBOLEX"

N.Y. OFFICE
SUITE 1820
135 WEST 50TH STREET
NEW YORK, NEW YORK 10020
(212) 333-3301

March 3, 1986

Robert C. Harris, Esq.
Linden & Deutsch
110 E. 59th Street
New York, NY 10022

Re: (1) "JEM" (Kinder & Bryant) and (2) " MY LITTLE PONY" (Kinder & Bryant, Rick Brenckman)

Dear Bob:

Pursuant to my February 13, 1986 letter, I have discussed the above — mentioned Agreements with my clients. Although they appreciate the revisions that have already been incorporated into these Agreements, my clients wish to pursue the additional points listed below that were denied in our previous negotiations.

(A) "JEM" (Kinder & Bryant), "MY LITTLE PONY" (Kinder & Bryant and Rick Brenckman)

    (1) Paragraph 5 (c) — The Agreements should provide that with respect to all compositions for which my clients write the music and a third party writes the lyrics, performance royalties and all other royalties should be split as follows:

        royalties from vocal uses of the composition should be shared 50/50, with royalties from instrumental uses being paid at 100% to the music writer (e.g. ASCAP/BMI registration should provide "Music by Ford Kinder & Anne Bryant (50%), lyrics by Barry Harman (50%)" / on cue sheets — vocal cues should provide "Ford Kinder & Anne Bryant (50%) / Barry Harman (50%)", instrumental cues should provide "Ford Kinder & Anne Bryant (100%)".

    Alternatively, Kinder & Bryant (not Rick Brenckman) would agree that royalties from all uses (vocal or instrumental) be equally shared between all writers 1/3 — 1/3 — 1/3 (e.g. ASCAP/BMI registration should provide "Music by Ford Kinder (1/3), Anne Bryant (1/3), Barry Harman (1/3)", "Lyrics by Ford Kinder (1/3), Anne Bryant (1/3), Barry Harman (1/3)" / all cue sheets should then provide "Anne Bryant (1/3), Ford Kinder (1/3) and Barry Harman (1/3).

MAR 6 1986



DEFENDANT'S
EXHIBIT

H

(2) Paragraph 5 (c), fifth, last line – correct typographical error to read "assignee";

(3) Paragraph 5 (a) – additional payment of 50% of creative fee for each composition embodied on audio recordings distributed as premiums or on videocassettes;

(4) Paragraph 6 (a) – royalties should be paid quarterly;

(5) Paragraph 10 – delete "arising out of any use of the Music or any part thereof or";

(6) Paragraph 10 – delete second sentence since it pertains to lyrics, which are not furnished by Kinder & Bryant or Rick Brenckman.

(B) "JEM" (Kinder & Bryant)

Additional – if masters produced by Kinder & Bryant are embodied in audio recordings for commercial distribution (i.e. sale or rental), Kinder & Bryant should receive additional producer compensation in the amount of 25% of all advances and royalties received by Griffin Bacal from such distribution.

(C) "MY LITTLE PONY" (Rick Brenckman)

(1) Pages 10, 11, 13 – first name is "Rick", not "Rich";

(2) Paragraph 7 – credit should read "Rick Brenckman/Easy Writer Music";

(D) Please advise us regarding the desired dates to be inserted in the Agreements.

In considering the financial points, please be advised that the performing rights society revenues are not as substantial a source of revenue from these projects as might be expected.

I look forward to your response to this letter.

Best regards.

Sincerely,

*Bill*

William M. Dobishinski

cc: Anne Bryant
    Ford Kinder
    Rick Brenckman

# EXHIBIT 57

# LINDEN AND DEUTSCH

## ATTORNEYS AT LAW

DAVID BLASBAND
JOSEPH CALDERON
ALVIN DEUTSCH
SIDNEY FEINBERG
FREDERICK F. GREENMAN, JR.
EDWARD KLAGSBRUN
BELLA L. LINDEN
DAVID Z. ROSENSWEIG
NANCY F. WECHSLER
RICHARD A. WHITNEY
PAUL S. WOERNER

ROBERT C. HARRIS
BERNARD G. SCHNEIDER

110 EAST 59TH STREET
NEW YORK, N.Y. 10022

(212) 758-1100

CABLE; ANALOGUE, N.Y.

TELEX 424288

TELECOPIER (212) 593-3960

May 30, 1986

William M. Dobishinsky, Esq.
Suite 1500
6430 Sunset Boulevard
Hollywood, CA 90028

Re: JEM; MY LITTLE PONY

Dear Bill:

My apologies for not responding sooner to your March 3, 1986 letter.

I have now had an opportunity to discuss your requested changes with our client and can advise as follows (numbered in accordance with your March 3, 1986 letter):

(A)
(1) Your first alternative is acceptable and has been incorporated.

(2) OK

(3) This is unacceptable. The compensation set forth in the agreement is the compensation that had been agreed to by the parties. Our client is unwilling to change the deal at this time.

(4) Our client is agreeable to paying semi-annually, and this change has been made in the document.

(5) Ok

(6) Ok

(B)
(Additional)—Again, this was not part of the agreement negotiated by the parties and our client is unwilling to change the



DEFENDANT'S EXHIBIT I

SUN 0395

LINDEN AND DEUTSCH

William M. Dobishinsky, Esq.
May 30, 1986
Page Two

financial terms.  In the event that phonorecordings are made and
our client wishes to utilize the service of Kinder & Bryant as
producers, an agreement will be reached at that time.

(C)

(1)  Ok

(2)  Ok

(D) - We suggest the following dates be inserted in the
agreements: JEM — June 1, 1985; PONY — December 1, 1985.

I am enclosing three copies of each of the three
agreements incorporating these changes as noted above.  I would
appreciate you having them signed and returned to me.

Best regards.

Sincerely yours,

Robert C. Harris

RCH:alm
cc:  Ms. Carole Weitzman

SUN 0396

# EXHIBIT 58

AGREEMENT made of this 1st day of December, 1985, by and between SUNBOW PRODUCTIONS, INC. ("Company"), whose business address is 380 Lexington Avenue, Suite 1105, New York, New York 10168, and KINDER & BRYANT LTD. ("Contractor") whose business address is 41 West 73rd Street, New York, New York 10023, f/s/o Anne Bryant and Ford Kinder (jointly referred to as "Writer").

In consideration of the mutual covenants herein contained, the parties hereto have agreed and do agree as follows:

1.   Company hereby engages Contractor and Contractor hereby accepts such engagement, to furnish the services of Writer to Company for the purpose of writing, preparing and delivering to Company original musical material (hereinafter referred to as the "Music") for songs to be used in a fully-animated children's television series consisting of sixty-five one-half hours, or in animated television motion pictures, or a combination thereof, presently entitled "MY LITTLE PONY & FRIENDS" (the "Show") (it being understood that the mention of the Show is for purposes of identification only and shall in no way restrict Company's rights in the Music, and the use thereof, as set forth in this Agreement).  The number of songs for which music is to be written and delivered by Writer hereunder shall be determined by Company.  The Music shall be delivered to Company in accordance with a schedule to be mutually determined by the Company and Contractor.  The elements of the Music to be delivered to Company shall consist of a "composer demo", satisfactory to Company, and a lead sheet based upon the composer demo approved by Company. Contractor agrees that Writer will revise a composer demo until satisfactory to Company.

2.   For all rights herein granted to Company in the Music, and for performance by Contractor of all obligations hereunder, Company shall pay Contractor a fee of Three Hundred Fifty ($350.00) Dollars for each song for which Writer writes and delivers the Music, payable on delivery of the lead sheet thereof.

3.   Payment by a parent or affiliate of Company shall be deemed to constitute payment by Company hereunder.  Nothing herein contained shall be deemed to impose any obligation on Company to use or authorize the use of the Music, and Company shall have fully discharged its obligations to Contractor hereunder by payment to Contractor of the amount specified in Paragraph 2.

4.   It is understood and agreed that Writer may write the Music at such times and places as Writer may choose, subject only to Contractor's obligation to make timely delivery of the Music in accordance with the terms of this Agreement.



DEFENDANT'S
EXHIBIT

N

5.    (a)   Contractor warrants, acknowledges and agrees
that the Music to be written by Writer and delivered by
Contractor is to be written by Writer under and pursuant to an
employment agreement between Contractor and Writer pursuant to
which Contractor is entitled to the exclusive services of Writer,
and to all the results of Writer's services; that the Music was
specifically ordered and commissioned by Company for use as part
of an audiovisual work; and that the Music is a work made for
hire within the meaning of Section 101 of the United States
Copyright Act.  Upon writing of the Music, all right, title and
interest therein shall automatically vest in Company and Company
shall be the sole and unlimited owner thereof and of all rights
therein throughout the world forever, and Company shall be
entitled to copyright therein, including statutory copyright and
all renewals thereof, as copyright author and proprietor.
Company may freely assign and grant rights and licenses with
respect to the Music and any copyright therein (including any
renewals thereof), and in this connection Contractor agrees to
execute and deliver and/or cause Writer to execute and deliver to
Company any and all instruments required by Company in connection
with the use and enjoyment of the Music and of Company's rights
therein and thereto.  Contractor hereby appoints Company as
Contractor's and Writer's attorney-in-fact with the right but not
the obligation to execute any such instruments in Contractor's or
Writer's name on Company's behalf.  On execution hereof,
Contractor shall sign and shall cause Writer to sign the
Certificate of Authorship attached hereto for the Music.

(b)   Without in any way limiting the generality of
the foregoing, it is agreed that Company shall have the exclusive
right and may license others to use, adapt, arrange, change, add
to, or subtract from the Music and to combine the same with other
literary material and/or lyrics and to publish, record, produce,
reproduce, transmit, perform, broadcast, telecast, and/or
otherwise communicate the same or any version or versions thereof
by any means (including, but not limited to, in synchronization
with motion pictures, television and/or any other form of
recordation or reproduction of sight and/or sound), whether now
known or hereafter devised, publicly for profit or otherwise, it
being understood that Contractor and Writer hereby waive any
so-called "moral rights" which may now be or may hereafter be
recognized.  It is understood and agreed that neither Contractor
nor Writer shall have any right, title or interest in any other
literary material and/or lyrics which may be combined with the
Music.

(c)   During any period or periods of time during
which Writer is affiliated with any small performing rights
society (herein called the "Society"), Company shall and does
hereby, under and pursuant to this Paragraph, license back to
Writer the so-called "writer's share" (i.e., fifty (50%) percent)
(but, if the Music or any form thereof are the composition of

- 2 -

0172B

SUN 0884

Writer and other composers and/or lyricists, then the grant
hereunder shall be deemed a grant of the "writer's share" to
Writer and all other such lyricists and/or composers jointly
except that for instrumental uses, only Writer and any other
composer(s) shall share in the "writer's share") in the
non-dramatic (i.e., "small") performing rights in the Music so as
to enable Writer to license such non-dramatic performing rights
to Society, and to collect the "writer's share" of royalties
derived therefrom, it being understood, in this connection, that
Company (or any assignee or licensee of all or any of Company's
rights under this Agreement) shall not exercise such non-dramatic
performing rights during such period or periods without obtaining
a license therefor from Society, except that Company and/or any
such assignee or licensee, may exercise such non-dramatic
performing rights in the Music by reason of, under and pursuant
to this Agreement,

     (i)   during any period or periods during which
such non-dramatic performing rights are not controlled
by and/or available for license to Company or any such
assignee or licensee at standard rates from Society, or
in the case of public performances of the Music in
geographical areas outside of Society's jurisdiction,
from any other organization or society which is
affiliated with Society or which has a collection
agreement with Society and which controls the
non-dramatic performing rights in any geographical area
in which the Music is to be performed; and/or

     (ii)  in connection with theatrical exhibitions
in the United States, its territories and possessions;
and/or

     (iii) in connection with any performance of the
Music within the United States, its territories and
possessions, which is not a public performance;

it being understood that Company (and/or any such assignee or
licensee) shall have no obligation to pay any royalties or other
sums to Writer, Contractor, Society, or any successor to the
rights of any of them with respect to non-dramatic performances
of the Music made pursuant to subclauses (i) through (iii)
hereof.  If Company makes or authorizes any non-dramatic
performances of the Music under and pursuant to this Agreement,
and if Writer or Contractor shall assert any claim that any such
performance violates any rights of Writer or Contractor, then (A)
under no circumstances shall Writer or Contractor have the right
to take any action or initiate any proceeding with respect to
such claim which would have the effect of enjoining and/or
preventing and/or otherwise interfering with any said
non-dramatic performances, it being agreed that any such action
or proceeding shall be limited to an action at law for damages;

0172H

SUN 0885

and (B) if Writer or Contractor shall assert such a claim pertaining to a non-dramatic performance of the Music made by any assignee or licensee of Company, then any action taken or proceeding brought by Writer or Contractor shall be limited to an action at law for damages against such assigee or licensee exclusively.  The foregoing references to Society shall not be construed as giving Society any independent right to take any action or initiate any proceeding against Company or any of its assignees or licensees with respect to any such claim.

      (d)  Without limiting the generality of any rights granted under this Agreement, and notwithstanding any license hereunder to Writer pursuant to subparagraph (c) above, Writer and Contractor expressly acknowledge that Company, its successors, assigns and/or licensees shall have the right to collect the "publisher's share" of performance royalties becoming due and payable hereunder from any small performing rights society by reason of performances of the Music, it being expressly agreed that Writer and Contractor shall not be entitled to any share of such monies which are distributed to Company, its successors, assigns, and/or licensees by any small performing rights society.  Writer shall be entitled to collect the "writer's share" of any such royalties with respect to the Music jointly with any other lyricists and/or composers of such Music. The terms "publisher's share" and "writer's share" as used in this Agreement have the same meaning here as is commonly understood in the music publishing and motion picture and television industries.  Company may represent to any domestic or foreign performing rights society or similar organization requiring an acknowledgement of the type made by Writer herein that Contractor and Writer have acknowledged Company's right to collect and retain the publisher's share of royalties; further, if any such society or organization requires written authorization from Writer or Contractor in order to make payments of the publisher's share of royalties to Company, Writer and Contractor shall promptly execute and deliver such authorization.  If any such society or organization makes payment to Writer or Contractor of all royalties (i.e., both "writer's" and "publisher's" share) with respect to any performance to Writer, Contractor shall promptly remit one-half (1/2) of such royalty to Company.

      6.  Further, in the exercise of its rights hereunder and without in any way limiting the generality of the foregoing, Company shall have, as owner and copyright proprietor of the Music, the complete control of the publication of the Music and of all rights incident thereto, including, but not limited to, the right to license the manufacture of phonograph records and other recordings of the Music and the right to license motion picture synchronization rights (all of which rights are herein sometimes collectively called "music publishing rights").  Without limiting the generality of the foregoing, it is agreed

0172H

SUN 0886

that Company may assign or license any or all such music publishing rights and/or any or all other rights granted to Company under this Agreement to any music publishing company or production company which is a parent or subsidiary of Company or otherwise affiliated with Company or to any other third party.

(a)  With respect to Company's exercise of music publishing rights in the Music (as defined above) uses of the Music combined with lyrics (but, if the Music with lyrics or any form thereof is the composition of Writer and other composers and/or lyricists, then the royalties hereunder shall be shared equally by all such lyricists and/or composers):

(i)  sums equal to fifty (50%) percent of the net proceeds (as defined below) received by Company from third parties for licenses for the manufacture or commercial phonograph records and/or licenses of theatrical motion picture synchronization rights (as defined below);

(ii)  for regular piano copies, if any, sold and paid for at wholesale in the United States and/or Canada, sums equal to eight cents (.08) per copy for the first one hundred thousand (100,000) copies sold, and ten cents (.10) per copy for copies sold in excess of 100,000;

(iii)  sums equal to fifty (50%) percent of net proceeds received by Company from third parties for regular piano copies, if any, sold and paid for at wholesale outside of the United States and/or Canada;

(iv)  with respect to orchestrations, including band arrangements, if any, sold and paid for at wholesale anywhere in the world, sums equal to ten (10%) percent of the wholesale price therefor, after trade discounts;

(v)  with respect to any songbook, folio or similar publication, if any, sold and paid for at wholesale anywhere in the world, sums equal to the amount resulting from dividing ten (10%) percent of the wholesale price, after trade discounts, therefor by the total number of copyrighted musical compositions contained in such publication;

(vi)  with respect to other uses of the Music hereunder, sums equal to the amount resulting from dividing fifty (50%) percent of the net proceeds received by Company from third parties therefor by the total number of copyrighted musical compositions and/or literary materials contained or included in such uses.

— 5 —

0172H

SUN 0887

No royalties shall be payable hereunder for professional material not sold or resold; further, no royalties shall be payable to Writer with respect to uses of the Music except as hereinabove expressly set forth. The term "theatrical motion picture rights" as used herein refers to synchronization rights granted with respect to motion pictures intended primarily and initially for theatrical release by direct projection before paid-admission audiences; in no event shall such term refer to motion pictures or other methods of recordation, whether now known or hereafter devised, which are produced primarily and initially for television broadcasting by any means whatsoever. The term "net proceeds" as used hereinabove, shall mean all monies (including advances) actually received by Company (or any assignee of Company's rights or licensee hereunder) which are directly attributable to licenses issued authorizing the manufacture of commercial phonograph records and/or licenses relating to theatrical motion picture synchronization rights, and/or for the exercise of publication rights referred to in subclause (iii) above, as the case may be, after the deduction of all costs, expenses, fees and commissions which are directly attributable to the exploitation of the Music and combined music by way of commercial phonograph records or by way of theatrical motion picture synchronization, or by way of publication, as the case may be, computed in accordance with good and standard practices. In the event that Company licenses the Music in a form containing music or other literary materials written or composed by any third party or parties, then Contractor's royalties thereon, shall be reduced proportionately to an amount equal to the royalties payable hereunder divided by the number of composers and lyricists (including Writer) who have furnished materials and services for such use and who are entitled to receive royalties from Company, provided that in no event shall Writer receive less than one-half of the royalty Writer would otherwise be entitled to receive hereunder. Company shall render royalty statements to Contractor, accompanied by any remuneration due Contractor, such statements to be rendered at least twice during each calendar year during which royalties are payable.

       (b) If, for any reason, exportation of money to the United States from any foreign country, territory or place should be prohibited, prevented or rendered commercially impracticable, the amount received by Company (if Company's share thereof is actually paid to Company in such foreign country, territory or place) shall not be considered gross receipts hereunder unless and until the same shall have actually been received in the United States in United States currency, less any discounts, losses, costs or expenses suffered by or imposed upon Company with respect to transmittal of such money to the United States and the conversion thereof to United States currency; provided, however, that if Contractor so requests in writing, that portion of such blocked or frozen funds which would represent Contractor's share of net proceeds of such gross

- 6 -

0172H

SUN 0888

receipts, but for being frozen or blocked, shall be deposited in Contractor's name in any bank or depository designated by Contractor in such country wherein such funds are blocked or frozen subject to the laws of such country with respect to such deposits and withdrawals by Contractor therefrom. Contractor shall have the right at Contractor's sole expense to inspect Company's books and records relative to gross receipts derived from use of the Music hereunder and to make extracts thereof provided such inspection shall be made at Company's offices during reasonable business hours and upon reasonable notice and not more frequently than once per year. All royalties, statements and other accounts rendered by Company shall be binding upon Contractor and not subject to any objection by Contractor unless specific objection in writing, stating the basis thereof, is given to Company by Contractor by one (1) year from the date rendered.

(c) If Company assigns or licenses any uses of the music publishing rights to any third party (including any aforementioned subsidiary or affiliated company) and if Company authorizes such third party to account directly to Contractor with respect to royalties payable to Contractor by reason of any such uses of such music publishing rights, then Contractor agrees that, during the term of any such assignment or license, Writer shall look only to such assignee or licensee for payment of such royalties (and shall be entitled only to inspect such assignee's or licensee's books and records relative to uses of the Music at reasonable business hours and at such assignee's or licensee's offices), provided that Company shall not be relieved of its obligations with respect thereto unless the assignee is a parent, subsidiary or affiliate of Company, or a recognized distributor of motion pictures or television programs, or a "major" motion picture company (as that term is understood in the motion picture industry), or a "major" television network (as that term is understood in the television industry), or a "major" record company or music publishing company (as those terms are understood in the music industry).

(d) Contractor acknowledges that Company has not made and is not hereby making any representation or warranty with respect to the amount of royalties, if any, which may be derived from uses of music publishing rights, it being further understood that nothing herein shall be deemed to impose any obligation on Company to use or authorize the use of the Music and/or any music publishing rights derived therefrom.

7.    Company agrees that:

(a) if the description of the Music in Paragraph 1 of this Agreement refers to a particular television program in connection with which such Music may be used, and if such Music or a substantial portion thereof are used in connection with such

0172H

SUN 0889

program or are otherwise used hereunder, then Company shall give Writer (or cause Writer to be given) credit as Writer of such Music or as a writer of the television series on all release prints of such programs. Company further agrees to use best efforts to have Writer given credit in connection with other uses of the Music;

        (b)  if any of the Music as described in Paragraph 1 of this Agreement is used as Music for the theme song for a television pilot program and/or television series, then Company shall give Writer (or cause Writer to be given) credit on all release prints of any such program in which such theme song is used as the theme song, as Writer of the Music of such theme song.

The form, style, size, placement and nature of any credit provided for herein shall be determined by Company (or its assignee or licensee) in its sole discretion except that Company agrees that the identification of Writer shall be in the form "Kinder and Bryant." Any unintentional and/or inadvertent failure to give credit as above provided, whether because of lack of broadcast time or otherwise, shall not be a breach of this Agreement.

       8.   Company shall have the right and may grant to others the right to use, disseminate, reproduce, print and publish Writer's name, likeness, voice and biographical material concerning Writer as news or informative matter and in connection with advertising and for purposes of trade in connection with any motion picture or television program in which the Music is used, and/or in connection with any other uses of the Music. The rights granted herein shall not include the right to use or to grant to others the right to use Writer's name, voice, likeness and biographical material in any direct endorsement of any product or service without Writer's prior written consent.

       9.   Contractor hereby warrants that Contractor is free and able to enter into and fully perform this Agreement, to furnish the services of Writer, and to grant all rights herein granted. Further, Contractor warrants that the Music in the form in which it is delivered shall be wholly original with Writer and shall not be copied from any other work and shall not, nor shall the use thereof, infringe or violate the copyright or any common law right or any personal, proprietary, or other right of any kind whatsoever of any person, firm, corporation or association. If any of the Music delivered hereunder is described as based upon traditional or public domain compositions, Contractor warrants that such compositions are in the public domain throughout the world and that Writer's treatment of such compositions is original and shall not be copied from any work other than such public domain compositions, nor shall the use thereof infringe or violate the copyright or any common law right or any personal, proprietary or other right of any kind

- 8 -

0172H

SUN 0890

whatsoever of any person, firm, corporation or association. Notwithstanding the foregoing, if any of the Music delivered hereunder is described as based upon materials furnished by Company or as based upon traditional or public domain compositions furnished by Company, Contractor makes no warranty as to the originality or ownership of such materials or compositions furnished by Company.

10. Contractor shall indemnify and hold Company, its successors, assigns and licensees, any network and/or stations over which the Music shall be broadcast, the sponsors, if any, of any program on which they are broadcast, and their advertising agencies, if any, and any other parties who shall utilize the Music or any part thereof in any way with Company's permission, and the directors, officers, agents and employees of any of the foregoing, free and harmless from any and all claims, damages, liabilities, costs and expenses, including reasonable counsel fees, arising out of any breach by Contractor of any warranty or agreement made by Contractor herein, in an amount not to exceed the monies paid to Contractor by Company hereunder.

11. It is understood and agreed that all or part of this Agreement and all the results and proceeds thereof may be assigned by Company to any third party without Contractor's consent and in this event, Company's successors and/or assigns shall be entitled to any and all rights, privileges, and equities to which Company is entitled under and by virtue of this Agreement. In the event of such an assignment, Company shall not be relieved of its obligations hereunder unless the assignee is a parent, subsidiary or affiliate of Company or a recognized distributor of motion pictures or television programs, or a "major" motion picture company (as that term is understood in the motion picture industry), or a "major" television network (as that term is understood in the television industry), or a "major" record company or music publishing company (as those terms are understood in the music industry).

Nothing in this Agreement shall in any way derogate from, diminish or impair any rights granted to the Company or to any parent, subsidiary or affiliate of Company under any other agreement entered into between Writer and Company or any parent, subsidiary or affiliate thereof.

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their successors, assigns and licensees.

12. Company agrees to furnish Contractor with cue sheets of the Music within sixty (60) days of the initial broadcast of the Show.

13. (a) This Agreement shall be governed by and construed in accordance with the internal laws of the State of

- 9 -

One Revision: JK

(W) AS

New York applicable to contracts entered into and fully to be performed therein.

(b)  A waiver by either party of any of the terms and conditions of this Agreement in any one instance shall not be construed to be a waiver of such term or condition for the future, or of any subsequent breach thereof.  All remedies, rights, undertakings, obligations and agreements contained in this Agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either party.

(c)  This Agreement contains the entire understanding of the parties hereto relating to the subject matter herein contained and this Agreement cannot be changed, rescinded or terminated orally.

(d)  If any provisions of this Agreement as applied to any party or to any circumstances shall be adjudged by a court to be void or unenforceable, the same shall in no way affect any other provision of this Agreement, the application of such provision in any other circumstances or the validity or enforceabililty of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

SUNBOW PRODUCTIONS, INC. ("Company")

By: _____
         Its

KINDER & BRYANT LTD. ("Contractor")

By _____
      Its

– 10 –

0172H

SUN 0892

Schedule A

Anne Bryant and Ford Kinder ("Writers") hereby certify that they wrote certain original music as employees of KINDER & BRYANT LTD. ("Contractor") in the regular course of their employment. Contractor hereby certifies that Contractor was specially commissioned by SUNBOW PRODUCTIONS, INC. ("Company") to furnish the services of Writers to write and deliver said music to Company for use as part of a fully-animated children's television series tentatively entitled "MY LITTLE PONY & FRIENDS" pursuant to an agreement dated as of _____, 1985. Accordingly, Writers and Contractor acknowledge and agree that the said music is a work made for hire within the meaning of Section 101 of the United States Copyright Act and that Company is the author and owner thereof and is entitled to copyright therein (and all renewals thereof), and all rights of any kind or nature therein, with the right to make such changes therein and uses thereof as Company may from time to time determine as such author and owner.

                              KINDER & BRYANT LTD.
                                        ("Contractor")


Dated:                        By:_____


                              _____
Dated:                             Anne Bryant


                              _____
Dated:                             Ford Kinder


- 11 -

0172H

SUN 0893

INDUCEMENT LETTER

Dated as of                , 1985

Sunbow Productions, Inc.
380 Lexington Avenue
Suite 1105
New York, New York  10168

    Re:  Sunbow Productions, Inc. with
        Kinder & Bryant Ltd./"MY LITTLE PONY & FRIENDS"

Gentlemen:

    Reference is made to that certain agreement dated as of
_____, 1985 (herein called the "Agreement") between
KINDER & BRYANT LTD. (herein called "Contractor") and you, which,
among other things, makes available the services of the
undersigned by Contractor to you for the purposes set forth in
said Agreement.

    As an inducement to you to enter into the Agreement and as a
material part of the consideration moving to you for so doing,
each of the undersigned hereby represents, warrants and agrees as
follows:

        1.   That the undersigned has heretofore entered into an
agreement (herein callled the "Employment Agreement") with
Contractor covering the rendition of the undersigned's services
for Contractor and that Contractor has the right and authority to
enter into the Agreement and to furnish the rights and services
of the undersigned upon the terms and conditions therein
specified.

        2.   That the undersigned is familiar with each and all
of the terms, covenants and conditions of the Agreement and
hereby consents to the execution thereof; that the undersigned
shall perform and comply with all of the terms, covenants and
conditions of the Agreement on the part of the undersigned to be
performed and complied with, even if the Employment Agreement
should hereafter be terminated or suspended; that the
representations and warranties of Contractor contained in the
Agreement are true; that the undersigned shall render all of the
services provided for under the Agreement and hereby confirms
that there have been granted to Contractor all of the rights
granted by Contractor to you under the Agreement; that all
notices served upon Contractor in accordance with the Agreement
shall be deemed notices to the undersigned of the contents
thereof.

- 12 -

0172H

SUN 0894

3.    That the undersigned is under no obligation or disability by law or otherwise which would prevent or restrict the undersigned from performing and complying with all of the terms, covenants and conditions of the Agreement on the part of the undersigned to be performed or complied with.

4.    That, except in the event that the undersigned is deemed substituted for Contractor as a direct party to the Agreement, pursuant to Paragraph 6 hereof, the undersigned will look solely to Contractor and not to you for all compensation and other remuneration for any and all services and rights which the undersigned may render and/or grant under the Agreement.

5.    That you shall be entitled to equitable relief against the undersigned by injunction or otherwise to restrain, enjoin and/or prevent the violation or breach by the undersigned of any obligation of the undersigned to be performed as provided in the Agreement and/or the violation or breach by the undersigned of any obligations or agreements under this present instrument.

6.    That if Contractor should be dissolved or should otherwise cease to exist or for any reason whatsoever should fail, be unable, neglect or refuse to perform and observe each and all of the conditions of the Agreement requiring performance or compliance on its part, the undersigned shall at your election be deemed substituted as a direct party to the Agreement in the place and stead of Contractor and, further, that in the event of a breach or threatened breach of the Agreement by Contractor or by the undersigned you shall be entitled to legal and equitable relief by way of injunction or otherwise against Contractor or against the undersigned or both of us in your discretion, in any event without the necessity of first resorting to or exhausting any rights or remedies which you may have against Contractor; all of the foregoing to be to the same extent and with the same force and effect as if the undersigned were a direct party to the Agreement in the first instance and as if in the Agreement the undersigned had personally agreed to render the services therein provided to be rendered by the undersigned and to perform and observe each and all of the terms and conditions of the Agreement requiring performance or compliance on the part of the Contractor or the undersigned or both of us.

Very truly yours,

_Ford Kinder_
_____
FORD KINDER

_A. Bryant_
_____
ANNE BRYANT

- 13 -

0172H

SUN 0895

# EXHIBIT 59

SUNBOW PRODUCTIONS, INC.
130 Fifth Avenue
New York, New York 10011

March 15, 1986

Kinder & Bryant Ltd.
41 West 73rd Street
New York, New York 10023

Attention:  Anne Bryant and Ford Kinder

Re:  JEM

Dear Anne and Ford:

Reference is made to our June 1, 1985 Agreement concerning the above (including, without limitation, all defined terms therein).

It is hereby agreed that effective as of the date of this letter:

(1)  the term "Music" in said Agreement shall be deemed to refer to all original music heretofore or hereafter delivered by Contractor to Company for "JEM" (until written notice by either party that Music delivered after the notice date shall not be deemed "Music");

(2)  Music delivered pursuant to the engagement of the original Agreement shall be subject only to the terms of the original Agreement; and

(3)  Music delivered subsequent to the engagement of the original Agreement shall be subject to the terms of the original Agreement, except that Paragraph 2(a) of the said Agreement is hereby deleted and the following inserted in its stead:

"For all rights herein granted to Company in the Music and for performance by Contractor of all obligations hereunder (including but not limited to composing and arranging the Music and supervision of the orchestra recording of the Music for the Show), Company shall pay Contractor a fee of One Thousand Three Hundred and Fifty ($1,350) Dollars for each song for which Writer writes and delivers the Music, payable on delivery thereof. For each such song actually used on phonorecordings sold or distributed in conjunction with merchandise based on the Show ("Premium Cassettes"), Company shall pay Contractor an additional fee of One Thousand ($1,000) Dollars as full consideration therefor."

In all other respects, the said Agreement is hereby ratified and confirmed.



DEFENDANT'S
EXHIBIT

FENGAD 800-631-6989

Anne Bryant and Ford Kinder
Page 2


     If  the foregoing accurately sets forth your understanding,
kindly sign in the space provided below,  which signature shall create
a valid and binding amendment to the said Agreement.


                        Very Truly yours,

                        SUNBOW PRODUCTIONS, INC.
                           ("Company")

                        By _____


ACCEPTED AND AGREED TO:

KINDER & BRYANT, LTD.
   ("Contractor")

By _____

SUN 0869

# EXHIBIT 60

SUPREME COURT OF THE STATE OF NEW YORK
IAS PART, ROCKLAND COUNTY

Present:   HON. ANDREW P. O'ROURKE
           Supreme Court Justice

                                                  **ORDER**

--------------------------------------------X
ANNE BRYANT,

                              Plaintiff,

          -against-                        **Index No. 5192/00**

BROADCAST MUSIC INC., (a/k/a "BMI"),
CLIFFORD A. "FORD" KINDER, KINDER &
CO., LTD., VADIVOX, LTD., JULES M.
"JOE" BACAL, GRIFFIN BACAL, INC.,
STARWILD MUSIC BMI, WILDSTAR MUSIC
ASCAP, SUNBOW PRODUCTIONS, INC.M AND
JOHN AND JANE DOES 1 - 10,

                              Defendants.
--------------------------------------------X

Only recently defendant Sunbow Productions, Inc. has produced a
number of documents, including work-made-for hire agreements, which
purportedly bear plaintiff Bryant's signature and/or initials, and those
of her former partner, Ford Kinder.  Plaintiff challenges the Court's
consideration of these documents which have been produced at this late,
mid-trial date, after having been given numerous prior representations
by said defendant that all of the written agreements in issue are no
longer available, same having been destroyed years ago in a New York
City flood.

Moreover, plaintiff challenges the authenticity of many of these
documents, stating outright that they are forgeries and/or have been
cobbled from several different documents, and that certain documents
have obvious irregularities, including the annexation of riders from
different agreements, lack of dates and verifications.  With respect to

certain of these documents purportedly bearing the signature of Ford Kinder, plaintiff has submitted an affidavit from Dr. Kinder wherein he avers that his purported signature and initials on the Visionaries Agreement, dated April 8, 1998, and the Transformers Agreement, dated April 8, 1988, "are in fact forged." Additionally, Dr. Kinder states that certain other documents, including W-4 forms, "appear to be forgeries," and that he is "unsure" about certain other identified documents.

Plaintiff notes that no one has attested to the origin of these documents and that Carole Weitzman, the Sunbow signatory on these challenged documents, not only has not attested herein to the authenticity of these documents, but she never previously swore to having witnessed either Ms. Bryant or Mr. Kinder having signed any such documents, notwithstanding that she had been deposed and has submitted affidavits on prior dismissal motions.

Pursuant to CPLR 4536, the Court has made a comparison of the disputed signatures with signatures of Ms. Bryant whose authenticity is not in issue, and while the Court is inclined to find that the disputed signatures are proved to its satisfaction, nevertheless, under all of the circumstances presenting and the issues raised regarding the late locating of these documents as well as the specter of certain of these documents not being true and genuine, instead having been artificially created, the Court hereby Orders a framed issue hearing addressing the issues surrounding the locating of the challenged documents and the

issues of the genuineness and authenticity of the documents and the signatures they bear, at which time is anticipated that expert testimony will be presented, as well as that of Ms. Weitzman.

Parenthetically, the Court notes that, to the extent Ms. Bryant appears to be arguing that even if Dr. Kinder's signatures/initials on behalf of their partnership Kinder & Bryant are genuine and the documents upon which they appear are found to be authenticate and true, that he did not and could not have bound her, she appears to be mistaken. See Partnership Law, Section 20.

The parties shall appear at 10:00 a.m. on October 19, 2004, for the foregoing hearing, which date may not be adjourned without the Court's consent.

Dated: September 22, 2004
       New City, New York

_____
ANDREW P. O'ROURKE
J.S.C.

To:   Patrick J. Monaghan, Esq.
      Monaghan, Monaghan, Lambs & Marchisco
      25 East Salem Street
      Hackensack, New Jersey 07601

      Patterson, Belknap, Webb & Tyler LLP
      Attys. For Deft. Sunbow
      1133 Avenue of the Americas
      New York, New York 10036-6710

-3-

# EXHIBIT 61

AGREEMENT made of this 2nd day of September , 1985, by and between SUNBOW PRODUCTIONS, INC. ("Company"), whose business address is 380 Lexington Avenue, Suite 1105, New York, New York 10168, and BHB PRODUCTIONS, INC. ("Contractor") whose business address is 35 West 92nd Street, New York, New York 10025, f/s/o Barry Harman ("Writer").

In consideration of the mutual covenants herein contained, the parties hereto have agreed and do agree as follows:

1.    Company hereby engages Contractor and Contractor hereby accepts such engagement, to furnish the services of Writer to Company for the purpose of writing, preparing and delivering to Company original lyrics (hereinafter referred to as the "Lyrics") for songs to be used in a fully-animated children's television show consisting of either five one-half hours, fifteen segments, or a television motion picture, presently entitled "JEM" (the "Show") (it being understood that the mention of the show is for purposes of identification only and shall in no way restrict Company's rights in the Lyrics, and the use thereof, as set forth in this Agreement).  The number of songs for which lyrics are to be written and delivered by Writer hereunder shall be determined by Company, but in no event will be less than five (5).  The Lyrics shall be delivered to Company in accordance with a schedule to be mutually determined by the Company and Contractor.

2.    (a)  For all rights herein granted to Company in the Lyrics, and for performance by Contractor of all obligations hereunder, Company shall pay Contractor a fee of One Thousand One Hundred ($1,100) Dollars for each song (including both television length lyric as well as an expanded version thereof upon request of Company) for which Writer writes and delivers the Lyrics, in each case payable on delivery of the Lyrics.

(b).  For each master phonorecording containing the Lyrics produced and used to make phonorecordings sold or distributed in conjunction with merchandise based on the Show ("Premium Cassette"), Company shall pay Contractor a fee of One Thousand ($1,000) Dollars as full consideration therefor.

(c)  Payment by a parent or affiliate of Company shall be deemed to constitute payment by Company hereunder. Nothing herein contained shall be deemed to impose any obligation on Company to use or authorize the use of the Lyrics, and Company shall have fully discharged its obligations to Contractor



DEFENDANT'S EXHIBIT

hereunder by payment to Contractor of the amount specified in subparagraph (a) of this Paragraph 2.

3.    Contractor shall deliver one (1) copy of the Lyrics to Company as Company shall designate.

4.    It is understood and agreed that Writer may write the Lyrics at such times and places as Writer may choose, subject only to Contractor's obligation to make timely delivery of the Lyrics in accordance with the terms of this Agreement.

5.    (a)  Contractor warrants, acknowledges and agrees that the Lyrics to be written by Writer and delivered by Contractor are to be written by Writer under and pursuant to an employment agreement between Contractor and Writer pursuant to which Contractor is entitled to the exclusive services of Writer, and to all the results of Writer's services; that the Lyrics were specifically ordered and commissioned by Company for use as part of an audiovisual work; and that the Lyrics are a work made for hire within the meaning of Section 101 of the United States Copyright Act.  Upon writing of the Lyrics, all right, title and interest therein shall automatically vest in Company and Company shall be the sole and unlimited owner thereof and of all rights therein throughout the world forever, and Company shall be entitled to copyright therein, including statutory copyright and all renewals thereof, as copyright author and proprietor. Company may freely assign and grant rights and licenses with respect to the Lyrics and any copyrigt therein (including any renewals thereof), and in this connection Contractor agrees to execute and deliver and/or cause Writer to execute and deliver to Company any and all instruments required by Company in connection with the use and enjoyment of the Lyrics and of Company's rights therein and thereto.  Contractor hereby appoints Company as Contractor's and Writer's attorney-in-fact with the right but not the obligation to execute any such instruments in Contractor's or Writer's name on Company's behalf.  On execution hereof, Contractor shall sign and shall cause Writer to sign the Certificate of Authorship attached hereto for the Lyrics.

(b)  Without in any way limiting the generality of the foregoing, it is agreed that Company shall have the exclusive right and may license others to use, adapt, arrange, change, add to, or subtract from the Lyrics and to combine the same with other literary material and/or music and to publish, record, produce, reproduce, transmit, perform, broadcast, telecast, and/or otherwise communicate the same or any version or versions thereof by any means (including, but not limited to, in synchronization with motion pictures, television and/or any other form of recordation or reproduction of sight and/or sound), whether now known or hereafter devised, publicly for profit or

- 2 -

SUN 0855

otherwise, it being understood that Contractor and Writer hereby waive any so-called "moral rights" which may now be or may hereafter be recognized. It is understood and agreed that neither Contractor nor Writer shall have any right, title or interest in any other literary material and/or music which may be combined with the Lyrics.

(c)  During any period or periods of time during which Writer is affiliated with any small performing rights society (herein called the "Society"), Company shall and does hereby, under and pursuant to this Paragraph, license back to Writer a non-exclusive undivided one-half (1/2) interest (but, if the Lyrics or any form thereof are the composition of Writer and other lyricists and/or composers, then the grant hereunder shall be deemed a grant of an undivided one-half (1/2) interest to Writer and all other such lyricists and/or composers jointly) in the non-dramatic (i.e., "small") performing rights in the Lyrics (but only when the Lyrics are combined with music) so as to enable Writer to license such non-dramatic performing rights to Society, and to collect the Writer's share of royalties derived therefrom, it being understood, in this connection, that Company (or any assignee or licensee of all or any of Company's rights under this Agreement) shall not exercise such non-dramatic performing rights during such period or periods without obtaining a license therefor from Society, except that Company and/or any such assignee or licensee, may exercise such non-dramatic performing rights in the Lyrics by reason of, under and pursuant to this Agreement,

(i)  during any period or periods during which such non-dramatic performing rights are not controlled by and/or available for license to Company or any such assignee or licensee at standard rates from Society, or in the case of public performances of the Lyrics in geographical areas outside of Society's jurisdiction, from any other organization or society which is affiliated with Society or which has a collection agreement with Society and which controls the non-dramatic performing rights in any geographical area in which the Lyrics are to be performed; and/or

(ii)  in connection with theatrical exhibitions in the United States, its territories and possessions; and/or

(iii)  in connection with any performance of the Lyrics within the United States, its territories and possessions, which is not a public performance;

- 3 -

SUN 0856

it being understood that Company (and/or any such assignee or
licensee) shall have no obligation to pay any royalties or other
sums to Writer, Contractor, Society, or any successor to the
rights of any of them with respect to non-dramatic performances
of the Lyrics made pursuant to subclauses (i) through (iii)
hereof.  If Company makes or authorizes any non-dramatic
performances of the Lyrics under and pursuant to this Agreement,
and if Writer or Contractor shall assert any claim that any such
performance violates any rights of Writer or Contractor, then (A)
under no circumstances shall Writer or Contractor have the right
to take any action or initiate any proceeding with respect to
such claim which would have the effect of enjoining and/or
preventing and/or otherwise interfering with any said
non-dramatic performances, it being agreed that any such action
or proceeding shall be limited to an action at law for damages;
and (B) if Writer or Contractor shall assert such a claim
pertaining to a non-dramatic performance of the Lyrics made by
any assignee or licensee of Company, then any action taken or
proceeding brought by Writer or Contractor shall be limited to an
action at law for damages against such assigee or licensee
exclusively.  The foregoing references to Society shall not be
construed as giving Society any independent right to take any
action or initiate any proceeding with respect to any such claim.

          (d)  Without limiting the generality of any rights
granted under this Agreement, and notwithstanding any license
hereunder to Writer pursuant to subparagraph (c) above, Writer
and Contractor expressly acknowledge that Company, its
successors, assigns and/or licensees shall have the right to
collect the publisher's share of performance royalties becoming
due and payable hereunder from any small performing rights
society by reason of performances of the Lyrics combined with
music, it being expressly agreed that Writer and Contractor shall
not be entitled to any share of such monies which are distributed
to Company, its successors, assigns, and/or licensees by any
small performing rights society.  Writer shall be entitled to
collect the Writer's share of any such royalties with respect to
the Lyrics jointly with any other lyricists and/or composers of
such Lyrics.  The terms "publisher's share" and "Writer's share"
as used in this Agreement have the same meaning here as is
commonly understood in the music publishing and motion picture
and television industries.  Company may represent to any domestic
or foreign performing rights society or similar organization
requiring an acknowledgement of the type made by Writer herein
that Contractor and Writer have acknowledged Company's right to
collect and retain the publisher's share of royalties; further,
if any such society or organization requires written
authorization from Writer or Contractor in order to make payments
of the publisher's share of royalties to Company, Writer and
Contractor shall promptly execute and deliver such

- 4 -

authorization. If any such society or organization makes payment to Writer or Contractor of all royalties (i.e., both Writer's and publisher's share) with respect to any performance to Writer, Contractor shall promptly remit one-half (1/2) of such royalty to Company.

6. Further, in the exercise of its rights hereunder and without in any way limiting the generality of the foregoing, Company shall have, as owner and copyright proprietor of the Lyrics, the complete control of the publication of the Lyrics and of all rights incident thereto, including, but not limited to, the right to license the manufacture of phonograph records and other recordings of the Lyrics and the right to license motion picture synchronization rights (all of which rights are herein sometimes collectively called "music publishing rights"). Without limiting the generality of the foregoing, it is agreed that Company may assign or license any or all such music publishing rights and/or any or all other rights granted to Company under this Agreement to any music publishing company or production company which is a parent or subsidiary of Company or otherwise affiliated with Company or to any other third party.

(a) With respect to Company's exercise of music publishing rights in the Lyrics (as defined above), uses of the Lyrics combined with music (but, if the Lyrics with music or any form thereof is the composition of Writer and other composers and/or lyricists, then the royalties hereunder shall be shared equally by all such lyricists and/or composers):

(i) sums equal to fifty (50%) percent of the net proceeds (as defined below) received by Company from third parties for licenses for the manufacture or commercial phonograph records and/or licenses of theatrical motion picture synchronization rights (as defined below), except that neither Writer nor Contractor shall receive any royalties or other payments from the sale or distribution of Premium Cassettes, except as provided in Paragraph 2(b) hereof;

(ii) for regular piano copies, if any, sold and paid for at wholesale in the United States and/or Canada, sums equal to six cents (.06) per copy for the first one hundred thousand (100,000) copies sold, and eight cents (.08) per copy for copies sold in excess of 100,000;

(iii) sums equal to fifty (50%) percent of net proceeds received by Company from third parties for regular piano copies, if any, sold and paid for at wholesale outside of the United States and/or Canada;

- 5 -

SUN 0858

(iv)   with respect to orchestrations, including band arrangements, if any, sold and paid for at wholesale anywhere in the world, sums equal to ten (10%) percent of the wholesale price therefor, after trade discounts;

(v)   with respect to any songbook, folio or similar publication, if any, sold and paid for at wholesale anywhere in the world, sums equal to the amount resulting from dividing ten (10%) percent of the wholesale price, after trade discounts, therefor by the total number of copyrighted musical compositions contained in such publication;

(vi)   with respect to other uses of the Lyrics hereunder, sums equal to the amount resulting from dividing fifty (50%) percent of the net proceeds received by Company from third parties therefor by the total number of copyrighted musical compositions and/or literary materials contained or included in such uses.

No royalties shall be payable hereunder for professional material not sold or resold; further, no royalties shall be payable to Writer with respect to uses of the Lyrics except as hereinabove expressly set forth.   The term "theatrical motion picture rights" as used herein refers to synchronization rights granted with respect to motion pictures intended primarily and initially for theatrical release by direct projection before paid-admission audiences; in no event shall such term refer to motion pictures or other methods of recordation, whether now known or hereafter devised, which are produced primarily and initially for television broadcasting by any means whatsoever.   The term "net proceeds" as used hereinabove, shall mean all monies actually received by Company (or any assignee of Company's rights or licensee hereunder) which are directly attributable to licenses issued authorizing the manufacture of commercial phonograph records and/or licenses relating to theatrical motion picture synchronization rights, and/or for the exercise of publication rights referred to in subclause (iii) above, as the case may be, after the deduction of all costs, expenses, fees and commissions which are directly attributable to the exploitation of the Lyrics and combined music by way of commercial phonograph records or by way of theatrical motion picture synchronization, or by way of publication, as the case may be, computed in accordance with good and standard practices.   In the event that Company licenses the Lyrics or any songs in a form containing music or other literary materials written or composed by any third party or parties, then Contractor's royalties hereunder, with respect to the Lyrics or such songs in such form, shall be reduced proportionately to an amount equal to the royalties payable hereunder divided by the

- 6 -

SUN 0859

number of composers and lyricists (including Writer) who have
furnished materials and services for such music and Lyrics and
who are entitled to receive royalties from Company, provided that
in the event that both one or more composers and one or more
lyricists have furnished materials and services for such songs,
then the total royalties payable to all such lyricists (including
Writer) collectively in accordance with the aforesaid
proportionate reduction with respect to such Lyrics or such songs
shall be equal to the total royalties payable to all such
composers collectively in accordance with said reduction with
respect to such Lyrics or such songs. Company shall render
royalty statements to Contractor, accompanied by any remuneration
due Contractor, such statements to be rendered at least once
during each calendar year during which royalties are payable.

(b)  If, for any reason, exportation of money to
the United States from any foreign country, territory or place
should be prohibited, prevented or rendered commercially
impracticable, the amount received by Company (if Company's share
thereof is actually paid to Company in such foreign country,
territory or place) shall not be considered gross receipts
hereunder unless and until the same shall have actually been
received in the United States in United States currency, less any
discounts, losses, costs or expenses suffered by or imposed upon
Company with respect to transmittal of such money to the United
States and the conversion thereof to United States currency;
provided, however, that if Contractor so requests in writing,
that portion of such blocked or frozen funds which would
represent Contractor's share of net proceeds of such gross
receipts, but for being frozen or blocked, shall be deposited in
Contractor's name in any bank or depository designated by
Contractor in such country wherein such funds are blocked or
frozen subject to the laws of such country with respect to such
deposits and withdrawals by Contractor therefrom.  Contractor
shall have the right at Contractor's sole expense to inspect
Company's books and records relative to gross receipts derived
from use of the Lyrics hereunder and to make extracts thereof
provided such inspection shall be made at Company's offices
during reasonable business hours and upon reasonable notice and
not more frequently than once per year.  All royalties,
statements and other accounts rendered by Company shall be
binding upon Contractor and not subject to any objection by
Contractor unless specific objection in writing, stating the
basis thereof, is given to Company by Contractor by one (1) year
from the date rendered.

(c)  If Company assigns or licenses any uses of the
music publishing rights to any third party (including any
aforementioned subsidiary or affiliated company) and if Company
authorizes such third party to account directly to Contractor

- 7 -

SUN 0860

with respect to royalties payable to Contractor by reason of any such uses of such music publishing rights, then Contractor agrees that, during the term of any such assignment or license, Writer shall look only to such assignee or licensee for payment of such royalties (and shall be entitled only to inspect such assignee's or licensee's books and records relative to uses of the Lyrics at reasonable business hours and at such assignee's or licensee's offices), provided that Company shall not be relieved of its obligations with respect thereto unless the assignee is a parent, subsidiary or affiliate of Company, or a recognized distributor of motion pictures or television programs, or a "major" motion picture company (as that term is understood in the motion picture industry), or a "major" television network (as that term is understood in the television industry), or a "major" record company or music publishing company (as those terms are understood in the music industry).

(d)   Contractor acknowledges that Company has not made and is not hereby making any representation or warranty with respect to the amount of royalties, if any, which may be derived from uses of music publishing rights, it being further understood that nothing herein shall be deemed to impose any obligation on Company to use or authorize the use of the Lyrics and/or any music publishing rights derived therefrom.

7.   Company agrees that:

(a)   if the description of the Lyrics in Paragraph 1 of this Agreement refers to a particular television program in connection with which such Lyrics may be used, and if such Lyrics or a substantial portion thereof are used in connection with such program or are otherwise used hereunder, then Company shall give Writer (or cause Writer to be given) credit as Writer of such Lyrics or as a writer of the television series on all release prints of such programs;

(b)   if any of the Lyrics as described in Paragraph 1 of this Agreement are used as Lyrics for the theme song for a television pilot program and/or television series, then Company shall give Writer (or cause Writer to be given) credit on all release prints of any such program in which such theme song is used as the theme song, as Writer of the Lyrics of such theme song.

The form, style, size, placement and nature of any credit provided for herein shall be determined by Company (or its assignee or licensee) in its sole discretion. Any unintentional and/or inadvertent failure to give credit as above provided, whether because of lack of broadcast time or otherwise, shall not be a breach of this Agreement.

Wherever the Composer's name appears, so shall the Writer's, in the same form, style and size.

- 8 -

SUN 0861

8.   Company shall have the right and may grant to others the right to use, disseminate, reproduce, print and publish Writer's name, likeness, voice and biographical material concerning Writer as news or informative matter and in connection with advertising and for purposes of trade in connection with any motion picture or television program in which the Lyrics are used, and/or in connection with any other uses of the Lyrics. The rights granted herein shall not include the right to use or to grant to others the right to use Writer's name, voice, likeness and biographical material in any direct endorsement of any product or service without Writer's prior written consent.

9.   Contractor hereby warrants that Contractor is free and able to enter into and fully perform this Agreement, to furnish the services of Writer, and to grant all rights herein granted.   Further, Contractor warrants that the Lyrics in the form in which they are delivered shall be wholly original with Writer and shall not be copied from any other work and shall not, nor shall the use thereof, infringe or violate the copyright or any common law right or any personal, proprietary, or other right of any kind whatsoever of any person, firm, corporation or association.   If any of the Lyrics delivered hereunder are described as based upon traditional or public domain compositions, Contractor warrants that such compositions are in the public domain throughout the world and that Writer's treatment of such compositions is original and shall not be copied from any work other than such public domain compositions, nor shall the use thereof infringe or violate the copyright or any common law right or any personal, proprietary or other right of any kind whatsoever of any person, firm, corporation or association.   Notwithstanding the foregoing, if any of the Lyrics delivered hereunder are described as based upon materials furnished by Company or as based upon traditional or public domain compositions furnished by Company, Contractor makes no warranty as to the originality or ownership of such materials or compositions furnished by Company.

10.  Contractor shall indemnify and hold Company, its successors, assigns and licensees, any network and/or stations over which the Lyrics shall be broadcast, the sponsors, if any, of any program on which they are broadcast, and their advertising agencies, if any, and any other parties who shall utilize the Lyrics or any part thereof in any way with Company's permission, and the directors, officers, agents and employees of any of the foregoing, free and harmless from any and all claims, damages, liabilities, costs and expenses, including reasonable counsel fees, arising out of any use of the Lyrics or any part thereof or arising out of any breach by Contractor of any warranty or agreement made by Contractor herein.   Company shall similarly indemnify and hold Contractor harmless with respect to any claims

— 9 —

SUN 0862

by any third party that the separate music itself (as opposed to the Lyrics or the music combined with Lyrics) infringes the copyright or other rights of third parties.

11. It is understood and agreed that all or part of this Agreement and all the results and proceeds thereof may be assigned by Company to any third party without Contractor's consent and in this event, Company's successors and/or assigns shall be entitled to any and all rights, privileges, and equities to which Company is entitled under and by virtue of this Agreement. In the event of such an assignment, Company shall not be relieved of its obligations hereunder unless the assignee is a parent, subsidiary or affiliate of Company or a recognized distributor of motion pictures or television programs, or a "major" motion picture company (as that term is understood in the motion picture industry), or a "major" television network (as that term is understood in the television industry), or a "major" record company or music publishing company (as those terms are understood in the music industry).

Nothing in this Agreement shall in any way derogate from, diminish or impair any rights granted to the Company or to any parent, subsidiary or affiliate of Company under any other agreement entered into between Writer and Company or any parent, subsidiary or affiliate thereof.

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their successors, assigns and licensees.

12. (a) This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to contracts entered into and fully to be performed therein.

(b) A waiver by either party of any of the terms and conditions of this Agreement in any one instance shall not be construed to be a waiver of such term or condition for the future, or of any subsequent breach thereof. All remedies, rights, undertakings, obligations and agreements contained in this Agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either party.

(c) This Agreement contains the entire understanding of the parties hereto relating to the subject matter herein contained and this Agreement cannot be changed, rescinded or terminated orally.

— 10 —

SUN 0863

(d)  If any provisions of this Agreement as applied to any party or to any circumstances shall be adjudged by a court to be void or unenforceable, the same shall in no way affect any other provision of this Agreement, the application of such provision in any other circumstances or the validity or enforceabililty of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

SUNBOW PRODUCTIONS, INC. ("Company")

By:_____
         Its

BHB PRODUCTIONS, INC. ("Contractor")

By: _____
       Its
            Pres.

- 11 -

SUN 0864

edule A

reby certifies that he wrote
employee of BHB PRODUCTIONS, INC.
ourse of his employment.
at Contractor was specially
IONS, INC. ("Company") to furnish
e and deliver said lyrics to
ully-animated children's television
JEM" pursuant to an agreement dated
1985.   Accordingly, Writer and
ee that the said lyrics are a work
ng of Section 101 of the United
Company is the author and owner
yright therein (and all renewals
y kind or nature therein, with the
rein and uses thereof as Company
e as such author and owner.

      BHB PRODUCTIONS, INC.
           ("Contractor")

BY: _____
    Pre

    _____
    Barry Harman

TER

Dated as of *Sept. 2*  , 1985

greement dated as of
l the "Agreement") between
ntractor") and you,
le the services of the
purposes set forth in

o the Agreement and as a
g to you for so doing,
nts and agrees as follows:

eretofore entered into an
t Agreement") with
undersigned's services
ne right and authority to
the rights and services
ditions therein

iliar with each and all
the Agreement and
that the undersigned
terms, covenants and
f the undersigned to be
Employment Agreement
ed; that the
tor contained in the
shall render all of the
and hereby confirms
all of the rights
reement; that all
ce with the Agreement
l of the contents

- 12 -

SUN 0865

<u>**INDUCEMENT LETTER**</u>

Dated as of *Sept. 2* , 1985

Sunbow Productions, Inc.
380 Lexington Avenue
Suite 1105
New York, New York  10168

    Re:  Sunbow Productions, Inc. with
        <u>BHB Productions, Inc./"JEM"</u>

Gentlemen:

    Reference is made to that certain agreement dated as of *September 2* , 1985 (herein called the "Agreement") between BHB PRODUCTIONS, INC. (herein called "Contractor") and you, which, among other things, makes available the services of the undersigned by Contractor to you for the purposes set forth in said Agreement.

    As an inducement to you to enter into the Agreement and as a material part of the consideration moving to you for so doing, the undersigned hereby represents, warrants and agrees as follows:

        1.    That the undersigned has heretofore entered into an agreement (herein called the "Employment Agreement") with Contractor covering the rendition of the undersigned's services for Contractor and that Contractor has the right and authority to enter into the Agreement and to furnish the rights and services of the undersigned upon the terms and conditions therein specified.

        2.    That the undersigned is familiar with each and all of the terms, covenants and conditions of the Agreement and hereby consents to the execution thereof; that the undersigned shall perform and comply with all of the terms, covenants and conditions of the Agreement on the part of the undersigned to be performed and complied with, even if the Employment Agreement should hereafter be terminated or suspended; that the representations and warranties of Contractor contained in the Agreement are true; that the undersigned shall render all of the services provided for under the Agreement and hereby confirms that there have been granted to Contractor all of the rights granted by Contractor to you under the Agreement; that all notices served upon Contractor in accordance with the Agreement shall be deemed notices to the undersigned of the contents thereof.

        – 13 –

SUN 0866

3.    That the undersigned is under no obligation or disability by law or otherwise which would prevent or restrict the undersigned from performing and complying with all of the terms, covenants and conditions of the Agreement on the part of the undersigned to be performed or complied with.

4.    That, except in the event that the undersigned is deemed substituted for Contractor as a direct party to the Agreement, pursuant to Paragraph 6 hereof, the undersigned will look solely to Contractor and not to you for all compensation and other remuneration for any and all services and rights which the undersigned may render and/or grant under the Agreement.

5.    That you shall be entitled to equitable relief against the undersigned by injunction or otherwise to restrain, enjoin and/or prevent the violation or breach by the undersigned of any obligation of the undersigned to be performed as provided in the Agreement and/or the violation or breach by the undersigned of any obligations or agreements under this present instrument.

6.    That if Contractor should be dissolved or should otherwise cease to exist or for any reason whatsoever should fail, be unable, neglect or refuse to perform and observe each and all of the conditions of the Agreement requiring performance or compliance on its part, the undersigned shall at your election be deemed substituted as a direct party to the Agreement in the place and stead of Contractor and, further, that in the event of a breach or threatened breach of the Agreement by Contractor or by the undersigned you shall be entitled to legal and equitable relief by way of injunction or otherwise against Contractor or against the undersigned or both of us in your discretion, in any event without the necessity of first resorting to or exhausting any rights or remedies which you may have against Contractor; all of the foregoing to be to the same extent and with the same force and effect as if the undersigned were a direct party to the Agreement in the first instance and as if in the Agreement the undersigned had personally agreed to render the services therein provided to be rendered by the undersigned and to perform and observe each and all of the terms and conditions of the Agreement requiring performance or compliance on the part of the Contractor or the undersigned or both of us.

Very truly yours,

_Barry Harman_
BARRY HARMAN

- 14 -

SUN 0867