# EXHIBIT 64

5.5576-017

| SERIAL NO. | 238 |
|---|---|
| SERVED | |
| RECEIVED | |
| FILED | |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

———————————————————— x
                                            :
ANNE BRYANT,                                :
                                            :
                 Plaintiff,                 :     Index No. 5192/00
                                            :
           v.                               :     Hon. Andrew P. O'Rourke
                                            :
BROADCAST MUSIC, INC., (a/k/a "BMI"),       :
CLIFFORD A. "FORD" KINDER, KINDER & :
CO., LTD., VADIVOX, LTD., JULES M.          :
"JOE" BACAL, GRIFFIN BACAL, INC.,           :
STARWILD MUSIC BMI, WILDSTAR                :
MUSIC ASCAP, SUNBOW PRODUCTIONS, :
INC., and JOHN AND JANE DOES 1-10,          :
                                            :
                 Defendants.                :
                                            :
———————————————————— x
                                            :
ANNE BRYANT                                 :
                                            :
                 Plaintiff,                 :
                                            :
           v.                               :     Index No. 2821/02
                                            :
SUNBOW PRODUCTIONS, INC.                    :     Hon. Andrew P. O'Rourke
                                            :
                 Defendant.                 :
                                            :
———————————————————— x

## DEFENDANT SUNBOW PRODUCTION, INC.'S POST-HEARING BRIEF IN SUPPORT OF ITS CONTENTIONS THAT: (1) PLAINTIFF'S SIGNATURES ARE GENUINE, (2) PLAINTIFF ALWAYS WORKED PURSUANT TO WRITTEN WORK-FOR-HIRE AGREEMENTS, AND (3) THE CASE SHOULD BE DISMISSED ENTIRELY

PATTERSON, BELKNAP, WEBB & TYLER LLP
ATTORNEYS FOR DEFENDANT SUNBOW PRODUCTIONS, INC.
1133 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK  10036
(212) 336-2000
GLORIA C. PHARES
LAUREN HAMMER BRESLOW

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES..................................................................................................... ii

PRELIMINARY STATEMENT.............................................................................................1

ARGUMENT..........................................................................................................................3

I.     Anne Bryant Signed Both the Jem and
       My Little Pony & Friends Agreements. .......................................................................3

       A.     The Disputed Signatures Are Genuine. .............................................................3

       B.     The Agreements Are Authentic. .........................................................................7

II.    The Significance of Plaintiff's Signatures Being Genuine:
       She Worked Pursuant to Written Work-for-Hire Agreements,
       Not Oral Agreements as She Has Claimed. ..................................................................8

III.   This Case Should Be Dismissed. ................................................................................13

       A.     Because Plaintiff Worked for Sunbow Pursuant to
              Written Work-for-Hire Agreements, Nothing Remains
              of Her Claim to Damages Under Her Theory of an Oral
              Working Agreement. ..........................................................................................13

       B.     Plaintiff's Pattern of Changing Her Testimony Makes
              Her Incredible and Unworthy of Being Trusted. .............................................14

       C.     Plaintiff's Unjust Enrichment and Constructive Trust
              Claims Must Be Dismissed Because Sunbow Received
              No Part of Plaintiff's Performance Royalties.....................................................18

              1.     Sunbow Received None of the Writers' Share of
                     Performance Royalties.............................................................................19

              2.     Plaintiff and Sunbow Had No Confidential or
                     Fiduciary Relationship. ..........................................................................20

CONCLUSION......................................................................................................................21

## TABLE OF AUTHORITIES

PAGE

### CASES

A&M Wallboard, Inc. v. Marina Towers Assoc.,
169 A.D.2d 751, 565 N.Y.S.2d 118 (2d Dep't 1991)............................................9

Hastings v. Brooklyn Life Ins. Co.,
138 N.Y. 473, 34 N.E. 289 (1893) ..........................................................................9

Mellencamp v. Riva Music Ltd.,
698 F. Supp. 1154 (S.D.N.Y. 1988) .....................................................................21

Mente v. Wenzel,
178 A.D. 705, 577 N.Y.S.2d 167 (3d Dep't 1991) ..............................................19

Paine Webber Real Estate Sec., Inc. v. D.G. Meyer & Co.,
835 F. Supp. 116 (S.D.N.Y. 1993),
aff'd, 9 F.3d 242 (2d Cir. 1993) ...........................................................................21

People v. Deblinger,
179 Misc. 2d 35, 683 N.Y.S.2d 814
(N.Y. Sup. Ct. 1998), aff'd, 267 A.D.2d 395,
700 N.Y.S.2d 723 (2d Dep't 1999) ......................................................................15

Sharp v. Kosmalski,
40 N.Y.2d 119, 386 N.E.2d 721, 386 N.Y.S.2d 72 (1976)............................19, 20

Twyeffort v. Unexcelled Mfg. Co.,
263 N.Y. 6, 188 N.E. 138 (1923) ............................................................................9

United States v. Weinstein,
452 F.2d 704 (2d Cir. 1971) .................................................................................14

Van Valen v. Ferraro,
114 A.D.2d 621, 494 N.Y.S.2d 459 (3d Dep't 1985).............................................8

Vogt v. Orlando,
33 A.D.2d 705, 306 N.Y.S.2d 193 (2d Dep't 1969)...............................................4

## TABLE OF AUTHORITIES

PAGE

### STATUTES

17 U.S.C. § 201(a)...................................................................................................16

### OTHER

N.Y. Pattern Jury Instructions — Civil 1:22 (2004).......................................14

Sunbow Productions, Inc. ("Sunbow") submits this brief pursuant to the Court's October 29, 2004 order that the parties submit papers addressing whether Plaintiff's disputed signatures are genuine, the significance of a finding that the signatures are Plaintiff's, and "what remains, if anything, in this trial." (Ex. 1, 10/29/04 Hearing Transcript, p. 81.) Sunbow respectfully submits that (1) Plaintiff's disputed signatures are genuine; (2) Plaintiff worked pursuant to written agreements, not oral agreements as she has claimed; and (3) the Court should dismiss Plaintiff's case entirely because the only reason she survived summary judgment was her now disproved oral agreement theory, and Plaintiff has now admitted that Sunbow never received any part of her "writer's share" of performance royalties, the issue that was the subject of Sunbow's original motion for summary judgment.

## PRELIMINARY STATEMENT

Since November 2003, when Plaintiff first claimed she had worked for Sunbow pursuant to an oral working relationship, Sunbow has steadfastly maintained that it would not have hired Plaintiff without a written work-for-hire agreement and that there were such written agreements for all the compositions at issue in the case, even if they could not be found. Because of this belief, Sunbow continued to search for the original contracts even during the trial, a search which ultimately proved successful. In August 2004, Sunbow discovered several relevant contracts, which it immediately produced to Plaintiff and the Court.

Two of the written agreements Sunbow discovered are work-for-hire agreements between Sunbow and Kinder & Bryant Ltd. ("Kinder & Bryant"), the

company at which Plaintiff worked during the relevant period: a 1985 Jem agreement
and a 1986 amendment to it (collectively "the Jem agreement") and a 1985 My Little
Pony & Friends agreement. In addition to Ford Kinder's original signatures for Kinder
& Bryant, Plaintiff's original ink signatures are on two ancillary pages of each of these
agreements. Sunbow also produced three written and executed work-for-hire
agreements with Griffin Bacal, Inc. ("GBI"), the advertising agency for which Plaintiff
also testified that Kinder & Bryant worked pursuant to oral agreements and had never
signed agreements.

 In an August 19, 2004 letter to the Court, Sunbow stated its position that
(1) the signed documents with Sunbow proved what Sunbow had been telling the
Court—that Plaintiff worked for Sunbow pursuant to written agreements—and
(2) Plaintiff's oral agreement case should be dismissed.

 Plaintiff submitted two affidavits in response to Sunbow's letter: hers and
another from Ford Kinder, the former President of Kinder & Bryant, and the signatory
for Kinder & Bryant on both the Jem and My Little Pony & Friends agreements. Kinder
stated that the signatures on the Jem and My Little Pony & Friends agreements
appeared to be his. (Ex. V, ¶6.) Plaintiff nevertheless claimed the two work-for-hire
agreements were not genuine because her signatures had been forged or had been
improperly fixed to the contracts. (Ex. 2, Pl's 9/8/04 Affidavit.) Based on this
contention, the Court ordered a framed issue hearing as to the validity of the written
Sunbow work-for-hire contracts.

Before the hearing was held, Plaintiff's counsel, Patrick Monaghan, Jr.,
submitted a letter to the Court in which he explained that Plaintiff, contrary to her
original claims of forgery, now acknowledged that the signatures on the Jem contract
were hers. (Ex. W, p. 2.)

At the hearing, Sunbow proved not only that the disputed signatures were
indeed Plaintiff's, but that it was Sunbow's custom and practice to work with artists
only when they signed work-for-hire agreements, just as Plaintiff did in this case.
Although Plaintiff cross-examined Sunbow's witnesses, she offered not a shred of
evidence to support her claims that the signatures on the contracts were forgeries or
were improper.

Because the written work-for-hire contracts are genuine and authentic, the
Court should dismiss Plaintiff's claims that an oral agreement entitles her to payment
for the use of songs she wrote for Sunbow. Also, for the reasons explained below, the
Court can dispose of the remainder of Plaintiff's complaint, namely her unjust
enrichment and constructive trust claims.

## ARGUMENT

### I.    Anne Bryant Signed Both the Jem and My Little Pony & Friends Agreements.

#### A.    The Disputed Signatures Are Genuine.

Even before the framed issue hearing, this Court noted, based on its own
examination of the documents, that the contract signatures that Plaintiff disputed
looked similar to the signatures she had identified as genuine. Sunbow's handwriting
expert confirmed the accuracy of the Court's impression, concluding that the

"questioned signatures and the known signatures were all the product of the same person." (Ex. 1, p. 65.) Plaintiff offered no contradictory evidence. Accordingly, the Court should conclude that the disputed signatures on the Jem and My Little Pony & Friends agreements are genuine.

New York CPLR R 4536 states that: "Comparison of a disputed writing with any writing proved to the satisfaction of the court to be the handwriting of the person claimed to have made the disputed writing shall be permitted." While a court can consider whether a signature is genuine on its own accord, expert witnesses may be called to compare genuine and disputed writings. See Vogt v. Orlando, 33 A.D.2d 705, 306 N.Y.S.2d 193 (2d Dep't 1969).

Pursuant to CPLR R 4536, the Court preliminarily ruled it was "inclined to find that the disputed signatures are proved to its satisfaction [to be Plaintiff's]." (Ex. 3, 9/22/04 Order p. 2.) The Court "nevertheless" ordered a framed issue hearing regarding "the genuineness and authenticity of the documents and the signatures they bear."[1] (Id., p. 3)

In response to the Court's order, Sunbow called Gus R. Lesnevich, a noted handwriting expert,[2] to compare original contemporaneous samples of Plaintiff's

---

[1]    The Court also suggested that it expected to hear information about the discovery of the agreements, but the Court confirmed in chambers on October 29, 2004 that it did not need more commentary on their discovery because the issue was addressed at length by Sunbow's counsel at the September 13, 2004 hearing.

[2]    Mr. Lesnevich has a lengthy and distinguished record judging handwriting: he trained with the United States Army Criminal Investigation Laboratory, worked with the U.S. Secret Service, and, while now in private practice, still works for the government in many cases. His resume includes work on the Iran-Contra affair, the Vince Foster suicide, and the embassy bombings in Africa. He has also been engaged on civil matters like this one, including a case involving the Harry Potter series. (Ex. 1, p. 56-56.) His objectivity as a witness is further

genuine signatures with the disputed signatures in the Jem[3] and My Little Pony &
Friends agreements. (See Ex. U.)

        To determine whether Plaintiff's signatures on the contracts are genuine,
Mr. Lesnevich compared the original Jem agreement and the My Little Pony & Friends
agreement with the originals of several signatures from the same period that Plaintiff
provided and identified as genuine. For his analysis, Mr. Lesnevich used the genuine
signatures on the following documents: six checks from the 1980s, a 1987 5500EZ tax
form, the 1989 dissolution agreement between Plaintiff and Ford Kinder, and a 1987
Schedule P tax form. He organized these documents into one exhibit, admitted into
evidence at the framed issue hearing as Exhibit U.

        Mr. Lesnevich firmly concluded that the signatures on the disputed and
genuine documents were made by the same person. (Ex. 1, p. 65.) He showed the
Court that even among the known signatures, "there [was] a great deal of variation in
[the] individual's signing of the name," but certain elements of the signatures were the
same. (Ex. 1, p. 68.) For example, he noted the "spontaneous and natural" form of the
signature by pointing the Court to how "the writer goes from the middle letter to the
last letter [and] you can see the pen['s] coming up very little before it gets heavy in the
final movements." (Ex. 1, p. 68; see Arrow 5 of Ex. U.) Another example of the
consistency among the signatures is the eyelet within the signature, demonstrated by

---

confirmed by Plaintiff's counsel's statement that Sunbow "got [his name], from me." (Ex. 1,
p. 57.)

3    By letter dated September 26, 2004 and at the hearing, Plaintiff had conceded that the
signatures on the Jem contract were hers. (Ex. W; Ex. 1, p. 65.) Because she originally denied
the signatures, however, Sunbow's expert addressed their validity.

Arrow 2 in Q1b of Exhibit U. As Mr. Lesnevich explained, "the writer starts to make a

formation like a triangle" and then, as demonstrated by Arrow 3, makes a lateral

movement to the next letter. (Ex. 1, p. 69-70; Ex. U.)

>       After further explanation to the Court, Mr. Lesnevich concluded that:

> *[The disputed signatures] were naturally and spontaneously written.* Each one
> has normal variations to it but the same variations can be found within the
> known signatures. If you're dealing with simulations or forgeries you
> would expect all . . . of the questioned signatures to look almost the same.
> If a person were using one model to work with or if a person practiced all
> [the signatures] it would be almost the same. You would not have this
> natural variation you see. *Plus the signatures are written quickly and rapidly,
> and there's no evidence of any hesitation or tracing.*

(Ex. 1, p. 71-72 (emphasis added).)[4]

>       On cross-examination, Mr. Lesnevich explained, "I would not have

rendered a definitive conclusion such as this [i.e., that the signatures were Plaintiff's] . . .

if I didn't feel I had enough known writings." (Ex. 1, p. 73) In other words, in his expert

opinion, Mr. Lesnevich is certain that Plaintiff signed both the Jem agreement and the

My Little Pony & Friends agreement.

>       Plaintiff offered no evidence to rebut Mr. Lesnevich's conclusion that the

signatures are genuine. Accordingly, the Court should find the signatures on the

contracts to be Plaintiff's.

---

4       The hearing transcript for the October 29, 2004 framed issue hearing is full of spelling
errors. Rather than pepper quotations with [sic]s, we have corrected the spelling.

B.     The Agreements Are Authentic.

In her affidavit and at the hearing, Plaintiff insinuated — without supporting evidence — that the pages bearing her signature were somehow affixed to the wrong documents. Plaintiff offered no proof of such malfeasance.[5]

Moreover, the very pages Plaintiff signed dispense with her unsupported speculation. Plaintiff signed the Jem agreement twice, once on Schedule A (Ex. M, p. 11), and once on the inducement letter. (Id., pp. 12-13.) Schedule A specifically refers to the Jem agreement, and, in that Schedule A, Plaintiff warrants that the work she did for Kinder & Bryant was made for hire. (Id., p. 11.) The inducement letter that Bryant signed has the following re line: "Sunbow Productions, Inc. with *Kinder & Bryant Ltd./Jem*" (emphasis added). (Id., p. 12-13) In that letter, Plaintiff warrants, among other things, that she "entered into an agreement . . . with [Sunbow]" and that she "is familiar with each and all of the terms, covenants and conditions of the Agreement and . . . consents to the execution thereof. " (Id., pp. 12-13.)

Plaintiff likewise signed the same two documents with regard to My Little Pony & Friends; the only difference in the form documents is that those two refer to the My Little Pony & Friends agreement (as opposed to the Jem agreement). (Ex. N, pp. 11-13.) Because the pages she signed refer to and incorporate the agreements to

---

5    At the September 13, 2004 conference, Sunbow proffered that its counsel had found the Sunbow contracts in notebooks in the page order in which they were produced to Plaintiff and the Court. The Court offered Plaintiff's counsel the opportunity to examine Sunbow's counsel about the search and the discovery of the contracts, but Plaintiff's counsel declined the opportunity to examine Sunbow's counsel.

which they belong, Plaintiff has no claim that they were improperly attached to the agreements.

Finally, Kinder's original ink signature is on each of the four pages Bryant signed. It strains credulity to think that one of these signatures was forged but the other one was not. There is no evidence of forgery or mismatching. Accordingly, based on the Court's own review of the signatures and the expert witness testimony, the Court should conclude that Plaintiff's signatures on both the Jem and My Little Pony & Friends agreements are genuine and that the documents are authentic. Van Valen v. Ferraro, 114 A.D.2d 621, 622, 494 N.Y.S.2d 459, 461 (3d Dep't 1985) (upholding trial court's conclusion that defendants' signatures were genuine, where defendants offered no expert witness, and court visually compared signatures and found defendants' testimony was "incredible").

II.    The Significance of Plaintiff's Signatures Being Genuine:
       She Worked Pursuant to Written Work-for-Hire Agreements,
       Not Oral Agreements as She Has Claimed.

The record demonstrates—as Sunbow has maintained to the Court throughout this case—that Plaintiff always worked for Sunbow pursuant to written agreements only. She never worked for Sunbow pursuant to oral agreements (as she only began to claim in the fall of 2003).

First, Plaintiff's genuine signatures on the Jem and My Little Pony & Friends agreements show she signed written agreements with Sunbow. Second, Ford Kinder, the President of Kinder & Bryant, signed these agreements for their company. In his September 9, 2004 declaration, Kinder expressly states that the signatures on the

Jem and My Little Pony agreements appear to be his.  (Ex. V, ¶ 6.)  This Court has

already concluded that the signatures of Kinder (President of Kinder & Bryant) for

Kinder & Bryant bind the company, regardless of whether Plaintiff co-signed the

contracts (Ex. 3, p. 3), because "[t]he president or other general officer of a corporation

has power, prima facie, to do any act which the directors could authorize or ratify."

Hastings v. Brooklyn Life Ins. Co., 138 N.Y. 473, 479, 34 N.E. 289, 291 (1893); Twyeffort

v. Unexcelled Mfg. Co., 263 N.Y. 6, 9-10, 188 N.E. 138, 139 (1923) (same); A&M

Wallboard, Inc. v. Marina Towers Assoc., 169 A.D.2d 751, 565 N.Y.S.2d 118 (2d Dep't

1991) ("President . . . is presumed to . . . have authority to enter into contracts in the

ordinary course of the corporation's business."); see also Ex. 4, 3/31/03 Bryant

Deposition, p. 44 ("Q:  Did you have a written contract to produce the compositions at

issue in this case?  A:  Ford Kinder told me that there was a contract.  I don't remember

signing a contract with them, but he was my partner and he said that there was contract

at some point in our association with those people.")  Thus, Kinder's signatures alone

support the conclusion that Plaintiff worked, as part of Kinder & Bryant, pursuant to

written agreements with Sunbow.[6]

---

[6]     That Kinder & Bryant worked pursuant to written agreements, not oral agreements, is
further corroborated by the agreements that Kinder and Plaintiff signed with GBI, Inc., a non-
party to this case, with whom Bryant testified Kinder & Bryant had also worked pursuant only
to oral agreements and had never signed work-for-hire agreements.  Sunbow produced three
examples of contracts that Kinder & Bryant signed with GBI during the same time period that it
worked for Sunbow: a March 21, 1984 Transformers agreement (with a personal
acknowledgement signed by Plaintiff); an April 8, 1988 Visionaries agreement, and an April 8,
1988 Transformers agreement.  Sunbow Production Numbers 896-918.  At the framed issue
hearing, Plaintiff conceded that she signed the March 21, 1984 agreement.  (Ex. 1, p. 49.)

Third, at the framed issue hearing, Sunbow offered testimonial and documentary evidence that it was Sunbow's practice to work with composers and lyricists, such as Plaintiff, only after they signed written agreements. This evidence corroborates that Plaintiff worked pursuant to written agreements with Sunbow for all the compositions in this case.

At the hearing, Sunbow presented the testimony of Robert Harris, an entertainment and intellectual property lawyer, who was Sunbow's former outside counsel from 1982 through 1998, and is familiar with Sunbow's contractual practices during that period. (Ex. 1, p. 3.)  Harris testified that it was Sunbow's practice to obtain signed work-for-hire agreements from the artists with whom it worked. (Ex. 1, p. 4.) He explained that Sunbow did this because "television and film productions are collaborative efforts . . . and in order to obtain ownership of the various contributions and hence the entire production, it was necessary either to acquire them by work for hire or assignment, and . . . we would use work for hire agreements."  (Id.) Harris also specifically contradicted Plaintiff's oral agreement theory when he testified that, to his knowledge, Sunbow did not "work with writers, lyricists, or composers according to oral agreements." (Id.) Also, as far as Harris is aware, Sunbow did not "contract with creative people without" the involvement of his firm. (Ex. 1, p. 10.)

Harris further testified that Sunbow's practice was to use form agreements with its artists. (Ex. 1, p. 5-6.) He identified the various work-for-hire agreements in the Jem binder (Exhibit K) and My Little Pony binder (Exhibit L) as the "[kinds of]

agreements that were used."[7] (Ex. 1, p. 6, 8, 11.) Harris also reviewed a binder of 14

written work-for-hire agreements (Exhibit Q), all signed by Sunbow and various artists

for TV series based on Hasbro toys. He told the Court that they were all "basically the

same work for hire agreements." (Ex. 1, p. 25.)

        Harris testified further with regard to the agreements at issue here. He

confirmed that he prepared written work-for-hire agreements for the relevant Hasbro

toys, including Transformers, Jem, My Little Pony, My Little Pony & Friends, G.I. Joe,

Visionaries, Charmkins, and Glow Friends. (Ex. 1, p. 4.)

        What is more, Harris specifically recalled preparing written agreements

between Sunbow and Kinder & Bryant and negotiating with Kinder & Bryant's lawyer,

William Dobishinski. (Ex. 1, p. 13-14.) Harris specifically recalled negotiating the Jem

agreement and the amendment to it, admitted as Exhibit M and Exhibit O. He also

identified the signatures on both those documents as belonging to Carole Weitzman,

Sunbow's Senior Vice-President of Production, who signed many of the agreements for

Sunbow. (Ex. 1, p. 15-17.) Harris similarly remembered negotiating the My Little Pony

& Friends agreement, admitted as Exhibit N, and identified Carole Weitzman's

signature on that agreement. (Ex. 1, p. 16.)

        Thus, Harris established at the hearing that Sunbow's custom and practice

was to require artists to sign standard written work-for-hire agreements. Moreover, he

specifically recalled Plaintiff's company, Kinder & Bryant, engaging in the negotiation

---

[7]    Mr. Harris even recognized his handwriting on the Jem contract with the lyricist. (Ex. 1, p. 9.)

of such written contracts. In summary, Plaintiff's signature, Kinder's signature, and the testimony of Sunbow's former counsel all demonstrate that Plaintiff worked for Sunbow pursuant to written agreements, not oral agreements. Plaintiff offered no evidence to the contrary.

Plaintiff has offered nothing to rebut Sunbow's evidence that she signed contracts with Sunbow, contrary to her testimony since November 30, 2003. The expert witness demonstrated her claims of forgery to be false, and the signed contracts prove her representations about oral agreements to be at least false, if not a fraud on the Court. Indeed, before Sunbow disclosed that it could not locate the work-for-hire agreements in response to Plaintiff's late discovery request, Plaintiff repeatedly testified at her March 31, 2003 deposition that she had always worked with Sunbow and GBI pursuant to written work-for-hire agreements. (Ex. 4, p. 44 ("Q: Did you have a written contract to produce the compositions at issue in this case? A: Ford Kinder told me that there was a contract. I don't remember signing a contract with them, but he was my partner and he said that there was contract at some point in our association with those people."); p. 49 ("Q: So under these working agreements you were not the copyright owner of the composition? A: No.")). Supporting Plaintiff's March 2003 deposition testimony and the Jem and My Little Pony & Friends agreements signed by Plaintiff is Mr. Harris's testimony that it was Sunbow's custom and practice to execute written contracts with the artists it commissioned, just as it did with Kinder & Bryant.

Accordingly, based on all the evidence presented at the framed-issue hearing, this Court should find that Plaintiff signed written agreements with Sunbow

for all her work for Sunbow and that she did not work for Sunbow pursuant to oral

agreements.

III.   This Case Should Be Dismissed.

Sunbow contends that nothing in this case remains to be tried: (1) all the

credible evidence shows that Plaintiff always worked with Sunbow pursuant to written

work-for-hire agreements (this case should never have gone to trial in an effort to prove

the terms of her so-called oral working arrangement because such an arrangement

never existed); and (2) Plaintiff has now admitted that Sunbow received no part of the

performance royalties due to Plaintiff that served as the basis for her unjust enrichment

claim. As nothing remains to Plaintiff's case, it should be dismissed with prejudice.

A.   Because Plaintiff Worked for Sunbow Pursuant to Written
Work-for-Hire Agreements, Nothing Remains of Her Claim to
Damages Under Her Theory of an Oral Working Agreement.

This case went to trial because the Court concluded that Plaintiff's

putative oral agreement with Sunbow raised a triable issue of fact. (Ex. 5, 12/24/03

Order, p. 4.) The evidence Sunbow presented at the framed-issue hearing supports the

conclusion that Kinder & Bryant signed not only the two work-for-hire agreements that

Sunbow was able to locate (for Jem and My Little Pony and Friends), but comparable

work-for-hire agreements for all the TV Series on which she worked. In other words,

the evidence shows that Plaintiff's claim of oral working agreements – the only reason

why this case proceeded to trial – was bogus.

Plaintiff has suggested only one theory for not dismissing this case

outright and continuing the trial: the Court should infer that she did not sign any

falsification, and to make it no more than prudent to regard all that [she] says with strong suspicion and to place no reliance on [her] mere statements." (citation omitted) (Friendly, J.)); People v. Deblinger, 179 Misc.2d 35, 41, 683 N.Y.S.2d 814, 818 (N.Y. Sup. Ct. 1998), aff'd, 267 A.D.2d 395, 700 N.Y.S.2d 723 (2d Dep't 1999) (trial court questioned "entire testimony" of complainant where she "testified falsely about one aspect of the case.").

The chronological record of this case leads to the inescapable conclusion that Plaintiff manufactured her claim of an oral working arrangement only after she learned that Sunbow was unable to locate the signed work-for-hire agreements that could disprove the claim. When Plaintiff filed her original complaint in 2000, she did not allege an oral working agreement. Nor did she do so when she re-filed her complaint against Sunbow in 2002. Nor did she do so when she amended her complaint in December 2002.

Nor did she at her March 2003 deposition. There, in the presence of her lawyer, who was an active participant, she testified repeatedly that

"[a]s it always applied in my career . . . the work I've done has been made for hire on behalf of the publisher, client, whomever they assigned it to" (Ex. 4, p. 42:23-43:2.)

She confirmed that "when [she] wrote the compositions in this case, [she] was working on a work for hire basis." (Id. at 43:23-44:2.)

When asked whether she had a written agreement to produce the musical compositions for the TV Series, she replied "Ford Kinder told me that there was a contract. I don't remember ever signing a contract with them, but he was my partner and he said there was a contract at some point in our association with those people. " (Id. at 44:5-9.)

> In response to the question whether as a general matter, Kinder & Bryant
> used a <u>written</u> contract in their business dealings with its clients, Plaintiff
> answer "As a general rule, there was always some kind of piece of paper I
> think that existed. There may have been exceptions but [there was] some
> kind of royalty assignment or payment agreement or reimbursement that
> set forth the terms. They often presented it to us, that more often was the
> case." (<u>Id.</u> at 74:14-18, 75: 4-10.)

Thus, as of March 2003, Plaintiff had said nothing about working pursuant

to an oral working relationship. She worked for hire; the agreements were written; they

were usually provided by their clients; and her partner Ford Kinder handled the

paperwork, and she relied on him.

All that changed in October 2003 when Plaintiff learned from Sunbow's

responses to her late-filed discovery requests that Sunbow could not locate the signed

work-for-hire agreements. At this time, Sunbow had already served its motion for

summary judgment, and Plaintiff had yet to file her response in opposition.

Suddenly, in her opposition to Sunbow's motion, Plaintiff for the first time

claimed that she was a copyright owner (Ex. 6, Pl's 11/26/03 Motion in Opp. to Defs'

Motion for Summary Judgment, p. 22-24) — as indeed she would have been had she

never signed agreements with Sunbow, because by statute, copyright vests initially in

the creator of a work, 17 U.S.C. § 201(a). In her affidavit, Plaintiff states that "[she]

<u>never executed a written contract with GBI, Sunbow</u>, or [Sunbow's publishing

companies]." (Ex. 7, 11/25/03 Bryant Aff., p. 6 (emphasis added).) The memorandum

of law submitted by her lawyer stated "there is no dispute that <u>plaintiff never signed</u>

<u>any contract transferring or assigning her rights to her compositions</u> to any of the

defendants. Accordingly, <u>plaintiff retains all rights in her compositions</u> . . . ." (Ex. 6,

p. 3 (emphasis added.)) In other words, knowing that Sunbow could not refute the contention, Plaintiff simply abandoned the sworn testimony she had given in March 2003 and swore to the opposite in November 2003.

Plaintiff — and her lawyer — maintained that position until Sunbow found the agreements that exposed the lie. Although Ford Kinder candidly acknowledged his signatures on the agreements that Sunbow found, Plaintiff still could not own up to her dissembling and claimed that the signatures were forged and the documents manipulated. At a hearing called to test the claim of forgery, Sunbow's expert testified that the signatures were genuine without any hesitation or qualification, and Plaintiff offered no affirmative evidence.

Part of the role of a fact-finder is to assess the demeanor and veracity of a witness. If a witness is not candid in any part of her testimony, the fact-finder is entitled to dismiss it as to other matters, especially as here when supported by other testimony and documents. Sunbow has produced executed agreements supporting its contention, maintained since Plaintiff raised the issue, that Plaintiff had signed work-for-hire agreements. It has provided solid and probative evidence that it was Sunbow's practice to do so in all cases, and that it did so in all cases with Plaintiff.

The only testimony to the contrary is Plaintiff's. The Court has ample evidence that Plaintiff manipulated the facts rather than tell the truth. In assessing veracity and drawing inferences, the Court should reject Plaintiff's shameful effort to engineer an outcome in this case that was not consistent with the facts. It should reject Plaintiff's testimony and find, as Plaintiff herself readily conceded in March 2003 at her

deposition, that she did indeed sign work-for-hire agreements with Sunbow for all the

compositions she wrote and she did so in written agreements.

Going to trial to determine the terms of Plaintiff's putative oral

agreements was unnecessary because Plaintiff always worked pursuant to written

work-for-hire agreements. As the evidence of that is now clear, the trial should not

continue. This case should be dismissed with prejudice to the extent it rests upon

Plaintiff's claim that she was entitled to recovery based on oral agreements.

C.    Plaintiff's Unjust Enrichment and Constructive Trust
      Claims Must Be Dismissed Because Sunbow Received
      No Part of Plaintiff's Performance Royalties.

The Court should also dismiss the case that Plaintiff originally pled — for

unjust enrichment and constructive trust — based on a diversion of performance

royalties due her from BMI. Plaintiff has admitted that Sunbow received none of these

royalties.

As discussed at trial, performance royalties are those royalties earned

from the exercise of the public performance of a musical composition, for example, from

the broadcast on TV of a children's cartoon program. Performance royalties are thought

of as having two parts: half is paid to the publishers of a musical composition, and the

other half is paid to the songwriters. The first half is referred to as the "publisher's

share" and the latter as the "writer's share" of the public performance royalties. Public

performance societies such as Broadcast Music, Inc. ("BMI") license the right to perform

the music in their catalogues to entities such as TV networks, auditoriums where music

is performed, and clubs and dance halls. The performing rights societies also collect

royalties from these public performances and then distribute those royalties to their song writer and publisher members.

Plaintiff is a member of BMI and the gist of her claim regarding the performance royalties was that a portion of the writer's share of performance royalties that she was entitled to receive was diverted to others who were thereby unjustly enriched and on whom she sought to impose a constructive trust. (The publisher's share of the public performance royalties were never at issue.)

> 1.   Sunbow Received None of the Writers'
>        Share of Performance Royalties.

To prevail, Plaintiff was required to prove as an element of both her unjust enrichment and constructive trust claims that Sunbow received some part of the writer's share of the performance royalties due to Plaintiff. See, e.g., Mente v. Wenzel, 178 A.D. 705, 706, 577 N.Y.S.2d 167, 169 (3d Dep't 1991) (unjust enrichment arises when defendants obtain "benefit that in equity and good conscience they should not have obtained or possessed"); Sharp v. Kosmalski, 40 N.Y.2d 119, 121, 386 N.E.2d 721, 723, 386 N.Y.S.2d 72, 74 (1976) (constructive trust warranted where defendant has acquired property under circumstances where cannot "in good conscience" retain it). Not only has Plaintiff failed to show that Sunbow received any part of the writer's share of the public performance royalties, but Plaintiff has consistently admitted — both at her March 31, 2003 deposition and at trial — that it did not.

During her March 2003 deposition, Plaintiff admitted that she does not believe that "Sunbow has collected any monies that are due and owing" to her. (Ex. 4,

p. 194.) At trial, Plaintiff confirmed that she does not contend that Sunbow has ever received any part of the writers' share of public performance royalties that Plaintiff believes she has been deprived. (Ex. 8, 7/9/04 Trial Tr., pp. 32-33.) Because Plaintiff does not claim that Sunbow retained any public performance royalties that rightfully belong to her, her claims for unjust enrichment and for a constructive trust fail as a matter of law.

2. Plaintiff and Sunbow Had No
Confidential or Fiduciary Relationship.

Plaintiff's claim against Sunbow for a constructive trust fails for the additional reason that Plaintiff failed to demonstrate that she had a confidential or fiduciary relationship with Sunbow on which she relied in connection with her public performance royalties, an essential element to a constructive trust claim. See Sharp, 40 N.Y.2d at 121, 386 N.E.2d at 723, 386 N.Y.S.2d at 74 (1976) (requiring plaintiff to prove a confidential or fiduciary relation, a promise, a transfer in reliance thereon and unjust enrichment for constructive trust claim).

As the Court has already concluded, Plaintiff had nothing more than a commercial relationship with Sunbow. (Ex. 9, pp. 15-16 (stating "The Court further finds . . . that plaintiff woefully failed to demonstrate that it is appropriate to pierce the corporate veil and find that Bacal's identity was one with the production company Sunbow, which of course otherwise had no confidential relationship with plaintiff . . ." (emphasis added)); Ex. 4, p. 90, 92-94.) Thus, as a matter of law, she did not have the kind of confidential or fiduciary relationship required before imposing a constructive

trust.  See Paine Webber Real Estate Sec., Inc. v. D.G. Meyer & Co., 835 F. Supp. 116, 119

(S.D.N.Y. 1993), aff'd, 9 F.3d 242 (2d Cir. 1993); see also Mellencamp v. Riva Music Ltd.,

698 F. Supp. 1154, 1157-58 (S.D.N.Y. 1988).

       In other words, as a matter of law, nothing remains in this case of

Plaintiff's claims for unjust enrichment and constructive trust and this Court should

dismiss the Amended Complaint with prejudice.

### CONCLUSION

       For the foregoing reasons, Sunbow respectfully requests that the Court

conclude that (1) Plaintiff's signatures on the work-for-hire agreements are genuine;

(2) Plaintiff worked for Sunbow pursuant to signed work-for-hire agreements for all the

compositions in this case; and (3) the case should be dismissed with prejudice both

because Plaintiff never worked with Sunbow pursuant to an oral agreement and, as

Plaintiff admits,  Sunbow never received any part of Plaintiff's writers' share of

performance royalties.

Dated:     New York, New York
           January 28, 2005

                  Respectfully submitted,

                  PATTERSON, BELKNAP, WEBB & TYLER LLP

                  By:_____
                      Gloria C. Phares
                      Lauren Hammer Breslow
                  1133 Avenue of the Americas
                  New York, New York 10036
                  (212) 336-2000

                  Attorneys for Defendant Sunbow Productions, Inc

# EXHIBIT 65

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

55576-017

SERIAL NO. 245

SERVED

RECEIVED

FILED

| ANNE BRYANT, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| BROADCAST MUSIC, INC. | : | |
| (a/k/a/"BMI"), FORD KINDER, | : | |
| KINDER & CO., LTD., | : | Index No. 5192/00 |
| VADIVOX, INC., JULES M. "JOE" | : | Hon. Andrew P. O'Rourke |
| BACAL; GRIFFIN BACAL, INC., | : | |
| STARWILD MUSIC BMI, WILDSTAR | : | |
| MUSIC ASCAP, SUNBOW | : | |
| PRODUCTIONS, INC., | : | |
| | : | |
| Defendants. | : | |
| ANNE BRYANT, | : | |
| Plaintiff, | : | |
| | : | Index No. 2821/02 |
| v. | : | Andrew P. O'Rourke |
| | : | |
| SUNBOW PRODUCTIONS, INC., | : | |
| | : | |
| Defendant. | : | |

---

**MEMORANDUM OF LAW RELATIVE TO FRAMED ISSUE HEARING OF
OCTOBER 29, 2004**

---

Monaghan, Monaghan, Lamb &
Marchisio, LLP
Attorneys for Plaintiff
150 West 55th Street, Suite 1G
New York, New York 10019
Tel. (212) 541-6980
Fax. (212) 541-6994

- and -

28 West Grand Avenue
Montvale, New Jersey 07645
Tel. (201) 802-9060
Fax. (201) 802-9066

Patrick J. Monaghan, Jr., Esq.
Carlos E. Perez, Esq.

## PRELIMINARY STATEMENT

This matter comes before the Court after a Framed

Issue Hearing ("FIH") held on October 29, 2004, regarding

the documents, produced by defendant Sunbow Productions,

Ltd. ["Sunbow"], in mid trial. At the FIH, Sunbow

proffered only two witnesses , Robert Harris, Esq., prior

attorney for Sunbow and Griffin Bacal, Inc., ["GBI"] and Mr.

Gus Lesnevich, a handwriting expert. The Court ordered the

parties to respond to the evidence at the FIH and state

their respective positions as to the impact of the alleged

documents and agreements on the proceedings. It is noted

that the application of the statute of frauds, an issue

raised for the first time immediately before trial by

Sunbow, is not in the case as the Court ruled that Sunbow

had delayed in raising it. Accordingly, the documents are

to be viewed in the context of their application to matters

other than the requirement of a writing and with regard to

confirming, or rejecting, or delineating any alleged

agreements between the parties.

## POINTI

### A NEGATIVE INFERENCE SHOULD BE DRAWN FROM SUNBOW'S FAILURE TO PRODUCE CAROL WEITZMAN, JULES BACAL OR THOMAS GRIFFIN

The Court, as the trier of fact, should draw a

negative inference from Sunbow's failure to produce Sunbow

witnesses, and so designated by it, Carol Weitzman, Jules

2

Bacal or Thomas Griffin at the FIH held on October 29, 2004
and conclude that such witnesses would substantiate
plaintiff's contentions as to the agreement regarding
plaintiff's retention of her writer's share of publishing
income.   In fact, these important Sunbow witnesses,
Weitzman, Griffin and Bacal, would have to agree with the
statements in the November 14, 1994 letter of Sunbow's own
attorney, the draftsman of the GBI and Sunbow agreements,
Robert Harris, Esq. (Bryant Exhibit E) when he advised
Weitzman that Sunbow must honor the commitment to share in
music publishing income.

    A party is entitled to a missing witness charge where
the uncalled witness bears information on a material issue,
would be expected to provide non cumulative testimony in
favor of the opposing party and is under the control of and
available to that party.   R.T. Cornell Pharmacy, Inc. v.
John R. Guzzo /d/b/a Hudson Valley Computer System, 135
A.D.2d 1000 (3rd Dep't 1987), (citing People v. Gonzalez, 68
N.Y.2d 424, 427 (1986)).   The concept of control is not
precisely definable, but is utilized in a broad sense and
focuses on the relationship between the witness and the
party.   Gonzalez Supra. 428-429.   This question should not
detain the Court for an instant for it is abundantly clear
that Sunbow could have brought any or all of these

3

witnesses to Court: they were named by it as trial
witnesses.

In this matter, Carol Weitzman was Sunbow's Vice
President in charge of production and has first hand
knowledge of Sunbow's operations. Defendant, can not
realistically argue that Ms. Weitzman is beyond its
control. Defendant has named Ms. Weitzman as a trial
witness and has been able to prepare and submit Ms.
Weitzman's Affidavit in the prior summary judgment motion
before the Court. The plaintiff was never afforded the
opportunity to question Ms. Weitzman with regard to the
recently produced agreements and undoubtedly the Court
wanted to hear from her. This coupled with the timing of
the production of the alleged agreements in mid trial
placed the plaintiff at a disadvantage at this late stage
of the case.

While Sunbow has often argued that plaintiff, who did
not have the documents recently produced, was switching
theories in fact it is Sunbow which has switched from its
statute of frauds argument to reliance upon newly
discovered writings-albeit likely altered, incomplete and
questionable as they are.

4

## POINT II

## THE INTENT OF THE PARTIES HERE CAN ONLY BE DETERMINED IN THE CRUCIBLE OF THE TRIAL

It is well established in contract law that the object when interpreting contracts is the meaning and intent of the parties. "The intention of the parties must be sought for in the language used. To understand the language we may put ourselves in their place and discern if possible the objects they had in view and the motives which dictated their choice of words. A wider meaning may thereby be disclosed." Empire Properties Corp. v. Manufacturers Trust Co., 288 N.Y. 242 (1942) (citing Halsted v. Globe Indemnity Co., 258 N. Y. 176, 180 (1932)). Here that intent should not be determined from what the lawyers on either side say, but rather from the mouths of the parties themselves and that cannot occur without a full hearing. The court, so far as it can, will put itself in the position of the parties and ascertain their intention from the words used, their context and the surrounding circumstances. Shinnecock Hills & Peconic Bay Realty Co. v. Aldrich, 132 A.D. 118, 120 (2nd Dep't 1909); affd., 200 N. Y. 533 (1910). Ambiguities in an agreement should be interpreted most strongly against the draftsman. Rentways, Inc. v O'Neill Milk & Cream Co., 308 N.Y. 342, 348 (1955). However, where a particular interpretation would lead to an absurd result,

5

the courts can reject such a construction in favor of one
which would better accord with the reasonable expectations
of the parties.   Sutton v. East Riv. Sav. Bank, 55 N.Y.2d
550, 555 (1982); Tougher Heating & Plumbing Co. v State of
New York, 73 A.D.2d 732, 733 (3rd Dep't 1979).

    The understandings here between plaintiff and Jules M.
Bacal, the evasive Jules Bacal as the Court noted, are
twenty years old and made even before the technologies
which are now used to exploit plaintiff's music existed.

    From plaintiff's standpoint, Joe Bacal was Sunbow and
GBI.   She has already proven that Bacal, and Sunbow have
made large sums of money on properties using plaintiff's
music. Plaintiff could not have been expected to be
prescient about a broader definition of "record" in dealing
with a contractual definition of mechanical royalties.
Defendant acknowledges that plaintiff is entitled to
performance and mechanical royalties and the Sunbow Jem
Feature Song Agreement, as discussed by Harris certainly
supports her claims.

    The continued interest in publishing income is the
industry standard.   Only defendant's attorneys have claimed
that the plaintiff is not entitled to her writer's share of
publishing income.   This self serving interpretation, *by
Sunbow's attorneys*, of the alleged agreements, if given
effect, would lead to a never-intended result.

## POINT III

## PLAINTIFF SHOULD BE GRANTED LEAVE TO AMEND THE COMPLAINT TO CONFORM TO THE PROOFS IN THE EVENT THE COURT FINDS THE ALLEGED AGREEMENTS TO BE VALID

In the event that the Court finds that the Sunbow Jem agreement governed the parties' relationship, the Plaintiff should be permitted to amend the complaint to include a breach of contract claim by defendant, Sunbow.

Pursuant to CPLR § 3025(c), "a party may amend his pleading, or supplement it by setting forth additional or subsequent transactions or occurrences, at any time by leave of court or by stipulation of all parties.  Leave shall be freely given upon such terms as may be just including the granting of costs and continuances."  An application to amend under CPLR § 3025(c) which authorizes the court to "permit pleadings to be amended before or after judgment to conform them to the evidence, upon such terms as may be just" is addressed to the sound discretion of the court and should be determined in the same manner and by weighing the same considerations as upon a motion to amend pursuant to CPLR § 3025(b).  Murray v. New York, 43 N.Y.2d 400 (1977).

If the court accepts the defendant's documents as valid contracts, then they would nevertheless be subject to interpretation.  As previously discussed, the intent of the parties is essential in contract interpretation.  Given the

7

testimony, even by defendant's own witnesses, the plaintiff

has a cause of action for a breach of contract. The

defendant can not maintain that it would be prejudiced if

the court permits plaintiff to amend the complaint when the

defendant has brought in the documents after the

commencement of trial.

MONAGHAN, MONAGHAN, LAMB & MARCHISIO LLP
Attorneys for Plaintiff
150 W. 55th Street
New York, N.Y. 10019
Tel. 212-541-6980

_____
Patrick J. Monaghan, Jr.

8

# EXHIBIT 66

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

5.557L-c17

SERIAL NO. 246

SERVED

RECEIVED

FILED

```
ANNE BRYANT,                        :
               Plaintiff,           :
                                    :
      v.                            :
                                    :
BROADCAST MUSIC, INC.               :
(a/k/a/"BMI"), FORD KINDER,         :
KINDER & CO., LTD.,                 :    Index No. 5192/00
VADIVOX, INC., JULES M. "JOE"  :         Hon. Andrew P. O'Rourke
BACAL; GRIFFIN BACAL, INC.,         :
STARWILD MUSIC BMI, WILDSTAR        :
MUSIC ASCAP, SUNBOW                 :
PRODUCTIONS, INC.,                  :
                                    :
               Defendants.          :
ANNE BRYANT,                        :
               Plaintiff,           :
                                    :    Index No. 2821/02
      v.                            :    Andrew P. O'Rourke
                                    :
SUNBOW PRODUCTIONS, INC.,           :
                                    :
               Defendant.           :
```

---

AFFIDAVIT OF PLAINTIFF ANNE BRYANT RELATIVE TO FRAMED ISSUE
HEARING OF OCTOBER 29, 2004

---

STATE OF NEW YORK    )
                     ) ss:
COUNTY OF ROCKLAND   )

ANNE BRYANT, being duly sworn, deposes and says:

## MY DAY(S) IN COURT?

1.    Before I finished my testimony as the very first

witness and had any redirect examination in my long-awaited

trial in this almost five-year old case[1], and after I won

several hugely expensive and time-consuming summary

judgment and dismissal motions, and I beat back Sunbow

Productions, Ltd's ["Sunbow"] unsuccessful eve of trial

attempt to drag me into Federal Court, I and this Court are

forced to deal with the distraction of yet another

meritless argument. The latest attempt to detour the trial

concerns questionable documents unearthed in mid-trial by

Sunbow which would rather spend millions for defense than

address the realization that the evidence they belatedly

produced in mid-trial[2], flawed and irregular as it is,

actually confirms exactly what I have urged and the experts

confirm: as the writer of the music exploited by Sunbow,

its numerous worldwide licensees, and its successor

Loonland A.G., I am entitled to my writer royalty share of

any publishing income attributable to my music and also to

performance royalties, which Sunbow concedes I am entitled

to receive, and which royalties have been steered to others

by former defendant Jules Bacal and Sunbow's use of cue

sheet filings with BMI.[3]

---

[1] Aside from not even finishing my own testimony, I have not even had a chance to call my other witnesses including Ford Kinder, David Berman,  former President of Capitol records, Carol Weitzman, Jules Bacal, Thomas Griffin , Sandy Wilbur, and the rest of my witnesses listed in my witness list [Exhibit A].
[2] I served a Request For Production in June 2003 [Exhibit B] which covered every document which Sunbow has now produced.
[3] The Court has two previous affidavits from me discussing the documents before the Court at the Framed Issue Hearing ("FIH") on October 29, 2004. I may refer

2.    I also mention that the attorneys for Sunbow never
adequately explained why an efficient search in 2001, 2002,
2003 or even earlier in 2004, wouldn't have revealed these
documents at a time when the Sunbow signatories Carol
Weitzman, Jules Bacal or Thomas Griffin, or others, might
have been questioned about them. In short, I am penalized
in mid-trial for Sunbow's late documents-something
completely in Sunbow's control and out of mine.   Sunbow's
lawyers also never explain why these important Sunbow
witnesses were never produced at the October 29, 2004
Hearing despite the serious questions in my prior
Affidavits I raised about not only signatures on said
documents but also whether these documents were complete
and accurately reflected my understanding at the time with
Joe Bacal, and Joe's companies Sunbow and Griffin Bacal,
Inc⁻["GBI"].

### SUNBOW'S LAWYERS VS SUNBOW'S WITNESSSES

3.    Sunbow's lawyers brashly suggest think they have
blown out the case in mid-trial with the newly-produced
documents. This is just not true. If Sunbow's work for hire
argument somehow deprived me of my writer's share of
publishing income from the exploitation of my music and the

---

to or quote them herein.[3]

various new uses of my music by Sunbow[4] [including C.D's;
DVD's video's], certainly the Court would expect that
Sunbow's own witnesses Weitzman, Bacal or Robert Harris,
Esq., rather than Sunbow's lawyers, would have said so in
their testimony especially after a thorough prepping on the
subject by their lawyers.  Instead the opposite is true.

### WHAT DID SUNBOW'S WITNESSES SAY BEFORE?

4.  Instead of supporting Sunbow's litigation strategy
disputing my "standard" and continuing interest in my
writer's share of publishing income, Sunbow's witnesses
said in their prior testimony either that I have such an
interest [Harris} or that such witnesses [Bacal and
Weitzman] who had to know about the deal "didn't know' why
I was not receiving my share of compensation:

### Carole Weitzman, Deposition Page 57

```
     8        Q.   Do you have any knowledge as to
 9        why Anne Bryant wouldn't be paid mechanical
10             royalties on videos or DVDs that have music
11             composed by her?
12        A.     I honestly don't know what her
13             deal was.
```

### Jules Bacal, Deposition Page 85

```
 7             Q.      Was Sunbow credited on the video
 8   jacket for the Transformers?
 9             A.      I don't know.  You'd have to look
10   at see, I don't know, but it's certainly possible
```

---

[4] As I showed in my Affidavit dated November 25, 2003, Sunbow reaped millions in third-party licensing-of not only the Sunbow commissioned music as for example the JEM THEME (a.k.a. "Truly Outrageous") but also music composed for advertising purposes for GBI such as the Transformers THEME [see Ex C various Foreign License Agreements with summary [with Sunbow No.'s 0001-0410] and Ex D Rhino-Sunbow Exclusive License Agreement dated April 18 , 2000].

11    that they were --

12        Q.      Weren't you shown as the executive

13    producer, you personally?

14        A.      I am.  I was.

15        Q.      Do you know whether Anne Bryant got

16    any royalties or monies whatsoever arising out of

17    the sales of the videos or the movie?

18        A.      I have no idea.

19        Q.      Why wouldn't she get any money out

20    of that?

21                MS. VALENCIA:  Objection.

22        A.      No, no, I just have no idea.  You

23    understand you're asking questions that I have no

24    idea what she received or didn't receive and this

25    is back in the eighties.  I have no idea what she

                        Page 86

1    received or didn't receive.

     . . . .

                        Page 129

16                Did Anne Bryant have any rights in

17    the music that was used in the TV show?

18                MS. VALENCIA:  Objection.

19        A.      I don't know the answer to that.  I

20    don't know the answer to that.  I'm not an expert

21    on music rights.  I don't know what rights she

22    had or didn't have.

## SUNBOW AND GBI 'S LAWYER ROBERT HARRIS
Robert Harris, Esq. [Sunbow and GBI's

Lawyer who drafted the documents] testified at the FIH as

follows:

        a.    "It is standard practice in the entertainment
              industry for a commissioning party to obtain
              work-for-hire agreements to exploit the song on
              behalf of both the song writer and the
              commissioning party" (Transcript, 10/29/04,
              Page 30, Line 9);

b. It is "standard for the writer to retain a financial participation" (Transcript, 10/29/04, Page 30); and

c. The fact there is a work-for-hire agreement does not necessarily mean that no rights are retained by the composer and that "it depends on the agreement" (Transcript, 10/29/04, Page 30).

5. Sunbow has unearthed six documents miraculously spared from the flood which hit its New York offices. Three relate to Sunbow and three relate to GBI. None help Sunbow's cause. To clear the confusion created by Sunbow I will state my position as to each of these documents but wish to remind the Court that Sunbow acknowledged that the GBI documents are not in the case. [5]

### Sunbow Documents

A. Jem Agreement dated June 1, 1985?? (Sunbow 870-882).

MY POSITION:

i. I do not contest the signatures on the JEM Agreement but reiterate my point that this Agreement deals with the feature songs[6] and not the JEM THEME, a far more valuable composition because, in contrast to a single feature song, which would play only once in a given episode, the THEME is played at the beginning and end of each of 65 episodes, and the THEME also provides the musical source material for the

[6] Sunbow, which licensed the GBI music I composed for advertising purposes, understandably has not offered the three GBI unsigned and irregular documents and Ms. Phares told the Court these are not in the case and used them only at the FIH "for impeachment" (Tr., Page 44).

background music of all of the shows
["the underscore"].  [Pltfs Ex. 6 is
the March 7, 1985 JEM THEME Score].

ii.  As interpreted by its draftsman Robert
Harris, Esq. this document provided
Kinder & Bryant  "..sharing in music
publishing income.." [Letter dated
November 14, 1994 Harris to Weitzman
[Exhibit B hereto].

iii. By submitting the JEM Feature Song
Agreement and Harris's testimony about
it, Sunbow has conceded I am entitled
to my writer's share of publishing
income. If on the other hand, Sunbow's
lawyers argue that I do not have any
continued writer's share of the
publishing, contrary to Harris'
testimony; contrary to Harris' letter
of November 14, 1994 to Carol Weitzman
and to the experts, then regardless of
the validity of the Agreement's
signatures it is inapplicable to the
Jem Theme.

iv   **JEM Feature Song Agreement IF**
**APPLICABLE TO THEME WOULD Confirm My**
**Continued Interests IN ANY EVENT**

-Among the provisions in the Jem Feature
Song Agreement are the following:

(i) "The terms "publishers' share and
writer's share as used in this Agreement
have the same meaning here as is commonly
understood in the music publishing and
motion picture and television industries."
[Parag 5 (d) Sunbow 0873] [6]

---

[6] In discussing what is customary regarding royalty splits between publisher and
writer, I cited among others the various expert treatises in my April 29, 2004
Affidavit, including "This Business of Music: The Definitive Guide To The Music
Industry" by Krasilovsky and Shemmel (a treatise cited by Sunbow) [Pages 167-
168], indicating a 50/50 split on mechanicals and synchronization fees and "A
similar division applies to a publisher's receipts from licensing, the
synchronization, or reproduction of music on television, video, motion picture
and sound tracks, video games, and even bell tones for cellular phones." [Pages
167-168]. Sunbow, and/or its successor Loonland has licensed all those uses.

and

ii. The "Company shall have, as owner and
copyright proprietor of the Music, the
complete control of the publication of the
Music and of all rights incident thereto,
including, but not limited to, the right to
license the manufacture of phonograph
records and other recordings of the music
and the right to license motion picture
synchronization rights (all of which rights
are herein sometimes collectively called
"music publishing rights"( Parag 6-Sunbow
873).

iii. Page 5 of the JEM Agreement [Sunbow
0874] which deals with payments to Kinder &
Bryant reads:

"(a) With respect to Company's exercise
of music publishing rights in the Music (as
defined above)

*    *    *    *

(I) sums equal to fifty (50%)
percent of the net proceeds (as defined
below) received by Company from third
parties for licenses[7] for the manufacture or
commercial phonograph records and/or
licenses of theatrical motion picture
synchronization rights (as defined below);[8]

---

[7] Sunbow has made a fortune licensing not only the Sunbow commissioned music but also the music
composed for advertising purposes for GBI. See e.g. Foreign Licenses binder submitted herewith as
Exhibit C and the Sunbow Rhino License covering a domestic license Exhibit D.
[8] This is pre-CD, DVD, and bell tone technologies.

****

iv. with respect to other uses of the Music

hereunder, sums equal to the amount

resulting form dividing fifty (50%) percent

of the net proceeds received by Company from

third parties therefore by the total number

of copyrighted musical compositions and/or

literary materials contained or included in

such uses.

v. WRITER'S SHARE CONFIRMED BY HARRIS'
TESTIMONY ON 10/29/04. Robert Harris, Esq.
Sunbow and GBI's attorney, who was called as
a witness at the FIH, drafted the relevant
Sunbow and GBI agreements including the
above language. I have already cited what
Harris said on the witness stand on October
29, 2004 about what was standard in the
entertainment industry.

vi.  SHARE OF PUBLISHING CONFIRMED BY
HARRIS' LETTER 11/14/94. In his letter to
Carole Weitzman, Sunbow's Vice President in
charge of Production and the signer of
virtually every Sunbow agreement [Exhibit
E], Harris dealt with the JEM Agreement now
before the Court he stated the following:

> "IN ANY EVENT, THE LATEST DRAFT OF THE
> AGREEMENT, AS DOES THE HARMAN
> AGREEMENT, PROVIDES FOR SHARING IN
> MUSIC PUBLISHING INCOME, AND I BELIEVE
> THAT YOU MUST HONOR THAT."[9]

This repeated Harris' earlier comment

---

[9] Wouldn't it be interesting to the Court to hear from Weitzman and Harris why
the question of "honoring" our agreement was in this communication? For
example, one obvious question is did Sunbow disregard its own lawyer's advice
in  failing to pay royalties to me?

in this letter regarding Barry Harman's
Agreement (which is the same as the JEM
Agreement), "As you will see, it
provides that Harman shares in music
publishing income."

vii. THE EXPERTS AGREE. As I believe the
Court noted, the experts confirm that it is
customary that a songwriter retain 50% of
the publishing income.  I pointed to the
various treatises in my "Affidavit in
Response to Helene Blue Affidavit" and cited
Passman author of "All You Need to Know
About the Music Business"; Krasilovsky and
Shemmel authors of "This Business of Music:
A Definitive Guide to the Music Industry" (a
treatise cited by Sunbow) and "Everything
You'd Better Know About The Record
Industry." which indicates as follows:

"In the agreement between the songwriter and
publisher, provision is made for the writer
to share in mechanical license fees received
by the publisher.  The customary share is
50% of the publisher's receipts in the
United States.  This means 50% of 100% of
license fee payments from US record
companies, Harry Fox Agency collection
charge of 5.75% on mechanicals.  For
mechanical license earnings, outside of the
United States, the writer is usually
entitled to 50% of the net sums received
domestically by the US publisher.  A similar
division applies to a publisher's receipts
from licensing, the synchronization, or
reproduction of music on television, video,
motion picture sound tracks, video games,
and even bell tones for cellular telephones.
Such licenses are referred to as
synchronization licenses.  Harry Fox no
longer administers synchronization rights
for publishers" [Page 167-168].

viii. DEFENDANT'S EXPERT HELENE BLUE
CONFIRMS MY WRITER'S CONTINUED INTEREST IN
PUBLISHING INCOME.  Even Sunbow's expert
Helene Blue, who submitted Affidavits in

> this case, acknowledged in Paragraph 5 of
> her Supplemental Affidavit that typical
> work-for-hire agreements, including Sunbow's
> typical work-for-hire agreements, were
> consistent with the practice that the
> songwriter receive 50% of the net proceeds
> received from the exercise of  certain
> publishing rights including mechanical[10] and
> synchronization licenses.

6.    Sunbow will agree I am entitled to mechanical

royalties but will not agree that this right would include

later technologies such as CD's, DVD's, and the like.

Sunbow would be wrong, urging a position contrary to

industry understanding, custom, and practice.

### WHAT IS A RECORD?

7.    Donald Passman, author of "All You Need To Know

About The Music Business" (© 2000, Simon & Schuster) said

in his book and one of my designated witnesses said in that

book:

> "Let's now turn to a real basic: What's a record?
> As simple and straightforward as that questions
> sounds, the answer is not what you'd expect.   Of
> course, the term "record" means the devices
> you're thinking of- compact discs, pre-recorded
> cassettes, and vinyl discs (R.I.P).   However, in
> virtually every record agreement made since the
> 1960's, the contractual definition of record says
> a record is both an audio-only and an audiovisual
> device (meaning one with sound and visual
> images), such as videocassettes and DVD's, which
> play video as well as audio material.   (This is

particularly interesting when you remember that
audiovisual devices weren't even invented in the
1960's!  Companies anticipated their development,
even though no one knew what form they would
take.)  The definition of records also included
(and still does) any other device now or
hereafter known that is capable of transmitting
sound alone, or sound with visual images.  As
you'll see later, the inclusion of audiovisual
devices in record deals can make life a bit
tricky if you're a recording artist and also an
actor or an actress in films.  Stay tuned'
[Passman, Page 87-previously furnished to the
Court].  [See also "Everything You Better Know
About The Music Industry" (Kashif Michael Jones,
1st Ed. 1996)].  "Also remember the publisher's
share and the writer's share are equal" [Page
147-149].  The numerous licenses issued by Sunbow
to domestic and foreign licenses are clearly
publishing activities subject to the obligation
to split the publishing revenues with me as the
writer.[11]

8.  I now turn to the rest of the documents Sunbow

revealed.

      B.  **JEM Modification Agreement dated March 15,
      1986(Sunbow 0868-0869.**

      MY POSITION:

      i.  This agreement was not signed by me but
      I understand that Ford Kinder does
      acknowledge it.

      ii.  It does not alter the fact that the
      agreement with Sunbow provided for my
      continuing sharing in music publishing
      income as stated by Robert Harris and the
      experts;

---

[11] "CD's obviously play music and generate mechanical royalties. But DVD's of course can likewise be
played as music only and in fact the JEM boxed DVD set (Exhibit 15 in evidence) has a specific "play
songs" feature, as do many such DVD's.  This makes it clearly equivalent to a record. I note that the JEM
Agreement, Paragraph 6 [Sunbow 873 ] referred to "other recordings of the music" which seemingly
encompass use of my music in any other medium even if combined with visual images.

C.   **My LITTLE PONY AND FRIENDS AGREEMENT DATED
DECEMBER 12, 1985 (0883-0895).**

MY POSITION:


i. As I've testified to and stated in
several Affidavits, Kinder & Bryant did not
write the feature songs for My Little Pony
and Friends; we did write the THEME for My
Little Pony and Friends.


ii. The THEME we wrote for My Little Pony
and Friends which would have been written
pursuant to the same understanding as set
forth above regarding the JEM Theme.


iii. I repeat here what I've said above
about the greater value of a THEME:  A THEME
is "a far more valuable composition because,
in contrast to a single feature song, which
would play only once in a given episode, the
THEME is played at the beginning and end of
each of 65 episodes, and the THEME also
provides the musical source material for the
background music of all of the shows ["the
underscore"].

iv.  For the MY LITTLE PONY AND FRIENDS
THEME, I composed, arranged, orchestrated
and produced the music session, which
required that I travel to Los Angeles to
conduct the orchestra recording session.
Subsequent to that session, Ford Kinder and
I produced the vocal session [and both
performed as singers] in New York. I promise
the court that I/we did not do this job for
a fee of $350. [Please see MLP&F orchestra
score in evidence, Plaintiff's # 35].

**GBI Documents**

D.  **GBI TRANSFORMERS AGREEMENT DATED MARCH 2, 1984 (PLAINTIFF'S 47 ID AND SUNBOW 0896-0902).**

MY POSITION:

i.   This document is not in the case as stated by Sunbow's counsel Gloria Phares.

ii. This Agreement is irregular and was not signed by Griffin Bacal, Inc. and includes a second page regarding Spencer Michlin, an employer for whom I worked previously. Someone slipped page 2 in the document.

iii. This Agreement, even if it were valid and countersigned, would not apply to anything more than use of music for advertising purposes (remember GBI was an advertising firm).

iv. Any compensation realized by Sunbow from the exploitation of music publishing would have to be split.

v. Sunbow has not produced any agreement reflecting that Kinder & Bryant gave up rights regarding the use of this music so Sunbow is bound to pay the music publishing royalties I am due for my writer's share. In fact it has been used and licensed to others by Sunbow in television shows, DVD, video games, and home entertainment.

E.  **GBI Transformers Agreement dated April 8, 1988 relative to *PowerMasters* only (Sunbow 0903-0914)**

MY POSITION:

i. This document is not in the case as per Ms Phares..

ii.   There are no claims being made with respect to use of the Transformers PowerMasters composition and this Agreement has no relevance to this proceeding

iii. This document does not contain Ford
Kinder's signature as he attested to in his
Affidavit;

iv.   On the other hand, Sunbow's use of the
Transformers music THEME composed by me (See
plaintiff's Exhibits 7,8,9,10,and 11) would
be subject to the understanding and
agreement of my continued interest in music
publishing income.

v. Sunbow has not produced any agreement
reflecting that Kinder & Bryant gave up
rights regarding the use of this music so
Sunbow is bound to pay the music publishing
royalties I am due for my writer's share. In
fact it has been used and licensed to others
by Sunbow in television shows, DVD, video
games, and home entertainment.

**F.   GBI Visionaries Agreement dated April 8,
1988 (Sunbow 0913-0914)**

MY POSITION:

i.   This document is not in the case.

ii. This is not an authentic document and
Ford Kinder has affirmed it is not his
signature.

iii. Sunbow has not produced any agreement
reflecting that Kinder & Bryant gave up
rights regarding the use of this music so
Sunbow is bound to pay the music publishing
royalties I am due for my writer's share. In
fact it has been used and licensed to others
by Sunbow in television shows, DVD, video
games, and home entertainment.

## SUNBOW'S FAILURE TO PRODUCE WITNESSES

Where's Weitzman-and the other Sunbow witnesses?

9.    Sunbow never produced Ms. Weitzman, Mr. Bacal, or

Mr. Griffin at the October 29, 2004 Hearing.  Although they

were aware of the special importance of producing Carole

Weitzman, the Sunbow Vice President in charge of production

and an employee with first-hand knowledge, and despite

naming her as a Sunbow trial witness, submitting an

Affidavit by her in support of an unsuccessful summary

judgment motion and proffering her as Sunbow's deposition

witness, Ms. Weitzman was not produced at the FIH.

Sunbow's failure to produce any of these witnesses raises

serious questions.  Ms. Phares is not a witness and her

statements are not evidence.


### GBI and SUNBOW- COMMON INTERESTS- COMMON OWNERSHIP

10.  Another reason why Weitzman, Bacal, and Griffin

were not produced as witnesses at the FIH may be the fact

that the two salvaged Sunbow loose-leaf binders [Exhibits K

(JEM) and L (My Little Pony)] contain documents showing

that Weitzman and other Sunbow personnel are shown to be

acting for both GBI and Sunbow at the same time.  This is

relevant because I have alleged that Sunbow and Bacal used

my Transformer's THEME [composed and intended for

advertising purposes only] and other music without

compensation to me or authority to do so. Correspondence

contained in the two recently-discovered bound volumes submitted in evidence by Sunbow reflects this including a letter dated 7/29/86 from the attorney for Roy Eaton to Mary Lou Phipps-Winfrey at Griffin Bacal, Inc., 130 5th Avenue, New York, New York- the same address as Sunbow [Exhibit F]. This was contained in the folder for "My Little Pony" (defendants' Exhibit L in Evidence, 10/29/04) and relates to a Roy Eaton Music Contract with Sunbow 18/15/86, for Music For "Moondreamers."

### CORRESPONDENCE REGARDING JEM TO GBI FROM HARRIS' FIRM

11.   Further evidence that Sunbow and GBI acted in concert is reflected in defendants' Exhibit K related to the JEM contracts, where there is contained correspondence from attorney Harris' partner Bernard Schneider, Esq. to Weitzman not at Sunbow but at Griffin Bacal, Inc.   This relates to the JEM 1987 Agreement Marvel Productions, Limited and it is addressed to Thomas Griffin at Griffin Bacal despite the fact that it is a Sunbow Agreement regarding animated programs based on JEM (See Exhibit G hereto).

### MARVEL JEM AGREEMENT

12.   On Page Two of the Sunbow Marvel Agreement, Marvel agreed to produce underscoring "to supplement the existing ninety minute JEM Music Library" which undoubtedly

included the main JEM theme composed by me.    This

buttresses my point that Griffin Bacal and Sunbow simply

utilized the music in the library and mixed and matched

whenever it suited them.

13.    Aside from the compositions mentioned above, I

am entitled to writer royalties on G.I. Joe; Inhumanoids

and Robotix which have been licensed by Sunbow.    I ask the

Court to resume the trial and let me finish putting in my

case.

DATED: February 4, 2005

_____

ANNE BRYANT

Sworn before me this 4th
day of February, 2005.

_____

CARLOS E. PEREZ
Attorney-At-Law For The
State of New Jersey

Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

| | |
|---|---|
| ANNE BRYANT,<br>                    Plaintiff,        : | : |
| | : |
| -v-                                     : | : |
| | : |
| BROADCAST MUSIC, INC. | :    Index No. 5192/00 |
| (a/k/a/"BMI"), FORD KINDER,      : | |
| KINDER & CO., LTD., | :    Hon. Andrew P. O'Rourke |
| VADIVOX, INC., JULES M. "JOE" | : |
| BACAL; GRIFFIN BACAL, INC.,   : | |
| STARWILD MUSIC BMI, WILDSTAR     : | |
| MUSIC ASCAP, SUNBOW | : |
| PRODUCTIONS, INC., | : |
| | : |
| ____Defendants.__  : | |
| ANNE BRYANT, | :    Index No. 2821/02 |
|                    Plaintiff,   : | |
| | :    Hon. Andrew P. O'Rourke |
| -v-                                     : | |
|                             : | |
|                        : | |
| SUNBOW PRODUCTIONS, INC., | : |
| | : |
|                    Defendant.  : | |

**SECOND AMENDED WITNESS LIST FOR PLAINTIFF ANNE BRYANT**

PLEASE TAKE NOTICE that Plaintiff Anne Bryant, through her
undersigned counsel, hereby designates the following individuals
as witnesses who will provide testimony at the trial of this
action:

        1.    Anne Bryant

        2.    Joseph M. "Jules" Bacal

        3.    Jay Bacal

        4.    Thomas Griffin

        5.    Donald S. Passman, Esq.

6.   Jack Scherer, Esq. (Expert)

7.   David Berman, Esq. (Expert)

8.    Faith Norwick

9.    Richard Piemonte

10.   Peter Phillips

11.   Tia Sinclair

12.   Steve Bill

13.   Diva Gray

14.   Carole Weitzman

15.   Alison Smith

16.   Ford Kinder

17.   Barry Harmon

18.   Eileen Monaghan (Re: calculation of foreign royalties)

19.   A representative of Screen Actors Guild

20.   A representative of American Federation of Musicians, Local 802

21.   A representative of Sunbow Entertainment, LLC

22.   A representative of Chad Entertainment, LLC

23.   Sam Millstone now, or formly, Sunbow's Chief Financial Officer of Sunbow Productions

24.   Mike Tucker of Sunbow Productions

25.   A representative of Warner Strategic Marketing and/ or Warner Music, Inc.

26.   Kerry Romeo of Sunbow Productions

PLEASE TAKE FURTHER NOTICE that Anne Bryant

reserves the right to designate one or more additional witnesses .

on her case in chief or rebuttal.

DATED: July 2, 2004          MONAGHAN, MONAGHAN, LAMB & MARCHISIO
                              Attorneys for Plaintiff

                     By:_____
                          Patrick J. Monaghan, Jr.
**New Jersey Address:**             150 West 55th Street
28 W. Grand Avenue           New York, New York 10019
Montvale, N.J. 07645         (212) 541-6980
(201) 802-9060

18814

3

**EXHIBIT B**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND _____

ANNE BRYANT,

              Plaintiff,         INDEX NO. 2821/02

    -v-

SUNBOW PRODUCTIONS, INC.,

           Defendant.

**PLAINTIFF'S SECOND
DEMAND FOR PRODUCTION
OF DOCUMENTS TO DEFENDANT
SUNBOW PRODUCTIONS, INC.**

To:  Roseann Kitson Schuyler, Esq.
     Patterson, Belknap, Webb & Tyler
     1133 Avenue of the Americas
     New York, N.Y.  10036

SIRS:

    **PLEASE TAKE NOTICE** that pursuant to Section 3101 and
R.3120 of the Civil Practice Law & Rules, plaintiff Anne
Bryant by her attorneys Monaghan, Monaghan, Lamb & Marchisio,
hereby request that defendant Sunbow Productions, Inc. produce
for inspection and copying the documents specified herein
within its possession, custody or control or the possession,
custody or control of any agent, representative or other
person acting or purporting to act on its behalf at the
offices of Monaghan, Monaghan, Lamb & Marchisio, 150 W. 55th
Street, Suite 1G, New York, New York 10019 on July 18, 2003 at
10:00 a.m. or at such time and place as may be mutually agreed
upon by counsel for the parties, the documents and things
requested below.

## DOCUMENTS TO BE PRODUCED

1.   Any and all agreements relating to Ann Bryant's purported relinquishment of royalties of any type, including but not limited to performance royalties, mechanical royalties and/or synchronization fees for any of the musical compositions or songs "G.I. Joe," "Transformers," "Jem," "My Little Pony" and/or "Visionaries."

2.   Copies of every agreement relevant to the issues in the case upon which defendant, Sunbow Productions, Inc. will rely upon at trial.

3.   Every agreement which defendant Sunbow Productions, Inc. and/or any of its subsidiary companies and/or any companies owned by defendant Sunbow Productions, Inc. entered into with plaintiff Anne Bryant.

4.   Every agreement which Starwild Music, Inc. entered into with plaintiff Anne Bryant.

5.   Every agreement which defendant Sunbow Productions, Inc. and/or any of its subsidiary companies and/or any companies owned by defendant Sunbow Productions, Inc. entered into with Griffin Bacall, Inc.

6.   Any agreement which would reflect upon the status of Anne Bryant's compositions as "works made for hire," as defined by the United States Copyright Act, 17 U.S.C. § 101.

John J. Donovan, Esq.

Dated: June 30, 2003

2

**EXHIBIT C**

**ONLY PROVIDED TO JUDGE O'ROURKE**

**Exhibit D**

der No. 5105
ILUMBERG, INC.
'C 10013
0% P.C.W.

**ONLY PROVIDED TO JUDGE O'ROURKE**

**Exhibit E**

## LEAVY ROSENSWEIG & HYMAN

SIDNEY FEINBERG
ROBERT I. FREEDMAN
NEAL I. GANTCHER
STEVEN J. HYMAN
MORTON L. LEAVY
DAVID Z. ROSENSWEIG
CLIFFORD A. MAIL
ROBERT C. HARRIS
PAUL H. LEVINSON
PAUL E. McGLOIN
JANET G. NESCHIS
BERNARD G. SCHNEIDER
S. JEAN WARD

SCOTT R. LAZARUS

11 EAST 44TH STREET
NEW YORK, NY 10017

(212) 885-0400

TELECOPIERS  (212) 983-8537
             (212) 867-8331

PAUL S. WOERNER
(1952-1982)

OF COUNSEL
CARL DeSANTIS
JOEL SEGAL
STEVEN J. WEISSMAN

November 14, 1994

**BY HAND**

Ms. Carole Weitzman
Sunbow Productions, Inc.
130 Fifth Avenue
New York, NY  10011

        Re:  JEM

Dear Carole:

        As I mentioned on the telephone last week to your assistant, all of our JEM
files were in storage.  They have now been retrieved and have I had a chance to review
them.

        I have located a contract dated September 2, 1985 with BHB Productions,
Inc., for the services of Barry Harman as lyricist.  I am enclosing a copy of that contract
for you.  As you will see, it provides that Harman shares in music publishing income.

        The situation for Kinder & Bryant is more complicated.  Our file indicates a
prolonged exchange of correspondence with Bill Dobishinski (whom you know), who
entered the picture on behalf of Kinder & Bryant.  I am enclosing a copy of my May 30,
1986 letter to Bill, which comments on his comment letter of March 3, 1986, and
encloses a revised draft of agreement.  That is the latest draft of agreement contained in
our files.  I am also enclosing a letter from Bill Dobishinkski to you dated February 9,
1987 in which he enclosed an amendment to that draft, and asked for your comments,
along with reserving the rights of his clients to comment.  I have no further
correspondence beyond this, and I do not know whether you actually approved the
documents, and whether they were eventually signed by Kinder & Bryant.

276/1

LE     Y ROSENSWEIG & HYMAN

Ms. Carole Weitzman
November 14, 1994
Page 2

In any event, the latest draft of the agreement, as does the Harman agreement, provides for sharing in music publishing income, and I believe that you must honor that.

If I can be of any further assistance to you, or you would like to discuss this further, please give me a call.

Warmest regards.

Sincerely yours,

Robert C. Harris

RCH/tm
Enclosures

276/2

Exhibit F



# ROY EATON MUSIC Inc.

July 29, 1986

Mary Lou Phipps-Winfrey
Griffin Bacal, Inc.
130 Fifth Avenue
New York, NY 10011

Dear Mary Lou:

　　　I have enclosed for your consideration the letter from my
attorney with his suggestions regarding the indemnity provision
in paragraph 10 and the right to object in paragraph 6(b).

　　　I will contact you in a few days after you've had a chance
to consider these items.

　　　Have a nice day.

RE:gc

encl.

**EXHIBIT  G**



AVERY ™

RECYCLED PAPER MADE FROM 20% POST CO

# LINDEN AND DEUTSCH

ATTORNEYS AT LAW

DAVID BLASBAND
JOSEPH CALDERON
ALVIN DEUTSCH
FREDERICK F. GREENMAN, JR.
EDWARD KLAGSBRUN
BELLA L. LINDEN
NANCY F. WECHSLER
RICHARD A. WHITNEY

ROBERT C. HARRIS
BERNARD G. SCHNEIDER

IIO EAST 59TH STREET
NEW YORK, N.Y. 10022

(212) 758-1100

CABLE ANALOGUE, N.Y.

TELEX 424286

TELECOPIER (212) 593-3560

March 18, 1987

BY HAND

Ms. Carol Weitzman
Griffin Bacal, Inc.
130 Fifth Avenue
New York, NY   10011

Re: "Jem"/1987

Dear Carol:

I am pleased to enclose a fully executed original agreement dated as of February 9, 1987 and side letter agreement dated March 4, 1987, received today from Marvel Productions Ltd. I have retained the other original counterpart in our files.

If I can be of further assistance, please let me know.

Best regards.

Sincerely,

Bernard G. Schneider

Bernard G. Schneider

Enclosure

cc: Tom Griffin (w/encl)

BGS/lcb
1677S



**MARVEL PRODUCTIONS LTD.**
6007 SEPULVEDA BLVD.
VAN NUYS, CALIFORNIA 91411
(818) 988-8300 • TELEX #182325

MICHAEL WAHL
VICE PRESIDENT, BUSINESS AFFAIRS

2/4/87

As of February 9, 1987

Mr. Thomas L. Griffin
Griffin/Bacal, Inc.
130 Fifth Avenue
New York, N.Y. 10011

          Re:   "JEM"/1987

Dear Tom:

        The purpose of this letter is to summarize the agreement
between MARVEL PRODUCTIONS LTD., ("MPL") and SUNBOW PRODUCTIONS,
INC. ("SPI") with respect to the production of animated programs
based upon "JEM", its characters, events, stories and elements
thereof, as heretofore and hereafter constituted ("the
Property"), during the 1986/1987 production season.

        We have agreed as follows:

        1.    (a)   MPL shall produce, complete and deliver at SPI's
direction thirty-nine (39) one half hour (approximately twenty
(20) minutes, containing not less than 12,000 cells) animated
episodes based upon the Property ("the Programs") in accordance
with the teleplays and songs developed and written by SPI and
consistent with approval and production schedules attached
hereto.    Said schedules provide procedures for the initial
thirty (30) Programs.   Schedules for the remaining nine (9)
Programs shall be mutually agreed upon, such agreement to be
made no later than June 1, 1987.

        MPL shall be responsible for all pre-production,
production, post-production including, but not limited to,
animation, voice-overs, background music, sales artwork (see
Paragraph 1(c)), 3/4" workprint and final tapes to SPI New York
and VHS workprint and final tapes to SPI Los Angeles, etc., but
excluding development and writing of teleplays and songs.    MPL
shall select production personnel exercising best efforts to
utilize individuals requested by SPI.   In the event MPL does not

A CADENCE COMPANY



**MARVEL PRODUCTIONS LTD.**

3/4/7

Page 2.

utilize the individuals requested by SPI, the individuals they do utilize must have the mutual written approval of SPI and MPL. Provided however, that in any event at least one of the three producers, mutually approved and engaged on the Programs, shall again be mutually approved as the producer who shall work from the commencement of production through post-production, subject to such producer's continuing availability.

(b)  MPL shall produce additional original background music (e.g. underscore, stings, bumpers etc.) to supplement the existing ninety minute "JEM" music library.  The additional music shall not be less than a total of forty-five (45) minutes nor exceed sixty (60) minutes, and shall be written and composed in the rock and roll style and fashion of the songs of the currently existing "JEM" program(s).

(c)  As part of its obligations hereunder MPL agrees to prepare one poster and two original setups (i.e. simple characters against a simple background) it being understood that MPL shall not be required to spend more than Twenty Five Thousand Dollars ($25,000) for such poster and setups.  In the event MPL determines that more than $25,000 is required for the preparation of said poster and setups, it shall so advise SPI and SPI and MPL shall mutually agree upon the amount of such excess and the allocation of the cost of same between SPI and MPL.  MPL shall not incur costs in excess of Twenty Five Thousand Dollars ($25,000) for such poster and setups without SPI's prior approval.

2.  All services rendered by employees or independent contractors of MPL shall be on an "employee for hire" or "work made for hire" basis with no additional compensation due them from SPI except for residual payments required by the Screen Actors Guild Basic Agreement having jurisdiction over those services rendered.

3.  (a)  The following elements, ready for television broadcast, shall be timely delivered by MPL to SPI consistent with the attached Schedule B for all Programs produced hereunder:



**MARVEL PRODUCTIONS LTD.**

3/4/r1

Page 3.

    (i)    One – 3/4" and one – 1/2" VHS videotape work print;

    (ii)    One – 3/4" and one – 1/2" VHS final edited Program;

    (iii)    One – fully edited original 35mm negative;

    (iv)    One – music and effects track (with all music, dialogue and sound fully synchronized);

    (v)    One – 1" NTSC video master and one copy thereof;

    (vi)    The format and music cue sheet for each Program;

    (vii)    Copy of roughs and final shipped story-board of each Program (see Paragraph 8).

    (b)    The dates for script delivery as set forth in Schedule A shall be deemed adhered to if the requisite delivery is effected at any time during the business week during which the specific delivery date falls (e.g. if a delivery is to be made on January 12, 1987 such delivery may be made at any time on or before January 16, 1987).

    "Delivery" of a script shall be defined as receipt by MPL of the final script and rough music demo (including final lyrics and "click track"). Notwithstanding the foregoing, script delivery shall be deemed completed if the click track is received by MPL during the week immediately following delivery of the script.

    (c)    Commencing January 12, 1987, in the event of a late delivery of a particular script (the "Late Script"), the date upon which such Program (that is, the Program based on such Late Script) is to be delivered by MPL to SPI based upon such Late Script shall be extended one week for each week the Late



**MARVEL PRODUCTIONS LTD.**

Page 4.

Script is delivered late.  The delivery dates of any and all
other Programs based on scripts to be delivered subsequent to
such Late Script (the "Later Programs") shall each be extended by
the number of weeks such script is delivered late, subject to
MPL's agreement to use all efforts to deliver all Later Programs
on the dates set forth in the attached Schedule A dated November
20, 1986.  Further, for each week a particular script is
delivered late hereunder, SPI shall pay MPL the sum of $7,500.
Subject to the foregoing, each late script shall be accounted for
separately.

(d)    Effective January 12, 1986, subject to Paragraph
3(c), MPL shall meet all time requirements for all work to be
performed and/or delivered by MPL, all as set forth in Schedule
A.   In the event MPL fails to meet the delivery schedule for
final Programs, with mutually agreed upon retakes, as set forth in
Schedule A, it shall pay SPI the sum of $7,500 for each week each
such final Program is delivered late.  However, if the cause of
such late delivery is materially and substantially due to SPI,
its agents or affiliates, or due to force major events, no sums
shall be due and owing to SPI from MPL for late delivery of the
particular final program or subsequent programs.

(e)    As of November 1, 1986, it is agreed and
acknowledged that scripts 1 and 2 have not been delivered (as
defined in Paragraph 3(b) above) and SPI shall reimburse MPL in
the sum of $57,000.00, representing all out-of-pocket costs and
expenses incurred in "holding" the "JEM" production unit.

(f)    All sums due either party pursuant to Paragraph
3(c) and (d), shall be due and payable within thirty (30) days of
receipt of invoices therefor and shall not affect the cash flow
set forth in Schedule B.

4.    As between SPI and MPL, SPI shall be the sole owner of
the Programs and all elements thereof for any and all purposes.
In this regard, MPL acknowledges that in accordance with the
Standard Terms and Conditions, relating to the Property, Hasbro
is the owner all rights in and to the Programs, subject to
Sunbow's rights of ownership as set forth in the Standard Terms
and Conditions, and that consistent with such ownership by

MARVEL PRODUCTIONS LTD.

Page 5.  3/4/87

Hasbro, Hasbro (subject to Sunbow's rights ~~of ownership~~) may deal in and with and otherwise exploit the programs or refrain from so doing.  Similarly SPI may exploit its rights as SPI may deem appropriate or may refrain from exploiting its rights.  MPL shall affix the appropriate copyright notice on all Programs as requested by SPI.

5.    (a)  SPI shall pay MPL, consistent with the attached Schedule B Two Hundred and Seventy Thousand Two Hundred Forty-Four Dollars ($270,244) for each of the initial thirty (30) Programs.  In this regard, MPL shall exert all efforts to reduce the cost of each of said thirty (30) Programs below $270,244. MPL has acknowledged that it is currently negotiating a reduction in the fees charged by Toei to MPL for services rendered on the Programs in Japan.  If MPL is successful in negotiating such a reduction, any savings realized thereby shall be credited against the per Program production fee.  MPL shall notify SPI of the amount of any such reduction no later than ~~February (1,)~~ 1987.

With respect to each of the remaining nine (9) Programs, SPI shall pay MPL, consistent with a mutually agreed upon schedule, Two Hundred Seventy Thousand Two Hundred Forty-Four Dollars ($270,244) plus all applicable union and industry-wide increases, it being understood and agreed that MPL shall exert all efforts to reduce the cost of each of said nine (9) Programs below $270,244.

Notwithstanding the foregoing, SPI acknowledges that MPL may incur California Use Tax obligations for services rendered on MPL's behalf by off-shore studios in the production of the Programs.  SPI shall reimburse MPL for all sums deposited by MPL in this regard, it being understood that if MPL is not required to pay such use tax assessments, MPL shall reimburse SPI for all such sums plus the interest received from the State of California thereon.



MARVEL PRODUCTIONS LTD.



Page 6.

(b)   It is agreed and acknowledged that each Program produced hereunder shall have a cast averaging fifteen (15) actors.   In the event the cumulative compensation paid such actors exceeds that which would be due for five hundred eighty-five (585) day player performers at the then applicable SAG scale (15 x 39 Programs), all direct out-of-pocket costs, including fringe, paid by Marvel, shall be reimbursed by SPI.   In the event the cumulative sums actually paid by Marvel hereunder is less than the applicable SAG scale compensation for five hundred and eighty-five (585) day player performers, any savings realized thereby shall be paid by MPL to SPI.

6.   (a)   In addition SPI shall pay to MPL an amount equal to ten percent (10%) of the Sunbow Net Proceeds as defined in the Standard Terms and Conditions of the agreement between SPI and Hasbro, Inc. ("Hasbro") relating to this Property, a copy of which is attached (the "Standard Terms and Conditions").

(b)   Further, MPL shall be entitled to receive an amount equal to 10% of 65% of the "media value" or "syndicated value" of time utilized directly by Hasbro or any of its companies during the Subsequent Term as hereinafter defined.

7.   Definitions of Subsequent Term and "media value" or "syndicated value":   The reference in the Standard Terms and Conditions to the "Subsequent Term" shall mean the period commencing 10/1/89.   The definition of "media value" or "syndicated value" shall be that set forth in the Standard Terms and Conditions.

8.   SPI shall have the right to approve the final storyboard prior to its shipment overseas by MPL for production. Any changes requested by SPI must be received by MPL not less than three (3) business days after receipt of such storyboard by SPI. Any out-of-pocket costs or expenses incurred by MPL due to SPI's subsequent requested changes which are inconsistent with the previously approved script or SPI instructions, shall be borne by SPI.   After final storyboard approval no change shall be made by MPL without SPI's prior written approval.



**MARVEL PRODUCTIONS LTD.**

Page 7.

9.   SPI shall have the right to make minor dialogue
revisions in the scripts (not to exceed thirty lines per script)
and provided SPI receives the storyboard at least six days prior
to the applicable recording session, such revisions are to be
received by MPL at least seventy-two (72) hours prior to the
applicable recording session.  In the event MPL does not give SPI
such six days prior notice, SPI may make changes up to the
recording sessions.  In any event, MPL shall give SPI the
storyboard at least three (3) days prior to any recording session
and SPI shall have such three days to review and comment on the
storyboard.

10.   It is understood that the current program production
fee of $270,244 per episode includes payment of 17,800,000 Yen at
an exchange rate of 154 Yen to the Dollar.  The program
production fee shall be adjusted based upon an "average" exchange
rate of Yen to the Dollar (which shall include the cost, if any,
of securing forward Yen contracts) upon confirmation of MPL's
purchase of Yen Forward Contracts to be completed no later than
~~February 1, 1987~~.  An additional downward adjustment will occur upon
completion of MPL's negotiation of the aforementioned Yen
denominated fees due Toei, the off-shore production facility.
The parties agree and acknowledge that they are currently
contemplating use of alternate offshore production facilities and
any savings realized thereby shall be passed on to SPI.
Provided, however, that except for one program which was sent to
Manila for production in such country, no alternate off-shore
facilities shall be used without mutual agreement of the parties.

11.   MPL, its employees and subcontractors shall be accorded
appropriate on-air/screen credit, including, but not limited to,
Company name and logo, Executive Producer, Producer and Executive
in Charge of Production.  Additionally, MPL, as the production
entity, shall receive credit in all paid advertising placed and
controlled by SPI in and to the same degree SPI receives credit.



**MARVEL PRODUCTIONS LTD.**

Page 8.

12.    The quality of the Programs to be produced and delivered by MPL shall be as set forth in Paragraph A in the Standard Terms and Conditions.  SPI warrants and represents with respect to materials furnished by SPI and MPL warrants and represents with respect to all other materials in or on the programs that same will not infringe or violate any property or other rights of any person.  Both MPL and SPI agree to indemnify and hold harmless, the other, from any loss, liability, obligation, cause of action or expense, including reasonable counsel fees and expenses arising out of or by reason of the breach by SPI or MPL, as the case may be, of their respective representations, warranties or agreements set forth herein.

13.    This agreement also includes other terms common in the entertainment industry, including, but not limited to, force majeure, insurance, modification, termination, revenue allocation, warranties and indemnities, which shall be more precisely determined in a more extensive document between parties, but pending execution of such document this agreement shall constitute a binding agreement between MPL and SPI.

14.    In the event additional services with respect to the Programs are requested by SPI, MPL and SPI shall negotiate the terms therefor in good faith.

15.    This letter agreement supersedes all prior agreements between us with reference to this matter, which prior agreements are deemed null and void and of no effect.  This agreement shall be binding upon, and inure to the benefit of, the respective successors or permitted assigns of the parties hereto.  MPL shall not assign its rights or delegate its obligations hereunder except to any parent or to any entity with whom any parent is merged or consolidated or to any entity acquiring all or substantially all of the stock or assets of MPL or any such parent.  MPL shall remian liable despite any merger or transfer of the assets permitted herein.

AGREED AND ACCEPTED:                    AGREED AND ACCEPTED:
SUNBOW PRODUCTIONS, INC.                MARVEL PRODUCTIONS LTD.


BY: _____          BY: _____

DATED: ____3/4/87____                   DATED: ____3/10/87____

AMENDED 2-9-87

## SCHEDULE B
## PAYMENT SCHEDULE

| | PERCENT | 30 Programs | 9 Programs | Total |
|---|---|---|---|---|
| Commitment | 25% | $2,026,830 | $ 608,049 | $ 2,634,879 |
| Delivery of scripts at beginning of month due | 40% | $3,242,928 | $ 972,878 | $ 4,215,806 |
| For each Program at end of month actually delivered | 35% | $2,837,562 | $ 851,269 | $ 3,688,831 |
| TOTAL | 100% | $8,107,320 | $ 2,432,196 | $10,539,516 |

MONTHLY PAYMENT SCHEDULE

| | SCRIPT DUE | | FINAL PROGRAM DELIVERED | | TOTAL $ | CUMULATIVE $ |
|---|---|---|---|---|---|---|
| Dec 01 | 5 | $ 540,488.00 | | $0.00 | $ 540,488.00 | $ 540,488.00 |
| Jan 10 | Commitment (39) | $2,634,879.00 | | $0.00 | $2,634,879.00 | $3,175,367.00 |
| Jan 01 | 4 | $ 432,390.40 | | $0.00 | $ 432,390.40 | $3,607,757.40 |
| Feb 01 | 5 | $ 540,488.00 | | $0.00 | $ 540,488.00 | $4,148,245.40 |
| Mar 01 | 6 | $ 648,585.60 | | $0.00 | $ 648,585.60 | $4,796,831.00 |
| Apr 01 | 5 | $ 540,488.00 | | $0.00 | $ 540,488.00 | $5,337,319.00 |
| May 01 | 5 | $ 540,488.00 | 4 | $378,341.60 | $ 918,829.60 | $6,256,148.60 |
| Jun 01 | | $0.00 | 2 | $189,170.80 | $ 189,170.80 | $6,445,319.40 |
| Jul 01 | | $0.00 | 6 | $567,512.40 | $ 567,512.40 | $7,012,831.80 |
| Aug 01 | | $0.00 | 6 | $567,512.40 | $ 567,512.40 | $7,580,344.20 |
| Sep 01 | | $0.00 | 7 | $662,097.80 | $ 662,097.80 | $8,242,442.00 |
| Oct 01 | | $0.00 | 5 | $472,927.00 | $ 472,927.00 | $8,715,369.00 |
| TOTAL | 30 | $5,877,807.00 | 30 | $2,837,562.00 | $8,715,369.00 | |

The outstanding balance of $1,824,147 (10,539,516 - 8,715,369) for the remaining nine Programs shall be payable to MPL pursuant to a schedule to be agreed upon no later than June 1, 1987.

7mw2



March 4, 1987

Reference is made to that certain agreement dated as of February 9, 1987, between the undersigned (the "Jem/1987 Agreement"), which we are executing simultaneously with this letter.

Anything in the Jem/1987 Agreement to the contrary notwithstanding:

1)   Sunbow acknowledges that the delivery schedule set forth as Schedule A to the Jem/1987 Agreement will be mutually modified to reflect changes in circumstance on the production of the series.

2)   The final 35% of each Program shall be due and payable by Sunbow to Marvel at the end of the month in which Marvel actually delivers such final Program to Sunbow.

Except as expressly set forth above, the Jem/I987 Agreement remains in full force and effect.


MARVEL PRODUCTIONS LTD.          SUNBOW PRODUCTIONS, INC.

BY: _____      BY: _____

DATED: ____3/10/89____           DATED: ____3/4/87____

PAGE ___ 1

DATE  11-20-86

PREPARED BY ___

Sunbow Prod
Rec Schd

SCHEDULE A

JEM 86-87

| START STORYBOARD | | FINISH STORYBOARD | | APPROVE STORYBOARD | | APPROVE MODELS | | RECORD DIAL WK. OF | | START DIRECTION | | SHIP | | RETURN WORK PIC | | RETAKES REC | | DUBB | | DELIVER MASTER | | AIR DATE | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DATE | ACTUAL | DATE | ACTUAL | DATE | ACTUAL | DATE | ACTUAL | DATE | ACTUAL | DATE | ACTUAL | DATE | ACTUAL | DATE | ACTUAL | DATE | ACTUAL | DATE | ACTUAL | DATE | ACTUAL | DATE | ACTUAL |
| 11-24 | | 12-1 | 11-29 | 12-9 | 12.23 | 12-9 | | 12-9 | | 12-16 | 12.22 | 12-23 | | Dec 19 | 1-16 | FEB 27 | | | | | | MAR 23 | | | |
| 12-8 | | 8/12-24 | | 12-29 | | 15 | 5 | 1-5 | 1-6 | | | 29 | | 26 | 1-23 | MAR 6 | | | | | | 30 | | | |
| 29 | | 12-22 | | | | 1-5 | | 1-5 | | 1-12 | | 1-12 | | JAN 13 | 1-30 | APR 3 | | | | | | APR 22 | | | |
| | | 27 | | 1-5 | | 1-12 | | 1-12 | | 2-6 | | 1-19 | | 30 | | 3 | | | | | | MAY 4 | | | |
| 1-12 | | 1-26 | | 1-9 | | 2-9 | | 2-9 | | 2-9 | | 2-2 | | FEB 13 | | MAR 6 | | | | | | JUN 1 | | | |
| | | 2-2 | | 2-3 | | 16 | | 16 | | 16 | | 2-16 | | MAR 6 | | 15 | | | | | | 8 | | | |
| 2-6 | | 9 | | 9 | | 16 | | 23 | | 13 | | 3-2 | | 13 | | 23 | | | | | | 15 | | | |
| 2-6 | | 16 | | 23 | | 6 | | 23 | | 23 | | 3-2 | | 20 | | 29 | | | | | | 22 | | | |
| 2-2 | | 23 | | 23 | | 3-2 | | 30 | | 3-2 | | 9 | | 27 | | JUL 3 | | | | | | 29 | | | |
| 9 | | 23 | | 3-1 | | 9 | | 9 | | 9 | | 16 | | APR 3 | | 12 | | | | | | JUL 6 | | | |
| 16 | | 3-1 | | 9 | | 16 | | 23 | | 23 | | 23 | | 10 | | 19 | | | | | | 13 | | | |
| 23 | | 30 | | 16 | | 23 | | 23 | | 30 | | 30 | | 10 | | 26 | | | | | | 20 | | | |
| 23 | | 4-6 | | 16 | | 23 | | 30 | | 6 | | 6 | | 12 | | 24 | | | | | | 27 | | | |
| 3-2 | | 13 | | 23 | | 30 | | 13 | | 13 | | 13 | | 24 | | JUL 3 | | | | | | AUG 3 | | | |
| 4-6 | | 27 | | 4-6 | | 23 | | 13 | | 10 | | 20 | | MAY 1 | | 10 | | | | | | 10 | | | |
| 13 | | 5-4 | | 13 | | 20 | | 20 | | 27 | | 8 | | 17 | | 10 | | | | | | 17 | | | |
| 20 | | 5-4 | | 17 | | 26 | | 27 | | 5-4 | | 8 | | 24 | | 17 | | | | | | 17 | | | |
| 27 | | 11 | | 20 | | 27 | | 5-4 | | 18 | | 15 | | 31 | | 24 | | | | | | 21 | | | |
| 5-4 | | 18 | | 5-4 | | 5-4 | | 11 | | 25 | | 22 | | JUN 5 | | 31 | | | | | | 31 | | | |
| 11 | | 25 | | 11 | | 11 | | 18 | | 6-1 | | 29 | | 5 | | AUG 7 | | | | | | SEP 7 | | | |
| 18 | | 11 | | 18 | | 18 | | 25 | | 8 | | 6-1 | | 12 | | 14 | | | | | | 14 | | | |
| 27 | | 18 | | 25 | | 25 | | 6-1 | | 15 | | 15 | | 19 | | 21 | | | | | | 21 | | | |
| 5-4 | | 6-1 | | 6-1 | | 6-1 | | 8 | | 8 | | 22 | | 26 | | 28 | | | | | | 28 | | | |
| 11 | | 8 | | 8 | | 8 | | 8 | | 15 | | 15 | | JUL 3 | | SEP 4 | | | | | | OCT 5 | | | |
| 18 | | 8 | | 8 | | 15 | | 15 | | 15 | | 24 | | 3 | | 11 | | | | | | 5 | | | |
| 1-18 | | | | | | | | | | 22 | | 29 | | 10 | | 18 | | | | | | OCT 12 | | | |
| 25 | | | | | | | | | | | | | | | | | | | | | | | | | |

MARVEL PRODUCTIONS LTD.

## PRODUCTION SCHEDULE

JEM 86 - 87

| SHOW NO. | TITLE | FINAL SCRIPT DATE | FINAL SCRIPT ACTUAL | START STORYBOARD DATE | START STORYBOARD ACTUAL | FINISH STORYBOARD DATE | FINISH STORYBOARD ACTUAL | APPROVE STORYBOARD DATE | APPROVE STORYBOARD ACTUAL | APPROVE MODELS DATE | APPROVE MODELS ACTUAL | RECORD DIAL WK. OF DATE | RECORD DIAL WK. OF ACTUAL | START DIRECTION DATE | START DIRECTION ACTUAL | SHIP DATE | SHIP ACTUAL | RETURN WORK PIC DATE | RETURN WORK PIC ACTUAL | R DAT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 28 | SCANDAL | 11-3 | 11/11 | 11-4 | | 12-2 | | 12-9 | | 12-9 | | 12-16 | | 12-19 | | 12-19 | | 4-14 | | |
| 29 | PRESIDENTIAL DILEMMA | 11-10 | 11-11 | 11-24 | | 12-8 | | 12-15 | | 12-15 | | 12-22 | | 12-29 | | 12-26 | | 4-28 | | |
| 30 | TALENT SEARCH (E) | 12-8 | 12-8 | 12-8 | | 12-8 | | 12-29 | | 12-29 | | 12-29 | | 12-26 | | 2-13 | | 5-8 | | |
| 31 | TALENT SEARCH (I) | 12-15 | 12-16 | 12-15 | | 12-29 | | 1-5 | | 1-5 | | 1-12 | | 1-19 | | 2-13 | | 5-8 | | |
| 32 | TRICK OR TECH BAT | 1-12 | 1-12 | 1-12 | | 1-26 | | 2-2 | | 2-9 | | 2-9 | | 2-16 | | 3-6 | | 5-15 | | |
| 33 | BANDS BREAK UP | 1-19 | 1-19 | 1-19 | | 1-26 | | 2-9 | | 2-9 | | 2-9 | | 2-16 | | 3-20 | | 5-29 | | |
| 34 | DANCE TIME | 1-26 | 1-26 | 1-26 | | 2-9 | | 2-16 | | 2-16 | | 2-23 | | 3-2 | | 3-27 | | 6-5 | | |
| 35 | THE FAN | 1-26 | 1-26 | 1-26 | | 2-9 | | 2-16 | | 2-16 | | 2-23 | | 3-2 | | 3-20 | | 5-29 | | |
| 36 | JOURNEY'S... STRANGER? 94 | 2-2 | 2-2 | 2-2 | | 2-16 | | 2-23 | | 2-23 | | 2-23 | | 3-9 | | 4-3 | | 6-12 | | |
| 37 | TREASURE HUNT | 2-9 | 2-9 | 2-9 | | 2-23 | | 3-2 | | 3-2 | | 3-9 | | 3-16 | | 4-10 | | 6-19 | | |
| 38 | ONE JEM TOO MANY | 2-16 | 2-9 | 2-16 | | 3-2 | | 3-9 | | 3-9 | | 3-16 | | 3-16 | | 4-17 | | 6-26 | | |
| 39 | MUSIC IS MAGIC | 2-23 | 2-17 | 2-23 | | 3-9 | | 3-16 | | 3-16 | | 3-23 | | 3-23 | | 4-24 | | 7-3 | | |
| 40 | FATHERS DAY | 2-23 | 2-23 | 2-23 | | 3-9 | | 3-16 | | 3-16 | | 3-23 | | 3-30 | | 5-1 | | 7-10 | | |
| 41 | THE JAZZ PLAYER | 3-2 | 2-24 | 3-2 | | 3-16 | | 3-23 | | 3-23 | | 3-30 | | 4-6 | | 5-8 | | 7-17 | | |
| 42 | THE ROCK'N'ROLL PROCESS | 3-9 | 3-2 | 3-9 | | 3-23 | | 3-30 | | 3-30 | | 4-6 | | 4-13 | | 5-15 | | 7-24 | | |
| 43 | THE MIDDLE OF NOWHERE | 3-16 | 3-9 | 3-16 | | 3-30 | | 4-6 | | 4-6 | | 4-13 | | 4-20 | | 5-22 | | 7-31 | | |

# MARVEL PRODUCTIONS LTD. — PRODUCTION SCHEDULE

Approved Marvel 3/25

Ven 86-87

| SHOW NO. | TITLE | FINAL SCRIPT DATE | ACTUAL | START STORYBOARD DATE | ACTUAL | FINISH STORYBOARD DATE | ACTUAL | APPROVE STORYBOARD DATE | ACTUAL | APPROVE MODELS DATE | ACTUAL | RECORD DIAL WK. OF DATE | ACTUAL | START DIRECTION DATE | ACTUAL | SHIP DATE | ACTUAL | RETURN WORK PIC. DATE | ACTUAL | RETAIN REC. DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 44 | Cody Plumber | 3-23 | 3/6 | 3-23 | | | | | | | | | | | | | | | | |
| 45 | Cyclac | 3-23 | 3/6 | 3-23 | | | | | | | | | | | | | | | | |
| 46 | REIGN begins | 3-30 | 3-23 | 3-30 | 3-93 | | | | | | | | | | | | | | | |
| 47 | VIDEO WITS | 4-6 | 3-30 | 4-6 | | 4-6 | 4-13 | 4-13 | | 4-13 | | 4-20 | | 4-27 | | 6-5 | 8-14 | | | |
| 48 | REIGN HIGH HAIR | 4-13 | | 4-13 | | 4-6 | 4-13 | 4-13 | | 4-27 | | 4-20 | | | | 6-5 | 8-21 | | | |
| 49 | | 4-20 | | 4-20 | | 4-27 | 5-11 | 5-11 | | 4-20 | | | | 4-27 | | 6-19 | 8-28 | | | |
| 50 | | 4-20 | | 4-20 | | 4-27 | 5-4 | 5-4 | | 5-4 | | 5-18 | | 5-18 | | 6-26 | 9-4 | | | |
| 51 | | 4-27 | | 4-27 | | 4-27 | 5-11 | 5-11 | | 5-11 | | 5-18 | | 5-4 | | 7-3 | 9-11 | | | |
| 52 | | 5-4 | | 5-4 | | 5-18 | 5-11 | 5-11 | | 5-4 | | 5-11 | | 5-25 | | 7-3 | 9-4 | | | |
| 53 | | 5-11 | | 5-11 | | 5-25 | 5-18 | 5-18 | | 5-25 | | 5-18 | | 5-25 | | 7-17 | 9-25 | | | |
| 54 | | 5-18 | | 5-18 | | 6-1 | 6-1 | 6-8 | | 6-8 | | 6-15 | | 6-22 | | 7-24 | 10-2 | | | |
| 55 | | 5-18 | | 5-18 | | 6-1 | 6-8 | 6-8 | | 6-8 | | 6-15 | | 6-23 | | 7-31 | 10-9 | | | |
| 56 | | 5-25 | | 5-25 | | 6-8 | 6-15 | 6-15 | | 6-15 | | 6-22 | | 6-29 | | 7-31 | 10-16 | | | |
| 57 | | 6-1 | | 6-1 | | 6-1 | 6-22 | 6-29 | | 6-22 | | 6-29 | | 7-6 | | 8-7 | 10-23 | | | |
| 58 | | 6-8 | | 6-8 | | 6-22 | 6-29 | | | 6-39 | | 6-39 | | 7-13 | | 8-14 | 10-30 | | | |
| 59 | | | | 6-15 | | 6-29 | | | | | | | | | | | 11-6 | | | |