# EXHIBIT 67

SERIAL NO. 249

SERVED

RECEIVED

FILED

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

———————————————————— x
                                        :
ANNE BRYANT,
                                        :
                    Plaintiff,          :    Index No. 5192/00
                                        :
            v.                          :    Hon. Andrew P. O'Rourke
                                        :
BROADCAST MUSIC, INC., (a/k/a "BMI"),
CLIFFORD A. "FORD" KINDER, KINDER & :
CO., LTD., VADIVOX, LTD., JULES M.
"JOE" BACAL, GRIFFIN BACAL, INC.,       :
STARWILD MUSIC BMI, WILDSTAR
MUSIC ASCAP, SUNBOW PRODUCTIONS, :
INC., and JOHN AND JANE DOES 1-10,
                                        :
                    Defendants.
                                        :
                                        :
———————————————————— x
                                        :
ANNE BRYANT
                                        :
                    Plaintiff,          :
                                        :
            v.                          :    Index No. 2821/02
                                        :
SUNBOW PRODUCTIONS, INC.                :    Hon. Andrew P. O'Rourke
                                        :
                    Defendant.          :
                                        :
———————————————————— x

**DEFENDANT SUNBOW PRODUCTION, INC.'S REPLY POST-HEARING BRIEF
IN SUPPORT OF ITS CONTENTIONS THAT:  (1) PLAINTIFF'S
SIGNATURES ARE GENUINE, (2) PLAINTIFF ALWAYS WORKED PURSUANT
TO WRITTEN WORK-FOR-HIRE AGREEMENTS, AND
(3) THE CASE SHOULD BE DISMISSED ENTIRELY**

PATTERSON, BELKNAP, WEBB & TYLER LLP
ATTORNEYS FOR DEFENDANT SUNBOW PRODUCTIONS, INC.
1133 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK  10036
(212) 336-2000

GLORIA C. PHARES
LAUREN HAMMER BRESLOW

Sunbow Productions, Inc. ("Sunbow") submits this reply brief pursuant to the Court's order, made during a February 1, 2005 conference telephone call with the parties, permitting Sunbow to respond to Plaintiff's brief, which Sunbow received on February 7, 2005.

## ARGUMENT

### I.    Plaintiff Ignores the Framed Issue Hearing.

Following the October 29, 2004 framed issue hearing, the Court directed the parties to address three issues:  (1) whether Plaintiff's disputed signatures are genuine, (2) the significance of a finding that the signatures are Plaintiff's, and (3) "what remains, if anything, in this trial." (Ex. 1, 10/29/04 Hearing Transcript, p. 81.)

Plaintiff's memorandum of law has not addressed a single one of these issues.  It does not address the testimony of the expert witness that Plaintiff's signatures on the work-for-hire agreements are all genuine.  Nor does it address the testimony of Robert Harris, who testified about negotiating those agreements with Plaintiff's counsel and described Sunbow's unwavering practice of having all creative people sign the same form work-for-hire agreements, numerous copies of which he also identified. Plaintiff's memorandum of law says <u>nothing</u> about any of that testimony.

Plaintiff herself has submitted a lengthy affidavit, which similarly does not address these issues.  Moreover, Plaintiff chose not to testify at the framed issue hearing and submit to cross-examination.  Having made that decision, this Court should not credit anything in her affidavit on the issues that were the subject of the hearing. <u>Lupinsky v. Windham Constr. Corp.</u>, 293 A.D.2d 317, 318, 739 N.Y.S.2d 717,

719 (1st Dep't 2002) (a self-serving affidavit offered to contradict deposition testimony does not raise a bona fide question of fact and will be disregarded); Ringel v. Blue Ridge Ins. Co., 293 A.D.2d 460, 462, 740 N.Y.S.2d 109, 111 (2d Dep't 2002) ("plaintiff's affidavit . . . was insufficient to raise an issue of fact . . . because it was inconsistent with his previous deposition testimony); Nieves v. ISS Cleaning Servs. Group Inc., 284 A.D.2d 441, 442, 726 N.Y.S.2d 456, 457 (2d Dep't 2001) ("contradictory statements [made in an affidavit after her deposition] raised a feigned factual issue designed to avoid the consequences for her earlier admission"); see also Seinfeld v. Robinson, 300 A.D.2d 208, 209, 755 N.Y.S.2d 69, 70 (1st Dep't 2002) ("affidavits should not have been received by Judicial Hearing Officer from witnesses who were not available for cross-examination in court"); In Re Bicks' Trust, 12 A.D.2d 395, 398, 212 N.Y.S.2d 548, 552 (1st Dep't), aff'd, 10 N.Y.2d 331, 219 N.Y.S.2d 30 (1961) (the court "should not have permitted the use of . . . [an] exparte affidavit, over objection, without insisting that the [affiant] be called to testify and subject herself to cross-examination").

  Indeed, the entire thrust of Plaintiff's papers is that she concedes that her signatures are genuine and that she worked pursuant to the form work-for-hire agreements.  Further evidence that Plaintiff endorses the authenticity of the work-for-hire agreements is her complaint that she was denied the opportunity at the framed issue hearing to examine third-party witnesses about the construction of the written agreements.  (Pl. Br. at 2-3.)  She suggests that these witnesses might support her new breach of contract theory.  But the framed issue hearing had nothing to do with what various witnesses might have said about Plaintiff's written agreements with Sunbow.

The witnesses Sunbow called at the framed issue hearing were those that it deemed the most probative to address the issue that was subject of the hearing—the authenticity of Plaintiff's signatures on agreements that she denied she had signed. Plaintiff wants to forget her forgery claims now that the issue has been resoundingly resolved against her.

The natural consequence of Plaintiff's concession that she signed written work-for-hire agreements is that the premise on which the Court permitted this case to go to trial no longer exists. Plaintiff did not "always" work pursuant to oral agreements, as she told the Court, and there is no need to have a trial to construe the scope of those oral agreements. Because of representations to the Court that Plaintiff now concedes were false, Plaintiff has wasted over a year of the Court's and Sunbow's time, put Sunbow to the expense of contesting Plaintiff's false claims of oral agreements, and forced a framed issue hearing on an issue Plaintiff did not even contest at the hearing.[1]

---

[1]    Plaintiff's argument (Pl. Br. at 4) that it is Sunbow that has switched its theories—once relying on the Statute of Frauds and now the signed work-for-hire agreements—is a stark misstatement of the record. Sunbow's brief in support of its argument that Plaintiff's oral argument theory violated the Statute of Frauds began as follows:

> Sunbow has always taken the position that Plaintiff worked for hire according to a written work-for-hire agreement that granted her good and sufficient payments for her services. Until last November, when she first claimed that she controlled the copyrights in her music, Plaintiff has also steadfastly testified that she had always worked for hire pursuant to a written agreement. * * * Accepting for the purpose of this motion only Plaintiff's current oral "working arrangement" theory, as the Court has directed us to do, Sunbow contends that any such "working arrangement" must have been made in the 1980s when the parties were working together and is therefore barred by the Statute of Frauds because the ongoing nature of the arrangement precludes its being performed in a year.

1145754v3

## II.    Plaintiff's Motion to Amend Her Complaint Should Be Denied.

As Plaintiff's last attempt to prevent the logical conclusion of the framed issue hearing — that this case should be dismissed — and in yet another attempt to reinvent this case, Plaintiff now makes the preposterous argument that she should be permitted to amend her complaint — in the middle of her trial! — so that she can now start her case anew, seeking construction of agreements that until now she denied existed. (Pl. Br. at 7.) Plaintiff is currently in the middle of a trial attempting to prove the terms of an <u>oral</u> agreement that she never plead, but now she wants to amend her complaint to allege a breach of a written contract. While the pleading rules and cases generally support liberal amendment of pleadings, there are limits to that generosity.

When a plaintiff delays pleading a theory and then seeks to do so late in the proceedings when the defendant is prejudiced, the appellate courts routinely respect a trial court's decision to deny amendment. In <u>Felix v. Lettre</u>, 204 A.D.2d 679, 612 N.Y.S.2d 435 (2d Dep't 1994), a case that presents facts strikingly similar to these, the plaintiff sued to recover damages for negligent construction. Four years after service of the complaint, the case went to trial. When the defendants moved to dismiss on the ground that the proof tended to show only a breach of contract and not negligence, plaintiff sought leave to serve a supplemental complaint to state a cause of action for breach of contract. The trial court denied plaintiff's motion, which the Appellate Division sustained:

---

(Sunbow's Br. on Statute of Frauds at pp. 2-3 (emphasis added)). Sunbow's unwavering position throughout this entire case, even when it was unable to locate the signed documents, was that Plaintiff had worked pursuant to signed work-for-hire agreements. Sunbow made the obvious Statute-of-Frauds argument only because the Court was proceeding to trial on an oral agreement theory.

4

> Although delay alone will not be sufficient cause to deny a party's motion to amend, delay coupled with significant prejudice to the nonmoving party should mandate the denial of the belated motion to amend the pleading. [citations omitted]  Moreover, <u>where an action has long been certified as ready for trial and the moving party had full knowledge of the new cause of action</u>, in the absence of good cause for the failure to move to amend at an earlier date, <u>the motion should be denied</u> on the ground of gross laches alone.  Here, the plaintiffs . . . allowed more than four years to elapse before they sought . . . leave to serve an amended complaint or to conform the pleadings to the proof.  Consequently, <u>the defendant had no notice that it should have prepared a defense for an allegation of breach of contract</u>.

<u>Felix</u>, 204 A.D.2d at 680, 612 N.Y. S.2d at 436 (emphasis added).

For similar reasons, the Court should deny Plaintiff's motion to amend the complaint or to conform it to the proof.  The expert evidence shows (and Plaintiff concedes) that she signed work-for-hire agreements, and she should be charged with knowledge of them.  She clearly knew that she had worked pursuant to a written contract, but she did not claim breach of contract when she filed her first complaint nearly five years ago.  Nor did she plead a breach of contract claim when she re-filed her complaint against Sunbow in 2002.  The Court permitted Plaintiff to amend her complaint in December 2002, and again she did not allege a breach of contract.  In March 2003 at her deposition, Plaintiff testified repeatedly that she had always worked pursuant to a written work-for-hire agreement (<u>see</u> Sunbow's Opening Br. at 15-16), but gave no hint that she was relying on breach of contract.

Plaintiff filed her note of issue in June 2003, still without amending her complaint or even suggesting that she was relying on breach of contract.  Five months later, in response to Sunbow's motion for summary judgment, Plaintiff for the first time alleged Sunbow violated an oral working agreement.  But by then Plaintiff knew that

5

Sunbow could not locate the written work-for-hire agreements, so she conveniently abandoned her deposition testimony that she had worked pursuant to a written contract and claimed that Sunbow had breached an <u>oral</u> agreement. But even in December 2003, when Sunbow produced the unsigned Jem agreement and her lawyer's correspondence relating to it, Plaintiff should have been on notice of the written contracts. Instead, she persisted on claiming she had worked only pursuant to oral agreements. Now that Plaintiff's "oral working agreement" gambit has been shown to be a trick, Plaintiff seeks to start this case again.

At no time since service of the original complaint in this case and before the close of discovery was Sunbow ever on notice that it was defending a breach of contract case. Permitting Plaintiff to amend her complaint now in the midst of trial to allege a <u>new</u> contract theory, based on some construction of the written agreements, prejudices Sunbow. At no time was Sunbow given the opportunity to conduct discovery on Plaintiff's various contract theories. Sunbow has never served discovery on Plaintiff on the breach of contract theory, has never sought expert and third-party discovery—notably of Ford Kinder, who signed the agreements for Kinder & Bryant, and never deposed Plaintiff herself on her new breach of contract theory.

The record shows that, despite knowledge of the written agreements, Plaintiff withheld her argument for breach of contract and has only now advanced it—in the middle of trial—after her other theories have proved baseless. See <u>Smith v. Hercules Construction Corp.</u>, 274 A.D.2d 467, 711 N.Y.S.2d 453 (2d Dep't 2000) (upholding denial of plaintiffs' motion to amend their bill of particulars where plaintiffs

waited more than three years until the eve of trial and did not provide good cause for their failure to move for leave to amend earlier); Linares v. Spencer-Cameron Leasing Corp., 121 A.D.2d 606, 607, 503 N.Y.S.2d 639, 640-41 (2d Dep't 1986) (upholding denial of plaintiff's motion to amend his complaint "to change the theory of his case nearly four years after inception of the law suit and after all discovery had been completed.").

Plaintiff has not even attempted to show good cause for failing to plead breach of her signed work-for-hire agreements until after a week of trial, and permitting her to do so prejudices Sunbow. Moreover, Plaintiff's suggestion that she was prejudiced by the late production of the signed work-for-hire agreements turns reality on its head. The only prejudice Plaintiff suffered was that flowing from the Court's discovery that she had testified falsely.

Sunbow demonstrated in its opening brief that there is nothing left to be tried—not the original unjust enrichment and constructive claims and not the oral working agreement that Plaintiff manufactured in response to Sunbow's motion for summary judgment. This Court should deny Plaintiff's motion to amend.

## CONCLUSION

For the foregoing reasons and those stated in Sunbow's opening brief, Sunbow urges this Court to find that the signatures on Plaintiff's work-for-hire agreements are genuine; there were no grounds to go to trial; Plaintiff's motion to amend her complaint should be denied; and, finally, Plaintiff's complaint should be dismissed with prejudice as she has conceded that Sunbow was not unjustly enriched by monies due to Plaintiff, the only basis for the claims in her original complaint.

New York, New York
February 14, 2005

Respectfully submitted,

PATTERSON, BELKNAP, WEBB & TYLER LLP

By: _____

Gloria C. Phares
Lauren Hammer Breslow
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

Attorneys for Defendant Sunbow Productions, Inc.

1145754v3

# EXHIBIT 68

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

| | | |
|---|---|---|
| ANNE BRYANT, | : | |
| Plaintiff, | : | |
| | : | |
| -v- | : | |
| | : | |
| BROADCAST MUSIC, INC. | : | |
| (a/k/a/"BMI"), FORD KINDER, | : | |
| KINDER & CO., LTD., | : | Index No. 5192/00 |
| VADIVOX, INC., JULES M. "JOE" | : | |
| BACAL; GRIFFIN BACAL, INC., | : | |
| STARWILD MUSIC BMI, WILDSTAR | : | **NOTICE OF MOTION (1) TO VACATE** |
| MUSIC ASCAP,SUNBOW PRODUCTIONS | : | **ORDER OF MARCH 3, 2005; (2) TO** |
| | : | **DEEM PLEADINGS AMENDED TO** |
| | : | **INCLUDE CAUSES OF ACTION** |
| | : | **FOR BREACH OF WRITTEN** |
| | : | **CONTRACTS; (3) FOR ADDITIONAL** |
| | : | **DISCOVERY; AND (4) FOR** |
| | : | **BIRFUCATION OF CLAIMS RELATING** |
| | : | **TO PERFORMANCE ROYALTIES AND** |
| | : | **PUBLISHING ROYALTIES AND FOR A** |
| | : | **DATE CERTAIN FOR RESUMPTION OF** |
| | : | **TRIAL AS TO PERFORMANCE** |
| | : | **ROYALTY CLAIMS** |
| | : | |
| ANNE BRYANT, | : | |
| Plaintiff, | : | |
| | : | |
| -v- | : | |
| | : | |
| | : | Index No. 2821/02 |
| | : | |
| SUNBOW PRODUCTIONS, INC., | : | |
| Defendant. | : | Hon. Andrew P. O'Rourke |

TO:  Gloria Phares, Esq.
     Patterson, Belknap, Webb & Tyler LLP
     1133 Avenue of the Americas
     New York, NY 10036-6710
     Attorneys for Defendant
     Sunbow Productions, Inc.

     Judith Saffer, Esq.
     Attorney for BMI
     BMI Legal Department
     350 5th Avenue
     New York, New York 10118

**PLEASE TAKE NOTICE** that upon the annexed Affirmation of Patrick J. Monaghan, Jr., Esq. dated December 6, 2005 and Affidavit of Anne Bryant dated December 6, 2005 and the filed papers and proceedings had in this matter Plaintiff will move the Court on the 16th day of December at 9:30 in the forenoon at the Putnam Courthouse, 40 Gleneida Avenue, Carmel, New York, 10512 or at such other place and time as directed by the Court, before the Hon. Andrew O'Rourke, J.S.C. for an Order:

    A. Entry of an Order directing resumption of further proceedings in this matter;

    B. Bifurcation of the two basic royalty claims made in this case (performance and publishing) to permit claims based on performance royalties against Defendant Sunbow Productions Inc. ["Sunbow"]and Broadcast Music, Inc. to conclude discovery and proceed to trial on the performance royalty claims without further undue delay;

    C. For permission to take deposition testimony on damages and testimony to protect and preserve the record of important witnesses, such as Ford Kinder, a Florida resident and my expert David Berman, a California resident; and

    D. To allow and to deem Plaintiff's claims and pleadings  amended to conform to the proofs

elicited at trial to state claims for breach of
written contracts with Defendant Sunbow based on
among other things, the additional and subsequent
transactions and occurrences in this case
including Sunbow's August 2004 mid-trial
production of written agreements.

Dated: December 6, 2005    By: _____

Patrick J. Monaghan, Jr.
Monaghan, Monaghan, Lamb &
Marchisio, LLP
150 West 55th Street, Suite 1G
New York, NY 10019
Tel. 212-541-6980
Fax. 212-541-6994
        and
28 W. Grand Avenue
Montvale, N.J. 07645
Tel. 201-802-9060

22290                       Fax. 201-802-9066

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

```
––––––––––––––––––––––––––––––––––––––
ANNE BRYANT,                         :
            Plaintiff,               :
                                     :
    –v–                              :
                                     :
BROADCAST MUSIC, INC.                :
(a/k/a/"BMI"), FORD KINDER,          :
KINDER & CO., LTD.,                  :Index No. 5192/00
VADIVOX, INC., JULES M. "JOE"        :
BACAL; GRIFFIN BACAL, INC.,          :Hon. Andrew P. O'Rourke
STARWILD MUSIC BMI, WILDSTAR         :
MUSIC ASCAP, SUNBOW                  :
PRODUCTIONS, INC.,                   :
                                     :
            Defendants.              :
––––––––––––––––––––––––––––––––––––––:        AFFIRMATION OF
ANNE BRYANT,                         :        PATRICK J. MONAGHAN, JR.
            Plaintiff,               :
                                     :Index No. 2821/02
    –v–                              :
                                     :Hon. Andrew P. O'Rourke
                                     :
SUNBOW PRODUCTIONS, INC.,            :
                                     :
            Defendant.               :
––––––––––––––––––––––––––––––––––––––:
```

PATRICK J. MONAGHAN, JR., being duly sworn, affirms under penalty of perjury as follows:

1. I am a member of Monaghan, Monaghan, Lamb & Marchisio, attorneys for Plaintiff in this matter. Along with the accompanying Affidavit of Plaintiff Anne Bryant ["Bryant Affid."] I submit this Affirmation in support of the Plaintiff's Motion for an Order granting the following relief:

(A) Vacating the Court's Order of March 3, 2005 which stayed this action indefinitely pending certain appeals by Defendant Sunbow Productions, Ltd ["Sunbow"];

(B) Although not conceding that such are not already in the case, and to avoid further controversy about the matter, conforming the pleadings to the proofs elicited at trial and deeming the Amended Complaint and plaintiff's pleadings further amended to include causes of action and claims based on breaches of written agreements which were produced by Sunbow after trial had commenced in this action in August of 2004;

(C) Permitting limited additional discovery in this action including discovery on damages which have been sustained by plaintiff since the filing of the Note of Issue which occurred on June 30, 2003;

(D) Permitting the deposition testimony of certain out-of-state witnesses including Ford Kinder, a Florida resident and Plaintiff's expert witness, David Berman, a California resident, to be taken by video tape, for among other purposes, use at trial in the event of their unavailability;

(E) Allowing bifurcation of the trial of (a) plaintiff's claims for performance royalties and (b)

the separate claims for publishing royalties, to permit the expeditious trial and resolution of the performance royalty claims against both Sunbow and Broadcast Music, Inc. ["BMI"]; and

(F) For a date certain for trial of the performance royalty claims following the conclusion of the foregoing discovery.

## PRESENT STATUS

2.    The Court's Order of May 28, 2004 reflects that it had afforded the Defendants on March 2, 2004 "an additional final opportunity to more for dismissal." Despite that clear mandate and the fact that the defendants had made numerous unsuccessful summary judgment and dismissal motions in the case, the Court has entered a sua sponte stay by its Order dated March 3, 2005 (see Order dated March 3, 2005) based on documents produced in mid-trial in August of 2004 never before produced, [and demanded over a year before trial].

3.    The March 2005 Order does not explain why Sunbow's late document production should in any way be treated as dispositive or why the Court's earlier Order which precluded any further motions was no longer effective.  Further in 2003 plaintiff had made her own summary judgment motion which was rebuffed by the Court as untimely.

4.    After several unsuccessful communications with the Court pointing out some of these issues and that the pending

appeals will not dispose of the claims in this case and requesting that the Court resume the proceedings, we are compelled to file the within Motion.

5.    Accompanying this Affirmation is the Affidavit of Plaintiff Anne Bryant, which spells out the compelling reasons why the relief sought on this Motion should be granted.    Without conceding in any way that any of the claims should be stayed pending the outcome of the appeals, Plaintiff urges that at the very least the performance royalty issue should not be the subject of a continued stay.

6.    Our office recently checked with the Clerk of the Appellate Division Second Department and we were advised that the appeals have not yet been calendared.    The appeals are meritless; there is no other way to describe them.    This Court and the United States District Court have found that subject matter jurisdiction was present in the Supreme Court of the State of New York.    The unsuccessful removal to the Federal Court was an eve of trial gambit.    Any statute of frauds argument, if there ever was one, has been decimated by the production of written agreements by Sunbow.    Sunbow's reluctance to let the Second Department review those agreements merely shows how desperate it is to avoid dealing with a singular fact-Sunbow and its assignees and licensees used and are using Ms Bryant's music in violation of the very agreements which it produced and without paying just compensation to Ms Bryant.

4

7.   Certain facts must be recognized by the Court:

A.   No proper dispositive CPLR application was ever before the Court and the action should not have been stayed;

B.   No motion for a stay was ever filed with the Court or the Appellate Division;

C.   At the Pre-Trial Conference of March 2, 2004, the Court allowed "defendants an additional **_final_** opportunity to move for dismissal" [see Order May 28, 2004 denying the motions made based on that "one final opportunity"].  The Court had refused plaintiff's 2003 motion for summary judgment finding it untimely [Order of December 16, 2003].

D.   The pending appeals are meritless but in any event do not dispose of all claims as to all parties and plaintiff should at least be permitted to have a resolution of her performance rights claims;

E.   The JEM Agreement, **a writing** in evidence[1], confirms not only Plaintiff's rights to her share of publishing royalties but to performance royalties from Sunbow as well and the statute of frauds arguments are invalidated by Sunbow's own belated production in August 2004;

F.   Any mid-trial discovery needed now as referred to in Ms Bryant's Affidavit and delay in this case is entirely Sunbow's fault.

G.   BMI was given the settlement documents necessary to effect the appropriate changes on its records.

## THERE IS NO PENDING DISPOSITIVE APPLICATION AND IF THERE WERE IT WOULD AND SHOULD BE IN FAVOR OF PLAINTIFF BASED ON THE AUGUST 2004 DOCUMENT PRODUCTION

8.   We submit there is no proper pending dispositive

application before the Court because such applications have to be

in conformity with the CPLR and such has not been the case here.

Sunbow's document production in mid-trial is not equivalent to a

---

[1]   Unsigned version is defendant's Trial Exhibit G-Sunbow 0874 and signed version is in Binder EX K Sun 0925.  An additional copy is attached here.

motion covered in the CPLR or case law and plaintiff had demanded and was entitled to have those documents far in advance of the trial.[2]  The Court had set September 30, 2003 as the last day for Summary Judgment motions (see Order dated December 15, 2003 referring to that date) and the Court refused to hear Plaintiff's or any further Summary Judgment motions.[3]  Said Order states, "It had been made clear to all parties that summary judgment motions, in this long protracted action, were to have been served by September 30, 2003."  The Court later relented as to the defendants and permitted them the "one final opportunity" in March 2004.  They lost that one final opportunity and it is manifestly unfair to the plaintiff to allow Sunbow to make a stealth, unauthorized motion, when the Court specifically prohibited such.  More importantly, a reading of the very agreements dropped on the Court and Plaintiff in mid-trial does not at all support defendant's position and in fact confirms plaintiff's rights to both performance royalties and publishing royalties.

8.  Ms Bryant's February 4, 2005 Affidavit made it clear that she did not contest the signature on the Jem Feature Song Agreement and she cited relevant portions of that Agreement which

---

[2] Sunbow produced six documents in August of 2004 -three were Sunbow documents and three were GBI documents. Ms. Phares has not offered or sought to put the GBI documents in evidence telling the Court that they are being used for "impeachment" [Framed Issue Hearing trans p. 44].

[3] Based on the Jem Agreements and the GBI agreements produced in mid-trial it would be plaintiff, not defendants, who would be entitled to move for summary judgment as a matter of law.

confirmed her right to 50% of the publishing royalty income

received by Sunbow:

Paragraph 6 on page 5 of the JEM Agreement[4] states in part:

> "(a) With respect to Company's exercise of music
> publishing rights in the Music (as defined above) (but
> excluding use in connection with Premium Cassettes as
> defined in Paragraph 2(a) for which Contractor shall
> not receive any further compensation), uses of the
> Music combined with lyrics (but, if the Music with
> lyrics or any form thereof is the composition of Writer
> and other composers and/or lyricists, then the
> royalties hereunder shall be shared equally by all such
> lyricists and/or composers):
> (I) sums equal to fifty (50%) percent of the net
> proceeds (as defined below) received by Company from
> third parties for licenses for the manufacture or
> commercial phonograph
> records and/or licenses of theatrical motion picture
> synchronization rights (as defined below);
>
> ****
>
> (vi) with respect to **other uses** of the Music hereunder,
> sums equal to the amount resulting from dividing fifty
> **(50%) percent** of the net proceeds received by Company
> from third parties therefor by the total number of
> copyrighted musical compositions and/or literary
> materials contained or included in such uses.

### SUNBOW'S LAWYER AGREES

9.  The above confirms Ms. Bryant's 50% interest.  We also

pointed out that Sunbow's own witness Robert Harris, Esq.,

draftsman of the Jem Agreement, confirmed Ms Bryant's position

both in his testimony in October of 2004 and in his prior

---

[4]  See attached Jem Agreement- Paragraph 6.

7

correspondence with Sunbow's Carol Weitzman-Sunbow's missing witness.

> "IN ANY EVENT, THE LATEST DRAFT OF THE AREEMENT, AS DOES THE HARMAN AGREEMENT, PROVIDES FOR SHARING IN MUSIC PUBLISHING INCOME, AND I BELIEVE THAT YOU MUST HONOR THAT" [Harris Letter 11/14/94 Exhibit B Bryant Affidavit 2/04/05].

## THE JEM AGREEMENT ALSO PROVIDES A REMEDY FOR PLAINTIFF

## REGARDING PERFORMANCE ROYALTIES AGAINST SUNBOW

10.  Another red herring argument of the many advanced by Sunbow is that plaintiff has no claims against Sunbow regarding performance royalties but that is just wrong.  Paragraph 5 (c) of the Jem Agreement provides that the Company [Sunbow, holder of the copyright] licenses back to the Writer the Writer's share of performance royalties *"...so as to enable Writer ,,,to collect the "writer's share" of royalties derived therefrom."*  This clause would be rendered meaningless if Sunbow which had the copyrights did not assure that the proper registrations were filed with the performance rights society which in this case was BMI.  BMI is culpable because it allowed changes in its own members' registrations to occur without confirming those changes with the very members whom it represents.

11. As Ms Bryant's Affidavit indicates, Sunbow controlled and was responsible for giving effect to these provisions and there is no dispute about the fact that the registrations were wrongly filed.  The Court will recall the

disingenuous testimony by Bacal, who owned Sunbow, and how he could not explain how it was that Ms Bryant was not receiving proper credits for her music.  Surely he and Ford Kinder would not have settled and agreed to amend those registrations if Ms Bryant were not correct. But that has not happened yet and those registrations remain as they were when this case was filed despite the settlements.  Ms. Bryant has lost hundreds of thousands of dollars in performance royalties alone.  Ms. Bryant clearly has a remedy in contract and unjust enrichment and constructive trust against Sunbow for its conduct and against BMI for its part in the wrongdoing.

## LANDSCAPE OF THE CASE BEFORE 2004 TRIAL

12.  According to the Court's ruling of May 26, 2004 filed on May 28, 2004 the Court had already found [thus as law the case], after numerous motions which were hotly contested, the following:

> i) Sunbow admitted that... "the Jem Agreement is identical to all the other agreements for the Hasbro T.V. series relating to what Plaintiff is entitled to receive..." (Ruling, Page 12).

> (ii) A triable issue of fact existed as to the nature of Plaintiff's relationship with Bacal (Ruling, Page 15, Footnote 8).

> (iii) Bacal had not denied receiving royalty payments and licensing fees from Sunbow or through his various companies "or that said companies have received such benefits."

> (iv) Plaintiff "produced evidence that substantial mechanical royalties and license fees generated by the use of her compositions have been received by Defendant

Bacal's various companies or that said companies have received such benefits" (Ruling, Page 16).

(v) That Plaintiff "produced evidence that substantial mechanical royalties and license fees generated by the use of her compositions had been received by Defendant Bacal's various companies named Defendants herein" (Ruling, Pages 16 and 17).

(vi) That if Plaintiff is able to show that Bacal used Sunbow for known purposes, that the Court should be able to permit the Plaintiff to pierce the corporate veil and recover "any financial benefit that has been wrongfully conferred upon Sunbow" and that the same analysis applied to Starwild, Wildstar, and ASCAP (Ruling, Pages 17-18).

(vii) Even if the Court were to permit the Defendants to have relied upon the Statute of Frauds . . . it would not preclude Plaintiff from recovering on a theory of quantum meruit (Ruling, Page 20.

(viii) That the Defendants conceded all the elements of the quantum meruit claim save Plaintiff establishing the reasonable value of her services (id.)

(ix) Plaintiff had offered evidence supporting her claim that she was entitled to wrongfully withheld performance royalties in excess of $238,000.00 (Ruling, Page 61).

(x)  The value of Plaintiff's services in the 80's included 50% of her publishing royalties (Id.)

(xi) Sunbow had acknowledged that it is obliged to pay Plaintiff a royalty of 50% of net profits for licenses to third parties of mechanical or synchronization fees (Ruling, Page 22).  The Court did not address the other uses provision of the Sunbow Jem Agreement and stated that "there ought to be no further motions in this action" (Ruling, Page 22).

(xii) In its ruling of January 23, 2004 on Sunbow's unsuccessful motion for reconsideration, the Court said, "the scope and terms of the parties' work relationship and their agreements shall properly be the subject of inquiry and examination at trial" (Ruling, Page 3).

13. This was the state of affairs based on an extensive record of motions and decisions when the parties finally went to trial in July of 2004. None of those rulings have been overturned or reversed and they are law of the case.

## BIFURCATION OF CLAIMS

14.  Ms Bryant details the reasons why she is being damaged by the failure to achieve a resolution of her claims.  She points out the reasons why the performance right claims and the publishing claims should be dealt with separately to at least conclude the part of the case dealing with her uncontested right to correct performance royalties which are now far over $238,000. These claims are unaffected by the appeals and should not have to abide those appeals-frivolous as they are.

## RESUMPTION OF DISCOVERY

15. Plaintiff also requests permission to conduct additional discovery on damages and to allow the video depositions of certain witnesses.  The latter issue came up during the trial and the Court found on July 21, 2004 that plaintiff would be required to call its out of town witnesses either "..in court or …proceed with a video conference deposition that the parties and the deponent can all attend" without the need for a commission. [Transcript attached along with letter of Gloria Phares, ESq dated August 18, 2004].

16.   Plaintiff should not be put in a position of having stale information about her damages, and run the risk of her important witnesses not being available when the trial resumes.

## AMENDMENTS TO CONFORM TO THE PLEADINGS

17.   It is well settled that the Court can permit the pleadings to be amended to conform to the proofs, whatever the source of those proofs, at trial or even after trial and on appeal.   Sunbow has produced written agreements which confirm plaintiff's rights to both publishing and performance royalties but maintains that the case was being tried on an oral agreement theory.   Although we disagree with that characterization, and to avoid further dispute on the issue, we ask the Court to deem the pleadings amended to include claims based on the terms of the Jem Feature Song agreement put in evidence by Sunbow as Exhibit M.


_____
PATRICK J. MONAGHAN,, JR.

Dated:   December 6, 2005


word.doc.mva.12.6.05.4:00

12

Reorder No. 5105
JULIUS BLUMBERG, INC.
NYC 00013
© 10% P.C.W.

AGREEMENT made of this 1st day of June, 1986, by and between SUNBOW PRODUCTIONS, INC. ("Company"), whose business address is 380 Lexington Avenue, Suite 1105, New York, New York 10168, and KINDER & BRYANT LTD. ("Contractor") whose business address is 41 West 73rd Street, New York, New York 10023, f/s/o Anne Bryant and Ford Kinder (jointly referred to as "Writer").

In consideration of the mutual covenants herein contained, the parties hereto have agreed and do agree as follows:

1. Company hereby engages Contractor and Contractor hereby accepts such engagement, to furnish the services of Writer to Company for the purpose of writing, preparing and delivering to Company original musical material (hereinafter referred to as the "Music") for songs to be used in a fully-animated children's television show consisting of either five one-half hours, fifteen segments, or a television motion picture, presently entitled "JEM" (the "Show")(it being understood that the mention of the Show is for purposes of identification only and shall in no way restrict Company's rights in the Music, and the use thereof, as set forth in this Agreement). The number of songs for which music is to be written and delivered by Writer hereunder shall be determined by Company. The Music shall be delivered to Company in accordance with a schedule to be mutually determined by the Company and Contractor.

2. (a) For all rights herein granted to Company in the Music, and for performance by Contractor of all obligations hereunder (including but not limited to composing and arranging the Music, supervision of the orchestra recording of the Music for the Show, and Company's right to use the Music on and in connection with phonorecordings sold or distributed in conjunction with merchandise based on the Show ["Premium Cassettes"]), Company shall pay Contractor a fee of Two Thousand Two Hundred ($2,200) Dollars for each song for which Writer writes and delivers the Music, payable on delivery thereof.

(b) Payment by a parent or affiliate of Company shall be deemed to constitute payment by Company hereunder. Nothing herein contained shall be deemed to impose any obligation on Company to use or authorize the use of the Music, and Company shall have fully discharged its obligations to Contractor hereunder by payment to Contractor of the amount specified in subparagraph (a) of this Paragraph 2.

3. Contractor shall deliver one (1) copy of the Music to Company as Company shall designate.

4. It is understood and agreed that Writer may write the Music at such times and places as Writer may choose, subject only to Contractor's obligation to make timely delivery of the Music in accordance with the terms of this Agreement.



DEFENDANT'S EXHIBIT

5.   (a)  Contractor warrants, acknowledges and agrees that the Music to be written by Writer and delivered by Contractor is to be written by Writer under and pursuant to an employment agreement between Contractor and Writer pursuant to which Contractor is entitled to the exclusive services of Writer, and to all the results of Writer's services; that the Music was specifically ordered and commissioned by Company for use as part of an audiovisual work; and that the Music is a work made for hire within the meaning of Section 101 of the United States Copyright Act.  Upon writing of the Music, all right, title and interest therein shall automatically vest in Company and Company shall be the sole and unlimited owner thereof and of all rights therein throughout the world forever, and Company shall be entitled to copyright therein, including statutory copyright and all renewals thereof, as copyright author and proprietor.  Company may freely assign and grant rights and licenses with respect to the Music and any copyright therein (including any renewals thereof), and in this connection Contractor agrees to execute and deliver and/or cause Writer to execute and deliver to Company any and all instruments required by Company in connection with the use and enjoyment of the Music and of Company's rights therein and thereto.  Contractor hereby appoints Company as Contractor's and Writer's attorney-in-fact with the right but not the obligation to execute any such instruments in Contractor's or Writer's name on Company's behalf.  On execution hereof, Contractor shall sign and shall cause Writer to sign the Certificate of Authorship attached hereto for the Music.

(b)  Without in any way limiting the generality of the foregoing, it is agreed that Company shall have the exclusive right and may license others to use, adapt, arrange, change, add to, or subtract from the Music and to combine the same with other literary material and/or lyrics and to publish, record, produce, reproduce, transmit, perform, broadcast, telecast, and/or otherwise communicate the same or any version or versions thereof by any means (including, but not limited to, in synchronization with motion pictures, television and/or any other form of recordation or reproduction of sight and/or sound), whether now known or hereafter devised, publicly for profit or otherwise, it being understood that Contractor and Writer hereby waive any so-called "moral rights" which may now be or may hereafter be recognized.  It is understood and agreed that neither Contractor nor Writer shall have any right, title or interest in any other literary material and/or lyrics which may be combined with the Music.

(c)  During any period or periods of time during which Writer is affiliated with any small performing rights society (herein called the "Society"), Company shall and does hereby, under and pursuant to this Paragraph, license back to Writer the so-called "writer's share" (i.e., fifty (50%) percent) (but, if the Music or any form thereof are the composition of

- 2 -

SUN 0871

Writer and other composers and/or lyricists, then the grant hereunder shall be deemed a grant of the "writer's share" to Writer and all other such lyricists and/or composers jointly except that for instrumental uses, only Writer and any other composer(s) shall share in the "writer's share") in the non-dramatic (i.e., "small") performing rights in the Music so as to enable Writer to license such non-dramatic performing rights to Society, and to collect the "writer's share" of royalties derived therefrom, it being understood, in this connection, that Company (or any assignee or licensee of all or any of Company's rights under this Agreement) shall not exercise such non-dramatic performing rights during such period or periods without obtaining a license therefor from Society, except that Company and/or any such assignee or licensee, may exercise such non-dramatic performing rights in the Music by reason of, under and pursuant to this Agreement,

> (i)  during any period or periods during which such non-dramatic performing rights are not controlled by and/or available for license to Company or any such assignee or licensee at standard rates from Society, or in the case of public performances of the Music in geographical areas outside of Society's jurisdiction, from any other organization or society which is affiliated with Society or which has a collection agreement with Society and which controls the non-dramatic performing rights in any geographical area in which the Music is to be performed; and/or

> (ii)  in connection with theatrical exhibitions in the United States, its territories and possessions; and/or

> (iii)  in connection with any performance of the Music within the United States, its territories and possessions, which is not a public performance;

it being understood that Company (and/or any such assignee or licensee) shall have no obligation to pay any royalties or other sums to Writer, Contractor, Society, or any successor to the rights of any of them with respect to non-dramatic performances of the Music made pursuant to subclauses (i) through (iii) hereof. If Company makes or authorizes any non-dramatic performances of the Music under and pursuant to this Agreement, and if Writer or Contractor shall assert any claim that any such performance violates any rights of Writer or Contractor, then (A) under no circumstances shall Writer or Contractor have the right to take any action or initiate any proceeding with respect to such claim which would have the effect of enjoining and/or preventing and/or otherwise interfering with any said non-dramatic performances, it being agreed that any such action or proceeding shall be limited to an action at law for damages; and (B) if Writer or Contractor

- 3 -

0040H

SUN 0872

shall assert such a claim pertaining to a non-dramatic performance of the Music made by any assignee or licensee of Company, then any action taken or proceeding brought by Writer or Contractor shall be limited to an action at law for damages against such assignee or licensee exclusively.  The foregoing references to Society shall not be construed as giving Society any independent right to take any action or initiate any proceeding against Company or any of its assignees or licensees with respect to any such claim.

       (d)  Without limiting the generality of any rights granted under this Agreement, and notwithstanding any license hereunder to Writer pursuant to subparagraph (c) above, Writer and Contractor expressly acknowledge that Company, its successors, assigns and/or licensees shall have the right to collect the "publisher's share" of performance royalties becoming due and payable hereunder from any small performing rights society by reason of performances of the Music, it being expressly agreed that Writer and Contractor shall not be entitled to any share of such monies which are distributed to Company, its successors, assigns, and/or licensees by any small performing rights society. Writer shall be entitled to collect the "writer's share" of any such royalties with respect to the Music jointly with any other lyricists and/or composers of such Music.  The terms "publisher's share" and "writer's share" as used in this Agreement have the same meaning here as is commonly understood in the music publishing and motion picture and television industries.  Company may represent to any domestic or foreign performing rights society or similar organization requiring an acknowledgement of the type made by Writer herein that Contractor and Writer have acknowledged Company's right to collect and retain the publisher's share of royalties; further, if any such society or organization requires written authorization from Writer or Contractor in order to make payments of the publisher's share of royalties to Company, Writer and Contractor shall promptly execute and deliver such authorization.  If any such society or organization makes payment to Writer or Contractor of all royalties (i.e., both "writer's" and "publisher's" share) with respect to any performance to Writer, Contractor shall promptly remit one-half (1/2) of such royalty to Company.

       6.    Further, in the exercise of its rights hereunder and without in any way limiting the generality of the foregoing, Company shall have, as owner and copyright proprietor of the Music, the complete control of the publication of the Music and of all rights incident thereto, including, but not limited to, the right to license the manufacture of phonograph records and other recordings of the Music and the right to license motion picture synchronization rights (all of which rights are herein sometimes collectively called "music publishing rights").  Without limiting the generality of the foregoing, it is agreed that Company may assign or license any or all such music publishing rights and/or any or all other rights granted to Company under this Agreement to

- 4 -

0040H

SUN 0873

any music publishing company or production company which is a parent or subsidiary of Company or otherwise affiliated with Company or to any other third party.

(a)  With respect to Company's exercise of music publishing rights in the Music (as defined above)(but excluding use in connection with Premium Cassettes as defined in Paragraph 2(a) for which Contractor shall not receive any further compensation), uses of the Music combined with lyrics (but, if the Music with lyrics or any form thereof is the composition of Writer and other composers and/or lyricists, then the royalties hereunder shall be shared equally by all such lyricists and/or composers):

(i)  sums equal to fifty (50%) percent of the net proceeds (as defined below) received by Company from third parties for licenses for the manufacture or commercial phonograph records and/or licenses of theatrical motion picture synchronization rights (as defined below);

(ii)  for regular piano copies, if any, sold and paid for at wholesale in the United States and/or Canada, sums equal to eight cents (.08) per copy for the first one hundred thousand (100,000) copies sold, and ten cents (.10) per copy for copies sold in excess of 100,000;

(iii)  sums equal to fifty (50%) percent of net proceeds received by Company from third parties for regular piano copies, if any, sold and paid for at wholesale outside of the United States and/or Canada;

(iv)  with respect to orchestrations, including band arrangements, if any, sold and paid for at wholesale anywhere in the world, sums equal to ten (10%) percent of the wholesale price therefor, after trade discounts;

(v)  with respect to any songbook, folio or similar publication, if any, sold and paid for at wholesale anywhere in the world, sums equal to the amount resulting from dividing ten (10%) percent of the wholesale price, after trade discounts, therefor by the total number of copyrighted musical compositions contained in such publication;

(vi)  with respect to other uses of the Music hereunder, sums equal to the amount resulting from dividing fifty (50%) percent of the net proceeds received by Company from third parties therefor by the total number of copyrighted musical compositions and/or literary materials contained or included in such uses.

- 5 -

SUN 0874

No royalties shall be payable hereunder for professional material not sold or resold; further, no royalties shall be payable to Writer with respect to uses of the Music except as hereinabove expressly set forth.  The term "theatrical motion picture rights" as used herein refers to synchronization rights granted with respect to motion pictures intended primarily and initially for theatrical release by direct projection before paid-admission audiences; in no event shall such term refer to motion pictures or other methods of recordation, whether now known or hereafter devised, which are produced primarily and initially for television broadcasting by any means whatsoever.  The term "net proceeds" as used hereinabove, shall mean all monies (including advances) actually received by Company (or any assignee of Company's rights or licensee hereunder) which are directly attributable to licenses issued authorizing the manufacture of commercial phonograph records and/or licenses relating to theatrical motion picture synchronization rights, and/or for the exercise of publication rights referred to in subclause (iii) above, as the case may be, after the deduction of all costs, expenses, fees and commissions which are directly attributable to the exploitation of the Music and combined music by way of commercial phonograph records or by way of theatrical motion picture synchronization, or by way of publication, as the case may be, computed in accordance with good and standard practices.  In the event that Company licenses the Music in a form containing music or other literary materials written or composed by any third party or parties, then Contractor's royalties thereon, shall be reduced proportionately to an amount equal to the royalties payable hereunder divided by the number of composers and lyricists (including Writer) who have furnished materials and services for such use and who are entitled to receive royalties from Company, provided that in no event shall Writer receive less than one-half of the royalty Writer would otherwise be entitled to receive hereunder.  Company shall render royalty statements to Contractor, accompanied by any remuneration due Contractor, such statements to be rendered at least twice during each calendar year during which royalties are payable.

             (b)  If, for any reason, exportation of money to the United States from any foreign country, territory or place should be prohibited, prevented or rendered commercially impracticable, the amount received by Company (if Company's share thereof is actually paid to Company in such foreign country, territory or place) shall not be considered gross receipts hereunder unless and until the same shall have actually been received in the United States in United States currency, less any discounts, losses, costs or expenses suffered by or imposed upon Company with respect to transmittal of such money to the United States and the conversion thereof to United States currency; provided, however, that if Contractor so requests in writing, that portion of such blocked or frozen funds which would represent Contractor's share of net proceeds of such gross receipts, but for being frozen or blocked, shall be deposited in Contractor's name in any bank or

- 6 -

SUN 0875

depository designated by Contractor in such country wherein such funds are blocked or frozen subject to the laws of such country with respect to such deposits and withdrawals by Contractor therefrom.  Contractor shall have the right at Contractor's sole expense to inspect Company's books and records relative to gross receipts derived from use of the Music hereunder and to make extracts thereof provided such inspection shall be made at Company's offices during reasonable business hours and upon reasonable notice and not more frequently than once per year.  All royalties, statements and other accounts rendered by Company shall be binding upon Contractor and not subject to any objection by Contractor unless specific objection in writing, stating the basis thereof, is given to Company by Contractor by one (1) year from the date rendered.

(c)  If Company assigns or licenses any uses of the music publishing rights to any third party (including any aforementioned subsidiary or affiliated company) and if Company authorizes such third party to account directly to Contractor with respect to royalties payable to Contractor by reason of any such uses of such music publishing rights, then Contractor agrees that, during the term of any such assignment or license, Writer shall look only to such assignee or licensee for payment of such royalties (and shall be entitled only to inspect such assignee's or licensee's books and records relative to uses of the Music at reasonable business hours and at such assignee's or licensee's offices), provided that Company shall not be relieved of its obligations with respect thereto unless the assignee is a parent, subsidiary or affiliate of Company, or a recognized distributor of motion pictures or television programs, or a "major" motion picture company (as that term is understood in the motion picture industry), or a "major" television network (as that term is understood in the television industry), or a "major" record company or music publishing company (as those terms are understood in the music industry).

(d)  Contractor acknowledges that Company has not made and is not hereby making any representation or warranty with respect to the amount of royalties, if any, which may be derived from uses of music publishing rights, it being further understood that nothing herein shall be deemed to impose any obligation on Company to use or authorize the use of the Music and/or any music publishing rights derived therefrom.

7.  Company agrees that:

(a)  if the description of the Music in Paragraph 1 of this Agreement refers to a particular television program in connection with which such Music may be used, and if such Music or a substantial portion thereof are used in connection with such program or are otherwise used hereunder, then Company shall give Writer (or cause Writer to be given) credit as Writer of such

- 7 -

0040H

SUN 0876

Music or as a writer of the television series on all release
prints of such programs. Company further agrees to use best
efforts to have Writer given credit in connection with other uses
of the Music;

      (b)  if any of the Music as described in Paragraph 1
of this Agreement is used as Music for the theme song for a
television pilot program and/or television series, then Company
shall give Writer (or cause Writer to be given) credit on all
release prints of any such program in which such theme song is
used as the theme song, as Writer of the Music of such theme song.

The form, style, size, placement and nature of any credit provided
for herein shall be determined by Company (or its assignee or
licensee) in its sole discretion except that Company agrees that
the identification of Writer shall be in the form "Kinder and
Bryant." Any unintentional and/or inadvertent failure to give
credit as above provided, whether because of lack of broadcast
time or otherwise, shall not be a breach of this Agreement.

      8.  Company shall have the right and may grant to others
the right to use, disseminate, reproduce, print and publish
Writer's name, likeness, voice and biographical material
concerning Writer as news or informative matter and in connection
with advertising and for purposes of trade in connection with any
motion picture or television program in which the Music is used,
and/or in connection with any other uses of the Music. The rights
granted herein shall not include the right to use or to grant to
others the right to use Writer's name, voice, likeness and
biographical material in any direct endorsement of any product or
service without Writer's prior written consent.

      9.  Contractor hereby warrants that Contractor is free
and able to enter into and fully perform this Agreement, to
furnish the services of Writer, and to grant all rights herein
granted. Further, Contractor warrants that the Music in the form
in which it is delivered shall be wholly original with Writer and
shall not be copied from any other work and shall not, nor shall
the use thereof, infringe or violate the copyright or any common
law right or any personal, proprietary, or other right of any kind
whatsoever of any person, firm, corporation or association. If
any of the Music delivered hereunder is described as based upon
traditional or public domain compositions, Contractor warrants
that such compositions are in the public domain throughout the
world and that Writer's treatment of such compositions is original
and shall not be copied from any work other than such public
domain compositions, nor shall the use thereof infringe or violate
the copyright or any common law right or any personal, proprietary
or other right of any kind whatsoever of any person, firm,
corporation or association. Notwithstanding the foregoing, if any
of the Music delivered hereunder is described as based upon
materials furnished by Company or as based upon traditional or

- 8 -

0040H

SUN 0877

public domain compositions furnished by Company, Contractor makes no warranty as to the originality or ownership of such materials or compositions furnished by Company.

10.  Contractor shall indemnify and hold Company, its successors, assigns and licensees, any network and/or stations over which the Music shall be broadcast, the sponsors, if any, of any program on which they are broadcast, and their advertising agencies, if any, and any other parties who shall utilize the Music or any part thereof in any way with Company's permission, and the directors, officers, agents and employees of any of the foregoing, free and harmless from any and all claims, damages, liabilities, costs and expenses, including reasonable counsel fees, arising out of any breach by Contractor of any warranty or agreement made by Contractor herein, in an amount not to exceed the monies paid to Contractor by Company hereunder.

11.  It is understood and agreed that all or part of this Agreement and all the results and proceeds thereof may be assigned by Company to any third party without Contractor's consent and in this event, Company's successors and/or assigns shall be entitled to any and all rights, privileges, and equities to which Company is entitled under and by virtue of this Agreement. In the event of such an assignment, Company shall not be relieved of its obligations hereunder unless the assignee is a parent, subsidiary or affiliate of Company or a recognized distributor of motion pictures or television programs, or a "major" motion picture company (as that term is understood in the motion picture industry), or a "major" television network (as that term is understood in the television industry), or a "major" record company or music publishing company (as those terms are understood in the music industry).

Nothing in this Agreement shall in any way derogate from, diminish or impair any rights granted to the Company or to any parent, subsidiary or affiliate of Company under any other agreement entered into between Writer and Company or any parent, subsidiary or affiliate thereof.

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their successors, assigns and licensees.

12.  Company agrees to furnish Contractor with cue sheets of the Music within sixty (60) days of the initial broadcast of the Show.

13.  (a)  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to contracts entered into and fully to be performed therein.

One Revision:

- 9 -

0040B

SUN 0878

(b)    A waiver by either party of any of the terms and conditions of this Agreement in any one instance shall not be construed to be a waiver of such term or condition for the future, or of any subsequent breach thereof.  All remedies, rights, undertakings, obligations and agreements contained in this Agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either party.

(c)    This Agreement contains the entire understanding of the parties hereto relating to the subject matter herein contained and this Agreement cannot be changed, rescinded or terminated orally.

(d)    If any provisions of this Agreement as applied to any party or to any circumstances shall be adjudged by a court to be void or unenforceable, the same shall in no way affect any other provision of this Agreement, the application of such provision in any other circumstances or the validity or enforcebililty of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

SUNBOW PRODUCTIONS, INC. ("Company")

By: _____
    Its

KINDER & BRYANT LTD. ("Contractor")

By: _____
    Its

- 10 -

0040H

SUN 0879

Schedule A

Anne Bryant and Ford Kinder ("Writers") hereby certify that they wrote certain original music as employees of KINDER & BRYANT LTD. ("Contractor") in the regular course of their employment. Contractor hereby certifies that Contractor was specially commissioned by SUNBOW PRODUCTIONS, INC. ("Company") to furnish the services of Writers to write and deliver said music to Company for use as part of a fully-animated children's television program tentatively entitled "JEM" pursuant to an agreement dated as of _____, 1986. Accordingly, Writers and Contractor acknowledge and agree that the said music is a work made for hire within the meaning of Section 101 of the United States Copyright Act and that Company is the author and owner thereof and is entitled to copyright therein (and all renewals thereof), and all rights of any kind or nature therein, with the right to make such changes therein and uses thereof as Company may from time to time determine as such author and owner.

                        KINDER & BRYANT LTD.
                              ("Contractor")


Dated:                  By: _____



                        _____
Dated:                        Anne Bryant


                        _____
Dated:                        Ford Kinder


- 11 -

0040H

SUN 0880

11

<u>INDUCEMENT LETTER</u>

Dated as of            , 1986

Sunbow Productions, Inc.
380 Lexington Avenue
Suite 1105
New York, New York  10168

    Re:  Sunbow Productions, Inc. with
       <u>Kinder & Bryant Ltd./"JEM"</u>

Gentlemen:

    Reference is made to that certain agreement dated as of
_____, 1986 (herein called the "Agreement") between
KINDER & BRYANT LTD. (herein called "Contractor") and you, which,
among other things, makes available the services of the
undersigned by Contractor to you for the purposes set forth in
said Agreement.

    As an inducement to you to enter into the Agreement and as a
material part of the consideration moving to you for so doing,
each of the undersigned hereby represents, warrants and agrees as
follows:

    1.    That the undersigned has heretofore entered into an
agreement (herein callled the "Employment Agreement") with
Contractor covering the rendition of the undersigned's services
for Contractor and that Contractor has the right and authority to
enter into the Agreement and to furnish the rights and services
of the undersigned upon the terms and conditions therein
specified.

    2.    That the undersigned is familiar with each and all
of the terms, covenants and conditions of the Agreement and
hereby consents to the execution thereof; that the undersigned
shall perform and comply with all of the terms, covenants and
conditions of the Agreement on the part of the undersigned to be
performed and complied with, even if the Employment Agreement
should hereafter be terminated or suspended; that the
representations and warranties of Contractor contained in the
Agreement are true; that the undersigned shall render all of the
services provided for under the Agreement and hereby confirms
that there have been granted to Contractor all of the rights
granted by Contractor to you under the Agreement; that all
notices served upon Contractor in accordance with the Agreement
shall be deemed notices to the undersigned of the contents
thereof.

- 12 -

0040H

SUN 0881

12

3.    That the undersigned is under no obligation or disability by law or otherwise which would prevent or restrict the undersigned from performing and complying with all of the terms, covenants and conditions of the Agreement on the part of the undersigned to be performed or complied with.

4.    That, except in the event that the undersigned is deemed substituted for Contractor as a direct party to the Agreement, pursuant to Paragraph 6 hereof, the undersigned will look solely to Contractor and not to you for all compensation and other remuneration for any and all services and rights which the undersigned may render and/or grant under the Agreement.

5.    That you shall be entitled to equitable relief against the undersigned by injunction or otherwise to restrain, enjoin and/or prevent the violation or breach by the undersigned of any obligation of the undersigned to be performed as provided in the Agreement and/or the violation or breach by the undersigned of any obligations or agreements under this present instrument.

6.    That if Contractor should be dissolved or should otherwise cease to exist or for any reason whatsoever should fail, be unable, neglect or refuse to perform and observe each and all of the conditions of the Agreement requiring performance or compliance on its part, the undersigned shall at your election be deemed substituted as a direct party to the Agreement in the place and stead of Contractor and, further, that in the event of a breach or threatened breach of the Agreement by Contractor or by the undersigned you shall be entitled to legal and equitable relief by way of injunction or otherwise against Contractor or against the undersigned or both of us in your discretion, in any event without the necessity of first resorting to or exhausting any rights or remedies which you may have against Contractor; all of the foregoing to be to the same extent and with the same force and effect as if the undersigned were a direct party to the Agreement in the first instance and as if in the Agreement the undersigned had personally agreed to render the services therein provided to be rendered by the undersigned and to perform and observe each and all of the terms and conditions of the Agreement requiring performance or compliance on the part of the Contractor or the undersigned or both of us.

Very truly yours,

_____          _____
FORD KINDER                       ANNE BRYANT

0040H

– 13 –

SUN 0882

13

Reorder No. 5105
JULIUS BLUMBERG, INC.
NYC 10013
©10% P.C.W.

08/18/2004 19:48 FAX 2123369222          Patterson Belknap           002/008

# Patterson, Belknap, Webb & Tyler LLP

1133 Avenue of the Americas
New York, NY 10036-6710
(212) 336-2000
Fax (212) 336-2222

Christopher C. Angell
Douglas E. Barzelay
Susan F. Bloom
Henry P. Bubel
Laura E. Butzel
William F. Cavanaugh, Jr.
Lisa E. Cleary
Edward F. Cox
John Dellavennari
Gregory L. Diskant
David M. Dykhouse
Philip R. Forlenza
Hugh J. Freund
Paul G. Gardephe
Eugene M. Gelernter
Alan Gettner
David M. Glaser
Antonia M. Grumbach
Erik Haas
Andrew L. Herz
Dana W. Hiscock
Scott Horton
Scott B. Howard
Karen C. Hunter
Kenneth J. King
Rochelle Korman
Robin Krause
Jeffrey E. LaGueux
Kim J. Landsman

Robert W. Lehrburger
Jeffrey I.D. Lewis
Robert P. LoBue
Ellen M. Martin
Maureen W. McCarthy
Thomas C. Morrison
Bernard F. O'Hare
Gloria C. Phares
Thomas W. Pippert
Herman H. Raspé
Robert M. Safron
Karla G. Sanchez
Kenneth L. Sankin
John Sare
Peter J. Schaeffer
Andrew D. Schau
John E. Schmeltzer, III
John P. Schmitt
Arthur D. Sederbaum
Karl E. Seib, Jr.
Saul B. Shapiro
Michael J. Timmons
Peter W. Tomlinson
Richard R. Upton
Frederick B. Warder III
William W. Weisner
John D. Winter
Stephen P. Younger
Steven A. Zalesin

Of Counsel

Harold R. Tyler
———————————
Anthony P. Coles
David F. Dobbins
George S. Frazza
Robert M. Pennoyer
Stephen W. Schwarz
Robert B. Shea
Ira T. Wender, P.C.
———————————
Direct Phone
(212) 336-2666

Email Address
gcphares@pbwt.com

August 18, 2004

Debra Cohen, Esq.
Law Secretary to the
   Honorable Andrew P. O'Rourke
Supreme Court of New York
County of Rockland
27 New Hempstead Road
New City, New York 10956

Re:    Bryant v. Broadcast Music Inc. No. 5192/00
       Bryant v. Sunbow Productions, Inc., No. 2821/02

Dear Ms. Cohen:

I'm responding to Jeffrey C. Primiano's August 18, 2004 letter regarding plaintiff's late efforts to obtain the testimony of out-of-town witnesses which she wishes to present at trial. Mr. Primiano was not present on July 21, 2004, when this issue was discussed with Justice O'Rourke in chambers, so that may explain his misunderstanding of what Justice O'Rourke ruled.

I emphasized during our conference with Justice O'Rourke that defendant Sunbow will not sacrifice its constitutional right to confront in person any trial witness. In response to this, the Court made the following order, which I confirmed on the record (pp. 49-50, attached; emphasis added): Mr. Monaghan will call his out of town witnesses either "in court or he will proceed with a video conference deposition that

Debra Cohen, Esq.
August 18, 2004
Page 2

[the parties and the deponent] can all attend" without the need for a commission.
Sunbow did not consent to, and Justice O'Rourke never approved, the kind of
procedure that plaintiff is now proposing – i.e., a video conference with the deponents
in another city. That was precisely what Justice O'Rourke rejected.

      In our call today I told Mr. Primiano what Justice O'Rourke had ruled, and
he conceded that he had not been present at trial on July 21. Before accusing Sunbow of
unreasonably obstructing his proposal and seeking the intervention of the Court, he
should have made more diligent efforts – for example by consulting with Mr.
Monaghan or by reading the transcript – to ascertain that the Court had already ruled
on and dismissed the very proposal he's now advancing.

      Mr. Primiano's suggestion that my vacation schedule is all that prevents
his carrying out his plan to depose two people in Miami and Dallas is nonsense. The
conference with Justice O'Rourke was held on July 21; that is 29 days ago. Not until
today have I heard one word from plaintiff about any depositions. (And today's
communication came only after I emailed Mr. Monaghan yesterday to inquire whether
he would be completing his direct case on September 13-15 so that I could make
arrangements for defense witnesses.) The allegation that it is "due in large part to Ms.
Phares' vacation schedule" that plaintiff is having difficulty scheduling two out-of-town
depositions, each of which would require a day of travel, is due entirely to plaintiff's
failure diligently to arrange the depositions earlier.

      Plaintiff made no effort to conduct this discovery in the four years since
she first brought this case, and she has made no effort to do so in the 29 days since the
last trial day. Now when there is very little time before my (and my associate's)
vacations (both of which Mr. Monaghan was aware of) and very little time after those
vacations and before the resumption of trial, plaintiff finally tries to schedule
depositions. We conduct busy practices, and we are entitled to use the little time that is
left after our vacations for our own preparation for trial without being required to
accommodate plaintiff's lack of diligence. If there is insufficient time in which to do so,
that problem cannot be laid at the feet of defendant Sunbow.

      But plaintiff does not need the intervention of the Court to resolve her
dilemma. Justice O'Rourke offered her two alternatives: to call the witnesses at trial or
a video deposition at which all parties are present. Plaintiff has squandered the time

Debra Cohen, Esq.
August 18, 2004
Page 3


available to avail herself of the latter alternative.  She can still avail herself of the former
option and call her witnesses to testify in court.

Sincerely yours,

Gloria C. Phares


cc:    Patrick J. Monaghan, Esq.
       Judith Saffer, Esq.

SUPREME COURT OF THE STATE OF NEW YORK
ROCKLAND COUNTY
-----------------------------------------------X

ANNE BRYANT,

                           Plaintiff          Index No.
                                         5192/2000

       -against-

BROADCAST MUSIC, INC., (a/k/a "BMI"),
CLIFFORD A. "FORD" KINDER, KINDER & CO.,
LTD., VADIVOX, LTD., JULES M. "JOE"
BACAL, GRIFFIN BACAL, INC.; STARWILD
MUSIC BMI, WILDSTAR MUSIC ASCAP,
SUNBOW PRODUCTIONS, INC. and JOHN AND
JANE DOES - 10,

                           Defendants
-----------------------------------------------X

ANNE BRYANT,

                           Plaintiff,
                                       Index No.
       -against-                       2821/2002

SUNBOW PRODUCTIONS, INC.,

                           Defendant
-----------------------------------------------X

  NON-JURY TRIAL

                      Rockland County Courthouse
                      One South Main Street
                      New City, New York  10956
                      July 21, 2004

  B  E  F  O  R  E:

              HON. ANDREW P. O'ROURKE,
                Supreme Court Justice

  ROBERT FRITZ                     DONNA RACANELLI
  SENIOR COURT CLERK            COURT REPORTER

08/18/2004 19:49 FAX 2123362222          Patterson Belknap                    ☒006/008

2

A P P E A R A N C E S:

```
        MONAGHAN, MONAGHAN, LAMB & MARCHISIO, ESQS.
        Attorneys for the Plaintiff
        150 West 55th Street
        New York, New York  10019
    BY:  PATRICK J. MONAGHAN, JR., ESQ.


        PATTERSON, BELKNAP, WEBB & TYLER, LLP
        Attorney for the Defendant SUNBOW
        1133 Avenue of the Americas
        New York, New York  10036-6710
    BY:  GLORIA C. PHARES, ESQ.
              -and-
        LAUREN HAMMER BRESLOW, ESQ.


    ALSO PRESENT:  JUDITH M. SAFFER, ESQ.
                   Assistant General Counsel - BMI
```

July 21, 2004

Bryant - Cross                              49

1    this 15 years around the world out of our

2    sight.

3            THE COURT:  All right, now go to lunch.

4            THE WITNESS:  It would have gotten

5    raised.

6            THE COURT:  Now go to lunch.  See you

7    back here at two o'clock.

8            (Whereupon, court stood in luncheon

9    recess.  After the recess the proceedings

10   continued as follows.)

11           MR. PHARES:  Your Honor, before we

12   begin I want to confirm on the record the

13   agreement that we made in chambers that if

14   Mr. Monaghan is going to call his out of

15   town witnesses that he will either do so

16   in court or he will proceed with a video

17   conference deposition that we can all

18   attend without the need for a commission,

19   is that correct?

20           THE COURT:  There is no need for a

21   commission and if you can work it out

22   through a video conference that is fine.

23           MR. MONAGHAN:  Thank you, Judge.

24           THE COURT:  Otherwise, have to be in

Bryant - Cross                    50

1
2         court.

3                    MR. MONAGHAN:  Understood.

4   CONTINUED CROSS-EXAMINATION

5   BY MS. PHARES:

6         Q    Miss Bryant, at the break I just put up here on

7   the board what I think is a summary of, may not be a well

8   spelled summary, but it is a summary of what we discussed

9   this morning, and I want to be sure that you don't think

10  there is any mistake in it.

11               That in the 1989 separation agreement you were

12  bought out of your corporate interest.  There was

13  provision for public performance, but not for music

14  publishing, is that correct?

15        A    That is correct.

16        Q    The 1994 settlement agreement you were paid

17  $70,000.  There were no further corporate obligations.

18  You provided for your performance royalties but no music

19  publishing, is that correct?

20        A    That is correct.

21        Q    And then in the 2000 settlement agreement with

22  Mr. Kinder you provided for your performance royalties

23  and there was no provision for music publishing, is that

24  correct?

25        A    Ford Kinder was not my publisher and Kinder and

# EXHIBIT 69

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

————————————————————

ANNE BRYANT,                          :
                    Plaintiff,        :
                                      :
        -v-                           :
                                      :
BROADCAST MUSIC, INC.                 :
(a/k/a/"BMI"), FORD KINDER,           :
KINDER & CO., LTD.,                   :Index No. 5192/00
VADIVOX, INC., JULES M. "JOE" :
BACAL; GRIFFIN BACAL, INC.,           :Hon. Andrew P. O'Rourke
STARWILD MUSIC BMI, WILDSTAR          :
MUSIC ASCAP, SUNBOW                   :
PRODUCTIONS, INC.,                    :
                                      :
                    Defendants.       :
                                      :
————————————————————
ANNE BRYANT,                          :
                    Plaintiff,        :
                                      :Index No. 2821/02
        -v-                           :
                                      :Hon. Andrew P. O'Rourke
                                      :
SUNBOW PRODUCTIONS, INC.,             :
                                      :
                    Defendant.        :
————————————————————

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE ORDER OF
MARCH 3, 2005; TO DEEM PLEADINGS AMENDED; FOR ADDITIONAL
DISCOVERY; FOR BIFURCATION OF CLAIMS AND RESUMPTION OF TRIAL**

---

TO: Gloria Phares, Esq.
    Patterson, Belknap, Webb & Tyler
    1133 Avenue of the Americas
    New York, New York 10036-6710
    Attorneys for Defendant Sunbow

    Judith Saffer, Esq.
    BMI Legal Department
    320 West 57th Street
    New York, New York 10019          On the Brief:
                                      Patrick J. Monaghan, Jr.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES........................................4,5

PRELIMINARY STATEMENT.........................................6

BACKGROUND FACTS..............................................7

FINDINGS WHICH WERE ALREADY LAW OF THE CASE...................7

**POINT I: THE COURT SHOULD MODIFY OR VACATE ITS**

**MARCH 3, 2005 ORDER.........................................9**


**POINT II: THE COURT SHOULD ALLOW THE PLEADINGS**

**TO BE DEEMED AMENDED TO INCLUDE CLAIMS**

**BASED ON WRITTEN AGREEMENTS (i.e. THE JEM AGREEMENT- EX. M**

**IN EVIDENCE TO ELIMINATE ANY DOUBTS REGARDING THE**

**VIABILITY OF SUNBOW'S STATUTE OF FRAUDS ARGUMENT.............9**

    -STATUTE OF FRAUDS DOES NOT PRECLUDE <u>QUANTUM MERUIT</u>

    AWARD ANYWAY.........................................10

    -PLAINTIFF'S 50% INTEREST IN MUSIC PUBLISHING ROYALTIES

    ARE CLAIMS ALREADY IN THE CASE.......................11

    -SUNBOW'S OWN ATTORNEY AGREES........................11

    -THE CLAIM SHOULD BE DEEMED IN THE CASE BECAUSE

    PLAINTIFF, THROUGH NO FAULT OF HERS, DID NOT

    HAVE THE WRITTEN AGREEMENTS..........................12

    -THE CLAIM SHOULD BE DEEMED IN THE CASE BECAUSE PLAINTIFF

    TESTIFIED THERE WERE WRITTEN AGREEMENTS AND

    DEMANDED THEIR PRODUCTION............................12

    -THE "WE COULDN'T LOCATE IT PREVIOUSLY ARGUMENT........15

2

<u>TABLE OF CONTENTS(continued)</u>

-BACAL'S TESTIMONY AGREES ABOUT THE UNDERSTANDING.......16

-WHAT IS SUNBOW AFRAID OF- IT'S OWN DOCUMENT?..........16

-THIS TRIAL RECORD INCLUDES THE JEM AGREEMENT..........17

<u>POINT III: SUNBOW'S AUGUST 2004 DOCUMENT PRODUCTION WAS NOT A</u>

<u>DISPOSITIVE MOTION</u>.........................................19

<u>POINT IV: THE COURT HAS THE POWER TO BIFURCATE THE CLAIMS FOR</u>

<u>PUBLISHING ROYALTIES AND PERFORMANCE</u>

<u>ROYALTIES</u>................................................20

<u>POINT V: PLAINTIFF SHOULD BE ALLOWED AN OPPORUNITY TO CONDUCT</u>

<u>FURTHER DISCOVERY</u> ........................................20

<u>CONCLUSION</u>...............................................21

# TABLE OF AUTHORITIES

**New York Cases:**

Burstin v. Public Service Mutual Insurance
Company, 98 A.D.2d. 928, 471 N.Y.S.2d 33
(3rd Dept. 1983). . . . . . . . . . . . . . . . . . . . . . . 19

Di Rosse v. Wein, (2d Dept 1965) 24 A.D.2d 510,
261 N.Y.S.2d 623, app den (1965)
16 N.Y.2d 487 . . . . . . . . . . . . . . . . . . . . . . . 17

EDP Hosp. Computer Sys. v. Bronx-Lebanon Hosp. Cen., 212 A.D.2d
569, 622 N.Y.S2d 556 (2nd Dept. 1995). . . . . . . . . . . . .19

Halloran v. Halloran, 161 A.D.2d 562,
555 N.Y.S.2d 139(2nd Dept. 1990) . . . . . . . . . . . . . . 9

Helen v. Murphy, 45 A.D.2d 693, 356 N.Y.S.2d 865
(1st Dept. 1974). . . . . . . . . . . . . . . . . . . . . . 9

Jo-Cook Realty Corp. v. Lorge, 133 A.D.2d 447,
519 N.Y.S.2d 664 (2nd Dept. 1987) . . . . . . . . . . . . . .17

Marazita v. Nelbach, 91 A.D. 604,
456 N.Y.S.2d 423 (2nd Dept. 1982) . . . . . . . . . . . . . .19

Murray v. City of New York, 43 N.Y.2d 400,
401 N.Y.S.2d 773, 372 N.E.2d 560 (1977),
reh dismd (1978) 45 N.Y.2d 966 . . . . . . . . . . . . . . .18

Soggs v. Crocco, 184 A.D.2d 1021, 585 N.Y.S.2d
260 (4th Dept. 1992). . . . . . . . . . . . . . . . . . . .19

**TABLE OF AUTHORITIES (continued)**

Robert Morris v. Port Authority of New York

and New Jersey, 290 A.D.2d 22,

736 N.Y.S.2d 324 (1st Dept. 2002). . . . . . . . . . . . . . . 19

Ruben v. American and Foreign Insurance Co.,

185 A.D.2d 63, 592 N.Y.S.2d 167(4th Dep. 1992). . . . . . . . . 9


**Federal Statutes:**

17 USC § 101. . . . . . . . . . . . . . . . . . . . . . . 14


**State Statutes:**

CPLR § 2221 . . . . . . . . . . . . . . . . . . . . . . . .9

CPLR § 3025 (c) . . . . . . . . . . . . . . . . . . . . . 18

CPLR § 3211 . . . . . . . . . . . . . . . . . . . . . . . 19

CPLR § 3212 . . . . . . . . . . . . . . . . . . . . . . . 19

CPLR § 4011 . . . . . . . . . . . . . . . . . . . . . . . 20

CPLR § 4014 . . . . . . . . . . . . . . . . . . . . . . . 20

## PRELIMINARY STATEMENT

Plaintiff now moves the Court for an Order granting the following relief:

(A) **Vacate Order**. Vacating the Court's Order of March 3, 2005 which stayed this action indefinitely pending certain appeals by Defendant Sunbow Productions, Ltd ("Sunbow");

(B) **Conform Pleadings**. Although not conceding that such are not already in the case, and to avoid further controversy about the matter, conforming the pleadings to the proofs elicited at trial and deeming the Amended Complaint and plaintiff's pleadings further amended to include causes of action and claims based on breaches of written agreements and specifically the JEM Agreement dated June 1, 1986 (Exhibit M in evidence) which were produced by Sunbow after trial had commenced in this action in August of 2004;

(C) **Permit Additional Discovery**. Permitting limited additional discovery in this action including discovery on damages which have been sustained by plaintiff since the filing of the Note of Issue which occurred on June 30, 2003;

(D) **Permit Deposition Testimony For Use at Trial**. Permitting the deposition testimony of certain out- of-state witnesses including Ford Kinder, a Florida resident and Plaintiff's expert witness, David Berman, a California resident, to be taken by video tape, for among other purposes, use at trial in the event of their unavailability;

(E) **Bifurcate Claims Regarding Performance and Publishing Royalties**. Allowing bifurcation of the trial of (a) plaintiff's claims for performance royalties and (b) the separate claims for publishing royalties, to permit the expeditious trial and resolution of the performance royalty claims against both Sunbow and Broadcast Music, Inc. ["BMI"]; and

(F) **Resume Trial**. For a date certain for trial of the performance royalty claims following the conclusion of the foregoing discovery.

## BACKGROUND FACTS

The basis for the relief sought by Plaintiff is set forth in great detail in the Affidavit of Plaintiff Anne Bryant ("Bryant Affid.") and Affirmation of counsel Patrick J. Monaghan, Jr., Esq. ("Monaghan Affirm."). Familiarity with the record in this case is assumed.

## FINDINGS WHICH WERE ALREADY LAW OF THE CASE

As set forth in the Monaghan Affirmation in Paragraph 12, the Court had already rendered Rulings related to the understandings and agreements between the parties. These include the following findings in its Ruling of May 28, 2004:

> (i) Sunbow admitted that... "the Jem Agreement is identical to all the other agreements for the Hasbro T.V. series relating to what Plaintiff is entitled to receive..." (Ruling, Page 12).

> (ii) A triable issue of fact existed as to the nature of Plaintiff's relationship with Bacal (Ruling, Page 15, Footnote 8).

> (iii) Bacal had not denied receiving royalty payments and licensing fees from Sunbow or through his various companies "or that said companies have received such benefits."

> (iv) Plaintiff "produced evidence that substantial mechanical royalties and license fees generated by the use of her compositions have been received by Defendant Bacal's various companies or that said companies have received such benefits" (Ruling, Page 16).

> (v) That Plaintiff "produced evidence that substantial mechanical royalties and license fees generated by the use of her compositions had been received by Defendant Bacal's various companies named Defendants herein" (Ruling, Pages 16 and 17).

> (vi) That if Plaintiff is able to show that Bacal used Sunbow for known purposes, that the Court should be

7

able to permit the Plaintiff to pierce the corporate
veil and recover "any financial benefit that has been
wrongfully conferred upon Sunbow" and that the same
analysis applied to Starwild, Wildstar, and ASCAP
(Ruling, Pages 17-18).

(vii) Even if the Court were to permit the Defendants
to have relied upon the Statute of Frauds . . . it
would not preclude Plaintiff from recovering on a
theory of quantum meruit (Ruling, Page 20.

(viii) That the Defendants conceded all the elements of
the quantum meruit claim save Plaintiff establishing
the reasonable value of her services (id.)

(ix) Plaintiff had offered evidence supporting her
claim that she was entitled to wrongfully withheld
performance royalties in excess of $238,000.00 (Ruling,
Page 61).

(x)  The value of Plaintiff's services in the 80's
included 50% of her publishing royalties (Id.)

(xi) Sunbow had acknowledged that it is obliged to pay
Plaintiff a royalty of 50% of net profits for licenses
to third parties of mechanical or synchronization fees
(Ruling, Page 22).  The Court did not address the other
uses provision of the Sunbow Jem Agreement and stated
that "there ought to be no further motions in this
action" (Ruling, Page 22).


(xii) In its ruling of January 23, 2004 on Sunbow's
unsuccessful motion for reconsideration, the Court
said, "the scope and terms of the parties' work
relationship and their agreements shall properly be
the subject of inquiry and examination at trial"
(Ruling, Page 3).

## POINT I

### THE COURT SHOULD MODIFY OR VACATE ITS MARCH 3, 2005 ORDER

Under CPLR § 2221, the Court may modify a prior Order and as required by the Rule the motion must be made to the Justice who signed the original Order.  Since the March 3, 2005 Order was entered sua sponte, this motion is not a motion for re-argument or renewal of a prior motion.

The Supreme Court has the inherent power to control its own calendars and may set aside, correct or modify its own orders. Helen v. Murphy, 45 A.D.2d 693, 356 N.Y.S.2d 865 (1st Dept. 1974).  Halloran v. Halloran, 161 A.D.2d 562, 555 N.Y.S.2d 139(2nd Dept. 1990).  This may be done even during the pendency of an appeal, Ruben v. American and Foreign Insurance Co., 185 A.D.2d 63, 592 N.Y.S.2d 167(4th Dep. 1992).  That power should be exercised here in the interest of justice.

## POINT II

### THE COURT SHOULD ALLOW THE PLEADINGS TO BE DEEMED AMENDED TO INCLUDE CLAIMS BASED ON WRITTEN AGREEMENTS (i.e. THE JEM AGREEMENT- EX. M IN EVIDENCE) TO ELIMINATE ANY DOUBTS REGARDING THE VIABILITY OF SUNBOW'S STATUTE OF FRAUDS ARGUMENT

The Court denied Defendants' belated attempt to raise the Statute of Frauds.  Here is what the Court said in its prior Order of May 28, 2004- the last Order before trial began:

> "The last issue to be addressed as an urged basis for
> dismissal is the defense of the Statute of Frauds.
> Having carefully considered the parties respective

arguments on this defense, the Court is greatly troubled by the extreme lateness with which Defendants have raised this defense.[1] While it is true that Plaintiff had expanded her theories of recovery in this action in November 2002, as condoned by the Court's granting of her cross motion to amend her Complaint against Sunbow, it must be stated that Defendants had noticed as early of that date that Plaintiff was claiming entitlement to share in royalties for derivative uses of her jingles and compositions. Indeed, she specifically pleads in her Amended Complaint that Defendant 'has received payments from the sale and marketing of videos, movies, and CD's and other products which use Plaintiff's compositions without compensation due her and that Defendants are thereby unjustly enriched to the detriment of Plaintiff'" (Order dated May 28, 2004, Page 18).

## STATUTE OF FRAUDS DOES NOT PRECLUDE *QUANTUM MERUIT* AWARD ANYWAY

The Court in its May 28, 2004 Order discussed the Defendants' failure to raise the Statute of Frauds at any time previously in the litigation. The Court stated, "In any event even if the Court were to have permitted the Defendants to rely on the Statute of Frauds the Court would not bar the Plaintiff from recovering on a theory of quantum meruit (Order, Page 20).[2] The Court also discussed the fact that Plaintiff had offered evidence related to her 50% interest in publishing royalties (Order, Page 21) and that "in its Reply Memorandum, Sunbow clarifies that it agrees that it is obligated to pay Plaintiff a royalty of 50% of the net profits from licenses to third parties of mechanical or synchronization rights" (Order, Page 22). This

---

[1] The Statute of Frauds was never raised in the Defendants' Answers as an affirmative defense.

[2] This point alone should moot the issue of Sunbow's Statute of Frauds appeal as reason to delay the trial.

is but one of several reasons an appeal based on the Statute of Frauds should not detain the Court.

## PLAINTIFF'S 50% INTEREST IN MUSIC PUBLISHING ROYALTIES ARE CLAIMS ALREADY IN THE CASE

A second reason why the Statute of Frauds appeal should not hold up proceedings is that there is a writing in evidence reflecting the understanding against the party to be charged. The right to 50% of the net profits from those licenses from mechanical or synchronization rights, a Music Publishing interest, which the Court cited above is based on the language of the JEM Agreement which Sunbow produced in mid-trial (see Monaghan Affirmation citing JEM Agreement-Exhibit M in evid). The same Agreement provides for an additional 50% Music Publishing interest where Sunbow or other licensees received proceeds "with respect to other uses of the music…"  Other uses would encompass all other uses including those uses for which royalties are claimed by Plaintiff – CD's, DVD's, videos and the like.

### SUNBOW'S OWN ATTORNEY AGREES

At the Framed Issue Hearing in October of 2004, Sunbow produced as its witness, attorney Robert Harris, Esq. who drafted the Sunbow Agreement.  Mr. Harris substantially confirmed Ms. Bryant's entitlement to additional revenues which would necessarily have to include publishing revenues.  In fact, in Mr.

Harris' letter of November 14, 1994 to Carol Weitzman of Sunbow, which had been put before the Court by Sunbow said precisely that, he wrote, "the latest draft of the Agreement, as does the Harmon Agreement, provides for sharing in music publishing income, and I believe you must honor that" (Harris letter 11/14/94- attached as Exhibit B to Bryant Affidavit of 2/4/05).

## THE CLAIM SHOULD BE DEEMED IN THE CASE BECAUSE PLAINTIFF, THROUGH

### NO FAULT OF HERS, DID NOT HAVE THE WRITTEN AGREEMENTS

When Plaintiff filed her Complaint and Amended Complaint, she did not have signed agreements in her possession.  In fact, if any credence is given to Sunbow, Sunbow itself apparently did not have them and did not find them until August of 2004 when they were produced at the trial during Ms Bryant's examination which has yet to be completed.  Plaintiff could hardly have put before the Court in her Complaint a claim based on written agreements she could not produce.

## THE CLAIM SHOULD BE DEEMED IN THE CASE BECAUSE PLAINTIFF

### TESTIFIED THERE WERE WRITTEN AGREEMENTS AND

### DEMANDED THEIR PRODUCTION

Ms. Bryant testified repeatedly that there were written agreements, but she did not have them in her possession (See Bryant Affidavit, Para. 4 which relates her prior testimony).  It is not as though Plaintiff did not demand that Sunbow produce the written agreement before trial because Plaintiff's Second Demand for Production of Documents dated June 30, 2003, well over a year

before trial, specifically requested all such documents.  Now,
here is what the Request sought and Sunbow's contentious
Responses to each demand:

Request No. 1:   **"Any and all agreements related to Anne Bryant's
purported relinquishment of royalties of any
type,** including but not limited to performance
royalties, mechanical royalties and/or
synchronization fees for any of the musical
compositions or songs "G.I. Joe,"
"Transformers," "JEM," "My Little Pony" and/or
"Visionaries."

Response:   Sunbow objects to this request on the grounds
that it is overly broad and seeks information
that is neither relevant to the claims or
defenses in this litigation nor reasonably
calculated to lead to the discovery of
admissible evidence.  Sunbow further objects to
this request for the reasons described in
General Objection No. 3 above.  Subject to and
without waiving the foregoing objections and the
General Objections, **Sunbow is producing all
agreements that it has located** between it and
plaintiff relating to the copyright ownership of
the compositions she wrote for the television
series listed in this request and any royalties
payable to plaintiff in connection therewith.

Request No. 2:   Copies of every agreement relevant to the issues
in the case upon which defendant, Sunbow
Productions, Inc. will rely upon at trial.

Response:   Sunbow objects to this interrogatory on the
grounds that it is premature and seeks
information that is protected by the work
product privilege.  Sunbow will identify the
documents on which it will rely at trial at a
time and in a manner consistent with the CPLR
and the Court's instructions in this case.

Request No. 3:   **Every agreement** which defendant Sunbow
Productions, Inc. and/or any of its subsidiary
companies and/or any companies owned by
Defendant Sunbow Productions, Inc. **entered into
with Plaintiff Anne Bryant.**

Response:   Sunbow objects to this request of the grounds
that it is overly broad and seeks information
that is neither relevant to the claims or
defenses in this litigation nor reasonably
calculated to lead to the discovery of
admissible evidence.  Subject to and without
waiving the foregoing objections and the General
Obligations, **Sunbow is producing all agreements
that it has located between it and plaintiff.**

Request No. 4:   **Every agreement** which Defendant Sunbow
Productions, Inc. **entered into with Plaintiff
Anne Bryant.**

Response:   Sunbow objects to this request on the grounds
that it is overly broad and seeks information

that is neither relevant to the claims or defenses in this litigation nor reasonably calculated to lead to the discovery of admissible evidence and because it is a burdensome fishing expedition inasmuch as plaintiff has never contended that she entered into any agreements with Starwild Music, Inc. Subject to and without waiving the foregoing objections and the General Objections, **Sunbow states that it has not located any documents that are responsive to this request.**

Request No. 5:       Every Agreement which Defendant Sunbow Productions, Inc. and/or any of its subsidiary companies and/or any other companies owned by defendant Sunbow Productions, Inc. entered into with Griffin Bacal, Inc.

Response:       Sunbow objects to this request on the grounds that it is overly broad and seeks information that is neither relevant to the claims or defenses in this litigation nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections and the General Objections, **Sunbow states that it has not located any documents that are responsive to this request.**

Request No. 6:       **Any agreement** which would reflect upon the status of Plaintiff Anne Bryant's compositions as **"works made for hire"** as defined by the United States Copy Right Act 17 USC § 101"

Response:       Sunbow objects to this request on the grounds that it is a fishing expedition in that it seeks documents that are not relevant to any of the claims that plaintiff has raised in her complaint or in her deposition, during which she conceded that her services for Sunbow were work made for hire. Subject to and without waiving the foregoing objections and the General Objections, **Sunbow is producing all documents that it has located that are responsive to this request.** (Phares Affirmation In Support of Motion for Summary Judgment or to Dismiss, Exhibit W, March 30, 2004).

When Sunbow gave those answers in 2003, it produced no agreements signed by Plaintiff. It would be the most egregious injustice to refuse to permit Plaintiff to make claims upon the understandings set forth in the June 1, 1986 JEM Agreement which Defendant Sunbow produced belatedly in August 2004.

14

### THE "WE COULDN'T LOCATE IT PREVIOUSLY ARGUMENT"

With much fanfare generated by it in August 2004, Sunbow finally produced six documents —three pertaining to Griffin Bacal, Inc and three pertaining to Sunbow[3] and delivered them to the Court and opposing counsel trumpeting them as dispositive[4]. Sunbow's motives were not to shed light on the issues but rather to try and impeach plaintiff's testimony.

But this case is not an episode of Perry Mason or Boston Legal where someone comes running into Court with an eleventh-hour save-the-day document.  There are formal procedures for requesting document production, which plaintiff followed, and for responses, which defendants failed to follow.  The Court must recall that in response to her document demands and Interrogatories plaintiff was told that no ___signed___ written agreements were in either Bacal's or Sunbow's possession.[5]  But having said that we repeat that the agreements support and do not

---

[3]  The documents were the Sunbow JEM Agreement dated June 1, 1986 (Exhibit M in Evidence); Sunbow JEM Feature Song Agreement dated June 1, 1986; Sunbow JEM Modification Agreement dated March 15, 1986 (Exhibit O); Sunbow My Little Pony and Friends Feature Song Agreement dated December 1, 1985 (Exhibit N); Griffin Bacal Transformers Agreement dated March 24, 1984 (Plaintiff's 47 for identification- SUN 899); GBI Transformers Agreement dated April 8, 1988 relative to Power Masters (not admitted into evidence, SUN 905 and SUN 906); and GBI Visionaries Agreement dated April 8, 1988 (not admitted into evidence, SUN 913 and SUN 914).

[4]  If the Jem Agreement [Exhibit M in evid.] is dispositive of anything, it is that plaintiff has continued interests in publishing and performance royalties for her music [see paragraphs 5 and 6 JEM Agreement, 6/1/86, Ex. M in evidence].

[5]  "Are you aware of any agreements wherein plaintiff relinquished any rights she may have possessed relative to any of the compositions at issue in this litigation: G.I. Joe; Visionaries; My Little Pony; Jem and Transformers?" Bacal's Response, which followed his objections was, "Bacal is not aware of any written agreements responsive to this Interrogatory. (These responses have been previously provided to the Court.)

refute, plaintiff's claims.  What Sunbow is really about is to try and poison the Court's mind by falsely accusing plaintiff, and her counsel, of saying that Plaintiff testified her agreements were oral only.

Plaintiff had testified that her understandings were made with Jules M. Joe Bacal [one of the two Sunbow principals and owners] and she had a working arrangement with him.

### BACAL'S TESTIMONY AGREES ABOUT THE UNDERSTANDING

42        Jules M. Bacal
  24   The thing throughout all of our
  25   relationships was one of -- you know, it was
43        Jules M. Bacal
   1   really kind of any kind of collaborative effort,
   2   there really was a collaborative effort.
   3   So what happened was even though I
   4   gave them the rights, as I gave to all other
   5   composers throughout the years basically, the
   6   rights within the commercial area.

(Jules M. Bacal Dep. testimony, 11-15-01, Pages 42-43)

This is a clear admission by Bacal and Sunbow that Ms. Bryant has those commercial rights.

### WHAT IS SUNBOW AFRAID OF - IT'S OWN DOCUMENT?

As previously pointed out to the Court, Sunbow refused to let the Appellate Division, Second Department review the signed JEM Agreement, choosing instead to pursue its Statute of Frauds argument and moved successfully before the Appellate Division to strike the belatedly produced JEM Agreement (Exhibit M) because

it was not part of the record upon which the Court's original
Decision was based.

### THIS TRIAL RECORD INCLUDES THE JEM AGREEMENT

However, the record before this Court sitting as a trial
Court now clearly includes the JEM Agreement which is in evidence
as Exhibit M and it is appropriate for the pleadings to be
amended to conform to the proofs. Sunbow can hardly object to
the JEM Agreement- it produced it and offered it in evidence.
Accordingly, we do not even have to deal with a situation where
evidence not within the allegations of the pleadings is being
introduced and there is no objection on that ground during the
trial. Here the evidence is coming from the adversary. *See* <u>Di
Rosse v. Wein</u>, (2d Dept 1965) 24 A.D.2d 510, 261 N.Y.S.2d 623,
<u>app den</u> (1965) 16 N.Y.2d 487.

In the case of <u>Jo-Cook Realty Corp. v. Lorge</u>, 133 A.D.2d
447, 519 N.Y.S.2d 664 (2nd Dept. 1987), the Court there had
before it something in the nature of the converse of the
proposition here. The Appellate Division said in <u>De Rosse</u> that
the Supreme Court had improperly denied the buyer's motion to
conform the pleadings to show that a rescinded written contract
had been orally renewed but nevertheless found the oral agreement
barred by the Statute of Frauds.

Certainly here the proposed amendments to conform to the
proofs are not presenting any surprise to Sunbow or to Broadcast
Music, Inc. ("BMI"). The Amended Complaint in this action
against Sunbow, among other allegations, complained that Sunbow
was involved in and received financial benefits from musical

compositions and musical cues formerly registered to Plaintiff's
BMI account, which subsequently to 1993 were altered and re-
registered to benefit Kinder, Griffin Bacal and Sunbow (Amended
Complaint, Para. 10) and Sunbow was thereby unjustly enriched
(Complaint, Para. 11). Plaintiff claimed that various
productions, movies, videos, television productions, and CD's
utilized music written by Plaintiff without compensation to
Plaintiff or authorization for its use (Amended Complaint, Paras.
3 and 4). Plaintiff thereby demanded an accounting from Sunbow
and also an imposition of a constructive trust. Thus there is no
surprise that Plaintiff claimed there were agreements with
Sunbow.

CPLR § 3025 (c) authorizes the Court to permit pleadings to
be amended before or even after Judgment to conform them to the
evidence upon such terms which may be just. This is addressed to
the sound discretion of the Court. Murray v. City of New York,
43 N.Y.2d 400, 401 N.Y.S.2d 773, 372 N.E.2d 560 (1977), reh dismd
(1978) 45 N.Y.2d 966.

Accordingly, Plaintiff's pleadings should be deemed amended
to state claims for breach of the agreements regarding both
publishing and performance royalties as set forth in the JEM
Agreement dated June 1, 1996 (Exhibit M).

We point out that the Court had already ruled that Sunbow
admitted "the JEM Agreement is identical to all the other
agreements for the Hasbro T.V. series relating to what Plaintiff
is entitled to receive" (Ruling of May 26, 2004).

18

## POINT III

## THE COURT SHOULD NOT HAVE TREATED SUNBOW'S AUGUST 2004 DOCUMENT

## PRODUCTION AS A DISPOSITIVE MOTION

Having made numerous unsuccessful dismissal and summary judgment motions in the case, pursuant to both CPLR § 3211 and § 3212 presumably Sunbow was familiar with proper procedure for such motions.  The Court may not on its own initiative convert Sunbow's August 2004 action into a motion for summary judgment without adequate notice to the parties and an opportunity for the parties to bear their proofs.  Robert Morris v. Port Authority of New York and New Jersey, 290 A.D.2d 22, 736 N.Y.S.2d 324 (1st Dept. 2002).  A Court would not even be permitted to grant a default judgment in lieu of a request for summary judgment when a default judgment was not demanded.  Soggs v. Crocco, 184 A.D.2d 1021, 585 N.Y.S.2d 260 (4th Dept. 1992).  Any action by the Court without compliance with the statutory requirements is a nullity and requires that such further action be vacated.  Marazita v. Nelbach, 91 A.D. 604, 456 N.Y.S.2d 423 (2nd Dept. 1982) and see also Burstin v. Public Service Mutual Insurance Company, 98 A.D.2d. 928, 471 N.Y.S.2d 33 (3rd Dept. 1983).  Although this rule usually applies where a Court perhaps converts a motion for preliminary injunction into one for summary judgment, its logic and rationale apply nonetheless.  EDP Hosp. Computer Sys. v. Bronx-Lebanon Hosp. Cen., 212 A.D.2d 569, 622 N.Y.S2d 556 (2nd Dept. 1995). (Also providing that under the circumstances of that case the Plaintiff should have been afforded the opportunity for additional discovery.)

Sunbow's August 2004 filings were not procedurally or substantively a proper basis for being characterized as "dispositive" and the Court should resume the trial.

### POINT IV

### THE COURT HAS THE POWER TO BIFURCATE THE CLAIMS FOR PUBLISHING ROYALTIES AND PERFORMANCE ROYALTIES

CPLR § 4014 indicates that "a trial shall continue until it is completed" and the Court may bifurcate the issues under CPLR § 4011.  CPLR § 4011 provides that, "the Court may determine the sequence in which the issues shall be tried and otherwise regulate the conduct of the trial in order to achieve a speedy and unprejudiced disposition of the matters at issue in a setting of proper decorum."

The Advisory Committee notes to this section states, "the Rule is probably unnecessary because the Court would have discretion to determine the sequence of trial without it.  The power is made express, however, in the hope that it will encourage use of this discretion to reduce delay and expense." That power should also be exercised here as plaintiff requests.

### POINT V

### PLAINTIFF SHOULD BE ALLOWED AN OPPORUNITY TO CONDUCT FURTHER DISCOVERY

Normally, "the filing of a Note of Issue and statement of readiness by any party will constitute a waiver of any further pretrial procedures…" However, "the rule may be relaxed in the sound discretion of the court, when special, unusual or

extraordinary circumstances exist." <u>Liberty Dressing Co. v.</u>
<u>Foster Sportswear Co.</u>, 14 A.D.2d 196, 217 N.Y.S.2d 741 (3rd Dept.
1961); <u>Fierro v. Delgaudio</u>, 14 A.D.2d 816 (2nd Dept. 1961); and
<u>Cerrone v. S'Doia</u>, 11 A.D.2d 350, 206 N.Y.S.2d 95 (4th Dept.
1960).  The Note of Issue in the case at bar was filed in June
2003 and trial began over a year later in July and continued into
August 2004.  Discovery, therefore, has been on hold for almost
two and a half years due to no fault of the Plaintiff.

This extraordinary delay when combined with belated document
production in mid-trial by Defendants, long after Plaintiff's
demand for production, warrants the Court's relaxation of the
rigid enforcement of this Special Rule Regarding Calendar
Practice.  Plaintiff should be afforded an equitable opportunity
to conduct reasonable discovery so as to complete her case before
the resumption of the trial.  See <u>Fox v. Wyeth Laboratories,</u>
<u>Inc.</u>, 135 A.D.2d 487, 521 N.Y.S.2d 728 (2nd Dept. 1987).

### CONCLUSION

Plaintiff's motion should be granted in all respects.

Dated: 12/14/05

_____
Patrick J. Monaghan, Jr.
Monaghan, Monaghan, Lamb &
Marchisio, LLP
150 West 55th Street
New York, New York 10019

—and—

28 West Grand Avenue
Montvale, New Jersey 07645
(201) 802-9060