# EXHIBIT 73

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

-------------------------------------------------------x

ANNE BRYANT,                                :

             Plaintiff,                    :          Index No. 5192/00

      - against -                         :          Hon. Andrew P. O'Rourke

BROADCAST MUSIC, INC., (a/k/a "BMI"),   :
CLIFFORD A. "FORD" KINDER, KINDER &
CO., LTD., VADIVOX, LTD., JULES M. "JOE"  :
BACAL, GRIFFIN BACAL, INC., STARWILD
MUSIC BMI, WILDSTAR MUSIC ASCAP,        :
SUNBOW PRODUCTIONS, INC., and JOHN
AND JANE DOES 1-10,                         :

            Defendants.                   :

-------------------------------------------------------x
                                :

ANNE BRYANT,                                :

             Plaintiff,                    :          Index No. 2821/02

      - against -                         :          Hon. Andrew P. O'Rourke

SUNBOW PRODUCTIONS, INC.,               :

            Defendant.                    :

-------------------------------------------------------x

**SUNBOW PRODUCTIONS, INC.'S SUPPLEMENTAL MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFF'S MOTION (1) TO VACATE ORDER OF
MARCH 3, 2005; (2) TO DEEM PLEADINGS AMENDED TO INCLUDE CAUSES OF
ACTION FOR BREACH OF WRITTEN CONTRACTS; (3) FOR ADDITIONAL
DISCOVERY; (4) FOR BIFURCATION OF CLAIMS RELATING TO
PERFORMANCE ROYALTIES AND PUBLISHING ROYALTIES; AND
[(5)] FOR A DATE CERTAIN FOR RESUMPTION OF TRIAL AS TO
PERFORMANCE ROYALTY CLAIMS**

                             PATTERSON, BELKNAP, WEBB & TYLER LLP
                             Attorneys for Defendant Sunbow Productions, Inc.
                             1133 Avenue of the Americas
                             New York, New York 10036
                             (212) 336-2000
                             Gloria C. Phares

Defendant Sunbow Productions, Inc. ("Sunbow") files this supplemental brief to respond to the May 1, 2005 Affidavit of David Berman, which Plaintiff Anne Bryant ("Bryant") did not include in her moving papers on her notice of motion (1) to vacate the Court's March 3, 2005 order to suspend proceedings pending decision by the Second Department on Sunbow's appeals; (2) to amend the pleadings to include causes of action for breach of written contracts; and for other relief.

Plaintiff did not provide the Berman Affidavit until January 10, 2006, five days <u>after</u> defendants' papers were due. As the return date (and the date for Plaintiff to reply to defendants' papers) has been extended until January 20, 2006, Sunbow responds to the Berman Affidavit before Plaintiff's papers are due.[1]

Plaintiff did not rely on the Berman Affidavit in her opening papers, except for passing references to the need to depose him.[2] That Plaintiff is providing the affidavit now, after defendants have submitted their papers, suggests that she intends to reply by making <u>new</u> arguments relying on the affidavit. That is improper argument on reply and prejudices defendants.

Because Plaintiff did not rely on the Berman Affidavit in her moving papers and then provided after Sunbow's opposition was filed, Sunbow contends that the Berman Affidavit should be stricken from consideration on the motion. However, rather than forgo an opportunity to explain the irrelevancy of the Berman Affidavit should the Court decide to consider it, Sunbow submits this supplemental brief.

---

[1]    Nor did Plaintiff serve Exhibit A to her December, 2005 affidavit until January 16, 2006.

[2]    <u>See</u> Bryant Aff. at 8, ¶ 7; Monaghan Affirm. at 2, ¶ 1(D); and two statements that Plaintiff claims are "law of the case," but are really statements of Plaintiff's argument opposing the motion to dismiss on Statute of Frauds grounds, which rely on the Berman affidavit. Bryant Br. at 8, ¶¶ (ix) and (x); <u>see</u> Sunbow Br. at 2-3, n.4.

## THE BERMAN AFFIDAVIT DOES NOT SUPPORT
## ANY PART OF PLAINTIFF'S MOTION TO AMEND

Under the theory of her case that Plaintiff now wants the Court to accept, her relationship with Sunbow is governed by written work-for-hire agreements signed by Kinder & Bryant in the 1980s such as the Jem agreement. Thus, if Plaintiff is entitled to any recovery arising from Sunbow's distribution of the 1980s TV Shows in the home video market, she must find that entitlement in the 1980s agreements.[3]

Nowhere in her opening brief does Plaintiff explain why the Berman Affidavit is relevant to her motion, but we assume that Plaintiff will rely on the affidavit to support her claim that an amendment of the complaint would not be in vain because the Jem agreement supports her entitlement to the vast publishing income she claims.

The Berman Affidavit does no such thing:  (1) Mr. Berman's experience does not qualify him to testify about the acquisition of rights from songwriters for audiovisual works such as the TV Shows; and (2) even more important, Mr. Berman does not discuss or construe the language of the Jem agreement; indeed, he relies on agreements used in the recording industry (as opposed to the TV industry) and attempts to use terms defined in those agreements as a basis for interpreting the Jem agreement, ignoring the Jem agreement's own defined terms.  In other words, nothing in Mr. Berman's affidavit supports the conclusion that the Jem agreement entitles Bryant to the royalties she claims.

---

[3]    As Sunbow has already explained (Sunbow Br. at 13 n.11), any so-called oral agreements are irrelevant under the theory of her case that Plaintiff is now trying to adopt.  And under a breach of written contract theory, Plaintiff's suggestion (Bryant Br. at 10-11) that quantum meruit remains in the case as the basis for recovery is also wrong; quantum meruit is relevant only as a theory of recovery based on an oral agreement.  Plaintiff cannot have it both ways.

2

1.   Berman's Expertise in the Record Business Does Not Qualify
     Him to Give Testimony in a Case Involving Audiovisual Works

Mr. Berman has a long history of working in the record business. Berman

Aff. at 2, ¶¶ 4-10. Even when he worked within the Disney organization, he was

responsible for "four different record labels and a publishing company" (id. at ¶ 10); he

did not work on the film side. Although Mr. Berman tries to elevate his work in the

record industry to being "fully familiar with music and entertainment industry

standards and company and practices, especially as it relates to publishing interests and

writer-publisher income sharing" (Berman Aff. at 2, ¶ 12), he claims no experience (and

cites none) in the acquisition of rights from the creative contributors (writers,

cinematographers, actors, animators, art designers, as well as songwriters) by producers

of audiovisual works such as movies or television shows, the kinds of works at issue in

this case.

Contrary to the implication in Mr. Berman's broad and general claims of

expertise in "the music and entertainment industry," the acquisition of rights to music

differs greatly in the record industry, the movie and television business, the Broadway

musical business, and the advertising jingle business.[4]  The contracts and business

---

[4]     Indeed, a simple comparison of Kinder & Bryant's Sunbow agreements for the TV
Shows and their agreements with Kinder & Bryant for advertising jingles (Phares Affirm., Exh.
I; Trial Exhs. N; and Exh. P to the January 17, 2006 Supplemental Affirmation of Gloria C.
Phares (Phares Supp. Affirm") (the March 24, 1984 advertising agreement on Transformers
between Griffin Bacal Inc. and Kinder & Bryant), all of which Mr. Berman claims to have
reviewed (see Berman Aff. at 3, ¶ 15(A-C)), demonstrates obvious differences. For example, the
advertising agreement, unlike the agreements for the TV Shows, granted Kinder & Bryant no
royalties from publishing.

practices in each of these businesses differ from the others, even if they may all involve music in varying degrees. Generalizations based on one do not apply to the others.[5]

Despite his generalized claims of expertise, Mr. Berman's background and expertise are not relevant to the issues in this case. His affidavit should be excluded on this basis alone.[6]

2.    Berman Does Not Construe the Jem Agreement At All

Even though Plaintiff's right to the publishing royalties, if any, must be found in her written Sunbow agreements, Mr. Berman's testimony does not purport to discuss the specific language that entitles her to 50% of Sunbow's royalties from the distribution of the TV Show in the home video market.

Mr. Berman states that he "is prepared to testify" that Plaintiff is

> entitled to her writer's share of publishing income and royalties with respect to any exploitation of her music as for example where the publisher realizes income from licenses granted to third parties, as

---

[5]    See Phares Supp. Affirm., Exh. Q at ¶¶ 6-21 (April 5, 2004 Affidavit of Helene Blue supporting Sunbow's Motion to Dismiss or, in the Alternative, for Summary Judgment) and Phares Supp. Affirm., Exh. R at ¶¶ 10-12 (May 5, 2004 Supplemental Affidavit of Helene Blue supporting the same motion). Both of these affidavits were prepared before the signed Jem agreement was found; however, the signed version is identical to the unsigned one to which Ms. Blue refers. The affidavits were intended to support Sunbow's argument on quantum meruit, when Plaintiff was still denying that she had signed and worked pursuant to written agreements, but both affidavits include information relevant to Plaintiff's contentions about her work-for-hire agreements with Sunbow. These affidavits are already in the record, but as those copies are located in Rockland County, they are being provided as attachments to a Supplemental Affirmation of Gloria C. Phares as a convenience to the Court.

[6]    Mr. Berman's "understanding" of the facts of the case is also inaccurate, probably because they were "provided to [him] by the plaintiff." Berman Aff. at 3, ¶ 13. This case does not involve claims regarding jingles created for Griffin Bacal, Inc., which is not now and never has been a party in this case. Id. Nor has Sunbow ever contended that the work-for-hire agreements in this case do not grant publishing royalties to Kinder & Bryant from the use of certain rights. Id. at ¶ 16. Sunbow has always conceded that its agreements were generous to the songwriters in granting them publishing royalties (see Bryant Br. at 12-13), but it disagrees that any of the publishing provisions in Section 6(a) of the Jem agreement (or any other work-for-hire agreement) grants Kinder & Bryant any publishing royalties, let alone 50% of the income earned, from the reproduction and distribution of the TV Shows in the home video market.

4

> for example sync licenses or <u>any</u> other licenses allowing for the use
> of <u>an intellectual property</u> containing her music.

Berman Aff. at 4, ¶ 19 (emphasis added).

He does not support that broad claim by reference to the Jem agreement.

Nor can he, because the Jem agreement conflicts with it. In the first place, Mr. Berman

does not address the fact that the Jem agreement (and all the work-for-hire agreements

Sunbow signed with Kinder & Bryant) distinguishes between the Music and the Shows,

and defines those terms so that Music refers only to the musical material and Show is

the entire audiovisual work—each commissioned television episode. <u>See</u> Sunbow Br. at

11-12; Phares Affirm. Exh. I at ¶ 1. That distinction has significance throughout the

agreement, but particularly in those provisions relating to Kinder & Bryant's right to

receive performance royalties (Phares Affirm., Exh. I at 2-4 § 5) and publishing royalties

(<u>id,</u> at 4-6, § 6). Mr. Berman never refers to it.

Moreover, despite Mr. Berman's example of Plaintiff's right to "her writer's

share" from "any exploitation" of her Music such as a sync license,[7] he completely

ignores the specific language of the Jem agreement, which provides royalties for

"theatrical motion picture synchronization rights" (Phares Affirm., Exh. I at 5, § 6(a)(i)),

but defines them narrowly to include only

> motion pictures intended primarily and initially for theatrical release
> by direct projection before paid-admission audiences; in no event
> shall such term refer to motion pictures or other methods of

---

[7]    See <u>Freeplay Music, Inc. v. Cox Radio, Inc.,</u> 2005 WL 3434394 *2 (S.D.N.Y. Dec. 12, 2005)
("The Copyright Act does not explicitly define or confer any separately-labeled
'synchronization' right. * * *[The Second Circuit has described] the so-called synchronization
right, or 'synch' right . . . [as] the right to reproduce the music onto the soundtrack of a film or a
videotape in synchronization with the action. The 'synch' right is a form of the reproduction
right . . . ." (internal quotes and citations omitted)).

recordation, whether now known or hereafter devised, which are produced primarily and initially for television broadcasting by any means whatsoever.

Id. at 6. Mr. Berman's broad description of Plaintiff's rights simply ignores the language of the Jem agreement, which is the sole source of her entitlement to publishing rights.

Mr. Berman also ignores the specific language of Section 6(a) relating to licenses of Music (a defined term) "for the manufacture o[f] commercial phonograph records." As Sunbow has already demonstrated (see Sunbow Br. at 12 n.8), the reference to "phonograph records" was not accidental. It is consistent with the fact that "phonograph records" refers only to Music, and not the Shows.

Knowing that the Shows are distributed in the home video market on DVDs and videocassettes, Berman claims that any reference to records refers to "income from newer technologies such as DVD's, and CD's and the like." Berman Aff. at 5, ¶ 21. His authority for this broad declaration statement is not the language of the Jem agreement, but a long quote from the book, All You Need to Know About the Music Business by Donald Passman ("Passman"). Berman Aff. at 4, ¶ 20. But the Passman quote does not support Mr. Berman's conclusion. In the first place, it is describing the record business, not the acquisition of rights for an audiovisual work. The passage Mr. Berman quotes appears in Passman on p.67 in the chapter entitled "Broad-Strokes Overview of the Record Business." Commissioning music for television programs is dealt with in three pages (pp. 410-12) of a 425-page book devoted to the recording business.

6

1247706v2

Second, Passman is describing, as he quite candidly concedes, "virtually every <u>record</u> agreement made since the 1960s" <u>Id.</u> (emphasis added). In other words, Mr. Berman is not describing the acquisition of rights from a songwriter for an audiovisual work, which is the kind of agreement on which Plaintiff now relies. <u>See</u> Phares Supp. Aff., Exh. Q at ¶¶ 11-21.

Most astounding of all, Mr. Berman (per Passman) is referring to a "<u>contractual definition</u>" in these recording agreements that states that "a record is both an audio-only and an audiovisual device (meaning one with sound and visual images), such as videocassettes and DVD's, which play video as well as audio material." Berman Aff. at 4, ¶ 20. The reason those record agreements include such a definition is that the recording company is attempting to capture all uses of the music and is attempting to overcome the Copyright Act's statutory definition of "phonorecord." <u>See</u> Sunbow Br. at 12 n.8. But the Sunbow agreements had no such intention. Doing so would have conflicted with Sunbow's desire to separate use of the Music (alone) from use of the TV Shows as a whole and to grant the songwriters publishing royalties only for the former. It is clear from Sunbow's definition of theatrical motion picture synchronization rights (<u>see</u> p. 5-6, <u>supra</u>) that Sunbow knew very well how to define terms so as to account for new technology— when it chose to do so. Its failure to define "phonograph records" broadly and to rely on the statutory definition was intentional and significant, but Berman (and Plaintiff) has completely ignored the implications of the omission. [8]

---

[8]     The intent to exclude songwriters from publishing royalties associated with the Shows is also reflected in the definition of theatrical motion picture rights (<u>see</u> p. 5-6 <u>supra</u>), which defines the right so as to exclude royalties from the synchronization of music with works made "primarily and initially for television broadcasting," <u>i.e.</u>, the kind of programs Sunbow might

Mr. Berman's analysis is based on defined terms in the standard agreements of another business and takes no account of the internal definitions and construction of the only contracts that would matter in this case were the Court to grant Plaintiff's motion — the Jem agreement and the other work-for-hire agreements between Kinder & Bryant and Sunbow.

Finally, If Mr. Berman were providing a careful and complete analysis of the Jem agreement, he would also have to address the fact that, even if Plaintiff had acknowledged the written work-for-hire agreements instead of denying them for three years, she was obliged to make written claims for royalties not paid to her within one year of the dates of the royalty statements that she claims failed to include them.  Phares Affirm., Exh. I, at 7, § 6(b).  That she never made any such written claim also undercuts her claim that amending the complaint in the middle of trial on her prior theory would lead to a successful claim for damages.

---

produce or have produced.  In other words, the Jem and other work-for-hire agreements were carefully drafted to ensure that publishing royalties were paid to songwriters only for use of their Music alone and not for any future use of the existing Shows or even in future television Shows that might be produced.

1247706v2

## CONCLUSION

For the foregoing reasons, the Berman Affidavit offers no support

necessary to support any part of Plaintiff's motion.  In particular, it offers no persuasive

evidence that if the complaint were amended as Plaintiff requests, the Jem agreement

and the other work-for-hire agreements that Kinder & Bryant signed with Sunbow in

the 1980s support her claim for publishing royalties arising from the distribution of the

TV shows on DVDs or videotape.  Sunbow also incorporates here the conclusion of its

principal brief.

New York, New York
January 17, 2006

Respectfully submitted,

PATTERSON, BELKNAP, WEBB & TYLER LLP

By: _____
Gloria C. Phares
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

Attorneys for Defendant Sunbow Productions, Inc.

9

1247706v2

# EXHIBIT 74

55576-017

SERIAL NO. 292

SER? FY

D    2 6 06 M

N

## DECISION AND ORDER

To commence the statutory
period of appeals as of right
CPLR (5515 [a]), you are advised
to serve a copy of this order,
with notice of entry, upon all
parties.

## SUPREME COURT OF THE STATE OF NEW YORK
## IAS PART, ROCKLAND COUNTY

Present:  Hon. Andrew P. O'Rourke
              Supreme Court Justice

-------------------------------------------------------X

ANNE BRYANT,

INDEX NO.: 5792/2000
MOTION
DATE: 1/13/06

                              Plaintiff,

          -against-

BROADCAST MUSIC, INC., (a/k/a/ BMI"), CLIFFORD
A. "FORD" KINDER, KINDER & CO., LTD.,
VADIVOX, LTD., JULES M. "JOE" BACAL, GRIFFIN
BACAL, INC., STARWILD MUSIC BMI, WILDSTAR
MUSIC ASCAP, SUNBOW PRODUCTIONS, INC.,
and JOHN AND JANE DOES 1-10,

                              Defendants.
-------------------------------------------------------X

The following documents numbered 1 to 44 read on this motion by Plaintiff to proceed with this
action.

          Notice of Motion- Affidavits 1, 2, 7, 8
          Answering Affidavits 9, 10, 12, 17, 36
          Replying Affidavits 40, 44
                    Affidavits
          Pleadings-Exhibits-Stipulations-Minutes 3-5, 11-16, 18-33, 37-39, 41-42
          Briefs: Plaintiff 6, 43

                                        1

Defendant 34-35

Motion is decided as follows:

Plaintiff moves for the following relief; 1) to vacate the March 3, 2005 order of this Court

staying this action until the determination of the appeals by Defendant Sunbow Productions

LTD; 2) to amend the complaint to conform to the proof elicited at trial as to breaches of written

agreements; 3) to permit limited discovery as to damages Plaintiff sustained since the filing of

the Note of Issue on June 30, 2003; 4) to video the depositions of two out of state witnesses; 5) to

bifurcate the trial as to claims for performance royalties and publishing royalties.

Plaintiff alleges at the very least the performance royalty issue should not be subject to

the continued stay. Plaintiff claims the appeals are merit less. It was determined that subject

matter jurisdiction was present in the Supreme Court not the United States District Court. The

statute of frauds argument has been decimated by Sunbow's production of written agreements.

Plaintiff further states there is no dispositive application before the Court. Even the

pending appeals will not dispose all the issues in this case.

All summary judgment motions were to be made by March 2004, not having done so all

parties are now precluded. Plaintiff contends the JEM Agreements and the GBI Agreements

produced by Sunbow mid-trial confirm Plaintiff's rights to both performance royalties and

publishing royalties. Plaintiff claims the Agreement "licenses back to the Writer the writer's

share of performance royalties 'so as to enable writer...to collect the "writer's share" of royalties

derived therefrom." Pursuant to this clause, Sunbow was to file the proper registrations with

BMI, BMI failed to confirm changes in registration with the members it represents.

Plaintiff claims because the registrations were filed improperly and never corrected, Plaintiff has lost hundreds of thousands of dollars in performance royalties, giving Plaintiff causes of action in contract and unjust enrichment and for a constructive trust against Sunbow and against BMI for its wrong doing.

Plaintiff alleges she has two basic royalty claims. Public Performance Rights Royalties which are collected and distributed by Defendant BMI for domestic and foreign broadcast licensing and use of theme songs which Plaintiff composed. Plaintiff is also suing for Music Publishing Royalty Income earned from mechanical royalties and from various licenses issued to third party manufactures and distributors of tangible goods, such as CD's, Home Videos, and DVD's featuring Plaintiff's music.

Plaintiff stated even Defendant Sunbow's expert agrees she is entitled to retain these rights even with a "work for hire" contract and Plaintiff is entitled to 50% of the profit.

Plaintiff alleges the stay should be lifted and the trial proceed because there was never a formal motion from the Defendant Sunbow requesting a stay. Furthermore, the Appellate Division never issued a stay on the filing of the appeal. Plaintiff alleges her claims to Public Performance Rights Royalties are not an issue on appeal and therefore, this portion of her case should proceed to trial.

Plaintiff alleges she requires the restoration of subpoena powers to compel "Royalty Reporting Services" to produce cue sheets identifying those individuals credited with writing Transformers theme and the amount of Royalties they have collected for her composition. This will assist in tabulating the sums of Performance Rights Royalties to which Plaintiff is entitled.

Plaintiff also seeks permission to video and preserve the testimony of key witnesses and

3

experts.

In opposition, Defendant, Broadcast Music, Inc. (BMI) states Plaintiff's motion should be denied because her assessment of the amount of public performing right royalties to which she is entitled is inaccurate. Additionally BMI states pursuant to Plaintiff's affiliation agreement with BMI this dispute should have been submitted to arbitration.

BMI states Plaintiff was advised to secure an agreement with co-writers so that Plaintiff could be properly registered and receive her royalties. Plaintiff entered into settlement agreements with Defendants Kinder and Bacal. However, BMI advised Plaintiff "without specific direction, to which all of the parties agree, identifying the individual musical works and spelling out how the royalties should be allocated among the writer[s], BMI could not change its records." BMI states had Plaintiff arranged with Kinder and Bacal to agree to the percentages as indicated in a spread sheet which Plaintiff produced to BMI, then BMI would have made the adjustments she requested.

BMI states if Plaintiff claims she is not receiving the royalties she is entitled to, then Plaintiff should proceed against the songwriters and composers whom she alleges have been incorrectly paid for her work, not BMI.

BMI presented spread sheets to the Court showing monies paid to Plaintiff and her co-writers Kinder and Bacal for the period 1994 through 2004 totaling $49,150.01. For that same period of time, Plaintiff received $147,292.94

BMI states it updated its spread sheets from July 29, 2004 and the additional royalties owed to Plaintiff are approximately $3,000.

BMI indicates since the trial began Plaintiff has received $32,800.21 in royalties. If

4

Plaintiff claims she is due more money, then, Plaintiff should recover same from whomever it was that was incorrectly identified for the composer's shares in the BMI registration. BMI contends a bifurcated trial, would not resolve the issue of Plaintiff's performing right royalties.

BMI does not contest that Plaintiff is entitled to at least a portion of the writer's share of the royalties generated in connection with the public performance of Plaintiff's work. The dispute is what Plaintiff's share of those royalties should be.

BMI states if Plaintiff wanted a disposition on the performing right royalties she should have commenced an arbitration proceeding in February of 2001.

Defendant Sunbow Productions Inc., alleges Plaintiff's request to amend the pleadings amounts to the introduction of a new cause of action for breach of contract and for permission to conduct discovery necessary to prove her new claim. Defendant alleges Plaintiff has vehemently denied ever working pursuant to a written agreement and now with production of signed copies of said agreements she wishes to amend her pleadings alleging breach of written contracts.

Sunbow queries why Plaintiff waited so many years to amend her complaint and states to permit her to do so "in the middle of trial" is prejudicial to Sunbow.

Sunbow claims it has already been put to unnecessary expense and to resume this trial without an Appellate Division decision, which could terminate this proceeding is prejudicial.

Sunbow alleges Plaintiff's application to amend the complaint should be denied. This case was noticed for trial, went through a framed issue hearing and five days of trial. Now 10 years later Plaintiff moves to amend her complaint. Plaintiff has not submitted an affidavit of merit nor has she offered a reasonable excuse for her delay as required under, CPLR 3025 (b).

5

It is alleged Plaintiff knew or should have known of the existence of the contracts signed in the 1980's when she first commenced her action.

Nevertheless she alleged they did not exist. However, at the framed issue hearing (Feb. 2005) without explanation she acknowledged the authenticity of the agreements and moved to amend her complaint.

The contracts provide that Plaintiff is entitled to 50% of Sunbow's income for the use of her "music" but not from the distribution of "shows."

Sunbow has no royalty disagreements with Plaintiff. Sunbow has always conceded that Plaintiff is entitled to be paid performance royalties. However, performance royalties are not collected or paid by Sunbow but by Broadcast Music, Inc. (BMI). Plaintiff agreed that Sunbow never collected or received moneys to which she was entitled. Thus there is no claim against Sunbow for unjust enrichment or the need for a constructive trust.

Sunbow alleges the two open issues in this case, copyright preemption and the statute of frauds are before the Appellate Division and a decision from the Appellate Division will dispose of this case altogether.

After a review of all documentation submitted the Court denies Plaintiff's request to vacate the stay of March 3, 2005, to amend the complaint or to bifurcate the trial.

However, the Court grants Plaintiff's request for video depositions of Ford Kinder, a Florida resident and David Berman a California resident.

Plaintiff is also encouraged to provide BMI with the necessary documentation for proper registration so that she will receive her royalties.

Defendant BMI prepared updated spreadsheets regarding payments made or due

6

Plaintiff. All outstanding royalty payments, if any, should be forwarded to Plaintiff.

Upon receipt of the decision from the Appellate Division, this Court will proceed accordingly.

This constitutes the order of the Court.

Andrew P. O'Rourke
Justice of the Supreme Court

Dated: January 30, 2006
     Carmel, NY

7

# EXHIBIT 75

S5576-017

SERIAL NO. 313A

SERVED

RECEIVED

FILED

# DECISION AND ORDER

**To commence the statutory period of appeals as of right CPLR (5515 [a]), you are advised to serve a copy of this order, with notice of entry, upon all parties.**

**FILED**

JUN 1 5 2006   9

**ROCKLAND COUNTY CLERK'S OFFICE**

## SUPREME COURT OF THE STATE OF NEW YORK
## IAS PART, PUTNAM COUNTY

Present:  Hon. Andrew P. O'Rourke
             Supreme Court Justice

------------------------------------------------------------X

ANNE BRYANT,

                    Plaintiff,

         -against-

BROADCAST MUSIC, INC., (a/k/a "BMI") CLIFFORD A. "FORD" KINDER, KINDER & CO., LTD., VADIVOX, LTD., JULES M. "JOE" BACAL, GRIFFIN BACAL, INC., STARWILD MUSIC BMI, WILDSTAR MUSIC ASCAP, SUNBOW PRODUCTIONS, INC., and JOHN AND JANE DOES 1-10,

                  Defendants.
------------------------------------------------------------X
ANNE BRYANT,

                    Plaintiff,

         -against-

SUNBOW PRODUCTIONS, INC.,

                   Defendant.
------------------------------------------------------------X

INDEX NO.: 5192/2000

INDEX NO.: 2821/2002

1

This intellectual properties action was set down for a framed issue hearing on October 29, 2004 before this Court. Thereafter a stay of these proceedings was initiated by the Court awaiting the appeal of three determinative decisions of this Court by the Appellate Division, Second department. The appeal was argued in February, 2006 and a decision rendered in March 2006 unanimously affirming this Court's decisions below.

In the interim the Court had both cases transferred from Rockland County Supreme Court to Putnam County Supreme Court and since this was an ongoing bench trial retained jurisdiction there over.

It appears that no decision was ever rendered in the framed issue hearing and having finally obtained copies of the post trial briefs and submissions the Court decided as follows:

The Court is satisfied that there were written and valid signed contracts between Plaintiff and Defendant Sunbow. The Plaintiff now claims that there were also oral agreements besides these written contracts and these form the basis of her complaint. This is a matter for Plaintiff to prove on future trial of this matter.

At the end of the framed issue hearing the Court also asked each side to submit a "short analysis" of this issue on the signatures and also:

"If those signatures are Ms. Bryant's ...what is the stand of each party about what remains, if anything, in this trial..."

Each party has submitted briefs and various submissions on these matters. The Defendant's claim that the case is over and should be dismissed. The Plaintiff has taken further deposition of no-parties. This Court wished that the matter were as clear as the parties suggest. However it is not.

2

This case must go on for a while longer.  Both sided should decide which are their essential witnesses and be prepared to present them before the end of this year in person or by videos (EBT's.)  From the Court's point of view experts in this particular area of authorship and attendant needs for compensation would be a benefit to both sides.  Multiple fact cumulative witnesses will not be tolerated.

The Court will have a telephone conference with each side on July 7, 2006 or at a later mutual agreed upon date.  Each side should furnish the Court with a new witness list, including the subject matter of such witnesses and approximate times involved.

There will be no further discovery allowed in this matter.

This constitutes the order of the Court.

Hon. Andrew P.  O'Rourke
Justice of the Supreme Court

Dated: June 12, 2006
       Carmel, NY



ENTERED
JUN 1 5 2006     A.M.
                 P.M.
County Clerk Rockland

3