# EXHIBIT 76

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

------------------------------------------- x
                                           :
ANNE BRYANT,                               :
                                           :
              Plaintiff,                   :
                                           :
       v.                                  :
                                           :
BROADCAST MUSIC, INC., (a/k/a "BMI"),      :
CLIFFORD A. "FORD" KINDER, KINDER &        :
CO., LTD., VADIVOX, LTD., JULES M. "JOE"   :
BACAL, GRIFFIN BACAL, INC., STARWILD       :
MUSIC BMI, WILDSTAR MUSIC ASCAP,           :
SUNBOW PRODUCTIONS, INC., and JOHN         :
AND JANE DOES 1-10,                        :
                                           :
              Defendants.                  :
                                           :
------------------------------------------- x
                                           :
ANNE BRYANT                                :
                                           :
              Plaintiff,                   :
                                           :
       v.                                  :
                                           :
SUNBOW PRODUCTIONS, INC.                   :
                                           :
              Defendant.                   :
                                           :
------------------------------------------- x

**RECEIVED**
ROCKLAND COUNTY
JUL 0 6 2006
CHIEF CLERKS
OFFICE

Index No. 5192/00

Hon. Andrew P. O'Rourke    $55 76 - 017A

SERIAL NO. 318
SERVED 7/6/06 FE Ex
RECEIVED
FILED 7/6/06

Index-RJI    JD-NO

JUL 0 6 2006

Motion Cross SOS-S/Disc
Fee Pd $ 45

**NOTICE OF MOTION FOR
LEAVE TO REARGUE**

Index No. 2821/02

Hon. Andrew P. O'Rourke

PLEASE TAKE NOTICE that upon the annexed affirmation of Gloria C.

Phares, dated July 6, 2006, and the annexed exhibits, and upon all the papers and

proceedings heretofore had in this case, a motion will be made pursuant to CPLR

R 2221(a) and (d),  before this Court on July 21, 2006, at 9:30 o'clock in the forenoon of

that day or as soon thereafter as counsel can be heard, for leave to reargue the Court's

Order and Decision entered June 15, 2006, which ruled on the issues presented at a

framed issue hearing held on October 29, 2004, before this Court, on the grounds set

forth in the annexed affirmation of Gloria C. Phares, and for such other and further

relief as may be just, proper, and equitable.  In accordance with CPLR § 2214(b),

answering papers, if any, shall be served 7 days prior to the return date.

Dated:   New York, New York
         July 6, 2006


                                   Patterson Belknap Webb & Tyler LLP


                                   _____
                                   Gloria C. Phares, Esq.
                                   Mark Gregory Young, Esq.
                                   1133 Avenue of the Americas
                                   New York, New York  10036
                                   (212) 336-2000

                                   *Attorneys for Defendant-Appellant*
                                   *Sunbow Productions, Inc.*


TO:   Patrick J. Monaghan, Esq.
      Monaghan, Monaghan, Lamb & Marchisio LLP
      Attorneys for Plaintiff Anne Bryant
      150 West 55th Street
      New York, New York 10019

1291945v1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
------------------------------------------- x
                          :

ANNE BRYANT,

               Plaintiff,            Index No. 5192/00

                  v.              Hon. Andrew P. O'Rourke

BROADCAST MUSIC, INC., (a/k/a "BMI"),
CLIFFORD A. "FORD" KINDER, KINDER &
CO., LTD., VADIVOX, LTD., JULES M. "JOE"
BACAL, GRIFFIN BACAL, INC., STARWILD
MUSIC BMI, WILDSTAR MUSIC ASCAP,
SUNBOW PRODUCTIONS, INC., and JOHN
AND JANE DOES 1-10,

               Defendants.

------------------------------------------- x

ANNE BRYANT

               Plaintiff,

                  v.

SUNBOW PRODUCTIONS, INC.

               Defendant.

------------------------------------------- x

**AFFIRMATION OF GLORIA C. PHARES IN SUPPORT OF SUNBOW PRODUCTIONS, INC.'S MOTION FOR LEAVE TO REARGUE**

Index No. 2821/02

Hon. Andrew P. O'Rourke

        GLORIA C. PHARES, an attorney admitted to practice before the courts of this State, makes the following affirmation under penalty of perjury:

        1.     I am a member of the firm Patterson Belknap Webb & Tyler LLP, attorneys for Defendant Sunbow Productions, Inc. ("Sunbow"). I am thoroughly

familiar with the facts contained in this affirmation in support of Sunbow's Motion for Leave to Reargue.

2. Sunbow requests leave to reargue the Court's Decision and Order, entered on June 15, 2006 (the "Decision"), on the grounds that the Court overlooked or misapprehended certain dispositive facts. (A true copy of the Court's Decision is attached to this affirmation as Exhibit A.) Specifically, when the Court found that

> The Plaintiff now claims that there were also oral agreements besides these written contracts and these form the basis of her complaint. This is a matter for Plaintiff to prove on future trial of this matter.

the Court overlooked the fact that the valid, signed contracts, which the Court found existed between Plaintiff and Sunbow, each contains an integration or merger clause that states that the written agreement is the "entire" agreement between the parties relating to the subject of the agreement and precludes any oral change, rescission, or termination.

## ARGUMENT

3. "It is well settled that 'a motion for reargument is addressed to the sound discretion of the court which decided the prior motion and may be granted upon a showing that the court overlooked or misapprehended the facts or law or for some other reason mistakenly arrived at its earlier decision.'" *Hoey-Kennedy v. Kennedy*, 294 A.D.2d 573, 573, 742 N.Y.S.2d 573, 573 (2 Dept. 2002) (quoting *Long v. Long*, 251 A.D.2d 631, 631, 675 N.Y.S.2d 557, 557 (2d Dep't 1998).

4.    In the Court's Decision, it held that there were "written and valid signed contracts between Plaintiff and Defendant Sunbow."[1] (Exh. A at 2.)

5.    At the framed issue hearing, Sunbow introduced several signed written agreements between Plaintiff and Sunbow. It also introduced many other signed written agreements between Sunbow and several other songwriters in order to show that all those contracts between Plaintiff and Sunbow (and between Sunbow and all other songwriters) were essentially identical except for the initial fees and the description of the music to be delivered. The signed Jem agreement is an example of all those contracts, a true copy of which is attached to this affirmation as Exhibit B. The final page of the Jem contract includes a paragraph that states in full:

> [13](c)  This Agreement contains the entire understanding of the parties hereto relating to the subject matter herein contained and this Agreement cannot be changed, rescinded, or terminated orally.

(Exh. B, at p. 10, ¶ 13(c).)

6.    In other words, by the terms of the contracts that the Court found existed between the parties, there *cannot* be, as Plaintiff now claims, "oral agreements besides these written contracts." The law is settled that in the face of an integration or merger clause like the one in the contracts between Plaintiff and Sunbow, a party cannot introduce oral statements to vary the terms of the agreements. *See Jarecki v. Shung Moo Louie*, 95 N.Y.2d 665, 669, 722 N.Y.S.2d 784, 786, 745 N.E.2d 1006, 1009 (2001) ("The purpose of a merger clause is to require the full application of the parol evidence

---

[1]    In a decision and order entered on January 30, 2006, this Court denied Plaintiff's motion, made after five days of trial and the framed issue hearing, to amend the complaint to allege the written agreements between Sunbow and Plaintiff that she had formerly denied even existed.

1291946v2

rule in order to bar the introduction of extrinsic evidence to alter, vary or contradict the terms of the writing." (citing *Matter of Primex Intl. Corp. v. Wal-Mart Stores*, 89 N.Y.2d 594, 599, 657 N.Y.S.2d 385, 679 N.E.2d 624 (1997))); *New York City Health and Hospitals Corp. v St. Barnabas Hospital*, 10 A.D.3d 489, 782 N.Y.S.2d 12 (1st Dep't 2004) (reversing judgment for plaintiff and dismissing complaint which alleged a breach of a non-written agreement purportedly modifying a fully integrated contract).

       7.     In light of this settled law and the uncontroverted fact that such an integration or merger clause is present in all the contracts between Sunbow and Plaintiff, there is no basis for continuing the trial to determine Plaintiff's alleged oral agreements.[2] Under the terms of the integration clauses in the parties' agreements, any change, rescission, or termination of the agreement must be in writing. Continuing the trial in order to determine the terms of an oral agreement that the parties have already agreed could have no effect would be a complete nullity. Sunbow urges this Court to reconsider its decision to continue the trial of this case "for a while longer" and to dismiss this case.

Dated: New York, N.Y.
       July 6, 2006

                                    Gloria C. Phares

---

[2]    Sunbow's argument here puts aside the question how it is that Plaintiff can even "now claim" that there were *also* oral agreements between her and Sunbow, which "form the basis of her complaint," without ever having alleged the elements of this so-called oral agreements in any pleading that would have put Sunbow on notice of these oral agreements and provided Sunbow with an opportunity to conduct discovery on them.

1291946v2

**Exhibit A**

# DECISION AND ORDER

**To commence the statutory
period of appeals as of right
CPLR (5515 [a]), you are advised
to serve a copy of this order,
with notice of entry, upon all
parties.**

FILED

JUN 1 5 2006  9

ROCKLAND COUNTY
CLERK'S OFFICE

**SUPREME COURT OF THE STATE OF NEW YORK
IAS PART, PUTNAM COUNTY**

Present:  Hon. Andrew P. O'Rourke
              Supreme Court Justice

-------------------------------------------------------------X

ANNE BRYANT,

INDEX NO.: 5192/2000

                        Plaintiff,

            -against-

BROADCAST MUSIC, INC., (a/k/a "BMI") CLIFFORD
A. "FORD" KINDER, KINDER & CO., LTD.,
VADIVOX, LTD., JULES M. "JOE" BACAL,
GRIFFIN BACAL, INC., STARWILD MUSIC BMI,
WILDSTAR MUSIC ASCAP, SUNBOW
PRODUCTIONS, INC., and JOHN AND JANE
DOES 1-10,

                        Defendants.

-------------------------------------------------------------X

ANNE BRYANT,

INDEX NO.: 2821/2002

                        Plaintiff,

            -against-

SUNBOW PRODUCTIONS, INC.,

                        Defendant.

-------------------------------------------------------------X

1

BOOK **106** PAGE **2345**

This intellectual properties action was set down for a framed issue hearing on October 29, 2004 before this Court. Thereafter a stay of these proceedings was initiated by the Court awaiting the appeal of three determinative decisions of this Court by the Appellate Division, Second department. The appeal was argued in February, 2006 and a decision rendered in March 2006 unanimously affirming this Court's decisions below.

In the interim the Court had both cases transferred from Rockland County Supreme Court to Putnam County Supreme Court and since this was an ongoing bench trial retained jurisdiction there over.

It appears that no decision was ever rendered in the framed issue hearing and having finally obtained copies of the post trial briefs and submissions the Court decided as follows:

The Court is satisfied that there were written and valid signed contracts between Plaintiff and Defendant Sunbow. The Plaintiff now claims that there were also oral agreements besides these written contracts and these form the basis of her complaint. This is a matter for Plaintiff to prove on future trial of this matter.

At the end of the framed issue hearing the Court also asked each side to submit a "short analysis" of this issue on the signatures and also:

"If those signatures are Ms. Bryant's ...what is the stand of each party about what remains, if anything, in this trial..."

Each party has submitted briefs and various submissions on these matters. The Defendant's claim that the case is over and should be dismissed. The Plaintiff has taken further deposition of no-parties. This Court wished that the matter were as clear as the parties suggest. However it is not.

2

This case must go on for a while longer. Both sided should decide which are their

essential witnesses and be prepared to present them before the end of this year in person or by

videos (EBT's.) From the Court's point of view experts in this particular area of authorship and

attendant needs for compensation would be a benefit to both sides. Multiple fact cumulative

witnesses will not be tolerated.

The Court will have a telephone conference with each side on July 7, 2006 or at a later

mutual agreed upon date. Each side should furnish the Court with a new witness list, including

the subject matter of such witnesses and approximate times involved.

There will be no further discovery allowed in this matter.

This constitutes the order of the Court.

Hon. Andrew P. O'Rourke
Justice of the Supreme Court

Dated: June 12, 2006
      Carmel, NY



3

**Exhibit B**

AGREEMENT made of this 1st day of June, 1985, by and between
SUNBOW PRODUCTIONS, INC. ("Company"), whose business address is
380 Lexington Avenue, Suite 1105, New York, New York 10168, and
KINDER & BRYANT LTD. ("Contractor") whose business address is 41
West 73rd Street, New York, New York 10023, f/s/o Anne Bryant and
Ford Kinder (jointly referred to as "Writer").

In consideration of the mutual covenants herein contained, the
parties hereto have agreed and do agree as follows:

1.    Company hereby engages Contractor and Contractor
hereby accepts such engagement, to furnish the services of Writer
to Company for the purpose of writing, preparing and delivering to
Company original musical material (hereinafter referred to as the
"Music") for songs to be used in a fully-animated children's
television show consisting of either five one-half hours, fifteen
segments, or a television motion picture, presently entitled "JEM"
(the "Show")(it being understood that the mention of the Show is
for purposes of identification only and shall in no way restrict
Company's rights in the Music, and the use thereof, as set forth
in this Agreement). The number of songs for which music is to be
written and delivered by Writer hereunder shall be determined by
Company. The Music shall be delivered to Company in accordance
with a schedule to be mutually determined by the Company and
Contractor.

2.    (a)  For all rights herein granted to Company in the
Music, and for performance by Contractor of all obligations
hereunder (including but not limited to composing and arranging
the Music, supervision of the orchestra recording of the Music for
the Show, and Company's right to use the Music on and in
connection with phonorecordings sold or distributed in conjunction
with merchandise based on the Show ["Premium Cassettes"]), Company
shall pay Contractor a fee of Two Thousand Two Hundred ($2,200)
Dollars for each song for which Writer writes and delivers the
Music, payable on delivery thereof.

(b)  Payment by a parent or affiliate of Company
shall be deemed to constitute payment by Company hereunder.
Nothing herein contained shall be deemed to impose any obligation
on Company to use or authorize the use of the Music, and Company
shall have fully discharged its obligations to Contractor
hereunder by payment to Contractor of the amount specified in
subparagraph (a) of this Paragraph 2.

3.    Contractor shall deliver one (1) copy of the Music
to Company as Company shall designate.

4.    It is understood and agreed that Writer may write
the Music at such times and places as Writer may choose, subject
only to Contractor's obligation to make timely delivery of the
Music in accordance with the terms of this Agreement.



SUN 0870

5.    (a)  Contractor warrants, acknowledges and agrees
that the Music to be written by Writer and delivered by Contractor
is to be written by Writer under and pursuant to an employment
agreement between Contractor and Writer pursuant to which
Contractor is entitled to the exclusive services of Writer, and to
all the results of Writer's services; that the Music was
specifically ordered and commissioned by Company for use as part
of an audiovisual work; and that the Music is a work made for hire
within the meaning of Section 101 of the United States Copyright
Act.  Upon writing of the Music, all right, title and interest
therein shall automatically vest in Company and Company shall be
the sole and unlimited owner thereof and of all rights therein
throughout the world forever, and Company shall be entitled to
copyright therein, including statutory copyright and all renewals
thereof, as copyright author and proprietor.  Company may freely
assign and grant rights and licenses with respect to the Music and
any copyrigt therein (including any renewals thereof), and in this
connection Contractor agrees to execute and deliver and/or cause
Writer to execute and deliver to Company any and all instruments
required by Company in connection with the use and enjoyment of
the Music and of Company's rights therein and thereto.  Contractor
hereby appoints Company as Contractor's and Writer's
attorney-in-fact with the right but not the obligation to execute
any such instruments in Contractor's or Writer's name on Company's
behalf.  On execution hereof, Contractor shall sign and shall
cause Writer to sign the Certificate of Authorship attached hereto
for the Music.

(b)  Without in any way limiting the generality of
the foregoing, it is agreed that Company shall have the exclusive
right and may license others to use, adapt, arrange, change, add
to, or subtract from the Music and to combine the same with other
literary material and/or lyrics and to publish, record, produce,
reproduce, transmit, perform, broadcast, telecast, and/or
otherwise communicate the same or any version or versions thereof
by any means (including, but not limited to, in synchronization
with motion pictures, television and/or any other form of
recordation or reproduction of sight and/or sound), whether now
known or hereafter devised, publicly for profit or otherwise, it
being understood that Contractor and Writer hereby waive any
so-called "moral rights" which may now be or may hereafter be
recognized.  It is understood and agreed that neither Contractor
nor Writer shall have any right, title or interest in any other
literary material and/or lyrics which may be combined with the
Music.

(c)  During any period or periods of time during
which Writer is affiliated with any small performing rights
society (herein called the "Society"), Company shall and does
hereby, under and pursuant to this Paragraph, license back to
Writer the so-called "writer's share" (i.e., fifty (50%) percent)
(but, if the Music or any form thereof are the composition of

- 2 -

0040H

Writer and other composers and/or lyricists, then the grant
hereunder shall be deemed a grant of the "writer's share" to
Writer and all other such lyricists and/or composers jointly
except that for instrumental uses, only Writer and any other
composer(s) shall share in the "writer's share") in the
non-dramatic (i.e., "small") performing rights in the Music so as
to enable Writer to license such non-dramatic performing rights to
Society, and to collect the "writer's share" of royalties derived
therefrom, it being understood, in this connection, that Company
(or any assignee or licensee of all or any of Company's rights
under this Agreement) shall not exercise such non-dramatic
performing rights during such period or periods without obtaining
a license therefor from Society, except that Company and/or any
such assignee or licensee, may exercise such non-dramatic
performing rights in the Music by reason of, under and pursuant to
this Agreement,

          (i)   during any period or periods during which
     such non-dramatic performing rights are not controlled by
     and/or available for license to Company or any such
     assignee or licensee at standard rates from Society, or
     in the case of public performances of the Music in
     geographical areas outside of Society's jurisdiction,
     from any other organization or society which is
     affiliated with Society or which has a collection
     agreement with Society and which controls the
     non-dramatic performing rights in any geographical area
     in which the Music is to be performed; and/or

          (ii)  in connection with theatrical exhibitions
     in the United States, its territories and possessions;
     and/or

          (iii) in connection with any performance of the
     Music within the United States, its territories and
     possessions, which is not a public performance;

it being understood that Company (and/or any such assignee or
licensee) shall have no obligation to pay any royalties or other
sums to Writer, Contractor, Society, or any successor to the
rights of any of them with respect to non-dramatic performances of
the Music made pursuant to subclauses (i) through (iii) hereof.
If Company makes or authorizes any non-dramatic performances of
the Music under and pursuant to this Agreement, and if Writer or
Contractor shall assert any claim that any such performance
violates any rights of Writer or Contractor, then (A) under no
circumstances shall Writer or Contractor have the right to take
any action or initiate any proceeding with respect to such claim
which would have the effect of enjoining and/or preventing and/or
otherwise interfering with any said non-dramatic performances, it
being agreed that any such action or proceeding shall be limited
to an action at law for damages; and (B) if Writer or Contractor

- 3 -

SUN 0872

shall assert such a claim pertaining to a non-dramatic performance of the Music made by any assignee or licensee of Company, then any action taken or proceeding brought by Writer or Contractor shall be limited to an action at law for damages against such assigee or licensee exclusively.  The foregoing references to Society shall not be construed as giving Society any independent right to take any action or initiate any proceeding against Company or any of its assignees or licensees with respect to any such claim.

(d)  Without limiting the generality of any rights granted under this Agreement, and notwithstanding any license hereunder to Writer pursuant to subparagraph (c) above, Writer and Contractor expressly acknowledge that Company, its successors, assigns and/or licensees shall have the right to collect the "publisher's share" of performance royalties becoming due and payable hereunder from any small performing rights society by reason of performances of the Music, it being expressly agreed that Writer and Contractor shall not be entitled to any share of such monies which are distributed to Company, its successors, assigns, and/or licensees by any small performing rights society. Writer shall be entitled to collect the "writer's share" of any such royalties with respect to the Music jointly with any other lyricists and/or composers of such Music.  The terms "publisher's share" and "writer's share" as used in this Agreement have the same meaning here as is commonly understood in the music publishing and motion picture and television industries.  Company may represent to any domestic or foreign performing rights society or similar organization requiring an acknowledgement of the type made by Writer herein that Contractor and Writer have acknowledged Company's right to collect and retain the publisher's share of royalties; further, if any such society or organization requires written authorization from Writer or Contractor in order to make payments of the publisher's share of royalties to Company, Writer and Contractor shall promptly execute and deliver such authorization.  If any such society or organization makes payment to Writer or Contractor of all royalties (i.e., both "writer's" and "publisher's" share) with respect to any performance to Writer, Contractor shall promptly remit one-half (1/2) of such royalty to Company.

6.    Further, in the exercise of its rights hereunder and without in any way limiting the generality of the foregoing, Company shall have, as owner and copyright proprietor of the Music, the complete control of the publication of the Music and of all rights incident thereto, including, but not limited to, the right to license the manufacture of phonograph records and other recordings of the Music and the right to license motion picture synchronization rights (all of which rights are herein sometimes collectively called "music publishing rights").  Without limiting the generality of the foregoing, it is agreed that Company may assign or license any or all such music publishing rights and/or any or all other rights granted to Company under this Agreement to

- 4 -

0040H

SUN 0873

any music publishing company or production company which is a
parent or subsidiary of Company or otherwise affiliated with
Company or to any other third party.

    (a) With respect to Company's exercise of music
publishing rights in the Music (as defined above)(but excluding
use in connection with Premium Cassettes as defined in
Paragraph 2(a) for which Contractor shall not receive any further
compensation), uses of the Music combined with lyrics (but, if the
Music with lyrics or any form thereof is the composition of Writer
and other composers and/or lyricists, then the royalties hereunder
shall be shared equally by all such lyricists and/or composers):

    (i)  sums equal to fifty (50%) percent of the
net proceeds (as defined below) received by Company from
third parties for licenses for the manufacture or
commercial phonograph records and/or licenses of
theatrical motion picture synchronization rights (as
defined below);

    (ii)  for regular piano copies, if any, sold and
paid for at wholesale in the United States and/or Canada,
sums equal to eight cents (.08) per copy for the first
one hundred thousand (100,000) copies sold, and ten cents
(.10) per copy for copies sold in excess of 100,000;

    (iii)  sums equal to fifty (50%) percent of net
proceeds received by Company from third parties for
regular piano copies, if any, sold and paid for at
wholesale outside of the United States and/or Canada;

    (iv)  with respect to orchestrations, including
band arrangements, if any, sold and paid for at wholesale
anywhere in the world, sums equal to ten (10%) percent of
the wholesale price therefor, after trade discounts;

    (v)  with respect to any songbook, folio or
similar publication, if any, sold and paid for at
wholesale anywhere in the world, sums equal to the amount
resulting from dividing ten (10%) percent of the
wholesale price, after trade discounts, therefor by the
total number of copyrighted musical compositions
contained in such publication;

    (vi)  with respect to other uses of the Music
hereunder, sums equal to the amount resulting from
dividing fifty (50%) percent of the net proceeds received
by Company from third parties therefor by the total
number of copyrighted musical compositions and/or
literary materials contained or included in such uses.

- 5 -

0040H

SUN 0874

No royalties shall be payable hereunder for professional material
not sold or resold; further, no royalties shall be payable to
Writer with respect to uses of the Music except as hereinabove
expressly set forth.   The term "theatrical motion picture rights"
as used herein refers to synchronization rights granted with
respect to motion pictures intended primarily and initially for
theatrical release by direct projection before paid-admission
audiences; in no event shall such term refer to motion pictures or
other methods of recordation, whether now known or hereafter
devised, which are produced primarily and initially for television
broadcasting by any means whatsoever.   The term "net proceeds" as
used hereinabove, shall mean all monies (including advances)
actually received by Company (or any assignee of Company's rights
or licensee hereunder) which are directly attributable to licenses
issued authorizing the manufacture of commercial phonograph
records and/or licenses relating to theatrical motion picture
synchronization rights, and/or for the exercise of publication
rights referred to in subclause (iii) above, as the case may be,
after the deduction of all costs, expenses, fees and commissions
which are directly attributable to the exploitation of the Music
and combined music by way of commercial phonograph records or by
way of theatrical motion picture synchronization, or by way of
publication, as the case may be, computed in accordance with good
and standard practices.   In the event that Company licenses the
Music in a form containing music or other literary materials
written or composed by any third party or parties, then
Contractor's royalties thereon, shall be reduced proportionately
to an amount equal to the royalties payable hereunder divided by
the number of composers and lyricists (including Writer) who have
furnished materials and services for such use and who are entitled
to receive royalties from Company, provided that in no event shall
Writer receive less than one-half of the royalty Writer would
otherwise be entitled to receive hereunder.   Company shall render
royalty statements to Contractor, accompanied by any remuneration
due Contractor, such statements to be rendered at least twice
during each calendar year during which royalties are payable.

          (b)    If, for any reason, exportation of money to the
United States from any foreign country, territory or place should
be prohibited, prevented or rendered commercially impracticable,
the amount received by Company (if Company's share thereof is
actually paid to Company in such foreign country, territory or
place) shall not be considered gross receipts hereunder unless and
until the same shall have actually been received in the United
States in United States currency, less any discounts, losses,
costs or expenses suffered by or imposed upon Company with respect
to transmittal of such money to the United States and the
conversion thereof to United States currency; provided, however,
that if Contractor so requests in writing, that portion of such
blocked or frozen funds which would represent Contractor's share
of net proceeds of such gross receipts, but for being frozen or
blocked, shall be deposited in Contractor's name in any bank or

- 6 -

SUN 0875

depository designated by Contractor in such country wherein such
funds are blocked or frozen subject to the laws of such country
with respect to such deposits and withdrawals by Contractor
therefrom.  Contractor shall have the right at Contractor's sole
expense to inspect Company's books and records relative to gross
receipts derived from use of the Music hereunder and to make
extracts thereof provided such inspection shall be made at
Company's offices during reasonable business hours and upon
reasonable notice and not more frequently than once per year.  All
royalties, statements and other accounts rendered by Company shall
be binding upon Contractor and not subject to any objection by
Contractor unless specific objection in writing, stating the basis
thereof, is given to Company by Contractor by one (1) year from
the date rendered.

        (c)  If Company assigns or licenses any uses of the
music publishing rights to any third party (including any
aforementioned subsidiary or affiliated company) and if Company
authorizes such third party to account directly to Contractor with
respect to royalties payable to Contractor by reason of any such
uses of such music publishing rights, then Contractor agrees that,
during the term of any such assignment or license, Writer shall
look only to such assignee or licensee for payment of such
royalties (and shall be entitled only to inspect such assignee's
or licensee's books and records relative to uses of the Music at
reasonable business hours and at such assignee's or licensee's
offices), provided that Company shall not be relieved of its
obligations with respect thereto unless the assignee is a parent,
subsidiary or affiliate of Company, or a recognized distributor of
motion pictures or television programs, or a "major" motion
picture company (as that term is understood in the motion picture
industry), or a "major" television network (as that term is
understood in the television industry), or a "major" record
company or music publishing company (as those terms are understood
in the music industry).

        (d)  Contractor acknowledges that Company has not
made and is not hereby making any representation or warranty with
respect to the amount of royalties, if any, which may be derived
from uses of music publishing rights, it being further understood
that nothing herein shall be deemed to impose any obligation on
Company to use or authorize the use of the Music and/or any music
publishing rights derived therefrom.

        7.   Company agrees that:

        (a)  if the description of the Music in Paragraph 1
of this Agreement refers to a particular television program in
connection with which such Music may be used, and if such Music or
a substantial portion thereof are used in connection with such
program or are otherwise used hereunder, then Company shall give
Writer (or cause Writer to be given) credit as Writer of such

- 7 -

0040H

SUN 0876

Music or as a writer of the television series on all release
prints of such programs. Company further agrees to use best
efforts to have Writer given credit in connection with other uses
of the Music;

          (b)  if any of the Music as described in Paragraph 1
of this Agreement is used as Music for the theme song for a
television pilot program and/or television series, then Company
shall give Writer (or cause Writer to be given) credit on all
release prints of any such program in which such theme song is
used as the theme song, as Writer of the Music of such theme song.

The form, style, size, placement and nature of any credit provided
for herein shall be determined by Company (or its assignee or
licensee) in its sole discretion except that Company agrees that
the identification of Writer shall be in the form "Kinder and
Bryant." Any unintentional and/or inadvertent failure to give
credit as above provided, whether because of lack of broadcast
time or otherwise, shall not be a breach of this Agreement.

      8.  Company shall have the right and may grant to others
the right to use, disseminate, reproduce, print and publish
Writer's name, likeness, voice and biographical material
concerning Writer as news or informative matter and in connection
with advertising and for purposes of trade in connection with any
motion picture or television program in which the Music is used,
and/or in connection with any other uses of the Music. The rights
granted herein shall not include the right to use or to grant to
others the right to use Writer's name, voice, likeness and
biographical material in any direct endorsement of any product or
service without Writer's prior written consent.

      9.  Contractor hereby warrants that Contractor is free
and able to enter into and fully perform this Agreement, to
furnish the services of Writer, and to grant all rights herein
granted. Further, Contractor warrants that the Music in the form
in which it is delivered shall be wholly original with Writer and
shall not be copied from any other work and shall not, nor shall
the use thereof, infringe or violate the copyright or any common
law right or any personal, proprietary, or other right of any kind
whatsoever of any person, firm, corporation or association. If
any of the Music delivered hereunder is described as based upon
traditional or public domain compositions, Contractor warrants
that such compositions are in the public domain throughout the
world and that Writer's treatment of such compositions is original
and shall not be copied from any work other than such public
domain compositions, nor shall the use thereof infringe or violate
the copyright or any common law right or any personal, proprietary
or other right of any kind whatsoever of any person, firm,
corporation or association. Notwithstanding the foregoing, if any
of the Music delivered hereunder is described as based upon
materials furnished by Company or as based upon traditional or

- 8 -

SUN 0877

public domain compositions furnished by Company, Contractor makes no warranty as to the originality or ownership of such materials or compositions furnished by Company.

10. Contractor shall indemnify and hold Company, its successors, assigns and licensees, any network and/or stations over which the Music shall be broadcast, the sponsors, if any, of any program on which they are broadcast, and their advertising agencies, if any, and any other parties who shall utilize the Music or any part thereof in any way with Company's permission, and the directors, officers, agents and employees of any of the foregoing, free and harmless from any and all claims, damages, liabilities, costs and expenses, including reasonable counsel fees, arising out of any breach by Contractor of any warranty or agreement made by Contractor herein, in an amount not to exceed the monies paid to Contractor by Company hereunder.

11. It is understood and agreed that all or part of this Agreement and all the results and proceeds thereof may be assigned by Company to any third party without Contractor's consent and in this event, Company's successors and/or assigns shall be entitled to any and all rights, privileges, and equities to which Company is entitled under and by virtue of this Agreement. In the event of such an assignment, Company shall not be relieved of its obligations hereunder unless the assignee is a parent, subsidiary or affiliate of Company or a recognized distributor of motion pictures or television programs, or a "major" motion picture company (as that term is understood in the motion picture industry), or a "major" television network (as that term is understood in the television industry), or a "major" record company or music publishing company (as those terms are understood in the music industry).

Nothing in this Agreement shall in any way derogate from, diminish or impair any rights granted to the Company or to any parent, subsidiary or affiliate of Company under any other agreement entered into between Writer and Company or any parent, subsidiary or affiliate thereof.

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their successors, assigns and licensees.

12. Company agrees to furnish Contractor with cue sheets of the Music within sixty (60) days of the initial broadcast of the Show.

13. (a) This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to contracts entered into and fully to be performed therein.

One Revision:

- 9 -

004 OH

SUN 0878

(b)  A waiver by either party of any of the terms and conditions of this Agreement in any one instance shall not be construed to be a waiver of such term or condition for the future, or of any subsequent breach thereof.  All remedies, rights, undertakings, obligations and agreements contained in this Agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either party.

(c)  This Agreement contains the entire understanding of the parties hereto relating to the subject matter herein contained and this Agreement cannot be changed, rescinded or terminated orally.

(d)  If any provisions of this Agreement as applied to any party or to any circumstances shall be adjudged by a court to be void or unenforceable, the same shall in no way affect any other provision of this Agreement, the application of such provision in any other circumstances or the validity or enforceabililty of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

SUNBOW PRODUCTIONS, INC. ("Company")

By: _____
    Its

KINDER & BRYANT LTD. ("Contractor")

By: _____
    Its

— 10 —

0040H

SUN 0879

Schedule A

Anne Bryant and Ford Kinder ("Writers") hereby certify that they wrote certain original music as employees of KINDER & BRYANT LTD. ("Contractor") in the regular course of their employment. Contractor hereby certifies that Contractor was specially commissioned by SUNBOW PRODUCTIONS, INC. ("Company") to furnish the services of Writers to write and deliver said music to Company for use as part of a fully-animated children's television program tentatively entitled "JEM" pursuant to an agreement dated as of _____, 1986.    Accordingly, Writers and Contractor acknowledge and agree that the said music is a work made for hire within the meaning of Section 101 of the United States Copyright Act and that Company is the author and owner thereof and is entitled to copyright therein (and all renewals thereof), and all rights of any kind or nature therein, with the right to make such changes therein and uses thereof as Company may from time to time determine as such author and owner.

KINDER & BRYANT LTD.
("Contractor")

Dated:                          By: _____

Dated:                          _____
                                         Anne Bryant

Dated:                          _____
                                         Ford Kinder

- 11 -

0040H

SUN 0880

<u>INDUCEMENT LETTER</u>

Dated as of            , 1986

Sunbow Productions, Inc.
380 Lexington Avenue
Suite 1105
New York, New York  10168

     Re:  Sunbow Productions, Inc. with
         <u>Kinder & Bryant Ltd./"JEM"</u>

Gentlemen:

    Reference is made to that certain agreement dated as of
_____, 1986 (herein called the "Agreement") between
KINDER & BRYANT LTD. (herein called "Contractor") and you, which,
among other things, makes available the services of the
undersigned by Contractor to you for the purposes set forth in
said Agreement.

    As an inducement to you to enter into the Agreement and as a
material part of the consideration moving to you for so doing,
each of the undersigned hereby represents, warrants and agrees as
follows:

    1.    That the undersigned has heretofore entered into an
agreement (herein callled the "Employment Agreement") with
Contractor covering the rendition of the undersigned's services
for Contractor and that Contractor has the right and authority to
enter into the Agreement and to furnish the rights and services
of the undersigned upon the terms and conditions therein
specified.

    2.    That the undersigned is familiar with each and all
of the terms, covenants and conditions of the Agreement and
hereby consents to the execution thereof; that the undersigned
shall perform and comply with all of the terms, covenants and
conditions of the Agreement on the part of the undersigned to be
performed and complied with, even if the Employment Agreement
should hereafter be terminated or suspended; that the
representations and warranties of Contractor contained in the
Agreement are true; that the undersigned shall render all of the
services provided for under the Agreement and hereby confirms
that there have been granted to Contractor all of the rights
granted by Contractor to you under the Agreement; that all
notices served upon Contractor in accordance with the Agreement
shall be deemed notices to the undersigned of the contents
thereof.

- 12 -

0040H

SUN 0881

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK )
                     :ss.:
COUNTY OF NEW YORK )

CHRISTINA I. BELANGER, being duly sworn, deposes and says:

1.    I am over 18 years of age, not a party to this action, and am employed by

the law firm of Patterson, Belknap, Webb & Tyler LLP, located at 1133 Avenue of the Americas,

New York, New York 10036.

2.    On July 6, 2006, I served a true copy of the foregoing NOTICE OF

MOTION FOR LEAVE TO REARGUE by overnight courier service (Federal Express) upon the

following, directed to them at the addresses below:

> Patrick J. Monaghan, Esq.
> MONAGHAN, MONAGHAN, LAMB & MARCHISIO
> 38 W. Grand Avenue
> 2nd Floor
> Montvale, New Jersey 07645
>
> Judith M. Saffer, Esq.
> Broadcast Music, Inc.
> 320 West 57th Street
> New York, New York 10019-3790

CHRISTINA I. BELANGER

Sworn to before me this
6th day of July, 2006

Notary Public

SYLVIA ANDREEV
Notary Public, State of New York
No. 01AN6119735
Qualified in Queens County
Certificate Filed in New York County
Commission Expires Dec. 6, 2008

# EXHIBIT 77

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

ANNE BRYANT,                              :
            Plaintiff,                    :
                                          :
    -v-                                   :
                                          :
BROADCAST MUSIC, INC.                     :
(a/k/a/"BMI"), FORD KINDER,               :
KINDER & CO., LTD.,                       :     Index No. 5192/00
VADIVOX, INC., JULES M. "JOE"             :
BACAL; GRIFFIN BACAL, INC.,               :     Hon. Andrew P. O'Rourke
STARWILD MUSIC BMI, WILDSTAR              :
MUSIC ASCAP, SUNBOW                       :
PRODUCTIONS, INC.,                        :
                                          :
            Defendants.                   :
                                          :     **AFFIRMATION OF**
ANNE BRYANT,                              :     **PATRICK J. MONAGHAN, JR.**
            Plaintiff,                    :     **IN OPPOSITION TO**
                                          :     **SUNBOW'S MOTION FOR**
                                          :     **"LEAVE TO REARGUE"**
                                          :
                                          :     Index No. 2821/02
    -v-                                   :
                                          :     Hon. Andrew P. O'Rourke
                                          :
SUNBOW PRODUCTIONS, INC.,                 :
                                          :
            Defendant.                    :
                                          :


     PATRICK J. MONAGHAN, JR., being duly sworn, affirms in

accordance with CPLR 2106 under penalty of perjury the truth of

the following:

     1.  I am a member of Monaghan, Monaghan, Lamb & Marchisio,

LLP, attorneys for Plaintiff in this matter, and I am an attorney

admitted to practice before the Courts of the State of New York.

     2.  I am fully familiar with the facts of this case.  I

submit this Affirmation in Opposition to the latest motion by

Sunbow Productions, Inc., [which is mischaracterized as a motion for leave to reargue the Decision and Order entered on June 15, 2006 following a Hearing rather than motion]. This is merely Sunbow's latest effort to distract and delay the Court from concluding the trial in this matter.

## IT IS SUNBOW WHICH OVERLOOKED MATTERS

3.   The premise of Sunbow's motion is that the Court in its Decision of June 12, 200 overlooked that there are "valid signed contracts," with integration clauses. Without indicating which contracts it was talking about, Sunbow states these unidentified agreements contain integration clauses indicating that the written agreement is the entire agreement between the parties precluding oral modification. But plaintiff is not talking about oral modification-she has already accepted the Jem Agreement as has Sunbow as outlining the terms of the Sunbow relationship.

4.   Assuming Sunbow is talking about Framed Issue Hearing, Ex. M, the June 1, 1985 Jem Agreement integration clause, on its face [see paragraph 1 therein] this Agreement applies only to the Jem Feature songs for the 65 episodes (see Affidavit of Anne Bryant dated February 4, 2005 a copy of which is submitted herewith). The Jem Themes at issue are not referred to in this Agreement.

5.   There is no Sunbow written agreement before the Court relating to the Transformers Themes, Inhumanoids, or Visionaries

2

music.  The task for the Court then will be at trial to determine the understandings and agreements as to other compositions.

6.  To state the obvious- where there is no written contract before the Court with respect to certain compositions there obviously can be an oral agreement not precluded by an unrelated written agreement.

7.  Plaintiff's February 2005 Affidavit set forth in detail here position as to the six documents dredged in 2004 from the flooded Sunbow environs [about which there has been zero testimony or discovery in this case].

8.  We paraphrase Ms. Bryant's earlier Affidavit:

<div align="center">

**Sunbow Agreements**

</div>

A. **Jem Agreement dated June 1, 1985, Framed Issue Hearing, Ex. M (Sunbow 870-882).**

    **MS. BRYANT'S POSITION:**

        i.    **ACCEPTED**. Ms. Bryant accepted the signatures on the JEM Agreement but pointed out that the Agreement dealt with the feature songs and not the JEM THEME and is interpreted by the draftsman Robert Harris, Esq. as providing Kinder & Bryant **"..for sharing in music publishing income.." [Letter dated November 14, 1994 Harris to Weitzman.**

        ii.    **JEM Agreement In Fact Confirms Continued Interests**
Page 5 of the JEM Agreement [Sunbow 0874] confirmed Ms. Bryant's continued publishing royalties.[1]

---

[1] "(a) With respect to Company's exercise of music publishing rights in the Music (as defined above) (but excluding use in connection with Premium Cassettes as defined in Paragraph 2(a) for which Contractor shall not receive any further compensation), ****
(vi) with respect to other uses of the Music hereunder, sums equal to the amount resulting form dividing fifty (50%) percent of the net proceeds received by Company from third parties therefore by the total number of copyrighted musical compositions and/or literary materials contained or included in such uses.

<div align="center">

3

</div>

7/21/2006 6:23:53 PM

iii.    SHARE OF PUBLISHING CONFIRMED BY HARRIS'
        LETTER 11/14/94.

        "IN ANY EVENT, THE LATEST DRAFT OF THE
        AREEMENT, AS DOES THE HARMAN AGREEMENT,
        PROVIDES FOR SHARING IN MUSIC PUBLISHING
        INCOME, AND I BELIEVE THAT YOU MUST HONOR
        THAT."

iv.    THE EXPERTS AGREE. As the Court noted in its
       previous Decision, the experts confirm that
       it is customary that a songwriter retain 50%
       of the publishing income.  **The customary
       share is 50% of the publisher's receipts.**

B.    JEM Modification Agreement dated March 15,
      1986(Sunbow 0868-0869), Framed Issue Hearing,
      Ex. D.

      MS. BRYANT'S POSITION:

      i.   ACCEPTED.  This agreement was not signed by
      Ms. Bryant but Ford Kinder did acknowledge it.

      ii.  It does not alter the fact that the agreement
      with Sunbow provided for Ms. Bryant's continuing
      sharing in music publishing income as stated by
      Robert Harris and the experts;

C.    MY LITTLE PONY AND FRIENDS AGREEMENT dated
      December 12, 1985 (0883-0895) (collectively Sunbow
      Agreements), Framed Issue Hearing, Ex. N

      MS. BRYANT'S POSITION:

      i.   Kinder & Bryant did not write the feature
      songs for My Little Pony and Friends, but did
      write the THEME for My Little Pony and Friends.

      ii.  The THEME we wrote for My Little Pony and
      Friends would have been written pursuant to the
      same understanding as set forth in the JEM
      Agreement as confirmed by Harris as indicated

4

7/21/2006 6:23:53 PM

> above, contained my writer's share of publishing
> income.

### GBI Agreements

9.   The Court does not have to deal with the GBI Agreements because Sunbow has already told the Court that the Jem Agreement was a representative agreement insofar as the relationship between the parties (see Ms. Phares' earlier letter dated July 19, 2006 and numerous prior submissions to the Court cited by Plaintiff).

10.   Moreover the GBI Agreements **do not contain any integration clause**.   The GBI Agreements are still contested and contain all of the irregularities that were cited by Plaintiff in her Affidavit of February 4, 2005 including lack of a counter-signature by Griffin Bacal, Inc, the inclusion of Spence Michlin who had nothing to do with Kinder Bryant and the lack of any Sunbow Agreement in writing dealing with the Transformer's music giving Sunbow the right to exploit the music as it has done.

### REARGUMENT CRITERIA

11. Sunbow's motion here, as is the case with its motion before the Second Department, meets none of the criteria for reargument and in fact is puzzling because there were no arguments to reargue. A motion to reargue is addressed to the sound discretion of the Court and may be granted only on a showing that the Court overlooked or misapprehended the relevant facts or misapplied the applicable law.   Amato v. Lord and

5

7/21/2006 6:23:53 PM

Taylor, Inc., 10 AD3d 374, 375, 781 NYS2d 125 (2nd Dept. 2004).

Reargument, however, is not designed to allow an unsuccessful

party like Sunbow, yet another opportunity to reargue the issues

previously decided or to present new or different arguments

related to previously decided issues. McGill v. Goldman, 261

AD2d 593, 594, 691 NYS2d 75 (2nd Dept. 1999).

### AN INTEGRATION CLAUSE WOULD, IF APPLICABLE, ONLY BAR INCONSISTENT OR CONTRARY ORAL UNDERSTANDINGS

12. **Where's The Beef?** In the absence of a valid and

applicable written agreement , [e.g. Transformer's theme music],

the terms of the Jem Agreement integration clause would not

preclude plaintiff from offering evidence as she will that the

compensation provisions set forth in the Jem Agreement applied to

all the compositions. But this is exactly what Sunbow has told

the Court all along so there should be no conflict.

### EVEN IF THE "INTEGRATION" CLAUSE APPLIED TO ALL COMPOSITIONS-MS. BRYANT'S PERFORMANCE WOULD EFFECTIVELY NEGATE THE EFFECT

13. In this case there is no question but that the

compositions authored by plaintiff were delivered to and used by

Sunbow even though there is a gap in evidence as to how Sunbow

obtained the rights to use the Transformer's and Visionaries

music.

14. The Court of Appeals has held that "Where oral

agreement to modify written contract which includes proscription

against oral modification has in fact been acted upon to

6

7/21/2006 6:23:53 PM

completion, not only may past oral discussions be relied upon to test alleged modification, but actions taken may demonstrate, objectively, nature and extent of modification. Rose v Spa Realty Associates  42 NY2d 338, 397 NYS2d 922, 366 NE2d 1279 (1977).

   15. Further the First Department has held that the partial performance of an oral agreement to modify written contract, if unequivocally referable to modification, avoids statutory requirement of writing. Algemene Bank Nederland N.V. v Toepfer 175 AD2d 4, 573 NYS2d 72, (1991, 1st Dept) Fairchild Warehouse Assocs., LLC v United Bank of Kuwait, PLC  285 AD2d 444, 727 NYS2d 153 (2001, 2d Dept) (defendant was improperly granted summary judgment on ground that original mortgage prohibited oral modifications, where plaintiff raised triable issues of fact by submitting evidence of partial performance of alleged oral modification agreement). See also  Calica v Reisman, Peirez & Reisman, LLP  744 NYS2d 495 (2002, App Div, 2d Dept).  and Madison Ave. Leasehold, LLC v. Madison Bentley Assoc., LLC, 811 N.Y.S.2d 47, 2006 N.Y. App. Div. LEXIS 2744, 2006 NY Slip Op 1747 (N.Y. App. Div. 1st Dep't 2006) ["a contracting party may orally waive enforcement of a contract term notwithstanding a provision to the contrary in the agreement (Alside Aluminum Supply Co. v Berliner, 32 A.D.2d 731, 302 N.Y.S.2d 180). Such waiver may be evinced by words or conduct, including partial performance (see Rose v Spa Realty Assoc., 42 N.Y.2d 338, 343-344, 366 N.E.2d 1279, 397 N.Y.S.2d 922) " and Donald v. Barbato, 27 A.D.3d 414,

7/21/2006 6:23:53 PM

810 N.Y.S.2d 665, 2006 N.Y. App. Div. LEXIS 2562, 2006 NY Slip Op

1573 (N.Y. App. Div. 2d Dep't 2006).

16. In short, the Jem Agreement integration clause while

applicable as far as it goes [i.e. to the Jem episodes] won't bar

testimony about the oral understandings about different

compositions.

17. We remind Sunbow that the Court found as law of the case,

[according to the Court's ruling of May 26, 2004 filed on May 28,

2004 and its Ruling of January 2004 as follows:

> (a) Sunbow admitted that... "the Jem Agreement is
> identical to all the other agreements for the Hasbro
> T.V. series relating to what Plaintiff is entitled to
> receive..." (Ruling, Page 12).
>
> (b) [A] triable issue of fact existed as to the nature
> of Plaintiff's relationship with Bacal (Ruling, Page
> 15, Footnote 8).
>
> (c) Bacal had not denied receiving royalty payments and
> licensing fees from Sunbow or through his various
> companies "or that said companies have received such
> benefits."
>
> (d) Plaintiff "produced evidence that substantial
> mechanical royalties and license fees generated by the
> use of her compositions have been received by Defendant
> Bacal's various companies or that said companies have
> received such benefits" (Ruling, Page 16).
>
> (e) That Plaintiff "produced evidence that substantial
> mechanical royalties and license fees generated by the
> use of her compositions had been received by Defendant
> Bacal's various companies named Defendants herein"
> (Ruling, Pages 16 and 17).
>
> (f) That if Plaintiff is able to show that Bacal used
> Sunbow for known purposes, that the Court should be
> able to permit the Plaintiff to pierce the corporate
> veil and recover "any financial benefit that has been
> wrongfully conferred upon Sunbow" and that the same

7/21/2006 6:23:53 PM

analysis applied to Starwild, Wildstar, and ASCAP
(Ruling, Pages 17-18).

(g) Even if the Court were to permit the Defendants to
have relied upon the Statute of Frauds… it would not
preclude Plaintiff from recovering on a theory of
quantum meruit (Ruling, Page 20).

(h) That the Defendants conceded all the elements of
the quantum meruit claim save Plaintiff establishing
the reasonable value of her services (id.)

(i) Plaintiff had offered evidence supporting her claim
that she was entitled to wrongfully withheld
performance royalties in excess of $238,000.00 (Ruling,
Page 61).

(j)  The value of Plaintiff's services in the 80's
included 50% of her publishing royalties (Id.)

(k) Sunbow had acknowledged that it is obliged to pay
Plaintiff a royalty of 50% of net profits for licenses
to third parties of mechanical or synchronization fees
(Ruling, Page 22). (Ruling, Page 22).

(l) In its ruling of January 23, 2004 on Sunbow's
unsuccessful motion for reconsideration, the Court
said, "the scope and terms of the parties' work
relationship and their agreements shall properly be
the subject of inquiry and examination at trial"
(Ruling, Page 3).

18. Those Rulings remain unscathed after Sunbow's four

unsuccessful appeals and the affirmances by the Second

Department.[2]

PATRICK J. MONAGHAN,, JR.

Dated:  July 21, 2006

---

[2] Plaintiff will reserve her right to make such motions as are appropriate including a motion to comform the pleadings
to the proofs after and during the trial.

# EXHIBIT 78

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
-------------------------------------------- x
ANNE BRYANT,                                  :

                      Plaintiff,              :
                                                     Index No. 5192/00
              v.                              :
                                                     Hon. Andrew P. O'Rourke
BROADCAST MUSIC, INC., (a/k/a "BMI"),         :
CLIFFORD A. "FORD" KINDER, KINDER &
CO., LTD., VADIVOX, LTD., JULES M. "JOE"      :
BACAL, GRIFFIN BACAL, INC., STARWILD
MUSIC BMI, WILDSTAR MUSIC ASCAP,              :
SUNBOW PRODUCTIONS, INC., and JOHN
AND JANE DOES 1-10,                           :

                      Defendants.             :      **REPLY AFFIRMATION OF
                                                     GLORIA C. PHARES IN SUPPORT
                                              :      OF SUNBOW PRODUCTIONS,
                                                     INC.'S MOTION TO REARGUE
-------------------------------------------- x      UNDER CPLR R 2221(a)**
                                              :
ANNE BRYANT                                   :

                      Plaintiff,              :
                                                     Index No. 2821/02
              v.                              :
                                                     Hon. Andrew P. O'Rourke
SUNBOW PRODUCTIONS, INC.                      :

                      Defendant.              :
                                              :
-------------------------------------------- x

        GLORIA C. PHARES, an attorney admitted to practice before the courts of

this State, makes the following affirmation under penalty of perjury:

        1.    I am a member of the firm Patterson Belknap Webb & Tyler LLP,

attorneys for Defendant Sunbow Productions, Inc. ("Sunbow"), and admitted to practice

in the State of New York. I am thoroughly familiar with the facts contained in this reply

affirmation in support of Sunbow's Motion for Leave to Reargue.

**Reargument**

2.        Plaintiff claims that Sunbow mischaracterized its motion as a

motion to reargue because Sunbow's motion refers to the Court's Order and Decision

following the briefing on the framed issue hearing, rather than a decision on Sunbow's

motion. (July 21, 2006 Affirmation of Patrick J. Monaghan, Jr. in Opposition to

Sunbow's Motion for Leave to Reargue ("Monaghan Affirm.") ¶¶ 2, 11.) This elevates

form over substance.

3.        Plaintiff requested the framed issue hearing during the parties'

September 13, 2004 appearance before the Court. Following the hearing, the Court

directed both parties to submit briefs. Sunbow seeks reargument of so much of the

Court's June 15, 2006 Order and Decision on those briefs, namely the order for further

testimony, as appeared to be in conflict with the Court's conclusion that signed, written

agreements governed all the relations between Kinder & Bryant and Sunbow,

agreements that contain merger clauses. Even Plaintiff does not dispute that, however

characterized, Sunbow's motion properly arises under CPLR R 2221(a) as recited in

Sunbow's Notice of Motion. *McGill v. Goldman*, 261 A.D.2d 593, 691 N.Y.S.2d 75 (2d

Dep't 1999), on which Plaintiff relies (Monaghan Affirm. ¶ 11), provides no support for

her contention; that case involved a *second* motion for reargument.

## ARGUMENT

4.    Plaintiff apparently believes that there are two categories of agreements in this case upon which she can offer testimony about additional orally negotiated terms: (1) the contracts between Sunbow and Plaintiff's former company, Kinder & Bryant, regarding the music written for Sunbow's animated productions; and (2) the contracts between Plaintiff (via Kinder & Bryant) with *another* entity, Griffin-Bacal, Inc. ("GBI") regarding various "other compositions" ("themes") that Kinder & Bryant wrote as advertising jingles. However, Plaintiff cannot proceed on an oral modification theory with respect to the Sunbow agreements, the terms of which Plaintiff concedes govern her relationship with Sunbow, because each contains a merger clause prohibiting oral modification. Plaintiff cannot proceed on an oral agreement theory against Sunbow with respect to the "other compositions" that Plaintiff wrote for GBI because Sunbow was not a party to those agreements and GBI is not a defendant in this case.

### Written Agreements with Merger Clauses

5.    Plaintiff does not dispute Sunbow's principal contention that the merger clause in each of the valid, written agreements between Sunbow and Plaintiff's company, Kinder & Bryant, bars any testimony about *oral agreements* relating to the subject matter of those contracts because the merger clause states that "this Agreement cannot be changed, rescinded, or terminated orally." (*See* Monaghan Affirm. ¶ 3.) Neither does Plaintiff even address any of the cases Sunbow cites supporting its contention that where there is a merger clause, a party cannot introduce oral statements to vary the terms of the agreements. (*See* July 6, 2006 Affirmation of Gloria C. Phares

-3-

("Phares Affirm.") ¶ 6.) Therefore, there is no basis for continuing the trial to take

testimony about oral agreements relating to any of the contracts between Sunbow and

Kinder & Bryant.[1]

       6.     But Plaintiff makes the astounding suggestion that Sunbow does

not "indicat[e] which contracts it was talking about" and then describes the contracts as

"unidentified." (Monaghan Affirm. ¶ 3.) This is not credible. This entire case relates to

music that Kinder & Bryant composed for Sunbow under agreements relating to

animated TV shows that Sunbow produced in the 1980s. At the framed issue hearing,

Sunbow contended that the same basic form agreement governed the relationship

(except financial terms) with all songwriters who composed for those productions. In

support of that contention, Sunbow offered signed, written agreements between

Sunbow and Kinder & Bryant for some of the productions (*see*, e.g., Phares Affirm.,

Exh. B (Jem Agreement)); numerous signed, written agreements, all identical to the

contracts with Kinder & Bryant (except for upfront payments) between Sunbow and

numerous other songwriters who composed for Sunbow productions; and the

testimony of the Sunbow lawyer who had drafted the contracts in the 1980s and was

---

[1]    During a July 7, 2006 conference call with the parties, the Court expressed an interest in knowing whether composers have a "natural right" to royalties. In the United States, an author's copyright rights derive completely from a federal statutory scheme, 17 U.S.C. §§ 101 *et seq.*, known as the Copyright Act, which preempts common law for works that fall within its scope, such as music, *id.* at §§ 102(2) & 301. Under the statute, unless musical compositions are created as works for hire, a songwriter is the copyright owner of her compositions at the time they are composed, 17 U.S.C. § 201(a-b), and can exercise the copyright rights as she chooses. But once a songwriter signs a work-for-hire agreement or an agreement assigning or licensing rights for consideration, the terms of the agreement control. If a composer signs a work-for-hire agreement, the commissioning party is the copyright owner of the commissioned work, and the songwriter receives the consideration negotiated in the work-for-hire agreement. That is the case here. Kinder & Bryant signed work-for-hire agreements with Sunbow, and the terms of those agreements govern.

able to describe Sunbow's practice of using the same form contract with all songwriters who composed for Sunbow productions.

7.    Relying on Sunbow's showing, this Court ruled in its June 15, 2006 Decision and Order that "there were valid and signed contracts between Plaintiff and Defendant Sunbow." (Phares Affirm., Exh. A at 2.)  During a July 7, 2006 conference call with the parties, the Court confirmed its conclusion that there was a valid, signed agreement between Sunbow and Kinder & Bryant for each of the Sunbow animated cartoon productions.  There is nothing unclear about the contracts that Sunbow has been talking about, nor has Sunbow failed to identify them, nor is there any question which contracts the Court was referring to.

8.    There is no dispute between the parties that the merger clause in each of the signed, written agreements between Sunbow and Kinder & Bryant bars any further testimony about "oral agreements" related to the subject of those agreements. (Monaghan Affirm. ¶ 3.)  Nor is the interpretation of those agreements before the Court (despite the commentary on them in Monaghan Affirm. ¶ 8 and the attached February 4, 2005 affidavit of Anne Bryant submitted for the framed issue hearing) because in a decision and order entered on January 30, 2006, this Court denied Plaintiff's motion to amend the complaint to allege the written agreements between Sunbow and Plaintiff that she had formerly denied even existed.  The Court ruled that the motion was too late, inadequately supported, and prejudicial to Sunbow.

9.    Plaintiff next advances an entirely new, alternative theory that "would effectively negate the effect [of the merger clause]" in the agreements between

Plaintiff and Sunbow. (Monaghan Affirm., Heading preceding ¶ 13.) To justify this Court's hearing further testimony, Plaintiff relies on cases holding that an oral modification to a contract can be enforced, notwithstanding a contractual provision prohibiting oral modification, when (1) there is full performance of that oral modification or (2) where there is partial performance of the oral modification "[b]ut only if the partial performance be unequivocally referable to the oral modification." *E.g., Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 343-44 (1977); *see also* N.Y. Gen. Oblig. Law § 15-301(1). But Plaintiff never explains what the purported modification of her contracts was, what consideration the parties exchanged for the purported modification,[2] or how she performed her obligations under the purported modification, either fully or partially. She fails to explain this theory because there never was such a modification of the agreements with Sunbow. Thus, *Rose* and the cases Plaintiff cites following *Rose* have no bearing on this case and do not justify further proceedings.

10.    Thus, there are no issues remaining to be resolved in this case relating to the contracts between Plaintiff and Sunbow, and this Court should dismiss the case.

**Oral Agreements**

11.    In a further attempt to prolong this case, Plaintiff claims that she requires a hearing "to determine the understandings and agreements as to *other compositions*" for which "[t]here is no Sunbow written agreement before the Court."

---

[2]    She appears to suggest that her performance that "modified" the agreements was to compose and deliver the compositions to Sunbow. (Monaghan Affirm. ¶ 13.) But that performance was called for in the written agreements and thus does not "evidence[] an indisputable mutual departure from the written agreement." *Rose*, 42 N.Y.2d at 344.

-6-

(Monaghan Affirm. ¶ 5 (emphasis added).)  A careful reading of Plaintiff's submission reveals that the "other compositions" to which she refers are the Jem Themes (as distinct from Jem Feature songs), the Transformers Themes, Inhumanoids, and Visionaries. (Monaghan Affirm. ¶¶ 4, 5, 10, 12.)

12.    Noteworthy, however, is Plaintiff's focus on "other compositions" and her omission of the fact, as she has claimed repeatedly in this case, that she wrote these "other compositions" as advertising jingles for Griffin Bacal, Inc. ("GBI").[3]  None of these "other compositions" is the music that Kinder & Bryant composed under the contracts with Sunbow.  They are compositions composed for GBI.[4]

13.    As this Court knows, GBI is not a defendant in this case and never has been.  When Plaintiff tells the Court that its "task . . . will be at trial to determine the understandings and agreements as to *other compositions*" (Monaghan Affirm. ¶ 5 (emphasis added)), she is saying that this Court should now resume trial to take testimony on understandings and agreements that are irrelevant to Sunbow and relate to GBI, an entity that is not, and never has been, before this Court.

---

[3]    As Plaintiff stated in her November 25, 2003 affidavit, "It is more accurate to characterize [the music at issue in this case] as <u>seven</u> original compositions – one for Transformers, GI Joe, Jem, My Little Pony, Visionaries, Inhumanoids, and Robotics – plus numerous derivative uses and/or re-uses of these seven original compositions, <u>which were originally written for Griffin-Bacal, Inc.</u>"  (Affidavit of Plaintiff Anne Bryant in Opposition to Motions for Summary Judgment Submitted by Defendants Jules M. Bacal and Sunbow Productions Inc, and in Support of Plaintiff's Cross-Motion for Partial Summary Judgment, ¶5.)

A year later, in her February 4, 2005 affidavit (a copy of which is attached to the Monaghan Affirmation), Plaintiff stated that "the *Transformer's Theme* was *written for GBI* for advertising and as a TV commercial jingle . . . ."  (Affidavit of Plaintiff Anne Bryant Concerning Framed Issue Hearing and in Response to Sunbow's Counsel's Letters of 8/19/04 and 9/23/04, ¶ 6 (emphasis not in bold added).

14.    Any doubt that this is what Plaintiff means is dispelled by her discussion of the GBI Agreements, which she claims are "still contested." (Monaghan Affirm. ¶ 10.)  And justifying her right to prove oral understandings relating to the GBI agreements, Plaintiff points out that the GBI agreements "<u>do not contain any integration clause</u>." (Monaghan Affirm. ¶ 10 (emphasis in original).)  In other words, says Plaintiff, "the Jem Agreement integration clause while applicable as far as it goes [i.e. to the Jem episodes] won't bar testimony about the oral understandings about *different compositions*." (Monaghan Affirm. ¶ 16 (emphasis added).)  Why?  Because the "different compositions" are compositions that were not written for Sunbow, but for GBI, and are not bound by a merger clause.

15.    Despite Plaintiff's effort to manufacture an outstanding oral agreement on which she is entitled to adduce testimony, the agreements with GBI are not part of this case, and this Court should not continue this case in order to take testimony relating to compositions composed for GBI.  As nothing remains to be tried in this case with regard to the contracts between Plaintiff and Sunbow, Sunbow urges this Court to dismiss this case in its entirety.

---

4    That Plaintiff is referring to music written for GBI is confirmed by other statements.  For example, she states that "there is a gap in evidence as to how Sunbow obtained the rights to use the Transformer's and Visionaries music." (Monaghan Affirm. ¶ 13.)  The implication of that statement is that this music was written for another party (*i.e.*, GBI), not Sunbow, but if it was not part of an agreement with Sunbow, it is an issue that is not before this Court.

**"Law of the Case"**

16.     Finally, Plaintiff concludes with an "argument" that she made—in the very same words—in her motion to amend her complaint.[5]  She lists 12 statements (Monaghan Affirm. ¶ 17(a-l)) that she claims are "law of the case," reserving "her rights to make a motion to conform the pleadings to the proofs after and during the trial" (*id.* ¶ 17 & n.2.)  While this portentous statement suggests that the 12 statements continue to be relevant to this case, nothing could be further from the truth.  The statements are misquoted, taken out of context, misleadingly incomplete, relate to parties no longer in the case, and are contrary to subsequent rulings of this Court.[6]  These statements were

---

[5]     *See* Plaintiff's December 14, 2005 Memorandum of Law in Support of Motion . . . to Deem Pleadings Amended. . . at 7-8; *see also* December 6, 2005 Affirmation of Patrick J. Monaghan, Jr. at 9-10.

[6]     The catalogue of quotations is from the Court's May 28, 2004 Decision and Order on Sunbow's Motion to Dismiss on the Statute of Frauds.  (A true copy of that Decision is attached to this affirmation as Exhibit C.)  Several of these statements (Monaghan Affirm. ¶ 17 (b, c, d, e, f)) that Plaintiff is passing off as law of the case include statements regarding arguments made, not by Sunbow, but by co-defendant Bacal, with whom Plaintiff has now settled.  (Exh. C. at 15 n.8, 16, 17, 18.)

Two of the statements (Monaghan Affirm. ¶ 17 (e) & (f)) are not "law of the case," but merely descriptions of Plaintiff's allegations.  More importantly, those statements overlook the conflicting holding of the Court's December 15, 2003 decision (a true copy of which is attached to this affirmation as Exhibit D), that "plaintiff has woefully failed to demonstrate that it is appropriate to pierce the corporate veil and find that Bacal's identity was one with his production company Sunbow, which of course otherwise had no confidential relationship to plaintiff, so as to render Sunbow potentially liable for alleged wrongdoings which otherwise would be time-barred" (Exh. D at 15-16).

Two other statements (Monaghan Affirm. ¶ 17 (i) & (j)) are based on an affidavit of David Berman, which Plaintiff does not provide with the Monaghan Affirmation, but the fact that Plaintiff offered evidence does not make it the "law of the case."

Three of the statements are misleadingly incomplete.  For example, the statement quoted in Monaghan Affirm. ¶ 17 (k) omits the Court's acknowledgement that "Sunbow does not agree . . . that the licenses that were made for the distribution of the television shows in videocassettes and DVDs is an exercise of [either the mechanical or the synchronization] licenses in Bryant's written agreements with Sunbow." (Exh. C. at 22.)  And while it is true that Sunbow acknowledged in its Motion to Dismiss on Statute of Frauds grounds that Bryant's only remedy (if the Court granted Sunbow's Statute of Frauds motion) was under quantum meruit (Monaghan Affirm. ¶ 17 (g) & (h)), Plaintiff fails to add that Sunbow also argued that based on comparable contracts in the record of other composers and lyricists, she was not entitled to more than the millions of dollars she had already been paid.  Now that Plaintiff concedes that

not law of the case in December 2005, and are even less so now. Nothing about them
requires a continuation of this case.

17.    No open issues remain in this case. Plaintiff's efforts to suggest
otherwise should be denied and this case should be dismissed.

18.    During a conference in chambers during the July 2004 trial,
Sunbow commented that no other creative person who had contributed to the Sunbow
TV series, including no other songwriter, had ever made the extravagant claims for
royalties that Plaintiff has tried to make in this case. The Court replied that that was
because the other creative people (including the other songwriters) had written
contracts with Sunbow. At the time, of course, Plaintiff was denying that she ever
signed written agreements and was attempting to prove oral ones. But now the Court
has concluded that Plaintiff, like all the other creative contributors to Sunbow's
productions, signed written agreements with Sunbow. Plaintiff's company negotiated

---

signed agreements govern her relations with Sunbow, any quantum meruit remedy based on
oral agreements is moot. Similarly, the Court stated that the scope of the parties' work
relationship and agreements would be the subject of inquiry and examination at trial (January
23, 2004 Decision and Order at 3, a true copy of which is attached as Exhibit E) that statement
was made when Plaintiff had persuaded this Court that she had "never" signed any written
agreement with Sunbow. Now that she has conceded (and the Court has found) the contrary, it
is misleading to suggest that that the Court's statement continues to have the same validity.

Finally, Sunbow agrees that the statement that "[T]he Jem Agreement is identical to all
the other agreements for the Hasbro TV. series" is law of the case, but it was not the law of the
case in the Court's May 28, 2004 Decision and Order as Plaintiff implies. (Monaghan Affirm.
¶ 17(a).) It was the Court's *quotation* of Sunbow's arguments (Exh. A at 12) and did not become
the Court's holding until after the written agreements were discovered and after the Court
accepted Sunbow's showing at the framed issue hearing in its June 15, 2006 Decision and Order
(Phares Affirm. Exh. A. at 2).

agreements that bind their relationship and allow for no oral modifications.  There is

nothing left to be done, and this case should be dismissed.

Dated:    New York, N.Y.
          July 28, 2006

_____
Gloria C. Phares

**Exhibit C**

# DECISION AND ORDER

To commence the statutory
period of appeals as of right
(CPLR 5513[a]), you are advised
to serve a copy of this order,
with notice of entry, upon all
parties.

SUPREME COURT OF THE STATE OF NEW YORK
IAS PART, ROCKLAND COUNTY

Present:   HON. ANDREW P. O'ROURKE
               Supreme Court Justice

---------------------------------------------X

ANNE BRYANT,
                              Plaintiff,         Motion Date: 5/7/04

          -against-
                                                 Index No. 5192/00

BROADCAST MUSIC INC., (a/k/a "BMI"),
CLIFFORD A. "FORD" KINDER, KINDER &
CO., LTD., VADIVOX, LTD., JULES M.
"JOE" BACAL, GRIFFIN BACAL, INC.,
STARWILD MUSIC BMI, WILDSTAR MUSIC
ASCAP, SUNBOW PRODUCTIONS, INC. AND
JOHN AND JANE DOES 1 - 10,
                              Defendants.
---------------------------------------------X
ANNE BRYANT,
                                                 Index No. 2821/02

                              Plaintiff,

          -against-

SUNBOW PRODUCTIONS, INC.,

                              Defendant.
---------------------------------------------X

          The following papers numbered 1 to 34 were read on this
motion by defendant Jules M. Bacal for an Order of dismissal pursuant
to CPLR 3211, subdivision (a), paragraphs 5 and 7, or for an Order
granting summary judgment, and on this motion by defendant Sunbow
Productions, Inc. for an Order of dismissal pursuant to CPLR 3211,

subdivision (a), paragraph 5, and for summary judgment.

<u>Papers Numbered</u>

Notice of Motion - Affidavit (Tannenbaum) -  Exhs.  (A-G) -
   Affidavit (Bacal) - Exhs. (1-5) - Affidavit (Griffen) -
Exhs. (1-2) ............................................  1 - 7
Notice of Motion - Affidavits (Blue, Rigby, Harris,
   Weitzman) - Affirmation (Phares) - Exhs. (A-Y, 1-48) ...  9 - 15
Exhs.  (1-2) - Affirmation (Kitson) - Exhs. (A-K) ........ 6 - 11
Answering Affidavit (Bryant) - Exhs. (A-C) - Affidavit
   (Bryant) - Exhs. (1-3) - Affidavit (Bryant) - Exhs. (1-3)
   - (Bryant) - Exhs. (1-2) - Affidavit (Bryant) - Affidavit
(Bryant) .................................................. 12 - 26
Affirmation (Monaghan) - Exhs. (A-G) .................... 13 - 17
Answering/Replying Affirmation (Tannenbaum) - Exhs. (A-B). 19 - 20
Answering/Replying Affidavit (Rigby) - Exhs. (A-F) -
   Affirmation (Phares) - Exhs. A-J) ...................... 22 - 25
Replying Affirmation (Bacal) - Exhs. (A-D) .............. 28 - 29
Objection - Exh. - Affidavit (Blue) ..................... 31 - 33
Memoranda of Law ........................................ 8,16,27
                                                           30,34

Upon the foregoing papers, it is Ordered that these

motions are disposed of as follows:

The relevant background facts of these actions previously

have been set forth in numerous prior Court Decisions and Orders

and will thus not be restated herein except to the extent

necessary. At the pre-trial conference conducted on March 2, 2004,

this Court had granted defendants an additional final opportunity

to move for dismissal, the Court's intention being to clarify the

issues remaining for trial; defendants Bacal and Sunbow each have

made their respective motions.[1]

_____

[1]Contrary to plaintiff's contention, the Court did not limit
defendants' dismissal motion solely to the issue of the Statute

Following extensive prior motion practice, plaintiff's First Amended Complaint specifically pleads two causes of action against defendant Bacal for unjust enrichment and constructive trust, and a single cause of action against defendant Sunbow for unjust enrichment, for which plaintiff seeks compensatory damages and an accounting.[2] With respect to these two defendants, plaintiff essentially asserts that she had an oral working relationship with defendant Bacal, part-owner of both defendants Griffin Bacal, Inc., an advertising agency, and Sunbow Productions, Inc., a television production company, with respect to her created musical arrangements, compositions and jingles whereby she allegedly had reserved her writer's royalties in her works, but had transferred her musical creations to defendants GBI and Sunbow for them to exploit on her behalf. Plaintiff contends that in recent years she has lost substantial royalties with respect to her works, allegedly as the result of wrongful re-registrations of her work by the named defendants, including defendant BMI, the performing rights

of Frauds.

[2]However, the Court notes that while unorthodox, plaintiff, in her First Amended Complaint under Index Number 5192/00, states in paragraph one thereof that she "repeats and realleges every allegation contained in the Verified Complaint as though fully set forth at length hereat." This Court necessarily finds that plaintiff has not abandoned her claims against defendant Bacal of wrongful re-registrations of her works. This theory of wrongful re-registration is also asserted in plaintiff's Amended Complaint against defendant Sunbow under Index Number 2821/02.

society which monitors, collects and distributes perrormance royalties, either separately or conspiratorially.[3]  Plaintiff also maintains that she wrongfully has been deprived of mechanical royalties and synchronization license fees from the sales of videos, DVD's, cassettes and other products wherein her re-used and/or rearranged compositions were included.

According to defendant Bacal, plaintiff's claims are false and predicated upon misstatements of the relevant facts pertaining to the parties' relationship and agreements.  He adamantly denies plaintiff's claims that any oral working agreement had existed between plaintiff, Bacal and Sunbow, and specifically denies her claim that she had agreed to receive a far lower creative fee for her work than she ordinarily would have received in exchange for additional writer's share rights in her compositions.  Instead, defendant Bacal and his Sunbow and Griffin Bacal, Inc. partner, Thomas Griffin, have submitted supporting affidavits wherein both assert that it was Sunbow's "strictly enforced" general practice, and the industry-wide standard, to require signed work-for-hire agreements from all artistic contributors, including musical composers like plaintiff.  Indeed, Griffin avers that, at his direction, Sunbow did not work with

_____

[3]The Court has no current information regarding the current status of the Court-Ordered arbitration of plaintiff's dispute with BMI.

artists without the requisite written agreement. While Bacal claims that all of the executed work-for-hire contracts were damaged in the January, 1990 Manhattan water main break that had flooded the basement where their business records were stored, Griffin states that he is "certain" that Sunbow had insisted that plaintiff's company execute work-for-hire agreements for all the musical compositions it had delivered to Sunbow for use in the Hasbro T.V. shows, and specifically the JEM Agreement. This meant, according to defendant, that plaintiff, as composer, would have received a flat creative fee for her work, the writer's share of income from the public performance rights in the music (allocated in accordance with contributions to the work) and certain additional payments from the publication of sheet music, arrangements and orchestrations. Bacal and Griffin claim that, with respect to plaintiff, Hasbro, pursuant to its contract with Sunbow, alone owns all other usage rights of plaintiff's works and the underlying copyrights to her compositions. Bacal specifically denies having had any fee negotiations with plaintiff or her company. According to Bacal and Griffin, the payment terms in the work-for-hire agreements that Sunbow had used in the 1980's were comparable to the payment terms in typical work-for-hire agreements.

Defendant Bacal submits that, in addition to the

foregoing establishing that plaintiff does not have a viable cause of action, he is also entitled to dismissal of the complaint because, firstly, plaintiff cannot state a viable cause of action for constructive trust since he claims there is no fiduciary relationship between him and plaintiff, secondly, that plaintiff's claims are time-barred, thirdly, that he has not been enriched by receiving any mechanical royalties or license fees purportedly paid to Sunbow after SONY purchased Sunbow in 1998, and lastly that the alleged oral working relationship between plaintiff and Sunbow is void under the Statute of Frauds.

In support of his above arguments, Bacal avers that he has not, either directly or through Sunbow, ever received any mechanical royalties or license fees for the works in issue.[4] Moreover, Bacal notes that plaintiff's allegations involving mechanical royalties or license fees relating to video and DVD sales is for the period of October 1999 through September 2002, whereas SONY had purchased Sunbow in 1998, more than one year earlier. Since Bacal has not received any monies from Sunbow from the re-use or re-work of plaintiff's compositions in issue, he maintains that there has not been any unjust enrichment and no basis for imposition of a constructive trust.

---

[4]Bacal's income from BMI for public performance royalties during the period of 1995 through 2003 was $11,532.11, according to his Miscellaneous Income tax Returns for 1995 forward.

Moreover, defendant Bacal contends that plaintiff's claims predicated upon an oral working arrangement are barred by the Statute of Frauds and since, as a matter of law, there is no fiduciary relationship between Bacal and plaintiff based merely upon their musical collaborations, particularly where Bacal claims to only have spoken briefly with plaintiff on limited prior occasions, that Bacal is not estopped from arguing that plaintiff's claims are also time-barred under the applicable six year statute of limitations. Bacal maintains that based upon the commencement of this action on August 24, 2000, any claims against Bacal that arose prior to August 24, 1994, clearly are barred, and yet plaintiff complains herein about alleged re-registrations of her compositions in the 1980's when the cue sheets for her compositions were originally submitted to defendant BMI. Plaintiff, according to defendant Bacal, had failed to exercise due diligence at that time to ascertain whether she was receiving the royalties to which she claims entitlement and her claims herein are time-barred.

Sunbow, in support of its motion, argues that plaintiff has taken the legally untenable and internally inconsistent position herein that plaintiff orally had conveyed exclusive rights to Sunbow for it to decide how the compositions she authored for the TV Series would be exploited, notwithstanding that the Copyright Act requires that any such agreement be in writing, and

-7-

that this asserted "working arrangement" entitles her to a portion
of whatever monies Sunbow earns from the exploitation of
plaintiff's musical compositions, in whatever medium. According to
Sunbow, plaintiff's claim, if true, is barred by the Statute of
Frauds, as set forth in General Obligation Law Section 5-701,
subdivision (a), since such agreement, if made, would have been
made in the 1980's and the obligation thereunder to continue to
make royalty payments to plaintiff would have taken longer than one
year to perform. Indeed, defendant Sunbow submits that it is this
very scenario, where a plaintiff surfaces twenty years after an
alleged oral agreement, when witnesses are no longer available and
memories are vague, claiming that a different deal had been made,
that had prompted enactment of the Statute of Frauds. According to
Sunbow, New York law is very clear that oral agreements involving
royalties or commissions based on exploitation of copyrights are
prohibited.

        Since the Statute of Fraud applies here to bar
plaintiff's claims, Sunbow contends plaintiff may not succeed on a
theory of unjust enrichment. While a quantum meruit cause of
action may provide plaintiff with an avenue of relief, Sunbow notes
that plaintiff has not pleaded such cause of action.

        In any event, Sunbow argues that plaintiff would not
otherwise be entitled to pursue a quantum meruit cause of action

because she already has been reasonably compensated for her services consistent with industry standards at the time. According to Sunbow, plaintiff has not established what the market rate was for her TV production song writing services in the 1980's and she cannot demonstrate that she did not receive the "going market rate" for such services. Sunbow observes that plaintiff never asserts nor offers evidence that the alleged working arrangement she had with Sunbow was for the market value paid and she never identifies the specified percentage of profits she allegedly was to have received from all other uses of her compositions.

In further support of its dismissal motion, defendant Sunbow has proffered an affidavit from Helene Blue, a music publisher and administrator for 35 years, wherein she describes the commissioning of television and movie music and evaluates four sample Sunbow Agreements from the 1980's, concluding that they were similar and typical, and not substantively dissimilar to more recent agreements, and opines that "it would be inconceivable for a producer to commission or acquire the rights to use music in an audiovisual work without entering into a written agreement of some sort that secures the rights to the producer;" she states that "producers insist on a work-for-hire agreement ... because works for hire are not subject to the Copyright Act's termination provisions."

Defendant Sunbow further has proffered an affidavit from
Neil Rigby, head of Legal and Business Affairs for TV-Loonland AG,
which had acquired Sunbow from SONY in 2000.    Therein he sets
forth the efforts he and his company have made to locate documents
pertaining to plaintiff, Ford Kinder and /or Kinder & Bryant Ltd.
and  Sunbow,  Griffin Bacal,  Inc.  Starwild Music,  Inc.  and/or
Wildstar Music, Inc., as well as production agreements between
Sunbow and Hasbro.  His efforts have uncovered an unsigned copy of
an agreement between Kinder & Bryant, Ltd. and Sunbow relating to
the JEM television series, and three related letters, two dated in
1986 between plaintiff and Sunbow's legal counsels relating to
"revisions to the JEM Contract and the contract for My Little
Pony." The other letter was between counsel, dated February 9,
1987, relating to a proposed amendment of the JEM Contract.

Also, defendant Sunbow has submitted an affidavit from
Robert C. Harris, an attorney who had represented Sunbow for 15
years, up until its sale in 1998, wherein he avers that he had
drafted and negotiated agreements between Sunbow and various
artists whom Sunbow commissioned to create works and that "it was
always  Sunbow's  practice  to  commission  work  ...,  including
composers of music, on a 'work-for-hire' basis using written
agreements," because Sunbow desired to own all rights in the
television series and movies it was producing for Hasbro and the

-10-

Copyright Act specifies that such agreements be in writing.    He
recalls   having   prepared   several   work-for-hire   agreements
commissioning music from Kinder & Bryant, Ltd.    While he no longer
has client files relating to Sunbow, he reviewed the four sample
agreements submitted herein by Sunbow and believes that he had
drafted all of those agreements.    He specifically states that he
has no recall of Sunbow ever working with an artist except pursuant
to a work-for-hire agreement.

         Similarly, defendant Sunbow has submitted an affidavit
from Carole Weitzman, who had been employed by Sunbow from 1980
through 2001, and was Senior Vice President of Production at the
time she had left its employ.    She relates that the Manhattan water
main break in January, 1990, had caused immense flooding to
Sunbow's sub-basement storage facility, destroying many boxes of
Sunbow documents.       To her knowledge, however, "Sunbow required
every artist that it employed for the TV Series to sign agreements
... referred to as 'work-for-hire' agreements."    She states that
"Sunbow's practice was never to authorize paying an artist unless
he or she had signed an agreement with Sunbow."    Ms. Weitzman avers
that plaintiff "must have signed work-for-hire agreements with
Sunbow.    I know that I would not have authorized payments to her
... if she had not signed such an agreement.    This would have been
contrary to Sunbow's policy."

Sunbow submits "that on the record [it] has now assembled, there is no material issue of fact that Plaintiff signed work-for-hire agreements with Sunbow for the Hasbro TV Series, and under the terms of their agreements she is not entitled to the broad recovery she claims"; indeed, it claims that the "overwhelming evidence shows that the unsigned JEM agreement is a copy of the agreement signed by Plaintiff, the JEM agreement is identical to all the other agreements for the Hasbro TV Series relating to what Plaintiff is entitled to receive from later exploitation of the TV Series or her compositions, which does not include the monies from Sunbow's distribution of the TV Series on videotapes and DVD's ...".[5]

Plaintiff vigorously opposes the motions in all respects and argues that in the circumstances presented that this Court should refuse to address any issues raised by defendants other than the issue of the Statute of Frauds, and that as to that defense it should determine that defendants had waived invocation of same by their failures any time earlier to have raised said defense. Plaintiff argues that not only have defendants waited until the eve

---

[5]Previously, this Court had determined that plaintiff's cause of action for constructive trust was not viable as against defendant Sunbow because it did not have a fiduciary relationship with plaintiff. (Dec. & Ord., 12/15/03). Further, the Court had determined that plaintiff's claims against Sunbow relating to conduct occurring before 1994 are barred by the six year Statute of Limitations. (Dec. & Ord.,1/2/04).

-12-

of trial to invoke this defense, but that the record is replete
with transcript testimony and Interrogatory Responses wherein Bacal
had stated that he was not aware of any written agreements, and
defendants have offered no reasonable explanation for their failure
to have interposed the defense at an earlier time.

In any event, plaintiff contends that the law is well
settled that the Statute of Frauds is not a defense to an action
seeking   imposition   of   a   constructive   trust   and/or   unjust
enrichment.

Were this Court to otherwise find the defense viable,
plaintiff further maintains that her agreement with defendants is
outside the ambit of the Statute of Frauds because, by its terms,
it was capable of being fully performed within one year[6] and was
not subject to the will of a third party.[7]

Furthermore, plaintiff argues that royalty statements
such as those received by plaintiff constitute a writing sufficient
to satisfy the Statute of Frauds and that her full performance of
her obligations which are "unequivocally referable" to the parties'
working relationship also removes this action from the Statute of

---

[6]Said argument is predicated upon evidence that animated TV
series and the commercials upon which many of them were based
were expected to run only for a thirteen-week period of time.

[7]Indeed, plaintiff argues that Sunbow, the production
company, had exercised complete control as to whether to continue
running the series using plaintiff's compositions.

Frauds.

Alternatively, plaintiff suggests that defendants should be equitably estopped from asserting said defense since plaintiff, to her detriment, had relied upon Bacal's promise on behalf of Sunbow and Griffin Bacal that she would receive all of the writer's royalties on her compositions.

Finally, plaintiff argues that were this Court to find that plaintiff may only recover in quantum meruit, the reasonable value of her services must include all writer's royalties attributable to her musical compositions, including mechanical royalties and synchronization license fees.

Firstly, the Court must note that this action has been an intensive study in "all one needs to know about royalties associated with jingle and musical compositions for commercial use." The attorneys are to be commended and thanked for their exemplary lawyering and the skill with which they have made this highly specialized, technical area of law both comprehensible and more user-friendly to a Court with heretofore limited experience in this field.    As the record unfortunately demonstrates, however, even those more learned in the field apparently have differing understandings of the musical registration process and many of the applicable terms of art.

Secondly, while the Court had offered to entertain this

-14-

one final dismissal motion by defendants, it had not been the Court's intention to re-visit specific issues previously decided on prior summary judgment motions, including the issues of whether a fiduciary relationship had existed between Bacal and plaintiff and the related statute of limitations issue. This Court's determinations with respect to those issues are law of the case, and the Court notes that defendant Bacal has offered nothing more herein, other than his self-serving affidavit on this issue regarding the nature of his allegedly limited relationship with plaintiff – he offers nothing new obtained through subsequent discovery which otherwise justifies his having a second bite of the proverbial apple on these issues. Accordingly, defendant Bacal cannot and will not be rewarded herein for arguably making a stronger case this go round on these issues, particularly where this Court previously had admonished Bacal for his less than candid earlier discovery responses.[8]

Nor does this Court find that defendant Bacal correctly contends that the claims for unjust enrichment and constructive trust must be dismissed against him because plaintiff has asserted claims involving mechanical royalties or license fees relating to

---

[8]In any event, the Court still concludes that a triable issue of fact is presented with respect to the nature of plaintiff's relationship with Bacal and specifically whether he had owed a fiduciary duty to her.

video and DVD sales for the period of October 1999 through September 2002, whereas SONY had purchased Sunbow in 1998, more than one year earlier, and Bacal claims that he has not received any monies from Sunbow from the re-use or re-work of plaintiff's compositions in issue.     Firstly regarding this issue, the Court observes that plaintiff has not limited her First Amended Complaint to the time period that defendant Bacal identifies; rather, she seeks "any and all monies received by ... now or in the future until this matter is finally resolved, from the sale and distribution of any products, cd's videos, movies, tapes, or any product whatsoever which utilized music from the compositions set forth above and regardless of the source of any such monies received by defendants." Further, defendant Bacal has not denied indirectly receiving such royalty payments and licensing fees from Sunbow or through his various companies, or that said companies have received such benefits.

Secondly, while plaintiff has not proffered any evidence directly tracing to Bacal personally mechanical royalties or license fees monies acquired through plaintiff's works, she has produced evidence that substantial mechanical royalties and license fees generated by the use of her compositions have been received by

defendant Bacal's various companies, named defendants herein.[9]    As

this Court had noted in a prior Decision and Order, erroneously

dated February 25, 2003,[10] "if plaintiff is able to establish that

Bacal's relationship with his company Sunbow had been such that he

had exercised such complete domination and control thereof that it

may be said that the corporation was in reality a shell or dummy

corporation for Bacal's own purposes, then the Court fails to see

why the Court, to achieve justice, should not permit plaintiff in

essence to pierce the corporate veil, find such an identity between

Bacal and Sunbow that Bacal's relationship with plaintiff is the

same as Sunbow's relationship to plaintiff, and thereby permit

plaintiff to recover any financial benefit that has been wrongfully

conferred upon Sunbow. Cf. Morris v. New York State Department of

Taxation, 82 N.Y.2d 135, 141 (1993); Port Chester Electrical

Construction Corp. v. Atlas, 40 N.Y.2d 652, 656-657 (1976);

International Aircraft Trading Co. v. Manufacturers Trust Co., 297

N.Y. 285, 292 (1948).    This same analysis applies to defendant

Bacal's other companies, defendants Starwild Music BMI and Wildstar

---

[9]Plaintiff claims that despite her repeated requests,
defendants have failed to provide plaintiff with records of
payments received prior to 1999 pursuant to the licensing and
distribution agreements in place

[10]The return of this referenced motion had been March 7,
2003; therefore, the Decision and Order properly could not have
been dated February 25, 2003.

Music ASCAP.

Further with respect to this issue, in a prior Decision and Order, dated September 26, 2002, this Court had noted that a video using plaintiff's work had identified Bacal personally as the executive producer with respect to same and that it had been marketed and sold as recently as February 15, 2001 by Amazon.com.    This Court necessarily finds that defendant Bacal has not demonstrated entitlement to judgment as a matter of law dismissing this aspect of the complaint.

The last issue to be addressed as an urged basis for dismissal is the defense of the Statute of Frauds.    Having carefully considered the parties' respective arguments on this defense, the Court is greatly troubled by the extreme lateness with which defendants have raised this defense.    While it is true that plaintiff had expanded her theories of recovery in this action in November, 2002, as condoned by this Court's granting of her cross-motion to amend her complaint against Sunbow, it must be stated that defendants had notice as early as of that date that plaintiff was claiming entitlement to share in royalties for derivative uses of her jingles and compositions.    Indeed, she specifically pleads in her Amended Complaint that defendant "has received payments from the sale and marketing of videos, movies and CD's and other products which use plaintiff's compositions without compensation due her and that defendants is thereby unjustly enriched to the

detriment of plaintiff."

Thereafter, during her examination before trial in March, 2003, plaintiff had testified about her arrangement with Bacal and Sunbow, specifically her asserted entitlement to performance royalties, mechanical royalties and other considerations for composers, never mentioning that she had a written agreement with defendant Bacal with respect to her works. Notwithstanding her testimony, defendants had failed to raise the defense of the Statute of Frauds, let alone move to move to dismiss based upon same. Nor had defendants raised the Statute of Frauds defense in their answering papers to plaintiff's cross-motion for partial summary judgment, or in their replying papers to their motions for summary judgment, all returnable December 15, 2003, notwithstanding that plaintiff had definitively stated in her November 25, 2003, affidavit that she had "never executed a written contract with GBI, Sunbow, Wildstar or Starwild concerning the music I composed." Nor had defendant Sunbow argued the Statute of Frauds as a basis for dismissal when, just two weeks after the aforementioned failed summary judgment motion, it attempted to have the complaint dismissed based upon an alleged lack of subject matter jurisdiction. Nor is there any indication that defendants had raised this defense at the pre-trial conference held on January 14, 2004. It was not until more than two months thereafter, at the

pre-trial confere__e conducted on March 22, 2004, and after years of litigation and numerous dispositive motion practice, that defendants finally have raised this issue.

Upon all of the circumstances presenting, the Court finds defendants' attempt to interpose said defense at this late date must fail. See CPLR 3211, subd. (e); 23/23 Communications Corp. v. General Motors Corporation, 257 A.D.2d 367 (1st Dept. 1999), lv. to app. den. 93 N.Y.2d 805 (1999); Con-Solid Contracting, Inc. v. Liwak Development Corp., 236 A.D.2d 437 (2nd Dept. 1997); Raoul v. Olde Village Hall, Inc., 76 A.D.2d 319, 333 (2nd Dept. 1980); cf. Bronson v. Potsdam Urban Renewal Agency, 74 A.D.2d 967, 967 (3rd Dept. 1980).

In any event, the Court notes that even were it to have permitted defendants to rely upon the Statute of Frauds and the Court were to find that said defense operates as a bar to plaintiff's claims, as defendants recognize, this would not preclude plaintiff from otherwise recovering from defendants on a theory of quantum meruit, at least to the extent that plaintiff's claims are not otherwise barred by the statute of limitations. Defendants concede that all of the elements of such claim, save the element of plaintiff's establishing the reasonable value of her services, have been established.

The Court finds, however, that plaintiff has offered

some evidence supporting her claim that she is entitled to allegedly wrongfully withheld performance royalties in excess of $238,000.00 and that the value of her services in the 1980's includes fifty percent of the publishing royalties, as evidenced by a copy of a written agreement she had with another company wherein she had retained 50% of the publishing royalties. Additionally, she has quoted both Donald S. Passman, an author of "All You Need to Know About the Music Business," as well as a supposed treatise on the music industry, entitled "This Business of Music: The Definitive Guide to the Music Industry," by Krasilovsky and Shemmel, wherein it is stated that a songwriter's customary share is 50% of the publisher's net collections, which includes mechanical and synchronization income that plaintiff seeks to recover.

        While defendant Sunbow aptly notes that there are critical differences between the nature of Bryant's relied upon agreement, which is for a one-time record album, as compared to music for an on-going television series, the matter here in issue, as well as other critical payment differences, which renders this agreement insufficient to establish the market value of plaintiff's song writing services for television in the 1980's, the Court finds that plaintiff has sufficiently raised a triable issue of fact regarding same.

Parenthetically, the Court notes that in its replying memorandum, Sunbow clarifies that it agrees that is obliged to pay plaintiff a royalty fo 50% of the net profits from licenses to third parties of mechanical or synchronization rights.   Sunbow does not agree, however, that the licenses that were made for the distribution of the television shows in videocassettes and DVDs is an exercise of such right since, from its view, a mechanical license refers only to the right to reproduce and distribute non-dramatic musical works, such as CDs and audiotapes.   Also, according to Sunbow, the synchronization license requires payment to plaintiff only where plaintiff's song is synchronized into a film exhibited in movie theaters.   Accordingly, defendant Sunbow maintains that the dramatic TV series and the videocassettes and DVD recordings of the TV series, are not subject to mechanical royalties and synchronization licenses.

Finally, Sunbow's request pursuant to CPLR 3103, subdivision (c), that plaintiff be precluded from introducing at trial any and all documents improperly obtained is reserved for determination at trial.   It would, of course, behoove plaintiff, if she has not already done so, to forthwith provide defendants with full disclosure relating to these documents which allegedly have been improperly obtained.

There are to be no further motions in this action.   The

parties shall appear, as previously scheduled, for trial at 9:30 a.m. on June 2, 2004.  This date will not presently be adjourned. Any party's failure to appear may result in the imposition of costs and/or sanctions.

Dated: May 26, 2004
       New City, New York


_____
ANDREW P. O'ROURKE
J.S.C.


Duane Morris LLP
Atty. for Deft. Bacal
380 Lexington Avenue
New York, New York 10168

Patterson, Belknap, Webb & Tyler LLP
Attys. For Deft. Sunbow
1133 Avenue of the Americas
New York, New York 10036-6710

Monaghan, Monaghan, Lamb & Marchisio
Attys. for Pltf.
150 West 55th Street, Suite 1G
New York, New York 10019

# DECISION AND ORDER

**To commence the statutory
period of appeals as of right
(CPLR 5513[a]), you are advised
to serve a copy of this order,
with notice of entry, upon all
parties.**

```
SUPREME COURT OF THE STATE OF NEW YORK
IAS PART, ROCKLAND COUNTY

Present:   HON. ANDREW P. O'ROURKE
           Supreme Court Justice
```

--------------------------------------------X

ANNE BRYANT,

                                          **Plaintiff,**

        -against-

BROADCAST MUSIC INC., (a/k/a "BMI"),
CLIFFORD A. "FORD" KINDER, KINDER &
CO., LTD., VADIVOX, LTD., JULES M.
"JOE" BACAL, GRIFFIN BACAL, INC.,
STARWILD MUSIC BMI, WILDSTAR MUSIC
ASCAP, SUNBOW PRODUCTIONS, INC. AND
JOHN AND JANE DOES 1 - 10,

                            **Defendants.**

Index No. 5192/00
Motion Date: 12/5/03

--------------------------------------------X

ANNE BRYANT,

                                       **Plaintiff,**

        -against-

SUNBOW PRODUCTIONS, INC.,

                                  **Defendant.**

Index No. 2821/02

--------------------------------------------X

      The following papers numbered 1 to 26 were read on this
motion by defendant Jules M. Bacal for an Order granting summary
judgment dismissing this action, and on this motion by defendant
Sunbow Productions for an Order granting summary judgment
dismissing this action, and on this cross-motion by plaintiff for

-1-

an Order granting _ar partial summary judgment.

**Papers Numbered**

```
Notice of Motion - Affidavits (Tannenbaum, Bacal) -
  Exhs. (B-H) ............................................. 1 - 4
Notice of Motion - Affidavits (Weitzman, Smith) -
  Exhs. (1-2) - Affirmation (Kitson) - Exhs. (A-K) ........ 6 - 11
Notice of Cross-Motion -Affidavit (Bryant) - Exhs. (A-U) -
  Affirmation (Monaghan) - Exhs. (A-G) ................... 13 - 17
Answering/Replying Affirmation (Tannenbaum) - Exhs. (A-B). 19 - 20
Answering/Replying Affidavit (Rigby) - Exhs. (A-F) -
  Affirmation (Phares) - Exhs. A-J) ..................... 22 - 25
Memoranda of Law ....................................... 5,12,18
                                                           21,26
```

Upon the foregoing papers, it is Ordered and adjudged that these motions are disposed of as follows:

The relevant background facts of these actions previously have been set forth in a number of prior Court Decisions and Orders. Basically, plaintiff asserts a loss of royalty income over recent years from a number of her created musical arrangements, compositions and jingles, allegedly as the result of wrongful re-registrations of her work by the named defendants, either separately or conspiratorially.

Defendant Broadcast Music, Inc. ("BMI") is a performing rights society, comprised of publisher members and writer members, which licenses to third parties rights to the musical works of its members. BMI registers its members' works in catalogs, and monitors and collects royalty payments due to its writers and publishers and distributes same to them pursuant to a formula which

-2-

recognizes the respective parties' contribution to the particular
compositions.

Defendant Sunbow Production Company ("Sunbow") is a
television production company which, from 1980 until approximately
1998, had been owned by defendant Joe Bacal and Tom Griffen.
Sunbow had registered the musical compositions used in its
television productions with BMI so that the various writers and
publishers of those compositions could be paid the royalties to
which they are entitled.  Payment of royalties is effected through
the use of cue sheets which list the television producer for the
particular episode, the air date for the episode, the title given
to each musical compositions used in the episode, the writer(s) and
publisher(s) of each individual composition used in the episode and
their respective shares of the public performance royalties for
each composition used.    The cue sheets thereafter would be
submitted to BMI by music administrators.

Griffen and defendant Bacal at this time also had been
partners in an advertising agency, Griffen Bacal, Inc., which was
responsible for writing musical compositions for commercials.  At
a certain time, plaintiff had been employed by Griffen Bacal, Inc.

Following extensive motion practice, the single cause of
action pleaded against defendant Bacal in the Amended Complaint
under Index No. 5192/00 and against Sunbow in the Amended Complaint

-3-

under Index No. 28. ./02 is for unjust enrichment and imposition of a constructive trust and accounting. Both defendants are now separately moving for summary judgment dismissing this sole remaining claim. Their respective arguments are similar to the extent that they both argue that plaintiff's allegations with respect to the 48 specific works that plaintiff has identified as being here in issue are either time-barred pursuant to the applicable six-year statute of limitations, or must be dismissed based upon the documentary proof which establishes that, contrary to plaintiff's theory, there had not been any re-registration of the work since the time that BMI first accepted the registration thereof in the 1980's, or must be dismissed based upon the documentary proof which establishes that plaintiff is mistaken in her claims because the cue sheets establish that she in fact is receiving the full percentage shares for which she is entitled, and therefore neither defendant could not have been unjustly enriched, or must be dismissed based upon the documentary proof which establishes that for most of plaintiff's registered works Bacal is not listed as receiving a percentage and therefore could not have been unjustly enriched, or must be dismissed because plaintiff lacks standing to assert claims of injury to parties other than herself.

In an affidavit submitted by Sunbow in support of its

-4-

motion for summary judgment, Sunbow's former production assistant
and later vice president of production, Carole Weitzman, avers that
she was responsible for maintaining copies of the BMI submitted cue
sheets and "to the best of [her] knowledge, [she has] never
submitted a cue sheet of any other type of form to BMI that sought
to change the amount of royalties that Plaintiff would receive for
her compositions." Additionally, she has "no knowledge of anyone
else at Sunbow or on Sunbow's behalf ever submitting a cue sheet or
other form to BMI seeking to reduce the amount of royalties the
Plaintiff would receive for any of her compositions."

Bacal also has submitted in support of his motion an
affidavit from Alison Smith, presently Senior Vice President of
BMI, who has worked at BMI since 1985. Ms. Smith oversees the
process by which BMI pays out royalties to its affiliated
songwriters, composers and music publishers, and she investigates
questions of problems with respect to same. According to Ms.
Smith, unless BMI is notified in writing otherwise as to a
different distribution, BMI allocates royalties collected to its
affiliates by giving 100 percent of the writers' share to the
writers of the composition and 100 percent of the publisher's share
to the publishers, so that the total performance royalties
available for a particular composition equal 200 percent. If there
are multiple writers for a single composition, usually the cue

-5-

sheet would specify how much goes to each; if tne cue sheet does not indicate any specific distribution, BMI would equally divide the royalty.

A catalog is published by BMI which lists all compositions that are registered, including those by the use of cue sheets. At times, Ms. Smith admits that mistakes occur in the catalog to the extent that there may be multiple entries for the same composition used on the same day. Her examination of plaintiff's catalog reveals that mistakes have occurred in plaintiff's catalog whereby multiple listings inadvertently appear for a single composition.

Ms. Smith avers that she had met with plaintiff and her counsel in October, 2000, at which time they had reviewed "hundreds of cue sheets that had been submitted to BMI by or on behalf of Sunbow in the 1980's for television episodes in which her compositions had been used." Plaintiff thereafter had been sent copies of the cue sheets, along with a copy of her catalog. According to Ms. Smith, a comparison of the writer's royalty shares listed for plaintiff on these cue sheets with the writer's royalty shares listed for BMI's then-current BMI catalog "demonstrated to plaintiff that there had been no change to her share of the writer's royalty for the compositions in her catalog." While there were entry dates listed in June, 1993, for compositions in

-6-

plaintiff's catalog which plaintiff asserts evidence that her writer's shares were reduced for those compositions on those dates, Ms. Smith explains BMI had changed computer systems on that date, which caused an entry "change" on that date, but that "the writer's royalties for her compositions did <u>not</u> change on this date."

Furthermore, Ms. Smith avers that BMI has a process for changing the writer's share on a composition which is already listed with BMI and that is to request documentation or confirmation from all of the affected persons before changing its records to reflect any new change as to writer's percentages. As to plaintiff's works which are here in issue, Ms. Smith states that BMI has not located any cue sheets or registration forms submitted to it after the original cue sheets or registration forms for those compositions which purport to make any writer's share changes.

Both moving defendants have submitted charts which list each of the compositions which plaintiff has identified as being in issue in these cases, along with a statement of plaintiff's allegation as to wrongful conduct involving the identified composition and a synopsis of why, according to defendants, summary judgment dismissing any claim with respect to that identified composition is warranted.

Plaintiff vigorously opposes both defendants' motions and has attempted to cross-move for partial summary judgment. The

-7-

Court, however, will not accept plaintiff's untimely motion for substantive consideration.  It had been made clear to all parties that summary judgment motions, in this long protracted action, were to have been served by September 30, 2003. Plaintiff not only had failed to request prior permission from the Court for the making of her untimely motion for summary judgment, but she has offered herein no explanation or excuse for her two month delay in making her motion.  Her papers shall therefore be considered only as opposition to defendants' motions.

Essentially, plaintiff maintains that defendants have attempted to portray the claims and issues presented in an overly simplified matter where instead complex factual issues abound. Moreover, plaintiff submits that defendants' entire presentations exclusively address the issue of plaintiff's entitlement to performance royalties and that they have failed to address plaintiff's further claims that she is entitled to mechanical royalties and synchronization, as well.[1]  According to plaintiff, it is inaccurate to view this matter, as defendants have done, as involving 48 of plaintiff's compositions where instead it is more

---

[1]Mechanical royalties are royalties paid on sales of music reproduced and sold on records, cassettes and compact discs, as distinguished from performance royalties which are based upon public performances of songs on radio, television and the like. Synchronization licensing fees are paid in exchange for a license to use a copyrighted composition in "timed-relation" or synchronization with an audiovisual work.

-8-

accurate to view the matter as involving 7 compositions - one for Transformers, GI Joe, JEM, My Little Pony, Visionaries, Inhumanoids and Robotics, all with subsequent numerous derivative uses, re-uses and arrangements.

Moreover, it is entirely misleading, plaintiff contends, for defendants to simply compare the cue sheets submitted to BMI by Sunbow with BMI's catalog to establish, as they contend, that no reduction in plaintiff's royalties has occurred. Plaintiff notes that BMI creates its catalog based upon submissions from production companies, i.e., Sunbow, and here the cue sheets submitted by Sunbow were wrong and not reflective of the agreements she had with Bacal and Griffen Bacal Inc.

Plaintiff has submitted evidence which she claims demonstrates that defendants had filed BMI Clearance Forms that diluted the percentage of royalties attributed to plaintiff for her compositions and that by filing such defendants simply took plaintiff's composition, gave it a new name, and thereupon wrongfully took claim to the performance royalties. Other times, plaintiff maintains, the evidence establishes that defendants had re-registered plaintiff's compositions, diluting or vitiating her royalty allocation, through the use of cue sheets, which cue sheets plaintiff argues she had no involvement with and are properly only used to register music when the composition is composed

-9-

specifically for a television production, which is not her situation; all of plaintiff's music in issue having been composed as jingles for television commercials. A comparison of plaintiff's early royalty statements with later statements or BMI catalog entries for re-uses of plaintiff's compositions appears to support plaintiff's claim that her royalties have been diminished. By altering royalty allocations on cue sheets, plaintiff submits that defendant Sunbow had effected changes in the original registration of her works and saved on production costs by not having to pay what are called creative fees to those persons who subsequently used plaintiff's compositions in a re-arrangement. Plaintiff claims that she never had given approval to royalty changes for any of her compositions and that she had never been notified by defendants that others would be receiving a percentage of royalties originally allocated to plaintiff.

With respect to her additional claims seeking mechanical and synchronization fees, plaintiff contends that the evidence demonstrates that Sunbow has been paid $2,471,868.61 in mechanical royalties and/or synchronization licenses from Rhino Entertainment for video and DVD sales during the period of October, 1999 through September, 2002, that plaintiff is the owner of the compositions prominently used in these videos and DVDs, that she has never been paid any fees for the use of her compositions and that she

-10-

therefore is entit .d to a constructive trust on the sum paid by Rhino to Sunbow.

Plaintiff further insists that, contrary to defendants' contentions, she is entitled to pursue her claims regarding re-registrations of three Visionaries works attributed to Ford Kinder because of her 1994 legal settlement with Kinder in which it had been contractually agreed that she would be entitled to his royalty shares with respect to such works.  Accordingly, she argues here that the three compositions in which Kinder's royalty shares were improperly reduced consequently diminishes the amount of royalties to which plaintiff is entitled.

Finally, it is plaintiff's position that defendants should be equitably estopped from asserting a defense based upon the statute of limitations because, as previously found by this Court, there was a confidential relationship between plaintiff and Bacal, wherein Bacal had a duty to disclose to plaintiff wrongful conduct which diminished her royalty rights and that his failure to have done so, where it "is virtually impossible for Bacal not to have known that he was given a new or larger share of certain compositions, and that this would negatively affect Bryant's royalties," estops him from asserting that plaintiff's claims are time-barred, particularly since plaintiff commenced action within a reasonable time after first learning that she had a cause of

-11-

action.

Similarly, since the re-registrations of plaintiff's works had been effected through cue sheets submitted by Sunbow, Bacal's production company, and Sunbow had carte blanche with respect to musical compositions that had been created specifically for Griffen Bacal Productions, also owned by Bacal, plaintiff claims that "Bacal had treated Sunbow and GBI as one and the same entity, which he clearly controlled, dominated, and operated for his personal gain" and the fiction of Sunbow's corporate entity should be disregarded, so that Sunbow to should be equitably estopped from asserting a statute of limitations defense.

By way of their replies, defendants make several arguments. Firstly, defendants contend that plaintiff has altered her theory of liability from initially claiming that she had written compositions for Sunbow, a TV and movie production company, to instead arguing that the seven musical jingles that she had written were for Griffen Bacal Inc, an advertising company, and that her works here in issue are derivative works of those seven jingles, and that when the musical compositions for the TV series were registered with BMI there had been an unauthorized change in the percentage of performance royalties.

They further contend that plaintiff has failed to come forward with any proof supporting her bald assertion that her

jingles and compositions are the derivative source of the
compositions for which she claims she is entitled to share in
royalties.

Further, it appears that defendants have hit upon what
they argue is a major flaw in plaintiff's theory, that being that
plaintiff, contrary to her position, is not the copyright owner of
her jingle works, since same were created for hire; therefore, they
submit that she is not entitled to any apportion of royalty
interests for the claimed derivative works.

Defendant Bacal also argues that plaintiff is mistaken in
her claim that certain works have been excluded or removed from her
catalog because the BMI catalog does not list commercial jingles
written prior to the late 1990's and that "none of the jingles
addressed by Bryant were ever in her BMI catalog."

Additionally, defendant Sunbow argues that it is not
bound by this Court's earlier determination that there had existed
a fiduciary relationship between Bacal and plaintiff because it had
not had an opportunity to be heard at the time that issue was
presented to the Court and, in any event, that evidence now
establishes that theirs was actually in the nature of a
conventional business relationship (plaintiff's relationship with
him was that his companies were clients of companies for which she
had worked or where she had been a principal, i.e. Kinder and

-13-

Bryant) and contracts between plaintiff's company and Sunbow, which
had been negotiated by counsel, had existed between them.
Moreover, defendant Sunbow insists that plaintiff merely glosses
over the fact that Sunbow was a corporate entity separate from
Bacal and argues that plaintiff has made no showing that it is
appropriate to pierce the corporate veil.

Initially, the Court finds that defendant Bacal has
failed to establish entitlement to judgment as a matter of law
dismissing plaintiff's claims which are alleged to be time-barred.
It is well settled that a defendant may be precluded from pleading
the statute of limitations as a defense where the plaintiff had
been induced by fraud, misrepresentations or deception from filing
suit.  Simcuski v. Saeli, 44 N.Y.2d 442, 448-449 (1978); Herman v.
Depinies, 273 A.D.2d 146 (1st Dept. 2000).  While ordinarily the
doctrine requires proof of an actual misrepresentation, if a
fiduciary had concealed facts which he was required by virtue of
his relationship to disclose, and the plaintiff had relied upon the
non-disclosure and based thereon had delayed suit, a defendant may
properly be estopped from asserting that the plaintiff's late filed
claims are time-barred. See  (1st Dept. 2003); Gleason v. Spota, 194
A.D.2d 764 (2nd Dept. 1993); Powers Mercantile Corp. v. Feinberg,
109 A.D.2d 117, 122 (1st Dept. 1985), affd. 67 N.Y.2d 981 (1986).
The doctrine does not properly apply, however, where a plaintiff

-14-

possesses timely knowledge sufficient to place him under a duty to inquire and ascertain the relevant facts. See <u>Contento v. Cortland Memorial Hosp.</u>, 237 A.D.2d 725 (3rd Dept. 1997), lv. to app. den. 90 N.Y.2d 802 (1997); <u>Greene v. Abbott Laboratories</u>, 148 A.D.2d 403 (1st Dept. 1989); <u>Gleason v. Spota</u>, <u>supra</u>; <u>Melvor v. DiBenedetto</u>, 121 A.D.2d 519 (2nd Dept. 1986).

Here, this Court previously had determined that a relationship of trust and confidence had existed between plaintiff and Bacal. Clearly, discovery has since transpired which may, as defendant Bacal argues, limit that earlier determination. Therefore, the Court finds that a triable issue of fact is presented as to whether a confidential fiduciary relationship had existed between plaintiff and Bacal with respect to any of the works here in issue, whether Bacal had failed to disclose to plaintiff that which he was obligated to disclose with respect to diminished royalties and whether plaintiff had been in possession of sufficient facts by virtue of her having received periodic statements and royalty payments which had imposed upon her the duty to inquire earlier. See <u>Nick v. Greenfield</u>, 299 A.D.2d 172 (1st Dept. 2002); <u>Thompson v. Whitestone Savings and Loan Association</u>, 131 A.D.2d 749, 751 (2nd Dept. 1987).

The Court further finds, however, that plaintiff has woefully failed to demonstrate that it is appropriate to pierce the

-15-

corporate veil and find that Bacal's identity was one with his production company Sunbow, which of course otherwise had no confidential relationship to plaintiff, so as to render Sunbow potentially liable for alleged wrongdoings which otherwise would be time-barred. Accordingly, the Court finds that any and all claims against Sunbow for alleged wrongdoings which pre-date six years before the commencement of the action against Sunbow in 2002 are time-barred and hereby dismissed.

The Court also rejects at this time defendants' contentions that plaintiff lacks standing to assert any diminishment of royalty rights of her former partner Kinder since she, by virtue of her prior settlement with Kinder, had stepped into his shoes and inherited his rights with respect to those musical compositions. Summary judgment as to those claims is therefore also denied.

As to the substantive merits of defendants' summary judgment motions, the Court, after careful review of the record at bar and the parties' respective arguments, finds that the issues presented are highly complex, even more so than originally thought, and that the evidence presented and pertaining to this unique industry is, on the whole, seemingly contradictory and confusing; consequently, the Court finds that there exists triable issues of fact which preclude outright dismissal of the non-time-barred

claims.

Initially in this regard, the Court notes, contrary to defendant Bacals' contention that plaintiff has failed to offer any proof that the additional works for which she seeks royalties had derived from her jingles or compositions, that as the movant for summary judgment, the burden had been on Bacal - not plaintiff- to remove all triable issues of fact. Here, the Court finds that Bacal has not submitted any evidence establishing that the compositions in question were not derived from plaintiff's original jingles or compositions, and thus he is not entitled to summary judgment on this basis.

The Court finds that plaintiff has submitted sufficient evidence of allegedly improper re-registrations of her work, through a comparison of original BMI royalty statements with later statements of catalog entries for re-uses of the same composition showing a diminishment in her royalty share or in no credit at all being given to her for compositions for which she originally had been receiving 100 percent of the royalties, and that improper credit may be being given to Bacal and/or Kinder and/or others with respect to works for which she has demonstrated entitlement to 100 percent of performance royalties and that Bacal appears to be receiving shares of royalty credit for compositions authored by plaintiff on which he previously had received no royalties.

-17-

Defendants therefore have failed to establish entitlement to judgment as a matter of law with respect to plaintiff's claims pertaining to performance royalties.

The Court also finds that a triable issue of fact is presented with respect to whether plaintiff has any copyright rights in the musical compositions used for the TV shows and whether she is entitled to any royalties with respect thereto. While defendants have addressed this issue at length in their respective replying memoranda of law, same appears to not have been raised in their initial briefs and plaintiff has not been afforded the opportunity to respond to same. The function of a reply is to address arguments made in opposition to the movant's position and not to afford the movant to introduce new arguments in support of his motion. See Lumbermens Mutual Casualty Company v. Morse Shoe Company, 218 A.D.2d 624, 625 (1st Dept. 1995); Azzopardi v. American Blower Corp., 192 A.D.2d 453 (1st Dept. 1993).

With respect to plaintiff's claims that she is owed mechanical royalties and synchronization, the Court finds that, notwithstanding that Bacal had sold Sunbow in 1998 and plaintiff alleges that Sunbow has been profiting from mechanical royalties and synchronization license fees beginning in 1999, that there still exists an issue of fact as to whether Bacal nevertheless improperly is receiving monies from these other mediums using

-18-

derivatives of plaintiff's work product, which properly belong to plaintiff.    Contrary  to  defendant's  claim  that  this  issue  of mechanical  royalties  and  synchronization  license  fees  is  newly contrived  by  plaintiff,  plaintiff  had  asserted  in  her  amended complaint that "defendants ..., including defendant Bacal, ..., have  received  payments  from  the  sale  and  marketing  of  videos, movies,  and  CD's  and  other  products  which  use  plaintiff's compositions,  without  compensation  due  her,  and  defendants  are thereby  unjustly  enriched  to  the  detriment  of  plaintiff."

The parties are reminded that these actions are scheduled to be heard in the Mediation Part, at 10:00 a.m. on January 14, 2004, with a scheduled trial date of February 23, 2004.   These dates may not be changed without the Court's consent.   Any party's failure  to  appear  may  result  in  the  imposition  of  costs  and/or sanctions.

Dated: December 15, 2003
       New City, New York

_____
ANDREW  P.  O'ROURKE
J.S.C.

-19-

Duane Morris LLP
Atty. for Deft. Bacal
380 Lexington Avenue
New York, New York 10168

Patterson, Belknap, Webb & Tyler LLP
Attys. For Deft. Sunbow
1133 Avenue of the Americas
New York, New York 10036-6710

Monaghan, Monaghan, Lamb & Marchisio
Attys. for Pltf.
150 West 55th Street, Suite 1G
New York, New York 10019

-20-

Exhibit E

# DECISION AND ORDER

To commence the statutory time
period of appeals as of right
(CPLR 5513[a]), you are advised
to serve a copy of this order,
with notice of entry, upon all
parties.

> FILED AND ENTERED
> ON_____2004
> ROCKLAND
> COUNTY CLERK

SUPREME COURT OF THE STATE OF NEW YORK
IAS PART, ROCKLAND COUNTY

FILED - MK

Present: HON. ANDREW P. O'ROURKE
        Supreme Court Justice

JAN 2 3 2004    9-

ROCKLAND COUNTY
CLERK'S OFFICE

-------------------------------------------------X

ANNE BRYANT,

                              Plaintiff,

        -against-

                                          Index No. 5192/00
                                          Motion Date: 1/16/04

BROADCAST MUSIC INC., (a/k/a "BMI"),
CLIFFORD A. "FORD" KINDER, KINDER &
CO., LTD., VADIVOX, LTD., JULES M.
"JOE" BACAL, GRIFFIN BACAL, INC.,
STARWILD MUSIC BMI, WILDSTAR MUSIC
ASCAP, SUNBOW PRODUCTIONS, INC. AND
JOHN AND JANE DOES 1 - 10,

                              Defendants.
-------------------------------------------------X
ANNE BRYANT,

                              Plaintiff,

        -against-

SUNBOW PRODUCTIONS, INC.,

                              Defendant.
-------------------------------------------------X

        The following papers numbered 1 to 14 were read on this motion
by defendant Sunbow Productions, Inc. for reconsideration and
clarification of the Court's December 15, and 24, 2003, Decision and
Orders, and on this cross-motion for an Order granting modification of
this Court's December, 2003 Decision and Order.

Notice of Motion  - Affirmation (Jennings) - Exhs. (A - J)..... 1 - 3
Notice of Cross-Motion - Affirmation (Monaghan) - Exhs. (A-F).. 5 - 7
Answering/Replying Affirmation.(Phares) - Exh. (A-B) .......... 9 - 10
Answering Affidavit (Tannenbaum) - Exhs. (A-B) ................ 11 - 12
Replying Affirmation (Monaghan) ............................... 14

BOOK 98 PAGE 0429

Memoranda of Law .................................. 4,8,13

Upon the foregoing papers, it is Ordered that these motions are disposed of as follows:

Defendant Sunbow's motion for "reconsideration and clarification" of this Court's December 15, and 24, 2003, Decision and Orders is denied. The Court is unaware of any authority for such relief and, to the extent that what defendant seeks is actually reargument of those Decisions and Orders, the Court finds that defendant has failed to demonstrate that this Court, in reaching its prior Decision and Order, had misapprehended any of the relevant facts or had misapplied any controlling principal of law. See CPLR 2221, subd. (d), par. 2; Pro Brokerage Inc. v. Home Insurance Co., Inc., 99 A.D.2d 971 (1st Dept. 1984); Foley v. Roche, 68 A.D.2d 558, 567 (1st Dept. 1979). Indeed, it is notable that defendant does not even set forth the proper standard of review, and instead merely attempts to get a second bite at the proverbial apple and have this Court once again consider the very same arguments that had been asserted by defendant at the time of the original motion and rejected.

Defendant's protestations to the contrary notwithstanding, this Court previously determined in its December 24, 2003, Decision and Order, that plaintiff is not seeking relief within the exclusive ambit of the Copyright Act. While defendant continues to maintain a contrary position, its recourse is to take an appeal of this Court's earlier Decision and Order.

BOOK 98 PAGE 0430

To the extent that defendant is seeking to have this Court herein review and determine whether the submitted JEM Agreement is illustrative of the destroyed, original written agreements that plaintiff had for TV shows and, if so, whether plaintiff is entitled thereunder to the payments she seeks, the Court finds that defendant has not demonstrated entitlement to any declaration that the JEM Agreement is representative of the terms of all agreements plaintiff had with Sunbow with respect to TV shows and that, as previously stated by this Court in its December 24th Decision and Order, the scope and terms of the parties' work relationship and their agreements shall properly be the subject of inquiry and examination at trial.

Having previously determined that this Court has subject matter jurisdiction of plaintiff's claims, it rejects defendant's proposal herein that the Court conduct, prior to the full trial, a framed issue hearing as to whether plaintiff can "prove a set of facts that do not implicate any copyright issues that establish the terms of a contract under which she is entitled to all the royalties she claims."

Addressing the cross-motion, the Court, in the exercise of its discretion, grants same to the extent that it finds, under all of the circumstances presenting and in the interests of justice, that it must re-visit its earlier interlocutory Order which had determined that all of plaintiff's claims against Sunbow which pre-dated six years before the commencement of this action in 2002 are time-barred and dismissed. See Liss v. Trans Auto Systems, Inc., 68 N.Y.2d 15, 19 (1986); General

-3-

Electric Real Estate Equities, Inc. v. Bell Realty Management, Inc., 291 A.D.2d 313, 314 (1st Dept. 2002); Matter of Budihas v. Board of Education of City of New York, 285 A.D.2d 549, 550 (2nd Dept. 2001); Matter of Estate of Burns, 228 A.D.2d 674, 675 (2nd Dept. 1996), lv. to app. dsmd. 98 N.Y.2d 765 (2002).   This Court is not persuaded that plaintiff's failure to have raised this issue in a more timely manner or to have sought reargument from this Court's prior Decision and Order that had been issued in March, 2003, and which first had referenced 2002 as the relevant date for statute of limitation purposes, requires, as defendant earnestly contends, the outright rejection of plaintiff's request for relief at this time.

Upon reconsideration, the Court finds that, in previously having stated that 2002 was the year of commencement of the action against Sunbow and thus the relevant date for statute of limitations analysis, the Court inadvertently had overlooked the fact that Sunbow had been served with process in the initial action commenced in 2000, wherein it had defaulted[1], and that by subsequent Court Order the action commenced against Sunbow in 2002 had been consolidated with the earlier action "under the first filed action."

While plaintiff properly should have raised this issue much earlier, nevertheless, upon equitable considerations and this Court's

---

[1] Plaintiff had been forced to commence a subsequent separate action against Sunbow since she had not timely moved for entry of a default judgment against Sunbow within one year of its default and her delay could not be reasonably excused.

BOOK    98 PAGE 0432

attempt to do full and complete justice, it accordingly finds that plaintiff is entitled to have the statute of limitations measured from the time the original action had been commenced; therefore, Sunbow properly is entitled to dismissal on statute of limitation grounds only those claims which pre-date six years before the commencement of the original action in 2000. Any heretofore erroneously dismissed claims of plaintiff are hereby re-instated.

The trial shall take place at 9:30 a.m. on March 22, 2004. This date may not be changed without the Court's consent. Any party's failure to appear may result in the imposition of costs and/or sanctions.

```
┌─────────────────────────┐
│  ENTERED                │
│  JAN 2 9 2004   A.M.    │
│                  P.M.   │
│  Edward Gorman          │
│  County Clerk Rockland  │
└─────────────────────────┘
```

Dated: January 22, 2004
       New City, New York


                    ANDREW P. O'ROURKE
                         J.S.C.



To:  Patterson, Belknap, Webb & Tyler LLP
     Attys. For Deft. Sunbow
     1133 Avenue of the Americas
     New York, New York 10036-6710                BOOK  95 PAGE 0433

                            -5-

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK        )
                               :ss.:

COUNTY OF NEW YORK     )

        MATTHEW M. FINNEGAN, being duly sworn, deposes and says:

        1.     I am over 18 years of age, not a party to this action, and am employed by the law firm of Patterson, Belknap, Webb & Tyler LLP, located at 1133 Avenue of the Americas, New York, New York 10036.

        2.     On July 28, 2006, I caused the foregoing **REPLY AFFIRMATION OF GLORIA C. PHARES IN SUPPORT OF SUNBOW PRODUCTIONS, INC.'S MOTION TO REARGUE UNDER CPLR R 2221(a)** to be served upon the following attorneys for the parties herein by overnight courier service (Federal Express), directed to them at the addresses below:

        Patrick J. Monaghan, Esq,
        Monaghan, Monaghan, Lamb & Marchisio
        28 W. Grand Avenue, 2nd Floor
        Montvale, NJ 07645

        Judith M. Saffer, Esq.
        BMI, Inc.
        320 West 57th Street
        New York, NY 10019-3790

                                      MATTHEW M. FINNEGAN
                                      Lic. No. 0955687

Sworn to before me this 28th
day of July, 2006

Notary Public

JACQUES LYSIUS
Notary Public, State of New York
No. 01LY6057658
Qualified in Kings County
Certificate Filed in New York County
Commission Expires April 30, 2007