# EXHIBIT 89

# EXHIBIT D

1

```
 1                    (EXPEDITED COPY)

 2               Continuing Bench Trial
                        (Day 5)
 3
                                    December 6, 2006
 4                                  9:30 AM
                                    40 Gleneida Avenue
 5                                  Putnam County Office
                                     Building
 6                                  Carmel, New York

 7
         BEFORE:  HON. ANDREW P. O'ROURKE
 8                    Presiding Supreme Court Justice

 9

         SUPREME COURT OF THE STATE OF NEW YORK
10       COUNTY OF ROCKLAND
                                              X
11       _____

         ANNE BRYANT
12                                   Plaintiff

13       - versus -                         Index No.
                                             5192/00
14       BROADCAST MUSIC, INC., (a/k/a "BMI"),
         FORD KINDER, KINDER & CO., LTD., VADIVOX, INC.,
15       JULES M. "JOE" BACAL; GRIFFIN BACAL, INC.,
         STARWILD MUSIC BMI, WILDSTAR MUSIC ASCAP,
16       SUNBOW PRODUCTIONS, INC.,
                                   Defendants
17       _____  X

18       ANNE BRYANT
                                   Plaintiff
19                                   Index No.
         - versus -                   2821/02
20

21       SUNBOW PRODUCTIONS, INC.,
                                   Defendant
22

23       _____
                      Laurie Hardisty, RMR
24               Official Court Reporter
            44 Gleneida Avenue, Carmel, NY 10512
25                 (845) 225-3641 Ext. 294
```

2

```
 1        APPEARANCES:    PATRICK J. MONAGHAN, JR., ESQ.,
                            and MICHAEL KORIK, ESQ., Co-counsel
 2                        Monaghan, Monaghan, Lamb &
                            Marchisio, Esqs.
 3                        Attorneys for Plaintiff

 4

 5                        GLORIA C. PHARES, ESQ.,
                            and JOHN C. KNAPP, ESQ., Co-counsel
 6                        Patterson, Belknap, Webb & Tyler, Esqs.
                          Attorneys for Defendant Sunbow

 7

 8

 9                        JUDITH SAFFER, ESQ.,
                          and JOHN COLETTA, ESQ.,
10                        Co-counsel BMI Legal Department

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                    THE COURT:  We're prepared to go forward,

 2          Counselor?

 3                    MR. MONAGHAN:  Yes, I am, Your Honor.

 4                    THE COURT:  All right.  Call your witness.

 5                    MR. MONAGHAN:  All right.  The Plaintiff

 6          calls David Berman.

 7

 8               (Whereupon the witness, David M. Berman,

 9                took the witness stand.)

10

11                    THE COURT:  Left hand on the Bible.  Raise

12          your right hand.

13                    Do you solemnly swear that the evidence

14          you're about to give in the matter herein before this

15          court will be the truth, the whole truth, and nothing

16          but the truth, so help you God?

17                    THE WITNESS:  Yes.

18

19          DAVID M. BERMAN, having been duly sworn, was examined

20          and testified as follows:

21

22                    THE COURT:  Please be seated.  State your

23          name and your business address and spell your last

24          name.

25                    THE WITNESS:  David Berman,
```

4

| | | |
|---|---|---|
| 1 | | B-E-R-M-A-N, 5142 Calvin Avenue, Tarzana, California. |
| 2 | | MS. PHARES:  Your Honor, just for the record, |
| 3 | | could we please have an explanation of what cause of |
| 4 | | action we are proceeding on this morning? |
| 5 | | THE COURT:  I'm going to take the testimony. |
| 6 | | As I said yesterday, I limited this witness to certain |
| 7 | | things that I would take testimony from him on, and I |
| 8 | | think that's what we're going on it. |
| 9 | | Let's go ahead. |
| 10 | | MS. PHARES:  And, for the record, I object to |
| 11 | | our proceeding with this witness until there has been |
| 12 | | a decision on our motion to dismiss. |
| 13 | | THE COURT:  Overruled.  Exception granted. |
| 14 | | Go ahead. |
| 15 | | MR. MONAGHAN:  Thank you, Your Honor. |
| 16 | | DIRECT EXAMINATION BY MR. MONAGHAN: |
| 17 | Q. | Mr. Berman, you have given your full name and address |
| 18 | | to the Court Reporter? |
| 19 | A. | Yes. |
| 20 | Q. | Okay.  And what is your occupation, sir? |
| 21 | A. | Essentially I'm retired, but I do do a fair amount of |
| 22 | | expert witnessing in music-related matters. |
| 23 | Q. | Okay.  And are you also an attorney? |
| 24 | A. | I'm currently an inactive member of the California |
| 25 | | Bar. |

5

```
 1              MR. MONAGHAN:  All right.  I'm going to have
 2         the Reporter mark this document as ...
 3              MS. PHARES:  Could you ask Mr. Monaghan to do
 4         his examination from the podium so we can see the
 5         witness?
 6              THE COURT:  I'm sure he will, I'm sure he
 7         will as he can.  But I think maybe his questions are
 8         on that computer there.
 9              MR. MONAGHAN:  That's correct, Your Honor.
10         And I'm over here, and I think everybody can see from
11         here.  That's why I moved to the left side of the
12         table.
13              THE COURT:  Okay.  But do try to speak up.
14         We don't have that noise we had yesterday, but make it
15         back.
16              Go ahead.
17
18         (PLAINTIFF'S EXHIBIT NO. 49 - CURRICULUM
19            VITAE OF DAVID M. BERMAN - FOR IDENTIFICATION.)
20
21              MR. MONAGHAN:  I'm going to show the witness
22         a document which will be marked Plaintiff's 49 for ID
23         at this time.
24    Q.    Mr. Berman, can you identify this document?
25    A.    Yes, I can.
```

6

1    Q.    What is it, sir?

2    A.    It's my CV.

3    Q.    I'm sorry.  I didn't catch your answer.

4    A.    It's my CV.

5    Q.    Your CV, your resume?

6    A.    Yes.

7           THE COURT:  Any objection to that going into

8    evidence?

9           MS. PHARES:  I don't have any objection to

10    this going into evidence, but I don't want that to be

11    considered a waiver of our position of whether or not

12    he's qualified.

13           THE COURT:  Counselor, I'm not waiving

14    anything for you.

15           MR. PHARES:  I'm just making the record, Your

16    Honor.

17           THE COURT:  Now, it's been accepted into

18    evidence.

19

20           (PLAINTIFF'S EXHIBIT NO. 49 — CURRICULUM

21            VITAE OF DAVID M. BERMAN — RECEIVED IN

22            EVIDENCE.)

23

24           THE COURT:  Go ahead.

25    Q.    Now, sir, is this a current resume?

7

```
 1   A.    Actually, the only addition to the current one I use
 2         is there's a paragraph at the end which just indicates
 3         my activities as an expert witness in music-related
 4         matters.
 5   Q.    Okay.  And can you tell the Court, in your on words, a
 6         brief resume of your educational background?
 7   A.    I went to University of Michigan, graduated with a
 8         Bachelor's of Business Administration in 1966, and
 9         then I received a J.D. from Harvard Law School in
10         1969.
11   Q.    Okay.  What did you do after you graduated Harvard Law
12         School?
13   A.    I joined the law firm of Mitchell, Silberberg, and
14         Knupp, K-N-U-P-P.
15   Q.    Okay.  And when did you do that?
16   A.    In 1969.
17   Q.    Did you start as an associate?
18   A.    I started as an associate in the Entertainment
19         Department, specifically the Music Division of the
20         Entertainment Department, specializing in music-
21         related matters.
22   Q.    And we'll get to some of what you did there.
23         What did you do after you were at Mitchell,
24         Silberberg, and Knupp, after you left Mitchell,
25         Silberberg?
```

8

1    A.    I left Mitchell.  I went to Warner Brothers Records in

2          April of 1976 as the Vice President and later Senior

3          Vice President of Business Affairs.

4    Q.    Okay.  Coming back to your -- so, now we've got your

5          career from '69 through '87?

6    A.    That's correct, beginning of '87, yes.

7    Q.    Okay.  When you were at Mitchell, Silberberg, what

8          involvement did you have with the music industry in

9          general and specifically with music publishing?

10   A.    At Mitchell we represented -- we represented a wide

11         variety of songwriters, music publishers, Hoyt Axton,

12         -- he wrote Joy to the World -- Buffy Saint Marie, The

13         Doors, The Beach Boys.  We represented a number of

14         publishing companies, relative -- fairly large ones,

15         such as Almo/Irving, the publishing affiliate of A&M

16         Records, Island Music, the publishing affiliate of

17         Island Records.

18               We also represented a number of smaller

19         publishing companies.  Hoyt Axton's company, Buffy

20         Saint Marie's company, Perry -- Richard Perry, a well-

21         known producer, his company.  They all -- they all

22         acquired copyrights in various ways, either as writers

23         or, in the case of producers, often acquiring

24         copyrights of artists they would produce.  And we

25         would, in fact, administer those smaller publishing

9

```
 1              companies.  So, we actually administered the

 2              publishing for Hoyt and Buffy Saint Marie, and Richard

 3              Perry, and many others like that.

 4      Q.      This is while you were at Mitchell Silberberg?

 5      A.      This was all while I was at Mitchell Silberberg.

 6                    In addition, at Mitchell, we were involved

 7              with the licensing of copyrights for soundtrack albums

 8              and for theatrical motion pictures.

 9      Q.      Okay.  Now, you went to Warner Brothers, according to

10              your Exhibit 49, your resume, in 1976; is that right?

11      A.      That's correct.

12      Q.      And you were Vice President, Senior Vice President of

13              Business Affairs?

14      A.      That's correct.

15      Q.      Tell the Court, please, what that involved, generally.

16      A.      Well, on the music publishing side, it involved again,

17              obviously, acquiring mechanical licenses for all of

18              the recordings that we made.  We also had somewhat of

19              a joint venture arrangement with Warner Music, the

20              publishing arm the Warner Music group, whereby if we

21              signed an artist to a recording contract, I would

22              contact, at the time, a gentleman by the name of Chuck

23              Kay, who was running Warner Music, and he would

24              attempt to get the publishing on that artist.  It was

25              a bit of synergy.  And if he was able to do so, and we
```

10

```
 1            would cooperate, then we would share in the publishing
 2            income derived from that artist.  So, we were also in
 3            the publishing business in that sense.
 4    Q.      So, you've had --
 5    A.      Excuse me.  Plus, we also did a large number of
 6            soundtrack albums and was involved in licensing music
 7            rights for the -- the theatrical motion pictures and
 8            the soundtrack albums therefrom.
 9    Q.      And did there come a time when you left Warner
10            Brothers?
11    A.      Yes.  In February of '87, I went to Capital --
12            actually, I started as the President of Capital
13            Industries, Inc., which was a North American holding
14            company authority of EMI, and in that capacity, I was
15            responsible for international, Canada, human resources
16            legal, finance, etcetera, as well as, I had
17            responsibilities for Screen Gems Music, which was the
18            publishing affiliate of, at the time it was Thorne
19            EMI.
20    Q.      And when you were at Warner Brothers, what were some
21            of the artists that you dealt with in publishing
22            agreements that you dealt with?
23    A.      I don't remember -- well, in terms of artists involved
24            with, Prince, Rod Stewart, George Benson, Fleetwood
25            Mac --
```

11

```
 1   Q.     How about Madonna?

 2   A.     Madonna.

 3   Q.     And how about some of the publishing companies, can

 4          you recall the names of any of the publishing

 5          companies that you were involved with at that time?

 6          That's at Warner Brothers.

 7   A.     Well, the direct involvement with the publishing there

 8          was with arrangement we had with Warner Brothers

 9          Music.

10   Q.     How about, does the name Chrysalis Records, Island

11          Records, Tommy Boy Records mean anything -- those

12          names mean anything to you?

13   A.     Well, yes, they do, but they were all record deals,

14          not necessarily publishing agreements.

15   Q.     Okay.  Now, you mentioned EMI.  What is that company,

16          please?

17   A.     Well ...  I'm sorry?

18   Q.     I think you mentioned that you, when you were at

19          Capital, that was the North American subsidiary of

20          EMI.

21              MS. PHARES:  We can't hear, we can't see, and

22          I know that Mr. Monaghan has apparently given up using

23          his screen.

24              MR. MONAGHAN:  No, no, I haven't.  It's a

25          combination.
```

12

```
 1              MS. PHARES:  Well, it's not turned on.

 2              THE COURT:  All right.  Mr. Monaghan, I'm

 3         going to ask you to keep your voice up.  Perhaps you

 4         could go a little this way, just to make sure that

 5         you're heard.

 6              MR. MONAGHAN:  I'll hide behind the screen,

 7         Judge.  They'd probably like me to do that.

 8    Q.   All right.  And for how long were you at Capital

 9         Industries, sir?

10    A.   For approximately six months I was the President of

11         Capital Industries, Inc., till -- from roughly

12         February through October.  I then went and became the

13         President of Capital Records, the label itself.

14    Q.   And you mentioned Screen Gems.  What was Screen Gems?

15    A.   Screen Gems was the publishing arm of EMI, a pretty

16         substantial publishing company.  And Screen Gems

17         reported to me when I was President of Capital

18         Industries.

19    Q.   Over the course of the period of time that you were

20         first an associate of Mitchell Silberberg and then

21         through the period of time you were at Capital,

22         approximately how many music publishing agreements

23         would you have had dealings with?

24    A.   Oh, my good -- starting at Mitchell?

25    Q.   Right.
```

13

```
 1   A.    Hundreds.

 2   Q.    Okay. And in what capacities?  For example, were you

 3         involved with drafting them, reviewing them, giving

 4         opinions about them, any of those?

 5   A.    All of the above.

 6   Q.    And have you been hired --

 7               THE COURT:  He said "all of the above".

 8               Go ahead.

 9   Q.    Okay.  And were you retained by the Plaintiff in this

10         matter?

11   A.    Yes.

12   Q.    And are you being paid for your services?

13   A.    Yes, I am.

14   Q.    And have you testified before as an expert witness in

15         various matters?

16   A.    Yes, I have.

17   Q.    And approximately how many matters have you testified?

18   A.    Oh, testimony, either via affidavit, expert report,

19         deposition, or trial testimony, in probably 20 cases.

20   Q.    And, overall, how long is your experience in the music

21         business?

22   A.    Well, since 1969.

23   Q.    And have you also, after your Capital Industries

24         tenure, did you have occasion to take on another

25         position?
```

14

```
 1   A.    I left Capital, and for about a year, from roughly

 2         1990 to early '91, I went back to Mitchell,

 3         Silberberg.  And then in '91, May, I think, of '91, I

 4         became -- I went to Geffen Records, where I was -- we

 5         didn't have titles per se.  I think my contract

 6         referred to me as a Senior Executive in charge of

 7         business affairs and administration.  And I

 8         subsequently took on the title of General Counsel.

 9   Q.    Okay.  And then did there come a time when you left

10         Geffen Records?

11   A.    I left in February of '98 to become the President of

12         the Buena Vista Music Group, which is the recorded

13         music and music publishing arm of the Walt Disney

14         Company.

15               MR. MONAGHAN:  We offer Mr. Berman, Your

16         Honor, as a Plaintiff's expert on the subject matters

17         that were discussed by the Court yesterday.

18               MS. PHARES:  Voir dire, Your Honor?

19               THE COURT:  Yes, certainly.

20         VOIR DIRE BY MS. PHARES:

21   Q.    How are you, Mr. Berman.  I'm Gloria Phares.  I'm

22         counsel for the Defendant, Sunbow Productions, Inc.

23   A.    Good Morning.

24   Q.    You mentioned that when you were at Mitchell,

25         Silberberg, you said "we represented", and I take it
```

15

```
 1              you mean the firm represented, a wide variety of

 2              interests and so forth; is that correct?

 3    A.        The firm did.  I believe that every writer, producer,

 4              or publishing company that I mentioned I also worked

 5              on.

 6    Q.        And when you say you worked on it, were you directly

 7              drafting agreements with publishing agreements?

 8    A.        Yes.

 9    Q.        And could you say roughly what -- what number of them

10              you did while you were there?

11    A.        I did practically all of the agreements for Almo/

12              Irving, which is a very large publishing affiliate of

13              A&M Records.  It could have been hundreds in the seven

14              plus years I was there.

15    Q.        Did they involve -- did any of these agreements

16              involve the commissioning of music for movies?

17    A.        At times it did.  We -- I was involved with the movie

18              Shaft.  Isaac Hayes wrote the theme for Shaft.  There

19              were others.  I can't recall specifically right now.

20    Q.        Was the commissioning of music for TV and movie a

21              large portion of your publishing work?

22    A.        Not a large portion, no.

23    Q.        What proportion would you say it was?

24    A.        Of the publishing work?

25    Q.        Yes.
```

1    A.    10%.

2    Q.    And have you ever participated directly in the

3          auditing of a -- company songwriters, audits of their

4          royalty statements?

5    A.    I have not performed an audit, but I've certainly

6          reviewed and been involved with audits.

7    Q.    And how have you been involved?

8    A.    As the attorney for the writer or the publisher, both

9          sides.

10   Q.    How many times?

11   A.    Oh, 10, 15.

12   Q.    Are you familiar with music publishing royalty

13         statements?

14   A.    Yes, I am.

15   Q.    And have you had extensive experience reviewing them?

16   A.    I certainly had a lot of experience reviewing them.

17   Q.    Have you ever reviewed them in connection with an

18         audit?

19   A.    Yes.

20   Q.    And when you were at Warner Music, did you have direct

21         day-to-day responsibility for its publishing work?

22   A.    No, I was not at Warner Music.  I was at Warner

23         Brothers Records.

24   Q.    Correct.

25   A.    And I dealt with their music publishing affiliate,

17

```
 1            Warner Music.
 2     Q.     But you did not have day-to-day work with their music
 3            publishing when you were at Warner Music?
 4     A.     I believe I used "responsibility".
 5     Q.     At Warner Records.
 6     A.     At Warner Records I did not have responsibility for
 7            Warner Music.
 8     Q.     Right.  So, you were not doing day-to-day music
 9            publishing work when you were at Warner Records?
10     A.     I did -- I did get involved occasionally on publishing
11            issues.  I didn't have day-to-day publishing
12            involvement.
13     Q.     Did you get involved with the commissioning of music
14            for motion pictures while were you at Warner Records?
15     A.     Yes.
16     Q.     In what capacity?
17     A.     In the case of Purple Rain, Prince's movie, which he
18            was a Warner Brothers artist, and we of course had the
19            soundtrack album and we were involved in the entire
20            creation of that film and the licensing of all the
21            rights; other soundtracks as well.
22     Q.     But that wasn't commissioned music, was it?
23     A.     All of the music in Purple Rain was written for the
24            film.
25     Q.     And when you were at Capital Industries, you said you
```

18

```
 1          had responsibilities for Screen Gems and they reported
 2          to you.  Did you have day-to-day responsibility for
 3          the music publishing in that capacity?
 4    A.    Well, the head of ...  It was one of the areas of my
 5          responsibility.  I didn't do the day-to-day publishing
 6          work, but the entire operation of Screen Gems Music
 7          reported to me.
 8    Q.    But you didn't have day-to-day responsibility for the
 9          work or you weren't participating in their day-to-day
10          operations?
11    A.    I was certainly involved in any dealings that they
12          would make, in any signings that they would enter
13          into.  I had responsibility for the operation of the
14          publishing company.
15    Q.    Well, I understand, I do understand your being
16          responsible.  What I'm looking for is whether or not
17          you have the day-to-day experience with the
18          commissioning of music, with the licensing of it on a
19          day-to-day basis, as opposed to being ultimately
20          responsible for it?
21    A.    I didn't personally license the music, nor did even
22          the head of Screen Gems.  That went down substantial
23          layers.
24    Q.    How much are you being paid?
25    A.    $500.00 an hour.
```

19

```
 1   Q.    And of your 20 cases, could you say generally how they
 2         break down of whether or not you represent song-
 3         writers or publishers?
 4   A.    My goodness.
 5   Q.    Or record companies, I suppose.
 6   A.    Right.  It runs the gamut.  Songwriters, artists,
 7         record companies, Solomon Smith Barney I represented
 8         in one case on a music matter.  I'd say more of them
 9         were in the record area than the publishing area, but
10         some of them certainly did deal with music.
11   Q.    How many?
12   A.    Maybe five.
13   Q.    And when you were at Geffen, were you directly
14         involved with day-to-day publishing matters?
15   A.    At Geffen, for the initial few years, there was also
16         an affiliated company, Geffen Music, a publishing
17         company, and I had responsibilities for Geffen Music.
18         We ultimately sold that to Universal but I continued
19         to be involved in publishing issues.  We did a large
20         number of soundtrack albums, and -- and it became
21         prevalent by that time, when a label would acquire a
22         soundtrack album, that essentially what we were doing
23         was paying the music budget for entire film.  And in
24         that sense, any music that was being commissioned
25         specifically for the film, the film company generally
```

1          insisted on ownership of at least half the copyright.

2          Since we were paying for that, I got intimately

3          involved in the negotiation and the contractual

4          negotiation of those licenses.

5     Q.   With the songwriters?

6     A.   With representatives of the songwriters, yes.

7     Q.   And when you were at Buena Vista Music?

8               I mean, I understand that record companies

9          have publishing labels, so -- and I understand the

10         notion of your being ultimately responsible, but what

11         I'm looking for is how much experience you have on a

12         day-to-day level with the commissioning of music for

13         TV or motion pictures.

14    A.   Well, you said at Buena Vista?

15    Q.   Uh-huh.

16    A.   At Buena Vista, again, I had responsibility for the

17         Walt Disney Publishing Company, a very large

18         publishing operation.  In addition, we did do a number

19         every soundtrack albums on the record side with

20         Paramount, under the same terms that I just described,

21         where essentially we paid for the entire music budget.

22         Paramount insisted on anything that was written for

23         the movie that they own the copyright.  So, I became

24         involved in negotiating those.

25              Finally, at the Disney Company, on the

```
 1              animated side, the Walt Disney Company demands
 2              complete and total ownership of a hundred percent of
 3              the copyright on any composition that is written for
 4              and included in their animated features.  And while I
 5              was there, we did Tarzan, and, you know ...  I can't
 6              remember all the features we did.  So, yeah, I was
 7              involved in those issues.
 8    Q.        Now, you mentioned throughout your answers references
 9              to movies.
10                   Have you ever done any music publishing work
11              in connection with the commissioning of work for
12              television?
13    A.        Yes, but much less.
14    Q.        When did you do it?
15    A.        I know I did some at Mitchell Silberberg.
16    Q.        You mean in the early in the 70s?
17    A.        Yeah, I left in 78, yes.
18    Q.        '78 or '76?  Maybe I misread this.
19    A.        I left Mitchell, Silberberg in '76; you're right.
20    Q.        And any other occasion which you have done the
21              commissioning of music for television in the last 30
22              years?
23    A.        Yes, yes, but I can't recall specifically right now.
24    Q.        Is that because there's so little of it?
25    A.        There wasn't that much television work.
```

1           MS. PHARES:  Your Honor, I am going to oppose

2      the admission of the -- or acceptance of Mr. Berman as

3      an expert for the subjects with which he's being asked

4      to testify --

5           THE COURT:  All right.

6           MS. PHARES:  -- based on his qualifications.

7           THE COURT:  I'm allowing his testimony, and

8      I'll put such weight on it as I feel is warranted.

9           Thank you, Counsel.

10          MR. MONAGHAN:  Thank you, Your Honor.

11          So, the Court is an accepting Mr. Berman as

12     an expert for the subject matters discussed?

13          THE COURT:  Yes, yes.

14          MR. MONAGHAN:  All right.

15     DIRECT EXAMINATION BY MR. BERMAN:

16  Q.  Now, Mr. Berman, what is music publishing?  What does

17     that mean?

18          MS. PHARES:  Your Honor, could we please ask

19     Mr. Monaghan to use the podium?  He's not -- he's

20     really working off his --

21          MR. MONAGHAN:  Your Honor, that's a very tiny

22     podium and I have a lot of papers --

23          MS. PHARES:  We can't see.

24          MR. MONAGHAN:  -- and I don't think I'm

25     impeding anybody's view, or if I have to speak up, I

23

```
 1              certainly will.
 2                   MS. PHARES:  I can't see.
 3                   THE COURT:  Well, if you'd move more that way
 4              so that you can see whatever you need to get hold of
 5              you there, in front of you, maybe that will solve the
 6              problem.
 7                   Go ahead.
 8                   MR. MONAGHAN:  Can everybody back there see?
 9                   THE COURT:  Well, now you're looking at them.
10                   MS. PHARES:  At the moment.
11                   THE COURT:  Try looking this way and make
12              sure they understand.
13                   MR. MONAGHAN:  All right.
14    Q.        Same question:  What's music publishing to the
15              uninitiated?
16    A.        Music publishing involves the exploitation of
17              copyrights into musical compositions.
18    Q.        And for whose benefit is that done, that exploitation
19              you just mentioned?
20    A.        Well, for the benefit of the publisher, the owner of
21              the copyright, and the writer of the composition, or
22              writers.
23    Q.        And are you -- what is the extent of your familiarity
24              with the general customs and practices in the music
25              publishing business?
```

```
 1                    Are you saying you're an expert in that area

 2            as well, specifically?

 3    A.      Yes, I am.

 4    Q.      Okay.  Now, what does administration, which is a term

 5            you've used, what does that mean, administration of

 6            publishing?

 7    A.      The administrator of the publishing is the entity,

 8            whether or not they own the copyright, that is the

 9            entity that issues the licenses, be they mechanical

10            synchronization, enters into foreign publishing

11            agreements, etcetera, collects the income, and pays

12            out to the respective participants, be they

13            co-publishers or writers.

14    Q.      Okay.  So, the job of the administrator is to exploit

15            the copyright and then collect the monies and pay and

16            also account for those monies; is that not right?

17    A.      That's correct.

18    Q.      Okay.  And what are some of the tasks involved in

19            doing that?  From -- take the Court from start to

20            finish.  Let's take it from the time that -- assume a

21            writer -- and you're allowed to make assumptions here

22            as an expert witness -- assume that a writer has

23            conveyed the copyright to a publishing company.

24    A.      Okay.

25    Q.      Take the Court through that whole process, please.
```

25

1    A.    All right.  The writer conveys the copyright to the

2          publishing company in question.  The publishing

3          company then has the obligation to register the

4          copyright with the copyright office, also to register

5          the composition with the appropriate performing rights

6          society.

7    Q.    Who would they be?

8    A.    The prominent ones are ASCAP or BMI.  There's also

9          SESAT (sic), a lesser -- a smaller company.

10   Q.    If I can interrupt this.  It's not a good idea for me

11         to interrupt you either.

12               And for whose benefit is that registration

13         with the performing rights society provide?  For who

14         is that done?

15   A.    That is done for both the publisher and the writer,

16         performing rights, law performing rights, the income

17         derived from that is collected by the performing

18         rights society, essentially BMI or ASCAP.  They

19         collect them, and they pay directly to the publisher

20         the publisher's share of performing royalties and

21         directly to the writer or writers the writer's share.

22   Q.    And what information is filed by the publisher with

23         the performing rights society?  Are you familiar with

24         how that's done?

25   A.    Yes.

26

```
 1    Q.      Please tell the Court.

 2                    MS. PHARES:  Objection.  Relevance?

 3                    THE COURT:  I'll allow it.

 4                    Go ahead.

 5    A.      In the case of a basic composition, they will send a

 6            copy of the composition with the appropriate

 7            information of the writer -- the writers, etcetera.

 8                    In the case of music for television, written

 9            for television, there's a cue sheet which is sent to

10            the performing rights society, and the cue sheet is a

11            notation of the music to be included in the

12            appropriate TV show.  And the performing rights

13            society uses the cue sheet in a very complicated

14            manner that I can't explain to eventually calculate

15            how much performance income is going to be paid to the

16            publisher and writer for the music contained in the

17            appropriate television show.

18    Q.      Okay.  Now, we were talking about what's involved in

19            administering publishing.  You've said filing the

20            copyright, registering with the performing rights

21            society.

22                    What is about licensing?

23    A.      The administrator will also issue or cause to be

24            issued various licenses, mechanical licenses, for the

25            reproduction of a record, CD, etcetera;
```

27

```
 1          synchronization licenses, the licensing of the
 2          composition for inclusion in a motion picture,
 3          theatrical motion picture, or television or
 4          commercial; print licenses, for the licensing of
 5          sheet music, music folios, band arrangements,
 6          etcetera.
 7    Q.    Now, you said mechanical licensing.  Can you be a
 8          little more -- can you elaborate a little bit on what
 9          a mechanical license involves and what products or use
10          of the music come within your understanding as an
11          expert, with all that background that you've testified
12          to, regarding mechanical licenses?
13    A.    In order to manufacture and distribute a phonograph
14          record, which embodies a musical composition, the
15          record company in question has to obtain what is
16          called a mechanical license, which gives them the
17          right to include that composition in that record.  And
18          record includes not only CCS, DVD -- not only CDs,
19          vinyl, cassettes, etcetera, but also DVD, audiovisual
20          devices, etcetera.
21    Q.    Audiovisual devices?
22    A.    Yes.
23    Q.    So, would I be correct that if one were to bring out a
24          DVD which had a video component, but also an audio
25          component, that would require some sort of mechanical
```

1          license from the -- either the administrator, the

2          publisher, or the composer?

3    A.    Yes.

4    Q.    And, typically, who keeps track?  Is there some

5          organization that is generally used with respect to

6          the mechanical licensing?

7    A.    There was an agency called the Harry Fox Agency, which

8          many publishers and small publishing companies use to

9          issue mechanical licenses, to collect mechanical

10         royalties, and then to distribute them accordingly.

11   Q.    Now, you also used the term sync license, I believe,

12         or synchronization license.

13   A.    Correct.

14   Q.    Under what circumstances would a synchronization

15         license come into play with respect to the

16         administration of publishing?

17   A.    A synchronization license is required to synchronize a

18         musical composition in timed relationship with moving

19         images.  So, to include a composition in a theatrical

20         motion picture or a television show, the film company

21         or television production company, as the case may be,

22         is required to obtain a synchronization license, which

23         is issued by the publisher.

24   Q.    Okay.  Are there any other ways that income is

25         generated in connection, in your experience in the

1        business, from the use of a piece of music?

2   A.    Well, there are -- the four predominant methods of

3        generating income from a musical composition are

4        performing rights; there's also a concept, grand

5        performing rights, which is for production of a live

6        theatrical presentation, a Broadway play would be

7        grand performing rights.  So, you have performing

8        rights, mechanical royalties, synchronization

9        licenses, and print licenses, and those are the four

10       predominant areas of earning money off of a copyright.

11  Q.    And BMI deals with small performing rights, as opposed

12       to grand performing rights; is that right?

13  A.    That's correct.

14  Q.    Okay.  In connection with your retention by the -- in

15       this matter, what documents or materials were you

16       given?

17  A.    Let me think.  I reviewed an Amended Complaint in this

18       matter.  I reviewed what I think is being referred to

19       as the Jem Agreement.

20  Q.    Is that -- is that the document I'm showing you now,

21       Exhibit M in evidence (handing)?

22  A.    Yes, yes.

23  Q.    And did you review that agreement in detail?

24  A.    Yes, I did.

25  Q.    And you've had this agreement for a couple of years

```
 1           now; correct?

 2   A.      I think it's been almost three years, I think.

 3   Q.      Anything else you reviewed?

 4   A.      I reviewed an expert report or affidavit -- I think

 5           affidavit of a Helene Blue.

 6   Q.      How about any other agreements?

 7   A.      Yes.  I reviewed some other songwriter's agreements of

 8           Ms. Bryant, as well as I reviewed a number of foreign

 9           licensing agreements.

10   Q.      Licensing agreements by Sunbow?

11   A.      Yes.

12   Q.      Okay.  Now, you reviewed these agreements in the

13           context and with the background of the experience

14           you've had in the music publishing and music business

15           generally; correct?

16   A.      That's correct.

17   Q.      Okay.  Did you see anything different in the Jem

18           Agreement, in general, in terms of consents and income

19           sources than you've seen throughout your career in

20           music publishing agreements?

21   A.      Not really, no.

22   Q.      Did the Jem Agreement deal with those types of income

23           that you've described are generated by the use of a

24           musical composition?

25   A.      Yes, it did.
```

```
 1   Q.    Okay.  So, it dealt with all four areas of the

 2         generation of income, did it not?

 3   A.    Yes, it did.

 4   Q.    Okay.  And did it have a -- did it not have a

 5         provision for payment of writers' royalties?

 6   A.    Yes, it did.

 7   Q.    And did you see anything in the agreement where there

 8         was a waiver in the agreement of any rights to either

 9         performance royalties or publishing royalties by the

10         writer?

11   A.    There's no waiver.  There are two exclusions.  I

12         wouldn't call them a waiver.

13               The agreement does specify that the writer is

14         not entitled to synchronization license income from

15         the inclusion of the music in the television broad-

16         cast of the show.  And, also, there -- it does not --

17         the writer is not entitled to mechanical royalties on

18         what I believe is referred to as promotional

19         cassettes.  But, other than that, the writers'

20         royalties provided for in the agreement are the

21         standard and typical writers' royalties.

22   Q.    Now, do you have the agreement in front of you?

23   A.    No.

24   Q.    Can you tell the Court, please, which paragraphs of

25         the agreement deal with which type of royalties?
```

32

```
 1   A.    Paragraph 5 deals with performing rights and makes it

 2         clear that the writer is entitled to his or her share

 3         of performance income, also makes clear that the

 4         writer is not entitled to the publisher's share of

 5         performance income.

 6               Paragraph 6 covers all of the other sources

 7         of income.

 8   Q.    Okay.  Now, if I can direct your attention to

 9         Paragraph 6, which begins on the bottom of Page 4;

10         okay?

11               Do you agree with me, and this is in

12         evidence, so we can actually read it into the record,

13         but we won't burden the Court with that.  It's seen

14         this for a while now.

15               This deals with music publishing rights, does

16         it not, on the bottom of Page 4?

17   A.    Yes, yes.

18   Q.    Then it goes on to provide, does it not, that if the

19         Company -- and in this case the Company is Sunbow;

20         correct?

21   A.    Yes.

22   Q.    If the Company that exercises music publishing rights

23         in the music, but excluding the premium cassettes --

24         that's the exclusion you just talked about?

25   A.    Correct.
```

33

```
 1    Q.    Okay -- for which the Contractor shall not receive any

 2          further compensation, uses of the music, combined with

 3          lyrics -- and then it goes on to say -- and then it

 4          goes on to define what the writer is supposed to get.

 5          Is that not correct?

 6    A.    That's correct.

 7    Q.    Okay.  And what does Subparagraph 6(ai) deal with?

 8    A.    6(ai) deals essentially with mechanical royalties and

 9          synchronization licenses for theatrical motion

10          pictures.

11    Q.    Now, are there synchronization licenses for other than

12          motion pictures?

13    A.    Yes.

14    Q.    Okay.  And you might have touched upon this, but would

15          you please elaborate now and tell us where a

16          synchronization license might be obtained for a -- the

17          use of the music other than in a theatrical motion

18          picture?

19    A.    A television show or a television commercial, certain

20          Karaoke videos, things like that.

21    Q.    Okay.  Now, and in your expert opinion, what is a --

22          what is the industry's customary interpretation of the

23          term phonograph records?

24    A.    Essentially, any audio and/or audiovisual device

25          intended for home use.
```

34

```
 1   Q.   Okay.  And was this a -- this audiovisual device
 2        intended for home use that you talked about, when did
 3        such devices actually start to come into use in the
 4        United States?
 5   A.   I believe audio/video cassettes -- excuse me -- boy,
 6        I'm showing my age.  I'm going to say late '70s.
 7   Q.   Okay.  This is Jem -- this is Exhibit 13 in evidence,
 8        Jem.  Is that the type of audio cassette -- audio/
 9        video cassette we're talking about?
10   A.   Yes.
11   Q.   You play that in a video recorder?
12   A.   Old-fashioned VCR.
13   Q.   Okay.  The technology -- we're dealing with a contract
14        here, what is it, 1986 contract.  And is it your
15        testimony, under oath, that --
16             MS. PHARES:  Objection, Your Honor.  The
17        contract is an '85 contract.  We keep going over and
18        over this.
19             MR. MONAGHAN:  Okay.  That's fine.  I change
20        that.
21             THE COURT:  All right.  1985.
22             MR. MONAGHAN:  Thank you.  It actually helps
23        the question.
24   Q.   So, we're dealing with a 1985 contract that talks
25        about license of commercial phonograph records.  Now,
```

1           this is a typical clause in 1985; isn't it?

2    A.     Yes.

3    Q.     Okay.  Now, if this -- if this similar subject matter

4           were in a typical contract today, what would you have

5           expected the language dealing with that subject matter

6           to say?

7                    MS. PHARES:  Objection.  Relevance.

8                    THE COURT:  Sustained.

9    Q.     Okay.  Now, so you've covered mechanical royalties.

10          So, Subparagraph 6(ai) would deal with mechanical

11          royalties?

12   A.     Yes.

13   Q.     Okay.  And this Exhibit 13, would you please tell the

14          Court whether or not you would have expected that the

15          use of the music in this, which is a Sunbow

16          Production, would have required an accounting and

17          payment of mechanical royalties?

18   A.     It would have required a payment of some form, be it

19          mechanical or synchronization, for the right to

20          include music in that device.

21   Q.     Coming within Paragraph 6(ai)?

22   A.     6(ai) or 6(avi), a combination thereof.

23   Q.     You're talking about the paragraph -- that

24          subparagraph that says with respect to Other Uses of

25          The Music?

36

| | | |
|---|---|---|
| 1 | A. | That's correct. |
| 2 | Q. | Okay. So, it's either going to be in "I" or in 6a -- |
| 3 | | 6(avi)? |
| 4 | A. | "vi", that's correct. |
| 5 | Q. | Okay. And, likewise, what about licenses for DVD? |
| 6 | A. | Same answer. |
| 7 | | MS. PHARES: Objection, Your Honor. |
| 8 | | THE COURT: What's the objection? |
| 9 | | MS. PHARES: We're talking about the period of |
| 10 | | these contracts as 1985. DVD weren't in existence in |
| 11 | | 1985. |
| 12 | | MR. MONAGHAN: That's precisely the point |
| 13 | | he's here to testify about. |
| 14 | | THE COURT: Well, we're talking, as I said -- |
| 15 | | MS. PHARES: We're talking about the terms of |
| 16 | | the contract. |
| 17 | | THE COURT: -- yesterday, that I would take |
| 18 | | testimony of his opinion as to the terms that are in |
| 19 | | this agreement. |
| 20 | | In this agreement, it's your opinion that |
| 21 | | they were looking forward to DVD? |
| 22 | | THE WITNESS: It is my opinion that the -- by |
| 23 | | 1985, the standard definition of phonograph record, as |
| 24 | | commonly used, included all audio or audiovisual |
| 25 | | devices for home use now known or hereafter devised. |

37

1              So, yes, it did include DVD, in my opinion,

2        in '85, even though there were no DVD in '85.

3              THE COURT:  All right.  Go ahead.

4              MR. MONAGHAN:  Okay.

5    Q.   Now, are you familiar with --

6              THE WITNESS:  Excuse me.  That is not a

7        complete answer, Your Honor.

8              THE COURT:  All right.  Go ahead.  What's the

9        complete answer?

10             THE WITNESS:  The DVD, whether known in '85

11       or not, when it did come into existence, required the

12       licensing of the music.

13             Paragraph 6(avi) contemplates payment to the

14       writer for any other use not specified.  Since the DVD

15       required music to be licensed and income to be paid to

16       the publisher for that --

17             THE COURT:  So, your opinion is:  If some day

18       they invent a hologram that sits in the middle of your

19       living room and sings for you, that there is, even

20       though it isn't spelled out anywhere in here, it is

21       assumed, because the word "phonograph" was in there,

22       that it applies?

23             THE WITNESS:  And because 6(avi) includes any

24       other use of music.  Any future use of music, anything

25       not covered by "a", by "i", double "ii", triple "iii",

```
 1              etcetera.

 2                      THE COURT:  Isn't that a pretty broad view of

 3              two words that say other license, or whatever it says?

 4                      THE WITNESS:  It's totally standard.  It's

 5              totally --

 6                      THE COURT:  All right.  Go ahead, Counselor.

 7              I don't want to interrupt you.

 8                      Go ahead.

 9     Q.       In terms of accounting and royalty statements, sir,

10              are there any customary practices of which you're

11              aware of in the music publishing business, music

12              business in general?

13     A.       Well, generally, a royalty statement by a publisher

14              to --

15                      MS. PHARES:  Wait a minute.  Excuse me.

16                      Is there any focus of this question?  Any

17              general practice regarding royalty statements?  I

18              don't even understand the question.

19                      MR. MONAGHAN:  Yeah.  The question is:  Are

20              there general practices in terms of when we're dealing

21              with income that's supposed to be received by the

22              writer, is there any general practice about how the

23              writer gets information about what the writers --

24                      THE COURT:  Well, wait a minute.

25                      Aren't we all in agreement that whatever is
```

```
 1          in this agreement is what binds the writer, and this
 2          witness is being called upon to give his opinion about
 3          what this means?
 4                    MR. MONAGHAN:  No, no, not at this -- at this
 5          point in the question, I'm laying a foundation for his
 6          knowledge and experience with how this thing works.
 7                    How does the system work?
 8                    MS. PHARES:  Your Honor --
 9                    MR. MONAGHAN:  How does the system of
10          reporting and accounting for royalties that are due,
11          how does that work?
12                    THE COURT:  All right.  I will allow some
13          questioning.  Go ahead.
14                    MS. PHARES:  I will just say for the record
15          that I adopt Your Honor's objection.  I think we
16          are -- our concern with royalties has to do with what
17          was agreed to between the parties, not what the
18          general practice is.
19                    THE COURT:  Well, I have a general idea --
20          excuse me -- we're just getting some very quick
21          background.  So, let's get to the quick background.
22                    Go ahead.
23     A.   Generally, a royalty statement will be issued either
24          quarterly or semi-annually, as the general rule, and
25          will include an accounting or income from all of the
```

```
 1              various licenses that had been issued during that

 2              accounting period, a listing of mechanical licenses

 3              and the income therefrom, synchronization licenses and

 4              the income therefrom, print licenses and the income

 5              therefrom.  Essentially, that's it.

 6    Q.        Okay.  And is there some frequency that these reports

 7              are rendered?

 8                   MS. PHARES:  Asked and answered.

 9                   THE COURT:  No, I'll allow it.

10                   Go ahead.

11    A.        Generally semi-annually and sometimes quarterly.

12    Q.        Okay.  Now, have you seen any reporting or royalty

13              statements in connection with this case?

14    A.        Yes.

15    Q.        Okay.  And how many such statements have you seen?

16    A.        Well, a statement rendered to the Plaintiff?

17    Q.        Right.

18    A.        I saw one, I believe, one or two.

19    Q.        And did they describe the types of licenses that were

20              involved?

21    A.        No.

22    Q.        Did they say anything about mechanical licenses?

23    A.        No.

24    Q.        Synchronization licenses?

25    A.        No.
```

```
 1   Q.    Now, what is the --

 2               MS. PHARES:  Clarification?  Could -- could

 3         we understand a little bit better the one or two?

 4         What does that refer to?  What is it that the witness

 5         saw?

 6               MR. MONAGHAN:  Oh.

 7   Q.    Were you shown, Mr. Berman, a document dealing with

 8         some December 1, 2006, communication?  And I'm showing

 9         you now a document purporting to be a Sony ATV royalty

10         statement with the name TV Loonland on it.

11               Did you see this (handing)?

12               MS. PHARES:  Your Honor, I mean, is the

13         document in evidence?

14               MR. MONAGHAN:  Well, I think it's your

15         Exhibit 48.

16               MS. PHARES:  Well, if it has a number on it,

17         it's your exhibit.

18               THE COURT:  All right.  Hold on.  There was

19         one of them that didn't go into evidence.  48 is in

20         evidence --

21               MR. MONAGHAN:  Yeah.

22               THE COURT:  -- according to my record.

23               But ask the witness, did you see it.

24   Q.    Did you see this?  Yeah.

25   A.    I did see this, but this is not what I was referring
```

42

```
 1          to.

 2   Q.     Okay.  And now I'm showing you AA for identification.

 3   A.     I also saw this, but this is not what I'm referring

 4          to.

 5   Q.     Okay.  And perhaps you can help me out.  I don't

 6          remember what you're referring to either.

 7   A.     It was a -- purported to be a statement from Sunbow

 8          that had various time periods --

 9   Q.     Oh, I see.  I recall.

10   A.     -- with merely a gross amount of money and no

11          indication, no back-up or information of the source of

12          any of the income.

13   Q.     You're talking about this page from Exhibit 48 in

14          evidence (handing)?

15   A.     That's exactly what I'm talking about.

16               MR. MONAGHAN: Okay.

17               MS. PHARES:  Well, Your Honor, are you

18          marking this so that we know what we're talking about?

19               MR. MONAGHAN:  That's it.

20               MS. PHARES:  Yes, I see it.  So --

21               THE COURT:  I think counsel just said it was

22          part of 48 in evidence.

23               MR. MONAGHAN:  Right.

24               THE COURT:  Let's not remark things.

25               MR. MONAGHAN:  Counselor did say that.  Now
```

```
 1          Counsel --
 2                    MS. PHARES:  But is it there?
 3                    MR. MONAGHAN:  I don't see it there.
 4                    THE COURT:  All right.  Then you may mark it.
 5                    MR. MONAGHAN:  Let's just mark it separately.
 6
 7               (PLAINTIFF'S EXHIBIT NO. 50 - SONY ATV
 8                ROYALTY STATEMENT, 12/1/06, SINGLE PAGE
 9                - MARKED FOR IDENTIFICATION.)
10
11                    THE COURT:  Is there any objection to it
12          going into evidence?
13                    MS. PHARES:  No objection, Your Honor.
14
15               (PLAINTIFF'S EXHIBIT NO. 50 - SONY ATV
16                ROYALTY STATEMENT, 12/1/06, SINGLE PAGE
17                - RECEIVED IN EVIDENCE.)
18
19                    MR. MONAGHAN: Your Honor, would this be a
20          time to take a morning break.  I don't have too much
21          more.
22                    THE COURT:  Let me tell you, we're on a very
23          strict schedule today.  That I now have 20 minutes
24          after 10:00.  I want you all back in your seats at
25          10:30.
```

44

```
 1                      MR. MONAGHAN:  Yes, sir.

 2                      THE COURT:  All right.

 3

 4                 (Recess taken at 10:20 AM.)

 5

 6                 (Court reconvened at approximately 10:30 AM.)

 7

 8       CROSS-EXAMINATION BY MS. SAFFER:

 9   Q.  Good Morning, Mr. Berman.  My name is Judith Saffer.

10       I'm the Assistant General Counsel at BMI.

11   A.  Good Morning.

12   Q.  As you're aware, BMI is one of the Defendants in this

13       lawsuit.

14                 You testified a few minutes ago about various

15       matters which impact BMI, and I'd like to ask you

16       about them.

17                 Isn't it correct that during your Direct

18       Testimony, you indicated that registrations to BMI,

19       which are sent in by publishers, are submitted with a

20       copy of the sheet music?

21   A.  I believe I did.

22   Q.  Would you be surprised to learn that, in fact, that is

23       not the practice?

24   A.  No, because in thinking about it, I know that was

25       incorrect.
```

45

1    Q.    You also testified that cue sheets are normally filed

2          with BMI by the publishers, didn't you?

3    A.    Or the production -- the television production entity.

4    Q.    In your experience, would you say that it was more

5          usual for publishers or production companies to file

6          cue sheets?

7    A.    Probably production companies.

8    Q.    In your role as counsel to record companies and

9          publishing companies, were you involved in the

10         preparation of cue sheets?

11   A.    In the preparation, no.

12   Q.    Did your staff prepare cue sheets?

13   A.    In various capacities, yes.

14   Q.    Did you ever review any of these cue sheets?

15   A.    I have, I have seen cue sheets, so I am generally

16         familiar with them.

17   Q.    Would you please explain what you mean by "generally

18         familiar with them"?

19   A.    I have seen cue sheets.  They're notations of music.

20   Q.    Would you surprised to learn that cue sheets do not

21         contain notations of music?

22   A.    Yes.

23   Q.    Would you be surprised to learn that cue sheets

24         normally list a composition and provide time

25         indications and not the notations of music?

```
 1   A.    I know they contain time.  I know they contain the

 2         timing of the use of the music.

 3   Q.    In the course of your Direct Testimony a few minutes

 4         ago, you said, and I quote, I can't explain how rights

 5         are calculated by PROs from the submission of cue

 6         sheets.  Performing rights organizations.

 7   A.    Societies.

 8   Q.    I'm sorry.

 9   A.    What I should have said is, and what I mean is, that

10         the entire method by which ASCAP or BMI collects and

11         disseminates performance income is extremely complex

12         and it is more complex than I could explain.

13             MS. SAFFER:  Your Honor?

14   A.    There are formulas for varying uses of the composition

15         that create a public performance right, some of which

16         are specific for the use and some of which are some

17         formula that I don't know.

18             MS. SAFFER:  Your Honor, based upon this

19         testimony, I would move to strike the expert witness

20         insofar as his qualification on any accounting or

21         dispute concerning royalty payments made by BMI since

22         he has admitted he doesn't understand the process.

23             THE COURT:  Denied.

24             Go ahead.

25             MS. SAFFER:  Okay.
```

1   Q.   I'd like to draw your attention to Defendant's Exhibit

2        M, which has been shown to you by your counsel, the

3        contract.

4             MS. PHARES:   The Jem Agreement.

5   Q.   The Jem Agreement, the contract, some pages of which

6        are contained on this -- some of which are contained

7        on the blowups.

8             MS. SAFFER:   Is it up here from before?

9             MR. MONAGHAN:   There is my copy.

10             MS. PHARES:   It's there someplace.

11   Q.   I'd like to refer you back to Paragraph 5, which Mr.

12        Monaghan pointed out to you earlier.

13             Doesn't that paragraph specifically say that

14        the Company, which is Sunbow, has the exclusive right

15        to change, add, or subtract from the music?

16   A.   I believe it does.

17   Q.   Doesn't that paragraph also contain the language that

18        the Company has the exclusive right to combine

19        Plaintiff's music with lyrics?

20   A.   I believe it does.

21   Q.   Wouldn't that language mean to you that the Company,

22        Sunbow, has the right to add music, which might be

23        creating a new work or a derivative work?

24   A.   Adding music -- adding music might create a derivative

25        work.  Adding just a different arrangement, in my

48

```
1              opinion, would not be a derivative work.
2    Q.        What about the addition of lyrics?
3    A.        Yes.
4    Q.        Yes, that would be creating a new work or a derivative
5              work?
6    A.        Take your pick.
7    Q.        Would you not agree that creation of a new work or a
8              derivative work, whichever word you want to use, would
9              require the submission of a new cue sheet in order to
10             indicate the participation of the additional writers?
11   A.        Yes.
12   Q.        I'd like to refer you to Paragraph 5 again.  Later on
13             in that paragraph doesn't that say that Sunbow has the
14             right to extend the writer's share of royalties to all
15             others who have participated in the making of this new
16             work or derivative work?
17   A.        I'm not exactly sure of the language specifically
18             referred to.
19   Q.        5C.
20   A.        Yes; but I believe it's in the context of adding
21             lyrics.  I could be wrong.
22   Q.        The words are "writer and all other such lyricists."
23   A.        Right.  The adding of lyrics, yes, I agree.
24                  MS. SAFFER:  Okay.  I have no further
25             questions.
```

49

```
 1                    THE COURT:  All right.  Ms. Phares.

 2          CROSS-EXAMINATION BY MS. PHARES:

 3    Q.    Mr. Berman, you said that there were, in fact, two

 4          exclusions indicated in this contract; is that

 5          correct?

 6    A.    Yes.

 7    Q.    And you describe one of them as a for-TV-broadcast of

 8          the show; is that correct?

 9    A.    Yes.

10    Q.    And I want to ask you where this exclusion is; if you

11          would identify it?

12    A.    I know that you could probably point it to me easier

13          than I can find it.

14    Q.    All right.  How about this try:  Look at Page 6,

15          beginning on the fourth line.

16    A.    Correct.

17    Q.    Well, would you read that sentence for me?  Beginning

18          with "the term".

19    A.    "The term theatrical motion picture rights, as used

20          herein, refers to synchronization rights granted with

21          respect to motion pictures intended primarily and

22          initially for theatrical release by direct projection

23          before a paid audience."

24    Q.    Paid admission audiences; correct?

25    A.    Paid admission audiences.
```

1    Q.    Semi-colon.  Keep reading.

2    A.    Want me to continue?

3    Q.    Yes, please.

4    A.    "In no event shall such term refer to motion pictures

5          or other methods of recordation, whether now known or

6          hereafter devised, which are produced primarily and

7          initially for television broadcasting by any means

8          whatsoever."

9    Q.    So, in fact, it's not just the TV broadcast of the

10         show that's excluded here, it's any kind of movie that

11         is made primarily for TV; is that correct?

12               MR. MONAGHAN:  What's the -- I'm sorry.  I

13         have to object to the form.  What's the "it" in that

14         question?  "It's not just" ...  I don't ...

15   Q.    All right.  This is a -- this is a definition that --

16         that goes with provision 6a; is that correct?

17   A.    Are you saying that this refers only to 6a and not

18         to --

19   Q.    Well, this says that there is a sync right, does it

20         not, for licenses of theatrical motion picture

21         synchronization as defined below.  Correct?

22   A.    Yes.

23   Q.    And "below" is a reference to this definition, is it

24         not?

25   A.    Of sync, yes.

51

| | | |
|---|---|---|
| 1 | Q. | All right.  So, we're talking now about licenses to |
| 2 | | third parties to synchronize music written under this |
| 3 | | agreement; is that correct? |
| 4 | A. | Yes. |
| 5 | Q. | In theatrical motion pictures.  And that's defined to |
| 6 | | mean only a theatrical motion picture that is |
| 7 | | exhibited to a paid admission audience; correct? |
| 8 | A. | So far. |
| 9 | Q. | And, therefore, it does not apply to any audiovisual |
| 10 | | work made for TV? |
| 11 | A. | No.  Well, that -- that -- so far you might be |
| 12 | | correct. |
| 13 | Q. | Well, how wouldn't I be correct? |
| 14 | A. | Because the -- maybe more relevant portion is 6(avi) |
| 15 | | which covers any other use.  And in order to release a |
| 16 | | home audiovideo device of the TV show, a license is |
| 17 | | required, and that comes under "avi", Other Use. |
| 18 | Q. | I'm talking about the definition of theatrical motion |
| 19 | | picture in 6a-1; correct? |
| 20 | A. | Okay. |
| 21 | Q. | We're just focusing on that.  And a theatrical motion |
| 22 | | picture is defined to exclude, does it not, any motion |
| 23 | | picture which is produced primarily and initially for |
| 24 | | television broadcasting? |
| 25 | A. | Yes. |

| | | |
|---|---|---|
| 1 | Q. | It does not include any such movie; correct? |
| 2 | A. | Yes, yes. |
| 3 | Q. | That's all I want to know. |
| 4 | A. | Okay. |
| 5 | Q. | Now, you also testified that your definition of -- of |
| 6 | | a phono record includes DVDs and videocassettes and so |
| 7 | | forth; correct? |
| 8 | A. | That's the industry generally-accepted definition. |
| 9 | Q. | Are you familiar with the definition of a phono-record |
| 10 | | in the Copyright Act? |
| 11 | A. | I've seen it.  I don't recall it right now. |
| 12 | Q. | Well, would you -- I'm reading to you from the |
| 13 | | Copyright Act; that the phonograph -- a -- phonograph |
| 14 | | records are material objects in which sounds, other |
| 15 | | than those accompanying a motion picture or other |
| 16 | | audiovisual work, are fixed by any method now known or |
| 17 | | later developed and from which the sounds can be |
| 18 | | perceived, reproduced, or otherwise communicated |
| 19 | | either directly or with the aid of a machine or |
| 20 | | device. |
| 21 | | Does that sound familiar to you? |
| 22 | A. | Yes. |
| 23 | Q. | And under that definition, is it not clear -- is it |
| 24 | | also true that -- that it would not include the sound |
| 25 | | which is associated with an audiovisual work like a TV |

```
 1          show?

 2    A.    The -- the reference to phonograph records in 6(ai) is

 3          in the context of mechanical licenses.

 4    Q.    Well, it doesn't say mechanical licenses, does it?

 5    A.    Well, that is -- to anybody knowledgeable about music

 6          publishing, that is what is being referred to there.

 7    Q.    Well, I have -- I have I just want -- I understand

 8          that you think that that's being referred to, but is

 9          it not also possible that this was very carefully

10          drafted to refer to the new definition in the

11          Copyright Act that was effective in 1978?

12    A.    It obviously wasn't very carefully drafted to say that

13          because it doesn't say that.

14    Q.    Because ...?

15    A.    It could have said phono-records as defined in the

16          Copyright Act of 1978; so, it wasn't clear drafted to

17          say that.

18    Q.    It just doesn't -- it just refers to phonograph

19          records, you mean, without the -- without the

20          reference to the Act?

21    A.    My recollection is that the Act refers to phono-

22          records, not phonograph records.

23    Q.    And is it not also true that the Act includes the

24          reference to phono-records in order to distinguish

25          them from copies which includes audiovisual works?
```

54

```
 1   A.    I'm not following that.  I'm sorry.

 2   Q.    There are two kinds of forms of copies in the

 3         Copyright Act, right, phono-records and copies?

 4   A.    Okay.

 5   Q.    And copies includes audiovisual works, including their

 6         sounds, and phono-records does not include audiovisual

 7         -- the sounds of audiovisual works?

 8   A.    Phono-records, yes.

 9   Q.    So, doesn't it seem more likely to you that

10         phono-record is used here because it's referring not

11         to the audiovisual works?

12   A.    No, because this doesn't refer to phono-records.  It

13         refers to phonograph records.  So, it's not tracking

14         the language in the Copyright Act.

15   Q.    I see.  And what were we calling those things in which

16         music was fixed in 1978?

17   A.    A variety of things; among others, phonograph records.

18   Q.    And ...?

19   A.    And what?

20   Q.    And what else?

21   A.    Records.  Sometimes records used alone.

22   Q.    Anything else in that time?

23   A.    Master recordings.

24   Q.    But for the synchronization of -- I mean for the --

25         for making copies of music alone, what were we calling
```

1          those things in 1978, and '85 for that matter?

2     A.   I don't know.

3     Q.   You don't know.  All right.

4     A.   I don't know what you were calling them.

5     Q.   And are you aware that in connection with the

6          negotiation of this Jem contract, that there was a

7          negotiation involving videocassettes, and that video-

8          cassettes were denied by Sunbow?

9               MR. MONAGHAN:  Objection.  He would not have

10         any knowledge, nor can he be asked about what the

11         negotiations were.

12              MS. PHARES:  I asked him --

13              THE COURT:  Well, this is Cross-examination.

14         He's being asked if he knows anything about it.  He

15         can answer it either way.

16    A.   No, I have no information on that.

17    Q.   So, you're not aware that -- that Ms. Bryant's lawyer

18         asked for payments for videocassettes and that they

19         were denied?

20    A.   I'm not aware of that.

21    Q.   And I have another question for you.  If you would --

22         since we don't have the front page of this agreement,

23         if you would turn to the front page of this contract,

24         and in Paragraph 1, you'll see that there is a

25         reference to the -- the writing, preparing, and

```
 1            delivering to the Company original musical material,

 2            which is here and after referred to as the -- capital

 3            M  -- Music, for songs to be used in a fully animated

 4            children's television show.

 5                    Do you see that?

 6    A.      Yes, I do.

 7    Q.      And do you also see, further along in that sentence,

 8            that the fully-animated children's television show

 9            consisting of either 5 one-half hours, 15 segments, or

10            a television motion picture presently entitled "Jem",

11            and that is referred to as The Show; correct?

12    A.      Correct.

13    Q.      And, in your mind, how would you distinguish "Music"

14            and "The Show" as they appear in this contract?

15    A.      Music are the musical compositions created pursuant to

16            this contract for the show, and the show is the visual

17            portion of the dialogue, the --

18    Q.      So, you think that when it describes the five

19            one-and-a-half hours, 15 segments, or the television

20            motion picture, that that -- that ensemble is the

21            show, but that doesn't you include the music?

22    A.      No, I said it includes the music.

23    Q.      It includes the music?

24    A.      Yes.

25    Q.      Okay.  So, then, if you turn to Section 6, where the
```

```
 1              publishing rights are described, and specifically to

 2              Section 6a-1, that's a reference to Other Uses of the

 3              Music -- Capital M -- isn't that correct?

 4     A.       Yes.

 5     Q.       It's not a reference to other uses of the show; isn't

 6              that correct?

 7     A.       To other uses of the Music.  It doesn't exclude others

 8              uses of music with the show, but it is of the Music,

 9              that's correct.

10     Q.       But it uses specifically the defined term Music, with

11              a Capital M, does it not?

12     A.       Certainly it does, because the writer of the music

13              would have no economic interest in the exploitation of

14              the show absent the music.  The rights granted here-

15              under to the writer only pertain to income derived

16              from the music.

17     Q.       The composer really wouldn't have any economic

18              interest in the show as a whole; isn't that correct?

19     A.       No.  In the show, absent the music, would be correct.

20     Q.       But you just said that the show -- didn't you just

21              testify that the show included the music, that that

22              was a unitary whole; isn't that correct?

23     A.       For certain purposes.  But if you are reproducing the

24              show, with the music, pursuant to a license to a third

25              party, you are granting them rights to the music and
```

58

```
 1          the other elements that make up the show.  You're

 2          granting a broad bundle of rights, part of which is

 3          the rights to the music.

 4    Q.    Isn't it true, Mr. Berman, that this entire section,

 5          6a, refers only to -- in every single section, it

 6          refers to, Capital M, Music?

 7    A.    I believe it -- yes, it only refers to the music.

 8    Q.    And under your definition, we would have -- we have a

 9          confusion, don't we?  We have -- we could use show, by

10          your example.  It wouldn't make any difference,

11          because we would always be picking out the music

12          portion of it?

13    A.    No, we couldn't -- well, show would certainly create,

14          use of that term, a gross ambiguity as to whether or

15          not the writer was entitled to income derived from

16          elements of the show other than the music, which I'm

17          not maintaining.

18    Q.    So, in fact, didn't the contract define them

19          separately so we wouldn't have that confusion, isn't

20          that correct?  If we were using the music --

21    A.    I don't --

22    Q.    If we were using the music alone, we use the word

23          "music"?

24    A.    I'm not sure that was intended.

25    Q.    But you don't know; isn't that correct?
```

59

```
 1   A.   I -- I can't specifically say I know.

 2   Q.   Now, you also said that royalty statements sometimes

 3        refer to mechanical licenses; isn't that correct?

 4   A.   Mechanical income, yes, from the licenses.

 5   Q.   And, well, are you making distinction between

 6        mechanical licenses and mechanical income?

 7   A.   For what purpose?  For the purpose of --

 8   Q.   I don't know.  You just corrected me.  I was wondering

 9        if you were making a distinction.

10   A.   I was referring to what generally is provided for in a

11        royalty statement to a writer, and it would indicate,

12        in general, mechanical royalty income that was derived

13        from any licenses issued during the relevant period.

14   Q.   And that would refer to -- and that's because you'd

15        see a reference to mechanicals; is that correct?

16   A.   Yes, with generally the catalog number of the record

17        in question for which the license was issued.

18   Q.   Now, you're familiar with these kinds of royalty

19        statements in the record business; isn't that correct?

20   A.   No, I'm talking about a publishing statement.

21   Q.   A publishing statement.  And do publishing statements

22        include income from foreign countries?

23   A.   Yes.

24   Q.   Do foreign countries charge mechanical licenses for

25        things that are different than what are charged for
```

60

```
 1              mechanicals in the United States?

 2       A.     I am sorry?

 3       Q.     Are mechanical licenses made in foreign countries for

 4              uses that are -- that differ from the uses made in the

 5              United States?

 6       A.     There is a custom -- it's a ...  Possibly.

 7       Q.     What do you mean by "possibly"?

 8       A.     The custom and practice currently for royalties on

 9              home audiovisual devices, particularly for television

10              pictures, is that the initial license for the

11              television show is a synchronization license, and it

12              has now become standard that, in addition to the

13              synchronization license, there is a buy-out, not a

14              waiver, but a buy-out of the rights to include the

15              composition in home audiovisual devices.  The buy-out

16              can be a lump sum, the buy-out can be a royalty, but

17              it's generally taken care of at the time the music is

18              licensed for the show.

19                   I believe it may be true in certain foreign

20              countries where the norm for the licensing of the

21              music in a home audiovisual device is a straight

22              mechanical royalty.

23       Q.     You say you "believe".  Do you know?

24       A.     I think that to be the case.

25                   MS. PHARES:  Do we have double A in evidence
```

1      yet?

2              MR. MONAGHAN:  That's not in evidence.

3              MS. PHARES:  Do we know where it is?

4              MR. MONAGHAN:  Sure.  Right here.  (Handing).

5

6           (Off the record discussion between Ms. Phares

7           and co-counsel. )

8

9              MS. PHARES:  Exhibit 48 -- I am completely

10      confused with -- oh, these are duplicates.  Okay.

11  Q.    Now, did you say you were or were not shown

12      Plaintiff's 48 and Defendant's Exhibit A, which has

13      been offered, apparently, only for identification --

14      but, actually, I would be happy to offer it in

15      evidence, if Your Honor would clear that up now.  This

16      was offered --

17              MR. MONAGHAN:  I know she'd be happy, but we

18      have a serious objection.  There's no foundation for

19      this exhibit at all.  The only witness who has

20      testified about it is the Plaintiff, who said she

21      never got it.  The only way you can get it in is with

22      a person to say it was either sent or received.

23              MS. PHARES:  So, there is, actually, Your

24      Honor, attached, as Exhibit B to the affidavit that

25      was admitted yesterday, a letter from me to Mr.

62

| | |
|---|---|
| 1 | Monaghan in 2004, transmitting this document. |
| 2 | I don't have it with me, but I can bring it |
| 3 | on Friday, a document in which Mr. Monaghan is |
| 4 | complaining about having received it. |
| 5 | THE COURT:  Okay. |
| 6 | MS. PHARES:  So, if that's -- |
| 7 | THE COURT:  Hold on.  The question yesterday |
| 8 | of the witness was had she ever seen it, and the |
| 9 | answer was no. |
| 10 | Now, Mr. Monaghan and you may send anything |
| 11 | back and forth to each other, but it doesn't make it |
| 12 | evidence. |
| 13 | MS. PHARES:  Well, the issue -- I understand |
| 14 | that.  The issue related, however, to whether or not |
| 15 | they had been provided to -- to Ms. Bryant.  She said |
| 16 | she couldn't recall. |
| 17 | MR. MONAGHAN:  No, she said "no". |
| 18 | THE COURT:  So, what you're saying -- hold |
| 19 | on.  What you're saying is, by sending a copy of it to |
| 20 | her lawyer, she's, in fact -- in fact provided with |
| 21 | it? |
| 22 | MS. PHARES:  I think that's a fair |
| 23 | assumption. |
| 24 | THE COURT:  Well, I'll consider that.  But |
| 25 | not now. |

63

```
 1                    Go ahead.

 2                    MS. PHARES:  It was produced in discovery in

 3           this case.

 4                    MR. MONAGHAN:  But that's not -- that's not

 5           the issue.  The issue --

 6                    MS. PHARES:  It was also sent to --

 7                    MR. MONAGHAN:  The issue is was a royalty

 8           accounting rendered pursuant who whatever the contract

 9           requires?

10                    MS. PHARES:  Well, she also said she

11           certainly remembered receiving the receipt -- the

12           checks that went with it.

13                    MR. MONAGHAN:  I make my arguments to the

14           Court.

15                    THE COURT:  All right.  Please, let's go

16           forward with this.

17    Q.     All right.  In any event, have you been shown what is

18           in evidence as Defendant's Exhibit double A?

19                    MR. MONAGHAN:  It's not in evidence.

20    Q.     I mean  -- I beg your pardon.  It has been identified

21           as Defendant's Exhibit double A (handing).

22    A.     I think I saw this.

23    Q.     And you're testifying that you don't have any

24           indication of what the uses are when you read this; is

25           that correct?
```

64

```
 1   A.   No, I didn't say that.

 2   Q.   Oh, I thought you had said earlier that there were no

 3        indications on what you had seen for -- of the uses of

 4        the -- of the material.  Is that incorrect?

 5             THE COURT:  I think that's 50 he was talking

 6        about.

 7             MR. MONAGHAN:  That's correct, Your Honor.

 8        Objection.

 9   Q.   I see.  But on these royalty statements, Mr. Berman,

10        are the uses indicated on the royalty statements?

11   A.   Yes.

12   Q.   And what else is indicated on the royalty statements?

13        And tell me what you're looking at, just so we're

14        clear for the record.

15   A.   Well, I'm looking at Exhibit AA.

16   Q.   Okay.  Just use the top page, maybe, as an example or

17        choose a page and give us the production number so

18        we're clear?

19             THE COURT:  Well, you're asking him to read

20        something that's not in evidence, Counselor.

21   Q.   Are you familiar with these kinds of royalty

22        statements?

23   A.   Not this one specifically.

24   Q.   I said:  Are you familiar with these kinds of royalty

25        statements?
```

```
 1                    MR. MONAGHAN:  Well, what does that mean?

 2          Object to the form.  There's no -- "kind" means

 3          there's some standard, some form typical --

 4                    THE COURT:  No, I think that's an answerable

 5          question.

 6                    Have you seen statements like that before?

 7                    THE WITNESS:  Not exactly like this.

 8          Somewhat like this.

 9                    THE COURT:  Well, somewhat like this.

10                    And in those statements, did they identify

11          the source, purported source, of the money that was

12          being paid to the artist?

13                    THE WITNESS:  To some extent, yes.

14                    THE COURT:  Okay.

15                    MS. PHARES:  Your Honor, I offer this exhibit

16          in evidence.

17                    MR. MONAGHAN:  Object, Your Honor, on the

18          grounds that have already been discussed.

19                    THE COURT:  Yes; sustained.

20     Q.   So, all right.  Would you turn to the other exhibit,

21          Number 40?

22                    Have you ever seen a royalty statements like

23          that?

24     A.   Somewhat, yes.

25     Q.   And do those statements indicate the origin of the
```

66

|   |   |   |
|---|---|---|
| 1 |    | monies that are being paid? |
| 2 | A. | I'm just looking at the first page now. |
| 3 | Q. | Would you give me the production number? |
| 4 | A. | I'm sorry? |
| 5 |    | MR. MONAGHAN:  The dates numbered on the |
| 6 |    | bottom. |
| 7 | A. | 1142. |
| 8 | Q. | Well, rather than look at that summary page, why don't |
| 9 |    | you look at one of the regular pages that is a royalty |
| 10 |   | statement.  Let's say 1143. |
| 11 | A. | What's the question? |
| 12 | Q. | Can you describe for me, based on your familiarity |
| 13 |   | with royalty statements, for example, taking the first |
| 14 |   | entry, what is indicated by this statement? |
| 15 | A. | Yes, to a certain extent I can. |
| 16 | Q. | Would you do so, please? |
| 17 | A. | It's a mechanical royalty statement.  The initial |
| 18 |   | section is for GI Joe.  It gives units, it gives the |
| 19 |   | time period, it gives the amount received.  I can't |
| 20 |   | tell -- I mean, it does have -- and it has record or |
| 21 |   | catalog numbers.  I can't tell by looking at it, |
| 22 |   | because I don't know what the catalog numbers refer |
| 23 |   | to, whether this is for a CD, a DVD, a video device, |
| 24 |   | or not; I don't know.  But it's a mechanical royalty |
| 25 |   | statement and it lists the catalog number of the item |

1           in question.

2    Q.     And does it indicate who the -- who the other -- or

3           the people who are to be paid for the particular ...

4    A.     I believe it does.

5    Q.     You believe so or does it?

6    A.     Well, it says Douglas/Bryant/Walsh.

7                    MR. PHARES: Right.

8    A.     I'm making an assumption -- I don't have first-hand

9           knowledge -- I'm making the assumption that those are

10          the writers of these cues for which a mechanical

11          royalty is being paid.

12   Q.     And then the next row over is under "units".  What do

13          you understand that to mean?

14   A.     The number of units sold or for which a royalty was

15          paid.

16   Q.     And then for the next period, the -- the row, cap

17          period?

18   A.     The time period in which those units were sold.

19   Q.     And . The next column, what do you understand that to

20          mean?

21   A.     The amount received by --

22   Q.     I mean, the column that has above it, Percent,

23          P-E-R-C.

24   A.     I read that column to indicate percent received.

25   Q.     Okay.  And then the next column?

68

```
 1    A.    Amount received.

 2    Q.    And the next column?

 3    A.    Your share.

 4    Q.    And then the next column?

 5    A.    Amount due.

 6    Q.    And then the next column?

 7    A.    It's a total.

 8    Q.    Okay.  That was the easy part.

 9    A.    No, it's pretty clear.

10    Q.    And the rest of these statements indicate the other

11          kinds of royalty income?

12    A.    Well, I haven't studied these.  If you want me to take

13          the time I will.

14    Q.    Is there -- do you see any income for ring tones?

15    A.    There may well -- yes, I do, yes.

16    Q.    And do you see any ring tones for which Ms. Bryant is

17          the recipient of income?

18                    MR. MONAGHAN:  Object to the form of the

19          question.  If I can explain this objection, Your

20          Honor?

21                    THE COURT:  No.  Overruled.  You've got an

22          expert witness on the stand.  He can answer the

23          question.  If he can't, he's going to tell us.

24                    MR. MONAGHAN:  This is an entirely different

25          subject matter.  This royalty statement is not a
```

69

```
 1              royalty statement addressed to Ann Bryant.  When they
 2              say your share, it's addressed to TV Loonland.
 3                   THE COURT:  Counselor?
 4                   MR. MONAGHAN:  The attempt here has been
 5              made --
 6                   THE COURT:  Counselor?
 7                   MR. MONAGHAN:  Okay.  Withdrawn.
 8                   THE COURT:  Go ahead.
 9    A.        I'm sorry.  Where --
10                   THE COURT:  Start -- let's go to a new
11              question.
12    Q.        Can you identify an entry here that shows the payment
13              of ring tones to Ms. Bryant?
14    A.        Oh, I can't identify anything that shows a payment to
15              Ms. Bryant on any of this.  This doesn't indicate any
16              payment to Ms. Bryant.  It appears to me to indicate
17              money that would be due Ms. Bryant.
18    Q.        And why is it that you wouldn't be able to do that?
19    A.        It is a statement from Sony ATV Music Publishing, LLC,
20              to TV Loonland purporting, in my estimation, to set
21              forth the various royalties that TV Loonland would be
22              obligated to pay various writers.
23    Q.        Okay. And now turn back to Page 1, the one that we
24              spurned earlier.  And --
25    A.        My goodness.
```

1   Q.   Which is Sunbow 1142 is the production number.  Do you

2        see an entry on that page referring to Ms. Bryant?

3   A.   Referring to Ms. Bryant?  Yes.

4   Q.   And from that you are able to determine payments?

5   A.   Not to Ms. Bryant.

6   Q.   All right.  What can you determine from them?

7   A.   Well, I can't determine.  I intuit, and I think

8        logically so, that there was a payment of a total of

9        approximately $60,000.00 paid by Sony ATV Music to TV

10       Loonland.

11  Q.   That's what you -- right.  And for what purpose.

12  A.   For the exploitation of various musical compositions

13       in various foreign territories.

14  Q.   Attributable to the people who are listed -- and these

15       monies are attributable to these publishing companies

16       and these composers or lyricists; is that correct?

17  A.   That would be my understanding.

18  Q.   And one of them is Ms. Bryant; is that correct?

19  A.   That would be -- that would be my understanding.

20  Q.   Thank you.  Now, one of the -- all right.

21            Well, before we leave that one, why don't you

22       turn to the next -- to the next page, 1143, and do you

23       see at the top, which we were looking at -- at the top

24       of that page, where it says "in account with"?

25  A.   Yes.

71

| | | |
|---|---|---|
| 1 | Q. | And what does it say? |
| 2 | A. | Anne Bryant.  Bryant, comma, Anne. |
| 3 | Q. | I beg your pardon? |
| 4 | A. | Bryant, comma, Anne. |
| 5 | Q. | And do you understand, then, this to be a page |
| 6 | | referring to Ms. Bryant? |
| 7 | A. | It refers to Ms. Bryant, yes. |
| 8 | Q. | And this is a breakdown of royalties with respect to |
| 9 | | her? |
| 10 | A. | I believe it is. |
| 11 | Q. | Okay.  And what about the next page? |
| 12 | A. | I believe the same. |
| 13 | Q. | And the next? |
| 14 | A. | The same. |
| 15 | Q. | And the next? |
| 16 | A. | The same. |
| 17 | Q. | Okay.  And then what's the next page, Mr. Berman? |
| 18 | A. | Again a summary page. |
| 19 | Q. | It's another summary page, isn't it? |
| 20 | A. | Correct. |
| 21 | Q. | And then what about the next page?  Does it not also |
| 22 | | have a ledger referring to, In account with Bryant, |
| 23 | | Anne? |
| 24 | A. | Yes, it does. |
| 25 | Q. | So, is there really -- is it really so difficult for |

72

```
 1          you to figure out what it is that she has been paid
 2          by -- based on looking at these statements?
 3     A.   It's not difficult, it's impossible.
 4     Q.   And why is that?
 5     A.   Because all this does is refer to payments that are
 6          due, and presumably paid, but I don't even know that
 7          for a fact, payments that are due from Sony ATV Music
 8          to TV Loonland.
 9     Q.   Correct.  But these particular payments on these
10          particular royalties are referring to those assigned
11          to Anne Bryant, are they not?
12     A.   I would make the logical assumption that this
13          indicates specific amounts of money that TV Toonland
14          (sic) would owe Ms. Bryant.  I have no knowledge
15          whatsoever of whether or not those payments were ever
16          made.
17     Q.   You certainly -- you certainly -- well ...
18     A.   I don't even know, have any knowledge, as to whether
19          Sony ATV paid these amounts to TV Loonland.  I'm
20          making that assumption.
21     Q.   You're not aware -- you're saying that Sunbow has sent
22          a check to Ms. Bryant for the summary of the amounts
23          that are shown on these pages?
24     A.   That's correct.
25     Q.   But you wouldn't be surprised to learn that they have,
```

```
 1         would you?

 2   A.    I wouldn't be surprised, no.

 3   Q.    And in your earlier testimony you mentioned a number

 4         of major stars for whom you have negotiated

 5         agreements.

 6              Isn't it true that these kinds of publishing

 7         agreements are, in fact, the subject of negotiation;

 8         isn't that correct?

 9   A.    As a general statement, that's true.

10   Q.    And it's also true that the -- the form of the deal is

11         very likely going to relate to how much clout each

12         side has; isn't that correct?

13   A.    That's a generally true statement.

14   Q.    And it's probably likely, also, that a major artist or

15         a major composer may end up with a more favorable deal

16         than a -- than a more junior, less well-known artist

17         or composer or lyricist; correct?

18   A.    I would agree.

19   Q.    So, it's -- that it's quite possible, also, that

20         somebody who ends up with a deal that includes

21         extensive publishing rights may differ from a person

22         who has very little clout and can't demand that from a

23         publisher?

24   A.    I don't think you phrased it very well.  I do believe

25         I know what you're getting at.
```

74

```
 1   Q.   Well, why don't you patronize me and tell me what you
 2        think.
 3   A.   I do not want to be patronizing here.
 4             There are artists, writers, who have more
 5        clout, as you say, more bargaining power than others
 6        and would get more favorable terms.
 7   Q.   And isn't it also true, Mr. Berman, that very often,
 8        especially in the field of commissioned music for
 9        movies and TV, that major, major, writers do not get
10        any publishing?
11   A.   Publishing in the sense, then, because the term is
12        used ambiguously, even by people within the industry,
13        publishing in the sense of ownership of copyright,
14        yes.  Publishing in the sense of right to what I refer
15        to as, quote, songwriters royalties, definitely, no.
16   Q.   And your definition of songwriter royalties are those
17        that are described in this agreement?
18   A.   In general, yes.
19   Q.   And you think it was common in the mid '80s for a
20        songwriter to have a provision that allowed for other
21        uses of music?
22   A.   I'm not -- I'm not following.
23   Q.   Isn't it true that for a songwriter to have obtained a
24        provision like Section 6a in an agreement, for
25        commissioned music for a TV show or movies, was highly
```

1          unusual?

2    A.    No, I would say that is part of the standard song-

3          writers royalties provision; 50% of all other income.

4          The normal split between -- of income between the

5          publisher and the writer, because for me the writer

6          has no interest in the copyright, is -- and excluding

7          print -- is roughly 50/50.

8    Q.    Well, print is a big part of these -- of these rights

9          here.  I mean, print doesn't go on a 50/50 basis.

10   A.    Print does not go on a 50/50 basis and print is

11         generally the least lucrative of any of the rights or

12         income producing properties of a composition.

13   Q.    Do you happen to know whether or not any of Ms.

14         Bryant's compositions for Sunbow have been licensed

15         for a theatrical motion picture.

16   A.    I believe I was informed -- I don't know it from

17         first-hand knowledge.  I believe I've been advised

18         that that is the case.

19   Q.    By somebody other than someone in this case?

20   A.    By Mr. Monaghan.

21   Q.    Okay.  Not by anybody in this case.

22               Do you know whether or not any of Ms.

23         Bryant's music has ever been -- whether a phono-record

24         has ever been made of any of her songs?

25   A.    I don't know.

76

```
 1   Q.   Do you know whether or not --
 2   A.   Excuse me.  By phono-record, you -- in the context of
 3        that question, you're excluding audiovisual devices?
 4   Q.   Correct.
 5   A.   I don't know.
 6   Q.   And a synchronization right, let's make it clear, a
 7        synchronization right in this agreement only refers to
 8        a license made to a third party; isn't that correct?
 9   A.   I would have to really study it to see that.  I think
10        that's probably the case.
11   Q.   Well, when it says received by the Company from third
12        parties for licensing, doesn't that mean to you that
13        it would have to be from a third party?
14   A.   Well, that includes the mechanical license also.
15   Q.   Correct.
16   A.   I think it pretty much all refers to third parties; I
17        agree.
18   Q.   It all refers to third parties.
19             None of these refer to exploitations by
20        Sunbow itself; correct?
21   A.   I have never addressed that issue.  I think that's
22        quite possibly true.
23   Q.   Mr. Berman, let's go back to the Page 1 where we
24        indicate that the definition of music for this -- for
25        this contract refers to -- well, let me go back.
```

```
 1              Let's see.  That -- I don't want to take this out of

 2              context -- but that this is -- music, for purposes of

 3              this definition, is original musical material for

 4              songs to be used in a fully-animated children's

 5              television show that are being delivered pursuant to

 6              this agreement.

 7                   Is that correct?

 8    A.        That's my understanding.

 9    Q.        So, am I correct that -- or would you agree, then,

10              that the Sunbow contracts for this contract applies

11              only to the compositions written for Sunbow and not

12              for compositions written for other entities?

13                   MR. MONAGHAN:  That's -- objection; because

14              the contract speaks for itself and this witness is not

15              privy to the rulings about the other compositions.

16                   MS. PHARES:  If so we wouldn't have this

17              witness.

18                   THE COURT:  Hold on.  He's an expert witness.

19              If he can answer it.  Now, you know, there are things

20              that you can't answer because you don't know all the

21              parts, in which case you say, I can't answer it that

22              way, or ...

23                   THE WITNESS:

24    A.        I really don't know.  I ... I ...  It's beyond my

25              purview.
```

```
 1                    THE COURT:  Okay.  Let's move along with this

 2           witness.

 3     Q.    Wait a minute.  You're saying to me that you would

 4           understand that -- that the music written under this

 5           agreement could be governed by some agreement other

 6           than this agreement?

 7     A.    Well, certainly there could be other agreements which

 8           would modify or amend it, so, that is possibly true.

 9           It's also possibly true that this agreement is being

10           used, however so, to interpret other agreements, not

11           this agreement.  I don't have knowledge of that; I

12           don't know.

13     Q.    I just want to tell you that there is a merger clause

14           in this contract and it makes no reference to any

15           other agreements.

16     A.    That doesn't mean there can't be a subsequent

17           amendment to it.

18     Q.    Well, there is actually a subsequent amendment, that's

19           true, but Mr. Monaghan hasn't deemed it important to

20           show that to you.

21                    MR. MONAGHAN:  Not fair, Judge.  Object to

22           the form.

23                    THE COURT:  Well, I'm not paying any

24           attention to remarks of counsel.  Let's keep going

25           here.  I want to move along with this witness.
```

79

1                    Let's go on.

2                    MS. PHARES:  I have no further questions,

3          Your Honor.

4                    THE COURT:  All right.

5                    Mr. Monaghan, have you got Redirect?

6          REDIRECT EXAMINATION BY MR. MONAGHAN:

7     Q.   Is there any doubt in your mind, Mr. Berman, but that

8          any licenses issued by Sunbow to third parties, such

9          as Kid Rhino Productions, would have come within the

10         purview of the agreement that you've been testifying

11         about?

12    A.   None.

13    Q.   Is there any doubt but that there should have been

14         reporting about any such licenses?

15    A.   None.

16    Q.   Have you seen any reporting about licenses to, for

17         example, Kid Rhino or any of these other entities?

18    A.   No.

19                   MR. MONAGHAN:  Thank you, Sir.

20                   THE COURT:  Ms. Saffer?

21                   MS. SAFFER:  No further questions.

22                   THE COURT:  All right.

23                   THE COURT:  Ms. Phares?

24                   MS. PHARES:  Just one moment, Your Honor.

25

```
1                    (Off the record discussion between

2                    Ms. Phares and co-counsel.)

3

4               THE COURT:  You're limited, of course, by the

5     Redirect.

6               MS. PHARES:  I have nothing more, Your Honor.

7               MR. MONAGHAN:  Thank you, Judge.

8               THE COURT:  Mr. Berman, you're not finished

9     yet.  I have a couple questions for you.

10              THE WITNESS:  Yes, Your Honor.

11              THE COURT:  First of all, you know, you have

12    pointed out that the system for dividing up the rights

13    or -- or, even better, put the money is a very

14    complicated one.  You said that, so, just --

15              THE WITNESS:  Oh, excuse me.  I'm glad you

16    asked that, because I was narrowly referring to the

17    methodology used by BMI and ASCAP --

18              THE COURT:  Yeah.

19              THE WITNESS:  -- which I doubt that many

20    people, including those working for BMI and ASCAP,

21    could explain to you the methodology of how

22    performance income is divided up.

23              THE COURT:  Okay.  Now imagine, now, you,

24    with a very reasonable background in this field, are

25    having trouble with this.  Now imagine a layman, such
```

1    as myself, trying to figure this out.  And that leads

2    me up to the following question:    Would it be any

3    surprise to you that the Plaintiff in this case, Anne

4    Bryant, would only get eight percent or

5    eight-and-a-half percent for transformers?

6                THE WITNESS:  Yes, it's surprising to me.

7                THE COURT:  So, you think that through all

8    the iterations that have gone on with this, that she

9    still should be getting a much larger share of the

10   transformer bucks that are coming in?

11               THE WITNESS:  Yes, I do.

12               THE COURT:  All right.

13               Yes?

14               MS. SAFFER:  If I may, I'd like to ask him a

15   specific question relating to yours.

16               THE COURT:  Well, hold on, hold on.  If my

17   few questions give rise to something else that you

18   want to ask, you obviously will be permitted to ask

19   that.

20               MS. SAFFER:  Thank you, Your Honor.

21               THE COURT:  All right.

22               Is there any doubt in your mind that Ms.

23   Bryant was a -- was involved as -- I'm trying to

24   figure the right word, but an artist-for-hire; this

25   was a contract, right?

```
 1                    THE WITNESS:  That's correct.
 2                    THE COURT:  All right.  And under that
 3         contract, she had rights to receive a statement, I
 4         take it, every six months?
 5                    THE WITNESS:  That is my opinion, yes.
 6                    THE COURT:  All right.  Now, that right, I
 7         take it, she didn't have to ask for a statement; they
 8         were just supposed to be given to her?
 9                    THE WITNESS:  That's my understanding.
10                    THE COURT:  Now, if there came a time when
11         for years no statement came in, and transformers is
12         all over, it made it into Tom Clancy's books, as a
13         matter of fact, his kids in London, one of them are
14         listening to the transformers tape, wouldn't you think
15         that a reasonable writer would investigate about why
16         there wasn't any money coming in, when obviously it
17         was doing so well?
18                    THE WITNESS:  I can't say a writer wouldn't.
19         I can think of a couple of issues where a writer might
20         not.
21                    If Ms. Bryant was regularly receiving
22         performance income from BMI, she might have thought,
23         improperly, that that was all the activity that was
24         going on.  I don't know how sophisticated Ms. Bryant
25         in terms of royalty accountings.
```

1          Secondly -- I suppose it not for me to say,

2    Your Honor, but there is a No Waiver Clause in this

3    agreement.  So that to the extent that she did -- she

4    should have objected at some point, there is a

5    provision in the agreement that says that -- that no

6    waiver doesn't waive any subsequent actions.

7          THE COURT:  Okay.  But there is a requirement

8    that within a year you have to do something?

9          THE WITNESS:  There's a requirement that you

10   have to object to a statement within a year, but if

11   you never get the statement, I don't know how the year

12   commences.

13         THE COURT:  So, you feel it's a reasonable

14   action on the part of a writer -- and I'm asking you

15   this as an expert -- with a product, if I can call it

16   that, that is obviously immensely popular, not to

17   wonder through years why no checks are coming?

18         THE WITNESS:  Well, my problem -- my problem

19   with that is that there were checks coming.  They

20   certainly weren't of the amount that I think they

21   should have been.

22         THE COURT:  All right.  Final question.

23         Ms. Bryant is entitled to an accounting, is

24   she not, for the money that she purports to be owed

25   under this agreement?

84

1              THE WITNESS:  Yes, that's my understanding.

2              THE COURT:  All right.  Now, what must she do

3         under this agreement to get that accounting?

4              THE WITNESS:  Well, under this agreement, she

5         shouldn't have to do anything to get that accounting.

6              THE COURT:  Well, she at least has to say I'm

7         unhappy.

8              THE WITNESS:  Well, the burden of the

9         accounting is on the publisher, on Sunbow.  The

10        agreements provide that they're obligated, as is the

11        norm in any such arrangement, that the publisher is

12        obligated to render these periodic accounting

13        statements.

14             THE COURT:  All right.  That's all the

15        questions I have.

16             If that raises other questions in the mind of

17        any of the attorneys here present, they may now ask

18        them.

19   RE-RECROSS EXAMINATION BY MS. SAFFER:

20   Q.   I think that there is one point that's universally

21        accepted by everybody in this courtroom, that this

22        product is valuable and that Ms. Bryant participated

23        in the creation of the music.  The argument's over how

24        much, to what extent, etcetera.

25             Now, would you agree that there are multiple,

```
 1              multiple versions, many versions of this music that

 2              has appeared in TV commercials, jingles, whatever, on

 3              all of these things that have been waived around by

 4              Mr. Monaghan?

 5      A.      I don't know that for a fact, but I wouldn't be

 6              surprised if that were the case.

 7      Q.      Okay.  And you have testified that when an inversion's

 8              created because lyrics are added, I think those were

 9              your words, that that would call for the submission to

10              BMI of a new cue sheet?

11      A.      An additional lyrics, yes, I would agree with that.

12      Q.      Okay.  Would you agree that if there's new material

13              added by the copyright owner, which you have conceded

14              is Sunbow, that that is going to reduce Ms. Bryant's

15              participation as new writers with new material are

16              added?

17      A.      It depends upon whether it is new material or merely a

18              new arrangement.

19      Q.      I didn't say new arrangement.  I said new material.

20      A.      If you are distinguishing it from a new arrangement, I

21              would agree with you.

22      Q.      Okay.  Would you be surprised to learn that BMI has

23              cue sheets in which Ms. Bryant is indicated as the

24              only writer of the composition?

25      A.      No.
```

1   Q.   Would you be surprised to learn that BMI has received

2         cue sheets in which she is the listed as a co-writer?

3   A.   I have no first-hand knowledge, but I wouldn't be

4         surprised.

5   Q.   Would you be surprised to learn that there has been

6         one cue sheet received by BMI which reduced Ms.

7         Bryant's share to, I think it was, eight-and-a-half

8         percent?

9   A.   I just have no knowledge of this.

10   Q.   Do you have any knowledge of BMI ever creating cue

11         sheets themselves?

12   A.   No, I don't.

13   Q.   And you have testified that it is BMI's practice to

14         accept cue sheets that are submitted by publishers and

15         producers, have you not?

16   A.   It was my understanding that if BMI or ASCAP received

17         new cue sheets which reduced the share -- well, I'm

18         talking about arrangements.  New material, which I

19         agree Sunbow had the right to add, I would have

20         thought it would be Sunbow -- excuse me -- BMI's

21         practice to go to the original writer to confirm that

22         this was the case.

23   Q.   Why would you have thought so?

24   A.   Because the new material being submitted negatively

25         impacts upon BMI's obligation to pay the original

1          writer.

2    Q.    Have you ever, in your many, many, many years of being

3          in the music business, submitted a cue sheet and had

4          BMI come to you and say, wait a minute, this is a new

5          cue sheet for a show and, therefore, we're rejecting

6          your cue sheet?

7    A.    No.

8    Q.    Has that ever happened to you?

9    A.    Not to me, no.

10               MS. SAFFER:  Okay.  Thank you.

11               No further questions.

12               THE COURT:  Ms. Phares?

13         RE-RECROSS EXAMINATION BY MR. BERMAN:

14   Q.    Mr. Berman, I want to talk about this -- this

15         provision of --

16               MR. MONAGHAN:  Your Honor said any questions

17         generated by the questions --

18               MS. PHARES:  Yes, I do know.

19               MR. MONAGHAN:  -- that Your Honor asked.

20               THE COURT:  Right.

21               MS. PHARES:  That he asked, and that's

22         exactly what I'm asking about.

23   Q.    I'm asking about this audit and notice right of the --

24         of the composer.  Specifically where it says that the

25         Contractor -- which under this agreement was Kinder

88

```
 1        and Bryant -- shall have the right, at the
 2        Contractor's sole expense, to inspect the Company's
 3        books and records relative to gross receipts derived
 4        from the use of the Music hereunder and to make
 5        extracts thereof, provided such inspection shall be at
 6        the Company's offices during reasonable business hours
 7        and upon reasonable notice, and not more frequently
 8        than once a year.  All royalties, statements, and
 9        other accounting rendered by Company shall be binding
10        upon the Contractor -- that's, again, Kinder and
11        Bryant -- and not subject to any objection by -- by
12        the Contractor, unless specific objection in writing
13        stating the basis thereof is given to Company by
14        Contractor by one year from the date rendered.
15             Correct?
16   A.   Yes.
17   Q.   So, if -- so, that one year doesn't begin to run until
18        those statements are received; isn't that correct?
19   A.   That would be my interpretation.
20   Q.   So, if they happen to be late, that really -- that one
21        year still runs from the date that they're received;
22        isn't that correct?
23   A.   I would interpret that to be the case.
24   Q.   I mean, if Sunbow happens to send a statement late, it
25        means that that one year is still going to run from
```

89

```
 1          whenever it's received by the -- by the artist, the
 2          composer; correct?
 3    A.    Yes.  I don't know if that negates a breach, but in
 4          general I agree with that.
 5    Q.    All right.  And then -- and then what is the
 6          obligation exactly of the -- of the composer at that
 7          point?
 8                MR. MONAGHAN:  The contract speaks for
 9          itself, Judge.
10                THE COURT:  No, I'll allow it.
11    A.    The obligation is nothing.  The right of the
12          contractor is to object within a year of receiving the
13          statement.
14    Q.    And, in order to help them do that, they can even
15          demand the right to inspect the books of the company;
16          is that correct?
17    A.    That have -- that is a fairly typical audit provision,
18          yes, they have the right to audit the books.
19    Q.    And they could do that if they had a problem
20          interpreting or they questioned something on the
21          statement, isn't that correct?
22    A.    Yes, they could.
23    Q.    And that is -- and if they don't do that, however,
24          then that claim is barred; is that correct?
25    A.    Well, you know, that's ...  What's interesting about
```

90

```
 1         that, in my opinion, poorly drafted clause, is the

 2         right to audit, which it normally would be, is not

 3         specifically limited to the one year from the date

 4         rendered.  It does say, shall be binding, not subject

 5         to objection.  But it doesn't -- within one year of

 6         rendering --

 7    Q.   Wait a minute, wait a minute.

 8    A.   -- but it doesn't --

 9              MR. MONAGHAN:  Can he finish his answer,

10         Judge.

11    Q.   What is it that -- I know, but it had a lot of -- what

12         is it that you say is binding or not binding?

13    A.   The account rendered, the royalty statements and other

14         accounts rendered --

15              MS. PHARES:  Okay.

16    A.   -- if not objected to within a year from being

17         rendered.

18    Q.   Let's take as an example where you were last employed

19         at Buena Vista Music.

20              Did those agreements, say, with the people

21         who wrote music for the -- the animated Disney shows,

22         did they include an accounting provision like this?

23    A.   Not, that strenuous, not that onerous, no.

24    Q.   And those -- those composers also had publishing

25         rights from that music?
```

91

```
 1   A.    Again, ambiguous term.  My answer to that would be
 2         absolutely no, because I distinguish between song-
 3         writers royalties and publishing royalties, and in
 4         Disney's animated feature films, Disney insists on
 5         owning clearly 100% of the copyright.
 6   Q.    Of the copyright.  But --
 7   A.    And, therefore, 100% of the, quote, publishing or the
 8         publisher's share of income.
 9   Q.    Of the publisher's share.  But there were -- but those
10         agreements included publishing royalties to the
11         composers of the music?
12   A.    Well, you can refer to it in that way.  I think that's
13         a poor way of referring to it.  It did include song-
14         writers' royalties to the writers.
15               MR. MONAGHAN:  This is way beyond the
16         questions, Judge.
17               MS. PHARES:  I'm just -- I was trying to use
18         an example, but I want to make sure we're talking
19         about the same thing.
20   Q.    I see.  But those agreements included what you're
21         calling songwriter royalties?
22   A.    Absolutely.
23   Q.    And they would have included -- what would have been
24         less onerous?
25               THE COURT:  Well, let's stick to this
```

92

```
 1              contract alone.
 2                      MS. PHARES:  All right, Your Honor.
 3                      THE COURT:  I'm having enough trouble with
 4              that.
 5                      MS. PHARES:  That's fine.
 6     Q.       And, then, in your view, this -- if then there had
 7              been an audit by the -- by the composer, and they had,
 8              in fact, made their objection within one year, then
 9              what would happen in the ordinary course of an
10              auditing of that procedure?
11     A.       The audit would have been presented.  There would have
12              been some kind of dialogue or negotiation.  A
13              settlement would have been reached or a lawsuit would
14              have been filed.
15     Q.       And it's at that point that if there were no
16              settlement, that a lawsuit would be filed?
17     A.       That would be a typical case of what would happen.
18     Q.       And that's what would be required under the agreement,
19              too; isn't that correct?
20     A.       What, a lawsuit?
21     Q.       No, that you would have to pursue this -- this process
22              before you get to the point of deciding that you're
23              going to sue.
24     A.       If the statements were rendered, I think that's
25              probably true, if they were rendered, yes.
```

93

```
1              MS. PHARES:  Thank you, Your Honor.

2              THE COURT:  All right.

3              MS. PHARES:  Thank you, Mr. Berman.

4              THE COURT:  All right, Mr. Berman, you may

5        step down.

6              THE WITNESS:  Thank you.

7

8              (Whereupon the witness, David M. Berman,

9              was excused at approximately 11:45 AM.)

10

11             THE COURT:  All right.  I have said that

12       we'll meet on Friday.

13             Let me ask Mr. Monaghan, have you had time to

14       put in whatever response you want?

15             MR. MONAGHAN:  Not at all.  Haven't even

16       looked at it yet, Your Honor.  We were with Mr.

17       Berman.  We're going to do that today, this afternoon.

18             THE COURT:  Well, I, tomorrow, am out all

19       day, as I told you.  And, so, my question is:  Do you

20       want to put our next meeting off until Monday?

21             MR. MONAGHAN:  Yes, that's fine.

22             THE COURT:  Ms. Phares?

23             MS. PHARES:  Well, Your Honor, is -- is the

24       Plaintiff resting?

25             MR. MONAGHAN:  No, of course not.
```

94

1           MS. PHARES:  Well, what's ...

2           THE COURT:  Well, what I'm putting off is the

3      oral argument on your motion.

4           MR. MONAGHAN:  Right.

5           MS. PHARES:  Yes, I understand that, but

6      that's -- the only thing that -- that I'm asking:  Is

7      the Plaintiff resting?

8           MR. MONAGHAN:  No, of course not.

9           THE COURT:  He said "no".

10          MR. MONAGHAN:  We have admissions we're going

11     to get into the record, formal judicial admissions.

12     We have witnesses we've subpoenaed.

13          We're not resting.

14          MS. PHARES:  Your Honor, I mean, I can -- if

15     this is the end of that, I can convert that motion to

16     a directed verdict and we can argue that on Friday,

17     but I don't want --

18          THE COURT:  I thought that from what you said

19     the other day orally that that was your motion for a

20     directed verdict?

21          MS. PHARES:  I was -- that motion was a

22     motion for -- I made a directed verdict at the end of

23     Ms. -- at the end of Ms. Bryant's testimony --

24          THE COURT:  Right.

25          MS. PHARES:  -- when she had conceded the

```
 1          merger of her oral agreements.  That's what we were on

 2          trial for.  Then Mr. Monaghan was raising new issues

 3          that he thought he was entitled to proceed on.  That

 4          motion, and the motion we filed yesterday, was

 5          explaining that there is no claim for an equitable

 6          accounting in this case and cannot be as a matter of

 7          law because there is no fiduciary relationship between

 8          Ms. Bryant and Sunbow Productions.

 9                    And, in addition to that, we were also

10          arguing that as a condition precedent to any -- to any

11          contractual accounting, she is required to go through

12          the -- the audit notice provisions that are in her

13          contract.  That's the subject of that motion.

14                    THE COURT:  Yeah.  Well, so, it comes down to

15          this:  I intend to decide whether or not at this point

16          there is a viable claim for an accounting.

17                    Now, I have already decided on the record

18          that there is no problem with the contracts.  We've

19          been through that.  There are written contracts; there

20          are no oral contracts.  They have all been assumed

21          into the final written version.  So, as far as I'm

22          concerned, that's not in the case anymore.  The only

23          question is:  What right, if any, does Ms. Bryant have

24          for an accounting, for an audit, or whatever?  And I

25          am prepared to rule on it on Friday or Monday.
```

```
 1           However, to give Mr. Monaghan a reasonable chance to

 2      read your papers --

 3              MS. PHARES:  I understand, Your Honor, but --

 4              THE COURT:  -- I put it over until Monday.

 5              MS. PHARES:  But here's my confusion.  If she

 6      has no right to an accounting, then I don't understand

 7      why we're hearing evidence on an accounting, which, I

 8      mean, we only did this with Mr. Berman today because

 9      of the representation that he was already en route to

10      the -- to the court.

11              THE COURT:  No, I said -- I said several

12      times that if he was allowed to be called, I was

13      interested in his view on, you know, the terms and

14      also on the question of the accounting, and I think

15      we've gone into that.

16              MS. PHARES:  But I guess I'm trying to also

17      deal with just the practicality of the time that's

18      available to us, is that if Mr. Monaghan is talking

19      about having many, many more witnesses that he's

20      noticed, but he noticed them on an issue that I think

21      Your Honor has said is behind us, so I'm trying to

22      figure out what's left.

23              THE COURT:  Well, I told you what's left.

24      From my standpoint what's left is whether or not Ms.

25      Bryant is entitled, on this action, to go ahead with
```

```
1              an accounting of any sort, and I'm willing to decide

2              that on Friday, if that's what the parties all want;

3              or, to give Mr. Monaghan time to answer a motion that

4              I think he justifiably claims he hasn't even read yet

5              because he's been involved in preparing an expert

6              witness, etcetera, so I think fairness would require

7              me to say that, regardless of any objection, that I

8              will see you all on Monday morning at 10:00 o'clock.

9              And, at that time, I'll listen to any oral argument

10             you have and probably decide this from the bench

11             because I will have done whatever I wanted to do over

12             the weekend.

13                  MS. SAFFER:  Your Honor, I have, I guess one

14             would call it scheduling or housekeeping.

15                  THE COURT:  I thought you told me you were

16             available on Monday.

17                  MS. SAFFER:  I am available on Monday.

18                  THE COURT:  Good.

19                  MS. SAFFER:  And I will be here on Monday, I

20             promise.  I mean, you know, as they say, God willing.

21                  THE COURT:  All right.

22                  MS. SAFFER:  But if we are to go forward, I

23             do have some problems later on during the week, as I

24             do with my witness.

25                  THE COURT:  I'll address those on Monday.
```

98

```
 1              MS. SAFFER:  Okay, okay.

 2              MS. PHARES:  But, Your Honor, I understand

 3      and I appreciate your wanting to make time for us to

 4      make a directed verdict, but I can't make a directed

 5      verdict unless I know whether or not Mr. Monaghan is

 6      resting.

 7              THE COURT:  Let me give you an analogy, even

 8      though it will -- Libby said all analogies limp.

 9      Well, this one may do worse than that.  But let me put

10      you into a standard negligence case.  And there gets

11      to be a time when the Plaintiff is on the stand and it

12      turns out that he didn't fall off this roof, he

13      actually fell down the stairs in his own home and he

14      carried himself up and all this.  It comes out that

15      way.  The Plaintiff hasn't called his doctor yet,

16      etcetera, and the defense gets up, and they move for a

17      directed verdict or a dismissal.  The Judge, in that

18      case, could handle it without the Defense -- excuse

19      me -- the Plaintiff ever resting.

20              It's up to me.  This case has been a little

21      disjointed, but mostly, I would say, that that falls

22      on the complexity of the matter, the density of the

23      Court in appreciating it all, and also a great many

24      speeches that have been put into this record, and I

25      think everybody's responsible for that.
```

1          So, I'm pointing out to you that, as far as

2     I'm concerned, you made a motion, dismissal, directed

3     verdict, whatever you want to call it.  I'm going to

4     see what's left in this case over the next couple of

5     days, and I'll also read any last minute tidbits you

6     want to send to me, but don't send them after Friday,

7     please, because I have to read this over the next

8     couple of days, and I don't want to be here on Monday

9     morning reading things.  All right?  So, anything you

10    send to me after Friday afternoon will not be read.

11         MS. PHARES:  But we're arguing the motion

12    that I made earlier on Monday morning, are we not?

13         THE COURT:  On your motion, which you made at

14    that time for a directed verdict, and which I pointed

15    out that the Plaintiff doesn't have to rest as far as

16    I'm concerned.

17         MS. PHARES:  You know what?  I think maybe

18    there's confusion.  I did make a motion for a directed

19    verdict at the time of Ms. Bryant's testimony.  Then,

20    if you'll recall, Your Honor, yesterday we had papers

21    on the motion to dismiss these new claims that Mr.

22    Monaghan then advanced on Monday afternoon, and I

23    thought that's what we were going to argue on Monday

24    morning.

25         But are you saying that we're going to argue

1       both of those motions?

2               THE COURT:  As far as I'm concerned, on

3       Monday morning, I am prepared to tell you where this

4       case stands and what, if anything, is left in this

5       case and -- but, first, obviously, I'm going to allow

6       each of you to make a record, a short record of your

7       points.  I'm sure Mr. Monaghan is going to say, how

8       can you do this when you haven't heard the entire

9       Plaintiff's case?  A very good argument.  I pointed

10      out how that can happen in other types of cases, and

11      it could happen here.

12              Now, if I haven't thoroughly confused you,

13      which was not my intention, at least in my own mind I

14      know what's going on and I will see you -- don't

15      laugh; I'm not kidding.  And I will see you on Monday

16      morning at 10:00 o'clock.

17              MS. PHARES:  It's not Friday.  Monday

18      morning?

19              THE COURT:  Yes.

20              MS. PHARES:  Okay.

21              THE COURT:  I've decided that Mr. Monaghan

22      deserves a chance to put in any papers he wants.

23              And, remember, Friday don't send me any

24      papers after Friday.

25              MS. PHARES:  So, but now yesterday -- so,

1      this is a revision of the briefing schedule we

2      discussed yesterday?

3              THE COURT:  Yes.

4              MS. PHARES:  Okay.  So, Mr. Monaghan is going

5      to -- we're going to, what, simultaneously brief?  We

6      don't get to see what Mr. Monaghan's saying at all in

7      response to ours?

8              THE COURT:  Well, you have made a very

9      extensive oral argument on the record about this, and

10     the -- which I have had a copy of; so, I know what you

11     said.  Mr. Monaghan and you made a written motion.

12     Mr. Monaghan deserves to be able to answer that.

13             MS. PHARES:  And we were going to reply to it

14     by the following --

15             THE COURT:  And you can reply to it by -- as

16     long as it isn't after Friday afternoon.

17             MS. PHARES:  Well, unfortunately, Mr.

18     Monaghan only serves at 5:05 on Fridays, so that will

19     be difficult for us to respond to.

20             MR. MONAGHAN:  How about we'll serve the

21     papers by 12:00 or -- 1:00 o'clock on Friday?

22             THE COURT:  Personally, I don't know what

23     more there is to say in this case.

24             MS. PHARES:  Well, the problem is that we say

25     it and then it changes, and then we have to have an

102

1        opportunity to respond.

2              THE COURT:  Well, Ms. Phares, I have done my

3        best to whittle the issues in this case down, and we

4        are where we're at, and I'm going to see what is left,

5        and I will see you on Monday morning at 10:00 o'clock.

6        No brief from anybody will be accepted after 5:00

7        o'clock on Friday -- let me make it 4:30 because I'm

8        going to leave at 5:00 o'clock.

9              This has been a very hard-fought case, which

10       may or may not be over.  Some very, very good points

11       have been made; and, in all honesty, Mr. Berman, I'm

12       glad we had you as a witness.

13             MR. BERMAN:  Thank you.

14             THE COURT:  Doesn't mean I understand it any

15       better, but I've tried.

16             MR. MONAGHAN:  One very brief, very quick --

17             THE COURT:  Go ahead.

18             MR. MONAGHAN:  On our Plaintiff's case we

19       still have admissions to get in the record.  I don't

20       want to burden the Court with it now, but -- but on

21       Monday --

22             THE COURT:  If there are admissions, I tell

23       you, submit them.

24             MR. MONAGHAN:  I will.

25             THE COURT:  If they're admissions, they're

103

1          admissions.

2                    MS. PHARES:  If you have them, why don't we

3          just do them now?  We're here.

4                    THE COURT:  All right.

5                    MR. MONAGHAN:  Okay.

6                    THE COURT:  My recollection is that there

7          weren't that many.

8                    All right.  We'll take a ten-minute break.

9          Then we'll have the admissions.

10                   MR. MONAGHAN:  Thank you, Judge.

11

12              (Whereupon a recess was taken at approximately

13              11:55 AM.)

14

15              (Court reconvened at approximately 12:10 PM.)

16

17                   THE COURT:  All right, Mr. Monaghan.

18                   MR. MONAGHAN:  I will make this very short.

19                   We are asking the Court to take formal

20          judicial notice of the following admission made by

21          Sunbow in its Memorandum of Law in support of its

22          motion to dismiss, dated May 7, 2004.  That's one of

23          the many Sunbow motions you've dealt with.

24                   In that motion, Sunbow made the following

25          statement, on Page 19.  On appeal this was referenced

1    A802.  Sunbow said, and I'm reading from Paragraph 4:

2    "Under the standard Sunbow work-for-hire agreements,

3    Plaintiff still has publishing rights.  Plaintiff

4    appears to be confused about the publishing royalties

5    available to her under the Sunbow agreements.  She

6    cites Sunbow as stating she has no rights to

7    mechanical or synchronization royalties."

8         Plaintiff's brief at 31-33, Bryant affidavit,

9    Blue paragraphs 15, 17, and 19.  "Sunbow does not say

10   this.  While this misunderstanding does not impact the

11   Court's analysis of the sufficiency of Plaintiff's

12   evidence for purposes of summary judgment, we think it

13   would be helpful to point out that Sunbow is not

14   interpreting Plaintiff's rights under the Sunbow

15   contracts as narrowly as she claims they are.  Under

16   the Sunbow agreements, and the Kohn, K-O-H-N, Form

17   3.8, Phares Exhibit G to J", parens, "Sunbow is

18   obliged to pay Plaintiff a royalty of 50% of the net

19   profits from licenses to third parties of mechanical

20   or synchronization rights, assuming they are not

21   barred by the Statute of Limitations", parens, "see

22   Section 2C, Intro., CEG, Phares Exhibit H-k, Paragraph

23   6a-1."

24        And here's the rub.  "But Sunbow does not

25   agree that the licenses made for the distribution of

105

1      the TV shows and videocassettes and DVDs is an
2      exercise of either one of those rights", closed paren.
3              So, that's why we're here, that's the
4      admission, and that -- you've heard the expert
5      witness.
6              MS. PHARES:  Your Honor, that sounds to me
7      like argument.
8              MR. MONAGHAN:  No, it was asked as an
9      admission.
10             THE COURT:  The Court will take it any way it
11     wants.
12             MS. PHARES:  Well, I mean --
13             THE COURT:  Let's not have any more argument
14     today on it.
15             MS. PHARES:  Okay.
16             THE COURT:  Anything else?
17             MR. MONAGHAN:  No, Your Honor.
18             THE COURT:  Any other admissions?
19             MR. MONAGHAN:  No, Your Honor.
20             THE COURT:  Okay.  I'll see you all at 10:00
21     o'clock on Monday morning.  And I've already told you
22     what to do with any other papers you want to submit.
23             MR. MONAGHAN:  Thank you, Judge.
24             THE COURT:  Have a good day, good afternoon,
25     and a good weekend.

106

1                I N D E X   T O   E X H I B I T S

2

3     (PLAINTIFF'S EXHIBIT NO. 49 – CURRICULUM

4          VITAE OF DAVID M. BERMAN – FOR IDENTIFICATION.)

5     ............................................... 5:18

6

7     (PLAINTIFF'S EXHIBIT NO. 49 – CURRICULUM

8          VITAE OF DAVID M. BERMAN – RECEIVED IN

9          EVIDENCE.)................................ 6:20

10

11    (PLAINTIFF'S EXHIBIT NO. 50 – SONY ATV

12         ROYALTY STATEMENT, 12/1/06, SINGLE PAGE

13         – MARKED FOR IDENTIFICATION.)............ 43:7

14

15    (PLAINTIFF'S EXHIBIT NO. 50 – SONY ATV

16         ROYALTY STATEMENT, 12/1/06, SINGLE PAGE

17         – RECEIVED IN EVIDENCE.)................ 43:15

18

19    (PLAINTIFF'S EXHIBIT NO. 50 – SONY ATV

20         ROYALTY STATEMENT, 12/1/06, SINGLE PAGE

21         – RECEIVED IN EVIDENCE.)................ 43:15

22

23

24

25