# EXHIBIT 93

55576-017

SERIAL NO. 379

SERVED

RECEIVED

FILED

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
----------------------------------------X
ANNE BRYANT,

Index No. 5192/00

                              Plaintiff,        **NOTICE OF MOTION**

                -against-

BROADCAST MUSIC, INC.
(a/k/a "BMI"), FORD KINDER,
KINDER & CO., LTD., VADIVOX,
INC., JULES M. "JOE" BACAL,
GRIFFIN BACAL, INC., STARWILD
MUSIC BMI, WILDSTAR MUSIC ASCAP,
SUNBOW PRODUCTIONS, INC.,

                              Defendants.
----------------------------------------X
ANNE BRYANT,

                              Index No. 2821/02

                    Plaintiff,

                -against-

SUNBOW PRODUCTIONS, INC.,

Defendant.
----------------------------------------X


        PLEASE TAKE NOTICE, that upon the annexed Affirmation

of Patrick J. Monaghan, sworn to on the 23rd day of January,

2007, and the exhibits annexed thereto, and upon all prior

pleadings and proceedings heretofore and herein, Plaintiff ANNE

BRYANT ("Plaintiff") by her attorneys MONAGHAN, MONAGHAN, LAMB

& MARCHISIO, LLP, will move this Court at the Motion Support Part thereof at the Courthouse located at 40 Gleineida Ave., Carmel, New York on, on the 6thth day of February, 2007 at 9:30 a.m. or as soon thereafter as Counsel can be heard for an Order:

a. Allowing this trial to proceed and to allow the testimony of Ford Kinder, Jules M. "Joe" Bacal and Carole Weitzman; and

b. Granting Plaintiffs such other, further and different relief as the Court may deem just and proper.

PLEASE TAKE FURTHER NOTICE that pursuant to CPLR §2214(b) demand is hereby made that any answering affidavits and all memorandum of law, if any, are to be served upon the undersigned at least (7) days before the time at which this motion is to be heard.

Dated:   New York, New York
         January 23, 2007

MONAGHAN, MONAGHAN,
LAMB & MARCHISIO LLP

By: _____
Patrick J. Monaghan, Jr.
Attorney for Plaintiffs
150 West 55th Street
New York, New York 10019
(212) 541-6980

---and---

28 West Grand Avenue
Montvale, New Jersey 07645
(201) 802-9060


TO:  Gloria C. Phares, Esq.
     PATTERSON BELKNAP WEBB & TYLER LLP
     1133 Avenue of the Americas
     New York, New York 10112

     Judith M. Saffer, Esq.
     Broadcast Music, Inc.
     320 West 57th Street
     New York, New York 10019

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
--------------------------------------X
ANNE BRYANT,

                        Index No. 5192/00

               Plaintiff,

  -against-                    **AFFIRMATION IN**
                                    **SUPPORT OF MOTION**

BROADCAST MUSIC, INC.
(a/k/a "BMI"), FORD KINDER,
KINDER & CO., LTD., VADIVOX,
INC., JULES M. "JOE" BACAL,
GRIFFIN BACAL, INC., STARWILD
MUSIC BMI, WILDSTAR MUSIC ASCAP,
SUNBOW PRODUCTIONS, INC.,

               Defendants.
--------------------------------------X
ANNE BRYANT,

                        Index No. 2821/02

           Plaintiff,

     -against-

SUNBOW PRODUCTIONS, INC.,

           Defendant.
--------------------------------------X


      PATRICK J. MONAGHAN, JR., an attorney and member of the
Bar of New York affirms, under penalty of perjury in
accordance with CPLR 2106, the following:

      1.      I am a member of MONAGHAN, MONAGHAN, LAMB &
MARCHISIO LLP, attorneys for Plaintiff ANNE BRYANT
("Plaintiff") and submit this Affirmation in Support of
Plaintiff's Motion for the Court to allow Plaintiff to

complete her case including, but not limited to, allowing and considering at trial the *de bene esse* testimony of Plaintiff's partner Dr. Ford Kinder ("Kinder")[1], Defendant Sunbow's representative Carole Weitzman ("Weitzman"), and Jules M. "Joe" Bacal ("Bacal"), who was subpoenaed and agreed to appear for the trial in December of 2006.

2. Pursuant to 3117(a)(2), Weitzman's deposition transcript is admissible at trial as testimony given by an authorized agent of Sunbow.[2] Kinder's testimony was taken pursuant to an Order of the Court on Plaintiff's motion in contemplation of being used at trial and is therefore admissible at trial. Thus all three witnesses must be heard and Plaintiff must be allowed to finish her case. Anything short of that is a travesty in this six year old case.

3. The testimony of Weitzman, Kinder and Bacal supports Plaintiff's claims on critical elements of Plaintiff's case. Plaintiff should not once again be deprived of a full opportunity to present her claims – an opportunity this Court has repeatedly said would be granted to her.

---

[1] By Order dated March 8, 2006, after Plaintiff's Motion for that relief, the Court ordered both the Kinder and David Berman depositions be allowed for trial.

[2] Carole Weitzman appeared at a deposition in 2004 on behalf of Sunbow which produced and represented her in response to Plaintiff's Notice

## WHY THE COURT SHOULD ALLOW
## THE TESTIMONY AND THE COMPLETION OF THE TRIAL

### THE PROPER EVIDENTIARY STANDARD
### EVIDENCE WHICH "TENDS" TO PROVE

4.    Sunbow and BMI apparently do not understand the standard for admissible evidence on Plaintiff's case.  They have interrupted the entire case, and the two disjointed phases of the trial which began in 2004, with meritless motions, arguments and appeals including a misguided removal to federal court; all actions deliberately calculated to interrupt and interfere with the Plaintiff's presentation of her case and overwhelm her counsel with a blitzkrieg of paper. The Court should not have allowed and indulged this conduct which even now has the case on hold once again.

5.    The standard for admission of evidence is that Plaintiff's evidence need only <u>tend to prove her claims,</u> or tend to disprove the defenses.  Each element of proof in her case need not be a ninth inning grand slam out of the park walk-off home run.  It is sufficient if her proofs *tend to* support her claims <u>or tend to disprove</u> the defenses.  That examination by the Court must abide a full trial of her case

and Plaintiff's Counsel must to be allowed to present the entire case without further interruption.

## FORD KINDER *DE BENE ESSE* TRIAL TESTIMONY

6. This Court has already ruled, on Plaintiff's motion, which was vigorously contested, that Plaintiff would be allowed to go to Florida and take the videotaped testimony of Dr. Ford Kinder, Plaintiff's former partner and a former Defendant in this case. This *de bene esse* deposition was taken at great expense and inconvenience to Plaintiff [and to all parties for that matter] in August of 2006 in Miami, Florida. The deposition was videotaped at even greater expense to Plaintiff so that this Court could view it and make its own judgments as to weight, credibility and relevance in this non-jury case with a trial which began two and one half years ago.

## THE COURT NOT ONLY ALLOWED, BUT ENCOURAGED THE KINDER TESTIMONY TO BE TAKEN

7. In granting Plaintiff's motion in its Order of January 12, 2006, the Court specifically noted that the testimony of the out-of-state witnesses was sought by Plaintiff to preserve the testimony for trial and in fact,

4

in subsequent conferences, this Court prodded Plaintiff to pursue those depositions. Of course at additional expense, Plaintiff flew her expert David Berman in and after yet another pitched battle, he was allowed to testify at trial in December 2006 [and we submit very favorably for Plaintiff especially about her continuing right to publishing royalties.]

8.    Without limiting its relevance on other issues in the case, Kinder's testimony is relevant and is proof of essential elements of Plaintiff's claims as stated below.

### THE ISSUES

**THE TESTIMONY FROM FORD KINDER,
JULES M. "JOE" BACAL AND CAROLE WEITZMAN
SUPPORTS PLAINTIFF'S CLAIMS ON CRITICAL ELEMENTS**

**BACAL EQUALS SUNBOW EQUALS GBI-CONSTRUCTIVE TRUST ISSUES**

9.    As part of her claims for imposition of a constructive trust and unjust enrichment against Sunbow, Plaintiff believes it is important for the Court to recognize that in Kinder and Bryant's dealings with Bacal, both Kinder and Bryant dealt with him first personally and the entities he later used after commissioning music were entirely his decision, depending on his needs and wishes.

Thus, these companies were effectively Bacal's alter egos at least in the dealings with Plaintiff.

10. The Court has already ruled that Plaintiff can make a case against Bacal for a special confidential relationship and, notwithstanding any settlement with Bacal, Plaintiff can make the same case against non-settling defendant Sunbow which was owned and controlled by Bacal.[3]

11. Plaintiff testified that she dealt with Bacal personally and it was he who hired her. The testimony about the unity of interest of Bacal and his entities Sunbow, Starwild, Wildstar and GBI was corroborated by Kinder's testimony in August of 2006 and indeed in several respects by Sunbow's own representatives Weitzman and Bacal.

12. This Court has already held that Bacal and Plaintiff had a fiduciary relationship and it follows necessarily that by the testimony of Kinder, Bacal and Weitzman, Plaintiff can establish a fiduciary relationship with Sunbow through Bacal. And it is without dispute that it was Sunbow which filed the incorrect BMI registrations and diminished plaintiff's shares and credits for all these

---

[3] See Decision and Order erroneously dated February 25, 2003 at page 7.

years [considerably in excess of $238,000 worth of broadcast performance royalties as of 2000 as set forth in this Court's Decision dated May 26, 2004] and further deprived her of her writer's share of music publishing monies-breaching that relationship.

13. The Court has already held:

"If Plaintiff is able to establish that Bacal's relationship with his company Sunbow had been such that he had exercised such complete domination and control thereof that is may be said that the corporation was in reality a shell or dummy corporation for Bacal's own purposes, then the Court fails to see why the Court, to achieve justice, should not permit Plaintiff in essence *to pierce the corporate veil, find such an identity between Bacal and Sunbow that Bacal's [fiduciary] relationship with Plaintiff is the same as Sunbow's relationship to Plaintiff, and thereby permit Plaintiff to recover any financial benefit that has been wrongfully conferred upon Sunbow."* Decision and Order dated May 26, 2004 quoting Decision and Order erroneously dated February 25, 2003 at page 17.

14. The Court should not backtrack and ignore its own rulings and must allow the testimony of Kinder, Bacal and Weitzman to establish Bacal's unity of interest and relationship with Sunbow.

## KINDER'S *DE BENE ESSE* TESTIMONY

15. The following cites are to portions of the sworn testimony of Kinder on the issue:

## KINDER TESTIMONY

(transcript annexed hereto as Exhibit "A")

A. GBI and Sunbow were essentially the same entity. Page 29, Lines 7 - 11

B. GBI was an ad agency for Hasbro and Sunbow was the spin-off for production of cartoon shows "but they were very intertwined." Page 34 and 35, Lines 18-4.

C. Writers could not tell the difference between GBI and Sunbow or whether they were being hired by Sunbow or GBI because "the people hiring us were the same. Joe Bacal and the writers from Sunbow were the same as the people from GBI. There was no differentiation." Page 35, Lines 12-17

D. Joe Bacal represented Griffin Bacal, Inc. and Sunbow. Page 37, Lines 12 and 13.

Carol Weitzman, whom Sunbow has assiduously avoided producing as a witness for obvious reasons, also gave relevant testimony:

## WEITZMAN TESTIMONY

(Transcript attached as Exhibit "B")

A. "….Joe Bacal owned Sunbow. Page 9, Lines 12-18.

B. "…..[Griffin and] Joe Bacal were in command at Sunbow. Page 18, Lines 22-25.

8

C.  **Sunbow hired Bill Dobishinski** to administer Sunbow's publishing rights[4]. Page 33, Lines 6-10.

D.  Tom Griffin and Joe Bacal <u>were responsible for all of the percentage allocations</u>. Pages 41-42, Lines 21-17 and Page 49, Lines 6-18.

E.  <u>The information on the Sunbow cue sheets came from Tom and Joe [Bacal]</u>. Page 52, Lines 11-19.

F.  <u>Joe and Tom made all the deals for Sunbow</u>. Page 82, Lines 1-14.

Jules M. "Joe" Bacal also gave relevant testimony as to these issues:

## BACAL TESTIMONY (Exhibit "C")

A.  Bacal admitted he owned Sunbow who "controlled" Starwild and Wildstar. Pages 25-26, Lines, 18-10.

### BACAL ON WHO HIRED DOBISHINSKI

B.  Bacal admitted he and Sunbow hired Dobishinski who handled the publishing rights [which included plaintiff's rights] for Sunbow:

> Q.  I understand.
>
> A.  It just happened, but we did hire an expert and that was Bill. And I do believe that the composers were all

---

[4]  In the last argument on December 11, 2006 the Court [apparently with Sunbow's last faxed submission in mind which included a letter from Dobishinski to Harris dated March 3, 1986] engaged in an exchange with counsel about the JEM agreement negotiations suggesting that Plaintiff [through her alleged lawyer Dobishinski] had not obtained rights she sought. This is dead wrong because Dobishinski was Sunbow's agent, as testified to by both Weitzman and Bacal, and because this letter, which was one of many in a two year negotiation process, was written more than a year before Kinder & Bryant signed the final JEM agreement [in 1987—despite its 1985 backdate] which did provide for those music publishing royalties.

> encouraged to work with him and I guess
> it was Ford who worked with him to my
> understanding, because he was the person,
> really, to handle those kinds of things
> with Anne and Kinder Bryant.
> (Exhibit C, Bacal Testimony, November 15,
> 2001, Page 48, Lines 3-10).

II. **Sunbow Was Responsible For The Alteration of BMI Registrations That Led To Plaintiff's Diminished Writer's Share Of The Public Performance Royalties and Sunbow Has Not Paid The Writers' Share of the Music Publishing Money**

16.     It is without dispute that cue sheets were the vehicle used here to make changes to Plaintiff's BMI catalog.

17.     Generally cue sheets list among other things: (a) the television producer for the episode in question; (b) the air date for the episode; (c) the title given to each of the musical compositions used in the episode; (d) the writer(s) and publisher(s) of each individual composition used in the episode; and (e) their respective shares of the public performance royalties for each such project as discussed in the September 30, 2003 Affidavit of Alison Smith at Paragraph 7.

18. Coincidentally, Jules M. "Joe" Bacal was credited as the Executive Producer on the Transformers Video.[5] Clearly, Bacal as Executive Producer of the Transformers videos and as Co-Chairman of Sunbow has some responsibility for the diminished percentages submitted on the cue sheets to BMI for Plaintiff's compositions.

19. Moreover, Kinder, Weitzman and Bacal can also offer some insight as to how these diminished percentages came to be:

### KINDER TESTIMONY (Exhibit "A")

A. Kinder, had nothing to do with the changes in the registrations and those were not the percentages that he agreed to. Page 31, Lines 13-15.

B. Kinder has no idea who it was gave him, Kinder, an 83.4% and Ms. Bryant only an 8.3% interest in the Transformers music. Page 31, Lines 1-12.

C. Sunbow and Starwild had the responsibility for advising BMI as to the allocation of contributions and credits. Page 30, Lines 20-24.

D. As individual writers (represented by Kinder Bryant), they personally retained all of the writer's share of the music publishing in any work that was created (this included all royalties). Page 44 Lines 20-22 and Page 45, Line 10.

E. Kinder and Bryant were very protective of their rights (mostly for future possible uses of those creations). Page 46, Line 1-4.

---

[5] *See* Full Cast and Crew IMDB listings of "JEM," "InHumanoids," "My Little Pony: The Movie," "The Transformers: The Movie," "The Great Space Coaster," and "Robotix" wherein Joe Bacal is listed as Producer; *See* copies of IMDB listings annexed hereto as Exhibit "D."

F. Paragraph 6 of the JEM Agreement (Trial Exhibit M in evidence) reflects his understanding that Kinder and Bryant "would receive payment for future uses of this product for whatever it was used for in the future." Page 55, Lines 19-23.

G. Neither Plaintiff nor Kinder [the writers] nor Kinder Bryant, Ltd. [the writers' production company] has ever received any music publishing payments [generated] from the sale of VHS, DVD and CD products embodying the music they composed [originally for television broadcast] for Transformers, GI Joe, Inhumanoids, the JEM Show, Visionairies, My Little Pony and Friends or Robotix "No payments." Page 56, Lines 16-22.

## BACAL TESTIMONY (Exhibit "C")

A. Bacal did not know how Kinder received 83.4% and Anne received 8.3%, "…that doesn't make sense." Page 59, Lines 2-24.

B. Bacal had no idea why the percentages paid to the original writers on the Transformers opening theme were altered from the original percentages. Page 124, Lines 2-14.

C. Bacal did not know who provided clearance information to Sony [regarding Plaintiff's percentage share]. Page 137, Lines 15-20.

## WEITZMAN TESTIMONY (Exhibit "B")

A. Tom or Joe [Bacal] provided authorship information on cue sheets that were submitted to BMI. Page 33, Line 6-10.

B. The music deals were worked out with Tom and Joe [Bacal]. Pages 41-42, Lines 21-3.

C. Tom Griffin and Joe Bacal were responsible for the percentage allocations on the cue sheets. Page 42, Lines 4-17.

D.   Tom and Joe [Bacal] were responsible in the deals
     with Anne Bryant's compositions. Pages 45-46,
     Lines 22-15.

E.   Tom or Joe did the contracts that gave the
     percentages. Page 49, Lines 5-18.


## The Court has already found *Prima Facie* Evidence of $238,000 of Wrongfully Withheld BMI Performance Royalties

20.   $238,000 represents an incomplete accounting of
royalties wrongfully diverted to Kinder and Bacal and third
party writers [unknown] up to year 2000. Many statements
that are needed for a complete accounting up until year 2000
are missing. [More than 20% are missing]. To date,
Plaintiff's damages continue. Since this trial began six
years ago, Plaintiff has been further damaged by the
inaction and delays caused by the Court. Twenty-nine BMI
payment quarters have passed since this trial began.
Plaintiff's damages continue to increase, in part, because:

- No accountings have been ordered by the Court;

- Defendant BMI has still not completed correcting
  its records in accord with the Bacal and Kinder
  settlements;

- In the matter of her valuable TRANSFORMERS
  title, for example, until recently, Plaintiff
  continued to be paid at diminished rates as low
  as 8% in lieu of the 100% share that Plaintiff
  was entitled to until her 2006 settlement with

former Defendant Ford Kinder. Yet, while these corrections must be made to BMI's records, it is essential that the Court understands that the bulk of the royalties for the TRANSFORMERS THEME have been diverted to BMI and ASCAP third party <u>authors [unknown]</u> through a continual stream of additional registrations by the Publisher of this theme music which was composed by Plaintiff in 1983 and registered to her at BMI all along. See additional "writers" listed under Plaintiff's compositions in Exhibit "E"

- Most importantly, Defendant BMI has not been forthcoming with the names of these third party <u>authors, unknown</u> to the Plaintiff, that are collecting the <u>vast majority</u> of royalties for her TRANSFORMERS theme;

21. Sunbow submitted cue-sheets to BMI that altered the percentage allocation of Plaintiff's public performance right publishing shares in favor of other parties and Bacal himself. Plaintiff is prepared to submit these cue sheets submitted by Sunbow that altered Plaintiff's percentages of authorship; all of which were authorized by Carole Weitzman.


## BMI'S SEE NO EVIL HEAR NO EVIL DEFENSE DOES NOT FLY

22. As the Court is aware, this action is against not only Sunbow but also BMI. As plead in the Complaint, BMI breached its responsibility to Plaintiff by:

   A. breaching the terms of the agreement between Plaintiff and BMI;

B. failing to prevent unauthorized "writer changes" by allowing continual re-registrations of an existing BMI titles; and

C. failing to protect Plaintiff's interest in her BMI titles [by allowing ASCAP to claim and distribute royalties for Plaintiff's titles their ASCAP writers].

D. failing to collect and distribute the royalties due to Plaintiff [from all broadcast sources, including from three daily television series airing since year 2000];

23. The standard BMI form agreement, dated August 24, 1971, between Plaintiff and BMI expressly states that BMI shall furnish statements to Plaintiff at least twice during each year… [of the relevant period]… Although Plaintiff is in receipt of statements, these statements do not fully account for all royalties due to Plaintiff. *See* Exhibit "1" in Evidence at Trial at Paragraph 7.

24. In addition, the aforementioned standard BMI agreement contains a clause wherein BMI has the right to withhold payment of all sums due to Plaintiff upon notification to BMI or any of its licensees of a claim with

respect to any of Plaintiff's works. This paragraph includes a warranty from the Plaintiff that all works submitted are original. *See* Exhibit "1" in Evidence at Trial at Paragraph 10.

25. Since at least 2000, BMI has been on notice of a claim against the compositions that are at issue in this action. BMI has continued to pay known and unknown third parties Plaintiff's share of public performance royalties for said compositions, despite Plaintiff's attempts to resolve these issues. As such, BMI has failed to withhold the appropriate funds due to Plaintiff and has further breached its agreement with Plaintiff.

26. BMI's multitude of breaches has resulted in a significant loss of income and has decreased the value of Plaintiff's BMI catalog.

27. BMI had an obligation to protect Plaintiff, its own writer-member, from later alterations of her percentage allocations because, of among other things, the fact that in every contract there is a covenant of good faith and fair

dealing *which encompasses any promises that a reasonable promisee would understand to be included.* [6]

28. Brian McLaughlin, Director of Special Research at BMI, testified that there is no method in place at BMI to verify the veracity of information submitted by publishers on cue sheets and/or jingle data sheets.

> Q: Well, what systems, if any, are in place at BMI to make sure that the information in these forms is accurate?
> A: Only the information submitted by the publisher, sir.

> Q: Is there any system of verification, any check or balance, at BMI that you are aware of to verify that the information being submitted by a writer or publisher is accurate?

> A: No, sir.

> June 30, 2003 - Brian McLaughlin (BMI) Deposition at pages 73-74, Lines 19-9.

29. Without verifying any of the information, BMI is left to rely upon information submitted by publishers, even if the information submitted is intentionally inaccurate thereby resulting in diminished percentages for subsequent re-registrations of Plaintiff's compositions by Sunbow through BMI.

---

[6] *See Dalton v Educational Testing Servs.,* 87 N.Y.2d 384, 639 N.Y.S.2d 977, 663 N.E.2d 289;

30. BMI's failure to protect Plaintiff's public performance interests in her compositions amounts to a clear violation of the covenant implicit if not explicit in the BMI agreement.

31. BMI's defense, that the burden placed upon it would be too great if it were to make a determination as to whether a cue sheet reflected an original work, a modified version or a brand new work unrelated to the original because it represents hundreds of thousands of other songwriters, composers and music publishers, is disingenuous.

32. In fact, BMI must make decisions on who to protect and who not to protect. BMI claims that it will not "..take steps to secure additional royalties on… [Plaintiff's]… behalf… [because]…such steps would have been adverse to the rights of other BMI affiliated songwriters, composers, and music publishers…" *See* BMI Reply Memorandum in Further Support of Defendant's Motion to Dismiss at Page 3. However, this is obviously untrue as BMI has chosen the subsequent "writers" listed on the cue sheets as the parties whom they sought to protect to Plaintiff's detriment by continuing to pay out royalties to unknown third parties for

the invalid registrations of Plaintiff's compositions. BMI
is thus accountable.

33. Accordingly, BMI's breach of the agreement in
effect between Plaintiff and BMI has resulted in unspecified
damages that would require a full accounting of all payments
made to all parties for Plaintiff's compositions.

## KINDER'S TESTIMONY ON ISSUE OF BMI RESPONSIBILITY

34. As the Court may recall, Plaintiff's testimony and
belief has always been that BMI, as a performing rights
society, was under an obligation to protect Plaintiff's
performing rights.

35. Kinder's testimony supported Plaintiff's
understanding. Kinder testified under oath that it was his
understanding that BMI would protect his rights under the
agreement and ensure that "...no changes could be made to
authorship [of his compositions] without written permission
from all parties..." *See* Exhibit "A" at page 20. Plaintiff
testified to the same as did her expert, David Berman.

## CONCLUSION

36. According to the November 2, 2006 Order and Decision of this Court, both sides will be given ample time to put on their cases. After approximately six years, Plaintiff has had her hours of Court time spread over the course of several days over two and one half years. Plaintiff is not asking for anything more than to what the Court said she is already entitled. Plaintiff must be allowed to continue, without further delay and interruption.

37. For the foregoing reasons, Plaintiff's motion must be granted and the testimony of Kinder, Bacal, and Weitzman must be allowed and the trial continued.

New York, New York
January 23, 2007

PATRICK J. MONAGHAN, JR.

S:\MATTERS\3689\Motions\Motion to Allow Testimony\PJM Affirmation.doc

20

Exhibit A

**Page 1**

1    SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF ROCKLAND FLORIDA
2

    HON. ANDREW P. O'ROURKE
3
4 ANNE BRYANT,
5    Plaintiff.   Index No. 5192/00
6  v.
7 BROADCAST MUSIC, INC. (a/k/a/"BMI"), FORD KINDER,
    KINDER & CO., LTD., VADIVOX, INC., JULES M. "JOE"
8 BACAL; GRIFFIN BACAL, INC., STARWILD MUSIC BMI,
    WILDSTAR MUSIC ASCAP, SUNBOW PRODUCTIONS, INC.,
9
    Defendants.
10
- - - - - - - - - - - - - - - - - - - - - - - -x
11 ANNE BRYANT,
12    Plaintiff,   Index No. 2821/02
13  v.
14 SUNBOW PRODUCTIONS, INC.,
15    Defendant.
16 - - - - - - - - - - - - - - - - - - - -x
17    19 West Flagler Street
    Miami, Florida
18    August 9, 2006
    8:50 a.m. - 4:25 p.m.
19
20    DEPOSITION OF DR. CLIFFORD KINDER
21
22    Taken before Dina Amato, Certified Shorthand
23 Reporter, and Notary Public for the State of Florida
24 at Large, pursuant to Notice of Taking Deposition
25 filed in the above cause.

**Page 2**

1
    APPEARANCES
2
    PATRICK J. MONAGHAN, ESQ., of the firm of
3 MONAGHAN, MONAGHAN, LAMB & MARCHISIO, on behalf of
    the Plaintiff.
4
    GLORIA C. PHARES, ESQ., of the firm of
5 PATTERSON, BELKNAP, WEBB & TYLER, on behalf of the
    Defendant, Sunbow.
6
    JUDITH. M. SAFFER, ESQ., of BROADCAST MUSIC,
7 INC., on behalf of BMI.
8
    ALSO PRESENT: ANNE BRYANT
9
10

11
12
    I N D E X
13
    Witness    Direct Cross Redirect Recross
14
    DR. CLIFFORD KINDER  5  87-103  180    184
15
16
17
18
    E X H I B I T S
19
    KINDER'S    For Ident.
20
    1    3
21  2    10
    3    10
22  4    22
    5    58
23  6    71
    7    72
24  8    84
    9    96
25

**Page 3**

1 (EXHIBIT-1 MARKED FOR IDENTIFICATION)
2 Thereupon--
3    DR. CLIFFORD KINDER
4 was called as a witness by the Plaintiff and, having
5 been first duly sworn, testified as follows:
6
7    MS. PHARES: Before we get started, I just
8    want to state for the record that this is a one
9    day deposition of Dr. Kinder and as we -- I
10    have mentioned to Mr. Monaghan before, if there
11    is insufficient opportunity for all parties to
12    conduct cross, that we will object to the
13    admission of the deposition at any trial.
14    MR. MONAGHAN: My silence shouldn't be
15    deemed acquiescence that you won't have an
16    adequate opportunity for cross-examination but
17    what is adequate may be in the mind of whoever
18    wants to raise the point.
19    So I think we'll cross that bridge when we
20    come to it. We're going to do the best we can to
21    complete the examination so that you'll have
22    sufficient time for cross.
23    DIRECT EXAMINATION
24 BY MR. MONAGHAN:
25  Q.  Good morning, Dr. Kinder.

**Page 4**

1  A.  Good morning.
2  Q.  My name is Patrick Monaghan, as has been
3 indicated, I represent Ann Bryant, the plaintiff in
4 this case. Now this is a videotaped deposition. There
5 will be a transcription of the questions, answers and
6 colloquy that's on the record made by the court
7 reporter. You are also being videotaped.
8    The deposition may be used in the court
9 proceeding with which we are involved for whatever
10 purposes the rules of the court allow. I'm going to
11 be asking the questions. The court reporter is going
12 to be transcribing those questions, your answers and
13 I'm going to ask you to wait until I'm finished with
14 the question before you answer it.
15    If you don't understand the question, let
16 me know I'll try and clarify it. The deposition is
17 being conducted pursuant to a court order which was
18 entered by Justice O'Rourke. Exhibit-1 is the
19 commission for the deposition to proceed.
20    I believe you have seen a copy of this
21 before, have you not?
22  A.  Yes, I have.
23    MS. PHARES: That's your Exhibit-1 for the
24    deposition; is that right?
25    MR. MONAGHAN: Let's call them by the

5

1    witness's name, Kinder-1.
2    Q.  Before we proceed, have we met before?
3    A.  Yes.
4    Q.  We met last night, did we not?
5    A.  We did.
6    Q.  Am I representing you to a certain degree
7    in certain matters pertaining to this lawsuit?
8    A.  Yes, you are.
9    Q.  What might those be?
10   A.  I take it to be any overlapping interest
11   that pertain to -- that may benefit me in terms of
12   the work I've performed which is on trial here.
13   Q.  Please give the court reporter your
14   residence?
15   A.  6355 LaGorce Drive, Miami Beach, Florida.
16   Q.  And do you have a business address as well?
17   A.  Yes.
18   Q.  What is that?
19   A.  That's Mercy Hospital, 3661 South Miami
20   Avenue, Suite 806, Miami, Florida, 33133.
21   Q.  And you are a medical doctor, are you not?
22   A.  Right.
23   Q.  And I would ask you to give your answers
24   either yes or no rather than by a nod because the
25   reporter is not allowed to interpret gestures.

6

1    A.  Yes.
2    Q.  You're licensed to practice medicine in the
3    State of Florida?
4    A.  I am.
5    Q.  When did you receive that license?
6    A.  '99 I think.
7    Q.  And what is the nature of your practice?
8    A.  I'm Board certified in family medicine with
9    a subspecialty in HIV care. My practice is 99 percent
10   HIV and AIDS patients.
11   Q.  This is done at the Mercy Hospital?
12   A.  Yes.
13   Q.  Would you give us a brief resume of your
14   education?
15   A.  Okay. I did premed at Fordham University in
16   the late 70s. Then was in the music business for a
17   long time. Then I went to medical school in 1991,
18   finished in '96, went to residency at University of
19   South Carolina School of Medicine from '96 to '99 and
20   then started practicing.
21   Q.  Since you've been a practicing physician,
22   have you had any involvement in the music business?
23   A.  No direct involvement, some consulting,
24   that's all. I haven't had time.
25   Q.  Could you also give us a brief resume of

7

1    your musical formal training, if any?
2    A.  Actually, I grew up in the music business.
3    My parents were both musicians and my father was a
4    composer of music commercials and television, radio
5    station I.D.s, so I started singing commercials when
6    I was eight years old.
7         I started singing the adult commercials
8    when I was 15, wrote my first commercial at 18,
9    studied privately from age six.
10   Q.  With whom?
11   A.  Many different teachers, did some music in
12   college but in college, focused on pre-med, continued
13   private training.
14        Then when I was about 23 after college went
15   to work at my father's company which was recording
16   studios in Atlanta. We had three 24 track recording
17   studios, originally opened in 1964 as the first eight
18   track studio in Atlanta.
19        So, by the time I was 24, I had been in the
20   business for my whole life. So, I got picked up by a
21   New York music house who gave me a five-year
22   contract, Michlin Company, as a singer composer and
23   things went very well there.
24   Q.  Where were they located, Dr. Kinder?
25   A.  41 East 56 Street or something like that.

8

1         MS. BRYANT: I thought it was 44.
2         MR. MONAGHAN: Anne, you can't do that.
3    A.  56 Street, New York City.
4    Q.  And what was the nature of the business of
5    Michlin Company?
6    A.  We did music for advertising and some other
7    stuff but mostly music for advertising at that time.
8    Q.  Who was the -- who were the principals of
9    Michelin and Company?
10   A.  Spencer Michlin was the sole owner and Anne
11   Bryant was the music director and there were two
12   others of us that were staff writers with Anne.
13   Q.  Did you have an officership, a title?
14   A.  Later, after I was there a couple years, I
15   was made a vice president and had a lot more to do
16   with the business as well as the music.
17   Q.  What period of time were you -- for what
18   period of time were you associated with Michlin?
19   A.  From '78 to '83.
20   Q.  Can you recall the names of some clients of
21   Michelin and Company?
22   A.  No.
23        MS. PHARES: Objection, relevance.
24        Q.  That's okay. You can answer.
25   A.  Pepsi, Mountain Dew, Chevrolet, Hasbro, we

9

1 worked -- Proctor & Gambel. We worked for every
2 major advertising agency in New York and, therefore,
3 for almost every big American company.
4    Q.  Now, you mentioned Hasbro. Are we talking
5 about the Hasbro toy company?
6    A.  Yes.
7    Q.  And was the work that was done for Hasbro
8 done directly for that client or for an agency?
9    A.  It was done originally for Benton & Bowles
10 who had the Hasbro account and later for Griffin
11 Bacal which took the Hasbro account and opened their
12 own agency. We also worked for other toy companies,
13 Mattel, Fisher Price.
14    Q.  This is at Michelin?
15    A.  Yes.
16    Q.  Did you come to know Joe Bacal during any
17 of these experiences?
18    A.  Yes. I met Joe Bacal in about 1979 when he
19 was one of the creative directors at Benton & Bowles
20 Advertising which had the Hasbro account.
21    Q.  We'll come back to Mr. Bacal later on. Are
22 you familiar with the concept of a performing rights
23 society?
24    A.  Yes.
25    Q.  Were you a member of any performing rights

10

1 society in the period of time you were at Michlin and
2 Company?
3    A.  Yes. At Michlin and ,I was a member of
4 ASCAP.
5    Q.  And did you ever become a member of another
6 performing arts society?
7    A.  Later, it appeared more beneficial for me
8 to be at BMI because their payments for my type of
9 work was better, so I switched to BMI in I think '86
10 or '87.
11    MR. MONAGHAN: Mark this as Exhibit-2. This
12 will be Exhibit-3.
13    (EXHIBITS 2-3 MARKED FOR IDENTIFICATION)
14    MS. PHARES: Do you have a keep of your
15 exhibit?
16    MR. MONAGHAN: I'll provide them afterwards.
17    MS. PHARES: We can't do this unless we can
18 see the exhibit.
19    MR. MONAGHAN: You're welcome to examine it
20 on cross.
21    MS. PHARES: I can't see the exhibit while
22 you are doing the examination.
23    MR. MONAGHAN: You don't have to.
24    MS. PHARES: I may have to,
25    MR. MONAGHAN: We'll cross that bridge when

11

1    we come to it. I'm happy to provide you with a
2 copy when I can. I don't have it now. I
3 schlepped as much stuff as I could on the trip.
4 I think you gave --
5    MS. PHARES: I thought you said you were
6 putting these on -- you had scanned these and
7 you've put others -- you've scanned others.
8    MR. MONAGHAN: That's correct. I've scanned
9 others.
10    Q.  Dr. Kinder, the reporter has marked as
11 Exhibit-2 a document which is -- has the name
12 Broadcast Music, Inc. on the first page.
13    MS. PHARES: Does it have production
14 numbers, Pat?
15    MR. MONAGHAN: No.
16    MS. PHARES: This is a document you've never
17 produced?
18    MR. MONAGHAN: It's a document I think we
19 got from you among --
20    MS. PHARES: Does it have Sunbow production
21 numbers on it?
22    MR. MONAGHAN: It does not. At the moment, I
23 don't know where this came from. Can I continue?
24    MS. PHARES: I'd like to know what the
25 document is.

12

1    MR. MONAGHAN: It's my belief it's
2 Dr. Kinder's BMI contract, a poor copy. I was
3 going ask Dr. Kinder to see if he can locate a
4 better copy for -- if Judith can locate a better
5 copy --
6    MS. SAFFER: I believe, and I can answer
7 better if I take a closer look, that that might
8 have come out of BMI's records and given to you
9 and it looks like it's from a microfilm copy
10 which is the way the old records were kept and I
11 may not be able to get a better copy.
12    MR. MONAGHAN: At the moment, I don't know
13 where this came from.
14    MS. SAFFER: Can I take quick look at it?
15    MR. MONAGHAN: Sure.
16    MS. SAFFER: I believe my original
17 assumption is probably correct. I can try to get
18 better copies but chances are they won't be much
19 better. I'll offer for everybody to get the form
20 contract and this doesn't appear to have had any
21 alterations and by using the form of the
22 contract, I can get one that's legible.
23    MR. MONAGHAN: Just for the record, Judy, it
24 appears to be exactly the same as trial
25 Exhibit-1 which was Anne's BMI contract and it

---

13

1    appears to be the same as Joe Bacal's.
2         MS. PHARES: For the record, it is almost
3    totally illegible and in fact on some of these
4    pages, there's no writing at all. So I don't
5    know how you can make that representation but
6    perhaps Judy can find you another copy.
7         MR. MONAGHAN: That's what I'm going to go
8    through with the witness. I think I'm going to
9    establish that it's the same.
10   Q. Dr. Kinder, you have in front of you
11   Exhibit-2 for identification, Exhibit-3 for
12   identification which will you agree with me bears the
13   name Jules and Michael Bacal, Broadcast Music, Inc.
14   on the letterhead, April 7, 1988 as the date?
15   A. Yes, it does.
16        MS. SAFFER: Excuse me. Bacal's is what
17   date?
18        MR. MONAGHAN: April 7, 1988.
19        MS. PHARES: So Exhibit-3 is Bacal's?
20        MR. MONAGHAN: BMI contract. We'll make
21   copies of this at the next break.
22   Q. Showing you now Miss Bryant's BMI contract
23   which was Plaintiff's-1 in evidence at the trial. So,
24   before you now, you have all three of these BMI
25   agreements and Ms. Saffer has volunteered to attempt

14

1    to get a clean copy of the form.
2         MS. SAFFER: What is the date of each one of
3    these contracts and the reason I ask is that
4    from time to time, the form of agreement
5    changed. If they are all on or about the same
6    date, it's a fair assumption that it is the same
7    contract. If they are several years apart, it
8    may be a different contract.
9         MR. MONAGHAN: Understood.
10        MS. SAFFER: Which is substantially similar
11   but may have some different provisions.
12        MR. MONAGHAN: I understand. I don't think
13   that's the case as I'm about to point out.
14   Q. I'm directing your attention to the most
15   legible of the three which is Plaintiff's-1 in
16   evidence at trial consisting of four pages and
17   comparing that --
18        MS. PHARES: Dated?
19        MR. MONAGHAN: August 24, 1971.
20   Q. Comparing that to your contract -- what
21   appears to be your contract which -- the date of
22   which we can't make out at the moment.
23        MS. PHARES: Some time in the late 80s
24   according to the deposition.
25        MR. MONAGHAN: Yeah.

15

1         MS. PHARES: So we're talking 15 years apart
2    or something to that effect, correct?
3         MR. MONAGHAN: Right.
4    Q. Would you agree with me, Dr. Kinder, and
5    counsel can disagree, they are free to do that, that
6    the first pages of each of these exhibits appear to
7    be the same by looking at, for example, the words on
8    the parameter?
9         MS. PHARES: Objection. Is there a
10   question?
11        MR. MONAGHAN: Would you agree with me that
12   they appear to be the same is the question.
13   A. They appear --
14        MR. MONAGHAN: We'll have a long day.
15        MS. PHARES: Yes, I know that.
16   A. They appear to be similar but I can't --
17   Q. Do you see the word performance on
18   Exhibit-3 on the bottom right?
19   A. Yes.
20   Q. Do you see the word performance on the
21   bottom?
22   A. These two appear to be the same and this
23   one appears to be similar.
24   Q. Okay.
25        MS. SAFFER: Which -- I couldn't tell what

16

1    he was talking about.
2    A. The Bacal and Kinder ones appear to be the
3    same and the Bryant one seems to be similar.
4         MS. SAFFER: The Ford agreement is in the
5    late 80s and the Bacal agreement is 1988. I'm
6    not trying put words in your mouth. I'm asking.
7    A. Yes.
8    Q. And would you agree with me that the second
9    page of exhibits two and three, Kinder two and three
10   appear to be the same judging by the words on the
11   parameter?
12        MS. PHARES: Objection, leading.
13   A. They appear to be the same.
14        MR. MONAGHAN: If I had a clean copy,
15   believe me, I'd be examining about it.
16        MS. SAFFER: Would it be helpful in an
17   effort to move this along, if I called my office
18   and asked to get faxed here the form of
19   agreement that was offered to writers at that
20   period of time and then we would have a legible
21   agreement I hope?
22        MR. MONAGHAN: That's fine if we can do that
23   at a break.
24        MS. SAFFER: It won't be the actual
25   agreement. It will be the form of agreement in

17

1   the late 80s.
2       MR. MONAGHAN: That would be fine if we can
3   do that at a break. I'm actually going to ask
4   about only one paragraph of this agreement.
5       Q.  The last page of what we've -- I've been
6   describing as your agreement is almost totally
7   illegible and it's not very legible on Exhibit-3
8   either, but superficially, it does appear to be the
9   same, would you agree?
10      A.  I agree.
11      Q.  Now, I want to direct your attention to
12  paragraph 11 of the most legible of these exhibits
13  which is Miss Bryant's trial Exhibit-1, the BMI
14  agreement, August 24, 1971. I'm placing that before
15  you now.
16          Would you be good enough to read into the
17  record, sir, paragraph 11?
18      MS. SAFFER: He is being asked to read
19  paragraph 11 from Anne Bryant's contract which
20  is dated 1971 which may or may not be the same
21  as the paragraph in his agreement which was from
22  the late 80s, which may or may not be affected
23  by other terms in the agreement which is right
24  now illegible? The copy you have is illegible.
25      MR. MONAGHAN: May or may not is the key

18

1   phrase.
2       MS. SAFFER: That's right.
3       Q.  If you could read that out loud,
4   Dr. Kinder.
5       A.  "We shall have the right upon written
6   notice to you to exclude from this agreement at any
7   time any work which in our opinion is similar to a
8   previously existing composition and might constitute
9   a copyright infringement or has a title or music or
10  lyric similar to that of a previously existing
11  composition and might lead to a claim of unfair
12  competition or is offensive, in bad taste or against
13  public morals or is not reasonably suited for
14  performance." Do you want A, B and C?
15      Q.  I think that's the last part of that, isn't
16  it?
17      A.  A, B and C.
18      Q.  That's all I'd ask you to read. Now, you
19  don't know if you have a better copy of your
20  agreement, is that correct?
21      A.  It's unlikely that I do.
22      Q.  Did there come a time when you actually had
23  some songs registered in your name at BMI?
24      A.  Yes.
25      Q.  Are you familiar with the song registration

19

1   process at all?
2       A.  Yes.
3       Q.  How does it work as you understand it?
4       A.  I think there were a couple ways. One, I
5   could register send them in with cards that they had
6   provided to us. The main way we did it was the
7   publishing company sent cue sheets showing authorship
8   and, frankly, we never saw them.
9       MS. PHARES: Just for clarification, what
10  period of time are we talking about when you
11  refer to company?
12      THE WITNESS: I'm talking about Wildstar
13  Music and Starwild Music which are publishing
14  companies with Sunbow Productions and starting
15  from '84 through about '91.
16      Q.  Okay.
17      A.  Maybe '83.
18      Q.  What was your understanding -- you've just
19  read that paragraph.
20      What was your understanding of what BMI was
21  supposed to do when a registration of a composition
22  was submitted to it?
23      MS. SAFFER: Objection. The contract speaks
24  for itself. The language is there, it's in
25  evidence. The Judge can interpret what it may

20

1   mean or what the relevance is, etc., plus the
2   fact he's not reading from his own contract.
3   He's reading from somebody else's contract so
4   you're asking him to give, at best, a legal
5   opinion. I think it's inappropriate.
6       MR. MONAGHAN: I think you misunderstood my
7   question. I simply asked him for his
8   understanding of what BMI was supposed to do
9   when a composition was registered.
10      A.  My understanding was this and it started
11  with ASCAP and it continued with BMI and what was
12  explained to me --
13      MS. SAFFER: Excuse me, ASCAP and BMI are
14  two separate companies. If you are going to --
15      you should differentiate if you are going to
16  give an opinion what ASCAP told you.
17      A.  My understanding is that they would protect
18  my copyright and my authorship, represent me for
19  broadcasting, plays or other media and process the
20  monies so that I would receive my writer's share. It
21  was also my understanding that no changes could be
22  made to an authorship without written permission from
23  all parties involved and even that -- whoever the
24  original authors or a piece of music were, generally
25  it would retain that way.

21

1     For instance, when Weird Al did the spoof
2 songs of Michael Jackson, that Michael Jackson would
3 have -- he would retain full publishing rights to
4 that, even though the lyrics were changed.
5     So my understanding is that BMI represented
6 me to protect my copyright, to administer the
7 payments to me through uses of those works.
8     Q.  We're talking about public performance
9 royalties?
10    A.  Yes.
11    Q.  And just for the record, could you define
12 what you understand those royalties to be, that type
13 of royalty, public performance royalty?
14    A.  Writer's share for broadcast, phono
15 records, DVDs, sheet music, mechanicals.
16    Q.  When is the earliest time you had this
17 understanding of what BMI was supposed to do as far
18 as you understood?
19    A.  Before I signed my contract.
20    Q.  And do you still have that understanding as
21 of today?
22    A.  I still think that's how I would read the
23 contract although that isn't exactly what's taken
24 place.
25    Q.  Are you familiar with the term publisher as

22

1 it's used in the music business?  I think you've used
2 it already.
3     A.  Yes.
4     Q.  What does that mean?
5     A.  The publisher is the administrator of the
6 musical composition who essentially sort of like the
7 business person, they make the deals to get the music
8 used in different media.
9     Q.  And when you use the word media, what are
10 you talking about?
11    A.  Television, movies, phono records, now ring
12 tones.  I have to apologize if some of my language
13 isn't the music business language because it's been a
14 long time since I was active in that.
15        MR. MONAGHAN:  Mark this please, Dina, as
16    the next exhibit?
17        (EXHIBIT-4 MARKED FOR IDENTIFICATION)
18    Q.  It's a page from the BMI catalog.  I
19 represent that this is -- rather than mark the entire
20 exhibit, this is page 72 from trial Exhibit-2 in the
21 trial of this action which is Anne Bryant's BMI
22 catalog dated March 16th, 2000.
23        Have you got Exhibit-2 before you,
24 Dr. Kinder?
25    A.  Yes, I do.

23

1        MS. PHARES:  I beg your pardon.  Are you
2.   referring to Exhibit-2 or Kinder-4?.
3        Q.  Exhibit-4, thank you very much.  Exhibit-4.
4 The page from trial Exhibit-2, do you have that
5 before you?
6     A.  Yes, I do.
7     Q.  What compositions are reflected on this
8 page?
9     A.  Transformers opening theme, it looks like
10 three versions, and the title song Truly Outrageous
11 from the TV Jem show.
12    Q.  Are you able to identify from your own
13 independent knowledge what this document -- what type
14 of document this is?
15    A.  Yes, I am.
16    Q.  And what is it?
17    A.  It's a listing of -- from BMI of the
18 writer's share percentages for each person and for
19 the publisher.
20    Q.  Do you know this to be a page from Anne
21 Bryant's catalog?
22    A.  It appears to be that, yes.
23        MS. PHARES:  Objection, foundation.
24        MR. MONAGHAN:  What's the -- never mind.
25    Q.  You recognize this, do you not, Dr. Kinder?

24

1     A.  Yes, I do.
2     Q.  This is, in fact, page 72 from Anne
3 Bryant's catalog as of March 16, 2000?  You have to
4 answer verbally.
5     A.  Yes.
6     Q.  You've seen runs like this or catalogs like
7 this before?
8     A.  Yes, I have.
9     Q.  Have you seen a catalog like this for your
10 own songs?
11    A.  Yes, I have.
12    Q.  Have you seen a catalog like this for other
13 songwriters who are BMI writers?
14    A.  No.
15    Q.  Okay.  So the only two you would be familiar
16 with would be your own and Anne's?
17    A.  Yes.
18    Q.  Have you seen any catalogs similar to this
19 with respect to the publisher, Wildstar or Starwild?
20    A.  I have not seen that catalog.
21    Q.  Now, directing your attention to Exhibit-4
22 in the first composition titled Transformers Theme
23 Open, do you see that reference?
24    A.  The one at the top?
25    Q.  Right.

25

1    A.  Yes.
2    Q.  And you see there's a column for a
3 participant?
4    A.  Exactly.
5    Q.  And the participants are Joe Bacal, Anne
6 Bryant, Ford Kinder, Starwild Music Inc., correct?
7    A.  Correct.
8    Q.  And the total of the shares here equals 200.
9 percent, does it not?
10    A.  Does it.
11    Q.  Is that your understanding of how the
12 system worked?
13    A.  Yes.
14    Q.  And then the Starwild Music Inc. is shown
15 as having a 100 percent share, correct?
16    A.  Yes.
17    Q.  And do you know what is Starwild Music Inc.
18 to this composition?
19    A.  Starwild Music Inc. is the publisher of
20 record for the Transformers theme.
21    Q.  Now, next to Joe Bacal, am I correct the
22 designation P appears next or on the same line as
23 Starwild Music Inc.?
24    A.  Yes.
25    Q.  And that signifies publisher, does it not?

26

1    A.  It does.
2    Q.  And BMI next to it signifies the
3 affiliation that publisher has with respect to this
4 composition?
5    A.  That's correct.
6    Q.  Now, above that reference is Mr. Bacal's
7 name, Miss Bryant's name and your own name, correct?
8    A.  Correct.
9    Q.  And there are various account numbers shown
10 there?
11    A.  Right.
12    Q.  Am I correct?
13    A.  Uh huh.
14    Q.  I wouldn't put you to the test, but do you
15 have any reason to believe this isn't an accurate
16 reflection of your account number?
17    A.  I have no reason to think it would not be
18 my account number.
19    Q.  And you are shown as having an 83.40
20 percent interest in that composition, is that right?
21    A.  That's correct.
22    Q.  And that's an 83.40 interest in the public
23 performance royalties associated with that
24 composition?
25    A.  With the writer's share.

27

1    Q.  With the writer's share. And the 83.4 and
2 the 8.3 and 8.3 next to your name and Joe Bacal's
3 name respectively would add up to the other hundred
4 percent?
5    A.  That's right.
6    Q.  Do you know how it is these percentages
7 came to be on the records at BMI in the period of
8 March 16, 2000?
9    A.  I have no idea.
10    Q.  Did you, sir, cause those registrations to
11 be made in that fashion to ascribe those percentages
12 to the individuals indicated?
13    A.  I had nothing to do with it and I was not
14 made aware of it.
15    Q.  When is the first time that you learned
16 that BMI was reflecting -- withdrawn.
17        Who composed the Transformers?
18    A.  The music was composed by Anne Bryant.
19    Q.  And the lyrics?
20    A.  Lyrics were composed by Joe Bacal and me.
21    Q.  And with respect to -- I'll take the
22 opportunity now to ask this question.
23        What was -- did you have familiarity with
24 any understanding between Mr. Bacal and -- who was
25 Mr. Bacal by the way?

28

1    A.  Joe Bacal was at this time creative
2 director and owner of Griffin Bacal Incorporated
3 Advertising Company.
4    Q.  When you say at this time, are you
5 referring to the time that the composition --
6    A.  That we created the Transformers.
7    Q.  That would be what year approximately?
8    A.  '83 or '84.
9    Q.  And did you have occasion to have any
10 involvement at all in connection with financial
11 dealings between -- let me back up and get a couple
12 background questions in here.
13        You testified earlier you were with Michlin
14 and Company up until approximately 1983, was it?
15    A.  Yes.
16    Q.  And then did there come a time when you
17 became associated with another company?
18    A.  Yes, I left Michlin Company and formed my
19 own business in partnership with Anne Bryant called
20 Kinder and Bryant Limited.
21    Q.  And at some point in time --
22    A.  Kinder, Bryant and Aquino Limited
23 initially.
24        MS. PHARES:  I have two objections.  First
25 of all, Ann Bryant should not be making signals

29

1 to the witness as she just did and second of
2 all, I'm going to have a standing objection to
3 any questions reflecting or relating to the
4 relationship with GBI. GBI is not a defendant
5 in this case and we're wasting our time with
6 questions relating to GBI.
7 A. I could substitute everything that said GBI
8 and say Sunbow Productions because from my point of
9 view, from our point of view as writers, they were
10 the same entity, although in paper they were
11 different.
12 Q. You just heard an objection from counsel
13 about some kind of signals that apparently counsel
14 thinks were sent to you by Miss Bryant.
15 Did these signals have any bearing
16 whatsoever on your testimony?
17 A. No.
18 Q. Did you interpret these signals to suggest
19 any answers?
20 A. No.
21 MR. MONAGHAN: Anne? Okay.
22 Q. Would your testimony in any way change?
23 A. No.
24 Q. You're here to tell the truth, are you not?
25 A. Yes, completely.

30

1 Q. You took an oath?
2 A. Right.
3 Q. As far as you know, has this registration
4 been changed even up until today in terms of the
5 performance royalties relative to the Transformers
6 theme, changed on the records of BMI as yet?
7 A. No, it has not been changed as yet.
8 Q. Now, I'm going to ask you the same question
9 --
10 A. You mean changed back to what it should be?
11 Q. Right.
12 MS. SAFFER: Objection. Witness is making a
13 legal conclusion in a statement such as this.
14 A. To what I perceive it should be.
15 Q. Now with respect to the second title that's
16 shown on page 72, Exhibit-4, Transformers Theme Open,
17 do you have any idea as to how the credits that are
18 shown there came to be on the records of BMI?
19 A. I have no idea.
20 Q. Do you know who it was that was responsible
21 for advising BMI, if anyone, as to the allocation of
22 contributions and credits?
23 A. Well, it came from Sunbow Productions and
24 from Starwild Music.
25 Q. Again, you're shown as having an 83.4

31

1 percent interest, Messrs. Bacal -- Mr. Bacal and
2 Ms. Bryant are shown as having each an 8.3 percent
3 interest and then there's a split between the two
4 publishers shown there, is that correct?
5 A. Right.
6 Q. Do you know how that came to be?
7 A. I don't understand that.
8 Q. And I'm going to ask you the same questions
9 with respect to the next composition Transformers
10 Vocal Theme Two, same question, do you know how those
11 registrations were accomplished --
12 A. No, I don't know.
13 Q. You had nothing to do with any changes of
14 these registrations?
15 A. No. These are not the percentages that I
16 agreed to.
17 Q. I see a name but just because it may come
18 up in the course of the litigation, it would be good
19 to have it identified on the record, Barry Harman on
20 the composition on the bottom of Exhibit-4?
21 A. Right.
22 Q. Who is Barry Harman?
23 A. Barry Harman is a lyricist that on a couple
24 of projects we worked with, he wrote lyrics and we
25 wrote music.

32

1 Q. Do you have in mind, any particular --
2 A. In particular, GI Joe, the movie theme, he
3 wrote the lyrics on that and the Jem Show, he wrote
4 the lyrics on the songs. Actually, we took his
5 phrases and made them into lyrics.
6 Q. Anne Bryant, when you first meet Anne
7 Bryant?
8 A. 1978.
9 Q. What were the circumstances?
10 A. I went to work at Michlin -- it was called
11 Michlin and Hill at that time, a music production
12 company in New York City.
13 I was given a five-year contract there and
14 I met Anne Bryant as the music director of that
15 company.
16 Q. And did you come to collaborate with her
17 with respect to jingles, compositions?
18 A. Yes, I did.
19 Q. Can you give us some of the names of some
20 of the jingles that you collaborated on?
21 A. Well, if we use collaboration kind of as a
22 loose term because we used to write separately but
23 then we would get together and play for each other
24 what we had come up with, mostly -- rarely changes
25 were made at all but in that sense, we collaborated

33

1 because if one of us won, we all won because we were
2 working for a music production house. We all
3 benefited regardless of which writer's song was
4 chosen.
5    Q.  What's your present relationship with
6 Miss Bryant?
7    A.  Friends.
8    Q.  You've been involved with litigation with
9 Anne Bryant, have you not?
10   A.  Yes, I have.
11   Q.  In fact, you were originally a defendant in
12 this case?
13   A.  Yes, I was.
14   Q.  And also involved in a prior litigation
15 that terminated in 1994, I believe?
16   A.  I think so.
17   Q.  And without holding you to details, do you
18 recall generally how -- strike that.
19      Had you reached some sort of a resolution
20 of whatever differences you had that caused these
21 litigations to ensue?
22   A.  Yes.
23   Q.  Without holding you to the details, can you
24 tell us please for the record what the resolution of
25 the differences was?

34

1    A.  Yeah.  Generally, it was just a
2 misunderstanding of interpretation of our termination
3 agreement when I bought Michlin -- I mean Kinder and
4 Bryant from Anne, I bought her share so through the
5 course of litigation, we worked out a settlement of
6 that, basically leaving whatever was in her name in
7 her name, what is in my name in my name and we went
8 on.
9    Q.  When you say in her name, you mean where?
10   A.  Writer's shares at BMI.
11   Q.  And GI Joe was in her name at BMI?
12   A.  Some of the GI Joe was in her name.
13   Q.  Now, what is the relationship of Sunbow to
14 GBI as you understood it?  Let me back up a little
15 bit.
16      Griffin Bacal, Inc., what is or was that
17 entity?
18   A.  Griffin Bacal, Incorporated was an
19 advertising agency that represented Hasbro Toys which
20 was really their only large account at the time.  They
21 later got some business from Sharp Electronics whom
22 we also worked for.
23      Sunbow Productions was the spin-off arm for
24 production of cartoon shows associated with the
25 products that GBI represented.

35

1    Q.  And spin-off from what entity?
2    A.  From Griffin Bacal.  I would imagine
3 legally, they are separate entities but they were
4 very intertwined --
5      MS. PHARES:  Objection, foundation.
6      MR. MONAGHAN:  You can't interrupt his
7   answer.  You can objection after he's done but
8   you can't object in the middle of an answer.
9   That's the way the system works. So please the
10  hold the objection until he's done.
11   Q.  Can you finish your answer?
12   A.  The reason I'm making that point is
13 sometimes we weren't even that conscious if we were
14 being hired by Sunbow or by GBI because the people
15 hiring us were the same. Joe Bacal and the writers
16 from Sunbow were the same as the people from GBI.
17 There was no differentiation.  At the time of
18 contracts, that would be made clear.
19   Q.  Who were the principals of Sunbow?
20   A.  The principals I knew, Tom Griffin and Joe
21 Bacal.
22   Q.  And who were the principals, if you know,
23 of GBI?
24   A.  Tom Griffin and Joe Bacal.
25   Q.  And where were the offices of the

36

1 companies?
2    A.  They were on 19th Street and 5th Avenue.
3    Q.  Both companies?
4    A.  Same office.
5    Q.  When you went to the offices, what was on
6 the door, what names were on the door?
7    A.  Griffin Bacal, Incorporated. I don't
8 remember it saying Sunbow Productions.
9    Q.  And getting back to your transition from
10 Michlin and Company to Kinder, Bryant, Aquino
11 originally, did there come a time that name changed?
12   A.  Yeah. Within the first year, Sarah Aquino
13 was the salesperson that came with us and didn't
14 quite gel so we bought her out relatively quickly and
15 made it Kinder and Bryant.
16   Q.  As far as any continued relationship if any
17 with Griffin Bacal or Joe Bacal, what happened in
18 that regard?
19   A.  The relationship just continued to grow.
20   Q.  What kind of work were you doing for
21 Mr. Bacal?  When I say what kind of work, what
22 accounts, what jingles?
23      MS. PHARES:  Before you begin, the question
24   misrepresents the prior testimony.  As far as we
25   know, he was not working for Mr. Bacal.

37

1    Q.  You can answer the question.
2    MR. MONAGHAN: We don't know that.  A judge
3  can rule on that.
4        MS. PHARES: I'm just objecting to the form
5  of your question.  He can answer.
6        MR. MONAGHAN: I didn't hear you say form of
7  the question.
8    A.  Could you say the question again?
9    Q.  Actually, let me ask the question since
10 counsel raises it.  Who did you consider yourself as
11 doing the work for?
12   A.  Well, directly, Joe Bacal and he
13 represented Griffin Bacal and Sunbow Productions.
14   Q.  I guess that answers that issue.  You were
15 working on which accounts of their clients?
16   A.  Hasbro Toys, virtually every major product
17 that they had, we worked on.  We were doing probably
18 85 percent of music for Hasbro Toys for many years.
19   Q.  Can you describe, please, what if anything
20 happened to Hasbro in terms of how the business grew
21 or did not grow in this time period that you are
22 doing work, jingles?
23   A.  When we first met Joe Bacal and he called
24 us, he worked at Benton & Bowles, to come over and
25 take a look at some of their toy projects that they

38

1  had, it was a very small toy company at that time.
2        Apparently, they had been bigger in the
3  past but had lost a lot of business.  For us, it
4  was -- we considered it a very small account because
5  it was a small account.
6    Q.  This is what time period?
7    A.  In the -- '78, '79.  Joe Bacal would have a
8  meeting with us, he'd show us Poloroid pictures of a
9  mockup of the toy that they were projecting to build,
10 the prototype and essentially saying do something.
11 Sometimes there was a line but usually not even a
12 line, just here's what the toy is going to do, here's
13 what it looks like, go do an ad campaign and we would
14 write lyrics, a campaign, music.  We'd get back
15 together with Joe --
16   Q.  Let me stop you right there.  Was there
17 anything in writing recording an understanding, a
18 financial understanding at that point?
19   A.  I don't think there's anything in writing.
20 Initially, it would be verbal.  After a verbal --
21 because the work usually had to be rapid.  We had to
22 get -- they had a job to do, they wanted to present
23 it to the client, we had to get it going.  There would
24 probably be a verbal understanding that if we would
25 go further, they would cover the cost of the demo

39

1  production and a small fee, $750 or something for a
2  demo.  Later, contracts were done if something went
3  final.
4    Q.  Now, were you also a performer?
5    A.  Yes.
6    Q.  And how about Miss Bryant?
7    A.  Yes.
8    Q.  And was that limited to singing or were you
9  also a musician?
10   A.  Musician and singing.
11   Q.  What instruments did you play?
12   A.  I played keyboards and I played percussion.
13   Q.  And how about --
14   A.  It doesn't mean I played that on
15 everything.  Sometimes I hired people better than me.
16 And Anne also performed.  In the musician's union,
17 performance also includes leader and contractor.
18 Leader is the person who is leading the orchestra,
19 they are considered a performer, and generally Anne
20 or I were leader on eventually everything.
21   Q.  Now you mentioned unions.  What unions are
22 you referring to?
23        MS. PHARES: Objection, relevance.
24   A.  American Federation of Musicians, Screen
25 Actor's Guild for the singing and also other things

40

1  for singing, American Federation of Television and
2  Radio Artists.
3    Q.  If you know, what's the relationship or
4  what was the relationship at that point in time
5  between Griffin Bacal, Inc. and the unions regarding
6  any of these compositions that you were involved
7  with?
8    A.  Griffin Bacal had to be a signatory to each
9  of those unions meaning they had signed documents
10 with the union, a contract with the union agreeing to
11 pay at least scale wages for every performer as
12 determined through the unions including residuals for
13 performance rights.
14   Q.  What about Sunbow?
15   A.  Same thing.
16        MS. PHARES: Objection, form of the
17 question.
18   Q.  You understood my question to mean exactly
19 the same as the prior question regarding GBI?
20   A.  It was my understanding Sunbow was a
21 signatory to American Federation of Television and
22 Radio Artists, Screen Actors Guild and American
23 Federation of Musicians.
24   Q.  And what if anything are your
25 responsibilities as a song leader -- is song leader

41

1 the right term?
2 MS. PHARES: Objection, relevance.
3 A. Music leader. The leader's responsibility
4 is to see that the contracts are created, meaning a
5 contract with the union which was actually a
6 contract, as I recall, between the agency and the
7 union or Sunbow and the union. We were kind of the
8 administrator of that.
9 We would create the contract, send it to
10 Sunbow or to Griffin Bacal who would then pay the
11 contract to the union. We didn't pay the contract,
12 nor did we bill Griffin Bacal or Sunbow for the
13 contracts.
14 Q. Who would have that function?
15 A. Which function?
16 Q. Who, if anyone, had the function of billing
17 Sunbow or GBI as the case may be?
18 A. Well, I don't think anybody billed them.
19 With the contract, they sent the payments. As they
20 registered the work with the union, they would send
21 the checks with the contract.
22 Q. Do you have any knowledge, Dr. Kinder, as
23 to whether or not Sunbow or GBI have made payments
24 for the singers and musicians with respect to the
25 compositions at issue in this case, Transformers?

42

1 A. For the original television, absolutely.
2 They paid the demo fees, the session fees.
3 Q. I'm talking about to the unions?
4 A. To the unions.
5 Q. Okay.
6 A. And the residuals because I receive those.
7 Any subsequent uses --
8 MS. PHARES: Objection.
9 MR. MONAGHAN: Can you let him finish his
10 answer? I don't care that you don't like it.
11 MS. PHARES: It has nothing to do with my
12 liking, it's irrelevant. The unions are not in
13 this case. There are no union issues in this
14 case.
15 Q. Can you finish your answer? Then we can
16 move on.
17 A. It's a regulation of the union and of the
18 contract that for every media, if this work goes into
19 a different media, a new contract has to be generated
20 as if it was recreated even if it's the same work.
21 For instance, at Sunbow and Griffin Bacal,
22 Transformers, if we did a Transformers commercial, we
23 had a contract, it was registered as a television
24 commercial. If they used the same music and put it on
25 a television show which I think in some cases they

43

1 did, a new contract had to be generated representing
2 the work as a television theme song.
3 MS. SAFFER: Since it appears that you are
4 moving on perhaps to a slightly different area,
5 Pat, could we take this opportunity to take a
6 few minute break? I will call the office and ask
7 them to see if they can find the contracts. The
8 sooner I do it, the more chance we have.
9 MR. MONAGHAN: Sure.
10 (SHORT BREAK)
11 Q. Back on the record, Dr. Kinder. You
12 testified earlier that you had met Mr. Bacal when he
13 was the creative director at Benton & Bowles. Do you
14 recall that testimony?
15 A. Yes, I do.
16 Q. Now, did you have any involvement at that
17 time with respect to any financial arrangements
18 between Michlin and Company and the clients of
19 Michlin and Company?
20 A. Initially at that time, no.
21 Q. Did there come a point in time?
22 A. Yes.
23 Q. This is while you were at Michlin and
24 Company?
25 A. Right.

44

1 Q. What was the extent of your involvement
2 when you did get involved in terms of financial
3 interest?
4 A. Later on, you know, Spencer traveled a lot
5 and I would negotiate contracts, pricing, do the
6 budgets for the productions, get them approved with
7 the client, the whole gamut.
8 Q. Did Michlin and Company employ written
9 agreements?
10 A. Yes.
11 Q. And this involvement of yours, did that
12 also include dealing with the written contracts?
13 A. Yes, it did.
14 Q. I don't have any written contracts of
15 Michlin and Company here to ask you about, but I'm
16 going to ask you for your understanding of what the
17 composer's continued interests were, if any, in any
18 of the compositions?
19 MS. PHARES: Objection, relevance.
20 A. In our standard contract, the writers, we
21 retained all the publishing writer's share and
22 publisher's share in any work that we created.
23 Q. That's Michlin and Company?
24 A. Huh?
25 Q. You created all the publishing?

45

1    A.  Right.
2    Q.  And all of the writer's royalties?
3    A.  Right.
4    Q.  Now using as a frame of reference the
5 catalog that we looked at earlier, page 72,
6 Exhibit-4, when you say retained all the writer's
7 royalties and publishing, are you limiting your
8 answer to just the public performance royalties or
9 other types of royalties?
10    A.  It would include all royalties.
11    Q.  What other kinds of royalties are there in
12 your understanding, now I'm asking only about at
13 Michlin and Company?
14    A.  Well, at that time, there wasn't that much
15 connection with the performance agencies to get our
16 writer's royalties for commercials. If we did other
17 things, movie scoring or something, then it would be.
18        The biggest reason we retained the rights
19 was so that if these commercials became something
20 bigger, sometimes a commercial could become a song, a
21 hit song or used in a movie, then it would have
22 value. Later on, we started registering the
23 commercials for payment as music on air and it became
24 more valuable.
25    Q.  Registering with --

46

1    A.  That happened after I had my own company,
2 Kinder and Bryant, but we were very protective of the
3 rights mostly for future possible uses of those
4 creations.
5    Q.  At the point in time that you formed your
6 own company and I believe you've already testified
7 you continued to do business with Joe Bacal, now he's
8 left Benton & Bowles and has his own agency, Griffin
9 Bacal, Inc.?
10    A.  Correct.
11    Q.  And he has his own TV production company,
12 Sunbow?
13    A.  Right.
14    Q.  What discussions did you have with
15 Mr. Bacal about the financial arrangements vis-a-vis
16 the writer's continued interests?
17        MS. PHARES: Objection, relevance. GBI is
18    not in this case.
19    A.  We had one discussion and it was
20 essentially one sentence, same deal as Michlin. We
21 both nodded as if we both understood what that was
22 because we had dealt with finances at Michlin and
23 Company together when he was the client and I was
24 representing Michlin and Company and we proceeded.
25    Q.  Is this a discussion you had directly with

47

1 Joe Bacal?
2    A.  Yes.
3    Q.  Anyone else present?
4    A.  Anne Bryant was there as well.
5    Q.  Do you know where it occurred?
6    A.  At Griffin Bacal's, Joe Bacal's office.
7    Q.  And was there anyone else present besides
8 the three of you?
9    A.  Not that I remember.
10    Q.  And what did you understand that to mean in
11 the context of any continued relationship with Joe
12 Bacal?
13    A.  It meant that we would continue to do union
14 work, we would receive fees for production and Anne
15 Bryant and I would sing on every commercial and
16 perform as musicians. The deal with Griffin Bacal and
17 Sunbow at that time was we had negotiated that they
18 would keep the publisher's share of the works, we
19 would keep the writer's share. That had become a
20 negotiation in the Michlin contract.
21    Q.  And when you say they would keep the
22 publisher's share, you're talking about the BMI
23 performance royalties?
24    A.  Yes, and the responsibilities. A publisher
25 does more than just collect royalties. They have a

48

1 responsibility to the writers to represent them and
2 that's my understanding of what the agreement was
3 that they represent that they'll promote the product,
4 get it placed and help us make money from it.
5    Q.  I don't think I asked you, approximately
6 when did this discussion ensue? We had a general
7 timeframe about the time of the transition. Can you
8 pinpoint the year?
9    A.  It would be late '93 -- I mean late '83 or
10 early '84.
11    Q.  How about in terms of where you were in
12 delivering music, any particular compositions that
13 come to mind in that timeframe?
14    A.  I believe the first job we did as Kinder
15 Ann Bryant was Transformers.
16    Q.  And this is a job for Joe Bacal?
17    A.  Joe Bacal.
18    Q.  And did there come a time when there was a
19 production for or music produced for Sunbow as a
20 separate entity that you know of -- withdrawn.
21        Does the name The Great Space Coaster mean
22 anything to you?
23    A.  Yes.
24    Q.  And what was that?
25    A.  That was the theme song for a television

49

1 show that Sunbow produced for kids.
2     MS. SAFFER: Could you repeat the name?
3     MR. MONAGHAN: The Great Space Coaster.
4     A. We did that job at Michlin and Company and
5 Anne Bryant wrote that song.
6     Q. Who at Kinder Bryant if anyone had
7 responsibility for the financial dealings and
8 negotiations with Mr. Bacal?
9     A. Officially, Anne and I were equal partners
10 and either of us could negotiate any deal. In general
11 practice, I handled more of the business than Anne
12 did. We didn't give each other titles other than
13 chairman and president.
14     Q. Dr. Kinder, you had put in an affidavit in
15 this case pertaining to certain agreements that were
16 produced in 2004.
17     Do you recall executing an affidavit or
18 declaration I think it was?
19     A. Yes, I do. Are you referring to the
20 signature affidavit?
21     Q. Yeah.
22     A. Yes.
23     Q. I'm going to show you now some exhibits.
24 I'm also going to attempt to actually get these up on
25 the wall. I'm referring now counsel, to Exhibit-M, at

50

1 the trial, the Jem agreement, June 1, 1985.
2     MS. SAFFER: Is this Exhibit-5 for this
3 deposition?
4     MR. MONAGHAN: No, at the trial.
5     MS. SAFFER: Is this going to be Exhibit-5
6 right now?
7     MR. MONAGHAN: Aren't we just cluttering up
8 the record that way? This is the trial exhibit.
9 There won't be any dispute.
10     MS. SAFFER: Exhibit what?
11     MR. MONAGHAN: Five --
12     MS. SAFFER: From the trial, what was it.
13     MR. MONAGHAN: It was Exhibit-M at the
14 trial.
15     MS. SAFFER: M.
16     MR. MONAGHAN: At the framed issue hearing.
17     MS. PHARES: It's Defendant's Exhibit-M.
18     MR. MONAGHAN: That's correct.
19     MS. PHARES: You know what, I can't see in
20 the dark. Can we -- is there any way --
21     MR. MONAGHAN: I have a hard copy of this
22 exhibit too.
23     Q. This is a document from the defendant
24 Sunbow's appendix on appeal -- no, actually, it's
25 respondent's appendix. It's from our appendix. And

51

1 it was trial Exhibit-M, the Jem feature song
2 agreement between Sunbow Productions, Inc. and Kinder
3 and Bryant dated June 1, 1985.
4     Are you familiar with this document,
5 Dr. Kinder?
6     A. Yes, I am.
7     Q. That's my marking on the exhibit. I'm
8 going to take you to the signature page. If you'd
9 like to look at the hard copy, I have it here as
10 well. I'm going to ask you to go through the
11 agreement, Exhibit-M.
12     You don't have to read every line as long
13 as you have -- I'd like you to satisfy yourself in
14 terms of --
15     MS. PHARES: I object to the fact that the
16 witness has been handed a paper copy that is
17 highlighted.
18     MR. MONAGHAN: If you have another one,
19 that's fine.
20     MS. PHARES: You know what, it's your
21 deposition but you're not supposed to be using
22 the exhibits that are highlighted.
23     A. I can read the one from up here if you
24 would rather.
25     Q. Give me that back since counsel is

52

1 objecting. This page, Dr. Kinder, page nine of this
2 agreement, does that bear your initials?
3     A. It looks like my initials.
4     Q. And do you recognize the signature of Carol
5 Weitzman on the next page?
6     A. Yes, Carol Weitzman.
7     Q. How about yours?
8     A. That appears to be my signature.
9     Q. That's page ten?
10     A. Yes.
11     Q. Referring to Schedule A to that agreement
12 which I'm showing you now, do you recognize the
13 initials?
14     A. Yes.
15     Q. Is that Anne Bryant's initials?
16     A. It looks like her initials and my
17 signature.
18     Q. Page 13, the inducement letter, are you
19 familiar with those signatures?
20     A. Yes.
21     Q. Is that yours?
22     A. That appears to be mine.
23     Q. And Ms. Bryant's?
24     A. Yes.
25     Q. Now, I'm going to go back up to the top of

53

1 this. What compositions does this agreement deal with
2 if you know? ................................. :
3    A. I believe it deals with the Jem songs that
4 we wrote, there were over 150 songs we wrote for the
5 Jem Show and this contract covered production
6 agreement on those songs.
7    Q. And was there anything that you see in the
8 agreement that suggests that this agreement covers
9 the songs, the feature songs?
10       MS. PHARES: Objection to the form of the
11 question.
12    Q. In other words, how can you tell?
13       MS. PHARES: Leading.
14       MR. MONAGHAN: I rephrased the question.
15    Q. How can you tell?
16    A. Well, it specifically refers to writing,
17 preparing and delivering original music for songs to
18 be used in the fully animated children's television,
19 show.
20    Q. Are you familiar with paragraph six of this
21 agreement, I'll bring it up, which begins on the
22 bottom of page four?
23    A. Yes.
24    Q. You see there's a term "music publishing
25 rights" in quotes on that page?

55

1 we all realized there was a strong possibility that
2 they could become an entity of their own in some form
3 in the future rather than just the television show.
4       So, we negotiated that we would be paid for
5 other forms, other media they would be used in, sheet
6 music, mechanicals, it was supposed to encompass if
7 they became phonograph records. I don't think we had
8 DVDs yet but -- if they became a salable product,
9 there was a possibility, in fact, we had a hope that
10 one or many of the songs would become hits. There was
11 certainly that possibility.
12       This was a cartoon rock band and we were
13 writing and producing their songs. So they were --
14 it was like creating a record, a music record.
15    Q. And having said what you just said, what
16 did this mean to you in terms of what your continued
17 interest would be?
18       MS. PHARES: Objection.
19    A. We anticipated that there would be other
20 uses of this product in the future and some of those
21 were outlined that we would receive payment for
22 future uses of this product for whatever it was used
23 for in the future.
24    Q. Now --
25    A. Actually, we anticipated that we didn't

54

1    A. Right.
2       MS. PHARES: Objection, these agreements are
3    not in this case. The court has already ruled
4    that we are not trying this case on these
5    agreements. This is not relevant. We are
6    wasting our time.
7       MR. MONAGHAN: Couldn't disagree with you
8    more, counsel.
9       In fact, I think the last decision said
10    they are valid written agreements. I don't know
11    which ones you think the good judge is talking
12    about.
13    Q. Now, referring to paragraph 6(a), you see
14 that there are a series of rights granted to the
15 contractor in this case, correct?
16    A. Yes.
17    Q. And what I'm asking you now is how does
18 this paragraph comport with your understanding of
19 whatever continued interests Kinder Bryant and
20 Ms. Bryant had in these compositions?
21       MS. PHARES: Objection, calls for a legal
22    conclusion.
23    Q. How does this square with your
24 understanding? ............................
25    A. Since we were creating songs, there was --

56

1 know what it would be exactly, but we hoped that this
2 was going to be bigger than just the television show.
3    Q. Can you give me any examples of where
4 payments were received after a contract period and
5 after the composition was delivered to GBI or Sunbow
6 as the case may be for uses in other media?
7       MS. PHARES: Objection, form of the
8    question.
9    A. Well, not outlined in this contract but we
10 did create music cassettes that were sold as a
11 product with the dolls. We received payment for that
12 separate.
13       In this particular thing, other than the
14 television show, I don't think we received payments
15 as per the contract.
16    Q. To your knowledge, has Kinder Bryant or you
17 or Miss Bryant individually ever received any
18 payments for the uses of any of the music composed at
19 Kinder Bryant for Transformers DVDs, GI Joe DVDs,
20 Inhumanoids DVDs, Jem Show, any of those
21 compositions?
22    A. No payments.
23    Q. Have you ever spoken to Miss Phares before?
24    A. Yes.
25    Q. And when was that?

57

1    A.  Two or three years ago, two years ago.
2    Q.  Was that face-to-face or telephone?
3    A.  On the telephone, she called me at my
4 office.
5    Q.  And what did she say to you and what did
6 you say to her?
7    A.  I think initially she was asking me if I
8 had some documents, in particular, it might have been
9 this agreement.
10   Q.  Referring to the Jem agreement?
11   A.  The Jem agreement which I did not have. She
12 proceeded to have more discussions with me and about
13 what my participation in this might be since at the
14 time I was also a defendant and she made some
15 comments that it was likely that we probably were due
16 some other, at least publishing money writer's
17 royalties based on other uses of the music.
18       We particularly spoke about the Jem Show
19 DVD which I had just come to understand it recently
20 had been released. I had reviewed it myself and
21 noticed that not only did they show the episodes but
22 on the special features, it has a songs only section.
23 In other words, it's being sold like a music video
24 with just our music being played with the videos. You
25 don't have to watch the shows at all and I took

58

1 exception that they were using the music without
2 permission and where were the royalties we were
3 supposed to get.
4    Q.  You took exception in your conversation
5 with Miss Phares?
6    A.  Yes. It wasn't a confrontational
7 conversation. She's a very nice lady, and she
8 responded by saying you may very well be due more
9 money and if you are so entitled, you should be paid.
10   Q.  Did she say who might owe that money?
11   A.  She did not.
12   Q.  Now you mentioned Jem. We don't have a Jem
13 DVD here, so am I correct that the play songs feature
14 would be on a DVD -- oh, this is the DVD?
15   A.  This is the DVD.
16   Q.  Did you bring this with you today? Can we
17 mark this please?
18       (EXHIBIT-5 MARKED FOR IDENTIFICATION)
19   Q.  Showing you now Kinder Exhibit-5 for
20 identification, Dr. Kinder. Can you identify that?
21   A.  This is the complete first and second
22 seasons Jem and the Holograms DVD series.
23   Q.  Have you actually had occasion to put that
24 in a machine and play it?
25   A.  Yes, I have.

59

1    Q.  And it has a play songs feature?
2    A.  Absolutely.
3    Q.  So let me see if I can get that up and
4 running.
5        Was this the DVD you were referring to in
6 the conversation with Miss Phares?
7    A.  Yes, it was.
8    Q.  Should I click that?
9    A.  Extra features, play songs.
10   Q.  For the record, can you tell us please
11 where the cursor is now on this Jem DVD?
12   A.  Under special features, it has a section
13 called play songs.
14   Q.  By the way, does this DVD contain the songs
15 that are the subject of that agreement?
16   A.  Absolutely.
17   Q.  That agreement being Exhibit-M?
18   A.  Exactly.
19   Q.  I clicked play songs.
20   A.  It will just play the songs like it's a
21 record album.
22   Q.  I can turn off the video now and just
23 continue to listen to this music, is that correct?
24   A.  Yeah.
25   Q.  Is there a story line associated with the

60

1 play songs feature or is it just the music?
2    A.  It's not part of the show. In this context,
3 it's just like it's a music video and they just play
4 song after song after song, no story line. Next song.
5    Q.  Was that the Jem Show theme that we just
6 heard?
7    A.  No. This is a new song now. If you do show
8 the video with the songs, in between each one the
9 credit comes up just like on MTV, it comes up, it
10 says what the song is, Jem and the Holograms, the
11 title before it and then it goes to the next song,
12 next song, next song. You play it just like a record
13 album.
14   Q.  You said Miss Phares said you may very well
15 be entitled to additional payments with respect to
16 what we just heard, correct?
17   A.  Right.
18   Q.  And you haven't gotten any, have you?
19   A.  No.
20   Q.  Have you any understanding as to whether
21 Anne has received any payments?
22   A.  To my knowledge, she hasn't.
23   Q.  Now I'm going to play the boy's songs. For
24 the record, I'm going to be taking a DVD from
25 Plaintiff's Exhibit-10 in evidence at the trial which

## 61

1 is entitled Transformers Season Two Part One. It
2 consists of I think three DVDs. Let me see.
3     MS. PHARES: The trial exhibit again is?
4     MR. MONAGHAN: Ten.
5     Q. I'm mistaken, it's four. Do you know what
6 Rhino is Dr. Kinder?
7     A. Before this, I really didn't know who they
8 were.
9     Q. Okay, that's fine.
10     MS. PHARES: While this is going on, I am
11 going to repeat for the record my objection to
12 this whole continuing line of inquiry given that
13 these agreements are not in this case.
14     MR. MONAGHAN: For the record, this is a
15 Sunbow production, so listed on the back on the
16 jacket, 1986 Sunbow Productions, Inc.
17     That's the same Sunbow as the defendant.
18     MS. PHARES: I said the contracts for these
19 are not in this case. Maybe you misunderstood
20 my objection.
21     Q. What are we looking at now, Dr. Kinder?
22 Whose voice is that?
23     A. That's me.
24     Q. That electronically altered voice?
25     A. Yes, that's me, the electronic voice is me.

## 62

1     Q. Whose music is that?
2     A. Anne Bryant wrote the music. It's also a
3 production, this is the television show and this is
4 the production that we did. I think it's a
5 commercial.
6     MS. PHARES: I don't believe there is a
7 question pending.
8     Q. You had something to add there, Doctor?
9     A. I believe this is a commercial that was
10 lifted and placed in the television show.
11     MS. PHARES: Is there a question pending? If
12 not, should we turn this off and continue?
13     Q. Dr. Kinder, I think you just said, correct
14 me if I'm wrong, that this was originally a
15 commercial, a jingle?
16     MS. PHARES: Objection, there is no -- I
17 don't know where you're getting -- you're
18 clarifying something that hasn't been said.
19     Q. Didn't you say that a moment ago?
20     A. Yes, I did.
21     Q. And what did you mean by that?
22     A. I believe that we created this as a
23 commercial.
24     Q. This being that music?
25     A. This piece of music and this version and it

## 63

1 was lifted to become the theme song for the
2 television show.
3     Q. Lifted by whom or what?
4     A. Sunbow.
5     Q. And so when the music was composed, it was
6 composed for GBI?
7     A. Originally.
8     Q. And then it was lifted by Sunbow for the TV
9 production?
10     A. Right.
11     Q. And then as I've mentioned, Sunbow is shown
12 as the producer on the jacket for the DVD?
13     A. As I explained before, when something goes
14 from one medium to another, a new contract has to be
15 done as if it was recreated with the union.
16     Q. Do you know how the music -- how Sunbow
17 obtained any license or rights to use this music?
18 Only if you know, don't guess.
19     A. No. For the original television show, I
20 believe that was done correctly, at least where we
21 were concerned.
22     I think they did another musicians and
23 singers contract, paid to put it on air as a
24 television --
25     Q. A union contract?

## 64

1     A. A union contract, paid to put it on air as
2 a television theme song and -- but that's the end of
3 it. Any other use, there's not been --
4     Q. Now we've just seen a Sunbow Jem agreement
5 dated June, 1985, Exhibit-M.
6     Do you know of any comparable Sunbow
7 agreement related to Transformers music?
8     A. In my memory, they generally did create a
9 new contract when it went to Sunbow but I don't
10 remember that particular contract.
11     Q. Would the form of the agreement, if there
12 was one, be the same as the one we've seen relative
13 to Jem?
14     A. It would probably be similar, but maybe not
15 as explicit because of the particular aspect of the
16 Jem songs being a different product. It wasn't just a
17 theme song, it was an actual product.
18     Q. In terms of timing, which would have come
19 first, Transformers or Jem?
20     A. Transformers.
21     Q. The understandings that you've testified to
22 earlier that you have with Mr. Bacal and am I
23 correct, that would also include GBI and Sunbow?
24     A. Yes.
25     Q. The understanding that you testified about

65

1 about retaining writer's royalties, would that have
2 applied to the music we're listening to now?
3    A. Yes.
4    Q. Do you know of any agreement where those
5 rights were relinquished totally in favor of Sunbow
6 or GBI?
7    A. No. In fact, we never in any circumstance
8 relinquished our writer's royalties to anyone. In
9 fact, these songs were registered with ASCAP and BMI
10 and we were given writer's royalties.
11    Q. How about on the publishing side,
12 mechanical royalties or synchronization rights, those
13 types of interest?
14    A. I don't know that was specified, but we
15 would have expected to be paid for them, the writer's
16 share.
17         MR. MONAGHAN: Counsel, are you willing to
18 stipulate if I were to put the other three disks
19 in and the theme would be played, that the
20 witness's answers would likely be the same or do
21 I have to play each one again?
22         MS. PHARES: You're just saying -- you're
23 asking whether or not --.
24         MR. MONAGHAN: That's Anne Bryant's music.
25         MS. PHARES: You don't need the DVD to ask

66

1 him that.
2         MR. MONAGHAN: All I'm asking for, are you
3 willing to stipulate to it.
4         MS. PHARES: I don't know what I'm
5 stipulating to, Pat.
6         MR. MONAGHAN: That if I were to put the
7 other disks in and ask the same questions when
8 the theme music comes up again --
9    Q. Am I correct, Dr. Kinder, the theme music
10 would come up on each of these?
11    A. Yes.
12         MS. PHARES: You mean the Transformers theme
13 music?
14         MR. MONAGHAN: I do, this exhibit.
15         MS. PHARES: I'm sure that the -- it's the
16 music that was created for the original
17 production for Sunbow. I have no objection to
18 that.
19         MR. MONAGHAN: That's not my question.
20         MS. PHARES: Don't these DVDs reproduce
21 those original productions?
22         MR. MONAGHAN: I'm only asking whether you
23 are willing to stipulate that that music I
24 played before would be the same on each of
25 these, the theme music and that the witness is

67

1    likely to give the same answers? If I need to go
2 through it, I'll go through it.
3         MS. PHARES: I really don't understand your
4 question. It's the music that would accompany
5 the original productions. If you permit me, I'll
6 ask the witness that and we can then stipulate
7 to that.
8         MR. MONAGHAN: No. You can cover it on
9 cross.
10    Q. Dr. Kinder, would all of this music on
11 these four DVDs and all these various shows have been
12 composed at the same sessions or different sessions?
13    A. All of the music -- can you clarify, on
14 these four?
15    Q. Yeah -- I'm talking about were there
16 multiple jingle recording sessions?
17    A. There were.
18    Q. I'll only take it the first few bars. Do
19 you have any understanding -- you didn't recognize
20 the name Rhino, am I correct?
21    A. No.
22         MS. PHARES: Asked and answered.
23    A. I've heard of them now because after I saw
24 this, I went on line.
25         MS. PHARES: Objection, there is no -- Mr.

68

1 Kinder, when there is no question pending --
2    A. I was finishing the answer to the question.
3         MS. PHARES: And there was an objection made
4 and Mr. Monaghan did not carry on with his
5 question.
6    Q. Is that that same Transformers theme music?
7    A. Yes, it is.
8    Q. That's Miss Bryant's music?
9    A. Yes.
10    Q. And your voice was --
11    A. It's my voice.
12    Q. Is it possible even though that doesn't
13 have the set, that Exhibit-10 set of DVDs, even
14 though it doesn't have a specific play songs
15 function, you'll have to help me here, is it possible
16 that you can simply play the songs, you can turn off
17 the video?
18    A. Yeah, because first of all, on the
19 beginning there, it just plays the song over and over
20 and over until you start the show. It plays the
21 theme, it just repeats the theme.
22    Q. I'm now going to insert the DVD from
23 plaintiff's trial Exhibit-8 into evidence
24 "Transformers Villains, the Ultimate Doom."
25         MR. MONAGHAN: My son had this stuff.

69

1    Q. I believe you'll see J. Edgar Hoover again
2 here...
3    Dr. Kinder, is that the same theme we've
4 heard?
5    A. It's the same theme, a different
6 production.
7    Q. Different production?
8    A. That we did.
9    Q. Different recording session?
10   A. Yes.
11   Q. Who were the musicians?
12   A. Well, Anne and me and we tended to use --
13 a group of people, the studio players in New York
14 that we tended to use over and over. Also the singers
15 are -- Anne Bryant and I are both singing on there, I
16 can hear my voice and the solo is me.
17   Q. That was a segment from Exhibit-8 in
18 evidence, by the way.
19      I just want to make a comment for the
20 record that Plaintiffs Exhibit-8 is also --
21      MS. PHARES: Objection, you are just reading
22 from the jacket of this, correct?
23      MR. MONAGHAN: Let me finish, please.
24      MS. PHARES: Is this your testimony?
25      MR. MONAGHAN: Plaintiff's Exhibit-8 bears

70

1 the name Sunbow Productions, Inc./Wildstar
2 Music/Hasbro Inc. 1986.
3      I've never been in a deposition where the
4 counsel keeps interrupting before you even get
5 halfway through whatever it is you're going to
6 say.
7      MS. SAFFER: The copy of the agreement has
8 been faxed by my office. It's probably -- I'm
9 going to go see if I can pick it up. You may
10 continue with this.
11     MR. MONAGHAN: Thank you very much. I'm
12 wondering if we can take a ten minute break.
13     (SHORT BREAK)
14   Q. Dr. Kinder, I'm going to come back to
15 testimony about a series of written documents in the
16 case that were produced by Sunbow in the fall or late
17 summer of 2004 while we were on trial and counsel for
18 Sunbow had put together a binder of various
19 agreements which were captioned Bryant and Kinder
20 Signatures Conceded and Disputed.
21     You testified earlier about an affidavit
22 that you had put in in the case regarding a number of
23 these?
24   A. Yes, I did.
25   Q. I'm going to show you a document which was

71

1 marked as --
2      MR. MONAGHAN: This for the record, by the
3 way, counsel, is the document produced under the
4 tab GBI Transformers agreement 1984 in the
5 binder that you furnished to us and it was also
6 marked as Plaintiff's 47 for identification at
7 the framed issue hearing. Let's just use this
8 one.
9      Q. I'm going to show you now, Dr. Kinder --
10 first I'm going ask Dina to mark this.
11     (EXHIBIT-6 MARKED FOR IDENTIFICATION)
12     Q. What we'll do is we'll take all the flags
13 and tags off this for the official copy.
14     MS. PHARES: Why don't you take them off
15 now?
16     MR. MONAGHAN: That's fine. They're
17 actually your flags except for one, but that's a
18 good suggestion.
19     Q. I'm going ask you to take a look at this
20 document, Dr. Kinder. Read it over very carefully
21 and I'm going to ask you a few questions about it?
22     MS. SAFFER: What's being looked at now?
23     MR. MONAGHAN: This is the next exhibit. It
24 should be Exhibit-6 which was Plaintiff's 47 for
25 I.D. which is the Transformers agreement that

72

1 Gloria produced.
2      MS. SAFFER: I don't know why I think I'm up
3 to Exhibit-9. Obviously I can't count.
4      MS. PHARES: He's not giving numbers as
5 trial exhibits.
6      MS. SAFFER: I see. That's why I'm all
7 screwed up.
8      MR. MONAGHAN: It's too confusing to have
9 too many exhibit references.
10     MS. PHARES: That's exactly the problem.
11     Q. Have you had an opportunity to review that
12 Exhibit-6?
13   A. Yes.
14   Q. Okay, Dr. Kinder, I'm also showing you now,
15 we mine as well mark this as the next exhibit,
16 Exhibit-7, which is a copy of Dr. Kinder's
17 declaration which was submitted in this case back in
18 September 2004.
19     (EXHIBIT-7 MARKED FOR IDENTIFICATION)
20   Q. Do you recall the declaration, Dr. Kinder?
21   A. Both or which one?
22   Q. The declaration is Exhibit-6. Do you
23 recall signing -- is that your signature?
24   A. Yes.
25   Q. And now referring to Exhibit-5 --

**73**

    1    A.  I have six and seven.
    2    Q.  Referring to the Exhibit-6, would you take
    3  a look at the first page and tell us what that refers
    4  to?
    5    A.  Refers to the Transformers composition
    6  music and lyrics.
    7    Q.  And are you familiar with this document?
    8    A.  Yes.
    9    Q.  This was produced by Sunbow in the course
   10  of the litigation. Does this document on any page
   11  bear your signature?
   12    A.  Yes, it does.
   13    Q.  What page is that?
   14    A.  On page four.
   15    Q.  Does that have a Sunbow document production
   16  number down on the bottom?
   17    A.  Yes.
   18    Q.  Is that 899?
   19    A.  Yes, it is.
   20    Q.  Okay. Have you ever seen this agreement
   21  before this litigation?
   22    A.  Yes.
   23    Q.  Have you seen it before the case?
   24    A.  Well, I saw it when I signed it.
   25    Q.  Now --

**74**

    1    A.  But I have an objection to this agreement.
    2  When I did --
    3        MS. PHARES: Objection. There is no
    4  question pending.
    5    Q.  What is your objection to the agreement?
    6    A.  My objection to the agreement is that
    7  whereas I did agree in this document that this
    8  appears to be my signature, this is not our
    9  agreement.
   10        On page two, it refers to "in the event
   11  that you determine that Anne Bryant and/or Spencer
   12  Michlin can satisfy your requirements, you agree",
   13  Spencer Michlin had nothing to do with this
   14  agreement, he did not work for us, we had no
   15  relationship with him. This is clearly from a Michlin
   16  and Company contract and is not part of the contract
   17  that I signed.
   18    Q.  So --
   19        MS. PHARES: Objection. First of all, I am
   20  going to make again a continuing --
   21        MR. MONAGHAN: You don't have to.  If it's
   22  continuing, it's continuing.
   23        MS. PHARES: To the fact that this case does
   24  not involve GBI. GBI is not a defendant in this
   25  case, GBI is not here.

**75**

    1    Q.  Do you have any explanation for how it is
    2  that there's a page two with a reference to Spencer
    3  Michlin in an agreement that purports to be an
    4  integrated agreement? Do you have any idea how this
    5  came about?
    6    A.  I would have no idea how this came about
    7  except that someone put the document together
    8  incorrectly.
    9    Q.  Now, have you ever seen a fully
   10  countersigned agreement with a signature by Griffin
   11  Bacal?
   12    A.  Not that I recall.
   13    Q.  And the exhibit that I've shown you here,
   14  Exhibit-6, is it?
   15    A.  Yes.
   16    Q.  Does Exhibit-6 bear the signature of
   17  Griffin Bacal?
   18    A.  No, it does not.
   19    Q.  And when you gave this declaration
   20  indicating that your signature was on page 899, did
   21  you intend to suggest that this was a valid
   22  integrated agreement?
   23    A.  No.
   24        MS. PHARES: Objection, leading.
   25    Q.  You were merely confirming --

**76**

    1    A.  I was confirming, this document referred to
    2  signatures.
    3    Q.  So then when counsel for Sunbow submitted
    4  to the court this binder with counsel's summary of
    5  whether or not -- with counsel's summary of what in
    6  counsel's opinion was a valid agreement or not a
    7  valid agreement, when counsel in column, under your
    8  name, says "concede signature at Sunbow 899", but
    9  then refers to contract validity and says "valid",
   10  that would not be the conclusion that one could
   11  accurately draw from your signature being conceded as
   12  valid on 899, correct?
   13        MS. PHARES: Objection. You're asking for
   14  what this witness knows about what was in
   15  Sunbow's head. He's not competent to answer
   16  that question.
   17        MR. MONAGHAN: No. You submitted this to
   18  the court.
   19        MS. PHARES: I'm not going to argue with
   20  you, Pat. I'm not arguing with you. I'm just
   21  making an objection.
   22        MR. MONAGHAN: Okay. Now I'm making a
   23  statement. You submitted this --
   24        MS. PHARES: You are here to ask questions
   25  or to answer questions and to make objections.

77

1    This isn't a place for statements. You can make
2    those to the court at the right time.
3        MR. MONAGHAN: You submitted to the court
4    this binder with a series of agreements that put
5    this case on hold for two years while you
6    pursued a meritless appeal distracting all the
7    parties.
8        You've lost virtually every motion, you
9    lost all four appeals, you lost your motion for
10   reargument. You submitted this and you told
11   Judge O'Rourke that this was a valid agreement
12   because Dr. Kinder had conceded his signature.
13   That was a misrepresentation to the court.
14       MS. PHARES: Mr. Monaghan, I object to your
15   statements on the record, especially when they
16   have no basis.
17       Let's continue with this deposition because
18   if we do not finish it by the end of the day,
19   this deposition is not going to be used at
20   trial.
21   Q. Now, Dr. Kinder, are you aware of any --
22   the existence of any agreement, any agreement
23   integrated agreement dealing with the Transformers
24   music composed by Anne?
25   A. No, I don't know where one is.

78

1    Q. Now, what would your understanding have
2    been as the person who dealt primarily with these
3    matters with Mr. Bacal, and Mr. Bacal on behalf of
4    his companies, concerning the financial arrangements
5    between Kinder Bryant and Bacal and his companies
6    related to the Transformers music?
7        MS. PHARES: Objection as to form, objection
8    as to relevance. It's a compound question. Who
9    are we talking about?
10   Q. What was the deal regarding the composition
11   of the Transformers between Bacal and your company?
12       MS. PHARES: Are we talking about GBI? Are
13   we talking about Sunbow?
14   A. Essentially, initially we created demo
15   songs for them to choose from. We ultimately decided
16   -- they ultimately decided on this song which Anne
17   Bryant had written. They paid us some fees up front
18   of the demo. At the point which it goes final or
19   they're purchasing it for air, they pay us more
20   money, pay the musicians' contracts for on air use,
21   pay the singers' contracts for on air use and they
22   put it with their commercials.
23   Q. What about writer's royalties?
24   A. We always retained our writer's royalties.
25   Q. Now, may I have the exhibit back? Now, in

79

1    your declaration dated September 2nd, 2004, you in
2    paragraph six appear to have stricken and -- let me
3    ask the question. Okay.
4        Do your initials and strike out appear in
5    paragraph six?
6    A. Yes.
7    Q. And do you know what you were striking out
8    there, can you make that out?
9    A. Looks like 901.
10   Q. I'm going to show you the page marked
11   Sunbow 0901, the personal acknowledgment page?
12       MS. PHARES: Of what? What are we talking
13   about?
14       MR. MONAGHAN: Exhibit-6.
15   A. The reason I struck it out is because this
16   is not my signature. It's Anne's signature, if it's
17   anyone's.
18   Q. You're saying that -- right, yeah. So 901
19   --
20   A. It didn't pertain to me.
21   Q. It didn't pertain to you. What is 902?
22   A. 902 is a lead sheet with the melody of the
23   Transformers theme.
24   Q. What is a lead sheet?
25   A. A lead sheet is a musical representation on

80

1    paper with the notes so that someone can perform a
2    song?
3    Q. Who prepared that lead sheet?
4    A. This probably was prepared by -- we used
5    to hire transcribers, music transcribers who would
6    take our charts and put them into forms that we used
7    in the studio. This would have been used with the
8    singers.
9    Q. Now with respect to the composition GI Joe,
10   you wrote GI Joe, is that right?
11   A. Yes.
12   Q. And GI Joe, I'm trying to speed this up, GI
13   Joe was in the BMI catalog but attributed to Anne,
14   correct?
15   A. GI Joe is in -- first of all, there are
16   many versions of the -- the original composition was
17   filed with ASCAP. Later, there was a GI Joe, the
18   movie, which was an adaptation of the original song
19   in which Anne composed part of the instrumental and
20   did the arrangement and some of the -- some
21   variations of the song are in her catalog.
22   Q. And as part of your settlement, you agreed
23   that even though you had composed -- you're the
24   principal composer, that that would remain in Anne's
25   catalog?

81

1    A. Right.
2       MS. PHARES: May we take a brief break?
3       MR. MONAGHAN: Sure.
4       (SHORT BREAK)
5    Q. Dr. Kinder, do you know the name
6 Dobishinski?
7    A. Yes.
8    Q. Who was that person?
9    A. Bill Dobishinski was -- he was a lawyer
10 who ran a publishing administration company so we
11 worked with him through Sunbow Productions where our
12 royalties would go to him, he would take a percentage
13 for administrating them and he filed the cue sheets
14 with BMI and ASCAP. He administrated the publishing.
15    Q. I'm going to read you some testimony from
16 the deposition of Carol Weitzman. Do you know who
17 she is?
18    A. Yes.
19    Q. Who is she?
20    A. She was the business person for Sunbow.
21    Q. I'm reading from page 32, line 12.
22    "Q. Bill Dobishinski?
23    A. Yes.
24    Q. Do you know where he is?
25    A. He kind of disappeared off the face of

82

1 the earth. I don't know what happened to him.
2    Q. Well, have you heard of a company called
3 TAMAD?
4    A. Oh, yeah.
5    Q. Do you know what that stands for?
6    A. No.
7    Q. And he was an administrator of the
8 publishing for Starwild and Wildstar?
9    A. He would track the monies and hound
10 people to get the monies in and then he would
11 get a fee.
12    Q. He took a fee from the monies he
13 tracked?
14    A. Yes.
15    Q. Who hired him?
16    A. Sunbow hired him.
17    Q. To administer Sunbow's publishing
18 rights?
19    A. Yes.
20    Q. Who provided the information to
21 Dobishinski as to what compositions he was to
22 administer?
23    A. He got copies of the cue sheets".
24    MS. PHARES: Objection. What is the
25 question here, what is this?

83

1       MR. MONAGHAN: This is me about to ask him a
2 question.
3    Q. Now, I just read you some testimony by
4 Carol Weitzman. Does that testimony sound accurate to
5 you in terms of the relationship of Dobishinski to
6 Sunbow?
7    A. Yes.
8       MS. PHARES: Objection, foundation.
9    A. Yes, it does.
10    Q. It's your understanding he was Sunbow's
11 guide, correct?
12    A. Yes.
13    Q. I'm just going to play a few more tunes.
14    MR. MONAGHAN: Can we go off for a second,
15 Jason?
16    (SHORT BREAK)
17    Q. I'm going to have marked as Exhibit-8, we
18 have a disk here that has more than we need to deal
19 with. What I'm going to do now is I'm going to play
20 some downloads that are on this CD. However, this CD
21 I have placed on here has other material on it that
22 is not going to be part of the exhibit and what I'll
23 do is we'll make a disk with just the items which
24 I'll identify and I'm going to ask that we substitute
25 that when that disk is made -- we'll mark it at that

84

1 point as Exhibit-8.
2    (EXHIBIT-8 MARKED FOR IDENTIFICATION)
3    MS. PHARES: You have to tell us what all
4 the -- what the contents are.
5    MR. MONAGHAN: Yes, I do.
6    Q. What will be Exhibit-8 when it is marked is
7 a series of downloads of the Transformers music from
8 a number of different sites. The first one is Hasbro
9 which I've got the cursor on, I don't know how clear
10 it is on the screen. The second one is Meatbee.
11 What is Meatbee?
12    MS. BRYANT: Meatbee is an Australian
13 rock'n'roll group of quite a size.
14    Q. The next one is Transformers Energon which
15 we understand is a DVD and a show which is produced
16 by the cartoon network. This is a download from the
17 cartoon network.
18    The next one is another cartoon network
19 show with Transformers Armada and the last one is
20 another Meatbee.
21    MS. BRYANT: That's the sound of the
22 Meatbee. The other was a press release.
23    MR. MONAGHAN: I see, okay. So we don't
24 need the press release.
25    Q. I'm now going to play the first of the four

85

1 which is downloaded from the Hasbro site.
2 MS. PHARES: Before you do this, just stop
3 for a moment. On the record, I want to just
4 object as I did at trial that there is no
5 evidence that you have shown that any of these
6 have any connection with Sunbow and I believe,
7 therefore, that they are irrelevant and is
8 inadmissible as the judge ruled at trial.
9 Q. Do you recognize that music, Dr. Kinder?
10 A. I recognize the tune, the melody, the song.
11 Q. Are you able to make out who the performers
12 are?
13 A. No.
14 Q. And the tune, what do you recognize it to
15 be?
16 A. The song is the same Transformers theme
17 that we've been discussing written by Anne Bryant.
18 The performers, I don't know who they are.
19 Q. Have you ever had occasion to go to this
20 site, the Hasbro site?
21 A. No.
22 Q. I'm now going to play the Transformers
23 Energon.
24 Same questions relative to Energon?
25 A. Yes, this is the same song. I don't know

86

1 who the performers are but I have seen it on
2 television and when I saw this on television, I
3 became very concerned because again, we're not
4 getting payments for this.
5 Q. That's Transformers Energon?
6 A. Yes, nor did I have any knowledge of it
7 before I saw it on television.
8 Q. Do you know if it's still running?
9 A. I don't know.
10 Q. Did you see it on the cartoon network?
11 A. Yes.
12 Q. Now I'm playing Armada, Transformers
13 Armada. Do you recognize the music?
14 A. Yes, it's again the Transformers theme
15 song.
16 Q. Do you recognize the performers?
17 A. No.
18 Q. Have you had occasion to see this show on
19 Cartoon Network?
20 A. Yes, I have.
21 Q. And they played that music in connection
22 with that show on the Cartoon Network?
23 A. Yes.
24 Q. Are you familiar with Meatbee?
25 A. No.

87

1 Oh, my God. That's great. Oh, my.
2 Q. Do you recognize that melody?
3 A. Absolutely.
4 Q. Whose melody is that?
5 A. Anne Bryant's melody and my lyrics.
6 Q. Do you recognize the Transformers?
7 A. No.
8 MR. MONAGHAN: I don't have any further
9 questions at this time.
10 MS. PHARES: Should we do our lunch break
11 now and come back or what do you want to do?
12 MR. MONAGHAN: That's fine.
13 (LUNCHEON ADJOURNMENT)
14 CROSS EXAMINATION
15 BY MS. SAFFER:
16 Q. Good afternoon. My name is Judith Saffer.
17 I'm the assistant general counsel at BMI. Dr. Kinder,
18 I have just a few questions I'd like to ask you
19 relating to the testimony that you gave earlier today
20 when you were being questioned by Mr. Monaghan.
21 During the course of that deposition, you
22 were asked early on about belonging to BMI after
23 having originally joined ASCAP and in the course of
24 that conversation, you gave your understanding of
25 what BMI does.

88

1 I'd like if possible for you to elaborate
2 on what you believe the role of BMI was in dealing
3 with music which you had written?
4 A. Okay. My understanding is that I would
5 register with BMI and, therefore, anything that I
6 composed, any music I composed would -- the agreement
7 was it would be registered through BMI, would then
8 administer payments as presented to them for
9 performance royalties.
10 I also would have understood that they
11 would protect a title, in other words, if another
12 title came in under the same name, then their
13 computer or whatever would show that this title is
14 already registered and they would either contact me
15 and say is this the same thing, is this a different
16 thing and go from there, try to figure it out.
17 By the same token, that I'm representing
18 what I write is original to me and what I file I've
19 really participated in.
20 Q. Where did you get this understanding that
21 you've just mentioned, where did you get that from?
22 A. First of all, it was explained to me, I
23 don't remember who I met with there, but it was
24 explained to me that's what they do. Secondly, it's
25 just logical.

**89**

1 If I write a song and it has a certain
2 title and somebody else files something five years
3 later that has the same title, only they put their
4 name on it, somebody should ask a question.
5 Q. Are you aware of how many writers and
6 publishers are represented by BMI?
7 A. I don't think that's relevant because --
8 Q. Excuse me. I asked you a question. You
9 either have the answer or you don't know the answer
10 or whatever, but you answer the question that's
11 asked, please.
12 A. Okay. No, I would say thousands.
13 Q. Okay.
14 A. I would expect it to be thousands.
15 Q. Would you be surprised if I told you it was
16 over 300,000?
17 A. No.
18 Q. Do you have any idea of how many musical
19 works are licensed by BMI?
20 A. No, I don't.
21 Q. Would you be surprised if I told you that
22 it was many millions of compositions?
23 A. No, that wouldn't surprise me.
24 MR. MONAGHAN: I just have to assert an
25 objection that I don't think the numbers mean

**90**

1 anything. They're not relevant. In the age of
2 computers, it shouldn't be a difficult task.
3 MS. SAFFER: Excuse me, Pat, this is not
4 your deposition. The witness will answer the
5 questions I ask and the importance of those
6 questions or relevance of those questions.
7 ultimately will be determined by the judge.
8 MR. MONAGHAN: I'm still entitled to put an
9 objection on the record.
10 MS. PHARES: Yes, but not a speaking
11 objection and certainly not under the court's
12 new rules about speaking objections.
13 MR. MONAGHAN: I'll make whatever objections
14 I think are appropriate.
15 Q. Are you aware that there are many, many.
16 different compositions with the same title?
17 A. I know there are some and generally, they
18 have some method either by the number or something to
19 denote which one is which.
20 Q. Who is they?
21 A. BMI.
22 Q. How do you know, who explained to you or
23 what documents did you rely on to get your
24 understanding of how BMI operates?
25 A. Well, first of all, all of my titles have

**91**

1 numbers and some of the numbers, the percentages of
2 the same number were changed.
3 Q. Could you give me specifics?
4 A. I don't have that with me.
5 Q. How do you know that happened?
6 A. I don't have it with me. I said I've seen
7 it in my own catalog.
8 Q. Okay.
9 A. In my own catalog, the number, the
10 percentage that was allotted to me under a title with
11 a number was changed without any knowledge or
12 question to me.
13 Q. Have you reported that to BMI?
14 A. No.
15 Q. Why not?
16 A. Because my catalog at this point is small
17 and I've been really busy with other things, going to
18 medical school, becoming a physician, seeing
19 patients. I only became aware of it in the last
20 couple years. It was already being dealt with in
21 this lawsuit, not for me personally, but the issue.
22 Q. Are you aware of the procedures that BMI
23 follows in registering and crediting musical
24 compositions?
25 A. I didn't register my own compositions most

**92**

1 of the time. It was done through the publishing
2 company.
3 Q. Are you aware that BMI takes registrations
4 of music for TV and background music theme from
5 production companies?
6 A. Yes.
7 Q. Are you aware of who the copyright owner is
8 on the music that has been registered with BMI?
9 MR. MONAGHAN: Can we be more specific? Is
10 this a hypothetical?
11 MS. SAFFER: Yeah, we're talking about BMI
12 procedures which Dr. Kinder has indicated he has
13 some knowledge or understanding and I'm trying
14 to find out the extent of his alleged expertise.
15 MR. MONAGHAN: You're asking a general
16 question?
17 MS. SAFFER: Yes.
18 A. First of all, I don't claim to be an expert
19 on BMI. All I see is that they are an agent that I
20 signed with and trusted them to follow the money that
21 was entitled to be given to me.
22 I didn't expect them to be a policeman but
23 at the same time, in order to pay me appropriately, I
24 would expect that they have to have some knowledge of
25 what's being sent to them, which composition it is.

93

```
 1    Q.   What makes you believe that BMI has not
 2 paid you appropriately?
 3    A.   Because the percentages on my statements
 4 changed.
 5    Q.   Why is that inappropriate?
 6    A.   Because why would a composition change?
 7 It's registered 50/50 and suddenly it comes in with
 8 new composers at different percentages.
 9    Q.   Are you aware that a writer at BMI receives
10 royalties pursuant to their agreement with BMI?
11    A.   Right.
12    Q.   And that in most cases and we are talking
13 generalities, the publisher is the copyright owner
14 and also receives royalties?
15    A.   Right.
16    Q.   Are you aware that under the copyright law,
17 the copyright owner has the right to do with a
18 composition whatever he, she or it may wish?
19         MR. MONAGHAN: I have to object that you are
20 asking for a legal conclusion here.
21         MS. SAFFER: You, during the course of the
22 direct, asked Dr. Kinder for many conclusions
23 that were, as far as I was concerned, legal
24 conclusions. You asked him to interpret a
25 contract.
```

94

```
 1         I'm asking the same thing. If he has no
 2 knowledge, he has no knowledge.  He can answer
 3 that way.  I'm asking what his understanding is.
 4    A.   My understanding of what, Miss Saffer?
 5    Q.   Excuse me?
 6    A.   I don't understand the question.
 7    Q.   During the course of your direct testimony,
 8 your lawyer, Mr. Monaghan, asked you what the role of
 9 the publisher was and you responded, correct?
10    A.   He asked me what my understanding of it
11 was. I don't claim to be a lawyer.
12    Q.   I'll also ask you what your understanding
13 is. In each one of these questions that I'm asking,
14 you can only give your understanding.
15    A.   Right. And it should be made clear I'm not
16 trying to be a lawyer or to interpret any contract in
17 a legal manner, just my own understanding of what I
18 thought the provisions of that contract relating to
19 me are.
20         So, what is a publisher?  They are
21 essentially administrating and marketing the
22 copyright so that it will benefit them and benefit me
23 as the writer. It's administered through BMI who also
24 since they are administering money, should have some
25 fiduciary responsibility to see that it's accurate
```

95

```
 1 and that's a simple explanation of my understanding.
 2    Q.   Where did you get your understanding that
 3 BMI had a fiduciary duty to you?
 4    A.   When I signed the contract, that's my
 5 understanding.  I can't tell you where I got it.
 6 That's just my understanding.
 7    Q.   Would you be surprised to learn that there
 8 have been cases which have said that BMI's
 9 relationship with its writers and publishers is
10 contractual and not a fiduciary relationship?
11         MR. MONAGHAN: That's improper, that's an
12 improper question. It assumes facts not in
13 evidence and I don't care if he's surprised or
14 not, it's not going to add anything to the
15 relevant information.
16         MS. SAFFER: The witness has used the term
17 of art and if he's using it, I would expect that
18 he knows what in fact he is stating.
19         If he's using it and is not aware of what
20 it means, I would suggest that he shouldn't use
21 that terminology.
22         MR. MONAGHAN: I'm addressing only a
23 question that says would you be surprised that
24 there's case law out there.
25         MS. SAFFER: This is cross-examination and
```

96

```
 1 there is a little bit more latitude in
 2 cross-examination.  When you are on direct, you
 3 can't lead a witness. On cross-examination, you
 4 are allowed to ask the witness questions that
 5 might be considered a leading question on
 6 direct.
 7         MR. MONAGHAN: I'm not saying you can't ask
 8 leading questions.  I'm saying I don't believe
 9 you should ask a question that assumes a fact
10 that's not in evidence as though it's a matter
11 of fact.
12         MS. PHARES: We're not at trial.
13    Q.   During direct, there was some questions
14 asked about the contract which you signed with BMI.
15 The contract that was produced was not legible. It
16 was a xerox copy of something that had come out of
17 microfilm.
18         During the break with the consent of all
19 the attorneys, I got a form agreement from our office
20 which is I believe the same form of agreement that
21 you signed although this is not your actual
22 agreement, it was distributed to everybody, they have
23 it.  I'd like to mark this as Kinder-9.
24    (EXHIBIT-9 MARKED FOR IDENTIFICATION)
25    Q.   This has been produced simply because it is
```

97

1 more legible than the one that was brought by your
2 attorney.
3       During the course of direct, your attorney
4 referred you to paragraph 11. Can you look at that
5 paragraph now?
6    A. Yes, ma'am.
7    Q. The paragraph begins with the words "we
8 shall have the right", correct?
9    A. Upon written notice to me, okay.
10    Q. Who is the we in that paragraph, what is
11 the we?
12    A. I think I'd have to read the whole
13 contract. Just jumping in, I would think it was BMI.
14    Q. It is BMI. Let me remind you that you were
15 the one who pointed us to this provision so I presume
16 that you had reviewed it before we began?
17    A. I didn't point you there. The lawyer asked
18 me a question about it.
19    Q. Your lawyer asked you a question about it,
20 correct?
21       MR. MONAGHAN: I asked him a question about
22 it.
23    Q. Dr. Kinder, didn't you state in the
24 beginning of your examination that Patrick Monaghan
25 was acting as your counsel for purposes of this

98

1 deposition?
2    A. For purposes of this deposition, I don't
3 really -- I don't think of him as my counsel for this
4 deposition. He is representing some interest for me
5 in the lawsuit.
6       MR. MONAGHAN: That wasn't said, for the
7    record. I clearly said I'm not here
8    representing -- the witness was without counsel.
9    A. I don't have representation really.
10    Q. Let's continue with the review of the
11 contract.
12    A. I haven't seen this contract, not to be
13 volunteering too much, but I haven't seen this
14 contract in years until today.
15    Q. You said during the course of your direct
16 testimony that you believed that this paragraph put
17 upon BMI an obligation to protect your rights. What
18 in this paragraph gives you that belief?
19       MR. MONAGHAN: That's an incorrect
20    characterization. I object to it.
21    MS. SAFFER: Okay, let's start over.
22    MS. PHARES: Let him answer.
23    A. I just have a little bit of a problem that
24 I feel like you're putting -- you're summarizing what
25 I said and it's not what I said.

99

1    Q. I'm giving you an opportunity to say it
2 again.
3    A. I don't quite know how to answer those
4 questions. You're making conclusions that I don't
5 feel is what I said.
6    Q. What does paragraph 11 mean to you?
7    A. Okay. To me, and I'm not a lawyer and I
8 don't have a lawyer to interpret it for me, it says
9 that you have the right to exclude from written
10 notice to me any work which in your opinion infringes
11 on the copyright of another composition. That's
12 exactly what I'm talking about.
13    Q. That means that BMI has the right to
14 exclude a work from licensing?
15    A. Right.
16    Q. If we believe it's an infringing
17 composition?
18    A. And infringing compositions came in which
19 infringed on my work and you didn't exclude them and
20 they should have been.
21    Q. No. This provision doesn't give you any
22 rights, it gives BMI rights --
23    A. I understand that --
24    Q. It gives us rights vis-a-vis a user of the
25 music. It says we have the right to exclude a work

100

1 if we believe we need to. There is nothing in this
2 provision that gives you any rights, nor is there
3 anything in this provision which puts any obligations
4 on BMI.
5       If you disagree with what I'm saying, I'd
6 like you to point the language out to me.
7    A. I disagree with it because I think it
8 implies that by you telling that to me, you're
9 telling that to any other writer who puts a
10 composition in and my composition percentages were
11 changed and this paragraph should have been
12 implemented by BMI to the person infringing on my
13 copyright.
14    Q. And how do you think this paragraph in any
15 way puts upon BMI an obligation to take a position
16 vis-a-vis one BMI writer versus another, where in
17 this paragraph does it obligate BMI to protect you
18 and, therefore, perhaps damage another BMI writer?
19    A. If I'm signing a contract with BMI that
20 doesn't offer me any protection or imply any
21 responsibility of BMI to see that someone won't come
22 in and steel my copyright percentage, why would I be
23 with you at all? What is your responsibility to me
24 then?
25    Q. Have you read your contract?

## 101

1   A.   Not lately.
2   Q.   Did you read it when you signed it?
3   A.   Yes, I did.
4   Q.   And obviously you thought there was
5 something worthwhile in there which is why you signed
6 it?
7   A.   Right, but I also thought it would protect
8 my -- help -- not full responsibility, the
9 publisher has responsibility, I understand that, but
10 if you're collecting money on my behalf for titles
11 registered to me, then I expect you to know what
12 those titles are and be sure that an outside source
13 does not come in and change my percentage.
14   Q.   Where in the contract does it put that
15 obligation on BMI?
16   A.   I don't know. I do think that this
17 paragraph has some implication of that because you're
18 telling me that if I try to infringe on another
19 copyright, you have the right to refuse it.
20 Therefore, you're telling everyone else who signs,
21 you have the right to refuse anything that infringes
22 on the copyright of something already registered
23 here.
24   Q.   BMI has a right to exclude a composition,
25 BMI has no obligation to take a position?

## 102

1   A.   There's an implied obligation.
2   Q.   Implied where?
3   A.   To me. I'm not a lawyer.
4       MR. MONAGHAN: You're arguing with the
5   witness.
6   A.   I'm not a lawyer and I don't claim to be.
7 I'm saying I put my trust in BMI. Okay? Before my
8 composition's percentages were changed, someone
9 should have contacted me and asked me if this was
10 appropriate. If you didn't think that was
11 appropriate, why did you have me sign that paper I
12 gave you this morning?
13   Q.   Excuse me. I am taking your deposition,
14 you are not taking mine. I am the lawyer, you are
15 witness. You don't ask questions, you answer them.
16   A.   I have a question.
17       MR. MONAGHAN: If you want to beat a dead
18   horse, go ahead.
19       MS. SAFFER: Thank you.
20   Q.   Have you had -- do you have any knowledge
21 of who registers compositions with BMI?
22   A.   In our case, I believe it was the
23 publishing company.
24   Q.   Do you believe as well that it may be a
25 production company?

## 103

1   A.   Yes, it could be a production company. It
2 could also be the administrator which was Bill
3 Dobishinski at some point.
4   Q.   Do you think BMI registers compositions for
5 people?
6   A.   No, no.
7   Q.   In your attempt to understand what BMI's
8 obligations are to you, have you ever read any of the
9 materials on, for example, the BMI web site or any of
10 the printed materials distributed by BMI talking
11 about what role BMI plays for its writer and
12 publisher?
13   A.   I don't think there was any web site at the
14 time that I signed this.
15   Q.   I said or printed materials?
16   A.   No.
17       MR. MONAGHAN: Printed materials other than
18   this?
19       MS. SAFFER: Yes, other than this agreement.
20   A.   I read -- they gave me a packet when I
21 joined and I read that. Everything was fine for
22 years, the relationship was fine for a very long
23 time. There weren't any problems.
24   Q.   In fact, you received hundreds of thousands
25 of dollars from BMI over the years, didn't you?

## 104

1   A.   Yes, I have.
2   Q.   Having discussions about registrations
3 having been changed and in that regard, I'd like to
4 refer you to a copy of your settlement agreement in
5 the -- I'm going refer to it as the first litigation
6 with Anne Bryant. I don't know in fact how many
7 times you've been involved in litigation with her --
8 oh, excuse me, it's not the settlement agreement.
9 It's the dissolution agreement.
10   A.   Okay.
11   Q.   This document was already produced as
12 Defendant's Exhibit-S.
13       MS. PHARES: This is actually in evidence at
14   trial.
15   Q.   I refer you please to page six of that
16 agreement and ask if you recognize the signatures?
17   A.   Yes, that looks like my signature and
18 Anne's signature.
19   Q.   On page two of this agreement, paragraph 4A
20 talks about the way various compositions are going to
21 be registered with BMI and how you and Ms. Bryant
22 will split royalties on a number of compositions,
23 correct?
24   A.   Yes.
25   Q.   Did you ever contact BMI and provide them

105

1 with a copy of this agreement and ask that changes be
2 made?
3    A.  No, because it didn't require BMI to make
4 any changes.
5    Q.  This is exactly the way everything was
6 being paid?
7    A.  Yes.
8    Q.  I'd like to refer you to the settlement
9 agreement in this litigation in which you were
10 originally a defendant. It's already Defendant's
11 Exhibit-F at trial.
12       This document refers to various percentages
13 of compositions. Are you sure that BMI's records
14 reflected these percentages?
15    A.  No, I don't think these were enacted by BMI
16 yet.
17    Q.  Did you ever ask BMI to make these changes?
18    A.  No. Anne was going to take care of that.
19    Q.  Did you ever submit to BMI prior to this
20 morning a document which would clearly allow BMI to
21 make the changes that Anne requested?
22    A.  No. This morning I submitted it.
23    Q.  This morning you submitted it?
24    A.  Uh huh.
25    Q.  Okay.

107

1 this lawsuit?
2    A.  I'm really not -- I'm not an expert on the
3 legalities of this, but I don't think that the writer
4 owns the copyright. I think we retained the right,
5 the writer's royalties.
6    Q.  What do you mean by the writer's royalties?
7    A.  The writer's share of performance royalties
8 distributed by BMI.
9    Q.  And what is your understanding as to why
10 you are entitled to receive those rights?
11    A.  Because I wrote the composition, it was
12 filed with BMI as me as the composer or one of the
13 composers with a certain percentage due me and as it
14 comes into BMI that it's been performed, I should be
15 paid for the performance.
16    Q.  If you believe that somebody has made an
17 unauthorized use of music that you have written, what
18 do you believe your remedy is?
19    A.  First, ask BMI if they can straighten it
20 out. Second, go back to the publisher and see how it
21 was filed wrong and if they don't correct it, sue.
22    Q.  What about the individual that you feel has
23 made an unauthorized new version, do you feel they
24 have any responsibility?
25    A.  Yes, I do.

106

1       MR. MONAGHAN: For the record, is that the
2 letter that --
3       MS. SAFFER: Yes, the letter agreement which
4 was given to me before the deposition began this
5 morning and not prior to.
6       MR. MONAGHAN: I understand what you're
7 saying. That's the one that we've been
8 furnished a copy of?
9       MS. SAFFER: Right.
10       MR. MONAGHAN: Can we also impose upon you
11 to send a copy of the signed agreement?
12       MS. SAFFER: Absolutely.
13    Q.  Are you aware of who owns the rights in the
14 compositions which are involved in this lawsuit?
15       MR. MONAGHAN: Object.
16       MS. SAFFER: I will clarify.
17       MR. MONAGHAN: I want to ask which
18 particular rights.
19    A.  Which rights?
20    Q.  Do you know who the copyright owner is of
21 the compositions involved in this litigation?
22    A.  I believe the copyright is owned by the
23 publishing company.
24    Q.  Accordingly, you're not claiming to be the
25 copyright owner of the music in any of the music in

108

1    Q.  Okay.
2    MS. SAFFER: I have no further questions.
3    Thank you.
4       MR. MONAGHAN: I'll reserve re-direct until
5    Gloria is done.
6       CROSS EXAMINATION
7 BY MS. PHARES:
8    Q.  Dr. Kinder, for purposes of this
9 examination, I am Gloria C. Phares. Actually, I'm
10 Gloria C. Phares all the time.
11       I'm also representing Sunbow Production,
12 Inc., okay? I'd like to explore a little bit about
13 this relationship that you have with Mr. Monaghan.
14       You say that he's not representing you for
15 this deposition, is that correct?
16    A.  Well, I didn't feel that he was, no.
17    Q.  You had another lawyer when you were sued
18 in this lawsuit by Miss Bryant, isn't that correct?
19    A.  That's true.
20    Q.  And but you say -- Mr. Monaghan represents
21 you to the extent your interests are the same as, I
22 think you said, or overlaps with Miss Bryant's?
23    A.  Right.
24    Q.  To what extent do your interests overlap?
25    A.  Well, essentially what happened was and

Veritext/Florida Reporting Co.
Serving the State of Florida (305) 376-8800

109

1 this is really the biggest problem I have with BMI is
2 that BMI, by allowing these percentages to be
3 changed, put me in the position of appearing to be in
4 agreement with these changes which I had no knowledge
5 of or anything to do with. That's how I got named in
6 this lawsuit.
7        Once it became clear what the lawsuit was
8 about, it was very easy to understand that Anne and I
9 were actually on the same side. So going through the
10 understanding of what the lawsuit was about with my
11 lawyer took some time, but once it became clear to
12 both to Anne Bryant and me that neither of us had any
13 participation or knowledge of these changes and that
14 we were actually on the same side of this, we both
15 had our catalogs altered, then we could come to a
16 settlement about it because there was no disagreement
17 any further.
18    Q.   And you came to a settlement in this case
19 in 2001, is that correct?
20    A.   I'm not good with the years. 2001.
21    Q.   And when did you retain Mr. Monaghan to
22 represent you with respect to the interests that
23 overlap with Ms. Bryant's interests?
24    A.   Some time after that. I'm not quite sure.
25 I'm not quite sure how long after.

110

1    Q.   Was it more than six months ago?
2    A.   Yes.
3    Q.   Was it more than a year ago?
4    A.   I think it was three years ago maybe, four.
5 I'm sorry, I don't know the exact date. I did sign a
6 document with him.
7    Q.   With Mr. Monaghan?
8    A.   Yes.
9    Q.   An engagement letter, is that what you
10 signed with Mr. Monaghan?
11    A.   I don't know what the title of it would be.
12    Q.   And are you paying Mr. Monaghan legal fees
13 or is he —
14    A.   Contingency.
15    Q.   Do you speak regularly with Mr. Monaghan
16 about this case?
17    A.   No. There hasn't been anything to discuss
18 because it's been on hold for so long.
19    Q.   When is the last time you spoke to Mr.
20 Monaghan?
21    A.   Last night.
22    Q.   And before that?
23    A.   Before that, I don't know, probably a year
24 or two.
25    Q.   Maybe more than two years?

111

1    A.   Maybe.
2    Q.   And who participated in your conversation
3 with Mr. Monaghan last night?
4    A.   It was Mr. Monaghan, Miss Bryant and
5 myself.
6    Q.   Do you have a joint cooperation agreement
7 with Miss Bryant?
8    A.   I don't know what that means.
9    Q.   Have you ever signed a document that is a
10 joint cooperation agreement or a joint --
11        MR. MONAGHAN: Defense agreement.
12        MS. PHARES: It's not a defense agreement,
13     you're the plaintiff.
14        MR. MONAGHAN: Offense agreement.
15    Q.   An agreement to join and to have the same
16 interests in this lawsuit?
17    A.   I don't know -- an agreement with Anne,
18 no, I don't think so. I'm not sure what that is.
19    Q.   What did you discuss with Mr. Monaghan last
20 night?
21        MR. MONAGHAN: Just one second. I'm not
22     going to foreclose your opportunity to ask about
23     this because I'm sure it's a subject of great
24     curiosity, but I don't want anything -- my
25     allowing these questions to be interpreted as

112

1 any kind of a waiver of any attorney/client
2 privilege beyond limited to the discussions last
3 night. I don't care what you ask about last
4 night, that's fine. But we're not waiving any
5 privileges that belong to either Dr. Kinder or
6 Anne Bryant with respect to any other
7 conversations at any other time.
8        So feel free to enquire about whatever was
9 said last night.
10    A.   It was really just a review because you
11 know I'm a doctor now, I have a very busy practice, I
12 haven't been involved in this case so -- but I have
13 signed documents so basically what we did last night
14 was reviewed documents that I had already signed, for
15 instance, this document.
16    Q.   By this document, you're referring to the
17 stipulation of settlement without prejudice?
18    A.   No, not that.
19    Q.   Which document?
20    A.   Yes, I took a brief look at this last night
21 but mostly it was the signature pages.
22    Q.   I tell you what, would you hand me the one
23 you're looking at so we're sure we're both talking
24 about the same thing? All right. What the witness
25 has handed me is an unmarked copy but which appears

113

1 to be identical, is what I think has Mr. Monaghan's
2 784 number on top of it and on the Defendant's
3 Exhibit-F which is in evidence at trial. The
4 production numbers are 3544 through 3549.
5        MR. MONAGHAN: Are those my numbers? Yeah,
6    that's fine.
7    A. Basically it was a simple meeting just kind
8 of going through the documents I've already signed in
9 reference to the case, particularly the signature
10 pages where I said this is my signature, this isn't
11 my signature. We discussed some of the settlement
12 agreements we had had before.
13        It was just kind of bringing me back up to
14 date because I haven't had my mind in this for quite
15 a while. So, it was basically a review of what had
16 already taken place and my own involvement.
17    Q. Did you look at any documents that
18 Mr. Monaghan did not introduce today at the
19 deposition?
20    A. Any document, I might have.
21    Q. Did you look at any correspondence with
22 third parties?
23    A. I saw -- there was a correspondence between
24 Bill Dobishinski and Sunbow I think or their lawyer
25 talking about or -- there were a couple

114

1 correspondence, that one which had to do with the
2 fact that the Jem agreement had taken a long time to
3 negotiate.
4        In fact, we were way into production before
5 we ever signed that agreement. That's why we didn't
6 even remember signing it. There was another
7 correspondence from Sunbow's lawyer to Sunbow
8 explaining to them that he felt they had an
9 obligation due to the contract to pay the --
10    Q. I'm just asking you what he showed you.
11    A. I'm trying to explain it.
12    Q. We're going to talk about that letter.
13        MR. MONAGHAN: Let him finish his answer.
14    A. That's the document, I found that one
15 particularly interesting that their own lawyer told
16 them they owed us money.
17    Q. Were there any other documents that you
18 looked at that Mr. Monaghan did not introduce today?
19    A. There are certainly no documents that
20 hadn't already been introduced into evidence so there
21 was a lot of paperwork and I don't remember every
22 document he introduced today.
23    Q. The section that you found so interesting
24 in that letter, who pointed that out to you?
25    A. He just showed me the letter and I found it

115

1 very interesting that Sunbow's own lawyer told them
2 that they owed us royalties.
3    Q. And did Ms. Bryant make any comments about
4 the letter to you?
5    A. No.
6    Q. Was she entirely silent during this
7 conversation?
8    A. No but --
9        MR. MONAGHAN: Which one, about the letter
10 or in general?
11    Q. Did she make any comments about any of the
12 documents that were provided?
13    A. Mostly Miss Bryant got us take-out food.
14    Q. I'm not talking about what she mostly did.
15 I asked you whether or not she had any comments about
16 any of the documents that were provided to you?
17    A. Very few. This was mostly a discussion
18 between Patrick and myself. I'm sorry.
19    Q. What if anything did Mr. Monaghan tell you
20 about these documents?
21    A. He just said here's the document and you
22 might find this interesting and I did.
23    Q. Did he point out any sections of the
24 documents?
25    A. Not that I recall.

116

1    Q. You read all the documents last night?
2    A. This is a letter, we're talking about a
3 letter. The letter wasn't long.
4    Q. You're now just referring to the letter
5 from the Sunbow lawyer. Who was the letter to, do you
6 remember that?
7    A. It might have been to Carol Weitzman.
8    Q. And do you recall who the recipients and
9 the senders were of the other correspondence that you
10 saw?
11    A. I don't remember the name of the lawyer for
12 Sunbow but he was the guy who wrote the agreements. I
13 also saw some testimony, printed testimony from the
14 Sunbow lawyer when he testified in deposition or
15 court, one or the other.
16    Q. Anything else?
17    A. No, not that I recall. Patrick simply said
18 go in, tell the truth, tell them what your
19 understanding of this is. We reviewed documents that
20 I had already signed --
21    Q. The only question that's pending is did you
22 see anything else?
23    A. There were a lot of papers, I'm not sure.
24    Q. Well, as we go through the papers that I'm
25 offering, if there's anything you saw last night that

117

1 has not already been admitted here today, I want to
2 know about it.
3     A.  Okay.
4     Q.  Are you aware of what positions, what
5 position Ann Bryant is taking in the current lawsuit?
6     A.  I believe I am.
7     Q.  Would you tell me what your understanding
8 is of those positions?
9     A.  The position that the -- that Sunbow and
10 the publishing companies have not fulfilled their
11 obligations to us by licensing out the works that we
12 had created to other companies, for instance, the
13 Rhino Productions, etc., etc. and not fulfilling
14 their obligation to her in terms of payment that
15 would have been due.
16    Q.  Did you discuss that last night?
17    A.  No.
18    Q.  Not at all?
19    A.  No.
20    Q.  Have you ever discussed that with
21 Miss Bryant?
22    A.  Yeah, I think I've discussed it with her in
23 the past.  That's why we didn't need to discuss it
24 then.
25    Q.  When did you discuss it with her in the

118

1 past?
2     A.  That's what the lawsuit is about.
3     Q.  I asked you when, that was the question.
4 When did you discuss it with her?
5     A.  When the lawsuit first happened when it was
6 first filed.
7     Q.  You mean when it was first filed against
8 you?
9     A.  Yes.
10    Q.  So this is in 2000?
11    A.  Okay, we didn't speak personally
12 initially but over time, as things became clear that
13 we were in the same boat, we started talking
14 personally, not just through lawyers.
15    Q.  And was that after you had signed your
16 settlement agreement as well?
17    A.  No, that was before.
18    Q.  Before you signed your settlement
19 agreement.
20    A.  You mean this current settlement agreement?
21    Q.  The one that you signed with Miss Bryant
22 settling her case against you?
23    A.  This current case, yes.
24    Q.  So you began talking to her before that,
25 before 2001?

119

1     A.  Yes.
2     Q.  And did she explain how it was that she
3 thinks that Sunbow is not complying with its
4 obligations?
5     A.  Well, I think I understood that through my
6 lawyer.  I didn't need to talk to Anne about that.  My
7 lawyer explained that here's what the case is, here's
8 what the -- what she's suggesting and I didn't need
9 Anne to explain it to me.  I needed my -- my lawyer
10 already explained it to me.
11    Q.  Whether your source was your lawyer or Ms.
12 Bryant, what was it your understanding -- what was
13 your understanding of the way in which Sunbow was not
14 fulfilling its obligation?
15    A.  I think I already answered that.  They were
16 licensing our works to other entities charging a lot
17 of money for it and not fulfilling their obligation
18 to us per our contracts.
19    Q.  I see.  So you understood that you had an
20 entitlement to something pursuant to your written
21 agreements, is that correct?
22    A.  Could you say that a little more in
23 English?
24    Q.  You understood that you had a right to
25 receive monies under your agreements?

120

1     A.  Yes.
2     Q.  You just said your contracts.  I said
3 agreements, but it's the same thing.
4     A.  Yeah, yes, ma'am.
5     Q.  And those are the, for example, the written
6 agreements that we were looking at earlier, is that
7 correct?
8     A.  The agreements like for the Jem Show, yes.
9     Q.  And you spoke about that with Ms. Bryant
10 some time beginning in, before 2001 and afterwards,
11 is that correct?
12    A.  Yes.
13    Q.  I'd like to go back to your declaration
14 about your signature which is Exhibit-7.  Could you
15 tell me who drafted this agreement?
16        MR. MONAGHAN:  Who drafted the declaration?
17    Q.  I beg your pardon.  Who drafted the
18 document, the declaration?
19    A.  I figure Patrick did, but I don't really
20 know.
21    Q.  Was Mr. Monaghan representing you at the
22 time that you drafted this?
23    A.  I don't think so.
24    Q.  This was a September 2004, and you do not
25 believe he was representing you?

121

1 A. Oh, he may have been. I really don't know.
2 Q. So you don't know when he became -- if he
3 was your lawyer before or after 2004?
4 A. I think I signed that agreement with him
5 before that but I'm not sure what the date was. We
6 need to get that document.
7 Q. You mean you think you signed your
8 engagement with him before then?
9 A. If that's what you call it.
10 Q. Or the agreement by which you made an
11 arrangement to pay Mr. Monaghan?
12 A. Probably before this. I'm sorry I can't be
13 more specific. I should have looked at it more
14 closely.
15 Q. Do you remember, was it sent to you in
16 draft and with the documents that you referred to, is
17 that how you did this?
18 A. This?
19 Q. Yes.
20 A. I think this is the only one.
21 Q. I'm now referring to the Kinder Exhibit-7.
22 So are you saying you received it, you compared it
23 with the documents that were provided to you and then
24 --
25 A. No, the documents were provided to me. I

122

1 went through them personally and determined which
2 signatures I believed were mine and which were not
3 and I reported to him which documents I felt I had
4 signed and which ones I had not, gave him the numbers
5 of the documents and then this was drawn up. Then I
6 corrected it -- as far as I know, there was only one
7 draft because I corrected this by hand.
8 Q. I see. So, the textual parts of this were
9 provided by Mr. Monaghan?
10 A. Yes, I believe so.
11 Q. I want to talk about this period in which
12 you said that you were working at Michlin and
13 Company.
14 A. Okay.
15 Q. I take it you were there, if I have your
16 dates correct, from 1978 until '83, is that correct?
17 A. Right.
18 Q. And did you personally own the copyrights
19 in any of the jingles you wrote while you were at
20 Michlin?
21 A. Actually, I believe I did because the
22 contract I had with them, my memory of that, I don't,
23 have that contract here but Spencer Michlin always
24 said a writer owns his music and I would never take
25 that from you.

123

1 Q. And earlier you said that you also
2 negotiated contracts for Michlin and Company, is that
3 correct?
4 A. Sometimes, yes.
5 Q. And you were negotiating with the
6 advertising companies, is that correct?
7 A. Yes.
8 Q. And --
9 A. We also had a business person. It wasn't
10 only me but yes, I was involved in it.
11 Q. And you say that you used the standard
12 contract when you were negotiating with those --
13 A. We would start with the standard contract.
14 Q. And you said that we retained all
15 publishing and all writers' shares?
16 A. In our initial standard contract.
17 Q. And your standard contract was between
18 Michlin and Company and the advertising company, is
19 that correct?
20 A. Correct.
21 Q. Do you recall whether or not those --
22 those agreements included any provisions relating to
23 copyrights?
24 A. The standard agreement that we started with
25 retained ownership of the copyright to the company

124

1 and/or writers.
2 Q. Which?
3 A. You're asking me to go back 25 years here.
4 Q. I know but that's what we've been doing all
5 day so I have my time too.
6 A. I think I know where you're going and I'm
7 not sure I can answer the question. Do you want to
8 just ask me the question, did Michlin and Company own
9 the copyright or did I own the copyright?
10 Q. Did the standard agreement between Michlin
11 and the advertisers, you said -- I thought you
12 testified that the standard agreement retained the
13 copyright and I'm asking you was it for Michlin?
14 A. The exact wording of it, I don't remember.
15 Q. I don't care about the exact wording. Was
16 the import of it that Michlin retained the
17 copyrights?
18 A. Probably.
19 (SHORT BREAK)
20 Q. Dr. Kinder, you said you believed you own
21 the copyright and some of the music that you wrote
22 while you were at Michlin and Company. Is that
23 correct?
24 A. Now I'm thinking about it, I think that
25 Michlin and Company owned the publisher's share and

125

1 what he always reserved for us was the writer's
2 share. That's -- I'm pretty sure that was accurate.
3 Q. Do you mean the writer's share of the
4 performance rights?
5 A. Yeah, any writer's share of anything of the
6 composition, that he had a publishing company -- it's
7 coming back to me now. So the publisher's share went
8 into Michlin Company's publishing company and I
9 forget the name of that and the writer's share was
10 retained by the writer.
11 Q. And do you know who owned the copyright in
12 that music?
13 A. Well, it depended on how the negotiation
14 went with the client. Most of the time, the client
15 didn't care about the copyright so they allowed it to
16 be owned by Michlin's publishing company.
17 Occasionally, that was a negotiating position.
18 Q. So, it was Michlin's publishing company
19 that authorized the licensing for that music, is that
20 correct?
21 A. Right. But there was very little of that
22 done at the time.
23 Q. Did you write any of the music or did you
24 write any jingles for which Hasbro was the client
25 while you were at Michlin and Company?

126

1 A. Yes.
2 Q. Which?
3 A. GI Joe, actually many GI Joes, My Little
4 Pony, My Pretty Pony. Gosh, those are a few of them.
5 Q. Well, Inhumanoids?
6 A. Yes.
7 Q. Visionaries?
8 A. No, I think Anne wrote that.
9 Q. I'm talking about when you were at Michlin
10 and Company?
11 A. Okay. It's a little hard for me to
12 remember that --
13 Q. If you don't remember, I'd rather you tell
14 me that. Let's go back. My Little Pony?
15 A. Okay, Michlin and Company. I wrote that at
16 Michlin and Company.
17 Q. GI Joe?
18 A. I wrote that at Michlin and Company. You
19 said Inhumanoids.
20 Q. And you thought Miss Bryant did that?
21 A. Inhumanoids I did and I think that was
22 Kinder and Bryant.
23 Q. And so you did that --
24 A. My Little Pony was Michlin and Company and
25 I wrote that.

127

1 Q. Visionaries?
2 A. Anne wrote that.
3 Q. I'm just doing what you did while you were
4 at Michlin for the moment.
5 A. There were so many. I'm sorry, I tend to
6 remember the biggest ones.
7 Q. Do you understand the term work for hire,
8 as that's used in connection with copyrights?
9 A. I don't understand it from a lawyer's point
10 of view.
11 Q. What is your understanding from a writer's
12 point of view?
13 A. That I mean hired by -- somebody
14 representing another company to write a work for that
15 company and they are going to provide some fee for
16 it.
17 I realize that it's unclear to me other
18 than it's a relationship where they are hiring me to
19 specifically give them a product.
20 Q. Do you understand work for hire to include
21 the work done by an employee for his employer?
22 A. I think so.
23 Q. I'd like to go back again to the settlement
24 agreement between you and Ms. Bryant in this case
25 which is defendant's -- you have the document in

128

1 front of you?
2 A. Yes.
3 Q. All right.
4 A. Is this the right one? It says 784.
5 Q. That's correct. Would you turn to the last
6 page where the signatures are? It's actually page
7 six but there's no six on that page, at least not on
8 my copy.
9 A. Page six?
10 Q. Yes.
11 A. The signature says page seven on mine. We
12 must be on different agreements.
13 Q. Hold on. I'm using a copy that you now
14 have, at least I think I am. No. I beg your pardon.
15 MR. MONAGHAN: That's it.
16 MS. PHARES: It's a different document.
17 MS. SAFFER: They are two different
18 documents.
19 MS. PHARES: One of these documents, the one
20 that's an exhibit in the trial is the one that
21 you produced with your production numbers and
22 it's not on your -- it's not on the stationery
23 of -- this document has -- let's see if we have
24 the same paragraphs. No.
25 MR. MONAGHAN: The text is the same.

129

1      MS. SAFFER: They have different numbering
2   of paragraphs and things, I don't know in which
3   way they're different.
4      MR. MONAGHAN: Let me see. Excuse me one
5   second. This isn't signed by Anne.
6      MS. PHARES: I see that.
7      MS. SAFFER: It's more than that.
8      MR. PHARES: But it is the document that she
9   identified at trial.
10     MR. MONAGHAN: It's obviously the wrong one.
11  You have this, too, that's the marked exhibit
12  here.
13     MS. PHARES: I don't frankly -- whether it's
14  marked here or not is not what makes it the
15  final document or not.
16     MS. BRYANT: I know the answer to it.
17     MR. MONAGHAN: Tell me outside. Do you have
18  a copy that I can --
19     MS. SAFFER: Yes, sure.
20     MS. PHARES: Bring it back.
21  Q.  Sorry.
22  A.  It's okay.
23     (SHORT BREAK)
24     MR. MONAGHAN: I see there's a missing page
25  four. We're missing page four.

130

1      MS. PHARES: Were you examining the witness
2   about this document? Did you put this in
3   earlier?
4      MR. MONAGHAN: No.
5      MS. SAFFER: I did.
6      MS. PHARES: We're going to substitute the
7   one that you were looking at. I'm going to give
8   you a good copy. I'm going to give you the copy
9   that was in evidence of this document so that
10  we're all working off of the same document and
11  we're talking about the defendant's exhibit in
12  evidence at trial, Defendant's Exhibit-F.
13     MR. MONAGHAN: But there may be an error
14  because that one does not bear Miss Bryant's
15  signature.
16     MS. PHARES: Miss Bryant identified it as
17  her settlement agreement at trial. That's all
18  I'm telling you.
19     MR. MONAGHAN: I know and I don't think
20  you're trying to make anything more of that than
21  that but it appears there's a missing page.
22     MS. PHARES: But not in the one that was
23  introduced at trial.
24     MR. MONAGHAN: But there's an important
25  element missing, i.e. a signature and the other

131

1   copy I have has the signature.
2      MS. PHARES: Are you suggesting that your
3   document, if it had its missing page, would be
4   any different than the one that's at trial, the
5   one --
6      MR. MONAGHAN: No, I'm not.
7      MS. PHARES: So they are essentially the
8   same document except yours happens to have
9   Miss Bryant's signature?
10     MR. MONAGHAN: Yeah, there's something a
11  little funny about the way the signature page
12  is.
13     MS. PHARES: It was faxed to you, you said.
14     MR. MONAGHAN: No. It looks like there's a
15  cut and paste or something. I don't know.
16  There's a handwritten -- paragraph seven has
17  some handwriting on it.
18     MS. PHARES: Without costs or attorneys
19  fees, correct?
20     MR. MONAGHAN: Yeah, with initials.
21  Q.  Do you know whose initials those are, Mr.
22--
23  A.  That's me.
24     MR. MONAGHAN: I think what happened was we
25  were not all present. I'm not suggesting

132

1   anything. These were not executed with
2   everybody present at the same time and we may
3   have sought and obtained Dr. Kinder's signature
4   by fax, but I'd have to go back and look. We'll
5   straighten it out.
6   Q.  For purposes of my questions, as far as
7   you're concerned, Mr. Kinder or Dr. Kinder --
8   A.  Either one, I'm still Mr. Kinder.
9   Q.  You did indeed enter into a settlement
10  agreement with Miss Bryant, did you?
11  A.  Yes, I did.
12  Q.  So far as you know, the settlement
13  agreement you entered into with Miss Bryant, she
14  signed?
15  A.  Yes. I believe I have a signed copy.
16  Q.  And if you would turn to the signature page
17  of the document that's before you, you'll notice that
18  you signed on the line that says Ford Kinder, is that
19  correct?
20  A.  Right.
21  Q.  Also for Kinder and Company, right?
22  A.  Right.
23  Q.  And for Vadivox Limited?
24  A.  Right.
25  Q.  Under paragraph six of this agreement which

## 133

1 begins on page five, is it correct that the Kinder
2 defendants agree to use their best efforts and to
3 cooperate to provide information including
4 documentation on request of plaintiff or her counsel
5 with respect to the pursuit of plaintiff's claims
6 against parties other than the Kinder defendants, is
7 that correct?
8    A.  Yes.
9    Q.  And it goes on.  And am I correct that in
10 the last sentence, it says that "such cooperation
11 shall include but not be limited to meetings,
12 telephone conferences and file review should such be
13 deemed necessary", is that correct?
14    A.  Exactly.
15    Q.  And is it also true that the release of the
16 claims, I'm looking at paragraph eight by the way,
17 that the release of the claims that the parties
18 exchange are being held pending your compliance with
19 the condition that you cooperate?
20       Or let me ask a background question.  Did
21 you also sign releases with Ms. Bryant as part of
22 your settlement, do you remember?
23    A.  I don't remember.
24    Q.  This document says that contemporaneously
25 with the agreement, you're executing and delivering a

## 134

1 general release?
2    A.  So we probably did.
3    Q.  And this document also says that "the
4 releases shall be held in escrow by plaintiff's
5 counsel pending satisfaction of the conditions herein
6 by the Kinder defendants."
7       Do you know what an escrow means?
8    A.  Just that it's held in a safe place until
9 the terms are executed and satisfied.
10    Q.  Do you know whether or not -- and the
11 plaintiff's counsel here is Mr. Monaghan, is that
12 correct?
13    A.  Right.
14    Q.  Do you know if Mr. Monaghan is still
15 holding your release?
16    A.  I don't.
17    Q.  Do you know whether you ever received it?
18    A.  I don't remember.
19    Q.  So, when you met last night with
20 Mr. Monaghan, you were meeting with him both pursuant
21 to this agreement and your obligations to cooperate,
22 is that correct?
23    A.  It's not because of this agreement.  I would
24 have met with him anyway whether it was in this
25 contract or not.

## 135

1    Q.  And anyway, now he's representing you, is
2 that correct?
3    A.  True.
4    Q.  And did Ms. Bryant ever ask you for copies
5 of the agreements between Kinder and Bryant and
6 Sunbow?
7    A.  No.
8    Q.  Never?
9    A.  Between Kinder and Bryant and Sunbow?  You
10 did.
11    Q.  Right.
12    A.  I think probably, yeah, they probably did.
13    Q.  I didn't ask you if they probably did.  Do
14 you remember whether they did?
15    A.  I don't remember.
16    Q.  Do you remember actually separately did Mr.
17 Monaghan ever ask you?
18    A.  I don't think he did.
19    Q.  Did either one of them ask you for copies
20 of the agreements between Kinder and Bryant and GBI?
21    A.  It was sort of a -- it's more than a yes or
22 no.  I'm sorry.  It was like a one time question, do
23 you have any of the old contracts because they're
24 having trouble finding them and my answer was I don't
25 have any of the old contracts.

## 136

1    Q.  Who asked you that?
2    A.  Anne, I think.
3    Q.  When did she ask you that?
4    A.  Early, before any settlement.
5    Q.  So before 2001, she was asking you if you
6 had any of the old written agreements, is that
7 correct?
8    A.  Oh, this is so difficult. I believe so. Did
9 we -- I can't ask.
10    Q.  It's not a yes or no as you say?
11    A.  Everyone was trying to find the documents
12 and someone, both sides asked me if I had any and I
13 didn't.
14    Q.  Now you said earlier today and just to
15 reorient ourselves that as between you and Ms. Bryant
16 once you had formed Kinder and Bryant, that you
17 probably had more of the laboring noir, shall we say,
18 with respect to negotiating agreements, is that
19 correct?
20    A.  Yes.
21    Q.  And did you -- was that true both with
22 respect to your making agreements with Kinder and
23 Bryant and as well as making agreements with Sunbow
24 -- I beg your pardon, let me strike that and start
25 over.

---

**137**

1    Were you also sort of handling or basically
2 responsible for the negotiations on behalf of Kinder
3 and Bryant when dealing with GBI as well as with
4 Sunbow?
5    A. It's an overstatement. Anne and I discussed
6 almost everything. I sort of took the position of
7 being the spokesperson but if there was anything to
8 be discussed, we always talked it over. It wasn't
9 routine, you know, there's a lot of routine business
10 that gets done, I took care of that. There was
11 negotiations going on, I didn't negotiate contracts
12 and not talk to Anne. We had a very close
13 relationship and we talked all the time. We didn't
14 make decisions independently.
15    Q. And the business that Sunbow was in was
16 producing animated children's programs, is that
17 correct?
18    A. And movies.
19    Q. And movies.
20    A. Television programs and movies.
21    Q. What sort of work was Sunbow commissioning
22 Kinder and Bryant to do?
23    A. Well, they commissioned us to do theme
24 songs for cartoon shows and songs, television show
25 songs.

---

**138**

1    Q. And in both cases, these were -- this was
2 music that was to be part of the sound track of the
3 TV cartoon or the movie, is that correct?
4    A. Not solely. The theme songs were generally
5 part of it but there were other uses. They would take
6 a theme song and put it in a -- not a video game but
7 --
8    Q. I'm talking about when you first worked
9 with them in the 80s?
10    A. Right.
11    Q. When you wrote the music initially for them
12 for Sunbow, I'm not talking about any later
13 exploitation of music, I'm just talking about the
14 agreement between Kinder and Bryant and Sunbow.
15    MR. MONAGHAN: I don't understand the
16 question.
17    MS. PHARES: I haven't finished the
18 question. How about that?
19    A. I'll understand it better too.
20    Q. What was the -- you were writing music for
21 a particular TV series or a TV program or a cartoon
22 program, is that correct?
23    A. It's correct, but I think it's important to
24 note that a lot of these shows were number-one so we
25 were used to having success. Generally, if there's

---

**139**

1 success, it means it's going to have other uses.
2    Q. I'm only asking that one question. We'll
3 go on from there, but I get to decide how we are
4 going to go on from there.
5    A. Okay.
6    Q. When you negotiated with Sunbow, did
7 anybody represent you, did a lawyer represent you?
8    A. No.
9    Q. And did you negotiate with terms with
10 someone at Sunbow?
11    A. What do you mean with terms?
12    Q. The terms of your contract?
13    A. Yeah, yes.
14    Q. Who did you negotiate the terms of your
15 contract with?
16    A. I think Suzette Bouchett, Carol Weitzman, I
17 think that was mostly it. Sometimes Joe would be
18 involved.
19    Q. Was Tom Griffin ever involved?
20    A. No, not that I recall.
21    Q. What was the process, was there a form
22 agreement and then you said, well, we like this
23 provision or we don't like some other provision and
24 then you'd negotiate the provisions that way?
25    A. Yes.

---

**140**

1    Q. And were they often changed?
2    A. They were occasionally changed.
3    Q. So that when you say occasionally meaning
4 basically, there was a form agreement and sometimes
5 you were able to negotiate some changes?
6    A. Yes.
7    Q. Did William Dobishinski ever represent you?
8    A. No.
9    Q. Ever represented Kinder and Bryant?
10    A. I don't know what the word -- we never
11 paid him to represent us. He was somebody who said I
12 can be an intermediary between the two places. I
13 always figured he worked for Sunbow because there's
14 were the bulk of the money was.
15    We had an agreement that he would
16 administer the money but --
17    Q. Who had an agreement that he would
18 administer the money?
19    A. We signed an agreement with TAMAD, his
20 company, that he would administer the money that came
21 out of the writer's share of the royalties.
22    Q. When you say we, you mean Kinder and
23 Bryant?
24    A. Right.
25    Q. So Kinder and Bryant had an agreement with

141

1 TAMAD, Mr. Dobishinski's company?
2 A. And we may have individually had agreements
3 with him.
4 Q. What would the individual agreements have
5 been for?
6 A. For the same thing.
7 Q. The same thing. And he was handling your
8 share of the writer's performance royalties, is that
9 correct?
10 A. The checks actually went to him in
11 California. He would deposit them, deduct his
12 percentage, split the money and send Anne and me
13 checks.
14 Q. What checks are you talking about, checks
15 from whom?
16 A. Royalty checks from BMI or ASCAP.
17 Q. So you're talking about the performance
18 royalty money, is that correct?
19 A. Yes.
20 Q. Do you remember ever discussing with Bill
21 Dobishinski the terms of any of the agreements with
22 Sunbow?
23 A. Yes, I remember one time. I remember it
24 just went back and forth a long time. Mostly it was
25 Bill just coming and saying here's what you should

142

1 do.
2 Q. Mr. Dobishinski was a lawyer, wasn't he?
3 A. He was a lawyer.
4 Q. When he was telling you what you should do,
5 what did you think he was doing?
6 A. Telling us what Sunbow would agree to.
7 Q. And he was corresponding with Sunbow on
8 your behalf?
9 A. I think you have to understand the nature
10 of the relationship between -- not Dobishinski,
11 between Joe Bacal and me. I think that's something
12 that's being left out here.
13 Q. That's because I'm not asking you about it.
14 A. It has a lot to do with how this --
15 Q. At the moment, what I'm concerned about is
16 the relationship that you had with Mr. Dobishinski?
17 A. I never considered him a lawyer.
18 Q. I don't mean you. I mean Kinder and
19 Bryant.
20 A. We never considered him our lawyer because
21 he worked for them and I didn't see how he could be
22 our lawyer and work for them. It didn't --
23 Q. That makes two of us.
24 A. Okay.
25 Q. Did Miss Bryant participate in the

143

1 discussion of the terms of the agreements with
2 Sunbow?
3 A. Probably.
4 Q. Do you remember?
5 A. At least with me, not necessarily with
6 Bill.
7 Q. She talked to you?
8 A. I mean I would always discuss -- we
9 discussed everything.
10 Q. And so she was completely familiar with
11 what was going on with anything that you did on
12 behalf of Kinder and Bryant?
13 A. Completely familiar, neither of us were
14 legal people, we were musicians. There were a lot of
15 contracts involved. We had a good relationship with
16 Sunbow, with Griffin Bacal, a trusting relationship.
17 Completely familiar with that stuff, I don't think
18 either of us were.
19 Q. And was it your role as president of Kinder
20 and Bryant to sign all the agreements with Sunbow?
21 A. No.
22 Q. For the production?
23 A. Either of us could sign and Anne was
24 chairman, I was president.
25 Q. Either one of you could have signed. Did

144

1 you in fact usually sign for Kinder and Bryant?
2 A. I don't think I necessarily signed more
3 than Anne did. I might have. It wasn't my role. I
4 wasn't the business guy. We were both musicians.
5 I just had a little more sense of business
6 than Anne did and didn't mind doing it. Anne did
7 more arrangements, musical arrangements than I did so
8 we sort of split the work that way.
9 It wasn't an assigned thing.
10 Q. I understand, most relationships, people
11 end up taking out the garbage or --
12 A. Good analogy.
13 Q. Now I'd like to show you what is trial
14 Exhibit-M which is the Jem agreement. Tell me when
15 you've had a chance to look at it?
16 A. I've looked at it. It's long. I've seen it
17 before.
18 Q. And I'm not going to repeat the testimony
19 that you've given in your declaration about the
20 signatures on this agreement, but I think we are
21 agreed that you signed this agreement?
22 A. Yes.
23 Q. And I want to first ask you what do you
24 understand that the music that you were writing under
25 this agreement, what was it for?

145

1     A.   It was for the music videos that were
2 contained within the television show; the Jem Show.
3     Q.   Well, originally, we weren't talking about
4 music videos, it was for a television program?
5     A.   They were actually little music videos and
6 that's part of why there's a separate agreement here.
7     Q.   When you are talking about video, are you
8 talking the material on which they were created?
9     A.   No, I'm talking about the final product as
10 we viewed them earlier. Just like MTV, there's a
11 picture that went with the sound. We did the sound
12 first, then they did the picture. It came up with a
13 -- just like on MTV, the name of the song, who was
14 performing it, just like a little video, they were a
15 little bit shorter than regular songs on MTV and that
16 was the concept of the show. It was all based on
17 this music.
18     Q.   And the show was what?
19     A.   The Jem Show.
20     Q.   And the Jem Show was -- what was the theme
21 of the television series?
22     A.   It was two female rock bands competing to
23 be the number one rock band in the world. We wrote
24 music videos or songs, performances for both bands.
25     Q.   And then those music videos were fitted

146

1 into the animated series, is that correct?
2     A.   They would fit into the program as
3 independent pieces with the knowledge that they could
4 be taken out and used separately which they were even
5 in the beginning and that's what they were created
6 for.
7     Q.   And then they were created as part of that
8 -- they were part of that story of the competing
9 bands, is that correct?
10     A.   That's true.
11     Q.   And then the songs -- were the songs that
12 the performers or that the bands were performing as
13 part of the competition, is that the idea?
14     A.   Exactly.
15     Q.   This didn't include the lyrics, did it,
16 that you created?
17     A.   The lyrics were written mostly by Barry
18 Harman, although he didn't write them as lyrics. He
19 wrote stanzas and then we would pick a stanza to be
20 like we'd say this would be a good chorus, these
21 would be good verses, maybe I could mix these lines
22 up and it would work better. He still deserves
23 credit for the lyrics although we did manipulate what
24 he gave us.
25     Q.   In fact, he gets half of the writer's share

147

1 doesn't he?
2     A.   That's right.
3     Q.   And on the page ten of the agreement when
4 you signed this, you were signing for Kinder and
5 Bryant, is that correct?
6     A.   Yes.
7     Q.   And Kinder and Bryant was the contractor,
8 isn't that correct, under this agreement?
9     A.   Right.
10     Q.   And on page 11 which is the so-called
11 Schedule A, that's also your agreement, isn't it?
12     A.   Yes.
13     Q.   Do you know what this Schedule A is?
14     A.   My understanding of it is that it says that
15 Kinder and Bryant as a corporation can make an
16 agreement on behalf of the services of the writers,
17 Ann Bryant and Ford Kinder.
18     Q.   And it also says that you were employees of
19 Kinder and Bryant, doesn't it, that you wrote
20 original music as employees of Kinder and Bryant,
21 line two?
22     A.   Yes, it says that.
23     Q.   Above your signature, that's Anne's
24 signature, is that correct?
25     A.   Yes.

148

1     Q.   And on page 13, that's also your signature,
2 is that correct?
3     A.   Yes.
4     Q.   And this is on a two-page letter that's
5 labeled an inducement letter, is that correct?
6     A.   Right.
7     Q.   And do you understand what the inducement
8 letter is?
9     A.   To me, yeah, it's us acknowledging that we
10 would work for the contractor which is the company to
11 provide services for this production.
12     Q.   And it also says, am I correct, that in
13 paragraph two, you say you're familiar with all the
14 terms of the agreement?
15     A.   It says that.
16     Q.   And that you will perform and comply with
17 all the terms?
18     A.   Yes.
19     Q.   And that the representations and warranties
20 of the contractor in the agreement are true?
21     A.   It says that.
22     Q.   And that it also confirms that there have
23 been granted to the contractor all of the rights
24 granted by the contractor to you under the agreement?
25     A.   Yes.

149

1    Q. On the signature page next to yours, is
2 that also Miss Bryant's signature?
3    A. Yes.
4    Q. With the exception of the -- at the
5 beginning of this just to -- the beginning on the
6 first page of this agreement in paragraph two, this
7 sets out payment terms, is that correct?
8    A. Production fees.
9    Q. Well, let me just be clear. The paragraph
10 begins, "For all the rights granted to the company in
11 the music and for performance by contractor of all
12 the obligations hereunder", and then it proceeds to
13 describe what that is or isn't, "the company shall
14 pay contractor a fee of $2,200 for each song for
15 which writer writes and delivers the music payable on
16 delivery thereof", is that correct?
17    A. Yes.
18    Q. It's not just a performance fee, isn't that
19 correct?
20    A. Not performance, production.
21    Q. It's not just a production fee, this is a
22 payment for all the -- all that goes on in this
23 agreement?
24       MR. MONAGHAN: Object to the form.
25    A. I don't think that's really accurate.

150

1    Q. You don't have any disagreement that this
2 has to do also with the conveyance of rights, do you?
3    A. I think we considered this a production fee
4 for writing arrangements, producing the songs which
5 took hours and hours and hours, hiring all the
6 people, booking all the people, sending demos to the
7 agency, there's a lot involved. This was a production
8 fee.
9    Q. Tell me what you think the first clause of
10 this, that section 2A means, "for all
11 rights herein granted to company in the music"?
12    A. I think the rights --
13    Q. Company is, by the way, under this
14 agreement is Sunbow.
15    A. I don't know what rights it is referring to
16 exactly.
17    Q. Let me refer you then to section five on
18 page two and this is a section that begins with,
19 "Contractor warrants, acknowledges and agrees that
20 the music to be written by writer and delivered by
21 contractor is to be written by writer under and
22 pursuant to an employment agreement between
23 contractor and writer".
24       That's the employment agreement that we
25 looked at a little earlier?

151

1    A. Right.
2    Q. "Pursuant to which contractor is entitled
3 to the exclusive services of writer and to all the
4 results of the writer's services."
5       Is that correct?
6    A. Right.
7    Q. Then move down another two lines "and that
8 the music is a work made for hire within the meaning
9 of section 101 of the copyright act."
10       Then it goes on to say, "upon writing of
11 the music, all right, title and interest therein
12 shall automatically vest in the company", is that
13 correct, "and company shall be the sole and unlimited
14 owner thereof".
15       Having looked at that and referring back to
16 section 2A, do you think that 2A, that first line
17 perhaps refers to the transfer of those rights?
18    A. I think but I think that there are many
19 other paragraphs that also refer to.
20    Q. There are surely other paragraphs and we
21 will come to them.
22       You said earlier that -- hang on, just one
23 question. What was the procedure by which you and
24 Anne Bryant signed agreements with Sunbow?
25       Did they send them to you signed or did

152

1 they send them to you and you signed them and they
2 were sent back?
3    A. They sent it to us unsigned -- I don't
4 really -- we never met.
5    Q. It was done through the mail or something?
6    A. Yeah, I think sometimes they were unsigned
7 and sometimes they were signed. I would say more
8 often than not they were unsigned.
9    Q. And then you were paid as the -- according
10 to this agreement, as the music was delivered? How
11 were you paid?
12    A. Yes, after we delivered the tracks, they
13 would pay us.
14    Q. When you -- by the time you delivered the
15 tracks, had you already signed the agreements?
16    A. No.
17    Q. Not always?
18    A. Most of the time, I'd say no.
19    Q. How many of these agreements can you
20 remember signing?
21    A. Many, many, many.
22    Q. You remember signing many?
23    A. We signed a lot of agreements.
24    Q. I'm talking just with Sunbow?
25    A. We signed a lot of agreements with Sunbow

153

1 as well. They weren't real efficient but the tracks
2 had to be there so we produced the music and the
3 paperwork got done as efficiently as they could do
4 it. They also usually took four months to pay us.
5      Q.   I want to give you also a copy of a
6 document which is already in evidence as Defendant's
7 Exhibit-O.
8           Do you recognize this agreement?
9      A.   I vaguely remember it.
10     Q.   Is your signature on the second page?
11     A.   Yes.
12     Q.   Do you know what this agreement does?
13     A.   I think what it was an extension -- wait a
14 minute. I'm getting confused.
15          I think this was an addendum to the
16 contract referring to cassettes that were sold as
17 product, separate product with the dolls.
18     Q.   These are the dolls that you referred to
19 earlier today, is that correct?
20     A.   The Jem dolls.
21     Q.   Is that correct?
22     A.   Uh huh. I don't know if I've talked about
23 the dolls earlier.
24     Q.   You earlier said that you were also -- that
25 there was a separate use in connection with the

154

1 dolls?
2      A.   Okay, yes, the same dolls.
3      Q.   This is the contractual provision that
4 provided payments to Sunbow for that use, is that
5 correct?
6      A.   It was a payment to use them specifically
7 for that one time on the cassettes that were sold to
8 help sell the dolls. They were sold as if you were
9 buying a record.
10          We did some work I believe putting together
11 the masters, I think there were three songs on each
12 cassette.
13     Q.   I now want to give you a copy of what's an
14 exhibit in evidence as Defendant's Exhibit-N. Do you
15 recognize it?
16     A.   Yeah.
17     Q.   What is it?
18     A.   This is something I barely looked at, I
19 think. Okay. Yes, My Little Pony and Friends.
20     Q.   This is the contract between Kinder and
21 Bryant and Sunbow for My Little Pony and Friends?
22     A.   Yes, and this was something we didn't --
23 this is a job we actually turned down. There's a
24 contract -- the fees were too low on this job so we
25 did not take it. Joe called me as a special favor, he

155

1 needed one song which was called How Does My Garden
2 Grow. He said please, please, please, could you
3 write this song really fast and send it over and I
4 said -- whenever he asks for a favor, I said yes.
5 That's why this contract exists.
6      Q.   Just to let you know something, is it your
7 signature on page ten?
8      A.   Yes.
9      Q.   Is it your signature on page 11?
10     A.   Yes.
11     Q.   And that's also Anne Bryant's signature?
12     A.   As far as I know.
13     Q.   And on page 13, is that your signature?
14     A.   Yes.
15     Q.   Does that also appear to you to be Anne
16 Bryant's signature?
17     A.   It appears to be.
18     Q.   Now, would you put Defendant's Exhibit-N
19 and M next to each other and tell me if these are the
20 same except for the payment provisions, are these
21 basically the same agreements?
22     A.   You know, Gloria, I don't think that's fair
23 to me. These documents are 12 pages long. How can I
24 tell you that they are the same.
25          MR. MONAGHAN: They speak for themselves

156

1 anyway.
2      Q.   Okay. Do you know what's -- do you know
3 what provisions these agreements provide to Kinder
4 and Bryant with respect to royalties?
5      A.   Which royalties are you referring to?
6      Q.   Let's start with the ones, let's look at
7 the Jem agreement and that's Defendant's Exhibit-M.
8           First of all, there are performance
9 royalties which begin in paragraph 5C at the bottom
10 of page two.
11     A.   Okay. It gives us our writer's share.
12     Q.   And the performance royalties, is that
13 correct?
14     A.   Yes.
15     Q.   And it also provides how those performance
16 royalties will be divided among the various lyricists
17 and songwriters, is that correct?
18     A.   Yes.
19     Q.   And then in paragraph six, there is a
20 reference to what are referred to in the agreement,
21 I'm not making this up, as music publishing rights,
22 do you see that?
23     A.   Music publishing rights.
24     Q.   Correct. Then those are listed on the next
25 page?

---

157

```
1     A. Right.
2     Q. And you said earlier today that you weren't
3  very familiar with these publishing rights?
4     A. I'm familiar with it, but I don't claim to
5  be an expert on it or anything.
6     Q. This is my question to you, do you know
7  whether or not Sunbow has made licenses to third
8  parties for commercial phono records? That's a yes
9  or a no or I don't know.
10    A. I think yes, they have.
11    Q. What phono records do you think they have
12 licensed?
13    A. I think this DVD is a phono record.
14    Q. Do you know what a phono record is?
15    A. I think a phono record, my understanding is
16 anything, a record album, a cassette, a DVD, any form
17 in which it is a record.
18    Q. What's the basis of that understanding?
19    A. It's just my understanding. I'm not a
20 lawyer, I told you that.
21    Q. Has Anne Bryant told you that's what it
22 is?
23    A. No.
24    Q. That's just what your understanding is?
25    A. Yes.
```

158

```
1     Q. Do you know whether or not phono record is
2  a technical term in the copyright act?
3     A. Probably is.
4     Q. I'm only asking you whether you know or
5  not?
6     A. No, I don't.
7     Q. Do you know what a synchronization right
8  is?
9     A. I don't.
10    Q. Do you know whether or not Sunbow has
11 authorized the synchronization of the songs that were
12 produced in a theatrical motion picture?
13    A. I don't know.
14    Q. Do you know whether or not Sunbow has
15 authorized the creation of piano copies?
16    A. I don't know.
17    Q. Do you know whether or not it has
18 authorized the creation of orchestrations?
19    A. No, I don't know.
20    Q. Do you know whether it's authorized the
21 creation of any songbook, folio or similar
22 publication?
23    A. I don't know.
24    Q. Do you know whether or not it has
25 authorized any other uses of the music?
```

159

```
1     A. Yes, it has.
2     Q. I should say that in this agreement, other
3  uses is defined on the next page and it's a little
4  hard to refer you to it but about midway down the
5  page almost in the middle of the page is a sentence
6  beginning "in the event that"?
7     A. Right.
8     Q. Do you see that "in the event that company
9  licenses the music in a form containing music or
10 other literary materials written or composed by any
11 third party or parties", do you see that?
12    A. Uh huh.
13    Q. Do you know whether or not Sunbow has
14 licensed the music to be used in a form containing
15 music or other literary materials written by third
16 parties?
17    A. I don't know that they have.
18    Q. When you and Ms. Bryant dissolved Kinder
19 and Bryant, did all the written agreements between
20 Sunbow and Kinder and Bryant stay at Kinder and
21 Company?
22    A. Any pre-existing documents were to be
23 continued to be split between us as --
24    Q. I mean were the physical documents, did
25 they remain at Kinder and Bryant -- I mean at Kinder
```

160

```
1  and Company?
2     A. Yes.
3     Q. When you sold Kinder and Company, were they
4  still there?
5     A. I don't know.
6     Q. Did you ever make copies of those
7  agreements for Ms. Bryant?
8     A. No.
9     Q. Did she ever ask for them?
10    A. Originally as I stated earlier, you and she
11 asked me and I didn't have any copies.
12    Q. But at the time of the dissolution, did she
13 ask you for any copies?
14    A. No.
15        (SHORT BREAK)
16    Q. Dr. Kinder, I'm going to hand you what's
17 already in evidence at trial as Defendant's
18 Exhibit-H. I know that you are familiar with this
19 because you said you reviewed it with Mr. Monaghan
20 last night, is that correct?
21    A. I didn't look at it this closely. Okay. I
22 have never really seen this.
23    Q. You were copied on this letter, weren't
24 you?
25    A. I don't remember it.
```

161

1 Q. Were you copied? You are copied on the
2 letter?
3 A. I just don't remember it.
4 Q. Do you recognize the signature?
5 A. No. I don't remember what his signature
6 looked like.
7 Q. This is a letter to Robert Harris, is that
8 correct, from Mr. Dobishinski?
9 A. Right.
10 Q. And the re line says what?
11 A. The what?
12 Q. The re line underneath Harris's address?
13 A. "'Jem' (Kinder and Bryant) and (2) 'My
14 Little Pony' (Kinder and Bryant, Rick Brenckman).
15 Q. Do you know who Rick Brenckman is?
16 A. Yes.
17 Q. Who is he?
18 A. He is another music writer in New York and
19 I guess he worked on the My Little Pony show.
20 Q. You guess he did or do you know?
21 A. I don't know for sure, I think he did.
22 Q. And at the beginning of this letter or this
23 letter appears to be a negotiation that Mr.
24 Dobishinski is carrying on with Mr. Harris about
25 these two agreements, isn't it, Jem and My Little

162

1 Pony?
2 A. Appears to be.
3 Q. And he says that "I've discussed the above
4 mentioned agreements with my clients", is that
5 correct?
6 A. It says that.
7 Q. But you don't think you were
8 Mr. Dobishinski's client?
9 A. With him as an administrator, yes.
10 Q. I didn't ask you that.
11 A. You mean as a lawyer, no.
12 Q. He did not have authority to negotiate the
13 license -- the Jem agreement on your behalf with
14 Sunbow, is that what you're saying?
15 A. Yes, but he had that authority from Sunbow.
16 Q. Wait a minute. He was representing you?
17 MR. MONAGHAN: He just said no, he wasn't as
18 a lawyer.
19 A. He wasn't representing me as a lawyer.
20 Q. So when he wrote this letter to Sunbow
21 asking for concessions for the agreement for you for
22 Kinder and Bryant, that is, he was not representing
23 Kinder and Bryant?
24 A. No, he was representing us as an
25 administrator for the publishing royalties.

163

1 Q. Well, when he was administering publishing
2 royalties; that had to do with performance royalties,
3 correct?
4 A. I don't know the difference.
5 Q. You earlier told me, I'm just going back to
6 what you had testified, am I correct that you said
7 that you had -- you, Kinder and Bryant, had an
8 agreement with Mr. Dobishinski that he received your
9 performance royalties, took a cut and sent the two
10 checks to you and to Anne Bryant, correct?
11 A. It wouldn't have only been performance
12 royalties. If there were more royalties, he would
13 have received those too.
14 Q. You're saying whatever royalties you were
15 entitled to, Mr. Dobishinski negotiated for you?
16 A. I think so, yes.
17 Q. And he negotiated those on your behalf, is
18 that correct?
19 A. He did.
20 Q. I assume you don't recognize any of the
21 other handwriting on this agreement, is that correct?
22 A. No, I don't.
23 Q. So, Mr. Dobishinski was being paid for the
24 work that he was doing here out of the commissions he
25 received on whatever you were paid, is that correct?

164

1 A. Exactly.
2 Q. And if you look at the agreement, if you
3 look down at the paragraph beginning A, do you see
4 that, Dr. Kinder?
5 A. A?
6 Q. Right.
7 A. Yes.
8 Q. It says, "Jem", and again he repeats
9 "Kinder and Bryant" and then "My Little Pony" and in
10 parenthesis "(Kinder and Bryant and Rick Brenckman)",
11 correct?
12 A. Yes.
13 Q. And then in paragraph one, he refers to
14 paragraph 5C, is that correct?
15 A. Yes.
16 Q. And do you understand that 5C refers to the
17 paragraphs of those agreements?
18 A. It appears to, yes.
19 Q. And on the next page in paragraph two where
20 it says, "Paragraph 5(c), fifth, last line", those
21 also appear to be referring to the same paragraph,
22 same lines?
23 A. I'm sorry, where was it?
24 Q. The very top of the page, paragraph 5(c).
25 A. Yes.

---

**165**

1    Q.   And then the letter continues and refers to
2  paragraph 6A then to paragraph ten, is that correct?
3    A.   Yes.
4    Q.   And --
5         MR. MONAGHAN: Let me put an objection on
6  the record. The reference line does say what it
7  says --
8         MS. PHARES: Are you putting an objection on
9  the record or are you going to read the
10  agreement?
11         MR. MONAGHAN: I'm going to give a context
12  to the objection. The reference line does refer
13  to Jem and My Little Pony but it doesn't tell us
14  which specific agreement by date we're talking
15  about and I don't think the witness has
16  knowledge, you obviously can ask him and you
17  are, as to which particular iteration or
18  compositions, whether we're talking shows, theme
19  or whatever are being referred to in this March
20  3, 1986 letter.
21    Q.   Did you sign more than one Jem agreement?
22    A.   I think we signed -- there may have been
23 more than one, yes.
24    Q.   We've looked at one Jem agreement which you
25 had before you, correct, and there was one amendment

---

**166**

1  to the Jem agreement, correct?
2    A.   We've seen an amendment, yes.
3    Q.   And you said earlier, am I correct, that
4  basically, you were always working off the form
5  agreement from Sunbow, is that correct?
6    A.   Not for that.
7    Q.   Not for what?
8    A.   Not for the Jem agreement.
9    Q.   Not for the Jem agreement. So you think
10 the Jem agreement is different from the other
11 agreements?
12    A.   It's different from some of the other
13 agreements, yes.
14    Q.   But we could tell that by looking at them
15 just by comparing them, couldn't we?
16    A.   Exactly.
17    Q.   But now to get back to what I'm talking
18 about, in that first section, this letter is
19 referring to Jem and My Little Pony as having the
20 same paragraph, the same provisions in each of the
21 paragraphs as mentioned, is that correct?
22    A.   It appears to say that, but I'm not sure
23 what he means by My Little Pony. The television show
24 wasn't called My Little Pony.
25    Q.   There are two different programs, isn't

---

**167**

1  that correct, My Little Pony and My Little Pony and
2  Friends?
3    A.   I don't think so. Maybe there was, I don't
4  remember.
5    Q.   Let me just finish. At the end of the
6  letter, would you please read what's written under
7  paragraph capital D?
8    A.   You want me to read that?
9    Q.   Yes, please.
10    A.   "Please advise us regarding the desired
11 dates to be inserted in the agreements."
12    Q.   Okay. If you would refer back to the Jem
13 agreement and what is the date that's written under
14 it?
15    A.   6-1-85.
16    Q.   What is the date of the Jem agreement? I'm
17 handing you now Defendant's Exhibit-M at trial.
18    A.   It says 6-1-198-- something with a
19 handwritten five in it.
20         MR. MONAGHAN: Now I'd like to get my
21  objection on the record. To the extent that
22  there is a suggestion that because there's a
23  letter here that uses the term my clients, when
24  the testimony has already been given in the
25  record by this witness that Dobishinski was not

---

**168**

1  his lawyer or Anne's lawyer or Kinder and
2  Bryant's lawyer and there is testimony of record
3  by Carol Weitzman that Dobishinski was selected
4  by Sunbow, hired by Sunbow and you and I know
5  the law very well on that record, you can't
6  represent both sides as a lawyer, so any
7  suggestion that somehow any action on the part
8  of Dobishinski would in any way, shape or form
9  bind my client, the plaintiff in this action, is
10  rejected.
11         It's unethical for him to have represented
12  both sides in a transaction. Anything he did
13  would be suspect and that's it.
14    Q.   Dr. Kinder, are you taking the position
15 that if Mr. Dobishinski negotiated something in your
16 favor, you're rejecting it?
17         MR. MONAGHAN: You can't ask him that
18  question.
19         MS. PHARES: I can ask him whatever I want
20  to ask him.
21         MR. MONAGHAN: That's objectionable. We
22  don't need a hypothetical here.
23    Q.   I'm just asking you --
24    A.   First of all, I didn't see him as
25 negotiating for us. I saw him as representing Sunbow

---

169

1 and presenting us with options.
2 Q. And he was presenting you with -- he was
3 presenting these options to Sunbow, was he not?
4 A. Right.
5 Q. He was --
6 A. Because he had a separate position, he was
7 an administrator in Hollywood.
8 Q. And then he was also representing you, is
9 that correct?
10 A. He was presenting us with contracts.
11 Q. And he was representing -- he was
12 presenting them to Sunbow?
13 A. Just like Carol Weitzman presented me with
14 contracts, so did Bill Dobishinski.
15 Q. And Dobishinski was representing whom?
16 A. Sunbow.
17 Q. When he -- he was writing to Sunbow?
18 A. I can't say why he wrote the letter the way
19 he wrote it. I'm me, he's him. I don't know why he
20 wrote, phrased it that way.
21 Q. Hey, I just then refer you to again, let's
22 look back at Defendant's Exhibit-S which is already
23 -- it's a document that Miss Saffer asked to you look
24 at and, therefore, should already be in that pile.
25     This is -- the document we're looking at is

170

1 your dissolution agreement between Kinder and Bryant
2 -- well, the dissolution between Anne Bryant and
3 Ford Kinder and your company, Kinder and Bryant. I
4 want to refer you to paragraph 4A, if you would?
5 A. Okay.
6 Q. And what does that provision provide?
7 A. It provides what I've stated before, that
8 the public performance royalties from BMI would be
9 paid to TAMAD, Bill Dobishinski's company, and he
10 would disburse the money after taking out his fee.
11 Q. And it says nothing about publishing
12 rights, is that correct?
13 A. It doesn't eliminate them either.
14 Q. I'm just asking you what it says?
15 A. I don't see anything about publishing
16 rights.
17 Q. Okay. I'd like to now show you a document
18 that is Defendant's Exhibit-J in evidence at trial.
19 Do you recognize this?
20 A. No.
21 Q. You're copied on this letter, are you not?
22 A. From 20 years ago, yes.
23 Q. What this appears to be and what it says is
24 this is an agreement -- I think if you look at the
25 very last two pages, you'll see that this is a

171

1 proposal, this is the amendment to the Jem agreement
2 that we looked at earlier which was the -- you got
3 the last two pages?
4 A. Of this?
5 Q. Yes. This is the amendment having to do
6 with the dolls for the Jem agreement?
7 A. This looks like the thing we saw before.
8 Q. Right, that's exactly right.
9 A. Right.
10 Q. And the two pages before that is what's
11 known as a red line which shows changes from a prior
12 draft and the cover letter is from Bill Dobishinski
13 to Carol Weitzman?
14 A. Okay.
15 Q. And this is an amendment that Mr.
16 Dobishinski is submitting to Sunbow on the Jem
17 agreement?
18     MR. MONAGHAN: Is this in evidence?
19     MS. PHARES: Yes.
20     MR. MONAGHAN: How did it get into evidence?
21     MS. PHARES: On cross.
22 Q. On behalf of the -- on behalf of Kinder and
23 Bryant, is that correct?
24 A. Yes.
25 Q. And this was eventually signed, was it not?

172

1 A. I have no idea.
2 Q. You can look at Defendant's Exhibit-O. I
3 think it's right in the pile that you've just been
4 working on.
5 A. Which was what eventually signed --
6 Q. The last two pages.
7 A. We saw a signed copy of this.
8 Q. Is that correct? So Mr. Dobishinski handled
9 that amendment for Kinder and Bryant on the amendment
10 of the Jem agreement, correct?
11 A. Yes.
12 Q. Have you ever had occasion, Dr. Kinder, to
13 see an agreement between Barry Harman and Sunbow?
14 A. No.
15 Q. Between any lyricist and Sunbow?
16 A. No.
17 Q. Do you know whether they looked anything
18 like the agreements that Kinder and Bryant had with
19 Sunbow?
20     MR. MONAGHAN: It would be tough to answer
21 that since he just said he never had seen them.
22 A. I don't know. I assumed they were similar.
23 Q. I think this is just the last thing I have.
24 If we go back to Kinder-6 which Mr. Monaghan showed
25 you this morning, this is the agreement of March 21,

173

1 1984 between Kinder and Bryant and GBI, is that
2 correct?
3    A.  It appears to be that.
4    Q.  Do you have any reason to think it isn't?
5    A.  Yes, because the second page is the wrong
6 page.
7    Q.  Do you remember this morning, you also
8 testified that the agreements you did between Michlin
9 and Company and GBI were essentially the same as the
10 agreements between Kinder and Bryant and GBI?
11    A.  They were similar but they weren't the
12 same.
13    Q.  They weren't the same?
14    A.  They wouldn't have Spencer Michlin.
15    Q.  I didn't ask you that.  Just for the
16 moment, forget your answer and listen to my question.
17    A.  Okay.
18    Q.  Were the basic form agreements between
19 Michlin and Company and GBI similar to the basic form
20 agreements between Kinder and Bryant and GBI?
21    A.  Yes, they were similar.
22    Q.  And to the extent that you could recall,
23 how were they different?
24    A.  I don't recall.
25    Q.  Would you look at paragraph two of this

174

1 agreement?  This is -- do you understand what
2 paragraph two is?
3    A.  You know, before this meeting, I would have
4 said yes, but now I know to say no. I'm much more
5 confused about what this stuff means than I was
6 before I got here.
7    Q.  So, when it says that "we", and we in this
8 case is Kinder and Bryant, "sell, assign, transfer
9 and set over to you all material prepared, created,
10 written and delivered by artist and/or us hereunder
11 and all copyrights and all other rights therein in
12 perpetuity throughout the universe."
13       You don't know what that means?
14    A.  I think it sounds verbose and ostentatious
15 to be quite honest and to me, it says we're selling
16 them a product but we never gave up our writer's
17 share and that's my understanding of this.
18    Q.  When you refer to writer's share, you're
19 referring to the writer's share of the performance
20 royalties?
21    A.  And the other thing which no one has asked,
22 as you've seen, every other media that these songs
23 were put into, we were paid again.  It was always
24 understood and I don't know where it states it in
25 here, I'm not a lawyer, that this was not a complete

175

1 agreement, we were always paid for every other use,
2 every commercial, it went on for years. It was
3 common practice.
4       To try to imply that this was the complete
5 payment for everything in the whole universe is just
6 ludicrous because it wasn't the practice, it wasn't
7 the agreement.
8    Q.  Well, what does the agreement say?
9       MR. MONAGHAN:  Let me object, time out. He
10    said this isn't the agreement, number one, so
11    every time you've asked him a question about the
12    agreement, you're asking a question he's already
13    said does not cover this agreement.  He's
14    already said he doesn't believe it's the
15    agreement.  He said page two is not a page two
16    that would have been in any agreement with the
17    parties because it has Mr. Michlin's name and
18    the last page is not countersigned.
19       So, I object to the form of any question
20    that assumes in evidence that this is an
21    agreement, a valid agreement between the
22    parties.
23    Q.  Do you know what paragraph D -- the
24 paragraph that refers to Michlin and -- that refers
25 to Spencer Michlin, do you know what this paragraph

176

1 refers to, what the subject of this paragraph is?
2    A.  It seems to refer to more than one thing.
3 So, okay, it says it will be available to create new
4 versions of the composition and then it says that
5 Spencer Michlin will satisfy the document and of
6 course he didn't work for us.
7    Q.  Hang on.  Am I correct that in the first
8 sentence, it says that if in the event that you, that
9 you're talking to GBI in this thing, in the event
10 that you determine to create any new musical versions
11 of the composition, you agree that subject only to
12 our availability within your required time period for
13 the production of any such musical versions, we shall
14 be entitled to receive upon the completion of all our
15 services, including arrangement and production for
16 any such musical variations as you may require and as
17 for pull payment for any such revision, the sum of
18 $1,000 for each such musical variation produced by
19 you.
20       Do you understand this to relate to the
21 writing of music or to the performing and creation of
22 new variations?  Do you see what I mean?
23    A.  Those are arrangement fees.
24    Q.  Those are arrangement fees?
25    A.  It is to pay an arranger to do a new

---

177

1 version. It's an arrangement and production fee.
2 Q. That's what this clause refers to?
3 A. Refers to.
4 Q. You said earlier that you didn't really
5 know whether you were signing an agreement with GBI
6 or with Sunbow, do you remember that, or who was
7 hiring you is what you said?
8 A. Well, that's not quite what I said. What I
9 said was the call would come again a job. It was not
10 said this is a Sunbow job or this is a GBI job. It
11 said here's the job, it came from the same person,
12 Joe Bacal.
13 We proceeded on doing whatever it was he
14 wanted us to do. The contracts came later.
15 Q. But when you signed a contract with GBI,
16 you knew you were signing a contract with GBI, right?
17 A. Of course.
18 Q. When you signed a contract with Sunbow, you
19 knew you were signing a contract with Sunbow, right?
20 A. Although they overlapped.
21 Q. Not the agreements?
22 A. Not the agreements, but the product
23 overlapped.
24 Q. Fair enough.
25 A. And so did the companies. It was just

---

178

1 incestuous, kind of.
2 Q. But it's your understanding, is it not,
3 that when you created work for -- when Kinder and
4 Bryant created work for GBI, GBI acquired the
5 copyright, is that correct?
6 A. As I understand it.
7 Q. And --
8 A. Actually I thought Hasbro acquired the
9 copyright.
10 Q. And if -- I'm only talking about the
11 relationship between you, you, Kinder and Bryant and
12 GBI.
13 A. Right, I thought -- this first page isn't
14 even my memory because I thought it said Hasbro
15 retained the copyright.
16 Q. But whoever owned the copyright would then
17 have a right to exploit or exercise the rights in the
18 copyright, is that correct?
19 A. Which of course we wanted them to do.
20 Q. Your answer to that was yes, is that
21 correct?
22 A. Yes.
23 Q. I realize it's a long time ago but I'm
24 assuming -- I assure that you read all of the
25 agreements before you signed them, is that correct?

---

179

1 A. I would read -- initially I read them and
2 then if there were changes, I reviewed the changes,
3 I didn't necessarily -- we didn't necessarily read
4 every word of every contract.
5 Q. And that's because they were basically the
6 same except for the changes?
7 A. If they appeared to be the same. We had a
8 very trusting relationship with them.
9 Q. So, the reason I'm asking you this is that
10 you said earlier in answer to Miss Saffer that BMI
11 should have done something for its writers when it's
12 infringing my copyright?
13 A. Okay. I used the copyright incorrectly. My
14 share of the royalty.
15 Q. You didn't intend to suggest that you owned
16 the copyright, is that correct?
17 A. No.
18 Q. And so when you said that they were
19 stealing my copyright percentage --
20 A. I meant my share of the writer's royalty
21 percentage.
22 MS. PHARES: That's all, for the moment
23 anyway.
24 MR. MONAGHAN: How about we take a five
25 minute break?

---

180

1 (SHORT BREAK)
2 RE-DIRECT EXAMINATION
3 BY MR. MONAGHAN:
4 Q. Dr. Kinder, you have testified about the
5 understandings between Sunbow on the one hand and
6 Kinder Bryant on the other and also between GBI on
7 the one hand and Kinder Bryant on the other hand.
8 What if anything were the substantive
9 differences between the two in terms of your
10 continued -- you being Kinder Bryant's right to
11 continued participation in any royalties?
12 A. There was no difference. As you can see in
13 our payments, the commercial royalties were paid
14 through BMI and ASCAP, television theme songs paid
15 through BMI and ASCAP and one was GBI and one was
16 Sunbow. They often overlapped.
17 Q. Just to come back to this, have you ever
18 seen what in your mind's eye was a complete
19 integrated contract dealing with the Transformers
20 music, has anyone shown you that yet?
21 A. No.
22 Q. Now you were shown My Little Pony and
23 Friends agreement a moment ago which was Exhibit-N.
24 Do you recall that?
25 A. Yes.

181

1      Q. And I believe you said you, Kinder and
2 Bryant, did not do the show and correct me if I'm
3 wrong, and this agreement pertained to a single
4 composition?
5      A. Yes.
6      Q. What was the name of the composition?
7      A. How Does My Garden Grow. And it was an
8 exception. Normally we each worked on something and
9 submitted at least two versions. That was not the
10 case on this, it was like two hours, he called up,
11 can you send it. I sent it over, done.
12          It wasn't handled the way most of these
13 were. I did write the theme song for the show but
14 this contract wasn't for that. My Little Pony and
15 Friends, we did the theme song but not the songs,
16 other than that one, and it was a gift.
17      Q. Let me just take a look at the exhibits.
18 When was the Jem Show theme written, do you recall,
19 how about in terms of date on the agreement?
20      A. I've been so good with dates. '85?
21      Q. Don't guess.
22      A. I feel like I'm on a game show because I
23 really don't know. I don't remember.
24      Q. And with respect to Dobishinski and TAMAD,
25 your testimony was that he took a fee from the monies

182

1 he collected and then he distributed them to you and
2 to Anne, he split it basically?
3      A. Took his fee out, the monies went directly
4 to him in Hollywood which actually created a big
5 problem for us because California determined we were
6 making income in California and they sent us tax
7 bills that were huge and it took us every year, we
8 had to go through the same thing, letters and letters
9 and letters to prove that we didn't make that money
10 in California.
11      Q. What were the source of the funds from
12 which Dobishinski took his cut and then paid you and
13 Ms. Bryant?
14      A. BMI and Ascot.
15      Q. Performance royalties only?
16      A. I think that's all we ever received. There
17 may have been some synchronization fees.
18      Q. Do you know of any?
19      A. I don't know what they were.
20      Q. And this was a videotaped deposition taken
21 pursuant to the court order but would you make
22 yourself available for testimony at the trial when
23 the trial resumes?
24      A. Yes, I'll make every effort to do that.
25      Q. Do you know, sir, whether there was a

183

1 different agreement between Sunbow and Kinder Bryant
2 related to My Little Pony and Friends theme, the one
3 that you did write?
4      A. I think there was.
5      Q. And what would you -- would your
6 recollection have been in terms of the compensation
7 arrangement?
8          MS. PHARES: Excuse me. Was there or was
9      there not a separate agreement?
10         MR. MONAGHAN: He said he thinks there was.
11     A. I think there was but I don't remember the
12 terms.
13     Q. Okay, that's fine. One last run-through.
14         Ms. Phares was asking you whether or not,
15 because the settlement agreement provided for leases
16 to be held in escrow, whether somehow that subject,
17 I'm paraphrasing, somehow that issue had a bearing on
18 your testimony here today. Did it?
19     A. Absolutely none. In fact, I had completely
20 forgotten about that.
21     Q. Have you told the truth today, sir?
22     A. Yes, I have.
23         MS. PHARES: Objection.
24         MR. MONAGHAN: You object to the truth?
25         MS. PHARES: I object to the question.

184

1          MR. MONAGHAN: That's it. Thank you very
2 much, sir.
3          RE-CROSS EXAMINATION
4 BY MS. PHARES:
5      Q. What does an integrated contract mean?
6          MR. MONAGHAN: I didn't cover that in my
7      re-direct.
8          MS. PHARES: You asked about an integrated
9      contract.
10         MR. MONAGHAN: I did but I didn't cover it
11 in my re-direct, but go ahead.
12         MS. PHARES: You asked it in your re-direct,
13 Pat.
14         MR. MONAGHAN: I don't think so.
15     Q. What does an integrated contract mean?
16     A. You'd have to give it some context. Oh,
17 integrated between Sunbow and --
18     Q. Don't look at Mr. Monaghan. If you know,
19 you know.
20     A. You've taken it out of context now.
21     Q. Mr. Monaghan asked you if you had ever seen
22 an integrated contract for Transformers?
23         MR. MONAGHAN: I believe it said complete.
24     Q. Complete integrated contract for
25 Transformers?

185

1    A.  Okay.  Now I know what you're asking. I
2 have not. Integrated contract to me, complete,
3 integrated contract, if I can use that word, means
4 the pages that belong together are all there and in a
5 row and those are not the pages that belong together.
6 So I don't even know if that's the contract.
7    Q.  I'm only talking -- I'll ask a different
8 question. No, I won't ask a question.
9        So the one you're talking about is the
10 contract between Kinder and Bryant and GBI, is that
11 correct?
12    A.  True.  I have not seen any other contract
13 than that, so I have not seen a complete integrated
14 contract.
15    Q.  And in the notion of a complete integrated
16 contract, does complete and integrated meant anything
17 different to you?  Do those two terms mean anything
18 different to you?
19    A.  Only it could be complete and out of order.
20 Integrated would mean in order to me.
21    Q.  I think maybe in a later question you
22 answered this but I wasn't sure.  When you say you
23 wrote the theme song for My Little Pony and Friends,
24 that was the song for the fully animated children's
25 television series, is that correct?

186

1    A.  Yes.  It was based on the original My Little
2 Pony that I wrote at Michlin and Company and then a
3 new section was written to go along with it, to
4 extend it and make it longer.
5        Of course, I did that with Anne Bryant, who
6 was -- because that was at Kinder and Bryant that we
7 did that.
8        MS. PHARES: Thank you.
9        MS. SAFFER: Could we have a moment please?
10       (SHORT BREAK)
11       MS. SAFFER: I have no further questions.
12       (Reading and subscribing waived.)
13       (Thereupon the taking of the deposition was
14 concluded.)
15
16         - - -
17
18
19
20
21
22
23
24
25

187

1        CERTIFICATE OF OATH
2
3
4 STATE OF FLORIDA
5 COUNTY OF MIAMI-DADE
6
7
8    I, the undersigned authority, certify that DR.
9 CLIFFORD KINDER personally appeared before me and was
10 duly sworn.
11
12    WITNESS my hand and official seal this 10th day
13 of August 2006.
14
15
16
17    _____
18
19         DINA M. AMATO
20    Notary Public  - State of Florida
21      My Commission No.  DD197337
22        Expires: June 3, 2007
23
24
25

188

1    REPORTER'S DEPOSITION CERTIFICATE
2
3        STATE OF FLORIDA
4        COUNTY OF MIAMI-DADE
5
6    I, DINA M. AMATO, Certified Shorthand Reporter,
7 certify that I was authorized to and did
8 stenographically report the deposition of DR.
9 CLIFFORD KINDER, that a review of the transcript was
10 not requested; and that the transcript is a true and
11 complete record of my stenographic notes.
12
13    I further certify that I am not a relative,
14 employee, attorney, or counsel of any of the parties,
15 nor am I a relative or employee of any of the
16 parties' attorney or counsel connected with the
17 action, nor am I financially interested in the
18 action.
19
20    DATED this 10th day of August 2006.
21
22
23
24
25         DINA M. AMATO