# EXHIBIT 103

SERIAL NO. 407

*Received by mail 14 June 07*

# DECISION AND ORDER

To commence the statutory
period of appeals as of right
CPLR (5515 [a]), you are advised
to serve a copy of this order,
with notice of entry, upon all
parties.

SUPREME COURT OF THE STATE OF NEW YORK
IAS PART, ROCKLAND COUNTY

Present:   Hon. Andrew P. O'Rourke
           Supreme Court Justice

-----------------------------------------------------------------X
ANNE BRYANT,

                              Plaintiff,

      -against-

BROADCAST MUSIC, INC., (a/k/a "BMI") CLIFFORD
A. "FORD" KINDER, KINDER & CO., LTD.,
VADIVOX, LTD., JULES M. "JOE" BACAL,
GRIFFIN BACAL, INC., STARWILD MUSIC BMI,
WILDSTAR MUSIC ASCAP, SUNBOW
PRODUCTIONS, INC., and JOHN AND JANE
DOES 1-10,

                              Defendants.
-----------------------------------------------------------------X

INDEX NO.: 5192/2000
ACTION #1

ANNE BRYANT,

                              Plaintiff,

      -against-

SUNBOW PRODUCTIONS, INC.,

                              Defendant.
-----------------------------------------------------------------X

INDEX NO.: 2821/2002
ACTION #2
MOTION DATE:6/8/2007

The following documents numbered 1 to 8 were read on this motion by Plaintiff to vacate the "Final" Judgment of this Court dated May 8, 2007.

>
> Notice of Motion- Affidavits 1-2
> Cross Motion
> Answering Affidavits 7
> Replying Affidavits 8
>     Affidavits
> Pleadings-Exhibits-Stipulations-Minutes 3-5
> Briefs: Plaintiff 6
>     Defendant

Motion is decided as follows:

Plaintiff moves to vacate the order of this Court alleging there was no service upon Plaintiff of the Ex Parte Judgment. That no motion was made to determine the form of the judgment. Plaintiff alleges the Final Judgment was erroneous and Plaintiff's case was not dismissed with prejudice.

In opposition Defendant alleges there is no credible evidence upon which to vacate the judgment.

Defendant alleges Plaintiff concedes that "where a decision orders no relief other than money or costs or denies relief, the judgment need not be made by motion."

This judgment awarded costs and disbursements and denied all other relief. Thus Sunbow's submission of the proposed judgment to the Clerk upon notice to all parties was proper.

Plaintiff interposed a reply.

It is also noted that Plaitniff has filed a noticeof appeal with reference to the Judgment

and order it seeks to vacate.

    This Court will take no further action herein until Plaintiff's appeal is resolved.

    Plaintiff's motion is in all respects denied.

    This constitutes the order of the Court.

                                              Hon. Andrew P. O'Rourke
                                              Justice of the Supreme Court

Dated: June 12, 2007
       Carmel, NY

Monaghan Monaghan Lamb and Marchisio LLP
Attorney for Plaintiff
28 West Grand Avenue
Montvale, NJ 07645

Patterson Belknap Weber and Tyler, Esq.
Attorney for Sunbow
1133 Avenue of the Americas
NY, NY 10036

Judith Saffer, Esq.
Attorney for Broadcast Music
320 West 57th Street
NY, NY 10019

# EXHIBIT 104







# EXHIBIT 105





# G.I. JOE
## THE MOVIE

### SPECIAL COLLECTORS EDITION

**25 Original G.I. Joe Public Service Announcements**

**2 Theatrical Movie Trailers**

**2 Vintage Commercials**

**5.1 Audio**

ISBN 1-56605-556-3

A 40,000-year-old race of snake people resurface, and with the help of Serpentor, Destro, Baroness, and Dr. Mindbender, plan to eliminate all of mankind and rebuild Cobrala. Once rulers of Earth, the Snake people were driven underground by ice-age temperatures. While in exile, they developed a plant whose spores turn ordinary men into mindless, weak animals. The key to their plan is G.I Joe's secret project — the Broadcast Energy Emitter (B.E.T.). Only this device generates enough heat so that the spores can mature. Humankind's very existence depends on G.I. Joe, but are they strong enough, smart enough, cunning enough to fight a warrior race with 40,000 years of experience?

Don Johnson, Burgess Meredith, Sgt. Slaughter, and others lend their amazing voice talents to this exciting animated feature.

±94 Minutes/Color



RHINO HOME VIDEO, 10635 Santa Monica Blvd., Los Angeles, CA 90025-4900. Packaging © 2000 Rhino Entertainment Company, d/b/a Rhino Home Video. Program ©1987 Sunbow Production Inc./Hasbro Inc. All rights reserved. Printed in U.S.A.

# EXHIBIT 106



243

INTERNATIONAL
VIDEO RECORDING DISTRIBUTION AGREEMENT

THIS AGREEMENT entered into as of May 1, 1994 by and between SUNBOW PRODUCTIONS INC., of 130 Fifth Avenue, New York, NY 10011, USA (hereinafter "LICENSOR") and Backlund & Co. Kft. of Istvan Gallai, Kovirag Ut, 47, Pecs, Hungary 7601 (hereinafter "DISTRIBUTOR") on the following terms and conditions:

1. GRANT.

(a) Basic Rights. LICENSOR grants to DISTRIBUTOR the right to manufacture COPIES (as hereafter defined) of the PROPERTY and to sell and distribute such COPIES in the TERRITORY for the TERM, all as PROPERTY, TERRITORY and TERM are described in Exhibit A annexed. Such grant is for sale and distribution directly through video store and other retail outlets only, but without limitation not through (i) mail order or (ii) sublicensees or subdistributors other than those expressly authorized by LICENSOR in writing. "COPIES" (and in the singular "COPY") will mean copies (or a copy) of the PROPERTY manufactured on video cassette or video disc, excluding any so-called interactive software, for viewing in only private homes, of visual images by means of a device attached to television receivers located at the place of exhibition (the Private Home) and for which viewing no admission or other fee is charged. "COPY" will not include any copy of the PROPERTY intended for broadcast on free, other over-the-air, pay or cable television, or for theatrical or non-theatrical exhibition. DISTRIBUTOR will not distribute or authorize others to distribute COPIES free or as a "free bonus", "premium" or "no-charge", which right is expressly reserved by LICENSOR. DISTRIBUTOR agrees to place the following notice on the packaging of each COPY and in the beginning of each COPY:

> "WARNING: FOR PRIVATE HOME USE ONLY, ANY
> UNAUTHORIZED COPYING, HIRING, LENDING OR
> PUBLIC PERFORMANCE OF THIS PROGRAM IS
> PROHIBITED BY LAW. VIOLATORS WILL BE SUBJECT
> TO PROSECUTION."

DISTRIBUTOR may utilize a third party to manufacture COPIES. In such event, DISTRIBUTOR will obtain from such manufacturer and will forward to LICENSOR a letter in the form attached as Exhibit B.

(b) Editing. In the event that DISTRIBUTOR is required to edit or modify the PROPERTY to meet requirements of censorship in the TERRITORY, DISTRIBUTOR will have the right, subject at all times to the written approval of LICENSOR, to edit or modify the PROPERTY to meet such requirement. In no event will DISTRIBUTOR make any change in the titles, credits, trademarks or copyright notice of the PROPERTY without LICENSOR'S prior written approval.

(c) Dubbing and Subtitling. DISTRIBUTOR will have the right to have the PROPERTY dubbed and/or subtitled into the language set forth in Exhibit A annexed, but only for sales in the TERRITORY. Any such dubbing or subtitling will be the sole property of LICENSOR and LICENSOR will be entitled to own the copyright of such dubbed or subtitled version throughout the world. DISTRIBUTOR will bear the costs and sole obligations of creating any dubbed or subtitled versions of the PROPERTY. Further, at any time following the production of such dubbed and/or subtitled versions, such versions will be made available to LICENSOR at laboratory cost.

2. PAYMENT.

(a) Guarantee. DISTRIBUTOR agrees to pay LICENSOR the non-returnable sum of Three Thousand United States Dollars ($3,000.00 US) payable as follows:

(i) Three Thousand U.S. Dollars (US$3,000.00) upon the execution (upon DISTRIBUTOR'S request to be delivered the original duplicating material (hereinafter "ORIGINAL DUPLICATING MATERIALS") set forth on Exhibit C) of this agreement but no later than September 15, 1994.

The amount of said Guarantee applicable to each title is as specifically set forth on Exhibit A. Such payments will be an advance against and may be deducted from royalties earned in the TERRITORY and payable to LICENSOR as described herein. LICENSOR will not be required to deliver the ORIGINAL DUPLICATING MATERIALS until the payments described in this subparagraph are received by LICENSOR.

(b) Royalty Percentage. In consideration of the rights granted by LICENSOR hereunder, DISTRIBUTOR will pay LICENSOR:

(i) For Sales to Mass Market Outlets: a sum equal to Ten (10%) of DISTRIBUTOR'S GROSS SALES (as hereinafter defined) derived from the exploitation of the rights granted herein.

(ii) For Sales to Video Stores: a sum equal to Ten (10%) of DISTRIBUTOR'S GROSS SALES (as hereinafter defined) derived from the exploitation of the rights granted herein.

(c) Definition of Gross Sales. "GROSS SALES" shall mean the aggregate of all sales of COPIES by DISTRIBUTOR determined by multiplying the WHOLESALE PRICE of each COPY by the number of COPIES sold. The WHOLESALE PRICE will be the price in UNITED STATES DOLLARS at which COPIES are sold by DISTRIBUTOR for ultimate distribution by retailers through normal distribution channels. A COPY will be deemed sold upon the earlier of (i) the date of shipment or (ii) the date an invoice is rendered covering such sale. Shipments made and invoices rendered after the TERM pursuant to arrangements reached during the TERM will be covered by the terms of this Agreement and LICENSOR shall be entitled to payment by reason thereof provided, however, in no event will DISTRIBUTOR enter into any agreement which requires or provides for shipment more than one (1) month after the TERM. The risk of collection will be DISTRIBUTOR'S alone, and LICENSOR'S royalties will not be reduced by credits or returns or by failure of any purchaser from DISTRIBUTOR to make payment.

(d) Taxes. GROSS SALES will exclude any and all sums paid or accrued on account of sales, use, value added, and other taxes (provided DISTRIBUTOR furnishes LICENSOR with the basis of the tax calculations) to any government authority, assessed upon the COPIES or any other materials relating to the PROPERTY, or upon the use or distribution of COPIES. Any sums paid or accrued on account of DISTRIBUTOR'S income will not be deductible in computing GROSS SALES hereunder.

(e) Statements. Within thirty (30) days after the initial distribution of the COPIES, and promptly on the twentieth (20th) day after the close of each calendar quarter thereafter, DISTRIBUTOR will furnish to LICENSOR, complete and accurate statements in a form showing amounts translated to United States Dollars certified to be accurate by DISTRIBUTOR, or if a corporation, by an officer of DISTRIBUTOR. Each statement will show the appropriate calculations relating to the computation of GROSS SALES hereunder on a Title-by-Title basis, and any and all deductions will be itemized and show the appropriate calculations for the applicable calendar quarter, and all calculations on a cumulative basis. Such statements will be furnished to LICENSOR whether or not any of the COPIES have been sold during the quarter to which such statements refer. Upon demand of LICENSOR, DISTRIBUTOR will at its own expense, furnish to LICENSOR a detailed statement by an independent certified public accountant or an officer of DISTRIBUTOR, showing the information listed in this subparagraph as required in the statement. All hereunder will be deemed rendered when actually received by LICENSOR.

(f) Payments. Any portion of GROSS SALES payable to LICENSOR hereunder will be remitted to LICENSOR at the time each statement is due to be rendered in accordance with subparagraph (e). Such payments and those referred to in subparagraph 2(a) hereof will be made in United States Dollars via wire transfer to the account of LICENSOR as set forth below:

Sunbow International
Acct. # 006-923631
Transit/ABA 021001088
Marine Midland Bank NA
250 Park Avenue
New York, NY 10017 USA

There will be deducted from any remittance due the amount of any tax required to be withheld by DISTRIBUTOR based on payments due which DISTRIBUTOR may be required to make pursuant to any law or governmental order. The receipt or acceptance by LICENSOR of any of the statements furnished pursuant to this Agreement, or of any royalties paid hereunder will not preclude LICENSOR from questioning the correctness thereof at any time after the expiration and/or termination of this Agreement, and in the event that any inconsistencies or mistakes are discovered in such statements or payments, they will be immediately rectified and the appropriate payment made by DISTRIBUTOR. DISTRIBUTOR will pay the LICENSOR in the same manner as LICENSOR requires that royalty payment be made herein; interest on late payments at an interest rate of 1.5% per month or the applicable legal rate of interest, whichever is lower from the date such payments should have been made to the LICENSOR. Additionally, DISTRIBUTOR will be liable for any loss o LICENSOR due to fluctuations in currency rates between the date that payment should have been made and the date of the late paymen to LICENSOR.

SUN 0403

(g) Late Statements or Payments. A failure of DISTRIBUTOR to timely make the accountings and payments required hereunder be a material breach by DISTRIBUTOR of DISTRIBUTOR'S obligations under this agreement.

(h) Records. DISTRIBUTOR agrees to keep accurate books of account and records covering all transactions relating to the license hereby granted, and LICENSOR and its duly authorized representatives shall have the right to an examination of said books of account and records and LICENSOR may make COPIES of or extracts therefrom. All books of account and records will be kept available for a least two (2) years after the termination of this license. In the event the LICENSOR'S duly authorized representatives discover a discrepancy of 5% or more in payments due but not made to LICENSOR pursuant to any such examination, DISTRIBUTOR shall pay to LICENSOR a reasonable cost for such examination. Payments found to be due as a result of LICENSOR'S examination of the DISTRIBUTOR'S books of account should be paid immediately with interest at an interest rate of 1.5% per month or the applicable legal rate of interest, whichever is lower, from the date the royalty amount should have been paid to the LICENSOR.

3. MARKETING/MUSIC:

(a) DISTRIBUTOR shall be solely responsible for all manufacturing, distributing, marketing, advertising and all other cost incidental to the exploitation of the rights granted hereunder.

(b) The rights granted to DISTRIBUTOR under this Agreement are subject in all respects to the rights of composers, authors, music publishers and performing rights societies of all music embodied in the PROPERTY, and DISTRIBUTOR shall pay any and all applicable royalties or license fees to any such persons and organizations arising out of the manufacture and/or exploitation of COPIES in the TERRITORY and shall secure at DISTRIBUTOR'S sole cost all required consents and approvals to use all music in the PROPERTY.

4. DUPLICATING MATERIALS:

(a) Delivery. On or before the dates specified on Exhibit C, LICENSOR will deliver to DISTRIBUTOR, at DISTRIBUTOR'S office, the DUPLICATING MATERIALS described on Exhibit C, subject to DISTRIBUTOR'S payment of applicable Material fees as set forth on Exhibit C and the guarantee payments specified in Paragraph 2(a) above.

(b) Returns. In accordance with the dates specified on Exhibit C, DISTRIBUTOR will return to LICENSOR the DUPLICATING MATERIALS described on Exhibit C. DISTRIBUTOR further agrees to forward within sixty (60) days of dubbing or subtitling (if allowed herein) one (1) one-inch submaster of the dubbed or subtitled version of the PROPERTY to LICENSOR at one of the following locations:

> To the Account of Sunbow Productions, Ltd.
> c/o Bonded Services International, Ltd.
> Unit #6, Armstrong Way
> Great Western Industrial Park, Windmill Lane
> Southall, Middlesex UB2 4SD, England

The master videotape produced by DISTRIBUTOR from the ORIGINAL DUPLICATING MATERIAL will be retained by DISTRIBUTOR for the use and distribution of COPIES, until the end of the TERM. At the end of the TERM, DISTRIBUTOR will deliver such master videotape to LICENSOR with a Certificate of Destruction attesting and certifying to destruction of all COPIES unless sold to LICENSOR as hereafter provided. It is expressly understood and agreed that DISTRIBUTOR will not own any rights in the tangible materials manufactured by DISTRIBUTOR hereunder including the master videotape, the transfer tape, disc master and disc stampers, all of which will be LICENSOR'S sole property. Promptly following the end of the TERM, DISTRIBUTOR will, at LICENSOR'S election, either:

(i) Destroy any remaining COPIES in DISTRIBUTOR'S
possession made in accordance with the rights
granted hereunder;

or

(ii) Sell to LICENSOR all or a portion of the inventory
of such COPIES then in DISTRIBUTOR'S possession at
DISTRIBUTOR'S out-of-pocket costs for such COPIES.

(c) Expenses. All costs for delivery and return of the DUPLICATING MATERIALS, including, without limitation, packaging shipping, insurance, customs fees and duties will be borne by DISTRIBUTOR.

HOVROYAI.BAS.MAS/2-23-92                3

SUN 0404

5. COPYRIGHT PROTECTION.

(a) <u>Copyright</u>. The PROPERTY, as delivered, will contain the following copyright notice: " c 199 All Rights Reserved." As between LICENSOR and DISTRIBUTOR, LICENSOR will own and control the copyright in and to the PROPERTY for any and all purposes, subject only to the terms of this Agreement.

(b) <u>Approvals</u>. DISTRIBUTOR agrees that the use of any trademarks and other copyrightable material on any videotape or videocassette, container, carton, advertising, or promotional material must be approved by LICENSOR in writing, prior to use. To this end, DISTRIBUTOR agrees, prior to use, to forward copies and configurations of any proposed use of such trademarks and copyrights and one (1) prototype copy and its packaging promptly after such prototype's manufacture and prior to its sale to LICENSOR for written approval.

6. QUALITY.

(a) <u>Standards</u>. DISTRIBUTOR agrees that all video transfers and replications will be of the highest quality and in accordance with prevailing industry standards.

(b) <u>Approvals</u>. LICENSOR will have a right of approval of all video transfer quality on the final product to be offered for sale hereunder. LICENSOR will also have the right to approve the quality and style of any carton, container, packaging, wrapping material, artwork and advertising. All approvals hereunder must be in writing.

(c) <u>Samples</u>. DISTRIBUTOR will provide LICENSOR, without cost with four (4) samples of COPIES from each production run.

7. REPRESENTATIONS AND WARRANTIES.

DISTRIBUTOR represents, warrants and agrees as follows:

(a) DISTRIBUTOR has full power and authority to enter into and carry out the terms of this Agreement.

(b) DISTRIBUTOR will comply with all government laws, rules and regulations relating to DISTRIBUTOR'S operations in the manufacture and distribution of the COPIES.

(c) Any payments due to any person, firm, corporation or other entity by reason of DISTRIBUTOR distributing COPIES will be the obligation of DISTRIBUTOR and DISTRIBUTOR agrees to indemnify and defend LICENSOR against any claims or actions against LICENSOR arising out of or resulting from DISTRIBUTOR'S activities hereunder.

(d) No other property or other material shall be coupled with the PROPERTY in the manufacture and distribution of any videocassettes or videodiscs or COPIES hereunder or in connection with any of the rights granted to DISTRIBUTOR hereunder.

(e) DISTRIBUTOR shall strictly comply with all contractual requirements for advertising credits to persons who rendered services or furnished materials in connection with the PROPERTY of which LICENSOR notifies DISTRIBUTOR.

8. INDEMNIFICATION.

DISTRIBUTOR agrees to indemnify and hold harmless LICENSOR and its affiliates, successors, licensors, assigns, directors, shareholders, officers, employees, producers and other representatives from and against any and all liability, loss, damage, cost and expense (including reasonable attorneys' fees) arising out of or relating to any breach by DISTRIBUTOR of any of DISTRIBUTOR'S representations, warranties or covenants contained herein and from any dubbing or titling made by or under the direction of DISTRIBUTOR.

9. RESERVATION OF RIGHTS.

Any and all rights not expressly granted herein to DISTRIBUTOR are expressly reserved by LICENSOR for its unrestricted use and disposition, and LICENSOR will have all rights in and to such reserved rights for any and all purposes without any obligation to DISTRIBUTOR.

10. TERMINATION.

(a) In addition to and without prejudice to any rights and remedies at law or otherwise, LICENSOR may send to DISTRIBUTOR written notice of default and if DISTRIBUTOR has not cured such default within twenty (20) days of the giving of such notice then this Agreement shall automatically thereupon terminate if any of the following events occurs:

SUN 0405

(i) If DISTRIBUTOR has not commenced in good faith to manufacture and/or distribute COPIES in substantial quantities within six (6) months of delivery of duplication materials or if any time thereafter in any calendar quarter DISTRIBUTOR fails to sell any COPIES;

(ii) If DISTRIBUTOR fails to fulfill any of its material obligations under this Agreement or is negligent in its performance under this Agreement;

(iii) If DISTRIBUTOR becomes insolvent, or if a petition in bankruptcy or for reorganization is filed by or against it, or if any insolvency proceedings are instituted by or against it under any law, of if it makes assignment for the benefit of its creditors, of if a receiver is appointed for its property and business and remains undischarged for a period of fifteen (15) days, or if it liquidates its business in any manner whatsoever, or if any distress, execution or attachment is levied on any of its assets and remains undischarged for a period of fifteen (15) days, or if DISTRIBUTOR abandons the manufacture of COPIES.

(b) Upon the termination of this license, notwithstanding anything to the contrary herein, all royalties on sales theretofore made will become immediately due and payable. No guarantee will be repayable.

(c) Sixty (60) days before the expiration of the TERM and again, within ten (10) days after such expiration (or, in the event of termination of this license, ten (10) days after receipt of notice of termination or the happening of the event which terminates this Agreement where no notice is required), a statement showing the number and description of COPIES on hand or in process shall be furnished by DISTRIBUTOR to LICENSOR. LICENSOR shall have the right to take physical inventory to ascertain or verify such inventory and statement.

(d) After expiration of this Agreement, DISTRIBUTOR, except as otherwise provided in this Agreement, may dispose of COPIES which are on hand or in process at the time of expiration for a period of ninety (90) days after expiration, provided advances, guarantees and royalties with respect to that period are paid and contrary herein, DISTRIBUTOR shall not manufacture, sell or dispose of any COPIES, after termination hereof by reason of termination for any of the causes set forth in subparagraph 10(a).

## 11. RELATIONSHIP OF THE PARTIES.

Nothing herein shall be construed to create a partnership or joint venture by or between DISTRIBUTOR and LICENSOR. Each party agrees not to hold itself out as a partner or agent of the other or to otherwise state or imply any relationship between the parties in any manner contrary to the terms of this Agreement and neither will become liable or bound by any representation, act, omission or agreement of the other.

## 12. FORCE MAJEURE.

In the event that LICENSOR is unable to make delivery of the PROPERTY or DISTRIBUTOR is unable to accept delivery of the PROPERTY, or, having accepted delivery of the PROPERTY, DISTRIBUTOR'S activities with regard to the PROPERTY are materially interfered with by reason of fire, flood, epidemic, earthquake, explosion, accident, war, act of a public enemy, civil disturbance, labor dispute, strike, lockout, new enactment of law or any act of God or similar cause (all of the foregoing are referred to as events of "force majeure") then the affected party will immediately give notice of such event of force majeure. If the term of such force majeure continues for a period in excess of three (3) months, then LICENSOR will have the right to terminate this Agreement by notice to DISTRIBUTOR during the continuance of such event of force majeure, whether or not DISTRIBUTOR has recouped any advance monies paid to LICENSOR under this Agreement.

## 13. ASSIGNABILITY.

LICENSOR may assign this Agreement or any of its rights or privileges hereunder to any person, firm, corporation or other entity which assumes the obligations of LICENSOR hereunder.

This Agreement and all rights and duties hereunder are personal to DISTRIBUTOR and shall not, without the written consent of LICENSOR, be assigned, mortgaged, sublicensed, delegate or otherwise encumbered by DISTRIBUTOR or by operation of law. For purposes of this Agreement, any change of control of the ownership of DISTRIBUTOR shall be deemed an assignment prohibited without the express written consent of LICENSOR.

## 14. LAWS AND JURISDICTION.

This Agreement will be governed by the internal laws of the State of New York, United States of America, with the full force and effect as though this Agreement had been executed in and fully performed in such State, and without giving effect to conflicts of laws. In the event of any dispute hereunder, the parties expressly agree that the courts of such State will have full jurisdiction over the parties hereto, and the

SUN 0406

...reby bind themselves over fully and completely to the jurisdiction of such courts. In the event that process must be served in ...tion with any such dispute, the parties agree that such process may be served by personal delivery within or without said State of New ... or by registered or certified mail.

## 15. NOTICES.

Any notice which either party may desire to give or which is required hereunder will be given in writing, by courier express mail or by telefacsimile (if the receiving party has compatible equipment), or by personal service (in all cases, all charges prepaid) to the addresses first noted herein. In the event any such notice is given by telefacsimile, such notice will be deemed given on the date which is two (2) business days following the date of such transmission.

## 16. WAIVER AND REMEDIES.

No waiver by either of the parties hereto of any failure by the other to keep or perform any covenant or condition of this Agreement will be deemed to constitute a waiver of or consent to any succeeding breach of the same or any other covenant or condition. Except as expressly provided to the contrary, the remedies herein provided for will be deemed cumulative, and the exercise of one will not preclude the exercise of any other remedy nor will the specifications of remedies herein exclude any rights or remedies at law or in equity which may be available in the premises.

## 17. DISPUTES.

In the event that a dispute arises between DISTRIBUTOR and LICENSOR out of or in relation to this Agreement, DISTRIBUTOR agrees not to withhold any monies due and payable to LICENSOR under this Agreement as a set-off against any claim for damages sought by DISTRIBUTOR.

## 18. ENTIRE AGREEMENT.

This Agreement represents the entire agreement between the parties, superseding and replacing all prior oral or written understandings and representations with regard to the subject matter hereof. No provisions of this Agreement may be waived or amended, except by a written instrument executed by the party to be charged.

The parties have duly signed this Agreement which will be effective as of the date first noted above.

Backlund & Co. Kft.　　　　　　　Sunbow Productions, Inc.
(DISTRIBUTOR)　　　　　　　　(LICENSOR)

BY: _____　　　　　BY: _____

　　　　　　　　　　　　　　　　SENIOR VP
(Title)　　　　　　　　　　　　　(Title)  18-5-94
(Date) 1994.05.06　　　　　　　(Date)

BACKLUND CO.
HUNGARY KFT.
7634 Pécs, Kővirág u. 47.
Adószám: 10632741-2-02

6

SUN 0407